**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JAIME RIOS


      Plaintiff,

          vs.                               Case No.

REYNALDO GUEVARA
MICHAEL MASON
ERNEST HALVORSEN
BARBARA RILEY
CITY OF CHICAGO
COOK COUNTY,



      Defendants.                       JURY TRIAL DEMANDED

## COMPLAINT

      NOW COMES the Plaintiff, JAIME RIOS, by and through his attorneys Stephen L.

Richards and Joshua S.M. Richards and makes the following complaint against Defendants

Reynaldo Guevara, Michael Mason, Ernest Halverson, Barbara Riley and the City of Chicago.

In support thereof, JAIME RIOS states as follows:


### JURISDICTION

1. This action is brought pursuant to 42 U.S.C. Sec. 1983 to redress the deprivation of law

    of Jaime Rios's civil rights as secured by the United States Constitution.


2. This court has jurisdiction of the action pursuant to 28 U.S.C. Secs. 1331, 1343, 1367.

**VENUE**

3.  Venue is proper under 28 U.S.C. Sec. 1391(b).

**PARTIES**

4.  Plaintiff Jaime Rios is a male  person who is a United States citizen and a resident of Cook County, Illinois.

5.  Reynaldo Guevara  was at all times relevant to this suit a gang specialist and  detective in the Chicago Police Department.  He is sued in his individual capacity.

6.  Michael Mason was at all times relevant to this suit a detective in the Chicago Police Department.  He is sued in his individual capacity.

7.  Ernest Halvorsen, deceased, was at all times relevant to this suit a detective in the Chicago Police Department.

8.  Barbara Riley was at all times relevant to this action an Assistant States Attorney employed by Cook County.

9.  Defendant City of Chicago  is a Municipal Corporation, organized pursuant to the laws of the State of Illinois.

10. Defendant Cook County is a Municipal Corporation organized pursuant to the laws of the State of Illinois.

`

## FACTUAL ALLEGATIONS

*Procedural History*

11. Jaime Rios was convicted of first degree murder in Illinois state court in a jury trial on November 30, 1990.

12. On January 3, 1991, he was sentenced to serve 36 years in the Illinois Department of Corrections at 50 per cent time.

13. His conviction was affirmed on appeal on July 15, 1991.

14. It is anticipated that on August 9, 2022, his conviction will be vacated and the State of Illinois will nolle prose all charges.

15. Jaime Rios spent 17 years in custody.      .

*Course of the Investigation, Trial, and Newly Discovered Evidence*

16. Shortly before the shooting, Samantha Hudson, who was living at 2419 west Potomac, was sitting outside with her sister in law.

17.  At around 11:30 or 11:45 p.m., Hudson went into the alley to take garbage to the garbage cans. As she got to the garbage cans, she saw two men behind one of the garbage cans. One of the men came from behind the garbage can. He had "black straight curly hair."

18.  The man had a green shirt on and was wearing British Knight gym shoes. He was clean shaven, without a mustache. He was about 5 foot five inches tall, weighing about 138 to 140 pounds. A second man with him was the same height and weight and was also wearing British Knight gym shoes.

19. The second person had blond hair.

20. Both men had their arms on the right side of their legs and were holding something. Hudson asked the first man what the fuck he was doing back there. The man told her to mind her own damn business and to shut the fuck up.

21. Shortly after her encounter with the two men, Hudson heard gunshots.

22. At the time he was shot, Luis Morales was walking with his friend, Javier Torres, also known as "Loco," through a gangway between Artesian Street and Western Avenue. A few minutes before the shooting, Torres saw a man named Jose "Macho" Melendez walking through the gangway. Melendez was with another man. "Macho" Melendez was the leader in of the "Latin Kings" in that area.

23. Torres was walking about five steps behind Morales. As Morales stepped out of the gangway, he was approached by a man who pulled out a pistol and started shooting. Torres ran away and returned to find Morales dying, being held by another man, Luis Huertas. Morales was lying next to a parked car.

24. Luis Morales died of multiple gun shot wounds. He was shot five times, once in the head. There were abrasions on his face, which were consistent with a fall after being shot or with someone taking Morales's head and pushing it down onto the sidewalk or against a car.

25. There was no evidence of stippling on the wounds or close range firing. Stippling normally occurs if a gun is fired closer than 2 or 3 feet away.

26. Three .25 caliber cartridge casings were recovered from the sidewalk where the shooting took place, close to the car and a light pole. No .38 or .22 caliber shells were recovered from the street or the sidewalk.

27.  On the evening of June 27, 1989, Cristino Garcia, a Latin King, was at home with his girlfriend, Hermina Cruz and his mother Elena Carrau. They ordered pizza and rib-tips from Father & Sons Pizza.

28.  On that same evening, Jaime Rios was at home with his girlfriend, Diana Rodriguez, and their two month old baby Jaime Rios, Jr. They lived at 1440 north Leavitt.

