Page 1

1         IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF ILLINOIS
3               EASTERN DIVISION
4   JAIME RIOS,                )
5            Plaintiff,        )
6      -vs-                    ) Case No.
7   REYNALDO GUEVARA           ) 1:22-cv-03973
8   MICHAEL MASON              )
9   ERNEST HALVORSEN           )
10  BARBARA RILEY              )
11  CITY OF CHICAGO            )
12  COOK COUNTY,               )
13            Defendants.      )
14
15       The videotaped deposition of MICHAEL MASON,
16  via Zoom, called for examination, taken pursuant to
17  the Federal Rules of Civil Procedure of the United
18  States District Courts pertaining to the taking of
19  depositions, taken before NANCY A. GUIDOLIN, CSR
20  No. 84-2531, a Notary Public within and for the
21  County of DuPage, State of Illinois, and a
22  Certified Shorthand Reporter of said state, at
23  Chicago, Illinois, on the 23rd day of June, 2023,
24  commencing at 9:36 a.m.

Page 2

1   PRESENT: (VIA ZOOM)
2
3        LAW OFFICE OF STEPHEN L. RICHARDS,
4        (53 West Jackson Boulevard, Suite 756,
5        Chicago, Illinois 60604,
6        773-817-6927), by:
7        STEPHEN L. RICHARDS, ESQ.,
8        sricha5461@aol.com,
9            appeared on behalf of the Plaintiff;
10
11  THE SOTOS LAW FIRM, P.C.,
12       (141 West Jackson Boulevard, Suite 1240A,
13       Chicago, Illinois 60604,
14       630-735-3300), by:
15       JOSEPH M. POLICK, ESQ.,
16       jpolick@jsotoslaw.com,
17           appeared on behalf of Defendant
18           Michael Mason and Joanne Halvorsen;
19
20
21
22
23
24

Page 3

1   PRESENT:  (VIA ZOOM)
2
3        LEINENWEBER BARONI & DAFFADA, LLC,
4        (120 North LaSalle Street, Suite 200,
5        Chicago, Illinois 60602
6        847-251-4091), by:
7        MEGAN K. McGRATH, ESQ.,
8        mkm@ilesq.com,
9            appeared on behalf of Defendant
10           Reynaldo Guevara;
11
12       ROCK FUSCO & CONNELLY, LLC,
13       (333 West Wacker Drive, 19th Floor,
14       Chicago, Illinois 60606,
15       312-970-3474), by:
16       THERESA B. CARNEY,
17       tcarney@rfclaw.com,
18       LAUREN FERRISE, ESQ.,
19       lferrise@rfclaw.com,
20           appeared on behalf of Defendant
21           City of Chicago.
22
23  REPORTED BY:  NANCY A. GUIDOLIN, C.S.R.,
24           CERTIFICATE NO. 84-2531.

Page 4

1        (WHEREUPON, the witness was duly
2        sworn.)
3           MICHAEL MASON,
4   called as a witness herein, having been first duly
5   sworn, was examined and testified as follows:
6           EXAMINATION
7   BY MR. RICHARDS:
8      Q.  Mr. Mason, I heard the court reporter
9   swear you in, but I didn't hear your response.
10  Detective Mason, can you speak so I can make sure
11  that I hear you?
12     A.  I did.  I said I do.
13     Q.  I didn't hear you, and that's why I
14  asked you to repeat it.  My fault.  Not yours.
15  Okay?
16     A.  Okay.
17     MR. POLICK:  Are you able to hear him alright,
18  Stephen?
19     MR. RICHARDS:  When he said I do, I can hear
20  that.  I guess I missed the first I do.  I'm fine
21  now.
22     MR. POLICK:  Alright.  That's good.
23  BY MR. RICHARDS:
24     Q.   Detective Mason, could you state your



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
5–8

Page 5

1  name for the court reporter spelling your first and
2  last name?
3      A.    Michael Mason, M-i-c-h-a-e-l, M-a-s-o-n.
4      Q.    Okay.  Mr. Mason, let me just give you
5  some ground rules.  I don't know if you have been
6  deposed before, but I will ask you that shortly.
7  This is a deposition.  I'm going to ask you
8  questions under oath.  If you don't understand a
9  question, just ask me to repeat it, and I will try
10 to be more clear.
11         If you can't hear something, again, tell
12 me that.  If at any point your attorney objects to
13 a question, if the objection is based on a
14 privilege, I will not proceed, but if the objection
15 is just a general objection or relevancy objection,
16 I will ask that you answer the question, again, as
17 long as your attorney agrees.
18         If at any point you think that you would
19 like a break to speak with your attorney, you're
20 entitled to do so.  You just can't do that in the
21 middle of a question; in other words, if I ask a
22 question, you have to answer.  After your answer if
23 you think that you need a break or a consultation,
24 just tell me that and we will accommodate you, or

Page 6

1  if you think that you need a break for any other
2  reason during the course of the deposition.
3         My next question is:  Did you hear my
4  instructions and do you have any questions about
5  them, and do you understand them?
6      A.    I understand them.  I do have a
7  question, though.  I can't really see your face on
8  my screen.
9      Q.    Is that better?
10     A.    That's better.
11     Q.    Can you see my face?
12     A.    That's better.  Okay.
13     MR. POLICK:  We also had somebody else join
14 us, Stephen.  If they could identify who that is
15 for the record.
16     MR. RICHARDS:  Somebody just joined us.  Is
17 that Mr. Rios?
18     MS. McGRATH:  No.  It's Megan McGrath.  The
19 Zoom wasn't working on my end.
20     MR. POLICK:  Thanks, Megan.
21 BY MR. RICHARDS:
22     Q.    First of all, is it okay if I call you
23 Detective Mason as a title?
24     A.    Fine.

Page 7

1      Q.    Detective Mason, have you ever been
2  deposed before?
3      A.    Yes.
4      Q.    How many times?
5      A.    I believe just once.
6      Q.    And what was the case in which you were
7  deposed, if you can recall?
8      A.    I believe it was a case of Natalie
9  McFall.
10     Q.    Natalie McFall being the plaintiff?
11     A.    Yes.
12     Q.    And was that a lawsuit in the Northern
13 District of Illinois?
14     A.    I don't know.
15     Q.    Okay.  And do you know what the nature
16 of that lawsuit was?
17     A.    Natalie alleged that I held her against
18 her will at the police station.
19     Q.    Approximately what date did that case
20 occur, or was that case filed?  Do you remember?
21     A.    I don't remember.
22     Q.    Could you at least narrow it down?  Was
23 it the 2000s?  1990s?  Anything of that sort?
24     A.    It was -- I believe it was in the 2000s,

Page 8

1  early 2000s.
2      Q.    Do you remember who represented you on
3  that case?
4      A.    I do not.
5      Q.    Do you remember what the outcome of that
6  case was?
7      A.    I do not.
8      Q.    All right.  And Natalie McFall --
9  McFall, would that be the common M-c-F-a-l-l?
10     A.    That's my recollection.
11     Q.    All right.  And when you were deposed,
12 do you remember if you were in a lawyer's office or
13 someplace else?
14     A.    I don't recall.  I don't know whose
15 office it was.  It was a facility.  Not my lawyer's
16 office.
17     Q.    Okay.  And apart from that one
18 experience with having a deposition, you have never
19 been deposed before; correct?
20     A.    Not that I recall.  No.
21     Q.    Okay.  Now, let me just begin by getting
22 to know a little bit about you.  First of all,
23 Detective Mason, how old are you?
24     A.    I'm 71.



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
9–12

Page 9

1    Q.    Sorry.  What?
2    A.    I'm 71.
3    Q.    Okay.  And where did you grow up?  Where
4  were you raised?
5    A.    Chicago.
6    Q.    And where did you graduate from high
7  school?
8    A.    Saint Pat's.
9    Q.    Did you go to college?
10    A.    Part time.
11    Q.    What college did you go to part time?
12    A.    City College.
13    Q.    And what year did you cease going to
14  City College?
15    A.    I'm sorry?  Could you repeat that?
16    Q.    I'm sorry.  What were the years when you
17  went part time to City College?  What are we
18  talking about in terms of the time frame.
19    A.    It was the late '60s, early '70s.  In
20  there.
21    Q.    All right.  What was the first job that
22  you held?
23    A.    In my life?
24    Q.    Yes.

Page 10

1    MR. POLICK:  Objection to relevance, but you
2  can go ahead and answer.
3  BY THE WITNESS:
4    A.    The first job that I held was at a
5  grocery store.
6  BY MR. RICHARDS:
7    Q.    And how long did you work at the grocery
8  store?
9    A.    I don't know.  Maybe a year on and off.
10  You know, it wasn't a full-time job.  It was a
11  part-time job.
12    Q.    Was that a part-time job during high
13  school?
14    A.    Grade school.
15    Q.    Grade school.  Okay.  And after you
16  graduated from high school, what was your first
17  job?
18    MR. POLICK:  The same objection to relevance,
19  but you can go ahead and answer.
20  BY THE WITNESS:
21    A.    I'm not sure.  I had a bunch of jobs,
22  you know, during high school, after high school.  I
23  don't remember what was the first one.
24  BY MR. RICHARDS:

Page 11

1    Q.    Okay.  What kind of jobs did you -- just
2  in general what kind of jobs did you hold?
3    A.    I worked at a parts store for a while.
4  I worked at a retail establishment.  I worked for
5  the City of Chicago for a little while.
6    Q.    What did you do for the City of Chicago?
7    MR. POLICK:  Object to the relevance, but go
8  ahead and answer.
9  BY THE WITNESS:
10    A.    Well, I was a police officer.
11  BY MR. RICHARDS:
12    Q.    Oh, okay.  We definitely want to get to
13  that.  Was being a police officer your first
14  full-time job?
15    A.    No.
16    Q.    What was your first full-time job?
17    A.    I can't say for sure, but I think maybe
18  the auto parts store.
19    Q.    Okay.  When did you -- when did you join
20  the Chicago Police force?
21    A.    1973.
22    Q.    All right.  Was that your first job as a
23  police officer?
24    A.    Yes.

Page 12

1    Q.    And have you ever worked for any other
2  police department aside from the City of Chicago?
3    A.    Not a police department, no.
4    Q.    All right.  When did you retire from the
5  City of Chicago Police Department?
6    A.    In 2006.
7    Q.    Okay.  Since 2006 have you had another
8  job or employment?
9    A.    I worked part time for the Department of
10  Aviation.
11    Q.    Okay.  And when you worked part time for
12  the Department of Aviation, what was your position?
13    A.    Security.
14    Q.    How long did you work for the Department
15  of Aviation as security?
16    A.    It was about five years in total, but it
17  was part time.
18    Q.    All right.  Aside from that job, have
19  you had any other jobs since you retired from the
20  City of Chicago Police Department?
21    A.    No.
22    Q.    Okay.  Let me go through your career
23  with the City of Chicago Police Department, just
24  hitting some of the highlights.  What was your



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
13–16

Page 13

1  first assignment when you came on in 1973?
2      A.   I was assigned to the 20th District as a
3  patrol officer.
4      Q.   What is the geographic area of the 20th
5  District?
6      A.   Then or now?
7      Q.   Then.  In '73.
8      A.   Okay.
9      MR. POLICK:  Do you understand the question,
10  Mike?
11      THE WITNESS:  Yeah.
12      MR. POLICK:  Go ahead.
13  BY THE WITNESS:
14      A.   Roughly the city limits on the north,
15  Lake Michigan on the east, Montrose Avenue on the
16  south, and the north branches of the Chicago River
17  on the west.
18  BY MR. RICHARDS:
19      Q.   Okay.  So basically that would be the
20  area we have known as Rogers Park; is that fair?
21      A.   There are several neighbors in there.
22  Rogers Park is one of them.
23      Q.   Okay.  And how long did you work in the
24  20th District as a patrol officer?

Page 14

1      A.   About seven years.
2      Q.   All right.  So that maybe brings us to
3  1980.  In 1980 what did you do then?  Where were
4  you assigned?
5      A.   The City opened a new police district
6  called the 24th District, and I was transferred to
7  the 24th District.
8      Q.   When you were transferred to the 24th
9  District, were you still a patrol officer?
10      A.   I was a patrol officer for a while.
11      Q.   Okay.  What were the geographic
12  boundaries of the 24th District approximately?
13      A.   So the city limits on the north, the
14  lake on the east, the Chicago branch -- north
15  branch of the Chicago River on the west, and
16  Petersen Avenue on the south.
17      Q.   Okay.  So it was a similar geographic
18  area to the 20th, the north part of the City;
19  correct?
20      A.   It was basically the north part of the
21  20th District.
22      Q.   Okay.  You said that you worked as a
23  patrol officer there.  How long did you work as a
24  patrol officer before you received another

Page 15

1  assignment to a different position?
2      A.   I don't recall exactly.  Maybe a year or
3  so, and then they expanded the tactical unit, and I
4  worked on the tactical unit.
5      Q.   Okay.  When you worked on the tactical
6  unit, would your title be gang specialist?
7      A.   No.
8      Q.   When you worked on the tactical unit,
9  what was your title?
10      A.   Police officer.
11      Q.   Okay.  Explain to me the difference
12  between being a patrol officer and working on the
13  tactical unit?
14      A.   Well, the tactical unit is each district
15  has a unit with -- usually there's about 24
16  officers assigned to it broken up into three
17  different shifts, and sometimes they work
18  plainclothes, sometimes this work in uniform.
19      So they don't necessarily respond to
20  radio calls.  They work in what's considered
21  problem areas within the District, and it's pretty
22  much at the discretion of the district commander as
23  to what -- you know, what they want you to work on.
24      Q.   All right.  Would I be correct in saying

Page 16

1  one difference between patrol officers and tactical
2  officers is that tactical officers generally don't
3  work in uniform?
4      A.   Not always.  I mean, you can often be
5  working in plainclothes, but you would often get
6  some detail that took you outside of the District
7  to another part of the City, and you might be in
8  uniform for that, or you might be in uniform if
9  they needed you to be in uniform in the District.
10      It was kind of discretionary to, you
11  know, the district commander and the tactical
12  lieutenant.
13      Q.   Correct me if I'm wrong.  Isn't another
14  difference between the patrol officers and the
15  tactical unit officers that the tactical unit
16  officers often drive in either what are called
17  detective cars or unmarked cars?
18      A.   Yeah.  They are assigned to unmarked
19  cars.
20      Q.   Oh, I'm sorry.  Well, let me make a
21  further distinction.  The unmarked cars those are
22  the ones that are sometimes properly known as
23  detective cars in that they don't have the Chicago
24  Police insignia, but they do have a license plate



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
17—20

Page 17

1  by which you could tell that it's a police car; is
2  that fair?
3      A.    Yeah.  That's fair.
4      Q.    And sometimes tactical officers will
5  work in what would be more accurately called not
6  unmarked but undercover vehicles, which are
7  ordinary vehicles without any showing that they're
8  police cars; is that correct?
9      A.    Not in my experience.
10     Q.    Okay.  So now in terms of tactical
11  officers -- when you were a tactical officer, in
12  general, you don't need to get into a lot of
13  details or specifics, how did you operate on the
14  street?  First of all, did you work with a partner?
15     A.    Yes.
16     Q.    Who was your partner or partners when
17  you were a tactical officer?
18     A.    Frank Costello.
19     Q.    How long was Frank Costello your
20  partner?
21     A.    Let's see.  He was my partner for a
22  while in the 20th District.  We both transferred to
23  the 24th, and we were both in the tactical unit for
24  three or four years, something like that.  So

Page 18

1  probably five, six years.
2      Q.    And give me an approximate date, you
3  don't have to be, you know, super accurate, as to
4  when your partnership with Frank Costello ended?
5      A.    I would say around 1985.
6      Q.    Okay.  So about 1985.  And then let me
7  also ask you this.  In terms of -- when you worked
8  as a tactical officer, did you work with
9  confidential informants?
10     A.    I never -- I wouldn't consider any of
11  the people that I spoke with to be confidential
12  informants, no.
13     Q.    Okay.  So you just spoke to people on
14  the street, but -- just to get the distinction, one
15  definition of a confidential informant or one type
16  of a confidential informant is somebody who is
17  actually registered with the police and paid as a
18  confidential informant; correct?
19     A.    That is, yeah.
20     Q.    I'm sorry?
21     A.    Yes.  Yes, that is a description.
22     Q.    Okay.  Now, after you worked with Frank
23  Costello, what happened then?  Were you still a
24  tactical officer, or did something else happen?

Page 19

1      A.    No, I was still a tactical officer for a
2  while.
3      Q.    And who was your partner after Frank
4  Costello?
5      A.    I think his name was Ernie Bernhauser.
6      Q.    I'm sorry.  What was his last name?
7      A.    Bernhauser.
8      Q.    Okay.  So his last name is Bernhauser.
9  Is that spelled B-e-r-n-h-a-u-s-e-r?  And what was
10  his first name?
11     A.    His first name is Ernie, and it's
12  Bernhauser with a B.  The rest of it was correct
13  the way that you spelled it.
14     Q.    I thought that I said B, but I was
15  misunderstood.  So his first name was Bernie and
16  his last name was Bernhauser?
17     A.    No.  His first name was Ernie, with an
18  E.
19     Q.    Ernie.  Okay.  Ernie Bernhauser.  I've
20  got it.
21         How long did you work as a tactical
22  officer with Ernie Bernhauser?
23     A.    It was about two years.
24     Q.    So that brings us maybe, I'm guessing,

Page 20

1  to about 1990, or am I wrong?
2      A.    No.  That's closer to 1987.
3      Q.    Okay.  After you stopped working with
4  Ernie Bernhauser in 1987, who did you work with, or
5  what position did you have or both?
6      A.    Well, I was promoted to detective in
7  '87.
8      Q.    Okay.  And when you were promoted to
9  detective, where were you assigned?
10     A.    Area 5 violent crimes.
11     Q.    And what was the geographic area of Area
12  5 violent crimes?
13     A.    Well, it basically covers the northwest
14  side of the City.  I could be more specific if you
15  need me to.
16     Q.    Please.
17     A.    So it covers five districts.  The 14th,
18  15th, 16th, 17th and the 25th District.  Those are
19  not the same districts now.  Things have changed.
20  But when I was assigned there, that's what it was.
21     Q.    Okay.  And from 1987 -- when you were
22  assigned to be or promoted to be a detective in
23  1987, who was your partner or your first partner?
24     A.    Arlene Stampnick.



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
21–24

Page 21

1    Q.    Arlene common spelling, A-r-l-e-n-e?
2    A.    That's right.
3    Q.    Can you please spell her last name?
4    A.    S-t-a-m-p and I think it's n-i-c-k.
5    Q.    All right.  And how long was Stampnick
6  your partner?
7    A.    About six months.
8    Q.    So that brings us to sometime in 1987 or
9  1988.  Who was your next partner?
10    A.    John Gavin.
11    Q.    So John common spelling, J-o-h-n?
12    A.    Yes.
13    Q.    And spell the last name, please?
14    A.    G-a-v-i-n.
15    Q.    Gavin, G-a-v-i-n.  How long was John
16  Gavin your partner?
17    A.    About a year.
18    Q.    After John Gavin was no longer your
19  partner, who was your partner?
20    A.    I probably worked alone for a little
21  bit, and then Bernie Brennan and I became partners.
22    Q.    Okay.  So Brennan is spelled
23  B-r-e-n-n-a-n; correct?
24    A.    Yes.

