## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JAIME RIOS,<br>                Plaintiff<br><br>          v.<br><br>REYNALDO GUEVARA, *et al.*<br>                Defendants | No. 22 CV 3973<br><br>Judge Jeremy C. Daniel |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jaime Rios filed this wrongful-conviction action under 42 U.S.C. § 1983 against Defendant City of Chicago ("the City"), one of its former police officers, Defendant Reynaldo Guevara, and two of its former detectives, Defendants Michael Mason and Ernest Halvorsen. (R. 61 ("SAC"); R. 194 ("Pl.'s Resp. to Mason's & Halvorsen's SOF") ¶¶ 4–5.)[1] Before the Court are cross-motions for partial summary judgment under Federal Rule of Civil Procedure 56 filed by Rios (R. 109), Guevara (R. 177), Mason and Halvorsen (R. 180), and the City (R. 179). For the following reasons, Rios' motion is denied in its entirety, Guevara's motion is denied in part and granted in part, Mason's and Halvorsen's motion is denied in part and granted in part, and the City's motion is denied in its entirety.

---

[1] For ECF filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

## BACKGROUND[2]

Following a criminal jury trial in 1990, Rios was convicted of the first-degree murder of Luis Morales. (R. 145 ("Guevara's Resp. to Pl.'s SOF") ¶ 5; Pl.'s Resp. to Mason's & Halvorsen's SOF ¶ 59.) He was sentenced to thirty-six years' incarceration and was released in 2008 upon completion of his sentence. (Pl.'s Resp. to Mason's & Halvorsen's SOF ¶¶ 59, 61.) In 2022, Rios filed an unopposed motion to vacate his conviction, which Judge Atcherson of the Circuit Court of Cook County granted. (Guevara's Resp. to Pl.'s SOF ¶ 51; Pl.'s Resp. to Mason's & Halvorsen's SOF ¶¶ 62, 66–67; *see* R. 113, Ex. A.)

This wrongful-conviction suit followed—Rios alleges that Guevara, then a gang crimes specialist for the City, conspired with detectives Mason and Halverson (collectively, "the defendants") to violate his constitutional right to due process by coercing his confession. (SAC ¶¶ 145–51.) Rios further asserts the following: that Guevara fabricated evidence that confidential informants implicated Rios in Morales' homicide, (*id.* ¶¶ 152–56); the defendants fabricated police reports concealing the circumstances of Rios' coerced confession, (*id.* ¶¶ 157–68); Guevara coerced the grand jury and trial testimony of Benjamin Carrero about the supposed murder weapon, (*id.* ¶¶ 175–78); the defendants used suggestive identification techniques in connection with Luis Huertas' lineup identification of Rios, (*id.* ¶¶ 169–74); Guevara suppressed evidence that the person Rios identified as the shooter in his allegedly coerced confession, Cristino Garcia, had an alibi and was physically assaulted by

---

[2] The background facts are taken from the parties' L.R. 56.1 Statements, the materials cited therein, and other aspects of the record in this case.

Guevara, (*id.* ¶¶ 179–84); and the defendants maliciously prosecuted Rios. (*Id.* ¶¶ 185–206.) Rios also seeks indemnification by the City. (*Id.* at 28–29.)

The following recitation of the facts focuses on the background that is necessary to understanding the above-described claims.

## I. THE EYEWITNESSES & PHYSICAL EVIDENCE

Morales was shot just before midnight on June 27, 1989. (Guevara's Resp. to Pl.'s SOF ¶¶ 8, 11, 13; Pl.'s Resp. to Mason's & Halvorsen's SOF ¶ 7.) There was allegedly one shooter and an accomplice, with the shooting reportedly occurring in a gangway between Artesian Street and Western Avenue in Chicago. (Guevara's Resp. to Pl.'s SOF ¶¶ 8, 14; Pl.'s Resp. to Mason's & Halvorsen's SOF ¶ 11.) The offense was also apparently gang-related; Morales was a member of the Spanish Cobras, and the shooter purportedly shouted out a rival gang, the Latin Kings, as he fled on foot into Latin King territory. (Guevara's Resp. to Pl.'s SOF ¶ 15; Pl.'s Resp. to Mason's & Halvorsen's SOF ¶ 12.) From the scene, the police recovered three .25 caliber cartridge cases. (Guevara's Resp. to Pl.'s SOF ¶ 46.)

Javier Torres reported being with Morales just before the shooting occurred. (Pl.'s Resp. to Mason's & Halvorsen's SOF ¶ 13; Guevara's Resp. to Pl.'s SOF ¶ 13.) Torres did not make an identification of Rios; he testified at Rios' trial that he did not see what either offender looked like because he ran away when the shooter pulled out a pistol. (Pl.'s Resp. to Mason's & Halvorsen's SOF ¶¶ 9–10, 13–14.) Afterward, Torres told police that the shooter pushed Morales against a car, pulled his hair, and dragged him to the ground. (Guevara's Resp. to Pl.'s SOF ¶ 25.) That car was dusted for

3

fingerprints and produced a testable sample which did not match Rios' fingerprints. (*Id.* ¶¶ 26–28.)

The only eyewitness to identify Rios as the shooter at his trial was Luis Huertas, a friend of Morales. (Guevara's Resp. to Pl.'s SOF ¶ 29; Pl.'s Resp. to Mason's & Halvorsen's SOF ¶ 11.) When the shooting occurred, Huertas was sitting south of the gangway outside a bar. (Pl.'s Resp. to Mason's & Halvorsen's SOF ¶ 11.) Huertas was able to see the shooter's face for ten or fifteen seconds, and identified Rios as the shooter. (Guevara's Resp. to Pl.'s SOF ¶ 29.) Huertas further testified that Rios was only a foot away from Morales, and that the first shot struck Morales in the head. (*Id.* ¶¶ 29–30.) Yet, there was no evidence of close-range firing with respect to any of Morales' wounds; stippling, *i.e.*, evidence of close-range firing, normally occurs if a gun is fired closer than two or three feet away from the entrance wound. (Guevara's Resp. to Pl.'s SOF ¶ 31.)

## II.   RIOS' ALLEGED COERCED CONFESSION

Guevara testified at Rios' trial that, on or before July 6, 1989, informants told him and another officer that Rios had shot Morales and identified someone named "Tino" as the second offender. (Pl.'s Resp. to Mason's & Halvorsen's SOF ¶ 19.) Mason and Halverson's lieutenant also learned this information from one of his informants. (*Id.* ¶ 20.)

On that same day, Guevara arrested Rios outside of his home and took him to the local police station for questioning. (Guevara's Resp. to Pl.'s SOF ¶ 32.) After Guevara placed Rios in a chair inside an interrogation room, it is disputed whether

Guevara participated in questioning Rios or departed. (R. 206 ("Mason's & Halvorsen's Resp. to Pl.'s SOAF") ¶ 16.) Mason and Halvorsen testified that Mason conducted the interview of Rios during which Halvorsen, but not Guevara, was present. (*Id.* ¶¶ 16, 18.) But Rios asserts that Guevara took him to an interrogation room where Mason and three other unidentified officers were present and questioned him. (Pl.'s Resp. to Mason's & Halvorsen's SOF ¶¶ 24, 26.)

