FILED
8/10/2022 4:34 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
89CR1652501
Linn, James B
19021997

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT – CRIMINAL DIVISION**

PEOPLE OF THE STATE OF ILLINOIS

        Respondent

             vs.                No. 89-CR-16525

JAIME RIOS,

        Petitioner

**PETITION FOR A CERTIFICATE OF INNOCENCE AND SUPPORTING**
**<u>DOCUMENTATION</u>**

NOW COMES the Petitioner, JAIME RIOS, by and through his attorneys Stephen L. Richards and Joshua S.M. Richards and pursuant to 735 ILCS 5/2-792, petitions for a certificate of innocence as to all charges filed under the indictment in case number 89-CR-16525.

        In support thereof, JAIME RIOS states as follows:

*Procedural History*

1. Jaime Rios was convicted of first degree murder in Illinois state court in a jury trial on November 30, 1990.

2. On January 3, 1991, he was sentenced to serve 36 years in the Illinois Department of Corrections.

3. His conviction was affirmed on appeal on July 15, 1991.

4. On August 9, 2022, his conviction was vacated and the State of Illinois nolle prossed all charges against him.

5. Jaime Rios spent 6849 days in custody, or 18 years and 279 days.

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

*The Jury Trial*

6. Luis E. Morales testified. He gave life and death testimony regarding the victim, his son, Luis Morales. (R. 147-49).

7. He last saw Luis Morales alive three or four days before June 27, 1989. (R. 148).

8. The People then called Luis Alfredo Huertas, a friend of the victim, Luis Morales. (R. 15-52).

9. Huertas was not a member of the Spanish Cobras street gang. (R. 152).

10. He had two felony convictions for possessing a stolen motor vehicle, one in 1986 and one in 1987. (R June 27, 1989. 189-90).

11. Huertas knew Luis Morales by the nickname "New York." (R. 151-52). Morales was a member of the Spanish Cobra street gang. (R. 157, 200).

12. On June 27, 1989, at approximately 11:15 p.m., Huertas was in front of 1310 north Western Avenue, a place where he and Luis Morales used to shoot pool. (R. 152).

13. Huertas stated that Western Avenue was known as the borderline between the Spanish Cobras and the Latin Kings street gangs. (R. 166).

14. Huertas had been waiting for Morales for about 45 to 50 minutes when he noticed two men turning left on to Western Avenue from Potomac Street and heading northbound on Western (R. 153) in his direction. (R. 155-56).

15. Huertas did not recognize either of the two men. They appeared to be Hispanic. (R. 153-54).

16. The taller of the two men was a little shorter than Huertas, who was 5 feet nine inches tall. The taller man was slim and light skinned. He had a thin mustache which was just growing out. (R. 155).

17. The taller man was wearing a green hospital shirt, short pants, and gym shoes. The shorter man

FILED DATE: 8/10/2022 4:34 AM  89CR1652501

was wearing something red. (R. 191-92).

18. Huertas did not get a good look at the shorter man. (R. 156).

19. The street was well lit. There were working street lights and lights from the stores. (R. 155-56).

20. The taller man "represented" the Spanish Cobras gang by saying the name "Spanish Cobras." (R. 156-57).

21. Huertas remained seated. He viewed the face of the taller man for 10 or 15 seconds. (R. 200).

22. Huertas identified Jaime Rios as the taller of the two men he saw on that night. (R. 158-59).

23. The two men continued walking northbound on Western Avenue, as Huertas watched. (R. 157-58).

24. Huertas then saw Luis Morales and another Spanish Cobra, Javier Torres, also known as Loco, walk out of a gangway or alley. (R. 159-60). Luis came first, and Javier was behind him. (R. 160).

25. Huertas saw Luis Morales approach the two men walking northbound on Western Avenue. (R. 160-61). Morales made a gesture with his arms up and palms outstretched as if he were saying "what's up?" (R. 161).

26. Huertas then saw the taller man take one step back, lift his arm toward his belt and point a pistol at Luis Morales. (R. 161-62). The taller man was about a foot from Morales. (R. 162).

27. The taller man's first shot struck Morales in the head. (R. 196-97).

28. Huertas heard "about four gunshots" and then saw Luis Morales fall to the ground.

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

29. (R. 162-63). Morales fell on his left side, with his body hitting a car and a pole. (R. 163).

30.  Huertas watched as Torres ran westbound toward Torres's house. (R. 163). Huertas saw the taller man running east through a big empty lot. (R. 163).

31. When the taller man reached the other side of Western Avenue, he yelled "king love" and "Spanish Cobra killer." (R. 164). Huertas lost sight of the taller man when the taller man ran through an alley. (R. 165).

32. The shorter man stopped in the middle of Western Avenue, turned and shot at Torres. (R. 165). Huertas lost sight of the shorter man when he ran though the same empty lot that the taller man had run through. (R. 167).

33. Huertas then ran to Luis Morales and was the first person to attempt to assist him. (R. 167). Huertas held Luis Morales in his arms and tried to talk to him, but Morales did not respond. Morales had a bullet hole on the left side of his head and there appeared to be an injury to his stomach as well. (R. 167-68).

34. Torres came back to the scene of the shooting and began crying: "No, not New York. No, can't be New York." Loco then went to get an ambulance. (R. 169). The ambulance and the police arrived.

35. Huertas spoke with police that evening and the next morning was contacted again by the police. (R. 170-72).

36. On that morning, June 30, 1989, Huertas went in to view a line-up but could not identify anyone. (R. 172-73). Jaime Rios was not in the line-up that Huertas viewed. (R. 174).

37. On July 7th, 1989, Detective Guevara brought Huertas to the station to view another line-up and Mr. Huertas picked out Rios immediately. (R. 177).

38. On cross-examination, Huertas was asked if he had told the police that the shooter was about 5

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

foot six or seven with brown hair reaching to his shoulders. (R. 198).

39. Huertas responded that the shooter was five foot six and had brown hair reaching to his collar. (R. 198-99). He did not tell the police that the shooter had a beard. (R. 199).

40. Huertas denied that he had told the police that the shorter person was also five foot six or five foot seven and that that person was wearing a red T-shirt. (R. 199).

41. Officer Joseph Moran, an evidence crime laboratory technician with the Chicago Police Department testified. (R. 205). Officer Moran investigated the crime scene at 1316 North Western Avenue on June 28, 1989 and described the bullet casings found at the scene. (R. 208-14).

42. On the scene, Moran recovered three .25 caliber cartridge casings, which would have been fired from a semi-automatic weapon. (R. 209-10, 214-15). The cartridge casings were recovered from the sidewalk near where the shooting took place, close to the car and the light police. (R. 212-13).

43. Moran did not recover any .38 or .22 caliber shells from the street or the sidewalk. (R. 210-11).

44. Officer Moran also described, on cross-examination, how he dusted the car at the crime scene for fingerprints and found five fingerprints which were suitable for comparison. (R. 219-20).

45. He dusted the car for fingerprints because he had been told that Morales and the shooters had been in that area wrestling or fighting. (R. 222).

46. Javier Torres, who was also known as Loco, testified.  (R. 227).

47. At the time he testified, Torres was in juvenile custody and had cases pending. (R. 228).  He was charged with two sales of cocaine and a violation of probation. (R. 246). He admitted that he know the States Attorney could help him on his juvenile case (R. 245), but testified that no promises had been made. (R. 246).

