IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS

    Plaintiff,

      vs.                               Case No. 1:22-cv-03973

REYNALDO GUEVARA
MICHAEL MASON
JOANN HALVORSEN AS
SPECIAL REPRESENTATIVE FOR
ERNEST HALVORSEN, DECEASED
CITY OF CHICAGO

    Defendants.                     JURY TRIAL DEMANDED

    Defendants.

**RESPONSE TO DEFENDANTS' SUCCESSIVE MOTON FOR SUMMARY JUDGMENT AND MOTON TO RECONSIDER**

Plaintiff, Jaime Rios, by and through his attorneys, Stephen L. Richards and Joshua S.M. Richards submits the following Response to Defendant's Motion For Reconsideration and Successive Summary Judgment. (Dkt # 227). In support thereof, Jaime Rios states as follows:

**LEGAL STANDARDS**

*Motions to Reconsider*

Although Federal Rule of Civil Procedure ("Rule") 54(b) permits the Court to exercise its inherent authority to reconsider its interlocutory orders, see *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983) ("every order short of a final decree is subject to reopening at the discretion of the district judge"); *Sims v. EGA Prods., Inc.*, 475 F.3d 865, 870 (7th

1

Cir.2007) ("nonfinal orders are generally modifiable"), motions for reconsideration under Rule 54(b) serve the limited function of correcting manifest errors of law or fact. See *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir.1987); *Zurich Capital Mkt., Inc. v. Coglianese*, 383 F.Supp.2d 1041, 1045 (N.D.Ill.2005). Unless the court has "patently misunderstood" a party, or has made a decision "outside the adversarial issues" presented to the court by the parties, or has made an "error not of reasoning but of apprehension," a motion to reconsider should ordinarily be denied. *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) And although a controlling or significant change in the law or facts since the submission of the issue to the court would be a further basis for a motion to reconsider, "[s]uch problems rarely arise and the motion to reconsider should be equally rare." *Bank of Waunakee*, 906 F.2d at 1191. Whether to grant a motion for reconsideration is "entrusted to the sound judgment of the district court." *Matter of Prince*, 85 F.3d 314, 324 (7th Cir.1996); see also *United States v. Resnick*, 594 F.3d 562, 568 (7th Cir.2010).

*Summary Judgment*

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But a "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to survive summary judgment. *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 936 (7th Cir. 2022) (quoting *Anderson*, 477 U.S. at 252). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007).

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). " Or, to put it in another way:

> "[S]ummary judgment is not a vehicle for resolving factual disputes. 10 Charles A. Wright, Arthur R. Miller Mary K. Kane, Federal Practice and Procedure: Civil § 2712, at 574 (2d ed. 1983). And because summary judgment is not a paper trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Anderson v. Liberty Lobby*, Inc.,477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)."

*Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

## FACTS

*Facts Relating to Reynaldo Guevara's Fabrication of Supposed Information
From Confidential Informant Which Implicated Jaime Rios in the Morales Murder*

Reynaldo Guevara fabricated the existence of informants who implicated Jaime Rios and Cristino Garcia in the Luis Morales murder. (SAF, ¶5).[1] During the time period between June of 1989 and November of 1990, Guevara wrote false police reports detailing what he claimed the informants had said and conveyed the same false information to the prosecutors during the course of the investigation of the Morales murder and the subsequent trial. (SAF, ¶6). The supplemental

---

[1] "SAF" refers to Plaintiff's Local Rule 56.1(b)(3) Statement of Additional Material Facts (Dkt # 196).

3

report authored by Guevara stated that Guevara and his partner "developed information from two separate reliable informants that the subject that killed [Luis Morales] was "Jamie" Jamie RIOS." (SAF, ¶7). During the time period between June of 1989 and November of 1990, Guevara falsely claimed in conversations with the prosecutors and other detectives that the supposed informants had told Guevara where the guns used in the Morales murder could be found. (SAF, ¶8).

On July 6, 1989, at 12:00 or 1:00 p.m. in the afternoon, Jaime Rios was standing by a school with a Latin King he knew as "Little Mike." Guevara and his partner drove up, parked, and started taking pictures of Jaime Rios and "Little Mike." Guevara grabbed "Little Mike," and threw "Little Mike" in his car. When Rios asked Guevara: "You want me – You want me too? You need me to go with you too?, Guevara replied: "No, Rios. Get out of here." (SAF, ¶9).

