IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS

    Plaintiff,

        vs.                                  Case No. 1:22-cv-03973

REYNALDO GUEVARA
MICHAEL MASON
JOANN HALVORSEN AS
SPECIAL REPRESENTATIVE FOR
ERNEST HALVORSEN, DECEASED
CITY OF CHICAGO

    Defendants.                            JURY TRIAL DEMANDED

    Defendants.

**MOTION IN LIMINE TO PRESENT THE TESTIMONY OF JOSE MAYSONET**

    Plaintiff, Jaime Rios, by and through his attorneys, Stephen L. Richards and Joshua S.M. Richards submits the following motion in limine to present the testimony of Jose Maysonet. In support thereof, Jaime Rios states as follows:

**INTRODUCTION**

    On August 14, 2023, Jaime Rios was ordered to identify fifteen 404(b) witnesses on a will call list, as many as ten of whom could testify with respect to Reynaldo Guevara's misconduct. (Dkt # 82). On August 16, 2023, Rios sent a letter to Guevara's counsel naming 404(b) ten witnesses with respect to Reynaldo Guevara, among them, Jose Maysonet. (See Exhibit A). Anticipating that Reynaldo Guevara, as he has done in previous cases, will move in limine to bar all 404(b) evidence with respect to Reynaldo Guevara. (See *Johnson v. Guevara*, 1:20-cv-04156,

1

Dkt # 402, 48-59), Jaime Rios moves to admit Jose Maysonet's testimony. [1]

In the interests of clarity, Jaime Rios will separately move in limine with respect to each of the 404(b) witnesses.

### CLAIMS FOR WHICH MAYSONET'S TESTIMONY IS RELEVANT

*Count I: Coercion of Jamie Rios's "Confession"*

Before the interrogation of Jaime Rios began, Reynaldo Guevara and Ernest Halvorsen agreed that the interrogation of Jaime Rios would be conducted using illegal physical force and illegal threats and promises with respect to Jaime Rios. (SAF, ¶16). [2]

Jaime Rios was arrested by Reynaldo Guevara and another officer, and taken to 5555 west Grand for questioning. Jaime Rios was interrogated by Reynaldo Guevara in an interrogation room at 5555 West Grand. (SAF, ¶17).

Guevara told Rios that Guevara was investigating a murder and that Rios should just say that he was present when the murder took place. Guevara, detective Mason, and another officer told Rios he was "there about the guy that killed the guy, that for me to let them know where the other guy was at. And to say that I was just there with the guy that killed the guy." Rios told the officers that he did not know what they were talking about. (SAF, ¶18).

In response, detective Mason grabbed Rios by the hair and slammed his head against the table. Mason and Guevara kept telling Rios about the details and facts of a murder. Guevara was present when Rios was assaulted. (SAF, ¶19).

Guevara and Mason then told Rios about the details of a murder committed by "Tino."

---

[1] In the *Johnson* case Guevara also argued that the 26(a)(1) disclosures and interrogatory responses as to the 404(b) witnesses were deficient. (See *Johnson v. Guevara*, 1:20-cv-04156, Dkt # 402, 43-49) In the interests of sanity, Jaime Rios hopes that Guevara is not making such an argument here. But if such an argument is made, it should be noted that Guevara never complained about insufficient responses while fact discovery was still open, and never deposed any of the 404(b) witnesses.
[2] "SAF" are references to Jaime Rios's Statement of Additional Facts. (Dkt # 191).

Guevara and Mason then said: "well, we heard you and Tino went to Western and went to kill somebody over there on Western you had crossed the street and went through an alley. We seen some guys in the alley and that we speak to them. They say, who is that? And that we says, it is me. And that we walked, there was a car that parked right there and asked if we selling reefer. We said, no, we don't got no reefer. We kept walking, went around the corner. And that is when we got by a bar and we had a shooting against a guy that was there." (SAF, ¶20).

Guevara and Mason threatened Rios that they would take his child away if he didn't agree with what they said. They told him that all he had to do was just "be there" and they would not take his child away. Rios agreed to make a statement to the police out of fear of losing his son. (SAF, ¶21).

