IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS

  Plaintiff,

    vs.          Case No. 1:22-cv-03973

REYNALDO GUEVARA, et al,

  Defendants.        JURY TRIAL DEMANDED

**MOTION TO ADMIT THE TESTIMONY OF DR. GEOFFREY LOFTUS AS AN EXPERT ON EYEWITNESS PERCEPTION AND EYEWITNESS MEMORY**

  Plaintiff Jaime Rios, by and through his attorneys, Stephen L. Richards and Joshua S.M. Richards submits the following motion in limine to admit the testimony of Dr. Geoffrey Loftus as an expert on eyewitness perception, eyewitness memory, and eyewitness identification. This motion is filed in anticipation that defendants will file a *Daubert* motion to preclude Dr. Loftus's testimony. [1] In support thereof, Jaime Rios states as follows:

**FACTUAL BACKGROUND**

  Although Jaime Rios's guilt or innocence is not directly at issue in this Section 1983 case, the facts surrounding the murder of Luis Morales.

  Morales was approached by two men on June 27, 1989 at 11:50 p.m. at 1316 North Western Avenue in Chicago and one of the two men shot him. Although a number of people witnessed the shooting, only one, Luis Huertas, identified Jaime Rios as the shooter. Huertas had never seen Rios or the shooter before.

---

[1] Dr. Loftus's report is attached as Exhibit A.

1

Huertas testified at trial that, just before the shooting, he saw two men, who appeared to be Hispanic, turning left on to Western Avenue from Potomac Street and heading northbound on Western in Huertas's direction.

The taller of the two men was a little shorter than Huertas, who was five feet nine inches tall. The taller man was wearing a green hospital shirt, short pants, and gym shoes. He was slim and light skinned and had a thin moustache which was just growing out.

Huertas did not get a good look at the shorter, second man. But as Huertas was seated, the taller man called out: "Spanish Cobras." Huertas then saw the taller man approach Luis Morales and another Spanish Cobra, Javier Torres, as Morales and Torres walked out of a gangway or alley.

Huertas witnessed a short encounter between Morales and the taller man. After Morales made a gesture indicating "what's up"?, the taller man pulled out a gun and fired four or five shots, killing Morales.

Huertas viewed the face of the taller man for a total of ten to fifteen seconds.

Two witnesses, Samantha Hudson and Javier Torres, viewed lineups which included Jaime Rios but did not identify him. Javier Torres also viewed a "gang book," which included a photograph of Jaime Rios, but did not identify him.

On July 7, 1989 Reynaldo Guevara picked up Luis Huertas. Guevara showed Huertas a series of photographs and told Huertas to pick the shooter out of the photographs. Huertas told Guevara that he did not recognize the shooter in any of the photographs. Guevara threatened to have Huertas locked up if he did not identify the shooter. Guevara then took Huertas to the station, where Huertas identified Rios in a lineup. Rios was the only person who was in both the lineup and in the photo-array.

2

**SUBSTANCE OF DR. GEOFFREY LOFTUS'S ESTIMONY**

*Qualifications*

Geoffrey R. Loftus is an Emeritus Professor of Psychology at the University of Washington in Seattle where he has taught since 1972. His area of expertise, in which he been working for approximately 57 years, is human perception and memory. His professional experience includes, among other things, co-authorship of 8 books and approximately 110 articles, presentation of approximately 160 invited addresses in 9 countries, 41years of continuous grant funding from the National Science Foundation, the National Institutes of Health, and other funding agencies, assorted journal editing, assorted government grant reviewing, and assorted consulting. Over the past 40 years, he has been qualified and testified at trial as an expert in perception and memory in approximately 500 cases.

*Scope and Rationale for Testimony*

With respect to the rationale for his testimony, Dr. Loftus will offer the following opinions:

1. Although Dr. Loftus will testify as to the general theory of perception and memory he will not testify as to whether Luis Huertas's identification of Jaime Rios was correct or incorrect. Instead. Dr. Loftus will provide information to the jury about the scientific bases of various relevant aspects of perception and memory. Jurors can eventually use this information as a tool to help them carry out their job of assessing the reliability of, and concomitantly, the weight to be given to, whatever eyewitness memory is relevant in the case.

