# EXHIBIT D – LOFTUS REPORT

December 2, 2023

To: Mr. Stephen Richards
From: Geoffrey R. Loftus
re: Report: People v. Jaime Rios 89-CR-16525

## I. Qualifications and background

My name is Geoffrey R. Loftus. I am Emeritus Professor of Psychology at the University of Washington in Seattle where I have taught since 1972. My area of expertise, in which I have been working for approximately 57 years, is human perception and memory.

My professional experience includes, among other things, co-authorship of 8 books and approximately 110 articles, presentation of approximately 160 invited addresses in 9 countries, 41 years of continuous grant funding from the National Science Foundation, the National Institutes of Health, and other funding agencies, assorted journal editing, assorted government grant reviewing, and assorted consulting. This experience is described more fully in my CV which can be found at,

http://faculty.washington.edu/gloftus/CV/CV.html

Over the past 40 years, I have been qualified and testified at trial as an expert in perception and memory in approximately 500 cases. These cases have been tried in superior courts in 55 counties across 16 states in the U.S., in U.S. Federal courts in 11 cities (including Chicago), in U.S. Military court in Sigonella, Italy, and in Canadian court in Winnipeg, Manitoba. Included in this experience is giving testimony 26 times in the Circuit Court of Cook County.

I was asked to prepare this report by Mr. Richards, who sent me copies of police reports and transcripts of trial testimony.

## II. Fact summary

On Tuesday, June 27, 1989 at 11:50 PM, Luis Morales was shot by two people on the street near 1316 N Western Ave. in Chicago. Mr. Morales later died of his wounds. The shooting was witnessed by a number of people, among them Luis Huertas and Javier Torres.

Although Mr. Torres claimed that he had seen an individual named José Melendez commit the shooting, Jaime Rios became the primary suspect in the case based on information provided to Chicago police from a confidential informant. On July 3, 1989, Mr. Rios was indicted by a Grand Jury.

On July 7, 1989, Mr. Rios was arrested and confessed to the shooting of Mr. Morales while being interviewed by Chicago Detectives Guevara and Mason[1]. On the same date, Mr. Rios was placed in a five-person live lineup, from which he was identified as the shooter by Mr. Huertas, although not by Mr. Torres. In November, 1990 at trial, Mr. Huertas again identified Mr. Rios as one of the offenders whom he had seen shoot Mr. Morales. Based in part on Mr. Huertas's identifications of Mr. Rios, Mr. Rios was convicted of the killing.

## III. Scope of and rationale for testimony

If I were to testify at Mr. Rios's civil trial, I would discuss, at a minimum, factors relevant to eyewitness perception and eyewitness memory that comprise the numbered list that appears below. Before going through these factors, however, I would like to clarify two issues: the first involving what conclusions I do and do not make when I testify at trial, and the second involving the fundamental rationale for having an expert in human perception and memory testify at trial to begin with. I note that these issues apply not only to me, but to any eyewitness expert, as discussed in more detail elsewhere (e.g., Buckout, 1974; Loftus & Ketcham, 1991; Penrod & Cutler, 1995).

First, when I testify, I do not, as a matter of course, opine about whether a particular witness's identification of a suspect is correct or incorrect. Instead, I provide information to the jury about the scientific bases of various relevant aspects of perception and memory. The hope is that jurors can eventually use this information as a tool to help them carry out their job of assessing the reliability of,

---

[1] As will be described elsewhere in this report, this confession was likely made under duress.

and concomitantly, the weight to be given to, whatever eyewitness memory is relevant in the case. Normally, I do not mention case participants by name when I testify; I do so in this report for expositional simplicity in articulating the relevance of my proposed testimony to this case.

The second issue concerns, as noted, the fundamental rationale for having an expert in perception and memory testify at trial. A central issue discussed by such an expert is that, contrary to common sense, a confident witness may not be an accurate witness. Over the past three decades, this issue has been attracting the attention of the judicial community, largely because of the increasing number of convicted but eventually exonerated individuals who were found to have been originally convicted on the basis of confident, yet demonstrably false identifications of the defendant at trial[2,3]. This problem was cogently described in a 2001 memo issued by New Jersey Attorney General John Farmer that accompanied new guidelines for identification procedures in his state. Attorney General Farmer noted that, "Studies have established that the confidence level that witnesses demonstrate regarding their identifications is the primary determinant of whether jurors accept identifications as accurate and reliable." This is certainly correct—see, e.g., Penrod & Cutler, 1995; Cutler, Penrod, & Dexter, 1989—and an expert in perception and memory is in a position to alert jurors to situations which, on the basis of scientific studies, are known to lead to such a false sense of confidence.

It is important first to establish *why* a confident witness sways jurors. The reason, quite simply, is that in most of normal, everyday life, high confidence *is* predictive of high accuracy. Therefore it makes sense that an average juror would believe intuitively that high confidence is *always* associated with high accuracy, or at least that the juror should use such predictive power as a default assumption in evaluating the credibility of a witness's identification.

However, contrary to intuition, such predictive power can break down, and a great deal of scientific research has delineated the circumstances under which such a breakdown occurs. These circumstances include (1) an original event that does not lend itself to a witness's being able to easily form an accurate memory of a criminal's appearance (e.g., seeing a an offender commit a crime under conditions of poor lighting, high stress, and/or limited or inappropriately allocated attention) along with (2) some form of suggestive *post-event information* that would bias the witness to reconstruct his or her memory of the offender's appearance in some systematic fashion (e.g., identifying a suspect in a biased identification procedure). Under such circumstances, the witness is inclined to rehearse this reconstructed memory of the original event (in this case, the shooting) such that the witness's memory becomes strong and confidence-inducing. Accordingly, although nonintuitively, the witness's confident identification of the suspect—now the defendant—at trial is based not, as the witness believes, on original information about the *offender's* appearance acquired while the crime was unfolding, but on potentially inaccurate, post-event information acquired about the *defendant's* appearance at the time of the identification procedure.

