**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JAIME RIOS

     Plaintiff,

          vs.                       Case No. 1:22-cv-03973

REYNALDO GUEVARA, et al,

     Defendants.                 JURY TRIAL DEMANDED

**MOTION TO ADMIT THE TESTIMONY OF DR. MELISSA RUSSANO AS AN
EXPERT ON FALSE CONFESSIONS**

Plaintiff  Jaime Rios, by and through his attorneys, Stephen L. Richards and Joshua S.M. Richards submits the following motion in limine to admit the testimony of Dr. Melissa Russano as an expert on false confessions. This motion is filed in anticipation that defendants will file a *Daubert* motion to preclude Dr. Russano's testimony. [1]In support of thereof, Jaime Rios states as follows:

**SUBSTANCE OF DR. MELISSA RUSSANO'S TESTIMONY**

*Qualifications*

Dr. Melissa Russano is a Professor of Criminal Justice at Roger Williams University. She has a Ph.D. in Psychology (with a legal psychology specialization) from Florida International University (2004). She is a research psychologist with a background in social and cognitive psychology. Her  primary areas of research and expertise are investigative interviewing, interrogations, and confessions, in the law enforcement, military, and human intelligence domains.

---

[1] Dr. Russano's report is attached as Exhibit A.

She has been conducting research in the area of investigative interviewing, interrogations, and confessions since 2002. She has published approximately 20 scholarly peer-reviewed articles and chapters on these topics, and has created one of the most often used and influential laboratory paradigms for studying true and false confessions. She has regularly given presentations to academic and practitioner audiences, and she has trained local, state, and federal law enforcement officers in science-based methods of interviewing and interrogation training. Since 2007, she has received over $2.4 million for her research on investigative interviewing, interrogations, and confessions from the U.S. Department of Defense and the U.S. Department of Justice via the High-Value Detainee Interrogation Group.

*Social Science of False Confessions – General Principles*

With respect to the science of false confessions, Dr. Russano has offered the following opinions, in summary.

1.      The phenomenon of false confessions is counterintuitive in that most people cannot imagine confessing to a crime that they did not commit and are not aware of the risk factors for false confessions.

2.      Nevertheless there is empirical evidence that false confessions occur, although there is no way to determine the rate of false confessions. Empirical evidence includes a 13 percent rate of confessions in DNA exoneration cases, a 23 percent rate for confessions in homicide cases in the National Registry of Exonerations, and a 62 percent rate of confessions for exonerees convicted of murder. For Chicago, confessions played a role in 33 percent of all exoneration cases, and in 54 percent of exonerees convicted of murder.

3.     Scientific research on false confessions derives from three bodies of literature: (1) studies of documented false convictions, (2) fundamental principles of developmental, social, cognitive, abnormal, and clinical psychology, (3) specific studies relevant to the topics of interviewing, interrogation, and confessions in the forensic context, including observational studies, survey research, field research, content analyses, and laboratory studies. A 2010 White Paper by the American Psychology-Law Society summarizes the knowledge in the field and represents generally accepted views or findings.

4.     Most confessions are a product of interrogation. Types of confessions include voluntary false confessions, in which people confess absent external pressures, compliant confessions in which people confess to crimes they did not commit because of external pressures, and internalized false confessions in which an innocent person confesses to a crime because that person starts to question their own innocence.

5.     Modern "accusatorial" techniques of interrogation  involve psychological pressure, consisting of three components: (1) custody and isolation, (2) confrontation, and (3) minimization. These techniques are guilt-presumptive, and often involve the use of leading/suggestive questions.

6.     The leading accusatorial technique, the "Reid" interrogation technique, is premised upon a pre-accusatorial phase of the interview where the investigator decides by assessing verbal and non-verbal cues as to whether the suspect is giving a true or false denial of guilt. However, studies have shown that police officers have no better than a 50 per cent, or chance rate, of accurately distinguishing between true and false denials.

7.     The Reid technique involves a nine-step method in which the interrogator attempts to persuade the suspect that the benefits of confessing outweigh the detriments of persisting in a denial.

8.     The overwhelming goal of the interrogation is to develop a "theme," in which the interrogator seeks to minimize the suspect's culpability, for example, by blaming a co-conspirator.

9.     Although interrogators are not legally permitted to promise leniency, the technique is designed to suggest to the suspect that he will receive a benefit if he confesses and a detriment if he continues to deny.

10.     Although such accusatorial techniques are sometimes successful in eliciting confessions from guilty people, they also may be successful in eliciting confessions from innocent people.

