December 15, 2023

**Report for *Rios v. Guevara et al.***

## I. Introduction

I have been retained by the Law Office of Stephen L. Richards as an expert consultant in the fields of social and cognitive psychology, and on the psychology of interviewing, interrogation, and confessions, in reference to a case involving Mr. Jaime Rios. On November 30, 1990, Mr. Rios was convicted of the first-degree murder of Mr. Luis Morales which occurred on June 27, 1989 in Chicago, Illinois.[1] At the time of the alleged offense, Mr. Rios was 19 years old.[2] Mr. Rios was sentenced to 36 years in prison, and he was paroled in 2008.[3] The primary evidence against Mr. Rios at his jury trial was his own court-reported confession, which he has consistently maintained was false and the product of physical and psychological coercion.[4] There was no forensic evidence linking Mr. Rios to Mr. Morales' murder, and the only person to directly implicate Mr. Rios in the Morales homicide – Mr. Luis Huertas – recanted his eyewitness identification in 2020.[5] Other circumstantial evidence presented against Mr. Rios included the testimony of Mr. Benjamin Carrero. A .32 caliber gun was recovered during a search of Mr. Carrero's home after a confidential informant told investigators that they could find a blue steel .38 caliber gun at that location which had purportedly been used by Mr. Rios during the Morales homicide. According to police reports and his testimony in front a grand jury, Mr. Carrero said that on the night of the Morales homicide, Mr. Rios gave him a black .32 caliber revolver to hold for him and indicated that he had just shot somebody with it. At trial, Mr. Carrero testified that while Mr. Rios did give him the gun, he denied that Mr. Rios asked him to hold it because he had just shot someone. He also indicated that the police treated him poorly while he was at Area 5 by threatening to lock him up and take away his child when he initially told him that he did not know anything.[6] In a 2020 affidavit, Mr. Carrero completely recanted his trial testimony, indicating that the revolver found at his home was one that he had bought on the street, and that Mr. Rios never gave him a gun to hold.[7] Notably, the .32 caliber revolver found at

---

[1] Petition for Certificate of Innocence (PFP002624-PFP002661)

[2] Jaime Rios' Birth Certificate; Jaime Rios' Driver's License

[3] PFP002624-PFP002661; Deposition of Jaime Rios (6/30/23)

[4] Jaime Rios' Motion to Suppress Testimony; Trial Testimony of Jaime Rios; Petition for Certificate of Innocence (PFP002624-PFP002661)

[5] Luis Huertas Affidavit (PFP002276-PFP002277); In his 2020 affidavit, Mr. Huertas describes that his identification of Mr. Rios was the product of highly suggestive identification procedures (see expert reports by Dr. Geoffrey Loftus [6/21/22 & 12/2/23] for an analysis of the eyewitness identification issues in this case). He also claimed that Officer Reynaldo Guevara threatened to lock Mr. Huertas up if he did not make an identification, that he knew Officer Guevara to be a "dirty cop" who would put charges on innocent individuals, and that he did not recant his identification earlier because he was afraid of Officer Guevara.

[6] Trial Testimony of Benjamin Carrero (PFP000457-PFP000476); Trial Testimony of Donald Flannery (PFP000559-PFP000567); PFP007271; PFP007234; Deposition of Michael Mason (6/23/23)

[7] Mr. Carrero further swore in his affidavit that he was interrogated over the course of two days, and that Officer Guevara threatened that if he did not say that Mr. Rios gave him the gun, that Mr. Carrero's children would be taken away and he would be charged with gun possession. He also wrote in his affidavit that he did not come forward before because he was afraid of Officer Guevara (PFP002273-

Mr. Carrero's home did not match the .25 caliber cartridge casings found at the homicide scene, nor was it consistent with the details in Mr. Rios' court-reported statement about the gun Mr. Rios was purportedly carrying.[8] During cross-examination, Detective Michael Mason conceded that the firearm found at the Carrero home could not have been the one that was used to kill Mr. Morales.[9]

In February 2021, Mr. Rios filed a motion to vacate his conviction, based on newly discovered evidence of innocence which included Mr. Carrero's and Mr. Huerta's affidavits, an affidavit by Mr. Cristino Garcia (Mr. Rios' alleged but never charged co-conspirator), and pattern and practice of misconduct by Detective Reynald Guevara.[10] On August 9, 2022, the

_____

PFP002274). I would note that in his affidavit Mr. Carrero cites the weapon found in his home as a .22 caliber, but police records indicate it was a .32 caliber (PFP007227-PFP0072290).

[8] Mr. Rios' court-reported statement indicated that there were two guns used during the commission of the Morales homicide. Mr. Rios said he was carrying a black .38 caliber snub nose revolver. Mr. Rios first said that he thought Mr. Garcia was carrying (and fired) an automatic .22 caliber firearm; however, in response to a leading response/question by Assistant State's Attorney Barbara Riley ("A .22 or a .25?"), Mr. Rios said "He had a Mag .22 or .25. It was just a small automatic gun" that was black (Jaime Rios' Court-Reported Statement [PFP000086-PFP000096]).

Initial police reports indicated that police had reason to believe that the shooter used a .25 caliber blue steel handgun (JGS_RIOS 00082-JGS_RIOS 00093; PFP007640-PFP007653), and several .25 caliber casings were found at the crime scene. The same confidential informant who purportedly provided Mr. Rios' name to police purportedly told Detective Mason on July 9, 1989 that Mr. Carrero had shown him a blue steel .38 caliber gun at his home and told him it had been used in the Morales homicide (PFP007271). The confidential informant also purportedly told Detective Mason that a Mr. Alexander Lopez had shown the informant a .25 caliber semi-automatic firearm at his home and told him it was used in the Morales homicide (PFP007273). Neither a .25 caliber or a .38 caliber firearm was recovered during searches of Mr. Carrero's and Mr. Lopez' homes, however the .32 caliber revolver was found at the Carrero residence (Deposition of Michael Mason, 6/23/23; PFP007227-PFP007229).

[9] Trial Testimony of Michael Mason

[10] In July of 1989, Officer Reynaldo Guevara was an investigator for the Gang Crimes Unit (he would subsequently become a detective). He testified at Mr. Rios' trial that no colleague or supervisor asked him to get involved in the Morales case, but rather he heard about the case and voluntarily got involved by talking to people on the streets. Officer Guevara testified that he spoke to two "reliable informants" who gave him the names Jaime (who he believed to be Jaime Rios, someone he was familiar with and had prior contact with) and Tino (later identified as Cristino Garcia) as being involved in the Morales homicide. The official police account of Officer Guevara's direct interaction with Mr. Rios and Mr. Rios' version of events are strikingly different and cannot be reconciled. While all agree that Mr. Guevara was involved in locating and then transporting Mr. Rios to Area 5 on July 6, 1989, Officer Guevara denies being involved in Mr. Rios' interrogation. Mr. Rios, on the other hand, claims Officer Guevara actively participated in his interrogation; he alleges that Officer Guevara threatened him that Mr. Rios' baby would be taken away if he did not provide a statement, fed him facts about the crime and told him what to say, and did nothing to intervene when he was physically abused by Detective Michael Mason.

In a 2020 affidavit, Mr. Garcia denied any involvement with the Morales homicide and described his whereabouts that night. He further describes being interrogated about the Morales homicide by Officers Aubrey O'Quinn and Guevara on July 28, 1989. He alleges that Officer Guevara was "very loud and physical" with him. He describes Officer Guevara placing a phone book on his head and hitting him on top of the phone book with a billy club or flashlight until he fell to his knees. He also stated that Officer Guevara got very angry when he heard Mr. Garcia asking his sister to get him a lawyer (this conversation purportedly occurred when he was allowed to make a phone call after promising to sign a statement to get Guevara to stop hitting him) and that Officer Guevara subsequently started smacking him with an open

State of Illinois vacated Mr. Rios' conviction and nolle prossed all charges. On February 3, 2023, Mr. Rios received a certificate of innocence from the state of Illinois.[11]

I was asked to provide a written opinion and possible expert testimony in relation to the interrogation and confession of Mr. Jaime Rios. I view my role as an expert witness as one of an educator; specifically, my role is to help educate the trier of fact about the psychology of interrogations and confessions/admissions so that they may be better informed when evaluating the reliability of a given confession or statement. This may include me explaining: the process of police interviewing and interrogation (and the related psychological underpinnings); different types of false confessions; risk factors associated with false confessions/statements; laypersons and juror perceptions of confessions and interrogations; the science of memory, persuasion, and influence; and the methodology for evaluating the reliability of admissions/confessions/statements. In addition, I can identify the types of interrogation techniques that were purportedly used, what risk factors for false confessions/statements (if any) may be present in a particular case, and I can assist in guiding triers of fact of what they might consider in a particular case with respect to a reliability analysis of a given statement. Although it is never my role to offer an ultimate opinion as to whether a particular confession or statement is true or false or opine on the credibility of any person involved with the case, I can and do form an opinion about whether a particular interview/interrogation process is likely to have produced a statement or confession that triers-of-fact can confidently rely upon.

In this report, I first review my qualifications and background (Part II) and the materials reviewed in this case (Part III). I then provide an overview of the scientific literature relevant to the issues of police interrogation and false confessions/admissions/statements (Part IV) and known risk factors for false confessions/admissions/statements (Part V). In Part VI, I discuss the nature and power of false confessions/admissions/statements, and in Part VII I introduce a framework by which fact-finders can systematically evaluate a statement that was a product of interrogation. Parts IV-VII are by no means a comprehensive and exhaustive review of the scientific literature; however, they are meant to provide a context for the subsequent sections of my report (Part VIII), in which I identify the specific issues that based on my review of the case materials appear to be relevant in Mr. Rios' case and provide some guidance to fact-finders with respect to how to conduct a reliability analysis of Mr. Rios' confession (Part IX) . In the last section of the report (Part X), I provide my summary and conclusions.

---

hand. He indicates that the abuse stopped when Officer O'Quinn told him to stop hitting Mr. Garcia because his lawyer had arrived (Affidavit of Cristino Garcia, 11/14/2020). Mr. Garcia did not give or sign an incriminating statement of any kind, an eyewitness (Mr. Javier Torres) failed to identify him from a lineup, and charges were never filed against him (JGS_RIOS 00107_JGS_RIOS 00110).

Although it is not a focus of my analysis, fact-finders may find it relevant to consider allegations of a past pattern of misconduct by Officer Guevara, Detective Mason and Detective Halvorsen when weighing the credibility of Mr. Rios and various others' (e.g., Mr. Garcia, Mr. Huertas, Mr. Carrero, Ms. Iris Mendez) allegations of coercion and abuse. According to Mr. Rios' 2021 motion to vacate his conviction, at least 16 people have had their convictions vacated at least in part because of allegations that Officer Guevara has routinely engaged in misconduct, including coercing witnesses and suspects to make false statements, using suggestive identification procedures, and fabricating the existence of confidential informants (PFP002705-PFP002786).

[11] PFP002273-PFP002274; Order Vacating Conviction (8/2/22); Order Granting Certificate of Innocence (2/3/23)

## II. Professional Qualifications

I am currently a Professor of Criminal Justice at Roger Williams University. I received my Bachelor of Arts degree in Psychology from the University of Virginia (1999), and my Masters (2001) and Ph.D. in Psychology (with a legal psychology specialization) from Florida International University (2004). I am a research psychologist with a background in social and cognitive psychology. My primary areas of research and expertise are investigative interviewing, interrogations, and confessions, in the law enforcement, military, and human intelligence domains. I have been conducting research in the area of investigative interviewing, interrogations, and confessions since 2002, have published approximately 20 scholarly peer-reviewed articles and chapters on these topics, and I created one of the most oft used and influential laboratory paradigms for studying true and false confessions.[12] I regularly give presentations to academic and practitioner audiences, and I have trained local, state, and federal law enforcement officers in science-based methods of interviewing and interrogation training. Since 2007, I have received over $2.4 million for my research on investigative interviewing, interrogations, and confessions from the U.S. Department of Defense and the U.S. Department of Justice via the High-Value Detainee Interrogation Group. My regular hourly rate for this case is $350/hour.

## III. Case Materials Reviewed

I have received the following materials pertaining to this case. I did not rely on any of the past pattern and practice material in formulating my opinions, and I did not review materials pertaining to these issues beyond what was needed to assess whether they fell under that category of materials.

Permanent Retention File (JGS_RIOS 00082_JGS_RIOS 00119)
Plaintiffs' First Production Bate Stamped (PFP000001_PFP004232)
Final Plaintiffs Third Production (PFP004256_PFP006312)
Plaintiffs Sixth 26(a)(1) Disclosures (PFP007050_PFP008678)
Minute Entry Re: Experts
Deposition of Reynaldo Guevara (3/27/23)
Deposition of Barbara Riley (9/7/23)
Deposition of Janet Lupa (9/25/23)
Deposition of Michael Mason (6/23/2023)
Deposition of Jaime Rios (6/30/2023)
Reports of Dr. Geoffrey Loftus (6/21/22 & 12/2/23)
Jaime Rios' Birth Certificate
Jaime Rios' Driver's License
Order Granting Certificate of Innocence (2/3/23)
Order Vacating Conviction (8/2/22)

---

[12] Russano, Narchet, Meissner & Kassin (2005)

**IV. General Background on Interrogations and False Confessions and False Witness Statements[13]**

     Making a false confession or admission[14] is inherently counterintuitive in that being held criminally responsible for a crime you did not commit is fundamentally counter to one's self-interest. Most people cannot possibly imagine themselves confessing to a crime they did not commit, particularly a serious one, absent perhaps torture or a desire to protect a loved one. As such, the phenomenon of false confessions is quite difficult for most people (including police officers, jurors, judges, attorneys, and laypersons) to appreciate and understand. Much of what we know about the risk factors for false confession is beyond the common knowledge of jurors, and expert testimony can help educate jurors and other fact-finders about these issues so that they make more informed decisions (see Woody & Forrest, 2020 for a thorough discussion of these issues). Although there is no way to know the true prevalence rate of false confessions,[15] the existence of false confessions within the American and international legal systems is quite well-documented.[16] The growing number of DNA exonerations in this country affords us the unique ability to examine the contributing factors to wrongful convictions. In 375 DNA exoneration cases between 1989 and 2020 that have been documented by the Innocence Project, false confessions or admissions were given in approximately one out of every four cases (29%), making false confessions a leading cause of wrongful conviction in this country.[17] Out of 3,428 exonerations since 1989 documented by the National Registry of Exonerations, false confessions played a role in 13% of those cases.[18] Although counterintuitive, the data demonstrate that false confessions occurred at a higher rate in homicide cases than other types of cases. False

---

[13] Scientific understanding of the psychology of interrogation, coerced confessions, and false statements (whether they be primary false confessions, secondary false confessions, or false witness statements) draws not only on empirical research specifically focused on these topics, but on the larger psychological literature that encompasses the scientific study of human behavior, which includes but is not limited to basic principles of social psychology (e.g., persuasion, influence, and compliance), cognitive psychology (e.g., principles of memory, perception, and metacognition), developmental psychology (e.g., brain development, age differences in cognition and decision-making), and clinical and abnormal psychology (e.g., overcoming resistance, how mental illness or intellectual disability affects decision-making and suggestibility). In this case, although I am focusing my report on Mr. Rios' statement, there are two different types of potential false statements at issue – a primary false confession by Mr. Rios and a false witness statement by Mr. Carrero. Although much of the literature I review focuses on suspect interviewing and primary false confessions, as discussed later in this section, the research on suspect interrogations and primary false confessions is directly relevant and applicable to the elicitation of false witness statements.

[14] A confession is generally considered a full admission of guilt, where admissions generally refer to more limited, but still incriminating, statements. The process by which confession and admissions are elicited generally do not differ, and the research on confessions is applicable to admissions.

[15] Many false confessions go undetected or unchallenged because of the inability to identify exonerating evidence (e.g., DNA evidence in the case either never existed or currently does not exist) or procedural or practical issues that prevent a false confessor from establishing their innocence (e.g., they lack the knowledge or ability to pursue legal challenges, cases that end in false guilty pleas that are difficult to challenge, etc.) (Kassin, 2022).

[16] Bedau & Radelet (1987); Drizin & Leo (2004); Kassin, Drizin, Grisso, Gudjonsson, Leo & Redlich (2010)

[17] https://www.innocenceproject.org/dna-exonerations-in-the-united-states/

[18] http://www.law.umich.edu/special/exoneration/Pages/ExonerationsContribFactorsByCrime.aspx#

confessions occurred in 23% of exonerations involving homicide cases in the National Registry of Exoneration database, and false confessions played a role in a whopping 62% of DNA exonerees convicted of murder.[19] Moreover, the false confession phenomenon appears to be a particular problem in Chicago (Cook County). In an analysis published in 2020, false confessions played a role in 33% of *all* Chicago exoneration cases, and in 54% of cases involving exonerees convicted of murder in Chicago. Moreover, 22% of all known documented false confessions nationwide (64/292) involved Chicago cases in which individuals falsely confessed in homicide cases.[20]

      Another way to document the existence of false confessions is to ask people to self-report whether they have ever provided (suspects) or taken (police officers) a false confession. Self-reported false confession rates in community samples range from 1.2% to 13.8%, and from 0% to 28% in samples of prisoners and those with serious mental illness.[21] Even police officers recognize the problem of false confessions; in one study, North American police investigators estimated that nearly 5% of innocent suspects provide false admissions or false confessions.[22] While none of these metrics allow us to determine a precise prevalence rate of false (vs. true confessions),[23] it is clear that false confessions occur with some degree of problematic regularity, and most researchers and legal scholars in the area believe known false confession cases represent only a small fraction of the larger population of false confession cases.

      Although not *the* leading cause of wrongful conviction, false confessions are particularly pernicious because of the power and nature of confession evidence. Confession evidence is widely considered to be one of the most powerful forms of evidence against a defendant, superseding damaging character evidence, eyewitness testimony/identifications, and even exculpatory DNA evidence (when that DNA evidence can be 'explained away' by the

---

[19] As of July 9, 2018. See https://www.innocenceproject.org/dna-exonerations-in-the-united-states/; One explanation for the counter-intuitive statistic that false confession rates are high in the most serious of cases is that it is in precisely those cases that police may be more likely to use problematic techniques that create a heightened risk for false confessions. The pressure to close a case involving a serious violent crime, coupled with media attention that may accompany such crimes, likely increases investigators' motivation to aggressively pursue incriminating statements (Kassin, 2022), particularly if forensic or other strong evidence does not exist.

[20] Gross, Possley, Roll & Stephens (2020)

[21] See Gudjonsson (2010) for a review; Redlich, Summers & Hoover (2010)

[22] Kassin et al. (2007)

[23] False versus true confession prevalence rates are unknowable for a variety of reasons. First, to establish a prevalence rate of true and/or false confessions, we would first need to know how many confessions occur every year. Law enforcement officers (and other investigators who take confessions such as private security personnel or school resource officers) do not systematically document every interrogation they conduct. Second, researchers would need to be able to objectively establish ground truth in each of these cases/interrogations independent of the confession – an impossible task even if given access to all case materials (e.g., in many cases, there will be no objective way to veracity of the confession), which is in and of itself a highly improbable scenario. The fact that a known prevalence rate of false confessions cannot be established does not mean that it is not a recognizable problem that can and should be acknowledged. Efforts by some critics to undermine the scientific study of false confessions because a prevalence rate cannot be established reveals not only a fundamental lack of understanding of the nature and state of the science, but also research methodology naivete.

prosecution).[24] As such, when a false confession becomes evidence in a criminal trial, it arguably becomes the most damning evidence against a defendant possible, and it is highly likely to lead to a wrongful conviction. In one examination of 125 documented cases of proven false confessions, in a subset of those cases that went to trial ($n = 37$), false confessions led to wrongful convictions in 81% of the cases.[25] This phenomenon is due in large part to the fact that legal decision-makers (including jurors, police officers, and polygraph examiners) are not able to easily and reliably distinguish between true and false confessions on their face.[26] This is because false confessions typically look quite similar to true confessions – which is to say that they are typically detailed narratives that contain specific details, including details that reference people, locations, times, motives, expressions of remorse, etc. Moreover, many false confessions contain non-public details about the crime that only the true perpetrator should know; for example, approximately 52% of false confessions by DNA exonerees included non-public details.[27] The existence of non-public details in a false confession is particularly dangerous because these details are generally viewed as an indication that a confession is true by police, prosecutors, judges, juries, and other fact-finders. However, the presence of non-public details in a false confession case by definition does not speak to the guilt of the confessor, but rather to contamination that occurred during an interrogation (see Dependent Corroboration section of this report for a more detailed discussion of this phenomenon).

To understand the phenomenon of false confessions/statements, researchers (including myself) rely on three primary bodies of literature: 1) case studies of documented wrongful conviction cases involving false confessions/statements, 2) fundamental principles of developmental, social, cognitive, abnormal, and clinical psychology drawn from over 100 years of research on such topics as memory and communication, persuasion and compliance, suggestibility, decision-making, and learning and reinforcement principles, and 3) specific studies relevant to the topics of interviewing, interrogation, and confessions in the forensic context, including observational studies, survey research, field research, content analyses, and laboratory studies.[28] Taken together, these bodies of literature sufficiently advanced our knowledge about this field to the extent that in 2010 the American Psychology-Law Society (a division of the American Psychological Association) published a White Paper which summarized the state of the knowledge at that time and represents generally accepted views and findings in the field,[29] and the American Psychological Association has submitted eleven amicus

---

[24] Appleby & Kassin (2016); Kassin & Neumann (1997); It is not uncommon in cases of wrongful conviction for confession evidence to "trump" DNA evidence. For example, in the case of Mr. Jeffrey Deskovic, who served nearly 16 years for a rape and murder he did not commit, it was known at the time of trial that the semen found on the victim did not match Mr. Deskovic. Because of Mr. Deskovic's confession, the prosecution forged ahead with the criminal trial and 'explained away' the semen by suggesting that the victim must have had consensual sex with someone else prior to her rape and murder (see Leo & Drizin, 2010, and http://www.westchesterda.net/Jeffrey%20Deskovic%20Comm%20Rpt.pdf).

[25] Drizin & Leo (2004)

[26] Honts, Forrest & Stephanescu (2019); Honts, Kassin & Craig (2014); Kassin, Meissner & Norwick (2005),

[27] Appleby, Hasel & Kassin (2013); Garrett (2010); https://innocenceproject.org/dna-exonerations-in-the-united-states/

[28] Kassin (2007); Kelly & Russano (in press); Russano, Kelly & Meissner (2020)

[29] Kassin et al. (2010)

curiae briefs in various cases presenting generally accepted research findings related to interrogation and confessions.[30]

Most confessions or admissions, whether true or false, are a product of an interrogation.[31] Police officers (and most other members of the criminal justice system) generally should have two related goals: obtain true confessions from the guilty[32] while minimizing the number of false confessions procured from the innocent.[33] Researchers generally distinguish between three types of false confessions.[34] A *voluntary* false confession is one in which an innocent person confesses to something he or she did not do absent any external pressures.[35] *Compliant* false confessions are ones in which innocent people confess to crimes they did not commit because they are acquiescing to the pressures of an external situation and for some instrumental gain (e.g., they may want to escape an unpleasant interrogation or they believe that by confessing they will receive some benefit or avoid some threatened harm). Finally, an *internalized* false confession is one in which an actually innocent person confesses to a crime because he or she actually starts to question his or her own innocence.[36]

Prior to the 1930s, the so-called "third degree" (i.e., the infliction of physical and mental pain) was commonplace in American interrogation rooms, as documented by the 1931 Wickersham Commission report.[37] Criticisms of these techniques centered not only on the concern that confessions procured via the "third degree" might be involuntary but also *unreliable* (i.e., could not be relied upon as truthful), and court rulings began limiting police officers' abilities to rely on such practices.[38] Modern-day interrogations are now designed to be

---

[30] https://www.apa.org/about/offices/ogc/amicus/index-issues

[31] I tend to more frequently use the term 'interrogation' to refer to the interview of a suspect, as opposed to an interview of a witness or victim (although I oftentimes use the term interchangeably). Moreover, I will use the term interrogation regardless of whether the suspect is in police custody (custodial interrogation) or not (non-custodial interrogation). In my experience it is not uncommon for law enforcement officers to reject the term interrogation (likely because they believe it is negatively valanced), opting instead to use the term interview with all types of interviewees, including suspects. Importantly, the label used to describe a particular interaction is far less important than the substance, tenor, and techniques utilized during that interaction.

[32] Confessions speed the process of justice in several ways. First, confessions are considered to be extremely powerful evidence of guilt (i.e., because most people cannot imagine falsely confessing themselves, they assume that is a person confessed, that person must be guilty). Second, confessions encourage guilty pleas, thereby reducing the amount of time and resources that need to be dedicated to a case. Finally, as discussed, confessions admitted at trial are highly likely to lead to convictions.

[33] Not only can false confessions have potentially tragic consequences for an innocent suspect (i.e., wrongful conviction), but when a false confession is believed, the actual perpetrator remains at large.

[34] Kassin & Wrightsman (1985)

[35] The most commonly cited reason for providing a voluntary false confession is to protect someone else (see Gudjonsson, 2003; 2010).

[36] Internalized false confessions are almost always a product of highly suggestive interrogations, in which a suspect becomes convinced that his or her memory of not committing the offense is untrustworthy (e.g., due to the passage of time, alcohol/drug use, repression), and the suspect is also confronted with false evidence of his or her guilt (Gudjonsson, 2003; Kassin et al., 2010). Examples of documented cases of internalized false confessions include those of Michael Crowe, Marty Tankleff, and Peter Reilly.

