# Schafer and Associates

**201 South Washington Street**

**Westmont, Illinois 61473**

**(661) 547-9572**

**jackschafer500@gmail.com**

May 31, 2024

**Rios v. City of Chicago, et al.**

## I. Assignment

On March 15, 2024, Joseph M. Polick of the Sotos Law Firm, P.C. retained me to provide expert analysis in the pending civil litigation of *Jamie Rios v. City of Chicago et al.* concerning the investigation of the Luis Morales murder, specifically the interview and interrogation of Jamie Rios that resulted in his disputed confession. I was also asked to respond to the opinions of Dr. Melissa Russano, as documented in her expert report that relates to the disputed confession of Jamie Rios.

## II. Method of Analysis

As explained in more detail in Section IV, I possess specialized knowledge in the field of interrogation techniques and disputed confessions, which I have acquired based on the following:

- My training, experience, and skills I developed as an FBI agent, including my time in the FBI's Behavioral Analyst Program, having interviewed and interrogated over a thousand criminal suspects and witnesses;

- My training in the methods of evaluating and analyzing research that I received when I obtained my Ph.D. in psychology, along with my master's degrees in media psychology, clinical psychology, and criminal justice;

- My knowledge of the published research in the field of interviewing and interrogation techniques and disputed confessions, including my publications about advanced interviewing techniques and psychological narrative analysis; and

- My work consulting with federal, state, and local agencies, including the Department of Defense, on interviewing and interrogation techniques.

My opinions, summarized in Section III of this report, are based on the application of reliable principles and methods that I have acquired through my specialized knowledge in the field of interrogation techniques and disputed confessions to my analysis of the materials provided to me by counsel including police reports, trial testimony, and deposition testimony as listed in Section VI.

### III. Summary of Opinions

In my report, I summarize my qualifications and the relevant facts from the resource materials. I then explain typical methodologies employed in social science research. This is followed by a synopsis of the social science research on interrogations and the causes of

confessions, including false confessions. I also discuss the problems with research methodology on the causes of confessions, research limitations, and the application of the research to Rios' disputed confession. Based on my training, experience, and consulting work, I further explain the actual experiences of interrogators inside the interrogation room and the general rules and techniques interrogators use when interrogating suspects. Further detailed explanations underlying my opinions are provided in sections VIII, IX, X, and XI of this report.

The following list is a summary of the opinions I reached based on this analysis:

1) Russano based her opinions on experimental studies exploring the risk factors that may lead to false confessions. However, the experimental studies upon which she rests her opinions lack external validity, which precludes any valid associations between participants in the experimental studies and actual suspects facing potential criminal charges in the interrogation room. Therefore, Russano's opinions should be viewed with extreme caution.

2) Russano's report is replete with word qualifiers such as may, might, and could. By definition, the use of the word qualifiers such as may, might, and could suggest the same thing that may happen may also not happen. Russano only focused on the fact that something may happen and ignored the possibility that something may not happen. Russano stated in her deposition she uses tentative language to draw attention to risk factors that have not been supported in the official record (pp. 145-46). Russano contends that the absence of certain risk factors in the record may also increase the risk of a false confession (p.146). For example, Rios said he was given water to drink during his time at the police station, but Russano contends that the record does not reflect that

Rios was offered any food to eat in addition to water, so the lack of food may have also contributed to his false confession. Russano is highlighting risk factors that do not explicitly exist in the record by using tentative language. Russano's use of tentative language when describing the risk factors for false confessions should be examined in detail to determine if support actually exists for a risk factor or if Russano is merely speculating that the absence of supporting documentation somehow suggests a risk factor was present.

3) Detectives investigating Rios' involvement in the Morales murder did not fall victim to confirmation bias, as suggested by Russano. The active investigative steps taken by detectives were not the product of confirmation bias. In example, even after Rios confessed to his involvement in the Morales murder in the early morning of July 7, 1989, detectives continued their investigation by locating eyewitnesses. Rios was not formally charged until late in the afternoon of July 7, 1989. Detectives thereafter sought search warrants to search for the weapons used in the crime. The evidence the detectives uncovered shaped the investigation's course, not confirmation bias. If confirmation bias was a factor, Rios would have been charged immediately following his confession. The detectives would not have continued their investigation to seek additional evidence and eyewitnesses to corroborate Rios's admissions.

4) Rios's youth did not represent a vulnerability that might have led Rios to confess falsely. At the time of Rios' interview, he was two months shy of his twentieth birthday. Rios had numerous interactions with the police for criminal violations, including aggravated assault, robbery, burglary, battery, disorderly conduct, theft, and controlled

substance possession. Rios was well acquainted with the criminal justice system. Rios' age and extensive experience with and knowledge of the criminal justice system at the time of his confession in this case, belie youth as a situational factor.

5) Whether Rios was isolated during from his arrival at the Area 5 station at 10:00 pm on July 6, 1989, until 12:30 am on July 7, 1989, when he was told he was under arrest after admitting to his involvement in the Morales shooting is disputed. Russano implied that Rios was isolated from his girlfriend, Diana Rodriquez, and their baby when Rios was at the Area 5 police station. Detective Mason testified at the criminal trial that Rios was allowed to see and personally speak with Rodriguez. In fact, police officers provided Rodriguez with a ride to the Area 5 police station. Further, Russano cannot make a determination if isolation is a factor in Rios's confession unless she knows Rios's personality, behavioral characteristics, and personal preferences. Rios may be a person who likes to be alone. If Rios's relationship with Rodriguez was strained, he may not have wanted to see Rodriguez while he was talking with detectives. Rios may be the type of person who likes to be alone to think. Without knowing Rios' personality characteristics, making a determinization that isolation was a risk factor in Rios' confession is not possible. Nonetheless, investigators seek to create a quiet interview/interrogation environment conducive for meaningful conversations and devoid of distractions as this is critical to the interview/interrogation process, and the detectives had no obligation to allow Rios to receive visitors during the investigation and Rios' subsequent interview.

6) Russano's definition of the total time of interrogation includes both the time of the actual interrogation and the total in-custody time. This is not the standard definition of interrogation time. The standard method to calculate the length of an interrogation is from the beginning of the interrogation until the end of the interrogation, excluding the times when suspects are not actually being interrogated. Using the standard definition of interrogation time, Rios was interrogated by detectives for a total of 30 minutes. Rios' interrogation began at approximately midnight and ended at 12:30 am on July 7, 1989. Rios' subsequent conversation with ASA Riley and his court-reported statement do not constitute interrogations because Rios merely repeated and memorialized what he previously told detectives. Using Russano's definition, the total in-custody time including Rios' 30-minute interrogation was approximately 3 hours -- from 9:30 pm on July 6, 1989, until 12:30 am on July 7, 1989. Between Rios' arrival at the Area 5 station at 10:00 pm on July 6, 1989 and the start of his interview at 12:00 am (midnight) on July 7, 1989, investigators were searching for the witnesses to the crime. Even by Russano's definition, 3 hours of in-custody time is well within acceptable limitations. The length of interrogation is not a factor in Rios's interrogation by detectives.

7) In Russano's Rios report, she posited, according to Rios' account, he suffered physical abuse at the hands of the interviewing detectives and physical discomfort from being handcuffed. Rios stated in his deposition that while he was seated handcuffed behind his back, Mason grabbed Rios behind the back of his head and slammed his face on the table. Detective Mason testified at trial and in his deposition that he did not slam Rios' head onto a table. Mason further testified he and Detective Halvorsen interviewed Rios

6

and not Officer Guevara. When and how long Rios was handcuffed is also disputed between Rios and the detectives. Photographic evidence of Rios at the time of his court-reported statement, line-up , and intake at the Cook County Jail, does not indicate Rios sustained any visible injuries. Additionally, Rios' Cook County Jail intake medical examination record does not record any physical injuries, nor did Rios make any complaints of injury to jail personnel (Rios dep. pp. 266-67). Nonetheless, if Rios' version of events is credited, using physical force on suspects during an interview or interrogation is unacceptable.

8) Russano posited in her report that Rios may have also been denied basic necessities such as food, drink, and bathroom privileges, and that these deprivations are likely to produce unreliable statements. Russano's opinion is based on conjecture and should be viewed with caution. In his deposition Rios testified that the answers to ASA Barbara Riley's questions about having water to drink and being allowed to use the bathroom in his court-reported statement were truthful. (Rios dep. pp. 248-49). ASA Riley testified in her deposition that she spoke with Rios alone while they waited for the court reporter to arrive (Riley dep. p. 44), and during her conversation with Rios she asked him how he was doing, if he needed anything, and how he had been treated by the police (p. 45). Rios told Riley that he was treated "just fine" by the police (pp. 45-46). Russano does not know in July 1989 how long Rios could go without food before becoming hungry or how often he would need to use the washroom (Russano dep. pp. 323-24), so determining Rios' hunger level or need to use the bathroom is not possible. Therefore,

the impact of Rios' hunger or need to use the washroom cannot be reliably attributed to Rios' decision to confess.

9) Sleep deprivation was not a factor in the police interview and interrogation of Rios. Rios did not indicate in his trial testimony, court-reported statement, or his deposition that sleep deprivation influenced his decision to provide information to the detectives and the assistant state's attorney. Rios had an opportunity to sleep, nap, or nod off during the down time between 10:00 pm on July 6, 1989, when he arrived at the Area 5 police station, and 12:00 am, when he was interrogated by detectives. There is no evidence the detectives intentionally prevented Rios from sleeping, a hallmark of the sleep deprivation interrogation technique. Russano does not know Rios' sleep patterns at the time of the events on July 7, 1989. Without knowing Rios' sleep patterns (Russano dep. p. 323-24), any opinion rendered by Russano regarding sleep deprivation as a risk factor is pure guesswork.

10) Rios was not subjected to a guilt-presumptive, accusatorial interrogation approach as posited by Russano. Before interviewing Rios, the detectives vetted the confidential informants' information. Additionally, the detectives sought to locate witnesses Hudson, Torres, and Huertas to view a live line-up containing Rios. Since the interview with Rios was not videotaped or audio recorded, Russano can only speculate as to what interviewing techniques were used by the detectives. Further, the social science research on guilt-presumptive questioning significantly increasing the likelihood of a false confession is limited in application because the experimental research designs lack external validity.

8

11) Rios was not presented with false evidence as advanced by Russano. Russano posited that when detectives told Rios confidential informants named him as the shooter of Morales, it constituted the functional equivalent of the presentation of false or fabricated evidence, and that would have increased the likelihood of a false confession from Rios. Detectives followed up on the information from Guevara's confidential informants with Kijowski, who received the same information from his informant. Furthermore, Mason personally met with Guevara's confidential informants to verify the information they provided to Guevara. The information presented to Rios regarding the information provided by the confidential sources was real. The information was not false or fabricated. By definition, presenting evidence that is truthful or thought to be truthful at the time the evidence is presented does not constitute a false evidence ploy. Notwithstanding, the social science research on false evidence ploys significantly increasing the likelihood of a coerced compliant confession is limited in application because the experimental research designs lack external validity.

In Russano's deposition she concedes that the detectives did, in fact, receive information from confidential informants, which does not constitute a false evidence ploy (Russano dep. p. 167). Russano noted that the information from the confidential sources may or may not have been reliable (p. 171). Because the information from the criminal informants may have been unreliable, Russano contends the presentation of information that may have been unreliable constitutes a false evidence ploy, not the existence of the confidential informants themselves. Russano's proposition drawn to its logical conclusion would suggest that any question an interrogator asks a suspect based

9

on a supposition, an assumption, or an inference would constitute a false evidence ploy. The purpose of asking suspects questions is to seek information. The most efficient way to find out if the information provided by the criminal informants is true or not is to present the information to Rios and evaluate his response. The presentation of information that may or may not be reliable does not constitute a false evidence ploy.

