*Rios v. Guevara, et.al*
22 CV 3973

# EXHIBIT B

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ILLINOIS

3                 EASTERN DIVISION

4    JAIME RIOS,                )

5              Plaintiff,   )

6      -vs-                 ) Case No.

7    REYNALDO GUEVARA        ) 1:22-cv-03973

8    MICHAEL MASON            )

9    ERNEST HALVORSEN          )

10   BARBARA RILEY            )

11   CITY OF CHICAGO           )

12   COOK COUNTY,             )

13             Defendants.   )

14

15       The videotaped deposition of MICHAEL MASON,

16   via Zoom, called for examination, taken pursuant to

17   the Federal Rules of Civil Procedure of the United

18   States District Courts pertaining to the taking of

19   depositions, taken before NANCY A. GUIDOLIN, CSR

20   No. 84-2531, a Notary Public within and for the

21   County of DuPage, State of Illinois, and a

22   Certified Shorthand Reporter of said state, at

23   Chicago, Illinois, on the 23rd day of June, 2023,

24   commencing at 9:36 a.m.

1   PRESENT: (VIA ZOOM)

2

3        LAW OFFICE OF STEPHEN L. RICHARDS,

4        (53 West Jackson Boulevard, Suite 756,

5        Chicago, Illinois 60604,

6        773-817-6927), by:

7        STEPHEN L. RICHARDS, ESQ.,

8        sricha5461@aol.com,

9            appeared on behalf of the Plaintiff;

10

11       THE SOTOS LAW FIRM, P.C.,

12       (141 West Jackson Boulevard, Suite 1240A,

13       Chicago, Illinois 60604,

14       630-735-3300), by:

15       JOSEPH M. POLICK, ESQ.,

16       jpolick@jsotoslaw.com,

17            appeared on behalf of Defendant

18            Michael Mason and Joanne Halvorsen;

19

20

21

22

23

24

```
 1   PRESENT:  (VIA ZOOM)

 2

 3        LEINENWEBER BARONI & DAFFADA, LLC,

 4        (120 North LaSalle Street, Suite 200,

 5        Chicago, Illinois 60602

 6        847-251-4091), by:

 7        MEGAN K. McGRATH, ESQ.,

 8        mkm@ilesq.com,

 9           appeared on behalf of Defendant

10            Reynaldo Guevara;

11

12         ROCK FUSCO & CONNELLY, LLC,

13         (333 West Wacker Drive, 19th Floor,

14         Chicago, Illinois 60606,

15         312-970-3474), by:

16         THERESA B. CARNEY,

17         tcarney@rfclaw.com,

18         LAUREN FERRISE, ESQ.,

19         lferrise@rfclaw.com,

20            appeared on behalf of Defendant

21            City of Chicago.

22

23   REPORTED BY:  NANCY A. GUIDOLIN, C.S.R.,

24            CERTIFICATE NO. 84-2531.
```

1              (WHEREUPON, the witness was duly

2              sworn.)

3                   MICHAEL MASON,

4    called as a witness herein, having been first duly

5    sworn, was examined and testified as follows:

6                   EXAMINATION

7    BY MR. RICHARDS:

8        Q.    Mr. Mason, I heard the court reporter

9    swear you in, but I didn't hear your response.

10   Detective Mason, can you speak so I can make sure

11   that I hear you?

12       A.    I did.  I said I do.

13       Q.    I didn't hear you, and that's why I

14   asked you to repeat it.  My fault.  Not yours.

15   Okay?

16       A.    Okay.

17       MR. POLICK:  Are you able to hear him alright,

18   Stephen?

19       MR. RICHARDS:  When he said I do, I can hear

20   that.  I guess I missed the first I do.  I'm fine

21   now.

22       MR. POLICK:  Alright.  That's good.

23   BY MR. RICHARDS:

24       Q.    Detective Mason, could you state your

1   name for the court reporter spelling your first and

2   last name?

3      A.   Michael Mason, M-i-c-h-a-e-l, M-a-s-o-n.

4      Q.   Okay.  Mr. Mason, let me just give you

5   some ground rules.  I don't know if you have been

6   deposed before, but I will ask you that shortly.

7   This is a deposition.  I'm going to ask you

8   questions under oath.  If you don't understand a

9   question, just ask me to repeat it, and I will try

10  to be more clear.

11          If you can't hear something, again, tell

12  me that.  If at any point your attorney objects to

13  a question, if the objection is based on a

14  privilege, I will not proceed, but if the objection

15  is just a general objection or relevancy objection,

16  I will ask that you answer the question, again, as

17  long as your attorney agrees.

18          If at any point you think that you would

19  like a break to speak with your attorney, you're

20  entitled to do so.  You just can't do that in the

21  middle of a question; in other words, if I ask a

22  question, you have to answer.  After your answer if

23  you think that you need a break or a consultation,

24  just tell me that and we will accommodate you, or

1  if you think that you need a break for any other

2  reason during the course of the deposition.

3         My next question is:  Did you hear my

4  instructions and do you have any questions about

5  them, and do you understand them?

6     A.    I understand them.  I do have a

7  question, though.  I can't really see your face on

8  my screen.

9     Q.    Is that better?

10    A.    That's better.

11    Q.    Can you see my face?

12    A.    That's better.  Okay.

13    MR. POLICK:  We also had somebody else join

14  us, Stephen.  If they could identify who that is

15  for the record.

16    MR. RICHARDS:  Somebody just joined us.  Is

17  that Mr. Rios?

18    MS. McGRATH:  No.  It's Megan McGrath.  The

19  Zoom wasn't working on my end.

20    MR. POLICK:  Thanks, Megan.

21  BY MR. RICHARDS:

22    Q.    First of all, is it okay if I call you

23  Detective Mason as a title?

24    A.    Fine.

MICHAEL MASON                                          June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                                    7

1    Q.   Detective Mason, have you ever been

2   deposed before?

3    A.   Yes.

4    Q.   How many times?

5    A.   I believe just once.

6    Q.   And what was the case in which you were

7   deposed, if you can recall?

8    A.   I believe it was a case of Natalie

9   McFall.

10    Q.   Natalie McFall being the plaintiff?

11    A.   Yes.

12    Q.   And was that a lawsuit in the Northern

13   District of Illinois?

14    A.   I don't know.

15    Q.   Okay.  And do you know what the nature

16   of that lawsuit was?

17    A.   Natalie alleged that I held her against

18   her will at the police station.

19    Q.   Approximately what date did that case

20   occur, or was that case filed?  Do you remember?

21    A.   I don't remember.

22    Q.   Could you at least narrow it down?  Was

23   it the 2000s?  1990s?  Anything of that sort?

24    A.   It was -- I believe it was in the 2000s,

1   early 2000s.

2       Q.   Do you remember who represented you on

3   that case?

4       A.   I do not.

5       Q.   Do you remember what the outcome of that

6   case was?

7       A.   I do not.

8       Q.   All right.  And Natalie McFall --

9   McFall, would that be the common M-c-F-a-l-l?

10      A.   That's my recollection.

11      Q.   All right.  And when you were deposed,

12  do you remember if you were in a lawyer's office or

13  someplace else?

14      A.   I don't recall.  I don't know whose

15  office it was.  It was a facility.  Not my lawyer's

16  office.

17      Q.   Okay.  And apart from that one

18  experience with having a deposition, you have never

19  been deposed before; correct?

20      A.   Not that I recall.  No.

21      Q.   Okay.  Now, let me just begin by getting

22  to know a little bit about you.  First of all,

23  Detective Mason, how old are you?

24      A.   I'm 71.

1    Q.   Sorry.  What?

2    A.   I'm 71.

3    Q.   Okay.  And where did you grow up?  Where

4  were you raised?

5    A.   Chicago.

6    Q.   And where did you graduate from high

7  school?

8    A.   Saint Pat's.

9    Q.   Did you go to college?

10   A.   Part time.

11   Q.   What college did you go to part time?

12   A.   City College.

13   Q.   And what year did you cease going to

14  City College?

15   A.   I'm sorry?  Could you repeat that?

16   Q.   I'm sorry.  What were the years when you

17  went part time to City College?  What are we

18  talking about in terms of the time frame.

19   A.   It was the late '60s, early '70s.  In

20  there.

21   Q.   All right.  What was the first job that

22  you held?

23   A.   In my life?

24   Q.   Yes.

1     MR. POLICK:  Objection to relevance, but you

2  can go ahead and answer.

3  BY THE WITNESS:

4     A.   The first job that I held was at a

5  grocery store.

6  BY MR. RICHARDS:

7     Q.   And how long did you work at the grocery

8  store?

9     A.   I don't know.  Maybe a year on and off.

10  You know, it wasn't a full-time job.  It was a

11  part-time job.

12     Q.   Was that a part-time job during high

13  school?

14     A.   Grade school.

15     Q.   Grade school.  Okay.  And after you

16  graduated from high school, what was your first

17  job?

18     MR. POLICK:  The same objection to relevance,

19  but you can go ahead and answer.

20  BY THE WITNESS:

21     A.   I'm not sure.  I had a bunch of jobs,

22  you know, during high school, after high school.  I

23  don't remember what was the first one.

24  BY MR. RICHARDS:

1    Q.    Okay.  What kind of jobs did you -- just

2  in general what kind of jobs did you hold?

3    A.    I worked at a parts store for a while.

4  I worked at a retail establishment.  I worked for

5  the City of Chicago for a little while.

6    Q.    What did you do for the City of Chicago?

7    MR. POLICK:  Object to the relevance, but go

8  ahead and answer.

9  BY THE WITNESS:

10    A.    Well, I was a police officer.

11  BY MR. RICHARDS:

12    Q.    Oh, okay.  We definitely want to get to

13  that.  Was being a police officer your first

14  full-time job?

15    A.    No.

16    Q.    What was your first full-time job?

17    A.    I can't say for sure, but I think maybe

18  the auto parts store.

19    Q.    Okay.  When did you -- when did you join

20  the Chicago Police force?

21    A.    1973.

22    Q.    All right.  Was that your first job as a

23  police officer?

24    A.    Yes.

1      Q.    And have you ever worked for any other

2  police department aside from the City of Chicago?

3      A.    Not a police department, no.

4      Q.    All right.  When did you retire from the

5  City of Chicago Police Department?

6      A.    In 2006.

7      Q.    Okay.  Since 2006 have you had another

8  job or employment?

9      A.    I worked part time for the Department of

10  Aviation.

11      Q.    Okay.  And when you worked part time for

12  the Department of Aviation, what was your position?

13      A.    Security.

14      Q.    How long did you work for the Department

15  of Aviation as security?

16      A.    It was about five years in total, but it

17  was part time.

18      Q.    All right.  Aside from that job, have

19  you had any other jobs since you retired from the

20  City of Chicago Police Department?

21      A.    No.

22      Q.    Okay.  Let me go through your career

23  with the City of Chicago Police Department, just

24  hitting some of the highlights.  What was your

1  first assignment when you came on in 1973?

2      A.   I was assigned to the 20th District as a

3  patrol officer.

4      Q.   What is the geographic area of the 20th

5  District?

6      A.   Then or now?

7      Q.   Then.  In '73.

8      A.   Okay.

9      MR. POLICK:  Do you understand the question,

10  Mike?

11      THE WITNESS:  Yeah.

12      MR. POLICK:  Go ahead.

13  BY THE WITNESS:

14      A.   Roughly the city limits on the north,

15  Lake Michigan on the east, Montrose Avenue on the

16  south, and the north branches of the Chicago River

17  on the west.

18  BY MR. RICHARDS:

19      Q.   Okay.  So basically that would be the

20  area we have known as Rogers Park; is that fair?

21      A.   There are several neighbors in there.

22  Rogers Park is one of them.

23      Q.   Okay.  And how long did you work in the

24  20th District as a patrol officer?

MICHAEL MASON                                      June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                                14

1      A.    About seven years.

2      Q.    All right.  So that maybe brings us to

3  1980.  In 1980 what did you do then?  Where were

4  you assigned?

5      A.    The City opened a new police district

6  called the 24th District, and I was transferred to

7  the 24th District.

8      Q.    When you were transferred to the 24th

9  District, were you still a patrol officer?

10     A.    I was a patrol officer for a while.

11     Q.    Okay.  What were the geographic

12  boundaries of the 24th District approximately?

13     A.    So the city limits on the north, the

14  lake on the east, the Chicago branch -- north

15  branch of the Chicago River on the west, and

16  Petersen Avenue on the south.

17     Q.    Okay.  So it was a similar geographic

18  area to the 20th, the north part of the City;

19  correct?

20     A.    It was basically the north part of the

21  20th District.

22     Q.    Okay.  You said that you worked as a

23  patrol officer there.  How long did you work as a

24  patrol officer before you received another

1   assignment to a different position?

2       A.   I don't recall exactly.  Maybe a year or

3   so, and then they expanded the tactical unit, and I

4   worked on the tactical unit.

5       Q.   Okay.  When you worked on the tactical

6   unit, would your title be gang specialist?

7       A.   No.

8       Q.   When you worked on the tactical unit,

9   what was your title?

10      A.   Police officer.

11      Q.   Okay.  Explain to me the difference

12  between being a patrol officer and working on the

13  tactical unit?

14      A.   Well, the tactical unit is each district

15  has a unit with -- usually there's about 24

16  officers assigned to it broken up into three

17  different shifts, and sometimes they work

18  plainclothes, sometimes this work in uniform.

19          So they don't necessarily respond to

20  radio calls.  They work in what's considered

21  problem areas within the District, and it's pretty

22  much at the discretion of the district commander as

23  to what -- you know, what they want you to work on.

24      Q.   All right.  Would I be correct in saying

MICHAEL MASON                                June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                        16

1   one difference between patrol officers and tactical

2   officers is that tactical officers generally don't

3   work in uniform?

4       A.   Not always.  I mean, you can often be

5   working in plainclothes, but you would often get

6   some detail that took you outside of the District

7   to another part of the City, and you might be in

8   uniform for that, or you might be in uniform if

9   they needed you to be in uniform in the District.

10          It was kind of discretionary to, you

11  know, the district commander and the tactical

12  lieutenant.

13      Q.   Correct me if I'm wrong.  Isn't another

14  difference between the patrol officers and the

15  tactical unit officers that the tactical unit

16  officers often drive in either what are called

17  detective cars or unmarked cars?

18      A.   Yeah.  They are assigned to unmarked

19  cars.

20      Q.   Oh, I'm sorry.  Well, let me make a

21  further distinction.  The unmarked cars those are

22  the ones that are sometimes properly known as

23  detective cars in that they don't have the Chicago

24  Police insignia, but they do have a license plate

1   by which you could tell that it's a police car; is

2   that fair?

3       A.   Yeah.  That's fair.

4       Q.   And sometimes tactical officers will

5   work in what would be more accurately called not

6   unmarked but undercover vehicles, which are

7   ordinary vehicles without any showing that they're

8   police cars; is that correct?

9       A.   Not in my experience.

10      Q.   Okay.  So now in terms of tactical

11  officers -- when you were a tactical officer, in

12  general, you don't need to get into a lot of

13  details or specifics, how did you operate on the

14  street?  First of all, did you work with a partner?

15      A.   Yes.

16      Q.   Who was your partner or partners when

17  you were a tactical officer?

18      A.   Frank Costello.

19      Q.   How long was Frank Costello your

20  partner?

21      A.   Let's see.  He was my partner for a

22  while in the 20th District.  We both transferred to

23  the 24th, and we were both in the tactical unit for

24  three or four years, something like that.  So

1  probably five, six years.

2      Q.   And give me an approximate date, you

3  don't have to be, you know, super accurate, as to

4  when your partnership with Frank Costello ended?

5      A.   I would say around 1985.

6      Q.   Okay.  So about 1985.  And then let me

7  also ask you this.  In terms of -- when you worked

8  as a tactical officer, did you work with

9  confidential informants?

10     A.   I never -- I wouldn't consider any of

11  the people that I spoke with to be confidential

12  informants, no.

13     Q.   Okay.  So you just spoke to people on

14  the street, but -- just to get the distinction, one

15  definition of a confidential informant or one type

16  of a confidential informant is somebody who is

17  actually registered with the police and paid as a

18  confidential informant; correct?

19     A.   That is, yeah.

20     Q.   I'm sorry?

21     A.   Yes.  Yes, that is a description.

22     Q.   Okay.  Now, after you worked with Frank

23  Costello, what happened then?  Were you still a

24  tactical officer, or did something else happen?

1    A.   No, I was still a tactical officer for a

2  while.

3    Q.   And who was your partner after Frank

4  Costello?

5    A.   I think his name was Ernie Bernhauser.

6    Q.   I'm sorry.  What was his last name?

7    A.   Bernhauser.

8    Q.   Okay.  So his last name is Bernhauser.

9  Is that spelled B-e-r-n-h-a-u-s-e-r?  And what was

10  his first name?

11    A.   His first name is Ernie, and it's

12  Bernhauser with a B.  The rest of it was correct

13  the way that you spelled it.

14    Q.   I thought that I said B, but I was

15  misunderstood.  So his first name was Bernie and

16  his last name was Bernhauser?

17    A.   No.  His first name was Ernie, with an

18  E.

19    Q.   Ernie.  Okay.  Ernie Bernhauser.  I've

20  got it.

21       How long did you work as a tactical

22  officer with Ernie Bernhauser?

23    A.   It was about two years.

24    Q.   So that brings us maybe, I'm guessing,

1  to about 1990, or am I wrong?

2      A.   No.  That's closer to 1987.

3      Q.   Okay.  After you stopped working with

4  Ernie Bernhauser in 1987, who did you work with, or

5  what position did you have or both?

6      A.   Well, I was promoted to detective in

7  '87.

8      Q.   Okay.  And when you were promoted to

9  detective, where were you assigned?

10     A.   Area 5 violent crimes.

11     Q.   And what was the geographic area of Area

12  5 violent crimes?

13     A.   Well, it basically covers the northwest

14  side of the City.  I could be more specific if you

15  need me to.

16     Q.   Please.

17     A.   So it covers five districts.  The 14th,

18  15th, 16th, 17th and the 25th District.  Those are

19  not the same districts now.  Things have changed.

20  But when I was assigned there, that's what it was.

21     Q.   Okay.  And from 1987 -- when you were

22  assigned to be or promoted to be a detective in

23  1987, who was your partner or your first partner?

24     A.   Arlene Stampnick.

MICHAEL MASON                                         June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                              21

1    Q.   Arlene common spelling, A-r-l-e-n-e?

2    A.   That's right.

3    Q.   Can you please spell her last name?

4    A.   S-t-a-m-p and I think it's n-i-c-k.

5    Q.   All right.  And how long was Stampnick

6  your partner?

7    A.   About six months.

8    Q.   So that brings us to sometime in 1987 or

9  1988.  Who was your next partner?

10   A.   John Gavin.

11   Q.   So John common spelling, J-o-h-n?

12   A.   Yes.

13   Q.   And spell the last name, please?

14   A.   G-a-v-i-n.

15   Q.   Gavin, G-a-v-i-n.  How long was John

16  Gavin your partner?

17   A.   About a year.

18   Q.   After John Gavin was no longer your

19  partner, who was your partner?

