*Rios v. Guevara, et.al*
22 CV 3973

# EXHIBIT E

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION

3
JAIME RIOS,                 )
4                           )
            Plaintiff,      )
5                           )
        -vs-            ) No. 22 CV 03973
6                           )
REYNALDO GUEVARA, MICHAEL    )
7  MASON, JOANN HALVORSEN,     )
   as Special Representative for )
8  Ernest Halvorsen, Deceased,  )
   BARBARA RILEY, the CITY OF   )
9  CHICAGO, and COOK COUNTY,    )
                            )
10           Defendants.   )

11

12          The deposition of KAREN G. SHIELDS, taken

13   pursuant to notice and the Federal Rules of Civil

14   procedure for the United States District Courts,

15   reported by Sally Durkin, Certified Shorthand Reporter

16   and Notary Public within and for the County of Cook,

17   State of Illinois, at 141 West Jackson Boulevard,

18   Suite 1240A, Chicago, Illinois, on Tuesday, August 29,

19   2023 at the hour of 10:00 o'clock a.m.

20

21

22

23

24

 1   APPEARANCES:

 2      LAW OFFICE OF STEPHEN J. RICHARDS
        BY:  MR. STEPHEN L. RICHARDS (Via Zoom)
 3      53 West Jackson Boulevard, Suite 756
        Chicago, Illinois  60604
 4      srichards@aol.com
        (773) 817-6927

 5

 6      LEINENWEBER BARONI & DAFFADA, LLC
        BY:  MR. MICHAEL J. SCHALKA
 7      120 North LaSalle Street, Suite 2000
        Chicago, Illinois  60602
 8      mjs@ilesq.com
        (847) 241-4091

 9

10           On behalf of the Defendant,
              Reynaldo Guevara;

11

12      SOTOS LAW FIRM, PC
         BY:  MS. CAROLINE GOLDEN
13      141 West Jackson Boulevard, Suite 1240A
         Chicago, Illinois  60604
14      cgolden@sotoslaw.com
         (630) 735-3300

15           On behalf of the Defendants,
              Michael Mason, Joann Halversen, as
16            Special Representative for Ernest
              Halvorsen, Deceased;

17

18      ROCK FUSCO & CONNELLY, LLC
        BY:  MS. THERESA BEROUSEK CARNEY
19      333 West Wacker Drive, 19th Floor
        Chicago, Illinois  60606
20      tcarney@rfclaw.com
        (312) 494-1000

21           On behalf of the Defendant,
              City of Chicago.
22

23
     ALSO PRESENT:  Nick Trotta, Legal Videographer
24               Urlaub Bowen & Associates.

1                          I N D E X

2

3      WITNESS                      PAGE     LINE

4
           KAREN G. SHIELDS
5
       Examination By Ms. Golden          5      13
6      Examination By Mr. Richards      219      14
       Examination By Ms. Golden       261       1
7      Examination By Mr. Richards     269      18

8

9                       EXHIBITS

10

11      EXHIBITS                     PAGE     LINE

12
       Deposition Exhibit No. 1        70      12
13      Deposition Exhibit No. 2      104      20
       Deposition Exhibit No. 3      120      16
14      Deposition Exhibit No. 4      128       7
       Deposition Exhibit No. 5      141       7
15      Deposition Exhibit No. 6      165      11
       Deposition Exhibit Nos. 7 to 14    172      18
16      Deposition Exhibit No. 15     203       9

17 (Exhibits retained.)

18

19

20

21

22

23

24

1      THE VIDEOGRAPHER:  Good morning.  This is the

2   beginning of media unit one.  We are now on the video

3   record at 10:30 a.m.  This is the video-conferenced

4   discovery deposition of Karen J. Shields -- G. Shields

5   being taken on August 29th, 2023.  We are located at

6   141 West Jackson Boulevard, Suite 1240A, Chicago,

7   Illinois.

8           This deposition is being taken on behalf

9   of the defendant in the matter of Jaime Rios versus

10  Reynaldo Guevara, et al.  The case number is

11  22-CV-3973 filed in the United States District Court

12  for the Northern District of Illinois, Eastern

13  Division.

14          My name is Nick Trotta, Legal

15  Videographer, representing Urlaub Bowen & Associates

16  with offices at 20 North Clark Street, Suite 600,

17  Chicago, Illinois.  The court reporter today is Sally

18  Durkin also of Urlaub Bowen & Associates.

19          Counsel, please identify yourselves for

20  the video record and the parties which you represent.

21     MS. GOLDEN:  Caroline Golden for the officer --

22  for the defendant -- for the Mason and Halverson

23  defendants.

24     MS. CARNEY:  Theresa Carney on behalf of the City

1   of Chicago.

2      MR. SCHALKA:  Michael Schalka on behalf of

3   Defendant Guevara.

4      THE VIDEOGRAPHER:  Will the court reporter --

5      MR. RICHARDS:  Stephen Richards on behalf of the

6   plaintiff, Jaime Rios.

7      THE VIDEOGRAPHER:  Will the court reporter please

8   swear in the witness.

9          (Witness sworn.)

10         KAREN G. SHIELDS,

11       having been first duly sworn, was

12       examined and testified as follows:

13         EXAMINATION

14  BY MS. GOLDEN:

15     Q.  Could you please state and spell your full

16  legal name, for the record?

17     A.  Karen Gay Shields.  S-H-I-E-L-D-S.

18     Q.  And have you ever gone by any other names?

19     A.  For a few years back in the 70s, I was

20  married to somebody else, and I went by his last name.

21     Q.  And what was that name?

22     A.  DeWaters.

23     Q.  Can you spell it?

24     A.  Capital D-e, capital W-a-t-e-r-s.

1    Q.   During what period of time did you go by that

2  name?

3    A.  1972 to 1976.

4    Q.  Okay.  Were you practicing law during that

5  period of time?

6    A.  No.

7    Q.  So I think we briefly talked before this

8  deposition, you told me you have not given a

9  deposition before, correct?

10    A.  That's correct.

11    Q.  Have you ever testified in court before?

12    A.  Yes.

13    Q.  Okay.  How many times?

14    A.  I'm not sure.  I remember once.  I remember

15  once.

16    Q.  And what do you remember about that?

17    A.  It was at 26th Street, and I was testifying

18  in a post-conviction matter that I had been the

19  attorney on.

20    Q.  Okay.  And how was it that you came to

21  testify?

22    A.  The attorney for the -- who -- the defendant,

23  it was his post-conviction.  He had asked me to come

24  in and testify.

1    Q.   The criminal defendant or the criminal

2   defendant's lawyer?

3    A.   The criminal defendant's lawyer asked me to

4   come in to testify in the case.

5        Oh, you know what.  I am sorry.  I'm wrong.

6   The state's attorney asked me to come in and testify.

7    Q.   Okay.  Who was the criminal -- who was the

8   criminal defendant?

9    A.   It will come to me during the day.

10    Q.   Okay.

11    A.   It's not here right now.

12    Q.   Who was his lawyer?

13    A.   I do not remember that at all.

14    Q.   Who was the state's attorney that asked you

15   to testify?

16    A.   I don't remember.

17    Q.   When was this?

18    A.   A number of years ago.  I mean, like 10 to

19   15.  I was on the bench then, and I've been off the

20   bench for 15 years.  So, I mean, beyond that.

21    Q.   So more than 15 years ago?

22    A.   Yeah.

23    Q.   Okay.  What was the nature of your testimony?

24    A.   The allegation was that I, as the defendant's

1   attorney and the other attorney, who was not there had

2   been negligent, or we didn't do a good job was the

3   allegation.

4       Q.   Was it a claim of ineffective assistance of

5   counsel?

6       A.   It was.

7       Q.   And what was the nature of the claim in terms

8   of what you did or didn't do that was ineffective?

9       A.   I'm not going to be able to resurrect like

10  very specific, but I can tell you that it had to do

11  with something that -- the allegation was we had not

12  followed up on when the questions had been asked in

13  court.

14      Q.   Questions of who?

15      A.   Good question.  I don't know.

16      Q.   Okay.

17      A.   I don't remember.

18      Q.   Okay.  Do you remember what your response

19  was?

20      A.   Only to the degree that I answered

21  truthfully.

22      Q.   Okay.  So was that a motion for a new trial

23  based on ineffective assistance of counsel?  Was it a

24  post-conviction evidentiary hearing?  Do you remember

1   the precise nature of the proceeding in which you

2   testified?

3       A.  It was a post-conviction with the typical

4   allegation of ineffective assistance in order to

5   overturn the case and either -- usually to get a new

6   trial.

7       Q.   And you said typical.  Why do you say that's

8   typical?

9       A.  Because that used to be done all the time,

10  and I think it's still done.  Although, I don't have

11  any reason to know that.

12      Q.   And the reason you knew about this particular

13  one because you were asked to testify, right?

14      A.  Correct.

15      Q.   Have there been other claims made by -- and

16  that was made by a former client of yours when you

17  were at the public defender's office, right?

18      A.  Correct, correct.

19      Q.   Had there been other claims made against you

20  that you're aware of for ineffective assistance of

21  counsel, or not against you, but about you?

22      A.  None that I remember, no.

23      Q.   Okay.  Have you testified in court any other

24  time that you can remember?

1      A.  I don't recall doing so, no.

2      Q.  And, you know, we're going to -- I am going

3   to ask you a lot of questions about a lot of things

4   that happened a long time ago.  So all I need you to

5   do is, you know, do as well as you can.

6          As you know, I am not asking you -- I am not

7   expecting you will have the answer to every question I

8   ask.  So don't feel bad if you don't.

9          Okay.  I understand -- now I looked at your

10  profile on JAMS, right?  And JAMS is where your --

11  what do you call your working relationship with JAMS?

12     A.  I am self employed and a contract worker with

13  JAMS.

14     Q.  Okay.  And JAMS is what?

15     A.  JAMS is an exceedingly large -- the largest,

16  arbitration, mediation, ADR firm in the world.

17     Q.  And what do you do in connection with your

18  work there?

19     A.  I am a mediator, arbitrator.

20     Q.  And you've been doing that for 15 years?

21     A.  Yes.

22     Q.  Have you -- is your profile on JAMS updated

23  and complete?

24     A.  Probably not.  It probably hasn't been

1  updated for, I think, a couple years.  But every now

2  and then I think of something, and then I call them

3  and have them update it.

4      Q.   So it may not be updated with the last couple

5  of years, but is it updated and complete as of a

6  couple years ago?

7      A.   Yes.

8      Q.   Okay.  So everything prior to, let's say,

9  2020 should be on there?

10     A.   Yes.  Depending on what that everything is,

11  right.

12     Q.   Your legal experience, your education, the

13  background, education, speaking engagements,

14  publications, honors, memberships, and professional

15  activity, those are all updated as of 2020?

16     A.   Speaking engagements is not because I didn't

17  typically put most of them down there, but I always

18  put down the most important ones, I think.

19     Q.   Okay.  Well, according to the profile -- I'm

20  not sure we have gotten them.  I have not been able to

21  determine that, but according to your profile on JAMS,

22  you got your Bachelor's of Arts from the University of

23  Illinois, Chicago in 1977, is that correct?

24     A.   That's correct.

1     Q.   Okay.  And what was your degree in?

2     A.   Poli sci.

3     Q.   And you graduated from DePaul College of Law

4   in 1980, is that correct?

5     A.   That's correct.

6     Q.   And then the first job, I think, that's

7   listed on your profile is the public defender's office

8   in 1982?

9     A.   Correct.

10     Q.   Is that when you started there?

11     A.   Yes.

12     Q.   Okay.  And it says that you were at the

13   public defender's office from 1982 until 1991, is that

14   correct?

15     A.   Correct.

16     Q.   Now, so there is a gap of -- it could be a

17   year.  It could be two years between graduating from

18   DePaul and the public defender's office.

19           What did you do in that time period?

20     A.   So in that year and a half, I worked part

21   time for Dawn Clark Netsch in her senate office.  I

22   did that some -- most of the time I was law school

23   also.

24           I worked with CVLS, Chicago Volunteer Legal

1  Services.  At the time, they didn't have the same kind

2  of office they do now.  But what they would do is have

3  these satellite offices, and people -- there would be

4  one night a week where a volunteer attorney would be

5  there, and people would come in with their problems.

6          And the attorney who was there would pick

7  those cases up to do voluntarily pro bono, and I did a

8  great deal of that including letting other people take

9  the nights, and then I would take the case from them.

10  So I did a lot of pro bono work then, and it went into

11  different fields because you never knew what was

12  coming in the door.

13          And I got hired on a couple of cases by, you

14  know, friends of family, families that weren't my

15  family.  You know, that kind of thing.  I reached out

16  to do everything I could.  I applied for a lot of

17  jobs.  I would get told I could have the job, and I'd

18  call back to the PD's office, and ask if they were

19  going to take a lot longer because all I wanted was to

20  be a PD.

21      Q.   And why was that?

22      A.   It just appealed to me.  It just appealed to

23  me.

24      Q.   What about it appealed to you?

1      A.   The idea of representing people who need

2    their rights -- someone defending them.  It's not

3    about guilt or innocence, but it's about making sure

4    everybody gets the rights that they're entitled to,

5    and I wanted to do it.

6           And during law school, of course, you get

7    some access, and that helps hone that because I didn't

8    start law school thinking I would be a PD for sure or

9    even in criminal work, but then I loved it.

10     Q.   What were the experiences in law school that

11   you had that drew you to the public defender's office?

12     A.   I took a trial ed course with a judge who, I

13   think, was Judge Heck, if I remember correctly.  And

14   his office -- his chambers and his courtroom were in

15   the Daley Center, and he didn't do a lot of teaching,

16   I might say.  You know, there are some like that.

17          But he had one night where he had the head of

18   the PD's office, and I think his name was Jim Doherty.

19   I know it was Doherty because we always called him by

20   his last name, Doherty.  And he was there, and he did

21   a song and dance number for three hours, and it was so

22   amazing, the stories he told.

23          He didn't teach.  He just told.  And it

24   grabbed me, and after that night, that's all I was

1   going to do.

2       Q.  Can you remember any of the stories he told

3   that stuck -- particularly stuck with you?

4       A.  No.  Not a one.

5       Q.  Was there a theme to these stories?

6       A.  If there were, I can't remember.  I can't

7   tell you, but it was war stories.  And, you know, we

8   enjoy people's war stories, or we like telling them

9   for sure.  Right?

10      Q.  Sure.  Okay.  Can you remember anything else

11  about the office or what you thought about the office

12  that drew you to want to work there?

13      A.  No.  At that time I was a little afraid of

14  going into court because I was very shy back then, but

15  I got the idea that I would learn how to be in court.

16  And learn you do, right, from day one.  And I just

17  loved it.  That's it.

18      Q.  Okay.  So according to your profile you left

19  the public defender's office in 1991, and went into

20  private practice, is that right?

21      A.  That is.

22      Q.  Okay.  And what was the nature of your

23  private practice?

24      A.  So I was a solo practitioner, and I started

1  out thinking that the only thing I would do would be

2  criminal work because that's what I knew.

3       Once you do enough criminal work in a

4  courtroom, there aren't many different kinds of things

5  people can throw at you.  So you know, go out, be

6  alone, but I could do that.  And everything that

7  walked through the door -- not everything, but just

8  about everything was family law because family law

9  reigns, right.  Everybody has access -- has had some

10  experience with family law.  So I ended up a family

11  law lawyer by the time -- um, by the time I got out of

12  being a solo practitioner.

13     Q.   So from 1991 to 1995 you were a solo

14  practitioner?

15     A.   I was.  I officed with some other people, but

16  we didn't practice together.  You know how you rely on

17  someone else sometimes.  I could take a vacation, and

18  somebody would cover my cases and vice versa.  But we

19  didn't office -- we didn't practice together.

20     Q.   And from 1991 to 1995 the primary focus of

21  your practice as a solo practitioner was family law?

22     A.   After a while.  In the beginning I still had

23  a lot of criminal cases, and 26th Street was calling

24  me.  Sometimes it was the presiding judge, and

1   sometimes it was a judge in a courtroom, and sometimes

2   it was somebody else to take a case from them, and

3   handle it.  And so that happened at times.  So I still

4   had a core of criminal cases, but I rarely had those

5   walk through the door.

6       Q.   Did you -- how many -- did you have any jury

7   trials in a criminal case between 1991 and 1995?

8       A.   Yes.

9       Q.   How many?

10      A.   I can't tell you exactly, but I can tell you

11  that I still had at least two or three jury trials

12  that went -- or cases that went to jury trial after I

13  left the office.

14      Q.   That went to verdict --

15      A.   Yes.

16      Q.   -- with a jury?

17      A.   Right.

18      Q.   What can you tell me about those cases?  What

19  kind of cases were they?

20      A.   Murder.

21      Q.   All three -- all two to three?

22      A.   Yes.

23      Q.   And what were the verdicts?

24      A.   I think they were all guilty.

1    Q.   Do you remember the facts of any of those

2   cases?

3    A.   There is one, maybe two.  So what's happening

4   for me right now is being in the office and being out

5   of the office, and I'm not sure at what point I took

6   some of the cases, and some of them finished up

7   before.  And sometimes PDs that were working on the

8   case with me still did the case with me even though I

9   was out of the office because it was technically --

10    Q.   I see your point.  I think I can come back at

11   it in an easier way for you to answer it.

12    A.   Okay.

13    Q.   So we'll come back to this.  So don't worry

14   about that.

15    A.   Thank you.

16    Q.   1995 to 1996, it looks like you were a judge,

17   is that correct?

18    A.   Right.

19    Q.   And were you elected or appointed?

20    A.   I was appointed.

21    Q.   Who appointed you?

22    A.   Bilandic.

23    Q.   Did you have a personal relationship with

24   him?

1      A.   I did not.

2      Q.   Do you know how it was that he decided to

3  appoint you?

4      A.   So my husband knew him well.  He wasn't my

5  husband then; but after all these years, he -- Richard

6  had been Michael Bilandic's attorney when Bilandic was

7  mayor.  So they had a good relationship.

8      Q.   Okay.  Your husband's name is?

9      A.   Richard Neville.

10     Q.   Judge Neville?

11     A.   Yes.

12     Q.   Got it.  And you -- what was your assignment

13  during that time period?

14     A.   Oh, when I was -- okay.

15     Q.   '95 to '96, yeah, that first stint.

16     A.   Okay.  So that was a year and eight months,

17  and I went straight to family law.  I did not go to

18  traffic at all.  At the time, I was happy about that.

19  I love family law.  So I went to family law, and I was

20  in Judge Nell's team.

21     Q.   And excuse me.  I assume that during 1995 and

22  1996 when you were presiding on the bench, you did not

23  preside over any criminal jury trials, right?

24     A.   I did not.

1      Q.   And then it looks like in 1997, according to

2   your JAMS profile, you went to Nadler Pritikin

3   Mirabelli & Shields?

4      A.   So --

5      Q.   So what happened there?

6      A.   All right.  So December 2, 1996 my

7   appointment ended.

8      Q.   Uh-huh.

9      A.   It was the days of the subcircuit just

10  starting, and what had happened was they were opening

11  subcircuits in layers.  Like there would be four

12  opened up, and then a couple of months later they

13  would open up two more, and it was very strange.

14         But what was happening was the supremes were

15  grabbing those spots and making appointments to them

16  because they were open judgeships that nobody could

17  run for until the next election, and they were not

18  appointing people from those subcircuits.

19         So what happened was in -- when we got to

20  that time when mine ended, 35-ish, something like

21  that, people -- there were more of them appointed than

22  could go on the bench to those spots.  And many of

23  them were appointed to spots that they couldn't run

24  for because it wasn't their subcircuit, even though

1  they were appointed there right now.

2      Q.  Uh-huh.

3      A.  Okay.  So we as a group came off, and I

4  called up Jim Pritikin and said, do you have a space

5  in your office where I can sit?  I'm going to open my

6  own practice.

7          I was in court on a case within three days of

8  being taken off the bench.  Okay.  So I was determined

9  to work.  So I officed in his library.  That's long

10 enough ago that people still had library books, and so

11 I was in this little room with all these books around

12 me and a table just a fraction of this size, and

13 that's where I sat for almost a year and worked, and I

14 had my own cases.

15         We were not together, I mean, none of that

16 group, Nadler, Pritikin, or Mirabelli.  It turned out

17 that Nadler and Pritikin were talking to Enrico

18 Mirabelli about joining forces.  And then they said,

19 oh, and now we have a former judge with us.  We'll

20 make her be part of us, and I said, no, I am going

21 back to the bench as soon as I can.

22         I then realized what if I didn't get back?

23 So I said, okay, I'll be part of the group, but I'm at

24 the end of the group.  I will not be the first of the

1    group or the middle of the group because at the end of

2    group, you can take me off the wall, and that's what

3    happened.

4          The whole office opened, I think, in

5    September of that year, which would be '97.  And I

6    went back to the bench December 2nd of '97 as an

7    associate.

8    Q.  Okay.  So let me understand the judgeships a

9    little bit more.

10          When you were appointed, were you appointed

11   to a full circuit or a subcircuit?

12   A.   When I was appointed, it was to a full

13   circuit.

14   Q.   Okay.  And did you run again to retain that

15   position, or was it eliminated?

16   A.   The spot was there.  I had been appointed to

17   one where a judge out of 26th had died --

18   Q.   Okay.

19   A.   -- during his judgeship, and when I came

20   back, I came back as an associate.

21   Q.   I know.  But I'm trying to understand why

22   didn't you run for retention of the -- to the position

23   you had been appointed to?

24   A.   The party did not appoint me or --

1      Q.   Slate you?

2      A.   -- slate me for that spot.

3           And I had run two years earlier full circuit.

4   I lost by a couple hundred votes in a county-wide

5   race, and I just -- I couldn't do it.  I may have run

6   at some point.  I just have this memory of running

7   again, but it was halfhearted.  At that point, I was

8   going to look for a different route.

9      Q.   Okay.  So is this how it went, the first time

10  you ran for judge was during the period of time you

11  were in private practice as a solo practitioner,

12  right?

13     A.   Yes.

14     Q.   And you were unsuccessful, and then you were

15  appointed to a --

16     A.   Yes.

17     Q.   -- full circuit position.  And then the

18  party, I assume you mean the Democratic Party?

19     A.   Yes.

20     Q.   Did not pick you as the candidate, correct?

21     A.   Uh-huh.

22     Q.   To continue on in the appointment, right?

23     A.   Correct.

24     Q.   And you decided that you didn't want to go

1   against the -- their selection, right?

2       A.  (Nodding.)

3       Q.  So you decided not to run to retain the

4   position you had?

5       A.  Correct.

6       Q.  And so then -- so after you decided not to

7   run against the party, you for nine months only,

8   right, are working in private practice?

9       A.  I worked --

10      Q.  In '97?

11      A.  Oh, in '97 when I came off?

12      Q.  Right.  After you decided not to run against

13  the party?

14      A.  So I worked in private practice 'til I went

15  back on the bench as an associate which was 365 days.

16      Q.  December of '97 is when you went back on the

17  bench, right?

18      A.  Yes.  I always have to --

19      Q.  And how did you get to the bench that time?

20      A.  So there was an associate listing that came

21  out in that fall, and I immediately filled out the

22  form that you fill out to apply.  I was selected when

23  they picked the double the number, and then I went

24  around and saw all the judges, and I was voted in as

1    an associate.

2       Q.   And the full circuit judges vote, right?

3       A.   Yes.

4       Q.   And is that the same position you held until

5    you left the bench in 2008?

6       A.   Yes.

7       Q.   Okay.  And from -- so you were an associate

8    judge from December of '97 to 2008, correct?

9       A.   Right.

10      Q.   And you were elected by the full circuit

11   judges, correct?

12      A.   Yes.

13      Q.   And what were your assignments during that

14   period of time?

15      A.   Family law.

16      Q.   The entirety of those years?

17      A.   Right.  The Domestic Relations Division is

18   the formal name.

19      Q.   So I take it from 1997 to 2008 you did not

20   preside over any criminal jury trials, right?

21      A.   You're correct.

22      Q.   Okay.  And then the mediation experience you

23   had from 2008 to the present does not deal with

24   criminal matters, is that correct?

1    A.  That's correct.

2    Q.  Okay.  So now I'm going to go back to the

3  jury trial question.

4    A.  Okay.

5    Q.  I think it will be easier, right, because the

6  only period of time that you were practicing criminal

7  law is from 1982 to 1995, is that right?

8    A.  Yes.

9    Q.  Okay.

10    A.  So just to clarify, '81 and the first four

11  months of '82 when I was out by myself, and I was

12  working for Dawn Netsch, and I was, you know, just

13  doing whatever.  Every now and then I didn't do any

14  felonies, but I did pick up a couple of like criminal

15  damage to property --

16    Q.  Sure.

17    A.  -- batteries, that kind of thing.  Nothing of

18  any merit other than it got me into court.

19    Q.  So in that period of time in 1997 when you

20  were not on the bench, did you have any criminal jury

21  trials?

22    A.  No.

23    Q.  So the only criminal jury trials that you

24  handled were in that time period from 1982 to 1995,

1    right?

2       A.  Correct.

3       Q.  Okay.  So that's when you were at the public

4    defender's office and then those, you know, first few

5    years after you left, right?

6       A.  Right.

7       Q.  And so why did you leave the public

8    defender's office?

9       A.  I was in murder task force, and when you are

10   a PD, typically, that's kind of the ultimate.  There

11   is nowhere else to really go unless you want to be a

12   supervisor.  I had helped unionize the office years

13   earlier.  So I hoisted myself on my own petard and

14   found I had no within where else to go.  You could

15   not -- because we had rules against the supervisors

16   taking the best cases.  So if you wanted to be a

17   supervisor and do some cases, too, you'd have to have

18   someone take you in with them.  You know, like, you

19   know, hey, Karen, I really need you to handle this

20   case with me.

21          But even then some of the PDs would complain

22   because everybody wanted to have good cases.  They

23   wanted to go to trial.  You know, that was part of

24   what we did in life.  And so I knew I had to leave the

1   office.  I needed to go somewhere.  I needed to do

2   something different.

3       Q.   Okay.  And what do you mean by the best cases

4   and good cases?

5       A.   Not your just run of the mill, you know,

6   batteries or whatever.  I mean, like so there is the

7   heater cases.  Some of us didn't necessarily want a

8   heater case.  We didn't want to be in the press, but

9   some people wanted that.  So those would be considered

10  a good case.  The murder cases, those kind of cases.

11        And what's considered good is meaning

12  something that you had to be able to really look into.

13  You had more witnesses.  You needed your

14  investigators.  You needed more information than you

15  did in the typical, let's call it, misdemeanor

16  courtrooms, for instance.  That kind of thing.

17      Q.   And so to you the murder and the heater cases

18  were good cases, right?

19      A.   They would be considered that.  I didn't do

20  heater cases.  I can't remember doing a case that got

21  a lot of press.  I got more of that in family, but

22  because -- but some people thought heater cases were

23  good cases.

24      Q.   And I'm just interested in what you thought

1  was a good case?

2      A.  Um, for me it wasn't.  I liked doing murder

3  cases as a PD.

4      Q.  Why?

5      A.  Again, you know, in anything, you work your

6  way up.  So you start -- I was in juvenile court and

7  representing people charged with abusing their

8  children.

9          And then you go into -- you know, you move

10  from that, which is tough work.  And then you move to

11  representing children, and children they were, from --

12  for doing things -- for charges of doing some things

13  that were really awful, you know.  It might have been

14  a shooting.  It might have been, you know, that kind

15  of -- whatever.  It was not good.

16          And then you want to go to 26th Street

17  because that's where you get the juries.  You don't

18  get the juries in juvenile.  So you go to 26th Street.

19  Everybody -- almost everybody I knew wanted to go to

20  26th Street.

21          So you get to 26th Street, get assigned to a

22  courtroom.  Now you've got a regular call, and you get

23  to like really live with your cases.  You get to know

24  the people.  You get to learn the case itself, but you

1    have a whole lot of them.

2         And then you start doing murders before you

3    get to task force.  You know, somebody wants to -- has

4    a murder case assigned to that courtroom that you're

5    in, and they ask you to work with them because it does

6    two things.  One, you know the judge.  And the other

7    thing is, it gets you the background and the knowledge

8    of what's different about murder cases, or how to

9    handle them, and helps you move along that continuum

10   of maybe even getting to task force.

11       Q.   Okay.  And so I think I asked you why did you

12   like murder trials?  Was that your answer to that

13   question?

14       A.   I think so.  It's part of the substance, you

15   know.

16       Q.   Is it because they were more complicated?

17       A.   Yeah.  More complicated.  More to do.

18       Q.   More complex?

19       A.   And more -- I don't know.  More to sink your

20   teeth into.

21       Q.   And that's something you enjoyed doing?

22       A.   Yeah.

23       Q.   I think you also mentioned you liked getting

24   to know the people.

1          What did you mean by that?

2      A.   I think you always get to know people, but

3   the difference in -- if you were in -- if you were in

4   task force, you usually had that case -- a case that

5   lasted a year, two years, three years.  And you really

6   got to know your client better, and that was

7   important.

8          So when you're in a courtroom, the case may

9   come in, you may see the file, and maybe you'll see

10   them again.  You know, you would go over to the jail

11   and visit them, but you didn't have a lot of time.

12   You would go.  And this is what you would do.  You

13   would talk about, you know, whatever, the drug case,

14   or the agg batt, or whatever it was.

15          With murder, you got to know the people

16   better.

17      Q.   And by the people, you are referring to your

18   client, their family, the witnesses, right?

19      A.   Usually.  Yeah.

20      Q.   Okay.  And you also said, I think, you liked

21   the murder cases because there was something you had

22   to really look into, and you mentioned investigators.

23          What can you tell me about the investigators

24   that were available to you as a public defender when

1    you were handling a murder case?

2        A.  So we had investigators in the office, and we

3    used them for the other cases, too.  I mean, so like

4    if I'm in a courtroom, and I've got the general thing

5    of cases, right, whatever the charges are, you could

6    use the investigators.

7            In murder cases, you really needed them

8    because you might go talk to a witness.  If you did

9    that, you took your investigator with you a lot of

10   time, you know, because you wanted proof.

11           And sometimes you did that when you went to

12   meet your client, not in jail usually, but like if you

13   go to meet their families.  There were so many pieces,

14   and there was always stuff people could tell you if

15   you had the opportunity and the right investigator to

16   dig into it enough.

17       Q.  If you needed -- I mean, was the -- how many

18   different investigators were available to you?

19       A.  I don't remember.  Something sticks about

20   five in my head, but I may be making that number up.

21   I really -- I don't remember.

22       Q.  Okay.  And do you remember asking

23   investigators at the public defender's office to do

24   anything other than go with you to interviews?

1    A.  Oh, yeah.

2    Q.  What else would you ask them to do?

3    A.  Go out and take pictures of sites.  Go out

4  and talk to a witness.  Go out and just check out if,

5  you know, something that had been described in the

6  reports could -- was possible.  You know, could you

7  have seen from there?

8        And they could do that, and if it raised

9  enough red flags, you'd go yourself.  But you would

10  always go back with the investigator for -- you know,

11  because then you could see what they saw, so...

12    Q.  And I imagine investigators weren't available

13  on demand, but if you gave them enough notice, they

14  would get done what you needed to get done, right?

15    A.  Oh, yes.

16    Q.  Can you remember any time when you asked an

17  investigator to do something that they refused?

18    A.  No.

19    Q.  And if they did refuse, you would kind of

20  have raised it with their supervisor, right?

21    A.  I would have told everybody.  I don't know.

22    Q.  I imagine you wouldn't let that stand?

23    A.  No, you couldn't.

24    Q.  And were the investigators employees of the

1   public defender's office, or did they work for some

2   other entity?

3       A.  I think they were employees of the PD's

4   office.

5       Q.  And how was it that you would go about asking

6   an investigator to do something for you on a case?  Is

7   there paperwork or phone call?  Or what did that

8   process look like?

9       A.  I think there was paperwork.  It's a long

10  time, but I think there was a form, and you would just

11  very generally -- it was more to say that you were

12  going to make a request, or you were making a request

13  for something done on a case.

14          And I'm sure that they had to have it for

15  their office, right, to know that they had been asked

16  to do that.  They weren't just sitting around

17  twiddling fingers, you know, that kind of thing.  So I

18  don't remember exactly, but I believe there was a

19  form.

20      Q.  Do you remember whether or not there had to

21  be a form filled out before an investigator could do

22  something or --

23      A.  I don't remember.

24      Q.  So you don't remember.  So it's possible you

1    could have just had an oral conversation with

2    investigator and said, hey, can you go do this, and

3    they would have been able to do it?

4        A.  I can't say.  I really don't know.

5        Q.  Okay.

6        A.  I don't remember.

7        Q.  Okay.  Did you sometimes -- after you filled

8    out the form to make an investigative request, did you

9    have ever have oral communications with the

10   investigator to further explain, you know, the nature

11   of your request and why maybe even you wanted them to

12   do it?

13       A.  Yes.

14       Q.  Okay.  And did they report back in writing,

15   or did they generally report back orally?

16       A.  They always reported back in writing, as I

17   recall, and sometimes would come to explain or ask

18   more questions to see if there was something else.  I

19   don't think that was always the case.  I just don't

20   remember.

21       Q.  Okay.  Okay.  So let us go back to this 1982

22   to 1995 time period.

23       A.  Okay.

24       Q.  So we're all on the same page.  And this, I

1   think you said, is the only period of time where you

2   had criminal jury trials, right?

3       A.   Correct.

4       Q.   So maybe it will be easier to break down your

5   time in the public defender's office a little bit.

6           So when you started, do you remember the

7   series of assignments you had?

8       A.   Yes.

9       Q.   Yeah, I imagine.

10      A.   I gave them to you a moment ago.

11      Q.   Right.  I thought you did.  So maybe you

12  could a little more slowly walk us through those

13  different assignments.

14      A.   Okay.  In April of '82 I went into the PD's

15  office, and I was assigned to juvenile court, and I

16  was assigned to abuse and neglect.

17      Q.   And how long did you stay there?

18      A.   So juvenile court incorporated at the time --

19  I think they call things differently now.  But it

20  incorporated abuse and neglect, and --

21      Q.   Delinquency?

22      A.   -- delinquency, right.  So I moved into a

23  delinquency courtroom, I mean, probably three or four

24  months later.  I'm not -- maybe longer, but it felt

1   like I got into a delinquency courtroom fairly

2   quickly.  Then I was in delinquency until -- now this

3   is where it's hazy.  I know I moved over to 26th

4   Street in the fall, and I think it was 1985, but I

5   could be off by a year on that.  But it would be an

6   earlier year, not a later year.

7        I moved over to 26th Street, and I was in a

8   courtroom with, forgive me, a wacky judge, for about

9   two weeks.  It was God awful.  I can't remember his

10  name.  I really think he got taken off because he was

11  having problems.

12       And I was put into the courtroom with Stephen

13  Schiller, and I was in his courtroom for a year and

14  three months is my memory.

15       So December of 1986 I went into Judge

16  Neville's courtroom.  I came out of there in August of

17  '87.  And I think that's when I went into Karnezis's

18  courtroom.  I don't know why it's so hazy.  I know I

19  went to Huida.  No.  I am sorry.  Not Huida.  I'll

20  think of his name, the other one.  But I went to

21  Karnezis's courtroom for a year.

22       Hett.  I went to Hett's courtroom.

23  Q.  How do you spell that?

24  A.  H-E-T-T.  And what I don't remember is if I

1  went into task force from Hett's courtroom or from

2  Karnezis's courtroom.  I'm not clear.  But it might

3  have been Hett, then Karnezis.

4        And then I went to task force, and I can't

5  remember when I went to task force.  It feels like I

6  was only there a year or a year and a half.  But it

7  feels like that because I was doing some of the

8  murders with other people before I ended up on task

9  force.

10     Q.  Are you done?

11     A.  Yes.

12     Q.  Okay.  So sounds like juvenile court was

13  from -- whether it was abuse or neglect or delinquency

14  from April of '82 until the fall of '84 or '85.  So

15  two to three years?

16     A.  Right.  Yes.

17     Q.  So did you have any jury trials while you

18  were in -- assigned to juvenile court?

19     A.  No.  They were not permitted.

20     Q.  Right.  And then it sounds like you were in

21  one courtroom or another, but it was the -- the

22  courtrooms were -- aside from the wacky judge, Judge

23  Schiller, Judge Neville, Judge Karnezis, and Judge

24  Hett?

1    A.   Right.

2    Q.   Those were your four assigned courtrooms?

3    A.   Right.

4    Q.   Okay.  And that was from either '84 or '85

5  until the murder task force, right?

6    A.   Yes.

7    Q.   And the murder task force was the assignment

8  that you had at the time that you left to go into

9  private practice?

10   A.   Correct.

11   Q.   And is the judge that you referred to your

12 husband?

13   A.   Yes.

14   Q.   Thought I heard that name before.  Okay.

15 When did you get married?

16   A.   We got married July of 1999, which was at his

17 retirement party.

18   Q.   You got married at his retirement party?

19   A.   (Nodding.)

20   Q.   Ha-ha.  That's funny.

21   A.   We decided the day before.

22   Q.   Oh, I guess there were probably plenty of

23 judges around.

24   A.   That's right.  It was easy.

1     Q.   That's funny.  Okay.  This is not -- you know

2   what I am saying.  I am sorry.  I don't mean to be

3   insulting.

4     A.   Oh, don't.  Don't worry.  It was more of our

5   fun parts.

6     Q.   So let's talk about that period of time then

7   from the fall of 84-85 until you left in -- well,

8   until you left private practice to go sit on the bench

9   in '95.

10         Approximately -- now, did you have all the

11   same, I guess, I don't know how to say this -- I want

12   to say rank, but that's not the right word, but do you

13   know what I am saying?

14         At the public defender's office, like your

15   title?  I guess your job title.  You must have become

16   elevated at some point in time?  How would you

17   describe that process?

18     A.   So we didn't really have that process.

19     Q.   What?

20     A.   At the time, we were all just PDs, you know,

21   be moved around, whatever.  And then you go to task

22   force.  That's the elevation right there.

23     Q.   Okay.  And you're still a public defender,

24   but are you just called -- are you called something

1   else?

2       A.  No.

3       Q.  Did you get a raise?

4       A.  No.

5       Q.  Everybody makes the same amount of money as a

6   public defender, assistant public defender?

7       A.  So before we unionized, it was whatever was

8   decided by the powers that be.

9       Q.  And then after you unionized the office, how

10  did that change?

11      A.  We had -- and I think they still have, I just

12  don't know what it looks like, a step plan, you know.

13      Q.  I have heard of that.

14      A.  Yeah.

15      Q.  So depending on your experience -- a

16  combination of experience and years in, that's how

17  you're paid?

18      A.  Right.  Right.

19      Q.  All right.  All right.  So from the time you

20  were transferred to 26th and California until 1995,

21  approximately how many -- let me back up.

22          When you were assigned to the wacky judge,

23  did you have any -- I take it, you didn't have any

24  jury trials?

1    A.  No.  I was still trying to figure out felony

2   court.

3    Q.  Right.  And when you were assigned to Judge

4   Schiller's courtroom, you said that was three months?

5    A.  No.  That was a year and three months.

6    Q.  My bad.  Were there other public defenders

7   assigned to that courtroom?

8    A.  Yes.

9    Q.  Okay.  How many?  Typically, how many public

10   defenders were assigned to a particular courtroom?

11    A.   In every courtroom, except Schiller's, there

12   were two PDs assigned.  There were three of us in

13   Schiller's because Schiller worked round the clock.

14   We would finish a jury, or somebody would finish a

15   jury at 5:00 o'clock, and the rest of us, whoever had

16   a case ready, would -- we would do a bench trial in

17   the night while he was waiting for the jury to come

18   back.

19    Q.  Okay.

20    A.  No joke.  It was crazy, but we liked it.

21    Q.  Sounds like you would.

22    A.  Uh-huh.  Get a lot of work.

23    Q.  All right.  So how many -- what was his

24   assignment?  Was he misdemeanors or felonies?

1    A.  Felonies, yeah.

2    Q.  Okay.  Judge Neville, and then Judge Karnezis

3  was, and Judge Hett, were they all --

4    A.  Felonies.

5    Q.  -- felonies, felony courtrooms?

6        Okay.  And then how many jury trials did you

7  have while you were assigned to Judge Schiller's

8  courtroom?

9    A.  I don't remember.  In that year and three

10  months, I know I did a couple in there.  I don't know

11  how many, but Schiller was a very good judge to be in

12  front of.

13       It didn't matter what he believed about

14  someone.  Or if he heard the case, and said there is a

15  lack of -- I've got reasonable doubt here, he would

16  make that finding.  He didn't care if the guy had a

17  background a million miles.  So it was a wonderful

18  place to work, but it also meant you didn't get a lot

19  of juries.

20    Q.  Okay.  And why is that?  How do you make that

21  connection?

22    A.  Because you would give it to him to do the

23  trial.  You would do the trial in front of him instead

24  of doing it as a jury.

1     Q.   You would pick a bench?

2     A.   Uh-huh.

3     Q.   Do you remember the facts of any of those

4   jury trials that you had in front of Judge Schiller?

5     A.   I can't even remember what I might have had

6   in front of him as a jury trial.

7     Q.   Okay.  And then Judge Neville, how many jury

8   trials did you have in front of him?

9     A.   I don't remember having any.  I probably did

10   have one or two; but when I left there, I went to my

11   supervisor and said, I'm not getting enough juries.  I

12   had had now Schiller and Neville, who were good judges

13   to do benches with.  So I got plenty of trial work,

14   but I didn't get juries.  So I asked to be moved.

15     Q.   So Judge Neville was the same way as Judge

16   Schiller in the sense that he was a judge that you

17   could elect -- you could get a fair bench trial from?

18     A.   Correct.

19     Q.   So that is sometimes preferable to a jury

20   from a criminal defense perspective, right?

21     A.   Correct.

22     Q.   That only works, right, when you think the

23   judge is going to do the right thing?

24     A.   Correct.

1    Q.   Okay.  So then Judge Hett, how long -- I am

2  sorry.  How long were you in front of Judge Neville or

3  assigned to his courtroom?

4    A.   From the beginning of December to August the

5  following year, '86 to '87.  So not a year.

6    Q.   I am sorry.  I was floating, my mind.

7  December of '86 until when?

8    A.   August of '87.

9    Q.   I was counting months when I should have been

10  thinking.

11       So eight months, right?

12    A.   Yes.

13    Q.   And Schiller was a year and three months, and

14  Judge Neville was eight months, and then Judge

15  Karnezis was one year?

16    A.   It's where I'm just not sure.  I think

17  Karnezis was about a year, and it might have been that

18  Hett was before Karnezis or just -- but, God, did I

19  spend a whole year there?  I don't know.

20    Q.   I know you said you didn't remember the

21  order.  I don't mean to box you in there.  I am just

22  trying to understand regardless of what order how long

23  you were assigned to Judge Karnezis's courtroom?

24    A.   Karnezis, I do believe I was in there for a

1   full year.

2       Q.  Okay.  And what about Judge Hett?

3       A.  It could have been a year.  I just don't --

4       Q.  Just your best estimate is what we're looking

5   for?

6       A.  Call it a year.  That's all I can say.  I

7   think.

8       Q.  Okay.  And at the time of Mr. Rios's trial,

9   were you assigned to murder task force or to a

10  courtroom?

11      A.  I was assigned to task force, I believe.  No.

12  I had to be, yeah.

13      Q.  Are you sure?

14      A.  Well, it's 1990, right?

15      Q.  Right.

16      A.  That's when the trial is?

17      Q.  Uh-huh.  And it was in front of Judge

18  Karnezis?

19      A.  Right.  Well, in '90 --

20      Q.  I don't want to confuse you because I think

21  we have an email on point.  So I'll just ask you after

22  you've had a chance to look at the email.

23      A.  Okay.

24      Q.  I'll just withdraw the question, if you're

1   all right with that?

2      A.  I left the office in '91, and I was in task

3   force for at least a year.  And in 1990 it looks like

4   I was assigned to this case, and I was in task force

5   by that time.

6      Q.  So I think I saw somewhere in the record that

7   Mr. Carey asked you to try the case with him, and this

8   was the last one you did before you went to the murder

9   task force.

10         Does that ring a bell?

11     A.  It's possible.

12     Q.  Okay.  I think there is document about this

13  somewhere.  So we'll figure it out.

14     A.  Okay.

15     Q.  Okay.  But, in any event, your memory, you

16  believe that you were in the murder task force from

17  when to when?

18     A.  I don't know.  '89 to '91 when I left.  Or

19  all of '90 and '91.  That little bit of '91.

20     Q.  And you think it was more than a year?  Can

21  you be more specific than that or not?

22     A.  (Nodding.)

23     Q.  Is that a no?

24     A.  No.  I just don't know.

1    Q.   Okay.  Did you have any -- aside from the

2    Rios case, did you have any other jury trials in front

3    of Judge Karnezis?

4    A.   I can't be certain.  I think I did.  I'm

5    fairly certain I did.  I have a memory of a case that

6    I can't even tell you what it was, but I can remember

7    the courtroom being so full of people, and the judge

8    getting into a fight with one of the sheriffs because

9    I asked her to move.  And I just -- but I can't tell

10   you the case.  I can't tell you how many cases I did

11   as a jury in there with him.

12        If they were murder, then I was doing it as a

13   second chair with somebody else, but I had a whole

14   case load.  So, theoretically, I had to have had a

15   couple, at least.

16   Q.   Do you remember the facts and circumstances

17   of any of the cases that you may have tried in front

18   of Judge Karnezis other than the Rios case?

19   A.   You mean as a jury?

20   Q.   Yes.

21   A.   I can't.  I can't remember a case right now

22   that I tried as a jury.  Other than some -- you know,

23   I didn't really remember Jaime Rios's case.  And then

24   there is a couple of other cases that I remember a

1  little better, but they weren't in front of Karnezis,

2  I don't think.

3      Q.   Okay.  What can you tell me about the jury

4  trials that you do remember, and we're going to put

5  Rios to the side here.

6      A.   Okay.

7      Q.   So aside from the Rios case, what other jury

8  trials do you remember?

9      A.   I remember Kevin Murray, and I remember Keith

10 Washington.  I'm trying to think back.  I remember a

11 rape case, which was not a murder, obviously, and it

12 was very soon after I went to 26th Street that we

13 tried.

14         I remember an armed robbery, and my brain is

15 obviously lacking here because of the number of years,

16 but I did somewhere between 20 and 25, I believe.  I

17 think it was 25 juries while I was at 26th Street.

18     Q.   And how do you know that?

19     A.   It's the number that I have in my mind.  You

20 know, you leave the office, and that's -- I did one

21 jury in federal court as a second chair to somebody

22 else after I left during that '80 -- '91 to '95.  I

23 was almost like a bump on a log in this.

24     Q.   Okay.  So we've talked about one, two, three,

1  four, five different jury trials.  I mean, I know it's

2  a long time ago.

3    A.  Yes.

4    Q.  And like I said, I am -- one of my purposes

5  here is to exhaust your memory.  So we're going to get

6  to the point that I go --

7    A.  Okay.  I'm drained.

8    Q.  Right.  So, please, by my questions, I don't

9  intend to make you feel bad for not remembering.  Just

10  do your best.  That's all we're looking for.

11        So we talked about five jury trials that you

12  recalled.  One was Kevin Murphy.  One was Keith

13  Washington.  There was a rape case, an armed robbery

14  case, and a case in federal court.

15        Do you remember any other jury trials that

16  you had from the time period of 1982 to 1995?

17    A.  I will wake up in the night at 3:15, which is

18  my normal time, remembering cases and say, oh, I

19  remember.  But right now --

20    Q.  That's it?

21    A.  Yeah.

22    Q.  And so now you know what I am going to do,

23  right?  What do you remember about the Kevin Murray

24  case?

1    A.  Do you know who Detective Kato is?

2    Q.  Yes.

3    A.  Okay.  So it's a Kato case.

4    Q.  Well, let me ask -- okay.  Now, I'll let you

5  say what you remember.

6    A.  I always believed Kevin was innocent, and it

7  was like a gang shooting type case, and he got picked

8  up after a time and held for a couple of days, and

9  from day one said, I was beaten, I was beaten, I was

10  beaten.  I had to do it.  I had to say it.

11       And that case haunts me.  I think I need to

12  tell you -- this is where I am not supposed to just

13  talk, but I am testifying in November at 26th Street

14  in the Kevin Murray case.  That's how long it's taken

15  for this to get here.  So because that case is

16  really -- you can imagine.  So that was Kevin's case.

17       Keith Washington was a Kato case.  This woman

18  was, I want to say, stabbed in her house.  I can't

19  remember now what -- she was either stabbed or shot,

20  but I think she was stabbed.  Anyway, they didn't have

21  anybody charged.  A couple of weeks later, Kato got on

22  the case, picked Keith up kind of randomly on the

23  street, held him for a couple of days; and, of course,

24  all of a sudden Keith had a -- it all written down and

1    did it, did it.

2         So I've always felt bad about that case

3    because he was kind of soft.  You kind of felt like he

4    was not going to make it in jail.  Okay.

5         Q.  Do you want a minute?

6         A.  No.  I just had a memory of one.  So when we

7    go back, when you take me back again, I'll pull it

8    out.

9         Q.  Okay.

10         A.  Just making me relive some of my worst

11    moments.  Only kidding.  Okay.

12         Q.  What else do you remember about the Keith

13    Washington case?

14         A.  That I never saw a post-conviction on that

15    case.  I never figured out what happened to him, and

16    I've always thought he might not have made it out

17    alive.  But I don't know.

18         Q.  Okay.  What can you tell me -- or what do you

19    remember about the rape case?

20         A.  That one was a long time ago.  It was the

21    craziest case, but I can't remember the facts of it.

22    I remember that one of the PDs was very pregnant, and

23    she tried it with me.  Isn't that a crazy thing to

24    remember, but that's the memory.  And it was --

1    Q.  I have those memories.

2    A.  And it was a not guilty.  I think it both

3  had, you know, ID.  You know, that kind of thing.

4    Q.  Was it a statement case?

5    A.  No.

6    Q.  Was there multiple offenders?

7    A.  No.

8    Q.  Okay.  The armed robbery.

9        Theresa, you didn't get my joke about the

10  pregnant co-counsel.

11    MS. CARNEY:  I missed it.

12  BY MS. GOLDEN:

13    Q.  But can you tell me about the armed robbery?

14    A.  That the guy -- this might have been in front

15  of Karnezis.  That the guy that was charged -- oh,

16  this is another one.  Forgive me, I am a going to say

17  it, I think he was guilty.  And it was an ID case.  He

18  was pending trial on another one in another courtroom,

19  and that wasn't allowed to be brought in, of course.

20        In fact, he went -- I think he went straight

21  there for that one after the not guilty on this one.

22  It's amazing that I didn't pass out in court going

23  (Indicating.)  Because it was not a pretty case, and

24  there were lots of IDs, and it was weird.  You know,

1  you just don't know sometimes what happens.  And being

2  a PD, we don't get many NDs -- NGs, right.

3      Q.  Was it a statement case?

4      A.  No.

5      Q.  Were there more than one offender?

6      A.  That I don't remember.  There was not more

7  than one offender at the table.  That much I remember.

8      Q.  Okay.  And I take it the verdicts in the

9  Washington and the Murray case were guilty, correct?

10     A.  Correct.

11     Q.  The federal court case, can you tell me what

12  that involved?

13     A.  Not much.  Dan -- what is Dan's last name.

14     Q.  Dan Webb?

15     A.  No.  An old-time guy well known at 26th

16  Street, and all the little courts, too.  And he was

17  one of the people who officed at my office when I was

18  out in private practice.

19     Q.  That Nadler Pritikin?

20     A.  No.  When I was out in the private practice.

21     Q.  Oh, got it.

22     A.  '91.

23     Q.  Oh, yeah.

24     A.  So it was probably just before I went on the

1    bench.  But I -- he wanted me -- he had a case in

2    federal court.  It was something I had never done.  So

3    I did sit like a bump on a log, but he just needed me

4    to be there to take notes and to run things past.

5        Q.  Do you remember what the charges were?

6        A.  Was it -- it was beyond that -- I don't

7    remember.  But it wasn't -- it wasn't a criminal case

8    at that moment.  It had been a criminal case, and he

9    had taken it to federal court.

10       Q.  Was it a jury trial?

11       A.  Yes.

12       Q.  Was it a civil case?

13       A.  Yeah.  But I can't -- it was a jury trial.

14   Otherwise, I think, he wouldn't even have had me come

15   to do it with him.

16       Q.  So it was a civil case or a criminal case?

17       A.  Now, I'm not sure.  I'm really not.

18       Q.  Okay.  And there was a verdict in that case?

19       A.  Yes.

20       Q.  Do you recall what the verdict was?

21       A.  No.  But I don't remember it being whatever

22   it was for the defendant.

23       Q.  For your client?

24       A.  Yeah.

1    Q.  So you may have had a plaintiff?

2    A.  Right.  Thank you.

3    Q.  Just so we're all clear.  Okay.  But the

4  facts and circumstances of that criminal case you

5  don't recall, is that fair?

6    A.  That is.

7    Q.  Whatever it was --

8    A.  Right.

9    Q.  The criminal element of the federal court

10  case, you don't recall those?

11   A.  Correct.

12   Q.  And that was in that '91 to '95 time frame?

13   A.  It was.

14   Q.  Okay.  And the arm robbery, when was that?

15   A.  I don't remember whose courtroom it was, and

16  it was a courtroom assignment.

17   Q.  So it was -- I am sorry.

18   A.  That could have been Karnezis.

19   Q.  Okay.

20   A.  It could have been Schiller, but I don't

21  think it was.  I'm not sure.  It was sometime in

22  there.

23   Q.  So it was sometime in that -- so if it was

24  Schiller, it could have been sometime in that, okay,

1    in that '85 to '95 -- no, '85 to 1990 time frame?

2       A.   Right.

3       Q.   And the rape case, do you remember who

4    presided over that?

5       A.   I don't.  But I'm assuming that because it

6    was so early in the -- my time frame of being at 26th

7    Street, I'm assuming it's Schiller.

8       Q.   And is this another client that you thought

9    was guilty?

10      A.   No.  Not necessarily.

11      Q.   When you were talking about the armed

12   robbery, you said that was another one you thought was

13   guilty.

14           Who was the other one?  Did we talk about

15   that case?

16      A.   I don't know that I --

17      Q.   I assumed you were referring to the rape

18   case?

19      A.   No.  Uh-uh.  That was one of those.  I didn't

20   look to see whether people were guilty or not.  I

21   looked differently.

22      Q.   And how did you look?

23      A.   To see that all their rights were met, that

24   we've done what we could, that they didn't get wrongly

1    accused and convicted, as best you could.  And then do

2    the best you could for their futures.

3        Q.   Now, there were and are, right, limitations

4    on what evidence an ethical lawyer can seek to

5    introduce, right?

6        A.   Correct.

7        Q.   Okay.  And do you remember what those

8    standards were back in the time that you were handling

9    criminal matters?

10       A.   I'm not sure how to come at that.

11       Q.   However you would like.  There is certain

12   evidence you couldn't introduce, right?

13            Like I am specifically speaking about you

14   have to have a good faith basis to ask a question,

15   right?

16       A.   Right.

17       Q.   And what does that mean?  Does that mean

18   there has to be sufficient evidence to believe that

19   the question is relevant, or what does that mean to

20   you, good faith basis to ask a question?

21       A.   I think it's an impossibility.  It's kind of

22   like describing reasonable doubt, which has no

23   definition, right?  Everybody's tried, and you always

24   get slapped down in court for trying to define it for

1    a jury, a good faith basis, and the judge will be the

2    decider of whether it was a question you could ask.

3        Q.   Well, you have to have sufficient evidence to

4    justify asking a witness --

5        A.   Sure.

6        Q.   -- a question?

7        A.   You just don't just pull it out of the air.

8        Q.   That's what I meant.

9             And what about -- and you can't introduce

10   evidence you know to be false?

11       A.   False.  Correct.

12       Q.   That's what I was asking.

13       A.   Oh, okay.

14       Q.   Sorry.

15       A.   Don't lie is part of it.

16       Q.   And you can't elicit --

17       A.   Don't make up.

18       Q.   And you can't elicit a lie as a lawyer,

19   right?

20       A.   Correct.  You shouldn't.

21       Q.   Correct.  An ethical lawyer.

22            All right.  And I think when we were talking

23   about these cases, you seemed to remember another

24   case, is that right?  Do you still have that memory?

1    A.   Yes.

2    Q.   All right.  Let's hear it.

3    A.   This was a murder case.  I must have been at

4    task force because otherwise why would it have been

5    mine?

6         Henry Oaks.  I just saw the front of the file

7    in my head.  That's a memory.  Henry, his case --

8    somehow I got assigned the case.  And the first time I

9    sat with Henry, he turned to me and he said, get me

10   life, and I will plead.  Don't let them give me death.

11   Get me life.  I will plead.

12        And we tried, and I tried, and I tried, and I

13   tried.  I had to have been in task force because this

14   was in front of Judge Huida, H-U-I-D-A, Judge Huida.

15   Most judges having heard that would have pushed or

16   given an indication so that there would not have to be

17   a trial, and the guy would get life.  But Huida

18   wouldn't do that.  So we had to do a trial, and we

19   knew we had to do a jury on the death piece.

20   Q.   Is that because you knew there would be a

21   guilty verdict?

22   A.   We knew there would be a guilty verdict, and

23   we knew that Judge Huida would give him death.

24   Q.   Right.  So you had to --

1    A.  We had to.

2    Q.  So there was a guilty verdict?

3    A.  Oh, yeah.

4    Q.  Okay.  What was the -- was it -- what can you

5  tell me about the facts of the murder?

6    A.  It was awful.  He went into this woman's

7  house, I want to say, in the afternoon.  It was the

8  afternoon, and he raped her, and he stabbed her to

9  death, and it got seen by both her small child, who

10  came into the room at one point, and somebody else.

11       The child went out and got someone, and

12  someone like -- I want to say like a FedEx guy, but I

13  don't know it was a FedEx guy.  Some guy walked in,

14  and because the kid was saying you got to come with

15  me, my mom, my mom, and he saw it happening.

16       And so our whole goal was to get life, the

17  entire goal.  We did the trial, but the goal was life,

18  and he got death.

19    Q.  Did he give a statement?

20    A.  You know, I don't remember.

21    Q.  Was it a single offender case?

22    A.  Yes.  And the jury, I think, had nine women.

23  And so that's a crapshoot right there, and so it was

24  death.  And then that was before Governor Ryan

1   commuted them all.

2       Q.  Okay.  Have you, during the course of our

3   talking about prior jury trials, come to remember any

4   other trial -- jury trial other than the trials

5   involving Kevin Murray, Keith Washington, or the

6   two -- the Henry Oaks murder and rape, the rape case,

7   the armed robbery, and the federal court case?

8       A.  No.

9       MS. GOLDEN:  Okay.  All right.  I think this is a

10  good time for a break.

11      THE WITNESS:  It's a good time for a bathroom.

12      MS. GOLDEN:  I have been thinking that for a

13  while.  So 10 minutes, Stephen?  Is that all right?

14      MR. RICHARDS:  10 minutes is fine.

15      MS. GOLDEN:  Okay.  Thank you.

16      THE VIDEOGRAPHER:  We're going off the video

17  record at 11:52 a.m.

18              (A break was taken.)

19      THE VIDEOGRAPHER:  We are back on the video

20  record.  This is the beginning of media unit two.  We

21  are back on the video record at 12:05 p.m.

22  BY MS. GOLDEN:

23      Q.  Okay.  When you left the public defender's

24  office, did you retain any files or materials relating

1   to your representation of Jaime Rios?

2       A.  No.

3       Q.  Did you retain any files representing to

4   your -- did you retain any files relating to your

5   representation of any other clients when you left the

6   public defender's office?

7       A.  Yes.

8       Q.  What files did you retain?

9       A.  I retained a couple of the murder cases that

10  I tried after I left the office, and that was it.

11      Q.  All right.  Murder -- oh, murder trials that

12  you may or may not have tried in that '91 to '95 time

13  frame, right?

14      A.  Correct.

15      Q.  And I think, correct me if I'm wrong, but of

16  the jury trials that you do remember the facts of, the

17  only two not guilties were the rape case and the armed

18  robbery case, right?

19      A.  It's the only ones I said, yes, right.

20      Q.  Did the defense introduce any evidence of

21  police coercion in the Kevin Murray case?

22      A.  Yes.

23      Q.  Okay.  And what was that?

24      A.  So the difficulty with this one is that it's

1    still alive.

2        Q.   That's all right.  I don't know, why is that

3    difficult?

4        A.   It's very much alive.

5        Q.   But the evidence that you introduced at the

6    criminal trial is over and done, right?

7             So what I'm asking is, did the defense

8    introduce evidence -- did you, as part of Kevin

9    Murray's defense team, introduce into evidence at his

10   criminal trial any evidence of police coercion?

11       A.   Yes.

12       Q.   And what was the evidence that you introduced

13   at the criminal trial relating to police coercion?

14       A.   That Kato held him in a lockup for a couple

15   of days and used physical force against him.

16       Q.   Any other evidence that was introduced

17   regarding police coercion into the Kevin Murray case

18   that you recall?

19       A.   I think -- and the way I answered it was to

20   give you everything I could, and that I think the use

21   of physical coercion, there is not much more I can

22   say.

23       Q.   Okay.

24       A.   Okay.

1    Q.   What about psychological coercion?

2    A.   Holding someone for a couple of days will do

3  that.

4    Q.   Okay.  So you told us what you remember about

5  the evidence of physical and psychological coercion

6  that was introduced at Kevin Murray's criminal trial?

7    A.   Yes.  I've told you about it.

8    Q.   Okay.  And what about the Keith Washington

9  case, did the defense introduce any evidence of

10  physical or psychological coercion of the defendant or

11  any witnesses in that case?

12    A.   Yes.

13    Q.   And what was that evidence?

14    A.   It was physical and psychological coercion.

15  Holding him in the police station for a couple of

16  days, overnights, and using physical force against

17  him.

18    Q.   What was the physical force?

19    A.   Hitting, kicking, the old phone books.

20    Q.   Why do you say old phone books?

21    A.   Because we don't have phone books anymore.

22  They were used a lot in the past.

23    Q.   Is there any other evidence of physical force

24  you recall introducing in the defense of Keith

1    Washington's criminal case?

2        A.   I don't recall.

3        Q.   Was the Kevin Murray case a statement case?

4        A.   Yes.

5        Q.   Okay.  And I think in the Keith Washington

6    case, you told me about evidence of physical and

7    psychological coercion that was introduced by the

8    defense, and that was coercion against the criminal

9    defendant, right?

10       A.   Yes.

11       Q.   Was there evidence of physical or

12   psychological coercion against a witness introduced in

13   the Keith Washington case?

14       A.   No.

15       Q.   Was there any evidence of physical or

16   psychological coercion against a witness introduced in

17   the Kevin Murray case?

18       A.   I don't remember one way or the other.

19       Q.   And in the rape case that you told us about,

20   was there any evidence of coercion introduced by the

21   defense in that case?

22       A.   No.

23       Q.   Was there any evidence of coercion introduced

24   into -- by the defense in the armed robbery case?

1    A.  No.

2    Q.  Do you recall any evidence of coercion being

3  introduced by you -- your team in the federal court

4  case?

5    A.  Can't say that I remember.

6    Q.  And in the Henry Oaks case, did the defense

7  introduce any evidence of physical or psychological

8  coercion?

9    A.  No.

10   Q.  Okay.  All right.  So I want to ask you a few

11  questions about Jack Carey.

12       You remember Mr. Carey, right?

13   A.  Oh, yes.

14   Q.  And that's who you tried the Rios case with,

15  right?

16   A.  Correct.

17   Q.  And he was the first chair?

18   A.  He was.

19   Q.  And you were the second chair?

20   A.  I was.

21   Q.  And how would you explain the difference

22  in -- between the -- in the duties and

23  responsibilities between a first chair and a second

24  chair?

1   A.  It's more defined by the two people than it

2  is -- I mean, we all know that the first chair is the

3  lead on the case, and this was his case.

4       So you're in task force, and you get the case

5  sent to you, and it becomes yours.  At some point you

6  pick someone to be your second always because you just

7  don't try juries by yourself.

8       Jack did all of the workup on the case.  He

9  did the opening and closing.  He did almost all of the

10  witnesses.  He -- the reason he told me he wanted me

11  on the case was because it was before Judge Karnezis,

12  and he had never -- I think, never tried a case in

13  front of Karnezis.  So he didn't know him well.

14       So it was me because I had been in there for

15  so long.  I believe I was already on task force then.

16  This is what I'm just not clear on, but I think I was,

17  and I think I had just come out of there.

18   Q.  Out of Karnezis's courtroom?

19   A.  I think when I got into task force, I had

20  come from Karnezis.  That's, you know, that shift in

21  timing, but I think so.

22   Q.  Okay.  Now, at the time you tried the Rios

23  case with Mr. Carey, Mr. Carey was an experienced

24  trial attorney, right?

1    A.  Yes.

2    Q.  And he had been at the public defender's

3  office for longer than you.

4        How much longer than you?

5    A.  I don't know.  I really don't.  It was just

6  Jack was always there.  I don't know, so...

7    Q.  Had you ever tried a case with him before?

8    A.  No.

9    Q.  Uh-huh.  What did he -- did he have a

10  reputation within the office as a competent and

11  experienced trial lawyer?

12    A.  Yes, he did.

13    Q.  And did he also have a reputation in the

14  public defender's office as somebody who would go the

15  extra mile to interview witnesses, track down leads,

16  investigate his cases?

17    A.  Yes.  Very definitely.

18    Q.  And did it seem to you that he did that in

19  this particular case?

20    A.  Yes.

21    Q.  The Rios case, I mean?

22    A.  Yes.

23    Q.  As you were preparing for trial, did you

24  notice anything or come across anything that caused

1    you to ask Mr. Carey whether or not something had been

2    done?

3      A.  No.

4      MS. GOLDEN:  Okay.  Okay.  I meant to do this.

5    Could you mark -- did you mark it?

6      THE REPORTER:  No.

7      MS. GOLDEN:  Okay.  I guess 1.  We're going to

8    mark, Stephen, something that's not been produced.

9    The witness's biography that's on the JAMS website.

10         Okay?

11     MR. RICHARDS:  Yeah.  I don't need to see a copy

12   of it when you show it to her, that's fine.  I can

13   look at it later.

14        (Whereupon, Deposition Exhibit

15         No. 1 was identified.)

16   BY MS. GOLDEN:

17     Q.   Sure.  We're showing you what we marked as

18   Exhibit 1, and I'll ask you what you recognize that to

19   be?

20     A.   That is my biography that JAMS has on its

21   website as a neutral in the JAMS world.

22     Q.   Do you have a CV?

23     A.   This is what we use.

24     Q.   Okay.  Can you just take a minute to look

1    through that, and tell me if you need to add anything?

2        A.  I've been over this thing so much in my life.

3    I told you earlier, every two years or so we try to

4    update them.  But if you don't keep really good track

5    of other things, you forget to add them.  As far as I

6    know, there is nothing of import to be added.

7        Q.  Do you remember Mr. Carey asking you to work

8    on the Rios case with him?

9        A.  I don't remember specifically.  I just know

10   he did.

11       Q.  Right.  So you don't remember what, if

12   anything, he told you about the case at the time?

13       A.  I do not.

14       Q.  Let me take that.  Let's give that to Theresa

15   because the exhibits are so voluminous, I'm going to

16   retain them unless somebody has a problem with it.

17   Otherwise, they're going to charge us like $5,000 to

18   copy the exhibits.  It drives me crazy.

19           Okay.  We're past page 1.  It's not as bad as

20   it looks.  Okay.

21       A.  It's going to be a long day.

22       Q.  Two.  Okay.  Have you ever been sued?

23       A.  Sued.  Have I ever been sued?

24       Q.  Have you ever been a defendant in a lawsuit

1  that you recall?

2      A.  I don't think so.

3      Q.  Okay.  Have you ever sued anybody?

4      A.  I once tried to sue a guy in law school

5  because he took my money to make t-shirts, and then

6  didn't give me the t-shirts, but that's it.

7      Q.  Okay.

8      A.  And I lost him somewhere.  I truly don't

9  recall.  It doesn't mean it didn't happen, but I --

10  truly, I don't recall it.

11     Q.  Has anyone filed an ARDC complaint against

12  you?

13     A.  Back during PD days --

14     Q.  At any time?

15     A.  -- they were a dime a dozen.

16     Q.  Okay.

17     A.  But I think I only had two or three.  I think

18  so.

19     Q.  Do you remember what the claims were in

20  either of them?

21     A.  Typically stuff like, you know, didn't do, or

22  did do, or something.

23     Q.  Do you remember any of the didn't do's?

24     A.  No, I really don't.  They were so long ago.

1     Q.   Right.  And did they all -- all the ARDC

2   claims relate back to the time that you were at the

3   public defender's office?

4     A.   Yes.

5     Q.   Okay.  Okay.  What can you tell me about the

6   training at the public defender's office?  How and

7   when it happened and what it consisted of?

8     A.   I think it varied.  We got better training as

9   we went along -- as the years went by.  But you had a

10   supervisor, and they would talk to you and take you

11   into court.  And when you first had to go to trial,

12   they would sit in there and observe and talk to you

13   about it.

14        Later on we started doing trainings for

15   people, real trial-ad training kind of trainings.  I

16   don't know what they do now.

17     Q.   Do you remember any training at the public

18   defender's office, formal or informal, that related to

19   how to handle an initial client interview?

20     A.   No, I don't, but...

21     Q.   I am sorry.  Did you have -- I am sorry.

22        Did you have a custom and practice in terms

23   of what you would do in an initial client interview?

24        And I'm going to just talk about felony

1    murder cases here, right, because that's what -- the

2    kind of case we're here to discuss.

3        A.   Okay.

4        Q.   So what would you typically do in a case like

5    that in an initial interview?

6        A.   Talk a little bit about my job, talk a little

7    bit about what we needed to do.  We needed truth.  We

8    needed witnesses.  We need this, we need that.

9            Ask the client to tell us in his own story

10   what happened.  Why is he charged with this?  And then

11   whatever you're told, just follow those strings,

12   follow the strings.

13       Q.   Okay.  And what would you tell the client

14   what your job was?

15       A.   To represent them in court.  To do the best

16   job we could do, make sure that he gets all of his

17   rights, his constitutional rights.  Those sorts of

18   things.  I haven't had to do it in a long time.

19       Q.   Brings you back, doesn't it?

20       A.   Yeah.

21       Q.   So now did the client also have a job to do

22   in terms of your representation of him or her?

23       A.   Well, first off to tell me the truth.  Tell

24   me if there -- is there anybody that can help us in

1    some way, witnesses, et cetera, you know.

2          And, again, it depended on what the threads

3    of the case were.

4      Q.  Is there anything -- and you didn't just have

5    initial interviews with clients --

6      A.  No.

7      Q.  -- right?

8          I mean, there were as many meetings as you

9    needed to get ready to do whatever you needed to do in

10   the criminal case, right?

11     A.  Right.

12     Q.  You probably had to meet with them to talk

13   about discovery?

14     A.  Tell them what is going on.

15     Q.  Give them statuses.  You had to meet with

16   them to prepare for trial?

17     A.  Correct.

18     Q.  And as different issues came up in police

19   reports or subpoenaed documents, you might have to go

20   back and meet with them again, right?

21     A.  (Nodding.)

22     Q.  And you were never kept from accessing your

23   client?

24     A.  No.

1      MS. GOLDEN:  God bless you.

2      MS. CARNEY:  Thank you.

3   BY MS. GOLDEN:

4      Q.   And so in that initial interview, is an alibi

5   typically something that would be addressed, whether

6   there was an alibi?

7      A.   If it was a case to deal with an alibi.

8      Q.   And if it was a case where the defendant

9   had -- in any case, if the -- if your client had an

10  alibi, and there were alibi witnesses, that was

11  something that you would investigate, pursue; and if

12  you uncovered competent evidence of an alibi,

13  competent and credible evidence of an alibi, that's

14  something you would introduce at trial?

15     A.   Correct.

16     Q.   Okay.  And then in a statement case, were

17  there particular topics that you would address with

18  your client?

19     A.   Yes.

20     Q.   And what are those?

21     A.   Did he say these things?  What was the

22  situation around saying them?  Go through every line

23  of it, and ask, did you say this?  Is this what

24  happened?  What actually happened?  Or is this what

1   happened?

2         Okay.  Go through it all, and then you find

3   out -- because a lot of times from there, again, the

4   threads of the case come loose for you, and you can

5   start following that path.

6      Q.   And if -- there is a difference, right,

7   between whether you said this, and whether or not it's

8   true, right?

9      A.   Well, you do both.

10      Q.   Right.  Right.  That's why you ask both

11   questions?

12      A.   Right.

13      Q.   Because there is a difference?

14      A.   Right.

15      Q.   And is one of the things you would cover in a

16   statement case whether or not the signature of the --

17   the purported signature of your complaint was actually

18   his?

19      A.   Correct.

20      Q.   Would you also go over whether or not the

21   people who the statement seems to suggest were present

22   were actually present --

23      A.   Present.

24      Q.   -- in the room?

1     A.   Yes.

2     Q.   Right.  Because, typically, those statements,

3   first of all -- and in this particular case, we have a

4   court-reported statement, right?

5     A.   Right.

6     Q.   And there can also be handwritten statements,

7   right?

8     A.   Right.

9     Q.   But the statements typically identify who was

10   present during the time that the statement is taken?

11     A.   Correct.

12     Q.   There is usually a state's attorney, right?

13     A.   Uh-huh.

14     Q.   If there is a court reporter, there is a

15   court reporter.  If it's a court-reported statement,

16   there is a court reporter present, right?

17     A.   Yes.

18     Q.   And sometimes there is other people present

19   like officers?

20     A.   Yes.

21     Q.   Okay.  And so if your client told you that

22   some or -- one or some of those people weren't

23   actually present for the taking of his statement, is

24   that something you would address?

1     A.   Say it again.  I am sorry.

2     Q.   Okay.  So let's just say the statements of

3   these four people are present, and your client says,

4   no, only two were present, or none of them were

5   present, is that something you would address in terms

6   of circumstances of the statement?

7     A.   Yes.

8     Q.   Okay.  And if what your client's memory -- to

9   the extent your client's memory diverged from the

10   statement itself, that's something that you would

11   address in court?

12     A.   Yes.

13     Q.   Okay.  And if there was a statement case, I'd

14   imagine you would talk to your client about any

15   physical or psychological threats that were employed

16   against him in the course of giving the statement?

17     A.   Yes.

18     Q.   And if there were any such threats, you would

19   file a pretrial motion to suppress the statement,

20   right?

21     A.   Yes.

22     Q.   And so do you remember back in the day of the

23   Rios case to what level of specificity you were

24   required to make those allegations of coercion in

1  terms of the description of the coercion and the

2  identity of the person who allegedly did it?  Do you

3  know what I'm saying?

4       A.  Uh-uh.

5       Q.  Long question.  Okay.  I've seen in a bunch

6  of these -- a bunch of cases from back in the 80s and

7  90s, a judge saying, like I need more information

8  about who did it or what was done.

9          Was there case law on the topic of whether --

10  what level of specificity was required in terms of

11  identifying the officer that allegedly was coercing?

12      A.  I don't think there was anything that was

13  like a rule.

14      Q.  Okay.

15      A.  A hard and fast rule.  You would follow as

16  much as possible descriptions, anything identifying --

17  the way we do now, right.

18      Q.  Okay.

19      A.  He was this tall and this size.

20      Q.  So if you couldn't identify the person by

21  name, the practice was to identify them with a

22  physical description, as best you as could?

23      A.  As best you could.

24      Q.  Okay.  And would that same be true for the

1   allegations of coercion, they would be -- the acts

2   would be described as best you could?

3      A.   Yes.

4      Q.   Okay.  Now, if a client said that he didn't

5   say the things that were contained in his statement --

6   or if he said he said them, but they weren't true,

7   what would you do to follow-up on that?

8      A.   We'd figure out how we showed that his

9   statement wasn't true.  And, therefore, was it

10  coerced?  Was it -- you know, why is it there?  How

11  did it get there?  If it's not true is really, I

12  guess, the bottom line.

13     Q.   So if the client -- if there is something

14  that the client purportedly said in the statement that

15  you could -- that he said that he never said and

16  wasn't true, you would do your best to disprove --

17  disprove -- whatever that was.  That may be not the

18  worst question I've ever asked.  I'll try again

19  anyway.

20         So to follow that thread if a client -- if a

21  statement attributed your client, a statement that he

22  claimed wasn't true, you would try to disprove it?

23         So if he said that -- if the statement said

24  that he was at the bus stop -- I am sorry.  If the

1    statement said that he was, you know -- if the

2    statement said that he was -- that he took the 737 bus

3    to the scene of the crime, and you could prove that

4    the 737 bus wasn't operating on that date, that's

5    something you would pursue?

6        A.  Probably.  Everything depends on the whole

7    picture --

8        Q.  Okay.

9        A.  -- and the pieces.  The pieces and the

10   picture, they're together.

11       Q.  Okay.  But you would -- if a complaint said

12   that he didn't make the statements contained in a

13   court-reported statement, you would try to prove that

14   the statements he made weren't true?  That would be

15   helpful?

16       A.  I think I followed that correctly, and the

17   answer would be yes.

18       Q.  Okay.  I think we got it.

19       A.  Okay.

20       Q.  A lot of statements.  Okay.  So here I wrote

21   it down beforehand.  It's much better than me

22   thinking.

23           Was it your practice in a case where your

24   client gave a court-reported confession to make every

1  effort to prove the statement could not be true?  I

2  read it too fast maybe.

3     A.  Yeah.  Read it again.

4     Q.  Was it your practice in a case where your

5  client gave a court-reported statement to make every

6  effort to prove that what he said in the

7  court-reported statement could not be true, to

8  disprove the statement?

9     A.  If the client said I didn't make that

10  statement, and it's not true, then, yes, you would

11  want to try to disprove the pieces of it.

12    Q.  Much better.  Thank you.

13        Okay.  What would you do if your client told

14  you that the assistant state's attorney told him what

15  to say in a court-reported statement?

16    A.  I have rarely seen that one.  It's always the

17  police and not the state's attorney.  The state's

18  attorney being present.  I guess you would treat it

19  the same way you would the police.

20        You would try to figure out how to show that

21  it's not true, if it's what your client is saying is

22  that it's not true.

23    Q.  Would you cross examine the state's attorney

24  about it?

1    A.  Of course.

2    Q.  And would the same also be true for any acts

3  of physical or psychological coercion that your client

4  says were committed in the presence of the state's

5  attorney?  Is that also something you would ask the

6  state's attorney about?

7    A.  Yes.

8    Q.  In a lineup case -- in defending a lineup

9  case, a case where there is a physical lineup, right,

10  you look for prior non-identifications, right?

11    A.  Yes.

12    Q.  You look for use of a single photo prior to

13  the lineup, right?

14    A.  Yes.

15    Q.  You look to see if the makeup of the lineup

16  is fair?

17    A.  Yes.

18    Q.  You look at fillers, likeness of fillers in

19  terms of age, height, weight, all those sorts of

20  things, right?

21    A.  Yes.

22    Q.  And you also ask your client about whether or

23  not he heard or observed any undue influence on the

24  witness, right?

1    A.   Right.

2    Q.   Whether or not he was asked to perform

3  something in the lineup that the other participants

4  were not, right?

5    A.   Correct.

6    Q.   And then in terms of allegations of physical

7  coercion, you would also follow the thread and look

8  for corroborating evidence in terms of witnesses and

9  photographs, right?

10    A.   I am sorry.  I'm drifting at times now, you

11  know.

12    Q.   Salad is coming.

13    A.   Yeah.  I think it's coming for all of us.

14  Okay.

15    Q.   I am going faster now.  So I'll slow down.

16        So in terms of it if your client claimed that

17  he was physically coerced, you know, physically struck

18  or injured or hurt physically, assaulted in some way,

19  you would follow that thread and look for

20  corroborating evidence, right?

21    A.   Yes.

22    Q.   And that could be witnesses, right?

23    A.   Yes.

24    Q.   It could be photographs, right?

1    A.  Yes.

2    Q.  And it could be documented in terms of intake

3  records at the jail or at Cermak, right?

4    A.  It could be many things, right.

5    Q.  Okay.  But if there was an allegation of

6  physical coercion, and you found credible

7  corroborating evidence, that's something that you

8  would introduce in a pretrial hearing and/or at trial,

9  right?

10    A.  Right.

11    Q.  Okay.  Pretrial discovery, at some point in

12  the time, the state has to file -- I think it's an

13  answer to motion for discovery, right?

14    A.  Right.

15    Q.  And they -- that contains a list of

16  witnesses?

17    A.  Yes.

18    Q.  And what typically do you do with that -- or

19  did you do with that?

20    A.  Typically, you look at it.  You try to see

21  why these witnesses are being called.  You know, they

22  usually -- the state's attorneys would list everyone

23  who ever hit a police report.  And, of course, a lot

24  of those people are pretty extraneous.

1        So you're trying to figure out who these

2   people are.  And then other times there is people on

3   there that you just have no idea, and you have got to

4   follow-up because otherwise it will be a surprise,

5   so...

6       Q.   Okay.  So is one of the things you would do

7   is compare the witness list that the state provides to

8   the police reports that they provided --

9       A.   Yes.

10      Q.   -- to figure out what each witness's role is

11  in the case?

12      A.   Right.

13      Q.   And then I suppose you would also compare

14  that to any other documents that were subpoenaed in

15  the case, right?

16      A.   Right.

17      Q.   Are there certain sets of documents that you

18  would typically subpoena in representing a felony

19  murder case?

20      A.   We subpoena everything possible.

21      Q.   Okay.  Whose criminal histories would you

22  typically subpoena?

23      A.   Any of the other -- any witnesses.  Witnesses

24  especially.  Any of your witnesses.  We were not

1    allowed to subpoena anything about police officers.

2    So if it was a coercion case, we were not allowed that

3    evidence.  We asked for it repeatedly.  That's back in

4    the OPS days.  They keep changing that name, too.  But

5    we were never allowed that information.

6        Q.   So but you would subpoena criminal histories

7    from witnesses you intended to call and state

8    witnesses, right?

9        A.   Right.

10       Q.   And if they -- the purpose of that was to see

11   if there was impeachment, right?

12       A.   Right.  And also you get more information

13   sometimes.  Sometimes those are useless, right?  You

14   know, you have a gang case, or you have a drug case,

15   it's not unusual for everybody to have that kind of

16   thing on their rap sheet.

17            But you might be able to see where what looks

18   like some, I don't know, some -- something else that

19   makes -- that fits into the case somehow, right?  What

20   someone has done before.

21            So there is other avenues there.  Impeachment

22   is the main reason you say you're getting it, but then

23   sometimes you can find something else to use.

24       Q.   And you would also interview -- I am sorry.

1   You would also obtain your client's criminal history,

2   right?

3       A.  Oh, of course.

4       Q.  And is that something that you would go over

5   with the client?

6       A.  Yeah, for sure.

7       Q.  Okay.  Is the witness list something you

8   would go over with your client?

9       A.  Oh, yeah.  Oh, yes.

10      Q.  And what would the purpose be there?

11      A.  In case there is something you don't know.

12  Plus, the client needs to know what's really going on.

13  They may not be able to absorb it, but it's easier to

14  be able to say, remember when I told you this person

15  was on this list?  And they might say something like

16  this, you know, because you have gotten something out

17  of a police report or whatever.  So, yes, you would.

18      Q.  Would you -- was it your custom and practice

19  to also ask the client whether or not the witnesses on

20  the state's list could provide helpful testimony --

21      A.  Yes.

22      Q.  -- to your case?

23      A.  Yes.

24      Q.  And then if so, what it was, right?

1    A.  Right.

2    Q.  And then you as the defense team has to also

3  disclose witnesses before trial, right?

4    A.  Correct.

5    Q.  And those are witnesses you may call, right?

6    A.  Right.

7    Q.  Is that also something you would go over with

8  your client?

9    A.  Yeah.  Yeah, for sure.  Just in case.

10    Q.  Right.  And you would ask your client whether

11  the witnesses that you were going to disclose could

12  provide good and/or whether or not they could be a

13  liability, right?

14    A.  Correct.

15    Q.  And by a liability, we mean what?

16    A.  They might say something that your defense

17  counsel is not expecting but you know, or you might

18  have some bad blood with each other.

19        So that also can be used for impeachment in

20  addition to knowing that you might have some surprises

21  on the witness stand.

22    Q.  Okay.  So you would ask the client if that --

23  a particular witness was, you know, potentially going

24  to be asked questions that could be incriminating,

1    right?

2        A.   Incriminating could hurt you.

3        Q.   Right.  Okay.  And those are witnesses that

4    you would leave off?

5            So there might be a witness who has a piece

6    of helpful information, but the liability is so great

7    you just leave them off the list?

8        A.   Could happen.

9        Q.   And that's something you do in consultation

10   with the client, right?

11       A.   Correct.

12       Q.   So you would ask your client what their

13   relationship was with -- what their relationship is or

14   how they know the witnesses, if they do at all?

15       A.   Right.

16       Q.   And then in terms of witnesses that were

17   called at evidentiary hearings, was it your practice

18   to interview them before you called them if they would

19   agree to interview?

20       A.   If we could.  It was frowned on.

21       Q.   How so?

22       A.   Evidentiary witnesses that were not the

23   state.  They would call the state.  We would go out

24   and ask the investigators to talk to them about what

1    they saw, or what they're saying; and they would call

2    the state, and the state would tell the judge, we're

3    not allowed to talk, or would tell them, don't talk to

4    them.

5         So it was frowned on big time, and we had a

6    really hard time getting evidentiary witnesses to talk

7    to us most of the time.

8    Q.   The state's witnesses, though, right?

9    A.   Yes.  Our own would talk to us once they

10   understood that they weren't getting in trouble and

11   that we were not there to do something to them.

12   Q.   Okay.  Because the witness always has the

13   option to talk to the state or the defense, right?

14   A.   Or neither.

15   Q.   Correct.  Not correct, but --

16   A.   Maybe not.  Maybe not with the state.  The

17   state can force in a way that --

18   Q.   Well, the state can force with a subpoena,

19   right?

20   A.   (Nodding.)

21   Q.   So when they go to court, they have to

22   testify.  But before that they don't --

23   A.   Right.

24   Q.   -- have to talk to anybody, right?

1    A.   That's correct.

2    Q.   Okay.  So now is it fair to say then that any

3   witness on the defense list would be someone that you

4   had interviewed beforehand?

5    A.   Yes.

6    Q.   Okay.  And when you're interviewing witnesses

7   beforehand, you and Mr. Carey are doing a thorough job

8   of interviewing them and identifying what possible

9   information they have that could be helpful to your

10   client, right?

11    A.   So in a typical case because we're still

12   talking typical case.

13    Q.   Yes.  I am sorry.  I did kind of segue, and I

14   apologize.

15    A.   Yeah, you did.  And so I have to --

16    Q.   I added Mr. Carey.  So you want me to reask

17   it?

18    A.   Yes, please.

19    Q.   Okay.  Because I hate when people do that.

20   It's not really fair.

21        So, typically, when you're interviewing a

22   defense witness before they take the stand, you're

23   trying to find out everything they know about anything

24   that could be helpful to your case, right?

1       A.   Or harmful.

2       Q.   And/or harmful, right?

3       A.   Yes.

4       Q.   Okay.  And if they have anything helpful,

5   you're going to elicit it at the pretrial hearing or

6   the trial, right?

7       A.   Yes.

8       Q.   All right.  I want to ask you briefly about

9   the posttrial process and the presentence

10  investigation report.

11      A.   Okay.

12       Q.   What is the point of the section in the

13  presentence investigative report about support --

14  financial support.

15          You know, there is a part -- you know what

16  I'm talking about?

17      A.   I do.

18       Q.   What's the point of that?

19       A.   I can't say why they originally put it in

20  there.  But support both from a standpoint of how one

21  supports oneself, and who they have to support, and do

22  they work, and do people around them work?  Are they

23  supportive?

24          Okay.  Because it takes many forms, right --

1      Q.  Right.

2      A.  -- about support.

3          People who have people who will support them,

4   by that I don't necessarily mean money, but it could

5   mean money or just people who are there for them, can

6   make a difference about people's success on the

7   street.

8      Q.  Let's talk about financial support.

9      A.  Okay.

10     Q.  What's the purpose of that section in the

11  presentence investigation?

12     A.  If you don't have any income, and you don't

13  have anybody who can help you by feeding you or

14  putting a roof over your head, you either need to find

15  a job and support -- if you have a probation officer,

16  for instance, then they're supposed to send you in

17  avenues.  They're supposed to help.

18     Q.  We're talking presentence?

19     A.  Right.

20     Q.  Okay.

21     A.  But the sentencing --

22     Q.  Okay.

23     A.  So they -- let's say the state is looking at

24  the sentencing, and it says, they have no income, and

1    they have no one to help them.  There is no wife who

2    is working.  There is no mother, father who is

3    working.  Maybe, you know, whatever.

4         And so that focuses badly on the defendant,

5    sadly enough, because who is more likely to go out and

6    commit a crime like theft or robbery than someone who

7    doesn't have something?  We all know about that.

8    Q.  Right.

9    A.  I mean, it does exist, and it's also a --

10   okay.  So can this person pay if it's a fine?  There

11   are those.  And there are people who would be stuck

12   with court fines that they couldn't pay, and then they

13   would be in violation.  So there is all kinds of

14   pieces around it.

15   Q.  Uh-huh.  Sure.

16   A.  And while I would like to say that it wasn't

17   really relevant to a sentencing, it was --

18   Q.  Okay.

19   A.  -- in many ways.

20   Q.  Sure.  Is the presentence investigation

21   report something that typically you would go over with

22   your client to make sure that there were no errors?

23   A.  Yes.  Yes.

24   Q.  And if there were material errors, that's

1    something you would point out to the Court at

2    sentencing?

3        A.  Yes.  Or try.

4        Q.   In aggravation and mitigate -- in

5    aggravation, the state puts on witnesses to enhance

6    the sentence, right?

7        A.   Right.

8        Q.   And do you get -- does the defense get

9    advanced notice of the state aggravation witnesses?

10       A.   Not usually.  At least not back then.

11       Q.   Okay.  Were you involved in the Rios case

12   after the jury verdict?

13       A.   I don't think so.

14       Q.   Okay.

15       A.   I don't think I was.

16       Q.   Do you have any recollection of being

17   involved in the Rios case after the jury verdict?

18       A.   No.

19       Q.   Okay.  So let us talk about your

20   representation of Mr. Rios.

21           Did you represent him in his appeal?

22       A.   No.

23       Q.   Did you ever handle criminal appeals?

24       A.   No.

1    Q.   And I think I saw from some of your

2    correspondence that you do remember Jaime Rios, and

3    you remember his girlfriend, Diana Rodriguez, right?

4    A.   Right.

5    Q.   I think we talked at one point, and you

6    remember that Mr. Rios was short, and his girlfriend

7    was even shorter?

8    A.   Yes.

9    Q.   Or did I flip that?

10   A.   They were both short.  And Diana had a

11   beautiful face.  Isn't that interesting that that's

12   what I remember?  I just remember that she was this

13   cute, little thing.

14   Q.   Why don't you tell me what you -- well, maybe

15   we should talk about the documents first.

16        You got two -- you didn't take any documents

17   relating to Mr. Rios's representation -- your

18   representation of Mr. Rios with you when you left the

19   public defender's office, right?

20   A.   Correct.

21   Q.   So was the next time that you talked to

22   anyone about the Rios case when Mr. Richards called

23   you?

24   A.   Yes.

1    Q.  And that was how many years after the trial

2  in 1990?

3    A.  Well, trial was in 1990.  And I think I

4  talked to Mr. Richards last year around -- and the

5  only reason I think that it was April of last year is,

6  I think, that was one of the Dropbox dates.

7    Q.  Okay.

8    A.  So I think it was around then.

9    Q.  So it had been, I'm going to say, 22 years?

10   A.  No.

11   Q.  32?

12   A.  Uh-huh.

13   Q.  Wow.  So 32 years.  You get a call from

14  Mr. Richards that you're not expecting, right?

15   A.  Right.

16   Q.  And Mr. Richards explains that he is current

17  counsel for Mr. Rios?

18   A.  Right.

19   Q.  And what else does he tell you?

20   A.  Just that it was a Guevara case, and that

21  there were things that were found out that we -- I say

22  we -- I guess, I would say Jack Carey did not know

23  during the trial.  He really didn't tell me much else.

24       He said there had been a certificate of

1  innocence found for -- given to Jaime Rios, and he

2  told me that this case had been filed, and that's

3  about it.

4        And I told him I have almost no memory of the

5  trial whatsoever, but I would try to resurrect a

6  memory.  He asked me also if I had any files, and I

7  told him, no, I didn't.

8        And the only reason I remembered it, and I

9  don't remember if this happened in the first -- I've

10  only had a couple of conversations with Stephen.  I

11  don't -- I don't know.  I might have had two, and then

12  a couple this year, but not more than that.

13        But once I understood what case it was, and

14  that's probably when I knew it was Jack Carey, who was

15  on -- who was the lead on this.  Richard and I -- my

16  husband, Richard, and I had moved into Wicker Park,

17  and we lived a few doors away from where Diana and, I

18  think, Jaime lived.  Diana for sure.  Right around the

19  corner from them, which is stunning in and of itself.

20        And so that means the shooting itself

21  happened maybe three, four blocks from our house.  So

22  that made me remember the case better, you know, in

23  the sense of who it was and the two people that I

24  remembered.

1    Q.   Okay.  So what did you take Mr. Richards'

2    comment that this was a Guevara case to mean?

3    A.   Well, I won't say he said it exactly like

4    that.

5    Q.   Sure.

6    A.   He mentioned that there were some issues

7    about whether Guevara had used force.  And, I mean, I

8    can't tell you what he said to me exactly because I

9    don't remember.

10        And, of course, we all see Guevara's name and

11   face in the paper all the time now.  I didn't

12   remember.  Someone asked me whether I had ever had a

13   Guevara case, and I said, oh, no.  So I didn't

14   remember it at all.

15   Q.   So when you were handling the Rios case with

16   Mr. Carey, you had no prior negative experience with

17   Detective Guevara, is that correct?

18   A.   Correct.

19   Q.   Did you -- when you were trying the Rios case

20   with Mr. Carey in 1990, did you have any prior

21   negative experience with Detective Mason?

22   A.   I don't think so.  Mason's name is familiar

23   to me.  But, you know, if you have one case with

24   someone, and it's -- you know, the name gets familiar,

1   and Mason is not an uncommon name, so...

2       Q.  Sure.  So you don't know whether you had any

3   contact with Detective Mason prior to 1990?

4       A.  I don't remember, yeah.

5       Q.  Okay.  And what about Detective Halverson, do

6   you remember any contact with Detective Halverson

7   prior to 1990?

8       A.  I thought I did, but to be fair, I would have

9   to say Halverson's name is very familiar to me; but it

10  could have been from this case.  I couldn't say it was

11  from something else.

12      Q.   And can you remember any specific contact

13  with Detective Halverson, Detective Guevara -- or

14  that's a bad question.

15        Do you remember any specific contact with

16  Detective Halverson since you handled the Rios case?

17      A.  Oh, no.

18      Q.   What about Detective Mason, do you know

19  anything about him since you handled the Rios case?

20      A.  No.

21      Q.  Okay.  Now, I think you said Mr. Richards

22  said in this conversation in April of '22, and I would

23  imagine there were a couple.  You said there were a

24  couple conversations in April of '22, and maybe you

1    can't distinguish one from another, right?

2      A.   Right.  And neither were long.  I mean, they

3    were short, so...

4      Q.   Okay.  But at some point in time about a year

5    ago or more, a little bit more than a year ago, he

6    told you that there were issues about the case that

7    you handled; and you said things were found out that

8    Jack Carey did not know during the trial.

9          Did he tell you what those were back in April

10   of 2022?

11     A.   I can't say what he exactly said to me.

12   That's the problem.

13     Q.   Okay.

14     A.   And so any paraphrasing becomes not quite --

15   you know, how we all take in things to mean different

16   things when we repeat them.

17          So I am not sure.  I just understood that the

18   allegation was that Guevara had coerced some people in

19   the case.  I think that was about it.

20     Q.   Okay.  Did he mention any other officer by

21   name other than Detective Guevara?

22     A.   I can't say.  I don't know.  I don't

23   remember.

24     Q.   And at some point in time did he explain his

1    purpose in calling you?  What was he looking for?

2       A.   Well, he explained to me that, you know, I

3    was the only person standing, and so he was calling on

4    me because there was this case pending; and at the

5    time that's all he said, basically.  I said, oh, and

6    my friend Jack had to go and die, you know.

7       Q.   Calling on you to do what?

8       A.   For any assistance that might be needed here.

9       Q.   Did he tell you specifically what he was

10   looking for?

11      A.   He said he -- I said -- he said he would like

12   an affidavit from me, and I -- again, I mean, I will

13   tell you, I told him repeatedly, I didn't remember

14   much.  But I said, if you will draft it, I will take a

15   look at it.

16      Q.   Okay.  And was that in August?

17      A.   I'm not sure.

18      Q.   Or April?

19      MS. GOLDEN:  All right.  So let's just go to the

20   exhibits.  It will be easier.  Okay.  We'll mark this

21   as 2.

22         (Whereupon, Deposition Exhibit

23          No. 2 was marked for identification.)

24      MS. GOLDEN:  Are you good?

1          And these are, Stephen, the emails back

2   and forth between you and Ms. Shields.

3    THE WITNESS:  Me.

4    MS. GOLDEN:  The Dropboxes.  That's what's in

5   here.

6    MR. RICHARDS:  Okay.  You don't have to show it to

7   me.  I'm familiar with it.

8   BY MS. GOLDEN:

9    Q.  All right.  So, actually, before we get into

10  that, you sent me an email last week with a list of

11  the materials you received, right?

12   A.  I did, yeah.

13   Q.  And there were two different Dropbox lists?

14   A.  Right.

15   Q.  Okay.  In one there was the court record, the

16  trial record, the federal complaint, a motion for

17  summary judgment, and a sixth disclosure.

18       Do you remember that?

19   A.  Yes.

20   Q.  And all those came together at one time,

21  right?

22   A.  Correct.

23   Q.  To you from -- via -- from Mr. Richards via

24  Dropbox?

1    A.  Correct.

2    Q.  And then in another Dropbox, you received the

3  deposition transcript of Cristino Garcia and Michael

4  Mason, correct?

5    A.  Correct.

6    Q.  And those came to you from Mr. Richards via

7  Dropbox, right?

8    A.  Correct.

9    Q.  Okay.  And there was also an amended motion

10  to vacate conviction that was on the list of materials

11  that you reviewed, right?

12    A.  I think that was in the first Dropbox.

13    Q.  Okay.  Do you think -- could it have come as

14  an attachment to an email from Mr. Richards?

15    A.  I don't think so.  I'm not -- but I don't

16  think so.

17    MS. GOLDEN:  Stephen, were you able to find a

18  Dropbox receipt from April of 2022?

19    MR. RICHARDS:  Um, no, I was not.  I think that

20  was done -- there is two different ways of doing

21  Dropbox.  One is by share, and the other is by -- I

22  can't remember what they call it.  It's sort of a send

23  type thing function.

24         And the send function is an email, and

1    the share function I don't think is.  But I will

2    straighten that out for you, you know, however you

3    want.  And if you need like an admission as to when

4    different things were sent, or a stipulation, I'll

5    provide that for you.

6        MS. GOLDEN:  Okay.  We'll see where we go from

7    here.

8    BY MS. GOLDEN:

9        Q.  Okay.  So the first page of Exhibit 2 -- you

10   have the originals.  Okay.  That is -- and it's an

11   email chain.

12          So the first thing that happens is on the

13   second page, which is stamped JGS Rios 00590.

14       A.  Okay.

15       Q.  And that is an email from Mr. Richards to you

16   on April 14th, and do you see on the bottom there, it

17   looks like the Final Amended 2-1401 Rios Final with

18   exhibits as an attachment?

19       A.  I do.

20       Q.  Okay.  Does that refresh your recollection

21   that you received that particular document by

22   attachment to an email from Mr. Richards as opposed to

23   a Dropbox?

24       A.  It does not, but it doesn't mean I don't have

1   it.  I went through everything, and I don't -- this

2   just doesn't --

3       Q.  Okay.  I'm going to show you what I have --

4   just disregard my notes.

5       A.  Okay.

6       Q.  And this is your email to me.

7       A.  Yeah.  With the list.

8       Q.  Right.  And do you see that this amended

9   motion to vacate is not listed as coming with either

10  of Dropbox links?

11      A.  Then I must have had it --

12      Q.  Some other way?

13      A.  -- separately.

14      Q.  Okay.  Does that refresh your recollection?

15      A.  I know I have seen the 2-1401.  I say that.

16  That's about the most I know.  I can't explain this.

17      Q.  Okay.  So we have an email here from

18  Mr. Richards to you, which appears to attach the

19  2-1401.

20      A.  Right.

21      Q.  Do you see that on April 14th at 6:30 p.m.?

22      A.  2022.

23      Q.  Right.

24      A.  Okay.

1    Q.   A year ago.  A little more than a year ago.

2         And then we have an email from you to

3    Mr. Richards on the following morning, Friday

4    April 15th at 9:18 a.m.

5    A.   Right.

6    Q.   Do you see that?

7    A.   Uh-huh.

8    Q.   And you write, I read the first paragraph and

9    remembered Jamie very well.

10        And what did you remember about Jamie, at

11   that time, if you can recall?

12    A.   So I talked to him once, I want to say, when

13   Jack wasn't there, but I can't say that for sure.

14        And I remember saying to him, what about that

15   bar on the corner across the street from you and

16   Diana?  And he said, what do you know about the bar?

17   I said, do they run drugs and guns out of there?  And

18   he looked at me, and he said, how do you know this?

19   And I said, do they?  And he said, yes.

20        I'm sitting there like, as his second defense

21   counsel, right?  He's just met me or something, and

22   I'm like questioning him.  And he says, yes.  And he

23   said, how do you know?  I said, I live three doors

24   away.  And he said, no, you can't live in that

1    neighborhood.  And I said, but I do.

2         So I then set out to get the precinct voted

3    dry, and I did, and closed that bar.  That was my joy.

4    We thought maybe it would make the neighborhood a

5    little better and safer because people were running

6    around with guns in front of our house all the time.

7    You'd hear the shooting outside, and you would go to

8    the window, and there they'd be.

9         That's why I remember him so well.  Because

10   when do you get a witness with that kind -- you know,

11   like a client who's got that kind of knowledge, and

12   you're living right there.

13   Q.   What else did you remember about Jamie at the

14   time you wrote this email?

15   A.   So I remember talking to him a little bit

16   about the case.  I couldn't tell you what he said to

17   me, but I can tell you that he didn't say anything

18   different from what I understood from Jack.

19        I never, call it, got close to or got very

20   familiar with him -- with Jamie because he was Jack's

21   client first and foremost.  And I think I came on that

22   case, I mean, just a short, short, short time before

23   the case went to trial.

24   Q.   So before when we were talking about your

1    custom and practices in defending a murder case,

2    right?

3    A.  Uh-huh.

4    Q.  Is that a yes?

5    A.  Yes.  I am sorry.

6    Q.  Those are the custom and practices of

7    reasonably well qualified public defenders at the

8    time, right?

9    A.  Yes.

10    Q.  And so to the extent, you said you -- it was

11    your custom and practice -- forget that.

12        I want to ask you back to Exhibit 2, you say

13    here, you reference Diana, too, as remembering well.

14        What did you remember about Diana at the time

15    you wrote the email?

16    A.  She was this short, little, cute thing who

17    lived with Jamie or lived with her mother.  I could

18    never tell whether Jamie actually lived in the house

19    with them or whether he lived a block over and then

20    came in and out.

21        And I know I had to go meet with her one day

22    because I was doing her direct.  I do remember that.

23    I don't remember where we did it.  I don't remember if

24    I went to her house.  I don't remember -- she sure

1   didn't come to mine, and I don't remember if she came

2   down to the courthouse.  I just don't remember.

3       Q.   But in that general sense you remember

4   preparing her to testify at trial?

5       A.   Yes.

6       Q.   Do you remember preparing any other witnesses

7   to testify at trial?

8       A.   I don't.

9       Q.   Do you remember interviewing any witnesses

10  other than -- or potential witnesses other than Diana

11  Rodriguez?

12      A.   I think I had another short witness, and I

13  don't mean in stature.  I mean, a short witness.

14      Q.   Is it a female?

15      A.   I'm not sure.

16      Q.   Was it a witness that you put on the stand?

17      A.   Yes.

18      Q.   Okay.  Okay.  So then in the third line here

19  of Exhibit 2, it says -- you say, there is more to

20  this story, but none of my remembrances extend to the

21  case itself.

22           And so there is more to the story, is that

23  what you were talking about, getting that precinct

24  dry?

1    A.  Oh, just everything.

2    Q.  Yeah.  Okay.

3    A.  Just everything.

4    Q.  And when you say none of my remembrances

5  extend to the case itself, what do you mean?

6    A.  I mean, I couldn't remember at the time.  I

7  remembered that it was a shooting, and I remembered

8  that it was a murder.  I didn't remember much of

9  anything else.

10    Q.  So -- okay.  So the memory about talking to

11  Jamie the one time, and preparing Diana Rodriguez for

12  trial, those memories came later after you reviewed

13  documents, right?

14    A.  Correct.  I did remember that I had put Diana

15  on the stand.  I thought that was the only person --

16  the only piece I did in the trial.

17    Q.  And since then you've come to find out that

18  that's not right?

19    A.  And two small other little pieces, but...

20    Q.  And then it says -- you say, it had to be a

21  jury trial because that was the one chance we had to

22  get a not guilty.

23        Can you tell me what you mean by that?

24    A.  With the statement.  Statement cases are

1   hard.  I don't care what evidence you have.  So with

2   the statement, his statement, and then I think there

3   was the one I did, and then there was the whole gun

4   thing.  There was nothing other than Jamie saying that

5   he had been coerced into making the statement.  None

6   of the substance that exists today, the stuff that's

7   being worked with, was present.

8     Q.  Okay.  And you say, um, sorry I do not

9   remember more about what you need.

10        What do you remember about what he needed?

11        Because then you go on and wish him luck.  So

12   it sounds like you don't think you can be helpful.

13    A.  So when I say it had to be a jury trial

14   because that was the one chance.  So Karnezis was a --

15   frequently a guilty.

16    Q.  Okay.

17    A.  You could just about bet on it.  And the case

18   didn't have many places to go, right, with what was

19   coming in.

20        And I think when Stephen called me, he was

21   just looking for information for what I remembered.

22   And that's pretty much what he asked, what do you

23   remember?

24    Q.  And you didn't remember much?

1    A.  No.  And I said I would keep trying in my own

2  head, but I didn't.

3    Q.  So aside from the -- do you remember -- I am

4  sorry.

5        The very first paragraph, it says, I read the

6  first paragraph, and I remembered Jamie very well.

7        The first paragraph of what?

8    A.  Well, I am assuming, now that you say this,

9  that it's the 2-1401 because it's the day before.

10   Q.  Right.  Okay.  All right.  So if we go to the

11  next page in the exhibit, it should be JGS Rios 591,

12  and this is an email exchange that goes all the --

13  591, 592, 593, and then 604, 605, and 606 right after

14  it.

15       And I didn't get things all in the -- at the

16  same time or in the right order.  So that's why those

17  Bates numbers jump around a little bit.

18   A.  Okay.

19   Q.  And so if you go to the page JGS Rios 593,

20  this is the next communication that was produced to

21  me, which is an email from Mr. Richards to you that

22  appears to have an affidavit attached to it.

23   A.  Right.

24   Q.  And that email is dated April 21, '23 at 4:20

1   a.m.

2        Do you see that?

3   A.  Yes.

4   Q.  And then attached to it, I believe, is what

5   will be marked -- what follows JGS Rios 604 to 606.

6        And this affidavit, you'll notice in

7   paragraph 1, has a blank.  The date that you were

8   licensed is not filled in.

9   A.  Right.

10   Q.  Okay.  So do you remember he sent you a draft

11   affidavit, and then you supplied him with some

12   information and some corrections, and then he sent you

13   back a revised affidavit that you signed?  Is that how

14   that went?

15   A.  Yes.

16   Q.  Okay.  So this, since the date is blank,

17   appears to be the draft affidavit that you were first

18   provided, right?

19   A.  Correct.

20   Q.  And this was provided to you in April of

21   2023?

22   A.  Correct.

23   Q.  And had -- did you have a conversation with

24   Mr. Richards before he provided you with this draft

1  affidavit?

2      A.  Only to the degree that I said before, he

3  asked me if I would do an affidavit or some kind of

4  document.  And I said, draft it up because I don't

5  know where I fit in when I don't remember these

6  things, so...

7      Q.  But back in April of 2022 -- this is August

8  now of 2022.

9      A.  Uh-huh.

10     Q.  I am sorry.  My apologies.  This is April of

11  2023.

12     A.  Right.

13     Q.  The previous email exchange was in April of

14  '22, and I don't see a draft affidavit.

15     A.  Back in the day?

16     Q.  Right.  Back in April of 2022.

17     A.  I don't think there was one.

18     Q.  Okay.  That was my question.  So then is

19  there a phone call -- so he calls you again.  He

20  says -- does he send you more documents and say, you

21  know, maybe this will help you remember the case?

22         What happens in April or the -- what, if

23  anything, do you remember that precedes this April 21,

24  2023 email when he's providing you all of a sudden

1    with a draft affidavit?

2        A.   I don't recall a call at all.  I do remember

3    there was a long period in there where we had no

4    contact.

5        Q.   Okay.

6        A.   As I mentioned earlier, we had very, very,

7    very little telephone contact.

8        Q.   Uh-huh.

9        A.   Mostly it was sending me this stuff.  And, as

10   you can see, it wasn't a whole lot.  And I -- so I

11   don't think there was anything that happened between

12   April 2022 and April of 2023.  It's right about a

13   year.

14       Q.   Okay.  Okay.  So if we go and look at JGS

15   Rios 592.

16       A.   Okay.

17       Q.   And this is your email to Mr. Richards with

18   the suggested modifications to the affidavit -- the

19   draft affidavit he sent to you.

20            Do you see that?

21       A.   Yes.

22       Q.   And you say here, initially I went over

23   everything.  It was a bit much and did not really need

24   to read every word.

1        Okay.  So do you know what documents you're

2   referring to there when you say, I went over

3   everything?

4      A.  I am assuming that I got something.  I think,

5   isn't the first Dropbox April 2023?

6      Q.  I was just going to look for that.

7      A.  I think maybe that's it, and that was the one

8   with the five documents in it.

9      Q.  April 21st, 2023.

10     A.  I think.

11     Q.  I'm not sure it's in this pack.

12     A.  Yeah.  609.

13     Q.  Do you have it in the pack?  So on April --

14     A.  And 610.

15     Q.  Okay.  So the documents that you're referring

16   to in your email of April 21st that you've reviewed

17   now came to you on April 21st at 10:00 a.m.-ish, is

18   that right?

19     A.  I'm not sure.  Where am I?  Where is the

20   10:00 a.m.?

21     Q.  So I am going to just -- do you have it?

22        Let's go off the record for a quick second.

23        THE VIDEOGRAPHER:  We're going off the video

24   record at 1:24 p.m.

1              (Off the record.)

2        MS. GOLDEN:  All right.  We'll mark these.

3        MR. RICHARDS:  Might I suggest a 5-minute bathroom

4    break, which I am needing, and maybe that time could

5    be used to make sure you got the documents in the

6    order you want them?

7        MS. GOLDEN:  Um.  You know, my policy is if anyone

8    needs a bathroom break, we take a bathroom break.  I

9    am ready to go, though.  So it's up to you.

10       THE WITNESS:  5 minutes would be fabulous.

11       MR. RICHARDS:  It can be 5-minute or less.  Okay.

12             (A break was taken.)

13       THE VIDEOGRAPHER:  This is the beginning of media

14   unit three.  We're going back on the video record at

15   1:55 p.m.

16         (Whereupon, Deposition Exhibit No. 3

17          was marked for identification.)

18   BY MS. GOLDEN:

19     Q.   Okay.  I -- you have in front of you what we

20   marked as Exhibit 3, which I will tell you are the two

21   emails you forwarded me from Dropbox, and the two that

22   Mr. Richards forwarded to me from Dropbox.

23     A.   Okay.

24     Q.   And you'll see the first one, if you go look

1   at the bottom of the first page there, is an email

2   from -- that you sent to me, but it was you're

3   forwarding a Dropbox link that Mr. Richards shared

4   with you on April 21st, 2023 at 9:57 a.m.

5        Do you see that?

6   A.  I do.

7   Q.  Okay.  And you said you've gotten --

8   THE VIDEOGRAPHER:  Sorry, counsel.  Adjust your

9   mic.

10  MS. GOLDEN:  Oh, yeah.  Sorry about that.

11  BY MS. GOLDEN:

12  Q.  You've said you have gotten two Dropbox links

13  from Mr. Richards, right?

14  A.  Right.

15  Q.  And then page 2 of the Exhibit 3 is a Dropbox

16  link that you received on August 22, 2023 at 5:46 a.m.

17  from Mr. Richards relating to the Rios case.

18       Do you see that?

19  A.  Yes.

20  Q.  So the first link it appears was sent to you

21  in April of '23 -- 2023, and the second in August of

22  2023?

23  A.  Correct.

24  Q.  Okay.  And do you remember, based on the

1  email you had sent to me, what documents of the two

2  Dropbox links came to you first?

3      A.  The one at the top, okay, which says court

4  record, trial record, federal complaint amended,

5  motion for summary judgment, and plaintiff's sixth

6  disclosure.

7      Q.  So those were the materials that came to you

8  in the first Dropbox link?

9      A.  Yes.

10     Q.  And the Garcia deposition and the Mason

11  deposition are documents that came to you in the

12  second Dropbox link, right?

13     A.  Correct.

14     Q.  So now I think you were on the emails that

15  Mr. Richards forwarded to me which are pages 3 and 4

16  of Exhibit 3, and this shows a download by you on

17  August 24th, 2023 at 4:44 p.m.

18         And then on the next page there is another

19  download by you on the same day, August 24th, 2023, an

20  hour later at 5:51 p.m.

21         Do you see that?

22     A.  I do.

23     Q.  Okay.  I don't have anything from

24  Mr. Richards showing that you downloaded that first

1   set of materials or downloaded anything at any other

2   time than on August 24th, 2023.

3       A.  So I didn't.  Now I have -- like now I can go

4   right in, but I hate Dropbox.

5       Q.  Okay.

6       A.  I got rid of my Dropbox.  I had to get it

7   like kind of resurrected, find my -- you know, all the

8   ways to get into it.  I hate Dropbox.

9           So I didn't look at these things when I first

10  got them.  So this -- I was having trouble in my

11  Dropbox.  And so it's a couple of days later.  But if

12  you noticed, let's see, on the one it's got the two

13  views or two downloads, and the other one is five, and

14  that's those distinguishing characteristics of the

15  ones I said.

16      Q.  Let me grab --

17      A.  Which ones?

18      Q.  No.  I got it.

19      A.  Okay.

20      Q.  So we can share this.  So it's fair to say

21  that both of the records of downloads are on

22  August 24th, right, of 2023?

23      A.  Yes.  When I actually opened them up and

24  downloaded them.

1    Q.   So both Dropbox links were opened by you for

2    the first time in August of 2023?

3    A.   I -- I believe so, but I know for sure the

4    two.

5    Q.   For sure the depositions, right?

6    A.   Right.

7    Q.   Because they weren't even taken before.

8    A.   So, I believe, yeah.

9    Q.   You opened both Dropbox links within a short

10   period of time of each other, right?

11   A.   I did.

12   Q.   Okay.

13   A.   That doesn't mean it was the very first time

14   on the five which came in -- when did we figure out

15   they came in?

16   Q.   Well, we know the link was sent to you on

17   April 21st, '23, but we don't have any record of when

18   you opened it -- when you opened that link.

19        And I am trying to figure out if you opened

20   it on August 24th, 2023 or some other time?

21   A.   I don't know.

22   Q.   Okay.

23   A.   The only thing I can tell you is that I

24   didn't read much before getting near to this date.

1    Q.   Okay.  Okay.  All right.  So let's go back to

2   Exhibit 2.

3    A.   Which is the long one, right?

4    Q.   They should be marked.  Are they not?

5    A.   It is.

6    Q.   Do you want to maybe clip them, so you -- and

7   then we were looking at your April 21st, 2023 email

8   where you're proposing changes to the affidavit?

9    A.   Right.

10    Q.   Okay.  And if you flip to the next page, I

11   think -- no.  Do you have a page that looks like this?

12   (Indicating.)

13    A.   (Indicating.)

14    Q.   Yeah.  Keep going.

15    A.   Here.  There.  Okay.

16    Q.   So in April you received a draft affidavit

17   from Mr. Richards at 4:20 in the morning on

18   April 21st.  And then you respond to him the same day

19   at 1:38 p.m. with proposed changes to the affidavits.

20        Do you see that?

21    A.   Yes.

22    Q.   And then he responds to you about an hour and

23   a half later saying that your suggestions make sense.

24   He talks about getting summary judgment.  And then you

1  guys have a -- he makes a comment about judge's

2  statements -- I am sorry, Judge Karnezis?

3    A.  I did, right.

4    Q.  He did?

5    A.  Oh, okay.

6    Q.  And then you respond shortly thereafter about

7  a comment about Judge Karnezis, right?

8    A.  Right.

9    Q.  And you ask him to put the affidavit in

10  proper form, and send it to you?

11    A.  Right.

12    Q.  Okay.  And then we move to this page.  It

13  looks like this.  (Indicating.)

14    A.  The blocked out one?

15    Q.  Yeah.  It might be the first one.  Here, this

16  one.  (Indicating.)  These should be in order now.

17    A.  Okay.  Should be.

18    Q.  Then on April 23rd, 2023, shortly after

19  midnight, I am sorry -- go to the next page.

20    A.  Okay.

21    Q.  That on April 23rd, 2023 shortly after

22  midnight he sends you the draft affidavit, right?

23    A.  Okay.

24    Q.  Do you remember that he made your changes?

1    A.   Yeah.

2    Q.   Did you check to make sure he made your

3    changes?  I'm not asking if he did.  I'm asking if you

4    checked before you signed the affidavit to see if he

5    made your changes?

6    A.   I think I perused it, and when I -- I thought

7    that my -- the fact that I had -- yeah.  So when I saw

8    that since 1980 was on the first line, I assumed my

9    changes were made.

10   Q.   Okay.  And surely you read the affidavit

11   before you signed it?

12   A.   Sure.

13   Q.   I mean, did you?

14   A.   I don't know.  I probably did.

15   Q.   Okay.  You signed it, and sent it back to

16   him, right?

17   A.   Yes.

18   Q.   Do you remember what documents you had

19   reviewed at the time you executed the affidavit?

20        I'm just asking for your memory right now.

21   A.   Yeah.  Right now I cannot tell you.  I do not

22   remember.  I looked at something.

23   Q.   Okay.

24   A.   But I don't know what.

1      MS. GOLDEN:  I'm going to show you what we'll mark

2   as Exhibit 4, which is the Amended Motion to Vacate

3   Conviction under 735 ILCS 5/2-14.01.

4            And, you guys, it's in your pile

5   somewhere.

6      MR. SCHALKA:  Yeah.

7       (Whereupon, Deposition Exhibit

8         No. 4 was marked for identification.)

9   BY MS. GOLDEN:

10     Q.   Do you recognize this document?

11     A.   I do.

12     Q.   And does this look like the document that you

13   had reviewed before you executed the affidavit?

14     A.   I can't say.

15     Q.   Attached to the document, if you go towards

16   the back of it --

17     A.   Yes.

18     Q.   -- the very final pages of Exhibit 4, there

19   are three affidavits.  There is an affidavit of

20   Benjamin Carrero, Luis Huertas, and Cristino Garcia.

21          Do you see those affidavits?

22     A.   I do.

23     Q.   And do those look familiar?

24     A.   They do.

1    Q.   Does this refresh your recollection that this

2  is the document that you had in hand when you executed

3  the affidavit?

4    A.   I remember the amended motion.  I have

5  recently read all the following documents.

6    Q.  Okay.

7    A.  I can't tell you when I did it, though.  And

8  I didn't keep track.  I just didn't.

9    Q.  Uh-huh.  So if we go back to Exhibit 2.

10   A.  Okay.

11   Q.  Do you have a page like this?  (Indicating.)

12   A.  No.  Is that --

13   Q.  I think yours are all out of order now.  So I

14  just need to --

15   A.  Correct them.

16   Q.  Well, I just don't know how to direct you

17  to --

18   A.  Show me the page.  What does it looks like?

19   THE REPORTER:  There are some more on that side.

20   MS. GOLDEN:  It's JGS Rios 594.  So it's taken out

21  of this order.

22   MR. RICHARDS:  Do we have another copy?

23  BY MS. GOLDEN:

24   Q.  I have another copy I can give you that's in

1    order.

2         Here, why don't you look at this.  This is

3    another set.  Maybe keep it in order.

4         Okay.  So if you look at JGS Rios 594 through

5    597, this is an email sent from you to Mr. Richards

6    regarding statement, and it's sent April 23rd, 2023 at

7    7:00 a.m.

8         And attached to it is the executed affidavit,

9    right?

10   A.  Correct.

11   Q.  Okay.  And that's your signature on the last

12   page?

13   A.  Yes, it is.

14   Q.  Okay.  So you sent your executed affidavit to

15   him on April 23rd at 7:00 o'clock in the morning?

16   A.  Correct.

17   Q.  Okay.  Do you -- and correct me if I'm wrong,

18   but as you sit here today, you can't tell me which

19   of -- well, we know you didn't have the depositions

20   when you executed the Dropbox -- I am sorry, when you

21   executed the affidavit in April of 2023, right?

22   A.  Right.

23   Q.  And you -- can you say whether or not you had

24   the amended motion to vacate at that time, and whether

1   you had reviewed it?  It's Exhibit 4.

2       A.  I can't say one way or the other.

3       Q.   And can you say one way or the other whether

4   or not you had opened the Dropbox link containing the

5   court records, the trial record, the complaint, and

6   the summary judgment, and the disclosures when you --

7   at the time you had -- at the time you executed the

8   affidavit in April of 2023?

9       A.  I can't be for sure, but I don't believe I

10  had.

11      Q.   Okay.  And we know for sure you didn't have

12  either of the depositions when you executed the

13  affidavit, right?

14      A.   Correct.

15      Q.   Okay.  And then -- and then I called you,

16  right?

17      A.   Right.

18      Q.   And I told you that we were going to ask you

19  to give a deposition in the case, and sent you the

20  subpoena, right?

21      A.   Right.

22      Q.   And you then sent that to Mr. Richards?

23      A.   I did.

24      Q.   And why did you do that?

1      A.   Because I figured he had a right to know.

2      Q.   Okay.  But you didn't send me any of his

3   correspondence, right?

4      A.   I didn't know you.  I didn't have anything

5   before me, you know.  I didn't know you existed.

6   Sorry.

7      Q.   But you understood that Mr. Rios was a party

8   in a civil case, right, and there were defendants?

9      A.   Yeah.

10      Q.   Okay.

11      A.   And I had signed this affidavit.

12      Q.    And what was your understanding what he was

13   going to do with the affidavit?

14      A.   I assumed he would attach it to something.

15      Q.   Did you know he was going -- Mr. Rios was

16   going to use it in his civil case?

17      A.   I assumed.

18      Q.    And the affidavit itself, is that something

19   that you did the initial draft, or Mr. Richards did?

20      A.   Mr. Richards.

21      Q.   Okay.  So the words were chosen originally by

22   him?

23      A.   Yes.

24      Q.   And then modified slightly by you?

1    A.   Only slightly.

2    Q.   Okay.  And I think you told me about the

3    substance of the conversations you had with

4    Mr. Richards in -- originally in April of 2022, and

5    then there was this long period of time?

6    A.   Right.

7    Q.   And then the case resurfaced in your mind,

8    right?

9    A.   Correct.

10   Q.   Do you remember anything else that was

11   discussed with Mr. Richards in any subsequent phone

12   call that we haven't already talked about?

13   A.   No.

14   Q.   Okay.  I think when we talked back in June of

15   this year, you told me that -- excuse me.  I think you

16   told us before in today's deposition that when you --

17   at some point in time when you talked to Mr. Richards,

18   he told you that Mr. Rios had a COI, right?

19   A.   Had a --

20   Q.   COI, certificate of innocence?

21   A.   Yes.

22   Q.   And then, I think, when we talked in June of

23   this year, you told me you were happy about that,

24   right?

1    A.  Yes.

2    Q.  Okay.  And we've talked a little bit about

3  your recollection of your representation of Mr. Rios.

4    A.  Yes.

5    Q.  All right.  Let's do you a favor and put --

6    A.  Things back together.

7    Q.  Right.

8    A.  I sort of did.

9    Q.  It's got a tab on it.  Let's leave it to one

10  stack.  I think I gave you these.  We'll leave all

11  these --

12    A.  That was a repeat.

13    Q.  Yeah.  Okay.  Good.  Let's get these out of

14  your way.  Very good.

15        Okay.  I think you told me you recalled one

16  meeting with Mr. Rios, and you guys talked about

17  running of guns and drugs outside of the bar in your

18  neighborhood?

19    A.  Yes.

20    Q.  Do you recall any -- do you have any specific

21  recollection of any other conversation with Mr. Rios?

22    A.  Not on my own.  Jack Carey pretty much had

23  all of the -- was the lead, and he always -- he talked

24  to Jamie, and he decided how the case was going to go.

1        I think I had -- I had wanted to talk to

2   Jamie to introduce myself because I was going to be

3   sitting at the table with him.  And so we had a

4   conversation, and that was about it.

5      Q.  The conversation, do you remember what he

6   said to you?

7      A.  I just remember that he repeated to me that

8   he hadn't done it, and he told me the story of how

9   there had been a car, and somebody had shot out of it,

10  or yelled or something.  But I don't remember it.

11     Q.  Do you remember him telling you that when he

12  was shot at outside his house, it happened on a day

13  other than the murder?

14     A.  I don't remember one way or the other.

15     Q.  Okay.  But do you remember that somehow a

16  shooting aimed at him or in his direction was

17  important to the case?

18     A.  At this point, I don't.

19     Q.  Okay.

20     A.  Other than having read a little bit of the

21  transcript and what was said and, you know, that kind

22  of thing.

23     Q.  Okay.

24     A.  But other than that, I do not.

1    Q.   Okay.  Do you remember what's the first thing

2  you did in connection with his defense, or was it

3  literally preparing for trial and sitting down at the

4  defense table?

5    A.   I remember nothing about the very beginning.

6  I went through the court record to look for nothing

7  but when did I show up.

8    Q.   Okay.

9    A.   And the first thing I saw is like earlier

10  that month of the trial or something like that.  It

11  was very close.

12    Q.   Close in time to the trial?

13    A.   Yeah.

14    Q.   Do you remember preparing for trial?  Do you

15  remember what you did to prepare for trial?

16    A.   No.

17    Q.   Do you remember any of the witnesses as they

18  took the stand during trial?

19    A.   No.

20    Q.   Do you remember the verdict coming back?

21    A.   Yes and no.  I don't remember, as I sit here,

22  looking at a jury and listening to the, you know, is

23  this now, you know, your verdict.  But you always

24  remember that it came in.

1    Q.   Sure.  Do you remember anything about any

2  particular juror?

3    A.   No.

4    Q.   Do you remember anything about the way any of

5  the witnesses testified?

6    A.   That stands out?

7    Q.   Or at all?

8    A.   No.

9    Q.   Have you had any contact with Mr. Rios since

10  his conviction?

11    A.   No.

12    Q.   Anyone contacted you about his case from the

13  time that he was convicted until the time Mr. Richards

14  contacted you in 2022, right?

15    A.   Correct.

16    Q.   Okay.  So let us talk about preparing for

17  this deposition.

18    A.   Okay.

19    Q.   So we -- we know you opened -- you opened the

20  two Dropbox links, right?

21    A.   Right.

22    Q.   And how would you describe your review of the

23  volume of materials that were contained in those

24  links?

1    A.  I started going through one.  Then I went

2  through the other.  And some of it I read.  Some of it

3  I went on through.

4       I will say that I spent a lot of time

5  reviewing it, but I wasn't completely thorough.  There

6  was a lot of information.  And, admittedly, I didn't

7  open it when I got it, and so I didn't have as much

8  time left to do that.

9    Q.  Okay.  And by not opening it when you got it,

10  you mean the first Dropbox link, right?

11    A.  Right.

12    Q.  Because the second one you got and opened

13  closer in time to receiving it?

14    A.  Right.  It was very much closer.

15    Q.  Yeah.  Okay.  So how much time would you say

16  you spent reviewing the materials in the Dropbox link

17  in preparation for the deposition today?

18    A.  Good Lord.  Maybe 20 hours.  I don't know.

19  Really, that's a shot in -- you know, out there.

20  Trying to think about how many days I went through it,

21  but I couldn't do it all at every moment.  It was just

22  impossible.

23       I tried to get through and make sure that I

24  saw enough so that I could kind of be familiarized.

1  What I was really looking for was things that would

2  increase the memory of this case, and I didn't find a

3  lot of that for myself, as I think you probably

4  noticed it.

5      Q.   Right.  So I think in terms of your memories

6  of the case, you've told us that you remember talking

7  to Rios the one time when we talked about the running

8  of guns out of the bar?

9      A.   Right.

10     Q.   And you remember introducing yourself to him

11 in court somewhere?  Was it in court?

12     A.   Um, I don't know if it was in court, or if I

13 went over to the jail.

14     Q.   You remember an introductory meeting?

15     A.   Right.

16     Q.   And then you remembered preparing Diana for

17 trial?

18     A.   I do.

19     Q.   Did your review of the materials as you

20 prepared for this deposition cause you to remember

21 anything else?

22     A.   Not much.  You know, little things like a

23 name without really knowing -- you know, like trying

24 to put the name in the right place.

1    Q.   Some of the names were familiar to you?

2    A.   They were familiar, but I --

3    Q.   In terms of what you did for Mr. Rios and how

4  you represented him, did that -- did the review of

5  those documents cause you to remember any of that?

6    A.   Of what I did?

7    Q.   Correct.

8    A.   So I read the transcript of Diana's

9  testimony, and that was all very familiar.  When I say

10  familiar, I don't have it memorized.  I just read the

11  words and what she had said.  I saw that I had done

12  the cross on the gunshot or the gun.

13    Q.   Ballistics?

14    A.   Yeah.  Ballistic guy, Kanacki, something like

15  that.  And that gave me the memory that I had done it.

16    Q.   Anything else?

17    A.   Nothing stands out.  I -- no, nothing stands

18  out.

19    Q.   Okay.  Where is her pile?

20    A.   What pile?

21    MS. GOLDEN:  You may not have a pile.  Can I have

22  that?

23    MS. CARNEY:  Which one do you need?

24    MS. GOLDEN:  The common law record.  It would be

1   the smallest.

2      MS. CARNEY:  So these aren't even the same.

3      MS. GOLDEN:  Oh, here it is.  Sorry.  Mark this 5.

4         (Whereupon, Deposition Exhibit No. 5

5          was marked for identification.)

6   BY MS. GOLDEN:

7      Q.  Okay.  And I'm showing you what we've marked

8   as Deposition Exhibit No. 5, which is the common law

9   record that was in the Dropbox.  I downloaded it

10  directly from the Dropbox.  So it's not Bates stamped.

11  I guess we can't Bates stamp it.

12          And does this look like one of the documents

13  that you reviewed in preparation for the deposition?

14     A.  Yes.

15     Q.  Turning to -- it's numbered as it is a court

16  record, but it's not Bates stamped.  So if you can

17  turn to page 6.

18     A.  Okay.

19     Q.  You'll see this is the grand jury indictment

20  of Mr. Rios, right?

21     A.  Correct.

22     Q.  Do you recall reviewing any grand jury

23  testimony from any of the witnesses in the case either

24  in preparation for the deposition or in advance of

1   executing the affidavit?

2       A.  I do not.

3       Q.   Okay.  If you turn to page 10, you will see

4   an answer to discovery filed by the state on

5   September 7th, 1989 and signed by -- on page 14, or

6   not signed, but not signed, right?

7       A.   Right.

8       Q.   So but it's filed -- you see the stamp on the

9   upper right-hand corner on page 10.  So this is

10  something that was filed with the court by the people,

11  right?

12      A.   There is a Bates stamp.

13      Q.   Not a Bates stamp, a court stamp?

14      A.   Oh, just this.

15      Q.   A court stamp on page 10, first page of it.

16      A.   Got it.

17      Q.   Do you see that?

18      A.   Yes.

19      Q.   So this was filed with the court on that

20  date, right?  That's what that stamp means, clerk of

21  the court?

22      A.   I see it.  Oh, okay.  Now I see it.

23  September 7th.  Something like that.

24      Q.   1989.

1    A.  Got it.  Okay.

2    Q.  Okay.  But that means -- it gets stamped when

3  it's filed in court?

4    A.  Right, right.

5    Q.  Okay.  And so as of this date, this is the

6  document we were talking about before, the state's

7  answer to discovery where they're putting the defense

8  on notice that they may or may not call the people

9  listed in paragraph 2 as witnesses in the case?

10   A.  Right.

11   Q.  And this is the list that you or Mr. Carey

12  would have gone over with Mr. Rios and asked his input

13  on?

14   A.  Correct.

15   Q.  Okay.  Okay.  Page 15.  There is a Motion to

16  Produce Informant filed with the court by the defense,

17  signed by John Carey, and filed on December 18, 1989.

18      Do you see that?

19   A.  Yes.

20   Q.  And is this like a -- or, you know, the kind

21  of motion that was routinely filed by the defense

22  whenever there was a confidential informant?

23   A.  Yes.

24   Q.  And what was the purpose of that?

1      A.  To try to get them to produce the informant.

2  You never knew whether there really was an informant.

3      Q.  Okay.

4      A.  And they never produced.

5      Q.  Okay.  Can you remember any time when a

6  motion like this was ever successful in any of your

7  cases?

8      A.  No.

9      Q.  Now, if you -- do you remember any

10  conversation with Mr. Rios about who he thought the

11  informants were?

12      A.  No.

13      Q.  Do you remember what the defense theory was

14  in this particular case about whether or not -- about

15  who the confidential informants were?

16      A.  I don't know.

17      Q.  Do you remember whether or not you and

18  Mr. Carey considered the possibility that there

19  were -- I'm going to withdraw that.

20          I'm going to ask you to look at page 17 of

21  this Exhibit 5, and this is a second motion to produce

22  informants?

23      A.  Uh-huh.

24      Q.  Also signed only by Mr. Carey, and filed with

1   the court in December of 1989.

2        Do you see that?

3    A.  I do.

4    Q.  And this motion, if you look at page 2 of it,

5   which is marked 18, the stated purpose of identifying

6   the CIs is to potentially impeach them with gang

7   affiliation or non-affiliation.

8        Do you see that?

9    A.  Yes.

10   Q.  Paragraph 5.

11   A.  I see it.

12   Q.  Do you remember or were you ever told why

13  there was a second motion to produce informants?

14   A.  No.  And they're slightly different motions.

15   Q.  Uh-huh.

16   A.  Based on different things.

17   Q.  Uh-huh.  So these were additional purposes or

18  additional bases?

19   A.  Right.

20   Q.  It's what you're surmising, but you don't

21  remember?

22   A.  I don't remember.  Can I just read?

23   Q.  Okay.  The handwriting on page 19 -- I am

24  sorry, 17 and 20 of the motion to produce, the second

1   motion to produce informants, is that your handwriting

2   after paragraphs 2 and 3?

3       A.   No.

4       Q.   And then the last page --

5       A.   That's --

6       Q.   -- that's Mr. Carey's handwriting?

7       A.   That is.

8       Q.   Okay.  If we go to pages 25 through 28 of

9   Exhibit 5, you will see there is a motion to suppress

10  statements.

11          Do you see that?

12      A.   I do.

13      Q.   You know it might be easier for you to unclip

14  those.

15      A.   Well, I didn't want to mess 'em all up again.

16      Q.   Just use it like a book.  There you go.

17      A.   Okay.

18      Q.   And do you see -- I'll give you a minute to

19  look at it, but I think you said you looked it before,

20  right?

21      A.   Yes.

22      Q.   And this was filed by Mr. Carey on

23  January 5th, 1990.

24          Do you see that?

1    A.  I do.

2    Q.  And do you see in paragraph 2 the names Mason

3  and Halverson are crossed out?

4    A.  I see that there is a line.

5    Q.  Okay.  There is a line through the names,

6  right?

7    A.  Right.

8    Q.  Do you know why the names are crossed out?

9  Or I am sorry.  Do you know why there is a line

10  through their names?

11    A.  I do not know.

12    Q.  Do you know why paragraph 3 is crossed out?

13  Well, I guess, I should say, do you agree that

14  paragraph 3 is crossed out?

15    A.  Well, paragraph 3 looks to be crossed out.  I

16  would -- I have a suspicion, but I don't have a

17  memory.

18    Q.  Okay.  Do you know why?

19    A.  I have no idea.

20    Q.  Okay.  So on page 33 and 34 of the common law

21  record, which we've marked as Exhibit 5, we have the

22  defense answer to the People's Motion for Pretrial

23  Discovery.

24        And you see that?

1    A.  I do.

2    Q.  And it was filed in court by Mr. Carey on

3  April 12th, 1990, right?

4    A.  Correct.

5    Q.  Okay.  And in paragraph 2 there is a list of

6  some witnesses, right?

7    A.  Right.

8    Q.  And this is the defense disclosure of

9  witnesses that we talked about earlier, right?

10    A.  Correct.

11    Q.  Something that you or Mr. Carey would have

12  gone over with Mr. Rios before witnesses were

13  disclosed?

14    A.  I assume.

15    Q.  And do you have any present memory of doing

16  that with Mr. Rios?

17    A.  No.  I don't even think I was on the case

18  yet.

19    Q.  Do you have any present memory of discussing

20  that process with Mr. Carey?

21    A.  Nope.

22    Q.  Okay.  You see the first witnesses there are

23  Maria and Noria Garcia?

24    A.  Yes.

1    Q.  Do you know who they are or what role they

2  played in Mr. Rios's case?

3    A.  I believe they were neighbors.

4    Q.  Do you remember anything more than that?

5    A.  The last name Garcia.  There is someone else

6  in the case with the last name Garcia.

7    Q.  Cristino Garcia?

8    A.  Tino.

9    Q.  Tino.  Yeah.

10   A.  Okay.  So there is a relative there somehow.

11   Q.   Okay.  Would you expect that Maria and Noria

12  Garcia would have been thoroughly interviewed before

13  they were disclosed as witnesses in the case by either

14  you or Mr. Carey?

15   A.  I guess so.

16   Q.   And if they had any exculpatory evidence that

17  it would have been elicited at pretrial hearing or at

18  trial?

19   A.  At trial, yes.

20   Q.  Do you remember what role Cynthia Bayer

21  played in this case?

22      APD, do you think that means assistant public

23  defender?

24   A.  Yeah.

1    Q.  Well, that's the address, right?

2    A.  Assistant.

3    Q.  Do you remember what her role in Mr. Rios's

4   case was, or what she was expected or potentially

5   going to be called about?

6    A.  I have no idea.

7    Q.  Is there, you know, a particular public

8   defender role that would, you know, frequently make it

9   to a witness list in a criminal murder trial?

10   A.  As a prover.

11   Q.  So for --

12   A.  A witness.

13   Q.  Okay.  So in addition to using investigators

14  as provers, you could use a peer?

15   A.  Correct.

16   Q.  And is it fair to say that if she was going

17  to be called a prover, you don't remember what exactly

18  you it was you intended to call her to prove?

19   A.  Yes.  That's fair to say.

20   Q.  Okay.  I mean, and you've heard the term

21  flipper, right?

22   A.  Yes.

23   Q.  And what does that refer to?

24   A.  Someone who flips their positions, changes

1   their position.

2       Q.   And that can be from the grand jury to trial,

3   correct?

4       A.   Correct.

5       Q.   And if there was a flipper in a case, is that

6   something that you might use an assistant -- if you

7   had a flipper, if you had a witness in a case who

8   testified one way in front of the grand jury, and you

9   were told that he would testify for the defense

10  differently when you were interviewing him, you're

11  kind of locking him in with the assistant public

12  defender, a flipper, right?

13      A.   Well, trying to, yes.

14      Q.   For whatever it's worth?

15      A.   Right.

16      Q.   So now Jorge Rosa Gonzalez, do you

17  remember -- I don't know if that's a man or a woman,

18  but do you remember that person's role in Mr. Rios's

19  case?

20      A.   No.

21      Q.   And Daryl Ellis?

22      A.   Daryl was an investigator at the office.

23      Q.   And what do you remember about his

24  investigative abilities?  Was he one of the good ones

1   you were talking about?

2       A.  He was one of the good ones, yeah.

3       Q.  Could you request an investigator, or did you

4   just get who you got?

5       A.  You would maneuver it to get the best.

6       Q.  And he was a good one?

7       A.  He was a good one.

8       Q.  Do you remember what he was -- why he was

9   listed?  What was he was potentially going to be

10  called to testify about?

11      A.  I don't know, but I know that he would have

12  gone out to the scene and perhaps taken pictures, I

13  think.  I don't know, but he --

14      Q.  As you sit here today, do you remember what

15  you were going to call him to testify about?

16      A.  No idea.  None.

17      Q.  And what about Paul Brown?

18      A.  I don't know who that is.

19      Q.  Do you remember why -- and Diana Rodriguez,

20  we have talked about, was Mr. Rios's girlfriend?

21      A.  Girlfriend.

22      Q.  And mother of his child, right?

23      A.  Right.

24      Q.  And so she is definitely someone that was

1   thoroughly interviewed before she was disclosed?

2      A.   Right.

3      Q.   And Diana was cooperative, right, with the

4   defense team?

5      A.   Yes.

6      Q.   And no roadblocks from her?

7      A.   No.  That I remember.  Not that I remember.

8      Q.   Okay.  And so would you expect that when she

9   testified at trial that any exculpatory testimony she

10  had would have been elicited?

11     A.   Yes.  Assuming that Jack Carey or I knew that

12  she had that information.

13     Q.   But you would have expected to discover any

14  exculpatory evidence when you interviewed her, right?

15     A.   That's the theory.  One hopes.

16     Q.   That's the plan?

17     A.   Yeah.

18     Q.   Oh, and then on the next page, 35, we have

19  Mr. Carey again is filing on November of 1990 --

20  November 19th of 1990 another witness disclosure

21  identifying Paul Brown.  It looks like he's with

22  Holiday Inn.

23          Does that ring any bells as to his role in

24  the case?

1    A.  No.

2    Q.  Okay.  And then on page 38 and 39 we have a

3  motion to bar the use of evidence of prior conviction

4  to impeach the credibility of the defendant.

5       Do you see that?

6    A.  Yes.

7    Q.  And it was filed by -- or it looks like

8  signed by you and Mr. Carey this time on

9  November 28th, 1990.

10       Do you see that?

11    A.  I do.

12    Q.  And that's the day of jury selection, right?

13    A.  Right.

14    Q.  So we know you're in the case at least as of

15  this date?

16    A.  Right.

17    Q.  But you don't remember how much earlier you

18  joined the defense team, right.

19    A.  I do not.  But I would say not much earlier

20  just based on this.

21    Q.  Sure.  Are you talking months or days?

22    A.  I wish I knew.

23    Q.  Okay.  And so now here we have -- he had a

24  prior conviction for aggravated assault which is a

1    felony, right?

2        A.  Uh-huh.  Yes.

3        Q.   And this is a motion to limit the information

4    about that felony conviction that's presented to the

5    trial, right?

6        A.  Right.

7        Q.  Presented to the jury.

8            And if he had not been convicted of this

9    aggravated assault, and it was just a pending charge,

10   would it have been admissible?

11       A.  Should not have been.

12       Q.  Okay.

13       A.  There is a difference --

14       Q.  I get that.

15       A.  -- with the judges.

16       Q.  But the chances of it getting admitted

17   increase with --

18       A.  Conviction.

19       Q.  -- the guilty plea?

20       A.  Yes.

21       Q.  They don't decrease with a guilty plea?  They

22   don't decrease with a no plea with a pending charge?

23   The chances of a felony conviction -- I am sorry.  The

24   chances of a felony -- because there is no conviction

1    then.

2      A.   Charge.

3      Q.   Charge.  Does it matter whether or not a

4    defendant pleads guilty or goes trial in terms of

5    whether or not it's admissible in a subsequent trial?

6      A.   Whether they went to trial by jury or by

7    judge -- by bench?

8      Q.   Or by plea?

9      A.   Or by plea.

10     Q.   Right.

11     A.   No.  A conviction is a conviction is a

12   conviction.

13     Q.   Do you remember having any involvement in

14   representing Mr. Rios in connection with the

15   aggravated assault, his prior conviction?

16     A.   No.  Not at all.

17     Q.   And his pleading guilty to the aggravated

18   assault obviously did not prevent the state from

19   introducing it into evidence at the criminal trial in

20   which you represented him, right?

21     A.   Say that again.  I am sorry.

22     Q.   Pleading guilty did not prevent the state

23   from the introducing the conviction into evidence in

24   his trial?

1    A.  No.

2    Q.  I'm correct?

3    A.  You're correct.

4    Q.  Thank you.  Okay.  Page -- then we have -- we

5  have another motion in limine.  We have jury

6  instructions that we all know and love.

7        Okay.  Do you have a present recollection of

8  Diana Rodriguez taking the stand?

9    A.  Vaguely.

10    Q.  What do you remember?

11    A.  I remember -- it's funny what I remember.  I

12  remember that she had brought the baby down with her

13  in the stroller.  And, of course, witnesses were not

14  allowed in the courtroom during other testimony, but

15  she was outside pushing the baby around.

16        And I went to the judge and asked that --

17  what do we do about the baby?  Can she bring the baby

18  in?  The baby will be quiet if the baby is near her.

19    Q.  Uh-huh.

20    A.  And he said no, and he ordered one of

21  deputies to take the baby outside and push the

22  stroller around.

23    Q.  Do you remember anything about her as she

24  testified?

1    A.  I remember that she was calm, and that --

2    some people get up there, and they just act out, and

3    she did not.  She stayed calm.  She answered the

4    questions, did what she should.

5    Q.  Do you remember anything about Barbara

6    Riley's demeanor as she testified?

7    A.  Barbara is Barbara.  I mean, nothing unusual.

8    Nothing at all.  At all.

9    Q.  Was her testimony credible?

10    A.  I can't answer that.

11    Q.  Was it credible to you?

12    A.  I can't say it was, or it wasn't.  We were so

13    accustomed to state's attorneys who we liked who we

14    worked with getting up and not being completely honest

15    because they couldn't turn on the police -- the bad

16    police because then there would be all kinds of

17    ramifications.

18         And so that's why this has nothing to do with

19    this case.  It has to do with your question.  I can't

20    say whether she's credible or not credible.

21    Q.  Okay.  Do you remember her getting on the

22    stand in the Rios case and saying something you

23    thought not to be true?

24    A.  I do not remember that happening.

1    Q.   What about Ben Carrero, do you remember him

2   as he was testifying?

3    A.   No.

4    Q.   What about Detective Halverson, do you

5   remember him as he was testifying?

6    A.   I don't.

7    Q.   What about Detective Mason, do you remember

8   him as he was testifying?

9    A.   No.

10    Q.   What about Luis Huertas, do you remember him

11   as he was testifying?

12    A.   No.  To be clear, all of this is because I

13   have no memory of this trial.

14    Q.   To be clear, I am not expecting you to

15   remember.

16    A.   Oh, God.

17    Q.   Okay.  We're looking -- I think I have you on

18   page 43, or maybe not, of Exhibit 5.

19    A.   (Indicating.)

20    Q.   Okay.  Right.  And this is a pattern jury

21   instruction given in almost every criminal case,

22   right?

23    A.   Correct.  Or was.  I don't know what they

24   look like anymore.

1    Q.   And it's given over defense objection, right?

2   I am sorry.  Given without defense objection?

3    A.   Right.  I'm pretty sure.

4    Q.   Yeah.  Okay.  And then jury -- I'm sorry,

5   page 53 of Exhibit 5 we have another jury instruction,

6   and this one is IPI 3.13, which means it's a pattern

7   instruction, right?

8    A.   Right.

9    Q.   And this relates to the evidence that was

10   introduced of Mr. Rios's prior conviction for

11   aggravated assault, right?

12   A.   Right.

13   Q.   On page 54 there is a jury instruction,

14   People's Instruction No. 11, which means that it's

15   proposed by the state, right?

16   A.   Correct.

17   Q.   And it's also a pattern instruction, right?

18   A.   Correct.

19   Q.   And you remember this is an instruction given

20   in a case where there is like joint responsibility,

21   more than two offenders, right?

22   A.   Correct.

23   Q.   And in Mr. Rios's case -- in the case that --

24   in the murder charge -- in the crime that Mr. Rios was

1   charged with committing, there were two offenders; one

2   who actually shot the victim, and the other one who

3   was with him and also pointed a gun and yelled out,

4   right?

5      A.   That's what we were told.

6      Q.   Okay.  That's the case you were defending?

7      A.   Correct.

8      Q.   Okay.  And then page 55 of Exhibit 5 is

9   another jury instruction, and this is also proposed by

10   the state.

11        It's Peoples No. 12, and it comes from IPI

12   Criminal.  So it's a pattern instruction.  And this

13   relates to the issue that Tino Garcia, who purportedly

14   committed the crime with Mr. Rios, was not, in fact,

15   charged, right?

16      A.   Right.

17      Q.   And the fact that Mr. Garcia was not charged

18   or prosecuted for the murder of Luis Morales is

19   something that obviously you and Mr. Carey knew about

20   in advance of trial?

21        Did you and Mr. Carey know that Mr. Garcia

22   was not being charged with the case, right?  That was

23   in the police report.

24      A.   Yes.  Absolutely.

1    Q.   Okay.  And then on page 64 through 69 there

2    is a motion for a new trial that your name is on, but

3    I take it based on your prior testimony, that you

4    don't recall working on this motion for a new trial

5    since it came after the verdict?

6    A.   No, I don't.  It looks like it was only

7    signed by Jack.

8    Q.   Well, your name is in the header.

9    A.   Oh, I know it is.  Yeah.

10    Q.   But if you have had any involvement, you

11    don't remember it, right?

12    A.   No.

13    Q.   Okay.  Now, what follows on pages 71

14    through -- and following is the presentence

15    investigation that we talked about.

16        Do you see that?

17    A.   I do.

18    Q.   And this is for Mr. Rios, right?

19    A.   Correct.

20    Q.   And this is something that you or Mr. Carey

21    would have gone over with Mr. Rios when you received

22    it?

23    A.   Right.

24    Q.   And if there were any material errors in it,

1  that's something that would have been addressed with

2  the court?

3    A.  It would have been addressed somehow.

4    Q.  Okay.  And if not with the court, how?  If

5  not with the court, then how?

6    A.  Oh.

7    Q.  You said somehow.

8    A.  With the court, with the state, with the

9  probation department, whoever created this thing.

10   Q.  It would have been corrected?

11   A.  Mr. or Ms. Jordan.

12   Q.  If there was a material error or omission, it

13  would have been corrected so that the court can

14  consider?

15   A.  We would try.

16   Q.  Oh, gosh, yeah.  So then on pages 84 through

17  92 of Exhibit 5 we have the statement, right?

18   A.  Correct.

19   Q.  And this was, you know, probably the most

20  inculpatory piece of evidence that was introduced

21  against Mr. Rios?

22   A.  Yes.

23   Q.  And this is a statement of the kind that we

24  discussed before that -- that either you or Mr. Carey

1   should have gone over with him line by line to see

2   where there were any discrepancies between the

3   statement itself and your client's story?

4      A.  Right.

5      Q.  And this is something that you or Mr. Carey

6   would have taken pains to prove false, if you could?

7      A.  Yes.

8      Q.  And you would have to ask him whether the

9   signatures were his -- signatures and initials were

10  his?

11     A.  Correct.

12     Q.  And you would have asked him whether Barbara

13  Riley and Michael Mason and the court reporter were

14  present when this happened, right?

15     A.  Correct.

16     Q.  I mean, you would have to ask him if the

17  time, the place, and the location were accurate as

18  well, right?

19     A.  Yes.

20     Q.  And those are the threads that as a defense

21  team you would have followed to zealously advocate on

22  Mr. Rios's behalf?

23     A.  Yes.

24     Q.  Okay.  I think we can put --

1    A.  This away.

2    Q.  I think so.

3    MS. GOLDEN:  Okay.  I'm going to show you what

4  we'll mark as Exhibit 6, which is the trial testimony

5  dated November 29, 1990, and then I have just

6  excerpted the trial testimony of Mr. Guevara, and it's

7  in your piles.

8       (Whereupon, Deposition Exhibit No. 6

9        was marked for identification.)

10  BY MS. GOLDEN:

11    Q.   And I'll represent to you, Ms. Shields, that

12  this is a subset of the trial file.

13    A.  The big file.

14    Q.   That was contained in, you know, the first

15  Dropbox that you opened in August of this year.

16    A.  Okay.

17    Q.   Okay.  So do you -- how would you

18  characterize the intensity that you -- with which you

19  read -- and this is just Detective Guevara's

20  examination at trial.

21       So how would you characterize the depth in

22  which you examined this testimony to prepare for

23  today?

24    A.  For now?

1    Q.   Yeah.

2    A.   I read through it.  Not great intensity.

3    Q.   Okay.  So I'm going to direct your attention

4  to what's marked in the record as page 283 of Exhibit

5  6.  Actually, I'm just going to ask you to take a

6  minute.  I am going to stop that and reverse.  I think

7  I'm going come back to this.  I am sorry.

8    A.   Get rid of this altogether?

9    Q.   Just put it to the side.

10        Do you remember any conversations with

11  Mr. Carey about any of the witnesses who testified at

12  trial?

13    A.   No.

14    Q.   Do you remember any conversations with

15  Mr. Carey about any of the people involved in the case

16  who did not testify?

17    A.   No.

18    Q.   And by the way, typically, as you're getting

19  ready for trial, and you have that long list of

20  witnesses from the state, they'll remove some

21  witnesses, right?

22    A.   Right.

23    Q.   And any witness that they remove, the defense

24  can still call if they want to, right?

1    A.  Correct.

2    Q.  Do you recall any conversation with Mr. Carey

3  about this case, Mr. Rios's case?

4    A.  No.  I just remember that he wanted me to

5  come do it with him because he hadn't tried a case in

6  front of Judge Karnezis.

7    Q.  You don't -- so I take it, it's true that you

8  don't remember any conversation with him about what he

9  did before you joined the defense team, is that right?

10    A.  That's true.

11    Q.  Okay.  Do you remember anything he told you

12  about what Mr. Rios told him?

13    A.  I do not.

14    Q.  All right.  What does it mean to nolle pros a

15  case?

16    A.  It means to -- for the state to terminate the

17  case, drop it.  Basically to drop.

18    Q.  It's not the same as a finding of not guilty,

19  right?

20    A.  No, it's not.

21    Q.  And a finding of not guilty is different than

22  innocence, right?

23    A.  Correct.

24    Q.  And have you ever litigated a certificate of

1    innocence proceeding?

2       A.  No.

3       Q.  Do you know who has the ability to oppose a

4    certificate of innocence proceeding?

5       A.  No.

6       Q.  But you know that vacating a conviction is

7    not the same as a not guilty as well, correct?

8       A.  Correct.

9       Q.  Okay.  Do you -- I am going to apologize.  I

10   think I asked you.

11          The only witnesses you remember speaking to

12   are Rios, Diana Rodriguez, and based on the transcript

13   you remember -- you believe you must have talked to

14   the ballistic's guy, right?

15      A.  I don't remember talking to him beforehand.

16      Q.  Okay.  So then other than Mr. Rios and Diana

17   Rodriguez, do you remember speaking to anyone else

18   about Mr. Rios's case?

19      A.  No.

20      Q.  Do you remember representing Mr. Rios or any

21   of his family members in any other case?

22      A.  No.

23      Q.  Do you recall having any difficulty

24   understanding MR. Rios?

1      A.  No.

2      Q.  Do you recall him having any difficulty

3  understanding you?

4      A.  No.

5      Q.  The public defender's file.  So you've got

6  two lawyers working up the case, right, or working on

7  the case at least at trial, right?

8      A.  (Nodding.)

9      Q.  Is there one file, or do you each have your

10  own file?  Or how did you work that?

11      A.  So both attorneys would have their own file

12  while you're doing it.  But when it's all over, it's

13  one file that goes back to the PD's office, or goes

14  into their files.

15          Some people put their notes into that file,

16  and some people didn't, you know.  But the police

17  reports, that kind of thing, would go in there, so...

18      Q.  Did you put your notes into the files when

19  they were done?

20      A.  Sometimes.  It depended on the file.  You

21  know, what was going to happen to it, whether it would

22  ever come out of that -- I call it a closet, but I

23  really think it's a dungeon somewhere where all these

24  files are.  Usually I did not put my notes in there.

1    Q.   Is this the kind of case you would or would

2  not have put your notes into at the conclusion of the

3  trial?

4    A.   As the second chair, I gave my notes probably

5  to Jack Carey and said, here, and that was only

6  probably because I would have been -- because I would

7  have had notes for like Diana and whoever else I was

8  questioning, or whatever I was doing, but I don't

9  recall whether I did that or not.

10    Q.   When you were -- and this is a general matter

11  because I know you don't remember in this particular

12  case.

13        But as a general matter, when you were

14  interviewing witnesses to determine whether or not

15  they should be disclosed or preparing them for trial,

16  would you take notes of those interviews?

17    A.   Absolutely.

18    Q.   Did Mr. Carey have a practice of keeping his

19  notes in the file?

20    A.   I have no idea.

21    Q.   If Mr. Rios told you that a detective had

22  told him the facts and details -- had supplied him

23  with the facts and details of the case so that he

24  could make the court-reported statement, is that

1    something you would have asked the detective about on

2    cross examination?

3        A.  Yes.  For all the good it would do.

4        Q.  Okay.  When was the first time that you

5    heard -- well, forget about that.  I am getting

6    faster.

7            Police reports, would you have provided -- in

8    general, would you have provided your client with a

9    set of police reports so they could assist you in your

10   defense?

11       A.  That's an interesting question because

12   sometimes we did.  The state objected strenuously and

13   raised a fit in court.  And I don't mean on this case.

14   I mean generally.

15       Q.  Sure.

16       A.  When they would find out that the police

17   reports were out there in the world.

18       Q.  Do you remember when that started happening?

19       A.  It happened off and on.  Sometimes never.

20   But, you know, if you thought that there was any

21   danger in it going out, you wouldn't share it with

22   your client.  You might show it to them.

23       Q.  You could show it to them.  You could read

24   them the information if there was information in a

1  police report that you needed to impart to your

2  client, there were ways to do it other than providing

3  them the actual --

4     A.  Yes, right.

5     Q.  -- actual document?

6        Sometimes you gave them the document --

7     MR. RICHARDS:  Sorry.  Can we take a 5-minute

8  break?

9     MS. GOLDEN:  Sure.

10     MR. RICHARDS:  Thanks.

11     THE WITNESS:  He's got a lot of sun in there.

12     THE VIDEOGRAPHER:  We're going off the video

13  record at 3:09 p.m.

14           (A break was taken.)

15        (Whereupon, Deposition Exhibit Nos. 7

16         to 14 were marked for identification.)

17     THE VIDEOGRAPHER:  This is the beginning of media

18  unit four.  We're going back on the video record at

19  3:26 p.m.

20  BY MS. GOLDEN:

21     Q.  Okay.  Judge -- I am sorry.  Ms. Shields, I'm

22  showing you what we just marked as Exhibit 7, which is

23  the email from you to me of last week that talks about

24  the documents that you have, right?

1    A.   The documents that I had, right.

2    Q.   Right.

3    A.   Okay.

4    Q.   And these are the two -- your email refers to

5    the two different sets of documents you received via

6    Dropbox that you opened in August of this year?

7    A.   Correct.

8    Q.   And just so we have records, this is the

9    email that I was showing you previously, right?

10    A.   Right.

11    Q.   Okay.  You can put that aside.  I'm going to

12    show you what we marked as Exhibit 8, which is also

13    marked CCPDSTD 269, which I'll represent to you that

14    Bates stamp means it came from the Cook County Public

15    Defender's file on the bottom right-hand corner.

16    A.   Oh.

17    Q.   So this came from the public defender's file.

18    I stamped them.  Don't worry.  Oh, wait.  Yeah, I

19    think so.

20    A.   You stamped CCPD.

21    Q.   The red.  Cook County Public --

22    A.   I was going to say, I never seen that before.

23    Q.   And then the STD means it was obtained by

24    subpoena, and then 269 is just the page number.

1     A.  All right.

2     Q.  So do you -- is any of the handwriting on

3   this page yours?

4     A.  No.

5     Q.  But this is what we were talking -- the kind

6   of document we were talking about before, the criminal

7   history of, in this case, your client that would have

8   been subpoenaed and gone over with the client, right?

9     A.  By Jack Carey.

10     Q.  Is that his handwriting?

11     A.  It is.

12     Q.  Thank you.  Can you read the handwriting?

13     A.  Most of it.

14     Q.  All right.  Can you tell me what it says?

15     A.  The first line is girlfriend.

16     Q.  Okay.  And what about the CB7745262?

17     A.  That one, let's see.  Hanging in front of

18   house.  Something noisy, late disorderly conduct.

19   Yeah.

20     Q.  What about CB7772458?

21     A.  Slap girl and took jewelry in retaliation for

22   sis.

23     Q.  And what about CB7841278?

24     A.  Dope under sidewalk by school yard.

1    Q.  And then underneath that?

2    A.  Damen and Potomac with friend, rained -- I am

3  not sure what the next word is -- and then friend had

4  reefer.

5    Q.  Okay.  And then CB809214?

6    A.  Coke in hand.

7    Q.  And the next one CB8177596?

8    A.  Went to see mother, I think, security guard

9  at Anderson School, cops drove by, trespass.

10    Q.  And CB8249223?

11    A.  Sis.

12    Q.  And CB8295153?

13    A.  State trooper's car.

14    Q.  Okay.  All right.  You can put that the

15  aside.

16        Okay.  Now I'm going to show you what we've

17  marked as Exhibit 9 --

18    A.  Uh-huh.

19    Q.  -- which is the affidavit of Benjamin

20  Carrero.

21        And, you see, it purports to be signed by

22  Mr. Carrero on May 22nd, 2020?

23    A.  Yes.

24    Q.  And you'll remember that this is one of the

1    documents that was attached to the amended motion to

2    vacate that you reviewed when you originally were

3    asked to look at the case.

4         Do you remember that?

5    A.  Yes.

6    Q.  Okay.  Okay.  Do you know anything about --

7    at the time that you executed your affidavit -- I am

8    sorry.

9         In April of 2023 you didn't have

10   Mr. Carrero's -- or you still don't have -- you don't

11   have any testimony from Mr. Carrero.  When you signed

12   the affidavit in April of 2023, you didn't have any

13   testimony of Mr. Carrero, correct?

14   A.  I think that's correct, yes.  I don't recall

15   him.

16   Q.  Okay.  All you had in terms of what

17   Mr. Carrero was now saying was the affidavit that we

18   have marked as Exhibit 9, right?

19   A.  Correct.

20   Q.  And you didn't have any information when you

21   signed your affidavit about how the affidavit of

22   Mr. Carrero was obtained?

23   A.  Correct.

24   Q.  So you don't know whose words -- who drafted

1    it, right?

2      A.  Correct.

3      Q.   Whether there were prior drafts?  You don't

4    know whether or not there were any prior drafts of

5    this?

6      A.  Oh, no.

7      Q.   And you don't know whether or not like you

8    and Mr. Carrero negotiated the language that was --

9    that is contained in this affidavit, right?

10     A.  Yeah.  I don't know.

11     Q.   Okay.  And do you have any idea -- in the

12   first paragraph of the affidavit, he says -- or it

13   states that he testified at the trial of Jamie Rios

14   that on June 28, 1989 at approximately 12:30 a.m.

15   defendant gave him a gun to hold.

16         And you don't know how Mr. Carrero remembers

17   30 plus years later how he testified on June -- about

18   how he testified, right?  You don't know how

19   Mr. Carrero was able to recall what's stated in

20   paragraph 1, right?

21     A.  No.

22     Q.   And do you remember Mr. Carrero flipping at

23   trial?

24     A.  I do not.

1    Q.   Now, in paragraph 5 it says, a picture of

2   Detective Guevara provided is attached to this

3   affidavit.

4        And did you have -- were you provided with a

5   picture of Detective Guevara that was attached to this

6   affidavit at sometime as referred to in paragraph 5?

7    A.   Not with this affidavit.

8    Q.   Have you ever seen that picture?

9    A.   I have no idea.

10    Q.   Okay.  Has Mr. Richard ever provided you with

11   a picture of Detective Guevara?

12    A.   I think there was a picture of Guevara in

13   the -- something that was in the Dropbox.

14    Q.   Okay.  Maybe -- I don't know.  Do you

15   remember what it was attached to, which --

16    A.   I think it was attached to something to do

17   with police records where they were reported, you

18   know, like the old OPS.  That's what I keep calling

19   it, OPS.

20    Q.   CRS?

21    A.   Yeah.  What are they now?  Yeah.

22    Q.   CRS?  Complaint register files.

23    A.   So I literally was flipping through the back

24   of there and saw a picture of someone, and it said it

1   was Guevara.

2       Q.  Okay.

3       A.  That's the best I can do.

4       Q.  Okay.  Do you -- I mean, according to

5   paragraph 5, it looks like you don't know whether or

6   not Mr. Carrero was provided with one picture of one

7   detective or five pictures of five different

8   detectives and asked to identify doctor -- or

9   Mr. Guevara, right?

10      A.  You mean was he in a photo lineup?

11      Q.  Right.

12      A.  I do not know.

13      Q.   And if they just gave him a single picture

14  and said, is this is the guy, right, you would have a

15  problem with that in terms of an identification

16  procedure for a criminal defendant, right?

17      A.  Okay.  Sure.  I mean --

18      Q.  Wouldn't you?

19      A.  If it was a criminal defendant.

20      Q.   Right, right, right.  Well, in terms of an

21  identification procedure, there is a difference,

22  right, between saying, hey, isn't this detective --

23  the guy who told you to do this, or which one of these

24  guys told you to do this?  There is a big difference,

1   isn't there?

2       A.  I'm always going to have trouble answering

3   that question because it's like a question that needs

4   three paragraphs, and I am not giving you that.

5       MS. CARNEY:  Hold on one second.  We just lost the

6   Zoom.

7       MS. GOLDEN:  Okay.  We'll wait.

8       THE VIDEOGRAPHER:  Do you want to go off?

9       MS. GOLDEN:  Yeah, he'll come back.

10      THE WITNESS:  Okay.

11      MS. GOLDEN:  He's coming back, I think, already.

12   He probably had a heart attack at my bad question.

13      MS. CARNEY:  It says it's connecting.

14      THE VIDEOGRAPHER:  You want to go off the record?

15      MS. GOLDEN:  Yeah.  Let's go off.

16      THE VIDEOGRAPHER:  Going off the video record at

17   3:37 p.m.

18              (Off the record.)

19      THE VIDEOGRAPHER:  This is the continuation of

20   media unit four.  We're going back on the video record

21   at 3:40 p.m.

22   BY MS. GOLDEN:

23      Q.  Okay.  I'm going to ask you to just take a

24   minute because I don't think I let you do that before

1   and read the entirety of this affidavit of Mr. Carrero

2   that we marked as Exhibit 9.

3       A.  Okay.

4       Q.  And this exhibit of Mr. Carrero is one of the

5   things that you relied on to execute your affidavit of

6   April of 2023, correct?

7       A.  Yes.

8       Q.  And when you executed your declaration, did

9   you assume all the things in this affidavit to be

10  true?

11      A.  Yes.

12      Q.  Okay.  Was there anything about what's

13  written in this affidavit that then or now doesn't

14  make sense to you?

15      A.  No.  Not really.

16      Q.  In paragraph 6 it refers to Iris Mendez.

17          Do you know who she is, or what her role in

18  the case was?

19      A.  I do not.

20      Q.  Do you know what her relationship to

21  Mr. Carrero is?

22      A.  It's a relative or a girlfriend.

23      Q.  Do you know what Mr. Carrero's relationship,

24  if any, to Mr. Rios is?

1     A.  I do not.

2     Q.  In paragraph 13 on page 2 of Exhibit 9, it

3  says, I was never charged with the gun.

4         Is it your understanding from what Mr. --

5  what's contained in this affidavit that Mr. Carrero

6  was not arrested because he cooperated with the police

7  by giving the inculpatory statement?

8     A.  It would be easy for that to be a conclusion.

9     Q.  Is that a conclusion that you draw based on

10  what's written here?

11    A.  I did not draw any.

12    Q.  Okay.  And, again, you don't know what

13  Mr. Carrero was told about the case or Mr. Rios's

14  claims before he executed the affidavit, right?

15    A.  That's true.

16    Q.  Okay.  So I'm going to show you what we've

17  marked as Exhibit 10, which is the affidavit of

18  Cristino Garcia.

19         And this is the affidavit that comes from --

20  that is also attached to the amended motion to vacate

21  the conviction that you first received from

22  Mr. Stevens backs in the day.

23         Remember that?

24    A.  Right.

1    MR. RICHARDS:  Objection.  Richards.

2    MS. GOLDEN:  Oh, sorry.  My apologies.

3    THE WITNESS:  I remember thinking it sounded odd.

4    MR. RICHARDS:  No problem.

5    MS. GOLDEN:  Between you and her husband, it's

6  hard to keep it straight.  There is a Richard and --

7  okay.

8  BY MS. GOLDEN:

9    Q.  So Exhibit 10 is the Cristino Garcia

10  affidavit, right?

11    A.  Right.

12    Q.  And he went by Tino?

13    A.  Yes.

14    Q.  And like the affidavit of Mr. Carrero, you

15  don't have -- when you executed your declaration in

16  April of '23, you didn't have any information about

17  the circumstances surrounding the creation of this

18  affidavit, right?

19    A.  That's correct.

20    Q.  You don't know what he was told, where he

21  was, who he was with, whether this is his handwriting,

22  or someone else's handwriting, correct?

23    A.  Correct.

24    Q.  But since then -- and when you executed your

1   affidavit, you took the things that are stated in the

2   Garcia affidavit we marked as 10 to be true?

3      A.  Yes.

4      Q.  And since then you have been provided with a

5   copy of Mr. Garcia's deposition transcript, correct?

6      A.  I have.

7      Q.  Do you recall seeing any conflict between

8   what Mr. Garcia said in his deposition testimony and

9   what's contained in his affidavit?

10     A.  I don't recall it.

11     Q.  Are you aware of any relationship between

12  Mr. Garcia who authored this affidavit we have marked

13  as No. 10 and Mr. Rios?

14     A.  I believe they used to be friends back in the

15  day, but I don't know anything now.

16     Q.  Did you know that back at the time that you

17  were trying the case?

18        Let me put it a different way.

19        Do you remember whether or not you knew that

20  back when you were trying the case?

21     A.  That they were friends?

22     Q.  Correct.

23     A.  Let me think.  What I know has to do with

24  what Jamie put in his statement that he signed, which

1    related to Tino.

2        Q.  And so you would have asked Mr. Rios about

3    Tino, right?  Or you or Mr. Carey would have asked

4    Mr. Rios about Cristino Garcia?

5        A.  At the trial?

6        Q.  Right.  Yeah.

7        A.  I believe so.

8        Q.  Right.  So you would have asked him -- one or

9    both of you would have asked Mr. Rios about whether --

10   how he knew this Tino that was referred to in the

11   statement, right?

12       A.  I suppose.

13       Q.  Okay.  And then if they were friends at the

14   time, Cristino Garcia is somebody you would have -- or

15   Mr. Carey would have tried to interview as you were

16   following the threads in preparation for trial?

17       A.  I suppose.  I can't answer that yes or no

18   because of the way it all came down.  You know,

19   Jamie's statement implicated Cristino as being the

20   shooter, right?  That's what I remember of Jamie's

21   statement.

22       Q.  So wouldn't you have asked Jamie what he knew

23   about Cristino Garcia and interviewed him, if

24   possible?

1     MR. RICHARDS:  Objection.  Asked and answered.

2          But you may answer.

3     THE WITNESS:  I suppose there was probably a

4  discussion about Cristino with Jamie.

5  BY MS. GOLDEN:

6     Q.  Okay.  And depending on what information he

7  provided you, he's one of those witnesses -- Cristino

8  Garcia is probably one of those witnesses that we

9  discussed before, if there was potentially more harm

10  than benefit, he wouldn't be called, right?

11     A.  Right.

12     Q.  Okay.  But in either event if he was a friend

13  of Mr. Rios, he would certainly be somebody you would

14  have tried to interview?

15     MR. RICHARDS:  Objection.  Asked and answered.

16     THE WITNESS:  I'm not sure that that's true.  I

17  mean, just because he was a friend.  It's his part of

18  this.

19  BY MS. GOLDEN:

20     Q.  Right.

21     A.  Whatever that part is or was in reality, he

22  was part of it somehow.

23     Q.  Okay.  Do you recall -- I am sorry.  In

24  paragraph 7 of Mr. Garcia's affidavit, he refers to a

1   female assistant state's attorney still being in the

2   room.

3          I am sorry.  Strike that.

4          When you read -- and I'll give you a minute

5   to read Mr. Garcia's affidavit from start to finish,

6   if you want.

7      A.  I have been reading it.

8      Q.  Okay.  Tell me when you've read it start to

9   finish.

10         And my question is going to be, does anything

11  in here not make sense to you?  So just could you read

12  it with that purpose.

13     A.  Okay.

14     Q.  Does anything in there not make sense to you?

15     A.  Not on the surface of it, no.

16     Q.  Okay.  All right.  I'm going to show you what

17  we marked as Deposition Exhibit No. 11, which is the

18  Huertas affidavit, and this is one of the affidavits

19  that you referred to in your declaration of April 23,

20  2023, right?

21     A.  Okay.

22     Q.  Is that yes?

23     A.  Yes.  I am sorry.

24     Q.  And this is -- appears to be executed by Luis

1  Huertas on May 19th, 2020, correct?

2     A.  Yes.

3     Q.  And did you take the statements of

4  Mr. Huertas that are contained in this affidavit to be

5  true when you executed your declaration in April of

6  2023?

7     A.  So --

8     Q.  Or assumed them to be true?

9     A.  I assumed them to be true.

10    Q.  Okay.  And did you see any testimony in the

11 record that you reviewed that conflicted with any of

12 the things that were stated in this affidavit?

13    A.  Did I see anything in the record?

14    Q.  The trial record?

15    A.  That conflicted with this?

16    Q.  With what he says in his affidavit?

17    A.  Well, there is something in each of these

18 that conflicts with the trial record.

19    Q.  Okay.  And are you determining that -- so

20 you're not saying that what Mr. Huertas or what

21 Mr. Carrero or what Mr. Garcia say in their affidavit

22 is true, correct?

23    A.  I can't.

24    Q.  You just assumed them to be true in terms of

1    stating what you did in your declaration?

2       A.  So my declaration or affidavit, whatever we

3    want to call it, says effectively these things are now

4    alleged.  They're put out there by these people.

5          And if Jack Carey and I had that information

6    before the trial, we would have followed up on it.

7    And each of these merges in a way to say, let's look

8    at this about what really happened.  Okay.  So that's

9    what that represents.

10      Q.  Okay.  Do you know anything about the

11   circumstances surrounding the creation of the Huertas

12   affidavit, Exhibit 11?

13      A.  The one we were --

14      Q.  The last one we just talked about?

15      A.  Okay.  No.

16      Q.  Did you compare the affidavit of Mr. Huertas

17   to the testimony he gave at trial?

18      A.  No.

19      Q.  Did you compare the affidavit of Mr. Huertas

20   to the police reports that mention him?

21      A.  No.  I did think about all of that in the

22   sense that I know that there were differences, and

23   they acknowledge those in their affidavits, like each

24   of them says.  He says, I testified, but it was false.

1    Q.  Right.  Okay.  But you didn't pull any --

2    with respect to Mr. Huertas, you didn't pull any

3    police reports?  You didn't pull -- 'cause you had the

4    police reports, right?  The police reports were in

5    plaintiff's sixth disclosure?

6    A.  Yeah, they're there.

7    Q.  You had them, but you didn't pull out the

8    police reports that related to Mr. Huertas,

9    Mr. Carrero, or Mr. Garcia in terms of when you were

10   considering their affidavits?

11   A.  No.

12   Q.  I am correct?  That's correct?

13   A.  Yeah.  You're right.  And I purposely did not

14   do it.

15   Q.  Okay.  And why did you purposely not do that?

16   A.  Because at the time that I was approached by

17   Mr. Richards, I had very little memory.  Today is

18   bringing some of it back, but not enough for me to

19   feel like I'm -- I can say too many things

20   definitively.

21        However, what I was asked to do was this

22   affidavit of what we would have done at trial assuming

23   that we'd had this information.  And you have to

24   assume it's true for the moment.

1      So assuming these things known before trial,

2   would we have done something differently?  And, of

3   course, we would have followed through on it, and

4   checked it all out.

5      But it doesn't work like that before trial

6   because everybody's scared, and nobody wants to be the

7   one that gets taken down because they didn't say what

8   they were told to say, so...  And that doesn't mean

9   that it happened that way.

10     Q.  Uh-huh.  Sure.  Do you have any -- well, I

11   think you told us -- I don't need to do that.

12      So I'm going to ask you about Exhibit 12,

13   which is your affidavit.

14     A.  Okay.

15     Q.   And this is your declaration originally

16   drafted by Mr. Richards, and you signed it on

17   April 23rd, 2023 after making some modifications to

18   his proposed language, right?

19     A.   Right.

20     Q.   And in paragraph 8 it says, I reviewed the

21   affidavits of Luis Huertas, Benjamin Carrero, and

22   Cristino Garcia.

23      And those affidavits are the affidavits we

24   just discussed, which were exhibits to your deposition

1    9, 10 and 11, right?

2    A.  Correct.

3    Q.  Okay.  And then it goes on to say that if you

4    had the information in the Huertas affidavit in

5    paragraph 9, you would have filed a motion to suppress

6    identification.

7         If -- would there ever be a reason to prepare

8    a motion to suppress identification and not file it?

9    A.  It happens.

10   Q.  What would be defense strategy in that?

11   A.  Well, there is no strategy because you just

12   have it ready.  I mean, there is no strategy if you

13   don't file it.

14   Q.  What strategy would be behind a decision to

15   not file it?

16   A.  It depends on the circumstances and what

17   happened and what you have in front of you, basically.

18   Q.  Can you think of any reason why in this case

19   a motion to suppress identification was prepared but

20   not filed?

21   A.  So I'm not sure what was going to happen --

22   what Jack's thinking was because I can't go there,

23   unfortunately.  So I don't know.

24   Q.  Do you -- are you aware that Mr. Huertas to

1    this day insists that Mr. Rios was the person he saw

2    shoot and kill Mr. Morales?

3        A.  No.

4        Q.  When you read Mr. Huertas's affidavit, which

5    we marked as Exhibit 11 --

6        A.  Yes.

7        Q.  -- when you read paragraph 9, do you read

8    paragraph 9 to say that Guevara then threatened me to

9    have me locked up if I did not identify Rios or

10   something different?

11           When Mr. Huertas refers to the shooter, do

12   you think he -- do you read it to mean Rios?

13       A.  I would say it's a little vague.

14       Q.  How did you take it?

15           Right.  Because one reading of it is, I

16   wanted him to tell me -- Guevara said, I was going to

17   lock him up if he didn't tell me who shot Morales.

18           Another reading is Guevara threatened to have

19   me locked up if I did not identify Rios, right?

20           And I am just wondering which of those two

21   readings was the take that you took?

22       A.  Obviously, I would have taken it as the

23   latter.

24           Hear me again, though, I did not take any of

1   this as it's the absolute truth any more than I take

2   police reports as being absolute truth.

3        It is what it is, and it's the circumstances

4   and what's happening.  It's always trying to see where

5   you're at and what's coming in and what you can do

6   with what you have at the time.

7        So now it's a little different, and all I'm

8   saying is if I had known these things -- now, maybe

9   there'd had to be more of a follow-up on Huertas.

10  Maybe not.  Who knows?  More follow-up with Tino or

11  with Benjamin Carrero.  Okay.

12     Q.   And I'm not asking you whether this is true.

13  I'm asking you what you understood the words in this

14  affidavit that you relied on to mean.

15       And so if I understand you correctly, when

16  you read the shooter in paragraph 9, you understood

17  Mr. Huertas to mean Rios?

18     A.   Yes.

19     Q.   Okay.  And when you -- in paragraph 12 when

20  it says, he was the only person in the lineup who was

21  also in the photo array, what did you understand

22  Mr. Huertas to mean by the --

23     A.   He --

24     Q.   -- by photo array?

1    A.   When he showed him some pictures.  He says

2    that Guevara showed him pictures, a series of

3    photographs, and then photo array would have been

4    those.

5    Q.   So the photo array refers to the same series

6    of photographs that are mentioned in paragraph 7?

7    That's you how took it?

8    A.   Right.

9    Q.   Okay.  And then the series of photographs, I

10   don't see any other information about those

11   photographs contained in this affidavit.

12        Do you?

13   A.   No.

14   Q.   So you don't know whether those came out of a

15   gang book, or they were loose photos, or they were

16   presented in some other way, right?

17   A.   No.

18   Q.   That's correct?

19   A.   That's correct.

20   Q.   Okay.  All right.  Back to Exhibit 12, which

21   is your affidavit, you say you would have cross

22   examined Huertas and Reynaldo Guevara about this

23   information at trial.

24        And so I'm going to ask you what you would

1   have asked Mr. Huertas?

2       A.  If I can answer that at this point.

3       Q.  I know you are tired.

4       A.  Oh, my God.  Just a bit.

5       Q.  Do you want to take a quick break?

6       A.  It doesn't help.  All I can think about is

7   being done at the end of the day.

8       Q.  I am sorry.  I can't tell you we're going to

9   be close because I know what you're going to say.

10      A.  It's like --

11      Q.  We're closer than we were a bit ago.

12      A.  And there is a good --

13      Q.  Lawyer-ism.

14      A.  Uh-huh.  Okay.

15      Q.  I mean, you say if the motion had been

16  successful, we would have cross examined Huertas and

17  Reynaldo Guevara about this information at trial.

18          And I assume the information you are

19  referring to is the information in the affidavit,

20  right?

21          But what I'm wondering is, what would you

22  have asked them about specifically?

23      A.  Well, you know how cross is done, and the

24  cross obviously would have to do with what he says

1   here.  (Indicating.)

2       Q.   Uh-huh.

3       A.   So it would be about the photo array and who

4   was there and what the pictures were.  It would be the

5   substance if it hasn't been already brought out.

6       Q.   And I think you said before you don't know

7   whether or not what is contained in the affidavit is

8   true, correct?

9       A.   I can't say.

10      Q.   And I imagine you don't know what Mr. Huertas

11  or Mr. Guevara would have said about it on cross

12  examination at trial, correct?

13      A.   Correct.

14      Q.   Okay.  If we go to the next -- so paragraph

15  11 talks -- paragraphs 11 talks about the Carrero --

16      A.   Uh-huh.

17      Q.   -- affidavit which we marked as Exhibit 9.

18      A.   Right.

19      Q.   Okay.  And you say here, had I and Jack Carey

20  known that Guevara had coerced Benjamin Carrero into

21  making the false statement that Jamie Rios had given

22  him a gun.

23           So I just want to unpack it just a minute.

24           And you don't know whether or not that

1   statement is true or fall, right?

2       A.   I can't say that it's true or false.

3       Q.   And so when you say had I and Jack Carey

4   known than Guevara had coerced, you mean probably to

5   be more accurate, had I and Jack Carey known that

6   Benjamin Carrero alleged Guevara coerced him, right?

7       A.   Or that Benjamin Carrero says.

8       Q.   Okay.  Says, alleged, same sort of thing,

9   right?

10      A.   And testifies, you know.

11      Q.   Or would testify, right?

12          And you would have elicited that -- when you

13  say we would have elicited this information at trial,

14  you would have elicited it from Carrero, correct?

15      A.   Correct.

16      Q.   And, generally, how are witnesses who admit

17  to lying to the grand jury, and then lying again to

18  the trial court received when they recant and testify

19  differently?

20      A.   Not well.  The state always threatens them.

21  The judge threatens them.  There is a lot of

22  threatening going on.  And you never know really what

23  the truth is, so...

24      Q.   Okay.

1      A.   So if you put all of these pieces together,

2    it would appear one story.  You take pieces of it, you

3    can get another story.  You take all of these three,

4    you get another story.  I mean, it's just -- so this

5    goes back to, though, having the best trial you can

6    and not getting falsely accused.

7      Q.   I'm going to ask you about paragraph 13 and

8    paragraph 15, which relate to the Garcia affidavit

9    which we marked as Exhibit 10, correct?

10     A.   Correct.

11     Q.   I'm just asking if that relates to Garcia.  I

12   think you answered me.

13          Okay.  So did you -- and then putting aside

14   that particular affidavit, did you in connection with

15   what's stated in your declaration here do any legal

16   research?

17     A.   No.

18     Q.   Okay.  And in paragraphs 10 and 14 -- I am

19   sorry.  Strike that.

20          All right.  In paragraph 10, it says -- and

21   we're back to the Huertas affidavit.  It says, in my

22   opinion, had the information about Guevara's coercion

23   of Huertas been made known to the jury, there was a

24   reasonable probability that the jury would have

1   acquitted Rios.

2        Do you see that?

3   A.  I do.

4   Q.  And that is -- those words were originally

5   proposed by Mr. Richards, Mr. Rios's attorney, right?

6   A.  I do believe so.

7   Q.  Okay.  And what is the basis for that

8   opinion?

9   A.  So this probably could have been written in a

10  better way, which means I needed to pay more

11  attention.

12       However, it goes back to what I was trying to

13  say a moment ago, which is when you put all of this

14  together, then you have -- it's like the investigation

15  police do on the street.  They put it all together.

16  They don't have the smoking gun in the guy's hand

17  usually right at that moment, right?

18       So this is the same.  This is -- if these

19  three people say that similar things happened to them,

20  by similar, some of the same people, then you've got a

21  better shot at trial.

22       And that's what I'm trying to say.  As an

23  individually -- individual, these in a typical trial,

24  one of these doesn't work.  You can't -- you've got to

1  like really give the jury or the judge a lot of

2  information and a lot of things.  Because no one wants

3  to disbelieve a police officer.

4         No one believes these guys anyway because

5  they're gang kids at the time from the street, no

6  matter who they are today.  So it's very tough to put

7  this affidavit into a way that does what I meant it to

8  do.  But it is, assuming all of these things, true or

9  not yet, but assuming all of this together, Jamie

10  could have had a better shot at a trial.  A better

11  more fair --

12    Q.   Okay.  Paragraph 10, paragraph 14, paragraph

13  16, and paragraph 18 begin with the phrase, in my

14  opinion.

15    A.   Or it is my opinion.

16    Q.   It is my opinion, right.

17         Okay.  So now is this your personal opinion,

18  or is this your -- or are you purporting to be an

19  expert witness?

20    A.   I don't know the answer to that.

21    Q.   Okay.

22    A.   When I signed this, it was my opinion as an

23  attorney who had worked on this case at trial many

24  years ago.

1    Q.   Okay.  But you understand, right, that there

2  is a difference between --

3    A.  I do.

4    Q.   And to be an expert, you have to have a

5  specialized knowledge, experience, or training in

6  order to be qualified as an expert to testify at

7  trial.

8       You know that, right?

9    A.  I understand that.

10    Q.   Okay.  What specialized knowledge,

11  experience, or training do you have to render an

12  expert opinion in this case aside from your experience

13  at the public defender's office?

14    A.   In my trainings and the people I trained in

15  the public defender's office.  Those things.

16    Q.   Anything else?

17    A.   Without going through years of everything,

18  no.

19    Q.   Okay.  When you looked through the

20  plaintiff's sixth disclosure, which had the police

21  reports and transcripts, did you see or notice any

22  documents that had your handwriting on it?

23    A.   I saw one, and it was just one word.  And it

24  was --

1    Q.  Go ahead.  I'm listening.  I'm listening.

2    A.  I don't remember the word.  It was just one

3  word.

4    Q.  Do you remember what the word was?

5    A.  No.

6    MS. GOLDEN:  All right.  So I think we're up to

7  15.

8    THE WITNESS:  Okay.  You want me to take this?

9      (Whereupon, Deposition Exhibit

10        No. 15 was marked for identification.)

11  BY MS. GOLDEN:

12    Q.  Yeah.  You can take the rubberband off, but I

13  would use it like a book, and you'll see this has

14  Bates stamps.  They're very small.

15        Do you see them at the bottom?

16    A.  Yeah.  Or do I?  Yeah.  Very small.

17    Q.  Yeah.  Okay.  So I was going to ask you about

18  the page that's marked PFP007051, and ask you if you

19  recognize this?

20    A.  This?  (Indicating.)

21    Q.  Yes, ma'am.

22    A.  Okay.  Yes.

23    Q.  Okay.  And what's this?

24    A.  This is a copy of the cover of the folder

1  that we used in the public defender's office.  So the

2  folders were manila colored, and they were bigger

3  because we were using longer paper sometimes.

4       But we would write on them.  We were always

5  supposed to keep our dates out here.  Not everybody

6  did that.  It looks like Jack did, yes.

7     Q.   And then on the back of that page, do you

8  recognize what that is?

9     A.   It looks like Jack's handwriting.  Three new

10  Ws, meaning witness.

11    Q.   Does that first look like Jamaican?

12    A.   Yeah, Jamaican.

13    Q.   Two others in projects?

14    A.   Yeah.  And then Manny Huertas maybe.

15    Q.   And then Luis is oldest?

16    A.   Yes.  Right.

17    Q.   Can you read what comes after that?

18    A.   It looks like Luis something, but I'm not

19  sure.

20    Q.   Okay.  And then the following page, PFP007052

21  looks like the back of a phone message.

22    A.   Jack's handwriting.

23    Q.   That's Jack handwriting again.

24       And the last -- the last line there says,

1    Lenny Garcia, right?

2      A.  Definitely says Garcia.

3      Q.  Okay.  Okay.  Then I'm going to direct your

4    attention to the page marked PFP7083.

5      A.  Got it.

6      Q.  And do you see the handwriting on that page?

7      A.  Right.

8      Q.  Is that yours?

9      A.  No.

10     Q.  And did --

11     A.  Now I'm going to say that.

12     Q.  Okay.

13     A.  It could be, but it's not.  I just know it's

14   not.

15     Q.  How do you know that?

16     A.  It just doesn't look like the way I would

17   write it.

18     Q.  Okay.  The capital I like that, is that a

19   common abbreviation for informant?  Did you use that

20   to --

21     A.  No.

22     Q.  You don't know?

23     A.  That I, I don't even know what that would be

24   for, no.

1    Q.   What about page 7095 -- PFP7095, keep going,

2  which is the directive of Diana Rodriguez?

3    A.   Okay.

4    Q.   And up in the top there is a handwritten

5  Diana.

6         Is that your handwriting?

7    A.   It is.

8    Q.   Is that the word that you found when you were

9  looking for it?

10   A.   No.  I thought it was another one.

11   Q.   So that means that at some point in time you

12  read this transcript, right?

13   A.   Is this the --

14   Q.   Pretrial hearing.

15   A.   Yeah.  The pre-- presentencing, right?

16   Q.   No.  I think there was a motion to suppress

17  and a motion to quash arrest.

18   A.   Okay.

19   Q.   So, typically, if there were evidentiary

20  hearings in connection with the motion to quash arrest

21  and motion to suppress statements, the transcripts

22  would be ordered, and they would be reviewed in

23  preparation for trial, right?

24   A.   Yeah.  And so what that is, is Jack got that,

1   and gave it to me to look at because I was doing Diana

2   for trial.

3        Q.   Okay.  So page PFP7165.

4        A.   7165.  That is also my handwriting.

5        Q.   The Diana there?

6        A.   Yeah.

7        Q.   Okay.  If we look at PFP7190 there is another

8   handwritten I with a big circle around it.

9             Is that your handwriting?

10       A.   No.

11       Q.   Do you know what that refers to?

12       A.   No.  I can't even guess.

13       Q.   And then PFP7198 is the --

14       A.   Oh, here it is.

15       Q.   Here.  Oh, what is yours, Jack, the question

16   mark?

17       A.   Yeah.

18       Q.   Do you know what that means?

19       A.   It means is Jack going to cross examine this

20   guy, Mario?  And I don't know who it is.

21       Q.   What about PFP7250?

22       A.   72 --

23       Q.   Which is a page from --

24       A.   Yeah, I see it.

1    Q.   The defense copy of Mr. Rios's statement.

2    A.   That is Jack's handwriting.

3    Q.   And it says no intent, right?

4    A.   Right.

5    Q.   And then did you read the police reports?

6         I think I maybe heard you say before you

7    stayed away from reading the police reports with

8    respect to Huertas, Garcia, and --

9    A.   I glanced through them.  I did not do what I

10   used to do and just, you know, comb it.

11   Q.   Yeah.

12   A.   Yeah.

13   Q.   Did you notice any of your handwriting on the

14   police reports?

15   A.   No.  Fairly certain of that.

16   Q.   Okay.  On page PFP7386 --

17   A.   Okay.

18   Q.   -- do you see there where it says no Tino and

19   no Lopez?

20   A.   Yeah.  Both of those comments are Jack's

21   handwriting.

22   Q.   Okay.  Done with that one.

23   A.   Are we done with this?

24   Q.   We are indeed.  And that was 15?

1    A.  15.

2    Q.  Do you know why Jack didn't call any

3  witnesses in mitigation?

4    A.  I do not.

5    Q.  Was the defense theory at trial that a person

6  named Tino was the shooter?

7    A.  So I don't really remember, but I did notice

8  as I was riffling through the instructions that we

9  asked to have included the instruction of -- that you

10  can be -- of a different crime, and the state put in

11  the instruction that even if you didn't pull --

12  basically, if you didn't pull the trigger, but you're

13  there, you can still be convicted.  So those two.

14        There was something that I'm going to say we,

15  Jack and I put in, which makes me think that that was

16  part of the theory.  We would always look for every

17  theory; and always the question was, do you go for the

18  straight -- do you put in more than one theory when

19  you're talking to a jury because will they understand

20  that they need one of those, at least, to do the

21  conviction?  They don't have to have both.  It was

22  always a tough issue.

23    Q.  Okay.  So I'm going to show you what we

24  marked previously as Exhibit 5, and point you to where

1   the jury instructions start.

2       A.  Okay.

3       Q.  Because I remember the one the state put in.

4   I'm wanting you to show me which one the defense put

5   in.

6       A.  I think that we put in.  Hopefully I didn't

7   make it up.

8       Q.  Huh.

9       A.  I remember now that I didn't see it in here.

10  It wasn't here that I saw it.  I saw it in the

11  transcript when the judge said okay.

12      Q.  Okay.  In a proceeding transcript?

13      A.  It was when we were doing the jury

14  instructions, and I don't know why I looked at that,

15  but I don't see it.  So I don't know what I'm talking

16  about.

17      Q.  Well, don't say that.

18      A.  Right now I don't.

19      Q.  That seems harsh.  Okay.  I think I am

20  needing a break.  I am not going to make any promises,

21  but I am needing a break to go over my notes.

22          Let me do this first.  I'm going to show you

23  what we've marked as Exhibit 13, which is the first

24  amended complaint.  That was in the first Dropbox link

1  that, I believe, you opened for the first time in

2  August of this year.

3       Right?

4    A.  It looks like it, yes.

5    Q.  Okay.  So this was something that you did not

6  have at the time you executed your affidavit in April

7  of '23 -- 2023?

8    A.  That's correct.  If I did, I don't remember

9  it.

10   Q.  You can put it here.

11   A.  Put that there?

12   Q.  Yeah.  And this is Exhibit 14, which was also

13  listed in the -- 14 is the motion for judgment on the

14  pleadings alone, summary judgment motion.

15       And this is a list of materials that you

16  provided to me in Exhibit 7 as part of the Dropbox

17  link --

18   A.  Yes.

19   Q.  -- that you opened for the first time in

20  August of this year, right?

21   A.  Yes.  Yes.

22   Q.  So this is something that you did not have

23  when you executed the affidavit?

24   A.  Correct.

1    Q.   Okay.  And the same thing would be true for

2   the trial transcripts, that was something that you --

3   was in that -- that's listed in Exhibit 7 as being in

4   that first Dropbox link --

5    A.   Right.

6    Q.   -- that was opened by you for the first time

7   in August of 2023.

8        So you did not have it when you executed the

9   affidavit, right?

10   A.   Correct.

11   MS. GOLDEN:  Okay.  I think that's housekeeping.

12  I need -- maybe take -- I am going to try to be as

13  quick as possible, but 10 minutes?  Is that all right?

14   THE WITNESS:  Okay.

15   MR. RICHARDS:  Yeah.  10 minutes is fine.

16   MS. GOLDEN:  Okay.  Thank you.

17   THE VIDEOGRAPHER:  We're going off the video

18  record at 4:34 p.m.

19           (A break was taken.)

20   THE VIDEOGRAPHER:  This is the beginning of media

21  unit five.  We're going back on the video record at

22  4:48 p.m.

23  BY MS. GOLDEN:

24   Q.   Okay.  And back to, you know, this morning

1  when I was talking to you about preparing for the

2  deposition, I think we got a little sidetracked.

3      You told me you spent about 20 hours

4  reviewing materials?

5    A.  (Indicating.)

6    Q.  That was your best estimate to be fair,

7  right?

8    A.  Right.

9    Q.  Okay.  And then you had some conversations

10 with Mr. Richards, right?

11   A.  Right.

12   Q.  Okay.  And did he provide you with any

13 information about the case that wasn't contained in

14 the materials you reviewed?

15   A.  Oh, no.  Uh-uh.

16   Q.  About how many conversations would you say

17 you had with Mr. Richards to prepare for today?

18   A.  Oh, I didn't have any to prepare for today.

19   Q.  Those were just in the course of creating the

20 affidavit?

21   A.  Right.  Right.

22   Q.  And so did you do anything other than review

23 materials then to prepare for today?

24   A.  No.

1    Q.   Okay.  I had a couple more questions about

2   your affidavit, which we marked as Exhibit 12.

3    A.   Okay.

4    Q.   And in the second page we start talking about

5   Cristino Garcia.

6    A.   Uh-huh.  Yes.

7    Q.   So now you talk about putting on evidence of

8   his alibi, right, in paragraph 13 and 14?

9    A.   Yes.

10    Q.   And you can't say whether or not you would

11   put on any particular evidence of his alibi because

12   you have to investigate the alibi first, right?

13    A.   Yes.  Definitely.

14    Q.   And so you don't know -- in his affidavit, he

15   says he was at home with his mother and his

16   girlfriend; but if his mother and girlfriend don't

17   back him up, you can't call them as witnesses, right?

18    A.   Correct.

19    Q.   You don't know whether or not his mother and

20   girlfriend can back him up?

21    A.   Don't know.

22    Q.   And you couldn't really call Cristino Garcia,

23   right, because he is going to take the Fifth

24   Amendment, right?

1    A.   Didn't he say that's what he would have done.

2    Q.   Right.  But he was the unindicted co --

3  alleged coconspirator, right?

4    A.   Correct.

5    Q.   So in all likelihood he is going to take 5,

6  right?

7    A.   Okay.

8    Q.   Do you agree?

9    A.   Probably, but I don't really know.

10    Q.   Okay.  Well, if he takes 5, that's not good

11  for Mr. Rios, right?

12    A.   Correct.  Well, or for him.

13    Q.   Well, it's not -- it's going to hurt

14  Mr. Rios's case if the person he's claimed to have

15  committed the crime with gets up on the stand and

16  takes the Fifth Amendment -- invokes the Fifth

17  Amendment in order to avoid answering questions about

18  whether or not he was involved in the case, right?

19    A.   Okay.  Yes.

20    Q.   You agree?

21    A.   Yes.

22    Q.   Do you know why -- do you know whether or not

23  Mr. Carey interviewed Mr. Huertas before the trial?

24    A.   I do not know.

1     Q.   Do you know whether or not he interviewed

2   Mr. Carrero before the trial?

3     A.   I don't know.

4     Q.   But do you know whether or not he interviewed

5   Mr. Garcia before the trial?

6     A.   I don't know.

7     Q.   Do you recall any -- do you have a present

8   recollection of any impediment to interviewing any of

9   those three?

10    A.   Present?

11    Q.   Presently remember anything that prevented

12  you or Mr. Carey from interviewing those three

13  witnesses back when you were preparing for trial?

14    A.   I don't know, generally speaking, because --

15    Q.   You don't remember?

16    A.   I don't remember.  However, impediments to

17  interviewing people.  So Huertas is the one that was

18  with Morales when he died, right?  I believe so.  If

19  that's who it is, the state -- he's a state witness,

20  and the state would be all over that.  I mean, like

21  crazed.

22         And that doesn't mean that someone didn't go

23  out to talk to him.  It doesn't mean that Daryl Ellis,

24  the investigator, didn't go out and talk to him.  The

1    others, I would suspect that Cristino Garcia was

2    trying to stay out of the limelight.  And Carrero was

3    a state witness.

4        Q.  Do you have any present recollection -- I'm

5    just going to -- because I know you are surmising.

6        A.  You know, my brain's going crazy is what is

7    going on.

8        Q.  I know you're surmising what could have been

9    an impediment.  My question is, I know you know, is a

10   little bit different.

11           Do you have a present recollection as to any

12   impediment to interviewing -- a specific recollection

13   of anything preventing you or Mr. Carey from

14   interviewing those witnesses as you were preparing for

15   trial?

16       A.  Just what I said.

17       MR. RICHARDS:  Objection.  Asked and answered.

18       THE WITNESS:  It's okay.

19       MR. RICHARDS:  But you may answer.

20       THE WITNESS:  Okay.  Thank you.  As I said.

21   BY MS. GOLDEN:

22       Q.  And your answer, you didn't remember

23   anything --

24       A.  No.

1    Q.   -- specifically.  You remembered things that

2   you were providing potential?

3    A.   Right.  I was surmising.

4    Q.   And do you know who Lemont Burr is?  Lemont

5   Burr?

6    A.   No.

7    Q.   Okay.  So I take it you don't remember any

8   attempts to interview him, is that fair?

9    A.   Yes.

10   Q.   Okay.  Do you remember anything preventing

11  you either you or Mr. Carey from interviewing any

12  witness?

13   A.   My answer is no, I don't remember.

14   Q.   Do you remember Diana's family being

15  generally cooperative with the case?

16   A.   I don't remember them being generally

17  cooperative or not.

18   Q.   Okay.  Do you have any reason to believe that

19  Diana's family would not have been cooperative?

20   A.   No.

21   MS. GOLDEN:  Okay.  I don't have any other

22  questions.  I don't have any other questions, but...

23   MS. CARNEY:  I don't.

24   THE WITNESS:  This is the look of please.

1    MS. CARNEY:  I do not --

2    MR. RICHARDS:  Is it my turn, or does the other

3  defense counsel want to go first?

4    THE WITNESS:  They're debating.

5    MS. GOLDEN:  People are trying to be brave, but I

6  think they're not going to be.

7    MS. CARNEY:  No.  It's not about not being brave.

8  I have no questions.

9    THE WITNESS:  Thank you.

10    MR. SCHALKA:  I have no questions.

11    MS. GOLDEN:  It is Mr. Richards' floor.

12    MR. RICHARDS:  All right.  So it's on me.

13                    EXAMINATION

14  BY MR. RICHARDS:

15    Q.   Okay.  So let me start near the end of the

16  questions and then work backwards a little bit.

17        First of all, in terms of the questions about

18  your expertise, I think you were cut off a little bit,

19  and I would like to ask you some things in more

20  detail.

21        First of all, you remembered that you had

22  done 25 jury trials as a public defender before you

23  left the office, approximately?

24    A.   Yes.

1    Q.   And one reason why you might remember the

2   number without remembering specific cases is that when

3   you apply for judge, that's kind of the information

4   you have to list, correct?

5    A.   It is.  It is.

6    Q.   So at some point you probably wrote a

7   document either, you know, application to the Supreme

8   Court or, you know, something to a bar association

9   where it said, they're asking about your

10   qualifications; you said, well, I've done 25 jury

11   trials, correct?

12    A.   Yes.

13    MS. GOLDEN:  Object to form.

14   BY MR. RICHARDS:

15    Q.   You can answer.

16    A.   Every two to four years those bar association

17   things.

18    MS. GOLDEN:  So if I object, you don't -- no one

19   needs to say, you can answer.  You can just always

20   answer.

21    THE WITNESS:  Okay.

22   BY MR. RICHARDS:

23    Q.   Okay.  I'll skip that.  In any -- now, in

24   terms of the public defender's office, I want to go

1    into a little more detail about it.

2          Before the union was instituted, partially

3    due to your efforts and other people, there was such a

4    thing as murder task force, correct?

5       A.   There was.

6       Q.   But people went on to murder task force just

7    because they were co-opted by management or the people

8    on murder task force and invited to come in, correct?

9       A.   Some of them.  Some of them, that's true.

10   Yeah.

11      Q.   And they didn't get any more money just for

12   being on murder task force.  It was just they wanted

13   to be on murder task force, correct, or somebody

14   wanted them to be?

15      A.   Correct.

16      Q.   And throughout the office, public defenders

17   would have reputations in terms of their skills as an

18   attorney, correct?

19      A.   Yes.

20      Q.   In fact, there was constant discussion

21   throughout the office of, you know, who was good, who

22   was bad, who was winning, who had done a good job, all

23   that sort of thing, correct?

24      A.   Correct.

1    Q.   Now, I'm not asking you to blow your own

2  horn, but maybe I am; but would it be fair to say that

3  throughout the office, you were recognized as one of

4  the better -- the kind of elite of the attorneys in

5  the trial division?

6    A.   I had a good reputation.

7    Q.   One of the things that happens when you have

8  a good reputation in the public defender's office in

9  those days is that you were invited to do training

10  either as a coach or as a lecturer or both, correct?

11    A.   Yes.

12    Q.   And you were, in fact, asked and did those

13  things on a number of occasions, correct?

14    A.   Yes.

15    Q.   In fact, you probably don't remember this,

16  but you were one of my coaches or teachers at a

17  training once upon a time.

18    A.   You're right.  I don't remember.

19    Q.   All right.  Then I'll skip it.

20    A.   It goes with everything else I didn't

21  remember today.  Sorry.

22    Q.   But in any event 25 jury trials over the

23  period you were in the -- first of all, the 25 juries

24  that you had when you were in the public defender's

1   office, you told us earlier that when you were in

2   juvenile, basically, there were very few jury trials,

3   correct?

4       A.  There were none.

5       Q.  Right.  There is a couple of exceptions.

6   There is a couple of times when you can have a jury

7   trial in juvenile; but, generally, there is no right

8   to a jury trial.

9           So it's all bench trials, right?

10      A.  Correct.

11      Q.  So all -- and in addition in terms of the

12  number of jury trials you did, two of the judges, as

13  you've described, were judges who it wasn't a good

14  idea to do a jury trial in front of them because they

15  were such good judges for the defense, right?

16      A.  Correct.

17      Q.  So the majority of your jury trials would

18  have been in the period when you were with more pro

19  prosecution judges, like Judge Hett and Judge

20  Karnezis, or when you were in murder task force,

21  correct?

22      A.  Correct.

23      MS. GOLDEN:  Object to form.

24  BY MR. RICHARDS:

1    Q.   And so in that short period of time when you

2    had those courtrooms assignments, and you were in

3    murder task force, you, in fact, did 25 jury trials,

4    correct?

5    A.   Correct.

6    Q.   Which -- and correct me if I am wrong, based

7    on experience, many civil attorneys don't do jury

8    trials in their entire career in their lifetime,

9    correct?

10   MS. GOLDEN:  Object to foundation.

11   THE WITNESS:  Correct.

12   BY MR. RICHARDS:

13   Q.   Now, let me just focus on something in your

14   affidavit, which I think gave you a little bit of

15   trouble.  Maybe I can help you out with this.

16        You were asked about the phrase, reasonable

17   probability of a different outcome.

18        Do you remember that question?

19   A.   Yes.

20   Q.   Okay.  Would it surprise you to learn that

21   the legal definition of reasonable probability of a

22   different outcome is not that there was more likely

23   than not a different outcome; but that there is a

24   reasonable probability such to undermine competence in

1  the verdict?

2      MS. GOLDEN:  Object to form.

3      MS. CARNEY:  And leading.

4      THE WITNESS:  How about if I say okay, I

5  understand what you just said, and I didn't know that.

6  BY MR. RICHARDS:

7      Q.  Okay.  Well, now that -- just assuming

8  hypothetically that my recitation of the law as to

9  what reasonable probability means is correct, and you

10  can check out Strickland versus Washington if you have

11  a doubt, are you now more comfortable saying that had

12  you known -- had these three things been known,

13  Cristino Garcia's new evidence, Luis Huertas's new

14  evidence, Benjamin Carrero's new evidence, that that

15  would have been sufficient to undermine confidence in

16  the verdict?

17      MS. GOLDEN:  Object to form and undisclosed

18  opinion.

19      THE WITNESS:  I would say it makes me more

20  comfortable.  I understand.

21  BY MR. RICHARDS:

22      Q.  Okay.  And as long as we're on the topic, you

23  didn't say this in your affidavit, but you did read

24  the amended motion to vacate, which in addition to

1  having those three affidavits also details the many,

2  many instances where Guevara has been accused and, in

3  fact, found liable for misconduct.

4       That was in the amended post-conviction

5  petition as well, correct?

6    A.  Correct.

7    Q.  In the amended motion to vacate as well,

8  correct?

9    A.  Correct.

10    Q.  And you read that, right?

11    A.  I did.  I went through it.  Let's just not

12  say -- I can't say I just read it.  I'm going to stick

13  to what I've been saying because I didn't read it all,

14  but I read.  And you know from what I've said today, I

15  riffled through a lot of stuff, and I did see that

16  stuff.  Yes.

17    Q.  Well, let me just ask you this just as a

18  hypothetical.

19       Let's say that Cristino Garcia's affidavit,

20  Lewis Huertas's affidavit, and Benjamin Carrero's

21  affidavit -- by the way he's also testified to, but

22  leaving that aside -- let's say they had all said that

23  these things were done not by Officer Guevara but by

24  Officer Joe Friendly, who nobody has ever heard of and

1  has never been accused of misconduct, would it make a

2  difference that all three of them are identifying

3  Officer Reynaldo Guevara as the person who did this

4  misconduct?

5      MS. GOLDEN:  Object to form.

6      MS. CARNEY:  Incomplete hypothetical.

7      THE WITNESS:  Do you mean would it make a

8  difference if they're all saying Joe Friendly?

9  BY MR. RICHARDS:

10     Q.   In other words, they're not all saying Joe

11 Friendly.

12        Yes.  If they're all just saying, it's some

13 officer who none of us have heard of whose never been

14 accused of misconduct --

15     A.  Okay.

16     Q.  -- and we have those affidavits to

17 undermine -- to undermine confidence in the verdict,

18 is that going to make -- well, let me flip it around.

19        Is it going to make -- does it make the

20 affidavits more credible or more important that they

21 all name Reynaldo Guevara, who has been credibly

22 accused of misconduct in other instances?

23     MS. GOLDEN:  Object to form and foundation.

24     THE WITNESS:  Yes.

1    BY MR. RICHARDS:

2       Q.  That leads me into another topic, which I'd

3    like to get into, and I think you sort of touched on

4    it.  Let's take our minds back to the early 90s in the

5    public defender's office and in murder task force.

6            Was there a belief among many public

7    defender, yourself included, that there were a

8    substantial number of officers out there who engaged

9    in misconduct particularly in the investigation of

10   murder cases?

11      MS. CARNEY:  Objection.  Form, foundation,

12   incomplete hypothetical.

13      THE WITNESS:  I have a -- I can't go quite that

14   far.

15            I will say the police officers that were

16   talked about the most in our work, whether it was task

17   force or other felony courtrooms, were the ones who

18   acted up, who did things.

19            They're always going to be the ones that

20   get talked about, right?  They're the ones we're going

21   to -- that we all know from the office.

22   BY MR. RICHARDS:

23      Q.  Okay.  And I want to go such into detail

24   about the officers who were known or at least

1   suspected at the time.

2        Have you ever heard of Officer Jon Burge?

3   A.  Yes.

4   MS. CARNEY:  Hold on.  Sorry.  Objection.  Form.

5   MR. RICHARDS:  What?

6   MS. CARNEY:  I am just putting on the record,

7   form, foundation.

8   MR. RICHARDS:  Okay.

9   MS. CARNEY:  Outside the scope of her affidavit

10  and relevance.

11  BY MR. RICHARDS:

12   Q.  Got it.  Have you ever heard of Officer Jon

13  Burge?

14        For the court reporter that's spelled J-O-N.

15  And last name is Burge, B-U-R-G-E.

16        Have you ever heard of him?

17   A.  Yes.

18   Q.  And had you heard of him when you were in

19  murder task force?

20   A.  I don't recall hearing of him when I was in

21  task force.  It was after that.

22   Q.  After that you heard of him?

23   A.  Yes.

24   Q.  You had mentioned a name to me that had come

1   up in connection with this case, which I'm blanking

2   on, but you mentioned in one of your emails that, I

3   think, it begins with a V.

4        Is it Vukovich?

5   A.  Yes.

6   Q.  Okay.  So what was known or what was

7   suspected about Officer Vukovich at the time?

8   MS. GOLDEN:  Form.

9   THE WITNESS:  I can't put it together again.  I

10  really can't.

11       However, he sometimes was partnered with

12  Detective Kato, and there were plenty of issues there.

13  And so sometimes Vukovich was a part of that, I

14  believe, if I remember everything correctly.

15  BY MR. RICHARDS:

16   Q.  All right.  Now, as to Officer Kato, and

17  that's -- is that Officer Kriston Kato?

18       K-R-S-T-I-N.  Kato spelled K-A-T-O.

19       Was Officer Kato suspected of misconduct at

20  the -- at that time when you were in murder task

21  force?

22  A.  Yes.

23  Q.  Did you personally suspect him of misconduct?

24  A.  Yes.

1      MS. GOLDEN:  All right.  So we are really far

2   afield of the allegations in the complaint.  You don't

3   have a Monell claim, and so I don't know what we're

4   doing with this, but I'll let you go a little bit.

5      MR. RICHARDS:  Well, I appreciate the speech.  But

6   speaking objections, I think, are inappropriate,

7   No. 1.  No. 2, you brought this up when you asked her

8   about the Mari case.

9      MS. GOLDEN:  The what?

10     MR. RICHARDS:  And it is relevant to an issue in

11   the case, and I'll try it up in a moment.

12     MS. GOLDEN:  Okay.  Great.

13     MR. RICHARDS:  That all being said, unless there

14   is a privilege objection, I would like to have the

15   question answered.

16   BY MR. RICHARDS:

17     Q.   So you had told me that you did suspect

18   Kriston Kato of misconduct when you were on murder

19   task force, correct?

20     A.   Yes.

21     Q.   Okay.  And did you take steps with Officer

22   Kato to try and uncover evidence of his misconduct

23   apart from your case, like evidence of a propensity?

24     A.   Yes.

1    Q.   What steps did you take to uncover evidence

2   of his misconduct?

3    A.   There were a number of cases in the office,

4   and a number of cases with private attorneys, all of

5   which pointed the same direction, same basic stuff.

6         And we got together to share information.  We

7   were trying to get the judges to let us put that

8   information forth.

9    Q.   In other words, if you had one case in which

10   he was accused of misconduct, if you knew of other

11   cases where similar misconduct was alleged, whether

12   private attorneys or public defenders, you tried to

13   get that evidence admitted in your case, correct?

14    A.   Correct.

15    Q.   And in terms of misconduct that your were

16   alleging against Kriston Kato, some of it involved

17   physical violence towards suspects, correct?

18    A.   Correct.

19    Q.   Including using -- including using either a

20   phone book by itself, heavy, old-style phone books, or

21   a flashlight or baton struck through a phone book in

22   order to inflict pain on suspects, correct?

23    A.   Um, I personally am very concerned about

24   continuing to talk about Kriston Kato.  I know that I

1    said his name earlier.  It was in a context, and I

2    think that it would be wiser for me not to do this at

3    this time.  I don't think it will help in this case

4    because it's not the same people, and I do have that

5    testimony coming up later this year on a case that's

6    that same age as this one.

7        Q.  I understand.  I understand.

8        A.  It makes me really uncomfortable.

9        Q.  I understand that.  And I understand you were

10   uncomfortable earlier.

11            But the point I am leading to is this, and

12   I'll get to the heart of it, knowing -- had you known

13   that Guevara had been credibly accused of using the

14   phone book flashlight method in this case on Cristino

15   Garcia, is that something you would have wanted to

16   investigate?

17       MS. CARNEY:  Objection.  Form, leading.

18       THE WITNESS:  Yes.

19   BY MR. RICHARDS:

20       Q.  And just, in general, was it your experience

21   that some of the methods used by some officers, not

22   naming anyone in particular, such as the phone book

23   method or methods such as pulling hair or more binder

24   sorts of physical abuse were undertaken precisely

1  because they were less likely to leave a mark or

2  visible injuries?

3     MS. GOLDEN:  All right.  Foundation.

4     MS. CARNEY:  Objection.  Form, foundation, outside

5  the scope in that there is no Monell claim.

6     THE WITNESS:  You guys have to tell me what that

7  is later.

8         Yes.

9  BY MR. RICHARDS:

10    Q.  Okay.  Now, so that all being -- that all

11  being said, at the time -- at the time of, um, Jaime

12  Rios's trial, correct me if I am wrong, you had no

13  knowledge of a pattern of practice with respect to

14  Reynaldo Guevara of some of the things we're talking

15  about here?  You didn't know anything about him, did

16  you?

17    A.  No.

18    MS. GOLDEN:  Is that correct?

19  BY MR. RICHARDS:

20    Q.  And, in fact --

21    MS. GOLDEN:  Double negative.

22  BY MR. RICHARDS:

23    Q.  -- in the documents you read, doesn't it

24  appear that he was a gang specialist until a few

1   months before your -- he was a gang specialist, not a

2   detective at the time of the investigation of the

3   Morales murder and didn't become a detective until

4   shortly before he testified in Jaime Rios's trial, is

5   that true?

6       MS. GOLDEN:  Form.

7       MS. CARNEY:  And leading.

8       THE WITNESS:  I think I read that.  I think he

9   testified to that or something along those lines.  I'm

10  not sure, but I thought I knew that about this case.

11  BY MR. RICHARDS:

12      Q.   Moving on to something that was brought up in

13  the questioning about informants.  It was pointed out

14  that there was a couple of motions to disclose

15  informants that were done in this case, and you said

16  that that was typically something that was done, but

17  the judges never gave anybody any traction on that.

18          Is that fair?

19      A.   Yes.

20      Q.   Do you recall that in Guevara's testimony

21  both at the motion and at trial he gave varying counts

22  of when he spoke to the informants, how many

23  informants there were, and whether they were all

24  confidential informants, or some of them were not?

1          Do you recall that testimony?  If you don't,

2    that's fine.  I'm just asking.

3        A.  I remember it's in there.  I didn't read it

4    with any detail.

5          Again, that wasn't something I thought would

6    come up today.  So I didn't, you know, memorize

7    anything.  Sorry.

8        Q.  Fair enough.  With respect to -- you did

9    have -- I did show you or gave you Mason's deposition.

10         Okay.  Were you able to look at that in any

11    detail?

12        A.  I looked at it.

13        Q.  Detective Mason.

14        A.  I did read it.

15        Q.  Okay.  Do you recall that in Detective

16    Mason's deposition, he claims that he met with some of

17    the informants but is not able to give one single

18    piece of description of any of the informants as to

19    their age, height, weight, anything, name, anything

20    about them?  Do you recall his testimony?

21        A.  No.  Sorry.  I didn't -- I don't.

22        Q.  Okay.  Assuming that's true, would that raise

23    also a suspicion as to whether the informants actually

24    existed and gave all this information?

1      A.   Yes.

2      Q.   We talked a little bit, in general, about --

3   oh, and you had mentioned before, I just wanted to

4   reiterate, one of the things that you did in terms of

5   investigating officers suspected of misconduct was you

6   tried to subpoena their complaint registers, correct?

7      A.   Correct.

8      Q.   But at that point, the judges uniformly shut

9   you down?

10      A.   Correct.

11      Q.   Would it also be fair to say that there was

12   kind of a split opinion that many public defenders

13   believed that there were officers out there who were

14   using, you know, illegal tactics including physical

15   violence; but that many of the prosecutors and the

16   judges would claim that such things never happened?

17      MS. GOLDEN:  Object to form and foundation.

18      THE WITNESS:  I don't really understand the

19   question.

20   BY MR. RICHARDS:

21      Q.   Well, let me ask you this:  You earlier said,

22   I think you agree, that many public defenders at least

23   from their own experience and based on their cases,

24   believed that there were some officers out there who

1   were using illegal tactics including physical

2   violence, correct?

3       MS. GOLDEN:  Object to foundation.

4       THE WITNESS:  Yes.  There were some.

5   BY MR. RICHARDS:

6       Q.  Okay.  One of them being you?

7       MS. GOLDEN:  Some officers or some public

8   defenders?

9       THE WITNESS:  Oh, some public defenders.

10  BY MR. RICHARDS:

11      Q.  Yes.

12      A.  Okay.

13      Q.  One of those public defenders being you.  You

14  believed that?

15      A.  Yes.

16      Q.  Okay.  Would it also be fair to say that

17  there were a fair number of prosecutors and judges who

18  would maintain that these things, the physical

19  violence on the part of the officers never happened?

20      MS. CARNEY:  Objection.  Form, foundation.

21      THE WITNESS:  Yes.

22  BY MR. RICHARDS:

23      Q.  Now, we already talked, and you were asked a

24  fair number of questions about Jaime Rios's

1    court-reported statement and circumstances of it.

2          First of all, do you recall -- well, put it

3    this way.  In terms of deciding whether a confession

4    is truth, reflects the truth, or is something that's

5    been fabricated by the police, suggested, or otherwise

6    coerced, isn't one of the factors you looked at to see

7    whether the confession matches up to the physical

8    evidence?

9          Would that be a fair statement?

10    A.  Sure.  Yes.

11    Q.  Okay.  And if you don't remember this or know

12    it, just you can tell me that.

13          Do you recall whether Jaime Rios's

14    description of the distance between the gun when it

15    was fired and Ms. Morales was consistent with the

16    medical examiner's testimony or not?

17    A.  I think there were a lot of inconsistencies

18    about distance of the gun.  There is something about

19    5 miles and something about 5 feet, and something

20    about -- you know, so I'm not sure I have all of that.

21    Q.  Well, you have memory of some of it.  So

22    let's just go over some of it just on what you said.

23          Do you remember the part of it where Jaime

24    Rios is asked how far away he was, and when Cristino

1    allegedly fired, and he first says 5 miles away?  Do

2    you remember that part?

3        A.  I do.  I do.

4        Q.  Sort of striking, isn't it?

5        A.  Yes.

6        Q.  And would one theory as to what's happening

7    is that Jaime is -- or Jamie is trying to tell the

8    state's attorney that this is all false, that he

9    really wasn't there?

10        A.  I don't think I can answer that.

11        Q.  Okay.  That's fair.  But it's a part of the

12    statement that's not consistent with anything else,

13    correct?

14        MS. GOLDEN:  Object to foundation.

15        THE WITNESS:  It's not consistent.

16    BY MR. RICHARDS:

17        Q.  Okay.  And the part of the statement where

18    Jamie says that the gun was less than a foot away from

19    Morales's head before he was shot, is that consistent

20    with the medical examiner's testimony that there was

21    no evidence of close-range firing?

22        MS. GOLDEN:  Object to foundation.

23        THE WITNESS:  I wasn't clear.  Close range, a few

24    feet away, 5 miles away.  I just -- I don't know the

1   answer to that.

2   BY MR. RICHARDS:

3       Q.  Okay.  All right.  And do you remember if --

4   do you remember there were search warrants done to try

5   and find the guns used in the shooting?  Do you recall

6   that from the transcript?

7       A.  Yes.

8       Q.  And one of the guns -- one of the guns by

9   ballistics was a 25 caliber, correct?

10      MS. GOLDEN:  Foundation.

11      THE WITNESS:  I know there was the issue of a 22,

12  a 25, and a 38.

13  BY MR. RICHARDS:

14      Q.  Right.  And --

15      A.  That's all from memory.

16      Q.  Well, first of all, in terms of 22 or 25, and

17  in Jaime Rios's statement he first says 22; and then

18  the state's attorney says, well, couldn't it have been

19  a 25, and then he says okay.

20          Do you remember that part of the statement?

21      A.  Yes.

22      Q.  And, in fact, the ballistics or the recovered

23  shells were all from a 25 caliber, not a 22, correct?

24      MS. GOLDEN:  Foundation.

1    THE WITNESS:  I believe that's correct.

2   BY MR. RICHARDS:

3    Q.  If you recall?

4    A.  I believe.

5    Q.  And in terms of the 38 caliber, which in the

6   statement Jaime Rios says that he had supposedly, in

7   fact, the gun -- the gun recovered from Benjamin

8   Carrero, which he had claimed he had got from Jamie

9   Rios was a different caliber.

10       It wasn't a 38, correct?

11    MS. GOLDEN:  Object to form and leading.

12    THE WITNESS:  I just know it wasn't a 38.

13   BY MR. RICHARDS:

14    Q.  It didn't match up with the 38 in the

15   statement, correct?

16    A.  Right.

17    MS. GOLDEN:  Same objections.

18   BY MR. RICHARDS:

19    Q.  Now, the state's attorney asked you a number

20   of questions, and I think I need to untangle this.

21    MS. GOLDEN:  Are you talking about me?

22    MR. RICHARDS:  Oh, I called you a state's

23   attorney.

24    MS. GOLDEN:  You did indeed.

1    THE WITNESS:  Out of habit.

2    MR. RICHARDS:  That is out of total habit, and

3  I'll strike those remarks.  I won't accuse you of

4  anything that you're not.

5  BY MR. RICHARDS:

6    Q.  In any event, what I want to get at is this:

7        In general, when you have talked to some --

8  you talked to a defendant, and the defendant tells you

9  something about how a statement was coerced, right,

10  would it be ethical to cross -- at trial to cross

11  examine the interrogating detective about your

12  client's accusations without knowing whether your

13  client is going to take the stand to actually put

14  those accusations into evidence?

15    A.  Most judges would not allow you to.  Or some

16  of them wouldn't allow you to.

17    Q.  Right.  And that was for the reason that was

18  pointed out by your earlier questioning, that you have

19  to have a good faith belief to ask a question, and if

20  you make an accusation or insinuation, generally,

21  you're expected to be able to prove it up, right?

22    A.  Correct.

23    Q.  And in a criminal trial, you never can know

24  whether you can prove up an accusation coming from the

1  mouth of your client because you can't be absolutely

2  certain your client will testify, correct?

3     A.   That's true.

4     Q.   Which is the reason why when Detectives Mason

5  and Guevara testified in the state's case in chief, no

6  one asked them about Jamie Rios's accusations, fair?

7     MS. GOLDEN:  Object to foundation.

8     THE WITNESS:  I don't know.  I don't know.

9  BY MR. RICHARDS:

10    Q.   Well, do you remember that, in fact, isn't

11 the usual sequence that if the defendant then takes

12 the stand and accuses officers of misconduct, then the

13 state's attorney or the state will bring in the

14 officers in rebuttal to deny the misconduct, correct?

15    A.   Yes.

16    Q.   And isn't that exactly what happened in this

17 case when Jaime Rios testified to coercion and

18 fabrication of the statements, and then he was

19 rebutted by Detective Mason who came in to -- or to

20 say it wasn't true?

21    MS. GOLDEN:  Object to foundation.

22    MS. CARNEY:  And leading.

23 BY MR. RICHARDS:

24    Q.   And if you don't recall, that's fine.

1    A.  I don't recall.

2    Q.  But in terms of how criminal trials go, that

3  would be a typical sequence of events, fair?

4    A.  Absolutely.

5    Q.  Now, it was also implied earlier that Jaime

6  Rios had never told you or had never told Jack Carey

7  that parts of his statement were fabricated.

8       Do you remember those questions?

9    MS. GOLDEN:  Object to foundation.

10    THE WITNESS:  That parts of his statement were

11  fabricated?

12  BY MR. RICHARDS:

13    Q.  Well, first of all -- well, let me approach

14  this in another way.

15       In Jamie Rios's testimony at the trial,

16  didn't he say both in direct and more specifically

17  when cross examined by the state's attorney that

18  certain parts of the court-reported statement were not

19  things he had said, but things he had been told to say

20  by Detectives Mason and Guevara?

21    MS. GOLDEN:  Object to foundation.

22    THE WITNESS:  He did say that, yes.

23  BY MR. RICHARDS:

24    Q.  Okay.  Well, let me put it this way to you,

1  and a number of questions have been asked maybe going

2  beyond a privilege, but frankly we don't care, about

3  whether Jaime Rios had given certain information to

4  you.

5       Do you think, based on your knowledge of Jack

6  Carey, that he would have put Jaime Rios on the stand

7  to make those accusations about a fabricated statement

8  if he had not known, Carey that is, that that was what

9  Jaime Rios was going to say?

10     MS. GOLDEN:  Form.

11     THE WITNESS:  I think Jack Carey was a fine, fine

12  attorney who operated in both an ethical and -- way,

13  and that he really didn't leave many stones unturned,

14  if any.

15          I can't answer your question only

16  because I'm not sure what the question is.  I'm sorry.

17  I am -- it's late, and I'm just getting kind of tired.

18  But so I just can't answer it with a yes or no.

19  BY MR. RICHARDS:

20     Q.   Okay.  Well, let me put it to you the

21  following:  Assume that Jaime Rios testified that both

22  in direct and cross that his court-reported

23  statement -- certain parts of the court-reported

24  statement, in fact most of the court-reported

1    statement, was suggested to him by Guevara and Mason

2    rather than being the truth --

3      A.  Okay.

4      Q.  -- or things that he had provided to them.

5          The question is, given your knowledge of Jack

6    Carey, do you think Jack Carey would have put Jaime

7    Rios on the stand to testify and bring out those

8    things without knowing that that's what he was going

9    to testify to?

10     A.  No.

11     Q.  By the way, it was mentioned that -- we

12   earlier established that you -- at least you or anyone

13   you knew of had no suspicions as to Detective Guevara

14   at this point back in 1990.

15         And, in addition, did you notice in your

16   review of the police reports there are not, in fact, a

17   lot of mentions of Guevara or documents authored by

18   Guevara?

19     MS. GOLDEN:  Object to form and foundation.

20   BY MR. RICHARDS:

21     Q.  Did you notice or take note of that or not?

22     A.  I didn't notice it.

23     Q.  Okay.  That's fair.

24         Do you remember that during the trial both

1   Mason and Guevara testified that Guevara played no

2   part in the interrogation?  He wasn't even there.  Do

3   you remember that?

4       MS. GOLDEN:  Foundation.

5       THE WITNESS:  In the interrogation of Jamie?

6   BY MR. RICHARDS:

7       Q.  Yes.  Jamie Rios, yes.

8       A.  Yes.  I remember that.

9       Q.  Okay.  Is there any reasonable -- and, in

10  fact, the only person who said Guevara participated in

11  the interrogation was Jamie Rios, correct?

12      MS. GOLDEN:  Object to foundation.

13      THE WITNESS:  I'm not sure.  I'm not sure.

14  BY MR. RICHARDS:

15      Q.  Okay.  Well, wouldn't one explanation for the

16  fact that Jaime -- Jamie Rios put Guevara in the

17  interrogation as doing certain things; whereas, other

18  people did not, or at least Mason and Halverson did

19  not put him there, wouldn't one explanation be that

20  Jamie -- Jamie, and particularly given Guevara's later

21  record, wouldn't one explanation for that be that

22  Jamie Rios was telling the truth, and Guevara was in

23  the interrogation and did abuse him?

24      MS. GOLDEN:  Object to form and foundation.

1     THE WITNESS:  I can't answer that.  I don't know.

2   BY MR. RICHARDS:

3     Q.   Okay.  You said a number of things about how

4   the public defenders investigated in those -- in those

5   days.  But, frankly, as a public defender who was

6   around there at the time, I found fascinating.  But I

7   want to get -- nail them down.

8          You said one problem with talking to

9   witnesses on the state list was that it often created

10   problems or issues, correct?

11     A.   Yes.

12     Q.   One of these issues was that when the -- our

13   investigators went out there, when the public

14   defenders' investigators went out there, they would

15   often get accused, maybe unfairly argue of

16   misrepresenting who they worked for, or telling people

17   things or doing things to try and get people to make

18   false statements, correct?

19     A.   Yes.

20     Q.   And these accusations were commonplace?

21     A.   Yes.

22     MS. GOLDEN:  Object to form.

23   BY MR. RICHARDS:

24     Q.   And, in fact, what many publicly defenders

1   decided to do in the face of those accusations was not

2   do interviews of state witnesses to avoid any problem

3   with being accused of misconduct or tainting the

4   witnesses, correct?

5       A.   Certainly to avoid any problems, without a

6   doubt.

7       Q.   And it's also true that in terms of

8   investigation of the case comparing, let's say, the

9   police doing the investigation and public defender

10  investigators doing the investigation or asking

11  questions, is the police have a certain authority or

12  clout with the witnesses just because of their

13  position as police officers, right?

14      A.   Yes.

15      Q.   And would it be fair to say that in your

16  experience some officers would use that position or

17  clout in unfair ways such as threatening witnesses

18  with loss of their children or being charged or other

19  things to get the witnesses to say what they wanted

20  them to say?

21      MS. GOLDEN:  Object to form and foundation.

22      THE WITNESS:  Yes.  Luckily, it's not all, all of

23  them.

24  BY MR. RICHARDS:

1    Q.  I didn't say it was all, but some.

2        Now, the -- so there was that.  So there is

3    the general principle or a general tendency, we'd say,

4    tilting against interviewing state witnesses before a

5    trial?

6    A.  Definitely.

7    Q.  Let me also talk to you about alibis and

8    alibi witnesses.

9        Would it be fair to say that whether to

10   introduce an alibi or to bring in alibi witnesses was

11   a complicated question on which people had different

12   opinions and depended a lot on the individual

13   circumstances?

14   MS. GOLDEN:  Object to form.

15   THE WITNESS:  Yes.  That would be true.

16   BY MR. RICHARDS:

17   Q.  And one circumstance, for example, might be

18   how soon after a crime had been committed the

19   defendant had been arrested, correct?

20   A.  It helps people remember where they are, as

21   you can see.

22   Q.  Right.

23   A.  Case in point.

24   Q.  Well, as it's coming back to you -- well,

1    just to give you a hypothetical, for example, if a

2    suspect is related weeks after a crime, or a year

3    after a crime, as opposed to within a day of the

4    crime, a jury is less likely to be thinking, gee, he

5    should know where he was, why haven't we heard about

6    an alibi, correct?

7        A.   True.

8        Q.   And another factor is whether the alibi is

9    something that depends on work records or being in a

10   particular place or being in jail as opposed to an

11   alibi that's backed up only by relatives, correct?

12       A.   Yes.

13       Q.   And there is a real problem with alibis being

14   backed up only by relatives, like if you're at home,

15   because juries tend to assume a narrative that the

16   relatives are going to lie for you, and that's all it

17   means is relatives are lying for you, correct?

18       A.   Correct.

19       Q.   In Jamie Rios's case he didn't have -- he

20   wasn't arrested immediately after the crime, correct?

21       A.   Not the same day.

22       Q.   He was arrested about a week later or a

23   little more than a week, correct?

24       MS. GOLDEN:  Foundation.

1    THE WITNESS:  I don't recall.  Honestly, I don't

2   recall.

3   BY MR. RICHARDS:

4    Q.  Okay.  And when he testified at trial, he

5   testified he was basically at home, not that he was at

6   work or in jail or had punched a time clock.  He

7   didn't testify to anything like that, correct?

8    MS. GOLDEN:  Foundation.

9    THE WITNESS:  As far as I know.

10   BY MR. RICHARDS:

11    Q.  Now in terms of -- in terms of

12   interviewing -- in terms of interviewing, I think we

13   have already covered Luis Huertas as a witness who

14   might have been interviewed.

15        In terms of interviewing Cristino Garcia, do

16   you recall that, in fact, he did recant part of his

17   statement to the officers at trial?

18    MS. GOLDEN:  Object to foundation.

19   BY MR. RICHARDS:

20    Q.  Or do you?

21    MS. GOLDEN:  I think your witness is confused.

22    THE WITNESS:  Yeah, certainly.  I don't recall

23   that.

24   BY MR. RICHARDS:

1    Q.  Okay.  Then we don't need to touch that.

2         But in terms of Cristino Garcia, one of the

3    problems -- one problem that you identified in

4    interviewing Cristino Garcia is that Jaime Rios's

5    court-reported statement made Garcia into the shooter,

6    correct?

7    A.  Correct.

8    MS. GOLDEN:  Object.  Hold on.

9    BY MR. RICHARDS:

10   Q.  So that Garcia was very unlikely --

11   MS. GOLDEN:  Hold on a second.  I have a belated

12   objection --

13   MR. RICHARDS:  Sorry.

14   MS. GOLDEN:  -- to the form and foundation for the

15   previous question.  I think it misstates the record.

16   BY MR. RICHARDS:

17   Q.  Okay.  With respect to Cristino Garcia --

18   with respect to Cristino Garcia, would it be fair to

19   say that one problem with interviewing Garcia or

20   trying to get him in as a witness might be that at

21   some point somebody was going to tell him, if he

22   didn't already know, that Jaime Rios had made a

23   court-reported statement which identified Garcia as

24   the shooter and the murderer?

1      MS. GOLDEN:  Object.

2      THE WITNESS:  That would have been a problem,

3   absolutely.

4   BY MR. RICHARDS:

5      Q.   And another problem might have been in terms

6   of whatever Garcia was going to testify to or might

7   have testified to, there was no indication in the

8   police reports that he had made any statement at all,

9   correct?

10     MS. GOLDEN:  Object to form.

11     THE WITNESS:  Garcia --

12  BY MR. RICHARDS:

13     Q.   Or if you don't remember that, that's fine.

14     A.   I don't.  I don't.

15     Q.   Okay.  And, finally, a problem with calling

16  Cristino Garcia as a witness might have been that he

17  would have taken the Fifth, correct?

18     A.   Yes.

19     Q.   And contrary to what was suggested earlier,

20  there is a rule in criminal law that you can't call a

21  witness in front of a jury just to have the witness

22  take the Fifth, correct?

23     A.   I don't remember that.

24     Q.   Or do you?

1   A.  I don't remember that.

2   Q.  Okay.  All right.

3   A.  It seems like a cheat, but...

4   Q.  Well, different rules in criminal and civil

5   as --

6   A.  No.  But I don't --

7   Q.  -- Donald Trump --

8   A.  I just don't remember.  I really don't.

9   Q.  One moment.  Oh, okay.  Just a few more loose

10  ends.  I apologize to the witness for the hour and for

11  dragging you into this altogether, but there were also

12  some questions asked about the presentence

13  investigation.

14      So back then who would do the presentence

15  investigations?  Who actually made -- would do the

16  questions and make up the report?

17  A.  The probation officer.  Didn't they do them?

18  Q.  Was it -- I understand.

19      And would you also say that it's fair to say

20  that back then the quality of the work and the

21  accuracy of the reports varied between probation

22  officers?

23  A.  I wouldn't say there was all that much

24  variance.

1    Q.   Whereas, were they uniformly good or

2  uniformly bad?

3    A.   Uniformly bad.  Lacking.  Seriously lacking.

4    Q.   In other words, they didn't ask a lot of the

5  appropriate questions, didn't probe a lot, didn't do

6  all of those things, correct?

7    A.   Check the boxes.

8    Q.   In fact, I'm not sure if you're familiar with

9  this, but isn't there a huge contrast between that

10  quality of work and, let's say, the quality of work

11  done by pretrial officers or probation -- the people

12  who write the probation reports in federal court?

13    MS. GOLDEN:  Foundation.

14    THE WITNESS:  I don't have experience with the

15  ones in federal court, but I would be guessing so.

16  BY MR. RICHARDS:

17    Q.   And in terms of how they're actually done,

18  was it ever the practice or ever allowed for the

19  defense attorney to be present when the probation

20  officer was questioning the defendant for the pretrial

21  services report?

22    A.   No.

23    Q.   That never happened, did it?

24    A.   No.  No.

1    Q.   And you were also asked some questions about

2   how the defense counsel would check those reports for

3   accuracy.

4         Wasn't it the case that the normal practice

5   was for the pretrial services report to be delivered

6   on the day of sentencing, and that any review between

7   the defendant and -- between the defendant and the

8   attorney would have to take place right then sort of

9   in between the motion for new trial and the

10   sentencing?

11    A.   I remember that as being typically true.

12   More than that, I can't say.

13    Q.   And you, in fact, were not the attorney

14   present during the motion -- you were not present for

15   the motion for new trial and sentencing in this case,

16   at least as you recall, correct?

17    A.   I don't think so.  I don't have any memory of

18   being there.  It doesn't mean I wasn't, but I don't

19   have any memory of it.

20    Q.   All right.  You were also asked about the

21   question of calling mitigation witnesses at a

22   sentencing.

23         In general, at sentencing in murder cases

24   back then, would calling mitigation witnesses tend to

1   have a lot of impact or effect on a sentence?

2       A.   Judges knew what they wanted.  So the answer

3   would probably be no, not in most cases.  Every now

4   and then, but not usually.

5       Q.   Okay.  And Judge Karnezis who, by the way, I

6   have to say a word for because he did become much more

7   pro defense later on, which you didn't have any

8   experience of.

9            Would it be fair to say that back in those

10  days, he was a fairly pro prosecution judge and a

11  tough sentencer?

12      MS. GOLDEN:  Object to foundation.

13      THE WITNESS:  Not fairly.  He just was.

14  BY MR. RICHARDS:

15      Q.   Oh, I was saying fair to say, not that he was

16  fair.

17      A.   Okay.  But, yes, he was very.

18      Q.   Okay.

19      A.   Notably.

20      Q.   You were asked about whether there was a

21  question about accountability in a case, and we have

22  gone over that a little bit.

23           Do you remember also in the case there was a

24  theory -- well, first of all, Jaime Rios when he

1    testified never said anything like, I was there, but

2    it was all Cristino.  I didn't have anything to do

3    with it.

4         He never gave such testimony, did he?

5     MS. GOLDEN:  Object foundation.

6     THE WITNESS:  Not to my memory.

7         Sorry.

8    BY MR. RICHARDS:

9     Q.   And wasn't there a fairly significant theory

10   in the case that he had been misidentified by Luis

11   Huertas, and that the real killer was almost certainly

12   Jose Macho Melendez, one of the original suspects?  Do

13   you remember that?

14    A.   No.  I don't recall that.

15    MR. RICHARDS:  Okay.  I think that's all I have.

16    MS. GOLDEN:  I just have a little follow-up.

17    THE WITNESS:  Oh, my gosh.

18    MS. GOLDEN:  Do you want a break before we finish?

19    THE WITNESS:  No.  No, no, no.  I want out of

20   here.

21    MS. GOLDEN:  I know.  I know.  I have to go to the

22   bathroom.  I don't want to break either.

23                  EXAMINATION (Resumed)

24   BY MS. GOLDEN:

1    Q.  Okay.  Javier Torres, do you remember what he

2   looks like?

3    A.  No.

4    Q.  Ben Carrero, do you remember what he looks

5   like?

6    A.  No.

7    Q.  Do you remember what Detective Mason looks

8   like?

9    A.  No.

10    Q.  Do you remember what Samantha Hudson looks

11   like?

12    A.  No.

13    Q.  Do you remember what Iris Mendez looks like?

14    A.  No.

15    Q.  Did I ask you about Luis Huertas?

16    MS. CARNEY:  No.

17   BY MS. GOLDEN:

18    Q.  Do you remember what he looks like?

19    A.  No.

20    Q.  Okay.  But you saw all of them testify at the

21   criminal trial of Mr. Rios, right?

22    A.  Whoever testified, I saw --

23    Q.  Okay.

24    A.  -- at the trial.

1    Q.   Okay.  I think you said before, do you know

2   who Little Mike is?

3    A.   Boy, I remember that name, but I do not know.

4    Q.   I think you said -- I think you called Mr. --

5   well, you had some very nice things to say about

6   Mr. Carey and his trial skills and him as a person,

7   right?

8    A.   It's true, yeah.

9    Q.   And when did he pass?

10    A.   I don't remember.  I wasn't in the office

11   anymore, obviously.  And so, you know, I knew he was

12   sick, and then I just didn't know when he died.

13    Q.   Is it fair to say that some of the best

14   criminal defense attorneys and attorneys, in general,

15   know what witnesses not to call?

16    A.   Yes.

17    Q.   And they know what questions not to ask,

18   right?

19    A.   Yes.

20    Q.   That's often the hardest part of being a

21   litigation lawyer?

22    A.   I think it's true.

23    Q.   Okay.

24    A.   Because then you get second guessed.

1    Q.   Okay.  You said that there were officers back

2    in the day that used methods because they did not

3    leave a mark.

4         And were -- are you talking about -- I mean,

5    obviously, you're not in the head of any of these

6    officers as they're doing anything, right?

7    A.   Correct.

8    Q.   So this is just your personal opinion?

9    A.   Borne of years of defendants as clients.

10    Q.   And are any of the officers that you are

11   referring to that you had experience with, are any of

12   them Officer Guevara, Detective Mason, or Detective

13   Halverson?

14    A.   No.

15    Q.   You talked about the Fifth Amendment.  I am

16   going to pass on that because I can't remember it.

17        I think you said there were prosecutors and

18   judges who believed that police misconduct never

19   happened.

20    A.   They had blinders on.

21    Q.   Okay.  Were any of those prosecutors that you

22   are referring to involved in the Rios case?

23    A.   So I can't point fingers.  I can say that

24   some state's attorneys would get friendly and

1   acknowledge that, you know, officer so and so or

2   detective so and so, you know, did this probably; but

3   you know, it would -- they were not in a position of

4   revealing or going to someone and saying, yeah, I know

5   what happened here.  Or I was there.

6        But for the most part, it's one of the

7   reasons why the PDs and state's attorneys had to stay

8   apart for some, you know.

9   Q.  Okay.  So I am just looking for the

10  foundation for you to make at that statement.  Okay.

11       And I'm going to ask you if you can tell me

12  who -- by name who the prosecutors were that believed

13  that coercion never happened?

14  A.  I wouldn't give names.  I wouldn't know any

15  longer.  It's been a long time.

16  Q.  And what about the judges?  Do you remember

17  the names of any of the judges that you were referring

18  to when you said that believed coercion never

19  happened?

20  A.  Maloney, Hett, Huida, Karnezis.  I am sure I

21  could name some others, but I don't offhand -- didn't

22  work in front of them necessarily.

23  Q.  And so it's your understanding that they

24  never granted a motion to quash, never granted a

1 motion to suppress, and never sustained any

2 allegations of police misconduct?

3  A. None that I'm aware of certainly.  Not in my

4 cases.

5  Q. Okay.  So your basis for saying that is what

6 happened in the cases that you defended in their

7 courtrooms?

8  A. So my cases plus the fellowship of the public

9 defender's office.

10  Q. Okay.

11  A. You have to understand the PDs love good

12 judges.  They do.  It's not a thing of wanting to hang

13 judges or hang state's attorneys.  Everybody went and

14 drank at Jean's after work, you know, together.  It's

15 not that.  Everybody knew.

16  Q. But the basis for you're saying that -- that

17 there were judges -- that those specific judges never

18 believed that there was no such thing as police

19 coercion, it was of the cases that you had in front of

20 them and then talk amongst public defenders?

21  A. Right.

22  Q. Okay.  I think you also said in response to

23 one of Mr. Richards' questions that some officers

24 threatened witnesses with the loss of their child in

1    order to get them to say what they wanted.

2         And what officers are you referring to?  Are

3    you referring to Officer Guevara, Detective Halverson,

4    or Detective Mason?

5       A.  I can't say.  I know that there are

6    allegations in this case of that, but that's not

7    something I know of myself.

8       Q.  So when you made the statement that some

9    officers back in the day threatened to take away a

10   witness's child in order to get them to say what they

11   wanted, that was not based on any experience you had

12   with any of those three officers, correct, Mason,

13   Guevara, and Halverson?

14      A.  So that's a strange question considering that

15   if these things are true as alleged, then they are

16   part of that in here.

17         I'm ignoring these guys right now, and I'm

18   saying that I had lots of cases over the years; and in

19   those cases, and it didn't matter what the case were,

20   usually it was the felonies, though.  They -- there

21   were some officers who would say -- you know, and

22   these were sometimes the officers that were good

23   officers, but they needed that extra push.  You know,

24   something could happen to your kids, if you don't tell

1    us the truth.  You know, now do you get the truth, or

2    do you not get the truth, right?

3          Do you get what they think they want to hear,

4    or do you get the truth?  So those things happened a

5    lot, and I say a lot.  I don't mean all cops are bad

6    by any means.  They're some of my favorite people.

7    It's just a reality.

8      Q.  All right.  Putting aside the allegations in

9    this case about threatening witnesses with a loss of a

10   child, which you weren't aware of until, you know,

11   less than a year ago, right, or about a year ago?

12     A.  Okay.

13     Q.  So you made the statement that some officers

14   threatened witnesses with the loss of a child.

15          So putting aside the allegation in this case,

16   are you aware of any other instances where Detective

17   Halverson, Detective Mason, or Detective Guevara are

18   alleged to have done just that?

19     A.  On a personal level, I am not.

20     Q.  Okay.  So you're -- okay.  Is it fair to say

21   that if Mr. Carey drove a state's witness to trial

22   that he had the opportunity to interview and vet that

23   witness and anticipate what he was likely to say when

24   called?

1      A.   He would probably not have interviewed him, a

2   person in the car with him, if he was driving them to

3   court because that has a way of coming back on a

4   defense counsel big time.

5      Q.   Is it unusual for a defense lawyer to drive a

6   state's witness to court to testify?

7      A.   No.  Not if they're Jack Carey.

8      Q.   Okay.

9      A.   That was the kind of thing he would do.

10      Q.   And so how would that happen?

11      A.   My guess is --

12      Q.   Is he calling them, and asking them if they

13   needs a ride, or are they calling Rios, or how does

14   that work?

15      A.   My guess, I don't know.  My guess is that he

16   interviewed them before, not --

17      Q.   He drove them to court?

18      A.   Yeah.

19      Q.   Okay.

20      A.   And I don't mean that morning.  I mean, and

21   then do you need the ride?

22      Q.   And that's something like that he would do,

23   if he was particularly interested in making sure that

24   a state witness made it to court, especially if he

1   knew he was going to flip, he would make sure he got

2   there?

3      A.  Sure.

4      MS. GOLDEN:  Okay.  I don't -- I think I'm done.

5   Thank you.

6          There might be more from Mr. -- anyone?

7      MS. CARNEY:  Not me.

8      MR. RICHARDS:  I have just a tiny bit of

9   follow-up.

10     THE WITNESS:  Oh, no, you don't.

11     MS. GOLDEN:  It never ends.

12     THE WITNESS:  Go ahead.

13     MR. RICHARDS:  Yes.

14     THE WITNESS:  Just don't make me come back.

15     MR. RICHARDS:  I am not going to make you come

16  back.  Not me, anyway.

17     MS. GOLDEN:  Famous last words.

18          EXAMINATION (Resumed)

19  BY MR. RICHARDS:

20     Q.  Part of the problem with being the defense

21  attorney in a criminal trial is, even if you put a

22  witness under subpoena, even if you expect them to

23  testify, if in the middle of the trial they say

24  something like I don't -- I can't come, I don't have a

1   ride, it's -- you know, et cetera, et cetera, you have

2   no option either to ask for a continuance, which is

3   going to send the, you know, judge through the roof,

4   or giving them a ride yourself?  I mean, isn't that

5   what happens?

6       A.  Yes.  It happened a lot.

7       MS. GOLDEN:  Is that it?

8       MR. RICHARDS:  Yes.

9       THE WITNESS:  Thank you.

10      MS. GOLDEN:  So you have not given a deposition

11  before.  So I will tell you quickly about signature.

12  Okay.  The court reporter here has been hard at work

13  typing down what we say, and you have the right to

14  review the transcript before it's considered final,

15  and make any errors in transcription.

16          You can't change the substance of your

17  testimony, but you can change errors in transcription.

18  You can probably note some mistakes.  That's called

19  reserving signature.

20          You can also waive signature, and then

21  the -- when and if the transcript is ordered written,

22  you would not have the opportunity to make any

23  corrections or changes, and that's called waiving

24  signature.

1          And it is entirely your choice.  Would

2   you like waive or reserve?

3       THE WITNESS:  Reserve.

4       MS. GOLDEN:  Okay.  Signature is reserved.

5       THE VIDEOGRAPHER:  This concludes media unit

6   five --

7       MR. RICHARDS:  We're off the record.

8       THE VIDEOGRAPHER:  This concludes media unit five

9   of today's video deposition of Karen Shields.  We're

10   going off the video record at 6:04 p.m.

11

12               ****

13

14

15

16

17

18

19

20

21

22

23

24

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4
               RIOS vs. GUEVARA
5                 22 CV 03973

6

7        I hereby certify that I have read the

8  foregoing transcript of my deposition given on

9  Tuesday, August 29, 2023 consisting of pages 1 through

10  273 inclusive, and I do again subscribe and make oath

11  that the same is a true, correct, and complete

12  transcript of my deposition so given as aforesaid as

13  it now appears.

14

15          Please check one:

16          _____ I have no corrections.

17              Number of errata sheets
           _____ enclosed.
18

19        _____
                KAREN G. SHIELDS
20

21  SUBSCRIBED AND SWORN TO
   before me this_____
22  day of_____20__.

23

24  _____
   Notary Public

1  STATE OF ILLINOIS        )
                            ) SS.
2  COUNTY OF COOK           )

3

4         I, Sally A. Durkin, Illinois CSR, and Notary
   Public, do hereby certify that on Tuesday, August 29,
5  2023 at the hour of 10:00 o'clock a.m. appeared before
   me at 141 West Jackson Boulevard, Suite 1240A,
6  Chicago, Illinois, KAREN G. SHIELDS, in a certain
   cause now pending and undetermined in the United
7  States District Court for the Northern District of
   Illinois, Eastern Division.
8         I further certify that the said witness was
   first duly sworn to testify to the truth, the whole
9  truth, and nothing but the truth in the cause
   aforesaid; that the testimony then given by said
10 witness was reported stenographically by me in the
   presence of the said witness, and afterwards was
11 transcribed via computer-aided transcription, and the
   foregoing is a true and correct transcript of the
12 testimony so given by said witness.
          I further certify that I am not counsel for
13 nor in any way related to any of the parties to this
   suit nor am I in any way interested in the outcome
14 thereof.
          IN TESTIMONY WHEREOF, I have hereunto set my
15 hand and affixed my notarial seal on September 30,
   2023.

16

17

18         _____
           Sally A. Durkin, CSR
19          State of Illinois
           CSR License No. 003144
20

21

22

23

24

1  Errata Sheet

2

3  NAME OF CASE: JAIME RIOS vs REYNALDO GUEVARA, et al.

4  DATE OF DEPOSITION: 08/29/2023

5  NAME OF WITNESS: Karen G. Shields

6  Reason Codes:

7      1. To clarify the record.

8      2. To conform to the facts.

9      3. To correct transcription errors.

10 Page _____ Line _____ Reason _____

11 From _____ to _____

12 Page _____ Line _____ Reason _____

13 From _____ to _____

14 Page _____ Line _____ Reason _____

15 From _____ to _____

16 Page _____ Line _____ Reason _____

17 From _____ to _____

18 Page _____ Line _____ Reason _____

19 From _____ to _____

20 Page _____ Line _____ Reason _____

21 From _____ to _____

22 Page _____ Line _____ Reason _____

23 From _____ to _____

24

25              _____

KAREN G. SHIELDS, 08/29/2023

**$**

**$5,000** 71:17

**0**

**00590** 107:13

**1**

**1** 70:7,15,18 71:19 116:7 177:20 231:7

**10** 7:18 62:13,14 142:3,9,15 182:17 183:9 184:2,13 192:1 199:9,18,20 201:12 212:13,15

**10:00** 119:17,20

**10:30** 4:3

**11** 160:14 187:17 189:12 192:1 193:5 197:15

**11:52** 62:17

**12** 161:11 191:12 194:19 195:20 214:2

**1240A** 4:6

**12:05** 62:21

**12:30** 177:14

**12th** 148:3

**13** 182:2 199:7 210:23 214:8

**14** 142:5 172:16 199:18 201:12 211:12,13 214:8

**141** 4:6

**14th** 107:16 108:21

**15** 7:19,20,21 10:20 143:15 199:8 203:7,10 208:24 209:1

**15th** 109:4

**16** 201:13

**17** 144:20 145:24

**18** 143:17 145:5 201:13

**19** 145:23

**1972** 6:3

**1976** 6:3

**1977** 11:23

**1980** 12:4 127:8

**1982** 12:8,13 26:7,24 35:21 50:16

**1985** 37:4

**1986** 37:15

**1989** 142:5,24 143:17 145:1 177:14

**1990** 46:14 47:3 57:1 99:2,3 101:20 102:3,7 146:23 148:3 153:19,20 154:9 165:5 247:14

**1991** 12:13 15:19 16:13,20 17:7

**1995** 16:13,20 17:7 18:16 19:21 26:7,24 35:22 41:20 50:16

**1996** 18:16 19:22 20:6

**1997** 20:1 25:19 26:19

**1999** 39:16

**19th** 153:20 188:1

**1:24** 119:24

**1:38** 125:19

**1:55** 120:15

**2**

**2** 20:6 104:21,23 107:9 111:12 112:19 121:15 125:2 129:9 143:9 145:4 146:2 147:2 148:5 182:2 231:7

**2-1401** 107:17 108:15,19 115:9

**20** 4:16 49:16 138:18 145:24 213:3

**2008** 25:5,8,19,23

**2020** 11:9,15 175:22 188:1

**2022** 103:10 106:18 108:22 117:7, 8,16 118:12 133:4 137:14

**2023** 4:5 116:21 117:11,24 118:12 119:5,9 121:4,16,21,22 122:17,19 123:2,22 124:2,20 125:7 126:18,21 130:6,21 131:8 176:9,12 181:6 187:20 188:6 191:17 211:7 212:7

**21** 115:24 117:23

**21st** 119:9,16,17 121:4 124:17 125:7,18

**22** 99:9 102:22,24 117:14 121:16 241:11,16,17,23

**22-CV-3973** 4:11

**22nd** 175:22

**23** 115:24 121:21 124:17 183:16 187:19 211:7

**23rd** 126:18,21 130:6,15 191:17

**24th** 122:17,19 123:2,22 124:20

**25** 49:16,17 146:8 219:22 220:10 222:22,23 224:3 241:9,12,16,19,23

**269** 173:13,24

**26th** 6:17 16:23 22:17 29:16,18,20, 21 37:3,7 41:20 49:12,17 51:13 54:15 57:6

**28** 146:8 177:14

**283** 166:4

**28th** 154:9

**29** 165:5

**29th** 4:5

**2nd** 22:6

**3**

**3** 120:16,20 121:15 122:15,16 146:2 147:12,14,15

**3.13** 160:6

**30** 177:17

**32** 99:11,13

**33** 147:20

**34** 147:20

**35** 153:18

**35-ish** 20:20

**365** 24:15

**38** 154:2 241:12 242:5,10,12,14

**39** 154:2

**3:09** 172:13

**3:15** 50:17

**3:26** 172:19

**3:37** 180:17

**3:40** 180:21

**4**

**4** 122:15 128:2,8,18 131:1

**43** 159:18

KAREN G. SHIELDS, 08/29/2023

**4:20** 115:24 125:17

**4:34** 212:18

**4:44** 122:17

**4:48** 212:22

---

**5**

**5** 120:10 141:3,4,8 144:21 145:10 146:9 147:21 159:18 160:5 161:8 163:17 178:1,6 179:5 209:24 215:5,10 239:19 240:1,24

**5-minute** 120:3,11 172:7

**5/2-14.01** 128:3

**53** 160:5

**54** 160:13

**55** 161:8

**591** 115:11,13

**592** 115:13 118:15

**593** 115:13,19

**594** 129:20 130:4

**597** 130:5

**5:00** 42:15

**5:46** 121:16

**5:51** 122:20

**5th** 146:23

---

**6**

**6** 141:17 165:4,8 166:5 181:16

**600** 4:16

**604** 115:13 116:5

**605** 115:13

**606** 115:13 116:5

**609** 119:12

**610** 119:14

**64** 162:1

**69** 162:1

**6:04** 271:10

**6:30** 108:21

---

**7**

**7** 172:15,22 186:24 195:6 211:16 212:3

**7095** 206:1

**70s** 5:19

**71** 162:13

**7165** 207:4

**72** 207:22

**735** 128:3

**737** 82:2,4

**7:00** 130:7,15

**7th** 142:5,23

---

**8**

**8** 173:12 191:20

**80** 49:22

**80s** 80:6

**81** 26:10

**82** 26:11 36:14 38:14

**84** 38:14 39:4 163:16

**84-85** 40:7

**85** 38:14 39:4 57:1

**86** 45:5,7

**87** 37:17 45:5,8

**89** 47:18

---

**9**

**9** 175:17 176:18 181:2 182:2 192:1, 5 193:7,8 194:16 197:17

**90** 46:19 47:19

**90s** 80:7 228:4

**91** 47:2,18,19 49:22 54:22 56:12 63:12

**92** 163:17

**95** 19:15 40:9 49:22 56:12 57:1 63:12

**96** 19:15

**97** 22:5,6 24:10,11,16 25:8

**9:18** 109:4

**9:57** 121:4

---

**A**

**a.m.** 4:3 62:17 109:4 116:1 119:20 121:4,16 130:7 177:14

**a.m.-ish** 119:17

**abbreviation** 205:19

**abilities** 151:24

**ability** 168:3

**absolute** 194:1,2

**absolutely** 161:24 170:17 244:1 245:4 255:3

**absorb** 89:13

**abuse** 36:16,20 38:13 233:24 248:23

**abusing** 29:7

**access** 14:7 16:9

**accessing** 75:22

**accountability** 259:21

**accuracy** 256:21 258:3

**accurate** 164:17 198:5

**accusation** 243:20,24

**accusations** 243:12,14 244:6 246:7 249:20 250:1

**accuse** 243:3

**accused** 58:1 199:6 226:2 227:1, 14,22 232:10 233:13 249:15 250:3

**accuses** 244:12

**accustomed** 158:13

**acknowledge** 189:23 264:1

**acquitted** 200:1

**act** 158:2

**acted** 228:18

**activity** 11:15

**acts** 81:1 84:2

**actual** 172:3,5

**add** 71:1,5

**added** 71:6 93:16

KAREN G. SHIELDS, 08/29/2023

**addition** 90:20 150:13 223:11 225:24 247:15

**additional** 145:17,18

**address** 76:17 78:24 79:5,11 150:1

**addressed** 76:5 163:1,3

**Adjust** 121:8

**admissible** 155:10 156:5

**admission** 107:3

**admit** 198:16

**admitted** 155:16 232:13

**admittedly** 138:6

**ADR** 10:16

**advance** 141:24 161:20

**advanced** 97:9

**advocate** 164:21

**affidavit** 104:12 115:22 116:6,11, 13,17 117:1,3,14 118:1,18,19 125:8,16 126:9,22 127:4,10,19 128:13,19 129:3 130:8,14,21 131:8,13 132:11,13,18 142:1 175:19 176:7,12,17,21 177:9,12 178:3,6,7 181:1,5,9,13 182:5,14, 17,19 183:10,14,18 184:1,2,9,12 186:24 187:5,18 188:4,12,16,21 189:2,12,16,19 190:22 191:13 192:4 193:4 194:14 195:11,21 196:19 197:7,17 199:8,14,21 201:7 211:6,23 212:9 213:20 214:2,14 224:14 225:23 226:19,20,21 229:9

**affidavits** 125:19 128:19,21 187:18 189:23 190:10 191:21,23 226:1 227:16,20

**affiliation** 145:7

**afield** 231:2

**afraid** 15:13

**afternoon** 61:7,8

**age** 84:19 233:6 236:19

**agg** 31:14

**aggravated** 154:24 155:9 156:15, 17 160:11

**aggravation** 97:4,5,9

**agree** 91:19 147:13 215:8,20 237:22

**ahead** 203:1 269:12

**aimed** 135:16

**air** 59:7

**alibi** 76:4,6,7,10,12,13 214:8,11,12 251:8,10 252:6,8,11

**alibis** 251:7 252:13

**alive** 52:17 64:1,4

**allegation** 7:24 8:3,11 9:4 86:5 103:18 267:15

**allegations** 79:24 81:1 85:6 231:2 265:2 266:6 267:8

**alleged** 189:4 198:6,8 215:3 232:11 266:15 267:18

**allegedly** 80:2,11 240:1

**alleging** 232:16

**allowed** 53:19 88:1,2,5 92:3 157:14 257:18

**altogether** 166:8 256:11

**amazing** 14:22 53:22

**amended** 106:9 107:17 108:8 122:4 128:2 129:4 130:24 176:1 182:20 210:24 225:24 226:4,7

**Amendment** 214:24 215:16,17 263:15

**amount** 41:5

**and/or** 86:8 90:12 94:2

**Anderson** 175:9

**answering** 180:2 215:17

**anticipate** 267:23

**anymore** 65:21 159:24 262:11

**APD** 149:22

**apologies** 117:10 183:2

**apologize** 93:14 168:9 256:10

**appeal** 97:21

**appealed** 13:22,24

**appeals** 97:23

**appears** 108:18 115:22 116:17 121:20 187:24

**application** 220:7

**applied** 13:16

**apply** 24:22 220:3

**appoint** 19:3 22:24

**appointed** 18:19,20,21 20:21,23 21:1 22:10,12,16,23 23:15

**appointing** 20:18

**appointment** 20:7 23:22

**appointments** 20:15

**approach** 245:13

**approached** 190:16

**approximately** 40:10 41:21 177:14 219:23

**April** 36:14 38:14 99:5 102:22,24 103:9 104:18 106:18 107:16 108:21 109:4 115:24 116:20 117:7, 10,13,16,22,23 118:12 119:5,9,13, 16,17 121:4,21 124:17 125:7,16,18 126:18,21 130:6,15,21 131:8 133:4 148:3 176:9,12 181:6 183:16 187:19 188:5 191:17 211:6

**arbitration** 10:16

**arbitrator** 10:19

**ARDC** 72:11 73:1

**argue** 249:15

**arm** 56:14

**armed** 49:14 50:13 53:8,13 57:11 62:7 63:17 66:24

**array** 194:21,24 195:3,5 197:3

**arrest** 206:17,20

**arrested** 182:6 251:19 252:20,22

**Arts** 11:22

**assault** 154:24 155:9 156:15,18 160:11

**assaulted** 85:18

**assigned** 29:21 30:4 36:15,16 38:18 39:2 41:22 42:3,7,10,12 43:7 45:3,23 46:9,11 47:4 60:8

**assignment** 19:12 39:7 42:24 56:16

**assignments** 25:13 36:7,13 224:2

**assist** 171:9

**assistance** 8:4,23 9:4,20 104:8

**assistant** 41:6 83:14 149:22 150:2 151:6,11 187:1

**associate** 22:7,20 24:15,20 25:1,7

Urlaub Bowen & Associates, Inc.   312-781-9586

KAREN G. SHIELDS, 08/29/2023

**Associates** 4:15,18

**association** 220:8,16

**assume** 19:21 23:18 148:14 181:9 190:24 196:18 246:21 252:15

**assumed** 57:17 127:8 132:14,17 188:8,9,24

**assuming** 57:5,7 115:8 119:4 153:11 190:22 191:1 201:8,9 225:7 236:22

**attach** 108:18 132:14

**attached** 115:22 116:4 128:15 130:8 176:1 178:2,5,15,16 182:20

**attachment** 106:14 107:18,22

**attack** 180:12

**attempts** 218:8

**attention** 166:3 200:11 205:4

**attorney** 6:19,22 7:6,14 8:1 13:4,6 19:6 68:24 78:12 83:14,17,18,23 84:5,6 187:1 200:5 201:23 221:18 240:8 241:18 242:19,23 244:13 245:17 246:12 257:19 258:8,13 269:21

**attorneys** 86:22 158:13 169:11 222:4 224:7 232:4,12 262:14 263:24 264:7 265:13

**attributed** 81:21

**August** 4:5 37:16 45:4,8 104:16 117:7 121:16,21 122:17,19 123:2, 22 124:2,20 165:15 173:6 211:2,20 212:7

**authored** 184:12 247:17

**authority** 250:11

**avenues** 88:21 95:17

**avoid** 215:17 250:2,5

**aware** 9:20 184:11 192:24 265:3 267:10,16

**awful** 29:13 37:9 61:6

---

**B**

---

**B-U-R-G-E** 229:15

**baby** 157:12,15,17,18,21

**Bachelor's** 11:22

**back** 5:19 13:18 15:14 18:10,13 21:21,22 22:6,20 24:15,16 26:2

33:10 35:14,15,16,21 41:21 42:18 49:10 52:7 58:8 62:19,21 72:13 73:2 74:19 75:20 79:22 80:6 88:3 97:10 103:9 105:1 111:12 116:13 117:7,15,16 120:14 125:1 127:15 128:16 129:9 133:14 134:6 136:20 166:7 169:13 172:18 178:23 180:9, 11,20 184:14,16,20 190:18 195:20 199:5,21 200:12 204:7,21 212:21, 24 214:17,20 216:13 228:4 247:14 251:24 256:14,20 258:24 259:9 263:1 266:9 268:3 269:14,16

**backed** 252:11,14

**background** 11:13 30:7 43:17

**backs** 182:22

**backwards** 219:16

**bad** 10:8 42:6 50:9 52:2 71:19 90:18 102:14 158:15 180:12 221:22 257:2,3 267:5

**badly** 96:4

**Ballistic** 140:14

**ballistic's** 168:14

**ballistics** 140:13 241:9,22

**bar** 109:15,16 110:3 134:17 139:8 154:3 220:8,16

**Barbara** 158:5,7 164:12

**based** 8:23 121:24 145:16 154:20 162:3 168:12 182:9 224:6 237:23 246:5 266:11

**bases** 145:18

**basic** 232:5

**basically** 104:5 167:17 192:17 209:12 223:2 253:5

**basis** 58:14,20 59:1 200:7 265:5, 16

**Bates** 115:17 141:10,11,16 142:12,13 173:14 203:14

**bathroom** 62:11 120:3,8 260:22

**baton** 232:21

**batt** 31:14

**batteries** 26:17 28:6

**Bayer** 149:20

**beaten** 51:9,10

**beautiful** 98:11

**begin** 201:13

**beginning** 4:2 16:22 45:4 62:20 120:13 136:5 172:17 212:20

**begins** 230:3

**behalf** 4:8,24 5:2,5 164:22

**belated** 254:11

**belief** 228:6 243:19

**believed** 43:13 51:6 237:13,24 238:14 263:18 264:12,18 265:18

**believes** 201:4

**bell** 47:10

**bells** 153:23

**Ben** 159:1 261:4

**bench** 7:19,20 19:22 20:22 21:8,21 22:6 24:15,17,19 25:5 26:20 40:8 42:16 44:1,17 55:1 156:7 223:9

**benches** 44:13

**benefit** 186:10

**Benjamin** 128:20 175:19 191:21 194:11 197:20 198:6,7 225:14 226:20 242:7

**bet** 114:17

**big** 92:5 165:13 179:24 207:8 268:4

**bigger** 204:2

**Bilandic** 18:22 19:6

**Bilandic's** 19:6

**binder** 233:23

**biography** 70:9,20

**bit** 22:9 36:5 47:19 74:6,7 103:5 110:15 115:17 118:23 134:2 135:20 196:4,11 217:10 219:16,18 224:14 231:4 237:2 259:22 269:8

**blank** 116:7,16

**blanking** 230:1

**bless** 76:1

**blinders** 263:20

**block** 111:19

**blocked** 126:14

**blocks** 100:21

**blood** 90:18

KAREN G. SHIELDS, 08/29/2023

**blow** 222:1

**bono** 13:7,10

**book** 146:16 195:15 203:13 232:20,21 233:14,22

**books** 21:10,11 65:19,20,21 232:20

**Borne** 263:9

**bottom** 81:12 107:16 121:1 173:15 203:15

**Boulevard** 4:6

**Bowen** 4:15,18

**box** 45:21

**boxes** 257:7

**Boy** 262:3

**brain** 49:14

**brain's** 217:6

**brave** 219:5,7

**break** 36:4 62:10,18 120:4,8,12 172:8,14 196:5 210:20,21 212:19 260:18,22

**briefly** 6:7 94:8

**bring** 157:17 244:13 247:7 251:10

**bringing** 190:18

**Brings** 74:19

**brought** 53:19 157:12 197:5 231:7 235:12

**Brown** 152:17 153:21

**bump** 49:23 55:3

**bunch** 80:5,6

**Burge** 229:2,13,15

**Burr** 218:4,5

**bus** 81:24 82:2,4

---

**C**

**caliber** 241:9,23 242:5,9

**California** 41:20

**call** 10:11 11:2 13:18 28:15 29:22 34:7 36:19 46:6 88:7 90:5 91:23 92:1 99:13 106:22 110:19 117:19 118:2 133:12 143:8 150:18 152:15 166:24 169:22 189:3 209:2 214:17, 22 255:20 262:15

**called** 14:19 21:4 40:24 86:21 91:17,18 98:22 114:20 131:15 150:5,17 152:10 186:10 242:22 262:4 267:24 270:18,23

**calling** 16:23 104:1,3,7 178:18 255:15 258:21,24 268:12,13

**calls** 117:19

**calm** 158:1,3

**candidate** 23:20

**capital** 5:24 205:18

**car** 135:9 175:13 268:2

**care** 43:16 114:1 246:2

**career** 224:8

**Carey** 47:7 67:11,12 68:23 70:1 71:7 93:7,16 99:22 100:14 101:16, 20 103:8 134:22 143:11,17 144:18, 24 146:22 148:2,11,20 149:14 153:11,19 154:8 161:19,21 162:20 163:24 164:5 166:11,15 167:2 170:5,18 174:9 185:3,15 189:5 197:19 198:3,5 215:23 216:12 217:13 218:11 245:6 246:6,8,11 247:6 262:6 267:21 268:7

**Carey's** 146:6

**Carney** 4:24 53:11 76:2 140:23 141:2 180:5,13 218:23 219:1,7 225:3 227:6 228:11 229:4,6,9 233:17 234:4 235:7 238:20 244:22 261:16 269:7

**Caroline** 4:21

**Carrero** 128:20 159:1 175:20,22 176:11,13,17,22 177:8,16,19,22 179:6 181:1,4,21 182:5,13 183:14 188:21 190:9 191:21 194:11 197:15,20 198:6,7,14 216:2 217:2 242:8 261:4

**Carrero's** 176:10 181:23 225:14 226:20

**case** 4:10 7:4 9:5 13:9 17:2,7 18:8 21:7 27:20 28:8,10,20 29:1,24 30:4 31:4,8,13 32:1 34:6,13 35:19 42:16 43:14 47:4,7 48:2,5,10,14,18,21,23 49:7,11 50:13,14,24 51:3,7,11,14, 15,16,17,22 52:2,13,15,19,21 53:4, 17,23 54:3,9,11 55:1,7,8,12,16,18 56:4,10 57:3,15,18 59:24 60:3,7,8 61:21 62:6,7 63:17,18,21 64:17 65:9,11 66:1,3,6,13,17,19,21,24 67:4,6,14 68:3,4,8,11,12,23 69:7, 19,21 71:8,12 74:2,4 75:3,10 76:7,

8,9,16 77:4,16 78:3 79:13,23 80:9 82:23 83:4 84:8,9 87:11,15,19 88:2,14,19 89:11,22 90:9 93:11,12, 24 97:11,17 98:22 99:20 100:2,13, 22 101:2,13,15,19,23 102:10,16,19 103:6,19 104:4 110:16,22,23 111:1 112:21 113:5 114:17 117:21 121:17 131:19 132:8,16 133:7 134:24 135:17 137:12 139:2,6 141:23 143:9 144:14 148:17 149:2, 6,13,21 150:4 151:5,7,19 153:24 154:14 158:19,22 159:21 160:20, 23 161:6,22 166:15 167:3,5,15,17 168:18,21 169:6,7 170:1,12,23 171:13 174:7 176:3 181:18 182:13 184:17,20 192:18 201:23 202:12 213:13 215:14,18 218:15 230:1 231:8,11,23 232:9,13 233:3,5,14 235:10,15 244:5,17 250:8 251:23 252:19 258:4,15 259:21,23 260:10 263:22 266:6,19 267:9,15

**cases** 13:7,13 16:18,23 17:4,12, 18,19 18:2,6 21:14 27:16,17,22 28:3,4,7,10,17,18,20,22,23 29:3,23 30:8 31:21 32:3,5,7 48:10,17,24 50:18 59:23 63:9 69:16 74:1 80:6 113:24 144:7 220:2 228:10 232:3, 4,11 237:23 258:23 259:3 265:4,6, 8,19 266:18,19

**caused** 69:24

**CB7745262** 174:16

**CB7772458** 174:20

**CB7841278** 174:23

**CB809214** 175:5

**CB8177596** 175:7

**CB8249223** 175:10

**CB8295153** 175:12

**CCPD** 173:20

**CCPDSTD** 173:13

**Center** 14:15

**Cermak** 86:3

**certificate** 99:24 133:20 167:24 168:4

**cetera** 75:1 270:1

**chain** 107:11

**chair** 48:13 49:21 67:17,19,23,24 68:2 170:4

**chambers** 14:14

KAREN G. SHIELDS, 08/29/2023

**chance** 46:22 113:21 114:14

**chances** 155:16,23,24

**change** 41:10 270:16,17

**changing** 88:4

**characteristics** 123:14

**characterize** 165:18,21

**charge** 71:17 155:9,22 156:2,3 160:24

**charged** 29:7 51:21 53:15 74:10 161:1,15,17,22 182:3 250:18

**charges** 29:12 32:5 55:5

**cheat** 256:3

**check** 33:4 127:2 225:10 257:7 258:2

**checked** 127:4 191:4

**Chicago** 4:6,17 5:1 11:23 12:24

**chief** 244:5

**child** 61:9,11 152:22 265:24 266:10 267:10,14

**children** 29:8,11 250:18

**choice** 271:1

**chosen** 132:21

**circle** 207:8

**circuit** 22:11,13 23:3,17 25:2,10

**circumstance** 251:17

**circumstances** 48:16 56:4 79:6 183:17 189:11 192:16 194:3 239:1 251:13

**CIS** 145:6

**City** 4:24

**civil** 55:12,16 132:8,16 224:7 256:4

**claim** 8:4,7 231:3 234:5 237:16

**claimed** 81:22 85:16 215:14 242:8

**claims** 9:15,19 72:19 73:2 182:14 236:16

**clarify** 26:10

**Clark** 4:16 12:21

**clear** 38:2 56:3 68:16 159:12,14 240:23

**clerk** 142:20

**client** 9:16 31:6,18 32:12 55:23

57:8 73:19,23 74:9,13,21 75:23 76:9,18 78:21 79:3,14 81:4,13,14, 20,21 82:24 83:5,9,13,21 84:3,22 85:16 89:5,8,12,19 90:8,10,22 91:10,12 93:10 96:22 110:11,21 171:8,22 172:2 174:7,8 243:13 244:1,2

**client's** 79:8,9 89:1 164:3 243:12

**clients** 63:5 75:5 263:9

**clip** 125:6

**clock** 42:13 253:6

**close** 110:19 136:11,12 196:9 240:23

**close-range** 240:21

**closed** 110:3

**closer** 138:13,14 196:11

**closet** 169:22

**closing** 68:9

**clout** 250:12,17

**co-counsel** 53:10

**co-opted** 221:7

**coach** 222:10

**coaches** 222:16

**coconspirator** 215:3

**coerced** 81:10 85:17 103:18 114:5 197:20 198:4,6 239:6 243:9

**coercing** 80:11

**coercion** 63:21 64:10,13,17,21 65:1,5,10,14 66:7,8,12,16,20,23 67:2,8 79:24 80:1 81:1 84:3 85:7 86:6 88:2 199:22 244:17 264:13,18 265:19

**COI** 133:18,20

**Coke** 175:6

**College** 12:3

**colored** 204:2

**comb** 208:10

**combination** 41:16

**comfortable** 225:11,20

**comment** 101:2 126:1,7

**comments** 208:20

**commit** 96:6

**committed** 84:4 161:14 215:15 251:18

**committing** 161:1

**common** 140:24 141:8 147:20 205:19

**commonplace** 249:20

**communication** 115:20

**communications** 35:9

**commuted** 62:1

**compare** 87:7,13 189:16,19

**comparing** 250:8

**competence** 224:24

**competent** 69:10 76:12,13

**complain** 27:21

**complaint** 72:11 77:17 82:11 105:16 122:4 131:5 178:22 210:24 231:2 237:6

**complete** 10:23 11:5

**completely** 138:5 158:14

**complex** 30:18

**complicated** 30:16,17 251:11

**concerned** 232:23

**concludes** 271:5,8

**conclusion** 170:2 182:8,9

**conduct** 174:18

**confession** 82:24 239:3,7

**confidence** 225:15 227:17

**confidential** 143:22 144:15 235:24

**conflict** 184:7

**conflicted** 188:11,15

**conflicts** 188:18

**confuse** 46:20

**confused** 253:21

**connecting** 180:13

**connection** 10:17 43:21 136:2 156:14 199:14 206:20 230:1

**considered** 28:9,11,19 144:18 270:14

**consisted** 73:7

KAREN G. SHIELDS, 08/29/2023

**consistent** 239:15 240:12,15,19

**constant** 221:20

**constitutional** 74:17

**consultation** 91:9

**contact** 102:3,6,12,15 118:4,7 137:9

**contacted** 137:12,14

**contained** 81:5 82:12 137:23 165:14 177:9 182:5 184:9 188:4 195:11 197:7 213:13

**context** 233:1

**continuance** 270:2

**continuation** 180:19

**continue** 23:22

**continuing** 232:24

**continuum** 30:9

**contract** 10:12

**contrary** 255:19

**contrast** 257:9

**conversation** 35:1 102:22 116:23 134:21 135:4,5 144:10 167:2,8

**conversations** 100:10 102:24 133:3 166:10,14 213:9,16

**convicted** 58:1 137:13 155:8 209:13

**conviction** 106:10 128:3 137:10 154:3,24 155:4,18,23,24 156:11, 12,15,23 160:10 168:6 182:21 209:21

**Cook** 173:14,21

**cooperated** 182:6

**cooperative** 153:3 218:15,17,19

**cops** 175:9 267:5

**copy** 70:11 71:18 129:22,24 184:5 203:24 208:1

**core** 17:4

**corner** 100:19 109:15 142:9 173:15

**correct** 6:9,10 9:14,18 11:23,24 12:4,5,9,14,15 18:17 23:20,23 24:5 25:8,11,21,24 26:1 27:2 36:3 39:10 44:18,21,24 54:9,10 56:11 58:6 59:11,20,21 63:14,15 67:16 75:17 76:15 77:19 78:11 85:5 90:4,14

91:11 92:15 93:1 98:20 101:17,18 105:22 106:1,4,5,8 113:14 116:19, 22 121:23 122:13 129:15 130:10, 16,17 131:14 133:9 137:15 140:7 141:21 143:14 148:4,10 150:15 151:3,4 157:2,3 159:23 160:16,18, 22 161:7 162:19 163:18 164:11,15 167:1,23 168:7,8 173:7 176:13,14, 19,23 177:2 181:6 183:19,22,23 184:5,22 188:1,22 190:12 192:2 195:18,19 197:8,12,13 198:14,15 199:9,10 211:8,24 212:10 214:18 215:4,12 220:4,11 221:4,8,13,15, 18,23,24 222:10,13 223:3,10,16, 21,22 224:4,5,6,9,11 225:9 226:5, 6,8,9 231:19 232:13,14,17,18,22 234:12,18 237:6,7,10 238:2 240:13 241:9,23 242:1,10,15 243:22 244:2,14 248:11 249:10,18 250:4 251:19 252:6,11,17,18,20,23 253:7 254:6,7 255:9,17,22 257:6 258:16 263:7 266:12

**corrected** 163:10,13

**corrections** 116:12 270:23

**correctly** 14:13 82:16 194:15 230:14

**correspondence** 98:2 132:3

**corroborating** 85:8,20 86:7

**counsel** 4:19 8:5,23 9:21 90:17 99:17 109:21 121:8 219:3 258:2 268:4

**counting** 45:9

**counts** 235:21

**County** 173:14,21

**county-wide** 23:4

**couple** 11:1,4,6 13:13 20:12 23:4 26:14 43:10 48:15,24 51:8,21,23 63:9 64:14 65:2,15 100:10,12 102:23,24 123:11 214:1 223:5,6 235:14

**court** 4:11,17 5:4,7 6:11 8:13 9:23 15:14,15 21:7 26:9 36:15,18 38:12,18 42:2 49:21 50:14 53:22 54:11 55:2,9 56:9 58:24 62:7 67:3 73:11 74:15 78:15,16 79:11 92:21 96:12 97:1 105:15 122:3 131:5 136:6 139:11,12 141:15 142:10,13,15,19,21 143:3,16 145:1 148:2 163:2,4,5,8,13 164:13 171:13 198:18 220:8 229:14 257:12,15 268:3,6,17,24 270:12

**court-reported** 78:4,15 82:13,24 83:5,7,15 170:24 239:1 245:18 246:22,23,24 254:5,23

**courthouse** 112:2

**courtroom** 14:14 16:4 17:1 29:22 30:4 31:8 32:4 36:23 37:1,8,12,13, 16,18,21,22 38:1,2,21 42:4,7,10,11 43:8 45:3,23 46:10 48:7 53:18 56:15,16 68:18 157:14

**courtrooms** 28:16 38:22 39:2 43:5 224:2 228:17 265:7

**courts** 54:16

**cover** 16:18 77:15 203:24

**covered** 253:13

**crapshoot** 61:23

**crazed** 216:21

**craziest** 52:21

**crazy** 42:20 52:23 71:18 217:6

**created** 163:9 249:9

**creating** 213:19

**creation** 183:17 189:11

**credibility** 154:4

**credible** 76:13 86:6 158:9,11,20 227:20

**credibly** 227:21 233:13

**crime** 82:3 96:6 160:24 161:14 209:10 215:15 251:18 252:2,3,4,20

**criminal** 7:1,3,7,8 14:9 16:2,3,23 17:4,7 19:23 25:20,24 26:6,14,20, 23 36:2 44:20 55:7,8,16 56:4,9 58:9 64:6,10,13 65:6 66:1,8 75:10 87:21 88:6 89:1 97:23 150:9 156:19 159:21 161:12 174:6 179:16,19 243:23 245:2 255:20 256:4 261:21 262:14 269:21

**Cristino** 106:3 128:20 149:7 182:18 183:9 185:4,14,19,23 186:4,7 191:22 214:5,22 217:1 225:13 226:19 233:14 239:24 253:15 254:2,4,17,18 255:16 260:2

**cross** 83:23 140:12 171:2 195:21 196:16,23,24 197:11 207:19 243:10 245:17 246:22

**crossed** 147:3,8,12,14,15

**CRS** 178:20,22

KAREN G. SHIELDS, 08/29/2023

current 99:16

custom 73:22 89:18 111:1,6,11

cut 219:18

cute 98:13 111:16

CV 70:22

CVLS 12:24

Cynthia 149:20

D

D-E 5:24

Daley 14:15

damage 26:15

Damen 175:2

Dan 54:13,14

Dan's 54:13

dance 14:21

danger 171:21

Daryl 151:21,22 216:23

date 82:4 116:7,16 124:24 142:20 143:5 154:15

dated 115:24 165:5

dates 99:6 204:5

Dawn 12:21 26:12

day 7:9 15:16 39:21 51:9 71:21 79:22 111:21 115:9 117:15 122:19 125:18 135:12 154:12 182:22 184:15 193:1 196:7 252:3,21 258:6 263:2 266:9

days 20:9 21:7 24:15 51:8,23 64:15 65:2,16 72:13 88:4 123:11 138:20 154:21 222:9 249:5 259:10

deal 13:8 25:23 76:7

death 60:10,19,23 61:9,18,24

debating 219:4

December 20:6 22:6 24:16 25:8 37:15 45:4,7 143:17 145:1

decided 19:2 23:24 24:3,6,12 39:21 41:8 134:24 250:1

decider 59:2

deciding 239:3

decision 192:14

declaration 181:8 183:15 187:19 188:5 189:1,2 191:15 199:15

decrease 155:21,22

defendant 4:9,22 5:3 6:22 7:1,8 55:22 65:10 66:9 71:24 76:8 96:4 154:4 156:4 177:15 179:16,19 243:8 244:11 251:19 257:20 258:7

defendant's 7:2,3,24

defendants 4:23 132:8 263:9

defended 265:6

defender 31:24 40:23 41:6 149:23 150:8 151:12 219:22 228:7 249:5 250:9

defender's 9:17 12:7,13,18 14:11 15:19 27:4,8 32:23 34:1 36:5 40:14 62:23 63:6 69:2,14 73:3,6,18 98:19 169:5 173:15,17 202:13,15 204:1 220:24 222:8,24 228:5 265:9

defenders 42:6,10 111:7 221:16 232:12 237:17,22 238:8,9,13 249:4,24 265:20

defenders' 249:14

defending 14:2 84:8 111:1 161:6

defense 44:20 63:20 64:7,9 65:9, 24 66:8,21,24 67:6 90:2,16 92:13 93:3,22 97:8 109:20 136:2,4 143:7, 16,21 144:13 147:22 148:8 151:9 153:4 154:18 160:1,2 164:20 166:23 167:9 171:10 192:10 208:1 209:5 210:4 219:3 223:15 257:19 258:2 259:7 262:14 268:4,5 269:20

define 58:24

defined 68:1

definition 58:23 224:21

definitively 190:20

degree 8:20 12:1 117:2

delinquency 36:21,22,23 37:1,2 38:13

delivered 258:5

demand 33:13

demeanor 158:6

Democratic 23:18

deny 244:14

department 163:9

Depaul 12:3,18

depended 75:2 169:20 251:12

depending 11:10 41:15 186:6

depends 82:6 192:16 252:9

deposition 4:4,8 6:8,9 70:14 104:22 106:3 120:16 122:10,11 128:7 131:19 133:16 137:17 138:17 139:20 141:4,8,13,24 165:8 172:15 184:5,8 187:17 191:24 203:9 213:2 236:9,16 270:10 271:9

depositions 124:5 130:19 131:12

depth 165:21

deputies 157:21

describe 40:17 137:22

describing 58:22

description 80:1,22 236:18 239:14

descriptions 80:16

detail 219:20 221:1 228:23 236:4, 11

details 170:22,23 226:1

detective 51:1 101:17,21 102:3,5, 6,13,16,18 103:21 159:4,7 165:19 170:21 171:1 178:2,5,11 179:7,22 230:12 235:2,3 236:13,15 243:11 244:19 247:13 261:7 263:12 264:2 266:3,4 267:16,17

detectives 179:8 244:4 245:20

determine 11:21 170:14

determined 21:8

determining 188:19

Dewaters 5:22

Diana 98:3,10 100:17,18 109:16 111:13,14 112:10 113:11,14 139:16 152:19 153:3 157:8 168:12, 16 170:7 206:2,5 207:1,5

Diana's 140:8 218:14,19

die 104:6

died 22:17 216:18 262:12

difference 31:3 67:21 77:6,13 95:6 155:13 179:21,24 202:2 227:2,8

differences 189:22

differently 36:19 57:21 151:10 191:2 198:19

KAREN G. SHIELDS, 08/29/2023

**difficult** 64:3

**difficulty** 63:24 168:23 169:2

**dig** 32:16

**dime** 72:15

**direct** 111:22 129:16 166:3 205:3 245:16 246:22

**direction** 135:16 232:5

**directive** 206:2

**directly** 141:10

**disbelieve** 201:3

**disclose** 90:3,11 235:14

**disclosed** 148:13 149:13 153:1 170:15

**disclosure** 105:17 122:6 148:8 153:20 190:5 202:20

**disclosures** 131:6

**discover** 153:13

**discovery** 4:4 75:13 86:11,13 142:4 143:7 147:23

**discrepancies** 164:2

**discuss** 74:2

**discussed** 133:11 163:24 186:9 191:24

**discussing** 148:19

**discussion** 186:4 221:20

**disorderly** 174:18

**disprove** 81:16,17,22 83:8,11

**disregard** 108:4

**distance** 239:14,18

**distinguish** 103:1

**distinguishing** 123:14

**District** 4:11,12

**diverged** 79:9

**division** 4:13 25:17 222:5

**do's** 72:23

**doctor** 179:8

**document** 47:12 107:21 117:4 128:10,12,15 129:2 143:6 172:5,6 174:6 220:7

**documented** 86:2

**documents** 75:19 87:14,17 98:15, 16 113:13 117:20 119:1,8,15 120:5 122:1,11 127:18 129:5 140:5 141:12 172:24 173:1,5 176:1 202:22 234:23 247:17

**Doherty** 14:18,19,20

**Domestic** 25:17

**Donald** 256:7

**door** 13:12 16:7 17:5

**doors** 100:17 109:23

**Dope** 174:24

**double** 24:23 234:21

**doubt** 43:15 58:22 225:11 250:6

**download** 122:16,19

**downloaded** 122:24 123:1,24 141:9

**downloads** 123:13,21

**dozen** 72:15

**draft** 104:14 116:10,17,24 117:4,14 118:1,19 125:16 126:22 132:19

**drafted** 176:24 191:16

**drafts** 177:3,4

**dragging** 256:11

**drained** 50:7

**drank** 265:14

**draw** 182:9,11

**drew** 14:11 15:12

**drifting** 85:10

**drive** 268:5

**drives** 71:18

**driving** 268:2

**drop** 167:17

**Dropbox** 99:6 105:13,24 106:2,7, 12,18,21 107:23 108:10 119:5 120:21,22 121:3,12,15 122:2,8,12 123:4,6,8,11 124:1,9 130:20 131:4 137:20 138:10,16 141:9,10 165:15 173:6 178:13 210:24 211:16 212:4

**Dropboxes** 105:4

**drove** 175:9 267:21 268:17

**drug** 31:13 88:14

**drugs** 109:17 134:17

**dry** 110:3 112:24

**due** 221:3

**duly** 5:11

**dungeon** 169:23

**Durkin** 4:18

**duties** 67:22

## E

**earlier** 23:3 27:13 37:6 71:3 118:6 136:9 148:9 154:17,19 223:1 233:1,10 237:21 243:18 245:5 247:12 255:19

**early** 57:6 228:4

**easier** 18:11 26:5 36:4 89:13 104:20 146:13

**Eastern** 4:12

**easy** 39:24 182:8

**ed** 14:12

**education** 11:12,13

**effect** 259:1

**effectively** 189:3

**effort** 83:1,6

**efforts** 221:3

**elect** 44:17

**elected** 18:19 25:10

**election** 20:17

**element** 56:9

**elevated** 40:16

**elevation** 40:22

**elicit** 59:16,18 94:5

**elicited** 149:17 153:10 198:12,13, 14

**eliminated** 22:15

**elite** 222:4

**Ellis** 151:21 216:23

**else's** 183:22

**em** 146:15

**email** 46:21,22 105:10 106:14,24 107:11,15,22 108:6,17 109:2 110:14 111:15 115:12,21,24 117:13,24 118:17 119:16 121:1

KAREN G. SHIELDS, 08/29/2023

122:1 125:7 130:5 172:23 173:4,9

**emails** 105:1 120:21 122:14 230:2

**employed** 10:12 79:15

**employees** 33:24 34:3

**end** 21:24 22:1 196:7 219:15

**ended** 16:10 20:7,20 38:8

**ends** 256:10 269:11

**engaged** 228:8

**engagements** 11:13,16

**enhance** 97:5

**enjoy** 15:8

**enjoyed** 30:21

**Enrico** 21:17

**entire** 61:17 224:8

**entirety** 25:16 181:1

**entitled** 14:4

**entity** 34:2

**error** 163:12

**errors** 96:22,24 162:24 270:15,17

**established** 247:12

**estimate** 46:4 213:6

**et al** 4:10

**ethical** 58:4 59:21 243:10 246:12

**event** 47:15 186:12 222:22 243:6

**events** 245:3

**everybody's** 58:23 191:6

**evidence** 58:4,12,18 59:3,10 63:20 64:5,8,9,10,12,16 65:5,9,13, 23 66:6,11,15,20,23 67:2,7 76:12, 13 85:8,20 86:7 88:3 114:1 149:16 153:14 154:3 156:19,23 160:9 163:20 214:7,11 225:13,14 231:22, 23 232:1,13 239:8 240:21 243:14

**evidentiary** 8:24 91:17,22 92:6 206:19

**examination** 5:13 165:20 171:2 197:12 219:13 260:23 269:18

**examine** 83:23 207:19 243:11

**examined** 5:12 165:22 195:22 196:16 245:17

**examiner's** 239:16 240:20

**exceedingly** 10:15

**exceptions** 223:5

**excerpted** 165:6

**exchange** 115:12 117:13

**exculpatory** 149:16 153:9,14

**excuse** 19:21 133:15

**execute** 181:5

**executed** 127:19 128:13 129:2 130:8,14,20,21 131:7,12 176:7 181:8 182:14 183:15,24 187:24 188:5 211:6,23 212:8

**executing** 142:1

**exhaust** 50:5

**exhibit** 70:14,18 104:22 107:9 111:12 112:19 115:11 120:16,20 121:15 122:16 125:2 128:2,7,18 129:9 131:1 141:4,8 144:21 146:9 147:21 159:18 160:5 161:8 163:17 165:4,8 166:4 172:15,22 173:12 175:17 176:18 181:2,4 182:2,17 183:9 187:17 189:12 191:12 193:5 195:20 197:17 199:9 203:9 209:24 210:23 211:12,16 212:3 214:2

**exhibits** 71:15,18 104:20 107:18 191:24

**exist** 96:9

**existed** 132:5 236:24

**exists** 114:6

**expect** 149:11 153:8 269:22

**expected** 150:4 153:13 243:21

**expecting** 10:7 90:17 99:14 159:14

**experience** 11:12 16:10 25:22 41:15,16 101:16,21 202:5,11,12 224:7 233:20 237:23 250:16 257:14 259:8 263:11 266:11

**experienced** 68:23 69:11

**experiences** 14:10

**expert** 201:19 202:4,6,12

**expertise** 219:18

**explain** 35:10,17 67:21 103:24 108:16

**explained** 104:2

**explains** 99:16

**explanation** 248:15,19,21

**extend** 112:20 113:5

**extent** 79:9 111:10

**extra** 69:15 266:23

**extraneous** 86:24

**F**

**fabricated** 239:5 245:7,11 246:7

**fabrication** 244:18

**fabulous** 120:10

**face** 98:11 101:11 250:1

**fact** 53:20 127:7 161:14,17 221:20 222:12,15 224:3 226:3 234:20 241:22 242:7 244:10 246:24 247:16 248:10,16 249:24 253:16 257:8 258:13

**factor** 252:8

**factors** 239:6

**facts** 18:1 44:3 48:16 52:21 56:4 61:5 63:16 170:22,23

**fair** 44:17 56:5 84:16 93:2,20 102:8 123:20 150:16,19 201:11 213:6 218:8 222:2 235:18 236:8 237:11 238:16,17,24 239:9 240:11 244:6 245:3 247:23 250:15 251:9 254:18 256:19 259:9,15,16 262:13 267:20

**fairly** 37:1 48:5 208:15 259:10,13 260:9

**faith** 58:14,20 59:1 243:19

**fall** 24:21 37:4 38:14 40:7 198:1

**false** 59:10,11 164:6 189:24 197:21 198:2 240:8 249:18

**falsely** 199:6

**familiar** 101:22,24 102:9 105:7 110:20 128:23 140:1,2,9,10 257:8

**familiarized** 138:24

**families** 13:14 32:13

**family** 13:14,15 16:8,10,21 19:17, 19 25:15 28:21 31:18 168:21 218:14,19

**Famous** 269:17

**fascinating** 249:6

**fast** 80:15 83:2

KAREN G. SHIELDS, 08/29/2023

**faster** 85:15 171:6

**father** 96:2

**favor** 134:5

**favorite** 267:6

**federal** 49:21 50:14 54:11 55:2,9 56:9 62:7 67:3 105:16 122:4 257:12,15

**Fedex** 61:12,13

**feeding** 95:13

**feel** 10:8 50:9 190:19

**feels** 38:5,7

**feet** 239:19 240:24

**fellowship** 265:8

**felonies** 26:14 42:24 43:1,4,5 266:20

**felony** 42:1 43:5 73:24 87:18 155:1,4,23,24 228:17

**felt** 36:24 52:2,3

**female** 112:14 187:1

**fields** 13:11

**fight** 48:8

**figure** 42:1 47:13 81:8 83:20 87:1, 10 124:14,19

**figured** 52:15 132:1

**file** 31:9 60:6 79:19 86:12 165:12, 13 169:5,9,10,11,13,15,20 170:19 173:15,17 192:8,13,15

**filed** 4:11 72:11 100:2 142:4,8,10, 19 143:3,16,17,21 144:24 146:22 148:2 154:7 192:5,20

**files** 62:24 63:3,4,8 100:6 169:14, 18,24 178:22

**filing** 153:19

**fill** 24:22

**filled** 24:21 34:21 35:7 116:8

**fillers** 84:18

**final** 107:17 128:18 270:14

**finally** 255:15

**financial** 94:14 95:8

**find** 77:2 88:23 93:23 95:14 106:17 113:17 123:7 139:2 171:16 241:5

**finding** 43:16 167:18,21

**fine** 62:14 70:12 96:10 212:15 236:2 244:24 246:11 255:13

**fines** 96:12

**fingers** 34:17 263:23

**finish** 42:14 187:5,9 260:18

**finished** 18:6

**fired** 239:15 240:1

**firing** 240:21

**firm** 10:16

**fit** 117:5 171:13

**fits** 88:19

**flags** 33:9

**flashlight** 232:21 233:14

**flip** 98:9 125:10 227:18 269:1

**flipper** 150:21 151:5,7,12

**flipping** 177:22 178:23

**flips** 150:24

**floating** 45:6

**floor** 219:11

**focus** 16:20 224:13

**focuses** 96:4

**folder** 203:24

**folders** 204:2

**follow** 74:11,12 80:15 81:20 85:7, 19

**follow-up** 81:7 87:4 194:9,10 260:16 269:9

**foot** 240:18

**force** 27:9 30:3,10 31:4 38:1,4,5,9 39:5,7 40:22 46:9,11 47:3,4,9,16 60:4,13 64:15 65:16,18,23 68:4,15, 19 92:17,18 101:7 221:4,6,8,12,13 223:20 224:3 228:5,17 229:19,21 230:21 231:19

**forces** 21:18

**foremost** 110:21

**forget** 71:5 111:11 171:5

**forgive** 37:8 53:16

**form** 24:22 34:10,19,21 35:8 126:10 220:13 223:23 225:2,17 227:5,23 228:11 229:4,7 230:8 233:17 234:4 235:6 237:17 238:20

242:11 246:10 247:19 248:24 249:22 250:21 251:14 254:14 255:10

**formal** 25:18 73:18

**forms** 94:24

**forwarded** 120:21,22 122:15

**forwarding** 121:3

**found** 27:14 86:6 99:21 100:1 103:7 206:8 226:3 249:6

**foundation** 224:10 227:23 228:11 229:7 234:3,4 237:17 238:3,20 240:14,22 241:10,24 244:7,21 245:9,21 247:19 248:4,12,24 250:21 252:24 253:8,18 254:14 257:13 259:12 260:5 264:10

**fraction** 21:12

**frame** 56:12 57:1,6 63:13

**frankly** 246:2 249:5

**frequently** 114:15 150:8

**Friday** 109:3

**friend** 104:6 175:2,3 186:12,17

**friendly** 226:24 227:8,11 263:24

**friends** 13:14 184:14,21 185:13

**front** 43:12,23 44:4,6,8 45:2 46:17 48:2,17 49:1 53:14 60:6,14 68:13 110:6 120:19 151:8 167:6 174:17 192:17 223:14 255:21 264:22 265:19

**frowned** 91:20 92:5

**full** 5:15 22:11,12 23:3,17 25:2,10 46:1 48:7

**fun** 40:5

**function** 106:23,24 107:1

**funny** 39:20 40:1 157:11

**futures** 58:2

---

**G**

**gang** 51:7 88:14 145:6 195:15 201:5 234:24 235:1

**gap** 12:16

**Garcia** 106:3 122:10 128:20 148:23 149:5,6,7,12 161:13,17,21 182:18 183:9 184:2,8,12 185:4,14, 23 186:8 188:21 190:9 191:22

KAREN G. SHIELDS, 08/29/2023

199:8,11 205:1,2 208:8 214:5,22 216:5 217:1 233:15 253:15 254:2, 4,5,10,17,18,19,23 255:6,11,16

**Garcia's** 184:5 186:24 187:5 225:13 226:19

**gave** 33:13 36:10 82:24 83:5 134:10 140:15 170:4 172:6 177:15 179:13 189:17 207:1 224:14 235:17,21 236:9,24 260:4

**Gay** 5:17

**gee** 252:4

**general** 32:4 112:3 170:10,13 171:8 233:20 237:2 243:7 251:3 258:23 262:14

**generally** 34:11 35:15 171:14 198:16 216:14 218:15,16 223:7 243:20

**girl** 174:21

**girlfriend** 98:3,6 152:20,21 174:15 181:22 214:16,20

**give** 43:22 60:10,23 61:19 64:20 71:14 72:6 75:15 129:24 131:19 146:18 187:4 201:1 236:17 252:1 264:14

**giving** 79:16 180:4 182:7 270:4

**glanced** 208:9

**goal** 61:16,17

**God** 37:9 45:18 76:1 159:16 196:4

**Golden** 4:21 5:14 53:12 62:9,12, 15,22 70:4,7,16 76:1,3 104:19,24 105:4,8 106:17 107:6,8 120:2,7,18 121:10,11 128:1,9 129:20,23 140:21,24 141:3,6 165:3,10 172:9, 20 180:7,9,11,15,22 183:2,5,8 186:5,19 203:6,11 212:11,16,23 217:21 218:21 219:5,11 220:13,18 223:23 224:10 225:2,17 227:5,23 230:8 231:1,9,12 234:3,18,21 235:6 237:17 238:3,7 240:14,22 241:10,24 242:11,17,21,24 244:7, 21 245:9,21 246:10 247:19 248:4, 12,24 249:22 250:21 251:14 252:24 253:8,18,21 254:8,11,14 255:1,10 257:13 259:12 260:5,16, 18,21,24 261:17 269:4,11,17 270:7,10 271:4

**Gonzalez** 151:16

**good** 4:1 8:2,15 19:7 27:22 28:4, 10,11,18,23 29:1,15 43:11 44:12

58:14,20 59:1 62:10,11 71:4 90:12 104:24 134:13,14 138:18 151:24 152:2,6,7 171:3 196:12 215:10 221:21,22 222:6,8 223:13,15 243:19 257:1 265:11 266:22

**gosh** 163:16 260:17

**Governor** 61:24

**grab** 123:16

**grabbed** 14:24

**grabbing** 20:15

**graduated** 12:3

**graduating** 12:17

**grand** 141:19,22 151:2,8 198:17

**granted** 264:24

**great** 13:8 91:6 166:2 231:12

**group** 21:3,16,23,24 22:1,2

**guard** 175:8

**guess** 39:22 40:11,15 70:7 81:12 83:18 99:22 141:11 147:13 149:15 207:12 268:11,15

**guessed** 262:24

**guessing** 257:15

**Guevara** 4:10 5:3 99:20 101:2,7, 13,17 102:13 103:18,21 165:6 178:2,5,11,12 179:1,9 193:8,16,18 195:2,22 196:17 197:11,20 198:4,6 226:2,23 227:3,21 233:13 234:14 244:5 245:20 247:1,13,17,18 248:1,10,16,22 263:12 266:3,13 267:17

**Guevara's** 101:10 165:19 199:22 235:20 248:20

**guilt** 14:3

**guilties** 63:17

**guilty** 17:24 53:2,17,21 54:9 57:9, 13,20 60:21,22 61:2 113:22 114:15 155:19,21 156:4,17,22 167:18,21 168:7

**gun** 114:3 140:12 161:3 177:15 182:3 197:22 200:16 239:14,18 240:18 242:7

**guns** 109:17 110:6 134:17 139:8 241:5,8

**gunshot** 140:12

**guy** 43:16 53:14,15 54:15 60:17

61:12,13 72:4 140:14 168:14 179:14,23 207:20

**guy's** 200:16

**guys** 126:1 128:4 134:16 179:24 201:4 234:6 266:17

**H**

**H-E-T-T** 37:24

**H-U-I-D-A** 60:14

**Ha-ha** 39:20

**habit** 243:1,2

**hair** 233:23

**half** 12:20 38:6 125:23

**halfhearted** 23:7

**Halverson** 4:22 102:5,6,13,16 147:3 159:4 248:18 263:13 266:3, 13 267:17

**Halverson's** 102:9

**hand** 129:2 175:6 200:16

**handle** 17:3 27:19 30:9 73:19 97:23

**handled** 26:24 102:16,19 103:7

**handling** 32:1 58:8 101:15

**handwriting** 145:23 146:1,6 174:2,10,12 183:21,22 202:22 204:9,22,23 205:6 206:6 207:4,9 208:2,13,21

**handwritten** 78:6 206:4 207:8

**hang** 265:12,13

**Hanging** 174:17

**happen** 72:9 91:8 169:21 192:21 266:24 268:10

**happened** 10:4 17:3 20:5,10,19 22:3 52:15 73:7 74:10 76:24 77:1 100:9,21 118:11 135:12 164:14 171:19 189:8 191:9 192:17 200:19 237:16 238:19 244:16 257:23 263:19 264:5,13,19 265:6 267:4 270:6

**happening** 18:3 20:14 61:15 158:24 171:18 194:4 240:6

**happy** 19:18 133:23

**hard** 80:15 92:6 114:1 183:6 270:12

KAREN G. SHIELDS, 08/29/2023

**hardest** 262:20

**harm** 186:9

**harmful** 94:1,2

**harsh** 210:19

**hate** 93:19 123:4,8

**haunts** 51:11

**hazy** 37:3,18

**he'll** 180:9

**head** 14:17 32:20 60:7 95:14 115:2 240:19 263:5

**header** 162:8

**hear** 60:2 110:7 193:24 267:3

**heard** 39:14 41:13 43:14 60:15 84:23 150:20 171:5 208:6 226:24 227:13 229:2,12,16,18,22 252:5

**hearing** 8:24 86:8 94:5 149:17 206:14 229:20

**hearings** 91:17 206:20

**heart** 180:12 233:12

**heater** 28:7,8,17,20,22

**heavy** 232:20

**Heck** 14:13

**height** 84:19 236:19

**held** 25:4 51:8,23 64:14

**helped** 27:12

**helpful** 82:15 89:20 91:6 93:9,24 94:4 114:12

**helps** 14:7 30:9 251:20

**Henry** 60:6,7,9 62:6 67:6

**Hett** 37:22 38:3,24 43:3 45:1,18 46:2 223:19 264:20

**Hett's** 37:22 38:1

**hey** 27:19 35:2 179:22

**hired** 13:13

**histories** 87:21 88:6

**history** 89:1 174:7

**hit** 86:23

**Hitting** 65:19

**hoisted** 27:13

**hold** 177:15 180:5 229:4 254:8,11

**Holding** 65:2,15

**Holiday** 153:22

**home** 214:15 252:14 253:5

**hone** 14:7

**honest** 158:14

**Honestly** 253:1

**honors** 11:14

**hopes** 153:15

**horn** 222:2

**hour** 122:20 125:22 256:10

**hours** 14:21 138:18 213:3

**house** 51:18 61:7 100:21 110:6 111:18,24 135:12 174:18

**housekeeping** 212:11

**Hudson** 261:10

**Huertas** 128:20 159:10 187:18 188:1,4,20 189:11,16,19 190:2,8 191:21 192:4,24 193:11 194:9,17, 22 195:22 196:1,16 197:10 199:21, 23 204:14 208:8 215:23 216:17 253:13 260:11 261:15

**Huertas's** 193:4 225:13 226:20

**huge** 257:9

**Huida** 37:19 60:14,17,23 264:20

**hundred** 23:4

**hurt** 85:18 91:2 215:13

**husband** 19:4,5 39:12 100:16 183:5

**husband's** 19:8

**hypothetical** 226:18 227:6 228:12 252:1

**hypothetically** 225:8

___

**I**

**ID** 53:3,17

**idea** 14:1 15:15 87:3 147:19 150:6 152:16 170:20 177:11 178:9 223:14

**identification** 104:23 120:17 128:8 141:5 165:9 172:16 179:15, 21 192:6,8,19 203:10

**identified** 70:15 254:3,23

**identify** 4:19 78:9 80:20,21 179:8 193:9,19

**identifying** 80:11,16 93:8 145:5 153:21 227:2

**identity** 80:2

**IDS** 53:24

**ignoring** 266:17

**ILCS** 128:3

**illegal** 237:14 238:1

**Illinois** 4:7,12,17 11:23

**imagine** 33:12,22 36:9 51:16 79:14 102:23 197:10

**immediately** 24:21 252:20

**impact** 259:1

**impart** 172:1

**impeach** 145:6 154:4

**impeachment** 88:11,21 90:19

**impediment** 216:8 217:9,12

**impediments** 216:16

**implicated** 185:19

**implied** 245:5

**import** 71:6

**important** 11:18 31:7 135:17 227:20

**impossibility** 58:21

**impossible** 138:22

**inappropriate** 231:6

**included** 209:9 228:7

**including** 13:8 232:19 237:14 238:1

**income** 95:12,24

**incomplete** 227:6 228:12

**inconsistencies** 239:17

**incorporated** 36:18,20

**increase** 139:2 155:17

**incriminating** 90:24 91:2

**inculpatory** 163:20 182:7

**Indicating** 53:23 125:12,13 126:13,16 129:11 159:19 197:1 203:20 213:5

KAREN G. SHIELDS, 08/29/2023

**indication** 60:16 255:7

**indictment** 141:19

**individual** 200:23 251:12

**individually** 200:23

**ineffective** 8:4,8,23 9:4,20

**inflict** 232:22

**influence** 84:23

**informal** 73:18

**informant** 143:16,22 144:1,2 205:19

**informants** 144:11,15,22 145:13 146:1 235:13,15,22,23,24 236:17, 18,23

**information** 28:14 80:7 88:5,12 91:6 93:9 114:21 116:12 138:6 153:12 155:3 171:24 176:20 183:16 186:6 189:5 190:23 192:4 195:10,23 196:17,18,19 198:13 199:22 201:2 213:13 220:3 232:6,8 236:24 246:3

**initial** 73:19,23 74:5 75:5 76:4 132:19

**initially** 118:22

**initials** 164:9

**injured** 85:18

**injuries** 234:2

**Inn** 153:22

**innocence** 14:3 100:1 133:20 167:22 168:1,4

**innocent** 51:6

**input** 143:12

**insinuation** 243:20

**insists** 193:1

**instance** 28:16 95:16

**instances** 226:2 227:22 267:16

**instituted** 221:2

**instruction** 159:21 160:5,7,13,14, 17,19 161:9,12 209:9,11

**instructions** 157:6 209:8 210:1,14

**insulting** 40:3

**intake** 86:2

**intend** 50:9

**intended** 88:7 150:18

**intensity** 165:18 166:2

**intent** 208:3

**interested** 28:24 268:23

**interesting** 98:11 171:11

**interrogating** 243:11

**interrogation** 248:2,5,11,17,23

**interview** 69:15 73:19,23 74:5 76:4 88:24 91:18,19 185:15 186:14 218:8 267:22

**interviewed** 93:4 149:12 153:1,14 185:23 215:23 216:1,4 253:14 268:1,16

**interviewing** 93:6,8,21 112:9 151:10 170:14 216:8,12,17 217:12, 14 218:11 251:4 253:12,15 254:4, 19

**interviews** 32:24 75:5 170:16 250:2

**introduce** 58:5,12 59:9 63:20 64:8,9 65:9 67:7 76:14 86:8 135:2 251:10

**introduced** 64:5,12,16 65:6 66:7, 12,16,20,23 67:3 160:10 163:20

**introducing** 65:24 139:10 156:19, 23

**introductory** 139:14

**investigate** 69:16 76:11 214:12 233:16

**investigated** 249:4

**investigating** 237:5

**investigation** 94:10 95:11 96:20 162:15 200:14 228:9 235:2 250:8, 9,10 256:13

**investigations** 256:15

**investigative** 35:8 94:13 151:24

**investigator** 32:9,15 33:10,17 34:6,21 35:2,10 151:22 152:3 216:24

**investigators** 28:14 31:22,23 32:2,6,18,23 33:12,24 91:24 150:14 249:13,14 250:10

**invited** 221:8 222:9

**invokes** 215:16

**involved** 54:12 97:11,17 166:15 215:18 232:16 263:22

**involvement** 156:13 162:10

**involving** 62:5

**IPI** 160:6 161:11

**Iris** 181:16 261:13

**issue** 161:13 209:22 231:10 241:11

**issues** 75:18 101:6 103:6 230:12 249:10,12

---

**J**

**J-O-N** 229:14

**Jack** 67:11 68:8 69:6 99:22 100:14 103:8 104:6 109:13 110:18 134:22 153:11 162:7 170:5 174:9 189:5 197:19 198:3,5 204:6,23 206:24 207:15,19 209:2,15 245:6 246:5,11 247:5,6 268:7

**Jack's** 110:20 192:22 204:9,22 208:2,20

**Jackson** 4:6

**jail** 31:10 32:12 52:4 86:3 139:13 252:10 253:6

**Jaime** 4:9 5:6 48:23 63:1 98:2 100:1,18 234:11 235:4 238:24 239:13,23 240:7 241:17 242:6 244:17 245:5 246:3,6,9,21 247:6 248:16 254:4,22 259:24

**Jamaican** 204:11,12

**Jamie** 109:9,10 110:13,20 111:17, 18 113:11 114:4 115:6 134:24 135:2 177:13 184:24 185:22 186:4 197:21 201:9 240:7,18 242:8 244:6 245:15 248:5,7,11,16,20,22 252:19

**Jamie's** 185:19,20

**JAMS** 10:10,11,13,14,15,22 11:21 20:2 70:9,20,21

**January** 146:23

**Javier** 261:1

**Jean's** 265:14

**jewelry** 174:21

**JGS** 107:13 115:11,19 116:5 118:14 129:20 130:4

**Jim** 14:18 21:4

**job** 8:2 12:6 13:17 40:15 74:6,14, 16,21 93:7 95:15 221:22

**jobs** 13:17

**Joe** 226:24 227:8,10

**John** 143:17

**joined** 154:18 167:9

**joining** 21:18

**joint** 160:20

**joke** 42:20 53:9

**Jon** 229:2,12

**Jordan** 163:11

**Jorge** 151:16

**Jose** 260:12

**joy** 110:3

**judge** 14:12,13 16:24 17:1 18:16 19:10,20 21:19 22:17 23:10 25:8 30:6 37:8,15 38:22,23 39:11 41:22 42:3 43:2,3,7,11 44:4,7,15,16,23 45:1,2,14,23 46:2,17 48:3,7,18 59:1 60:14,23 68:11 80:7 92:2 126:2,7 156:7 157:16 167:6 172:21 198:21 201:1 210:11 220:3 223:19 259:5,10 270:3

**judge's** 126:1

**judges** 24:24 25:2,11 39:23 44:12 60:15 155:15 223:12,13,15,19 232:7 235:17 237:8,16 238:17 243:15 259:2 263:18 264:16,17 265:12,13,17

**judgeship** 22:19

**judgeships** 20:16 22:8

**judgment** 105:17 122:5 125:24 131:6 211:13,14

**July** 39:16

**jump** 115:17

**June** 133:14,22 177:14,17

**juries** 29:17,18 43:19 44:11,14 49:17 68:7 222:23 252:15

**juror** 137:2

**jury** 17:6,11,12,16 19:23 25:20 26:3,20,23 36:2 38:17 41:24 42:14, 15,17 43:6,24 44:4,6,7,19 48:2,11, 19,22 49:3,7,21 50:1,11,15 55:10, 13 59:1 60:19 61:22 62:3,4 63:16 97:12,17 113:21 114:13 136:22

141:19,22 151:2,8 154:12 155:7 156:6 157:5 159:20 160:4,5,13 161:9 198:17 199:23,24 201:1 209:19 210:1,13 219:22 220:10 222:22 223:2,6,8,12,14,17 224:3,7 252:4 255:21

**justify** 59:4

**juvenile** 29:6,18 36:15,18 38:12, 18 223:2,7

**K**

**K-A-T-O** 230:18

**K-R-S-T-I-N** 230:18

**Kanacki** 140:14

**Karen** 4:4 5:10,17 27:19 271:9

**Karnezis** 38:3,23 43:2 45:15,17, 18,24 46:18 48:3,18 49:1 53:15 56:18 68:11,13,20 114:14 126:2,7 167:6 223:20 259:5 264:20

**Karnezis's** 37:17,21 38:2 45:23 68:18

**Kato** 51:1,3,17,21 64:14 230:12,16, 17,18,19 231:18,22 232:16,24

**keeping** 170:18

**Keith** 49:9 50:12 51:17,22,24 52:12 62:5 65:8,24 66:5,13

**Kevin** 49:9 50:12,23 51:6,14 62:5 63:21 64:8,17 65:6 66:3,17

**Kevin's** 51:16

**kicking** 65:19

**kid** 61:14

**kidding** 52:11

**kids** 201:5 266:24

**kill** 193:2

**killer** 260:11

**kind** 13:1,15 17:19 26:17 27:10 28:10,16 29:14 33:19 34:17 51:22 52:3 53:3 58:21 73:15 74:2 88:15 93:13 110:10,11 117:3 123:7 135:21 138:24 143:20 151:11 163:23 169:17 170:1 174:5 220:3 222:4 237:12 246:17 268:9

**kinds** 16:4 96:13 158:16

**knew** 9:12 13:11 16:2 19:4 27:24 29:19 60:19,20,22,23 100:14 144:2

153:11 154:22 161:19 184:19 185:10,22 232:10 235:10 247:13 259:2 262:11 265:15 269:1

**knowing** 90:20 139:23 233:12 243:12 247:8

**knowledge** 30:7 110:11 202:5,10 234:13 246:5 247:5

**Kriston** 230:17 231:18 232:16,24

**L**

**lack** 43:15

**lacking** 49:15 257:3

**language** 177:8 191:18

**large** 10:15

**largest** 10:15

**lasted** 31:5

**late** 174:18 246:17

**law** 6:4 12:3,22 14:6,8,10 16:8,10, 11,21 19:17,19 25:15 26:7 72:4 80:9 140:24 141:8 147:20 225:8 255:20

**lawsuit** 71:24

**lawyer** 7:2,3,12 16:11 58:4 59:18, 21 69:11 262:21 268:5

**Lawyer-ism** 196:13

**lawyers** 169:6

**layers** 20:11

**lead** 68:3 100:15 134:23

**leading** 225:3 233:11,17 235:7 242:11 244:22

**leads** 69:15 228:2

**learn** 15:15,16 29:24 224:20

**leave** 27:7,24 49:20 91:4,7 134:9, 10 234:1 246:13 263:3

**leaving** 226:22

**lecturer** 222:10

**left** 15:18 17:13 25:5 27:5 39:8 40:7,8 44:10 47:2,18 49:22 62:23 63:5,10 98:18 138:8 219:23

**legal** 4:14 5:16 11:12 12:24 199:15 224:21

**Lemont** 218:4

KAREN G. SHIELDS, 08/29/2023

**Lenny** 205:1

**letting** 13:8

**level** 79:23 80:10 267:19

**Lewis** 226:20

**liability** 90:13,15 91:6

**liable** 226:3

**library** 21:9,10

**licensed** 116:8

**lie** 59:15,18 252:16

**life** 27:24 60:10,11,17 61:16,17
71:2

**lifetime** 224:8

**likelihood** 215:5

**likeness** 84:18

**limelight** 217:2

**limine** 157:5

**limit** 155:3

**limitations** 58:3

**lines** 235:9

**lineup** 84:8,9,13,15 85:3 179:10
194:20

**link** 121:3,16,20 122:8,12 124:16,
18 131:4 138:10,16 210:24 211:17
212:4

**links** 108:10 121:12 122:2 124:1,9
137:20,24

**list** 86:15,22 87:7 89:7,15,20 91:7
93:3 105:10 106:10 108:7 143:11
148:5 150:9 166:19 211:15 220:4
249:9

**listed** 12:7 108:9 143:9 152:9
211:13 212:3

**listening** 136:22 203:1

**listing** 24:20

**lists** 105:13

**literally** 136:3 178:23

**litigated** 167:24

**litigation** 262:21

**live** 29:23 109:23,24

**lived** 100:17,18 111:17,18,19

**living** 110:12

**load** 48:14

**located** 4:5

**location** 164:17

**lock** 193:17

**locked** 193:9,19

**locking** 151:11

**lockup** 64:14

**log** 49:23 55:3

**long** 10:4 21:9 34:9 36:17 45:1,2,
22 50:2 51:14 52:20 68:15 71:21
72:24 74:18 80:5 103:2 118:3
125:3 133:5 166:19 225:22 264:15

**longer** 13:19 36:24 69:3,4 204:3
264:15

**looked** 10:9 57:21 109:18 127:22
146:19 202:19 210:14 236:12
239:6

**loose** 77:4 195:15 256:9

**Lopez** 208:19

**Lord** 138:18

**loss** 250:18 265:24 267:9,14

**lost** 23:4 72:8 180:5

**lot** 10:3 13:10,16,19 14:15 16:23
28:21 30:1 31:11 32:9 42:22 43:18
65:22 77:3 82:20 86:23 118:10
138:4,6 139:3 172:11 198:21
201:1,2 226:15 239:17 247:17
251:12 257:4,5 259:1 267:5 270:6

**lots** 53:24 266:18

**love** 19:19 157:6 265:11

**loved** 14:9 15:17

**luck** 114:11

**Luckily** 250:22

**Luis** 128:20 159:10 161:18 187:24
191:21 204:15,18 225:13 253:13
260:10 261:15

**lying** 198:17 252:17

---

**M**

**Macho** 260:12

**made** 9:15,16,19 52:16 82:14
100:22 126:24 127:2,5,9 199:23
254:5,22 255:8 256:15 266:8
267:13 268:24

**main** 88:22

**maintain** 238:18

**majority** 223:17

**make** 21:20 34:12 35:8 43:16,20
50:9 52:4 59:17 72:5 74:16 79:24
82:12,24 83:5,9 95:6 96:22 110:4
120:5 125:23 127:2 138:23 150:8
170:24 181:14 187:11,14 210:7,20
227:1,7,18,19 243:20 246:7 249:17
256:16 264:10 269:1,14,15 270:15,
22

**makes** 41:5 88:19 126:1 209:15
225:19 233:8

**makeup** 84:15

**making** 14:3 20:15 32:20 34:12
52:10 114:5 191:17 197:21 268:23

**Maloney** 264:20

**man** 151:17

**management** 221:7

**maneuver** 152:5

**manila** 204:2

**Manny** 204:14

**Mari** 231:8

**Maria** 148:23 149:11

**Mario** 207:20

**mark** 70:5,8 104:20 120:2 128:1
141:3 165:4 207:16 234:1 263:3

**marked** 70:17 104:23 116:5
120:17,20 125:4 128:8 141:5,7
145:5 147:21 165:9 166:4 172:16,
22 173:12,13 175:17 176:18 181:2
182:17 184:2,12 187:17 193:5
197:17 199:9 203:10,18 205:4
209:24 210:23 214:2

**married** 5:20 39:15,16,18

**Mason** 4:22 101:21 102:1,3,18
106:4 122:10 147:2 159:7 164:13
236:13 244:4,19 245:20 247:1
248:1,18 261:7 263:12 266:4,12
267:17

**Mason's** 101:22 236:9,16

**match** 242:14

**matches** 239:7

**material** 96:24 162:24 163:12

**materials** 62:24 105:11 106:10

KAREN G. SHIELDS, 08/29/2023

122:7 123:1 137:23 138:16 139:19 211:15 213:4,14,23

**matter** 4:9 6:18 43:13 156:3 170:10,13 201:6 266:19

**matters** 25:24 58:9

**mayor** 19:7

**meaning** 28:11 204:10

**means** 100:20 142:20 143:2 149:22 160:6,14 167:16 173:14,23 200:10 206:11 207:18,19 225:9 252:17 267:6

**meant** 43:18 59:8 70:4 201:7

**media** 4:2 62:20 120:13 172:17 180:20 212:20 271:5,8

**mediation** 10:16 25:22

**mediator** 10:19

**medical** 239:16 240:20

**meet** 32:12,13 75:12,15,20 111:21

**meeting** 134:16 139:14

**meetings** 75:8

**Melendez** 260:12

**members** 168:21

**memberships** 11:14

**memories** 53:1 113:12 139:5

**memorize** 236:6

**memorized** 140:10

**memory** 23:6 37:14 47:15 48:5 50:5 52:6,24 59:24 60:7 79:8,9 100:4,6 113:10 127:20 139:2 140:15 147:17 148:15,19 159:13 190:17 239:21 241:15 258:17,19 260:6

**Mendez** 181:16 261:13

**mention** 103:20 189:20

**mentioned** 30:23 31:22 101:6 118:6 195:6 229:24 230:2 237:3 247:11

**mentions** 247:17

**merges** 189:7

**merit** 26:18

**mess** 146:15

**message** 204:21

**met** 57:23 109:21 236:16

**method** 233:14,23

**methods** 233:21,23 263:2

**mic** 121:9

**Michael** 5:2 19:6 106:3 164:13

**middle** 22:1 269:23

**midnight** 126:19,22

**Mike** 262:2

**mile** 69:15

**miles** 43:17 239:19 240:1,24

**mill** 28:5

**million** 43:17

**mind** 45:6 49:19 133:7

**minds** 228:4

**mine** 20:20 60:5 112:1

**minute** 52:5 70:24 146:18 166:6 180:24 187:4 197:23

**minutes** 62:13,14 120:10 212:13, 15

**Mirabelli** 20:3 21:16,18

**misconduct** 226:3 227:1,4,14,22 228:9 230:19,23 231:18,22 232:2, 10,11,15 237:5 244:12,14 250:3 263:18 265:2

**misdemeanor** 28:15

**misdemeanors** 42:24

**misidentified** 260:10

**misrepresenting** 249:16

**missed** 53:11

**misstates** 254:15

**mistakes** 270:18

**mitigate** 97:4

**mitigation** 209:3 258:21,24

**modifications** 118:18 191:17

**modified** 132:24

**mom** 61:15

**moment** 36:10 55:8 138:21 190:24 200:13,17 231:11 256:9

**moments** 52:11

**Monell** 231:3 234:5

**money** 41:5 72:5 95:4,5 221:11

**month** 136:10

**months** 19:16 20:12 24:7 26:11 36:24 37:14 42:4,5 43:10 45:9,11, 13,14 154:21 235:1

**Morales** 161:18 193:2,17 216:18 235:3 239:15

**Morales's** 240:19

**morning** 4:1 109:3 125:17 130:15 212:24 268:20

**mother** 96:2 111:17 152:22 175:8 214:15,16,19

**motion** 8:22 79:19 86:13 105:16 106:9 108:9 122:5 128:2 129:4 130:24 143:15,21 144:6,21 145:4, 13,24 146:1,9 147:22 154:3 155:3 157:5 162:2,4 176:1 182:20 192:5, 8,19 196:15 206:16,17,20,21 211:13,14 225:24 226:7 235:21 258:9,14,15 264:24 265:1

**motions** 145:14 235:14

**mouth** 244:1

**move** 29:9,10 30:9 48:9 126:12

**moved** 36:22 37:3,7 40:21 44:14 100:16

**Moving** 235:12

**multiple** 53:6

**murder** 17:20 27:9 28:10,17 29:2 30:4,8,12 31:15,21 32:1,7 39:5,7 46:9 47:8,16 48:12 49:11 60:3 61:5 62:6 63:9,11 74:1 87:19 111:1 113:8 135:13 150:9 160:24 161:18 221:4,6,8,12,13 223:20 224:3 228:5,10 229:19 230:20 231:18 235:3 258:23

**murderer** 254:24

**murders** 30:2 38:8

**Murphy** 50:12

**Murray** 49:9 50:23 51:14 54:9 62:5 63:21 64:17 66:3,17

**Murray's** 64:9 65:6

---

### N

**Nadler** 20:2 21:16,17 54:19

**nail** 249:7

**named** 209:6

**names** 5:18 140:1 147:2,5,8,10 264:14,17

**naming** 233:22

**narrative** 252:15

**nature** 7:23 8:7 9:1 15:22 35:10

**NDS** 54:2

**necessarily** 28:7 57:10 95:4 264:22

**needed** 28:1,13,14 32:7,17 33:14 55:3 74:7,8 75:9 104:8 114:10 172:1 200:10 266:23

**needing** 120:4 210:20,21

**negative** 101:16,21 234:21

**neglect** 36:16,20 38:13

**negligent** 8:2

**negotiated** 177:8

**neighborhood** 110:1,4 134:18

**neighbors** 149:3

**Nell's** 19:20

**Netsch** 12:21 26:12

**neutral** 70:21

**Neville** 19:9,10 38:23 43:2 44:7, 12,15 45:2,14

**Neville's** 37:16

**NGS** 54:2

**nice** 262:5

**Nick** 4:14

**night** 13:4 14:17,24 42:17 50:17

**nights** 13:9

**Nodding** 24:2 39:19 47:22 75:21 92:20 169:8

**noisy** 174:18

**nolle** 167:14

**non-affiliation** 145:7

**non-identifications** 84:10

**Noria** 148:23 149:11

**normal** 50:18 258:4

**North** 4:16

**Northern** 4:12

**Nos** 172:15

**Notably** 259:19

**note** 247:21 270:18

**notes** 55:4 108:4 169:15,18,24 170:2,4,7,16,19 210:21

**notice** 33:13 69:24 97:9 116:6 143:8 202:21 208:13 209:7 247:15, 21,22

**noticed** 123:12 139:4

**November** 51:13 153:19,20 154:9 165:5

**number** 4:10 7:18 14:21 24:23 32:20 49:15,19 173:24 220:2 222:13 223:12 228:8 232:3,4 238:17,24 242:19 246:1 249:3

**numbered** 141:15

**numbers** 115:17

———————————————

**O**

**Oaks** 60:6 62:6 67:6

**object** 220:13,18 223:23 224:10 225:2,17 227:5,23 237:17 238:3 240:14,22 242:11 244:7,21 245:9, 21 247:19 248:12,24 249:22 250:21 251:14 253:18 254:8 255:1, 10 259:12 260:5

**objected** 171:12

**objection** 160:1,2 183:1 186:1,15 217:17 228:11 229:4 231:14 233:17 234:4 238:20 254:12

**objections** 231:6 242:17

**observe** 73:12

**observed** 84:23

**obtain** 89:1

**obtained** 173:23 176:22

**occasions** 222:13

**odd** 183:3

**offender** 54:5,7 61:21

**offenders** 53:6 160:21 161:1

**offhand** 264:21

**office** 9:17 12:7,13,18,21 13:2,18 14:11,14,18 15:11,19 16:19 17:13 18:4,5,9 21:5 22:4 27:4,8,12 28:1 32:2,23 34:1,4,15 36:5,15 40:14

41:9 47:2 49:20 54:17 62:24 63:6, 10 69:3,10,14 73:3,6,18 98:19 151:22 169:13 202:13,15 204:1 219:23 220:24 221:16,21 222:3,8 223:1 228:5,21 232:3 262:10 265:9

**officed** 16:15 21:9 54:17

**officer** 4:21 80:11 95:15 103:20 201:3 226:23,24 227:3,13 229:2,12 230:7,16,17,19 231:21 256:17 257:20 263:12 264:1 266:3

**officers** 78:19 88:1 228:8,15,24 233:21 237:5,13,24 238:7,19 244:12,14 250:13,16 253:17 256:22 257:11 263:1,6,10 265:23 266:2,9,12,21,22,23 267:13

**offices** 4:16 13:3

**old-style** 232:20

**old-time** 54:15

**oldest** 204:15

**omission** 163:12

**oneself** 94:21

**open** 20:13,16 21:5 138:7

**opened** 20:12 22:4 123:23 124:1, 9,18,19 131:4 137:19 138:12 165:15 173:6 211:1,19 212:6

**opening** 20:10 68:9 138:9

**operated** 246:12

**operating** 82:4

**opinion** 199:22 200:8 201:14,15, 16,17,22 202:12 225:18 237:12 263:8

**opinions** 251:12

**opportunity** 32:15 267:22 270:22

**oppose** 168:3

**opposed** 107:22 252:3,10

**OPS** 88:4 178:18,19

**option** 92:13 270:2

**oral** 35:1,9

**orally** 35:15

**order** 9:4 45:21,22 115:16 120:6 126:16 129:13,21 130:1,3 202:6 215:17 232:22 266:1,10

**ordered** 157:20 206:22 270:21

**original** 260:12

KAREN G. SHIELDS, 08/29/2023

**originally** 94:19 132:21 133:4
176:2 191:15 200:4

**originals** 107:10

**outcome** 224:17,22,23

**overnights** 65:16

**overturn** 9:5

---

**P**

---

**p.m.** 62:21 108:21 119:24 120:15
122:17,20 125:19 172:13,19
180:17,21 212:18,22 271:10

**pack** 119:11,13

**pages** 122:15 128:18 146:8 162:13
163:16

**paid** 41:17

**pain** 232:22

**pains** 164:6

**paper** 101:11 204:3

**paperwork** 34:7,9

**paragraph** 109:8 115:5,6,7 116:7
143:9 145:10 147:2,12,14,15 148:5
177:12,20 178:1,6 179:5 181:16
182:2 186:24 191:20 192:5 193:7,8
194:16,19 195:6 197:14 199:7,8,20
201:12,13 214:8

**paragraphs** 146:2 180:4 197:15
199:18

**paraphrasing** 103:14

**Park** 100:16

**part** 12:20 21:20,23 27:23 30:14
59:15 64:8 94:15 186:17,21,22
209:16 211:16 230:13 238:19
239:23 240:2,11,17 241:20 248:2
253:16 262:20 264:6 266:16
269:20

**partially** 221:2

**participants** 85:3

**participated** 248:10

**parties** 4:20

**partnered** 230:11

**parts** 40:5 245:7,10,18 246:23

**party** 22:24 23:18 24:7,13 39:17,18
132:7

**pass** 53:22 262:9 263:16

**past** 55:4 65:22 71:19

**path** 77:5

**pattern** 159:20 160:6,17 161:12
234:13

**Paul** 152:17 153:21

**pay** 96:10,12 200:10

**PD** 13:20 14:8 27:10 29:3 54:2
72:13

**PD's** 13:18 14:18 34:3 36:14
169:13

**PDS** 18:7 27:21 40:20 42:12 52:22
264:7 265:11

**peer** 150:14

**pending** 53:18 104:4 155:9,22

**people** 13:3,5,8 14:1 16:5,15
20:18,21 21:10 28:9,22 29:7,24
30:24 31:2,15,17 32:14 38:8 48:7
54:17 57:20 68:1 73:15 77:21
78:18,22 79:3 86:24 87:2 93:19
94:22 95:3,5 96:11 100:23 103:18
110:5 142:10 143:8 158:2 166:15
169:15,16 189:4 200:19,20 202:14
216:17 219:5 221:3,6,7 233:4
248:18 249:16,17 251:11,20
257:11 267:6

**people's** 15:8 95:6 147:22 160:14

**Peoples** 161:11

**perform** 85:2

**period** 6:1,5 12:19 19:13 23:10
25:14 26:6,19,24 35:22 36:1 40:6
50:16 118:3 124:10 133:5 222:23
223:18 224:1

**permitted** 38:19

**person** 80:2,20 89:14 96:10 104:3
113:15 193:1 194:20 209:5 215:14
227:3 248:10 262:6 268:2

**person's** 151:18

**personal** 18:23 201:17 263:8
267:19

**personally** 230:23 232:23

**perspective** 44:20

**perused** 127:6

**petard** 27:13

**petition** 226:5

**PFP007051** 203:18

**PFP007052** 204:20

**PFP7083** 205:4

**PFP7095** 206:1

**PFP7165** 207:3

**PFP7190** 207:7

**PFP7198** 207:13

**PFP7250** 207:21

**PFP7386** 208:16

**phone** 34:7 65:19,20,21 117:19
133:11 204:21 232:20,21 233:14,
22

**photo** 84:12 179:10 194:21,24
195:3,5 197:3

**photographs** 85:9,24 195:3,6,9,
11

**photos** 195:15

**phrase** 201:13 224:16

**physical** 64:15,21 65:5,10,14,16,
18,23 66:6,11,15 67:7 79:15 80:22
84:3,9 85:6 86:6 232:17 233:24
237:14 238:1,18 239:7

**physically** 85:17,18

**pick** 13:6 23:20 26:14 44:1 68:6

**picked** 24:23 51:7,22

**picture** 82:7,10 178:1,5,8,11,12,24
179:6,13

**pictures** 33:3 152:12 179:7 195:1,
2 197:4

**piece** 60:19 91:5 113:16 163:20
236:18

**pieces** 32:13 82:9 83:11 96:14
113:19 199:1,2

**pile** 128:4 140:19,20,21

**piles** 165:7

**place** 43:18 139:24 164:17 252:10
258:8

**places** 114:18

**plaintiff** 5:6 56:1

**plaintiff's** 122:5 190:5 202:20

**plan** 41:12 153:16

**played** 149:2,21 248:1

KAREN G. SHIELDS, 08/29/2023

**plea** 155:19,21,22 156:8,9

**plead** 60:10,11

**pleading** 156:17,22

**pleadings** 211:14

**pleads** 156:4

**plenty** 39:22 44:13 230:12

**point** 18:5,10 23:6,7 40:16 46:21
50:6 61:10 68:5 86:11 94:12,18
97:1 98:5 103:4,24 133:17 135:18
196:2 206:11 209:24 220:6 233:11
237:8 247:14 251:23 254:21
263:23

**pointed** 161:3 232:5 235:13
243:18

**Poli** 12:2

**police** 63:21 64:10,13,17 65:15
75:18 83:17,19 86:23 87:8 88:1
89:17 158:15,16 161:23 169:16
171:7,9,16 172:1 178:17 182:6
189:20 190:3,4,8 194:2 200:15
201:3 202:20 208:5,7,14 228:15
239:5 247:16 250:9,11,13 255:8
263:18 265:2,18

**policy** 120:7

**position** 22:15,22 23:17 24:4 25:4
151:1 250:13,16 264:3

**positions** 150:24

**possibility** 144:18

**post-conviction** 6:18,23 8:24 9:3
52:14 226:4

**posttrial** 94:9

**potential** 112:10 218:2

**potentially** 90:23 145:6 150:4
152:9 186:9

**Potomac** 175:2

**powers** 41:8

**practice** 15:20,23 16:16,19,21
21:6 23:11 24:8,14 39:9 40:8
54:18,20 73:22 80:21 82:23 83:4
89:18 91:17 111:11 170:18 234:13
257:18 258:4

**practices** 111:1,6

**practicing** 6:4 26:6

**practitioner** 15:24 16:12,14,21
23:11

**pre--** 206:15

**precedes** 117:23

**precinct** 110:2 112:23

**precise** 9:1

**precisely** 233:24

**preferable** 44:19

**pregnant** 52:22 53:10

**preparation** 138:17 141:13,24
185:16 206:23

**prepare** 75:16 136:15 165:22
192:7 213:17,18,23

**prepared** 139:20 192:19

**preparing** 69:23 112:4,6 113:11
136:3,14 137:16 139:16 170:15
213:1 216:13 217:14

**presence** 84:4

**present** 25:23 77:21,22,23 78:10,
16,18,23 79:3,4,5 83:18 114:7
148:15,19 157:7 164:14 216:7,10
217:4,11 257:19 258:14

**presented** 155:4,7 195:16

**presentence** 94:9,13 95:11,18
96:20 162:14 256:12,14

**presentencing** 206:15

**Presently** 216:11

**preside** 19:23 25:20

**presided** 57:4

**presiding** 16:24 19:22

**press** 28:8,21

**pretrial** 79:19 86:8,11 94:5 147:22
149:17 206:14 257:11,20 258:5

**pretty** 53:23 86:24 114:22 134:22
160:3

**prevent** 156:18,22

**prevented** 216:11

**preventing** 217:13 218:10

**previous** 117:13 254:15

**previously** 173:9 209:24

**primary** 16:20

**principle** 251:3

**prior** 11:8 62:3 84:10,12 101:16,20
102:3,7 154:3,24 156:15 160:10

162:3 177:3,4

**Pritikin** 20:2 21:4,16,17 54:19

**private** 15:20,23 23:11 24:8,14
39:9 40:8 54:18,20 232:4,12

**privilege** 231:14 246:2

**pro** 13:7,10 223:18 259:7,10

**probability** 199:24 224:17,21,24
225:9

**probation** 95:15 163:9 256:17,21
257:11,12,19

**probe** 257:5

**problem** 71:16 103:12 179:15
183:4 249:8 250:2 252:13 254:3,19
255:2,5,15 269:20

**problems** 13:5 37:11 249:10
250:5 254:3

**procedure** 179:16,21

**proceeding** 9:1 168:1,4 210:12

**process** 34:8 40:17,18 94:9
148:20

**produce** 143:16 144:1,21 145:13,
24 146:1

**produced** 70:8 115:20 144:4

**professional** 11:14

**profile** 10:10,22 11:19,21 12:7
15:18 20:2

**projects** 204:13

**promises** 210:20

**proof** 32:10

**propensity** 231:23

**proper** 126:10

**property** 26:15

**proposed** 125:19 160:15 161:9
191:18 200:5

**proposing** 125:8

**pros** 167:14

**prosecuted** 161:18

**prosecution** 223:19 259:10

**prosecutors** 237:15 238:17
263:17,21 264:12

**prove** 82:3,13 83:1,6 150:18 164:6
243:21,24

**prover** 150:10,17

**provers** 150:14

**provide** 89:20 90:12 107:5 213:12

**provided** 87:8 116:18,20,24 171:7, 8 178:2,4,10 179:6 184:4 186:7 211:16 247:4

**providing** 117:24 172:2 218:2

**psychological** 65:1,5,10,14 66:7, 12,16 67:7 79:15 84:3

**public** 9:17 12:7,13,18 14:11 15:19 27:3,7 31:24 32:23 34:1 36:5 40:14,23 41:6 42:6,9 62:23 63:6 69:2,14 73:3,6,17 98:19 111:7 149:22 150:7 151:11 169:5 173:14, 17,21 202:13,15 204:1 219:22 220:24 221:16 222:8,24 228:5,6 232:12 237:12,22 238:7,9,13 249:4,5,13 250:9 265:8,20

**publications** 11:14

**publicly** 249:24

**pull** 52:7 59:7 190:1,2,3,7 209:11, 12

**pulling** 233:23

**punched** 253:6

**purported** 77:17

**purportedly** 81:14 161:13

**purporting** 201:18

**purports** 175:21

**purpose** 88:10 89:10 95:10 104:1 143:24 145:5 187:12

**purposely** 190:13,15

**purposes** 50:4 145:17

**pursue** 76:11 82:5

**push** 157:21 266:23

**pushed** 60:15

**pushing** 157:15

**put** 11:17,18 37:12 49:4 94:19 112:16 113:14 126:9 134:5 139:24 164:24 166:9 169:15,18,24 170:2 173:11 175:14 184:18,24 189:4 199:1 200:13,15 201:6 209:10,15, 18 210:3,4,6 211:10,11 214:11 230:9 232:7 239:2 243:13 245:24 246:6,20 247:6 248:16,19 269:21

**puts** 97:5

**putting** 95:14 143:7 199:13 214:7 229:6 267:8,15

---

**Q**

**qualifications** 220:10

**qualified** 111:7 202:6

**quality** 256:20 257:10

**quash** 206:17,20 264:24

**question** 8:15 10:7 26:3 30:13 46:24 58:14,19,20 59:2,6 80:5 81:18 102:14 117:18 158:19 171:11 180:3,12 187:10 207:15 209:17 217:9 224:18 231:15 237:19 243:19 246:15,16 247:5 251:11 254:15 258:21 259:21 266:14

**questioning** 109:22 170:8 235:13 243:18 257:20

**questions** 8:12,14 10:3 35:18 50:8 67:11 77:11 90:24 158:4 214:1 215:17 218:22 219:8,10,16,17 238:24 242:20 245:8 246:1 250:11 256:12,16 257:5 258:1 262:17 265:23

**quick** 119:22 196:5 212:13

**quickly** 37:2 270:11

**quiet** 157:18

---

**R**

**race** 23:5

**rained** 175:2

**raise** 41:3 236:22

**raised** 33:8,20 171:13

**ramifications** 158:17

**ran** 23:10

**randomly** 51:22

**range** 240:23

**rank** 40:12

**rap** 88:16

**rape** 49:11 50:13 52:19 57:3,17 62:6 63:17 66:19

**raped** 61:8

**rarely** 17:4 83:16

---

**reached** 13:15

**read** 83:2,3 109:8 115:5 118:24 124:24 127:10 129:5 135:20 138:2 140:8,10 145:22 165:19 166:2 171:23 174:12 181:1 187:4,5,8,11 193:4,7,12 194:16 204:17 206:12 208:5 225:23 226:10,12,13,14 234:23 235:8 236:3,14

**reading** 187:7 193:15,18 208:7

**readings** 193:21

**ready** 42:16 75:9 120:9 166:19 192:12

**real** 73:15 252:13 260:11

**reality** 186:21 267:7

**realized** 21:22

**reask** 93:16

**reason** 9:11,12 68:10 88:22 99:5 100:8 192:7,18 218:18 220:1 243:17 244:4

**reasonable** 43:15 58:22 199:24 224:16,21,24 225:9 248:9

**reasons** 264:7

**rebuttal** 244:14

**rebutted** 244:19

**recall** 10:1 35:17 55:20 56:5,10 64:18 65:24 66:2 67:2 72:1,9,10 109:11 118:2 134:20 141:22 162:4 167:2 168:23 169:2 170:9 176:14 177:19 184:7,10 186:23 216:7 229:20 235:20 236:1,15,20 239:2, 13 241:5 242:3 244:24 245:1 253:1,2,16,22 258:16 260:14

**recalled** 50:12 134:15

**recant** 198:18 253:16

**receipt** 106:18

**received** 105:11 106:2 107:21 121:16 125:16 162:21 173:5 182:21 198:18

**receiving** 138:13

**recently** 129:5

**recitation** 225:8

**recognize** 70:18 128:10 203:19 204:8

**recognized** 222:3

**recollection** 97:16 107:20 108:14

129:1 134:3,21 157:7 216:8 217:4, 11,12

**record** 4:3,20 5:16 47:6 62:17,20, 21 105:15,16 119:22,24 120:1,14 122:4 124:17 131:5 136:6 140:24 141:9,16 147:21 166:4 172:13,18 180:14,16,18,20 188:11,13,14,18 212:18,21 229:6 248:21 254:15 271:7,10

**records** 86:3 123:21 131:5 173:8 178:17 252:9

**recovered** 241:22 242:7

**red** 33:9 173:21

**reefer** 175:4

**refer** 150:23

**reference** 111:13

**referred** 39:11 178:6 185:10 187:19

**referring** 31:17 57:17 119:2,15 196:19 263:11,22 264:17 266:2,3

**refers** 173:4 181:16 186:24 193:11 195:5 207:11

**reflects** 239:4

**refresh** 107:20 108:14 129:1

**refuse** 33:19

**refused** 33:17

**register** 178:22

**registers** 237:6

**regular** 29:22

**reigns** 16:9

**reiterate** 237:4

**relate** 73:2 199:8

**related** 73:18 185:1 190:8 252:2

**relates** 160:9 161:13 199:11

**relating** 62:24 63:4 64:13 98:17 121:17

**Relations** 25:17

**relationship** 10:11 18:23 19:7 91:13 181:20,23 184:11

**relative** 149:10 181:22

**relatives** 252:11,14,16,17

**relevance** 229:10

**relevant** 58:19 96:17 231:10

**relied** 181:5 194:14

**relive** 52:10

**rely** 16:16

**remarks** 243:3

**remember** 6:14,16 7:13,16 8:17, 18,24 9:22,24 14:13 15:2,6,10 18:1 28:20 32:19,21,22 33:16 34:18,20, 23,24 35:6,20 36:6 37:9,24 38:5 43:9 44:3,5,9 45:20 48:6,16,21,23, 24 49:4,8,9,10,14 50:15,19,23 51:5,19 52:12,19,21,22,24 54:6,7 55:5,7,21 56:15 57:3 58:7 59:23 61:20 62:3 63:16 65:4 66:18 67:5, 12 71:7,9,11 72:19,23 73:17 79:22 89:14 98:2,3,6,12 100:9,22 101:9, 12,14 102:4,6,12,15 103:23 104:13 105:18 106:22 109:10,14 110:9,13, 15 111:14,22,23,24 112:1,2,3,6,9 113:6,8,14 114:9,10,23,24 115:3 116:10 117:5,21,23 118:2 121:24 126:24 127:18,22 129:4 133:10 135:5,7,10,11,14,15 136:1,5,14,15, 17,20,21,24 137:1,4 139:6,10,14, 20 140:5 144:5,9,13,17 145:12,21, 22 149:4,20 150:3,17 151:17,18,23 152:8,14,19 153:7 154:17 156:13 157:10,11,12,23 158:1,5,21,24 159:1,5,7,10,15 160:19 162:11 166:10,14 167:4,8,11 168:11,13, 15,17,20 170:11 171:18 175:24 176:4 177:22 178:15 182:23 183:3 184:19 185:20 203:2,4 209:7 210:3,9 211:8 216:11,15,16 217:22 218:7,10,13,14,16 220:1 222:15, 18,21 224:18 230:14 236:3 239:11, 23 240:2 241:3,4,20 244:10 245:8 247:24 248:3,8 251:20 255:13,23 256:1,8 258:11 259:23 260:13 261:1,4,7,10,13,18 262:3,10 263:16 264:16

**remembered** 100:8,24 109:9 113:7 114:21 115:6 139:16 218:1 219:21

**remembering** 50:9,18 111:13 220:2

**remembers** 177:16

**remembrances** 112:20 113:4

**remove** 166:20,23

**render** 202:11

**repeat** 103:16 134:12

**repeated** 135:7

**repeatedly** 88:3 104:13

**report** 35:14,15 86:23 89:17 94:10, 13 96:21 161:23 172:1 256:16 257:21 258:5

**reported** 35:16 178:17

**reporter** 4:17 5:4,7 70:6 78:14,15, 16 129:19 164:13 229:14 270:12

**reports** 33:6 75:19 87:8 169:17 171:7,9,17 189:20 190:3,4,8 194:2 202:21 208:5,7,14 247:16 255:8 256:21 257:12 258:2

**represent** 4:20 74:15 97:21 165:11 173:13

**representation** 63:1,5 74:22 97:20 98:17,18 134:3

**represented** 140:4 156:20

**representing** 4:15 14:1 29:7,11 63:3 87:18 156:14 168:20

**represents** 189:9

**reputation** 69:10,13 222:6,8

**reputations** 221:17

**request** 34:12 35:8,11 152:3

**required** 79:24 80:10

**research** 199:16

**reserve** 271:2,3

**reserved** 271:4

**reserving** 270:19

**respect** 190:2 208:8 234:13 236:8 254:17,18

**respond** 125:18 126:6

**responds** 125:22

**response** 8:18 265:22

**responsibilities** 67:23

**responsibility** 160:20

**rest** 42:15

**Resumed** 260:23 269:18

**resurfaced** 133:7

**resurrect** 8:9 100:5

**resurrected** 123:7

**retain** 22:14 24:3 62:24 63:3,4,8 71:16

Index: retained-services

KAREN G. SHIELDS, 08/29/2023

**retained** 63:9

**retaliation** 174:21

**retention** 22:22

**retirement** 39:17,18

**revealing** 264:4

**reverse** 166:6

**review** 137:22 139:19 140:4
213:22 247:16 258:6 270:14

**reviewed** 106:11 113:12 119:16
127:19 128:13 131:1 141:13 176:2
188:11 191:20 206:22 213:14

**reviewing** 138:5,16 141:22 213:4

**revised** 116:13

**Reynaldo** 4:10 195:22 196:17
227:3,21 234:14

**Richard** 19:5,9 100:15,16 178:10
183:6

**Richards** 5:5 62:14 70:11 98:22
99:4,14,16 102:21 105:6,23 106:6,
14,19 107:15,22 108:18 109:3
115:21 116:24 118:17 120:3,11,22
121:3,13,17 122:15,24 125:17
129:22 130:5 131:22 132:19,20
133:4,11,17 137:13 172:7,10
183:1,4 186:1,15 190:17 191:16
200:5 212:15 213:10,17 217:17,19
219:2,12,14 220:14,22 223:24
224:12 225:6,21 227:9 228:1,22
229:5,8,11 230:15 231:5,10,13,16
233:19 234:9,19,22 235:11 237:20
238:5,10,22 240:16 241:2,13
242:2,13,18,22 243:2,5 244:9,23
245:12,23 246:19 247:20 248:6,14
249:2,23 250:24 251:16 253:3,10,
19,24 254:9,13,16 255:4,12 257:16
259:14 260:8,15 269:8,13,15,19
270:8 271:7

**Richards'** 101:1 219:11 265:23

**rid** 123:6 166:8

**ride** 268:13,21 270:1,4

**riffled** 226:15

**riffling** 209:8

**right-hand** 142:9 173:15

**rights** 14:2,4 57:23 74:17

**Riley** 164:13

**Riley's** 158:6

**ring** 47:10 153:23

**Rios** 4:9 5:6 48:2,18 49:5,7 63:1
67:14 68:22 69:21 71:8 79:23
97:11,17,20 98:2,6,18,22 99:17
100:1 101:15,19 102:16,19 107:13,
17 115:11,19 116:5 118:15 121:17
129:20 130:4 132:7,15 133:18
134:3,16,21 137:9 139:7 140:3
141:20 143:12 144:10 148:12,16
156:14 158:22 160:24 161:14
162:18,21 163:21 167:12 168:12,
16,20,24 170:21 177:13 181:24
184:13 185:2,4,9 186:13 193:1,9,
12,19 194:17 197:21 200:1 215:11
239:24 242:6,9 244:17 245:6
246:3,6,9,21 247:7 248:7,11,16,22
254:22 259:24 261:21 263:22
268:13

**Rios's** 46:8 48:23 98:17 149:2
150:3 151:18 152:20 160:10,23
164:22 167:3 168:18 182:13 200:5
208:1 215:14 234:12 235:4 238:24
239:13 241:17 244:6 245:15
252:19 254:4

**roadblocks** 153:6

**robbery** 49:14 50:13 53:8,13 56:14
57:12 62:7 63:18 66:24 96:6

**Rodriguez** 98:3 112:11 113:11
152:19 157:8 168:12,17 206:2

**role** 87:10 149:1,20 150:3,8 151:18
153:23 181:17

**roof** 95:14 270:3

**room** 21:11 61:10 77:24 187:2

**Rosa** 151:16

**round** 42:13

**route** 23:8

**routinely** 143:21

**rubberband** 203:12

**rule** 80:13,15 255:20

**rules** 27:15 256:4

**run** 20:17,23 22:14,22 23:3,5 24:3,
7,12 28:5 55:4 109:17

**running** 23:6 110:5 134:17 139:7

**Ryan** 61:24

---

**S**

**S-H-I-E-L-D-S** 5:17

**sadly** 96:5

**safer** 110:5

**Salad** 85:12

**Sally** 4:17

**Samantha** 261:10

**sat** 21:13 60:9

**satellite** 13:3

**scared** 191:6

**scene** 82:3 152:12

**Schalka** 5:2 128:6 219:10

**Schiller** 37:13 38:23 42:13 43:11
44:4,12,16 45:13 56:20,24 57:7

**Schiller's** 42:4,11,13 43:7

**school** 12:22 14:6,8,10 72:4
174:24 175:9

**sci** 12:2

**scope** 229:9 234:5

**search** 241:4

**section** 94:12 95:10

**security** 175:8

**seek** 58:4

**segue** 93:13

**selected** 24:22

**selection** 24:1 154:12

**senate** 12:21

**send** 95:16 106:22,24 117:20
126:10 132:2 270:3

**sending** 118:9

**sends** 126:22

**sense** 44:16 100:23 112:3 125:23
181:14 187:11,14 189:22

**sentence** 97:6 259:1

**sentencer** 259:11

**sentencing** 95:21,24 96:17 97:2
258:6,10,15,22,23

**separately** 108:13

**September** 22:5 142:5,23

**sequence** 244:11 245:3

**series** 36:7 195:2,5,9

**services** 13:1 257:21 258:5

**set** 110:2 123:1 130:3 171:9

**sets** 87:17 173:5

**share** 106:21 107:1 123:20 171:21 232:6

**shared** 121:3

**sheet** 88:16

**shells** 241:23

**sheriffs** 48:8

**Shields** 4:4 5:10,17 20:3 105:2 165:11 172:21 271:9

**shift** 68:20

**shoot** 193:2

**shooter** 185:20 193:11 194:16 209:6 254:5,24

**shooting** 29:14 51:7 100:20 110:7 113:7 135:16 241:5

**short** 98:6,10 103:3 110:22 111:16 112:12,13 124:9 224:1

**shorter** 98:7

**shortly** 126:6,18,21 235:4

**shot** 51:19 135:9,12 138:19 161:2 193:17 200:21 201:10 240:19

**show** 70:12 83:20 105:6 108:3 128:1 129:18 136:7 165:3 171:22, 23 173:12 175:16 182:16 187:16 209:23 210:4,22 236:9

**showed** 81:8 195:1,2

**showing** 70:17 122:24 141:7 172:22 173:9

**shows** 122:16

**shut** 237:8

**shy** 15:14

**sick** 262:12

**side** 49:5 129:19 166:9

**sidetracked** 213:2

**sidewalk** 174:24

**signature** 77:16,17 130:11 270:11,19,20,24 271:4

**signatures** 164:9

**signed** 116:13 127:4,11,15 132:11 142:5,6 143:17 144:24 154:8 162:7 175:21 176:11,21 184:24 191:16 201:22

**significant** 260:9

**similar** 200:19,20 232:11

**single** 61:21 84:12 179:13 236:17

**sink** 30:19

**sis** 174:22 175:11

**sit** 21:5 40:8 55:3 73:12 130:18 136:21 152:14

**sites** 33:3

**sitting** 34:16 109:20 135:3 136:3

**situation** 76:22

**sixth** 105:17 122:5 190:5 202:20

**size** 21:12 80:19

**skills** 221:17 262:6

**skip** 220:23 222:19

**Slap** 174:21

**slapped** 58:24

**slate** 23:1,2

**slightly** 132:24 133:1 145:14

**slow** 85:15

**slowly** 36:12

**small** 61:9 113:19 203:14,16

**smallest** 141:1

**smoking** 200:16

**soft** 52:3

**solo** 15:24 16:12,13,21 23:11

**song** 14:21

**sort** 106:22 134:8 198:8 221:23 228:3 240:4 258:8

**sorts** 74:17 84:19 233:24

**sounded** 183:3

**sounds** 38:12,20 42:21 114:12

**space** 21:4

**speaking** 11:13,16 58:13 168:11, 17 216:14 231:6

**specialist** 234:24 235:1

**specialized** 202:5,10

**specific** 8:10 47:21 102:12,15 134:20 217:12 220:2 265:17

**specifically** 58:13 71:9 104:9 196:22 218:1 245:16

**specificity** 79:23 80:10

**speech** 231:5

**spell** 5:15,23 37:23

**spelled** 229:14 230:18

**spend** 45:19

**spent** 138:4,16 213:3

**split** 237:12

**spoke** 235:22

**spot** 22:16 23:2

**spots** 20:15,22,23

**stabbed** 51:18,19,20 61:8

**stack** 134:10

**stamp** 141:11 142:8,12,13,15,20 173:14

**stamped** 107:13 141:10,16 143:2 173:18,20

**stamps** 203:14

**stand** 33:22 90:21 93:22 112:16 113:15 136:18 157:8 158:22 215:15 243:13 244:12 246:6 247:7

**standards** 58:8

**standing** 104:3

**standpoint** 94:20

**stands** 137:6 140:17

**start** 14:8 29:6 30:2 77:5 187:5,8 210:1 214:4 219:15

**started** 12:10 15:24 36:6 73:14 138:1 171:18

**starting** 20:10

**state** 5:15 86:12 87:7 88:7 91:23 92:2,13,16,17,18 95:23 97:5,9 142:4 156:18,22 160:15 161:10 163:8 166:20 167:16 171:12 175:13 198:20 209:10 210:3 216:19,20 217:3 244:13 249:9 250:2 251:4 268:24

**state's** 7:6,14 78:12 83:14,17,23 84:4,6 86:22 89:20 92:8 143:6 158:13 187:1 240:8 241:18 242:19, 22 244:5,13 245:17 263:24 264:7 265:13 267:21 268:6

**stated** 145:5 177:19 184:1 188:12 199:15

**statement** 53:4 54:3 61:19 66:3

KAREN G. SHIELDS, 08/29/2023

76:16 77:16,21 78:4,10,15,23 79:6, 10,13,16,19 81:5,9,14,21,23 82:1, 2,13 83:1,5,7,8,10,15 113:24 114:2,5 130:6 163:17,23 164:3 170:24 182:7 184:24 185:11,19,21 197:21 198:1 208:1 239:1,9 240:12,17 241:17,20 242:6,15 243:9 245:7,10,18 246:7,23,24 247:1 253:17 254:5,23 255:8 264:10 266:8 267:13

**statements** 78:2,6,9 79:2 82:12, 14,20 126:2 146:10 188:3 206:21 244:18 249:18

**states** 4:11 177:13

**stating** 189:1

**station** 65:15

**stature** 112:13

**statuses** 75:15

**stay** 36:17 217:2 264:7

**stayed** 158:3 208:7

**STD** 173:23

**step** 41:12

**Stephen** 5:5 37:12 62:13 70:8 100:10 105:1 106:17 114:20

**steps** 231:21 232:1

**Stevens** 182:22

**stick** 226:12

**sticks** 32:19

**stint** 19:15

**stipulation** 107:4

**stones** 246:13

**stop** 81:24 166:6

**stories** 14:22 15:2,5,7,8

**story** 74:9 112:20,22 135:8 164:3 199:2,3,4

**straight** 19:17 53:20 183:6 209:18

**straighten** 107:2

**strange** 20:13 266:14

**strategy** 192:10,11,12,14

**street** 4:16 6:17 16:23 29:16,18, 20,21 37:4,7 49:12,17 51:13,23 54:16 57:7 95:7 109:15 200:15 201:5

**strenuously** 171:12

**Strickland** 225:10

**strike** 187:3 199:19 243:3

**striking** 240:4

**strings** 74:11,12

**stroller** 157:13,22

**struck** 85:17 232:21

**stuck** 15:3 96:11

**stuff** 32:14 72:21 114:6 118:9 226:15,16 232:5

**stunning** 100:19

**subcircuit** 20:9,24 22:11

**subcircuits** 20:11,18

**subpoena** 87:18,20,22 88:1,6 92:18 131:20 173:24 237:6 269:22

**subpoenaed** 75:19 87:14 174:8

**subsequent** 133:11 156:5

**subset** 165:12

**substance** 30:14 114:6 133:3 197:5 270:16

**substantial** 228:8

**success** 95:6

**successful** 144:6 196:16

**sudden** 51:24 117:24

**sue** 72:4

**sued** 71:22,23 72:3

**sufficient** 58:18 59:3 225:15

**suggest** 77:21 120:3

**suggested** 118:18 239:5 247:1 255:19

**suggestions** 125:23

**Suite** 4:6,16

**summary** 105:17 122:5 125:24 131:6 211:14

**sun** 172:11

**supervisor** 27:12,17 33:20 44:11 73:10

**supervisors** 27:15

**supplied** 116:11 170:22

**support** 94:13,14,20,21 95:2,3,8, 15

**supportive** 94:23

**supports** 94:21

**suppose** 87:13 185:12,17 186:3

**supposed** 51:12 95:16,17 204:5

**supposedly** 242:6

**suppress** 79:19 146:9 192:5,8,19 206:16,21 265:1

**Supreme** 220:7

**supremes** 20:14

**surely** 127:10

**surface** 187:15

**surmising** 145:20 217:5,8 218:3

**surprise** 87:4 224:20

**surprises** 90:20

**surrounding** 183:17 189:11

**suspect** 217:1 230:23 231:17 252:2

**suspected** 229:1 230:7,19 237:5

**suspects** 232:17,22 260:12

**suspicion** 147:16 236:23

**suspicions** 247:13

**sustained** 265:1

**swear** 5:8

**sworn** 5:9,11

---

**T**

**t-shirts** 72:5,6

**tab** 134:9

**table** 21:12 54:7 135:3 136:4

**tactics** 237:14 238:1

**tainting** 250:3

**takes** 94:24 215:10,16 244:11

**taking** 27:16 78:23 157:8

**talk** 31:13 32:8 33:4 40:6 51:13 57:14 73:10,12,24 74:6 75:12 79:14 91:24 92:3,6,9,13,24 95:8 97:19 98:15 135:1 137:16 214:7 216:23,24 232:24 251:7 265:20

**talked** 6:7 49:24 50:11 98:5,21 99:4 109:12 133:12,14,17,22 134:2,16,23 139:7 148:9 152:20

KAREN G. SHIELDS, 08/29/2023

162:15 168:13 189:14 228:16,20 237:2 238:23 243:7,8 263:15

**talking** 21:17 57:11 59:22 62:3 93:12 94:16 95:18 110:15,24 112:23 113:10 139:6 143:6 152:1 154:21 168:15 174:5,6 209:19 210:15 213:1 214:4 234:14 242:21 249:8 263:4

**talks** 125:24 172:23 197:15

**tall** 80:19

**task** 27:9 30:3,10 31:4 38:1,4,5,8 39:5,7 40:21 46:9,11 47:2,4,9,16 60:4,13 68:4,15,19 221:4,6,8,12,13 223:20 224:3 228:5,16 229:19,21 230:20 231:19

**teach** 14:23

**teachers** 222:16

**teaching** 14:15

**team** 19:20 66:4 67:3 90:2 153:4 154:18 164:21 167:9

**technically** 18:9

**teeth** 30:20

**telephone** 118:7

**telling** 15:8 135:11 248:22 249:16

**tells** 243:8

**tend** 252:15 258:24

**tendency** 251:3

**term** 150:20

**terminate** 167:16

**terms** 8:7 73:22 74:22 79:5 80:1, 10 84:19 85:6,8,16 86:2 91:16 139:5 140:3 156:4 176:16 179:15, 20 188:24 190:9 219:17 220:24 221:17 223:11 232:15 237:4 239:3 241:16 242:5 245:2 250:7 253:11, 12,15 254:2 255:5 257:17

**testified** 5:12 6:11 9:2,23 137:5 151:8 153:9 157:24 158:6 166:11 177:13,17,18 189:24 226:21 235:4, 9 244:5,17 246:21 248:1 253:4,5 255:7 260:1 261:22

**testifies** 198:10

**testify** 6:21,24 7:4,6,15 9:13 92:22 112:4,7 151:9 152:10,15 166:16 198:11,18 202:6 244:2 247:7,9 253:7 255:6 261:20 268:6 269:23

**testifying** 6:17 51:13 159:2,5,8,11

**testimony** 7:23 89:20 140:9 141:23 153:9 157:14 158:9 162:3 165:4,6,22 176:11,13 184:8 188:10 189:17 233:5 235:20 236:1,20 239:16 240:20 245:15 260:4 270:17

**theft** 96:6

**theme** 15:5

**theoretically** 48:14

**theory** 144:13 153:15 209:5,16,17, 18 240:6 259:24 260:9

**there'd** 194:9

**Theresa** 4:24 53:9 71:14

**thing** 13:15 16:1 26:17 28:16 30:7 32:4 34:17 44:23 52:23 53:3 71:2 88:16 98:13 106:23 107:12 111:16 114:4 124:23 135:22 136:1,9 163:9 169:17 198:8 212:1 221:4,23 265:12,18 268:9

**things** 10:3 16:4 29:12 30:6 36:19 55:4 71:5 74:18 76:21 77:15 81:5 84:20 86:4 87:6 99:21 103:7,15,16 107:4 115:15 117:6 123:9 134:6 139:1,22 145:16 181:5,9 184:1 188:12 189:3 190:19 191:1 194:8 200:19 201:2,8 202:15 218:1 219:19 220:17 222:7,13 225:12 226:23 228:18 234:14 237:4,16 238:18 245:19 247:4,8 248:17 249:3,17 250:19 257:6 262:5 266:15 267:4

**thinking** 14:8 16:1 45:10 62:12 82:22 183:3 192:22 252:4

**thought** 15:11 28:22,24 36:11 39:14 52:16 57:8,12 102:8 110:4 113:15 127:6 144:10 158:23 171:20 206:10 235:10 236:5

**thread** 81:20 85:7,19

**threads** 75:2 77:4 164:20 185:16

**threatened** 193:8,18 265:24 266:9 267:14

**threatening** 198:22 250:17 267:9

**threatens** 198:20,21

**threats** 79:15,18

**throw** 16:5

**til** 24:14

**tilting** 251:4

**time** 6:1,5 9:9,24 10:4 12:19,21,22 13:1 15:13 16:11 19:13,18 20:20 23:9,10 24:19 25:14 26:6,19,24 31:11 32:10 33:16 34:10 35:22 36:1,5,18 39:8 40:6,16,20 41:19 46:8 47:5 50:2,16,18 51:8 52:20 56:12 57:1,6 58:8 60:8 62:10,11 63:12 68:22 71:12 72:14 73:2 74:18 78:10 86:12 92:5,6,7 98:21 101:11 103:4,24 104:5 105:20 109:11 110:6,14,22 111:8,14 113:6,11 115:16 120:4 123:2 124:2,10,13,20 127:19 130:24 131:7 133:5,17 136:12 137:13 138:4,8,13,15 139:7 144:5 154:8 164:17 171:4 176:7 184:16 185:14 190:16 194:6 201:5 206:11 211:1, 6,19 212:6 222:17 224:1 229:1 230:7,20 233:3 234:11 235:2 249:6 253:6 264:15 268:4

**times** 6:13 17:3 77:3 85:10 87:2 223:6

**timing** 68:21

**Tino** 149:8,9 161:13 183:12 185:1, 3,10 194:10 208:18 209:6

**tiny** 269:8

**tired** 196:3 246:17

**title** 40:15

**today** 4:17 114:6 130:18 138:17 152:14 165:23 190:17 201:6 213:17,18,23 222:21 226:14 236:6

**today's** 133:16 271:9

**told** 6:8 13:17 14:22,23 15:2 33:21 65:4,7 66:6,19 68:10 71:3,12 74:11 78:21 83:13,14 89:14 100:2,4,7 103:6 104:13 131:18 133:2,15,16, 18,23 134:15 135:8 139:6 145:12 151:9 161:5 167:11,12 170:21,22 179:23,24 182:13 183:20 191:8,11 213:3 223:1 231:17 245:6,19

**top** 122:3 206:4

**topic** 80:9 225:22 228:2

**topics** 76:17

**Torres** 261:1

**total** 243:2

**touch** 254:1

**touched** 228:3

KAREN G. SHIELDS, 08/29/2023

**tough** 29:10 201:6 209:22 259:11

**track** 69:15 71:4 129:8

**traction** 235:17

**traffic** 19:18

**trained** 202:14

**training** 73:6,8,15,17 202:5,11 222:9,17

**trainings** 73:14,15 202:14

**transcript** 106:3 135:21 140:8 168:12 184:5 206:12 210:11,12 241:6 270:14,21

**transcription** 270:15,17

**transcripts** 202:21 206:21 212:2

**transferred** 41:20

**treat** 83:18

**trespass** 175:9

**trial** 8:22 9:6 14:12 17:12 26:3 27:23 42:16 43:23 44:6,13,17 46:8, 16 53:18 55:10,13 60:17,18 61:17 62:4 64:6,10,13 65:6 68:24 69:11, 23 73:11 75:16 76:14 86:8 90:3 94:6 99:1,3,23 100:5 103:8 105:16 110:23 112:4,7 113:12,16,21 114:13 122:4 131:5 136:3,10,12, 14,15,18 139:17 149:18,19 150:9 151:2 153:9 155:5 156:4,5,6,19,24 159:13 161:20 162:2,4 165:4,6,12, 20 166:12,19 169:7 170:3,15 177:13,23 185:5,16 188:14,18 189:6,17 190:22 191:1,5 195:23 196:17 197:12 198:13,18 199:5 200:21,23 201:10,23 202:7 206:23 207:2 209:5 212:2 215:23 216:2,5, 13 217:15 222:5 223:7,8,14 234:12 235:4,21 243:10,23 245:15 247:24 251:5 253:4,17 258:9,15 261:21,24 262:6 267:21 269:21,23

**trial-ad** 73:15

**trials** 17:7,11 19:23 25:20 26:21,23 30:12 36:2 38:17 41:24 43:6 44:4,8 48:2 49:4,8 50:1,11,15 62:3,4 63:11,16 219:22 220:11 222:22 223:2,9,12,17 224:3,8 245:2

**trigger** 209:12

**trooper's** 175:13

**Trotta** 4:14

**trouble** 92:10 123:10 180:2 224:15

**true** 77:8 80:24 81:6,9,11,16,22 82:14 83:1,7,10,21,22 84:2 158:23 167:7,10 181:10 182:15 184:2 186:16 188:5,8,9,22,24 190:24 194:12 197:8 198:1,2 201:8 212:1 221:9 235:5 236:22 244:3,20 250:7 251:15 252:7 258:11 262:8,22 266:15

**Trump** 256:7

**truth** 74:7,23 194:1,2 198:23 239:4 247:2 248:22 267:1,2,4

**truthfully** 8:21

**turn** 141:17 142:3 158:15 219:2

**turned** 21:16 60:9

**Turning** 141:15

**twiddling** 34:17

**type** 51:7 106:23

**typical** 9:3,7,8 28:15 93:11,12 200:23 245:3

**typically** 11:17 27:10 42:9 72:21 74:4 76:5 78:2,9 86:18,20 87:18,22 93:21 96:21 166:18 206:19 235:16 258:11

**typing** 270:13

**U**

**Uh-huh** 20:8 21:2 23:21 42:22 44:2 46:17 69:9 78:13 96:15 99:12 109:7 111:3 117:9 118:8 129:9 144:23 145:15,17 155:2 157:19 175:18 191:10 196:14 197:2,16 214:6

**Uh-uh** 57:19 80:4 213:15

**ultimate** 27:10

**unclip** 146:13

**uncomfortable** 233:8,10

**uncommon** 102:1

**uncover** 231:22 232:1

**uncovered** 76:12

**undermine** 224:24 225:15 227:17

**underneath** 175:1

**understand** 10:9 22:8,21 45:22 194:15,21 202:1,9 209:19 225:5,20 233:7,9 237:18 256:18 265:11

**understanding** 132:12 168:24 169:3 182:4 264:23

**understood** 92:10 100:13 103:17 110:18 132:7 194:13,16

**undertaken** 233:24

**undisclosed** 225:17

**undue** 84:23

**unfair** 250:17

**unfairly** 249:15

**uniformly** 237:8 257:1,2,3

**unindicted** 215:2

**union** 221:2

**unionize** 27:12

**unionized** 41:7,9

**unit** 4:2 62:20 120:14 172:18 180:20 212:21 271:5,8

**United** 4:11

**University** 11:22

**unpack** 197:23

**unsuccessful** 23:14

**untangle** 242:20

**unturned** 246:13

**unusual** 88:15 158:7 268:5

**update** 11:3 71:4

**updated** 10:22 11:1,4,5,15

**upper** 142:9

**Urlaub** 4:15,18

**useless** 88:13

**usual** 244:11

**V**

**vacate** 106:10 108:9 128:2 130:24 176:2 182:20 225:24 226:7

**vacating** 168:6

**vacation** 16:17

**vague** 193:13

**Vaguely** 157:9

**variance** 256:24

**varied** 73:8 256:21

KAREN G. SHIELDS, 08/29/2023

**varying** 235:21

**verdict** 17:14 55:18,20 60:21,22 61:2 97:12,17 136:20,23 162:5 225:1,16 227:17

**verdicts** 17:23 54:8

**versa** 16:18

**versus** 4:9 225:10

**vet** 267:22

**vice** 16:18

**victim** 161:2

**video** 4:2,20 62:16,19,21 119:23 120:14 172:12,18 180:16,20 212:17,21 271:9,10

**video-conferenced** 4:3

**views** 123:13

**violation** 96:13

**violence** 232:17 237:15 238:2,19

**visible** 234:2

**visit** 31:11

**volume** 137:23

**voluminous** 71:15

**voluntarily** 13:7

**volunteer** 12:24 13:4

**vote** 25:2

**voted** 24:24 110:2

**votes** 23:4

**Vukovich** 230:4,7,13

**W**

**W-A-T-E-R-S** 5:24

**wacky** 37:8 38:22 41:22

**wait** 173:18 180:7

**waiting** 42:17

**waive** 270:20 271:2

**waiving** 270:23

**wake** 50:17

**walk** 17:5 36:12

**walked** 16:7 61:13

**wall** 22:2

**wanted** 13:19 14:5 27:16,22,23 28:9 29:19 32:10 35:11 55:1 68:10 135:1 167:4 193:16 221:12,14 233:15 237:3 250:19 259:2 266:1, 11

**wanting** 210:4 265:12

**war** 15:7,8

**warrants** 241:4

**Washington** 49:10 50:13 51:17 52:13 54:9 62:5 65:8 66:5,13 225:10

**Washington's** 66:1

**ways** 96:19 106:20 123:8 172:2 250:17

**Webb** 54:14

**website** 70:9,21

**week** 13:4 105:10 172:23 252:22, 23

**weeks** 37:9 51:21 252:2

**weight** 84:19 236:19

**weird** 53:24

**West** 4:6

**whatsoever** 100:5

**Wicker** 100:16

**wife** 96:1

**window** 110:8

**winning** 221:22

**wiser** 233:2

**withdraw** 46:24 144:19

**witness's** 70:9 87:10 266:10

**witnesses** 28:13 31:18 65:11 68:10 69:15 74:8 75:1 76:10 85:8, 22 86:16,21 87:23,24 88:7,8 89:19 90:3,5,11 91:3,14,16,22 92:6,8 93:6 97:5,9 112:6,9,10 136:17 137:5 141:23 143:9 148:6,9,12,22 149:13 157:13 166:11,20,21 168:11 170:14 186:7,8 198:16 209:3 214:17 216:13 217:14 249:9 250:2,4,12,17,19 251:4,8,10 258:21,24 262:15 265:24 267:9,14

**woman** 51:17 151:17

**woman's** 61:6

**women** 61:22

**wonderful** 43:17

**wondering** 193:20 196:21

**word** 40:12 118:24 175:3 202:23 203:2,3,4 206:8 259:6

**words** 132:21 140:11 176:24 194:13 200:4 227:10 232:9 257:4 269:17

**work** 10:18 13:10 14:9 15:12 16:2, 3 21:9 29:5,10 30:5 34:1 42:22 43:18 44:13 71:7 94:22 169:10 191:5 200:24 219:16 228:16 252:9 253:6 256:20 257:10 264:22 265:14 268:14 270:12

**worked** 12:20,24 21:13 24:9,14 42:13 114:7 158:14 201:23 249:16

**worker** 10:12

**working** 10:11 18:7 24:8 26:12 96:2,3 162:4 169:6

**works** 44:22

**workup** 68:8

**world** 10:16 70:21 171:17

**worry** 18:13 40:4 173:18

**worst** 52:10 81:18

**worth** 151:14

**Wow** 99:13

**write** 109:8 204:4 205:17 257:12

**writing** 35:14,16

**written** 51:24 181:13 182:10 200:9 270:21

**wrong** 7:5 63:15 130:17 224:6 234:12

**wrongly** 57:24

**wrote** 82:20 110:14 111:15 220:6

**Ws** 204:10

**Y**

**yard** 174:24

**year** 12:17,20 19:16 21:13 22:5 31:5 37:5,6,13,21 38:6 42:5 43:9 45:5,13,15,17,19 46:1,3,6 47:3,20 99:4,5 100:12 103:4,5 109:1 118:13 133:15,23 165:15 173:6 211:2,20 233:5 252:2 267:11

**years** 5:19 7:18,20,21 10:20 11:1,

KAREN G. SHIELDS, 08/29/2023

5,6 12:17 19:5 23:3 25:16 27:5,12
31:5 38:15 41:16 49:15 71:3 73:9
99:1,9,13 177:17 201:24 202:17
220:16 263:9 266:18

**yelled**  135:10 161:3

---

### Z

**zealously**  164:21

**Zoom**  180:6