*Rios v. Guevara, et.al*
22 CV 3973

# EXHIBIT N

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAIME RIOS, | ) | |
| | ) | Case No.  22 CV 3973 |
| Plaintiff, | ) | |
| vs. | ) | Judge Pacold |
| | ) | |
| REYNALDO GUEVARA, et al., | ) | Magistrate Judge Kim |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S ANSWERS TO DEFENDANT
MICHAEL MASON'S
FIRST SET OF INTERROGATORIES TO PLAINTIFF**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Jaime Rios answers defendant Mason's First Set of Interrogatories as follows:

**INTERROGATORIES**

1.      Have you ever been a member of or affiliated with any street gang?  If so, identify the name of any such street gang and/or organization, the dates of each membership and/or affiliation, your rank(s) or position(s) within the gang and/or organization, your duties and/or responsibilities relative to the street gang and/or organization, any aliases, nicknames or street names by which you were known within the gang, the name of any rival gangs, the date (if any) when you left the gang, and the reasons (if any) that you left the gang.

**ANSWER:**

Yes. I joined the  Latin Kings in 1980 or 1981 and was a Latin King  until about 1987. In 1987 I started stepping off from them because I had a child. After 1989 when I was arrested I was not a member of the gang. When I was a member of the gang  I was a foot soldier. I had no rank. I was selling drugs, protecting the neighborhood from other gangs,

1

etc. I was called Jaime or Rios. The rival gangs were the Gangster Disciples, Spanish Cobras, Harrison Gents, and Ashland Vikings.

2.    Besides those referenced in police records, have you (or anyone acting on your behalf) had any conversations or do you know of any statements, with or by any person at any time with regard to the matters referenced in your complaint?  If the answer to this interrogatory is in the affirmative, state the following:

     a.      The date or dates of such conversations and/or statements;

     b.      The place of such conversations and/or statements;

     c.      All persons present for such conversations and/or statements;

     d.      The matters and things stated by the person in the conversations and/or statements;

     e.      Whether the conversations was oral, written and/or recorded; and,

     f.      Who has possession of the statement if written and/or recorded.

**ANSWER:**

Benjamin Carrero:

I spoke with him:

a.  Sometime in 1992, 1993 or 1994
b.  Pontiac Correctional Center
c.  Other inmates may have been present
d.  Benjamin told me how he had been coerced by Guevara
e.  The conversation was not written or recorded.
f.  NA

a.  Sometime in 2005 or 2006
b.  Dixon Correctional Center
c.  Javier Torres's brother was there.
d.  Benjamin told me how he may have been coerced by Guevara.
e.  The conversation was not written or recorded.
f.  NA

Ricardo Rios, my brother spoke with Carrero just before he signed the affidavit on May 22, 2020.

a. Shortly before May 22, 2020
b. I am not sure
c. I am not sure
d. Rios told Carrero to contact my attorney, Stephen L. Richards
e. The conversation was not written or recorded
f. NA

Luis Huertas

Luis Huertas spoke with investigator Heather Kulkowski

a. Shortly before May 19, 2020
b. Kulkowski and Huertas's wife were present
c. Huertas supplied the details of his interactions with Guevara
d. Not sure if the conversation was written or recorded
e. NA

3.     Please identify all newspaper articles, magazine articles, memoirs, journals, articles, on-line or social media posts, including but not limited to Facebook or Twitter posts, that you authored or posted, that relate to the homicide investigation of Luis Morales, your conviction, your post-conviction proceedings, the vacating of your conviction, your release from prison, and to your complaint herein.

**ANSWER:**

I did not author or post anything about this case.

4.     Has any student, reporter, journalist, newscaster, or other person affiliated with any school, newspaper, television station or other media outlet or organization, at any time, been provided access to any documents in your, your attorney(s), and/or your agent(s) possession related to the incident alleged in your complaint? If so, please provide the name and address of such person(s) provided or given access, and for each such person identify the documents you, your attorneys, or your agents provided or gave to them.

3

**ANSWER:**

Yes. My attorney, Stephen L. Richards, supplied documents to Maurice Possley at the

National Registry of Exonerations

5.      Please describe with specificity any and all communications by you and/or your

attorneys/agents/representatives with the following individuals (a) Cristino Garcia; (b) Benjamin

Carrero; and (c) Luis Huertas.  Identify all facts, documents, and/or witnesses that support these

communications.

**ANSWER:**

See above.  In addition, my attorney Stephen L. Richards interviewed Garcia, Carrero and

Huertas prior to the hearing on the motion to vacate on August 1, 2022.

6.    Please state whether you, or anyone acting on your behalf, has made a complaint, allegation, or

other statement to the Office of Professional Standards, the Independent Police Review

Authority, the Civilian Office of Police Accountability, the Illinois Torture Inquiry and Relief

Commission, the Illinois Prisoner Review Board, the Office of the Governor of the State of

Illinois, the Cook County State's Attorney, the Illinois Attorney General, the Federal Bureau of

Investigation, the United States Department of Justice, any other local, state, or federal

government or quasi-governmental agency, or to any private entity (e.g. any type of innocence

project, exoneration project, school of journalism, justice project) against any of the named

defendants you have sued in this litigation. If so, please state:

a.      the governmental or private entity to which you have ever made your
complaint or allegation;

b.      the date on which you made the complaint or allegations;

c.      the named defendant(s) against whom you made your complaint or
allegation;

d.      if you did not make the complaint or allegation personally, the person(s)
who made the complaint or allegation on your behalf; and

e.      the substance and nature of the complaint or allegations.

