**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JAIME RIOS


      Plaintiff,


          vs.                     Case No. 1:22-cv-03973

REYNALDO GUEVARA
MICHAEL MASON
JOANN HALVORSEN AS
SPECIAL REPRESENTATIVE FOR
ERNEST HALVORSEN, DECEASED
CITY OF CHICAGO



      Defendants.                JURY TRIAL DEMANDED



      Defendants.

## PLAINTIFF'S MOTIONS IN LIMINE

Plaintiff, Jaime Rios, by and through his attorneys, Stephen L. Richards and Joshua S.M. Richards submits the following motions in limine. In support thereof, Jaime Rios states as follows:

### MOTION IN LIMINE NO: 1: TO PRECLUDE THE PROSECUTION FROM INTRODUCING JAIME RIOS'S PRIOR CONVICTIONS FOR IMPEACHMENT UNDER FEDERAL RULE OF EVIDENCE RULE 609

### PRIOR CONVICTIONS

Jaime Rios is certain to testify on his own behalf in this lawsuit. Based on defendants' disclosures and deposition questions, Jaime Rios believes that defendants will seek to impeach him with two prior felony convictions: (1) his 1990 felony conviction for aggravated assault in the

Circuit Court of Cook County, 89 CR 1405601    and (2) his 1995 conviction for unlawful possession of  unlawful possession of contraband in a penal institution in the Circuit Court of Livingston County, case No. 95 CF 127.  Jaime Rios was released from confinement for the 1990 conviction in 1990, having received time considered served, and was released for confinement on the 95 CF 127 case in July of 2008.

## ARGUMENT

Under Federal Rule of Evidence 609, Jaime Rios's prior convictions should be excluded and defendants should not be allowed to use them for impeachment.

Federal Rule of Evidence 609 provides:

"(a) In General. The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction:

(1) for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence:

(A) must be admitted, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant; and

(B) must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant; and

(2) for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving--or the witness's admitting--a dishonest act or false statement.

(b) Limit on Using the Evidence After 10 Years. This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if:

(1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and

(2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use."

Since more than 10 years have passed since Jaime Rios's release from confinement on these cases, these convictions cannot be admitted for impeachment unless the "probative value, supported by specific facts and circumstances, substantially outweighs" their  "prejudicial effect."

In this case, the probative value of these convictions does not substantially outweigh their prejudicial effect and the convictions should be excluded.

The Seventh Circuit provides the following balancing test for comparing the prejudicial effect of a prior conviction under Rule 609: (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness' subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and, (5) the centrality of the credibility issue. *U.S. v. Montgomery*, 390 F.3d 1013, 1015 (7th Cir. 2004). Even if the convictions were less than ten years old, application of the *Montgomery* test would almost certainly preclude their admission.

First, the impeachment value of the prior crimes is low. The Seventh Circuit has found that crimes that involve dishonesty or fraud, have a higher impeachment value than other crimes. *Montgomery*, 390 F.3d at 1015 (finding the defendant's prior convictions, which did not speak to his truthfulness, did not have a high impeachment value and favored exclusion); *U.S. v. Nurudin*, 8 F.3d 1187, 1192 (7th Cir. 1993) (finding a prior conviction did not involve dishonesty or fraud, so the first factor weighed in favor of exclusion); *U.S. v. Causey*, 9 F.3d 1341, 1344 (7th Cir. 1993) (stating crimes that do not involve dishonesty have a low impeachment value and favor exclusion).

Neither of Jaime Rios's extant convictions, aggravated assault and unlawful possession of contraband in a penal institution, are crimes involving dishonesty or fraud. The first factor weighs heavily against exclusion.

The point in time of the conviction and Jaime Rios's subsequent history also weigh heavily against admission. The 1990 conviction is 35 years old. The 1995 conviction is 30 years old. Since his release from prison, Jaime Rios has no other convictions, or even arrests. He has led a peaceful, law-abiding life for 27 years.

3

With respect to the 1990 conviction, the similarity between the past crime and the conduct alleged as part of this lawsuit also weighs against admission. Aggravated assault, a crime of violence, is similar to the murder charge, for which Jaime Rios was exonerated. It would therefore be extremely prejudicial as it would suggest to the jury that Jaime Rios has a propensity for violence and is really guilty. And while he need not prove his innocence as part of this lawsuit, the jury's perception of his possible guilt will inevitably play a role in their deliberations.

Only the last two factors weigh in favor of admission. But particularly under the ten year rule, it would be impossible to show that their probative value *substantially* outweighs their prejudicial effect.

Even with respect to convictions within the ten year rule, district courts in this district have often excluded felony convictions of plaintiffs. See, e.g. *Coles v. City of Chicago*, No. 02 C 9246, 2005 WL 1785326, at *2 (N.D. Ill. July 22, 2005)(excluding plaintiff's armed robbery conviction*); Earl v. Denny's, Inc.*, No. 01 C 5182, 2002 WL 31819021, at *3 (N.D. Ill. Dec. 13, 2002))(excluding plaintiff's aggravated criminal sexual assault conviction).

Therefore, this court should exclude  evidence of Jaime Rios's prior criminal convictions for use as impeachment.

### PLAINTIFF'S MOTION IN LIMINE NO: 2-- TO INTRODUCE EVIDENCE OF THE GRANT OF PLAINTIFF'S PETITION FOR A CERTIFICATE OF INNOCENCE

### THE GRANT OF THE PETITION FOR CERTIFICATE OF INNOCENCE

On August 10, 2022, following his exoneration, Jaime Rios filed a petition for certificate of innocence. (See Exhibit 1).

On December 1, 2022, the State announced that they were not intervening to oppose the petition. (See Exhibit 2).

4

On February 3 2023, Cook County Circuit Judge Erica Reddick granted Jaime Rios' s petition for certificate of innocence. (See Exhibit 3).

With respect to whether Jaime Rios had proved by a preponderance of evidence that he was innocent Judge Reddick ruled:

> "I will say after reviewing the petition which included the affidavits of witnesses who testified as part of the trial proceedings who indicated that they testified falsely in instances because of their fear of Detective Guevara, now disgraced former detective, where there is a clear pattern of conduct on his part with respect to garnering witness testimony against accused defendants often in murder charges, there is ample evidence in the case.
> The Court, after reviewing it, considering the affidavits and information, does find that there is a requisite prima facie showing.
> Without the contest to the petition, that entitles Mr. Rios to relief, so the Court will grant the petition for a certificate of innocence."

(Exhibit 4, 3-4).

## ARGUMENT

The leading cases of *Kluppelberg v. Burge*, 84 F. Supp. 3d 741, 745 (N.D. Ill. 2015) and *Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 11887787, (N.D. Ill. Mar. 29, 2017) establish that the Cook County Circuit's grant of Jaime Rios's petition for certificate of innocence is admissible.

In *Harris* the court ruled that grant of a petition for certificate of innocence is relevant and admissible to demonstrate that criminal proceedings were terminated in plaintiff's favor in relation to his malicious prosecution claim, as well as to his damages if defendants argued that the plaintiff committed the crime. In addition, a certificate of innocence "may bear on the due process claim insofar as it is needed to keep the jury's focus on the materiality issue as opposed to [plaintiff's] actual guilt or innocence." *Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 11887787, at *2 (N.D. Ill. Mar. 29, 2017).

Jaime Rios therefore seeks the admission of the petition for certificate of innocence

(Exhibit 1), the file stamped grant of the certificate of innocence (Exhibit 3), and the transcript of Judge Reddick's ruling granting the certificate. (Exhibit 4). Jaime Rios does not object to the admission of the transcript establishing that the State did not intervene to oppose the petition. (Exhibit 2).

### MOTION IN LIMINE NO. 3 -- TO CALL REYNALDO GUEVARA AS PLAINTIFF'S WITNESS AND TO ASK HIM QUESTIONS ABOUT THE ALLEGATIONS IN THE COMPLAINT AS WELL AS HIS MISCONDUCT IN OTHER CASES, EVEN IF HE AGAIN ASSERTS THE FIFTH AMENDMENT

### INTRODUCTION

Reynaldo Guevara has been deposed in this case, and has asserted the fifth amendment in response to virtually every question which was posed to him. (See Exhibit 5). His assertion of the fifth amendment is consistent with his prior assertions in other cases involving his misconduct, since he last testified in a post-conviction case on July 29, 2013.     .

Jaime Rios anticipates that Reynaldo Guevara, as he has in other cases, will attempt to avoid being called as a witness by plaintiff and having to assert the fifth amendment or answer questions in front of the jury. This attempt should be firmly rejected.

