IN THE CIRCUIT COURT OF COOK
COUNTY COUNTY DEPARTMENT ---
CRIMINAL DIVISION

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | |
| | ) | |
| PLAINTIFF, | ) | No. 89-CR-16525 |
| | ) | |
| **vs.** | ) | |
| | ) | |
| | ) | Hon. Leroy Martin, |
| JAIME RIOS | ) | Judge Presiding |
| DEFENDANT | ) | |

**EXHIBIT NINE – WILLIAM DORSCH TESTIMONY**

1

```
1    STATE OF ILLINOIS    )
                          ) SS:
2    COUNTY OF C O O K    )
          IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
3             COUNTY DEPARTMENT - CRIMINAL DIVISION

4    THE PEOPLE OF THE       )
     STATE OF ILLINOIS,      )
5                            )
               Plaintiff,    )
6                            )
               vs.           )
7                            )
     ARTURO REYES,           ) No. 98 CR 12240-02
8    GABRIEL SOLACHE,        ) No. 98 CR 12240-03
                             )
9              Defendants.   )

10             POST-CONVICTION EVIDENTIARY HEARING

11             REPORT OF PROCEEDINGS had before the

12   HONORABLE JAMES M. OBBISH, on the 14th day of February,

13   2013, in Chicago, Illinois.

14        APPEARANCES:
               HON. ANITA M. ALVAREZ,
15             State's Attorney of Cook County, by:
               MR. JAMES PAPA,
16             MR. KURT SMITKO,
               MS. CELESTE STACK,
17             Assistant State's Attorneys,
                    appeared for the People;
18
               MR. DAVID SAUNDERS,
19             MR. ANDREW VAIL,
                    appeared for Defendant Reyes.
20             MS. KAREN DANIEL,
               MS. JANE RALEY,
21             MS. ERIC TOPP,
               MR. WILLIAM STAES - 711,
22             MS. SHARON MAKOWSKY - 711,
               MS. LINDSEY SIELING - 711,
23                  appeared for Defendant Solache.
     ELLEN DUSZA, CSR No. 84-3386
24   Official Court Reporter
     773-674-6065
```

1

```
1                      I N D E X

2          PEOPLE  VS. ARTURO REYES - 98 CR 12240-02

3          PEOPLE  VS.  GABRIEL SOLACHE - 98 CR 12240-03

4

5     Date:  2/13/2013

6     Pages:  1 through 155

7

8     FOR THE PETITIONER

9     WITNESS                    DX   CX   RDX   RCX   EXAM

10    WILLIAM DORSCH

11         By Ms. Sieling...........71.......141

12         By Mr. Vail..............87.......142

13         By Ms. Stack.................88.........143

14         By The Court................................145

15

16                     E X H I B I T S

17

18    NUMBER              MARKED FOR ID   RECEIVED

19    Respondent's Exhibit

20         Group No. 1............90

21         No. 2.................95

22

23

24              CONTINUED UNTIL 2/14/2013
```

2

Solache 002138

```
 1          THE COURT:  Everyone, please introduce themselves

 2   for the benefit of the court reporter.

 3          MS. RALEY:  Jane Raley, R-a-l-e-y, here on behalf of

 4   Gabriel Solache.

 5          MS. DANIEL:  Karen Daniel on behalf of Mr. Solache.

 6   And I might as well introduce a third attorney, Erin

 7   Topp, T-o-p-p.  We have three 711 students, William

 8   Staes, S-t-a-e-s, Lindsey Sieling, S-i-e-l-i-n-g, and

 9   Sharon Makowsky, M-a-k-o-w-s-k-y.

10          THE COURT:  All right.

11          MR. SAUNDERS:  David Saunders on behalf of Arturo

12   Reyes.

13          MR. VAIL:  And Andrew Vail -- both Mr. Saunders and

14   I are with Jenner & Block on behalf of Mr. Reyes.

15          THE COURT:  State.

16          MS. STACK:  Celeste Stack, S-t-a-c-k.

17          MR. SMITKO:  Kurt Smitko, S-m-i-t-k-o.

18          THE COURT:  All right.  Now, this is a third-stage

19   post-conviction hearing we set aside and I hoped to start

20   earlier today and again my apologies to all of the

21   parties here.  I had hopped that we would have begun

22   these proceedings much earlier.

23              At the request of the Petitioners, both have

24   been writted here to the courtroom today, so, Officers,
```

3

```
 1      what you may do is have the gentlemen have a seat at

 2      counsel table there somewhere where you find it

 3      convenient to do your job.

 4           MS. DANIEL:  Your Honor, we have a slight request

 5      regarding Mr. Solache's placement.  He's hard of hearing.

 6      He doesn't hear out of the one ear.  It would be subject

 7      to obviously the guards, but whether it might be possible

 8      for him to sit in the jury box or someplace closer to the

 9      witness stand.

10           THE COURT:  Is he going to have an interpreter?

11           THE INTERPRETER:  Yes.

12           THE COURT:  I don't think it will be necessary

13      because the interpreter is going to be sitting next to

14      him and she'll be interpreting.

15           MS. DANIEL:  That is true.

16           THE COURT:  That alleviates that request.

17                Officers, knowing that -- do both gentlemen

18      need an interpreter?

19           MR. SAUNDERS:  Yes, your Honor.

20           THE COURT:  You have to set it up in some way that

21      the interpreter can sit between them so that both can

22      hear and that you're comfortable with the security

23      arrangements.

24                While the Petitioners are being seated, there
```

4

1  are some motions that were filed on Monday and there's

2  been responses being filed by the Petitioner as well.

3  There was -- I was hoping to resolve one matter last

4  Friday when I wasn't here.  Is that still a relevant

5  motion or have you decided not to call -- or present that

6  evidence.

7       MS. RALEY:  Your Honor, that motion, and this was

8  the State's motion to bar the testimony of Jed Stone on

9  the grounds of hearsay.  That motion -- is that the

10  motion you're referring to?

11       THE COURT:  That's the motion I'm referring to.

12       MS. RALEY:  That motion is moot.

13       THE COURT:  You're not going to offer the affidavit

14  of the attorneys?

15       MS. RALEY:  No.

16       THE COURT:  So there's no need to deal with that.

17       MR. SMITKO:  If there's any witnesses in court, I

18  would ask for a motion to exclude.  I don't know if

19  we're dealing with any issues that may arise during

20  testimony.

21       THE COURT:  Once any witness -- once we begin any

22  kind of testimony, then, I will enter an order excluding

23  any witnesses that might testify in this case, that they

24  be removed from the courtroom during the course of any

5

Solache 002141

1    other witnesses' testimony.  I'm going to rely on the

2    attorneys to make sure that you keep your own future

3    witnesses out of the courtroom when any other witness is

4    testifying, but I'll allow them to stay at the moment

5    until we get to that point.

6        MR. VAIL:  We understand that, your Honor.  Just to

7    note, we do intend as, you know, present Petitioner

8    Mr. Reyes and he'll be sitting here.

9        THE COURT:  All right.  That's fine.

10           Swear in the interpreter, please.

11              (Interpreter sworn.)

12       THE COURT:  Your name, for the record, please,

13   ma'am.

14       THE INTERPRETER:  Good afternoon, your Honor.  For

15   the record, Denise Romo, R-o-m-o, Spanish interpreter.

16       THE COURT:  Good afternoon, Ms. Romo, and thank you,

17   as always, for your assistance.

18           Mr. Solache, I see here, has signed consent

19   forms allowing his attorneys to be assisted by the 711

20   law students that have been identified already and to

21   allow the legal clinic at Northwestern School of Law and

22   those students to assist.

23           Mr. Solache -- which gentleman is Solache?

24       DEFENDANT SOLACHE:  Here.

6

```
 1          THE COURT:  Is that your signature on these two

 2   various documents granting your permission to allow the

 3   711 law students to assist your attorneys in your

 4   representation?

 5          DEFENDANT SOLACHE:  Yes.

 6          THE COURT:  All right.  That will be made part of

 7   the court file.

 8              State has filed some motions.  Is there one you

 9   wish to proceed on first, Ms. Stack or Mr. Smitko?

10          MS. STACK:  Just so we're straight, the one with Jed

11   Stone is withdrawn or moot.

12          THE COURT:  That's moot because they're not going to

13   offer Mr. Stone's affidavit in this hearing.

14          MS. STACK.  The next one, then, would be our

15   supplemental motion for discovery regarding the witness

16   that was recently added by the defense, a former CPD

17   investigator turned -- detective turned private

18   investigator by the name of William Dorsch, D-o-r-s-c-h.

19          THE COURT:  Is Mr Dorsch present?

20          MR. VAIL:  Yes.

21          THE COURT:  Ask him to step out.

22              Any additional argument?

23          MS. STACK:  Judge, as you're aware, Mr. Dorsch --

24   there been extensive discovery passed back and forth over
```

Solache 002143

1    the years, and he came on the case I believe January 8th

2    we were in court and we got a supplemental list of

3    witnesses that included Jed Stone and William Dorsch but

4    with no other information.  We asked for more

5    information, we were told we could interview Mr. Dorsch.

6         Then on the next court date, again, given the

7    wide range of evidence here, the time range, et cetera,

8    the nature of the hearing, your Honor asked them to give

9    us something in writing as to what Mr. Dorsch would

10   testify to.

11        That led to a memo being tendered which was

12   generated on January 11th of this year at, I believe, the

13   offices of Jenner & Block with all the attorneys present,

14   and we got a two-page memo that describes an incident

15   that occurred in 1989 or 1990.  Allegedly, it's a murder

16   case and the bottom line is Mr. Dorsch claims he saw

17   Detective Guebara point to a photo in a photo array to

18   indicate to a witness who to pick out.

19        We've been unable to find anything that matches

20   this.  Counsel represented that they've submitted two or

21   three --

22        THE INTERPRETER:  I'm having difficult hearing,

23   Counsel.

24        MS. STACK:  I'm sorry.

Solache 002144

```
 1            In any event, we're asking for more information
 2       about Mr. Dorsch because as we looked into this, we found
 3       on his resume on his website he is working for the same
 4       attorneys that are present.  Ms. Daniel used him in a
 5       case she recently filed, the Daniel Taylor case, and on
 6       the website he talked about the work he's done for
 7       Northwestern Center on wrongful conviction.  We believe
 8       this is similar to when an expert testifies that monetary
 9       consideration is relevant for this witness by his
10       interest and motive.
11            I went through the history, it's not like
12       Mr. Dorsch's name appears in any case file or any of
13       these transcripts, he just recently appeared, and it
14       turns out that he's also a private investigator who makes
15       a living off of working for defense attorneys.
16            We would ask to find out what cases he is
17       working on for the attorneys present and what kind
18       of monetary consideration he's received or is
19       receiving.
20       THE COURT:  All right.  Response.
21       MS. DANIEL:  Your Honor, Mr. Dorsch was disclosed as
22       a witness a year ago in the discovery answer filed on
23       February 24, 2012, so initial response is that this
24       motion for --
```

Solache 002145

```
 1            THE INTERPRETER:  Your Honor, I can't hear a thing.
 2            THE COURT:  This is a difficult courtroom.  I have
 3       the microphone on.  Do you see a brass plate in front of
 4       here.  Is there another one on this side to the extent
 5       that you can try to direct your -- it's terrible.
 6            MS. DANIEL:  I'll try to project.  I'll stand back
 7       and project.
 8                 As I said, Mr. Dorsch was disclosed as a
 9       witness a year ago, so this motion for discovery coming
10       now on the eve of the hearing is untimely.  We would ask
11       your Honor in the first instance to deny the motion on
12       that ground alone.
13                 In addition, it's important to note that
14       Mr. Dorsch is going to testify in this case as a fact
15       witness regarding something that he observed 20 or so
16       years ago while he was a Chicago homicide detective.
17       Since his retirement from the Chicago police force, he's
18       become a licensed private investigator.
19            THE COURT:  How long is that, how long has he been
20       retired?
21            MS. DANIEL:  He retired in 1994.
22            THE COURT:  All right.
23            MS. DANIEL:  He's been a PI in Wisconsin since 1994
24       and I believe in Illinois since 2006.  He has done work
```

Solache 002146

1    for a variety of attorneys, he has done work for my

2    office.  He's never been a private investigator in this

3    case, he's only a fact witness in this case.

4           Therefore, the State's request, which is to

5    have every record -- to have records, witness statements,

6    everything he's done in every case in any way involved

7    with my office is completely -- it's overbroad, it bears

8    no relationship to the matter about which he's going to

9    testify in this hearing, and while we certainly don't

10   object to some cross-examination on financially

11   remuneration that he's received from working with my

12   office, confidential information about in many cases

13   ongoing cases, it's off limits, it's not relevant to

14   these proceedings.

15          Finally, your Honor, I'm sure you're aware in

16   the post-conviction hearing, discovery is limited.  The

17   regular rules of discovery don't apply, it's limited to

18   what is necessary for these proceedings, it's limited to

19   good cause shown, and the State has not even attempted to

20   argue any sort of good cause other than they want to

21   cross-examine Mr. Dorsch, but they would not be allowed

22   to cross-examine him about other independent cases that

23   he's worked on that are not related to this case.

24          For all of those reasons, we would ask your

Solache 002147

1    Honor to deny this belated motion for discovery and allow

2    Mr. Dorsch to testify as planned today.

3         MR. VAIL:  Your Honor, on behalf of Mr. Reyes, I'll

4    be very brief.

5         We, of course, agree with all the arguments

6    presented by Northwestern, especially the argument that

7    the State has filed to comply with the local rules to

8    file this motion, but to cut through it on behalf of

9    Mr. Reyes, I can represent to the Court that we have no

10   responsive discovery, we've not engaged Mr. Dorsch in any

11   matters, and so for our purposes, their motion has no

12   need to be responded in substance.

13        THE COURT:  Anything else?

14        MS. STACK:  Judge, just that our focus is on what is

15   relevant for cross-examination that is monetary.  We

16   don't want the details or confidential workup of -- we

17   don't want his investigative files, we just want to know

18   the extent of work that he's done for Northwestern, and

19   that is obviously a very valid subject for

20   cross-examination.

21        And, again, as far as I'm aware, and of course

22   I can always be mistaken, the first details that we've

23   received as far as what he's going to testify to were

24   received on January 13th of this year.

12

1      THE COURT:  All right.

2      MS. STACK:  We have no objection to an in camera

3   review, too, your Honor, if you want to screen whatever

4   is produced.

5      THE COURT:  With respect to the statement made by

6   Mr. Vail, I'll accept that as an officer of the Court

7   that there has been no prior investigative work done by

8   the witness with that law firm.  That's correct?

9      MR. VAIL:  That's my understanding, your Honor.

10      THE COURT:  With respect to this case, has your

11   law firm been billed in any way by the witness to your

12   firm?

13      MR. VAIL:  Absolutely not, your Honor.

14      THE COURT:  And has there ever been any kind of --

15   or do you expect that there would in the future be any

16   invoices submitted to your law firm with respect to this

17   case?

18      MR. VAIL:  My understanding is absolutely not, your

19   Honor.

20      THE COURT:  That will resolve that.

21          With respect to Mr. Solache's case, though, I

22   would grant the State's motion for -- to discover the

23   financial arraignments between the representatives here

24   of Mr. Solache and the witness.  The -- I think what will

Solache 002149

```
1    be fair to turn over would be the various amounts of
2    money that he received since working for the legal
3    clinic, and I don't think it's -- and what -- how much
4    he's billing on this particular case, if anything, or how
5    much he would expect to be invoicing in the future with
6    respect to this particular case as well.
7            I do think it's a little bit unique even though
8    his name -- I'll certainly take the attorney's name that
9    his name may have appeared on an answer to discovery on a
10   prior date, it really was only -- apparently only
11   disclosed what the substance of his testimony might have
12   been quite recently.
13           It's somewhat unique.  I think everyone would
14   have to agree that someone who is working for the
15   attorneys representing an individual in court all of a
16   sudden then becomes a witness not based on his work as an
17   investigator but he's now placing himself in the case as
18   a fact witness as you've described to an incident which
19   allegedly took place many years ago.
20           I've tried to once this matter was going to be
21   set for this third-stage hearing, I've allowed the
22   parties to engage in a wide amount of discovery because I
23   don't believe that this hearing should be conducted in
24   any kind a way that would give the appearance that one
```

14

1   side or the other is being ambushed, and since this

2   testimony is so sort of different from what anyone would

3   really expect it, I think that it would be fair game for

4   the State to be able to cross-examine Mr. Dorsch with

5   respect to his financial arraignments with the legal

6   clinic university, how long it's existed, what the extent

7   of his payments has been over the course of the length of

8   time that he's been working for the legal clinic.

9           I'm not interested in getting involved in

10  anything for producing -- having him or your office or

11  your university produce anything which would be work

12  product or even detail individual witnesses, perhaps,

13  that he's interviewed on other cases, which perhaps your

14  clinic or you have no -- perhaps no reason to ever

15  disclose to the State on some other cases or whatever.

16  But do you have those records, financial records that you

17  could turn over to the State?

18      MS. DANIEL:  I do, Judge.  I brought then with me to

19  provide to the State.  It's a list of all the paid

20  invoices from our clinic to Mr. Dorsch.  They span from

21  November of 2011 through January of this year.  I have

22  the amounts.  The matters are not named, it is simply the

23  date of the invoice and the dollar amount and a total.

24  I'm prepared to provide that to the state's attorneys.

Solache 002151

```
 1          THE COURT:  That will be all of --
 2          MS. DANIEL:  That's the entirety of all of his paid
 3     invoices.  I will -- oh, from the Bloom Legal Clinic,
 4     that's right, from the Bloom Legal Clinic, which is where
 5     Ms. Raley and I work.  It's from our legal clinic, and
 6     I'll disclose various -- I believe there he is an
 7     outstanding invoice somewhere but it's not in our system,
 8     I could not get that one, the current one.
 9               And I'd also state for the record that none of
10     these invoices are in any way related to this case.  He's
11     not building us for any work in this case and we do not
12     expect in the future that he'll be building us for any
13     work in the case because he's a fact witness and not an
14     investigator.
15          THE COURT:  Including his time today?
16          MS. DANIEL:  Correct.
17          THE COURT:  Turn that over to the State.
18               One moment.
19                    (WHEREUPON, the above-entitled
20                     cause was passed and later recalled.)
21          THE CLERK:  Solache and Reyes.
22          THE COURT:  State, do you have another motion.
23          MS. STACK:  The final one, your Honor, is
24     entitled -- it has a long title, but it's basically -- as
```

Solache 002152

1    you know, as you suffered through we filed a number of

2    pleadings about the relevancy determinations that we

3    believe that should be made beforehand.  We've also been

4    looking into the situation where we are here on the eve

5    of the hearing and it appears that one of the defendants

6    is going to testify and then Mr. Dorsch who is -- we just

7    discussed what Mr. Dorsch is.

8            For all the people who have complaints against

9    Detective Guebara, whose names and situations were

10   represented to the appellate court, they're not coming to

11   court.  You're getting partial transcripts, and it is

12   something that we've looked into, but there's one

13   section, Section 122-6.  It is our position having

14   recently extensively research and discovered the Supreme

15   Court Rules take precedent over statutes.

16           This comes out of the separation of powers

17   clause.  The Supreme Court has the exclusive jurisdiction

18   to administrate the Courts and that includes the evidence

19   rules.  The evidence rules were designed by the Supreme

20   Court of Illinois, a committee that was appointed.  And

21   in discussing this upcoming hearing with no witnesses

22   with our appellate division, we discovered this very

23   pertinent and important issue and did our best to present

24   it to the Court as we have in the best way that we could

Solache 002153

1    as quickly as possible.

2            And what we have here is a motion to apply the

3    Rules of Evidence that were recently codified in January

4    of 2011 to this hearing, and it is our position after

5    reviewing this area of law that the Supreme Court Rules

6    take precedence over 122-6.  122-6 allows Petitioners --

7    hearings to be conducted by affidavits, depositions, live

8    testimony or however the Court deems fit.

