IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAIME RIOS | ) | |
| | ) | Case No. 22 CV 3973 |
| Plaintiff, | ) | |
| | ) | Hon. Jeremy C. Daniel |
| vs. | ) | |
| | ) | |
| REYNALDO GUEVARA, et al | ) | Magistrate Young B. Kim |
| | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | JURY DEMAND |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION TO ADMIT OPINION TESTIMONY OF DR. MELISSA RUSSANO**

Defendants, by and through their undersigned counsel, and in response[1] to Plaintiff's Motion to Admit the Testimony of Dr. Melissa Russano ("Russano"), move for an order barring Russano's opinions and testimony – who seeks to opine at trial that Rios' confession was neither credible nor reliable. In support of their motion, Defendants submit the following:

**INTRODUCTION**

Rios has disclosed Dr. Melissa Russano as a "false confession" expert to testify and opine on the circumstances of the confession that Rios provided to the Morales murder at the Chicago Police Department ("CPD") in July 1989. Russano's opinions are essentially split into two categories: (1) she identifies the circumstances under which a confession may be coerced and applies them to Rios' version of events, and (2) she conducts a "reliability analysis," which dissects Rios' confession to conclude it is unreliable because it purportedly contradicts objective

---

[1] As set forth in Defendants' motion in limine No. 20 (Dkt. 248), given Rios moved affirmatively to admit the opinions of Russano into evidence (Dkt. 246), Defendants have incorporated their argument to exclude Russano's opinions into this response for purposes of efficiency and to avoid cross-briefing the motion.

1

evidence. More specifically, she opines that:

**Category 1 (risk factors):**

1. "[C]onfirmation bias [of the police interrogators] might have taken insidious root throughout the investigation of this case," likely due to "tunnel vision" (Ex. 1, Expert Report of Melissa Russano, Ph.D. ("Russano Report") at 30);
2. Rios' "status as a young adult represents a vulnerability that might have increased the likelihood of him providing a false confession" (*id.* at 33);
3. Given the length of his custody and interrogation, Rios "would have been at heightened risk for providing a false confession" (*id.* at 34);
4. To the extent he experienced physical abuse, physical discomfort, and/or deprivation of food, Rios would have been placed "at dramatically high risk for providing a false confession" (*id.* at 35);
5. "Sleep deprivation was likely a risk factor in Mr. Rios' case" (*id.*);
6. "[T]he investigators involved in questioning Mr. Rios seemed to utilize a fairly classic guilt-presumptive, accusatorial interrogation approach" (*id.*);
7. Factfinders should "consider whether they believe that false evidence was a risk factor present in Mr. Rios' interrogation" (*id.* at 37);
8. Threatening to take away Rios' child "would have placed Mr. Rios at very high risk for providing a false confession" (*id.* at 38);
9. Officers' questioning conditions and techniques—if Rios' version of events is credited—"could lead an innocent person (or one that lacks guilty knowledge) to provide a false statement in a homicide case" (*id.* at 45); and

**Category 2 (reliability):**

10. There were "numerous inconsistencies between Mr. Rios' statement and the objective evidence in this case" (*id.* at 39);
11. The statement's possible contamination, inconsistent and inaccurate details, and lack of independent and dependent corroboration mean "a statement procured under the conditions described by Mr. Rios cannot and should not be relied upon to determine Mr. Rios' guilt or innocence." (*id.*)

In his motion in limine, Rios argues that all of Russano's opinions, except on the ultimate opinion on whether or not the confession is false, should be admitted at trial. (*See generally* Ex. 2, Motion to Admit the Testimony of Dr. Melissa Russano ("Motion to Admit")). Rios asserts that (i) Russano is properly qualified to opine on false confessions, (ii) the "science" of false confessions is sound, and (iii) Russano should be permitted to opine on both the factors that could lead to a false confession during Rios interview and that Rios' confession was unreliable because

2

it contradicted the objective evidence in the police investigation. (*Id.* at 11-15.) Additionally, Rios unpersuasively contends that Russano's testimonial limitation in *Washington v. Boudreau* "makes no sense". (*Id.* at 15.)

But as explained in detail below, Plaintiff is wrong. Russano should be barred from testifying **at all** because her opinions do not meet the minimum admissibility requirements of Rule 702 and *Daubert*. Alternatively, the testimony Plaintiff is allowed to elicit from Dr. Russano should be limited to only offering opinions on factors that could potentially lead to a false confession.

