*Rios v. Guevara, et al.*
22-CV-3973

# EXHIBIT 3

**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF ILLINOIS

 3                   EASTERN DIVISION

 4   JAIME RIOS,                )

 5        Plaintiff,            )

 6   -vs-                       ) Case No.

 7   REYNALDO GUEVARA, MICHAEL  ) 1:22-cv-03973

 8   MASON, ERNEST HALVORSEN,   )

 9   BARBARA RILEY, CITY OF     )

10   CHICAGO, COOK COUNTY,      )

11        Defendants.           )

12

13       The videotaped videoconference deposition of

14   JACK SCHAFER, called for examination, taken

15   pursuant to the Federal Rules of Civil Procedure of

16   the United States District Courts pertaining to the

17   taking of depositions, taken remotely before ALICE

18   M. SCHWINGER, CSR NO. 84-2913, a Certified

19   Shorthand Reporter of the State of Illinois, on the

20   11th day of June, A.D. 2024, commencing at

21   10:12 a.m.

22

23

24
```

**Page 2**

```
 1   APPEARANCES:

 2       LAW OFFICE OF STEPHEN L. RICHARDS,

 3       (53 West Jackson Boulevard, Suite 756,

 4       Chicago, Illinois 60604,

 5       773/817-6927), by:

 6       MR. STEPHEN L. RICHARDS,

 7           appeared on behalf of the Plaintiff;

 8

 9       LEINENWEBER, BARONI & DAFFADA, LLC,

10       (120 North LaSalle Street, Suite 200,

11       Chicago, Illinois 60602,

12       847/251-4091), by:

13       MR. MICHAEL J. SCHALKA,

14           appeared on behalf of Defendant,

15           Reynaldo Guevara;

16

17       THE SOTOS LAW FIRM, PC,

18       (141 West Jackson Boulevard, Suite 1240A,

19       Chicago, Illinois 60604,

20       630/735-3300), by:

21       MR. JOSEPH M. POLICK,

22           appeared on behalf of Defendants

23           Mason and Halvorsen;

24
```

**Page 3**

```
 1   APPEARANCES (Continued):

 2       ROCK, FUSCO & CONNELLY, LLC,

 3       (321 North Clark Street, Suite 2200,

 4       Chicago, Illinois, 60654,

 5       312/494-1000), by:

