**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JAIME RIOS,** | ) | |
| | ) | **Case No. 22 CV 3973** |
| **Plaintiff,** | ) | |
| | ) | **Judge Jeremy Daniel** |
| **vs.** | ) | |
| | ) | |
| **REYNALDO GUEVARA, MICHAEL MASON, ERNEST HALVORSEN, CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION TO ADMIT THE TESTIMONY OF DR. GEOFFREY LOFTUS**

Loftus is a proffered eye-witness expert and his opinions should be barred for several reasons. They do not withstand *Daubert* scrutiny, are not relevant, do not assist the trier of fact in this case because no fact at issue is made more or less likely true or not with or without Loftus' assistance, and even if they were somehow relevant any opinions must be barred under Rule 403.

Plaintiff Jaime Rios was charged and convicted for the June 27, 1989 shooting murder of Luis Morales. Plaintiff confessed and was convicted of this murder based, in part, on his admission and on the testimony of eyewitness Luis Huertas ("Huertas"). Huertas identified Plaintiff in a lineup and, later, in person at Plaintiff's criminal trial. Years later, Huertas again identified Plaintiff in his deposition and denied police somehow forced/tricked him to identify Plaintiff. Plaintiff originally brought claims seeking damages based on the alleged suggestiveness of the tactics used by Defendants to procure Huertas' identification, and the alleged "suppression" of same. *See* Dckt. No. 61 at Cts. VIII-IX. This Court originally denied summary judgment on these claims but the Seventh Circuit decided *Blackmon v. Jones*, 132 F.4th 522 (7th Cir. 2025) subsequent to the ruling and Defendants requested this court revisit the issue based on new precedent. This Court reconsidered its ruling and entered judgment for Defendant Guevara on such claims. *See* Dckt. No. 243.

Despite the fact that his claims are foreclosed as a matter of law, Plaintiff wants to call Loftus, to testify: (1) Huertas had a poor memory of the offenders' appearance at the time of the shooting and is thus unreliable; and (2) Huertas' "confident" identification and "strong memory of Mr. Rios as the shooter was not constructed based on Mr. Huertas's perceptions of the actual shooter," but on suggestive lineup procedures conducted by Defendants. Ex. 1 (Loftus Report) at 4-5, 6-8. Loftus' opinions must be barred pursuant to Federal Rules of Evidence 702, 401, 402 and 403.

**LEGAL STANDARD**

Admission of expert testimony is governed by Fed. R. Evid. 702 and the framework established by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). This Court acts as a gatekeeper, and has an obligation to ensure all expert evidence is both relevant and reliable. *Daubert,* 509 U.S. at 589; *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999). "The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue." *Hartman v. EBSCO Indus., Inc.,* 758 F.3d 810, 817 (7th Cir. 2014). The first requirement of Rule 702 is that the expert's knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Expert testimony helps the trier of fact if it is relevant, it is not within the jury's common knowledge and experience, and the testimony will not usurp the jury's role of evaluating a witness's credibility. *United States v. Rodriguez-Felix,* 450 F.3d 1117, 1123 (10th Cir. 2006); *United States v. Libby,* 461 F. Supp. 2d 3, 7 (D.D.C. 2006). When cross examination, argument, and jury instructions are sufficient to allow the jury to assess the evidence, expert evidence is unhelpful. *Daubert,* 509 U.S. at 591-92; *United States v. Hall,* 165 F.3d 1095, 1107 (7th Cir. 1999). The remainder of Rule 702 requires that expert testimony be based on sufficient facts or data, that it be the product of reliable principles and methods, and that the expert reliably apply the principles and methods to the facts of the case.

Fed. R. Evid. 702(b)-(d). Even if proposed expert testimony is admissible under Rule 702, the court may exclude it under Fed. R. Evid. 403 if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, or wasting time. As the Supreme Court recognized in *Daubert,* "expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," and therefore, "the judge in weighing possible prejudice against probative force…exercises more control over experts than over lay witnesses." *Id.* at 595.

