**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JAIME RIOS


      Plaintiff,


        vs.                    Case No. 1:22-cv-03973

REYNALDO GUEVARA
MICHAEL MASON
JOANN HALVORSEN AS
SPECIAL REPRESENTATIVE FOR
ERNEST HALVORSEN, DECEASED
CITY OF CHICAGO



      Defendants.                  JURY TRIAL DEMANDED



           Defendants.

**DEPOSITION DESIGNATIONS AND COUNTERDESIGNATONS – REYNALDO
GUEVARA TRIAL TESTIMONY**


      Plaintiff, Jaime Rios, by and through his attorneys, Stephen L. Richards and Joshua S.M.

Richards submits the attached deposition designations and counter-counter designations for the

deposition of Luis Huertas. Plaintiff's designations are marked in orange and defendants'

counter-designations are marked in yellow.


      Respectfully Submitted,


                  JAIME RIOS

                  By and through

                  /s/ Stephen L. Richards

By: Stephen L. Richards Attorney
for Plaintiff
53 West Jackson
Suite 756
Chicago, IL 60604
773-817-6927
sricha5461@aol.com Attorney No:
6191946

```
 1   STATE OF ILLINOIS )
                       )  SS:
 2   COUNTY OF COOK    )

 3

 4                     IN THE CIRCUIT COURT OF COOK COUNTY
                       COUNTY DEPARTMENT-CRIMINAL DIVISION
 5

 6
     THE PEOPLE OF THE   )
 7   STATE OF ILLINOIS   )
                         )
 8                       )   Indictment No.  89 CR 16525
           vs            )
 9                       )   Before: JUDGE THEMIS KARNEZIS
                         )
10   JAMIE RIOS          )   Thursday, November 29, 1990.
                         )
11

12   Court having reconvened pursuant to adjournment.

13

14   APPEARANCES:

15                 HON. CECIL A. PARTEE,
                   State's Attorney of Cook County,  by
16                 MS. KAY HANLON and
                   MR. ANTHONY CARBALLO,
17                 Assistant State's Attorneys,
                   appeared on behalf of the People;
18

19                 MR. RANDOLPH N. STONE,
                   Public Defender of Cook County, by
20                 MS. KAREN SHIELDS and
                   MR. JACK CAREY,
21                 Assistant Public Defenders,
                   appeared on behalf of the Defendant;
22

23

24
```

103
AWW

2 28

PFP000

1     MR. CARBALLO:

2     Q.   Doctor, based on the number of autopsies you

3  have performed, specifically autopsies relating to

4  bullet wounds, is it uncommon for someone to not have

5  stippling on their -- in the area of the wounds or the

6  body and have been shot at close range?

7     MR. CAREY: Same objection, Judge.

8     THE COURT: Overruled.

9     THE WITNESS: Now this depends on how close he was

10  shot and depends on the gun and the ammunition used.

11     MR. CARBALLO: Thank you.

12               RECROSS EXAMINATION

13                 BY MS. SHIELDS:

14     Q.   Doctor, at close range, though, there will be

15  stippling, is that correct?

16     A.   Yes.

17     MS. SHIELDS: Thank you.

18     THE COURT: State?

19     MR. CARBALLO: Nothing further, Judge.

20     THE COURT: Thanks, Doctor.  You may step down.

21                   (witness excused)

22     THE COURT: Call your next, State.

23               RAYMONDO GUEVARA,

24  called as a witness on behalf of the People of the

1   State of Illinois, having been first duly sworn, was

2   examined and testified as follows:

3                    DIRECT EXAMINATION

4                    BY MS. HANLON:

5      Q.   Sir, could you please state your full name,

6   spelling your last name for the court reporter?

7      A.   Detective Raymondo Guevara, G-u-e-v-a-r-a.

8   Star number is 16345.  And I'm assigned to the Area 4

9   Violent Crimes Unit, Chicago Police Department.

10     Q.   How long have you been a Chicago Police

11  Officer?

12     A.   Eighteen years.

13     Q.   Eighteen years?

14     A.   Correct.

15     Q.   How long have you been a detective?

16     A.   I have been a detective for the past four

17  months.

18     Q.   I'd like to call your attention to June and

19  July of 1989.  How were you assigned within the

20  Chicago Police Department, at that time?

21     A.   I was an investigator for the Gang Crime

22  Unit.

23     Q.   Can you explain to the ladies and gentlemen

24  what an investigator in the Gang Crime Unit does?

148
AWW

271

1      A.    An investigator in the Gang Crime Unit, they

2  deal with the gang activities in the area.    Area 5,

3  Area 6.  Usually 2 areas.    And what we deal with is

4  with any crime that's committed by gang, gang members.

5      Q.    Detective, what areas were you specifically

6  assigned to during that time?

7      A.    I was assigned to Area 5 and Area 6.    Both

8  areas.

9      Q.    Can you tell the ladies and gentlemen of the

10  jury the general boundaries to Area 5 and Area 6?

11      A.    Area 5 is covered from the river all the way

12  up to O'Hare Field.    And from I would say Roosevelt on

13  the west end to Evanston.

14      Q.    And what about Area 6?

15      A.    Area 6 covers east of the river up to

16  Evanston and down to, I would say, about Lake Street.

17  Somewhere around there.

18      Q.    Now, Detective, I want to call your attention

19  specifically to July 3rd, of 1989, did you become

20  involved in an investigation of the shooting death of

21  Mr. Luis Morales?

22      A.    Yes, I did.

23      Q.    And how is it that you became involved in

24  that particular investigation?

