*Rios v. Guevara, et.al*
22 CV 3973

# EXHIBIT 1

IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT
COOK COUNTY, ILLINOIS

THE PEOPLE OF THE     )
STATE OF ILLINOIS,    )
                      )          Criminal
                      )
         vs.          )          No. 89-CR-16525
                      )
JAIME RIOS            )          Charge:  Murder

FILED

MAY 15 1992

AURELIA PUCINSKI
CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

REPORT OF PROCEEDINGS of the hearing before

the HONORABLE THEMIS N. KARNEZIS, on the 9th day of

February, 1990.

APPEARANCES:

    MR. CECIL A. PARTEE,
        State's Attorney of Cook County, by
    MR. FRANK MAREK,
    Assistant State's Attorney,
        appeared for the Respondent;

    MR. RANDOLPH N. STONE,
        Public Defender of Cook County, by
    MR. JACK CAREY,
    Assistant Public Defender,
        appeared for the Petitioner.

PAG   2

1      MR. CAREY:  No further questions.

2      MR. MAREK:  Nothing further.

3      THE COURT:  Thank you.  You may step down, ma'am.

4              (Witness excused.)

5      MR. CAREY:  Judge, at this time we will -- the

6  defense will rest on both the motions.

7      THE COURT:  Stipulate no arrest warrant, I assume.

8      MR. MAREK:  So stipulated.

9      THE COURT:  Okay.  No arrest warrant.

10     MR. MAREK:  Your Honor, we will call Officer

11  Guevara.

12     THE COURT:  All right.

13            (Witness sworn.)

14          RENALDO GUEVARA,

15  called as a witness on behalf of the Respondent,

16  having been first duly sworn, was examined and

17  testified as follows:

18          DIRECT EXAMINATION

19         BY  MR. MAREK:

20    Q.  Officer, would you state your full name for

21  the record, please?

22    A.  Investigator Renaldo Guevara, that's

23  G-u-e-v-a-r-a.

24    Q.  And Officer Guevara, by whom are you employed?

1      A.   I am employed by the Chicago Police Department

2  Gang Crimes Unit.

3      Q.   And how long have you been a Chicago Police

4  Officer?

5      A.   I have been a Chicago Police Officer for 17

6  years.

7      Q.   And how long have you been with the Gang

8  Crimes Unit?

9      A.   I have been with the Gang Crime Unit for 12

10  years.

11     Q.   Officer Guevara, I want to direct your

12  attention back to June and July of 1989.  Were you a

13  Gang Crimes Officer back in those months?

14     A.   Yes, I was.

15     Q.   And sometime after June 27, 1989, did you

16  learn that on that date a man by the name of Luis

17  Morales had been shot to death at 1316 North Western

18  Avenue?

19     A.   Yes, I did.

20     Q.   And after learning that information, did you

21  speak to anybody about that?

22     A.   Yes, I did.

23     Q.   And when did you speak to that person or

24  persons?

1      A.   I spoke to those persons a couple of days

2   prior to that -- I mean a couple of days after that.

3      Q.   Do you remember the exact date?

4      A.   No, not exactly I don't.

5      Q.   And how many persons did you speak to?

6      A.   Numerous persons.

7      Q.   Did you receive information from any persons

8   relative to the shooting of Luis Morales?

9      A.   Yes, I did.

10      Q.   And when did that occur?

11      A.   That occurred a couple of days prior to the

12   6th of June or July.

13      Q.   Did you obtain this information on the street?

14      A.   Yes, I did.

15      Q.   And how many persons gave you information?

16      A.   Several.

17      Q.   Specifically what information did you obtain

18   relative to the shooting of Luis Morales?

19      A.   The information that I received relating to

20   the shooting of Luis Morales was that as far as the

21   two individuals that were involved in the shooting.

22      Q.   And were individuals identified to you as

23   being involved?

24      A.   One named Jaime, also known as Jaime Rios, and

42

1    the other one's name Tino.  At that time I did not

2    know who Tino was.

3       Q.  The person or persons you learned that from,

4    were these people informants of yours?

5       A.  Yes, they were.

6       Q.  And do you remember specifically -- strike

7    that.

8            In conveying the information about who the

9    people involved were, did these informants ever give

10   you the source of their information?

11      A.  Yes.

12      Q.  How did these people -- what did these people

13   indicate -- how did these people indicate to you that

14   they knew that Mr. Rios was involved?

