*Rios v. Guevara, et.al*
22 CV 3973

# EXHIBIT 10

867 C

STATE OF ILLINOIS )
) SS.
COUNTY OF COOK )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT - CRIMINAL DIVISION

JAIME RIOS )
)
Petitioner, ) Indictment No. 89-16525
) Charge: Murder
vs. )
)
PEOPLE OF THE )
STATE OF ILLNOIS )
Respondent. )

REPORT OF PROCEEDINGS on a motion to quash the arrest and suppress the evidence had in the above-entitled cause on Tuesday, the 26th day of February, A.D., 1990, before the Honorable, THEMIS N. KARNEZIS, Judge of said court.

APPEARANCES:

HON. CECIL PARTEE,
State's Attorney of Cook County, by
MR. FRANK MAREK,
MS. ELIZABETH RIVERA
Assistant State's Attorneys,
Appeared for the People-Respondent.

MR. RANDOLPH STONE,
Public Defender of Cook County, by
MR. JACK CAREY,
Assistant Public Defender,
Appeared for the Defendant-Petitioner.

Stephanie J. Windham
Official Court Reporter
Circuit Court of Cook County
County Department - Criminal Division.

Detective Halvorsen.

(Witness duly sworn.)

ERNEST HALVORSEN,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

D I R E C T   E X A M I N A T I O N

BY MR. MAREK:

Q. Detective, would you state your name for the record, please?

A. Ernest Halvorsen.

Q. And detective, by whom are you employed?

A. Chicago Police Department.

Q. And your unit of assignment?

A. Area Five Violent Crimes.

Q. And how long have you been a Chicago police officer?

A. Eighteen years.

Q. And how long have you been a violent crimes detective?

A. Nine years.

Q. Detective, I want to direct your attention to July 6th of 1989 during the evening hours. On that

date and at that time, did you become involved in the investigation into the shooting of Mr. Luis Morales?

A. That's correct.

Q. And what happened at that time which made you become involved in that shooting?

A. I was in the office at Area Five Violent Crimes at 5555 West Grand Avenue. Some officers from Gang Crimes North brought an individual in who they felt might have information about this case. They initially informed Detective Mason about this person they had because he had been working on the case. Detective Mason then asked if I would help him in this investigation.

Q. Had you been working on the investigation up until then?

A. No.

Q. And about what time of day was this when these officers brought this individual into the station?

A. It was about ten o'clock on the evening of the 6th of July.

Q. Is Detective Mason working at the present time?

A. No, he's not. He has had a heart attack and

he has been off at least a month and a half.

Q. Detective, what is the first thing you did after you were asked to assist in the investigation by Detective Mason?

A. I read the reports that had been prepared up to that time and I conferred with the Office of Gang Crimes why they felt this individual had information about the homicide.

Q. What happened then?

A. We attempted to locate the witnesses that had been mentioned in the reports. We couldn't find them. After the witnesses were unavailable, me and Detective Mason sat down with Mr. Rios and conducted an interview.

Q. Now at this time, at the time that you spoke to Mr. Rios, was he handcuffed?

A. No.

Q. Up to this point had he been in handcuffs at all?

A. No.

Q. Where was Mr. Rios when you conducted this interview with him?

A. He was seated in interview room C at our office at Area Five?

A. Was the door to that room locked?

A. It was not.

Q. Was Mr. Rios free to leave?

A. Yes, he was.

Q. Was he under arrest at that time?

A. No, he was not.

Q. Did you, in fact, speak to Mr. Rios concerning investigation into the homicide of Luis Morales at this time?

A. I sat in the room with Detective Mason as Detective Mason informed him of his Miranda rights and asked him a series of questions regarding this crime.

Q. And did Mr. Rios furnish a statement with respect to this homicide?

A. Yes, he did.

Q. And what was the substance of that statement?

A. Basically that he and another individual by the name Victor Matino.

MR. CAREY: I am going to object to the substance of the statement.

THE COURT: This is-- Give me one second, please.

Sustained.

MR. MAREK: Judge if I, just for purposes of the record.

2

THE COURT: Go ahead.

MR. MAREK: This is only offered-- Ordinarily we would not go into the statement at this point. But in view of the Court's statement that more was, more was needed, that is the reason we are offering it.

