*Rios v. Guevara, et.al*
22 CV 3973

# EXHIBIT 12

```
     STATE OF ILLINOIS  )
                        )     SS.
 2   COUNTY OF C O O K  )

 3            IN THE CIRCUIT COURT OF COOK COUNTY
              COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
     THE PEOPLE OF THE  )
 5   STATE OF ILLINOIS  )
                        )     No. 89-CR-16525
 6      VS              )
                        )     Before JUDGE THEMIS N. KARNEZIS
 7   JAIME RIOS         )
                              Fri., Nov. 30, 1990
 8                            9:30 a.m.

 9        Court convened pursuant to adjournment.

10        Present:

11                HONORABLE CECIL A. PARTEE,
                     State's Attorney of Cook County, by
12                Ms. Kay Hanlon and Mr. Anthony Carballo,
                     Assistant State's Attorneys,
13                   appeared for the People;

14                MR. RANDOLPH N. STONE,
                     Public Defender of Cook County,
15                Ms. Karen Shields and Mr. Jack Carey,
                     Assistant Public Defenders,
16                   appeared for the defendant.

17   - - - - - - - - - - - - - - - - - - - - - - - - -

18        THE CLERK:  People versus Jaime Rios.

19                    (Defendant enters.)

20        THE COURT:  Good morning, Mr. Rios.  You may go

21   over by counsel table.

22                    Please bring in the jury.

23                    (Jury enters.)

24        THE COURT:  You may be seated, ladies and
```

339

1

1   that you had problems getting to court and your child,

2   is that right?

3       A.   Yes.

4       Q.   And at that time I offered to give you a

5   ride?

6       A.   Yes.

7       Q.   Did I say that I want anything for driving

8   you over here?

9       A.   No.  I asked you the date so you can ride me

10  over here.

11      MR. CAREY:  No further questions.

12      MS. HANLON:  I have nothing else, Judge.

13      THE COURT:  Thanks very much, Ma'am.  You may

14  step down, Ms. Mendez.

15                    (Witness excused.)

16      MR. CAREY:  Can we have just a second, Judge?

17      THE COURT:  Sure.

18      MR. CAREY:  Judge, we will call Detective

19  Curley.

20      MS. SHIELDS:  He is in the back.

21      THE COURT:  Detective, please raise your right

22  hand.

23                    (Witness sworn.)

24              DET. RICHARD CURLEY,

    193                     532

1  called as a witness on behalf of the defense, being

2  first duly sworn, was examined and testified as

3  follows:

4                    DIRECT EXAMINATION

5                    By Mr. Carey:

6      THE COURT:  Please be seated.

7  MR. CAREY:

8      Q.   Sir, would you tell us your name?

9      A.   Richard Curley.       .

10     Q.   How are you employed?

11     A.   I am a detective with the Chicago police

12  department.                                            .

13     Q.   Were you working as a detective in the

14  Chicago police department in July of 1990?

15     A.   Yes, sir.

16     Q.   And what was your assignment at that time?

17     A.   July of 1990 I was --

18     Q.   I am sorry.  '89.  I apologize.

19     A.   I was assigned to area 5 violent crimes.

20     Q.   And as part of that assignment were you

21  given what, were you given an assignment to execute a

22  search warrant at 1419 North Wicker Park?

23     A.   Yes, sir.

24     Q.   And was the warrant for a .38 calibre

194                    533

1    revolver?

2         A.   Yes, sir.  I believe it was.

3         Q.   And did you go to that location?

4         A.   Yes, sir.  I did.

5         Q.   And how many police officers were with you?

6         A.   7 officers.

7         Q.   Did one of the officers have a shotgun?

8         A.   No, sir.  Not that I recall.

9         Q.   Not that you recall?

10        A.   No, sir.

11        Q.   Did you arrest Iris Mendez?

12        A.   Yes, sir.  I did.

13        Q.   Did you take her to area 5?

14        A.   Yes, sir.  I did.

15        Q.   Did you question her?

16        A.   Let me correct that.  I did not take her.

17   We had another car transport her.

18        Q.   Did you eventually question her?

19        A.   Yes, sir.  I did.

20        Q.   You were at the scene when the warrant was

21   executed, is that right?

