**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JAIME RIOS


      Plaintiff,


        vs.                      Case No. 1:22-cv-03973

REYNALDO GUEVARA
MICHAEL MASON
JOANN HALVORSEN AS
SPECIAL REPRESENTATIVE FOR
ERNEST HALVORSEN, DECEASED
CITY OF CHICAGO


      Defendants.                JURY TRIAL DEMANDED


          Defendants.

**DESIGNATIONS DR. YUKSEL KONACKI  TRIAL TESTIMONY**


      Plaintiff, Jaime Rios, by and through his attorneys, Stephen L. Richards and Joshua S.M.

Richards submits the attached  designations  for the trial testimony of  Dr. Yuksel Konacki.

Plaintiff's designations are marked in orange.

      Respectfully Submitted,


                    JAIME RIOS

                    By and through

                    /s/ Stephen L. Richards

                    By: Stephen L. Richards Attorney
for Plaintiff

53 West Jackson
Suite 756
Chicago, IL 60604
773-817-6927
sricha5461@aol.com Attorney No:
6191946

```
 1                    RECROSS EXAMINATION
 2                    BY MR. CAREY:
 3       Q.    You have been in the system for a while,
 4   haven't you, Javier?
 5       MS. HANLON: Objection, Judge.
 6       THE WITNESS: Yes.
 7       MR. CAREY:
 8       Q.    You know how it goes, don't you.
 9       A.    Yes.
10       MS. HANLON: I'll withdraw the objection he's been
11   in the system.
12       THE COURT: Thank you.  Okay.  Anything else?
13       MS. HANLON: Nothing else, Judge.
14       THE COURT: Thank you.  You may step down, sir.
15   Call your next.
16       MR. CARBALLO: At this time we'd call Dr. Konakci.
17                    YUKSEL KONAKCI,
18   called as a witness on behalf of the People of the
19   State of Illinois, having been first duly sworn, was
20   examined and testified as follows:
21                    DIRECT EXAMINATION
22                    BY MR. CARBALLO:
23       Q.    Doctor, could you please introduce yourself
24   to the ladies and gentlemen of the jury and please
```

124
AWW

247



```
 1   spell your first name and your last name for the court
 2   reporter?
 3        A.    My first name is Yuksel, Y-u-k-s-e-l.  Last
 4   name is Konakci, K-o-n-a-k-c-i.
 5        Q.    Doctor, what is your profession?
 6        A.    I'm a physician.
 7        Q.    And are you licensed -- in what jurisdictions
 8   are you licensed to practice medicine?
 9        A.    I'll, Missouri, Texas and Georgia.
10        Q.    Okay.  How long have you been listened to
11   practice medicine in the State of Illinois?
12        A.    Since 1972.
13        Q.    Doctor, could you please tell the ladies and
14   gentlemen of the jury what your educational background
15   is?
16        A.    I graduated --
17        MR. CAREY: We'll stipulate to his qualifications
18   if the State wants.
19        THE COURT: You want to accept the stipulation to
20   his qualifications?  It's up to the State.  If you
21   want to accept it, that's fine.
22        MR. CARBALLO: No, Judge.  Few more questions.
23        THE COURT: Fine.  Proceed.
24        MR. CARBALLO:
```

125
AWW

248



1     Q.    Would you please briefly explain to the
2  ladies and gentlemen what your educational background
3  is?
4     A.    I graduated from the University of Ankara,
5  A-n-k-a-r-a in Turkey, 1960.   Then I was in the Turkey
6  army as a doctor for two years.   Then I train and work
7  in pediatrics in Turkey for four and a half years.
8  Then I came to the United States.   And I had residency
9  training in pathology for total of 6 years.   Then, in
10 July, 1974 I start working in the Cook County Corners
11 Office which later on became Cook County Medical
12 Examiner's Office.
13    Q.    Are you a member of any professional
14 organizations?
15    A.    Yes, sir.
16    Q.    What organizations?
17    A.    American Academy Forensic Scientists and
18 Chicago Pathological Society.
19    Q.    And do you specialize today in any particular
20 field of medicine?
21    A.    Yes, sir.
22    Q.    What field is that?
23    A.    In anatomical and clinical pathology and in
24 forensic pathology.

126
AWW

1      Q.   Could you please explain to the ladies and

2  gentlemen of the jury what the field of forensic

3  pathology is?

