```
STATE OF ILLINOIS    )
                     ) SS.
COUNTY OF COOK       )

        IN THE CIRCUIT COURT OF COOK COUNTY
        COUNTY DEPARTMENT - CRIMINAL DIVISION

JAIME RIOS                )
                          )
        Petitioner,       ) Indictment No. 89-16525
                          ) Charge: Murder
        vs.               )
                          )
PEOPLE OF THE             )
STATE OF ILLNOIS          )
        Respondent.       )
```

REPORT OF PROCEEDINGS on a motion to quash the arrest and suppress the evidence had in the above-entitled cause on Tuesday, the 26th day of February, A.D., 1990, before the Honorable, THEMIS N. KARNEZIS, Judge of said court.

APPEARANCES:

    HON. CECIL PARTEE,
      State's Attorney of Cook County, by
    MR. FRANK MAREK,
    MS. ELIZABETH RIVERA
      Assistant State's Attorneys,
        Appeared for the People-Respondent.

    MR. RANDOLPH STONE,
      Public Defender of Cook County, by
    MR. JACK CAREY,
      Assistant Public Defender,
        Appeared for the Defendant-Petitioner.

Stephanie J. Windham
Official Court Reporter
Circuit Court of Cook County
County Department - Criminal Division.

C1

1   Detective Halvorsen.

2                                       (Witness duly sworn.)

3

4                       ERNEST HALVORSEN,

5   called as a witness herein, having been first duly

6   sworn, was examined and testified as follows:

7

8                    D I R E C T   E X A M I N A T I O N

9                          BY MR. MAREK:

10      Q.   Detective, would you state your name for the
11 record, please?

12      A.   Ernest Halvorsen.

13      Q.   And detective, by whom are you employed?

14      A.   Chicago Police Department.

15      Q.   And your unit of assignment?

16      A.   Area Five Violent Crimes.

17      Q.   And how long have you been a Chicago police
18 officer?

19      A.   Eighteen years.

20      Q.   And how long have you been a violent crimes
21 detective?

22      A.   Nine years.

23      Q.   Detective, I want to direct your attention to
24 July 6th of 1989 during the evening hours. On that

C4

1  date and at that time, did you become involved in the
2  investigation into the shooting of Mr. Luis Morales?
3      A.  That's correct.
4      Q.  And what happened at that time which made you
5  become involved in that shooting?
6      A.  I was in the office at Area Five Violent
7  Crimes at 5555 West Grand Avenue. Some officers from
8  Gang Crimes North brought an individual in who they
9  felt might have information about this case. They
10 initially informed Detective Mason about this person
11 they had because he had been working on the case.
12 Detective Mason then asked if I would help him in this
13 investigation.
14     Q.  Had you been working on the investigation up
15 until then?
16     A.  No.
17     Q.  And about what time of day was this when
18 these officers brought this individual into the
19 station?
20     A.  It was about ten o'clock on the evening of
21 the 6th of July.
22     Q.  Is Detective Mason working at the present
23 time?
24     A.  No, he's not. He has had a heart attack and

C5

1     he has been off at least a month and a half.

2     Q.   Detective, what is the first thing you did
3     after you were asked to assist in the investigation by
4     Detective Mason?

5     A.   I read the reports that had been prepared up
6     to that time and I conferred with the Office of Gang
7     Crimes why they felt this individual had information
8     about the homicide.

9     Q.   What happened then?

10    A.   We attempted to locate the witnesses that had
11    been mentioned in the reports. We couldn't find them.
12    After the witnesses were unavailable, me and Detective
13    Mason sat down with Mr. Rios and conducted an
14    interview.

