**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAIME RIOS, | ) | |
| | ) | **Case No. 22 CV 3973** |
| Plaintiff, | ) | |
| | ) | **Judge Jeremy Daniel** |
| vs. | ) | |
| | ) | |
| REYNALDO GUEVARA, MICHAEL MASON, | ) | |
| ERNEST HALVORSEN, CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' MOTION FOR SANCTIONS

NOW COME Defendants, by and through their undersigned counsel, and moving for sanctions under Fed. R. Civ. P. 37 and the inherent powers of this Court, state as follows:

### INTRODUCTION

Trial in the above-captioned matter concluded its first week on Friday, February 6, 2026. During this first week, several incidents occurred which raise serious questions about the integrity of the claims in this lawsuit as well as Plaintiff's counsel's conduct in both discovery and during the related underlying post-conviction proceedings. These include: (1) the revelation that Plaintiff failed to provide highly relevant factual evidence during discovery on the identity of confidential informants that directly relates to Plaintiff's claims and contradicts Plaintiff's legal and factual theories in this case; and (2) that, during the underlying post-conviction proceedings, Plaintiff's counsel directed an affiant, Cristino Garcia, to supply materially false information in his post-conviction affidavit in order to falsely establish that this evidence was new evidence that could not have been discovered during the time of the trial. These incidents individually and in concert are egregious and merit significant sanctions, up to and including, dismissal of all claims.

## <u>ARGUMENT</u>

I.    **Plaintiff Failed To Provide Highly Relevant Information During Discovery Regarding The Existence Of Confidential Informants That Is Central To Plaintiff's Claims And Theories.**

As this Court is well-aware, the allegations regarding Defendant Guevara (and apparently Defendant Mason as well) fabricating the existence of and information provided by Confidential Informants has permeated this trial and this case since its inception. To this end, Plaintiff's counsel repeatedly made these claims in his opening statement regarding the evidence in this case:

- The number of informants always vary. To this day, none of the informants, not one of them has been identified. Not by Mason. Not by Guevara. Not by anybody. All Guevara could tell anyone about it was that he had gone out on the street maybe on July 2nd, maybe on July 6th -- his accounts vary slightly -- and talked to two confidential informants or several informants and some non-confidential informants. **And, again, we don't know who these people were.** Tr. at 16:4-13 (emphasis added).

- Whether they gave reliable information will be an issue. **But you will never hear their names in this court, because nobody identified them.** Tr. at 16:20-22.

- Guevara at that point, despite saying at other times that he had found out about Rios or his involvement from informants earlier, doesn't take Rios into custody. He takes Little Mike into custody. And Rios asks him, well, what do you want with me? And Guevara says, I'm not bothering with you. I want Little Mike. And, then, he takes Little Mike away. What happened between him and Little Mike? Who knows. According to other evidence, supposedly he takes Little Mike or maybe a different confidential informant -- but anyway, two confidential informants -- to Area 5 to talk to detectives or investigators there. Tr. 17:8-18.

- Now, you will hear Mason testify in this case because Mason will claim that he spoke to these informants. But Mason will not be able to tell you who they were, what their names were, what their ages were, what their race was. He will say he doesn't remember anything about them. Nothing. Even though according -- he drafted search warrants because he said they told him where the guns could be found in the case. We'll see in a moment where that led or didn't lead. **But, again, we don't know who these people are.** Tr. 17:19-18:2.

Plaintiff's counsel then finally concluded:

**It's our claim that the confidential informants and/or their information was fabricated by Guevara. They may have never existed or at least they didn't give the information that it was claimed they gave.** Tr. at 32:19-23 (emphasis added).

Despite there being no claim against Defendant Mason on this issue, Plaintiff's counsel extensively questioned Defendant Mason regarding the identities of these confidential informants and Defendant Mason's failure to recall any identifying details of them. Tr. at 971:1-972:21. After Defendant Mason denied recalling any such information, Plaintiff went a step further and blurted out the names of two individuals "Michael or Miguel Martinez" or "Hector Quintano or Quintero" in front of the jury and asked Defendant Mason whether these individuals were the Confidential Informants at issue. Tr. at 972:22-973:10. Plaintiff then referenced a document "obtained from the state's attorney" immediately thereafter and began attempting to read from this document in front of the jury, with the clear implication that this document contained these names. *Id.*

On Defendant Guevara's counsel's objection, this Court called a sidebar to address these matters. Plaintiff's counsel first attempted to suggest that he was attempting to refresh Defendant Mason's recollection, which this Court quickly rejected given the fact that Defendant Mason had not indicated that his recollection needed to be refreshed and because Plaintiff's counsel was simply stating information out loud to the jury which is obviously not the proper protocol for refreshing recollection. Tr. at 973:16-974:10.

More importantly, this Court inquired of Plaintiff's counsel what his good faith basis was for asking Defendant Mason about the substance of this document and (correctly) seemed concerned that Plaintiff's counsel was attempting to "impute information from this document to this witness" because "that would be improper." Tr. at 974:14-16. The following colloquy then occurred:

MR. S. RICHARDS: The only good-faith basis I have is it was a document in the state's attorney's file. It has the name Jaime Rios on it with his IR number. It has the name Miguel Martinez. I do have –

THE COURT: Okay. You are about a foot away from the microphone. My concern is that you are too far away such that the jury is hearing the sidebar. So, please –

3

MR. S. RICHARDS: Okay. So, with respect to the document, one name given at trial for the informants was Little Mike. I do have a good-faith basis for believing that Little Mike is Miguel Martinez. I was hoping that –

THE COURT: What good-faith basis do you have that this witness knows the names of the informants?

MR. S. RICHARDS: I -- I just find it absolutely incredible that he has no knowledge whatsoever even of race and age or anything else. So, I'm trying to get him to say that, yes, indeed, he does know their identities. But if you think that I have no good-faith basis, then I will withdraw.

THE COURT: I can only think or evaluate the good-faith basis that you put forth. And that is why I'm asking you what good-faith basis. Now, what you've told me is that you find it incredible that he does not know. I am not aware of that being a reason to establish a good-faith basis. It doesn't matter what you think. What evidence can you point me to that suggests there is a good-faith basis to ask these questions of this witness when this witness has said he does not recall these names, there's no indication that he created these documents, or any other tidbit of evidence from which I see a good-faith basis? So, can you point me to something?

MR. S. RICHARDS: **I have stated the good-faith basis I have, that Little Mike is identified as -- in other documents or other evidence as the name of an informant. <u>I have been told that Little Mike's real name was Miguel Martinez.</u>** That's –

THE COURT: Now tie it to this witness to create a good-faith basis for asking this witness these questions.

MR. S. RICHARDS: All I can say is that the only good-faith basis would be that the name's recorded in the state's attorney's file and that this witness has said that he has absolutely no knowledge of these things. And I was hoping that -- to show that he does have knowledge and that these are the names.

THE COURT: Okay. Yes?

MR. SCAHILL: I'm sorry, Judge, did I hear counsel just say that he knows the name of Little Mike? Because this is the first I'm hearing of this and tying this up to whoever this person is. I'm not sure where that comes from.

MR. POLICK: Me either, your Honor.

THE COURT: None of that matters in the sense that I am simply trying to -- I'm not trying to litigate the case at sidebar. That's not my purpose here. My purpose is to understand whether there is a basis for the questions in light of the objection. I have not heard a basis -- a good-faith reason to ask this witness whether he knows these names when it does not appear in any of his reports, there is no witness testimony that you're pointing to saying that, well, so-and-so said they told this witness that. This witness has not indicated that he ever knew the names of these individuals that he met with. He simply does not recall. And, so, there's no indication that this witness contributed to what's in the state's attorney's documents. I think we all know

4

that police reports get put on to the prosecutors and the prosecutors continue to conduct their investigation. So, there are any number of intervening events that can explain why these names are in the state's attorney's files but may not be known by this witness, and I have not been shown any reason why any further examination on this topic concerning the state's attorney's files should be asked of this witness because Mr. Richards has not presented a good-faith basis. Tr. at 973:16-977:13.

At the conclusion of the trial day, Defendant Guevara's counsel raised the issue again because of the obvious relevance of this issue to the matters being discussed at trial. Tr. at 1000:14-22. Defendant Guevara's counsel expressed concern that Plaintiff's counsel stated that he was "told" that at least one of the Confidential Informants (who Plaintiff's counsel himself had told the jury in opening statements were made up entirely) was the person he mentioned in his question of Defendant Mason, specifically, Miguel (or Michael) Martinez. *Id.* Plaintiff's counsel advised that he did not "believe that was requested of us in discovery" but that he "can provide counsel with what information I have." *Id.* at 1000:24-1001:1. Plaintiff then reiterated once again that he was still pursuing a claim that Defendant Guevara had either made up the informants entirely or made up the information they provided. *Id.* at 1001:17-21.

