1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


JAIME RIOS,                        )
                                   )
                Plaintiff,         )
                                   )
-vs-                               )  Case No. 1:22-cv-03973
                                   )
REYNALDO GUEVARA; MICHAEL          )
MASON; and JoANN HALVORSEN,        )
as Special Representative of       )
ERNEST HALVORSEN, Deceased,        )  Chicago, Illinois
                                   )  January 22, 2026
                Defendant.         )  1:00 p.m.

                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:     LAW OFFICE OF STEPHEN L. RICHARDS
                       BY:  MR. STEPHEN L. RICHARDS
                       53 West Jackson Boulevard, Suite 205
                       Chicago, Illinois  60604


For Defendant          BORKAN & SCAHILL, LTD.
Guevara:               BY:  MR. TIMOTHY P. SCAHILL
                            MR. GRAHAM P. MILLER
                       20 South Clark Street, Suite 1700
                       Chicago, Illinois  60602

For Defendants         THE SOTOS LAW FIRM, P.C.
Mason and              BY:  MR. JOSEPH M. POLICK
Halvorsen:                  MR. JOSH MICHAEL ENGQUIST
                            MR. JEFFREY ROBERT KIVETZ
                            MS. CAROLINE P. GOLDEN
                       141 West Jackson Boulevard, Suite 1240A
                       Chicago, Illinois  60604

For Defendant          ROCK, FUSCO & CONNELLY
City of Chicago:       BY:  MS. THERESA CARNEY
                       333 West Wacker Drive, 19th Floor
                       Chicago, Illinois  60606

Court Reporter:         CHARLES R. ZANDI, CSR, RPR, FCRR
                        Official Court Reporter
                        219 S. Dearborn Street, Room 1426
                        Chicago, Illinois  60604
                        Telephone:  (312) 435-5387
                        charles_zandi@ilnd.uscourts.gov

                  *    *    *    *    *

              PROCEEDINGS REPORTED BY STENOTYPE
     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK:  22 C 3973, Rios versus Guevara, et al., for final pretrial conference.

THE COURT:  All right.  Counsel, you can sit at counsel's table if you want.  Just state your -- we'll start with appearances for plaintiff.

MR. S. RICHARDS:  Stephen Richards on behalf of plaintiff Jaime Rios.

THE COURT:  Okay.  And for the defendants?

MR. SCAHILL:  Good afternoon, your Honor.  Timothy Scahill and Graham Miller on behalf of Reynaldo Guevara.

MR. POLICK:  Joseph Polick on behalf of Defendants Mason and Halvorsen.

MR. KEVITZ:  Good afternoon, your Honor.  Jeff Kevitz on behalf of Defendants Mason and Halvorsen.

MR. ENGQUIST:  Josh Engquist, E-N-G-Q-U-I-S-T, on behalf of Halvorsen and Mason.

MS. GOLDEN:  Caroline Golden, also for Defendants Halvorsen and Mason.

MS. CARNEY:  Theresa Carney on behalf of the City of Chicago.

MR. MILLER:  Grant Miller for Defendant Guevara.

THE COURT:  Okay.  One second while I do my multi-factor authentication.

Okay.  I guess I should start with the -- so, for the

final pretrial conference, I'll go through how I run my trials first, and then the second half we'll deal with the specific issues that I need to address today.

Looking around, with three defendants and lots of lawyers, the question is: Do I need another table?

MR. POLICK: If it's not too much of an imposition, Judge, we expect Defendant Mason to be here throughout the course of the trial, and Mrs. Halvorsen has told us that she would also like to be here. I don't know that Mrs. Halvorsen is going to be able to attend every day, but she's expressed a desire to be here.

THE COURT: Okay. So, I suspect that given that there are two more seats that I need to have space for, my initial thought is the table at the side would work, and we can just reposition that so that it's not -- you folks aren't looking at the wall.

I'll talk to my courtroom deputy. I don't think I need a bigger courtroom, meaning the ceremonial courtroom. I just need another few seats. All right.

MR. POLICK: Thank you, Judge.

THE COURT: So, I'll start with the trial conduct, and then we can go into the specifics. As I go through this first part, feel free to ask questions as necessary.

I'll start with a few admonishments. I will not continue the trial for purposes of settlement. If I get an

email the Saturday before trial saying, "We're there. We just need to finalize paperwork," my response will be, "Come Monday, pick a jury, or dismiss the case. And we're done -- I'm not delaying for settlement."

I value the jury's time. We're asking them to give three weeks, and I will not waste their time. I'll tell you more about my schedule. But the wasting time means the courtroom will be open at 9:00 each day. Most days, I'll have call at 9:30, but that should not deter you from coming in and testing the equipment each day to the extent you need to do so. You're on trial, so you'll have priority with respect to positions in the courtroom.

And so this happens more often than you think, but, you know, we get to like 10:45, and counsel just realizes that the screens aren't up or their laptop isn't compatible with the presentation software; and I'm not stopping the trial because I view that as a waste of the jury's time when you could have come in prior to the trial starting so that I could have called the appropriate people to come up and resolve the issue. So, you should be prepared to move on.

Same thing applies to witnesses. My trial schedule I adhere to as best I can, and it's not an answer to say, "Well, I only had two witnesses today." If you are out of evidence to present, I assume that you are resting your case -- or not that I assume; you will be resting your case if you have no evidence

to present.

There are a few exceptions to that. If you can show me that a witness was scheduled to be here and their flight was canceled, okay. And I even acknowledge that if you can show me that you had six witnesses lined up for the day and there was no reason to think that we'd blow through them all, okay. But short of exceptional circumstances like that, you must be prepared at all times because you will not waste the jury's time.

The trial day itself, it's roughly from 10:00 until noon, where the jury will come in at 10:00. I will do my best to keep my call short so that I don't run past 10:00. I just had an eight-day trial. Only one day did I not call the jury in at 10:00 a.m.

We have that two-hour chunk in the morning. We will break for an hour until 1:00 p.m. At 1:00, we'll come back, and we'll go until 2:30, roughly. There will be an afternoon break for 20 to 30 minutes, and we'll come back and go from 3:00 to 4:30.

That gives you -- I think it's five-and-a-half hours per day for trial time. I think this is important, one, to have the jury understand what their schedule is so they can make adjustments. I think it's important that you have a sense of what's happening so that you can't say you didn't expect it. And there are a couple of reasons behind that.

I don't want to disrupt jurors' morning routines. If they've got kids to get to school, things like that, they know what time we expect them here. And then I break at 4:30 for two reasons: One for the jurors to be able to get home and handle their evening responsibilities, but also so that you have your evenings to do the work that you need to do to get ready for the next day.

To the extent that I need to hear things, any motions or issues that have come up, I will do it on the breaks because again, I will not waste the jury's time.

That comes up in various ways. The most -- the one way it comes up most often is plaintiff rests. I know the defendants will have a motion. I will hear that at a break. We will move into the case. You will not waive your ability to bring your motion, but I will do that when the jury's not expected to be in the box.

Every now and then, I will have a juror -- or a jury that's not able to sit for two hours; and if that's the case, I will adjust that morning schedule so that we're breaking every 75 to 90 minutes, so maybe it goes from 10:00 to 11:15, and then 11:30 to 12:30. That's only been in one trial so far where a juror had an issue where they needed to be up more often -- or they couldn't sit for a two-hour period.

Any questions about the trial day?

MR. S. RICHARDS: Your Honor, I just want to make sure

I got this correct. 10:00 to noon, break for an hour, 1:00 to 2:30, and then break for a half an hour?

THE COURT: Yes, roughly. So, it's 1:00 to 2:30 and then 3:00 to 4:30.

MR. SCAHILL: And we will not begin before 10:00 a.m.? I'm just asking because I also have childcare issues and I want to make sure we have that covered and I'm here --

THE COURT: Right. I will be here for my call most days at 9:30. If you know you have an issue you need to raise with me, if you raise it the day before, I'll ask you to come in -- I'll look at my call, and if I've got 30 minutes' worth of call, I might ask you to come in at 9:15; but I also am able to hear that issue at the lunch break, if need be.

But that's -- yeah. So, I won't ask you in early. You guys might have issues that require me to hear something early. Okay?

MR. SCAHILL: Fair enough. Thank you.

THE COURT: Jury selection process, I will seat eight jurors. I'll probably bring up 30 for the venire. They will come up. We'll put 16 in the box. The other half will be in the gallery.

They will receive a letter downstairs. The letter does two things. It welcomes them, but it also provides an overview of the jury selection process; and it will have all of my voir dire questions on it. I will send you a copy of that

letter early next week so that you can review it. I'll talk about that more in a bit.

But the letter essentially explains the process, which is this: 16 in the box, two sets of questions. First set of questions will be asked in open court in front of everybody. The jurors will pass a microphone, and these are just basic background questions, "Who are you? Where do you live? How far did you go in school," et cetera. This is your opportunity to see how the jurors -- prospective jurors present, their confidence, whatever you're looking for.

Once I go through all 16, with the questions that are -- the first set of questions, I will then read them the second set of questions. These are questions that I worry could possibly taint the rest of the jury pool, and so I don't have them answer them out loud. Instead, I read all the questions, and I will then ask the jurors, "If the answer to any of those questions is yes, raise your hand." I'll take a note of who it is. They'll come up to the witness box. We'll go to the headphones, and then I will ask them, out of the hearing of the rest of the jury pool, which questions. And then we will ask follow-up questions.

I'll start with the follow-up questions. "My brother is employed by the Chicago" -- you know, "Which question?"

"Do I have any family members who are law enforcement? Yes."

"Okay.  Who?"

And then I'll ask my questions.  I'll then ask plaintiff if you have any follow-up questions.  I'll ask defense if you have any follow-up questions.  If I feel that a question is inappropriate or perhaps a bit too slanted, I may re-ask it.  That's my signal to you that you should adjust your questioning in the future.  But you will have an opportunity to question jurors.

An important note, if there are any jurors that you wanted to bring to sidebar to ask additional questions of and they did not raise their hand, just let me know who they are, and I will call them over, too.

So, you will have an opportunity to ask any questions you have of each juror, but please understand that purpose.  It does no one any good for someone to say either -- a prospective juror to say in front of all 30, either, "Cops are great," or, "Cops are horrible."  So, I just don't -- to avoid that, I bring them over to sidebar, and that's when we ask what I consider the sensitive questions.

After we have 16 in the box and we've questioned them all, I will take your cause strikes.  I'll rule on them then.  And so from the first 16, we'll know how many are standing after cause strikes, before I put the next 14 or whatever in the box.  And then we just repeat the process until we have six -- or 14 prospective jurors.

Once that process is complete, you'll get 10 minutes, 15 minutes to talk about your peremptories, and then we will have our jury.

Any questions about jury selection?

MR. S. RICHARDS: Your Honor, how many peremptories?

THE COURT: Three each. Oh, wait. I've got multiple defendants. That just means I need a bigger venire. It's three each. Okay?

MR. SCAHILL: One follow-up question?

THE COURT: Yeah.

MR. SCAHILL: With respect to the attorneys' questioning of the jurors, just so I understand it, you're going to automatically take each juror who has answered yes, and we're going to question them. After that, if we want to question a juror who has not raised their hand, we must make a request to also have them questioned; or are we going to have the opportunity automatically to do our questioning of each juror?

THE COURT: You must identify any juror to me who you want to ask additional questions of. Meaning there's 16 in the box, and six of them raised their hands, but you wanted to ask a juror who didn't, while we're on the headphones, you just say, "Judge, can we have Juror 8 come over," and I'll ask you -- you know, actually, they'll come over, and you can ask your questions.

MR. SCAHILL: Okay. And the scope of the questions, whether the raised hand or we've asked them to come up, are you saying it's limited to what the issues are on the raised hand questions, or it's just sort of things that we might want to ask them about that wouldn't be appropriate in front of the entire venire?

THE COURT: You have to have a reason for asking the question. You're not going to call all 16 over just because I didn't include one of your preferred voir dire questions in my questionnaire.

If you have legitimate concerns, for example, I go through the same exercise of if there's someone that I think needs additional questioning -- I think in the last trial, there was someone who, like, was a litigation paralegal with a firm that did work with the City, and it was a 1983 case against the City. So, she didn't raise her hand. I circled her and said, "I think I've got questions." It turns out that it was odd work or something that she wasn't involved in, so it wasn't related to the case.

But there needs to be some reason to bring them over. It's not because you want to question each -- you want to ask a question that I did not approve of each juror.

MR. SCAHILL: Understood.

MR. S. RICHARDS: Your Honor, if the defendants get a total, then, of nine peremptories, three each, three for each

set of defendants, do we get nine peremptories?

THE COURT: You won't get nine, but I understand the view.

What are the defendants' positions?

MR. SCAHILL: That sounds like an awful lot amongst the two sets, to have nine and nine. I think what we would suggest is perhaps -- I would like to maybe consult with my codefendants, but perhaps we don't each need three, but it would be like three and five or three and six or something like that that would account for the additional parties.

But 18 seems like we're going to spend a lot of time on jury selection. I think we'd like to avoid that.

THE COURT: Right. So, I can't remember if it's by statute or by rule, each defendant gets three, but -- so I won't take it away from you; but if you agree, like if you want two each or you came up with a number and you were in agreement, then I am fine walking back -- walking it back.

But it will remain proportionate. It won't be one-to-one as far as your strikes.

MR. S. RICHARDS: Well, your Honor, this is not something I thought of originally, so if I have further thoughts of that or --

THE COURT: I don't want thoughts. I want authority.

MR. S. RICHARDS: Exactly. I was going to -- my next words out of my mouth were case law or statute. I would have

to research that to provide you with that because I didn't think of it until just now.

THE COURT: Okay.

MR. SCAHILL: Can we -- we'll consult, and perhaps we can just send something over to your deputy or file something? What's the Court's pleasure?

THE COURT: File a -- if there's an agreement, file a stipulation. If there's not an agreement, file a status report stating each party's position.

All right. Any other questions about the voir dire process?

MR. S. RICHARDS: None from plaintiff.

MR. SCAHILL: None from us.

MR. POLICK: No, your Honor.

THE COURT: Okay. Once we have a jury, I'll give them some preliminary instructions. Most are logistical, "This is where the jury room is. These are the elevators you use," et cetera. Some will be pulled from the jury instructions, but usually not an elements instruction. It's just, "You can take notes, direct, circumstantial evidence," things like that.

Once they're seated, they'll get their -- you'll make your openings. Have -- has each side thought about how much time they will need for their opening statements? Plaintiff?

MR. S. RICHARDS: Yes. We anticipate between one-and-a-half hours and two-and-a-half hours. I realize

that's long, but the case has some complications.

And I've written out most of it, and I expect to finish it probably by Monday in terms of what I'm going to write out. And I can give -- once I do that, I can give the Court, just based on the number of words, a more exact number.

THE COURT: For defendants? Guevara?

MR. SCAHILL: It's going to be nowhere near that. I mean, I think for Guevara, probably a max of 30 to 35 minutes.

THE COURT: For Mason?

MR. POLICK: Approximately 45 minutes, your Honor.

THE COURT: And for Halvorsen?

MR. POLICK: That includes Halvorsen.

THE COURT: Okay. Normally I don't put time constraints on opening statements, but I also think one to two hours is -- not only is it a long time, but that's a lot of leeway. And so it won't be more than 90 minutes.

So, this brings up another question. I've allotted three weeks for the trial. I have concerns, based on statements such as that, as far -- and then there have been multiple times where parties have raised trials within trials. And so I will likely put you guys on a clock, meaning I will take up the number of trial days, multiply that by the anticipated trial hours. I'll probably subtract a few hours for the purpose of administrative-type time, and then divvy it up between the sides.

And so if I do that, then you can take as much time as you want to open, but it will come off your time.

MR. S. RICHARDS: Your Honor, I understand. I had made another suggestion to the defendants, which I know they don't have to take me up on; but I was willing to give them estimates of each direct, if they would give me estimates of each cross. And that way I would know when exactly to call each witness and slot them in.

And I have a tentative order worked out.

THE COURT: Okay. Unless I've instructed the parties to confer on something, I don't care what cross talk happens. I encourage you to cross talk and I encourage you to reach agreement, but I don't get involved because it doesn't concern me. I decide things. I don't negotiate things.

And so you have my intention, which is just to put you on a clock. Does anyone object to the use of a clock?

MR. S. RICHARDS: On plaintiff's side, no. We enthusiastically endorse it.

MR. SCAHILL: Well, I mean, the concept of a clock, of course, is not an issue. As your Honor referenced, there are some mini-trial issues that require some substantive discussion because some of that gets a little bit into the weeds, but the concept of a clock, of course, we all want to move in an efficient fashion.

THE COURT: And I should be clear. I realize I'm

fairly rigid and structured, but I want you to be able to try the case that you want to try within the confines of the Rules of Evidence and any case law that places restrictions.

