IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                          )  Case No. 22 C 3973
                                     )
                 Plaintiff,          )
                                     )
-vs-                                 )
                                     )
REYNALDO GUEVARA; MICHAEL            )
MASON; and JoANN HALVORSEN,          )
as Special Representative of         )
ERNEST HALVORSEN, Deceased,          )  Chicago, Illinois
                                     )  February 2, 2026
                 Defendant.          )  2:12 p.m.


VOLUME 1
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:


For the Plaintiff:     LAW OFFICE OF STEPHEN L. RICHARDS
                       BY:  MR. STEPHEN L. RICHARDS
                            MR. JOSHUA S. RICHARDS
                       53 West Jackson Boulevard, Suite 205
                       Chicago, Illinois  60604


For Defendant          BORKAN & SCAHILL, LTD.
Guevara:               BY:  MR. TIMOTHY P. SCAHILL
                            MR. GRAHAM P. MILLER
                       20 South Clark Street, Suite 1700
                       Chicago, Illinois  60602


For Defendants         THE SOTOS LAW FIRM, P.C.
Mason and              BY:  MR. JOSEPH M. POLICK
Halvorsen:                  MR. JOSH MICHAEL ENGQUIST
                            MR. JEFFREY ROBERT KIVETZ
                            MS. CAROLINE P. GOLDEN
                       141 West Jackson Boulevard, Suite 1240A
                       Chicago, Illinois  60604

APPEARANCES (Cont'd):

Court Reporters:          JOSEPH RICKHOFF, CSR, RMR, CRR
                          KATHLEEN FENNELL, CSR, RMR, FCRR
                          Official Court Reporter
                          219 S. Dearborn Street, Room 1426
                          Chicago, Illinois  60604
                          Telephone:  (312) 435-5387
                          charles_zandi@ilnd.uscourts.gov

                    *   *   *   *   *
            PROCEEDINGS REPORTED BY STENOTYPE
   TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

\* \* \* \* \*

OPENING STATEMENT ON BEHALF OF PLAINTIFF

BY MR. S. RICHARDS:

Good afternoon, ladies and gentlemen.

This case is about many things.  I first want to talk to you a little bit just about life and how life proceeds.  A lot of the things we do in life are within our control.  Choices we make.  Choices we don't make.

But a lot of life is accident.  We didn't choose our parents.  If our parents hadn't gotten married to each other, we wouldn't be here.  We wouldn't exist.  Somebody else would exist.  If we hadn't chose -- met a particular person, chose to get married to them, then we'd have a different spouse.  We'd have different children.  If we hadn't picked a particular job or place to go, the life we'd be living in is different.  There's a lot of accident and contingency in life.

Now, if Jaime Rios had not met the defendants in this case -- Reynaldo Guevara, Michael Mason, and Ernest Halvorsen -- his life would have been different.  Might not have been perfect, but it would have been very, very different.  Because had he not met the defendants, he would not have spent 17 years of his life in prison for a crime he did not commit.

He would be probably with a different person.  He would have a different relationship with his son, Jaime Rios,

Jr. His job prospects might have been different. He might have been living in a different state, place. Everything about him in his life changed in the moment when he met the defendants.

What happened was his life was broken. How much is a broken life worth? How much should be paid for a broken life? These are the critical questions of this case.

Now, this case is also about two men, essentially -- or several. One of the people involved is Jaime Rios. He's right here. Now, in most respects, Jaime Rios is just like you and me. He's married. He has a job as a building engineer at a hotel. He has one son, Jaime Rios, Jr. And he's just an ordinary person. But he's different than you and me in one respect. He's different because he was convicted of a crime -- a murder -- he did not commit, and he spent 17 years of his life in prison for that crime he did not commit. He served on that crime 17 years in prison, and he was released.

And, then, another accident: he met me. I met him four or five years ago. And even though he had been out of prison for quite a while and was off parole, he knew that he wanted to right that wrong. He knew he wanted to get that conviction off his record. He wanted a new trial. So, he filed a petition in the Circuit Court of Cook County to vacate his conviction to get a new trial. And the case proceeded through the system.

Now, eventually, the State's Attorney of Cook County agreed with him, said he was entitled to a new trial, his conviction should be vacated. His conviction was vacated. And, then, rather than retrying him, the State's Attorney did what's called a nolle pros. They dropped the case, and he demanded trial.

Then he did another procedure. He went to the circuit court and asked for a petition of Certificate of Innocence. State's Attorney didn't oppose it, and it was granted.

MR. SCAHILL: Objection. Motions.

THE COURT: Ladies and gentlemen, the opening statements are what the attorneys believe the evidence will show. It's not evidence itself. The objection is overruled.

Mr. Richards, you may continue.

MR. S. RICHARDS: Thank you, your Honor.

BY MR. S. RICHARDS:

And we will talk throughout the case about what the Certificate of Innocence means, what it can be used for, and what it can't be used for. And I'm going to implore you to use it only for the proper purposes.

Now, you see Jaime Rios right here. You see his face. You see defendant Mason. And you see a representative for defendant Halvorsen, his widow. These people are here.

There's one person you may have noticed is not here, and that is this person. This is the other defendant in this

case, Reynaldo Guevara. He is not here. But it was the intersection of his life and Jaime Rios's life that broke Jaime Rios's life.

Now, he has a right to be here. He's chosen not to. That's fine. We don't dispute that that's his right. But he has another right, and that's the right to testify in his own behalf. And we believe that rather than testifying in his own behalf, he is going to do what's called take the Fifth Amendment. He's going to be asked questions, and as to every question, he's going to say, I'm not answering that question because it might tend to incriminate me. And that's all, we believe, you will hear from Reynaldo Guevara as to all of the accusations we have made against him. So, he will not be telling his side of the story, we believe.

Now, who is Reynaldo Guevara? He is a former Chicago police detective. He was first a beat officer, then he was a gang specialist, and eventually he became -- actually, shortly before the trial of Jaime Rios but after he had taken steps against Jaime Rios, he was what's called a gang specialist. And let me explain to you a little bit about the difference between different types of police officers.

The type of police officer we all know that we come most into contact with are beat officers, blue and whites. They travel in blue and white cars. They wear uniforms. The cars say "serve and protect" on them. And their function in

the police system is they drive around. They watch for traffic violations. They watch for crimes. They serve and protect. They're there as a deterrent, and they're there to pick up on anything that they see right away. They serve the community.

Then there's another kind of officer that you encounter less often, the detectives. You probably see them most on TV shows or things like that. You probably don't encounter one in real life very often.

They often wear suits and ties. They drive in unmarked cars. And when something happens, a murder or robbery, they're called to the scene and they start to investigate. You'll hear a lot about this investigation in this case. They interview witnesses. They try and collect the crime evidence. They issue warrants. They do all sorts of things.

Then there's another type of police officer. In 1999, Reynaldo Guevara was this type of police officer. He was what's called a gang specialist or gang tech. And this is kind of middle between the detectives and the beat officers. This sort of officer also drives an unmarked car. Often they may dress a little differently. They may dress a little bit rougher. They often have insignia, such as badges and things like that, so you can tell they're police officers.

But they drive around in cars. They're not responding to citizen calls or 911 calls. They're out there sort of

looking for crime on the street.  And that was Reynaldo Guevara's function up until sometime in 1990, when he became a detective.  He was a gang specialist in the neighborhood called Humboldt Park, which is a very rough, gang-infested neighborhood.

Now, we will believe -- we think you will see from the evidence in this case, and from Jaime Rios's encounters with Reynaldo Guevara, that Reynaldo Guevara was not an honest cop. He was not just seeking to do good things.  Jaime Rios witnessed him stop people, demand their property, demand chains, jewelry, cash.  And he -- in Jaime Rios's words, he was perceived by Jaime Rios as a thug.  He was, in Jaime Rios's perception and what he knew, a corrupt officer, not the officer who was out to seek the truth.

Reynaldo Guevara, when he testified at trial, admitted that he knew Jaime Rios -- never has denied that; he knew him for many years -- and that he knew Jaime Rios's mother, Secura Rotget.  Unusual name, R-o-t-g-e-t.  She was a officer at a school, a security officer.  At one point, they had an encounter, which was conveyed to Jaime Rios and influenced his perception, in which she, of all the people in the neighborhood, called him out for what he was doing.  And he blew her off.  But he remembered that.  And Jaime Rios remembered that.

There is another occasion when Jaime Rios remembers

Guevara's being part of a group which stopped him and arrested him on a marijuana charge.  It was dismissed.

So, there was a history between these two.  And part of the history -- and we have to be clear about this -- is at this time, Javier Rios was a very young man, was a gang member. He was a member of the Latin Kings.

Now, you'll hear a lot of disputes in this trial about when he was a member, when he left the gang, how he left the gang, did he leave the gang.  I would suggest to you that all those disputes have nothing to do with the price of tea in China.

He was a member of the Latin Kings.  And you'll also hear evidence, either from our side or from theirs, about how gangs operated in this neighborhood, Humboldt Park neighborhood.

Basically, in these neighborhoods, there was a breakdown in law and order, generally.  The gangs had territories.  They sold drugs within the territories.  They fired guns at each other to keep each other out of their territories.  And, in general, they had something going, and possibly because not all the police officers were honest and were suppressing them.

Now, Jaime Rios joined the gang when he was 12 years old because in this neighborhood, you have to make certain choices.  If you're in a place -- if you're a neutral, you're

neutron, you're not a member of a gang, you're a target. You're a victim. So, there's huge pressure to choose sides to become a member. And that's what Jaime Rios did.

That was obviously a terrible choice and a choice for which he paid a price. But you have to understand where he was, who he was, what his options were. Had he been given all the money in the world and been able to move for a different neighborhood, maybe. But in the neighborhood where he was at, a neighborhood that was ruled by gangs and by rival gangs, people sometimes didn't have a great choice.

But there's also a lot of good in Jaime Rios. And he was starting to make moves in the right direction. He started a relationship with a woman, Diana Rodriguez. He had a child by her, Jaime Rios, Jr. And he was starting the process of leaving the gang.

You'll hear, both from him and actually from some other witnesses, that often this is a process. It's not dramatic. You're not beaten out of a gang. But when you become a family man, you step back and your role is less important, and you're also less important to the gang and you're somebody who could be possibly sacrificed.

Now, let me talk to you about the murder of Luis Morales. This is the crime for which Jaime Rios was wrongfully convicted. And before I talk to you about it, let me make clear we are not trying a murder case here. We don't have any

option of trying a murder case. The State's Attorney has dropped the charges. We demanded trial. Unless they decided to retry Jaime Rios, we can't retry the murder case.

This is a civil rights case. It is about the violations of civil rights that these defendants inflicted on my client, Jaime Rios.

Now, are the facts of the murder important? Yes. But only in a very limited way. The facts of the murder are important because in determining whether there's a civil rights violation, you will have to consider the weight and the quality of that evidence. So, you'll hear a number of witnesses and depositions and transcripts about what the evidence was in the murder case.

So, let me talk to you about that and talk to you about the circumstances first of the murder and second of the investigation.

Now, the murder took place on a borderline between the neighborhood controlled by the Latin Kings and the neighborhood controlled by the Spanish Cobras, who were their rivals. And that border is basically what ran along Western Avenue.

Now, let's go to June 27th of 1989. Sometime around 11:30, a man named Mario T. Flores, who was a Spanish Cobra, was with another Spanish Cobra whose name was J -- Javier Torres. Javier, J-a-v-i-e-r, Torres.

They're on the corner late at night, corner of Western

Avenue and Potomac. They see an all-brown Buick four-door drive up and Jose "Macho" Melendez, who was the leader of the Latin Kings in that area, walked up to the car. The people in the car asked Macho for some bone, or marijuana. Macho said he did not have any, and the car drove off.

Now, on the same date, there's a woman named Samantha Hudson. Not a gang member, just a person in the neighborhood. She was living at 2419 West Potomac in Chicago. And on the side of that building was an alley bordered on one side by Potomac and the other side by Western Avenue.

About 11:30 or 11:45, she's sitting outside with her sister-in-law. She goes to the alley to take out her garbage. And as she's taking out her garbage, she noticed two men walking -- walking up. One of the men was wearing a green shirt and British Knight gym shoes, which had the logo BK for British Knights on the side. He was clean shaven. He was about five foot five inches tall and weighed 130 to 140 pounds.

There was a second person who she didn't get such a good look at, but she said that that person had blonde hair. And the first person had black hair, which she described as curly, smooth or something like that, or possibly an Afro.

And Samantha asked that first person, what the fuck are you doing here?

And he says, mind your own fucking damn business, and walks on. And she noticed something peculiar about these two

men. The two men have their arms down by their right sides as if they're holding something. Doesn't see a gun. But it's a little bit suspicious. And a little worried because she goes back inside. Then she hears gunshots. And that's all she knows about the case.