29. Rios was a member of the Latin Kings street gang, but was in the process of leaving the gang.

30. The police investigation into the Morales murder was initiated on June 28, 1989 by defendant Michael Mason.

31.  Police received descriptions of two offenders from the witnesses Mario Flores and Javier Torres.

32. The first description was of a male white Hispanic, 18 years old, 5 feet eight inches tall, 145 pounds, muscular, short afro style combed back, low black gym shoes, armed with a .25 caliber blue steel revolver.

33.  The second person was described as 16 to 18 years old, male white Hispanic, five feet eight inches tall, 140 pounds, short black afro combed hair, dark complexion, wearing a dark long sleeve sweater, black shorts above the knee and dark gym shoes.

34.  The morning of June 28, 1989, Javier Torres spoke to the police and told them that "Macho," a Latin King, had shot Luis Morales. He picked a photograph of Macho out of a "gang book." The photograph showed Jose "Macho" Melendez with short, afro-like hair.

35.  "Macho" Melendez was 5 foot six inches tall and 145 pounds.

36. Torres knew Morales from the neighborhood. Torres told the police that the person with "Macho" was younger and less muscular. He also told police that he saw Morales being grabbed and pushed up against a car.

37. During the course of the police investigation, Torres was also shown a "gang book," which had a picture of Jaime Rios. He did not pick out Jaime Rios's picture.

38. On June 30, 1989, Luis Huertas went to view a lineup but he could not identify anyone. Jaime Rios was not in that lineup.

39. At the time of the investigation into the Morales murder, defendant Reynaldo Guevara had been an officer in the Chicago police department for 18 years. He was not a detective. He was a gang specialist. He was promoted to detective after the investigation of the Morales murder but before he testified at trial.

40. No one asked Guevara to become involved in the investigation of the Morales murder. He heard about the murder and became involved "voluntarily."

41. What he "heard" was that a man named Luis Morales had been shot to death at 1316 north Western Avenue.

42. Guevara has testified that he became involved in the investigation on June 27, 1989, the day of the killing.

43. He has also testified that he became involved several days later on July 3, 1989.

44. At the time, Guevara was investigating the case, he had reviewed the beat officer's report and the case report but none of the detectives' supplementary reports.

45. Guevara has claimed that he was unaware that "Macho" Melendez had been named as the shooter.

46. Guevara has claimed that unnamed informants told him that the murder had been perpetrated by "Tino," and "Jaime," whom he believed to be Cristino Garcia and Jaime Rios. He recognized Jaime as Jaime Rios, a member of the Latin Kings with whom he had previous contacts. The informants allegedly told him that Jaime Rios was the shooter.

47. For unknown reasons, Guevara fabricated the existence of the informants and the contents of their information.

48. Guevara authored false reports detailing the informants' claims and conveyed that same false information to prosecutors during the course of the investigation of the Morales murder and the subsequent trial.

49. Guevara falsely claimed that the informants told him that where the guns used in the murder could be found.

50. Based on this information, search warrants were issued for the homes of Alex Lopez and Benjamin Carrero.

51. According to Guevara, none of the informants had witnessed the murder, and their information was second or third hand. They gave him the source of their information. They described the person who was killed as "New Yorker," not "New York." All the informants were all gang members.

52. Guevara's descriptions of the informants and his contacts with them has varied. He first testified that there were "numerous" confidential informants, then that there were "several" informants and finally that there were two informants.

53. One of the informants was named "Little Mike." At one point during his testimony Guevara stated that there were two confidential informants and that the other informants were not confidential.

54. On July 3, 1989, Guevara began to look for Jaime Rios. On July 6, 1989 at about 9:30 p.m. at night, Guevara found Rios riding a bicycle in front of his house at 1440 north Leavitt.

55. As Rios was standing in front of the house, two officers approached him. One of the officers was officer Guevara. Guevara said he wanted to talk to Rios. When Rios asked for what, Guevara said that Rios was being questioned. When Rios continued to argue, Guevara grabbed him and took him to the back of the house.

56. When Guevara took Rios to the back of the house, he handcuffed Rios. Another officer pulled Rios by the fence while Guevara went to the middle door and went upstairs. About five or six police officers, in total, were present.

57. The officers were in Rios's house for about 15 or 20 minutes. The officers took Rios to the next block, which was Bell, and then put him in a car. Rios was taken to 5555 west Grand and put into a room on the second floor.

58. Before the interrogation began Mason, Guevara, and Mason's partner, defendant Ernest Halvorsen. had agreed and conspired that interrogation should be conducted using illegal physical force and illegal threats and promises.

59. Guevara, detective Mason, and another officer came into the room where Rios was being held. They told Rios he was "there about the guy that killed the guy, that for me to let them know where the other guy was at. And to say that I was just there with the

guy that killed the guy." Rios told the officers that he did not know what they were talking about.

60. Defendant Guevara authored false police reports and gave false information to prosecutors where he concealed his statement to Rios, suggesting that Rios was present on the scene when Garcia killed Morales and that he should just say he was there.