Page 22

1    Q.    And what is his first name?
2    A.    Bernie with a B.
3    Q.    B-e-r-n-i-e?  Bernie Brennan?
4    A.    Yes.
5    Q.    How long did you work as a partner with
6  Bernie Brennan?
7    A.    I would say about 15 years.
8    Q.    All right.  So when you say 15 years,
9  was he your partner up until the end of the time
10  that you were with the Chicago Police Department,
11  or did you ever have another partner?
12    A.    I had another partner around 2003 I
13  think that it was.  I worked with Rich Milz.
14    Q.    Richard Mills, common spelling both
15  names?
16    A.    M-i-l-z.
17    Q.    Oh, M-i-l-z.  Thank you.
18          And he was your last partner until you
19  retired?
20    A.    Yes.
21    Q.    Okay.  In terms of your work as a
22  detective, did you work with confidential
23  informants?
24    A.    No.

Page 23

1    Q.    You never talked to a confidential
2  informant when you were a detective?
3    A.    Oh, I have, yes.
4    Q.    Well, that was my question.
5    A.    I didn't understand it.  I thought that
6  you meant did I regularly work with confidential
7  informants, but I did occasionally speak with them,
8  yes.
9          MR. POLICK:  Object to the form, because I
10  understood the question the same way that my client
11  did.  If you want to rephrase it, go ahead.
12  BY MR. RICHARDS:
13    Q.    Yeah, I can rephrase it.  Yeah.
14          Let's disregard the phrase "work with."
15  Did you ever on occasion as a detective receive
16  information from confidential informants?
17    A.    Yes.
18    Q.    And in terms of the confidential
19  informants you received information from, were any
20  of those paid informants, if you remember?
21    A.    No.
22    Q.    None of them were paid informants?
23    A.    No.
24    Q.    In terms of the confidential informants

Page 24

1  that you received information from, did any of --
2  were any of those confidential informants -- were
3  their names and identities recorded in any sort of
4  Chicago Police record?
5    A.    No.
6    Q.    All right.  And so let me -- what were
7  the kind of confidential informants that you
8  received information from?  Were they just people
9  whose identity that you promised to keep
10  confidential?  Is that what it meant?
11    A.    That's what it means to me.  People
12  would sometimes talk to you, but I'm not going to
13  court, and I don't want to -- I don't want anybody
14  to know that I'm telling you this, but, you know,
15  then they tell you something.
16    Q.    Okay.  And in all of your career you
17  never worked -- just to repeat, you never worked
18  with a confidential informant who was being paid by
19  the Police Department or the City of Chicago;
20  correct?
21    A.    Correct.
22    Q.    And you never worked with a confidential
23  informant whose identity was kept in some fashion
24  or recorded by either you or by the City of



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
25—28

Page 25

1  Chicago; correct?
2    A.  Correct.
3    Q.  Well, when you worked with a
4  confidential informant, did you ever at least like
5  make notes of their name or phone number or address
6  so that you could keep in contact with them?
7    A.  I suppose that I did at some time.
8    Q.  And those notes or records, the names,
9  the addresses, phone numbers, where would have
10  those -- what would have happened to those notes?
11  Do they still exist?
12    A.  No.
13    Q.  Did you destroy any of the such notes?
14    A.  I imagine they got lost or destroyed.
15    Q.  Can you be anymore specific as to what
16  happened to those notes?  Well, let me ask you
17  this.  I will withdraw that question.
18        Do you ever remember sitting down and
19  deliberately looking over your notes seeing that
20  you had notes of the names and, you know, contact
21  information for a confidential informant and
22  actually destroying that note physically?  Do you
23  ever remember doing that?
24    A.  I don't have any recollection of that.

Page 26

1    Q.  Well, when you say that they got -- when
2  you were working as a detective, where would you
3  keep those notes or information?  Would you keep it
4  in a notebook?  Would you keep it on sheets of
5  paper?  Where would you keep that information?
6    A.  I hear some background.
7    MR. RICHARDS:  I heard some background, too.
8  Was that an objection?
9    MR. POLICK:  No.  It was not.  It was
10  background noise.  So if you could repeat your
11  question, I think that he can go ahead and answer
12  it.
13  BY MR. RICHARDS:
14    Q.  Okay.  These notes as to confidential
15  informants, did you keep them in a notebook?
16    A.  No, I'm kind of losing track of when
17  we're talking about.  Ever?
18    Q.  Ever.
19    A.  Or specifically?
20    Q.  Well, let's start with ever, and then we
21  will narrow it down.  Ever?
22    A.  I don't really recall taking notes of
23  confidential informants as a patrol officer and,
24  again, my definition of a confidential informant is

Page 27

1  somebody who doesn't want to be identified, or, you
2  know, be put on any official reports.  They just
3  want to tell me information.
4        So sometimes I wouldn't know exactly who
5  I'm talking to, and so I don't know that I would
6  even have taken notes in that instance.
7    Q.  All right.  But there are some instances
8  in which there was a confidential informant, and
9  you did know who they were talking to -- who you
10  were talking to; correct?
11    A.  Yes.
12    Q.  So in some instances in terms of your
13  memory you did record their name or address or
14  phone number or all three; correct?
15    A.  I'm assuming here that I -- that that's
16  correct.  I don't -- I don't recall having done
17  that, but at some point if I was talking to
18  somebody that I didn't know and they were willing
19  to tell me who they were, I would think that I
20  would have written their name down.
21    Q.  All right.  But you cannot tell us
22  whether any time that you did that you destroyed
23  that information at some point, you know, the
24  actual physical record of the information or you

Page 28

1  lost it?  You can't give us any information --
2  further information on that; is that true?
3    A.  Yeah, I don't -- I don't recall what
4  happened to any of those notes if they exist.
5    Q.  All right.  In terms of confidential
6  informants, would you agree that the value of a
7  confidential informant's information can depend as
8  to whether they have a track record for
9  reliability?
10    MR. POLICK:  Object to the form of the
11  question, but you can answer over the objection.
12  BY MR. RICHARDS:
13    Q.  Or I can give you more clarification if
14  you need it.
15    A.  At least repeat what your thought is.
16    Q.  All right.  Let me just ask you this.
17  And I'll start this way.  Sometimes confidential
18  informants give you information which turns out to
19  be false; correct?
20    A.  Yeah.  That is correct.
21    Q.  Sometimes they give you information that
22  turns out to be true?
23    A.  That's also correct.
24    Q.  Would you agree with me that a



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
29–32

Page 29

1  confidential informant who gives you information
2  which turns out to be true would have a -- what we
3  might call a track record for reliability?
4      MR. POLICK:  Objection to the form of the
5  question, and it's an incomplete hypothetical, but
6  go ahead and answer.
7  BY THE WITNESS:
8      A.   I guess I would -- I would gauge the
9  information that somebody gave me to be more likely
10  to be true if they had given me information in the
11  past that also turned out to be true.
12  BY MR. RICHARDS:
13      Q.   Okay.  Now, in terms of the informants
14  that you dealt with -- first of all, we're talking
15  about right now the period when you were a
16  detective, which is the period that you said that
17  you dealt with confidential informants.
18          During that period when you were a
19  detective and you were dealing with confidential
20  informants, how did you remember which informants
21  had given you good information in the past?  Did
22  you write that down, or did you just have a memory
23  of it?
24      A.   I didn't deal with confidential

Page 30

1  informants on a continuing basis.  If somebody was
2  going to give me information on a case, it's not
3  like I'm going to be working on a similar case
4  necessarily.  That information was for that case,
5  and I never went back to that person for further
6  information.
7      Q.   Well, let me ask you this.  Did you ever
8  draft an affidavit for a search warrant which was
9  based on information that you got from a
10  confidential informant?
11      A.   Yes.
12      Q.   And did you ever write -- put in one of
13  those affidavits that the informant had given you
14  reliable information in the past?
15      A.   No, I don't recall that I said that he
16  had given me reliable information.  I don't recall
17  that.
18      Q.   Okay.  When you dealt with confidential
19  informants, would you ask other detectives if the
20  informants had given reliable information in the
21  past?
22      A.   I don't understand.
23      Q.   Okay.  Let's talk about a hypothetical.
24  You're drafting an affidavit for a search warrant

Page 31

1  and you put in the search warrant that an informant
2  has given reliable information in the past.
3          First of all, you have drafted such
4  search warrants, haven't you, where -- or
5  affidavits for search warrants where you said that
6  I got information from an informant, and the
7  informant has given reliable information in the
8  past?  That you have done in the course of your
9  career; correct?
10      MR. POLICK:  Objection.  I think that
11  misstates the witness's testimony, but go ahead and
12  you can answer over the objection.
13  BY THE WITNESS:
14      A.   Yes, I have.
15  BY MR. RICHARDS:
16      Q.   All right.  In those instances would it
17  be fair to say that your information as to whether
18  the informant was reliable came not from your own
19  experience but from the experience of other
20  informants -- of other detectives with the same
21  informant?
22      A.   That's correct.
23      Q.   And so whenever you are dealing with an
24  informant -- whenever you did that, you put that

Page 32

1  information in an affidavit for a search warrant,
2  you must have had conversations with other
3  detectives or officers about their previous
4  experience with the informant; correct?
5      A.   Yes.
6      Q.   Okay.  Let me ask you about another
7  topic -- some other topics, and then we are going
8  to move on -- we're going to move on to looking at
9  some documents.
10          You told me all of your partners -- let
11  me also give you some names of some other
12  detectives and talk about your connection or
13  association or knowledge of them.
14          First of all, when did you meet Reynaldo
15  Guevara?
16      A.   Specifically?
17      Q.   Yes.  Specifically.
18      A.   I don't know.
19      Q.   Can you narrow it down?  Did you meet
20  him in the '80s?
21      A.   Yes.
22      Q.   Okay.  Was it the early '80s or late
23  '80s?
24      A.   Well, it was after I was promoted to



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
33–36

Page 33

1  detective. So it would have been after 1987.
2      Q.   All right. And when you met Detective
3  Guevara at first, was he a gang specialist?
4      A.   Yes.
5      Q.   What is or was a gang specialist? What
6  does a gang specialist do?
7      A.   Well, I'm not a hundred percent certain.
8  I have never been a gang specialist, but my
9  understanding is that they are a support unit that
10  investigates gang crimes and they sort of become
11  somewhat experts on certain gangs.
12      MS. McGRATH: Belated objection to the
13  question. Foundation.
14      MR. RICHARDS: I note the objection.
15  BY MR. RICHARDS:
16      Q.   But you answered your question, and I
17  appreciate your answer.
18      MR. POLICK: No, he answered --
19  BY MR. RICHARD:
20      Q.   Now, in terms of Reynaldo Guevara,
21  before you began your investigation of the Luis
22  Morales murder case, how many times would you say
23  that you have met Reynaldo Guevara?
24      A.   I would say maybe a handful.

Page 34

1      Q.   Okay. A handful meaning probably less
2  than 10?
3      A.   Yeah. I would say that's fair.
4      Q.   Alright. Now, in the Police Department
5  police officers have reputations among the other
6  officers. Would you agree? You know, people talk
7  about each other?
8      MS. McGRATH: Objection.
9      MR. RICHARDS: I note the objection.
10  BY MR. RICHARDS:
11      Q.   People talk about each other and they
12  form opinions and they convey their opinions to
13  others; is that true?
14      A.   I don't know about that.
15      Q.   Alright. Did Detective Guevara have a
16  reputation among the other officers that you know
17  of?
18      MS. McGRATH: Objection. Form. Foundation.
19      MR. POLICK: Same objections.
20  BY MR. RICHARDS:
21      Q.   During the period from 1987 to the
22  beginning of the Luis Morales murder investigation,
23  did Detective Guevara -- I'm sorry. Strike that
24  question.

Page 35

1      During the period between when you first
2  met Detective Guevara and the beginning of the Luis
3  Morales murder investigation, during that period
4  did Guevara as a gang specialist have a particular
5  gang that he was an expert in to your knowledge?
6      MS. McGRATH: Objection. Form.
7      MR. POLICK: Join. You can answer.
8  BY THE WITNESS:
9      A.   Yeah, I don't -- I didn't know what gang
10  he worked on, no.
11  BY MR. RICHARDS:
12      Q.   Alright. And let me go to after the
13  Luis Morales murder case -- first of all, during
14  the Luis Morales murder case both you and then gang
15  specialist Guevara worked on that case; correct?
16      MR. POLICK: Objection to the form of the
17  question, but go ahead and answer.
18  BY THE WITNESS:
19      A.   I worked on the case. I know that he
20  had some input on the case, but -- I guess yes.
21  BY MR. RICHARDS:
22      Q.   Okay. After that case, did you ever
23  work with gang specialist Guevara or eventually
24  Detective Guevara on any other case?

Page 36

1      A.   Well, specifically I don't know. I'm
2  sure that I worked -- you know, once he was
3  assigned to Area 5, detectives work together on
4  cases. Sometimes just for, you know, a moment,
5  sometimes for a day or two. They don't necessarily
6  stay together on that case, you know. If somebody
7  needs a few extra bodies to perform some
8  investigation, you know, you help out, but I don't
9  know any specifics.
10      Q.   Okay. Is your answer that it's possible
11  that you may have worked with him, but you can't
12  remember any specific case that you worked with him
13  on after the Luis Morales murder case?
14      A.   That's correct.
15      Q.   Okay. Shortly after the beginning of
16  the Luis Morales murder case and before it went to
17  trial, were you aware that gang specialist Guevara
18  had been promoted to detective?
19      A.   I guess. If that's when he was
20  promoted, I guess that I would have been aware of
21  it.
22      Q.   Alright. Did you have any input? Did
23  you make any recommendation to anybody that he be
24  promoted?



MICHAEL MASON       June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA       37—40

Page 37

1   A.   That wasn't my job.
2   Q.   Well, when he was promoted, did anyone
3 ask you for any input as to whether he should be
4 promoted?
5   A.   No.
6   Q.   Okay. Let me share screen.
7      Before I ask you a series of questions,
8 what preparations -- without going into details of
9 conversations with your attorney, what preparations
10 did you make for your deposition today? What
11 documents did you review? How did you prepare?
12   A.   I would go through the police reports
13 relevant to this case. I reviewed my testimony on
14 this case.
15      (WHEREUPON, a certain document was
16      marked Mason Deposition Exhibit
17      No. 1, for identification, as of
18      6-23-23.)
19 BY MR. RICHARDS:
20   Q.   Okay. I have done a share screen. And
21 for the court reporter this would be our Exhibit
22 No. 1.
23      I'm going to just scroll over this
24 document slowly, and then ask you if you can

Page 38

1 recognize it. Okay?
2   A.   Okay.
3      MR. POLICK: Stephen, just for the record,
4 I've printed out a hard copy of the exhibits that
5 you sent over yesterday. So if it's easier and you
6 are in agreement, I can give Detective Mason a hard
7 copy, and he can look it over rather than scrolling
8 up and down, if that's okay with you.
9      MR. RICHARDS: It's an excellent suggestion,
10 and for now I will stop the share.
11 BY MR. RICHARDS:
12   Q.   Detective Mason, if you could review
13 what we have marked as Exhibit 1, and, Detective,
14 just let me know when you finish your review and
15 you can answer questions.
16   A.   Alright.
17   Q.   Okay. So, Detective Mason, is that --
18 what's been marked as Deposition Exhibit 1 is that
19 document, in fact, a court reported statement of
20 Jaime Rios?
21   A.   Yes, it is.
22   Q.   And before this litigation began, had
23 you seen that document before?
24   A.   Yes.

Page 39

1   Q.   And were you present when that statement
2 was transcribed by the court reporter?
3   A.   Yes.
4   Q.   And aside from the court reporter, who
5 else was present when the statement was taken?
6   A.   The state's attorney Barbara Riley.
7   Q.   Okay. I had forgotten to ask you
8 another question, but when did you meet Detective
9 Halvorsen, Ernest Halvorsen?
10   A.   When did I meet him?
11   Q.   Yes.
12   A.   For the first time?
13   Q.   Yes.
14   A.   I believe that it was sometime during
15 the time that I was assigned to the 24th District.
16   Q.   So would that be in the late '80s?
17   A.   Probably the early '80s.
18   Q.   Okay. When you first met Halvorsen, was
19 he a detective or a patrol officer?
20   A.   He was a patrol officer.
21   Q.   Alright. And during the period in the
22 1980s how well did you know Ernest Halvorsen?
23   A.   I didn't really know him. I knew who he
24 was, you know, from -- we were both assigned to the

Page 40

1 24th District. So we would see each other on
2 occasion, but I had never worked with him.
3   Q.   Okay. Before the investigation of the
4 Luis Morales murder, had you ever worked with
5 Ernest Halvorsen?
6   A.   No.
7   Q.   After the investigation of the Luis
8 Morales murder, did you ever work with Ernest
9 Halvorsen again?
10   A.   No.
11   Q.   Let me ask you this. You did work with
12 him during the investigation of the Luis Morales
13 murder; is that correct?
14   A.   Yes.
15   Q.   Okay. But your regular partner was
16 Detective Brennan; correct?
17   A.   That's right.
18   Q.   And why were you working with
19 Halvorsen rather than your regular partner,
20 Detective Brennan?
21   A.   I assume that Detective Brennan was off
22 that day.
23   Q.   Okay. And that would be the only reason
24 why you were working with Detective Halvorsen?