It is further disputed whether Mason and Guevara physically assaulted Rios during this interview. (Mason's & Halvorsen's Resp. to Pl.'s SOAF ¶ 16.) Rios testified both at his criminal trial and in his civil deposition that, after being seated for the interrogation, Mason grabbed him by the back of his head, and slammed his face "hard" into the table one time. (Pl.'s Resp. to Mason's & Halvorsen's SOF ¶ 25.) He also testified that Guevara and/or Mason threatened to take his baby away if he did not admit involvement. (Guevara's Resp. to Pl.'s SOF ¶ 38; Pl.'s Resp. to Mason's & Halvorsen's SOF ¶¶ 27–29.) Guevara "grilled" Rios about the homicide for about fifteen to twenty minutes, but Rios denied any knowledge or involvement. (Pl.'s Resp. to Mason's & Halvorsen's SOF ¶ 27.) The defendants say none of this occurred. (Mason's & Halvorsen's Resp. to Pl.'s SOAF ¶ 18.)

After interviewing Rios, Mason contacted the Cook County State's Attorney's Office Felony Review Unit. (*Id.* at ¶ 30.) During the early morning of July 7, Assistant State's Attorney ("ASA") Barbara Riley came to the police station to review the case and interviewed Rios. (*Id.* ¶¶ 31–34.) After speaking with Riley, Rios provided an incriminating statement to the police outside of Guevara's presence; the statement

also implicated Rios' childhood friend, fellow Latin Kings gang member, Garcia, as the shooter. (Guevara's Resp. to Pl.'s SOF ¶ 6; R. 191 ("Pl.'s Resp. to Guevara's SOF") ¶¶ 3, 23.) The parties dispute whether Rios' statement was transcribed by a court reporter at the police station. (*See* Rios Dep. at 199:3–200:4, 204:2–208:10.)

In his statement, Rios stated that he was with Garcia just before Morales' murder. (Guevara's Resp. to Pl.'s SOF ¶ 41.) He also stated that he was armed with a .38 caliber snub nose revolver. (*Id.* ¶ 42.) Rios initially said Garcia was armed with a .22, but when asked if Garcia's gun was a .22 or .25, Rios said it could have been either. (*Id.* ¶ 43.) He also said that Garcia shot Morales with his arm outstretched, from about one foot away. (*Id.* ¶ 44.) Further, Rios said that after Garcia shot Morales, Garcia shouted, "King Love" and fired two shots into the air. (*Id.* ¶ 6.) Rios alleges this confession was coerced. (Guevara's Resp. to Pl.'s SOF ¶ 40; Pl.'s Resp. to Guevara's SOF ¶ 7.)

Each of the defendants prepared initial and supplemental police reports summarizing their investigation. (Pl.'s Resp. to Mason's & Halvorsen's SOF ¶¶ 51–52, 69, 71.) Rios alleges that the defendants fabricated details in these reports by noting that informants implicated Rios and Garcia, which he asserts was untrue. (SAC ¶¶ 157–68.) Rios further alleges that these reports omitted details of his beating by Mason and Guevara, that Rios initially denied any involvement in the Morales shooting, that Mason and Guevara fed Rios details of the murder to induce him to confess, that they told Rios to say that he was present for the offense, and that they threatened to take Rios' child away unless he admitted involvement. (*Id.*) He further

6

claims that, before his interview, the defendants agreed amongst themselves to use coercive investigation tactics. (*See* SAC ¶ 59; R. 191-3 ("Guevara Dep.") at 51:3–16.)

### III. HUERTAS' ALLEGED COERCED LINEUP IDENTIFICATION OF RIOS

On July 7, sometime between approximately 4:30 and 5:00 p.m., Guevara picked Huertas up from work and brought him to the police station. (Pl.'s Resp. to Mason's & Halvorsen's SOF ¶ 43; R. 196-12 ("Huertas Aff.") ¶ 7.) Huertas was shown a live lineup containing Rios and identified him as the shooter. (Pl.'s Resp. to Mason's & Halvorsen's SOF ¶¶ 44–45.)

The parties dispute whether, while en route to the police station, Guevara or another officer showed Huertas photos of Rios before demanding that he identify the shooter. (Guevara's Resp. to Pl.'s SOF ¶ 53; Huertas Aff. ¶ 7.) Rios relies upon an affidavit authored by Huertas that accompanied Rios' 2022 motion to vacate. (Guevara's Resp. to Pl.'s SOF ¶ 52; Huertas Aff. ¶ 6.) In that affidavit, Huertas affirmed that in 1989, he knew Guevara as a "dirty cop," "who would put cases on people and would charge them for no reason." (Guevara's Resp. to Pl.'s SOF ¶ 52; Huertas Aff. ¶ 6.) Huertas reported that Guevara showed him "a series of photographs" one of them depicting Rios, and "told [him] to pick out the shooter [he] had seen." (Huertas Aff. ¶¶ 7, 11.) According to Huertas, though he said that he did not recognize any of the photographs, Guevara threatened to have him "locked up" if he did not identify the shooter. (*Id.* ¶¶ 7–9.) Once at the station, during the live lineup procedure, Huertas recognized Rios as the only individual who was in both the lineup and the pictures that Guevara showed him in the car. (*Id.* ¶¶ 10–12.) Huertas said

7

he never told anyone that this was the basis for his identification of the shooter because he "was afraid [Guevara] would retaliate." (*Id.* ¶ 13.) However, the defendants point out that, at his civil deposition in 2023, Huertas recanted the claims he made in his affidavit, testifying that no one told him who to pick in the lineup or photos he reviewed and he never saw a photo of Rios before the lineup. (Pl.'s Resp. to Mason's & Halvorsen's SOF ¶ 47.)

## IV. BENJAMIN CARRERO'S ALLEGEDLY COERCED GRAND JURY & TRIAL TESTIMONY

On July 8, the police executed a search warrant at the home of Carrero, a fellow Latin Kings gang member. (Guevara's Resp. to Pl.'s SOF ¶ 59; R. 197-7 ("Carrero's Trial Test.") at 9:6–10.) Both the basis and the results of this search are disputed. Rios asserts, and Guevara denies, that the warrant was based on Guevara's untrue claim that confidential informants told him where the guns used in the Morales murder could be located. (Guevara's Resp. to Pl.'s SOF ¶ 48; R. 196-6 at 118:6–23.) It is also disputed whether the gun recovered from the search was a .22, .32, or .38 caliber gun. (Guevara's Resp. to Pl.'s SOF ¶ 59 (providing that Guevara and fellow officers "found a .22 caliber revolver"); Carrero's Trial Test. at 18:30–21:13 (Carrero disputing his grand jury and direct testimony that the gun recovered "was black. It was a .38," by testifying in contradiction on cross "[the gun] was a .32").)