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

48.   On June 27, 1989, at about ten minutes to midnight Torres was with Luis Morales, walking

      from Artesian through the gangway to Western. (R. 228).

49.   Torres was about five steps behind Morales. Morales stepped out of the gangway first. (R. 228).

50.   As he stepped out of the gangway, Torres saw a "dude" pulling out a pistol. He started running

      as fast as he could. The "dude" started shooting, and Torres started running faster. Torres could

      not see what the person who pulled the pistol looked like. (R. 229).

51.   Torres came back to the scene to find Huertas holding Morales. Torres was crying. (R. 229).

52.   That morning, Torres spoke to the police and told them that "Macho," a Latin King, had shot

      Morales. He testified that this was a lie.  (R. 230).

53.   Torres admitted that he looked through a "gang book" and picked out a picture of Macho. (R.

      238).  Torres denied ever telling the police that he had lied about "Macho." He did

      acknowledge that he had viewed a lineup and had not picked anyone out. He said that he named

      Macho because he did not get along with Macho. (R. 232).

54.   However, Torres  did say that he saw Macho in the alley a few minutes before with another

      person he did not recognize. (R. 238-39). Both Macho and the person he was with had short

      Afro-like hair. (R. 240).

55.   Torres  admitted that he told the police that Macho was the shooter because he had reasoned

      that Macho had walked east from the alley and had come north on Western to do the shooting.

      (R. 240). Torres identified a photograph of Macho Melendez, which depicted  him with short,

      Afro-like hair. (R. 241, C.L.R. 93). Torres knew Macho from the neighborhood. (R. 241).

56.   Torres admitted that he told the police that the person with Macho was younger and less

      muscular, but claimed that this statement was a lie. (R. 243). He also admitted telling the police

      that he saw Morales being grabbed and pushed up against a car by a perron who saud "Latin

FILED DATE: 8/10/2022 4:34 AM 89CR1652501

King," but said that this was also a lie. (R. 243-45).

57. Dr. Yuksel Konakci, an assistant medical examiner, testified. (R. 248).

58. He performed the autopsy of Luis Morales. (R. 251-63).

59. In Dr. Konakci's opinion, Luis Morales had died as a result of multiple gunshot wounds. (R. 261). He was shot five times. Two bullets had lodged in his body and the other three wounds were through and through wounds. (R. 255).

60. There was a bullet entrance wound on the left anterior upper aspect of the forehead. The bullet travelled from the front to the rear of the brain and lodged in the posterior aspect of the brain inside the cerebellum. (R. 253-54).

61. A second bullet entered the left elbow and exited the left forearm. (R. 254).

62. A third bullet entered the navel and lodged in the muscular tissue in the back of the abdomen. (R. 254).

63. A fourth bullet entered the right thigh and travelled through and through, while a fifth and last bullet entered the rear of the right arm, travelled through and through and made an exit in the inner aspect of the right arm. (R. 265).

64. Both of the recovered bullets were deformed. (R. 261-62).

65. There were nine abrasions and lacerations on one side of the face, which were consistent with a fall after being shot. (R. 262, 267). They were also consistent with someone taking Morales's head and pushing it down onto the sidewalk or against a car. (R. 267-68).

66. There was no evidence of close range firing with respect to any of the wounds. (R. 264-65). Stippling, or evidence of close range firing normally occurs if a gun is fired closer than 2 or 3 feet away from the entrance wound. (R. 268, 270).

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

67.     Detective Reynaldo Guevara testified. (R. 270).

68.     In July of 1989 he was an investigator with the Gang Crimes unit. (R. 271-72).

69.     Four months before the Rios trial, after being a Chicago policeman for 18 years, Guevara

        become a detective. (R. 271).

70.     Guevara testified that he became involved in the investigation of the Luis Morales murder on

        June 27, 1989, the day of killing. (R. 272-73). He started talking with "people in the streets."

        (R. 274).

71.      On cross-examination, Guevara said that he first become involved with the investigation on

        July 3, 1989. No one asked him to get involved; he heard about the shooting and got involved

        "voluntarily." (R. 281-82).

72.     At the time he was investigating the case, Guevara had reviewed the beat officer's report, and

        the case report, but none of the detectives' supplementary reports. (R. 284-87). He did not use

        any of the information in the reports to help him in his investigation. (R. 287).

73.     Guevara was aware that none of the reports named Jaime Rios. (R. 285). He was unaware that

        Macho Melindez had been named as a shooter. (R. 285-86).

74.     Guevara claimed that "reliable" confidential informants told him that the shooting had been

        perpetrated by "Tino" and "Jamie," and that Jamie was the shooter. (R. 273, 273-74).

75.     Guevara claimed that the two confidential informants also told him where the guns which had

        been used in the murder could be found. (R. 300).

76.     On cross-examination, Guevara first said that there were "several" confidential informants and

        then that there were two confidential informants and that the "rest" were informants but not

        confidential. (R. 283).

77.     None of the informants were present for the murder, and their information was second or third

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

hand. (R. 284-85).

78.     One of the informants was "Little Mike." (R. 283).

79.     Guevara claimed that he "recognized" Jamie as Jamie Rios, a member of the Latin Kings, with

whom he had prior contacts. (R. 274).  On cross-examination Guevara conceded that the

confidential informants were gang members, that gang members sometimes lie to the police,

and that they will sometimes  set each other up just to get a member of a rival gang off the

streets. (R. 282).

80.     Guevara began to look for Rios on July 3, 1989. (R. 274-75).

81.     Guevara claimed that he and his partner, Steven Garwys,  found Rios on July 6, 1989  at 9:30

at night. Rios was riding on a bicycle in front of 1440 Leavitt. (R. 275, 278).

82.     Guevara claimed that he said to Rios: "Jamie, I have been looking for you for the past 3 days. A

few days or so. Where have you been hiding?" Rios replied: "I haven't been hiding anyplace. I

have been around." (R. 276).

83.     Guevara claimed that he asked Rios to come to Area 5 to speak with Guevara about the

investigation of the shooting of  "New York"  and that Rios agreed. (R. 277).

84.     After Rios had been placed in the squad car, Rios's girlfriend approached.

Guevara claimed that he told her that Rios was under investigation, that he was going to Area 5,

and that he would be brought back later on. (R. 278).

85.     Detective Guevara  claimed  that Rios voluntarily went to Area Five for questioning, that Rios

was not handcuffed prior to his arrest,  which occurred at Area Five, and he denied searching

defendant's apartment. (R. 278-290).

86.     Guevara claimed  that when he arrived at Grand and Central, he introduced Rios to detectives

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

Mason and Halverson of Area 5 Violent Crimes and then left.    (278). When he returned later, he learned that Rios had given a statement implicating himself. (R. 278-79).

87.   On July 7, 1989, between 4:30 and 4:45 p.m., Guevara picked up Luis Huertas at 1313 Western. (R. 279).

88.   Guevara took Huertas to detectives Mason and Halverson for the purpose of viewing a lineup. (R. 280).

89.   Guevara identified Jaime Rios in open court. (R. 280).

90.   Guevara claimed that he brought one of the two confidential informants to a detective to tell the detective where the murder weapon might be found. (R. 300- 01).

91.   Guevara admitted that based upon what the confidential  informants told the detectives, search warrants were issued for the homes of Alex Lopez (R. 301) and Ben Carrero. (R. 302).

92.   However, no .25 caliber gun until was recovered from the Alex Lopez warrant, and no .38 caliber gun from the Benjamin Carrero warrant. (R. 302).