During his interrogation of Jaime Rios on July 7, 1989, Guevara showed Jaime Rios a mugshot of a Latin King who Rios knew as "Michael" or "Little Mike" and told Jaime Rios that "Michael" had told Guevara that Rios has "killed the guy." (SAF, ¶10).

On February 9, 1990, Guevara testified at the motion to quash arrest and suppress evidence that he received information from "numerous" or "several" informants that Jaime Rios and "Tino" were involved in the shooting of Luis Morales. Guevara claimed that he received the information from the informants either a couple of days after June 27, 1989 or a couple of days before July 6, 1989. (SAF, ¶11).

With respect to his claim that he had received information from confidential informants, Guevara testified on direct examination at Jaime Rios's criminal trial as follows:

> "Q. During the course of your investigation and speaking with people on the streets, did you come to learn the name of the shooter?
> A. Yes, I did.
> Q. What name were you given?
> A. I was given by informant the name of Jamie and Tino as being involved in the shooting of Luis Morales. Jamie being the shooter.

4

>MR. CAREY: I'll object to the hearsay.
>THE COURT: Sustained.
>MS. HANLON:
>Q. Detective, how is it that you gained information on that particular day?
>A. The names were given to me. Jamie and Tino.
>Q. How were those names given to you?
>A. Through reliable informants.
>Q. Can you explain to the ladies and gentlemen what a reliable informant is?
>A. Reliable informant is a person I had been dealing that had given me prior information and people being involved in shooting and that lead to convictions.
>Q. After receiving that information, Detective, did you recognize either of those two people?
>A. Yes, I did.
>Q. Which person did you recognize?
>A. I recognized the person of Jamie.
>Q. And who did you recognize that person to be or who did you know him as?
>A. As Jamie Rios.
>Q. And how is it that you knew Jamie Rios?
>A. Well, I have -- I know Jamie Rios as being a member of the Latin Kings. And I know his mother and I have had prior contacts with him."

(SAF, ¶12).

On cross-examination, at Jaime Rios's criminal trial Reynaldo Guevara testified as follows:

>"Q. Right. Now, the -- you talked to how many people on this case?
>A. In numbers, I couldn't give you. But it was several peoples, yes.
>Q. Several people?
>A. Yes
>Q. Several confidential informants?
>A. Yes. Specifically, 2 confidential informants. And the rest of them were informants but they were not confidential.
>Q. So, what were the names of those people that weren't confidential?
>MS. HANLON: Objection, Judge. They are informants.
>THE COURT: Sustained. Sustained.
>MR. CAREY:
>Q. They weren't confidential, is that right?
>THE COURT: Sustained.
>MR. CAREY:
>Q. So, you talked to some informants over a period of what time?
>A. I'd say for a period of -- I started working at 9:00 o'clock that morning. All through the day.

> Q. Did you talk to Little Mike?
> A. I talked to Little Mike, yes.
> Q. And he was an informant on this case, is that right?
> MS. HANLON: Objection.
> THE COURT: Sustained."

(SAF, ¶13).

At trial, Guevara claimed that when he located Jaime Rios, he said to Jaime Rios: "Jamie, I have been looking for your for the past 3 days. A few days or so. And where have you been hiding?" Guevara claimed that Jaime replied: "I haven't been hiding anyplace. I have been around." (SAF, ¶14).

In opening closing argument, prosecutor Anthony Carballos made the following statement:

> "These gang crimes experts are out on the street. They are out fighting the war on the street day after day.
>
> "They know people on the street. They deal with informants. They deal with people from rival gangs and his own gang, his own friends. They talk to people. And when they talk to people, to informants Officer Guevara gets information.
> The information, the word is out Jaime is the shooter. And his friend Tino is out there with him. Jaime and Tino killed Luis Morales. What does Officer Guevara do? He knows Jaime Rios. He has known him for several years. He even knows his family, his mother.
>
> "He is out looking for Jaime Rios and he can't find him. This happens a couple days before. He is out looking for him."