Sometime after July 6, 1989, Guevara wrote false police reports and gave false information to prosecutors where he concealed his statement to Rios suggesting that Rios was present at the scene when Garcia killed Morales and that Rios should just say that he was there. (SAF, ¶22).

Jaime Rios's court-reported statement was admitted at trial through the testimony of Assistant States Attorney Barbara Riley. (SAF, ¶22).

*Count X: Coercion of Benjamin Carrero*

On July 8, 1989, the day Reynaldo Guevara and other officers executed a search warrant at Benjamin Carrero's house at 1419 North Lincoln Park and found a .22 caliber revolver, Carrero was taken to the police station at Grand and Central and interrogated over the course of two days. (SAF, ¶34).

Guevara told Benjamin Carrero to say that on June 28, 1989 at approximately 12:30 a.m., Jaime Rios gave him the .22 caliber revolver. Guevara told Carrero that if Carrero

3

did not say Jaime Rios was the one who gave him the gun, Guevara would take Carrerro's kids away and he would be charged with possessing the gun. (SAF, ¶35).

Jaime Rios testified that the "murder" or attempt murder he originally described to the interrogating officers occurred on July 2 or July 3, 1989. (SAF, ¶40).

*Counts XI and XII: Reynaldo Guevara's Interactions With Cristino Garcia*

On June 27, 1989, Cristino Garcia was at home with his girlfriend, Hermina Cruz, and his mother, Elena Carrau. (SAF, ¶41).

On July 28, 1989, after Cristino Garcia had been arrested by Chicago police officer Aubrey O'Quinn, placed in handcuffs, and taken to Area 5 (Grand and Central) Reynaldo Guevara informed Garcia that he was being accused of murder. ((SAF, ¶42). When Aubrey O'Quinn arrested Cristino Garcia he told Garcia that Garcia was being arrested "for the shooting." (SAF, ¶43).

When Aubrey O'Quinn brought Cristino Garcia to Area 5, Garcia told Aubrey O'Quinn that he had an alibi for where he was at the time of the murder, that he was at home with his mother and girlfriend and that he had ordered pizza and rib tips from Father and Son's pizza. O'Quinn left the room to check the alibi. When O'Quinn said that the alibi had checked out, Reynaldo Garcia was in the room. (SAF, ¶44).

Guevara interrogated Garcia in the presence of a woman who introduced herself as an assistant States Attorney, whom Garcia described as "Hispanic," and "very pretty." . (SAF, ¶45). Former Assistant States Attorney Barbara Riley would "absolutely not" describe herself as Hispanic or as of Hispanic ethnicity, and she does not believe that anyone could so describe her. (SAF, ¶46). Barbara Riley was not the person in the interview room with Cristino Garcia who described herself as an assistant states attorney. (SAF, ¶47).

4

Reynaldo Guevara read or showed Garcia a piece of paper apparently saying that Garcia was involved. Guevara told Garcia that he should sign a statement saying someone else did it. (SAF, ¶49). Garcia refused and told Guevara that he was not around the area when the "crime was made." (SAF, ¶50).

Garcia gave Guevara the alibi for where he was at the time of the murder. (SOF, ¶67). Guevara then placed a phone book on Garcia's head and hit him with a billy club or flashlight three times until Garcia fell to his knees on the ground. (SAF, ¶51). While Guevara was hitting Garcia, a person who Garcia believed was a female states attorney was in the room and O'Quinn was outside the door. (SOF, ¶52).

Garcia then told Guevara to stop and Garcia would sign a statement, but first he needed to make a phone call. (SOF, ¶53).

Garcia called his sister, Maria Garcia, and asked her to get him a lawyer. Maria Garcia told Cristino Garcia not to sign the statement and that she was going to send a lawyer down. When Guevara heard that, he got "really mad," took Garcia back to the interrogation room, and began smacking Garcia with an open hand. (SAF, ¶54).

A few minutes later, detective Aubrey O'Quinn came to the door and told Guevara to stop hitting Garcia because Garcia's lawyer was there. (SAF, ¶55). When Cristino Garcia's lawyer arrived, the lawyer said that the lawyer could not stay there all day but Garcia should not sign anything. (SAF, ¶56).