2. One rationale for having a witness on false identification testify at trial is that contrary to common sense, a confident witness may not be an accurate witness.

3. Factors which undermine the reliability of confident witnesses identification include: (1) an original event that does not lend itself to a witness's being able to easily form an accurate memory of a criminal's appearance (e.g., seeing a an offender commit a crime under conditions of poor lighting, high stress, and/or limited or inappropriately allocated attention) along with (2) some form of suggestive post-event information that would bias the witness to reconstruct his or her memory of the offender's appearance in some systematic fashion (e.g., identifying a suspect in a biased identification procedure). Under such circumstances, the witness is inclined to rehearse this reconstructed memory of the original event (in this case, the shooting) such that the witness's memory becomes strong and confidence-inducing. Accordingly, although nonintuitively, the witness's confident identification of the suspect—now the defendant—at trial is based not, as the witness believes, on original information about the offender's appearance acquired while the crime was unfolding, but on potentially inaccurate, post-event information acquired about the defendant's appearance at the time of the identification procedure.

*Testimony Specifics*

Scientific Principles Regarding Perception and Memory

Dr. Loftus will testify to the following scientific principles regarding perception and memory:

1. The scientific principles regarding perception and memory are accepted in the field of psychology.

2. The information has been gathered over the past century primarily using controlled laboratory research as a means of identifying basic scientific laws. Such research has typically been funded by research grants from national agencies which, in the U.S. for

4

example, would include the National Science Foundation, and the National Institutes of Health, along with military research arms such as the Air Force and the Naval offices of scientific research and the Defense Advanced Research Projects Agency. The results of such research studies have been published in peer-reviewed journals mainly in the fields of Biology, Computer Science, Neuroscience, and Psychology, as well as in the premier cross-discipline journals, principally Nature and Science.

3. Generalization of laws formulated under scientifically controlled settings to the world outside the laboratory comes about in part by observations of real-life incidents that bear on the conclusions that issue from the laboratories. An example of such real-life phenomena that is directly relevant to many eyewitness cases, including the present one comes, as noted earlier, from cases of eventually exonerated individuals convicted on the basis of highly confident, yet demonstrably false identifications of the defendant at trial. Another such example, also relevant to the present case, derives from a study, conducted in Illinois, of actual police lineups.

4. A witness's memory can be unreliable for either of two reasons, both of which are applicable to the case of Jaime Rios.

    (a) Circumstances during the event were such that a witness would have been unlikely to form a complete and detailed memory of the shooter's appearance to begin with. If such is true then it would not be possible for the witness's incomplete memory to strongly match the defendant's (or anyone's) appearance and no identification of anyone by the witness would be reliable.

    (b) The second reason is the identification procedure is itself biased or unreliable. To the degree that the identification procedure is itself unreliable, one cannot rule out

    the possibility that the witness's identification of the suspect was influenced primarily by some aspect(s) of the identification procedure itself rather than by a match between the witness's memory of the offender and the suspect's appearance.

5. The general theory of perception and memory includes the following principles:

    First, initial memories of an event, based on what are often limited sensory information acquired as the event is taking place, are fragmented, disorganized, and incomplete.

    Second, based on subsequently acquired post-event information, the witness's initial memory changes in such a way as to become more detailed, more coherent, more organized, and more complete—but, because post-event information is of unknown accuracy, not necessarily more accurate.

    Third, the witness is not generally aware of which information in his or her eventual memory is based on the sensory data acquired during the event versus what is potentially false post-event information acquired subsequently.

6. As a consequence of these factors the witness ends up with an eventual memory that is strong, detailed, real seeming and confidence-inducing, but is potentially incorrect in important respects.

7. Four factors would have impacted Luis Huertas's identification of Jaime Rios:

    (a) Low lighting. The only source of lighting at the scene was streetlights. Street lights are dim by design, relatively sparsely placed along the street, and provide only partial illumination.

    (b) Divided attention. During the shooting, Huertas's attention would have been divided among multiple competing goals such as trying to keep himself from being hurt or killed. He would have also been vulnerable to weapon focus, which

would have concentrated his attention on the weapon rather than the shooter's face.