While this combination of circumstances is rare in most peoples' experience, it is relatively common in crimes such as the shooting that is the focus of this case. It is also clear, based on common sense, on confirming laboratory studies, and on outcomes of real-life trials, that a highly confident eyewitness can be quite persuasive to a jury. Accordingly, a central theme that runs through testimony provided by an expert in perception and memory is an account of these scientifically understood circumstances under which confidence should not be taken as a predictor of accuracy. The correspondence of these circumstances to the facts of the case at hand are often underscored via hypothetical questions from the defense attorney and/or the prosecuting attorney.

Such expert testimony will allow the jury at Mr. Rios's trial to evaluate in a reasonably informed and principled fashion the implications of Mr. Huertas's lineup and in-court identifications of Mr.

---

[2] See, for example, Scheck, Neufeld, & Dwyer (2000) for an assessment of this issue as of 18 years ago. Useful supplements to the falsely-convicted database can be found in Thompson, Cotton & Torneo (2009), Garrett (2011), as well as the Innocence Project's web site: https://www.innocenceproject.org/causes/eyewitness-misidentification/.

[3] Typically, trial identification had been preceded by some flawed identification procedure such as a biased lineup.

Rios as the shooter. More generally, a jury must consider what prior circumstances are consistent with a witness's recounting a strong, confident memory that, if true, would be strongly favorable to the prosecution case and detrimental to the defense case[4]. There are two possibilities. The first is the one that is most intuitively obvious to lay people including jurors: the witness's confidently described memories are accurate reflections of what actually happened and should thus be given heavy weight in their evaluation of the defendant's guilt or innocence—that is, that the defendant is likely the offender who committed the crime and was viewed by the witness. The second possibility is that the defendant is *not* the offender who was viewed by the witness, but that the witness nonetheless expresses a strong, honest, confident belief that he was. This second possibility is not at all obvious to jurors. However, decades of scientific research have demonstrated the circumstances under which it can occur. If these circumstances characterize the case at hand, then it is useful to explain them to the jury.

## IV. Testimony specifics

The factors regarding perception and memory about which I would testify at Mr. Rios's trial are those described in the numbered list below. I note for the record that all information that I discuss is generally accepted in the field of Psychology (see, e.g., Kassin, Ellsworth, & Smith, 1989; Kassin, Tubb, Hosch, & Memon, 2001; Schmechel, O'Toole, Easterly & Loftus, 2006). The information has been gathered over the past century primarily using controlled laboratory research as a means of identifying basic scientific laws. Such research has typically been funded by research grants from national agencies which, in the U.S. for example, would include the National Science Foundation, and the National Institutes of Health, along with military research arms such as the Air Force and the Naval offices of scientific research and the Defense Advanced Research Projects Agency. The results of such research studies have been published in peer-reviewed journals mainly in the fields of Biology, Computer Science, Neuroscience, and Psychology, as well as in the premier cross-discipline journals, principally *Nature* and *Science*.

Generalization of laws formulated under scientifically controlled settings to the world outside the laboratory comes about in part by observations of real-life incidents that bear on the conclusions that issue from the laboratories. An example of such real-life phenomena that is directly relevant to many eyewitness cases, including the present one comes, as noted earlier, from cases of eventually exonerated individuals convicted on the basis of highly confident, yet demonstrably false identifications of the defendant at trial. Another such example, also relevant to the present case, derives from a study, conducted in Illinois, of actual police lineups. This study will be described in more detail later in this report.

1. **Reliability**. When I testify, I generally convey to a jury a definition of what is meant, from a scientific standpoint, by a reliable identification.

    In particular, a witness's identification of a suspect or a defendant can be construed as reliable if, based on the witness's identification, it can be reasonably concluded that the witness's memory of the offender strongly matches the suspect's or defendant's appearance.

    A witness's memory can be *un*reliable for either of two reasons, both of which, as I will detail below, were applicable to Mr. Rios's case.

    - The first reason is that circumstances during the event were such that a witness would have been unlikely to form a complete and detailed memory of the shooter's appearance to begin with. If such is true then it would not be possible for the witness's incomplete memory to strongly match the defendant's (or anyone's) appearance and no identification of anyone by the witness would be reliable.
    - The second reason is the identification procedure is itself biased or unreliable. To the degree that the identification procedure is itself unreliable, one cannot rule out the possibility that the witness's identification of the suspect was influenced primarily by some aspect(s) of the

---

[4] Or vice-versa as in, e.g., State of Alaska v. Korakahn Phornsavanh 3AN-13-06468CR, wherein I consulted and testified at trial for the State about the same general issues that I discuss in this report.

    identification procedure itself rather than by a match between the witness's memory of the offender and the suspect's appearance.

    Given this definition of a reliable memory, it logically follows that to the degree that a witness's identification of a defendant trial is deemed unreliable, it should be given commensurately little weight by the trier of fact in assessing the defendant's guilt or innocence.

2. **A general theory of perception and memory**. I will briefly describe a longstanding and well accepted theory of how perception and memory operate. This theory has been described in many places, initially by Neisser (1967); see also Neisser & Hyman (1999), and applications of it to legal issues have been described elsewhere (e.g., Busey & G. Loftus, 2007; G. Loftus, 2010a, 2010b; E. Loftus, 1979; E. Loftus & Doyle, 1997). Briefly, three points are most relevant to legal issues.