11.     The same science is also relevant to interrogations of witnesses and false statements made by witnesses.

*Risk Factors for False Confessions*

        With respect to risk factors for false confessions, Dr. Russano has offered the following opinions, in summary:

<u>Confirmation Bias</u>

1.     Confirmation bias or tunnel vision occurs when a person forms an initial opinion, and subsequently processes new information in a way that confirms his or her initial opinion.

2.     Confirmation bias has been shown to increase the risk of false confession via the use of accusatorial, guilt-presumptive techniques.

4

<u>Individual Risk Factors</u>

1.      Individual risk factors  refer to characteristics pertaining to the person that make them more vulnerable to providing a false confession or statement.

2.      Those vulnerabilities fall into two categories: trait vulnerabilities and state vulnerabilities.

3.      Trait vulnerabilities are relatively stable vulnerabilities such as age, mental capacity, and mental illness.

4.      State vulnerabilities refer to more transient conditions that can elevate a person's risk to providing a false statement, such as fatigue and physical state (e.g.,  intoxication, drug withdrawal, pain level).

5.      Youth, including a person's status as a juvenile or young adult, is  a trait vulnerability which increases the risk of a false confession.

6.      State vulnerabilities include fatigue or sleep deprivation, states which increase the risk of a false confession.

<u>Situational Risk Factors</u>

1.      Situational risk factors include prolonged custody, isolation, and interrogation.

2.      Each of these factors, alone, or in combination, increases the risk of a false confession.

3.      Even where active questioning takes place during intervals in an interrogation, the total length of the custody and isolation in which the questioning takes place increases the risk of a false confession.

4.      Another situational risk factor is physical violence against a suspect or deprivation of basic necessities.

5.      Physical violence and/or deprivation of basic necessities increases the risk of a false confession.

5

6.      In one study, 36 percent of false confessions involved the threat or use of violence. For Chicago, the figure was 69 percent.

7.      Another situational risk factor, intentional sleep deprivation, also increases the risk of a false confession.

8.      Guilt-presumptive methods of interrogation also increase the risk of a false confession.

9.      Presentation of false or unreliable evidence increases the risk of a false confession.

10.      Explicit and implicit threats and promises increase the risk of a false confession.

*General Considerations Regarding the Power of False Confessions*

1.      Research indicates the people cannot reliably distinguish between true and false convictions simply by observing, reading, or viewing the statement.

2.      False convictions typically contain the same type of detail as true confessions, including details about the time and place of the crime, details about the victim's behavior, the motive for the crime, minimization themes, expressions of remorse, and error corrections.

3.      False convictions can trigger a process which leads to an illusion of corroboration and corroboration inflation, in which investigators focus on information which corroborates the false confession and ignore or minimize evidence which contradicts it.

*Reliability Analysis*

Based upon scientific research, Dr. Russano has identified the following factors which impact the reliability of a confession:

1. The Accuracy and Completeness of the Narrative

The reliability of a confession is determined in part by whether the details of a statement are consistent with known, objective facts/evidence in a case. The more consistency between the known, objective facts/evidence and the statement, the greater the reliability of the statement.

2. Dependent Corroboration: Presence of Non-Public Details

The reliability of confession is also determined by the presence of non-public details, details which only the perpetrator would know. However, non-public details are only indicative of reliability if the details are not intentionally or unintentionally leaked to the subject by the investigators.

3. Independent Corroboration: Details Unknown to Police but Later Corroborated

The gold standard for establishing the reliability of a statement is to see if the person provides corroborative details which were not known to investigators at the time of the statement but those are later verified via objective evidence.

*Specific Risk Factors Identified in the Jaime Rios Case*

Dr. Russano identified the following specific risk factors in the Jaime Rios case: (1) confirmation bias, (2) Jaime Rios's youth, an individual risk factor, (3) prolonged custody, isolation, and interrogation, (4) physical abuse, discomfort, and deprivation of basic necessities, (5) the guilt presumptive interrogation techniques described by Rios, (6) presentation of false evidence, and (7) use of threats and promises, express and implied.

*Reliability Analysis*

With respect to reliability, Dr. Russano identified the following factors bearing upon whether the court reported statement of Jaime Rios was reliable.

As to the accuracy and completeness of the narrative, Jaime Rios's statement contains numerous inconsistencies with the objective evidence, including the number of times Morales was shot, the location of the wounds on Morales's body, the lack of evidence of close range firing, the details of the physical interaction between Morales and the shooter, the type of gun used to shoot Morales, the statements made by the offenders during the shooting, the number of shots fired into the air, the details of the interaction between Huertas and the offenders, and the location and disposal of the .38 caliber gun.