[37] Leo (2004)

[38] Sheridan (2011)

psychologically-based in nature, and the dominant method of interrogation in the United States is *accusatorial* in nature.[39] Accusatorial interrogation generally involves three components: *custody and isolation* (e.g., often being interviewed in a small room and without a source of social support within the room); *confrontation* (e.g., an investigator who has come to believe that a suspect is guilty confronts a suspect with this belief and refuses to entertain the suspect's denials, which heightens the anxiety of the suspect), and *minimization* (which involves attempting to persuade the suspect to 'tell the truth' in the form of an admission, often by providing face-saving excuses). By virtue of its guilt-presumptive nature, accusatorial interrogation typically involves the use of many closed-ended questions, as well as leading/suggestive questions.[40]

Although the exact type and amount of interrogation training investigators receive varies considerably,[41] the *Reid Technique of Interviewing and Interrogation* (hereafter 'the Reid technique') has made an indelible impact on the process of interrogation in this country. It typifies the manner in which modern-day interrogation in the United States has been almost uniformly been conducted, at least until very recently.[42] I detail the Reid technique here as an example of the classic accusatorial approach, and because most modern-day law enforcement interrogations incorporate components that are consistent with the Reid technique, even if investigators have never received formal training in the Reid method and/or are unaware of whether and to what extent their approaches are similar to Reid.[43]

The aforementioned shift away from third-degree tactics to modern-day accusatorial-style interrogation (which has remained fairly consistent since the 1970s) can be attributed in large part to the pioneering and well-intentioned work of Mr. Fred Inbau, who first published his training manual, *Lie Detection and Criminal Interrogation,* in 1942.[44] This work formed the foundation for the first edition of the Reid manual, *Criminal Interrogation and Confessions*, published in 1962. Interrogation manuals (and corresponding training programs) became a critically important, and perhaps the most influential way, of formally training investigators to conduct interrogations, and historically there have been relatively few documented alternatives to the Reid technique in North America.[45] Those alternatives that do or did exist tend to teach either Reid directly, or a program that is essentially a reformulated version of a Reid-style approach.[46] Headquartered in Chicago, Reid and associates began offering courses in 1974, and they claim to

---

[39] Costanzo & Redlich (2010); Kassin (2022); (Leo (2008)

[40] Kassin et al. (2010); Kassin & Gudjonsson (2004); Leo (2008); Meissner et al. (2014)

[41] Kassin et al. (2007); Kostelnik & Reppucci (2009). Many detectives report not having received any formal training at all on how to conduct interrogations; rather, many report learning on-the-job, often by observing more seasoned investigators who pass along their skill set (Cleary & Warner, 2016).

[42] See generally Leo (2008). In recent years, some agencies have started to move away from interrogation techniques based upon the Reid approach—and its core tenants of guilt-presumptive questioning and confrontation — in part because of concerns that some components of the Reid techniques may lead to unreliable confession statements (e.g., Brandon & Meissner, 2023; Clarke, 2018).

[43] Kassin et al. (2007)

[44] Inbau (1942); Leo (2004)

[45] Leo (2004)

[46] For example, in 1984, another successful training firm, Wicklander-Zulawski & Associates, began training the Reid Method of Interview and Interrogation (https://www.wzacademy.com/about-us).

have trained more than 500,000 investigators to date.[47] The Reid technique is the most widely used and influential questioning technique in the world (and certainly in North America), and their manual has been cited by the U.S. Supreme Court.[48] As previously discussed, many investigators who have not directly been Reid trained have likely been influenced by the method, given that interrogation skills are handed down from investigator to investigator via on-the-job training and observation.[49]

Although the technique has evolved somewhat over time,[50] the basic Reid technique is generally divided into two phases: a non-accusatorial pre-interrogation interview and an accusatorial interrogation.[51] The primary purpose of the non-accusatorial pre-interrogation interview is for the investigator to decide whether the suspect is being truthful or deceptive. Reid and associates teach investigators to look for specific verbal and non-verbal indicators of deception. The ability of investigators to reliably distinguish between true and false denials is of critical importance to the Reid technique because Reid advises that only suspects who an investigator believes to be deceptive (i.e., guilty) should be subjected to accusatorial interrogation techniques. In other words, Reid assumes that investigators can systematically and reliably identify innocent persons during the pre-interrogation interview with a high degree of accuracy (via a pattern of verbal and non-verbal responses) and weed them out of the process – therefore, few, if any, innocent persons should be subjected to an accusatorial interrogation. However, this assumption is fundamentally flawed.

A wealth of scientific research indicates that people, including police officers, are *no better than chance* at detecting deceit (with an average accuracy rate of 53%).[52] Counterintuitively, investigators with more experience and who reported more training in detecting deception tend to be *less* accurate at distinguishing between truth-tellers and liars. Despite low accuracy rates, police officers tend to exhibit over-confidence in their ability to detect deceit.[53] Poor performance at detecting deceit (and the accompanying over-confidence effect) is not particularly surprising from a research perspective. By and large, the cues that investigators are traditionally taught are indicators of deceit are in fact *not* reliable cues to deception. For example, Reid and associates (as well as other interrogation schools/manuals)[54] teach that certain non-verbal (e.g., lack of eye contact, grooming behaviors, closed posture, shifting in a chair) and verbal (e.g., offering specific denials, using qualifying phrases such as 'generally' or 'not often' or 'to the best of my knowledge', using indicators of so-called rehearsed language such as noncontracted denials, 'I did not kill her') responses are cues that a person is lying.[55] Unfortunately, such cues are not reliable indicators of deceit[56] – and relying on them can not only confuse investigators, but may in fact lead them to the incorrect conclusion. In

---

[47] http://archive.reid.com/success_reid/r_success.html; http://reid.com/resources/whats-new/2011-book-recognizes-john-e-reid-and-associates-as-the-leader-in-interview-and-interrogation-training
[48] Inbau, Reid, Buckley & Jayne (2013); Kozinski (2018); Stansbury v. California (1994)
[49] Cleary & Warner (2016)
[50] Leo (2004)
[51] Inbau et al. (2013)
[52] Aamodt & Custer (2006); Granhag & Stromwall (2004); Memon, Vrij, & Bull (2003); Vrij (2008)
[53] Meissner & Kassin (2002, 2004)
[54] Narchet, Coffman, Russano & Meissner (2004)
[55] Inbau et al. (2013)
[56] DePaulo, Lindsay, Malone, Muhlenbruck, Charlton & Cooper (2003)

one study examining the effectiveness of Reid cues to deceit, truth-tellers exhibited more Reid indicators of deceit than liars, suggesting reliance on such cues may lead real-world investigators to not only identify truth-tellers as liars, but vice versa.[57] Taken together, this creates a potentially dangerous situation in which confident investigators use non-diagnostic cues to identify liars and proceed to an accusatorial phase comforted by the notion that the suspects they are interrogating are most likely or definitely guilty.

Given the mindset that only guilty/deceptive persons should be subjected to an accusatorial interrogation, most interrogation researchers agree that the fundamental goal of a U.S. law enforcement interrogation is to secure incriminating statements, an admission, or a full confession.[58] An accusatorial interrogation typically begins by isolating the suspect in small room, an environment that is designed to create feelings of hopelessness and anxiety and keep the suspect isolated from social support (such as family and friends). The process of interrogation ultimately involves trying to convince a suspect that it is in his or her best interest to cooperate by confessing – in other words that the benefits of confessing outweigh the benefits of continued denial. In practice, this often means convincing suspects that the only reasonable way out of the situation they currently find themselves in is to admit wrongdoing. The modern-day Reid technique involves a nine-step process[59] which includes firmly and directly accusing a suspect of having committed the crime and convincing him/her of the futility of denying it (i.e., direct positive confrontation),[60] offering sympathy and developing and suggesting 'themes' that make it easier for the suspect to confess, shutting down denials and overcoming suspect objections, keeping the suspect focused on the interrogator and handling any signs of psychological withdrawal, presenting an 'alternative question' (in which two incriminating options are presented to the suspect, but one is face-saving), and finally securing an oral and then written confession statement.[61] This nine-step process is not necessarily linear nor is every step necessarily implemented in a given interrogation (i.e., steps may not always occur in order, and certain steps may be emphasized more than others, occur more than once, or not occur at all, depending on the nature of the specific interrogation and the individual suspect).

The 'theming' aspect of the interrogation process is particularly important. Theming typically involves providing face-saving excuses, rationalizations, or justifications for

---

[57] Vrij, Mann, & Fisher (2006); see also Sporer & Schwandt (2007)

[58] Kassin et al. (2010). One section of the current version of the Reid manual does state that the primary purpose of an interrogation is to learn the truth, and it acknowledges that innocent persons may occasionally be interrogated. However, elsewhere in the manual, it states "the purpose for interrogation is to persuade a suspect who the investigator believes to be lying about involvement in a crime to tell the truth" (Inbau, Reid, Buckley & Jayne, 2001, p. 419). Given that the investigator believes the suspect is lying, the "truth" in this instance translates to an admission or confession. In practice, most interrogation researchers agree that, in light of the process and flow of an interrogation itself (e.g., shutting down of denials, overcoming suspect objections), the practical goal of an interrogation is the elicitation of incriminating statements.

[59] The nine-step process was codified in the third edition of *Criminal Interrogation and Confessions* (Inbau, Reid & Buckley, 1986). However, previous editions advocated use of most of the same techniques, including the theming aspects of the interrogation.

[60] To accomplish this, investigators sometimes confront a suspect with true evidence of guilt, lie about having evidence of guilt, or bluff about evidence.

[61] Inbau et al. (2013)

committing the crime that are supposed to map on to the suspect's preexisting rationalizations for committing the crime. These excuses, rationalizations, and justifications - which can be operationalized in many forms, from explicit statements to implied suggestions via leading questions or innuendo - often involve *minimization* strategies in which the interrogator downplays the moral seriousness of the crime (e.g., his behavior is common; his actions could have been much worse) or provides moral justifications for the suspect's behavior (e.g., he was provoked by the victim; he needed the money; minimizing the suspect's role by blaming an alleged co-conspirator). Other themes may involve the use of *maximization* tactics, which are techniques/themes that tend to play up the seriousness of the situation (e.g., exaggerating the seriousness of the crime, the potential charges, or the seriousness of the suspect's intent).

Of interest is the relationship of common theming approaches to the willingness of a suspect to confess. Reid and associates acknowledge that "every successful interrogation technique must offer the guilty person a real or perceived benefit to telling the truth."[62] The interrogation process is often portrayed as an opportunity for the suspect to tell 'his side of the story.' Reid and associates note that legally investigators are not permitted to tell a suspect that s/he will receive more lenient treatment by the criminal justice system if s/he confesses, however, they state that investigators hope that the suspect draws this conclusion on his or her own (and the themes are designed to encourage this).[63] In fact, Reid and colleagues are correct in their assumption that certain themes communicate information to suspects about their likely treatment within the criminal justice system. Research supports the notion that certain common minimization tactics are the functional equivalent of direct promises of leniency whereas certain common maximization tactics are the functional equivalent of direct threats of harsher punishment; in other words, minimization and maximization techniques that manipulate a suspect's perceptions of the consequences of confessing pragmatically imply leniency in exchange for a confession and harsher punishment in response to continued denial.[64] Moreover, minimization and maximization techniques that manipulate a suspect's perception of the consequences of confessing have been shown in experimental laboratory research to *increase the likelihood of false confessions* in comparison to techniques that do not manipulate perception of consequences.[65]

Case studies, surveys of experienced investigators, and experimental laboratory research supports the notion that accusatorial methods may sometimes be successful at eliciting admissions and confessions from guilty people; however, it is also true, that that same body of literature suggests that certain accusatorial techniques and approaches are successful at eliciting

---

[62] Inbau et al. (2013, p. 368)

[63] The logic here is that the suspect will grasp on to the moral justification or excuse suggested by the theme (e.g., My child is unruly and this is just a case of parental discipline taken too far), and the suspect will come to believe that since the investigator understands why s/he behaved the way s/he did, other people (e.g., prosecutors, jurors, judges) will similarly understand, and therefore, s/he will be treated more leniently (Inbau et al., 2013).

[64] Horgan, Russano, Meissner & Evans (2012); Kassin & McNall (1991); Luke & Alceste (2020); Russano et al. (2005)

[65] Horgan et al. (2012); Meissner et al. (2014); Horgan et al. (2012) found that in addition to increasing the false confession rate, techniques that manipulate perception of consequences decreased the true confession rate as compared to techniques that did not manipulate perception of consequences.

admissions and confessions from *innocent* people.[66] For example, techniques such as direct positive confrontation, and the presentation of false evidence, especially when coupled with minimization and maximization tactics that manipulate a suspect's perceptions of the consequences of denying or confessing, as well as explicit threats and promises, have been shown in laboratory experiments to elevate the risk of false confessions[67] – and these techniques are frequently present in documented cases of false confessions.[68]

The extant literature review provided thus far is relevant not only to suspect interviewing and primary false confessions (i.e., admissions made directly by an innocent person), but also to interviewing that results in a false witness statement (i.e., testimony from a third party that provides false incriminating information). This is because any person, regardless of whether they are ultimately deemed a perpetrator, accomplice witness, or non-involved but cooperating witness, who is subjected to an interview process that looks and feels like an accusatorial interrogation is at risk for providing a false statement. Witnesses (and even victims) are sometimes subjected to an accusatorial-style interaction, with the same problematic techniques that are commonly employed with suspects. In fact, the Reid manual specifically advises investigators to treat reluctant witnesses and informants as suspects, and to interrogate them using the same methods used with suspects. Reid advises reassuring the witness or informant that that police will help protect the person from retaliation, and if all else fails, they should capitalize on the person's desire to protect himself by accusing "…the subject of committing the crime (or of being implicated in some way) and proceed with an interrogation as though the person was, in fact, considered to have involvement in the crime."[69] Reid asserts that this false accusation should motivate the offender to cooperate with police by providing evidence against the actual suspect(s).[70] As such, it is clear that the accusatorial interrogation experience is not reserved solely for suspects, and all of the risk factor categories associated with primary false confessions (i.e., confirmation bias, individual vulnerabilities, and situational risk factors) are similarly risk factors for providing false witness statements. In fact, false witness statements may be easier to procure than a false confession. When suspects incriminate themselves, they are likely to face severe consequences, and therefore they should be more motivated to withstand interrogation to the extent possible. In contrast, witnesses should be less motivated to withstand an interrogation since the act of providing a false witness statement incriminates someone else rather than themselves. This trend is likely exacerbated in situations where witnesses are led to believe that a failure to incriminate the other person would mean they themselves might face significant consequences (legal or personal). In essence, when risk factors for false statements are present, when considering the likely reliability of a witness' statement versus a suspect's statement, a coerced witness' statement is even more likely to be unreliable than a coerced suspect's statement.[71] Like primary false confessions, false witness statements (given by jailhouse informants, accomplice witnesses, or cooperating witnesses) are a known contributing factor to

---

[66] For example, see Bedau & Radelet (1987); Drizin & Leo (2004); Horgan et al. (2012); Kassin et al. (2007); Kassin & Kiechel (1996); Klaver, Lee & Rose (2008); Meissner et al. (2014); Narchet, Meissner & Russano (2011); Ofshe & Leo (1997a, 1997b); Perillo & Kassin (2011); Russano et al. (2005)

[67] e.g., Kassin & Kiechel (1996); Horgan et al. (2012); Narchet et al. (2011); Russano et al. (2005)

[68] Ofshe & Leo (1997a, 1997b); In addition, Kassin et al. (2007) found that law enforcement investigators commonly report the use of such techniques.

[69] Inbau et al., 2013, p. 337

[70] Inbau et al. (2013)

[71] Sheridan (2011)

wrongful convictions. Data from the Innocence Project indicate that these types of false statements played a role in approximately 17% of DNA exoneration cases, and 21% of cases involving people who were exonerated from death row between 1973 and 2004.[72]

Although accusatorial interrogation remains the predominant interrogation style in the United States, the tides, however slowly, appear to be turning to a more information-gathering, science-based approach to interviewing and interrogation. New training models in science-based practices are growing in popularity, and as of March 2017, Wicklander-Zulawski & Associates, a large private firm that previously trained investigators in the Reid method, announced that they would cease training Reid and adopt a non-confrontational approach.[73] Science supports this change; a 2014 meta-analysis comparing accusatorial methods and information-gathering methods[74] found that while information-gathering methods decrease the likelihood of false confessions (while maintaining or increasing the likelihood of true confessions), accusatorial methods increase the rate of both true and false confessions.[75]

## V. Risk Factors for False Confessions

It is the opinion of this interrogation scientist that the goal for the criminal justice system ought to be to identify and use science-based, diagnostic interrogation approaches;[76] in other words, we should strive to identify and use techniques that maximize the likelihood of true confessions/admissions while simultaneously minimizing the likelihood of false confessions/admissions. Researchers have long been studying the factors associated with false confessions, and there is a growing body of literature identifying diagnostic approaches that maximize the ratio of true to false confessions as well as those techniques that disproportionately heighten the risk of false confession.[77] The existing research on interrogations and confessions have allowed us to identify three major categories of risk for false confessions: 1) confirmation bias or 'tunnel vision', 2) individual vulnerabilities, and 3) situational risk factors associated with the nature of the interrogation itself.[78]

---

[72] Warden (2004); https://www.innocenceproject.org/dna-exonerations-in-the-united-states/; https://www.innocenceproject.org/informing-injustice/

[73] Brandon & Meissner, in press; Brandon et al. (2019); Brandon, Wells & Seale (2018) https://olis.leg.state.or.us/liz/2017R1/Downloads/CommitteeMeetingDocument/110332

[74] The information-gathering approach is more common in the United Kingdom, and countries such as Australia, Norway, Sweden, and New Zealand. This approach emphasizes a hypothesis-testing frame of mind (i.e., a truth-focus as opposed to a confession-focus), developing rapport, the use of open-ended questions, and the avoidance of the use of leading/suggestive questions and deception (see Meissner et al., 2014, and Russano, Kelly & Meissner, 2020 for descriptions of this approach).

[75] Meissner et al. (2014)

[76] Meissner, Hartwig & Russano (2010); Kelly & Russano (in press)

[77] Russano et al. (2005); Narchet et al. (2011); Horgan et al. (2012); Evans, Meissner, Ross, Houston, Russano & Horgan (2013); Meissner et al. (2014)

[78] Meissner & Russano (2003)

### Confirmation Bias

*Confirmation bias* or *"tunnel vision"* occurs when a person forms an initial opinion, and subsequently processes new information in a way that confirms his or her initial opinion. This occurs when information that is consistent with the initial opinion is given significant attention or weight, information that is inconsistent with that opinion is dismissed, ignored, or given little weight, and ambiguous information is interpreted in a way that supports the initial opinion. Tunnel vision is also closely related to the concept of *belief perseverance* – the phenomenon that people tend to have difficulty changing their beliefs despite being exposed to evidence that directly contradicts or refutes those beliefs.[79] Investigator tunnel vision is a well-established phenomenon in social science research, and it is the consequence of investigators honing in on a particular suspect, becoming convinced that the suspect is guilty, focusing in and attending to information that appears to support that the suspect is guilty, and ignoring or giving less weight to potentially exculpatory evidence.[80]

Confirmation bias can trigger a process of behavioral confirmation in which investigators behave in a guilt-presumptive accusatorial manner (i.e., we know you did it, there is no point in denying it) and ask questions in such a way (e.g., leading and suggestive in nature) that results in a suspect acting in ways that appear to confirm the investigators' prior belief in the suspect's guilt (e.g., acting defensive and nervous, incorporating specific incriminating details into their narrative that were provided via leading questioning strategies). Confirmation bias has been demonstrated to increase the risk of false confession via the use of accusatorial, guilt-presumptive tactics. It is important to note that a guilt-presumptive accusatorial interview does not necessarily mean that investigators raise their voices or treat the suspect with disrespect – in fact, many guilt-presumptive, accusatorial interviews occur under the umbrella of what lay persons would interpret as a friendly (i.e., "good cop") approach. However, the impact of confirmation bias and other psychological processes remain regardless of the outward veneer under which they occur (and in many ways, what appear to be "friendly" interviews are more dangerous to an innocent person than an interview where investigators outwardly show frustration and anger because it lulls the suspect into a false sense of security).

### Individual Risk Factors

*Individual (aka dispositional) vulnerabilities* refer to characteristics pertaining to the person that make them more vulnerable to providing a false confession or statement. Individual vulnerabilities can be divided into two sub-types: trait vulnerabilities and state vulnerabilities. Trait vulnerabilities are relatively stable characteristics about a person, such as age, mental capacity, and mental illness. State vulnerabilities refer to more transient conditions that can

---

[79] Burke (2006); Ross & Lepper (1980); Nickerson (1998); Trope & Liberman (1996)
[80] Meissner & Kassin (2002); Mortimer & Shepherd (1999); Narchet et al. (2011); Tavris & Aronson (2007); for an overview, see Nickerson (1998) and Trope & Liberman (1996); A belief in a suspect's guilt can also lead investigators to behave in ways that elicit what they interpret to be deceptive behavior from suspects, thereby confirming the investigator's belief in the suspect's guilt (Kassin, Goldstein & Savitsky, 2003; Narchet et al., 2011).

elevate a person's risk to providing a false statement, such as fatigue and physical state (e.g., intoxication, drug withdrawal, pain level).[81]

*__Trait vulnerabilities.__* In terms of trait vulnerability, generally speaking, younger persons, people with cognitive deficits, and persons suffering from mental illness are more likely to provide false confessions, due in part to heightened suggestibility and a lesser ability to cope with the stress of interrogation.[82] The younger a person is, the more at risk they are for providing a false confession or statement.[83] Juveniles and young adults are overrepresented in false confession cases. In Drizin and Leo's (2004) study of false confessors, 35% of false confessors were under the age of 18, and 55% of those juvenile false confessors were under the age of 15. Similarly, out of the 29% of DNA exonerations cases in which there was a false confession, 49% of those confessions were provided people under the age of 22.[84] When examining the first 3,060 exonerations documented by the National Registry of Exonerations since 1989, juveniles were 3.4 times more likely to provide a false confession than adults.[85]

A wealth of self-report data also supports the notion that youth is a risk factor for false confessions in the interrogation room; younger people self-report providing false confessions and waiving their rights at a higher rate than older persons.[86] In a survey of nearly 25,000 European juveniles, 14% reported having falsely confessed to authorities.[87] Finally, in a study of incarcerated youth in California, 17.1% of juveniles claimed to have made a false confession to authorities, and self-reported self-confessions were associated with longer interrogation duration (greater than two hours).[88] Finally, laboratory research supports the finding that juveniles are more likely to falsely confess than older persons. Redlich and Goodman (2003) found that youths were more likely to falsely confess than adults to crashing a computer during a laboratory study, and younger children were more likely to confess than older children, particularly when confronted with false evidence of their guilt. In a more recent study, adolescents (ages 14 to 17) were more likely to falsely confess to cheating during an academic task than college students.[89]

Juveniles are also more likely to waive their Miranda rights than adults, which by definition means they are more likely to land up in an interrogation that puts them at greater risk for providing a false confession.[90] One of the reasons that juveniles may waive their rights at a higher rate than adults is poor comprehension of those rights. Numerous studies have documented the very stable finding that adolescents are less likely to understand their Miranda

---

[81] Woody & Forest (2020)

[82] Drizin & Leo (2004); Garrett (2011); Gudjonsson (2003; 2018); Inbau et al. (2013); Kassin & Gudjonsson (2004); Kassin et al. (2010); Schatz (2018); To the best of my knowledge, age and mental illness are not likely factors at issue in this case, so I have not expounded on the background literature relevant to these categories.

[83] Age and Mental Status FINAL CHART.pdf (umich.edu); Gross et al. (2020)

[84] https://www.innocenceproject.org/dna-exonerations-in-the-united-states/

[85] Zelle, Riggs Romaine & Goldstein (2014); See also Kassin et al. (2010)

[86] For example, see Gudjonsson, Sigurdsson, Asgeirsdottir & Sigfusdottir (2006); Gudjonssson, Sigurdsson & Sigfusdottir (2009a); Gudjonsson et al. (2006); Haney-Caron, Goldstein & Mesiarik (2018); Malloy, Shulman & Cauffman (2014); Viljoen, Klaver & Roesch (2005)

[87] Gudjonssson, Sigurdsson & Sigfusdottir (2009a)

[88] Malloy et al. (2014)

[89] Pimental, Arndorfer & Malloy (2015)

[90] For example, see Viljoen et al. (2005)

rights than adults.[91] Even when adolescents seem to have a basic factual understanding of their rights (e.g., they understand that they literally have the right to have an attorney present), they tend to not understand what the practical implications of those rights are and how exercising those rights might serve a protective function (e.g., they do not understand what an attorney would actually do for them). They are also more likely to focus on the perceived short-term benefits of waiving their rights (e.g., that they will tell their story and be allowed to go home) as opposed to the possible long-term consequences of doing so (e.g., providing an incriminating statement).[92]

Although our legal system generally considers an 18-year-old a legal adult, from a scientific perspective, there is ample evidence that even individuals in their late teens and early twenties are not the biological, psychological, or emotional equivalent of older adults. Brain development can help us understand why this is so; for example, the process by which different regions of the brain communicate and the parts of the brain (e.g., the prefrontal cortex) that control decision-making, impulse control, judgement, memory, and attention do not fully develop until the early twenties or beyond.[93] These biological realities can disadvantage younger persons within the interrogation room. Compared to older adults, younger people are more susceptible to suggestion, are more likely to acquiesce to pressure from authority, are more likely to engage in risk-prone behavior, they and are more likely to prioritize short-term benefits over long-term consequences.[94] As such, particularly when subjected to an accusatorial interview, younger adolescents and young adults are more likely to provide false confessions/statements than older adolescents and older adults. Unfortunately, research indicates that the majority of law enforcement officers are generally insensitive to developmental maturity issues, and adolescents and younger adults are routinely subjected to the same types of interrogation techniques as older adults.[95] At least on paper, Reid acknowledges that youths are more at risk for providing a false confession than adults; yet, at the same time they endorse the use of a "confrontational approach" that includes theming with children ages 10 and up.[96]

Persons with low intelligence or I.Q. are also overrepresented amongst false confessors.[97] In a 2017 analysis of 245 false confessors, 23.7% had an intellectual disability (compared to 1 to

---

[91] See Kassin et al. (2010) for a review of the literature
[92] Zelle, Riggs Romaine & Goldstein (2014); See also Kassin et al. (2010)
[93] Johnson, Blum & Giedd (2009)
[94] See Woody & Forest (2020) and Kassin et al. (2010) for reviews of the relevant literature.
[95] Cleary & Warner (2016); Feld (2006); Kostelnik & Reppucci (2009); Malloy et al. (2014); Meyer & Reppucci, 2007; Reppucci, Meyer & Kostelnik, 2010
[96] http://www.reid.com/pdfs/MarchApril2018InvTip.pdf; Inbau et al. (2003); In written documentation, Reid suggests caution with the presentation of false evidence, and other forms of trickery and deceit, for youthful suspects *with low social maturity or cognitive challenges*, leaving the door open for its use on adolescents investigators perceive not to fit into these vulnerable categories (http://www.reid.com/pdfs/MarchApril2018InvTip.pdf, pg. 19). When I personally completed the Reid course, my instructor Mr. Michael Masokas (who happened to be the interrogator who years prior elicited a false confession from 16-year-old Juan Rivera) made no mention of treating juveniles different than adults. When I found an opportunity to ask whether the technique should be altered for juveniles, Mr. Masokas responded by suggesting that the two things investigators should avoid with youthful subjects was prolonged interrogation and the presentation of false evidence.
[97] Drizin & Leo (2004); Garrett (2010); Gudjonsson (2003); Kassin et al. (2010); Leo (2008); Perske (2008)

3% of the general population).[98] People with cognitive impairment, and particularly those who fall in the mental retardation range,[99] are more easily influenced by others, are more likely accept blame for negative outcomes, and have more difficulty maintaining focus and attention for long stretches of time.[100] People with lower IQ have a strong desire to please authority figures, are more likely to acquiesce to leading questions, and they tend to prioritize short-term outcomes/needs over long-term ones.[101] They are generally quite poor at anticipating the long-term consequences of their decisions, particularly as it relates to the interrogation process,[102] and they are less able to cope with the pressures of police interrogation.