12) Whether Rios was subjected to threats and false promises is disputed. The investigating detectives and ASA Riley testified under oath that Rios was not subjected to threats or false promises. If Rios' account is credited, detectives threatening to take Rios' baby away from him constitutes a threat that is never permitted in the interrogation room. Russano cannot resolve these disputed issues and she does not know how Rios responded or reacted to threats or promises in July 1989 (Russano dep. pp. 324-35). Russano's opinion that threats and promises were a risk factor that likely elicited a false confession are conjecture.

## IV. Qualifications

I am employed as a professor in the School of Law Enforcement and Justice Administration at Western Illinois University (WIU), Macomb, Illinois. I have been employed as a WIU professor for 13 years. My research, training, and specialization areas include psychology, interview and interrogation techniques, statement analysis, behavioral analysis, and detecting verbal and nonverbal deception. I earned a Ph.D. in Psychology from Fielding Graduate University, Santa Barbara, California; a Master of Arts degree in Media Psychology from Fielding Graduate University, Santa Barbara, California; a Master of Arts degree in Clinical Psychology from Fielding Graduate University, Santa Barbara, California; a Master

10

Science degree in Criminal Justice from Western Illinois University, Macomb, Illinois; a Bachelor of Science degree in Business Administration from Elmhurst College, Elmhurst; Illinois; and a Bachelor of Science degree in Psychology from Western Illinois University, Macomb, Illinois. I also earned a certificate from the Defense Language Institute, Monterey, California, in the Korean language.

From 1985 until 2005, I served as a Special Agent with the Federal Bureau of Investigation (FBI). During my 20 years as an FBI Special Agent, I conducted over a thousand interviews and interrogations of witnesses and suspects. Specifically, from 1986 until 1988, I investigated homicides and child sexual assault violations on the Navajo and Hopi Indian Reservations in Northern Arizona. As a result of my investigations, I arrested five Bureau of Indian Affairs (BIA) schoolteachers and interviewed over 300 hundred children who were victimized.

In 1988, I transferred to the FBI Los Angeles Field Office, whereat I conducted intelligence and counterintelligence investigations. My duties included apprehending domestic and foreign spies. In general, I developed personality assessments of suspected spies and recruitment targets. Based on the assessments, I developed recruitment and interviewing strategies. As a result, I conducted several undercover and false flag operations, netting four foreign spies and one domestic spy.

As an FBI Special Agent, I investigated citizen complaints alleging violations of 18 USC 242, Deprivation of Rights Under Color of Law. As part of these investigations, I interviewed numerous police officers and witnesses involved in use of force allegations. I also conducted investigations into civil rights violations in Lancaster, California. A group of about 50 white

11

supremacists calling themselves Nazi Low Riders (NLR) stabbed, beat, and murdered minorities in Lancaster. Of the 50 members of the NLR group, 39 members were arrested and sentenced to prison. During this investigation, I interviewed hundreds of white supremacists and witnesses. Many of these investigations consisted of multiple suspects who confessed. Many of the suspects provided self-serving accounts of their crime participation to lessen their culpability or denied they participated in the crime. In some cases, suspects provided partial confessions. In other cases, suspects provided false information to mislead investigators. As an investigator, I was required to detect signs of deception and evaluate the reliability of the suspects' statements.

For the last seven years of my FBI career, I served as a member of the FBI National Security Division's Behavioral Analysis Program (BAP). As a behavioral analyst, I specialized in behavioral profiling to support FBI intelligence, counterintelligence, and counterterrorism investigations. I continuously received training and conducted research in areas including but not limited to forensic psychology, cognitive psychology, and social psychology. As an FBI Special Agent, I also served as a pilot and Korean linguist.

Currently, I own my own consulting company, Schafer and Associates. I consult with police agencies, prosecutors, and defense attorneys to develop investigative strategies and evaluate the veracity of witnesses, victims, and defendants. I trained FBI Special Agents on how to interview Middle Eastern terrorist suspects. I trained DoD, law enforcement, and civilian personnel in interviewing, interrogation, elicitation, detecting deception, negotiation skills, and psychological narrative analysis. I taught Defense Intelligence Agency (DIA) intelligence officers basic and advanced negotiation skills. I also taught negotiating techniques

12

to Special Forces units prior to their deployment to Iraq and Afghanistan. These units include Navy Seal Teams, Asymmetrical War Group, 82nd Airborne Civil Affairs Units, and 82nd Airborne Psychological Operations Units. Furthermore, I trained federal, state, and local law enforcement personnel in intermediate and advanced interviewing techniques, detecting deception, the psychopathology of hate/terrorism, and psychological narrative analysis.

I authored or coauthored two books on interviewing and interrogation techniques, *Advanced Interviewing Techniques: Proven Techniques for Police, Military, and Security Personnel 4th Ed.* (Charles C. Thomas Publishing Company, 2023) and *Psychological Narrative Analysis: A Professional Method to Detect Deception in Oral and Written Communications (2nd Ed.)* (Charles C. Thomas Publishing Company, 2019). I also coauthored *The Like Switch: An Ex-FBI Agent's Guide to Influencing, Attracting, and Winning People Over* (Simon & Schuster, 2015) and *The Truth Detector: An Ex-FBI Agent's Guide for Getting People to Reveal the Truth* (Simon & Schuster, 2020).

I authored or coauthored over 40 magazine and peer-reviewed journal articles on various topics, including the psychopathology of hate, ethics in law enforcement, civil rights, detecting deception, and the universal principles of criminal behavior.

I was designated an expert witness in statement analysis in a Florida court. I was also certified as a white supremacist gang subject matter expert and testified as an expert witness in state and federal court. My qualifications are summarized in greater detail in my curriculum vitae (Attachment A).

## V. Fee Arrangement

My consultation rate is $450 per hour.

**VI.  Materials Reviewed**

For a list of the documents reviewed for this analysis, refer to Attachment B.

**VII.  Summary of Events**

On June 27, 1989, at approximately 11:50 pm, Luis Morales was shot five times on the sidewalk in front of 1316 North Western Avenue, Chicago, Illinois. Several hours later, Morales succumbed to his injuries. Javier Torres was with Morales when he was shot. Morales and Torres self-identified as members of the Spanish Cobra street gang. Torres identified Jose Melendez, a member of a rival street gang called the Latin Kings, as the person who shot Morales. Torres also reported that a person unknown to Torres was with Melendez during the shooting.

Melendez voluntarily went to the Area 5 police station to talk to detectives about the Morales murder. Melendez provided an alibi to detectives. Detectives confirmed Melendez's alibi and eliminated him as a suspect in the Morales shooting. When detectives confronted Torres with Melendez's alibi, Torres recanted his identification of Melendez as the person who shot Morales.

Detectives identified Samantha Hudson as a witness to the events leading up to the Morales shooting. On June 27, 1989, at approximately 11:30 pm, Hudson sat on the stairs of her residence. Hudson heard some people in the alley. Hudson walked into the alley, where two male Hispanics stood near the garbage can behind her residence, just south of Potomac Avenue. After Hudson exchanged words with one of the Hispanic males, she returned to the stairs and sat down. A few minutes later, one of the Hispanic males exited the alley and looked at Hudson. The Hispanic male removed a small, dark-colored handgun from his pocket and

14

walked to the north side of Potomac Avenue. The second Hispanic male exited the alley. Hudson observed the first Hispanic male signal the second Hispanic. The two Hispanic males then ran east on Potomac Avenue toward Western Avenue and turned north on Western Avenue. Seconds later, Hudson heard several gunshots, but she did not witness the shooting.

Gang Crimes Officer Noon identified Luis Huertas as an eyewitness to the Morales shooting. Detectives later interviewed Huertas. On June 27, 1989, at approximately 11:45 pm, Huertas was sitting in front of 1310 North Western Avenue and saw two people walking north on Western Avenue from Potomac Avenue. The two people noticed Huertas and represented the Spanish Cobras street gang. Huertas stood up and got a good look at both Hispanic males. Huertas then saw Morales and Torres exit a gangway at 1316 North Western Avenue. Morales said, "What's up?" to the two Hispanic males. Huertas then saw the second Hispanic male shoot Morales. Torres ran away after the shooting started.

Hudson and Huertas viewed a live line-up, including Melendez, at the Area 5 police station. Neither Hudson nor Huertas made an identification.

Three .25 caliber cartridge casings were recovered from the crime scene. Additionally, two bullets were recovered during the autopsy of Morales.

Gang Crimes Officers Guevara and Gawrys contacted their confidential sources in an effort to find out who shot Morales. Two confidential sources identified Jaime Rios as the shooter and Cristino Garcia, aka Tino, as the person who was with Rios when he shot Morales. Rios and Garcia are self-identified members of the Latin Kings street gang. Detectives followed up on the information from Guevara's confidential informants with Lt. Kijowski, who received the same information from his informant.

15

On July 6, 1989, at approximately 9:30 pm, Guevara located Rios at his residence. According to the police accounts, Rios agreed to accompany Guevara to the Area 5 police station to be interviewed regarding the Morales shooting. Rios arrived at the Area 5 police station at approximately 10:00 pm and was placed in an interview room. Detectives attempted to locate witnesses to the crime. At approximately midnight, Rios was interviewed by Detectives Mason and Halverson. Rios provided the following summary of events excerpted from Mason's July 7, 1989, supplemental report.

> Rios stated that on the evening of 27 June 89, at approximately 2245 hour, he was in the vicinity of Levitt and Lemoyne with his girlfriend and some other friends when a car drove by and fired several shots at him. Rios stated that he believed those persons to be Spanish Cobra gang members. Rios stated that he then went to his apartment and retrieved a gun that he kept there and then went out into the street where he met up with a friend of his by the name of Tino. Rios stated that he told Tino what had occurred and Tino stated that he would get a gun and then the two could go into Spanish Cobra territory. Rios stated that Tino left and returned with a gun and then the two of them walked to Western and Division. From that location they went north through the west alley of Western to Potomac. Rios walked west on Potomac to Artesian to look for some Cobras, not finding any he returned to the alley. Rios stated that he observed two persons in the alley north of Potomac and that they walked east through a gangway towards Western. Rios further stated that while he was in the alley a car pulled up and tried to buy some dope from him. Rios and Tino then went to Western Av. and walked north where they encountered a man sitting on the step in front of the bar. Rios stated that they continued north and then encountered the victim and another. Rios stated that Tino then pulled his gun out and began firing at the victim who then fell to the ground. Rios stated that when it was over Tino ran eastbound across Western Av. and he, Rios followed. When Rios got to the middle of the street he fired two shots from his gun back in the direction of the victim and yelled King Love.

Mason contacted Felony Review for a charging review. ASA Barbara Riley responded and interviewed Rios. Rios provided ASA Riley with the same basic facts as he related to Mason and Halverson. After Riley's interview with Rios, he agreed to give a court-reported statement. On July 7, 1989, at approximately 4:39 am, Rios began his court-reported statement.

16

Rios' court-reported statement ended at 4:51 am. The court reporter typed Rios' statement. Rios reviewed his court-reported statement, made corrections, and signed the document at 6:10 a.m. The court reporter took a photograph of Rios after he signed the document. Rios was not formally charged by prosecutors at that time.