20   A.   I probably worked alone for a little

21  bit, and then Bernie Brennan and I became partners.

22   Q.   Okay.  So Brennan is spelled

23  B-r-e-n-n-a-n; correct?

24   A.   Yes.

1    Q.    And what is his first name?

2    A.    Bernie with a B.

3    Q.    B-e-r-n-i-e?  Bernie Brennan?

4    A.    Yes.

5    Q.    How long did you work as a partner with

6  Bernie Brennan?

7    A.    I would say about 15 years.

8    Q.    All right.  So when you say 15 years,

9  was he your partner up until the end of the time

10  that you were with the Chicago Police Department,

11  or did you ever have another partner?

12    A.    I had another partner around 2003 I

13  think that it was.  I worked with Rich Milz.

14    Q.    Richard Mills, common spelling both

15  names?

16    A.    M-i-l-z.

17    Q.    Oh, M-i-l-z.  Thank you.

18          And he was your last partner until you

19  retired?

20    A.    Yes.

21    Q.    Okay.  In terms of your work as a

22  detective, did you work with confidential

23  informants?

24    A.    No.

1    Q.   You never talked to a confidential

2  informant when you were a detective?

3    A.   Oh, I have, yes.

4    Q.   Well, that was my question.

5    A.   I didn't understand it.  I thought that

6  you meant did I regularly work with confidential

7  informants, but I did occasionally speak with them,

8  yes.

9    MR. POLICK:  Object to the form, because I

10  understood the question the same way that my client

11  did.  If you want to rephrase it, go ahead.

12  BY MR. RICHARDS:

13    Q.   Yeah, I can rephrase it.  Yeah.

14       Let's disregard the phrase "work with."

15  Did you ever on occasion as a detective receive

16  information from confidential informants?

17    A.   Yes.

18    Q.   And in terms of the confidential

19  informants you received information from, were any

20  of those paid informants, if you remember?

21    A.   No.

22    Q.   None of them were paid informants?

23    A.   No.

24    Q.   In terms of the confidential informants

1   that you received information from, did any of --

2   were any of those confidential informants -- were

3   their names and identities recorded in any sort of

4   Chicago Police record?

5       A.   No.

6       Q.   All right.  And so let me -- what were

7   the kind of confidential informants that you

8   received information from?  Were they just people

9   whose identity that you promised to keep

10  confidential?  Is that what it meant?

11      A.   That's what it means to me.  People

12  would sometimes talk to you, but I'm not going to

13  court, and I don't want to -- I don't want anybody

14  to know that I'm telling you this, but, you know,

15  then they tell you something.

16      Q.   Okay.  And in all of your career you

17  never worked -- just to repeat, you never worked

18  with a confidential informant who was being paid by

19  the Police Department or the City of Chicago;

20  correct?

21      A.   Correct.

22      Q.   And you never worked with a confidential

23  informant whose identity was kept in some fashion

24  or recorded by either you or by the City of

1   Chicago; correct?

2      A.   Correct.

3      Q.   Well, when you worked with a

4   confidential informant, did you ever at least like

5   make notes of their name or phone number or address

6   so that you could keep in contact with them?

7      A.   I suppose that I did at some time.

8      Q.   And those notes or records, the names,

9   the addresses, phone numbers, where would have

10  those -- what would have happened to those notes?

11  Do they still exist?

12     A.   No.

13     Q.   Did you destroy any of the such notes?

14     A.   I imagine they got lost or destroyed.

15     Q.   Can you be anymore specific as to what

16  happened to those notes?  Well, let me ask you

17  this.  I will withdraw that question.

18         Do you ever remember sitting down and

19  deliberately looking over your notes seeing that

20  you had notes of the names and, you know, contact

21  information for a confidential informant and

22  actually destroying that note physically?  Do you

23  ever remember doing that?

24     A.   I don't have any recollection of that.

1    Q.   Well, when you say that they got -- when

2  you were working as a detective, where would you

3  keep those notes or information?  Would you keep it

4  in a notebook?  Would you keep it on sheets of

5  paper?  Where would you keep that information?

6    A.   I hear some background.

7    MR. RICHARDS:  I heard some background, too.

8  Was that an objection?

9    MR. POLICK:  No.  It was not.  It was

10  background noise.  So if you could repeat your

11  question, I think that he can go ahead and answer

12  it.

13  BY MR. RICHARDS:

14    Q.   Okay.  These notes as to confidential

15  informants, did you keep them in a notebook?

16    A.   No, I'm kind of losing track of when

17  we're talking about.  Ever?

18    Q.   Ever.

19    A.   Or specifically?

20    Q.   Well, let's start with ever, and then we

21  will narrow it down.  Ever?

22    A.   I don't really recall taking notes of

23  confidential informants as a patrol officer and,

24  again, my definition of a confidential informant is

1  somebody who doesn't want to be identified, or, you

2  know, be put on any official reports.  They just

3  want to tell me information.

4          So sometimes I wouldn't know exactly who

5  I'm talking to, and so I don't know that I would

6  even have taken notes in that instance.

7      Q.   All right.  But there are some instances

8  in which there was a confidential informant, and

9  you did know who they were talking to -- who you

10  were talking to; correct?

11     A.   Yes.

12     Q.   So in some instances in terms of your

13  memory you did record their name or address or

14  phone number or all three; correct?

15     A.   I'm assuming here that I -- that that's

16  correct.  I don't -- I don't recall having done

17  that, but at some point if I was talking to

18  somebody that I didn't know and they were willing

19  to tell me who they were, I would think that I

20  would have written their name down.

21     Q.   All right.  But you cannot tell us

22  whether any time that you did that you destroyed

23  that information at some point, you know, the

24  actual physical record of the information or you

1  lost it?  You can't give us any information --

2  further information on that; is that true?

3      A.   Yeah, I don't -- I don't recall what

4  happened to any of those notes if they exist.

5      Q.   All right.  In terms of confidential

6  informants, would you agree that the value of a

7  confidential informant's information can depend as

8  to whether they have a track record for

9  reliability?

10     MR. POLICK:  Object to the form of the

11  question, but you can answer over the objection.

12  BY MR. RICHARDS:

13     Q.   Or I can give you more clarification if

14  you need it.

15     A.   At least repeat what your thought is.

16     Q.   All right.  Let me just ask you this.

17  And I'll start this way.  Sometimes confidential

18  informants give you information which turns out to

19  be false; correct?

20     A.   Yeah.  That is correct.

21     Q.   Sometimes they give you information that

22  turns out to be true?

23     A.   That's also correct.

24     Q.   Would you agree with me that a

1   confidential informant who gives you information

2   which turns out to be true would have a -- what we

3   might call a track record for reliability?

4       MR. POLICK:  Objection to the form of the

5   question, and it's an incomplete hypothetical, but

6   go ahead and answer.

7   BY THE WITNESS:

8       A.   I guess I would -- I would gauge the

9   information that somebody gave me to be more likely

10  to be true if they had given me information in the

11  past that also turned out to be true.

12  BY MR. RICHARDS:

13      Q.   Okay.  Now, in terms of the informants

14  that you dealt with -- first of all, we're talking

15  about right now the period when you were a

16  detective, which is the period that you said that

17  you dealt with confidential informants.

18          During that period when you were a

19  detective and you were dealing with confidential

20  informants, how did you remember which informants

21  had given you good information in the past?  Did

22  you write that down, or did you just have a memory

23  of it?

24      A.   I didn't deal with confidential

1    informants on a continuing basis.  If somebody was

2    going to give me information on a case, it's not

3    like I'm going to be working on a similar case

4    necessarily.  That information was for that case,

5    and I never went back to that person for further

6    information.

7        Q.   Well, let me ask you this.  Did you ever

8    draft an affidavit for a search warrant which was

9    based on information that you got from a

10   confidential informant?

11       A.   Yes.

12       Q.   And did you ever write -- put in one of

13   those affidavits that the informant had given you

14   reliable information in the past?

15       A.   No, I don't recall that I said that he

16   had given me reliable information.  I don't recall

17   that.

18       Q.   Okay.  When you dealt with confidential

19   informants, would you ask other detectives if the

20   informants had given reliable information in the

21   past?

22       A.   I don't understand.

23       Q.   Okay.  Let's talk about a hypothetical.

24   You're drafting an affidavit for a search warrant

1   and you put in the search warrant that an informant

2   has given reliable information in the past.

3          First of all, you have drafted such

4   search warrants, haven't you, where -- or

5   affidavits for search warrants where you said that

6   I got information from an informant, and the

7   informant has given reliable information in the

8   past?  That you have done in the course of your

9   career; correct?

10      MR. POLICK:  Objection.  I think that

11  misstates the witness's testimony, but go ahead and

12  you can answer over the objection.

13  BY THE WITNESS:

14      A.   Yes, I have.

15  BY MR. RICHARDS:

16      Q.   All right.  In those instances would it

17  be fair to say that your information as to whether

18  the informant was reliable came not from your own

19  experience but from the experience of other

20  informants -- of other detectives with the same

21  informant?

22      A.   That's correct.

23      Q.   And so whenever you are dealing with an

24  informant -- whenever you did that, you put that

1  information in an affidavit for a search warrant,

2  you must have had conversations with other

3  detectives or officers about their previous

4  experience with the informant; correct?

5     A.   Yes.

6     Q.   Okay.  Let me ask you about another

7  topic -- some other topics, and then we are going

8  to move on -- we're going to move on to looking at

9  some documents.

10        You told me all of your partners -- let

11 me also give you some names of some other

12 detectives and talk about your connection or

13 association or knowledge of them.

14        First of all, when did you meet Reynaldo

15 Guevara?

16    A.   Specifically?

17    Q.   Yes.  Specifically.

18    A.   I don't know.

19    Q.   Can you narrow it down?  Did you meet

20 him in the '80s?

21    A.   Yes.

22    Q.   Okay.  Was it the early '80s or late

23 '80s?

24    A.   Well, it was after I was promoted to

1  detective.  So it would have been after 1987.

2      Q.    All right.  And when you met Detective

3  Guevara at first, was he a gang specialist?

4      A.    Yes.

5      Q.    What is or was a gang specialist?  What

6  does a gang specialist do?

7      A.    Well, I'm not a hundred percent certain.

8  I have never been a gang specialist, but my

9  understanding is that they are a support unit that

10  investigates gang crimes and they sort of become

11  somewhat experts on certain gangs.

12      MS. McGRATH:  Belated objection to the

13  question.  Foundation.

14      MR. RICHARDS:  I note the objection.

15  BY MR. RICHARDS:

16      Q.    But you answered your question, and I

17  appreciate your answer.

18      MR. POLICK:  No, he answered --

19  BY MR. RICHARD:

20      Q.    Now, in terms of Reynaldo Guevara,

21  before you began your investigation of the Luis

22  Morales murder case, how many times would you say

23  that you have met Reynaldo Guevara?

24      A.    I would say maybe a handful.

1      Q.    Okay.  A handful meaning probably less

2   than 10?

3      A.    Yeah.  I would say that's fair.

4      Q.    Alright.  Now, in the Police Department

5   police officers have reputations among the other

6   officers.  Would you agree?  You know, people talk

7   about each other?

8      MS. McGRATH:  Objection.

9      MR. RICHARDS:  I note the objection.

10  BY MR. RICHARDS:

11     Q.    People talk about each other and they

12  form opinions and they convey their opinions to

13  others; is that true?

14     A.    I don't know about that.

15     Q.    Alright.  Did Detective Guevara have a

16  reputation among the other officers that you know

17  of?

18     MS. McGRATH:  Objection.  Form.  Foundation.

19     MR. POLICK:  Same objections.

20  BY MR. RICHARDS:

21     Q.    During the period from 1987 to the

22  beginning of the Luis Morales murder investigation,

23  did Detective Guevara -- I'm sorry.  Strike that

24  question.

1       During the period between when you first

2  met Detective Guevara and the beginning of the Luis

3  Morales murder investigation, during that period

4  did Guevara as a gang specialist have a particular

5  gang that he was an expert in to your knowledge?

6     MS. McGRATH:  Objection.  Form.

7     MR. POLICK:  Join.  You can answer.

8  BY THE WITNESS:

9     A.   Yeah, I don't -- I didn't know what gang

10  he worked on, no.

11  BY MR. RICHARDS:

12     Q.   Alright.  And let me go to after the

13  Luis Morales murder case -- first of all, during

14  the Luis Morales murder case both you and then gang

15  specialist Guevara worked on that case; correct?

16     MR. POLICK:  Objection to the form of the

17  question, but go ahead and answer.

18  BY THE WITNESS:

19     A.   I worked on the case.  I know that he

20  had some input on the case, but -- I guess yes.

21  BY MR. RICHARDS:

22     Q.   Okay.  After that case, did you ever

23  work with gang specialist Guevara or eventually

24  Detective Guevara on any other case?

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                              36

1      A.   Well, specifically I don't know.  I'm

2   sure that I worked -- you know, once he was

3   assigned to Area 5, detectives work together on

4   cases.  Sometimes just for, you know, a moment,

5   sometimes for a day or two.  They don't necessarily

6   stay together on that case, you know.  If somebody

7   needs a few extra bodies to perform some

8   investigation, you know, you help out, but I don't

9   know any specifics.

10     Q.   Okay.  Is your answer that it's possible

11  that you may have worked with him, but you can't

12  remember any specific case that you worked with him

13  on after the Luis Morales murder case?

14     A.   That's correct.

15     Q.   Okay.  Shortly after the beginning of

16  the Luis Morales murder case and before it went to

17  trial, were you aware that gang specialist Guevara

18  had been promoted to detective?

19     A.   I guess.  If that's when he was

20  promoted, I guess that I would have been aware of

21  it.

22     Q.   Alright.  Did you have any input?  Did

23  you make any recommendation to anybody that he be

24  promoted?

1      A.   That wasn't my job.

2      Q.   Well, when he was promoted, did anyone

3    ask you for any input as to whether he should be

4    promoted?

5      A.   No.

6      Q.   Okay.  Let me share screen.

7           Before I ask you a series of questions,

8    what preparations -- without going into details of

9    conversations with your attorney, what preparations

10   did you make for your deposition today?  What

11   documents did you review?  How did you prepare?

12     A.   I would go through the police reports

13   relevant to this case.  I reviewed my testimony on

14   this case.

15             (WHEREUPON, a certain document was

16             marked Mason Deposition Exhibit

17             No. 1, for identification, as of

18             6-23-23.)

19   BY MR. RICHARDS:

20     Q.   Okay.  I have done a share screen.  And

21   for the court reporter this would be our Exhibit

22   No. 1.

23          I'm going to just scroll over this

24   document slowly, and then ask you if you can

1  recognize it.  Okay?

2      A.   Okay.

3      MR. POLICK:  Stephen, just for the record,

4  I've printed out a hard copy of the exhibits that

5  you sent over yesterday.  So if it's easier and you

6  are in agreement, I can give Detective Mason a hard

7  copy, and he can look it over rather than scrolling

8  up and down, if that's okay with you.

9      MR. RICHARDS:  It's an excellent suggestion,

10  and for now I will stop the share.

11  BY MR. RICHARDS:

12      Q.   Detective Mason, if you could review

13  what we have marked as Exhibit 1, and, Detective,

14  just let me know when you finish your review and

15  you can answer questions.

16      A.   Alright.

17      Q.   Okay.  So, Detective Mason, is that --

18  what's been marked as Deposition Exhibit 1 is that

19  document, in fact, a court reported statement of

20  Jaime Rios?

21      A.   Yes, it is.

22      Q.   And before this litigation began, had

23  you seen that document before?

24      A.   Yes.

MICHAEL MASON                                      June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                              39

1    Q.   And were you present when that statement

2  was transcribed by the court reporter?

3    A.   Yes.

4    Q.   And aside from the court reporter, who

5  else was present when the statement was taken?

6    A.   The state's attorney Barbara Riley.

7    Q.   Okay.  I had forgotten to ask you

8  another question, but when did you meet Detective

9  Halvorsen, Ernest Halvorsen?

10   A.   When did I meet him?

11   Q.   Yes.

12   A.   For the first time?

13   Q.   Yes.

14   A.   I believe that it was sometime during

15  the time that I was assigned to the 24th District.

16   Q.   So would that be in the late '80s?

17   A.   Probably the early '80s.

18   Q.   Okay.  When you first met Halvorsen, was

19  he a detective or a patrol officer?

20   A.   He was a patrol officer.

21   Q.   Alright.  And during the period in the

22  1980s how well did you know Ernest Halvorsen?

23   A.   I didn't really know him.  I knew who he

24  was, you know, from -- we were both assigned to the

1    24th District.  So we would see each other on

2    occasion, but I had never worked with him.

3        Q.    Okay.  Before the investigation of the

4    Luis Morales murder, had you ever worked with

5    Ernest Halvorsen?

6        A.    No.

7        Q.    After the investigation of the Luis

8    Morales murder, did you ever work with Ernest

9    Halvorsen again?

10       A.    No.

11       Q.    Let me ask you this.  You did work with

12   him during the investigation of the Luis Morales

13   murder; is that correct?

14       A.    Yes.

15       Q.    Okay.  But your regular partner was

16   Detective Brennan; correct?

17       A.    That's right.

18       Q.    And why were you working with

19   Halvorsen rather than your regular partner,

20   Detective Brennan?

21       A.    I assume that Detective Brennan was off

22   that day.

23       Q.    Okay.  And that would be the only reason

24   why you were working with Detective Halvorsen?

1    A.    Yes.

2          (WHEREUPON, a certain document was

3          marked Mason Deposition Exhibit

4          No. 2, for identification, as of

5          6-23-23.)

6    BY MR. RICHARDS:

7    Q.    Okay.  I would like to turn now to

8    Exhibit No. 2, and I ask if Detective Mason can be

9    provided with a copy of Exhibit No. 2.

10         MR. POLICK:  Okay.  And can you identify for

11   the record which testimony?  I know it's testimony,

12   but which proceeding are we talking about here?

13         MR. RICHARDS:  Okay.  We are talking about

14   testimony during the Luis Morales trial -- I'm

15   sorry, the trial of Jaime Rios for the Luis Morales

16   murder.  We're talking about Detective Michael

17   Mason's testimony at trial.  So that would be

18   Exhibit No. 2.

19         MR. POLICK:  Alright.  Just for the record,

20   this exhibit is marked PFP 476 through PFP 494.  I

21   don't believe that's a complete copy of Mr. Mason's

22   testimony, but I'm going to show him what you have

23   marked as Exhibit 2.

24   BY MR. RICHARDS:

1    Q.    Okay.  Detective Mason, after you have

2   finished reviewing that, let me know when you are

3   finished, and I can ask you some questions.

4   Alright?

5    A.    Alright.

6    Q.    Detective Mason, have you finished

7   reviewing that document?

8    A.    Yes.

9    Q.    Okay.  I recognize that some of the

10   pages from the cross-examination have been left

11   out, but the pages that you reviewed, are those an

12   accurate transcription of your testimony on direct

13   and part of your testimony on cross?

14    A.    They appear to be, yes.

15    Q.    Okay.  And before you gave that

16   testimony, did you speak with the prosecutor -- the

17   trial prosecutor on the case?

18    A.    I'm sure that I did.  I don't have any

19   recollection of who the prosecutor was.