**ANSWER:**

No.

7.      Please list all Illinois Department of Corrections facilities in which you were incarcerated after your conviction for the murder of Luis Morales and the period of time you were at each facility.

**ANSWER:**

Pontiac, 1991 to 1996 or 1997. Menard in 1999. Danville in 2000. Dixon from 2000 to my release in 2008.

8.      Please state the precise date that you were released from the Illinois Department of Corrections for the murder of Luis Morales, and if there were any conditions of your release (e.g. probation, parole, mandatory supervised released, half-way house, electronically monitored home confinement, etc.), please identify the condition(s) of your release, the location, and the time period for each condition of your release.

**ANSWER:**

June 7 or July 7, 2008.      I went to Milwaukee under the interstate compact  for three years.  My parole had no special conditions.

9.      For each of the following individuals, please state if you know (knew) the individual, how long you have known the individual, how often you saw or spoke to the individual, whether you spoke to the individual at any time during your incarceration, whether you spoke to the individual after your release from incarceration, and the nature of those encounters:  (a) Cristino Garcia; (b) Benjamin Carrero; and (c) Luis Huertas.

**ANSWER:**

Cristino Garcia

I met Cristino Garcia five to six years before my arrest. I would see him and greet him periodically here and there in the neighborhood. I did not speak with him or see him after incarceration.

Benjamin Carrero

I have known Benjamin Carrero since childhood in the early eighties maybe from 1978 onwards. We went ice skating in Wicker Park.  I stopped  seeing him after I began to leave the gangs. I spoke to him during my incarceration.

Luis Huertas

I have never met or spoken to Luis Huertas.

10.      Please specify in complete detail where you were and who you were with on June 27, 1989.

**ANSWER:**

I woke up in my house, 1440 north Leavitt at around eight or nine in the morning. I showered and went to my mom's house at 1246 north Wolcott. I walked the dogs and fed them. I went home at nine or ten o'clock. I stayed at my house for the rest of the night.

6

11.     Please identify each and every statement(s) you gave to Chicago Police Department personnel and/or Cook County State's Attorney's personnel regarding the Luis Morales murder or the incident in which Luis Morales was murdered, and specify in complete detail the statement(s) or part of your statement(s) that was fabricated, and identify the Defendant who fabricated the statement(s) or part(s) thereof.

**ANSWER:**

I initially told Mason and Guevara that I had no involvement in the Morales murder and told them about a different shooting incident. The following portions of my court reported statement were fabricated by Mason and Guevara and they forced me to make these statements.

Q. Jaime, are you a member of a gang?

A. Yes.

Q. What gang?

A. Latin Kings.

Q. How long have you been a member of that gang?

A. I have been at least 5 years.

Q. Since you were how old?

7

A. Since I was 12.

Q. You are how old now?

A. 18.

Q. Okay. What is your rank in that gang?

A, Foot soldier.

Q, Calling your attention to the evening of June 27th, 1989, That was a Tuesday night. What were you doing?

A. I was outside in the front.

*Fabricated (as to date). Mason and Guevara.*

Q. Of where you live?

*Fabricated (as to date) Mason and Guevara*

A. Yes.

*Fabricated (as to date) Mason and Guevara*

Q. Would that be 1440 North Leavitt?

A. Yes, Ma'am.

Q. Who was with you?

A. My brother-in-law, my friend Lamont and my lady.

*Fabricated (as to date) Mason and Guevara*


Q. What happened at that time?


A. Well, a Cutlass came by and passenger, and the driver took out his right hand and held the steering wheel with his left hand. He tried to shoot at me and shot his friend one time and shot 3 times towards me and my lady.

*Fabricated (as to date) Mason and Guevara.*


Q. You said that was a Cutlass?


A. A Cutlass.

*Fabricated (as to date) Mason and Guevara.*


Q. Two-door Cutlass black.


Q. And what direction on Leavitt was that car going?

*Fabricated (as to date) Mason and Guevara.*


A. He was going straight on Leavitt?

*Fabricated (as to date).  Mason and Guevara.*


Q. Straight down Leavitt?

9

*Fabricated (as to date). Mason and Guevara.*

A. He was going straight.

*Fabricated (as to date). Mason and Guevara.*

Q. So where did you go after he shot at you?

*Fabricated (as to date). Mason and Guevara.*

A. After the shooting he past the stop sign and he went up Hirsch. He took a right up Hirsch.

*Fabricated (as to date). Mason and Guevara.*

Q. Did you know who was in that car?

*Fabricated. Mason and Guevara.*

A. No.

Q. What did you presume that they were?

*Fabricated (as to date) Mason and Guevara.*

A. I presumed they were Cobras because they went straight across Western.

*Fabricated (as to date) Mason and Guevara.*

Q. So, in other words, they drove back into Cobra territory?

*Fabricated (as to date) Mason and Guevara.*

A. Yes.

Q. So what did you do after this happened?

*Fabricated. Mason and Guevara.*

A. I went upstairs and got my gun.

*Fabricated.  Mason and Guevara.*

Q. What kind of gun is that?

A .38 snub nose.