The general rule, of course, is that a plaintiff may call a defendant as a witness even though plaintiff knows that defendant may take the fifth. *Kaye v. Newhall*, 356 Mass. 300, 305, 249 N.E.2d 583, 586 (1969). [1]

---

[1] Guevara's attorneys have recently asserted that he may not attend the trial, possibly precluding his being called as a live witness. If he cannot be called, Jaime Rios believes he will be able to comment on Guevara's voluntary absence from trial and will seek a missing witness instruction. See *Rainey v. Taylor*, 941 F.3d 243, 251 (7th Cir. 2019)(missing witness instruction properly given as to defendant who absented himself from trial). As a preliminary matter, it should be noted that Guevara was deposed in this case and took the fifth in response to every question. (See Exhibit 5). This deposition was recorded on videotape. Presentation to the jury of the video may be problematic because defense counsel objected to every question, and these objections would have had to be redacted from the tape if it were played for the jury. If Guevara does not show up to trial, and is genuinely unavailable, plaintiff will seek to have the video deposition played and/or to have a redacted transcript read to the jury.

Jaime Rios anticipates that Reynaldo Guevara will argue, as he has in other cases: (1) evidence of his invocation of the fifth amendment should be excluded because he is subject to punitive damages in multiple cases and would therefore suffer too high a cost from having to invoke, (2) evidence of his invocation should be presented by instruction rather than live testimony and/or by prescreened questions, (3) independent evidence supporting each negative inference must be introduced before the questions can be asked, and (4) Jaime Rios should be barred from asking Guevara questions about matters which were adjudicated against Jaime Rios on summary judgment. All of these arguments should be rejected.

## ADMISSIBILITY OF THE INVOCATION

As this court has already held, Guevara's invocation of the fifth amendment is admissible evidence. (Dkt # 215, 24-25).

"The Fifth Amendment provides that no person 'shall be compelled in any criminal case to be a witness against himself.'" Its protections "privilege[] [individuals] not to answer official questions put to [them] in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77, (1973) (quoting U.S. Const. Amend. V). "To be privileged by the Fifth Amendment to refuse to answer a question, the answer one would give if one did answer it (and answer it truthfully) must have some tendency to subject the person being asked the question to criminal liability." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663–64 (7th Cir. 2002). In civil cases, "[t]he general rule is that an adverse inference may be drawn from" a person's invocation of their Fifth Amendment privilege. 295 F.3d at 663. Courts abide by this rule "to protect the integrity and truth-seeking function of the judicial system" and to ensure that undue prejudice does not result to the adverse party. *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 640 (9th

Cir. 2012).

With respect to Guevara's invocations of the fifth amendment, the following should be noted.

First, to the extent that Guevara's invocation is based upon a fear that he might be prosecuted for felony offenses committed against Jaime Rios, Cristino Garcia, or the forty plus people whose wrongful convictions he engineered over the years, this fear is not well-founded. The statute of limitations in Illinois requires that, unless specifically provided for elsewhere, a defendant be prosecuted for any felony offense within three years of the commission of that offense. 720 ILCS 5/3–5(b) (West 2002). Guevara could admit these acts without any fear of criminal prosecution.

Therefore, Guevara can only be afraid that if he answered questions about those acts, and lied, he would be subject to prosecution for perjury. In other words, if forced to answer, he is planning to lie. This is precisely what happened to the notorious Jon Burge, who could not be prosecuted for his multiple crimes against criminal defendants because the statute of limitations had passed and who was only convicted when he chose to testify and to deny his crimes and was thereafter convicted of perjury and sent to federal prison. That is what Guevara is afraid of, and he is right to be afraid.

Under these circumstances, it is particularly important that the jury learn Guevara's position as to these accusations and draw the appropriate inference from his invocation of the fifth amendment should he again choose to invoke.

In other litigation, Guevara has taken the position that because he is facing multiple punitive damages awards he will suffer the equivalent of a prison sentence and therefore should not have to invoke his fifth amendment privilege in response to questioning. (*Johnson v. Guevara*,

1:20-cv-04156, Dkt # 402, 23-26).

Jaime Rios is unable to respond to this argument because he has no idea of what it means. Apparently if you violate the rights of a large enough number of plaintiffs, you can choose not to give information in any one of these cases and enjoy immunity from having to assert the fifth amendment. This is ridiculous.

As Guevara acknowledged in the *Johnson* case he can always attempt to reduce punitive damages by testifying as to his financial condition and can tell the jury that he is facing punitive damages in multiple other cases. (*Johnson v. Guevara*, 1:20-cv-04156, Dkt # 402, 23-26). Nothing stops him from testifying, for that matter, and telling the jury what he knows about these allegations. But letting him get off scot-free merely because he has, by his own actions, become the poster child for police misconduct, makes no sense whatsoever.

In previous litigation, Guevara argued, in the alternative, that his invocation should be presented by some other method – any other method – in lieu of live testimony. His suggestions included instruction by the court instead of live testimony or a limited set of questions prescreened by court. All of these suggestions should be rejected. [2]

With respect to this issue, Jaime Rios acknowledges that this court has discretion to control the manner and mode of examination of witnesses, see *Jimenez v. City of Chicago*, 877 F. Supp. 2d 649, 672 (N.D. Ill. 2012), *aff'd*, 732 F.3d 710 (7th Cir. 2013), and there might exist, in another case, unusual circumstances which would justify some restriction on a live invocation. But no such circumstances are present here.

With respect to the general rule, the case of *Hillmann v. City of Chicago*, 834 F.3d 787, 793 (7th Cir. 2016) is dispositive.

_____

In *Hillman*, two potential witnesses invoked their fifth amendment privilege and refused to testify in deposition, citing potential criminal exposure in connection with a political-patronage scandal involving the Department of Streets and Sanitation. The defendant's motion in limine to preclude their testimony and any reference to their Fifth Amendment invocation was granted. The original trial judge excused the two witnesses from testifying, and ruled that the issue could not be raised in front of the jury. 834 F.3d at 792.

After a second judge granted a new trial because of this error, the Seventh Circuit affirmed the grant, saying:

> "Chief Judge Castillo concluded that a new trial was warranted because Judge Hibbler should not have wholly excused Sullivan and Drumgould from testifying based on blanket assertions of their Fifth Amendment privilege against self-incrimination. That ruling correctly understands how the privilege works in this situation; in a civil case, the jury is permitted to hear evidence of a witness's invocation of the privilege and may draw an adverse inference from it."

834 F.3d at 793.

Although *Hillman* dealt with a total exclusion of the invocation, the vast majority of judges in this district have applied it to reject preclusion of live testimony or restrictions upon live testimony. See, e.g., *Jimenez v. City of Chicago*, 877 F. Supp. 2d 649, 671 (N.D. Ill. 2012), *aff'd*, 732 F.3d 710 (7th Cir. 2013)(trial court did not abuse its discretion by allowing plaintiff to call witness who was suspect in murder for live invocation of the fifth and rejecting contention that plaintiff should be required to stipulate to the invocation); *Rivera v. Guevara*, No. 12-CV-04428, 2018 WL 11468922, at *1-2 (N.D. Ill. May 29, 2018)(denying motion in limine to require plaintiff to submit questions to Guevara in advance of live examination); *Ramirez v. City of Chicago*, No. 05C317, 2009 WL 3852378, at *5 (N.D. Ill. Nov. 17, 2009)(denying motion in limine to bar "any adverse inference or any reference to invocation" by defendant police officer); *Robinson v. City*

*of Harvey*, No. 99 C 3696, 2004 WL 2033714, at *7 (N.D. Ill. Aug. 13, 2004), *on reconsideration*, No. 99 C 3696, 2004 WL 2392009 (N.D. Ill. Oct. 22, 2004), *aff'd*, 489 F.3d 864 (7th Cir. 2007)(in context of fee petition, noting that defendant police officer had asserted the fifth amendment in response to all questions); *Logan v. Burge*, No. 1:09-cv-05471, Dkt. 423 at 8-9 (denying motion in limine to preclude plaintiff from calling Jon Burge for live invocation of the fifth amendment and rejecting argument that invocation could be admitted by stipulation).

As many of these courts have recognized, requiring the plaintiff to stipulate would violate the general principle that a party in a civil case cannot be forced to stipulate "in lieu of proving a point at trial." *Jimenez*, 877 F. Supp. 2d at 672. The same principle generally applies in criminal cases, of course, and the one exception, *Old Chief v. United States*, 519 U.S. 172 (1997) is obviously distinguishable. In that case, the stipulation required -- that defendant had been previously convicted without giving the name of the conviction --- was both sufficient to meet the prosecution's burden and necessary to avoid prejudice.