9            In previously looking at this, there are many

10   cases that quote that language and talk about your

11   Honor's great discretion in conducting hearings.  But as

12   we have set out in this document that we filed -- we were

13   going to file it Friday, and, unfortunately, your Honor

14   was sick and we filed it Monday, due to my circumstances,

15   my delays, but in any event, it is a very important issue

16   because the Supreme Court rules do take precedence over

17   122-6 and we believe that to go forward on 122-6 will

18   result in us being back here in a couple years, Judge,

19   and that's why we filed the motion that we did.

20           There is strong case law supporting the fact

21   that the Rules of Evidence apply to this hearing, they

22   were not exempted, and to go forward on documents,

23   transcripts that are not admissible anywhere else is

24   going to put all the hard work your Honor has put into

18

Solache 002154

```
1    this, all the hours everyone has put into this, I believe
2    there's a very, very strong possibility it will come back
3    due to this issue, and that's why we filed this motion.
4         Two witnesses is not an onerous evidentiary
5    hearing for us to conduct, your Honor.  The implications
6    by the motions filed today complaining about the
7    timeliness of this, you know, by -- we've had these
8    documents for years.  The appellate court that remanded
9    this case had most of the documents that they are asking
10   you to conduct a hearing on, and, you know, that's not
11   the issue.
12        The issue is stumbling at the end of the road
13   when we have such an important issue here, and that the
14   Rules of Evidence would make these documents they're
15   relying on inadmissible hearsay.
16        Also, there's strong relevancy rules in the 400
17   section, and I've spelled this out, but we believe that
18   the evidence they intend to rely upon is inadmissible in
19   Illinois as the Supreme Court Rules prevail.
20        There's also an attended argument that
21   separation of powers is violated here because of this
22   dichotomy between what the legislature has control over
23   and what the Supreme Court has control over.  As a matter
24   of fact Section 122-8 of the PC Code was found
```

Solache 002155

1   unconstitutional about 25 years ago.  That Section 122-8

2   said that when a post-conviction petition was filed, it

3   would be assigned to the judge that heard the trial,

4   which sounds like it makes sense.  And that section was

5   found unconstitutional because it interfered with the

6   Supreme Court's exclusive right to administer the

7   judiciaries, its rules for the judiciary.

8           It was under that line of cases and that

9   precedent that we discovered this discrepancy between

10  122-6 and the Code of -- the recently codified Rules of

11  Evidence.  You can blame it on my inability or failure to

12  know all the rules of construction, et cetera.  I

13  certainly don't, but as soon as we saw this discrepancy

14  and this problem, we put it together and filed it, your

15  Honor, and it's a motion in limine.

16          Motion in limines are normally filed

17  pre-hearing, and the importance of this case, the

18  importance of the time we've all put into it, this matter

19  should be resolved, we believe in good faith, before we

20  proceed and finish this hearing.

21          MR. VAIL:  Your Honor.

22          THE COURT:  Yes.

23          MR. VAIL:  Let me briefly respond and then I'll let

24  my colleague respond in substance.

Solache 002156

```
1              Counsel, again, failed to follow the rules in

2    filing their motion.  Now, we'll go beyond that.  But for

3    that very reason, your Honor, having filed this on Monday

4    with absolutely then no notice given the Court holiday,

5    the motion is improper and it should be stricken.

6         MS. STACK:  We have no objection to them having more

7    time to respond.

8         MR. VAIL:  We don't need it.  We will respond, but

9    it should be stricken.  They filed it on Monday knowing

10   full well that we've been waiting nine years to have this

11   hearing.

12        THE COURT:  Let's move beyond that.  I understand

13   that, it's a big concern of mine because I also have, you

14   know, although it wouldn't be obvious given how long our

15   call was this morning, but I also have set aside a lot of

16   court time in order to try to get as much of the hearing

17   completed this week as possible, so it is a concern.

18        MR. VAIL:  We can address it, your Honor.  We can do

19   it --

20        THE COURT:  We don't want to do --

21        MR. VAIL:  They're wrong and we can explain why.

22        MR. SAUNDERS:  As Mr. Vail said, this issue is

23   pretty black and white.  The State is wrong.  The

24   commentary to the Codified Rules of Evidence states, and
```

Solache 002157

```
 1      I quote, "It is important to note that the Illinois Rules
 2      of Evidence are not intended to abrogate or supersede any
 3      current statutory Rules of Evidence.  The committee
 4      sought to avoid in all instances effecting the validity
 5      of any existing statutes promulgated by the Illinois
 6      legislature."
 7              The committee notes go on.  "The committee
 8      believes it avoided affecting the validity of existing
 9      statutes promulgated by the Illinois legislature."  In
10      fact, the committee highlights in the commentary one
11      single possible conflict that it thinks the codified
12      rules have, and that's in Section 5-1501(c) related to
13      the Juvenile Court Act.
14              Now, as a fallback, the State has argued that
15      the codified rules conflict with Section 122-6, creates a
16      separation of powers issue.  Well, the State's wrong on
17      that, too.
18              The Illinois Supreme Court has said that, and I
19      quote, "The legislature has the power to create laws
20      which govern judicial practice so long as they do not
21      unduly infringe upon the inherent powers of the
22      judiciary."  People v. Porter, 112 Ill.2d, 64.  The
23      Illinois Supreme Court has held that the legislature of
24      the State has the power to prescribe new and alter
```

22

Solache 002158

1    existing Rules of Evidence or importantly here to

2    prescribe methods of proof.  That's People v.

3    Rolfingsmeyer, R-o-l-f-i-n-g-s-m-e-y-e-r, 101, Ill.2d,

4    137.

5            The Supreme Court's own authority -- the

6    State's own authority on its motion indicates that the

7    Supreme Court has, quote, "Upheld the legislature's

8    enactment of the Rules of Evidence."  That's

9    People  v. Joseph, 113 Ill.2d 36.

10           The Supreme Court has previously described this

11   third-stage hearing as a creature of statute and

12   therefore governed by Rule 122-6.  In People v. Johnson,

13   206 Ill.2d 348.  The Illinois Supreme Court's

14   jurisprudence thus permits this proceedings under 122-6.

15           Now, if the committee notes weren't enough, and

16   the Illinois Supreme Court jurisprudence wasn't enough,

17   the State's Attorney General, Lisa Madigan, is arguing in

18   a case pending before the Supreme Court currently that

19   the Court should accept hearsay testimony that was the

20   basis for a DCFS ruling because the Illinois legislature

21   enacted a rule of evidence allowing that reliance.  So

22   Lisa Madigan is arguing before the Supreme Court, your

23   Honor, the exact opposite position that the State has

24   taken.

Solache 002159

1    If the State is right that the codification of

2 the Rules of Evidence wipes away any legislatively

3 enacted rule of evidence, there's no telling how many

4 other statutes, but I tried to do some quick research.

5 725 ILCS 5104-25, evidentiary rules regarding discharge

6 hearings for those unfit to stand trial.  That rule would

7 be gone.  720 ILCS 529(b)(i), evidentiary rules regarding

8 in rem proceedings related to money laundering charges,

9 gone.  725 ILCS 5115-10.5, rules permitting a hearsay

10 exception for drug cases occurring in and around safe

11 zones, gone.

12    There are a number of other legislatively

13 enacted instances of evidentiary rules that the committee

14 that codified the rules indicated that they had no intent

15 to abrogate, supersede nor did they believe they did.

16    We have the Illinois Supreme Court indicating

17 that it is within the advent of the legislature to make

18 new or alter existing Rules of Evidence or to identify

19 burdens -- or to identify orders of proof.

20    Your Honor, the State is simply wrong on this

21 legal argument; and I'll leave my co-counsel to address

22 the remainder of the motion.

23   MS. DANIEL:  Thank you.

24    Judge, the Solache team certainly agrees

24

1    regarding the applicability of evidence rules to this

2    proceeding.  But the alternative argument is this, that

3    the inquiry for this Court is not to conduct 20 different

4    credibility mini hearings on each of the 20 persons who

5    have made allegations against Detective Guebara.  The

6    purpose of this hearing -- and I'm sure you'll be glad to

7    hear that, Judge.  The purpose of the hearing is to

8    determine whether there is evidence of a pattern and

9    practice of misconduct by Detective Guebara that is

10   material to this case because the allegations are similar

11   enough to each other and to the allegations of misconduct

12   by Mr. Reyes and Mr. Solache and whether it's material

13   because the incidents are close enough in time to the

14   allegations of misconduct by the Petitioner in this case.

15           To evaluate that, your Honor just needs to know

16   what the allegations are.  We are presenting evidence of

17   what the allegations are.  Mostly through prior

18   testimony, but in one instance, in the case of Mr. Dorsch

19   through testimony because there is no prior testimony.

20           The evidence in the case is the existence of

21   the evidence regarding Detective Guebara, so the

22   alternative approach to this is that there's no hearsay

23   problem at all.  We're presenting your Honor with

24   existence of evidence much like would be the case if

Solache 002161

1   there were Brady evidence that we're alleging, which

2   actually at one time we also alleged that this is Brady

3   material, but your Honor has dismissed that claim.

4           Again, the sum total of the argument is that

5   you're looking -- your job at this hearing is primarily

6   to determine materiality, relevance, timeliness, and then

7   to evaluate this new evidence in light of what was

8   presented at the time of trial through the testimony of

9   our clients and Officer Guebara and finally make a

10  determination as to whether the new evidence would

11  probably change the outcome of what happened at trial.

12          All you need is a representation of what the

13  allegations are, and we're presenting that to you mostly

14  through sworn testimony, and as I said in one instance,

15  through a live witness.

16          Thank you.

17      THE COURT:  Ms. Stack.

18      MS. STACK:  Your Honor, number one, I appreciate

19  counsel moving forward so we can argue this, but, number

20  two, neither he nor I can verify anything that

21  Mr. Saunders said or look at the cases he has.  If he has

22  them, I would like to look at them, I'm not going to read

23  them in front of the bench.

24          But watching what he did with the committee

Solache 002162

```
1    comments, the committee comments state that we did not

2    expect -- or we're not expected to change any evidentiary

3    statutes.  Those are the kind of statutes he read later

4    that talked about hearsay, your 115-10 types of statutes,

5    those are evidentiary statutes.  If you want to buy their

6    primary argument then you have to say that the

7    Post-Conviction Hearing Act is an evidentiary statute.

8    It is not.

9            122-6 is part of the Post-Conviction Hearing

10   Act.  It talks about the disposition in the trial court.

11   The main conundrum here is why are we here.  Ms. Daniel

12   told you that your job is just to read their documents

13   and, you know, decide -- I'm trying to quote accurately.

14   Your purpose is to -- you don't need live witnesses, your

15   purpose is to look at materiality, et cetera.

16            Your Honor, the purpose of the Court, the

17   purpose of an evidentiary hearing, this is the first time

18   that we get to challenge the credibility or the factual

19   basis of any of these matters.  They're giving you

20   transcripts, they're not giving you the whole record, we

21   asked for them to provide you the entire case that

22   they're relying on, but you're getting transcripts of a

23   defendant who has a motion to suppress and in those cases

24   the motion to suppress was denied and he was later
```

Solache 002163

```
 1   convicted.  Most of their witnesses who actually
 2   testified about coerced confessions are in IDOC.  They're
 3   easily -- we can bring them to court on a writ, but
 4   instead of bringing them to court on a writ and having
 5   them come in here and look you in the eye and telling you
 6   what Ray Guebara did to them, they're taking his
 7   transcript out of a motion to suppress, they're not
 8   providing you with a ruling of the trial court who heard
 9   that witness at the stand, and the Court who heard the
10   entire motion to suppress, the Court who heard the entire
11   trial, they're giving you a tiny portion and saying
12   that's all you get, and that's our problem with this.
13           You are getting the exact same thing that the
14   appellate court got, and they had a first stage -- Judge
15   Sacks threw the case out because the statements had been
16   litigated at motion to suppress, at trial, the OPS
17   records have been explored, witnesses had even been
18   allowed to testify, this issue in Judge Sacks' mind was
19   res judicata.
20           The appellate court said no, under Patterson
21   there's new evidence, and that's fine, but bring it here
22   for your Honor.  That's the purpose of remanding it.  The
23   first stage -- it was sent back, your Honor spent a lot
24   of time going through all our filings on the second stage
```

Solache 002164

```
 1    and gave them a hearing.  And instead of a hearing,

 2    you're getting the same documents that they gave to the

 3    appellate court after all this work.

 4            We always hear about the delay, the delay, like

 5    it's all on us.  Your Honor would not have let this case

 6    be delayed for years if it was the State the whole time.

 7    They've taken months to file their pleadings to do their

 8    works as well.  It's been a huge undertaking.  Originally

 9    there were 40-some collateral cases.  Now at least it's

10    pared down to 20, but, again, there's not a single

11    witness that's going to come in and tell you that Ray

12    Guebara did something bad.

13            MR. VAIL:  That's incorrect.  Mr. Reyes will sit --

14            THE COURT:  Don't interrupt her.

15            MS. STACK:  Mr. Reyes testified already.  They got a

16    hearing under the guise of newly discovered evidence, and

17    they're not presenting one live witness.

18            MR. VAIL:  Incorrect.

19            THE COURT:  Don't argue.

20            MS. STACK:  And it -- the record speaks for itself.

21    The situation speaks for itself, and it's troubling, but

22    under 122-6, they were allowed to get away with it.  And

23    I believe that the, again, the sense of urgency today is

24    because the same thing, the committee is still in place
```

Solache 002165

1    on the rules, and they can speak out when they find out

2    that this issue is out there. They could easily issue

3    another comment and say ASA Stack is out of her mind and

4    122-6 rules.

5         We believe this is an important issue that

6    has to be explored, and we believe the urgency here is to

7    get the hearing done before something like that might

8    happen or before an appellate court might rule in our

9    favor. In any event, we think it deserves some more

10   consideration.

11        What Lisa Madigan does on a DCFS administrative

12   case involving a hearsay statute has nothing to do with

13   where we are now. Think about it, Judge, Solache and

14   Reyes, they're not here as most people are in your

15   courtroom. Most of the people that come in, they're

16   suspects, they've been arrested, they haven't had their

17   chance to take advantage of their constitutional rights,

18   their 4th, 5th, 6th amendment.

19        These gentlemen had excellent counsel, the top

20   people that we're able to provide in Cook County, which

21   has an excellent bar, both through the Public Defender's

22   Office and the attorneys that are appointed. They were

23   looking at the death penalty because they killed a young

24   couple. They home invaded them, stabbed them to death in

Solache 002166

1       the middle of the night and stole their young children.

2       It's a very, very serious case.  They were looking at

3       the --

4               THE COURT:  Stick to the point.

5               MS. STACK:  I will.

6               The point is this, Judge, they are not here

7       with the presumption of innocence with a clean slate.

8       They are here, they've been convicted.  Their confessions

9       have been gone over, their motions were reviewed on

10      appeal and -- so why are we here?  Are you going to

11      reverse all the work of the courts at a hearing where no

12      evidence is presented, the Rules of Evidence are not

13      followed, hearsay is put in, irrelevant evidence is put

14      in, not a single witness who is going to complain about

15      Ray Guebara comes forward, and look at the array of

16      attorneys here, and they can't bring in any of these

17      witnesses from IDOC to get on the stand.

18              Your job is to weigh the credibility.  The case

19      law is replete.  As the State, we are bound -- we cannot

20      attack the credibility at the second stage, we must take

21      all their well pled facts as true.  So anything that's

22      sworn or an affidavit, we have to treat it as true.  This

23      is the only chance we get to attack the credibility.

24              If you believe what they're saying, then you

31

Solache 002167

1    can't look at the credibility of any of these people.

2    You have to just accept what other judges didn't accept

3    and what other judges found to be incredible.

4         The simple thing here is to let this hearing be

5    conducted the way every other hearing in the criminal

6    justice system is done, by live witnesses, by applying

7    the Rules of Evidence, by presenting your Honor with the

8    witnesses that are readily obtainable.  We'll get the

9    writs for them.  If they have a problem finding a

10   witness, we'll help them find him and bring him in.

11   That's not the issue, and you know it, Judge.  They don't

12   want to present these witnesses, and they've had ample

13   opportunity and ample resources to do so.  By you looking

14   at the codified evidence rules, they are in contradiction

15   to 122-6, and the law is clear, the law is clear that the

16   Supreme Court has the jurisdiction.

17        We're not saying we did not present you with a

18   pure separation of powers issue, we just mentioned that

19   this is partially the genesis for the division and why

20   the Supreme Court Rules are generously applied and

21   regarded in the fact that they have the authority over

22   court procedure.

23        We believe that the committee intended for a

24   post-conviction hearing that is dealing with issues of

32

1    these magnitude, constitutional violations where you have

2    the power to grant new trials and other forms of relief

3    that they should be conducted where you get to see the

4    credibility of the witnesses where the hearsay rules and

5    all the Rules of Evidence apply, and -- so that is the

6    policy decision, but we have presented you with a lot of

7    case law that is very clear.  122-6 is superseded by the

8    Rules of Evidence, and that this -- it is improper to go

9    forward on a bunch of hearsay that is a partial depiction

10   of other collateral hearings.

11          THE COURT:  Thank you.

12                All right.

13          MR. SAUNDERS:  Your Honor, if I may.

14          THE COURT:  No, the argument is over.

15                The Post-Conviction Act is a creature of the

16   Illinois legislature.  They have created this procedure,

17   they have -- when they did it, they provided certain

18   rules with respect to how the hearings could be

19   conducted.  They obviously felt that the Rules of

20   Evidence as they exited at the time should be relaxed in

21   a post-conviction proceeding.

22                I don't disagree with a lot of what Ms. Stack

23   has to say with respect to the issue regarding hearings

24   being conducted with the Rules of Evidence being applied.

33

Solache 002169

1    We do have the Illinois Rules of Evidence which are in

2    place, but there does not appear, at least to this point,

3    to be a court of review which has issued an opinion

4    stating that the Post-Conviction Act procedure is, in

5    fact, a violation of the Illinois Codified Rules of

6    Evidence.  They've been in effect for a while, so I don't

7    know that the issue actually has ever been presented up

8    to this point.  Maybe that's the reason we have no law

9    from a higher court.

10              I think ultimately what we will have here is

11    sort of a hybrid hearing.  I'm going to deny the State's

12    motion with respect to the extent that it would preclude

13    the submission of various pieces of affidavits or

14    transcripts or whatever.  The case has moved along under

15    that premise for I'm sure many, many months.  In fact,

16    I'm sure it's stretched out to over a year.

17              The State -- some evidence, obviously, that

18    will be proffered by the Petitioners will come in the

19    form of live testimony, subject to all the Rules of

20    Evidence and the appropriate objections which may be made

21    and cross-examination.  The State clearly has been

22    invited on prior occasions and I'm sure they intend to do

23    so based on their list of witnesses that have been

24    proffered, we'll be able to produce live testimony

Solache 002170

1    regarding the same events that certain affidavits perhaps

2    apply to -- ultimately decisions will be made by this

3    Court regarding the materiality, relevance of all these

4    allegations.

5            And although I don't think what the State

6    argues, as I said, is inappropriate, I do, again, point

7    out the direction that the circuit court was given by the

8    appellate court in the opinion that applies to this

9    particular case.  I think it contains some rather strong

10   language and direction to move forward, they took some

11   unusual steps with respect to where the case would be

12   resolved at the second and subsequent stages.  I was not

13   a volunteer where I said this was going to be my case

14   where I am interested in going out and making new law or

15   something.  This is not a situation where -- I don't

16   think any judge is grasping to try to place themselves

17   above the facts in the law, but it is a case that was

18   assigned to me and I intend to follow the law as I

19   perceive it and as I have been, I believe, directed or

20   anybody would be directed by the appellate court opinion

21   which applies to this case, which recently was very much

22   commented upon in another case that just came down from a

23   different panel from the First District Appellate Court.