## LEGAL STANDARD

Fed. R. Evid. 702 permits a witness who is qualified as an expert by their "knowledge, skill, experience, training or education" to testify "if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." A proffered expert's opinion must "have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592. Evidence "that is connected to existing data only by the *ipse dixit* of the expert" should be excluded. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"The district court is the gatekeeper of expert testimony" and must assess its reliability by examining whether: (1) the theory has or can be tested; (2) the theory has been subjected to peer-review and/or academic publication; (3) there is a known rate of error; and (4) the theory is generally accepted in the relevant scientific community. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (citations omitted). Additional factors include whether the expert has

unjustifiably extrapolated an unfounded conclusion from an accepted premise and has not accounted for "obvious alternative explanations." *Harris v. Wexford Health Sources, Inc*., 2021 WL 1192437, at *3 (N.D. Ill. March 30, 2021) (*quoting* Fed. R. Evid. 702 advisory committee's note to 2000 amendment). "Where [an expert's] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (citation omitted).

## ARGUMENT

I. **Russano's "False Confession" Testimony Should Be Barred as The Product of an Unreliable Methodology Based on Insufficient and Untrustworthy Data.**

Despite Rios' confidence that "any challenge to the science of false confessions will fail" (Ex. 2, Motion to Admit at 12), Russano's false confession opinions are based on fundamentally flawed data and non-existent methodology, rendering them inadmissible under Rule 702(b) and (c).

### 1. The Seventh Circuit has never endorsed the reliability of false-confession theory.

The Seventh Circuit has never held that any "false confession" expert's methodology passes muster under Fed. R. Evid. 702(b)-(d). In *United States v. Hall*—which predated the 2000 amendments to Rule 702—the Seventh Circuit found error in the district court's failure to conduct "a full *Daubert* inquiry" into the admissibility of the opinion testimony of false confession "expert" Richard Ofshe. 93 F.3d 1337 (7th Cir. 1996). In doing so, the appeals court merely "assumed" *arguendo* that Ofshe's opinions were valid without "prejudging the outcome of that inquiry in any further proceedings[.]" *Id*. at 1344–45.

Seven years later, the Seventh Circuit affirmed Ofshe's exclusion in *U.S. v. Mamah*, 332 F.3d 475 (7th Cir. 2003). The court found an "absence of an empirical link between [the] research

4

and the opinion that Mamah likely gave a false confession[,]" and Ofshe's inability to "connect his research to the particulars of Mamah's case[,]" rendered his opinions insufficiently reliable for admission. *Id*. at 478. *Mamah* dictates that, like all experts, false confession experts must sufficiently tether their opinions to empirical data and research in the context of the case at hand to hold water under Fed. R. Evid. 702.

Despite *Mamah's* clearly mandated analysis of proffered "false confession" expert testimony, courts in this district have inexplicably permitted such testimony without conducting the required analysis. *See, e.g.*, *Brown v. City of Chicago,* 2023 WL 2561728, at *10–12 (N.D. Ill. March 17, 2023) (partially admitting false confession testimony without mention or analysis of *Mamah*); *Taylor v. City of Chicago,* 2021 WL 12242781, at *2–3 (N.D. Ill. Dec. 1, 2021) (same); *Caine v. Burge,* 2013 WL 1966381, at *3 (N.D. Ill. May 10, 2013) (same); *Andersen v. City of Chicago,* 2020 WL 1848081, at *3 (N.D. Ill. April 13, 2020) (partially admitting false confession testimony without analysis of *Mamah*); *Harris v. City of Chicago*, 2017 WL 2436316, n. 2 (N.D. Ill. June 5, 2017) (partially admitting false confession testimony and relegating *Mamah* to a footnote). The failure to test such proffered testimony against the requisite analysis is unfortunate, as *Mamah* is binding, and it should be carefully considered when addressing whether Russano's "false confession" testimony should be admitted.

**2. "False confession theory" has been deemed unreliable throughout the country.**

*Mamah* was certainly not an outlier—courts around the country have found false confession expert testimony inadmissible due to its unreliability. *See e.g.*, *United States v. Phillipos*, 849 F.3d 464, 471–72 (1st Cir. 2017); *United States v. Redlightning*, 624 F.3d 1090, 1112 (9th Cir. 2010); *United States v. Begay*, 497 F.Supp.3d 1025, 1069–80 (D.N.M. 2020); *Austin v. Brown*, 2024 WL 1602968, at *14 (D.Colo. Feb. 22, 2024); *United States v. Deuman*, 892 F.