 6       MS. EILEEN E. ROSEN,

 7       MS. THERESA B. CARNEY,

 8           appeared on behalf of Defendant City of

 9           Chicago;

10

11

12

13

14

15

16

17

18   ALSO PRESENT:  Abby King, summer intern

19   VIDEOTAPED BY:  MEGAN SCZYGELSKI

20   REPORTED BY:  ALICE M. SCHWINGER, CSR

21                 CSR No. 84-2913.

22

23

24
```

**Page 4**

```
 1       THE VIDEOGRAPHER:  Good morning.  I've now
 2   started the recording, and we are now on the
 3   record.  The time is 10:12 a.m. Central, on
 4   Tuesday, June 1, 2024.
 5       This begins the videoconference
 6   deposition of Jack Schafer taken in the matter of
 7   Jaime Rios versus Reynaldo Guevara, et al, filed in
 8   the United States District Court, Northern District
 9   of Illinois, case number 22-cv-3973.
10       My name is Megan Sczygelski.  I'm your
11   remote videographer today.  The court reporter is
12   Alice Schwinger.  We are representing Esquire
13   Deposition Solutions.
14       Will everyone present please identify
15   themselves and state whom they represent after
16   which the court reporter will swear in the witness.
17   MR. RICHARDS:  Stephen Richards on behalf of
18   the plaintiff in this case, Jaime Rios.
19   MR. POLICK:  Joseph Polick, P-o-l-i-c-k, on
20   behalf of defendants Mason and Halvorsen.
21   MS. ROSEN:  Eileen Rosen on behalf of
22   defendant City of Chicago.  And also here with me
23   is summer associate working for Rock Fusco, Abby
24   King.
```



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
5–8

Page 5

1    MR. SCHALKA:  Michael Schalka on behalf of
2  defendant Guevara.
3    THE COURT REPORTER:  My name is Alice
4  Schwinger, Illinois certified shorthand reporter.
5  This deposition is being held via videoconferencing
6  equipment.  The witness and reporter are not in the
7  same room.  The witness will be sworn in remotely
8  pursuant to agreement of all parties.  The parties
9  stipulate that the testimony is being given as if
10  the witness was sworn in person.
11        (WHEREUPON, the witness was duly
12        sworn.)
13        JACK SCHAFER,
14  called as a witness herein, having been first duly
15  sworn, was examined and testified as follows:
16        EXAMINATION
17  BY MR. RICHARDS:
18    Q.    All right.  Mr. Schafer, would you
19  prefer to be called mister or doctor, whatever
20  you'd like?
21    A.    Either one is -- is okay.
22    Q.    All right.  And you're a little bit
23  slightly out of sync with me.  It doesn't bother
24  me, but just to let you know if I have any, you

Page 6

1  know, issues with that, I'll let you know.
2        First of all, have you ever done a
3  deposition before?
4    A.    Yes.
5    Q.    All right.  How many depositions have
6  you done?
7    A.    Criminal or civil?
8    Q.    Well, let's deal with them one at a
9  time.  How many criminal depositions have you done?
10    A.    Done one -- one prior to this one.
11    Q.    One criminal deposition?
12    A.    Yes.  It was in a -- a juvenile case --
13    Q.    And in what --
14    A.    -- where I had to elevate the juvenile
15  to an adult status.
16    Q.    And what jurisdiction was that
17  deposition done in?
18    A.    Los Angeles, California.
19    Q.    Okay.  And how many civil depositions
20  have you done?
21    A.    I've done one prior to this one.  Or
22  actually two, two of them.
23    Q.    Two of them.  Okay.  So the depositions
24  that you've done prior to this one, do you remember

Page 7

1  the names of those cases?
2    A.    No, I don't.  The one I recently did was
3  Gomez versus Chicago.
4    Q.    All right.  And I'm familiar with that
5  one.  And that's -- that's a case involving
6  Detective Guevara; correct?
7    A.    Yes.
8    Q.    When did you do that deposition?
9    A.    I believe it was February 22, 2024.
10    Q.    Okay.  Before that deposition, have
11  you -- you said there was one other.  What was the
12  other civil deposition that you did?
13    A.    That was a personal lawsuit.
14    Q.    All right.  So a personal lawsuit,
15  meaning either you were suing somebody or somebody
16  was suing you on something unconnected with your
17  status as an expert witness?
18    A.    Yes.
19    Q.    Okay.  And let me just go over some
20  things I'm sure you've heard before in terms of
21  doing a deposition, and I know that you've had
22  probably experience testifying in court as well.  I
23  will ask you questions.  You can give answers.  If
24  you don't understand something I'm saying, please

Page 8

1  ask me to clarify.  If any of the defense attorneys
2  objects to my question, normally, just answer my
3  question.  If they object and instruct you not to
4  answer, then you should obey whatever their
5  instruction is and not answer, and then we'll have
6  maybe a discussion on whatever that question --
7  whatever the question might be.
8        If you can't hear me at any time, let me
9  know.  If you want to take a break at any time,
10  just let me know.  And as I'm sure you know, yes or
11  no rather than nods of the head or "uh-huh" are
12  better answers and easier to deal with.
13        Is everything clear so far?
14    A.    Yes.
15    Q.    All right.  I'm first going to go over
16  your education, then we can go on to other matters.
17  So, first of all, I don't see -- I don't see an
18  indication in your education of where you graduated
19  from high school.  Where did you graduate from high
20  school?
21    A.    Morgan Park High School in Chicago.
22    Q.    And what year?
23    A.    1972.
24    Q.    All right.  And then you got a bachelor



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
9–12

Page 9

1  of arts in psychology from Western Illinois
2  University; correct?
3      A.   Yes.
4      Q.   That's Western Illinois University in
5  Macomb?
6      A.   Yes.
7      Q.   Now, when you went for your degree in
8  psychology, was that a four-year course?
9      A.   Yes.
10     Q.   And did you reside in Macomb when you
11  were taking your -- getting your degree?
12     A.   Yes.
13     Q.   In terms of getting your psychology
14  degree, what were the sort of courses that you
15  took?
16     A.   I took general psychology degree --
17  courses.  I took statistic courses.  I took
18  clinical courses.  I took sociology, anthropology,
19  juvenile delinquency.
20     Q.   All right.  And you then got another
21  bachelor of arts later in business administration
22  from Elmhurst College in Elmhurst; correct?
23     A.   Yes.
24     Q.   And when you got that degree, did you

Page 10

1  attend full-time or was that part-time?
2      A.   Full-time.
3      Q.   Okay.  And were you a commuter or were
4  you living on campus?
5      A.   I was working at the time.
6      Q.   Okay.  But you were working at the time,
7  but you took courses in your spare time to earn the
8  second bachelor of arts; correct?
9      A.   Yes.
10     Q.   All right.  And then your next degree
11  was in -- at Western Illinois University, again in
12  Macomb, you got a master's in criminal justice;
13  correct?
14     A.   Yes.
15     Q.   And how did you earn that degree?  Did
16  you live on campus or was that by correspondence?
17  How did that work?
18     A.   I was in residence on campus.
19     Q.   Okay.  And that was for how long to get
20  your master's?
21     A.   Three semesters.
22     Q.   All right.  Now, you next have three
23  degrees at different times from Fielding Graduate
24  University in Santa Barbara; correct?

Page 11

1      A.   Yes.
2      Q.   Now, Fielding Graduate University,
3  that's a school which conducts their courses by
4  correspondence or virtual learning or something of
5  the sort.  Is that true?
6      MR. POLICK:  Objection to the form.
7          But you can answer.
8  BY THE WITNESS:
9      A.   It's a blended course of in-residence
10  and also correspondence.
11  BY MR. RICHARDS:
12     Q.   Okay.  You got a -- two master's of arts
13  there, one in political psychology and one in media
14  psychology; correct?
15     A.   Yes.
16     Q.   By the way, do you have your report and
17  resume in front of you if you need to refer to it?
18     A.   Yes.
19     Q.   Because I have it on the screen, but I
20  found that the share screen doesn't work as well as
21  you just looking at whatever you want to look at.
22  So what I'm going by is page -- it's file-stamped
23  page 56.  Either way, it's page 56, which is where
24  your resume begins on your combined resume and

Page 12

1  report.
2      A.   I see it, yes.
3      MR. RICHARDS:  All right.  Unfortunately,
4  folks, I have to take a break at this point just
5  for five minutes, and I'll be right back, unless
6  somebody wants a longer break, but I don't want to
7  make it too long at this point.  Is that okay with
8  everybody?
9      MR. POLICK:  Sure.
10     THE VIDEOGRAPHER:  Okay.  We are going off the
11  record at 10:23 a.m.
12         (WHEREUPON, a short break was
13          taken.)
14     THE VIDEOGRAPHER:  We are going back on the
15  record at 10:26 p.m.
16  BY MR. RICHARDS:
17     Q.   Okay.  Mr. Schafer, I just want to go
18  backwards a little bit.  The degree you got in
19  psychology from Western Illinois University, did
20  you earn any sort of honors with that?
21     A.   No.
22     Q.   Okay.  Similarly with the degree you got
23  in business administration, any honors, any special
24  recognition there?



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
13–16

Page 13

1   A.   No.

2   Q.   And lastly, master of arts in criminal

3   justice.  I'm not sure if this applies, but were

4   there any honors attached to that one either?

5   A.   No.

6   Q.   All right.  Now, going into the

7   course -- the degrees that you got from Fielding

8   Graduate University, you said that it's a blended

9   program where some of it is on campus and some of

10  it either remote or correspondence.  Is that a fair

11  statement?

12  A.   The classes were remote from the major

13  campus in Santa Barbara, and I attended classes at

14  Claremont College where we met with the professor

15  for classes.  So it's a remote location.

16  Q.   Okay.  And when you were attending the

17  classes remotely, were you in Illinois and the

18  professors were in California, or you were also in

19  California?

20  A.   I was in California in the classes

21  personally with the professors.

22  Q.   Okay.  The entire time or just part of

23  the time?

24  A.   Well, we were given assignments where we

Page 14

1   had to go home and do research, and I wasn't in

2   class at that time.

3   Q.   Okay.  But I'm just trying to get a

4   sense of what this is.  Was there an actual

5   Fielding Graduate University campus where you would

6   go and be in the same room as the professor, and

7   the professor would lecture?  Was that how it

8   worked?

9   A.   I had -- I attended a remote location in

10  Claremont College.  And at sometimes, I met in the

11  professor's house for the class, but it was always

12  in person but not always on the main campus.  And

13  there was a couple of classes I attended remotely

14  from UCLA.

15  Q.   Okay.  Were you living in California at

16  the time when you were attending -- you were

17  attending Fielding Graduate University?

18  A.   Yes.

19  Q.   All right.  And we'll get into

20  employment and that sort of thing later.  When

21  you -- you applied to Fielding Graduate University,

22  did you apply to other schools at the same time as

23  well or just to that one?

24  A.   Just to that one.

Page 15

1   Q.   All right.  And you eventually in 2007

2   got a Ph.D. in psychology; correct?

3   A.   Yes.

4   Q.   Now, for the Ph.D. in psychology, did

5   you have to write a thesis?

6   A.   No, I had to write a dissertation.

7   Q.   Okay.  Maybe I'm using the wrong term.

8   So -- and what was the dissertation that you wrote

9   to get your Ph.D. in psychology?

10  A.   The grammatical differences between

11  truthful and deceptive statements.

12  Q.   Okay.  And was that dissertation ever

13  published in a peer-reviewed journal?

14  A.   Yes.

15  Q.   What journal was your dissertation

16  published in?

17  A.   I don't remember the exact name.  It was

18  Amer -- applied psychology journal of

19  criminology or -- I don't remember.  I'd have to

20  look at my notes, my resume.

21  Q.   Okay.  Which you have that in front of

22  you; correct?

23  A.   Yeah, I'll look at it.  It's the Applied

24  Psychology in Criminal Justice.

Page 16

1   Q.   Okay.

2   A.   And I also published a book on the

3   dissertation.

4   Q.   And what was the title of the book?

5   Again, feel free to review your --

6   A.   Psychologic -- it was -- the title of

7   the book was Psychological Narrative Analysis.

8   Q.   And that's also on your resume; correct?

9   A.   Yes.

10  Q.   Now, since we talked about depositions,

11  have you -- in this particular -- well, in this

12  particular case, would I be correct in

13  understanding that you would be testifying as an

14  expert in confessions and interrogation techniques?

15  Would that be a fair summary of what you're

16  testifying about?

17  A.   Yes.

18  Q.   All right.  Have you ever been qualified

19  in any court as an expert in those subject matters?

20  A.   No.

21  Q.   All right.  And you -- the two -- the

22  case you mentioned earlier, the Gomez case, is that

23  the first case in which you have been hired as a

24  potential expert to testify as to interrogation



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
17–20

Page 17

1   techniques and confessions?
2       A.   Yes.
3       Q.   And I take it that case has not yet gone
4   to trial?
5       A.   No.
6       Q.   And you haven't yet been qualified as an
7   expert and testified in that case obviously;
8   correct?
9       A.   Yes.
10      Q.   Okay.  I'm going to go a little bit
11  backwards because we're going to go through some of
12  your employment history.  So, first of all, before
13  1980 --
14           (WHEREUPON, there was a brief
15            interruption.)
16  BY MR. RICHARDS:
17      Q.   Before 1980, basically you served -- you
18  served our country as a military officer, correct,
19  as a military personnel?  What?
20      A.   Yes.
21      Q.   All right.
22      A.   Yes.
23      Q.   And then from 1980 to '85, you were a
24  police officer with the Hinsdale Police Department;

Page 18

1   right?
2       A.   Yes.
3       Q.   Okay.  So when you were a police officer
4   with the Hinsdale Police Department, what were your
5   duties?  Where were you assigned?
6       A.   I was a patrol officer.
7       Q.   And that was for that entire period from
8   1980 to '85?
9       A.   Yes.
10      Q.   During that period, did you ever testify
11  in court?
12      A.   Yes.
13      Q.   How many times, approximately?
14      A.   I don't know.  I'd have to put it in
15  excess of a hundred, over five years.
16      Q.   All right.  And were you ever made
17  detective or did you ever serve as a detective
18  during that period of time?
19      A.   No.
20      Q.   In terms of the cases you testified in,
21  do you recall testifying in any murder cases?
22      A.   Not in Hinsdale.
23      Q.   Okay.  Well, during the period from 1980
24  to '85, during just that period, did you testify in

Page 19

1   any murder cases in other places?
2       A.   No.
3       Q.   All right.  And then your next -- your
4   next big batch of time is you became a special
5   agent with the Federal Bureau of Investigation
6   where you served from 1985 to 2005; right?
7       A.   Correct.
8       Q.   Okay.  Now, was -- was your thought or
9   your career path that you got your degree in
10  criminal justice with a view to doing work with the
11  FBI?
12      A.   At the time I was taking the degree?
13      Q.   Well, let me just -- let me just --
14      A.   Or --
15      Q.   -- let me just -- let me just check
16  that.  You got your -- okay.  You got your degree
17  in criminal justice, your master's in criminal
18  justice in 1985, and it looks like you entered the
19  FBI in 1985.  So I'm just asking are those two
20  events related?  Did you get that qualification to
21  get the job with the FBI or to help you get the
22  job, or what did -- how did that happen?
23      A.   It happened coincidentally.
24      Q.   Okay.  So it wasn't part of the career

Page 20

1   plan.  You just got the -- you got the degree and
2   you got the job with the FBI separately.  Is that
3   fair?
4       MR. POLICK:  Objection to it.
5            You can answer.
6   BY THE WITNESS:
7       A.   I -- the degree helped me get the job
8   with the FBI, but when I took the degree, I didn't
9   have the intention of joining the FBI.
10  BY MR. RICHARDS:
11      Q.   Okay.  And what led you to decide to
12  join the FBI?
13      A.   A friend of mine was a fellow police
14  officer.  We were fueling our cruisers up at the
15  gas station, and he said that it was his last day,
16  that he was going to become an FBI agent, and the
17  FBI was hiring.  He suggested I file an
18  application.
19      Q.   All right.  And then when you were hired
20  with the FBI as a special agent, I assume you had
21  to do the training at Quantico?
22      A.   Yes.
23      Q.   All right.  And you list your job with
24  the FBI as -- well, let me see if I can get this --



JACK SCHAFER

RIOS V. GUEVARA

June 11, 2024

21–24

Page 21

1  you cite your job with the FBI, you cite one job as

2  behavioral analyst, another as foreign

3  counterintelligence, another as counterterrorism,

4  another as civil rights/color of law, white collar

5  crime/public corruption, and violent crimes.

6        I mean, are those all separate

7  assignments?

8     A.   Some of them overlap.

9     Q.   Okay.  So --

10    A.   I was -- I was a pilot for the FBI and

11 that overlapped with my duties on the Indian

12 reservation.

13    Q.   Okay.  So, I'm sorry, you were -- I

14 didn't get the last.  You were what with the FBI

15 which overlapped with your duties on the Indian

16 reservation?

17    A.   I was an airplane pilot.

18    Q.   For the FBI?

19    A.   Flew airplanes for the FBI, yes.

20    Q.   I didn't know they had their own pilots.

21 And what -- what kind of thing -- did you pilot

22 helicopters?

23    A.   No.

24    Q.   What kind of planes did you pilot?

Page 22

1     A.   Fixed-wing Cessna 210 turboprop.

2          (WHEREUPON, there was a brief

3           interruption.)

4  BY THE WITNESS:

5     A.   The Cessna fixed-wing, Cessna 210

6  turboprop.

7  BY MR. RICHARDS:

8     Q.   Okay.  And what was -- what did you do

9  in terms of those flights?  Were those, like,

10 surveillance flights or just transportation, or

11 what was that all about?

12    A.   Primarily surveillance flights.

13    Q.   Okay.  For example, looking for drug

14 trafficking, things like that?

15    A.   No.

16    Q.   Surveillance of what, then?

17    A.   Spies.

18    Q.   Oh, okay.  Intelligence?

19    A.   Yes.

20    Q.   All right.  And you say that when you

21 worked in -- well, you have on the resume here from

22 1960 -- '86 to 1988, you worked in violent crimes

23 in Flagstaff, Arizona, investigating violent crimes

24 and specializing in child molestation on the Navajo

Page 23

1  and Hopi Indian Reservations.  Is that correct?

2     A.   That's correct.

3     Q.   All right.

4     A.   Yes.

5     Q.   Now, in the course of investigating

6  violent crimes on the reservation, did you ever

7  have an occasion to testify in court?

8     A.   Yes.

9     Q.   Approximately how many times?

10    A.   Probably dozens of times.

11    Q.   All right.  Were any of those cases

12 murder cases?

13    A.   The majority of them were.

14    Q.   All right.

15    A.   Homicide.

16    Q.   Now, when you were doing homicide

17 investigations, were you doing interrogations or

18 questioning, whatever you want to call it?

19    A.   Yes.

20    Q.   All right.  Do you know approximately

21 how many interrogations over that period you

22 conducted?

23    A.   I have no idea.  It would be -- the

24 entire time on the Navajo Indian Reservation, the

Page 24

1  Hopi Indian Reservation alone?

2     Q.   Yeah, I'm just talking about 1986 to

3  1988, Hopi Indian Reservation.

4     A.   It would be in the upper hundreds, maybe

5  a thousand interviews.

6     Q.   Okay.  In terms of preparing for your

7  interviews, did you get any training in

8  interrogation techniques at that point?

9     A.   Yes.

10    Q.   Did your -- did your training involve

11 the Reid interrogation method?

12    A.   Yes.

13    Q.   Aside from the Reid interrogation

14 method, were you trained in other methods of

15 interrogation?

16    A.   Yes.

17    Q.   What were the other methods of

18 interrogation you were trained in?

19    A.   I don't know if there's a specific name

20 for it at the time, but it resembles the PEACE

21 Model that's invoked today.

22    Q.   Okay.  And I think in your report you

23 described the differences between the Reid

24 interrogation and the PEACE Model, and maybe it's



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
25–28

Page 25

1  just for organizational purposes, we'll wait and
2  get into that a little bit later, but those were
3  the two major ones you used.  Is that fair?
4      A.   No.
5      Q.   Okay.  Was there another method that you
6  used besides Reid and the PEACE Model?
7      A.   No, I didn't -- I didn't discuss the
8  Reid or the PEACE in my paper.
9      Q.   Oh, okay.  I probably -- I think I'm
10  going by something else.
11          Did you do a report in the Gomez case
12  where you discussed those methods?
13      A.   Yes.
14      Q.    So -- but just to get back to it, in
15  terms of the methods you used between 1986 and
16  1988, you used the Reid method and what's now
17  called the PEACE method.  Is that fair?
18      A.   No, it wouldn't be good characterization
19  because what I did was I was exposed to a lot of
20  interrogation techniques and training, read books,
21  and I developed, based on my experience
22  interviewing people, I developed an eclectic
23  approach to interviewing.
24      Q.    Okay.  And this eclectic approach drew

Page 26

1  from both what's now called the PEACE method and
2  also from the Reid method; is that accurate?
3      A.    Yes, and other -- I've outlined my --
4  the eclectic approach I used, I wrote a book on it
5  called Advanced Interviewing Techniques, contains
6  my method of interviewing.
7      Q.   Okay.  And this method of interviewing,
8  the eclectic approach, this is something that you
9  developed yourself, I take it?
10      A.   Well, I took it from a number of
11  interviewing models, and I experimented with the
12  models and found out what worked and what didn't
13  work for me and my personality, and then I
14  highlighted those and used those.
15      Q.   Okay.  As long as we're -- well, let
16  me -- and I'll again defer to get more detail on
17  that, but would you say that during this period,
18  1986 to 1988, that you developed for yourself this
19  eclectic method?
20      A.   It was the beginning.  It was a
21  continuation throughout my career developing and
22  further honing my skills as an interviewer.
23      Q.   Okay.
24      A.   So it began.

Page 27

1      Q.   All right.  But you're saying it began
2  then, but it developed or changed over time as you
3  did more interviews or did more interrogations?
4      A.   That's correct.
5      Q.   All right.  And also, I assume you
6  got -- did more research or got more information on
7  what techniques to use?
8      A.   That's correct.
9      Q.   All right.  And then you have something
10  that doesn't have a date to it, white collar
11  crime/public corruption, Lancaster, California, and
12  then also civil rights/color of law, Lancaster
13  California, counterterrorism, where you say -- you
14  said your -- your duties were classified, so I
15  assume if I asked you about that, you'd have to
16  kill me?  That's -- it's a joke, but what?
17      A.   No, I would not kill you if you asked
18  that question.
19      Q.   Okay.  But I assume that's something
20  that you can't talk about because you're under
21  legal bar to do so?
22      A.   I wouldn't kill you, but I wouldn't
23  answer the question, so there would be no need to
24  kill you, sir.

Page 28

1      Q.   You got a point there.  In terms of the
2  cases you -- how long were you in Lancaster,
3  California, doing these three different things?
4      A.   From 19 -- I was assigned to the
5  Lancaster resident agency from 1988 to 2005.
6      Q.   Okay.  And did you do all three of those
7  things during that whole period, or did you switch
8  from one thing to another?
9      A.   I conducted simultaneous investigations
10  in all three areas.
11      Q.   All right.
12      A.   Because it was a resident agency.
13      Q.   Okay.  Well, let's first deal with white
14  collar crime/corruption.  You say you investigated
15  contract fraud in U.S. government agencies.  In the
16  course of doing that work, did you conduct
17  interrogations?
18      A.   Depends how you define interrogation.  I
19  did a lot of interviews of suspects, but I wouldn't
20  consider it interrogations.
21      Q.   Well, let me just give you, like, sort
22  of a broad distinction.  Could we agree that
23  there's something called custodial questioning or
24  interrogation and something called noncustodial



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
29–32

Page 29

1  questioning or interrogation?
2      MR. POLICK:  Objection to the form.
3          But go ahead and answer.
4  BY THE WITNESS:
5      A.    Custodial -- I define custodial
6  investigation as when the person is under arrest,
7  and they cannot leave the presence of the facility.
8  BY MR. RICHARDS:
9      Q.    Yeah, me too.  That's exactly what I was
10  saying.  So --
11      A.    You're under arrest.
12      Q.    But you're saying you did both forms,
13  where somebody is under arrest and types where
14  somebody is not under arrest, right, questioning?
15      A.    I interviewed many people in that --
16  those particular cases that I ran.
17      Q.    All right.  And in terms of the white
18  collar crime/public corruption segment, did you
19  testify in court in those cases?
20      A.    The grand jury, but I didn't testify in
21  court.
22      Q.    All right.  And then you say that you
23  also did civil rights/color of law where you
24  investigated hate crimes and color of law

Page 30

1  investigations.  Did those also involve various
2  forms of questioning?
3      A.    Yes.
4      Q.    And did any of those cases involve
5  testifying in court?
6      A.    Yes.
7      Q.    Do you know how many -- approximately
8  how many times you testified in court on the hate
9  crimes and color of law investigations?
10      A.    At least a dozen times.  I didn't keep
11  count.
12      Q.    All right.
13      A.    But I --
14      Q.    Please go ahead and finish your answer.
15      A.    I'm finished.  Thank you.
16      Q.    All right.  In any of those three areas
17  where you were in Lancaster, California, as an FBI
18  agent, did you -- were any of those what we might
19  call heater cases, highly publicized cases, cases
20  you would remember?
21      A.    Yes.
22      Q.    Can you give me the names of some of
23  those cases or the ones that stand out the most?
24      A.    In Lancaster, California, it was a group

Page 31

1  of white supremacists that called themselves the
2  Nazi Low Riders.  There was approximately 50 gang
3  members in this particular gang, and they would
4  terrorize the minorities in Lancaster, California.
5  They would beat them up, stab them, chop them up
6  with machetes, and murder them.
7          I was assigned to conduct civil rights
8  investigations to investigate the white supremacy
9  activities in Lancaster, California.  The major
10  case that I investigated involved three suspects.
11  The first suspect was -- I can't even remember him
12  anymore.  Rojas, Randy Rojas was one of them.  The
13  other one was -- I can't remember.  I can't
14  remember the names.  But they received life
15  sentences.  And it was a national case, and it had
16  international implications.
17      Q.    Okay.  So that's the one that stands out
18  the most, I take it?
19      A.    That's the one that had the most
20  notoriety.
21      Q.    Okay.  In any of the cases that you did
22  between -- between 1989 and 2005 when you were in
23  Lancaster, in any of those cases, were people who
24  were convicted with your assistance ever

Page 32

1  exonerated, to your knowledge?
2      A.    No.
3      Q.    Okay.  Now, you also say under Special
4  Agent, FBI, 1985 to 2005, you list your specialty