Plaintiff has the burden of establishing that his proposed expert evidence is admissible (*id.* at 592; *Bourjaily v. United States,* 483 U.S. 171, 175-76 (1987), and in determining such admissibility, this Court has broad discretion (*Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 141-42 (1997)). The Seventh Circuit "ha[s] held, many times, that a trial court does not abuse its discretion by excluding expert evidence about the reliability of eyewitness testimony." *United States v. Bartlett,* 567 F.3d 901, 906 (7th Cir. 2009).

## ARGUMENT

### I. Loftus' Opinions Are Irrelevant And Unduly Prejudicial.

Relying on *Blackmon v. Jones,* 132 F. 4th 522 (7th Cir. 2025), this Court held that Plaintiff was not permitted to pursue any claims that Defendant Guevara engaged in conduct with eyewitnesses that produced unduly suggestive (and, thus, unreliable) identifications. Dckt. No. 243 at 4-6. Moreover, this Court held that, while the Seventh Circuit held that "unusual circumstances" such as deception of prosecutors and coercion of witnesses to falsely testify at trial might provide an exception to this rule, Defendant Guevara was entitled to Qualified Immunity. *Id.* at 5. As such, this Order does not allow for Plaintiff to attempt to establish that any witness identification was unreliable because it was made by employing unduly suggestive identification techniques. *Id.*

Evidence on claims that have been dismissed as legally invalid are not admissible at trial. *See Cerda v. Chicago Cubs Baseball Club, LLC*, 2023 WL 11951488, *1 (N.D.Ill. 2023)("Defendant points out that courts routinely exclude argument and evidence tied to previously dismissed claims as

irrelevant."); *Sturm v. Hedges*, 2017 WL 11001656, at *5 (S.D. Ind. 2017); *Artunduaga v. Univ. of Chi. Med. Ctr.*, 2016 WL 7157352, *4 (N.D. Ill. 2016); *Tompulis v. Schwartz & Freeman*, 1994 WL 419607, *4 (N.D. Ill. 1994). Indeed, an identical motion was granted in another case involving Guevara. *See Rivera v. G*uevara, 2018 WL 11468607 (N.D.Ill. 2018). In *Rivera*, a case decided prior to *Blackmon*, the court granted summary judgment to the defendants on an unduly suggestive identification claim. *Id.*, 2018 WL 11468607 at *1. The defendants filed a motion seeking to bar the plaintiff's eyewitness identification expert, Jennifer Dysart. *Id.* The defendants argued, as here, that dismissal of the unduly suggestive identification claims made such expert testimony both irrelevant and unduly prejudicial. *Id.* The court agreed and held that it would be confusing and unduly prejudicial to allow the jury to hear such testimony because that the claim was dismissed prior to trial. *Id.* at *2 ("After balancing the competing interests, the court finds that introducing Dysart's testimony would be more confusing and potentially prejudicial than probative…Dysart's opinions stand to confuse this issue and risk conflating the dismissed claim with the fabrication claim…Dysart may not testify at trial.").

Moreover, the prosecution in the underlying case, of course, was well-aware of all of the putative limitations on Huertas' viewing/perception of the crime. Indeed, issues of lighting, proximity, timing, and other perceptual matters were addressed repeatedly during Plaintiff's criminal trial as was the sequence of events leading to Huertas' identification of Plaintiff. Ex. 3 at 190:24-204:20. The prosecution's decision to but on questionable or otherwise uncertain evidence can never be a basis to impose liability against a police officer in a subsequent civil case. *Blackmon*, 132 F. 4th at 525 ("A prosecutor's use of evidence at trial is a weak ground of liability for police officers. The people who make the decisions—prosecutors and judges—are outside police officers' control and cannot be liable. A prosecutor has absolute immunity for acts during trial. The judge too has absolute immunity. The three defendant officers had absolute immunity for their testimony."); *Washington v. City of Chicago*, 98 F.4th 860, 873 (7th Cir. 2024)(prosecutors own investigation into supposedly bad evidence and

decision to introduce it nonetheless at trial barred any claim against defendant police officers). Allowing Plaintiff to present Loftus to bolster claims of alleged perceptual problems of a witness who was presented by the prosecution with full knowledge of such things would be little more than an "end run" around the law and would be highly confusing and unduly prejudicial to Defendants.