149
AWW

272

PFP000388



1    A.   I got involved in that investigation when I

2  came to work early that day, found out that the person

3  by the name of Luis Morales was shot and killed at

4  Potomac.  And being familiarized with the area I

5  started talking to people on the streets.

6    Q.   During the course of your investigation and

7  speaking with people on the streets, did you come to

8  learn the name of the shooter?

9    A.   Yes, I did.

10    Q.   What name were you given?

11    A.   I was given by informant the name of Jamie

12  and Tino as being involved in the shooting of Luis

13  Morales.  Jamie being the shooter.

14    MR. CAREY: I'll object to the hearsay.

15    THE COURT: Sustained.

16    MS. HANLON:

17    Q.   Detective, how is it that you gained

18  information on that particular day?

19    A.   The names were given to me.  Jamie and Tino.

20    Q.   How were those names given to you?

21    A.   Through reliable informants.

22    Q.   Can you explain to the ladies and gentlemen

23  what a reliable informant is?

24    A.   Reliable informant is a person I had been

150
AWW
                                        273


1    dealing that had given me prior information and people

2    being involved in shooting and that lead to

3    convictions.

4        Q.    After receiving that information, Detective,

5    did you recognize either of those two people?

6        A.    Yes, I did.

7        Q.    Which person did you recognize?

8        A.    I recognized the person of Jamie.

9        Q.    And who did you recognize that person to be

10   or who did you know him as?

11       A.    As Jamie Rios.

12       Q.    And how is it that you knew Jamie Rios?

13       A.    Well, I have -- I know Jamie Rios as being a

14   member of the Latin Kings.  And I know his mother and

15   I have had prior contacts with him.

16       Q.    After learning his name, Detective, did you,

17   yourself, do anything?

18       A.    Yes, I did.

19       Q.    Tell the ladies and gentlemen what you did.

20       A.    For several days I was looking for him.

21       Q.    That search began on the 3rd of July, 1989?

22       A.    Yes, it did.

23       Q.    Were you able to find him on that particular

24   date?

151
AWW

1       A.   No, I did not.

2       Q.   Did you continue to look for him?

3       A.   Yes, I did.

4       Q.   On July 6, 1989, were you able to find Jamie

5    Rios?

6       A.   Yes, I did.

7       Q.   Under which circumstances did you find him?

8       A.   He was on the street at -- in front of 1440

9    on Leavitt riding on a bicycle.

10      Q.   About what time of the day was it that you

11   first saw him?

12      A.   Approximately about 9:30 at night.

13      Q.   Were you alone at that time or were you with

14   one of your partners?

15      A.   I was with my partner.

16      Q.   As you were working out on the street that

17   night, Officer, were you in a uniform or were you

18   wearing plain clothes?

19      A.   I was working plain clothes.

20      Q.   When you say plain clothes, are you referring

21   to being dressed much like the way you're dressed

22   today?

23      A.   No.

24      Q.   Can you tell us what you mean by plain

152
AWW

275

PFP000391

```
 1   clothes?

 2        A.    Blue jeans, jacket -- and regular street

 3   clothes.

 4        Q.    And what type of a car were you driving?

 5        A.    An unmarked car.

 6        Q.    And what do you mean by an unmarked car?

 7        A.    Police vehicle that does not have any lights.

 8   Or any markings indicating police squad.

 9        Q.    Now, Detective, when you first saw Jamie

10   Rios, what did you do?

11        A.    I approached him.

12        Q.    When you approached him, were you on foot or

13   were you in your car?

14        A.    I was on foot.

15        Q.    And as you approached him, did you say

16   anything to him?

17        A.    Yes, I did.

18        Q.    What did you say?

19        A.    I said "Jamie, I have been looking for you

20   for the past 3 days.  A few days or so.  And where

21   have you been hiding?"  He says, "I haven't been

22   hiding anyplace.  I have been around."

23        Q.    Did you say anything else to him?

24        A.    Yes, I did.
```

276

PFP000392

```
1      Q.   What did you say next?

2      A.   Then I informed him that I would like him to

3  come to Area 5 with us on an investigation of the

4  shooting of New York.  How that happened on Western

5  Avenue.

6      Q.   And where is Area 5 located in the city?

7      A.   5555 West Grand.

8      Q.   After you told him that you would like him to

9  accompany you to Area 5, did he make any kind of

10 response to you?

11     A.   Yes, he did.  He said he would.

12     Q.   After he indicated that he would go with you,

13 what did you do next?

14     A.   Walked toward the car that was parked on

15 Bell.  And put him in the back seat of the car.

16     Q.   After he was placed inside of the car, where

17 did you go?

18     A.   Well, we stayed there for a few seconds

19 because a female approached us, also, meaning his girl

20 friend.  And wanted to find out why was he in the car.

21     Q.   Did she identify herself to you?

22     A.   I believe she did.

23     Q.   And she asked you why he was in the car, is

24 that right?
```

154
AWW

PFP000393

1      A.   Yes.

2      Q.   Did you tell her anything?

3      A.   Yes, I did.

4      Q.   What did you tell her?

5      A.   I told her we're under investigation of the

6   shooting that happened on Western Avenue.  That he was

7   going to go to Area 5 with us and that I would bring

8   him back later on.

9      Q.   Did you then go to Area 5 with the defendant?

10     A.   Yes, I did.

11     Q.   Did you have any other partners with you in

12  the car?

13     A.   Yes.

14     Q.   And what would be your partner's name?

15     A.   Steven Garr.

16     Q.   Now, once you got to Grand and Central, what

17  did you do with Jamie Rios?