15      A.  Well, the time that I spoke with them on the

16   street, they related to me that they heard of one

17   Jaime Rios, to them known at that time as Jaime.

18           I produced (sic) if it was Jaime Rios, they

19   said yes, Rios.  Him and Tino were involved in the

20   shooting of Luis Morales, known to them as New Yorker

21   at the time.

22      Q.  So the victim was known to these people as New

23   York?

24      A.  Correct.

PFP000966

A37

1    Q.  And was -- officer, when they -- when you were

2  given the name Jaime Rios, did you know who they were

3  speaking about?

4    A.  Yes, I did.

5    Q.  And in fact did you know Jaime Rios?

6    A.  Yes, I did.

7    Q.  And is that person in court?

8    A.  Yes, he is.

9    Q.  And would you identify him for the record?

10    A.  (Indicating) It's the gentleman sitting right

11  there with the back and grayish jacket, gray pants.

12  And the white socks, black shoes.

13    Q.  Did do you know him to be a member of a gang?

14    A.  Yes, I did.

15    Q.  Did you have any information to indicate that

16  this shooting had in fact been gang related?

17    A.  Yes, I did.

18    Q.  Now, after obtaining this information from

19  these confidential informants, what did you do?

20    A.  After I received the information from the

21  informants, I began to look for Jaime Rios.

22    Q.  Did you do anything else at the same time?

23    A.  Yes, I did.

24    Q.  What were you doing at the same time you were

44

1  looking for Mr. Rios?

2      A.   At the same time that I was looking for Mr.

3  Rios, I was also looking for the witnesses on the

4  incident.

5      Q.   And were there more than -- was there more

6  than one witness that you were looking for?

7      A.   Yes, there was more than one.

8      Q.   Did you succeed in locating any of these

9  witnesses before you saw Mr. Rios?

10     A.   No, I did not, I located Jaime Rios before.

11     Q.   And when was that?

12     A.   That was on the 6th of June or July.

13     Q.   July 6th?

14     A.   July 6th.

15     Q.   And about what time of day was that?

16     A.   It was about 10:00 o'clock at night when I

17  located Jaime, between 9:30 and 10:00 o'clock at

18  night.

19     Q.   And at that time you were working?

20     A.   Yes, I was still working.

21     Q.   You were in an unmarked vehicle?

22     A.   Yes, I was.

23     Q.   Were you working with a partner at that time?

24     A.   Yes, I was.

47

1    Q.   And who was that?

2    A.   My partner, Steve Gawrys.

3    Q.   When you located Mr. Rios, where was he at?

4    A.   He was riding a bike on the street in front of

5    1440 Leavitt.

6    Q.   And did you later learn that that was in fact

7    his address?

8    A.   Yes, I did.

9    Q.   And what happened then, officer, after you

10   located Mr. Rios on the street?

11   A.   After I located Mr. -- after I located Jaime,

12   Jaime and I prior, had prior conversation before so I

13   knew Jaime.  And I asked him to accompany us to Area 5

14   for further investigation of this particular incident.

15   Q.   Did you tell him what incident you were

16   referring to?

17   A.   Yes, I did.

18   Q.   What did Mr. Rios say at this time?

19   A.   He agreed to go to Area 5 with us.

20   Q.   Did you in fact take him to Area 5?

21   A.   Yes, I did.

22   Q.   Was Mr. Rios handcuffed at this time?

23   A.   No, he was not.

24   Q.   Was he free to leave?

**46**

1    A.  He was free to go any time he wanted to.

2    Q.  And you and your partner drove Mr. Rios to

3 Area 5?

4    A.  Yes, we did.

5    Q.  And when you got to Area 5, did you ever do

6 any questioning -- did you personally ever do any

7 questioning of Mr. Rios?

8    A.  No, I did not.

9    Q.  And to your knowledge was that done by the

10 Area 5 detectives?

11    A.  Yes, it was.

12    Q.  Now, Officer Guevara, did you subsequently

13 learn from the Area 5 detectives that in fact Mr. Rios

14 had made a statement with regard to the shooting of

15 Luis Morales?

16    A.  Yes, I did.

17    Q.  And approximately what time did you first

18 learn that in fact Mr. Morales had made a statement

19 concerning that incident?

20    A.  You mean Mr. Rios.

21    Q.  I'm sorry, Mr. Rios?

22    A.  Yes, that was approximately midnight or a

23 little bit after midnight on the same night.