THE COURT: Let me say this right now. We are proceeding on motion to quash arrest, right?

MR. MAREK: Yes, Judge.

THE COURT: Only.

MR. MAREK: Yes.

MR. CAREY: (Nods head).

THE COURT: You can make an offer if you want, but I don't know that it is necessary. I'd be looking at whether to quash--

At the time he makes the statement, he's under arrest, right?

MR. MAREK: That is not our position, Judge. He's not arrested until after the statement is made.

THE COURT: I'm sorry, strike that. Go ahead, proceed.

BY MR. MAREK:

Q. What was the substance of the statement, detective.

A. Prior to Mr. Rios giving us a statement, we

had absolutely no real evidence that he was an offender in this case. We had information from informant that he may possibly be an offender.

The substance of his statement was he and another individual by the nickname of Tino were in fact involved in this matter. He claimed that Tino did the actual killing, but in the discussion -- conclusion of his statement, he indicates to me he fires his gun two times in the direction of the victim and yells out King love.

Q. After Mr. Rios gave that statement, what happened?

A. At that time I walked out of the room and told him he was under arrest and locked the door.

THE COURT: You told who?

THE WITNESS: Mr. Rios.

BY MR. MAREK:

Q. Is that person in court today?

A. Yes, he is.

Q. Would you identify him for the record?

A. He's sitting at the table wearing a gray shirt with a dark colored jacket.

MR. MAREK: May the record reflect an in-court identification of the defendant, your Honor?

THE COURT: Yes, it may.

MR. MALEK: Nothing further, Judge.

THE COURT: Thank you. Cross?

MR. CAREY: Thank you, Judge.

C R O S S   E X A M I N A T I O N

BY MR. CAREY:

Q. Detective Halvorsen, your first involvement was the evening of the 6th of July; is that correct?

A. That's correct.

Q. About what time did you become involved in the investigation?

A. About ten o'clock at night.

Q. And you said at that time you attempted to contact witnesses; is that correct?

A. That's correct.

Q. Did you do that by phone?

A. I don't recall how they were located.

Q. Do you remember how many witnesses that they tried to contact?

A. Two, I believe.

Q. Do you remember their names?

A. No.

Q. Was one of them Mario Flores?

A. I'd have to review the reports in the case.

MR. CAREY: Judge, may I approach the bench?

THE COURT: Sure.

BY MR. CAREY:

Q. I am going to show you what has been marked at Defendant's No. 2, for identification. This is the June 28th report of Detectives Mason and Brennan, which is a review of the witnesses in that case. You want to take a look at that.

Is your recollection refreshed as to those witnesses?

A. I see in the report there are two people listed at being eyewitnesses.

Q. Well, in fact there were four people; isn't that true?

A. As eyewitness, no.

Q. Well, do you remember, based on your review of the report now, which witnesses you contacted?

A. I remember that on the 17th we did a lineup that I conducted of Mr. Huertes or Mr. Torres.

Q. Mr. Torres is the person that was standing right next to the victim when he was shot?

A. Again I have to review the file because I did not do the initial investigation in this case.

MR. CAREY: Judge, if I can approach the witness again.

THE COURT: Sure.

BY MR. CAREY:

Q. I show you what has been marked as Defendant's No. 2, and direct you to the statement of Javier Torres.

A. From that report doesn't indicate where Mr. Torres is at the time of the shooting. Says he was re-interviewed.

Q. I'm sorry. Then let me show you an earlier report. Now is your recollection refreshed?

A. Yes, it is.

Q. Okay. So Javier Torres was then the person standing right next to the victim when he was shot; is that correct?

A. That's correct.

Q. And he did not identify Jaime Rios at that lineup, did he?

MR. MAREK: Objection.

THE COURT: Sustained.

BY MR. CAREY:

Q. Now, you had, prior to the 6th of July, you had no prior involvement in this investigation; is

3

that right?

A. That's correct.

Q. And so you read all the reports that existed up until then; is that right?

A. That's correct.

Q. And you knew that there was four witnesses, Samantha Hudson, a Luis Huertes, a Mario Flores and a Javier Torres; is that right?