22        A.   Yes, sir.

23        Q.   And you learned at that time that she had a

24   4-month old child?

195                        534
                           XXX

1     MS. HANLON:  Objection.  Relevance.

2     THE COURT:  Overruled at this point.

3     MR. CAREY:

4     A.  I am sorry.  I didn't hear you, sir.

5     THE COURT:  Overruled.  You may answer.  I am

6  sorry.

7     A.  Yeah.

8     MR. CAREY:

9     Q.  You learned at that time that she had a

10  4-month old child, is that right?

11    A.  I don't remember about a child, sir.

12    Q.  Okay.  When you took her into the police

13  station did you bring the child with?

14    A.  No, sir.  I didn't bring no child.

15    Q.  So, she was not -- at that point when she

16  was at area 5 she didn't know where her child was?

17    MS. HANLON:  Objection.

18    THE COURT:  Sustained.

19    MR. CAREY:

20    Q.  Well, did you tell her where her child was?

21    A.  I didn't know she had a child.

22    Q.  You went into her apartment, though, didn't

23  you?

24    A.  I am sorry.  Would you repeat that?

196                          535

1       Q.    You went into her apartment?

2       A.    I went into an apartment.  Yes, sir.

3       Q.    Well, is the apartment where she was

4   living?

5       A.    She said she was.  Yes, sir.

6       Q.    You didn't see a child there?

7       A.    No, sir.

8       Q.    Did you see other people there?

9       A.    Yes, sir.

10      Q.    About how many?

11      A.    I saw --

12      MS. HANLON:  Objection, Judge.  Relevance how

13  many people were in the house.

14      THE COURT:  Overruled.

15      A.    I saw one elderly woman.

16      MR. CAREY:

17      Q.    That was all?

18      A.    At that time.  Yes, sir.

19      Q.    Well, -- One moment, Judge.

20            Now, Detective, you filled out a report in

21  this case, didn't you?

22      A.    Yes, sir.

23      Q.    And you signed the report?

24      A.    Yes, sir.  I believe I did.

197                     536

1     Q.   And I am going to show you what I am going

2  to mark as Defendant's No. 13 for identification.  I

3  am going to ask you to take a look at this and see if

4  you recognize this?

5     A.   (Witness does so.)

6     A.   Yes, sir.

7     Q.   I am going to ask you to look at the top of

8  the second page?

9     A.   (Witness does so.)  Okay.

10     Q.   Now, in the portion of your report that says

11  in custody you made an entry that says Iris Mendez, is

12  that correct?

13     A.   Yes, sir.

14     Q.   And under that you said unemployed, one

15  child, two and a half months old, is that correct?

16     A.   That is what the report says.  Yes, sir.

17    MR. CAREY:  No further questions.

18    THE COURT:  State.

19          CROSS-EXAMINATION

20          By Mr. Carballo:

21     Q.   Officer Curley, on July 9th, 1989 you state

22  you went to the house located at 1419 North on Wicker

23  Park to execute a search warrant?

24     A.   Yes, sir.

537

1    Q.   That was a search warrant for a gun,

2  correct?

3    A.   Yes, sir.

4    Q.   When you arrived at the house could you tell

5  the ladies and gentlemen what you did?

6    A.   We arrived at the scene, myself with the

7  other officers, and we proceeded to walk up the front

8  stairs to the second floor landing.

9         As we were walking up the stairs there was a

10  man and a woman standing there subsequently identified

11  as Benjamin Carrero and Iris Mendez.  And several

12  other people standing on the porchway itself.

13         That is on the porchway on the outside of

14  the building.

15    Q.   When you confronted those people on the

16  porch what happened at that time?

17    A.   At that time we identified Mr. Carrero as

18  the gentleman we were looking for.  We identified

19  oursleves.  We were in plainclothes, but we had a

20  uniform officer with us.

21         At that time he was presented with a copy of

22  a search warrant for his apartment and was told the

23  reason we were there, as was Miss Mendez.

24    Q.   Did you proceed into the building?

199                    538

1      A.   We were directed by Mr. Carrero up to the

2 top floor of the building.

3      Q.   Could you describe the building?

4      A.   Yes, sir.  The building is an older

5 building.  As you walk up to the sidewalk there is an

6 apartment that you would walk ground level right

7 into.