4      A.   It is a branch of general pathology which is

5  related with unnatural cause of death.

6      Q.   Do you hold any certifications from the

7  American Board of Pathology?

8      A.   Yes, sir.

9      Q.   What certifications are those?

10     A.   I am certified in the anatomical pathology,

11  clinical pathology and forensic pathology.

12     Q.   How did you earn those certifications?

13     A.   First I completed required training.  Then I

14  pass the examination given by the American Board of

15  Pathology.

16     Q.   Doctor, for how many years have you been

17  engaged in the actual practice of pathology?

18     A.   Since I finish my residency in 1974.

19     Q.   Doctor, where are you currently employed?

20     A.   By the Cook County Medical Examiner's Office.

21     Q.   What is your position there?

22     A.   Assistant Medical Examiner.

23     Q.   How long have you been an Assistant Medical

24  Examiner at the Cook County Medical Examiner's Office?

127
AWW

250

1      A.    When I first started it was Cook County

2   Corner's Office in 1974.   Then in 1976, medical

3   examiner's system started.   And since that time I'm an

4   Assistant Medical Examiner.

5      Q.    What is an autopsy?

6      A.    External inspection and internal examination

7   of the body to determine the cause of death.

8      Q.    In your career as a forensic pathologist,

9   approximately how many autopsies have you performed?

10     A.    Several thousand.

11     Q.    Have you testified previously in court as an

12  expert in the field of forensic pathology?

13     A.    Yes, sir.

14     Q.    How many times?

15     A.    Several hundred times.

16  MR. CARBALLO: Your Honor, we would tender the

17  doctor as an expert in the field of forensic

18  pathology.

19  THE COURT: Good.   Thank you.

20  MR. CAREY: No objection.

21  MR. CARBALLO:

22     Q.    Doctor, I want to call your attention back to

23  the date of June 29, 1989.   Were you working at the

24  Cook County Medical Examiner's Office?

128
AWW

1      A.   Yes, sir.

2      THE COURT: So things are clear, is there any

3   objection to the Doctor if need be referring to his

4   report?

5      MR. CAREY: No, Judge.

6      THE COURT: Very good.  Thank you.

7      MR. CARBALLO:

8      Q.   Doctor, I want to show you a photograph which

9   has previously been marked as People's Exhibit Number

10  15 for identification.  Do you recognize that

11  photograph?

12     A.   Yes, sir.

13     Q.   And is that a photograph of the victim in

14  this case, Luis Morales?

15     A.   Yes, sir.

16     Q.   Did you have occasion on that date to perform

17  an autopsy on the person of the victim, Luis Morales?

18     A.   Yes, sir.

19     Q.   Does that photograph truly and accurately

20  portray Luis Morales on the date that you performed

21  the autopsy on June 29th?

22     A.   Yes, sir.

23     Q.   Does the Cook County Medical Examiner's

24  Office assign a particular case number to each

129
AWW

252

1    autopsy, each case?

2        A.    Yes.

3        Q.    What was the case number assigned to this

4    case?

5        A.    It is 553 of June, 1989.

6        Q.    Doctor, did you perform an autopsy -- Strike

7    that.

8              Did your autopsy of Luis Morales include

9    both and internal and external examination?

10       A.    Yes, sir.

11       Q.    Could you please explain to the ladies and

12   gentlemen what your external examination of Luis

13   Morales revealed?

14       A.    I observed multiple gunshot wounds.  And also

15   multiple abrasions and several small lacerations.

16       Q.    Specifically, as to the gunshot wounds, where

17   were these -- where were these wounds located?

18       A.    That was bullet entrance wound on the left

19   anterior upper aspect of the forehead around this

20   area.

21       Q.    Indicating, for the record, the doctor is

22   pointing to the upper left of his forehead?

23       A.    Yes.  This enter into cranial cavity, travel

24   from front to rear.  Lacerated the brain and logged in

130
AWW

1    the posterior aspect of the brain inside the

2    cerebellum.

3        Q.  Where was the next wound that you located?

4        A.  Also, there was bullet entrance wound on the

5    left elbow area, posterior inner aspect around here.

6    And that was exit wound of the same bullet on the left

7    forearm and on the interior aspect of this bullet

8    traveled through and through inside the left elbow and

9    left forearm and made an exit.