15    Q.   Now at this time, at the time that you spoke
16    to Mr. Rios, was he handcuffed?

17    A.   No.

18    Q.   Up to this point had he been in handcuffs at
19    all?

20    A.   No.

21    Q.   Where was Mr. Rios when you conducted this
22    interview with him?

23    A.   He was seated in interview room C at our
24    office at Area Five?

1       A.      Was the door to that room locked?

2       A.      It was not.

3       Q.      Was Mr. Rios free to leave?

4       A.      Yes, he was.

5       Q.      Was he under arrest at that time?

6       A.      No, he was not.

7       Q.      Did you, in fact, speak to Mr. Rios
8  concerning investigation into the homicide of
9  Luis Morales at this time?

10      A.      I sat in the room with Detective Mason as
11 Detective Mason informed him of his Miranda rights and
12 asked him a series of questions regarding this crime.

13      Q.      And did Mr. Rios furnish a statement with
14 respect to this homicide?

15      A.      Yes, he did.

16      Q.      And what was the substance of that statement?

17      A.      Basically that he and another individual by
18 the name Victor Matino.

19      MR. CAREY: I am going to object to the substance
20 of the statement.

21      THE COURT: This is-- Give me one second, please.

22              Sustained.

23      MR. MAREK: Judge if I, just for purposes of the
24 record.

1  THE COURT: Go ahead.

2  MR. MAREK: This is only offered-- Ordinarily we
3  would not go into the statement at this point. But in
4  view of the Court's statement that more was, more was
5  needed, that is the reason we are offering it.

6  THE COURT: Let me say this right now. We are
7  proceeding on motion to quash arrest, right?

8  MR. MAREK: Yes, Judge.

9  THE COURT: Only.

10  MR. MAREK: Yes.

11  MR. CAREY: (Nods head).

12  THE COURT: You can make an offer if you want, but
13  I don't know that it is necessary. I'd be looking at
14  whether to quash--

15       At the time he makes the statement, he's
16  under arrest, right?

17  MR. MAREK: That is not our position, Judge. He's
18  not arrested until after the statement is made.

19  THE COURT: I'm sorry, strike that. Go ahead,
20  proceed.

21  BY MR. MAREK:

22  Q. What was the substance of the statement,
23  detective.

24  A. Prior to Mr. Rios giving us a statement, we

C8

1  had absolutely no real evidence that he was an
2  offender in this case. We had information from
3  informant that he may possibly be an offender.
4       The substance of his statement was he and
5  another individual by the nickname of Tino were in
6  fact involved in this matter. He claimed that Tino
7  did the actual killing, but in the discussion --
8  conclusion of his statement, he indicates to me he
9  fires his gun two times in the direction of the victim
10 and yells out King love.
11    Q. After Mr. Rios gave that statement, what
12 happened?
13    A. At that time I walked out of the room and
14 told him he was under arrest and locked the door.
15    THE COURT: You told who?
16    THE WITNESS: Mr. Rios.
17 BY MR. MAREK:
18    Q. Is that person in court today?
19    A. Yes, he is.
20    Q. Would you identify him for the record?
21    A. He's sitting at the table wearing a gray
22 shirt with a dark colored jacket.
23    MR. MAREK: May the record reflect an in-court
24 identification of the defendant, your Honor?

C9

PFP001009    86

```
 1      THE COURT:  Yes, it may.
 2      MR. MALEK:  Nothing further, Judge.
 3      THE COURT:  Thank you.  Cross?
 4      MR. CAREY:  Thank you, Judge.
 5
 6              C R O S S   E X A M I N A T I O N
 7                     BY MR. CAREY:
 8      Q.   Detective Halvorsen, your first involvement
 9 was the evening of the 6th of July; is that correct?
10      A.   That's correct.
11      Q.   About what time did you become involved in
12 the investigation?
13      A.   About ten o'clock at night.
14      Q.   And you said at that time you attempted to
15 contact witnesses; is that correct?
16      A.   That's correct.
17      Q.   Did you do that by phone?
18      A.   I don't recall how they were located.
19      Q.   Do you remember how many witnesses that they
20 tried to contact?
21      A.   Two, I believe.
22      Q.   Do you remember their names?
23      A.   No.
24      Q.   Was one of them Mario Flores?
```

1      A.   I'd have to review the reports in the case.

2      MR. CAREY:   Judge, may I approach the bench?

3      THE COURT:   Sure.

4  BY MR. CAREY:

5      Q.   I am going to show you what has been marked
6  at Defendant's No. 2, for identification.  This is the
7  June 28th report of Detectives Mason and Brennan,
8  which is a review of the witnesses in that case.  You
9  want to take a look at that.