Defendant Guevara's counsel then reiterated that Plaintiff had never linked the informant referenced as Lil' Mike to this specific Miguel Martinez person and, indeed, had said the contrary (specifically, that Plaintiff did not know the actual name of Lil' Mike but that his name was "Michael-something"). Tr. at 1001:17-1002:12. Defendant Guevara's counsel then added that the problem was that Defendant Guevara was defending himself against a claim of the making up of the existence of informants for which Plaintiff appears to have had information were not "made up" at all given that Plaintiff's counsel had been "told" that one of the informants was Miguel Martinez. *Id.* This Court indicated that the parties should confer on the matter. *Id.* at 1002:13-23.

The following day, Defendants' counsel reached out to Plaintiff's counsel requesting the information that was offered in court. *See* Ex. A. Defendants' counsel received no response from

Plaintiff's counsel by the time of filing. Nonetheless, the specific source of the information is immaterial at this point insofar as Plaintiff's counsel admitted on the record having been provided factual information identifying the Confidential Informant as Miguel Martinez.

First, Plaintiff is incorrect that this information was not requested in discovery and otherwise required to be disclosed to Defendants. In discovery, the following Interrogatory was propounded on Plaintiff:

> 2. Besides those referenced in police records, have you (or anyone acting on your behalf) had any conversations or do you know of any statements, with or by any person at any time with regard to the matters referenced in your complaint? If the answer to this interrogatory is in the affirmative, state the following:
>
> > a. The date or dates of such conversations and/or statements;
> >
> > b. The place of such conversations and/or statements;
> >
> > c. All persons present for such conversations and/or statements;
> >
> > d. The matters and things stated by the person in the conversations and/or statements;
> >
> > e. Whether the conversations was oral, written and/or recorded; and,
> >
> > f. Who has possession of the statement if written and/or recorded. *See* Ex. B at ¶ 2.

Plaintiff (correctly) interpreted this statement as seeking statements made not only to Plaintiff himself but also any statements obtained by Plaintiff's attorneys in their capacity as Plaintiff's representative because two such statements were included therein (a statement obtained by Plaintiff's attorney's investigator of Luis Huertas and a statement obtained by Plaintiff's brother Ricardo of Benjamin Carrero). *Id.* However, no statements of anyone attributing the identity of the Confidential Informant to be Miguel Martinez was ever supplied in this answer. *Id.* Plaintiff also supplied no privilege log objecting to the disclosure of any such information nor would any such claim of privilege had been meritorious. *See E.E.O.C. v. Jewel Food Stores, Inc.*, 231 F.R.D. 343, 346–49 (N.D.Ill. 2005)(party must disclose statements of fact made to witnesses interviewed by counsel in response to interrogatory requesting "the identities of persons who have information or who have made

statements relating to the claims or defenses in the case, the substance of the information they possess, and the statements they have made"); *see also Gingerich v. City of Elkhart Probation Dept.*, 273 F.R.D. 532, 540 (N.D.Ind. 2011)(same)*Clark Equipment Co. v. Lift Parts Mfg. Co., Inc.*, 1985 WL 2917, at *7 (N.D.Ill. 1985)("The attorney work product privilege does not preclude the disclosure of facts or the identity of witnesses or documents simply because their existence was discovered by counsel."). Simply stated, if Plaintiff's counsel was "told" information that identified Lil' Mike as Miguel Martinez, Plaintiff was required to disclose this information in response to this interrogatory. He did not do so.

Second, insofar as Plaintiff clearly intended to use the identities of these Confidential Informants persons as evidence in this case, Plaintiff was required to list them in his Fed. R. Civ. P. 26(a) disclosures (along with a description of their role in the case)(i.e. Miguel Martinez is "Lil' Mike" and has information about his interactions with Defendants Guevara and Mason). Indeed, Plaintiff specifically elicited their names in front of the jury and asked Defendant Mason outright whether they were the Confidential Informants at issue. Under Fed. R. Civ. P. 26(a), "a party must, without awaiting a discovery request, provide to the other parties…the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A). Rule 26(a) mandates the disclosure of any persons with discoverable *information* who the plaintiff "may use" to support his claims *even if the plaintiff does not intend to actually call this person as a witness at trial. See* Fed. R. Civ. P. 26, Committee Comments (2000)("The scope of the disclosure obligation is narrowed to cover only *information* that the disclosing party may use to support its position… The disclosure obligation applies to "claims and defenses," and therefore requires a party to disclose information it may use to support its denial or rebuttal of the allegations, claim, or defense of another party."). This Rule applies precisely to the situation here

where a party knows a witness has discoverable information and intends to use this information at trial indirectly without actually calling them as a witness.

Under Fed. R. Civ. P. 37(c), the consequences for failing to disclose discoverable information in response to an interrogatory or failure to disclose information under Rule 26(a) are stated as follows:

If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)—(vi). *See* Fed. R. Civ. P. 37(c)(1).

The remedies set forth in Rule 37(b)(2)(A)(i)-(iv) include:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party. Fed. R. Civ. P. 37(b)(2)(A).

Moreover, a district court has inherent power to sanction a party who "has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Secrease*, 800 F.3d 397; *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 793 (7th Cir. 2009); *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 48-49 (1991); *Greviskes v. Univ. Research Ass'n*, 417 F.3d 752, 758-59 (7th Cir. 2005). A district court may dismiss a case or otherwise sanction a party for discovery violations, lying in a deposition or other egregious conduct in litigation under Federal Rule of Civil Procedure 37 or under the inherent

authority of the district court. *See Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016)("We have construed the sanctioning power conveyed by Rule 37 to extend to instances of a party hiding evidence and lying in his deposition."); *Greviskes*, 417 F.3d at 758-59; *White v. Williams*, 423 Fed. Appx. 645 (7th Cir. 2011).

Although Rule 37 requires violation of a judicial order before a court imposes sanctions, "[c]ourts can broadly interpret what constitutes an order for purposes of imposing sanctions" and a formal order is not required. *Quela v. Payco-Gen. Amer. Credits, Inc.*, 2000 WL 656681, *6 (N.D. Ill. 2000)(collecting cases); *see also Hal Commodity Cycles Mgmt. v. Kirsh*, 825 F.2d 1136, 1139 (7th Cir.1987); *Lightspeed Media Corp. v. Smith*, 2015 WL 3545253, *5 (S.D. Ill. 2015); *JFB Hart Coatings, Inc. v. AM Gen. LLC*, 764 F. Supp. 2d 974, 981-82 (N.D. Ill. 2011). As explained by Judge Castillo in *Quela*:

> In this case, although there has been no specific court order, we believe such an order is not required to provide notice that parties must not engage in such abusive litigation practices as …lying to the court, and tampering with the integrity of the judicial system. Because all litigants are presumed to know that contumacious conduct of this sort is absolutely unacceptable, we can properly consider the sanctions available under Rule 37. *Quela*, 2000 WL 656681 at *6.

Federal Rule of Civil Procedure 37(a)(4) treats an evasive and incomplete answer in discovery as equivalent to no answer, and thus a failure to comply with court-ordered discovery. F.R.C.P. 37(a)(4). Further, the Seventh Circuit has "construed the sanctioning power conveyed by Rule 37 to extend to instances of a party hiding evidence and lying in his deposition." *Ramirez*, 845 F.3d 772 *citing Negrete v. Nat'l R.R. Passenger Corp.*, 547 F.3d 721, 723-24 (7th Cir. 2008).

Unlike Rule 37, no order of any sort is required to dismiss a case or take other actions based on the inherent authority of this Court. These inherent powers "are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 43. Under these powers, courts can impose sanctions including entering judgment and shifting attorney's fees. *See id.* at 44-45.

In deciding what measure of sanctions to impose, the district court should consider the egregiousness of the conduct in question "in relation to all aspects of the judicial process." *Greviskes,* 417 F.3d at 758-59. The "contumacious" conduct required for dismissal of a case with prejudice occurs "where a party has displayed fault, bad faith, or willfulness." *Id. citing Downs v. Westphal*, 78 F.3d 1252, 1257 (7th Cir.1996). Willfulness and bad faith are associated with conduct that is either "intentional or reckless[.]" *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000); *see also Maynard v. Nygren*, 332 F.3d 462, 467-68 (7th Cir. 2003). For a court to exercise its sanctioning power, the court must "find that the responsible party acted or failed to act with a degree of culpability that exceeds simple inadvertence or mistake before it may choose dismissal as a sanction for discovery violations." *Ramirez*, 845 F.3d at 776; *Secrease*, 800 F.3d at 410.