But I think that the clock would allow each side to present the case they want to present. And it would be a chess clock. I'll just have it here, and I'll switch sides back and forth. But I think that's likely the way I will go in this case. I will confirm that in a minute order and identify the number of hours that each side has to present their respective cases.

Exhibits, anybody plan on using exhibits in their opening? Plaintiff?

MR. S. RICHARDS: Yes. We would like to use a PowerPoint in the opening, which will -- will not be argumentative, but will just be pictures of things. And what I'm willing to do is identify those as exhibits I think both sides expect to come into evidence, and I would like to use those. And I will disclose those in advance if I'm given permission to do that.

THE COURT: I would expect you to disclose them in advance so that I can address any issues because you probably have a sense that pulling it out as you intended to use it, if it required a sidebar, I'd probably get frustrated because that would be wasting the jurors' time.

So, I'll put an order in that requires the parties to

exchange demonstratives by a certain time.

Any of the defendants intend on using exhibits in their opening?

MR. SCAHILL: Not currently. That could change over the course of the next week, but I don't intend to use anything right now. But of course, if that changes --

THE COURT: Okay. Mason and Halvorsen?

MR. POLICK: Yes, Judge. We intend to use something similar to what plaintiff is envisioning.

THE COURT: Okay. I assume any exhibits shown in the PowerPoints, the parties would anticipate admitting at trial.

I wanted to circle back to the peremptories. 28 USC Section 1870, please take a look at that. It says that in civil cases, each party shall be entitled to three peremptory challenges. Several defendants or several plaintiffs may be considered as a single party for the purposes of making challenges, or the Court may allow additional peremptory challenges and permit them to be exercised separately or jointly.

I suspect having read that, you'll still have an opportunity to weigh in. I encourage you to go take a look at it, but my sense is that it probably makes sense to just increase each side's peremptories to the same amount, whether it's six and six or what have you. But please talk and sort out where it is or what the parties think it should be.

All right.  So, we get to openings.  Then we go into the evidence.  You know my practice on objections to exhibits, which is I need the context to be able to sort them out. Hopefully after my rulings on the motions *in limine*, we'll have a better sense of -- or you'll have a better sense of any objections or exhibits that you'd like to raise objections to.

But it's not just objections.  Like, if they're agreed exhibits, I appreciate when the parties are able to streamline their admission.  In the last trial, a lawyer kept standing up, identifying it, and then moving to admit it with no foundation, which wouldn't be a problem except the other side didn't agree with that approach.  And so that seemed like -- the whole time, I'm thinking to myself, "You guys could have talked about this beforehand," because they weren't controversial exhibits.

It's -- but anyhow, if there are agreements with respect to the admission of exhibits, great.  If not, lay the foundation and put them in or go through the full process.

The -- are there -- I know there are a lot of witnesses named.  Is this a case where we will have a lot of witnesses called?  Like, if the plaintiff calls a witness that the defense plans to call in their case, will the witness go up once, or do the parties prefer to call these witnesses twice?  Have we thought about this at all?

MR. S. RICHARDS:  I have, your Honor, but --

MR. SCAHILL:  I have always been a believer that each

witness should only be called once. It's confusing doing it any other way. That's what my position is and has always been.

THE COURT: Okay. Plaintiff?

MR. S. RICHARDS: The only witness who falls into that category where we might want to call him in our case and the defense might want to call him in their case is Detective Mason. Otherwise, I would agree, everybody should be just called once.

I would also say that one way to expedite it would be to skip beyond the scope objections during the witness's first testimony so that nobody's forced to call them again if they want to go beyond the scope.

THE COURT: All right. Okay. I have no problem with that. I agree. I think that's the most efficient way, and I'm fine if the parties want to give markers to the jury in the sense of -- there are two ways to do it, right? One is to just go beyond the scope and treat it as you will. The other would be to say, "Okay. Now I'm going to ask you some questions about my case," or somehow shift to alert the jury that we're done with your cross and you're moving to affirmative evidence that you were seeking to admit.

It's not necessary. It's again something for the parties to consider, and I'm fine with it going either way. If the parties can't agree or if there's a dispute, that's the only reason I bring it up because I'd rather you talk about it

now instead of seeing or hearing something and object, and then we have to have a sidebar at trial. It's just a trial presentation thing that I've seen both in practice and while on the bench, so something to think about.

As far as exhibits, a couple of notes on them. I talked about the foundation, if they're agreed or if they're disputed. I do expect the parties to keep track of what's been admitted. I will have my list, but that's my list, not your list. And my list is used to resolve disputes. But you should know what's been admitted and what hasn't.

Typical practice, if something has not been admitted, me or my law clerk will be controlling who it's shown to. Whether you have paper or electronic, it's up to you what you want the witness to have.

I have no problem with if you know you're going to use 10 exhibits with a witness, giving him a binder or a folder with all 10 exhibits.

I have no problem with you identifying an exhibit for identification purposes and having it displayed on the screen in front of the witness. Either way works for me. What's important is if it has not been admitted, then it's helpful to have a cue of, "for identification," or, "to be shown to the witness," as opposed to published.

Once it's admitted, it can be published at any time; and so if you've admitted an exhibit and you want to show it to

a different witness at a later time in the trial, then I would expect or hope for language along the lines of, "I'm now showing you Exhibit X, which has been previously admitted." That's our cue to publish it. If it hasn't been admitted, then you wouldn't ask -- or reference that it had previously been admitted, of course, or you wouldn't use the word "publish" because that's something different than just showing to the witness.

Any questions about that?

MR. S. RICHARDS: Not from plaintiff.

MR. SCAHILL: No.

MR. POLICK: No, Judge.

THE COURT: You'll have the opportunity to come in and try the different courtroom technology. You can use laptops at the table. You can use laptop at either -- or I think this lectern, but I think the cord extends over to the other. You can use the document camera to present evidence or to -- if you're going paper.

At the end of the trial, when it comes to exhibits, when the jury -- after I've instructed them, I'll tell them they can go back and start deliberating, and we'll get them the exhibits in 20 or 30 minutes. And during that time, hopefully before that time, the parties have talked and there's an agreed set of exhibits. If that's the case, we'll go back on the record, say, "Plaintiff, are these the exhibits to go back to

the jury?  Defense, are these the exhibits to go back to the jury," and they go back.  If there are disputes, we'll resolve the disputes and then we'll have a record.  But I want a record that each side agrees that what's going back to the jury is the complete set of exhibits admitted in the case.

As far as the form that they go back, you can do paper or you can do electronic.  If you do electronic, I am not using the JERS system yet.  I find it creates a lot of hiccups for the parties.  Instead, they'd be .pdfs, and one side would have to have a clean laptop, meaning a laptop that just has viewing software and no other -- so, it's not a dumb laptop in that it's just like Adobe, but you shouldn't have your opening on it.

So, one side would have to provide a clean laptop either with the exhibits on it or with a thumb drive with the exhibits on it.  In the jury room -- and if you want to see it, I'm happy to show you -- we've got a monitor or television screen.  It's got like an HDMI and I think the other with the pins where you can plug in a laptop and they can view the exhibits that way.  It's up to you which form they go back, either paper or electronic.

Any questions about exhibits?

MR. POLICK:  Judge, there's one side issue, as long as we're on the subject.  We have a number of exhibits that were produced by the Cook County State's Attorney's Office in this

case. They stamped them, "Confidential." Several of them are redacted. There is a protective order that was entered in the case I think before your Honor got control of this case.

We are close to an agreement on modifying that protective order so that we can remove those "Confidential" stamps for use of the exhibits at trial. So, my question is: Do you want us to motion up that modification order, or is that something that we can submit as a proposed order to the Court?

THE COURT: To modify the protective order?

MR. POLICK: Yes, Judge.

THE COURT: Are they withdrawing the designation?

MR. POLICK: I think they're going to remove them, or that's what we're asking them to do, to remove them, because we're going to use some of these exhibits at trial.

THE COURT: Okay. So, if it's under the protective order, and if I didn't enter it, those go away at trial. Like if it's presented in court, it's a public document. And so the designation goes away.

To the extent that you're concerned -- unless you're aware of some other provision in the protective order that said it would maintain that.

MR. POLICK: I think my concern is that showing the jury something with a big "Confidential" stamp on it --

THE COURT: Right.

MR. POLICK: -- or a redaction may -- I don't know what they'll think about it; but our main goal is to see if we can get that removed.

THE COURT: Right. And so if there's no dispute as between the parties here that what was Exhibit X with a confidential thing against is now Exhibit X without it, I don't need anything.

If -- I guess the flip side of that is if the County doesn't agree to remove it and so you have these documents with "Confidential" on it, I can just tell the jury, "These documents came from another party. They designated it as confidential. Don't give it any thought. Don't wonder why or what have you."

I think it's fairly obvious that certain types of files would be confidential at some point.

Same thing with redactions. They'll get an instruction that, "Disregard or don't speculate as to why something's redacted. It's just protected information."

Does that address your concern?

MR. POLICK: Yes, your Honor.

THE COURT: All right. Any other questions about evidence or exhibits?

MR. S. RICHARDS: No. Just for the record, however, I am forbidden by firm policy to try and keep track of exhibits. That would be done by my co-counsel.

THE COURT: Okay. Like I said, it doesn't matter to me. I have my list, and my list will be used to resolve any disputes; but I won't do your work for you, meaning you can't keep saying, "I think this was admitted." Counsel, you either know or you don't. And so -- yeah, it's not my job.

When it comes to examination, normally, I caution counsel that I will nudge them at times if I feel they're becoming repetitive or getting bogged down on a topic. If you're on the clock, I won't do that, but I'll say it for completeness.

So, usually it's like an escalation. So the first time, it's just a curious, "Counsel, how much more do you have?" That's me saying, "Okay, I'm tired of this now." The next one will be, "Counsel, move on." And finally, it will be, "Counsel, you're wasting time."

So, understand that you will get a nudge that is harmless, but then if we get bogged down, you will get -- or I will tell you to move on.

Any questions about that? Again, probably not going to come into play because if you're on a clock, I don't care what you do with your time. You're not getting more.

So, all right. I already mentioned once plaintiff rests, I'll hear any motions during a break. We'll go into the defense case. And, plaintiff, if there's a rebuttal, you can put that case on.

For closing, I'll do the same thing. I'll ask your estimates. Normal cases where I'm not on the clock, I use the estimate just to alert you whether you're going long. For example, if you say, "I'm going to go 60 minutes," and we're at 70, I'll say, "Counsel, it's 70 minutes." That's not telling you to stop. It's just reminding you that you might be going long. Probably not an issue in a case where you're on a clock.

As far as instructions, I don't have a set rule on whether I instruct before or after closings. It's really just tied to the clock, meaning if it's -- in this last trial, the evidence ended at, like, 11:00 a.m. We were an hour out from lunch. I didn't think each side would get their closings done in an hour, so I instructed then.

I understand that each of you want the opportunity to go gather your thoughts, and so if I see that opportunity, I will ensure that you have that opportunity and try to tie closings to a break or what have you. If I think it will end the day, maybe I instruct at the end of the day so you have the evening, or we'll just break early. I'm not sure yet. But there's no hard-and-fast rule as to when I instruct.

Any questions from anyone about how I expect the trial to run?

MR. S. RICHARDS: Yes, I have a couple.

First of all, during opening statement, are we confined to the podium, or can we move around the courtroom?

Same thing for closing argument.

THE COURT: Yeah. Again, I want you to be able to try the case you want to try. You notice many court reporters these days wear headphones. That's because they have more clarity when they hear you through the audio system. And so you can move, but I encourage you to be near a microphone.

The microphones are relatively sensitive. When I was still trying cases, I would turn one -- like, I'd have space in between the two microphones. I'd turn one toward the lectern, and I'd just kind of gravitate between the two. But as long as you're near a microphone and the sound is being picked up, I don't care where you move.

You will not approach the jurors, so imagine a visible line at the edge of counsel's table; but other than that, you're free to move about.

MR. S. RICHARDS: And one further question on the same topic. I do have some difficulties standing for long periods of time. Would it be okay if I ask some questions from some witnesses from counsel's table? And I guess my plan would be to be on that side of counsel table furthest away from the jurors asking -- from the jurors when I ask questions.

THE COURT: I have no problem with that.

MR. S. RICHARDS: Thanks.

THE COURT: Any other questions from defense side?

MR. POLICK: In that same vein, your Honor, I'm

assuming the same rules would apply in examining witnesses, you want us near a microphone and don't get near the jury?

THE COURT: Right. You can -- you'll have free leave to approach the witnesses. I just mean like I don't want anyone leaning up -- we've all seen the movie. You're not leaning on the box to get close to the jurors. So, that won't happen.

I forgot to -- yes.

MR. MILLER: There is the microphone back there. Are we allowed to use that one, even though it's fairly close to the jury, for direct examinations?

THE COURT: Yes. So, that gets you close to the jury. If you've seen federal prosecutors, they usually examine from the end of counsel table, and they just -- I would have my trial cart. I'd put a box in it, and I'd set the microphone on the box in the trial cart.

And I think you can get to about here and still be picked up by the microphones, but judging by the court reporter, there's -- you want it as close as you can so that you get picked up. I don't project like I used to because I don't need to.

And again, you can come in and test the courtroom and see whether whatever setup you're trying to have allows the microphones to pick you up.

I forgot to address objections. I don't allow

speaking objections, so it will be, "Objection. Hearsay. Objection. Relevance," but you won't do the next. If I need more explanation, we'll go to sidebar and put the headphones on, and I'll hear you out that way.

All right. So, that's trial. We'll move into some of the specifics now.

MR. POLICK: Judge, I just had one more, if I may.

THE COURT: Yeah.

MR. POLICK: Do you have any prohibition on passing notes to another attorney while they're doing an examination of a witness?

THE COURT: No problem with passing notes, and every lawyer does it. "Judge, can I have a moment," and you go back and you see if there's anything more. But they should be moments and not extended deliberations.

MR. POLICK: Understood.

MR. S. RICHARDS: Your Honor, on that topic, I presume the rule is that whichever attorney puts on or does the examination of the witness, only that attorney is allowed objections on cross-examination, rather than multiple attorneys, or not?

THE COURT: Only one attorney per party may object to an examination. So, it doesn't have to be the examining attorney. It just can't be multiple attorneys.

MR. S. RICHARDS: Okay.

MR. SCAHILL: And, Judge, just one more issue with respect to objections. Would you like us to stand for each objection that we make, or does your Honor have a different rule?

THE COURT: I haven't seen anything throughout this case that leads me to believe that anyone here doesn't afford the Court the appropriate level of deference. I understand that trials move quickly and you need to get your objection off before the witness starts answering.

The standing, I prefer it only in that it's a visual cue that there's an objection, but I will not -- there are lawyers who -- parties who have been, in my view, disrespectful, then I'm going to hold you to, like, full rules of decorum. But it doesn't slight me just because you don't stand for an objection.

So, there's no requirement. Is it helpful? Yes. But so is projecting and being loud for the objection, so --

MR. SCAHILL: That will not be a problem.

THE COURT: All right. Now getting to the specific items, I have the parties' statement of the case. I will review it. I will probably condense it, and I will send it to the parties for review.

I keep referencing sending it to the parties for review. This will come in one of two ways. There are several things where I have your stuff. I will take my cut of it, and

then I will distribute it to you either by email. If I do it by email, I will make clear that this is a transmittal email. It is not a way to do business. So, I don't want any responses, objecting, or notes or anything like that. If you need relief, file a motion, or you address it in open court.

My purpose there is I don't want to -- I don't want formalities to hold up me getting information out. And so the statement of the case gets to you. It's something that I will need early on, and so I will get it to you so that you can file any objections to it that you may have before I start voir dire.

It will be simple. It will be basic. It will provide an overview of the case.

I don't recall many, if any, stipulations between the parties.

MR. POLICK: Only with respect to Defendant Halvorsen, that the plaintiff is not seeking punitive damages against Halvorsen or his special representative.

THE COURT: Okay. But that's not a jury -- that's not a factual stipulation, so it won't go to the jury. It just will come about in other ways in that the verdict form and the instructions will not name Halvorsen when it comes to punitives.

Okay. So, there's nothing to address about stipulations, other than to refer to my earlier comment, which

is I am surprised by the number of times lawyers come in and they try to get me to weigh in on stipulations. Either the parties agree or you're presenting evidence. It's that simple in my book.

Motions *in limine*, I will come back to.

Witness lists, you've exchanged them. Great. It's great if you notify each other of who you anticipate calling. I told you what I expect as far as you know you're going into each day with five to five-and-a-half hours of trial presentation. You should have enough witnesses available to fill that time.

Exhibit lists, I know they've been exchanged. I addressed this earlier, but I'll address it again.

The court reporter would like a paper set, if possible, of exhibits that you intend to use. I would like an electronic set so that I have them available during the trial if I need them.