Now, at around the same time -- again, we're speaking between 11:45 and midnight on June 27th -- Javier Torres saw a man pulling out a pistol. And he initially identified this man as Javier "Macho" Melendez, the leader of the Latin Kings. He initially told the police and said that he saw Macho shoot at two other people and he saw him shoot his friend, who was the victim in this case, Luis Morales. Luis Morales was shot four times. He fell down against a car possibly and was laying in the gutter. The police were called.

Now, three .25 caliber semiautomatic shells were found at the scene. .25 caliber is a kind of unusual caliber. Doesn't occur too often. It's not a .22 caliber, but it's also a very small bullet. And those three shells were found nearby. And those are important in terms of how the case was investigated and tried. There were .25 caliber shells.

Now, the beat officers arrive. They get descriptions. Again, descriptions are of short male Hispanics, five foot three, five-five wearing this clothing I described earlier.

Where was Jaime Rios then? At that time, he was in front of his house at 1440 North Leavitt. He was hanging out

with a man named Jamaica, because he had a Jamaican accent, who was a little bit older. And he knew absolutely nothing about what was happening on Potomac and Western.

Now, we also have to talk about another man who is involved in this case, Cristino Garcia. And for reasons which we'll get into, you're going to hear from Cristino Garcia, probably either today or maybe tomorrow or the next day.

On June 27th, 1989, where was Cristino Garcia? Well, Cristino Garcia was with his mother and girlfriend at his house. His girlfriend was pregnant. And they all ordered pizza and rib tips from Father & Son's Pizza. Pizza being a craving of his girlfriend, Hermina Cruz, that she liked to have. So, he was also nowhere near this shooting. He was someplace else.

Now, in the early morning hours of the 28th of 1989 -- in other words, it happened near midnight and we're going to the early morning hours -- the case was assigned to two detectives named Robert Boris and William Johnston. These two detectives began to look at the case. They talked to Javier Torres. They got the description or the naming actually of Jose "Macho" Melendez as the shooter. And naturally, they put a stop order on Jose "Macho" Melendez.

But then this case took a very strange turn because what happened from there is that Macho Melendez walked in the next day to the police station. And the shift had changed.

The new detectives assigned to the case were Michael Mason and his partner Detective Brennan. They spoke to Macho Melendez, and he gave them an alibi. And some parts of the alibi checked out.

And, then, they went to Javier Torres. At this point, Javier Torres said, oh, wait a minute, I lied. It's not Macho Melendez. I just made that up because I didn't like Macho Melendez.

But he never varied from saying that just before the shooting, he had seen Macho Melendez, which contradicted Macho Melendez's alibi.

So, at that point, it was a mystery. It's like one of these 48 Hours Investigations. Case went cold. Nobody knew what was up.

And at that point, Reynaldo Guevara jumps into the case. Now, remember, at this point Reynaldo Guevara is not a detective. No one says, you know, go be a detective, you're assigned to the case. No. According to him and what he's testified to in previous occasions, he says that he just heard about the case and jumped in, decided to start investigating. Didn't talk to Mason. Didn't talk to Brennan. Just went out on the street, trying to do whatever he was going to do. And we will never know, I believe, the reasons why he did that. But it was certainly very unusual.

You'll also see evidence that he contradicted himself

because in some of his reports, he said he was assigned by his commander, Officer Staziga. But repeatedly he testified, I just jumped in. Nobody asked me. I went into this case.

What does he say he did? What he says he did is he went and he talked to informants. The number of informants always vary. To this day, none of the informants, not one of them has been identified. Not by Mason. Not by Guevara. Not by anybody. All Guevara could tell anyone about it was that he had gone out on the street maybe on July 2nd, maybe on July 6th -- his accounts vary slightly -- and talked to two confidential informants or several informants and some non-confidential informants. And, again, we don't know who these people were.

And he admitted repeatedly that the informants did not give him what is called probable cause. In other words, they did not give him a legal reason to arrest Jaime Rios. None whatsoever. What they gave him was secondhand or maybe thirdhand information or maybe rumor, according to him. Whether these informants actually existed will be an issue. Whether they gave reliable information will be an issue. But you will never hear their names in this court, because nobody identified them.

What did Guevara do then? Well, according to him, he was looking for Jaime Rios for several days and couldn't find him. We think this is nonsense. And this is the reason:

because on July 5th, in the morning, Jaime Rios was at a schoolyard. He was with somebody he knew as Little Mike. At the schoolyard, as they're there, Guevara and his partner Steven Gawrys -- it has a weird spelling, G-a-w-r-y-s -- drive up and start taking pictures of the people on the schoolyard. Something they do, it seems, as a tactic. You know, take pictures, we know who you are.

Guevara at that point, despite saying at other times that he had found out about Rios or his involvement from informants earlier, doesn't take Rios into custody. He takes Little Mike into custody. And Rios asks him, well, what do you want with me? And Guevara says, I'm not bothering with you. I want Little Mike. And, then, he takes Little Mike away.

What happened between him and Little Mike? Who knows. According to other evidence, supposedly he takes Little Mike or maybe a different confidential informant -- but anyway, two confidential informants -- to Area 5 to talk to detectives or investigators there.

Now, you will hear Mason testify in this case because Mason will claim that he spoke to these informants. But Mason will not be able to tell you who they were, what their names were, what their ages were, what their race was. He will say he doesn't remember anything about them. Nothing. Even though according -- he drafted search warrants because he said they told him where the guns could be found in the case. We'll see

in a moment where that led or didn't lead.  But, again, we don't know who these people are.

Now, at that point, Guevara went out with his partner supposedly to see if Jaime Rios -- this gang banger, this Latin King, this person he thought had committed a murder -- would voluntarily accompany him to the police station to talk.  We will suggest to you that that story is as phoney as a $3 bill because he didn't just go out with his partner, he went out with eight other officers.  And it wasn't to see if Jaime Rios was going to come in.  It was to arrest Jaime Rios, a citizen, on the street without one shred of probable cause.

What Jaime Rios will tell you happened is that Guevara approached him; he put him in handcuffs; he and the other officers searched Jaime Rios's house; and, then, they took him in handcuffs to Area 5.  Didn't give him Miranda warnings at all.

Jaime Rios was put into Area 5.  And eventually he gave a court reported statement.  But this is how this came about.

First of all, Jaime Rios was put into a room.  He was handcuffed to a wall.  There are a number of officers there.  One was Detective Mason, the officer assigned.  There were other gang specialists nearby or in the room, including Guevara.  Jaime Rios sat there handcuffed to the wall, and Mason began to ask him about the murder.

Jaime Rios said he did not know anything about it. And, then, what Detective Mason did standing behind him was to grab Jaime Rios by his hair and slam his head into the desk. And Jaime Rios will testify to that.

Now, there will be evidence from the defense in which they will claim that that's not true because they will say there was no marks on Jaime Rios's face. We'll discuss during the trial how plausible that is and what that is.

But as you hear a little later, there are ways of torturing people without leaving a mark. You can pull hair. It's painful, but it doesn't leave any mark. You can use a phone book and a flashlight. It's painful, but it doesn't leave any mark. And these were the kinds of tactics which were used in this case.

Now, Jaime Rios -- after that, Guevara, again, not a detective, a gang specialist, started to interrogate Jaime Rios together with Mason and basically said -- they said, we know you're guilty. We know you committed this murder. Of course, at this point, they didn't know anything. All they knew is rumors or hearsay. But that was their tactic: you did it.

And they also said, just tell us you were there. Just tell us you were there.

And Guevara said to Jaime Rios -- and you'll hear he did this in other instances in this case, as well -- he said, we're going to take your kids away if you don't say you were

there.

In desperation, Jaime Rios told them about another incident that happened July 2nd or 3rd, not on June 27th, when he witnessed people shooting at a possible murder. But they weren't buying any of it. They conflated that story with what they wanted to hear. And they, Guevara and Mason, led him through the story they wanted.

Eventually, Jaime Rios was taken to see a state's attorney. And she was a Felony Review assistant. You'll hear from her in this case. She won't have much memory of the events. But, basically, the idea here is that when people come to the police station and detectives think they have a case, what they often do is call a state's attorney from the Felony Review Unit, which is available 24/7, to help them take statements or do an investigation.

So, the state's attorney did show up, Barbara Riley. At that point, after he had already been interrogated, after he was already in custody, for the first time they gave him Miranda warnings. And, then, using a whiteboard, Mason and Barbara Riley led them through what they thought he should say. And eventually he gave a statement to the court reporter.

Now, the defendants are going to make a lot of that statement. And I want you to, too. I want you to look at it really carefully because -- we're not going to go through it now line by line, but there are a lot of things that stand out

about this court reported statement. One thing that stands out is that there's no description of an encounter with a black woman, Samantha Hudson, which we almost certainly know happened because Samantha Hudson testified to it.

There's also one point at which they ask Jaime, how far away were you when you shot? And he says, five miles away. And they say, what? Okay, five feet away.

At another point in the statement, he says that the gun was fired within a foot of Luis Morales's head. But you will hear that the medical examiner at trial testified that there was no evidence of close-range firing. Close-range firing means that you fire a bullet close to somebody. It's going to leave what's called stippling or marks from the gun powder. Generally, within a foot that's going to happen. Further away from a foot or two or three feet away, it's not going to happen. No evidence of stippling.

One point, they asked him what he did with the gun. Jaime Rios said two weeks later --

A JUROR: I need water.

(Pause.)

BY MR. S. RICHARDS:

Jaime Rios in this court reported statement says, two weeks after the murder, I threw the gun into the lake. Well, two weeks after January 27th is after July 6th. So, he's talking about something which cannot have possibly happened

yet.

At another point, he's asked what gun was used, right? He says a .22. And they're on -- you can't say .22. There's .25 caliber. Sure. Wasn't it really .25? He says, okay, yeah, sure it was a .25. He's following their lead.

The other important thing about this statement is it's not a confession that he was the killer. What it said in the statement is that the person he was with, Cristino Garcia -- you remember the person who has the alibi -- he was the shooter and he used obviously the .25.

Now, I always get this wrong, but Jaime Rios says that he -- the gun he had was either a .32 caliber revolver or .38, one or the other. But we'll see how that doesn't match when we get further along.

So, in any event, they take this court reported statement.

Now, there's another person I haven't spoken about yet, a man named Luis Huertas. He was also one of the original people interviewed by Detectives Boris, Johnston, Mason, and so forth. He said he was at the scene. He said he witnessed the shooting. He was confronted with a lineup of Macho. He said that's not the guy. Samantha Hudson saw Macho in the lineup, said that's not the guy. But Luis Huertas was the last possible witness.

Again, Samantha Hudson and Javier Torres viewed

lineups. They did not identify my client, Jaime Rios. In fact, Samantha Hudson, when she viewed the lineup, said, I do recognize somebody. Who is that? The guy in the middle, I went to high school with him. Obviously, not the shooter. Did not identify Jaime Rios.

Then Guevara springs into action again. We believe that the evidence will show that all the witnesses taken to lineups, particularly back in the beginning when Guevara wasn't even involved, were taken to the lineups by different officers than Guevara. And every time these people took witnesses to these lineups, nobody's identified.

But Guevara picks up Luis Huertas. And what happens then? Guevara tells Huertas that, we have the guy. He shows him a picture of Jaime Rios, either a single picture or one of the numbered pictures, and he says, isn't that the guy? And Huertas says, no. And Guevara says, well, you know, we're going to charge you, possibly charge with you obstruction of justice, unless you identify him.

So, then, Guevara takes Huertas to the station, and then Huertas, of all the other witnesses and the only witness taken to the station by Guevara, says Jaime Rios did it, he's the guy, picks him out of a lineup, which is not hard because Guevara had shown him Jaime Rios's picture before.

But Guevara is not done. What about the guns? Well, as I said, search warrants are done for the guns. One search

warrant is for the .25 caliber. Supposedly, it's at the house of a man named Alex Lopez. Officers go to the house, no gun. Not there. Nothing.

They say the .32 or the .38 is going to be found at the house of Benjamin Carrero. So, officers get a search warrant and they go there. We believe, and the evidence will show, that Guevara was one of the officers who went there, even though he didn't put his name on any of the reports.

But the officers go to the house. Carrero, who's also a gang member, also a Latin King, is living with his girlfriend Iris Mendez. And he does have a gun in the house. He has it stashed in the laundry room in a dryer or washer or something, with the gun and marijuana.

Now, when the police come, Iris Mendez goes to the window and tosses the gun out of the window. In the meantime, Carrero has been put in a squad car.

So, what do the police do? Well, they arrest Carrero and Iris Mendez and take them to the station. And what they say to him there -- Guevara, among others -- Guevara says listen, you can get out of this. You don't have to be charged with the gun. Don't have to be charged with obstruction of justice. Just tell us what we want to hear.

And what Guevara gets Carrero to say is that Carrero got the gun on June 27th from Jaime Rios who gave it to him and said, I just shot a guy.