61. Defendant Mason authored false police reports and gave false information to prosecutors where he concealed his statement to Rios, suggesting that Rios was present on the scene when Garcia killed Morales and that he should just say he was there.

62. Jaime Rios told defendants Guevara and Mason that he did not know what they were talking about.

63. Defendant Guevara authored false police reports and gave false information to prosecutors where he concealed his Rios's statement that he did not know what the officers were talking about.

64. Defendant Mason authored false police reports and gave false information to prosecutors where he concealed his Rios's statement that he did not know what the officers were talking about.

65. In response, Mason grabbed Rios by the hair and slammed him against the table.

66. Guevara witnessed Mason's abuse of Rios and approved of it.

67. Mason and Guevara kept telling Rios about the details and facts of a murder. Rios responded by telling them about a different murder that happened in front of his house.

68. Rios told them about a shooting that happened while he was in front of his house on July 2 or July 3, 1989, three days before. He was at his house with his brother in law and a friend. Diana was coming out of the gangway when a car came by, the barrel of a

gun came out of the window and a shot was fired. Rios ran. Later the police came and told Rios's brother in law not to worry because there were no shots from outside the car.

69. Guevara and Mason then told Rios about the details of a murder committed by "Tino." They said: "well, we heard you and Tino went to Western and went to kill somebody over there on Western you had crossed the street and went through an alley. We seen some guys in the alley and that we speak to them. They say, who is that? And that we says, it is me. And that we walked, there was a car that parked right there and asked if we selling reefer. We said, no, we don't got no reefer. We kept walking, went around the corner. And that is when we got by a bar and we had a shooting against a guy that was there."

70. Guevara and Mason threatened Rios that they would take his child away if he didn't agree with what they said.

71. They told Rios  that all he had to do was just "be there" and they would not take his child away.

72. Guevara and Mason told Rios that they had heard the details of the crime from informants, and they supplied him with these details.

73. At the time Guevara and Mason were speaking with him, Rios believed they wanted him to be a witness against Cristino Garcia, and that he would be released if he gave a statement.

74. Rios also believed that if he did not say what Guevara and Mason told him to say, they would take away his child.

75. Guevara authored false police reports and falsely concealed from prosecutors his statement to Rios that if he did not make a statement his child would be taken away.

76. Mason  authored false police reports and falsely concealed from prosecutors his statement to Rios that if he did not make a statement his child would be taken away.

77. After Guevara and Mason had supplied Rios with the details of the statement he was to make, he was taken to see Assistant States Attorney Barbara Riley. Rios did not tell Rios about the abuse he had suffered because she said that she was not his attorney and was working with the police.


78. The court reported statement which Rios gave to Riley contains the following significant details.


79.  In the statement Rios described his gun as a ".38 caliber snub nose," not a .32. He initially described Cristino Garcia's gun as a ".22" When prompted with the question '.22 or .25" he said that it was a ".22 or .25."

80.  Rios said that when Garcia first shot the victim, Garcia's arm was outstretched and the gun was one foot away from the victim. He said that Garcia shot the victim three times, toward the stomach. He did not mention a shot to the head.

81.  When asked where he was when Garcia was shooting, Rios first replied: "I was at least five miles away from him." Rios said that because he wanted to give Riley a clue that the statement was false.

82. In the statement Rios said that he was intention was to scare the Cobras as they had scared him but not to hurt anyone. He also said that after Garcia shot the victim, Rios hollered "King Love" and shot twice towards the air towards the building near the empty lot.

83. On July 7, 1989 Reynaldo Guevara picked up Luis Huertas. Guevara showed Huertas a series of photographs and told Huertas to pick the shooter out of the photographs.

84. Huertas told Guevara that he did not recognize the shooter in any of the photographs. Guevara threatened to have Huertas locked up if he did not identify the shooter.

85. Guevara then took Huertas to the station, where Huertas identified Rios in a lineup. Rios was the only person who was in both the lineup and in the photoarray.

86. Guevara authored false police reports and gave false information to prosecutors where he concealed the fact that he had coerced Huertas into making the identification.

87. On July 9, 1989, at 1:15 p.m., Guevara and other officers executed a warrant on the house Benjamin Carrero showed with Iris Mendez.

88. Carrero had a .32 caliber automatic, which he had purchased "off the street." While the police were searching downstairs, Mendez went to a room upstairs, took the gun out,and threw it out the window. The officers found the gun.

89. Carrero and Iris Mendez were taken to the police station at Grand and Central and interrogated over the course of two days.

90. During the course of the interrogation, Guevara told Carrero to say that Jaime Rios had given him the gun. He threatened Carrero that if he did not say Jaime was the one who had given him the gun, he would be charged with possessing the gun.

91.  Police told Iris Mendez that they should tell them if she knew anything about the Morales murder, she should tell them, and that if she did not tell them, they would take her baby away.

92. Guevara authored false police reports and falsely concealed from prosecutors that he had coerced Carrero into providing false testimony inculpating Jaime Rios.

93. Carrero was never charged with possessing the gun. Iris Mendez was charged with possessing the gun and received probation.