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
41–44

Page 41

1    A.   Yes.
2         (WHEREUPON, a certain document was
3         marked Mason Deposition Exhibit
4         No. 2, for identification, as of
5         6-23-23.)
6    BY MR. RICHARDS:
7    Q.   Okay.  I would like to turn now to
8    Exhibit No. 2, and I ask if Detective Mason can be
9    provided with a copy of Exhibit No. 2.
10        MR. POLICK:  Okay.  And can you identify for
11   the record which testimony?  I know it's testimony,
12   but which proceeding are we talking about here?
13        MR. RICHARDS:  Okay.  We are talking about
14   testimony during the Luis Morales trial -- I'm
15   sorry, the trial of Jaime Rios for the Luis Morales
16   murder.  We're talking about Detective Michael
17   Mason's testimony at trial.  So that would be
18   Exhibit No. 2.
19        MR. POLICK:  Alright.  Just for the record,
20   this exhibit is marked PFP 476 through PFP 494.  I
21   don't believe that's a complete copy of Mr. Mason's
22   testimony, but I'm going to show him what you have
23   marked as Exhibit 2.
24   BY MR. RICHARDS:

Page 42

1    Q.   Okay.  Detective Mason, after you have
2    finished reviewing that, let me know when you are
3    finished, and I can ask you some questions.
4    Alright?
5    A.   Alright.
6    Q.   Detective Mason, have you finished
7    reviewing that document?
8    A.   Yes.
9    Q.   Okay.  I recognize that some of the
10   pages from the cross-examination have been left
11   out, but the pages that you reviewed, are those an
12   accurate transcription of your testimony on direct
13   and part of your testimony on cross?
14   A.   They appear to be, yes.
15   Q.   Okay.  And before you gave that
16   testimony, did you speak with the prosecutor -- the
17   trial prosecutor on the case?
18   A.   I'm sure that I did.  I don't have any
19   recollection of who the prosecutor was.
20   Q.   Well, let me ask you this.  How many
21   times -- you've testified in court on cases;
22   correct?
23   A.   Yes.
24   Q.   Can you give us any estimate of the

Page 43

1    approximate number of times that you have testified
2    in court on a criminal case?
3    A.   I don't think that I could.  No.
4    Q.   Well, would it be more than a hundred?
5    A.   I would say so, yes.
6    Q.   Would it be more than 500?
7    A.   It could be.
8    Q.   Okay.  And let's narrow it down a little
9    bit.  Do you know approximately how many times that
10   you've testified in court on a murder case?
11   A.   I would not know how to -- I wouldn't
12   know how to even assess that.
13   Q.   Alright.  You don't keep -- you have
14   never kept any record for yourself of the number of
15   times and the dates and the cases that you have
16   testified in?
17   A.   No.
18   Q.   Can you ever remember in any of the
19   cases that you testified in a situation where you
20   testified without first speaking to the prosecutor
21   about your testimony?
22   A.   Can you repeat that question, please?
23   Q.   Yes.  Of all of the times that you've
24   testified in court on criminal cases, can you

Page 44

1    remember any one instance where you testified, you
2    were put on the stand, without having talked to the
3    prosecutor first?
4    A.   You know, there might be some
5    misdemeanor cases.  Some of those cases you never
6    get a chance to talk to the prosecutor.  The court
7    moves kind of fast.
8    Q.   Okay.  Leaving aside misdemeanor cases,
9    felony cases, can you ever remember any instance in
10   a felony case where you testified without talking
11   to the prosecutor first?
12   A.   I can't remember that happening.
13   Q.   Would it be fair to say that that has
14   never happened in your experience?
15   A.   Yeah, I don't think that has ever
16   happened.
17   Q.   Okay.  And since felony cases include
18   murder cases, would it be also fair to say that
19   there has never been a murder case where you have
20   testified on the stand without talking to the
21   prosecutor first about your testimony; fair?
22   A.   That's fair.
23   Q.   Do you have any reason to believe that
24   in the trial of the Jaime Rios murder case you



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
45—48

Page 45

1  testified without talking to the prosecutors first
2  about your testimony?
3      A.  No.
4      Q.  And in general just as a matter of what
5  happens usually in cases, I'm not asking you to
6  remember specific instances, when you discuss with
7  a prosecutor your testimony, you know, before you
8  testify at a trial, do you usually have your police
9  reports available to you?
10     A.  Yes.
11     Q.  And does the prosecutor also usually
12  have the police reports available?
13     A.  Yes.
14     Q.  Can you remember any instance in which
15  you testified in a criminal trial where during your
16  preparation with the prosecutor the police reports
17  were not available?
18     A.  I can't recall that.  No.
19     Q.  Okay.  Would it be fair to say that to
20  the best of your recollection -- strike that.  I
21  will withdraw that question.
22     MR. RICHARDS:  Okay.  I would next like to go
23  on to Mason Deposition Exhibit No. 3.
24         (WHEREUPON, a certain document was

Page 46

1          marked Mason Deposition Exhibit
2          No. 3, for identification, as of
3          6-23-23.)
4      MR. POLICK:  Stephen, before we move to No. 3,
5  can we take a quick bathroom break?
6      MR. RICHARDS:  Not only can we, but I would
7  welcome it.  Do you want to give it 10 minutes?
8      MR. POLICK:  That would be fine.  Thank you.
9          (WHEREUPON, a recess was had.)
10  BY MR. RICHARDS:
11     Q.  Detective Mason, I would like to show
12  you what has been marked as Mason Deposition
13  Exhibit No. 3, testimony of Ernest Halvorsen, and,
14  again, Detective Mason, when you have finished
15  reviewing that, let me know.
16     A.  I will.  Okay.
17     Q.  So you reviewed that document.  Does
18  that document purport to be the testimony of Ernest
19  Halvorsen at the Jaime Rios trial?
20     MR. POLICK:  I am going to object to the form
21  of that question.
22  BY MR. RICHARDS:
23     Q.  Put it this way, have you ever seen that
24  document before this litigation?

Page 47

1      A.  No.
2      Q.  Okay.  After reviewing that document, do
3  you believe that Detective Ernest Halvorsen's
4  testimony at the trial was accurate?
5      MR. POLICK:  I'm going to object to the form
6  of the question and also his competence to answer
7  it, because typically witnesses are excluded during
8  these proceedings, but he can answer over the
9  objection.
10  BY MR. RICHARDS:
11     Q.  Okay.  Detective Mason, did you
12  understand my question, or would you like me to
13  repeat it?
14     A.  Yeah, actually repeat it, please.
15     Q.  Okay.  To your knowledge is what
16  Detective Halvorsen testified to during that trial
17  -- to your knowledge is it accurate what he
18  testified to?
19     MR. POLICK:  Again, objection to the form, but
20  you can go ahead and answer.
21  BY THE WITNESS:
22     A.  It appears to be accurate although --
23  yeah, it appears to be accurate.  My recollection
24  of the incident now I have to rely on, you know,

Page 48

1  the reports available and the testimony that I
2  gave.  I don't have an independent recollection of
3  all of the events, but it does appear to be
4  accurate.
5  BY MR. RICHARDS:
6      Q.  Okay.  By the way, in terms of your
7  memory of the events of this murder investigation,
8  would you say that you have a good memory, a fair
9  memory, or a poor memory of what transpired?
10     A.  I have a -- I have a vague memory of
11  some of it.  Not all of it.
12     Q.  Okay.  So it would be accurate to say
13  that on some issues you have no memory?  We will
14  not go into right now what the issues are, but on
15  some issues or aspects of what happened you have no
16  memory; is that fair?
17     A.  That's correct.
18     Q.  And on other aspects or issues you have
19  a vague memory; correct?
20     A.  Yes.
21     Q.  But on none of the issues or facts do
22  you have a clear memory; is that true?
23     MR. POLICK:  Objection to form, but you can
24  answer.



MICHAEL MASON                                           June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                          49–52

Page 49

1  BY THE WITNESS:
2      A.  Could you repeat that, please?
3  BY MR. RICHARDS:
4      Q.  Well.  Let me ask you this.  Is there
5  anything -- are there any events or aspects of the
6  Louis Morales murder investigation which you have a
7  clear memory?
8      A.  I guess I would have to say all of the
9  memory that I do have is a bit cloudy.
10     Q.  Okay.  Well, so the answer to that
11  question is no, you don't have a clear memory as to
12  any of the events or the aspects of the Luis
13  Morales murder investigation?  Is that a fair
14  statement?
15     MR. POLICK:  Objection.  That mischaracterizes
16  the answer and his testimony.  You can answer over
17  the objection.
18  BY THE WITNESS:
19     A.  Yeah, I guess if you want to use that
20  terminology, I have some -- I have some
21  recollections, but, you know, they may be moments
22  and they may not all connect.  So that's the
23  answer.
24  BY MR. RICHARDS:

Page 50

1      Q.  Let's go over that since we are on that
2  topic.
3          What do you remember about the Luis
4  Morales murder investigation?
5      A.  I remember being assigned to it the day
6  after -- not the day after.  Well, the incident
7  occurred around midnight, I think, on the 27th of
8  June, and I was assigned to it on the dayshift with
9  Bernie Brennan, and I have some recollection of
10  some of those events that day.
11     Q.  Well, let's start with that day then.
12  I'm sorry to interrupt.  I just want to clearly
13  break down your testimony.  I'm not preventing you
14  from saying anything, but I just want to clearly
15  demarcate some parts of your testimony.
16          So what do you remember about the first
17  day when you were assigned the case with Bernie
18  Brennan?
19     A.  There was a suspect named originally,
20  and that person had gone into the 14th District and
21  told the police there that he heard the police were
22  looking for him.
23     Q.  Okay.  And do you remember the name of
24  that suspect, or has your recollection been

Page 51

1  refreshed by looking at any of your reports?
2      A.  My recollection has been refreshed by
3  looking at the reports.  I still can't remember his
4  first name, but his last name was Melendez.
5      Q.  Okay.  Do you remember the nickname
6  Macho?
7      A.  Yes.
8      Q.  Okay.  I want to ask you a little bit
9  more information about this.  Before this
10  investigation, had you ever heard of Jose Macho
11  Melendez?
12     A.  No.
13     Q.  Were you familiar with the gangs in the
14  area where the murder occurred?
15     A.  I don't know what you mean by familiar.
16     Q.  Well, I mean, had you ever heard of the
17  Spanish Cobras?
18     A.  Oh, I have.
19     Q.  Had you ever heard of the Latin Kings?
20     A.  Yes.
21     Q.  Were you aware of the boundary line
22  between the Kings' territory and the Cobras'
23  territory?
24     A.  At that time?  Are you asking me at that

Page 52

1  time?
2      Q.  Yeah, at that time.  Not presently.
3  Back during the investigation of the Luis Morales
4  murder in 1989 were you aware of what the
5  borderline was between the Cobras' territory and
6  the Kings' territory?
7      A.  Yeah, it was -- Western Avenue was
8  basically the dividing line.
9      Q.  Alright.  And do you remember where this
10  murder occurred?
11     A.  No, I don't.
12     Q.  Okay.  So in terms of the first day that
13  you were assigned, you remember Mr. Melendez coming
14  to the police station.  What else do you remember?
15     A.  I remember that we spoke with him at --
16  myself and Detective Brennan spoke with him at
17  Area 5, and we subsequently ran a lineup with him
18  in it also at Area 5.
19     Q.  Okay.  Do you remember the results of
20  the lineup?
21     A.  He was not identified.
22     Q.  And do you remember who viewed the
23  lineup?
24     A.  It was -- let me think now.  So are you



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
53–56

Page 53

1  asking me do I remember independently or --
2      Q.   Well, yes.  This is what I'm asking you.
3  Later we are going to go over the police reports to
4  see if you can identify them, so that will be fine.
5  But right now I'm just dealing with your present
6  memory after it's been refreshed by reviewing the
7  reports, you know, privately.
8         As you're sitting there now, do you
9  remember who was -- who viewed the lineup of
10  Mr. Melendez?
11     A.   I still don't understand.  So are you
12  asking me independently of my review of the reports
13  or --
14     Q.   Yes.
15     A.   -- prior to my review of the reports?
16     Q.   Yes, I'm asking you for your present
17  memory -- I mean, if your memory is based on your
18  recent review of the reports and that's refreshed
19  your recollection and you remember right now, you
20  can tell me, but if you don't remember, you can say
21  that.  Whatever is the truth.
22     A.   Yeah.  My recollection has been
23  refreshed by the review of my reports as to the
24  names of the people.

Page 54

1      Q.   Okay.  So who was the name of the
2  people/person who viewed the lineup?
3      A.   So that would have been Samantha Hudson
4  and Luis Huertas.
5      Q.   Now, just for the court reporter,
6  Samantha is common spelling and Hudson is also
7  common spelling; is that true?
8      A.   Yes.
9      Q.   And Luis Huertas is spelled L-u-i-s, and
10  the last name is spelled H-u-e-r-t-a-s?
11     A.   That's correct.
12     Q.   Okay.  What else do you remember about
13  your activities the first day of the investigation?
14     A.   I remember going to a Holiday Inn, it
15  was in Evanston, and talking to some people there.
16     Q.   And do you remember what the purpose was
17  of going to the Holiday Inn?
18     A.   Sure.
19     Q.   What was the purpose of going to the
20  Holiday Inn?
21     A.   I was looking for two people that
22  Mr. Melendez had said that he was with the evening
23  that this murder occurred.
24     Q.   Okay.  And do you remember what

Page 55

1  conversations that you had with those people?
2      A.   Yeah, I do.
3      Q.   What conversations did you have with
4  those people?
5      A.   I asked them if they knew Mr. Melendez,
6  and if they recalled seeing him -- well, let's see.
7  I don't remember exactly -- you know, I don't
8  remember my exact words, but it was words to the
9  effect that I wanted to know -- I gave them a time
10  frame and asked if they remember seeing
11  Mr. Melendez.
12     Q.   Okay.  And do you remember if they
13  responded, and, if so, what they responded?
14     A.   Yeah.  They both responded that they had
15  seen him.
16     Q.   And did they respond that they had seen
17  him during the time frame that you're talking
18  about?
19     A.   Yes.
20     Q.   Now, did the time frame they mentioned,
21  did that establish an absolute alibi for
22  Mr. Melendez in terms of the murder?
23     MR. POLICK:  Objection to form, but you can
24  answer.

Page 56

1  BY THE WITNESS:
2      A.   I don't know that -- I don't remember
3  exactly what times they said that they saw him, but
4  it did cover the times very well.
5  BY MR. RICHARDS:
6      Q.   Okay.  And do you remember how far the
7  Holiday Inn was from the scene of the murder?
8      A.   It was in the neighborhood of eight
9  miles.
10     Q.   Okay.  What else do you remember about
11  the first day of the investigation?
12     MR. POLICK:  Object to the form of the
13  question, but you can answer over the objection.
14  BY THE WITNESS:
15     A.   I remember that I spoke with Javier
16  Torres.
17  BY MR. RICHARDS:
18     Q.   And what was your conversation with
19  Javier Torres?
20     A.   It was about the shooting.
21     Q.   Okay.  And what did Javier Torres say
22  about the shooting?
23     A.   Again, I can give you a -- you know, he
24  basically said that he was with Luis Morales, and



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
57—60

Page 57

1  at the location where this happened, which I don't
2  recall, and they were on foot, some other people
3  approached them on foot, and started shooting at
4  them.
5      Q.   Anything else that you remember about
6  that conversation with Javier Torres?
7      A.   Not independently, no.
8      Q.   Okay.  Anything else that you remember
9  about the first day of your investigation?
10     A.   Not that I recall, no.
11     Q.   Okay.  The second -- after that day, the
12  next day did you continue the investigation or not?
13     A.   Well, the next day I think is when we
14  actually ran the lineups.
15     Q.   Okay.  And do you remember which lineups
16  -- which lineups that you ran; in other words, who
17  viewed the lineups that you ran on the second day?
18     A.   That was Samantha Hudson and Luis
19  Huertas.
20     Q.   Do you remember if either of them made
21  an identification?
22     A.   They did not.
23     Q.   Okay.  Apart from the lineups on the
24  second day, anything that you remember about the

Page 58

1  second day?
2      A.   No.
3      Q.   Okay.  The third day of the
4  investigation, did anything happen that day?
5      A.   Not that I recall.
6      Q.   Okay.  The fourth day of the
7  investigation, anything that you remember about
8  that?
9      A.   I don't know -- when you say the fourth
10  day of the investigation, I'm not sure how to take
11  that.  I don't --
12     Q.   Well, I'm sorry.  I will withdraw the
13  question and ask it in a different way.
14      After the lineups of you by Samantha
15  Hudson and Luis Huertas, what is the next thing
16  that you remember happened during the
17  investigation?
18     A.   Sometime later, I guess this is the 6th
19  of July, Officers Gawrys and Guevara came into Area
20  5 with some people that had information about this.
21     Q.   So let's concentrate on July 6th then.
22  Guevara and his partner, that was Steven Gawrys?
23  I'm not sure if I am pronouncing it right.
24     A.   Yeah.  I think it's pronounced Gawrys.

Page 59

1      Q.   Would you agree with me that it's
2  spelled first name S-t-e-v-e-n and his last name is
3  spelled G-a-w-r-y-s?
4      A.   That sounds right.
5      Q.   Okay.  We will take it for now.  Thank
6  you.
7      Do you remember what time that the two
8  of them came -- Guevara and Gawrys came into -- and
9  what was the district?
10     A.   Area 5.
11     Q.   What time did they come into Area 5?
12     A.   It was around the time -- I think that
13  it was around the time that I started, which was
14  around 4:00 in the afternoon.
15     Q.   Alright.  You said that they came in
16  with some people.  Who were the people that they
17  came in with?
18     A.   I don't recall.
19     Q.   How many people did they come in with?
20     A.   Two people.
21     Q.   Those two people, were they men or
22  women?
23     A.   My recollection is that they were men.
24     Q.   Okay.  What race or ethnicity were they?

Page 60

1  White?  Black?  Hispanic?
2      A.   I don't recall that at this time.
3      Q.   Do you recall the names of either of
4  those two people?
5      A.   No.
6      Q.   Do you remember if they told you their
7  names?
8      A.   They did.
9      Q.   Okay.  Do you remember -- do you
10  remember one of them having the nickname Little
11  Mike?
12     A.   I don't recall that.
13     Q.   Alright.  What, if anything, did these
14  two people tell you?
15     A.   They told me that they had heard that
16  Jaime Rios was the person who was doing the
17  shooting, or one of the people that was doing the
18  shooting that killed Luis Morales.
19     Q.   Alright.  When they said that they had
20  heard that, did they tell you from whom they had
21  heard that?
22     A.   No.
23     Q.   Did you ask them from whom they had
24  heard that?



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
61–64

Page 61

1    A.   I don't recall.

2    Q.   Is there anything else that you can

3  recall about your conversation with these two

4  people?

5    A.   No.

6    Q.   Alright.  How long did this conversation

7  last?  Do you know that?

8    A.   I don't know.

9    Q.   And was anything else done with respect

10  to your knowledge, or did you take any -- did you

11  take any other action on July 6th with respect to

12  the investigation?

13    A.   Yes.

14    Q.   What did you do, if anything?

15    A.   I talked to my lieutenant -- violent

16  crimes lieutenant and gave him a little update

17  about what I had just learned.  We had a

18  conversation.

19    Q.   When you say your violent crimes

20  lieutenant, would that be lieutenant -- I think is

21  it Kijowski?  Or who was the violent crimes

22  lieutenant?

23    A.   It's pronounced Kijowski.

24    Q.   Can you spell it for me?

Page 62

1    A.   K-i-j-o-w-s-k-i.

2    Q.   What is Lieutenant Kijowski's first

3  name?

4    A.   I think it's Ed.

5    Q.   I'm sorry?

6    A.   I think it's Ed.

7    Q.   Evan.  Okay.

8    A.   Ed, E-d.

9    MR. POLICK:  Ed, E-d.

10  BY MR. RICHARDS:

11    Q.   Let me start -- spell the first name for

12  me?

13    A.   E-d.

14    Q.   The first name is spelled E-e?

15    A.   E-d, Ed, Edward.

16    Q.   Oh, Edward.  Ed, I got it.  Okay.

17  Edward Kijowski, is he still alive?

18    A.   I don't believe so.

19    Q.   Okay.  Do you know when he retired from

20  the force?

21    A.   No.

22    Q.   Okay.  This conversation that you had

23  with Edward Kijowski, what do you remember about --

24  first of all, where did this conversation take

Page 63

1  place?

2    A.   I don't know.  It was probably in his

3  office at Area 5, but it may have been in the

4  sergeant's office.  I don't know.

5    Q.   Was anyone else present for that

6  conversation?

7    A.   I don't recall.

8    Q.   Okay.  Do you remember if Reynaldo

9  Guevara or Steven Gawrys were present?

10    A.   They would not have been present, no.

11    Q.   How about any of the informants?

12    A.   No.

13    Q.   Okay.  At the time that you spoke to

14  Lieutenant Kijowski, were the informants still in

15  the police station?