The parties further dispute whether Carrero was next taken from his home to the police station and interrogated for two days. (Guevara's Resp. to Pl.'s SOF ¶ 59; R. 207 ("Guevara's Resp. to Pl.'s SOAF") ¶ 34.) The parties also dispute whether

Guevara was present for Carrero's interrogation. (R. 130, Plaintiff's Response to Guevara's Statement of Additional Facts ("Pl.'s Resp. to Guevara's SOAF") ¶ 33.)

During Carrero's interrogation, Carrero told police that, on the day of Morales' shooting, Rios gave Carrero the gun to hold and told him that he, Rios, had just shot someone. (Guevara's Resp. to Pl.'s SOAF ¶ 36.) On July 10, Carrero testified to this before the grand jury and during direct examination at Rios' trial. (*Id.*) On cross-examination, however, Carreo recanted his claim that Rios had given him the gun, instead, testifying that he initially told the police that he did not know anything, but then implicated Rios after the police threatened to lock him up and take away his child. (Carrero's Trial Test. at 25:14–26:2.)

## V.    GUEVARA'S ALLEGED PHYSICAL ASSAULT OF CRISTINO GARCIA

On July 28, City police officers Aubrey O'Quinn and P. Mertes arrested Garcia and took him to the police station for questioning about his alleged involvement in Morales' homicide. (Pl.'s Resp. to Guevara's SOAF ¶ 1; Guevara's Resp. to Pl.'s SOF ¶¶ 62–63; R. 113-9 ("Garcia Dep.") at 36:10–17.) At the station, O'Quinn placed Garcia in an interview room with Guevara and an unnamed Hispanic woman, who, according to Garcia, identified herself as an ASA. (Pl.'s Resp. to Guevara's SOF ¶¶ 5–6; Garcia Dep. at 37:1–6, 159:18–161:8.)

It is disputed whether Garcia told O'Quinn and Guevara that, on the night of the shooting, he was home having pizza with his girlfriend and mother. (Pl.'s Resp. to Guevara's SOAF ¶¶ 8–9; Guevara's Resp. to Pl.'s SOF ¶¶ 61, 64; R. 149 ("Guevara's Resp. to Pl.'s Supp. SOF") ¶ 6; Garcia Dep. at 62:20–24, 157:15–59:15; *see* R. 128-10

("O'Quinn Decl.").) It is also disputed whether O'Quinn stepped out of the interview, called the pizza restaurant Garcia ordered from the night of the murder, and said, in Guevara's presence, that the alibi checked out. (Guevara's Resp. to Pl.'s SOF ¶ 64; Pl.'s Resp. to Guevara's SOAF ¶¶ 9–11; Garcia Dep. 157:15–159:8, 172:3–15.) Garcia could not remember whether the unnamed ASA was present when O'Quinn confirmed the alibi. (Garcia Dep. 159:9–11.)

According to Garcia, Guevera proceeded to read a statement, authored by someone else, that blamed Morales' shooting on Garcia; after reading the statement, Guevara told Garcia he should make his own statement, and blame someone else for the shooting. (Guevara's Resp. to Pl.'s SOF ¶ 65; Garcia Dep. at 40:2–19, 69:2–16.) Garcia refused to do so and denied involvement. (Guevara's Resp. to Pl.'s SOF ¶ 66; Garcia Dep. 69:3–6.) O'Quinn then left the room, and Guevara allegedly "placed a phone book on [Garcia's] head and hit [him] with a Billy club or flashlight" three times until Garcia fell to his knees. (Guevara's Resp. to Pl.'s SOF ¶¶ 68–69; Pl.'s Resp. to Guevara's SOF ¶ 7; Guevara's Resp. to Pl.'s Supp. SOF ¶ 2; Garcia Dep. at 37:1–41:3, 70:9–23, 127:7–15.) Guevara denies encouraging Garcia to make a statement or using any force against Garcia. (Guevara's Resp. to Pl.'s SOF ¶¶ 65, 68.)

Garcia further asserts that he told Guevara to stop and that he would sign a statement, but first he needed to make a phone call. (*Id.*) Garcia was permitted to leave the interrogation room and call his sister. (*Id.*) On the call, he asked for a lawyer. (*Id.*) Garcia's sister told him not to sign the statement and that she was going to send a lawyer. (*Id.*) When Guevara overheard Garcia's sister, he got "really mad,"

10

took Garcia back to the interrogation room, and began smacking Garcia with an open hand. (*Id.* ¶ 71; Garcia Dep. at 72:1–7.) The parties dispute whether the ASA was present for only the first, or both beatings. (Pl.'s Resp. to Guevara's SOF ¶ 9; *compare* Garcia Dep. at 42:6–17, 72:1–7, *with id.* at 37:1–41:3, 70:9–23.) The parties dispute whether, when O'Quinn returned to the interrogation room, he told Guevara to stop hitting Garcia because Garcia's lawyer was there. (Guevara's Resp. to Pl.'s SOF ¶ 72.)

The next day, Mason approached Garcia for an interview and Garcia declined to speak with Mason. (Pl.'s Resp. to Guevara's SOAF ¶ 14; Pl.'s Resp. to Guevara's SOF ¶¶ 14, 17.) Garcia then was placed in a live line-up to be viewed by Torres, who was with Morales before the shooting. (Pl.'s Resp. to Guevara's SOAF ¶ 15.) Torres did not identify anyone in the lineup, including Garcia, as one of the persons involved in the shooting. (*Id.*) Garcia was subsequently released from police custody and no longer pursued as a suspect. (Pl.'s Resp. to Guevara's SOAF ¶ 16.) Garcia's accompanying release stated, "that the investigation revealed that there was not sufficient cause to further detain Garcia." (*Id.*) About a month after Garcia was released from custody but before Rios' trial, Guevara twice stopped Garcia on the street, threw Garcia against a wall, took a Polaroid picture of him, and threatened to tell rival gangs to "get him." (Guevara's Resp. to Pl.'s SOF ¶ 75.) Garcia was not called to testify at Rios' trial nor contacted or interviewed by Rios' attorneys prior to trial. (*Id.* ¶ 78; Pl.'s Resp. to Guevara's SOF ¶¶ 26–28.)

## LEGAL STANDARD

"Summary judgment is appropriate where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Moran*

*v. Calumet City*, 54 F.4th 483, 491 (7th Cir. 2022) (citing Fed. R. Civ. P. 56(a)). "A fact is 'material' if it is one identified by the law as affecting the outcome of the case." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 722 (7th Cir. 2015). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court "review[s] all evidence in the light most favorable to the non-moving parties . . . and give[s] them the benefit of all reasonable inferences from the evidence in their favor." *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). Even so, "the moving party may prevail 'by showing an absence of evidence to support' the nonmoving party's claims." *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (quoting *Tyburski v. City of Chi.*, 964 F.3d 590, 597 (7th Cir. 2020)). "Where, as here, the parties file cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made." *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017).