93.   Guevara acknowledged that there were many shootings in the area where Luis Morales was killed, and that it was high crime area. (R. 303). There were a particularly high number of murders in that area because it was the border between two gang territories. (R. 303-04).

94.   Guevara knew that Macho Melindez was a Latin King, and the head of the Latin Kings in that section. (R. 304).

95.   Chicago police officer  Daniel Noon, a gang crimes specialist, testified. (R. 313-14). After summarizing the structure of Chicago street gangs (R. 319-24)  Noon testified that Jaime Rios had admitted that he was a foot soldier in the Latin Kings street gang. (R. 324-26).

96.   On June 28, 1989, Noon picked up Luis Huertas and took him to view a lineup. (R. 326-27).

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

Huertas was not able to identify anyone. (R. 332). Jaime Rios was not in that lineup. (R. 328).

97.     Noon also took Huertas to show him some books containing photographs of gang members. (R. 327-28). Huertas did not identify anyone. (R. 329). Jaime Rios's photo was not in any of the books. (R. 329-31).

98.     On cross-examination, Noon admitted that there was a different book of photographs of Latin Kings at the 14th District which were shown to witnesses to the Morales murder. (R. 332).

99.     Noon was not present when Mario Flores and Javier Torres looked at the photo books at the 14th District. (R. 332-33).

100.    Noon did not show the 14th District books to Huertas. (R. 334-35).

101.    Benjamin Carrero testified. He was good friends with Jaime Rios and had known him for four years. (R. 341-42). Mr. Carrero was also a member of the Latin Kings. He was a foot soldier. (R. 342).

102.    Carrero testified that July 9, 1989 at 10:15 p.m., officers came over to his house with a search warrant for a gun. (R. 342-43).

103.    The officers recovered a gun from his house. (R. 345-46).

104.    The gun was thrown from the house by Iris Mendez, his girlfriend. (R. 343-44).

105.    The gun was a .32 caliber revolver. (R. 344).

106.    After the gun was recovered, Carrero was taken to Area 5, and had a conversation with police officers who were there. (R. 344-45).

107.    Mr. Carrero testified that on June 28, 1989, at approximately 12:30, Jaime Rios came to Carrero's house at 493 North Lincoln Park and gave Carrero a gun to hold. (R. 348-49).

108.    At trial, Carrero denied telling police officers on the day that the search warrant was executed

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

that at the time Jaime Rios handed Carrero the gun, Rios said: "Hold this for me. I just shot

somebody. I will be back." (R. 349-50).

109. Carrero acknowledged that on July 18, 1989, he went to testify before the grand jury. (R. 350-

51).

110. Carrero denied telling the grand jury that Rios told Carrero to hold the gun because he had just

shot somebody. (R. 353-54).

111. Carrero admitted that Rios's defense attorney, assistant public defender Jack Carey, had driven

him to court on the day he testified. (R. 354-55).

112. On cross-examination, Carrero said that he had first told the police that he did not know anything

about the gun, but they had threatened to lock him up and take his kid away. (R. 356-57).

113. Chicago police detective Michael Mason testified. (R. 359-60).

114. On July 6, 1989, at approximately 8 p.m., Mason spoke to officers from gang crimes, Guevara

and Goris, who had brought in Jaime Rios. (R. 362-63).

115. Mason left Rios in an interrogation room while he went to locate witnesses to the

murder. (R. 363-64).

116. At 12:00 a.m. on July 7, 1989, Mason and his partner, detective Halverson, went into the

interrogation room and gave Rios Miranda warnings. (R. 364). After speaking with Rios for

half an hour, Mason told Rios that he was under the arrest for the murder of Luis Morales. (R.

364-65). Mason placed Rios in handcuffs and notified felony review. (R. 365).

117. Although Mason arrested Rios, Guevara and Gawrys signed the arrest report. (R.

401-02).

118. At 2:30 a.m., Mason was present when Rios gave Assistant States Attorney Barb Riley another

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

statement which was consistent with the one he had given to Mason earlier. Riley again advised Rios of his Miranda warnings and told him that she was a lawyer working in the States Attorney's Office and not his lawyer. (R. 366). This conversation also lasted for a half hour. (R. 366-67).

119. Rios agreed to give a statement in front of a court reporter. (R. 367). The court reported statement took about 15 or 20 minutes. (R. 367).

120. The statement was typed up and reviewed by Rios, who made corrections and signed it. (R. 367-68).

121. Later on July 7, 1989, at 5:15 p.m., Mason, together with detective Halverson, conducted a lineup. (R. 368-69).

122. Luis Huertas and Javier Torres viewed the lineup. (R. 369-70).

123. Huertas identified Rios as the shooter. Torres said he could not identify anyone. (R. 371).

124. On cross-examination, Mason conceded that Jaime Rios was the only person in the lineup who was from Latin King territory; all the other people in the lineup were from Cobra territory. (R. 411-13).

125. On July 9, 1989, Mason had a conversation with Benjamin Carrero. (R. 371-72). Carrero told Mason that on June 28, 1989, between 12:30 and 1:00 a.m. in the morning, Rios gave Carrero a gun and told Carrero that he had just shot somebody. (R. 373). Carrero remembered the day because it was his birthday. (R. 373-74).

126. On cross-examination, Mason testified that on July 29, 1989, Christino Garcia was placed in a lineup which was viewed by Javier Torres. (R. 385-86). Torres did not identify Garcia. (R. 386-87).

FILED DATE: 8/10/2022 4:34 AM    89CR1652501

127.    Mason also testified that based on information he received from confidential informants

provided by Guevara he searched the home of Al Lopez for a .25 caliber pistol and the home

of Benjamin Carrero for a .38 caliber pistol. Neither were recovered. (R. 397-98). The gun

recovered from Carrero was a .32 caliber pistol. It is not possible to fire .25 caliber bullets from

a .32 caliber pistol. (R. 398-99).

128.    Detective Mason denied hitting Jaime Rios. (R. 402).

129.    Mason testified that he watched Gloria Rodriguez, the girlfriend of Jaime Rios go into the

interview room with Rios and stated that she was in the room with him for a "few minutes." (R.

408).

130.    On redirect examination, Detective Mason testified that the only time Jaime Rios was

handcuffed was when he was in the room by himself after he had been arrested. (R. 436).

131.    Donald Flannery, an official court reporter was called to testify to what Benjamin Carrero told

the grand jury. (R. 441-48). He testified that Carrero told the grand jury that Rios took the gun

from his waistband (446-47), and that Rios said he had just shot someone. (R. 450).

132.    Assistant State's Attorney Barbara Riley testified. (R. 451-52). She testified to the court

reported statement which read as follows:

"This is the statement of Jaime Rios taken in an interview room at area 5 violent crimes,

Chicago police department, 5555 West Grand Avenue, Chicago,

Cook County, Illinois on Friday, July 7th, 1989 at the hour of 4:39 o'clock a.m •• Present are

Ms. Barbara Riley, Assistant State's Attorney, Detective Mason Michael Mason, star number

12972, area 5 violent crimes. Reported by Janet K. Lupa. Book number 8907-7.

Miss Riley: Let the record reflect that we are in an interview room at area 5 violent crimes.

Today's date is July 7th, 1989. The time is 4:39 a.m .• Present in the room with me, Assistant

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

State's Attorney Barb Riley, are Detective Michael Mason, star 12972, the court reporter and

Jaime Rios.