(SAF, ¶15).

*Reynaldo Guevara's Interactions with Luis Huertas*

On July 7, 1989, Luis Huertas knew Reynaldo Guevara as a "dirty cop," who would put cases on people and would charge them for no reason. (SAF, ¶24).

Guevara picked Huertas up on July 7, 1989, showed him a series of photographs and told him to pick out the shooter he had seen. (SAF, ¶25). One of the people who was in the

6

photographs, Jaime Rios, was also in the lineup at the station. (SAF, ¶26). Huertas told Guevara that he did not recognize the shooter in any of the photographs. (SAF, ¶27). Guevara then threatened to have Huertas locked up if he did not identify the shooter. (SAF, ¶28).

After that conversation, Guevara took Huertas to the station where Huertas identified Rios in a lineup. Rios was the only person in the lineup who was also in the photo array. (SAF, ¶29).

Sometime after July 6, 1989, Guevara authored false police reports and gave false information to prosecutors where he concealed the fact that he had coerced Huertas into making the identification. (SAF, ¶30).

*Facts Relating to Malicious Prosecution*

There was no probable cause for Jaime Rios's arrest and prosecution. (SAF, ¶66). Knowing that there was no probable cause for Jaime Rios's arrest and prosecution, Guevara, instigated and initiated the prosecution of Jaime Rios for first degree murder by making false statements to the felony prosecutors who eventually filed charges against Jaime Rios. (SAF, ¶67). After Guevara had forced Jaime Rios into making a false statement, Guevara knew that he did not have probable cause to arrest or charge Rios. (SAF, ¶68).

Guevara commenced the prosecution of Jaime Rios by arresting him without probable cause, interrogating him, generating false police reports about him, coercing witnesses to give false statements about him, and by falsely testifying against him at trial. (SAF, ¶69). Guevara's actions played a significant role in the commencement and continuation of the prosecution of Jaime Rios. (SAF, ¶70).

By commencing the prosecution against Jaime Rios, arresting him, interrogating him and testifying falsely against him, Guevara acted with malice towards him and was motivated by hostility or ill will. (SAF, ¶70). In particular, Guevara was motivated by a general hostility toward Hispanic

7

suspects, as demonstrated by his pattern and practice of instigating false charges against at least 50 suspects over the course of years.(SAF, ¶71).

### DEFENDANT GUEVARA'S ARGUMENTS IN HIS ORIGINAL MOTION FOR PARTIAL SUMMARY JUDGMENT

In his initial motion for summary judgment defendant Guevara only cited *Vega v. Tokah*, 597 U.S. 134, 150 (2022) and the pending appeal in Blackmon with respect to Count VIII of the complaint, involving the suggestive identification procedure. (Dkt # 177, at 12-13).

In his arguments with respect to Count II (fabrication of confidential informants) (Dkt # 177, at 3-10) Count IX (Brady violation for suppression of the suggestive identification procedure, prior inconsistent statement of witness, and coercion of the witness)(Dkt # 177, at 14-16) and Count XIII (malicious prosecution) (Dkt # 177, at 30), Guevara made no mention of *Vega* or *Blackmon* at all and did not assert qualified immunity.

With respect to Count II, Guevara argued that there was no evidence that the fabrication of evidence that the information from confidential sources was fabricated (Dkt # 177, 4-6), that the report about confidential sources was not introduced at trial (Dkt # 177, 6-7), that Guevara enjoyed testimonial immunity for any testimony about the confidential informants (Dkt # 177, 7) that the confidential source information was not *Brady* material (Dkt # 177, 7-8), and that the information was not material. (Dkt # 177, 9-10).

With respect to Count IX, the *Brady* claim, Guevara combined his argument as to this Count with the argument with respect to Count VIII. (Dkt # 177, 12-19). His argument with respect to the *Brady* claim consisted of a single paragraph in which he argued that Rios's criminal defense attorneys could have discovered the impeaching information by interviewing Huertas. (Dkt # 177, 14).

With respect to Count XIII, malicious prosecution, Guevara made no independent argument

at all, and simply incorporated by reference the arguments made by codefendants Mason and Halvorsen. (Dkt # 177, 30).