After the interrogation of Cristino Garcia, Reynaldo Guevara authored false police reports and concealed from prosecutors that he had beaten Garcia, that Garcia had denied culpability and had provided an alibi for the night of the murder. (SAF, ¶57).

About a month after Garcia was released from custody but before the trial of

Jaime Rios, Guevara twice stopped Garcia on the street, threw Garcia against a wall, took a Polaroid picture of him and threatened to tell rival gangs to "get him." (SAF, ¶58).

## SUBSTANCE OF MAYSONET'S TESTIMONY

Maysonet has been deposed in his own case. (See Exhibit A). Based upon that deposition, Jaime Rios believes Jose Maysonet will testify as follows

Maysonet, a Latin King, began selling drugs while in high school. (Exhibit A, 54:24; 55:1-13, 57:4-15). During two encounters with Maysonet, Guevara pressured Maysonet into paying Guevara protection money in order to continue to sell drugs. Maysonet complied, and eventually began paying Guevara $2,000 and more for permission to sell drugs for a set period of time.

The agreement between Maysonet and Guevara lasted until Maysonet was arrested for attempt murder in 1990. (Exhibit A, 174:21-24; 175:1-3).

On August 22, 1990, Maysonet was interrogated by Guevara about a double murder. (Exhibit A, 262:19-24; 263:1-8; 278:13-24; 279:1-24: 280:1-10). Maysonet told Guevara Maysonet had no knowledge of the double murder. (Exhibit A, 278:13-24; 279:1-24: 280:1-10).

Guevara left the interrogation room and then returned with a flashlight, a Yellow Book and a pair of black gloves, which he put on the table. (Exhibit A, 278:13-24; 279:1-24: 280:1-10).

Guevara told Maysonet that he was going to talk, one way or the other. (Exhibit A, 278:13-24; 279:1-24: 280:1-10). Guevara started hitting Maysonet in the head with the book. (Exibit A, 278:13-24; 279:1-24: 280:1-10). Guevara put the book on the top of Maysonet's head and starting hitting the book with the flashlight. (Exhibit A, 283:14-24; 284:1-12).

Next, Guevara struck Maysonet in the ribs and in the back, again using the book and the flashlight. (Exhibit A, 286:9-24; 287:1-24). Guevara hit Maysonet in the groin with the flashlight a number of times. (Exhibit A, 288:1-17).

After that, Guevara stopped for a moment, left and came back. (Exhibit A, 288:18-24;

6

289:1-4). When Guevara came back, he continued the beating, again placing the book on different parts of Maysonet's body and striking the book with the flashlight. (Exhibit A, 288:18-24; 289:1-4). During the beating, Maysonet was cuffed in the back and cuffed to a ring on the wall. (Exhibit A, 289: 5-16).

Throughout the beatings, Maysonet kept saying to Guevara: "why are you doing this? I thought you were my friend." (Exhibit A, 293:6-24). Guevara threatened to take Rosa Bella's children away if Maysonet did not cooperate. (Exhibit A, 301:6-24; 302:1-9).

Rosa Bella came to the station and told Maysonet to cooperate. (Exhibit A, 300:8-24: 301:1-24; 302:1-9). After speaking with Rosa Bella, Maysonet provided the names of Liuvia, Tino, and Fro to the police. (Exhibit A, 302:10-24). Maysonet also gave the names of Cisco, Jefrey, and Efrain. (Exhibit A, 302:10-24; 303:1-20).

After giving those names, later on that evening, Maysonet spoke with a female assistant States Attorney. (Exhibit A, 305:6-24: 306:1-24; 307:1-17). Maysonet told the female assistant States Attorney that Guevara had beaten him up. (Exhibit A, 306:19-21). Maysonet also told the female assistant States Attorney that Maysonet wanted his lawyer present. (Exhibit A, 307:3-4).

The female assistant States Attorney told Maysonet that if Maysonet did not cooperate he would have to speak with Guevara again and he really did not want Guevara "in his hair." (Exhibit A, 307:3-10). After saying that, the female assistant States Attorney left. (Exhibit A, 307:5-10).

After the female assistant States Attorney left, Guevara came back into the room and resumed the beating with the phone book and flashlight. (Exhibit A, 307:11-24:308:1-13).