(c) Effects of stress on perception and memory. Contrary to popular belief, mental functioning during a high-stress experience is poorer than mental functioning during a moderate-stress experience. Essentially, a stressful event eventuates in a strong, detailed, real-seeming, and confidence-evoking memory because a highly stressful event is also typically a salient event—i.e., an event that the witness subsequently thinks about, talks about, is interviewed about, possibly testifies about, and so on. Accordingly, stressful event is one in which (a) few accurate details about the original event are memorized to begin with, but (b) there is substantial opportunity for this originally minimal memory to be supplemented with post-event information that is of dubious accuracy. Accordingly the witness's eventual memory of a highly stressful event is one that is typically replete with details and other richly represented, real-seeming information—but information that, unbeknownst to the witness (and counterintuitive to a trier of fact) is potentially false in important ways.

(d) Effects of duration on perception and memory. With a short duration for viewing less information is available for forming an original memory. Such factors as lighting and divided attention can further reduce the functional duration for forming an accurate memory.

<u>Scientific Evidence Regarding Line-Up Procedures</u>

Dr. Loftus will testify to the following principles regarding line-up procedures.

7

1. Definition of bias. A lineup is biased if there is anything about the lineup itself or the procedures by which the lineup is administered that would cause a witness to identify an innocent suspect with greater probability than the probability of identifying any (likewise innocent) filler.

2. Prior exposure to the suspect's appearance. A lineup is biased if a witness has had access to information—particularly visual information—indicating that the suspect is the offender. In this case, evidence that Luis Huertas was shown a picture of Jaime Rios before the lineup and was told he was the offender would be evidence of prior exposure.

3. Lack of Double-Blind Procedures. A line-up administered by a police officer who knows that the suspect is in the line-up may be biased because the officer may subconsciously communicate the identity of the suspect to the witness. This principle was demonstrated by a study carried out in 2006, based upon data from 548 live lineups and photo lineups conducted in three Illinois cities, Chicago, Evanston, and Joliet. The study showed 25 percent fewer suspects were identified in double-blind lineups than in traditional lineups. In this case, detective Mason, who conducted the lineup viewed by Huertas, knew that Rios was the suspect.

4. Confidence of suggestive post-event information for memory and witness confidence
A witness's confidence in an identification can also be enhanced by post-event information, such as repeated confrontations with a suspect in show-ups, lineups, or in court. This principle applies to Huertas's identification.

5. Scientific evidence regarding the relationship between confidence and accuracy
Scientific studies have found that a witness's confidence in an identification cannot be used as an index of accuracy. This principle applies to Huertas's identification.

# ARGUMENT

Dr. Loftus's testimony is admissible.

The admission of expert testimony is governed by the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Fed. R. Evid. 702, which provides that to admit a "witness who is qualified as an expert by knowledge, skill, experience, training, or education," the proponent must demonstrate, by a preponderance of the evidence, that:

> "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

Fed. R. Evid. 702.

In *Daubert*, the Court interpreted Rule 702 as appointing courts the gatekeeper to ensure "that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." 509 U.S. at 592. The Court's role as gatekeeper, however, is cabined to its review of the expert's methodology and analysis—*Daubert* does not invite the Court to critique the expert's ultimate conclusion or undertake its own efforts to debunk the underlying theory, so long as the opinion is based on "reliable principles and methods." *Eagle v. Vee Pak, Inc.*, 343 F.R.D. 552, 565 (N.D. Ill. 2023) ("Rather than scrutinizing the accuracy of the expert's conclusions, the Court evaluates 'the soundness and care' of the expert's analysis.") (quoting *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015)). "The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013). The *Daubert* gate keeping function applies not

9

only to "scientific testimony," but to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

With respect to expert testimony about eyewitness identification and eyewitness memory, courts in the Seventh Circuit have uniformly held that, at least in civil Section 1983 cases, such testimony is admissible. See, e.g,, *Blackmon v. City of Chicago*, No. 19 C 767, 2022 WL 3908593, at *1-7 (N.D. Ill. Aug. 30, 2022)(Dr. Loftus's opinions about eyewitness identification were admissible as methodologically reliable and relevant); *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 4398011, at *3-8 (N.D. Ill. Aug. 18, 2016)(testimony of Dr. Loftus that eyewitness's identifications of plaintiff were unreliable because of inadequate lighting, stress, and weapon focus as well as his testimony that the identification procedures were biased was admissible); *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 835-44 (N.D. Ill. 2013)(Dr. Brian Cutler, an expert in the field of eyewitness identification allowed to testify that investigating officers used procedures which were unfairly suggestive);

With respect to Dr. Loftus's testimony, application of these cases compels the conclusion that his opinions are admissible.