   - First, initial memories of an event, based on what are often limited sensory information acquired as the event is taking place, are fragmented, disorganized, and incomplete.
   - Second, based on subsequently acquired post-event information, the witness's initial memory changes in such a way as to become more detailed, more coherent, more organized, and more complete—but, because post-event information is of unknown accuracy, *not* necessarily more accurate.
   - Third, the witness is not generally aware of which information in his or her eventual memory is based on the sensory data acquired during the event versus what is potentially false post-event information acquired subsequently.

   As a consequence the witness ends up with an eventual memory that is strong, detailed, real-seeming, and confidence-inducing, but nonetheless potentially incorrect in important respects. Examples of such memories abound, both in the scientific laboratory and in everyday life. A striking and directly relevant class of such memories was alluded to earlier: those of eyewitnesses who strongly and confidently—yet falsely—identify as offenders, defendants who are later shown unequivocally to *not* have been the person whom the witness saw commit the crime.

   Relevant to the case at hand is that Mr. Huertas likely began with fragmented and incomplete initial memories of the shooter alleged to have been Mr. Rios—and yet identified Mr. Rios at trial based on reconstructed and plausibly false memories that included a strong representation of him as one of the shooters. The rationale for such a hypothesis is developed in what follows.

3. **Factors that would have implied Mr. Huertas to have had a poor memory of the offender's appearance at the time he made his in-court identification of Mr. Rios**

   There are four such factors: lighting, attention, stress, and duration.

   **Effects of low lighting on perception and subsequent memory**. Clearly illumination is relevant, as the shooting took place in the middle of the night. Thus Mr. Huertas viewed the shooter under poor lighting conditions.

   Under conditions of sufficiently low lighting, vision is accomplished using the *scotopic visual system*, which is incapable of detecting either color or the fine detail that is necessary to encode a person's appearance. These limitations on initial perception imply concomitant limits on the amount and kind of information about the offender's facial appearance that can be initially placed into memory (see any basic vision textbook, e.g., Wandell, 1995; see also Nyman, Antfolk, Lampinen, Tomisto, Kaakinen, Korkman, & Santtila, 2019).

   Although witness Javier Torres described the shooting area has having been lit by streetlights, streetlights do not generally provide a source of illumination that is adequate for perceiving and memorizing someone's appearance. Accordingly, I would have described to the jury the consequences of attempting to perceive and memorize critical information, such as an offender's appearance, using only streetlights as a source of light. Essentially, such perception is still relatively poor because (a) streetlights are quite dim by design, (b) streetlights are, in general, relatively sparsely placed along the street, and (c) streetlights provide only partial illumination of, e.g., a person: that is, a person illuminated only by a streetlight is partially lit (although, as noted, still poorly) and partially in darkness, in ways that depend on the exact configuration of the person being viewed, the witness, and the streetlight.

   **Effects of attention on memory**, with a particular emphasis on how attention is divided when

many aspects of the environment compete for attention.

Attention is a central focus of study in numerous scientific fields; for detailed accounts see, among many other articles, Moray (1969), Norman (1976), Sperling & Melchner (1978), Bundesen (1990), Loftus, Hanna, & Lester (1988), Pashler (1998), Reinitz (1990).

Attention is a critical component of the human brain whose purpose is to filter from the vast amount of information from the world that impinges on the brain at any given instant, that information that is *relevant* to the task at hand from that information that is *ir*relevant to the task at hand. Attention is a serial process—a useful (although incomplete) metaphor is that of an "attentional spotlight beam" that moves sequentially from one part of the witness's sensory world to another.

Any element of some event that is not attended to is lost to the witness; i.e., it is not remembered later on. A witness fails to pay to—and hence will not remember—some eventually important element of an event under either of two circumstances. The first is when the element is not relevant to the witness's task at hand. The second—in a sense the converse of the first—is when there are numerous element of the event that are *all* relevant to the witness's task at hand, and thus compete for the witness's limited attention. In this latter kind event, the witness must sacrifice paying attention to some elements of the event (such as a offender's appearance) in order to pay attention to other elements of the event that are potentially more important (such as those that are relevant to maintaining safety in the face of imminent danger).

Rather striking results, that underscore the critical relation between focused attention and later memory, issue from experiments on *change blindness* (see, e.g., Levin & Simons, 1997; Simons & Levin, 1998). These experiments demonstrate that, even when a witness engages in direct, face-to-face conversation with some person, the witness often will not recognize the person even seconds later—thereby demonstrating the requirement that a witness pay specific attention to a person's appearance in order to be later capable of identifying that person.

During the shooting, Mr. Huertas—as would be true of any normal human being under the circumstances—would have had multiple things competing for his attention, principally relating to his safety. These attentional competitors would have included, for example, trying to keep himself from being hurt or killed, seeking help, looking for potential escape routes, and so on. In contrast to these immediately relevant attentional attractors, the shooter's appearance—while relevant to any long-term goal that Mr. Huertas might have had of eventually being able to identify them—would have been largely irrelevant at the moment and would likely have been allocated minimal, if any, of Mr. Huertas's limited attentional resources.

A special note is warranted about attention to the gun that was used by the shooter. There is a substantial body of research on what has been referred to as *weapon focus*—which refers to inclination of people to pay attention to a weapon when a weapon is present, at the expense of attending to other potentially relevant aspects of the scene, such as the appearance of the person who is holding the weapon. Numerous experiments have demonstrated this phenomenon; see, e.g., Loftus, Loftus & Messo (1987) and for an overview, see Steblay (1992).