As to dependent corroboration, Jaime Rios's statements contains a number of details which are consistent with the evidence, but all of these details were known to investigators at the time and there is evidence that some or all of these details were supplied by investigators.

As to independent corroboration, none of the details in Jaime Rios's account were independently corroborated. Possible independent corroboration by Carrero and Huertas was tainted by other police misconduct. The information from the purported confidential informants did not result in the recovery of weapons relating to the murder. And other areas of potential independent corroboration were not pursued.

*Ultimate Conclusions*

It is Dr. Russano's opinion to a reasonable degree of scientific certainty in the field of psychology that the questioning conditions and techniques that Mr. Rios described could lead an innocent person (or one that lacks guilty knowledge) to provide a false statement in a homicide case. Moreover, a reliability analysis of his statement reveals a lack of indicators of reliability; the consistent details that were provided could have been a product of contamination (and therefore do not provide clear dependent corroboration), his statement consisted numerous inconsistent and inaccurate details, it did not contain a number of verifiable details one might reasonably expect

him to be able to provide if guilty, and his statement did not lead to independent corroboration. It is Dr. Russano's opinion that a statement procured under the conditions described by Mr. Rios cannot and should not be relied upon to determine Mr. Rios' guilt or innocence. Dr. Russano specifically states that she does not "assume or take a position do not assume or take a position on Mr. Rios' guilt or innocence, nor the ultimate veracity of the statement he provided."

## ARGUMENT

Dr, Russano's  testimony is admissible.

The admission of expert testimony is governed by the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), and Fed. R. Evid. 702, which provides that to admit a "witness who is qualified as an expert by knowledge, skill, experience, training, or education," the proponent must demonstrate, by a preponderance of the evidence, that:

> "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

Fed. R. Evid. 702.

In *Daubert*, the Court interpreted Rule 702 as appointing courts the gatekeeper to ensure "that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." 509 U.S. at 592. The Court's role as gatekeeper, however, is cabined to its review of the expert's methodology and analysis—*Daubert* does not invite the Court to critique the expert's ultimate conclusion or undertake its own efforts to debunk the underlying theory, so long as the opinion is based on "reliable principles and methods." *Eagle v. Vee Pak, Inc*., 343 F.R.D. 552, 565 (N.D. Ill. 2023) ("Rather than scrutinizing the accuracy of the expert's conclusions, the

Court evaluates 'the soundness and care' of the expert's analysis.") (quoting *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015)). "The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013). The *Daubert* gate keeping function applies not only to "scientific testimony," but to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

With respect to expert testimony about false confessions and interrogation techniques, courts in the Seventh Circuit have uniformly held that such testimony meets the requirements of *Daubert* and is admissible. See *United States v. Hall*, 93 F.3d 1337, 1344–45 (7th Cir. 1996)(trial court erred by excluding the testimony of Dr. Richard Ofshe, an expert in the field of coercive police tactics and false confessions as to the defendant's susceptibility to making a false confession without conducting a full *Daubert* hearing); *United States v. Hall*, 974 F. Supp. 1198, 1205 (C.D. Ill. 1997), *aff'd*, 165 F.3d 1095 (7th Cir. 1999)(Ofshe's testimony was admissible in that he could testify that false confessions do exist, that they are associated with the use of certain police interrogation techniques, and that certain of those techniques were used in defendant's interrogation in this case, but could not testify about whether the interrogation methods used in the case caused defendant to falsely confess); *Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *11-14 (N.D. Ill. Sept. 30, 2022)(Dr. Russano's testimony admissible as to science of false confessions, risk factors for false confessions, and reliability factors, but not as to application of reliability factors to aspects of police investigation); *Andersen v. City of Chicago*, No. 16 C 1963, 2020 WL 1848081, at *4 (N.D. Ill. Apr. 13, 2020) (Dr. Saul Kassim would be permitted to testify that false confessions exist and as to the risk factors for a false confession and would also