Like cognitive impairment, mental illness is an individual trait risk factor for making an unreliable statement. Criminal defendants with mental illness self-report that they have falsely confessed in their lifetime at nearly double the rate of those without mental illness,[103] and people with mental illness are overrepresented in documented cases of false confessions.[104] Of the 365 false confessors as documented by the National Registry of Exoneration, 33% were either mentally ill or intellectually disabled.[105] Several studies have identified mental illness as significant predictor of self-reported false confession.[106]

*__State vulnerabilities.__* In terms of state vulnerabilities, a person's physical condition, even when the interrogation is not the cause of the condition, is important to consider when evaluating the risk of procuring a false confession/statement. For example, fatigue or sleep deprivation is a known risk factor for false confessions. Research has shown in a variety of contexts that being deprived of sleep depletes a person's cognitive resources to the point that people become error-prone, decision-making abilities become impaired, suggestibility to outside influence is heightened, and the ability to maintain focus and attention suffers.[107] In the interrogation/ interview context, suspects are sometimes deprived of quality sleep intentionally (see Situational Risk Factors section below). In other cases, a subject may be sleep deprived by virtue of the amount of sleep the person had prior to active police questioning. However, the deleterious effects of fatigue and sleep deprivation on a person's psychological functioning occur regardless of where the responsibility for that state lies; in other words, investigators should be mindful about how well-rested (or not) a suspect is at the start and throughout the entire period of the custody and interrogation process. Similarly, physical discomfort or pain (regardless of the cause) can deplete an individual's resources to withstand the pressures of an accusatorial interrogation. Short-term consequences are more salient than distal ones, and humans tend to

---

[98] Schatz (2018)

[99] American Psychiatric Association (1994)

[100] Everington & Fulero (1999); Perske (2004)

[101] e.g., Finlay & Lyons (2002); Leo (2008); Perlman, Ericson, Esses, & Isaacs (1994); Shaw & Budd (1982)

[102] Clare & Gudjonsson (1995); Everington & Fulero (1999); Fulero & Everington (2004); Gudjonsson (2003)

[103] Redlich (2007)

[104] Drizin & Leo (2004); Garrett (2010; 2011); Gudjonsson (2003); Kassin et al. (2010); Leo (2008)

[105] Age and Mental Status FINAL CHART.pdf (umich.edu); Gross et al. (2020)

[106] Gudjonsson (2018); Gudjonsson et al. (2006); Rogers, Harrison, Hazelwood & Sewell (2007); Redlich, Kulish & Steadman (2011); Redlich, Summers & Hoover (2010)

[107] Blagrove (1996); Frenda, Berkowitz, Loftus & Fenn (2016); Harrison & Horne (2000); Pilcher & Huffcut (1996)

focus on their immediate needs.[108] It is fundamental human nature to prioritize the short-term benefit of ending a fatigue state or physical discomfort over the long-term consequences of falsely confessing to a crime one did not commit, especially given that accusatorial interrogation is designed to downplay the consequences of confession and maximize the consequences of continued denial. Furthermore, most innocent people believe that their actual innocence will become clear to investigators at a later time and thus fail to appreciate the weighty ramifications of providing a false admission.[109] In summary, investigators should be aware that fatigue, physical discomfort, or pain can increase the risk of false confessions/statements and exercise caution if any of these factors are present.[110]

**Situational Risk Factors**

Although individual risk factors can increase the likelihood of a false confession/statement,[111] it is important to understand that false statements can be elicited from typical individuals with no dispositional vulnerabilities (e.g., older adults with no cognitive limitations or mental illness). Of 365 false confessors documented by the National Registry of Exoneration, 50% were eighteen years or older without mental illness and intellectual disability.[112] Of the DNA exoneration cases that involved false confessions/statements, only 9% of false confessors had documented mental health or cognitive limitations, and 69% were provided by subjects 18 years or older.[113] Even without any individual risk factors present, situational risk factors – namely factors that increase the likelihood of false confessions/admissions are that are associated with the nature of the interrogation itself – can cause false confessions/statements.[114]

<u>**Prolonged custody, isolation, and interrogation.**</u> Most police interrogations last between 30 minutes and 2 hours,[115] with law enforcement officers in the U.S. citing the mean interrogation length as 1.6 hours.[116] Law enforcement manuals, including the Reid manual, caution against prolonged interrogation, citing it as a risk factor for coerced and/or false confessions.[117] At least one Reid-trained former investigator considers any interrogation lasting

---

[108] e.g., see Herrnstein (1970); Herrnstein, Rachlin & Laibson (1997); Rachlin (2000); for a discussion of individual differences, see Reynolds (2006)

[109] Kassin (2005) refers to this as the 'phenomenology of innocence.' Innocent persons believe that their innocence will eventually come to light, and so even if they make a false confession to benefit themselves in the short-term (e.g., to escape an unpleasant interrogation session), police investigators will eventually realize through further investigation and/or evidence that they are actually innocent.

[110] Gudjonsson (2018); Kassin et al. (2010); Leo (2008)

[111] For the sake of conciseness, I will heretofore generally use the term confession, instead of confession/statement, but as discussed elsewhere, the risk factors for procuring a false statement from a witness are the same as for false confessions.

[112] Age and Mental Status FINAL CHART.pdf (umich.edu); Gross et al. (2020)

[113] https://www.innocenceproject.org/dna-exonerations-in-the-united-states/

[114] For the sake of brevity and relevance, I have limited my discussion of the background literature primarily to those situational risk factors that appear to have been at issue in this case.

[115] Baldwin (1993); Irving (1980); Leo (1996); Wald, Ayres, Hess, Schantz & Whitebread (1967); Kassin, Russano, Amrom, Hellgren & Kukucka (2019)

[116] Kassin et al. (2007)

[117] Inbau et al. (2001, 2013)

over six hours de facto coercive, and the Reid manual suggests that rarely should an interrogation last more than three or four hours.[118] Lengthy, prolonged custody, isolation, and interrogation is commonplace in false confession cases, and therefore it is a recognized risk factor for false confessions/statements. One issue that often comes up when discussing length of interrogation is the difficulty in distinguishing between length of custody versus length of active questioning. This is because law enforcement officers rarely keep and provide exact records distinguishing between these two metrics (although as mandated recording of all questioning becomes commonplace, this will help to ameliorate this gap in knowledge). In one study of 125 proven false confessions, length of interrogation could only be approximated in 35% of cases, and within those cases, it was difficult in many cases to distinguish between length of active questioning and length of time in custody. In that study, the average length was 16.3 hours, with 16% lasting less than 6 hours, 34% lasting between 6 and 12 hours, and 39% lasting between 12 and 24 hours.[119]

However, a hyperfocus on trying to distinguish between total length of custody versus length of active questioning, is misguided and missing the point. That is because length of active questioning should not and cannot be considered in isolation. From a psychological perspective, it is the *entire length of custody, isolation, and questioning* that is associated with conditions that increase the risk of a false confession/statement, not simply the sum total of the number of minutes of active questioning.[120] Simply put, the clock does not stop each time the investigators leave the room or stop asking questions. The reason for this is that prolonged custody and questioning is usually accompanied by isolation of the interviewee from meaningful social support and contact with the outside world (e.g., friends, family members, attorneys), which is a form of psychological deprivation. It is standard practice in the U.S. to interrogate suspects in a small, barely furnished room, with nothing adorning the walls, and with minimal to no noise coming from the outside.[121] This environment helps heighten a person's sense of isolation and anxiety. Prolonged incommunicado custody and isolation deprives people of their fundamental needs for affiliation and social support,[122] which are particularly critical in times of stress, (e.g., during a prolonged accusatorial interrogation process).

In examining length as a risk factor, one should consider the entire length of custody and isolation, and the totality of the conditions under which a person was held and questioned. It is not uncommon in documented false confession cases for a subject to be held in custody for a prolonged period but questioned intermittently during that period. Cumulative active interrogation length is not the only or the most important consideration. It is misguided to only "count" the active questioning periods when considering risk level because there are cumulative and deleterious effects of the isolation and detention that cannot be disentangled from the time periods during which the questioning occurred. What occurred during breaks in questioning – for example, whether the person was allowed to sleep or rest in an environment conducive to sleep, whether they were permitted to speak with a family member or friend, whether their basic needs

---

[118] Blair (2005)
[119] Drizin & Leo (2004)
[120] In the cases this expert has personally consulted on, subjects are rarely subjected to continuous interrogation of the course of hours. Rather, it is far more typical to see periods of prolonged custody and isolation with intermittent questioning.
[121] Inbau et al. (2001, 2013); The *Reid* manual explicitly recommends that investigators to create this type of physical environment.
[122] Baumeister & Leary (1996)

of food, drink, medication, and bathroom were provided for – are critical considerations in determining just how great of a risk factor total elapsed custody, isolation, and interrogation time is in each case. In general, however, as total time elapses, a person's need and desire to escape an aversive situation (i.e., prolonged custody, isolation, and interrogation) intensifies, and many individuals (even innocent ones) will prioritize the short-term benefit of escaping the immediate situation by cooperating with investigators and providing an incriminating statement.[123]

*__Physical abuse/threats of physical harm/physical discomfort/deprivation of basic necessities.__* Prior to the 1930's, physical abuse of suspects during interrogations was fairly routine.[124] However, reform spurred on by the Wickersham Commission and case law decisions swept the country, and certainly by 1989, the courts, police training manuals, and legal guidelines had unequivocally declared physical abuse inappropriate and illegal in the context of a police interrogation or interview. The concern regarding physical abuse involved not only the issue of voluntariness (whether physical abuse causes a suspect's will to be overborne) but also reliability (the concern that physical abuse might lead to false statements). Threats of harm, physical abuse, and deprivations of basic needs such as food, drink, sleep and use of the bathroom are generally considered to be de facto coercive (i.e., involuntary) and likely to produce unreliable statements.[125] The fact that a false confession or false statement can be procured through physical abuse or threats of physical abuse should not come as a surprise to anyone and is non-controversial; humans tend to prioritize their immediate needs and short-term consequences (ending or avoiding physical pain) over long-term ones (the more abstract consequences of providing a false statement).[126] According to the Reid manual, "if physical coercion was involved, even a 30-minute interrogation may warrant" a claim of coercion or duress.[127] Similarly, threats of future physical abuse or harm is considered psychologically manipulative and coercive, and the courts have long recognized that confessions procured through threats of harm are not admissible in court.[128] Once again, the rationale for this is not simply based on the issue of voluntariness, but over legitimate concerns that confessions procured in this manner may be unreliable (i.e., false). In one analysis of exonerations cataloged by the National Registry of Exonerations, Gross and colleagues concluded that 36% of false confessions were a result of the threat or use of violence; in Chicago, that number jumped to violence being used or threatened in 69% of exonerations involving false confessions.[129]

*__Sleep deprivation.__* As previously discussed, sleep deprivation is a known risk factor for false confessions/admissions.[130] Intentional sleep deprivation has long been considered powerful yet coercive interrogation technique (and historically a common tactic reported by victims of

---

[123] Leo (2004); Kassin (2023); Leo (2008); Woody & Forest (2020)
[124] Leo (2004)
[125] Brown v. Mississippi (1936); Leo (2004); Sheridan (2011); Stein v. New York (1953)
[126] e.g., see Herrnstein (1970); Herrnstein, Rachlin & Laibson (1997); Rachlin (2000); for a discussion of individual differences, see Reynolds (2006)
[127] Inbau et al. (2001, p. 423)
[128] Leo (2004; 2008)
[129] Gross et al. (2020)
[130] Blagrove (1996); Harrison & Horne (2000); Pilcher & Huffcut (1996)

torture),[131] and it has been demonstrated in the laboratory to increase the likelihood of false confessions.[132]

 *__Guilt-presumptive approach: Direct positive confrontation, shutting down denials, and poor questioning techniques__*. As previously discussed, research comparing accusatorial interrogation methods and non-accusatorial, information-gathering methods has demonstrated that accusatorial interrogations overall are associated with a greater risk of false confession.[133] One of the hallmark features of a classic accusatorial approach is the use of direct positive confrontation, where an investigator directly accuses a person of being guilty with a strong degree of certainty. It is often accompanied with the message that the investigation is complete, that the investigators already know that the suspect was involved, that they have all the evidence they need to prove that, but they do not know *why* the person did it, and therefore the purpose of the interrogation is to give the suspect an opportunity to explain his side of the story. Direct positive confrontation serves to ramp up the person's anxiety level and, coupled with the ignoring or shutting down of repeated assertions of innocence, it communicates the message that there is no point in trying to maintain one's innocence. For guilty persons, the hope is that they will see the futility in continuing to lie to the investigators. For innocent persons, however, it creates feelings of hopelessness and the belief that protestations of their actual innocence are futile.[134] It also is designed to make these individuals believe that the only viable path of escape is to provide an inculpatory statement; in other words, that confessing or false incriminating someone else is their only way out of the situation they find themselves in.

 Another feature common to accusatorial interrogations is poor questioning techniques, with a particular overreliance on suggestive and leading questions. The research literature on questioning techniques (for witnesses, victims, and suspects alike) is clear that responses to open-ended questions are more likely to be accurate (e.g., "What happened?") than specific questions ("Did you stab him?"). Moreover, leading/suggestive questions (i.e., those that communicate what the answer might be to the person who is being asked the question), forced-choice questions (e.g., yes-no questions; asking a person to choose between a few provided options), and repetitive questioning[135] increase the risk of eliciting inaccurate details and reports.[136] One of the primary concerns surrounding the use of leading/suggestive questions or statements is that (either intentionally or unwittingly) investigators may communicate details about the crime to the interviewee, details that will likely be consistent with the investigator's theory of the crime and the facts known to investigators at the time of the interrogation (a process called "contamination"). The use of these problematic techniques muddies the waters for later fact-finders, who cannot be sure whether a statement that contains non-public details does so because the interviewee possessed actual guilty knowledge or because those details were suggested to the suspect via the questioning process.[137]

---

[131] Suedfeld (1990)

[132] Frenda et al. (2016)

[133] Meissner et al. (2014)

[134] Inbau et al. (2001, 2013)

[135] Repetitive questioning not only causes mental fatigue and frustration, but it communicates to the person being questioned that the answer they gave previously was incorrect or unsatisfactory.

[136] Mitchell & Johnson, 2000; Toglia, Read, Ross & Lindsay, 2006

[137] See Part VI of this report for a detailed discussion of the issue of contamination.

***Presentation of false/unreliable evidence.*** The presentation of false evidence of guilt (a form of trickery and deception) is a known, demonstrable risk factor for false confessions. False evidence presentation can take different forms, including explicit claims of false evidence (e.g., we have video that identifies you at the scene of the crime; you failed a polygraph) to implicit claims that often involve bluffing (e.g., we found DNA on that item and testing it to see if it matches you). It is important to note that implicit and explicit evidence ploys have similar psychological effects on innocent suspects.[138] Analyses of documented false confession cases in the U.S. indicate that the presentation of false evidence occurred in a large majority of these cases and contributed to the wrongful convictions of innocent suspects.[139] In addition, a wealth of basic social psychological research demonstrates that people are susceptible and vulnerable to false feedback in terms of their emotional state, judgment, memory, and decision-making processes.[140] Finally, laboratory studies of interrogation and confessions indicate that the presentation of false evidence increases the likelihood of false confession.[141] When an innocent person is confronted with false evidence, it often has the intended effect. That is, innocent persons become convinced that the evidence makes them appear guilty, there is no point to continuing to deny it (and in fact, there may be a severe cost to doing so), and they are going to be held responsible for committing the crime no matter what they say. False evidence presentation is typically coupled with the suggestion that if the suspect provides a statement, he or she may be treated more leniently.[142] This perfect storm can lead innocent persons to falsely confess if they see no other viable way out of the precarious situation they find themselves in.

Strategic presentation of *true* evidence, on the other hand, is recognized as a useful part of a science-based interview process that can maximize the likelihood of eliciting a reliable statement.[143] However, fundamental to the use of true evidence during the course of an interrogation is consideration of the likely reliability of that evidence. That is because not all forms of "evidence" are equally strong, credible, or trustworthy, either due to the inherent nature of the type of evidence or because of the way that the evidence was collected. For example, faulty eyewitness identification is one of the leading contributors to wrongful convictions;[144] the nature of human memory making eyewitness identification evidence inherently less reliable than, for example, the results from appropriately conducted DNA analyses. Moreover, methods of collecting evidence can exacerbate inherent reliability problems. If, for example, an investigator uses suggestive lineup procedures with an eyewitness, the reliability of a resulting identification is determined not only by the inherent difficulty of the memory task, but also the nature of the identification task process. Another example would be when a witness statement implicating a particular subject was procured with problematic questioning procedures, or when an informant provides unvetted information of questionable validity.

---

[138] Perillo & Kassin, 2011; Woody & Forest, 2020
[139] Drizin & Leo (2004); Leo & Ofshe (1998); Gross et al. (2020)
[140] Gudjonsson & Sigurdsson (1999); Kassin et al. (2007)
[141] Kassin & Kiechel (1996); Horselenberg, Merckelbach, & Josephs (2003); Horselenberg et al. (2006); Perillo & Kassin (2011); Redlich & Goodman (2003); Russano et al. (2005); Meyer & Youngjohn (1991); Nash & Wade (2009); Stewart, Woody & Pulos (2018)
[142] See next paragraph for effects of this technique.
[143] For a review of some strategic evidence disclosure methods, see Granhag & Hartwig (2015), Luke & Granhag (2022), Meissner, Surmon-Böhr, Oleszkiewicz & Alison (2017), and Sukumar, Wade & Hodgson (2016).
[144] www.innocenceproject.org/eyewitness-identification-reform/

The reasons it is important for investigators to carefully consider the reliability of what may appear to them to be true evidence before confronting a subject with it during an interrogation is because unreliable "true" evidence (i.e., the investigators are telling the truth about evidence they have but it turns out it is not objectively reliable/true) can have the same psychological impact as the intentional presentation of false evidence (i.e., investigators lying or bluffing about having evidence). In other words, for an innocent person, the psychological impact of being told that an eyewitness has identified them, a witness has implicated them, or that they failed a polygraph is the same regardless of whether the detective believes the evidence he is using is true or he is intentionally being deceptive. In the end, the presentation of evidence that an investigator possesses and believes to be true but is actually false is the functional equivalent of fabricating that same evidence when it comes to increasing the risk of eliciting a false confession/statement.

***Threats and promises (explicit and implied).*** Explicit and implicit threats of negative consequences for continued denial and explicit and implicit promises of a benefit in exchange for an incriminating statement is a significant and powerful risk factor for eliciting false confessions/statements.[145] Statements elicited as a result of underlined explicit threats of negative consequences (e.g., being charged with a more serious crime, losing custody or access to a child)[146] or more severe punishment (e.g., receiving the death penalty instead of life in prison, being charged with a crime) if one does not confess or via explicit promises of some benefit or leniency in exchange for cooperation (e.g., being allowed to go home; getting a lighter sentence, being treated as witness rather than a suspect) are generally considered inherently coercive (i.e., not voluntary). That is not only because of their coercive nature, but also because coerced confessions are more likely to be unreliable (i.e., false).[147] Implied threats and promises, which often come in the form of minimization (e.g., downplaying the role that the individual played in the crime, suggesting that the crime wasn't premeditated, shifting blame to an alleged co-conspirator, suggesting the offense is common, implied leniency in the form of suggesting the person will be 'better off' if they confess or suggesting that this is the person's opportunity to "help himself out" or "tell his side of the story") and maximization techniques (e.g., exaggerating the seriousness of the offense or the consequences of continued denial) have the same functional effect as direct threats and promises.[148] As previously discussed, research demonstrates that certain minimization and maximization techniques (and associated themes) *imply* leniency in exchange for confessing and *imply* harsher punishment if the person continues to deny; in essence, they are the functional psychological equivalent of direct threats and direct promises in the mind of the person being subjected to these techniques. Moreover, research demonstrates that techniques that communicate leniency in exchange for a statement and harsher punishment in light of continued denial, whether that communication is explicit or implied, increases the risk of false confessions/statements.[149]

---

[145] Gross et al. (2020); Horgan et al. (2012); Kassin et al. (2010); Klaver et al. (2008); Russano et al. (2005); Narchet, Meissner & Russano (2011)
[146] Lynumn v. Illinois (1963)
[147] Brown v. Mississippi (1936); Leo (2004); Horgan et al. (2012); Sheridan (2011)
[148] Leo (2004); Sheridan (2011)
[149] Gross et al. (2020); Horgan et al. (2012); Klaver et al. (2008); Luke & Alceste (2020); Russano et al. (2005); Narchet, Meissner & Russano (2011); See Vallano, Guyll, Ditchfield & Slapinski (2022) for a

## VI. The Nature and Power of False Confessions/Statements

One would hope that if a false confession is elicited from a suspect, various legal decision-makers examining the veracity and reliability of the statement (i.e., prosecutors, judges, jurors) would be able to recognize it as such and prevent that false statement from leading to a wrongful conviction. Unfortunately, research indicates that people cannot reliably distinguish between true and false confessions, just by observing, reading, or viewing the statement.[150] Why might that be? In addition to our generally dismal performance at detecting deception using non-science-based cues and approaches, the reason why it is so difficult to recognize a false confession when we see one is because false confessions typically *look* and *feel* like true confessions. That is, they typically consist of narratives that are chock full of specific details that mirror the type of detail provided in true confessions. In one content analysis of proven false confession cases, 100% of the false confession cases included details about the time and place of the crime, visual details about the crime, and details about the victim's behavior. Almost all (95%) referenced co-perpetrators, witnesses, or other people. A large majority contained details about what the victim allegedly said (80%) and what the victim looked like (75%), as well as reflections on what the suspect was feeling (85%) and the motive for the crime (80%). Approximately 60% contained references to minimization themes, such as shifting the blame to a co-conspirator, 40% contained expressions of remorse, 50% included statements of voluntariness,[151] and 44% had error corrections.[152] Not surprisingly, detailed false confessions

---

[150] discussion of how minimization may be especially problematic when combined with a rapport-building approach.

[150] Aamodt & Custer (2006); Granhag & Stromwall (2004); Honts, Kassin & Craig (2014); Kassin et al. (2005); Memon et al. (2003); Vrij (2008); Much of the research that is germane to people's poor performance at distinguishing between true and false confessions is specific to viewing confession statements – not the entire interrogation process leading up to the confession statement, and it does not concern an interrogators' own observations that the admission is unreliable based upon what they know about the case and interrogations they have conducted.

[151] Insertion of voluntariness statements (sometimes referred to as 'cleansing statements') are an intentional strategy to bolster the credibility of a statement (Leo, 2008; Appleby et al., 2013). For example, at the end of Mr. Rios' statement, there is language indicating that Mr. Rios had been treated fairly by police, that he was allowed to go the bathroom and smoke, and that no promises or threats were made in exchange for his statement.). On its face, it might appear that the inclusion of such statements increases the likelihood that the statement is reliable; however, caution is warranted. It is not uncommon for this type of language to be deliberately included in written statements as a way to sanitize the interrogation/interview process after the fact in order to make the statement appear more compelling and voluntary to outside observers. It is important to note, at least in false confession cases, that this language is typically inserted only at the end stages of an interrogation, at which point the suspect has already agreed to confess because s/he has come to believe that it is in his or her own best interest (Leo, 2008).

[152] Appleby et al. (2013); In this case, two minor grammatical corrections appeared in Mr. Rios' statement. Of note, law enforcement officers are taught to intentionally insert mistakes into a written statement so that the error can be corrected and initialed by the subject). These corrections become a compelling argument to judges and juries that the subject was an engaged, active participant in providing the statement. In essence, intentional insertion of errors is a psychological ploy to make a statement appear voluntary and reliable (Inbau et al., 2001, 2013; Leo, 2008). Whether the errors included Mr. Rios'

and admissions are compelling to jurors and other legal decision-makers, precisely because they contain the type of detail and so-called 'credibility cues' (i.e., expressions of remorse, motive, statements of voluntariness, error corrections, voluntariness statements and statements about having been treated well) that we would expect to see in true confessions. For these compelling narratives to be produced, scripting and rehearsal is commonplace in documented false confession cases.[153] Once taken, false confessions are highly likely to lead to plea bargains,[154] and most false confessors who go to trial are convicted.[155]

Notably, a false confession or statement can trigger a process that leads to an **illusion of corroboration**. This is because once a false confession or statement is taken, it has the power to influence and corrupt other evidence. This phenomenon leads to *corroboration inflation*, which refers to "a tendency for confessions to produce an illusion of support from other evidence."[156] Research demonstrates that knowledge that a person has provided an incriminating statement can shape both lay witnesses' memories for the crime/perpetrator as well as the forensic examiners' evaluations of trace evidence and polygraph examiners' interpretation of a suspect's veracity.[157] In one analysis, the vast majority (78%) of DNA exoneration cases involving false confessions contained other errors that contributed to the wrongful conviction (e.g., invalid forensic science, mistaken eyewitness identification). In 65% of the cases that contained multiple errors, the false confession **preceded** the collection of the other evidence (allowing for the confession to corrupt the other evidence and provide an illusion of corroboration).[158] This domino effect can feed a dangerous cycle of confirmation bias, in which decision-makers push forward with a case by focusing on possibly tainted evidence that is consistent with their theory of the case, and downplaying the significance of information that is inconsistent with their theory.