Later in the day on July 7, 1989, detectives placed Rios in a live line-up. Huertas viewed the line-up and identified Rios as the person who shot Morales. Torres viewed the line-up with Rios but did not make an identification. Rios was formally charged following his identification in the line-up.

Detectives determined through confidential informants that one of the guns used in the Morales shooting was at the residence of Benjamin Carrero. On July 9, 1989, at approximately 10:15 pm, a search warrant, based on confidential informant information, was issued to search Carrero's residence for a weapon that was used in the Morales murder. Detectives recovered a .32 caliber revolver from Carrero's residence. On July 10, 1989, Carrero testified before the Grand Jury. Carrero testified that on June 28, 1989, at approximately 12:30 am, Rios came to Carrero's house, gave Carrero a gun, and told Carrero that he (Rios) had just shot someone. Carrero further testified that Rios gave Carrero a black .38 caliber revolver. During Rio's criminal trial, Carrero admitted Rios gave him (Carrero) a .32 caliber gun, but he denied Rios said he shot someone.

On July 28, 1989, Cristino "Tino" Garcia was located and transported to the Area 5 police station for questioning. Garcia invoked his Miranda rights and did not provide a statement. Garcia was placed in a live line-up. Torres viewed the line-up, but he did not make an identification. Gracia was not charged and was subsequently released.

17

## VIII.  False Confession Research

Researchers studying the false confession phenomenon rely on two broad experimental methods to examine the impact of police interrogation techniques on false confessions: descriptive research and experimental research.

## Descriptive Research

Descriptive research identifies characteristics, frequencies, trends, and categories. Descriptive research aims to accurately and systematically describe a population, event, or phenomenon. Descriptive research investigates one or more variables and encompasses various research methods, including anecdotal studies, archival analyses of primary case documents, observations of live or taped interrogations, and surveys of police investigators. Unlike experimental research, researchers do not control or manipulate variables but only observe and catalog them. Descriptive research provides a starting point for further research. Descriptive research does not explain causes or relationships between variables, and the findings cannot be generalized to larger populations.

### *Anecdotal Analysis*

Anecdotal analysis, which includes analyzing case studies and archival data, is another form of descriptive research, but it often lacks a sound methodology and is difficult to replicate. Anecdotal cases are typically selected by researchers, which introduces the risk of confirmation bias because the reports selected may tend to support the researcher's hypotheses. The issue of bias is heightened if anecdotal evidence is not randomized, and other experimental controls are not put in place. The results of anecdotal reports cannot be generalized to larger populations because such evidence produces only the weakest inferences. Anecdotal studies do not permit

researchers to determine either the frequency of occurrence of something or its causes and effects.

### Surveys

Survey data can be unreliable for several reasons. The survey participants' characteristics may not represent a larger population. The design of the questionnaire may be flawed. The response format may be inappropriate. Survey participants may not respond honestly, depending on the topic's sensitivity. Survey data can be more reliable if the data is randomly collected, if the questionnaire is assessed for potential flaws by other researchers, and if the results are replicated in subsequent surveys.

## Experimental Research

Experimental research goes beyond simply cataloging phenomena or finding correlations. Experimental research is typically conducted by nonpracticing academicians in controlled, experimental environments. Experimental research allows scientists to manipulate one or more variables in a tightly controlled environment. Experimental research results provide strong evidence of how one factor influences another. In order to draw valid cause and effect relationships, the experiment must comprise experimental and control groups, the participants must be randomized, the experiment must have internal validity, external validity, and the extraneous variables must be controlled.

### Experimental and Control Groups

Experimental research typically includes a control group and an experimental group. The experimental and control group research methodology involves dividing participants into those two groups. The experimental group receives the treatment or intervention the researcher

19

is interested in testing. The control group does not receive the treatment or intervention. The control group is essential because it helps control for extraneous variables.

### Randomization

Researchers use random assignments to create a control group that is as similar as possible to the experimental group. Random assignment means each participant has an equal chance of being assigned to the experimental or control groups. Random sampling ensures the experimental and the control groups are statistically similar at the outset, strengthening the conclusion that any observed differences are due to the introduction of the independent variable. Researchers also try to ensure the experimental and control groups have similar demographics such as age, gender, ethnicity, and socioeconomic status.

### Sampling

Experimental researchers specify the population to be included in the experiment. If the population is too large to be included in the experiment, researchers randomly select participants, cases, or events from the entire targeted population. Randomization is the most accurate method to yield a truly representative sample. Random sampling is critical for researchers to statistically calculate the relationship between the sample and a larger population. Random sampling does not guarantee that the results of an experiment using a sample will perfectly match the larger population from which the sample was drawn. Still, the results will, most of the time, closely represent the population. The lack of randomization leads to sampling errors, invalidating any attempt to apply the experimental results to larger populations.

### *Internal Validity*

Researchers must ensure their studies have internal validity, which means their experiments, in fact, test the very thing their experiments seek to test. Experimental research must have internal validity before generalizations of the research outcomes can be attributed to larger populations. If the experiment has internal validity, external validity remains a potential concern.

### *External Validity*

External validity is the ability of the researcher to generalize experimental findings to a larger population outside the experimental group. If experimental research lacks external validity, the findings only hold true to the experimental group and cannot be generalized to a larger population. Additionally, no causality or associations of research findings can be applied to populations outside the experimental group in experiments that lack external validity.

### *Extraneous Variables*

Extraneous variables are factors that could affect the research outcome other than the treatment or intervention being examined. By having a control group that does not receive the treatment or intervention, the researcher can be more confident that any differences between the two groups are due to the treatment or intervention and not other factors. This allows the researcher to compare the outcomes of the two groups to determine the effect of the treatment or intervention.

### *Ethics*

Ethics plays a vital role in the experimental and control group research design. Researchers should not expose research participants to unethical treatments or stimuli. The

experimental and control group research methodology is a powerful tool to replicate the effects of treatments or interventions over time and context.

## IX. False Confession Research Methodology

False confession research is inconclusive. No controlled study has accurately measured the efficacy of police interrogation techniques on criminal suspects. To conduct a viable false confession study, the experimental group must share similar personalities and backgrounds and undergo the same interrogation procedures under actual interrogation conditions as the control group. This kind of realistic research would yield the best results; however, researchers would have to entice research participants to commit actual crimes and then have them undergo police interrogations. This research paradigm is unethical, thus prohibiting this type of direct research.

Consequently, alternative research methods must be established to collect data on police interrogation practices. False confession research is based on anecdotal reports, surveys, and laboratory studies comprising small sample sizes and employing unrealistic research methods, thus rendering generalizations to larger populations unreliable. Existing research methods can only simulate what happens during police interrogations.

Several researchers have attempted to replicate the police interrogation environment. The first laboratory study that attempted to simulate the interrogation room environment was conducted by Kassin and Kiechel (1996). In that experiment, university students were asked to complete a typing task with another student (a female confederate). The participants were explicitly instructed not to hit the ALT key because it would cause the computer to crash. One minute into the typing exercise, the computer suddenly crashed. The experimenters accused the participants of hitting the ALT key, although they did not actually hit the ALT key. All the

22

participants initially denied hitting the ALT key. When asked by the experimenter, the confederate said she saw the participant hit the ALT key or said she did not see the participant hit the ALT key. The experimenter asked participants to sign a confession that read, "I hit the ALT-key and caused the program to crash. Data were lost." The experimenter asked each subject to sign the confession statement. Signing the confession was interpreted by Kassin and Kiechel as evidence for the compliant type of false confession. While the results of the ALT key experiment were interesting, the experiment lacks external validity, preventing any valid associations between college students' actions in an experimental setting with no consequences and suspects in the interrogation room facing real consequences in the criminal justice system.

In a critique of the ALT key experiment, Russano (2005) stated, "…the paradigm is limited by its failure to capture certain key elements of real-world interrogations and confessions. First, all participants in Kassin and Kiechel's (1996) paradigm are factually innocent, which precludes the elicitation and study of true confessions and the ability to assess diagnosticity by comparing the rates of true and false confessions. Second, participants in this paradigm are accused of accidentally committing a highly plausible "crime," leaving open the possibility that many participants are unsure whether they are innocent or guilty. In contrast, most real-world suspects are accused of intentionally committing a criminal act and are certain (whether innocent or guilty) of their own culpability" (p. 482). Russano (2005) concluded, "Because suspects in the real world are accused of criminal acts that are more severe both in nature and in consequence than the act featured in this paradigm, one could imagine that the confession rates overall would be lower in the real world than in the laboratory" (p. 486).

Kassin (2008) stated, "Over the years, researchers have reported on numerous accounts

of proven false confessions, producing a vast literature of case studies. As reported in books, newspapers, TV documentaries, and analyses of actual case files, these stories reveal that false confessions occur with some unknown frequency, that they share certain common features, and that they seem more likely to occur in some types of people and under some conditions than others (e.g., see Gudjonsson 1992, 2003). From these descriptive analyses of specific instances and associations, one cannot draw conclusions about the causes of false confessions" (p. 195).

On October 13, 2006, Dr. Richard Ofshe testified as an expert witness in *State of Louisiana vs. Hays, 97-3780,* regarding false confession experimental research. Ofshe made the following comments:

Prosecutor: Is that the computer crash test [Kassin and Kiechel's (1996)]?

Ofshe: What?

Prosecutor: The computer crash test. You're familiar with that, aren't you?

Ofshe: Oh, I know about that yes.

Prosecutor: Could you explain that to the court, please?

Ofshe: That's a silly piece of research that I think is laughable, incompetent, and the kind of thing that people like you keep bringing up because it is so stupid.

Prosecutor: Well, why don't you explain it to the Court?

Ofshe: Oh, I'll be happy to explain it to the Court. Somebody thought he could simulate interrogation by setting up an experimenting which someone crashed a computer and was told they had hit the wrong key on the keyboard and when that person was gotten to admit to that, somehow this was offered as an example of eliciting a false confession. It is a terribly naïve,

incompetent piece of research which I have criticized in courtrooms all over this country and to the author of the work.

Prosecutor: This Dr. Redlich apparently cites as part of her testimony.

Ofshe: Then she doesn't know what she's doing.

Prosecutor: Okay, so you disagree with her on that?

Ofshe: That's a laughable piece of research. If a graduate student gave me that piece of research, I'd give the graduate student a "D" and recommend that they be dropped from graduate school.

I concur with Russano, Kassin, and Ofshe that no valid associations can be made between experimental findings in the laboratory and suspects in police interrogation rooms. Student participants faced no negative consequences for having confessed, unlike criminal suspects who face the real possibility of going to prison.

Subsequent researchers employed the Kassin and Kiechel (1996) ALT key experimental design to investigate other possible influences, such as the suspect's age (Redlich & Goodman, 2003); the gender of the interrogator or suspect (Abboud, Wadkins, Forrest, Lange, & Alavi, 2002); a pre-existing state of stress (Forrest, Wadkins, & Miller, 2002); individual difference variables such as locus of control and authoritarianism (Forrest, Wadkins, & Larson, 2006); the use of minimization and maximization techniques (Klaver, Lee, & Rose, 2008); and the consequences of confession (Horselenberg, Merckelbach, & Josephs, 2003). Since Kassin and Kiechel's experiment lacks external validity, any experimental results stemming from the subsequent experiments based on the ALT key experimental design cannot be extended beyond

the group of participants who participated in the studies, much less to criminal suspects in the interrogation room.