20    Q.    Well, let me ask you this.  How many

21   times -- you've testified in court on cases;

22   correct?

23    A.    Yes.

24    Q.    Can you give us any estimate of the

1   approximate number of times that you have testified

2   in court on a criminal case?

3       A.   I don't think that I could.  No.

4       Q.   Well, would it be more than a hundred?

5       A.   I would say so, yes.

6       Q.   Would it be more than 500?

7       A.   It could be.

8       Q.   Okay.  And let's narrow it down a little

9   bit.  Do you know approximately how many times that

10  you've testified in court on a murder case?

11      A.   I would not know how to -- I wouldn't

12  know how to even assess that.

13      Q.   Alright.  You don't keep -- you have

14  never kept any record for yourself of the number of

15  times and the dates and the cases that you have

16  testified in?

17      A.   No.

18      Q.   Can you ever remember in any of the

19  cases that you testified in a situation where you

20  testified without first speaking to the prosecutor

21  about your testimony?

22      A.   Can you repeat that question, please?

23      Q.   Yes.  Of all of the times that you've

24  testified in court on criminal cases, can you

1    remember any one instance where you testified, you

2    were put on the stand, without having talked to the

3    prosecutor first?

4         A.   You know, there might be some

5    misdemeanor cases.  Some of those cases you never

6    get a chance to talk to the prosecutor.  The court

7    moves kind of fast.

8         Q.   Okay.  Leaving aside misdemeanor cases,

9    felony cases, can you ever remember any instance in

10   a felony case where you testified without talking

11   to the prosecutor first?

12        A.   I can't remember that happening.

13        Q.   Would it be fair to say that that has

14   never happened in your experience?

15        A.   Yeah, I don't think that has ever

16   happened.

17        Q.   Okay.  And since felony cases include

18   murder cases, would it be also fair to say that

19   there has never been a murder case where you have

20   testified on the stand without talking to the

21   prosecutor first about your testimony; fair?

22        A.   That's fair.

23        Q.   Do you have any reason to believe that

24   in the trial of the Jaime Rios murder case you

1   testified without talking to the prosecutors first

2   about your testimony?

3      A.   No.

4      Q.   And in general just as a matter of what

5   happens usually in cases, I'm not asking you to

6   remember specific instances, when you discuss with

7   a prosecutor your testimony, you know, before you

8   testify at a trial, do you usually have your police

9   reports available to you?

10     A.   Yes.

11     Q.   And does the prosecutor also usually

12  have the police reports available?

13     A.   Yes.

14     Q.   Can you remember any instance in which

15  you testified in a criminal trial where during your

16  preparation with the prosecutor the police reports

17  were not available?

18     A.   I can't recall that.  No.

19     Q.   Okay.  Would it be fair to say that to

20  the best of your recollection -- strike that.  I

21  will withdraw that question.

22     MR. RICHARDS:  Okay.  I would next like to go

23  on to Mason Deposition Exhibit No. 3.

24          (WHEREUPON, a certain document was

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                              46

1              marked Mason Deposition Exhibit

2              No. 3, for identification, as of

3              6-23-23.)

4       MR. POLICK:  Stephen, before we move to No. 3,

5   can we take a quick bathroom break?

6       MR. RICHARDS:  Not only can we, but I would

7   welcome it.  Do you want to give it 10 minutes?

8       MR. POLICK:  That would be fine.  Thank you.

9              (WHEREUPON, a recess was had.)

10  BY MR. RICHARDS:

11      Q.    Detective Mason, I would like to show

12  you what has been marked as Mason Deposition

13  Exhibit No. 3, testimony of Ernest Halvorsen, and,

14  again, Detective Mason, when you have finished

15  reviewing that, let me know.

16      A.    I will.  Okay.

17      Q.    So you reviewed that document.  Does

18  that document purport to be the testimony of Ernest

19  Halvorsen at the Jaime Rios trial?

20      MR. POLICK:  I am going to object to the form

21  of that question.

22  BY MR. RICHARDS:

23      Q.    Put it this way, have you ever seen that

24  document before this litigation?

MICHAEL MASON                                      June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                              47

1    A.   No.

2    Q.   Okay.  After reviewing that document, do

3  you believe that Detective Ernest Halvorsen's

4  testimony at the trial was accurate?

5    MR. POLICK:  I'm going to object to the form

6  of the question and also his competence to answer

7  it, because typically witnesses are excluded during

8  these proceedings, but he can answer over the

9  objection.

10  BY MR. RICHARDS:

11    Q.   Okay.  Detective Mason, did you

12  understand my question, or would you like me to

13  repeat it?

14    A.   Yeah, actually repeat it, please.

15    Q.   Okay.  To your knowledge is what

16  Detective Halvorsen testified to during that trial

17  -- to your knowledge is it accurate what he

18  testified to?

19    MR. POLICK:  Again, objection to the form, but

20  you can go ahead and answer.

21  BY THE WITNESS:

22    A.   It appears to be accurate although --

23  yeah, it appears to be accurate.  My recollection

24  of the incident now I have to rely on, you know,

1  the reports available and the testimony that I

2  gave.  I don't have an independent recollection of

3  all of the events, but it does appear to be

4  accurate.

5  BY MR. RICHARDS:

6      Q.    Okay.  By the way, in terms of your

7  memory of the events of this murder investigation,

8  would you say that you have a good memory, a fair

9  memory, or a poor memory of what transpired?

10     A.    I have a -- I have a vague memory of

11 some of it.  Not all of it.

12     Q.    Okay.  So it would be accurate to say

13 that on some issues you have no memory?  We will

14 not go into right now what the issues are, but on

15 some issues or aspects of what happened you have no

16 memory; is that fair?

17     A.    That's correct.

18     Q.    And on other aspects or issues you have

19 a vague memory; correct?

20     A.    Yes.

21     Q.    But on none of the issues or facts do

22 you have a clear memory; is that true?

23     MR. POLICK:  Objection to form, but you can

24 answer.

1  BY THE WITNESS:

2      A.   Could you repeat that, please?

3  BY MR. RICHARDS:

4      Q.   Well.  Let me ask you this.  Is there

5  anything -- are there any events or aspects of the

6  Louis Morales murder investigation which you have a

7  clear memory?

8      A.   I guess I would have to say all of the

9  memory that I do have is a bit cloudy.

10     Q.   Okay.  Well, so the answer to that

11 question is no, you don't have a clear memory as to

12 any of the events or the aspects of the Luis

13 Morales murder investigation?  Is that a fair

14 statement?

15     MR. POLICK:  Objection.  That mischaracterizes

16 the answer and his testimony.  You can answer over

17 the objection.

18 BY THE WITNESS:

19     A.   Yeah, I guess if you want to use that

20 terminology, I have some -- I have some

21 recollections, but, you know, they may be moments

22 and they may not all connect.  So that's the

23 answer.

24 BY MR. RICHARDS:

1      Q.    Let's go over that since we are on that

2   topic.

3           What do you remember about the Luis

4   Morales murder investigation?

5      A.    I remember being assigned to it the day

6   after -- not the day after.  Well, the incident

7   occurred around midnight, I think, on the 27th of

8   June, and I was assigned to it on the dayshift with

9   Bernie Brennan, and I have some recollection of

10   some of those events that day.

11      Q.    Well, let's start with that day then.

12   I'm sorry to interrupt.  I just want to clearly

13   break down your testimony.  I'm not preventing you

14   from saying anything, but I just want to clearly

15   demarcate some parts of your testimony.

16           So what do you remember about the first

17   day when you were assigned the case with Bernie

18   Brennan?

19      A.    There was a suspect named originally,

20   and that person had gone into the 14th District and

21   told the police there that he heard the police were

22   looking for him.

23      Q.    Okay.  And do you remember the name of

24   that suspect, or has your recollection been

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                              51

1  refreshed by looking at any of your reports?

2      A.    My recollection has been refreshed by

3  looking at the reports.  I still can't remember his

4  first name, but his last name was Melendez.

5      Q.    Okay.  Do you remember the nickname

6  Macho?

7      A.    Yes.

8      Q.    Okay.  I want to ask you a little bit

9  more information about this.  Before this

10  investigation, had you ever heard of Jose Macho

11  Melendez?

12     A.    No.

13     Q.    Were you familiar with the gangs in the

14  area where the murder occurred?

15     A.    I don't know what you mean by familiar.

16     Q.    Well, I mean, had you ever heard of the

17  Spanish Cobras?

18     A.    Oh, I have.

19     Q.    Had you ever heard of the Latin Kings?

20     A.    Yes.

21     Q.    Were you aware of the boundary line

22  between the Kings' territory and the Cobras'

23  territory?

24     A.    At that time?  Are you asking me at that

MICHAEL MASON                                          June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                                    52

1   time?

2       Q.   Yeah, at that time.  Not presently.

3   Back during the investigation of the Luis Morales

4   murder in 1989 were you aware of what the

5   borderline was between the Cobras' territory and

6   the Kings' territory?

7       A.   Yeah, it was -- Western Avenue was

8   basically the dividing line.

9       Q.   Alright.  And do you remember where this

10  murder occurred?

11      A.   No, I don't.

12      Q.   Okay.  So in terms of the first day that

13  you were assigned, you remember Mr. Melendez coming

14  to the police station.  What else do you remember?

15      A.   I remember that we spoke with him at --

16  myself and Detective Brennan spoke with him at

17  Area 5, and we subsequently ran a lineup with him

18  in it also at Area 5.

19      Q.   Okay.  Do you remember the results of

20  the lineup?

21      A.   He was not identified.

22      Q.   And do you remember who viewed the

23  lineup?

24      A.   It was -- let me think now.  So are you

1  asking me do I remember independently or --

2      Q.   Well, yes.  This is what I'm asking you.

3  Later we are going to go over the police reports to

4  see if you can identify them, so that will be fine.

5  But right now I'm just dealing with your present

6  memory after it's been refreshed by reviewing the

7  reports, you know, privately.

8          As you're sitting there now, do you

9  remember who was -- who viewed the lineup of

10  Mr. Melendez?

11     A.   I still don't understand.  So are you

12  asking me independently of my review of the reports

13  or --

14     Q.   Yes.

15     A.   -- prior to my review of the reports?

16     Q.   Yes, I'm asking you for your present

17  memory -- I mean, if your memory is based on your

18  recent review of the reports and that's refreshed

19  your recollection and you remember right now, you

20  can tell me, but if you don't remember, you can say

21  that.  Whatever is the truth.

22     A.   Yeah.  My recollection has been

23  refreshed by the review of my reports as to the

24  names of the people.

1      Q.    Okay.  So who was the name of the

2    people/person who viewed the lineup?

3      A.    So that would have been Samantha Hudson

4    and Luis Huertas.

5      Q.    Now, just for the court reporter,

6    Samantha is common spelling and Hudson is also

7    common spelling; is that true?

8      A.    Yes.

9      Q.    And Luis Huertas is spelled L-u-i-s, and

10    the last name is spelled H-u-e-r-t-a-s?

11     A.    That's correct.

12     Q.    Okay.  What else do you remember about

13    your activities the first day of the investigation?

14     A.    I remember going to a Holiday Inn, it

15    was in Evanston, and talking to some people there.

16     Q.    And do you remember what the purpose was

17    of going to the Holiday Inn?

18     A.    Sure.

19     Q.    What was the purpose of going to the

20    Holiday Inn?

21     A.    I was looking for two people that

22    Mr. Melendez had said that he was with the evening

23    that this murder occurred.

24     Q.    Okay.  And do you remember what

1  conversations that you had with those people?

2      A.   Yeah, I do.

3      Q.   What conversations did you have with

4  those people?

5      A.   I asked them if they knew Mr. Melendez,

6  and if they recalled seeing him -- well, let's see.

7  I don't remember exactly -- you know, I don't

8  remember my exact words, but it was words to the

9  effect that I wanted to know -- I gave them a time

10  frame and asked if they remember seeing

11  Mr. Melendez.

12      Q.   Okay.  And do you remember if they

13  responded, and, if so, what they responded?

14      A.   Yeah.  They both responded that they had

15  seen him.

16      Q.   And did they respond that they had seen

17  him during the time frame that you're talking

18  about?

19      A.   Yes.

20      Q.   Now, did the time frame they mentioned,

21  did that establish an absolute alibi for

22  Mr. Melendez in terms of the murder?

23      MR. POLICK:  Objection to form, but you can

24  answer.

1   BY THE WITNESS:

2       A.   I don't know that -- I don't remember

3   exactly what times they said that they saw him, but

4   it did cover the times very well.

5   BY MR. RICHARDS:

6       Q.   Okay.  And do you remember how far the

7   Holiday Inn was from the scene of the murder?

8       A.   It was in the neighborhood of eight

9   miles.

10      Q.   Okay.  What else do you remember about

11  the first day of the investigation?

12      MR. POLICK:  Object to the form of the

13  question, but you can answer over the objection.

14  BY THE WITNESS:

15      A.   I remember that I spoke with Javier

16  Torres.

17  BY MR. RICHARDS:

18      Q.   And what was your conversation with

19  Javier Torres?

20      A.   It was about the shooting.

21      Q.   Okay.  And what did Javier Torres say

22  about the shooting?

23      A.   Again, I can give you a -- you know, he

24  basically said that he was with Luis Morales, and

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                           57

1   at the location where this happened, which I don't

2   recall, and they were on foot, some other people

3   approached them on foot, and started shooting at

4   them.

5       Q.    Anything else that you remember about

6   that conversation with Javier Torres?

7       A.    Not independently, no.

8       Q.    Okay.  Anything else that you remember

9   about the first day of your investigation?

10      A.    Not that I recall, no.

11      Q.    Okay.  The second -- after that day, the

12  next day did you continue the investigation or not?

13      A.    Well, the next day I think is when we

14  actually ran the lineups.

15      Q.    Okay.  And do you remember which lineups

16  -- which lineups that you ran; in other words, who

17  viewed the lineups that you ran on the second day?

18      A.    That was Samantha Hudson and Luis

19  Huertas.

20      Q.    Do you remember if either of them made

21  an identification?

22      A.    They did not.

23      Q.    Okay.  Apart from the lineups on the

24  second day, anything that you remember about the

MICHAEL MASON                                June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                        58

1   second day?

2       A.   No.

3       Q.   Okay.  The third day of the

4   investigation, did anything happen that day?

5       A.   Not that I recall.

6       Q.   Okay.  The fourth day of the

7   investigation, anything that you remember about

8   that?

9       A.   I don't know -- when you say the fourth

10  day of the investigation, I'm not sure how to take

11  that.  I don't --

12      Q.   Well, I'm sorry.  I will withdraw the

13  question and ask it in a different way.

14          After the lineups of you by Samantha

15  Hudson and Luis Huertas, what is the next thing

16  that you remember happened during the

17  investigation?

18      A.   Sometime later, I guess this is the 6th

19  of July, Officers Gawrys and Guevara came into Area

20  5 with some people that had information about this.

21      Q.   So let's concentrate on July 6th then.

22  Guevara and his partner, that was Steven Gawrys?

23  I'm not sure if I am pronouncing it right.

24      A.   Yeah.  I think it's pronounced Gawrys.

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                         59

1      Q.    Would you agree with me that it's

2    spelled first name S-t-e-v-e-n and his last name is

3    spelled G-a-w-r-y-s?

4      A.    That sounds right.

5      Q.    Okay.  We will take it for now.  Thank

6    you.

7            Do you remember what time that the two

8    of them came -- Guevara and Gawrys came into -- and

9    what was the district?

10     A.    Area 5.

11     Q.    What time did they come into Area 5?

12     A.    It was around the time -- I think that

13   it was around the time that I started, which was

14   around 4:00 in the afternoon.

15     Q.    Alright.  You said that they came in

16   with some people.  Who were the people that they

17   came in with?

18     A.    I don't recall.

19     Q.    How many people did they come in with?

20     A.    Two people.

21     Q.    Those two people, were they men or

22   women?

23     A.    My recollection is that they were men.

24     Q.    Okay.  What race or ethnicity were they?

1   White?  Black?  Hispanic?

2      A.   I don't recall that at this time.

3      Q.   Do you recall the names of either of

4   those two people?

5      A.   No.

6      Q.   Do you remember if they told you their

7   names?

8      A.   They did.

9      Q.   Okay.  Do you remember -- do you

10  remember one of them having the nickname Little

11  Mike?

12     A.   I don't recall that.

13     Q.   Alright.  What, if anything, did these

14  two people tell you?

15     A.   They told me that they had heard that

16  Jaime Rios was the person who was doing the

17  shooting, or one of the people that was doing the

18  shooting that killed Luis Morales.

19     Q.   Alright.  When they said that they had

20  heard that, did they tell you from whom they had

21  heard that?

22     A.   No.

23     Q.   Did you ask them from whom they had

24  heard that?

MICHAEL MASON                                June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                        61

1    A.   I don't recall.

2    Q.   Is there anything else that you can

3  recall about your conversation with these two

4  people?

5    A.   No.

6    Q.   Alright.  How long did this conversation

7  last?  Do you know that?

8    A.   I don't know.

9    Q.   And was anything else done with respect

10  to your knowledge, or did you take any -- did you

11  take any other action on July 6th with respect to

12  the investigation?

13    A.   Yes.

14    Q.   What did you do, if anything?

15    A.   I talked to my lieutenant -- violent

16  crimes lieutenant and gave him a little update

17  about what I had just learned.  We had a

18  conversation.

19    Q.   When you say your violent crimes

20  lieutenant, would that be lieutenant -- I think is

21  it Kijowski?  Or who was the violent crimes

22  lieutenant?

23    A.   It's pronounced Kijowski.

24    Q.   Can you spell it for me?

MICHAEL MASON                                          June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                                    62

1     A.    K-i-j-o-w-s-k-i.

2     Q.    What is Lieutenant Kijowski's first

3  name?

4     A.    I think it's Ed.

5     Q.    I'm sorry?

6     A.    I think it's Ed.

7     Q.    Evan.  Okay.

8     A.    Ed, E-d.

9     MR. POLICK:  Ed, E-d.

10  BY MR. RICHARDS:

11    Q.    Let me start -- spell the first name for

12  me?

13    A.    E-d.

14    Q.    The first name is spelled E-e?

15    A.    E-d, Ed, Edward.

16    Q.    Oh, Edward.  Ed, I got it.  Okay.

17  Edward Kijowski, is he still alive?

18    A.    I don't believe so.

19    Q.    Okay.  Do you know when he retired from

20  the force?

21    A.    No.

22    Q.    Okay.  This conversation that you had

23  with Edward Kijowski, what do you remember about --

24  first of all, where did this conversation take

1  place?

2      A.   I don't know.  It was probably in his

3  office at Area 5, but it may have been in the

4  sergeant's office.  I don't know.

5      Q.   Was anyone else present for that

6  conversation?

7      A.   I don't recall.

8      Q.   Okay.  Do you remember if Reynaldo

9  Guevara or Steven Gawrys were present?

10     A.   They would not have been present, no.

11     Q.   How about any of the informants?

12     A.   No.

13     Q.   Okay.  At the time that you spoke to

14  Lieutenant Kijowski, were the informants still in

15  the police station?