*Fabricated. Mason and Guevara.*

Q. What color is that gun?

*Fabricated. Mason and Guevara.*

A.  It is black.

*Fabricated. Mason and Guevara.*

Q. What did you do then?

*Fabricated. Mason and Guevara.*

A. I went towards Bell. And that is when I found Tino.

*Fabricated. Mason and Guevara.*

Q. Now, when you set off what was your goal? What were you going to do?

*Fabricated. Mason and Guevara.*

A. I was going to go straight to Western myself.

*Fabricated. Mason and Guevara.*

11

Q. You were going to go to Western by yourself? Were you going to cross Western?

*Fabricated. Mason and Guevara.*

A. No. I was going to shoot from inside my territory towards their territory to get them scared the way they scared me.

*Fabricated. Mason and Guevara.*

Q. Who did you run into?

A. Tino.

*Fabricated. Mason and Guevara.*

Q. What is his real name?

A. Christino.

*Fabricated. Mason and Guevara.*

Q. How long have you known Christino?

A. I have been knowing him at least 5 to 6 years.

Q. Is he a member of the Latin Kings also?

A, Yes.

Q. What is his rank?

12

A, He's got no Rank. He is a foot soldier just like me.

Q. Did you have a conversation with Tino when you met him?

A. Yeah.

*Fabricated. Mason and Guevara.*

Q. What did you talk about?

*Fabricated. Mason and Guevara.*

A. I was talking about the guys that came shooting at me. It had to be Cobras. I was going up that way. He wanted to come with me. And he wanted to meet me on Oakley.

*Fabricated. Mason and Guevara.*

Q. What did he say then?

A. He said, all right.

*Fabricated. Mason and Guevara.*

Q. Where did he go then?

*Fabricated. Mason and Guevara.*

A. He went and got the gun.

*Fabricated. Mason and Guevara.*

Q. Did you meet him on Oakley?

A. We met up on Oakley.

*Fabricated. Mason and Guevara.*

Q. How long was Tino gone to get that?

A. At least 10 minutes.

*Fabricated. Mason and Guevara.*

Q. Did you see what kind of gun he had when he

A. No.

*Fabricated. Mason and Guevara.*


Q. Did you know what kind of gun he had?


A. He had an automatic. .22 I think it was.

*Fabricated. Mason and Guevara.*

Q .22 or .25?


A. He had a magazine .22 or .25. It was just a small automatic gun.

*Fabricated. Mason and Guevara.*

Q. What color was his gun?


A. It was black.

*Fabricated. Mason and Guevara.*

Q. Where did he have it?


A. In his pocket.

*Fabricated. Mason and Guevara.*

Q. Where was your gun?

14

A. In my pocket.

*Fabricated. Mason and Guevara.*

Q. Now, where did you go?

A. We went all the way to Division and Western to look around.

Q. Did you see any Cobras at that time?

*Fabricated. Mason and Guevara.*

A. No.

Q. Did you cross Western?

A. Yeah.

*Fabricated. Mason and Guevara.*

Q. On what street?

A. From the street.

*Fabricated. Mason and Guevara.*

Q. Which street is that?

A. We crossed Western towards going to Potomac and Western.

*Fabricated. Mason and Guevara.*

15

Q. Where did you go then?

A. We went through the alley in front of a fire station.

*Fabricated. Mason and Guevara.*

Q. What happened when you got there?

A. Right there he stopped and I told him to wait while I went to the corner of Potomac and Artesian to take a peek.

*Fabricated. Mason and Guevara.*

Q, What were you looking for?

A. I was looking for a little crowd so I could shoot at the Cobras and scare them like they scared me without hurting anybody.

*Fabricated. Mason and Guevara.*

Q. Tino was the lookout?

A. Uh-huh.

*Fabricated. Mason and Guevara.*

Q. What made you think there would be a crowd there?

A. Because they be selling reefer out there in a crowd.

 *Fabricated. Mason and Guevara.*

Q. Did you see anybody when you got to Artesian?

A. No.

16

*Fabricated. Mason and Guevara.*

Q. What did you do then?


A. I turned back around, went towards the alley. Then I passed the alley. Then two guys in the alley, they told me, who is that. I told them it is me. They said all right.

*Fabricated. Mason and Guevara.*

Q. Did you know who these guys were?


A. Uh-uh.

*Fabricated. Mason and Guevara.*

Q. How many houses away were you from these guys when you saw them?


A. At least 3 houses away.

*Fabricated. Mason and Guevara.*

Q. Could you identify them as Cobras?


A. No.

*Fabricated. Mason and Guevara.*

Q. Could they identify you as a King?

A. I doubt it. I don't think so.

*Fabricated. Mason and Guevara.*

Q. Now, at the time that you were in that alley where was Tino?

A. He is in the other side of the alley by the fire station on the other side of

17

Potomac. He was on the same side of Potomac, but he was on the other side of the

alley by the fire house.