Here, no similar consideration applies. Trials in the Anglo-American tradition are dramas. Juries respond to real people giving live testimony. Every trial lawyer knows that stipulations are often ignored or misunderstood. Jaime Rios has the right to decide how he is going to present each piece of evidence in his case.

Moreover, Guevara's demeanor and manner while invoking the fifth is important. "A witness's answer could range from 'I refuse to answer on the ground that my answer may tend to incriminate me' to the more mundane 'On the advice of counsel, I decline to answer.'" *Evans v. City of Chicago*, 513 F.3d 735, 740 (7th Cir. 2008) As Exhibit 5 shows, Guevara invoked the fifth in a routine, dismissive manner, often barking out just the phrases: "Take the fifth," or "fifth." And with live testimony, there is always the possibility that Guevara will come to his senses and

answer questions.

Preselected questions are also unnecessary and inappropriate. As the district observed in

*Rivera,* No. 12-CV-04428, 2018 WL 11468922, at *2 (N.D. Ill. May 29, 2018):

> "Worrying that Rivera's counsel will manufacture adverse inferences by asking
> questions for which there is no independent evidentiary basis at trial, Guevara
> suggests that plaintiff be required to submit a list of questions in advance. That
> seems counterproductive. After reviewing Guevara's deposition at summary
> judgment, the court is convinced that the parties have a good idea of what Guevara
> will be asked. Guevara argues that fronting the questions will simplify his testimony
> by eliminating potentially lengthy objections at trial. If the conduct of this litigation
> so far is any guide, the more likely outcome will be double litigation of the
> objections, once before trial and again at the trial where defendants will argue that
> the pretrial ruling should be reconsidered in light of the testimony at trial."

Based on prior submissions in other cases, it is expected that Guevara will argue that

*Evans v. City of Chicago*, 513 F.3d 735, 740 (7th Cir. 2008) supports a bar on live testimony. But

a careful examination of *Evans* shows only that under unusual and " rather unique" circumstances,

513 F.3d at 741, a bar on live invocation might be justifiable.

In *Evans*, seven officers were sued – six at first asserted the fifth, but eventually relented

and testified. The one exception, officer Dignan, was allowed to present his invocation by court

instruction rather than by live testimony. The Seventh Circuit affirmed this exercise of discretion,

but on narrow grounds:

> "The situation presented here was rather unique. Evans candidly admits that he was
> "pleased" when Detective Dignan accepted his offer to rid himself of the punitive
> damage claim against him in exchange for a promise to continue to assert his Fifth
> Amendment privilege. Given this rather unusual scenario, it would be difficult to
> conclude that Judge Coar abused his discretion by not embracing this situation for
> its maximum effect."

*Evans*, 513 F.3d at 741.

In other words, with six officers waiving their fifth amendment rights at the last minute,

and over plaintiff's objection, plaintiff had a strong strategic reason for encouraging the last remaining defendant to continue to assert the fifth amendment. Plaintiff was even willing to forgo punitive damages in order to secure the live invocation.

In this case, Jaime Rios is not waiving his right to seek punitive damages. Quite the contrary. Guevara belongs in prison for what he has done. Since that remedy is not available, punitive damages are more than appropriate.

And Jaime Rios is not encouraging Guevara to assert the fifth. Jaime Rios would prefer that Guevara waive the fifth and agree to answer questions. If he waives tomorrow, Jaime Rios will seek a quick redeposition but will not otherwise object.

Lastly, it is expected that Guevara will argue, as he has in previous litigation, that he cannot be asked questions unless and until there is some independent proof other than his invocation, to support the inference suggested by the question and the invocation.

The short answer to this argument is that no case supports the proposition that a plaintiff cannot meet his burden of proof based upon a defendant's invocation alone.

There is case law supporting the proposition that judgment on the pleadings, *National Acceptance v. Bathalter*, 705 F.2d 924, 932 (7th Cir. 1983), or summary judgment against a non-moving party, cannot be granted based solely upon the invocation of the fifth amendment. *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995). But no case applies this proposition to a judgment at trial.

Even if such a rule existed, it cannot and should not be applied to prevent Jaime Rios from presenting his proof in the order and in the manner he chooses. Jaime Rios intends to call Reynaldo Guevara as his first or one of his first witnesses. Jaime Rios believes there will be independent evidence to support all of the questions he asked Guevara at his deposition and will ask at trial.

But unless and until Guevara identifies any question which cannot be supported by independent evidence, any motion in limine which interferes with the manner in which Jaime Rios presents the invocation should be denied.

This court should therefore grant this motion in limine to allow Jaime Rios to elicit Guevara's live invocation.

## MOTION IN LIMINE NO. 4 -- TO PRESENT THE TESTIMONY OF JOSE MAYSONET

### INTRODUCTION

On August 14, 2023, Jaime Rios was ordered to identify fifteen 404(b) witnesses on a will call list, as many as ten of whom could testify with respect to Reynaldo Guevara's misconduct. (Dkt # 82). On August 16, 2023, Rios sent a letter to Guevara's counsel naming ten 404(b) witnesses with respect to Reynaldo Guevara, four with respect to defendant Halvorsen, and one with respect to defendant Mason. Anticipating that Reynaldo Guevara, as he has done in previous cases, will move in limine to bar all 404(b) evidence with respect to Reynaldo Guevara (See *Johnson v. Guevara*, 1:20-cv-04156, Dkt # 402, 48-59), Jaime Rios moves to admit Jose Maysonet's testimony. Jaime Rios formally withdraws from the will call list all 404(b) witnesses not listed in this motion.

In the interests of clarity, Jaime Rios will separately move in limine with respect to each of the 404(b) witnesses.

### CLAIMS FOR WHICH MAYSONET'S TESTIMONY IS RELEVANT

*Count I: Coercion of Jamie Rios's "Confession"*

Before the interrogation of Jaime Rios began, Reynaldo Guevara and Ernest Halvorsen agreed that the interrogation of Jaime Rios would be conducted using illegal physical force and illegal threats and promises with respect to Jaime Rios. (SAF, ¶16).

Jaime Rios was arrested by Reynaldo Guevara and another officer, and taken to 5555 west Grand for questioning. Jaime Rios was interrogated by Reynaldo Guevara in an interrogation room at 5555 West Grand. (SAF, ¶17).

Guevara told Rios that Guevara was investigating a murder and that Rios should just say that he was present when the murder took place. Guevara, detective Mason, and another officer told Rios he was "there about the guy that killed the guy, that for me to let them know where the other guy was at. And to say that I was just there with the guy that killed the guy." Rios told the officers that he did not know what they were talking about. (SAF, ¶18).

In response, detective Mason grabbed Rios by the hair and slammed his head against the table. Mason and Guevara kept telling Rios about the details and facts of a murder. Guevara was present when Rios was assaulted. (SAF, ¶19).

Guevara and Mason then told Rios about the details of a murder committed by "Tino." Guevara and Mason then said: "well, we heard you and Tino went to Western and went to kill somebody over there on Western you had crossed the street and went through an alley. We seen some guys in the alley and that we speak to them. They say, who is that? And that we says, it is me. And that we walked, there was a car that parked right there and asked if we selling reefer. We said, no, we don't got no reefer. We kept walking, went around the corner. And that is when we got by a bar and we had a shooting against a guy that was there." (SAF, ¶20).

Guevara and Mason threatened Rios that they would take his child away if he didn't agree with what they said. They told him that all he had to do was just "be there" and they would not take his child away. Rios agreed to make a statement to the police out of fear of losing his son. (SAF, ¶21).

Sometime after July 6, 1989, Guevara wrote false police reports and gave false information

to prosecutors where he concealed his statement to Rios suggesting that Rios was present at the scene when Garcia killed Morales and that Rios should just say that he was there. (SAF, ¶22).

Jaime Rios's court-reported statement was admitted at trial through the testimony of Assistant States Attorney Barbara Riley. (SAF, ¶22).

### Count X: Coercion of Benjamin Carrero

On July 8, 1989, the day Reynaldo Guevara and other officers executed a search warrant at Benjamin Carrero's house at 1419 North Lincoln Park and found a .22 caliber revolver, Carrero was taken to the police station at Grand and Central and interrogated over the course of two days. (SAF, ¶34).

Guevara told Benjamin Carrero to say that on June 28, 1989 at approximately 12:30 a.m., Jaime Rios gave him the .22 caliber revolver. Guevara told Carrero that if Carrero did not say Jaime Rios was the one who gave him the gun, Guevara would take Carrero's kids away and he would be charged with possessing the gun. (SAF, ¶35). Jaime Rios testified that the "murder" or attempt murder he originally described to the interrogating officers occurred on July 2 or July 3, 1989. (SAF, ¶40).