24           This is the hearing that we planned for, this

Solache 002171

```
 1     is the hearing that the parties were told to prepare
 2     for --
 3           MS. STACK:  Judge, I do have an alternative.
 4           THE COURT:  We'll proceed with the hearing at this
 5     stage -- it's my intention, anyway, to proceed at this
 6     time and try to get as much done as possible within the
 7     next three days.
 8           MS. STACK:  Judge, we would make a request to stay
 9     this so we can take this issue up under Rule 383 for a
10     supervisory order.  We've got a conflict between the new
11     Rules of Evidence, as your Honor astutely pointed out,
12     there's no law on that yet.  A lot of PC hearings don't
13     go -- there's not that many PC hearings and there's very
14     few of this magnitude, again, as an officer of the Court,
15     I struggle with this issue and in talking to the
16     appellate people, I was looking at the appeal of this,
17     this case, and we have a conflict in the statutory
18     authorities from the Supreme Court Rules.  We could file
19     a supervisory order under Rule 383, they'll shut us down
20     or take us up, either way rather quickly, and then we
21     won't be back here in three years, if we are correct.
22           We do believe we are correct, we've looked into
23     this in a number of different ways, and we do believe
24     that the intention was that these hearings should be
```

Solache 002172

1    conducted under the Rules of Evidence, and we believe

2    that good faith and, again, they've got the paper ready,

3    there's two witnesses that are easily -- one is working

4    for Northwestern, one is in IDOC where he's going to

5    remain.

6                Even if you grant relief, we're going to appeal

7    this, and we are going to vehemently object to any I-bond

8    in a double murder case, so this, I believe, will

9    actually shorten the process because we'll get the

10   response on this issue, and then, again, if they send it

11   back and we're wrong, fine, they can put on their two

12   witnesses and we'll be done.  We have much more to gain

13   by allowing the stay, which is the proper procedure under

14   these rules which I learned over the last week or so, and

15   we will file a supervisory order.

16               Allen Spellberg's name is on this pleadings,

17   he's the head of the appellate division, he's the person

18   that talked to me about this, educated me about the

19   conflict here and the procedure, and he -- we will --

20   we're asking for a stay to at least look into this and

21   to -- and to get an answer on it Judge.

22               If they deny our request, which I believe they

23   do fairly quickly, we can be right back here in a couple

24   month.  It's two witnesses.  And we won't have this issue

Solache 002173

1    before us.

2         MR. VAIL:  Would you like a response, your Honor?

3         THE COURT:  Before you do respond, I'm not -- I'm

4    sure less familiar with the particular procedure you're

5    speaking of than you are just because it hasn't come up

6    in front of me on any of the cases that I've handled in

7    my 15 years on the bench, but I know of what you speak

8    but I'm -- it's not something that I have any -- where I

9    would call it real knowledge of --

10        MS. STACK:  Judge, if there's ever a case --

11        THE COURT:  Well, what I wanted to ask of you is

12   this:  They have live witnesses here today.  Without

13   ruling one way or the other on what you are going to ask

14   me to do with respect to certifying this for the

15   appellate court, is -- and if it is clear from the record

16   that I'm only doing it without ruling or is specifically

17   exempting you from waiving any argument that you wish to

18   make in front of the appellate court --

19        MS. STACK:  That's my concern, your Honor.

20        THE COURT:  Could we proceed with the live witnesses

21   that are here today and perhaps maybe tomorrow and then

22   while that issue is -- I'm going to --

23        MS. STACK:  I'd like to be certain.  Again, we do

24   have a private detective, who I don't mean to downplay

Solache 002174

1    the time that he's spent here --

2    THE COURT:  I'm also concerned about my court time

3    here because there's a lot of attorneys here, a lot of

4    people have devoted an enormous amount of time, including

5    yourself, including Mr. Smitko.  Believe me, I know.  I

6    don't in any way -- I hope you don't feel that I'm

7    somehow diminishing that in any way, certainly.  The

8    parties have to work a lot harder than the Courts do in

9    putting together hearings, especially one of this

10   magnitude considering the particular opinion that came

11   down here opening up many, many other cases and issues,

12   it wasn't just resolving around only the people that may

13   or may not have testified in this case that one would

14   normally expect to testify.

15          You know what, it's 20 to 2:00.  What is your

16   response, briefly, Mr. Vail?

17   MR. VAIL:  Briefly, your Honor, I do have copies of

18   rules that make this very clear.  But I'll say more than

19   that, your Honor, I think where you're going, as a matter

20   of practical concern, I would ask why did this come on

21   Monday when we've been handling this for nine years and

22   we have witnesses here to testify, the attorneys are

23   here, the Court's reserved time, there's no practical

24   reason --

Solache 002175

```
 1          THE COURT:  The only other issue could be a very
 2     important one is that we don't want to be doing this as a
 3     moot kind of hearing.
 4          MR. VAIL:  I understand that, and I don't believe in
 5     any way that we are.  I'll also do this to make it easy
 6     for Ms. Stack in her argument today.
 7               I'll acknowledge on the record by no means will
 8     Reyes argue that the State's waived any argument in this
 9     regard at any stage and they can make it at any point
10     they want going forward.  I've just said it on the record
11     for her, your Honor.
12          MS. STACK:  Judge, you know what --
13          MS. DANIEL:  May I proceed?  Because I do have some
14     as does Jane Raley, some understanding of appellate
15     practice.  I used to be an assistant appellate defender.
16               There's only certain situations by statue
17     and by rule under which the State's Attorney's Office
18     can file appeals and this is not one of them.
19     this is an evidentiary ruling in a post-conviction
20     proceeding.
21          MS. STACK.  That's not true, your Honor.
22          THE COURT:  Please don't interrupt her.
23          MS. DANIEL:  They can appeal dispositive rulings,
24     they can -- in the trial situation, they can appeal when
```

Solache 002176

1    they have a certificate of impairment that evidence has

2    been excluded, that they can't go forward with their

3    case, they're allowed to appeal in that situation, but in

4    this type of situation, this is not a dispositive ruling

5    that your Honor made.

6         I'll give you an example of the situation in

7    which they lost on this, and it was a case where a 116-3

8    motion for DNA testing was granted by another judge, they

9    attempted to appeal, the appellate court said I'm sorry,

10   there's no rule, there's no statute that applies in this

11   situation that allows you to appeal that ruling.  So it

12   was sent back.  And that's exactly what would happen in

13   this case.  If they --

14        MS. STACK:  What about --

15        MS. DANIEL:  Excuse me, I let you go on pretty long.

16        THE COURT:  All right.  Please, please, don't take

17   it personally.

18        MS. DANIEL:  If they -- they've made their record,

19   they've objected to the form of the evidence, if we

20   succeed in this hearing, they can raise that on appeal,

21   but there's no authority for them to appeal this ruling

22   at this time.

23        MR. VAIL:  Your Honor, I'd ask that this argument

24   has been rehashed I think the third or fourth time in a

41

Solache 002177

1    different form but the same argument.

2        THE COURT:  Well, the essence of the argument, but I

3    don't think it's a good idea for me to violate either

4    party's rights one way or the other, if they have them.

5        MS. STACK:  Your Honor, we do have them.  Maybe

6    Ms. Daniel is not aware of Rule 383, but it is a direct

7    appeal in the Supreme Court in a situation like this

8    where you have the conflict between the modified Rules of

9    Evidence and the statutory provision, and that's why I'm

10   asking for a stay.  I'm not asking for an appeal, this

11   isn't a trial where you throw out a confession.  This is

12   a situation where we would ask to stay the proceedings

13   and we will promptly file in the Supreme Court a

14   provision to have a supervisory order issued, and we

15   believe, number one, they'll either going to shut us down

16   quickly, but we believe that because of the importance of

17   this, that the Supreme Court will be interested in --

18   this is the Supreme Court Rules that conflict with this

19   provision of the Post-Conviction Hearings Act, and the

20   post-conviction hearings are very important with dealing

21   with grave issues like this.

22        Much is made about the delay, et cetera.  As I

23   explained before, this situation where after all this

24   time they're not calling any witnesses to prove up their

Solache 002178

1   case, and under 122-6 it appears, you know, that they can

2   do this.  It was thinking of the arguments in talking to

3   the appellate court that this discrepancy, this conflict

4   was set out and the way that we can address it.

5           Judge, cross-examining Mr. Reyes and

6   cross-examining Mr. Dorsch, this is not onerous at all.

7   They're making it sound as if we don't go to court

8   hearing today, that this is so prejudicial in every way

9   and form.

10          Cases, you know, get continued on the day of

11  trial all the time.  We did file this Monday, we came

12  here to court today not knowing what would happen.  We

13  did know that you set aside this time.  I mean no

14  disrespect to your case or your Court, but things happen,

15  people get sick, people get in car accidents.  This is a

16  legitimate issue, and it is a legitimate discrepancy, a

17  conflict between the Rules of Evidence, which are new,

18  one year is not any time to bring these types of issues,

19  especially in PC world where things move very slowly.

20  That's why there 's no case law, and, Judge, they're

21  forcing you, they're pushing you to go forward on an

22  issue like this and, you know, where -- what harm

23  would there be to stay this and get an opinion from the

24  Supreme Court and possibly the rules committee will chime

Solache 002179

1    in when they are put on notice of this and you'll get the

2    answer.

3         THE COURT:  All right.  When you talk about what

4    harm, all right, I also don't see what harm it would be

5    to proceeded today with the live witnesses that are here.

6    Again, counsel for Mr. Reyes has indicated that they will

7    not argue at any point that you have waived anything by

8    abiding by the Court's order to at least start this

9    hearing today.

10        MR. VAIL:  That's right, your Honor.

11        THE COURT:  And at least try to finish up with live

12   witnesses today and tomorrow.

13        Ms. Raley and Ms. Daniel, would you also state

14   on the record that at no point will you waive or say

15   that -- argue that the State has waived their argument

16   that the hearing should not even be going forward with

17   respect to the conflict as they see it between the

18   Codified Rules of Evidence and the post-conviction

19   hearing?

20        MS. DANIEL:  Yes, Judge, we do.  In fact, these are

21   live witnesses, these are the types of witnesses that

22   they want.

23        THE COURT:  Right.  I'm just trying to make sure

24   that the court of review said too bad, you've already

44

1    started and -- .

2         MS. DANIEL:  We make the same representation that

3    counsel for Mr. Reyes has made.

4         MS. STACK:  Thank you, Judge.

5              Judge, are we going to take a break before we

6    start?

7                   (WHEREUPON, discussion was had off the

8                   record.)

9         MS. DANIEL:  I would like to make a request.  If

10   there's any documents with regard to Mr. Dorsch that the

11   state's attorney is intending to use to cross-examine him

12   other than the document we provided and his website,

13   which we have, I would like those documents.

14        MR. VAIL:  Your Honor, for the record, I would note

15   that the State about a half hour ago tendered to us a

16   witness list that list three persons.

17        THE COURT:  All right.  About a half hour then.

18                   (Luncheon recess taken.)

19        THE COURT:  The record will reflect that all parties

20   previously identified are present, and we have a new

21   interpreter.

22        THE INTERPRETER:  For the record, Christina DeLeon,

23   Spanish interpreter, and I was previously sworn.

24        THE COURT:  Ms. DeLeon will assist both of the

45

1    Petitioners when they're out here.

2         Both Petitioners are present and situated with

3    the interpreter between them.  Go ahead, what was your

4    statement, Ms. Stack.

5         MS. STACK:  Judge, the motion that we argued before

6    the break, it had two parts, the other part was a motion

7    to reconsider the denial of our request for pre-hearing

8    relevancy determinations.

9         THE COURT:  All right.

10        MS. STACK:  I know --

11        THE COURT:  I don't want to hear anymore argument on

12   that.  I've made myself clear on that on prior occasions,

13   so I don't want to relitigate it at this point.  Your

14   motion to reconsider is respectfully denied.

15        MS. STACK:  Thank you, Judge, as to Mr. Dorsch, we

16   have a motion.  His testimony is irrelevant.  He gives an

17   unspecified date, time and place where he alleges he saw

18   Ray Guebara point to photo array, that is totally

19   dissimilar from the allegations by the Petitioners here

20   that say they were slapped in the face and therefore gave

21   false confessions to double murders.

22        Under Patterson, as we have set out in this

23   regard many times, that is dissimilar.  In the case

24   itself, Patterson's co-defendant's claims were barred

Solache 002182

1    because they filed different types of actions.  These are

2    totally different.  You have this vague allegation --

3         MR. VAIL:  Your Honor, I don't want to interrupt,

4    but so that the Court and counsel are aware, Detective

5    Dorsch is here, if you would like him to step out.

6         THE COURT:  Have him step out.

7         MS. STACK:  Judge, since we argued this some rule

8    23s have come down but also People versus DeAngelo

9    Johnson 962 NE2d Section 1160 at Pages 1176 to 1181.  In

10   that case --

11        MS. DANIEL:  I'm sorry, I might be mishearing, but

12   if Ms. Stack is citing unpublished orders in authority, I

13   would object to that.

14        MS. STACK:  I'm not.  I'm giving a cite of a

15   published opinion People versus DeAngelo Johnson.  It's

16   just another example of the case law that's out there

17   that says that this propensity type evidence, this bad

18   act evidence which is inadmissible.  To overcome that

19   barrier of inadmissibility, you have to show a nexus, you

20   have to show a great degree of similarity.

21             Mr. Dorsch's testimony is inadmissible under

22   case law, under precedent and under the Codified Rules of

23   Evidence because it's irrelevant, and we have an

24   objection to his testimony, a standing objection, and his

Solache 002183

1    testimony is totally dissimilar to the allegations of the

2    Petitioners before your Honor.

3        THE COURT:  All right.  Motion to bar his testimony

4    will, again, be respectfully denied.  State will be

5    allowed to explore the various areas that they have a

6    dispute with in the course of cross-examination, and

7    certainly although I'm going to allow the testimony to

8    proceed, I'll consider it, all of those issues as to

9    weight and ultimately everything's going to be considered

10   under the terms of relevancy and materiality to issues at

11   hand.

12       MS. STACK:  Judge, I have a question on that

13   procedurally, we've never discussed.  Mr. Dorsch will

14   testify, then Mr. Reyes.  Our position, which is in that

15   brief as well, is that they want you to consider all the

16   evidence and not make a relevancy determination until

17   after you consider all the evidence.

18           As we put in our brief, common sense dictates

19   of course they'd like it like that, but the point is that

20   Patterson and other cases say differently.  How and when

21   do you want to address the relevancy because it's --

22   they've put in 21 collateral cases that are by law

23   irrelevant unless they can show the relevancy here via

24   pattern.  And while some of the so-called paper witnesses

48

Solache 002184

```
1    that are not going to be here in court, do have coercion

2    complaints similar to these, I think there's about eight

3    of them, others have various complaints that aren't

4    similar at all.  They're both remote in time and they

5    involve different situations other than a coercion claim

6    when a detective is trying to get a confession out of

7    somebody.  Under Patterson, they're clearly irrelevant.

8              And, again, now we're at the hearing, we're

9    starting the hearing, they didn't want you to make a

10   decision before which is how we had asked to do it so

11   that we could prepare, you know, so that we knew which

12   witnesses were going to be allowed in, and they wanted to

13   wait until the hearing and they wanted to put in

14   everything and then after that you were supposed to

15   decide if it's relevant.

16             So we're in a position, we're at the hearing

17   now, and we would like relevancy determinations as to

18   their 20, 21 witnesses of which I think approximately

19   eight of them are actually, you know, former suspects who

20   claimed that Ray Guebara coerced them in some manner.  As

21   to those defendants in the time frame around 1998, they

22   would meet the patterns of analysis, but there's like two

23   sisters who --

24             THE COURT:  Ms. Stack, Ms. Stack, hold off on your
```

49

1    motion, your request at this point.  Let's proceed with

2    the part of the hearing which will take place today,

3    which will be the testimony of Detective Dorsch and

4    possibly one of the Petitioners.  Save your arguments for

5    a little bit later time at least after I get this stage

6    of the proceedings completed.

7        MS. STACK:  All right.  It's just -- I'm trying to

8    prepare, your Honor.

9        THE COURT:  Please.

10           All right.  You wanted to make an opening?

11       MR. DANIEL:  Mr. Staes will make the opening.

12           Should I wait until after the openings to get

13   Detective Dorsch in?

14       MS. STACK:  Yes.

15       THE COURT:  Yes.

16       OPENING STATEMENT ON BEHALF OF PETITIONER SOLACHE

17       MR. STAES:  William Staes, senior law student from

18   Northwestern University School of Law on behalf of

19   Gabriel Solache, who is in the courtroom today.

20           In 1996 less than two years prior -- before his

21   arrest, Mr. Solache came to this country from Mexico in

22   search of a better living an ultimately a better life.

23   At the time of his arrest, he could not speak, read or

24   write any English, but Mr. Solache was a hard worker.  He

Solache 002186

1    worked as a machine operator at a metal manufacturing

2    factory at the time of his arrest.

3            Prior to his arrest, Mr. Solache had never been

4    in any trouble.  He had never been arrested in either

5    this country or Mexico.  He was not in a gang nor was he

6    involved in any gang-related activities.

7            Mr. Solache has now been in prison for nearly

8    13 years.  He was convicted on two counts of first-degree

9    murder, aggravated kidnapping and home invasion.  The

10   State's case against Mr. Solache rested entirely upon

11   supposedly voluntary statements provided after three days

12   of interrogation at the hands of detective Reynaldo

13   Guebara.  Mr. Solache, however, has always maintained

14   that his statement was the product of intense physical

15   and verbal abuse that Detective Guebara inflicted upon

16   him throughout the course of his three-day

17   interrogations.

18           Mr. Solache testified that on April 2nd, 1998,

19   he learned of a young boy whom his housemate Rosado Mejia

20   had brought into their home had been kidnapped and that

21   the boy's parents had been murdered.  Upon hearing this,

22   Mr. Solache readily agreed to assist two of his house

23   mates, Rosado Mejia and Arturo Reyes in bringing the

24   young boy to the local police station.

Solache 002187

1    Upon arriving at the station and returning the
2    boy to police custody, Mr. Solache was taken into custody
3    himself and transferred to Area 5 where he was
4    interrogated by Detective Guebara for upwards to 40 hours
5    over the course of three days.
6        At Area 5, Mr. Solache testified that Detective
7    Guebara handcuffed him to a ring affixed to the
8    interrogation room wall. From there Detective Guebara
9    repeatedly slapped Mr. Solache across the left side of
10   his face, punched him in the stomach and threatened him
11   verbally throughout the 40-hour interrogation. At no
12   point was Mr. Solache ever given the reading of his
13   Miranda rights, his right to an attorney or his right to
14   contact the Mexican consulate.
15       Eventually, after Mr. Solache couldn't
16   withstand Detective Guebara's physical and verbal abuse
17   no more, he confessed, or in Mr. Solache's words, I
18   quote, "I pled guilty so the beating would stop."
19       Detective Guebara then served as the sole
20   translator between Mr. Solache and the assistant state's
21   attorney who took his statement. The statement was
22   written in English. It was never translated into Spanish
23   despite Mr. Solache's inability to read or understand the
24   English language.

Solache 002188

1            The only evidence that the State presented at

2    trial linking Mr. Solache to the crime was this

3    supposedly voluntary statement.  However, as the

4    documentary evidence that we'll submit in this case shows

5    there are significant inconsistencies between

6    Mr. Solache's confession and the crime scene evidence.

7            MS. STACK:  I'm going to object.  This is not

8    reasonable doubt.  We're not re-trying this case, it's

9    merely one issue.  Counsel is doing an excellent job, I

10   hate to interrupt him as a professional courtesy, but

11   it's obvious what's going on here.  We have one issue and

12   that's the only issue that the Court --

13           THE COURT:  Confine your remarks to the evidence

14   which would be admissible at this hearing for the issue

15   that we're here, not to retry the case.

16           MR. STAES:  What this boils down to, your Honor, is

17   a credibility contest between Mr. Solache's testimony

18   that his confession was the product of intense physical

19   and verbal abuse and Detective Guebara's testimony that

20   no such abuse occurred and that Mr. Solache confessed

21   voluntarily.