5

Supp. 2d 881, 888 (W.D. Mich. 2012).

The fatal flaws in this field of alleged expertise were highlighted in *Begay*, which barred a false confession expert who relied largely upon the methodology of Richard Leo—a leading proponent of false confession opinions. *See* 497 F.Supp.3d 1025 (D.N.M. 2020). After a detailed analysis, *Begay* concluded that "[f]alse-confession theory -- which posits that there is an understood mechanism by which false confessions are produced and that demonstrates false confessions' prevalence -- does not generally satisfy *Daubert*", due to its unreliability. (*Id*. at 1073.) *Begay* identified numerous flaws in false confession theory including: (1) the absence of quantification for how many confessions are false regardless of the tactic employed; (2) the inability to ascertain whether the data supporting the purported study of false confessions are actually false confessions; (3) false confession theory cannot be applied to determine whether a given confession is false, which renders it an untested hypothesis; (4) there is a lack of significant data from real world interrogations; and (5) it is based on primarily anecdotal evidence with statistically insignificant samples, conclusions drawn from unreliable sources, and prone to "an unacceptably high rate of error." *Id*. at 1073–77.

Stripped of rhetoric, so-called "false confession" experts do not employ a reliable methodology at all. Rather than applying a testable or falsifiable framework, they begin with a subjective conclusion that a particular confession is "false," accept plaintiff's narrative as true, and then work backwards to identify purported risk factors that are said to confirm that predetermined conclusion. *See Austin*, 2024 WL 1602968, at *17–19 (barring false confession expert based on "the dearth of empirical data on the false-confession theory, along with the absence of any established methodology for scientifically assessing that very limited data set").

To be sure—as a matter of common sense, not science—it is uncontroversial that some

6

factors Russano identifies could lead a person to involuntary confess. But whether that occurred in a particular case is precisely the question entrusted to the jury, based on its evaluation of all of the evidence and the credibility of the witnesses who participated in or observed an interrogation. An expert may not usurp that role by selectively marshalling facts, crediting only one side's version of events, and presenting a narrative that merely mirrors one side's theory of the case.

Allowing such testimony facilitates a closing argument disguised as expert opinion. That is impermissible absent a showing that the witness possesses scientific, technical, or other specialized knowledge that enables her to reliably interpret data in a way the jury cannot. Here, Russano's proffered opinions do not reflect the application of any reliable principles or methods to the facts of this case. Instead, they reveal her to be an advocate in expert clothing—precisely the kind of testimony Rule 702 and *Daubert* are designed to exclude.

### 3. Rule 702's recent amendment clarifies that the deficiencies in Russano's methodology is an issue of admissibility, not merely weight.

This Court should resist Plaintiff's urging that Defendants' objections go merely to weight, not admissibility. In 2023, Rule 702 was amended precisely to dispel the notion that methodological flaws should be left to cross-examination. *See, e.g.*, *Austin*, 2024 WL 1602968, at *10. It now expressly requires proponents of expert testimony to demonstrate that it is "more likely than not" that *each* reliability requirement is met, and gone are the days of writing off experts' gaping holes in reasoning and data as mere fodder for cross-examination.

Defendants acknowledge that Russano was permitted to offer very limited testimony in both *Chatman v. City of Chicago*, 2018 WL 11426430 (N.D. Ill. Oct. 23, 2018) and *Washington v. Boudreau*, 2022 WL 4599708 (N.D. Ill. Sept. 30, 2022). But those non-precedential decisions pre-date the 2023 amendments to Rule 702 and give short shrift to binding precedent in *Mamah*. Meanwhile, courts across the country that have meaningfully examined the empirical foundation

7

and methodology underlying so-called false confession expertise have concluded that it fails *Daubert*'s reliability standards. As the proponent, Plaintiff bears the burden of establishing that Russano's opinions are grounded in reliable principles and methods and supported by sufficient data. *See* Fed. R. Evid. 702. That burden cannot be met here.