5  as behavioral analyst.  So in the period when you
6  were in Lancaster, was that kind of your
7  designation, behavioral analyst?
8      A.    As I mentioned earlier, I worked in a
9  resident agency.  A resident agency is a satellite
10  office out of a main division office.  And in the
11  resident agency, we typically conducted
12  investigations on a variety of cases, because those
13  offices are typically manned with fewer personnel.
14  So we had to take on extra duties.
15          One of the duties that I took on was
16  that of a behavioral analyst.  And that was -- that
17  was governed from FBI headquarters in Washington,
18  DC.
19      Q.    All right.  To become a -- first of all,
20  what is a behavioral analyst?
21      A.    Typically what people think of as
22  behavioral analyst, they think of the shows they
23  see on TV where the FBI agents would go to a crime
24  scene and they would try to figure out who



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
33—36

Page 33

1  committed the crime, based on the evidence and
2  artifacts at the crime scene.  In other words, they
3  tried to figure out who did it.  They did not have
4  a subject.
5       Behavioral analyst -- an analyst, on the
6  other hand, what we did, we typically had suspects
7  or subjects that we have -- were looking at.  We
8  would examine their personalities, and then we
9  would devise interview and interrogation strategies
10  that would facilitate our interview of those
11  people, but we had a suspect or subject.
12       Perhaps we wanted to recruit somebody
13  from an embassy.  We would target a particular
14  person, find out what their weaknesses are, and
15  then develop strategies to enhance the success or
16  probability of success for a recruitment.
17       Q.   All right.  So I -- I get that.  So one
18  idea of behavioral analyst is like -- it's like as
19  you see in some of these spy movies, like the one
20  maybe about the Russian spies in America where
21  they're always trying to recruit somebody and they
22  figure out what their weaknesses are and so forth?
23  Is that the idea there?
24       MR. POLICK:  Objection to the form.

Page 34

1       Go ahead.
2  BY THE WITNESS:
3       A.   Yes.
4  BY MR. RICHARDS:
5       Q.   Okay.  And as a behavioral analyst, did
6  that have anything to do with your work in, like,
7  nonespionage criminal cases, like just -- like the
8  murders and things like that?  I mean, do that --
9  do those skills have some bearing on that?
10       A.   Yes, the skills that I developed
11  throughout my career were highlighted when I became
12  a behavioral analyst.  In the behavioral analysis
13  unit, there's only nine of us at the time in the
14  country, and you had to be personally invited to
15  join the behavioral analysis program.
16       And what they did was they looked at the
17  work you did and the methods you used to solve
18  cases, and in my particular case, I caught a number
19  of spies.  And what I did throughout my career
20  prior to joining the behavioral analysis program
21  was to -- was to develop my skills as a behavioral
22  analyst to look at people's personalities, to
23  figure out how people react to different
24  situations.  And because of all the experience that

Page 35

1  I gained, they invited me to become a member of the
2  behavioral analysis unit, the behavioral analysis
3  program.
4       Q.   And was that -- was that beginning in
5  1985 or at some other point?
6       A.   Well, my -- my education or my -- my
7  motivation started back when I was a young boy,
8  when my mom would take me to the mall.  I would sit
9  and look at people's behavior.  That's when I
10  became interested in why people do what they do.
11  So from that point forward, I just gained more and
12  more knowledge.
13       Q.   All right.  But the designation of
14  behavioral analyst, that was a formal designation;
15  correct?  There's only nine of you in the country,
16  right, at that time?
17       A.   At the time, yes.
18       Q.   And what was the year or the date, if
19  you remember, when you garnered the title of
20  behavioral analyst?
21       A.   I believe it was 1997.  Because I was a
22  behavioral analyst for seven years, and I retired
23  in 2005, so that would put the date around 1997.
24       Q.   Okay.  And all the -- the time in your

Page 36

1  last part of your career until you retired in 2005,
2  you were in Lancaster, California; correct?
3       A.   Yes.
4       Q.   Now, when you left the FBI, why 2005?
5  Did you reach retirement mark?  Was it you just
6  wanted to do something else?  What was it -- what
7  was that all about?
8       A.   Well, it was economics, sir, because
9  when you reach 20 years in the FBI, you are
10  eligible for a full pension, and if you work any
11  longer than 20 years, you're basically working for
12  half your pay because you would receive half your
13  pension.  So what I did was I retired at 51, and I
14  took on another position.
15       Q.   And what was --
16       A.   With Phoenix Consulting.
17       (WHEREUPON, there was a brief
18  interruption.)
19  BY THE WITNESS:
20       A.   I took another position with Phoenix
21  Consulting.  So, therefore, it was an economic
22  thing.  I got my pension plus my salary with
23  Phoenix Consulting Group.
24



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
37–40

Page 37

1  BY MR. RICHARDS:
2  Q.  Okay.  And --
3  A.  They kick you out at 57.  You're forced
4  out.  You're forced to retire at 57 in the FBI.
5  Q.  All right.  So it made sense for you to
6  retire earlier and draw your pension and get this
7  additional job; right?
8  A.  Yes.
9  Q.  Okay.  What is Phoenix Consulting Group?
10  A.  They -- they work with a lot of
11  classified information, but what I can tell you is
12  that I conducted training and interview,
13  interrogation, negotiations.
14  Q.  Okay.  And as part of Phoenix -- Phoenix
15  group, did you receive a salary?
16  A.  Yes.
17  Q.  You weren't a partner or anything like
18  that?
19  A.  No.
20  Q.  Okay.  And then it looks like you say
21  that you were -- so you were with Phoenix
22  Consulting Group from 2005 to 2010; correct?
23  A.  Yes.
24  Q.  But then there also appears to be

Page 38

1  overlap because you say from 2006 to present, you
2  were also the owner of Schafer and Associates.
3  Were you doing the two things at once at one time?
4  A.  Yes.
5  Q.  Okay.  And Schafer and Associates,
6  that's something you own; right?
7  A.  Yes.
8  Q.  Do you have employees?
9  A.  No.  Just myself.
10  Q.  Okay.  Just yourself, sole proprietor.
11  Got it.
12  A.  Yeah.  LLC.
13  Q.  LLC.  Okay.  Now -- and I think we've
14  already covered this, but in terms of court
15  testimony or expert witness work, that's something
16  you're just kind of starting on at present;
17  correct?
18  A.  Depending on what field you're talking
19  about.
20  Q.  The field of interrogation techniques
21  and confessions in terms of testifying in court.
22  A.  I was certified as an expert witness in
23  white supremacist organizations at the state level
24  and at the federal level, and I testified in

Page 39

1  several court cases.
2  Q.  As an expert in white supremacist
3  organizations?
4  A.  That's correct.
5  Q.  And was that all in California?
6  A.  Yes.
7  Q.  Have you testified as an expert in any
8  other field in court besides what you've mentioned?
9  A.  No.
10  Q.  Okay.  So let's go over some of your
11  publications.  This starts on page 59 of the
12  resume.
13  A.  Okay.  I see it.
14  Q.  So we're going to go backwards because
15  that's the way I like to do things.  This book,
16  Advanced Interviewing Techniques:  Proven
17  techniques for police, military, and security
18  personnel, that's a book that you've authored
19  recently; correct?
20  A.  Yes, 4th Edition.
21  Q.  All right.  And when was the first
22  edition, by the way?
23  A.  2000 -- I'd have to look.  Let me look.
24  2004.

Page 40

1  Q.  And then another -- another book you
2  have is The Truth Detector:  An Ex-FBI Agent's
3  Guide for Getting People to Reveal the Truth.
4  That's also a book you authored; correct?
5  A.  Yes.
6  Q.  Let me go backwards, I should not have
7  jumped ahead.  Advanced Interviewing Techniques:
8  Proven techniques for police, military, and
9  security personnel, can you summarize or give me a
10  thumbnail sketch of what that book teaches or what
11  kind of techniques it teaches for interviewing
12  people?
13  A.  Specifically, that book presents
14  techniques for interviewing people and to avoid
15  obtaining false confessions and false information.
16  In other words, it creates an environment where the
17  truth is the focus and not a confession, so to
18  speak, but the truth.
19  Q.  All right.  And how do you do that?
20  What are your favorite techniques or the kinds of
21  techniques used to get at the truth rather than a
22  false confession?
23  A.  The first thing you have to do and
24  probably the most important thing in an interview

JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
41–44

Page 41

1    is to develop rapport with the person you're
2    speaking with, whether it be a witness or a
3    suspect.
4        Q.   Okay.  That's important.  After rapport,
5    what else?
6        A.   After rapport, what you want to do is
7    ask -- number one, you want to tell the person why
8    you're interviewing them at some point so there's
9    focus on their -- their discussion.  And the second
10   thing you want to do is just ask for a narrative.
11   You say you were involved in this particular
12   incident, tell me what happened.
13       Q.   All right.  Without using --
14       A.   And you just --
15       Q.   -- leading questions?
16       A.   Right.  You just -- you just get an open
17   narrative of what occurred or what their
18   participation is.  Or in the case of a witness,
19   what did you see on that day when the crime
20   occurred.
21       Q.   Okay.  So I've got rapport -- the
22   rapport, narrative.  What's next?
23       A.   Well, in -- depends on if the person is
24   going to confess, then you continue the interview

Page 42

1    and get the confession and inculpatory statements.
2    Or in the case of a witness, you obtain as much
3    information as you can from the witness.
4        Q.   Well, how do you go from rapport and
5    narrative to getting someone to confess?
6        A.   A lot of times people just confess
7    without any prodding to confess.  I've had several
8    cases where I walked in and -- and in one
9    particular case, it was a child molester.  I spoke
10   with him.  I brought him -- I invited him to the
11   office for the interview.
12           And I greeted him.  I developed good
13   rapport with him.  And then at one point at the --
14   in the beginning of the interview, I asked him if
15   he wanted anything to drink.  He said, yes, I'd
16   like a Coca-Cola.  I said fine, I'll get you a
17   Coca-Cola.  I stood up.  I went to the door.  I
18   turned the door handle.  And he said, Mr. Schafer,
19   why do you treat me with such respect after what I
20   just did?
21           So I was able to obtain an admission
22   from him by developing good rapport with him.  I
23   didn't use any interviewing techniques.  Some
24   people just, based on my experience, want to tell

Page 43

1    you what happened.  They want to tell you the
2    truth.
3        On another occasion, I had a simple
4    check of $25 that went NSF, and they kind of told
5    me, don't worry about that because the FBI handles
6    larger cases.  I said, well, I'm going to just
7    follow up on this lead.
8        So I went to the office where the check
9    was written, and I asked the secretary there, I
10   just asked her, I said, what about this check that
11   went NSF?  Can you tell me about it?  And she
12   exclaimed at that point, oh, my gosh.  I knew we'd
13   get caught.  And I said, how do you mean that?  She
14   said, well, I kept double books and there's fraud
15   and there's all kinds of shenanigans going on.
16       So I was able to obtain inculpatory
17   information without any interviewing techniques,
18   other than developing good rapport.
19       And another case I remember, I was on
20   the Indian reservation, and I was investigating
21   some rumors that some -- or one of the teachers was
22   molesting children, a lot of children, at his home.
23   And we went through the Indian reservation, and we
24   tried to get witnesses.  We tried to get

Page 44

1    information.  I came up empty-handed.  So I decided
2    that I wanted to go interview the person.
3        And all I did was walk in.  I knocked on
4    his door.  He invited me into his house.  And I
5    just told him, there's rumors that children have
6    been over at your house and they -- and you've been
7    engaged in sexual shenanigans with them.  And at
8    that point, he says, yeah, that's right.  I did it.
9    And he confessed.
10       So in those cases, you don't need
11   interviewing techniques.  Just sometimes people
12   just want to tell you things.  So I give them the
13   opportunity, tell me what happened.
14       Q.   All right.  Let's say there's another
15   case, though, where somebody doesn't want to tell
16   you what happened but is still willing to talk to
17   you, presuming if they're under arrest, you've
18   given them Miranda warnings and so on.  If they're
19   denying or they're not telling you the truth, in
20   your view, how do you get them to tell the truth?
21       A.   You made a distinction there about
22   custodial arrest and Miranda.  If I don't have
23   probable cause to arrest somebody, I don't arrest
24   them or interview them in custody.  Many of my



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
45–48

Page 45

1 interviews have been done outside of formal
2 custody.
3 Q. Okay. Well, let's -- let's take that
4 off the table for a moment. Either way, if it's
5 not -- formal custody or no formal custody,
6 somebody doesn't -- after developing rapport and,
7 you know, and maybe you ask for a narrative, but
8 you don't get the truth at that point or what you
9 think is the truth, how do you get somebody to
10 confess, in your experience?
11 A. Well, I present the person with a known
12 fact at the time that we know is true, and I'll
13 state, this seems inconsistent with the story you
14 just told me. How do we reconcile that?
15 Q. Okay.
16 A. And let them explain it.
17 Q. Do you in your own practice ever tell
18 them a false fact or something that's not actually
19 true? For example, your fingerprints are on the
20 gun, in the case where there's no fingerprints, how
21 do you explain that? Do you ever use that
22 technique?
23 MR. POLICK: Objection to the form.
24 But you can go ahead and answer.

Page 46

1 BY THE WITNESS:
2 A. I used it in one case, I used that ploy.
3 BY MR. RICHARDS:
4 Q. Okay. And was that successful?
5 A. Yes. The young lady, she was part of
6 the Nazi Low Riders, called her a featherwood, and
7 the male counterparts are peckerwoods. So she was
8 a featherwood associated with the Nazi Low Riders.
9 And in order to earn bolts, which they tattoo to
10 the inside of their thigh -- their biceps, they had
11 to kill a minority.
12 The three of them went out one night,
13 four of them, actually, went out one night and
14 decided to earn their bolts. So they found an
15 African-American gentleman, homeless, in a vacant
16 lot. They attacked him. They beat him over the
17 head 13 times with a two-by-four. And as he's
18 laying on the ground, Jessica Colwell, I remember
19 her name now, she came with a piece of conduit, and
20 that's where they put electrical wire through it,
21 that metal pipe, and she shoved it in his eye.
22 And I asked her, after numerous
23 interviews, I had went and asked her just one
24 question. I said, why would your fingerprints be

Page 47

1 on that pipe? And she said, I thought I wiped them
2 all off with my shirt.
3 Q. Okay. So that's an example of saying
4 something that's not true, but if the suspect, you
5 know, thinks it's true, they might -- they might --
6 they might confess. Fair?
7 A. In this particular case, she did.
8 Q. Okay. Now, in terms of getting people
9 to confess, do you ever talk to them about what the
10 legal situation might be, like what their -- the
11 difference, for example, from being a witness or
12 not being a witness, being a suspect, do you ever
13 ask questions of that sort?
14 MS. ROSEN: Objection. Form.
15 MR. POLICK: Join in that objection.
16 BY THE WITNESS:
17 A. I -- I --
18 MR. POLICK: You can go ahead and --
19 BY THE WITNESS:
20 A. I don't understand exactly what
21 you're trying to get at.
22 BY MR. RICHARDS:
23 Q. All right. I'm going to -- I'm going to
24 take another stab at it. Okay? In interrogating a

Page 48

1 suspect, do you ever say something to them like,
2 well, you know -- for example, they say they
3 weren't there, they weren't at the scene, but you
4 think they were there. Do you say something to
5 them like, you know, if you were there, you should
6 just tell -- and you saw something, you should tell
7 us you were there?
8 A. Are you talking about a witness or are
9 you talking about a suspect?
10 Q. Well, I'm talking actually about both.
11 A. Okay.
12 Q. If something -- go ahead.
13 A. Go ahead. Finish your question, sir.
14 Q. Oh, sure. Okay. Well, let me -- let me
15 go -- something else. The -- you're familiar with
16 the Reid interrogation method; correct?
17 A. Yes.
18 Q. Isn't it fair -- isn't one of the Reid
19 techniques that you sometimes suggest to a suspect
20 that he might have done something but there might
21 be an excuse or a reason for what he had done?
22 A. You said "you" in there, meaning me or
23 you as in the --
24 Q. No, in general, somebody using --



JACK SCHAFER                                      June 11, 2024
RIOS V. GUEVARA                                        49–52

Page 49

1 somebody using the Reid interrogation technique.
2 Is that a Reid interrogation technique?
3      A.   Yes.
4      Q.   Have you ever used that technique?
5      A.   Specifically, I'm not sure what you're
6 looking at.  Are you talking about minimization?
7      Q.   Correct.
8      A.   Or rationalization?
9      Q.   Both.
10     A.   I've used rationalization, yes.
11     Q.   Okay.
12     A.   And I've used minimization.
13     Q.   All right.  So let's deal with each of
14 those.  So rationalization, for example, in a
15 murder case might be something like, you know, I
16 know you did it, but, you know, you might have
17 acted in self-defense.  Isn't -- that's an example
18 of rationalization?
19     A.   Yes.
20     Q.   And minimization might be something
21 like, I know you were there, but it was your buddy
22 who actually did the killing.  That would be
23 minimization; right?
24     A.   If you're -- if you're trying to -- if

Page 50

1 that's the person that committed the crime and
2 he's -- he's trying to put it on his friend?
3      Q.   Yeah.
4      A.   Is that what you're saying?
5      Q.   Well, I'm asking you if you have
6 somebody who is reluctant to make a statement,
7 isn't it a Reid technique to say that to person,
8 well, we know you were there, but maybe you were
9 just a witness or maybe you weren't part of it, it
10 was your buddy who was there who did it, isn't that
11 a technique of minimization?  In other words,
12 you're involved but you're not really the worse
13 guy?
14     A.   You made the mention -- you made the
15 assumption that's a Reid Technique.  In the realm
16 of the Reid Technique, yes, that is minimization
17 and rationalization.
18     Q.   Okay.  Have you ever used that
19 technique, the minimization technique?
20     A.   Yes, I have.
21     Q.   And has it been successful for
22 you on occasion in getting somebody to make an
23 inculpatory statement, even if they don't at first
24 fully confess to what they actually did?

Page 51

1      A.   Yes.
2      Q.   All right.  Let me go on to the next
3 book, The Truth Detector:  An Ex-FBI Agent's Guide
4 for Getting People to Reveal the Truth.  What kind
5 of -- I assume that's sort of more general than
6 interviewing techniques.  What's that about?
7      A.   The book is -- actually came from my
8 experience as an interviewer over the years that I
9 conducted many interviews.  And that is what you
10 want to do is you want to create an environment
11 that predisposes people to want to tell you
12 something, and the techniques involved in that book
13 are elicitation techniques.
14          An elicitation is a -- is a statement
15 whereby you get people to reveal the truth without
16 them actually knowing that they're revealing
17 sensitive information.
18     Q.   How do you do that?
19     A.   Well, there's 16 techniques, and the
20 ones that I particularly use as my favorites, the
21 first one is called the presumptive.  And the
22 presumptive is when you -- you make a statement
23 that's either true or false.  The person that's
24 listening is either going to confirm the statement,

Page 52

1 or they're going to correct the statement.  So, for
2 example, I could say, so I understand you're from
3 Wisconsin right now, vacationing, and your answer
4 will be, no, I'm actually not in Wisconsin.  I'm in
5 Illinois, in this particular town.
6          See?  So we got you to admit you were
7 without asking you a direct question.  Because when
8 you ask people direct questions, their shields have
9 a tendency to go up, and you don't want that.  You
10 want to have an open conversation with that person.
11          The other reason it works, the
12 underlying principle is that people like to correct
13 other people.  They have a -- a strong need to
14 correct other people.  Because when you correct
15 somebody else, you place yourself above that
16 person.  I use that technique quite a bit when I'm
17 in college, teaching.  I will demonstrate -- I will
18 explain the technique, and then I will demonstrate
19 by calling on one of the students and make a rather
20 insightful comment, and I'll say, that's pretty
21 insightful for a freshman, and they're seniors.
22          And this one particular student knew
23 what I was trying to do, and she resisted saying
24 something right away, and then about five minutes



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
53–56

Page 53

1 later, she came back and says, well, you know I am
2 a senior, don't you?  I said, yes, I do.  And I
3 said, let's stop and talk about what happened.  Why
4 did you feel it necessary five minutes later to
5 correct me?  She said it was just bugging me.  I
6 had to correct you.
7       So that presumptive statement is founded
8 on that psychological principle of the people's
9 need to correct other people.
10      Q.   Okay.  I know you can't probably rattle
11 off all 16 techniques, but why don't you just talk
12 about the ones you think are most important.  You
13 just did one.  Are there others that are equally
14 important?  Or all 16 --
15      A.   Yeah, the other one --
16      Q.   Go ahead.
17      A.   Well, there are some -- I laid out 16
18 techniques because investigators have different
19 personalities, and each personality, some
20 techniques work better for them than others.  So
21 what I tell investigators when I train them, find
22 the ones that work for you and hone those skills
23 and then rely on those as your go-tos.
24      My first one is the presumptive we just

Page 54

1 discussed.  The second one is my go-to is called an
2 empathic statement.  And what an empathic statement
3 is, it's a -- you look at a person and you listen
4 to what they say and you look at their physical
5 disposition, their emotional disposition, and
6 listen to what they say, and then you repeat back
7 to them using different language how they feel.
8       So, in other words, if I see a student
9 on the elevator and they're happy, they're smiling,
10 so I would say to them, so you must have had a
11 really good day, because people that are typically
12 smiling are having a good day.  She says, yes, I
13 had a real good day because I passed the test that
14 I studied hard for.  And my next empathic statement
15 was, so that hard work really paid off.  And she
16 said, yes, it did, and then she went on to give me
17 a whole list of things that she did that day that
18 she was very proud of.
19      So using elicitation, the empathic
20 elicitation tool, you're able to obtain a lot of
21 information from people without them knowing that
22 they're revealing information to you.  In fact, we
23 would take the intelligence agents that I taught
24 this elicitation technique to to the mall in

Page 55

1 Pentagon City, and we would point out strangers to
2 them and say, I want you to go over and get that --
3 that person's Social Security number, their
4 computer passwords for home and business.  And the
5 students are able to obtain computer passwords from
6 perfect strangers within three to five minutes of
7 meeting them, using these particular techniques.
8       Q.   Okay.  Any -- you've got the empathic.
9 You've got the presumptive.  Anything else that you
10 want to tell me about?
11      A.   I like using -- I like using the
12 bracketing technique where if you -- you want to
13 find out what somebody earns, you bracket it.  You
14 say, I'll bet -- you're an attorney, you probably
15 bring in maybe 250, 300,000 a year.  Now, if we're
16 close, you have an overwhelming, what, need to
17 correct.  If we're close, you'll say, yeah, that's
18 about right, then we can kind of narrow it down
19 with a presumptive.  Oh, maybe about 270?  Yeah,
20 you're close.
21      So what you're doing is now revealing
22 information to me without you knowing you're
23 revealing specific information.  So bracketing
24 works.  You can use it for people.  You can use it

Page 56

1 for things.  You can use it for numbers.
2      Q.   Okay.  Let me go on to the next one.
3 Psychological Narrative Analysis:  A professional
4 method to detect deception in oral and written
5 communications.  What's that book about?  What's
6 psychological narrative analysis?
7      A.   Psychological narrative analysis is the
8 system whereby when you listen to people talk; you
9 can discern their behavioral characteristics, their
10 personality.  And you can also determine their
11 veracity.  Because when people speak, those words
12 are a direct representation of what those people
13 are thinking, because words are a direct
14 representation of what people think.
15      Because when we think, we think in the
16 present tense, and then that idea goes to an area
17 in our brain called Wernicke's area where that idea
18 in the present tense is then associated with a
19 meaning, and then the information is then shunted
20 over to Broca's area where that meaning then is
21 associated with words, and then it goes yet to
22 another area that tells us how to speak, move our
23 tongue, our lips, and articulate.
24      So it's a very deliberate process that



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
57—60

Page 57

1 people go through when they speak. And this is
2 unlike the nonverbal indicators, which are a
3 secondary result of some physiological response.
4        So what we're doing is looking at the
5 grammatical characteristics of what people speak,
6 not the words themselves, but the underlying
7 grammar structure upon which the words are said.
8    Q.   Mr. Schafer, I want to get more
9 information about this, but I have to take another
10 break for my own needs. So if we can take --
11    A.   Okay.
12    Q.   -- five minutes, I'll come back, and
13 we'll deal with this in more detail, what you just
14 said. Okay?
15    A.   Okay.
16    THE VIDEOGRAPHER: We are going off the record
17 at 11:28 a.m.
18        (WHEREUPON, a short break was
19          taken.)
20    THE VIDEOGRAPHER: We are going back on the
21 records at 11:37 a.m.
22 BY MR. RICHARDS:
23    Q.   Okay. Mr. Schafer, I'm going to retune
24 my Broca's -- Broca's area -- Broca's area of my

Page 58

1 brain to ask you my previous question because your
2 answer was a little involved, and I want to make
3 sure I get it.
4        So a psychological narrative analysis,
5 you were explaining that to me, and please feel
6 free to repeat what you said and just go over it.
7 What's -- what is psychological narrative analysis?
8    A.   It's a method by which you can determine
9 somebody's behavioral characteristics and their
10 veracity by the words they speak.
11    Q.   Okay. And explain in detail, how do
12 you -- how do you get -- how do you determine their
13 veracity by the words they speak? What are the
14 kind of tells? How does that happen?
15    A.   There's two ways people basically lie.
16 The first way people lie is by obfuscation. In
17 other words, they use a lot of word qualifiers,