Exclusion of Loftus is wholly in accord with the limitations placed upon the presentation of expert testimony. As part of its gatekeeping functions under *Daubert*, the Court must assess whether proposed opinions of an expert will assist the jury in determining a factual issue that is actually relevant to a legal claim in the case. *See Myers v. Illinois Central* R. *Co.*, 629 F.3d 639, 644 (7th Cir. 2010). This is essentially a relevance inquiry. *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 613 (7th Cir.1993)("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."); *Roman v. Western Mfg., Inc.*, 691 F.3d 686, 694 (5th Cir.2012)("To be 'helpful' under Rule 702, the evidence must possess validity when applied to the pertinent factual inquiry…"); *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir.1985)("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."). If the science does not actually address a disputed issue, testimony on such issue is not admissible. *See Owens v. Auxilium Pharm., Inc.*, 895 F.3d 971, 972–74 (7th Cir. 2018). "[W]hether an expert's approach lines up with the basic facts of the case goes to the relevance and admissibility of the testimony itself." *Id.* Adhering to these standards, it is clear that expert testimony on a claim that the Seventh Circuit has explicitly held is not actionable as a matter of law would be error. Thus, this Court must bar Loftus.

Plaintiff cites the underlying pre-appeal District Court case in *Blackmon* (as well as another pre-*Blackmon* case). *See* Dckt. No. 245 at 8, 13-15 *citing Blackmon v. City of Chicago*, 2022 WL 3908593 (N.D. Ill. 2022); *Sanders v. City of Chicago Heights*, 2016 WL 4398011 (N.D. Ill. 2016). These cases arose *before* the Seventh Circuit's *Blackmon* decision and, critically, involved cases where unduly suggestive

identification claims were allowed to proceed. *Id.* In other words, this is no longer good law. Moreover, even in cases where a suggestive identification claim has not been conclusively rejected prior to trial, Loftus has been barred from rendering testimony on eyewitness identification because such testimony in essence usurps the role of the jury and would confuse and mislead the jury. *See U.S. v. Carter*, 410 F.3d 942, 950 (7th Cir. 2005)(barring of Loftus on eyewitness identification because his opinions "would not aid the jury in its determination and, further, that any such testimony might actually confuse, mislead, or unduly influence the jury."); *McKay v. City of St. Louis, Missouri*, 2019 WL 1436972, *18 (E.D.Mo., 2019)(barring Loftus; "[W]hether eyewitness identifications may be prone to mistake does not assist the trier-of-fact in determining whether the Police Detectives conducted a constitutional investigation in this case."); *U.S. v. Rodriguez-Berrios*, 445 F.Supp.2d 190, 194 (D.Puerto Rico 2006)(same in criminal case). The same applies here. The danger in allowing a witness like Loftus to testify is it would invite the jury to both discredit the veracity of Huertas (which is not a claim at issue that could attach liability to Defendants), fault Defendants for relying on his identification as credible evidence in the investigation (again not a claim), and unfairly suggest that Defendants may have engaged in misconduct (a totally improper purpose for this testimony). That is the core of what Rule 403 is designed to prevent as it confuses issues and would be unduly prejudicial to Defendants.