18     A.   When we got to Grand and Central, I

19  introduced him to Detective Mason and Halverson of

20  Area 5 Violent Crimes and I left.

21     Q.   Did you ever return back to Area 5 that day?

22     A.   Yes, I did.

23     Q.   When you returned back, did you learn

24  anything concerning Jamie Rios?

155
AWW



1     A.   Yes, I did.

2     Q.   What did you learn?

3     A.   I learned he had given a statement

4 implicating himself.

5     Q.   Now, Detective, were you also working on this

6 investigation on July 7, of 1989?

7     A.   Yes, I was.

8     Q.   And on that particular date, did you have

9 occasion to go out and find any witness?

10    A.   Yes, I did.

11    Q.   Do you recall the name of the person that you

12 went out to find?

13    A.   I went out and found Luis Huertas.

14    Q.   Do you remember where you picked up Huertas

15 on the 7th of July?

16    A.   Yes.  I picked him up in an ice cream parlor

17 on, I believe, 1313 on Western where he was working.

18    Q.   Do you recall about what time this would have

19 been?

20    A.   Between 4:30 and quarter to 5:00.

21    Q.   After you picked up Luis Huertas, where did

22 you take him?

23    A.   I took him to Area 5 Violent Crimes.

24    Q.   And once you got to Area 5, where did he go?

156
AWW

279

PFP000395

1    A.    I introduced him also to Detective Mason and

2  Halverson for the purposes of viewing a lineup.

3    Q.    I'm going to ask you, if you will, to look

4  around the courtroom.  See if you see the person you

5  know as Jamie Rios here today?

6    A.    Yes, I do.  The gentleman over there in the

7  gray -- in the dark suit over there.

8    MS. HANLON: May the record reflect the in court

9  identification of the defendant?

10   THE COURT: Sure.

11   MS. HANLON: May I have one second, Judge?

12             I have no other questions, Judge.  Thank

13  you.

14   THE COURT: Cross.

15   MR. CAREY: Thank you, Judge.

16                CROSS EXAMINATION

17                BY MR. CAREY:

18   Q.    Detective now?

19   A.    Yes.

20   Q.    You have been promoted to detective recently?

21   A.    Yes, I have.

22   Q.    I'm sorry.  How long had you been in gang

23  crimes?

24   A.    I was in gang crimes for twelve years.

157
AWW

1      Q.    And during that time, were you always working
2  in -- near northwest side over there in Area 5?
3      A.    Yes.
4      Q.    And so, during that twelve years, you became
5  quite familiar then with the gangs that operated in
6  that area?
7      A.    Yes, I did.
8      Q.    What the boundaries of those gangs were?
9      A.    Yes, I did.
10      Q.    Basically north of division and east of
11  Western was Latin King territory, is that right?
12      A.    Yes.
13      Q.    West of Western over to California would be
14  Cobras and Disciples?
15      A.    Yes.
16      Q.    And north of Division up to say Armitage?
17      A.    Yes.
18      Q.    Okay.  Now, when was your first involvement
19  with this case?
20      A.    If I recall, it was probably on the 3rd.
21      Q.    So, right after the shooting, you weren't
22  involved in this?
23      A.    No, I was not.
24      Q.    Okay.  Do you remember how -- who asked you

158
AWW

PFP000397

1   to get involved?

2       A.   No.   Nobody particular asked me to get

3   involved.

4       Q.   So, you sort of heard about the case and you

5   voluntarily got involved?

6       A.   That is correct.

7       Q.   And you say you talked to some confidential

8   informants, is that right?

9       A.   Yes, I did.

10      Q.   Were they gang members?

11      A.   Yes, they were.

12      Q.   Now, gang members sometimes lie to the

13  police, don't they?

14      A.   Sometimes.

15      Q.   They set each other up, don't they?

16      A.   Yes.   Sometimes.

17      Q.   Sometimes they will tell you somebody did it

18  just to get them off the street, won't they?

19      A.   If it's from the opposite gang, yes.

20      Q.   Right.   Now, the -- you talked to how many

21  people on this case?

22      A.   In numbers, I couldn't give you.   But it was

23  several peoples, yes.

24      Q.   Several people?

159
AWW

1      A.   Yes.

2      Q.   Several confidential informants?

3      A.   Yes.   Specifically, 2 confidential

4  informants.   And the rest of them were informants but

5  they were not confidential.

6      Q.   So, what were the names of those people that

7  weren't confidential?

8      MS. HANLON: Objection, Judge.   They are

9  informants.

10     THE COURT:   Sustained.   Sustained.

11     MR. CAREY:

12     Q.   They weren't confidential, is that right?

13     THE COURT: Sustained.

14     MR. CAREY:

15     Q.   So, you talked to some in informants over a

16 period of what time?

17     A.   I'd say for a period of -- I started working

18 at 9:00 o'clock that morning.   All through the day.

19     Q.   Did you talk to Little Mike?

20     A.   I talked to Little Mike, yes.

21     Q.   And he was an informant on this case, is that

22 right?

23     MS. HANLON: Objection.

24     THE COURT:   Sustained.

160
AWW

283

PFP000399

1    MR. CAREY:

2    Q.    Did you pay these individuals?

3    MS. HANLON: Objection.  Well, Judge, I'll withdraw

4    the objection.

5    THE COURT: May answer.

6    THE WITNESS: What's the question again?

7    MR. CAREY:

8    Q.    Were these informants paid?

9    A.    No, they were not.

10   Q.    Well, when people give information,

11   especially gang members, sometimes they expect

12   something in return, isn't that correct.

13   A.    Not necessarily, no.

14   Q.    Sometimes?

15   A.    Sometimes they do, yes.

16   Q.    Maybe some -- some consideration in the

17   future?