24    Q.  And is that when Mr. Rios was placed under

200 47

1    arrest?

2         A.   Yes, he was.

3         MR. MAREK:  If I could have just a moment.

4              No further questions.

5         THE COURT:  Cross.

6                        CROSS EXAMINATION

7                        BY  MR. CAREY:

8         Q.   Good afternoon.

9              Officer, you said that you do remember what

10   date it was when you first got assigned the case?

11        A.   No, not exactly.  I believe it was a couple of

12   days prior to having contact with Jaime Rios.

13        Q.   Okay.  And the shooting was on the 27th of

14   June, is that right?  To the best of your knowledge?

15        A.   To the best of my knowledge.

16        Q.   Now you said that you spoke to several people,

17   is that correct?

18        A.   That is correct.

19        Q.   Okay.  And several -- you learned in the

20   course of your investigation that several people had

21   identified a Jose Melendez, is that correct?

22        A.   No, I did not.

23        Q.   Okay.  And did you learn that Javier Torrez

24   who was with the victim identified Jose Melendez?

1    A.   No, I did not, not at that time.

2    Q.   And did you learn that Mario Flores who was on

3    the street with his girl friend that night identified

4    Jose Melendez?

5    A.   No, I did not.

6    Q.   Do you know Jose Melendez otherwise known as

7    Macho?

8    A.   I know a Macho, but I don't think that's the

9    Macho that I know.

10   Q.   Did you learn of a witness by the name of

11   Samantha Hudson?

12   A.   Yes, I did.

13   Q.   And her description of the two offenders were

14   two men five feet three to five feet five inches tall,

15   is that right?

16   A.   I don't recall the description, no.

17   Q.   Okay.  But you did talk to her?

18   A.   No, I don't think I talked to her.  I was

19   looking for her and another female which I didn't have

20   any succeed (sic) in finding.

21   Q.   They live right behind the firehouse on

22   Potomac?

23   A.   That is correct.

24   Q.   And do you remember what shifts you were

**40**

1    working then?  I mean you were working the third shift

2    the night you brought Jaime in, is that right?

3         A.  No, I was not, I was working the day watch.  I

4    was working the second shift from 0900 hours in the

5    morning to 1735, which is 5:30 at -- 1730 hours at

6    night.

7         Q.  So you were working overtime that day?

8         A.  Yes, I was.

9         Q.  Okay.  And did you work overtime any other day

10   in your attempts to contact these other witnesses who

11   were listed in the police report?

12        A.  I might have, I'm not sure about it.

13        Q.  And you were unsuccessful in locating any of

14   those witnesses, is that correct?

15        A.  That is correct, sir.

16        Q.  Now you said that -- you testified before that

17   several people gave you information about Mr. Rios, is

18   that correct?

19        A.  There is correct.

20        Q.  Did you put that in your report?

21        A.  I believe that what was put on the report was

22   some informants.

23        Q.  Okay.  Didn't you say that two informants?

24        A.  I believe it said -- said several.

50

1    Q.  Well, do you remember whether it said several

2    or two?

3    A.  No, I don't remember at this point right now.

4    Q.  Is there anything that would refresh your

5    recollection?

6    A.  Possibly the supplementary report.

7    Q.  Okay.  While I look for that -- now, you said

8    that the people you talked to gave you two names, is

9    that right?

10   A.  That is correct.

11   Q.  Okay.  Well now I have -- I am going to show

12   you -- may I approach the witness, Judge?

13   THE COURT:  Sure, why don't you go ahead and mark

14   it.

15   MR. CAREY:  Okay.

16   Q.  I am going to show you what I am marking

17   Defendant's Number 1 for identification.  I am going

18   to ask you to take a look at this, and see if you

19   recognize that.

20   A.  Yes.

21   Q.  Okay.  And what do you recognize that to be?

22   A.  This is the supplementary report.

23   Q.  Okay.  And in your supplementary report, isn't

24   it a fact that you wrote that you got information from

51

1    two separate reliable informants?

2        A.  Yes.

3        Q.  Okay.  And that's what -- you didn't put

4    several in here, did you?

5        A.  No, no several, two.

6        Q.  And do you remember when you got that

7    information?

8        A.  I believe it was a couple of days prior to

9    having contact with Mr. Rios.

10        Q.  Okay.  And do you remember the first time you

11    went to Mr. Rios' house?  Was it the day that you

12    brought him in for questioning?