A. From what I read in the report there, there were only two eyewitnesses.

Q. Mario Flores and Samantha Hudson, did you read the statements made by those two witnesses?

A. On the 6th of July, I am sure I did; but I don't remember what they say now.

Q. I am going to ask you to take a look at those statements. Again, Defendant's No. 2, for identification.

Now is your recollection refreshed on that issue?

A. All I can attest to is the fact I have read those reports, but I never myself talked to those persons.

Q. They did give description of two male white Hispanics, about five foot three to fight foot five

inches tall with long hair; isn't that correct.

MR. MAREK: Objection.

THE COURT: I'll let him answer.

BY THE WITNESS:

A. Again, I can only go with what is published in my report. And I never talked to those persons.

BY MR. CAREY:

Q. That is what you read in the report?

A. I have to take a look at it again, to be truthful.

To the first set of reports you presented to me to refresh my memory, nowhere does either one of these people give a physical description; for Samantha Hudson or Mario Flores in either of those statements in either of those reports.

Q. Does that report refresh your recollection as to the description?

A. Which report?

Q. This case report that you just looked at.

A. No, I have no independent recollection of description from back on the 27th of June, 1989.

Q. Did you look at Detective Mason's handwritten notes?

A. Not that I recall.

Q. Were you -- You want to take a look at these handwritten notes?

MR. MAREK: Judge, I will object.

THE COURT: Sustained.

BY MR. CAREY:

Q. So you don't know which report you looked at on the 6th of July?

A. I can't truthfully answer exactly every reports I did or didn't look at.

Q. Is it your practice to look at the case report?

A. That's correct.

Q. But in this case you have no independent recollection as to whether you looked at the case report; is that right?

A. I know I read the case report, but I can't recall what the case report said. I can't remember if I saw the --

Q. that the offenders were five foot three to five foot five inches tall, male white Hispanic?

A. Again, I have to you look at the report.

MR. MAREK: I object. Where are you--

BY MR. CAREY:

Q. First one five three to five seven, the first

one; five feet five; is that right?

A. Counsel, which report are we referring to here?

Q. The case report. You want to take a look at this, again?

A. This is the original reporting officer's report.

Q. Right, did you look at that?

A. Yes, I did.

Q. And did you look at the description on there?

A. I am sure I did.

Q. Did you call the witness that gave this description?

A. I don't know truthfully which witness gave that description.

Q. You remember based on any of your four reviews now of these reports, which witnesses you called?

A. We attempted to get ahold of Hudson-- Not Hudson, Torres and Huertes. Because in the report they are listed as the only persons that can identify the actual offender.

Q. Okay. Now, were you aware based on your review of these reports that two of the witnesses

named a Mocho Malendez as the person who was the shooter?

A. I read that.

Q. Did you speak to Detective Brennan at all?

A. Not that night.

Q. But you did speak to Detective Mason; is that correct?

A. That's correct.

Q. Okay. And did he tell you that he had requested assistance from Gang Crimes North?

A. I knew that Gang Crimes North was actively involved in this investigation.

Q. And that evening, in fact, the Gang Crimes North brought in Mr. Rios; is that right?

A. That's correct.

Q. Do you know how many officers from Gang Crimes North were involved?

A. From what I can recall, Officer Guevara and his partner Steve Gawrys.

Q. Were any other officers involved from Gang Crimes North?

A. Not initially that I can recall.

Q. You testified that before you spoke with Mr. Rios, you gave him his Miranda warnings; is that

correct?

A. Detective Mason gave him his Miranda warnings.

Q. Now, you were aware, were you not, based on your review of these records that detective or Gang Crimes Specialist Danny Noon had brought in Mr. Huertes and Mr. Torres, the same two witnesses that you contacted, to looks at mug books; is that right?

A. Again, I'd have to review this whole file as to entire scope of this investigation.

Q. You did review the file this morning, didn't you?

A. Not every single report, no. All I reviewed was the reports that had my name on them.

MR. MAREK: Judge, I will object. It is not really relevant. We are not saying there was any kind of --

THE COURT: Proceed. Pose another question.

MR. CAREY: I have no further questions of this witness.

THE COURT: State?

MR. MAREK: No redirect. Thank you.

(Witness excused.)