8           Then you would walk up, I would say about 15

9 stairs, which would take you to the one apartment and

10 then approximately another 15 or 20 stairs which would

11 take you to the upstairs apartment.

12     Q.   What happened then once you entered the

13 apartment?

14     A.   We were directed to the top apartment, the

15 top apartment by Mr. Carrero which he stated was his

16 apartment.

17     Q.   When you went up, you say the top floor, did

18 anything happen when you arrived to the top floor?

19     A.   Yes, sir.  Mr. Carrero and Miss Mendez or

20 Melendez, the door was open.  They took us into the

21 apartment.  At which time the officers began to search

22 the apartment.

23     Q.   Now, the top floor is what you officers

24 considered to be the second floor, since the first

200                    539

1   floor, actually what they were considering was the

2   first floor was actually the ground floor, is that

3   correct?

4        A.   No.   The top floor we were taken to I would

5   have considered the 3rd floor considering the basement

6   or, not the basement, but the ground level to be first

7   floor, the next one to be second, the next one to be

8   third.

9        Q.   I see.

10       A.   They evidentally interpreted it to be the

11   second floor.

12       Q.   What happened then?

13       A.   The search was going on and I was standing

14   there watching it close to the doorway.   And out of

15   the corner of my eye I observed Miss Mendez slipping

16   towards the doorway and saw her slip out the door and

17   start to go down the stairs to the second floor

18   apartment.

19       Q.   When you observed this what did you do?

20       A.   I immediately told my Sergeant I was going

21   to follow her.   And I followed her down to what I

22   would have called the second floor apartment.   At that

23   time she entered the apartment which was, the door was

24   open.   And there was an elderly woman standing there.

201                           540

1    Q.   Was this elderly woman subsequently

2    identified?

3    A.   Yes, she was.

4    Q.   Was she identified as Mr. Carrero?

5    A.   Yes, she was.

6    Q.   And when you arrived at the door of Mr.

7    Carrero what happened then?

8    A.   I identified myself to her as a police

9    officer and tried to explain to her why we were there,

10   but she did not speak English.

11          At that time I called for one of the uniform

12   officers that was with me who spoke Spanish, asked him

13   to translate for me our reason for being there.

14   Q.   Was that Officer Avila?

15   A.   Yes, sir.  It was.

16   Q.   What happened then?

17   A.   We explained to her why we were there.  At

18   that time she stated that her son Benjamin and Iris

19   lived in that apartment where she was standing.

20          I asked her, told her we were there looking

21   for a gun that ahd possibly been used in a murder, if

22   it was all right for us to search there.  She stated

23   it was.

24          At that time I had the officer through the

202

541

1  translator explain to her I would like to have her

2  sign a permission to search form.  She understood what

3  he had said and granted us permission and signed the

4  form.

5      Q.  Did you subsequently enter into the

6  apartment then?

7      A.  Yes, we did.

8      Q.  Where was Miss Mendez at this time?

9      A.  She was standing next to Mrs. Carrero.  The

10  3 of us were standing right there in the doorway of

11  the apartment.

12      Q.  Did Miss Mendez have occasion to then go

13  somewhere?

14      A.  Just prior to that my Sergeant and partner

15  came down from upstairs to make sure I was all right.

16  And they also entered into the apartment.

17          As we were standing there Miss Mendez again

18  slipped away and walked to the rear of the apartment.

19  And I saw her go into the room which would have been

20  to my left.  Not knowing what she was doing I

21  proceeded into the room after her.

22      Q.  Okay.

23      A.  Which turned out to be a bedroom.

24      Q.  What did Miss Mendez do then when you saw

203

542

1   her inside the bedroom?

2       A.   She was just standing there.  And I asked

3   her what she was doing.  She said, I came in to look

4   for something.  I didn't see nothing on her.

5            I just says, would you step back out into

6   the front room.  At that time she asked to use the

7   washroom.

8       Q.   What did you say when she asked to use the

9   washroom?

10      A.   I says, fine.  No problem.  It was like 3

11  feet across the hall from where we were standing.

12      Q.   Did she, in fact, go into the washroom?

13      A.   Yes, she did.

14      Q.   When she went into the washroom did she

15  close the door?