10       Q.  Where was the next bullet wound that you

11   observed?

12       A.  On the left side of the abdomen, upper aspect

13   in this area.  And that was --

14       MR. CARBALLO: Indicating for the record, the lower

15   left abdomen.

16       A.  About the navel around this area there was an

17   entrance wound.  This bullet entered through the

18   abdomen.  Lacerated the small intestine in the stomach

19   and lodge in the muscular tissue in the back of the

20   abdomen.

21       Q.  Where was the next bullet wound you located

22   on the person of Luis Morales?

23       A.  On the anterior aspect of the right thigh

24   anterior lower aspect around here, there was an

131
AWW

254

1    entrance wound of the same bullet on the lower inner

2    aspect of the right thigh.  This bullet traveled

3    through and through inside the right thigh and made an

4    exit.

5         Q.   Did you observe any other bullet wounds?

6         A.   There's fifth and last bullet wound.  It was

7    on the upper aspect of the right arm on the rear, this

8    area.  And there was bullet exit wound of the same

9    bullet and -- in the inner aspect of the right arm.

10   This bullet traveled through and through and made an

11   exit.

12        Q.   So, your examination, Doctor, revealed that

13   the victim was shot a total of 5 times?

14        A.   Yes.

15        Q.   And of the 5 bullet wounds that were a

16   inflicted here, 2 of those bullets had logged and 3

17   others were through and through wounds?

18        A.   That's correct.

19        Q.   Could you please explain to the ladies and

20   gentlemen what the procedure you conducted in your

21   internal examination of Luis Morales?

22        A.   I opened the chest and abdomen and the neck

23   areas with "Y" shaped incision and with the help of

24   autopsy technician.  Also head was opened by incision

132
AWW

1   starting behind one ear exit top of the head and

2   behind the other ear.  And opening the scalp and with

3   the -- with electrical saw, opening the skull exposing

4   the brain and examining the brain.

5        Q.   What did your examination of the brain

6   reveal?

7        A.   It revealed marked lacerations due to the

8   bullet wound on the left side of the forehead.

9   And I recovered a bullet inside the -- inside the

10  brain in the left side.  In the cerebellum.

11       Q.   What other findings did you make in your

12  internal examination?

13       A.   Also, in the abdomen, I saw lacerations of

14  the small intestine and laceration of the stomach.

15  And laceration of the muscle tissue in the rear of the

16  abdomen.  And I recovered bullet in the rear of the

17  abdomen and in the muscle tissue.

18       Q.   Did you find any other significant -- any

19  other significant finding in your internal examination

20  of Luis Morales?

21       A.   No, sir.

22       Q.   Doctor, I'm now going to show you what's been

23  previously marked as People's Exhibit Number 16 for

24  identification.  Do you recognize what's depicted in

133
AWW

256

1  that photograph?

2      A.    This depicts the forehead area, mainly left

3  side.  And it shows bullet entrance wound on that left

4  upper aspect of the forehead.  It also shows several

5  abrasions and on one of the abrasions shows 2

6  lacerations.

7      Q.    Okay.  Now, I'm going to show you what's been

8  previously marked People's Exhibit Number 17 for

9  identification.  Do you recognize that photograph?

10     A.    Yes, sir.  This depicts the brain showing

11 hemorrhages and lacerations.

12     Q.    Now I'll show you what's been previously

13 marked People's Exhibit Number 18 for identification.

14 Do you recognize that photograph?

15     A.    This shows the elbow area.  And shows the --

16 shows bullet wound.

17     Q.    This is the bullet wound to the elbow?

18     A.    Yes.

19     Q.    Now, I'll show you People's Exhibit Number 19

20 for identification.  Do you recognize that photograph?

21     A.    This shows left forearm area and it shows

22 bullet exit wound on the left forearm on the front of

23 the left forearm.

24     Q.    Okay.  Thank you.  People's Exhibit Number 20

134
AWW

1   for identification, do you recognize that photograph?

2      A.   This shows the left side of the abdomen and

3   bullet entrance wound in this area.

4      Q.   Okay.  People's Exhibit Number 21 for

5   identification, do you recognize that photograph?

6      A.   This shows stomach which was lacerated.  This

7   shows laceration on the stomach.

8      Q.   Thank you.  People Exhibit Number 22 for

9   identification, do you recognize what's depicted in

10   that photograph?