10         Is your recollection refreshed as to those
11 witnesses?

12     A.   I see in the report there are two people
13 listed at being eyewitnesses.

14     Q.   Well, in fact there were four people; isn't
15 that true?

16     A.   As eyewitness, no.

17     Q.   Well, do you remember, based on your review
18 of the report now, which witnesses you contacted?

19     A.   I remember that on the 17th we did a lineup
20 that I conducted of Mr. Huertes or Mr. Torres.

21     Q.   Mr. Torres is the person that was standing
22 right next to the victim when he was shot?

23     A.   Again I have to review the file because I did
24 not do the initial investigation in this case.

C11

1       MR. CAREY: Judge, if I can approach the witness
2   again.
3       THE COURT: Sure.
4   BY MR. CAREY:
5       Q. I show you what has been marked as
6   Defendant's No. 2, and direct you to the statement of
7   Javier Torres.
8       A. From that report doesn't indicate where
9   Mr. Torres is at the time of the shooting. Says he
10  was re-interviewed.
11      Q. I'm sorry. Then let me show you an earlier
12  report. Now is your recollection refreshed?
13      A. Yes, it is.
14      Q. Okay. So Javier Torres was then the person
15  standing right next to the victim when he was shot; is
16  that correct?
17      A. That's correct.
18      Q. And he did not identify Jaime Rios at that
19  lineup, did he?
20      MR. MAREK: Objection.
21      THE COURT: Sustained.
22  BY MR. CAREY:
23      Q. Now, you had, prior to the 6th of July, you
24  had no prior involvement in this investigation; is

C12

PFP001012  89

1   that right?
2     A. That's correct.
3     Q. And so you read all the reports that existed
4   up until then; is that right?
5     A. That's correct.
6     Q. And you knew that there was four witnesses,
7   Samantha Hudson, a Luis Huertes, a Mario Flores and a
8   Javier Torres; is that right?
9     A. From what I read in the report there, there
10   were only two eyewitnesses.
11     Q. Mario Flores and Samantha Hudson, did you
12   read the statements made by those two witnesses?
13     A. On the 6th of July, I am sure I did; but I
14   don't remember what they say now.
15     Q. I am going to ask you to take a look at those
16   statements. Again, Defendant's No. 2, for
17   identification.
18     Now is your recollection refreshed on that
19   issue?
20     A. All I can attest to is the fact I have read
21   those reports, but I never myself talked to those
22   persons.
23     Q. They did give description of two male white
24   Hispanics, about five foot three to fight foot five

C13

1  inches tall with long hair; isn't that correct.

2      MR. MAREK: Objection.

3      THE COURT: I'll let him answer.

4  BY THE WITNESS:

5      A. Again, I can only go with what is published

6  in my report. And I never talked to those persons.

7  BY MR. CAREY:

8      Q. That is what you read in the report?

9      A. I have to take a look at it again, to be

10 truthful.

11     To the first set of reports you presented to

12 me to refresh my memory, nowhere does either one of

13 these people give a physical description; for

14 Samantha Hudson or Mario Flores in either of those

15 statements in either of those reports.

16     Q. Does that report refresh your recollection as

17 to the description?

18     A. Which report?

19     Q. This case report that you just looked at.

20     A. No, I have no independent recollection of

21 description from back on the 27th of June, 1989.

22     Q. Did you look at Detective Mason's handwritten

23 notes?