Courts are not required to impose lesser sanctions if the misconduct is sufficiently serious. *See Patterson by Patterson v. Coca-Cola Bottling Co. Cairo-Sikeston, Inc.*, 852 F.2d 280, 284-85 (7th Cir.1988). Also, in assessing whether dismissal is appropriate under the inherent powers of the Court, the Court need not find party's misconduct caused prejudice. *See e.g. Barnhill v. U.S.*, 11 F.3d 1360, 1368 (7th Cir. 1993); *Raziev v. Compass Truck Sales, LLC*, 2016 WL 1449933, *9 (N.D. Ill. 2016)("The Seventh Circuit has not imposed a requirement of prejudice on a court's ability to dismiss or enter judgment as a sanction under its inherent power."); *Fuery v. City of Chic.*, 2016 WL 5719442, *11 (N.D. Ill. 2016)("Court may still impose sanctions even where there is no prejudice but the actions of the party exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court.").

If a party is found to have committed litigation misconduct, the court may shift attorney's fees and/or dismiss a case as a sanction. F.R.C.P. 37(b)(2)(A)(v) (finding that a court may use its inherent

power to "vacate its own judgment upon proof that a fraud has been perpetrated upon the court" and "assess attorney's fees when a party has "acted in bad faith"); *Diettrich v. Nw. Airlines, Inc.*, 1168 F.3d 961, 964 (7th Cir. 1999)(the court's inherent power to sanction a party "permit[s] a court to impose the ultimate sanction of a grant of judgment (or its equivalent, dismissal with prejudice)."); *Quela*, 2000 WL 656681 at *6 ("In addition to these sanctions, Rule 37 provides that a disobedient party may be ordered to pay costs and attorney's fees caused by its failure to obey the discovery order.").

The courts have found dismissal appropriate for a wide variety of abusive litigation tactics ranging from concealing key pieces of evidence, failing to provide complete or accurate discovery responses, and other gross abuses of the judicial process. *See Fuery v. City of Chicago*, 900 F.3d 450, 464 (7th Cir. 2018)(affirming district court's entering judgment in favor of defendant against plaintiff for litigation misconduct including, among other things, failure to disclose key information in pretrial disclosures); *Ladien v. Astrachan*, 128 F.3d 1051, 1057 (7th Cir. 1997)(dismissal based on repeated violation of the court's orders, failing to timely produce discoverable documents, inaccurately verifying that document production was complete, and other misconduct after having been repeatedly admonished by court); *Chung v. KPMG LLP*, 104 Fed. Appx. 576, 577-78 (7th Cir. 2004)(dismissal based upon "gross abuse" of judicial process); *China Ocean Shipping (Group) Co. v. Simone Metals Inc.*, 1999 WL 966443, *4 (N.D. Ill. 1999)(dismissal of suit under inherent powers of court and Rule 37 based on destruction of evidence); *Philips Med. Sys, Int'l, B.V. v. Bruetman*, 982 F.2d 211, 214 (7th Cir. 1992)(affirming default judgment as sanction for deception of court); *Profile Gear Corp. v. Foundry Allied Ind., Inc.*, 937 F.2d 351, 353-54 (7th Cir.1991)(same); *Hal Commodity Cycles Mgmt. Co.*, 825 F.2d at 1138-39 (default judgment against defendant for and dishonesty). Indeed, even "[i]ncomplete or evasive responses to interrogatories can support, in part, dismissal of the entire actual under Rule 37(b)." *Dotson v. Bravo*, 321 F.3d 663, 667 (7th Cir. 2003), citing *Roland v. Salem Contract Carriers, Inc.*, 811 F.2d 1175, 1180 (7th Cir. 1987).

Additionally, in assessing dismissal as a sanction under the inherent powers of the Court, the Court need not find a party's misconduct caused its opponent any prejudice. *See Barnhill v. U.S.*, 11 F.3d 1360, 1368 (7th Cir. 1993)("We continue to eschew grafting a requirement of prejudice onto a district court's ability to dismiss or enter judgment as a sanction under its inherent power."); *Raziev v. Compass Truck Sales, LLC*, 2016 WL 1449933, *9 (N.D. Ill. 2016)("The Seventh Circuit has not imposed a requirement of prejudice on a court's ability to dismiss or enter judgment as a sanction under its inherent power."). Some misconduct "may exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court." *Barnhill*, 11 F.3d at 1368. Thus, a court may use its inherent powers to dismiss a case or enter default judgment even when the innocent party "incur[s] no real inconvenience" and "suffer[s] no real prejudice." *Id.*; *see also Secrease*, 800 F.3d at 402 ("Even if it is not successful, the effort imposes unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly."); *Fuery*, 2016 WL 5719442 at *11 ("Court may still impose sanctions even where there is no prejudice but the actions of the party exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court.").

Finally, while a court may attempt to fashion remedies other than dismissal such as adverse inferences and monetary sanctions, such sanctions should not be used when they would, in effect, not provide an effective remedy for the misconduct at issue *See Malibu Media, LLC v. Tashiro*, 2015 WL 2371597, *37 (S.D. Ind. 2015)("[A] sanction short of default would not appropriately address the goals of deterrence and punishment…[S]uch a sanction would allow the case to continue to trial and would

thus allow Defendants to press their case to this Court. In light of their misconduct, Defendants should not be allowed to do so"); *White v. Lambert*, 2011 WL 691983, *8 (S.D. Ill. 2011)("The only meaningful sanction likely to deter Plaintiff and other inmates from submitting forged documents is to dismiss all claims against all of the defendants, with prejudice."); *Thomas*, 288 F.3d at 307 (dismissal with prejudice appropriate where "monetary sanction would probably be difficult to collect").

Finally, a court may impose all of these remedies regardless of whether it is the client or the attorney who committed the underlying misconduct. *See Fuery*, 900 F.3d at 464 (affirming district court's entering judgment in favor of defendant against plaintiff for litigation misconduct including, among other things, failure to disclose key information in pretrial disclosures); *Pyramid Energy, Ltd. v. Heyl & Patterson, Inc.*, 869 F.2d 1058, 1062 (7th Cir.1989)(affirming dismissal based on conduct of attorney and noting that "'Pyramid independently chose its counsel, and "a party who chooses his counsel freely should be bound by his counsel's actions.'…A trial court is entitled to say, under proper circumstances, that enough is enough, and less severe sanctions than dismissal need not be imposed where the record of dilatory conduct is clear.").

The failure to disclose this information has rendered this trial fundamentally unfair at its core. The issue of alleged fabrication of Confidential Informants has repeatedly been a part of this case from its inception and has been relied upon by Plaintiff (and this Court) as an issue relevant to the fairness of the entirety of the underlying criminal proceedings from which all the claims in this case arise. From the beginning, Plaintiff repeatedly claimed during this lawsuit and at trial that Defendant Guevara (in concert with other Defendants and police personnel) fabricated the entire existence of confidential informants who had implicated Plaintiff in the Morales murder as well as fabricated the information they provided regarding Plaintiff's involvement. *See Rios v. Guevara, et al.,* Dckt. No. 61 at ¶¶ 47-48 ("Guevara has claimed that unnamed informants told him that the murder had been perpetrated by "Tino," and "Jaime," whom he believed to be Cristino Garcia and Jaime Rios. He

recognized Jaime as Jaime Rios, a member of the Latin Kings with whom he had previous contacts. The informants allegedly told him that Jaime Rios was the shooter…For unknown reasons, Guevara fabricated the existence of the informants and the contents of their information."); Dckt. No. 196 at ¶ 5 ("Reynaldo Guevara fabricated the existence of informants who implicated Jaime Rios and Cristino Garcia in the Luis Morales murder."); Dckt. No. 192 at ¶ 2 ("Reynaldo Guevara fabricated the existence of informants who implicated Jaime Rios and Cristino Garcia in the Luis Morales murder."); Dckt. No. 191 (denying Defendant Guevara's allegation in Local Rule 56.1 Statement of Additional Facts that "[t]here is no evidence in this case that Defendant Guevara fabricated the existence of these confidential informants referenced in his report and at Plaintiff's trial."); Dckt. No. 228 at 3-4 ("Reynaldo Guevara fabricated the existence of informants who implicated Jaime Rios and Cristino Garcia in the Luis Morales murder."); *Id.* at 10 ("Guevara does not suggest that qualified immunity protects his fabrication of information from mythical confidential informants, nor could he do so.").

The alleged fabrication of these informants is not only the basis for Plaintiff's specific Fabrication of Evidence claims arising from this particular evidence (i.e. Count II) but permeates every claim insofar as Plaintiff points to this as *tainting the integrity of his entire criminal trial. See e.g.* Dckt. No. 192 at 17 ("[C]ontrary to Guevara's arguments, the supposed 'information' from confidential informants played a significant role in Jaime Rios's conviction…Even on the assumption that the jury only believed the confidential information was hearsay which could not prove Rios was guilty, the prosecutor still used the confidential informant narrative in support of an argument that Rios knew that he was guilty and evaded the police when he heard the rumors that he was the shooter…Prosecutor Carballos used this testimony to argue to the jury that Rios, who must have heard the rumors of his involvement was "hiding" from Guevara…Evidence that Rios, having heard the rumors of his involvement, was "hiding" from the police was powerful evidence of 'consciousness of guilt.'…Here, the inference the prosecution sought to have the jury draw was that Jaime Rios, like

Guevara, had heard the "rumors," through the alleged informants or otherwise, and that he was evading Guevara because he knew that he was guilty. If the jury had known, as we now know, that Guevara invented the informants and their supposed information, the inference could not have been drawn and the result at trial may well have been different…[T]here is substantial evidence that the reports had an impact on Jaime Rios's conviction. During the time period between June of 1989 and November of 1990, Guevara wrote false police reports detailing what he claimed the informants had said and conveyed the same false information to the prosecutors during the course of the investigation of the Morales murder and the subsequent trial.").