Deposition designations, I do have the defendants' set. Did the parties resolve the issue of getting me the plaintiff's set?

MR. S. RICHARDS: Your Honor, I worked on it in the time, but I wasn't able to finish or make sure it was correct, so I'd like just a couple more days to get that to you.

THE COURT: That's fine. My question about them is: Are there objections to the designations that have been made?

MR. S. RICHARDS: From plaintiff's side, no. I think all the designations that I received from the other side were appropriate.

THE COURT: And for the defense, do you know what designations the plaintiff is making yet?

MR. SCAHILL: Some.

THE COURT: Okay. So, I'll set a date certain, then, to identify the specific designations because that's one of the things that I need to look at if there are objections to them. Sometimes those objections are resolved with counter designations, rule of completeness. Other times, I will need to address whether it's relevant or whatever other objection there is.

Okay. As far as how you present the deposition designations, are they all video-recorded?

MR. SCAHILL: No.

MR. POLICK: No, your Honor.

THE COURT: Okay. So, you can read them in. You can -- and that can take various forms. You can put a reader on the stand and do the back-and-forth. You can just read them. You can put them on the document camera or show them to the jury, provided it's just the designated testimony with the other stuff redacted or the non-designated testimony redacted.

Think about how you want to present them and do that.

Are there any transcripts that are being admitted or

sought -- where a party is going to seek to admit a transcript from a court proceeding?

MR. S. RICHARDS: Yes, we are.

MR. POLICK: Yes, Judge.

THE COURT: Have you resolved the objections to those?

MR. SCAHILL: No.

THE COURT: Okay.

MR. SCAHILL: That -- well, so, I think there's two answers to that question. One of them is we have not gone through the objections with the unavailable witness designations. Some of them are depositions. Some of them are court testimony from the underlying criminal proceeding.

In our estimation, as the defendant, those are treated differently. If there's a witness, for example, who testified at the criminal trial who is now deceased, our position is we can use that. The plaintiff can't. We weren't part of that case. He was. So, we can use it as prior testimony. So, there may be some issues with respect to that admissibility that comes up.

As far as the question-by-question issues, that's -- you know, assuming that's not a problem, we still need to exchange, you know, objections and perhaps -- I mean, I think we did the counter designations, but I suppose if there's a change, that we may need to do others.

THE COURT: Okay. Everyone's aware that I just did

the *Jackson* -- or that I've been involved in the *Jackson* case. That case is the trial that just concluded.

This issue came up, and now I at least know to ask about it before trial because I didn't then, and I had to go through and -- I had to think through bases of admission of prior proceeding transcripts.

I can tell you in that case, there were a few different types. One were statements by judges. In *Jackson*, the sentencing judge was relevant because there were four -- the judge sentenced based on four narcotics transactions, even though the criminal case only involved one. The other three were nolle'ed after they factored in to the sentence.

And so with a limiting instruction to the jury, what the judge said -- the jury had seen me all week. They know judges speak. And so the limiting instruction was along the lines of, "It's not being offered for the truth, whether the individual conducted those other three transactions, just that the judge considered it." That was the effect.

There were officers who testified. They testified in the case before me, and so there was an exception -- or not an exception, I think it was just non-hearsay for most purposes.

But think through those issues and raise them. We have time because of the length of the trial, but these issues should be addressed before -- before you seek to admit them.

And so in that case, we should treat them like

deposition designations where each side knows what portions of transcripts you intend to admit. You identify any objections. And so I will set a schedule for that.

I explained to you voir dire. For jury instructions, I'll talk about process, and then I'll ask each side if there are any particular disputed instructions that you'd like to address.

The process is this: I have your recommendations. I have your -- or your proposals. I have your -- the basis for your objections. I will go through, and I will create -- I call it a draft set, my draft set. I will send that to you next week. I will likely set a date by which you're to file any objections to what I have, and then we'll take them up at the final pretrial conference, if not sooner.

So, you'll get my draft set. You'll have the chance to review them. You'll have the chance to object to them. And this is not something that is as rigid as other things. I view jury instructions as my one job, and I need to get them right, and I need your help to do that. And so you will have opportunities to -- or I understand that jury instructions remain fluid in the sense that something may happen at trial. It rates another jury instruction. Something may not happen at trial. It rates taking out a jury instruction.

And so we will keep tabs as we go along so that by the time the final jury instruction conference comes, we can agree

on -- well, we can agree -- we can have an understanding of which ones should still be in and which ones come out.

And the only caution that I have to you is that -- excuse me. You will often hear two questions from me when talking about jury instructions: Is it a correct statement of law? And does it fit the facts of the case?

So, if you're not coming -- if you're not raising arguments with authority, with case authority or some other authority that requires a legal statement to be made or references to evidence that warrants the instruction, then there's not really a conversation to be had.

Any questions about that process?

MR. SCAHILL: We're having a -- we're going to reconvene next week to finalize some things? Is that what your Honor --

THE COURT: No. We will finalize during trial because the evidence might change what instructions come in.

And so the way it works, the process -- again, I have yours. I will talk through any jury instructions. I have one that I have a question on. I will hear if there are any hotly disputed or things you want to raise or be heard on, with the current objections. I will hear some, if not all, of those today.

I will go back. I will create a draft set. I will send that to you so you know what I'm starting the trial with.

And then you can do whatever research you need to do. And then during the trial, as we near the end of trial, we will find time to have it.

I will have your written responses, but you can also raise arguments, because again, I want to get these right, at the final instruction conference.

But the written objections does two things. One, make sure that you have the law or apprises me of the law, and two, it gives me a sense of: How much time do we need for the final instruction conference? Do I have to set aside an afternoon, or is it something that's going to take an hour?

Usually the way it works, in the last trial, they closed the evidence Friday at 2:00. I got to turn to the jury, said, "You get to go home. I've got some work to do with the parties." And then we fleshed out the final set.

So, you'll get a draft set. It's not final. And to the extent that I make legal determinations, I will include that in a minute order.

So, the way you'll get those, I mentioned earlier, sometimes you get an email. Sometimes you'll get something on the docket. For the jury instructions, the draft will be filed on the docket. There will be a short signature order that addresses any issues that -- any legal issues that I felt the need to resolve. I'm trying to think of an example from the last case. Nothing is coming to mind, but there were like four

issues that I needed to address from a legal perspective. I guess everything should be from a legal perspective, but four issues that needed to be resolved; and then you now know what the starting point is for the instructions.

Any questions on the jury instruction process?

MR. S. RICHARDS: Not from plaintiff.

THE COURT: For defense?

MR. SCAHILL: No.

MR. POLICK: So, Judge, if we're making objections, considering whatever your rulings are going to be, do you want those on the record, or do we file something?

THE COURT: I'll set a date by which you should file objections to the initial set.

MR. POLICK: Okay.

THE COURT: And like I said, the purpose of that is so that I understand how much heartburn I've caused, and also because -- I can't say what the evidence warrants until I see what evidence comes in; but the legal authority, if I'm just wrong on something, this is not an element required or this element is required, well, then, I want the opportunity to read the case and see how wrong I was.

And so that, again, there will be a minute order explaining that.

And at the end of today, I'll go back and recap what you can expect from me in the coming days.

All right. So now, let's talk jury instructions. There was one that I wanted to raise, and this is for the defense. The mitigation of damages, how -- what evidence -- or how do the facts of this case support a mitigation of damages instruction? This is defendants' proposed No. 23.

MR. S. RICHARDS: Your Honor, may I jump in?

THE COURT: Not yet.

MR. S. RICHARDS: Okay.

MR. SCAHILL: Well, so part of the issue is this is not a case where the plaintiff was released from prison. He was released, I believe, in 2008. There was not a motion to vacate the conviction until, I believe, 2020.

So, there are issues with respect to, you know, he's seeking, obviously, compensation for that time with an intact conviction and the like. So, there's issues with respect to that. That's number one, with respect to the vacating conviction.

Number two, and this is something that comes up in the motions *in limine*, with respect to conditions of confinement when he's in prison, a couple of things happened. Number one, there is gang involvement there. There are -- he got convicted of a felony while he was in prison for having contraband in the penal institution, which he was given then a consecutive sentence on, which tacked time onto his sentence. So, he would have been released earlier had he not engaged in that conduct,

which doesn't have anything to do with the defendants.

I'm trying to think. I mean, I suppose there may be other fact-specific things that come out at trial, but that's sort of the general gist of it would be conditions of confinement and things that occurred in the interim between him being released from prison and taking steps to have his convicted vacated.

MR. POLICK: Judge, if I may add to that, earlier, you raised a concern in your last case about a sentencing hearing. We have a similar issue in this particular case.

There was a sentencing hearing with respect to Mr. Rios's murder trial. The judge heard evidence in aggravation on the subject of Mr. Rios's aggravated assault conviction. He did hear one of the victims testify. There was photographic evidence presented to the court showing a photograph of the vehicle that Mr. Rios had shot at with the bullet holes in it and the certified copy of the conviction itself.

I'm assuming Mr. Rios is going to tell the jury that he was sentenced to 36 years in prison, but the sentencing court did take that evidence into consideration in rendering that sentence.

So, I'm not sure if that's mitigation or apportionment, but our argument would be that some of that 36 years is attributable to the aggravated assault conviction

because the court did consider it.

THE COURT: How -- but the assault preceded this conviction, correct?

MR. POLICK: That's correct. He was a convicted felon at the time of the murder trial.

THE COURT: And so how can he mitigate something that he's already done?

MR. SCAHILL: So Mr. Polick brings up a good point. The incident that Mr. Polick is referring to that was used in aggravation happened actually after the murder that happened in this case. So, the murder in this case is on May 27th, I believe, and then the shooting incident is on June 5th, right?

MR. S. RICHARDS: June 27th is the shooting.

MR. SCAHILL: I'm sorry. I flip-flopped them, but they're around -- they're within a couple of weeks of each other.

Before Mr. Rios goes to trial on the murder, he pleads guilty on the aggravated battery, which is shooting at a vehicle. He gets a consecutive, consecutive, not concurrent, three-year sentence.

So, I'm not sure if this falls under the guise of mitigation, but what it does fall under is it's non-compensable time in custody because he was in prison for an offense that isn't related to this one.

So, again, I'm not sure that's mitigation. I think

mitigation is after you sustain an injury, what steps do you take to ameliorate those damages? I think it's just an issue we're flagging with respect to compensable time.

THE COURT: Okay. Mr. Richards?

MR. S. RICHARDS: Yes, your Honor. The reason I want to jump in is that we're -- while not conceding that anything the defendants said is actually admissible, because I think some of it is and some of it isn't.

For example, the -- as to the compensable time, we absolutely agree that the three-year sentence or the time he served on that -- on the aggravated assault comes off his damages and should not be considered by the jury. So, that we're in agreement on.

The other point, though, about mitigation of damages, which relates to another issue, is this: We're fine with the defendants arguing that he didn't mitigate damages by moving to vacate his conviction sooner than he actually did, the delay from 2008 to 2020. Now, we will have explanations as to why he didn't do that, but that also raises the issue of the steps he did take to mitigate his damages, by successfully moving to vacate his conviction and by obtaining a certificate of innocence.

So, to the extent that we originally objected to that mitigation of damages argument -- and I apologize for being a little sarcastic about it; but I've given it more thought, and

we will be withdrawing our objection to that instruction as to mitigation of damages.

MR. SCAHILL: I mean, again, I think we're talking maybe about an apple and an orange here, but we can -- that's a motion *in limine* issue. I mean, the vacating of the conviction, for sure, I mean, that has to come in. The guy's not in prison anymore. The COI obviously is a more delicate issue that we've all briefed.

THE COURT: When was he -- I think the first alleged act was Guevara having him -- or threatening to take away his kid if he didn't say he was at the scene. What date did that happen?

MR. S. RICHARDS: Well, that all happened on July -- the first interaction on that day was July 6th, when --

THE COURT: Okay.

MR. S. RICHARDS: -- Guevara approached him. Then later, we think he's arrested without probable cause --

THE COURT: I have enough.

MR. S. RICHARDS: Sorry.

THE COURT: This just goes back to my point. I agree that mitigation comes after the harm, and so the notion that the murder happened this date, the assault happened that date, if the conduct at issue in this case didn't happen until July, how is anything that happened before July -- how is he supposed to mitigate anything that he did before the conduct in this

case?  I don't think that fits.

I have to give some thought to this notion that he didn't seek to set aside his sentence sooner or he made his time in prison worse by possessing marijuana or what have you.

I agree that the things that added to his sentence unrelated to the conviction at issue, the murder conviction, are fair argument.  I just don't know that any of this is traditional mitigation.

Though now I'm in a position where I have an un-objected-to instruction, I'm just still not sure that it fits.  But okay.  That's helpful.

All right.  Any jury instructions that the parties want to raise now?

MR. S. RICHARDS:  If I'm going first, I could --

THE COURT:  Okay.

MR. S. RICHARDS:  The instruction on the COI, which the defendant said they thought was fine if your Honor granted -- omitted the COI, which, of course, they're objecting to, I've given it further thought based on the briefs, some of the briefing we've done; and I think a modification of that -- small modification of that instruction to tell the jury not only what the COI is not relevant to, but what it is relevant to, which would be manner indicative of innocence and damages, and mitigation of damages.  I think that would be helpful if that instruction was modified.

THE COURT: Okay. One general note on instructions is I will do my best to keep facts out of the instructions. They are statements of law, not statements of the case.

So, to the extent that -- I guess facts is too narrow a view, facts and argument, they just have no place in instructions, in my view. And so the instructions will be there. The parties can make their arguments based on the instructions; but they will not be tailored to certain aspects of the case in the sense of calling attention to, "Well, this instruction relates to that." No, they will just be statements of law.

Any other instructions?

MR. S. RICHARDS: The other instruction I would like to point to is on the issues instruction. In the view of plaintiff, we did a better job of that than the defendants' instructions; and I was particularly struck by the fact that both in the verdict form and in their instructions, they put together or merge different counts of the complaint.

Basically, they have one instruction covering at least four counts of the complaint, the two fabrication of evidence claims and the two *Brady* -- or suppression of exculpatory evidence claims.

THE COURT: All right. But the law with respect to fabrication of evidence and with respect to the *Brady* claims is the same as to each claim, correct?

MR. S. RICHARDS: Well, the -- the law -- yeah, the law as to the fabrication claims and the *Brady* claims is the same; however, the --

THE COURT: Said another way, if I go to a Seventh Circuit case, and it says, "To bring a due process fabrication of evidence claim, you have to prove four things," that doesn't matter whether the fabricated evidence is a photo array or a coerced confession, correct?

MR. S. RICHARDS: Correct. However, if it's not separated out either in the jury instructions or in the verdict form, the problem is this: We are not going to know whether the jury determined that there was fabrication as to confidential informants or not. We will not be able to determine whether there was fabrication as to Benjamin Carrero or not.

THE COURT: Right. The verdict form is entirely separate from the jury instructions.

MR. S. RICHARDS: I understand. I think it would be helpful for the jury if they knew that there were different claims when they were reading the instructions, even though the law as to each claim might be the same.

There was a fabrication claim as to Benjamin Carrero, fabrication claim as to confidential informants. There is two separate *Brady* claims as to Cristino Garcia. So --

THE COURT: Right. And the introductory paragraph to

most elements instructions will say, "For plaintiff to prove his Claim X, he must show four things," right?

MR. S. RICHARDS:  Correct.

THE COURT:  Okay.  Any others?

MR. S. RICHARDS:  I would just commend to your Honor our instruction on the 404(b) material, which I think would alleviate some concerns.  And otherwise, we'll stand on what I submitted.

THE COURT:  Okay.  For the defendants?

MR. SCAHILL:  Well, with respect to the fabrication and the suppression, I mean, we used the pattern instruction, which lumps everything together.  Again, my view -- so, I think that sort of should be given, perhaps slightly modified because there's some issues that are at issue or not at issue, but it says one instruction.

But the bigger issue with respect to the claims, the way that I look at either a fabrication or suppression is that you either were deprived of a fair trial or you weren't.  Now, there may be any number of reasons why that occurred, but the jury is supposed to look at the totality of the evidence to see whether you were deprived of a fair trial.

It kind of sounds like counsel is maybe conflating claims with prospective -- with something that might be addressed by a special interrogatory or something, although those are disfavored in federal court.  But I'm not so sure

looking at that from the perspective of: Did whatever happened to Mr. Garcia or Mr. Carrero or this issue with the confidential informants, is that standing alone a claim? Because I think they have to all be sort of lumped together under Supreme Court precedent because it's totality. You may have one thing and then another thing essentially renders it irrelevant.

So that's why when we submitted our verdict form, we only have fabrication, suppression, and then the state law claims. I do think that's the appropriate way to do it. I understand what counsel is saying, but that's, I guess, what our view is on the matter.