Now, you'll notice initially there's a little problem with that because the murder was committed with a .25 caliber, and the gun that Jaime Rios said he had in the statement is not a .25 caliber. It's a .38 caliber. So -- and, again, I may get these confused between .32 and .38. But the gun thrown out of the window is not a .25. It's not a .32. It's not the caliber of revolver described in the statement. It's a different caliber. I think it was .32 in the statement. I think it might have been actually a .38 that's thrown out the window. But the wrong caliber gun.

And not only that, Jaime Rios is supposedly saying, I just shot a guy with a gun which is not the murder weapon.

Carrero is held for over a day. Eventually he's not charged. Iris Mendez is charged with obstruction of justice. She's given probation. And what Guevara says to Carrero again, is, if you don't play ball, we are going to take your children away. And Carrero believes it.

So, what they do is they take Carrero to the grand jury and they have him say, Jaime gave me the gun. He said he just shot somebody. And, then, after he's taken from Cook County jail directly to the grand jury, he is released.

But Guevara is not done. There's another piece. Cristino Garcia, he's still out there. What happens? Well, about a month later, I believe on July 27th, 1989, an officer named Aubrey O'Quinn picks up Cristino Garcia on the street and

takes him to the police station, to Area 5. And you will hear from Garcia what happened then. Because they asked him about the murder, and he told them about the alibi. And O'Quinn heard it and Guevara heard it. Even at one point O'Quinn apparently tried to check it out.

But Guevara doesn't like that. He's not accepting that. He takes Garcia to a room where there's a woman who's identified as a state's attorney, pretty Hispanic woman who has a shirt, vest, and tie. Not Barbara Riley, by the way. It's clear you'll see that it's a different state's attorney, if it's a state's attorney. And, then, Guevara shows Garcia a piece of paper and says, you have to sign this. You have to tell us you were involved. Doesn't give him Miranda warnings. Doesn't do anything like that.

This is what he does do. He takes a phone book -- and you'll have to remember this is the days when phone books were phone books. Remember those days when it's a big -- Chicago phone book is sort of a big thing. Not like today when you just look it up on the Internet. He takes the phone book, places it on Garcia's head, and then beats him with a flashlight or billy club. Again, pain but no mark. So, he does that.

Now, Garcia has a thought. He's also -- he kind of actually manages to trick Guevara. He says, listen, I'll give you a statement. Just let me make one phone call. Just one

phone call. And Guevara falls for it. He says, okay, I'll let you make a phone call.

Garcia picks up the phone, calls his sister and says, they're holding me. And she says -- and Guevara's close enough to hear this and so is O'Quinn. She says, don't say anything. I'm sending a lawyer.

Guevara hears that. He is not a happy camper. He takes the phone book again, places it against Garcia's head, and beats him again. But then he stops. And they leave Garcia in the cell for an hour. And, then, eventually a lawyer does come. Garcia does not remember the name of the lawyer. It's been a long time. It was a Caucasian man in his 30s. The lawyer says, I can't do anything for you tonight. I have to go. But don't say anything, don't sign anything. That's that.

So, at that point, Garcia doesn't sign anything and doesn't say anything.

Now, the next point is important. Is that Garcia is held overnight. No detective comes to see him for a long period of time. Eventually, the next day Mason comes to see him. Garcia says, I'm not saying anything. Mason takes the case to the state's attorney. The state's attorney says, we can't charge this guy. The only evidence you have is Jaime Rios. What will you do, call Jaime Rios as a witness? We already got him in for murder.

So, Garcia is cut loose. But Guevara has not stopped

there. Later, in the months following, he stops Garcia on the street on a number of occasions, and he takes his picture and he threatens him again.

In this case, that is his MO. This is what he does in this case, Guevara.

So, what happens then? Well, eventually the case goes to trial. Jaime is represented by two public defenders, Karin Shields and Jack Carey. Jack Carey is now deceased, unfortunately, many years ago. But Karin Shields will testify the best she can as to her memory of the case.

What happened at trial? Basically, they hear a lot of the evidence you just heard. Javier Torres testifies and he's impeached with the other identification. Jaime testifies -- Jaime testifies at trial and says how he was beaten and forced to make the statement. There's some corroborating witnesses. Mason testifies. The state's attorney testifies.

The only wrinkle is that when Benjamin Carrero comes in, he says -- he recants. He says, Jaime never said this to me. I did get the gun from him, but he never said it to me. So, that part of my testimony to the grand jury was false.

Then what happens? Jaime is convicted. And on the day he is convicted, he's taken down to the cells and he sobs. He's been convicted of something he did not do. And, then, he goes to prison.

He's driven on the bus to prison with the other

prisoners going down first to Stateville and then to Pontiac, which the other inmates tell him is called -- nicknamed Thunderdome. I don't know why, but Thunderdome. And they start telling him about what prison is like. Because he's never been there. They tell him about the dangers, about the fears, about the rapes. They tell him about everything that can happen in prison. And he is being driven down there knowing that this is what he was facing.

Now, once he gets to prison, to make it clear, nobody assaults him during all the years he's there. He's not abused by the guards. The conditions at the prison do not violate constitutional standards. But it's prison.

One of the things he will tell you is that he had no choice but to immediately rejoin, re-up with the Latin Kings because the way it works is this: There's general population. That's where people have cells. They have cellmates. And conditions are maybe a little bit better than in the other place, which is protective custody.

And you can opt for protective custody. But the problem with protective custody is in terms of the gangs, who have a lot of measure of control in the prison, the general population cells are reserved for gang members. They're not for the lunatics, the aggressive, the crazy people, the dangerous people. Those are the guys who are going to go in protective custody. So, if you want to be safe, you don't go

into protective custody. You stay in gen pop. And that's what Jaime does. He stays in gen pop.

And he's there for 17 years. He is there. He has his girlfriend. She dumped him when he was in jail. That's over with. Occasionally he's able to see his son. Very, very occasionally. Before he was convicted, she already was pregnant with another man. That relationship is over. That's gone forever.

And he's also in the position where he knows that even people in his family think he might be guilty. Even his friends think that. So, he sits in his cell.

Some of his cellmates he likes. The vast majority he doesn't get along with. He has no choice but to be in a cell 24/7 with somebody he didn't choose as a roommate. He didn't advertise, you know, on renter.com. These are just people who were put there. And sometimes they're scary people. They're scared themselves. They make shivs out of cardboard hardened with glue or wires. And he has to lay there every night wondering what's happening to him, who is afraid of who, who is going to suddenly go off, what is going to happen.

His mother occasionally brings Jaime, Jr. to see him, but that's rare. It doesn't happen very often. And when -- and there's no further relationship with Jaime Rios, Jr.'s mother either.

You'll hear about the conditions under which people

visited him and how hard that was. At times, what Jaime would do is he would simply write everything that was happening to him out in longhand page after page, and then he'd throw it away. There were letters to his family that he never wanted to send because he never wanted them to know just how bad things were.

Eventually, he's paroled. He goes under the interstate commerce to Wisconsin. And from that point forward he does not have another single arrest ever. He's released sometime in 2007 I believe. Eventually, he moves back to Chicago. He gets a job as a building engineer.

All along the way, he's haunted by this impediment, by his criminal conviction. It doesn't go away just because he's out of prison. People can look it up. Employers can know about it. He doesn't know what jobs he's missed or lost because of it. But he applies to places and he's turned down. Everywhere he does get a job, he does well and he does better.

He marries a woman who he had met who he corresponded with in prison. They don't have children. But they have a happy, stable relationship. But throughout these years, he's haunted by this conviction he didn't commit.

So, then, as I said, around 2020, he files a petition to vacate his conviction. What's it based on? There's now an affidavit from Benjamin Carrero about what happened to him. We go get an affidavit from Cristino Garcia about what happened to

him. We go get an affidavit from Luis Huertas about what happened to him. He files this petition in the Circuit Court of Cook County. The State originally opposes it.

In April of '22, the case goes to hearing. I was there. I was the attorney. We subpoena Garcia, Huertas, and Carrero. Carrero testifies actually. But in the middle of the hearing, the state's attorney, no fault of her own, has a personal emergency and the hearing is continued into July of -- and August of 2022.

At that point, the State's Attorney drops the case. They agree the petition should be granted. They vacate the conviction. They do what's called a nolle pros or dropping the charges. We demand trial on the charges. And a few months later, Jaime Rios applies for, files for a Certificate of Innocence and gets one.

Now, let me tell you about what are the charges in this case or what's in the complaint, what we intend to prove, and how we intend to prove it.

So, the first charge involves the confidential informants. It's our claim that the confidential informants and/or their information was fabricated by Guevara. They may have never existed or at least they didn't give the information that it was claimed they gave.

Now, how will we prove this charge? One, we will introduce the circumstances of Jaime Rios's arrest. He'll

testify to that. We will introduce the invocations of Guevara, who will take the Fifth by Webex, we believe. And we will also bring in the testimony of Guevara at the pretrial motions and at trial, and possibly the testimony of defendant Mason. That's how we'll prove that.

As to Benjamin Carrero, we will introduce the Fifth Amendment invocations by Reynaldo Guevara where he says, I can't answer because I'm taking the Fifth, and the testimony of Benjamin Carrero. You'll hear from him in person.

Now, as to Cristino Garcia, we will introduce the testimony of Garcia and the invocations of Guevara. We don't know or we don't believe that there's going to be evidence on the other side, but we'll see.

And that charge is a little more complicated. Let me explain it to you. Basically, the problem with the beating with a phone book is not that Cristino Garcia was deprived of his rights -- although of course he was, but can't do anything about it -- but when Jaime Rios went to trial, his attorneys had a right to know that this had happened. This is what's called Brady material or exculpatory material. And our claim will be that he was deprived of a fair trial because his attorneys never knew about this. It was concealed from them by Guevara. Guevara never told about Garcia's alibi, never told about the beating with the phone book. And both of those things were important evidence, which you will hear could have

been introduced from trial -- at trial. And you'll hear from Karin Shields about how the case went down, what she would have done if she had known about it, whether she exercised reasonable diligence to find this. That will be the issue there.

Now, the last is a claim of malicious prosecution against Reynaldo Guevara. And that's the sort of complicated charge that has a number of elements. One is that you bring charges without probable cause.

The second is that you're the person who is initiating or commencing the prosecution, that Guevara's role was he pushed the prosecution forward by doing all the things we said he did: by fabricating evidence, by not revealing there was no probable cause, all that.

And, then, we have to prove that Jaime Rios's conviction was terminated in what's called a manner indicative of innocence. For that purpose, and that purpose alone, the Petition for Certificate of Innocence is important, and you will get to view that, indicating that he was -- charges were dropped and he was acquitted, not because the prosecution had other problems or didn't like the case or whatever, but it was -- ended in a manner indicative of innocence.

At the end of this case, you will find all the defendants liable, we believe. Of course we believe that. We're the plaintiffs. We're trying to prove this. And we'll

ask for money damages. So, you, the jury, will tell us what is the cost of a broken life. What price makes up for 17 years of prison and another 14 years living under a shadow of a wrongful conviction.

Jaime will wait, as he's awaited all these years, for your answer.

Thank you.

THE COURT: Ladies and gentlemen, we're going to take a short break. We'll reconvene at 3:30 p.m. It gives us just over 15 minutes. This is slightly shorter because we took an earlier break. But this gives you a chance to stretch your legs, get a refreshment. You are free to bring drinks into the courtroom over the course of the trial. There will be days where the courtroom's hot, where it's cold. So, bring jackets or sweaters, or what have you, to make yourself comfortable. I'll see you back at 3:30.

All rise.

(Jury out at 3:13 p.m.)

THE COURT: I will see you back at 3:30.

(Recess at 3:13 p.m., until 3:30 p.m.)

THE COURT: We're going back on the record.

As a reminder, I don't resolve technical issues during jury time. That's for the parties to work out before the jury time, during lunch, or at the close of the day.

We'll bring in the jury, and we'll get started with the defense opening. We'll go -- will there be one or two defense openings today?

MR. SCAHILL: It will be two. We're both around 35 minutes, so that's going to take us a little bit over 4:30. Is that going to work, or what's --

THE COURT: We'll see where we are with the end of the first. I will not keep the jury past 4:30.

So if we break and come back, if an opening is interrupted, it's interrupted.

So we'll bring in the jury.

(Jury in at 3:31 p.m.)

THE COURT: All right. Please take your seats.

Welcome back, ladies and gentlemen. You've heard the plaintiff's opening statement. We will now proceed with the defense opening statement.

As a reminder, there are multiple defendants, so you might hear from multiple defense attorneys.

You may proceed when you are ready.

OPENING STATEMENT ON BEHALF OF DEFENDANTS MASON AND HALVORSEN

BY MR. KIVETZ

MR. KIVETZ: Three times. Mr. Rios admitted to participating in the shooting of a rival gang member Luis Morales three separate times on July 7th, 1989. He provided a statement to Detectives Mason and Halvorsen. He provided a statement to a Cook County assistant state's attorney, and he provided a third statement before a court reporter that he reviewed, approved, and signed.

All three statements are consistent, and only after he confessed and was charged with murder did the allegations of misconduct arise.