94.  A search warrant for a .25 caliber  issued for the home of Alex Lopez. No .25 caliber gun was recovered.

95. There was no probable cause for Jaime Rios's arrest and prosecution.

96. Defendant Guevara, with knowledge that there was no probable cause for Jaime Rios's arrest and prosecution, instigated and initiated the prosecution of Jaime Rios for first degree murder by making false statements to the felony review prosecutors who eventually filed charges against him.

97.  Defendant Halvorsen, with knowledge that there was no probable cause for Jaime Rios's arrest and prosecution, instigated and initiated the prosecution of Jaime Rios for first degree murder by making false statements to the felony review prosecutors who eventually filed charges against him.

98. Defendant Mason, with knowledge that there was no probable cause for Jaime Rios's arrest and prosecution, instigated and initiated the prosecution of Jaime Rios for first degree murder by making false statements to the felony review prosecutors who eventually filed charges against him.

99.  On July 28, 1989, Cristino Garcia was picked up by several Chicago police officers, one of whom was Aubrey O'Quinn. He was placed in handcuffs and brought to the police station at Area 5.

100.     Reynaldo Guevara told Garcia that he was being accused of murder. Guevara and a number of other officers interrogated Garcia.

101.     Guevara became "very loud," and "very physical." He told Garcia that Garcia should sign a paper saying that he was involved and that someone else did it.

102.     Garcia refused. He told Guevara that he was nowhere around the area when the crime occurred.

103.     Guevara placed a phone book on Garcia's head and then struck him through the phone book with a heavy object, either a billy club or a flashlight. Garcia fell to his knees.

104.     Garcia told Guevara to stop and that he would sign a statement if he was allowed first to make a phone call.

105.     Garcia was given a phone and called his sister Maria Garcia. Cristino Garcia told his sister to get him a lawyer.

106.     Guevara overheard Garcia's conversation with his sister. He became enraged and took Garcia back to the interrogation room, where he started smacking Garcia around with an open hand.

107.     Cook County States Attorney Barbara Riley was present for Guevara's abuse of Garcia, but ignored it and made no report of it.

108.     A few minutes later, detective Aubrey Quinn came to the door and told Guevara to stop hitting Garcia, because Garcia's lawyer had arrived.

109.     Garcia met with his lawyer, and the interrogation ended. Garcia's lawyer told

him that he could not stay all night, but if they kept hitting him, not to sign a statement.

110.     Garcia authored false police reports and concealed from prosecutors that he had

beaten Garcia and that Garcia had denied culpability and  provided an alibi for the night

of the murder.

111.     At the time when they coerced Jaime Rios into making a false statement,

defendants knew they did not have probable cause to arrest or charge him.

112.      Before trial, Jaime Rios filed a motion to quash and suppress his custodial

statements.

113.     It was conceded that there was no probable cause to arrest Jaime Rios. The

motion turned upon a credibility contest between Guevara and other officers and Rios

and his witness as to whether Rios was arrested at the scene or whether he went to the

station voluntarily.

114.     The trial judge denied the motion.

115.     Jaime Rios also filed a motion to suppress statements. In response to the motion,

Guevara testified and denied pulling Jaime Rios's hair, witnessing his hair being pulled

or threatening Rios with loss of his parental rights.

116.     Detectives Michael Mason, Ernest Halvorsen and Assistant States Attorney

Barbara Riley also testified and denied the allegations in the motion.

117.     At trial, Luis Huertas testified. He claimed that he was not a member of the

Spanish Cobras gang. He testified as follows.

118.     On June 27, 1989, at approximately 11:15 p.m.,  Huertas was in front of 1310

north Western Avenue, a place where he and Luis Morales used to shoot pool. (R. 152).

Huertas had been waiting for Morales for about 45 to 50 minutes when he noticed two men turning left on to Western Avenue from Potomac Street and heading northbound on Western in his direction.

119.     Huertas did not recognize either of the two men. They appeared to be Hispanic.

120.     The taller of the two men was a little shorter than Huertas, who was 5 feet nine inches tall. The taller man was slim and light skinned. He had a thin mustache which was just growing out.

121.     The taller man was wearing a green hospital shirt, short pants, and gym shoes. The shorter man was wearing something red.

122.     Huertas did not get a good look at the shorter man. The street was well lit. There were working street lights and lights from the stores.

123.     The taller man "represented" the Spanish Cobras gang by saying the name "Spanish Cobras." Huertas remained seated. He viewed the face of the taller man for 10 or 15 seconds. Huertas identified Jaime Rios as the taller of the two men he saw on that night.

124.     The two men continued walking northbound on Western Avenue, as Huertas watched. Huertas then saw Luis Morales and another Spanish Cobra, Javier Torres, also known as Loco, walk out of a gangway or alley. Luis came first, and Javier was behind him.

125.     Huertas saw Luis Morales approach the two men walking northbound on Western Avenue. Morales made a gesture with his arms up and palms outstretched as if he were saying "what's up?"