16    A.   I don't recall.

17    Q.   Okay.  Do you remember when the

18  informants left the police station?

19    A.   No, I don't.

20    Q.   Can you give me any further description

21  of the informants as to height, age, or anything

22  else?

23    A.   No.

24    Q.   Okay.  On July 6 after this conversation

Page 64

1  with your lieutenant, what happened then?

2    A.   Well, the next thing that I recall was

3  Officers Gawrys and Guevara arrived back at Area 5,

4  and they had with them Jaime Rios.

5    Q.   By the way, a more general question,

6  Detective Mason.  You were not the lead detective

7  on this investigation; correct?

8    A.   No.

9    Q.   Who were the lead detectives or

10  detective?

11    A.   I don't know.  That term wasn't used.

12  So I don't know how to answer that.

13    Q.   Alright.  Let's get into that.  When

14  there's a murder investigation back then, was there

15  somebody designated as the lead detective?

16    A.   Like I said, nobody ever used that term,

17  and no.

18    Q.   Okay.  Well, is there some sort of

19  priority -- or let's put it this way.  When you

20  have a murder investigation when it's conducted

21  back in the '90s, how were the ultimate decisions

22  made?  I mean, was it -- you know, was it a group

23  effort?  Was it consensus?  Did somebody give the

24  marching orders?  How did it work?



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
65–68

Page 65

1    A.   Well, you said back in the '90s, but I
2   assume that you mean in the '80s.
3    Q.   I'm sorry.  I meant at the time of this
4   investigation in 1989.  My mistake.  Go ahead.
5    A.   So, you know, the violent crimes unit
6   has violent crimes sergeants and a violent crimes
7   lieutenant.  So those people would decide who is
8   going to work on the case, and, you know, it could
9   be -- every day it could be somebody different.  It
10  just depends on the manpower and, you know, other
11  needs.  So, I mean, that's how it is decided.  They
12  decide who is working on it.
13   Q.   Okay.  And is there any sort of priority
14  or seniority given to the first detectives who are
15  assigned to the case as opposed to detectives
16  assigned latter?
17   A.   I don't know if I can answer that,
18  because, you know, I'm not the one who made those
19  decisions.
20   Q.   Alright.  You said you spoke to your
21  lieutenant after learning this information.  Do you
22  know if your lieutenant gave any instructions or
23  directions to Guevara and Gawrys?
24   A.   I don't know that at all.  No.

Page 66

1    Q.   Did you give any instructions to Guevara
2   and Gawrys?
3    A.   Instructions, no.
4    Q.   Well, did you ask Guevara and Gawrys to
5   pick Jaime Rios up?
6    A.   No.
7    Q.   At the time that Gawrys and Guevara gave
8   you that information and you talked to the
9   informants, did you believe that you had probable
10  cause to arrest Jaime Rios for a murder?
11   A.   No.
12   Q.   Did you believe that you had probable
13  cause to arrest Jaime Rios for anything?
14   A.   No.
15   Q.   And what time did Guevara and Gawrys
16  come in with Jaime Rios?
17   A.   It was about 10:00 in the evening.
18   Q.   Alright.  And had you -- prior to this
19  had you ever had any contact with Jaime Rios?
20   A.   No.
21   Q.   Had you ever -- prior to the discussion
22  with the informants, had you ever heard Jaime Rios'
23  name?
24   A.   No.

Page 67

1    Q.   Do you remember the informants also gave
2   the name of somebody named Cristino Garcia?
3    A.   Yeah.  There was some mention of I think
4   a Tino.
5    Q.   Okay.  Now, when Guevara and Gawrys
6   brought Jaime Rios to the station at about 10, if
7   you have a present memory of this, describe, you
8   know, what happened.  How they came in, and what
9   happened when they came in?
10   A.   You know, I have no present memory of it
11  without referring to my reports.
12   Q.   We will get to the reports, but that's
13  the question that I am asking now.  Okay.  Do you
14  have a present memory of questioning Jaime Rios?
15   A.   I have a vague recollection of that,
16  yes.
17   Q.   Okay.  Tell me everything, not what's in
18  your reports, but everything that you can remember
19  about the interrogation of Jaime Rios.
20   A.   Myself and Detective Halvorsen sat down
21  with him, and I advised him of the Miranda
22  warnings, that he understood them, and I told him
23  we wanted to talk about this shooting, and asked if
24  he had anything to say.

Page 68

1    Q.   Okay.  Go ahead.
2    A.   And then he related some -- you know,
3   what he said was his involvement in it.
4    Q.   Okay.  And what did he tell you about
5   his involvement in it?
6    A.   Again, if I am relying just on my
7   memory, he had -- yeah, I don't know if I could say
8   that this is just from my memory.  So I guess I
9   don't have a clear recollection of what he said.
10   Q.   That's fine.  Do you have a clear
11  recollection of how long that you talked to him?
12   A.   It was approximately a half an hour.
13   Q.   Okay.  And do you have any present
14  recollection of any of the questions that you
15  asked?
16   A.   I don't.
17   Q.   Do you have a present recollection of
18  any of the questions that Detective Halvorsen
19  asked?
20   A.   No.
21   Q.   Do you have a present recollection of
22  what happened after you spoke to him for half an
23  hour?
24   A.   I informed him that he was under arrest,



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
69–72

Page 69

1 and that he was not going to be able to leave.

2   Q.   Okay. And after you informed him that
3 he was under arrest and he would not be able to
4 leave, what happened then?

5   A.   I handcuffed him.

6   Q.   Okay. Then what happened?

7   A.   I left the room.

8   Q.   Okay. After you left the room, what
9 happened then?

10   A.   Well, I made some phone calls.

11   Q.   Who did you call?

12   A.   I called the felony review unit, the
13 state's attorney's office.

14   Q.   Okay. By the way, this may be an
15 obvious question, but I want to ask it. After you
16 spoke to Jaime Rios, did you believe that you had
17 probable cause to make an arrest?

18   A.   Yes.

19   Q.   Now, you say that you called the felony
20 review unit. Can you explain what the felony
21 review unit is or was in 1989 and how it operated?

22   A.   Well, it was a section of the state's
23 attorney office that reviewed felony cases that the
24 police department was asking charges on. So

Page 70

1 somebody from that unit would be assigned to go
2 over the case and see if there was enough -- you
3 know, enough to charge.

4   Q.   Can we go back up for a moment? You had
5 said that Jaime Rios got to the station at 10 p.m.,
6 and that the interview with him took about a half
7 an hour.

8       Do you remember when the interview
9 started, either at 10 p.m. or some other time?

10   A.   It was about midnight when it started.

11   Q.   Okay. So between 10 p.m. and 12 p.m.,
12 Jaime Rios was in the police station; correct?

13   A.   He was at -- yeah, he was at our Area 5
14 headquarters, yes.

15   Q.   And do you remember what room that he
16 was in?

17   A.   I don't.

18   Q.   In general at Area 5 there are
19 conference rooms; correct?

20   A.   Well, there's -- you know, we call them
21 interview rooms.

22   Q.   Right.

23   A.   Is that what you're referring to?

24   Q.   Yeah. Now, the interview rooms back

Page 71

1 then, did they have doors?

2   A.   Yes.

3   Q.   Could the doors be locked?

4   A.   They could be looked.

5   Q.   Okay. Apart from the interview rooms,
6 were there holding cells?

7   A.   At Area 5?

8   Q.   Yes.

9   A.   Holding cells, no.

10   Q.   Okay. The interview rooms at Area 5
11 approximately how big were they?

12   A.   You know, I guess roughly 10 by 8.
13 Something like that.

14   Q.   And did all of the interview rooms have
15 a handcuff ring?

16   A.   I'm pretty sure that they all do.

17   Q.   Okay. And a handcuff ring being a ring
18 affixed to the wall which you can handcuff somebody
19 to the ring?

20   A.   Yes.

21   Q.   Alright. And apart from the handcuff
22 ring, did all of those rooms have, like, a hard
23 bench where somebody could sit down or lie down?

24   A.   Yes.

Page 72

1   Q.   Alright. And apart from the hard bench
2 and the handcuff ring, was there no other furniture
3 in those rooms?

4   A.   Well, generally there was a table, and,
5 you know, one or two chairs. The chairs were
6 removable; you know, so one room might have three
7 chairs and one room might have one chair, but --

8   Q.   Okay. And were the chairs brought in
9 when somebody was going to be interviewed?

10   A.   If needed.

11   Q.   Okay. Now, in terms of Jaime Rios being
12 -- you can say from your present memory that he was
13 in the interview room between 10 p.m. and 12 a.m.
14 when the interrogation started; correct?

15   A.   Yes.

16   Q.   Alright. And during that period was the
17 door to that interrogation room locked?

18   A.   I don't recall.

19   Q.   So you can't tell us one way or the
20 another?

21   A.   Not definitively, no.

22   Q.   Okay. Can you tell us one way or the
23 other whether Jaime Rios was handcuffed to the
24 handcuff ring?



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
73–76

Page 73

1    A.   Between 10 and midnight?

2    Q.   That's what I'm asking, yes.

3    A.   He was not.

4    Q.   Alright.  Now, at some point during the

5    time when Jaime Rios was in Area 5, did a female

6    who was connected with him come in and attempt to

7    see him?  Do you remember that?

8    A.   My recollection is that Jaime Rios

9    knocked on the door and motioned to a woman who was

10   seated in the back of the office.

11   Q.   Okay.  When did Jaime Rios knock on the

12   door?

13   A.   I don't remember exactly, but it was

14   during that 10 to 12 period.

15   Q.   Okay.  The woman seated in the office,

16   who was that woman?

17   A.   He referred to her as his girlfriend.

18   Q.   Do you remember if you ever spoke to his

19   girlfriend?

20   A.   I spoke to her briefly.

21   Q.   When did you speak to her, and what was

22   said between the two of you?

23   A.   Well, I spoke to her after Jaime Rios

24   knocked on the door and motioned to her, and I

Page 74

1    asked him what do you want, and he said, "Can I

2    talk to her?"

3         So I closed the door and I went over to

4    that woman, and I asked her if she knew him.

5    Q.   What did she say?

6    A.   She said she did know him, and then I

7    asked her something to the effect, well, he wants

8    to talk to you.  Do you want to talk to him?

9    Q.   Okay.  And what did she respond?

10   A.   She did.

11   Q.   Okay.  After she said that she wanted to

12   talk to him, what happened?

13   A.   We let her go in the room and talk to

14   him.

15   Q.   How long was she in the room talking

16   with him?

17   A.   I don't -- it was brief.  I don't know.

18   A few minutes, 10 minutes.  I don't know.

19   Q.   Okay.  After she left the room, what

20   happened next in respect to her?

21   A.   I don't recall.

22   Q.   Okay.  After you called felony review,

23   which would be after the half an hour

24   interrogation, what happened then?

Page 75

1    A.   Well, subsequently the assistant state's

2    attorney, Barb Riley, came to Area 5, and, you

3    know, we had a conversation.

4    Q.   Okay.  What did you say to her and what

5    did she say to you?

6    A.   I don't remember specifically what the

7    words that were spoken, but it was about this case

8    and the development, you know, to that point with

9    what we could present.

10   Q.   Okay.  Again, can you be anymore

11   specific?  Could you remember anymore details of

12   that conversation?

13   A.   Well, the conversation -- the

14   conversation that I had with Jaime Rios I told her

15   what he had told me, and I gave her what reports

16   that we had available.

17   Q.   Okay.  And how long did your

18   conversation with State's Attorney Riley last?

19   A.   I don't know.  I don't remember.  I

20   don't know.

21   Q.   That's fine.  And do you remember being

22   present when the court reporter statement was

23   taken?

24   A.   Yes.

Page 76

1    Q.   Okay.  And do you remember from your

2    present memory, and if you don't, that's fine, when

3    the court reported statement started?

4    A.   It started around 4:30 in the morning.

5    Q.   Okay.  How soon after your conversation

6    -- how soon after you calling felony review did

7    State's Attorney Riley arrive at Area 5?

8    A.   I have no recollection of how long that

9    it took, but I think that she got there around 2 in

10   the morning or something.

11   Q.   Okay.  By the way, as a general matter,

12   once you called felony review, or once you did call

13   felony review back in those days, how long would it

14   take them to arrive?

15   A.   It was different.  You know, each case

16   was different.  If it was a busy night, it might

17   take awhile.  I don't know how many assistants were

18   assigned to that, you know.

19   Q.   Alright.  So you're saying that it's

20   4:30 in the morning when the court reporter starts

21   to take a statement from Jaime Rios.  You were

22   present during that statement; correct?

23   A.   Yes.

24   Q.   Okay.  After the statement, did you have



MICHAEL MASON                                          June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                         77–80

Page 77

1   any -- did you have any further involvement with
2   the case, or did you do anything else with respect
3   to the case?
4       A.   The next day I conducted a lineup.
5       Q.   And who was in the lineup?  I mean not
6   every person.  Was Jaime Rios in that lineup that
7   next day?
8       A.   He was.
9       Q.   Who viewed the lineup?
10      A.   I would have to -- let's see.  I would
11  have to refer to my reports to be certain of the
12  names of the people.
13      Q.   Okay.  Well, we will do that later
14  maybe, review the reports, but do you have a
15  present memory of how the people who viewed the
16  lineup got to the lineup?
17      A.   Could you just say that again?
18      Q.   Okay.  First of all, did more than one
19  person view the lineup of Jaime Rios?
20      A.   Two people.  My recollection is two
21  people reviewed the lineup.
22      Q.   Okay.  The two people who viewed the
23  lineup, do you have any memory of how they got to
24  Area 5, whether they came on their own, were

Page 78

1   brought there or whatever?
2       A.   I have no idea.  No.
3       Q.   By the way, have you read the Complaint
4   in this case?
5       A.   The Complaint?
6       Q.   Yeah, the Second Amended Complaint that
7   was filed in this litigation, you know, in which
8   you are a defendant, have you ever read that
9   document?
10      A.   Yes, I have.
11      Q.   Okay.  Do you have any knowledge of any
12  of Reynaldo Guevara's contacts with Luis Huertas?
13      A.   I have no -- I have no knowledge if he
14  had contact with Luis Huertas.
15      Q.   You have absolutely no knowledge whether
16  Reynaldo Guevara had any interaction with Luis
17  Huertas prior to the lineup; is that correct?
18      A.   That's correct.
19      Q.   By the way, going backward a little bit,
20  do you have any recollection as to whether Guevara
21  ever told you anything that he knew about the
22  informants, the ones that would come in on July 6th
23  to talk to you?
24      A.   I don't know if I understand.  What now?

Page 79

1       Q.   Well, the informants who came in on July
2   6th, you never met these people before; is that
3   fair?
4       A.   That's correct.
5       Q.   Okay.  They had never given you
6   information in the past; is that correct?
7       A.   That's correct.
8       Q.   Do you have any memory as to whether
9   Guevara told you anything about his contacts with
10  the informants and/or whether he believed them to
11  be reliable?
12      A.   He knew who the informants were.
13      Q.   Okay.  That answers one part of the
14  question.  Did Guevara ever tell you anything about
15  as to whether he had received reliable information
16  from these informants in the past?
17      A.   Yeah, I believe that he said that he had
18  spoken with them in the past, and that they had
19  given accurate information.
20      Q.   Okay.  And did he ever specify for you
21  when they had given this accurate information in
22  the past and what that accurate information was?
23      A.   There was a little noise there.  So I
24  didn't catch the whole question.

Page 80

1       Q.   I'm going to repeat it.
2          Did Reynaldo Guevara tell you -- ever
3   tell you -- I'm sorry.  Withdrawn.
4          Did Reynaldo Guevara ever detail for you
5   his conversations with those informants?  I will
6   withdraw it again.
7          Did Reynaldo Guevara ever tell you when
8   these informants had previously supplied
9   information, what that information was, and why he
10  thought that it was reliable?
11      MS. McGRATH:  Objection to form.
12      MR. POLICK:  You can answer.
13  BY THE WITNESS:
14      A.   He gave me no specifics about the
15  information that had been provided.  And just to be
16  clear, this conversation was with both Gawrys and
17  Guevara.  I don't recall exactly who was speaking
18  at what time, but no, I didn't get any details
19  about what they had said, you know, prior to that.
20  BY MR. RICHARDS:
21      Q.   Okay.  Yeah, well, thanks for the
22  clarification on that.
23          Now, let's skip forward again.  You have
24  had the lineups that next day after -- the next day



MICHAEL MASON                                              June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                            81–84

Page 81

1  would have been, by the way, July 7th; correct?
2      A.   Yes.
3      Q.   Okay.  In the lineups on July 7th, was
4  Jaime Rios identified in either of the lineups?
5      A.   Yes, he was.
6      Q.   Okay.  In one or in both?
7      A.   In one.
8      Q.   Okay.  And after he was identified, did
9  you have any further -- did you do anything further
10 with respect to the investigation?
11     A.   Again, I made a phone call to felony
12 review and asked for their assistance and whether
13 or not we could charge, you know, at this point.
14     Q.   And did you receive a response?
15     A.   Yes.
16     Q.   And what was the response?
17     A.   The state's attorney by the name of Owen
18 responded, and he approved the charges.
19     Q.   Now, after Jaime Rios had been charged,
20 did the investigation continue?
21     A.   It did.
22     Q.   Okay.  And would it be correct to say
23 that one reason that he continued is that there was
24 another suspect still at large, that being Tino, or

Page 82

1  Cristino Garcia?
2      A.   That's correct.
3      Q.   Did you have any further -- what further
4  steps did you take, if any, in terms of the
5  investigation of the case after July 7th?
6      A.   Later in July, I can't recall the date,
7  but Cristino Garcia was picked up, and he was
8  brought into Area 5.
9      Q.   Do you know who brought him into Area 5?
10     A.   I don't recall the names of the
11 officers.
12     Q.   Okay.  Do you recall what time that he
13 was brought into Area 5, Cristino Garcia that is?
14     A.   I don't.
15     Q.   Okay.  Do you recall speaking with
16 Cristino Garcia?
17     A.   Yes.  At some point I did interview him.
18     Q.   Okay.  And what was -- what did he say
19 during the interview, and what did you say?
20     A.   Well, like before I advised him of his
21 Miranda warnings and told him why he was there and
22 asked him if he would speak with me.
23     Q.   Okay.  And what did he say, if anything?
24     A.   He said that he didn't want to talk to

Page 83

1  me.
2      Q.   Is that everything that you can remember
3  about that conversation?
4      A.   It is.
5      Q.   Do you know if anyone had spoken with
6  Garcia before -- after he was brought into the
7  Area 5, but before you spoke with him?
8      A.   I don't.  I have no idea.  I wasn't
9  there.
10     Q.   Well, on the date when he was brought
11 in -- when he was brought in, were you present at
12 Area 5 or had your shift started yet?
13     A.   I don't believe that I was there.  I
14 don't remember exactly when that was, but I don't
15 think that I talked to him until the next day after
16 he was brought in.
17     Q.   Okay.  The day that he was brought in,
18 do you know if you were on duty or not?
19     A.   I don't know if I was on duty or not,
20 but I don't recall hearing about him coming in if I
21 was, you know.
22     Q.   Okay.  Well, put it this way.  A major
23 part of the investigation had been left open, the
24 Cristino Garcia part of the investigation.  That