## ANALYSIS

Counts I through XII are brought under § 1983, which "creates a private right of action against any 'person' who violates the plaintiff's federal rights while acting under color of state law." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (quoting § 1983).[3] "[A] state defendant [has] a Fourteenth Amendment due process right to a fundamentally fair trial." *Perruquet v. Briley*, 390 F.3d 505, 511

---

[3] Subject matter jurisdiction over these federal claims is proper under 28 U.S.C. §§ 1331.

(7th Cir. 2004). Rios asserts that the defendants caused his trial to be fundamentally unfair by coercing his confession regarding the Morales homicide (Count I), fabricating evidence (Counts II–VII, IX, and X), using unduly suggestive identification techniques (Count VIII), and suppressing exculpatory material in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) (Counts XI and XII). (SAC at 19–25.) Counts I–XII are asserted against Guevara; Counts I and III–VIII are also alleged against Mason and Halvorsen. (*See id.*) Counts XIII, XIV, XV are Illinois malicious prosecution claims against Guevara, Mason, and Halverson, respectively. (*Id.* at 26–28.)[4] Finally, in Count XVI, Rios seeks indemnification from the City. (*Id.* at 29.)

## I. RIOS' SUMMARY JUDGMENT MOTION AGAINST GUEVARA

Rios moves for summary judgment on his *Brady* claims against Guevara, Counts XI and XII. (R. 109 at 3, 13.) Although Rios asserts two different *Brady* claims in name, "it's more accurate to say that [Rios] has a single *Brady* claim alleging the suppression of [two] baskets of evidence." *Camm v. Faith*, 937 F.3d 1096, 1108–09 (7th Cir. 2019). Count XI pertains to evidence that the person Rios identified as the shooter in his allegedly coerced confession, Garcia, had supplied an alibi. Count XII relates to Guevara concealing that he had physically assaulted Garcia when questioning him about the homicide. (*See* SAC ¶¶ 179–84.)

"A corollary of the prosecution's duty to disclose to the defense is that the police must disclose exculpatory evidence to the prosecutors." *Cairel*, 821 F.3d at 832.

---

[4] Subject matter jurisdiction over Rios' state law claims is proper under 28 U.S.C. § 1367.

To prevail on his civil *Brady* claim against Guevara, Rios must show that "(1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, 'materiality.'" *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008). "Evidence is 'suppressed' when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defense." *Id.* at 567. "Evidence is 'material' 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* A reasonable probability is a lesser standard of proof a preponderance of evidence and exists if "the cumulative effect of all the suppressed information . . . undermine confidence in the verdict." *Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019).

### A.    Count XI – Suppression of Garcia's Alibi

As mentioned, Count XI alleges that Guevara violated *Brady* by failing to inform the prosecution about Garcia's alibi. (SAC ¶¶ 152–56.) As set forth below, Guevara advances three arguments in opposition to Rios' motion. (*See* R. 147.) Although the Court disagrees with Guevara as to the first two arguments, the Court agrees that fact disputes require that Count XI be presented to a jury.

First, Guevara argues that Garcia's alibi was not suppressed as a matter of law because Garcia was known to the defense and Rios' attorneys could have learned of Garcia's alibi with reasonable diligence. (R. 147 at 11–13.) In his view, because

14

Garcia was listed as a witness by the government in its disclosures, and Rios' public defenders knew that he was previously a suspect in the murder, a jury could conclude they failed to exercise reasonable diligence. (*Id.*) But "it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a . . . witness possesses." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). While "[d]efense counsel can certainly be expected to ask witnesses (defense and otherwise) questions relevant to what counsel understands the witness's role to be in the case," "defense counsel cannot be expected to ask witnesses about matters completely unrelated to the witness's role in the case." *Id.* at 741.

Here, even exercising reasonable diligence, Rios' attorneys (even if they could have suspected) "did not know about the pressure tactics and inducements [Guevara] used" with Garcia and so it is not reasonable to infer that his alibi was available to the defense. *Avery*, 847 F.3d at 443–44 (holding *Brady* evidence was not suppressed for being "already known to the defendant" where the plaintiff "knew that the informants' statements were false, but he did *not* know about the pressure tactics and inducements the detectives used to obtain them") (emphasis in original). And the evidence that Guevara beat and threatened Garcia during his interview and continued threatening him one month after his arrest and before trial supports an inference that Garcia "may [have been] uncooperative or reluctant" to talk to Rios' attorneys. *Boss*, 263 F.3d at 740. The Court thus concludes that the evidence supports an inference that the favorable evidence of Garcia's alibi was suppressed.

Second, Guevara argues that Rios is not entitled to summary judgment because the evidence of Garcia's alibi was not material to his conviction. Guevara is incorrect; this evidence plausibly could have impeached Guevara's credibility about the steps of his investigation and why he came to believe Rios was the shooter. (Mason's & Halvorsen's Resp. to Pl.'s SOA ¶¶ 6, 12–14.) Further, it plausibly could have impeached Rios' statement taken at the police station, claiming Garcia's involvement in the shooting, which the government admitted at trial. (*Id.* ¶ 23; Guevara's Resp. to Pl.'s SOF ¶¶ 35–45.) In a case where no physical evidence linked Rios to the crime, the cumulative effect of this evidence, which undermines multiple pieces of evidence used to secure Rios' conviction, indeed could undermine a reasonable jury's confidence in Rios' guilt. (Guevara's Resp. to Pl.'s SOF ¶ 5.)

Finally, Guevara argues that summary judgment in Rios' favor is not warranted on this claim because it is disputed whether Garcia supplied an alibi. (R. 147 at 10.) Specifically, Garcia testified that he told O'Quinn about his alibi and that O'Quinn confirmed it. (Guevara's Resp. to Pl.'s SOF ¶ 64; Pl.'s Resp. to Guevara's SOAF ¶ 8; Garcia Dep. 158:2–59:8.)[5] Yet the police report O'Quinn authored about Garcia's arrest and subsequent interview makes no mention of an alibi, and O'Quinn asserts in a declaration that if Garcia had supplied one, he would have documented

---

[5] The parties dispute whether the ASA was ASA Riley, but this issue is immaterial to the Court's resolution of the pending motions. (*See, e.g.*, Guevara's Resp. to Pl.'s SOF ¶ 65.) Regardless of the ASA's identity, the evidence supports an inference that O'Quinn would have learned of Garcia's alibi. This fact dispute alone is sufficient to preclude summary judgment. *Wheeler v. Hronopoulos*, 891 F.3d 1072, 1073 (7th Cir. 2018) ("[S]ummary judgment is not appropriate if there are *any* genuine disputes as to any material facts[.]") (emphasis added).

such accordingly. (Pl.'s Resp. to Guevara's SOAF ¶¶ 9–11; O'Quinn Decl. ¶¶ 5–6.) This evidence creates a genuine dispute as to whether Garcia supplied an alibi, and so Count XI must go to a jury. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) ("Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied.").