We are here to take the statement of Jaime Rios concerning the investigation of the fatal

shooting of Luis Morales which occurred on June 27th, 1989 at approximately 11:50 p.m. at

1316 North Western.

Jaime, I talked to you earlier and I explained that I am an Assistant State's

Attorney, a lawyer working the police and not your lawyer, is that correct?
A. Correct.

Q. Before we spoke I advised you of your constitutional rights, is that correct?

A. Right.

Q. Now, I am going to read them to you again. Do you understand that you have the right to remain silent?
A. Yes.

Q. Do you understand that anything you say can be used against you in a court of law?
A. Yes, Ma'am.

Q. Do you understand that you have a right to talk to a lawyer and have him present with you while you are being questioned?
A. Yes, Ma'am.

Q. Do you understand that if you cannot afford to hire a lawyer, one would be appointed by the Court to represent you before any questioning, if you wished one?
A. Yes, Ma'am.

Q. Understanding these rights do you wish to talk do us now? gang?
Q. Jaime, are you a member of a gang?

A. Yes.

Q. What gang?

A. Latin Kings.

Q. How long have you been a member of that gang?

FILED DATE: 8/10/2022 4:34 AM    89CR1652501

A. I have been at least 5 years.

Q. Since you were how old?

A. Since I was 12.

Q. You are how old now?

A. 18.

Q. Okay. What is your rank in that gang?

A, Foot soldier.

Q, Calling your attention to the evening of June 27th, 1989, That was a Tuesday night. What were you doing?
A. I was outside in the front.

Q. Of where you live?

A. Yes.

Q. Would that be 1440 North Leavitt?

A. Yes, Ma'am.

Q. Who was with you?

A. My brother-in-law, my friend Lamont and my lady.

Q. What happened at that time?

A. Well, a Cutlass came by and passenger, and the driver took out his right hand and held the steering wheel with his left hand. He tried to shoot at me and shot his friend one time and shot 3 times towards me and my lady.

Q. You said that was a Cutlass?

A. A Cutlass.

Q. Two-door Cutlass black.

Q. And what direction on Leavitt was that car going?

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

A. He was going straight on Leavitt?

A.  Straight down Leavitt?

A. He was going straight.

Q. So where did you go after he shot at you?

A. After the shooting he past the stop sign and  he went up Hirsch. He took a right up Hirsch.
Q. Did you know who was in that car?

A. No.

Q. What did you presume that they were?

A. I presumed they were Cobras because they went straight across Western.

Q. So, in other words, they drove back into Cobra territory?

A. Yes.

Q. So what did you do after this happened?

A. I went upstairs and got my gun.

Q. What kind of gun is that?

A .38 snub nose.

Q. What color is that gun?

A. It is black.

Q. What did you do then?

A. I went towards Bell. And that is when I  found Tino.

Q. Now, when you set off what was your goal? What were you going to do?

A. I was going to go straight to Western myself.

Q. You were going to go to Western by yourself? Were you going to cross Western?

A. No. I was going to shoot from inside my territory towards their territory to get them scared

FILED DATE: 8/10/2022 4:34 AM 89CR1652501

the way they scared me.

Q. Who did you run into?

A. Tino.

Q. What is his real name?

A. Christino.

Q. How long have you known Christino?

A. I have been knowing him at least 5 to 6 years.

Q. Is he a member of the Latin Kings also?

A, Yes.

Q. What is his rank?

A, He's got no Rank. He is a foot soldier just like me.

Q. Did you have a conversation with Tino when you met him?

A. Yeah.

Q. What did you talk about?

A. I was talking about the guys that came shooting at me. It had to be Cobras. I was going up that

way. He wanted to come with me. And he wanted to meet me on Oakley.

Q. What did he say then?

A. He said, all right.

Q. Where did he go then?

A. He went and got the gun.

Q. Did you meet him on Oakley?

Q. We met up on Oakley.

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

A. How long was Tino gone to get that?

Q. At least 10 minutes.

A. Did you see what kind of gun he had when he

Q. No.

A. Did you know what kind of gun he had?

Q. He had an automatic. .22  I think it was.

Q .22 or .25?

A. He had a magazine .22 or .25. It was just a small automatic gun.

Q. What color was his gun?

A. It was black.

Q. Where did he have it?

A. In his pocket.

Q. Where was your gun?

A. In my pocket.

Q. Now, where did you go?

A. We went all the way to Division and Western to look around.

Q. Did you see any Cobras at that time?

A. No.

Q. Did you cross Western?

A. Yeah.

Q. On what street?

A. From the street.

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

Q. Which street is that?

A. We crossed Western towards going to Potomac and Western.

Q. Where did you go then?

A. We went through the alley in front of a fire station.

Q. What happened when you got there?

A. Right there he stopped and I told him to wait while I went to the corner of Potomac and Artesian to take a peek.

Q, What were you looking for?

A. I was looking for a little crowd so I could shoot at the Cobras and scare them like they scared me without hurting anybody.

Q. Tino was the lookout?

A. Uh-huh.

Q. What made you think there would be a crowd there?

A. Because they be selling reefer out there in a crowd.

Q. Did you see anybody when you got to Artesian?

A. No.

Q. What did you do then?

A. I turned back around, went towards the alley. Then I passed the alley. Then two guys in the alley, they told me, who is that. I told them it is me. They said all right.
Q. Did you know who these guys were?

A. Uh-uh.

Q. How many houses away were you from these guys when you saw them?

A. At least 3 houses away.

Q. Could you identify them as Cobras?

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

A. No.

Q. Could they identify you as a King?

A. I doubt it. I don't think so.

Q. Now, at the time that you were in that alley  where was Tino?

A. He is in the other side of the alley by the fire station on the other side of Potomac.

He was on the same side of Potomac, but he was on the other side of the alley by the fire house.
Q. Okay. So, what else occurred at this point?

A. At that point we walked.

Q. Did a car come by?

A. Yeah.

Q. What kind of car was that?

A. A car came by and asked me if I have any I told him no.

Q. What kind of car was it?

A. 4-door Chevy.

Q. Do you know what color?

A. It was like a goldish brown. Something like that.

Q. Where was Tino now?

A. Tino started walking towards Potomac.

Q. Are you walking together?

A. Yeah.

Q. And you are on the north side of Potomac?

A. Yeah.

Q. When you got to the corner which way did you go?

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

A. We turned left.

Q. So you are walking north on Western?

A. We turned left, north of Western.

Q. North on Western?

A. Yeah.

Q. Were you still looking for Cobras?

A. Yeah.

Q. What did you see next?

A. I seen this guy sitting by a bar. I told him, what's up. He told me, what's up. We kept walking.

Q. Could you identify him as a gang member?

A. No.

Q. So you kept on walking. Then what happened?

A. Then these two guys came out the empty lot. We looked. One of the guys went towards the street. And from the street he jumped back to the sidewalk. So he went like what. He went towards the street and from the street he went back to the sidewalk. He went like this towards Chris. That is (indicating) where Chris was. And Chris took out his gun and shot the guy.

Q. Let the record reflect that he is holding his hands up in the air with his palms facing toward the front. He went like this (indicating).

Q, And then what did Tino do?

A. Tino took his gun out of his pocket and shot the guy.

Q, At the point that Tino shot the guy how far away from the guy was he?

A.  He was at least one foot away from the guy.

Q. One foot?

A. He had his arm outstretched.

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

Q. So the gun was a foot away from the guy when he shot him? guy?

A, Uh-huh.