### THE COURT'S RULING WITH RESPECT TO SUMMARY JUDGMENT

With respect to the counts at issue, the court made the following rulings.

With respect to Count II, the court ruled that there was evidence of fabrication of the confidential informants based upon Guevara's invocation of the Fifth Amendment when asked questions about the informants at his deposition. (Dkt # 215, 24-25). The court also ruled that the informant evidence was material because a reasonable jury could conclude that evidence of how Guevara came to believe Rios was a suspect was material to his conviction. (Dkt # 215, 25-26).

With respect to Count VIII, the court ruled that claims of unduly suggestive identification techniques are cognizable under section 1983 and that Guevara was not entitled to qualified immunity. The court therefore denied Guevara's motion as to Count VIII. (Dkt # 215, 28-29).

With respect to Count IX, the court ruled that in so far as it alleged fabrication, summary judgment was granted as to Count IX because reports detailing Huertas's identification were not admitted at trial. (Dkt # 215, 23 n. 6). But the court ruled that Count IX survived as a *Brady* claim because there was an issue of fact as to whether Guevara had disclosed his coercive and suggestive techniques to the prosecutors. (Dkt # 215, 29-30). The court did not make a specific finding with respect to the claim in Count IX that Guevara had violated *Brady* by failing to disclose that Huertas had stated to Guevara that a photograph of Rios was not the photograph of the shooter.

With respect to Count XIII, the court denied summary judgment on the ground that there was an issue of fact as to whether Guevara, unlike Mason and Halvorsen, knew that Huertas's identification was unreliable. (Dkt # 215, 31-32).

**ARGUMENT**

Defendants Reynaldo Guevara and the City of Chicago have moved to reconsider this court's denial of their motion for summary judgment as to Counts II, VIII, IX, and XIII of the Second Amended Complaint and, with the court's permission, have filed a successive motion for summary judgment on those counts.

Jaime Rios acknowledges that with respect to Count VIII of the Second Amended Complaint, it is problematic whether the jury could be instructed on this claim consistent with *Blackmon v. Jones*, 132 F.4th 522 (7th Cir. 2025) and that, if nothing changes, Guevara might be entitled to move for a Rule 50 judgment as a matter of law with respect to Count VIII, either at the close of plaintiff's case or after the close of all evidence. Jaime Rios stands on the arguments he originally made against summary judgment as to Count VIII and reserves the right to appeal any adverse judgment on Count VIII if necessary.

As to Counts II, IX, and XIII however, neither the motion to reconsider nor the successive motion for summary judgment should be granted.

Count II

With respect to Count II, Guevara claims, mainly, that under the "principles" of *Blackmon*, he is entitled to testimonial immunity for his fabrication of the confidential informant reports and his testimony about the confidential informants. (Dkt # 227, 8-10). There are several problems with this argument.

First, *Blackmon*'s holding concerns qualified immunity, not testimonial immunity. In so far as *Blackmon* changes the law as to qualified immunity in general, or as to suggestive identification claims in particular, it has no bearing upon Count II. Guevara does not suggest that qualified immunity protects his fabrication of information from mythical confidential informants,

10

nor could he do so.

Second, the quoted statement about "bad evidence" in *Blackmon* is dicta concerning the general problems of proving 1983 claims, given the land mines of prosecutorial, judicial, and testimonial immunity. But it is not some rule that police officers are immune from money damages for all section 1983 claims involving the use of evidence at trial – if it was, section 1983 would be a dead letter.

Therefore, *Blackmon* has nothing to do with Count II, and neither the standards for a motion for reconsideration nor for the filing of a successive motion for summary judgment have been met. This court made no errors of "apprehension," and there has been no change in the law impacting the court's ruling on Count II.

The motion for reconsideration and the successive motion for summary judgment as to Count II should therefore be denied.

## Count IX

Count IX of the Second Amended Complaint alleged that Reynaldo Guevara violated the fourteenth amendment by "authoring false police reports and giving false information to prosecutor [sic] concealing that he had used a coercive and suggestive identification procedure to induce Luis Huertas to identify Jaime Rios and that *Huertas initially refused to identify a picture of Jaime Rios*." (Emphasis supplied).