At some point, Maysonet spoke with a male assistant States Attorney. (Exhibit A, 308: 14-23). Maysonet told the male assistant States Attorney that Maysonet had urinated and defecated on himself. (Exhibit A, 308:24; 1-9).

7

Maysonet told the male assistant States Attorney that Guevara was getting beat up by Guevara. (Exhibit A, 311:21-24; 312:1-11).

Maysonet also told the male assistant States Attorney that Maysonet wanted his lawyer. (Exhibit A, 311:8-11). After that, the male assistant States Attorney left the room. 311: 12-14. After the male assistant States Attorney left the room, Guevara came back and continued the beating. (Exhibit A, 311: 16-24).

Guevara grabbed Maysonet's penis and testicles. (Exhibit A, 311:18=24; 313:1-6). At that point Maysonet agreed to give Guevara information. (Exhibit A, 313: 7-12). Maysonet gave Guevara the names of Jeffrey, Cisco, and Efrain. (Exhibit A, 313: 13-16). Afterward, Guevara came back and asked for different names. Maysonet gave the names of Liuvia, Tino, and Fro. (Exhibit A, 313::23-24; 314:1-8). Eventually, Maysonet gave a court reported statement. (Exhibit A, 314:9-24; 315:1-24; 316: 1-12).

## ARGUMENT

Maysonet's testimony is admissible.

### *General Principles*

Rule 404(b) bars evidence of other acts offered "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But it allows other-act evidence for "another purpose," including but not limited to "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2); *United States v. Walter*, 870 F.3d 622, 628 (7th Cir. 2017).

In *United States v. Gomez*, the Seventh Circuit overhauled its test for determining whether evidence is admissible under Rule 404(b), 763 F.3d 845, 856 (7th Cir. 2014) (en banc). Following

8

*Gomez*, the Seventh Circuit has since "stressed that *Gomez* requires judges to look 'more generally to the Federal Rules of Evidence,'" *Jackson v. Esser*, 105 F.4th 948, 963 (7th Cir. 2024) (quoting *Burton v. City of Zion*, 901 F.3d 772, 779 (7th Cir. 2018)).

*Gomez* holds that Rule 404(b) "allows the use of other act evidence only when its admission is supported by some propensity-free chain of reasoning." 763 F.3d 845, 856 (7th Cir. 2014) (en banc); In other words: "the district court should not just ask whether the proposed other-act evidence is relevant to a non-propensity purpose but how exactly the evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference." 763 F.3d at 856. Nevertheless, "[o]ther-act evidence need not be excluded whenever a propensity inference can be drawn." 763 F.3d at 860. After analyzing whether other-acts evidence is admissible under Rule 404(b), including whether a jury could "find by a preponderance of the evidence that the other act was committed," *Harris v. City of Chicago*, No. 14-cv-4391, 2018 WL 2183992, at *16 (N.D. Ill. May 11, 2018) (quoting *Gomez*, 763 F.3d at 854), the court applies Rule 403 as well. *Gomez*, 763 F.3d at 857. The similarity of other acts to those at issue in a case remains a proper consideration for 404(b) relevancy analysis, although it is not dispositive. See, e.g., the similarity of other acts to those at issue in a case remains a proper consideration for 404(b) relevancy analysis, but it is not dispositive. See, *e.g.*, *Jackson*, 105 F.4th at 963.

*Similarities and Relevant Purposes*

As a preliminary matter, it should be noted that because Guevara is taking the fifth in this litigation, he has wide latitude to choose between defenses.

For example, Guevara may mount a defense with respect to his identity as the person who violated Jaime Rios's civil rights. During Jaime Rios's criminal trial, Guevara claimed that he was not even present during Rios's interrogation and that the interrogation was conducted by

9

Mason and Halvorsen. With respect to Benjamin Carrerro and Cristino Garcia, he may also claim that he was not one of the officers who arrested or interrogated them. Therefore, identity, a non-propensity purpose, is certain to be an issue.

Moreover, there will also be issues as to motive and intent. Guevara may claim that he lacked any motive to pin a case on Rios, or for that manner anyone else. But his pattern and practice of framing innocent people for crimes that they did not commit certainly bears on motive and intent.