### *Dr. Loftus's Qualifications*

It is unlikely (although given their litigious track record, not impossible) that defendants will challenge Dr. Loftus's qualifications. But any such challenge would be frivolous, and futile. Dr. Loftus has exemplary qualifications in the field of the psychology of human perception and memory. He is an Emeritus Professor of Psychology at the University of Washington in Seattle where he has taught since 1972. His area of expertise, in which he been working for approximately 57 years, is human perception and memory. His professional experience includes, among other things, co-authorship of 8 books and approximately 110 articles, presentation of

10

approximately 160 invited addresses in 9 countries, 41years of continuous grant funding from the National Science Foundation, the National Institutes of Health, and other funding agencies, assorted journal editing, assorted government grant reviewing, and assorted consulting.

Over the past 40 years, Dr. Loftus has been qualified and testified at trial as an expert in perception and memory in approximately 500 cases. He has been found qualified as an expert in this circuit. See, e.g., *Blackmon*, 2022 WL 3908593, at * 2; *Sanders*, No. 13 C 0221, 2016 WL 4398011, at *4 ; *United States v. Carter*, 410 F.3d 942, 950 (7th Cir. 2005), *disapproved of on other grounds by United States v. Herman*, 930 F.3d 872 (7th Cir. 2019). Dr. Loftus is qualified.

*Scientific Principles Regarding Perception and Memory*

Similarly, any challenge to the scientific principles regarding perception and memory will fail. The science has universally been held to pass *Daubert* muster in this circuit, see *Blackmon*, 2022 WL 3908593, at * 4-5 (Dr. Loftus's opinions about eyewitness identification were admissible as methodologically reliable); *Sanders,* No. 13 C 0221, 2016 WL 4398011, at *3-8 (testimony of Dr. Loftus that eyewitness's identifications of plaintiff were unreliable because of inadequate lighting, stress, and weapon focus as well as that the identification procedures were biased was admissible); *Cage,* 979 F. Supp. 2d 787, 835-44 (N.D. Ill. 2013)(even in criminal cases where the courts have excluded the testimony on the grounds that it invaded the province of the jury, courts have recognized that the science is reliable); *Accord*, *United States v. Hall*, 165 F.3d 1095, 1103 (7th Cir. 1999).

Apart from the Section 1983 district court cases holding such testimony admissible, the Seventh Circuit has also been increasingly receptive to such testimony. In *United States v. Hall*, 165 F. 3d 1095 (1999) the leading criminal case upholding exclusion, Judge Easterbrook, while

11

concurring in the exclusion of the testimony in that particular case, took issue with the court's holding that such testimony was not helpful to the jury:

> [p]roperly conducted social science research often shows that commonly held beliefs are in error. Jurors who think they understand how memory works may be mistaken, and if these mistakes influence their evaluation of testimony then they may convict innocent persons. A court should not dismiss scientific knowledge about everyday subjects. Science investigates the mundane as well as the exotic. That a subject is within daily experience does not mean that jurors know it correctly. A major conclusion of the social sciences is that many beliefs based on personal experience are mistaken. The lessons of social science thus may be especially valuable when jurors are sure that they understand something, for these beliefs may be hard for lawyers to overcome with mere argument and assertion.

165 F.3d at 1118 (Easterbrook, J., concurring). *Accord*, *United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009)(science which contradicts juror's common sense beliefs about eyewitness identifications, particularly about the relationship between expressed certainty and accuracy would be helpful to the jury).

Moreover, with respect to Dr. Loftus's opinions regarding the science underlying identification procedures, the Seventh Circuit has indicated that admission of such testimony is not only permissible, and within the district court's discretion, but may even be required. See *Phillips v. Allen*, 668 F.3d 912 (7th Cir. 2012)(absent expert testimony, court was reluctant to find that police tactic of telling witness who viewed photo-array of suspect's name and possible criminal activities was unduly suggestive).