Finally, in the unlikely event that Mr. Huertas *had* opted to pay attention to the shooters' appearance, any such attention would have had to be divided *between* the two offenders, which means that, on average, each offender's appearance would have received only half the attention that would have been allocable to appearance had there been only a single offender present.

**Effects of stress on perception and memory**. Certainly Mr. Huertas had reason to be stressed: an active shooting was occurring in his immediate vicinity which meant that his safety and perhaps his life were directly threatened.

Generally speaking, and contrary to popular belief, mental functioning during a high-stress experience is poorer than mental functioning during a moderate-stress experience (e.g., Baddeley, 1972; Berkun, Bialek, Kern, & Yagi, 1962; Morgan, Hazlett, Doran, Garrett, Hoyt, Thomas, Baranoski, & Southwick, 2004; Nourkova, Bernstein, & Loftus, 2004; Yerkes & Dodson, 1908).

It is noteworthy that lay people typically believe, incorrectly, that a vivid and accurate representation of a highly stressful event, replete with many details, is "stamped into a witness's memory" (e.g., Neisser & Harsch, 1999). This is perfectly in keeping with the scientific

underpinnings, sketched above, of how human perception and memory work. Essentially, a stressful event eventuates in a strong, detailed, real-seeming, and confidence-evoking memory because a highly stressful event is also typically a *salient* event—i.e., an event that the witness subsequently thinks about, talks about, is interviewed about, possibly testifies about, and so on. Accordingly a stressful event is one in which (a) few accurate details about the original event are memorized to begin with, but (b) there is substantial opportunity for this originally minimal memory to be supplemented with post-event information that is of dubious accuracy. Accordingly the witness's eventual memory of a highly stressful event is one that *is* typically replete with details and other richly represented, real-seeming information—but information that, unbeknownst to the witness (and counterintuitive to a trier of fact) is potentially false in important ways.

**Effects of duration on perception and memory**. Although a matter of common sense, it is an important part of the whole picture to point out that, with short duration, less information is available to the witness as a basis of forming an original memory.

Somewhat less apparent to common sense is the concept of *functional duration*: that, typically, of the total duration comprising some event, only a fraction of that duration is available to the witness for memorizing what will later be relevant. When it is an offender's appearance that is relevant, functional duration includes only that time during which the witness, simultaneously, (a) has the offender in his field of view, (b) has sufficient light to be able to discern the offender's facial features (see "Lighting" section above), (c) is paying attention specifically to the offender's appearance (see "Attention" section above), (d) is under a degree of stress that allows adequate cognitive functioning (see "Stress" section above), (e) is sufficiently close to the offender to be able to discern his facial features, and (f) is subject to various other necessary conditions as well. Even if an event itself lasts several seconds, the witness's functional duration for perceiving and memorizing the offender's appearance can, therefore, be as low as zero.

Finally, it is worth pointing out that a witness cannot compensate for lack of attention or for lack of illumination with greater duration. Additional relevant information may be found, for example in Wandell (1995); Loftus (1985); Laughery, Alexander, & Lane (1971).

4. **Scientific evidence concerning lineup procedures.** As has been discussed, there were several salient factors weighing against Mr. Huertas's ability to accurately form a memory of the shooter: lighting was poor, his attention was likely not on the shooter's appearance, he was likely under high stress, and he had minimal functional duration available to adequately perceive and memorize the shooter's appearance. All in all, his memory of the shooter would likely have been poor at best when identified Mr. Rios from the lineup. And yet Mr. Huertas *did* identify Mr. Rios from the lineup. On what basis might this have happened?

There are two possible answers to this question.
- Despite all the reasons for Mr. Huertas's memories of the shooter having likely been poor, his memory of the shooter's appearances was somehow sufficiently good that his identification of Mr. Rios was *reliable*, i.e., his identifications was based on a strong match between his memory of the shooter's appearance and Mr. Rios's appearance in the lineup.
- As would be expected Mr. Huertas's memory of the shooter was indeed poor but he chose Mr. Rios because the lineup was biased against Mr. Rios in some fashion. This would constitute an *unreliable* identification, i.e., an identification that was *not* based on the match between a reasonably strong memory of the shooter and Mr. Rios's appearance in the lineup—and thus should have been given little if any weight by the jury in their assessment of Mr. Rios's guilt or innocence.

Because of the aforementioned reasons why Mr. Huertas's memory of the shooters was likely poor, the first possibility strains credulity. Accordingly, these issues warrant a discussion of lineups, the forms of bias that lineups may assume, and, more generally, the circumstances under which lineups may lead to false identifications which in turn lead to false convictions. I proceed by first defining an unbiased lineup and then describe various ways in which a lineup may be biased (see, e.g., Wells, 1993, 1995; Wells & Seelau, 1995; Wells, Small, Penrod, Malpass, Fulero, & Brimacombe, 1998; Wells, Semmler, & Brewer, 2004).

Essentially a lineup is biased if there is anything about the lineup itself or the procedures by which the lineup is administered that would cause a witness to identify an innocent suspect with greater probability than the probability of identifying any (likewise innocent) filler.

In the present case, potential biases include the following[5].

**Prior exposure to the suspect's appearance.** A lineup is biased if a witness has had access to information—particularly *visual* information—indicating that the suspect is the offender.

According to an affidavit written by Mr. Huertas, dated May 19, 2020, Detective Guevara showed him a photo array containing Mr. Rios's picture prior to participating in the live lineup. Mr. Huertas made no identification from this photo array. Mr. Rios was then the only lineup member whose appearance Mr. Huertas had seen before; thus his identification of Mr. Rios may have been based in part *not* on a match between Mr. Rio's appearance in the lineup and his memory of the shooter, but rather on a match between Mr. Rio's appearance in the lineup and the photo array of Mr. Rios that Mr. Huertas had seen previously.