be allowed to apply the risk factors to the facts of the case, but would not be able to testify that the confession was in fact false); *Chatman v. City of Chicago*, No. 14 C 2945, 2018 WL 11426430, at *2 (N.D. Ill. Oct. 23, 2018) (Dr. Melissa Russano allowed to testify to the factors that are indicative of a false confession, and whether those factors were present in the case but prohibited from offering opinions as to actual innocence, whether the confession was in fact false, or the credibility of any witness at trial); *Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 2436316, at 3-16 (N.D. Ill. June 5, 2017)(Dr. Richard Leo permitted to testify as to the social science of false confessions, and the application of that science to plaintiff's confession, but not entitled to testify that interrogation was coercive or that plaintiff gave a false confession); *Kluppelberg v. Burge*, No. 13 C 3963, 2016 WL 6821138, at 4-5 (N.D. Ill. Sept. 16, 2016)(Dr. Richard Ofshe permitted to testify as to the phenomenon of false confessions in general and how a person could use the "fit" method to determine if a confession is false, but may not comment upon the credibility of witnesses); *Caine v. Burge*, No. 11 C 8996, 2013 WL 1966381, at 1-3 (N.D. Ill. May 10, 2013)(Dr. Richard Leo allowed to testify as to science of false confessions, but not allowed to testify to his opinions that the challenged confessions were false).

With respect to Dr. Russano's testimony, application of these cases compels the conclusion that her opinions, with one possible exception, are admissible.

### *Dr. Russano's Qualifications*

It is unlikely (although given their litigious track record, not impossible) that defendants will challenge Dr. Russano's qualifications. But any such challenge would be frivolous, and futile.

In addition to her credentials outlined above, Dr. Russano has been qualified to testify as an expert witness in false confessions in the following cases, among others: *Chatman v. City of*

*Chicago*, No. 14 C 2945, 2018 WL 11426430, at *2 (N.D. Ill. Oct. 23, 2018); *Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *11 (N.D. Ill. Sept. 30, 2022); *Day v. Comm'r of Correction*, No. CV17-4008971-S, 2024 WL 3770683, at *2 (Conn. Super. Ct. Aug. 5, 2024); *People v. Kendrick*, 2023 IL App (3d) 200127, ¶ 11. She has extensively published in the field and conducted scientific studies. There can be question that she is qualified.

*The Science of False Confessions*

Similarly, any challenge to the science of false confessions will fail. The science has universally been held to pass *Daubert* muster in this circuit. *See*, *e.g.*, *Andersen* , 2020 WL 1848081, at *3; *Kluppelberg,* 2016 WL 6821138, at *4; *Caine*, 2013 WL 1966381, at *2. Indeed, "the science of social psychology, and specifically the field involving the use of coercion in interrogations, is sufficiently developed in its methods to constitute a reliable body of specialized knowledge under Rule 702." *Kluppelberg*, 2016 WL 6821138, at *4 (citing *Hall*, 974 F. Supp. at 1205 (C.D. Ill. 1997)); see also *Harris*, 2017 WL 2436316, at *7 ("[N]umerous federal courts [have] conclud[ed] that the science of psychology in relation to police coercion in interrogations is sufficiently developed to constitute a reliable body of specialized knowledge[.]"). Accord, *Washington*, No. 16-CV-01893, 2022 WL 4599708, at *12.

Melissa Russano's opinions as to science of false confessions are therefore fully admissible.

*Specific Risk Factors*

Similarly, and, as part of the science of false confessions, Dr. Russano's opinions as to specific risk factors for false confessions are admissible, as is her opinion as to the application of these factors to this case. In the Seventh Circuit, courts have universally found that testimony as to risk factors for false confessions and the application of these risk factors to individual cases is

admissible. See, e.g. *Baker v. City of Chicago*, No. 16-CV-8940, 2024 WL 5114168, at *5 (N.D. Ill. Aug. 20, 2024); *Caine*, 2013 WL 1966381, at * 3 (N.D. Ill. May 10, 2013) (false-confession case in which the court rejected *Daubert* challenge that the expert was unable to "tell the jury how often a true confession is obtained using the same practices and techniques that [the expert] alleges may result in false confessions") (emphasis in original)). Such critiques of risk factor analysis are properly the subject of cross examination rather than a grounds for exclusion. *Caine*, 2013 WL 1966381, at * 3; *Andersen*, 2020 WL 1848081, at *3 ("Defendants will be permitted to point out the limits of false-confessions research upon cross-examination and to argue that the same risk factors that may indicate a false confession could also apply to a true confession.").

*Reliability Analysis*

Courts in this Seventh Circuit have also universally held that testimony by a qualified expert as to the factors which bear on the reliability of confessions is also admissible.