## VII. Facets of a Reliability Analysis

Given all of the above, fact-finders and observers cannot simply read or listen to a confession and make a judgment call about its veracity or reliability; instead they must engage in a systematic, in-depth analysis when considering its likely reliability (and therefore its probative value).[159] When conducting an analysis of the likely reliability of a post-admission narrative (i.e., the details provided by the suspect beyond an admission that the person was involved), there are

---

statement were intentional is unclear. However, given this insidious practice, and given that error corrections are commonly found in proven false confession cases, factfinders should proceed with extreme caution when interpreting error corrections as an indicium of reliability and/or voluntariness.

[153] Appleby et al. (2013); Kassin (2012); Leo (2008)

[154] Based on the National Registry of Exonerations database, false confessors are three times more likely to plead guilty than innocent exonerees who did not falsely confess (NRE.Guilty.Plea.Article4.pdf (umich.edu)).

[155] Drizin & Leo (2004)

[156] Kassin (2012), p. 440

[157] Dror & Charlton (2006); Elaad, Ginton & Ben-Shakhar (1994); Hasel & Kassin (2009)

[158] Kassin, Bogart & Kerner (2012)

[159] Even with this process, there is no way to know with 100% certainty whether a statement is true or false without other independent objective evidence that clearly exonerates or implicates the suspect. There is simply no "crystal-ball" method of merely examining a statement and determining its veracity.

three key conceptually overlapping questions triers-of-fact should consider: 1) to what extent is the post-admission narrative consistent with, or inconsistent with, the objective evidence/facts of the case, and to what extent is that narrative complete?; 2) did the post-admission narrative contain non-public details (i.e., details that were withheld from the public by the police) that only the true perpetrator would know, ***but which were not unintentionally or intentionally leaked by investigators?***; and 3) did the post-admission narrative lead to independent corroborating evidence (i.e., did the person provide details not known to the police at the time of the confession but that were later corroborated)? The more consistent and complete the post-admission narrative, the more non-public details provided (that could not be or were not the product of contamination), and the more independent corroborating evidence the statement led to, the greater the likelihood that the statement is reliable.

    I will now discuss each of the three specific facets of a reliability analysis that experts such as myself use to provide guidance to fact-finders on how to assess the reliability of a statement;[160] this framework may be of use to triers of fact as they evaluate the reliability of a statement in the larger context of a case, evidence, and trial.

    **<u>Accuracy and Completeness of the Narrative.</u>** In general, the more consistent the details of a statement are with the known, objective facts/evidence in a case, and the more complete the statement is, the more likely it is that the statement is reliable. When examining consistency, one should consider the extent to which the subject provided accurate details, keeping in mind how accurate details are defined. For the purpose of a reliability analysis, accurate details are those that are corroborated by other *objective* evidence. Providing details that cannot be corroborated[161] or can only be corroborated by another source that might also be inaccurate[162] is not nearly as informative for the purpose of a reliability analysis as details that can be or have been verified via more

---

[160] This analysis can be applied in equal measure to suspect admissions/confessions and witness statements.

[161] Examples of details that cannot be verified are statements made by the victim or perpetrator prior to the victim's death (assuming they were the only ones present and there is no recording of the event), details of what the victim or perpetrator did (that cannot be verified by forensic evidence), and the thoughts, feelings, or motives of the perpetrator. Reid refers to these types of the details as *rational corroboration* (Inbau et al., 2013), an arguably ironic word choice given that these types of details do not actually corroborate anything (since there is no way to objectively verify the accuracy of these details). Inbau et al. acknowledge that this type of "corroboration" is far weaker than dependent or independent corroboration. From a reliability analysis standpoint, these types of details are essentially useless (yet they can be dangerously compelling and misleading to fact-finders).

[162] For example, in a situation that involves two alleged co-conspirators, if one of the suspects provides a statement containing details about what the victim said or did before he died, and those statements are corroborated by the other co-conspirator, that sort of corroboration has limited utility if you cannot eliminate the possibility that the second co-conspirator's statement is a product of contamination (i.e., from being exposed to the details that the first co-conspirator provided). It is tempting to view the statements made by the two alleged co-conspirators as corroborating one another and therefore an indicium of reliability. However, assuming there was no objective recording of the victim's words, if contamination occurred, then all that the statements do is provide an illusion of corroboration because there is simply no way to establish through objective, untainted evidence that the statements attributed to the victim are accurate.

objective or reliable evidence. It is also important to recognize that the presence of accurate details alone is not a foolproof indicator of veracity because the accurate details may have been learned via various sources, such as other witnesses, media reports, or from investigators during the questioning process (see "Dependent Corroboration: Presence of Non-Public Details" for an in-depth discussion of this issue). It is also informative to consider the extent to which the subject provided *inaccurate* or *inconsistent* details (particularly if the inconsistent details are core details), as this weighs against the likely reliability of the statement. Inconsistent details are often present in false statements because the person giving the statement lacks guilty knowledge, and therefore may land up incorrectly guessing at some details or because they misremember the details they may have been exposed to during the interview process. Inaccurate details can be especially informative if the inaccurate detail was something that the investigators believed at the time of the interrogation but later turned out to be objectively false as it suggests contamination likely occurred. Finally, one should consider the *completeness* of the narrative. In other words, are there any noticeable gaps or details that are missing in the person's story that it seems they should have been able to provide? Relatedly, to what extent did they fail to account for known evidence/facts?

***Dependent Corroboration: Presence of Non-Public Details.*** One of the features that make false confessions so compelling is that they often contain details about the crime that police have withheld from the public that only the true perpetrator would know (aka 'inside information').[163] If police and prosecutors withhold certain details from the public/media **as well as from the suspect during interrogation** (and knowledge of those details cannot be attributed to another source), and an interviewee is able to provide those details, this is a strong indicia of reliability. In other words, it is an indication that the person possesses guilty knowledge of the crime either as a witness or perpetrator. Withholding certain details about the crime so that investigators can test the credibility of a subject is standard police practice,[164] and when 'inside information' is present in a person's statement or confession, it should rightfully increase an investigator's confidence that the statement being provided is true (assuming an untainted collection process). When a person provides non-public details, that is generally referred to as *dependent corroboration*.[165] However, non-public details in a statement are only an indicium of reliability ***if the details were not intentionally or unintentionally leaked to the subject by investigators***. If non-public details about the crime are leaked to a suspect, researchers refer to this as *contamination*.[166] Contamination can be intentional (e.g., purposefully telling a suspect 'we found a black rope around the victim's neck so we know she was strangled') or unintentional (e.g., unwittingly providing details via leading or suggestive questions). The process of contamination (i.e., the communication of non-public details) can be overt (i.e., information communicated directly via words) or subtle

---

[163] DeClue & Rogers (2015); Garrett (2010; 2015)
[164] Inbau et al. (2013)
[165] Inbau et al. (2013)
[166] See Leo (2008) and Leo & Drizin (2010) for an overview of the contamination error.

(e.g., via intonation, tone, facial responses, and other non-verbal behavior while asking questions or reacting to suspect's response). Contamination can also occur in other ways such as overhearing other knowledgeable parties talking (e.g., victims, witnesses, investigators) or by being exposed to crime scene photos or other evidence.

The fundamental problem when contamination occurs is that non-public details that have been leaked that appear in a subject's statement **are no longer probative**, in that there is no way to tell after the fact whether the person knew those details because s/he possessed actual guilty knowledge or because those details were leaked to him/her. Therefore, the presence of non-public details consistent with objective facts/evidence are only probative if we can eliminate contamination as a possible source of the information. When investigators choose to memorialize the entirety of an interview/interrogation by recording it, we have an objective record of what occurred during the interaction, and we can determine with certainty whether investigators contaminated the statement. However, when investigators do not record at all or record only portions of their interactions with a subject, we cannot eliminate the possibility of contamination.

It is particularly problematic when non-public details appear in false confession cases precisely because the non-public details are often pointed to as strong indicators that the statement is true (in fact, investigators are often trained to make sure to include non-public details in confession statements because it makes the statements more compelling to judges/juries).[167] Contamination is a known and recognized problem in proven false confession cases. An examination of 66 DNA exoneration cases between 1989 and 2014 involving false confessions indicates that contamination occurred in 94% of those cases. The non-public details in the confessions were used as evidence of the reliability of the suspects' confessions, and of those cases that went to trial, in all but one, police officers denied having revealed these non-public details to the suspects.[168] Although it is possible that investigators deliberately lie at trial about not having revealed non-public details to subjects, it is also quite likely that investigators are often simply unaware of the fact that they leaked those non-public details (e.g., in the form of leading questions, reinforcement of certain responses, etc.). Therefore, investigators may truly believe they did not contaminate a person's statement or confession even when they did.

**Independent Corroboration: Details Unknown to Police but Later Corroborated.**
The gold standard for establishing the reliability of a statement is to see if the statement led to *independent corroboration*. This occurs when a person provides details in his/her statement *that were not known to investigators at the time of the statement* and *those details could later be independently verified via objective evidence*. Examples of independent corroboration would be if a suspect told investigators where he disposed of the murder weapon or the victim's possessions (and investigators subsequently located those items where the suspect indicated they would be) or if the suspect provided information about a location where (unbeknownst to police) part of the crime occurred, and investigators were able to recover forensic evidence that verified the details of what

---

[167] Inbau et al. (2001, 2013); Leo (2008)
[168] DeClue & Rogers (2015); Garrett (2010; 2015)

occurred in that location (e.g., bullets recovered, DNA from the victim, etc.). Triers of fact should consider independent corroboration a strong indicium of reliability.

## VIII. Specific Risk Factors Identified in the Jaime Rios Case

In this section of the report, I will identify the known risk factors associated with false confessions that either were or might have been present in Mr. Rios' case based on my review of the case materials provided to me.[169]

### *Confirmation Bias*

When assessing whether and to what extent confirmation bias might have played a role in a case, we can look for signs that a guilt-presumptive mindset potentially shaped investigator behavior. There are numerous examples throughout the course of the investigations involving Mr. Rios that investigators might have experienced confirmation bias (and relatedly, belief perseverance) based on how they purportedly conducted interviews/interrogations. One of the hallmark features of confirmation bias is a guilt-presumptive approach to interviewing and interrogation. Recall that confirmation bias, or tunnel vision, can lead to a process of behavioral confirmation – a social psychological phenomenon in which our beliefs or expectations about a person causes us to act toward that person in ways that elicit behavior from that person that confirms our initial beliefs or expectations.[170] Empirical research has demonstrated that this process can put innocent persons at risk in the interrogation room. Investigators who form a belief that the suspect is guilty conduct more accusatorial, confirmatory, guilt-presumptive interrogations. Suspects who are interrogated in this way (as compared to a more neutral, information-gathering style) are in turn more likely to be perceived and judged as guilty, and innocent subjects more likely to falsely confess.[171]

Based on Mr. Rios' account, Officer Guevara and Det. Mason interviewed him with a highly guilt-presumptive approach. To understand how such a presumption might have developed, it is helpful to understand how Mr. Rios first became a suspect in the Morales homicide. In the immediate aftermath of the homicide, descriptions of two perpetrators were provided by circumstantial witnesses, and an eyewitness, Mr. Javier Torres (who was with Mr. Morales when he was shot), specifically named a Mr. Jose Melendez (aka 'Macho Melendez') as the shooter. According to the statement he gave to police on June 28, 1989, Mr. Torres and Mr.

---

[169] I do not assume or take a position on Mr. Rios' guilt or innocence, nor the ultimate veracity of the statement he provided. What I do in this report is identify the risk factors that, if present, would have increased the likelihood of a false statement if Mr. Rios is innocent. I also form an opinion as to whether the totality of the interrogation circumstances (if you credit Mr. Rios' account) would have produced statements that triers-of-fact can confidently rely upon. Although my analysis focuses on Mr. Rios' confession, a number of risk factors I discuss were or might have been present with respect to Mr. Carrero's statement.

[170] See Darley & Fazio, 1980, and Snyder, Tanke & Bercheid, 1977 for explanations of this basic phenomenon.

[171] Hill, Memon & McGeorge (2008); Kassin et al. (2003); Liden, Grans & Juslin (2018); Meissner & Kassin (2004); Narchet et al. (2011)

Morales (aka 'New York') were in the vicinity of Western and Potomac Avenues, and they saw and heard people in a brown four-door Buick ask Mr. Melendez for some marijuana in an alley. The car left the area after Mr. Melendez indicated that he did not have any, and they saw Mr. Melendez return to Western Avenue. Mr. Torres and Mr. Morales then walked through a gangway toward Western Avenue, and when they emerged on the sidewalk, they encountered Mr. Melendez and a second offender. Mr. Melendez grabbed Mr. Morales, both offenders shouted "Latin Kings", and Mr. Melendez shot Mr. Morales. Both offenders fled east across Western Avenue, and the second offender shot three to five times in the air before disappearing in an empty lot at 1315 N. Western. Mr. Torres expressed certainty that Mr. Melendez was the shooter, although he did not recognize the second offender.[172] He subsequently picked Mr. Melendez out of a gang book full of mug shots (and according to Detective William Johnson's trial testimony, he did not pick out Mr. Rios' photo from that same book)[173]. A second circumstantial witness (Mr. Mario Flores, Mr. Torres' cousin) also identified Mr. Melendez' photo as the person he saw in the general vicinity approximately 25 minutes before the shooting. Shortly after the shooting, Mr. Torres told Mr. Flores that Mr. Melendez was the shooter.[174]

Police interviewed Mr. Melendez and appeared to dismiss him as a suspect after he provided an alibi[175] and other possible witnesses[176] did not identify him from a lineup. At that point, Mr. Torres was re-interviewed and informed that Mr. Melendez had an alibi and that a witness had failed to identify him. Mr. Torres then purportedly expressed uncertainty that Mr. Melendez was the shooter and recanted his identification.[177]

---

[172] JGS_RIOS 00084-JGS_RIOS 00088

[173] PFP000566-PFP000578

[174] JGS_RIOS 00084-00093; Trial Testimony of Daniel Noon; JGS-RIOS 00087; According to Detective Johnson's trial testimony, Mr. Flores also did not select Mr. Rios' picture form a Latin King gang book.

[175] Mr. Melendez voluntarily sought out the police after he heard they were looking for him. He said on June 27, 1989 between 11:10pm and 11:30pm, he was at a Holiday Inn eight miles away waiting for his cousin to get off of work, drove his cousin home, and then arrived at his own home shortly after midnight. Mr. Hector Martinez, the cousin, confirmed that Mr. Melendez arrived at the hotel between 10:30 and 11:00pm, and he was in Mr. Melendez' car with him from approximately 11:35pm to midnight (JGS_RIOS 00084-00093)

[176] Ms. Samantha Hudson said that at approximately 11:30pm she interacted with two people in an alley at 2419 W. Potomac, one of whom had a small black handgun. She watched them head eastbound on Potomac, and then turn north on Western, and shortly after she heard several gunshots (JGS_RIOS 00082-JGS_RIOS 00083; JGS_RIOS 00084-00089). She did not identify Mr. Melendez from a live lineup (JGS_RIOS 00094-00095) on June 28, 1989 at approximately 5:20pm.

According to a Supplementary Police Report, the day after the shooting, Mr. Luis Huertas relayed to police that at approximately 11:45pm on June 27, 1989, he was at 1310 North Western, and two men walked past him heading northbound on Western Avenue from Potomac. These two men represented that they were members of the Spanish Cobras gang. He said he saw Mr. Melendez (a friend of his) and Mr. Torres exit the gangway located at 1316 North Western, and after Mr. Melendez said "what's up?", the first offender shot at Mr. Melendez. At that point, Mr. Torres began running westbound through a vacant lot, and the second offender shot in the direction of Mr. Torres. He then saw both offenders head east across Western Avenue. Mr. Huertas said that he recognized one of the offenders from the neighborhood but did not know the person's name. Mr. Huertas did not select Mr. Melendez from a lineup on June 28, 1989 (JGS_RIOS 00094-00095). Mr. Huertas did select Mr. Rios from a live lineup on July 7, 1989 (JGS_RIOS 00100); he recanted that identification in 2020 (see Footnote 5).

[177] JGS_RIOS 00084-00093

The next break in the case occurred on July 6, 1989 when two confidential informants purportedly told investigators they had heard a rumor that a 'Jaime' and a 'Tino' had committed the Morales murder.[178] There is much mystery in the record surrounding the alleged confidential informants (CIs) in this case. Their identities were never revealed, and the record is muddy as to who purportedly had direct contact with the informants. Officer Guevara testified at Mr. Rios' trial that a CI (or two) gave him the names 'Jaime' and 'Tino' and specified Jaime as the shooter. Officer Guevara said he knew 'Jaime' to be Mr. Jaime Rios (who he had had previous contacts with, knew Mr. Rios' mother, and knew him to be a member of the Latin Kings). Officer Guevara described the CIs as 'reliable' because he said they had provided information in the past that had led to arrests and convictions. In a 7/7/1989 Supplementary Report written by Dets. Mason and Ernest Halvorsen, they reported being informed by Gang Crimes Specialists Guevara and Gawrys about information from a reliable informant, and then also from Lieutenant Kijowski that a reliable informant named a Jaime as the shooter and Tino as the second offender who fired several shots at Mr. Torres as he ran away.[179] However, during his deposition, Det. Mason testified that Officers Guevara and Gawrys brought two male confidential informants in on July 6, 1989, and that the CIs directly told Det. Mason that Mr. Rios was one of the offenders.[180]

What is clear from the record is that when Officers Guevara and Gawrys brought Mr. Rios into Area 5 on July 7, 1989, they believed he was involved in the Morales homicide based on rumors heard by one or two CIs, and they communicated that belief to Dets. Mason and Halvorsen. Mr. Rios described being subjected to an extremely guilt-presumptive interrogation, in which he was repeatedly accused of being involved in the homicide, and his denials were rebuffed and disbelieved. He claimed it was only after he was physically assaulted by Det. Mason and after Officer Guevara threatened to take his baby away that he provided a false confession (see 'Situational Risk Factors' section of this report for a more detailed description of Mr. Rios' account of his interrogation).[181] If investigators approached Mr. Rios' interrogation with the preexisting belief that Mr. Rios was guilty and interrogated him in the manner that Mr. Rios' describes, it would be the very definition of a guilt-presumptive interrogation in which the goal was not necessarily to find out the truth – whatever that might be – but rather to elicit incriminating statements that would confirm what investigators walked into the room believing.

There are also indications in the record that suggest that confirmation bias might have taken insidious root throughout the investigation of this case. For example, there appears to have been little to no follow-up investigation of some key details and discrepancies provided by Mr. Rios in his statement (e.g., that another shooting had occurred in front of Mr. Rios' house on June 28, 1989; that he had discarded the gun he used in a lake; that he had discarded the gun two weeks after the murder, which was clearly impossible; according to police, Mr. Rios' home was never searched, even after he confessed to participating in the Morales homicide; there is no indication that Mr. Garcia's home was ever searched despite him having been implicated as the shooter).[182] This lack of follow-up could indicate that confirmation bias was leading investigators to readily accept information that was consistent with their theory of case (i.e., the CIs information; Mr. Rios implicating himself) with relatively little scrutiny.

---

[178] Trial Testimony of Reynaldo Guevara
[179] JGS_RIOS 00103-JGS_RIOS 00105
[180] Deposition of Michael Mason (6/23/2023)
[181] Deposition of Jaime Rios (6/30/23); Trial Testimony of Jaime Rios
[182] Jaime Rios' Court-Reported Statement (PFP000086-PFP000096); see Reliability Analysis section of this report for more details about the inconsistencies in Mr. Rios' statement.

There are also suggestions in the record that investigators might have placed less weight on information that was inconsistent with their theory of the case, key features of confirmation bias and belief perseverance. For example, there is also little indication in the record to suggest that investigators seriously re-evaluated their theory of the case after Mr. Torres failed to identify Mr. Rios from the lineup, Mr. Garcia failed to provide an incriminating statement (especially if he was subjected to the coercive interrogation he described), the CIs information about where the guns could be found turned out to be unreliable, and the gun recovered at Mr. Carrero's home did not match the murder weapon nor the gun Mr. Rios said he was carrying that night.

### Individual Risk Factors

Although most of the potential risk factors in the case fall under the category of situational risk factors, there is one individual vulnerability, namely youth, that is relevant to consider in this case. Although was not a legal juvenile, Mr. Rios was only 19 years old at the time of his interrogation (and he had not graduated from high school).[183] As discussed in Section V of this report, younger people (including adolescents and young adults) are over-represented amongst known false confessors, and areas of the brain that are responsible for decision-making, judgement, and risk assessment do not fully develop until the early twenties.[184] Thus, Mr. Rios' status as a young adult represents a vulnerability that might have increased the likelihood of him providing a false confession.[185]

### Situational Risk Factors

According to Mr. Rios' account, numerous situational risk factors were present in this case that are associated with a higher likelihood of eliciting a false statement.

**_Prolonged custody, isolation, and interrogation._** The record suggests that Officers Guevara and Gawrys located Mr. Rios in front of his residence between 9:00 and 9:30pm on July 6, 1989, Officer Frank Vukonich testified that he received a radio call at 9:30pm from Officers Gawrys and Guevara who told him that they were on their way to Area 5 with Mr. Rios at that time.[186] The interview that resulted in Mr. Rios' court-reported statement began at 4:39am and was completed at 4:51am on July 7, 1989.[187] We also know that the entire process of taking Mr. Rios' court-reported statement and having him sign it was completed by 6:10am on July 7, 1989

---

[183] Mr. Rios was two months shy of his 20th birthday (Jaime Rios' Birth Certificate; Jaime Rios' Driver's License).

[184] Feld (2013); Johnson et al. (2009); Kassin et al. (2010); Woody & Forest (2020)

[185] Mr. Benjamin Carrero was also 19 years old at the time he provided his statement to police that he now claims was a coerced false statement (PFP007232).

[186] Trial Testimony of Frank Vukonich; Mr. Rios reported being handcuffed and placed in an unmarked police car, and that during his time in custody, he believed he was under arrest and not free to leave (Jaime Rios' Motion to Suppress Testimony; Deposition of Jaime Rios, 6/30/23). The detectives involved maintain that Mr. Rios was not under arrest until after he made an incriminating verbal statement sometime after midnight, and that Jaime went to the station with them voluntarily (Trial Testimony of Michael Mason, Deposition of Michael Mason, 6/23/2023; Reynaldo Guevara Motion to Suppress Testimony).

[187] Jaime Rios' Court-Reported Statement (PFP000086-PFP000096)

because that is when the court-reporter, Ms. Janet Lupa, took a picture of Mr. Rios.[188] Although Det. Michael Mason testified that Mr. Rios was allowed to see and speak with the mother of his child (Ms. Diana Rodriguez) while at Area 5, Mr. Rios and Ms. Rodriguez dispute this, and Officer Guevara, Det. Halvorsen, and Assistant State's Attorney Barbara Riley have no memory of seeing Ms. Rodriguez at the station that night.[189] If you credit Mr. Rios account, he was isolated during the entirety of the time he was at Area 5 from any social support or communication with friends or family.

At a bare minimum, Mr. Rios experienced approximately 7 hours and 21 minutes of combined custody[190] and interrogation time from the time he was taken to Area 5 until the completion of the oral statement at 4:51am. Because investigators did not electronically record Mr. Rios' time at Area 5, nor did they take detailed contemporaneous notes, it is impossible to determine with certainty what portion of those seven plus hours involved active questioning. According to police accounts, Mr. Rios was actively questioned for approximately two 30-minute sessions, prior to the court-reported statement being taken.[191] However, as previously discussed, the most important metric is the entire length of combined custody and interrogation when considering the extent to which elapsed time was a risk factor. Given the entire length of custody and interrogation, Mr. Rios would have been at heightened risk for providing a false confession, particularly if you credit his account of other coercive techniques being used such as physical abuse and explicit threats and promises.

***Physical abuse/physical discomfort/deprivation of basic necessities.*** Mr. Rios' account of his experience in police custody includes allegations of physical abuse, and it raises the possibility of physical discomfort and deprivation of basic necessities as well. According to Mr. Rios, after Mr. Rios told detectives that he did not know anything about the Morales homicide, Det. Mason grabbed him by the hair on the back of his head and slammed his face against the table. Although he was not injured, he rated his pain as a 9 on a scale from 1-10. [192]

---

[188] Ms. Lupa testified during her deposition that after she typed up a statement, she would give the statement to the state's attorney who would review it with the detective and the deponent, and once they were done, she would go in and take a picture (which was signed and dated).

[189] Michael Mason's Motion to Suppress Testimony; Ernest Halvorsen Motion to Suppress Testimony; Barbara Riley's Motion to Suppress Testimony; Reynaldo Guevara Motion to Suppress Testimony

Ms. Rodriguez testified that she was told by police officers that Mr. Rios wanted to talk to her, and they asked her if she wanted to accompany them to the police station shortly after officers had left with Mr. Rios. Once at the station, she described being questioned for hours by multiple officers, with police badgering her to tell them what she knew. She said that they suggested that she could be arrested for accessory to murder and that they were going to take her baby away. She said she was never allowed to speak or interact with Mr. Rios, despite asking to see him three times. She said she was released at 3:40am, and when she asked to see Mr. Rios at that time, she was told he was sleeping (Diana Rodriguez' Motion to Suppress Testimony; Trial Testimony of Diana Rodriguez). Mr. Rios also testified that despite him asking to see Ms. Rodriguez once police told him she was at Area 5, he was never allowed to see or talk to her (Trial Testimony of Jaime Rios; Deposition of Jaime Rios [6/30/23]).

[190] For the purpose of this analysis, my use of the word custody does not imply that Mr. Rios was or was not under arrest. I simply use it to represent the period of between when he was picked up by police (voluntary or not) until the time he finished giving his court-reported confession.

[191] Trial Testimony of Michael Mason; Trial Testimony of Barbara Riley

[192] Trial Testimony of Jaime Rios; Deposition of Jaime Rios (6/30/23)

It also appears that Mr. Rios was not provided any food. During his court-reported statement, he was asked if he had anything to drink, and he responded that he had some water. He was not asked if he had eaten, and nowhere in the record is there an indication he was ever asked if he was hungry or provided food. Moreover, according to Mr. Rios, he was handcuffed with his hands behind his back or to a ring on the wall for long stretches of time, raising the concern that physical discomfort might have been a factor as well.