Russano, Meissner, Narchet, and Kassin (2005) attempted to correct the flaws in the earlier Kassin and Kiechel (1996) experimental design to better emulate the conditions in the interrogation room. Russano examined the effects of two interrogation techniques, the effect of leniency via minimization tactics and an explicit offer of leniency via a deal. The experimental design induced some participants to commit an intentional act of cheating. The experimenter then interrogated participants, who were factually guilty or innocent, to convince them to sign a handwritten confession. The experimenters also offered the participants a deal if they would sign the confession statement.

The undergraduate participants received class credit for their participation in the experiment. The participants were assigned to work individually or in concert with a confederate to solve logic problems. When working on individual problems, the confederate asked the participant for help solving the problem, violating the experiment's rules. Participants who assisted the confederate were guilty of cheating. Participants who did not assist the confederate were considered innocent. Each participant was then "interrogated" by six male experimenters aged 19 to 30 years. In the minimization condition, the interrogator reduced the seriousness of the "crime" by making statements sympathizing with the participants and providing them with facing-saving statements such as "I'm sure you didn't realize what a big deal it was" and assured the participants that it was in their interest to cooperate by signing the confession statement. The participants were assured that they would receive their research credit for the day, but they would have to return for another session without receiving

26

additional class credit. The participants were also told that if they did not agree to sign the statement, the experimenter would have to call the professor into the laboratory, and the professor would handle the situation as he saw fit, with the strong implication being that the consequences would likely be worse if the professor became further involved. Participants were faced with the choice of accepting the deal, which included the known consequence of having to return for another session without receiving credit or rejecting the deal and facing an angry professor and unknown but potentially severe consequences,

Russano's experimental design lacks external validity. Most false confession laboratory studies are conducted in universities using participants chiefly comprising undergraduate students. Student participants have low levels of motivation to participate in that they suffer no consequences for their actions during the experiment; the participants are not interviewed or interrogated by real police investigators; the structure of experimental studies differs from the interview structure used by police investigators; and the participant's actions and statements are not evaluated across time and do not consider the totality of the circumstances. In other words, false confession laboratory studies are conducted in a vacuum.

Furthermore, the mindset of college students and the mindset of criminal suspects is very different. College students do not face any serious consequences for their actions in the laboratory. The punishment of having to return to repeat the experiment without receiving extra credit does not come close to the consequences suspects face in the interrogation room.

Moreover, in Russano's experiment, non-police interrogators were used to "interrogate" the experimental participants. The experimenters were not trained as police interrogators; they were merely pretending to be police interrogators. Additionally, the experimental interrogators

used the same limited interrogation script for each participant interrogation. The interrogation methods used by the "experimental interrogators" do not come close to emulating the methods used by actual police interrogators.

In real-life, police investigators may have already collected data such as the suspect's relationship with the victim, the suspect's whereabouts at the time of the crime, eyewitness statements, and other relevant background material before interviewing a suspect. Police investigators judge the suspect's possible involvement in a crime based on the suspect's behavior, physical and forensic evidence, and known facts. The lack of actual police interrogators in Russano's experiment renders her findings suspect because her findings lack external validity. Since Russano's experimental design lacks external validity, no valid associations can be made outside the experimental group, much less to suspects in an interrogation setting.

False confession researchers routinely ignore external validity. Students are not a representative sample of the suspects in the interrogation room. Laboratory experiments that lack external validity could reach different conclusions depending on which experimental methodologies are employed. Experimental methodologies such as interviews, questionnaires, laboratory simulations, naturalistic experiments, and archival data collection produce different results. Even more diverse conclusions could be reached depending on which experimental subjects are used in a particular experiment.

Russano also rests her opinions, in part, on a study by Leo and Drizin (2004). Drizin and Leo analyzed 125 recent cases of proven interrogation-induced false confessions wherein indisputably innocent individuals confessed to crimes they did not commit. Of the 125 cases

28

analyzed, 113 cases were derived from newspaper articles, four cases were derived from a single case cite, five cases were derived from another single case cite, one case was derived from a journal article, and one case from a book reference. In other words, 90.4 percent of the cases analyzed were derived from newspaper articles.

### Reliability of newspaper articles

Newspaper articles are subjected to three types of biases. The first type of bias is ideology, which reflects a newspaper's desire to sway readers' opinions in a particular direction. The second type of bias is spin or slanting, which reflects the newspapers' attempt to create memorable stories. The third type of bias is economic. Newspaper articles are written to attract and retain readership. Newspaper articles are often written using sensational language to attract and keep readers' attention. In sum, newspaper articles are written through the journalist's worldview, personal biases, and the incentive to write stories the sell newspapers. Some newspapers prioritize fact-checking, while others may prioritize sensationalism or entertainment. Additionally, newspaper articles often provide summaries of events, potentially lacking the detailed analysis and thorough research found in primary sources. Newspaper article citations are not used in academic research due to their potential for bias, inaccuracy, and lack of rigorous peer-review.

### Flawed research

Drizin and Leo (2004) stated their analysis "includes only interrogation-induced false confessions that can be classified as "proven"-that is, confessions that are indisputably false because at least one piece of dispositive evidence objectively establishes, beyond any doubt, that the confessor could not possibly have been the perpetrator of the crime" (p. 925). This type

of analysis is not possible only referencing newspaper articles. Without reading trial transcripts, videotaped or written confessions, and talking to the police interrogators and suspects, no valid conclusions can be made regarding police interrogation methods. Additionally, newspaper articles often report allegations of police misconduct made by suspects. The newspaper articles do not examine the interrogation methods used by police investigators. Allegations, unless proven, are not facts and are unacceptable in academic research. Drizin and Leo's conclusions are severely flawed because their findings are based on severely flawed, unsubstantiated data. Leo even admitted the Drizin and Leo (2004) study did not go through the traditional social science peer review (Taylor v. Chicago Leo deposition, p. 48).

The problem with current false confession research is that the flawed research findings create the illusion that the research findings are valid when they are not. Other false confession researchers also use the same flawed research methodologies to bolster the illusion of truth. False confession researchers may have a biased view of how law enforcement officers interrogate suspects due to their overreliance on laboratory experimentation, their focus on anecdotal false confession cases, and their lack of real-world interrogation experience.

Repeating experiments using flawed research methodologies produces flawed experimental findings. Moreover, no matter how many times flawed studies are cited, the findings remain the same--flawed. The results of false confession research must be trusted before any sweeping changes are made to the criminal justice system. Without collecting data from the real-world interrogation room, determining the efficacy of police interrogation techniques cannot be reliably evaluated.

Research affirms coerced compliant confessions do occur, but no methodology supported by empirical scientific research can determine if any given confession is a coerced compliant confession (Kassin, Redlich, Alceste, & Luke, 2018). False confession research has yet to identify specific interrogation techniques that portend coerced compliant confessions, nor has it been able to determine the rate increase a specific interrogation technique is likely to cause a false confession. At this stage in false confession research, predicting false confessions with any certainty is mere guesswork.

## X. Inside the Interrogation Room

In her report, Russano addresses only one side of the interviewing/interrogation process– the alleged risk factors from the suspect's perspective. Russano failed to consider the dynamic aspect of the interviewing/interrogation process. Based on my over 25 years of experience as a police officer and an FBI behavioral analyst interviewing over 1,000 suspects and witnesses, I can provide a unique perspective into the interviewing/interrogation dynamic between suspects and interviewers that few nonpractitioners have experienced. Reviewing interview videos and reading interview transcripts do not totally account for the dynamics of an interview. My experienced-based perspective will give jurors a unique opportunity to understand the interviewing/interrogation process inside the interrogation room.

The interviewing/interrogation process is inherently stressful for innocent and guilty people alike. Interviewees who are guilty will do everything they can to create the illusion of innocence. Interviewees who are innocent will do everything they can to convey the truth. The problem for interviewers is the truthful versions of events and the deceptive version of events both sound truthful on their face. The interviewer aims to determine which version of events

reflects the verifiable facts. Without the advantage of hindsight, determining veracity remains challenging. Adding to the difficulty of decerning mendacity is that innocent suspects often say and do things that make them look guilty and guilty suspects often say and do things that make them look innocent. Consequently, innocent suspects must undergo the same vetting process as do guilty suspects.

### Interview Room Dynamics

Interviewers face a dilemma. If interviewers believe the version of events as told by guilty interviewees, the guilty suspects would be released back into society and commit additional crimes, and justice would not be served. If interviewers do not believe the version of events as told by innocent suspects, innocent people will be punished for crimes they did not commit, and justice will not be served.

Interviewers face the daunting task of discerning the truth in high-stakes situations. Both guilty and innocent suspects initially deny guilt. At the onset of interviews, interviewers do not know if the suspects they interview are truthful or deceptive. Interviewers cannot accept a denial from an innocent suspect or a guilty suspect because they both profess to be telling the truth. Over time, interviewing techniques were developed to differentiate truthful suspects from deceptive suspects. Experience has shown that some interviewing techniques are more effective than other interviewing techniques. In the interrogation room, interviewers are engaged in real-time and have seconds to determine suspects' veracity; critics have a lifetime to examine the facts in hindsight.

### *Cost-benefit analysis*

The first dilemma guilty suspects face is whether or not to confess. Guilty suspects conduct a quick cost-benefit analysis. If the guilty suspects have prior experiences with the criminal justice system, they may want to confess to get a better deal when they are sentenced. Some guilty suspects decide to confess after they know that the police have sufficient evidence to implicate them. Some guilty suspects may choose not to confess under any circumstances. Interviewing guilty suspects in the first category readily provide voluntary statements implicating themselves in the crime. Interviewing guilty suspects in the second and third categories is more difficult. The agnostic guilty suspects comprise the majority of guilty suspects.

### *Agnostic Guilty Suspects*

The first priority of agnostic guilty suspects is to determine how much evidence the interviewers possess. Based on survey data, there are three general reasons why guilty suspects confess: external pressure, internal pressure, and perception of proof. (Gudjonsson & Sigurdssonb, 1999). External pressure means suspects confess because of police interrogation tactics and/or custodial confinement. Internal pressure means suspects confess because of remorse and the need to talk about the offense. Perception of proof means suspects confess because of their understanding of the evidence police have against them. According to this research, perception of proof is the single most important reason suspects confess, although all three factors are typically present in confessions.

Suspects who possess guilty knowledge of crimes they committed often realize that the police interrogators possess sufficient evidence to prove the suspects committed the crimes or

were present when the crimes were committed. A guilty conscience adds additional pressure for suspects to confess. These two factors often lead to voluntary confessions. Nonetheless, agnostic guilty suspects use myriad techniques to glean how much evidence the interviewers have accumulated before deciding to confess. Several of the techniques are discussed below.

### Rapport building

Interviewers are taught to build rapport with suspects. Rapport builds a psychological bridge between interviewers and the suspects. If suspects like the interviewers, the suspects are more likely to provide inculpatory information. Likewise, suspects try to build rapport with the interviewers. If the interviewers like the suspects, the suspects think the interviewers are more likely to believe the suspects' version of events and let them go free or, at least, give the suspects the benefit of the doubt. More importantly, suspects who develop good rapport with the interviewers think the interviewers will be more likely to reveal the evidence against the suspects. Guilty suspects and interviewers constantly try to manipulate one another for a strategic psychological advantage.

### Innocent-presumptive technique

Guilty suspects try to provide as little information as possible yet remain believable. Unlike innocent suspects, guilty suspects avoid providing details that can be easily proven or disproven, thus producing fewer details and shorter narratives. Guilty suspects have something to hide and must provide false information to cover up the gaps in their narratives. One common technique is to tell the truth up to the point where the guilty suspects want to withhold information, withhold the incriminating information, and thereafter tell the truth. Using this technique, the guilty suspects' narratives have the ring of truth. Additionally, the guilty

suspects only have to remember the withheld information. Suspects hope interviewers reveal additional evidence to contradict the suspects' denials. As long as the guilty suspects determine the interviewers do not have sufficient evidence to implicate the guilty suspects, they maintain their innocence.