16     A.   I don't recall.

17     Q.   Okay.  Do you remember when the

18  informants left the police station?

19     A.   No, I don't.

20     Q.   Can you give me any further description

21  of the informants as to height, age, or anything

22  else?

23     A.   No.

24     Q.   Okay.  On July 6 after this conversation

MICHAEL MASON                                      June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                          64

1   with your lieutenant, what happened then?

2       A.   Well, the next thing that I recall was

3   Officers Gawrys and Guevara arrived back at Area 5,

4   and they had with them Jaime Rios.

5       Q.   By the way, a more general question,

6   Detective Mason.  You were not the lead detective

7   on this investigation; correct?

8       A.   No.

9       Q.   Who were the lead detectives or

10  detective?

11      A.   I don't know.  That term wasn't used.

12  So I don't know how to answer that.

13      Q.   Alright.  Let's get into that.  When

14  there's a murder investigation back then, was there

15  somebody designated as the lead detective?

16      A.   Like I said, nobody ever used that term,

17  and no.

18      Q.   Okay.  Well, is there some sort of

19  priority -- or let's put it this way.  When you

20  have a murder investigation when it's conducted

21  back in the '90s, how were the ultimate decisions

22  made?  I mean, was it -- you know, was it a group

23  effort?  Was it consensus?  Did somebody give the

24  marching orders?  How did it work?

MICHAEL MASON                                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                                           65

1      A.   Well, you said back in the '90s, but I

2   assume that you mean in the '80s.

3      Q.   I'm sorry.  I meant at the time of this

4   investigation in 1989.  My mistake.  Go ahead.

5      A.   So, you know, the violent crimes unit

6   has violent crimes sergeants and a violent crimes

7   lieutenant.  So those people would decide who is

8   going to work on the case, and, you know, it could

9   be -- every day it could be somebody different.  It

10  just depends on the manpower and, you know, other

11  needs.  So, I mean, that's how it is decided.  They

12  decide who is working on it.

13     Q.   Okay.  And is there any sort of priority

14  or seniority given to the first detectives who are

15  assigned to the case as opposed to detectives

16  assigned latter?

17     A.   I don't know if I can answer that,

18  because, you know, I'm not the one who made those

19  decisions.

20     Q.   Alright.  You said you spoke to your

21  lieutenant after learning this information.  Do you

22  know if your lieutenant gave any instructions or

23  directions to Guevara and Gawrys?

24     A.   I don't know that at all.  No.

MICHAEL MASON                                          June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                        66

1    Q.   Did you give any instructions to Guevara

2  and Gawrys?

3    A.   Instructions, no.

4    Q.   Well, did you ask Guevara and Gawrys to

5  pick Jaime Rios up?

6    A.   No.

7    Q.   At the time that Gawrys and Guevara gave

8  you that information and you talked to the

9  informants, did you believe that you had probable

10 cause to arrest Jaime Rios for a murder?

11   A.   No.

12   Q.   Did you believe that you had probable

13 cause to arrest Jaime Rios for anything?

14   A.   No.

15   Q.   And what time did Guevara and Gawrys

16 come in with Jaime Rios?

17   A.   It was about 10:00 in the evening.

18   Q.   Alright.  And had you -- prior to this

19 had you ever had any contact with Jaime Rios?

20   A.   No.

21   Q.   Had you ever -- prior to the discussion

22 with the informants, had you ever heard Jaime Rios'

23 name?

24   A.   No.

1  Q.   Do you remember the informants also gave

2  the name of somebody named Cristino Garcia?

3  A.   Yeah.  There was some mention of I think

4  a Tino.

5  Q.   Okay.  Now, when Guevara and Gawrys

6  brought Jaime Rios to the station at about 10, if

7  you have a present memory of this, describe, you

8  know, what happened.  How they came in, and what

9  happened when they came in?

10  A.   You know, I have no present memory of it

11  without referring to my reports.

12  Q.   We will get to the reports, but that's

13  the question that I am asking now.  Okay.  Do you

14  have a present memory of questioning Jaime Rios?

15  A.   I have a vague recollection of that,

16  yes.

17  Q.   Okay.  Tell me everything, not what's in

18  your reports, but everything that you can remember

19  about the interrogation of Jaime Rios.

20  A.   Myself and Detective Halvorsen sat down

21  with him, and I advised him of the Miranda

22  warnings, that he understood them, and I told him

23  we wanted to talk about this shooting, and asked if

24  he had anything to say.

1   Q.   Okay.  Go ahead.

2   A.   And then he related some -- you know,

3   what he said was his involvement in it.

4   Q.   Okay.  And what did he tell you about

5   his involvement in it?

6   A.   Again, if I am relying just on my

7   memory, he had -- yeah, I don't know if I could say

8   that this is just from my memory.  So I guess I

9   don't have a clear recollection of what he said.

10   Q.   That's fine.  Do you have a clear

11   recollection of how long that you talked to him?

12   A.   It was approximately a half an hour.

13   Q.   Okay.  And do you have any present

14   recollection of any of the questions that you

15   asked?

16   A.   I don't.

17   Q.   Do you have a present recollection of

18   any of the questions that Detective Halvorsen

19   asked?

20   A.   No.

21   Q.   Do you have a present recollection of

22   what happened after you spoke to him for half an

23   hour?

24   A.   I informed him that he was under arrest,

MICHAEL MASON                                          June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                               69

1  and that he was not going to be able to leave.

2      Q.   Okay.  And after you informed him that

3  he was under arrest and he would not be able to

4  leave, what happened then?

5      A.   I handcuffed him.

6      Q.   Okay.  Then what happened?

7      A.   I left the room.

8      Q.   Okay.  After you left the room, what

9  happened then?

10     A.   Well, I made some phone calls.

11     Q.   Who did you call?

12     A.   I called the felony review unit, the

13  state's attorney's office.

14     Q.   Okay.  By the way, this may be an

15  obvious question, but I want to ask it.  After you

16  spoke to Jaime Rios, did you believe that you had

17  probable cause to make an arrest?

18     A.   Yes.

19     Q.   Now, you say that you called the felony

20  review unit.  Can you explain what the felony

21  review unit is or was in 1989 and how it operated?

22     A.   Well, it was a section of the state's

23  attorney office that reviewed felony cases that the

24  police department was asking charges on.  So

1  somebody from that unit would be assigned to go

2  over the case and see if there was enough -- you

3  know, enough to charge.

4       Q.   Can we go back up for a moment?  You had

5  said that Jaime Rios got to the station at 10 p.m.,

6  and that the interview with him took about a half

7  an hour.

8           Do you remember when the interview

9  started, either at 10 p.m. or some other time?

10      A.   It was about midnight when it started.

11      Q.   Okay.  So between 10 p.m. and 12 p.m.,

12  Jaime Rios was in the police station; correct?

13      A.   He was at -- yeah, he was at our Area 5

14  headquarters, yes.

15      Q.   And do you remember what room that he

16  was in?

17      A.   I don't.

18      Q.   In general at Area 5 there are

19  conference rooms; correct?

20      A.   Well, there's -- you know, we call them

21  interview rooms.

22      Q.   Right.

23      A.   Is that what you're referring to?

24      Q.   Yeah.  Now, the interview rooms back

1   then, did they have doors?

2      A.   Yes.

3      Q.   Could the doors be locked?

4      A.   They could be looked.

5      Q.   Okay.  Apart from the interview rooms,

6   were there holding cells?

7      A.   At Area 5?

8      Q.   Yes.

9      A.   Holding cells, no.

10     Q.   Okay.  The interview rooms at Area 5

11  approximately how big were they?

12     A.   You know, I guess roughly 10 by 8.

13  Something like that.

14     Q.   And did all of the interview rooms have

15  a handcuff ring?

16     A.   I'm pretty sure that they all do.

17     Q.   Okay.  And a handcuff ring being a ring

18  affixed to the wall which you can handcuff somebody

19  to the ring?

20     A.   Yes.

21     Q.   Alright.  And apart from the handcuff

22  ring, did all of those rooms have, like, a hard

23  bench where somebody could sit down or lie down?

24     A.   Yes.

1    Q.   Alright.  And apart from the hard bench

2  and the handcuff ring, was there no other furniture

3  in those rooms?

4    A.   Well, generally there was a table, and,

5  you know, one or two chairs.  The chairs were

6  removable; you know, so one room might have three

7  chairs and one room might have one chair, but --

8    Q.   Okay.  And were the chairs brought in

9  when somebody was going to be interviewed?

10   A.   If needed.

11   Q.   Okay.  Now, in terms of Jaime Rios being

12  -- you can say from your present memory that he was

13  in the interview room between 10 p.m. and 12 a.m.

14  when the interrogation started; correct?

15   A.   Yes.

16   Q.   Alright.  And during that period was the

17  door to that interrogation room locked?

18   A.   I don't recall.

19   Q.   So you can't tell us one way or the

20  another?

21   A.   Not definitively, no.

22   Q.   Okay.  Can you tell us one way or the

23  other whether Jaime Rios was handcuffed to the

24  handcuff ring?

1    A.   Between 10 and midnight?

2    Q.   That's what I'm asking, yes.

3    A.   He was not.

4    Q.   Alright.  Now, at some point during the

5   time when Jaime Rios was in Area 5, did a female

6   who was connected with him come in and attempt to

7   see him?  Do you remember that?

8    A.   My recollection is that Jaime Rios

9   knocked on the door and motioned to a woman who was

10   seated in the back of the office.

11    Q.   Okay.  When did Jaime Rios knock on the

12   door?

13    A.   I don't remember exactly, but it was

14   during that 10 to 12 period.

15    Q.   Okay.  The woman seated in the office,

16   who was that woman?

17    A.   He referred to her as his girlfriend.

18    Q.   Do you remember if you ever spoke to his

19   girlfriend?

20    A.   I spoke to her briefly.

21    Q.   When did you speak to her, and what was

22   said between the two of you?

23    A.   Well, I spoke to her after Jaime Rios

24   knocked on the door and motioned to her, and I

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                            74

1   asked him what do you want, and he said, "Can I

2   talk to her?"

3        So I closed the door and I went over to

4   that woman, and I asked her if she knew him.

5   Q.   What did she say?

6   A.   She said she did know him, and then I

7   asked her something to the effect, well, he wants

8   to talk to you.  Do you want to talk to him?

9   Q.   Okay.  And what did she respond?

10  A.   She did.

11  Q.   Okay.  After she said that she wanted to

12  talk to him, what happened?

13  A.   We let her go in the room and talk to

14  him.

15  Q.   How long was she in the room talking

16  with him?

17  A.   I don't -- it was brief.  I don't know.

18  A few minutes, 10 minutes.  I don't know.

19  Q.   Okay.  After she left the room, what

20  happened next in respect to her?

21  A.   I don't recall.

22  Q.   Okay.  After you called felony review,

23  which would be after the half an hour

24  interrogation, what happened then?

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                          75

1      A.   Well, subsequently the assistant state's

2  attorney, Barb Riley, came to Area 5, and, you

3  know, we had a conversation.

4      Q.   Okay.  What did you say to her and what

5  did she say to you?

6      A.   I don't remember specifically what the

7  words that were spoken, but it was about this case

8  and the development, you know, to that point with

9  what we could present.

10     Q.   Okay.  Again, can you be anymore

11  specific?  Could you remember anymore details of

12  that conversation?

13     A.   Well, the conversation -- the

14  conversation that I had with Jaime Rios I told her

15  what he had told me, and I gave her what reports

16  that we had available.

17     Q.   Okay.  And how long did your

18  conversation with State's Attorney Riley last?

19     A.   I don't know.  I don't remember.  I

20  don't know.

21     Q.   That's fine.  And do you remember being

22  present when the court reporter statement was

23  taken?

24     A.   Yes.

1    Q.   Okay.  And do you remember from your

2    present memory, and if you don't, that's fine, when

3    the court reported statement started?

4    A.   It started around 4:30 in the morning.

5    Q.   Okay.  How soon after your conversation

6    -- how soon after you calling felony review did

7    State's Attorney Riley arrive at Area 5?

8    A.   I have no recollection of how long that

9    it took, but I think that she got there around 2 in

10   the morning or something.

11   Q.   Okay.  By the way, as a general matter,

12   once you called felony review, or once you did call

13   felony review back in those days, how long would it

14   take them to arrive?

15   A.   It was different.  You know, each case

16   was different.  If it was a busy night, it might

17   take awhile.  I don't know how many assistants were

18   assigned to that, you know.

19   Q.   Alright.  So you're saying that it's

20   4:30 in the morning when the court reporter starts

21   to take a statement from Jaime Rios.  You were

22   present during that statement; correct?

23   A.   Yes.

24   Q.   Okay.  After the statement, did you have

1   any -- did you have any further involvement with

2   the case, or did you do anything else with respect

3   to the case?

4       A.   The next day I conducted a lineup.

5       Q.   And who was in the lineup?  I mean not

6   every person.  Was Jaime Rios in that lineup that

7   next day?

8       A.   He was.

9       Q.   Who viewed the lineup?

10      A.   I would have to -- let's see.  I would

11  have to refer to my reports to be certain of the

12  names of the people.

13      Q.   Okay.  Well, we will do that later

14  maybe, review the reports, but do you have a

15  present memory of how the people who viewed the

16  lineup got to the lineup?

17      A.   Could you just say that again?

18      Q.   Okay.  First of all, did more than one

19  person view the lineup of Jaime Rios?

20      A.   Two people.  My recollection is two

21  people reviewed the lineup.

22      Q.   Okay.  The two people who viewed the

23  lineup, do you have any memory of how they got to

24  Area 5, whether they came on their own, were

MICHAEL MASON                                           June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                                    78

1  brought there or whatever?

2      A.   I have no idea.  No.

3      Q.   By the way, have you read the Complaint

4  in this case?

5      A.   The Complaint?

6      Q.   Yeah, the Second Amended Complaint that

7  was filed in this litigation, you know, in which

8  you are a defendant, have you ever read that

9  document?

10     A.   Yes, I have.

11     Q.   Okay.  Do you have any knowledge of any

12 of Reynaldo Guevara's contacts with Luis Huertas?

13     A.   I have no -- I have no knowledge if he

14 had contact with Luis Huertas.

15     Q.   You have absolutely no knowledge whether

16 Reynaldo Guevara had any interaction with Luis

17 Huertas prior to the lineup; is that correct?

18     A.   That's correct.

19     Q.   By the way, going backward a little bit,

20 do you have any recollection as to whether Guevara

21 ever told you anything that he knew about the

22 informants, the ones that would come in on July 6th

23 to talk to you?

24     A.   I don't know if I understand.  What now?

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                            79

1    Q.   Well, the informants who came in on July

2  6th, you never met these people before; is that

3  fair?

4    A.   That's correct.

5    Q.   Okay.  They had never given you

6  information in the past; is that correct?

7    A.   That's correct.

8    Q.   Do you have any memory as to whether

9  Guevara told you anything about his contacts with

10  the informants and/or whether he believed them to

11  be reliable?

12    A.   He knew who the informants were.

13    Q.   Okay.  That answers one part of the

14  question.  Did Guevara ever tell you anything about

15  as to whether he had received reliable information

16  from these informants in the past?

17    A.   Yeah, I believe that he said that he had

18  spoken with them in the past, and that they had

19  given accurate information.

20    Q.   Okay.  And did he ever specify for you

21  when they had given this accurate information in

22  the past and what that accurate information was?

23    A.   There was a little noise there.  So I

24  didn't catch the whole question.

1      Q.    I'm going to repeat it.

2            Did Reynaldo Guevara tell you -- ever

3    tell you -- I'm sorry.  Withdrawn.

4            Did Reynaldo Guevara ever detail for you

5    his conversations with those informants?  I will

6    withdraw it again.

7            Did Reynaldo Guevara ever tell you when

8    these informants had previously supplied

9    information, what that information was, and why he

10   thought that it was reliable?

11      MS. McGRATH:  Objection to form.

12      MR. POLICK:  You can answer.

13   BY THE WITNESS:

14      A.   He gave me no specifics about the

15   information that had been provided.  And just to be

16   clear, this conversation was with both Gawrys and

17   Guevara.  I don't recall exactly who was speaking

18   at what time, but no, I didn't get any details

19   about what they had said, you know, prior to that.

20   BY MR. RICHARDS:

21      Q.   Okay.  Yeah, well, thanks for the

22   clarification on that.

23           Now, let's skip forward again.  You have

24   had the lineups that next day after -- the next day

1  would have been, by the way, July 7th; correct?

2      A.   Yes.

3      Q.   Okay.  In the lineups on July 7th, was

4  Jaime Rios identified in either of the lineups?

5      A.   Yes, he was.

6      Q.   Okay.  In one or in both?

7      A.   In one.

8      Q.   Okay.  And after he was identified, did

9  you have any further -- did you do anything further

10  with respect to the investigation?

11     A.   Again, I made a phone call to felony

12  review and asked for their assistance and whether

13  or not we could charge, you know, at this point.

14     Q.   And did you receive a response?

15     A.   Yes.

16     Q.   And what was the response?

17     A.   The state's attorney by the name of Owen

18  responded, and he approved the charges.

19     Q.   Now, after Jaime Rios had been charged,

20  did the investigation continue?

21     A.   It did.

22     Q.   Okay.  And would it be correct to say

23  that one reason that he continued is that there was

24  another suspect still at large, that being Tino, or

1   Cristino Garcia?

2      A.   That's correct.

3      Q.   Did you have any further -- what further

4   steps did you take, if any, in terms of the

5   investigation of the case after July 7th?

6      A.   Later in July, I can't recall the date,

7   but Cristino Garcia was picked up, and he was

8   brought into Area 5.

9      Q.   Do you know who brought him into Area 5?

10     A.   I don't recall the names of the

11  officers.

12     Q.   Okay.  Do you recall what time that he

13  was brought into Area 5, Cristino Garcia that is?

14     A.   I don't.

15     Q.   Okay.  Do you recall speaking with

16  Cristino Garcia?

17     A.   Yes.  At some point I did interview him.

18     Q.   Okay.  And what was -- what did he say

19  during the interview, and what did you say?

20     A.   Well, like before I advised him of his

21  Miranda warnings and told him why he was there and

22  asked him if he would speak with me.

23     Q.   Okay.  And what did he say, if anything?

24     A.   He said that he didn't want to talk to

1   me.

2       Q.    Is that everything that you can remember

3   about that conversation?

4       A.    It is.

5       Q.    Do you know if anyone had spoken with

6   Garcia before -- after he was brought into the

7   Area 5, but before you spoke with him?

8       A.    I don't.  I have no idea.  I wasn't

9   there.

10      Q.    Well, on the date when he was brought

11  in -- when he was brought in, were you present at

12  Area 5 or had your shift started yet?

13      A.    I don't believe that I was there.  I

14  don't remember exactly when that was, but I don't

15  think that I talked to him until the next day after

16  he was brought in.

17      Q.    Okay.  The day that he was brought in,

18  do you know if you were on duty or not?

19      A.    I don't know if I was on duty or not,

20  but I don't recall hearing about him coming in if I

21  was, you know.

22      Q.    Okay.  Well, put it this way.  A major

23  part of the investigation had been left open, the

24  Cristino Garcia part of the investigation.  That

MICHAEL MASON June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA 84

1 was still open after Jaime Rios was charged;

2 correct?