*Fabricated. Mason and Guevara.*

Q. Okay. So, what else occurred at this point?

A. At that point we walked.

*Fabricated. Mason and Guevara.*

Q. Did a car come by?


A. Yeah.

*Fabricated. Mason and Guevara.*

Q. What kind of car was that?


A. A car came by and asked me if I have any I told him no.

*Fabricated. Mason and Guevara.*

Q. What kind of car was it?


A. 4-door Chevy.

*Fabricated. Mason and Guevara.*

Q. Do you know what color?


A. It was like a goldish brown. Something like that.

*Fabricated. Mason and Guevara.*

Q. Where was Tino now?

A. Tino started walking towards Potomac.

*Fabricated. Mason and Guevara.*

Q. Are you walking together?

A. Yeah.

*Fabricated. Mason and Guevara.*

Q. And you are on the north side of Potomac?

A. Yeah.

*Fabricated. Mason and Guevara.*

Q. When you got to the corner which way did you go?

A. We turned left.

*Fabricated. Mason and Guevara.*

Q. So you are walking north on Western?

A. We turned left, north of Western.

*Fabricated. Mason and Guevara.*

Q. North on Western?

A. Yeah.

*Fabricated. Mason and Guevara.*

Q. Were you still looking for Cobras?

19

A. Yeah.

*Fabricated. Mason and Guevara.*

Q. What did you see next?


A. I seen this guy sitting by a bar. I told him, what's up. He told me, what's up. We kept walking.

*Fabricated. Mason and Guevara.*

Q. Could you identify him as a gang member?


A. No.

*Fabricated. Mason and Guevara.*

Q. So you kept on walking. Then what happened?


A. Then these two guys came out the empty lot. We looked. One of the guys went towards the street. And from the street he jumped back to the sidewalk. So he went like what. He went towards the street and from the street he went back to the sidewalk. He went like this towards Chris. That is (indicating) where Chris was. And Chris took out his gun and shot the guy.

*Fabricated. Mason and Guevara.*

Q. Let the record reflect that he is holding his hands up in the air with his palms facing toward the front. He went like this (indicating).

Q, And then what did Tino do?


A. Tino took his gun out of his pocket and shot the guy.

20

*Fabricated. Mason and Guevara.*

Q, At the point that Tino shot the guy how far away from the guy was he?

A. He was at least one foot away from the guy.

*Fabricated. Mason and Guevara.*

Q. One foot?

A. He had his arm outstretched.

*Fabricated. Mason and Guevara.*

Q. So the gun was a foot away from the guy when he shot him? guy?

A, Uh-huh.

*Fabricated. Mason and Guevara.*

Q. How many times did he shoot him?

A. 3 times.

*Fabricated. Mason and Guevara.*

Q. Where on the guy's body did he hit him?

A. Toward the stomach.

*Fabricated. Mason and Guevara.*

Q. Where were you when Tino was shooting this guy?

A. I was at least 5 miles away from him.

21

Q. 5 what?

A. 5 or 8.

*Fabricated. Mason and Guevara.*

Q. Feet?

A. Yeah.

*Fabricated. Mason and Guevara.*

Q. Away from him to the side, toward the sidewalk?

A. Yes.

*Fabricated. Mason and Guevara.*

Q. Towards the sidewalk? Were you in front of or behind Tino? shot?

A. I was in front. And in front of Tino.

*Fabricated. Mason and Guevara.*

Q. About 5 to 8 feet to the side?

A. Yeah.

*Fabricated. Mason and Guevara.*

Q, There was another guy with the guy who got shot?

A. Yeah.

*Fabricated. Mason and Guevara.*

Q. What did he do?

A. He ran through the empty lot and got lost.

*Fabricated. Mason and Guevara.*

Q. He went back to the empty lot?

A. He was running west through the empty lot into the empty lot.

*Fabricated. Mason and Guevara.*

Q. Back into Cobra territory?

A. Uh-huh.

*Fabricated. Mason and Guevara.*

Q. What did Tino do after he shot the guy?

A, He was running back across Western.

Fabricated. Mason and Guevara.

Q. Back to King territory?

A. Yeah.

Fabricated. Mason and Guevara.

Q. What did you do then?

A. I was in the middle of Western and I hollared King love and I shot twice

towards the air towards the building.

*Fabricated. Mason and Guevara.*

Q. Which building is that?


A. Towards the building that was close to the empty lot, that building.

*Fabricated. Mason and Guevara.*

Q. At the time that you shot towards the building where was the guy that was running?

A. He was gone.

*Fabricated. Mason and Guevara.*

Q. He was gone? Where was the guy who was shot?


A. He was already on the floor by a car. A car was right there. So I couldn't even see the guy on the floor.

*Fabricated. Mason and Guevara.*

Q. Where did you run then?


A. We ran to the empty lot. And from there we split up.

*Fabricated. Mason and Guevara.*

Q. Where did you go then?


A. I ran to my mom's house, all the way to Wolcott.

*Fabricated. Mason and Guevara.*

Q. What did you do with that gun?

A. Well, about two weeks later I threw it in the lake. I got rid of it.

*Fabricated. Mason and Guevara.*

Q. Jaime, are you under the influence of any drugs or alcohol now?


A. No.

 *Fabricated. Mason and Guevara.*

Q. Have you been promised or threatened anything in return for this

statement?


A. No.

*Fabricated. Mason and Guevara.*

Q. Have the police treated you fairly since you have been in their custody?


A. Yes, Ma'am.

*Fabricated. Mason and Guevara.*

Q. Have you had something to drink?


A. I didn't really want anything to drink, just some water.


Q. Have you been allowed to go to the bathroom?


A. Yes.

Q. And smoke?

A. Yes.

Q. Can you read and write?

A. Yes.

Q. How far did you go in school?

A. I went through my third year of high."

12.     Please identify with specificity (including but not limited to manufacturer, caliber, type, revolver, semi-automatic, etc.) each and every firearm you owned, possessed, operated, discharged, borrowed, or utilized for the five (5) year time period before your arrest on July 7, 1989 for the Luis Morales murder.