### Counts XI and XII: Reynaldo Guevara's Interactions With Cristino Garcia

On June 27, 1989, Cristino Garcia was at home with his girlfriend, Hermina Cruz, and his mother, Elena Carrau. (SAF, ¶41).

On July 28, 1989, after Cristino Garcia had been arrested by Chicago police officer Aubrey O'Quinn, placed in handcuffs, and taken to Area 5 (Grand and Central) Reynaldo Guevara informed Garcia that he was being accused of murder. ((SAF, ¶42). When Aubrey O'Quinn arrested Cristino Garcia he told Garcia that Garcia was being arrested "for the shooting." (SAF, ¶43).

When Aubrey O'Quinn brought Cristino Garcia to Area 5, Garcia told Aubrey O'Quinn that he had an alibi for where he was at the time of the murder, that he was at home with his mother and girlfriend and that he had ordered pizza and rib tips from Father and Son's pizza. O'Quinn left the room to check the alibi. When O'Quinn said that the alibi had checked out, Reynaldo Garcia was in the room. (SAF, ¶44).

Guevara interrogated Garcia in the presence of a woman who introduced herself as an assistant States Attorney, whom Garcia described as "Hispanic," and "very pretty." . (SAF, ¶45). Former Assistant States Attorney Barbara Riley would "absolutely not" describe herself as Hispanic or as of Hispanic ethnicity, and she does not believe that anyone could so describe her. (SAF, ¶46). Barbara Riley was not the person in the interview room with Cristino Garcia who described herself as an assistant states attorney. (SAF, ¶47).

Reynaldo Guevara read or showed Garcia a piece of paper apparently saying that Garcia was involved. Guevara told Garcia that he should sign a statement saying someone else did it. (SAF, ¶49). Garcia refused and told Guevara that he was not around the area when the "crime was made." (SAF, ¶50). Garcia gave Guevara the alibi for where he was at the time of the murder. (SOF, ¶67). Guevara then placed a phone book on Garcia's head and hit him with a billy club or flashlight three times until Garcia fell to his knees on the ground. (SAF, ¶51). While Guevara was hitting Garcia, a person who Garcia believed was a female states attorney was in the room and O'Quinn was outside the door. (SOF, ¶52).

Garcia then told Guevara to stop and Garcia would sign a statement, but first he needed to make a phone call. (SOF, ¶53).

Garcia called his sister, Maria Garcia, and asked her to get him a lawyer. Maria Garcia told Cristino Garcia not to sign the statement and that she was going to send a lawyer down. When

Guevara heard that, he got "really mad," took Garcia back to the interrogation room, and began smacking Garcia with an open hand. (SAF, ¶54).

A few minutes later, detective Aubrey O'Quinn came to the door and told Guevara to stop hitting Garcia because Garcia's lawyer was there. (SAF, ¶55). When Cristino Garcia's lawyer arrived, the lawyer said that the lawyer could not stay there all day but Garcia should not sign anything. (SAF, ¶56).

After the interrogation of Cristino Garcia, Reynaldo Guevara authored false police reports and concealed from prosecutors that he had beaten Garcia, that Garcia had denied culpability and had provided an alibi for the night of the murder. (SAF, ¶57).

About a month after Garcia was released from custody but before the trial of Jaime Rios, Guevara twice stopped Garcia on the street, threw Garcia against a wall, took a Polaroid picture of him and threatened to tell rival gangs to "get him." (SAF, ¶58).

*Count XIII – Malicious Prosecution by Reynaldo Guevara*

Count XIII of the complaint alleges that there was no probable cause for Jaime Rios's arrest and prosecution. (SAF, ¶66). Knowing that there was no probable cause for Jaime Rios's arrest and prosecution, Guevara, instigated and initiated the prosecution of Jaime Rios for first degree murder by making false statements to the felony prosecutors who eventually filed charges against Jaime Rios. (SAF, ¶67). After Guevara had forced Jaime Rios into making a false statement, Guevara knew that he did not have probable cause to arrest or charge Rios. (SAF, ¶68).

Guevara commenced the prosecution of Jaime Rios by arresting him without probable cause, interrogating him, generating false police reports about him, coercing witnesses to give false statements about him, and by falsely testifying against him at trial. (SAF, ¶69). Guevara's actions played a significant role in the commencement and continuation of the prosecution of Jaime Rios.

(SAF, ¶70).

By commencing the prosecution against Jaime Rios, arresting him, interrogating him and testifying falsely against him, Guevara acted with malice towards him and was motivated by hostility or ill will. (SAF, ¶70). In particular, Guevara was motivated by a general hostility toward Hispanic suspects, as demonstrated by his pattern and practice of instigating false charges against at least 50 suspects over the course of years.(SAF, ¶71).

## SUBSTANCE OF MAYSONET'S TESTIMONY

Maysonet has been deposed in his own case. (See Exhibit 6). Based upon that deposition, Jaime Rios believes Jose Maysonet will testify as follows

Maysonet, a Latin King, began selling drugs while in high school. (Exhibit 6, 54:24; 55:1-13, 57:4-15). During two encounters with Maysonet, Guevara pressured Maysonet into paying Guevara protection money in order to continue to sell drugs. Maysonet complied, and eventually began paying Guevara $2,000 and more for permission to sell drugs for a set period of time.

The agreement between Maysonet and Guevara lasted until Maysonet was arrested for attempt murder in 1990. (Exhibit 6, 174:21-24; 175:1-3).

On August 22, 1990, Maysonet was interrogated by Guevara about a double murder. (Exhibit 6, 262:19-24; 263:1-8; 278:13-24; 279:1-24: 280:1-10). Maysonet told Guevara Maysonet had no knowledge of the double murder. (Exhibit 6, 278:13-24; 279:1-24: 280:1-10).

Guevara left the interrogation room and then returned with a flashlight, a Yellow Book and a pair of black gloves, which he put on the table. (Exhibit 6, 278:13-24; 279:1-24: 280:1-10).

Guevara told Maysonet that he was going to talk, one way or the other. (Exhibit 6, 278:13-24; 279:1-24: 280:1-10). Guevara started hitting Maysonet in the head with the book. (Exhibit 6, 278:13-24; 279:1-24: 280:1-10). Guevara put the book on the top of Maysonet's head and starting

hitting the book with the flashlight. (Exhibit 6, 283:14-24; 284:1-12).

Next, Guevara struck Maysonet in the ribs and in the back, again using the book and the flashlight. (Exhibit 6, 286:9-24; 287:1-24). Guevara hit Maysonet in the groin with the flashlight a number of times. (Exhibit 6, 288:1-17).

After that, Guevara stopped for a moment, left and came back. (Exhibit 6, 288:18-24; 289:1-4). When Guevara came back, he continued the beating, again placing the book on different parts of Maysonet's body and striking the book with the flashlight. (Exhibit 6, 288:18-24; 289:1-4). During the beating, Maysonet was cuffed in the back and cuffed to a ring on the wall. (Exhibit 6, 289: 5-16).

Throughout the beatings, Maysonet kept saying to Guevara: "why are you doing this? I thought you were my friend." (Exhibit 6, 293:6-24). Guevara threatened to take Rosa Bella's children away if Maysonet did not cooperate. (Exhibit 6, 301:6-24; 302:1-9).

Rosa Bella came to the station and told Maysonet to cooperate. (Exhibit 6, 300:8-24: 301:1-24; 302:1-9). After speaking with Rosa Bella, Maysonet provided the names of Liuvia, Tino, and Fro to the police. (Exhibit 6, 302:10-24). Maysonet also gave the names of Cisco, Jefrey, and Efrain. (Exhibit 6, 302:10-24; 303:1-20).

After giving those names, later on that evening, Maysonet spoke with a female assistant States Attorney. (Exhibit 6, 305:6-24: 306:1-24; 307:1-17). Maysonet told the female assistant States Attorney that Guevara had beaten him up. (Exhibit 6, 306:19-21). Maysonet also told the female assistant States Attorney that Maysonet wanted his lawyer present. (Exhibit 6, 307:3-4).

The female assistant States Attorney told Maysonet that if Maysonet did not cooperate he would have to speak with Guevara again and he really did not want Guevara "in his hair." (Exhibit 6, 307:3-10). After saying that, the female assistant States Attorney left. (Exhibit 6, 307:5-10).

20

After the female assistant States Attorney left, Guevara came back into the room and resumed the beating with the phone book and flashlight. (Exhibit 6, 307:11-24:308:1-13).

At some point, Maysonet spoke with a male assistant States Attorney. (Exhibit 7, 308: 14-23). Maysonet told the male assistant States Attorney that Maysonet had urinated and defecated on himself. (Exhibit 6, 308:24; 1-9).