22           Today Mr. Solache is here to present newly

23   discovered evidence of a pattern and practice of coercing

24   witnesses and suspects by Detective Guebara.  The

Solache 002189

1    evidence significantly undermines Detective Guebara's

2    credibility, it corroborates Mr. Solache's claim of

3    abuse, and it shifts the balance of the credibility in

4    the contest between Detective Guebara and Mr. Solache's

5    testimony about the voluntariness of his statement.

6         In support of his pattern and practice claim,

7    Mr. Solache will submit the accounts of 20 other

8    individuals who allege that they were either the victims

9    of or witnesses to Detective Guebara's pattern and

10   practice of coercion.  The accounts of these 20

11   individuals occurred on a continuous basis throughout

12   Detective Guebara's tenure at the Chicago Police

13   Department.  Taken together these accounts evidence a

14   pattern of practice of physical abuse and other

15   misconduct to extract false statements from witnesses and

16   suspects by the detective.

17        In addition, Mr. Solache and his co-Petitioner,

18   Arturo Reyes, will call former Chicago police detective

19   William Dorsch to testify as a live witness here today.

20   Retired Detective Dorsch worked as a Chicago police

21   detective for 24 years.

22        Today Mr. Dorsch will testify about a homicide

23   case in which both he and Detective Guebara were

24   intimately involved.  Mr. Dorsch will tell you that he

Solache 002190

1    personally observed how Detective Guebara manipulated a

2    photo array.  He will testify that he found Detective

3    Guebara's misconduct discerning and he went out of his

4    way to ensure that an innocent young man was not charged

5    with murder as a result of this misconduct.

6         The issue presented in this case, your Honor,

7    is whether this new evidence that Mr. Solache will

8    present of a pattern and practice of coercion by

9    Detective Guebara is sufficient to entitle him to a new

10   trial.  In order for the new evidence to be sufficient,

11   the evidence must not have been discoverable prior to

12   trial through the exercise of due diligence, must be

13   material and finally it must be of such conclusive

14   character that it would probably change the results of a

15   new trial.

16        The evidence that Mr. Solache will present

17   meets that standard.  The first of the new evidence could

18   not have been discovered with the exercise of due

19   diligence, rather these accounts could only have been

20   discovered had defense counsel interviewed every person

21   ever detained by Detective Guebara.  As the appellate

22   court in this case found, such efforts is an unreasonable

23   obligation and extends beyond that required by the

24   exercise of due diligence.

1          Second, this new evidence is material and

2     relevant to Mr. Solache's claim because it establishes a

3     pattern and practice of coercive conduct by Detective

4     Guebara which would impeach the detective's credibility

5     and corroborate Mr. Solache's claim that his confession

6     ws the product of coercion.

7          Each account Mr. Solache presents today

8     directly concerns Detective Guebara.  Each account

9     alleges that Detective Guebara engaged in either physical

10    abuse or other misconduct to coerce false statements.

11          An these two accounts of misconduct by

12    Detective Guebara are not too far removed in time to be

13    considered inadmissible.  Here Mr. Solache will present

14    20 new accounts of misconduct that occurred continually

15    from 1983 until 1998, the year in which Mr. Solache was

16    arrested and subjected to Detective Guebara's abuse.

17          Such a series of incidents which spans the

18    course of several years is precisely the sort of evidence

19    the Illinois Appellate Courts have considered relevant to

20    establish a pattern and practice claim.

21          Finally, your Honor, the new evidence that

22    Mr. Solache presents today is of such conclusive

23    character that it would probably change the results on a

24    new trial.

Solache 002192

1          The new evidence that Mr. Solache is presenting

2     as you stated earlier are 21 accounts of other

3     individuals who allege they were the victims of or

4     witnesses to Detective Guebara's pattern and practice of

5     coercion.  Taken together, these accounts evidence that

6     Detective Guebara engaged in a pattern of abuse and

7     coercion, and this evidence corroborates Mr. Solache's

8     claim that his confession was the product of similar

9     abuse.

10          Also, this evidence significantly shifts the

11     balance of credibility between Detective Guebara's

12     testimony and Mr. Solache's testimony concerning the

13     voluntariness of his statement.

14          As the appellate court noted in this case in

15     its opinion, if even a fraction of these allegations of

16     past abuse had been presented at trial, it would

17     substantially have called Detective Guebara's credibility

18     into question and most likely would have led to the

19     suppression of the defendant's statements.

20          In light of the fact that there was no physical

21     evidence linking Mr. Solache to the crime --

22          MS. STACK:  Objection, Judge.

23          THE COURT:  I think he's reading from the opinion.

24          MS. STACK:  Objection.

Solache 002193

1    MR. STAES:  Without Mr. Solache's confession, it is

2    probable, if not certain, that he would have been

3    acquitted at trial.

4         For these reasons, we respectfully request your

5    Honor grant Gabriel Solache a new trial where he can

6    present the new evidence of Detective Guebara's pattern

7    and practice of abuse.

8         Thank you, your Honor.

9    THE COURT:  Thank you.

10   MR. SAUNDERS:  I'll be brief, your Honor.

11   <u>OPENING STATEMENT ON BEHALF OF PETITIONER REYES</u>

12   MR. SAUNDERS:  Your Honor, David Saunders and my

13   colleague Andrew Vail on behalf of Petitioner Arturo

14   Reyes, who is here in court with us here today.

15        Mr. Reyes has spent nearly 13 years in jail

16   convicted of two counts of first-degree murder,

17   aggravated kidnapping and home invasion.  As the record

18   indicates, there's no physical evidence that links

19   Mr. Reyes to the crimes for which he's been convicted.

20   The sole evidence that the State has linking Mr. Reyes --

21   MS. STACK:  Objection, Judge, we just heard this.

22   THE COURT:  Continue.

23   MR. SAUNDERS:  Thank you, your Honor.

24        The sole evidence that the State has linking

Solache 002194

1    Mr. Reyes to the crimes in which he's convicted is

2    supposedly a voluntary statement that came as a result of

3    nearly three days of interrogation at the hands of former

4    Chicago police detective Reynaldo Guebara.

5              At the end of the hearing, the evidence will

6    show that Detective Guebara had a pattern and practice of

7    coercing suspects and witnesses and Mr. Reyes was a

8    victim of that pattern and practice.  His constitutional

9    rights were violated by Detective Guebara.

10             Now, as part of Mr. Reyes' evidence and his

11   co-Petitioner Gabriel Solache, we'll call two live

12   witnesses, Mr. Reyes and former Chicago police detective

13   William Dorsch.  In addition to these live witnesses,

14   Petitioners will submit nearly 20 document witnesses who

15   were either victims of or witnesses to Detective

16   Guebara's pattern and practice of coercion.

17             At the end of the hearing, the evidence will

18   show that Detective Guebara had a pattern and practice of

19   coercion practice, and it was this pattern and practice

20   that resulted in the only piece of evidence that the

21   State has connecting Mr. Reyes to the crimes that he

22   allegedly committed.

23             Now, your Honor, if even a fraction of the

24   evidence, if even the eight cases that the State admits

Solache 002195

1    were relevant were before the trial or in Mr. Reyes'

2    case, the outcome would have been different.  Today we'll

3    hear Mr. Reyes tell how in 1997 he came to this country

4    at the age of 23 without the ability speak or read

5    English looking for a way to help his family back in

6    Mexico.  He was a hard, found a job here, and he did not

7    commit the crimes for which he was convicted.

8           Mr. Reyes will testify that his supposedly

9    voluntary statement was a result of mental and physical

10   coercion at the hands of Detective Guebara, that the

11   statement came after repeated physical attacks by

12   Detective Guebara and threats with the electric chair.

13   Mr. Reyes' statement -- at the time Mr. Reyes made his

14   statement his will was overborn.

15          Now, in addition to Mr. Reyes, you'll hear from

16   former Chicago Police Detective William Dorsch.

17   Detective Dorsch will testify that he witnessed Detective

18   Guebara manipulate a photo array.  The live witnesses

19   that your Honor will hear today will give your Honor a

20   taste of Detective Guebara's pattern and practice of

21   coercion.  The documentary witnesses that the Petitioners

22   will provide reveal the depth of the pattern and

23   practice.

24          While I will not take the State's time of going

Solache 002196

1    through each and every one of examples, allow me to

2    highlight a few.

3         Gabriel Solache, also here in the courtroom

4    today.  As counsel for Mr. Solache just explained over

5    the same three-day period as Mr. Reyes, Gabriel Solache

6    was mentally and physically coerced by Detective Guebara

7    into providing supposedly voluntary statements.

8         David Velazquez.  In 1991, Detective Guebara

9    threatened Mr. Velazquez in order to get him to confess

10   to a murder.  Ultimately, Mr. Velazquez identified

11   another individual and later recanted.

12        Adolfo Frias-Munoz.  In 1993 over a nearly

13   two-day period, Detective Guebara physically beat and

14   mentally coerced Mr. Frias-Munoz, threatened both he and

15   his family in an effort to obtain a confession from

16   Mr. Frias-Munoz.  Ultimately, Mr. Frias-Munoz provided

17   again a supposedly voluntary statement which he, in fact,

18   even rehearsed with Detective Guebara before talking to

19   the state's attorney.

20        Samuel Perez.  In 1989 Detective Guebara

21   brought Mr. Perez into Detective Guebara's car, showed

22   him a picture of Juan Johnson and told Mr. Perez that he

23   should identify Juan Johnson as the individual who killed

24   another.  Mr. Johnson -- based in part on this episode,

Solache 002197

1     Mr. Johnson's post-conviction petition was granted, he

2     was awarded a new trial, acquitted and later sued both

3     the City of Chicago and Detective Guebara.  A jury found

4     that Detective Guebara -- found Detective Guebara guilty

5     of violating Mr. Johnson's civil rights and awarded

6     Mr. Johnson $21 million.

7            Now, in addition to these individuals, the

8     accounts of 15 others who are either victims of or

9     witnesses to the coercive practices of Detective Guebara.

10    At the end of this hearing, the Court will have before it

11    no fewer than 22 examples of over a nearly 20-year period

12    of Detective Guebara's pattern and practice of coercion.

13    This pattern and practice of coercion, the evidence that

14    will be before this Court demonstrates that Arturo Reyes'

15    constitutional rights were violated and the evidence will

16    be new, material and conclusive.

17            As a result, we respectfully request that this

18    Court grant Mr. Reyes' petition and award him a new trial

19    so that he may present this evidence.

20            Thank you.

21        THE COURT:  People.

22        OPENING STATEMENT ON BEHALF OF THE RESPONDENT

23        MS. STACK:  I'm sure you don't want to it hear from

24    me again.  I take that back, Judge.  I know that you take

62

Solache 002198

1   on all your burdens here, but this is the first time that

2   we get to respond to this.

3         Throughout the post-conviction process, we have

4   to take everything that they can provide documentary

5   proof for as true, and it's very interesting sitting here

6   listening to various remarks, the portrayal of the

7   evidence and how much leeway the Petitioners can take

8   with the paper.

9         What they are relying on here, Judge, is

10   evidence that is per se inadmissible.  Can you imagine as

11   a very experienced judge what trials would be like if

12   either side was able to bring in people to testify about

13   the bad things that the defendant did or the victim did.

14   It would be trial upon trial.  That's why it's called

15   propensity of the evidence.

16         When you get motions in limine from the State

17   where we ask to put in proof of other crimes, I'm sure

18   you examine them very thoroughly because it's powerful

19   evidence because it's so prejudicial.  It's so

20   prejudicial to let people come in and say, yeah, and he

21   did this and he did this and he did that.

22         When this claim was created by the Supreme

23   Court in 2000, there was a good reason for it.  There

24   were some things that occurred that were unique, that

Solache 002199

1      were scandalous that are still a blight on this system

2      that are still pending in this courthouse that we're

3      still dealing with.

4                  There were matters of a national magnitude, and

5      that is the scandal that came out of Area 2 or the John

6      Burge scandal which was in the 1980s.  Coincidentally,

7      Jon Burge was fired 20 years ago, and we're still dealing

8      with it.  And out of that situation came the Patterson

9      opinion.

10                 The Patterson case was unique.  You had a guy

11     who was arrested like this, a double murder, home

12     invasion of a couple where they were stabbed to death.

13     But it was a case -- they brought Aaron Patterson in, his

14     dad was a lieutenant with the Chicago Police Department.

15     Aaron was a bright guy.  He was questioned.  He dictated

16     a statement and then he didn't want to sign it,

17     et cetera, and he scratched some words in the bench in

18     Area 2.

19                 So as soon as he talked to a public defender in

20     bond court, he made an immediate outcry, the public

21     defender investigator went and photographed some -- it

22     said something like statement is false, code word is

23     Tonto, but there were bench scratchings that corroborated

24     what Aaron Patterson was saying, and this was about in

64

1       the mid-1980s.

2               The point is by the end of the 1990s when Aaron

3       Patterson filed his PC and he was on Death Row, by then

4       OPS had done special investigations of Area 2 and what

5       they found were, they didn't talk to any live witnesses,

6       but they just reviewed the complaints, and they found

7       about 63 complaints.  And there were gang ties and family

8       ties, but there were unique threads that ran through

9       those complaints.

10              People complained of being suffocated with a

11      typewriter cover.  People complained of having Russian

12      roulette played as a way to intimidate them.  There was a

13      good cop/bad cop routine that was unique.  And that is

14      the Goldston report, and it became famous and it's one of

15      the pieces of evidence and it's in the Burge opinion.

16      And even though Kenneth Goldston didn't talk to a single

17      human-being or make --

18          MR. SAUNDERS:  Your Honor, I object.  I'm not quite

19      sure what this has to do with the issue that we're here

20      for.

21          THE COURT:  Overruled.

22          MS. STACK:  It is the issue.

23              That was a unique document that came out and

24      showed these unique claims of abuse.  And by the time it

1    got back to the Supreme Court, Aaron Patterson had been

2    convicted, he had raised the issue, he lost his motion to

3    suppress.  After his motion to suppress, he tried to

4    reopen it, and that's when this Area 2 evidence was

5    building, there was a document called the Wilson Proffer

6    that had 15 cases that had been gathered by the defense.

7            Anyway, by 1920 -- excuse me, 2000, his PC had

8    been dismissed by Judge Morici and it was up on appeal to

9    the Supreme Court and the Supreme Court carved out the

10    claim that you have today.  It is a good rule that they

11    have fashioned, but with all due respect, this is not the

12    case, these are not the facts, and they are not showing

13    the unique type of evidence that must be shown in this

14    case.

15            What you have here is Ray Guebara who lived and

16    worked in the area that he policed his whole life, many

17    personal relationships there.  I'm glad they mentioned

18    the Juan Johnson case, the $21 million verdict that

19    resulted in a great increase in interest in Ray Guebara,

20    and he was on the police force for more than 30 years.

21    He was a gangs officer, he was a homicide detective in

22    the same area and he dealt with many, many gang crimes.

23            What you have before you is they were able to

24    piece together these cases that on the first-stage review

Solache 002202

1  to the appellate court, on the paper review, yes, the

2  appellate court said this has to go back and be reviewed.

3  And your Honor has spent many, many hours, many months

4  going over all the voluminous pleadings that we've

5  deluged you with, but now we're at the point where it's

6  time for them to meet their burden of proof. They have

7  been convicted, they've lost their appeals, they're not

8  like most of the people that stand before you and haven't

9  yet exercised their rights who haven't lost their

10  presumption of innocence. They have.

11         We're not here to relitigate their guilt or

12  innocence, but they have to show that there's a pattern

13  like the Burge cases where evidence has a very high

14  degree of similarity, such that it's an MO, and that is

15  throughout the Patterson opinion, it's in my briefs, they

16  repeatedly say when the trial court gets this back, the

17  trial court must weigh this, and not only must you find

18  that these collateral cases that are per se inadmissible

19  and normal circumstances, not only must you find that

20  they're admissible here, but they also have to meet a

21  second burden, which is that they have to be material and

22  the Supreme Court has also said probably the most

23  important element of a newly discovered evidence claim is

24  that they're conclusive.

67

Solache 002203

```
1              You've been given very simplified versions of
2    the evidence.  These people -- this young couple was
3    slaughtered, home invaded in the middle of the night.
4         MR. SAUNDERS:  Objection, your Honor.
5         MS. STACK:  Because a woman was pretending to be
6    pregnant and she --
7         MS. DANIEL:  Ms. Stack objected when we went to the
8    facts during the opening.
9         THE COURT:  Try to contain your argument to the
10   issues.
11        MS. STACK.  I will, Judge.  It's the first time I've
12   mentioned it.
13             My point is that they have simplified things.
14   There was much more on the record.  There's the
15   relationship between these people, there's the fact that
16   they had the kidnapped children in their possession, and
17   that's why they were in the station.  And most
18   importantly, you'll hear, too, that there were many
19   police officers working on it, but it's Ray Guebara that
20   we're going to focus on and they're reasons for that,
21   bias, interest and motive that will come out.
22             Unfortunately, we'd like to show you that
23   through their witnesses, but they keep talking about the
24   two live witnesses, they told the appellate court there
```

1    were 40.  They told you there's 20.  Half of them are in

2    IDOC.  Why aren't they here?  Why don't they want to

3    bring them in here and proudly display them to you?

4              And the question as you will see when you

5    review these cases, Judge, is that most of these people,

6    at least the ones that are arguably relevant, the ones

7    that have their coercion claim, they were found to be

8    incredible.  And, your Honor, you know more than anybody

9    in this room what it's like to weigh the evidence when

10   you're presented with a motion to suppress.  It's a heavy

11   burden.  You have to decide, you know, who's telling the

12   truth here.  And you have to look at the surrounding

13   factors.  You have to look at the surrounding factors.

14   You have to look what does the guy in the lockup say?

15   Was there any outcry?  Are there any extenuating

16   circumstances?  And judges just like you sat and listened

17   to these other witnesses/defendants and found them to be

18   incredible.

19        MS. DANIEL:  Your Honor, I object to that as not

20   relevant to these proceedings, and I don't believe that

21   would be admitted in these proceedings, other trier of

22   facts assessments of anybody's credibility.

23        THE COURT:  Overruled.

24        MS. STACK:  That right there is my point, is they

69

```
 1    don't want you to assess the credibility of any of it.

 2           We appreciate all the hard work you've done and

 3    the rulings that you have put a lot of time and effort

 4    into, we'll do our best to give you a full and fair

 5    picture, but the truth of the matter is it's their

 6    burden.  They've been convicted, they've lost their

 7    trials, their motions and appeals, and they have the

 8    burden of proof.  It's unusual in this building, but it's

 9    their burden of proof.

10           Before you let men who have been convicted of

11    these heinous crimes get another trial or another motion

12    to suppress, we ask that you hold them to their burden of

13    proof and make them provide credible evidence and make

14    them provide relevant evidence, Judge.  We believe

15    they'll sorrily fail in meeting their burdens here.

16           Thank you.

17       THE COURT:  You may proceed with your first witness.

18       MS. DANIEL:  Your Honor, under Illinois Supreme

19    Court Rule 711, I'm required to supervise Ms. Sieling and

20    I want the Court's permission to either stand here or at

21    least over there so that she can consult with me if

22    necessary during her examination of the witness.

23       THE COURT:  You may stand wherever it's most

24    convenient for you.
```

Solache 002206

```
 1              Please raise your right hand.
 2                   (Witness sworn.)
 3         THE COURT:  Please keep you are voice up a little
 4    louder so everyone can hear you the first time you
 5    respond.
 6              You may proceed.
 7                        WILLIAM DORSCH,
 8    called as a witness on behalf of the Petitioner, after
 9    having been first duly sworn, was examined and testified
10    as follows:
11                   DIRECT EXAMINATION
12                   BY MS. SIELING:
13         Q    Please state your name.
14         A    William Dorsch, D-o-r-s-c-h.
15         Q    Mr. Dorsch, were you previously employed by the
16    Chicago Police Department?
17         A    Yes.
18         Q    How long were you employed there?
19         A    I began my career with them on June 15, 1970
20    and I retired on August 14, 1994.
21         Q    And what units were you assigned to?
22         A    Beginning my career in patrol for eight months
23    at the 20th District, uniform patrol for about eight
24    months, and then I was tactical unit civilian dressed in
```

Solache 002207

1    the 20th District, 19th District, 13th District and then

2    I worked gang crimes west, returned to the 20th District

3    tactical unit and made detective in about 1985 or '86.