**4. Russano's opinions are based on methodological flaws and facts not of record.**

Ultimately, Russano's opinions rely on social science research that lacks any viable methodology and thus should be barred under the *Daubert* standard.

a. Questionable Experimental Design

Russano repeatedly relies on a 2005 study by Meissner, Narchet, Kassin, and Russano herself, that typifies the cognitive science research on false confessions. The authors purported to simulate a police interrogation by inducing students to cheat on an extra-credit assignment and then interrogating them with a non-police experimenter.[2] But the experimental setting bears little resemblance to an actual custodial interrogation. Student-participants: (i) faced no real consequences for their conduct, (ii) were not interviewed by police investigators, (iii) were faced with interview techniques that materially differ from real-world interrogation practices, and (iv) were neither evaluated across time nor in the context of a true interrogation. As Defendants' expert on interrogation techniques and disputed confessions, Dr. Jack Schafer, explained, "false confession laboratory studies are conducted in a vacuum." (Ex. 3, Expert Report of Jack Schafer, Ph.D. ("Schafer Report") at 27.)

These flaws fatally undermine the study's validity. Because the experimental design lacks the ability to predict real-life behavior, "no valid associations can be made outside the experimental group, much less to suspects in an interrogation setting." (*Id.* at 28.) Presenting conclusions

---

[2] Melissa Russano, Christian Meissner, Fadia Narchet, & Saul Kassin, *Investigating True and False Confessions Within a Novel Experimental Paradigm*, 16 PSYCHOLOGICAL SCIENCE 486 (2005).

premised on data that fails to account for so many variables would only confuse and mislead the jury on the reality and complexity of live interrogations.

    b. <u>Questionable Data</u>

Outside of laboratory settings, where real-life interrogation data might otherwise alleviate concerns about an experiment's predictive ability, equally serious methodological flaws emerge. Russano partially rests her conclusions on a 2004 study by Steven Drizin and Richard Leo ("Drizin & Leo Study")[3] which illustrates the dangers inherent in constructing purportedly empirical datasets for real-world false confession experimentation. Defendants' expert, Dr. Schafer, explained the study's flaw succinctly:

> Drizin and Leo analyzed 125 recent cases of proven interrogation-induced false confessions wherein indisputably innocent individuals confessed to crimes they did not commit. Of the 125 cases analyzed, 113 cases were derived from newspaper articles, four cases were derived from a single case cite, five cases were derived from another single case cite, one case was derived from a journal article, and one case from a book reference. In other words, 90.4 percent of the cases analyzed were derived from newspaper articles.

(Ex. 3, Schafer Report at 28-29.) Thus, the foundation for false confessions is a house of cards: both the "newspaper articles" sample and the study itself lack academic merit or predictive ability, not to mention that the study was never peer-reviewed by false confession experts (because it was a law review article). (Ex. 4, Deposition of Melissa Russano ("Russano Dep.") at 88:3-11.)

To understand why newspaper data is a problematic basis for experimentation, consider Drizin and Leo's study. Allegedly, it "includes only interrogation-induced false confessions that can be classified as 'proven'—that is, confessions that are *indisputably false* because at least one piece of dispositive evidence objectively establishes, beyond any doubt, that the confessor could not possibly have been the perpetrator of the crime." (Ex. 5, Article Published by Steven A. Drizin

---

[3] Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. REV. 891 (2004).

& Richard A. Leo at 923) (emphasis added). But in the same breath, Drizin and Leo admit that "[in some] cases, [they] were left only with the facts reported in newspaper stories, despite [their] determined efforts to acquire more information about the case." (*Id.* at 922.) These two statements are at odds: how can a sample of confessions, some of which are sourced "only [from] the facts reported in newspaper stories," be "indisputably false"? This study, which serves as a basis for Russano's opinions, is simply not credible.[4]

The crux of the issue is this: while it is universally accepted that coerced confessions occur, there is simply no "no methodology supported by empirical scientific research [that] can determine if any given confession is a coerced compliant confession." (Ex. 3, Schafer Report at 31.)[5] The objectionable experimental methods and inability to find representative and verifiable data samples, standing alone, should exclude Russano from testifying, as her "expert" opinions would mislead the jury into believing this pseudo-science is subject to the same rigor as other fields.

## II. In the alternative, Russano Should Not be Allowed to Offer Opinions Other Than Identifying Risk Factors That Could Lead to a Potential False Confession.

Russano's opinions are primarily split into two categories: (1) the circumstances under which a confession may be coerced, and (2) her "reliability analysis." While both should be outright prohibited, in the alternative, she should be limited to testifying about whether certain factors or techniques may raise the risk of a false confession, and nothing else.