18 tentative answers, innuendo, inferences, judo,
19 verbal judo, those types of things to kind of
20 confuse the listener.
21        The other way people lie is by omission.
22 In other words, they tell the truth up to the point
23 they want to withheld the information, and then
24 they tell the truth again. This is the way

Page 59

1 90 percent of the people lie using omission.
2 Because basically their story is true, and the only
3 thing that the person has to remember is the part
4 that they withheld or left out.
5        So in psychological narrative analysis,
6 there are certain words that people use to bridge
7 that gap. It's like you're building a road up to a
8 river, and you stop the road and there's a bridge,
9 and then the road continues on the other side of
10 the river. There's only so many ways to build that
11 bridge until the bridge collapses.
12        In grammar, and particularly
13 specifically English grammar, there's only so many
14 ways to bridge that gap. And based on my research,
15 I discovered there's several words that people
16 typically use to bridge that gap. And the word
17 that most people use to bridge the gap is the word
18 "and then." So when you hear the text bridges,
19 particularly during the incident portion of their
20 narrative, that indicates that there's left out
21 information or withheld information.
22        This works with witnesses as well as
23 suspects, because witnesses often will tell the
24 story and they will only articulate or tell you the

Page 60

1 parts of the story that they think are relevant,
2 and they would often leave out information. So you
3 listen to their narrative and you start hearing
4 these text bridges and you know that they're --
5 they're leaving out information that they don't
6 think is relevant but, in fact, may be relevant to
7 the case.
8        So this identifies where people leave
9 out intentionally or unintentionally leave out
10 information.
11    Q.   Okay. And you said one text bridge is
12 "and then"; correct?
13    A.   Then.
14    Q.   Then.
15    A.   The word "then."
16    Q.   Just the word "then"?
17    A.   Yeah, then or and then.
18    Q.   Okay. And you said you did experiments
19 to determine that these were words being used as
20 text bridges. What kind of research did you do
21 exactly?
22    A.   It was part of my dissertation. What I
23 did was I filmed somebody participating in a
24 shoplifting event. In other words, they walk into



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
61—64

Page 61

1 the store. They pick up an item. They put the
2 item back. They walk over to the cooler. They
3 open the cooler. They pull out a nondescript
4 bottle of something to drink, put it in their
5 pocket, and then they leave without paying for it.
6      So I showed a video to people, and I
7 asked them to write down everything they did in the
8 store, including the fact that they shoplifted.
9 And then I would have them take out another piece
10 of paper and write down everything they did in the
11 store but this time omit the fact that they
12 shoplifted. And because we were able to use the
13 subjects as their own control group, we control for
14 education, language use, and personality
15 characteristics.
16      So we examined both these narratives,
17 and we found out how do people avoid or withhold
18 information that they shoplifted.
19   Q.   Okay. Let me -- let me just suggest
20 something else to you and just for my own
21 experience to see if you agree or disagree. What I
22 sometimes tell juries is that when people are
23 very -- are telling lies, they're often very
24 inconsistent, the reason being if you're telling

Page 62

1 the truth, you have a visual memory of what
2 happened, but if you're making something up, you
3 don't have that visual memory, so your stories tend
4 to be inconsistent.
5      Is that something you've observed or you
6 think is true, or is that just something I made up?
7   MR. POLICK:  I'm going to object to the form.
8      But you may answer the question.
9 BY THE WITNESS:
10   A.   The research demonstrates that people
11 who lie use fewer words than people who tell the
12 truth because they haven't experienced it. They
13 don't have the emotional aspect of it. So, yes,
14 they do use similar -- smaller words.
15      But what they have a tendency to do is
16 to leave out information. So they'll tell the
17 truth. They'll leave out information and tell the
18 truth. That mimics truthful statement. And if you
19 don't know what a text bridge is and don't
20 recognize it, you don't realize that they're
21 leaving out information.
22 BY MR. RICHARDS:
23   Q.   Okay. I guess my -- my point was
24 somewhat more similar -- simple, which is that if

Page 63

1 somebody is lying and has to repeat the same story
2 in different context, to the police, on the witness
3 stand, and so forth, and if they don't have a
4 visual or emotional memory of the event, they will
5 tend to be inconsistent. Is that something you've
6 observed?
7   A.   Yes. In fact, in this Rios case, I
8 observed it. Because I looked at the police
9 reports and the police -- the statements that were
10 made by Mr. Rios, and then I looked at his
11 deposition and I -- and I -- and I noticed that he
12 had a lot of inconsistencies in his deposition as
13 opposed to his initial interview and court report
14 statement.
15      So, yes, so people who tend to not be --
16 lie, that is one hallmark of that, whether that is
17 the case here or not, but it's still -- there's the
18 hallmark there. There's the indicator.
19   Q.   Okay. Now, and so, in other words,
20 psychological narrative analysis is you're
21 analyzing the narrative and looking for these kind
22 of bridge terms. Is that the basic part of it?
23   A.   That's -- that's one part of it, yes. I
24 developed an algorithm that --

Page 64

1   Q.   Are there other parts to it?
2   A.   Yes, there are many other parts to it,
3 and I developed an algorithm that's currently in
4 commercial development to assess the veracity of
5 statements. And this is one of the things that I'm
6 working on because of the false confession
7 controversy that's going on right now.
8      Because in the false confession
9 research, there's a lot of problems with what we
10 call external validity. In other words, most, if
11 not all, of the false confession research is
12 conducted in the experimental setting using college
13 students, and they're trying to say because it
14 works with college students, we can externalize or
15 we can generalize to a larger population,
16 specifically suspects in the interview room, and
17 that cannot be done.
18      There is no external validity between an
19 experiment conducted by students, on students, or
20 the -- or I should say there's no difference --
21 there's a big difference between the students and
22 the person and the suspect in the interrogation
23 room undergoing real interrogation with real
24 consequences.



JACK SCHAFER                                                    June 11, 2024
RIOS V. GUEVARA                                                      65–68

Page 65

1    So therein lies the problem. And so
2  what I'm trying to do is find an alternative that
3  will bridge that particular gap. And I think
4  because all humans, especially English speaking,
5  native English speaking people, use the same
6  grammar structures, whether you're a suspect in an
7  interviewing room or a you're a student in a
8  laboratory setting. And what this does, then, is
9  it then crosses over to the interrogation.
10      So what we can do is resolve a lot of
11  the controversy that's involved with false
12  confession research, primarily external validity.
13     Q.   Okay. And by external validity-- so, in
14  other words, you're say -- well, a couple of
15  different things. You're saying that the
16  experiments that false confession experts do, you
17  think don't have validity because they're using
18  students rather than real suspects or criminals.
19  Is that one thing you're saying?
20     A.   I --
21     MR. POLICK: Objection to the form.
22      But go ahead.
23  BY THE WITNESS:
24     A.   I don't think it, sir. I know it.

Page 66

1  BY MR. RICHARDS:
2     Q.   Okay. Fine. You know it. And in terms
3  of your psychological narrative analysis, you,
4  however, did use students to develop this theory.
5  Is that fair?
6     A.   Yes.
7     Q.   Okay. But your hypothesis is that
8  because the -- your method of psychological
9  narrative analysis reflects something deep within
10  the brain, you developed a technique which applies
11  both to students and to real-life criminals and
12  suspects?
13     A.   That's my hypotheses that I'm
14  developing, and I'm currently doing research.
15     Q.   Okay. And what -- that hypothesis that
16  you're developing and you're doing research, are
17  you using students again for those experiments?
18     A.   The last experiment I did, I used --
19  with false statements, I used students, and then
20  the semester ended. And in the fall, I plan to
21  make contact with several prisons and run the same
22  experiment on prisoners.
23     Q.   But you have not done that as of yet?
24     A.   Not yet, no.

Page 67

1     Q.   Okay. Then your next book is Power
2  Tools for Success; correct?
3     A.   Yes.
4     Q.   Yeah, so -- and this was published in
5  Tokyo, Japan; correct?
6     A.   Yes.
7     Q.   Okay. Was it published in Japanese, by
8  the way, or English or both?
9     A.   Japanese.
10     Q.   Okay. Well -- and what are the power
11  tools for success?
12     A.   Primarily, I -- I wrote the book, we
13  talked about it earlier, The Like Switch. The Like
14  Switch was translated into 21 languages, one of
15  them being Japanese. It was very popular in Japan,
16  and the company wanted me to write a -- what they
17  call a magazine book. It's like -- in Japan they
18  have magazines that look like books, but they call
19  them magazines, and they only address one topic.
20      And so the topic they wanted me to talk
21  about was how do you develop rapport with --
22  with -- with people of interest in the romantic
23  situation, how do you develop rapport with people
24  in the business situation, and how do you

Page 68

1  communicate better with them. And I explained in
2  that book the techniques that were used to -- that
3  are used to become a better communicator.
4     Q.   So, in other words, Power Tools for
5  Success links to your next book on the list, which
6  is called The Like Switch: An Ex-FBI Agent's Guide
7  to Influencing, Attracting, and Winning People
8  Over?
9     A.   Yes.
10     Q.   Okay.
11     A.   That was --
12     Q.   So --
13     A.   That was the -- that was the foundation
14  for the publisher. See, I think we can narrow this
15  down, and what he -- what I think the primary
16  emphasis of the book was dating. I guess in Japan
17  they have trouble dating, and so they thought that
18  if we just kind of hyperfocus on dating, and then
19  the secondary focus would be on business
20  relationships.
21     Q.   Okay. So that's -- that's the point of
22  it. That's why the Japanese wanted to read about
23  it, I guess, but what is The Like Switch? What
24  does that mean?



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
69–72

Page 69

1    A.    What The Like Switch is is a culmination
2  of all the techniques I used as a
3  counterintelligence officer, as a criminal
4  investigator, working in homicides and child
5  molestation and other cases, recruiting spies,
6  conducting counterintelligence operations, talking
7  to suspects, getting confessions from suspects.
8  All those techniques that I used as an FBI agent, I
9  converted those into techniques that people in
10  social situations can use and also people in
11  business situations can use to enhance their
12  relationships with the people they want to connect
13  with.
14    Q.    Okay.  So let me just -- so is -- does
15  The Like Switch basically mean, you know, sort of
16  finding common ground with somebody?  For example,
17  if you want to -- if you're dating somebody and
18  want to, you know, be romantic, you sort of find
19  common grounds or interests or something?  Is that
20  the idea, or is it more than that?
21    A.    Well, it's more than that.  It's how do
22  we approach people, and then when we approach
23  people, how do we talk to people.  So there are
24  what I -- I identified as three friend signals.

Page 70

1  First friend signal is an eyebrow flash.  It's a
2  quick up and down movement of the eyebrow.  That is
3  a long distance signal that we share with one
4  another when we cross one another's paths.  In
5  other words, I will eyebrow flash you, you will
6  eyebrow flash me in return.  That means that you
7  are not a threat.  And it's just a quick up and
8  down movement.  It's a long distance signal.
9        And then the second signal that is a
10  friend signal is a head tilt.  And the reason
11  that's a friend signal is because you exposure your
12  carotid artery, a very vulnerable part of your
13  body.  And so I'm telling you, hey, when I tilt my
14  head, I trust that you're not going to take
15  advantage of my vulnerabilities.
16        And it -- it works in the animal world
17  because if you have -- people have dogs.  What
18  happens when the homeowner -- or the dog owner goes
19  home, what happens, the dog will sit there and it
20  will tilt its head.  And what that dog is saying is
21  I'm -- I'm not -- I'm not a threat to you.  And
22  then you go and rub their tummy or whatever and
23  then you're not a threat to them because they're
24  exposing the underbelly when they roll over for a

Page 71

1  tummy scratch.
2        So those are all signals that both
3  animals and humans use.
4        The last one is the smile.  When we
5  smile, we release endorphins.  Endorphins is the
6  hormone that makes us feel good about ourselves.
7  And that ties in with the Golden Rule of
8  Friendship:  If I want you to like me, I'm going to
9  make you feel good about yourself, and if you feel
10  good about yourself, you're going to like me.  So
11  what the smile does is you release endorphins,
12  therefore, I make you feel good about you.  And
13  that fulfills the elements of the Golden Rule of
14  Friendship.
15        Now, when you first talk to somebody, if
16  you don't have anything to say, you try to look
17  for, number one, you look for common ground.
18  There's three types of common ground.  First one is
19  contemporaneous common ground.  That means we share
20  something in common.  You are a student at Western
21  Illinois; I'm a student at Western Illinois
22  University.  We share that in common.
23        The second one is temporal common
24  ground.  That is over time, we -- we share

Page 72

1  experiences.  People often ask me where am I from,
2  and I'll say I'm from Illinois, and the person I'm
3  talking to will say, well, I'm from Texas, so what
4  I'll say is I went to Texas to do some training
5  several years ago.  So over time, we have what?  We
6  have common ground.
7        Typically if somebody is in the Army
8  now, I'll tell somebody, well, I was in the Army in
9  1974; so over time, we connect with common ground.
10  The last one is vicarious common ground.  In other
11  words, we live through another person.  One
12  particular case, I met a NASCAR driver -- or not a
13  driver, but somebody who liked a NASCAR driver.  I
14  think his name was Stewart something or other.  And
15  I don't know much about NASCAR, so in order to find
16  common ground with him, I noted that my sister
17  actually -- or not my sister, but my wife's sister
18  is a NASCAR fan and knew the driver.  And I said,
19  oh, I don't know the guy, but my sister does.  So
20  through my sis -- or my wife's sister, I was able
21  to get common ground with that person.
22        So those are three ways that -- basic
23  ways we get common ground.  And the other one is an
24  empathic statement, and we discussed those earlier.



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
73—76

Page 73

1  You want to keep the focus on the other person and
2  say, so you -- like NASCAR, so you are feeling good
3  today, so you're feeling bad today.
4      Q.   Okay.  So -- and would -- would this be,
5  in terms of your overall work or your theories,
6  would this be kind of an outgrowth of the rapport
7  aspect of interviewing?
8      A.   It is the interviewing process.  The
9  first thing I want to do when I interview somebody
10  is I want to eyebrow flash.  And the -- and the
11  problem comes with a lot of interviewers is that
12  when you have a child molester come in, you don't
13  particularly like this person because they've done
14  some heinous crimes.  So naturally what we don't
15  normally do is eyebrow flash people we don't like.
16      So what you have -- what I tell trainees
17  or other agents or police officers, I say, when you
18  speak to people you don't particularly like, like a
19  child molester, make sure you what, issue what?
20  Eyebrow flashes.  Make sure you tilt your head,
21  make sure you smile, make sure you -- you have a
22  good greeting for that person, because you want to
23  develop rapport with that person.
24      Q.   Okay.

Page 74

1      A.   And then you seek -- the next thing you
2  want to do is seek common ground and then use
3  empathic statements.
4      Q.   Okay.  The next publication is Advanced
5  Interviewing Techniques:  Proven techniques for
6  police officer, military, and security personnel.
7  That's the 3rd Edition of what we just discussed,
8  the 4th Edition, so I assume that's kind of the
9  same book, just an earlier version; correct?
10      A.   Yes.
11      Q.   And then 2010, you have Fibs to Facts:
12  A Parental Guide to Effective Communication.
13  What's that about?
14      A.   Parents would often come to me and ask
15  them, how do I communicate with my child without
16  shutting them down.  In other words, if I ask
17  direct questions to my children, they typically
18  will go shields up, and they will go on the
19  defensive and only respond with single-word
20  answers.
21      So using elicitation techniques, I was
22  teaching parents how to use the elicitation
23  techniques to create an environment where their
24  children are predisposed to talk with them.  As

Page 75

1  opposed to asking direct questions, use elicitation
2  techniques.  Elicitation techniques typically do
3  not involve any questions or very few questions, if
4  any.
5      So what you're doing is just creating a
6  better environment so people communicate.  And do
7  this a lot in my interviewing.  What I want to do
8  in an interview is I want to create an environment
9  that people are comfortable in, that they want to
10  tell me something, not because they have to,
11  because they want to.  I don't force it from them.
12  They -- they want to do this willingly and
13  voluntarily.  And that's the outgrowth of how you
14  can -- if it works on criminals, it's certainly
15  going to work on your kids.
16      Q.   Okay.  And then Psychological Narrative
17  Analysis:  A professional method to detect
18  deception in oral and written communications.
19  Again, that's the same topic we discussed before.
20  That grows out of your dissertation about
21  psychological narrative analysis; correct?
22      A.   That's the first edition.
23      Q.   Okay.  And then you've got the 2nd
24  Edition of Advanced Interviewing Techniques, so we

Page 76

1  don't need to go into that.  Then you have a book
2  called Catch a Liar.  What's that?
3      A.   The Catch a Liar book is an abridged
4  version of Psychological Narrative Analysis.
5      Q.   Okay.  And then Protecting America's
6  Borders.  I assume that has something -- that's
7  something else.  That's something about national
8  security or politics, or what's that about?
9      A.   No, what happens with -- if you go
10  overseas and you return back to the United States,
11  you have to typically go through customs and you
12  have to go through immigration.  When you go to the
13  customs official and show your passport, that
14  customs official has typically 60 to 90 seconds to
15  determine if that person is a threat to the United
16  States or if they're withholding things that need
17  to be declared.
18      So what this book is, it's filled with
19  techniques that are used to determine if somebody
20  is possibly a national -- a threat to national
21  security or they're withholding goods that should
22  be declared.  And if they see these certain
23  indicators, then they'll send the person to
24  secondary.



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
77—80

Page 77

1    Q.    Okay.  Yeah, I'm familiar with that
2  process.  So is this just a summary of what they --
3  what they should be doing when people -- they
4  screen people coming in at the border?
5    A.    Yes.  There's techniques that -- that --
6  that I created.  I trained a lot of the CBP people
7  with these techniques.  They're -- they're just
8  minor nonverbal and verbal indicators that say
9  perhaps there may be something wrong.  In fact, if
10  there's more than one or two indicators present,
11  then that's an indication that they should be sent
12  to secondary for further interrogation or inquiry.
13    Q.    Okay.  And then we -- we can skip over
14  the first edition of Advanced Interviewing
15  Techniques.  And then you have a series of book
16  chapters.  So one of the book chapters is in
17  Spanish.  It's called Influencers.  Is that -- is
18  that just a Spanish version of something else you
19  wrote separately?
20    A.    That is -- typically when I do book
21  chapters, somebody will ask me, would -- would I
22  mind just summarizing the techniques that are in
23  The Like Switch and put it into another chapter.
24  Because it was -- The Like Switch was translated

Page 78

1  into Spanish, and it -- it -- the sales were pretty
2  good in Spanish, and so they wanted just another
3  way to, I guess, hook on to the success of The Like
4  Switch.  So I wrote the chapter for them.
5    Q.    And the next one is a chapter, Verbal
6  Cues to Detect Deception, which looks like it's
7  part of a Turkish book.  What's that about?
8    A.    Yeah.  They -- that is basically the
9  Catch a Liar book that's -- that has a little more
10  meat to it.
11    Q.    Okay.  And then you have a book -- or a
12  chapter called Making Ethical Decisions:  A
13  Practical Model.  What's that chapter about?
14    A.    That is as a police officer, we're faced
15  daily with ethical decisions.  And this trains
16  police officers to recognize ethical dilemmas and
17  also provides them tools to prevent or -- in other
18  words, prevent dilemma from occurring or handling
19  dilemma if it does occur.
20    Q.    Okay.  And is there anything in that --
21  in that chapter that impacts interrogations or
22  questioning or false confessions, anything like
23  that?
24    A.    Yes, it does.  In fact, the ethical trap

Page 79

1  is what I teach interviewers.  And the ethical trap
2  is -- and I'll give you a good example.  You have a
3  rookie officer who gets in the car with his
4  training sergeant, and he smells alcohol on the
5  sergeant's breath.  Now, there's an ethical
6  dilemma.  So what do we do?  Do we turn the person
7  in, or do we let him drive?  And I'll ask my
8  students, what would you do?  Some of them say,
9  well, I'd let him drive and -- and just ignore it.
10    And then I tell them, what happens if he
11  gets two blocks from the police station and he
12  kills a wife -- a mom and a couple of kids and a
13  dog, and then the investigators are going to come
14  back and ask the rookie, did you smell alcohol on
15  the person's breath?  If he says yes, he's in
16  trouble because he should have reported them.  If
17  he says no, he's lying, and he's going to be
18  exposed to a lot of administrative problems.
19    So what I teach people to do is look for
20  ethical traps.  So in interviewing, if you are
21  tempted to use or cut a shortcut in an interview,
22  you got to think, what happens if somebody examines
23  this and I -- and I have to, what, get caught
24  either way.  Do I -- do I -- if you do something

Page 80

1  wrong, do I cover it up and lie or do I admit to it
2  and get fired or criminally prosecuted.
3    So I teach all the investigators and
4  patrol officers that you have to recognize ethical
5  traps.  And that's the primary thing that I focus
6  on is ethical traps.  You want to avoid those at
7  all costs.  And that -- how you avoid it, do the
8  right thing, and you'll never have an ethical
9  problem.
10    Q.    All right.  So, for example, just apply
11  to interrogations using physical force, even mild
12  physical force, would be unethical, correct, as
13  well as illegal?
14    A.    Correct.  It's an ethical trap because
15  if you use -- if you use force and get away with
16  it, nobody says anything, good for you.  But what
17  happens if -- if somebody says, hey, you used
18  physical force, did you or did you not use physical
19  force, then you're faced with an ethical dilemma,
20  do I lie and say no, I didn't do it, or do I tell
21  the truth and say yes, I did.  Either way, you're
22  in big trouble.  So a way to avoid that is don't
23  beat people up.  Don't use physical force in an
24  interrogation.



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
81–84

Page 81

1    Q.    And similarly, like saying things which,
2    you know, saying, like, if you don't talk, we'll
3    take away your kids, something of that sort, that
4    would also be, you know, an ethical problem;
5    correct?
6    A.    Talking about a threat?  Yes.  If you
7    make a threat like that, like in the Rios case, the
8    allegation is that there was a threat to take
9    Rios's child away from him if he didn't confess.
10   Now, according to his rendition of events, and if
11   you give that credibility, then that threat would
12   be wrong and it would be an ethical trap, because
13   if you lie about it, you're in trouble, and if you
14   tell the truth, you're in trouble.  So that would
15   be an ethical trap that I teach people to avoid
16   during the interview process.
17         On the other hand --
18   Q.    So let me --
19   A.    -- if you look at --
20   MR. POLICK:  He wasn't finished with his
21   answer.
22   MR. RICHARDS:  I know, and that's why I'm
23   stopping because I was -- even when I shouldn't, so
24   I'm stopping.  Go ahead.

Page 82

1    MR. POLICK:  Well, I don't -- I don't think he
2    can stop --
3    THE WITNESS:  He's saying he --
4    MR. POLICK:  All right.  Go ahead and let him
5    finish his answer.
6    BY THE WITNESS:
7    A.    All right.  All I was going to say is,
8    and if you look at the detective's rendition of
9    events and you give that credibility, then, in
10   fact, that there was no threat in the Rios case.
11   BY MR. RICHARDS:
12   Q.    Yes.  Let me also -- that brings up
13   another topic, and let me get your ex -- would you
14   agree with me that, generally speaking, there are
15   police officers who never do something unethical or
16   do something wrong for the reasons you said, and
17   there's another class of officers who, if they do
18   something wrong, they do it a lot because they've
19   gotten away with it or they think it's the right
20   thing to do or whatever?  Is that a fair statement?
21   MR. POLICK:  Objection to the form.
22         But you can go ahead.
23   BY THE WITNESS:
24   A.    No, I don't think it is a fair

Page 83

1    statement.
2    BY MR. RICHARDS:
3    Q.    Okay.  Well, let's deal -- would you
4    agree that there are officers who, when they're
5    faced with these ethical decisions and dilemmas, do
6    the right thing?  They don't do the wrong thing;
7    they do the right thing.  Is that fair?
8    A.    Fair to say that when -- when officers
9    are faced with ethical traps or dilemmas that they
10   do the right thing?  Yes, that is a fair statement.
11   Q.    Okay.  Is it a fair statement that there
12   are other officers, maybe a small minority, who,
13   when faced with ethical traps or dilemmas, do the
14   wrong thing, make the wrong choice?
15   A.    Yes.  And what we have in this
16   situation, there's always going to be people who
17   don't follow the rules.  In fact, I can re -- I can
18   think about a lot of court cases that I've reviewed
19   where the appellate court reversed the decision
20   because attorneys provided incompetent defense to
21   the defendant.  Does that mean all attorneys are
22   incompetent and they don't provide a good defense,
23   or is it just one or two attorneys that didn't
24   follow the rules?  It's the same way.  There are

Page 84

1    always going to be police officers and people,