## II. Loftus' Opinions Fail On The Remaining Prongs Of The *Daubert* Framework.

Loftus' opinions fail under *Daubert* and Fed. R. Evid. 702 as well. Loftus' opinions are as follows. Plaintiff first intends to offer Loftus' testimony on the general theory of perception and memory. Pl's Mot. at 3-4, Ex. 1 (Loftus Report) at 1-3. Loftus will apparently testify that even if an eyewitness appears confident in his or her identification of an offender, that identification may not be accurate. *Id.* Loftus plans to testify about several factors he claims undermine the reliability of a confident witness's identification that he deems applicable to this case. *Id.* These are factors which purportedly either (1) affected the witness's perception and memory of the original event

(circumstances surrounding the shooting); or (2) contributed to the reconstruction of an inaccurate memory based on "suggestive, post-event information that would bias the witness" (suggestive identification procedures). *Id.* Plaintiff will then presumably argue that, even if Huertas seems confident in his identification of Plaintiff as the shooter, that identification is unreliable. In other words, because these purported factors may have affected Huertas' memory, Huertas "shouldn't be believed," or "little weight" should be given to his identification. Ex. 2 (Loftus Dep.) at 145:23-148:1.

Loftus identifies four factors which he claims show Huertas had a "poor memory of the offender's appearance": (1) poor lighting; (2) his attention would have been divided by other goals such as trying to keep himself from being hurt or killed and he would have been vulnerable to "weapon focus"; (3) the stress associated with witnessing a shooting; and (4) the allegedly short duration of the event. Ex. 1 at 4-6, Pl's Mot. at 6-7. Loftus further opines that because of these factors, "Huertas's memory of the shooters was likely poor," and it "strains credulity" that Huertas' identification of Plaintiff is reliable. Ex. 1 at 6. Loftus then reasons that Huertas' identification of Plaintiff in the lineup must have been the result of suggestive lineup procedures, and identifies two "potential biases": (1) prior exposure to Plaintiff's appearance based on a photo array allegedly shown to Huertas prior to the lineup; and (2) the lack of "double-blind procedures" during the lineup, such that "one cannot rule out the possibility that the identification was based wholly or in part on information covertly provided by the police officer." *Id.* at 6-8. Loftus' opinions are completely untethered to the facts in this case but, more importantly, are not relevant and will not aid the jury.

**A. Loftus' Opinion That Four Factors Undermine Huertas' Memory And Identification Of Plaintiff Is Inadmissible.**

Loftus' opinion that there were four factors that undermined Huertas' memory and rendered his identification of Plaintiff unreliable is itself not based on a reliable methodology in that it is not remotely tethered to the actual facts and evidence in this case, nor would it aid the jury in understanding the evidence or to determine a fact issue in this matter.

To satisfy *Daubert*, the proffered testimony must have a reliable basis in the knowledge and experience of the relevant discipline, consisting of more than subjective belief or unsupported speculation. *Chapman v. Maytag Corp*., 297 F.3d 682, 686-87 (7th Cir. 2002); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). An "indicator of unreliability is the unjustifiable extrapolation from an accepted premise to an unfounded conclusion." *See Fuesting v. Zimmer, Inc*., 421 F.3d 528, 530-31 (7th Cir.2005). "The critical inquiry is whether there is a connection between the data employed and the opinion offered." *Gopalratnam v. Hewlett-Packard Co*., 877 F.3d 771, 781 (7th Cir. 2017). Rule 702's reliability elements require the expert to provide testimony that not only is based on a correct application of a reliable methodology, but also that the expert considered sufficient data to employ the methodology. *Stollings v. Ryobi Techs., Inc*., 725 F.3d 753, 765 (7th Cir. 2013). In that regard, Rule 702 explicitly requires that expert testimony be "based on sufficient facts or data." FRCP 702; *Gopalratnam*, 877 F.3d at 781. And to properly aid the jury, an expert's opinion must be tethered to the facts of the case. *Daubert,* 509 U.S. at 591 ("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."). Otherwise, it is inadmissible. *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1315–16 (Fed. Cir. 2011) ("[O]ne major determinant of whether an expert should be excluded under *Daubert* is whether he has justified the application of a general theory to the facts of the case."). Each of the four factors on which Loftus intends to testify are either unsupported by the facts in the record or squarely contradicted by them.

**1. The Only Evidence In This Case Is That The Street Was Well-Lit.**

Loftus first discusses the "effects of low lighting on perception and subsequent memory." Ex.