18   A.    True, yes.

19   Q.    Now, these confidential informants that you

20   talked to, neither one of them were at the scene the

21   night Luis Morales got shot, were they?

22   A.    No, sir.

23   Q.    So, what they told you was secondhand or

24   third hand?

161
AWW

284

1       A.      Secondhand, yes.

2       Q.      Well, you don't know whether it was

3   secondhand or third hand?

4       A.      True.

5       Q.      Now, you did look at police reports relative

6   to this case, didn't you?

7       A.      Some.

8       Q.      No one who was an actual witness the night of

9   the shooting named Jamie Rios, did they?

10      MS. HANLON: Objection, Judge.  I don't know who

11  he's referring to or if he's ever talked to those

12  people.

13      MR. CAREY:  I'll withdraw the question.

14      THE COURT: Sustained.  Thank you.

15      MR. CAREY:

16      Q.      No one named in a police reports that you

17  read, named Jamie Rios, did they?

18      A.      No.

19      Q.      In fact, 2 of the witnesses named another

20  person, Macho Melindez, isn't that correct?

21      MS. HANLON: Objection, Judge.

22      MR. CARBALLO: Objection.

23      THE COURT: Overruled.

24      THE WITNESS:  No.  I had no knowledge of anybody

162
AWW

285

1    name naming anybody else.

2        MR. CAREY:

3        Q.   You don't have any knowledge of that?

4        A.   No, sir, not at that time I didn't.

5        Q.   Do you recall what police reports you looked

6    at?

7        A.   I believe I recall looking at the first, the

8    beat officer's report.

9        Q.   Did you look at the report that the 2

10   detectives, Boris and Johnson, first detectives

11   supplementary reports that were made out the following

12   day, did you look at that report?

13       A.   No, I did not.

14       Q.   June 28th?

15       A.   No.

16       Q.   You didn't look at that?

17       A.   No, I did not.

18       Q.   That was available, though, wasn't it?

19       A.   Excuse me?

20       Q.   That report was available to you, wasn't it?

21       A.   It was made out on the 28th of June? I do

22   not recall whether it was available to me or not.

23       Q.   But the case report was available?

24       A.   Yes.

163
AWW

PFP000402

1    Q.   And you read that?

2    A.   Yes.

3    Q.   Now, the case report gave descriptions,

4    didn't it?

5    A.   I believe so.

6    Q.   It gave descriptions of people shorter than

7    Jamie Rios?

8    MS. HANLON: Judge, I'm going to object. He never

9    made the police report.

10   THE COURT: Sustained.

11   MR. CAREY:

12   Q.   Well, were you looking for people that were

13   described in the case report that you read?

14   A.   I was looking for the persons that were

15   involved in this case.

16   Q.   Well, did you use the information in the

17   report that you read to help you?

18   A.   No.

19   Q.   So, you ignored that?

20   A.   At this point, yes, I did.

21   Q.   Now, you worked overtime on this case, didn't

22   you?

23   A.   Yes, I did.

24   Q.   You knew the victim was a Cobra, didn't you?

164
AWW

*287*

```
 1        A.    Yes, I did.

 2        Q.    And you knew Jamie Rios?

 3        A.    Yes, I did.

 4        Q.    In fact, you saw Jamie Rios earlier in the

 5   day.  The day he got arrested at the school yard at

 6   Leavitt, didn't you?

 7        A.    No, I did not.

 8        Q.    You went by the school yard that did, didn't

 9   you.

10        MS. HANLON: Objection.  Relevancy.

11        THE COURT: I'll give you some leeway.  Overruled

12   at this point.

13        MR. CAREY:

14        Q.    You went by there that afternoon, didn't you?

15        A.    I have been by there several times, yes.

16        Q.    Jamie came up to your car, didn't he?

17        A.    No, he did not.

18        Q.    Well, Little Mike came up to you car, didn't

19   he.

20        MS. HANLON: Objection.

21        THE COURT: Sustained.

22        MR. CAREY:

23        Q.    Now, you said before when you came up to

24   Jamie, you said "Where you been hiding" right?
```

165
AWW

288

1        A.    Yes, I did.

2        Q.    Was he hiding when he was riding his bike in

3    front of his house?

4        A.    Not at that time.

5        Q.    So, you wouldn't characterize that as hiding?

6    Riding in a bike in front of his house?

7        A.    No, not at that time.    No.

8        Q.    And he didn't run away?

9        A.    No, he didn't.

10        Q.    Didn't try to escape?

11        A.    No, he did not.

12        Q.    Now, you say he went with you voluntarily, is

13    that right?

14        A.    That is correct.

15        Q.    Isn't it true that you handcuffed him and

16    took him to the back of the house?

17        A.    No, I did not.    That's not true.

18        Q.    Now, you had information from what you called

19    a reliable informant that this was the guy, Jamie

20    Rios, right?

21        A.    That is correct.

22        Q.    And so, he was your prime suspect in this

23    murder, is that right?

24        A.    Yes, he was.    He was one of them.

166
AWW

289

1    Q.   You didn't handcuff him?

2    A.   No, I did not.

3    Q.   He went with you voluntarily?

4    A.   Yes, he did.

5    Q.   And you didn't go into his house and search

6    either, did you?

7    A.   No, I did not.

8    Q.   Well, isn't it a fact that you stopped

9    handcuffed him, and put him by the fence along the

10   side of his house while you searched his house?

11   A.   No, sir, that's not true.

12   Q.   And isn't it also a fact that you and your

13   partner went in the middle door because Jamie lives in

14   the rear apartment up to the second floor and went in.