13        A.  No.  The first time I went to Mr. Rios' house

14    was the day that I received the information.

15        Q.  And how many days before you actually brought

16    him in was that?

17        A.  One or two days prior to that, I would say.

18        Q.  And do you remember what time it was when you

19    went by to see him?

20        A.  It was during the day.

21        Q.  Was his wife home?

22        A.  I went to the place that he was living before.

23    I did not know he was living there at the time.

24        Q.  And what was the other address -- what was the

1    address that you went to?

2         A.   Figures I cannot give you, but I can tell you

3    it was on Wolcott.

4         Q.   Did you put that in your report?

5         A.   No.

6         Q.   Now in fact you put -- the address you put in

7    your report was 1440 North Leavitt, isn't that

8    correct?

9         A.   That is correct.

10        Q.   Now in the course of your investigation, did

11   you learn that Mr. Morales, the person who had been

12   shot, was a Spanish Cobra?

13        A.   I knew that prior to that.

14        Q.   Okay.   When you received the name of Jamie

15   Rios, you knew who they were talking about, is that

16   right?   These informants?

17        A.   I received the name Jaime.

18        Q.   Okay.   Now in the course of your

19   investigation, do you remember going to the school

20   yard on Leavitt Street the afternoon of July 6th?

21        A.   I remember being in the neighborhood numerous

22   times.

23        Q.   Well I am just talking about July 6th, the

24   afternoon of July 6th, the day -- the afternoon before

53

1    Jaime came in for questioning?

2         A.   I remember.   I think I was there, yes.

3         Q.   Do you remember taking photographs of some of

4    the guys in the neighborhood that day?

5         A.   No, I don't think so.   Or I don't remember if

6    I took any photographs that day.

7         Q.   You have taken photographs of people in the

8    neighborhood before?

9         A.   I have taken photographs.   Yes, I have.

10        Q.   And it may have been that day but your

11   recollection is a little fuzzy on that, is that safe

12   to say?

13        A.   I don't recall taking any photographs that

14   particular day, no.

15        Q.   Well, do you remember being in the school yard

16   that afternoon?

17        A.   I have been in that school yard many times.

18        Q.   Do you remember seeing Jaime in the school

19   yard that afternoon?

20        A.   No, I don't remember seeing him that

21   particular afternoon.

22        Q.   Okay.   Had you seen him on other occasions in

23   the school yard?

24        A.   I don't remember I have seen him prior to that

54

PFP000977

A48

1  in the school yard, but I have seen Jaime Rios quite a

2  few times.

3      Q.  Do you remember -- now you were working with a

4  partner on July 6th of last year, is that right?

5      A.  That is correct.

6      Q.  With Detective Gawrys?

7      A.  Yes.

8      Q.  Okay.  Do you remember him taking any

9  photographs the afternoon of July 6th?

10      A.  No, I don't.  I don't remember any of us

11  taking any photos that particular day.

12      Q.  So you had the information about the witnesses

13  and about Jaime for approximately two or three days,

14  and the first person you were able to locate was Jaime

15  Rios, is that right?

16      A.  Yes, Jaime Rios was the first person we

17  located.

18      Q.  And after you located him, you brought in

19  Javier Torrez to look at a lineup, is that right?

20      A.  I don't remember if we brought in Javier

21  Torrez or not.

22      Q.  Okay.  But Javier Torrez was the individual

23  who was standing with the victim when he was shot, is

24  that right?

1      A.   He was one of the guys among another person

2  that was standing there, too.

3      Q.   And he was brought in to look at the lineup

4  that had Jaime Rios, and he said he couldn't identify

5  Jamie Rios?

6      MR. MAREK:   Judge, I will object to this as being

7  beyond the scope of the motion.

8      MR. CAREY:   I think it has to do with the --

9      THE COURT:   I am going to sustain the objection.

10     MR. CAREY:   Q.   Well, you knew that some of the

11 people who were at the scene named other people and

12 not Jamie Rios, is that right?  The people who are

13 listed as witnesses at the time of the shooting, none

14 of those people said it was Jaime Rios, is that fair

15 to say?

16     A.   No, I was -- during the time I was never aware

17 of anybody naming anybody other than the persons that

18 I spoke to naming Jaime Rios and Tino.

19     Q.   Did you pick up Tino?

20     A.   We were looking for him.  We never succeeded

21 in picking him up.

22     Q.   Now you did know that one of the descriptions

23 was for someone between five feet three and five feet

24 five, is that right?