16      A.   Yes, she did.

17      Q.   What did you do at that time?

18      A.   I listened at the bathroom door because from

19  past experience I know that guns and narcotics and

20  everything are hidden in the bathroom quite often in

21  the tank of a toilet bowl.

22      MR. CAREY:  Judge, I am going to object to the

23  history of crime in Chicago.

24      THE COURT:  I don't know if that is a proper

204                     543

1   characterization, but we will sustain.

2       MR. CAREY:  Thank you.

3       MR. CARBALLO:

4       Q.   You were listening at the bathroom door?

5       A.   Yes, I was.

6       Q.   What observations did you make?

7       A.   Well, I didn't hear the sound of any urine

8   going into the toilet.  I did not hear a toilet bowl

9   cover being moved, but I could hear what sounded like

10  the window in the bathroom.  It is an older building.

11  And I heard the window being raised in the bathroom.

12      Q.   Immediately after that what did you do?

13      A.   I told my partner, John, I am going outside

14  to watch the outside.  I immediately ran out the door,

15  ran to the side of the building.  As I --

16      Q.   Approximately how far was that that you

17  ran?

18      A.   50 feet.

19      Q.   When you ran outside the building did you

20  make any observations?

21      A.   Yes, sir.  I did.

22      Q.   What did you observe?

23      A.   As I entered the gangway I observed Miss

24  Mendez leaning out the window and throw a gun out the

205                        544

1     window into the gangway.

2        Q.    You state that Miss Mendez was subsequently

3     placed under arrest?

4        A.    Yes, she was.

5        Q.    Did you ever or did any other officer in

6     your presence ever threaten Miss Mendez?

7        A.    No, sir.

8        Q.    Did any, specifically did you or any other

9     officer threaten to take Miss Mendez' child away from

10    her?

11        A.    No, sir.

12        Q.    What kind of gun did you recover?

13        A.    It was a .32 calibre automatic or .32

14    calibre. I don't recall the name of the weapon.

15        Q.    Where was that recovered from?

16        A.    It was in the gangway along side the

17    building right next to the window from where, the

18    apartment where Miss Mendez had thrown it out.

19        Q.    After you executed the search warrant of at

20    this location did you have occasion to go back to area

21    5, to your police office?

22        A.    Yes, sir. We did.

23        Q.    And directing your attention to

24    approximately 11:30 p.m. did you have an interview

206                    

1    with Benjamin Carrero at area 5?

2        A.   Yes, sir.

3        MR. CAREY:   Objection.   Beyond the scope.

4        THE COURT:   Overruled.

5        MR. CARBALLO:

6        Q.   Who was present during the interview?

7        A.   Myself, Detective Mason and Mr. Carrero.

8        Q.   What did Benjamin Carrero say to you, if

9    anything, during this conversation?

10       MR. CAREY:   Objection, Judge.

11       THE COURT:   Question was what did he say to him

12   at that time?   Basis for the objection?

13       MR. CAREY:   Hearsay and beyond the scope.

14       THE COURT:   What do you have to say to that,

15   State?   Forget the scope objection.   We won't count

16   that one.   But what about the other one?

17       MR. CARBALLO:   Mr. Carrero testified and this is

18   just bringing out the circumstances of what he said to

19   the officer as impeachment to Mr. Carrero.

20       THE COURT:   Sidebar.

21                         (The following proceedings

22                         were had out of the

23                         presence and hearing of

24                         the jury.)

207                          546

1      THE COURT:  What is going to come out?  Is this

2  the young gentleman who we have impeached once, now we

3  are going to impeach here again?

4      MR. CARBALLO:  Yes, Judge.

5      THE COURT:  Okay.  I forgot about that.

6      MS. SHIELDS:  Judge, before we leave here since

7  we are going to have this problem, we have Diana who

8  is here with the baby.  She tried to get a

9  babysitter.  It was impossible.

10      Now, the problem is when she is out of the

11  sight, it is a one and half year old, when she is out

12  of sight of the kid it starts screaming.

13      THE COURT:  Where is she at?

14      MS. SHIELDS:  She is in the back with the baby.

15  When she testifies, he is in a stroller, he is very

16  good when she is near.