11      A.   This depicts the intestines with the

12   lacerations.  They were lacerated in 2 sides.  With

13   hemorrhage also.

14      Q.   People's Exhibit Number 23 for

15   identification, do you recognize what's depicted in

16   that photograph?

17      A.   This depicts right thigh area and bullet

18   entrance and exit wounds.

19      Q.   Okay.  Which is the -- in the photograph,

20   which is the entrance wound and which is the exit

21   wound?

22      A.   This the entrance wound, this the exit wound.

23      Q.   So, the entrance wound is to the outside of

24   the --

135
AWW

258

1     A.    Yes.   Interior aspect and exit wound on the

2   inner aspect.

3     Q.    All right.   People's Exhibit Number 24 for

4   identification, do you recognize that?

5     A.    This shows rear of the right arm and shows

6   the bullet entrance and exit wound.   This the entrance

7   wound, this the exit wound.

8     Q.    The top is the entrance wound the darker --

9   darker colored is the entrance wound?

10    A.    Yes.

11    Q.    And the lighter colored being the exit wound?

12    A.    Yes, sir.

13    Q.    Finally, I'm going to show you People's

14  Exhibit Number 25 for identification, do you recognize

15  what's depicted in that photograph?

16    A.    This shows the bullets which I recovered.

17  One inside the brain and one inside muscle tissue in

18  the abdomen.

19    Q.    Which one is the bullet that you recovered

20  from the brain and which is the bullet from the

21  abdomen?

22    A.    This disfigured bullet was recovered and the

23  top bullet was muscle tissue in the abdomen back left

24  side.

136
AWW

1       Q.    Okay.    Were you able to determine how the
2   bullet that was recovered from the brain was in a
3   deformed condition?
4       A.    Yes.
5       Q.    Why was that?
6       A.    Apparently due to impact on the skull.
7       Q.    Okay.    I'm going to show you what's been
8   previously marked as People's Exhibit Number 26 for
9   identification, do you recognize that exhibit?
10      A.    Yes, sir.    This is bullet envelope in which I
11  put the 2 bullets which I recovered.    It carries case
12  number 553 of June, 1989.    Name of the victim, Mr.
13  Luis Morales.    And date recovered.    My name.
14      Q.    Could you examine the contents of the bullet
15  envelope.
16      A.    There are 2 bullets.    Yellow jacketed.
17      Q.    Are those the bullets you recovered from the
18  victim, Luis Morales?
19      A.    These are similar to the ones I found.
20      Q.    One of those bullets is a deformed bullet, is
21  that correct?
22      A.    That's correct.
23      Q.    Where did you recover that bullet from?
24      A.    In the head inside the brain, sir.

137
AWW                                   260

1      Q.   Okay.   And the deformed bullet is recovered
2   from the abdomen area you indicated?
3      A.   Yes, sir.
4      Q.   Are those bullets in substantially the same
5   condition today as they were when you recovered them?
6      A.   Yes.   They are similar to the one I
7   recovered, sir.
8      Q.   And you prepared the envelope that these
9   bullets are contained in?
10      A.   Yes.
11      Q.   Doctor, based on your findings in this case,
12   based on your training, your background, your
13   experience, in performing autopsies, do you have an
14   opinion within a reasonable degree of medical
15   certainty as to the cause of death of Luis Morales?
16      A.   Yes, sir.
17      Q.   What was -- what is your opinion?
18      A.   It is multiple gunshot wounds.
19      Q.   Doctor, did you make any other observations
20   of injuries to the victim, Luis Morales?
21      A.   I observed several abrasions on the face
22   area.   And also, several small lacerations.
23      Q.   Now, the lacerations, abrasions to the face
24   area, where were those located?