24     A. Not that I recall.

C14

91

```
 1        Q.   Were you --  You want to take a look at these
 2   handwritten notes?
 3        MR. MAREK:  Judge, I will object.
 4        THE COURT:  Sustained.
 5   BY MR. CAREY:
 6        Q.   So you don't know which report you looked at
 7   on the 6th of July?
 8        A.   I can't truthfully answer exactly every
 9   reports I did or didn't look at.
10        Q.   Is it your practice to look at the case
11   report?
12        A.   That's correct.
13        Q.   But in this case you have no independent
14   recollection as to whether you looked at the case
15   report; is that right?
16        A.   I know I read the case report, but I can't
17   recall what the case report said.  I can't remember if
18   I saw the --
19        Q.   that the offenders were five foot three to
20   five foot five inches tall, male white Hispanic?
21        A.   Again, I have to you look at the report.
22        MR. MAREK:  I object.  Where are you--
23   BY MR. CAREY:
24        Q.   First one five three to five seven, the first
```

C15

```
 1   one; five feet five; is that right?
 2       A.   Counsel, which report are we referring to
 3   here?
 4       Q.   The case report.  You want to take a look at
 5   this, again?
 6       A.   This is the original reporting officer's
 7   report.
 8       Q.   Right, did you look at that?
 9       A.   Yes, I did.
10       Q.   And did you look at the description on there?
11       A.   I am sure I did.
12       Q.   Did you call the witness that gave this
13   description?
14       A.   I don't know truthfully which witness gave
15   that description.
16       Q.   You remember based on any of your four
17   reviews now of these reports, which witnesses you
18   called?
19       A.   We attempted to get ahold of Hudson-- Not
20   Hudson, Torres and Huertes.  Because in the report
21   they are listed as the only persons that can identify
22   the actual offender.
23       Q.   Okay.  Now, were you aware based on your
24   review of these reports that two of the witnesses
```

C16

1  named a Mocho Malendez as the person who was the
2  shooter?
3      A.  I read that.
4      Q.  Did you speak to Detective Brennan at all?
5      A.  Not that night.
6      Q.  But you did speak to Detective Mason; is that
7  correct?
8      A.  That's correct.
9      Q.  Okay.  And did he tell you that he had
10 requested assistance from Gang Crimes North?
11     A.  I knew that Gang Crimes North was actively
12 involved in this investigation.
13     Q.  And that evening, in fact, the Gang Crimes
14 North brought in Mr. Rios; is that right?
15     A.  That's correct.
16     Q.  Do you know how many officers from Gang
17 Crimes North were involved?
18     A.  From what I can recall, Officer Guevara and
19 his partner Steve Gawrys.
20     Q.  Were any other officers involved from Gang
21 Crimes North?
22     A.  Not initially that I can recall.
23     Q.  You testified that before you spoke with
24 Mr. Rios, you gave him his Miranda warnings; is that

C17

94
PFP001017

1   correct?

2   A.   Detective Mason gave him his Miranda

3   warnings.

4   Q.   Now, you were aware, were you not, based on

5   your review of these records that detective or Gang

6   Crimes Specialist Danny Noon had brought in

7   Mr. Huertes and Mr. Torres, the same two witnesses

8   that you contacted, to looks at mug books; is that

9   right?

10  A.   Again, I'd have to review this whole file as

11  to entire scope of this investigation.

12  Q.   You did review the file this morning, didn't

13  you?

14  A.   Not every single report, no.  All I reviewed

15  was the reports that had my name on them.

16  MR. MAREK:  Judge, I will object.  It is not

17  really relevant.  We are not saying there was any kind

18  of --

19  THE COURT:  Proceed.  Pose another question.

20  MR. CAREY:  I have no further questions of this

21  witness.

22  THE COURT:  State?

23  MR. MAREK:  No redirect.  Thank you.

24                    (Witness excused.)