These claims and arguments were also relied on by this Court in denying summary judgment to Defendant Guevara on not only on Count II but another count as well. *See e.g. Rios v. Guevara*, 2024 WL 5119954, at \*4 (N.D.Ill., 2024)(noting in regard to claims arising from coercion of Carrero that "[b]oth the basis and the results of this search are disputed" and "Rios asserts, and Guevara denies, that the warrant was based on Guevara's untrue claim that confidential informants told him where the guns used in the Morales murder could be located.").; *id.* at \*10 ("Viewing the evidence in a light most favorable to Rios, a reasonable jury could conclude that the evidence of how Guevara came to believe Rios was a suspect was material to Rios' conviction.").

Moreover, as noted above, despite there being no claim against Defendant Mason relating in any way to this issue, Plaintiff extensively questioned Defendant Mason regarding the identities of these confidential informants and Defendant Mason's failure to recall any identifying details of them. Tr. at 971:1-972:21. Plaintiff also (improperly) blurted out specific names of these Confidential Informants in front of the jury suggesting that Plaintiff's counsel indeed knew the identity of these persons and suggesting that the State had them in its possession all along. Tr. at 972:22-973:10. The clear takeaway that Plaintiff intended to draw with this line of questions is that Defendants are hiding something and that, if the identity of these persons were known and available, that Defendants would

be offering their testimony to bolster the veracity of the information Defendants relied upon in the investigation.

First, if these persons were, indeed, the Confidential Informants at issue, Plaintiff obviously has no claim under Count II for fabricating their existence. It is, of course, axiomatic that if a person exists, he has not been fabricated. While it has always been Defendants' position that there is a dearth of evidence showing that the information this Confidential Informants provided was fabricated by anyone, this Court disagreed on summary judgment and permitted this claim to proceed based largely on Defendant Guevara's Fifth Amendment invocation on the matter. *Rios*, 2024 WL 5119954, at *10.

Second, had this connection been made by Plaintiff (and had Plaintiff disclosed that he intended to pursue this theory), there is a certainty that Defendants would have attempted to locate these individuals and depose them. It is unknowable what these persons would have said but, at minimum, they could, of course, corroborate their own existence and corroborate that they provided information to Defendants. They could also provide further information regarding the basis of the information they provided to Defendants about Plaintiff's involvement. These individuals could also testify about prior involvement as sources of information and testify about connections to Plaintiff via gang or other connections to bolster the reliability of their information.

Indeed, it is certainly within the realm of possibility that these individuals may even have more information than they let on to the police in the form of firsthand knowledge about the shooting or hearing an admission made by Plaintiff or his co-perpetrator. Confidential sources of information tend to want to stay out of public court proceedings especially in gang-related crimes and couching information in terms of "rumor" when in reality the knowledge may be more direct is certainly a possibility. Even if not, rumors come from other sources. Thus, even if the information provided is indeed just a rumor, these persons could provide a bridge to other sources of more direct information that Defendants could have pursued. These possibilities are real but Defendants are now unable to do

anything to follow up on them. They are left with unproven allegations and a bell that cannot be unrung.

On this point, it is also important to note that Defendants repeatedly asked Plaintiff himself at his deposition for any information relating to the true identity of Lil' Mike and Plaintiff repeatedly denied knowing any other information other than that his name was "Michael-something." Ex. C at 169:4-170:8, 319:5-320:8, 322:12-14

While the direct claim relating to the alleged fabrication of the Confidential Informants is limited to Count II, this factual theory relates to essentially every claim premised upon the underlying trial because both the materiality elements for the purposes of the Fourteenth Amendment claims as well as the probable cause element of the Malicious Prosecution claim require that the jury examine all of the evidence at the underlying trial. *U.S. v. Agurs*, 427 U.S. 97, 112 (1976)(materiality under the Fourteenth Amendment "must be evaluated in the context of the entire record"); *Esco v. City of Chicago*, 107 F.4th 673, 682 (7th Cir. 2024)(" Probable cause depends on the totality of the circumstances."); *Lyons v. Vill. of Woodridge*, 2011 WL 2292299, *8 (N.D. Ill. 2011)("In performing the materiality analysis, courts are to consider the 'cumulative effect' of the evidence at issue 'as opposed to considering each piece alone.'"); *Phillips v. Allen*, 743 F. Supp. 2d 931, 948 (N.D. Ill. 2010).

Indeed, again, despite the fact that Plaintiff *has no claims whatsoever* against Defendant Mason relating in any way directly to the alleged fabrication of these informants, denial of a fair trial based thereon, or Malicious Prosecution, Plaintiff has repeatedly attempted to ascribe malfeasance or dishonesty to Defendant Mason on this issue both in opening statement and via adverse examination at trial. *See* Tr. 16:4-18:2, 971:1-973:10. Once again, the clear conclusion that Plaintiff seeks to have the jury draw is that Defendants knew this information and are hiding something and that, if this information had been favorable to them, that Defendants would have summoned Miguel Martinez and/or Hector Quintero to the witness stand to bolster the veracity of this information. This bell

cannot be un-rung nor the damage undone because Defendants are without the means to investigate and introduce the counter to this theory at this point.

Moreover, the alleged fabrication of this informant directly relates to Plaintiff's coerced confession claim as well. At his deposition in this case, Plaintiff testified at length regarding how Defendants Mason and Guevara confronted him with the alleged implication by the Confidential Informant known as "Lil' Mike" (who Plaintiff now, for the first time at trial, claims is Miguel Martinez) in an attempt to coerce him to confess to his involvement in the Morales murder. *See* Ex. C at 168:23-172:11, 319:2-11. To wit:

> Q. All right. And then when Guevara showed you this mugshot of Michael, what was he saying?
>
> A. He's saying, We know that you did this. We know that you killed the guy, and we -- we're going to make sure that you would -- you're the one. **And he started telling me about that the guy say that I did it, and that I was with Cristino when we did this.** And he kept on drilling me about you being the one, and -- and I'm going to go ahead and make sure that I take your kid away if you don't tell us what happened. And he start drilling me about stuff that I didn't even know, talking about that I was there, that I shot the guy, that I talked to a lady, that I did all type of stuff that I don't even remember any of that because I was never there. *Id.* at 170:9-24.

Plaintiff has also testified at length about this Lil' Mike person being involuntarily taken into custody by Defendant Guevara on the day of Plaintiff's own arrest with the clear implication being that Defendant Guevara coerced or mistreated this individual to force him to implicate Plaintiff in the Morales murder. *See* Ex. C at 321:14-322:14. To this end, Plaintiff's counsel has already rung this bell as well in opening statements:

> [O]n July 5th, in the morning, Jaime Rios was at a schoolyard. He was with somebody he knew as Little Mike. At the schoolyard, as they're there, Guevara and his partner Steven Gawrys -- it has a weird spelling, G-a-w-r-y-s -- drive up and start taking pictures of the people on the schoolyard. Something they do, it seems, as a tactic. You know, take pictures, we know who you are.
>
> Guevara at that point, despite saying at other times that he had found out about Rios or his involvement from informants earlier, doesn't take Rios into custody. He takes Little Mike into

custody. And Rios asks him, well, what do you want with me? And Guevara says, I'm not bothering with you. I want Little Mike. And, then, he takes Little Mike away.

What happened between him and Little Mike? Who knows. According to other evidence, supposedly he takes Little Mike or maybe a different confidential informant -- but anyway, two confidential informants -- to Area 5 to talk to detectives or investigators there. Tr. at 17:1-18.

On this point, Plaintiff went to great lengths to have his confession and interrogation expert, Dr. Melissa Russano, testify about how confronting criminal suspects with false information, while legal, is a tactic that is both psychologically coercive and can lead to a false confession. *See* Tr. at 843:7-9, 873:17-22, 911:11-14.

In fact, despite being barred from discussing the facts of this case by this Court, Dr. Russano insidiously sidestepped this preclusion and provided the very "hypothetical" scenario testified to by Plaintiff as an example of how confrontation with false evidence is coercive and might lead an innocent person to falsely confess to a crime:

We know that when suspects are confronted with false evidence, evidence that is not true -- and when I mean confronted, what I mean by that is the investigator tells them, "We have DNA evidence that puts you at the scene," **or, "We have a witness that has named you as the shooter," and that is actually false information -- whether or not the investigator knows it's false is irrelevant. If it's actually false and it doesn't exist, that increases the likelihood of a false confession because an innocent person -- because false confessions only happen from innocent people, right?.**

An innocent person when faced with an investigator saying, "We have evidence," that creates extreme anxiety and panic. Even though they know it's not true, they feel trapped. And they are trying to figure out: What am I going to do here? And remember, that gets coupled with the implication is if you confess, you will be better off. So, presentation of false evidence is a significant and serious risk factor to creation of false confessions. Tr. at 852:15-853:7 (emphasis added).