THE COURT: Okay. I'll take that into consideration as I go back and look at the law and come up with my set.

I do agree that the verdict form will break it out by -- I won't say finding. It's not a special interrogatory. "Plaintiff claims X. Did he meet his burden on X? Yes or no." And you take that for each of the claims.

And so then, I did not know that there was supposed to be, at least according to the defendants, just one place for damages, so I've got a case to read in that regard.

But my verdict forms tend to be a choose your own adventure a bit, perhaps not a quite right example, but it will read, "Did the plaintiff prove by a preponderance of the evidence that applicable defendant deprived him or violated his

constitutional right to a fair trial by," whatever the action was? And then yes or no. Here it's probably by defendant, yes or no, and then you move to the next claim.

And then the damages, if you answered yes to 1, 2, or 3, fill it in. If you find punitives. If you answered yes to 1, 2, or 3, 4, whatever the number is, and you find damages -- or punitives are appropriate, and then there's the space below for the damages amount that they find.

Earlier, I mentioned that jury instructions and verdict forms are two different things. I meant in the context of argument. I will in my verdict form essentially use the overarching language of the -- or punitives is probably an easier example. It will say, "If you found -- if you answered yes to 1, 2, or 3, and you found that it was malicious or with reckless disregard for his rights, then punitive damages may be appropriate. If you determine that they are, enter that amount below."

But you'll get a better sense of that next week when I send that out. So let's turn to -- or any other issues on jury instructions that the parties want to address today?

MR. S. RICHARDS: Not from plaintiff.

MR. POLICK: Yes, Judge, just briefly. The main claim against all three defendants is this coerced confession claim. Somewhat surprisingly, there's not a pattern instruction for that claim, so each side has submitted what they believe the

instruction should be. I just note that for the Court.

THE COURT: I appreciate it. And my first task is to go -- it's usually in the context of summary judgment. Rarely do you get, like, a commentary on a jury instruction. But the Seventh Circuit often says, "To prevail on their claim, they've got to prove these four things."

I would note that in going through them, I saw a lot of legal terms. I do try to distill those out or provide explanation of what they mean closer in space, with the idea being that the elements instruction should be on a page, as opposed to going two or three pages back, and, "Oh, that's what they meant by proximate cause. That's what it meant by knowingly."

I'd rather them all in one place. And so I will try my best to incorporate them into one instruction.

MR. S. RICHARDS: Just from --

THE COURT: Yes.

MR. S. RICHARDS: -- plaintiff's perspective, I thought that as well, that the coercion instruction needs more R & D, so I appreciate the Court's efforts in that respect.

THE COURT: Okay.

MR. SCAHILL: Flagging one issue. I mean, this has been -- I've tried a couple of these cases, coerced confession. And how we tell the jury what is a voluntary statement or not is a constant source of disagreement.

And one of the things that we were trying to flag in our -- I'm not sure that counsel put a voluntariness -- a separate instruction, but one of the issues that we have is conflating criminal standards with civil standards. Obviously, voluntariness in the context of a motion to suppress in a criminal case means one thing. In the context of suing a police officer under 1983, it actually means something completely different. At least that's what our position is.

And so, the struggle here -- and I understand not wanting to give too much legal jargon to the jurors, but one of the things that's important to us for the jury to understand and what we've tried to encapsulate in our instruction is that all interrogations to some extent are coercive when you're sitting with a police officer and being asked about a crime.

The issue that the Supreme Court has said in this context, at least this is what our position is, is we're talking about improper police coercion, so things that are actually illegal for the police to do, as opposed to something that they're allowed to do that the Supreme Court has said. Examples would be lying to a suspect, keeping them in custody for, depending on the year, 48 or 72 hours.

And so it's sort of a nuanced issue because of the context that we're here, that we've tried our best to encapsulate, probably imperfectly, but that was something that has been a source of disagreement for a number of years because

there's no pattern instruction.

So, that's just something that I wanted to flag for the Court when you're kind of going through that issue because the coerced confession claim obviously is an important claim in this case.

THE COURT: Right. My initial thought is that there is a one-to-two-sentence synopsis that has been -- that's in the case law concerning what it means to overcome a detainee's will so as to make a confession involuntary or coerced, and then there are dozens of examples. And I'm hesitant to include each and every potential permutation just for the sake of completeness in the sense that -- it's a bad way to phrase it -- each and every example, even if those examples do not apply in this case.

And so I understand your position, and I will keep it in mind while determining the appropriate instruction.

Anything else on instructions?

MR. S. RICHARDS: No. Just on that last point, I'd just note that for your Honor, the experts, both sides' experts sort of agree -- or really do agree on what's a legal tactic and what is not a legal tactic, so I don't think at the end of the day, the jury is going to be much confused on that issue.

THE COURT: We'll see.

MR. SCAHILL: I don't know that I agree on that. I mean, the false confessions experts that I've deposed and we've

had a trial, they really like to -- they don't care for police being allowed to lie to suspects, for example, and they take it into account in their opinions, but they can do it.

But that's neither here nor there.

THE COURT: Since experts are in, let's talk about the three motions concerning the experts. Is either side requesting a *Daubert* hearing, or do you want to hold off on that until we discuss the experts -- hold off on that question until we discuss the experts?

MR. S. RICHARDS: From plaintiff's perspective, I don't think a *Daubert* hearing is necessary as to any of the three. All three were deposed. All three gave reports. I think the Court has enough information.

But I'm not the Court. So if the Court thinks you need more information, then we should have a *Daubert* hearing.

THE COURT: Okay. Well, I'll have questions, and we'll see how they come out. What about for defense?

MR. KEVITZ: Same thing, your Honor. At this point, we don't see a need for a *Daubert* hearing on any of the three particular experts.

THE COURT: Okay. So, we'll start with Russano. My question is for plaintiff's counsel, what methodology did this expert use to reach conclusions concerning this particular case?

MR. S. RICHARDS: Well, the methodology she used was

she reviewed everything, all the reports, all the depositions. And in terms of her analysis, she used experimental data and literature data, both of which are acceptable and have been held acceptable.

So, her expertise is based on, one, being a social psychologist; second, being an expert on police interrogation techniques, and she's actually given training to officers and developed new methodologies of doing interrogations.

Then she also did -- it's also based on the literature review, part of which is the literature she's contributed to, as to the prevalence of false confessions, which is based upon some anecdotal evidence, some experimental evidence, and some mixture of the two.

So, her opinion is, you know, multi-faceted in terms of the things she's looking at. We don't agree that there is some requirement of external validity, whatever that means. That's for another expert to define that.

THE COURT: I think we're getting off topic.

MR. S. RICHARDS: Sure.

THE COURT: A note. I will ask very specific questions, and I expect answers to my question. I think that over the course of this afternoon, everyone has seen that I will come back and ask each side, "Is there anything more that you'd like to address?" But right now, I'm asking the questions.

And so my question concerned what methodology she applied. I understand that she reviewed everything and then she applied what she reviewed to the data that she has come across in her field.

MR. S. RICHARDS: Correct.

THE COURT: Is there any other methodology or any additional methodology that she applied?

MR. S. RICHARDS: No.

THE COURT: How is that methodology reproducible, if at all?

MR. S. RICHARDS: Well I'm not sure what you mean by reproducible, but --

THE COURT: Well, one indication of reliability would be if I say you take chemical A and you add chemical B and I get product C, someone else should be able to come behind me and get that same result and then determine whether I'm reliable or not or whether I have developed a reliable method for making my product.

And so is there any indicia of reliability of her methodology in that it's reproducible?

MR. S. RICHARDS: Yes.

THE COURT: And what is that?

MR. S. RICHARDS: Well, her experiments are all reproducible, and she did experiments in false confessions.

THE COURT: Did she do any experimentation -- did she

talk to any witnesses here?  Did she restructure or re -- not re-enact.  Did she -- what did she do in this case that would show that her opinions are reliable, as opposed to just being her thoughts on the evidence?

MR. S. RICHARDS:  Well, what she did was she compared the evidence here to the evidence in other cases as are reported in the literature of false confessions.

THE COURT:  And why does the jury need help with that? Isn't that what we're going to ask the jury to do?

MR. S. RICHARDS:  The jury does need help with that for several reasons.  One reason is that juries commonly -- some jurors commonly don't believe there is such thing as a false confession because:  Why would someone confess to something they didn't do?  There is an answer to that question, and the answer has something to do with police interrogation techniques, which can produce false confessions if some methods are used, just to take one example.

It's well-known, in fact, their expert concedes, that one technique that police officers use in interrogation is minimization.  In other words, they'll suggest a scenario to a suspect in which the suspect seems to come out innocent and then suggest that that was the scenario.  And by the way, that's not an illegal tactic, and we're not claiming it is. But it is a tactic that can produce a false confession, as in this case, where Rios's statement is a statement saying that

somebody else is the shooter.

So, there is a close connection between number one, the literature on this technique, which she will address; number two, the facts of this case; and number three, her opinion, based on the literature combined with the facts, to produce the result that it's possible this was a false confession.

She is not going to reach the conclusion that it is a false confession or that Rios is innocent because that would intrude upon the jury's province, but she will provide the jury with information which will be useful to them to determine whether the confession was false.

And just to make clear, the issue of whether the confession was false goes to damages. She's not going to make a legal determination that it was a coerced confession because that depends upon whether the jury believes Rios or Mason or Guevara as to what happened in the interrogation.

THE COURT: Okay. So, when she makes statements in her report such as, "Among them, confirmation bias seems to have led investigators to interrogate Mr. Rios as well as witnesses with a guilt-presumptive approach that is likely to elicit information consistent with an investigator's theories of the case," that's at docket 246-1 at 45, isn't she just speculating as to why investigators did what they did or did not do?

MR. S. RICHARDS:  No.  I think there's a basis for confirmation bias in the case.

THE COURT:  There's an argument for it.

MR. S. RICHARDS:  There's an argument for it.

THE COURT:  But how -- like, this isn't the type of opinion where it's 1 plus 1 equals 2.  This is speculative as to what led them to that result, isn't it?

MR. S. RICHARDS:  Well, all science is not 1 plus 1 equals 2, and particularly social science is not, as opposed to physical science --

THE COURT:  But 1 plus 1 equals 2 is reliable because it's reproducible and a validated methodology, correct?

MR. S. RICHARDS:  Correct, in that field of mathematics, 1 plus 1 equals 2.  In other fields, there's -- even in mathematics, there's algebra -- or I'm sorry, calculus, which is not -- which involves not exact measurements, but parameters or areas of, you know, how much area is under a curve and so forth.

So, some uncertainty in a method does not render the method unreliable.

THE COURT:  Right.  But there's no method here other than she looked at some stuff, and she compared it to the data.  And the jury can do that.  That's exactly what we're asking the jury to do.  So, she's just telling the jury how she thinks it should go.

MR. S. RICHARDS: I don't think so. Another point I make, from one of the original philosophers of science, August Comte, C-O-M-T-E, what he said is there's a element of certainty appropriate to different sciences. There's a level of certainty appropriate to mathematics. There's a level of certainty appropriate to physics. And there's a level of certainty appropriate to the social science. All of these are different based upon how much you can achieve with the data and with the variables.

In this particular case, I think her -- she has achieved a level of certainty one can achieve in such matters, given the data, given the literature, and given her appreciation of the evidence.

THE COURT: Okay. I agree that science generally is just the process of assigning a percent certainty to observed phenomena; however, with respect to Russano, I am concerned that this expert is simply looking at the facts and the evidence and then reaching conclusions that are not based on any reproducible or reliable methodology, and that it's a significant risk of having this expert supplant the jury.

I think that permissible opinions from this expert would be her understanding of research in the field of false confessions, data concerning the incidence of false confessions. I agree, the jury should understand that false confessions do occur and that they tend to or have been

observed to occur under certain circumstances.

But I think that's where it ends, and that having this expert say, "And in this case, we had those things, and here's the conclusion that's drawn from it," goes too far.

That might be too restrictive in the sense of -- consider whether the expert can testify as to, "Here's an excerpt. Is that consistent -- not consistent, but does that fall under this category or that?"

But going so far as to say what the investigators did or thought or opining that the questioning conditions and techniques that Mr. Rios described could lead an innocent person to provide a false statement in a homicide case is going too far.

In other words, how is -- I come back to: How is that helpful? You're telling the jury that threats and violence can lead to a false confession. Isn't that apparent? Why do you need an expert to tell them that?

MR. S. RICHARDS: On that issue, you don't, that particular issue, you don't. That's correct. And as I said, I think neither expert on this issue disputed what the law was as to use of force or what was illegal or not legal.

THE COURT: You say you don't need an expert, but I am reading a quote. "It is my opinion, to a reasonable degree of scientific certainty in the field of psychology, that the questioning conditions and techniques that Mr. Rios described

could lead an innocent person or one that lacks guilty knowledge to provide a false statement in a homicide case," end quote.

So, that is an opinion that Russano offered, and you acknowledged that it's not one that the jury can hear. And opinions in that nature are excluded, so --

MR. S. RICHARDS: Let me -- let me withdraw my agreement.

THE COURT: It doesn't matter. I'm not withdrawing my ruling. So, it's ruled on.

MR. S. RICHARDS: Of course, I know that. But just so I make sure that my record is clear -- obviously, whatever strictures your Honor imposes on her testimony are what will be followed. With respect to -- with respect to whether certain techniques could induce an innocent person to confess, without saying either Jaime Rios was innocent or these techniques did induce him to confess, we would stand by saying that she could testify to that.

THE COURT: So, my view is that the extent of her -- is it a male or female, Russano?

MR. S. RICHARDS: She's a male -- she's a female. I'm sorry. I guess these things are sometimes confused nowadays, but she's a female.

THE COURT: I just looked at the last name, and I'm tired of saying, "the expert," or, "Russano."

So again, she can testify to observed data and experiments or studies that have identified -- I think that provides context for the jury -- "This percentage of cases have been shown to result from false confessions," or, "Under these conditions, trends have shown or data analysis has shown that false confessions may result."

But with respect to her looking at the facts in this case and concluding that something did or did not happen or did or did not cause an event in this case, that's going too far, and those opinions will be excluded.

MR. S. RICHARDS: Understand, your Honor.

THE COURT: Anything from the defendants on Russano?

MR. KEVITZ: No, your Honor.

THE COURT: All right. Loftus, he falls into the same category. He's got opinions -- I apologize. I didn't pull the cites, but he says, "Effects of low lighting on perception and subsequent memory. Clearly, illumination is relevant, as the shooting took place in the middle of the night. Thus, Mr. Huertas viewed the shooter under poor lighting conditions."

How -- what -- what makes this different than Russano, who's simply looking at the records and then reaching conclusions, factual conclusions concerning what did or did not happen?

MR. S. RICHARDS: Your Honor, our position would be the same. I would note that despite what's in his report, my

experience with Dr. Loftus is he generally doesn't venture an opinion as to the application of a science to a particular set of facts, whether he did so in this report or not. And I have put him on as a witness recently.

And in fact, in the leading case in Illinois on this topic, the *Lerma* case, where he testified, the court did not reach the conclusion of -- the question of whether he could testify to application of the science to a particular set of facts because in that case, he did not. And whether an expert could testify to that is an open question in the Illinois courts.

So, while not agreeing with your ruling, I understand it; and if the ruling is the same as to Russano, that he can testify as to science, but not application to a set of facts, I understand the ruling.

THE COURT: There are -- I'll read other excerpts that I pulled. "During the shooting, Mr. Huertas, as would be true of any normal human being under the circumstances, would have had multiple things competing for his attention, principally relating to his safety."

There's no basis for him to conclude that. Only Mr. Huertas can say what was or wasn't competing for his attention. Perhaps Mr. Huertas is a Navy SEAL and he's super calm under fire. We don't know.

And so whereas Loftus could testify as to things that

have been shown to affect identification, what circumstances in this case may or may not have affected the identification has to come from the evidence and won't come from experts.

And so it will be the same ruling. He can testify to data and studies in his field concerning the reliability of identifications, but he cannot extrapolate that to this case because again, it invades the province of the jury, who will say -- I imagine the arguments of, "You heard all the things that can affect it, and we've got it here." And then you tick them off.

But you don't need an expert drawing that line for the jury, particularly when it doesn't come from -- the distinction I'm making is if we had an accountant who went through spreadsheets and spreadsheets and spreadsheets and came up with a bottom line, could the jury do the math? Sure. But they just need the number.

Here, they actually have to make determinations of what it was like, what was perceived, and what was said. And so in this case, it's not any type of methodology other than doing exactly what we're going to ask the jury to do, which is listen to the evidence and then make determinations.

I understand the defense says that Loftus isn't relevant at all after *Blackmon*. Do you wish to be heard on that or any other issues?