The evidence and testimony that you're going to hear over the next couple of weeks is going to show that each statement was voluntary, and those statements, along with an eyewitness identification, led to Mr. Rios's conviction for the murder of Luis Morales.

Your only job as it relates to my clients is to determine whether they coerced an involuntary confession from Mr. Rios. In order to make that determination, I want you to focus on the evidence. I want you to listen to what Mr. Rios says about the statements, not what his attorney Mr. Richards says happened, but what Mr. Rios says happened, and you determine for yourselves whether or not he's credible.

Look at the photo of Mr. Rios just after his head was allegedly pounded into the table. Now, you determine for yourselves whether or not he was mistreated.

I also want you to focus on Detective Mason's testimony and how he and his partners followed the evidence and how that investigation led to Mr. Rios as the shooter.

Finally, listen to Cook County Assistant State's Attorney Barbara Riley, an independent witness, and she's going to get on that stand and confirm that no misconduct occurred and that she certainly would never have participated in any misconduct.

Good afternoon.  Again, my name is Jeff Kivetz, and we represent Michael Mason, a retired detective with the Chicago Police Department, who spent 30 years of his life trying to keep the streets of Chicago safe.

We also represent Ernest Halvorsen, another former Chicago Police Department detective who also dedicated his life to serving the community here in Chicago.

Unfortunately, Ernie passed away about six years ago before this lawsuit was even filed, and he is represented here today by his wife, JoAnn Halvorsen, who is acting as special representative for her deceased husband.

Mrs. Halvorsen will be here today and at the close of trial and perhaps a few days more, but she will not be able to attend every day due to reasons outside of our control.

Make no doubt about it, this is a gang case. Mr. Rios's confession admits to gang retaliation.  Rios was a self-admitted member of the Latin Kings here in Chicago in the

1980s, and he confessed to being present at the shooting of Luis Morales, the victim in this case, who went by the nickname of New York and was a member of a rival gang, the Spanish Cobras.

The evidence is going to show that Luis Morales was murdered because members of the Spanish Cobra gang shot at Mr. Rios just outside his home just a short while before Luis Morales was shot. It was a gang retaliation shooting, simple and straightforward.

Now, I want to dig into the details of this investigation and how the investigation led the police to Rios as the person that shot and killed Luis Morales. You're going to hear a lot of names, a bunch of addresses, a bunch of dates, and it might get confusing at time; but by the end of this trial, you're going to be familiar with them all. You don't have to remember all of the names and dates right now, but I'm going to share them with you in order to show you the scope of this investigation and how the evidence, again, led to Mr. Rios as the shooter.

I want to bring your attention to the scene of the shooting, all the way back to June 27th, 1989, because it was almost 40 years ago since Morales was shot five times, and it was a different world back then.

The murder occurred just outside a gangway right on the sidewalk of 1316 Western Avenue, just between Hirsch and

Potomac. Luis Morales was walking through a gangway toward Western on the west sidewalk of Western Avenue, which if you're not familiar is a major street that runs north and south.

And he was with Javier Torres who was only 15 years old. They were members of the Spanish Cobras, and they were on the Spanish Cobra side of the street. What do I mean by that, the Spanish Cobra side of the street?

In 1989, the evidence is going to show that the area where the murder occurred was controlled primarily by two gangs. The Spanish Cobras were on the west side of Western, and the Latin Kings were on the east side of Western, and Western was generally considered to be the boundary or the dividing line between the two gangs.

So Luis Morales and Javier Torres, two Spanish Cobras, are heading through a gangway towards Western. They're coming from the Spanish Cobra side of the street, and when they get to Western, they are approached by two suspects, two Hispanic men.

But before these two suspects even get up to Morales and Torres, they walk right by an eyewitness, Luis Huertas, who is outside a bar on Western. It's almost midnight. The shooting occurred at 11:50 p.m. So Huertas is certainly keeping an eye on these two suspects. They walk right by him just outside of the bar, and there's a large overhead street light right there and an Old Style bar sign that's illuminating out onto the sidewalk.

The evidence is going to show that Huertas got a good look at the eventual shooter who passes right by him just a few feet away. It's a gang neighborhood. And so Huertas continues to watch him, and he sees the two suspects approach Luis Morales and Javier Torres.

Now, Huertas knows Morales. They've been friends for over ten years, and Huertas watches the first suspect shoot his friend Luis Morales multiple times, including a direct shot to the head.

Torres, the 15-year-old, takes off running into the Spanish Cobra territory, and the two suspects, they head east into the Latin King territory. Morales doesn't make it, and he essentially dies of his gunshot wounds.

The police show up, several different CPD units. They canvass the scene. They start interviewing people and they perform a crime scene investigation. This case is initially assigned to two midnight detectives from the Area 5 Violent Crimes Division, Detective Johnston and Detective Boris.

They first go to the hospital. They check on Morales, and the treaters tell them that Morales is still alive, but he's brain dead. The detectives then start following up on some of the initial interviews and that were conducted by the on-scene officers there that night. And the detectives talk with Javier Torres, the 15-year-old, who ended up coming out unscathed from the shooting.

The evidence is going to show that Torres initially said that he knew the shooter from the area, and he is a Latin King member named Macho. The detectives then showed Torres a Latin King photo album, and Torres identifies Macho who the police knew was the leader of the Latin Kings on the east side of Western.

Given Torres's identification of Macho, the detectives issue a stop order, which is essentially a broadband notice to all CPD that Macho is wanted for questioning in the murder.

The next day, June 28th, Area 5 Violent Crimes Detective Mason and Brennan are now assigned to the case, and they continue with the investigation. Now, word has gotten around that the police are looking for Macho, and he gets wind of this, and he decides to turn himself in a little bit earlier that day to the 14th District police station.

So Detectives Mason and Brennan go over to the 14th District, and they talk to the officers, and they ask them to transfer Macho over to Area 5 while they go and they look for some of the witnesses.

Detectives Mason and Brennan are able to track down Samantha Hudson, and they bring her to Area 5. In case you're not familiar with Area 5, this is a large police station at Grand and Central. The 25th District is on the first floor, and the Violent Crimes Division, the Detective Division, is on the second floor.

Ms. Hudson tells the detectives that she saw two Hispanic men, one with a gun standing by the garbage dumpster just outside her apartment on the corner of Potomac and Western, just a little bit south from where the shooting occurred. She then watched these same two men head over to Western, and they start walking north.

Ms. Hudson tells the detectives that shortly after they were out of sight, she heard approximately seven gunshots.

Detectives Mason and Brennan, they then go and they talk to Macho, and he tells them that he has an alibi, that at the time of the shooting, he was driving back to Chicago from a Holiday Inn in Evanston and that his cousin and the hotel chef there can vouch for him.

So the detectives follow the evidence. Mason goes to Evanston, and he talks to the hotel chef, and he also talks to Macho's cousin. The hotel chef says that Macho didn't leave Evanston until about 11:30 p.m., and his cousin confirmed that they didn't get back to Chicago until after midnight.

Mason also determined that it wasn't possible for Macho to participate in the shooting on Western at 11:50 p.m. if he left the Holiday Inn at 11:30 because it's 8 miles away. He's not getting back in time.

Nevertheless, they continue to investigate Macho, and Mason asks Samantha Hudson and Luis Huertas, the eye witnesses outside the bar who are now at Area 5, to view a lineup, and

neither one identifies Macho as either one of the perpetrators.

Detective Mason, then he goes and talks to Javier Torres, the 15-year-old who initially said that Macho was the shooter. Mason tells Javier Torres that Macho has an alibi, and he was not identified by two witnesses.

Javier Torres recants his identification. Torres tells Mason that he is no longer sure that Macho is the shooter, just that the shooter kind of looked like Macho, and he can no longer positively identify him as the shooter.

So the police, they continue with their investigation. They start to get other tips, and they follow the evidence.

In early July, Gang Crimes Specialists Gawrys and Reynaldo Guevara, who are from a completely different unit from the Area 5 Detective Division, they focus solely on gang crimes, and they hear on the street from two confidential informants that Jaime Rios was the person that shot Luis Morales, and he was with another Latin King gang member nicknamed Tino.

On July 6th, Gang Crimes Specialists Guevara and Gawrys, they bring the confidential informants down to Area 5, and Detective Mason meets with them. And the confidential informants tell Detective Mason that Jaime Rios is the shooter, and Tino was with him.

Having learned this information, Mason then goes, and he relays this confidential informant information to his boss,

to his superior, his lieutenant. His name is Lieutenant Ed Kujowski. During this conversation, Lieutenant Kujowski tells Mason that he's also getting information from a separate confidential informant who is also identifying Jaime Rios as the shooter and Tino as the accomplice.

So now Detective Mason has multiple tips that are pointing towards Rios as the shooter, and he continues to follow the evidence.

Later on that evening on July 6th, Gang Crimes Specialists Gawrys and Guevara locate Rios at his home, which is in the Latin King territory just four blocks away from where the shooting occurred.

The evidence will show that Rios voluntarily went with them. They transported Rios to Area 5, and they turned him over to Detective Mason who placed him in an interview room. It's now about 10:00 p.m. Detective Mason's regular partner, Detective Brennan, was not working that evening, so he asked Detective Halvorsen to assist him.

After trying unsuccessfully to locate some additional witnesses to the crime, at about midnight they entered the room, and they interviewed Jaime Rios.

Detective Mason is going to testify at this trial, and he's going to deny that any misconduct occurred, deny that he fed Rios any facts, deny that he banged Rios's head against the table or that he pulled his hair, and deny that any threats

were made.

We're also going to present to you some prior court-reported testimony from Detective Halvorsen from just before Mr. Rios's criminal trial when he was called by the prosecution to rebut the same involuntary confession allegations from Rios that you're going to hear over the next several weeks.

In that sworn testimony, Detective Mason denies any misconduct occurred in that interview. He denies that anyone pulled Rios's hair, and he denies that anyone threatened to take Rios's child away.

So what happens in that interview room? Detective Mason advises Rios of his *Miranda* warnings. Rios says he understands his rights. He tells Rios why he's there and explains that there are -- people are saying that Morales is -- that Rios is involved in Morales's murder and Mason asks Rios what does he have to say about it.

Rios then starts talking, and he implicates himself in the murder, but Rios doesn't admit to shooting Morales. He minimizes his involvement in the shooting. Rios claims that Tino, his fellow Latin King gang member, shot Morales and he was just present; that as they were running away, Rios shot two fires into the air and yelled out "King love."

But Rios does admit that Spanish Cobras shot at him outside his home earlier that night. Rios admits that he went

upstairs to grab a gun. He admits that he went over to Spanish Cobra territory to retaliate. Rios admits that he runs into Tino, and they track down two individuals believed to be Spanish Cobras, and he admits that he was there when Luis Morales was shot.

After Rios gives this statement to Mason and Halvorsen, they inform him that he's under arrest. Mason and Halvorsen leave the interview room, and Mason reaches out to the Cook County State's Attorney's Office Felony Review Unit. The Felony Review Unit consists of several state's attorneys, prosecutors, who are called to review a case and determine whether or not charges should be approved. It's their decision whether or not to prosecute a person for a felony case.

Around 2:00 a.m., Cook County State's Attorney Barbara Riley comes down to Area 5 and she talks with Mason. Mason explains the investigation to date and informs State's Attorney Riley that Rios has confessed to participating in the murder of Luis Morales. And she tells Mason that she wants to interview Rios, and they go and they talk to Rios.

State's Attorney Riley introduces herself. She tells Rios that she's an attorney with the Cook County State's Attorney's Office and that she specifically is not Rios's attorney. She then provides Rios with his *Miranda* rights, makes sure he understands them, and she starts questioning him.

The evidence is going to show that the only people in

that room are Rios, Mason, and Riley. And Rios essentially tells the same story that he told Detectives Mason and Halvorsen just a few hours before: That Spanish Cobras shot at him earlier in the night; that he went upstairs to grab his gun; he ran into Tino; they tracked down some Spanish Cobras, and Tino shot Morales while Rios was present.

After Rios provides this statement to State's Attorney Riley, she explains to Rios that his confession needs to be memorialized, and Rios agrees to provide a court-reported statement. So State's Attorney Riley makes arrangements to get an official court reporter down there.

Now, it's late, and it takes time for the court reporter to get there. Her name is Janet Lupa, and she doesn't get to Area 5 until around 4:00 a.m. in the morning on July 7th. While they're waiting for Ms. Lupa, State's Attorney Riley goes into the conference room and she speaks to Mr. Rios alone. And she asks him how have you been treated by the police? And he says fine. He makes no complaints about any officer.

So Janet Lupa, the court reporter, gets there around 4:00 a.m. Mason brings Rios into a larger conference room. Lupa then sets up her stenography equipment, and State's Attorney Riley begins the interview. State's Attorney Riley provides Rios again with his *Miranda* rights, and Rios again implicates himself in the crime.

This is now the third time that Rios has provided a statement. This time a court reporter, Janet Lupa, has typed out the entire interview. Janet Lupa then takes her equipment, she goes into a different room, and she types up the statement. She comes back, and she hands the statement to State's Attorney Riley.