126.     Huertas then saw the taller man take one step back, lift his arm toward his belt and point a pistol at Luis Morales. The taller man was about a foot from Morales. The taller man's first shot struck Morales in the head. Huertas heard "about four gunshots" and then saw Luis Morales fall to the ground. Morales fell on his left side, with his body hitting a car and a pole.

127.      Huertas watched as Torres ran westbound toward Torres's house. Huertas saw the taller man running east through a big empty lot.

128.     When the taller man reached the other side of Western Avenue, he yelled "king love" and "Spanish Cobra killer." Huertas lost sight of the taller man when the taller man ran through an alley.

129.     The shorter man stopped in the middle of Western Avenue, turned and shot at Torres. Huertas lost sight of the shorter man when he ran though the same empty lot that the taller man had run through.

130.     Javier Torres  also testified at trial He testified that his statement to the police that Morales had been shot by "Macho" was a lie. He said that he named "Macho" because he did not get along with "Macho." He confirmed however that he had seen "Macho" walking through the alley shortly before the shooting and that he had inferred from that sighting that "Macho" was the shooter.

131.     Benjamin Carrero testified at trial that on June 28, 1989, at approximately 12:30 a.m. Jaime Rios came to Carrero's house at 493 north Lincoln Park and gave Carrasco a gun to hold. However, Carrero  denied that Rios had said to him at that time: "Hold this for me. I just shot somebody. I will be back." He denied that he had said as much to police officers and to the grand jury.

132.    Carrero testified at trial that he had first told the police that he did not know anything about the gun, but they threatened to lock him up and take his child away. Carrero was impeached with testimony that he told the police and the grand jury about Rios's statement.

133.    Defendant Mason testified at trial. court that on July 6, 1989, Jaime Rios came into Area Five and went to an interview room.

134.    Mason testified that approximately 12:00 a.m., Detective Mason went into the interview room and gave Jaime Rios  Miranda warnings. He claimed that Jaime Rios gave a statement to the police and was then placed under arrest.

135.    At trial, Jaime Rios took the stand on his own behalf.

136.    Rios reiterated his earlier testimony that he had been handcuffed in front of 1440 North Leavitt Street before being taken to Area Five. Rios then testified that while he was in the interview room at Area Five, Detective Mason slammed his head onto a table and made him talk about a murder.

137.    Rios stated that he then told the officers that a car had come by earlier on the evening Luis Morales was killed and that the driver of the car shot a gun out the window.  Rios  stated that he then went inside and did not leave again that night.

138.    Rios testified that the police, and Detective Guevara in particular, provided the story about Rios and Tino crossing Western Avenue and shooting at Spanish Cobras.

139.    Rios further testified that the police threatened to take away his child. (R. 593).

140.    Rios then told the jury that he was only in the Latin Kings because his friends were and that he was in the third stage of gang involvement as a "family man."

141.    Rios denied killing Luis Morales. (R. 598).

142.     Jaime Rios was convicted by the jury and sentenced to 35 years in prison.

143.     After Jaime Rios filed a 2-1401 petition based upon newly discovered evidence, his conviction was overturned, criminal proceedings were terminated in his favor, and he was completely exonerated.

**COUNT I – VIOLATION OF DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS BY COERCING JAIME RIOS INTO MAKING A FALSE CONFESSION**

144.     Jaime Rios  realleges all previous paragraphs and incorporate them into this count by reference.

145.     Defendant Michael Mason,  acting in concert with defendants Guevara and Halvorsen coerced Jaime Rios into making a false and involuntary confession by pulling his hair and slamming his head down upon a table.

146.     Defendant Guevara was present when this physical abuse occurred and condoned, planned, and approved this action.

147.     Defendant Ernest Halvorsen conspired with and acted in concert with defendants Guevara and Mason in a plan to use physical violence to coerce Jaime Rios into making a false confession.

148.     Defendants Guevara and Mason both coerced Jaime Rios into making a false confession by telling him  that he would lose his child if he did not confess to being present at and participating in the Morales murder.

149.     These statements were made as part of a plan agreed to by defendant Halvorsen to use illegal threats to induce a confession from Jaime Rios.

150.     All statements made by Jaime Rios during the interrogation were involuntary, based upon the length, manner, and tone of the interrogation, Jaime Rios's physical and mental condition, and the use of promises, threats, and physical abuse.

**COUNT II – VIOLATION OF FOURTEENTH DUE PROCESS BY DEFENDANT REYNALDO GUEVARA BY FABRICATING FALSE REPORTS AND GIVING FALSE INFORMATION TO PROSECUTORS THAT CONFIDENTIAL INFORMANTS HAD IDENTIFIED JAIME RIOS AND CRISTINO GARCIA AS THE PERPETRATORS OF THE MORALES MURDER**

151.     Jaime Rios realleges all previous paragraphs and incorporates them by reference.

152.     Defendant Guevara has claimed that unnamed informants told him that the Morales murder had been perpetrated by "Tino," and "Jaime," whom he believed to be Cristino Garcia and Jaime Rios. The informants allegedly told Guevara that Jaime Rios was the shooter.