Page 84

1  was still open after Jaime Rios was charged;
2  correct?
3      A.   Yes.
4      Q.   And in Jaime Rios's statement he was
5  saying that Cristino Garcia was the actual killer;
6  correct?
7      A.   Yes.
8      Q.   Alright.  And certainly after speaking
9  with -- well, after speaking with Jaime Rios, did
10 you believe that it was possible that he was
11 telling the truth, and that Cristino Garcia was the
12 actual shooter?
13     MR. POLICK:  Objection to the form.  Calls for
14 speculation.  You can answer.
15 BY THE WITNESS:
16     A.   What was the question?  Did I believe
17 that he could be telling the truth?
18 BY MR. RICHARDS:
19     Q.   Yeah, that Jaime Rios could be telling
20 the truth that Cristino Garcia was the actual
21 shooter?
22     A.   I don't -- I don't know how to answer
23 that.  I just go by what I'm presented with, where
24 the clues take me.  I don't -- you know, I don't



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
85–88

Page 85

1 speculate as to whether somebody is being accurate.
2 I just take what they give me, and, you know, see
3 how it fits in.
4    Q.   Okay.  But, I mean, you do in general
5 make judgements when you interview people about
6 whether they are telling you the truth, don't you?
7    A.   If I can verify it, you know, what they
8 said against what other people have said or what
9 the evidence shows I do.
10    Q.   Okay.  In the case of Jaime Rios's
11 statement that Cristino Garcia was the actual
12 shooter, was that statement consistent with the
13 evidence that you had at that point?
14    A.   Well, Jaime Rios was identified in a
15 lineup as the shooter.  So it's not, you know,
16 necessarily consistent.
17    Q.   Okay.  It was inconsistent, because
18 somebody had identified Jaime Rios as the shooter
19 even though in the statement the statement says
20 that Cristino Garcia is the shooter; correct?
21    A.   Correct.
22    Q.   Let me -- we will wait on that.
23       After you spoke with Cristino Garcia,
24 did you have a conversation with the state's

Page 86

1 attorney?
2    A.   I did.
3    Q.   And what was the substance of that
4 conversation?
5    A.   Well, the new development in the case.
6    Q.   Sure.  And what did you say and what did
7 the state's attorney say?
8    A.   I don't recall the conversation
9 specifically, but I presented him with the new
10 development, and, you know, he made his decision
11 that there was not enough evidence to charge
12 Cristino Garcia.
13    Q.   Did you recommend to him that Cristino
14 Garcia not be charged?
15    A.   I didn't recommend one way or the other.
16 No.
17    Q.   Okay.  After the decision was made not
18 to charge Cristino Garcia and apart from your
19 testimony at motions or trial, did you have any
20 other further involvement with this investigation?
21    A.   So after the arrest of Cristino Garcia?
22 Is that what you're saying?
23    Q.   That's what I am referring to.
24    A.   I don't believe that I had any further

Page 87

1 involvement, no.
2    Q.   A couple of other questions about the
3 arrest of Cristino Garcia.  The state's attorney,
4 Barbara Riley, first of all, when you saw her
5 during the -- you know, when she called on felony
6 review and came to speak with Jaime Rios, had you
7 ever met Barb Riley before then?
8    A.   I don't believe so.
9    Q.   After that one encounter did you ever
10 see her again?
11    A.   I don't recall.
12    Q.   Well, did you see her on the date when
13 you came to interview -- when you came to interview
14 Cristino Garcia?
15    A.   No.
16    Q.   Did you see any felony review assistant
17 at Area 5 when you came to interview Cristino
18 Garcia?
19    A.   I'm not certain if I saw them at Area 5,
20 or -- you know, I don't recall.  I don't recall
21 speaking with them in person at all.
22       (WHEREUPON, a certain document was
23       marked Mason Deposition Exhibit
24       No. 4, for identification, as of

Page 88

1       6-23-23.)
2 BY MR. RICHARDS:
3    Q.   Okay.  I would like you now to look at
4 Mason Deposition Exhibit No. 4.  And so, Joe, if
5 you could supply him with that.
6    MR. POLICK:  Sure I will.  Give me a moment.
7 It's kind of long.  It will take a minute.
8    MR. RICHARDS:  Take your time.  If no one
9 minds, I will turn off my camera while he's doing
10 the review.
11    MR. POLICK:  Fine by us.
12    MR. RICHARDS:  Well, at this point I think
13 that I need a bathroom break, and if Mr. Mason
14 wants to, he can use the time, that's fine, too,
15 but at this point I would suggest another
16 ten-minute break unless anybody has an objection to
17 that.
18    MR. POLICK:  Yes.  That's fine.
19       (WHEREUPON, a recess was had.)
20    MR. RICHARDS:  Back on the record.
21 BY MR. RICHARDS:
22    Q.   So, Detective Mason, have you had a
23 chance to review that document?
24    A.   Yes, I did.



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
89—92

Page 89

1    Q.   Okay.  And is that a transcript of your
2  testimony at the motion to suppress statements held
3  in the Jaime Rios case?
4    A.   It's a transcript of my testimony.  I
5  don't recall which -- you know, if it was a motion
6  to suppress or if it was a trial.  I don't know
7  that I see that in here, but it's a transcript of
8  my statement.
9    Q.   Right.  And do you have any reason to
10  believe that it's not an accurate transcription of
11  your testimony; in other words, we are not talking
12  about some other Detective Mason or some confusion?
13  That's your testimony there?
14    A.   Yeah, it looks like mine.
15    Q.   Okay.  And do you have any present
16  memory now of testifying on a motion to suppress in
17  the Jaime Rios case?
18    A.   Yes, after reading the transcript.
19    Q.   Okay.  And I would like to show you --
20  actually, I think that we will skip Exhibit No. 5.
21    MR. POLICK:  I don't think that we have a
22  No. 5.  I have a No. 6.
23          (WHEREUPON, a certain document was
24            marked Mason Deposition Exhibit

Page 90

1            No. 6, for identification, as of
2            6-23-23.)
3  BY MR. RICHARDS:
4    Q.   In that case, we will go to
5  No. 6.  I just would like you to look at Exhibit
6  No. 6 and this is only a photograph.  So I think
7  that you can see it quickly.  Does he have a copy
8  of that?
9    MR. POLICK:  Not yet, but I can certainly
10  provide him if that's okay with you.
11    MR. RICHARDS:  It is.
12    MR. POLICK:  Okay.  He has a copy.
13  BY MR. RICHARDS:
14    Q.   So looking at that photograph, do you
15  recognize the person in the photograph?
16    A.   I do not.
17          (WHEREUPON, a certain document was
18            marked Mason Deposition Exhibit
19            No. 7, for identification, as of
20            6-23-23.)
21  BY MR. RICHARDS:
22    Q.   Okay.  Next, I would like you to take a
23  look at Mason Deposition Exhibit No. 7.  And if you
24  could review that and tell me if you recognize that

Page 91

1  document.
2    MR. POLICK:  Okay.  I have handed him No. 7.
3  He is reviewing it.
4  BY MR. RICHARDS:
5    Q.   Just let me know, Detective Mason, when
6  you have finished reviewing it.
7    A.   Okay.
8    Q.   Are you done?
9    A.   I'm done.
10    Q.   Okay.  Is that a document -- is that
11  document a supplementary report written by you and
12  signed by you and dated --  I'm sorry.  Is that a
13  -- strike that.
14          Is that a police report on the Luis
15  Morales investigation which is authored and signed
16  by Detective John A. Enault and Detective Richard
17  Curley?  And Enault is spelled E-n-a-u-l-t and
18  Curley is spelled C-u-r-l-e-y.
19    A.   Yes, it is.
20    Q.   Is that what that document is?
21    A.   Yes, it is.
22    Q.   A couple of questions.  Were Detectives
23  Enault and Curley among the detectives assigned to
24  the investigation of the murder of Luis Morales?

Page 92

1    A.   They were assigned on this day, the day
2  that the report refers to.
3    Q.   Okay.  And that would be -- and that
4  would be the date of June 27, 1989?
5    A.   No, this is July 9th, 1989.
6    Q.   Okay.  Oh, alright.  I'm sorry.
7          And does this report deal with the
8  arrest of somebody named Benjamin Carrero?
9    A.   Yes, it does.
10    Q.   I had asked you before about your
11  memories of investigative steps.  Do you have any
12  present memory of speaking with Benjamin Carrero?
13    A.   Yes, I do.
14    Q.   Okay.  When did you speak with Benjamin
15  Carrero?
16    A.   It was on the 9th of July.
17    Q.   Okay.  And how did you come to speak to
18  Benjamin Carrero?
19    A.   It was in executing a search warrant,
20  and he was one of the people in the apartment where
21  a weapon was recovered.
22    Q.   Do you remember what he said to you and
23  what you said to him?  Not based on review of your
24  report, but based on your present memory.

MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
93–96

Page 93

1    A.   Well, present memory basically he -- I
2   recall that he said that he knows Jaime Rios, and
3   Jaime Rios lives by where Carraro lives and gave
4   him a gun, and asked him to hold onto the gun and
5   told him that it was used in a murder and that he
6   would be back.
7    Q.   Okay.  Now, do you know who else was
8   present for this conversation?
9    A.   I believe Detective Curley.
10    Q.   Alright.  Was gang specialist Guevara
11   present?
12    A.   No.
13    Q.   Do you know where gang specialist
14   Guevara was when you had this conversation with
15   Carrero?
16    A.   I do not.
17    Q.   And a gun was recovered at the time of
18   the Carrero arrest; correct?
19    A.   Yes.
20    Q.   And the reason for going and doing the
21   search warrant was because the informants who had
22   originally fingered Jaime Rios and Cristino Garcia
23   said that a gun used in the murder would be found
24   where Carrero lived; correct?

Page 94

1    MR. POLICK:  Object to the form, but you can
2   answer.
3   BY THE WITNESS:
4    A.   My recollection -- I don't recall who
5   the informant was.
6   BY MR. RICHARDS:
7    Q.   Okay.  Was this an informant who was
8   different from the two informants who came in to
9   speak with you on July 6th?
10    A.   I don't recall.
11    Q.   Did the two informants who came in on
12   July 6th mention anything about where the guns
13   could be found?
14    A.   Are you speaking of the informants that
15   Guevara and Gawrys brought in?
16    Q.   Yes.
17    A.   Not at that time.
18    Q.   So this was some later informant who
19   gave the information about the gun, that the gun
20   could be found at Carrero's house; correct?
21    MR. POLICK:  Objection to the form of the
22   question, but you may answer.
23   BY THE WITNESS:
24    A.   I don't --  the information was given on

Page 95

1   July 9th.
2   BY MR. RICHARDS:
3    Q.   Okay.  The information was given on July
4   9th.  And how did it come about?  Was it a phone
5   call?  Was it an in-person meeting?
6    A.   I don't recall.
7    Q.   Do you recall who, if anyone, received
8   the information on July 9th?
9    A.   I spoke with the person who gave the
10   information.
11    Q.   But you can't recall whether you spoke
12   with them on the phone or in person?
13    A.   At this time I don't recall.
14    Q.   Is there any document that exists
15   anywhere that would refresh your recollection or
16   give you information about how you received this
17   information?
18    A.   Not that I'm aware of.
19    Q.   In fact, are you aware that the gun that
20   was recovered during that surge did not match any
21   of the ballistics from the murder?
22    MR. POLICK:  Objection to the form of the
23   question.  You may answer over the objection.
24

Page 96

1   BY THE WITNESS:
2    A.   I learned that -- I learned that the gun
3   that was recovered was not consistent with the
4   bullet evidence that was also recovered.
5   BY MR. RICHARDS:
6    Q.   Okay.  And the gun that -- the gun that
7   was recovered was -- because the ballistics
8   evidence that was recovered was from a 25 caliber;
9   correct?
10    A.   Yes.
11    Q.   And the gun that was recovered was a --
12   well, if you remember, the gun that was recovered
13   was a 32 caliber; correct?
14    A.   Yes.
15    Q.   And, in fact, the other gun mentioned in
16   Jaime Rios's statement was not a 32 caliber, was
17   it?
18    A.   He referred to it differently.
19    Q.   Yeah, he referred to it as either -- as
20   I believe a 35 caliber or a 38 caliber; correct?
21    A.   I believe that it was a 38 caliber.
22    Q.   Okay.  And, in fact, no 38 caliber was
23   ever recovered in connection with the
24   investigation; correct?



MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                   97—100

Page 97

1     A.   That's correct.

2     Q.   Now, just on the subject of the search

3  warrants and the informants, you also got

4  information at some point from an informant that a

5  gun used in the homicide could be recovered from a

6  man named -- and a residence of a man named Jose

7  Lopez; correct?

8     A.   Yes.

9     MR. POLICK:  Objection to the form of that

10  question.  The answer can stand.

11  BY MR. RICHARDS:

12     Q.   Was it the same informant who gave you

13  the information about the gun at Cararro's house or

14  a different informant that told you about the gun

15  at Lopez's house?

16     A.   At this time I don't recall.

17     Q.   Okay.  The informant who gave you the

18  information about the gun to be found at Lopez's

19  house, what date did he give you that information?

20     A.   On July 9th.

21     Q.   The same date as you got the information

22  about Carrero; correct?

23     A.   Yes.

24     Q.   Do you remember if the conversation

Page 98

1  about the gun to be found at Lopez's house occurred

2  in person or over the telephone?

3     A.   I don't recall.

4     Q.   Can you give us any details of any

5  information about the identity of either of the

6  persons who gave you the information about the gun

7  at Cararro's house and the gun at Lopez's house?

8     A.   Not at this time.

9     Q.   Will you be able to do it at any time?

10     MR. POLICK:  Objection.  Calls for

11  speculation.  You may answer.

12  BY THE WITNESS:

13     A.   I don't see how.

14  BY MR. RICHARDS:

15     Q.   Okay.

16     A.   I don't recall.

17     Q.   Fair enough.  And just to complete the

18  circle here a little bit, there was no gun found

19  after the search at Lopez's house, was there?

20     A.   That's correct.

21     Q.   Did any of these people who gave --

22  persons or people who gave you information on July

23  9th, did either of them tell you how they knew that

24  the guns would be located at Cararro's house and at

Page 99

1  Lopez's house?

2     A.   I believe that they did, but I don't

3  recall the specifics of how they knew it.  I would

4  have to refer to my report.

5     Q.   Okay.  I'm just asking you for your

6  present recollection at this point.

7        About Deposition Exhibit 7, that's not a

8  report that you authored, but you have reviewed

9  that report; correct?

10     A.   Yes.  Correct.

11     Q.   Is there anything in that report that is

12  untrue to your knowledge?

13     MR. POLICK:  Objection to the foundation, but

14  you may answer.

15  BY THE WITNESS:

16     A.   I have not seen anything that I consider

17  untrue.

18  BY MR. RICHARDS:

19     Q.   Okay.  So would it be your opinion that

20  that report is accurate?

21     A.   Yes.

22        (WHEREUPON, a certain document was

23         marked Mason Deposition Exhibit

24         No. 8, for identification, as of

Page 100

1         6-23-23.)

2  BY MR. RICHARDS:

3     Q.   Okay.  I would like you now to review

4  Deposition Exhibit No. 8 when you are supplied with

5  that.

6     MR. POLICK:  Alright.  I am going to hand him

7  No. 8.

8  BY THE WITNESS:

9     A.   Okay.

10  BY MR. RICHARDS:

11     Q.   Tell me when you have had a chance to

12  review that.

13     A.   I have.

14     Q.   Okay.  Is that a report authored by you?

15     A.   Well, I'm not certain if I completed the

16  report or if my partner, Detective Brennan,

17  completed the report, but it's our report, and I

18  agree with it.

19     Q.   Right.  And you also signed it; correct?

20     A.   I don't think that's my signature, but

21  Detective Brennan may have signed it with my

22  permission.

23     Q.   Okay.  And that was a common practice

24  between you and Detective Brennan that one of you



MICHAEL MASON

June 23, 2023

JAIME RIOS V. REYNALDO GUEVARA

101–104

Page 101

1  would author the report and the other would review
2  it to see if you agreed, and then the signatures
3  would be added both for you and for Detective
4  Brennan; correct?
5      A.   Yeah, that was common.
6      Q.   Okay.  Anything in that report that is
7  incorrect?
8      A.   I don't see anything incorrect.
9           (WHEREUPON, a certain document was
10               marked Mason Deposition Exhibit
11               No. 9, for identification, as of
12               6-23-23.)
13  BY MR. RICHARDS:
14      Q.   Okay.  I now would like you to review
15  Exhibit No. 9.  It's a little more lengthy.  It may
16  take a little bit more time.  Joe, if you could
17  give him Exhibit No. 9.
18      MR. POLICK:  Okay.  Give me a second.
19          Alright.  He has been giving Exhibit
20  No. 9 to review.
21  BY MR. RICHARDS:
22      Q.   Alright.  Detective Mason, that exhibit
23  is that a report which is dated June 28th of 1989?
24  I'm sorry.  Detective Mason, did you hear me?

Page 102

1      A.   I didn't hear the whole question
2  apparently.
3      Q.   Okay.  Let me start again.
4          Detective Mason, is that Deposition
5  Exhibit No. 9 a report dated June 29th of 2089?
6      A.   June 28, 1989.
7      Q.   Okay.  And is that a report, in fact,
8  authored by you or was it authored by Detective
9  Brennan or both, or do you know?
10      A.   By both of us.
11      Q.   Okay.  And you signed off on it?
12      A.   Yes.
13      Q.   And is that, in fact, your signature?
14      A.   Oh, no.  That's not my signature, again,
15  but --
16      Q.   Detective Brennan would have signed your
17  name with your permission?
18      A.   Yes.
19      Q.   Is there anything in that report that is
20  inaccurate?
21      A.   I don't believe so.
22      Q.   Is there any significant detail which
23  you remember now as to the events described in that
24  report which you can add?