Rios' view is that there is no fact dispute that Garcia supplied an alibi because the evidence that Guevera relies on to create the dispute, *i.e.*, O'Quinn's declaration and the police report, are inadmissible. *Gunville v. Webster*, 583 F.3d 979, 985 (7th Cir. 2009) (citations omitted) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment."). First, he argues that because O'Quinn's declaration provides that O'Quinn has no "specific memory" of the events of July 28, 1989, O'Quinn has no personal knowledge of whether Garcia supplied an alibi. (Pl.'s Resp. to Guevara's SOAF ¶ 9; R. 132 at 2–3.) This argument fails because O'Quinn has personal knowledge of his "practice[s] throughout [his] career as a Chicago Police Officer." (O'Quinn Decl. ¶ 5.) Thus, O'Quinn's claim that he would have recorded any alibi provided in a supplementary report is sufficiently based on personal knowledge and is not a "statement[] that [is] the result of speculation or conjecture or merely conclusory." *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999).

Next, Rios argues that O'Quinn's declaration violates the sham affidavit rule because "O'Quinn executed two prior sworn declarations" but "neither . . . contains a denial that Garcia ever provided an alibi." (Pl.'s Resp. to Guevara's SOAF ¶ 9; R. 132 at 3.) "The sham affidavit rule, as its name indicates, 'permits a judge to disregard a

"sham" affidavit—typically an affidavit that contradicts prior deposition testimony.'" *Craig v. Wrought Washer Mfg., Inc.*, 108 F.4th 537, 543 (7th Cir. 2024) (citation omitted). "The rule prevents a nonmoving party from creating an issue of fact by submitting a contradictory affidavit," *id.*, because "a genuine issue of material fact cannot be conjured out of nothing." *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020).

Here, Rios is mistaken. First, O'Quinn's second declaration denies that Garcia supplied an alibi. (R 129-3 ¶¶ 5–6.) Furthermore, the second and third affidavits are not sham affidavits because "amplification rather than contradiction" does not fall "within the 'sham' exclusionary rule." *Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015); *see, e.g.*, *Phillips v. United Airlines, Inc.*, No. 20 C 3333, 2021 WL 4192071, at *2 (N.D. Ill. Sept. 15, 2021) ("But the fact that a party provides more detail in a declaration than at her deposition, without more, does not subject the declaration to the sham affidavit rule."). Accordingly, O'Quinn's later testimony is not barred by his first declaration, which pertains only to whether O'Quinn had ever seen Garcia strike a suspect and makes no mention of Garcia's alibi or O'Quinn's practice for recording suspect alibis. Rios' motion is therefore denied as to Count XI.

### B. Count XII – Suppression of Guevara's Physical Assault of Garcia

For Count XII, Guevara argues that evidence of Garcia's physical assault was not suppressed as a matter of law because it occurred in the presence of a prosecutor, or alternatively, that he is entitled to qualified immunity. (R. 147 at 13, 17–18; R. 177 at 33–36; *see* Garcia Dep. at 41:1–3.)

While Seventh Circuit "case law has established that the police generally discharge their *Brady* duty by turning over exculpatory evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation," *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015) (holding that police officers discharged their *Brady* obligations by turning over to the prosecutors documentary evidence pointing to an alternative suspect), "[i]t is not likely that the police may take shelter behind a prosecutor who is conspiring with them to fabricate false evidence against innocent suspects." *Whitlock v. Brueggemann*, 682 F.3d 567, 576 (7th Cir. 2012).

In *Whitlock*, there was evidence that, during an interrogation, the "police defendants gave [an eyewitness with a known alcohol addiction] alcohol and told him details about the murders that he should include in his testimony." *Id.* at 572. The court rejected the police defendants' argument that "the fact that [the] State's Attorney. . . was aware of this conduct would have discharged [the defendant police officers'] *Brady* obligations." *Id.* at 576. The court reasoned that police discharge their *Brady* obligations by disclosing favorable evidence to a *competent* authority, but a prosecutor conspiring with police to fabricate evidence is not competent. *Id.*; *cf. Beaman*, 776 F.3d at 512 (distinguishing from *Whitlock* because there was no allegation "that the defendants conspired to *fabricate* evidence") (emphasis in original). Because this evidence supported an inference that the "police defendants' violated [the plaintiff's] right not to have police officers manufacture false evidence" the court affirmed the district court's denial of the police defendants' summary judgment motion. *Whitlock*, 682 F.3d at 576–77.

Here, Garcia testified at deposition that the woman present in the room at the beginning of his interrogation introduced herself as an ASA. (Pl.'s Resp. to Guevara's SOF ¶ 5; Garcia Dep. at 37:1–6, 159:18–61:8.) He said that she was present while Guevara "plac[ed] a phone book on [his] head and hit[] [him] across the head" using a Billy club or flashlight, (Guevara's Resp. to Pl.'s Supp. SOF ¶ 2; Garcia Dep. at 70:9–23); but also, that she was not present when Guevara "started hitting [him], slapping [him], and taking the book and putting it on [his] head and . . . was hitting [him] on [his] head." (Garcia Dep. at 42:6–17, 72:1–7.) Garcia's apparent doublespeak is plausibly a consequence of him describing two different assaults, one before he spoke with his sister, which occurred in the ASA's presence, and a second occurring after he asked his sister to get him a lawyer. (*See* Guevara's Resp. to Pl.'s SOF ¶¶ 68–69, 71 (plaintiff describing two different beatings).) Nevertheless, viewing these facts in a light most favorable to Guevara, Garcia's testimony indeed supports an inference that the ASA knew of at least some of Guevara's tactics.

But the Court disagrees with Guevara that this evidence means that he is absolved of beating Garcia; the authorities he relies upon in this respect are factually distinguishable from this case in a significant way, *i.e.*, here, there is evidence that the prosecution witnessed, ignored, and was thus complicit in Guevara's beating of a suspect. (*See* R. 147 at 13 (citing to *Moran*, 54 F.4th at 492–94) (affirming grant of summary judgment on allegation that police suppressed favorable ballistic match report because the government received report before trial).) The ASA's presence, accordingly, does not excuse Guevara's actions.

20

To the contrary, fact disputes preclude summary judgment on this count as well. *Wheeler*, 891 F.3d at 1073. Garcia testified that O'Quinn initially stepped out when Guevara's physical abuse of Garcia began. (Guevara's Resp. to Pl.'s SOF ¶ 69; Garcia Dep. at 37:1–41:3, 70:9–23.) Garcia further alleges that when his lawyer arrived, O'Quinn returned and told Guevara to stop hitting Garcia. (Guevara's Resp. to Pl.'s SOF ¶ 72.) But in O'Quinn's declaration, he attests that he has never observed Guevara hitting a suspect. (O'Quinn Decl. ¶ 4.) This factual dispute must go to a jury and precludes a finding that Guevara is entitled to qualified immunity. *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1019 (7th Cir. 2006); *Whitlock*, 682 F.3d at 576 (declining to analyze qualified immunity because "the record shows that there is enough admissible evidence supporting the plaintiffs' claim to create a dispute of material fact").