Q. How many times did he shoot him?

A. 3 times.

Q. Where on the guy's body did he hit him?

A. Toward the stomach.

Q. Where were you when Tino was shooting this guy?

A. I was at least 5 miles away from him.

Q. 5 what?

A. 5 or 8.

Q. Feet?

A. Yeah.

Q. Away from him to the side, toward the sidewalk?

A. Yes.

Q. Towards the sidewalk? Were you in front of or behind Tino? shot?

A. I was in front. And in front of Tino.

Q. About 5 to 8 feet to the side?

A. Yeah.

Q, There was another guy with the guy who got shot?

A.  Yeah.

Q. What did he do?

A. He ran through the empty lot and got lost.

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

Q. He went back to the empty lot?

A. He was running west through the empty lot into the empty lot.

Q. Back into Cobra territory?

A. Uh-huh.

Q. What did Tino do after he shot the guy?

A, He was running back across Western.

Q. Back to King territory?

A. Yeah.

Q. What did you do then?

Q. I was in the middle of Western and I hollared King love and I shot twice towards the air towards the building.

Q. Which building is that?

A. Towards the building that was close to the empty lot, that building.

Q. At the time that you shot towards the building where was the guy that was running?
A. He was gone.

Q. He was gone? Where was the guy who was shot?

A. He was already on the floor by a car. A car was right there. So I couldn't even see the guy on the floor.

Q. Where did you run then?

A. We ran to the empty lot. And from there we split up.

Q. Where did you go then?

A. I ran to my mom's house, all the way to Wolcott.

Q. What did you do with that gun?

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

A. Well, about two weeks later I threw it in the lake. I got rid of it.

Q. Jaime, are you under the influence of any  drugs or alcohol now?

A. No.

Q. Have you been promised or threatened anything in return for this statement?

A. No.

Q. Have the police treated you fairly since you have been in their custody?

A. Yes, Ma'am.

Q. Have you had something to drink?

A. I didn't really want anything to drink, just some water.

Q. Have you been allowed to go to the bathroom?

A. Yes.

Q. And smoke?

A. Yes.

Q. Can you read and write?

A. Yes.

Q. How far did you go in school?

A. I went through my third year of high This concludes the statement of Jaime Rios.

The time is now 4:51 a.m." (R. 466-80, C.L.R. 84-92).

133.  After the publication of the statement, the State rested. (R. 503).

134.  Samantha Hudson testified. (R. 507).

135.  In June of 1989  Hudson  was living at 2419 west Potomac. (R. 507). The building bordered the

alley between Artesian and Western. There is a fire station on the other side of the alley. (R.

508).

136.    On June 27, 1989, Hudson was sitting outside with her sister in law. (R. 508).

137.    At around 11:30 or 11:45 p.m., Hudson went into the alley to take garbage to the garbage cans. (R. 508). As she got to the garbage cans, she saw two men behind one of the garbage cans. (R. 508). One of the men came from behind the garbage can. He has "black straight curly hair." (R. 509).

138.    The man had a green shirt on and was wearing British Knight gym shoes. He was clean shaven, without a mustache. He was about 5 foot five inches tall, weighing about 138 to 140 pounds. A second man with him was the same height and weight and was also wearing British Knight gym shoes. (R. 510). The second person had blond hair. (R. 514).

139.    Both men had their arms on the right side of their legs and were holding something. (R. 514).

140.    Hudson asked the first man what the fuck he was doing back there. The man told her to mind her own damn business and to shut the fuck up. (R. 509).

141.    Hudson viewed two lineups and did not identify anyone. (R. 510-11).

142.    Hudson was shown two photographs of lineups by the defense and stated that she did not recognize anyone in the photographs, apart from someone she went to high school with. (R. 512-13).

143.    Shortly after her encounter with the two men, Hudson heard gunshots. Later she learned that the person who was shot was "New York," who was a friend of hers. She saw him laying on the sidewalk. (R. 515).

144.    On cross-examination, Hudson said that she could not make an identification because she did not get a good look at the two men. (R. 518).

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

145.     Chicago police officer Fred Harris testified. (R. 520). The fingerprints taken from the car which

         was at the scene did not match Jaime Rios's fingerprints. (R. 521- 525).

146.     Iris Mendez testified. (R. 526).

147.     In July of 1989, Mendez was living at 1419 north Wicker Park. She was living there with her

         boyfriend, Benjamin Carrero, his mother, her baby, and Carrero's siblings. (R. 527). Her baby

         was a four month old boy. (R. 527-28).

148.     On July 8, 1989, the police came to Mendez's house with a warrant. They said they were

         looking for a gun. (R. 528).

149.     While the police were searching upstairs, Mendez went back downstairs, went to a room, took

         the gun out, and threw it out the window. (R. 528-29).

150.     While the police were still at the house they questioned Mendez. They told her if she knew

         where the gun was to tell them and if she knew anything about the murder to tell them. If she

         did not tell them anything, they would take her baby away. (R. 529-30).

151.     Chicago police detective Richard Curley testified. (R. 532-33).

152.     In July of 1989 Curley was part of a team which executed a search warrant for a 38 caliber

         revolver at 1419 north Wicker Park. (R. 533-34).

153.     He arrested Irene Mendez and questioned her at the station. (R. 534).

154.     He claimed that he did not know that a child was present in the home (R. 534-36) but was

         impeached with a police report he authored, where it was noted that Iris had a two and one half

         month child. (R. 537).

155.     On cross-examination, Curley detailed the sequence of events which led to Mendez tossing the

         gun from the window. (R. 538-45). He denied threatening to take her child from her. (R. 544-

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

45).

156.    The gun recovered was a .32 caliber automatic. (R. 545).

157.    At 11:30 p.m., Curley, along with detective Mason interviewed Benjamin Carrero. (R. 547).

158.    Carrero told Curley that in the late evening hours of June 27, or the early morning hours of

June 28, 1989, he was sitting on the front stairs of his building at which time his friend Jamie

Rios rode by on a bicycle. Rios took a gun from his waistband and handed it to Benjamin

Carrero. Rios said that he had just shot somebody and wanted Carrero to hold the gun for him.

(R. 548). He would return to get the gun. Carrero took the gun and hid it in a closet in his

bedroom. (R. 549).

159.    Chicago police detective Aubrey O'Quinn testified. (R. 552).

160.    At the end of July, he received an assignment to arrest Christino Garcia. (R. 552- 53).

161.    On July 28, 1989, at 3:15 p.m., O'Quinn picked Garcia up at the corner of Spaulding and

Evergreen. (R. 564).

162.    When Quinn attempted to pick Garcia up, he ran into a store. (R. 554).

163.    Chicago police detective William Johnston testified. (R. 565-66).

164.    Johnston and his partner, detective Robert Boris were originally assigned to investigate the Luis

Morales murder. (R. 566).

165.    At the scene, Johnston and Boris received two descriptions of the offenders. (R.

568-69).

166.    The first description was of a male white Hispanic, 18 years old, 5 feet eight inches tall, 145

pounds, muscular, short afro style combed back, low black gym shoes, armed with a .25 caliber

blue steel revolver. (R. 568-69).

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

167. The second person was described as 16 to 18 years old, male white Hispanic, five feet eight inches tall, 140 pounds, short black afro combed hair, dark complexion, wearing a a dark long sleeve sweater, black shorts above the knee and dark gym shoes. (R. 569).