The evidence from both Guevara's deposition answers and Huertas's affidavit is that Guevara picked Huertas up on July 7, 1989, showed him a series of photographs and told him to pick out the shooter he had seen. (SAF, ¶25). One of the people who was in the photographs, Jaime Rios, was also in the lineup at the station. (SAF, ¶26). Huertas told Guevara that he did not recognize the shooter in any of the photographs. (SAF, ¶27).

11

As an initial matter, it should be noted that Huertas's statement that the photograph of Rios was not the photograph of the shooter forms the basis for a *Brady* violation apart from the suggestive identification procedure, since it is undisputed that Guevara never gave this information to the prosecutors or to Rios's defense attorney. Under Illinois law, a prior non-identification is substantive evidence, which is admissible as an exception to hearsay. *People v. Tisdel*, 201 Ill. 2d 210, 220 (2002). Huertas's prior statement was therefore exculpatory *Brady* material. And since *Brady* material also includes impeachment evidence, *Sims v. Hyatte*, 914 F.3d 1078, 1087 (7th Cir. 2019), Huertas's statement should also have been disclosed so that defense counsel could confront Huertas with the statement and undermine his credibility at trial.

This court did not specifically rule on this aspect of Count IX. It should do so, and should deny the successive motion for summary judgment at least as to Huertas's prior inconsistent statement, even apart from the coercive and suggestive identification procedure.

With respect to other aspect of Count IX, the suppression of the coercive and suggestive identification procedure itself, Guevara argues that *Blackmon* grants qualified immunity for *Brady* claims as to police officers who conceal coercive and suggestive identification procedures, apparently as a derivate of *Blackmon*'s holding that suggestive and coercive identification procedures cannot give rise to sec. 1983 liability. But Guevara cites no case for that proposition, apart from *Johnson v. Guevara*, 2025 WL 903813, at *24 (N.D. Ill., Mar. 24, 2025), which does not stand for this proposition at all.

In *Johnson*, the court relied upon the newly minted decision in *Blackmon* to hold that claims for using suggestive and coercive identification techniques, which might, in "unusual circumstances" constitute a constitutional violation, are nevertheless barred by qualified immunity. But the court made no ruling as to whether concealing the use of such techniques

12

from prosecutors and defense counsel would constitute a *Brady* violation. *Johnson*, 2025 WL 903813, at *24.

Such a ruling would make no sense. *Blackmon*'s holding rests upon the proposition that the prohibition against using suggestive identification techniques is a prophylactic rather than a constitutional rule and that police officers could not have known, at least before 2022, that using such techniques could subject them to liability. But the same cannot be said of *Brady*, a constitutional rule which has been the law of the land since 1963.

Guevara argues that converting claims for suggestive identifications into *Brady* claims would eviscerate *Blackmon*. But that is simply not true. Not all suggestive identifications are concealed from prosecutors or defense counsel – indeed most are recorded in police reports, lineups, and photo-arrays and are litigated in the underlying criminal proceedings. The core of *Blackmon* is that police officers do not violate the constitutional rights of defendants who are the subject of such procedures, precisely because there is no constitutional violation until the identifications are admitted at trial, where admission is subject to the unforeseeable decisions of prosecutors and judges.

But in cases where police officers conceal the fact that they use such techniques, particularly where, as here, they also conceal the exculpatory evidence that the witness refused to identify the defendant or even stated that the defendant was not the culprit, they violate *Brady*. Indeed, officers violate *Brady* even if they use no identification procedure at all, and merely conceal the fact that a witness had named someone other than the defendant or stated that the defendant was not the culprit.

The motion for reconsideration and the successive motion for summary judgment as to Count II should therefore be denied.

13

Count XIII

As to Count XIII, the state law claim for malicious prosecution, Guevara first argues, based upon *Blackmon*, that he enjoys qualified immunity for this claim. Guevara is wrong.