Lastly, there may well be issues as to opportunity, preparation, and plan. This court has ruled that there is sufficient evidence of conspiracy between Guevara and Mason and Halvorsen to defeat summary judgment. Evidence that in other instances, Guevara used tactics similar to, and, in one instance, nearly identical, to those employed here is relevant for this non-propensity purpose.

Guevara's treatment of Maysonet is most relevant to prove identity, motive, intent, opportunity, preparation, and plan with respect to the counts of the complaint involving Cristino Garcia.

The circumstances of Guevara's treatment of Maysonet are virtually identical to the circumstances surrounding the treatment of Garcia.

Maysonet and Garcia were both young Hispanics and members of the Latin Kings. They were both arrested and accused by Guevara of first-degree murder. They were both interrogated by Guevara in a room at Area Five.

The interrogations took place one year apart. In both instances Guevara, rather than simply asking questions, told the suspects what they should say. And in both instances Guevara would not take no for an answer.

10

Guevara beat Garcia using a telephone book placed on Garcia's head and then struck Garcia through the phone book with a nightstick or a flashlight. Guevara used precisely the same technique on Maysonet, striking him in the head with a flashlight and using the phone book as a buffer. In both instances, Guevara obviously intended to inflict pain without making a mark on the victim's person.

In both instances, Guevara worked with states attorneys who appeared to be aware of the beatings and condoned or ignored his tactics.

Although the similarities between the interrogation of Jaime Rios and the interrogation of Maysonet are less striking, they are still significant.

Both Rios and Mayonnet were young, male Hispanics and members of the Latin Kings. Both were arrested and interrogated by Guevara at Area 5. Both were accused of murder.

The interrogations took place one year apart. In both instances Guevara, rather than simply asking questions, told the suspects what they should say. And in both instances Guevara would not take no for an answer.

In both cases, Guevara threatened to take the suspect's children if the suspect refused to make the statement Guevara wanted. And in both cases, physical force was used, even though the force used was different.

In both instances, states attorneys were involved, although in the case of Rios's interrogation, the states attorney may not have known about Guevara's misconduct. And in both instances, Guevara succeeded in extracting a court reported statement.

With respect to the count involving Benjamin Carrero, Guevara, as in the Maysonet case, coerced a false or fabricated statement. And Guevara, as in the Maysonet case, threatened to take his victim's children.

11

*Identity – Modus Operandi*

The Maysonet evidence is relevant to prove Guevara's identity with respect to the counts involving Garcia, Rios, and Carrera.

Where defendants have engaged in similar acts of misconduct, those other acts are admissible to prove it was them this time as well. See *Gomez*, 763 F.3d at 861 ("[O]ne accepted way to use other-act evidence to prove identity is to argue that the perpetrator had a distinctive modus operandi."); *Shields v. United States*, 2017 WL 1196830 (N.D. Ill. Mar. 31, 2017) (holding that evidence of modus operandi is usually used to prove identity).

Jaime Rios must show "only that the prior acts bear 'a singular strong resemblance to the pattern of the offense charged.'" *United States v. Hudson*, 884 F.2d 1016, 1021 (7th Cir. 1989) (quoting *United States v. Shackleford*, 738 F.2d 776, 783 (7th Cir. 1984)). This is because "[d]istinctiveness is key to whether something is proper modus operandi evidence," and inherently, "[s]uch uniqueness lies on a spectrum." *Thomas*, 986 F.3d at 731 (7th Cir. 2021). The past incidents must only be "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof." *Shackleford*, 738 F.2d at 783. That said, Guevara's conduct with respect to Maysonet is virtually identical to his conduct with respect to Garcia, strongly reminiscent of his conduct with respect to Rios, and similar to his conduct with respect to Carrera.