The other observation to be made about the Seventh Circuit's criminal cases in this area is that all of these involved affirmances of district court's decisions under an abuse of discretion standard, and many involved special circumstances, such as identifications by multiple witnesses or witnesses who previously knew the suspect, circumstances that are not applicable here.

*Specific Reliability Factors Relevant to Luis Huertas's Identification of the Shooter*

Dr. Loftus opines that the following factors, all related to Huertas's initial opportunity to view, are relevant to the accuracy of his identification: (a) low lighting, divided attention., effects of stress on perception and memory, and effects of duration on perception and memory. Dr. Loftus's opinions on these matters are virtually identical to his opinions which were held admissible in *Blackmon* and *Sanders*.

In *Blackmon*, the plaintiff was convicted of the shooting of a man named Tony Cox by two assailants. Three eyewitnesses were shown a photo-array. Two of the eyewitnesses identified plaintiff from a photo-array and the third did not. After plaintiff was arrested, only one of the eyewitnesses identified plaintiff n a live lineup. *Blackmon*, 2022 WL 3908593, at *1.

Dr. Loftus was allowed to testify, inter alia, that the reliability of the eyewitness's identification of the plaintiff would have been affected by several factors, including divided attention in a stressful situation (a shooting) and the lack of time to memorize the shooter's appearance. *Blackmon*, No. 19 C 767, 2022 WL 3908593,at *4.

In this case, as in *Blackmon*, Huertas was the only one of three eyewitnesses to identify plaintiff. Huertas had only a limited opportunity to view, under difficult and stressful conditions.

In *Sanders*, the witness, together with the victim, was abducted by several men and held in a dark, secluded garage. After being questioned for a period of time, one of the men shot the witness and the victim, killing the victim and wounding the witness. Dr. Loftus was allowed to testify that the reliability of the witness's identification was severely diminished because of lack of the adequate lighting, lack of attention to the offender's appearance, lack of adequate time to

13

memorize the offender's appearance, and high stress, *Sanders*, 2016 WL 4398011, at *3 (N.D. Ill. Aug. 18, 2016).

In this case, as in *Sanders*, Huertas made his identification under stressful conditions with only a limited opportunity to view.

Dr. Loftus's opinions as to the factors affecting the reliability of the identification are therefore fully admissible.

*Factors Relating to Reliability of the Identification Procedures*

With respect to the procedures used to produce Huertas's identification of the shooter, Dr. Loftus opines that the reliability of those procedures was damaged by: (1) the bias of the lineup, (2) Huertas's prior exposure to Rios's appearance when he was shown a photograph of Rios and told he was the shooter, and (3) the lack of double-bind procedures. He will also describe the circumstances under which the normal relationship between a witness's confidence in an identification and the accuracy of the identification ceases to exist.

These opinions, or similar ones, have all been found to pass *Daubert* muster in prior cases.

In *Blackmon*, 2022 WL 3908593, at *2, the court admitted Dr. Loftus's opinion that the defendants carried out identification procedures that were biased against Blackmon and were inherently unreliable. In *Sanders*, the court admitted Dr. Loftus's opinion that the line-up procedure was biased because the officers who conducted the lineup knew Sanders was the suspect and Sanders was different in some critical respects from the fillers, 2016 WL 4398011, at *3. Finally, in *Cage*, 979 F. Supp. 2d at 835–36, the court found admissible Dr. Brian Cutler's opinions that the identification procedure were defective because of the absence of cautionary instructions to the victim, the suggestion to the victim that her assailant might be present at the procedure, and the failure to use fillers in the lineup presented to the victim.

Therefore, Dr. Loftus's testimony should be admitted.

Respectfully Submitted,

/s/ Stephen L. Richards

By: Stephen L. Richards

Attorney for Plaintiff

53 W. Jackson, Suite 756

Chicago, IL 60604

(773) 817-6927

sricha5461@aol.com

Attorney No: 6191946

# CERTIFICATE OF SERVICE

Stephen L. Richards certifies that on December 22, 2025   he served the   **MOTION TO ADMIT THE TESTIMONY OF DR. GEOFFREY LOFTUS  AS AN EXPERT ON EYEWITNESS PERCEPTION AND EYEWITNESS MEMORY**

through the ECF filing system.

/s/ Stephen L. Richards

By: Stephen L. Richards