**Lack of double-blind procedures.** A lineup administered by a police officer who knows the suspect's identity is potentially biased, as the officer is in a position to unconsciously provide information to the witness as to who the suspect is. I typically describe this form of bias within the context of the well known scientific principle of *double-blind procedures* (see e.g., Pietrowsky, Claassen, Frercks, Fehm, & Born, 2001 for an example in the traditional literature and Greathouse & Kovera, 2009 for double-blind procedures as applied to lineups). If a witness positively identifies a suspect from a lineup that is not double blind, one cannot rule out the possibility that the identification was based wholly or in part on information covertly provided by the police officer, rather than on what is fundamentally important, *viz*., the match between the witness's memory of the offender and the suspect's appearance[6, 7].

Seemingly innocuous, yet actually important information—either overt or covert—can also be provided by a lineup administrator who knows the suspect's identity, even after the witness has positively identified the suspect. Specifically, such a knowledgeable lineup administer is in a position to alert the witness—again either deliberately or unconsciously—that he "made the right choice." Conveying of such information to a witness is likely to produce what is known as the *lineup-feedback effect*. As shown in many experiments (e.g., Bradfield, Wells, & Olson, 2002; Semmler, Brewer, & Wells, 2004; Shaw & McClure, 1996; Wells & Bradfield, 1998; Wells, Olson, & Charman, 2003), a witness who believes that he has identified the suspect undergoes two kinds of memory changes. First, the witness is subsequently more confident that he had indeed identified the person whom he witnessed commit the crime. Second, the witness remembers the circumstances of the crime as being more conducive to perceiving and remembering the criminal's appearance—e.g., that he had more time, was under less stress, was paying more attention to the offender's appearance and so on.

Experimentally it has been shown that these kinds of increased confidence takes place *whether or not the witness made the correct identification to begin with.* The consequence of the lineup-feedback effect when a witness has falsely identified an innocent suspect is that the witness will display increased confidence when eventually identifying the defendant at trial. This is relevant to the last topic of this report, that of witness confidence and its relation to accuracy.

---

[5] Earlier I noted that witness Javier Torres told police that José Melendez was the shooter. Mr. Melendez and Mr. Rios looked similar to one another. Accordingly a reasonable possibility is that Mr. Huertas, like Mr. Torres, had a memory of Mr. Melindez as the shooter, which matched Mr. Rios's appearance in the lineup—and which in turn at least in part underlay Mr. Huerta's identification of Mr. Rios from the lineup.

[6] Double blind procedures had their origins in medical research. Certain categories of medical studies would not be taken seriously if they were not done double blind. Although such studies are logically equivalent to police lineups, it is only in recent years that being administered double blind have begun to be a *sine qua non* of a police lineup being taken seriously.

[7] Above I described Mr. Huertas's allegation that he had been shown a photo array containing Mr. Rios's picture prior to participating in the live lineup. In his affidavit, Mr. Huertas also indicated that Detective Guevara threatened to lock him up if he did not identify the shooter.

In the present case, Detective Mason who administered the lineup knew that Mr. Rios was the suspect; thus the possibilities of his covertly providing information to Mr. Huertas about (a) Mr. Rios's identity as the suspect and (b) that he "made the right choice" cannot be ruled out.

**The Illinois lineup study.** A study relevant to lineup bias was carried out in Illinois and described (although not published) by Sherri Mecklenburg in 2006. This study reported data from 548 actual police lineups (a mixture of live lineups and photo lineups) from three Illinois cities: Chicago, Evanston, and Joliet. Of these lineups, 319 used what I will refer to as the *traditional procedure*: the police officer who administered the lineup knew who the suspect was (i.e., the lineup was not done double-blind). The remaining 229 lineups used what I will refer to as a *recommended procedure*: the police officer who administered the lineup did not know who the suspect was (i.e., the lineup was done double-blind).

The data from the Illinois study are quite clear and are exactly what one would expect from the foregoing discussion of double-blind procedures: lineups carried out double-blind, produced approximately 25% fewer instances of witnesses identifying the suspect than did lineups not done double blind[8]. This implies that police knowing who the suspect was did not act neutrally: rather they behaved in ways that substantially increased the chances that the witness would identify the suspect.

5. **Consequences of suggestive post-event information for memory and witness confidence**. As sketched earlier in this report, post-event information is event-relevant information, which can be either correct or incorrect, that is acquired by a witness after the event and integrated into the witness's memory. Post-event information has been the subject of a substantial body of research over the past 40 years; see Loftus (1979); Loftus & Ketcham (1991); Schacter (1995). To the degree that post-event information is false, adding it to memory causes the memory to become stronger and more confidence-inducing, but at the same time less accurate. Addition of such post-event information is typically an unconscious act; that is, a witness is later unable to distinguish which aspects of an eventual memory are based on original events, versus which are based on post-event information added subsequent to the event.

In the present case, potentially relevant post-event information includes, but is not necessarily limited to Mr. Huertas's ability to use Mr. Rios's appearance in the lineup as a basis for reconstructing his memory of the shooter's appearance. That is, Mr. Huertas likely replaced his poor initial representation of the actual shooter, acquired at the time of the shooting, with a stronger representation based on subsequently seeing Mr. Rios in the lineup.