With respect to the science behind Dr. Russano's reliability analysis, this analysis has specifically been held to pass *Daubert* muster in *Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *13-14:

> "According to Russano, "research indicates that people cannot reliably distinguish between true and false confessions/statements," and "the reason why it is so difficult to recognize a false confession when we see one is because false confessions typically look and feel like true confessions." (Id.) She describes several "facets" of post-admission narrative statements indicative of those statements' reliability, including the "accuracy and completeness of the narrative[s]," the "presence of non-public [corroborating] details," and any "independent corroboration." (Id. at 52–55.) According to Russano, "[t]he more consistent the post-admission narrative, the more non-public details provided (that could not or were not the product of contamination), and the more independent corroborating evidence the statement led to, the greater the likelihood that the statement is reliable." (Id. at 51.) After describing the facets of reliability analysis, Russano analyzes the reliability of statements in the case, including those of Plaintiff Washington. (Id. at 55–69.)"

*Washington*, No. 16-CV-01893, 2022 WL 4599708, at *13.

The court held that Russano was qualified to testify about "reliability analysis—the "facets" of post-admission narratives indicative of reliability—and such testimony would assist the jury in understanding and evaluating statements made during Defendants' investigation."

*Washington*, No. 16-CV-01893, 2022 WL 4599708, at *14.

Similarly, in *Kluppelberg*, No. 13 C 3963, 2016 WL 6821138, at *4, Dr. Leo Ofshe offered the following opinions in a report which the court summarized as follows:

> "Part one discusses why a person may falsely confess to a crime, coercive tactics that law enforcement may use that could lead to a false confession, and how a false confession can be identified by determining whether confessed-to facts "fit" objectively knowable facts about a crime or, rather, whether the confession is the result of police formatting. Part two uses the "fit" technique, and Ofshe opines, among other things, that Kluppelberg's confession and Dawn Gramont's eyewitness account were false products of coercion."

*Kluppelberg*, No. 13 C 3963, 2016 WL 6821138, at *4.

The court held that Oshe could testify not only as to the "fit" method of assessing the reliability of a confession (essentially the same as Russano's reliability analysis) but also to the application of this method, with the exception of the ultimate conclusion that the confession was in fact false:

> "Because Ofshe's methodology is sound and can be applied to the facts in this case, he may testify concerning the false-confessions phenomenon in general and how a person may use the "fit" method to determine whether a confession is false. Further, he may explain how Kluppelberg's confession is consistent or inconsistent with objectively knowable facts so as to explain how his confession fits with his model of a false confession. He may not, however, comment or indicate that he believes Kluppelberg's trial testimony about the interrogation over that of a defense witness's account of the event."

*Kluppelberg*, No. 13 C 3963, 2016 WL 6821138.

Here, similarly, Dr. Russano should be permitted, without giving an ultimate conclusion, to testify that part of her opinion in which she analyzes the inconsistencies between the court reported statement and the case facts.

Jaime Rios acknowledges that in *Washington*, Dr. Russano was precluded from giving such opinions on the grounds that these opinions would involve matters involving police investigation or procedure which were beyond her expertise. *Washington*, No. 16-CV-01893, 2022 WL 4599708, at *14. But this conclusion makes no sense.

As the *Washington* court acknowledged in another part of their opinion, Dr. Russano could testify to the risk factors for false confession, and apply those factors to Jaime Rios and his confession; nor was she precluded from testifying to the "factual underpinnings" of her opinions, even though those underpinnings could be contested on cross-examination. *Washington*, No. 16-CV-01893, 2022 WL 4599708, at *12. There is no principled difference between allowing Dr. Russano to apply "risk factors" to the facts of Jaime Rios's interrogation and allowing her to apply "reliability analysis" to the confession itself. As in *Kluppelberg*, this testimony should be admitted. So long as Dr. Russano expresses no ultimate opinion as to whether Jaime Rios's confession was false, her testimony should be admitted. And if the court has further questions about how this distinction would work out in practice, the court should order an evidentiary hearing on any *Daubert* challenge.

Respectfully Submitted,

/s/ Stephen L. Richards
By: Stephen L. Richards
Attorney for Plaintiff

15

53 W. Jackson, Suite 756

Chicago, IL 60604

(773) 817-6927

sricha5461@aol.com

Attorney No: 6191946

## CERTIFICATE OF SERVICE

Stephen L. Richards certifies that on December 15, 2025,  he served the  **MOTION TO ADMIT THE TESTIMONY OF DR. MELISSA RUSSANO AS AN EXPERT ON FALSE CONFESSIONS**

through the ECF filing system.

/s/ Stephen L. Richards

By: Stephen L. Richards

17