There is no dispute that physical abuse can cause false confessions. As previously discussed, these tactics are illegal not only because of voluntariness concerns but also because of concerns that they will lead to unreliable statements. Police training manuals emphatically caution against the use of these tactics and recognize that even a brief interrogation that involves physical abuse can lead to a coerced and/or unreliable statement.[193] Physical pain and discomfort leads to myopic thinking, with a focus on our short-term needs as opposed to long-term outcomes. To the extent that Mr. Rios experienced physical abuse, physical discomfort, and/or deprivation of food, that would have placed him at dramatically high risk for providing a false confession – and Mr. Rios himself directly attributes his decision to sign what he contends is a false confession to the physical abuse he says he experienced.[194]

**_Sleep deprivation_**. Sleep deprivation was likely a risk factor in Mr. Rios' case, given that his oral court-reported confession did not finish until 4:51am, and it was not signed until approximately 6:10am.[195] There is no indication in either police accounts or Mr. Rios' account that he was afforded an opportunity to sleep during his time in custody.

**_Guilt-presumptive approach: Direct positive confrontation, shutting down denials, and poor questioning techniques_**. Unfortunately, we do not have an objective record of what occurred during Mr. Rios' interrogation. The questioning sessions were not recorded, and to my knowledge, no one chose to take and/or keep detailed notes of exactly what was said and by whom. As such, there is no objective, comprehensive, and contemporaneous record of the questioning and interrogation techniques that ultimately led to Mr. Rios' confession statement.

However, based on Mr. Rios' description of what occurred, the investigators involved in questioning Mr. Rios seemed to utilize a fairly classic guilt-presumptive, accusatorial interrogation approach, which included the use of direct positive confrontation, shutting down denials, and poor questioning techniques.[196] More specifically, Mr. Rios described interrogation sessions in which investigators repeatedly accused him of being involved in the Morales homicide (confronting him with the information from the CIs), and they refused to believe his denials. With respect to poor questioning strategies, Mr. Rios said that the crime-specific details

---

[193] Inbau et al. (2001, 2013); Leo (2008)
[194] Trial Testimony of Jaime Rios; Deposition of Jaime Rios (6/30/23)
[195] Deposition of Janet Lupa (9/25/23); Jaime Rios' Court-Reported Statement (PFP000086-PFP000096)
[196] Mr. Rios believes there were at times up to six officers present during portions of his custody and interrogation, although he testified that it was primarily Detective Mason and Officer Guevara that actively participated in the questioning (as well as ASA Barbara Riley) (Deposition of Jaime Rios, 6/30/23; Trial Testimony of Jaime Rios). In contrast, according to police accounts, Officer Guevara never questioned Mr. Rios, and only Det. Mason, Det. Halvorsen, and ASA Riley participated in questioning Mr. Rios (Michael Mason's Motion to Suppress Testimony; Ernest Halvorsen's Motion to Suppress Testimony; Barbara Riley's Motion to Suppress Testimony; Reynaldo Guevara's Motion to Suppress Testimony).

and narrative contained in the court-reported statement he gave and signed were fed to him throughout the course of the interrogation by investigators telling him with their theory of the case and what they believed Mr. Rios and Mr.Garcia did. The leading and suggestive questioning process he described even included at one point Det. Mason drawing on a whiteboard as Det. Mason mapped out and described what Mr. Rios allegedly did and what happened.[197] Dets. Mason and Halvorsen and Officer Guevara by their own testimony acknowledge that they provided at least some details and facts about the case to Mr. Rios.[198]

Recall that a guilt-presumptive approach to interrogation that involves direct positive confrontation and shutting down denials creates anxiety and a sense of hopelessness that there is no way out of the interrogation situation other than to cooperate by providing an incriminating statement, even for innocent persons. Consistent with this phenomenon, Mr. Rios testified during his trial that he agreed to make a statement in part because he felt like he had no other choice. Furthermore, one of the primary concerns surrounding the use of leading/suggestive questions and statements is that (either intentionally or unwittingly) investigators may contaminate a person's statement by communicating details about the crime or investigators' theory of the case to the suspect. If such problematic techniques were used during Mr. Rios' interrogation, it makes it difficult for fact-finders to determine whether the details provided in his confession statement were present because he possessed actual guilty knowledge or because those details were simply a product of contamination and investigator influence during the questioning. As a result, the probative value of the inclusion of such details in his statement is weak at best.

***Presentation of false/unreliable evidence.*** Although legally permissible under most circumstances,[199] the presentation of false evidence unequivocally increases the risk of eliciting a false statement from an innocent person or a person that lacks guilty knowledge. It is especially pernicious when paired with other problematic techniques, such as implying leniency in exchange for a confession or threatening other negative consequences. Mr. Rios testified that investigators told him that people had implicated Mr. Rios and 'Tino' in the Morales homicide. It is reasonable to assume that the 'people' investigators were referring to were the alleged confidential informants because according to Det. Halvorsen, there was "absolutely no real evidence that he [Mr. Rios] was an offender in this case" prior to Mr. Rios' confession, other than information from the alleged CIs.[200] At trial, Det. Mason confirmed that he told Mr. Rios that he had been named by the CIs.[201]

As previously discussed, when confronting suspects with evidence of guilt, and when considering the psychological impact such confrontation is likely to have, it important to consider the inherent reliability of the evidence presented. This is because if the evidence presented existed (i.e., the CIs did provide the information), but it was unreliable information (i.e., the information the CIs provided was actually false), then by telling Mr. Rios he had been named by CIs, it would have constituted the functional equivalent of the presentation of false or fabricated evidence – and that would have increased the likelihood of a false confession from

---

[197] Trial Testimony of Jaime Rios; Deposition of Jaime Rios (6/30/23); See Dependent Corroboration section of this report for a more detailed description of the details Mr. Rios said were fed to him.
[198] Ernest Halvorsen's Motion to Suppress Testimony; Reynaldo Guevara's Motion to Suppress Testimony; Deposition of Michael Mason; Trial Testimony of Reynaldo Guevara
[199] Frazier v. Cupp (1969); Leo (2008)
[200] Ernest Halvorsen's Motion to Suppress Testimony
[201] Trial Testimony of Michael Mason

Mr. Rios. Although Officer Guevara said he believed the CIs to be reliable because he claimed they previously provided information in other cases that led to arrests and convictions, we know that the CIs were not first-hand eyewitnesses to the Morales homicide, and that information they provided was rumor on the streets.[202] Furthermore, we know that some of the information the CIs later provided with regards to this case (i.e., where the weapons involved could be found) was not able to be substantiated when those locations were searched.[203] Fact-finders should consider the likely reliability of the CIs information, and based on that analysis, consider whether they believe that false evidence was a risk factor present in Mr. Rios' interrogation.

     ***Threats and promises (explicit and implied).*** Explicit and implicit threats of negative consequences for continued denial (e.g., harsher punishment; loss of parental rights) and explicit and implicit promises of a benefit or instrumental gain (e.g., a lighter sentence; being treated as a witness instead of a suspect; being able to go home) in exchange for an incriminating statement is a significant and powerful risk factor for eliciting compliant false confessions/statements.[204] Threats and promises are often presented in concert (e.g., if you continue to deny, things will be much worse for you [threat], but if you tell us the truth, you can help yourself out [promise]). Mr. Rios has consistently maintained that one of the reasons he provided a false confession was because Officer Guevara threatened that if he did not provide a statement and go along with what the investigators were saying, his two-month-old baby would be taken away from him. He further testified that investigators told him that if he just placed himself at the scene of the crime, then they would not take his son away. The suggestion that if he 'just placed himself there' carries with it the implied promise that he would be treated more leniently (and perhaps as a witness). Mr. Rios said that the threat about his son (and accompanying promise) occurred after Det. Mason had physically assaulted him by slamming his face on the table. When asked why he agreed to make the statement, Mr. Rios testified "Because I was scared. I didn't have no other choice. I just was scared to lose my son. He wasn't nothing but two months. And I was protecting him."[205] When asked why he did not tell ASA Riley when he was alone with her that he had been threatened and physically abused, Mr. Rios explained that it was because she was working with the police, and he was worried that they would take his son away from him.[206]

     Compliant false confessions and statements are generally provided for some sort of instrumental gain or benefit. That gain or benefit can come in the form of wanting or needing to escape an aversive situation (e.g., prolonged custody and interrogation that involves physical abuse and external pressure) or the belief that you will receive some a reward or benefit (e.g., not being charged; avoiding another harm). Communicating to an innocent person that the quickest way to end an aversive interrogation and avoid serious negative consequence(s) is to provide at statement increases the risk of eliciting a false statement.[207] All of the law enforcement personnel and ASA Riley categorically deny threatening or abusing Mr. Rios or witnessing anyone else threaten or abuse Mr. Rios. It is up to the fact-finder to determine who to believe; however, if the

---

[202] Trial Testimony of Michael Mason; Trial Testimony of Reynaldo Guevara; JGS_RIOS 00100
[203] Trial Testimony of Michael Mason
[204] Horgan et al. (2012); Kassin (2022); Klaver et al. (2008); Luke & Alceste (2020); Russano et al. (2005); Narchet, Meissner & Russano (2011)
[205] PFP002578-PFP002575
[206] Trial Testimony of Jaime Rios
[207] Horgan et al. (2012); Kassin et al. (2010); Kassin & McNall (1991); Russano et al. (2005); Luke & Alceste (2020)

fact-finder believes Mr. Rios was threatened with the loss of his child, it is this expert's opinion that it would represent an explicit threat so serious and powerful that it would have placed Mr. Rios at very high risk for providing a false confession.[208]

## IX. Reliability Analysis

As discussed in Section VII of this report, a post-hoc reliability analysis of a confession (or witness statement) can assist triers of fact in determining the likely reliability and/or probative value of a given statement. In addition to the framework I provided in Section VII, I offer some examples of issues to consider with respect to Mr. Rios' statement within each category of the framework to guide fact-finders on the process of how to conduct such an analysis.

### *Accuracy and Completeness of the Narrative*

Fact-finders should consider the extent to which Mr. Rios was able to provide details of the crime consistent with the known, objective evidence in the case.[209] In general, the more consistent the details, the more likely it is the statement is reliable. However, it is critical to keep in mind that consistent details provided are only probative if the presence of those details were not or could not have been a product of contamination. Fact-finders should also consider the extent to which Mr. Rios provided *inconsistent* or inaccurate details, as this would weigh against the reliability of the statement, as well as the extent to which his narrative was complete (i.e., he provided the type and amount of core details that he presumably should have been able to provide to form a relatively complete picture of what occurred if was in fact guilty/knowledgeable).

Mr. Rios' statement included the following details that were consistent with the **objective** evidence in the case:[210]

- Mr. Morales was shot on the evening of June 27, 1989 near an empty lot on Western Ave on the north side of Potomac Avenue.
- Mr. Morales might have been shot with a small caliber weapon (possibly a .25).
- There was a car near where Mr. Morales was shot.

[208] Mr. Rios testified that police investigators told him that both Ms. Rodriguez and his baby son were present at the police station (Deposition of Jaime Rios, 6/30/23; Trial Testimony of Jaime Rios). If Mr. Rios believed that his son was in police custody at the same time that he was being threatened that if he that his son would be taken away if he did not provide an incriminating statement, this likely would have heightened the impact and believability of the threat.

[209] Remember that any details that cannot be verified or have only been verified through other potentially problematic means (e.g., a witness statement elicited under conditions that might elicit an unreliable statement) are not useful in a reliability analysis (see section VII).

[210] For the purpose of this reliability analysis, I will consider the initial statements by the Mr. Huertas, Mr. Torres, and Ms. Hudson as objective evidence because they were given prior to Mr. Rios becoming a suspect (and therefore the details contained in their statements are less likely to be products of contamination). However, it is always important to consider the inherent reliability of different types of evidence when weighing its utility; eyewitness evidence – even when given by a person who is trying to be as cooperative and accurate as possible – can be fallible, especially with respect to peripheral details (see reports of Dr. Geoffrey Loftus, 6/21/22 & 12/2/23, and Lane & Houston, 2021).

- Two offenders were involved in the shooting (the first offender = the shooter).
- The offenders were believed to have walked down Potomac Avenue, and then north on Western Avenue.
- Another man was with Mr. Morales that night.
- Mr. Morales was shot in the stomach area by the first offender.
- Both offenders ran back across Western Ave toward Latin King territory.
- At some point during this event the second offender (the non-shooter) shouted something.
- The second offender stopped as he was running across Western Ave toward Latin King territory and fired his gun into the air.
- Prior to the shooting, one of the men believed to be an offender interacted with and had a brief verbal exchange with someone in an alley.
- Prior to the shooting, one of the offenders was asked by someone in a four-door brown Chevy if he had any reefer; and
- Prior to the shooting, as the two offenders were walking north on Western Ave, they passed a guy sitting by a bar.

Importantly, all of these consistent details were known to detectives at the time that they questioned Mr. Rios, which means fact-finders cannot eliminate the possibility that contamination was the source of Mr. Rios' knowledge of these details (see Dependent Corroboration section below).

There were numerous inconsistencies between Mr. Rios' statement and the objective evidence in this case. The inconsistencies included:

- The number of times Mr. Morales was shot. Mr. Rios stated that Mr. Garcia shot Mr. Morales three times, whereas witnesses reported hearing three to five shots, and the autopsy revealed 5 entrance wounds.[211]
- The location on his body that Mr. Morales was shot. Mr. Rios only indicated Mr. Garcia shot towards Mr. Morales' stomach area. While Mr. Morales was shot once in the abdomen, he also was shot in the forehead, left elbow, right bicep, and right knee.[212]
- The distance between the shooter and Mr. Morales. Mr. Rios indicated that Mr. Garcia's gun was about one foot away from Mr. Morales when he was shot, however the medical examiner testified that there was no evidence of stippling, an indication of close-range firing, on Mr. Morales body or clothing.[213]
- The victim's behavior prior to the shooting. According to Mr. Rios, Mr. Morales raised his hands up in the air with his palms facing toward Mr. Garcia, but initial witness reports did not contain this detail. While Mr. Huertas initially told police that Mr. Morales said "What's up?" to the offenders, Mr. Rios does not include this detail in his statement.[214]

---

[211] JGS-RIOS 00096-JGS_RIOS 00098
[212] JGS-RIOS 00096-JGS_RIOS 00098
[213] Trial Testimony of Dr. Yuksel Konacki (PFP000363-PFP000386)
[214] A police report indicates that Mr. Huertas told police on 6/28/1989 that Mr. Morales had said "What's up?" to the offenders, and he made no mention of Mr. Morales raising his hands. However, at trial he

- The details of the physical interaction with Mr. Morales prior to the actual shooting. An initial police report indicated Mr. Torres told police that the first offender had grabbed Mr. Morales and pushed him against a car and pulled Mr. Morales down by the hair before shooting him; Mr. Rios does not include any of these core details in his statement.[215]
- The type of gun that was used to shoot Mr. Morales. Mr. Rios initially told ASA Riley that Mr. Garcia used an automatic .22 to shoot Mr. Morales. It was only after ASA Riley asked a highly suggestive leading question "A .22 or a .25?" that Mr. Rios said that Mr. Garcia had a .22 or a .25 caliber gun. The actual murder weapon was a .25 caliber (three. 25 caliber cartridge casings were found at the scene and two bullets were found lodged in Mr. Morales' body).[216]
- The timing and details of the verbal statements made by the offenders. According to Mr. Torres' initial account to police, both offenders said "Latin Kings" prior to the first offender (who he named as Mr. Melendez) shot Mr. Morales. He made no mention of the second offender shouting anything when he fired his weapon in the air after starting to run off. However, in Mr. Rios' statement, there is no mention of either him or Mr. Garcia saying "Latin Kings" before or after the shooting, and he describes shouting "King Love" from the middle of Western before he discharged his weapon in the air.[217]
- The number of shots he purportedly fired into the air. According to Mr. Torres in his initial report to police on June 28, 1989, the second offender shot three to five times in the air.[218] Mr. Rios indicated in his statement that he shot only twice into the air.
- The details of the interaction between Mr. Huertas and the offenders. On June 28, 1989, Mr. Huertas told police that at approximately 11:45pm, he saw two men walking towards him on Western Avenue. He said that those two people represented Spanish Cobras, and at that point he stood up and took a good look at

---

denied telling police that Mr. Morales had said "What's up?" and instead described Mr. Morales raising his hands (JGS_RIOS 00089-JGS_RIOS00093; Trial Testimony of Luis Huertas).

I make no credibility assessments regarding which account of Mr. Huertas should be believed. It is noteworthy from a memory perspective, however, that if his description and memory of what occurred did change over time, this would also not be particularly surprising based on how memory works. Memory is a constructive process, and information that we learn after an event ('post-event information') can be incorporated into our memories. Specifically, when people are exposed to post-event information, that information can be incorporated without intention into our memories, regardless of whether that information is accurate or inaccurate (in the latter case, this is called the 'misinformation effect'). Later it can be difficult to remember the source of a particular piece of that information ('source confusion') (see Lane & Houston, 2021 for an overview of these basic memory principles). If Mr. Huertas was, for example, learned at some point prior to his testimony that Mr. Rios said that Mr. Melendez had raised his hands, this could be an example of post-event information affecting memory.

[215] JGS_RIOS 00084- JGS_RIOS 00088; At trial, Mr. Torres testified that he had lied to police about what he saw, and he offered no explanation for why he would have lied (PFP000360-PFP000361).

[216] JGS_RIOS 00084- JGS_RIOS 00088; JGS-RIOS 00096-JGS_RIOS 00098; Trial Testimony of William Johnson

[217] JGS_RIOS 00084- JGS_RIOS 00088

[218] JGS_RIOS 00084- JGS_RIOS 00088

them.[219] While Mr. Rios included passing a sitting man on Western Avenue in his statement, he made no mention of representing Spanish Cobras to the man. Rather, he stated that that he said "What's up?" to the man, and that the man responded "What's up?" back. Mr. Rios did not mention that the man stood up at any time.

- The behavior of the second man/victim. According to Mr. Rios, the man with Mr. Melendez ran west through an empty lot. Mr. Torres there is no indication in the official police reports that Mr. Torres told police he did this; it was not until the trial ~17 months later that that detail was included in his account.[220]

- Details about when the gun(s) were drawn. According to Mr. Rios' statement, Mr. Garcia did not remove his gun from his pocket until right before he shot the victim. He also stated that he had his gun in his pocket when they went searching for Cobras to scare. Ms. Hudson told police that one of the men she saw near a garbage dumpster at the mouth of an alley shortly before she heard shots fired was carrying a gun.[221] Although Mr. Rios does not specify when he purportedly took his gun out of his pocket, he does not say that he was openly carrying it as he was walking toward the scene or while interacting with anyone. To the extent that fact-finders believe that Ms. Hudson observed the actual offenders, this is a potential (albeit minor) inconsistency.

- The nature of the interaction with someone in the alley. According to Mr. Rios' statement, prior to the shooting, he passed two guys in an alley who said "Who's that?" and Mr. Rios responded "It's me", to which they said "All right." It is unclear whether this interaction is related to the testimony of Ms. Hudson, who reported seeing two men near the mouth of an alley. If factfinders believe Mr. Rios and Ms. Hudson were reporting on the same interaction, then there are significant inconsistencies between the two accounts (e.g., Mr. Rios said there were two men, Ms. Hudson is a female and was alone; Ms. Hudson described asking the offenders why they were in the alley, and one of the offenders responding "Shut the fuck up").[222]

- Where Mr. Rios was standing in relation to Mr. Garcia. During his court-reported statement, Mr. Rios initially says he was standing at least five to eight miles away from Mr. Garcia. ASA Riley responded with a suggestive prompt of "Feet?", to which Mr. Rios said yes. Clearly his initial response is on its face inconsistent with the objective facts of the case.

- The location and disposal of the .38 caliber gun. In his statement, Mr. Rios indicated that he was carrying a .38 caliber black snub nose revolver that night, and that about two weeks later, he discarded it by throwing it in a lake. This is demonstrably a false detail in the statement. The Morales homicide occurred on June 27, 1989. Mr. Rios was interrogated and provided his statement on July 6, 1989 – just nine days later. It is clearly impossible for Mr. Rios to have discarded the weapon two weeks after the crime since two weeks' time had not even elapsed

---

[219] JGS_RIOS 00089-JGS_RIOS00093
[220] At trial, Mr. Torres testified that as soon as he saw the gun, he started running (Trial Testimony of Javier Torres).
[221] JGS_RIOS 00084- JGS_RIOS 00088
[222] JGS_RIOS 00082-JGS_RIOS 00088

between the crime and Mr. Rios' confession. If Mr. Rios was innocent, the inclusion of such an obviously false detail suggests that he was unaware (or was not keeping track of) exactly when the incident occurred and/or how long ago it was, as would be understandable when someone is inventing details about an event he does not remember and was not involved in.

In terms of the completeness of Mr. Rios' statement, he failed to provide many key details that one might have expected him to be able to provide if he actually possessed guilty knowledge. For example, although Mr. Rios mentioned that the victim fell on the ground near a car, he does not specify provide any details about the car (e.g., make, model, color). He does not provide any details about what he or Mr. Garcia were purportedly wearing, nor does he describe what Mr. Melendez, Mr. Torres, or any of the people he supposedly passed or interacted with looked like or were wearing. He does not provide accurate details about what he purportedly did with the weapon he said he was carrying that night, and he does not express any knowledge about what Mr. Garcia purportedly did with the murder weapon. Had any of these details been elicited provided, they might have served as reliable dependent corroboration or led to independent corroboration.

In sum, although Mr. Rios provided some details that were generally consistent with objective evidence in the case, we cannot eliminate the possibility that that consistency was a function of contamination by investigators given Mr. Rios' account of his interrogation. In addition, his statement contained numerous inconsistencies with objective evidence, and two demonstrably false details (i.e., when he discarded his gun; how far away the shooter was from Mr. Morales). The false detail about how far Mr. Garcia purportedly was is particularly noteworthy if investigators at the time of interrogation did not know that the medical examiner found no evidence of close-range firing. Finally, Mr. Rios' account lacked completeness with respect to a number of crime relevant details.

### *Dependent Corroboration*

Dependent corroboration are details provided by the subject that are consistent with objective evidence that investigators knew to be true at the time of the interview but were withheld from the public. The presence of such non-public details (or "inside information") in a statement weighs toward the likely reliability of that statement, but ***only*** if their presence cannot be attributed to a contaminated interview process. Fact-finders should carefully examine Mr. Rios' statement to identify if he provided any non-public details, and if so, determine the likelihood that those non-public details were suggested to him through a suggestive interrogation process.

Many of the verifiably accurate details provided by Mr. Rios were in the public realm, including the location and timing of the homicide, the fact that there were two offenders, that several gunshots were fired, and the location of Mr. Morales's gunshot wounds. This is because numerous witnesses were present in the area either shortly before, during, or after the shooting. However, Mr. Rios testified that he had not heard about the Morales homicide prior to being interrogation on July 7, 1989, and therefore we can eliminate public knowledge as a potential source of information for Mr. Rios.[223] Critically, however, every single consistent detail that Mr. Rios provided were known to investigators at the time of Mr. Rios' interrogation and confession,

---

[223] Trial Testimony of Jaime Rios

and Mr. Rios has consistently maintained that all of those details were fed to him by Det. Mason and Officer Guevara during his questioning sessions.

A review of the court-reported statement reveals that at least some of consistent crime relevant details Mr. Rios provided were communicated to him by investigators. For example, ASA Riley provides details about the date, time and locations of the crime by beginning the statement with "We are here to take the statement of Jaime Rios concerning the investigation of the fatal shooting of Luis Morales, which occurred on June 27, 1989 at approximately 11:50 p.m. at 1316 North Western."[224] Even if one assumes that Mr. Rios had previously orally provided these details, both Officer Guevara and Det. Mason acknowledged that they provided information to Jaime about the crime they were investigating (including referencing the time and location of the shooting).[225] Evidence of suggestive questioning also appears in the court-reported statement itself; as previously discussed, after Mr. Rios said that Mr. Garcia shot Mr. Melendez with a .22 caliber weapon, ASA Riley responded with a highly leading and suggestive question that communicated that it may have been a .25 caliber, despite Mr. Rios not mentioning a .25 caliber. This is an excellent example of how contamination occurs. ASA Riley suggested a non-public detail to Mr. Rios (presumably because she was aware that his .22 caliber answer was inconsistent with the forensic evidence in the case), and Mr. Rios incorporated that suggestion into his statement. Because of this poor questioning technique, the inclusion of such a detail now becomes non-probative because we have no way of knowing whether that detail is indicative of actual guilty knowledge or whether it is a product of the suggestive process.

Mr. Rios testified about how Officer Guevara and Det. Mason provided him with the details that he eventually included in his statement. For example, at his trial testimony, he stated "Well, they were telling me I was there about the guy that killed the guy, but for me to let them know where the other guy was at. And to say that I was just there with the guy that killed the guy" and "they kept telling me details and facts of a murder". He explained that Officer Guevara, and later Det. Mason, kept reviewing the details of what he had supposedly done, including that he had committed the crime with Mr. Garcia, the route that they walked that night, that they passed a guy sitting next to a bar, that he interacted verbally with someone in an alley, that the victim was shot three times, that the victim was shot near a car, that Mr. Rios had yelled in the middle of Western Avenue and shot in the air towards a building, etc. During his deposition, Mr. Rios described first Officer Guevara feeding him details about the crime and what he believed happened, and then later Det. Mason mapping out he and Mr. Garcia's purported route and action on a whiteboard as Det. Mason went over the story. If you credit Mr. Rios' account, he gleaned the consistent crime-specific details he provided in his statement through a suggestive and leading interrogation, which included rehearsal of the story, prior to giving the court-reported statement. At trial when asked how he remembered the details that he had been given by Officer Guevara, he explained that way that ASA Riley asked the questions, he could remember what Officer Guevara told him happened (in other words, it sounds like Mr. Rios was suggesting that ASA Riley's questions cued him to provide the details that had been suggested to him). The fact that Mr. Rios got some details wrong (e.g., the number of times the victim was shot, the gender of the person he interacted with in the alley) could be a function of not being able to

---

[224] Jaime Rios' Court-Reported Statement (PFP000086-PFP000096)

[225] Trial Testimony of Reynaldo Guevara; Trial Testimony of Michael Mason; For example, Officer Guevara testified at Mr. Rios' trial that when they located Mr. Rios at his home on July 6th, they told him that they wanted to question him about the shooting of 'New York' that happened on Western Avenue (Trial Testimony of Reynaldo Guevara).

accurately remember all of the details suggested to him, or him filling in gaps in the story, or it is possible that the investigators were not fully knowledgeable about the objective evidence in the case at the time of the interrogation.[226] All of these phenomena are commonplace in documented false confession cases. Fact-finders must determine the credibility of Mr. Rios' account. If fact-finders believe that Mr. Rios was exposed to the non-public details that are consistent with the objective evidence in his case through a suggestive interrogation process, then contamination occurred and the presence of those details (on its face, dependent corroboration) becomes non-probative with respect to determining the reliability of the statement.