Rios in his deposition, repeatedly denied being with Garcia on July 7, 1989, and he repeatedly denied being present at the crime scene. Rios used an innocent-presumptive technique in a similar way the Russano reports that police interrogators use the guilt-presumptive technique.

### *False evidence ploys*

Guilty suspects use false evidence ploys to mislead interviewers. For example, a murder suspect owns two guns. The murder suspect used one of the guns to kill a person and then threw the gun in a lake. During the police interview, the suspect denies killing the person and as proof, directs the police to the location of the second gun ostensibly used in the shooting. The murder suspect knows the ballistics test will not match the gun used in the murder and confidently maintains innocence. Guilty suspects may also falsely identify other individuals who might have a motive to commit the crime to mislead investigators. Additionally, suspects often offer false alibis to cover for the time when they were engaged in criminal activity.

### *Reaffirming denials*

Guilty suspects continuously proffer denials of guilt. Denials of guilt in the face of overwhelming evidence builds a formidable truth barrier. Innocent suspects also continuously deny guilt, which makes the interviewer's job more difficult. Suspects use reaffirming denials

in a similar way the Russano reports that police interrogators stop suspects from making denials.

### *Truth overlays*

Guilty suspects will often use truth overlays to maintain their innocence. A truth overlay is when guilty suspects use a past truthful narrative of an event and overlays the narrative onto a current event. If a guilty suspect murdered a person, the guilty suspect may overlay a version of a past murder onto the present murder. For example, a guilty murder suspect overlays a narrative of a past murder he witnessed over the current murder for which he is being interviewed. The guilty suspect can conflate the two murders to confuse the interviewers by saying, "I don't know anything about the current murder you are asking me about. I thought you wanted me to discuss the past murder I witnessed." Truth overlays are difficult to detect because both narratives are true; they are only separated by time.

In Rios' deposition, he used a truth overlay when he confabulated a murder he previously saw in front of his house with the murder of Morales. Rios stated, "…he [the interviewer] told me he wanted to know about the murder. And I told him that there was a murder that happened in front of my house. That that's the only murder I really knew about" (Rios dep. p. 172). Rios further stated, I told him [the interviewer] I was not lying. I told him the truth about the murder that happened in front of my house, and I don't even know if it was a murder" (Rios dep. p. 179). By conflating two murders, Rios can claim to tell the truth by switching his narrative from one murder to the other.

### *Minimization*

Guilty suspects will often minimize their participation in a crime. For example, a guilty suspect may say, "I might have witnessed the crime, but I did not participate in the crime" or "I heard about the murder on the street. I had nothing to do with the murder." Guilty suspects may implicate other offenders to minimize the guilty suspect's participation in the crime. Guilty suspects will often confess to lesser included criminal acts to avoid increased punishment by admitting to the more serious crime.

In Rios' court-reported statement, he minimized his participation in the Morales shooting by identifying Garcia as the shooter. Rios gave the illusion that he was simply a witness to the shooting. Additionally, Rios admitted that he shot twice in the air after Garcia shot Morales, a lesser crime than murder. Rios used minimization in a similar way that Russano reports police interrogators use minimization.

Investigators try to discover the truth and guilty suspects try to provide an illusion of truth. During interviews, interviewers and guilty suspects engage in a tug of war for the truth. Ironically, the same situational factors cited by Russano in her Rios report are similar to the tactics used by guilty suspects to camouflage the truth. These situational factors include false evidence ploys, rejecting denials, guilty presumptive interviewing approaches, and minimization. The interviewing process is often a difficult, but necessary, process for guilty and innocent suspects alike.

Russano in her Rios report addresses the interviewing process from the suspect's perspective thereby limiting her analysis to one side of the interviewing/interrogation process. Russano does not account for the totality of the circumstances involved in the dynamics of the

interview/ interrogation process. Failing to consider both sides of the interviewing/interrogation dynamic can lead to skewed opinions. Furthermore, Russano's opinions are based solely on Rios's rendition of events, which suggests her opinions may be skewed.

## XI. Assessing Russano's Specific Risk Factors Identified in the Rios Case

The following is an analysis of the risk factors that can lead to false confessions cited by Russano in her report that relate to Rios' disputed confession.

### *Confirmation Bias*

Russano posited in her report, "One of the hallmark features of confirmation bias is a guilt-presumptive approach to interviewing and interrogation" (p. 30). In a statement to police investigators on June 28, 1989, Javier Torres, who was with Morales when he was shot, identified Jose Melendez as the shooter. Torres subsequently picked Melendez's picture out of a gang mug book.

According to police reports, Melendez heard the police were looking for him in connection with the Morales shooting. On June 28, 1989, Melendez voluntarily went to the police station and spoke with Detectives Mason and Brennan, who were assigned to follow-up the Morales' shooting investigation. Melendez provided an alibi for his whereabouts on June 27, 1989, between 11:10 pm and 11:30 pm, the approximate time of the Morales shooting. Detectives Mason and Brennan corroborated Melendez's alibi by interviewing witnesses regarding Melendez's whereabouts at the time of the crime. Melendez was picking up his cousin from work at an Evanston, Illinois Holiday Inn located more than eight miles from the scene of the incident. When Detectives Mason and Brennan advised Torres of Melendez's alibi, Torres recanted his identification of Melendez as the person who shot Morales.

Detective Mason later met with Gang Crimes Officers Guevara and Gawrys, who related that confidential informants identified Jaime Rios and "Tino," a Latin King gang member, as being involved in the Morales shooting. Detective Mason also met with Area 5 Police Lieutenant Kijowski, who said that he received information from a reliable informant who also identified Jaime as the person who shot Morales. The informant also identified Tino, a Latin King gang member, as the second person present during the murder of Morales. Based on the information provided by the confidential informants, Rios was sought for questioning.

On July 6, 1989, at approximately 10:00 pm, Officers Guevara and Gawrys brought Rios to the Area 5 police station for questioning. Between 10:00 pm and 12:00 am (midnight) on July 7, 1989, Rios remained in the interrogation room while detectives attempted to locate the witnesses to the Morales shooting. Detectives failed to locate the witnesses and subsequently interviewed Rios. During the interview with Rios, he admitted he was involved in the Morales shooting. Rios was also interviewed by ASA Barbara Riley regarding the Morales murder and admitted his involvement. Rios then gave a court-reported statement concerning his role in the Morales murder. Felony charges were not approved by Riley after she took Rios' court-reported statement. Later on July 7, 1989, Detectives conducted a live line-up with Rios as a participant. When Huertas, an eyewitness, viewed the line-up, he identified Rios as the person who shot Morales. ASA Owen approved first-degree murder charges after the positive line-up identification.

Based on the above facts, Detectives did not fall victim to confirmation bias, as suggested by Russano. Detectives investigated suspect Melendez's alibi following his identification by witness Torres and discovered Torres had mistakenly accused Melendez as the

shooter in the Morales murder. Detectives also re-interviewed witnesses Hudson and Torres who were identified by the scene detectives, and also interviewed eyewitness Huertas. Upon information from Gang Crimes Officers Guevara and Gawrys, confidential informants identified Morales' shooters as Latin Kings members Jaime and Tino. Detectives checked with their Lieutenant, Kijowski, who indicated he received the same information regarding Latin Kings Jaime and Tino from his informant regarding the Morales murder. Furthermore, Mason personally met with Guevara's confidential informants to verify the information they provided to Guevara (Trial transcript, p. 284). During an interview with detectives, Rios admitted he participated in the Morales shooting. Rios reiterated his admission to ASA Riley and provided a court-reported statement detailing his participation in the Morales murder. Detectives also conducted a live lineup wherein Rios was identified as the shooter. Following Rios' confession, Detectives interviewed confidential informants and obtained a search warrant to recover a weapon from Carrero's residence. After detectives executed the search warrant and recovered a .32 revolver at Carrero's residence, Carrero told detectives Rios gave Carrero a gun to hold and said Rios told him that he had just shot someone. Detectives investigated and vetted information provided by several sources and logically followed leads as they developed during the course of their investigation, both before and after Rios' confession. Thus, the detectives were not subjected to confirmation bias. Confirmation bias as a risk factor does not apply to Rios' investigation or confession.

**Youth Vulnerability**

Russano posited in her Rios report that Rios's status as a young adult represented a vulnerability that might have increased the likelihood of him providing a false confession (p.

33). Aside from Rios' age, Russano did not cite any evidence to support her opinion. Russano did not take into consideration Rios' prior interactions with the police or his psychological makeup. At the time of Rios' interview, he was two months shy of his twentieth birthday. Rios was an admitted gang member who had numerous interactions with the police for crimes, including aggravated assault, robbery, burglary, battery, disorderly conduct, theft, and controlled substance possession. Rios was well acquainted with police stations and with the criminal justice system at the time of his confession. Rios told ASA Riley that he knew his Miranda rights (Rios dep. p. 188-189). Rios' extensive experience with and knowledge of the criminal justice system at the time of his confession belie his purported youth as a situational risk factor.

**Prolonged Custody**

*Isolation*

Russano stated in her Rios report, "Although Det. Michael Mason testified that Mr. Rios was allowed to see and speak with the mother of his child (Ms. Diana Rodriguez) while at Area 5, Mr. Rios and Ms. Rodriguez dispute this, and Officer Guevara, Det. Halvorsen, and Assistant State's Attorney Barbara Riley have no memory of seeing Ms. Rodriguez at the station that night" (p. 34). Detective Mason testified at the criminal trial that Rios was allowed to see and personally speak with Rodriguez (p. 408). In fact, police officers provided Rodriguez with a ride to the Area 5 police station (Rodriguez trial testimony, p. 662).

Although Russano cites isolation as a risk factor, she fails to take several factors into consideration. First, Russano does not know if Rios is a person who likes to be alone or likes the company of others. If Rios is a person who likes to be alone, he may not have wanted

anyone to visit him while he was talking with the detectives. Second, Russano does not know the relationship status between Rios and Rodriguez. If Rios's relationship with Rodriguez was strained, he may not have wanted to see Rodriguez while he was talking with detectives. Third, Rios may be the type of person who likes to be alone to think. If this were the case, Rios may have wanted time alone to think things through. Without knowing Rios' personality characteristics, determining that isolation was a risk factor in Rios' confession is not possible. Notwithstanding, detectives were not obligated to allow people to visit Rios during the ongoing investigation.

From the investigator's perspective, creating an interview/interrogation environment conducive for meaningful conversations is critical to the interview/interrogation process. Suspects should be in a quiet environment devoid of distractions so they can focus of the topic at hand. The outcome of the interview/interrogation could have serious consequences that could permanently change the suspects' lives. Any distractions are harmful to the government's truth-finding endeavor as well as the suspect's ability to convey information.  From Russano's perspective, isolation is a risk factor for false confessions. From the investigator's perspective, isolation creates an environment wherein the truth can be discovered, and false confessions can be avoided.