3  A. Yes.

4  Q. And in Jaime Rios's statement he was

5 saying that Cristino Garcia was the actual killer;

6 correct?

7  A. Yes.

8  Q. Alright.  And certainly after speaking

9 with -- well, after speaking with Jaime Rios, did

10 you believe that it was possible that he was

11 telling the truth, and that Cristino Garcia was the

12 actual shooter?

13  MR. POLICK:  Objection to the form.  Calls for

14 speculation.  You can answer.

15 BY THE WITNESS:

16  A. What was the question?  Did I believe

17 that he could be telling the truth?

18 BY MR. RICHARDS:

19  Q. Yeah, that Jaime Rios could be telling

20 the truth that Cristino Garcia was the actual

21 shooter?

22  A. I don't -- I don't know how to answer

23 that.  I just go by what I'm presented with, where

24 the clues take me.  I don't -- you know, I don't

1   speculate as to whether somebody is being accurate.

2   I just take what they give me, and, you know, see

3   how it fits in.

4       Q.   Okay.  But, I mean, you do in general

5   make judgements when you interview people about

6   whether they are telling you the truth, don't you?

7       A.   If I can verify it, you know, what they

8   said against what other people have said or what

9   the evidence shows I do.

10      Q.   Okay.  In the case of Jaime Rios's

11  statement that Cristino Garcia was the actual

12  shooter, was that statement consistent with the

13  evidence that you had at that point?

14      A.   Well, Jaime Rios was identified in a

15  lineup as the shooter.  So it's not, you know,

16  necessarily consistent.

17      Q.   Okay.  It was inconsistent, because

18  somebody had identified Jaime Rios as the shooter

19  even though in the statement the statement says

20  that Cristino Garcia is the shooter; correct?

21      A.   Correct.

22      Q.   Let me -- we will wait on that.

23          After you spoke with Cristino Garcia,

24  did you have a conversation with the state's

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                        86

1   attorney?

2       A.   I did.

3       Q.   And what was the substance of that

4   conversation?

5       A.   Well, the new development in the case.

6       Q.   Sure.  And what did you say and what did

7   the state's attorney say?

8       A.   I don't recall the conversation

9   specifically, but I presented him with the new

10  development, and, you know, he made his decision

11  that there was not enough evidence to charge

12  Cristino Garcia.

13      Q.   Did you recommend to him that Cristino

14  Garcia not be charged?

15      A.   I didn't recommend one way or the other.

16  No.

17      Q.   Okay.  After the decision was made not

18  to charge Cristino Garcia and apart from your

19  testimony at motions or trial, did you have any

20  other further involvement with this investigation?

21      A.   So after the arrest of Cristino Garcia?

22  Is that what you're saying?

23      Q.   That's what I am referring to.

24      A.   I don't believe that I had any further

1    involvement, no.

2        Q.    A couple of other questions about the

3    arrest of Cristino Garcia.  The state's attorney,

4    Barbara Riley, first of all, when you saw her

5    during the -- you know, when she called on felony

6    review and came to speak with Jaime Rios, had you

7    ever met Barb Riley before then?

8        A.    I don't believe so.

9        Q.    After that one encounter did you ever

10   see her again?

11       A.    I don't recall.

12       Q.    Well, did you see her on the date when

13   you came to interview -- when you came to interview

14   Cristino Garcia?

15       A.    No.

16       Q.    Did you see any felony review assistant

17   at Area 5 when you came to interview Cristino

18   Garcia?

19       A.    I'm not certain if I saw them at Area 5,

20   or -- you know, I don't recall.  I don't recall

21   speaking with them in person at all.

22                 (WHEREUPON, a certain document was

23                  marked Mason Deposition Exhibit

24                  No. 4, for identification, as of

MICHAEL MASON                June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA           88

1        6-23-23.)

2 BY MR. RICHARDS:

3     Q.    Okay. I would like you now to look at

4 Mason Deposition Exhibit No. 4. And so, Joe, if

5 you could supply him with that.

6     MR. POLICK: Sure I will. Give me a moment.

7 It's kind of long. It will take a minute.

8     MR. RICHARDS: Take your time. If no one

9 minds, I will turn off my camera while he's doing

10 the review.

11     MR. POLICK: Fine by us.

12     MR. RICHARDS: Well, at this point I think

13 that I need a bathroom break, and if Mr. Mason

14 wants to, he can use the time, that's fine, too,

15 but at this point I would suggest another

16 ten-minute break unless anybody has an objection to

17 that.

18     MR. POLICK: Yes. That's fine.

19        (WHEREUPON, a recess was had.)

20     MR. RICHARDS: Back on the record.

21 BY MR. RICHARDS:

22     Q.    So, Detective Mason, have you had a

23 chance to review that document?

24     A.    Yes, I did.

MICHAEL MASON                                          June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                                    89

1      Q.    Okay.  And is that a transcript of your

2    testimony at the motion to suppress statements held

3    in the Jaime Rios case?

4      A.    It's a transcript of my testimony.  I

5    don't recall which -- you know, if it was a motion

6    to suppress or if it was a trial.  I don't know

7    that I see that in here, but it's a transcript of

8    my statement.

9      Q.    Right.  And do you have any reason to

10   believe that it's not an accurate transcription of

11   your testimony; in other words, we are not talking

12   about some other Detective Mason or some confusion?

13   That's your testimony there?

14     A.    Yeah, it looks like mine.

15     Q.    Okay.  And do you have any present

16   memory now of testifying on a motion to suppress in

17   the Jaime Rios case?

18     A.    Yes, after reading the transcript.

19     Q.    Okay.  And I would like to show you --

20   actually, I think that we will skip Exhibit No. 5.

21     MR. POLICK:  I don't think that we have a

22   No. 5.  I have a No. 6.

23             (WHEREUPON, a certain document was

24             marked Mason Deposition Exhibit

MICHAEL MASON                                          June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                                    90

1           No. 6, for identification, as of

2           6-23-23.)

3  BY MR. RICHARDS:

4     Q.   In that case, we will go to

5  No. 6.  I just would like you to look at Exhibit

6  No. 6 and this is only a photograph.  So I think

7  that you can see it quickly.  Does he have a copy

8  of that?

9     MR. POLICK:  Not yet, but I can certainly

10 provide him if that's okay with you.

11    MR. RICHARDS:  It is.

12    MR. POLICK:  Okay.  He has a copy.

13 BY MR. RICHARDS:

14    Q.   So looking at that photograph, do you

15 recognize the person in the photograph?

16    A.   I do not.

17           (WHEREUPON, a certain document was

18           marked Mason Deposition Exhibit

19           No. 7, for identification, as of

20           6-23-23.)

21 BY MR. RICHARDS:

22    Q.   Okay.  Next, I would like you to take a

23 look at Mason Deposition Exhibit No. 7.  And if you

24 could review that and tell me if you recognize that

1  document.

2      MR. POLICK:  Okay.  I have handed him No. 7.

3  He is reviewing it.

4  BY MR. RICHARDS:

5      Q.   Just let me know, Detective Mason, when

6  you have finished reviewing it.

7      A.   Okay.

8      Q.   Are you done?

9      A.   I'm done.

10     Q.   Okay.  Is that a document -- is that

11  document a supplementary report written by you and

12  signed by you and dated --  I'm sorry.  Is that a

13  -- strike that.

14          Is that a police report on the Luis

15  Morales investigation which is authored and signed

16  by Detective John A. Enault and Detective Richard

17  Curley?  And Enault is spelled E-n-a-u-l-t and

18  Curley is spelled C-u-r-l-e-y.

19     A.   Yes, it is.

20     Q.   Is that what that document is?

21     A.   Yes, it is.

22     Q.   A couple of questions.  Were Detectives

23  Enault and Curley among the detectives assigned to

24  the investigation of the murder of Luis Morales?

1      A.    They were assigned on this day, the day

2  that the report refers to.

3      Q.    Okay.  And that would be -- and that

4  would be the date of June 27, 1989?

5      A.    No, this is July 9th, 1989.

6      Q.    Okay.  Oh, alright.  I'm sorry.

7            And does this report deal with the

8  arrest of somebody named Benjamin Carrero?

9      A.    Yes, it does.

10     Q.    I had asked you before about your

11 memories of investigative steps.  Do you have any

12 present memory of speaking with Benjamin Carrero?

13     A.    Yes, I do.

14     Q.    Okay.  When did you speak with Benjamin

15 Carrero?

16     A.    It was on the 9th of July.

17     Q.    Okay.  And how did you come to speak to

18 Benjamin Carrero?

19     A.    It was in executing a search warrant,

20 and he was one of the people in the apartment where

21 a weapon was recovered.

22     Q.    Do you remember what he said to you and

23 what you said to him?  Not based on review of your

24 report, but based on your present memory.

1     A.    Well, present memory basically he -- I

2   recall that he said that he knows Jaime Rios, and

3   Jaime Rios lives by where Carraro lives and gave

4   him a gun, and asked him to hold onto the gun and

5   told him that it was used in a murder and that he

6   would be back.

7     Q.    Okay.  Now, do you know who else was

8   present for this conversation?

9     A.    I believe Detective Curley.

10     Q.    Alright.  Was gang specialist Guevara

11   present?

12     A.    No.

13     Q.    Do you know where gang specialist

14   Guevara was when you had this conversation with

15   Carrero?

16     A.    I do not.

17     Q.    And a gun was recovered at the time of

18   the Carrero arrest; correct?

19     A.    Yes.

20     Q.    And the reason for going and doing the

21   search warrant was because the informants who had

22   originally fingered Jaime Rios and Cristino Garcia

23   said that a gun used in the murder would be found

24   where Carrero lived; correct?

1    MR. POLICK:  Object to the form, but you can

2  answer.

3  BY THE WITNESS:

4    A.   My recollection -- I don't recall who

5  the informant was.

6  BY MR. RICHARDS:

7    Q.   Okay.  Was this an informant who was

8  different from the two informants who came in to

9  speak with you on July 6th?

10    A.   I don't recall.

11    Q.   Did the two informants who came in on

12  July 6th mention anything about where the guns

13  could be found?

14    A.   Are you speaking of the informants that

15  Guevara and Gawrys brought in?

16    Q.   Yes.

17    A.   Not at that time.

18    Q.   So this was some later informant who

19  gave the information about the gun, that the gun

20  could be found at Carrero's house; correct?

21    MR. POLICK:  Objection to the form of the

22  question, but you may answer.

23  BY THE WITNESS:

24    A.   I don't --  the information was given on

1   July 9th.

2   BY MR. RICHARDS:

3       Q.    Okay.  The information was given on July

4   9th.  And how did it come about?  Was it a phone

5   call?  Was it an in-person meeting?

6       A.    I don't recall.

7       Q.    Do you recall who, if anyone, received

8   the information on July 9th?

9       A.    I spoke with the person who gave the

10  information.

11      Q.    But you can't recall whether you spoke

12  with them on the phone or in person?

13      A.    At this time I don't recall.

14      Q.    Is there any document that exists

15  anywhere that would refresh your recollection or

16  give you information about how you received this

17  information?

18      A.    Not that I'm aware of.

19      Q.    In fact, are you aware that the gun that

20  was recovered during that surge did not match any

21  of the ballistics from the murder?

22      MR. POLICK:  Objection to the form of the

23  question.  You may answer over the objection.

24

1   BY THE WITNESS:

2       A.   I learned that -- I learned that the gun

3   that was recovered was not consistent with the

4   bullet evidence that was also recovered.

5   BY MR. RICHARDS:

6       Q.   Okay.  And the gun that -- the gun that

7   was recovered was -- because the ballistics

8   evidence that was recovered was from a 25 caliber;

9   correct?

10      A.   Yes.

11      Q.   And the gun that was recovered was a --

12  well, if you remember, the gun that was recovered

13  was a 32 caliber; correct?

14      A.   Yes.

15      Q.   And, in fact, the other gun mentioned in

16  Jaime Rios's statement was not a 32 caliber, was

17  it?

18      A.   He referred to it differently.

19      Q.   Yeah, he referred to it as either -- as

20  I believe a 35 caliber or a 38 caliber; correct?

21      A.   I believe that it was a 38 caliber.

22      Q.   Okay.  And, in fact, no 38 caliber was

23  ever recovered in connection with the

24  investigation; correct?

1    A.   That's correct.

2    Q.   Now, just on the subject of the search

3  warrants and the informants, you also got

4  information at some point from an informant that a

5  gun used in the homicide could be recovered from a

6  man named -- and a residence of a man named Jose

7  Lopez; correct?

8    A.   Yes.

9    MR. POLICK:  Objection to the form of that

10  question.  The answer can stand.

11  BY MR. RICHARDS:

12    Q.   Was it the same informant who gave you

13  the information about the gun at Cararro's house or

14  a different informant that told you about the gun

15  at Lopez's house?

16    A.   At this time I don't recall.

17    Q.   Okay.  The informant who gave you the

18  information about the gun to be found at Lopez's

19  house, what date did he give you that information?

20    A.   On July 9th.

21    Q.   The same date as you got the information

22  about Carrero; correct?

23    A.   Yes.

24    Q.   Do you remember if the conversation

1   about the gun to be found at Lopez's house occurred

2   in person or over the telephone?

3       A.   I don't recall.

4       Q.   Can you give us any details of any

5   information about the identity of either of the

6   persons who gave you the information about the gun

7   at Cararro's house and the gun at Lopez's house?

8       A.   Not at this time.

9       Q.   Will you be able to do it at any time?

10      MR. POLICK:  Objection.  Calls for

11  speculation.  You may answer.

12  BY THE WITNESS:

13      A.   I don't see how.

14  BY MR. RICHARDS:

15      Q.   Okay.

16      A.   I don't recall.

17      Q.   Fair enough.  And just to complete the

18  circle here a little bit, there was no gun found

19  after the search at Lopez's house, was there?

20      A.   That's correct.

21      Q.   Did any of these people who gave --

22  persons or people who gave you information on July

23  9th, did either of them tell you how they knew that

24  the guns would be located at Cararro's house and at

MICHAEL MASON                                          June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                                   99

1   Lopez's house?

2       A.   I believe that they did, but I don't

3   recall the specifics of how they knew it.  I would

4   have to refer to my report.

5       Q.   Okay.  I'm just asking you for your

6   present recollection at this point.

7            About Deposition Exhibit 7, that's not a

8   report that you authored, but you have reviewed

9   that report; correct?

10      A.   Yes.  Correct.

11      Q.   Is there anything in that report that is

12  untrue to your knowledge?

13      MR. POLICK:  Objection to the foundation, but

14  you may answer.

15  BY THE WITNESS:

16      A.   I have not seen anything that I consider

17  untrue.

18  BY MR. RICHARDS:

19      Q.   Okay.  So would it be your opinion that

20  that report is accurate?

21      A.   Yes.

22            (WHEREUPON, a certain document was

23            marked Mason Deposition Exhibit

24            No. 8, for identification, as of

1          6-23-23.)

2    BY MR. RICHARDS:

3       Q.    Okay.  I would like you now to review

4    Deposition Exhibit No. 8 when you are supplied with

5    that.

6       MR. POLICK:  Alright.  I am going to hand him

7    No. 8.

8    BY THE WITNESS:

9       A.    Okay.

10   BY MR. RICHARDS:

11      Q.    Tell me when you have had a chance to

12   review that.

13      A.    I have.

14      Q.    Okay.  Is that a report authored by you?

15      A.    Well, I'm not certain if I completed the

16   report or if my partner, Detective Brennan,

17   completed the report, but it's our report, and I

18   agree with it.

19      Q.    Right.  And you also signed it; correct?

20      A.    I don't think that's my signature, but

21   Detective Brennan may have signed it with my

22   permission.

23      Q.    Okay.  And that was a common practice

24   between you and Detective Brennan that one of you

1  would author the report and the other would review

2  it to see if you agreed, and then the signatures

3  would be added both for you and for Detective

4  Brennan; correct?

5    A.   Yeah, that was common.

6    Q.   Okay.  Anything in that report that is

7  incorrect?

8    A.   I don't see anything incorrect.

9         (WHEREUPON, a certain document was

10        marked Mason Deposition Exhibit

11        No. 9, for identification, as of

12        6-23-23.)

13  BY MR. RICHARDS:

14    Q.   Okay.  I now would like you to review

15  Exhibit No. 9.  It's a little more lengthy.  It may

16  take a little bit more time.  Joe, if you could

17  give him Exhibit No. 9.

18    MR. POLICK:  Okay.  Give me a second.

19         Alright.  He has been giving Exhibit

20  No. 9 to review.

21  BY MR. RICHARDS:

22    Q.   Alright.  Detective Mason, that exhibit

23  is that a report which is dated June 28th of 1989?

24  I'm sorry.  Detective Mason, did you hear me?

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                          102

1      A.   I didn't hear the whole question

2   apparently.

3      Q.   Okay.  Let me start again.

4           Detective Mason, is that Deposition

5   Exhibit No. 9 a report dated June 29th of 2089?

6      A.   June 28, 1989.

7      Q.   Okay.  And is that a report, in fact,

8   authored by you or was it authored by Detective

9   Brennan or both, or do you know?

10     A.   By both of us.

11     Q.   Okay.  And you signed off on it?

12     A.   Yes.

13     Q.   And is that, in fact, your signature?

14     A.   Oh, no.  That's not my signature, again,

15   but --

16     Q.   Detective Brennan would have signed your

17   name with your permission?

18     A.   Yes.

19     Q.   Is there anything in that report that is

20   inaccurate?

21     A.   I don't believe so.

22     Q.   Is there any significant detail which

23   you remember now as to the events described in that

24   report which you can add?

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                        103

1    A.    Which I can add did you say?

2    Q.    Add, yes.

3    A.    I'm not sure.  Are you asking me if

4  there is any additional information that's not

5  contained in the report that I can add?

6    Q.    Yes.

7    A.    No.

8    Q.    Okay.  To your knowledge was that a

9  report which would have been given to the state's

10  attorney at trial before you testified?

11    A.    Yes.

12          (WHEREUPON, a certain document was

13          marked Mason Deposition Exhibit

14          No. 10, for identification, as of

15          6-23-23.)

16  BY MR. RICHARDS:

17    Q.    Now, I would like to show you, and the

18  witness can be given, Mason Deposition Exhibit

19  No. 10.

20    MR. POLICK:  Okay.  He has been given the

21  exhibit and is looking that over.

22  BY THE WITNESS:

23    A.    Okay.

24  BY MR. RICHARDS:

MICHAEL MASON                                          June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                              104

1    Q.   So, Detective Mason, is Deposition

2  Exhibit No. 10 a report that is dated July 7th of

3  1989?

4    A.   Yes.

5    Q.   And are the names of the detectives

6  reporting yourself and Detective Halvorsen?

7    A.   Yes, it is.

8    Q.   And is that your signature on the

9  report, or did somebody else sign it for you?

10   A.   No.  That's my signature.

11   Q.   Okay.  Do you know if you authored this

12  report?

13   A.   I believe that I did.

14   Q.   Okay.  And after reviewing the report,

15  is there anything in the report that is inaccurate?