**ANSWER**

I possessed a .45 automatic – Smith and Wesson.

13.     Please identify all persons, if any, you may call to testify against each of the following defendants pursuant to Fed. R. Evid. 404(b): Michael Mason; Ernest Halvorsen; and, Reynaldo Guevara, and for each such person you may call to testify, identify:

     a.     the person's name and last known address and phone number;

     b.     the nature of the claim or incident involving the person;

     c.     the date of the claim or incident involving the person; and,

26

d.   any witnesses or other evidence you possess, or are aware of, that corroborates the defendant's involvement in the incident involving the person.

**Reynaldo Guevara**:

1. Samuel Perez
   a. 2405 S. Harding Avenue, Chicago, IL 60623
   b. Coercing Samuel Perez to make a false identification of Juan Johnson in a murder case
   c. September 11, 1988
   d. Samuel Perez's transcript, Juan Johnson's exoneration, collateral estoppel based upon the jury verdict in Juan Johnson's favor, Guevara's invocation of the fifth amendment

2. Daniel Pena
   a. Deceased
   b. Beating of Pena by defendant Guevara, including smacking him in the face and striking him between the legs with a flashlight in order to extract a false confession
   c. January 22-23, 1986
   d. Pena's transcript, Guevara's other misconduct, Guevara's invocation of the fifth amendment.

3. Jose Maysonet
   a. to be contacted through counsel, Jennifer Bonjean
   b. Beating of Maysonet by defendant Guevara, including placing a telephone book on various parts of Maysonet's body and striking the book with a flashlight.
   c. August 22, 1990
   d. Maysonet's exoneration and admission by States Attorney Kim Foxx as to Guevara's misconduct; grant of the certificate of innocence. Guevara's invocation of the fifth amendment.

4. Efrain Sanchez

   a. 4724 S. Springfield, Chicago, IL 60623
   b. Coerced by defendant Guevara to falsely identify David Colon as the murderer during a lineup
   c. October 5, 1993
   d. Colon's exoneration and admission by States Attorney Kim Foxx as to Guevara's misconduct; grant of the certificate of

innocence. Guevara's invocation of the fifth amendment.

5. Julio Sanchez

    a. 4724 S. Springfield, Chicago, IL 60623
    b. Coerced by defendant Guevara to falsely identify David Colon as the murderer during a lineup
    c. October 5, 1993
    d. Colon's exoneration and admission by States Attorney Kim Foxx as to Guevara's misconduct; grant of the certificate of innocence. Guevara's invocation of the fifth amendment

6. William Dorsch

a. William Dorsch currently lives in Greece
b. Suggesting to an identification witness that he pick out a suspect's photo from an array.
c. Approximately April, 1990
d. William Dorsch's testimony, States Attorney Kim Foxx's agreement to exoneration in cases where Dorsch has testified, Gueva's invocation of the fifth amendment

7. Gabriel Solache

a. Gabriel Solache currently resides in Mexico. Can be contacted through his attorney,
b. Beating Solache with an open hand to his face, breaking his ear drum and coercing him to confess to a murder he had not committed
c. April 3, 1998
d. Gabriel Solache's testimony, States Attorney Kim Foxx's agreement to exoneration in cases where Dorsch has testified, Gueva's invocation of the fifth amendment.

8. Arturo Reyes

a. Arturo Reyes currently resides in Mexico. Can be contacted through his attorney.
b. Slapping Reyes in the face and coercing him to sign a false confession to a murder he did not commit
c. April 3, 1998
d. Daniel Solache's testimony, States Attorney Kim Foxx's agreement to

28

exoneration in cases where Dorsch has testified, Guevara's invocation of the fifth amendment

9. David Velasquez

    a. 2707 N Kilpatrick Ave, Chicago, Cook County, Il 60639

    b. Slapping, choking, dousing with water, threatening to beat and kill David Velasquez and driving him to rival gang territory and threatening to strand him there in order that he give a false statement in a murder case.

    c. May 10, 1993

    d. David Velasquez's testimony, Kim Foxx's admissions as to Guevara's misconduct, Guevara's invocation of the fifth amendment.

10. Ruth Antonetty

    a. 65 E Lyndale Avenue, Melrose Park, Illinois

    b. Attempting to coerce Ruth Antonetty in making a false identification of a suspect in a murder case

    c. June 14, 1997

    d. Ruth Antonetty's affidavit, Kim Foxx's admissions as to Guevara's misconduct, Guevara's invocation of the fifth amendment.

11. Debbie Daniels

    a. 1834 N. Saint Louis Ave, Chicago, IL

    b. Attempting to coerce Ruth Antonetty in making a false identification of a suspect in a murder case

    c. June 13, 1997

    d. Debbie Daniels's affidavit, Kim Foxx's admissions as to Guevara's misconduct, Guevara's invocation of the fifth amendment.

12. Maria Castro

    a. Unknown. Investigation continues

    b. Attempting to coerce Maria Castro into making a false identification of a suspect in a murder case

    c.  June 13, 1997
    d.  Mario Castro's affidavit, Kim Foxx's admissions as to Guevara's misconduct, Guevara's invocation of the fifth amendment.

13. Carl Richmond

a.  1995 Howard Ave Apt 2R, Des Plaines, Cook Count, IL

b.  Coercing Richmond to make a false identification of Robert Bouto as a murderer by threatening to charge him if he did not.

c.  May 14, 1993

d.  Carl Richmond's affidavit and deposition testimony, Kim Foxx's admissions as to Guevara's misconduct, Guevara's invocation of the fifth amendment.