Maysonet told the male assistant States Attorney that he was getting beat up by Guevara. (Exhibit 6, 311:21-24; 312:1-11).

Maysonet also told the male assistant States Attorney that Maysonet wanted his lawyer. (Exhibit 6, 311:8-11). After that, the male assistant States Attorney left the room. (Exhibit 6, 311: 12-14. After the male assistant States Attorney left the room, Guevara came back and continued the beating. (Exhibit 6, 311: 16-24).

Guevara grabbed Maysonet's penis and testicles. (Exhibit 6, 311:18-24; 313:1-6). At that point Maysonet agreed to give Guevara information. (Exhibit 6, 313: 7-12). Maysonet gave Guevara the names of Jeffrey, Cisco, and Efrain. (Exhibit 6, 313: 13-16). Afterward, Guevara came back and asked for different names. Maysonet gave the names of Liuvia, Tino, and Fro. (Exhibit 6, 313::23-24; 314:1-8). Eventually, Maysonet gave a court reported statement. (Exhibit 6, 314:9-24; 315:1-24; 316: 1-12).

## ARGUMENT

Maysonet's testimony is admissible.

### *General Principles*

Rule 404(b) bars evidence of other acts offered "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But it allows other-act evidence for "another purpose," including but not limited to

"proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2); *United States v. Walter*, 870 F.3d 622, 628 (7th Cir. 2017).

In *United States v. Gomez*, the Seventh Circuit overhauled its test for determining whether evidence is admissible under Rule 404(b), 763 F.3d 845, 856 (7th Cir. 2014) (en banc). Following *Gomez*, the Seventh Circuit has since "stressed that *Gomez* requires judges to look 'more generally to the Federal Rules of Evidence,'" *Jackson v. Esser*, 105 F.4th 948, 963 (7th Cir. 2024) (quoting *Burton v. City of Zion*, 901 F.3d 772, 779 (7th Cir. 2018)).

*Gomez* holds that Rule 404(b) "allows the use of other act evidence only when its admission is supported by some propensity-free chain of reasoning." 763 F.3d 845, 856 (7th Cir. 2014) (en banc); In other words: "the district court should not just ask whether the proposed other-act evidence is relevant to a non-propensity purpose but how exactly the evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference." 763 F.3d at 856. Nevertheless, "[o]ther-act evidence need not be excluded whenever a propensity inference can be drawn." 763 F.3d at 860. After analyzing whether other-acts evidence is admissible under Rule 404(b), including whether a jury could "find by a preponderance of the evidence that the other act was committed," *Harris v. City of Chicago*, No. 14-cv-4391, 2018 WL 2183992, at *16 (N.D. Ill. May 11, 2018) (quoting *Gomez*, 763 F.3d at 854), the court applies Rule 403 as well. *Gomez*, 763 F.3d at 857. The similarity of other acts to those at issue in a case remains a proper consideration for 404(b) relevancy analysis, although it is not dispositive. See, e.g., the similarity of other acts to those at issue in a case remains a proper consideration for 404(b) relevancy analysis, but it is not dispositive. See, *e.g.*, *Jackson*, 105 F.4th at 963.

*Similarities and Relevant Purposes*

As a preliminary matter, it should be noted that because Guevara is taking the fifth in this litigation, he has wide latitude to choose between defenses.

For example, Guevara may mount a defense with respect to his identity as the person who violated Jaime Rios's civil rights. During Jaime Rios's criminal trial, Guevara claimed that he was not even present during Rios's interrogation and that the interrogation was conducted by Mason and Halvorsen. With respect to Benjamin Carrerro and Cristino Garcia, he may also claim that he was not one of the officers who arrested or interrogated them. Therefore, identity, a non-propensity purpose, is certain to be an issue.

Moreover, there will also be issues as to motive and intent. Guevara may claim that he lacked any motive to pin a case on Rios, or for that manner anyone else. But his pattern and practice of framing innocent people for crimes that they did not commit certainly bears on motive and intent.

Lastly, there may well be issues as to opportunity, preparation, and plan. This court has ruled that there is sufficient evidence of conspiracy between Guevara and Mason and Halvorsen to defeat summary judgment. Evidence that in other instances, Guevara used tactics similar to, and, in one instance, nearly identical, to those employed here is relevant for this non-propensity purpose.

Guevara's treatment of Maysonet is most relevant to prove identity, motive, intent, opportunity, preparation, and plan with respect to the counts of the complaint involving Cristino Garcia.

The circumstances of Guevara's treatment of Maysonet are virtually identical to the circumstances surrounding the treatment of Garcia.

Maysonet and Garcia were both young Hispanics and members of the Latin Kings. They

23

were both arrested and accused by Guevara of first-degree murder. They were both interrogated by Guevara in a room at Area Five.

The interrogations took place one year apart. In both instances Guevara, rather than simply asking questions, told the suspects what they should say. And in both instances Guevara would not take no for an answer.

Guevara beat Garcia using a telephone book placed on Garcia's head and then struck Garcia through the phone book with a nightstick or a flashlight. Guevara used precisely the same technique on Maysonet, striking him in the head with a flashlight and using the phone book as a buffer. In both instances, Guevara obviously intended to inflict pain without making a mark on the victim's person.

In both instances, Guevara worked with states attorneys who appeared to be aware of the beatings and condoned or ignored his tactics.

Although the similarities between the interrogation of Jaime Rios and the interrogation of Maysonet are less striking, they are still significant.

Both Rios and Mayonnet were young, male Hispanics and members of the Latin Kings. Both were arrested and interrogated by Guevara at Area 5. Both were accused of murder.

The interrogations took place one year apart. In both instances Guevara, rather than simply asking questions, told the suspects what they should say. And in both instances Guevara would not take no for an answer.

In both cases, Guevara threatened to take the suspect's children if the suspect refused to make the statement Guevara wanted. And in both cases, physical force was used, even though the force used was different.

In both instances, states attorneys were involved, although in the case of Rios's

interrogation, the states attorney may not have known about Guevara's misconduct. And in both instances, Guevara succeeded in extracting a court reported statement.

With respect to the count involving Benjamin Carrero, Guevara, as in the Maysonet case, coerced a false or fabricated statement. And Guevara, as in the Maysonet case, threatened to take his victim's children.

*Identity – Modus Operandi*

The Maysonet evidence is relevant to prove Guevara's identity with respect to the counts involving Garcia, Rios, and Carrera.

Where parties have engaged in similar acts of misconduct, those other acts are admissible to prove it was them this time as well. See *Gomez*, 763 F.3d at 861 ("[O]ne accepted way to use other-act evidence to prove identity is to argue that the perpetrator had a distinctive modus operandi."); *Shields v. United States*, 2017 WL 1196830 (N.D. Ill. Mar. 31, 2017) (holding that evidence of modus operandi is usually used to prove identity).

Jaime Rios must show "only that the prior acts bear 'a singular strong resemblance to the pattern of the offense charged.'" *United States v. Hudson*, 884 F.2d 1016, 1021 (7th Cir. 1989) (quoting *United States v. Shackleford*, 738 F.2d 776, 783 (7th Cir. 1984)). This is because "[d]istinctiveness is key to whether something is proper modus operandi evidence," and inherently, "[s]uch uniqueness lies on a spectrum." *Thomas*, 986 F.3d at 731 (7th Cir. 2021). The past incidents must only be "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof." *Shackleford*, 738 F.2d at 783. That said, Guevara's conduct with respect to Maysonet is virtually identical to his conduct with respect to Garcia, strongly reminiscent of his conduct with respect to Rios, and similar to his conduct with respect to Carrera.

Guevara's other acts are much more similar to the fact pattern in this case than the usual

case in which other acts are admitted to prove identity or *modus operandi*. See, *e.g.*, *United States v. Clark*, 774 F.3d 1108, 1114 (7th Cir. 2014) (evidence of uncharged robberies with very similar victims and descriptions of the perpetrator were relevant to identify defendant as the charged robber); *United States v. Vance*, 764 F.3d 667, 669 (7th Cir. 2014) (evidence of uncharged robberies of trio of restaurants relevant to show identity of perpetrators in a series of bank robberies where robbers used the same ski-masks and gun, and had one robber approach the counter while the other stood guard); *United States v. Brown*, 471 F.3d 802, 806 (7th Cir. 2006). (evidence that defendant had purchased drugs from the same drug dealer before was relevant when defense tried to argue that drug dealer had mistakenly identified defendant).

The Maysonet evidence is therefore admissible for this purpose.