4         Q    And in what unit or area were you detective in?

5         A    Area 5.

6         Q    And for how long was that?

7         A    My entire time as a detective from my promotion

8    until I retired in '94.

9         Q    And why did you leave the Chicago Police

10   Department?

11        A    Oh, I had reached 50, the minimum retirement

12   age.

13        Q    And during your tenure at the Chicago Police

14   Department, approximately how many homicides did you work

15   on?

16        A    Approximately 400 counting not only detective

17   but gang crimes and tactical units and so forth and so

18   on.

19        Q    After you left the Chicago Police Department,

20   did you work?

21        A    Yes.

22        Q    What did you do?

23        A    Well, I retired to northern Wisconsin where I

24   was contacted by the local sheriff's department asking me

Solache 002208

1    if I wanted to work with them as a part-time officer.  I

2    said I would do that.  They said I needed to be

3    certified, so they sent me to the University of Wisconsin

4    school where I had to take 40 hours only of a 400-hour

5    course and I became certified, again, in jail procedures

6    and patrol.  When I got done with the class, they offered

7    me a job teaching the very same classes.

8         Q    Other than your work with the law enforcement

9    in Wisconsin, had you had any other experience, work

10   experience?

11        A    Well, I've been a private investigator -- I did

12   two years of teaching, as I said, after I got certified

13   where I was training recruits teaching of the basic

14   required courses, and then I went into private

15   investigative work in the State of Wisconsin first and

16   then I returned to Chicago in 2003, 2004.

17        Q    Are you a licensed private investigator?

18        A    Yes, I am.

19        Q    While you worked in Area 5, were you familiar

20   with a police officer named Reynaldo Guebara?

21        A    Yes.

22        Q    Were you and Officer Guebara ever partners?

23        A    I don't think so.  I knew him first from

24   encounters on the street.  He might have been -- he might

73

Solache 002209

1    have been in the same gangs west unit when I was there,

2    but I'm not sure.  I knew he worked in 14, he worked in

3    gangs west, and then I became more familiar with him when

4    I was a detective and he would come into the Area.

5         Q    Did you ever work on cases or were you ever

6    assigned to the same cases as Officer Guebara?

7         A    Yes.

8         Q    Did one of those cases involve Officer Guebara

9    bringing in two new witnesses to a homicide --

10        MS. STACK:  I'm going to object to leading.

11        MS. SIELING:  Your Honor, we all know what he's

12   going to be testifying to, it's just to bring it to his

13   attention.

14        THE COURT:  In any event, don't lead the witness

15   toward an answer.

16        MS. SIELING:  I'll rephrase.

17   BY MS. SIELING:

18        Q    I want to draw your attention to an incident

19   you spoke with counsel for Solache and Reyes last month.

20   Do you know the incident I'm referring to?

21        A    Yes.

22        Q    Now, did that incident involve a case?

23        A    Yes.

24        Q    Do you remember the exact year that this case

                              74

1    occurred?

2          A    I tried to recall that with some difficulty,

3    but I remembered that it occurred about three months

4    before Guebara was meritoriously promoted to detective,

5    so about three months before his promotion to detective.

6          Q    And how did you get involved in the case?

7          A    Well, I was assigned to Area 5 to homicide and

8    police-related shootings.  On this particular evening, I

9    saw Guebara and another gangs officer come in and they

10   had three people with them, and the three people remained

11   in the waiting area while they went into the office and

12   talked to the supervisors.

13         Q    And was there a reason that you needed to be

14   involved in the case?

15         A    Well, not until the supervisor came out and

16   told me that me and my partner were to assist Detective

17   Guebara, that he found witnesses to an older homicide

18   that was months old and these people had -- we were told

19   that they had observed the homicide when it occurred.

20         MS. STACK:  Objection, double hearsay.

21         THE COURT:  Overruled.

22         THE WITNESS:  They had observed the homicide,

23   written the license plate number down of the offender's

24   car, but they never talked to any police officers that

Solache 002211

1    night or any other time until now when they encountered

2    Guebara and they talked to him about it and they brought

3    them in.

4    BY MS. SIELING:

5        Q    For a clarification, was Officer Guebara a

6    detective at that time?

7        A    No, he was working in gangs.

8        Q    And what information did you know about the

9    homicide?

10        A    Well, because it was a homicide, solved or

11    unsolved, I usually became familiar with everyone or as

12    many of them as I could.  I recall the event in

13    particular that occurred in the Humboldt Park area.  It

14    involved two cars.  The victim was driving his car with a

15    young girl, who was a relative, a cousin, who was seated

16    beside him.  A car pulled up in the opposite direction

17    and stopped and opened fire striking only the driver.

18        Q    Now, you mentioned that Officer Guebara brought

19    in three people.  Can you describe those persons?

20        A    Well, three people came in with the gangs

21    officers.  Two of them turned out to be young witnesses

22    that we interviewed and talked to, the third person

23    merely stayed out in the waiting area.  We never had

24    occasion to talk to him or a reason to talk to him.

Solache 002212

1      Q     What happened after those witnesses came in?

2      A     Well, we were advised by the sergeant to assist

3   them, and what we learned was they had a license plate

4   number that was given to Guebara and his partner by the

5   two young boys who said they saw the homicide.  So we ran

6   the license plate, got the identity, the owner of the

7   car.

8           The next step was to run an IR check on them.

9   We found out that the person did have a gun arrest which

10  would mean I would have a folder on file, so we kept the

11  two witnesses with us at the station.  Guebara left with

12  the other person per our request to get not only the

13  photo but a copy of the UUW arrest.

14     Q     And did Officer Guebara acquire a photograph?

15     A     Yes, he did.  He brought it back to us.

16     Q     What happened after you acquired the

17  photograph?

18     A     We waited for him to return, the purpose being

19  we wanted to see if we could get an identification.  So

20  we put that photo with six to eight other photos of

21  similar age and appearance, and we took the two boys back

22  to a larger room in the back of the Area 5 on the second

23  floor.

24          I separated the two boys.  I put the pictures

Solache 002213

1   down at one end of the table so only the one that I was

2   calling up could see him, and I asked the one boy to come

3   up.  I told him what I usually tell people is that you're

4   here to look at photos.  I don't know if the person that

5   you witnessed do these things is in the photos.  I want

6   you to be careful, take a good luck at them and only if

7   you see the person that did the crime point him out.  Do

8   not point out anybody because that's what you think I

9   want you to do, I want you to be sure it's the right

10  person, not the wrong person.

11          So with Guebara standing there with the first

12  kid, the second kid further back in the room unable to

13  see the photo spread, I spread the pictures out on the

14  table.  The young man was looking at the photos and

15  looking and looking, and I'm not uncomfortable with how

16  long it takes because sometimes it takes --

17      MS. STACK:  I'm going to object to the narrative

18  here, Judge.  He's talking about what his normal --

19      THE COURT:  Overruled.

20      THE WITNESS:  Sometimes witnesses are very quick to

21  identify, but other people need more time and I've

22  learned to give them more time.  I might ask them if

23  they're having difficulty, does somebody look like the

24  person.

78

1    THE COURT:  Do you recall if you -- if you did that

2    in this particular case?

3    THE WITNESS:  No, I didn't say that to him in this

4    case.

5    THE COURT:  Ask another question.

6    THE WITNESS:  I merely told him to look at the

7    photos after giving the instructions.  He took a

8    considerable amount of time, but I was not uncomfortable

9    with that, and then suddenly Detective Guebara just

10   reached out and put his finger right on the photo and

11   said, "That's him," and the kid said, "Yeah, that's him.

12   I was just about to say that was him.  He looks a little

13   different."

14        I said to Guebara -- it was unexpected, totally

15   unexpected.  I've never seen that before in my career.

16   It was something I didn't want.  I wanted the witness to

17   identify the photo and not with the help of someone else.

18        I immediately ordered Guebara and this kid out

19   of the room.  Then I took the photos, I mixed them all up

20   again and giving the same instructions to the second kid,

21   he came up and he looked at the photos for as much time

22   as he could and he did not identify anybody.

23   Q    What happened after the two witnesses viewed

24   the photo array?

79

Solache 002215

1       A    Well, I've got a problem here.  I want to get

2 an identification that's positive from the witness.

3       MS. STACK:  Your Honor, it's nonresponsive.  He was

4 asked what did he do next, and he begins this narrative

5 about his whole thought process, in general.

6       THE COURT:  Sustained.  Ask another question.

7 BY MS. SIELING:

8       Q    What did you specifically do after finishing

9 the photo lineup?

10       A    I went to the first person away from Guebara

11 and asked him is this the person that is the offender

12 because he had help in identifying him.  He was adamant,

13 he kept saying, yeah, it's him.  I know it's him.  He

14 looks a little bit different, it was a while ago.  So I

15 had to take that for what it was knowing that the second

16 kid couldn't identify him, but I knew I had to now call

17 felony review.

18       Q    Did you call felony review?

19       A    Yes.

20       Q    What happened?

21       A    Well, whoever it was responded to Area 5 and

22 they would have been allowed to interview both witnesses,

23 and they would have been appraised of the fact that one

24 person did identify and one person didn't identify.

Solache 002216

1    Q    And what happened after felony review

2    interviewed the witnesses?

3    A    Well, there was -- we were not done with the

4    process.  Now that we have an identification of photos, I

5    knew that we might be able to resolve --

6    MS. STACK:  Objection, Judge, same objection.  What

7    happened next?

8    THE COURT:  Sustained.

9    BY MS. SIELING:

10    Q    After felony review spoke with the witnesses,

11    what did you do?

12    A    We met with both witnesses, Guebara and his

13    partner, and asked that they take the witnesses home as

14    we were going to try to locate the person that was

15    identified and try to have a lineup as soon as possible.

16    We were hoping for the next day and that's what we did.

17    Q    So the next day did you go to the suspect's

18    home?

19    A    Yes.

20    Q    And was the suspect there?

21    A    Yes, he was.

22    Q    What happened when you arrived?

23    A    We knocked on the door, identified ourselves,

24    he invited us into the room.  We told him we wanted to

81

1    talk to him about an incident that occurred, we asked him

2    some things about himself.

3         MS. STACK:  Objection to "we."  I'm not sure of the

4    foundation.  Who is he with when this happens?

5         THE COURT:  All right.  Go ahead, expand on

6    foundation as to who else was present.

7         THE WITNESS:  It would have been -- my partner, I

8    believe, was Bill Johnston.  We went there together.  We

9    identified ourselves like I said, and he told us that he

10   was a college student that worked -- went to DePaul and

11   worked at Walgreens, and we told him we needed to bring

12   him in as he had been identified in an incident.

13   BY MS. SIELING:

14        Q    Did the suspect accompany you back to the

15   station?

16        A    Yes, he did.

17        Q    And what happened when you arrived back at the

18   station?

19        A    Then we would have -- then we contacted gangs

20   and asked Guebara to pick up the two witnesses.

21        Q    And what happened when the two -- did the two

22   witnesses come back to the station?

23        A    Yes.

24        Q    And what happened when they came back?

Solache 002218

1      A      Well, we needed to now do a physical lineup,

2   even though one had not identified the photos, I still

3   wanted him to look at the physical lineup not knowing if

4   he could identify him from the physical lineup.

5      Q      And what happened with the physical lineup?

6      A      We did two lineups separate, none of them

7   included Guebara.  We brought the first person in who

8   identified the photo and he did pick the person out of

9   the lineup as the same as the photo; and the second

10  person who didn't identify the photo could not pick

11  anybody out of the lineup.

12     Q      After the physical lineup, what happened next?

13     A      I had to recontact felony review and ask that

14  they come in and advise them that we had a lineup.

15     Q      And just to clarify, was anyone with the two

16  witnesses when they came back to the station?

17     A      Yes.

18     Q      Who?

19     A      The same third person that was with them the

20  first day.

21     Q      And once you called felony review, what

22  happened?

23     A      Well, they responded to our request.

24     Q      And did felony review approve the charges?

83

1      A      Yes.

2      Q      The following day did you do anything further

3  on the case?

4      A      The following day I had my partner, I told him

5  we're going to go back out and pick up the witnesses, and

6  we went and picked up both witnesses.  We talked to both

7  of them about the fact that I was not comfortable with

8  the way that first identification went down and wanted to

9  know if they were comfortable with putting perhaps an

10  innocent person in jail.  I just didn't feel -- something

11  was wrong, and they both told us that they didn't want to

12  put an innocent person in jail, but they had been paid by

13  the third person to identify this kid and that they were

14  paid money to do it.

15      Q      And that third person that paid them, was that

16  the same person that accompanied them to the station?

17      A      Yes.

18      MS. STACK:  I didn't hear that.

19      THE WITNESS:  Yes.

20      MS. STACK.  The same person that what?

21      THE COURT:  Accompanied them to the station.

22      MS. STACK:  Thank you.

23  BY MS. STACK:

24      Q      After you picked up the witnesses, what did you

84

Solache 002220

1    do with them?

2         A     Took them immediately to Branch 66 right here

3    in this building.

4         Q     Can you explain what Branch 66 is?

5         A     It's on the 4th floor.  It's right across from

6    the Grand Jury.  It's a place where you bring witnesses

7    to serious offenses where they have a first-time

8    interview before the case would be taken down to the main

9    court for assignment.

10        Q     And what happened what you brought the

11   witnesses to Branch 66?

12        A     They met with -- we informed the state's

13   attorney that was handling the case in 66 that these two

14   kids had picked out somebody the night before -- well,

15   one of them had picked out the offender as the offender,

16   and this kid was charged and now they were recanting

17   because they were paid.

18              They met with the state's attorney, told him

19   the same thing, that they had been paid money and this

20   was not the offender, so we asked that this kid be

21   released.

22        Q     As far as you know, were the charges dropped?

23        A     Yes.

24        Q     I'd like to discuss for a moment your

Solache 002221

1    relationship with the Bloom Legal Clinic.

2            As a private investigator, have you done work

3    for the Bloom Legal Clinic?

4        A    Since about 2011 I've been involved there, yes.

5        MS. STACK:   I'm sorry, done work with what?

6        THE COURT:   The Bloom Legal Clinic.

7        MS. STACK:   Judge, I asked for this information and

8    was vehemently objected to.  I'll withdraw the objection

9    right now, but ...

10       MS. DANIEL:   She's not going to go into it.  We

11   don't need to go into it.

12       THE COURT:   The objection is withdrawn.

13           Proceed.

14       MS. STACK:   Premature.

15   BY MS. SIELING:

16       Q    Are you currently an investigator on the -- on

17   this case, the Solache and Reyes case?

18       A    I've never been involved in this case.  I know

19   nothing about it.

20       MS. SIELING:   No further questions.

21       MR. VAIL:   A very brief examination, your Honor.

22       THE COURT:   All right.

23       MR. VAIL:   First I'd like to, for the record, your

24   Honor, adopt on behalf of Mr. Reyes and present on his

Solache 002222

3                    DIRECT-EXAMINATION

4                    BY MR. VAIL:

5        Q    Detective Dorsch, my name is Andrew Vail.  I

6   represent Petitioner Reyes.

7             Detective Dorsch, could you tell us why are you

8   testifying in this proceeding?

9        MS. STACK:  Objection, relevance.

10       MR. SAUNDERS:  It goes to credibility, your Honor.

11       MS. STACK:  I'll withdraw the objection.

12       THE COURT:  Objection is withdrawn.

13       THE WITNESS:  It was an unusual event.  It's been on

14   my mind so much so that it's even been -- I've even

15   written about it on my Web page.

16   BY MR. VAIL:

17       Q    I have one other question for you, Detective

18   Dorsch.  Was there any Chicago Police Department rule or

19   policy that would have prevented Detective Guebara by

20   recording either by audio or video his interrogation of

21   my client, Mr. Reyes?

22       A    I'm not involved in that at all.

23       MS. STACK:  Objection.  This is beyond the scope.

24       MR. VAIL:  Thank you.


                              87

```
1    behalf the testimony --

2         THE COURT:  All right.
```

Solache 002224

```
1              THE COURT:  Cross?
2              MS. STACK:  Thank you, Judge.
3                           CROSS-EXAMINATION
4                           BY MS. STACK:
5         Q    You weren't here to hear yourself described,
6    but how many years were you actually a detective with
7    Chicago?
8         A    Eight or nine, I believe.
9         Q    Not 24 years, correct?
10        A    Right.
11        Q    And when you turned 50, you retired, is that
12   what you testified to?
13        A    Yes.
14        Q    And you went to Wisconsin?
15        A    Yes.
16        Q    And your purpose was to retire?
17        A    Sometimes your dreams become your nightmare,
18   so ...
19        Q    So you've been working for how many years since
20   you've been retired from CPD?
21        A    I've been working as a private investigator
22   since 1996.
23        Q    And that career started in Wisconsin?
24        A    Yes.
```

Solache 002225

1  Q  And when did you move back to Illinois?

2  A  The end of 2003.

3  Q  What brought you back to our great state?

4  A  I guess I missed the type of work I always

5 did. I had sons on the police department here and family

6 here.

7  Q  So you came back for family or you came back

8 for work or --

9  A  Both.

10  Q  A combination. Okay.

11    Now, your website talks quite a bit about your

12 work for defense attorneys, correct?

13  A  Yes.

14  Q  And you've worked for the Innocence Project,

15 your website says?

16  A  I first worked with the Innocence Project for

17 the University of Wisconsin Law School.

18  Q  And when was that?

19  A  Oh, 2000. I brought them a case that I felt

20 that the person was innocent.

21  Q  Yeah, your website makes quite a few comments

22 that you're the one that brings these cases to the

23 attention of Innocence Projects and groups like the Bloom

24 Legal Clinic.

Solache 002226

```
 1          MS. DANIEL:  Objection.  Bloom Legal Clinic is not

 2    mentioned on Mr. Dorsch's website.

 3          THE COURT:  What's the question again?

 4          MS. STACK:  The question is -- I'll withdraw it and

 5    rephrase it.

 6          THE COURT:  Very well.

 7                      (WHEREUPON, a certain document was marked

 8                      Respondent's Group Exhibit No. 1, for

 9                      identification, as of 2/13/2013.)

10    BY MS. STACK:

11          Q    I'm going to show you what I'll mark as

12    Respondent's No. 1.  It is a copy of your resume that's

13    attached to your website.  There are four stapled pages

14    and one loose page.  I'll call it Respondent's Group

15    No. 1, I guess.

16          MS. DANIEL:  I haven't seen this exhibit.  Maybe I

17    have, but maybe if I could just see it --

18          MS. STACK:  I'm marking it for you, Ms. Daniel.

19    You'll have it in a second.

20                May I approach?

21                Counsel, I have copies for you, too.

22                Before we started, they asked if we were using

23    anything other than the materials on his website and I

24    said no.
```

Solache 002227

1        MR. VAIL:  Your Honor, I will object to the

2   relevancy of this line of questioning.

3        THE COURT:  What is your next question?

4  BY MS. STACK:

5       Q    Have you had a chance to review that?

6       A    Yes.

7       Q    You have yourself listed as an expert witness,

8  is that correct?

9       A    I've been used as an expert witness and

10  qualified as such in court, yes.

11       Q    What have you been qualified as an expert in?

12       A    In homicide.

13       Q    In homicide?

14       A    Homicide investigation.

15       Q    Who offered you as an expert in homicide

16  investigation?