### A. If permitted to testify, Russano's testimony must be carefully limited to only discussing her opinions on what factors raise the risk of a false confession.

---

[4] For further academic discussion on this issue, *see* David G. Ortiz, Daniel J. Myers, N. Eugene Walls, & Maria-Elena D. Diaz, *Where Do We Stand with Newspaper Data?*, 10 MOBILIZATION 397, 398 (2005) ("We find that the body of literature has located very serious flaws in newspaper data and suggests even more problems than have yet been fully documented."); *id.* at 397 ("[W]e conclude that newspaper data often do not reach acceptable standards for event analysis and that using them can distort findings and misguide theorizing.").
[5] Citing Saul Kassin, Allison Redlich, Fabiana Alceste, & Timothy Luke, *On the general acceptance of confessions research: Opinions of the scientific community*, 73 THE AMERICAN PSYCHOLOGIST 63 (2018).

10

If allowed to offer any opinions, Russano's testimony should be carefully limited to discussing her opinions on what specific factors may raise the risk of a false confession. She should not be permitted to analyze the underlying facts and evidence in this case and criticize the investigation in presenting her risk factor opinions, especially any opinions that are based on pure speculation (*e.g.*, lack of food, sleep deprivation, prolonged interrogation). Indeed, she has already been barred from offering such testimony by other courts in this district. *See Chatman,* 2018 WL 11426430 (discussed below). Yet she persists.

Russano's report lays out "risk factors" for false confessions including (a) "confirmation bias" or "tunnel vision;" (b) "individual vulnerabilities," such as age, intelligence, mental illness, and substance abuse; and (c) "situational risk factors" like prolonged custody, isolation, interrogation, sleep deprivation, physical abuse/threats of physical harm/physical discomfort, and interrogation tactics. (Ex. 1, Russano Report at 14-24.) The problem for Russano is that she purports to apply each of these risk factors to her cherry-picked facts from this case to conclude that Rios' confession was false. (*Id.* at 45.) She should be prohibited from digging into and analyzing a case's facts and evidence or assessing each step of an investigation as Russano aims to do here. Instead, any allowed opinion testimony from her must be limited to testimony that false confessions are a phenomena that exists and that her and like-minded researchers have an opinion that certain factors may create a risk for such a phenomena to occur.

For instance, in *United States v. Hall,* 974 F. Supp. 1198, 1205 (C.D. Ill. 1997) ("Hall II"), the court held:

> Dr. Ofshe ... will only testify to the correlation between false confessions and the various factors espoused by him. Thus, he can testify that false confessions do exist, that they are associated with the use of certain police interrogation techniques, and that certain of those techniques were used in Hall's interrogation in this case. Dr. Ofshe cannot explicitly testify about matters of causation, specifically, whether the interrogation methods used in this case caused Hall to falsely confess[.]

11

Russano's testimony has been similarly limited. In *Chatman*, the court limited her to "discussing the factors that are indicative of a false confession and whether those factors are present in this case. [But she could] not offer an opinion as to Plaintiff's actual innocence, whether he in fact provided a false confession, or the credibility of any witness at trial." 2018 WL 11426430, at *3. Similarly, in *Washington*, Russano was similarly limited to only addressing the potential factors that could lead to false confession. *See* 2022 WL 4599708, at 13.

Russano's report, however, goes well beyond false confessions "risk factor" expertise and digs deep into the underlying facts, drawing speculative inferences and criticizing the evidence and investigation as a whole. Examples of this practice are plentiful: (1) concluding Rios was deprived of food when the record is silent on the issue (*See* Ex. 1, Russano Report at 35), (2) concluding Rios was sleep deprived because there was no indication he slept (*id.*), and (3) concluding Rios experienced 7 hours and 21 minutes of custodial interrogation based on two 30-minute interviews (*id.* at 34). Each of these unsupported conclusions makes clear that she bases her factual interpretation of the evidence from the perspective of an advocate for Rios.

The upshot of her proposed testimony is to rob the jury of its opportunity to evaluate the evidence *on its own*. Because "it is a fundamental premise of our trial system that 'determining the weight and credibility of witness testimony ... belongs to the jury,'" the fact finder in this case should be able to make these factual and credibility determinations without the color of Russano's "expert opinion." *Davis v. Duran*, 277 F.R.D. 362, 370 (N.D. Ill. 2011) (*citing U.S. v. Scheffer*, 523 U.S. 303, 313 (1998)). Russano's factual (and often speculative) assessments improperly invade the jury's province and her risk factor opinions interwoven with factual analyses should be excluded. Thus, Dr. Russano should be limited to only addressing the risk factors that are indicative of a false confession, similar to Judge Lee's opinion in *Chatman*. *See*

*also Olson v. Gomez*, 2024 WL 3455066, at *8 (N.D. Ill. July 18, 2024) (limiting false confession expert to opinions related to the risk factors associated with a false confession).