2    doctors, lawyers, any kind of people that are going
3    to make mistakes and not do the -- not make the
4    right decisions when faced with an ethical
5    decision.
6    Q.    Okay.  Let me -- since we're on this
7    topic, let me move to somebody involved in this
8    case, Ricardo [sic] Guevara.  You know that is;
9    correct?
10   A.    Yes.
11   Q.    Okay.  Do you have any information or
12   any knowledge about -- about Ricardo Guevara's
13   possible ethical lapses?
14   MR. POLICK:  I'm going to object to the extent
15   that that goes into communications with attorneys
16   which are protected from disclosure.  So if you
17   want to rephrase your question, you can do so, but
18   as it stands now, I'm going to direct him not to
19   answer that question.
20   MR. RICHARDS:  I'm going to switch it up a
21   little bit.
22   BY MR. RICHARDS:
23   Q.    As part of the materials that you were
24   given to review, were you given the deposition of



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
85–88

Page 85

1  Reynaldo Guevara in this case?
2      A.   Yes, I believe I was.  Let me
3  double-check.
4      Q.   Okay.  If you need to double-check,
5  please do so.
6      A.   Yes, I did.
7      Q.   Okay.
8      A.   I did review his testimony.
9      Q.   I'm sorry.  What?
10     A.   Yes, I did review his testimony.
11     Q.   His testimony in the deposition;
12  correct?
13     A.   Correct.
14     Q.   Okay.  And you're aware that in his
15  deposition, he took the Fifth as to every question
16  he was asked, virtually?
17     A.   Yes.
18     Q.   And you're also aware that a number of
19  those questions accused him of misconduct,
20  including in this case; correct?
21     A.   Yes.
22     Q.   Okay.  Your next -- the next couple of
23  chapters you have are about the deterrent effects
24  of three strikes laws.  What's that -- what is --

Page 86

1  what are the -- it appears to be two chapters, both
2  with the same title.  What do those chapters talk
3  about?  What's the topic?
4      A.   In California, in the mid 1990s,
5  California passed what they called the three
6  strikes law.  The three strikes law said that if
7  you commit three felonies, that you would receive
8  life in prison.  The first felony, you got a
9  regular sentence.  Second felony, you re -- they
10  have to be violent felonies.  The first one is a
11  regular sentence.  The second one is a violent
12  felony, you double your sentence.  And then the
13  third strike, which can be any felony, you receive
14  25 years to life.
15         And there was a controversy as to
16  whether the three strikes law was -- had any
17  deterrents on crime.  And I thought to myself,
18  well, I could do an experiment with college
19  students and maybe ask them if it's a deterrent,
20  but that doesn't make much sense because college
21  students don't commit crimes for other reasons,
22  other than the potential of going to jail.  Maybe
23  they have -- they've brought up -- they have good
24  values.  They have good morals.  They're religious.

Page 87

1  They don't want to commit a particular crime.
2         So I said to myself, I should go to the
3  people who actually have one strike on them, which
4  are juveniles.  So I went to the local juvenile
5  detention facility.  I got a court order and the
6  judge allowed me to conduct some research on the
7  entire population at the Lancaster juvenile
8  facility.  And what I did was I gave them a
9  questionnaire, and I talked about the general
10  deterrents of three strikes and the specific
11  deterrents of three strikes.  In other words, I
12  asked them would the three strikes law prevent you
13  from committing additional felonies, and the
14  overwhelming answer was no, it would not prevent
15  that.
16         Specifically, I said, if you knew your
17  sentence will be doubled, would you commit
18  additional crimes.  They said no.  And then I said,
19  if you knew you got life in prison for committing a
20  third strike, would you commit that crime.  They
21  said no.  That demonstrated that there was specific
22  deterrents, not general deterrents.
23         The other thing that was kind of
24  shocking in that is that 65 percent of the

Page 88

1  juveniles with one strike said that they would kill
2  a witness or a police officer to pre -- to get away
3  and prevent them from getting a third strike.  And
4  as I got into my Ph.D. program, I brought that
5  topic up in one of my classes, and they said, let's
6  try the experiment again.
7         So, again, I went and got a court order,
8  went back to the juvenile facility, and I was able
9  to obtain the same research result.  And in that
10  particular case, I used the entire population in
11  that facility, so I didn't have to randomize my
12  participants.  And unlike the false confession
13  research that we see today is that they primarily
14  use college students, and college students have a
15  different mind-set than suspects in an
16  interrogation room.
17         So in order to get good valid research
18  in false confession research, what you have to do
19  is go to the interrogation room.  You have to
20  conduct the experiment using strict experimental
21  standards, and then you can start making some kind
22  of correlations or associations between a suspect
23  and a false confession.
24         So that's in contrast to what I did.  I



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
89—92

Page 89

1 actually went to the people who were involved, who
2 had one strike on them. So there you see the
3 difference between -- I can now make a
4 generalization to suspects who have one strike in
5 juvenile facilities will -- will probably say the
6 same thing as the -- the research that I conducted,
7 unlike in the current false confession research.
8     Q.   Okay. You then go to journal/magazine
9 articles: Verbal indicators of deception. That
10 was written with some other -- does that have any
11 new ideas that you haven't discussed so far, or is
12 that some of the same types of things?
13     A.   Which one are we talking about?
14     Q.   First one: Verbal indicators of
15 deception, Journal of Forensic Sciences and
16 Criminal Investigation.
17     A.   Is it on page 61?
18     Q.   No, it's on page 60.
19     A.   60. Oh, the first -- oh, verbal
20 indicators, yes, that one is different than the
21 other research. The other research was conducted
22 using written statements. What I did in this
23 particular case was I wanted to determine if the
24 same text bridges existed in oral statements.

Page 90

1     And so a grad student who was doing her
2 thesis in criminal justice asked me if she could
3 conduct the experiment jointly with me, and that's
4 the result was that text bridges do exist in oral
5 communications, as well as written communications.
6     Q.   Okay. And the next one is: How to ID
7 Deceptive Speech. Does that have new ideas we
8 haven't discussed so far?
9     A.   No.
10     Q.   Then you have one in French. And it
11 seems to do something with industrial espionage.
12 What's that about?
13     A.   That was an article describing how
14 people can use human engineering to commit fraud
15 and espionage, business espionage, industrial
16 espionage.
17     Q.   Okay. And the next one, Hacked by Bits
18 and Pieces: What can we learn from an example of
19 Corporate Espionage? Is that the same thing in
20 English?
21     A.   Yeah, it's the same one in English, but
22 it was published in a different platform.
23     Q.   And then the next one is Detecting
24 Truthful and Deceptive Statements: An Experiment

Page 91

1 on the Chinese Language International. What's that
2 about?
3     A.   I had an opportunity to go to Shanghai,
4 China, a number of years ago, and I -- I requested
5 permission to conduct my research in the Chinese
6 language using the same experimental design as my
7 dissertation, and the government of China agreed to
8 allow me to do it. I went to a university in China
9 and conducted the research, and I discovered that
10 the Chinese language contains the same text bridges
11 as does English and Spanish.
12     And the thing that kind of drew my
13 curiosity was it's a pictographic language. In
14 other words, they don't use alphabetic,
15 alphanumeric lettering and numbering; they use
16 pictographs. But I found out that, yes, indeed,
17 there are text bridges in the Chinese language.
18     And that goes to the -- the whole -- the
19 whole hypothesis that I have is that any language
20 has grammar structures, and they have to bridge the
21 information gap. So it doesn't depend on language
22 or language usage. It depends on how people use
23 the grammar structure to text the -- or create a
24 text bridge over withheld information.

Page 92

1     Q.   And I hesitate to ask, but I can't
2 resist. Do you know of a -- what's a typical text
3 bridge in Chinese or in Mandarin?
4     A.   I would have to look it up. I don't
5 recall exactly what it was.
6     Q.   Okay.
7     A.   But it's in the research.
8     Q.   Okay. The next one is: Detect false
9 names, dates of birth, and addresses generated by
10 suspects during criminal investigation. That seems
11 a little bit obvious. I mean, isn't it just a
12 matter of checking fingerprints or whatever, or is
13 there something more to it than that?
14     A.   Well, if -- if -- if you're a
15 practitioner, you make a traffic stop, and somebody
16 gives you -- you ask for a name and date of birth
17 and they give you a false name and a false date of
18 birth, the record won't show up in the system. So
19 it would be nice if officers had kind of a
20 guideline to say, how do people create false names,
21 and then we can back into their name and date of
22 birth.
23     Q.   Okay. And how do people create false
24 names?



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
93—96

Page 93

1    A.   Typically they use friends' names,
2  celebrity names, or famous peoples' names.  And the
3  other thing they do is they'll truncate, instead of
4  Clay -- South Clay Street, they'll say North Clay
5  Street and -- or West Clay Street, or they'll
6  transpose numbers.  Instead of 14, it will be 41.
7    Q.   Okay.  And then you have another article
8  called:  Deception in Sketch Drawings.  What's that
9  about?
10    A.   That was another thesis experiment
11  conducted by one of my grad students and with me
12  coordinating it.  They wanted to know if we could
13  determine or detect deception when we ask people to
14  sketch out information.  And this is particularly
15  important when you're talking about terrorists.
16  Terrorists will often come in and report on things
17  they've seen or done, and what you want to do is
18  say describe the house, not just describe it, draw
19  me a picture of the house.  And we were able to
20  determine that there's some indicators that will
21  give you a hint of the probability of deception.
22    Q.   What about The Psychopathology of
23  Corruption?
24    A.   That is an article I did on the

Page 94

1  subcultures in police departments, how they
2  operate, how to recognize them, how to combat them.
3    Q.   You mean the culture of corruption in
4  police departments?
5    A.   Subculture.
6    Q.   Subculture of corruption in police
7  departments?
8    A.   There's subcultures in a -- in larger
9  police departments, there's often a subculture that
10  don't adhere to the organizational goals.
11    Q.   Like in Training Day?
12    A.   They have their own set of -- yeah.
13    MR. POLICK:  Objection to the form.
14    But go ahead.
15  BY THE WITNESS:
16    A.   Yes, in an exaggerated form.  Training
17  Day would be a subculture.
18  BY MR. RICHARDS:
19    Q.   Yeah, I imagine killing drug dealers to
20  get their money is generally not part of the
21  goal -- or the stated goals of a police department?
22    A.   No, sir.
23    Q.   Okay.  What is -- you have another one
24  called Three-Question Management.  What's that

Page 95

1  about?
2    A.   I met an astronaut when I was out at one
3  of my presentations, and he was giving a
4  presentation after mine.  He listened to mine.  We
5  went to lunch.  And I couldn't resist asking the
6  astronaut every question I could possibly think of,
7  because I'll probably never meet a real astronaut
8  again.
9    So during the lunch conversation, one of
10  the last questions I asked him was what happens
11  when you hear the words "Houston, we have a
12  problem"?  And the astronaut said, well, very easy.
13  We use three questions.
14    First question they ask you from Houston
15  is do you have a plan?  Second question is if you
16  don't have a plan -- or the answer is if you don't
17  have a plan, get one.  If you had one, the second
18  question is how is it going?  If the plan is
19  working, you're doing well.  If the plan isn't
20  working, tweak the plan, get a new plan, figure out
21  a plan that works.  And the third question is are
22  you ahead or behind?  If you're ahead, good for
23  you.  If you're behind, hurry up.
24    I thought, well, that's an interesting

Page 96

1  concept.  I'll bet we can translate that into ways
2  to -- managers can manage subordinates.  Because in
3  today's world, people don't want to take
4  responsibility.  They want to, you know, give
5  things to the boss, give them to the boss, give
6  them to the boss.
7    What we wanted to do with police
8  officers is if the police officer says, Sergeant, I
9  have a problem, and then you say what's your
10  solution?  I don't have one.  Get one.  Find one.
11  Do you have a plan?  Is it working?  No, it isn't.
12  Well, make it work.  If it's not, find a new one.
13  And then ask are you ahead or behind.
14    But one addition that we added to that
15  is that new officers can tap into the resources of
16  the sergeant to help develop strategies to solve
17  problems.
18    MR. RICHARDS:  Okay.  I would like to stop at
19  this point.  Can we take our lunch break now if
20  anyone wants to do that.
21    MR. POLICK:  That's fine.
22    MR. RICHARDS:  I would suggest a lunch break
23  until 1:00, unless somebody wants longer.
24    MR. POLICK:  That's acceptable.



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
97–100

Page 97

1    MR. RICHARDS:  Okay.

2    MS. ROSEN:  All right.

3    MR. RICHARDS:  Mr. Schafer, have a nice lunch.

4    THE WITNESS:  Thank you.

5    THE VIDEOGRAPHER:  We are going off the record

6    at 12:28 p.m.

7        (WHEREUPON, a short break was

8         taken.)

9    THE VIDEOGRAPHER:  We are going back on the

10   record at 1:07 p.m.

11   BY MR. RICHARDS:

12   Q.   Okay.  The next article we're going to

13   discuss is:  Three signs someone is lying to you,

14   courtesy of an FBI agent, from The Muse in 2016.

15   What are the three signs someone is lying to you?

16   A.   I don't remember specifically what the

17   three signs I -- I highlighted in that article.

18   That was an article I wrote on the -- on the behest

19   of Simon & Schuster as part of the book -- public

20   relations.

21   Q.   Okay.  And then the next article is --

22   it has a Spanish title, which I don't -- Quer

23   'apanhar' um mentiroso?  Siga estas dicas.  Is that

24   the same idea or the same title?

Page 98

1    A.   I don't know.

2    Q.   Okay.

3    A.   I don't remember that article.

4    Q.   All right.  The next one is from Time

5    Magazine:  How to parent like an FBI agent.  Is

6    that sort of similar to the previous publication we

7    were talking about, about how to apply your lessons

8    to raising children?

9    A.   Yeah, and that was an article I wrote on

10   behest of Simon & Schuster for -- for book pub --

11   for book publication.

12   Q.   Okay.  The next one is:  Behaving

13   appropriately in a digital world.  What's that one

14   about?

15   A.   That was just pretty much in -- you

16   know, internet etiquette, how to behave on the

17   internet.

18   Q.   Okay.  Nothing really to do with

19   confessions or interrogations, I take it?

20   A.   No.

21   Q.   All right.  And then:  Grammatical

22   differences between truthful and deceptive

23   narratives.  Now, you may have covered this before,

24   but could you summarize what are the grammatical

Page 99

1    differences between truthful and deceptive

2    narratives?

3    A.   Yeah, I explained the differences.

4    People lie in two ways.  They -- they lie by

5    obfuscation, and they use word qualifiers.

6    Typically they'll use stop action words.  They'll

7    use push-pull words to kind of convolute their

8    answers.  So they're really not lying, but they're

9    really not telling the truth.

10       And this is very effective when you go

11   into the interviewing arena because you want to

12   recognize how people will -- will kind of

13   circumvent or skirt the issues.  And once you see

14   that somebody is skirting the issue, then you can

15   kind of draw them back in and say, hey, this is the

16   topic we're on.  Let's not obfuscate.  So it --

17   it -- it's very effective in the -- in the --

18   obtaining the truth in an interview situation.

19       The other way, of course, is when people

20   lie by omission.  They tell the truth.  They leave

21   things out, and then they tell the truth again,

22   which makes it very difficult to determine if

23   somebody is telling the truth or somebody is

24   engaged in perception management.  Because I think

Page 100

1    one of the areas that the false confession

2    researchers neglect is what goes on in the -- in

3    the interview room itself, and it's a dynamic

4    process.  It's -- it's a kind of a tug of war with

5    the truth between the investigator and the suspect.

6        And the suspect often engages in

7    perception management.  What I mean by that is they

8    try to present themselves as though they're telling

9    the truth.  But the problem comes when truthful

10   people try to convince the interviewer that they're

11   telling the truth, which they are, so there you

12   have a problem.  How do we discern who is telling

13   the truth or giving the illusion of truth?  And,

14   therefore, innocent people unfortunately have to go

15   through the same vetting process as do guilty

16   people.

17       And the other thing that the false

18   confession researchers fail to realize is that each

19   person in that interviewing room is different than

20   the previous person.  A lot of the research tries

21   to take a wide brush and cover suspects.  Well,

22   that's not how it works in real life.  Based on my

23   thousands of interviews and my experience training

24   and my experience in -- in actual conducting



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
101–104

Page 101

1 interviews, each person is different. Each person
2 brings a different set of morals, values,
3 perspectives, world views, personal views to the
4 interrogation.
5 So what you have is the -- the false
6 confession research, they -- they kind of address
7 the wider human baseline. In other words,
8 humans -- as humans, we all undergo certain
9 behavioral characteristics. In other words, we get
10 thirsty. We're tired. We're sleepy. We're
11 hungry. We have a libido. We have a lot of things
12 that motivate us.
13 But inside that human baseline, there's
14 a personal baseline, and we as investigators have
15 to determine what that person brings to the table,
16 what they bring to the interview room. That's
17 where false confession research fails. Because
18 students bring different set of values and
19 behavioral characteristics to the in -- to the
20 experimental room than do suspects. So what we
21 have to do as investigators is to kind of determine
22 that person's personality, determine the best way
23 we can communicate with them, based on the
24 personality that they have.

Page 102

1 Q. Okay. But let me just stop you because
2 I want to go back to grammatical differences. You
3 mentioned stop action grammar or phrases. What do
4 you mean by that, stop action?
5 A. That is when somebody says I started to
6 do something, they want to give the illusion that
7 that action was completed, but you can't start to
8 do anything. Either you do it or you don't do it.
9 Stop action words is I started -- in one rape case
10 I handled, the suspect said she started to take off
11 her clothes, and he says, I started to help her.
12 That doesn't mean she took off her clothes and that
13 doesn't mean he helped her. It means he started to
14 do it. You can't start to do anything.
15 So truthful people will tell you, I
16 started to go to the store, but the phone rang and
17 I couldn't go to the store. They tell you what
18 prevented that action from being completed. Liars
19 won't because they want to give the illusion that
20 that action actually took place when, in fact, it
21 did not.
22 Q. What about push-pull grammar, what do
23 you mean by that?
24 A. Some words need one word to identify

Page 103

1 what the word is, like a cup. One word can
2 identify a cup. Some words need two words to
3 complete the definition. You can't have an inside
4 without an outside. You can't have an up without a
5 down. You can't have an adult without a child.
6 You can't have an I -- I don't remember without an
7 I re -- I remember.
8 And that's where we tie it into the
9 interrogation is that a student -- I mean -- a
10 student -- a suspect will say, I don't remember
11 doing that. Well, in order to not remember
12 something, you had to remember it first. So I
13 always ask them, so it's in your head what you did,
14 you just can't remember doing it. And we -- we can
15 take it from there. Because most truthful people
16 say I don't know. And what versus I don't know is
17 I do know. So there's push-pull qualities of
18 words.
19 Sometimes -- I had a rape case where
20 they -- the suspect started his narrative in the
21 upstairs of his house. Now, he says upstairs, we
22 did this and this. I said, well, if there's an
23 upstairs, there has to be a downstairs. So let's
24 talk about what happened downstairs. And that's,

Page 104

1 in fact, where he slipped the Rohypnol into the
2 girl's drink.
3 So we use push-pull words quite a bit.
4 Q. Okay. So what you're saying is the
5 suspect, when there is words which are one half of
6 a -- a doublet, let's say. There's an -- there's
7 a -- there's an up, there's a down, there's an
8 upstairs, there's a downstairs. They will omit one
9 part of the doublet, and that's a tell that they
10 might not be telling the truth. Is that fair?
11 A. That's correct.
12 Q. Okay. Now, the next one is: Ex-FBI
13 Agent's Guide to Building Rapport and Making Sales.
14 I assume we can skip that one. That's applying
15 your lessons to a different topic; correct?
16 A. Yeah, that's another one I wrote for
17 Simon & Schuster for publication. What do they
18 call it? I can't think of the word.
19 Q. Publicity for your actual book?
20 A. Publicity for the book. Helps to
21 generate publicity so people could buy the book. I
22 wrote that, and they -- they actually published it
23 in that magazine. I guess they have a contact.
24 Q. Okay. You sound like you weren't too



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
105–108

Page 105

1 happy about the Simon & Schuster projects, or did
2 you care? I mean, what was the deal?
3    A.   No, very enthused -- very enthusiastic
4 about Simon & Schuster. They provided excellent
5 publication. I've been on, like -- I was on a book
6 tour, and they -- it was like -- initially it was
7 65 podcasts that they had me do, radio stations. I
8 was on Fox & Friends. I was in all kinds of
9 newspapers. They did a good job publishing. No,
10 I'm very happy with Simon & Schuster.
11    Q.   Okay. And then you have another
12 article: Can't We be Friends? Why Obama's
13 Likeability Quotient is Tumbling. Sounds
14 interesting, but does that have anything to do what
15 we're talking about here?
16    A.   No.
17    Q.   Next one is: A Former FBI Agent Reveals
18 the Secret of Persuasion. Is that something that,
19 you know, Simon & Schuster did to get you -- get
20 publicity for your other ideas or something unique
21 or different?
22    A.   No. That was, again, publicity for the
23 book. Reaching out into the business world.
24    Q.   All right. And A Former FBI Agent

Page 106

1 Reveals 3 Techniques to Detect Deception. We've
2 already covered those; correct?
3    A.   They may be three different ones. I'm
4 not sure.
5    Q.   Okay. You just don't remember. All
6 right.
7    A.   Right.
8    Q.   Then another one is: Don't Detonate
9 These Word Mines at Work. What are word mines? I
10 assume by mine, you mean, like, explosions, like
11 things go off if you detonate it?
12    A.   What happens is people attach emotions
13 to words, and if you trip on a word that
14 somebody -- a neutral word that somebody has
15 attached a lot of negative connotation to it,
16 sometimes they will get very angry. And I'll give
17 you an example. One of my colleagues was teaching
18 an interview class, and he said, you're supposed to
19 listen more than you speak during an interview
20 because God gave you two ears and one mouth.
21       Well, come to find out, one of the
22 people in the audience had a son that had only one
23 ear, and he made a complaint. And we said, well,
24 that's just a normal, natural thing that people

Page 107

1 say. It's an old adage. And I said, no, to him
2 it's very meaningful. So he attached a lot of
3 meaning to that word.
4       And then even in school, if I call
5 somebody mister and they want to be called miss or
6 they want to be called some other name and I -- and
7 I mispronounce it or I call them by a different
8 title, then they get angry because they've
9 associated a lot of emotion to that. So you want
10 to avoid those kinds of words at work.
11    Q.   Okay.
12    A.   It's tough. When you trigger a land
13 mine, it's a difficult social situation to get out
14 of.
15    Q.   Your next one is: Grammatical
16 differences between truthful and deceptive written
17 narratives. Have we covered this before?
18    A.   This has to do with Spanish speakers.
19 So the graduate student I talked about,
20 Mr. DiCicco, went down to Costa Rica on his study
21 abroad, and he conducted the experiment similar to
22 the one we did in English. And we found out that,
23 yes, indeed, Spanish does have the same equivalent
24 text bridges as does English.

Page 108

1    Q.   Your next one is Universal Principles of
2 Criminal Behavior: A tool to analyze criminal
3 intent. In The Encyclopedia of Penitentiary Law,
4 published in Russia. What does that article talk
5 about?
6    A.   There are universal principles of
7 criminal behavior. Very quickly, crime comes --
8 starts from an idea in your mind, and then that's
9 called ideation.
10       The second step that takes place is we
11 communicate that ideation by either verbally or
12 nonverbally. You see in a lot of crime cases,
13 you'll say, well, that person said they were going
14 to kill the neighbor, that person said that they
15 were going to blow up the school or blow up this,
16 but I didn't believe them. No, they're
17 communicating it. So that's communication.
18       Then they facilitate that. In other
19 words, they -- they take steps to -- to prepare.
20 They go out and practice shooting in the forest.
21 They buy bomb parts. They do that kind of thing.
22 And then they actually commit the crime.
23       Then after they commit the crime, they
24 have to communicate it again, because the only way



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
109–112

Page 109

1  you get any kind of psychological satisfaction of
2  doing something clever is to tell somebody.  So
3  they're almost psychologically predisposed to talk.
4  So the simple way to say it is big talk, act, do
5  talk.  So when we investigate, we can now hone in
6  on different aspects of the crime and discover how
7  it was prepared and how it was actuated, how they
8  did it.
9      Q.    Okay.  By the way, unrelated topic,
10  would you agree that in terms of a lot of criminal
11  behavior, it kind of begins as a cognitive problem
12  that the -- the way they think about achieving
13  their goals is -- is a cognitive problem, not so
14  much emotional or, you know, driven by -- driven by
15  the way they think and the way they observe the
16  world?
17      A.    Well, emotions can cause you to think.
18  I need to do -- make things better.  Because happy
19  people do everything they can to do -- everything
20  they can to remain happy.  Sad people do everything
21  they can to be happy.  And criminals are not
22  happy -- they're not happy people.  They're sad
23  people because they're lacking something.
24        So what happens is they think about,

Page 110

1  hmm, how do I make my situation better so I can be