1 at 4. He theorizes, "[c]learly illumination is relevant, as the shooter took the place in the middle of the night. Thus, Mr. Huertas viewed the shooter under poor lighting conditions." *Id.* Loftus then employs scientific jargon to state the obvious that poor lighting conditions may impair the ability to observe. *Id.* (*e.g.,* "Under conditions of sufficiently low lighting, vision is accomplished using the *scotopic visual system,* which is incapable of detecting either color or the fine detail that is necessary to encode a person's appearance. These limitations on initial perception imply concomitant limits on the amount and kind of information about the offender's facial appearance that can be initially placed into memory").

There is no evidence that the lighting was poor, in fact the opposite. While the shooting took place at night, Huertas testified that there were operating street lights both where he was sitting (where Plaintiff came within four feet of him prior to the shooting) as well as right in front of where the shooting took place. Ex. 3 (Huertas Trial Testimony) at 197:19-198:6. In fact, on cross examination during Plaintiff's criminal trial, Huertas pointed out on photographs the streetlights directly over where he was sitting and directly over the area of the shooting. *Id.* He also testified that, in addition to the street lights, there was light from the bar he was sitting in front of. *Id.* at 156:8-156:10. Huertas described the area as "well lit up." *Id.* at 155:24-156:10. The only other eyewitness to the shooting, Javier Torres, also described the area as being lit by the streetlights. Ex. 1 at 4. There is no other evidence relating to illumination in the record, and no evidence whatsoever that the lighting was poor.

Apparently recognizing this, Loftus states he plans to testify about the "consequences of attempting to perceive and memorize critical information, such as an offender's appearance, using only streetlights as a source of light." Ex. 1 at 4. Loftus claims perception under streetlights is poor because "(a) streetlights are quite dim by design, (b) streetlights are, in general, relatively sparsely placed along the street, and (c) streetlights provide only partial illumination." *Id.* Loftus provides no authority supporting these conclusions about streetlights, and nothing in his CV suggests he is qualified to opine as to the luminosity of streetlights in Chicago in 1989. He admitted that he does not actually know of

the lighting conditions at 1316 N. Western Ave, in fact has never been to the scene, is not "in a position to exactly evaluate the configuration of the streetlights at that address" or how far apart they are, has no knowledge of the light being given off by nearby businesses such as the bar Huertas was sitting in front of, and in fact cannot say whether dim lighting actually affected Huertas' identification of the shooter. Ex. 2 at 112:20-113:24. Thus, Loftus' opinions about lighting conditions and what affect they may have on perception and memory are both belied by the record and entirely irrelevant to the facts in this case. At best, Loftus could suggest that relative lighting conditions might play a role in *someone's* ability to see something (which Huertas himself disputes was a problem). But a jury does not need an expert to tell it that the lower the light, the harder it is to see and identify a suspect. Allowing Loftus to opine about how dim lighting can render an identification unreliable when there is absolutely no evidence that the lighting was an issue and which the witness himself disputes will confuse the jury or, worse, suggest to it that in fact there was an issue with the lighting despite the actual evidence.

**2. Loftus' Opinions On The Relationship Between Attention And Perception And Memory Is Not Tethered To The Facts Of This Case.**

Loftus goes into significant detail in his report describing the effects of attention on memory. Ex. 1 at 4-5. Loftus opines that "[d]uring the shooting, Mr. Huertas …would have had multiple things competing for his attention, principally relating to his safety." He declares that "attentional competitors" such as trying to keep himself from being hurt/killed, seeking help, and looking for escape routes would have rendered Huertas' attention to observing the appearance of the suspect "largely irrelevant," and "would likely have been allocated minimal, if any, of Mr. Huertas' limited attentional resources." *Id.* 5. Moreover, Loftus claims, Huertas would have been subject to "weapon focus," which is when "people pay attention to a weapon when a weapon is present, at the expense of attending to other potentially relevant aspects of the scene, such as the appearance of the person who is holding the weapon." *Id.*