15   You let about three or four other police officers in

16   the back door, isn't that correct?

17   A.   No, sir, that's not correct.

18   Q.   Well, it is correct that there were about 6

19   other police officers out there that night, isn't that

20   correct?

21   A.   I don't know if there were 6 but there were

22   other police officers.

23   Q.   They're all gang crimes guys too, right?

24   A.   Yes.

167
AWW

1      Q.    Let's say somewhere between 5 and 8 police

2   officers out there including yourself and your

3   partner?

4      A.    No, I wouldn't say 5 --

5      Q.    How many would you say?

6      A.    I'd say about 4, 5, yes.

7      Q.    So about -- at least -- well 5?

8      A.    Yes.   I would say.

9      Q.    Okay.   So, there were at least 5 out there.

10  Now, you sent 5 people out to pick up somebody that

11  you weren't going to arrest that was going to come in

12  voluntarily, is that right?

13      MS. HANLON: Objection, Judge.

14      THE COURT: Sustained.

15      MR. CAREY:

16      Q.    You knew this was a murder case?

17      MR. CARBALLO: Objection.   Asked and answered.

18      THE COURT:  May answer.

19      THE WITNESS: Yes, I did.

20      MR. CAREY:

21      Q.    The weapon hadn't been recovered by the time

22  you went out to Jamie's house, had it?

23      A.    No, it has not been.

24      Q.    If fact, the information you had there were 2

168
AWW

*291*

PFP000407

1    weapons, right?

2        A.    That is correct, yes.

3        Q.    You didn't go up into his apartment and look

4    for a weapon?

5        MS. HANLON: Objection.  Asked and answered.

6        THE COURT:  May answer.  Overruled.

7        THE WITNESS:  No I did not.

8        MR. CAREY:

9        Q.    In the case report that you read and ignored,

10   there was very specific clothing descriptions, weren't

11   there?

12       MR. CARBALLO: Objection.

13       THE COURT: Overruled.

14       THE WITNESS: I don't recall about any description

15   whether just only on the heights and that's it.

16       MR. CAREY;

17       Q.    Well, do you recall reading that one of the

18   persons was wearing a red T-shirt, red shorts, British

19   Knight gym shoes and the second person hospital type

20   shirt, blue jeans shorts and British Knight gym shoes.

21   Do you remember that?

22       A.    No, not really.

23       Q.    You don't remember that?  So, you didn't go

24   in searching for those types of clothes either in

169
AWW

*202*

1    Jamie Rios' apartment?

2        A.    No, I did not.

3        Q.    Did any of the other police officers that

4    were with you, to your knowledge, read any of the

5    police reports?

6        MS. HANLON: Objection.

7        THE COURT: Sustained.

8        MR. CAREY:

9        Q.    To your knowledge?

10       THE COURT: Objection sustained.

11       MR. CAREY:

12       Q.    So, now, when Jamie came in voluntarily, his

13   wife asked to come along with him, didn't she?

14       A.    I do not recall her ever asking if she --

15       Q.    You don't recall that?

16       A.    No.

17       Q.    She came to the police station, though,

18   didn't she?

19       A.    I -- I didn't see her at the police station.

20       Q.    You didn't see her?

21       A.    No, I did not.

22       Q.    She's a young attractive woman, isn't she?

23       MS. HANLON: Judge objection.   Objection.

24       THE COURT: May answer.   I guess it's -- well, I'll

1   tell you what.  No, no.  Excuse me.  Objection will be

2   sustained.  Rephrase your question.

3       MR. CAREY:

4       Q.   You did see her out by the police car when

5   Jamie was in the car, right?

6       A.   Yes, I did.

7       Q.   You didn't let them have a conversation at

8   that time, did you?

9       A.   They did.  They had a conversation.

10      Q.   Well, you told her in fact we'll bring him

11  back, right?

12      A.   True.  I did.

13      Q.   Okay.  And she wanted to know what this was

14  all about, right?

15      A.   That's correct.

16      Q.   And didn't you learn later from one of your

17  fellow officers that some of your fellow officers took

18  her into the police station?

19      A.   No, I did not.

20      Q.   And she sat there until about 3:30, 4:00

21  o'clock in the morning?

22      A.   No, I did not.

23      Q.   And -- well, you were back at Area 5, weren't

24  you?

171
AWW

294

1     A.   Yes, I was.

2     Q.   And you were in and out that night, weren't

3 you?

4     A.   Yes, I was.

5     Q.   You were in the open area.  For the ladies

6 and gentlemen the second -- you were on the second

7 floor.  Jamie was on the second floor, is that right?

8     A.   That is correct.

9     Q.   There's an open area on the second floor?

10    A.   Yes, there is.

11    Q.   And then, there's small interview rooms?

12    A.   That is correct.

13    Q.   Around.  And you didn't see her in that open

14 area?

15    A.   No, I did not.

16    Q.   Did you go into any of those small rooms?

17    A.   No, I did not.

18    Q.   Did you ever go into see Jamie?

19    A.   No, I did not.

20    Q.   You never went in to talk to Jamie?

21    A.   No, I didn't.

22    Q.   Didn't you in fact go in and say Jamie, I

23 know you were out there.  Why don't you tell us that

24 you were out there?

172
AWW

PFP000411

295

1     A.   No.

2     Q.   You don't remember saying that?

3     A.   I did not. I do not say it.

4     Q.   Well, you were the arresting officer on this

5 case, weren't you?

6     A.   Yes.

7     Q.   You signed the arrest report, you and your

8 partner?

9     Q.   And on the arrest report, there are 8 police

10 assigned as personnel, assigned and assisting in the

11 arrest, is that right.