56

1      A.   I believe so.

2      Q.   And Tino is five feet four, isn't that right?

3      MR. MAREK:   Objection.   He said he never contacted

4   him.

5      THE COURT:   I will let him answer the question.

6           You may answer.

7      MR. CAREY:   Q.   You got a daily bulletin on Tino,

8   right, with his photograph and description, and the

9   description was five feet four, a hundred ten pounds?

10     A.   No, I have never gotten --

11     Q.   Okay.   Did you ever learn that this Tino was

12  an individual five feet four inches tall?

13     MR. MAREK:   Objection.

14     THE COURT:   I am going to sustain it.

15     MR. CAREY:   Q.   Now the knowledge that you had

16  when you had went looking for Jaime Rios, was any --

17  was that based on anyone who had been on the scene at

18  the time of the shooting?   In other words did any of

19  the people who were on the scene listed in the reports

20  as witnesses say it was Jamie Rios?

21     A.   Not to me, no.

22     Q.   Okay.   And the only persons that you knew of

23  were your confidential informants and rumors on the

24  street?

                                    ~u( 57

1     A.   Correct.

2     Q.   Did you ever have a conversation with Mr. Luis

3   Juartez?

4     A.   Yes, I did.

5     Q.   And he was one of the people who was on the

6   street at the time of the shooting, is that right?

7     A.   That is correct, yes.

8     Q.   Okay.  And his description was essentially the

9   same as that of Samantha Hudson, the woman you were

10  looking for, is that right?

11    MR. MAREK:  Objection.

12    THE COURT:  You may answer.

13    THE WITNESS:  The conversation that I had with

14  Juartez was I picked him up to view a lineup and that

15  was after Jaime was in custody.

16     MR. CAREY:  Q.  Now had you seen any descriptions

17  that he gave in any of the police reports before you

18  brought Mr. Juartez in?

19    A.   I might have seen it.

20    THE COURT:  Excuse me, hold on.  Now this is after

21  the arrest, right?

22    MR. MAREK:  Yes.

23    THE COURT:  I think respectfully, Mr. Carey,

24  anything that happened after the arrest would not be

1   relevant to the issues as far as -- at least as to

2   these motions.

3      MR. CAREY: Q. Well, the description that he gave

4   before the arrest was that one person had brown hair

5   to his shoulders with a mustache and no beard, is that

6   right?

7      MR. MAREK: Judge, objection. It's not relevant.

8   It has nothing to do with his --

9      THE COURT: Why don't you -- I thought he said he

10   didn't -- wasn't aware of -- well, pose a different

11   question, if you will lay a little bit better

12   foundation, maybe that will clear it up.

13      MR. CAREY: Okay.

14      Q. You said that in the course of your

15   investigation you read some of the police reports, is

16   that right?

17      A. I said prior -- during the course of my

18   investigation, I have knowledge of two persons

19   involved in the incident. That's it.

20      Q. Did you read any of the police reports?

21      A. Some, not all.

22      Q. Okay. Did you read the description given by

23   Mr. Luis Juartez?

24      A. No, I did not.

1    Q.   Okay.  Were you aware that Detective Noone

2  brought Mr. Juartez in to look at photograph books?

3    A.   No, I was not aware of that.

4    Q.   Do you remember which police reports you did

5  read?

6    A.   No, I don't.

7    Q.   Other than Mr. Juartez, after the arrest, did

8  you talk to any of the witnesses listed in the police

9  reports?

10    A.   No I didn't.  I tried to look for them, but I

11  couldn't get in contact with them.

12    MR. CAREY:  I have no further questions at this

13  time, Judge.

14    THE COURT:  State.

15    MR. MAREK:  Nothing further, Judge.

16    THE COURT:  Okay.  We are going to take a break

17  until 1:30.

18                    (Which were all the proceedings

19                     had by this reporter on this

20                     date.)

21

22

23

24

60

IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT

COOK COUNTY, ILLINOIS


I, NOREEN SULLIVAN ERICKSON, an Official Court Reporter for the Circuit Court of Cook County, Cook Judicial Circuit of Illinois, do hereby certify that I reported in shorthand the proceedings had on the hearing in the above-entitled cause; that I thereafter caused the foregoing to be transcribed into typewriting, which I hereby certify to be a true and accurate transcript of the proceedings had before the Honorable THEMIS N. KARNEZIS, Judge of said court.


OFFICIAL COURT REPORTER


61