17      MR. CARBALLO:  Judge.

18      MS. HANLON:  No.  No way.

19      MS. SHIELDS:  I don't know what to do with him.

20      THE COURT:  I will tell what we can do.  We can

21  tell one of the deputies to take a walk with the

22  baby.

23      MS. SHIELDS:  Okay.

24      THE COURT:  Sure.

208                    647

1          (End sidebar.)

2     THE COURT:  Objection overruled.

3     MR. CARBALLO:

4     Q.   Detective Curley, do you recall what

5  Benjamin Carrero said during this conversation?

6     A.   Yes, sir.  I do.

7     Q.   What did he say?

8     A.   After he had been advised of his rights by

9  Detective Mason he stated that on the late evening

10  hours of the 27th or early morning hours of the --

11     MR. CAREY:  Judge, I am going to object.  This is

12  not impeachment.  It is not in the State's case.

13     THE COURT:  Just give me one second, please?

14          Overruled.

15     MR. CARBALLO:

16     Q.   You can answer the question, Detective.

17     A.   On the late evening hours of the 27th or

18  early morning hours of the 28th of June 1989 he stated

19  he had been sitting on the front stairs of his

20  building, at which time a friend of his by the name of

21  Jaime Rios rode up on a bicycle.

22          Mr. Rios then took a gun from his waistband

23  and handed it to Mr. Carrero and says, I just shot

24  somebody.  I want to you hold this gun for me.

209                    548

1    MR. CAREY:  Judge, I am going to object.

2    A.    And I will return --

3    THE COURT:  Overruled.

4    A.    I will return later to get the gun.  Mr.

5  Carrero said he subsequently took the gun into the

6  apartment and hid it in the closet in the bedroom.

7          At that time I left the --

8    THE COURT:  Excuse me.  Pose another question.

9    MR. CARBALLO:  I have no further questions.

10  Thanks a lot, Detective.

11    THE COURT:  Redirect.

12              REDIRECT EXAMINATION

13              By Mr. Carey:

14    Q.    Iris Mendez was arrested for obstruction of

15  justice, is that right?

16    A.    Yes, sir.

17    Q.    That was for throwing the gun out of the

18  window, is that right?

19    A.    No, sir.

20    Q.    You arrested her for that, was there a

21  warrant for her arrest --

22    MS. HANLON:  Objection.

23    MR. CARBALLO:  Objection.

24    MR. CAREY:

210

1     Q.    (Continuing) -- For obstruction of justice?

2     THE COURT:  I think I am going to sustain the

3   objection.

4     MR. CAREY:

5     Q.   Did you have a warrant of any type for her?

6     MR. CARBALLO:  Objection.

7     MS. HANLON:  Objection, Judge.  It is

8   irrelevant.

9     THE COURT:  Overruled.

10    A.   No, sir.

11    MR. CAREY:

12    Q.   After she threw the gun out the the window

13  you arrested her for obstruction of justice?

14    MS. HANLON:  Objection.  Asked and answered.

15    THE COURT:  You may answer.

16    A.   It was not for just throwing the gun out the

17  window.  No, sir.

18    MR. CAREY:

19    Q.   There were no other charges brought against

20  her, is that right?

21    A.   No, sir.

22    MR. CAREY:  No further questions.

23    THE COURT:  State.

24    MR. CARBALLO:  I have no further questions.

211                    550

1   Thank you.

2      THE COURT:  Thanks, Detective.

3              (Witness excused.)

4      THE COURT:  Call your next.

5      MR. CAREY:  Just one minute, Judge.

6        Judge, can we have a sidebar for a second?

7              (The following proceedings

8              were had out of the

9              presence and hearing of

10              the jury.)

11      MR. CAREY:  The gang book has not arrived yet.  I

12  can put one witness on.

13      MR. CARBALLO:  Judge, I don't know.  They were

14  going to bring the gang book down.  And they are

15  sending a beat car down with the gang book.

16      THE COURT:  They were doing that at 1 o'clock.

17      MR. CARBALLO:  Yes.

18      MR. CAREY:  Noon told me that.

19      THE COURT:  Long ride from Wood Street.

20      MS. HANLON:  They had to find a beat car to drive

21  there to pick it up to drive it here.

22      THE COURT:  See, I don't care.  I don't care if

23  we are here to midnight.  Doesn't make any different

24  to me.