138
AWW

2⍥1

1    A.    There was abrasion on the left side of the
2    forehead around here.    And on this abrasion there were
3    2 small lacerations.    And also, under the left eye,
4    around this area there was an abrasion.    Lateral left
5    eye in this area there was linear laceration.    On the
6    left lower aspect of the forehead there was a small
7    abrasion.    On the nose, on the top there was an
8    abrasion.    On the tip of the nose there was
9    rectangular shape abrasion.    On the left cheek there
10   was an area of abrasions exhibiting linear patterns.
11   And on the upper lip and left side there was also an
12   area of abrasions with linear pile and radical
13   patterns.    Also lateral to the left mouth area in this
14   area there was an abrasion in this area.
15       Q.    Now, these abrasions -- could these abrasions
16   have been caused from falling after being shot,
17   falling on the victim's side of the face?
18       A.    Yes, sir.
19       Q.    Finally, Doctor, I want to show you what's
20   been previously marked as People's Exhibit Number 27
21   for identification.    Do you recognize that document?
22       A.    Yes.
23       Q.    What is that document?
24       A.    This is the report of post mortem examination

139
AWW                          262




1    in the case of Mr. Luis Morales, case number 553 of

2    June, 1989.

3         Q.   Is this a certified copy of your report?

4         A.   Yes, sir.

5         MR. CARBALLO: I have no further questions.  Thank

6    you, Doctor.

7         THE COURT:  Cross.

8                        CROSS EXAMINATION

9                        BY MS. SHIELDS:

10        Q.   Doctor, you indicated that you removed 2

11   bullets from the body of Mr. Morales?

12        A.   Yes.

13        Q.   And both of those bullets were a small size?

14        A.   Yes.

15        Q.   Do you know what caliber they were?

16        A.   I don't know.

17        Q.   You don't know?

18        A.   No.

19        Q.   You have had experience in removing bullets

20   in the past?

21        A.   Yes.

22        Q.   And you do know that as bullets go, this was

23   a very small size?

24        A.   Yes.

140
AWW

263

1     Q.   Okay.  And they were about the same size?

2     A.   Yes.

3     Q.   You -- when Mr. Morales came to you there was

4 a bag of his clothing, is that correct?

5     A.   Yes.

6     Q.   And you observed the clothing?

7     A.   Yes.

8     Q.   You have already stated that you observed the

9 body?

10    A.   Actually, I received them later on in a bag.

11    Q.   And you indicated just that you looked at

12 that clothing?

13    A.   Yes.

14    Q.   And it is your opinion that the shooting

15 occurred from quite a distance, isn't that correct?

16    A.   There was no evidence of tattooing called

17 stippling around the entrance wound.

18    Q.   Would you explain to the ladies and gentlemen

19 of the jury what stippling is?

20    A.   It is kind of black multiple discoloration of

21 the skin around the entrance wound due to embedding of

22 the unburnt or partially burned powder particles

23 coming out of the gun.

24    Q.   So, it's a discoloration around the wound?

141
AWW

264

1     A.   Yes.

2     Q.   And that occurs on either the body or the

3 clothing when the shooting is at a very close range,

4 is that right?

5     A.   That's correct.

6     Q.   And you saw no evidence of stippling either

7 on the body or the clothing?

8     A.   No.

9     Q.   That clothing and those two bullets that you

10 removed, you gave to the police department?

11     A.   Yes.

12     Q.   Now, when you did the autopsy, you noted a

13 number of tattoos on the body, is that correct?

14     A.   Yes.

15     Q.   And on the right arm there was a pitchfork?

16     A.   Yes.

17     Q.   On the left upper chest there was the name

18 "Luis"?

19     A.   Yes.

20     Q.   On the left arm a picture of a heart?

21     A.   Yes.

22     Q.   And on the right hand another pitchfork?

23     A.   Yes.

24     Q.   When you did this autopsy, you also removed

142
AWW

265

1   some blood from the body and had it analyzed, is that

2   correct?

3       A.   That's correct.

4       Q.   And that analysis showed there were no

5   opiates in his body, isn't that true?

6       A.   That's correct.

7       Q.   No alcohol?

8       A.   No alcohol.

9       Q.   And no cocaine?

10      A.   There was no cocaine, however, there was

11  metabolic of cocaine, Benzoequaline.

12      Q.   Would you explain to the ladies and gentlemen

13  what a metabolize is?

14      A.   Degradation product of a substance in the

15  body.

16      Q.   It is what cocaine breaks down to after it's

17  been in the body for a while, is that correct?

18      A.   That's correct.

19      Q.   That means that Mr. Morales had ingested

20  cocaine but not recently at the time of his death?

21      A.   Not recent.

22      Q.   Not very recently?

23      A.   Yes.

24      Q.   Because this is what cocaine broke down into?

143
AWW

266

1    A.    Yes.

2    Q.    Is that correct?

3    A.    Yes.

4    Q.    You indicated that there were a number of

5    abrasions to the face?