On cross-examination, Dr. Russano conceded that confronting suspects with false information is legal but nonetheless told the jury that such tactic was psychologically coercive and increased the risk of a person being coerced into involuntarily providing a false confession:

Q. In fact, it's even permissible to lie to a suspect during interrogation, right?

A. Yes.

Q. You can, to use your terms, bluff a suspect, right?

A. It's legally permissible. It's not psychologically wise, but it's legally permissible. Tr. at 873:17-22.

Building upon this topic on re-direct, Plaintiff's counsel then again elicited from Dr. Russano in even more stark terms that this tactic of providing false information was "a very dangerous proposition" and that "the legality of it is somewhat irrelevant for me from a psychological perspective." Tr. at 911:11-14.

Accordingly, the relevance of this information to all of Plaintiff's claims is clear. Defendants are now forced to not only defend these claims without the benefit of being able to corroborate the validity of the underlying evidence but have also been put in the position of the jury having already heard the names of these possible informants knowing full-well that Defendants will not be able to summon them to testify about the relevant matters. Once again, this is severe prejudice that cannot be un-done. Plaintiff has made sure that this issue has permeated every single one of his claims and constitutes a large portion of his underlying factual theories.

The minimum sanction that must be imposed as a result of these violations is striking and dismissing with prejudice Count II (fabrication of Confidential Informants) and instructing the jury explicitly that there is no evidence that any Defendant fabricated either the existence of any Confidential Informant nor any information provided by any such Confidential Informant and that they must disregard any evidence heard on that matter and any statements made by Plaintiff's counsel on this matter. *See* Fed. R. Civ. P. 37(c)(1)(C); Fed. R. Civ. P. 37(b)(2)(A)(i), (ii), (iii), (v).

This sanction, while certainly appropriate, is not a full and adequate remedy. Given the repeated information on this issue paraded in front of the jury already and the clear relevance of this information to almost every important issue in this case, Defendants believe that the only appropriate remedy which will ameliorate the prejudice that has already occurred should be dismissing Plaintiff's

claims in their entirety. *See* Fed. R. Civ. P. 37(c)(1)(C); Fed. R. Civ. P. 37(b)(2)(A)(v)(court may dismiss action "in whole or in part" for failure to provide relevant discovery material in response to interrogatories or Rule 26(a) disclosures); *Dotson*, 321 F.3d at 667 ("[i]ncomplete or evasive responses to interrogatories can support, in part, dismissal of the entire actual under Rule 37(b)."); *Fuery*, 900 F. 3d at 461-62 (affirming vacating of plaintiff's verdict based on, among other things, destruction of notes taken by Plaintiff because defendants were deprived of this information to use at trial and doing so despite also giving a spoliation instruction); *Ladien*, 128 F.3d at 1057 (dismissal based on, among other things, failing to timely produce discoverable documents and inaccurately verifying that document production was complete); *Chung*, 104 Fed. Appx. at 577-78 (dismissal based upon "gross abuse" of judicial process); *China Ocean Shipping (Group) Co.*, 1999 WL 966443, *4 (dismissal of suit under inherent powers of court and Rule 37 based on destruction of evidence).

## II.    Plaintiff's Counsel Directed A Witness In The Underlying Post-Conviction Proceedings To Provide Materially False Information In An Affidavit Submitted In Support Of Post-Conviction Relief.

On Day 2 of this trial, Plaintiff summoned to the stand an individual named Cristino Garcia. As this Court is aware, Garcia was named as a co-offender in Plaintiff's confession but was released without charging when an eyewitness could not identify him in a lineup. Garcia was listed not only in Plaintiff's own confession but also on the discovery answers supplied to Plaintiff's criminal defense attorneys in the underlying criminal case. Garcia, however, was not called as a witness at Plaintiff's criminal trial. According to Plaintiff (and Garcia), Garcia was brought into police custody in late July 1989, was physically abused by Defendant Guevara, and provided an alibi for the night of the Morales murder. Plaintiff has brought claims against Defendant Guevara for allegedly engaging in this conduct and concealing this information from the prosecution. Tr. at 14:4-14, 25:22-28:3, 31:22-32:1, 33:10-34:5.

In order to further his claim that the information provided by Garcia was not available to his criminal defense attorney, Plaintiff's counsel (who was also Plaintiff's post-conviction counsel) procured an affidavit from Garcia during the post-conviction process and used it as a basis to seek vacating of his conviction. *See* Tr. at 31:22-32:1 ("So, then, as I said, around 2020, he files a petition to vacate his conviction. What's it based on?...We go get an affidavit from Cristino Garcia about what happened to him."). This affidavit was used at the post-conviction did not merely state that Garcia was subjected to alleged mistreatment by Defendant Guevara but also provided a carefully worded explanation attributed to Garcia explaining why he would not have provided this information earlier and would have plead the Fifth if he had been summoned to testify because he was "afraid of Detective Reynaldo Guevara." *See* DX34 at ¶ 14 (attached hereto as Ex. D); DX 60 (Pl.'s Amended Motion To Vacate Conviction Under 735 Ill. Comp. Stat. 5/2-1401)(attached hereto Ex. E) at ¶ 316 ("Garcia was not asked to testify at Jaime Rios's trial and if called to testify would have taken the fifth amendment because he was afraid of Guevara."). Despite the affidavit itself being written in the handwriting of Garcia (and containing numerous misspellings which might bolster in genuineness), this particular verbiage was quite convenient for the purposes of the underlying post-conviction proceedings. This is because, in order to prevail based on such information, it was incumbent upon Plaintiff to prove that the information at issue was new evidence that could not have been discovered earlier. *See* Ex. E (DX 60) at ¶¶ 392, 395.

> Here, the evidence of…Cristino Garcia…could not have [been] discovered earlier than trial through the exercise of due diligence…Cristino Garcia's evidence is newly discovered because he states that he would have refused to testify out of fear of Guevara and would have taken the fifth amendment had he been called as a witness at Jaime Rios's trial.

This representation was crucial to having this evidence considered for post-conviction purposes because the petitioner is required to make a showing under Section 2-1401 that the evidence relied upon is indeed new evidence which could not have been discovered with reasonable diligence.

*See People v. Dillon*, 2025 IL App (1st) 241535, ¶ 29 (1st Dist. 2025)( "To obtain relief under section 2-1401, the defendant 'must affirmatively set forth specific factual allegations supporting each of the following elements: (1) the existence of a meritorious defense or claim; (2) due diligence in presenting this defense or claim to the circuit court in the original action; and (3) due diligence in filing the section 2-1401 petition for relief.'"). Specifically, a party generally cannot establish a valid claim under Section 2-1401 if based on the claims of witnesses which could otherwise have been discovered much earlier. *See People v. Hallom*, 265 Ill.App.3d 896, 906 (1st Dist. 1994)(rejecting 2-1401 proceeding because witness-affiants could have been discovered well before petition was filed and at the time of the underlying trial). Indeed, in Plaintiff's post-conviction proceeding, Plaintiff's counsel cited *People v. Molstad*, 101 Ill.2d 128, 135 (Ill. 1984) for the proposition that the fact that a criminal co-defendant would have plead the Fifth at the time of a criminal trial made their later statements newly discovered evidence. Simply stated, this language was the key language that made it relevant to the post-conviction proceedings because without it Plaintiff would have had no credible reason to claim this was newly discovered and unavailable at the time of the criminal trial.

Subsequent to the submission of this Petition, CCSAO elected not to oppose Plaintiff's Petition. Shortly thereafter, Plaintiff then turned around and filed a Petition for Certificate of Innocence ("COI"). *See* Ex. F. These allegations of Garcia (and the affidavit itself) were, once again, put forth by Plaintiff as a basis to award him the COI. *Id.* at ¶¶ 229-243 and Ex. C thereto. Indeed, this affidavit and the two others procured by Plaintiff (Carrero and Huertas) were attached to this Petition as Exhibits *Id.* Plaintiff himself then swore to the veracity of the contents of this Petition. *Id.* at PFP002674. In granting the COI (which was unopposed by CCSAO and not subject to any evidentiary hearing), Judge Atcherson explicitly relied on the affidavits as the basis for entering the COI. Ex. G at 4:9-14 ("The Court, after reviewing it, considering the affidavits and information, does

find that there is a requisite prima facie showing. Without the contest to the petition, that entitles Mr. Rios to relief, so the Court will grant the petition for a certificate of innocence.").