MR. SCAHILL: We do stand on that argument, and what I

will mention with respect to *Blackmon*, counsel cited the district court opinion in *Blackmon*, which Judge Jenkins did, in fact, allow that to go forward before then; and of course, *Blackmon* sort of changed the landscape.

We did reference the *Rivera* case, where a very similar thing happened. This is pre-*Blackmon*, where the court said, "Well, we got rid of on the merits the unduly suggestive identification; therefore, allowing expert testimony on that issue would be confusing to the jury because it's not an actual claim."

So, that essentially was the crux of that claim. We don't think that the prior district court opinion in *Blackmon* really would apply.

So, that's really more of a relevance prong of *Daubert*. Call it relevance for *Daubert*, or just call it relevance under 402; but that's essentially that aspect.

And the only other thing I would mention is the second part of our brief that fleshed out issues we had with the methodology of Dr. Loftus was these factors that he talks about -- and I understand your Honor's not allowing him to apply the factors to the facts of the case, but the larger issue for us is that he seems to be talking about factors that weren't up in the air at all.

I mean, the poor lighting, the Court just talked about that, but more importantly, a huge portion of his report talks

about stressors, weapon focus, things of that nature and how that impacts perception and all of that.

The problem that we have here is the perception of Mr. Huertas occurred before any of that happened, so I'm not sure that the science even applies. And I think he admitted mostly at his deposition that he hadn't really looked into that.

So, we definitely have some pause, even with respect to some of the methodology, just because it doesn't seem to be addressing what the case is about with respect to Mr. Huertas.

So, I suppose that's the only issue that I would flag for the Court, even if we're talking about generalities with eyewitness perception experts.

THE COURT: So, how does it fit, or how is it relevant?

MR. S. RICHARDS: Well, in terms of relevance, first of all, the science which can lead to a false identification is relevant beyond any suggestive claim because it's relevant to the issue of damages based upon --

THE COURT: Not in that sense. When I use "fit," the term "fit," it's under the *Daubert* thing where the expert must fit or be relevant to the case.

And so what -- the defense argument is that many of the items that Loftus presents to the jury, much of the context doesn't apply in this case. And so does it?

MR. S. RICHARDS: Yes, it does.

THE COURT: In what way?

MR. S. RICHARDS: Well, first of all, it's not clear that the identification was made before or after the shooting. And there are problems -- there are multiple problems with the identification, so weapon focus is an issue.

Lighting is an issue, particularly given the fact that Huertas at his deposition said that the lighting was poor, whereas before, he had said the lighting was good.

And, therefore, there's -- those factors do apply in terms of stress, weapon focus, ability to perceive, and low lighting environment, and so forth.

So, those things are all still pertinent, and they're pertinent not only to a suggestive ID, but they're also pertinent to malicious prosecution and to guilt/innocence as it applies to damages.

I think in terms of the defendants' problems with his opinion, those can be addressed on cross-examination.

THE COURT: Okay.

MR. SCAHILL: I'm not -- Judge, I'm sorry. I don't know what counsel is referring to with respect to Mr. Huertas saying the lighting was poor. I think -- I'm not aware of that, so --

MR. S. RICHARDS: Well, let me just look at it.

THE COURT: We'll hear it at trial. I think that over

defendants' objection, Loftus may testify, if only to provide context to the jury that misidentifications do occur.

This is something that I do think may be beyond the reach. Much like false confessions, I can imagine someone who is not in the area, the field, thinking, "Why would -- how could you misidentify someone? Why would anyone confess?" And so presenting data concerning the incidence of misidentification, to the extent that he can, and trends or observations concerning misidentifications provides appropriate context for a jury in which witness identification will be presented.

And then lastly, we have the motion to exclude plaintiff -- or defendants' rebuttal expert, Schafer. I understand that he's a Ph.D. in psychology, correct?

MR. KEVITZ: That's correct, your Honor.

THE COURT: And my assumption is that a Ph.D. in psychology can read a study just as well as anyone else; and if that's true and he's being offered in rebuttal concerning Russano's reading of studies, do you have any additional arguments against allowing him -- allowing Schafer to testify, Mr. Richards?

MR. S. RICHARDS: Yes, there are several specific points in his opinion.

One point that he makes is that he thinks that police officers have an ability to discern who is lying and who is

telling the truth. There's no scientific basis for that, and there's scientific data, which Dr. Russano -- which actually Dr. Russano has in a report, which shows that police officers have about the same chance of telling whether somebody's lying or telling the truth, about 52 percent, which is just about the same as chance.

So, that particular opinion is definitely, I think, inadmissible. More generally --

THE COURT: One second. Is he going to offer that opinion, given what I've said about Russano?

MR. KEVITZ: No, your Honor.

MR. S. RICHARDS: Takes care of that.

THE COURT: Yeah.

MR. S. RICHARDS: The other thing that I think is taken care of by your opinion as -- your judgment as to Russano is he testifies basically that suspects are responsible for their own false confessions because they do things like -- which he thinks that Jaime Rios did, like minimizing, using truth overlays, et cetera, which is sort of like the flip side of what Russano says about the effect of police techniques on people giving statements.

So, to the extent that she is prohibited from commenting on the facts of this case, I think he should be as well.

THE COURT: He will be. Let me see if I can

short-circuit some of this.

I would imagine -- or will Schafer's testimony -- this is an oversimplification of it -- be, "Russano talked about seven studies. Those studies either don't say what she said they did, or those studies are trash"?

MR. KEVITZ: That will be the first part, yes, your Honor.

THE COURT: What's the second part?

MR. KEVITZ: The second part will be discussing what certain suspects say in order to reduce or minimize their involvement and participation in a particular crime, such tactics as the innocent presumptive responses, false evidence ploys, truth overlays, and minimization, which is backed by his research and experience in the field.

And, you know, to the extent that Dr. Russano is permitted to talk about risk factors for -- that might lead to false confessions, so should Dr. Schafer, which talk about the certain tactics that suspects use in order to minimize their involvement in the crime.

THE COURT: Tactics that he's observed suspects use in his experience?

MR. KEVITZ: That's exactly right, also based upon research --

THE COURT: And how that aligns with the research?

MR. KEVITZ: That's correct, your Honor.

THE COURT: Okay. Objection to that?

MR. S. RICHARDS: Yes. Well, I mean, I need to clarify. If Russano is allowed to testify that certain techniques can produce false confessions based upon the literature and the research --

THE COURT: She can.

MR. S. RICHARDS: Well --

THE COURT: Again, my view on this is the jury isn't reading *Psychology Today*. They're not reading False Confessions 101. At least I'm presuming that's knowledge -- specialized knowledge beyond the average juror. Who knows, we might get some Psych Ph.D.s on the jury.

And so those studies, the data, and the things gleaned from that data, that's all fair. It's getting into the specifics of this case and saying, "Yes, this happened to Mr. Rios in this case," that's -- those are findings that the jury has to make.

So, she can go -- or she can go there, and if she does, Schafer would be able to rebut that. Okay?

MR. S. RICHARDS: Yeah, I understand.

THE COURT: All right. I'll write something on each of the experts. Were there any other issues with respect to these three experts that I need to address? Yes.

MR. MILLER: Judge, could I just briefly address back with respect to Dr. Loftus? Part of this argument that these

factors that Dr. Loftus raises are actually reflected as facts in the record or at least through discovery, I don't know what order Mr. Loftus -- or Dr. Loftus is going to be presented, but I guess I would just ask leave that we could revisit this if at the time that Dr. Loftus is about to testify, that again, with whatever is in evidence, that none of these factors appear to be relevant to the case.

Because, you know, if you're talking about poor lighting and there's no evidence that the lighting was poor, one, it's not relevant; but it also is prejudicial inasmuch as there's no evidence of poor lighting, and the jury will think, "Well, why is this guy talking about poor lighting for 20 minutes as a factor in misidentifications," and it may suggest to them that, in fact, that is an issue.

So, I guess I would just ask leave to revisit this if, when Dr. Loftus takes the stand, there still is no evidence that any of these four factors he identified are supported by the evidence.

MR. S. RICHARDS: Your Honor, if I could be -- I might be able to clarify a little bit.

THE COURT: Go ahead.

MR. S. RICHARDS: So, my current plan is that Russano and Loftus will testify towards the end of the case, if not at the very end. And I do believe -- I respectfully disagree as to lighting because he goes into the difference between street

lighting and --

THE COURT: We don't need to get into the details. It sounds like you can revisit this if you want. It's -- that's fine. I just -- my initial instinct is -- and you can argue that. "The expert was up there talking about this, this, and that. You heard none of that. Where is the evidence? It doesn't fit."

That said, if there's an objection to the scope, I can revisit -- we can revisit that. It can be an objection -- particularly if the witnesses come last, the way I imagine it happening is the question will be asked. There will be an objection. Either -- given this discussion, the objection will be there's no -- it doesn't fit the case. And I'll hear from each side as to whether it fits or if there's an offer of proof or what have you.

So, yes, it's fine. You're fine to object. *Daubert*s and motions *in limine*, they allow us to address issues before trial, but you still have the right to object at trial. Oftentimes, the answer will be, "I've addressed that," and then I'll just refer to the motion; but circumstances change, and I acknowledge and accept that.

In that vein, I'll note that when you ask me to revisit rulings, it's not -- I don't like it. As with jury instructions, show me the error of law. Show me the new evidence or circumstances that warrant it because I have no

intention of revisiting issues for the sake of revisiting them.

All right. So --

MR. S. RICHARDS: May I --

THE COURT: All right. Go ahead.

MR. S. RICHARDS: May I bring up another point which may be slightly apropos? In terms of Dr. Wixted, who I didn't move for a *Daubert* hearing and I have no objection to his testimony, is it permissible for me to call him in my case if I wish?

THE COURT: Is he your expert?

MR. S. RICHARDS: No, he's theirs.

THE COURT: Then no.

MR. S. RICHARDS: Okay.

THE COURT: Are you paying him to testify in your case?

MR. S. RICHARDS: No. If I have to, I will.

THE COURT: Okay. That's something the parties can discuss.

MR. S. RICHARDS: Okay.

THE COURT: But typically, an expert testifies for the party that's paying them, meaning they show up to testify. You'll do what you do with respect to their fees and whether that imputes any bias.

But, yeah, I wouldn't expect that; but if the parties agree, I'm not opposed to it. Just I suspect there won't be

agreement on that.

All right. Motions *in limine* for the plaintiffs. Motion *in limine* 1 is looking to preclude the 1990 aggravated assault and 1995 contraband in a penal institution convictions under Rule 609. I understood the response to be, "We're not using it for 609. We want to use it for other purposes."

Having reviewed the filings, I'm going to grant the motion as to 609. It's available for other purposes, and subject to objections then, Mr. Richards, if you think that it's not being used for a proper purpose.

MR. S. RICHARDS: Thank you, your Honor. Did you want me to address that, not being used for a proper purpose?

THE COURT: No. That's the ruling.

MR. S. RICHARDS: Okay. Got it.

THE COURT: So, like, I -- if the 1995 possession of contraband is coming in to show that it added time to the sentence, that's an appropriate purpose independent of 609. That's fine. If the 1990 conviction is coming in to show that the assault was gang-related or that it contradicts some other statements, that's fine.

It's just a matter of argument as far as the purpose it was admitted for, where the defendants can't stand up and say, "Oh, by the way, Rios is a liar because he's a felon." Can't use it for that purpose.

Plaintiff's 2, this is the certificate of innocence.

Mr. Richards, what else do you -- what other evidence do you have to show favorable termination for your malicious prosecution claim, if any?

MR. S. RICHARDS: Your Honor, the whole -- I may be summarizing what I said before, but the whole gestalt of this -- the ending of Mr. Rios's criminal status was as follows: As the defendants say, and they're quite accurate in this, there was kind of a mass exoneration of Guevara defendants by Kim Foxx in July and August of 2022. And they're also right that maybe this had something to do with discussions between other defense counsel and Ms. Foxx, but I'll say this: I wasn't one of them. Nobody let me into any room to let her know what her thinking was.

I think there's an argument that they can make, which I'm perfectly happy with them making, which is that she did not look at the facts of each case to determine whether these people were innocent, but she determined that since Guevara was such a terrible guy or cop or whatever you want to call him, she wanted to grant all of these exonerations.

So, if they want to make that argument, that's fine; but a counter to that argument is that when we shortly thereafter moved for a certificate of innocence, she didn't oppose that, either. So, that adds to the manner indicative of innocence to show that, in fact, it was terminated in a manner indicative of innocence.

You have to take a look at the whole sequence. We almost had a hearing. Cal Rogallo (phonetic) had a problem, personal problem. We didn't finish the hearing. And then we were ready for the hearing. We were hoping to win the hearing, but Kim Foxx just said, "Fine."

So, I think the jury has a right to know that there is -- that it was terminated favorably. That's number one.

Number two is mitigation of damages. He mitigated his damages, the wrongful conviction, by seeking and getting the certificate of innocence.

THE COURT: How did he -- how did his release from incarceration come about?

MR. S. RICHARDS: His release from incarceration came about just because he reached the end of his sentence back in 2008.

THE COURT: Okay.

MR. S. RICHARDS: So, between 2008 --

THE COURT: So, how does the certificate of innocence mitigate his damages?

MR. S. RICHARDS: Because -- in several ways. One, after the certificate of innocence was granted, he was no longer a convicted murderer, so that would affect his potential job prospects.

Second and most importantly, among his family members, many of whom thought he was a murderer, including his son,

Jaime Rios, Jr., that reassured them that he was not a murderer, and that improved his relationship with his son. And he will testify to that. So, he mitigated his damages in that way.

He didn't have to seek the certificate of innocence, but he did. And he mitigated his damages by removing the criminal conviction from his record and replacing it with a certificate from a judge that said he was more likely than not innocent.

Now, that's not dispositive on any issue here because I don't have to prove his innocence. They can claim he's guilty, and I'm going to beat them on that. But it's relevant to show that he mitigated his damages, and part of his damages was having the criminal conviction, not just serving the time. Criminal conviction for murder is nothing to sneeze at.

By the way, on this topic, your Honor, I just want to give you a little tidbit that I didn't throw in to my motions, which were provoked by your ruling in the *Jackson* case, obviously.

One of the differences between this case and the *Jackson* case, which I did not note, was that Jackson actually legally was not entitled even to a certificate of innocence because under current law, after the Illinois Supreme Court case of *People versus Reid*, where he had three nolle pros'ed charges, he shouldn't have gotten it at all.

He was lucky because that case hadn't come down yet; whereas, in the case of Jaime Rios, that issue doesn't exist. There was no charges that were left outstanding or nolle pros'ed or not taken care of. And, therefore, the certificate of innocence was valid.

I addressed in my motions what I think is a slight misunderstanding of the process by which these are granted. And I know from personal experience. I represented William Dukes. Judge Reddick, the same Judge Reddick, denied the petition, even though the State did not object. I appealed it, and I lost the appeal.

So, I think these are contested proceedings, not identical to every other proceeding, but contested proceedings and --

THE COURT: We're getting far afield from whether it shows a favorable termination.

Defendants, are you going to argue that there was no coerced confession or fabricated evidence because Rios did it?

MR. SCAHILL: Well, we're certainly going to argue that there was evidence of his guilt, factual guilt, for sure. That is going to be an issue that we bring up. I'll keep it to that until you ask me how that applies to the COI, but yes, we are going to argue factual guilt.

THE COURT: Okay. What prejudice do you suffer if I introduce the COI?

MR. SCAHILL: Well, a couple of things. Number one, if the suggestion is that the COI can be used in any way, shape, or form to even imply factual innocence, the problem we have with that is *Patrick*, which I think pretty clearly marked a line in the sand there, which said these things are really only to satisfy a procedural fact, rather than being evidence of the underlying facts that were baked in to that decision.

In other words, what we have in the COI is another fact-finder, which I suppose you can call them that. It's not the adversarial fact-finder, but they have to find something because they say by a preponderance of the evidence, this person is innocent.

What that is is something that, all the way back to *Greycas* and those cases, is the substance of those findings being used to prove that in a subsequent case, which I don't think is permitted under *Greycas*, and I don't think is permitted under *Patrick*, either.

So, there's that issue. The second issue is even with respect to the procedural termination, I understand -- *Patrick* was my case. I understand that that's what the Seventh Circuit said as far as the state law malicious prosecution claim. But as your Honor also recognized in *Jackson* and the Seventh Circuit recognized in *Patrick*, too, that does not end the inquiry. What -- you still need to go to 403.

So there's a couple of issues, and some of them are

general to all reversed conviction cases, and some of them are more specific to this case in particular.

So, with respect to all cases, the -- even if you have a jury instruction that says, "You're going to hear evidence that another finder of fact said by a preponderance of the evidence that this person is innocent, but sort of disregard that," it strikes me as a little Pollyannaish to think that most lay jurors are going to be able to appreciate that nuance. So, there is some inherent prejudice which I think *Patrick*, you know, pretty much put -- put out there.