And Riley goes through the entire 11-page statement with Rios, allowing him to make corrections if needed. Rios then signs the statement, and he initials each page verifying its accuracy.

In the court-reported statement, Rios again admits to being a Latin King member. He admits that Spanish Cobras shot at him that night. He admits to going upstairs and grabbing his gun. He admits to running into Tino, and he admits seeing a guy at the bar just before the shooting. He then again minimizes his involvement in the shooting and says that Tino shot and killed the guy.

After the statement is signed and as part of the practice in providing a court-reported statement, Janet Lupa then takes a Polaroid photo of Rios that he also signs.

This is Mr. Rios after the court-reported statement. No visible injuries.

Now, you're going to hear from State's Attorney Riley. She testified twice at Rios's criminal trial back in 1990, and she will confirm that no misconduct occurred, and she certainly

did not engage or participate in any misconduct.

I want to take a break here and talk about minimization because I've said that term a couple of times this afternoon, how Rios minimized his involvement in the shooting.

You're going to hear from an interview interrogation and disputed confessions expert. His name is Dr. Jack Schafer. He's a former FBI agent, and for a long time, he was with a specific unit of the FBI called the Behavioral Analysis Program.

You're going to hear that he's interviewed over a thousand suspects. He's also an applied psychologist that focuses on disputed confessions, a professor that focuses his research on interviews, interrogations, and disputed confessions, and he's even written a textbook on the subject.

He's going to talk to you about some of the dynamics that happen in the interview process and certain tactics that guilty suspects utilize in the interrogation room. You're going to hear that one of those tactics is called minimization, and it's a tactic that a guilty suspect uses to minimize or reduce their participation in the crime.

For example, a guilty suspect might say I might have witnessed the crime, but I had nothing to do with the crime; or I heard about the murder on the street, but I had nothing to do with the murder on the street.

So back to the police investigation. Rios has now

provided his third statement, but the police have to continue with the investigation, and they try and confirm Rios's statement with some of the individual witnesses.

On the evening of July 7th, approximately 12 hours after the court-reported statement, Luis Huertas, the victim's friend who was hanging outside the bar near the shooting, is asked to come down to Area 5. The reason he's asked to come down to Area 5 is to participate in a live lineup procedure and determine whether or not Rios was one of the suspects involved in the shooting.

At Area 5, they have a room where they conduct live lineups, and Luis Huertas is behind a one-way glass mirror with Detective Mason. Rios is on the other side of the mirror, along with four similar-looking Hispanic men. Rios picks his position out. He picks No. 1, and they conduct the lineup.

Detective Mason, he opens a curtain so the eyewitness, Huertas, can view the participants, and Huertas positively identifies Rios as the shooter, not as the accomplice, but as the shooter.

The police then document the lineup, and they take photos. And this is another close-up of Rios just after the lineup. No visible injuries.

So in addition to Rios's court-reported statement, there's now an eye witness identification as Rios as the shooter. Detective Mason reaches out to the Cook County

State's Attorney's Office Felony Review Unit. This time Kip Owen, a felony review prosecutor, he comes down to Area 5. He reviews the entirety of the case, and he approves charges against Rios for the murder of Luis Morales.

Rios is then transferred over to Cook County Jail, where he went through intake and he was photographed again. He was also examined by a paramedic. Here's that photo. Again, no visible injuries.

And during this examination at the Cook County Jail by a certified paramedic, he makes no complaints. There's no evidence of any injury to the head. Nothing. He's fine.

Now, just because Rios is arrested and charged, the police investigation does not stop. It continues if they get any additional leads or they need to follow up on some type of evidence.

On July 9th, two days after Rios was identified by the shooter, Mason gets a lead on the guns used in the Morales shooting. He's told by confidential informants that one of the guns is at Alex Lopez's house, and the other gun is at Benjamin Carrero's house. Both of them are Latin King members, and both of them live in the vicinity of the shooting. So the police continue to follow the evidence where it led them.

They did not find anything at Alex Lopez's house, but they do recover a gun at Benjamin Carrero's. When the police were there, Benjamin's girlfriend was caught throwing a gun

outside of their bathroom window. So they bring Benjamin and the girlfriend in to Area 5. Benjamin Carrero was then interviewed by Detective Mason and another Area 5 detective, Detective Curley, and he provides them with additional information about Rios from the night of the shooting.

Carrero tells them that on the night of the shooting, June 27th, 1989, Rios rode up on his bicycle to Carrero's apartment. He gives him a gun and tells him that he needs to hold onto the gun because it was just used in a shooting.

About three weeks later, on July 28th, 1989, two gang crime specialists, O'Quinn and Maritez, they find Tino, who the police now know as Tino Garcia, and they bring him down to Area 5 for questioning. Mason's not there, and so Tino is held overnight.

When Mason gets back the next day, he sits down with Tino Garcia. He provides him with his *Miranda* rights, but Tino refuses to talk. So naturally, the interview ends.

But they have to continue with the investigation, so Mason looks for witnesses, and he locates Javier Torres, the 15-year-old. Torres views Tino and other participants in a lineup, but Tino is not able to identify him as one of the shooters -- sorry -- but Torres is not able to identify Tino as one of the shooters.

So they call Felony Review again, and the Cook County State's Attorney Office elects not to charge Tino Garcia.

About a year later, Rios went to trial for the murder of Luis Morales before a criminal jury, similar to you all here, in November of 1990. That jury heard some of the same allegations from Rios that he's going to present to you here over the next couple of weeks. The criminal jury heard that Detective Mason allegedly fed him details of the crime, hit his head against the table and pulled his hair, and that Detective Halvorsen did nothing to stop him.

But that jury also heard from Detective Mason, they heard from State's Attorney Barbara Riley, and they heard from the eyewitness, Luis Huertas. And that jury found Rios guilty of murdering Luis Morales, and he's sent to prison.

I want to step back for just one second and let you know that Luis Huertas, the eyewitness, is unfortunately not going to be able to attend the trial. He has serious health issues.

But you will hear recent testimony from him, and that testimony will reveal that he saw Rios shoot and kill his friend, Luis Morales, on June 27th, 1989.

I know Mr. Richards spent a great deal of time talking next in this kind of timeline of events that we're going through about how Rios served his time in prison, that his motion to vacate was granted, and that he received a Certificate of Innocence.

We're going to get into the reasons behind those

decisions as we get through this trial, but I want to leave you with this: You will not hear any evidence that either the court that granted the certificate or the court that granted Rios's motion to vacate ever heard the testimony that is going to be presented to you, the jury, over the next couple of weeks.

Those decisions were not based on any testimony from Detective Mason, Barbara Riley or Luis Huertas, the eyewitness who to this day still believes that Rios killed his friend. In fact, neither of those courts ever even heard from Rios himself.

So don't let it distract you from making your decision when you get back to that jury room at the end of this trial. As Mr. Richards just conceded, it's not at all relevant to the single question that you have to answer as it relates to our clients, Michael Mason and Ernie Halvorsen. Only you and that criminal jury in 1990 will have heard the actual evidence surrounding the three times that Rios confessed. That jury didn't believe that Rios's statements were coerced in any way, and neither will you.

I want to thank you all for being here today. We know you have busy schedules and other obligations. The defense is going to try to make this as painless as possible, but we ask for your patience. We ask for you to look at all the evidence, and we're going to ask you to find in favor of Michael Mason

and Ernie Halvorsen on the claim that they allegedly coerced a confession from plaintiff, which is the only claim against these two former detectives.

Thank you.

THE COURT: All right, ladies and gentlemen. It's 4:05. I told you I would break every day at 4:30. I am faced with the question of whether I allow counsel to present his opening statement at the risk of going a little bit past 4:30. Any objections from anyone if we went until 4:45 today?

All right. Seeing no objections, we'll go ahead and get started. And, of course, Mr. Scahill, if 4:45 comes and you need more time, you're welcome to carry over to tomorrow.

MR. SCAHILL: I will be done by then, Judge, I assure you.

Judge, I may be using the document camera, but not right now.

THE COURT: Okay.

OPENING STATEMENT ON BEHALF OF DEFENDANT GUEVARA BY MR. SCAHILL

MR. SCAHILL: Thank you.

Good afternoon, everybody. I introduced myself at the beginning of the day. My name is Timothy Scahill. Along with my partner, Graham Miller, I represent an individual named Reynaldo Guevara. You saw a picture of him earlier. You're going to be hearing from Mr. Guevara tomorrow, I believe.

Mr. Guevara is 82 years old currently. He's been

retired from the Chicago Police Department for about 20 years. He served as a Chicago police officer for 30 years, from about 1975 until 2005 when he retired.

He lives with his wife, who's also elderly, outside of San Antonio, Texas. He survives on a police pension from which he supports himself and his wife. He has not been involved in police work in a very, very, very long time.

And he's not here today, and he will not be joining us in person, as with many people who are sort of in the twilight parts of their lives, it's difficult for Mr. Guevara to travel. He has challenges that some of us have, some of us will have when we get to that age. So please do not take offense at the fact that he's not joining us here, but you will hear from him live.

We heard a lot of things about Mr. Guevara from Mr. Richards in particular. Almost all of them are completely and entirely untrue, which we're going to prove to you throughout this trial. But there is one thing that I need to address, and there is one thing that is true, and that is that Mr. Guevara has decided to use his constitutional rights and to not testify in this case. We're not running away from that fact. That is a fact in the case.

You were all asked in jury selection in your questionnaires about that and whether you could look at that fact and still look at all of the evidence fairly, and all of

you indicated that you could. That's why you're selected.

Here's what you're also going to hear about that. Mr. Guevara is not getting that advice from me. He's not getting it from Mr. Miller either. He has another attorney that he's deciding to rely on their advice with respect to that.

The evidence in this case is going to show that there are some perfectly reasonable reasons for him to be doing what he's doing. There's perfectly reasonable reasons why he would rely on the advice of his counsel to do that under the circumstances of this case.

The Fifth Amendment has been in our Constitution for 230 years. It protects innocent people. It protects everyone. It protects everyone from governmental overreach, from overzealous prosecution. I mean, that's why it exists in our Constitution, and it protects everybody.

And context is very, very, very important when you're looking at that, not just generally, but why Mr. Guevara would decide to do it in this case in particular.

Are there reasons why an 82-year-old retired man might be fearful that he might be subject to an unjust prosecution? I'll submit to you that there are a lot of reasons for that, and none of them have to do with him being guilty of any crimes.

Here's another thing you need to keep in mind when

you're listening to the evidence in this case. Mr. Guevara is the defendant in this case. He's not the plaintiff.

You heard a little bit about the burden of proof from Judge Daniel. Mr. Guevara does not bear the burden of proof. He has no obligation actually to put on any evidence at all. Now, we will put on evidence for sure, but he does not have any obligation whatsoever in that. The law doesn't require him to do that at all.

The Constitution also does not require him to sacrifice his own rights to help out Mr. Rios. It just doesn't.

So let's talk about the evidence. Let's talk about the context in which that arises, and I think the best way to look at the evidence is not to start at the beginning, not to start in 1989, but to start at the end of the story.

Mr. Rios stands in this courtroom here today before all of you as a former convicted murderer. He got convicted of the murder of Luis Morales in November of 1990 by a jury of his peers, a jury that heard evidence, a jury that heard testimony, a jury where he was cross-examined, police officers were cross-examined, eye witnesses were cross-examined, and they convicted him.

You hear sometimes about people being freed from prison because of new evidence. That is not what happened in this case. Mr. Rios served every single day and then some of

his sentence for the murder of Luis Morales. He got out in 2008, and he did absolutely nothing for over a decade. Made no attempts to challenge his conviction. Did nothing.

Mr. Rios, his conviction gets vacated in 2022, which I'm going to go into in a minute. He then goes to get what's called a Certificate of Innocence. Got that in 2023. And this is the third stop, which is what was the intention all along, which is a lawsuit seeking money.

So how did we get here? How did we get to a point where somebody who's convicted by a jury of their peers finds their way into a courtroom asking for money? What does all of that mean? We're going to show you.

What did he do in order to convince the State's Attorney's Office to throw out his conviction and to hand him what's called a Certificate of Innocence? Because that is the only reason why any of us are here is because he was able to do that.

You're going to hear a lot about that process. You're going to hear a lot about that process from persons from the State's Attorney's Office because we're going to call them and we're going to ask them about that, and the short answer to what they did, what that process consisted of is not a lot. Not a lot at all.

Mr. Rios filed a petition in 2020 to have his conviction thrown out. He made a lot of the same claims that

he's making in this lawsuit, that Guevara and Mason coerced him, that his friend Benjamin Carrero was coerced into saying that Mr. Rios gave him a gun and copped to the shooting, that his friend Cristino Garcia got mistreated by Guevara, that Mr. Huertas, this eyewitness, didn't see what he's saying that he saw. That was the crux of his -- of his claims there.

2020, pandemic hits, things slow down a bit, courts are closed, it's difficult to interview witnesses, and the case languishes for a bit.