153.     For unknown reasons, Guevara fabricated the existence of the informants and the contents of their information.

154.     Guevara authored false reports detailing the informants' claims and conveyed that same false information to prosecutors during the course of the investigation of the Morales murder and the subsequent trial.

155.     These statements were a material factor in Reynaldo Guevara's conviction and deprived him of his fourteenth amendment right to due process.

**COUNT III – VIOLATION OF DUE PROCESS BY DEFENDANTS GUEVARA, MASON AND HALVERSON BY FABRICATING FALSE REPORTS AND GIVING FALSE INFORMATION TO PROSECUTORS, CONCEALING THE FACT THAT JAIME RIOS HAD INITIALLY DENIED PARTICIPATION IN THE MORALES MURDER**

156.     Jaime Rios realleges all previous paragraphs and incorporates them by reference.

157.     Defendants Guevara, Mason, and Halverson, acting individually and in concert, fabricated false reports and gave false information to prosecutors concealing from them the fact that Jaime Rios had initially denied participation in the Morales murder.

158.     These false statements and reports were a material factor in Jaime Rios's conviction.

**COUNT IV – VIOLATION OF DUE PROCESS BY DEFENDANTS GUEVARA, MASON AND HALVERSON BY FABRICATING FALSE REPORTS AND GIVING FALSE INFORMATION TO PROSECUTORS, CONCEALING THE FACT THAT THEY HAD SUPPLIED JAIME RIOS WITH DETAILS OF THE MORALES MURDER IN ORDER TO INDUCE A FALSE CONFESSION**

155.     Jaime Rios realleges all previous paragraphs and incorporates them by reference.

156.     Defendants Guevara, Mason, and Halverson, acting individually and in concert, fabricated false reports and gave false information to prosecutors concealing from them the fact

that they had supplied Jaime Rios with details of the Morales murder in order to induce a false

confession.

157.    These false statements and reports were a material factor in Jaime Rios's conviction.

**COUNT V – VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS BY DEFENDANTS GUEVARA, MASON AND HALVERSON BY FABRICATING FALSE REPORTS AND GIVING FALSE INFORMATION TO PROSECUTORS, CONCEALING THE FACT THAT THEY HAD TOLD RIOS THAT HE WAS PRESENT ON THE SCENE AND SHOULD JUST SAY THAT HE WAS THERE**

159.    Jaime Rios realleges all previous paragraphs and incorporates them by

reference.

160.    Defendants Guevara, Mason, and Halverson, acting individually and in concert,

fabricated false police reports and gave false information to prosecutors, concealing the

fact that they told Jaime Rios that he was present on the scene and should just say that

he was there.

161.    These false statements and reports were a material factor in Jaime Rios's

conviction.

**COUNT VI – VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS BY DEFENDANTS GUEVARA, MASON AND HALVERSON BY FABRICATING FALSE REPORTS AND GIVING FALSE INFORMATION TO PROSECUTORS, CONCEALING THE FACT THAT MASON HAD COERCED RIOS'S CONFESSION BY USING PHYSICAL ABUSE**

162.    Jaime Rios realleges all previous paragraphs and incorporates them by

reference.

163.    Defendants Guevara, Mason, and Halverson, acting individually and in concert,

fabricated false police reports and gave false information to prosecutors, concealing the fact that Mason used physical abuse to coerce a confession from Jaime Rios.

164.     These false statements and reports were a material factor in Jaime Rios's conviction.

**COUNT VII – VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS BY DEFENDANTS GUEVARA, MASON AND HALVERSON BY FABRICATING FALSE REPORTS AND GIVING FALSE INFORMATION TO PROSECUTORS, CONCEALING THE FACT THAT MASON AND GUEVARA HAD COERCED RIOS'S CONFESSION BY TELLING HIM THAT IF HE DID NOT MAKE A STATEMENT HIS CHILD WOULD BE TAKEN AWAY**

165.     Jaime Rios realleges all previous paragraphs and incorporates them by reference.

166.     Defendants Guevara, Mason, and Halverson, acting individually and in concert, fabricated false police reports and gave false information to prosecutors, concealing the fact that they told Jaime Rios that he was present on the scene and should just say that he was there.

167.     These false statements and reports were a material factor in Jaime Rios's conviction.

**COUNT VIII – VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS BY DEFENDANT GUEVARA, MASON AND HALVERSON BY USING A COERCIVE AND SUGGESTIVE IDENTIFICATION PROCEDURE TO INDUCE LUIS HUERTAS TO IDENTIFY JAIME RIOS**

168.     Jaime Rios realleges all previous paragraphs and incorporates them by reference.

169.     Defendant Guevara deprived Jaime Rios of due process by showing Luis

Huertas a series of photographs and then by threatening to lock Huertas up if he did not

identify Jaimes Rios as the shooter.

170.     Defendant Guevara's coercion of this identification and use of a suggestive

procedure was a material factor in Jaime Rios's conviction.