Page 103

1      A.   Which I can add did you say?
2      Q.   Add, yes.
3      A.   I'm not sure.  Are you asking me if
4  there is any additional information that's not
5  contained in the report that I can add?
6      Q.   Yes.
7      A.   No.
8      Q.   Okay.  To your knowledge was that a
9  report which would have been given to the state's
10  attorney at trial before you testified?
11      A.   Yes.
12           (WHEREUPON, a certain document was
13               marked Mason Deposition Exhibit
14               No. 10, for identification, as of
15               6-23-23.)
16  BY MR. RICHARDS:
17      Q.   Now, I would like to show you, and the
18  witness can be given, Mason Deposition Exhibit
19  No. 10.
20      MR. POLICK:  Okay.  He has been given the
21  exhibit and is looking that over.
22  BY THE WITNESS:
23      A.   Okay.
24  BY MR. RICHARDS:

Page 104

1      Q.   So, Detective Mason, is Deposition
2  Exhibit No. 10 a report that is dated July 7th of
3  1989?
4      A.   Yes.
5      Q.   And are the names of the detectives
6  reporting yourself and Detective Halvorsen?
7      A.   Yes, it is.
8      Q.   And is that your signature on the
9  report, or did somebody else sign it for you?
10      A.   No.  That's my signature.
11      Q.   Okay.  Do you know if you authored this
12  report?
13      A.   I believe that I did.
14      Q.   Okay.  And after reviewing the report,
15  is there anything in the report that is inaccurate?
16      MR. POLICK:  Just to make a record here, the
17  version that we have been given here has some
18  highlighted portions and stray marks on it.
19          Are you referring to the typed portion
20  of the report?
21      MR. RICHARDS:  Okay.
22  BY MR. RICHARDS:
23      Q.   Let me just make a record.  This is a
24  report received -- a copy of the report was



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
105—108

Page 105

1  received from the public defender's office.  So I'm
2  assuming that the stray marks were made by them and
3  the highlighting.
4        First of all, Detective Mason, just to
5  clarify, the highlighting on the report and the
6  stray marks, those were not written by you;
7  correct?
8    A.   Correct.
9    Q.   Okay.  Aside from the highlighting and
10  stray marks not being a part of the original
11  report, this is an accurate copy of the report that
12  you authored; correct?
13    A.   It does appear to be.
14    Q.   Alright.  Is there anything in this
15  report that is inaccurate?
16    A.   I don't believe so.
17    Q.   Okay.  Is there anything in this report
18  that you remember that is omitted from the report?
19    A.   No.
20        (WHEREUPON, a certain document was
21        marked Mason Deposition Exhibit
22        No. 11, for identification, as of
23        6-23-23.)
24  BY MR. RICHARDS:

Page 106

1    Q.   Okay.  I would like you to look at Mason
2  Deposition Exhibit No. 11.
3    MR. POLICK:  Alright.  Give me a second here,
4  and I will give him a copy of it.
5  BY THE WITNESS:
6    A.   Okay.
7  BY MR. RICHARDS:
8    Q.   Alright.  Now, is that -- is that a
9  report dated July 7th of 1989?
10    A.   Yes, it is.
11    Q.   And do you know if you or detective --
12  and is that report signed off on by you and
13  Detective Halvorsen?
14    A.   Yes, it is.
15    Q.   And it bears signatures.  Is that, in
16  fact, your signature on the report?
17    A.   It is.
18    Q.   And does it appear also to be signed by
19  Detective Halvorsen?
20    A.   There is a signature.  It could be that
21  he gave me permission to sign his name.
22    Q.   Okay.  And just for the record, there
23  are some stray marks and notations on the report.
24  Apart from those stray marks and notations and

Page 107

1  handwriting, is this an accurate copy of the report
2  that you authored?
3    A.   It does appear to be.
4    Q.   Alright.  And is there anything that
5  would need to be added to that report?  Anymore
6  detail than you can think of or that you remember?
7    A.   No.
8    Q.   Is the report inaccurate in any respect?
9    A.   No.
10    Q.   And like the other reports, is this a
11  report that would have been given by you to the
12  state's attorney before you testified?
13    A.   Given by me to the state's attorney?
14    Q.   Okay.  Is this something that the
15  state's attorney would have had available to him
16  and to you before you testified at trial?
17    A.   Yes.
18        (WHEREUPON, a certain document was
19        marked Mason Deposition Exhibit
20        No. 12, for identification, as of
21        6-23-23.)
22  BY MR. RICHARDS:
23    Q.   Okay.  I next want you to look at Mason
24  Deposition Exhibit No. 12, and have a chance to

Page 108

1  review that.
2    MR. POLICK:  Okay.  Give me a second.
3        Okay.  He has got No. 12.
4  BY MR. RICHARDS:
5    Q.   Just let me know when you are finished
6  reviewing it.
7    A.   Alright.
8    Q.   Is this document, Mason Deposition
9  Exhibit No. 12, a copy of two complaints for search
10  warrants and search warrants where you are the
11  complainant on both search warrants?
12    A.   Yes.
13    Q.   Okay.  And this copy is not signed by
14  you, but is this -- do you believe this is an
15  accurate copy of the complaint for search warrant
16  -- the complaints for the search warrants for the
17  homes of Benjamin Carrero and Jose Lopez?
18    A.   Yes.
19    Q.   And is there anything inaccurate about
20  any of the information which you put in these
21  complaints for search warrants?
22    A.   I don't believe so.
23    Q.   Is there anything important that's left
24  out of either of the complaints that you want to



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
109—112

Page 109

1   tell us about at this time?
2     A.   No.
3     Q.   And to your knowledge would this
4   document be one of the documents which would have
5   been available to the state's attorney at the
6   motion to suppress and at trial before you
7   testified?
8     A.   Yeah, I suppose.
9         (WHEREUPON, a certain document was
10         marked Mason Deposition Exhibit
11         No. 13, for identification, as of
12         6-23-23.)
13   BY MR. RICHARDS:
14     Q.   I would like you to review Deposition
15   Exhibit No. 13.
16     MR. POLICK:  Give me a second here.
17   BY THE WITNESS:
18     A.   Okay.
19   BY MR. RICHARDS:
20     Q.   Having reviewed that document, is that
21   an arrest report which you authored on -- which you
22   authored on July 9th of 1989?
23     A.   Yes.
24     Q.   Okay.  And is that an arrest report for

Page 110

1   Benjamin Carrero?
2     A.   Yes, it is.
3     Q.   And did you, in fact, sign this report?
4     A.   I did.
5     Q.   And that is your signature on the
6   report?
7     A.   It is.
8     Q.   Okay.  And by the way, since this is an
9   arrest report, this is sworn to under oath;
10   correct?
11     A.   Yes.
12     Q.   And you swore to it under oath?
13     A.   Yes.
14         (WHEREUPON, a certain document was
15         marked Mason Deposition Exhibit
16         No. 14, for identification, as of
17         6-23-23.)
18   BY MR. RICHARDS:
19     Q.   I next would like you to look at Mason
20   Deposition Exhibit No. 14, if that can be provided.
21     MR. POLICK:  Yes.  Give me a second here,
22   because it looks like there is more than one page
23   here.
24     MR. RICHARDS:  There are three.

Page 111

1     MR. POLICK:  Okay.  Alright.  He is reviewing.
2   BY MR. RICHARDS:
3     Q.   Okay.  Detective Mason, is the document
4   that I have showed you, Defendant's Deposition
5   Exhibit 14, are those copies of general progress
6   reports authored by you in connection with the
7   investigation of the murder of Luis Morales?
8     A.   Yes.
9     Q.   And are those general progress reports
10   signed by you?
11     A.   Yes, they are.
12     Q.   And is there anything in those reports
13   which is inaccurate?
14     A.   I don't believe so.
15     Q.   And general progress reports are reports
16   that you write in handwriting or possibly type up,
17   but usually contemporaneous with whatever you are
18   doing; correct?
19     A.   Yes.
20     Q.   And then you used those handwritten
21   notes or sometimes typed notes to write your case
22   reports and supplemental reports; correct?
23     A.   Yes, they're just notes, you know, to
24   refresh your memory as you're doing the report

Page 112

1         (WHEREUPON, a certain document was
2         marked Mason Deposition Exhibit
3         No. 15, for identification, as of
4         6-23-23.)
5   BY MR. RICHARDS:
6     Q.   Okay.  And now I would like you to
7   review Deposition Exhibit 15.
8     MR. POLICK:  Before we move off 14, there are
9   some highlighted portions there.  I assume that you
10   are not including those highlighted portions with
11   regard to your questioning of Mr. Mason?
12     MR. RICHARDS:  I am going to clarify that
13   right now.
14   BY MR. RICHARDS:
15     Q.   In terms of the highlighted portions on
16   the handwriting, those highlights were not added by
17   you; correct?
18     A.   They were not.
19     Q.   And the reports as you originally
20   authored them are the same except for the
21   highlighting; correct?
22     A.   Yep.
23     Q.   Okay.  We can go on to Exhibit 15.
24     MR. POLICK:  Alright.  Give me a moment.



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
113–116

Page 113

1  BY MR. RICHARDS:
2      Q.   Alright.  So, Detective, can you
3  identify -- we are at Exhibit 15; correct?
4      MR. POLICK:  Right.
5  BY MR. RICHARDS:
6      Q.   Okay.  So Exhibit 15 is that -- are
7  those copies of other general progress reports
8  which you authored in connection with the Luis
9  Morales murder investigation?
10     A.   Yes, they are.
11     Q.   And aside from any yellow highlighting,
12 are the documents an accurate reflection of what
13 you wrote?
14     A.   Yes.
15     Q.   Okay.  And, obviously, they are just
16 notes, they are not a full report, but is there
17 anything that is omitted there that you think
18 should have been in there and it is not?
19     A.   No.
20         (WHEREUPON, a certain document was
21          marked Mason Deposition Exhibit
22          No. 16, for identification, as of
23          6-23-23.)
24     MR. RICHARDS:  And next I would like to have

Page 114

1  him look at Deposition Exhibit No. 16.
2      MR. POLICK:  Okay.  Give me a second.
3  BY THE WITNESS:
4      A.   Okay.
5  BY MR. RICHARDS:
6      Q.   So is that a general progress report
7  that you wrote about your interview with Jaime Rios
8  on July 7th, 1989?
9      A.   Yep.
10     Q.   And is that document signed by you?
11     A.   Yes, it is.
12     Q.   Okay.  And, again, these are just notes,
13 but is there anything omitted there that you think
14 should have been included and was not included?
15     A.   It appears to be incomplete, like there
16 is another page.
17     Q.   Yeah, I was going to ask you
18 about that.  Have you ever seen in your review of
19 any discovery in this case a second page of this
20 document?
21     A.   Not that I recall.
22     Q.   Okay.  If you ever receive additional
23 information, if you want to convey that to your
24 attorney, and we can see if we can ever find a

Page 115

1  second page.
2      MR. POLICK:  If we discover that, that's
3  certainly something that will be turned over in
4  discovery.
5      MR. RICHARDS:  Okay.  Very good.  Thank you.
6         (WHEREUPON, a certain document was
7          marked Mason Deposition Exhibit
8          No. 17, for identification, as of
9          6-23-23.)
10 BY MR. RICHARDS:
11     Q.   Next, I want to look at Defendant's
12 Exhibit No. 17.  Could you give him a copy and can
13 you look over that document?
14     MR. POLICK:  Yes.  Give me one second.
15         Okay.  He has been given a copy and he
16 is reviewing.
17 BY THE WITNESS:
18     A.   Okay.
19 BY MR. RICHARDS:
20     Q.   After having reviewed the report, is
21 that a report that was authored by you concerning
22 the arrest of Cristino Garcia on July 28th of 1989
23 and his subsequent period being held for
24 investigation through July 29th of 1989?

Page 116

1      A.   Yes.
2      Q.   And that report was authored by you;
3  correct?
4      A.   Yes.
5      Q.   And it was signed by you; correct?
6      A.   Correct.
7      Q.   Now, according to the report Mr. Garcia
8  was arrested on July 28th of 1989 at 1515 hours; in
9  other words, 3:15 in the afternoon; correct?
10     A.   That's right.
11     Q.   And according to the report, you didn't
12 interview him until 11 a.m. the next morning, July
13 29th; correct?
14     A.   Correct.
15     Q.   Okay.  Do you know anything that
16 transpired with respect to Cristino Garcia at the
17 police station or at Area 5 between 3:15 on July
18 28, 1989, and 11 a.m. on July 29, 1989?
19     A.   I don't know personally, because I was
20 not there when he got brought in.
21     Q.   I understand.  I understand that you
22 don't have personal knowledge.  Do you have
23 knowledge from any other source?  Did anyone else
24 tell you what happened with him between when he was



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
117–120

Page 117

1 brought in and when you talked to him?

2      MR. POLICK: I'm going to interpose an
3 objection to that question since any other person
4 would include his attorneys, so if you mean other
5 than his attorneys, if you want to rephrase that, I
6 will let him answer.

7      MR. RICHARDS: I absolutely will rephrase
8 that.

9      MR. POLICK: Go ahead.

10 BY MR. RICHARDS:

11      Q.    Other than your attorneys, at any time
12 did any other person tell you what happened to
13 Mr. Garcia between 3:15 July 28, 1989, and 11 a.m.
14 July 29th, 1989?  Between the 28th and 29th did
15 anyone tell you what happened with Mr. Garcia at
16 Area 5 between those two dates?

17      A.    I don't recall who might have told me,
18 but I was instructed that he was being held in the
19 25th District lockup.

20      Q.    Okay.  And that was the only information
21 that you had that he is being held in the 25th
22 District lockup; correct?

23      A.    Yes.

24      Q.    By the way, were you working or on duty

Page 118

1 on July 28th?

2      A.    I don't know.  I don't recall.

3      Q.    Is there any reason why on July 29th
4 when you went to interview Mr. Garcia you didn't
5 have a partner with you?  You didn't have Brennan
6 or Halvorsen or anyone else.  Do you know why that
7 was?

8      A.    I don't know why.  I assume that neither
9 of them were there, but I don't know.

10      Q.    Okay.  Have you had a chance to read the
11 allegations in the Second Amended Complaint
12 concerning gang specialist Guevara's interactions
13 with Cristino Garcia on July 28th of 1989?

14      A.    I guess I zoned out there.  Could you
15 repeat that?

16      Q.    Sure.  It's been a long day, and
17 whenever anyone wants to take a break, you let me
18 know.  Let me see if I can zone in.

19      Are you aware of the allegations in the
20 Second Amended Complaint in this lawsuit regarding
21 detective -- I'm sorry, gang specialist Guevara's
22 actions with respect to Cristino Garcia on the date
23 of July 28th, 1989, and possibly July 29th of 1989?
24 Were you aware of those allegations?

Page 119

1      A.    I am aware that there were allegations,
2 and I read it.  At this moment I don't recall what
3 the allegations are.

4      Q.    Okay.  Well, the allegations that
5 Guevara used physical force against Cristino Garcia
6 and, in essence, attempted to make a false
7 confession, does that remind you of what those
8 allegations were?

9      A.    That sounds accurate.

10      Q.    Okay.  Do you have any information one
11 way or another as to the truth of any of those
12 allegations?

13      A.    I have no idea.

14      Q.    Alright.  I would like you to turn now
15 to Mason Deposition Exhibit -- before we leave that
16 topic, are you aware -- or a similar topic.  Are
17 you aware of the allegations in the Second Amended
18 Complaint as to Detective Guevara's interactions
19 with Luis Huertas reminding you of the allegations
20 that he showed Huertas a single photograph of Jaime
21 Rios and told him to identify Jaime Rios?  Are you
22 aware of those allegations in the Second Amended
23 Complaint?

24      A.    Yeah.

Page 120

1      Q.    And do you have any information one way
2 or another as to whether those allegations are true
3 or not?

4      A.    I do not

5           (WHEREUPON, a certain document was
6           marked Mason Deposition Exhibit
7           No. 18, for identification, as of
8           6-23-23.)

9      MR. RICHARDS: Alright.  If you can now go to
10 Mason Deposition Exhibit 18, and if you could show
11 that to him.

12      MR. POLICK: Can we take a short break before
13 we get to No. 18?

14      MR. RICHARDS: I think it might be -- since
15 we're getting into the early afternoon, maybe it's
16 better to take like a 15 or 20-minute break at this
17 point to give everybody a stretch or whatever they
18 want to do.

19      MR. POLICK: Okay.  I don't want to hold you
20 to it, but do you have any idea how much further
21 that you need to go?  Is this a good point to grab
22 lunch?

23      MR. RICHARDS: I think it's a good point to
24 grab lunch, and then I can complete it -- I can



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
121–124

Page 121

1 complete my examination after lunch.
2    MR. POLICK:  Okay.  So why don't we say 20, 25
3 minutes?
4    MR. RICHARDS:  25 minutes is fine.  I will be
5 here.  Thank you.
6       (WHEREUPON, a recess was had.)
7 BY MR. RICHARDS:
8    Q.   Detective Mason, did you have a chance
9 to review Plaintiff's Exhibit 18 during the break?
10    MR. POLICK:  No.  We can give that to him now.
11 BY MR. RICHARDS:
12    Q.   Okay.  Why don't you look at that and
13 then review it.  It may take a little while to read
14 it all, but then I may have some questions.
15    MR. POLICK:  He is reviewing it now.
16 BY MR. RICHARDS:
17    Q.   Alright.  Detective Mason, I will ask
18 you some questions about this lawsuit.  Let me tell
19 you in advance that I read what you said to OPS
20 back then.
21       So I'm not going to have many questions
22 about the substance of this, but do you remember
23 being sued by somebody named Jon Burge, and is this
24 a copy as far as -- of his Complaint, his Amended

Page 122

1 Complaint?
2    MR. POLICK:  Objection to the form.  Compound.
3 But go ahead.  You can answer.
4 BY THE WITNESS:
5    A.   I don't recall being sued by Jon Burge.
6 I don't recall seeing this document before.
7 BY MR. RICHARDS:
8    Q.   Okay.  And do you recall being
9 questioned about this incident by OPS back in the
10 '80s?
11    A.   I do not.
12    Q.   Alright.  Have you had a chance -- have
13 you ever reviewed any of the documents -- the OPS
14 documents that were tendered to us in discovery?
15    A.   No.
16    Q.   This is a complaint against you and
17 Frank Costello; correct?
18    A.   Yes.
19    Q.   And back then at the time Frank Costello
20 was your partner; correct?
21    A.   Yes.
22    Q.   Okay.  You say that you have no memory
23 of the Complaint and no memory of the OPS
24 investigation; correct?

Page 123

1    A.   That's correct.
2    Q.   Alright.  Is there any possibility of
3 refreshing your recollection with either the
4 Complaint, your police report, or any other
5 documents?
6    A.   If you have any documents that I
7 prepared, that might help.
8    Q.   I think -- actually, I will drop this
9 topic and just attempt to get information in a
10 different way.
11       So next, then, seeing as you have no
12 memory of it, do you have any memory of any of the
13 complaints against you either by OPS, COPA, or any
14 of the other bodies?
15    A.   I do not.
16    Q.   Let me ask you a more general question.
17 You investigated a number of murder cases; correct?
18    A.   Yes.
19    Q.   Any idea about approximately how many?
20    A.   No.
21    Q.   Would it be under a hundred or over a
22 hundred?
23    A.   I don't know.  I was a detective for
24 19 years.

Page 124

1    Q.   Okay.  And for the 19 years that you
2 were a detective, is it accurate to say that for
3 those entire 19 years you were a detective in
4 violent crimes, or no?
5    A.   Yes.
6    Q.   And violent crimes by definition, the
7 kinds of crimes that you investigate are things
8 like murder, armed robberies, sexual offenses, and
9 things of that sort; correct?
10    A.   Correct.
11    Q.   You don't investigate garden variety
12 burglaries, retail thefts, or other such matters;
13 correct?
14    A.   Yeah, not normally.
15    Q.   An investigation might come up in
16 connection with something more serious, but that's
17 not your -- that's not ordinarily your bread and
18 butter; correct?
19    A.   Correct.
20    Q.   Now, you have also testified during
21 murder trials; right?
22    A.   Yes.
23    Q.   And do you have any approximation of the
24 number of murder trials that you have testified in?