For the foregoing reasons, Rios' motion for summary judgment is denied.

## II.   GUEVARA'S SUMMARY JUDGMENT MOTION

Guevara moves for summary judgment on Counts I–XIII. For the foregoing reasons, Guevara's motion for summary judgment on Counts XI and XII is denied. For the following reasons, Guevara's motion is granted as to Counts III–VII, and denied as to Counts I, II, VIII, IX, X, and XIII.

### A.   Count I – Rios' Coerced Confession

Count I asserts a coerced confession claim. (SAC ¶¶ 145–51.) Guevara argues this claim is time-barred. (R. 177 at 11.) While the statute of limitations for § 1983 claims is two years, *Brooks v. Ross*, 578 F.3d 574, 578–79 (7th Cir. 2009), a claim is eligible for "deferred accrual" where the "civil claims against the officers necessarily

imply the invalidity of [the plaintiff's] criminal conviction." *Heck v. Humphrey*, 512 U.S. 477, 483 (1994); *see also Tolliver v. City of Chicago*, 820 F.3d 237, 242 (7th Cir. 2016). In a *Heck*-bar case, "accrual is deferred until the conviction is overturned." *Johnson v. Winstead*, 900 F.3d 428, 431 (7th Cir. 2018).

Guevara's view is that, based on *Moore v. Burge*, Rios had to bring his coerced confession claim in 1990, when the coercion occurred. (R. 177 at 11) (citing to 771 F.3d 444, 446 (7th Cir. 2014) ("[C]laims based on out-of-court events, such as gathering of evidence, accrue as soon as the constitutional violation occurs.").) But the Seventh Circuit, "[a]pplying [*Moore*]," has held "that *Heck*'s rule of deferred accrual applies to § 1983 claims for violation of the Fifth Amendment right against self-incrimination." *Johnson*, 900 F.3d at 431. In *Johnson*, the court reasoned that "[a] claim of this kind seeks a civil remedy for a trial-based constitutional violation that results in wrongful conviction and imprisonment. Such a claim, if successful, necessarily implies the invalidity of the conviction and under *Heck* is neither cognizable nor accrues until the conviction has been overturned." *Id.*

In light of the foregoing, it is evident that Rios' coerced confession claim is not time-barred. Rather, Rios was *Heck*-barred from bringing this claim until his conviction was reversed because his confession was admitted at his trial; thus, any such claim inherently implied the invalidity of his criminal conviction. Because the original complaint was filed within two years after Rios' conviction was overturned, Guevara is not entitled to summary judgment on Count I. (*Compare* R. 113, Ex. A (Rios conviction vacated in 2022), *with* R. 1 (complaint filed on July 21, 2022).)

22

## B.      Counts II–VII, and X – Fabricated Evidence[6]

"The essence of a due-process evidence-fabrication claim is that the accused was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial and thus depriving him of liberty without due process." *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020). For these claims to survive summary judgment, as the nonmovant, Rios must point to evidence supporting an inference that "[Guevara] manufactured false evidence against him, which was later used to deprive [Rios] of his liberty in some way." *Moran*, 54 F.4th at 498 (citation omitted). Additionally, "[t]he fabricated evidence must be material, which means there is a reasonable likelihood the evidence affected the judgment of the jury." *Id.* "What's relevant is not the label on the claim, but whether the officers 'created evidence that *they knew to be false.*'" *Avery*, 847 F.3d at 439 (emphasis in original) (citation omitted). And, although "a police officer has absolute immunity from liability under § 1983 for providing perjured testimony at a criminal trial," *Bivens v. Hudson*, 81 F.3d 163 (7th Cir. 1996), "no absolute testimonial immunity attaches to the actions of the officers outside of trial," such as lying to prosecutors who successfully indict an accused. *Ienco v. City of Chicago*, 286 F.3d 994, 1000 (7th Cir. 2002).[7]

---

[6] Count IX also asserts a fabrication claim for failing to disclose the alleged use of a coercive identification procedure with Huertas. Because the allegedly offending reports were not admitted a trial, a fabrication claim fails for the reasons set forth in II(B)(2). Rios' concedes this; his response brief to Guevara's motion for summary judgment only argues that "the *Brady* aspect of this claim" survives. (*See* R. 192 at 28.) Accordingly, Count IX will be analyzed with Rios' related unduly suggestive identification techniques claim, Count XIII.

[7] Accordingly, the Court considers the defendants' trial testimony to the extent it is relevant to deciding whether disputed evidence was material to Rios' conviction. (*See generally* R. 177 at 16); *Avery*, 847 F.3d at 443 (concluding that the "detectives are liable under § 1983 for [fabricating evidence] even though their trial testimony, standing alone, would not subject them to damages liability").

1.    **Count II – Hearsay Information from Confidential Sources**

Count II alleges that Guevara fabricated evidence by testifying falsely at Rios' trial that confidential sources implicated Rios and Garcia in Morales' murder. (SAC ¶¶ 152–56; *see* 196-10 at 64:11–66:24 (Guevara's trial testimony).) Guevara argues that he is entitled to judgment on this claim because there is no evidence that he fabricated the confidential informant evidence, and even if there was, the confidential informant evidence was not material to Rios' conviction. (R. 177 at 13–19.)[8]

Rios, however, argues that there is evidence of fabrication because Guevara repeatedly responded to questions about this topic by invoking his Fifth Amendment privilege against self-incrimination. (R. 192 at 16–17.) For instance, at his deposition, Guevara refused to answer when asked whether it was true that he had "fabricated the existence of informants who implicated [Rios] and [Garcia] in the murder[]." (Guevara Dep. at 9:14–20, 11:6–19). And Guevara pleaded the Fifth when asked whether it was true that he "wrote false police reports" and "conveyed . . . to the prosecutors" that informants had implicated Rios and Garcia. (*Id.* at 10:2–17.)

"The Fifth Amendment provides that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Lefkowitz v. Turley*, 414 U.S. 70, 77, (1973) (quoting U.S. Const. Amend. V). It's protections "privilege[] [individuals] not to answer official questions put to [them] in any other proceeding, civil or criminal,

---

[8] Guevara additionally argues that Rios' claims fail "to the extent Plaintiff claims this information was *Brady*." (R. 177 at 16.) The Court does not address this argument because Rios' response brief does not make any assertion of a *Brady* claim based on this evidence. (R. 192 at 15–22; *see Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (providing that an issue is waived where a party fails to develop arguments related to that discrete issue).