168. These descriptions came from Mario Flores and Javier Torres. (R. 569, 576).

169. Javier Torres told the officers that Morales had been pushed against a car and that his hair was pulled and dragged to the ground. (R. 572-73).

170. Javier Torres was shown the Latin King gang book number two which was kept at district 14. (R. 573-74).

171. A photograph of Jose M. Melendez, or Macho, was on page 112 B of the book. (R. 574).

172. A photograph of Jaime Rios was on page 109B of the book. (R. 574).

173. When they looked at the book, neither Torres nor Flores picked out Jaime Rios. (R. 575).

174. Jaime Rios testified. (R. 578).

175. In June of 1989, he was living at 1440 north Leavitt with his girlfriend, Diana Rodriguez and his two month old baby. (R. 579, 580).

176. On July 6 or July 7 in the early evening hours Rios was in front of his house with a friend he knew only as "Jamaica." (R. 580).

177. Rios had a bicycle with him. He was waiting for Diane to come back. He could not leave the house because the door was unlocked. (R. 580-81).

178. As he was standing in front of the house, two officers approached him. One of the officers was officer Guevara. Guevara said he wanted to talk to Rios. When Rios asked for what, Guevara said that Rios was being questioned. When Rios continued to argue, Guevara grabbed him and took him to the back of the house. (R. 581).

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

179. When Guevara go Rios to the back of the house, he handcuffed Rios. Another officer pulled Rios by the fence while Guevara went to the middle door and went upstairs. (R. 582). About five or six police officers, in total, were present. (R. 585).

180. The officers were in Rios's house for about 15 or 20 minutes. (R. 586).

181. The officers took Rios to the next block, which was Bell, and then put him in a a car. (R. 587).

182. Rios was taken to 5555 west Grand and put into a room on the second floor. (R. 588-89).

183. Guevara, detective Mason, and another officer came into the room. (R. 569). They told Rios he was "there about the guy that killed the guy, that for me to let them know where the other guy was at. And to say that I was just there with the guy that killed the guy." (R. 589).

184. Rios told the officers that he did not know what they were talking about. In response, detective Mason grabbed Rios by the hair and slammed him against the table. Mason and Guevara kept telling Rios about the details and facts of a murder. Rios responded by telling them about a murder that happened in front of his house. (R. 590).

185. Rios told them about a shooting that happened while he was in front of his house.

186. He was there with his brother in law and a friend. Diana was coming out of the gangway when a car came by, the barrel of a gun came out of the window and a shot was fired. (R. 590-91). Rios ran. Later the police came and told Rios's brother in law not to worry because there were no shots from outside the car. (R. 591). This happened on the second or third of July, 1989. (R. 591-92).

187. Guevara and Mason then told Rios about the details of a murder committed by "Tino." They said: "well, we heard you and Tino went to Western and went to kill somebody over there on Western you had crossed the street and went through an alley. We seen some guys in the alley

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

and that we speak to them. They say, who is that? And that we says, it is me. And that we walked, there was a car that parked right there and asked if we selling reefer. We said, no, we don't got no reefer. We kept walking, went around the corner. And that is when we got by a bar and we had a shooting against a guy that was there."

188.    Guevara and Mason threatened Rios that they would take his child away if he didn't agree with what they said. They told him that all he had to do was just "be there" and they would not take his child away. (R. 593). Rios agreed to make the statement out of fear of losing his son. (R. 596).

189.    At one point, Rios asked the officer to see Diana. (R. 593). At another point, the officers told Rios that she was at the station (R. 593), but he was never able to see or speak with her while he was at the station. (R. 593-94).

190.    Rios was a member of the Latin Kings. He joined when he was 12 years old. (R. 595). He did not have any gang tatoos. (R. 595-96).

191.    After he began living with Diana in 1988, Rios gradually became disaffected with the gang life, but remained because his friends were still gang members. (R. 597, 597-98).  He did not go to gang meetings. (R. 598).

192.    Rios testified that he did not shoot Morales and that he was not with a man who shot Morales. (R. 598).

193.    On cross-examination, Rios said that the murder he initially told the police about occurred on July 2 or July 3, 1989. (R. 603). In that incident, a man on the passenger's side of the car was murdered. (R. 604).

194.    Rios admitted that he was alone with assistant states attorney Riley at one point and did not  tell

FILED DATE: 8/10/2022 4:34 AM  89CR1652501

her about the abuse. (R. 613-14).

195. Rios conceded that the part of his statement about being shot at by people in a two door black Cutlass was true, but that this happened on the day of the murder. which occurred in the front of his house. (R. 615-17). Everything else in the statement was false. (R. 620-24). All the facts and details were supplied by Guevara. (R. 617-19, 629-38).

196. Rios denied that he gave a gun to Benjamin Carrero on June 27, 1989. (R. 645).

197. Diana Rodriguez testified. (R. 647).

198. Rodriguez, reiterated her earlier hearing testimony. (R. 651-55). At trial, however, Rodriguez added the fact that she did talk to Rios as Rios sat in the back of the police car when defendant was asked to go in for questioning. (R. 654). Rodriguez further added that Rios told her he would be home soon and that the officers told her that Rios was being brought in for questioning and that they would let him go home soon. (R. 655).

199. On cross-examination, Rodriguez admitted that she loved Jaime Rios and would help him if she thought he was in trouble. (R. 661).

200. After closing arguments, the jury deliberated and then found Jaime Rios guilty of first degree murder. (R. 762).

201. After considering factors in aggravation and mitigation, the court sentenced Jaime Rios to thirty-six years in the Illinois Department of Corrections. (R. 802).

OTHER EVIDENCE OF INNOCENCE

202. Since Jaime Rios was convicted, five lines of newly discovered evidence have emerged: (1) Benjamin Carrero has recanted his trial and grand jury testimony and has given an affidavit stating that detective Reynaldo Guevara coerced him into falsely testifying that Rios gave him

FILED DATE: 8/10/2022 4:34 AM 89CR1652501

a gun just after the shooting, (2) Luis Huertas has given an affidavit stating that detective Guevara showed him a photograph of Jaime Rios before he viewed Rios in the lineup, that Guevara threatened to lock Huertas up if he did not identify Rios, and that Rios was the only person in the lineup who was also in the photoarray, (3) Cristino Garcia has now given an affidavit that he did not commit the murder of Luis Morales with Jaime Rios, that he has an alibi for the night of the murder, and that Reynaldo Guevara beat him in an attempt to get him to falsely implicate himself and Jaime Rios, (4) detective Guevara has taken the fifth amendment and refused to answer questions about his misconduct in the Luis Morales murder case, and (5) Detective Guevara has a well-documented pattern and practice of misconduct, strikingly similar to the misconduct attested to by Rios at trial, and by Carrero, Huertas, and Garcia in their affidavits.

A.

### Benjamin Carrero

203. Benjamin Carrero has now recanted his testimony at trial, where he testified that Jaime Rios gave him a gun to "hold" on the day of the murder. Carrero has also attested that Guevara coerced him into giving this false testimony, telling him what to say and threatening him with prosecution if he did not say it. (See Exhibit A – Carrero Affidavit).

204. His affidavit is summarized as follows.

205. In his affidavit, Carrero states that he testified at the trial of Jaime Rios that on June 28, 1989, at approximately 12:30 a.m., Jaime gave him a gun to hold.