First, and foremost, Count XIII is a state law claim, and the qualified immunity defense to section 1983 actions simply does not apply to supplemental state law claims. See *Herion v. Vill. of Bensenville,* No. 00 C 1026, 2000 WL 1648937, at *4 (N.D. Ill. Nov. 1, 2000)(" Public officials can raise the affirmative defense of qualified immunity in a damages action under Section 1983, insofar as their conduct does not violate a clearly established constitutional or federal statutory right *** That immunity however does not extend to state law claims.) *Accord*, *Gossmeyer v. McDonald*, 128 F.3d 481, 486 (7th Cir.1997) (finding that qualified immunity extended to the Section 1983 claim, but remanding the remaining supplemental defamation claim to district court); *In Re State Police Litigation*, 88 F.3d 111, 126 (2d Cir.1996) (finding that in order for officers to have qualified immunity against state law statutory claim they must establish a qualified immunity under state law). Therefore, Guevara's entire discussion of *Blackmon* and its supposed implications is simply beside the point. [2]

Second, Guevara did not raise a qualified immunity defense of any sort in his initial motion for summary judgment as to Count XIII, and Mason and Halvorsen's motion, which Guevara adopted, did not raise one either. (Dkt # 181, 16-20). This claim has therefore been waived.

Lastly, Guevara rehashes his argument that Luis Huertas's identification was reliable and

---

[2] Jaime Rios anticipates that with their usual ingenuity, Guevara's defense attorneys will raise a state law defense of qualified immunity in their reply to this response. Any such defense would, of course, be waived. But, in any event, as the attached circuit court opinion in *Durdin v. City of Chicago*, 2015 WL 10571178 (Ill. Cir. Ct.)(Trial Order) (Appendix A) establishes, such a defense would not justify the grant of summary judgment under Illinois state law. And *Blackmon*, which is not a state law case, has nothing to do with such a defense.

14

that, therefore, he had probable cause to initiate Jaime Rios's arrest and prosecution. But since Guevara has chosen to hide behind the Fifth Amendment, he is stuck with his deposition admissions that: (1) there was no probable cause for Jaime Rios's arrest and prosecution (SAF, ¶66), (2) he coerced witnesses to give false statements about Jaime Rios (SAF (¶69) [3], and (3) he knew that he did not have probable cause to arrest or charge Rios. (SAF, ¶68). There is at least a question of fact as to whether Guevara had probable cause to initiate the prosecution of Rios when he knew that *all* of the evidence against Rios was false, and that he had manufactured it. [4]

Therefore, the successive motion for summary judgment and motion to reconsider as to Count XIII should be denied.

Respectfully Submitted,

JAIME RIOS

By and through

/s/ Stephen L. Richards

By: Stephen L. Richards Attorney for Plaintiff
53 West Jackson
Suite 756
Chicago, IL 60604
773-817-6927
sricha5461@aol.com
Attorney No: 6191946

---

[3] Although the deposition question to Guevara only mentioned that Guevara coerced "witnesses" to give false statements, without naming the witnesses, there were only two witnesses who gave false statements and false testimony at Guevara's behest – Benjamin Carrero and Luis Huertas. Therefore, the reference to witnesses means that Guevara admitted to coercing Luis Huertas to falsely identify Jaime Rios. This is the short answer to Guevara's claim, repeated ad nauseum, that there is no issue of fact as to whether Huertas's identification of Jaime Rios was false.

[4] As this court held, in his regard, Guevara is in a different position than Mason and Halvorsen, who were not present when Guevara coerced Huertas to make a false identification and did not know that Huertas had initially denied that Rios's photograph, which Guevara showed him, was a photograph of the shooter. Mason and Halvorsen were entitled to believe Guevara's lies and therefore had probable cause, which is a defense to the state law claim of malicious prosecution against them. (Dkt # 215, at 31-32).

15

## **CERTIFICATE OF SERVICE**

Stephen L. Richards certifies that on October 26, 2025 he served **RESPONSE TO DEFENDANTS' SUCCESSIVE MOTON FOR SUMMARY JUDGMENT AND MOTON TO RECONSIDER**

through the ECF filing system.

*/s/ Stephen L. Richards*
By: Stephen L. Richards
Attorney for Plaintiff
53 W. Jackson, Suite 756
Chicago, IL 60604
(773) 817-6927
sricha5461@aol.com
Attorney No: 6191946