Guevara's other acts are much more similar to the fact pattern in this case than the usual case in which other acts are admitted to prove identity or *modus operandi*. See, *e.g.*, *United States v. Clark*, 774 F.3d 1108, 1114 (7th Cir. 2014) (evidence of uncharged robberies with very similar victims and descriptions of the perpetrator were relevant to identify defendant as the charged robber); *United States v. Vance*, 764 F.3d 667, 669 (7th Cir. 2014) (evidence of uncharged robberies of trio of restaurants relevant to show identity of perpetrators in a series of bank robberies

12

where robbers used the same ski-masks and gun, and had one robber approach the counter while the other stood guard); *United States v. Brown*, 471 F.3d 802, 806 (7th Cir. 2006). (evidence that defendant had purchased drugs from the same drug dealer before was relevant when defense tried to argue that drug dealer had mistakenly identified defendant).

The Maysonet evidence is therefore admissible for this purpose.

*Motive, Intent, Opportunity, Preparation and Plan*

With respect to the Maysonet evidence, the Seventh Circuit the case of *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993), *as modified on denial of reh'g* (Dec. 8, 1993), is clearly dispositive on the issues of motive, intent, opportunity, preparation, and plan.

*Wilson*, was a section 1983 suit against the notorious, and now deceased, Chicago police detective Jon Burge. Wilson claimed that Burge tortured him into confessing by use of an electroshock device. The trial judge excluded evidence that nine days before Wilson's arrest Burge had tortured another suspect using an electroshock device and had also beaten a second suspect. The Seventh Circuit reversed:

> "While the judge was far too generous in allowing the defendants to present evidence, he was far too chary in allowing the plaintiff to present evidence. He kept out on grounds of relevance the plainly relevant testimony of Melvin Jones, who claimed to have been subjected to electroshock by Burge and other officers nine days before the interrogation of Wilson. If Burge had used an electroshock device on another suspect only a few days previously, this made it more likely (the operational meaning of "relevant") that he had used it on Wilson. Another excluded plaintiff's witness, Donald White, would have testified that he was arrested as a suspect in the murder of the two police officers shortly before Wilson's arrest and was taken to a police station where he was beaten for several hours by Burge and other defendant officers. Although evidence of prior bad acts is inadmissible to prove a propensity to commit such acts, it is admissible for other purposes, including intent, opportunity, preparation, and plan. Fed.R.Evid. 404(b). Jones's evidence would have served all four of these purposes, White's all but the third (preparation); and, since Burge had denied under cross-examination that he had ever had or used an electroshock instrument, Jones's evidence could also have been used to impeach that denial."

13

6 F.3d at 1237-38.

Here, the Maysonet evidence shows that Guevara, as in the Maysonet case, intended to extract a false confession from Garcia, and was not simply engaging in sadistic brutality for no purpose. The common site of both torture sessions, Area 5, shows that Guevara had the opportunity to commit these acts and that he did so as part of a preconceived plan, requiring careful preparation as what he would say and do. And the fact that in neither case was he afraid of the presence of an assistant States Attorney, also bears upon opportunity.

The same factors make the Maysonet evidence relevant to the claim that Jaime Rios's confession was coerced. Although a different method of torture was used – everything else was the same, including the setting, the presence of a State's attorney, the coaching and fabrication of the false statement, and the threat to take children. These similarities prove motive, intent, opportunity, preparation, and plan.

Lastly, the Maysonet evidence is relevant to the claim involving Carrero. Although no physical torture was used and no assistant States Attorney was present, the interrogation took place at Area 5, there was a threat to take Carrero's children, and Guevara was motivated by the intent to create fabricated evidence.

## CONCLUSION

For the foregoing reasons, the motion in limine to admit the testimony of Jose Maysonet should be granted.

Respectfully Submitted,

JAIME RIOS

By and through

/s/ Stephen L. Richards

By: Stephen L. Richards Attorney for Plaintiff
53 West Jackson
Suite 756
Chicago, IL 60604
773-817-6927
sricha5461@aol.com
Attorney No: 6191946

# CERTIFICATE OF SERVICE

Stephen L. Richards certifies that on November 18, 2025 he filed the **MOTION IN LIMINE TO PRESENT THE TESTIMONY OF JOSE MAYSONET**

through the ECF filing system.

*/s/ Stephen L. Richards*
By: Stephen L. Richards
Attorney for Plaintiff
53 W. Jackson, Suite 756
Chicago, IL 60604
(773) 817-6927
sricha5461@aol.com
Attorney No: 6191946