Later at trial, Mr. Huertas's confident in-court identification of Mr. Rios as the shooter was likely based on a strong memory of Mr. Rios as shooter. However, and critically, this strong memory of Mr. Rios as the shooter was not constructed based on Mr. Huertas's perceptions of the actual shooter operating during the actual shooting (carried out, as described, under poor conditions for perceiving and memorizing), but rather had been *re*constructed after the fact, based on post-event information as just described (carried out under good conditions for perceiving and memorizing).

6. **Scientific evidence concerning the relation between confidence and accuracy**. Generally speaking, and contrary to common sense, confidence cannot be used as an index of accuracy when (a) circumstances for forming and maintaining the original memory are poor, and (b) there are apparent sources of potentially false and biasing post-event information (e.g., Bradfield, Wells, & Olson, 2002; Busey, Tunnicliff, Loftus, & Loftus, 2000; Deffenbacher, 1980; Wells, Fegueson, & Lindsay, 1981; Wells, Olson, & Charman, 2003; Wells, Semmler, & Brewer, 2004; Wells, Small, Penrod, Malpass,

---

[8] In her report of the study, Ms. Mecklenburg asserts, incorrectly, that her results favor the traditional procedure because, compared to the recommended procedure, the traditional procedure produces more instances of the witness choosing the suspect. Mecklenburg's logical error in this assertion is her presumption that all lineup suspects are in fact guilty, i.e., that *all witness identifications of the suspect are correct*. Such a presumption defies common sense; if it were true, there would be no reason to carry out an identification procedure (or even have a trial) to begin with. In fact, a careful mathematical analysis of the data demonstrates the opposite of what Mecklenburg asserted: that false identifications are considerably more likely in the traditional compared to the recommended procedure as described by Loftus, Wells, & Stahl (2013).

Fulero, & Brimacombe, 1998; Wells, Douglass, Meissner, Kovera, Brewer, & Wixted, 2020[9]).

As indicated above, both of these circumstances apply in this case. Mr. Huertas's original perceptions and memories of the shooter's appearance were likely poor as discussed in Point 3 above. Post-event information was available in the form of Mr. Rios's appearance in the live lineup as discussed in Points 4-5 above.

As part of this discussion, I will emphasize that a witness testifying inaccurately about some critical fact is not necessarily lying; rather, decades of scientific research have indicated that a witness may be testifying honestly about the contents of a memory that seems very real but that is false, because it is based largely on post-event information that is itself false.

## V. References

Baddeley, A.D. (1972). Selective attention and performance in dangerous environments. *British Journal of Psychology*, 63, 537-546.

Berkun, M.M., Bialek, H.M., Kern, R.P., and Yagi, K. (1962). Experimental studies of psychological stress in man. *Psychological Monographs: General and Applied, 76*, whole.

Bradfield, A. L., Wells, G. L., & Olson, E. A. (2002). The damaging effect of confirming feedback on the relation between eyewitness certainty and identification accuracy. *Journal of Applied Psychology*, 87, 112-120.

Bruner, J.S. & Postman, L. (1949). On the perception of incongruity: A paradigm. *Journal of Personality, 18*, 206-223.

Buckout, R. (1974). Eyewitness testimony. *Scientific American, 231*, 23 31.

Bundesen, C. (1990). A theory of visual attention. *Psychological Review, 97*, 523 547.

Busey, T.A., Tunnicliff, J., Loftus, G.R. & Loftus, E.F. (2000). Accounts of the confidence-accuracy relation in recognition memory. *Psychonomic Bulletin & Review*, 7, 26-48.

Busey, T.A. & Loftus, G.R. (2007). Cognitive science and the law: Moving science from the laboratory to the courtroom. *Trends in Cognitive Science*, 11, 112-117.

Carmichael, LC, Hogan, HP, & Walters, AA. 1932. An experimental study of the effect of language on the reproduction of visually perceived form. *Journal of Experimental Psychology*, 15, 73-86

Chandler, C. C. (1994). Studying related pictures can reduce accuracy, but increase confidence, in a modified recognition test. *Memory and Cognition, 3*, 273 280.

Cherry, E.C. (1953). Some experiments on the recognition of speech with one and with two ears. *Journal of the Acoustical Society, 25*, 975-979.

Cutler, B.L., Penrod, S.D., & Dexter, H.R. (1989). The eyewitness, the expert psychologist, and the jury. *Law and Human Behavior, 13*, 311-332.

Cutler, B.L., Penrod, S.D., & Stuve, T.E. (1988). Juror Decision Making in Eyewitness Identification Cases. *Law and Human Behavior*, 12, 41-55

Cutler, B.L., Penrod, S.D., & Martins, T.K. (1987). Improving the reliability of eyewitness identification: Putting context into context. *Journal of Applied Psychology, 10*, 629-637.

Deffenbacher, K. (1980). Eyewitness accuracy and confidence: Can we infer anything about their relationship? *Law and Human Behavior, 4*, 243 260.

Garrett, B.L. (2011). *Convicting the innocent: Where criminal prosecutions go wrong.* Cambridge: Harvard University Press.

Goldstein, B. (2002). *Sensation and Perception, Sixth Edition*. Pacific Grove, CA: Wadsworth.

---

[9] In most cases involving eyewitness identification, the prime source of post-event information is, as is true in this case, the suspect's picture or the suspect himself viewed by the witness in an identification procedure.

It should be noted that if the identification procedure is itself reliable and unbiased (which as described in detail above is *not* true in this case) then there is a positive relation between the witness's confidence in his or her identification response and the accuracy of his or her response, e.g., Wixted, Mickes, Dunn, Clark, & Wells (2016).

Greathouse, S.M., & Kovera, M.B. (2009). Instruction bias and lineup presentation moderate the effects of administrator knowledge on eyewitness identification. *Law and Human Behavior 33*, 70-82.