### *Independent Corroboration*

Fact-finders should consider whether Mr. Rios' statement resulted in independent corroboration. Recall that independent corroboration occurs when a person provides a detail that was unknown to investigators at the time of the interview, and investigators are subsequently able to find objective evidence to verify that information. If, for example, investigators had followed up on Mr. Rios' claim that he had discarded the gun he purportedly used in a lake and had recovered a black .38 caliber snub nose revolver, that would have served as strong independent corroboration. Similarly, if investigators had questioned Mr. Garcia using diagnostic questioning techniques and elicited an uncontaminated corroborating account, that statement could have served as independent corroboration. To my knowledge, Mr. Rios did not provide a single detail in his statement that led to any independent corroboration. Rather, there is a notable lack of independent corroboration. At first glance, one might think that Mr. Huertas identification of Mr. Rios from a live lineup and Mr. Carrero's statement to police serves as independent corroboration. However, neither the statement nor the identification (both of which were procured after Mr. Rios' confession) meets the criteria of objective independent evidence because the reliability of both is in question due to the nature of the interview and identification procedures that were purportedly used with Mr. Huertas and Mr. Carrero. As discussed previously in this report, both Mr. Huertas and Mr. Carrero signed affidavits describing coercion and both have recanted their testimonies.[227] Instead of independent corroboration, these pieces of evidence may serve as an example of an illusion of corroboration due to a confession tainting the collection of other evidence.

Another potential avenue for independent corroboration that was a dead end was the information purportedly provided by the CIs about where the .22 and .38 could be found. The searches of the two different did not result in the recovery of a weapon related to this crime. Other potential areas for independent corroboration – for example a search of Mr. Rios' or Mr. Garcia's homes to find clothing or guns that could be linked to the Morales homicide; an investigation into whether another shooting had occurred in front of Mr. Rios' home on June 27, 1989; the dredging of a lake to locate the gun Mr. Rios said he discarded – appeared not to have been actively pursued.[228]

Taken together, a reliability analysis of Mr. Rios's confession raises serious concerns about the extent to which fact-finders can confidently rely on his statement. The details he

---

[226] Deposition of Jaime Rios (6/30/23); Trial Testimony of Jaime Rios
[227] PFP002273-PFP002277; In addition, see Dr. Geoffrey Loftus' (6/21/22 & 12/2/23) expert reports.
[228] The lack of follow-up, as discussed elsewhere in this report, suggest confirmation bias might have been a risk factor in this case.

provided that were consistent with the known objective facts/evidence in this case were known to police at the time of questioning. If you credit Mr. Rios' account, he described interrogation sessions rife with explicit contamination, rendering whatever possible dependent corroboration that might have existed non-probative. Mr. Rios also provided many inconsistent details, and he had at least two verifiably false details in his statement (i.e., that he discarded the gun he used two weeks after the crime; that Mr. Morales was shot at close-range), which weighs strongly against reliability. Moreover, Mr. Rios did not provide a single detail that led to any clearly reliable independent corroborating evidence (a pattern symptomatic of false confession cases).

## X. Summary and Conclusion

Investigator accounts differ dramatically from Mr. Rios' account of his interrogation. It is the purview of the fact-finders in this case to determine which version of events to believe. Assuming, however, that Mr. Rios' account is true, there are a number of serious risk factors for false confessions present in this case. Among them, confirmation bias seems to have led investigators to interrogate Mr. Rios (as well as witnesses) with a guilt-presumptive approach that is likely to elicit information consistent with investigators' theory of the case. Nineteen-year-old Mr. Rios experienced a combined period of custody, isolation, and detention that heightened his risk of providing a false confession (both because of duration but also likely sleep deprivation), and Mr. Rios described the use of interrogation tactics that can cause false statements, most notably physical abuse, explicit threats and explicit and implied promises (about having his child taken away), and the presentation of evidence that had a high likelihood of being false. Finally, Mr. Rios reported being fed crime-relevant details through a highly leading and suggestive questioning process.

When evaluating the likely reliability of Mr. Rios' confession, triers of fact should keep in mind that each risk factor does not exist in a vacuum; rather, the effects of the risk factors are cumulative and perhaps multiplicative. The risk factors should be considered with a totality of the circumstance approach in mind. The use of non-diagnostic interview techniques with a young adult, both individually and especially in combination, would have rendered both Mr. Rios' statement at great risk of being unreliable. Whenever investigators use techniques to procure a statement that increase the likelihood of a false statement, the probative value of the resulting statement is lessened or even destroyed – and fact-finders are left with the difficult challenge of determining whether the statement is true or false and how much weight should be attached to it.

It is my opinion to a reasonable degree of scientific certainty in the field of psychology that the questioning conditions and techniques that Mr. Rios described could lead an innocent person (or one that lacks guilty knowledge) to provide a false statement in a homicide case. Moreover, a reliability analysis of his statement reveals a lack of indicators of reliability; the consistent details that were provided could have been a product of contamination (and therefore do not provide clear dependent corroboration), his statement consisted numerous inconsistent and inaccurate details, it did not contain a number of verifiable details one might reasonably expect him to be able to provide if guilty, and his statement did not lead to independent corroboration. It is my opinion that a statement procured under the conditions described by Mr. Rios cannot and should not be relied upon to determine Mr. Rios' guilt or innocence.

The opinions expressed in this report are based in part on the case specific materials I have reviewed. Should any new or additional information become available, my opinions about this case may change.

Thank you,

*Melissa Russano*

Melissa B. Russano, Ph.D.[229]

---

[229] My full legal name is Melissa Beth Russano Rodriguez, however, I generally do not use Rodriguez professionally except for legal purposes (Russano is my maiden name, and the name I have established myself under professionally).

## XI. References

Aamodt, M. G., & Custer, H. (2006). Who can best catch a liar? A meta-analysis of individual differences in detecting deception. *Forensic Examiner, 15,* 6-11.

Abram, K. M., Teplin, L. A., & McClelland, G. M. (2003). Comorbidity of severe psychiatric disorders and substance use disorders among women in jail. *American Journal of Psychiatry, 160,* 1007–1010.

Appleby, S. C., Hasel, L. E., & Kassin, S. M. (2013). Police-induced confessions: An empirical analysis of their content and impact. *Psychology, Crime & Law, 19,* 111-128.

Appleby, S. C., & Kassin, S. M. (2016). When self-report trumps science: Effects of confessions, DNA, and prosecutorial theories on perceptions of guilt. *Psychology, Public Policy, and Law, 22,* 127-140.

Baldwin, J. (1993). Police interview techniques: Establishing truth or proof? *British Journal of Criminology, 33,* 325–352.

Baumeister, R. F., & Leary, M. R. (1996). The need to belong: Desire for interpersonal attachments as a fundamental human motivation. *Psychological Bulletin, 117,* 497–529.

Bedau, H. A., & Radelet, M. L. (1987) Miscarriages or justice in potentially capital cases. *Stanford Law Review, 40,* 21-179.

Blagrove, M. (1996). Effects of length of sleep deprivation on interrogative suggestibility. *Journal of Experimental Psychology: Applied, 2,* 48–59.

Blair, J. P. (2005). A test of the unusual false confession perspective: Using cases of proven false confessions. *Criminal Law Bulletin, 41,* 127-144.

Brandon, S. E., Arthur, J. C., Ray, D. G., Meissner, C. A., Kleinman, S. M., Russano, M. B., & Wells, S. (2019). The High-Value Detainee Interrogation Group (HIG): Inception, evolution, and impact. In M. Staal & S. Harvey's (Eds.), *Operational psychology: A new field to support national security and public safety* (pp. 263-285). Santa Barbara, CA: ACB-CLIO.

Brandon, S. E., & Meissner, C. A. (2023). From research to practice: The High-Value Detainee Interrogation Group. To appear in G. Oxburgh, T. Myklebust, M. Fallon, & M. Hartwig (Eds.), *Interviewing and interrogation: A review of research and practice since World War II.* TOAEP.

Brandon, S. E., Wells, S., & Seale, C. (2018). Science-based interviewing: Information elicitation. *Journal of Investigative Psychology and Offender Profiling, 15,* 133-148.

Brown v. Mississippi, 297 U.S. 278 (1936).

Burke, A. S. (2006). Improving prosecutorial decision making: Some lessons of cognitive science. *William and Mary Law Review, 47,* 1587-1633.

Cialdini, R. B. (2007). *Influence: the psychology of persuasion.* Rev. ed.; 1st Collins Business Essentials ed. New York, Collins.

Clare, I. C. H., & Gudjonsson, G. H. (1995). The vulnerability of suspects with intellectual disabilities during police interviews: A review and experimental study of decision-making. *Mental Handicap Research, 8*, 110-128.

Clark, M. (2018, April 19). *Controversial police interrogation technique that often results in false confessions abandoned by influential training consultant.* Retrieved from https://www.criminallegalnews.org/news/2018/apr/19/controversial-police-interrogation-technique-often-results-false-confessions-abandoned-influential-training-consultant/

Cleary, H. M. D., & Warner, T. C. (2016). Police training in interviewing and interrogation methods: A comparison of techniques used with adult and juvenile suspects. *Law and Human Behavior, 40,* 270-284.

Costanzo, M., & Redlich, A. (2010). Use of physical and psychological force in criminal and military interrogations. In J. Knuttsson, & J. Kuhns (Eds.), *Policing around the world: Police use of force.* Santa Barbara: Praeger Security International.

Darley, J. M., & Fazio, R. H. (1980). Expectancy confirmation processes arising in the social interaction sequence. *American Psychologist, 35*, 867–881.

DeClue, G., & Rogers, C. S. (2015). The Inside Information Checklist (IIC). *The Police Chief*, *82,* 50-56.

DePaulo, B. M., Lindsay, J. L., Malone, B. E., Muhlenbruck, L., Charlton, K. & Cooper, H. (2003). Cues to deception. *Psychological Bulletin, 129,* 74–118.

DiPietro, A. L. (1993). Lies, promises, or threats: The voluntariness of confessions. *FBI Law Enforcement Bulletin, 62,* 27-31.

Drizin, S. A., & Leo, R. A. (2004). The problem of false confessions in the post-DNA world. *North Carolina Law Review, 82,* 891-1007.

Dror, I. E., & Charlton, D. (2006). Why experts make errors. *Journal of Forensic Identification, 56,* 600–616.

Elaad, E., Ginton, A., & Ben-Shakhar, G. (1994). The effects of prior expectations and outcome knowledge on polygraph examiners' decisions. *Journal of Behavioral Decision Making, 7,* 279–292.

Evans, J. R., Meissner, C. A., Ross, A. B., Houston, K. A., Russano, M. B., & Horgan, A. J. (2013). Obtaining guilty knowledge in human intelligence interrogations: Comparing accusatorial and information-gathering approaches with a novel experimental paradigm. *Journal of Applied Research in Memory and Cognition, 2,* 83-88.

Everington, C., & Fulero, S. (1999). Competence to confess: Measuring understanding and suggestibility of defendants with mental retardation. *Mental Retardation, 37,* 212–220.

Feld, B. C. (2006). Police interrogation of juveniles: An empirical study of policy and practice. *Journal of Criminal Law & Criminology, 97,* 219-316.

Feld, B. C. (2013). *Kids, cops, and confessions: Inside the interrogation room.* New York: New York University Press.

Finlay, W., & Lyons, E. (2002). Acquiescence in interviews with people who have mental retardation. *Mental Retardation, 40*, 14-29.

Frazier v. Cupp, 394 U.S. 731 (1969).

Frenda, S. J., Berkowitz, S. R., Loftus, E. F., & Fenn, K. M. (2016). Sleep deprivation and false confessions. *PNAS Proceedings of the National Academy of Sciences of the United States of America, 113*, 2047–2050.

Fulero, S. M., & Everington, C. (1995). Assessing competency to waive Miranda rights in defendants with mental retardation. *Law and Human Behavior, 19*, 533–543.

Fulero, S. M., & Everington, C. (2004). Mental retardation, competency to waive Miranda rights, and false confessions. In G.D. Lassiter (Ed.), *Interrogations, confessions, and entrapment* (pp. 163-179). New York: Kluwer Academic.

Garrett, B. L. (2010). The substance of false confessions. *Stanford Law Review, 62,* 1051-1119.

Garrett, B. L. (2011). *Convicting the innocent: Where criminal convictions go wrong.* London: Harvard University Press.

Garrett, B. L. (2015). Contaminated confessions revisited. *Virginia Law Review Association, 101,* 395-454.

Granhag, P. A., & Hartwig, M. (2015). The strategic use of evidence (SUE) technique: A conceptual overview. In P. A. Granhag, A. Vrij, & B. Verschuere (Eds.), *Deception detection: Current challenges and new approaches* (pp. 231–251). Hoboken, NJ: Wiley.

Granhag, P. A., & Strömwall, L. A. (2004). *The detection of deception in forensic contexts.* Cambridge, Cambridge University Press.

Grano, J. D. (1979). Voluntariness, free will, and the law of confessions. *Virginia Law*

*Review, 65,* 859-945.

Gross, S. R., Possley, M. J., Roll, K. J., & Stephens, K. H. (2020). Government misconduct and convicting the innocent: The role of prosecutors, police and other law enforcement. *University of Michigan Public Law Research Paper,* 21-003. Available at http://dx.doi.org/10.2139/ssrn.3698845

Gudjonsson, G. H. (2003). *The psychology of interrogations and confessions: A handbook.* Chichester, England: Wiley.

Gudjonsson, G. H. (2010). The psychology of false confessions: A review of the current evidence. In G. D. Lassiter & C. A. Meissner (Eds.) *Police Interrogations and False confessions: Current Research, Practice and Policy Recommendations* (pp. 31-47). Washington, DC: American Psychological Association.

Gudjonsson, G. H. (2018). *The psychology of false confessions: Forty years of science and practice.* Hoboken, New Jersey: John Wiley & Sons, Inc.

Gudjonsson, G. H., & Sigurdsson, J. F. (1999). The Gudjonsson Confession Questionnaire Revised: Factor structure and its relationship with personality. *Personality and Individual Differences, 27,* 953-968.

Gudjonsson, G. H., Sigurdsson, J. F., Asgeirsdottir, B. B., & Sigfusdottir, I. D. (2006). Custodial interrogation, false confession, and individual differences: A national study among Icelandic youth. *Personality and Individual Differences, 41,* 49-59.

Gudjonssson, G. H., Sigurdsson, J. F., & Sigfusdottir, I. D. (2009a). Interrogations and false confessions among adolescents in seven countries in Europe: What background and psychological factors best discriminate between false confessors and non-false confessors? *Psychology, Crime and Law, 15,* 711-728.

Gudjonssson, G. H., Sigurdsson, J. F., & Sigfusdottir, I. D. (2009b). False confession among 15- and 16-year olds in compulsory education and their relationship with adverse life events. *Journal of Forensic Psychiatry and Psychology, 20,* 950-963.

Gudjonssson, G. H., Sigurdsson, J. F., & Sigfusdottir, I. D., Asgeirsdottir, B. B., Gonzalez, R. A., & Young, S. (2016). A national epidemiological study investigating risk factors for police interrogation and false confession among juveniles and young persons. *Social Psychiatry and Psychiatric Epidemiology, 51,* 359-367.

Haney-Caron, E., Goldstein, N. E., & Mesiarik, C. (2018). Self-perceived likelihood of false confession: A comparison of justice-involved juveniles and adults. *Criminal Justice and Behavior, 45,* 1944-1976.

Harrison, Y., & Horne, J. A. (2000). The impact of sleep deprivation on decision making: A review. *Journal of Experimental Psychology: Applied, 6,* 236–249.

Hasel, L. E., & Kassin, S. M. (2009). On the presumption of evidentiary independence: Can confessions corrupt eyewitness identifications? *Psychological Science, 20,* 122–126.

Herrnstein, R. J. (1970). On the law of effect. *Journal of the Experimental Analysis of Behavior, 7,* 243–266.

Herrnstein, R. J., Rachlin, H., & Laibson, D. I. (Eds.). (1997). *The matching law: Papers in psychology and economics.* New York: Russell Sage Foundation.

Hill, C., Memon, A., & McGeorge, P. (2008). The role of confirmation bias in suspect interviews: A systematic evaluation. *Legal and Criminological Psychology, 13*, 357–371.

Honts, C. R., Forrest, K., & Stepanescu, A. (2019). Polygraph examiners unable to discriminate true and false juvenile confessions. *Polygraph & Forensic Credibility Assessment: A Journal of Science and Field Practice, 48*, 1-9.

Honts, C. R., Kassin, S. M., & Craig, R. A. (2014). 'I'd know a false confession if I saw one': A constructive replication with juveniles. *Psychology, Crime & Law, 20,* 695-704.

Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2012). Minimization and maximization techniques: Assessing the perceived consequences of confessing and confession diagnosticity. *Psychology, Crime, & Law, 18,* 65-78.

Horselenberg, R., Merckelbach, H., & Josephs, S. (2003). Individual differences and false confessions: A conceptual replication of Kassin and Kiechel (1996). *Psychology, Crime and Law, 9,* 1-18.

Horselenberg, R., Merckelbach, H., Smeets, T., Franssens, D., Ygram Peters, G-J., & Zeles, G. (2006). False confessions in the lab: Do plausibility and consequences matter? *Psychology, Crime and Law, 12*, 61-75.

Inbau, F. E. (1942). *Lie detection and criminal interrogation*. Baltimore: Williams & Wilkins.

Inbau, F. E., Reid, J., & Buckley J. P. (1986). *Criminal interrogation and confessions* (3rd ed.). Baltimore: Williams & Wilkins.
Inbau, F. E., Reid, J. E., Buckley, J. P., & Jayne, B. C. (2001). *Criminal interrogation and confessions* (4th ed.). Gaithersberg, MD: Aspen.

Inbau, F. E., Reid, J. E., Buckley, J. P., & Jayne, B. C. (2013). *Criminal interrogation and confessions* (5th ed.). Burlington, MA: Jones & Bartlett.

Irving, B. (1980). *Police interrogation. A case study of current practice. Research Studies No 2.* London: HMSO.

Johnson, S. B., Blum, R. W., & Giedd, J. N. Adolescent maturity and the brain: The promise and

pitfalls of neuroscience research in adolescent health policy. *Journal of Adolescent Health, 45,* 216-221.

Kassin, S. M. (2005). On the psychology of confessions: Does innocence put innocents at risk? *American Psychologist, 60,* 215–228.

Kassin, S. M. (2007). Expert testimony on the psychology of confessions: A pyramidal model of the relevant science. In E. Borgida & S. Fiske (Eds.), *Psychological Science in Court: Beyond Common Knowledge* (pp. 195-218). Oxford, England: Blackwell Publishing.

Kassin, S. M. (2012). Why confessions trump innocence. *American Psychologist, 67,* 431-445.

Kassin, S. M. (2022). *Duped: Why innocent people confess – and why we believe their confessions*. Landham, MD: Prometheus.

Kassin, S. M., Bogart, D., & Kerner, J. (2012). Confessions that corrupt: Evidence from the DNA exoneration case files. *Psychological Science, 23,* 41–45.

Kassin, S. M., Drizin, S., Grisso, T., Gudjonsson, G., Leo, R., & Redlich, A. (2010). Police induced confessions: Risk factors and recommendations. *Law and Human Behavior, 34*, 3-38.

Kassin, S. M., Goldstein, C. J., & Savitsky, K. (2003). Behavioral confirmation in the interrogation room: On the dangers of presuming guilt. *Law and Human Behavior, 27,* 187–203.

Kassin, S. M., & Gudjonsson, G. H. (2004). The psychology of confession evidence: A review of the literature and issues. *Psychological Science in the Public Interest, 5,* 35–69.

Kassin, S. M., & Kiechel, K. L. (1996). The social psychology of false confessions: Compliance, internalization, and confabulation. *Psychological Science, 7,* 125–128.

Kassin, S. M., Leo, R. A., Meissner, C. A., Richman, K. D., Colwell, L. H., Leach, A-M., & La Fon, D. (2007). Police interviewing and interrogation: A Self-report survey of police practices and beliefs. *Law and Human Behavior, 31,* 381-400.

Kassin, S. M., Meissner, C. A., & Norwick, R. J. (2005). "I'd know a false confession if I saw one": A comparative study of college students and police investigators. *Law and Human Behavior, 29,* 211-227.

Kassin, S. M., & McNall, K. (1991). Police interrogations and confessions: Communicating promises and threats by pragmatic implication. *Law and Human Behavior, 15,* 233–251.

Kassin, S. M., & Neumann, K. (1997). On the power of confession evidence: An experimental test of the ''fundamental difference'' hypothesis. *Law and Human Behavior, 21,* 469–484.

Kassin, S. M., Russano, M. B., Amrom, A. D., Hellgren, J., & Kukucka, J. (2019). Does recording inhibit crime suspects?: Evidence from a fully randomized field experiment. *Law and Human Behavior, 43,* 45-75.

Kassin, S. M., & Wrightsman, L. S. (1985). Confession evidence. In S. Kassin & L. Wrightsman (Eds.), *The psychology of evidence and trial procedure* (pp. 67–94). Beverly Hills, CA: Sage.

Kelly, C., & Russano, M. B. (in press, 2023). The science of interviewing: How do we know what we know? To appear in G. Oxburgh, T. Myklebust, M. Fallon, & M. Hartwig (Eds.), *Interviewing and interrogation: A review of research and practice since World War II.* TOAEP.

Klaver, J., Lee, Z., & Rose, V. G. (2008). Effects of personality, interrogation techniques and plausibility in an experimental false confession paradigm. *Legal and Criminological Psychology, 13,* 71–88.

Kostelnik, J. O., & Reppucci, N. D. (2009). Reid training and sensitivity to developmental maturity in interrogation: Results from a national survey of police. *Behavioral Sciences & the Law, 27,* 361–379.

Kozinski, W. (2018) The Reid interrogation technique and false confessions: A time for change. *Seattle Journal for Social Justice, 16,* 301-345.]

Lane, S. M., & Houston, K. A. (2021). Understanding eyewitness memory: Theory and applications. New York University Press.

Leo, R. A. (1996). Inside the interrogation room. *Journal of Criminal Law and Criminology, 86,* 266-303.

Leo, R. A. (2004). The third degree and the origins of psychological interrogation in the United States. In G.D. Lassiter (Ed.), *Interrogations, confessions, and entrapment (pp. 37-84).* New York: Kluwer Academic.

Leo, R. A. (2008). *Police Interrogation and American Justice.* Cambridge, MA: Harvard University Press.

Leo, R. A. & Drizin, S. A. (2010). The three errors: Pathways to false confession and wrongful conviction. In G. D. Lassiter & C. Meissner's (Eds.), *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations* (pp. 9-30). Washington, DC: APA.

Leo, R. A., & Ofshe, R. J. (1998). The consequences of false confessions: Deprivations of liberty and miscarriages of justice in the age of psychological interrogation. *Journal of Criminal Law and Criminology, 88,* 429-496.

Liden, M., Grans, M., & Juslin, P. (2018). The presumption of guilt in suspect interrogations: Apprehension as a trigger of confirmation bias and debiasing techniques. *Law and Human Behavior, 42,* 336-354.

Luke, T. J., & Alceste, F. (2020). The mechanisms of minimization: How interrogation tactics suggest lenient sentencing through pragmatic implication. *Law and Human Behavior, 44,* 266-285.

Luke, T. J., & Granhag, P. A. (2022). The shift of strategy (SoS) approach: Using evidence strategically to influence suspects' counter-interrogation strategies. *Psychology, Crime and Law.* Advanced online copy.

Lynumn v. Illinois, 372 U.S. 528 (1963).

Malloy, L. C., Shulman, E. P., & Cauffman, E. (2014). Interrogations, confessions, and guilty pleas among serious adolescent offenders. *Law and Human Behavior,* 38, 181-193.

Meissner, C. A., Hartwig, M., & Russano, M. B. (2010). The need for a positive psychological approach and collaborative effort for improving practice in the interrogation room. *Law and Human Behavior, 34,* 43-45.

Meissner, C. A., & Kassin, S. M. (2002). "He's guilty!" Investigator bias in judgments of truth and deception. *Law and Human Behavior, 26,* 469–480.

Meissner, C. A., & Kassin, S. M. (2004). "You're guilty, so just confess!" Cognitive and confirmational biases in the interrogation room. In G. D. Lassiter. (Ed.), *Interrogations, confessions, and entrapment* (pp. 85–106). New York: Kluwer Academic.

Meissner, C. A., Redlich, A. D., Michael, S. W., Evans, J. R., Camilletti, C. R., Bhatt, S., & Brandon, S. (2014). Accusatorial and information-gathering interrogation methods and their effects on true and false confessions: A meta-analytic review. *Journal of Experimental Criminology, 10*, 459-486.

Meissner, C. A., & Russano, M. B. (2003). The psychology of interrogations and false confessions: Research and recommendations. *Canadian Journal of Police & Security Services, 1,* 53-64.

Meissner, C. A., Surmon-Böhr, F., Oleszkiewicz, S., & Alison, L. J. (2017). Developing an evidence-based perspective on interrogation: A review of the U.S. Government's High-Value Detainee Interrogation Group research program. *Psychology, Public Policy, and Law, 23*(4)*,* 438-457.

Memon, A., Vrij, A., & Bull, R. (2003). Psychology and law: Truthfulness, accuracy and credibility (2nd ed.). Chichester: Wiley.

Meyer, J. R., & Reppucci, N. D. (2007). Police practices and perceptions regarding juvenile interrogation and interrogative suggestibility. *Behavioral Sciences & the Law, 25,* 757–780.

Meyer, R. G., & Youngjohn, J.R. (1991). Effects of feedback and validity expectancy on response in a lie detector interview. *Forensic Reports, 4*, 235-244.

Mitchell, K. J., & Johnson, M. K. (2000). Source monitoring: Attributing mental experiences. In E. Tulving & F. I. M. Craik (Eds.), *The Oxford handbook of memory* (pp. 179–195). New York, NY: Oxford University Press.

Mortimer, A., & Shepherd, E. (1999). Frames of mind: Schemata guiding cognition and conduct in the interviewing of suspected offenders. In A. Memon and R. Bull (Eds), *Handbook of the psychology of interviewing* (p. 293-315). Chichester: Wiley.

Narchet, F. M., Coffman, K. A., Russano, M. B., & Meissner, C. M. (2004, November). *A comparative analysis of classic and modern day interrogation manual*s. Paper presented at the American Society of Criminology 2004 Annual Conference, Nashville, Tennessee.