### *Length of Interrogation*

Russano posited in her report, "Mr. Rios experienced approximately 7 hours and 21 minutes of combined custody and interrogation time from the time he was taken to Area 5 until the completion of the oral statement at 4:51 am" (p. 34). Russano defines the length of investigation as the total time in custody, not just interrogation time. This is not the standard

definition of interrogation time. The standard method to calculate the length of an interrogation is from the beginning of the interrogation until the end of the interrogation, excluding the times when suspects are not actually being interrogated. Using the standard definition of interrogation time, Rios was interrogated by detectives for a total of 30 minutes. Rios' interrogation began at approximately midnight and ended at 12:30 am on July 7, 1989. Rios' subsequent conversation with  ASA Riley and Rios' court-reported statement do not constitute interrogations because Rios merely repeated and memorialized what he previously told detectives. Using Russano's definition, the total in-custody time including Rios' 30-minute interrogation was approximately 3 hours from 9:30 pm on July 6, 1989,when Gang Crimes officers located his at his residence until 12:30 am on July 7, 1989, after he made his inculpatory statement to detectives and was told he was under arrest. During the downtime between 10:00 am on July 6, 1989, when he arrived at the Area 5 station, and 12:00 am on July 7, 1989, when his interview began, investigators were searching for witnesses. Even by Russano's definition, 3 hours of in-custody time is well within acceptable limitations. The length of interrogation is not a factor in Rios's interrogation by detectives.

Russano supported her opinion that the length of Rios' interrogation and in-custody time heightened the chances of a false confession on the Drizin and Leo (2004) article. In Russano's Rios report, she stated, "In one study (Drizin and Leo (2004) of 125 proven false confessions, length of interrogation could only be approximated in 35% of cases, and within those cases, it was difficult in many cases to distinguish between length of active questioning and length of time in custody. In that study, the average length was 16.3 hours, with 16% lasting less than 6 hours, 34% lasting between 6 and 12 hours, and 39% lasting between 12 and

24 hours" (p. 20). As mentioned above, the Drizin and Leo (2004) study is fatally flawed and based primarily on newspaper articles. No valid associations can be made between the newspaper accounts cited by Drizin and Leo (2004) and real-life police interrogations, and particularly as to time of interrogation. Russano's reliance on Drizin and Leo (2004) renders her argument defective. Russano's personal opinion is based on Drizin and Leo's personal opinions, not on valid scientific associations. Regardless of how Rios' actual length of interrogation or the length of interrogation plus in-custody time is calculated, the length of Rios' interrogation is well within limitations based on my experience and expertise in the field of interviews/interrogations. The length of interrogation is not a factor in Rios's interrogation by detectives.

**Physical Abuse**

*Handcuffs*

Russano stated in her Rios report, Rios was handcuffed with his hands behind his back or to a ring on the wall for long periods, raising the concern that physical discomfort might have been a factor that led to his confession. Detective Guevara testified at trial that he did not handcuff Rios (p. 289). Detective Mason testified at trial he placed Rios in handcuffs after he was arrested. Prior to Rios's arrest, he was not handcuffed (p. 436). Rios stated in his deposition, he was handcuffed by Guevara when he escorted Rios to the back of his house (p. 151). Rios further testified that he was handcuffed behind his back while he sat in the interrogation room (p. 164). Rios also testified in his pretrial motion testimony that he was initially cuffed, uncuffed in the interrogation room, and, at some point, cuffed again (p. 24). No timeframe was provided for how long Rios was uncuffed in the interrogation room or when

Rios was cuffed again. Also, Rios made no complaints about injury when he arrived at Cook County Jail. (pp. 266-67). Given the disputed facts of when and for how long Rios was handcuffed, Russano cannot opine that physical discomfort was a risk factor that led to Rios' confession.

### Deprivation of Physical Needs

Russano posited in her report that Rios may have also been denied basic necessities such as food, drink, and bathroom privileges, and that these deprivations are likely to produce unreliable statements.  Russano contends that the absence of risk factors in the record  may also increase the risk of a false confession. Rios said he was given water to drink during his time at the police station, but Russano contends that the record does not reflect that  Rios was  offered any food to eat, so the lack of food may have contributed to his false confession. (Russano dep. p. 145-46). Russano stated, "there is no indication in the record that he's eaten, there was a discussion of water …because there is no indication of food that could have been an issue here" (p. 148), "So I tend to be a little more tentative and just flag it as a potential concern…" (p.145). Russano is highlighting a risk factor that does not explicitly exist in the record by using tentative language. Russano's opinion is based on conjecture and should be viewed with caution because she is speculating that the absence of supporting documentation somehow suggests a risk factor was present.

In his deposition Rios testified  that the answers to ASA Barbara Riley's questions about having water to drink and being allowed to use the bathroom  his court-reported statement were truthful. (Rios dep. pp. 248-49).  ASA  Riley testified in her deposition that she spoke with Rios alone while they waited for the court reporter to arrive (Riley dep. p. 44), and

during her conversation with Rios she asked him how he was doing, if he needed anything, and how he had been treated by the police (p. 45). Rios told Riley that he was treated "just fine" by the police (p. 45-46). Russano does not know how long Rios could go without food before becoming hungry or how often he would need to use the washroom in July 1989 (Russano dep. p. 323-24), so determining Rios' hunger level or need to use the bathroom is not possible. Therefore, the impact of Rios' hunger or need to use the washroom cannot be reliably attributed to Rios' decision to confess.

### Head Injury

In Russano's Rios report, she posited, according to Rios' account, he suffered physical abuse at the hands of the interviewing detectives. Detective Mason testified that he did not slam Rios' head into a table (p. 435). Mason further testified that he and Detective Halvorsen interviewed Rios and not Officer Guevara. Rios stated in his deposition that while he was seated, he was handcuffed behind his back. Rios further stated Mason grabbed Rios behind the back of his head and slammed his face on the table (p. 164). The photograph of Rios taken when he signed his court-reported statement at 6:10 am on July 7, 1989, the line-up photographs taken of him later in the day on July 7, 1989, and Rios' Cook County Jail intake photograph taken on July 8, 1989, do not show any visible injuries to Rios' face or head. Rios also made no complaints regarding injury or his treatment by police to anyone at Cook County Jail upon intake (Rios Deposition. pp. 266-67; Cermak Health Services physical examination). Nonetheless, if Rios' version of events is credited, using physical force on suspects during an interview or interrogation is not acceptable.

**Sleep Deprivation**

Rios stated in her Rios report, "Sleep deprivation was likely a risk factor in Mr. Rios'
case, given that his oral court-reported confession did not finish until 4:51 am, and it was not
signed until approximately 6:10 am" (p. 35). Sleep deprivation typically occurs after 24 to 36
continuous hours without sleep (Davis & Leo, 2012). Police, however, do not control when
crimes occur. If a crime occurs during overnight hours, the police must respond and investigate
the crime. Time is critical in police investigations, and police are not afforded the luxury of
conducting investigations only during normal business hours. Police also do not control
whether a suspect decides to sleep or not sleep. Rios had an opportunity to sleep, nap, or nod
off during the down time between 10:00 pm on July 6, 1989, when he arrived at the Area 5
police station, and 12:00 am on July 7, 1989, when he was interrogated by detectives.
Interrogators did not intentionally prevent Rios from sleeping, a hallmark of the sleep
deprivation interrogation technique.

Rios did not indicate in his trial testimony, court-reported statement, or his in deposition
that sleep deprivation influenced the information he provided to the detectives and the assistant
state's attorney. Russano does not know Rios' sleep pattern at the time of the events on July 7,
1989. Without knowing Rios' sleep pattern, any opinion rendered by Russano is pure
guesswork.

**Guilt Presumptive Interrogation Approach**

Russano posited in her report that Rios was subjected to a guilt-presumptive,
accusatorial interrogation approach (p. 35). The interrogation process is a fact-finding
endeavor. At some point in the interrogation, the suspect must be asked the direct question,

"Did you commit the crime?" An effective interrogation cannot occur if the suspect does not know why he is being interrogated. Logically, suspects must be told why they are being interrogated.

Based on my interviewing experience and expertise, an interview is the process whereby a suspect willingly provides information. An interrogation is the process whereby a suspect is reluctant to provide information. If, during an interview, a suspect provides an alibi, the investigator has an obligation to verify the suspect's alibi. Conversely, if a suspect makes inculpatory admissions during an interview, the investigator is responsible for conducting additional inquiries. If the suspect freely volunteers additional information, an interrogation is unnecessary. An interrogation could be conducted if the suspect is reluctant to provide additional information. Since Rios' interview with detectives was not recorded, the interviewing techniques used by the detectives cannot be determined. The interview with Rios lasted about 30 minutes. The court-reported statement took 12 minutes for Rios to relate his activities on the night of the Morales murder in a similar question-and-answer format as a police interview would be conducted. That leaves approximately 18 minutes for detectives to introduce themselves and read Rios his Miranda warnings. The few, if any, remaining minutes severely limit the time interrogation tactics can be employed with any effect. Additionally, after Rios was detained, the detectives sought to locate witnesses to the Morales shooting to view a live line-up containing Rios, further supporting the proposition that the interview of Rios was not guilt-presumptive.

Since the interview with Rios was not videotaped or audio recorded, Russano can only speculate as to what interviewing techniques were used by the detectives. Further, the social

48

science research on guilt-presumptive questioning significantly increasing the likelihood of a false confession is limited in application because the current experimental research designs lack external validity.

**Presentation of False/Unreliable Evidence**

Russano, in her Rios report, posited, "Although legally permissible under most circumstances, the presentation of false evidence unequivocally increases the risk of eliciting a false statement from an innocent person or a person that lacks guilty knowledge" (p. 36). In Russano's deposition she concedes that the detectives did, in fact, receive information from confidential informants, which does not constitute a false evidence ploy (p. 167). Russano noted that the information from the confidential sources may or may not have been reliable (p. 171). Because the information from the criminal informants may have been unreliable, Russano contends the presentation of information that may have been unreliable constitutes a false evidence ploy.

Russano's proposition drawn to its logical conclusion would suggest that any question an interrogator asks a suspect based on a supposition, an assumption, or an inference would constitute a false evidence ploy. The purpose of asking suspects questions is to seek information. The most efficient way to find out if the information provided by the criminal informants is true or not is to present the information to Rios and evaluate his response. The presentation of information that may or may not be reliable does not constitute a false evidence ploy.

The standard definition of a false evidence ploy is when interviewers knowingly present fictitious evidence such as DNA evidence, fingerprint evidence, or made-up eyewitness

accounts to suspects, giving them the impression the evidence against them is overwhelming and denying their participation in the crime is futile. In the Rios investigation, detectives presented Rios with vetted information from multiple confidential informants. Furthermore, Detective Mason personally met with the informants and also verified their information with confidential source information received by Lieutenant Kijowski. The information presented to Rios regarding the information provided by the confidential sources was real. The information was not false or fabricated. By definition, presenting evidence that is truthful or thought to be truthful at the time the evidence is presented does not constitute a false evidence ploy. Notwithstanding, the social science research on false evidence ploys significantly increasing the likelihood of a coerced compliant confession is limited in application because the experimental research designs lack external validity.

**Threats and Promises**

Russano posited in her Rios report, "Explicit and implicit threats of negative consequences for continued denial (e.g., harsher punishment; loss of parental rights) and explicit and implicit promises of a benefit or instrumental gain (e.g., a lighter sentence; being treated as a witness instead of a suspect; being able to go home) in exchange for an incriminating statement is a significant and powerful risk factor for eliciting compliant false confessions/statements" (p. 37). In his deposition Rios testified that the answers to ASA Barbara Riley's questions about having water to drink and being allowed to use the bathroom in his court-reported statement were truthful. (Rios dep. pp. 248-49). ASA Riley testified in her deposition that she spoke with Rios alone while they waited for the court reporter to arrive (Riley dep. p. 44), and during her conversation with Rios she asked him how he was doing, if

he needed anything, and how he had been treated by the police (p. 45). Rios told Riley that he was treated "just fine" by the police (p. 45-46).