16   MR. POLICK:  Just to make a record here, the

17  version that we have been given here has some

18  highlighted portions and stray marks on it.

19       Are you referring to the typed portion

20  of the report?

21   MR. RICHARDS:  Okay.

22  BY MR. RICHARDS:

23   Q.   Let me just make a record.  This is a

24  report received -- a copy of the report was

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                            105

1   received from the public defender's office.  So I'm

2   assuming that the stray marks were made by them and

3   the highlighting.

4          First of all, Detective Mason, just to

5   clarify, the highlighting on the report and the

6   stray marks, those were not written by you;

7   correct?

8       A.   Correct.

9       Q.   Okay.  Aside from the highlighting and

10  stray marks not being a part of the original

11  report, this is an accurate copy of the report that

12  you authored; correct?

13      A.   It does appear to be.

14      Q.   Alright.  Is there anything in this

15  report that is inaccurate?

16      A.   I don't believe so.

17      Q.   Okay.  Is there anything in this report

18  that you remember that is omitted from the report?

19      A.   No.

20             (WHEREUPON, a certain document was

21             marked Mason Deposition Exhibit

22             No. 11, for identification, as of

23             6-23-23.)

24  BY MR. RICHARDS:

1    Q.    Okay.  I would like you to look at Mason

2  Deposition Exhibit No. 11.

3    MR. POLICK:  Alright.  Give me a second here,

4  and I will give him a copy of it.

5  BY THE WITNESS:

6    A.    Okay.

7  BY MR. RICHARDS:

8    Q.    Alright.  Now, is that --  is that a

9  report dated July 7th of 1989?

10   A.    Yes, it is.

11   Q.    And do you know if you or detective --

12  and is that report signed off on by you and

13  Detective Halvorsen?

14   A.    Yes, it is.

15   Q.    And it bears signatures.  Is that, in

16  fact, your signature on the report?

17   A.    It is.

18   Q.    And does it appear also to be signed by

19  Detective Halvorsen?

20   A.    There is a signature.  It could be that

21  he gave me permission to sign his name.

22   Q.    Okay.  And just for the record, there

23  are some stray marks and notations on the report.

24  Apart from those stray marks and notations and

1   handwriting, is this an accurate copy of the report

2   that you authored?

3      A.   It does appear to be.

4      Q.   Alright.  And is there anything that

5   would need to be added to that report?  Anymore

6   detail than you can think of or that you remember?

7      A.   No.

8      Q.   Is the report inaccurate in any respect?

9      A.   No.

10     Q.   And like the other reports, is this a

11  report that would have been given by you to the

12  state's attorney before you testified?

13     A.   Given by me to the state's attorney?

14     Q.   Okay.  Is this something that the

15  state's attorney would have had available to him

16  and to you before you testified at trial?

17     A.   Yes.

18              (WHEREUPON, a certain document was

19              marked Mason Deposition Exhibit

20              No. 12, for identification, as of

21              6-23-23.)

22  BY MR. RICHARDS:

23     Q.   Okay.  I next want you to look at Mason

24  Deposition Exhibit No. 12, and have a chance to

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                          108

1  review that.

2      MR. POLICK:  Okay.  Give me a second.

3         Okay.  He has got No. 12.

4  BY MR. RICHARDS:

5      Q.    Just let me know when you are finished

6  reviewing it.

7      A.    Alright.

8      Q.    Is this document, Mason Deposition

9  Exhibit No. 12, a copy of two complaints for search

10  warrants and search warrants where you are the

11  complainant on both search warrants?

12     A.    Yes.

13     Q.    Okay.  And this copy is not signed by

14  you, but is this -- do you believe this is an

15  accurate copy of the complaint for search warrant

16  -- the complaints for the search warrants for the

17  homes of Benjamin Carrero and Jose Lopez?

18     A.    Yes.

19     Q.    And is there anything inaccurate about

20  any of the information which you put in these

21  complaints for search warrants?

22     A.    I don't believe so.

23     Q.    Is there anything important that's left

24  out of either of the complaints that you want to

1   tell us about at this time?

2       A.   No.

3       Q.   And to your knowledge would this

4   document be one of the documents which would have

5   been available to the state's attorney at the

6   motion to suppress and at trial before you

7   testified?

8       A.   Yeah, I suppose.

9            (WHEREUPON, a certain document was

10           marked Mason Deposition Exhibit

11           No. 13, for identification, as of

12           6-23-23.)

13  BY MR. RICHARDS:

14      Q.   I would like you to review Deposition

15  Exhibit No. 13.

16      MR. POLICK:  Give me a second here.

17  BY THE WITNESS:

18      A.   Okay.

19  BY MR. RICHARDS:

20      Q.   Having reviewed that document, is that

21  an arrest report which you authored on -- which you

22  authored on July 9th of 1989?

23      A.   Yes.

24      Q.   Okay.  And is that an arrest report for

1   Benjamin Carrero?

2        A.   Yes, it is.

3        Q.   And did you, in fact, sign this report?

4        A.   I did.

5        Q.   And that is your signature on the

6   report?

7        A.   It is.

8        Q.   Okay.  And by the way, since this is an

9   arrest report, this is sworn to under oath;

10  correct?

11       A.   Yes.

12       Q.   And you swore to it under oath?

13       A.   Yes.

14            (WHEREUPON, a certain document was

15            marked Mason Deposition Exhibit

16            No. 14, for identification, as of

17            6-23-23.)

18  BY MR. RICHARDS:

19       Q.   I next would like you to look at Mason

20  Deposition Exhibit No. 14, if that can be provided.

21       MR. POLICK:  Yes.  Give me a second here,

22  because it looks like there is more than one page

23  here.

24       MR. RICHARDS:  There are three.

MICHAEL MASON                                      June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                            111

1      MR. POLICK:  Okay.  Alright.  He is reviewing.

2  BY MR. RICHARDS:

3      Q.    Okay.  Detective Mason, is the document

4  that I have showed you, Defendant's Deposition

5  Exhibit 14, are those copies of general progress

6  reports authored by you in connection with the

7  investigation of the murder of Luis Morales?

8      A.    Yes.

9      Q.    And are those general progress reports

10  signed by you?

11      A.    Yes, they are.

12      Q.    And is there anything in those reports

13  which is inaccurate?

14      A.    I don't believe so.

15      Q.    And general progress reports are reports

16  that you write in handwriting or possibly type up,

17  but usually contemporaneous with whatever you are

18  doing; correct?

19      A.    Yes.

20      Q.    And then you used those handwritten

21  notes or sometimes typed notes to write your case

22  reports and supplemental reports; correct?

23      A.    Yes, they're just notes, you know, to

24  refresh your memory as you're doing the report

MICHAEL MASON                                June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                      112

1              (WHEREUPON, a certain document was

2              marked Mason Deposition Exhibit

3              No. 15, for identification, as of

4              6-23-23.)

5   BY MR. RICHARDS:

6       Q.    Okay.  And now I would like you to

7   review Deposition Exhibit 15.

8       MR. POLICK:  Before we move off 14, there are

9   some highlighted portions there.  I assume that you

10  are not including those highlighted portions with

11  regard to your questioning of Mr. Mason?

12      MR. RICHARDS:  I am going to clarify that

13  right now.

14  BY MR. RICHARDS:

15      Q.    In terms of the highlighted portions on

16  the handwriting, those highlights were not added by

17  you; correct?

18      A.    They were not.

19      Q.    And the reports as you originally

20  authored them are the same except for the

21  highlighting; correct?

22      A.    Yep.

23      Q.    Okay.  We can go on to Exhibit 15.

24      MR. POLICK:  Alright.  Give me a moment.

MICHAEL MASON                                June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                        113

1   BY MR. RICHARDS:

2       Q.   Alright.  So, Detective, can you

3   identify -- we are at Exhibit 15; correct?

4       MR. POLICK:  Right.

5   BY MR. RICHARDS:

6       Q.   Okay.  So Exhibit 15 is that -- are

7   those copies of other general progress reports

8   which you authored in connection with the Luis

9   Morales murder investigation?

10      A.   Yes, they are.

11      Q.   And aside from any yellow highlighting,

12  are the documents an accurate reflection of what

13  you wrote?

14      A.   Yes.

15      Q.   Okay.  And, obviously, they are just

16  notes, they are not a full report, but is there

17  anything that is omitted there that you think

18  should have been in there and it is not?

19      A.   No.

20           (WHEREUPON, a certain document was

21            marked Mason Deposition Exhibit

22            No. 16, for identification, as of

23            6-23-23.)

24      MR. RICHARDS:  And next I would like to have

1    him look at Deposition Exhibit No. 16.

2        MR. POLICK:  Okay.  Give me a second.

3    BY THE WITNESS:

4        A.    Okay.

5    BY MR. RICHARDS:

6        Q.    So is that a general progress report

7    that you wrote about your interview with Jaime Rios

8    on July 7th, 1989?

9        A.    Yep.

10       Q.    And is that document signed by you?

11       A.    Yes, it is.

12       Q.    Okay.  And, again, these are just notes,

13   but is there anything omitted there that you think

14   should have been included and was not included?

15       A.    It appears to be incomplete, like there

16   is another page.

17       Q.    Okay.  Yeah, I was going to ask you

18   about that.  Have you ever seen in your review of

19   any discovery in this case a second page of this

20   document?

21       A.    Not that I recall.

22       Q.    Okay.  If you ever receive additional

23   information, if you want to convey that to your

24   attorney, and we can see if we can ever find a

MICHAEL MASON                                      June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                              115

1  second page.

2      MR. POLICK:  If we discover that, that's

3  certainly something that will be turned over in

4  discovery.

5      MR. RICHARDS:  Okay.  Very good.  Thank you.

6          (WHEREUPON, a certain document was

7          marked Mason Deposition Exhibit

8          No. 17, for identification, as of

9          6-23-23.)

10  BY MR. RICHARDS:

11     Q.   Next, I want to look at Defendant's

12  Exhibit No. 17.  Could you give him a copy and can

13  you look over that document?

14     MR. POLICK:  Yes.  Give me one second.

15          Okay.  He has been given a copy and he

16  is reviewing.

17  BY THE WITNESS:

18     A.   Okay.

19  BY MR. RICHARDS:

20     Q.   After having reviewed the report, is

21  that a report that was authored by you concerning

22  the arrest of Cristino Garcia on July 28th of 1989

23  and his subsequent period being held for

24  investigation through July 29th of 1989?

MICHAEL MASON                                          June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                              116

1    A.   Yes.

2    Q.   And that report was authored by you;

3  correct?

4    A.   Yes.

5    Q.   And it was signed by you; correct?

6    A.   Correct.

7    Q.   Now, according to the report Mr. Garcia

8  was arrested on July 28th of 1989 at 1515 hours; in

9  other words, 3:15 in the afternoon; correct?

10   A.   That's right.

11   Q.   And according to the report, you didn't

12 interview him until 11 a.m. the next morning, July

13 29th; correct?

14   A.   Correct.

15   Q.   Okay.  Do you know anything that

16 transpired with respect to Cristino Garcia at the

17 police station or at Area 5 between 3:15 on July

18 28, 1989, and 11 a.m. on July 29, 1989?

19   A.   I don't know personally, because I was

20 not there when he got brought in.

21   Q.   I understand.  I understand that you

22 don't have personal knowledge.  Do you have

23 knowledge from any other source?  Did anyone else

24 tell you what happened with him between when he was

1   brought in and when you talked to him?

2      MR. POLICK:  I'm going to interpose an

3   objection to that question since any other person

4   would include his attorneys, so if you mean other

5   than his attorneys, if you want to rephrase that, I

6   will let him answer.

7      MR. RICHARDS:  I absolutely will rephrase

8   that.

9      MR. POLICK:  Go ahead.

10  BY MR. RICHARDS:

11     Q.   Other than your attorneys, at any time

12  did any other person tell you what happened to

13  Mr. Garcia between 3:15 July 28, 1989, and 11 a.m.

14  July 29th, 1989?  Between the 28th and 29th did

15  anyone tell you what happened with Mr. Garcia at

16  Area 5 between those two dates?

17     A.   I don't recall who might have told me,

18  but I was instructed that he was being held in the

19  25th District lockup.

20     Q.   Okay.  And that was the only information

21  that you had that he is being held in the 25th

22  District lockup; correct?

23     A.   Yes.

24     Q.   By the way, were you working or on duty

1  on July 28th?

2      A.   I don't know.  I don't recall.

3      Q.   Is there any reason why on July 29th

4  when you went to interview Mr. Garcia you didn't

5  have a partner with you?  You didn't have Brennan

6  or Halvorsen or anyone else.  Do you know why that

7  was?

8      A.   I don't know why.  I assume that neither

9  of them were there, but I don't know.

10     Q.   Okay.  Have you had a chance to read the

11  allegations in the Second Amended Complaint

12  concerning gang specialist Guevara's interactions

13  with Cristino Garcia on July 28th of 1989?

14     A.   I guess I zoned out there.  Could you

15  repeat that?

16     Q.   Sure.  It's been a long day, and

17  whenever anyone wants to take a break, you let me

18  know.  Let me see if I can zone in.

19          Are you aware of the allegations in the

20  Second Amended Complaint in this lawsuit regarding

21  detective -- I'm sorry, gang specialist Guevara's

22  actions with respect to Cristino Garcia on the date

23  of July 28th, 1989, and possibly July 29th of 1989?

24  Were you aware of those allegations?

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                         119

1      A.   I am aware that there were allegations,

2  and I read it.  At this moment I don't recall what

3  the allegations are.

4      Q.   Okay.  Well, the allegations that

5  Guevara used physical force against Cristino Garcia

6  and, in essence, attempted to make a false

7  confession, does that remind you of what those

8  allegations were?

9      A.   That sounds accurate.

10     Q.   Okay.  Do you have any information one

11  way or another as to the truth of any of those

12  allegations?

13     A.   I have no idea.

14     Q.   Alright.  I would like you to turn now

15  to Mason Deposition Exhibit -- before we leave that

16  topic, are you aware -- or a similar topic.  Are

17  you aware of the allegations in the Second Amended

18  Complaint as to Detective Guevara's interactions

19  with Luis Huertas reminding you of the allegations

20  that he showed Huertas a single photograph of Jaime

21  Rios and told him to identify Jaime Rios?  Are you

22  aware of those allegations in the Second Amended

23  Complaint?

24     A.   Yeah.

1    Q.    And do you have any information one way

2  or another as to whether those allegations are true

3  or not?

4    A.    I do not

5            (WHEREUPON, a certain document was

6            marked Mason Deposition Exhibit

7            No. 18, for identification, as of

8            6-23-23.)

9    MR. RICHARDS:  Alright.  If you can now go to

10  Mason Deposition Exhibit 18, and if you could show

11  that to him.

12    MR. POLICK:  Can we take a short break before

13  we get to No. 18?

14    MR. RICHARDS:  I think it might be -- since

15  we're getting into the early afternoon, maybe it's

16  better to take like a 15 or 20-minute break at this

17  point to give everybody a stretch or whatever they

18  want to do.

19    MR. POLICK:  Okay.  I don't want to hold you

20  to it, but do you have any idea how much further

21  that you need to go?  Is this a good point to grab

22  lunch?

23    MR. RICHARDS:  I think it's a good point to

24  grab lunch, and then I can complete it -- I can

1  complete my examination after lunch.

2      MR. POLICK:  Okay.  So why don't we say 20, 25

3  minutes?

4      MR. RICHARDS:  25 minutes is fine.  I will be

5  here.  Thank you.

6              (WHEREUPON, a recess was had.)

7  BY MR. RICHARDS:

8      Q.    Detective Mason, did you have a chance

9  to review Plaintiff's Exhibit 18 during the break?

10     MR. POLICK:  No.  We can give that to him now.

11 BY MR. RICHARDS:

12     Q.    Okay.  Why don't you look at that and

13 then review it.  It may take a little while to read

14 it all, but then I may have some questions.

15     MR. POLICK:  He is reviewing it now.

16 BY MR. RICHARDS:

17     Q.    Alright.  Detective Mason, I will ask

18 you some questions about this lawsuit.  Let me tell

19 you in advance that I read what you said to OPS

20 back then.

21         So I'm not going to have many questions

22 about the substance of this, but do you remember

23 being sued by somebody named Jon Burge, and is this

24 a copy as far as -- of his Complaint, his Amended

1   Complaint?

2      MR. POLICK:  Objection to the form.  Compound.

3   But go ahead.  You can answer.

4   BY THE WITNESS:

5      A.   I don't recall being sued by Jon Burge.

6   I don't recall seeing this document before.

7   BY MR. RICHARDS:

8      Q.   Okay.  And do you recall being

9   questioned about this incident by OPS back in the

10   '80s?

11     A.   I do not.

12     Q.   Alright.  Have you had a chance -- have

13   you ever reviewed any of the documents -- the OPS

14   documents that were tendered to us in discovery?

15     A.   No.

16     Q.   This is a complaint against you and

17   Frank Costello; correct?

18     A.   Yes.

19     Q.   And back then at the time Frank Costello

20   was your partner; correct?

21     A.   Yes.

22     Q.   Okay.  You say that you have no memory

23   of the Complaint and no memory of the OPS

24   investigation; correct?

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                          123

1    A.   That's correct.

2    Q.   Alright.  Is there any possibility of

3  refreshing your recollection with either the

4  Complaint, your police report, or any other

5  documents?

6    A.   If you have any documents that I

7  prepared, that might help.

8    Q.   I think -- actually, I will drop this

9  topic and just attempt to get information in a

10  different way.

11        So next, then, seeing as you have no

12  memory of it, do you have any memory of any of the

13  complaints against you either by OPS, COPA, or any

14  of the other bodies?

15    A.   I do not.

16    Q.   Let me ask you a more general question.

17  You investigated a number of murder cases; correct?

18    A.   Yes.

19    Q.   Any idea about approximately how many?

20    A.   No.

21    Q.   Would it be under a hundred or over a

22  hundred?

23    A.   I don't know.  I was a detective for

24  19 years.

1      Q.    Okay.  And for the 19 years that you

2    were a detective, is it accurate to say that for

3    those entire 19 years you were a detective in

4    violent crimes, or no?

5      A.    Yes.

6      Q.    And violent crimes by definition, the

7    kinds of crimes that you investigate are things

8    like murder, armed robberies, sexual offenses, and

9    things of that sort; correct?

10     A.    Correct.

11     Q.    You don't investigate garden variety

12   burglaries, retail thefts, or other such matters;

13   correct?

14     A.    Yeah, not normally.

15     Q.    An investigation might come up in

16   connection with something more serious, but that's

17   not your -- that's not ordinarily your bread and

18   butter; correct?

19     A.    Correct.

20     Q.    Now, you have also testified during

21   murder trials; right?

22     A.    Yes.

23     Q.    And do you have any approximation of the

24   number of murder trials that you have testified in?

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                              125

1     A.   No.

2     Q.   You have testified at motions to

3 suppress, have you not?

4     A.   Yes.

5     Q.   Do you have any estimate of the number

6 of times that you have testified at motions to

7 suppress?

8     A.   No.

9     Q.   But you have testified -- okay.  In

10 terms of the motions to suppress, do you have any

11 recollection of testifying in a motion to suppress

12 where you were personally accused of violating a

13 suspect's rights?