14. Jose Melendez
`

    a.  951 W 115th Place, Chicago, Illinois

    b.  Coercing Muniz to falsely identify Manuel Rivera as the shooter in a gang related murder by threatening to charge him if he did not make the identification

    c.  September 30, 1989

    d.  Muniz's affidavit, Rivera's exoneration, Cook County States Attorney Kim Foxx's agreement to exoneration, Guevara's invocation of the fifth amendment

15. Evelyn Diaz

a.  1938 N Lamon Ave

b.  Threatening Diaz with reporting her to DCFS in attempt to falsely identify Juan Johnson as the murderer

c.  August 22, 1990

d.  Diaz's deposition testimony, Juan Johnson's exoneration, Cook County States Attorney Kim Foxx's agreement to exoneration, Guevara's invocation of the fifth amendment

16. Luis Figueroa

    a.  1726 north California, Chicago, IL

    b.  Telling Luis Figueroa to falsely identify Angel Diaz in a lineup as a murderer

    c.  February 6, 1995

    d. Figueroa's trial testimony, Guevara's invocation of the fifth
       amendment

17. Wilfredo Rosario

    a. 409 N Kildare Ave, Apt 1, Chicago, IL
    b. Threatened to charge Rosario with murder or conspiracy if he
       did not give false in various murder cases
    c. January, 1991
    d. Rosario's trial testimony, Guevara's invocation of the fifth
       amendment

18. Robert Ruiz
    a. Not available. Investigation continues
    b. Telling Robert Ruiz to falsely identify the Santiago brothers
       as murderers
    c. Early July, 1997
    d. Ruiz's trial testimony, Guevara's invocation of the fifth amendment

19. Timothy Rankins
    a. 6519S S Kenwood Ave, Chicago, IL
    b. Beating Timothy Rankins in order to get him to sign a false
       statement in the Armando Serrano, Jose Montanez, and Jorge
       Pacheco cases.
    c. June 10, 1993
    d. Timothy Rankins' testimony, Cook County States Attorney
       Kim Foxx's admission as to Guevara's misconduct, Guevara's
       invocation of the fifth amendment

20. Rosauro Mejia
    a. 6228 S Mozart St, Chicago, IL
    b. Punching Mejia in the stomach and hitting him in the face in
       order to persuade him to give false testimony about Gabriel
       Solache, Arturo Reyes, and Adriano Mejia
    c. April 3, 1998
    d. Rosauro Mejia's deposition testimony

21. Adriana Mejia
    a. 15471 Ridgeway Ave, Markham, IL
    b. Pulling Mejia's hair and hitting her in the back of her neck
    c. April 3, 1998

       d.  Mejia's deposition testimony, exonerations of Reyes and Solache, Guevara's invocation of the fifth

22. Gloria Ortiz Bordoy
       a.  326 Morris Ave, Bellwood, IL
       b.  Threatening Bordoy that her children would be sent to DCFS if she admitted to taking part in a shooting and falsely testifying to her involvement
       c.  December 13, 1995
       d.  Bordoy's deposition testimony, Guevara's invocation of the fifth amendment

23. Rosa Bello

   a.  23 Greenfield Rd, Montgomery, IL
   b.  Threatening Bello to place her children in DCFS unless she gave a false statement implicating Jose Maysonet for murder
   c.  1990
   d.  Bello's deposition testimony, Guevara's invocation of the fifth amendment

24. Colleen Miller

       a.  Not available. Investigation continues.
       b.  Threatening Miller that if she did not falsely implicate David Gecht in a murder she would be giving birth in jail
       c.  January, 1999
       d.  Miller's testimony, the exoneration of David Gecht and Cook County States Attorney Kim Foxx's admission of Guevara's misconduct, Guevara's invocation of the fifth amendment.

25. Virgilio Munoz

   a.  951 W 115th Pl, Chicago, IL
   b.  Threatening Munoz that if he did not identify Manuel Rivera as the shooter in the murder of Marlon Wade, he would be going down for the murder.
   c.  October 1, 1989
   d.  Muniz's affidavit, Guevara's invocation of the fifth amendment.

26. Daniel Rodriguez

a.   To be contacted through counsel, Jennifer Bonjean
b.   Threatening to raid his girlfriend's house and falsely charging his girlfriend with a crime
c.   May 11, 1999
d.   Rodriguez's testimony, his exoneration, Cook County States Attorney Kim Foxx's admission of Guevara's misconduct, Guevara's invocation of the fifth amendment

27.  Lashurn Hunt

a.   386 Gus Thornhill Jr Dr, Atlanta, GA
b.   Slapping Hunt on the face with an open hand in an effort to get him to confess
c.   February 15, 1983
d.   Lashurn Hunt's affidavit and testimony, Guevara's invocation of the fifth amendment

28. Armando Serrano

a.   To be contacted through counsel, Jennifer Bonjean
b.   Slapping Armando Serrano across the face and hitting him in the body in attempt to get him to falsely confess to a murder he did not commit.
c.   June 8 or June 9, 1993
d.   Armando Serrano's affidavit, his exoneration, Cook County States Attorney Kim Foxx's admission of Guevara's misconduct. Guevara's invocation of the fifth amendment

29. Victor Vera
    a.   NA. Investigation continues.
    b.   Coercing Vera to make a false confession to the murder of Edwin Castenada
    c.   Around April 23, 1989
    d.   Vera's affidavit, Cook County States Attorney Kim Foxx's admission of Guevara's misconduct. Guevara's invocation of the fifth amendment

33

30. David Rivera

    a.   To be contacted through counsel, Steven Art, Loevy & Loevy

    b.   Threatening Rivera that if he did not confess he would serve 40-50 years in prison but he would only serve seven years if he did.

    c.   February 21-22, 1991

    d.   Rivera's affidavit, his exoneration, Cook County States Attorney Kim Foxx's admission of Guevara's misconduct, Guevara's invocation of the fifth amendment.