*Motive, Intent, Opportunity, Preparation and Plan*

With respect to the Maysonet evidence, the Seventh Circuit the case of *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993), *as modified on denial of reh'g* (Dec. 8, 1993), is clearly dispositive on the issues of motive, intent, opportunity, preparation, and plan.

*Wilson*, was a section 1983 suit against the notorious, and now deceased, Chicago police detective Jon Burge. Wilson claimed that Burge tortured him into confessing by use of an electroshock device. The trial judge excluded evidence that nine days before Wilson's arrest Burge had tortured another suspect using an electroshock device and had also beaten a second suspect. The Seventh Circuit reversed:

> "While the judge was far too generous in allowing the defendants to present evidence, he was far too chary in allowing the plaintiff to present evidence. He kept out on grounds of relevance the plainly relevant testimony of Melvin Jones, who claimed to have been subjected to electroshock by Burge and other officers nine days before the interrogation of Wilson. If Burge had used an electroshock device on another suspect only a few days previously, this made it more likely (the operational meaning of "relevant") that he had used it on Wilson. Another excluded plaintiff's witness, Donald White, would have testified that he was

arrested as a suspect in the murder of the two police officers shortly before Wilson's arrest and was taken to a police station where he was beaten for several hours by Burge and other defendant officers. Although evidence of prior bad acts is inadmissible to prove a propensity to commit such acts, it is admissible for other purposes, including intent, opportunity, preparation, and plan. Fed.R.Evid. 404(b). Jones's evidence would have served all four of these purposes, White's all but the third (preparation); and, since Burge had denied under cross-examination that he had ever had or used an electroshock instrument, Jones's evidence could also have been used to impeach that denial." 6 F.3d at 1237-38.

Here, the Maysonet evidence shows that Guevara, as in the Maysonet case, intended to extract a false confession from Garcia, and was not simply engaging in sadistic brutality for no purpose. The common site of both torture sessions, Area 5, shows that Guevara had the opportunity to commit these acts and that he did so as part of a preconceived plan, requiring careful preparation as what he would say and do. And the fact that in neither case was he afraid of the presence of an assistant States Attorney, also bears upon opportunity.

The same factors make the Maysonet evidence relevant to the claim that Jaime Rios's confession was coerced. Although a different method of torture was used – everything else was the same, including the setting, the presence of a State's attorney, the coaching and fabrication of the false statement, and the threat to take children. These similarities prove motive, intent, opportunity, preparation, and plan.

Lastly, the Maysonet evidence is relevant to the claim involving Carrero. Although no physical torture was used and no assistant States Attorney was present, the interrogation took place at Area 5, there was a threat to take Carrero's children, and Guevara was motivated by the intent to create fabricated evidence.

*Rule 403 Considerations*

Jaime Rios is aware that, in addition to Rule 404(b), this court must consider whether, and to what extent, the probative value of the Rule 404(b) evidence might be substantially outweighed

by its prejudicial effect under Federal Rule of Evidence 403. And, with respect to the Maysonet evidence and the other 404(b) evidence, Jaime Rios is prepared to address that concern.

Jaime Rios expects that defendants will argue that the 404(b) evidence will convince the jury that Reynaldo Guevara is a bad person who deserves whatever he gets. This concern, although real, is less of an issue than it would be in a criminal case, where a defendant's liberty is at stake. And to the extent that Guevara is subject to punitive damages, as well as to liability under Count XIII, malicious prosecution, the intentionality and repeated nature of his conduct are arguably relevant to whether an award is necessary for general and specific deterrence.

But in any event, the most direct way to deal with any prejudice is by jury instruction, and this is what Jaime Rios proposes. With respect to Guevara, Jaime Rios proposes that the jury be instructed with a modified version of The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit (2023 Ed.) , No. 3.11, as follows:

> "You have heard testimony and evidence that defendant Reynaldo Guevara committed acts other than the ones alleged in the complaint. Before using this evidence, you must decide whether it is more likely than not that defendant Reynaldo Guevara took the actions that are not charged in the complaint. If you decide that he did, then you may consider that evidence to help you decide whether or not he was the person who committed the acts alleged by Jaime Rios, Cristino Garcia, and Benjamin Carrero, his motive for committing those acts, his intent in committing those acts, his opportunity to commit those acts, as well as any preparation or plan to commit those acts. You may not consider this evidence for any other purpose. To be more specific, you may not use the evidence to conclude that, because Reynaldo Guevara committed an act before or after the acts alleged in the complaint, he is more likely to have committed the acts alleged in the complaint. The reason is that Reynaldo Guevara is not on trial for these other acts. Rather, he is only on trial for violations of Jaime Rios's civil rights. Jaime Rios has the burden to prove by a preponderance the elements of the civil rights violations charged in the indictment. This burden cannot be met with an inference that Reynaldo Guevara is a person whose acts suggest bad character or a willingness or tendency to civil rights violations."

This jury instruction should serve to alleviate any possible prejudice. The motion in limine

to admit the Rule 404(b) Maysonet evidence as well as the other 404(b) evidence should therefore be granted.

## MOTION IN LIMINE NO. 5  TO INTRODUCE TESTIMONY OF TIMOTHY DUANE RANKINS

Jaime Rios incorporates by reference the statement of the claims for which the testimony of Jose Maysonet are relevant. In addition, to the extent that the complaint alleges conspiracy between defendants Halvorsen and Guevara, this testimony is relevant to those claims as well.

## SUBSTANCE OF TIMOTHY DUANE RANKINS'S TESTIMONY

In the spring of 1993, Timothy Rankins was living in Chicago on Central Park and Shakespeare in the area of Central Park and Shakespeare in the area of Humboldt Park. (Exhibit 7, 5:15-21). At that time, Timothy Rankins was a member of the Insane Spanish Cobras. (Exhibit 7, 5:23; 6:1-9).

In the evening hours of June 10, 1993, Rankins was arrested in the area of Shakespeare and Central Park. (Exhibit 7,  6:10-23; 7:1-17). He was placed in an unmarked Chicago police car. (Exhibit 7, 7:8-13). Three detectives were in that car: detective Reynaldo Guevara, detective Halvorsen, and sergeant Mingey. (Exhibit 7, 7:14-23; 8:1-10).

Rankins was taken to the police station at Grand and Central, Area Five. (Exhibit 7, 8:11-14). He was placed in an interrogation room with the three officers. (Exhibit 7, 8:21-23; 9:4-8).

The three officers presented Rankins with a statement implicating three people, Armando Serrano, Jose Montanez, Jose Pacheco  in two murders. (Exhibit 7, 9:14-23; 10:1-20). Guevara asked Rankins to testify and give statements against these three. (Exhibit 7, 11:8-16).

Rankins refused and said that he did not know anything about it. (Exhibit 7, 11:17-20). In response, Guevara kicked out the chair in which Rankins was sitting and Rankins fell to the floor,

in handcuffs. (Exhibit 7, 11:23-24).

While Rankins was on the floor, Guevara threw the statement on the floor in front of Rankins with pictures of the three purported murderers and told Rankins to study the statement and sign it. (Exhibit 7, 12:12-21).

Guevara, Mingey, and Halvorsen kicked Rankins in the stomach and back. They put a phonebook over his head and started beating it with a mag light flashlight. (Exhibit 7, 13. 4:22).

Eventually, the beating ended. The officers walked out. Rankins was told to study the statement and the officers came back 20 or 30 minutes later. (Exhibit 7, 13:23; 14:1-4).

When the officers came back, they went over the statement with Rankins and told him what to say. (Exhibit 7, 14:8-22;15:1-23; 16:1-13). Halvorsen told Rankins to study the statement. He said that the detectives would be coming back and that Rankins had better know that the officers meant business. (Exhibit 8, 16:10-19).

Rankins took "mean business" as a threat of another beating. (Exhibit 7, 16:20-23; 17:1-5). When the officers came back, Rankins was choked and assaulted until he agreed to sign the statement. (Exhibit 7, 18:7-23; 19:1-14). Eventually he signed the statement. (Exhibit 7, 19:4-9).

## ARGUMENT

For the same reasons as adduced with respect to the testimony of Jose Maysonnet, the testimony of Timothy Duane Rankins is admissible.

The beating of Rankins with a phone book and a flashlight during an interrogation at Area 5 in order to extract a statement is admissible to show Guevara's identity with respect to the Rios and Garcia interrogations, and his well as his motive, intent, opportunity, preparation and plan. It is also relevant to support the allegation of a conspiracy between Halvorsen and Guevara.

This testimony should therefore be admitted.