17        THE COURT:  Who offered him or who --

18        MS. STACK:  Who offered him.

19        THE WITNESS:  The case of Evan Zimmerman in northern

20  Wisconsin --

21  BY MS. STACK:

22       Q    Who offered you as the expert?

23       A    I don't remember now.

24       Q    Was it the Defense or the State?

Solache 002228

```
1        A      The State -- no, it would have been the
2   Defense.  We were appealing the case.
3        Q      Right.  You testified for the defense as an
4   expert?
5        A      Yes.  Yes.
6        Q      And was your role there to criticize the job
7   that the original officer had done in the case?
8        A      No, it was to get it right by procedure and
9   other evidence.
10       Q      I'm sorry, to do what by -- to get it right?
11       A      To correct some errors.  As a matter of fact,
12  the case was thrown out.
13       Q      So when you testified as an expert, you were
14  called by the defense to criticize the job that was done
15  by the original police, correct?
16       A      Yes, but I need -- in that case, your Honor, I
17  didn't testify, they threw it out before they got to it.
18       MS. STACK:  Judge, I have another objection to the
19  nonresponsive answers.
20       THE COURT:  All right.  Mr. Dorsch, please only
21  respond to the question that has been put to you by the
22  attorney.
23       THE WITNESS:  Yes.  I understand.
24       THE COURT:  Strike the last portion of his answer.
```

Solache 002229

```
1    BY MS. STACK:

2         Q    How many years did you work in Area 5?

3         A    Eight or nine years.

4         Q    And that was between '84 and '96?

5         A    '94 I left.

6         Q    Before you left the State, correct?

7         A    Yes.

8         Q    Now, this incident that you just described in

9    great detail for the judge, when did that occur, what

10   year?

11        A    To the best of my memory, it's about three

12   months or less before Detective Guebara was promoted, so

13   it had to be -- I struggle with what year he got

14   promoted.

15        Q    You don't know what year?

16        A    Now I think I'm better --

17        Q    Can you name a year?

18        THE COURT:  Let him try to -- one person at a time.

19        MS. STACK:  All right, Judge.

20        THE COURT:  For the benefit of everyone here, most

21   importantly the benefit of the court reporter.

22             All right.  Ask a question.

23   BY MS. STACK:

24        Q    Can you name the year that it occurred?
```

Solache 002230

```
 1        A     I think it was '88 or '89.

 2        Q     So you don't know whether it was 1988 or 1989?

 3        A     I've tried through FOIA requests and other

 4   means to get this case better identified with no

 5   cooperation from the Chicago Police Department.

 6        Q     Is that -- I'm asking what you remember.

 7        A     Okay.  I remember it was about '88 or '89.

 8        Q     '88 or '89?

 9        A     Yeah.

10        Q     And you were just -- throw that half question

11   away.

12              When was the first time that you told the

13   attorneys representing Solache and Reyes here that you

14   had evidence against Ray Guebara?

15        A     They called me and asked for a meeting.

16        Q     They called and asked for you?

17        A     Yeah.

18        Q     Explain what happened to the Court there.  How

19   did you get involved in this case?

20        A     I was asked to meet with them.

21        Q     When was this?

22        A     At their offices.

23              Maybe a month ago.

24        Q     And that was the first time you had talked to
```

Solache 002231

1    them about Ray Guebara suggesting --

2        A    Yes.

3        Q    Okay.  And that was about a month ago in

4    January, right?

5        A    About that time.

6        Q    And they -- to your knowledge, did they

7    memorialize that interview in a two-page memo?

8        A    I have no idea what they did.

9        Q    They didn't show you the memo that -- any

10   documents they wrote?

11       MR. SAUNDERS:  Objection, your Honor.  This

12   mischaracterizes the document that I believe Ms. Stack

13   has in her hand.

14       MS. STACK:  I'll lay a foundation for that.

15       THE COURT:  The objection is overruled.

16       MS. STACK:  I thought he would know about it.

17   BY MS. STACK:

18       Q    I'm going to show you what I'll mark as

19   Respondent's No. 2.  It is a two-page document entitled

20   Interview of William Dorsch, dated January 11, 2013.

21                  (WHEREUPON, a certain document was marked

22                  Respondent's Exhibit No. 2, for

23                  identification, as of 2/13/2013.)

24       MS. STACK:  Counsel, I'm sorry, I only have one copy

Solache 002232

1    of this.

2        MS. DANIEL:  I object to the showing of a witness a

3    report that he didn't write and had no knowledge of.

4        MS. STACK:  That's what I'm trying to ascertain.

5        THE COURT:  What is the purpose of showing it to

6    him?

7        MS. STACK:  It's a memo that was drafted concerning

8    an interview with him.  Judge, I objected to his name

9    appearing last month with no explanation.

10       THE COURT:  My question is when you show an

11   exhibit to a witness, it's usually done with a purpose.

12   And so if you show him the exhibit, what is the purpose?

13   Are you going to impeach him with something that was

14   said?

15       MS. STACK:  What I was trying to do was I asked him

16   if he was aware that this existed.

17       THE COURT:  And he said no.

18       MS. STACK:  He gave a number of answers, and I was

19   just going to show him and ask had he ever seen this

20   before.  It's really a lot of much ado about nothing, but

21   there are impeaching facts in here, and if he --

22       THE COURT:  You can use the statement as an

23   impeaching document, if you choose to, based on what he

24   may or what would be attributed to him as he gave the

96

1    statement to the attorneys.

2         MS. STACK:  I'm not sure who I'll have to call to

3    prove it up, Judge.

4             May I approach the witness and see if he's

5    familiar with this?

6         THE COURT:  Go ahead.

7    BY MS. STACK:

8         Q    Have you ever seen this two-page document that

9    is a memorandum of your meetings with the attorneys?

10        A    No.

11        Q    Can you look at the date?  Is that the date --

12        A    I wouldn't recall the date.

13        Q    It's last month, January 11th?

14        A    I have a pretty busy calendar.  I don't recall

15   the date.

16        Q    Did you meet with attorneys for Petitioners

17   more than once in the month of January 2013?

18        A    No.

19        Q    So you met with them only one occasion?

20        A    One occasion only.

21        Q    And if this is dated January 11th, that

22   describes a meeting that would probably be the occasion?

23        MR. VAIL:  Objection, your Honor.

24        THE COURT:  Speculation.  Sustained.

97

```
1    BY MS. STACK:
2         Q    What month did this occur where you observed --
3         THE COURT:  About a month ago.
4         MS. STACK:  Judge, I'm sorry.
5    BY MS. STACK:
6         Q    Drawing your attention back to the misconduct
7    that you allegedly saw Ray Guebara observe, what month
8    did that occur?
9         A    I'm not sure.
10        Q    Do you remember what the weather was like, what
11   season it was?
12        A    I remember that I was at the shooting scene, it
13   was not winter definitely, it was more like spring or
14   summer.
15        Q    And do you remember the address of the shooting
16   scene?
17        THE COURT:  Aren't you asking him about the month
18   when the incident that he's testifying to about Guebara
19   took place.
20        MS. STACK:  Right.
21        THE COURT:  I don't know if that's the same as the
22   shooting or not.
23        THE WITNESS:  Yeah.
24   BY MS. STACK:
```

Solache 002235

```
 1          Q    All right.  You don't know what month the

 2    shooting occurred, correct?

 3          MR. VAIL:  Objection, your Honor.

 4          THE COURT:  Sustained as to the -- overruled.

 5               You may answer.

 6          THE WITNESS:  The shooting was more like summer.

 7    BY MS. STACK:

 8          Q    What was the name of the murder victim?

 9          A    I don't recall.

10          Q    What was the name of the person in the car with

11    the murder victim?

12          A    All I recall is it was a 13-year-old relative,

13    and she went back to Puerto Rico the very next day.

14          Q    What was her name?

15          A    I don't recall.  It would have been in the

16    reports.

17          Q    How old was the murder victim?

18          A    I don't recall anymore.

19          Q    Was it a male or a female?

20          A    Male.

21          Q    Were you assigned the murder case?  Was that

22    your murder case?

23          A    No.

24          Q    When were you first assigned it?
```

99

Solache 002236

```
 1          A    Technically assigned it?  It was the date that
 2   Guebara walked in with the witnesses.
 3          Q    And you got involved with this because your
 4   supervisor asked you to follow-up on the people that
 5   Guebara had brought into the station, right?
 6          A    Correct.
 7          Q    What was the name of the first witness that was
 8   brought in?
 9          A    I don't recall.
10          Q    How old -- was it a male or female?
11          A    Both were about 15.
12          Q    Male or female?
13          A    Male.
14          Q    What was the name of the second one?
15          A    I don't recall.
16          Q    What was the name of the man that brought them
17   into the station?
18          A    Guebara.
19          Q    Didn't you say that the two boys were brought
20   in --
21          A    They all came together.
22   THE INTERPRETER:  I'm having a difficult time
23   listening to the witness and the interjecting -- not
24   allowing the witness to answer.
```

Solache 002237

```
 1          THE COURT:  Please give a pause before you begin
 2    your next question.
 3          MS. STACK:  I apologize.
 4    BY MS. STACK:
 5          Q    What date did these witnesses come into the
 6    station?
 7          A    I don't recall.
 8          Q    What year was it?
 9          MS. DANIEL:  Asked and answered, Judge.
10          MR. VAIL:  Join.
11          MS. STACK:  As the judge pointed out, there's two
12    separate instances, the actual murder and date the
13    witnesses came into the station.
14          THE COURT:  This is cross-examination.  The
15    objection is overruled.
16    BY MS. STACK:
17          Q    Was it still summer?
18          A    Yeah, late summer, early fall.
19          Q    What kind of car was involved in the murder?
20          A    The only description that came was from the
21    13-year-old passenger and she described the large white
22    car as the offender's vehicle.
23          Q    What was the name of the suspect in the photo
24    array?
```

101

```
1        A    I don't recall.

2        Q    How many photographs were in the photo array?

3        A    Because there was one person that was -- that

4   we were looking at, there were six to eight.

5        Q    You don't remember the exact number?

6        A    It would have been standard for me to do six or

7   eight to one.

8        Q    I appreciate your extensive experience, but

9   what do you remember about this particular case, sir?  Do

10  you remember how many photographs were used?

11       A    I know that those photographs are inventoried.

12       Q    Do you know how many photographs were used?

13       A    Six to eight.

14       Q    The answer is no?

15       MR. VAIL:  Objection, mischaracterizes.

16       THE COURT:  Sustained.

17  BY MS. STACK:

18       Q    Once these boys were brought into the

19  station --

20       THE COURT:  Which occasion?

21  BY MS. STACK:

22       Q    On the second occasion when you say Ray Guebara

23  brought the two witnesses in, right?

24       A    And the third person, too.
```

102

```
 1          Q     What was the third person's name?

 2          A     I never talked to him.

 3          Q     How old was he?

 4          A     He was about three or four years older than the

 5    boys.

 6          Q     You never talk to him.  Did you record his name

 7    somewhere?

 8          A     He never went past the waiting room.  I was

 9    never made known that he was part of the case.

10          Q     Did his name ever appear in the case reports?

11          A     No.

12          Q     Yet he was the man that you ultimately

13    determined had brought false witnesses into your

14    statement, correct -- into your station?

15          A     Yes.

16          Q     And just to be clear, at the end of this event

17    that you described, it was this third unknown man that

18    walked the two teenage boys into the station that told

19    them to give false evidence, correct?

20          A     Correct.

21          Q     And not Ray Guebara?

22          A     I didn't ask --

23          Q     I'm asking you --

24          A     I never talked to the third person.
```

103

1    Q    And it's your testimony that when they brought

2    these two witnesses in, they told you that you got the IR

3    and eventually put together a photo array, correct?

4    A    Correct.

5    Q    What happened when you got the photos together

6    to show to the boys?  Can you describe that again for me?

7    A    We took the photos back to the larger room in

8    the rear of the station.

9    Q    Who is "we"?

10    MR. VAIL:  Objection, your Honor.  If she would

11    allow the witness to finish his answer.

12    MS. STACK:  I apologize.

13    THE COURT:  He's answering "we."  I think that would

14    be an appropriate thing to clarify.

15    THE WITNESS:  Detective Johnston and myself.

16    BY MS. STACK:

17    Q    Earlier when you mentioned Detective Johnston,

18    you said he was probably your partner around that time.

19    Do you have an actual memory of Detective Johnston being

20    present for this event or are you supposing that it was

21    probably him?

22    A    No, I believe it was Bill Johnston.

23    Q    Detective, when you use the terminology "I

24    believe" --

104

```
 1          A    Yes.

 2          Q    It gives the impression that you're guessing.

 3          A    It was Bill Johnston.

 4          MR. VAIL:  Objection, your Honor.

 5          THE COURT:  Overruled.

 6          MS. STACK:  I just wanted to clarify.

 7    BY MS. STACK:

 8          Q    So you have a memory of him?

 9          A    Yes.

10          Q    Who else was there?

11          A    In the back room?

12          Q    Yes.

13          A    The two gang crimes officers, one of which was

14    Guebara.

15          Q    Who was the other?

16          A    I believe it would have been Steve Gawyrs.  I'm

17    not sure, though.

18          Q    Can you spell that last name?

19          A    G-a-w-y-r-s.

20          Q    And about how old was that officer?

21          A    Well, he's retired now.  He's probably about

22    60.

23          Q    Do you know where he lives?

24          A    No, I don't.
```

Solache 002242

1    Q    And you're saying that he was present for this,

2    correct?

3         MR. VAIL:  Objection.

4         THE COURT:  Overruled.

5         THE WITNESS:  Yes.

6    BY MS. STACK:

7    Q    He was there for the photo array?

8    A    Yes.

9    Q    What happened next?

10   A    Where are we in the photo array?

11   Q    Well, my understanding is you, Johnston,

12   Guebara and the third -- excuse me, the fourth officer

13   whose name I didn't quite get --

14        THE COURT:  Spell that again.

15        THE WITNESS:  G-a-w-y-r-s.

16   BY MS. STACK:

17   Q    You go into a room and is that in the Area or

18   the district?

19   A    The second floor area.

20   Q    The second floor of Area 5?

21   A    Right.

22   Q    And you take the two witnesses and there's

23   four officers and you go and -- what happens next when

24   you get into the room with the two witnesses and the

106

```
 1    photo array?

 2         A    Well, you never want both witnesses to look at

 3    the same time.  I separated them.

 4         Q    Mr. Dorsch, please.

 5         A    I separated them.

 6         Q    You separated them?

 7         A    Yes.

 8         Q    Describe how you did that?

 9         A    I tell one officer who is not going to see the

10    photos the first show to stand towards the back of the

11    room.

12         Q    So who did you tell --

13         MR. VAIL:  Objection, your Honor.

14         THE COURT:  Ms. Stack you're interrupting.

15         MS. STACK:  I'm sorry, Judge.  I'm sorry.

16         MR. VAIL:  Objection to those comments, your Honor.

17    BY MS. STACK:

18         Q    Who took the first witness with away?

19         A    He didn't take them away I merely asked them to

20    move to the other end of the room.

21         Q    Who did that?

22         A    I did.

23         Q    Then what happened?

24         A    Gave instructions to the other person who was
```

107

```
 1    up there with Guebara, me and my partner, to look at the
 2    photos but telling him again that the person may not be
 3    in those photos, to be careful, take his time and to
 4    point out only a personal he can identify, don't point
 5    someone out because you think you have to.
 6         Q    So you're all still in the same room together?
 7         A    Yes.
 8         Q    So the witnesses were not separated?
 9         A    They're separated by -- meaning that he can't
10    see the photos.  I don't want him to see the photos.
11         Q    Okay.  You don't remember the names of the
12    witnesses, right?
13         A    No, I don't.
14         Q    So let's call the one that you say was
15    suggested to by Ray Guebara, witness number one.  Did
16    witness number one see the photo array first?
17         A    The identifying person was the first person and
18    he saw it first.
19         Q    Okay.  So you took him to the other side of the
20    room?
21         A    After he was done?  You're talking about the
22    first witness after he was involved in the photo ID?
23         Q    Whoever saw the photo array first, I would like
24    you to describe that.
```

Solache 002245

1    A    I asked him to leave the room with Officer

2    Guebara.

3    Q    I'm sorry, can you repeat that?

4    A    I told the first person to leave the room with

5    Officer Guebara.

6    Q    And by "the first person," are you saying

7    witness number one who was suggested to allegedly?

8    A    Yes.

9    MR. VAIL:  Objection.

10   BY MS. STACK:

11   Q    Okay.

12   THE COURT:  Let's take a five-minute break.  Take a

13   breath, and I'm going to take one, too.  Let's try to

14   move the hearing along with appropriate questions,

15   appropriate responses and appropriate objections and a

16   little less dripping sarcasm and hostility towards

17   everybody.  A five-minute recess.

18            (WHEREUPON, a recess was had.)

19   THE COURT:  We'll resume with the cross-examination

20   of the witness.  The record will reflect that all parties

21   are present.

22            Ms. Stack, you may continue.

23   BY MS. STACK:

24   Q    Going back to the photo array which is the

1      basis for your testimony here today.  Witness number one

2      would be the number that Ray Guebara pointed to the

3      photograph, okay?

4          A    Yes.

5          Q    And witness number two would the other

6      15-year-old that was with him, okay?

7          A    Yes.

8          Q    And witness number three would be the gentleman

9      that brought them to the station, just to give him a

10     name?

11         A    "Witness" is not how I refer to him.

12         Q    Give him any name you want so we can move it?

13         A    Companion.

14         Q    Companion.  All right.

15              So companion is outside, witness one and two

16     are with you and three other officers and describe what

17     happened with the photo array briefly.

18         A    The first one.

19         Q    Start from the beginning, the first witness who

20     saw the first photo array.

21         A    To make sure that they view them one at a time

22     I separated them.  Number one came up with Guebara to the

23     table where I spread out the photos.  I gave him

24     instructions --

110

1    Q    Who, you?

2    A    Yes, instructions.

3    Q    You gave him the instructions?

4    A    Yes.

5    Q    Okay.

6    A    I asked that he look at the photos and point

7    out someone if he recognize him as the person and gave

8    him time to view the photos.

9    Q    Okay.

10    A    And then a very awkward moment when suddenly

11    Detective Guebara reached out and put his finger right on

12    the photo and said, "That's him" (indicating).

13    Q    And then what happened?

14    A    That's the -- number one almost immediately

15    said, "Yes, that's him.  I was going to point him out.

16    He just looks a little different."

17    Q    Now, where was witness number two when Guebara

18    did this?

19    A    In the room but positioned in the corner with

20    where he couldn't view the photos.

21    Q    Okay.  What happened next?

22    A    I immediately asked Guebara and number one to

23    leave.  I asked number two to come up and I reshuffled

24    the photos on the table so they weren't in the same

111

Solache 002248

1    order.  Same instructions, I asked him to review the

2    photos and I gave him time to do so.

3         Q    I'm sorry?

4         A    I gave him time to view the photos.

5         Q    What happened next?

6         A    He could not identify anyone.

7         Q    Backing up a little bit.  When witness one and

8    two first came into the station, did you speak to them to

9    ascertain what they had witnessed of the crime?

10        A    Yes.

11        Q    And you got a narrative from them about what

12   they saw at the crime scene, correct?

13        A    Yes, it was that they had been on the street,

14   witnessed the shooting, wrote down the license plate

15   number and never talked to the police.

16        Q    Did they describe the opportunity that they

17   had to view the person who shot the gun at the murder

18   victim?

19        A    They said they were -- we wanted to know where

20   they were.  They said they were in such a position they

21   could see the driver's side of the vehicle, which would

22   have been the shooter's side.

23        Q    All right.  So after witness number two could

24   not pick anybody out of the photo array, what did you do

112

1    next?

2         A    I went out and talked to number one.

3         Q    What happened after that?

4         A    Because he was insistent that he was about to

5    identify the person without any help, I called felony

6    review.

7         Q    So you're saying because witness number one was

8    adamant about the identification, you called felony

9    review?

10        A    Right.

11        Q    And you started the process with felony review

12   to bring charges against the person who had been

13   identified by witness number one, is that correct?

14        A    Start, yes.

15        Q    You started paperwork with the Chicago police

16   in addition to the call?

17        A    No, not at that time.

18        Q    What else did you do to start formal charging

19   of the person identified by witness number one?

20        A    Made preparations for the next date to try to

21   find the person and bring him in for a lineup.

22        Q    Okay.  Did you bring him in for a lineup the

23   next day?

24        A    Yes.

Solache 002250

1  Q And witness number one identified him again,

2 correct?

3  A Yes.

4  Q And did you place the suspect under arrest at

5 that time?