### B. Russano's "Reliability Analysis" impermissibly invades the jury's province.

Russano's "reliability analysis" should be barred entirely. She engages in a post-hoc reconciliation of the details in Rios' statement with the "objective" evidence, categorizing each fact as "consistent" or "inconsistent" to deem the statement unreliable. (Ex. 1, Russano Report at 38-42.) In a 5-page factual critique, Russano (i) cites record evidence, (ii) churns that evidence though an "Accuracy and Completeness" analysis, and (iii) concludes that the confession does not measure up to her own metric of reliability. She then concludes that a "statement procured under the conditions described by Mr. Rios *cannot and should not* be relied upon to determine Mr. Rios' guilt or innocence." (Ex. 1, Russano Report at 45) (emphasis added).

Russano's attempt to opine on what is or is not the truth or, as she puts it, "reliable," should be barred as Courts do not permit expert witnesses to testify regarding whether a disputed confession is true or not, or likely occurred in a particular case. *See, e.g.*, *Chatman,* 2018 WL 11426430; *Washington,* 2022 WL 4599708; *Caine v. Burge,* 2013 WL 1966381, at *3 (N.D. Ill. 2013) (concluding that expert cannot opine that plaintiffs' confessions were false, nor may he measure the witnesses' confessions with the physical evidence); *Harris,* 2017 WL 2436316 (barring expert from testifying "to his comparison of the witnesses' confessions and physical evidence of the crime."); *see also Hall II,* 974 F. Supp. at 1205 (barring expert from assessing inconsistencies between statement to police and evidence presented at trial because the expert "has no more expertise to perform this task than any juror"). Accordingly, Russano's reliability analysis opinions, formed after comparing the investigation to the confession, must be excluded.

### III. Russano Should be Barred from Offering Opinions Beyond her Expertise.

If Russano is allowed to testify at all, her testimony must be limited to subject matters about which she has proven expertise. Russano admits she is not an expert in homicide investigations (Ex. 4, Russano Dep. at 275:21-276:1), firearms (*id.* at 276:9-11), ballistics (*id.* at 276:12-13), street gangs (*id.* at 277:8-10), police procedures (*id.* at 275:17-20), medicine (*id.* at 272:21-22), psychiatry (*id.* at 272:23-24), and clinical psychology (*id.* at 273:9-12). Yet, to reach her conclusions and opinions on Rios' statement, Russano critiques, analyzes, concludes, and offers opinions on expert areas outside of her province. *See, e.g.*, *Andersen v. City of Chicago,* 2020 WL 1848081, at *2 (N.D. Ill. Apr. 13, 2020) (barring expert from "opin[ing] on areas of criminal investigation outside of false confessions, including, but not limited to, police practices (outside of interrogations), appropriate evidence collection methods, and DNA results"); *Harris*, 2017 WL 2436316, at *15 (barring expert from testifying about other issues related to police investigation)

Russano's critiques of the murder investigation beyond police interviewing are plentiful and baseless. She criticizes detectives' lack of follow-up on "key details and discrepancies provided by Mr. Rios in his statement" and that "investigators might have placed less weight on information that was inconsistent with their theory of the case," contending these alleged failures demonstrate confirmation bias or tunnel vision. (Ex. 1, Russano Report at 32-33.) Russano has no expert basis to offer these opinions—they amount to direct, tactical criticisms of how the police conducted their investigation and weighed conflicting evidence amidst the uncertainty of an evolving situation. Most egregiously, she opines that Rios' confession was likely the product of police contamination, given various inconsistencies between Rios' statement and "objective evidence". (*Id.* at 39-42.) In particular, Russano opines on the discrepancies between Rios' statement and the ballistic evidence, including discussion of exit wounds, bullet wound locations,

14

and evidence of stippling—which are far afield from her own expertise. (*Id.* at 39.)