2  happy?  Perhaps if I rob a bank, that may make me
3  happy with money or drugs or car or whatever
4  they're going to have.  So that's how it -- it
5  connects.  So your emotional instability may cause
6  you to think about how to make yourself happier.
7      Q.    Now, Predicting school violence saves
8  lives.  Is that -- does that have anything to do
9  with what the topics we're talking about here, or
10  is that something separate?
11      A.    It's something separate.
12      Q.    What about:  Three minutes after the
13  cuffs go on?
14      A.    That, I tried to describe what happens
15  when you arrest somebody, what goes through their
16  mind at that point.  And there's a little technique
17  I developed, and that's called the prisoner's
18  timeline, basically.
19        So the first thing you want to address
20  when you arrest somebody is the present.  They'll
21  say, I have a pizza in the oven and it's cooking.
22  Can you turn off the pizza?  They're worried about
23  pizza.  They're worried about their kids.  They're
24  worried closing the house up.  They worry about all

Page 111

1  those things.  You have to solve that first.
2        And then the next thing they want to
3  know is what's going to happen to me?  So you look
4  for the future.  You're going to be under arrest.
5  You're going to be arraigned.  You're going to be
6  interviewed and processed.  And then and only then
7  can you go to the past and say, geez, how did we
8  get to where we're at?  Because you satisfied all
9  those immediate needs of the person.
10        And the other thing you have to think
11  about is the time -- the mind-set of the person
12  that's just been arrested.  There's certainly going
13  to be some type of fight-flight response, that you
14  have to build rapport to overcome that fight-flight
15  response.
16      Q.    Okay.  By the way -- well, let me see if
17  you agree with this observation.  Many people
18  charged with crimes or in a situation where they're
19  accused of crimes, they feel they have a lack of
20  control over their future situation, and they seek
21  to control, like, minor things, like, you know,
22  what my -- you know, what my cell is like, what
23  access to toiletries I have, you know, things that
24  are minor but they might be able to control or make

Page 112

1  better.  Or you don't agree with me about that?
2      A.    I don't have any opinion on that.  I've
3  never thought about that.
4      Q.    Okay.  The next one is:  Controlling
5  angry people.  What's that one about?
6      A.    That's a little model I -- I came up
7  with to control angry people.  When you have an
8  angry person, their world is out of sync.  So what
9  you want to do is bring their world back into sync.
10  And what you can do is you can provide an
11  explanation for that person.  The reason I'm
12  putting cuffs on you today is because it's policy.
13  FBI policy says I must cuff you when I arrest you.
14        Or you provide some kind of explanation,
15  and typically that's enough to assuage mild anger.
16  And if that isn't enough and they continue to vent,
17  what you don't want to do is throw fire or fuel on
18  that fire.  So what you do is you let them vent,
19  and then when they finish their initial venting,
20  you insert an empathic statement, so you're angry
21  because.  And then once they acknowledge that and
22  say yes, they'll vent some more and then you --
23  when they pause again, you do another empathic
24  statement, mirroring back what they just were



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
113–116

Page 113

1  venting about.

2       And then at some point they are
3  completely vented, the anger in their shoulders
4  drop and there's a deep breath, and then that's
5  when you insert what I call a presumptive
6  statement. That is a course of action you want
7  that person to take where they have a very
8  difficult time refusing.

9    Q. Okay. And what would be an example,
10  like, with somebody who has just been arrested of a
11  presumptive statement where they have a difficult
12  time refusing? Something like sit down? Or...

13    A. No, it -- you could -- it's happened to
14  me. People go, like, I don't want to talk to you.
15  I don't want to do this. I don't want to do that.
16  And I'll say -- and they'll say, I have to go to
17  work. I have get back to my family. I have to do
18  those things.

19       I'll say, yes, there's a way we can do
20  this. How about if we just focus on the topic, get
21  the information we need, and then you -- you're
22  able to proceed with your life.

23    Q. Okay. And that's something you've --
24  you've typically said to witnesses or suspects.

Page 114

1  Fair?

2    A. Well, in -- people typically -- I've run
3  into very few angry people because I don't cause
4  them to be angry at me. And typically when
5  somebody's angry at me, I ask them, what have I
6  done since I entered this room to cause you to
7  treat me with such disrespect? And they have a
8  very difficult time explaining what it is.

9       So I don't fuel the fire. I don't call
10  them liars. I don't -- I don't do anything in --
11  in -- in that provocative nature.

12    Q. But one technique for controlling angry
13  people is the presumptive technique, as you said.
14  You say, you know, I know you need to do this,
15  this, and this, and you can get back to it, but
16  first we need to talk about whatever you're talking
17  about; right?

18    A. Out of context, it's difficult for me to
19  answer that question, and I think what you're
20  trying to tap into is what happened in the Rios
21  case where your -- Mr. Rios, if you want to credit
22  his statement, which I'm not crediting his
23  statement, but if you do credit his statement, then
24  you're saying that there's some kind of leniency

Page 115

1  promise that was made to him. You read between the
2  lines, according to his rendition, which, again, is
3  up to the fact finders to determine if that's
4  credible.

5    Q. Okay. The one about school bullies, is
6  that relevant to what we're talking about or
7  irrelevant?

8    A. It's irrelevant.

9    Q. Okay. This one seems interesting. Let
10  Their Words Do the Talking: Reading the criminal
11  mind. What are you saying there in that article?

12    A. Basically, that article I covered some
13  nonverbals that indicate what a person is thinking.
14  You can use lips. If you read people's lips, not
15  the words they speak but the nonverbal displays of
16  their lips. If they bite their lip a little bit,
17  top or bottom, they tug at it, it means they want
18  to say something, but they're afraid to say it.

19       If they do -- well, it's called a lip
20  compression, that means they want to say something,
21  but they're afraid to say it. I typically see that
22  right before I hear a confession or admission from
23  the suspect.

24       And the last one is if you go through a

Page 116

1  series of topics and they purse their lips, and
2  that's just a slight outward movement of the lips,
3  that means that person has already formed a
4  negative opinion about what you just said. A good
5  example of this is if I'm lecturing in my classes
6  and I see a student purse their lips, I ask -- I
7  use an empathic statement and say, so you don't
8  agree with what I just said, and they look amazed
9  and say, how do you know that? Well, you've been
10  shouting it nonverbally to me.

11       And we can use those techniques in the
12  interview room to find out what topics suspects
13  don't agree with you on without letting them know
14  that you know what they're thinking.

15    Q. Well, maybe I'm wrong in -- maybe -- or
16  maybe just too obvious, but isn't a sign that
17  somebody's not telling the truth often when they,
18  you know, put their hand to their mouth or over
19  their mouth or some indication that they're -- you
20  know, they're speaking about the same time their
21  hand is near their mouth, like as if they didn't
22  really want to say it or that's not true?

23    A. Nope, it's not true. You can't take one
24  nonverbal indicator and suggest veracity by that



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
117–120

Page 117

1  one nonverbal indicator.  You have to listen to the
2  topic that's addressed.  You have to look for
3  clusters of clusters of nonverbal indicators.
4       See, that's the difference between
5  the -- the verbal and nonverbal indicators.  The
6  verbal indicators are a direct representation of
7  your mind, of what you're thinking, the words, and
8  nonverbal is a secondary indication based on
9  physiological responses, which can be caused by
10  many things.
11  Q.   Okay.  The next one is:  Text Bridges
12  and the Micro-action Interview.  I think you told
13  me what text bridges are, but what is the
14  micro-action interview?
15  A.   What the micro-action interview is, is
16  when you listen to the narrative of -- of a suspect
17  and they use a text bridge, that tells you there's
18  withheld information.  You use the micro-action
19  interview to go and retrieve that information.
20       So what you do is you take that person
21  back to the -- anchor them prior to the text bridge
22  and then ask them what happened next.  And then
23  they will explain what happened next.  And if
24  they're guilty, they're going to have to bridge the

Page 118

1  gap again, so they use another grammar text bridge.
2  And then you bring them back to that previous one
3  and ask them what happened next.  And as that gap
4  closes, people have more and more difficulty trying
5  to figure out how to avoid admitting that they
6  withheld inculpatory information.
7       On the other hand, innocent people will
8  gladly answer every question you have.  In fact, a
9  lot of times they'll say why are you asking me so
10  many questions, Mr. Schafer?  And I'll say, well,
11  you didn't do this, did you?  They'll say, of
12  course not.  If I can record or figure out what you
13  did every minute during the time of the crime, then
14  we can prove you didn't do it.  And they typically
15  say, yes, I'll be more than happy to answer any
16  questions.
17       And that is one way to subtly determine
18  if somebody is giving you true or false
19  information.
20  Q.   All right.  The next one is The
21  Seven-Stage Hate Model:  The psychopathology of
22  hate groups.  What's that about?
23  A.   That is the seven stages that hate
24  groups go through, and you can predict behavior

Page 119

1  based on the seven stages.
2  Q.   Okay.
3  A.   And I typically -- I -- that came from
4  the white supremacist cases that I investigated,
5  and we translated that into -- to terrorist
6  organizations, followed the same model.
7  Q.   Okay.  And it sounds interesting but
8  doesn't really have anything to do with what we're
9  talking about here.  Fair?
10  A.   No.
11  Q.   Okay.  The ethical use of psychology in
12  criminal investigations.  What's your thesis in
13  that article?
14  A.   That -- I wrote that article in response
15  to an -- a behave -- there was a case called the
16  Squillacote case down in Florida where there was a
17  Cuban agent who was caught spying, and we used
18  the -- they used the BAP team to design a -- a
19  strategy to bring that person out into the open so
20  we could arrest them.
21       And somebody wrote an article that said
22  it's unethical for psychologists to engage in
23  activities that hurt people by using those
24  techniques, and I just responded to that.

Page 120

1  Q.   And what was your response?
2  A.   I'm not -- I -- number one, I don't
3  belong to the American Psychological Association,
4  therefore, I am not subjected to their ethics.  End
5  of story.
6  Q.   Oh, okay.  So you basically just
7  disagreed with their -- their fiat that certain
8  forms of psychology shouldn't be used in criminal
9  investigations.  You don't think that's true?
10  A.   True.
11  Q.   Okay.  We'll skip over -- we can skip
12  over, unless you think it's important,
13  Investigating child sexual abuse in the American
14  Indian community, Hate Unmasked --
15  A.   What?
16  Q.   Sorry.  What?
17  A.   I mean, the -- detecting deception in
18  the -- the American Indian community is -- is -- is
19  critical because we had five Anglo teachers who
20  were molesting hundreds of children.  And in the
21  one case that I talked to you about is that we
22  used -- I got a confession from that guy just by
23  mentioning that we had a lot of rumors on the
24  street, similar to what happened in the Rios case,



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
121–124

Page 121

1   where there was some rumors on the street, we had
2   nothing else. In my case on the Indian
3   reservation, and likewise in the Rio -- Rios case,
4   the detectives only had information from criminal
5   informants.
6          So what do you do in that situation?
7   Well, what I did was I wanted to present the
8   suspect with the rumors and evaluate his response.
9   And I think that's the same thing that happened in
10  the Rios case. The detectives had nothing but
11  information they received on the street. They
12  verified it with different sources and said, yes,
13  the informants are saying this and the street is
14  saying this, therefore, what they did was, they
15  just went in and asked him, we heard -- we heard
16  this information on the street. What's going on?
17         That seems like the best and only
18  approach. It's -- it's -- it's not like
19  Ms. Russano -- or Dr. Russano says, it's a guilt
20  presumptive interview, which, in fact, it wasn't
21  guilt presumptive. All they did was say, hey, we
22  heard some stuff on the street. It doesn't mean he
23  did it or didn't do it. What --
24     Q.   Well, let me -- let me get to that

Page 122

1   topic, as long as you brought it up. You know that
2   one of the persons who said that he -- or who first
3   brought it to somebody's attention that there were
4   informants who were saying things was Detective
5   Guevara. You remember that; correct?
6      A.   And Gawrys.
7      Q.   What?
8      THE COURT REPORTER: Sorry?
9   BY THE WITNESS:
10     A.   Guevara and Gawrys.
11     THE COURT REPORTER: Say that again.
12  BY THE WITNESS:
13     Q.   G-a-w --
14  BY MR. RICHARDS:
15     Q.   I know who you're talking about.
16  It's -- we can get it -- the spelling for the court
17  reporter at some point, but the spelling is G -- I
18  believe G-a-w-y-r-e-i-s. But we're talking about
19  the same person; right?
20     A.   Yes.
21     Q.   Guevara's partner?
22     A.   Yes.
23     Q.   Okay. Since we're on this topic, did
24  you read all the trial transcripts and all the

Page 123

1   motion transcripts?
2      A.   Yes, I did.
3      Q.   Okay. Did you notice that Guevara gave
4   different answers when asked about how many
5   informants there were between the motion and the
6   trial testimony?
7      A.   Yes.
8      Q.   Did you notice that at one point he said
9   some of the informants were not confidential
10  informants? At trial, he said that. Do you
11  remember that?
12     A.   Yeah, what I think he did, as a gang
13  officer, his job was to gather intelligence on the
14  gangs, so he probably spoke with multiple gang
15  members, multiple criminal informants. Some of
16  them are open -- more open than others. And he
17  probably didn't know how many he talked to because
18  in the -- in similar situation that I've had in my
19  past is I talk to a lot of people about information
20  about a crime, and you may talk to 10 or 12 people
21  that you know are your either formal informants or
22  we call them hip pocket informants. So --
23     Q.   Okay. But you do it --
24     A.   I see that --

Page 124

1      Q.   I understand --
2          (WHEREUPON, there was a brief
3          interruption.)
4   BY MR. RICHARDS:
5      Q.   But your hypothesis would be that he
6   could have talked to 10 or 12 informants, but
7   that's not the answers he gave either at the motion
8   or at trial, is it? He never said, I talked to 10
9   or 12 informants?
10     A.   But the implication there was he talked
11  to multiple informants, either formal --
12     Q.   Yeah, but --
13     A.   -- or informal informants.
14     Q.   Yeah, but my question was he never said
15  something like, I talked to -- I talked to 10 or 12
16  informants. He never used those words. Is that
17  fair?
18     A.   No, he used an indefinite noun to
19  describe the informants, I believe, as I recall.
20     Q.   All right. Well, you might want to
21  check that, but let -- let's go on.
22         In terms of the informants, did you ever
23  see in any of the documents, including the
24  deposition of Mason, a description of any of the



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
125–128

Page 125

1  informants?
2      A.    No.  And based on my experience, you're
3  not going to see that.  You're not going to see
4  their identity.  You're not going to see a
5  description.  There's a reason they call them
6  confidential informant is because they're giving
7  information, especially in a gang situation, they
8  could lose their life.  They could get killed.
9      I've had a number of confidential
10  informants.  I would not give their description,
11  their name, anything out.  You would have to have a
12  judge order me to do that, and the bureau would
13  support me on that.  They say never reveal criminal
14  informants for their safety.
15      So no, I -- that's normal.  That's very
16  normal in -- in the --
17      Q.    Okay.
18      A.    -- police world.
19      Q.    And you would say it's normal for
20  Detective Mason -- Detective Mason not to give the
21  description in a deposition which occurred last
22  year when the informants, if any, spoke to Mason
23  and Guevara back in the early '90s.  You'd still
24  say there's some safety consideration which would

Page 126

1  make him not want to give any description or
2  identity of the informants?
3      MR. POLICK:  Object to the form.  And I think
4  that calls to speculation to some extent, so I'll
5  object to the foundation as well.
6      But you can answer over the objection.
7  BY THE WITNESS:
8      A.    The -- that is normal procedure, that
9  we -- we don't ever release criminal inform --
10  because what happens if some -- something comes up
11  again and we go back to an old informant who
12  happens to be in a situation where they could
13  provide additional information in the future.  So
14  we never reveal confidential informants unless it's
15  under court order.
16  BY MR. RICHARDS:
17      Q.    Okay.  And so it's your hypothesis that
18  when Mason, at his deposition, says he couldn't
19  remember anything about the identity of the
20  informants, he could remember but he didn't want to
21  reveal their identity, and therefore he was lying
22  at his deposition.  Is that what you think?
23      MR. POLICK:  Objection.  That mischaracterizes
24  the witness's testimony, and we're not offering

Page 127

1  Dr. Schafer here as someone who is giving opinions
2  on Detective Mason's credibility, which I think
3  your question goes to.
4      But over those objections, you may
5  answer the question.
6  BY THE WITNESS:
7      A.    Yeah, I'm not.  I don't know anything
8  about Detective Mason's mind-set at the time, and
9  I'm not going to make a credibility assessment,
10  because I was tasked to address the risk factors
11  that Ms. Russano brought up in her Rios report, not
12  the credibility of the witnesses or the fact.
13  BY MR. RICHARDS:
14      Q.    I understand, but you brought up the
15  informants, so I'm just asking you questions about
16  the informants.  In terms of the -- in terms of the
17  informants, one of the -- you are aware that one of
18  the informants said that a -- a gun would be found
19  in a certain location; correct?
20      A.    Yes.
21      Q.    And, in fact, as to one of the
22  locations, no gun was found.  Are you aware of
23  that?
24      A.    Yes.

Page 128

1      Q.    And as to another informant, they said
2  that a certain model of gun would be found in a
3  location that is with Benjamin Carrero, and in
4  fact, a different model of gun was found.  Are you
5  aware of that?
6      A.    Yes.
7      Q.    Okay.  Now, I --
8      (WHEREUPON, there was a brief
9      interruption.)
10  BY MR. RICHARDS:
11      Q.    Hate Unmasked:  A practical model for
12  understanding and dealing with hate groups, we
13  already dealt with that topic; correct?
14      A.    Yes.
15      Q.    And we also dealt with Making Ethical
16  Decisions, right?
17      A.    Yes.
18      Q.    Also with the Seven-Stage Hate Model?
19      A.    Yes.
20      Q.    Okay.  The article, Detecting Deception
21  in the FBI Law Enforcement Bulletin, is there
22  anything in that article that we haven't already
23  covered?
24      A.    No.



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
129–132

Page 129

1    Q.   And then Universal Principles of
2  Criminal Behavior:  A tool for analyzing criminal
3  intent.  Obviously, there might be a lot involved
4  there, but is there anything there that's relevant
5  to your opinion here that you want to talk to me
6  about?
7       MR. POLICK:  Objection to the form.
8       But go ahead.
9  BY THE WITNESS:
10    A.   No.
11       (WHEREUPON, Theresa Carney left the
12       deposition proceedings.)
13    THE COURT REPORTER:  We lost somebody?
14    THE VIDEOGRAPHER:  Yeah, did we just lose
15  Theresa, possibly?  Can we continue --
16    MS. ROSEN:  No need to worry about that.
17  Yeah, you can go ahead.
18    THE VIDEOGRAPHER:  Thank you.
19  BY MR. RICHARDS:
20    Q.   Okay.  And then terrorism -- Dissecting
21  the militia structure, also not relevant; correct?
22    A.   Correct.
23    Q.   The deterrent effect of three strikes
24  laws, we've covered that; right?

Page 130

1    A.   Yes.
2    Q.   Color of law invest -- color of law
3  investigations, that really -- that has to do
4  with -- well, does that have to do with
5  investigating, you know, corrupt police departments
6  and things like that?
7    A.   Yes.
8    Q.   Okay.  And you had experience in
9  investigating corrupt police departments; is that
10  true?
11    A.   Yes.
12    Q.   And investigating corrupt police
13  officers; is that true?
14    A.   Yes.
15    Q.   Okay.  Sometimes corrupt police officers
16  are involved with drug dealers or drug dealing.
17  That's one pattern.  Is that fair?
18    A.   Yes.
19    Q.   And would you say it would be consistent
20  with an officer who is corrupt, that he would take
21  the Fifth as to any question in -- in -- in
22  proceedings?
23    MR. POLICK:  Objection to the form of the
24  question.  It calls for speculation.  And may be

Page 131

1  beyond this witness's field of expertise.
2       But I'll let -- you can answer over
3  those objections.
4  BY THE WITNESS:
5    A.   I have no idea.
6  BY MR. RICHARDS:
7    Q.   Okay.  Well, I mean, when you did
8  investigations of corrupt police officers, did you
9  encounter police officers who would take the Fifth
10  before grand juries or refuse to answer questions?
11    A.   No.  Refuse to answer questions in a
12  deposition or an interview?
13    Q.   Well, actually in either one.
14    A.   Yes.  Because they're represented and
15  they say talk to my attorney and they're not going
16  to make a statement.  So, yes, I have come in
17  contact with officers who don't talk.
18    Q.   Okay.
19    A.   Because --
20    Q.   Because they're represented by an
21  attorney and they want you to talk to the attorney,
22  not to them personally; correct?
23    A.   Correct.
24    Q.   Okay.  Prisons:  Partners in the

Page 132

1  community, does that have anything to do with this
2  case or your opinions here?
3    A.   No.
4    Q.   Corporation or corporate body, that
5  looks like it has something to do with something
6  totally different.  Is that fair?
7    A.   Correct.
8    Q.   The unsolved case of Special Agent Paul
9  E. Reynolds.  Investigator.  What's that about?
10    A.   There was an FBI agent back in, I think,
11  1920s at some point, and he was found murdered.
12  And it was an unsolved case and was out of Phoenix
13  division, and I was in the Phoenix division, and I
14  reviewed all the archives of that case and came up
15  with a hypothesis as to his death.
16    Q.   Okay.  I want to get to your opinions in
17  this case, but I want to kind of start with -- at
18  number XI, where it says, on page 51, Accuracy and
19  Completeness of the Narrative.
20    A.   Okay.  I'm there.
21    Q.   Well, at the very end, you -- there's
22  this paragraph.  It says:  As I was tasked to
23  evaluate risk factors posited by Russano that,
24  according to her, may lead to false confessions,



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
133—136

Page 133

1 and, according to her, were present during Rios's
2 confession, I do not make any further assessment of
3 the credibility of suspects and witnesses involved
4 in this matter. The weight to be given to their
5 statements falls exclusively within the purview of
6 the jury.
7     Do you see that passage?
8   A. Yes.
9   Q. Okay. My first question is in the Gomez
10 case, didn't you give an opinion as to whether the
11 confessions there were consistent or inconsistent
12 with what the witnesses were saying, or am I
13 mistaken about that?
14   A. I didn't make a determination. I just
15 drew a -- a list of things that were based on what
16 the Gomez folks were saying versus what was in
17 the -- the police report. I didn't make a
18 determination if either one was correct or should
19 be credited.
20   Q. Okay. In this particular instance, you
21 didn't make any list in your report of the things
22 in the re -- in the court-reported statement which
23 either did or did not -- which either were or were
24 not consistent with other witnesses or facts or

Page 134

1 physical evidence. Is that fair? That's not in
2 this report.
3   A. Not in the report because I was not
4 tasked to do that. I was tasked to address the
5 risk factors in the Rios interrogation and
6 interview.
7   Q. Okay. I don't want to get into --
8   A. Not the credibility --
9   Q. I get it. And I don't want to get into
10 anything confidential, but your report doesn't
11 concern consistencies or inconsistencies
12 with the -- that the statement might have with
13 other evidence. It only deals with the risk
14 factors. Fair?
15   A. I do make a comment that under normal
16 circumstances and normal cases, based on my
17 experience, no two witnesses come out with the same
18 perspective of what happened. In other words,
19 there's always going to be a conflict when you talk
20 to witnesses. That's normal. Based on my
21 experience, that's normal. Based on the Rios case,
22 that's normal to have witnesses produce different
23 accounts of the same event.
24   Q. Okay. Now -- okay. Now, I had earlier

Page 135

1 talked to you about the Reid interrogation method
2 and other interrogation methods. You do have -- in
3 the Gomez case, in your report, you did have a
4 discussion of some of those different methods, the
5 Reid method, the PEACE method, and so forth.
6     In this particular report, as you point
7 out to me, you don't have that same discussion. Is
8 that fair?
9   A. That's because, number one, there's no
10 record of it except for the court-reported
11 statement. So it's difficult and -- it's difficult
12 for me, and I would assume also Dr. Russano, to
13 make any kind of determination what interviewing
14 techniques were used by the detectives because
15 there's no record in the -- in their police report
16 as to what interrogation techniques were used.
17   Q. All right. That's very fair. And in --
18 further in, aside from the police reports, you've
19 read -- you've read Detective Mason's deposition;
20 correct?
21   A. Yes.
22   Q. Okay. And it would be fair to say that
23 he did not have a very detailed memory of how the
24 interrogation went or what questions were asked or

Page 136

1 what answers were given. Is that also fair?
2   A. But that -- but -- yes, but that's not
3 unusual, because that happened some 26 years ago,
4 and he's -- he's interviewed thousands of people
5 since then over his career. And like in my career,
6 I have a difficult time going back to 1985 or '86
7 as to who was arrested and who I interviewed and
8 what happened during the investigation.
9     The prime example is I put three
10 skinheads in jail for prison for the rest of their
11 lives, and I can't remember their names. So it's
12 not unusual that a detective won't remember a case
13 or won't remember what happened during a case.
14 Because if you -- if you interview so many people,
15 it's difficult to separate them, especially if
16 there's a lot of homicides.