This has no application here, because Huertas' perception and memory of the appearance of the shooter came *before* the shooting and *before* any weapon was brandished. Prior to the shooting,

Huertas had been sitting in front of the bar waiting for a friend with whom he planned to play pool. Ex. 3 at 152:14-152:24, 190:24-190:2. After 45-50 minutes, Huertas observed two men turn the corner from about three buildings down from where Huertas was sitting onto Western and walk northbound toward Huertas. *Id.* 153:4-153:10, 191:5-190:20. Huertas watched the men as they walked all the way up to him from Potomac. *Id.* 154:2-154:9, 158:4-158:7, 191:21-191:24. The two men walked right up to where Huertas was sitting, and Plaintiff came within 4 feet of Huertas. *Id.* at 154:14-154:20, 155:18-155:20. Plaintiff's face was facing toward Huertas as he walked up. *Id.* at 155:21-155:23. When Plaintiff was next to Huertas, he "represented" Spanish Cobras to Huertas and spoke the name of the gang, during which time Huertas was looking at the Plaintiff's face. *Id.* 156:14-157:1. Huertas estimated that Plaintiff looked at him **for 10-15** seconds after "representing" and before continuing to walk northbound on Western. *Id.* 156:23-157:7. The shooting occurred 30 seconds later as Morales and Torres came out of the alley onto Western north of where Huertas was sitting. *Id.* at 157:4-157:7, 157:23-158:13, 159:10-161:17. Huertas never lost sight of Plaintiff. *Id.* Also of note, in addition to being able to describe Plaintiff's appearance and identify him, Huertas was paying enough attention to the shooter to be able to describe his clothing (green hospital shirt, shorts, and gym shoes). *Id.* at 191:24-192:2.

Thus, Loftus' opinion that Huertas could not have been paying sufficient attention to the shooter to make a reliable identification because he would have been distracted by formulating escape routes and by the presence of a gun is irrelevant, because there was no danger and no gun during the extended period of time Huertas observed Plaintiff prior to the shooting. According to Huertas' testimony, he was paying undivided attention to the two men, particularly Plaintiff, from the time he turned the corner, walked down the sidewalk towards Huertas, and looked directly at Huertas for 10-15 seconds from as close as 4 feet away. Huertas directly interacted with the shooter and was able to fully see his face, without any distraction. Thus, Loftus' opinion that eyewitnesses cannot form good memories while observing someone holding a gun will not aid the jury in this case.

**3. Loftus' Opinions About The Effect Of Stress On Perception And Memory Are Irrelevant In This Case.**

Loftus also intends to tell the jury how stress impairs mental functioning, memories of stressful events are generally contaminated with false, post-event information, that Huertas certainly had reason to be stressed because "an active shooting was occurring in his immediate vicinity," and, therefore, Huertas' identification of Plaintiff is unreliable. Ex. 1 at 5-6. But as with Loftus' attention factor, this opinion ignores the record. There is no evidence that Huertas was stressed during the entire period he observed the shooter prior to the shooting. Indeed, Loftus admitted that his entire basis for assuming Huertas was stressed such that he would be unable to accurately observe and remember the shooter's appearance was "common sense," that "anybody who is in the presence of people who are shooting somebody else, are in positions where their lives are potentially threatened." Ex. 2 at 127:4-127:17. But no one was shooting during the period Huertas was forming his memory of the shooter's appearance, which, again, occurred **before** the shooting. As such, Loftus' testimony about the effects of stress on perception/memory will not aid the jury in this case either.