12     A.   That is correct, yes.

13     Q.   So there were 8 people?

14     A.   No, sir, there were not.

15     Q.   But there were 8 people on the arrest report?

16     A.   Yes, there are.

17     Q.   Now, you got information from these

18 confidential informants that Tino was one of the guys

19 and Jamie was one of the shooters, is that right?

20     A.   Yes.

21     Q.   Those were the 2 people involved?

22     A.   That is correct, yes.

23     Q.   And Tino was later put in a lineup, isn't

24 that correct?

173
AWW

1      MR. CARBALLO: Objection regards to Tino.

2      THE COURT: Overruled.

3      MR. CAREY:

4      Q.   Tino was later put in a lineup, wasn't he?

5      A.   I don't know about that.

6      Q.   You don't know about that?

7      A.   Not, I don't.

8      Q.   Did you read any other reports June of --

9   July of 1988 or 89 and today?

10     A.   No, I have not.

11     Q.   You never read anything about this case?

12     A.   No, I haven't.  I have not.

13     MR. CARBALLO: Objection.  Form of the question.

14     THE COURT:  Let the answer stand.

15     MR. CAREY:

16     Q.   Well, wasn't a fact your purpose in going out

17  to get Jamie Rios was to arrest him for murder?

18     A.   My purpose was to bring him in and find out

19  if he really was involved in the case.

20     Q.   Tino never got arrested, did he?

21     MS. HANLON: Objection.

22     THE COURT:  Sustained.

23     MR. CAREY:

24     Q.   You have never testified against Tino, have

174
AWW

297

PFP000413

1   you.

2        MR. CARBALLO: Objection.

3        MS. HANLON: Objection, Judge.

4        THE COURT: Sustained.

5        MR. CAREY:

6        Q.   These confidential informants also told you

7   where you could get the guns, right?

8        A.   Yes.

9        Q.   Told you you could get the 25 caliber gun at

10  Alex Lopez' house, right?

11       A.   I don't remember it, whether they said 25

12  caliber Alex Lopez' house and 32 at somewhere else or

13  the 38.  No, I don't.

14       Q.   If I showed you a copy of the warrant, would

15  that refresh your recollection?

16       A.   I did not make the warrant.

17       Q.   I said if I showed you a copy of it, would

18  that refresh your  --

19       MS. HANLON: I would objection to it refreshing his

20  recollection, Judge.

21       THE COURT: I'm going to overrule the objection.  I

22  don't think he's answer the question, though.

23       MR. CAREY:

24       Q.   If I showed you a copy of the warrant, would

175
AWW

298

PFP000414

1    that refresh your recollection?

2        A.    Yes.   Yes.

3        MR. CAREY: Defendant's 2.

4        Q.    I'm going to show you what I'm going to mark

5    as Defendant's Number 2 for identification.   Ask you

6    to just take a look at that for a second.

7        A.    Yes.   It's a warrant.

8        Q.    Is that the warrant for Alex Lopez in his

9    house?

10       A.    Yes, it is.

11       Q.    And is there a 25 -- the evidence to be

12   searched for is 25 caliber semi automatic gun in that

13   warrant, is that right?

14       A.    Yes, it is.

15       Q.    So, your recollection is refreshed now, is

16   that right?

17       A.    My recollection is refreshed as far as the

18   warrant, yes.

19       Q.    So, the confidential informant that told you

20   about the gun, the 25 told you you'd find it at Alex

21   Lopez' house, is that right?

22       A.    Again, didn't tell me.   He told the person

23   who made that warrant out.   Who wrote that warrant.

24       Q.    Well, so this was another confidential

176
AWW

299

1   informant or was it your confidential informant?

2        MS. HANLON: Objection.

3        THE COURT:  Sustained.  Objection sustained.

4        MR. CAREY:

5        Q.   Did you see this confidential informant tell

6   the person who got the warrant?

7        MS. HANLON: Objection.

8        MR. CAREY: Judge, there's an objection.

9        THE COURT: I'm sorry.  I missed the question.

10       MR. CAREY:

11       Q.   Did you see the confidential informant, your

12  confidential informant tell this police officer, give

13  him the information, for the warrant?

14       MR. CARBALLO: Objection.

15       THE COURT: I'm going to sustain the objection.

16  You might want to try to rephrase that.

17       MR. CAREY:

18       Q.   Well, you had 2 confidential informants, is

19  that right?

20       A.   Yes, sir.  Correct.

21       Q.   They told you who did it and where the guns

22  were, right?

23       A.   Yes.

24       Q.   Now, did you pass that information on to a

177
AWW

1  brother officer or did you bring the confidential

2  informant in to tell your brother officer?

3     A.   Brought him in to talk to the detectives.

4     Q.   So, you were with this confidential informant

5  when he came in to talk to this police officer?

6     A.   I brought him in and turned him over to them.

7     Q.   You knew what he was going to say, didn't

8  you?

9     A.   No, not exactly.  I knew he was going to say

10 about the gun but that's not it.

11    Q.   The purpose of bringing him in was to tell

12 this other officer where he could find the gun so he

13 could get a warrant, isn't it?