6    A.    Yes.

7    Q.    In all, there were 9 abrasions to the face?

8    A.    Yes.  I think about 9.

9    Q.    And Doctor, I'm going to show you what's been

10   marked People's Exhibit Number 15 and ask you if you

11   can see all of those abrasions in this photograph?

12   A.    Yes.

13   Q.    Okay.  You can see all 9 abrasions?

14   A.    Yes.  They are visible.

15   Q.    Okay.  Those abrasions would not be

16   consistent with or -- let me rephrase that, Doctor.

17            Those abrasions would not be caused by

18   the bullets, would they?

19   A.    No.

20   Q.    Would those abrasions be consistent with a

21   struggle or fight?

22   A.    They are due to blunt trauma.

23   Q.    As a result of blunt trauma?

24   A.    Yes.

144
AWW

267



1        Q.    And would they be consistent with taking the

2   persons head and pushing it down on the sidewalk or

3   against a car?

4        A.    Yes.

5        Q.    Doctor, you indicated stippling occurs at a

6   close range.  Do you know what is the range at which

7   stippling usually occurs on the skin or clothing?

8        A.    It depends on the weapon or ammunition used.

9        Q.    In a small caliber it probably wouldn't occur

10  further than what, 2, 3 feet?

11       A.    Yes.  Usually.

12       MS. SHIELDS: Nothing further.

13       THE COURT:    Redirect.

14       MR. CARBALLO: Just a few questions.

15                     REDIRECT EXAMINATION

16                     BY MR. CARBALLO:

17       Q.    Doctor, the abrasions that you have observed

18  on the victim's face, on the side of his face you

19  indicated were from blunt trauma?

20       A.    Yes.

21       Q.    And that falling flat on your face from --

22  after being shot in this manner, that would be

23  consistent with the blunt trauma you observed on his

24  face, is that correct?

145
AWW

266

1      A.    That's correct.

2      Q.    You were talking about stippling.  You

3  indicated stippling depends upon the type of gun?

4      A.    Yes.  And the type of ammunition used.

5      Q.    So, if it's a smaller gun or 25 caliber gun,

6  there might not be any stippling observed, is that

7  correct?

8      A.    Well, if they were fired close, usually we

9  see stippling.

10      Q.    Okay.  And when you say observation of

11  stippling based upon a -- on the size of the gun and

12  caliber of the gun, approximately how many feet away,

13  it vary varies based upon the type of gun, is that

14  right?

15      A.    Yes.  Depends upon the gun and the ammunition

16  used.

17      Q.    Based on your experience in the thousands of

18  autopsies you have conducted, autopsies related to

19  bullet injuries, it's not uncommon for someone to be

20  shot at close distance not have stippling, is that

21  correct.

22      MR. CAREY: Judge, I'll object to leading at this

23  point.

24      THE COURT: Sustained.  Rephrase.

146
AWW                               269

```
 1      MR. CARBALLO:
 2      Q.   Doctor, based on the number of autopsies you
 3  have performed, specifically autopsies relating to
 4  bullet wounds, is it uncommon for someone to not have
 5  stippling on their -- in the area of the wounds or the
 6  body and have been shot at close range?
 7      MR. CAREY: Same objection, Judge.
 8      THE COURT: Overruled.
 9      THE WITNESS: Now this depends on how close he was
10  shot and depends on the gun and the ammunition used.
11      MR. CARBALLO: Thank you.
12                  RECROSS EXAMINATION
13                  BY MS. SHIELDS:
14      Q.   Doctor, at close range, though, there will be
15  stippling, is that correct?
16      A.   Yes.
17      MS. SHIELDS: Thank you.
18      THE COURT: State?
19      MR. CARBALLO: Nothing further, Judge.
20      THE COURT: Thanks, Doctor.  You may step down.
21                      (witness excused)
22      THE COURT: Call your next, State.
23                  RAYMONDO GUEVARA,
24  called as a witness on behalf of the People of the
```

147
AWW

1   State of Illinois, having been first duly sworn, was

2   examined and testified as follows:

3                   DIRECT EXAMINATION

4                   BY MS. HANLON:

5     Q.   Sir, could you please state your full name,

6   spelling your last name for the court reporter?