The problem, however, is that Garcia's alleged intention to plead the Fifth and not tell anyone about the information he had appears to have been concocted out of whole cloth by Plaintiff's attorney during the post-conviction process. During Garcia's testimony, he explicitly and repeatedly testified that this language about pleading the Fifth was included in the affidavit because Plaintiff's counsel, Stephen Richards, directed him to put it in the affidavit and that he (Garcia) did not know what this meant:

> Q. Okay. Let's go to Paragraph 13. I will read it and then I will ask you some questions about it. You wrote here: I was not asked to testify at the trial of Jaime Rios, and had I have been asked to testify, I would have pled the Fifth, not because I was guilty, but because I was afraid of Detective Reynaldo Guevara. Right?
> A. Yes.
>
> Q. That information is information Mr. Richards told you to put in there, wasn't it?
> A. Yes.
>
> Q. That didn't come from you, did it?
> A. No, it didn't.
>
> Q. And you didn't know what that meant, did you?
> A. No.
>
> Q. Okay. So Mr. Richards comes to you and says, you need to put this information in your affidavit about things that you had no idea what they meant, right?
> A. That part right there?
>
> Q. Yes.
> A. Yes, that part right there.
>
> Q. And then –
> A. But I asked -- Go ahead, sorry.
>
> Q. And you agreed to do that, didn't you?
> A. Yes.
>
> Q. Is this Mr. Richards' sworn statement or yours, sir?

24

A. The whole affidavit is mine.

Q. Right. So why are you putting things in there that you don't know what they mean and swearing under penalty of perjury to them when you have no idea what they mean, sir?
A. Paragraph 13 you are speaking about, right?

Q. That is correct. Do you need me to repeat the original question?
A. Yes.

Q. Why would you put information in there and swear under penalty of perjury to it because someone told you to put it in there if you didn't know what it meant?
A. I can't -- I don't think I put a lie in there.

Q. If you don't know whether something is true or not, you don't know what it means, and you put it in there, it means it is not true, right? Sir, if you don't know if a fact is true or false, and you say that a fact is true, it is not -- that is false, right? Right?
A. Yes.

Q. And that is what you did in this affidavit, right?
A. I wrote down something that he told me to write, but it wasn't about the case.

Q. He told you to –
A. It wasn't about the events I am saying. It wasn't about an event that happened to me in there.

Q. You didn't think it mattered whether you knew what it meant or not in there?
A. No, I didn't.

Q. So you just kind of went along with what he told you to do?
A. With this part right here, yes.

Q. Not knowing whether that was true or false or something else, right?
A. Yes.
Q. Did you say to Mr. Richards at some point, why are you asking me to put things in here and swear to them when I don't know what they mean? Did you ever say anything like that to him?
A. I asked him what it meant, what did it mean.

Q. You didn't know what it meant though, right?
A. Not at the beginning, no.

Q. But you did it any way, right?
A. Right…

Q. But in actuality, you didn't know whether this was true or false at all, you are just putting it there because his lawyer said to put it there to help him, right?
A. Yes.

Q. And this is factually false, isn't it? The first part about -- that you would have pled the Fifth had you been asked to testify, right?
A. If I would have been asked to testify I would have pled the Fifth. The Fifth is that you don't testify, you don't say nothing, right?

Q. Do you know what it means? Do you know what this means, what you wrote here?
A. Yes, not to testify.

Q. This is saying that if you had been asked to testify that you would have pled the Fifth, right? But you told us though at the very begin [sic] when I was asking you questions that you actually wanted to testify, right? Is that correct, sir?
A. I am not sure.

Q. Okay. So when you put in here about what you would have done in 1989, you don't know whether that was true or false or somewhere in between, right?
A. When I put Paragraph 13?

Q. Yes.
A. I knew it was –

Q. You didn't know whether this was true or false when you wrote this, you just put it there because you were told to by your friend's attorney to use to try to get his conviction thrown out, right?
A. I guess. I don't know. I just -- yeah.

Q. Did you say yes?
A. Yes. Tr. at 168:4-172:23

This evidence of a blatant fraud on the court in the underlying post-conviction proceedings is unrebutted. Plaintiff's counsel did not attempt to rehabilitate Garcia on this topic nor will there be any evidence submitted at this trial to the contrary. Tr. at 209:21-211:19. The only persons with knowledge of these statements are Garcia and Mr. Richards and Mr. Richards, of course, has not listed himself as a witness nor would such be an appropriate process without disqualifying Mr. Richards from representing Plaintiff in this case. *U.S. v. Marshall*, 75 F.3d 1097, 1106 (7th Cir.1996)(" Under the

advocate-witness rule, counsel is barred from acting as both an advocate and a witness in a single proceeding except under special circumstances.").

The evidence of knowingly fraudulent material being submitted to the court in the underlying post-conviction extended beyond just Garcia. Indeed, evidence that numerous statements contained within the three post-conviction affidavits submitted by Plaintiff (Garcia, Carrero, and Huertas) are demonstrably false has been shown repeatedly during trial in this case. *See* Tr. at 571:2-574:13, 580:11-583:5 (Carrero testifying that he told Plaintiff about alleged abuse by Defendant Guevara several years after his conviction in the mid-90s while affidavit claimed that he would not have told "anyone" until he executed affidavit in 2020); Tr. at 530:12-538:3 (Huertas denying numerous representations about him being coerced and directed to identify Plaintiff). In fact, just as with Garcia, Plaintiff's other witness, Carrero, similarly admitted that the claim in his post-conviction affidavit that he would not have told anyone about the information he had was just plain false because he had not only told someone about this but, in fact, had told Plaintiff himself. *Id.* Thus, at the time that Plaintiff submitted this affidavit of Carrero, Plaintiff himself knew that these representations were just flat out false and that they were being used to falsely show that Plaintiff did not have access to this information before 2020. *Id.* Once again, all of this is entirely unrebutted and there are no witnesses who can or will contradict this evidence at this trial. Simply stated, this is shocking evidence of blatant and repeated fraud on the court by virtue of the submission of perjured witness statements designed to obtain the vacating of a criminal conviction. And, of course, the vacating of the conviction is the sole and exclusive reason why this lawsuit is permitted in the first place because without a reversed conviction Plaintiff's claims would all be barred under *Heck v. Humphrey*, 512 U.S. 477 (1994).

Independently and in conjunction with the blatant discovery violations, this merits the severest of sanctions, up to and including dismissal of all claims. Simply stated, this evidence establishes both perjury in the underlying criminal proceeding as well as witness tampering.

> "[F]alsifying evidence to secure a court victory undermines the most basic foundations of our judicial system. If successful, the effort produces an unjust result. Even if it is not successful, the effort imposes unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly."

*Secrease v. W. & So. Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015). This case is a near perfect example of the wisdom of these legal principles.

In applying these standards, Courts find instances of perjury particularly appropriate subjects on which dismissal is warranted. "[P]erjury strikes at the heart of the integrity of the judicial system...." *U.S. v. Stokes*, 211 F.3d 1039, 1046 (7th Cir. 2000). It "undermines the function and province of the law and threatens the integrity of judgments." *U.S. v. Alvarez*, 132 S. Ct. 2537, 2540 (2012). It "poisons the life blood of the administration of justice." *U.S. v. DiStefano*, 464 F.2d 845, 854 (2d Cir. 1972). Because of its seriousness, perjury in the course of discovery may warrant the sanction of dismissal. *Jackson v. Murphy*, 468 Fed. Appx. 616, 619-20 (7th Cir .2012); *Ridge Chrysler Jeep, LLC v. Daimler Chrysler Serv. N. Am., LLC*, 2006 WL 2808158, *8 (N.D. Ill. 2006)(dismissing case as a sanction: "When discovery non-compliance [ ] is coupled with lies to both an adversary and the Court in order to gain an advantage in the litigation, the Court must step in and impose the ultimate sanction in order to preserve the integrity of the federal judicial system."); *Thomas v. Gen. Motors Acceptance Corp.*, 288 F.3d 305, 306, 308 (7th Cir. 2002)(dismissing suit with prejudice where plaintiff knowingly filed false application to proceed in forma pauperis).

Courts have a strong interest in both punishing dishonesty and deterring similar misconduct. *See Secrease*, 800 F.3d at 402; *Greviskes*, 417 F.3d at 759. Lying cannot be condoned in any formal proceeding, including depositions and discovery. *See ABF Freight Sys., Inc. v. N.L.R.B.,* 510 U.S. 317, 323 (1994)("False testimony in a formal proceeding is intolerable."). "Our legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts." *Quela*, 2000 WL 656681 at *7. Thus, "[p]arties who wish to use the judicial system to settle disputes have certain

obligations and responsibilities" and "[o]ne of those responsibilities is to tell the truth" *Id.* quoting *Rodriguez v. M & M/Mars*, 1997 WL 349989, *2 (N.D. Ill. 1997).