With respect to this case, as we fleshed out in the motion, and this is, you know, something that I think applies more to Mason and Halvorsen, remember, they do not have a malicious prosecution claim against them. They're two-thirds of the defendants in this case.

So there's some serious danger of spill-over prejudice to them, particularly when they're going to be saying -- and remember, when they're talking about factual guilt versus factual innocence, for sure that is a thing in these cases. It relates to damages. But with respect to them and with respect to my client, we have a coerced confession case where he's saying, "I was coerced to give a false confession," and we're saying, "No, you gave a true confession."

So it's something that has a very serious risk of intruding upon the province of the jury and essentially having

them stop listening to the evidence once they've heard that a judge, applying the same standard that they're going to be told by your Honor, preponderance of the evidence, found something different.

Now, could we get into, "Well, there was no hearing, and you reviewed this and you didn't review that"?  You could do that.  And, Judge, I think these are both Judge Jenkins cases.

In both *Blackmon* and I believe *Brown*, Judge Jenkins said that's getting a little bit far afield because then what we're doing is we're essentially trying to make the jury understand how the Code of Civil Procedure works and the difference between this and that, and they're weighing two different proceedings when that's really not germane to the issue.

So at bottom, what we had produced with respect to this prejudice issue, which is the question that your Honor asked, was to, you know, essentially follow the framework of what Judge Shah did in the *Walker* case, which -- and that case did not have a number of defendants that did not even have a malicious prosecution case.  I think it was only defendant in that case.  And Judge Shah still said, "You know, this is something that just is so inflammatory, we're just going to take this element off of the table, and you don't have to prove it."

Now, I understand Mr. Richards does not want to agree to that, which I understand; however, what it certainly sounds like, in -- and this is in the supplemental brief, it sounds like the reason why he doesn't want to take that off is that there is some -- I think it's actually more of an insinuation that he wants them to use it for purposes other than the procedural disposition because he says it in the brief. He says, "This is relevant to damages because it proves I'm innocent." I don't think you can do that. I think, again, *Patrick* drew a line in the sand.

So, with respect to your Honor's questions about prejudice, there's inherent prejudice. It's only relevant to the procedural aspect, which can be taken off of the table. And we have other interested parties here, where even if you take that off of -- off the table, it's going to be difficult for them to get around that.

There's a way to fashion an outcome here that does not have to put that in there, and he's going to have to prove less to do it.

THE COURT: For damages, is it your contention that the certificate of innocence is relevant to damages, Mr. Richards?

MR. S. RICHARDS: Yes.

THE COURT: How?

MR. S. RICHARDS: It's relevant to damages in two

different ways. One way is as the -- one of the courts said, it's relevant to take the jury's focus away from the issue of whether he's guilty or innocent, which is only relevant to damages and not relevant to anything else.

So, it's one way of saying, "Listen, don't speculate too much about guilt or innocence because that's not an issue as to whether his civil rights were violated." A guilty person's civil rights can be violated. An innocent person's civil rights can be violated. Civil rights violations are civil rights violations.

The only relevance of guilt and innocence is to suggest that it's relevant to damages because a guilty person should get less damages than an innocent person, which they can make that argument all they want, and I appreciate it.

But to keep the jury's focus on whether the civil rights violations have been proved and also whether there is a reasonable likelihood of a different outcome by a jury based upon the civil rights violations, it's relevant in that respect.

I would also say that if we're talking about other adjudications, remember, the jury is going to know that a previous jury found Jaime Rios guilty. They have to know that because that's why he was incarcerated, and eventually, he was exonerated.

So, the fact that another fact-finder -- I'm

multiplying my facts.  The fact that another trier of fact found something is not a reason to keep it out, we have the same problem with the jury verdict, which of course, favors them, not me.

Second --

THE COURT:  Right.  But that jury considered, in your view, fabricated evidence.

MR. S. RICHARDS:  Correct.

THE COURT:  Whereas, presumably, the judge did not.  So, isn't that a false comparison?

MR. S. RICHARDS:  No, I don't believe so.  I think that the jury should vote both things.  I think juries are intelligent enough to know why evidence is being given.

Now, also as to damages, as I've said before, it's relevant to mitigation of damages because he mitigated damages by receiving the certificate of innocence, and that changed his life in a remarkable way.  Now, I think again, the jury can be instructed to train their minds on those purposes.

Now, with respect to Mason, I think this issue comes up throughout, that Mason -- some of these things are not relevant to Mason.  To the extent Mason is in the -- is arguing that my client is guilty, it is relevant; but if it's not relevant to Mason --

THE COURT:  How is it relevant to Mason arguing that your client is guilty?

MR. S. RICHARDS: Because I assume that Mason is going to argue my client is guilty; therefore, he should get less damages.

THE COURT: And so your response would be this certificate of innocence says he's innocent?

MR. S. RICHARDS: My certificate -- it says that -- it weighs against him being guilty. It doesn't mean he's innocent.

THE COURT: "Because some other fact-finder determined that he wasn't guilty, so, jury, you don't have to"?

MR. S. RICHARDS: No. What I'm saying is, "Jury, when you look at whether he's guilty or innocent, look at everything."

THE COURT: Including the certificate of innocence, which says he's innocent?

MR. S. RICHARDS: Correct, which is what --

THE COURT: Which would mean that you're intending to offer it for the precise purpose that you're not allowed to offer it?

MR. S. RICHARDS: No. We're not -- we're offering it -- one of the cases says we can offer it for that purpose; but aside from that --

THE COURT: Which case says you can offer it to show that he's actually innocent.

MR. S. RICHARDS: I believe that was the case where

Amy St. Eve gave the instruction.

THE COURT: No. The instruction specifically says you are not to consider it to decide actual guilt or innocence. It says you can consider it only for purposes of favorable termination. You are to decide whether -- what happened on that particular day. I'm paraphrasing. That was not the *Harris* instruction.

MR. S. RICHARDS: If you give me a moment, your Honor, I may be able to pull this up, but --

MR. SCAHILL: Judge, counsel is referring, I believe, to *Kluppelberg*, which is a pre-*Patrick* case.

MR. S. RICHARDS: Yes, I think that was the case, and I think *Kluppelberg* is the one that reviewed --

THE COURT: Right. But now we have *Patrick*, which reviewed a St. Eve instruction and said to a different district court and said, "You should have used this one." Isn't that *Patrick*?

MR. S. RICHARDS: I think that is true. The other final reason, though, is I go back --

THE COURT: So, how is your statement consistent with the instruction that the Seventh Circuit endorsed in *Patrick*?

MR. S. RICHARDS: It would not be, so, therefore, I withdraw that argument.

With respect, however, to the mitigation of damages, the same -- the same argument applies that it mitigated his

damages because it removed the stigma of the criminal conviction from him, and he's being asked to -- the defendants are making the argument that he should have mitigated his damages either by filing the motion earlier or presumably by not removing the conviction. This shows he took the steps to remove the conviction, and that does go to damages.

But to return to Mason, that argument would apply to Mason, but to the extent that Mason is all -- is claiming that he's in a different position than Guevara, I think there are two choices. One is to instruct the jury not to consider the certificate of innocence against Mason, and the second is to sever the trials and try Mason separately. We're fine with doing that.

THE COURT: Okay. I'm going to take plaintiff's motion *in limine* No. 2 under advisement.

MR. SCAHILL: Can I just make one other comment?

THE COURT: One second. I have one more question for you, Mr. Richards.

You mentioned that a guilty person is entitled to less damages than an innocent person, but my question is: Is a person who has been wrongfully convicted any -- and who obtained a certificate of innocence harmed in any different way than a wrongfully convicted person who has not obtained a certificate of innocence?

MR. S. RICHARDS: No. He -- no. He has -- all I can

say is that if he obtains a certificate of innocence, he has mitigated his damages by taking a reasonable step, as the defendants' instruction says, to reduce the damages to himself, which also highlights, by the way, what the damages were before he got the certificate of innocence because before that, he was under this stigma, and afterwards, he is not.

THE COURT: Okay. What were you going to say, Mr. Scahill?

MR. SCAHILL: It actually relates to that point. We are not making and will not make any sort of argument that the failure to get a certificate of innocence is a lack of mitigation of damages. The issue with respect to removing the stigma of a criminal conviction is accomplished by vacating the conviction, which, you know, has to come in or else they'll still think he's in prison.

The certificate of innocence is not -- you're not even eligible for one unless your conviction has already been vacated, which that removes the stigma of it. That's point one.

The other issue, which is addressed in our supplemental memorandum, this idea of the relationship with his son, this is the first we're hearing of this. It was asked in discovery. It's not disclosed. There's nothing about post-release damages and relationships. So that's an issue.

And the third thing, which gets back to this prejudice

issue, I appreciate counsel saying that this whole process with Ms. Foxx and vacating these convictions because of apparently what she thought about the, you know, practices of Mr. Guevara raises some serious problems because we're getting then into policy and political issues at a trial which should be constrained to the facts of this case.

And so while under normal circumstances, you know, gun to our head, are we forced to put on a mini trial as to what happened with the COI, do we do it? Yes. It is so much more complicated in this case because you're talking about a world of all of these other cases and what went into that and political stuff, which, by the way, we were sort of precluded from getting into the specifics by deliberative process.

So, it opens up so many prejudicial things that we're going to be fighting with not one, but two hands behind our back on.

THE COURT: Okay. I will take it under advisement. I realize we've been going for more than two hours, so we'll take a 12-minute break, come back at 3:35, to give everyone an opportunity to stretch their legs. So, I'll see you back in about 12 minutes.

MR. SCAHILL: Thank you.

(Recess had from 3:23 p.m. to 3:35 p.m.)

THE COURT: All right. We are back on the record.

We'll take plaintiff's motion *in limine* 2 concerning

the certificate of innocence under advisement.

Plaintiff's 3 is to call Defendant Guevara so that he could take the Fifth. It's unclear to me what questions you intend to ask of Defendant Guevara.

MR. S. RICHARDS: Your Honor, well, those would be the questions that we -- first of all, we asked questions at the deposition. I've given the defendants designations as to which questions I would want to introduce that are relevant. So -- and I also have a tape of that.

So, apart from calling him as a witness, we can introduce that evidence through the videotape if that is allowed.

However, there may be additional questions that occur during the course of the trial, which I -- are based on information I wasn't aware of at the time of the initial deposition. There are some additional questions I can think of now. I didn't give you a list of them. But if you give me time, like a day, I can file with the Court a list of additional questions I think that are -- that were not asked at the deposition that I would like to ask so that you can rule on those in advance.

And so that's what I would like to have him present either in person or by Zoom for.

In regard to your question about whether the Court has jurisdiction over him, if he was a witness and without -- and

beyond the 100 miles, that would be an issue. And I think there's a split of authority on that. But since he's a party, I think your Honor can require him to appear for the purpose of being a witness or face some sort of sanction, like default judgment or whatever.

So, I can't tell you right now exactly the questions, but I should be able to do that in short order, meaning questions beyond those I asked at deposition.

THE COURT: Okay. And response from Mr. Scahill?

MR. SCAHILL: Well, I mean, part of -- there's cross motions on this, of course. I think this is our 7. But with respect to the questions to be asked, that is one of the things that I would like to know because we all know what the answer is going to be to those questions, as I articulated this morning.

And so normally, I would not ask a questioning attorney, "What question are you going to ask my client," because the answer is going to always be, "You're going to have to wait and see." But here -- because you could coach them on that. There's no risk of that. There is a risk, as has happened in pretty much every deposition that's been taken of Mr. Guevara, there's questions that ask any manner of things that's out there, and that's just what he says, unfortunately.

So, the danger is the question becoming the evidence, as opposed to the answer becoming the evidence, which is why I

think it is -- and I'm not sure if counsel is disputing this. You know, I would like sort of a list of these questions, not because I want a preview. It's not going to matter. He's going to say what he's going do say, but so your Honor can hew the questions to what is proper and not allow this to sort of get out of hand to use the questions as evidence.

THE COURT: Okay.

MR. SCAHILL: Oh, I'm sorry. With respect to him showing up, I mean, again, I thought this morning with this -- he can appear -- if your Honor, you know, denies the other portions of the motion, he can appear by WebEx.

To force an octogenarian who has health issues to travel here for the purpose of not giving substantive testimony, you know, I disagree with that, that the authority is there. But it seems quite unnecessary, given the fact that he is not going to be giving substantive testimony that needs to be, you know, showing exhibits and the like.

THE COURT: All right. Okay. So, I'm going to grant the motion to call Guevara, with the caveat that the plaintiff will provide the questions that you intend to ask to me and to opposing counsel, the purpose of that being making sure the questions aren't for any inappropriate purpose, and that the questions align with some other independent basis of evidence so that defendants can raise the issue, they know more about the case than I do, or I can address the issue prior to

Mr. Guevara testifying.

Do you -- I don't think there's any opposition to him appearing by video?

MR. S. RICHARDS: WebEx? Absolutely not. As I said in the motion, no offense to Detective Guevara, but even he does not deserve to have to travel all this way in his condition to answer questions in open court that I can ask on WebEx.

THE COURT: Okay. So, I'm granting 262, which is the motion to testify remotely, and I'm granting plaintiff's motion *in limine* 3, which is to call him, even though it's expected that he's going to take the Fifth.

MR. SCAHILL: Judge, can I ask a logistical question about that?

THE COURT: Certainly.

MR. SCAHILL: Mr. Guevara is in San Antonio. As luck would have it, I have an attorney who lives there who will facilitate this. I'm not sure what the Court's pleasure is or counsel's pleasure. I can have him set up at his home, or I can have him delivered to a court reporter's office.

He has given many depositions from his home with the facilitation of one of my partners, but I can certainly deliver him to a court reporter's office if your Honor requires that.

THE COURT: I don't require that. I just ask that he not be in a car with people coming up and asking him to move

along, which has happened at a trial.

MR. SCAHILL: I had a guy working a shift at his restaurant at his deposition and making food. So, he will be in a place that is quiet and uninterrupted.

THE COURT: Okay. And when it comes to scheduling something like that, I have no problem interrupting the order of trial if -- for example, if we know -- it probably makes sense to have him go on just after one of the breaks so that he has a time certain. We have a time certain.

And so like if before the lunch break, we're on witness X and we break, witness X isn't done, but we've scheduled a remote witness for 1:00 p.m. Central Time, we can take that witness out of order; and I'll just explain to the jury that we're doing it as a courtesy to the witness and as a practical issue.

All right. So, plaintiff's 4 through 11 are essentially motions to call other witnesses who either were -- or were in some way victims of similar conduct. The proffered purposes are to establish motive, modus operandi, intent, opportunity, preparation, or plan. I don't think any of those apply here.

As far as motive, there's no evidence concerning -- or no indication that the motive is the same from one to the other, other than perhaps closing cases, but I don't think you need that other bad acts evidence to come in to establish that.

As far as modus operandi, while there are some similarities in the conduct, it's not the type of unique conduct that would necessarily identify an individual, meaning this isn't a serial killer who takes the index fingernail off the victims. It's just abuse or coerced confessions that isn't necessarily -- doesn't have a signature calling that would qualify as a modus operandi.

Intent, opportunity, preparation or plan, again, they're -- all of this, I think, fails. It's really to show that this is what he did on those occasions; and, therefore, you know he did it -- or you can believe the people in this case when they say that he did it to them because he did it to others.

And so I think it's improper propensity evidence, and I'm denying the motions to admit their testimony concerning any abuse that they suffered or claim that they suffered from Guevara.

That takes care of the plaintiff's. Is there any, aside from the certificate of innocence, that you want me to address any further?

MR. S. RICHARDS: No, your Honor. I will move to reconsider that ruling, and I'll do that in writing as soon as possible.

THE COURT: Okay. The defendants' motions *in limine*, the first one concerns the certificate of innocence, so that is

under advisement.

The second concerns suggestiveness or coercion leading to identifications in this case or failure to inform the prosecutors of that. As I understand -- or my sense of this or my thoughts on this are that just because a claim was decided on this at summary judgment doesn't change that it happened or is alleged to have happened. So, claims don't necessarily influence the facts and can be relevant to other issues in the case.

For example, it could be relevant to materiality, if one says that the false confession wasn't that material because there was an identification, et cetera. So, these issues are still at play; and, therefore, the underlying -- the evidence concerning them are still at play. So, Defendants' 2 is denied.

Defendants' 3, bar evidence or argument contradicting admissions made during summary judgment proceedings, essentially asking for judicial admissions, this is denied. Many of the purported judicial admissions concern Huertas and what the plaintiff said Huertas did or didn't do, but isn't Huertas listed as a witness?

MR. SCAHILL: Yes.

THE COURT: And so if he's going to testify, that will be the ultimate determinant as to what he did or didn't see.