You're going to hear from an individual named Carol Rogala. Carol Rogala is a supervisor, or was a supervisor in the Cook County State's Attorney's Office Post-Conviction Unit. What's the Post-Conviction Unit of the State's Attorney's Office? Well, I'm about to tell you. She'll tell you more articulately than I can, but let me give you just a little bit of a preview.

When a person is convicted of a criminal offense, there are rules and statutes under Illinois law that allow them to challenge it. Maybe you have new evidence. You can do it when you're in prison. You can do it actually when you've gotten out of prison even if you've served your whole sentence. That's what Mr. Rios did.

It's a very busy unit, as you might imagine in Cook County. And it is the duty of the Post-Conviction Unit to take this very seriously because this is a very serious request.

This -- murder is the most serious crime in the United States for a reason. You're taking another person's life. The State's Attorney's Office is supposed to treat these post-conviction proceedings with the same seriousness that they take the underlying prosecution because it is important.

The integrity of murder convictions is important. It's not just important because it's important that people pay the penalties for committing crimes even when they've gotten out, but it's important to the families, and it's important to society that they take this seriously.

Ms. Rogala will tell you that. She was -- she's retired now, but she was pretty much a lifetime employee of the Cook County State's Attorney's Office, well versed in their practices of how to litigate post-conviction petitions, how to investigate them, what you're supposed to do. And she was trained on these policies for a very long time, had handled dozens and dozens and dozens of these.

Essentially what you're supposed to do is leave no stone unturned. You've got to talk to the witnesses. If there's new witnesses, you interview them. You talk to the eye witnesses to the crime, see what they have to say. You talk to the police officers in the underlying investigation, see what they have to say.

Cook County State's Attorney's Office, they're the ones that prosecute crime, these are their own employees, you

talk to them if they're still around.  The trial attorneys, the people that take statements and confessions, you talk to them, what happened here?  Is this valid?  Is the claims that this person is making consistent with your recollection?

I mean, that's what you do.  That's what this whole process is supposed to be about is to treat this with seriousness and to treat it like this is something that -- that matters.

They didn't do it.  They didn't do any of it really, and I think that Ms. Rogala is going to admit that to you.  Ultimately, they didn't do the things they were supposed to do, and that's why we're here.

They didn't interview a single police officer, not one.  Forget about Guevara.  They didn't interview Mason.  They didn't interview Halvorsen.  They didn't interview Steve Gawrys.  You heard all of these names from Mr. Kivetz and Mr. Richards.  They didn't bother to ask a single one of them what happened.

They didn't interview their own employees.  Barbara Riley sat down with Mr. Rios and heard him confess to this crime, which he's going to accuse her of being somehow complicit in this, didn't even ask her what her recollection of this.  Didn't even pick up the phone.

Tony Carballo, you're going to hear from him, too.  He was one of the trial prosecutors.  Interviewed Mr. Huertas,

worked up the case. He's the one who decided this is a good case to go forward and prosecute. You'd think he'd know a little bit about the evidence and what happened in 1989.

Never talked to him. Never interviewed him. These are not people with axes to grind. These are not people who are friends with Mr. Guevara or Mr. Mason. These are upstanding members of the community. These are members of the Cook County State's Attorney's own office, and they didn't even bother to talk to them.

And if they had, as you'll see when they testify in this case, they will tell you that those accusations that Mr. Rios is making are false, that this was a good prosecution, that it was a prosecution they believed in then, it's a prosecution they believe in now; that it's a prosecution that they instituted, the Cook County State's Attorney's Office instituted because they believed that Mr. Rios was guilty beyond a reasonable doubt, and a jury agreed with them.

What about Mr. Huertas? Mr. Huertas was the key to the prosecution's case. He's an eyewitness. He says I saw this man a few feet in front of me, the man who sits before you today, take the life of my friend. That's what he said at trial.

You would think in a case where an individual is trying to get that murder conviction thrown out when you have an eyewitness saying that that's what I saw, that you would

talk to that person, that you would interview that person. They didn't. They didn't pick up the phone. They didn't send an investigator to talk to him. And the problem with that is that Mr. Richards, who was the post-conviction attorney, was saying the same stuff that he just said about an hour and a half ago, which is supposedly that Mr. Huertas was threatened to identify Mr. Rios, that he saw a picture that, you know, was him and said it wasn't him.

That didn't happen. We know for a fact it didn't happen, and the reason we know for a fact it didn't happen is because you're going to hear testimony from Mr. Huertas in this case. Now, he can't travel out here. He's an old man now. You know, there's health issues, but we took what's called a deposition, which is sworn testimony. You're going to hear it, and he said nothing of the sort.

He said I was not shown a picture of Mr. Rios. I picked Mr. Rios out because he was the one who killed my friend. I told the truth in 1990, and I'm telling the truth now. We know that that's what's going to happen because that is the testimony he gave in this case. It is undisputed, and the State's Attorney's Office didn't bother to even talk to this guy.

He's never put on the witness stand. Never examined. Nothing. The court didn't hear it. The state's attorney didn't hear it.

What about Mr. Carrero and Mr. Garcia? These are people that Mr. Rios has brought forward as people supporting his claims. You're going to hear from them in this trial. They brought them up. They submitted affidavits from these guys, making all sorts of allegations. Never talked to Cristino Garcia ever. Never cross-examined him, put him on the witness stand. None of that. These guys are the heart and soul of his case.

Mr. Rios submitted affidavits from them, which are pieces of paper that Mr. Richards filled out without them having to be challenged on it on claims that they had not --

MR. S. RICHARDS: Objection.

THE COURT: What's the basis of the objection?

MR. S. RICHARDS: Not true as Cristino Garcia --

THE COURT: Okay.

MR. S. RICHARDS: -- wrote out his own affidavit.

THE COURT: Okay. Ladies and gentlemen, the opening statement is the attorney's view of what the evidence will show. You have not received any evidence yet. When you receive the evidence, you will evaluate it and determine what weight to assign that evidence.

The objection is overruled.

MR. SCAHILL: You know what the evidence is going to show when the first time these two guys ever said anything about Rey Guevara doing anything to them? 31 years. 31 years.

And lest you think these are just people who had a crisis of conscience and came forward because they wanted to do the right thing, I think you can guess that there's a pretty close relationship there.  These are his friends.  These are his fellow gang members.  These are people that knew he was being prosecuted.  These are people he's known his whole life, and they didn't say a darned thing for 31 years while their friend is in prison.  Take that into account when you're listening to them testifying because they will be here live testifying.

Who are these people?  Are they random, disinterested citizens?  No.  When did they first start making these claims?  Is there a reasonable explanation for why they would sit on their claims for 31 years?  Was Mr. Rios involved or people working on his behalf involved in getting these people to support him 31 years later?

Is their testimony even internally consistent?  Is it supported by other evidence, evidence from 1989 to 1990 that any of the things that they are saying happened happened?  But most importantly, you're going to get a chance to listen to them testify, to see their demeanor.

Ask yourself when you're listening to that is if a jury heard them testifying and say the things that they said and through cross-examination, is that something that would believe that they are -- that that jury would believe they're telling the truth?

I'll submit to you you'll come to the conclusion absolutely not. These are exactly the kind of people that you get when you have nobody else, when you need somebody to say anything that you want. That's the kind of people that Cristino Garcia are and Benjamin Carrero are, guys who say nothing for 31 years while they are friend's in prison, and they come out of the woodwork when there's a lawsuit in the works. That's the kind of people that these guys are.

What else did the Cook County State's Attorney's Office not do? How about talk to Mr. Rios? They can do that. In a post-conviction, they can absolutely talk to the person making the claims. They can interview them. They can put them on the stand. They can cross-examine them about the claims they're making.

Never did it. Never did it. This is what happened at the hearing. Carol Rogala is going to tell you that she was opposing this post-conviction proceeding on behalf of the State's Attorney's Office. She did not believe it had merit. She wanted to fight it. They were taking it to a hearing. The hearing lasted a half of a day in April of 2022. There was one witness. It was Mr. Carrero.

Now, lest you think that Ms. Rogala was so bowled over by his credibility that she just decided to, you know, we're going to vacate this thing, she is going to disabuse you of that notion real quick. That hearing ended very quickly

because Ms. Rogala had a family emergency. She wanted to go full steam ahead challenging this, did not believe that he was entitled to that relief, and they intended to prove that at the hearing.

In fact, Ms. Rogala is going to tell you when Mr. Carrero is on the stand, she's impeaching him, which means confronting him with an inconsistent statement, as being a serial perjurer. This is a guy that will you hear has lied under oath repeatedly and admittedly over the years over and over again.

Half of a day in April of 2022, cut short because Ms. Rogala had a family emergency.

In July of 2022, Ms. Rogala gets a call from her boss, former State's Attorney Kim Foxx. No longer the state's attorney now, but she was then, and she tells Ms. Rogala stop. Stop what you're doing. No explanation. No investigation. Nothing. Just stop what you're doing.

It's undisputed. That's exactly what happened in this case, and Ms. Rogala had no choice. There was no other investigation done other than that. Zero. Kim Foxx made a decision based on nothing. Case closed. Game over. No hearing. No cross-examination. No more witness testimony. No documents. Nothing. That's the record we're dealing with here. This is undisputed.

We're here because the State's Attorney's Office

didn't do what they're supposed to do, and this is what they've wrought.

Certificate of Innocence. That probably sounds pretty good to you guys, doesn't it? It really must mean something to get a Certificate of Innocence in the State of Illinois. Let me tell you what happened with that: Nothing.

Kim Foxx, through the State's Attorney's Office, said we're just going to sit this one out. The State's Attorney's Office is the only party that is allowed to participate in that other than the plaintiff. The police don't get to do it. Nobody else. And when they sit it out, it gets entered.

No hearing. Nobody had to testify. You know how long that hearing lasted? It lasted less time than it's just taken me to tell you about how long it lasted. It was about a minute and a half.

That's why we're here because of all of that that happened, because they didn't do their job. Now we have to do it. We don't technically have any duty to do it, but we're going to have to do it, and we're going to try to put on evidence in this case to show you what should have been presented, what should have been presented to contest the motion to vacate this conviction which should have been presented on the certificate.

And we think when you see that, you will see that none of these things should have happened, that this is a travesty,

that there should be no lawsuit.  This case is just as strong if not stronger now than it was in 1990.  Something funny happened here leading up to these things getting thrown out, and now we're going to have to go through it.

And once you see that, how this played out, it's going to put in my client Mr. Guevara's decision not to sit by and say things in this case in a new light, an 82-year-old man living out his twilight years who has seen that the State's Attorney's Office, who's responsible for prosecuting crimes, has completely derogated their duty.  That's the context that you need to look at that in.

So that's the procedural history.  Let's talk about the evidence in this case with Mr. Guevara because, again, Mr. Guevara doesn't become the big bad guy until very, very, very late in the game here with respect to the allegations.

You actually don't even need to really hear much from Mr. Guevara, and here's why:  Mr. Guevara wasn't, like, the lead detective in this case.  He's a gang crimes officer, okay?  He's not interviewing -- you know, there's some cases where there's, you know, a dispute about, well, what happens in the interrogation here?  You know, is there something funny going on here?  Mr. Guevara was not in that interrogation room.  This is all made up.

Mr. Mason's going to say that.  You're going to hear testimony from Mr. Halvorsen, Detective Halvorsen.  These are

not people who are pleading the Fifth in this case. They're people who have been consistent on those issues over and over again, people who don't have any reason to lie about that.

Barb Riley, the state's attorney, she's going to come here, say the same thing. Mr. Guevara wasn't involved in this statement. That's not what gang crime officers do. This is all made up. The only person who's going to say anything about Mr. Guevara's involvement in any of that is the guy who's going to be asking you for money. That's it.

You're going to hear that the first time that Mr. Rios started saying anything about Mr. Guevara supposedly being involved in this was a year and a half after he got charged, after he had testified twice in his case, including on a motion where he was trying to get his confession thrown out.

Mr. Guevara's name does not come up out of Mr. Rios's mouth in court until his criminal trial, which is in November 1990, a year and a half after he's charged. And this is going to be a very common theme in this case: Mr. Rios and his witnesses not saying things that a normal person would say right away when your freedom is at stake and waiting and waiting and waiting until you need to come up with a story because that's exactly what the evidence is going to show happened here.

The confession itself, we're going to go through this line by line. It's not that long. 11 pages. But there's a

lot of interesting material in here, and Mr. Rios's account of what led to this is also going to be exceptionally interesting, and I implore all of you to listen very, very closely because there's some things in here that are truth tellers.

May I have the document camera, Your Honor?

So -- actually, before I put this on here, let me just give you a preview. Mr. Rios has been asked about this confession, what led up to it a bunch of times over the years, and he has never been consistent about what happened. He's changed who has been the people who are interrogating him. He's changed how he was supposedly fed information. He's changed what he was told to say sometimes.