**COUNT IX – VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS
BY DEFENDANT  BY AUTHORING FALSE POLICE REPORTS AND GIVING
FALSE INFORMATION TO PROSECUTOR CONCEALING THAT HE USED A
COERCIVE AND SUGGESTIVE IDENTIFICATION PROCEDURE TO INDUCE
LUIS HUERTAS TO IDENTIFY JAIME RIOS AND THAT HUERTAS HAD
INITIALLY REFUSED TO IDENTIFY A PICTURE OF JAIME RIOS**

171.     Jaime Rios realleges all previous paragraphs and incorporates them by

reference.

172.     Defendant Guevara authored false police reports and gave false information to

prosecutors where he concealed the fact that he had coerced Luis Huertas into making

the identification of Jaime Rios.

173.     Defendant Guevara's concealment and false statements were material factors in

Jaime Rios's conviction.

**COUNT X – VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS
BY DEFENDANT GUEVARA  BY COERCING BENJAMIN CARRERO TO
MAKE FALSE STATEMENTS AND GIVE FALSE TESTIMONY THAT
JAIME RIOS HAD GIVEN CARRERO A GUN AND TOLD CARRERO HE
HAD JUST SHOT SOMEONE**

174.     Jaime Rios realleges all previous paragraphs and incorporates them by

reference.

175.     Defendant Guevara fabricated false evidence by coercing Benjamin Carrero to falsely testify that Jaime Rios had given him a gun and said he just shot someone.

176.     Defendant Guevara authored false police reports and falsely concealed from prosecutors that he had coerced Carrero into providing this false testimony.

177.     Defendant Guevara's fabrication was a  material factors in Jaime Rios's conviction.

**COUNT XI  – VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS BY DEFENDANT GUEVARA  BY CONCEALING BRADY MATERIAL, THAT CRISTINO GARCIA HAD GIVEN GUEVARA AN ALIBI FOR THE DATE AND TIME OF THE MURDER**

178.     Jaime Rios realleges all previous paragraphs and incorporates them by reference.

179.     Defendant Guevara concealed exculpatory evidence from Jaime Rios and his trial counsel by failing to reveal to anyone that  Cristino Garcia had provided Garcia with an alibi for the date and time of the murder.

180.     Had defense counsel known that Garcia had an alibi, he could have subpoenaed Garcia to testify on his behalf.

181.     The omission of this material evidence from Defendant Guevara's trial was a material factor in his conviction.

**COUNT XII  – VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS BY DEFENDANT RILEY  BY CONCEALING BRADY MATERIAL, THAT GUEVARA HAD BEATEN GARCIA, EVIDENCE THAT WOULD HAVE ESTABLISHED THAT GUEVARA HAD A PATTERN AND PRACTICE OF USING PHYSICAL AND PSYCHOLOGICAL COERCION**

182.     Jaime Rios realleges all previous paragraphs and incorporates them by reference.

183.    Defendant Riley concealed exculpatory evidence from Jaime Rios and his trial
counsel by failing by concealing Brady material, that Guevara had beaten Garcia,
evidence that would have established that Guevara had a pattern and practice of using
physical and psychological coercion to reveal to anyone that  Cristino Garcia had
provided Garcia with an alibi for the date and time of the murder.

**PENDANT STATE CLAIMS**

**COUNT XIII  --  MALICIOUS PROSECUTION BY DEFENDANT REYNALDO GUEVARA**

184.    Jaime Rios realleges all previous paragraphs and incorporates them by
reference.

185.    Defendant Reynaldo Guevara, acting in concert with  other defendants
commenced the prosecution of Jaime Rios  by arresting him without probable cause,
interrogating him, generating false police reports about him, by giving prosecutors false
information about him,  by coercing witnesses to give false testimony against him and
by testifying falsely against him.

186.    Reynaldo Guevara's actions played a significant role in the commencement and
continuation of the prosecution of Jaime Rios.

187.    Reynaldo Guevara's  actions proximately caused the commencement and the
continuation of the prosecution of Jaime Rios.

188.    The prosecution was terminated in Jaime Rios's favor by the grant of  Jaime
Rios's 2-1401 petition and the prosecution nolle pros of all charges on August 9, 2022. .

189.    There was no probable cause for the indictment of Jaime Rios.

190.    In commencing the prosecution against Jaime Rios, arresting him, interrogating him, and testifying falsely against him, Reynaldo Guevara  acted with malice towards plaintiff, and was motivated by hostility or ill will.

191.    In particular, Reynaldo Guevara was motivated by a general hostility towards Hispanic suspects, particularly suspects of Mexican origin, as demonstrated by his pattern and practice of instigating false charges against at least 50 suspects over the course of years.

**COUNT XIV  --  MALICIOUS PROSECUTION BY DEFENDANT REYNALDO GUEVARA**

192.    Jaime Rios realleges all previous paragraphs and incorporates them by reference.

193.    Defendant Reynaldo Guevara, acting in concert with  other defendants commenced and continued  the prosecution of Jaime Rios  by arresting him without probable cause, interrogating him, generating false police reports about him, by giving prosecutors false information about him,  by coercing witnesses to give false testimony against him and by testifying falsely against him.