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
125–128

Page 125

1    A.    No.
2    Q.    You have testified at motions to
3  suppress, have you not?
4    A.    Yes.
5    Q.    Do you have any estimate of the number
6  of times that you have testified at motions to
7  suppress?
8    A.    No.
9    Q.    But you have testified -- okay.  In
10  terms of the motions to suppress, do you have any
11  recollection of testifying in a motion to suppress
12  where you were personally accused of violating a
13  suspect's rights?
14    A.    Yes.
15    Q.    Have you ever been accused by a suspect
16  -- I'm not saying any of these accusations are
17  accurate, but have you ever been accused by a
18  suspect of not giving Miranda warnings?
19    A.    I don't know.
20    Q.    You don't know if you have ever been
21  accused of that?
22    A.    I don't know.
23    Q.    Okay.  Have you ever been accused in a
24  motion to suppress using physical force against a

Page 126

1  suspect?
2    A.    Yes.
3    Q.    Okay.  How many times approximately have
4  you been accused of using physical force against a
5  suspect?
6    A.    I would not know how to estimate how
7  many times.
8    Q.    Okay.  Let's see if we can get to
9  specifics.  Can you remember the name of any
10  suspect who accused you of using physical force?
11    A.    No.
12    Q.    Would you have any way of accessing --
13  let me -- do you have any memory of the specifics
14  of any accusation against you for using physical
15  force?
16    A.    No.
17    Q.    Have you ever been accused of slapping a
18  suspect?
19    A.    Beyond using physical force, I don't
20  recall specifics.
21    Q.    So you can't recall beyond using
22  physical force whether the accusations involve, for
23  example, slapping; correct?
24    A.    Yeah, I can't recall the specifics of

Page 127

1  the accusation.
2    Q.    You can't recall if the accusations
3  involved punching; correct?
4    A.    I can't recall that, no.
5    Q.    You can't recall if the accusations
6  involved pulling hair?
7    A.    No.
8    Q.    You can't recall if the accusations
9  involved using an object such as a flashlight or a
10  nightstick; correct?
11    A.    Yeah.  I don't recall that.
12    Q.    You don't recall whether the accusations
13  involve using, let's say, a phone book and a
14  flashlight or a hard object to beat a suspect with;
15  correct?
16    A.    I don't recall that.
17    Q.    Well, during the '90s you were aware
18  that accusations -- serious accusations were made
19  against a number of Chicago police officers for
20  using unlawful physical force, were you not?
21    MS. McGRATH:  Objection.  Form.  Foundation.
22    MR. POLICK:  Join in those objections.
23  BY MR. RICHARDS:
24    Q.    You can answer.

Page 128

1    MR. POLICK:  Go ahead and answer the question.
2  BY THE WITNESS:
3    A.    I guess, you know, like everybody else,
4  I heard things on the news.
5  BY MR. RICHARDS:
6    Q.    Well, for example, have you ever heard
7  the name Jon Burge?
8    MS. CARNEY:  Objection.  Form, foundation,
9  relevance.
10    MR. POLICK:  I join in all of those
11  objections.
12  BY MR. RICHARDS:
13    Q.    With the objections noted, you were
14  aware of the accusations of physical force leveled
15  against Jon Burge and other detective associated
16  with him, are you not?
17    MR. POLICK:  If we're going to pursue this
18  Burge line of questioning, I'm going to have a
19  continuing objection to the relevance.  There is no
20  Monell claim in this case, and there's actually
21  nothing in the Complaint relating to Burge.  So I
22  don't see the relevance of it, but you can go ahead
23  and answer the question.
24    MS. CARNEY:  I'm going to join in his



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
129–132

Page 129

1 objections.
2    MR. RICHARDS:  Great.  And the objections are
3 noted.
4 BY MR. RICHARDS:
5    Q.   So were you aware of the specifics of
6 the allegations against Jon Burge?
7    A.   Not the specifics.  No.
8    Q.   Let me ask you this:  When you were a
9 police detective, you had certain means of finding
10 out information; correct?  I mean, for example, you
11 could look for previous reports; right?
12    A.   Yes.
13    Q.   Now, at the time in 1989 did the Chicago
14 Police Department had a method of indexing reports
15 where you could put in, for example, the name of a
16 particular person and find reports related to that
17 person?
18    MS. McGRATH:  Objection.  Form.  Foundation.
19    MR. POLICK:  I will join in those objections,
20 but you can answer over the objections.
21 BY THE WITNESS:
22    A.   I'm not sure if I recall that.
23 BY MR. RICHARDS:
24    Q.   Well, let me just give you a

Page 130

1 hypothetical.  Let's say that you have a person in
2 custody who is a suspect.  Let's say his name is
3 John Smith.  If you're investigating that person,
4 you could pull up John Smith's rap sheet; correct?
5    A.   Well, in 1989 I believe I had to request
6 it from identification.  So it wasn't like I had a
7 computer that I could access the information.
8    Q.   Okay.
9    A.   So I would request it, and then it would
10 be sent to me.
11    Q.   Alright.  You could also do a request --
12 you could also make requests from the records
13 department, correct, or the records division?
14    A.   Yes.
15    Q.   You could.  Okay.  Now, the records
16 division assigns what's called an RD number to
17 every police report of a crime; correct?
18    A.   Yes.
19    Q.   Now, if you had John Smith as a suspect,
20 could you request from the records division all
21 RD's related to John Smith?
22    MS. McGRATH:  Objection.  Foundation.  You can
23 answer if you know.
24    MR. POLICK:  I will join in that objection.

Page 131

1 Again, it's an incomplete hypothetical, but you can
2 answer over the objection.
3 BY THE WITNESS:
4    A.   Not with just the name John Smith, no.
5 I would need more information.
6 BY MR. RICHARDS:
7    Q.   Okay.  How about if you had John Smith's
8 date of birth?
9    MS. McGRATH:  Same objection.
10 BY THE WITNESS:
11    A.   That would be helpful.
12 BY MR. RICHARDS:
13    Q.   What?
14    A.   That would be helpful.
15    Q.   Okay.  And when you requested records
16 from the records division, could you also give them
17 a specific address to bring up all RDs about a
18 specific address?
19    MS. McGRATH:  Same objections.
20    MR. POLICK:  Objection to the form of the
21 question.  You can answer over the objection.
22 BY THE WITNESS:
23    A.   I have been retired for quite awhile,
24 and my memory of police operations at headquarters

Page 132

1 is very dim, and it changed frequently over the
2 years.  So I don't recall what information I could
3 get or what information I needed to get the
4 information that you're talking about.
5 BY MR. RICHARDS:
6    Q.   Okay.  In the course of your work as a
7 detective you generated police reports on the cases
8 that you worked on; right?
9    A.   Yes.
10    Q.   Now, when you generated those reports,
11 obviously, they went to some sort of -- they were
12 stored someplace; correct?
13    A.   I believe so.
14    Q.   Alright.  Well, after you wrote a
15 report, what would you do with it?
16    A.   I would turn it into my sergeant.
17    Q.   Okay.  And after you turned it into your
18 sergeant, would you keep a copy for yourself?
19    A.   No.
20    Q.   Okay.  So you never kept a copy?  Let's
21 say that you were still working on the case, would
22 you keep a copy for yourself in that instance?
23    A.   No.
24    Q.   Alright.  Was there any sort of -- to



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
133–136

Page 133

1 your knowledge any sort of index or record kept of
2 the cases that you had worked on?
3    MS. McGRATH: Objection. Form. Foundation.
4 You can answer.
5    MR. POLICK: I will join in those objections.
6 You can answer over the objection.
7 BY THE WITNESS:
8    A. So I understand the question, was there
9 any index of the cases that I worked on?
10 BY MR. RICHARDS:
11    Q. Yes. Any sort of list or index kept by
12 anybody of the cases that you had worked on.
13    A. Not that I am aware of.
14    Q. Okay. Do you know if the state's
15 attorneys kept any sort of list of cases in which a
16 particular detective had testified?
17    A. I don't know.
18    Q. Can you remember a specific -- the
19 specifics of any case in which -- other than this
20 one in which you testified at a motion to suppress?
21    A. Specifics, no.
22    Q. Can you remember the names of any of the
23 defendants other than this one in which you
24 testified at a motion to suppress?

Page 134

1    A. No.
2    Q. Did you ever work on a big case, a
3 heater case that got a lot of publicity?
4    MS. CARNEY: Objection. Form.
5    MR. POLICK: I join in the objection, but you
6 can answer over the objection.
7 BY THE WITNESS:
8    A. I don't recall.
9 BY MR. RICHARDS:
10    Q. Well, let me ask you this. Did you ever
11 work on a case that got a lot of headlines in the
12 press, sensational for whatever reason, a big case?
13 Do you remember anything like that?
14    A. I don't recall anything like that, no.
15    Q. Now, I would like to ask you maybe close
16 to the final question. Is there anything that you
17 know about the -- about the investigation into the
18 Luis Morales murder which you have not told us
19 during this deposition?
20    Is there anything that has been omitted,
21 left out, anything that you know that I haven't
22 elicited from you? Anything?
23    MR. POLICK: I will object to the form of that
24 question, because that calls for speculation, but

Page 135

1 you can answer over the objection.
2 BY THE WITNESS:
3    A. I know the reports contain additional
4 information that I haven't been asked for, haven't
5 stated, but I don't know of anymore information.
6 BY MR. RICHARDS:
7    Q. Okay. So any of the information that I
8 have not asked you about or subjects that I have
9 not touched on, those would be included in the
10 reports that we have gone over; correct?
11    MR. POLICK: Objection. Calls for
12 speculation. You can answer over the objection.
13 BY THE WITNESS:
14    A. Any of the information that I know would
15 be included in the reports.
16 BY MR. RICHARDS:
17    Q. Okay. Is there any report that you know
18 of that I didn't show you and that we didn't
19 review?
20    MR. POLICK: I am going to object to the form
21 of that question given the number of documents
22 produced in discovery, but you can answer over the
23 objection.
24

Page 136

1 BY THE WITNESS:
2    A. I don't know that this is the complete
3 set of all of the documents that I prepared. So I
4 don't know.
5 BY MR. RICHARDS:
6    Q. Alright. Can you think of any document
7 that you know that you authored relative to this
8 investigation that I did not show you?
9    MR. POLICK: Again, calls for speculation, but
10 you can answer over the objection.
11 BY THE WITNESS:
12    A. I don't recall any other documents.
13 BY MR. RICHARDS:
14    Q. Okay. Do you have anything to add or
15 anything to say about any of the accusations
16 against you in the Second Amended Complaint?
17    MR. POLICK: Objection. An Answer has been
18 filed to that Second Amended Complaint. So is
19 there a question pending here?
20 BY MR. RICHARDS:
21    Q. Yeah. The question is, you know,
22 swearing under oath, which is not in the answer,
23 because there is no swearing to it, is there
24 anything that you want to add concerning the



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
137–140

Page 137

1  accusations against you in the Second Amended
2  Complaint?
3      MR. POLICK:  I am going to object to the form
4  of that question, because there are several
5  allegations in the Second Amended Complaint, some
6  of them are not even against Detective Mason, and
7  I'm not going to have him editorialize on the
8  Second Amended Complaint.
9      So if you have a specific question you
10  want to ask him about the Second Amended Complaint,
11  then I think that he could answer that, but I'm
12  objecting to the form of this question.
13  BY MR. RICHARDS:
14      Q.    Alright.  The accusations against you in
15  the Second Amended Complaint, not against anybody
16  else, anything that you want to add or any
17  information that you want to give about any of
18  those allegations?  This is your opportunity.  Go
19  ahead.
20      MR. POLICK:  Objection to the form.  There is
21  no specific question pending.  You can answer over
22  the objection.
23  BY THE WITNESS:
24      A.    I believe I have answered that in the

Page 138

1  Complaint.  I have nothing to add to what we
2  answered.
3  BY MR. RICHARDS:
4      Q.    Okay.  You have nothing to add to the
5  Answer that you filed?
6      A.    Yes.
7      Q.    Okay.  And you reviewed the Answer
8  before it was filed; correct?
9      A.    Yes.
10      Q.    And everything that you said in your
11  Answer was the truth; correct?
12      A.    That's correct.
13      Q.    And if you had to swear to everything
14  that you said in the Answer, at least you have to
15  swear to the things that you answered, not the
16  things where you said that you had no knowledge,
17  you would be comfortable swearing to what -- to
18  your Answer to the Complaint; correct?
19      MR. POLICK:  I will object to the form of that
20  question.  It's vague.  It's nonspecific.  There
21  are several matters in that Answer which he
22  answered as to a lack of knowledge.
23      So I don't see how he could swear to
24  something that he has no knowledge about.  So if

Page 139

1  you have a specific question that you want to ask
2  him about an allegation, then please ask him that,
3  but I'm not going to -- this is shear speculation
4  without pointing to a specific allegation.
5      You can answer over the objection.
6  BY MR. RICHARDS:
7      Q.    Do you understand the question, or do
8  you need me to repeat it?
9      A.    If you could repeat it.
10      Q.    Apart from the -- apart from the answers
11  in your Answer to the Second Amended Complaint
12  where you said that you lack knowledge or couldn't
13  comment, obviously those things you are not
14  swearing to.  You just lack knowledge.  But in
15  terms of the denials in the Second Amended
16  Complaint, the denials of the accusations against
17  you, are you swearing that your denials are the
18  truth?
19      A.    Yes.
20      MR. RICHARDS:  Okay.  I believe that I have
21  nothing further.
22          EXAMINATION
23  BY MR. POLICK:
24      Q.    I have some follow-ups, Detective Mason.

Page 140

1  You testified earlier that around midnight on July
2  7th of 1989 you had the opportunity to interview
3  the plaintiff in this case, Mr. Jaime Rios.  Do you
4  remember being asked questions about that?
5      A.    Yes, I do.
6      Q.    And you did, in fact, interview Mr. Rios
7  along with Detective Halvorsen at that point;
8  correct?
9      A.    Yes.
10      Q.    Other than you and Detective Halvorsen,
11  was anyone else present for your interview with
12  Mr. Rios on July 7th at around midnight?
13      A.    No.
14      Q.    At any time during that interview of
15  Mr. Rios, did you ever pull his hair?
16      A.    No.
17      Q.    Did you ever slap him?
18      A.    No.
19      Q.    Did you ever punch him?
20      A.    No.
21      Q.    Did you ever slam his head on the table?
22      A.    No.
23      Q.    Did you ever hit him with a flashlight?
24      A.    No.



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
141–144

Page 141

1 Q. Did you ever hit him with any hard
2 object?
3 A. No.
4 Q. Did you ever threaten to deprive him
5 from seeing or being able to have a relationship
6 with his child?
7 A. No.
8 Q. During that same interview did Detective
9 Halvorsen ever slap Mr. Rios?
10 A. No.
11 Q. Did he ever pull Mr. Rios's hair?
12 A. No.
13 Q. Did he ever slam Mr. Rios's head on a
14 table?
15 A. No.
16 Q. Did Detective Halvorsen ever punch
17 Mr. Rios during that interview?
18 A. No.
19 Q. Did Detective Halvorsen ever hit
20 Mr. Rios with a flashlight or other hard object?
21 A. No.
22 Q. Did Detective Halvorsen during that
23 interview ever threatened Mr. Rios of taking away
24 his child or depriving him of the relationship with

Page 142

1 his child?
2 A. No.
3 Q. You were asked some questions about when
4 you first met Detective Guevara and also Detective
5 Halvorsen. Do you recall those questions?
6 A. Yes.
7 Q. Did you ever socialize with either gang
8 crime specialists or then Detective Guevara outside
9 of work?
10 A. No.
11 Q. Did you ever socialize with Detective
12 Halvorsen outside of work?
13 A. No.
14 Q. If you could take a look at what was
15 previously marked as Deposition Exhibit 11.
16 A. Okay.
17 Q. Do you have that document in front of
18 you?
19 A. I do.
20 Q. Okay. And you have previously
21 identified that as a lineup report that you
22 prepared, and this was on the 7th of July of 1989;
23 correct?
24 A. Yes.

Page 143

1 Q. And at the very top of that report there
2 is a crime classification of homicide murder. Do
3 you see that in the upper left-hand corner?
4 A. Yes, I do.
5 Q. And then there is an address of the
6 original occurrence. Do you see that?
7 A. Yeah.
8 Q. And that's 1316 North Western Avenue in
9 Chicago; correct?
10 A. That's correct.
11 Q. Does that now refresh your recollection
12 of where the murder occurred?
13 A. Yes, it does.
14 Q. Now, with respect to this report there
15 were two eyewitnesses -- or, I'm sorry, two
16 witnesses who viewed the lineup of Mr. Rios;
17 correct?
18 A. Yes.
19 Q. And that would be Mr. Luis Huertas,
20 H-u-e-r-t-a-s; correct?
21 A. Correct.
22 Q. And also Mr. Javier Torres; correct?
23 A. Correct.
24 Q. And you were the person who conducted

Page 144

1 this lineup?
2 A. Yes.
3 Q. And you were with the witnesses?
4 A. Yes.
5 Q. And Mr. Huertas was able to make an
6 identification of Jaime Rios as the person who was
7 the person who shot Mr. Luis Morales; correct?
8 A. That is correct.
9 Q. And Mr. Torres was not able to make an
10 identification; correct?
11 A. That's correct.
12 Q. And is it fair to say that each of these
13 witnesses would have viewed that lineup separately
14 from each other?
15 A. Yes, they did.
16 Q. You were asked some questions about the
17 interview room that Mr. Rios was placed in at
18 Area 5. Do you recall those questions?
19 A. Yes, I do.
20 Q. With regard to -- well, strike that.
21 You indicated that there was a door into
22 the interview room?
23 A. Correct.
24 Q. Was there any type of window on that



MICHAEL MASON                                                June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                              145–148

Page 145

1  door?
2      A.   Yes, there is.
3      Q.   Okay.  And when you testified earlier
4  that you heard Mr. Rios knock on the door and make
5  a motion, were you able to see that motion through
6  the window on the door?
7      A.   Yes, I was.
8      Q.   Okay.  I want to go back to what was
9  previously marked as Exhibit 8 to your deposition.
10 Give me a minute to pull that one up.
11         Do you have that in front of you,
12 Detective?
13     A.   I do.
14     Q.   Alright.  And you previously testified
15 today that this was a lineup report that was
16 prepared on the 28th of June 1989 by you and
17 Detective Brennan and yourself; correct?
18     A.   Yes.
19     Q.   And this lineup report concerns the
20 lineup conducted on the 28th of June of 1989 with
21 respect to Mr. Jose Macho Melendez; correct?
22     A.   Correct.
23     Q.   He was the purported suspect you
24 testified earlier that had come into the 14th

Page 146

1  District and then you subsequently interviewed him
2  along with Detective Brennan at Area 5; correct?
3      A.   That's correct.
4      Q.   And I believe that you previously
5  testified that the witnesses who viewed this lineup
6  were Samantha Hudson; correct?
7      A.   Correct.
8      Q.   And also Mr. Luis Huertas; correct?
9      A.   Correct.
10     Q.   And these witnesses would have viewed
11 the lineup separately?
12     A.   Yes.
13     Q.   And neither of those witnesses, neither
14 Ms. Hudson or Mr. Huertas, was able to make an
15 identification of anyone in that lineup; correct?
16     A.   That's correct.
17     Q.   If you can take a look, please, at what
18 was marked as Exhibit 12.
19     A.   Okay.
20     Q.   And let me know when you have that in
21 front of you.
22     A.   Alright.  I got it.
23     Q.   Okay.  Look at those documents there.
24 And you previously testified that these were the