24

formal or informal, where the answers might incriminate him in future criminal proceedings." *Id.* "To be privileged by the Fifth Amendment to refuse to answer a question, the answer one would give if one did answer it (and answer it truthfully) must have some tendency to subject the person being asked the question to criminal liability." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663–64 (7th Cir. 2002). In civil cases, "[t]he general rule is that an adverse inference may be drawn from" a person's invocation of their Fifth Amendment privilege. *Id.* at 663. Courts abide by this rule "to protect the integrity and truth-seeking function of the judicial system" and to ensure that undue prejudice does not result to the adverse party. *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 640 (9th Cir. 2012). Accordingly, Guevara's Fifth Amendment invocation supports an adverse inference that Guevara's answers to the questions about whether he lied in police reports, to prosecutors, and at Rios' trial that informants had placed blame on Rios and Garcia for the shooting would have been yes. Because this adverse inference constitutes a genuine dispute of material fact as to fabrication, summary judgment is not warranted on this basis.

There is also a material dispute regarding whether the informant testimony was material to Rios' conviction. Viewing the evidence in a light most favorable to Rios, a reasonable jury could conclude that the evidence of how Guevara came to believe Rios was a suspect was material to Rios' conviction. (Pl.'s Resp. to Guevara's SOF ¶ 43); *see, e.g.*, *Moran*, 54 F.4th at 499 (affirming decision that the allegedly fabricated evidence was not material because it "was not introduced at the trial"); *see*

25

*also Patrick*, 974 F.3d at 834 ("If fabricated evidence is . . . *used at trial to obtain a conviction*, the accused may have suffered a violation of his due-process right to a fair trial.") (emphasis added). Guevara's motion for summary judgment on Count II is denied.

### 2.    Counts III–VII – Police Reports Concealing the Circumstances of Rios' Coerced Confession

Counts III–VII assert that the defendants fabricated evidence surrounding Rios' coerced confession. (SAC ¶¶ 157–68; R. 192 at 23; Pl.'s Resp. to Mason's & Halvorsen's SOF ¶ 69.) Specifically, Rios alleges that the defendants conspired to produce police reports concealing that:

- Rios initially denied any involvement in the Morales shooting, Count III;

- the defendants fed Rios details of the murder to induce him to confess, Count IV;

- the defendants told Rios to say that he was present for the offense, Count V;

- the defendants physically abused Rios, Count VI; and

- the defendants threatened to take Rios' child away unless he admitted involvement, Count VII.

Because none of the allegedly offending police reports were admitted at Rios' trial, the defendants argue that they are entitled to summary judgment. (*See* R. 177 at 19–20 (Guevara adopting Mason & Halverson's arguments at R. 181 at 17–19); R. 192 at 20–21.) Rios argues that there is "at least . . . a question of fact as to whether Guevara's report was used in preparing him to testify and in shaping and guiding his

testimony on the stand." (R. 192 at 21.) Fatally, Rios fails to identify any testimony that could create a fact dispute as to this issue. For instance, Rios supplies no citation to Guevara's deposition testimony in which he was asked about whether he relied on the police report in preparing for trial, but took the Fifth and refused to answer. (*See id.* at 20–22.) Absent some evidence that police reports were used in some way to obtain Rios' conviction, these claims fail. *See, e.g.*, *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1159–60 (N.D. Ill. 2022) (granting summary judgment because "[the police] reports were not used against [the plaintiff] at trial. Neither report was introduced . . . and neither report was used to refresh a witness's recollection during either trial.").

### 3. Count X – Carrero's Testimony

Guevara argues that he is entitled to summary judgment on Rios' claim that Guevara coerced Carrero to testify in the grand jury and at trial that he received a gun from Rios the day after the offense, Count X. (R. 177 at 28–33.) Guevara argues this testimony was immaterial to Rios' conviction because Carrero recanted this assertion during cross-examination at Rios' trial. (*Id.* at 30.) But the jury could have credited Carrero's direct testimony, notwithstanding his cross-examination. Indeed, in summation, the government theorized that Carrero's grand jury and direct testimony were true, and his recent recantation was merely a lie to protect his fellow gang member. (Guevara's Resp. to Pl.'s SOAF ¶ 36.) A jury could thus reasonably conclude that Carrero's allegedly coerced grand jury and direct testimony was not immaterial. And Carrero's testimony identifying the gun he received from Rios as a .38 helped the government's case by bolstering Rios' statement (which he asserted

27

was coerced and untrue) admitting to being armed with a .38 caliber snub nose revolver. (*See* Carrero's Trial Test. at 18:30–21:13.) Guevara's summary judgment motion is thus denied as to Count X.

### C. Counts VIII and IX – Unduly Suggestive Identification Procedure Used with Huertas

Counts VIII and IX pertain to Rios' claim that the defendants impermissibly used suggestive identification techniques in connection with Huertas' lineup identification of Rios. (SAC ¶¶ 169–71; *see* R. 192 at 23–28.) Count VIII is an independent claim for the identification procedure; Count XI is a *Brady* claim.[9]

First, the defendants argue that unduly suggestive identification technique claims are not cognizable under § 1983. (*See* R. 177 at 21 (Guevara adopting Mason & Halverson's arguments at R. 181 at 223).) Yet, as they admit, this issue is currently on appeal, and so the Court is bound by precedent allowing plaintiffs to recover for flawed identification techniques which undermine their right to a fair trial:

> [The Constitution] guarantee[s] the right to a fair trial—in this context, via the due process clause of the Fourteenth Amendment—and that right is violated if unduly suggestive identification techniques are allowed to taint the trial . . . [the defendant] cannot be liable under § 1983 unless [the plaintiff] shows how the flaws in [the defendant's] identification techniques made his trial unfair.

*Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006).

Second, Guevara argues there is no evidence to support Counts VIII and IX, or alternatively, that he is entitled to qualified immunity. (R. 177 at 21–28.) But

---

[9] *See supra* note 6.

whether characterized as a third *Brady* claim or a claim for using unduly suggestive identification techniques, fact disputes preclude summary judgment. *See generally Goudy*, 922 F.3d at 838 (providing that whether labeled as "*Brady* claims" or "identification procedure claim[s]," such "allegations do not give rise to separate claims under section 1983" but rather "a single claim: that the defendants are liable for causing him to receive an unfair trial in violation of his due process rights"). Indeed, there is evidence from which a jury could conclude that Guevara used unduly suggestive identification techniques. This includes evidence of when Guevara showed Huertas a photograph of Rios just before a lineup containing Rios, and when Guevara threatened Huertas to make an identification. (Huertas Aff. ¶¶ 7–8.) A jury could also conclude that Guevara failed to disclose the true nature of his coercive tactics by failing to make the prosecution aware of it. *See, e.g., Avery*, 847 F.3d at 443 (analyzing allegations that the officers' "fail[ed] to disclose the details of the pressure and inducements they brought to bear to extract false statements from [jailhouse informants]" as *Brady* claims). It is also reasonably probable that prejudice ensued because Huertas testified to positively identifying Rios in a lineup at Rios' trial. *Goudy*, 922 F.3d at 842; *Patrick*, 974 F.3d at 834; Pl.'s Resp. to Mason's & Halvorsen's SOF ¶ 56.) Because there is evidence from which a jury could conclude that Guevara "orchestrat[ed] a show-up identification procedure that caused the criminal trial to be unfair" or " with[held] material exculpatory evidence from the defense and prosecutor," actions which undisputedly violate clearly established

rights, he is not entitled to qualified immunity at this time. *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008).