206. This testimony was in fact false.

207. Carrero did not see Jaime Rios on June 28, 1989, and Rios did not give him a gun to hold.

208. He testified falsely because he was threatened by Detective Reynaldo Guevara,

FILED DATE: 8/10/2022 4:34 AM 89CR1652501

who told him  what to say and to testify that Rios gave him a gun.

209.   Sometime in 1989 Guevara and other officers executed a search warrant on the house he shared

with Iris Mendez.

210.   During the course of the search, officers found a .22 caliber revolver, which Carrero had

purchased on the street.

211.   Carrero was taken to the police station at Grand and Central and interrogated over the course of

two days.

212.   Iris Mendez was also taken into custody.

213.   Guevara told Carrero  to say that Jaime was the one who gave hum  the gun.

214.   Guevara said that if Carrero did not say Jaime was the one who gave him  the gun, Carrero

would take his kids away and he would be charged with possessing the gun.

215.   Iris Mendez was charged with the gun and given probation.

216.   Carrero was never charged with the gun.

217.   Carrero was unwilling to come forward before this date, and would not have told anyone about

Guevara's conduct because Carrero  was afraid of Guevara and what he might do to him.  He

was only willing to come forward now because he had learned that Guevara is no longer a

police officer, is being investigated, and has taken the fifth amendment.

## B.

### *Luis Huertas*

218.   Luis Huertas, the only witness to identify Rios as present at the scene or as the shooter has now

given an affidavit which casts doubt upon the reliability of his identification and provides

further support for the claims of  Rios, Carrero, and Garcia  that Guevara engaged in

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

misconduct to secure Rios's conviction.  (See Exhibit B – Huertas Affidavit).

219.    Luis Huertas acknowledges that he testified at the trial of Jaime Rios and identified him as the

shooter in the murder with which he was charged.

220.    He also identified Rios in a line-up which he viewed on July 7, 1989.

However, before he was brought to this lineup he was contacted by  Reynaldo Guevara.

221.    He attests that Guevara was known to be a "dirty cop," who would put cases on people and

would charge them for no reason.

222.    Guevara picked Huertas up on July 7, 1989, showed him  a series of photographs and told him

to pick out the shooter he had seen.

223.    Huertas told Guevara that he did not recognize the shooter in any of the photographs.

224.    Guevara then threatened to have Huertas locked up if he did not identify the shooter.

225.    Guevara took Huertas to the station and showed him  a lineup.

226.    One of the people who was in the photographs, Jaime Rios, was also in the lineup at the

station.

227.    Rios was the only person in the lineup who was also in the photo array.

228.    Huertas was not willing to give this information to anyone before today because he wanted to

leave the past behind and was afraid that detective Guevara would retaliate.

C.

*Cristino Garcia*

229.    At trial, Reynaldo Guevara testified that confidential informants had told him that the murder of

Luis Morales was committed by Jaime Rios, acting together with "Tino," whom Guevara

identified as Cristino Garcia. In Jaime Rios's court reported statement he said that Cristino

FILED DATE: 8/10/2022 4:34 AM 89CR1652501

Garcia was with him and actually shot Morales. He testified at trial that Guevara persuaded him to make a false confession by providing him with the details of the crime and telling him to blame the actual shooting on Garcia, making him think that he would be a witness against Garcia and would not be charged. Evidence was also introduced that Garcia was arrested and placed in a lineup, but that he was not identified by Luis Huertas.

230. Garcia has now given an affidavit which exonerates Jaime Rios, undermines the reliability of Jaime Rios's court reported statement, and provides additional evidence that Guevara used illegal tactics in an attempt to fraudulently convict Jaime Rios of first degree murder. (See Exhibit C – Affidavit of Cristino Garcia).

231. In his affidavit, Garcia states that he was not present in the area where Luis Morales was shot on June 27, 1989. Instead, he was at home with girlfriend Hermina Cruz and his mother, Elena Carrau. They had ordered pizza and rib tips from Father & Sons.

232. On July 28, 1989, Garcia was picked up Chicago police officers, one of whom was Aubrey O'Quinn.

233. Garcia was placed in handcuffs and taken to Area 5.

234. Garcia was informed by Reynaldo Guevara that he was being accused of murder.

235. Guevara was "very loud and physical" with Garcia.

236. Guevara placed Garcia in two lineups. Garcia was not picked out in either one.

237. Guevara read Garcia a piece of paper saying that Garcia was involved and that he should sign a statement saying someone else did it.

238. Garcia refused and told Guevara that he was not around the area when the "crime was made."

239. Guevara then placed a phone book on Garcia's head and hit him with a billy club or flashlight

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

until Garcia fell to his knees.

240. Garcia then told Guevara to stop and Garcia would sign a statement, but first he needed to make a phone call.

241. Garcia called his sister, Maria Garcia, and asked her to get him a lawyer. When Guevara heard that, he got "really mad," took Garcia back to the interrogation room, and began smacking Garcia with an open hand.

242. A few minutes later, detective Aubrey O'Quinn came to the door and told Guevara to stop hitting Garcia because Garcia's lawyer was there.

243. Garcia was not asked to testify at Jaime Rios's trial and if called to testify would have taken the fifth amendment because he was afraid of Guevara.

ADDITIONAL ALLEGATIONS IN SUPPORT OF THE PETITION FOR CERTIFICATE OF INNOCENCE

244. After conviction, Jaime Rios spent 6849 days in custody, or 18 years and 279 days.

245. His conviction will be vacated on August 9, 2022 and he will be exonerated.

246. Because he is likely to succeed at trial in proving that he is innocent of the offenses charged in the indictment, this court should order an evidentiary hearing on the petition, if it is contested, and allow him an opportunity to prove, by a preponderance of the evidence, that he is innocent of these charges.

247. Under 735 ILCS 5/2-702, the legislature has given a person whose conviction has been reversed, an opportunity to obtain a certificate of innocence, so long as the "petitioner *** prove[s] by a preponderance of the evidence," that: "(1) the petitioner was convicted of one or more felonies by the State of Illinois and subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence; (2)(A) the judgment of conviction was reversed or

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

vacated, and the indictment or information dismissed or, if a new trial was ordered, either the petitioner was found not guilty at the new trial or the petitioner was not retried and the indictment or information dismissed; or (B) the statute, or application thereof, on which the indictment or information was based violated the Constitution of the United States or the State of Illinois.  (3) the petitioner is innocent of the offenses charged in the indictment or information or his or her acts or omissions charged in the indictment or information did not constitute a felony or misdemeanor against the State; and (4) the petitioner did not by his or her own conduct voluntarily cause or bring about his or her conviction."

49.  This petition contains adequate documentation in support of his claim of innocence, and transcripts of the trial will be tendered at the first available court date.

WHEREFORE, Petitioner requests: (1) a certificate of innocence and/or (2) a hearing with respect to his certificate of innocence.

Respectfully submitted,

Jaime Rios

by and through his attorney,

Stephen L. Richards
53 West Jackson Suite 756
Chicago, IL 60604
7738176927
(f) 773-634-8107
Sricha5461@aol.com

EXHIBIT A

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

FILED DATE: 8/10/2022 4:34 AM  89CR1652501

STATE OF ILLINOIS          )
                           ) SS.
COUNTY OF  COOK            )

IN THE CIRCUIT COURT OF COOK COUNTY,  ILLINOIS
COUNTY DEPARTMENT – CRIMINAL DIVISION

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS,  )<br>                                                     )<br>            Plaintiff,                            )<br>                                                     )<br>            vs                                    )<br>                                                     )<br>JAIME RIOS                                   )<br>                                                     )<br>            Defendant.                        ) | 89-CR-16525 |

<u>AFFIDAVIT OF BENJAMIN CARRERO</u>

I, Bejamin Carrero, under oath and penalty of perjury, subscribe and swear as follows:

1. I testified at the trial of Jaime Rios that on June 28, 1989, at approximately 12:30 a.m.,
   defendant gave him a gun to hold.