Johnson, M.K. (1998). Individual and cultural reality monitoring. *Annals of the American Academy of Political and Social Science, 560*, 179-193.

Johnson, M.K. & Burns, C.L. (1981). Reality Monitoring. *Psychological Review*, *81*, 67-85.

Kassin, S.M., Ellsworth, P.C. & Smith, V.L. (1989). The "general acceptance" of psychological research on eyewitness testimony: A survey of the experts. *American Psychologist, 44*, 1089-1098.

Kassin, S.M., Tubb, V.A., Hosch, H.M., & Memon, A. (2001). On the "General Acceptance" of Eyewitness Testimony Research. *American Psychologist, 56*, 405-416.

Laughery, K. R; Alexander, J.F, & Lane, A.B. (1971). Recognition of human faces: Effects of target exposure time, target position, pose position, and type of photograph. *Journal of Applied Psychology*. 55, 477-483

Leippe, M. (1980). Effects of integrative memorial and cognitive processes on the correspondence of eyewitness accuracy and confidence. *Law and Human Behavior, 4*, 261-274.

Lindsay, R. C. L., & Wells, G. L. (1985). Improving eyewitness identification from lineups: Simultaneous versus sequential lineup presentations. *Journal of Applied Psychology, 70*, 556-564.

Loftus, E.F. (1979). *Eyewitness Testimony*. Cambridge, MA: Harvard University Press.

Loftus, E.F. Coan, J.A., & Pickrell, J.E. (1996). Manufacturing false memories using bits of reality. In L. Reder (Ed.) *Implicit memory and metacognition*, pp. 195-220: Mahwah, NJ: Erlbaum.

Loftus, E.F. & Doyle, J. (1997). *Eyewitness Testimony: Civil and Criminal*. Lexis Law Publishing.

Loftus, E.F. and Castelle, G. (2000). Crashing Memories in Legal Cases In P.J. van Koppen & N.H.M. Roos (Eds). *Rationality, Information and Progress in Law and Psychology*. Maastricht: Maastricht University Press.

Loftus, E.F., Loftus, G.R., & Messo, J. (1987). Some facts about "weapon focus." Law and Human Behavior, 11, 55-62.

Loftus, E.F., Miller, D.G., & Burns, H.J. (1978). Semantic integration of verbal information into a visual memory. Journal of Experimental Psychology: Human Learning and Memory, 4, 19-31.

Loftus, E., & Palmer, J. (1974). Reconstruction of Automobile Destruction: An Example of the Interaction Between Language and Memory. *Journal of Verbal Learning and Verbal Behavior, 13*, 585-589.

Loftus, E.F. & Pickrell, J.E. (1995). The formation of false memories. *Psychiatric Annals, 25*, 720-725.

Loftus, G.R. (1972). Eye fixations and recognition memory for pictures. *Cognitive Psychology, 3*, 525 551.

Loftus, G.R. (1985). Picture perception: Effects of luminance level on available information and information extraction rate. *Journal of Experimental Psychology: General, 114*, 342-356.

Loftus, G.R. (2010). What can a perception-memory expert tell a jury? *Psychonomic Bulletin & Review*, 17, 143-148.

Loftus, G.R. (2010). Processi Cognitive, testimonianza dell'esterto e teorie su eventi di pertinenza legale. *Sistemi Intelligenti, a. XXII, n. 2, Agosto 2*. (English Translation: Cognition, expert testimony, and theories of legally relevant events).

Loftus, G.R. & Ginn, M. (1984). Perceptual and conceptual processing of pictures. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 10*, 435-441.

Loftus, G.R., Hanna, A.M., & Lester, L. (1988) Conceptual Masking: How One Picture Captures Attention from Another Picture. *Cognitive Psychology 20*, 231-282.

Loftus, G.R., & Kallman, H.J. (1979). Encoding and use of detail information in picture recognition. *Journal of Experimental Psychology: Human Learning and Memory, 5*, 197 211.

Loftus, G.R., Wells, G.L., & Stahl, M.B. What Can We Learn About Real-Life Lineups from Experiments that use Real-Life Lineups? Unpublished manuscript available from G. Loftus.

Case: 1:22-cv-03973 Document #: 245-1 Filed: 12/22/25 Page 11 of 12 PageID #:13915

Loftus report					People v. Jaime Rios					Page 11 of 12

Mecklenburg, S.H. (2006). Report to the Legislature of the State of Illinois: the Illinois pilot program on sequential double-blind identification procedures.

Moray, N. (1969). Attention in dichotic listening: Affective cues and the influence of attention. *Quarterly Journal of Experimental Psychology,* 11, 56 60.

Morgan, C.A. III, Hazlett, G., Doran, A., Garrett, S., Hoyt, G., Thomas, P., Baranoski, M., & Southwick, S.M. (2004) Accuracy of eyewitness memory for persons encountered during exposure to highly intense stress. *International Journal of Law and Psychiatry, 27*, 265–279.

Neisser, U. (1967). *Cognitive Psychology*, New York: Appleton Century Crofts.

Neisser, U. & Hyman, I.E. (1999). *Memory Observed*: *Remembering in Natural Contexts.* Worth Publishing.

Neisser, U. & Harsch, N. (1999). Phantom Flashbulbs. In Neisser, U. & Hyman, I.E. *Memory Observed*: *Remembering in Natural Contexts.* Worth Publishing.

Nolen-Hoeksema, S., Fredrickson, B., Loftus, G.R., & Wagenaar, W. (2009). *Hilgard's Introduction to Psychology, Fifteenth Edition.* London, UK: Cengage.