Narchet, F. M., Meissner, C. M., & Russano, M. B. (2011). Modeling the effects of investigator bias on the elicitation of true and false confessions. *Law and Human Behavior, 35,* 452-465. doi: 10.1007/s10979-010-9257-x

Nash, R.A., & Wade, K.A. (2009). Innocent but proven guilty: Using false video evidence to elicit false confessions and create false beliefs. *Applied Cognitive Psychology, 23,* 624-637.

Nickerson, R. S. (1998). Confirmation bias: A ubiquitous phenomenon in many guises. *Review of General Psychology*, *2*, 175–220.

Ofshe, R. J., & Leo, R. A. (1997a). The social psychology of police interrogation: The theory and classification of true and false confessions. *Studies in Law, Politics, and Society, 16,* 189–251.

Ofshe, R. J., & Leo, R. A. (1997b). The decision to confess falsely: Rational choice and irrational action. *Denver University Law Review, 74,* 979–1122.

Perillo, J. T., & Kassin, S. M. (2011). Inside interrogation: The lie, the bluff, and false confessions. *Law and Human Behavior, 35*, 327-337.

Perlman, N.B., Ericson, K., Esses, V., & Isaacs, B. (1994). The developmentally handicapped witness: Competency as a function of question format. *Law and Human Behavior, 18*, 171-187.

Perske, R. (2004). Understanding persons with intellectual disabilities in the criminal justice

system: Indicators of progress? *Mental Retardation, 42,* 484–487

Perske, R. (2008). False confessions from 53 persons with intellectual disabilities: The list keeps growing. *Intellectual and Developmental Disabilities, 46,* 468-479.

Pilcher, J. J., & Huffcut, A. (1996). Effects of sleep deprivation on performance: A meta-analysis. *Sleep, 19,* 318–326.

Pimental, P. S., Arndorfer, A., & Malloy, L. C. (2015). Take the blame for someone else's wrongdoing: The effects of age and reciprocity. *Law and Human Behavior, 39,* 219-231.

Rachlin, H. (2000). *The science of self-control.* Cambridge, MA: Harvard University Press.

Redlich, A. D. (2007). Double jeopardy in the interrogation room: Young age and mental illness. *American Psychologist, 62,* 609–611.

Redlich, A.D., & Goodman, G.S. (2003). Taking responsibility for an act not committed: The influence of age and suggestibility. *Law and Human Behavior, 27,* 141-156.

Redlich, A. D., Kulish, R., & Steadman, H. J. (2011). Comparing true and false confessions among persons with serious mental illness. *Psychology, Public Policy and Law, 17,* 394-418.

Redlich, A. D., Summers, A., & Hoover, S. (2010). Self-reported false confession and false guilty pleas among offenders with mental illness. *Law and Human Behavior, 34,* 79-90.

Reppucci, N. D., Meyer, J., & Kostelnik, J. (2010). Custodial interrogation of juveniles: Results of a national survey of police. In G. D. Lassiter & C. A. Meissner (Eds.), *Decade of behavior/Science conference grant. Police interrogations and false confessions: Current research, practice, and policy recommendations* (p. 67–80). American Psychological Association.

Reynolds, B. (2006). A review of delay-discounting research with humans: Relations to drug use and gambling. *Behavioural Pharmacology, 17,* 651-667.

Rogers, R., Harrison, K., Hazelwood, L, & Sewell, K. (2007). Knowing and intelligent: A study of Miranda warnings in mentally disordered defendants. *Law & Human Behavior, 31*, 401-418.

Ross, L., & Lepper, M. R. (1980). The perseverance of beliefs: Empirical and normative considerations. In R. Shweder & D. Fiske (Eds.), *New directions for methodology of social and behavioral science: Fallible judgement in behavioral research, Vol. 4* (pp. 17-36). San Francisco: Jossey-Bass.

Russano, M. B., Kelly, C., & Meissner, C. A. (2020). From the ivory tower to the interrogation

room: Training and field evaluation research on suspect interviewing. In R. Bull & I. Blandon-Gitlin's (Eds.), *The Routledge International Handbook of Legal and Investigative Psychology* (pp. 287-310). New York, NY: Routledge.

Russano, M. B., Meissner, C. M., Narchet, F. M., & Kassin, S. M. (2005). Investigating true and false confessions within a novel experimental paradigm. *Psychological Science, 16,* 481-486.

Schatz, S. J. (2018). Interrogated with intellectual disabilities: The risks of false confessions. *Stanford Law Review, 70,* 643-690.

Shaw, J.A., & Budd, E.D. (1982). Determinants of acquiescence and nay saying of mentally retarded persons. *American Journal of Mental Deficiency, 87,* 108-110.

Sheridan, S. (2011). Excluding coerced witness testimony to protect a criminal defendant's right to due process of law and adequately deter police misconduct. *Fordham Urban Law Journal, 38,* 1221-1265.

Sigurdsson, J. F., & Gudjonsson, G. H. (2001). False confessions: The relative importance of psychological, criminological and substance abuse variables. *Psychology, Crime and Law, 7,* 275–289.

Snyder, M., Tanke, E. D., & Berscheid, E. (1977). Social perception and interpersonal behavior: On the self-fulfilling nature of social stereotypes. *Journal of Personality and Social Psychology, 35*, 656–666.

Sporer, S. L., & Schwandt, B. (2007). Moderators of nonverbal indicators of deception: A meta-analytic synthesis. *Psychology, Public Policy and Law, 13*, 1-34.

Stansbury v. California, 511 U.S. 318 (1994).

Stein v. New York 346 U.S. 156 (1953).

Stewart, J. M., Woody, W. D., & Pulos, S. (2018). The prevalence of false confessions in research studies: A meta-analysis. *Behavioral Sciences and the Law, 36,* 12-31.

Suedfeld, P. (1990). *Psychology and torture.* Washington, DC: Hemisphere.

Sukumar, D., Wade, K. A., & Hodgson, J. S. (2016). Strategic disclosure of evidence: Perspectives from psychology and law. *Psychology, Public Policy, and Law, 22*, 306–313.

Tavris, C., & Aronson, E. (2007). *Mistakes were made (but not by me): Why we justify foolish beliefs, bad decisions and hurtful acts.* New York: Harcourt.

Toglia, M. P., Read, J. D., Ross, D. F., & Lindsay, R. C. L. (2006). *The Handbook of Eyewitness*

*Psychology: Volume I, Memory for Events.* Mahwah, NJ, US: Lawrence Erlbaum Associates Publishers.

Trope, Y. & Liberman, A. (1996). Social hypothesis testing: Cognitive and motivational mechanisms. In E. Higgins & A. Kruglanski (Eds.) *Social psychology: Handbook of basic principles* (p. 239-270). Guilford Press: New York, NY.

Vallano, J. P., Guyll, M., Ditchfield, R., & Slapinski, K. (2022). An experimental manipulation of rapport and moral minimization within a criminal interview. *Psychology, Public Policy, and Law, 28*(4), 515–531.

Viljoen, J., Klaver, J., & Roesch, R. (2005). Legal decisions of preadolescent and adolescent defendants: Predictors of confessions, pleas, communication with attorneys, and appeals. *Law and Human Behavior, 29*, 253–278.

Vrij, A. (2008). *Detecting lies and deceit: Pitfalls and opportunities* (2nd ed.). Chichester: John Wiley and Sons.

Vrij, Mann, & Fisher (2006). An empirical test of the Behaviour Analysis Interview. *Law & Human Behavior, 30,* 329-345.

Wald, M., Ayres, R., Hess, D. W., Schantz, M., & Whitebread, C. H. (1967). Interrogations in New Haven: The impact of Miranda. *The Yale Law Journal, 76,* 1519–1648.

Warden, R. (2004). The snitch system: How incentivized witnesses put 38 innocent Americans on death row. Chicago, IL: Northwestern University School of Law, Center on Wrongful Convictions.

Wetmore, S. A., & Neuschatz, J. S., & Gronlund, S. D. (2014) On the power of secondary confession evidence. *Psychology, Crime & Law, 20,* 339-357.

White, W. S. (2001). *Miranda's waning protections: Police interrogation practices after Dickerson.* Ann Arbor, MI: University of Michigan Press.

Wigmore, J. H. (1970). *Evidence* (Vol. 3) (revised by J. H. Chadbourn). Boston: Little, Brown.

Woody, W. D., & Forrest, K. D. (2020). *Understanding police interrogation.* New York, NY: New York University Press.

Zelle, H., Riggs Roamine, C. L., & Goldstein, N. E. S. (2014). Juveniles' Miranda comprehension: Understanding, appreciation, and totality of circumstances factors. *Law and Human Behavior, 39,* 281-293.

Appendix A

<u>Curriculum Vitae</u>
Melissa Beth Russano

## Contact Information

94 Reed Avenue        Telephone: 774-254-4792
North Attleboro, MA 02760      E-mail: mrussano119@gmail.com

## Education

| | |
|---|---|
| 2004 | Ph.D. in Psychology |
| | Florida International University |
| | Dissertation Topic: *True and False Confessions to an Intentional Act: A Novel Experimental Paradigm* |
| 2001 | M.S. in Psychology |
| | Florida International University |
| | Thesis Topic: *Close Relationships, Equity Theory, and Forgiveness* |
| 1999 | B.A. in Psychology, Minor in Spanish |
| | University of Virginia |
| | Graduated with Highest Distinction |
| | Distinguished Majors Thesis Topic: *Maternal versus Fetal Rights: Substance Use during Pregnancy* |

## Professional Experience

| | |
|---|---|
| 2016 – Present | Professor of Criminal Justice |
| | School of Justice Studies, Roger Williams University |
| 2010 – 2016 | Associate Professor of Criminal Justice |
| | School of Justice Studies, Roger Williams University |
| 2004 – 2010 | Assistant Professor of Criminal Justice |
| | School of Justice Studies, Roger Williams University |
| 2002 – 2004 | Instructor/Lecturer |
| | Department of Psychology, Florida International University |
| 2000 - 2002 | Graduate Research Assistant, Psychology & Law Laboratory, Department of Psychology, Florida International University; NSF Grant: *Investigator bias in identification procedures: Mechanisms and safeguards*; PIs: Margaret Bull Kovera, Ph.D., & Brian L. Cutler, Ph.D. |

1999 – 2000  Teaching Assistant; Department of Psychology; Florida International University; Courses: Abnormal Psychology; Attitudes and Social Behavior

## GRANTS, AWARDS, & HONORS

2018-2022  U.S. Department of Justice, Federal Bureau of Investigation ($335,713). *Are Some Law Enforcement Interrogation Techniques More Diagnostic than Others?: An Experimental Investigation with a Community Sample* (co-PI with K. Houston at Texas A&M International University).

2017-2021  U.S. Department of Justice, Federal Bureau of Investigation ($594,763). *Training Assessment and Field Validation of Science-Based Interrogation Techniques with Law Enforcement Agencies* (PI with C. Meissner at Iowa State University).

2019-2021  U.S. Department of Justice, Federal Bureau of Investigation ($62,229). *Improving Intelligence Interviewing: A Quasi-Experimental Study with Correctional Investigators* (PI with C. Kelly at St. Joseph's University).

2015-2017  U.S. Department of Justice, Federal Bureau of Investigation ($223,445). *Training of Science-Based Methods of Interrogation: A Follow-Up Analysis* (PI with C. Meissner at Iowa State University).

2015-2017  U.S. Department of Justice, Federal Bureau of Investigation ($108,170). *Interpreter-Facilitated Interrogations: Identifying Strategies for Maximizing Success* (co-PI with K. Houston at Texas A&M International University).

2014-2015  U.S. Department of Justice, Federal Bureau of Investigation ($104,178). *Assessing Accusatorial vs. Informational-Gathering Approaches to HUMINT Collection via an Interpreter* (PI with K. Houston at Texas A&M International University).

2013-2014  U.S. Department of Justice, Federal Bureau of Investigation ($116,240). *Investigating Interpreter-Target Rapport and Interpreter Placement in the HUMINT Context* (co-PI with K. Houston at the University of Texas at El Paso).

2012-2013  U.S. Department of Justice, Federal Bureau of Investigation ($82,279). *Structured Interviews of Experienced Analysts and Linguists* (Principal Investigator).

2011-2012  U.S. Department of Justice, Federal Bureau of Investigation ($55,840). *Structured Interviews of High-Value Detainee Interrogators* (Principal Investigator).

2010 - 2011    U.S. Department of Justice, Federal Bureau of Investigation ($187,776). *Structured Interviews on Interrogative Practices/Efficacy Involving Interrogators across U.S. Military and Federal Agencies* (Principal Investigator).

2008 – 2011    U.S. Department of Defense ($413,359). *Phase 2: Development of Evidence-Based Methods that Improve the Diagnostic Value of Interrogative Information* (co-PI with C. Meissner at the University of Texas at El Paso).

2007 – 2009    U.S. Department of Defense ($191,390). *Phase 1: Development of Evidence-Based Methods that Improve the Diagnostic Value of Interrogative Information* (co-PI with C. Meissner at the University of Texas at El Paso).

2006    Roger Williams University Outstanding Woman on Campus

2005    Roger Williams University Justice System Training & Research Institute ($8,536). *Police interrogation practices: A survey of law enforcement* (co-PI with F. Narchet at the University of New Haven).

2001    American-Psychology Law Society (Division 41 of APA) Grant-in-Aid ($500). *Perceptions of interrogations and confessions within the criminal justice community: An experimental study of defense attorneys, prosecutors, and jurors.*

2001    Florida International University Graduate Student Association Grant ($500). *Perceptions of interrogations and confessions within the criminal justice community: An experimental study of defense attorneys.*

PUBLICATIONS

Russano, M. B., Meissner, C. M., Atkinson, D., Brandon, S., Wells, S., Kleinman, S., Ray, D., & Jones, M. (under review). Evaluating the effectiveness of a five-day training on science-based methods of interrogation with U.S. federal, state, and local law enforcement investigators. *Psychology, Public Policy, and Law*.

Kelly, C., & Russano, M. B. (2023). The science of interviewing: How do we know what we know? In G. Oxburgh et al (Eds.), *Interviewing and Interrogation: A Review of Research and Practice since World War II*. Torkel Opsahl Academic EPublisher.

Mindthoff, A., Evans, J. R., Perez, G., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J. Z., Vallano, J. P., Woody, W. D., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Hayes, T., Meissner, C. A., Michael, S. W., Russano, M. B., & Stocks, E. L. (2020). Juror perceptions of intoxicated suspects' interrogation-related behaviors. *Criminal Justice & Behavior, 47,* 222-246. doi: 10.1177/0093854819888962

Russano, M. B., Kelly, C., & Meissner, C. A. (2020). From the ivory tower to the interrogation room: Training and field evaluation research on suspect interviewing. In R. Bull & I. Blandon-Gitlin's (Eds.), The Routledge International *Handbook of Legal and Investigative Psychology* (pp. 287-310). New York, NY: Routledge.

Kelly, C. E., Russano, M. B., Miller, J. C., & Redlich, A. D. (2019). On the road (to admission): Engaging suspects with minimization. *Psychology, Public Policy, and Law, 25,* 166-180. doi:10.1037/law0000199

Kassin, S. M., Russano, M. B., Amrom, A. D., Hellgren, J., & Kukucka, J. (2019). Does recording inhibit crime suspects?: Evidence from a fully randomized field experiment. *Law and Human Behavior, 43,* 45-75. doi: 10.1037/lhb0000319

Brandon, S., Arthur, J., Ray, D., Meissner, C., Kleinman, S., Russano, M., & Wells, S. (2019). The High-Value Detainee Interrogation Group (HIG): Inception, evolution, and impact. In M. Staal & S. Harvey's (Eds.), *Operational Psychology: A New Field to Support National Security and Public Safety* (pp. 263-285). Santa Barbara, CA: ACB- CLIO.

Mindthoff, A., Evans, J. R., Perez, G., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J. Z., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Meissner, C. A., Michael, S. W., Russano, M. B., Stocks, E. L., Vallano, J. P., & Woody, W. D. (2018). A survey of potential jurors' perceptions of interrogations and confessions. *Psychology, Public Policy, & Law, 24,* 430-448. doi: 10.1037/law0000182

Houston, K. A., Russano, M. B., Ricks, E. P. (2017). "Any friend of yours is a friend of mine": Investigating the utilization of an interpreter in an investigative interview. *Psychology, Crime and Law, 23,* 413-426. doi: 10.1080/1068316X.2017.1290091

Narchet, F. M., Russano, M. B., Kleinman, S. M., & Meissner, C. M. (2015). A (nearly) 360° perspective of the interrogation process: Communicating with high-value targets. In G. Oxburgh, T. Myklebust, T. Grant & B. Milne (Eds.) , *Communication in Investigative and Legal Contexts: Integrated Approaches from Forensic Psychology, Linguistics and Law Enforcement.* John Wiley & Sons, Ltd, Chichester, UK. doi: 10.1002/9781118769133.ch8

Russano, M. B., Narchet, F. M., & Kleinman, S. M. (2014). Analysts, interpreters and intelligence interrogations: Perceptions and insights. *Applied Cognitive Psychology, 28,* 829-846. doi:10.1002/acp.3070

Russano, M. B., Narchet, F. M., Kleinman, S. M., & Meissner, C. M. (2014). Structured interviews of experienced HUMINT interrogators. *Applied Cognitive Psychology, 28,* 847-859. doi:10.1002/acp.3069

Evans, J. R., Meissner, C. A., Ross, A. B., Houston, K. A., Russano, M. B., & Horgan,

A. J. (2013). Obtaining guilty knowledge in human intelligence interrogations: Comparing accusatorial and information-gathering approaches with a novel experimental paradigm. *Journal of Applied Research in Memory and Cognition, 2,* 83-88. doi: 10.1016/j.jarmac.2013.03.002

Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2012). Minimization and maximization techniques: Assessing the perceived consequences of confessing and confession diagnosticity. *Psychology, Crime, & Law, 18,* 65-78. doi: 10.1080/1068316X.2011.561801

Narchet, F. M., Meissner, C. M., & Russano, M. B. (2011). Modeling the effects of investigator bias on the elicitation of true and false confessions. *Law and Human Behavior, 35,* 452-465. doi: 10.1007/s10979-010-9257-x

Evans, J. R., Meissner, C. A., Brandon, S. E., Russano, M. B., & Kleinman, S. M. (2010). Criminal versus HUMINT interrogations: The importance of psychological science to improving interrogative practice. *Journal of Psychiatry & Law, 38,* 215-249. doi: 10.1177/009318531003800110

Meissner, C. A., Hartwig, M., & Russano, M. B. (2010). The need for a positive psychological approach and collaborative effort for improving practice in the interrogation room. *Law and Human Behavior, 34,* 43-45. doi: 10.1007/s10979-009-9205-9

Meissner, C. A., Russano, M. B., & Narchet, F. M. (2010). The importance of a laboratory science for improving the diagnostic value of confession evidence. In G. D. Lassiter & C. Meissner's (Eds.), *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations* (pp. 111-126). Washington, DC: APA. doi: 10.1037/12085-007

Evans, J. R., Schreiber Compo, N., & Russano, M. B. (2009). Intoxicated witnesses and suspects: Procedures and prevalence according to law enforcement. *Psychology, Public Policy, and Law, 15,* 194-221. doi: 10.1037/a0016837

Russano, M. B. (2008). Juries and the dynamite charge. In B. L. Cutler's (Ed.), *Encyclopedia of Psychology and Law, Vol. 1,* 245-247. Sage Publications.

Russano, M. B., Dickinson, J. J., Greathouse, S. M., & Kovera, M. B. (2006). "Why don't you take another look at number three?" Investigator knowledge and its effects on eyewitness confidence and identification decisions. *Cardozo Public Law, Policy and Ethics Journal, 4,* 355-379.

Russano, M. B. (2006). "It's really in your best interest to cooperate…". [Review of the book *Interrogations, confessions and entrapment*]. *Applied Cognitive Psychology, 20,* 131-133.

Russano, M. B., Meissner, C. M., Narchet, F. M., & Kassin, S. M. (2005). Investigating true and false confessions within a novel experimental paradigm. *Psychological Science, 16,* 481-486. doi: 10.1111/j.0956-7976.2005.01560.x

Meissner, C. A., & Russano, M. B. (2003). The psychology of interrogations and false confessions: Research and recommendations. *Canadian Journal of Police & Security Services, 1,* 53-64.

Kovera, M. B., Russano, M. B., McAuliff, B. D. (2002). Assessment of the commonsense psychology underlying Daubert: Legal decision makers' abilities to evaluate expert evidence in hostile work environment cases. *Psychology, Public Policy, and Law, 8,* 180-200.

Russano, M., & Kovera, M. B. (2000). Supreme Court revisits Miranda warnings. *Monitor on Psychology, 31(3),* 7.

## CONFERENCE PRESENTATIONS

Russano, M. B., Meissner, C. A., Rothweiler, J. & Jones, M. S. (2023, March). *Training assessment and field validation of a practitioner developed science-based interviewing and interrogation course.* Paper presented at the American Psychology-Law Society Conference, Philadelphia, PA.

Houston, K. A., & Russano, M. B. (2023, March). *Suspect decision-making and understanding resistance motivations during accusatorial and information-gathering interrogations.* Paper presented at the American Psychology-Law Society Conference, Philadelphia, PA.

Sparacino, M., Carlson, V., Evans, J. R., Russano, M. B., & Houston. K. (2023, March). *Recall of interpreted interrogations.* Paper presented at the American Psychology-Law Society Conference, Philadelphia, PA.

Sparacino, M., Carlson, V. Evans, J.R., Russano, M. B., & Houston, K. (2022, June). *The reliability of interpreter memory.* Paper presented at the Global Forensic Justice Center's Virtual 11th Annual Forensic Science Symposium.

Carlson, Victoria. H., Sparacino, M. C. M., Evans, J. R., Russano, M. B., & Houston, K. A. (2022, March). *Interpreters' memories for their interpreted interactions.* Paper presented at the American Psychology-Law Society Conference, Denver, CO.

Houston, K. A., & Russano, M. B. (2022, March). *Suspect decision-making and resistance motivations during interrogation* [Paper presentation cancelled due to COVID]. American Psychology-Law Society Conference, Denver, CO.

Houston, K. A., & Russano, M. B. (2020, March). *Modeling and understanding confession decisions in interpreter-facilitated interrogations.* Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Lowder, B., Russano, M. B., Meissner, C. A., & Atkinson, D. (2020, March). *Disparate effects of accusatorial techniques during real-world interrogations.* Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Atkinson, D., Russano, M. B., Miessner, C. A. (2020, March). *Evaluating a science-based*

*interrogation training program using a between-participants design.* Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Russano, M. B. (2019, November). *Researcher and practitioner collaborations: Lessons learned.* Panel discussion at the 9th Annual High-Value Detainee Interrogation Group Research Symposium, McLean, VA.

Russano, M. B., Meissner, C. A., & Atkinson, D. J. (2019, March). *Training science-based methods of interrogation: Do training effects persist over time?.* Paper presented at the American Psychology-Law Society Conference, Portland, OR.

Houston, K. A., & Russano, M. B. (2019, March). *Interpreter-facilitated interrogations: Identifying strategies for maximizing success.* Paper presented at the American Psychology-Law Society Conference, Portland, OR.

Perez, G., Mindthoff, A., Evans, J. R., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J. Z., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Meissner, C. A., Michael, S. W., Russano, M. B., Stocks, E.L., Vallano, J. P., & Woody, W. D. (2019, March). *Examining juror demographics and beliefs as predictors of interrogations and confessions perceptions.* Paper presented at the American Psychology-Law Society Conference, Portland, OR.

Russano, M. B. (2018, October). *What Works Reviews: The Cognitive Interview.* Paper presented at the 8th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., Meissner, C. A., & Atkinson, D. J. (2018, October). *Does it work? Evaluating a science-based interrogation training program.* Paper presented at the 8th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Houston, K. A., & Russano, M. B. (2018, October). *Interpreter-facilitated interrogations: Strategies for maximizing success.* Paper presented at the 8th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., Meissner, C. A., & Atkinson, D. J. (2018, March). *Training science-based methods of interrogation to state and local law-enforcement officers: A training evaluation and field validation study.* Paper presented at the American Psychology-Law Society Conference, Memphis, TN.

Kassin, S. M., Russano, M. B., Amrom, A. D., Hellgren, J., & Kukucka, J. (2018, March). *Does recording inhibit crime suspects?: Evidence from a fully randomized field experiment.* Paper presented at the American Psychology-Law Society Conference, Memphis, TN.

Houston, K. A., & Russano, M. B. (2018, March). *Evaluating advanced methods of interpreter utilization.* Paper presented at the American Psychology-Law Society Conference, Memphis, TN.

Mindthoff, A., Perez, G., Evans, J. R., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J. Z., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Meissner, C. A., Michael, S. W., Russano, M. B., Stocks, E. L., Vallano, J. P., & Woody, W. D. (2018, March). *Examining jurors' perceptions of interrogations and confessions: Are jurors finally starting to believe that false confessions exist?* Paper presented at the American Psychology-Law Society Conference, Memphis, TN.

Phillips, E., Meissner, C. A., & Russano, M. B. (2017, July). *What Works? A systematic review of interview and interrogation practices.* Paper presented at the International Investigative Interviewing Research Group Conference, Monterey, CA.

Russano, M. B., Meissner, C. A., Atkinson, D., & Dianiska, R. E. (2017, March). *Training science-based methods of interrogation with Air Force Office of Special Investigations.* Paper presented at the American Psychology-Law Society Conference, Seattle, WA.

Houston, K. A., Russano, M. B., & Alexander, J. A. (2017, March). *Comparing the effects of an interpreter during accusatorial vs. rapport-based, information gathering interviews.* Paper presented at the American Psychology-Law Society Conference, Seattle, WA.

Meissner, C. A., Russano, M. B., & Atkinson, D. (2017, Jan). *Science- based methods of interrogation: A training evaluation and field assessment.* Paper presented at the Society for Applied Research in Memory & Cognition Conference, Sydney, Australia.

Russano, M. B. (2016, October). *What Works: The Cognitive Interview.* Paper presented at the 6th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Meissner, C. M., & Russano, M. B. (2016, May). *A field validation of the cognitive interview as a science-based approach to suspect interrogations.* Paper presented at the Fishschrift ~ Applied Cognition and the Cognitive Interview: A Conference in Honor of Dr. Ron Fisher, Miami, FL.