Russano based her opinion on the study she conducted in Russano et al. (2005), the Kassin and Kiechel (1996) study, and a book by Kassin (2022) in which he examines anecdotal incidents of false confessions. As cited earlier, no valid associations can be made between the studies Russano et al. cited and the real-life experiences of suspects in a police interrogation room setting.

Russano further posited, "Mr. Rios has consistently maintained that one of the reasons he provided a false confession was because Officer Guevara threatened that if he did not provide a statement and go along with what the investigators were saying, his two-month-old baby would be taken away from him" (p. 37). The detectives and the ASA Riley testified at the Rios trial and in their depositions that no such threats were made to Rios. If Rios's version of events is credited, threatening to take away his child if he did not confess constitutes a threat and is strictly prohibited in the interrogation room. Because Russano cannot resolve these disputed issues and does not know how Rios responded or reacted to threats or promises in July 1989 (Russano dep. pp. 324-35), her opinion that threats and promises were a risk factor that likely elicited a false confession are conjecture.

## XI. Accuracy and Completeness of the Narrative

Russano stated in her Rios report, "Fact-finders should consider the extent to which Mr. Rios was able to provide details of the crime consistent with the known, objective evidence in the case. In general, the more consistent the details, the more likely it is the statement is

reliable" (p. 38). Russano then offered examples of inconsistencies in the details provided by witnesses and the details provided by Rios.

Based on my over 25 years of experience interviewing suspects and witnesses, differing witness accounts of traumatic events are inevitable. It is not uncommon for witnesses to see and hear things from different perspectives that may or may not comport with what other witnesses report. If Russano's proposition is drawn to its logical conclusion, her proposition makes no sense. If suspects who confess to committing crimes in investigations wherein witness accounts differ constitute false confessions, most, if not all, suspect confessions would be, according to Russano, deemed false confessions.

As I was tasked to evaluate risk factors posited by Russano that, according to her, may lead to false confessions, and, according to her, were present during Rios's confession, I do not make any further assessment of the credibility of suspects and witnesses involved in this matter. The weight to be given to their statements falls exclusively within the purview of the jury.

Respectfully,

John R. Schafer, Ph.D.

## References

Abboud, B., Wadkins, T. A., Forrest, K. D., Lange, J., & Alavi, S. (2002, March). False confessions: Is the gender of the interrogator a determining factor? Paper presented at the biennial meeting of the American Psychology-Law Society, Austin, TX.

Alison, L., Alison, E., Elntib, S., & Noone, G. (2010). ORBIT (Observing Rapport Based Interpersonal Techniques): A Manual for Assessing and Coding Interpersonal Rapport. *Internal Document, University of Liverpool*, UK.

Bachman, R. D. & Schutt, R. K. (2017). *The practice of research in criminology and criminal justice 6th Ed.* Thousand Oaks, CA: Sage Publications, Inc.

Collins, K. & Carthy, N. (2019). No rapport, no comment: The relationship between rapport and communication during investigative interviews with suspects. *Journal of Investigative Psychological and Offender Profiling, 61*, 8-31

Creswell, J. W. & Creswell, J. D. (2018). Research design: Qualitative, quantitative, and mixed methods Approaches 5th Ed. Thousand Oaks, CA: Sage Publications, Inc.

Findley, M. G., Kikuta, K., & Denly, M. (2021). External Validity, Annual Review of Political Science, Annual Reviews, 24, 365-393.

Drizin, S., & Leo, R. A. (2004). The problem of false confessions in the post-DNA world. North Carolina Law Review, 82, 891–1007.

Forrest, K. D., Wadkins, T. A., & Miller, R. L. (2002). The role of pre-existing stress on false confessions: An empirical study. The Journal of Credibility Assessment and Witness Psychology, 3, 23–45.

Forrest, K. D., Wadkins, T. A., & Larson, B. A. (2006). Suspect personality, police interrogations, and false confessions: Maybe it is not just the situation. Personality and Individual Differences, 40, 621–628. doi:10.1016/j.paid.2005.09.002.

Gross, Possley, Roll, and Stephens (2020. Misconduct and Convicting the Innocent: The Role of Prosecutors, Police and Other Law Enforcement. *The National Registry of Exonerations*.

Gudjonsson, G. H. & Sigurdssonb, J. F. (1999). The Gudjonsson confession questionnaire-revised (GCQ-R): factor structure and its relationship with personality. *Personality and Individual Differences 27*, 953-968.

Hagan, F. E. (2014). Research methods in criminal justice and criminology 9th Ed. Saddle Ridge, NJ: Pearson Education, Inc.

Hessler, R. M. (1992). *Social research methods*. St. Paul, MN: West Publishing Company.

Horselenberg, R., Merckelbach, H., Josephs, S. (2003). Individual differences and false confessions: a conceptual replication of Kassin and Kiechel 1996. *Psychologsy. Crime, and the Law 9*:1–18.

Kassin, S. M. (2008). The psychology of confessions. The Annual Review of Law and Social Science 4, 193-217.

Kassin, S. M. (2017). Internalized false confessions. In *The Handbook of Eyewitness Psychology: Volume I* (pp. 175-192). Psychology Press.

Klaver, J., Lee, Z., & Rose, V. G. (2008). Effects of personality, interrogation techniques, and plausibility in an experimental false confession paradigm. *Legal and Criminological Psychology, 13*, 71–88. doi:10.1348/135532507X193051.

Lodico, M. G., Spaulding, D. T., & Voegtle, K. H. (2010). *Methods in educational research: From theory to practice 2nd Ed*. San Franci,sco, CA: Jossey-Bass.

Maxfield, M. G. & Babbie, E. R. (2018). *Research Methods 8th Ed.,* Boston, MA: Cengage Learning.

Kassin, S. M., & Kiechel, K. L. (1996). The social psychology of false confessions: Compliance, internalization, and confabulation. Psychological Science, 7, 125–128.

Kassin, S. M. (2008). The psychology of confessions. *The Annual Review of Law and Social Science*, 193-217.

Neuman, W. L. (2003). *Social Research Methods 5th Ed*. New York: Pearson Education, Inc.

Redlich A. D & Goodman G. S. (2003). Taking responsibility for an act not committed: influence of age and suggestibility. *Law and Human Behavior. 27*:141–56.

Russano, M. B., Meissner, C. M., Narchet, F. M., & Kassin, S. M. (2005). True and false confessions to an intentional act: A novel paradigm. Psychological Science, 16, 486.

Russano, M. B. (2004). True and false confessions to an intentional act: A novel experimental paradigm (Unpublished doctoral dissertation). Florida International University, Miami, Florida.

Saks, M. J. (1992). Do We Really Know Anything About the Behavior of the Tort Litigation System--And Why Not? University of Pennsylvania Law Review, 1147, 1159-61.

Wachi, T., Kuraishi, H. Watanabe, K., Otsuka, Y, Yokota, K. & Lamb, M. E. (2018). Effects of Rapport Building on Confessions in an Experimental Paradigm. *Psychology, Public Policy, and Law, 24*, 36 – 47.

**Attachment A**

**Curriculum Vitae**

John R. "Jack" Schafer, Ph.D.

Telephone: (661) 547-9572

jackschafer500@gmail.com

**Education**

Ph.D. - Psychology, Fielding Graduate University, Santa Barbara, CA (2007)

Master of Arts - Media Psychology, Fielding Graduate University, Santa Barbara, CA (2006)

Master of Arts - Clinical Psychology, Fielding Graduate University, Santa Barbara, CA (2004)

Master of Arts - Criminal Justice, Western Illinois University, Macomb, IL (1985)

Bachelor of Arts - Business Administration, Elmhurst College, Elmhurst, IL (1983)

Bachelor of Arts - Psychology, Western Illinois University, Macomb, IL (1978)

Certificate - Defense Language Institute, Monterey, CA (Korean Language) (1989)

**Experience**

Professor

Western Illinois University (2011 – Present)

- Instruct courses for the School of Law Enforcement and Justice Administration (LEJA)
- Conduct social and psychological research

Intelligence Consultant

Schafer and Associates (Owner) (2006 – Present)

- Instruct negotiating techniques to Special Forces units prior to deployment to Iraq and Afghanistan. These units include Asymmetrical War Group (ASW), 82nd Airborne Civil Affairs Units, and 82 Airborne Psychological Operations Units

56

- Instruct Defense Intelligence Agency (DIA) intelligence officers on basic negotiation skills

- Instruct DoD, law enforcement, and civilian personnel in interviewing, interrogation, elicitation, detecting deception, negotiation skills, and Psychological Narrative Analysis

- Develop human intelligence course curriculum

- Conduct analyses of written and verbal statements using Psychological Narrative Analysis (PNA)

- Consult with prosecutors and defense attorneys to develop trial strategies and evaluate the veracity of witnesses, victims, and defendants

- Train FBI Special Agents to interview Middle Eastern terrorist suspects

- Train Undercover FBI Special Agents

- Train FBI Special Agents in the art of detecting deception

Institute for Intergovernmental Research (IIR) Bureau of Justice Administration (BJA) (2005 – 2015)

- Lecture federal, state, and local law enforcement personnel in intermediate and advanced interviewing techniques, detecting deception, the psychopathology of hate/terrorism, and Psychological Narrative Analysis

Phoenix Consulting Group (2005 – 2010)

- Instructed DoD, law enforcement, and civilian personnel in interviewing, interrogation, elicitation, detecting deception, negotiation skills, and Psychological Narrative Analysis

- Developed human intelligence course curriculum

- Conducted analyses of written and verbal statements using Psychological Narrative Analysis (PNA)

Special Agent, Federal Bureau of Investigation (FBI) (1985 – 2005)

Behavioral Analyst

- FBI National Security Division Behavioral Analysis Program (BAP), an elite team specializing in behavioral profiling counterintelligence and counterterrorism targets (Duties classified)
- Specialty-Psychological Narrative Analysis (PNA), the psychosocial examination of the spoken and written word

Foreign Counterintelligence - Los Angeles, California (Duties classified)

Counterterrorism - Los Angeles, California (Duties classified)

Civil Rights/Color of Law – Lancaster, California

- Investigated hate crimes and color of law investigations

White Collar Crime/Public Corruption - Lancaster, California

- Investigated contract fraud in U.S. Government agencies

Violent Crimes – Flagstaff, Arizona (FBI) (1986-1988)

- Investigated violent crimes and specialized in child molestation on the Navajo and Hopi Indian Reservations

Hinsdale Police Department (1980-1985)

- Police officer

Marine Corps Active Reserve (1978-1980)

- Heavy equipment operator

U. S. Army Active Duty (1974-1977)

- Helicopter mechanic stationed in Korea (1974-1976)
- Helicopter mechanic stationed at Fort Polk, Louisiana (1976–1977)

U. S. Merchant Marines (1973-1974)

- Engine Room (U. S. Steel Great Lakes Fleet)
- Deckhand (U.S. Steel Great Lakes Fleet)

**Publications**

**Books**

Schafer, J. R. (2023). *(4th Ed.). Advanced Interviewing Techniques: Proven techniques for police, military, and security personnel* Springfield, Illinois: Charles C. Thomas Publishing Company.

Schafer, J. R. & Karlins, M. (2020). *The truth detector: An Ex FBI Agent's guide for getting people to reveal the truth.* New York: Simon & Schuster.