14     A.   Yes.

15     Q.   Have you ever been accused by a suspect

16 -- I'm not saying any of these accusations are

17 accurate, but have you ever been accused by a

18 suspect of not giving Miranda warnings?

19     A.   I don't know.

20     Q.   You don't know if you have ever been

21 accused of that?

22     A.   I don't know.

23     Q.   Okay.  Have you ever been accused in a

24 motion to suppress using physical force against a

1  suspect?

2      A.   Yes.

3      Q.   Okay.  How many times approximately have

4  you been accused of using physical force against a

5  suspect?

6      A.   I would not know how to estimate how

7  many times.

8      Q.   Okay.  Let's see if we can get to

9  specifics.  Can you remember the name of any

10  suspect who accused you of using physical force?

11      A.   No.

12      Q.   Would you have any way of accessing --

13  let me -- do you have any memory of the specifics

14  of any accusation against you for using physical

15  force?

16      A.   No.

17      Q.   Have you ever been accused of slapping a

18  suspect?

19      A.   Beyond using physical force, I don't

20  recall specifics.

21      Q.   So you can't recall beyond using

22  physical force whether the accusations involve, for

23  example, slapping; correct?

24      A.   Yeah, I can't recall the specifics of

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                           127

1   the accusation.

2      Q.   You can't recall if the accusations

3   involved punching; correct?

4      A.   I can't recall that, no.

5      Q.   You can't recall if the accusations

6   involved pulling hair?

7      A.   No.

8      Q.   You can't recall if the accusations

9   involved using an object such as a flashlight or a

10  nightstick; correct?

11     A.   Yeah.  I don't recall that.

12     Q.   You don't recall whether the accusations

13  involve using, let's say, a phone book and a

14  flashlight or a hard object to beat a suspect with;

15  correct?

16     A.   I don't recall that.

17     Q.   Well, during the '90s you were aware

18  that accusations -- serious accusations were made

19  against a number of Chicago police officers for

20  using unlawful physical force, were you not?

21     MS. McGRATH:  Objection.  Form.  Foundation.

22     MR. POLICK:  Join in those objections.

23  BY MR. RICHARDS:

24     Q.   You can answer.

1      MR. POLICK:  Go ahead and answer the question.

2   BY THE WITNESS:

3      A.   I guess, you know, like everybody else,

4   I heard things on the news.

5   BY MR. RICHARDS:

6      Q.   Well, for example, have you ever heard

7   the name Jon Burge?

8      MS. CARNEY:  Objection.  Form, foundation,

9   relevance.

10     MR. POLICK:  I join in all of those

11  objections.

12  BY MR. RICHARDS:

13     Q.   With the objections noted, you were

14  aware of the accusations of physical force leveled

15  against Jon Burge and other detective associated

16  with him, are you not?

17     MR. POLICK:  If we're going to pursue this

18  Burge line of questioning, I'm going to have a

19  continuing objection to the relevance.  There is no

20  Monell claim in this case, and there's actually

21  nothing in the Complaint relating to Burge.  So I

22  don't see the relevance of it, but you can go ahead

23  and answer the question.

24     MS. CARNEY:  I'm going to join in his

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                           129

1  objections.

2      MR. RICHARDS:  Great.  And the objections are

3  noted.

4  BY MR. RICHARDS:

5      Q.   So were you aware of the specifics of

6  the allegations against Jon Burge?

7      A.   Not the specifics.  No.

8      Q.   Let me ask you this:  When you were a

9  police detective, you had certain means of finding

10  out information; correct?  I mean, for example, you

11  could look for previous reports; right?

12      A.   Yes.

13      Q.   Now, at the time in 1989 did the Chicago

14  Police Department had a method of indexing reports

15  where you could put in, for example, the name of a

16  particular person and find reports related to that

17  person?

18      MS. McGRATH:  Objection.  Form.  Foundation.

19      MR. POLICK:  I will join in those objections,

20  but you can answer over the objections.

21  BY THE WITNESS:

22      A.   I'm not sure if I recall that.

23  BY MR. RICHARDS:

24      Q.   Well, let me just give you a

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                        130

1  hypothetical.  Let's say that you have a person in

2  custody who is a suspect.  Let's say his name is

3  John Smith.  If you're investigating that person,

4  you could pull up John Smith's rap sheet; correct?

5    A.   Well, in 1989 I believe I had to request

6  it from identification.  So it wasn't like I had a

7  computer that I could access the information.

8    Q.   Okay.

9    A.   So I would request it, and then it would

10 be sent to me.

11   Q.   Alright.  You could also do a request --

12 you could also make requests from the records

13 department, correct, or the records division?

14   A.   Yes.

15   Q.   You could.  Okay.  Now, the records

16 division assigns what's called an RD number to

17 every police report of a crime; correct?

18   A.   Yes.

19   Q.   Now, if you had John Smith as a suspect,

20 could you request from the records division all

21 RD's related to John Smith?

22   MS. McGRATH:  Objection.  Foundation.  You can

23 answer if you know.

24   MR. POLICK:  I will join in that objection.

1   Again, it's an incomplete hypothetical, but you can

2   answer over the objection.

3   BY THE WITNESS:

4       A.   Not with just the name John Smith, no.

5   I would need more information.

6   BY MR. RICHARDS:

7       Q.   Okay.  How about if you had John Smith's

8   date of birth?

9       MS. McGRATH:  Same objection.

10  BY THE WITNESS:

11      A.   That would be helpful.

12  BY MR. RICHARDS:

13      Q.   What?

14      A.   That would be helpful.

15      Q.   Okay.  And when you requested records

16  from the records division, could you also give them

17  a specific address to bring up all RDs about a

18  specific address?

19      MS. McGRATH:  Same objections.

20      MR. POLICK:  Objection to the form of the

21  question.  You can answer over the objection.

22  BY THE WITNESS:

23      A.   I have been retired for quite awhile,

24  and my memory of police operations at headquarters

1   is very dim, and it changed frequently over the

2   years.  So I don't recall what information I could

3   get or what information I needed to get the

4   information that you're talking about.

5   BY MR. RICHARDS:

6      Q.   Okay.  In the course of your work as a

7   detective you generated police reports on the cases

8   that you worked on; right?

9      A.   Yes.

10     Q.   Now, when you generated those reports,

11  obviously, they went to some sort of -- they were

12  stored someplace; correct?

13     A.   I believe so.

14     Q.   Alright.  Well, after you wrote a

15  report, what would you do with it?

16     A.   I would turn it into my sergeant.

17     Q.   Okay.  And after you turned it into your

18  sergeant, would you keep a copy for yourself?

19     A.   No.

20     Q.   Okay.  So you never kept a copy?  Let's

21  say that you were still working on the case, would

22  you keep a copy for yourself in that instance?

23     A.   No.

24     Q.   Alright.  Was there any sort of -- to

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                          133

1  your knowledge any sort of index or record kept of

2  the cases that you had worked on?

3      MS. McGRATH:  Objection.  Form.  Foundation.

4  You can answer.

5      MR. POLICK:  I will join in those objections.

6  You can answer over the objection.

7  BY THE WITNESS:

8      A.   So I understand the question, was there

9  any index of the cases that I worked on?

10  BY MR. RICHARDS:

11      Q.   Yes.  Any sort of list or index kept by

12  anybody of the cases that you had worked on.

13      A.   Not that I am aware of.

14      Q.   Okay.  Do you know if the state's

15  attorneys kept any sort of list of cases in which a

16  particular detective had testified?

17      A.   I don't know.

18      Q.   Can you remember a specific -- the

19  specifics of any case in which -- other than this

20  one in which you testified at a motion to suppress?

21      A.   Specifics, no.

22      Q.   Can you remember the names of any of the

23  defendants other than this one in which you

24  testified at a motion to suppress?

MICHAEL MASON                                June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                        134

1    A.   No.

2    Q.   Did you ever work on a big case, a

3  heater case that got a lot of publicity?

4    MS. CARNEY:  Objection.  Form.

5    MR. POLICK:  I join in the objection, but you

6  can answer over the objection.

7  BY THE WITNESS:

8    A.   I don't recall.

9  BY MR. RICHARDS:

10    Q.   Well, let me ask you this.  Did you ever

11  work on a case that got a lot of headlines in the

12  press, sensational for whatever reason, a big case?

13  Do you remember anything like that?

14    A.   I don't recall anything like that, no.

15    Q.   Now, I would like to ask you maybe close

16  to the final question.  Is there anything that you

17  know about the -- about the investigation into the

18  Luis Morales murder which you have not told us

19  during this deposition?

20    Is there anything that has been omitted,

21  left out, anything that you know that I haven't

22  elicited from you?  Anything?

23    MR. POLICK:  I will object to the form of that

24  question, because that calls for speculation, but

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                              135

1   you can answer over the objection.

2   BY THE WITNESS:

3      A.   I know the reports contain additional

4   information that I haven't been asked for, haven't

5   stated, but I don't know of anymore information.

6   BY MR. RICHARDS:

7      Q.   Okay.  So any of the information that I

8   have not asked you about or subjects that I have

9   not touched on, those would be included in the

10  reports that we have gone over; correct?

11     MR. POLICK:  Objection.  Calls for

12  speculation.  You can answer over the objection.

13  BY THE WITNESS:

14     A.   Any of the information that I know would

15  be included in the reports.

16  BY MR. RICHARDS:

17     Q.   Okay.  Is there any report that you know

18  of that I didn't show you and that we didn't

19  review?

20     MR. POLICK:  I am going to object to the form

21  of that question given the number of documents

22  produced in discovery, but you can answer over the

23  objection.

24

1  BY THE WITNESS:

2     A.   I don't know that this is the complete

3  set of all of the documents that I prepared.  So I

4  don't know.

5  BY MR. RICHARDS:

6     Q.   Alright.  Can you think of any document

7  that you know that you authored relative to this

8  investigation that I did not show to you?

9     MR. POLICK:  Again, calls for speculation, but

10  you can answer over the objection.

11  BY THE WITNESS:

12     A.   I don't recall any other documents.

13  BY MR. RICHARDS:

14     Q.   Okay.  Do you have anything to add or

15  anything to say about any of the accusations

16  against you in the Second Amended Complaint?

17     MR. POLICK:  Objection.  An Answer has been

18  filed to that Second Amended Complaint.  So is

19  there a question pending here?

20  BY MR. RICHARDS:

21     Q.   Yeah.  The question is, you know,

22  swearing under oath, which is not in the answer,

23  because there is no swearing to it, is there

24  anything that you want to add concerning the

1    accusations against you in the Second Amended

2    Complaint?

3       MR. POLICK:  I am going to object to the form

4    of that question, because there are several

5    allegations in the Second Amended Complaint, some

6    of them are not even against Detective Mason, and

7    I'm not going to have him editorialize on the

8    Second Amended Complaint.

9          So if you have a specific question you

10   want to ask him about the Second Amended Complaint,

11   then I think that he could answer that, but I'm

12   objecting to the form of this question.

13   BY MR. RICHARDS:

14      Q.    Alright.  The accusations against you in

15   the Second Amended Complaint, not against anybody

16   else, anything that you want to add or any

17   information that you want to give about any of

18   those allegations?  This is your opportunity.  Go

19   ahead.

20      MR. POLICK:  Objection to the form.  There is

21   no specific question pending.  You can answer over

22   the objection.

23   BY THE WITNESS:

24      A.    I believe I have answered that in the

1 Complaint.  I have nothing to add to what we

2 answered.

3 BY MR. RICHARDS:

4    Q.   Okay.  You have nothing to add to the

5 Answer that you filed?

6    A.   Yes.

7    Q.   Okay.  And you reviewed the Answer

8 before it was filed; correct?

9    A.   Yes.

10    Q.   And everything that you said in your

11 Answer was the truth; correct?

12    A.   That's correct.

13    Q.   And if you had to swear to everything

14 that you said in the Answer, at least you have to

15 swear to the things that you answered, not the

16 things where you said that you had no knowledge,

17 you would be comfortable swearing to what -- to

18 your Answer to the Complaint; correct?

19    MR. POLICK:  I will object to the form of that

20 question.  It's vague.  It's nonspecific.  There

21 are several matters in that Answer which he

22 answered as to a lack of knowledge.

23        So I don't see how he could swear to

24 something that he has no knowledge about.  So if

MICHAEL MASON                                      June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                              139

1   you have a specific question that you want to ask

2   him about an allegation, then please ask him that,

3   but I'm not going to -- this is shear speculation

4   without pointing to a specific allegation.

5          You can answer over the objection.

6   BY MR. RICHARDS:

7       Q.   Do you understand the question, or do

8   you need me to repeat it?

9       A.   If you could repeat it.

10      Q.   Apart from the -- apart from the answers

11  in your Answer to the Second Amended Complaint

12  where you said that you lack knowledge or couldn't

13  comment, obviously those things you are not

14  swearing to.  You just lack knowledge.  But in

15  terms of the denials in the Second Amended

16  Complaint, the denials of the accusations against

17  you, are you swearing that your denials are the

18  truth?

19      A.   Yes.

20      MR. RICHARDS:  Okay.  I believe that I have

21  nothing further.

22                EXAMINATION

23  BY MR. POLICK:

24      Q.   I have some follow-ups, Detective Mason.

1   You testified earlier that around midnight on July

2   7th of 1989 you had the opportunity to interview

3   the plaintiff in this case, Mr. Jaime Rios.  Do you

4   remember being asked questions about that?

5      A.   Yes, I do.

6      Q.   And you did, in fact, interview Mr. Rios

7   along with Detective Halvorsen at that point;

8   correct?

9      A.   Yes.

10      Q.   Other than you and Detective Halvorsen,

11   was anyone else present for your interview with

12   Mr. Rios on July 7th at around midnight?

13      A.   No.

14      Q.   At any time during that interview of

15   Mr. Rios, did you ever pull his hair?

16      A.   No.

17      Q.   Did you ever slap him?

18      A.   No.

19      Q.   Did you ever punch him?

20      A.   No.

21      Q.   Did you ever slam his head on the table?

22      A.   No.

23      Q.   Did you ever hit him with a flashlight?

24      A.   No.

MICHAEL MASON                                      June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                          141

1      Q.    Did you ever hit him with any hard

2   object?

3      A.    No.

4      Q.    Did you ever threaten to deprive him

5   from seeing or being able to have a relationship

6   with his child?

7      A.    No.

8      Q.    During that same interview did Detective

9   Halvorsen ever slap Mr. Rios?

10     A.    No.

11     Q.    Did he ever pull Mr. Rios's hair?

12     A.    No.

13     Q.    Did he ever slam Mr. Rios's head on a

14  table?

15     A.    No.

16     Q.    Did Detective Halvorsen ever punch

17  Mr. Rios during that interview?

18     A.    No.

19     Q.    Did Detective Halvorsen ever hit

20  Mr. Rios with a flashlight or other hard object?

21     A.    No.

22     Q.    Did Detective Halvorsen during that

23  interview ever threatened Mr. Rios of taking away

24  his child or depriving him of the relationship with

MICHAEL MASON                                      June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                            142

1    his child?

2       A.   No.

3       Q.   You were asked some questions about when

4    you first met Detective Guevara and also Detective

5    Halvorsen.  Do you recall those questions?

6       A.   Yes.

7       Q.   Did you ever socialize with either gang

8    crime specialists or then Detective Guevara outside

9    of work?

10      A.   No.

11      Q.   Did you ever socialize with Detective

12   Halvorsen outside of work?

13      A.   No.

14      Q.   If you could take a look at what was

15   previously marked as Deposition Exhibit 11.

16      A.   Okay.

17      Q.   Do you have that document in front of

18   you?

19      A.   I do.

20      Q.   Okay.  And you have previously

21   identified that as a lineup report that you

22   prepared, and this was on the 7th of July of 1989;

23   correct?

24      A.   Yes.

MICHAEL MASON                                        June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                              143

1    Q.   And at the very top of that report there

2  is a crime classification of homicide murder.  Do

3  you see that in the upper left-hand corner?

4    A.   Yes, I do.

5    Q.   And then there is an address of the

6  original occurrence.  Do you see that?

7    A.   Yeah.

8    Q.   And that's 1316 North Western Avenue in

9  Chicago; correct?

10    A.   That's correct.

11    Q.   Does that now refresh your recollection

12  of where the murder occurred?

13    A.   Yes, it does.

14    Q.   Now, with respect to this report there

15  were two eyewitnesses -- or, I'm sorry, two

16  witnesses who viewed the lineup of Mr. Rios;

17  correct?

18    A.   Yes.

19    Q.   And that would be Mr. Luis Huertas,

20  H-u-e-r-t-a-s; correct?

21    A.   Correct.

22    Q.   And also Mr. Javier Torres; correct?

23    A.   Correct.

24    Q.   And you were the person who conducted

1    this lineup?

2        A.   Yes.

3        Q.   And you were with the witnesses?

4        A.   Yes.

5        Q.   And Mr. Huertas was able to make an

6    identification of Jaime Rios as the person who was

7    the person who shot Mr. Luis Morales; correct?

8        A.   That is correct.

9        Q.   And Mr. Torres was not able to make an

10   identification; correct?

11       A.   That's correct.

12       Q.   And is it fair to say that each of these

13   witnesses would have viewed that lineup separately

14   from each other?

15       A.   Yes, they did.

16       Q.   You were asked some questions about the

17   interview room that Mr. Rios was placed in at

18   Area 5.  Do you recall those questions?

19       A.   Yes, I do.

20       Q.   With regard to -- well, strike that.

21            You indicated that there was a door into

22   the interview room?

23       A.   Correct.

24       Q.   Was there any type of window on that

MICHAEL MASON                                                June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                                        145

1  door?

2      A.   Yes, there is.

3      Q.   Okay.  And when you testified earlier

4  that you heard Mr. Rios knock on the door and make

5  a motion, were you able to see that motion through

6  the window on the door?

7      A.   Yes, I was.

8      Q.   Okay.  I want to go back to what was

9  previously marked as Exhibit 8 to your deposition.

10  Give me a minute to pull that one up.

11         Do you have that in front of you,

12  Detective?

13     A.   I do.

14     Q.   Alright.  And you previously testified

15  today that this was a lineup report that was

16  prepared on the 28th of June 1989 by you and

17  Detective Brennan and yourself; correct?

18     A.   Yes.

19     Q.   And this lineup report concerns the

20  lineup conducted on the 28th of June of 1989 with

21  respect to Mr. Jose Macho Melendez; correct?

22     A.   Correct.

23     Q.   He was the purported suspect you

24  testified earlier that had come into the 14th

1  District and then you subsequently interviewed him

2  along with Detective Brennan at Area 5; correct?

3      A.   That's correct.

4      Q.   And I believe that you previously

5  testified that the witnesses who viewed this lineup

6  were Samantha Hudson; correct?

7      A.   Correct.

8      Q.   And also Mr. Luis Huertas; correct?

9      A.   Correct.

10     Q.   And these witnesses would have viewed

11  the lineup separately?

12     A.   Yes.

13     Q.   And neither of those witnesses, neither

14  Ms. Hudson or Mr. Huertas, was able to make an

15  identification of anyone in that lineup; correct?

16     A.   That's correct.

17     Q.   If you can take a look, please, at what

18  was marked as Exhibit 12.