31. Elizer Cruzado

    a.   NA. Investigation continues

    b.   Telling Cruzado that if he gave a statement he would be able to see his family again.

    c.   October 5, 1993

    d.   Cruzado's testimony, Kim Foxx's admission of Guevara's misconduct, Guevara's invocation of the fifth amendment

32. Voytek Dembski

    a.   NA. Investigation continues

    b.   Beating and slapping Dembski and coercing him to sign a false confession.

    c.   May 18, 1007

    d.   Jed Stone's affidavit, Guevara's invocation of the fifth amendment

33. Francisco Vincente

    a.   29 Gerard Way, Apt J, Holyoke, MA

    b.   Persuading Vincente to testify falsely against Armando Serrano, Jorge Pacheco and Jose Montanez

    c.   June, 1992

    d.   Vincente's affidavit, exoneration of Serrano and Montanez, Kim Foxx's admission, and Guevara's invocation of the fifth amendment

34. Jorge Laureano

    a.   4618 W Dickens Ave, Chicago, IL

    b.  Wrongfully arresting him for a murder for which Laureano had alibi, attempting to frame him for the murder of Jose Hernandez

    c.   1988 and 1991

    d.  Laureano's testimony, Guevara's invocation of the fifth amendment

35. David Velasquez

    a.   2707 N Kilpatrick Ave, Chicago

    b.   Chaining him to a pole, hitting him with a flashlight, threatening to charge him with murder, inducing him to falsely identify Daniel Rodriguez as the murderer of Jose Hernandez

    c.  May 10, 1991

    d.  Velasquez's deposition testimony, Guevara's invocation of the fifth amendment

36. Adrian Duta

    a.   205 Bode Rd, Hoffman Estates, IL

    b.   Striking Duta in the head with a folder and punching him in the stomach, coercing him into confessing to a murder

    c.   March 21, 1994

    d.  Duta's testimony, Guevara's invocation of the fifth amendment

37. Annie Turner

    a.   NA. Investigation continues

    b.   Forcibly pushing Turner off a bus, striking her across the nose while wearing a bracelet, and calling her bitch and the n word.

    c.   May 8, 1982

    d.   Turner's testimony, Guevara's invocation of the fifth amendment

38. Adolfo Frias, aka Adolfo Friar

    a.   Hill Correctional Center, B71561

    b.   Coercing Frias to make a false confession by hitting him in the face multiple times, while another detective hit him in the stomach and another detective placed a foot on his genitals, threatening to send his wife to prison

    c.   July 29, 1993

    d.   Frias's testimony, Guevara's invocation of the fifth amendment

39. Jose Melendez

    a.   NA. Investigation continues

    b.   Suggesting the false identification of Armando Sierra

    c.   May 23, 1995

    d.   Melendez's testimony, Cook County States Attorney Kim Foxx's admission of Guevara's misconduct, Guevara's invocation of the fifth amendment

40. David Gecht

    a.   To be contacted through his attorney, Anand Swaninathan, Loevy & Loevy

    b.   Physical abuse, coercing Gecht to give a false confession

    c.   January 29, 1999

    d.   Gecht's testimony, his exoneration, Cook County States Attorney Kim Foxx's admission of Guevara's misconduct, Guevara's invocation of the fifth amendment

**Ernest Halvorsen**

41. Timothy Rankins

    a.   6519S S Kenwood Ave, Chicago, IL

    b.   Beating Timothy Rankins in order to get him to sign a false statement in the Armando Serrano, Jose Montanez, and Jorge Pacheco cases.

    c.   June 10, 1993

    d.   Timothy Rankins' testimony, Halvorsen's invocation of the fifth amendment

42. Hemino Molina

    a.   NA. Puerto Rico

    b.   Concealed exculpatory evidence that Molina saw the shooting and that Reynaldo Munoz was not the shooter

36

    c.  October 14, 1985
    d.  Molina's affidavit and evidentiary deposition, Halvorsen's invocation of the fifth amendment

43. Daniel Rodriguez

    a.  Can be contacted through his attorney, Steven Art, Loevy and Loevy
    b.  Hitting Rodriguez in the chest and stomach coercing him into making a false inculpatory statement
    c.  May 11, 1991
    d.  Rodriguez's testimony, his exoneration, Halvorsen's invocation of the fifth amendment

44. Jorge Laureano
    a.  4618 W Dickens Ave, Chicago, IL
    b.  Wrongfully arresting him for a murder for which Laureano had alibi, attempting to frame him for the murder of Jose Hernandez
    c.  1988 and 1991
    d.  Laureano's testimony, Guevara's invocation of the fifth amendment