30

**MOTION IN LIMINE NO. 6 - TO PRESENT THE TESTIMONY OF JOSE E. MELENDEZ**

**CLAIMS FOR WHICH THE TESTIMONY OF JOSE E. MELENDEZ IS RELEVANT**

Jaime Rios incorporates by reference the statements of Count 1 (coercion of Jaime Rios), Counts XI and XII: (*Brady claim* as to Cristino Garcia) and Count XIII of the complaint (malicious prosecution).

**SUBSTANCE OF JOSE E. MELENDEZ'S TESTIMONY**

On one day in 1993 at around 3:00 or 4:00 p.m., Jose E. Melendez was driving when he was pulled over by three plainclothes detectives , who told Melendez they wanted to question him because the car he was driving had been used in a murder. (Exhibit 8, 7, 21:6-25; 22:1-25; 8, 23:1-22). They told Melendez to follow them to a police station. (Exhibit 8, 7, 21:22-25; 8, 22:1-2).

When they all got to the station, the three detectives escorted Melendez into the building. (Exhibit 8, 8, 23: 15-24 1-11). One of the detectives was a Hispanic detective, whom Melendez thought was of mixed Mexican and Puerto Rican ancestry. This detective had dark hair, streaked with gray, was "chunky," and wore glasses. (Exhibit 8, 8, 24:12-25; 25:1-4).

The Hispanic detective handcuffed Melendez. He took Melendez to an interrogation room. (Exhibit 8, 8, 25:19-25, 9, 26:1-18, 28:11-13). The Hispanic detective asked Melendez about an Oldsmobile '98 Melendez had owned. Melendez responded that he had sold the Oldsmobile '98 and he did not know what was going on. (Exhibit 8, 9, 26:17-24; 27:1-4).

The Hispanic detective responded by hitting Melendez with a "big ass blow to the head." (Exhibit 8, 9, 28:17-24) and then struck Melendez a second time. (Exhibit 8, 9, 28:21-25; 29:1-2). Melendez, who had experience as a boxer, moved his head in such a way that the Hispanic

detective broke a knuckle on a ring finger when he struck Melendez. (Exhibit 8, 9, 21:25; 29:1-2; 10, 33:18-25; 1-6).

The officer's ring finger had a big ring on it. The ring had an image of an Indian or a tiger. (Exhibit 8, 21, 77: 2-16).

The Hispanic detective stopped hitting Melendez and looked at his finger, which was becoming swollen. (Exhibit 8, 34: 6-13).

Melendez was released from the station the same day. (Exhibit 8, 11, 34:14-16).

Two or three days later, the Hispanic detective rearrested Melendez and he was charged with the first degree murder of Ruben Gonzalez. (Exhibit 8, 11, 36:1, 37:1-16; 12, 38:12-25; 1-13). Melendez had nothing to do with the murder, and was innocent. (Exhibit 8, 12, 19:14-17).

Melendez was acquitted of the murder in a bench trial. (Exhibit 8, 14, 46:15-24).

## ARGUMENT

The standards for admission of 404(b) material are given above.

Although the beating of Melendez is not identical to the beatings of Jaime Rios and Cristino Garcia, it is sufficiently similar to be relevant on the issues of identity, motive, intent, opportunity, preparation, and plan. All three beatings took place at Area 5, using physical force in an attempt to extract a false confession, which tends to establish Guevara's modus operandi and identity. The motive, extraction of a false confession, and the intent, infliction of physical pain, was the same. The common site of the beatings establishes opportunity, preparation, and plan. In addition, Guevara's multiple arrests of Melendez, without apparent probable cause, is relevant on the issue of malicious prosecution.

## MOTION IN LIMINE NO. 7 -- TO PRESENT THE TESTIMONY OF ADRIANA MEJIA

Adriana Mejia's testimony is relevant for the same claims, for the same or similar reasons.

## SUBSTANCE OF ADRIANA MEJIA'S TESTIMONY

In April of 1998, Adriana Mejia lived with her husband at Mozart and 62d in the City of Chicago. (Exhibit 9, 2-3).

On April 3, 1998, two officers came to her home and arrested her. (Exhibit 9, 2-4). One of the officers was Reynaldo Guevara. She was taken to a police station and was placed in Guevara's office. (Exhibit 9, 5-6).

Guevara questioned Mejia, but she was tired and refused to answer his questions. (Exhibit 9, 8-9).

After she refused to speak, Adriana Mejia was physically abused by Reynaldo Guevara (Exhibit 9, 9-10; 114:17-24; 115:1-2). Guevara slapped her in the back, hit her in the face once, and made her face bleed. (Exhibit 9, 30, 115:11-15). He also pulled her hair, about three times. (Exhibit 9, 9; Exhibit 9, 30, 11-16).

At Guevara's behest, Mejia eventually signed a statement. (Exhibit 9, 28-29).

At his deposition, Guevara took the fifth when asked whether on April 3, 1998, he pulled the hair of Adriana Mejia and hit her in the back of the neck. (Exhibit 5, 77: 11-24; 78:1).

## ARGUMENT

Jaime Rios incorporates by reference the authorities cited in support of the admission of Jose Maysonet's testimony.

Guevara's treatment of Adriana Mejia is most relevant to prove identity, motive, intent, opportunity, preparation, and plan with respect to the counts of the complaint involving the interrogation of Jaime Rios.

As in Jaime Rios's case, Guevara arrested Adriana Mejia and took her to Area 5 for

questioning. While there, he interrogated her even after she initially refused to answer questions and then pulled her hair in order to get her to cooperate. This method of physical coercion was extremely similar to the coercion that defendant Mason, in Guevara's presence and with his apparent approval, employed against Jaime Rios when Mason pulled Rios's hair and slammed his head against a table.

The mere fact that this method was employed by Mason and not Guevara does not defeat admissibility. This court has already ruled that Jaime Rios may prove conspiracy in connection with the various counts of the complaint. Guevara's presence in the room while Rios's hair was pulled and his face was slammed on the table strongly suggests that there was a pre-existing plan between Guevara and Mason to abuse Rios in this way. According to Mason, Guevara and Mason had just met; it is unlikely that Mason would commit a crime in front of Guevara unless he was confident Guevara would not object.

It should also be noted that this method of torture, hairpulling, like beating a suspect with a phonebook in conjunction with a nightstick or flashlight, is designed not to leave a mark.

Because Guevara has previously denied participating in the interrogation of Rios, and may well deny participation in the torture of Garcia and the coercion of Carrero, his actions towards Mejia bear upon identity as to all these counts of the complaint.

Moreover, the Mejia torture also goes to motive, intent, opportunity, preparation, and plan. The torture of Mejia strongly suggests that Guevara beat Garcia and condoned the torture of Rios for a purpose: to extract a confession, and not out of mere sadism. The site of the torture, a police station interrogation room, goes to opportunity, preparation, and plan.

Therefore, the testimony of Adriana Mejia should be admitted.

## MOTION IN LIMINE NO. 8  -- TO PRESENT THE TESTIMONY OF EVELYN DIAZ

### CLAIMS FOR WHICH THE TESTIMONY OF EVELYN DIAZ IS RELEVANT

Jaime Rios incorporates by reference the statements  of Count 1 (coercion of Jaime Rios) and Count X of the complaint. (coercion of Benjamin Carrero). In addition , the testimony of Evelyn Diaz is relevant to Count XIII of the complaint, which includes the coercion and coaching of Rios, Carrero, and Luis Huertas.

### SUBSTANCE OF EVELYN DIAZ'S TESTIMONY

In August of 1995, Evelyn Diaz was living at 2017 north Kedzie in Chicago. (Exhibit 10, 8-9).

On one day in August, 1995 at about 3 p.m. in the morning, Diaz  heard shots fired outside her bedroom window. (Exhibit 10, 31-43). When she looked out her window, after the hearing the shots she did not see anyone. (Exhibit 10, 39). The next day, Diaz found out that someone had been shot. (Exhibit 10, 43).

About three days later, a police officer came to Evelyn Diaz's house. The officer told her that the police  knew she saw what happened, that she had been seen at the window  and that she needed to come to the police station to answer questions. (Exhibit 10, 46-47).

Diaz told the officer that she did not see anybody. (Exhibit 10, 46-47, 50). The officer replied that he needed her to come to the station to look at some pictures to see if she recognized anyone. He told her if she did not come to the station, he was going to go to DCFS and have her six year old son  taken away from her. (Exhibit 10, 47, 50, 52).

Diaz did not know the name of the officer, but described him as Hispanic, wearing glasses, and have a mustache and a goatee. (Exhibit 10, 48-49). He was "chubby," and his face was chubby. The officer spoke to her in Spanish. (Exhibit 10, 49).