6  A Yes.

7  Q And after you placed the suspect under arrest,

8 did you call felony review again?

9  A Yes.

10  Q And did you ask for charges?

11  A Yes.

12  Q And it was based on witness number one and his

13 lineup identification, correct?

14  A Yes.

15  Q And someone came out from felony review?

16  A Yes.

17  Q And they talked to witness number one?

18  A Yes.

19  Q And do you remember that felony review ASA's

20 name?

21  A No.

22  Q Do you remember whether it was a man or a

23 woman?

24  A No.

Solache 002251

```
 1          Q     Do you remember if they were old or young?

 2          A     No.

 3          Q     White or Black?

 4          A     No.

 5          Q     Any detail about the ASA at all?

 6          A     No.

 7          Q     Did they physically come to Area 5?

 8          A     Yes.

 9          Q     Did they interview witness one?

10          A     Yes.

11          Q     Did they take a handwritten statement from

12   witness one?

13          A     I don't recall.

14          Q     Did they approve charges of murder against the

15   suspect?

16          A     Yes.

17          Q     And the suspect was processed and sent to Cook

18   County Jail?

19          A     We filled out the arrest report, the complaint,

20   and delivered them to the district lockup.

21          Q     And you signed the complaint against the

22   suspect?

23          A     I see that my name is on it, but it's not my

24   signature.
```

Solache 002252

1    Q    Whose signature was it?

2    A    I'm sorry, I'm thinking of another case.  I'm

3    confused.

4    Q    That's all right.

5    A    I don't know whose name was on the complaint.

6    Q    You don't know whose name was on the complaint?

7    A    No.

8    Q    And all this talking about it you don't

9    remember the name of the person that was arrested?

10   A    20-some years later, only unusual occurrences

11   cause you to remember certain things.

12   Q    So he was processed, the case was approved.

13   What happened after that?

14   A    Mow and my partner were sitting down at our

15   desks when suddenly the father of the designated offender

16   came in in tears asking to speak with us.

17   Q    So this would be the father of the man that you

18   had just gotten murder charges put against?

19   A    Yes.

20   Q    And by the way, when you called felony review

21   to get those murder charges approved against that

22   suspect, it was you that called in the case and not Ray

23   Guebara, correct?

24   A    It would have been either me or my partner.  I

116

```
1    don't know which one of us called.

2         Q    So the suspect's father came into the station

3    crying?

4         A    Oh, yes.

5         Q    And then what happened?

6         A    He asked if he could speak with us.  He sat

7    down at the table with us.  He said his son was a

8    hard-working kid, he never was in trouble.

9         Q    What was this man's name that spoke to you?

10        A    It was his father.  I don't know his name.

11        Q    And based on the conversation with the

12   suspect's father, what happened after that?

13        A    I had told the father that your son had a UUW

14   arrest, and he said well, he's not a gangbanger.  He did

15   get arrested once with a gun.  I had the arrest report

16   for the gun.  I reviewed the arrest report.  Probably

17   then for the very first time it was as the young man had

18   told me, that he got arrested with a gun one time.  He

19   said, "I did a stupid thing.  I was driving down an

20   alley, I saw a gun laying there.  I got out of my car,

21   picked it up, saw that the frame was broken.  I threw it

22   in the trunk of my car, I drove a few blocks and I was

23   stopped and arrested."  When I reviewed the case report

24   after the father had been with me, I did see that the gun
```

Solache 002254

1    had a broken frame.

2        Q    But the suspect had told you that story before

3    because --

4        A    I brought --

5        THE COURT:  Please.  Please.

6        THE WITNESS:  I'm sorry.

7    BY MS. STACK:

8        Q    So he had told it to you before?

9        A    Yes.

10       Q    But you didn't check it out when he told it to

11   you the first time?

12       A    We were busy with the other stuff.

13       Q    And you remember the details of that UUW

14   arrest, correct?

15       A    I remember that it was -- the police arrested

16   him, found a gun in the trunk, and the gun was listed in

17   the report as having a broken frame and it was

18   inoperable.

19       Q    What was the first name of the man that this

20   all happened to?  What was the name of the suspect?

21       A    Excuse me, the victim?

22       Q    The man that you falsely brought charges

23   against?

24       A    I don't remember.

118

```
 1          Q    Detective, it was you that continued with this
 2     case after you saw Ray Guebara suggest to this witness
 3     who to pick in the photo array, correct?
 4          A    Correct.
 5          Q    You did not contact your immediate supervisor
 6     and report Ray Guebara right then and there, did you?
 7          A    I don't know.
 8          Q    You don't know?
 9          A    I don't know if I did.
10          Q    Did you contact Ray Guebara's supervisor and
11     say he just ruined a murder case for us and told the
12     witness who to pick out of a photo array?
13          A    I don't know how to respond to that.  It's a
14     topic well-known amongst other detectives.
15          Q    Is it amusing?
16          A    No, it's a topic that is well-known, an
17     incident that is well-known by other detectives over
18     years of conversation.
19          Q    Well, then, somebody must remember the name of
20     this case, then, huh?
21          A    It's in the Chicago Police Department files, I
22     know that.
23          Q    But you were unable to find it?
24          A    They're not as cooperative to me now as they
```

Solache 002256

1    were when I was working.

2        Q    Did the attorneys you work for have subpoena

3    power?

4        A    I haven't discussed that with them.

5        Q    So right after it happened, you didn't report

6    it to anybody?

7        A    Report the --

8        Q    Guebara's misconduct, the basis for you being

9    here today.

10       A    I couldn't get into his mind.  I didn't know

11   what was his motivation.  Was it an overanxious

12   irrational act?  I say "irrational" because it's against

13   all protocol to do that.

14       Q    Well, you were suspect of the identification of

15   witness number one, correct?

16       A    But I as still hopeful that the next day the

17   lineup might make the second person identify him.

18       Q    Let's talk about the next day.

19            So you don't do anything day number one.  Day

20   number two you proceed with this case that is already

21   tainted, and you take it to the text step.  You bring

22   this suspect in, you put him in a lineup, and you let

23   this witness who you know his identification via photo

24   array has been tainted, you let him sit in the lineup,

120

1    correct?

2         MR. VAIL:  Objection, your Honor.  It wasn't even a

3    question.

4         THE COURT:  Overruled.

5    BY MS. STACK:

6         Q    Did you put on a lineup with this witness?

7         A    I have to.

8         Q    And the witness picked out the suspect,

9    correct?

10        A    He picked out the same person that he picked

11   out from the photo the day before.

12        Q    And this is the point when you said, "All

13   right, I've got to stop this.  We're taking it to the

14   supervisors.  We can't let this case go any further,"

15   right?

16        A    No.  The next step was to call felony review

17   and see what they thought about the identification.

18        Q    And you called felony review about this bad

19   identification?

20        A    I called him and told him I was not comfortable

21   with the identification.

22        Q    Did you tell him what Ray Guebara did?

23        A    I was more interested in getting the case right

24   and not looking at -- sometimes you don't want to ask

Solache 002258

1    certain questions if you don't want the answer.  I didn't

2    want to know what was in his head.

3         Q    Did you tell felony review what Ray Guebara

4    did?

5         A    I don't believe I did.

6         Q    Do you remember who you talked to in felony

7    review?

8         A    No.

9         Q    Male, female?

10        A    It was two days, two different people.  I don't

11   recall who they were.

12        Q    You don't remember either person?

13        A    No.  I've handled so many cases, I don't

14   remember.

15        Q    So after the lineup, you officially arrested

16   and booked this man, locked him up and had him charged

17   with murder one, right?

18        A    Based on approval of charges by felony review,

19   yes.

20        Q    Well, felony review based those charges on what

21   you told felony review, correct?

22        A    Not only what I tell them, what the witnesses

23   tell them.

24        Q    Was felony review present when Ray Guebara

Solache 002259

1      suggested who to pick in that photo array?

2          A    No.

3          Q    So our main suspect is shipped off.  Is it the

4      same night his poor father comes into the station?

5          A    The second night, yes.  He's in the lockup.

6          Q    So his son is still in the lockup?

7          A    Uh-huh.

8          Q    Were you able -- could you stop it then and get

9      the son sent home that night and report this misconduct

10     and stop this case?

11         A    It wouldn't have been proper.  It was going to

12     Branch 66 in the morning.  The father was asking me what

13     do I do, he's never been in trouble, do I get a lawyer.

14     And I instructed him just to go to Branch 66 tomorrow

15     and -- for bond court and see what happens.

16         Q    I'm sorry, can you please explain to me at the

17     beginning of your answer you said it wasn't proper?

18         A    Pardon me?

19         Q    When I asked you if you reported the misconduct

20     then when the father came in, you said it wasn't proper.

21     Will you explain that, please?

22         A    I don't think I remember the question being put

23     to me like that.

24         MR. VAIL:  Objection, your Honor, mischaracterizes

                                123

1   the testimony.

2        THE COURT:  Ask another question.

3   BY MS. STACK:

4        Q     Why didn't you report the conduct when the

5   father came in?

6        A     I was -- to tell the father?

7        Q     Why didn't you tell your supervisor and stop

8   this?

9        A     I told the supervisor that I was uncomfortable,

10  that I was going to be picking up the two witnesses in

11  the morning, which I did.  They were aware that I was

12  picking them up again in the morning to talk to them.

13       Q     You were going to pick him up in the morning --

14       A     I was working evenings.  I picked them up in

15  the morning.

16       Q     But you got charges approved?

17       A     Charges were approved that night, yes.

18       Q     So you took the witnesses to Branch 66 the next

19  morning?

20       A     After they told us that they had been paid by

21  the third person to finger this kid because this young

22  man didn't even know that -- well, didn't even know, he

23  did know I learned later, that he had been dating the

24  third man's ex-girlfriend.  That's what they told us,

Solache 002261

1    that's what they told people in Branch 66.

2         Q    Was that the reason when they admitted they'd

3    been paid off by the, quote, companion, was that the

4    reason you decided to stop the prosecution of this man?

5         A    Immediately.

6         Q    But you didn't stop it when you knew Ray

7    Guebara made the only identification tainted, did you?

8         A    I didn't know if it was impulsive on his part

9    or if he was part of it, and I didn't want to know the

10   answer after a while.  After the third person who was

11   with him unknowing to me participated in all the rides, I

12   knew nothing of the conversations that they had prior to

13   being at the station, I didn't even want the answers to

14   that.  I was focused on getting an innocent kid out of

15   jail on charges that I felt he didn't deserve of.

16        Q    That's right.  You became focused on that, but

17   not until the kid admitted he had been paid off by the

18   companion?

19        MR. VAIL:  Objection, your Honor, argumentative.

20        THE COURT:  Sustained.

21        THE WITNESS:  I think --

22        THE COURT:  Sustained.

23        THE WITNESS:  Sorry.

24        THE COURT:  Ask another question.

Solache 002262

1    BY MS. STACK:

2        Q    You knew that Ray Guebara had pointed out who

3    to pick in that photo array and you proceeded through

4    with charges contacting felony review a number of

5    times --

6        THE COURT:  Rephrase.  Rephrase.  Form of the

7    question.

8    BY MS. STACK:

9        Q    Mr. Dorsch, isn't it true that it wasn't Ray

10   Guebara's actions that caused you to finally do the right

11   thing on this case, is it?

12       A    It started me to question the entire

13   identification.

14       Q    It started you?

15       A    Yes.

16       Q    Yet you took no action, arrested an innocent

17   man, got charges against him, had him locked up and

18   proceeded with his prosecution until the witness finally

19   admitted he was bribed, correct?

20       MR. VAIL:  Objection, compound, argumentative.

21       THE COURT:  Sustained.

22   BY MS. STACK:

23       Q    Again, when was the first time that you

24   remembered this piece of evidence?

126

```
 1        A    Which piece?

 2        Q    When was the first time that you told the

 3  attorneys in this courtroom about this evidence?

 4        A    About this case?

 5        Q    Yes, about the misconduct of Ray Guebara?

 6        A    I hadn't met them until I was long retired.  I

 7  wasn't involved with any of these people.  I never worked

 8  with them.

 9        Q    It was a month ago was the first time?

10        A    No, I had conversation in 2011.

11        Q    In 2011?

12        A    Right.

13        Q    When in 2011?

14        A    I had met -- I was invited to a play at the law

15  school for the very first time, I had never been there

16  before, a play by John Conroy.  And it was at that event

17  that I met many people at Northwestern, and one of them

18  that I met was Jane Raley.  We just had a conversation,

19  and then about a month or so later, I wanted to ask her

20  about a case that I had been working on for three years

21  for nothing about a kid that is in jail here, in Cook

22  County, I've been working on --

23        Q    Is that the Jacques Rivera case?

24        A    No, it's a different case.
```

Solache 002264

```
 1          Q    Go on.

 2          A    So I took that case to meet with Jane hoping

 3     that they might be interested in taking it.

 4          Q    Did they take the case?

 5          A    No.

 6          Q    But they -- you have since developed a working

 7     relationship with them, correct?

 8          A    Well, them and many other agencies.

 9          Q    Mr. Dorsch, do you -- did you meet with the

10     attorneys for the Petitioners and describe this incident

11     that you just testified to the Court?

12          MR. VAIL:  Objection.  I would just like

13     clarification given that there's two sets of counsel.

14          MS. STACK:  Judge, there's impeachment here.

15     They're aware of it.  I'm trying to move through the

16     process of setting the foundation.

17          THE COURT:  Ms. Stack, people object.  Relax.

18          MS. STACK:  All right.

19          THE COURT:  Let me rule.

20          MS. STACK:  I apologize.

21          THE COURT:  Just rephrase your question just to be a

22     little more specific as to exactly what you're, you know,

23     going to ask him.

24          MS. STACK:  Yes, your Honor.
```

Solache 002265

```
1    BY MS. STACK:
2        Q    On January 11, 2013 between 10:00 and 11:00,
3    were you at the Law Offices of Jenner & Block with
4    William -- yourself, David Saunders, Andrew Vail, Jane
5    Raley, Bil Staes and Lindsay Sieling?
6        A    I did have a meeting with those persons.  The
7    date and time, I don't recall.  I'll defer to --
8        Q    Does that sound familiar?
9        A    Yes.
10       Q    And did you discuss the incident that you gave
11   evidence about today on that date and time?
12       A    Yes.
13       Q    And on that date and time when you talked to
14   those people, did you mention anything about the father
15   coming in and telling you about the UUW?
16       A    I already knew about the UUW.
17       THE COURT:  That wasn't the question, Mr. Dorsch.
18   Please answer the question.
19       THE WITNESS:  Please repeat the question.
20   BY MS. STACK:
21       Q    You're welcome to view this, but did you tell
22   them that it was the father's emotional plea to you about
23   the UUW that got you to take a look at the son's case --
24   I'll take that back.
```

Solache 002266

```
 1              Did you mention the father of the suspect to

 2    the attorneys?

 3         A    I don't know.

 4         Q    Is there anything that would -- did you -- when

 5    you talked to the attorneys, did you tell them that this

 6    murder investigation occurred in '89 or '90 instead of

 7    '88 or '89 as you testified today?

 8         A    It's been difficult, but I may have, I don't

 9    know.

10         Q    So now it could have been '88, '89, '90?

11         A    I think it was '88 or '89.

12         Q    Could you have -- strike that.

13              Did you tell the attorneys that you thought it

14    was '89 or '90?

15         A    I think I usually referred to it as being three

16    months before Guebara was meritoriously promoted.  That

17    would be a definitive way I could identify it by date.

18         Q    Did you tell them that it occurred in 1989 or

19    1990?

20         A    I don't recall.

21         Q    Just to be clear, you never reported this

22    incident to anybody in your chain of command at the

23    Chicago Police Department, correct?

24         A    Many people knew of it.
```

Solache 002267

```
 1          Q     Did you report it --
 2          A     Many people knew of it, and they never made an
 3    official report of it.
 4          THE COURT:  You need to answer the question,
 5    Mr. Dorsch.  Did you report that -- what you described to
 6    me today about Detective Guebara's actions that happened
 7    in front of you, did you report that to any of your
 8    supervisors in the Chicago Police Department at or about
 9    the same time that it happened.
10          THE WITNESS:  Yes.
11    BY MS. STACK:
12          Q     Who?
13          A     I don't recall.
14          Q     Can you describe what position this person
15    occupied?  Was it your sergeant, for example?
16          A     I don't know what sergeants were present that
17    day, but it was -- I don't want to elaborate.
18          Q     Tell us what you remember about reporting this
19    incident?
20          A     It was the subject of conversation for a long
21    time.
22          Q     Gossip, you mean?
23          A     Even today when you see people.
24          Q     Well, will you please give us the names of
```

Solache 002268

```
 1    other people that know about this incident?
 2         A    I don't -- guess you'd have to go to the roster
 3    would be the best way for me to say who knew about it.
 4         Q    How do you remember then that everybody knew
 5    about it?
 6         A    I didn't say everybody knew about it.
 7         Q    Give me the names of the people that do know
 8    about it.
 9         A    Detective Guebara.
10         Q    Okay.
11         A    Detective Garz, Bill Johnston, myself.
12         Q    Did Detective Johnston report this?
13         A    He was with me the whole time.  He went with me
14    the next day.
15         Q    The next day?
16         A    To pick up the boys.
17    THE COURT:  You really didn't answer the question.
18    THE WITNESS:  Sorry.
19              Did he report it?
20    BY MS. STACK:
21         Q    Did Detective Johnston report this to anybody
22    at CPD at or during around the time during this incident?
23         A    Report or talk is two different things.  We
24    talked about it, but we never reported it.
```

Solache 002269

1      Q     Did the other officer, the gang officer,

2  Officer Garz, did he ever report it to anybody?

3      A     I don't know.

4      Q     In the years after you left the Chicago Police

5  Department, did you ever tell anybody that you saw a

6  police officer tell a witness who to pick out of a photo

7  array?  Did you ever report Ray Garza (sic) after you

8  left CPD?

9      MR. VAIL:  Objection.

10      THE WITNESS:  Ray Garza?

11      THE COURT:  Rephrase your question.

12  BY MS. STACK:

13      Q     After you left CPD, did you ever report this

14  incident to anybody?

15      A     Report or talk to anybody?

16      Q     Report it.

17      THE COURT:  Report it -- when you say report it --

18      MS. STACK:  All right, I'll clarify it.

19  BY MS. STACK:

20      Q     Did you ever report this to anybody at CPD

21  after you left CPD?

22      A     No.

23      Q     Did you ever report it to anybody at OPS after

24  you left CPD?