Permitting such opinions would directly contradict Rule 702 and *Daubert*. As explained in *Washington* which, as discussed in Section II above, wholly barred Russano's reliability analysis with respect to the underlying case facts:

> [A]pplication of [the "facets" of post-admission narratives indicative of reliability] to the present case requires Russano to consider matters outside her area of expertise. Those areas include the quality of corroborating evidence and police investigation practices. Applying Russano's reliability analysis to Washington's statement, for example, requires her to evaluate the "[a]ccuracy and completeness of the narrative," which in turn requires her to probe the evidence that Defendants considered during their investigation.

*Washington*, 2022 WL 4599708 at *14 (internal citations omitted). The *Washington* court went on to conclude that "[Russano] is not qualified to assess other areas of the criminal investigation such as the quality of the Officer Defendants' evidence." *Id.*

To Rios, this conclusion "makes no sense." (Ex. 2, Motion to Admit at 15.) He alleges there is "no principled difference" between allowing Russano to apply "risk factors" to the facts of the Rios interrogation and allowing her to apply the reliability analysis to the confession itself. (*Id.*) But the difference, is actually quite stark: where highlighting the presence of "risk factors" requires only knowledge of the case and a background in interrogations, applying the reliability analysis (as noted by the *Washington* court) would allow Russano to don the cap of several experts at once. This Court should bar Russano from posing as a multi-domain expert and testifying to professional critiques about which she has no professional qualification.

## **CONCLUSION**

For the reasons set forth above, the Defendants respectfully request that this Court exclude Russano's testimony, and for any further relief this Court deems just and proper.

DATED: January 9, 2026                                              Respectfully submitted,

15

| | |
|---|---|
| /s/Eileen E. Rosen<br>EILEEN E. ROSEN<br>*Special Assistant Corporation Counsel*<br>*for City of Chicago*<br>Eileen E. Rosen<br>Catherine M. Barber<br>Theresa B. Carney<br>Austin G. Rahe<br>Rock Fusco & Connelly, LLC<br>333 West Wacker, 19th FL<br>Chicago, IL 60606<br>(312)494-1000<br>erosen@rfclaw.com | /s/ Jeffrey R. Kivetz<br>JEFFREY R. KIVETZ<br>*Special Assistant Corporation Counsel*<br>James G. Sotos<br>Caroline P. Golden<br>Joseph M. Polick<br>Josh M. Engquist<br>Jeffrey R. Kivetz<br>THE SOTOS LAW FIRM, P.C.<br>141 W. Jackson Blvd. – Suite 1240A<br>Chicago, IL 60604<br>(630) 735-3000<br>jkivetz@jsotoslaw.com<br>*One of the Attorneys for Detective Mason and Joann Halvorsen, Special Representative for Ernest Halvorsen, deceased* |

/s/Timothy P. Scahill
TIMOTHY P. SCAHILL
*Special Assistant Corporation Counsel*

Steven B. Borkan
Timothy P. Scahill
Borkan & Schahill, Ltd.
20 South Clark Street
Suite 1700
Chicago, IL 60603
(312)580-1030
tscahill@borkanscahill.com
*One of the Attorneys for Reynaldo Guevara*

**CERTIFICATE OF SERVICE**

I certify that on January 9, 2026, I electronically filed the foregoing **Defendants' Response in Opposition to Plaintiff's Motion to Admit Opinion Testimony of Dr. Melissa Russano,** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants listed in the below service list:

| ***Attorneys for Plaintiff:*** | **Attorneys for Reynaldo Guevara** |
|---|---|
| Stephen L. Richards | Timothy P. Scahill |
| Joshua Richards | Steven B. Borkan |
| 53 West Jackson Suite 756 | Michael J. Schalka |
| Chicago, IL 60604 | Borkan & Schahill, Ltd. |
| Tel: (773) 817-6927 | 20 South Clark St., Suite 1700 |
| sricha5461@aol.com | Chicago, IL 60603 |
| jsrichardscriminallaw@outlook.com | (312)580-1030 |
| | tscahill@borkanscahill.com |

**Attorneys for City of Chicago**
Eileen E. Rosen
Catherine M. Barber
Theresa B. Carney
Austin G. Rahe
Rock Fusco & Connelly, LLC
333 West Wacker Drive
Chicago, IL 60606
(312)970-3474
ersoen@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com
arahe@rfclaw.com

/s/Jeffrey R. Kivetz
JEFFREY R. KIVETZ
*One of the Attorneys for Defendants*
*Halvorsen and Mason*