17   Q. Okay. But the fact remains that one --
18 and I'm just trying to support your opinion -- one
19 reason you don't go into the different possible
20 interrogation techniques is that apart from the
21 lack of those in the police reports, Detective
22 Mason didn't supply more information about that
23 during his deposition. Is that fair?
24   A. We don't know what happened during that



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
137–140

Page 137

1  interview, so it's difficult to make any kind of
2  determination as to what techniques were or were
3  not used during that half-hour interrogation.
4      Q.    Okay.  But is there anything -- again,
5  my question is you're saying you can't determine
6  what techniques were or were not used because it's
7  not in the police report and it's not in Mason's
8  deposition.  Fair?
9      A.    Yes, any -- any judgment in -- as to
10  what techniques were used would be pure
11  speculation.
12      Q.    Okay.
13      A.    Because we don't know.  We can only
14  guess.
15      Q.    All right.  Well, let me ask you this:
16  You said that one group of techniques is the Reid
17  interrogation method; correct?
18      A.    Not in this report, no.
19      Q.    No, I mean, in general, there is such
20  thing as the Reid interrogation method; right?
21      A.    Yes.
22      Q.    And we've already talked about some of
23  the -- some of the aspects of the Reid
24  interrogation method; right?

Page 138

1      A.    Yes.
2      Q.    And, in fact, you remember using some of
3  those techniques yourself during the course of your
4  career; correct?
5      A.    Some variations of those techniques, but
6  not the Reid Technique specific, because based on
7  my training and the people I do train, most police
8  officers develop an eclectic approach.  They figure
9  out what works for them, and then they take bits
10  and pieces from a lot of interviewing techniques.
11  They take bits and pieces from experienced
12  officers, and they -- they form their own
13  personalized way of interviewing people.
14      So very, very few people, officers, that
15  I know of, adhere strictly to the Reid Technique.
16  They can say yes, I'll -- I'll use one of these
17  techniques and maybe I'll mush it and translate it
18  into my -- the way I like to use it, but very
19  rarely do police officers use the Reid Technique.
20  It's difficult to remember nine steps.
21      Q.    All right.  But one of the techniques
22  that you remember using was minimization; correct?
23      A.    Yes.  You want to -- you want to say,
24  well, why did you do this, you know, why did you

Page 139

1  commit this heinous crime?  A lot of times, why did
2  you molest that young -- that young six-year-old,
3  seven-year-old boy?  It's hard for someone to come
4  out and say, hey, I molested that person because
5  I'm an evil sex offender.
6      Q.    Okay.  But I --
7      A.    So it's easier --
8          (WHEREUPON, there was a brief
9          interruption.)
10  BY MR. RICHARDS:
11      Q.    I don't think we're talking about
12  minimization, the one point.  I thought there was
13  another word you used where, for example, you say
14  something like couldn't have been self-defense, I
15  mean, didn't -- if you -- you did it, but
16  wouldn't -- couldn't have been self-defense,
17  something which provides a rationale or a reason
18  for what they might have been doing.  That's one
19  technique, isn't it?
20      A.    Well, you said it "couldn't" be.
21  What -- what -- I think what you meant to say,
22  you're not a murderer, you didn't walk into that
23  bar with the intent to kill somebody or stab them.
24  You walked in there and somebody provoked you and

Page 140

1  did this and that, and you didn't mean to do that,
2  and you just kind of stabbed them out of passion.
3      Q.    Right.  Self-defense or --
4      A.    Is that what you're trying to say?
5      Q.    Or, yeah, or rage at -- rage at the
6  moment.  That technique -- that technique, that
7  would be giving some sort of -- would you call that
8  minimization or you call it something else?
9      A.    That would be rationalization or
10  minimization, giving somebody cover for what they
11  did.  So --
12      Q.    Rationalization.
13      A.    -- you can more openly discuss that
14  topic.  Because it's tough to say you're a killer.
15  You're a murderer.  You -- you -- you molested that
16  boy or that girl.  It's a lot easier to say, you
17  were engaged in sex education or you were trying to
18  teach that person some -- some facts of life or
19  something like that.  It's a lot easier for people
20  to admit that they've done evil things if you don't
21  attack them.
22      Q.    Right.  So what we're talking about in
23  that hypothetical was rationalization; right?
24      A.    Right.



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
141–144

Page 141

1    Q.   And you said before that that's a
2   technique you've used on occasion.  Fair?
3    A.   Yes, I've used rationalization.
4    Q.   And then minimization is something like,
5   you know, you were there but maybe it was your
6   buddy who it or you didn't play a big part in this.
7   Your activities were minimal.  That's minimization;
8   correct?
9    A.   Yeah, and that is minimization, and we
10  do see it in the Rios case.  Because the
11  confidential informants identified Jaime as the --
12  or Jaime as the shooter.  So when they interviewed
13  him, what he did is he minimized his participation
14  by identifying Torres -- Garcia as the actual
15  shooter, and he merely shot his gun up in the air
16  several times.  That's minimization.
17   Q.   Okay.  And minimization could be
18  something that's suggested by the suspect, but it
19  could also be something that's suggested by the
20  officer; correct?
21   A.   That's correct, but what -- what the
22  false confession researchers don't realize is that
23  interviewing is a dynamic process, because the
24  suspects are not going to walk in and say I did it

Page 142

1   when they -- when they, in fact, don't want to say
2   they did it.
3        What they typically do is they look for
4   the evidence that the police have.  So there's this
5   tug of war between the police, the interrogator and
6   the suspect, and what the -- what the false
7   confession researchers don't realize is that the
8   same techniques that they're blaming on the police
9   are the same techniques that suspects engage in to
10  take advantage of the police to convince the police
11  they weren't, in fact, participated in the crime.
12       So we -- we are -- the police are
13  victims of the same techniques we're being accused
14  of victimizing other people.
15   Q.   Yes, but you would agree --
16   A.   And that's --
17       (WHEREUPON, there was a brief
18        interruption.)
19  BY MR. RICHARDS:
20   Q.   You would agree -- you would agree with
21  me that both happens, that sometimes police
22  officers suggest a minimizing explanation to
23  suspects and sometimes suspects come up with a
24  minimizing explanation on their own.  Both things

Page 143

1   can happen; correct?
2    A.   Correct.
3    Q.   Okay.  And you went back in your -- in
4   your experience, have on occasion used the
5   minimization technique.  Fair?
6    A.   Yes.
7    Q.   Now, another point in your report, which
8   I'm not sure if I could find and I didn't quite --
9   quite understand, you said the fact that the police
10  continued to investigate after -- after Rios was
11  charged meant that they weren't assuming his guilt
12  because they were still continuing to investigate.
13  Do you remember when -- where you said that or
14  what -- or is that something that strikes you as
15  something you said?
16   A.   I remember.
17   Q.   Okay.  But after -- after -- immediately
18  after Rios gave the court-reported statement, he
19  was charged at that point, was he not?
20   A.   No, he was not.  There was a felony
21  review, but there was no charge made.  The charge
22  didn't come until the following day by State's
23  Attorney Owen, I believe, at about 5:30 in the
24  afternoon.

Page 144

1        So what happens is -- I know what you're
2   referring to is Dr. Russano said that the police
3   were subjected to confirmation bias.  That is not
4   applicable in this case.  Because the police went
5   in with information they heard on the street.  They
6   make a statement.  In then makes inculpatory
7   statements.  They didn't arrest him right then at
8   the time.  They called for felony review.
9        And then at the end of the felony review
10  and the court-reported statement, they still didn't
11  stop investigating.  If they were victims of tunnel
12  vision or confirmation bias, according to Russano,
13  he would have been arrested and that would have
14  been the end of the case.
15       But they continued to seek out eye
16  witnesses.  They continued to look for other eye
17  witnesses that weren't identified.  They continued
18  to investigate informants, information about where
19  the weapons could possibly be.  They executed a
20  warrant on Carrero's house, and then they obtained
21  inculpatory evidence that Carrero stated that it
22  was Rios actually gave him a gun and said, hold
23  this for me, I just shot somebody.
24       So if it was confirmation bias, they



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
145–148

Page 145

1 would not have continued their investigation. They
2 would have stopped it and just taken him off to
3 jail.
4 Q. Okay. Let me go backwards. You've
5 read -- you've read Mason's deposition; correct?
6 A. Yes.
7 Q. Okay. You've read the police reports;
8 correct?
9 A. Yes.
10 Q. You've -- you've read the court-reported
11 statement; right?
12 A. Yes.
13 Q. Okay. Now, is it your -- is it your
14 position that at the time Jaime Rios gave the
15 court-reported statement, he was not under arrest?
16 A. At the time he made the court-reported
17 statement, he was under arrest. He was arrested at
18 12:30 by Detective Mason.
19 Q. All right. And you're aware that the
20 police report also -- the police report says that
21 he was arrested by detective -- by Gang Specialist
22 Guevara? Guevara was the one who wrote the arrest
23 report?
24 A. But the Chicago -- the custom of the

Page 146

1 Chicago Police Department is to give everybody who
2 was involved in the arrest credit. So what the
3 custom there is is to include everybody on the
4 arrest report so they get credit for participating
5 in the investigation. It doesn't mean they
6 actually arrested the person. They were somehow a
7 party to the arrest of that person. But --
8 Q. Okay. Well, let me make it clear --
9 A. -- that he arrested Mr. Rios at 12:30
10 after he made his first inculpatory statement.
11 Q. Okay. So Rios is arrested at 12:30.
12 Would you concede that before 12:30, no one had
13 done these additional investigations you're talking
14 about, having the search warrants, going to find
15 where the guns might be, that had not been done
16 before 12:30; correct?
17 A. Correct. And that supports the
18 proposition that it wasn't confirmation bias
19 because, in fact, they continued their
20 investigation even after they had the statement
21 made by Rios.
22 Q. All right.
23 A. So what we see is officers making an
24 effort to corroborate information, not to close the

Page 147

1 case, but to ensure that they -- they can
2 corroborate the information. So that -- that shows
3 me there's no confirmation bias.
4 Q. Okay. But you had said before that he
5 wasn't arrested before they took these steps. In
6 fact, he was arrested before they took these --
7 they took these steps, isn't that true, because
8 he's arrested at 12:30; right?
9 A. Yes.
10 Q. Is that true?
11 A. Yes, he was arrested at 12:30.
12 Q. Okay. And -- and whatever you think of
13 the additional steps, those steps were taken after
14 he was arrested; correct?
15 A. That's correct.
16 Q. Okay. Okay. Would you agree that one
17 sign -- possible sign of a true confession is that
18 it includes evidence -- things that are not known
19 to the police, which come out later or are
20 corroborated from other sources. Is that fair?
21 A. I'm not sure what you mean. You mean
22 come out from the suspect themselves? Because
23 police often hold back information that only the
24 suspect -- or the perpetrator would know. And then

Page 148

1 if the perpetrator comes out with the information,
2 then they could say, ah-ha, they have personalized
3 information that nobody else could have except if
4 you were there.
5 Q. Well, let me -- let me -- let me --
6 that's not what I was saying, but let me make
7 myself clear. Let's say that in a suspect's
8 confession or statement, he gives the police
9 information they do not know, but later information
10 proves to be accurate.
11 So, in other words, he says something
12 the police don't know. They do some investigation,
13 and it turns out the suspect was telling the truth,
14 was truthfully confessing because that evidence
15 corroborates what the suspect said.
16 A. Well, let me rephrase that. So what
17 you're -- you're asking me is if a suspect provides
18 information to the police, the police go
19 investigate that piece of information and find out
20 that that information is, in fact, true, that would
21 lend credibility to the fact that the suspect was
22 being truthful.
23 Q. Yes.
24 A. Yes, I agree with that.



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
149–152

1    Q.   Okay.  For example, in Rios's
2   court-reported statement, you notice that he said
3   that he had ditched the gun in the lake --
4   actually, Oak -- Oak Street Beach, or the lake at
5   Oak Street Beach.  Had a gun been found at Oak
6   Street Beach, that would have corroborated the
7   statement; correct?
8        MR. POLICK:  Object to the form.  I think that
9   assumes facts outside the record.
10        But go ahead.
11   BY THE WITNESS:
12    A.   I'm not aware that he threw it.  He just
13   said "in the lake," in his court-reported
14   statement.  He didn't say at Oak Street Beach.
15   BY MR. RICHARDS:
16    Q.   Okay.  And -- but had the -- had the
17   police gotten more specific information about --
18   from him where he threw it in the lake, they had
19   gone to the lake, they found the gun, it matched
20   the ballistics, that would have been corroboration
21   that he was telling the truth.  Fair?
22    A.   In that hypothetical, yes.  If he says,
23   I threw it at Oak Street Beach, and they recover it
24   and the ballistics match, that would be an

1   indication that he was telling the truth, that he
2   threw the gun in the lake.
3        MR. RICHARDS:  Okay.  I think that's all I
4   have.
5        MR. POLICK:  Can we take five-minute break,
6   and I have some questions to follow up.
7        MR. RICHARDS:  Sure.
8        THE VIDEOGRAPHER:  We are going off the record
9   at 2:14 p.m.
10        (WHEREUPON, a short break was
11        taken.)
12        THE VIDEOGRAPHER:  We are back on the record
13   at 2:25 p.m.  Go ahead.
14   BY MR. RICHARDS:
15    Q.   Mr. Gomez, you were hired on this case.
16   You were also hired on the Gomez case; correct?
17    A.   Yeah, and I'm Mr. Schafer.
18    Q.   Oh, Mr. -- did I say -- did I say
19   Mr. Gomez?
20    A.   You said Mr. Gomez, yes.
21    Q.   Okay.  Well, that was -- that was a
22   Freudian slip.
23        Mr. Schafer, you were hired on the Gomez
24   case and on this case; correct?

1    A.   Yes.
2    Q.   Okay.  In both instances, the person or
3   the attorneys hiring you were the attorneys from
4   The Sotos Law Firm; correct?
5    A.   Correct.
6    Q.   Okay.  With respect to the -- this case,
7   you're charging 450 an hour.  Am I right about
8   that?
9    A.   Correct.
10    Q.   Okay.  And how much have you billed so
11   far?
12    A.   Let me think.  Maybe 40 -- upper 40 --
13   upper 40,000.
14    Q.   $40,000?
15    A.   Upward of -- upper 40s -- 40 --
16    Q.   Well, let's not guess.  If you --
17    A.   Approximately 40.
18    Q.   40,000.  Okay.  And --
19    A.   No, it's a little bit more.  It's
20   approximately 43 or 45, somewhere in there.  I -- I
21   didn't keep track.
22    Q.   Okay.  And would it be possible for you
23   at some point to produce your invoices to the
24   attorneys who hired you so that they could be

1   produced to us?
2        MR. POLICK:  If you're making a request for
3   those, Mr. Richards, we will provide you with
4   copies of Dr. Schafer's invoices on this case.
5        MR. RICHARDS:  Thank you.
6   BY MR. RICHARDS:
7    Q.   And similarly, on the Gomez case where
8   you were you hired by the same firm, do you
9   remember how much you billed on that case?
10    A.   I don't know the exact numbers, but it
11   was -- my W-2 for the end of the year was 62,000.
12   And I don't know what -- I think there was a
13   deposition after that.
14    Q.   Right.  But the deposition would have
15   been paid for, at least in large part, by the
16   plaintiff; correct?
17    A.   That's correct.
18    Q.   Okay.  So it was 62,000 for the Gomez
19   case and upwards of 40,000 for this case?
20    A.   I don't know exactly -- I'm just going
21   by what I remember on my taxes.
22    Q.   Okay.  Again, if you could produce the
23   relevant documents, not your whole taxes, but just
24   the record of the payment, we'll make a request



Page 153

1   that those be produced.

2       And also, in terms of your report, which

3   I've had a chance to -- you've had a chance to

4   review, is there any opinion left out of your

5   report that you think now and you're reflecting on

6   it should have been in there?  Something critical

7   that should be there that's not there?

8       A.   No.

9       MR. RICHARDS:  Okay.  I have nothing further.

10      MR. POLICK:  I have a few follow-up questions.

11          EXAMINATION

12  BY MR. POLICK:

13      Q.   Dr. Schafer, you told us that you worked

14  for the FBI for 20 years; is that correct?

15      A.   Yes.

16      Q.   And you were asked about certain

17  interrogation techniques by Mr. Richards, one of

18  them being the Reid Technique, that was something

19  you were exposed to?

20      A.   Yes.

21      Q.   And another technique that you referred

22  to that you were exposed to during your career

23  there at the FBI was something that today is called

24  the PEACE Model; is that correct?

Page 154

1       A.   That's correct, but it wasn't referred

2   to as the PEACE Model at the time I learned it.

3       Q.   It's something that's referred by that

4   acronym now; correct?

5       A.   Yes.

6       Q.   Was there a specific technique you were

7   taught by the FBI when you were being trained in

8   interviews and interrogations?

9       A.   Yeah, basically what we were taught is

10  to be nice to people, develop a rapport with the

11  suspects, and get -- develop a good connection with

12  them, and then ask for the narrative of what --

13  introduce to them this is why you're here, this is

14  why we're talking to you, and then ask them to

15  provide a narrative of what occurred.

16      And then what we do is we take the

17  narrative and we look for inconsistencies, based on

18  some evidence we may have gathered, because we

19  typically don't interview a suspect until the last

20  step in the investigation.  So we've got all the

21  facts.  So then we compare what the person said to

22  the facts, and that's a current strategy called

23  SUE, Strategic Use of Evidence.  So that's

24  something that's -- that's got a new name to it,

Page 155

1   but we've been taught for 40 years, that I know of,

2   that we strategically use evidence.

3       So if somebody comes up with a narrative

4   that you believe may not be true, do you say, well,

5   here's a little piece of evidence I'm going to show

6   you that contradicts what you just said, how do

7   you -- how do we clear that up?  And then you

8   listen to the -- to the narrative.

9       Q.   And then you told us -- well, strike

10  that.

11      When you were trained by the FBI in this

12  interview technique and -- and interrogation

13  technique that you just spoke of, were -- was the

14  concept or the phenomena of false confessions

15  raised at all during your training?

16      A.   Yes, that came up quite regular during

17  basic training and advanced interview training

18  where we designed interviewing techniques that

19  would avoid possible false confessions.  Number

20  one, we walk into the interview room with competing

21  hypothesis.  In other words, you walk into the room

22  and say that person is telling us the truth, that

23  person is lying, and then what we do is gather

24  evidence of either somebody's telling the truth or

Page 156

1   lying, and we weigh it kind of on a scale.

2       Because we come to find out that honest

3   people sometimes do and say things that make them

4   look dishonest, and dishonest people say and do

5   things that make them look honest.  So we want to

6   look for the preponderance of the evidence.  And

7   the FBI doesn't typically take a confession at face

8   value.  We then go out and corroborate what that

9   person said.

10      So we avoid confessions by

11  corroboration, competing hypotheses, and developing

12  an interview environment that is conducive to

13  people telling the truth.

14      Q.   I think you maybe misspoke there and

15  said you avoid confessions, but what you meant

16  is you try to avoid false confessions --

17      A.   False confessions.

18      Q.   -- by those techniques?

19      A.   Yeah, false confessions.

20      Q.   All right.  And then you told us over

21  time being exposed to the FBI interrogation

22  technique, as well as being exposed to Reid and

23  other techniques, that you developed your own

24  personal or eclectic approach to interviews and



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
157–160

Page 157

1  interrogations; correct?
2      A.   That's right.
3      Q.   All right.  And then when you developed
4  your own personal approach, did you incorporate
5  these ideas and techniques to avoid the phenomena
6  of false confessions?
7      A.   Yes.  I make a point of it because the
8  last thing we want to do as investigators is to
9  accuse an innocent person of doing something they
10  didn't do.  So I always stress, you walk in, you
11  build rapport, create the environment.  Another
12  thing you do is you create -- you walk in with
13  competing hypotheses, see who did what.
14          And then you ask them for a narrative.
15  You don't accuse them of anything.  You say tell me
16  what happened.  And then they provide the
17  narrative.  Then if the narrative differs from the
18  facts that you've gathered during your
19  investigation, then you confront them with the
20  conflicting facts.
21      Q.   And then you said at some point in your
22  career with the FBI and then after you left there
23  and went into the private sector, you, in addition
24  to doing interrogations, you were also training

Page 158

1  others on how to do interrogations and interviews;
2  is that correct?
3      A.   That's correct.
4      Q.   And over the course of your career, how
5  many interrogations do you think you've done?
6      A.   Thousands.
7      Q.   And that's not even counting the witness
8  interviews, I take it?
9      A.   That would be counting the witness
10  and --
11      Q.   I see --
12      A.   -- suspect interviews.
13      Q.   So combined witness interviews, suspect
14  interrogations, it would be in the thousands?
15      A.   Yeah.
16      Q.   And when you were doing those, did you
17  incorporate those principles and training to avoid
18  false confessions?
19      A.   Yeah, absolutely.  The -- the FBI really
20  instilled in us to -- to build rapport with people.
21  Because nobody wants to tell somebody a secret to a
22  person they don't like.  So you want to build
23  rapport with that person.
24      Q.   And then when you were training others

Page 159

1  in -- in interrogation techniques, both in the FBI
2  and in the private sector, did you incorporate
3  those concepts in your training of others to avoid
4  false confessions?
5      A.   Yes, I did.  I made an emphasis on that.
6      Q.   You were asked many questions about your
7  publications that are listed in your resume that --
8  an appendix to your report.  I'm not going to go
9  through all of them, but you now have a book in its
10  4th edition called Advanced Interviewing
11  Techniques; correct?
12      A.   Yes.
13      Q.   And I think you told us that this covers
14  various techniques that can be used for both
15  interviews and as well as interrogation?
16      A.   Yes.
17      Q.   And in your -- and in that publication,
18  do you address the issue of false confessions and
19  how to employ techniques to avoid false
20  confessions?
21      A.   Yes.  I put -- I put the techniques to
22  avoid false confessions in that book and in great
23  detail, how do you -- how do you execute the
24  technique, what do you look for, be aware of false

Page 160

1  confessions, deception.
2      Q.   And you said that you're
3  currently -- strike that.
4          You said that you have done research and
5  you are currently continuing your research in what
6  you call a psychological narrative analysis.  Is
7  that something you continue to research?
8      A.   Yes.
9      Q.   And this was the concept you were
10  talking about and explaining to Mr. Richards where
11  you're looking at the grammar or text of both
12  written and oral statements to determine certain
13  text bridges that can be indicators of deception.
14  Is that fair -- is that a fair assessment?
15      A.   That's -- one of the elements is text --
16  text bridges, and it's a major element.
17      Q.   Okay.  And you've indicated that you've
18  not only studied that in the English language but
19  in other languages and found that the concept is --
20  goes beyond languages or is cross-lingual, for lack
21  of --
22      A.   Yes.
23      Q.   -- or multi-lingual, for lack of a
24  better word; correct?



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
161–164

Page 161

1    A.   Yes.  It goes across languages because
2    of -- we're looking at the word -- the grammar
3    structure itself upon which the words sit.
4        Q.   And you were asked some questions about
5    your research and how it impacts the current
6    training on -- on false confessions.  And I think
7    you testified that this was a way to kind of go
8    beyond these risk factors that are prevalent in the
9    false confession research and literature and to
10   determine another method of detecting deception or
11   false confessions in statements given by witnesses
12   and suspects.  Is that a fair assessment?
13       A.   Yeah, that's true, because the main --
14   major problem, as I've -- I'm very familiar with
15   the current research in false confessions.  And
16   from the research, I see that they're only using
17   college students.  And I understand why they're
18   doing that because it's -- it's unethical to use --
19   you know, to have normal people commit crimes
20   intentionally without them knowing it and they have
21   police interrogate them and investigate it.  It's
22   ethically not possible.
23       So they try to simulate the interview
24   environment, which they can't do very effectively

Page 162

1    because college students think differently than
2    people who are suspects.  Because there's no
3    consequence for a college student.  There's no
4    ramification.  There's nothing that would affect
5    that college student, whether he lied or told the
6    truth.  In the interview interrogation room,
7    there's certainly a lot of -- a lot at stake.  And
8    the mind-set is totally different.
9        Q.   When you say "the mind-set is totally
10   different," can you explain what you mean by that?
11       A.   Because if a -- if a college student
12   gets caught lying in an experiment such as what
13   Russano did, somebody -- you gave somebody else
14   help during one of the experimental problems.  So
15   the consequence was they would have to repeat the
16   experiment and not receive credit for the
17   experiment, so they'd have to do it twice.  That
18   doesn't even compare to somebody who may go to jail
19   for a long time for a crime they committed.  Very
20   different mind-sets.
21       So you can't -- and the problem is with
22   that external validity.  An external validity
23   doesn't come on a continuum.  It's either you have
24   external validity or you don't have external

Page 163

1    validity.  And those experiments that they run in a
2    laboratory do not have external validity, which
3    means they cannot make any associations between