**4. Loftus' Opinions About Duration Do Not Aid the Jury.**

Finally, Plaintiff seeks to have Loftus testify that the longer a witness observes a person, the better chance he has of accurately recalling that person's appearance. Ex. 1 at 6. Recognizing this is a "matter of common sense," Loftus introduces the concept of "functional duration." *Id.* Functional duration, explains Loftus, means that "of the total duration compromising some event, only a fraction of that duration is available to the witness for memorizing what will later be relevant." *Id.* In other words, out of the total time period of an event, the only time period that counts is the time period which the witness (1) has the offender in his field of view; (2) has sufficient light to discern the offender's facial features; (3) is paying attention to the offender's appearance; (4) is under a degree of stress that allows adequate cognitive functioning; (5) is sufficiently close to the offender to be able to discern facial features; and (6) "is subject to various other necessary conditions as well." *Id.* Thus, Loftus states,

"[e]ven if an event itself lasts several seconds, the witness's functional duration for perceiving and memorizing the offender's appearance can, therefore, be as low as zero." *Id.*

There are several problems with this opinion. First, its speculative and a jury does not need an expert to explain that how long a person observes something may play a role in how much information that person retains. Huertas was looking at and paying attention to the Plaintiff's appearance, as opposed to the time of the event itself. This, too, is common sense. Second, this opinion is useless to a jury because Loftus cannot provide any quantification or even a guidepost for what would be a sufficient duration to render a later identification reliable, as if that is even an issue in the case. Ex. 2 at 133:1-133:6 ("Q. So when you are talking about a short event duration, are you quantifying that in some way in your field? Is there a minimum and a maximum that would define short duration as opposed to long, or is it just common layman's understanding of those concepts? A. No. It's just a continuum."). In other words, Loftus would just be telling the jury, in the abstract[1] that the longer a witness observed an offender, the more reliable he considers the identification to be. This would not further the inquiry as to whether Huertas was able to accurately perceive, remember, and later identify Plaintiff even if that were a claim in this case. Particularly in light of the fact that Huertas observed the offender for an extended period of time as the offender was walking up to Huertas, and then for 10 to 15 seconds while he was as close as 4 feet from Huertas. Finally, the factors to which Loftus would testify (*i.e.*, lighting, attention, stress) are, again, not actual considerations based on the evidence. In addition to not aiding the jury, this opinion risks confusing the jury or, worse, suggesting there are factors in play that are not supported by the actual evidence.

**C. Loftus' Opinions On Suggestive Lineups Are Inadmissible.**

Plaintiff also seeks to have Loftus testify about reliability of lineup procedures. Pl's Mot. at 7-8; Ex. 1 at 6-12. Specifically, Loftus seeks to testify that (1) prior exposure to a suspect's appearance

---

[1] Loftus was never aware of how long Huertas observed the offender's appearance. Ex. 2 at 133:7-33:14.

may bias a witness when identifying a suspect in a subsequent lineup; and (2) not using a double-blind procedure, where the officer administering the lineup does not know which participant is the suspect, runs the risk that the officer possibly provided covert information about the suspect's identity (or confirmation of that identity). *Id.* at 6-8. There are several reasons these opinions must be excluded.

First, the entire foundation on which Loftus believes the "science" of lineup procedures "warrants a discussion" is the assumption that the four factors addressed above (lighting, attention, stress, duration) render it likely that Huertas' memory of the shooter was "poor at best." *Id.* at 6. Loftus employs the following reasoning: (1) Because of the four factors, it "strains credulity" that Huertas could have formed an accurate memory of the shooter; (2) Yet he *did* identify the shooter during a lineup; (3) Therefore, "the lineup was biased against Mr. Rios in some fashion." *Id.* Even were this process-of-elimination framework a remotely acceptable expert methodology, it is entirely undermined by the fact that, as set forth above, none of the factors Loftus raised to challenge Huertas' identification were actually present under the facts in this case. Given this, even under Loftus' own framework, because there is no basis to question Huertas' perception and memory of the shooter, the "science of lineups" does not "warrant a discussion."