14    A.   That's correct.

15    Q.   Okay.  So, he got a warrant to search Alex

16 Lopez and his house, is that right?

17    A.   That is correct, yes.

18    Q.   They never got the gun from your -- from Alex

19 Lopez, did they?

20    MS. HANLON: Objection.

21    THE COURT: Basis?

22    MS. HANLON: I would say, Judge, basis is the

23 foundation from Alex Lopez from where.  From the

24 street, from --

178
AWW

PF000417

1      THE COURT: No.  I'm going to let him answer the
2  question.  You may answer the question.
3      THE WITNESS: Could you repeat the question,
4  please?
5      MR. CAREY:
6      Q.    Your brother officers who served this warrant
7  never recovered the 25 caliber gun, did they?
8      A.    No, they did not.
9      Q.    That was your reliable confidential informant
10  that gave them that information,
11      A.    Yes.
12      Q.    They also told you, your confidential
13  informant, reliable confidential informant told you
14  there was a 38 used in this case, right?
15      A.    Yes.
16      Q.    And you brought him in and got a warrant to
17  search Ben Corraro's house for that 38, didn't you?
18      A.    Yes.
19      Q.    You never got a 38, did you?
20      A.    No, we didn't.
21      Q.    That's the same confidential -- reliable
22  confidential informant?
23      A.    Yes.
24      Q.    Same one that gave you Tino too, right?

179
AWW

PFP000418       302

1      A.    That is correct, yes.

2      Q.    Now, the area of the shooting where Luis

3  Morales died, you would consider that a high crime

4  area, wouldn't you?

5      A.    Yes, I would.

6      Q.    Several shootings there during an average

7  week?  There would be several shooting in that area?

8      MR. CARBALLO: Objection, Judge.

9      THE COURT: Overruled.

10     THE WITNESS: I don't know about every week, but

11  yes, there's several shootings in that area.

12     MR. CAREY:

13     Q.    Well, this was in the summertime around the

14  4th of July.  That tends to be a time when there's

15  more shootings, wouldn't you say, based upon your

16  twelve years of experience?

17     A.    Yes.

18     Q.    That summer was really no different, last

19  summer, right, summer of '89?

20     A.    No, it wasn't.

21     Q.    Not all of them are murders but there's a lot

22  of shootings, right?

23     A.    Yes, there are.

24     Q.    Especially along Western there where there's

180
AWW

1    two gangs sort of rubbing up against one another?

2         A.    Yes.

3         Q.    You knew Macho Melindez, didn't you?

4         A.    I knew a Macho, yes.

5         Q.    In the Latin Kings?

6         A.    Yes.

7         Q.    Do you know what his rank was?

8         MR. CARBALLO: Objection.

9         THE COURT: Overruled.

10        THE WITNESS: I believe at that time he was the

11   head of the Latin Kings in that section there.

12        MR. CAREY:

13        Q.    So, he was the head of the Latin Kings.

14             Now, based on your twelve years as a

15   gang crimes specialist, your time as a detective,

16   sometimes confidential informants lie too, don't they?

17        MR. CARBALLO: Objection.  Asked and answered.

18        THE COURT:  I think we have been through that,

19   Counsel.  I'm going to sustain the objection.

20        MR. CAREY:

21        Q.    By the time you got the information from the

22   street about 7 or 8 days had gone by since the

23   shooting, is that right?

24        A.    I believe the shooting was on the 26th and I

181
AWW

PFP000420        304

1    started on the 3rd.  Yeah.  About that time.

2         Q.   Now, you had information from a reliable

3    informant and you never went to a judge to get a

4    warrant for the arrest of Jamie Rios, did you?

5         A.   No, I did not.

6         Q.   Now, you know how to get a warrant, don't

7    you.

8         MR. CARBALLO: Objection.

9         THE COURT: Sustained.  Objection sustained.

10   Strike that.  Objection overruled.  May answer.

11        MR. CAREY:

12        Q.   You know how to get a warrant, don't you?

13        A.   Yes, I do.

14        Q.   And you know a warrant has to be served

15   within a certain amount of time?

16        MR. CARBALLO: Objection.  Irrelevant.

17        THE COURT: I'm going to sustain the objection to

18   that question.

19        MR. CAREY:

20        Q.   You know you have to have probable cause for

21   arrest in order to get a warrant, don't you?

22        MR. CARBALLO: Objection.

23        THE COURT: I think you're getting a little far.

24   I'm going to sustain it.

182
AWW

305

PFP000421

1    MR. CAREY:

2    Q.   Can you tell us what a pitchfork tattoo

3 means?

4    A.   Pitchfork tattoo means that you are Disciple.

5 Latin Disciple.

6    Q.   Disciples run with the Cobras?

7    A.   Yes, that is correct.

8    Q.   Kind of like Pontiac and Buick.  They're all

9 part of General Motors.  They run together?

10    A.   Correct.

11    MR. CAREY: One moment, Judge.

12          No further questions at this time.

13    THE COURT: Thank you.  Redirect.

14          REDIRECT EXAMINATION

15          BY MS. HANLON:

16    Q.   Detective Guevara, can you explain the

17 purpose of keeping your informants confidential?

18    A.   Well, the purpose of keeping my informants

19 confidential, any informant is number one is to keep

20 them alive.

21    Q.   If you went around telling people who your

22 confidential informants were, what could happen to

23 them?