7     A.   Detective Raymondo Guevara, G-u-e-v-a-r-a.

8   Star number is 16345. And I'm assigned to the Area 4

9   Violent Crimes Unit, Chicago Police Department.

10     Q.   How long have you been a Chicago Police

11   Officer?

12     A.   Eighteen years.

13     Q.   Eighteen years?

14     A.   Correct.

15     Q.   How long have you been a detective?

16     A.   I have been a detective for the past four

17   months.

18     Q.   I'd like to call your attention to June and

19   July of 1989. How were you assigned within the

20   Chicago Police Department, at that time?

21     A.   I was an investigator for the Gang Crime

22   Unit.

23     Q.   Can you explain to the ladies and gentlemen

24   what an investigator in the Gang Crime Unit does?

148
AWW



1     A.   An investigator in the Gang Crime Unit, they

2  deal with the gang activities in the area.  Area 5,

3  Area 6.  Usually 2 areas.  And what we deal with is

4  with any crime that's committed by gang, gang members.

5     Q.   Detective, what areas were you specifically

6  assigned to during that time?

7     A.   I was assigned to Area 5 and Area 6.  Both

8  areas.

9     Q.   Can you tell the ladies and gentlemen of the

10  jury the general boundaries to Area 5 and Area 6?

11     A.   Area 5 is covered from the river all the way

12  up to O'Hare Field.  And from I would say Roosevelt on

13  the west end to Evanston.

14     Q.   And what about Area 6?

15     A.   Area 6 covers east of the river up to

16  Evanston and down to, I would say, about Lake Street.

17  Somewhere around there.

18     Q.   Now, Detective, I want to call your attention

19  specifically to July 3rd, of 1989, did you become

20  involved in an investigation of the shooting death of

21  Mr. Luis Morales?

22     A.   Yes, I did.

23     Q.   And how is it that you became involved in

24  that particular investigation?

149
AWW

272

1    A.    I got involved in that investigation when I

2    came to work early that day, found out that the person

3    by the name of Luis Morales was shot and killed at

4    Potomac.  And being familiarized with the area I

5    started talking to people on the streets.

6         Q.    During the course of your investigation and

7    speaking with people on the streets, did you come to

8    learn the name of the shooter?

9         A.    Yes, I did.

10        Q.    What name were you given?

11        A.    I was given by informant the name of Jamie

12   and Tino as being involved in the shooting of Luis

13   Morales.  Jamie being the shooter.

14        MR. CAREY: I'll object to the hearsay.

15        THE COURT: Sustained.

16        MS. HANLON:

17        Q.    Detective, how is it that you gained

18   information on that particular day?

19        A.    The names were given to me.  Jamie and Tino.

20        Q.    How were those names given to you?

21        A.    Through reliable informants.

22        Q.    Can you explain to the ladies and gentlemen

23   what a reliable informant is?

24        A.    Reliable informant is a person I had been

150
AWW
                                    273

1  dealing that had given me prior information and people

2  being involved in shooting and that lead to

3  convictions.

4      Q.   After receiving that information, Detective,

5  did you recognize either of those two people?

6      A.   Yes, I did.

7      Q.   Which person did you recognize?

8      A.   I recognized the person of Jamie.

9      Q.   And who did you recognize that person to be

10 or who did you know him as?

11     A.   As Jamie Rios.

12     Q.   And how is it that you knew Jamie Rios?

13     A.   Well, I have -- I know Jamie Rios as being a

14 member of the Latin Kings.  And I know his mother and

15 I have had prior contacts with him.

16     Q.   After learning his name, Detective, did you,

17 yourself, do anything?

18     A.   Yes, I did.

19     Q.   Tell the ladies and gentlemen what you did.

20     A.   For several days I was looking for him.

21     Q.   That search began on the 3rd of July, 1989?

22     A.   Yes, it did.

23     Q.   Were you able to find him on that particular

24 date?

151
AWW

## <u>CERTIFICATE OF SERVICE</u>

Stephen L. Richards certifies that on  January 28, 2026   he served the
**DESIGNATIONS DR. YUKSEL KONACKI   TRIAL TESTIMONY**

through the ECF filing system.

*/s/ Stephen L. Richards*
By: Stephen L. Richards
Attorney for Plaintiff
53 W. Jackson, Suite 756
Chicago, IL 60604
(773) 817-6927
sricha5461@aol.com
Attorney No: 6191946