"If perjury pays benefits when it escapes detection, but has no cost when detected, there will be far too much perjury and the accuracy of judicial decisions will be degraded." *Rivera v. Drake*, 767 F.3d 685, 686-87 (7th Cir. 2014). It is this guiding principle that directs courts to respond with dismissal when perjury is revealed regardless of whether the subject matter is important or tangential. Stated another way, perjury does not mandate dismissal simply because the subject matter of the perjury was misrepresented. Rather, it merits dismissal because: (1) it calls into question the *entirety* of the perjurer's testimony; (2) it compromises the integrity of the entire judicial system (which is reliant on litigants telling the truth); and (3) permitting perjury sends an unmistakable message to other litigants that perjury is acceptable and, thus, begets more perjury. *See Quela*, 2000 WL 656681 at *6; *Rhodes v. LaSalle Bank, N.A.*, 2005 WL 281221, *3 (N.D. Ill. 2005); *Brady v. U.S.*, 877 F. Supp. 444, 453 (C.D. Ill. 1994); *Escamilla v. Jungwirth*, 426 F.3d 868, 870 (7th Cir. 2005) *abrogated on other grounds by McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013).

Judge Castillo explained the duties upon the Court when faced with deliberate perjury:

Lying cannot be condoned in any formal proceeding. This Court, too, has a responsibility: where we find deliberate falsehoods told in proceedings, we cannot allow such conduct to go unchecked. Turning a blind eye to false testimony erodes the public's confidence in the outcome of judicial decisions, calls into question the legitimacy of courts, and threatens the entire judicial system. Our entire civil justice system is dependent on accurate and truthful discovery. Every day, litigants make settlement decisions on the basis of information obtained during the discovery process. Across the country, our fellow judges enter summary judgment in numerous cases on the basis of undisputed facts determined during the discovery process. Ultimately, the discovery process aids parties, who need to proceed all the way through trial to resolve a case, ensure that the trial is based on objective facts and not the parties' selective and subjective recollections about their respective positions. Therefore, the importance of accurate and truthful discovery to the civil justice system cannot be overstated. *Quela*, 2000 WL 656681 at *7-8.

Regardless of any potential merit of a plaintiff's underlying claim or whether the perjury involves matters material to the litigation at bar, dismissal for perjury remains appropriate to protect the integrity of the civil judicial system.

Notably, these standards apply regardless of whether the perjury occurs in the instant proceeding or, as here, in a related underlying criminal proceeding.

For example, in *Dotson v. Bravo*, 202 F.R.D. 559, 572 (N.D. Ill. 2001), *aff'd*, 321 F.3d 663 (7th Cir. 2003), a plaintiff was convicted of criminal offenses relating to his alleged discharge of a firearm at a police officer. *Id.* at 665-66. The defendant officer, Bravo, had testified against plaintiff at this criminal trial that plaintiff was the person who had shot at him. *Id.* However, audio recordings later surfaced which appeared to directly contradict the veracity of the defendant officer's account. *Id.* The plaintiff was immediately released from prison as a result and filed suit. *Id.* The plaintiff's problems began, however, when it was revealed that he had misrepresented his identity in the underlying criminal proceedings. *Id.* Despite the fact that the misrepresentation had nothing to do with the veracity of the plaintiff's version of the events, the Court dismissed the suit as a sanction for his dishonesty. *See id.* at 572. The Court held:

> Credibility and veracity issues are among the ultimate factually disputed issues in a trial, and are not to be resolved beforehand or otherwise be used as a basis for a sanction. Admitted perjury, however, is quite another matter. The fact is that whether or not [the defendant's] testimony under oath in prior state court proceedings or in these proceedings is inconsistent, contradictory, or in any way false remains to be determined by a trier of fact. [Plaintiff] has to prove before a jury of his peers that [defendant] is a prevaricator. [Plaintiff], on the other hand, is an admitted perjurer...Defendants need prove nothing with respect to this matter. No jury need make any factual determination regarding the matter. The only issue is whether [Plaintiff] will be permitted to profit from his deceit.

In affirming the dismissal of plaintiff's claim, the Seventh Circuit stated that the potential merit of Plaintiff's claim did not preclude dismissal of this claim based on the acts of dishonesty:

> Given the evidence that supported his acquittal from all criminal charges, we note that [Plaintiff's] civil rights case may well have had some merit. But, we cannot allow a plaintiff to so abuse the court system in order to avoid criminal justice, yet obtain civil reward. If [Plaintiff] sought to expose the "truth" of what occurred on January 1, 1998, he should not have begun the lie that now leads to the dismissal of his case. *Id.* at 669.

Moreover, the Seventh Circuit has explicitly held that litigants may not simply commit perjury, change their story, and then insist that such change is a valid excuse to avoid dismissal as a sanction.

30

For example, in *Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001), a § 1983 plaintiff attempted to create a genuine issue of material fact by contradicting a previous version of events given in an underlying criminal proceeding. *Id.* In affirming the entry of judgment in favor of defendants, the Court stated:

> Some of the statements that [Plaintiff] has made under oath in this litigation are inconsistent with statements he made under oath in state court…One or the other of [Plaintiff's] stories is perjury. His lawyer contends that [Plaintiff] was entitled to lie in state court to ensure that the judge accepted the favorable plea bargain, and that we should therefore disregard his earlier sworn statements. That is not a position any judicial system can, or does, tolerate. *Id.* at 298.

Similarly, the Seventh Circuit also rejected a habeas petitioner's attempt to seek post-conviction relief by changing the nature of his testimony in the underlying proceeding and noted:

> Litigants must live with the stories that they tell under oath…The legal system offers many ways to deal with problems; perjury is not among them. How could any court credit statements made by a litigant…who trumpets a willingness (indeed, asserts an entitlement) to lie under oath whenever deceit serves his interests? *See Escamilla*, 426 F.3d at 870.

As explained in *Rhodes v. LaSalle Bank, N.A.*, "[t]he decisions in these cases are premised on the fact that a litigant cannot be permitted to say 'oops, you've caught me,' and thereafter be 'allowed to continue to play the game.'" 2005 WL 281221 at *3. "Not to dismiss a case for such blatant disregard of the judicial process would 'erode the public's confidence in the outcome of judicial decision, call into question the legitimacy of courts, and threaten the entire judicial system.'" *Id.*

In this regard, the law is replete with dismissals being ordered even when the subject of the perjury concerns an issue that bears *little or no* relationship to the merits of the case. *See Dotson*, 321 F.3d at 667 (misrepresentation of name in criminal proceedings); *Thomas.*, 288 F.3d at 306, 308 (7th Cir.2002)(plaintiff knowingly filed false application to proceed *in forma pauperis*); *Secrease*, 800 F.3d at 402 (7th Cir. 2015)(lying on *in forma pauperis* form); *Rodriguez*, 1997 WL 349989, *2 (lying about criminal record).

Indeed, the courts find dismissal appropriate even when the case as a whole shows demonstrable merit. *See Dotson*, 321 F.3d at 669; *Ramirez*, 845 F.3d at 782 ("The court considered the possibility—indeed, it expressly assumed—that Ramirez may have had a meritorious case of

employment discrimination, and that dismissal would foreclose Ramirez from pursuing relief for that injury."); *Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc.*, 2006 WL 2434031, *1 (N.D. Ill. 2006)("[A]ssessment of the merits of the case are irrelevant to a determination of whether to enter default judgment as a sanction for gross misconduct."); *Aura Lamp & Lighting, Inc. v. Int'l Trading Corp.*, 2002 WL 215535, *2 (N.D. Ill. 2002)("[T]his court believes that at some point attorney or party misconduct may rise to such a level that the probable merits become essentially irrelevant.").

Countless courts addressing perjured testimony have found dismissal is necessary to protect the integrity of the judicial process. *See Dye*, 253 F.3d at 298; *Jackson*, 468 Fed. Appx. at 619-620 (dismissal of § 1983 case based on perjured testimony); *Allen c. Chic. Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003)("it is arguable that a litigant who defrauds the court should not be permitted to continue to press his case"); *Secrease*, 800 F.3d at 401 ("Dismissal can be appropriate when the plaintiff has abused the judicial process by seeking relief based on information that the plaintiff knows is false."); *Fuery*, 2016 WL 5719442 at *2 (vacating verdict based on misconduct and misrepresentations); *Ridge Chrysler Jeep, LLC*, 2006 WL 2808158 at *8 (dismissing case as a sanction); *Thomas*, 288 F.3d at 308 (dismissing suit where plaintiff filed false document); *Brady*, 877 F. Supp. at 453 ("Permitting this lawsuit to proceed would be an open invitation to abuse the judicial process. Litigants would infer they have everything to gain, and nothing to lose, if manufactured evidence is merely excluded while their lawsuit continues. Litigants must know that the courts are not open to persons who would seek justice by fraudulent means."); *Rodriguez*, 1997 WL 349989 at *2 ("False testimony in a formal proceeding is intolerable. This court is aware that the law favors a trial on the merits. That right to a trial, however, is not absolute…In the instant case, plaintiff sought to conceal relevant information bearing directly upon her credibility both as a witness and a litigant…This court cannot and will not allow a litigant to so abuse the judicial process.").