So, I don't view these 56.1 statements necessarily as

admissions, as much as they're statements of what certain evidence shows as to whether something's a disputed or undisputed fact. And so Defendants' 3 is denied.

Defendants' 4 concerns false testimony by any defendant at plaintiff's criminal trial. The immunity from suit for false statement does not mean that the statements didn't happen. They're still statements of a party opponent. They are still relevant to credibility. And so that one's denied.

MR. SCAHILL: Can I ask a question on that?

THE COURT: Yes.

MR. SCAHILL: And I think counsel agrees with this. I think the focus was -- I understand all of that and agree. I think the focus was more I don't want to be -- and I think Mason and Halvorsen don't want to be in a position where there's an argument that, for example, "You lied at trial; therefore, you maliciously prosecuted him." It's not necessarily the inadmissibility. It's more of a technical legal issue.

What's the Court's view on that?

THE COURT: So, you mean having any false statements by Guevara's codefendants imputed to him for the malicious prosecution?

MR. SCAHILL: No, no, no. So, for example, Guevara's testimony at the criminal trial comes in, and then counsel

says, "Well, we have a malicious prosecution claim. And you know that he has commenced and continued this because he got up on the stand there at trial, and he lied. Therefore, he maliciously prosecuted him."

I think this was addressed in your Honor's ruling on the reconsideration motion on summary judgment. I think that argument's out of bounds. The fact that the evidence happened and what was said is fair game.

So, I guess that's -- maybe I'm dancing on the head of a pin here, but that's sort of the distinction I'm inquiring of the Court as to what the view is.

THE COURT: Okay. Response?

MR. S. RICHARDS: I'm not sure I follow that, but let me just say our position. Our position is that all these people have absolute immunity for what they said at trial, and I would agree that what Guevara, for example, said at trial could not be part of a malicious prosecution claim.

On the other hand, to the extent that the things he said at trial are inconsistent with other evidence, I think they're admissions of a party opponent. But they can't arise by -- they can't create liability in and of themselves because he has absolute immunity.

I think I -- maybe I've danced on the head of the pin sufficiently with that distinction.

THE COURT: So, my take is there's no issue with the

plaintiff saying, "There are inconsistent statements. Therefore, this witness is not credible." But use of those inconsistent statements for some other purpose, such as to affirmatively establish proof of a claim, should not happen.

MR. SCAHILL: I think that's accurate, yes.

THE COURT: Okay. Did you intend to use prior false -- you wouldn't use the alleged lies at trial, because they're not favorable to you, for the truth, so, do you have any other purpose other than for credibility or impeachment purposes?

MR. S. RICHARDS: No, it's only for credibility and impeachment. And I can give you some quick examples. For example --

THE COURT: No, I think I'm okay.

MR. S. RICHARDS: Okay.

THE COURT: So, it's denied without prejudice, with the understanding that they will be used -- prior testimony will be used for impeachment purposes. If you feel that it's being used for some other purpose, either through examination or in argument, you're free to object.

MR. SCAHILL: Thank you.

THE COURT: Defendants' 5, there's this issue -- Defendants' 5 deals with prior claims of misconduct, citizen complaints and lawsuits. Plaintiff's not opposed, with the exception of wanting to allow Rios to testify as to what he

knew of Guevara's reputation. What's your response to that?

MR. SCAHILL: That sounds like a bit of a roundabout way of backdooring in 404(b) evidence; but perhaps the bigger issue is Mr. Rios didn't give any sort of substantiation as to what he was talking about. He had never had any prior interactions with Mr. Guevara. This whole bad reputation wasn't based on any, you know, personal experiences he has. It strikes me as sort of a backdoor way of getting in things that they wouldn't be able to get in the front door.

THE COURT: Okay.

MR. SCAHILL: At the end of the day, Mr. Rios is saying, you know, he got beat up and, you know, minimized and all of that. I don't know that all of this adds a whole heck of a lot anyway, even if it were relevant; but there are some serious prejudice issues with respect to just generally saying, "This is what your reputation was." Reputation evidence is governed by a specific Rule of Evidence which escapes me as I sit here today, but as I recall --

THE COURT: 6-something, but I don't know which one.

MR. SCAHILL: Yes, 6-something, but there's predicate foundational issues that you have to satisfy, which he has not.

THE COURT: My understanding is that defendant is not -- or plaintiff is not -- I apologize now because defendant becomes plaintiff, and so I will butcher those terms, or mis-assign those terms, so I apologize in advance. Though the

best apology would be to stop it, and I will endeavor to do that.

My understanding is plaintiff here wants to or intends to argue that, "The reason I agreed to put myself at the scene is because I was afraid of what Guevara may do to me," which I think is -- explains -- is a non-hearsay purpose there because it's the explanation of his conduct.

So, I'm going to deny Defendants' 5 without prejudice, in that you can raise it if you think it's getting beyond that.

MR. SCAHILL: Yeah. And I -- okay. And that's -- I respect that. I just want to make sure that we don't get too far afield with specifics of things that he had heard that he did.

Just if there was an issue with, "He did this to me and did that to me, and this is what happened," that would be one thing. But it seems like he's attributing specific things that Guevara supposedly had done that he didn't witness.

The reputational thing, I obviously respect the ruling of the Court, and we'll address that as appropriate. I just want to make sure -- and maybe this is just flagging for you that what I will be doing at trial is just making sure that we're hewing this to things that are not getting into hearsay land that wouldn't be necessary.

THE COURT: I understand your concerns, and I suspect Mr. Richards does as well; and we'll see what the testimony

looks like as it -- or sounds like as it comes in.

This is one of those areas where if we're getting too far into the weeds in the sense of starting to introduce specific instances, as opposed to a general understanding, you might be nudged to move along. Of course, the cure here would be a curative instruction to the jury if we go too far, but it's something that I will take as it comes in.

So --

MR. S. RICHARDS: And, your Honor, just -- I appreciate your ruling, and I hesitate to speak too much; but just for the record, Guevara did arrest Rios on a prior occasion, and a lot of this is things that Rios witnessed Guevara do to other people, not just hear about.

MR. SCAHILL: I don't think that he did, but in any event, we'll deal with that at trial, Judge.

THE COURT: Okay. Defendants' 6 concerns Loftus. I've already ruled on that.

Defendants' 7 is the Fifth Amendment issues. I've already ruled on that in the context of plaintiff's motion.

8 is tied up in the plaintiff's motion.

9 is denied in the sense -- or consistent with my earlier statement that while summary judgment eliminated claims, it didn't necessarily eliminate evidence.

Defendants' 10 concerns judicial commentary on the credibility of Defendant Guevara. Plaintiff responds that

Judge Obbish's comments are relevant to the Fifth Amendment invocation and Judge Reddick's views on the certificate of innocence. I did not quite understand how the judges' statements are relevant here.

MR. S. RICHARDS: I think it affects Guevara's state of mind. Guevara's state of mind is relevant, I think, because the defense, as they've said in their motions, are going to try to get the jury to speculate on other reasons why somebody would take the Fifth, other than the fact that he's guilty of something or could be guilty of something if he answered questions.

I think the fact that he started taking the Fifth after he was kind of raked over the coals by Judge Obbish is relevant to his state of mind.

THE COURT: Why does the state of mind matter?

MR. S. RICHARDS: Because the defendants, I think, will argue that he has some innocent frame of mind, which explains the invocation of the Fifth apart from the natural inference.

THE COURT: But the jury will be instructed as to the significance of the inference, so why does the state of mind matter?

MR. S. RICHARDS: Just because of what I anticipate is defendants' argument. If they don't make it, I'm wrong.

THE COURT: And then on the certificate of innocence,

Judge Reddick?

MR. S. RICHARDS: I will withdraw that.

THE COURT: All right. Defendants' 10 is granted. I don't find that there's any relevance of judicial commentary on Guevara's credibility. The jury will hear from Defendant Guevara, and even if he takes the Fifth, the jury will be instructed as to the significance of that; and so beyond that, I don't see any appropriate purpose for bringing in another fact-finder's determinations with respect to a particular witness's credibility here.

Defendants' 11 and 12 are agreed to.

Defendants' 13 concerns criminal defense attorneys speculating on the outcome of the trial. What's the purpose of this evidence, Mr. Richards?

MR. S. RICHARDS: I thought I agreed to that. I think Karen Shields testified at her deposition that she thought that the evidence would have made a difference. I think it only goes to her -- whether she exercised reasonable diligence in terms of any particular piece of evidence.

Actually, it only goes to Cristino Garcia, that her perception of the trial outcome or the trial evidence meant that she -- if she had known that Garcia had *Brady* material, she would have tried to get it.

THE COURT: Response?

MR. SCAHILL: That's not how I understood the response

to the motion *in limine*. If the issue is Ms. Shields saying, you know, "I didn't know about Garcia, and I would have interviewed him," or something, I do not have a problem with that.

The problem that I had was -- and I think this was in the response to this, that Mr. Richards said, "Well, I'm not going to ask Ms. Shields to say that, 'If I had known this, the outcome of the trial would have been different,' but I do want to ask her what her perception of the outcome of the trial would have been." You know, and so those seemed to be the same thing to me.

I don't think she can speculate as to what the jury would do. As far as her reasonable diligence, if that is what the extent of it is and why she did the things she did, fine. How it played in and what the jury might have done with that, I think is for our jury to decide.

THE COURT: Okay. I'm going to grant this in part. So, my sense of it is that the defense attorney can testify, "I did this in the case because I thought X. This is my estimation. I did these things because of how I saw it."

It gets murkier when you get to, "Had I known this, I would have done that." I think that's appropriate with respect -- it's like murkier in the sense of can't go too far, but it is still the flip side of that coin of, "I didn't interview this person because I didn't know about this person."

That's fine.  When we start talking about the outcomes of the trials and speculating as to what others have done, then I think we're beyond the witness's ability to speak to that, and I have concerns about the reliability.  So, what the defense attorney did and the reasons the defense attorney did those things -- did or did not do those things, I think are relevant and can come in.  Predictive -- predictive statements beyond the effect on the defense attorney themself I think gets too far afield.

Defendants' 14, this concerns testimony regarding Rios's friends and family, personal feelings, et cetera.  This is one of the reasons why I don't like granting page extensions because I got treated to three-quarters of a page dedicated to John Donne, which suggests maybe you didn't need that many pages.

But the point is well-taken, in that this is denied without prejudice because I can see -- whereas Rios can't say, "This affected my kid in this way," he can say, "I was affected because I learned my kid was affected in this way," meaning -- I'll use random examples like my -- this is not apples to apples.  I don't mean to suggest that it is.

"My dog whines when I leave the house."  All my kids are out of the house, so I can't think of the kids, but, "My dog whines when I leave because he has separation" -- or I can't say he has separation anxiety.  I can say that, "Hearing

him whine makes me wonder if he's going to be okay, and that bothers me." It's the same thing probably on a more real scale of, "Knowing that this affected my family -- it affected me knowing that this affected my family in this way."

So, the denial without prejudice means if you think something's objectionable, you can make the objection; but I can see the relevance of this going back to Rios's own damages in a case where emotional damages and psychological damages are at issue.

Defendants' 15, I think this comes down to disclosure and specifics, and so, Mr. Richards, beyond what the plaintiff's identified, what additional depth or context do you anticipate your client adding?

MR. S. RICHARDS: I'm sorry. I was -- I didn't have it in front of me. Depth or context to -- you mean prison conditions?

THE COURT: No. 15 is -- yes, abuse or illegal conditions of confinement experienced or witnessed by the plaintiff. The defendants' view is that they asked about this in discovery. They received a few answers, but not too many, and they want to limit you to what's been disclosed. Your response was he did identify specific depravations, but if he needs to add more detail, he will do that. They don't want you to because it's a disclosure issue.

So, what additional detail are we talking about?

MR. S. RICHARDS: Right. Well, there's a number of things that were not asked at the deposition. For example, the ride from -- how he got to Pontiac, the things that happened on the ride. There are conditions in the jail, not unconstitutional conditions, but they're just conditions of the jail. You have a cell. You have a -- you have a roommate in the cell. You don't get to choose the roommate in the cell. The roommate in the cell --

THE COURT: So, these are just general conditions of incarceration and not abuse or illegal conditions of incarceration?

MR. S. RICHARDS: They're not -- oh, absolutely. None of the conditions he's mentioning will be illegal conditions. They are conditions of confinement. They also have to do with explanations of why he rejoined the gang and what happens if you don't rejoin the gang in prison and --

THE COURT: But not abuse?

MR. S. RICHARDS: What?

THE COURT: But not abuse?

MR. S. RICHARDS: No, not abuse by the guards, not anything the guards did, not any rats in the cells.

THE COURT: Okay.

MR. S. RICHARDS: Nothing like that. The general conditions of prison, like, there's no air-conditioning. There's no heat. You know, things like that, which are not

unconstitutional, and he never made a complaint about them.

THE COURT: Okay. So, I'll grant Defendants' 15 concerning alleged abuse or illegal conditions, with the understanding that the plaintiff does not intend to introduce any evidence of abuse or illegal conditions, though the plaintiff is free to bring up general conditions of incarceration.

I recognize this might invite additional objections at trial, and the parties are free to raise them; but I understand the motion to be limited to alleged abuse or illegal conditions, is that correct?

MR. SCAHILL: Yes. The gang issue is a little fact-intensive, but -- and I'm not exactly sure what that refers to. I have an idea.

THE COURT: I suspect he's going to say, "I joined a gang because that's what you do in prison, and if I didn't, bad things would happen, and that led to other things." They're going to know about this conduct that led to more time. Maybe that's an explanation.

There's lots of different ways to think about it, but I don't think that rises to the level of abuse or unlawful or --

MR. SCAHILL: So, as -- and that's what I thought, too. As -- I just want to make sure there's not, like, going to be a specific, you know, "Join this gang or we're going to

kill you," or something like that, which seems to be more of a specific incident of abuse, as opposed to this idea of, "I don't want to get hurt, and the gangs run the prisons; therefore, I joined the gang."

THE COURT: Right. But he disclosed vague references to threats, although it doesn't seem like it's in this context. And so we'll just have to deal with them when they come up.

Defendants' 16, this is denied without prejudice. It concerns the exclusion of argument or questions regarding the failure to record interrogations, witness statements, or identification procedures. It seems like this is something that's answered with evidence. Was this a practice at the time?

And so it's denied without prejudice, meaning you can re-raise it; but at this point, I think that since we're dealing with the underlying trial, the weight of the evidence, the sufficiency, the materiality of the evidence, it comes into play.

Defendants' 17 concerns sufficiency of the investigation. Same rationale applies. It can be relevant to materiality. One possible thought is: Why would you do more if you could just make people confess? That's a reason to stop the investigation.

So, that's why I think it's relevant. I don't know that that's the case here, but I can see ways in which it can

explain issues in the case.

Defendants' 18, bar Chicago Police Department policy or practice violations, I understand one of plaintiff's arguments is that the defendants may open the door to this, and I think it ties in to Defendants' 17 concerning the sufficiency of the investigation, whether practices were followed.

The other response dealt with the opinions of Russano and Loftus. Is that still at play, given my rulings on what the experts can testify to? You wrote --

MR. S. RICHARDS: No.

MR. SCAHILL: No.

THE COURT: You wrote, "Such policies and procedures are relevant to the opinions of those experts, both of whom will testify that post-1989, reforms have reduced the dangers of false confessions and mistaken identifications."

MR. S. RICHARDS: We would stick with that. I think it's part of the general research.

THE COURT: Okay. Was any of that research specific to practices in Chicago?

MR. S. RICHARDS: Actually, yes. In fact, one of the studies that Loftus mentioned is a study of Chicago police lineups and how changes in the lineups made wrongful convictions less likely.

THE COURT: Okay. Response?

MR. SCAHILL: So, there's an issue there with

post-incident policy changes, which is implicating -- and the rule is going to escape me, I think this is in the 4s, of what policy changes happening after that and how it bettered the, you know, good of the policing.

That seems -- now, if Russano is talking about the policies in place, it may be one thing. If it's talking about changes in policing, it sounds like a post-incident remedial measure to me, and something relating to the City, as opposed to the officers, but the former one seems to be a little more problematic to me. 408? No.

MR. POLICK: Your Honor, these defendants are not policy-makers, your Honor. This sounds like *ex post facto* to me. How -- they used the policies that are in place at the time, not what would have happened years after the fact.

THE COURT: Slightly different question for you, Mr. Richards. What specific opinions have either of those experts offered concerning the policies and procedures in place in 1989?

MR. S. RICHARDS: Loftus has cited a study about wrongful convictions based on the procedures that were in place in 1989, which were pre the 2003 reforms -- or actually, the 2015 reforms in lineup procedures and so forth.

So, what I think it goes to, first of all, it's not remedial measures, because as the defendants pointed out, they're not remediers. They're just individual officers. It

doesn't matter what they remedied or not.