He says they told him to say he was the shooter. Other times he says they said he wasn't the shooter. Sometimes he says it's all Guevara. Sometimes he has Mason and Riley doing the feeding of information. Sometimes he says that there's no court reporter at all, that Barb Riley is literally sitting down typing out questions and answers on a piece of paper that he did not say.

Let me say that again.

This confession, which is question-and-answer transcript, Mr. Rios has said there's no court reporter. Literally, the state's attorney was writing things down that did not pass out of my mouth. That's what he has said from time to time. We'll see what he says when he's on the stand in

this case, but he's said all kinds of things.

Think to yourself what a jury, if they were able to hear this post-conviction or a judge would have thought about those changes in stories.

There is one thing of substance though I want you to think about here with respect to the crime. This is a gang crime. It's a gang retaliation, and it's a pretty basic story, which is unfortunately a very common story in the City of Chicago. One gang has a territory on the east side. One has territory on the west side. They're back and forth. They're fighting. Somebody gets shot. I'm going to go over to the other side and shoot somebody else.

It happens all the time unfortunately. It happened a lot in 1989, and it still happens today, and that's essentially what happened here, and that's the story that's told in this confession.

So what Mr. Rios says and the part that I've put up here I want you to be paying attention to when we're talking about it, what Mr. Rios says is that when I was sitting with the detectives, what I told them is that I was aware of a murder that happened. As a matter of fact, the person who -- during this incident, someone shot at me and they shot at my girlfriend, Diana Rodriguez, they shot at my friend Lamont Burr, and they shot at my brother-in-law.

This part that I have highlighted on here, other than

the date, are things that Mr. Rios said are the truth, okay? He's in front of his house. A car drives by, takes a shot at him, speeds down the street. All these people are out here. That's an incident that happened. That's what I told the police, and that's what the truth is, he says.

But, what he says is that didn't happen on June 27th of 1989. It happened after that in July 2nd or 3rd of 1989.

Here's the problem. When there are murders in the City of Chicago, there's police involvement. There's paperwork. There's documents. There's corroborating information.

You are not going to hear one single stitch of evidence that this other incident on July 2nd or 3rd of 1989 ever happened. Nothing. They're not going to show you a single thing. It's going to be the word of Mr. Rios, and it's going to be the word of another one of his friends, this guy named Lamont Burr.

The problem with all of this is that, remember, Mr. Rios testifies at his criminal trial, and he tells this story, this same story about this other murder supposedly happening.

He would have had a lot of evidence to corroborate that if he wanted. Think about this. Mr. Rios is facing decades, decades in prison if he gets convicted. And he's saying I told the police officers about this other incident.

It wasn't the day of the murder. It was another time. And you don't have to take my word for it. Here's my friend, Lamont Burr, to come and testify for me. My girlfriend who was there, too, she can say it happened. She'll get on the stand and say it happened, right?

What about my brother-in-law. Bring him in. Yep. All this happened. What about subpoenaing documents from the police department about this other shooting?

None of that happened. None of these people testified. There wasn't a stitch of anything about that. Think about that. If this is your defense to try to not spend decades in prison, you wouldn't go ahead and get that stuff and introduce it? It's coming up 31 years later.

Again, this is a common theme in this case, making things up after the fact, and this is another one of them.

Mr. Rios had the motive, he had the means, he had the opportunity to commit this crime. He's a Latin King foot soldier. He's going to tell you one of his duties as a Latin King foot soldier is protecting the neighborhood, which he's going to tell you included shooting rival gang members. He's going to tell you that out of his own mouth. That's one of the duties of the Latin King foot soldier, which he was, and that's what happened. That's what happened in this case, a senseless retaliation death.

That's what the confession shows, and that's what

happened in this case.

You know what else did not happen at his criminal trial? You heard from Mr. Richards that he has an alibi. He's sitting out there with his friend Jamaica. No alibi was presented at his criminal trial. None. He didn't testify about it. This Jamaica character didn't testify about it . He didn't say anything to the criminal jury about being anywhere other than murdering the person he was charged with murdering. Period.

Think about that. He testifies and says nothing about where he was other than that. And there's going to be nobody, not a single soul other than the guy who wants money from you who's going to step into this courtroom and say, oh, Mr. Rios couldn't have committed this murder. He was with me. Nobody.

These confidential informants, it's a distraction in this case. Apparently he's saying they're made up out of whole cloth despite the fact that it wasn't just Mr. Guevara who talked to them. Mason, a number of other people, they bring them in and they talk to these people, okay? So that's not going to add up.

No. 2, you know what Mr. Rios is going to say? He's going to say the police told me who one of the informants was. It was Little Mike. Remember Little Mike he was talking about? He's saying they're showing him the picture of this guy and telling him he's an informant.

So that's a pretty odd way to make up an informant, to show you a picture of him.  And that's what he says happens.

Third, Mr. Guevara did not do anything to conceal any confidential informants.  The use of confidential informants is a very, very delicate issue with gang crimes officers.  They're necessary.  They're used all the time.  They provide leads to apprehending criminals.  They give police a reason to sort of look in particular directions, but their confidentiality is super important because if you give up information on your confidential informant, one of two things is going to happen: They're either never going to give you information again, or they're going to be dead.  That's what's going to happen. Every police officer protects the confidentiality of their informants.

But Mr. Guevara did not conceal the identity of his informants at all.  Mr. Rios's attorneys, and you'll probably hear this from the trial prosecutors and maybe even his own defense attorney, they went in to court and tried to have the confidential informants' identities revealed.  The prosecution objected to that, and the court agreed that they did not need to be turned over.

It was not Rey Guevara at all.  Rey Guevara did not interfere with that process in any way, shape or form.  A judge made that decision.

The fourth thing about the CIs is that they don't have

any bearing on this case. If Mr. Guevara was looking to frame Mr. Rios with information from confidential informants, he probably would have come up with something better than there's rumors on the street.

You'll hear the testimony read in by Mr. Guevara. He never says these people are telling me we saw him pull the trigger. Think about that. The rumors on the street. You would come up with something better than that if you had some malicious motive towards Mr. Rios. He said it that way because that's the way that it happened. It's rumors. It has nothing to do with this case.

The evidence in this case is going to show that Mr. Rios was rightfully convicted of the murder of Luis Morales, that the criminal jury got it right, that the post-conviction hearing was a sham. There is an eyewitness who saw him do it who you're going to hear from. He confessed to his involvement.

It's up to you to do what Kim Foxx's office did not do. It's going to require you to look beneath the surface at some of this evidence. It's going to require you to put the procedural history of this case in the right context.

And Mr. Rios is going to try to tempt you away from that. He's going to talk about how this 82-year-old man is not testifying, and look what I got from the State's Attorney's Office. You can't be distracted by that. You have to look

beneath the surface as to how that happened because it informs everything else. Context is crucial in this case.

And at the end of this case, I'm going to stand up here, and I'm going to make my closing argument. And I'm confident once you do that, once you look beneath the surface, once you hear all of the evidence in this case and hear the witnesses, that you're going to find that Mr. Rios has not sustained any of his claims, and I'm going to ask you not to award him a single dollar.

Thank you.

THE COURT: All right. Ladies and gentlemen, that concludes the opening statements. That also concludes our day. I appreciate your indulging me. So that you know when I say typically we won't stop any later than 4:30, once we start the 4:00 hour, I will start looking for a natural breaking point each day with an eye towards making sure that we don't stay past 4:30.

As you leave for the day, I remind you please do not discuss the case. Please do not research the case. If anyone tries to talk to you about the case, tomorrow morning when you return, I will ask you if anyone has anything to report to me. That's what I mean.

Other than that, we will see you in court at 10:00, ask that you arrive at 9:30 tomorrow morning, and have a good evening.

All rise.

(Jury out at 4:41 p.m.)

THE COURT: Okay. Briefly, anything for me to address from the plaintiff's side?

MR. S. RICHARDS: Yes, Your Honor. I noticed in your jury instructions that you seem to contemplate a summary of trial evidence, so I'm preparing a summary, and I will submit it to the Court.

THE COURT: What do you mean, a summary of the trial evidence?

MR. S. RICHARDS: In your jury instructions, you say that the jury has gotten summaries of the trial evidence and sentencing transcripts and they're supposed to consider those. So I don't think anything like that has been prepared. I intended to prepare that because I assume that's something that you wanted.

THE COURT: I do not want it. That instruction may be a placeholder. I view the jury instruction process as like that cartoon where someone's fixing a car and they're throwing things in and they're pulling things out, and so if the parties don't submit any summaries, the jury instruction comes out.

The same thing for demonstratives or experts. If you decide no experts are testifying, the expert instruction comes out.

So I'm not inviting anything as far as evidence goes.

That's for the parties to decide what the evidence looks like.

MR. S. RICHARDS: All right. Well, I will continue, and I'll submit it to the Court and we'll see if you accept it or not.

THE COURT: What evidence do you think warrants a summary? This isn't a numbers case.

MR. S. RICHARDS: It's what case?

THE COURT: It's not a numbers case. It's not like we have thousands of invoices where somebody dropped it into a spreadsheet and saying I did the math for you.

MR. S. RICHARDS: No, but the jury will have to decide if there is a reasonable likelihood of a different outcome if the -- if the suppressed material, fabricated material had not been used.

So in order to make that judgment, they either have to hear from witnesses who testified at the trial, which in some cases is not possible because they're dead, or I'll try to remedy that, or they would need to hear a summary of what the trial evidence was with the instruction Your Honor has given, which is that to be considered only for that purpose and not for the truth of the matter asserted.

So, for example, the defendants have just said that Anthony Carballo would testify and they've said he'll say it's a righteous prosecution and the guy should have been convicted.

Now, I think that may run afoul of a motion *in limine*

about attorneys giving opinions as to the weight of the case, but I think at a minimum, the jury should know what the evidence presented was at the trial. Otherwise, it seems to me it's hard for them to make a decision as to whether the constitutional violations existed, given the trial evidence.

THE COURT: Okay. Response?

MR. SCAHILL: Well, that's misstating what we're going to elicit from Mr. Carballo, but that's a different issue. He's not going to testify about what the jury would or wouldn't have done. He's going to talk about his decision to institute the prosecution.

But as far as the summaries are concerned, I don't -- I mean, this seems like it's something that perhaps should have been done earlier, but if Mr. Richards is going to prepare something, as always, we'll look at it. I don't know what he's going to put in there, so I can't really -- typically, Judge, I will tell you with respect to the underlying case what I've done as a matter of practice and what I had intended to do in this case is to -- we do two things: We read in testimony as necessary, and we examine witnesses who had firsthand knowledge about the prosecution, which would be defense attorneys, which would be the prosecutor, which would be Mr. Rios who were all there during the trial.

So that's typically the way we've done it. I don't know what I'm going to get from Mr. Richards though.

THE COURT: I don't know what a summary of testimony looks like or is. I don't know that it's a proper form of evidence, and so without seeing it -- I understand to some extent the relevance of what the jury had in the underlying case in the sense that this jury needs to understand what the underlying criminal case's jury would have had to consider absent the coerced confession or the fabricated evidence.

Is there some other purpose for knowing what happened in the underlying criminal case?

MR. S. RICHARDS: No.

THE COURT: Okay.

MR. S. RICHARDS: Except that in addition to the fabricated evidence, what would have happened had the suppressed evidence also come in, both.

THE COURT: What suppressed evidence?

MR. S. RICHARDS: The *Brady* material as to Cristino Garcia.

THE COURT: Right. I left that category out.

Okay. I don't know what these summaries are going to look like. If you think that there's a basis for admissibility, you're welcome to put that together and present it. If it's something that should have been disclosed sooner, then it might be disallowed on that basis alone. This is the first I'm hearing of what this type of -- I guess it would be an exhibit.

In any event, I do agree with Mr. Scahill that the normal practice is to read in the testimony concerning what the jury, underlying criminal jury, heard. And typically this jury would not get the transcripts themselves, so I don't know why they would get the summary of it.

But anything else from the plaintiff's view?

MR. S. RICHARDS: Well, Your Honor, I would just say that in terms of my reading in testimony from the underlying trial, the defendants have taken the position that I can read in nothing because they didn't have a chance to cross-examine. For example, they object to the medical examiner's testimony being read in. They object to Javier Torres's testimony being read in.

So I think it's an alternative telling the jury what the first jury heard without saying it's true or false, but just knowing that this is what the evidence was would be helpful to that jury.

THE COURT: So the suggestion is to overcome hearsay objections by creating more hearsay?

MR. S. RICHARDS: No, it's by only allowing in what the jury did in fact hear just to show that's what the jury heard, not that that evidence is admissible as to guilt or innocence or anything else, just to let this jury know what the first jury heard so they can decide on the claims.

THE COURT: Okay. We'll circle back to some of these

witnesses.

Anything for the defense?

MR. SCAHILL: Just one thing. Counsel I think indicated that he wanted to call Mr. Guevara tomorrow morning. So we're going to need to have -- if that is going to work, we're going to need to have the WebEx set up if that's how he wants to proceed. I will make him available, of course.