194.    Reynaldo Guevara's actions played a significant role in the commencement and continuation of the prosecution of Jaime Rios.

195.    Reynaldo Guevara's  actions proximately caused the commencement and the continuation of the prosecution of Jaime Rios.

196.    The prosecution was terminated in Jaime Rios's favor by the grant of  Jaime Rios's 2-1401 petition and the prosecution nolle pros of all charges on August 9, 2022. .

197.    There was no probable cause for the indictment of Jaime Rios.

198.    In commencing the prosecution against Jaime Rios, arresting him, interrogating him, and testifying falsely against him, Reynaldo Guevara acted with malice towards plaintiff, and was motivated by hostility or ill will.

199.    In particular, Reynaldo Guevara was motivated by a general hostility towards Hispanic suspects, particularly suspects of Mexican origin, as demonstrated by his pattern and practice of instigating false charges against at least 50 suspects over the course of years.

## COUNT XV  -- MALICIOUS PROSECUTION BY DEFENDANT MICHAEL MASON

200.    Jaime Rios realleges all previous paragraphs and incorporates them by reference.

201.    Defendant Michael Mason, acting in concert with other defendants commenced and continued the prosecution of Jaime Rios by arresting him without probable cause, interrogating him, generating false police reports about him, by giving prosecutors false information about him and by testifying falsely against him.

202.    Michael Mason's actions played a significant role in the commencement and continuation of the prosecution of Jaime Rios.

203.    Michael Mason's actions proximately caused the commencement and the continuation of the prosecution of Jaime Rios.

204.    The prosecution was terminated in Jaime Rios's favor by the grant of Jaime Rios's 2-1401 petition and the prosecution nolle pros of all charges on August 9, 2022. .

205.    There was no probable cause for the indictment of Jaime Rios.

206.     In commencing the prosecution against Jaime Rios, arresting him, interrogating him, and testifying falsely against him, Michael Mason  acted with malice towards plaintiff, and was motivated by hostility or ill will.

**COUNT XVI    --  MALICIOUS PROSECUTION BY DEFENDANT ERNEST HALVORSEN**

207.     Jaime Rios realleges all previous paragraphs and incorporates them by reference.

208.     Defendant Ernest Halvorsen, acting in concert with  other defendants commenced the prosecution of Jaime Rios  by arresting him without probable cause, interrogating him, generating false police reports about him, and  by giving prosecutors false information about him.

209.     Ernest Halvorsen's actions played a significant role in the commencement and continuation of the prosecution of Jaime Rios.

210.     Ernest Halvorsen's  actions proximately caused the commencement and the continuation of the prosecution of Jaime Rios.

211.     The prosecution was terminated in Jaime Rios's favor by the grant of  Jaime Rios's 2-1401 petition and the prosecution nolle pros of all charges on August 9, 2022. .

212.     There was no probable cause for the indictment of Jaime Rios.

213.     In commencing the prosecution against Jaime Rios, arresting him, interrogating him, and testifying falsely against him, Ernest Halverson  acted with malice towards plaintiff, and was motivated by hostility or ill will.


**COUNT XVII: INDEMNIFICATION**

**(DEFENDANT CITY OF CHICAGO)**

180. Jaime Rios  realleges all previous paragraphs and incorporated them by reference.

181Illinois law provides that public entities, such as defendant City of Chicago are directed to pay any compensatory damages on a tort judgment against an employee who was acting within the scope of his or her employment.

182. At all relevant time, defendants Guevara, Mason, and Halverson were agents of defendant City of Chicago and of the Chicago Police Department acting within the scope of their employment. Defendant City of Chicago, therefore, is liable as principal for all torts committed by its agents, defendants Washburn and Rodriguez.

**COUNT XVIII – INDEMNIFICATION**

**(DEFENDANT COOK COUNTY)**

183.  Jaime Rios  realleges all previous paragraphs and incorporates them by reference.

184. Illinois law provides that public entities, such as defendant   are directed to pay any compensatory damages on a tort judgment against an employee who was acting within the scope of his or her employment.

185. At all relevant time, defendant Barbara Riley was an agent of defendant Cook County acting within the scope of her employment. Defendant Cook County therefore, is liable as principal for all torts committed by its agent, Barbara Riley.

**PRAYER FOR RELIEF**

WHEREFORE, Jaime Rios  requests this honorable court to grant Jaime Rios judgment against all defendants in a fair and just amount. Specifically Jaime rios  prays for both compensatory and punitive damages against all defendants in addition to costs and reasonable attorney's fees and all other relief as this court finds just and reasonable.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff Jaime Rios demands trial by jury for all the issues pleaded.

Plaintiff,  Jaime Rios

/s/ Stephen L. Richards

By: Stephen L. Richards
53 West Jackson Suite 756
Chicago, IL 60604
773-817-6927
Sricha5461@aol.com
Attorney No: 6191946