Page 147

1  complaints for search warrants for both
2  Mr. Benjamin Carrero's residence and Mr. Alex
3  Lopez's residence; correct?
4      A.   That's correct.
5      Q.   And you were asked some questions about
6  where you got the information to prepare these
7  complaints for search warrants; correct?
8      A.   Yes.
9      Q.   Do you recall those questions?
10     A.   I do.
11     Q.   And you previously testified that you
12 spoke to someone on the 9th of July of 1989
13 regarding those complaints for search warrants;
14 correct?
15     A.   Yes.
16     Q.   Okay.  Looking at the narrative portion
17 of those complaints for search warrants that were
18 marked as Exhibit 12, does it indicate there that
19 you got that information from a confidential
20 informant?
21     A.   Yes.
22     Q.   And does it indicate also that the
23 confidential informant that you met with regarding
24 these complaints for search warrants was one of the

Page 148

1  two informants that you had previously met with on
2  July 6th?
3      A.   That's correct.
4      Q.   Those would have been the two informants
5  that gang crime specialist Guevara and Gawrys
6  referred you to; correct?
7      A.   Yes.
8      Q.   You had previously testified that with
9  regard to Exhibit 16, that was the general progress
10 report relating to Mr. Rios and your interview of
11 him, that it appeared that there was a second page
12 that we don't have; correct?
13     A.   Yes.
14     Q.   Take a look at Exhibit 15, which is also
15 two GPRs, and in particular the one regarding
16 Mr. Huertas.
17     A.   Okay.
18     Q.   Looking at that GPR regarding your
19 interview of witness Luis Huertas, does it appear
20 that there may be a second page to this GPR as
21 well?
22     A.   Yes, it does.
23     Q.   And have you seen that second page in
24 your review of the materials in this particular



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
149–152

Page 149

1   case?
2        A.   No.
3        Q.   Alright.  If you can turn to Exhibit 17
4   to your deposition, and take a look at that and let
5   me know when you have that in front of you.
6        A.   Okay.
7        Q.   Do you have the document?
8        A.   I do.
9        Q.   Okay.  And this was a report that you
10  previously testified that you had prepared on the
11  29th of July of 1989?
12       A.   Correct.
13       Q.   And this report refers to your interview
14  of Mr. Cristino Garcia; correct?
15       A.   That's correct.
16       Q.   And he is also known by the nickname of
17  Tino; correct?
18       A.   Yeah.
19       Q.   And the report also refers to a lineup
20  that was conducted at Area 5 at 1320 hours in which
21  Mr. Garcia was a participate; correct?
22       A.   Yes.
23       Q.   And that lineup was viewed by a witness
24  Javier Torres?

Page 150

1        A.   Right.
2        Q.   And Mr. Torres was not able to make an
3   identification of anyone in that lineup, was he?
4        A.   No.  He wasn't able to.
5        Q.   Okay.  We had previously looked at a
6   lineup report for the lineup that Jose Melendez
7   participated in; correct?
8        A.   Yes.
9        Q.   And we previously looked at a lineup
10  report that Mr. Rios had participated in; correct?
11       A.   Yes.
12       Q.   Was there also a separate lineup report
13  for the lineup in which Mr. Cristino Garcia
14  participated in?
15       A.   Yes.
16       Q.   Okay.  And that was not one of the
17  documents Mr. Richards showed you here today, did
18  he?
19       A.   No.
20       Q.   But that is one of the documents that
21  you reviewed in preparation for your deposition
22  today; correct?
23       A.   Yes.
24       Q.   And it was one of the depositions --

Page 151

1   strike that.
2            It was one of the reports that you
3   prepared in connection with the Luis Morales
4   homicide investigation; correct?
5        A.   That's correct.
6        Q.   You were also asked some questions
7   regarding the allegations made in the Second
8   Amended Complaint regarding Reynaldo Guevara
9   physically abusing Mr. Cristino Garcia at the
10  police station.  Do you recall that line of
11  questioning?
12       A.   I do.
13       Q.   Were you a witness to any of those
14  allegations?
15       A.   No.
16       Q.   Do you even know if you were working the
17  day that Mr. Cristino Garcia was brought into the
18  police station?
19       A.   I don't believe that I was, but I don't
20  know for certain.
21       Q.   Do you have any knowledge of the
22  allegations made against Reynaldo Guevara with
23  respect to Mr. Garcia?
24       A.   No.

Page 152

1        MR. POLICK:  Alright.  I don't have any
2   further questions, Detective.  Some of the other
3   attorneys may have questions as well.
4        MS. CARNEY:  The City has no questions.
5                 EXAMINATION
6   BY MS. McGRATH:
7        Q.   I just have a couple of questions on
8   behalf of Defendant Guevara, and I will be quick,
9   Detective Mason.
10           If we can take a look back at Exhibit
11  10, it was the report from April 7 -- or, I'm
12  sorry, July 7th meeting.
13       A.   Okay.  I got it.
14       Q.   Yep.
15       A.   I have the report.
16       Q.   Okay.  If Mr. Rios had shown any signs
17  of abuse, would that have been noted?
18       A.   Yes.
19       Q.   If Mr. Rios had, let's say, a swollen
20  face, or if he had told you that he had been
21  slapped around by the gang crimes investigators,
22  would you have continued with your interview with
23  him?
24       A.   I would have noted that he said that.



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
153–156

Page 153

1    Q.    So you would have noted that in your
2  report?
3    A.    Oh, yeah.
4    Q.    Do you recall ever being told that by
5  Mr. Rios that he had been struck by any of the
6  gangs crime officers?
7    A.    No.
8    Q.    Do you recall him ever specifically
9  complaining about Detective Guevara?
10   A.    No.
11   Q.    At the time of this investigation, I
12  know it's a long time ago, how much involvement in
13  this murder investigation do you recall gang crimes
14  investigator Guevara having?
15       MR. POLICK: Objection to the form. Calls for
16  speculation, but you can answer over the objection.
17  BY THE WITNESS:
18   A.    All that I know is that Detective
19  Guevara brought in those two people that I spoke
20  with that mentioned that Jaime Rios was involved in
21  it, and then later Detective Guevara and Gawrys
22  brought in Jaime Rios. And that's about it.
23  BY MS. McGRATH:
24   Q.    Okay. Would a gang crimes specialist

Page 154

1  write any of the reports in the investigation?
2       MR. POLICK: Objection to the form and the
3  foundation, but you can answer over the objection.
4  BY THE WITNESS:
5    A.    They wouldn't write any detective
6  division reports, because they are not in the
7  detective division. They are in a separate unit.
8  I don't know -- I don't know what their
9  responsibilities are as far as reporting.
10  BY MS. McGRATH:
11   Q.    And as far as lineups go, who conducts
12  the lineup? Is it the detective division? Is it
13  gang crimes? Which unit would conduct the lineup?
14       MR. POLICK: Object to the form of the
15  question, because it's an incomplete hypothetical,
16  but I will let you answer over the objection.
17  BY THE WITNESS:
18   A.    The detective division conducts lineups.
19       MS. McGRATH: Okay. Thank you, Mr. Mason.
20  Have a great day.
21       MR. RICHARDS: I think that it's my turn.
22       MR. POLICK: I think that it is back to you,
23  Steve. If you have follow-up, go ahead.
24              FURTHER EXAMINATION

Page 155

1  BY MR. RICHARDS:
2    Q.    So, Detective Mason, the original
3  suspect in the Luis Morales murder was
4  Mr. Melendez; correct?
5    A.    Yes.
6    Q.    And that was because one of the
7  witnesses -- one of the initial witnesses who had
8  come forward had said that he was present at the
9  scene -- Mr. Melendez was present at the scene and
10  was the shooter; correct?
11   A.    That's correct.
12   Q.    But Mr. Melendez was abandoned as a
13  suspect when he provided an alibi and when he was
14  not identified by the suspect -- he was not
15  identified by witnesses who viewed lineups;
16  correct?
17       MR. POLICK: Objection to the form, but you
18  can answer over the objection.
19  BY THE WITNESS:
20   A.    Yeah, that he was not considered a
21  suspect after that.
22  BY MR. RICHARDS:
23   Q.    Okay. And when Mr. Melendez was
24  abandoned as a suspect or not considered a suspect

Page 156

1  anymore, there was -- the only new suspect to
2  emerge was Jaime Rios and -- new suspects to emerge
3  were Jaime Rios and Cristino Garcia; correct?
4    A.    As far as I know, yes.
5    Q.    And the officer -- the Chicago police
6  officer who brought to your attention the idea that
7  Jaime Rios and Cristino Garcia were suspects, that
8  officer was Guevara; correct?
9       MR. POLICK: Objection, form, but you may
10  answer over the objection.
11       MS. McGRATH: Form. Join.
12  BY THE WITNESS:
13   A.    Yes.
14  BY MR. RICHARDS:
15   Q.    The answer to that question is yes, is
16  it not?
17   A.    Yes.
18   Q.    And until Guevara and Gawrys, his
19  partner, brought in the two confidential
20  informants, the investigation was essentially at a
21  standstill, was it not?
22   A.    Well, yeah, we were waiting for the
23  physical evidence to be evaluated, so I guess it
24  was at a standstill.



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
157–160

Page 157

1    Q.    Right.
2    A.    We were waiting.
3    Q.    Sure.  And it might have been that the
4  physical evidence would have turned up fingerprints
5  or some other thing that might have helped, but
6  that certainly hadn't happened by July 7th;
7  correct?
8    A.    I don't believe so.
9    Q.    Now, in addition to bringing in these
10  two confidential informants, Guevara was also the
11  one who brought in Jaime Rios; correct?
12    A.    Yeah.
13    Q.    He was the one who located him; right?
14    A.    There's a bunch of officers that were
15  involved in locating him.  As far as I know, it was
16  Guevara and Gawrys and maybe some other officers
17  were with him.  I don't know that.
18    Q.    But it was definitely officers from the
19  gang crimes unit who located and brought in Jaime
20  Rios, not anyone from the detective division;
21  correct?
22    A.    That's correct.
23    Q.    And it was your understanding from
24  conversations with Detective Guevara that Jaime

Page 158

1  Rios had come in voluntarily without being
2  arrested; correct?
3    A.    Yes.
4    Q.    And you don't know of your own knowledge
5  whether or not that was true whether, in fact,
6  Guevara had arrested Jaime Rios and brought him in
7  rather than having Jaime Rios come in voluntarily;
8  correct?
9    MS. McGRATH:  Objection.  Form.
10    MR. POLICK:  Objection to the form.  You may
11  answer.
12  BY THE WITNESS:
13    A.    I wasn't there, so no, I didn't witness
14  any of it.
15  BY MR. RICHARDS:
16    Q.    Okay.  Now, in addition to bringing
17  these two -- the two confidential informants and
18  giving you the information that Jaime Rios and
19  Cristino Garcia might have been involved, and in
20  addition to bringing Jaime Rios to the police
21  station, Detective Guevara also brought Luis
22  Huertas to the police station, did he not?
23    MS. McGRATH:  Objection.  Form.
24    MR. POLICK:  Same objection.  You can answer

Page 159

1  over the objections.
2  BY THE WITNESS:
3    A.    No.
4  BY MR. RICHARDS:
5    Q.    No?  Who brought Luis Huertas to the
6  police station?
7    A.    It was gang crimes specialist Newton.
8    Q.    Okay.  And how do you know that gang
9  crimes specialist Newton brought Huertas to the
10  police station?
11    A.    I was there when he brought him in.
12    Q.    Okay.  And did you know if Detective
13  Newton had gotten Mr. Huertas from somebody else?
14    A.    I don't know.
15    Q.    So would it be fair to say that Guevara
16  by these various actions getting -- oh, let me ask
17  you this:  Did you ask gang specialist Guevara to
18  get involved in the investigation?
19    A.    No.
20    Q.    Do you know if anyone else requested
21  that gang specialist Guevara get involved in the
22  investigation?
23    MS. McGRATH:  Objection.  Form.
24

Page 160

1  BY THE WITNESS:
2    A.    Nobody that I know of.
3  BY MR. RICHARDS:
4    Q.    Do you know why gang specialist Guevara
5  got involved in the investigation?
6    MS. McGRATH:  Objection.  Form.  Foundation.
7    MR. POLICK:  I will object to the form as
8  well, but you can answer over the objection.
9  BY THE WITNESS:
10    A.    I would have to speculate that he
11  somehow was aware of the murder and got involved.
12  I don't know how he got involved.
13  BY MR. RICHARDS:
14    Q.    Okay.  In any of your previous
15  investigations before this investigation in 1989,
16  had you ever known somebody from the gang crimes
17  unit to voluntarily get involved in homicide
18  investigation?
19    A.    Yeah, it was -- if it was a gang
20  shooting or gang murder, they often got involved.
21    Q.    Alright.  Did they get involved on their
22  own volition, or would they get involved by a
23  request?
24    A.    Again, I don't have any specific



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
161–164

Page 161

1  instance to tell you, but I do know with my
2  experience when I was investigating a murder that
3  would fit into that gang murder category, that
4  oftentimes gang crimes people would touch -- you
5  know, would touch base with you at some point and
6  ask if you needed them to look for anybody or if
7  they got information, they would contact, you know,
8  the detective division and tell them what they had.
9      And I don't know how they got involved.
10 They have supervisors, you know.  I don't know who
11 directs them.
12   Q.   Okay.  You were asked questions about
13 Jaime Rios and about him not having any visible
14 signs of abuse or complaining about abuse by
15 anybody in the gang unit.
16      Do you remember those questions that you
17 were just asked?
18   MS. McGRATH:  Objection.  Form.
19 BY THE WITNESS:
20   A.   Yes.
21 BY MR. RICHARDS:
22   Q.   Okay.  But in -- strike that.
23   MR. RICHARDS:  Okay.  I have no further
24 questions.

Page 162

1    MS. CARNEY:  Still nothing from the City.
2    MR. POLICK:  Anybody else?  Signature will be
3  reserved.
4        (WHEREUPON, the deposition was
5        concluded at 3:03 p.m., this date.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 163

1  STATE OF ILLINOIS   )
2                      )  SS:
3  COUNTY OF DU PAGE   )
4
5        I, NANCY A. GUIDOLIN, CSR No. 84-2531, a
6  Notary Public within and for the County of DuPage,
7  State of Illinois, and a Certified Shorthand
8  Reporter of said state, do hereby certify:
9        That previous to the commencement of the
10 examination of the witness, the witness was duly
11 sworn to testify the whole truth concerning the
12 matters herein;
13        That the foregoing deposition transcript
14 was reported stenographically by me, was thereafter
15 reduced to typewriting under my personal direction
16 and constitutes a true record of the testimony
17 given and the proceedings had;
18        That the said deposition was taken
19 before me at the time and place specified;
20        That I am not a relative or employee or
21 attorney or counsel, nor a relative or employee of
22 such attorney or counsel for any of the parties
23 hereto, nor interested directly or indirectly in
24 the outcome of this action.

Page 164

1        IN WITNESS WHEREOF, I do hereunto set my
2  hand of office at Chicago, Illinois, this 10th day
3  of July, 2023.
4
5
6
7  _____
8        Notary Public,
9        DuPage County, Illinois.
10
11
12 NANCY A. GUIDOLIN, CSR No. 84-2531
13
14
15
16
17
18
19
20
21
22
23
24



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
165—168

```
                                     Page 165
1              I N D E X
2   WITNESS                    EXAMINATION
3   MICHAEL MASON
4       By Mr. Richards            4,154
5       By Mr. Polick               139
6       By Ms. McGrath              152
7
8            E X H I B I T S
9   NUMBER                  MARKED FOR ID
10  MASON DEPOSITION EXHIBIT
11      EXHIBIT NO. 1               37
12      EXHIBIT NO. 2               41
13      EXHIBIT NO. 3               46
14      EXHIBIT NO. 4               87
15      EXHIBIT NO. 5 (Not Marked)
16      EXHIBIT NO. 6               90
17      EXHIBIT NO. 7               90
18      EXHIBIT NO. 8               99
19      EXHIBIT NO. 9              101
20      EXHIBIT NO. 10             103
21      EXHIBIT NO. 11             105
22      EXHIBIT NO. 12             107
23      EXHIBIT NO. 13             109
24      EXHIBIT NO. 14             110
```

```
                                     Page 166
1            E X H I B I T S
2   NUMBER                  MARKED FOR ID
3   MASON DEPOSITION EXHIBIT
4       EXHIBIT NO. 15             112
5       EXHIBIT NO. 16             113
6       EXHIBIT NO. 17             115
7       EXHIBIT NO. 18             120
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                     Page 167
1         DEPOSITION ERRATA SHEET
2
3
4   Our Assignment No. J9882181
5   Case Caption: Jaime Rios
6   vs. Reynaldo Guevara, et al.
7
8      DECLARATION UNDER PENALTY OF PERJURY
9       I declare under penalty of perjury that I
10  have read the entire transcript of my Deposition
11  taken in the captioned matter or the same has been
12  read to me, and the same is true and accurate, save
13  and except for changes and/or corrections, if any,
14  as indicated by me on the DEPOSITION ERRATA SHEET
15  hereof, with the understanding that I offer these
16  changes as if still under oath.
17
18      Signed on the _____ day of
19  _____, 2023.
20
21
22  _____
23         MICHAEL MASON
24
```

```
                                     Page 168
1         DEPOSITION ERRATA SHEET
2   Page No. ___ Line No. ___ Change to: _____
3   _____
4   Reason for change:_____
5   Page No. ___ Line No. ___ Change to: _____
6   _____
7   Reason for change:_____
8   Page No. ___ Line No. ___ Change to: _____
9   _____
10  Reason for change:_____
11  Page No. ___ Line No. ___ Change to: _____
12  _____
13  Reason for change:_____
14  Page No. ___ Line No. ___ Change to: _____
15  _____
16  Reason for change:_____
17  Page No. ___ Line No. ___ Change to: _____
18  _____
19  Reason for change:_____
20  Page No. ___ Line No. ___ Change to: _____
21  _____
22  Reason for change:_____
23  Page No. ___ Line No. ___ Change to: _____
24  _____
```



MICHAEL MASON
JAIME RIOS V. REYNALDO GUEVARA

June 23, 2023
169

Page 169

```
1    Reason for change:_____

2    Page No. ____ Line No. ____ Change to: _____

3    _____

4    Reason for change:_____

5    Page No. ____ Line No. ____ Change to: _____

6    _____

7    Reason for change:_____

8    Page No. ____ Line No. ____ Change to: _____

9    _____

10   Reason for change:_____

11   Page No. ____ Line No. ____ Change to: _____

12   _____

13   Reason for change:_____

14   Page No. ____ Line No. ____ Change to: _____

15   _____

16   Reason for change:_____

17   Page No. ____ Line No. ____ Change to: _____

18   _____

19   Reason for change:_____

20   Page No. ____ Line No. ____ Change to: _____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24          MICHAEL MASON
```