### D.    Count XIII – Malicious Prosecution

Count XIII is a malicious prosecution claim against Guevara. (SAC ¶¶ 185–92.) "Under Illinois law, malicious prosecution requires proof of: '(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.'" *Moran*, 54 F.4th at 499. Summary judgment is warranted if the defendants "demonstrate that no reasonable jury could find an absence of probable cause to initiate the charges." *Cairel*, 821 F.3d at 834.

The defendants argue that Huertas' lineup identification constituted independent probable cause, dooming Rios' malicious prosecution claims. (R. 177 at 39) (Guevara adopting Mason & Halverson's arguments at R. 181 at 23–27).) Rios argues that a jury should decide whether Huertas' identification supplied probable cause because there is evidence to support an inference that Guevara knew Huertas' identification was unreliable. (R. 192 at 39–40.) The Court agrees with respect to Guevara; probable cause "exists if the totality of the facts and circumstances *known to the officer at the time* . . . would warrant a reasonable, prudent person in believing that the arrestee had committed . . . a crime." *Johnson v. Myers*, 53 F.4th 1063, 1068 (7th Cir. 2022) (emphasis added). A jury could conclude that a reasonably prudent

officer would not think an identification he coerced constituted probable cause, and so Guevara's summary judgment motion is denied as to Count XIII.

### III.    MASON AND HALVERSON'S SUMMARY JUDGMENT MOTION

Mason and Halverson seek summary judgment on Counts I, III–VIII, XIV, and XV. (R. 180 ¶¶ 3–6.) Their motion with respect to Count I is denied for the reasons set forth in II(A) and it is granted as to Counts III–VII for the reasons provided in II(B)(2). Remaining for analysis are Rios' claim that Mason and Halverson used suggestive identification techniques with Huertas, Count VIII; Rios' malicious prosecution claims against Mason and Halverson, Counts XIV and XV; and whether there is evidence to support a jury concluding that Mason and Halverson conspired with Guevara to commit Count I. (*See generally* SAC ¶¶ 59, 193–206); *Reddick v. Bloomingdale Police Officers*, No. 96 C 1109, 1997 WL 441328, at *13 (N.D. Ill. July 30, 1997) ("Section 1983 authorizes recovery for a conspiracy to violate a clearly established constitutional right, not for the conspiracy itself.") (citing *Hostrop v. Bd. of Jr. College Dist. No. 515*, 523 F.2d 569, 576 (7th Cir. 1975)).

First, Mason and Halverson argue that Count VIII fails against them "because the record establishes they had no role in allegedly coercing, unduly suggesting, or inducing Huertas to identify Rios." (R. 181 at 19.) The Court agrees. "Individual liability pursuant to § 1983 'requires personal involvement in the alleged constitutional deprivation.'" *Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018) (citation omitted). "The plaintiff must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct." *Id.* Here,

31

Rios does not dispute that there is no evidence Mason and Halverson participated in or knew about Guevara's alleged coercion of Huertas' identification of Rios. (*See* Pl.'s Resp. to Mason's & Halvorsen's SOF ¶¶ 63–65). Absent such evidence, no reasonable jury could find Mason and Halverson personally liable. *See, e.g.*, *Carmody*, 893 F.3d at 402–03 (affirming grant of summary judgment for supervisors "because there was no evidence that those defendants were personally involved in the alleged pre-termination violation of Carmody's due process rights").

Relatedly, the lack of proof that Mason and Halverson knew of Guevara's alleged coercion of Huertas's identification of Rios likewise means that Rios' malicious prosecution claims fail. No reasonable jury could find an absence of probable cause to initiate the charges with respect to Mason and Halverson, and so they are entitled to summary judgment on Counts XIV and XV. *See, e.g.*, *Moran*, 54 F.4th at 500 (providing that "even if questionable," "an eyewitness 'identification [is] enough to give [the police] probable cause to arrest").

Turning to the conspiracy claims, to prove a conspiracy under § 1983, Rios must prove that the defendants reached an agreement to deprive him of his constitutional rights, and that a member of the conspiracy engaged in an overt act to deprive him of those rights. *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018). Mason and Halverson argue there is no evidence that they conspired with Guevara, or, alternatively, that they are entitled to qualified immunity. (R. 181 at 29–32.) Rios, however, argues that "[t]here is substantial evidence that Guevara, Halvorsen, and Mason agreed, and reached a meeting of minds, to violate [Rios'] civil rights." (R. 193

at 19.) Rios points to Guevara's invocation of his Fifth Amendment privilege when asked whether he conspired with Mason and Halverson to violate Rios' due process rights. (Mason's & Halvorsen's Resp. to Pl.'s SOAF ¶ 16 (citing Guevara Dep. at 17:21–24; 18:1–11).) Because Guevara's Fifth Amendment invocation supports an adverse inference that his answer to this question would have been yes, there is a material dispute on this issue. (*See id.*)

True, Mason and Halverson are correct that an individual's Fifth Amendment invocation must "be weighed *in light of other evidence* rather than leading directly and without more to the conclusion of guilt or liability." *Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995) (emphasis in original). But the Court is not deciding that the defendants are liable based solely on Guevara's invocation, only that a material fact dispute precludes summary judgment. The question of liability on the conspiracy allegation, as well as the other claims surviving summary judgment will be decided by a jury. This fact dispute prevents a finding that Mason and Halverson are entitled to qualified immunity at this time. *See Dominguez*, 545 F.3d at 589.

## IV.   THE CITY'S SUMMARY JUDGMENT MOTION

The City asserts no independent grounds for summary judgment and only argues that summary judgment is proper on Rios' indemnification claim if the defendants are successful in their summary judgment motions. (*See* R. 179.) Because some of Rios' claims survive summary judgment, the City's motion for summary judgment on Count XVI is denied.

## CONCLUSION

For the reasons stated in this Memorandum Opinion, Rios' motion for summary judgment [109] is denied. Guevara's motion for summary judgment [177] is granted as to Counts III–VII, and denied as to Counts I, II, VIII, IX, and X–XIII. Mason and Halvorsen's motion for summary judgment [180] is granted as to Counts III–VIII, XIV and XV, and denied as to Count I and conspiracy. The City's motion for summary judgment [179] is denied. The parties shall be prepared to address the anticipated length of trial and the parties' availability for trial at the December 18, 2024, status hearing.

Date: December 16, 2024

_____
JEREMY C. DANIEL
United States District Judge