2. This testimony was in fact false.

3. I did not see Jaime Rios on June 28, 1989, and he did not give me a gun to hold.

4. I testified falsely because I was threatened by Detective Reynaldo Guevara, who told me
   to say and to testify that Rios gave me a gun.

5. A picture of Detective Guevara is attached to this affidavit and I would identify him as to
   detective who forced me to testify falsely against Jaime Rios.

6. Sometime in 1989 Guevara and other officers executed a search warrant on the house I
   shared with Iris Mendez.

FILED DATE: 8/10/2022 4:34 AM 89CR1652501

7. During the course of the search, officers found a .22 caliber revolver, which I had purchased on the street.

8. I was taken to the police station at Grand and Central and interrogated over the course of two days.

9. Iris Mendez was also taken into custody.

10. Guevara told me to say that Jaime was the one who gave me the gun.

11. Guevara said that if I did not say Jaime was the one who gave me the gun, he would take my kids away and I would be charged with possessing the gun.

12. Iris Mendez was charged with the gun and given probation.

13. I was never charged with the gun.

14. I was unwilling to come forward before this date, and would not have told anyone about Guevara's conduct because I was afraid of Guevara and what he might do to me.

15. I am only willing to come forward now because I have learned that Guevara is no longer a police officer, is being investigated, and has taken the fifth amendment.

Further this affiant sayeth naught.

Signed under the pains and penalties of perjury this __5__ day of __2,21__, 2020.

*Benjamin Carrero*

BENJAMIN CARRERO

Signed and sworn before me on __5-22-20__, 2020.

NOTARY PUBLIC

OFFICIAL SEAL
ROBERT FRANK GOMEZ
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:01/27/21

5-22-20

EXHIBIT B

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

STATE OF ILLINOIS      )
                       ) SS.
COUNTY OF COOK     )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | 89-CR-16525 |
| | ) | |
| JAIME RIOS | ) | |
| | ) | |
| Defendant. | ) | |

### AFFIDAVIT OF LUIS HUERTAS

I, Luis Huertas, under oath and penalty of perjury, subscribe and swear as follows:

1. I testified at the trial of Jaime Rios and identified him as the shooter in the murder he was charged with.

2. I also identified Rios in a line-up which I viewed on July 7, 1989.

3. However, before I was brought to this lineup I was contacted by detective Reynaldo Guevara.

4. I have viewed a photograph, which is attached to this affidavit and depicts Reynaldo Guevara.

5. I have viewed a second photograph, which depicts the person I picked out of the lineup.

6. Guevara was known to be a "dirty cop," who would put cases on people and would charge them for no reason.

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

FILED DATE: 8/10/2022 4:34 AM 89CR1652501

7. Guevara picked me up on July 7, 1989, and showed me a series of photographs and told me to pick out the shooter I had seen.

8. I told Guevara that I did not recognize the shooter in any of the photographs.

9. Guevara then threatened to have me locked up if I did not identify the shooter.

10. He took me to the station and showed me a lineup.

11. One of the people who was in the photographs, Jaime Rios, was also in the lineup at the station.

12. He was the only person in the lineup who was also in the photo array.

13. I have not willing to give this information to anyone before today because I wanted to leave the past behind and was afraid Detective Guevara would retaliate.

Signed under the pains and penalties of perjury this _19_ day of _May_, 2020.

LUIS HUERTAS

Signed and sworn before me on _May 19th_, 2020.

NOTARY PUBLIC

LYNDA R. LANG
Notary Public, State of New York
Qualified in Onondaga County
No. 01LA6209936
Commission Expires August 3, 20_21_

EXHIBIT C

FILED DATE: 8/10/2022 4:34 AM    89CR1652501

Affidavit Cristino Garcia

I CRistino Garcia, Under Oath and Penality of Pergury, Subscibe and Swear as follows;

1.) I was not Present in the area Were MR. Luis Moralez was harmed, June 27, 1989.

2.) On June 27, 1989, I was at home with my girl friend Hermina Cruz and Elena Carrau my Mother, Were We had Ordered Pizza and rib-tips from father & Sons.

3.) On July 28, 1989 I was picked-up by an Officer One of Who Was Aubrey O'Quinn.

4.) I was placed in hand-cuffs and Brought to the Police Station at Area 5.

5.) I was informed by an Detective Named Reynaldo Guevara that I was being Accused of Murder.

6.) There I was Interrogated by a Number of Officers, One which was Detective Reynaldo Guevara. He which was Very loud and Physical with me.

7.) Detective Reynaldo Guevara had put me in two line-ups, and I wasn't Picked-out in ether-one. Then Reynaldo Guevara Read a piece of Paper to Me saying that I was involve and that I should sign a statement saying that Someone else did it." I said NO, I was NO were around that area when the crime was made.

8.) After that Point that's When Detective Reynaldo Guevara got Very Physical, by Placing a phone Book on my head, then Hitting me across the head with a Billy club or flash light, until I fell to my Knee's.

9.) I then told Detective Raynaldo Guevara to stop and I will sign a statement, But first let me make a phone call. I was given a phone and I called my sister Maria Garcia and she got me a lawyer. But when officer Guevara heard me tell my sister to get a lawyer, he got Really mad and took me Back to the interigation Room, Were he started smaking me around, with a open hand.

10.) A few minutes later Detective Aubrey O'Quinn came to the door and told Detective Renaldo Guevara to stop hitting me, because my lawyer Was their.

FILED DATE: 8/10/2022 4:34 AM   89CR1652501

11.) My lawyer Seen me and the Interigation Ended.

12.) My lawyer told me that he couldn't Stay their all night, But If they Keep hitting me, don't sign any statment,

13.) I was not asked to testify at the trial of Jamie Rios, and had I've been asked to testify I Would of pled the 5th. Not because I was guilty, But because I was afraid of Detective Reynaldo Guevara.

14.) I'm Only willing to come forward now, Because I've learned Reynaldo Guevara is no-longer a police Officer of the Law, and is being Investigated and has taken the 5th Amendment.

ferther this Affiant sayeth Naught.

Sign Under the pains and Penalties of Perjury this ___14th day___

_____

they of ___November___, 2020

_Cristino Garcia jr_
CRISTINO Garcia JR.

Signed and Sworn before me
on ___November 14___, 2020

_Sheena Watkins_
NOTARY Public



SHEENA WATKINS
OFFICIAL SEAL
Notary Public - State of Illinois
My Commission Expires
March 06, 2024

FILED DATE: 8/10/2022 4:34 AM  89CR1652501

AFFIDAVIT

I,  Jaime Rios, being duly sworn under oath, do state that I have read the foregoing petition for certificate of innocence in its entirety, and that I swear to the truth of its contents.

FURTHER, YOUR AFFIANT SAYETH NOT,

Subscribed and sworn before me on this

_____ day of _____, 2022

NOTARY PUBLIC

DONNELL COLEMAN JR
Official Seal
Notary Public - State of Illinois
My Commission Expires Jun 20, 2023