Norman, D.A. (1976). *Memory and Attention*. New York: Wiley.

Nourkova, V., Bernstein, D.M., & Loftus, E.F. (2004). Altering traumatic memory. *Cognition and Emotion, 18,* 575-585.

Pashler, H. (1998). *The Psychology of Attention*. Cambridge, MA: MIT Press.

Penrod, S. & Cutler, B. (1995). Witness confidence and witness accuracy: Assessing their forensic relation. Special Issue: Witness memory and law. *Psychology, Public Policy, & Law, 1*, 817 845.

Pietrowsky, R, Claassen, L, Frercks, H, Fehm, H.L, & Born, J. (2001). Time course of intranasally administered cholecystokinin-8 on central nervous effects. *Neuropsychobiology*, 43, 254-259.

Reinitz, M.T. (1990). Effects of spatially directed attention on visual encoding. *Perception and Psychophysics, 47*, 497 505.

Reinitz, M.T., Peria, W., Séguin, J.A., &. Loftus, G.R. (2011). Different confidence-accuracy relationships for feature-based and familiarity-based memories. *Journal of Experimental Psychology: Learning, Memory, & Cognition.*

Reinitz, M.T., Séguin, J.A., Peria, W., &. Loftus, G.R. (2012). Confidence-accuracy relations for faces and scenes: Roles of features and familiarity. *Psychonomic Bulletin & Review, 19,* 1085–1093.

Schacter, D.L. (1995). *Memory Distortion*. Cambridge, MA: Harvard University Press.

Scheck, B. Neufeld, P., & Dwyer, J. (2000). *Actual Innocence*. New York: Doubleday.

Schmechel, R.S., O'Toole, T.P., Easterly, C., & Loftus, E.F. (2006). Beyond the ken? Testing jurors' understanding of eyewitness reliability evidence. *Jurimetrics*, Winter.

Semmler, C., Brewer, N., & Wells, G. (2004) Effects of postidentification feedback on eyewitness identification and nonidentification confidence. *Journal of Applied Psychology, 89*, 334-346.

Shaw, J.S. III & McClure, K.A. (1996). Repeated postevent questioning can lead to elevated levels of eyewitness confidence. *Law and Human Behavior, 20*, 629-653.

Simons, D.J., & Levin, D.T. (1998). Failure to detect changes to people during a real-world interaction. *Psychonomic Bulletin and Review, 5*, 644-649.

Steblay, N.M (1992). A meta-analytic review of the weapon focus effect. *Law and Human Behavior, 16*, 413-424

Sperling, G. & Melchner, M.J. ( 1978). Visual search, visual attention, and the attention operating characteristics. In J. Requin (Ed.) *Attention and Performance VII.* Hillsdale, N.J.: Erlbaum.

Thompson, J., Cotton, R., & Torneo, E. (2009). *Picking Cotton: Our memoir of injustice and redemption.* St. Martin's Press.

Wandell, B.A. (1995). *Foundations of Vision* Sunderland, MA: Sindaur Associates.

Wells, G. L. & Bradfield, A. L. (1998). "Good, you identified the suspect:" Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83*, 360-376.

Case: 1:22-cv-03973 Document #: 245-1 Filed: 12/22/25 Page 12 of 12 PageID #:13916

Loftus report                       People v. Jaime Rios                       Page 12 of 12

Wells, G. L. & Seelau, E. P. (1995). Eyewitness identification: Psychological research and legal policy on lineups. *Psychology, Public Policy, and Law, 1*, 765-791.

Wells, G. L., & Luus, E. (1990). Police lineups as experiments: Social methodology as a framework for properly-conducted lineups. *Personality and Social Psychology Bulletin, 16,* 106-117.

Wells, G. L., Ferguson, T. J., & Lindsay, R. C. L. (1981). The tractability of eyewitness confidence and its implication for triers of fact. *Journal of Applied Psychology, 66*, 688-696.

Wells, G.L., Olson, E.A., & Charman, S.D. (2003). Distorted retrospective eyewitness reports as functions of feedback and delay. *Journal of Experimental Psychology: Applied, 9*, 42-52.

Wells, G. L. (1993). What do we know about eyewitness identification? *American Psychologist, 48*, 553-571.

Wells, G. L., Small, M., Penrod, S., Malpass, R. S., Fulero, S. M. & Brimacombe, C. A. E. (1998), *Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads*, Law and Human Behavior, 22, 603-647.

Wells, G., Semmler, C, & Brewer, N. (2004). Effects of Postidentification Feedback on Eyewitness Identification and Nonidentification Confidence. *Journal of Applied Psychology, 89,* 334-346.

Wells, G.L., Douglass, A.B., Meissner, C.A., Kovera, M.B., Brewer, N., & Wixted, J.T. (2020), Policy and Procedure Recommendations for the Collection and Preservation of Eyewitness Identification Evidence, *Law & Human Behavior, 44*, 3-36.

Wixted, J.T., Mickes, L., Dunn, J.C., Clark, S.E., and Wells, W. (2016). Estimating the reliability of eyewitness identifications from police lineups. *PNAS, 113*, 304-309.

Yarmey, A.D. & Tressillian Jones, H.P. (1983). Is the psychology of we identification a matter of common sense? In S.M.A. Lloyd-Bostock & B.R. Clifford (eds.) *Evaluating witness evidence: Recent psychological research and new perspectives:* Chichester: Wiley.

Yerkes, R.M., & Dodson, J.D. (1908). The relation of strength of stimulation to rapidity of habit-formation. *Journal of Comparative and Neurological Psychology, 18*, 459-482.