Houston, K. A., Russano, M. B., Alexander, J., & Garcia, S. (2016, March). *Assessing accusatorial vs. information-gathering approaches to HUMINT collection via an interpreter.* Paper presented at the American Psychology-Law Society Conference, Atlanta, GA.

Narchet, F. M., Russano, M. B., Yasuhara, K., Newcity, L., & Axelrod, R. (2015, November). *An analysis of modern-day police interrogation manuals.* Paper presented at the American Society of Criminology 2015 Annual Conference, Washington, D.C.

Meissner, C. A., & Russano, M. B. (2015, October). *A training validation and field*

*assessment of science-based methods of interrogation.* Paper presented at the 5th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Houston, K. A., Russano, M. B., & Ricks, P. (June, 2015). *What is rapport? Questions of measurement and definition.* Paper presented at the 2015 conference of the Society for Applied Research in Memory and Cognition, Victoria, Canada.

Houston, K. A., Russano, M. B., & Ricks, P. (2015, March). *Interpreter facilitated communication: Relationship dynamics and seating configuration.* Paper presented at the American Psychology-Law Society Conference, San Diego, CA.

Sneyd, D., & Russano, M. B. (2015, March). *Perceptions of revenge porn: The effect of gender, method of transmission, and revenge motivation.* Poster presented at the American Psychology-Law Society Conference, San Diego, CA.

Narchet, F. M., Russano, M. B., Kleinman, S. M., & Meissner, C. A. (2015, March). *A 360° degree perspective of the interrogative process: Factors associated with a successful interrogation.* Poster presented at the American Psychology-Law Society Conference, San Diego, CA.

Houston, K. A., Russano, M. B., & Ricks, E. (2014, October). *Interpreter-facilitated communication: Relationship dynamics and seating configuration.* Paper presented at the 4th Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., Narchet, F. M., Kleinman, S. M., & Meissner, C. A. (2014, September). *Effectiveness of interrogation techniques: Perceptions of experienced interrogators, analysts and interpreters.* Poster presented at the 14th Annual Conference of the European Society of Criminology, Prague, Czech Republic.

Russano, M. B., & Narchet, F. M. (2014, March). *Letting them speak: Analyst and interpreter insights on the interview process.* Paper presented at the HIG Research Symposium, *Intelligence Interviewing: From Science to Practice*, Washington, D.C.

Russano, M. B., & Narchet, F. M. (2014, March). *Analysts and HUMINT interrogations: Role and perceptions.* Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Russano, M. B., & Narchet, F. M. (2014, March). *Interpreters and HUMINT interrogations: Perceptions and insights.* Paper presented at the American Psychology-Law Society Conference, New Orleans, LA.

Russano, M. B., and Narchet, F. M. (2013, October). *Analysts and HUMINT Interrogations: Role and Perceptions.* Paper presented at the 3rd Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., and Narchet, F. M. (2013, October). *Interpreters during HUMINT*

*Interrogations: Perceptions and Insights.* Paper presented at the 3rd Annual High-Value Detainee Interrogation Group Research Symposium, Washington, D.C.

Russano, M. B., and Narchet, F. M. (2013, March). *Interrogation practices and beliefs: Does high-value target experience matter?* Paper presented at the American Psychology-Law Society Conference, Portland, OR.

Russano, M. B., Narchet, F. M., Meissner, C., & Kleinman, S. M. (2012, March). *Structured interviews of expert military and intelligence interrogators: Training, rapport & lie detection.* Paper presented at the American Psychology-Law Society Conference, San Juan, Puerto Rico.

Russano, M. B., Narchet, F. M., Meissner, C. & Kleinman, S. M. (2011, November). *systematic study of interrogative practices across U.S. military and federal agencies.* Paper presented at the American Society of Criminology 2011 Annual Conference, Washington, D.C.

Russano, M. B., Narchet, F. M., & Correira, B. (2011, March). *Effect of crime type, citizenship status, ethnicity and location of interrogation on perceptions of enhanced interrogation.* Poster presented at the International Congress of Psychology & Law, Miami, FL.

Fountain, E. N., Schreiber Compo, N., Carlucci, M., & Russano, M. B. (2011, March). *Training to detect deception: Identifying physical signs of cognitive load.* Poster presented at the International Congress of Psychology & Law, Miami, FL.

Evans, J. R., Meissner, C. A., Russano, M. B. & Horgan, A. J. (2011, March). *The elicitation of guilty knowledge in intelligence interrogation settings: A novel experimental paradigm.* Paper presented at the International Congress of Psychology & Law, Miami, FL.

Evans, J. R., Meissner, C. A., & Russano, M. B. (2010, June). *The effectiveness of inquisitorial and accusatorial interrogation techniques at obtaining true and false confessions and information.* Paper presented at the European Association of Psychology and Law Conference, Gothenburg, Sweden.

Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2010, March). *"Should I just confess?": The perceived consequences of confessing and confession diagnosticity.* Paper presented at the American Psychology-Law Society Conference, Vancouver, BC.

Meissner, C.A., Russano, M. B., & Horgan, A. J. (2010, March). *The diagnostic efficacy of inquisitorial interrogative methods and their corollary benefit for credibility assessment.* Paper presented at the American Psychology-Law Society Conference, Vancouver, BC.

Narchet, F. M., & Russano, M. B. (2009, November). *The effect of crime type and citizenship on perceptions of torture.* Paper presented at the American Society of Criminology 2009 Annual Conference, Philadelphia, Pennsylvania.

Horgan, A. J., Russano, M. B., Meissner, C. A., Evans, J. R., & Michael, S. W. (2009, March). *The ironic effects of the perception of consequences on beliefs about confession.* Poster presented at the 2009 American Psychology-Law Society Conference, San Antonio, TX.

Russano, M. B., & Narchet, F. M. (2008, March). *Police officers' beliefs about the interrogation process.* Poster presented at the 2008 American Psychology-Law Conference, Jacksonville, FL.

Narchet, F. M., Russano, M. B., & Griffin, J. (2008, March). *The effect of crime type on perceptions of "enhanced" interrogation techniques.* Poster presented at the 2008 American Psychology-Law Conference, Jacksonville, FL.

Peterson, E., & Russano, M. B. (2008, March). *The effect of false confession type of juror decision-making.* Poster presented at the 2008 American Psychology-Law Conference, Jacksonville, FL.

Russano, M. B., & Narchet, F. M. (2007, September). *The future of research on interrogations and confessions*. Paper presented at Interrogations & Confessions: A Conference Exploring Current Research, Practice and Policy, El Paso, TX.

Russano, M. B. (2007, June). *The psychology of police interrogations*. Paper presented at the 2007 Rhode Island Bar Association's Annual Meeting, Providence, RI.

Russano, M. B., & Narchet, F. M. (2007, March). Police officers' self-reported use of interrogation techniques. In J. Dickinson (Chair), *Police interrogations and confession evidence.* Symposium presented at Off the Witness Stand: Using Psychology in the Practice of Justice Conference, New York, NY.

Narchet, F. M., & Russano, M. B. (2007, March). Police officer training and perceptions of false confessions. In J. Dickinson (Chair), *Police interrogations and confession evidence.* Symposium presented at Off the Witness Stand: Using Psychology in the Practice of Justice Conference, New York, NY.

Russano, M. B., & Narchet, F. M. (2006, November). *Who's telling the truth? Police officers' perceptions of lying and truth-telling.* Paper presented at the American Society of Criminology 2006 Annual Conference, Los Angeles, CA.

Narchet, F. M., & Russano, M. B. (2006, June). *"Okay, I did it!": Theories of confession.* Paper presented at the Northeastern Association of Criminal Justice Sciences 2006 Annual Conference, Bristol, RI.

Russano, M. B., Shpurik, M., Kassin, S. M., & Berman, G. (2006, March). *An experimental study of defense attorneys' perceptions of interrogations and confessions.* Poster presented at the 2006 American Psychology-Law Society Conference, St. Petersburg, FL.

Mitchell, T. L., Russano, M. B., & Narchet, F. M. (2006, March). *The influence of race*

*and crime on legal decision-making.* Poster presented at the 2006 American Psychology-Law Society Conference, St. Petersburg, FL.

Narchet, F. M., Meissner, C. M., & Russano, M. B. (2006, March). From the hot seat: An interrogation from the perspective of the suspect. Paper presented at the 2006 American Psychology-Law Society Conference, St. Petersburg, FL.

Russano, M. B., & Narchet, F. M. (2005, June). *The psychology of police interrogations and confessions.* Paper presented at the Northeastern Association of Criminal Justice Sciences 2005 Annual Conference, Bristol, RI.

Russano, M. B., Narchet, F. M., & Meissner, C. A. (2005, March). *Investigating the effects of presenting false evidence on true and false confessions.* Poster presented at the 2005 American Psychology-Law Society Conference, La Jolla, CA.

Narchet, F. M., Meissner, C. A., & Russano, M. B. (2005, March). *Modeling the role of investigator bias and interrogation techniques on the likelihood of confession.* Paper presented at the 2005 American Psychology-Law Society Conference, La Jolla, CA.

Narchet, F. M., Coffman, K. A., Russano, M. B., & Meissner, C. A. (2005, March). *A qualitative analysis of modern day police interrogation manuals.* Poster presented at the 2005 American Psychology-Law Society Conference, La Jolla, CA.

Russano, M. B., Narchet, F. M., & Meissner, C. M. (2004, November). *The effectiveness of three police interrogation techniques within a novel experimental paradigm.* Paper presented at the American Society of Criminology 2004 Annual Conference, Nashville, Tennessee.

Narchet, F. M., Coffman, K. A., Russano, M. B., & Meissner, C. M. (2004, November). *A comparative analysis of classic and modern day interrogation manual*s. Paper presented at the American Society of Criminology 2004 Annual Conference, Nashville, Tennessee.

Russano, M. B., Meissner, C.A., & Kassin, S. M. (2004, March). *True and false confessions to an intentional act: The effects of two common police tactics.* Paper presented at the American Psychology-Law Society 2004 Biennial Conference, Scottsdale, Arizona.

Russano, M. B., Meissner, C. A., & Kassin, S. M. (2003, July). *True and false confessions to an intentional act: Preliminary results from a novel paradigm.* Poster presented at the 2003 International Psychology & Law Conference, Edinburgh, Scotland.

Russano, M. B., Dickinson, J. J., Cass, S., Kovera, M. B., & Cutler, B. (2002, March). *Testing the effects of lineup administrator knowledge in simultaneous and sequential lineups.* Poster presented at the American Psychology-Law Society 2002 Biennial Conference, Austin, Texas.

Russano, M. B., & Kovera, M. B. (2001, August). *Psychologists' evaluations of valid and flawed psychological science.* Poster presented at the 109th Annual Convention of the American Psychological Association, San Francisco.

Russano, M. B., & Land, D. J. (2000, March). *Maternal versus fetal rights: Substance use by pregnant women.* Poster presented at the 108th Annual Convention of the American Psychological Association, Washington, D.C.

INVITED TALKS

Conviction Integrity/Wrongful Convictions Meeting, Quattrone Center for the Fair Administration of Justice (September, 2022). Virtual.

RWU Research Blitz (March, 2022). Bristol, RI.

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (July, 2021). Virtual.

Exoneration Project, University of Chicago Law School. (October, 2020). Virtual.

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2019). Washington, DC.

Roger Williams University School of Law, Roundtable Presentation (March, 2019). Bristol, RI.

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2018). Washington, DC.

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2017). Washington, DC.

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2016). Washington, DC.

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2015). Washington, DC.

Federal Bureau of Investigation, High-Value Detainee Interrogation Group (October, 2014). Washington, DC.

Federal Bureau of Investigation, Language Services Division (July, 2014). Washington, DC.

High-Value Detainee Interrogation Group, Federal Bureau of Investigation (August, 2012). Washington, DC.

High-Value Detainee Interrogation Group Research Committee, Federal Bureau of Investigation (February, 2012). Washington, DC.

Rhode Island's Working Group on Electronic Recording of Custodial Interrogations (September, 2011). Providence, RI.

High-Value Detainee Interrogation Group, Federal Bureau of Investigation (August, 2011). Washington, DC.

High-Value Detainee Interrogation Group, Federal Bureau of Investigation (March, 2011). Miami, FL.

Rhode Island Senate Judiciary Committee (March, 2007). Providence, RI.

Rhode Island House of Representatives Judiciary Committee (March, 2007).

Providence, RI.

Rhode Island Public Defender Conference on False Confessions: Confessions – False & Otherwise: How to Spot and Deal with Them (June, 2006). Providence, RI

Rhode Island House of Representatives Judiciary Committee (March, 2006). Providence, RI.

Rhode Island Senate Judiciary Committee (April, 2006). Providence, RI.

Rhode Island Continuing Legal Education Program for Criminal Defense Attorneys (October, 2005). Providence, RI.

Purchase College (March, 2004)

Westfield State College (March, 2004)

San Francisco State University (February, 2004)

Penn State McKeesport (February, 2004)

TEACHING EXPERIENCE

Introduction to Psychology

Introduction to Criminal Justice (in person & remote)

Research Methods in Psychology

Research Methods in Criminal Justice (in person & remote)

Legal Psychology (in person & remote)

Psychology and the Law (for Legal Studies students) (in person & remote)

Social Psychology

CJS 150: Research in Criminal Justice (CJS 450)

PSYCH 498: Research Practicum in Psychology (PSYCH 498)

Human Behavior in Perspective

Drugs, Society & Behavior

Witnesses, Suspects and Investigative Interviewing [graduate level] (in person & remote)

Psychology and the Legal System [graduate level] (in person & remote)

Survey of Research Methods [graduate level]

Critical Issues in Criminal Justice [graduate level - team-taught]

Criminal Justice System Overview [graduate level - team-taught]

CJS 605: Master's Thesis

DEPARTMENTAL AND UNIVERSITY SERVICE

RWU Mentor for the SOAR (Strive, Overcome, Achieve and Rise) Program (2023-2024)

RWU Mentor for the Intercultural Leadership Ambassador Program (2022-2023)

RWU Academic Appeals Policy Committee (Fall 2022-Present)

RWU Human Subjects Review Board (June 2014-June 2018; Fall 2023-Present)

Course Reviewer for the General Education Curriculum and Planning Committee (Spring 2023-Present)

RWU Academic Integrity Appeals Committee (Spring 2023)

Criminal Justice Living Learning Community Faculty Mentor (Fall 2014-Spring 2019)

Co-Advisor to the John Jay Society (Fall 2014-Spring 2019)

RWU Sabbatical Committee (Fall 2020)

RWUFA Contract Committee (October 2018-October 2019)

RWU Testing and Tracing Committee (Spring 2020-Summer 2020)

RWUFA Elections Committee (October 2017-October 2018)

RWU Faculty Association Secretary (October 2015-October 2017)

RWUFA Executive Committee (October 2015-October 2017)

RWU External Grants Policy Committee (Fall 2013-Spring 2016)

RWU Healthcare Advisory Committee (Fall 2012-Spring 2013)

Advisor to the RWU Paintball Club (Fall 2014-Spring 2015)

Honors Advisory Council (Fall 2012 – Spring 2013)

School of Justice Studies Curriculum Committee (Fall 2004 – Spring 2019; Chair – Fall 2007 – Fall 2010)

School of Justice Studies Academic Standards Committee (Fall 2004 – Spring 2022; Chair: Fall 2009 - Spring 2011 & Fall 2017 – Spring 2022)

School of Justice Studies Assistant Dean Search Committee (2017-2018)

School of Justice Studies Dean Search Committee (2016-2017)

School of Justice Studies School Faculty Review Committee (2015-2016; 2016-2017; 2017-2018; 2018-2019; 2019-2020; 2021-2022)

Faculty Senate Steering Committee (Fall 2012 – Spring 2013)

University Academics Appeals Committee (Fall 2008)

School of Justice Studies Faculty Search Committee (Co-Chair; Fall 2008 – Spring 2009)

RWU Associate Provost Search Committee (Fall 2008)

RWU Student Evaluation of Teaching Ad-Hoc Committee (Spring 2008 – Fall 2008)

Roger Williams 2020: Strategic Planning Taskforce 1 (May 2007 – November 2007)

School of Justice Studies Faculty Search Committee (Fall 2006 – Spring 2007)

Faculty Senate (Fall 2005 – Fall 2008)

Faculty Senate Academic Standards and Polices (August 2008 – Spring 2011)

Faculty Senate Curriculum Committee (Fall 2005 – May 2008)

RWU Academic Technology Committee (Fall 2004 – Spring 2005)

PROFESSIONAL SERVICE

Ad-hoc reviewer for *Applied Cognitive Psychology, Applied Psychology in Criminal Justice, Criminal Justice and Behavior, Journal of Applied Research in Memory & Cognition, Journal of Experimental Criminology, Journal of Policing, Intelligence and Counter Terrorism, Journal of Experimental Psychology: Applied, Law & Human Behavior, Psychological Reports: Perceptual and Motor Skills, Psychology, Crime and Law, Psychology, Public Policy and Law; Journal of Criminal Justice & Popular Culture, International Journal of Police Science and Management,* Worth Publishers (textbook reviews), SAGE Publications (textbook reviews), *National Science Foundation, Centre*

*for Research and Evidence on Security Threats, Netherlands Foundation for Scientific Research, American Psychology-Law Society Early Career Professional Grants-in-Aid Program; Journal of Investigative Psychology and Offender Profiling*

*Law and Human Behavior* Editorial Board (September 2017 – January 2021)
*Behavioral Sciences and the Law* Editorial Board (March 2017 – November 2019)
Student Editorial Board, *Law & Human Behavior* (2001-2002)
Program Chair for Interrogations, Confessions and Deception for the 2013 American-Psychology-Law Society Conference in Portland, OR
Ad-hoc reviewer for the American Psychology-Law Society Annual Conference
Ad-hoc reviewer for the American Psychological Association Annual Conference

PROFESSIONAL AFFILIATIONS

    American Psychology–Law Society
    American Psychological Association
    Association for Psychological Science
    International Investigative Interviewing Group

Appendix B

**List of Publications**

Kelly, C., & Russano, M. B. (2023). The science of interviewing: How do we know what we know? In G. Oxburgh et al (Eds.), *Interviewing and Interrogation: A Review of Research and Practice since World War II.* Torkel Opsahl Academic EPublisher.

Mindthoff, A., Evans, J. R., Perez, G., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J. Z., Vallano, J. P., Woody, W. D., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Hayes, T., Meissner, C. A., Michael, S. W., Russano, M. B., & Stocks, E. L. (2020). Juror perceptions of intoxicated suspects' interrogation-related behaviors. *Criminal Justice & Behavior, 47,* 222-246. doi: 10.1177/0093854819888962

Russano, M. B., Kelly, C., & Meissner, C. A. (2019). From the ivory tower to the interrogation room: Training and field evaluation research on suspect interviewing. In R. Bull & I. Blandon-Gitlin's (Eds.), *Handbook of Legal and Investigative Psychology* (pp. 287-310). New York, NY: Routledge.

Kelly, C. E., Russano, M. B**.**, Miller, J. C., & Redlich, A. D. (2019). On the road (to admission): Engaging suspects with minimization. *Psychology, Public Policy, and Law, 25,* 166-180. doi:10.1037/law0000199

Kassin, S. M., Russano, M. B., Amrom, A. D., Hellgren, J., & Kukucka, J. (2019). Does recording inhibit crime suspects?: Evidence from a fully randomized field experiment. *Law and Human Behavior, 43,* 45-75. doi: 10.1037/lhb0000319

Brandon, S., Arthur, J., Ray, D., Meissner, C., Kleinman, S., Russano, M., & Wells, S. (2019). The High-Value Detainee Interrogation Group (HIG): Inception, evolution, and impact. In M. Staal & S. Harvey's (Eds.), *Operational Psychology: A New Field to Support National Security and Public Safety* (pp. 263-285). Santa Barbara, CA: ACB- CLIO.

Mindthoff, A., Evans, J. R., Perez, G., Woestehoff, S. A., Olaguez, A. P., Klemfuss, J. Z., Normile, C. J., Scherr, K. C., Carlucci, M. E., Carol, R. N., Meissner, C. A., Michael, S. W., Russano, M. B., Stocks, E. L., Vallano, J. P., & Woody, W. D. (2018). A survey of potential jurors' perceptions of interrogations and confessions. *Psychology, Public Policy, & Law, 24,* 430-448. doi: 10.1037/law0000182

Houston, K. A., Russano, M. B., Ricks, E. P. (2017). "Any friend of yours is a friend of mine": Investigating the utilization of an interpreter in an investigative interview. *Psychology, Crime and Law, 23,* 413-426*.* doi: 10.1080/1068316X.2017.1290091

Narchet, F. M., Russano, M. B., Kleinman, S. M., & Meissner, C. M. (2015). A (nearly) 360° perspective of the interrogation process: Communicating with high-value targets. In G. Oxburgh, T. Myklebust, T. Grant & B. Milne (Eds.) , *Communication in Investigative and Legal Contexts: Integrated Approaches from Forensic Psychology, Linguistics and Law Enforcement.* John Wiley & Sons, Ltd, Chichester, UK. doi: 10.1002/9781118769133.ch8

Russano, M. B., Narchet, F. M., & Kleinman, S. M. (2014). Analysts, interpreters and intelligence interrogations: Perceptions and insights. *Applied Cognitive Psychology, 28,* 829-846. doi:10.1002/acp.3070

Russano, M. B., Narchet, F. M., Kleinman, S. M., & Meissner, C. M. (2014). Structured interviews of experienced HUMINT interrogators. *Applied Cognitive Psychology, 28,* 847-859. doi:10.1002/acp.3069

Evans, J. R., Meissner, C. A., Ross, A. B., Houston, K. A., Russano, M. B., & Horgan, A. J. (2013). Obtaining guilty knowledge in human intelligence interrogations: Comparing accusatorial and information-gathering approaches with a novel experimental paradigm. *Journal of Applied Research in Memory and Cognition, 2,* 83-88. doi: 10.1016/j.jarmac.2013.03.002

Horgan, A. J., Russano, M. B., Meissner, C. A., & Evans, J. R. (2012). Minimization and maximization techniques: Assessing the perceived consequences of confessing and confession diagnosticity. *Psychology, Crime, & Law, 18,* 65-78. doi: 10.1080/1068316X.2011.561801

Narchet, F. M., Meissner, C. M., & Russano, M. B. (2011). Modeling the effects of investigator bias on the elicitation of true and false confessions. *Law and Human Behavior, 35,* 452-465. doi: 10.1007/s10979-010-9257-x

Evans, J. R., Meissner, C. A., Brandon, S. E., Russano, M. B., & Kleinman, S. M. (2010). Criminal versus HUMINT interrogations: The importance of psychological science to improving interrogative practice. *Journal of Psychiatry & Law, 38,* 215-249. doi: 10.1177/009318531003800110

Meissner, C. A., Hartwig, M., & Russano, M. B. (2010). The need for a positive psychological approach and collaborative effort for improving practice in the interrogation room. *Law and Human Behavior, 34,* 43-45. doi: 10.1007/s10979-009-9205-9

Meissner, C. A., Russano, M. B., & Narchet, F. M. (2010). The importance of a laboratory science for improving the diagnostic value of confession evidence. In G. D. Lassiter & C. Meissner's (Eds.), *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations* (pp. 111-126). Washington, DC: APA. doi: 10.1037/12085-007

Evans, J. R., Schreiber Compo, N., & Russano, M. B. (2009). Intoxicated witnesses
 and suspects: Procedures and prevalence according to law enforcement. *Psychology,
 Public Policy, and Law, 15,* 194-221. doi: 10.1037/a0016837

Russano, M. B. (2008). Juries and the dynamite charge. In B. L. Cutler's (Ed.),
 *Encyclopedia of Psychology and Law, Vol. 1,* 245-247. Sage Publications.

Russano, M. B., Dickinson, J. J., Greathouse, S. M., & Kovera, M. B. (2006).
 "Why don't you take another look at number three?" Investigator knowledge and its
 effects on eyewitness confidence and identification decisions. *Cardozo Public Law,
 Policy and Ethics Journal, 4,* 355-379.

Russano, M. B. (2006). "It's really in your best interest to cooperate…". [Review of
 the book *Interrogations, confessions and entrapment*]. *Applied Cognitive
 Psychology, 20,* 131-133.

Russano, M. B., Meissner, C. M., Narchet, F. M., & Kassin, S. M. (2005). Investigating
 true and false confessions within a novel experimental paradigm. *Psychological
 Science, 16,* 481-486. doi: 10.1111/j.0956-7976.2005.01560.x

Meissner, C. A., & Russano, M. B. (2003). The psychology of interrogations and false
 confessions: Research and recommendations. *Canadian Journal of Police &
 Security Services, 1,* 53-64.

Kovera, M. B., Russano, M. B., McAuliff, B. D. (2002). Assessment of the
 commonsense psychology underlying Daubert: Legal decision makers'
 abilities to evaluate expert evidence in hostile work environment cases.
 *Psychology, Public Policy, and Law, 8,* 180-200.

Russano, M., & Kovera, M. B. (2000). Supreme Court revisits Miranda warnings.
 *Monitor on Psychology, 31(3),* 7.

Appendix C

**Testimony Provided**

*State of New York vs. Claude Bird* (2014) – Trial Testimony
*Carl Chatman vs. City of Chicago, et al.* (2016) – Deposition Testimony
*Commonwealth of Massachusetts v. Gabriel Burgos* (2017) – Pretrial Hearing Testimony
*People of the State of Illinois vs. Dannie Kendrick* (2019) – Trial Testimony
*Cathy Woods vs. City of Reno, et al.* (2019) – Deposition Testimony
*Commonwealth of Massachusetts vs. Ralph Wilson* (2020) – Pretrial Hearing Testimony
*Tyrone Hood vs. City of Chicago, et al.* (2020) – Deposition Testimony
*Adam Gray vs. City of Chicago, et al.* (2020) – Deposition Testimony
*Commonwealth of Massachusetts vs. Kenton Thomas* (2021) – Motion to Suppress Hearing
*Sam Hadaway v. City of Milwaukee et al.* (2023) – Deposition Testimony
*Adam Gray vs. City of Chicago, et al.* (2023) – Trial Testimony
*Arnold Day v. Kenneth Boudreau et al.* (2023) – Deposition Testimony
*Robert Day v. Commissioner* (2023) – Trial Testimony (Habeas Appeal)

<u>Appendix D</u>

**Potential Exhibits**

Jaime Rios' Court-Reported Statement (PFP000086-PFP000096)
JGS_RIOS 00084-JGS_RIOS 00088
JGS_RIOS 00089-JGS_RIOS 00093