Schafer, J. R. (2019) (2nd Ed.). *Psychological narrative analysis: A professional method to detect deception in oral and written communications*. Springfield, Illinois: Charles C. Thomas Publishing Company.

Schafer, J. (2018). *Power tools for success*. Tokyo, Japan: Mook Publications.

Schafer, J.& Karlins, M. (2015). *The like switch: An Ex-FBI Agent's guide to influencing, attracting, and winning people over.* New York: Simon & Schuster.

Schafer, J. R. & Navarro, J. (2009) (3rd Ed.). *Advanced interviewing techniques: Proven techniques for police, military, and security personnel*. Springfield, Illinois: Charles C. Thomas Publishing Company.

Schafer, J. R. (2010). *Fibs to facts: A parental guide to effective communication*. Alexandria, Virginia: Spiradoula Publications, LLC.

Schafer, J. R. (2010). *Psychological narrative analysis: A professional method to detect deception in oral and written communications*. Springfield, Illinois: Charles C. Thomas Publishing Company.

Schafer, J. R. & Navarro, J. (2009) (2nd Ed.). *Advanced interviewing techniques: Proven techniques for police, military, and security personnel*. Springfield, Illinois: Charles C. Thomas Publishing Company.

Schafer, J. R.(2009). *Catch a liar.* Alexandria, Virginia: Spiradula Publications, LLC.

Schafer, J. R. (2009). *Protecting America's borders*. Alexandria, Virginia: Spiradoula Publications, LLC.

Schafer, J. R. & Navarro, J. (2004). *Advanced interviewing techniques: Proven techniques for police, military, and security personnel*. Springfield, Illinois: Charles C. Thomas Publishing Company.

**Book Chapters**

Schafer, J. Building Rapport and Influence. In C. Rebate, (2017). *Influencers: Todo lo que necesitas saber de influencia digital*, Ediciones Urano, Barcelona.

Schafer, J. Verbal cues to detect deception. In Akçay, E. (2013). Külâhıma anlat, beden dili, sözsüz iletişim ve yalan tespiti. İstanbul: Destek Yayınları.

Schafer, J. R. Making ethical decisions: A practical model. In J. Naughton & J. Victor (2003). *Powerweb police*, Chapter 4, Reading 81. New York: McGraw Hill.

Schafer, J. R. The deterrent effects of three strikes laws. In R. L. Bing, D. T. Duhart, K. O. Korgen, J. Odo, R. Kyle, C. L. Segal, & R. Veach. (2002). *Perspectives: Criminal Justice*, Chapter 4, Reading 3. Arlington, Texas: University of Texas.

Schafer, J. R. The deterrent effect of three strikes laws. In T. Hickey (2006). *Taking Sides: Clashing views on controversial issues in criminal justice. Chapter 12*. London, England: McGraw Hill.

**Journal/Magazine Articles**

Schafer, J., Ekici, N., Young, D., Maldonado, K., & Karlins, M. (2023). Verbal indicators of deception. *Journal of Forensic Sciences and Criminal Investigation, 17*, 1-9.

Schafer, J. (November 2022). How to ID deceptive speech. *Psychology Today Magazine*.

Schafer, J. & Karlins, M. (June 2022). Taillés en bits et en pièces. Que pouvons-nous apprendre d'un exemple d'espionnage d'entreprise? *Cyber Security Trends*, 68-74.

Schafer, J. & Karlins, M. (2021). Hacked by Bits and Pieces: What Can We Learn from an Example of Corporate Espionage? *Journal of Information Security*, 12, 224-231.

Schafer, J., Wen, M., Ekici, N., & Young, D. (2021). Detecting truthful and deceptive statements: An experiment on the Chinese language International. *Scientific and Practical Conference Proceedings, Vladimir City, Russian Federation*, 95-107.

Schafer, J., Ekici, N., Bitner, C., & Deccico, A. (2018). Detect false names, dates of birth, and addresses generated by suspects during criminal investigations. *Law Enforcement Executive Forum, 19*, 25-31.

Decicco, A. & Schafer, J. R. (2018). Deception in Sketch Drawings. *Law Enforcement Executive Forum, 18*, 25-38.

Schafer, J. R. (2016). The Psychopathology of Corruption. *Sino-U.S. Anti-Corruption Law Enforcement Policy and Cooperation*. Institute of Law: Zhejiang University.

Schafer, J. R. (May 30, 2016). FBI 捜査官が実践「人の心のウラを見抜く」スゴ技 21. *President.* Tokyo, Japan.

Reily, J. & Schafer, J. R. (April 2016). Three-question management. *Police Chief.*

Schafer, J. R. (March 10, 2016). Three signs someone is lying to you, courtesy of an FBI agent. *The Muse* https://www.themuse.com/advice/3-signs-someone-is- lying-to-you-courtesy-of-a- former-fbi-agent.

Schafer, J. R. (February 8, 2016). Quer 'apanhar' um mentiroso? Siga estas dicas. *Journali*, www.ionline.pt/artigo/495482.

Schafer, J. R. (January 25, 2016). How to parent like an FBI agent. *Time Magazine*.

Karlins, M., Schafer, J., & Hargis, E. (2015). Behaving appropriately in a digital world. *Journal of Global Business Management, 11*, 12-15.

DeCicco, A. J. & Schafer, J. R. (2015). Grammatical differences between truthful and deceptive narratives. *Applied Psychology in Criminal Justice, 11*, 76-92.

Schafer, J. R. (July 16, 2015). An Ex-FBI Agent's Guide to Building Rapport and Making Sales. *Inc. Magazine,* http://www.inc.com/jack-schafer/ex-fbi-agent-guide- building-rapport- making-sales.html

Schafer, J. R. (February 13, 2015). Can't We be Friends? Why Obama's Likeability Quotient is Tumbling. *Fox News* http://www.foxnews.com/opinion/2015/02/13/cant-be-friends-why-obamas-likeability-quotient-is-tumbling/.

Schafer, J. R. (March 2, 2015). A Former FBI Agent Reveals the Secrets of Persuasion. *Inc. Magazine,* http://www.inc.com/jack-schafer/5-ways-to-get-to-yes- using-persuasion.html.

Schafer, J. R. (March 16, 2015). A Former FBI Agent Reveals 3 Techniques to Detect Deception. *Inc. Magazine* http://www.inc.com/jack-schafer/an-fbi-agent-on- how-to-detect-deception.html.

Schafer, J. R., Karlins, M., Hargis, E., Fuller, S., & Michaels, C. (2014). Don't Detonate These Word Mines at Work. *The Journal of Global Business Management, 10*, 114-116.

Schafer, J. R. (2014). Grammatical differences between truthful and deceptive written narratives. *The Legal and Economic Aspects of Public Administration in the Russian Federation and the USA: Theory, Practice, and Research, 3*, 269-287.

DeCicco, A. J. & Schafer, J. R. (2014). Grammatical differences between truthful and deceptive narratives written by native Spanish speakers from Costa Rica. *The Legal and Economic Aspects of Public Administration in the Russian Federation and the USA: Theory, Practice, and Research, 3*, 171-195.

Schafer, J. R. (2013). Universal Principles of Criminal Behavior (UPCB): A tool to analyze criminal intent. In *The Encyclopedia of Penitentiary Law.* (pp. 352-353). Moscow, Russia: Samara Law Institute.

Schafer, J. R. (2013). Predicting school violence saves lives. *In Legal Protection of Juveniles: National Traditions and International Experience*. Materials of Scientific-Practical Conference. Vladimir, Russia.

Schafer, J. R. (2012). Three Minutes after the cuffs go on. *Law Enforcement Executive Forum, 12,* 90-96.

Schafer, J. R. (2012). Controlling angry people. *Western Journal of Criminal Justice 4*, 1-12.

Schafer, J. R. (2011). School bullies- From playgrounds to computers: The ethics of monitoring social networks. *Law Enforcement Executive Forum, 11,* 21-26.

Schafer, J. R. (2010). Let their words do the talking: Reading the criminal mind. *PI Magazine (Sept/Oct)*.

Schafer, J. R. (2008). Text Bridges and the Micro-action Interview *FBI Law Enforcement Bulletin*, 77, 1, 20-25.

Schafer, J. R. & Navarro, J. (2006). The Seven-stage hate model: The psychopathology of hate groups. *Cultic Studies Review, 5*, 73-86.

Schafer, J. R. (2002). The ethical use of psychology in criminal investigations. *Journal of the American Academy of Psychiatry and the Law, 29,* 445-446.

Schafer, J. R. & MacIlwaine, B. (1992). Investigating child sexual abuse in the American Indian community. *The American Indian Quarterly, 2*, 16, 157-167.

Schafer, J. R. & Navarro, J. (2000). Hate unmasked: A practical model for understanding and dealing with hate groups. *Chicano Latino Law Review, 21*, 5-15.

Schafer, J. R. (2002). Making ethical decisions, *FBI Law Enforcement Bulletin, 71*, 14-17.

Schafer, J. R. & Navarro, J. (2003). The Seven-Stage Hate Model: The pathology of hate groups. *FBI Law Enforcement Bulletin, 72*, 1-8.

Navarro, J. & Schafer, J. R. (2001). Detecting deception. *FBI Law Enforcement Bulletin, 46*, 9-13.

Navarro, J. & Schafer, J. R. (2003). Universal principles of criminal behavior: A tool for analyzing criminal intent. *FBI Law Enforcement Bulletin, 72,* 2.

Schafer, J. R. (1998). Dissecting the militia structure. *Terrorism Digest*, 2, 4-6. (Classified Publication).

Schafer, J. R. (1999). The deterrent effect of three strikes laws. *FBI Law Enforcement Bulletin, 68*, 6-10.

Schafer, J. R. (2000). Color of law investigations. *FBI Law Enforcement Bulletin, 69,* 15-21.

Schafer, J. R. (1993). Prisons: Partners in the community. *FBI Law Enforcement Bulletin, 62,* 1-9.

Schafer, J. R. (1988). Corporation or corporate body. *The Banner*. Grand Rapids, Michigan:
    Christian Reformed Church, 8-9.

Schafer, J. R. (April 1992). The unsolved case of Special Agent Paul E. Reynolds. *Investigator*.
    U. S. Department of Justice, Federal Bureau of  Investigation.

**Attachment B**

**Documents Reviewed**

1) Photograph of Rios dated July 7, 1989

2) Jaime Rios Certificate of Innocence court proceedings

3) Crime scene photographs

4) Rios booking photograph

5) Affidavit of Benjamin Carrero

6) Affidavit of Cristino Garcia

7) Affidavit of Luis Huertas

8) Rios line-up photographs

9) Deposition of Bargara Riley

10) Deposition of Jaime Rios

11) Deposition of Cristino Garcia

12) Deposition of Janet Lupa

13) Deposition of Benjamin Carrero

14) Deposition of Reynaldo Guevara

15) Deposition of Luis Huertas

16) Deposition of Michael Mason

17) Police report

18) Photograph of Cristino Garcia

19) Rios court reported statement

20) Rios criminal case trial testimony

21) Rios criminal case pre-trial motion testimony

22) Court order granting petition for petition of innocence

23) Court order vacating jury convictions

24) Russano Rios report

25) Leo deposition Taylor v Chicago

26) Russano report Chatman v. Chicago, et al.

27) Russano deposition Chatman v. Chicago, et al.

28) Cermak Health Services report for Rios

29) Deposition of Kip Owens

30) Russano deposition Rios v. Chicago, et al.