19     A.   Okay.

20     Q.   And let me know when you have that in

21  front of you.

22     A.   Alright.  I got it.

23     Q.   Okay.  Look at those documents there.

24  And you previously testified that these were the

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                            147

1   complaints for search warrants for both

2   Mr. Benjamin Carrero's residence and Mr. Alex

3   Lopez's residence; correct?

4       A.   That's correct.

5       Q.   And you were asked some questions about

6   where you got the information to prepare these

7   complaints for search warrants; correct?

8       A.   Yes.

9       Q.   Do you recall those questions?

10      A.   I do.

11      Q.   And you previously testified that you

12  spoke to someone on the 9th of July of 1989

13  regarding those complaints for search warrants;

14  correct?

15      A.   Yes.

16      Q.   Okay.  Looking at the narrative portion

17  of those complaints for search warrants that were

18  marked as Exhibit 12, does it indicate there that

19  you got that information from a confidential

20  informant?

21      A.   Yes.

22      Q.   And does it indicate also that the

23  confidential informant that you met with regarding

24  these complaints for search warrants was one of the

MICHAEL MASON                                      June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                              148

1   two informants that you had previously met with on

2   July 6th?

3       A.   That's correct.

4       Q.   Those would have been the two informants

5   that gang crime specialist Guevara and Gawrys

6   referred you to; correct?

7       A.   Yes.

8       Q.   You had previously testified that with

9   regard to Exhibit 16, that was the general progress

10  report relating to Mr. Rios and your interview of

11  him, that it appeared that there was a second page

12  that we don't have; correct?

13      A.   Yes.

14      Q.   Take a look at Exhibit 15, which is also

15  two GPRs, and in particular the one regarding

16  Mr. Huertas.

17      A.   Okay.

18      Q.   Looking at that GPR regarding your

19  interview of witness Luis Huertas, does it appear

20  that there may be a second page to this GPR as

21  well?

22      A.   Yes, it does.

23      Q.   And have you seen that second page in

24  your review of the materials in this particular

1  case?

2      A.   No.

3      Q.   Alright.  If you can turn to Exhibit 17

4  to your deposition, and take a look at that and let

5  me know when you have that in front of you.

6      A.   Okay.

7      Q.   Do you have the document?

8      A.   I do.

9      Q.   Okay.  And this was a report that you

10  previously testified that you had prepared on the

11  29th of July of 1989?

12      A.   Correct.

13      Q.   And this report refers to your interview

14  of Mr. Cristino Garcia; correct?

15      A.   That's correct.

16      Q.   And he is also known by the nickname of

17  Tino; correct?

18      A.   Yeah.

19      Q.   And the report also refers to a lineup

20  that was conducted at Area 5 at 1320 hours in which

21  Mr. Garcia was a participate; correct?

22      A.   Yes.

23      Q.   And that lineup was viewed by a witness

24  Javier Torres?

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                           150

1      A.    Right.

2      Q.    And Mr. Torres was not able to make an

3   identification of anyone in that lineup, was he?

4      A.    No.  He wasn't able to.

5      Q.    Okay.  We had previously looked at a

6   lineup report for the lineup that Jose Melendez

7   participated in; correct?

8      A.    Yes.

9      Q.    And we previously looked at a lineup

10  report that Mr. Rios had participated in; correct?

11     A.    Yes.

12     Q.    Was there also a separate lineup report

13  for the lineup in which Mr. Cristino Garcia

14  participated in?

15     A.    Yes.

16     Q.    Okay.  And that was not one of the

17  documents Mr. Richards showed you here today, did

18  he?

19     A.    No.

20     Q.    But that is one of the documents that

21  you reviewed in preparation for your deposition

22  today; correct?

23     A.    Yes.

24     Q.    And it was one of the depositions --

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                            151

1   strike that.

2          It was one of the reports that you

3   prepared in connection with the Luis Morales

4   homicide investigation; correct?

5   A.   That's correct.

6   Q.   You were also asked some questions

7   regarding the allegations made in the Second

8   Amended Complaint regarding Reynaldo Guevara

9   physically abusing Mr. Cristino Garcia at the

10  police station.  Do you recall that line of

11  questioning?

12  A.   I do.

13  Q.   Were you a witness to any of those

14  allegations?

15  A.   No.

16  Q.   Do you even know if you were working the

17  day that Mr. Cristino Garcia was brought into the

18  police station?

19  A.   I don't believe that I was, but I don't

20  know for certain.

21  Q.   Do you have any knowledge of the

22  allegations made against Reynaldo Guevara with

23  respect to Mr. Garcia?

24  A.   No.

MICHAEL MASON                                     June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                          152

1      MR. POLICK:  Alright.  I don't have any

2   further questions, Detective.  Some of the other

3   attorneys may have questions as well.

4      MS. CARNEY:  The City has no questions.

5            EXAMINATION

6   BY MS. McGRATH:

7      Q.   I just have a couple of questions on

8   behalf of Defendant Guevara, and I will be quick,

9   Detective Mason.

10          If we can take a look back at Exhibit

11   10, it was the report from April 7 -- or, I'm

12   sorry, July 7th meeting.

13      A.   Okay.  I got it.

14      Q.   Yep.

15      A.   I have the report.

16      Q.   Okay.  If Mr. Rios had shown any signs

17   of abuse, would that have been noted?

18      A.   Yes.

19      Q.   If Mr. Rios had, let's say, a swollen

20   face, or if he had told you that he had been

21   slapped around by the gang crimes investigators,

22   would you have continued with your interview with

23   him?

24      A.   I would have noted that he said that.

MICHAEL MASON                                          June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                                   153

1    Q.   So you would have noted that in your

2  report?

3    A.   Oh, yeah.

4    Q.   Do you recall ever being told that by

5  Mr. Rios that he had been struck by any of the

6  gangs crime officers?

7    A.   No.

8    Q.   Do you recall him ever specifically

9  complaining about Detective Guevara?

10   A.   No.

11   Q.   At the time of this investigation, I

12 know it's a long time ago, how much involvement in

13 this murder investigation do you recall gang crimes

14 investigator Guevara having?

15   MR. POLICK:  Objection to the form.  Calls for

16 speculation, but you can answer over the objection.

17 BY THE WITNESS:

18   A.   All that I know is that Detective

19 Guevara brought in those two people that I spoke

20 with that mentioned that Jaime Rios was involved in

21 it, and then later Detective Guevara and Gawrys

22 brought in Jaime Rios.  And that's about it.

23 BY MS. McGRATH:

24   Q.   Okay.  Would a gang crimes specialist

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                        154

1   write any of the reports in the investigation?

2       MR. POLICK:  Objection to the form and the

3   foundation, but you can answer over the objection.

4   BY THE WITNESS:

5       A.    They wouldn't write any detective

6   division reports, because they are not in the

7   detective division.  They are in a separate unit.

8   I don't know -- I don't know what their

9   responsibilities are as far as reporting.

10  BY MS. McGRATH:

11      Q.    And as far as lineups go, who conducts

12  the lineup?  Is it the detective division?  Is it

13  gang crimes?  Which unit would conduct the lineup?

14      MR. POLICK:  Object to the form of the

15  question, because it's an incomplete hypothetical,

16  but I will let you answer over the objection.

17  BY THE WITNESS:

18      A.    The detective division conducts lineups.

19      MS. McGRATH:  Okay.  Thank you, Mr. Mason.

20  Have a great day.

21      MR. RICHARDS:  I think that it's my turn.

22      MR. POLICK:  I think that it is back to you,

23  Steve.  If you have follow-up, go ahead.

24              FURTHER EXAMINATION

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                          155

1   BY MR. RICHARDS:

2       Q.   So, Detective Mason, the original

3   suspect in the Luis Morales murder was

4   Mr. Melendez; correct?

5       A.   Yes.

6       Q.   And that was because one of the

7   witnesses -- one of the initial witnesses who had

8   come forward had said that he was present at the

9   scene -- Mr. Melendez was present at the scene and

10  was the shooter; correct?

11      A.   That's correct.

12      Q.   But Mr. Melendez was abandoned as a

13  suspect when he provided an alibi and when he was

14  not identified by the suspect -- he was not

15  identified by witnesses who viewed lineups;

16  correct?

17      MR. POLICK:  Objection to the form, but you

18  can answer over the objection.

19  BY THE WITNESS:

20      A.   Yeah, that he was not considered a

21  suspect after that.

22  BY MR. RICHARDS:

23      Q.   Okay.  And when Mr. Melendez was

24  abandoned as a suspect or not considered a suspect

1   anymore, there was -- the only new suspect to

2   emerge was Jaime Rios and -- new suspects to emerge

3   were Jaime Rios and Cristino Garcia; correct?

4       A.    As far as I know, yes.

5       Q.    And the officer -- the Chicago police

6   officer who brought to your attention the idea that

7   Jaime Rios and Cristino Garcia were suspects, that

8   officer was Guevara; correct?

9       MR. POLICK:  Objection, form, but you may

10  answer over the objection.

11      MS. McGRATH:  Form.  Join.

12  BY THE WITNESS:

13      A.    Yes.

14  BY MR. RICHARDS:

15      Q.    The answer to that question is yes, is

16  it not?

17      A.    Yes.

18      Q.    And until Guevara and Gawrys, his

19  partner, brought in the two confidential

20  informants, the investigation was essentially at a

21  standstill, was it not?

22      A.    Well, yeah, we were waiting for the

23  physical evidence to be evaluated, so I guess it

24  was at a standstill.

MICHAEL MASON                                          June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                                   157

1    Q.    Right.

2    A.    We were waiting.

3    Q.    Sure.  And it might have been that the

4    physical evidence would have turned up fingerprints

5    or some other thing that might have helped, but

6    that certainly hadn't happened by July 7th;

7    correct?

8    A.    I don't believe so.

9    Q.    Now, in addition to bringing in these

10   two confidential informants, Guevara was also the

11   one who brought in Jaime Rios; correct?

12   A.    Yeah.

13   Q.    He was the one who located him; right?

14   A.    There's a bunch of officers that were

15   involved in locating him.  As far as I know, it was

16   Guevara and Gawrys and maybe some other officers

17   were with him.  I don't know that.

18   Q.    But it was definitely officers from the

19   gang crimes unit who located and brought in Jaime

20   Rios, not anyone from the detective division;

21   correct?

22   A.    That's correct.

23   Q.    And it was your understanding from

24   conversations with Detective Guevara that Jaime

1  Rios had come in voluntarily without being

2  arrested; correct?

3     A.   Yes.

4     Q.   And you don't know of your own knowledge

5  whether or not that was true whether, in fact,

6  Guevara had arrested Jaime Rios and brought him in

7  rather than having Jaime Rios come in voluntarily;

8  correct?

9     MS. McGRATH:  Objection.  Form.

10     MR. POLICK:  Objection to the form.  You may

11  answer.

12  BY THE WITNESS:

13     A.   I wasn't there, so no, I didn't witness

14  any of it.

15  BY MR. RICHARDS:

16     Q.   Okay.  Now, in addition to bringing

17  these two -- the two confidential informants and

18  giving you the information that Jaime Rios and

19  Cristino Garcia might have been involved, and in

20  addition to bringing Jaime Rios to the police

21  station, Detective Guevara also brought Luis

22  Huertas to the police station, did he not?

23     MS. McGRATH:  Objection.  Form.

24     MR. POLICK:  Same objection.  You can answer

1   over the objections.

2   BY THE WITNESS:

3      A.   No.

4   BY MR. RICHARDS:

5      Q.   No?  Who brought Luis Huertas to the

6   police station?

7      A.   It was gang crimes specialist Newton.

8      Q.   Okay.  And how do you know that gang

9   crimes specialist Newton brought Huertas to the

10  police station?

11     A.   I was there when he brought him in.

12     Q.   Okay.  And did you know if Detective

13  Newton had gotten Mr. Huertas from somebody else?

14     A.   I don't know.

15     Q.   So would it be fair to say that Guevara

16  by these various actions getting -- oh, let me ask

17  you this:  Did you ask gang specialist Guevara to

18  get involved in the investigation?

19     A.   No.

20     Q.   Do you know if anyone else requested

21  that gang specialist Guevara get involved in the

22  investigation?

23     MS. McGRATH:  Objection.  Form.

24

1   BY THE WITNESS:

2      A.   Nobody that I know of.

3   BY MR. RICHARDS:

4      Q.   Do you know why gang specialist Guevara

5   got involved in the investigation?

6      MS. McGRATH:  Objection.  Form.  Foundation.

7      MR. POLICK:  I will object to the form as

8   well, but you can answer over the objection.

9   BY THE WITNESS:

10     A.   I would have to speculate that he

11  somehow was aware of the murder and got involved.

12  I don't know how he got involved.

13  BY MR. RICHARDS:

14     Q.   Okay.  In any of your previous

15  investigations before this investigation in 1989,

16  had you ever known somebody from the gang crimes

17  unit to voluntarily get involved in homicide

18  investigation?

19     A.   Yeah, it was -- if it was a gang

20  shooting or gang murder, they often got involved.

21     Q.   Alright.  Did they get involved on their

22  own volition, or would they get involved by a

23  request?

24     A.   Again, I don't have any specific

MICHAEL MASON                                    June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                        161

1   instance to tell you, but I do know with my

2   experience when I was investigating a murder that

3   would fit into that gang murder category, that

4   oftentimes gang crimes people would touch -- you

5   know, would touch base with you at some point and

6   ask if you needed them to look for anybody or if

7   they got information, they would contact, you know,

8   the detective division and tell them what they had.

9        And I don't know how they got involved.

10  They have supervisors, you know.  I don't know who

11  directs them.

12      Q.   Okay.  You were asked questions about

13  Jaime Rios and about him not having any visible

14  signs of abuse or complaining about abuse by

15  anybody in the gang unit.

16      Do you remember those questions that you

17  were just asked?

18      MS. McGRATH:  Objection.  Form.

19  BY THE WITNESS:

20      A.   Yes.

21  BY MR. RICHARDS:

22      Q.   Okay.  But in -- strike that.

23      MR. RICHARDS:  Okay.  I have no further

24  questions.

1    MS. CARNEY:  Still nothing from the City.

2    MR. POLICK:  Anybody else?  Signature will be

3  reserved.

4              (WHEREUPON, the deposition was

5              concluded at 3:03 p.m., this date.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1   STATE OF ILLINOIS   )

2                       )  SS:

3   COUNTY OF DU PAGE   )

4

5        I, NANCY A. GUIDOLIN, CSR No. 84-2531, a

6   Notary Public within and for the County of DuPage,

7   State of Illinois, and a Certified Shorthand

8   Reporter of said state, do hereby certify:

9        That previous to the commencement of the

10  examination of the witness, the witness was duly

11  sworn to testify the whole truth concerning the

12  matters herein;

13       That the foregoing deposition transcript

14  was reported stenographically by me, was thereafter

15  reduced to typewriting under my personal direction

16  and constitutes a true record of the testimony

17  given and the proceedings had;

18       That the said deposition was taken

19  before me at the time and place specified;

20       That I am not a relative or employee or

21  attorney or counsel, nor a relative or employee of

22  such attorney or counsel for any of the parties

23  hereto, nor interested directly or indirectly in

24  the outcome of this action.

1          IN WITNESS WHEREOF, I do hereunto set my

2    hand of office at Chicago, Illinois, this 10th day

3    of July, 2023.

4

5

6

7

8                Notary Public,

9                DuPage County, Illinois.

10

11

12   NANCY A. GUIDOLIN, CSR No. 84-2531

13

14

15

16

17

18

19

20

21

22

23

24

MICHAEL MASON                                          June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                                   165

1              I N D E X

2   WITNESS                    EXAMINATION

3   MICHAEL MASON

4      By Mr. Richards          4,154

5      By Mr. Polick            139

6      By Ms. McGrath           152

7

8          E X H I B I T S

9   NUMBER                    MARKED FOR ID

10  MASON DEPOSITION EXHIBIT

11     EXHIBIT NO. 1            37

12     EXHIBIT NO. 2            41

13     EXHIBIT NO. 3            46

14     EXHIBIT NO. 4            87

15     EXHIBIT NO. 5 (Not Marked)

16     EXHIBIT NO. 6            90

17     EXHIBIT NO. 7            90

18     EXHIBIT NO. 8            99

19     EXHIBIT NO. 9            101

20     EXHIBIT NO. 10           103

21     EXHIBIT NO. 11           105

22     EXHIBIT NO. 12           107

23     EXHIBIT NO. 13           109

24     EXHIBIT NO. 14           110

1      E X H I B I T S

2   NUMBER                        MARKED FOR ID

3   MASON DEPOSITION EXHIBIT

4      EXHIBIT NO. 15            112

5      EXHIBIT NO. 16            113

6      EXHIBIT NO. 17            115

7      EXHIBIT NO. 18            120

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1      DEPOSITION ERRATA SHEET

2

3

4   Our Assignment No. J9882181

5   Case Caption: Jaime Rios

6   vs. Reynaldo Guevara, et al.

7

8      DECLARATION UNDER PENALTY OF PERJURY

9      I declare under penalty of perjury that I

10   have read the entire transcript of my Deposition

11   taken in the captioned matter or the same has been

12   read to me, and the same is true and accurate, save

13   and except for changes and/or corrections, if any,

14   as indicated by me on the DEPOSITION ERRATA SHEET

15   hereof, with the understanding that I offer these

16   changes as if still under oath.

17

18      Signed on the _____day of

19   _____, 2023.

20

21

22   _____

23      MICHAEL MASON

24

MICHAEL MASON                                               June 23, 2023
JAIME RIOS V. REYNALDO GUEVARA                                      168

1         DEPOSITION ERRATA SHEET

2   Page No. ___ Line No. ___ Change to: _____

3   _____

4   Reason for change:_____

5   Page No. ___ Line No. ___ Change to: _____

6   _____

7   Reason for change:_____

8   Page No. ___ Line No. ___ Change to: _____

9   _____

10  Reason for change:_____

11  Page No. ___ Line No. ___ Change to: _____

12  _____

13  Reason for change:_____

14  Page No. ___ Line No. ___ Change to: _____

15  _____

16  Reason for change:_____

17  Page No. ___ Line No. ___ Change to: _____

18  _____

19  Reason for change:_____

20  Page No. ___ Line No. ___ Change to: _____

21  _____

22  Reason for change:_____

23  Page No. ___ Line No. ___ Change to: _____

24  _____

1   Reason for change:_____

2   Page No. ____ Line No. ____ Change to: _____

3   _____

4   Reason for change:_____

5   Page No. ____ Line No. ____ Change to: _____

6   _____

7   Reason for change:_____

8   Page No. ____ Line No. ____ Change to: _____

9   _____

10  Reason for change:_____

11  Page No. ____ Line No. ____ Change to: _____

12  _____

13  Reason for change:_____

14  Page No. ____ Line No. ____ Change to: _____

15  _____

16  Reason for change:_____

17  Page No. ____ Line No. ____ Change to: _____

18  _____

19  Reason for change:_____

20  Page No. ____ Line No. ____ Change to: _____

21  _____

22  Reason for change:_____

23  SIGNATURE:_____DATE:_____

24        MICHAEL MASON