45. Francisco Vincente

    a.  29 Gerard Way, Apt J, Holyoke, MA
    b.  Persuading Vincente to testify falsely against Armando Serrano, Jorge Pacheco and Jose Montanez
    c.  June, 1992
    d.  Vincente's affidavit, exoneration of Serrano and Montanez, Kim Foxx's admission, and Halvorsen's invocation of the fifth amendment

46. Fabian Santiago

    a.  Hill Correctional Center under name Fabin Santiago, B 79716
    b.  Threatening Santiago with a firearm, striking him with an open hand on the face and forehead and coaching him to provide a false confession
    c.  January 20, 1993
    d.  Santiago's testimony and Halvorsen's invocation of the fifth amendment

14. Do you contend Defendants Halvorsen, Mason, or Guevara withheld exculpatory evidence from Plaintiff prior to his criminal trial? If yes:

a. please identify by Bates Stamp number each piece of exculpatory evidence that was withheld from Plaintiff,

b. which Defendant withheld which piece of exculpatory evidence, or

c. identify by Bates Stamp number every piece of exculpatory evidence that was withheld but you lack knowledge or information to verify who withheld such evidence.

**ANSWER:**

1. The fact that Benjamin Carrerro never received a gun from me or saw me just after the murder and that he was coerced to say that he had received a gun from me.

   a. PFP 002273-002274,

   b. Reynaldo Guevara

   c. I lack knowledge or information to verify that Michael Mason and Ernest Halvorsen also withheld that evidence.

2. The fact that Luis Huertas was coerced into making an identification of me by Reynaldo Guevara and that he originally refused to pick my picture out of a photoarray.

   a. PFP 002276-002277

   b. Reynaldo Guevara

   c. I lack knowledge or information to verify that Michael Mason and Ernest Halvorsen also withheld that evidence.

38

3. The fact that Cristino Garcia refused to implicate me in the crime and was beaten by Reynaldo Guevara when he refused.

    a.     PFP 002278-002283

    b.     Reynaldo Guevara

    c.     I lack knowledge or information to verify that Michael Mason and Ernest Halvorsen also withheld that evidence.

4. The fact that Cristino Guevara had an alibi for the night of the murder.

    a.     PFP 002278-002283

    b.     Reynaldo Guevara

    c.     I lack knowledge or information to verify that Michael Mason and Ernest Halvorsen also withheld that evidence

15. Do you contend Defendants Halvorsen, Mason, or Guevara fabricated police reports falsely implicating Plaintiff in the murder of Luis Morales? If yes:

    a.     please identify each fabricated police report by Bates Stamp number,

    b.     the fabricated information contained in each report that falsely implicates Plaintiff for the Diaz murder,

    c.     which Defendant fabricated the false police report, or

    d.     every fabricated report by Bates Stamp number where you lack information or knowledge to identify who is responsible for the false information.

**ANSWER:**

1. Guevara/Gawrys Report

a. JGS_RIOS 00100
b. That two separate reliable informants told officer that Jaime Rios had murdered Luis Morales; that Jaime Rios voluntarily accompanied Guevara and Gawrys to Area 5; that Guevara "learned" that Jaime Rios had made a statement.
c. Reynaldo Guevara
d. NA

2. Mason/Halvorsen Report

    a. JGS_RIOS 00103-00105

    b. That Jaime Rios was interviewed by defendants Mason and Halvorsen rather than Defendants Mason and Guevara; that Jaime Rios made a voluntary statement implicating himself in the Luis Morales murder rather than being coerced into agreeing to a false statement where the details were supplied by Mason and Guevara

    c. Mason and Halvorsen

## <u>CERTIFICATE OF SERVICE</u>

      I, Stephen L. Richards, an attorney, certify that a true and correct copy of the foregoing **PLAINTIFF'S ANSWERS TO DEFENDANT MICHAEL MASON'S FIRST SET OF INTERROGATORIES TO PLAINTIFF** was served upon the attorneys listed below via electronic mail on December 25, 2022.

**Attorneys for Michael Mason**
**and Joanne Halvorsen**

James Gus Sotos
Joseph M. Polick
Caroline P. Golden
Elizabeth Reddington Fleming
Josh Michael Engquist
The Sotos Law Firm, P.C
141 W. Jackson Blvd.
#1240A
Jengquist@jsotoslaw.com
efleming@jsotoslaw.com
cgolden@jsotoslaw.com
jsotos@jsotoslaw.com
jpolick@jsotoslaw.com

**Attorneys for Reynaldo Guevara**
Thomas M. Leinenweber
Megan K. McGrath
Leinenweber Baroni & Daffada LLC
120 N. LaSalle Street, Suite 200

Chicago, IL 60602
(847) 251-4091
thomas@ilesq.com
mkm@ilesq.com

**Attorneys for City of Chicago**
Eileen E. Rosen
Catherine M. Barber
Theresa B. Carney
Austin G. Rahe
Rock Fusco & Connelly, LLC
333 West Wacker Drive 19th Fl
Chicago, IL 60606
(312)970-3474
erosen@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com
arahe@rfclaw.com

**Attorney for Cook County**
Joseph A. Hodal
David A Adelman
Cook County State's Attorney's Office
Civil Actions Bureau
500 Richard J. Daley Center
Chicago, IL 60602
(312)603-5470
joseph.hodal@cookcountyil.gov
David.Adelman@cookcountyil.gov

/s/ Stephen L. Richards
STEPHEN L. RICHARDS