When Diaz arrived at the police station, she was shown a book of pictures by the Hispanic officer, who looked at the books with her. (Exhibit 10, 64-65, 66). On more than one occasion, the Hispanic officer pointed to the photograph of a dark-complected individual in one of the books and asked if Diaz knew this person. (Exhibit 10, 65-66). Diaz replied that she had seen that person, but that did not mean that she knew him. (Exhibit 10, 68-69).

The Hispanic officer suggested to Diaz that the dark-complected individual was the shooter. (Exhibit 10, 69-70). Diaz said that she did not know him. (Exhibit 10, 70).

The Hispanic officer threatened to take Diaz to jail and take her son away if she did not identify the dark-complected individual as the shooter. (Exhibit 10, 71, 72).

Diaz began crying. Upon further questioning, she asked the Hispanic officer what she was supposed to say if she did not know the suspect. When the officer replied that she had seen him, Diaz said that she had seen him, but not that night. (Exhibit 10, 71, 73).

Sometime, later Diaz received a notification or subpoena to go to court. (Exhibit 10, 73-75). When she got to court, the Hispanic officer was there. (Exhibit 10, 76-77). When she was interviewed, she was told that she knew "whoever killed whoever." She told them the interviewers that she did not know anything. (Exhibit 10, 77). She said that she had seen the suspect in the neighborhood, but had not seen him shoot anyone. (Exhibit 10, 79).

## ARGUMENT

The standards for admission of 404(b) material are given above.

Guevara's interactions with Evelyn Diaz closely resemble his interactions with Rios,

Carrero, and Huertas. As he did with respect to Rios and Carrero, Guevara threatened to take a child away from a parent. As he did with respect to Huertas, Guevara tried to get Diaz to falsely identify a suspect and showed her the suspect's photograph, telling her that the suspect was the murderer.

Since Guevara is apparently denying that he was the person who coerced Rios, Carrero, and Huertas, Diaz's testimony is relevant to identity. And since the coercion took place at a police station (apparently Area 5) it is also relevant to opportunity, preparation, and plan. Finally, and particularly as to the malicious prosecution count, his conduct towards Diaz is relevant to prove malice, based upon his intent to wrongfully convict another suspect by using nefarious methods.

### MOTION IN LIMINE NO. 9 -- TO PRESENT THE TESTIMONY OF GLORIA ORTIZ BORDOY

### SUBSTANCE OF GLORIA ORTIZ BORDOY'S TESTIMONY

On December 13, 1995, Gloria Bordoy was questioned by police about their investigation of a shooting. (Exhibit 11, 27:20-24; 28:1-24).

On that date, Bordoy was in her first month of a pregnancy. (Exhibit 11, 33, 16-24). At around 10:00, Nelson Rivera came to her home and told her he had shot someone by accident. (Exhibit 11, 36:9-24;

At Area 5, Bordoy was interrogated by a police officer who was "very aggressive." (Exhibit 11, 44:1-15; 57:2-5). The officer had gray hair, was a little chubby, "middle big." (Exhibit 61:13-18). The officer was Latino. (Exhibit 11, 62:10-21).

The officer wore a gold ring, which had the face of an Indian etched on it. (Exhibit 11: 20-24, 62:1-9).

The officer told her that she was going down for a long time, that she was "involved,"

and that she was a liar. He called her a bitch. He threatened to take her children to DCFS (Exhibit 11, 44:16-23, 45:1-5; 73:2-7).

Eventually Bordoy gave a statement, implicating her boyfriend. (Exhibit 11,  62:5-17).

**ARGUMENT**

The standards for admission of 404(b) material are given above.

Guevara's interactions with Gloria Bordoy  closely resemble his interactions with Rios, Carrero, and Huertas. As he did with respect to Rios and Carrero, Guevara threatened to take a child away from a parent.

Since Guevara is apparently denying that he was the person who coerced Rios, Carrero, and Huertas, Diaz's testimony is relevant to identity. And since the coercion took place at a police station (apparently Area 5) it  is also relevant to opportunity, preparation, and plan.

Therefore, this testimony is admissible.

**MOTION IN LIMINE NO.  10  -- TO PRESENT THE TESTIMONY OF WILLIAM DORSCH**

**CLAIMS FOR WHICH THE TESTIMONY OF WILLIAM DORSCH  IS RELEVANT**

Jaime Rios incorporates by reference the statement  of  Count XIII of the complaint (malicious prosecution).

**SUBSTANCE OF WILLIAM DORSCH'S  TESTIMONY**

William Dorsch is a former Chicago police detective who retired in 1994, and who worked in Area 5. (Exhibit 12, 72-73). While he was in Area 5 he worked with Guevara on a homicide case. This assignment occurred while Guevara was still a gang specialist and about three months before Guevara was promoted to detective.  (Exhibit 12, 75-76).

Dorsch was present with Guevara when the two officers interviewed two young boys who had witnessed a homicide. (Exhibit 12, 76-77). Dorsch showed one of the boys a spread of six to eight photographs, including one which included the suspect. (Exhibit 12, 78-80).

The witness hesitated for a considerable length of time. (Exhibit 12, 79-80). Before the witness could make an identification, Guevara put his finger on the photograph of the suspect and said: "That's him." (Exhibit 12, 80-81). The witness agreed that was a photograph of the suspect and said that he was about to say that "that was him," but he looked a "little different." (Exhibit 12, 80).

Dorsch ordered Guevara out of the room, and then showed the photo-array to the second witness, who did not identify anyone. (Exhibit 12, 80). Afterwards, Dorsch conducted two lineups for the witnesses, without Guevara, where, again, one witness identified the suspect, and the other suspect did not. (Exhibit 12, 83-84).

Eventually Dorsch reinterviewed the two witnesses and learned that they had been paid by a third person to identify the suspect. (Exhibit 12, 85). After Dorsch conveyed this information to the States Attorney, charges were dropped. (Exhibit 12, 86).

Dorsch's testimony is relevant to establish the claim of malicious prosecution. Guevara's conduct with respect to Huertas was identical to his conduct with respect to the unnamed witness in the case Dorsch testified about. In both cases Dorsch showed the suspect a photo-array and, when the witness refused or hesitated, told the witness whom to pick out. In both cases, the identification was used to arrest a suspect, without probable cause. The Dorsch incident is relevant to establish Guevara's identity as the person who first interacted with Huertas, an identify he apparently disputes, and is relevant to establish his motive and intent to initiate a false prosecution against Jaime Rios.

**MOTION IN LIMINE NO. 11 -- TO PRESENT THE TESTIMONY OF GABRIEL SOLACHE BY VIDEO DEPOSITION**

**CLAIMS FOR WHICH THE TESTIMONY OF GABRIEL SOLACHE IS RELEVANT**

Jaime Rios incorporates by reference the statements of Count 1 (coercion of Jaime Rios), Counts XI and XII: (*Brady claim* as to Cristino Garcia) and Count XIII of the complaint (malicious prosecution).

Gabriel Solache is presently in Mexico and therefore cannot be served or subjected to the jurisdiction of this court. If service is not possible, Jaime Rios will seek to have his videotaped deposition testimony admitted, on the grounds that Guevara, Halvorsen and the City of Chicago conducted that deposition. Since the testimony would not be admissible against Mason and the jury could be so instructed, the testimony would be admissible against Guevara and Halvorsen, who had a full opportunity to cross-examine.

**SUBSTANCE OF GABRIEL SOLACHE'S TESTIMONY**

On March 27, 1998, Gabriel Solache was in an interrogation room at Area 5, and after he had denied committing a murder, he was approached by officer Reynaldo Guevara. (Exhibit 13, 126, 304:1-24). Guevara slapped Solache on the left side of Solache's face and also punched him in the stomach. (Exhibit 13, 129, 307:5-24: 130, 308:1-24; 134, 312:11-24; 135, 313:1-24; 136, 314:1-9; 137, 315:23-24: 138, 316:1-5). Eventually, Guevara took Solache to a room where there was a prosecutor, and Solache made a statement. (Exhibit 13, 145:1-24).

For reasons given above with respect to the other 404(b) witnesses, Solache's testimony is relevant to establish motive, intent, identity, opportunity, preparation and plan. It should be

noted that, as in other instances, Guevara used methods of torture, slapping in the face and punching in the stomach, which were designed not to leave a mark. This testimony is admissible.

## CONCLUSION

For the foregoing reasons, the motions in limine should be granted.

## CERTIFICATE OF SERVICE

Stephen L. Richards certifies that on December 22, 2025, he served **PLAINTIFF'S MOTIONS IN LIMINE**

through the ECF filing system.

/s/ Stephen L. Richards
By: Stephen L. Richards
Attorney for Plaintiff
53 W. Jackson, Suite 756
Chicago, IL 60604
(773) 817-6927
sricha5461@aol.com
Attorney No: 6191946