133

```
 1        A    No.
 2        Q    When was the first time that you brought it up
 3   to Petitioner's attorneys?
 4        MR. VAIL:  Objection.  We've asked this question a
 5   couple times, your Honor.
 6        THE COURT:  Overruled.
 7             You may answer.
 8        THE WITNESS:  Yes.  I had a conversation with Jane
 9   Raley at Northwestern, the first official visit I had
10   when I went there to see if she was interested in this.
11   BY MS. STACK:
12        Q    To see --
13        A    If she was interested in the case I had
14   brought.
15        Q    Can you give us a month and date?
16        THE COURT:  That was not anything to do with --
17        THE WITNESS:  Nothing to do with this, your Honor.
18   BY MS. STACK:
19        Q    Can you give us an approximate time frame of
20   that?
21        THE COURT:  Rephrase your question.  He's answering
22   something that has nothing to do with any case involving
23   Detective Guebara the way I understand his answers.
24        MS. STACK:  Okay.
```

Solache 002271

```
1          THE COURT:  I thought your question was when was the

2     first time he brought the subject of his testimony

3     earlier today to the attention of the attorneys.  Earlier

4     I believe he testified that it was last month.

5          MS. STACK:  Correct, Judge.  Thank you.

6     BY MS. STACK:

7          Q    As to the subject of Ray Guebara's actions that

8     you testified about today, when was the first time that

9     you discussed it with any of the Petitioner's attorneys?

10         A    The first time that I discussed it was in my

11    very first meeting, official meeting with Jane Raley

12    which was probably about 2010, late 2010, early 2011.

13         Q    Since that time, did you try to find out any of

14    the names of the people in this case?

15         A    Oh, yes.

16         Q    What efforts did you make?

17         A    I went to the Chicago Police Department seeking

18    the honorable mention that was given to me for solving

19    this case.  I went there because when it was given to me,

20    I threw it in the garbage.  I didn't want it, but I

21    thought now that it might help me -- I thought it might

22    help me recall the incident because that honorable

23    mention would have name and RD number.

24         Q    So you're telling the Court that you got an
```

135

```
 1    award for solving this crime?

 2         A    Yes, I did.

 3         Q    Which crime was that?

 4         A    The murder that we were investigating when

 5    Guebara brought the two kids in for the shooting.  Right.

 6         Q    The murder.  So you eventually found more

 7    witnesses on this case?

 8         A    No.

 9         Q    When you say "solved," do you mean when you

10    admitted to the State's Attorney's Office that you had

11    brought a witness who he watched and suggested to --

12         MR. VAIL:   Objection, your Honor.

13    BY MS. STACK:

14         Q    You got an award for that?

15         A    I found it laughable, too.

16         Q    Let's talk about the other crime that happened

17    here that you just described.  The, quote, companion that

18    brought the two 15-year-olds to the station and that is

19    the person that, according to your testimony, told the

20    15-year-old to lie about this murder.

21         A    Yes.

22         Q    What did you do as far as bringing charges

23    against him?

24         A    I returned to Area 5 from the Branch 66.  I
```

```
 1   informed them that the charges had been thrown out

 2   against the person that we rested the night before.

 3        Q    Who is "them"?

 4        A    The supervisors, whoever they were at the time

 5   on that day.  And I was informed that we were never going

 6   to clear this crime, they were going to carry this clear

 7   close, and it is today on the books as a clear closed

 8   even though that case never went to trial and nobody ever

 9   appeared in bond court that day or never was charged past

10   that day.  So that case has been carried as clear closed

11   based on the false identification of a person that night

12   who got charged by felony review who 12 hours later I got

13   released.  And if it's found, it's going to show it was

14   clear closed and it remains clear closed on the Chicago

15   Police Department's files and records, and we were not

16   allowed to work it.

17        Q    But despite your skills, we've never found an

18   RD number, name of any relevant person in the case or

19   been able to find any documentation that confirms this

20   case.

21        MS. DANIEL:  Objection, your Honor, this is not a

22   question.  This is argument.

23        THE COURT:  Sustained.

24   BY MS. STACK:
```

137

```
 1          Q    Have you found any RD numbers for this case?
 2          MS. DANIEL:  Objection, your Honor.  She's asking
 3    what He found, not what the witness has found.
 4          THE COURT:  I thought he said "he."
 5          MS. STACK:  I'll clear that up.
 6    BY THE COURT:
 7          Q    Have you found the RD number for this case?
 8          A    I cannot get access as I am no longer a member
 9    of the Chicago Police Department.
10          Q    So you have no investigative skills these days
11    to find the case?
12          MR. VAIL:  Objection, your Honor.
13          THE COURT:  Sustained.
14    BY MS. STACK:
15          Q    You haven't tried to find this case at all?
16          A    No, I have, very much.
17          Q    Have you found any documents supporting what
18    you testified to?
19          A    No police officers are going to give me any
20    documents because they would be in trouble for giving me
21    an outside member of the police department those
22    documents.
23          Q    Have you found any documents that convert this
24    case --
```

Solache 002275

```
1        A    I can't search documents.

2        Q    Is that a "No"?

3        A    No -- it is a "No."

4        Q    Thank you.

5             Back to the man who paid the 15-year-olds to

6    lie.  Did you pursue any action against him?

7        MS. DANIEL:  Asked and answered, Judge.

8        MS. STACK.  I don't think he answered it.

9        THE COURT:  Well, I would agree.  I don't believe he

10   answered it either.  He went back to the homicide case,

11   so that was clear closed.

12       THE WITNESS:  It is clear closed, no more work is

13   necessary.

14       THE COURT:  But she's talking now about the case of

15   the companion.

16       THE WITNESS:  I won't have access to anything so I

17   can't charge him.  I'm a civilian.

18       THE COURT:  Back then, back in 1988 or 1989 or 1990,

19   what happened back then?

20       THE WITNESS:  No, they refused.  It was a clear

21   close case.  They wanted no more action.

22       THE COURT:  The companion's case was a clear close?

23       THE WITNESS:  Yes.

24       THE COURT:  Or the homicide, I'm sorry, it was a
```

Solache 002276

1    clear close.

2         THE WITNESS:  The homicide was clear closed and no

3    one wanted us to follow-up on anything.

4    BY MS. STACK:

5         Q    And you're saying that you got an award for

6    this case, I just want that to be clear.

7         MR. VAIL:  Objection.

8         THE COURT:  Sustained.

9    BY MS. STACK:

10        Q    Did you include that in your conversation with

11   counsel on January 11, 2013?

12        A    I don't think so.

13        Q    Finally, Mr. Dorsch -- you already described

14   your meeting with Ms. Raley in 2010 or 2011?

15        A    Yes.

16        Q    And at some point you became a consultant for

17   the Bloom Legal Clinic?

18        A    I work for a variety of clinics.  They are one

19   of them.  I've worked for Cook County Public Defender's

20   Office on homicide cases, too.

21        Q    Okay.  In reference to the attorneys who

22   represent Mr. Solache, Jane Raley and Karen Daniel --

23        A    Yes.

24        Q    As you know, they are employees of the

Solache 002277

```
 1    Northwestern University Bloom Legal Clinic Center and
 2    unlawful conviction, correct?
 3        A    Jane Raley?
 4        Q    Yes.
 5        A    And Karen Daniel, yes.
 6        Q    And you have performed work for them, correct?
 7        A    Yes.
 8        Q    And would it be fair to say that between
 9    November 16th of 2011 and January 18th of 2013 you have
10    been paid $43,278.43 by them?
11        A    I'm not sure of that amount.  I know for the
12    last amount my 1099 was 30,000.
13        Q    If I was to tell you that they gave you that
14    figure, would that sound about accurate to you?
15        A    Yes.
16        MS. STACK:  Thank you.
17        THE COURT:  Any other questions on behalf of
18    Mr. Solache?
19        MS. SIELING:  Yes, your Honor.
20                    REDIRECT EXAMINATION
21                    BY MS. SIELING:
22        Q    Okay.  You told Ms. Stack that $43,000 was a
23    reasonable amount that you were paid by the legal chain?
24        A    That sounds about right.
```

141

Solache 002278

```
 1        Q    Was that work done for just Ms. Raley and
 2   Ms. Daniel?
 3        A    No.
 4        Q    Was the majority of the work done for other
 5   attorneys?
 6        A    Yes.
 7        MS. SIELING:  Thank you for your time.
 8             We have no further questions.
 9        MR. VAIL:  Very briefly, your Honor.
10        THE COURT:  Okay.
11                      REDIRECT EXAMINATION
12                      BY MR. VAIL:
13        Q    Detective Dorsch, you were asked a litany of
14   questions about at the time having not reported
15   officially this incident with Detective Guebara, do you
16   recall that examination, Mr. Dorsch.  Why didn't you
17   immediately report it?
18        A    My task at hand was getting a proper and
19   truthful identification of an offender on the homicide.
20   I struggled to get it and get past what had happened.  I
21   had hoped that maybe the second day the lineup might give
22   me the second offender, giving me an ID which would
23   solidify -- and then we'd maybe write-off that pointing
24   as an error, a mistake, but it went the way it went.
```

Solache 002279

1      Q    And to be clear, is it your testimony today

2   that others at the department were aware of this incident

3   involving Detective Guebara?

4      A    Yes.

5      THE COURT:  I'll let the answer stand.  I heard him

6   testify to that.

7   BY MR. VAIL:

8      Q    Finally, Detective Dorsch, why come forward

9   to testify under oath to this judge about this

10  incident?

11     A    When I was first gave this information to Jane

12  Raley, it was in a conversation about a whole mess of

13  other things.  I never knew that it was going to lead me

14  here today, but I've always tried to do the right thing,

15  so I'm here.

16     MR. VAIL:  Thank you.

17     THE COURT:  Any other questions?

18                      RECROSS-EXAMINATION

19                      BY MS. STACK:

20     Q    Concerning your expenses and fees that are --

21     MR. VAIL:  Objection, beyond the scope of any

22  re-examination, your Honor.

23     MR. PAPA:  It's based on Northwestern.

24     THE COURT:  Overruled.

143

Solache 002280

1    BY MS. STACK:

2        Q    Are you paid on a commission?  Do you get any

3    cut of the civil cases that are brought by the Center on

4    Wrongful Conviction?

5        A    I get about half of what I get in the private

6    practice.  I make double the money with other attorneys

7    and other cases.  I work for -- I just got paid by the

8    Illinois State Public --

9        THE COURT:  Do you get paid by the hour?

10       THE WITNESS:  I usually bill for hourly and

11   expenses.

12       THE COURT:  Do you get paid by commission?

13       THE WITNESS:  No.  Never.

14       MS. STACK:  Thank you, Judge.

15       THE COURT:  Any other questions?

16           All right.

17       MR. RALEY:  Your Honor, I think there's some

18   confusion.  The Center of Wrongful Convictions does not

19   bring civil suits against -- there's no -- I thought that

20   the question that Ms. Stack asked was whether he gets a

21   cut of the Center --

22       THE COURT:  Please, that's a collateral issue.  That

23   isn't going to help me in any event.  The answer that I'm

24   using is that he gets paid for his services based on his

144

1    hourly bill.

2                        EXAMINATION

3                    BY THE COURT:

4        Q    Mr. Dorsch, when you witnessed Detective

5    Guebara, as you say, suddenly reach out in front of you

6    and point out one of the photographs that you had put

7    into the photo spread, at any time did the -- did you

8    report that in any written police report you prepared for

9    that homicide investigation?

10       A    No.

11       Q    Your testimony seems to me that people in the

12   Area or in the police department locale, Area 5, all seem

13   to know about this, but as far as you know, none of your

14   fellow officers officially reported it to their

15   supervisors?

16       A    Correct.

17       Q    And you did not officially report it to a

18   supervisor?

19       A    I did not.

20       Q    All right.  And you did not tell the assistant

21   state's attorney at felony review who came out after the

22   photo array?

23       A    I don't think I told her that.

24       Q    It was a female?

Solache 002282

```
 1        A    Well I said "her."  I don't know who it was.

 2        Q    So the only way -- would it be fair to say that

 3   people were talking about this because -- would have been

 4   because either you or your partner or one of those two

 5   gang crimes officers was telling everybody that Detective

 6   Guebara did this, is that correct?

 7        A    Correct.

 8        Q    That award that you received for solving a

 9   case, when did that take place?

10        A    Just a few days -- it was --

11        Q    Was it after the murder suspect had been

12   released?

13        A    It was almost given as a joke, your Honor, and

14   that's why I treated it the way I did.

15        Q    But it was after he had been released?

16        A    Oh, yes.

17        Q    Do you recall who gave you that award?

18        A    It was right out of the sergeant's office.  I'm

19   not sure who it was or who prepared it.

20        Q    Was it a joke award?  I know that's how you're

21   saying you took it, but was it done as a joke amongst

22   fellow officers or was it really something that the

23   department ordinarily would have done?

24        A    Normally the copy would go to the downtown
```

Solache 002283

1    headquarters.  I took it as a joke that it was meant to

2    be a joke, but in seeking to try to identify the incident

3    better, I did make an effort in the last year to see if

4    they had it only to learn they threw everything away from

5    officers gone after ten years or something like that.

6        Q    But I get the sense, then, that it was really

7    sort of a joke amongst the police officers?

8        A    That's exactly the way I took it.

9        Q    All right.

10            Did you ever place in any police report the

11   statement of witness number one and witness number two

12   that companion had paid them to make an identification?

13       A    I didn't write a report, but the same

14   statements were made to the attorney in 66, so he had his

15   file folder.  I don't know if he was writing, I don't

16   know what he wrote.

17       Q    This incident, this incident regarding what you

18   allege Detective Guebara did here which caused you to be

19   startled, was it something that always sort of bothered

20   you?

21       A    Yes, it's always bothered me.  I take great

22   pleasure in putting great cases together and I also took

23   pleasure in the fact that I saved a kid from going to

24   jail for a crime he didn't do.

Solache 002284

1       Q    But you can't remember this person's name that

2  you saved?

3       A    I'm on the outside now, your Honor.

4       Q    But you can't remember?

5       A    Oh, no, I can't remember.  I'm sorry I didn't

6  keep something but I didn't.

7       Q    And you can't remember the name of the person

8  that was murdered?

9       A    I can remember the location, I can remember the

10  proximity of where we made the arrest.  I recall where he

11  went to school at DePaul University and worked at

12  Walgreens at six corners, but to identify him better than

13  that, I was only looking to get him out for something he

14  didn't do.

15       Q    Going back, then, to your first -- the first

16  time that you met with -- I believe it was Ms. Raley, you

17  said that you were bringing the Northwestern University

18  whatever the various projects or organizations there that

19  are relevant here, you were attempting to bring them a

20  case of somebody you felt had been improperly imprisoned

21  for a crime?

22       A    Yes.  I worked for a case in Wisconsin with the

23  Innocence Project.  I knew nothing of Northwestern's

24  work, but I thought they might be helpful.

Solache 002285

```
1         Q    So that was your purpose in meeting with the

2    attorneys the first time?

3         A    Correct.

4         Q    And that case that you had hoped that they

5    might take an interest in, did that case involve

6    Detective Guebara?

7         A    No.

8         Q    Is it at that first meeting though you say you

9    brought up Detective Guebara to the attorneys at

10   Northwestern or was it back -- I'm trying to figure out

11   when it is the first time that you told the attorneys who

12   represent Mr. Solache, those are the attorneys at

13   Northwestern, when is the first time that you told them

14   about this incident that you testified to here today?

15        A    The people on the Solache case.

16        Q    The Solache team, which are the ladies that are

17   seated there, when is the first time that you told

18   Solache's attorneys or --

19        A    I never knew about the Solache case or still

20   don't.

21        Q    When is the first time that you -- with

22   respect -- I'm not talking about their case, but what I'm

23   talking about the attorneys.  When is the first time that

24   you spoke to those attorneys that are now all here
```

149

Solache 002286

1    sitting around in front of you in court about the events

2    of Detective Guebara surprising you by reaching out in

3    the middle of one of your photo show-ups and identifying

4    the suspect?

5         A    As far as the group there, in January, the

6    other group would have been -- it wouldn't have been a

7    group, it would have been with Jane.

8         Q    That was when?

9         A    That was about the end of 2010 or beginning of

10   2011.

11        Q    How did Detective Guebara and this incident

12   come up in that case since Detective Guebara wasn't

13   involved in the case that you were bringing to them?

14        A    I understand, your Honor.

15             I had gone to Northwestern for the first time

16   in my life because I was invited by John Conroy who did

17   the investigation of the Burge case.  He did a big

18   investigation and wrote an article or a book about it, I

19   never read it, but I had -- but he invited me to

20   Northwestern to see a review of the play he had put

21   together.

22             It was there that I met not only Jane Raley but

23   two dozen other people and had brief conversations and

24   some became aware that I was a detective, so forth and so

150

1    on, exchanged business cards with some.  One of them was

2    Jane, and because I wanted to get this other case there I

3    came there, and a conversation that day with her sitting

4    down in her office, we talked about a lot of problems

5    with the Burge case and other officers, and I brought

6    up -- I asked even about myself, if I was involved in any

7    cases because I handled a lot of cases.  I don't know

8    what's going on, I've been gone for years but I know

9    these things can sometimes come back.

10           I asked about that, and that's how it started.

11   That's how it started right there.

12        Q    You brought it up?

13        A    Yes.

14        THE COURT:  I don't have any questions.  I'll allow

15   the attorneys for Solache to ask any questions at this

16   time, if you wish.

17        MS. SIELING:  We have nothing.

18        THE COURT:  Anything on behalf of Mr. Reyes.

19        MR. VAIL:  No, your Honor.

20        THE COURT:  State?

21        MS. STACK:  No, Judge.

22        THE COURT:  All right.  You may step down.

23           All right.  This would be an appropriate time

24   to take a break.  The officers will -- I'll continue the

151

Solache 002288

1    writs until tomorrow.

2              (WHEREUPON, discussion was had off the

3              record.)

4    THE COURT:  We can't get started at 10:00.  I think

5    we'll be able to get started very shortly thereafter.

6    We'll continue this matter until tomorrow.  Please be

7    here by 10:00.

8    MR. VAIL:  As you're aware, we intend to put on

9    Mr. Reyes tomorrow.  I believe there will be no other

10   live witnesses.

11   THE COURT:  When are you going to submit all of the

12   other matters to me?

13              Off the record.

14              (WHEREUPON, discussion was had off the

15              record.)

16   MS. STACK:  To reserve my record and preserve my

17   arguments that we feel very strongly about, we'd like to

18   address the relevancy of those document.

19   THE COURT:  What all is going to be submitted, all

20   of those binders?  Is it all that I'm looking at?

21   MS. DANIEL:  Yes.

22   THE COURT:  Can you leave it today, leave them today

23   so you don't have to carry them and let me perhaps

24   respond to you tomorrow, Ms. Stack.

Solache 002289

1    MS. STACK:  I would suggest is just like, for

2    instance, they say we have the case of John Doe, we

3    believe it's relevant because he testified that Ray

4    Guebara did XYZ.  We respond, and we say John Doe is

5    irrelevant because it's dissimilar in this way.  And

6    that's the way we've done it before.  We just want to

7    submit oral argument on those factors that are set out.

8    I really would give my Scout's honor to do the best to

9    keep it, you know, to the point and take a look, like I

10   said, at the ones where they are coerced confession

11   claims in that time frame to pare it down.

12        I'd say there's 10 to 12 that we're objecting

13   to, so literally my argument can be that fast.  I really

14   do think it will protect the record on this, Judge, to --

15   they're advocating that you consider all the evidence and

16   then make the relevancy finding.  Well, of course --

17   THE COURT:  Well, I brought that on myself, too, so

18   I can't -- I can't blame them for that.

19   MS. STACK:  This is a perfectly reasonable time to

20   still do it, Judge, the arguments.  We can get them done

21   in an hour.

22   THE COURT:  Like I said, I'll -- let me listen

23   tomorrow.

24   MR. VAIL:  Your Honor, if I may finish, given that

Solache 002290

1 we intend to put on the one live witness, we inquire

2 whether the State is tending to put on any witnesses

3 tomorrow so we can prepare.

4  THE COURT:  Do you have any that you would be

5 going ---

6  MS. STACK:  It was our understanding we were going

7 to finish their case in this period and move to ours

8 afterwards.

9  MR. VAIL:  That wasn't our understanding, your

10 Honor.

11  THE COURT:  Well, it's probably the only practical

12 way that it can be done.

13  MS. STACK:  Plus, we can't really know --

14  THE COURT:  I understand.  We'll deal with it

15 tomorrow.  Let's get the last live witness for the

16 Petitioners on the stand tomorrow and give me an

17 opportunity to try to digest the various requests that

18 are being made.

19    (The above-entitled cause was

20    continued until 2/14/2013.)

21

22

23

24

Solache 002291

```
 1    STATE OF ILLINOIS    )

 2                         ) SS:

 3    COUNTY OF C O O K    )

 4         IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

 5              COUNTY DEPARTMENT - CRIMINAL DIVISION

 6

 7         I, Ellen Dusza, Official Court Reporter of the

 8    Circuit Court of Cook County, County Department, Criminal

 9    Division, do hereby certify that I reported in shorthand

10    the proceedings had on the hearing in the aforementioned

11    cause; that I thereafter caused the foregoing to be

12    transcribed into typewriting, which I hereby certify to

13    be a true and accurate transcript of the Report of

14    Proceedings had before the HONORABLE JAMES M. OBBISH,

15    Judge of said court.

16

17                        _____

18                        Official Court Reporter

19                        Ellen Dusza, CSR 84-3386

20                        Circuit Court of Cook County

21

22

23

24    Date:_____
```

155

Solache 002292