4    what occurred in that laboratory setting and in the
5    interview interrogation room.  Can't be done.
6        Q.   Fair to say you're a psychologist by
7    profession?
8        A.   Yes.
9        Q.   And maybe label is too strong a word,
10   but what do you consider yourself?  Do you consider
11   yourself an experimental psychologist similar to
12   Dr. Russano, or would you describe yourself as
13   something different than what she does?
14       A.   I'm well familiar with the false
15   confession research, but what I am is an applied
16   psychologist.  I take what I've learned through my
17   experiences as a behavioral analyst in conducting
18   several thousand interviews, and what I do is I
19   apply that in real time, with real people, with
20   real suspects.
21       And that's what's lacking with
22   experimental psychologists.  They don't have the
23   opportunity to get into an interrogation room and
24   actually talk to a suspect to learn that not all

Page 164

1    suspects fit a generic description.  In other
2    words, all people are subjected to sleep
3    deprivation, as Ms. Russano says.  Well, that's not
4    the case.  Because every suspect is different.
5    Some people like to sleep early.  Some people like
6    to go to sleep late.  Some people stay up all
7    night.  Some people don't need as much sleep as
8    other people.
9        What Ms. Russano was -- or Dr. Russano
10   was intimating is that just because it happened at
11   night, there's sleep deprivation involved.  Well,
12   that's not necessarily the case without knowing
13   that personal -- remember I talked about the
14   personal baseline?  Without knowing that personal
15   baseline, there's no way that she can make that
16   kind of application of the experimental research
17   findings.
18       Q.   So when you were tasked in this case to
19   review Dr. Russano's report and provide expert
20   analysis on the risk factors that she believed were
21   present during Mr. Rios's interrogation and
22   statement, were those concepts or those risk
23   factors familiar to you as -- based on your
24   experience and training in your profession in doing



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
165–168

Page 165

1 interviews and interrogations?
2     A.    Yes, I'm well -- I'm well familiar with
3 the research in the area.  I keep current on the
4 research in the area, and I have since I began
5 interviewing.
6     Q.    Okay.  So even though you consider
7 yourself an applied psychologist, you do do your
8 own research, and your research into this
9 psychological narrative analysis is -- is an
10 example of the research that you're doing?
11     A.    Yes.
12     Q.    And any other impacts that that research
13 has on current thinking about confessions or the
14 concept of false confessions, other than what
15 you've already explained about, how you're trying
16 to take a different approach because what you feel
17 is a lack of external validity or application to
18 real life or real world interrogations?
19     A.    Yeah, if we can find a connection that
20 covers both the experimental room and the
21 interrogation room, then we can start talking about
22 apples and apples.  Because if we can determine if
23 prisoners or suspects use the same grammar as do
24 college students, which I -- my hypothesis, they

Page 166

1 do, then we can say, ah-ha, we can determine that
2 somebody's telling the truth or not.  If there is a
3 false confession, we know, based on the grammar
4 structures.
5         And the next step in the investigation
6 process that I'm working there is we are going to
7 make contact with the prisons and actually have
8 prisons do the same experiment with prisoners.
9 Like I did in that three strikes study, we actually
10 went to the people who had three strikes.  We were
11 actually going to the prisoners.
12         Now, we can start making associations.
13 I think that would clear up a lot of ambiguity in
14 the current research.  Because there's nothing
15 conclusive.  They don't know of any one particular
16 interview technique by the police that causes false
17 confessions.  They don't know how false confessions
18 occur.  They don't know how many false confessions
19 occur.  It's all speculation.
20         And they've come up with these things
21 that they found out in the experimental room, such
22 as the length of interrogations.  The length,
23 there's so many definitions of length, it's hard to
24 pin down what -- what the length of interrogation

Page 167

1 is.  Some -- some researchers say length of
2 interrogation is the entire time in custody.  Some
3 people say it's the entire time that you interview
4 somebody, but if you spend three hours in jail and
5 come back to get interviewed, we don't count
6 the three hours in jail.  So we don't know that.
7         In the law enforcement field, we
8 typically have -- if the policeman in the room with
9 the person and they're questioning, even if they're
10 not questioning, if the policeman is present in the
11 room, then that would be interrogation time,
12 excluding all the times that they're not being
13 questioned.
14     Q.    Okay.  So what you're pointing out
15 there, Doctor, is that there's a difference or at
16 least a difference of opinion between you and
17 Dr. Russano over the concept or what she terms as a
18 risk factor of length of interrogation time?
19     A.    It's very difficult to make any
20 determination if you don't have the right
21 definition.  If we're all working with different
22 definitions, nobody can come up with any kind of
23 conclusive finding.
24     Q.    Okay.  And you view her concept of

Page 168

1 interrogation time, as she indicated at her
2 deposition, that to be the total time in custody,
3 including the actual interrogation time and any
4 break taken therein.  Is that your understanding of
5 her position?
6     A.    And -- and if somebody came in as a
7 witness and then later determined that they may be
8 involved in the crime, she counts -- she encounters
9 the interview time or the time when somebody
10 voluntarily comes in.  So any time a policeman -- I
11 think she said any time a policeman is present
12 while you're being -- a person is being questioned,
13 that starts the clock.
14     Q.    All right.  And in your experience with
15 interrogations and how do you view what could be
16 termed "interrogation time"?
17     A.    Interrogation time is the time that the
18 policeman is actually in the presence of the
19 suspect in the interview room, not including times
20 where they're not being -- they're not actually
21 being questioned.
22     Q.    Okay.  And so not --
23     A.    In the Rios case, for example, the
24 interview started at midnight and he was -- it



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
169–172

Page 169

1 concluded at 12:30. So the interview time would be
2 30 minutes.
3    Q.   All right. And you addressed that in
4 your report, that that's your view on what the
5 interrogation time is there, the length of
6 interrogation time, whereas Dr. Russano has a much
7 longer seven-plus hours as -- as the length of
8 interrogation time, which she determines to be a
9 risk factor in this case.
10   A.   Yes.
11   Q.   Do you see it as a risk factor in this
12 case? What's your opinion?
13   A.   Well, I don't see it as a risk factor in
14 this case because, at best, he was arrested --
15 even -- he was in custody basically or he was in
16 the presence of police officers from 9:30 until
17 12:30, when he was arrested. At the end of his --
18 his interview, interrogation, he wasn't charged,
19 but he was arrested. Therefore, the interrog --
20 the -- even by Ms. Russano's -- or Dr. Russano's
21 calculations, it would be only three hours of
22 interrogation time. Because once the arrest
23 happened, it cuts off the time, because there's an
24 arrest made.

Page 170

1    Q.   What about the court-reported statement
2 itself, how do you view that? Do you view that as
3 part of the interrogation time?
4    A.   Well, I do not, because what happened in
5 this case, he was interviewed -- Mr. Rios was
6 interviewed from 12:00 to 12:30 by Detective Mason
7 and Halvorsen, and then they called the felony
8 review. See, Ms. Bailey -- was it Bailey? Yeah,
9 Bailey.
10   Q.   Riley.
11   A.   Yeah, Riley. Ms. Riley did not
12 interview Mr. Rios. All she did was listen to what
13 he told the detective, and it correlated with what
14 he told the detective, and then she asked him to
15 memorialize it in a court-reported statement.
16 That's not an interrogation. That's -- she's just
17 reiterating -- or he's just reiterating what he
18 told Mason prior to that.
19   Q.   Right. Well, you may be using the terms
20 "interview" and "interrogation" interchangeably,
21 though, but certainly she interviewed Mr. Rios --
22   A.   Yes.
23   Q.   -- before she took his statement?
24   A.   Yeah, but she didn't interrogate him.

Page 171

1    Q.   Okay.
2    A.   But she spoke with him, yes.
3    Q.   Right. She spoke with him, communicated
4 with him, got his version of events that basically
5 replicated what he had told Detectives Mason and
6 Halvorsen?
7    A.   Yes.
8    Q.   And she also interviewed him about how
9 he was treated by the police?
10   A.   Yes.
11   Q.   And she also asked him how he would like
12 to memorialize his statement, and he chose to do it
13 via a court-reported statement; correct?
14   A.   Correct.
15   Q.   And that's a court-reported statement
16 that you reviewed in this case?
17   A.   Yes.
18   Q.   But you don't consider that to be part
19 of an interrogation process that goes into the
20 length of the interrogation?
21   A.   No, I don't. Because it's not -- it's
22 not an interrogation. An interrogation is when you
23 talk to somebody, and they're reluctant to give you
24 information. Because an interrogation doesn't

Page 172

1 occur if I say what happened, and they say, well, I
2 did this, this, and this. That's not an
3 interrogation; that's an interview.
4        Interrogation only comes into play when
5 somebody doesn't want to tell you what happened or
6 they're reluctant to tell you what happened, then
7 you have to kind of interrogate them to find out,
8 you know, why are there discrepancies in your
9 story. That's not what occurred with Ms. Riley.
10   Q.   Okay.
11   A.   What happened there is she just said, I
12 understand you said this, this, and this, tell me
13 about what happened. So he just reiterated what he
14 previously said, which is not an interrogation. At
15 best, an interview.
16   Q.   Okay. And you know from Mr. Rios's
17 deposition in this matter that -- that he now
18 denies or disclaims even giving that -- that
19 court-reported statement; correct?
20   A.   Yes.
21   Q.   Any doubt in your mind that he gave a
22 court-reported statement in this matter?
23   A.   I've seen the court-reported statement.
24   Q.   All right.



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
173–176

Page 173

1    A.   So...
2    Q.   And that's the same court-reported
3   statement that Dr. Russano looked at to render some
4   of her opinions in this case?
5    A.   Yes.
6    Q.   And just while we're on this subject,
7   you know, I think there may have -- just to clarify
8   one thing.  We're clear that after Mr. Rios made
9   his inculpatory statement to Detectives Mason and
10  Halvorsen, they told him he was under arrest, and
11  he was under arrest at 12:30 after giving that
12  inculpatory statement to them?
13   A.   Yes.
14   Q.   All right.  So when you said that ASA
15  Barbara Riley, when she came as the felony review
16  state's attorney, she wasn't placing him under
17  arrest.  What you were talking about was the formal
18  charging process?
19   A.   Yes, she did not formally charge him at
20  the time.
21   Q.   Correct.  And then you said that that
22  formal charging did not come until sometime later
23  that day after Mr. Rios was identified in a live
24  lineup by witness Luis Huertas; correct?

Page 174

1    A.   That's correct.
2        (WHEREUPON, a discussion was had
3        off the record.)
4   BY MR. POLICK:
5    Q.   And then the formal charging was done
6   after the positive lineup by Assistant State's
7   Attorney Owens?
8    A.   Yes.  I believe it was 5:30 that
9   evening.
10   Q.   You also indicated that in your review
11  of this case, you acknowledge that there were
12  certain areas where there were disputed facts
13  between Mr. Rios and the detectives involved;
14  correct?
15   A.   That's correct.
16   Q.   All right.  So, for instance, one of
17  those disputed facts is whether there was any
18  physical abuse during the course of Mr. Rios's
19  interrogation.  He says that Detective Mason
20  slammed his head on the table, and Detective Mason
21  has denied that.  You're aware of that?
22   A.   Yes.
23   Q.   And that's dis -- that's disputed in
24  this case?

Page 175

1    A.   Yes.
2    Q.   And am I correct that you're not making
3   any credibility determinations of who's telling the
4   truth there?
5    A.   No.
6    Q.   Okay.  So meaning you're not doing that?
7    A.   I'm not doing that.  What I'm doing
8   is it --it's just recognizing that it's disputed.
9   It's not my job.  I wasn't tasked to decide the
10  credibility of either statement.  I was tasked to
11  determine the risk factors and how they imply --
12  apply to this case.
13   Q.   Okay.
14   A.   So it's up to the -- to the jury to make
15  the decision who's believable and who's not.
16   Q.   Okay.  So if the jury were to credit
17  Mr. Rios's version of events, then the physical
18  abuse could be a risk factor in his -- in his
19  interrogation?
20   A.   Yeah, if they credit --
21   Q.   Right.
22   A.   -- Mr. Rios's.
23   Q.   And on the same hand -- or on the other
24  hand, if the jury were to credit Detective Mason's

Page 176

1   version of events, then physical abuse does not
2   become a risk factor in his interrogation?
3    A.   That's true.
4    Q.   Okay.  And the same thing, I think you
5   brought up with respect to the threat, there was a
6   dispute about whether a threat was made to Mr. Rios
7   that they would take his child away if he didn't
8   confess.  You're aware of that disputed fact?
9    A.   Yes.
10   Q.   Mr. Rios claims that they said that if
11  he didn't confess, he could lose his child, who was
12  very young at the time.  And the detectives -- or
13  Detective Mason says that no threats were made.
14  When he was -- Mr. Rios was interviewed by ASA
15  Riley, he said that he was not threatened.  So
16  there's a dispute there.
17       So using that same analogy as with the
18  physical abuse, you're not making a credibility
19  determination of who's telling the truth about the
20  threat; correct?
21   A.   Correct.
22   Q.   What your opinion is is that if the jury
23  were to credit Mr. Rios's version of events, then
24  the threat could be a risk factor in his



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
177–180

Page 177

1  interrogation?

2      A.   Yes.

3      Q.   And if they were to credit Detective

4  Mason's version of events or ASA Riley's version of

5  events, then the threat is not a risk factor in

6  this interrogation?

7      A.   That's correct.

8      Q.   Okay.  You talked about how at the time

9  the detectives interviewed Mr. Rios, and by that I

10  mean Detective Mason and Detective Halvorsen, that

11  they really didn't have much to go on other than

12  these -- the information that had been developed

13  through these confidential informants in the

14  neighborhood?

15      A.   That's correct.

16      Q.   And did you see anywhere in the record

17  that Detective Mason and Halvorsen attempted to

18  corroborate what they were getting in terms of that

19  information from detective -- or not detective, but

20  gang crimes Officer Guevara and his partner,

21  Officer Gawrys?

22      A.   Yes, what -- what they did, they -- he

23  initially got the information, and then he went one

24  step further by saying I want to talk to these

Page 178

1  informants, to listen to what they actually said.

2          Not only that, he took an extra step by

3  going to his supervisor lieutenant and asked him

4  what his informants were hearing on the street.  So

5  then he goes and makes the extra effort by saying,

6  hey, we're getting the same information that Rios

7  and Garcia were the shooters or participated in the

8  homicide, so therefore, you have to follow up on

9  that.  You just can't leave that lead.  As

10  Dr. Russano suggests, we shouldn't go in there and

11  confront Mr. Rios with that information because she

12  says it would be a guilt presumptive interview.

13          But in my time as an FBI agent and all

14  the interviews I've done, I've never walked into an

15  interview, and I can say never, walked into an

16  interview and not told the person why I'm there,

17  unless I'm in an undercover capacity, which I have

18  not been.

19      Q.   So do you see, from your experience and

20  training, anything impermissible about telling the

21  suspect why he's there being questioned?

22      A.   It's very permissible.  In fact, you

23  have to do it.  Because if I walked into

24  somebody's -- somebody's office or confronted them

Page 179

1  and say, what happened the other night, where were

2  you, they would be like, why do you want to know?

3  People want to know, give you some context of why

4  the police are talking to you.  Because if the

5  police talk to you, something's wrong.  Something's

6  not right.

7      Q.   Even if that information is only based

8  on what informants or confidential informants are

9  saying about who committed a crime on the street?

10      A.   Yeah, but the best way you can test the

11  reliability from a criminal informant is to ask

12  Mr. Rios, this is what we hear on the street,

13  what's your take on it, and then evaluate his

14  response.

15      Q.   Do you, in your opinion, find that to be

16  guilt presumptive, using that approach?

17      A.   No, not -- not at all.  It's just --

18  it's courtesy, actually, by telling somebody this

19  is why I want to talk to you.

20      Q.   And you gave examples earlier in your

21  deposition where you said, I really didn't use an

22  interrogation technique, but I might have mentioned

23  one thing about the case or told the person that

24  why I was there to interview them, and you got

Page 180

1  either a spontaneous admission, or shortly

2  thereafter, you got an admission.  In your

3  experience and training, is that unusual for people

4  to do that when you tell them why they're there

5  being questioned?

6      A.   It's not unusual for two reasons.  First

7  reason is there's something called the spotlight

8  effect.  And that is when we do something wrong,

9  and we lie about it.  We think the person we're

10  talking to knows we're lying, when, in fact, they

11  don't know.

12          It's like when you have a spot on your

13  tie and nobody's going to see it until the person

14  is so self-conscious, they go, what, oh, look at

15  the spot on my tie, and then everybody spends the

16  rest of the afternoon looking at the spot on the

17  tie, which they would not have seen otherwise.

18  That's called the spotlight effect.

19          So you walk in to a guilty suspect, say

20  I heard information on the street, then

21  automatically they're going to go, oh, my gosh, in

22  view of this guilty lens that I'm looking at this

23  information through, they know I did it, and

24  they're apt to say, okay.  All right.  I was



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
181–184

Page 181

1 involved. And then they make that decision to
2 confess.
3         The other thing that happens is there's
4 something called gestalt. It's like the dot-to-dot
5 books that kids do, and if you're -- if you look at
6 the dots, we as adults can tell what the kid's
7 trying -- it's a Christmas tree, Junior, and he
8 says, well, I don't see it, Dad, I got to keep --
9 keep going with the dots. Well, they haven't been
10 able to fill in the blank spaces between the dots.
11 And it's called gestalt.
12         So what we do is if we go in and say,
13 hey, we heard on the street that you were involved
14 in this homicide, that person through that guilty
15 lens is automatically filling in the dots, and then
16 they assume, ah, they've got me. I might as well
17 confess. And there's several reasons. And some
18 people have a guilty conscious. They want to talk
19 to you. They want to confess because they feel
20 guilty.
21         And they -- some people want to be
22 punished for it, for some reason. I've done
23 something wrong. I want to be punished. We don't
24 know, and that's why I always take it upon myself

Page 182

1 to ask the people -- the suspects that I get a
2 confession from, why did you confess? And the chief
3 reason I typically hear is you had sufficient
4 evidence on me. I had no choice. I had to confess
5 because, yes, I did it, and you got the goods on
6 me, so I'm going to confess in hopes of, what, a
7 better deal or some other aspect.
8     Q.    Going back to telling -- the detective
9 telling Mr. Rios why he was there being questioned,
10 because they had this information that they had
11 garnered from confidential informants, in your
12 opinion, do you view that as what is referred to as
13 one of these risk factors called a false evidence
14 ploy?
15     A.    No, that's not a risk factor. A false
16 evidence ploy applies when an investigator
17 intentionally presents false evidence. In other
18 words, say, I have your fingerprints on that pipe.
19 I have your DNA on that desk. I have your DNA, and
20 when, in fact, they don't. That would be a false
21 evidence ploy.
22         What Ms. Russano is -- or Dr. Russano is
23 referring to in her report, she defines a false
24 confession as -- well, the information -- she

Page 183

1 agrees that the information was provided by the
2 informants. What she calls a false evidence ploy
3 is the detectives didn't know the reliability of
4 the information from the informants. And she says
5 that in and of itself, whether the reliability is
6 good or bad, that in and of itself constitutes a
7 false confession or a false confession ploy, which
8 is not practical. It's not -- it's not logical.
9         Because any time a police officer asks a
10 suspect a question based on an assumption or a
11 supposition, she would consider that a false
12 evidence ploy. It's not so.
13     Q.    And, in your opinion, does that get back
14 to informing the suspect why he's being questioned
15 or interrogated in the particular case, the reason
16 why he's there?
17     A.    Yeah, you have to tell them why they're
18 there.
19     Q.    Why is that so important --
20     A.    Because --
21     Q.    -- in your profession?
22     A.    Because nobody's going to -- they --
23 people want to know why -- why are you talking to
24 me? And if you're guilty, you want to know is it

Page 184

1 the right crime? I've committed four or five
2 crimes. Which one are you talking about? They
3 want to know what the crime is. Or they want to
4 know how much evidence do you have on this case.
5 Or what if -- what if you're calling me here as a
6 witness? I want to know how I can craft my --
7 my -- my interview response if you're guilty.
8         And if you're innocent, you're going,
9 like, why am I here? I didn't do anything. Well,
10 somebody said you did this. No, I didn't do that.
11 And then you pursue it.
12         So you have to tell somebody that.
13 It's -- it's not practical. And then, like I said,
14 in my experience, I've never gone into an interview
15 and not told the person why I'm talking to them.
16 You got to give people context as to why you're
17 there so they can properly address it.
18     MR. POLICK: I don't think I have any further
19 questions. So pass the baton over to Ms. Rosen.
20     MS. ROSEN: I don't have any questions.
21     MR. SCHALKA: I don't have any questions
22 either.
23     MR. RICHARDS: And I think the ball -- the
24 torch passes to me. And I don't think I have any



JACK SCHAFER
RIOS V. GUEVARA

June 11, 2024
185—188

Page 185

1  follow-up questions either.

2      MR. POLICK: Okay.

3      THE VIDEOGRAPHER: And for the attorneys --

4  I'm sorry.

5      THE COURT REPORTER: How about signature?

6      MR. POLICK: Dr. Schafer, your deposition is

7  going to be transcribed. You have two options.

8  You can either trust what the court reporter has

9  taken down today and waive your opportunity to

10  review the transcript, or you can take the other

11  option of reviewing the transcript. You don't need

12  to do that today. They will send the transcript to

13  me, and then I will get it to you to review. But

14  they would like to know today if you would like to

15  waive your opportunity to do that or reserve your

16  right to review the transcript.

17      THE WITNESS: I'd like to reserve my right to

18  reserve the transcript.

19      MR. POLICK: Okay. So signature is reserved.

20      THE VIDEOGRAPHER: Thank you. And then for

21  the attorneys just real quick before we go off the

22  record, I've got to get your video and transcript

23  orders. And we will start with Attorney Richards,

24  for you?

Page 186

1      MR. RICHARDS: PDF, no video at this point.

2      THE VIDEOGRAPHER: Thank you. Attorney

3  Polick?

4      MR. POLICK: We will take a copy of the

5  transcript, no video at this point.

6      THE VIDEOGRAPHER: Thank you. Attorney

7  Schalka?

8      MR. SCHALKA: Yep, no video -- or no orders.

9      THE VIDEOGRAPHER: No orders. Thank you. And

10  then Attorney Rosen?

11      MS. ROSEN: No orders.

12      THE VIDEOGRAPHER: Thank you. This concludes

13  the video conference deposition of Jack Schafer on

14  June 11, 2024. We are going off the record at 3:07

15  p.m.

16          (WHEREUPON, the deposition concluded

17          at 3:07 p.m.)

18

19

20

21

22

23

24

Page 187

1  STATE OF ILLINOIS   )

2                      )  SS:

3  COUNTY OF DUPAGE    )

4      I, ALICE M. SCHWINGER, CSR No. 84-2913,

5  a Certified Shorthand Reporter of the State of

6  Illinois, do hereby certify:

7          That previous to the commencement of the

8  examination of the witness, the witness was duly

9  sworn to testify the whole truth concerning the

10  matters herein;

11          That the foregoing deposition transcript

12  was reported stenographically by me, was thereafter

13  reduced to typewriting under my personal direction

14  and constitutes a true record of the testimony

15  given and the proceedings had;

16          That the said deposition was taken

17  before me at the time and place specified;

18          That I am not a relative or employee or

19  attorney or counsel, nor a relative or employee of

20  such attorney or counsel for any of the parties

21  hereto, nor interested directly or indirectly in

22  the outcome of this action.

23          IN WITNESS WHEREOF, I do hereunto set my

24  hand at Woodridge, Illinois, this 24th day of June,

Page 188

1  A.D. 2024.

2

3

4  *[signature]*

5

6          Certified Shorthand Reporter

7

8

9  ALICE M. SCHWINGER, CSR No. 84-2913

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



JACK SCHAFER                                          June 11, 2024
RIOS V. GUEVARA                                         189—192

Page 189

```
1                    I N D E X
2    EXAMINATION                          PAGE
3    JACK SCHAFER
     EXAMINATION                             5
4    BY MR. RICHARDS:
     EXAMINATION                           153
5    BY MR. POLICK
6
7             E X H I B I T S
8
9         (No exhibits marked.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 190

```
1              DEPOSITION ERRATA SHEET
2    Our Assignment No.  11356451
3    Case Caption:  Rios
4    vs.  Guevara
5        DECLARATION UNDER PENALTY OF PERJURY
6        I declare under penalty of perjury
7    that I have read the entire transcript of
8    my deposition taken in the captioned matter
9    or the same has been read to me, and
10   the same is true and accurate, save and
11   except for changes and/or corrections, if
12   any, as indicated by me on the deposition
13   errata sheet hereof, with the understanding
14   that I offer these changes as if still under
15   oath.
16       Signed on the _____ day of
17   _____, 2024.
18
19   _____
20        Jack Schafer
21
22
23
24
```

Page 191

```
1              DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23   SIGNATURE:_____DATE:_____
24        Jack Schafer
```

Page 192

```
1              DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23   SIGNATURE:_____DATE:_____
24        Jack Schafer
```