Second, Loftus' opinions regarding the bias of the lineup is not supported by the record. While experts are permitted to base their opinions on factual assumptions, they cannot base opinions on assumptions unsupported by evidence. *Buscaglia v. U.S.*, 25 F.3d 530, 533 (7th Cir. 1994). There is no evidence that any Defendant or other CPD officer covertly provided information to Huertas before or after the lineup. Ex. 2 at 165:7-165:12 ("Q. And is it your opinion in this case that Detective Mason actually covertly provided information to Mr. Huertas that Mr. Rios was the suspect? A. No. I have no knowledge of whether he did or not. I'm saying -- all I said was, as I said in the report, that that possibility can't be ruled out"), 165:15-165:20 ("Q. And is it your opinion that Detective Mason actually covertly provided information to Mr. Huertas that he made the right choice during the lineup

that contained Mr. Rios? A. No. Again, I don't know if he did, but you can't rule out that possibility"). Accordingly, Plaintiff intends to have Loftus *speculate* that there is a *possibility* that one of the Defendants covertly provided Huertas information without any grounding in the evidence. This sort of expert opinion is patently precluded by *Daubert*. *See Brown v. Burlington Northern Santa Fe Ry. Co.,* 765 F.3d 765, 770–76 (7th Cir. 2014)(court had discretion to exclude an expert's opinion when the expert did not use a reliable methodology to arrive at the opinion and instead used speculation). Moreover, any probative value of Loftus' speculation would be substantially outweighed by prejudice to Defendants where the jury could mistakenly assume that Defendants covertly provided information to Huertas, despite there being no support for this and no basis for liability in this case.

With regard to Loftus' opinion regarding prior exposure to Plaintiff's appearance, this is based on dubious and inadmissible evidence. Plaintiff claims that prior to Huertas viewing the lineup, Detective Guevara showed him a photo array containing Plaintiff's picture, and Loftus posits that because Plaintiff was the only lineup member who Huertas had seen before, his identification of Plaintiff may have been based on his memory of the photo array rather than his memory of the shooting. Ex. 1 at 7; Pl's Mot. at 2. But this contention that Guevara showed Huertas a photo array containing Plaintiff's picture prior to the lineup is based solely on a pre-drafted affidavit written by Plaintiff's attorneys or agents that Plaintiff's investigator was able to get Huertas to sign in 2020, and has since been disavowed by Huertas himself. Ex. 4 (Huertas Deposition) at 42:6-42:9. In that regard, Huertas testified at his deposition in 2023 that he does not remember ever seeing a photo of Plaintiff prior to the lineup, and that he never identified anyone from a photo, only the lineup. *Id.* at 43:18-43:22, 46:22-47:12, 49:4-49:11, 49:15-49:17. Nor did Huertas testify to any such photo array when he testified at trial in 1990. *See* Ex. 3 at 176:13-178:2 (describing events before the lineup).

WHEREFORE Defendants pray this Court deny Plaintiff's Motion to Admit Geoffrey Loftus and grant Defendants' Motion to Bar and for whatever other relief this Court deems fit.

Respectfully submitted,

BORKAN & SCAHILL, LTD.

By: /s/ Timothy P. Scahill
*Special Assistant Corporation Counsel*

Steven B. Borkan
Timothy P. Scahill
Special Assistants Corporation Counsel
Borkan & Scahill, Ltd.
20 South Clark Street
Suite 1700
Chicago, IL 60603
(312)580-1030
*Attorneys for Reynaldo Guevara*

By: /s/ Eileen E. Rosen
Special Assistant Corporation Counsel
for Defendant City of Chicago

Eileen E. Rosen
Catherine M. Barber
Theresa Berousek Carney
Austin G. Rahe
ROCK FUSCO & CONNELLY, LLC
333 West Wacker Dr., 19th Floor
Chicago, IL 60606
(312) 494-1000
erosen@rfclaw.com

s/ Caroline P. Golden
CAROLINE P. GOLDEN
*One of the Attorneys for Defendant Mason and Halvorsen*
James G. Sotos
Caroline P. Golden
Joseph M. Polick
Josh M. Engquist
Elizabeth R. Fleming
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd. – Suite 1240A
Chicago, IL 60604
(630) 735-3000
cgolden@jsotoslaw.com