24    A.   The same thing that happened to New York.

183
AWW

```
1        Q.    Now Detective Guevara, your role in this
2   investigation was to find Jamie Rios, is that right?
3        A.    That's correct.
4        Q.    Were other officers from gang crimes also
5   helping you to look for him?
6        A.    Yes, sir, they were.
7        Q.    You were not the detective assigned to this
8   case, were you?
9        A.    No, I was not.
10       Q.    Now, you already testified that you received
11  information from your informants about two
12  individuals, is that correct?
13       A.    That is correct.
14       Q.    Which individuals did you learn was the
15  actual shooter of New York?
16       A.    Jamie Rios.
17       Q.    Now, Counsel --
18       MR. CAREY:  I'm going to object.  Ask that be
19  stricken.
20       THE COURT: I'm going to let it stand.
21       MS. HANLON:
22       Q.    Now, Counsel asked you about you introducing
23  your informants to another officer who got a warrant.
24  Do you remember him asking you all about that?
```

184
AWW

307

```
 1        A.    Yes, I do.
 2        Q.    Detective Guevara, did you, yourself, go to
 3   Alex Lopez' house to get a gun?
 4        A.    No, I did not.
 5        Q.    Do you remember how many officers went to his
 6   house to look for this gun?
 7        A.    No, I don't.
 8        Q.    Do you know how long after this murder
 9   occurred that they went to the house to look for this
10   gun?
11        A.    No, I don't.
12        Q.    Do you know where exactly in that house they
13   looked?
14        A.    No, I don't.
15        Q.    Do you know who had come into that house and
16   had gone out of that house between the date of the
17   murder and the date that the officers went to look for
18   that gun?
19        A.    No, I don't.
20        Q.    How about Benjamin Corraro's house?  Did you
21   go there to look for a gun?
22        A.    No, I did not.
23        Q.    Do you know how many officers went there to
24   look?
```

185
AWW

PFP000424

1    A.    No, I don't know how many.

2    Q.    Do you know if they looked?

3    A.    No.

4    Q.    Do you know if anybody went in and out of his

5    house between the time of the murder and the time they

6    went to look for the gun?

7    A.    No, I do not.

8    MS. HANLON: Thank you, Judge.  I have no other

9    questions of Detective Guevara.

10    THE COURT:  Mr. Carey?

11    MR. CAREY: Just a couple of things.

12                    RECROSS EXAMINATION

13                    BY MR. CAREY:

14    Q.    You brought your confidential informant in

15    and introduced him to another police officer, did you

16    not?

17    A.    Yes.  Yes, I did.

18    Q.    Would that be considered a breach of

19    confidentiality?

20    MR. CARBALLO: Objection.

21    THE COURT: Sustain the objection.

22    MR. CAREY:

23    Q.    Now, you're the one that said that this

24    confidential informant was reliable, right?

186
AWW

```
1        A.    Yes.

2        Q.    And he told you not that the gun was there 2

3    weeks ago, he said you can find the gun there and

4    that's why he got the warrant, right?  You got the

5    warrant, right?

6        A.    Yes.

7        THE COURT:  Now, that's -- I'm going to strike his

8    answer.  I don't think that's -- that's not really his

9    testimony.

10       MR. CAREY: Well, that's what I'm asking.

11       THE COURT: I'm surprised the State didn't object.

12       MR. CAREY: Well, let me ask --

13       THE COURT: Rephrase your question.  Let me put it

14   that way.

15       MR. CAREY:

16       Q.    You talked to this confidential informant

17   sometime after the murder, right?

18       A.    Yes.

19       Q.    And he told you where you could find the

20   weapons then, not where they were 2 weeks ago.  He

21   said you can go find the weapons at Alex Lopez' and

22   Ben Corraro's and that's why you got the warrant,

23   right?

24       A.    He told us where the weapon might have been
```

PFP000426

1    at.

2        Q.   Well, you went to a judge or one of your

3    brother --

4        MR. CARBALLO: Objection, Judge.

5        MR. CAREY:

6        Q.   Brother officers went to a judge and got a

7    warrant to go into somebody's house?

8        MR. CARBALLO: Objection, Judge.

9        MR. CAREY:

10       Q.   Is that right?

11       THE COURT: Well, he can answer that specific

12   question.

13       MR. CAREY:

14       Q.   You went with this information to a brother

15   officer who went to a judge to get a warrant to go

16   into somebody's house to look for a gun.  And you said

17   that might have been, is that what you're telling us

18   now?

19       A.   That's what I'm saying, yes.

20       Q.   This guy was reliable, wasn't he?

21       A.   Yes, he was.

22       Q.   And you went to the judge because you knew

23   this was reliable information, right?

24       MS. HANLON: Objection.  Asked and answered.

188
AWW

PFP000427

1      THE COURT:  Sustained.

2      MR. CAREY:

3      Q.   Well, you didn't go on a guess, did you?

4      MR. CARBALLO: Objection.

5      THE COURT: Sustained.

6      MR. CAREY:

7      Q.   You wouldn't have asked a brother police

8  officer to go into a persons home if you didn't feel

9  like your reliable informant was giving you reliable

10  information, would you, Officer?

11      MR. CARBALLO: Objection.

12      THE COURT: Sustained.

13      MR. CAREY: No further questions.

14      MS. HANLON: May I have one minute, Judge, please.

15  Judge, I have no other questions of the detective.

16      THE COURT: Thank you.

17                          (witness excused)

18      THE COURT: Sidebar.

19                      (The following proceedings

20                      were held outside the presence

21                      and hearing of the Jury)

22      THE COURT: You got a 15 or 20 minute witness?

23      MR. CARBALLO: Next one is a long one.  But I don't

24  think he'll be more than 45 minutes though.

189
AWW

## <u>CERTIFICATE OF SERVICE</u>

Stephen L. Richards certifies that on  January 28, 2026   he served the    DEPOSITION DESIGNATIONS
AND COUNTERDESIGNATONS – REYNALDO GUEVARA TRIAL TESTIMONY

through the ECF filing system.

*/s/ Stephen L. Richards*
By: Stephen L. Richards
Attorney for Plaintiff
53 W. Jackson, Suite 756
Chicago, IL 60604
(773) 817-6927
sricha5461@aol.com
Attorney No: 6191946