Another area in which dismissal has been found appropriate is when a litigant has engaged in witness tampering (or even attempted to do so). It is well established that "[t]rying to improperly influence a witness is fraud on the court and on the opposing party…" *Ty Inc. v. Softbelly's, Inc.*, 517 F.3d 494, 498 (7th Cir. 2008). "[W]itness tampering is among the most grave abuses of the judicial process, and as such it warrants a substantial sanction." *Ramirez*, 845 F.3d at 782 citing *Secrease*, 800 F.3d at 402.

For example, in *Bishop v. White*, 2023 WL 35157 (N.D.Ill., 2023), Judge Alonso dismissed the claims of a civil rights plaintiff where the evidence showed that the plaintiff had tampered with a witness at his underlying criminal trial upon which some of his claims were premised. There, Judge Alonso held that Plaintiff's acquittal was tainted by the witness tampering and that "had plaintiff not been acquitted, most—perhaps all—of his claims in this case would never have accrued, or if any claims did accrue, they would be narrower than they are in their current form, with plaintiff alleging that he did nothing illegal." *Id.*, 2023 WL 35157 at *10-11. The Court explained:

> It goes without saying that this matter is of the utmost seriousness. Witness tampering "'strikes at the heart of the judicial system ... Our legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts.'" If it is true, as it appears, that plaintiff secured an acquittal by bribing Lee to change his testimony, then dismissal is an appropriate exercise of the Court's discretion:
>
>> Litigants that attempt to coerce witness[es] into giving false testimony abuse the truth-seeking function of the courts and obstruct the courts' ability to solve disputes accurately and efficiently. Not only does witness tampering interfere with the judicial branch's ability to function properly, it is a federal crime. See 18 U.S.C. § 1512(b) (2006). As such, tampering by the parties deserves the harshest sanction that the Court can deliver given the seriousness of the matter and in order to protect the judicial process. When the plaintiff is the one that commits the offense, dismissing the case is sensible as the very individual that seeks the Court's jurisdiction to solve his dispute (i.e., the plaintiff) is the party thwarting the Court's ability to get to the truth.
>
> And, although plaintiff does not make the argument, the Court observes that it makes no difference that the evidence draws a clearer link to tampering with testimony at plaintiff's state criminal trial than at any proceedings in this federal lawsuit. As the Court has already explained,

the identity of the person who shot Lee is a factual matter that sits at the heart of both lawsuits. *Id.*

The court in *Ramsey v. Broy*, dismissed suit although the plaintiff was unsuccessful in his attempts to bribe witnesses. In *Ramsey*, the court granted the defendant's motion to dismiss the plaintiff's case as a sanction after the plaintiff's neighbor revealed that the plaintiff attempted to bribe him to provide fabricated testimony, even though the witness declined the bribe and did not offer favorable testimony. 2010 WL 1251199, *3, 6 (S.D. Ill. 2010). Although the court found that the plaintiff "only *attempted* to tamper with witnesses without actually getting that witness' tampered testimony on the record[,]" the court still held that the sanction "best tailored to address the misconduct at hand and deter other is dismissal." *Id.* at *6 (emphasis in original). As the *Ramsey* Court explained:

> Litigants that attempt to coerce witnesses into giving false testimony abuse the truth-seeking function of the courts and obstruct the courts' ability to solve disputes accurately and efficiently. Not only does witness tampering interfere with the judicial branch's ability to function properly, it is a federal crime. *See* 18 U.S.C. § 1512(b) (2006)….As such, tampering by the parties deserves the harshest sanction that the Court can deliver given the seriousness of the matter and in order to protect the judicial process. When the plaintiff is the one that commits the offense, dismissing the case is sensible as the very individual that seeks the Court's jurisdiction to solve his dispute (*i.e.*, the plaintiff) is the party thwarting the Court's ability to get to the truth. *Id.* at *5.

Another case dealing with analogous misconduct is *Quela v. Payco-Gen. Am. Creditas, Inc.* In *Quela*, defendants willfully coerced an employee to lie about an issue central to the case, to the point where the defendants procured a false witness statement and had the employee perjure herself in a court proceeding. *Quela*, 2000 WL 656681, at *1. The court held the sanction of default judgment in favor of plaintiffs was "proportionate" to defendants' "egregious" misconduct. *Id.* at *8. The court stated, "[e]ntering a default judgment will send a strong message to other litigants, who scheme to abuse the discovery process and lie to the Court, that this behavior will not be tolerated and will be severely punished. *Id.*

Similarly, in *Ramirez v. T&H Lemont, Inc.*, the court affirmed dismissal with prejudice as a sanction for a plaintiff offering a witness money in exchange for favorable testimony. *Id.*, 845 F.3d at 774. The court found a witness's testimony that the plaintiff offered him money and that a discussion was had as to what favorable testimony the witness was to give supported a finding that plaintiff engaged in witness tampering. *Id.* at 781. The court concluded plaintiff "made a calculated effort to bolster his floundering case by offering payment to a witness to support his allegations[.]" *Id.* at 782.

*Dewitt v. Ritz*, 2021 WL 915146, *1 (D. Md. 2021) also supports complete dismissal of this action based on Plaintiff's misconduct. In *Dewitt*, the plaintiff brought a civil rights suit against the Baltimore Police Department ("BPD") and seven of its officers alleging that BPD detectives withheld an alleged police report containing a crucial eyewitness statement that the plaintiff was not the shooter. *Id.* at *1. The defendants moved to dismiss plaintiff's complaint as a litigation sanction after the defendants learned that the plaintiff had tampered with witnesses and fabricated the alleged police report containing exculpatory evidence. *Id.* at *2. The defendants learned of the plaintiff's deceit with the help of an expert forensic document examiner, but more important to this case, through a series of the plaintiff's recorded prison calls that captured the plaintiff promising to pay off witnesses in exchange for favorable testimony. *Id.* at *8-9. The court found that involuntary dismissal was the most appropriate sanction, in part, because the recorded prison calls constituted "irrefutable" evidence that the plaintiff bribed three key witnesses to provide false testimony. *Id.* at *12. The court also reasoned that the "Plaintiff's brazen attempt to profit from his scheme by pursuing the current civil action and promising to pay conspirators for their lies out of the anticipated proceeds of a fraudulent civil case […] make a mockery of the truth-seeking objectives of the judicial system and weaken its credibility as an institution deserving of public trust." *Id.* The court not only dismissed plaintiff's action but also awarded the defendants attorney's fees. *Id.* at *13.

The egregious presentation of perjury and witness tampering are at least as serious as in the above cases, if not more. Plaintiff presented knowingly false statements in court to obtain the vacating of his criminal conviction. He did so knowing these matters were not true and, in one instance with respect to Garcia, appears to have been made up by Plaintiff's attorney himself in order to fraudulently claim that the evidence could not be discovered earlier in order to avoid a procedural bar. Defendants and the taxpayers of the City of Chicago are now faced with a possibility of civil verdict of many millions of dollars on a case that should never have made it past the post-conviction stage. It is impossible to right this now. Double jeopardy does not allow the reinstatement of a conviction even if the product of a fraud on the court. The only effective remedy for this conduct at this stage is to dismiss the claims in this lawsuit along with other available relief such as attorney's fees and costs. Defendants understand that these are requests for drastic relief but the shocking evidence in this case merits that this be entered.

## **CONCLUSION**

WHEREFORE Defendants pray this Court enter the following sanctions:

A.  Enter Judgment on behalf of Defendants and against Plaintiff on all claims;

B.  Award reasonably attorneys fees and costs arising from this conduct;

C.  In the alternative:

    a.  Enter Judgment in favor of Defendant Guevara on Count II; and

    b.  Instruct the jury that there is no evidence that Defendant Guevara or anyone else fabricated either their existence or any information provided by them and to disregard any evidence or statements to the contrary.

D.  For whatever other relief this Court deems fit.

Respectfully submitted,

BORKAN & SCAHILL, LTD.

By:      /s/ Timothy P. Scahill
        *Special Assistant Corporation Counsel*

        Timothy P. Scahill
        Special Assistants Corporation Counsel
        Borkan & Scahill, Ltd.
        20 South Clark Street
        Suite 1700
        Chicago, IL 60603
        (312)580-1030
        *Attorneys for Reynaldo Guevara*

        /s/Caroline P. Golden
        CAROLINE P. GOLDEN, Atty No. 6270259 Special Assistant Corporation Counsel One of the Attorneys for Defendant Michael Mason and Joann Halvorsen, special representative for Ernest Halvorsen, deceased

        /s/ Eileen E. Rosen
        EILEEN E. ROSEN Special Assistant Corporation Counsel One of the Attorneys for Defendant City of Chicago