It goes to the likelihood of guilt or innocence, which is an issue raised by the defendants in terms of damages.

THE COURT: Right. But we're talking in the context of an expert. So, he disclosed the study. Did he disclose any specific opinion related to the study, other than it factoring in to his general opinion concerning the reliability of identification?

MR. S. RICHARDS: I don't have it in front of me, but I believe he did, yes.

MR. SCAHILL: Judge, the post-incident remedial measure rule does not have anything to do with who the party is that is the person making the remedy. The purpose of that rule is to prevent juries from looking at what happens in the future to prove that it should have been done differently in the past.

And so whether they make the policy or not, it's the same issue as saying things are done better now, and we are -- know more now; therefore, you should say what they did before was wrong. And that's what that rule was designed to prevent.

THE COURT: Right. I don't think the motion concerns this at all. I understand the premise of you can't -- this is an oversimplification, but just because someone decided to change something, that doesn't mean that the prior policy was -- it's not an admission that the prior policy was wrong.

Here, the motion *in limine* is essentially, "You can't

find these defendants liable just because they didn't do what the policy said to do because the policy is not the standard. The Constitution is the standard."

And so this is granted to the extent that anyone's arguing -- or you can't argue that they didn't follow policy and, therefore, they are liable. You have to argue the evidence, which maybe include reference to the policies, but that the actions and the conduct are what meet the elements, not the violation of the policy. So, this is granted.

19 deals with the code of silence. I am hesitant to allow that phrase, at least without establishing some basis in fact for it. But I do think that the notion of a code of silence is relevant to the claims here in that conduct happened in the presence of others and nobody did anything about it.

And so this is denied without prejudice. It's really going to come down to how it's presented.

The first question -- I'll tell you now, if the first question is, "You let this happen because there's a code of silence; you don't do whatever," that's going to be sustained all day.

Whereas, if there's a proper foundation that is leading to that, then we'll see how that comes in. So, 19 is denied without prejudice.

Defendants' 20 concerns Russano. That's been dealt with.

Defendants' 21 is agreed.

Defendants' 22 is to bar references to highly publicized cases of police misconduct. This is granted in part. I understand the experts have looked at historical data and analyses and cases, but they can discuss it without naming names.

And so I'm not limiting the experts in talking about what's in the literature, but -- this is not applicable here, but Burge would have an effect; and injecting that name into a case on Chicago police alleged misconduct could be problematic. And so I don't want an expert saying -- or bringing that into this case. Instead, they can talk about the data, and in general instances, "Well, in one case in the literature, this happened."

MR. KEVITZ: Excuse me, your Honor. Just one clarifying question as it relates to Dr. Russano.

I expect there might be some testimony from her that says the data supports that there is a high level of false confession cases in Chicago. That's what I'm a bit scared about with your ruling. I want to make sure that it's limited also to not just a particular case, but also to a particular city, such as Chicago, which I think would be highly prejudicial in this case specifically because all three defendants have a coerced confession claim against them.

THE COURT: Okay. Response?

MR. S. RICHARDS: Well, I think it's not really possible to sanitize the data to that degree. Most of the research has been done in cities like Chicago, which have large metropolitan police departments with many different types of officers.

I would agree, though, that mentioning any particular instances such as Burge, McWeeny, Halloran --

THE COURT: To be clear, I didn't mean to suggest that Burge had anything to do with this. It's just that as a Chicagoan, it's a name that comes to mind when you think of police misconduct.

Sorry to interrupt. Please continue.

MR. S. RICHARDS: No, so, I would not mention any of those people. I was going to go on, but I'll stop. I'll tell her not to mention any of those people, and I'll go over with her what in the studies needs to reference Chicago specifically, if anything does.

THE COURT: Okay.

MR. KEVITZ: Your Honor, I'm familiar with the studies, and I'm familiar with some of the testimony that false confession experts have given on this. They basically get into, "Hey, there's a national exoneration database, and a percentage of these database -- a percentage of the individuals who were found to be innocent in the database gave false confessions, and they were proven to be false by certain DNA

evidence."

And then what they do is they say a certain percentage of that exoneration database stems from Chicago. There's no need to get into the Chicago area. It's prejudicial, and it shouldn't be permitted.

They can say there is a percentage of cases from this national exoneration database that suggest that false confessions do occur under these circumstances.

THE COURT: Okay.

MR. SCAHILL: It sounds like *Monell*, essentially, saying this is a Chicago problem, as opposed to a problem with the idea of, you know, police conduct, I think is what our concern is.

THE COURT: In that respect, it's overruled. I do think that there is significant probative value under the theory of not just how it could happen, but it could happen here. And the data, if I recall, doesn't indicate that it happens in every case, but that in a percentage of the cases, and so that is relevant.

And I think that a limiting instruction or the instructions themselves will apprise the jury that they need to decide what happened in this case and whether that happened in this case. So, in that regard -- or I view that as permissible.

MR. S. RICHARDS: Your Honor, was that 23?

THE COURT: That was 22.

MR. POLICK: Judge, if I may on that, I mean, based on your ruling, would the expert be able to say, "Based on the research data, Chicago is the false confession capital of the United States"?

THE COURT: Is that what the study says?

MR. POLICK: I don't think so, but I'm asking if they could go that far because I think if allowed, they may do that.

MR. S. RICHARDS: Your Honor, we will not do that.

THE COURT: The expert can say, "Here's a study, and this is what the study found." Beyond that, no, your particular statement is not -- it's inflammatory, and it's inaccurate, or put another way, not proven.

And were something like that to come out, I would turn to the jury and say, "That is not a proven data point." And so that's the hedge against conduct like that.

MR. POLICK: Thank you, Judge.

THE COURT: Defendants' 23 seeks to bar arguing or referring to constitutional rights as a category of damages. My understanding of the plaintiff's response is that they're not going to argue a category of damages, just that constitutional violations led to his damages, is that correct, Mr. Richards?

MR. S. RICHARDS: Yes.

THE COURT: So, I'll grant 23 as written, but don't

think it's implicated based on the defendants' -- the way the defendants framed it and the plaintiff responded to it.

The jury will get an instruction concerning what damages are available. That instruction will not say, "constitutional rights." It will specify what harms they can consider.

Defendants' 24 concerns the Golden Rule. That's granted. There will be no arguments to put yourself in the plaintiff's shoes or think about that. You will argue the evidence and won't appeal to the jury's sympathy.

Defendants' 25 concerns the felony convictions of witnesses. A couple of wrinkles to this. For Carrero, there's the fact of them being incarcerated together that will come up, and that's, to the extent relevant, admissible. But I don't think any other details concerning the conviction warrants coming in. So, that's denied as to Carrero.

With respect to Garcia and Burr, there are two convictions within the 10-year period. Those can be used under 609 to impeach. I don't think there were -- is there any basis to admit -- are there any others that the defendants want to admit?

MR. SCAHILL: So, the wrinkle here is part of the -- this more applies to Garcia and Carrero, is this issue of -- well, Carrero, of course, was a trial witness. Garcia was a potential witness, at least according to the theory.

When we're looking at how their testimony would have affected the criminal trial -- and again, this is the theory that the plaintiff is bringing up -- it seems to me that if they have existing convictions at the time the testimony would have been given and they would like to say this would have changed, you know, the game essentially, how they would have presented as witnesses, including the fact that they would have been impeached by the fact that they had criminal histories at the time seems to me to be a non-609 issue that might require some thought here because it's a complex issue.

THE COURT: Okay. So, essentially, this jury should be apprised that the prior jury would have been advised that you can use 609 when considering their testimony?

MR. SCAHILL: Yeah. For example, if you had Garcia -- let's say they knew about Garcia. They said they didn't know it, but let's say that they did. He would have presented and said "A, B, C, and D," but also, there would have been other things that would have come up, too, that wouldn't look so good for him. And so that's sort of something that needs to be factored in.

And again, I understand this is sort of a complicated weighing issue because it's what if on what if, but materiality sort of commands that, it seems.

THE COURT: Did they both testify at the criminal trial?

MR. SCAHILL: Just Carrero. Garcia, they said, was not -- you know, they didn't know about him to call him, or something along those lines.

THE COURT: Okay. So, if he did not testify at the trial, it's still your position that since this jury will be evaluating the evidence, they should evaluate that evidence through the same framework that a jury sitting back then would have?

MR. SCAHILL: What they would have known then, which would not implicate all of the convictions --

THE COURT: Okay.

MR. SCAHILL: -- but would implicate the pretrial convictions, which for him, it looks like -- the trial was in '90. It's looking like his agg. batt., which was in '86.

THE COURT: Okay. Response to that argument?

MR. S. RICHARDS: Well, your Honor, if we're looking in that lens, the 1989 lens, Judge Themis Karnezis had an inflexible rule, which was that when convictions came in, they would only come in as felonies. I think he called it the room something or something rule, which is in our trial record, actually, where he says that.

So, if it's going to come in under that theory, it should come in as a mere felony because that's the way he would have let it in as to Garcia.

Now the other issue as to Garcia is the defendants

pointed out, I thought helpfully, that Garcia had a pending case and warrant, which bears upon whether he could have been brought to trial by reasonable diligence, and we have no objection to the jury knowing that at all.

MR. SCAHILL: I'm sorry. I missed that part. That Garcia had -- which one are we talking about?

MR. S. RICHARDS: I thought we were talking about Garcia. You said in your motion that he had a pending case that eventually resulted in a conviction, but he had a BFW on that case. Is that true or no?

MR. SCAHILL: No, no.

MR. POLICK: That's reflected in the certified copy of the conviction for that particular case. You're talking about the 1990 possession of a controlled substance case?

MR. S. RICHARDS: Right, which he didn't -- he wasn't convicted until after he testified -- I'm sorry. No. Garcia never testified. Garcia was not convicted on the 1990 case until after the 1990 trial, and he had a BFW at the time of trial, according to you.

MR. SCAHILL: We weren't referring to that one.

MR. S. RICHARDS: Well then, I'm confused about what you're referring to.

But my original point stands. If we're viewing it from the lens of 1989, Judge Karnezis had an inflexible rule, which he states on the record in this case, that if a

conviction is coming in, it's only coming in as a mere felony.

MR. SCAHILL: Yeah. I mean, that's what we're saying. Again, the idea is that you call a witness. They get impeached. This is something to impeach him with at the time.

THE COURT: Right. But I think Mr. Richards' point is that this jury should hear that -- only that these individuals had felony convictions, not the nature of the offense.

MR. SCAHILL: If -- if that's what Karnezis said on the record, I suppose we're willing to live with that. I've never been before him, so, you know -- again, we're -- this is an exercise in trying to figure out what people would have done 40 years ago and how they would have evaluated evidence. And so if that's what it is, then I suppose we're willing to live with that.

I mean, the most, of course, it would be is nature of the offense. But if this -- if there's something clear that can be established that that would not fly with that judge, that's what we have to try to recreate, I suppose.

THE COURT: Okay.

MR. S. RICHARDS: Your Honor, I don't mean to pull rank on this issue, but I was -- not only is it in the record in this case, but I was assigned to Judge Karnezis's courtroom for a year, and I was -- I am well familiar with his practices.

THE COURT: Okay. Well, I don't need to recreate that judge's practices. I'll just find -- or do find that

defendants' theory of relevance concerning the framework in which the jury would have -- that the jury at the time would have heard, that is a viable evidentiary theory; and that because of the age of these, irrespective of whatever Judge Karnezis's practice was, there's no need to get into the details of the convictions.

So, the jury can learn that there was -- about the fact of conviction as to the earlier offenses that are outside the 10-year window now but would not have been outside the 10-year window at the time of the underlying criminal trial; and then the second aspect is Garcia and Burr, those convictions that are within -- currently within the 10-year window, should they testify at this trial, can come in.

MR. SCAHILL: And Carrero, the fact that they were locked up together?

THE COURT: Right, but no other details concerning what led to them being locked up together. Okay.

Defendants' 26 is to exclude City of Chicago from the verdict form, jury instructions, and case caption. I'm granting that over the plaintiff's objection.

Yes, the City of Chicago is a defendant to this case, but they will not be on trial. I will tailor the jury instructions to the parties that are on trial before you, as opposed to the parties in this case, which is a true statement, an accurate statement, and consistent with what we will ask the

jury to consider in its deliberations.

That takes care of the motions *in limine*. Some administrative things before I ask if there are any other issues to address.

You'll get a few things from me over the course of the next week. Probably the most important, I will send out at least a chart, probably a chart with some reasoning concerning each ruling on the motions *in limine*. My goal will be to get that to you by Monday.

What I mean, what it will look like is I have my working chart. Some of them, I will be satisfied with what I said on the record. Others, I will do some -- a short explanation so that the Seventh Circuit down the road has a fuller understanding of my considerations and reasonings in ruling the way that I did. But that's probably the most pressing thing for you.

I will have that spreadsheet with me during trial so that I know what's been ruled -- what's been raised and what's been ruled on.

You'll get a few other things that will come by way of an order, and that will be the jury instructions as well as the voir dire questions will come through a minute entry. Attached to the minute entry will be the proposed instructions and the proposed jury letter that has the voir dire questions. And that minute entry will also have the timeline for filing any

objections to the jury instructions.

You'll get a minute entry concerning all the different deadlines, concerning the deadline to give me the status report on the parties' views on the peremptory challenges, the parties' deadline to exchange opening exhibits, the parties' deadline to submit trial designations or any objections to deposition designations. And that -- those shorter minute entries with your deadlines likely will come tomorrow. I need some time to do more work, so I'm going to take that time, which is why the jury instructions will likely come next week.

You'll also get a minute entry concerning the time allotted to each side to present their case.

Anything else that I can address for plaintiff today?

MR. S. RICHARDS: Your Honor, I have some witnesses subpoenaed for February 2nd. Assuming that they're witnesses your Honor is allowing, can I have those subpoenas entered and continued on that date?

THE COURT: In what sense? What do you mean?

MR. S. RICHARDS: Well, they've been subpoenaed to come to court on February 2nd, and I would ask that they be admonished to come back on the day that I need them.

THE COURT: I would imagine the subpoena says, "Show up February 2nd and continuing to the end of trial," right?

MR. S. RICHARDS: That's not usually the way I do my subpoenas. I mean, it scares people when they think they're

going to have to spend a week, so I usually subpoena them to the first day of court and then have the subpoena continued to the day I need them, whatever day it is.

THE COURT: Okay. If you need an order from me, submit something that tells me what I need to do, but normally it's -- there are different ways of handling it. Some lawyers would handle it by doing the continuing day to day and then immediately call the person or attach a letter saying, "You're required to be there the whole time; but as a courtesy, we can talk about what day you can actually show up."

But either way, if there's a concern about the witness showing up because of the dates on the subpoena, submit -- and you need an order from me, submit it.

Other concerns?

MR. S. RICHARDS: No. The other thing I just wanted the Court to be aware of, I take it there will be no more court dates, but I have a jury trial next week at 26th Street. So, unless you need me during that week, that's what I intend to do.

THE COURT: No. We don't need *Dauberts*, and much of what's happening after this will be on the papers until we show up. Of course, if someone files some type of emergency motion, I'll hear you on it, but my plan would be we show up Monday the start date of trial.

MR. S. RICHARDS: Okay.

THE COURT: I had a trial scheduled next week. I'm glad it went away.

MR. S. RICHARDS: Sorry?

THE COURT: I had a trial scheduled next week, and it just went away today. So, that's great.

Okay. For any of the defendants?

MR. SCAHILL: As far as scheduling, on February 2nd, is -- and I know this is more the plaintiff's issue than ours because they have to call witnesses, but as far as the expectations as to whether openings will be given on the 2nd or whether we're going to do them first thing on the 3rd? Does that depend on how long that takes? Does your Honor have a view on that as we sit here now?

THE COURT: It depends on how long it takes. I have not had a civil trial where we did not do openings on the first day yet. I also have not had a civil trial where the sides have had more than three peremptories.

Typically, I get through the first box, and then I go through the first row of the second box. And after that, I've had enough. I do think that I will have to go through the whole -- all 32 prospective jurors. And it usually takes about 90 minutes to two hours to get through the box, so that puts us at least to the afternoon break, if not beyond that.

So, this is one of those instances where I wouldn't be shocked if we didn't get to a witness on the first day, but I

would hope to get openings done the first day.

Other questions?

MR. SCAHILL: Not other than that.

THE COURT: All right. I'll work to get my stuff to you quickly, no later than next Wednesday for everything. And if I get something done sooner, I will get it out again with a target of Monday on the motions *in limine*.

Have a good afternoon. I'm glad we didn't do this at 4:00. I'm glad we didn't do this at 3:00. Take care. I'll see you in a week.

(Concluded at 4:42 p.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Charles R. Zandi*                    *January 29, 2026*
Charles R. Zandi
Official Court Reporter