THE COURT: Okay. My WebEx, I do need a time where we anticipate calling Mr. Guevara because we have to wheel in equipment so that the jury can see the witness testify. I prefer to do that timed around a break because the equipment tends to block the witness stand, and so it's not hard to predict, 10:00 a.m., 1:00 p.m. or 3:00 p.m. are the tentative starting times.

Guevara is going to be your first witness?

MR. S. RICHARDS: After we put in the Certificate of Innocence and after we put in the certified disposition.

THE COURT: Are you making an offer of proof as to the evidentiary foundation necessary to have someone invoke?

MR. S. RICHARDS: Yes. We are -- the evident proof will be that we intend to have the witnesses that we know testify as they testified at their depositions, and they are going to be called as live witnesses, as is Mr. Rios.

THE COURT: Okay. No, he's not going first because you have not laid the evidentiary foundation. I've listened to

your opening. I'm not convinced that you have evidentiary support for all the topics that you listed because you went in at length about Javier Torres, and you have not presented any evidence that he's unavailable.

I know you say that an investigator says that he talked to a family member and they're dead or that Mr. Torres is dead, but I don't have any affidavits. I haven't talked to these witnesses. You have not met your burden to show that he's unavailable. So Torres is out.

MR. S. RICHARDS: Well, Your Honor --

THE COURT: Amongst other reasons.

MR. S. RICHARDS: I have a death certificate.

THE COURT: When am I going to see it?

MR. S. RICHARDS: You're going to see it as soon as I email it to you tonight or I put it on the docket.

THE COURT: Okay.

MR. S. RICHARDS: I received it yesterday morning --

THE COURT: Stop. I don't know where you think you are or what type of case you intend to try, but these late disclosures, I am not accepting them anymore. You filed your motion last week to identify him.

I am here looking to rule on whether his testimony is admissible, and you're telling me that you have not submitted relevant, pertinent, and critical evidence supporting your theory of admissibility to me yet and that you're sitting on it

and waiting for me, waiting to email it to me tonight?

MR. S. RICHARDS: Your Honor, I received it this morning, period.

THE COURT: And so you've been in this courtroom all day with a smartphone, and you could not -- has defense counsel seen it?

MR. S. RICHARDS: I --

THE COURT: Have you shared it -- I'll ask a better question. Have you sent it to defense counsel?

MR. S. RICHARDS: I am not sure of the answer to that. I -- as I said, I received it --

THE COURT: Did you send it --

MR. S. RICHARDS: No.

THE COURT: -- to defense counsel?

MR. S. RICHARDS: No.

THE COURT: And so how are you not sure of the answer to whether you sent it to defense counsel? I asked you whether you sent it to defense counsel, and you said you're not sure. But you know you didn't send it. We're not playing these games. I told you before, I ask simple questions and I expect direct answers.

MR. S. RICHARDS: Your Honor, I received a text yesterday. I asked them to send it by email. I received the email, I believe, either yesterday or this morning of the death certificate.

THE COURT: And you have not shared it with defense counsel, and you have not submitted it to the Court.

MR. S. RICHARDS: No, Your Honor, I have not. I would note that in my original motion, I did present other evidence that he was dead, such as investigators speaking to his relatives.

THE COURT: Okay. And I referenced you did not submit an affidavit of that investigator, so all I have is attorney argument, which, guess what, is not evidence. So how does not evidence help you sustain your burden of proof or burden of production in this case?

MR. S. RICHARDS: Your Honor, as I said, I have a death certificate. He is dead.

THE COURT: That's not the question that I asked. I just covered this. I will ask simple, direct questions, and I expect direct answers.

How does something that is not evidence help you meet your burden of production?

MR. S. RICHARDS: It does not, but --

THE COURT: That's enough.

MR. S. RICHARDS: Okay.

THE COURT: Okay. Is there anything else that the defendants want to address?

MR. ENGQUIST: Yes, Your Honor. One other witness that plaintiff wants to bring us tomorrow would be retired

Detective Johnston. He wasn't on their witness list, that was our only objection to it, but the City did accept -- we will bring him in if your Court allows him to come in.

THE COURT: I'm fine that Detective Johnston coming in even if he wasn't on the witness list if there's no objection from the other defendants.

MR. SCAHILL: We did object. They just sent a subpoena, which we -- it was sent a subpoena, so it's not -- I mean, we have to comply with it, but we object to him being called because he wasn't on the list.

THE COURT: Why didn't you include him on your witness list, Mr. Richards?

MR. S. RICHARDS: He was on their witness list.

THE COURT: Why did you not include him on your witness list, Mr. Richards?

MR. S. RICHARDS: That was an oversight.

THE COURT: You can't call him. You didn't identify him. Deadlines matter. They're not suggestions. They're imperatives. You choose repeatedly to ignore them. You have to start suffering the consequences of your disregard for my orders and my practices and my procedures.

You cannot call Johnston in your case-in-chief. You do not have to produce him because the defendant -- or the plaintiff did not identify him as a potential witness. Plaintiff can't call him in his case-in-chief.

All right.  Huertas, do we -- he's not appearing in person it sounds like.

Mr. Richards, the defendants' objections to your designations are that you did not include any designations with respect to Huertas, you just attached the designations of Torres.

MR. S. RICHARDS:  I -- I thought I had attached the designations of Huertas, but they also provided their own designations.

THE COURT:  I know they --

(Counsel conferring.)

MR. S. RICHARDS:  And we countered the designations of Huertas, I believe.

THE COURT:  Okay.  None of that addresses you did not affirmatively designate or identify any testimony for Huertas. My question is -- I have the answer, it was an oversight.  That doesn't change anything, and I think you misunderstand the purpose of counter-designations, which we'll get to.

Repeatedly, you have taken advantage of my willingness to deviate from my schedule.  You did not make specific designations in the proposed final pretrial order.  I gave you additional time to do that.  That deadline was last Wednesday. I said if you do not affirmatively designate by that date, they will not be allowed as affirmative designations.

You did not submit anything for Huertas.  You say it

was an oversight, but the defendants filed their objections pointing this out on January 30th. Here it is, several days later, and it appears to me as though I am bringing this to your attention, whereas not my job. And so there are no affirmative designations for Huertas, you do not have any affirmative designations for Huertas.

Torres, you're going to submit this evidence of a death certificate. I will rule on the 804 objections this evening or at least by the time we appear tomorrow morning, and we will deal with that.

MR. S. RICHARDS: Your Honor, just may I ask for a clarification on one point?

THE COURT: Sure.

MR. S. RICHARDS: Okay. So the defendants indicated designations as to Huertas for his deposition.

THE COURT: As is their right, and they did it in compliance with my time deadline.

MR. S. RICHARDS: Okay. Am I precluded from calling Huertas or using their designations in my case?

THE COURT: Any objections to the plaintiff using your affirmative designations for Huertas in their case?

MR. SCAHILL: Can I consult for a minute? Probably not.

(Counsel conferring.)

MR. SCAHILL: No, I don't -- I think we're fine with

that, Judge.

THE COURT: Okay. You may use Huertas's designations identified by the plaintiff in your case-in-chief.

MR. SCAHILL: Identified by the defendant.

THE COURT: Correct.

MR. SCAHILL: Thanks.

THE COURT: Sorry.

Plaintiffs object to -- or the defendants object to the plaintiff's use of Samantha Hudson's trial testimony.

MR. SCAHILL: I thought Your Honor ruled on that because there was a disclosure issue there.

THE COURT: Right. That's sustained.

With respect to Richard Curley, the only objection that I would potentially sustain concerns the testimony at 534, lines 23 to 24 where there's a question designated but no answer.

Was that an oversight as well, Mr. Richards?

MR. S. RICHARDS: Yes.

THE COURT: So provided that the answer is included in the designation, that objection, as well as the others related to Curley, are overruled.

For Guevara, the witness will testify or at least appear and invoke the Fifth, and so there's no need to admit his deposition testimony, so that objection is sustained as to the deposition testimony.

As for the trial testimony, have you identified any trial testimony of Defendant Guevara that you intend to introduce in your case?

MR. S. RICHARDS: Yes. Testimony as to two motions and his trial testimony, and those were identified in the pretrial order.

THE COURT: Okay. And I don't recall seeing any objections to Guevara's trial testimony.

MR. ENGQUIST: That's correct, Your Honor. Potentially, Mason and Halvorsen designated it at one point.

THE COURT: All right. And then lastly we've got Dr. Konacki. Is this witness available?

MR. POLICK: No, he's deceased, Your Honor.

THE COURT: Okay. The parties agree that Dr. Konacki is deceased. He's otherwise unavailable. My understanding is that this witness is sort of like a forensic pathologist who did the autopsy, correct?

MR. POLICK: Yes, an expert.

MR. SCAHILL: Well, yeah, so I think this goes into the stippling issue that counsel talked about. We did object on 804(b)(1). But also there's an issue here with this being expert testimony which is not disclosed as expert testimony, in addition to the, you know, 804(b)(1) testimonial issues.

THE COURT: What is your response to the plaintiff's argument that it's not being offered for the truth of the

matter asserted, rather for context as to what the jury in the underlying criminal case heard?

MR. SCAHILL: Well, my response would be I listened to Mr. Richards' opening statement, and he was saying affirmatively they were going to see evidence of stippling that didn't happen, and so he's already said he's going to use it for the truth of the matter. It did not have to do with the underlying case. So it seems like that's what he wants to use it for.

MR. POLICK: I would join in that. He's going to give expert testimony, and he wasn't disclosed as an expert. That's the substance of his testimony. We're talking about stippling. That seems to be something outside the bounds of the jurors' common understanding. It's expert testimony that wasn't disclosed as expert testimony at this trial.

THE COURT: Okay. Yes.

MR. S. RICHARDS: Okay. First of all, I did receive at one point a request from the defendants to agree to include the testimony of Konacki, Daniel Noon, and one other witness. So my assumption was if they wanted to use it and were asking me if I had an objection, that they didn't have an objection based on lack of having an expert disclosure.

The other point about this is I stated in my opening, I think I was pretty clear, that the jury was not to consider such evidence as substantive evidence as whether my client was

guilty or innocent of the murder, which I remind Your Honor is not the issue before us. The issue before us is constitutional violations, and I specifically told the jury that they were supposed to consider this evidence that I was talking about in terms of whether there was a constitutional violation, not in terms of whether my client was substantively guilty or innocent.

MR. SCAHILL: Mr. Richards said at least three times in his opening that his client was not guilty of the murder and he was an innocent man. I mean, that's part of his case. He made it part of his case.

THE COURT: As do the defendants.

MR. SCAHILL: Yeah, that's true, that's true.

THE COURT: And so that issue is not what the jury will be asked to decide, and they will be told that what other tribunals thought of the guilt or innocence of Mr. Rios should not factor into their determination because they are the independent finders of fact with respect to the claims in this case.

Both sides have put it at issue. I don't see any undue prejudice coming from Konacki in that it is part of the trial testimony. I think that an appropriate limiting instruction explaining the purpose of that testimony, that is, to provide context as to what the jury in the underlying criminal case heard when passing on this case the first time,

at least from a criminal perspective is appropriate. So I'm going to overrule the objections to Konacki.

I will get the objections from -- or the response to the counter-designations this evening. My concern in looking at some of them are that they are not covering what counter-designations typically cover, which is rule of completeness types of objections, and I will not allow the counter-designations to serve as a back door for designating testimony that wasn't designated by the required deadline.

So I'll address Torres again before we start tomorrow. You've got to file that death certificate by 7:00 p.m. or else I'm not looking at it or considering it, period.

And then I will take up any other issues in the morning. Have a good -- yes.

MR. SCAHILL: So are we -- should I have Mr. Guevara available at 10:00?

THE COURT: No, he's not testifying tomorrow at 10:00 a.m. because I am not convinced that the necessary -- I won't have the appropriate context from which to evaluate whether the necessary evidentiary showing has been made or will be made concerning his testimony, and I'm not going to let you get up and just ask -- that is a bell that cannot be unrung, and so given the nature of the testimony, I don't think it's appropriate.

Put in other words, if I'm looking at the evidentiary

foundation, the independent bases, the good-faith bases to ask questions beyond or to ask any questions of Guevara knowing that he's going to invoke the Fifth Amendment, there is no evidentiary basis at this point, and so I will wait until one is developed.

I'll see you tomorrow morning.

MR. POLICK: Thank you, Your Honor.

MR. SCAHILL: Thank you, Your Honor.

(Adjourned at 5:07 p.m., until 2/3/26 at 10:00 a.m.)

* * * * *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Joseph A. Rickhoff*

*/s/ Kathleen M. Fennell*              February 3, 2026
Official Court Reporters               Date
United States District Court
Northern District of Illinois
Eastern Division

I N D E X

OPENING STATEMENTS                                        PAGE

Opening Statement on Behalf of Plaintiff                   3

Opening Statement on Behalf of Defendants                 36
Mason and Halvorsen

Opening Statement on Behalf of Defendant                  56
Guevara