99

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                          )   Case No. 22 CV 3973
                                     )
                Plaintiff,           )
                                     )
        v.                           )
                                     )
REYNALDO GUEVARA; MICHAEL            )
MASON; and JOANN HALVORSEN,          )
as Special Representative of         )
ERNEST HALVORSEN, Deceased,          )   Chicago, Illinois
                                     )   February 3, 2026
                Defendants.          )   9:50 a.m.

VOLUME 2
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:       LAW OFFICE OF STEPHEN L. RICHARDS
                         BY:  MR. STEPHEN L. RICHARDS
                              MR. JOSHUA S. RICHARDS
                         53 W. Jackson Boulevard
                         Chicago, Illinois 60604

For the Defendant        BORKAN & SCAHILL, LTD.
Guevara:                 BY:  MR. TIMOTHY P. SCAHILL
                              MR. GRAHAM P. MILLER
                         20 S. Clark Street
                         Chicago, Illinois 60602

For the Defendants       THE SOTOS LAW FIRM, P.C.
Mason and Halvorsen:     BY:  MR. JOSEPH M. POLICK
                              MR. JOSH M. ENGQUIST
                              MR. JEFFREY R. KIVETZ
                              MS. CAROLINE P. GOLDEN
                         141 W. Jackson Boulevard
                         Chicago, Illinois 60604

Court Reporter:          KRISTA M. BURGESON, RPR, RMR, CRR
                         Official Court Reporter
                         219 S. Dearborn Street, Room 1420
                         Chicago, Illinois 60604
                         Telephone:  (312) 435-5567
                         krista_burgeson@ilnd.uscourts.com

                    *    *    *    *    *

              PROCEEDINGS REPORTED BY STENOTYPE
    TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

THE CLERK:  22 C 3973, Guevara, et al., for jury trial.

THE COURT:  You can make your appearances from counsel table.

MR. S. RICHARDS:  Stephen Richards on behalf of plaintiff, Jaime Rios.

MR. SCAHILL:  Good morning, Your Honor.  Timothy Scahill on behalf of Reynaldo Guevara.

MR. ENGQUIST:  Good morning, Your Honor.  Josh Engquist on behalf of defendants, Mason and Halvorsen.

MR. KIVETZ:  Good morning, Your Honor.  Jeff Kivetz on behalf of defendants, Mason and Halvorsen.

MR. POLICK:  Good morning, Your Honor.  Joseph Polick on behalf of defendants, Mason and Halvorsen.

MS. GOLDEN:  Caroline Golden on behalf of defendants, Mason and Halvorsen.

MR. MILLER:  Graham Miller on behalf of defendant, Guevara.

MR. J. RICHARDS:  Joshua Richards on behalf of Mr. Rios.

THE COURT:  All right.  Good morning, everyone.  A few things before we get started.

Mr. Richards, I went back and looked at the instruction on the summary, I believe you were referring to

draft instruction Number 24.

Is that the right one?

MR. S. RICHARDS: It is, Your Honor.

THE COURT: That instruction starts with, the parties agree, concerning summaries.

Do the parties agree concerning summaries?

MR. S. RICHARDS: I can't say that we agree now.

THE COURT: So if there is no agreement, that instruction will come out, when the time comes.

MR. S. RICHARDS: I understand.

I will work on trying to secure an agreement and if I do I will --

THE COURT: I wanted to address speaking objections.

There was an objection yesterday, and as far as objections during the trial, if there is an objection and it is readily apparent to me the basis of the objection, I will rule. If I need more, I will ask counsel, basis. When I am asking for basis, I am expecting a short nonspeaking reasoning, relevance, hearsay, motion in limine. If it is something that requires discussion we will go to sidebar, we will not air it out in front of the jury.

MR. S. RICHARDS: Your Honor, just to clarify.

The first objection should be objection, period. If you ask for explanation it should be relevance or hearsay or something like that. And then further discussion at sidebar.

Is that accurate?

THE COURT: I am also fine with objection, relevance, objection, hearsay. What I am not fine with is, objection, there will be no evidence to that point. The objection is foundation. So be mindful not to offer speaking objections.

I wanted to re-visit the issue concerning the offer of proof concerning calling defendant Guevara first.

I don't accept the offer of proof at this point because I am not certain that there will be admissible evidence concerning some of the questions that the plaintiffs intend to pose to defendant Guevara. And so rather than invite error by allowing questions to be asked with the understanding that the witness intends to invoke his Fifth Amendment right, I will wait to have the evidentiary foundation laid concerning those.

One of my concerns based on what I have heard thus far from openings are some evidence will be admitted for a limited purpose. For example, I am allowing Mr. Rios to testify as to his understanding of defendant Guevara's tactics for the limited purpose of his -- or not because they happened, but because it was Mr. Rios' understanding and that influenced his course of conduct once he was approached or had dealings with defendant Guevara in this case.

And so if Mr. Rios were to get up and say, I understand that -- or scuttlebutt in the neighborhood said that Guevara did this, but he has no personal knowledge, then that

is not an evidentiary basis to ask a question of defendant Guevara knowing that he is going to invoke the Fifth. It is a different circumstance if Mr. Rios says, I saw him do this, now we have substantive admissible evidence, and not evidence limited for some other purpose.

So I will wait to hear what other evidence the plaintiff introduces before having Guevara called with the understanding that Guevara will invoke his Fifth Amendment right.

I saw the plaintiff's filing primarily concerning Huertas where the plaintiff raises for the first time that the defendants have not shown that Huertas is unavailable.

As I understand the plaintiff's argument, it derives from, I made the plaintiffs show that -- or Mr. Torres is not available by providing a death certificate, and yesterday I asked about affidavits or other substantive evidence, that was because at the January 29th motion hearing the defendants raised the issue of Torres' availability, which means prior to my January 30th, 2026, deadline, they objected to the admissibility of the testimony. Plaintiff's filing was made on February 2nd, raising this issue of availability of Huertas. So any question as to his availability has been waived and untimely.

With respect to the designations, I fear that I have invited a mess of the circumstance, and I lament that I did

that simply because the types of issues that the dozen plus filings over the last week concerning designations are raising are issues that I should have addressed at the final Pre-Trial Conference. That is on me. We are now in a position when I have to rule on these designations and counter designations and I will do that, but it is going to require some time and some discussion.

I intend to get a better understanding from the parties of the purpose of various designations to include whether the parties intend to admit it as substantive evidence and any theories of admissibility underlying that, and then addressing any objections to that. That is something that we will likely start with at noon, and then pick up with after the trial day has ended, but expect to address those issues so that I can get back to the parties an understanding of what the scope of the admissible evidence is concerning the deposition designations.

That brings us to 10:00 a.m.

Are there any issues before I bring in the jury that the plaintiffs need to raise this morning?

MR. S. RICHARDS: No, just -- Your Honor, just two matters.

One is we will start our case with the admission of the Certificate of Innocence, a certified copy, and so we expect that there will be a need for instruction by the Court.

THE COURT: Thank you for that notice.

MR. SCAHILL: Judge, I am actually not clear what counsel is intending to do. I mean, I understand there is a Certificate of Innocence out there, but I don't know what he is doing with that.

THE COURT: Why do you need to know? It is admissible evidence. Do you have an objection to its admissibility?

MR. SCAHILL: We do have an objection we raised before, but knowing that that was overruled, our objection was that the content of the actual certificate has matters that are stated in there that I believe run afoul of the Court's order. Specifically, there is a statement in the Certificate of Innocence that says, by a preponderance of the evidence the Court finds that this person is in fact innocent of the offenses for which they were charged, which I believe using it for that purpose and displaying those statements to the jury would run afoul of the purposes there. I think you can put in a Certificate of Innocence and the fact that it was entered without having to show the language of it, which I think is going to go a step too far.

THE COURT: When I ruled on the motions in limine concerning the Certificate of Innocence, I specifically called out that the Certificate itself was admissible.

Can you point me to -- are you asking me to reconsider that decision?

MR. SCAHILL: So when I read that I was under the impression it was the fact of its issuance. I think that was a statement that the Court made in the ruling.

THE COURT: I wrote, The plaintiff seeks to admit his petition for Certificate of Innocence, the Certificate of Innocence, and the transcript of the hearing on the petition for the Certificate of Innocence. Then I went on to rule that the Certificate was admissible, the petition and the transcript were not.

MR. SCAHILL: Understood.

The language I am referring to that I think perhaps we had confusion on, and if it means an oral motion for reconsideration then I would make it now, that there is a statement in there that says that they cannot use that for the purposes of establishing innocence.

So I guess what I would ask for would be one of two things. One, either that that portion be either not read or redacted out, or that Your Honor give the limiting instruction while this is read or right after it is read that this cannot be used for the purposes of establishing innocence.

THE COURT: Any request for a redaction is untimely and therefore it is denied. I don't -- plaintiff's counsel stood up and said, Judge, we are putting in the Certificate of Innocence, I think that invites the instruction, and so now you are wasting my time.

Anything else?

MR. SCAHILL: No.

MR. POLICK: One clarification.

THE COURT: Go ahead.

MR. POLICK: Just on the ruling regarding the convictions of Mr. Garcia and Mr. Burr. I understand the Court's ruling. I am assuming we are limited to date, crime charged, disposition.

Do I understand the Court's ruling?

THE COURT: For who?

MR. POLICK: Mr. Cristino Garcia and Mr. Lamont Burr. Defendants' motion in limine 25.

THE COURT: For the last ten years you can admit the convictions.

MR. POLICK: Yes.

So my question is, when we do admit them, are we limited to date, crime charged, disposition?

THE COURT: What were their convictions again?

MR. POLICK: Mr. Garcia has two convictions for possession of a controlled substance. He also has an aggravated battery conviction.

Mr. Burr has a conviction for armed habitual criminal and also a robbery conviction.

THE COURT: Those can come in.

MR. POLICK: Thank you, Judge.

THE COURT: And what was your second issue, Mr. Richards?

MR. S. RICHARDS: Yes, just following up on what you said.

We had a plan of reading transcripts and depositions for this afternoon. I understand we may not be able to get to it, but our plan was to present readings of Guevara's first suppression testimony, second suppression testimony, and trial testimony.

So I understand you may want to wait until 12:00 and discuss this all with us in terms of whether we, you know, screwed up the redactions, either way, but I just wanted to let you know as a heads up that was our plan. If we have to change the plan, we do so.

THE COURT: My understanding is that there aren't many objections, if any, to Guevara's testimony.

Is that correct?

MR. SCAHILL: Yes.

MR. POLICK: Yes, Your Honor.

THE COURT: And the only other -- or what is the purpose of reading in Guevara's pre-trial and trial testimony?

MR. S. RICHARDS: It is an admission of a party opponent, but there are statements he made about what he did, where he went, who he talked to, which are relevant to our claims. So they are admissions of a party opponent relative to

our claims.

THE COURT: Do you have objections to the portions of that testimony that the plaintiffs intend to -- or that the defendants intend to introduce?

MR. S. RICHARDS: Absolutely not.

THE COURT: So Guevara's testimony can come in because it seems like the parties agree, and it is the statement of a party opponent.

Is there a limiting instruction concerning --

MR. S. RICHARDS: Mason.

THE COURT: (Continuing) -- Mason and Halvorsen, the effect of the testimony?

MR. POLICK: He is not going to be invoking the Fifth in that testimony whatsoever, so I don't know that the limiting instruction with regard to Mason and Halvorsen is necessary at that point.

THE COURT: Okay.

MR. S. RICHARDS: And lastly, Your Honor, just to move things along, I think with respect to Yuksel Konacki, where basically the whole thing is designated, I would hope to be able to present that this afternoon unless there is some serious problem with it.

THE COURT: I ruled on that yesterday afternoon, and so over the defense objection, it can be introduced.

My understanding is that it is not coming in for the

truth, it is coming in for materiality as to what the jury considered.

MR. S. RICHARDS:  Absolutely.

THE COURT:  Okay.

We will bring in the jury then.

Who is your first witness, Mr. Richards?

MR. S. RICHARDS:  Cristino Garcia.

First our exhibit and then Cristino Garcia.

THE COURT:  Okay.

MR. SCAHILL:  I will just say objection, motions, so it is preserved.

THE COURT:  It is preserved.

(Jury in at 10:07 a.m.)

THE COURT:  Please take your seats.

Good morning, Ladies and Gentlemen.  We will -- we have concluded opening statements.

Before we start with the evidence I will ask, does anyone have anything to report to me concerning the case?  And so seeing no hands we will start with the plaintiff.

Mr. Richards, you may proceed.

MR. J. RICHARDS:  Your Honor, may I use the overhead projector?

THE COURT:  Yes.

MR. J. RICHARDS:  At this time, Your Honor, plaintiff seeks to admit Plaintiff's Exhibit 39, which is a certified

112

copy from the Clerk of the Circuit Court of Cook County of an order granting Certificate of Innocence, and if that admission is granted, we would seek to publish.

THE COURT: Any new objections?

MR. SCAHILL: None other than previously stated.

THE COURT: Okay.

The Certificate of Innocence is -- what is the exhibit number?

MR. J. RICHARDS: Exhibit Number 39.

THE COURT: Exhibit Number 39 is admitted over the defendants' objection.

You may publish it.

(Plaintiff's Exhibit No. 39 was received in evidence.)

MR. J. RICHARDS: Your Honor, there is some glare. I will take it out of the protective sleeve, if I may.

THE COURT: Okay.

MR. J. RICHARDS: In the Circuit Court of Cook County Illinois, People of the State of Illinois versus Jaime Rios, Number 89 CR 16525, Order Granting Certificate of Innocence.

This cause comes before the Court on the defendant/petitioner's petition for Certificate of Innocence pursuant to 735 ILCS 5/2-702.

The Court being fully advised finds by a preponderance of evidence that:

One. Box filled. The defendant/petitioner was

convicted of one or more than one felony by the State of Illinois in the County of Cook and was subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence.

Two. Box filled. The defendant/petitioner's judgment or conviction was reversed or vacated and the indictment or information dismissed.

Three. Box filled. The defendant/petitioner's indictment or information was dismissed or she/he was acquitted and a petition was filed within two years of the dismissal of the indictment or information or acquittal.

Four. Box filled. The defendant/petitioner is innocent of the offenses charged in the indictment or information.

Five. Box filled. The defendant/petitioner did not by his/her own conduct voluntarily cause or bring about his/her conviction.

It is therefore ordered as follows:

That the petition for a Certificate of Innocence is granted.

Two. That the Clerk of the Circuit Court shall transmit a copy of the Certificate of Innocence to the Clerk of the Court of Claims, together with the defendant/petitioner's current address as indicated on the petition.

Three. Documents for sentencing, not attached.

Entered, February 3, 2023, Judge's signature, Judge's Number 2038.

THE COURT: All right.

Ladies and Gentlemen, you just heard and saw evidence that the plaintiff, Jaime Rios, was awarded a Certificate of Innocence in the State Court.

The State Court's decision to issue a certificate of innocence is not binding on you in this case. The State Court decided different issues than those before you when the State Court issued its Certificate of Innocence.

The State Court was not asked nor did it decide the issue of whether the plaintiff's Constitutional rights were violated or whether the defendants engaged in any misconduct understate or Federal law.

The State Court was not asked nor did it decide the issues of whether the plaintiff's confession was false, fabricated, or coerced, whether the defendants fabricated or concealed any evidence, or whether defendant, Reynaldo Guevara, maliciously prosecuted the plaintiff. Those are issues for you alone to decide.

In addition, the State Court may not have had the same evidence before it that will be presented to you in this case. You will have the opportunity to listen and hear the evidence presented in this case, and then you are to decide this case based on the evidence that you receive in this case.

That is one of what I suspect will be several instructions that I give you during the course of the trial. At the end of the trial I will read even more instructions for you and most of those you will have with you in the jury room in paper form while you are deliberating.

So counsel, you may proceed.

MR. J. RICHARDS: Your Honor, we would call Cristino Garcia.

THE COURT: Please come up.

Before you take your seat, please raise your right hand.

(The witness was sworn.)

Please take your seat.

THE COURT: Mr. Richards, you may proceed once the witness is settled.

MR. J. RICHARDS: Your Honor, may I?

THE COURT: You may proceed once the witness is settled.

CRISTINO GARCIA, PLAINTIFF'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MR. J. RICHARDS:

Q. Mr. Garcia, in a clear and loud voice please state your name for the jury and spell it for the benefit of the court reporter.

A. Cristino Garcia, C-r-i-s-t-i-n-o.

Q. How old are you, sir?

A. 55.

Q. Are you currently working?

A. Yes.

Q. What is your current employment?

A. I would say -- I would call it cleaning houses. Doing like house -- maintaining houses, maintaining houses.

Q. And how long have you been doing that for?

A. One year.

Q. Where do you live?

A. At 933 North Sacramento Boulevard.

Q. What neighborhood do you live in?

A. In Humboldt Park.

Q. And who do you live there with?

A. Right now I am staying with my mom.

Q. What is your mother's name?

A. Elena Carrau.

Q. Can you, please, spell that for the benefit of the court reporter?

A. E-l-e-n-a C-a-r-r-a-u.

Q. Now, you are living in Chicago now. Have you always lived in Chicago?

A. Yes.

Q. What neighborhoods have you lived in?

A. I was raised in the Wicker Park area.

Q.   Now, I want to take you back to the 1980s in Chicago.

Were you living in the Wicker Park area then?

A.   Yes.

Q.   And at the time, who were you living with?

A.   I was with my mom.

Q.   In the 1980s, were you a member of a gang?

A.   Yes, I was.

Q.   Which gang was that?

A.   The Latin Kings.

MR. SCAHILL:   Judge, can I ask that the Court instruct the witness to speak up a little?

THE WITNESS:   I'm sorry.

THE COURT:   Mr. Garcia, you can move the microphone closer to you.   There you go.   Let's see how that works.

THE WITNESS:   Okay.

BY MR. J. RICHARDS:

Q.   At approximately what age did you join the Latin Kings?

A.   I think I was like 15 years old.

Q.   Why did you join the Latin Kings at 15?

A.   Pressure from all the gangs.

Q.   When you say pressure from other gangs, what do you mean?

A.   I was getting beat up and robbed from those gangs when I was going to grammar school.

Q.   What grammar school were you attending?

A.   Jose Diego.

Q. Do you remember whereabouts that was in Chicago?

A. It is by Clemente High School.

Q. Whereabouts is that in Chicago?

A. The street?

Q. Yes.

A. Claremont.

Q. When you were getting beat up by the other gangs, do you know why you were being beat up?

A. Just for simply living on the other side of the neighborhood.

Q. When you say living on the other side of the neighborhood, are you talking about there was a dividing line?

A. Yes. You could say that, yeah.

Q. What was the dividing line?

A. Say Western, the east side and the west side, Western.

Q. And the neighborhood that you lived in, what gang territory was that?

A. That was the Kings, the Latin Kings, yes.

Q. When you joined the Latin Kings at age 15, did you hold any rank with them?

A. No.

Q. Now, I want to go a little forward to 1989.

How old were you in 1989?

A. I was 19, 19 years old.

Q. Did you have a nickname at the time?

Garcia - direct

119

A.   Well, my nickname is Tino.

Q.   And was this a self-imposed nickname or a nickname that others --

A.   No, my family gave me that nickname.

Q.   And in 1989 -- or where approximately were you living in 1989?

A.   1989?  I was staying with my mom at the time.

Q.   Besides living with your mom in 1989, was anyone else living in the household?

A.   Yes, my daughter and my daughter's mom.

Q.   What is the name of your daughter's mother?

A.   Hermina Cruz.

Q.   Are you married to her now?

A.   No.

Q.   Were you ever married to her?

A.   No.

Q.   Now, in 1989, was your daughter living with you?

A.   In 1989?  No, she wasn't born yet.

Q.   When was she born?

A.   She was born in 1989.

Q.   What month?

A.   November 17.

Q.   Now, Mr. Garcia, are you convicted of a felony?

A.   Yes, I have.

Q.   And what was that felony for?

A. For possession of drugs.

Q. And what was your sentence in that charge?

A. Probation.

Q. Besides probation, did you have any other requirements to do?

A. Drug treatment.

Q. Now, I want to take you to June 27th, 1989.

Do you remember where you were that day?

A. At home. I was at home.

Q. What were you doing at home?

A. I was with my mom and my girlfriend ordering, ordering out food.

Q. Do you remember what you ordered?

A. Yes, pizza and some rib tips.

Q. From where?

A. Father & Son.

Q. Why did you order from Father & Son's Pizza?

A. Because I liked their pizza, it is good, it is good.

Q. And when you ordered that pizza, did the pizza arrive?

A. Yes.

Q. And did you eat the pizza after it arrived?

A. Yes.

Q. And besides that, did you do anything else that day or night on June 27th, 1989?

A. No, I did not. I stayed home.

Q. Now, sometime later did something happen to you?

A. That I was arrested?

Q. Yes.

Were you arrested?

A. Yes.

Q. Do you recall the date that you were arrested?

A. No.

Q. Do you recall --

A. Exactly the -- no.

Q. Do you recall the month you were arrested?

A. July, I think it was in July. I believe it was in July.

Q. So I want to talk to you about the circumstances of what happened with that arrest.

Do you remember where you were arrested in July of 1989?

A. Yes, I was on Evergreen and Spaulding.

Q. Why are you on Evergreen and Spaulding?

A. I was visiting my sister-in-law.

Q. Do you remember who arrested you?

A. Officer Detective O'Quinn.

Q. What does Detective O'Quinn look like at that time?

A. He was a male, white man, big.

Q. And when he arrested you, how did he go about arresting you?

A. Um, he just approached me and handcuffed me and told me

Garcia - direct

122

that I was under arrest.

Q. What happened next after you were handcuffed and told you were under arrest?

A. He put me in the car and he told me I was being arrested for a shooting, and he took me to the police station at Grand and Central.

Q. When he took you to the police station at Grand and Central, what happened next?

A. They put me in an interrogation room and another officer by the name of Guevara came in there and they handcuffed me to the wall in the interrogation room and he was accusing me of a shooting, saying that I did it, and where was I, questioning me.

Then he -- he was telling me to sign this paper saying that I did it, and I told him no, and he kind of like roughed me up a little bit, you know, slapped me around, put a phone book on my head and started hitting me on my head.

And then this lady came in, and she -- she said that she wasn't my lawyer, she was a State Attorney, and she just stood there, you know, and --

Go ahead, I will let you ask.

Q. I want to take a step back and -- you mentioned an interrogation room.

If you could describe for the jury what did that interrogation room look like?

Garcia - direct

123

A.   It is a square room, kind of small, it has a steel bench on the wall, and it has a bar on the wall where they handcuff you to, and a table and a chair.

Q.   And in terms of --

Do you recall where that interrogation room was located within the police station of Grand and Central?

A.   It was like first floor, a first floor from the police station.

Q.   You mentioned Guevara and you have mentioned O'Quinn and you have mentioned a person who identified themselves as an attorney?

A.   Yes.

Q.   Did the person who identified themselves as an attorney ever give you their name?

A.   No.

Q.   Do you remember what that person -- that attorney looked like?

A.   She was a female, Hispanic lady.

Q.   Do you recall her approximate age?

A.   She was pretty young.  She looked kind of young to me, yeah.

Q.   Now, you mentioned being -- a phone book.

Can you describe what happened more with that?

A.   The phone book?

Q.   Yes.

A.   I told him after he was hitting me --

Well, he was putting the phone book on my head and hitting me downward with a flashlight, a steel big flashlight. And I had told him to stop, that I would sign the paper if you let me make a phone call. And I went to call my sister, and I told her where was I at and what was going on and she told me not to sign no paper and she would send a lawyer.

The police officers were listening to me on the phone and they told me to hang up, and then they threw me back in the bullpen -- not the bullpen, interrogation room, put me back in there, and proceeded with their slapping me across the face and hitting me over the head with the Billy club and the phone book.

Officer O'Quinn was standing on the outside of the door watching. And the lady that said she was a State Attorney, she was sitting there too and didn't say nothing.

Q.   And so Officer O'Quinn is outside, the lady State's Attorney is sitting there saying nothing, and is it Officer Guevara who is hitting you?

A.   Yes, Officer Guevara is the one.

Q.   Now, did a lawyer come?

A.   Yes.

Q.   What happened when the lawyer came?

A.   O'Quinn knocked on the door and told Guevara to stop hitting me because my lawyer was there, and he picked -- he

Garcia - direct

125

grabbed his belt that he had took off in the beginning, the belt with the handcuffs and everything, picked up his badge, picked it up, and walked out. Then my lawyer came in and I told him what was happening. Then he went to investigate to see if it was all true. They denied it. And he stood there talking with me.

Q. What happened next after that?

A. Well, he told me he couldn't stay there with me all day, and that when he leaves, if they come back and hit me and tell me to sign anything, not to sign it. So that is what I did.

Q. And your lawyer left?

A. Yes, he had to leave. He couldn't stay there with me all day.

Q. And what happened after that?

A. They put me in a lineup, another lineup, they put me in two lineups, as a matter of fact, in two lineups, and they said that nobody pointed me out, that I beat the two lineups, you know, in other words.

Then they put me in a bullpen.

Q. What is the bullpen?

A. It is like where they hold you before they take you to the County.

Q. What happened next after you were put in the bullpen?

A. I would say 40 minutes later an officer came and opened up the gate and they released me.

Garcia - direct

126

Q. What did you do after they released you?

A. I called my baby's mother and she picked me up and I went home.

Q. Now, after that time, did you ever see Officer O'Quinn again?

A. Did I see them again afterwards? Yes. I seen Guevara. He seen me walking down the street one day and he pulled me over. He took out a camera, one of those old Polaroid cameras that comes out from the bottom, the picture, and he pushed me against the wall on the street and he was taking pictures of me saying that he was going to show it to some other gang to see if I could get hurt.

Q. Do you remember approximately how long after Guevara did that to you -- after that occurred from when you were released from custody at Grand and Central?

A. I would have to -- I would say like two weeks later, a week later, close to.

Q. And after that incident, were there any other further incidents that you had with Officer Guevara?

A. No.

MR. J. RICHARDS: Your Honor, may I have a moment?

THE COURT: Yes.

(Discussion held off the record.)

BY MR. J. RICHARDS:

Q. Do you know the first name of Officer Guevara?

A.   Reynaldo, I believe.

Q.   And what does Officer Guevara look like, or at the time what did he look like?

A.   Hispanic, got glasses, he was a little heavy set.  And he always had -- he always had a ring, a big Indian ring.

Q.   What do you mean when you say Indian ring?

A.   Because I seen it when he put his hand across my face, an Indian ring, a gold ring with an Indian on it.

Q.   Native American ring?

A.   Yes, an Indian.

          MR. J. RICHARDS:  Nothing further, Your Honor.

          I tender.

          THE COURT:  Okay.

          Cross?

          MR. SCAHILL:  Yes, thank you.

                    CROSS-EXAMINATION

BY MR. SCAHILL:

Q.   If I could have about 15 seconds to get my exhibits.  Thank you, Judge.

          Good morning, Mr. Garcia.

A.   Good morning.

Q.   My name is Timothy Scahill.  I am Mr. Guevara's lawyer and I will ask you some questions today.  All right?

A.   Okay.

Q.   First of all, Mr. Rios is someone you have known for a very

Q. long time, correct?

A. I know him, yes.

Q. You have known him for a long time though?

A. Yes.

Q. Since you were a teen-ager?

A. Yes.

Q. You actually have a family connection to him, correct?

A. Yes.

Q. Right.

Your sister is -- has kids with his brother, Ricardo?

A. Yes, yes.

Q. And Ricardo is somebody that you have also known for a very long time, right? Ricardo, his brother? Yes?

A. Yes.

Q. Okay.

You and Mr. Rios were friends back in 1989?

A. Yes.

Q. And you were also members of the same gang, right?

A. Yes.

Q. That was the Latin Kings gang?

A. Yes.

Q. And I think you told counsel that you joined that gang when you were 14 or 15 years old?

A. Yes.

Q. How long did you stay a member of that gang?

Garcia - cross

A.   I got out.  I got out of the gang in 1995, I believe.

Q.   You were 30 years old when you say you got out of the Latin Kings, right?

A.   Yes.

Q.   So you were a member for quite a long time, a decade?

A.   Yes.

Q.   As a member of the Latin Kings did you learn about the laws of the Latin Kings gang?

A.   A little bit.

Q.   What is the first law?

A.   I don't know.

Q.   The first law isn't "once a King, always a King"?  You don't know that?

A.   I wasn't into that.

Q.   You weren't into it but you were a member of the gang for over a decade?

A.   Yes, I was in it.

Q.   So you were also -- I think you said you went by the nickname of Tino?

A.   Everybody calls me Tino.

Q.   Including Mr. Rios?

A.   Everybody, yes.

Q.   Including him, right?

A.   Yes.

Q.   All right.

Garcia - cross

130

You mentioned that you have been convicted of a felony, right?

A.   Yes.

Q.   You have actually been convicted of two felonies, right?

A.   Yeah.

Q.   When did that happen?

A.   I don't know which one you are talking about.

Q.   I am talking about your two possession of a controlled substance convictions.  When did you -- when did you get convicted of those?

A.   1991.

Q.   Sir, isn't it true you got convicted of two possession of a controlled substance felonies in 2021?

A.   Yes, yes, I did.

Q.   Okay.  Did you forget about that, sir?

A.   Kind of, a little bit.

Q.   Okay.

So you are 55 now, right?

A.   Yes.

Q.   And so you were still in your 50s at the point you were getting convicted of both of these felonies, right?

A.   Yes.

Q.   You became aware that Mr. Rios, your friend and fellow gang member, had been charged with a murder when the trial was going on, right?

A.   What was the question again?

Sorry.

Q.   You were aware that your friend, Mr. Rios, was standing trial for a murder back in 1990, right?

A.   Yes.

Q.   And you wanted to testify for him, didn't you?

A.   In 1990?

Q.   Yes, when he was on trial.  This is your friend and you wanted to testify for him, right?

A.   I wasn't asked to.

Q.   That isn't what I asked you.

I asked, you wanted to testify for him, right?

A.   No.

Q.   Mr. Garcia, you recall that you gave a deposition in this civil case on July 19th of 2023, correct?

A.   Yes.

Q.   And at that deposition there was a court reporter there, the same way there is a court reporter here?

A.   Yes.

Q.   And they made you take an oath before you answered the questions?

A.   Yes, yes.

Q.   To swear to the truth, the whole truth, and nothing but the truth?

A.   Yes.

Q.   Okay.

This is going to be Defendants' Exhibit 117, Counsel, and this is at Page 136, Line 6.

You were asked these questions and you gave these answers on July 19, 2023:

"Q.   Did you want to testify for Jaime Rios at his trial?

"A.   Yes.

"Q.   Why did you want to testify for Jaime Rios at his trial?

"A.   Because he was a friend of mine, I'm sorry, he was a friend of mine."

Did you give those answers, sir?

A.   If it is on the paper I must have.

Q.   Okay.

A.   But I don't remember.

Q.   How is your memory, sir, about things that happened back in 1990?

A.   1990?

Q.   Yes.

A.   Well, they were fresh -- I remember what I wrote in the -- what I just spoke about right now, testified.

Q.   Back during that time period in 1989 to 1990, you had a pretty bad drug addiction, didn't you, sir?

A.   Yes.

Garcia - cross

133

Q.   You were a cocaine addict?

A.   Yes.

Q.   You were also drinking every day?

A.   Yes.

Q.   Yes?

A.   Yes.

Q.   And by your own admission, you had a bad habit, right?

A.   Yes.

Q.   You don't think that that has impacted your memory at all, sir?

A.   It might have.

Q.   It might have, okay.

      And you have continued to have substance abuse problems, right?

A.   Yes.

Q.   I think you told counsel you went into rehab after your drug conviction?

A.   Yes.

Q.   That is pretty recently, within the last couple of years, right?

A.   Yes.

Q.   And have you struggled with drug addiction over these decades between 1989 and just a couple of years ago?

A.   Yes.

Q.   Are you still struggling with that, sir?

A.   Yes.

Q.   When is the last time you used drugs, sir?

A.   This week.

Q.   This week.

Did you use any drugs today, sir?

A.   Yes.

Q.   What did you use, heroin?

A.   Yes.

Q.   Are you high right now, sir?

A.   No.

Q.   You used it this morning?

A.   Yes.

Q.   Do you intend to use it later today?

A.   No.

Q.   Are you still feeling the effects of the heroin you did this morning as you sit on the stand here?

A.   No, no.

Q.   What time did you use heroin today, sir?

A.   6:00.

Q.   6:00 a.m.?

A.   6:00 a.m.

Q.   So, in 2020 you are still addicted to drugs, right?

A.   Yes.

Q.   And in 2020 isn't it true that you get approached by your friend, Ricardo Rios, regarding his brother, Jaime Rios?

A.   Yes.

Q.   And Mr. Rios' brother told you in the fall of 2020 that he needed your help with his brother's criminal conviction, right?

A.   Um, I was told that it was to expunge his record.

Q.   To expunge his record.

A.   Yeah.

Q.   So when he came to you you didn't believe that he was coming to you to help his brother get his conviction overturned?

A.   No.

Q.   Are you just learning this information as you sit here today, sir?

A.   No.

Q.   Now you know that that is what it was for?

A.   Yes.  I found out two years ago, yes.

Q.   Two years ago, so in 2023?

A.   I found out after I did the affidavits.

Q.   Well, thank you for bringing that up.

So Mr. Rios' brother said he wanted to connect you with Jaime Rios' lawyer, Mr. Richards, right?

A.   Yes.

Q.   To get help with his criminal case?

A.   Yes.

Q.   And that was in October of 2020?

A.   I believe so.

Q. We are going to get into the substance of this affidavit in a minute.

I believe that you said that at some point in 1989 you got arrested and that you were mistreated in the police station by Mr. Guevara, right?

A. Yes.

Q. Okay.

The affidavit that you signed was signed in November of 2020?

A. Yes.

Q. And that came about, again, because Ricardo Rios had asked you to get in touch with this guy, Mr. Richards?

A. Yes.

Q. All right.

How did Ricardo Rios know to come to you to ask you whether you had information about Mr. Rivera that might help his brother's case?

A. Because he knew that I had got arrested in '89.

Q. Had you ever told Ricardo Rios anything about Mr. Guevara mistreating you before he came calling you up asking you for your help?

A. Yes, I told him.

Q. You actually, according to you, had told Ricardo Rios about Mr. Guevara mistreating you years before that?

A. Yes.

Q.   That was when Jaime Rios was still in prison?

A.   Yes.

Q.   When you first told Ricardo Rios that, Mr. Rios' brother about this stuff with Mr. Guevara, Mr. Richards didn't ask you to sign any affidavit at that point?

A.   No.

Q.   The first time that you told anyone other than Ricardo Rios about this all happening was in 2020, right?

A.   Yes.

Q.   That is about 31 years after you say this happened to you, right?

A.   Yes.

Q.   And while your friend and Mr. Rios' brother is still in prison, right?

A.   Wait, I'm sorry.  I didn't get the question.

Q.   The first time that you tell Ricardo Rios, Jaime Rios' brother about all of this, your friend and his brother, he is still in prison on his murder charge, right?

A.   Yes, I told him before he got out, yes.

Q.   And you understand that Jaime Rios was released from prison in 2008?

A.   Okay.

Q.   Okay.

      So you were aware of this information according to you about Mr. Guevara and told his brother over a decade before and

nobody asked you at any point to say anything or do anything to help out Jaime Rios with this information that you say you had.

A.   While he was incarcerated?  No.

Q.   Okay.

So Ricardo Rios asked you to talk to Mr. Richards, right?

A.   Yes.

Q.   And you do talk to Mr. Richards, correct?

A.   Yes.

Q.   And Mr. Richards asked you to write out an affidavit, correct?

A.   Yes.

Q.   And he told you some of the information to put in there, correct?

A.   Yes.

Q.   And when you wrote this affidavit you wrote it in your own hand, correct?

A.   Yes.

Q.   And again, you understood this was being used in a court proceeding, right?

A.   Yes, yes.

Q.   And you were trying to put down, now 31 years later, everything that you remembered at the time?

A.   Yes.

Q.   Did you do that?

A.   I think I did a good job.

Q.   Okay.

     I am going to put --

     MR. SCAHILL:   Judge, can I do the document camera just to show the witness to authenticate this?

     THE COURT:   Yes.

     MR. SCAHILL:   Thank you.

Q.   There is going to be a screen that will pop up -- I will just hand it to him.   I have another copy.

     May I approach him?

     THE COURT:   You have free leave to approach.

     MR. SCAHILL:   Thank you.

BY MR. SCAHILL:

Q.   Mr. Garcia, I am handing you what has been previously marked as Defendants' Exhibit 34.   This is for identification right now.

     If you can take a look at that, flip through it, and once you are done, look up, then I will ask you some questions about it.

A.   You want me to read it all?

Q.   I just want you to flip through it.   You don't have to read it for substance, we will go through it.   Just take a look at it and flip through it and then I will ask you a few questions about it.

A.   Okay.

Q.  All right.

First question, is this a true and accurate copy of the affidavit that you filled out in your own hand in or around November of 2020?

A.  Yes.  Yes, it is.

Q.  Okay.

MR. SCAHILL:  Judge, I move to publish and admit this evidence into the record.

THE COURT:  Any objection?

MR. J. RICHARDS:  Yes, Your Honor.

Objection, nonimpeaching.

THE COURT:  Response?

MR. SCAHILL:  Number one, I am going to impeach the witness with it.  And number two, it is basis for the post-conviction.

THE COURT:  The objection is sustained.  It is not clear to me your theory of admissibility of a prior statement.  You can ask the witness the questions.

MR. SCAHILL:  Okay.  Fair enough.

BY MR. SCAHILL:

Q.  You testified about some incidents that happened on June the 27th of 1989, correct?

A.  Yes.

Q.  First question, what time did you get up on June 27th of 1989?

Garcia - cross

141

A.  I don't remember.

Q.  Who were you with when you woke up that day?

A.  I was with my girlfriend, my daughter's mom.

Q.  Do you remember what day of the week it was?

A.  No.

Q.  Do you remember whether it was a weekend or a week day?

A.  No.

Q.  Do you remember what you had for breakfast that morning?

A.  No.

Q.  Do you remember what you had for lunch that day?

A.  No.

Q.  Do you remember what you had for dinner?

A.  Yeah, the pizza and the rib tips.

Q.  What time did you order it at?

A.  I don't remember what time it was.

Q.  Dinner time?

A.  Yeah.

Q.  6:00 o'clock, 7:00 o'clock, something like that?

A.  Yeah, you could say around there.

Q.  Did you tell Mr. Rios' attorney that you were not present in the area where Luis Morales was hurt on June 27th of 1989?

A.  Did I tell his lawyer that?

Q.  Yes.

A.  Yes.

Q.  At the time that you were completing this affidavit, did

you know who Luis Morales was?

A.   When I was writing the affidavit?

Q.   Yes.

A.   Yeah, I asked him and he told me.

Q.   He told you to put the name Luis Morales, you didn't know who --

A.   No, I didn't know.

Q.   And did you tell Mr. Richards that on June 27th, 1989, that you were home with your girlfriend, Hermina Cruz, and Elena Carrau, your mother, and you ordered pizza and rib tips from Father & Son?

A.   Yes.

Q.   Did you tell him what time you had ordered that?

A.   I don't think I did.

Q.   Your girlfriend was pregnant at this point?

A.   Yes.

Q.   And so at the time that you filled this out, you did not know at what time Mr. Morales was hurt on June 27th, 1989, correct?

A.   No, I didn't.

Q.   And you were not eating pizza and rib tips at 10:00 p.m., were you?

A.   If I wasn't?

Q.   You were done at that point, right?

A.   I don't remember what time I ate.

Q.   Okay.

On July 28th of 1989, did you remember what time you had eaten the rib tips?

A.   On what day?

Q.   In July of 1989, did you remember at what time you had eaten the pizza and the rib tips?

A.   In July?

Q.   Yeah.

A.   I thought you just said it was June.

Q.   Yeah, I did say that.  You ate them in June.  I said did you remember the time in July?

A.   I don't recall.

Q.   As you sit here today you can't tell us whether you were eating the rib tips at 5:00 p.m. or 9:00 p.m.?

A.   Correct.

Q.   But you weren't eating dinner at midnight?

A.   At midnight, no.

Q.   Okay.

So you were not eating pizza and rib tips with your girlfriend and your mother around midnight on June the 27th of 1989?

A.   At midnight, no.

Q.   So if Mr. Luis Morales was murdered at that time, you being at home eating pizza and rib tips would not give you an alibi for where you were at the time that that murder occurred, would

it?

A.   I don't know.

Wait, I don't understand what you just said.

Q.   Well, I think that you told Mr. Richards earlier that you were being asked about this murder that happened when you were in the police station, right?

A.   Yes.

Q.   And you were telling them where you were that day, right?

A.   Yes.

Q.   And your purpose for telling them where you were that day was to say, I wasn't at this place committing this murder, I was at this other place eating food with people, right?

A.   Correct.

Q.   So the question is, at the time -- assuming, if you will, that the murder occurred at midnight, the answer that you gave about where you were on June 27th, 1989, would not account for where you were at the time that this murder occurred, would it, sir?

A.   Well, the officer, he investigated -- he called the pizza place and found out what time they delivered it.  So he went by the time that they delivered it.  I was at home because I called to order.

Q.   It is not delivered at midnight though, right?

A.   No, it wasn't midnight.  I am not saying it is midnight.

Q.   So on June 27th of 1989, if you are eating pizza and rib

Garcia - cross

145

tips you are not saying that that occurred at the time -- assuming I am correct that Luis Morales was killed around midnight, that you were doing that activity instead of being at where Luis Morales was being shot?

A.   I don't understand what you are trying to say.

Q.   I am going to move on.

So you are brought into the police station by Mr. -- by Officer O'Quinn, correct?

A.   Yes.

Q.   And at the time that you got there was -- you had never seen or had dealings with Mr. Guevara; is that true, sir?

A.   With Guevara, no.

Q.   Mr. Guevara was the only person who interrogated you?

A.   Yes.

Q.   Now, when you filled out your affidavit that you gave to Mr. Richards did you tell them that you were interrogated by a number of officers, including Detective Guevara?

A.   Well, Quinn was there, O'Quinn was there.

Q.   Sir, focus in on my question, please.

Did you tell Mr. Richards in your affidavit that was being used for your friend's post-conviction that you were interrogated by a number of police officers?

A.   No, I don't think so.

I can't remember, to tell you the truth.

MR. SCAHILL:  At this point I am going to ask to

publish this to impeach this witness with his affidavit, Paragraph 6.

THE COURT: Okay.

Can we go to sidebar real quick?

(Side bar starts.)

THE COURT: So my concern -- or the reason I sustained the hearsay objection is because the affidavit writ large doesn't -- I suspect doesn't necessarily -- every statement in the affidavit is not an impeaching statement.

There is the issue of what the State Court had as part of the Certificate of Innocence record, and so what is the response from the plaintiff as to the admissibility based on that?

MR. J. RICHARDS: We agree.

THE COURT: And so -- okay.

So I am going to tell the jury that it is coming in for two purposes, one, to the extent it is inconsistent with his testimony here, and two, because it is a matter that the State Court considered when deciding to issue the Certificate of Innocence.

Any objection to that?

MR. J. RICHARDS: No, Your Honor.

MR. SCAHILL: No, Your Honor.

THE COURT: Okay.

(Side bar over.)

THE COURT: So, Ladies and Gentlemen, I am going to admit this affidavit into the record. It is coming in for two purposes. One is to the extent that anything in the affidavit is inconsistent with Mr. Garcia's testimony here today you may consider that. And two, the affidavit was part of the record before the State Court that issued the Certificate of Innocence.

You may remember earlier I told you that the State Court may have had some of the stuff you see, they may not have had, but this comes in for you to have an understanding of what that State Court had during the Certificate of Innocence process.

You may proceed, Mr. Scahill.

MR. SCAHILL: Thank you, Judge.

Permission to publish and move to admit.

THE COURT: It is admitted for the purposes of identification and published.

(Defendants' Exhibit No. 34 was received in evidence.)

BY MR. SCAHILL:

Q. So we can follow along here, Mr. Garcia.

You have a copy of the same affidavit that is on the screen, right?

A. Yes.

Q. Okay.

First question to tie up my line of questions before

Garcia - cross

148

the sidebar, you can read Paragraph 6 into the record at the top.

Can you read that?

A. For me to read it?

Q. Sure.

A. There I was interrogated by a number of officers, one which was Detective Reynaldo Guevara, he which was very loud and physical with me.

Q. Okay.

Is that statement true, that you were interrogated by a number of officers, one of whom was Mr. Guevara?

A. Well, number of officers, I might have wrote that, but he was the main one.

Q. Well --

A. It was only two of them.

Q. Sir, were you interrogated by a number of officers or were you just interrogated by Mr. Guevara?

A. Well, I wrote number of officers, but I said Guevara.

I mean, what do you want me to say? I made a mistake?

Q. I want to know which one is true.

Did you just get interrogated by Mr. Guevara, as I believe you said a moment ago, or did you get interrogated by a number of officers?

A. I am just trying to remember.

I would say a number of officers.

Q.   Okay.

So the affidavit is true, you were interrogated by a number of officers?

A.   Yes.

Q.   Okay.

Once again, you gave a deposition, sir, on July 19, 2023, in this case, correct?

A.   Did I --

I'm sorry?

Q.   Did you give a deposition in this case, in this civil case that you are now testifying on, on July 19, 2023, sir?

A.   Yes.

Q.   And once again, you took an oath to tell the truth, the whole truth, and nothing but the truth, in that deposition, right?

A.   Yes.

Q.   This is going to be Defendants' Exhibit 117, Page 68, Line 11 through Line 23.

You were asked these questions and you gave these answers at your deposition, and this is in reference to the same affidavit we are talking about.  The next page has Paragraph 6.

"Q.   There I was interrogated by a number of officers, one of which was Detective Reynaldo Guevara, he -- which was very loud and physical with me.  Do you see that?

"A.  Yes.

"Q.  Do you remember the names of any of the other officers that interrogated you?

"A.  He was the only one.

"Q.  Okay.  So there weren't a number of officers?

"A.  No."

Q.  So the affidavit was wrong, and it was only Mr. Guevara?

A.  That is right, that is right.

Q.  So the affidavit that you submitted, that is incorrect information, right?

A.  That part right there, yes.

Q.  You wrote this in your own handwriting, right?

A.  Yes.

Q.  And when you were doing that, did you remember at that point in 2020 that there were a number of officers?  Is that how you remembered it then?

A.  I was -- actually, I didn't remember that.  I just wrote it, that part right there.

Q.  Did you put that in there knowing that that was not what happened?

A.  Well, there was more than one officer, there were two of them.

Q.  But you know that there was only one officer according to you that was interrogating you, right?

A.  Yeah, physically, yeah.

Garcia - cross

151

Q.   And so when you were writing out this affidavit for your friend, Mr. Rios, you knew that it was not a number of officers, it was only one, right?

A.   Right.

Q.   But you decided to put information in there that was incorrect, right?

A.   I would say I was confused.  I was confused.

Q.   You didn't remember at that point in time, 2020, 30 years later, exactly what happened with --

A.   If there were a lot of officers, no, I didn't remember.

Q.   But you said that there was?

A.   Yes.

Q.   And that was not true, was it?

A.   I guess.  I wouldn't say I lied.  I made a mistake.  I wrote down numbers when I should have said two.

Q.   Well, you should have said one, right?

A.   One, yeah.

Q.   Are you saying that two people interrogated you or --

A.   The two arresting officers, O'Quinn and --

Q.   O'Quinn never interrogated you or questioned you, did he?

A.   No.

     I will just say one then, just one, Reynaldo.

Q.   Okay.

     Now let's go back to the first page, Paragraph 2, this is your explanation of your whereabouts on June 27th of 1989,

correct?

A.   Yes.

Q.   And you would agree with me that there is no timeframe there that is put in your affidavit, correct?

A.   Correct.

Q.   It doesn't say that I was eating this at midnight on June 27th, 1989, correct?

A.   Correct.

Q.   So this is all the information when you wrote this down that you remembered about that particular day, right?

A.   Yes.

Q.   Okay.

     Was June 27th, 1989, some sort of special occasion for you, Mr. Garcia?

A.   No.

Q.   What did you have for dinner on June 28th of 1989?

A.   I don't remember.

Q.   What did you have for dinner on June 26th of 1989?

A.   I don't remember.

Q.   What did you have for dinner on July 15th of 1989?

A.   I don't remember.

Q.   What did you have for dinner on January 3rd of 2026?

A.   January 3rd of 2026?

Q.   Yeah, a month ago.

A.   I don't remember.

Garcia - cross

153

Q.   Okay.

So you are telling us that in 2020, you remembered on a random day that had no significance exactly what you had for dinner in June of 1989?

A.   I remember because of the incident that happened.

Q.   What incident that happened, sir?

A.   This.

Q.   Let's go to July of 1989.

July of 1989 you get taken into custody, right?

A.   Yes.

Q.   This is about a month after you had had this pizza and rib tips, right?

A.   Yes.

Q.   And so you are saying at the time that the police took you into custody you were able to go back in your memory and remember exactly what you had for dinner a month before on a random day in June?

A.   I don't understand what you are saying, what you are trying to ask me.

Q.   Okay.  I will rephrase.

Can you explain to the Ladies and Gentlemen of the Jury how it was that you were able to remember what you had for dinner in June of 1989 on a random day a month later in July of 1989?

A.   I knew where I was at, and I knew what I was eating,

because I was informed of Jaime Rios, what he was being accused of.

Q. But that is in July, right?

A. No, it was June, no.

Q. Right, but you were informed in July. You were informed in July, right?

A. By the officers?

Q. Yes.

A. I was arrested.

Q. That is what you are saying? That is what you are saying, you were informed by the officers of that?

A. But -- no.

I knew, because he was arrested.

Q. And you knew that --

He got arrested in July, sir, right?

A. I got arrested in July.

Q. And he did too, right?

A. I don't know.

Q. So back to my original question.

This is your opportunity, explain to the Ladies and Gentlemen of the Jury how it is that you are able to remember on July 28th, 1989, what you specifically had had for dinner a month before.

A. In June -- in July I said where I was at and I knew what I was eating because I knew where I was at.

Garcia - cross

155

Q.   Okay.

And I am asking -- you said you couldn't tell us what you had a month ago right now as you sit here in 2026.  So tell us, how are you able to remember a specific meal on a random day a month later?

A.   I don't know.  I can't --

Q.   Are you making it up, sir?

A.   No.

Q.   But you don't have any explanation about how you are able to remember that?

A.   No, no.  That was too long ago.

Q.   Was January 3rd, 2026, too long ago?

A.   January 26th?

Q.   January 3rd, 2026, is that too long ago to remember what you had for dinner that day?

A.   You said January 26th?

Q.   January 3rd, we were talking about what you had for dinner a month ago.  Is that too long ago for you to sit here and remember today?

A.   Yes, that long ago.

Q.   But back then you could remember what you --

A.   I was younger.

Q.   Okay.

So let's go to Page 2 here, Paragraph 7, it says, Detective Reynaldo Guevara had put me in two lineups, and I

wasn't picked out in either one.  Then Reynaldo Guevara read a piece of paper to me saying that I was involved and that I should sign a statement saying that someone else did it.  I said no, I was nowhere around that area when the crime was made.

Did I read that correctly?

A.  Yes.

Q.  Is that how you remembered it when you wrote up this affidavit in 2020?

A.  Yes, I wrote that.

Q.  And is that how you remembered the sequence of events happening in 1989, when you wrote this down in 2020?

A.  Detective Reynaldo Guevara had --

It could have been reversed a little bit.  I don't know if it was that I got -- that he told me to sign the statement first or to write a statement saying that I did it or he put me in the lineup.  I can't recall if it was like that.

Q.  But the way that you wrote it here is that the lineups happened, you weren't picked out, then he reads the paper, right?  That is the way you wrote it here, right?

A.  Yes, that is the way I wrote it.

Q.  But that is not the way that it occurred, right?

A.  I wasn't sure -- I am not sure if he asked me first before they put me in the lineup.  That is what I am trying to say.

Q.  But the way you wrote it out in 2020 says that that is how

it happened, right?

A.   Yes, yes.

Q.   And you understood, because you put it at the beginning here, that this was under oath and under penalty of perjury, right?

A.   When I wrote this?

Q.   Yes.

A.   It was what?

Q.   You understood that this was supposed to be sworn under oath and penalty of perjury, right?

A.   Yes.

Q.   And somebody did come to your house and stamp this that Mr. Richards sent that you were affirming that this was a truth, right?

A.   Yes.

Q.   And you understood that this was being used for a very serious purpose, right?

A.   Yes.

Q.   And when you put this information in here about the sequence of events, is it true that you were not actually sure that is the way that it happened?

A.   Well, I was trying to remember everything that happened, and I would write it down, but it might not be in order the way it happened.  But it did happen, whatever I wrote.

Q.   Well, the way this reads is chronological, right?

A.   Yes.

Q.   And so the way that you decided to write it down here, chronologically was, lineups happened, then he is reading the paper, right?

A.   Yes.

Q.   That is not the sequence of events that you just testified to in this courtroom though, is it?  Is it?

A.   What do you mean I testified on it?

Q.   When Mr. Richards was asking you questions, I think you were telling us that there was questioning and then you got beat up, and then later you got put in lineups, right?

A.   Right.

Q.   But what your affidavit says is that first you are put in the lineups and then you are read the paper and then you are getting roughed up, right?

A.   Yes, yes.

Q.   Okay.

A.   Everything is like mixed up.

Q.   It is mixed up because you were mixed up when you were writing it, right?

A.   I was remembering the events that happened and I was writing them down and trying to put them in the right form.  I am not going to remember exactly everything the way it happened first, but it did happen.

Q.   But you put it in order when you were testifying a moment

ago with Mr. Richards, when he was asking you questions, right?

A.   Yes.

Q.   Then you put it in a different order in your affidavit in 2020, right?

A.   Yes.

Q.   Okay.

Do you remember this incident better now in 2026 after using heroin this morning or did you remember it better back then?

A.   No.   No, sir.   No.

Q.   Your memory doesn't get better as time goes on, does it?

A.   No, it don't.

Q.   And it certainly doesn't get better when you are using drugs all the time, does it?

A.   No.

Q.   So you are actually not sure even as you sit here today in what sequence any of this happened; is that correct?

A.   Well, the way I wrote it and said it, it is not.

Q.   So when Mr. Richards was asking you questions about what is the next thing that happened, why didn't you just tell him that you weren't sure about that?   Why did you give an answer?

A.   I just said, yes, because it happened.

Q.   But he was asking you, what happened next?   Why did you tell him what happened next if you are not sure about the sequence that it happened in, sir?

A.  I don't know.

Q.  Are you trying to help your friend, Mr. Rios?

A.  Am I trying to help him?

Q.  Yes.  Are you trying to help him?

A.  I am trying to help him in the right way, yes.

Q.  But when you were testifying to his attorney about the sequence that things happened, you didn't know whether those things were true or false, did you, you were just saying them, right?

A.  I was confused at first, but I know I said it.  So I said yes.

Q.  Okay.

So as your testimony is today, you are not put in lineups, then you are read the statement, then you are physically abused, right?  That is not the story you are telling here today.  I just want to make sure we are now on the same page.

A.  What?

I'm sorry.  Can you repeat that?

Q.  Okay.

Is what happened on July 28th of 1989 what you said in your affidavit or is it what you said to Mr. Richards when you were testifying to this jury a little while ago or is it that you don't know which it is?

A.  I will say that I didn't know which one went first, no.

Q. But you told this jury affirmatively that --

A. I'm sorry.

I didn't mean -- I am not trying to lie.

Q. But you did say something on direct examination that you didn't know whether that was true or false, right?

A. I should have said that, yes.

Q. Okay.

So when you said it happened in a sequence you didn't know whether it happened in that sequence or not?

A. I didn't know if it was in that sequence, no.

Q. Did you know in 2020 when you submitted this affidavit what sequence it was in?

A. No.

Q. Okay.

Before this trial did you meet with Mr. Richards about your testimony?

A. Yes.

Q. Did you go over the sequence of events with Mr. Richards during that time?

A. I was just going over the other papers.

Q. You didn't go over your affidavit?

A. No.

Q. Did they ask you what sequence of events happened, whether it was the lineup, then to sign the statement, and then the beating, or whether it was --

Garcia - cross

162

A.   No.

Q.   (Continuing) -- the beating, and then the statement, and then the lineup?

A.   No.

Q.   You don't know even as you sit here today whether any of that happened?

A.   What happened?

Q.   Any sequence of events that happened?

A.   It happened on that day.

Q.   But you don't know what happened first, second, or third, right?  You can't say?

A.   The truth is no.

Q.   Okay.

You mentioned having gotten hit with a flashlight or something with a phone book.

A.   Yes.

Q.   And was that right away or was that later on in the evening after you made the call you say to the lawyer or was it some other time?

A.   No, that was before, before I made a call.

Q.   So you are not hit with the phone book -- with the flashlight on the phone book after you make the call to the lawyer?

A.   I was slapped around, but I -- I was mainly hit with the phone book and Billy club before I asked to make the phone

call.

Q.  So the phone call -- so that is before the phone call.

After the phone call you say Mr. Guevara got upset and starting slapping you around but didn't hit you with --

A.  Right.

Q.  Didn't hit you with the flashlight and phone book at that time?

A.  No.

Q.  Okay.

Going to Defendants' Exhibit 117, this is going to be Page 126, Line 20, you were asked these questions and gave these answers:

"Q.  So you told us that when Officer Guevara overheard your conversation with your sister and knew that an attorney was coming, that is when he got mad?

"A.  Yes.

"Q.  More mad with you?

"A.  Yes.

"Q.  And he became physical, that is what you have on your affidavit, Paragraph 8, Page 2, right?

"A.  Yes.

"Q.  And you say that he placed a phone book on your head and then hit you across the head with a Billy club or flashlight until you fell to your knees.

"A.  Yes."

Are those the answers that you gave, sir?

A.   Yes.

Q.   So when you were giving your testimony at your deposition in this case you remember it was actually after you made the phone call to your sister that this business with the phone book and the flashlight happened, right?

A.   Yes.

Q.   But as you sit here today, now you are telling us that actually happened before that, correct?

A.   Yes.

Q.   So -- okay.

I think you testified that at some point when -- well, strike that.

When you first came to the police station you are placed in an interview room, right?

A.   Yes.

Q.   And this person who identified themselves as a State's Attorney actually went into the interview room first with you, right?

A.   Yes.

Q.   And then Mr. Guevara went in there, right?

A.   No, I was in there already and then she came in.

Q.   Right.

You go in, she comes in, and then Guevara comes in?

A.   Yes.

Garcia - cross

165

Q.   Okay.

        And she is present when you are getting, as you say, beaten up by Mr. Guevara?

A.   Yeah.   Yes, yes.

Q.   Is there any reference whatsoever in your affidavit to any State's Attorney or anyone else being present when any of that happened?

A.   If I wrote that in my affidavits --

Q.   Yes, you did.

A.   I am not sure.

Q.   Take a look.   You wrote it, take a look.

A.   Okay.

        No, I didn't write it on my affidavit.

Q.   No reference in there anywhere about this State's Attorney being in there, right?

A.   Right.

Q.   And I think you told me a little bit ago that when you were writing this you were trying to write down everything that you remembered, right?

A.   Yes.

Q.   So you did not remember this bit about the State's Attorney being in there in 2020 when you wrote this up?

A.   Yes, I didn't.

Q.   Okay.

        You testified about that though a few minutes ago when

Mr. Richards was asking questions, right?

A.   Yes.

Q.   When did you remember this little bit of information about the State's Attorney?

A.   When I did the other interview.

Q.   Are you talking about your deposition?

A.   Yes.

Q.   That is in 2023?

A.   Yes.

Q.   So this business with the State's Attorney being there when Mr. Guevara supposedly beat you up happens in 1989, right? Right?

A.   Yes.

Q.   You don't remember it in 2020, correct?

A.   In the beginning, yes.

Q.   But then three years after that, then you remember it, right?

A.   Yes.

Q.   And you gave a pretty detailed description to the State's Attorney, didn't you, when Mr. Richards was asking you questions?

A.   Yes.

Q.   Young, pretty, Hispanic, all of that?

A.   Yes.

Q.   So you don't remember it at all in 2020, but now you

remember all these little details about her appearance, now 33 years later, 34?

Can you explain that to the jury, how your memory functions like that?

A. No, I can't.

Q. Is it because you are making it up, sir?

A. No, I'm not. I am not making it up.

Q. So explain to us, how does that happen, that you are able to remember all of these details about this person's appearance at --

A. I can't explain it. It just came to me. It wasn't made up. I --

Q. It came to you in a dream?

THE COURT: We can't speak over each other. Question and then answer. That is how it works.

MR. SCAHILL: Sorry.

BY MR. SCAHILL:

Q. Did this come to you in a dream or something?

A. No.

Q. Just popped into your brain at some point in 2023?

Do you have an answer to the question?

A. No, I don't.

Q. Did it just pop into your brain at --

A. No, it didn't.

Q. When did you first remember it?

A. When I was in the room talking with them.

Q. In 2023?

A. Yes.

Q. Okay.

Let's go to Paragraph 13. I will read it and then I will ask you some questions about it.

You wrote here: I was not asked to testify at the trial of Jaime Rios, and had I have been asked to testify, I would have pled the Fifth, not because I was guilty, but because I was afraid of Detective Reynaldo Guevara.

Right?

A. Yes.

Q. That information is information Mr. Richards told you to put in there, wasn't it?

A. Yes.

Q. That didn't come from you, did it?

A. No, it didn't.

Q. And you didn't know what that meant, did you?

A. No.

Q. Okay.

So Mr. Richards comes to you and says, you need to put this information in your affidavit about things that you had no idea what they meant, right?

A. That part right there?

Q. Yes.

A.   Yes, that part right there.

Q.   And then --

A.   But I asked --

Go ahead, sorry.

Q.   And you agreed to do that, didn't you?

A.   Yes.

Q.   Is this Mr. Richards' sworn statement or yours, sir?

A.   The whole affidavit is mine.

Q.   Right.

So why are you putting things in there that you don't know what they mean and swearing under penalty of perjury to them when you have no idea what they mean, sir?

A.   Paragraph 13 you are speaking about, right?

Q.   That is correct.

Do you need me to repeat the original question?

A.   Yes.

Q.   Why would you put information in there and swear under penalty of perjury to it because someone told you to put it in there if you didn't know what it meant?

A.   I can't -- I don't think I put a lie in there.

Q.   If you don't know whether something is true or not, you don't know what it means, and you put it in there, it means it is not true, right?

Sir, if you don't know if a fact is true or false, and you say that a fact is true, it is not -- that is false, right?

Right?

A.   Yes.

Q.   And that is what you did in this affidavit, right?

A.   I wrote down something that he told me to write, but it wasn't about the case.

Q.   He told you to --

A.   It wasn't about the events I am saying.  It wasn't about an event that happened to me in there.

Q.   You didn't think it mattered whether you knew what it meant or not in there?

A.   No, I didn't.

Q.   So you just kind of went along with what he told you to do?

A.   With this part right here, yes.

Q.   Not knowing whether that was true or false or something else, right?

A.   Yes.

Q.   Did you say to Mr. Richards at some point, why are you asking me to put things in here and swear to them when I don't know what they mean?

        Did you ever say anything like that to him?

A.   I asked him what it meant, what did it mean.

Q.   You didn't know what it meant though, right?

A.   Not at the beginning, no.

Q.   But you did it any way, right?

A.   Right.

Q.   Do you think this is not an important part of your affidavit?

A.   Which part?

Q.   The part we have been talking about, Paragraph 13.

A.   No, it is important.

Q.   This is trying to explain why you didn't come forward for 31 years to help Mr. Rios, but now you are coming forward, right?

A.   Yes.

Q.   And you were blaming the person I represent, Mr. Guevara, for that, right?

A.   Yes.

Q.   But in actuality, you didn't know whether this was true or false at all, you are just putting it there because his lawyer said to put it there to help him, right?

A.   Yes.

Q.   And this is factually false, isn't it?  The first part about -- that you would have pled the Fifth had you been asked to testify, right?

A.   If I would have been asked to testify I would have pled the Fifth.

        The Fifth is that you don't testify, you don't say nothing, right?

Q.   Do you know what it means?  Do you know what this means, what you wrote here?

A.   Yes, not to testify.

Q.   This is saying that if you had been asked to testify that you would have pled the Fifth, right?

But you told us though at the very begin when I was asking you questions that you actually wanted to testify, right?

Is that correct, sir?

A.   I am not sure.

Q.   Okay.

So when you put in here about what you would have done in 1989, you don't know whether that was true or false or somewhere in between, right?

A.   When I put Paragraph 13?

Q.   Yes.

A.   I knew it was --

Q.   You didn't know whether this was true or false when you wrote this, you just put it there because you were told to by your friend's attorney to use to try to get his conviction thrown out, right?

A.   I guess.

I don't know.  I just -- yeah.

Q.   Did you say yes?

A.   Yes.

Q.   Okay.

Let's talk about Paragraph 14.  It says:  I'm only

willing to come forward now because I've learned Reynaldo Guevara is no longer a police officer of the law and is being investigated and has taken the Fifth Amendment.

Do you see that?

A. Yes.

Q. And who did you get that information from?

Do you remember the question, sir?

A. Yes.

Q. Who did you get that information from?

A. From the lawyer.

Q. Mr. Richards?

A. Yes.

Q. Once again, he told you to put that in there, right?

A. Twice, yes.

Q. And this stuff about pleading the Fifth, he told you to put that in there, right?

A. Yes.

Q. And did he explain to you, look, this guy is deciding not to talk, you can say whatever he wants, he won't be able to rebut it.

Did he say anything like that?

A. No.

Q. So if this information is coming from him and not you and you are writing this out in your own hand, why did you include it in there?

A.   He didn't tell me that.

Q.   He didn't tell you --

A.   What you just said, that he is not going to be here, and he is pleading the Fifth.

Q.   But this is information coming from him, not coming from you.

I am asking why did you put it in there then?

A.   Because I was told to.

Q.   By Mr. Rios' lawyer?

A.   Yes.

Q.   And you went along with it?

A.   Yes.

Q.   Let's go back to July 29th of 1989.

I think you told Mr. Richards that the State's Attorney, or the person identifying themselves as a State's Attorney, never gave you her name?

A.   I don't remember if she did.  Most likely she did and I just don't remember it.

Q.   How come when Mr. Richards asked you whether she had given you her name you said that she had not given you her name?

A.   Because I didn't know it.

Q.   Right, but there is a difference between not remembering her name and her not telling you her name then, right?

A.   That is true, yes.

Q.   And he asked you whether she had told you her name and you

said no, right?

A.   Yes.

Q.   And that is not true, is it?

A.   I don't remember.

Q.   Exhibit 117, Page 160, Line 6 -- actually, start at Line 1, talking about the State's Attorney.

"Q.   And you described this person as pretty and Hispanic?

"A.   Yes.

"Q.   You don't remember her name?

"A.   No.

"Q.   But she did give you her name at some point?

"A.   Yes."

Those were the questions you were asked and the answers you gave at your deposition, right?

A.   Yes.

Q.   Okay.

This person was not somebody who had like a badge and like a bulletproof vest or anything, right?

A.   No.   No, she didn't.

Q.   She was dressed in nice clothes?

A.   Yes.

Q.   And now you remember in your mind's eye what she is actually wearing, her attire, right?  Right?

A.   Yes.

Garcia - cross

176

Q. Can you picture her as you sit here today?

A. She didn't have no gun or badge or anything, no. She didn't look like an officer.

Q. But you can picture that, you can picture nice clothes, no badge or gun, pretty Hispanic, you can picture that as you sit here today?

A. Okay.

Q. But you didn't even remember this person existed in 2020, right?

A. I didn't think it mattered.

I didn't know what did and what didn't, what I should leave out and what I shouldn't. I didn't know.

Q. Wasn't the purpose of you sitting down and writing everything that you remembered, sir?

A. Yes.

Q. And you did not remember that, did you?

A. That -- no, I didn't.

Q. Okay.

So let's go and talk about the questioning that you said Mr. Guevara did with you.

Do you remember anything that he told you about this murder that he was implicating you in?

A. Do I remember anything?

Q. That is correct.

A. No.

Q. You don't remember a single thing that he told you about the murder that he was supposedly interrogating you about, right?

A. Not right now I don't.

Q. Didn't tell you who the victim was, according to you, right?

A. Don't remember.

Q. Didn't tell you what time of the day the murder occurred, right?

A. No.

Q. So if he didn't tell you what time of the day the murder occurred, how were you able to, according to you, give him an alibi for where you were at the time that the murder occurred?

A. Um, I knew already -- I had already knew when that had happened because he was incarcerated, Rios. And that is where I was at, at my home. So when I was arrested I told him to look it up, and that is where I was at.

Q. But you didn't know what time the murder occurred?

A. No, I didn't, but I knew where I was at.

Q. Well, you weren't eating pizza and rib tips at midnight, were you?

A. No, probably no.

Q. So if that is an alibi you gave him, that is not an alibi for the murder, is it?

A. I don't understand what you are trying to say.

Garcia - cross

178

Q.   I will move on.

So is it your testimony that you -- that this alibi or whatever it is that we are talking about, that this is information that you gave to Mr. Guevara?

A.   No, I gave it to O'Quinn.

Q.   You gave it to O'Quinn, not Guevara, right?

A.   O'Quinn.

Q.   So you didn't even tell Mr. Guevara about this supposed alibi at all, did you?

A.   He heard.  I think he was in the room.  I believe he was in the room.

Q.   So it was not just you and O'Quinn when he was asking the questions?

A.   It was both of them, probably.

Q.   Okay.

Let's go to Defendants' Exhibit 117, Page 167, Line -- this is going to be Page 167, Line 16.

"Q.    Mr. Garcia, you just told us that when you arrived at the station at Grand and Central that Officer O'Quinn had arrested you, that you told him you had an alibi; is that correct?

"A.    Well, he asked me -- in the police station he asked me where I was, and I told him where I was, at home.

"Q.    So when you had this conversation with Officer O'Quinn at the station at Grand and Central, was that right

Garcia - cross

179

after you had arrived there with him?

"A.   Yes.

"Q.   And was anyone else with you and Officer O'Quinn when he was asking you these questions after you arrived?

"A.   No, it was just me and him."

Those are the questions and answers you were asked at your deposition.

A.   Okay.

Q.   So Mr. Guevara, as you remember it now, was not present when you were even having this discussion about this alibi, right?

A.   If I said that, that is the way it is.

Q.   Do you not remember one way or another as you sit here today?

A.   It is just that -- I was trying to remember this and that, and it is all these years apart.  I am getting real confused here.

Q.   Is it difficult to keep the facts straight for you, sir?

A.   No.

Q.   You are having difficulty remembering what happened in July of 1989, right?

A.   Yes.

Q.   Okay.

Is that because you are kind of making things up as you go along, sir?

A.   No, sir.

Q.   But you are giving answers to questions that are different and have been different over the years, right?

A.   They are mixed up, yes.

Q.   All right.

So let's talk about this lawyer you say showed up at the police station.

So as I understand it, Mr. Guevara is beating you up and then you say, I will sign this statement but I want to make a phone call first.

Right?

A.   Yes.

Q.   And he says, Sure, Tino, let's go do that, right?

A.   Yes.

Q.   And then they take you out and you make a call, correct?

A.   Yes.

Q.   And you call your sister?

A.   Yes.

Q.   She tells you she is going to send a lawyer there, right?

A.   Yes.

Q.   And according to you, this lawyer shows up within 15 minutes?

A.   I am not sure right now.

Q.   Well, how long do you remember it was between when you made the call to your sister and this lawyer shows up?

A.   He must have been on his way because he didn't take that long.  I would say maybe 15, 20 minutes, or something like that.

Q.   So he was already on his way at the time --

A.   Yeah.

Q.   How did your sister know to send a lawyer when --

A.   Because they --

        THE COURT:  Mr. Garcia, you have to wait until the question is asked.

        THE WITNESS:  Okay.

        THE COURT:  Please ask the question.

BY MR. SCAHILL:

Q.   How did your sister know to send the lawyer?

A.   Because they let her -- someone told her that I was arrested, that I got arrested.

Q.   I see.

        So this is your sister, Maria?

A.   Yes.

Q.   And Maria is still around, right?

A.   Yes.

Q.   This lawyer that you say showed up, you do not remember his name?

A.   No.

Q.   The only thing you remember about him is a white guy in his 30s?

Garcia - cross

182

A.   Yes.

Q.   Never spoke to him again?

A.   No.

Q.   Did you ever go to your sister and say, hey, this lawyer that you got for me, I might need to get his information, it might help.

Did you ever do that?

A.   I did, and she doesn't remember.

Q.   And according to you, the lawyer comes and you tell the lawyer that you are being beat up, right?

A.   Yes.

Q.   And this lawyer says, okay, just don't sign a statement, right?

A.   Yes.

Q.   And then he leaves?

A.   He told me that he couldn't stay there with me all day, and that when he leaves, if they come and rough me up and tell me to sign a statement, not to sign it, and he will take care of the rest.  And that is it.

Q.   Okay.

A.   Then he had to go.

Q.   You told him you were being beaten up and he just left you there?

A.   In the police station, yes.

Q.   ]Did you ever report this lawyer for just kind of

Garcia - cross

183

abandoning you at the police station?

A.   I don't understand.

Q.   Well, you have a lawyer who is supposed to represent your interest, protect you, right?

A.   Yes.

Q.   He shows up at the police station, according to you, right? Right?

A.   Yes.

Q.   You tell him, again, according to you, that you are being abused, right?

A.   Yes.

Q.   And he says, can't stay, I have stuff to do, I'm leaving, right?

A.   No, he stayed there with me for a while.

Q.   And then he says, I get you are getting beat up but I have to go, other things to do, right?

A.   Yes.

Q.   Did you ever take any steps to report this guy and say, hey, this guy left me there and I was getting beat up?

A.   No.

Q.   You never even tried to find out who he was, did you?

A.   No.

Q.   And your sister, according to you, you tried to get that information from her?

A.   She doesn't even remember.

Q.   And she doesn't know who it is?

A.   No.

Q.   So we can't go and talk to that lawyer and try to figure out that --

           MR. J. RICHARDS:  Objection.

           THE COURT:  Sustained.

BY MR. SCAHILL:

Q.   So after the lawyer left, you were not touched any more by Mr. Guevara, right?

A.   After the lawyer left?

Q.   Right.

A.   Right.

Q.   Were you ever mistreated or abused after any of the lineups?

A.   After the lineups?

           I don't recall.

Q.   Okay.

           So you don't recall whether you were physically mistreated after either of the two lineups?

A.   I don't recall.

Q.   Okay.

           But your affidavit says that you were mistreated after both of the lineups, right?

           You don't know?

A.   On the affidavit?

I don't recall if I wrote that down.

Q. But that is what you wrote down, right?

A. That's what I wrote down.

Q. Okay.

Did Mr. Guevara read a piece of paper to you saying you were involved?

A. Yes.

Q. Did he --

Isn't it true that according to you, anyway, that Mr. Guevara just had a blank piece of paper and wanted you to write out what happened?

A. Yes.

Q. So is it -- which is it? Is he reading a piece of paper with information on it to you or is he asking you to write out information to him?

A. He had a piece of paper saying that -- well, he said that the paper said that they wrote -- that I was involved, and that I should write that they were involved.

Q. So he was showing you a piece of paper --

THE COURT: Before we continue with the examination it is noon, and we will take our lunch break.

So Ladies and Gentlemen, I will see you back at 1:00 p.m.

All rise.

(Jury out at 12:00 p.m.)

THE COURT: Mr. Garcia, you may step down. But before you go, you are on cross examination, so you can't discuss the substance of your conversation with anyone. You will come back here at 1:00 and be back on the stand, so you can leave those papers.

Also, I forgot to mention before, while you are testifying if you need water there is a pitcher and some cups there.

See you back at 1:00.

MR. SCAHILL: Can we admonish him not to --

THE COURT: I just told him not to discuss the substance of his testimony with anyone.

MR. SCAHILL: Thank you.

THE COURT: Okay.

I won't take too much of your time, but I do want to get a sense of the purpose of the various testimony.

So looking at the defendants' testimony designations, we have discussed Guevara as to each side.

I have got Luis Huertas' trial testimony and deposition testimony. Is this coming in as substantive evidence or some other purpose?

MR. SCAHILL: Huertas?

THE COURT: Yes.

MR. SCAHILL: It is substantive, yes, and other purpose.

THE COURT: Why is it substantively?

MR. SCAHILL: It is prior testimony under 804(b)(1) of an unavailable witness.

THE COURT: Why is he unavailable?

MR. SCAHILL: He lives in New York for one. He has health issues too, but he is out of state. So by rule he is unavailable.

THE COURT: And Mr. Richards, is your position still, no objection provided you get to designate for Huertas?

MR. S. RICHARDS: Absolutely. That is our position.

THE COURT: Any objection to it coming in as substantive testimony?

MR. S. RICHARDS: No.

THE COURT: Daniel Noon. Substantive?

MR. SCAHILL: Yes.

THE COURT: Under what --

MR. SCAHILL: Both, yes.

THE COURT: By what theory of admissibility?

MR. SCAHILL: Isn't he deceased?

MR. POLICK: Yes.

MR. SCAHILL: He is deceased.

THE COURT: Okay.

MR. S. RICHARDS: Just to make our position clear, we have no objection to it coming in substantively.

THE COURT: Janet Lupa?

MR. SCAHILL:  Yes.

THE COURT:  Substantively?

MR. SCAHILL:  Correct.

THE COURT:  Donald Flannery, substantively?

MR. SCAHILL:  Yes.

MS. GOLDEN:  Deceased.

THE COURT:  Halvorsen, substantively?

MR. SCAHILL:  Yes.

THE COURT:  Curley, substantively?

MR. POLICK:  Yes.

THE COURT:  Quinn, substantively?

MR. SCAHILL:  These are all both, but yes.

THE COURT:  Well, the reason I ask is I need to know -- if it is coming in as substantive evidence I don't need to give a limiting instruction.  If it is not, then I need to tell the jury, this is coming in for this purpose.

MR. SCAHILL:  Understood.

THE COURT:  One overall question concerning the issue of innocence or guilt, how is that relevant to either Mason or Halvorsen?

MR. SCAHILL:  It is relevant -- well, that is their clients, but it is relevant to damages.

THE COURT:  Is it relevant to them?

MR. POLICK:  I don't think it is because there is no malicious prosecution claim against my clients, Mason and

Halvorsen.

THE COURT: Mr. Richards, how is actual innocence or guilt relevant to defendants Mason and Halvorsen, if at all?

MR. S. RICHARDS: It is not, because they are charged with coercion, and the coercion claim does not depend upon guilt or innocence. The violation occurs once the statement is admitted and it doesn't matter whether it contributed to guilt or innocence or not.

THE COURT: And I ask this because I share that view in the sense that -- whether he did it or not, the Constitution doesn't let you coerce or beat or et cetera, and we have got all of this evidence coming in substantively, and I need to know whether I can tell -- or I should tell the jury that this testimony is coming in for the truth, but only as to Guevara, because that is the only defendant to whom actual guilt or innocence is relevant. It sounds like the parties agree that it is not relevant to Mason or Halvorsen.

MR. SCAHILL: So, I -- that is their clients. I am named on the other counts too. I actually do not agree with that.

THE COURT: Why not?

MR. SCAHILL: Because it is relevant to his damages for his coerced confession, for example, if he is convicted based on a coerced confession, whether true or false, guilt or innocence is not an element of that claim but it impacts his

damages for that, that is *Parish*, which we are all familiar with. It impacts the damages for the other claims in addition to being relevant to the prima fascia elements of the malicious prosecution claim.

THE COURT: Mr. Richards, any view as to whether it is relevant or not relevant to damages?

MR. S. RICHARDS: Well, Your Honor, as I have expressed throughout these proceedings many times, as I told the jury, I am trying a Civil Rights case, not a murder case.

So I think if it is coming in with respect to damages, I would urge the Court to consider the instruction I submitted, which tells the jury that guilt or innocence is relevant to damages, but is not relevant to whether a Civil Rights violation occurred.

THE COURT: I am trying to understand in that response whether you agree it is relevant to damages.

Is your response that it is relevant to damages and you should instruct the jury that it is only relevant to damages in the malicious prosecution claim? Or is there no answer to my question as to whether it is relevant to damages?

MR. S. RICHARDS: It is relevant to damages on the malicious prosecution claim. It is relevant to damages on the noncoercion claims. I think my position -- well, my position is it is not relevant to damages on the coercion claim because by definition the coercion claim stems from a Constitutional

violation without respect to whether the person is guilty, innocent, or something in between, i.e., *Andrew Wilson*, or e.g., *Andrew Wilson*.

THE COURT: So Mr. Scahill, if I understand your position, it is that it is relevant to damages under *Parish* because *Parish* says that, but here, if he did it, then he was going to go to prison anyway because he did it, and therefore, his damages are somehow reduced?

MR. SCAHILL: A little bit more nuanced than that.

It is that if he is, for the coerced confession, cabining it to that, if he is convicted based on a confession that is true, but coerced, there may be some measure of damages for that, but if he is, in fact, guilty, the damages that an innocent person would suffer from being in prison are more than a guilty person and vice versa.

So it does not matter what the underlying claim is because the governing principle under *Parish* is simply that a guilty person is -- suffers more damages from being incarcerated and -- actually, an innocent person suffers more damages from being incarcerated than a guilty person, full stop, regardless of what the claim is. If you were convicted on a coerced confession, it would be the same as if you are convicted on fabricated evidence or suppression or malicious pros.

MR. POLICK: We would share that view on the damages,

Your Honor.

THE COURT: Okay.

So I think I will provide the limiting instruction to the jury that all of this evidence concerning guilt or innocence is relevant to the malicious prosecution claim and to the issue of damages, not relevant to the merits of the Constitutional claims, the liability aspect of the Constitutional claims.

MR. POLICK: Judge, that is a tougher question, because I don't know what the jury is going to infer. If they believe that Mr. Rios was not coerced during his confession, they may infer that he is guilty because he confessed. If they believe that he was coerced, they may believe he gave a truthful statement. I don't know what they are going to infer from that.

MR. SCAHILL: Can I make a --

THE COURT: What does it matter what they will infer? Is it an accurate statement of the law? And is it an accurate assessment of the facts in this case?

MR. POLICK: The instruction that you just read, the limiting instruction you just read, would be an accurate statement of the law.

THE COURT: And does it not fit the facts of the case?

MR. POLICK: It does fit the facts of the case.

THE COURT: So why do I care what the jury will infer?

They get to find the facts and they are presumed to follow instructions.

MR. POLICK: Correct.

THE COURT: Okay.

Who wanted to be heard?

MR. SCAHILL: That was me.

I guess I would like to look, and I know Your Honor articulated the instruction, I guess I would like to look at the verbiage, because I am struggling with the coercion claim in this respect.

I understand that you can coerce a truthful confession and that still violates the Fifth Amendment, no dispute about that whatsoever. However, the theory of the case is not that, it is something else, it is that they fabricated a false confession. If we start telling the jurors that it doesn't matter what the substance of the confession is, I think we are getting into an issue that is going to infect what the factual theories are.

Your Honor was saying does it fit the facts of the case and --

THE COURT: Fabricated Mr. Rios' false confession?

MR. SCAHILL: Yes.

THE COURT: Is that a claim?

MR. S. RICHARDS: Your Honor, may I interject?

THE COURT: Is that a claim? I thought it was they

fabricated someone else's -- I guess it is they smashed Mr. Rios' head into the table, and that would be the coercion, but that is not --

Go ahead, Mr. Richards.

MR. S. RICHARDS: I'm sorry to be so eager.

But if you remember, the counts dealing with fabricating the confession were all dismissed. The count remaining with respect to confession is that it was coerced.

Now, whether the confession was fabricated or not obviously bears upon guilt or innocence, and there will be some discussion of that. But it doesn't bear upon the substance of the coercion claim, because just as in -- as *Andrew Wilson* was tortured to make a false statement, you know, he went to jury trial, he got $1 in damages, you know, that is -- I think that is what the defendants are aiming for, and more power to them. But the fabrication claims were dismissed as Constitutional claims by Your Honor, which we respect.

MR. SCAHILL: I don't think that is what happened. I think there is still a fabrication of evidence claim based on his confession. If they have withdrawn that or that is not part of the case, that is -- I am fine with that, but I did not understand it that way.

MR. S. RICHARDS: If you look back in the docket, I think it was Counts 2 through maybe 8, that were dismissed on summary judgment.

THE COURT: My understanding of the fabrication claims were that it wasn't Mr. Rios' evidence that was fabricated, it is the other evidence that was fabricated, for example, Mr. Garcia's -- or there was another individual who was beaten, allegedly beaten with a phone book and flashlight, who then identified Mr. Rios?

Isn't that the claim?

MR. S. RICHARDS: Not exactly.

In terms of the fabrication claims, there is one fabrication claim left in the case which involves Benjamin Carrero, and forcing him to make a false statement to the Grand Jury and at trial. So that is a fabrication claim that still exists.

The claim as to beating with phone books, which you just heard part of, is a *Brady* claim in that this happened and it wasn't conveyed to the prosecutors, if it had been something different might have happened at trial.

So those two claims remain. The alibi and beating with the phone books, fabrication claim remains. There is also a claim as to fabrication of the confidential informants, that remains.

So just so we are clear as to what I think is in the case, that is what is in the case.

And again, whether the confession is true or false goes to guilt or innocence, and we will hear evidence of that

from experts and Jaime Rios and so on.

THE COURT: Okay.

And then I believe I have addressed all of the plaintiff's affirmative designations. There is Huertas, Guevara, Torres, which is still subject to -- or you need a ruling from me on, Hudson, Curley, and Konacki.

MR. S. RICHARDS: Your Honor? Slight correction.

THE COURT: Yes.

MR. S. RICHARDS: I believe you threw out my designations on Hudson.

THE COURT: Right, as untimely disclosed. But that is my list of who you affirmatively designated by deadline, exception of Huertas wasn't actually designated because it was a Torres filing.

So that leaves the counter designations from the plaintiffs in lieu of objections to the defendants' designations that I haven't addressed.

Okay. I will review those and get you my rulings on those.

Enjoy your lunch. We will be back at 1:00 and continue with the testimony of Mr. Garcia.

MR. S. RICHARDS: Thank you.

MR. SCAHILL: Thank you, Your Honor.

MR. POLICK: Thank you.

(Recess at 12:18 p.m., until 12:58 p.m.)

197

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                         )
                                    )
                  Plaintiff,        )
                                    )
-vs-                                )  Case No. 1:22-cv-03973
                                    )
REYNALDO GUEVARA; MICHAEL           )
MASON; and JoANN HALVORSEN,         )
as Special Representative of        )
ERNEST HALVORSEN, Deceased,         )  Chicago, Illinois
                                    )  February 3, 2026
                  Defendant.        )  12:58 p.m.


                         VOLUME 2
          TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
          BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:     LAW OFFICE OF STEPHEN L. RICHARDS
                       BY:  MR. STEPHEN L. RICHARDS
                            MR. JOSHUA S. RICHARDS
                       53 West Jackson Boulevard, Suite 205
                       Chicago, Illinois  60604

For Defendant          BORKAN & SCAHILL, LTD.
Guevara:               BY:  MR. TIMOTHY P. SCAHILL
                            MR. GRAHAM P. MILLER
                       20 South Clark Street, Suite 1700
                       Chicago, Illinois  60602

For Defendants         THE SOTOS LAW FIRM, P.C.
Mason and              BY:  MR. JOSEPH M. POLICK
Halvorsen:                  MR. JOSH MICHAEL ENGQUIST
                            MR. JEFFREY ROBERT KIVETZ
                            MS. CAROLINE P. GOLDEN
                       141 West Jackson Boulevard, Suite 1240A
                       Chicago, Illinois  60604

198

Court Reporter:                 CHARLES R. ZANDI, CSR, RPR, FCRR
                                Official Court Reporter
                                219 S. Dearborn Street, Room 1426
                                Chicago, Illinois  60604
                                Telephone:  (312) 435-5387
                                charles_zandi@ilnd.uscourts.gov


                       *    *    *    *    *

                PROCEEDINGS REPORTED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE COURT: All right. Welcome back. I've got -- I received a note earlier from a juror. The note just read, "Can I receive a letter currently that estimates the length of this trial." I provided that note. Presumably it's for the juror's employer.

I'll wait a second for Mr. Richards to return.

Mr. Scahill, do you know how much -- do you know how much longer you plan to be?

MR. SCAHILL: I do. I have an exact number, and it's zero. I'm going to tender the witness.

THE COURT: And will there be cross on behalf of Mason and Halvorsen?

MR. POLICK: Yes, very briefly, Judge, maybe 10 or 15 minutes.

THE COURT: Do we have the witness?

MR. J. RICHARDS: He's in the hall. Your Honor, if I may address something first?

THE COURT: What is that?

MR. J. RICHARDS: I had a conversation with counsel, and I just wanted to clarify that when a transcript designation comes in as being read to the jury, are the exhibits that were shown at trial to that person who was testifying back then, are those exhibits also shown to the jury, like, interspersed?

THE COURT: Are we seeking admission of the exhibits

as substantive evidence?

MR. J. RICHARDS: Your Honor, I'm not asking for that. It was something that counsel asked me, and I wasn't sure what your Honor intended by the designations.

THE COURT: Is any side seeking the substantive admission of the underlying exhibits?

MR. SCAHILL: I believe the answer is yes.

MR. POLICK: Yes, Judge.

THE COURT: Are these exhibits on your exhibit list?

MR. POLICK: The ones we could locate, your Honor.

MR. SCAHILL: Yes.

MR. J. RICHARDS: Your Honor --

THE COURT: Go ahead.

MR. J. RICHARDS: I believe that under Plaintiff's Exhibit -- I think it's No. 10, which is the common law record, those trial exhibits are included in the common law record, so --

MR. SCAHILL: We have them individually marked also, that were impounded, of course.

THE COURT: Is there an objection from the plaintiffs to their admission?

MR. S. RICHARDS: No.

THE COURT: All right.

MR. S. RICHARDS: Sorry. No.

THE COURT: So, what I'm hearing is that there are

exhibits referenced in the testimony that the parties agree will come in as substantive evidence, and there's no objection to the admission of any exhibits referenced in the underlying trial testimony, correct?

MR. S. RICHARDS: That's correct.

THE COURT: Correct for the defendants?

MR. SCAHILL: Yes.

MR. POLICK: Yes, your Honor.

THE COURT: Then they are admissible and will be admitted with the -- admitted when the testimony is read in. Okay?

MR. SCAHILL: Yeah. The ones -- just so we're clear, the ones that are admitted and shown to the jury in the case. If there's, like, a refreshing recollection, that would not apply, of course, because the jury would never have seen it. I don't know that there really --

THE COURT: I don't know that we're talking about the same thing. My understanding is that we have transcript testimony that has been designated, and the parties agree that those -- at least that whatever transcript testimony is admitted -- before the break, I went through, "Is this coming in as substantive evidence? Is this not?" To every single transcript, it was substantive evidence.

And that is what I'm talking about. What do you mean by refreshing recollection? This is evidence, not --

MR. SCAHILL: Counsel, I believe, is referring to criminal trial testimony. When there are criminal trial exhibits, trial exhibits that were impounded that are referenced within the testimony, do we show those exhibits while the testimony from the criminal trial is being read because that's what the jury saw?

And I believe we both agree that we should do that. We have those marked, and they are in the exhibit lists for both, I believe.

THE COURT: Right. But then you went on to start referencing refreshing recollection. Why would you -- like, that's a separate thing. That's not the substantive testimony and exhibits that you're talking about admitting.

MR. SCAHILL: That is -- that's true, but they might be referenced. If somebody forgets something, you give it to them. We're not going to put that up.

THE COURT: I understand. So, within the transcript, if it's used to refresh recollection?

MR. SCAHILL: That is correct.

THE COURT: If the jury did not see it in the underlying testimony, then it would not come in.

MR. S. RICHARDS: Right.

MR. SCAHILL: Correct.

THE COURT: So, I will refine -- now I understand that with respect to the trial testimony, if an exhibit was admitted

in the designated testimony, that exhibit that was admitted and shown to the jury in the underlying criminal case can be admitted into evidence in this case by agreement of the parties, correct?

MR. SCAHILL:  Yes.

MR. POLICK:  Yes, your Honor.

THE COURT:  Mr. Richards?

MR. S. RICHARDS:  Correct, your Honor.  And I am 99 percent certain that no documents were used to refresh recollection in the testimony I read.

THE COURT:  Okay.  I will be going through that this afternoon and evening, but I will leave it to the parties to raise objections as the testimony is read in.

Okay.  We'll bring in the jury.

(Jury in at 1:06 p.m.)

THE COURT:  Please take your seats.

Mr. Garcia, I remind you that you remain under oath.  Please feel free to take a seat.

Once the witness has settled, you may resume your examination.

THE WITNESS:  Okay.

MR. SCAHILL:  I have no further questions of this witness at this time.  I would tender the witness.

THE COURT:  Okay.  Additional cross?

MR. POLICK:  Yes, your Honor.

CRISTINO GARCIA, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION

BY MR. POLICK:

Q.  Good afternoon, Mr. Garcia.

A.  Good afternoon.

Q.  You told us that when you were at the police station at Grand and Central when you were arrested, that you were released from the bullpen, is that correct?

A.  Yes.

Q.  Okay.  And the bullpen, as you're calling it, that's also referred to as the lockup, isn't it?

A.  Yes.

Q.  And it was a uniformed police officer in a blue uniform who released you from that lockup area, correct?

A.  Yes.

Q.  And while you were in the lockup, they took a photograph of you, right?  They took your picture?

A.  I don't -- I don't recall.

Q.  All right.  I'm going to show you what's been marked for identification as Defendants' Exhibit 35.

MR. POLICK:  May I approach, your Honor?

THE COURT:  Yes.  You have free leave to approach.

BY MR. POLICK:

Q.  Take a look, Mr. Garcia, at Defendants' Exhibit 35, and tell us who that is in that photograph.

Garcia - cross

205

A. It looks like me.

Q. That's you, isn't it?

A. Yeah.

Q. When you were 19, right?

A. Yeah.

Q. And that photograph fairly and accurately shows the way you looked when you were in the lockup, right?

A. Yes.

MR. POLICK: Move to admit Defendants' Exhibit 35 and publish that to the jury, your Honor.

THE COURT: Any objection?

MR. J. RICHARDS: No objection.

THE COURT: All right. Defendants' Exhibit 35 is admitted and may be published.

(Defendants' Exhibit No. 35 was received in evidence.)

BY MR. POLICK:

Q. All right. You told us during direct examination that Mr. Rios's older brother Ricardo has a child with your sister Nori, right?

A. Yes.

Q. So, Ricardo Rios is your brother-in-law, right?

A. Yes.

Q. And do you consider Mr. Rios, who is in the courtroom today, your brother-in-law as well?

A. Yes.

Q. And Nori is your younger sister, right?

A. My second older sister.

Q. Second oldest. And you have another sister Maria, right?

A. Yes.

Q. And that's the sister who you say you called on the phone when you were in the police station that day?

A. Yes.

Q. She went by the nickname Leni, right?

A. Yes.

Q. Now, back in June and July of 1989, your family and Mr. Rios lived very close together, didn't you?

A. Are you talking about Jaime Rios?

Q. Yeah. Jaime Rios and -- lived with his girlfriend Diana Rodriguez --

A. Yes.

Q. -- back in June and July of 1989?

A. Yes.

Q. Okay. And they lived at 1440 North Leavitt, right?

A. Yes.

Q. And you and your sisters and your family lived a block away at 1430 North Bell, right?

A. Yes.

Q. And your sister Maria and Diana Rodriguez were very close friends, weren't they?

A. Yes.

Q. They went to school together?

A. Yes.

Q. And they were about the same age?

A. Yes.

Q. And your sister Maria would often go and visit Mr. Jaime Rios and Diana at their place at 1440 North Leavitt?

A. Yes.

Q. You also know a gentleman by the name of Benjamin Carrero, isn't that correct?

A. Benjamin --

Q. He goes by the nickname Baby. Do you know who that is?

A. Oh, yes, yes.

Q. Do you know who I'm talking about now?

A. Yes, yes.

Q. Okay. He was also a Latin King, wasn't he?

A. Yes.

Q. And Mr. Benjamin Carrero, who you know as Baby, he lived across the street from Wicker Park, right?

A. Yes.

Q. And his address was 1419 North Wicker Park?

A. I'm not sure, but --

Q. But across from the park?

A. Yes.

Q. You know where the park is?

A. Yes.

Q. It's a few blocks from where your home was, right?

A. Yes.

Q. And you also know a gentleman by the name of Alex Lopez, correct?

A. Yes.

Q. And you went to grammar school at Diego Grammar School with Mr. Lopez?

A. Yes.

Q. And he lived a block north of where you live at 1448 North Bell in June and July of 1989, didn't he?

A. Yes.

Q. Now, you told us today that it was Mr. Richards who told you the name of the victim in this case, Luis Morales, correct?

A. Yes.

Q. Did you know Mr. Morales?

A. No.

Q. Did you know anybody that went by the nickname New York?

A. No.

Q. But you had heard about the murder that had occurred on Western Avenue --

A. Yes.

Q. -- in the 1300 block in late June, didn't you?

A. Yes.

Q. In fact, people on the street were talking about that murder, right?

A.   Yes.

Q.   And you heard from people on the street about that murder?

A.   Yes.

Q.   And that murder occurred very close to your home, at 1340 North Bell, right, about a block away -- a couple of blocks away, right?  Western is a few blocks away?

A.   Yes, yes.

Q.   And it was Mr. Rios's girlfriend Diana who told you that Mr. Rios had been arrested for that murder?

A.   Yes.

Q.   And you knew that Mr. Rios had been arrested for that murder when you were arrested in late July, right?

A.   Yes.

        MR. POLICK:  Thank you, Mr. Garcia.

        I don't have any further questions, your Honor.

        THE COURT:  Okay.  Redirect?

        MR. J. RICHARDS:  May I proceed.

        THE COURT:  Yes.

                    REDIRECT EXAMINATION

BY MR. J. RICHARDS:

Q.   Mr. Garcia, do you have any doubt in your mind as to whether or not Mr. Guevara hit you about the head with a phone book and a billy club?

A.   No, I don't have no doubt about that.

Q.   Now, when Mr. Guevara hit you with that phone book and

billy club, how exactly did he hit you with that?  Can you describe it a little bit more for me?

A.  Well, I was handcuffed to the wall with one arm, and he placed -- he placed the phone book on my head and just went back with the flashlight and just whack it over the head on top of the -- on top of the phone book a couple of times.

Q.  So, it's your head, phone book, and then billy club hitting?

A.  Yeah, yeah, yeah, exactly.

Q.  Now, being hit like this, had that ever happened to you before, ever in your life?

A.  No.

Q.  After this being hit like this, did it ever happen to you again?

A.  No.

Q.  So, this is the only time that you've ever been beaten about the head with a billy club and a phone book?

A.  Yes.

Q.  Now, counsel asked you about the alibi you gave about ordering pizza, and I want to ask you this:

Do you recall which officer you told that to?

A.  To O'Quinn.

Q.  And when you told that to O'Quinn, was anyone else around?

A.  I don't recall.

Q.  Now, you were asked about taking heroin.  Is the fact that

you took heroin today -- is that impacting your memory in any way about you being beat on the head with a phone book and billy club?

A.   No.

Q.   Why do you take heroin?

            MR. SCAHILL:  Objection.  Relevance.

            THE COURT:  Overruled.

BY THE WITNESS:

A.   I don't know.  Not -- I don't know.

            MR. J. RICHARDS:  May I have a moment, your Honor?

            THE COURT:  Yes.

     (Counsel conferring.)

BY MR. J. RICHARDS:

Q.   Do you know where Officer Guevara was when you were talking to O'Quinn about the alibi?

A.   No.  I don't recall.

            MR. J. RICHARDS:  Nothing further, your Honor.

            THE COURT:  Anything on that?

            MR. SCAHILL:  Just very, very briefly.

                      RECROSS-EXAMINATION

BY MR. SCAHILL:

Q.   Mr. Garcia, were you hit with a billy club, or were you hit with a flashlight?

A.   I believe it was a flashlight.

Q.   Okay.  Counsel just asked you about five times whether you

were hit with a billy club, and you said that you were hit with a billy club, right?

A.   He said flashlight bully club.

Q.   He said billy club, right?

A.   Did he?  Okay.

Q.   You weren't hit with a billy club, were you?

A.   No.  It was a flashlight.

Q.   Okay.  Then why did you agree with him when he said that you were hit with a billy club?

A.   Made a mistake.

Q.   Okay.  Do you not remember whether it was a flashlight or a billy club?

A.   Yes.  It was a flashlight.

Q.   But you just told us literally a minute ago about three times that it was a billy club.

A.   I have to be careful what I agree with.  Sorry.

         MR. SCAHILL:  No more questions, Judge.

         THE COURT:  Mr. Polick?

         MR. POLICK:  Nothing, your Honor.

         THE COURT:  Anything on that, Mr. Richards?

         MR. J. RICHARDS:  No.

         THE COURT:  Okay.  Mr. Garcia.  You may step down, you're released from your subpoena.

     (Witness excused.)

         THE COURT:  Next witness for plaintiffs?

You may come up and take the stand, please.  Before you step up, if you could raise your right hand.

(Witness sworn.)

THE WITNESS:  Yes.

THE COURT:  All right.  Please take a seat.  There's cups and water here if you need water at some point.

THE WITNESS:  Okay.  Thank you.

THE COURT:  Mr. Richards, you may proceed once the witness is settled.

KAREN SHIELDS, PLAINTIFF'S WITNESS, DULY SWORN

DIRECT EXAMINATION

BY MR. S. RICHARDS:

Q.   Ms. Shields, could you please state your first and your last name, spelling each name for the court reporter.

A.   Karen Shields, K-A-R-E-N, S-H-I-E-L-D-S.

Q.   And, Ms. Shields, if you don't mind my asking, how old are you?

A.   73.

Q.   And what is your occupation or profession?

A.   I'm retired.

Q.   And what are you retired from?

A.   Mediator is the most recent thing.

Q.   Are you a lawyer?

A.   I am -- or was.  I gave the license back last year.

Q.   Okay.  Where was your license -- the law license you gave

back, what state was that from?

A.   Illinois.

Q.   And going backwards, first of all, just maybe to be clear, would you like me to call you Karen or Ms. Shields or Attorney Shields or --

A.   Either one is fine.  Karen is fine.

Q.   So, Karen, first of all, how long have we known each other?

A.   Sometime back in my old PD days, which were the '80s and early '90s.  I don't know exactly.

Q.   Where did you graduate from college?

A.   I'm sorry?

Q.   Where did you graduate from college?

A.   University of Illinois Chicago.

Q.   When did you graduate?

A.   1977.

Q.   What was your degree in?

A.   Poli sci.

Q.   After you graduated, what did you do then?

A.   I went immediately to law school.

Q.   Where did you go to law school?

A.   DePaul.

Q.   When did you graduate?

A.   1980.

Q.   After you graduated from DePaul, what did you do?

A.   For about a year-and-a-half, I beat down the doors of the

PD's Office, and then finally, they hired me.

Q. And while you were beating down the doors of the PD's Office waiting to be hired, what did you do?

A. I did a lot of pro bono work. I did everybody's family work. And I went out on interviews and got hired, and then didn't take the jobs after because I wanted the PD's Office.

Q. Why did you want the PD's Office in particular?

A. In law school, there was a judge who was -- he did a class at night on criminal law. And he had the head of the PD's Office come one night, and it was riveting. And I liked what I saw, and that's all I wanted to do from then on.

Q. And who was the head of the PD's Office at that point?

A. Jim Doherty.

Q. Would it be fair to say that he was kind of a legend?

A. He was a -- yes, absolutely.

Q. Now -- and to beat down the doors of the PD's Office for a year-and-a-half, why did that happen? Why was it so difficult?

A. They only hired in April with the budgets, and if you weren't in the first -- which was the first few months after I got my license, then you had to wait another year. It was the way they worked.

Q. All right. And did you have to go before the Committee on Help?

A. Committee on who?

Q. The Committee on Help.

A.   I don't remember doing so.

Q.   Karen, after entering the PD's Office, where were you assigned?

A.   I was assigned to Juvenile.

Q.   How long did you do that for?

A.   Probably three years.

Q.   And after you were assigned to Juvenile, what was your next assignment?

A.   26th Street, felonies.

Q.   When you say 26th Street, do you mean the criminal courts buildings at 26th and California?

A.   Yes.

Q.   And when you're assigned to felonies, are you assigned to particular courtrooms, or were you back in those days?

A.   Was assigned to specific courtrooms for a period of time, yes.

Q.   Do you remember which courtrooms you were assigned to?

A.   The first year and three months, I was assigned to Steve Schiller's courtroom.  The next about eight months, I was assigned to Richard Neville's courtroom.  After that, I went to Judge Hett's courtroom, and I'm not sure if it was a whole year.  And after that, I went to Judge Karnezis's courtroom for a full year before I went to task force.

Q.   We'll get to that in a moment, but by the way, you -- is Judge Neville any relation to you at this point?

Shields - direct

217

A.   He is my husband.

Q.   And is he also retired?

A.   He is.

Q.   Now, when you were assigned to the courtroom -- you said at one point, you were assigned to the courtroom of Judge Karnezis?

A.   Correct.

Q.   And was the case of Jaime Rios tried in Judge Karnezis's courtroom?

A.   Yes.

Q.   Now, you said after that, you went to Murder Task Force, is that correct?

A.   Correct.

Q.   Could you explain the differences back then, or even now, between Murder Task Force and the courtroom felony attorneys?

A.   Well, in the courtrooms, you were assigned to any cases that came in to that courtroom.  So, if there were two public defenders in a courtroom and a case came up what I would call on the wheel, when it got assigned, when it very first was charged, then whoever was in that courtroom would get it.  So, we would split them.  So, you know, it would be mine, and the next would be the other PD in that courtroom.

     If you were in Murder Task Force, you only handled murder cases, and you -- that case was yours to follow wherever it went in the system, whether it was in 26th Street --

typically, that's the only place it was, 26th Street.

Q.   So, at the time of Jaime Rios's trial, were you assigned to Judge Karnezis or to the -- or to Murder Task Force?

A.   By that time, I was assigned to Murder Task Force.

Q.   Now, in terms of murder cases, how does it work in terms of who tries a particular case on Murder Task, and how many attorneys are assigned?

A.   One attorney is assigned, but there's a rule that no one does a trial without two attorneys in the Public Defender's Office.  So, I was not assigned the Rios case.  Jack Carey was.

Q.   Okay.  And did you know Jack Carey as a Public Defender?

A.   Very well.

Q.   And how would you characterize his reputation as a Public Defender, as an attorney?

A.   One of the most upstanding, capable ones that probably ever walked through the halls.  He is still much beloved in that office.

Q.   And, in fact, there are memorials for him or outings and awards and so forth?

A.   Yes, continues to be.

Q.   So, I'd like to talk to you about the process of trying a murder case.  When you try a murder case, what do you look for?  What do you do?  What are your first steps?

A.   You read police reports, go talk to the person who's been charged, start combing through things.  There are certain

Shields - direct

219

things you look for in a police report, any supplemental reports. And the client gives you a lot of information about what's happening, et cetera. That's the start.

Q. Now, I'm going to ask you about a couple of terms. What is *Brady* material?

A. I'm sorry?

Q. What is *Brady* material?

A. Oh, *Brady* material. It's a requirement from a case, I don't know, in the '60s, '80s, somewhere in there. A *Brady* -- the State's Attorney has to turn over any exculpatory information about a litigant -- or charged. Sorry. My last few years was spent in civil, so I became a litigant.

And so, the bottom line of it is that the State must turn over exculpatory information to the attorneys.

Q. What is exculpatory information? What does that mean?

MR. SCAHILL: Judge, objection to defining legal terms.

THE COURT: Sustained.

BY MR. S. RICHARDS:

Q. Well, did you -- in the course of looking through discovery, would there be times when the prosecution would turn over to you *Brady* material?

A. Yes.

THE COURT: Before you ask the next question, ladies and gentlemen, I already told you, at the end of the trial,

I'll instruct you on the law. *Brady* refers to a Supreme Court case. The instruction that you'll receive is that exculpatory evidence is evidence that tends to show that the accused is not guilty of the crime. There is an obligation from the government, the prosecution side, to have to turn over any *Brady* material.

To the extent that this witness testifies about her knowledge of the *Brady* material, it goes to show what she understood it to be at the time, but the actual legal definition, as will all legal definitions, will come from me.

You may continue.

MR. S. RICHARDS: Thank you, your Honor.

BY MR. S. RICHARDS:

Q. In terms of what we're calling *Brady* material, as the judge just defined, what kind of *Brady* material could there be? What could the prosecution turn over that would help your case?

A. There could be lots of different things, a witness who says, "That wasn't the person who did it." It could be alibis that checked out. It could be somebody else was charged with it and for whatever reason was let go, so at least there's something else to look at.

There's a lot of things it could be.

Q. Okay. Now, in terms of practices in a criminal trial, is there something called discovery or a process of discovery?

A. Yes.

Q.   All right.  As part of the process of discovery, does the prosecution provide you with a list of their potential witnesses?

A.   Yes.

Q.   Now, now I'd like to ask you about interviewing witnesses. In terms of interviewing witnesses that were listed by the prosecution, at the time you practiced in the '90s, were there particular obstacles to sending investigators to talk to prosecution witnesses?

A.   There were for the PD's Office.  I suspect it was for the private attorneys also.

If you sent an investigator, first off, the State always brought it up in court and said, "They shouldn't be talking to our witnesses," which of course, the People -- it wasn't supposed to be their witnesses.

And so there was -- and frankly, the judges didn't like you talking to the witnesses.  So -- and when I say the witnesses, I'm talking about the ones the State would call.

That was a problem all the time in every case I ever worked on in court that had that situation came up as, "But, Judge, they shouldn't be talking to our witnesses," kind of thing.

Q.   By the way, was there any legal rule against you talking to their witnesses?

MR. SCAHILL:   Judge, objection to this line.

THE COURT: That's --

MR. S. RICHARDS: Goes to reasonable diligence.

THE COURT: I didn't ask.

MR. S. RICHARDS: Sorry.

THE COURT: A reminder about the speaking objections. I will invite the lawyers to expand.

The objection's overruled. The witness can testify as to her understanding and her practice with respect to her work at the time.

MR. S. RICHARDS: Thank you.

BY MR. S. RICHARDS:

Q. In terms of your work at the time, did the Public Defender's Office have investigators on staff?

A. Yes.

Q. And where investigators were sent from the Public Defender's Office to interview State witnesses, what would tend to happen?

MR. SCAHILL: Objection. Foundation, relevance.

THE COURT: Overruled.

BY THE WITNESS:

A. I think basically what I just described, which is a complaint made in court, a complaint to the office, "You shouldn't be talking to our witnesses." It was -- it was frowned on. Let's just say that.

BY MR. S. RICHARDS:

Shields - direct

223

Q.   Now, in terms of your work on -- do you recall working on the case of the People versus Jaime Rios, the murder prosecution?

A.   Yes.

Q.   And how did you get assigned to the case?

A.   I wasn't.  It was assigned to Jack Carey; and because there was a rule in the office that you didn't try a case alone in the courtrooms, especially murder cases, you always needed someone else to be on the case with you, Jack came and asked me to do the case with him because he had never tried a case in front of Judge Karnezis, and I had worked in there for over a year.

Q.   Okay.  And by the way, were there peculiarities about working in Judge Karnezis's courtroom?

A.   There's a peculiarity about working in every judge's courtroom because they're just human.

Q.   Now -- and in terms of -- was it the practice back then that there was a rule that Murder Task Force attorneys got to pick their own second chairs, whoever they wanted?

A.   Pretty much.

Q.   It wasn't assigned; they just picked the person they liked?

A.   Correct.

Q.   Or thought they could work with?

A.   Right.

Q.   Now, in terms of the case of Jaime Rios, also, could you

Shields - direct

224

describe to me what you understood at the time, not any legal definition, but your understanding of pattern and practice material as to police officers?  What is that?

MR. SCAHILL:  Objection.  Relevance and motions.

THE COURT:  Sustained.

BY MR. S. RICHARDS:

Q.  Well, let me ask you some specific questions.

If, hypothetically -- if you had been told by a prosecutor that an accomplice in the case had been beaten by an officer with phone books, would that have been something you would have wanted to investigate?

A.  Yes.

Q.  And were you ever told anything like that during the course of the Jaime Rios prosecution?

A.  That an accomplice had been beaten?  No.

Q.  Yes.

A.  No, no.

Q.  The prosecutor never came to you and said, "By the way, we have this information that you need to know" --

A.  No.

Q.  -- "somebody was beaten by a police officer with a phone book"?

A.  I'm sure we never had that information under any circumstances.

Q.  Now, in terms of material which indicated that an

accomplice had an alibi for the date and time of the murder, hypothetically, if the prosecutor came to you and said, "There's this evidence that an accomplice has an alibi for the date and time of the murder," is that something you would have wanted to investigate?

A.   Absolutely.

Q.   Now, are you aware if Cristino Garcia was listed as a witness on the State's answers to discovery in the Jaime Rios case?

A.   It's my memory that he was.

Q.   Was there any -- would there have been any obstacles and dangers, besides the ones you mentioned about talking to prosecution witnesses, about going to interview the accomplice in a murder case without knowing beforehand what he would say?

A.   Well, the most obvious is if you have someone who's charged with the murder and he has said in his statement to the police that this was the accomplice and he did the shooting, there could be all kinds of flipping.

       And by flipping, I mean one flipping on the other, creating a situation that wasn't necessary.  Just pure facts can help.

Q.   So -- and do any -- do you recall at any time during the pendency of the case any other person, such as a relative of Cristino Garcia or anybody else ever came to you and gave you information that Cristino Garcia had an alibi for the night of

the murder and had been beaten with phone books -- with a phone book and a flashlight?

A.   I don't have any memory of that.  I know those are allegations.  I don't have any memory of it, of anybody coming to us.

Q.   Okay.  And you know about the allegations because at some point, you've seen the Cristino Garcia affidavit and other materials filed in this case --

A.   Correct.

Q.   -- and preceding cases?

     And those were given to you by me, correct?

A.   Correct.

Q.   All right.  By the way, in terms of your preparation, what else have I given you over the years?

A.   You gave me the report of proceedings.  I'm going to say you provided me with or had me provided with my own deposition transcript, and I want to say a police report -- the -- some police reports.

Q.   Okay.  That's all you recall.  That's fine.

     And you wrote your own affidavit in this case, correct?

A.   I asked you to write it, give it to me, and let me doctor it; and that's what we did.

Q.   Okay.  And at any time during this process of you getting the affidavit from me and you doctoring it, did I tell you what

to say?

A.   Never.

Q.   Now, let me skip a little bit because I didn't do this fully.  How long were you -- when you were with the Public Defender's Office, how many trials did you -- jury trials did you do, approximately?

A.   My memory is that it was 25 jury trials that I did.

Q.   Did you leave the Public Defender's Office at some point?

A.   In 1991.

Q.   What did you do after you left the Public Defender's Office?

A.   I went into private practice for four years.

Q.   What did your private practice consist of?

A.   It started -- I took about three of the murder cases that I had, two or three, out of the -- out of the PD's Office, asked by the judges, because once you've worked on them for a while, they don't want to start over with a new attorney.

So, I took some of those, and I thought I would be doing nothing but criminal; and then it turned out what walked through my door was family.  So, by the time my four years of being in solo practice were up, I was doing mostly family law.

Q.   And after doing family law, did you sort of graduate or move to a different position in the law?

A.   I did.

Q.   What position was that?

Shields - direct

228

A.   I became a judge.

Q.   Okay.  And a judge assigned to what court?

A.   I was assigned to family law, domestic relations downtown.

Q.   How long did you do that for?

A.   From 1995 to 2008.

Q.   After 2008, what did you do?

A.   I began mediating family law cases.

Q.   As a private mediator?

A.   Yes, correct.

Q.   How long did you do that for?

A.   Until -- effectively until I retired last year.

Q.   Let me ask you this:  Do you have any memory of the facts of the Jaime Rios trial, and have you -- has your memory improved any or benefited from looking at the transcripts or other materials?

A.   Yes.  I mean, you can't not remember a little better if you review what you did back then.  My overall memory of what all we did, and I think that's the key here, you know, is -- it was tough for me 35 years later, and also because a lot of the prior work had been done by Jack Carey and I was only brought on the case late.  Having said that, I'm clearly in the transcripts of the trial, et cetera.

Q.   Okay.  If you can remember this, fine.  If you can't, that's fine as well.  Do you remember in summary what the evidence against Jaime Rios was at the trial, just the general

picture?

A.   In summary, that he and another guy came around a corner shouting gang -- doing gang signs and shouting, and that one of the two -- in this situation, I think the allegation was Jaime did this, pulled a gun out of his waistband and shot the other -- the one kid on the street, killing him.

Q.   And that being the allegation, what was, if you remember, the major pieces of evidence the State used to try and prove that allegation?

A.   Two things, really, was all they had, which was Luis Huertas, I believe it was, who was -- said he was sitting on the street and saw this occur.  But -- and it was Jaime's statement.

Q.   The court reported statement?

A.   Yes.

Q.   Now, by the way, just going back to something I said earlier, if you heard an allegation that somebody had been beaten using phone books and a flashlight, would you have rejected that allegation as too absurd or unusual to take seriously?

A.   It was a common issue --

        MR. SCAHILL:  Objection.

        THE COURT:  That's overruled.

        You may answer.

BY MR. S. RICHARDS:

Shields - direct

230

Q.   Go ahead.

A.   So I heard it a lot.

Q.   Without knowing whether the allegations were true or false, it was something you heard a lot, correct?

A.   Right.

        MR. S. RICHARDS:  One moment.

BY MR. S. RICHARDS:

Q.   Okay.  In terms of using -- possibly people using a phone book and a flashlight to beat somebody, what was your understanding of why that was done, why that particular method was used?

        MR. SCAHILL:  Objection.  Foundation.

        THE COURT:  Sustained.  Lay a foundation.

BY MR. S. RICHARDS:

Q.   Did you -- in terms of the allegations that you heard of people being beaten with a phone book and a flashlight, first of all, did you hear this -- you said you heard it all the time, correct?

A.   I heard it frequently.

Q.   Okay.  Now, by the way, in your cases, did it often come up that in response to the allegations, the prosecution would introduce booking photographs or other photographs to show that there was no marks or bruises?  Did that happen?

A.   Of course.

Q.   And what was your understanding of the relationship between

Shields - direct

231

those photographs and the practice of beating somebody with using a phone book and a flashlight?

MR. SCAHILL: Objection. Foundation.

THE COURT: That's sustained. Just ask the question, "Did you have an understanding?"

BY MR. S. RICHARDS:

Q. Did you have an understanding of why phone books and flashlights would be used on a suspect?

A. Well, the phone books wouldn't leave bruises.

MR. SCAHILL: Objection. Non-responsive. Move to strike.

THE COURT: That's sustained. The question was did you have an understanding, ma'am.

THE WITNESS: Yes.

BY MR. S. RICHARDS:

Q. Well first of all, did you have an understanding as to why they would be used, without answering -- did you have an understanding of why a phone book and a flashlight would be used, just saying yes or no if you had an understanding?

A. Yes.

Q. And what was your understanding of why a phone book and a flashlight or other object would be used to beat somebody?

MR. SCAHILL: Objection. Foundation.

THE COURT: Overruled. You may answer.

BY THE WITNESS:

A.   Because phone books don't leave bruises.

MR. S. RICHARDS:  Nothing further.

THE COURT:  Cross?

MR. SCAHILL:  Thank you.

CROSS-EXAMINATION

BY MR. SCAHILL:

Q.   Good afternoon, Judge Shields.  How are you?

A.   I'm good.  Thank you.

Q.   My name is Tim Scahill.  I'm going to ask you some questions about the case.  Okay?

A.   Okay.

Q.   Actually, I want to start where they ended.  This business about the phone books and not leaving the bruises, you heard about this from people that you represented, right?

A.   Yes, and more.

Q.   Okay.  And when you would hear about this from the people you represented, that would come up in the context of your clients trying to get their confessions thrown out because of coercion typically, right?

A.   Typically.

Q.   Okay.  And that would come up in the context where they did not have any physical corroboration of injuries, but they still wanted to try to get this very, very important piece of evidence outside of the jury listening to it, right?

A.   Could you say that again?

Shields - direct

233

Q.   Yeah.   So, oftentimes when you would hear this business about the phone books, it was coming from people that your office represented who had a confession, who were saying they were now coerced to try to get the confession thrown out, but they did not have physical evidence to corroborate it.

That was a very familiar context when that would arise, right?

A.   What I'm struggling with is that they had no physical showing of the -- sometimes they did, and sometimes they didn't, so I'm kind of answering it.   Okay?   I hope.

Q.   Okay.   I think what you were expressing to counsel was you had this understanding that, well, there's phone books used and it doesn't leave a bruise, and so therefore, there's no physical evidence that this coercion occurred, right?

A.   Correct.

Q.   And that was a familiar context in which you would hear that, right?

A.   It was.

Q.   Now, you represented some people accused of some pretty serious crimes towards the end of your PD career, right?

A.   Correct.

Q.   Murder Task Force is just what it sounds like, murders, right?

A.   Right.

Q.   And back in those days, anyway, most people who were being

held over for trial were sitting in the Cook County Jail awaiting trial, correct?

A.   Correct.

Q.   And when they're in the Cook County Jail, they're there with other people who are awaiting trial, right?

A.   Yes.

Q.   Okay.  And inmates talk, don't they?

A.   They do.

Q.   Okay.  They talk about their cases, don't they?

A.   Sure.

Q.   And they talk about, "How am I going to get out of what the police have on me," right?

A.   I would assume.

Q.   Right.  And so you would see patterns in how your clients were talking about the things that they were allegedly subjected to while they were in police custody, right?

A.   At times, yes.

Q.   Okay.  And that included this story about the phone book that didn't leave any bruises, right?

A.   The allegation about the phone book.

Q.   Right.  Okay.  You were asked a bunch of questions about alibis, so what is an alibi?

A.   It's a -- I'm trying to think of a word.  It's that you -- that you have a -- I don't want to call it a tale or a story because that implies something, but it's a story and proof that

you were not where you would have been in order to have committed a crime.

Q. Okay. You were one place at a specific date and time instead of another place at a specific date and time, right?

A. Correct.

Q. Okay. If somebody says, "I was at a restaurant at 6:00 p.m. having dinner and then I went home," and a murder happened at midnight, the fact that they were at a restaurant at 6:00 p.m., not an alibi, is it?

A. Correct.

Q. Okay. Alibi is specific to not what you did at any point during that day; it's where were you at a specific date and time, right?

A. Correct.

Q. All right. Now, when you're representing a criminal defendant, the choice as to whether to raise an alibi is the criminal defendant's choice, right?

A. Correct.

MR. S. RICHARDS: Objection.

THE COURT: What's the objection?

MR. S. RICHARDS: Not an accurate statement of the law. It's not the defendant's choice.

THE COURT: Okay. One more time, Mr. Richards, I remind you, I do not allow speaking objections.

MR. S. RICHARDS: Objection --

Shields - direct

236

THE COURT: I didn't -- your objection is known to everyone because you've said it beyond what I've instructed you previously you could say. I'm not inviting you to object more or to speak more. I'm admonishing you that I've instructed you prior to this time and outside of the jury's hearing that I do not allow speaking objections.

MR. SCAHILL: May I proceed?

THE COURT: The objection is overruled. The question is, "When you're representing a criminal defendant, the choice as to whether to raise an alibi is the criminal defendant's choice, right?"

MR. SCAHILL: Yes.

BY THE WITNESS:

A. And the answer is yes.

BY MR. SCAHILL:

Q. Okay. That's what's called an affirmative defense, right?

A. Correct.

Q. So, what an affirmative defense is: The prosecution can't put at issue, you know, "You were at a particular -- you were here at a particular date and time, not at the place of the murder." It has to be the person who's defending themselves, right, the criminal defendant? They have to put it at issue?

A. I think I'm following you, and I think the answer is yes.

Q. Okay.

A. Okay.

Shields - direct

237

Q.   And I'm trying to use layman's terms because we have a lay jury here, of course, with legal terminologies like affirmative defenses, but let me just ask you this:

An affirmative defense of alibi is something that if a criminal defendant wants to pursue it, they actually have to put it in their answer to the State's discovery?

A.   Yes.

Q.   Okay.  So, if someone is at their house as opposed to at the scene of the murder, they have to say in a written pleading that is submitted to the prosecution, "I was not at the place of the murder.  I was at my house, and also, I was with these following people," correct?

A.   Yes.

MR. S. RICHARDS:  Objection.

THE COURT:  Basis?

MR. S. RICHARDS:  Basis is misstates the law.  I can elaborate on that outside of the hearing of the jury.

THE COURT:  Let's go to sidebar.

(Proceedings heard at sidebar:)

THE COURT:  Please explain to me how this is a statement of law at all.

MR. S. RICHARDS:  He said it's an affirmative defense.

THE COURT:  Please speak into the microphone so the jury does not hear our sidebar.

MR. S. RICHARDS:  Under Illinois law, alibi is not an

affirmative defense.  It is not listed under affirmative defenses in the statute.

It is also inaccurate to say that it's the defendant's choice to raise an alibi defense.  That is absolutely contrary to the law.  It is not among the choices given to a criminal defendant.  The choices which a criminal defendant owns are pleading guilty, not guilty, jury trial, bench trial, testify, not testify.

So, the information is inaccurate.  I can correct in some fashion later, but I just want to put on the record my objection that this is not an accurate statement of the law.

THE COURT:  Is it your view that this witness has been called or that the cross-examination is eliciting expert opinion concerning statements of the law?

MR. S. RICHARDS:  Yes.  I made that -- at this point, the expert statements of the law are being elicited, which as it happens, are not accurate.

THE COURT:  Okay.  The objections are overruled.  You called this witness to talk about her course of conduct with respect to the underlying criminal trial, from being asked by Mr. Carey to join the team through whether she would have pursued, hypothetically, information concerning misconduct by police officers.

So, you've opened the door.  You've introduced this witness, and these questions are designed to talk about her

understanding and her process with respect to the case that she had, her decisions with respect to the case, the underlying criminal case, to include whether to raise an alibi defense or what have you.  So, the objections are overruled.

Going forward, if you have similar objections, just let me know it's the same objection.

You may proceed, Mr. Scahill.

(Proceedings heard in open court, jury present:)

BY MR. SCAHILL:

Q.  Okay.  So, to distill this issue down, putting legal jargon to the side, if a criminal defendant wants to attempt to pursue a theory at trial that they are in a place other than the place of the murder, it is incumbent upon them to raise that and disclose that to the State before the trial, is that correct?

A.  Yes.

Q.  Okay.  Now, you reviewed a number of documents with respect to Mr. Rios's case, right?

A.  Yes.

Q.  Discovery was answered on behalf of Mr. Rios, right?

A.  Yes.

Q.  Okay.  Did Mr. Rios, in the written discovery before trial, disclose an alibi defense?

A.  Not that I recall.

Q.  Okay.  And Mr. Rios testified at his criminal trial, right?

A.  Yes, he did.

Shields - direct

240

Q.   Okay.  And we'll talk about that in a little bit what he said, but what he did not say was that he had an alibi for the time that the murder was committed, is that correct?

A.   I believe that's correct.

Q.   Okay.  Before trial -- well, strike that.

You became aware that there was a confession that was taken of Mr. Rios before trial by the police?

A.   Yes.

Q.   Okay.  And one of the ways that a criminal defendant can, for lack of a better term, attack a confession is to try to get it excluded so the jury does not hear that confession, right?

A.   Correct.

Q.   And that is through a procedural vehicle called a motion to suppress, right?

A.   Correct.

Q.   Now, there was, in fact, a motion to suppress filed by Mr. Rios with respect to his confession, right?

A.   Yes.  I think Jack Carey filed that before I got on the case.

Q.   Okay.  And there was, in fact, a hearing on that, right?

A.   And I also think that was before I was on the case.

Q.   Right.  And at that hearing, Mr. Rios testified, right?

A.   I assume so.

Q.   Okay.  You reviewed transcripts from this case, right?

A.   I did.

Q.   Okay.  Are you aware --

MR. S. RICHARDS:  Objection.

THE COURT:  Basis?

MR. S. RICHARDS:  May I be heard at sidebar?

THE COURT:  Yes.

(Proceedings heard at sidebar:)

MR. S. RICHARDS:  Mr. Rios did not testify at the motion to suppress statements.  He testified at the motion to quash arrest, so this is a misstatement of the evidence.  He did not testify.  Officers testified.  The motion was filed.

THE COURT:  Okay.

MR. SCAHILL:  May I respond?

THE COURT:  Yes.

MR. SCAHILL:  Okay.  He testified twice.  He testified during the hearings for both that were simultaneous.  I'm trying to elicit that he did not testify about the circumstances of the statement at the motion to suppress, which is exactly what I'm asking.

MR. S. RICHARDS:  May I respond?

THE COURT:  Yes.

MR. S. RICHARDS:  There were two separate motions.  There was a motion to quash arrest, at which he testified.  They were heard simultaneously, but the judge considered them separately.

Mr. Rios did not testify with respect to his statement or the circumstance of his statement at the motion to suppress. I think I've just said the same thing that defense counsel said, but I don't think the jury should be confused and think that Mr. Rios testified to something he didn't testify to.

THE COURT: The question right now is, "You reviewed transcripts from this case, right?"

"I did."

"Okay. Are you aware" --

"Objection."

What's objectionable about -- you don't even know what the question is. So, the objection is overruled because he didn't get the question out.

Please continue, Mr. Scahill.

(Proceedings heard in open court, jury present:)

BY MR. SCAHILL:

Q. Let's back up with respect to motions to suppress for a minute.

A motion to suppress can be filed for all kinds of reasons, right?

A. Right.

Q. And some of them would be, "The police abused me to force me to make a confession"? That would be one of them, right?

A. Yes.

Q. Okay. Another one of them would be, "The police fed me

information in the confession and sort of told me what to say"?
That would be something else?

A. I guess so.

Q. Okay. It would be things like, "They didn't give me my
Miranda rights," that sort of thing?

A. Right.

Q. Okay. Now, you litigated many motions to suppress, I would
imagine, over the years?

A. Yes.

Q. Probably in almost every single case where there was a
statement, there was a motion to suppress filed, wasn't there?

A. Absolutely.

Q. Okay. When you are litigating a motion -- well, let me
strike that.

        The reason why those are so commonplace is that a
confession can be a very powerful piece of evidence in a
criminal prosecution; would you agree?

A. Absolutely.

Q. Okay. And so you're doing your legal duty, essentially,
on behalf of the client to do anything you can to get that
conviction tossed so the jury doesn't hear it or the judge
can't consider it in the situation of a bench trial?

A. Yes.

Q. Now, with respect to a motion to suppress that is alleging,
you know, physical coercion or the feeding of information by

the police to the criminal defendant, there are a number of different ways you can litigate that, right?

A. Okay.

Q. Well, one of them is, you know, you can ask the police officers what happened, call them to the stand, right?

A. Yes.

Q. Okay. They're not typically saying, "Yes, I beat this guy up," fair?

A. Right.

Q. The main way that you have to put on your evidence at a motion to suppress is you have to call your client to the stand to talk about the things that happened to them so the court can consider it, right?

A. Correct.

Q. That's pretty much -- unless you have physical evidence or something like that is pretty much the only way you're going to succeed on a motion to suppress if you actually put them on that stand, right?

A. True.

Q. Okay. You are aware, of course, that there was a motion to suppress filed by Mr. Rios, right, before the trial?

A. Yes.

Q. Okay. Did Mr. Rios testify at that motion to suppress at any time about the circumstances of his interrogation or confession?

A.   I'm sorry.  I don't remember.

Q.   Okay.  Would it surprise you to learn that he did not?

A.   It would.

Q.   Okay.  It would surprise you to learn that because Jack Carey was -- among other reasons, probably, Jack Carey was a guy who did his job thoroughly and competently, right?

A.   Right.

Q.   Okay.  Do you have any -- knowing what you know about the facts of this case, can you think of any reason why Mr. Carey would not have put Mr. Rios on the stand at the motion to suppress to talk about the circumstances that produced his confession?

A.   I don't know because I wasn't there for that, so that didn't go through me.  So, I'm not certain.

Q.   Okay.  Are you aware that the very first time that Mr. Rios ever testified about any sort of coercive conduct during his confession was at his actual trial?

A.   I'm not aware, but I'll accept your -- that you're telling me the truth.

Q.   Is that surprising to you?

A.   I don't know what the reasoning would be, but -- so a little bit.  I'll say that.

Q.   I mean, if you're going to file a motion -- go to the trouble of filing a motion to suppress, typically, you would want to go through the process of actually litigating that as

best you can by putting on all the evidence of that, right?

A.   Yes.

Q.   Which would include, among other things, and probably most importantly, putting your own guy on the stand to say what happened to him, right?

A.   Yes.

Q.   So -- and a motion to suppress -- and a criminal defendant can testify on those things, and they're not waiving their Fifth Amendment rights; they don't have to worry about that being used against them at the trial unless they take the stand, right?

A.   Right, I think.

Q.   In other words, you can testify as a criminal defendant, "Whether the statement's true or not, I was coerced," and not have to worry about going to trial and having the jury hear about the things you said about the confession unless they decide to take the stand?

A.   Right.

Q.   Okay.  Another common theme in criminal cases is eyewitnesses, right?

A.   Yes.

Q.   Had a lot of cases involving eyewitnesses, right?

A.   Right.

Q.   And there is a procedural vehicle that you can use as a criminal defense attorney to try to prevent the jury from

Shields - direct

247

hearing that there's been an eyewitness identification, right?

A.   Like a motion or something along those lines, yes.

Q.   Like a motion to suppress an identification?

A.   Right.

Q.   Right, which would attempt to cast doubt upon the reliability or the circumstances that produced the eyewitness identification, right?

A.   Correct.

Q.   And that was a common thing, I would imagine, that you did when there were eyewitness cases?

A.   Right.

Q.   Okay.  You mentioned that there was an eyewitness in Mr. Rios's case, Mr. Huertas, right?

A.   Right.

Q.   And Mr. Huertas took the stand and identified Mr. Rios as the person who he saw commit the murder, correct?

A.   Correct.

Q.   Did you or Mr. Carey ever file a motion to suppress the identification of Mr. Huertas?

A.   I did not.  We were on trial by the time I got in there. I do not remember ever seeing a motion on the identification.

Q.   Okay.  Thank you.

        The other procedural vehicle I wanted to ask you about is the motion to identify confidential informants.  You're familiar with what that is, right?

A.   Yes.

Q.   Okay.  And that was -- cases involving confidential informants back in those days were pretty common, right?

A.   Yes.

Q.   Yes.  Particularly in gang cases?

A.   Yes.

Q.   And typically in those cases, the defense would try to, you know, see who these people are, right?

A.   Yeah.

Q.   Right.  And now, a motion to identify a confidential informant was something that was routinely objected to by the prosecution?

A.   Yes.

Q.   All right.  Now, that procedural vehicle and whether those informants are identified, that is something that's ultimately decided by the judge, right?

A.   Yes.

Q.   And do you recall in Mr. Rios's case, there was a motion to identify the informants?

A.   I don't remember if there was one.  I remember many times at trial once the testimony was coming out about the CIs, that -- and I know it was Jack Carey who was doing the questioning on this -- the judge was overruling and not allowing him to get any of that information, like who the CI was, et cetera.

Shields - direct

249

Q. Right. Okay. That back-and-forth, the State objecting and the judge ruling on whether they get it, that is something that does not involve the police officers advocating in the courtroom for unmasking confidential informants; that's something that is pursued by the State and then ruled on by the judge, is that true?

A. Typically. Sometimes the police officer might be present for that, but typically, I think what you said is correct.

Q. Yeah, but it's -- the State says, "We object to producing this -- the identities of these informants," and the judge either says yes or no?

A. Yes.

Q. Okay. But the police officers aren't coming in and saying, "Judge" --

A. Don't do it.

Q. -- "don't do it. It's dangerous," whatever?

Okay. With respect to your preparation of your clients, I think you testified a little bit about how you would kind of go about that if you had a case from the beginning. Do you remember those questions?

A. Yes.

Q. Generally? Okay.

And probably the biggest source of information that you can get is actually sitting down and talking to your client about the facts of his case, right?

A.  Correct.

Q.  Seeing if he can give you witnesses that might help him out, right?

A.  Yes.

Q.  If he can give you an alibi, that's also good, right?

A.  Sure.

Q.  If there's a statement, sort of giving you information about sort of how that came out, right?

A.  If there's anything like that, yes, absolutely.

Q.  Yeah, got it.

And in these circumstances where a statement was not suppressed, in other words, it's coming into evidence, you had to come up with sort of a strategy for how do you explain or attack that statement, right?

A.  Sure.

Q.  And one of the ways that you can go about doing that is to sort of dissect the statements in there and try to prove that, you know, statements within the confession are false; that would be one way to do it?

A.  That would be one.

Q.  Okay.  Do you recall in Mr. Rios's case that Mr. Rios had sort of an unusual explanation for how some of the statements in his confession got in there?

A.  I'm not sure what we're talking about, unusual.

Q.  All right.  Okay.  Let me just sort of cut to the quick.

Do you recall that Mr. Rios said that he did -- when he was talking to the investigating detectives, he did, in fact, tell them about the fact that he was aware of a murder having been committed, but the murder he was actually referring to was not one that led to him seeking retaliation but was some other one that happened at some other time?

A.   I remember that being in the police reports, yes.

Q.   You remember what being in the police reports?

A.   Not the police reports.  It was in the transcript.

Q.   Oh, the transcript of what Mr. Rios was saying?

A.   Yes.

Q.   Okay.  The police officers aren't saying in the police report --

A.   No, no.  I didn't mean to imply that.  Sorry.

Q.   All right.  You recall now that when Mr. Rios was on the stand, he was pursuing this theory of, "Yes, I did say I knew about a murder.  Yes, people did take a shot at me.  But I didn't go and retaliate.  This happened at a different time"?

A.   Yes.

Q.   Basic idea.  Okay.

One way you could go about corroborating that story would be to see whether this incident actually happened, this other shooting, right?

A.   Theoretically, yes.

Q.   So, if somebody said, "I was involved or present for a

shooting incident that happened and the police showed up and actually talked to me about it," one way you co go about corroborating that, "Hey, my guy is telling the truth," is you could actually try to get from the police department police reports, OEMC recordings, things of that nature to try to prove, "He's right, something did happen on this date as he said in his confession." You could do that, right?

A. Yes.

Q. Okay. And under those circumstances -- well, strike that. Let's talk about the real world.

One of the pieces of Mr. Rios's testimony when he was on the stand at his criminal trial was that he was in front of his house, some car pulled up and took a shot at him, and he was there with several other people. Do you recall that?

A. Yes.

Q. Okay. And the several other people who were present for this other incident that Mr. Rios said was not the thing that triggered him to go and retaliate were Diana Rodriguez, his girlfriend, right?

A. Right.

Q. A friend named Lamont, right?

A. Right.

Q. And his brother-in-law, correct?

A. That, I don't remember, but yes.

Q. Okay. So, according to Mr. Rios's testimony, there's three

people who could corroborate what he was saying happened on this other date that's not the date of the murder, if what he's saying is valid, correct?

A. Yes.

Q. Okay. At Mr. Rios's criminal trial, was any evidence put on whatsoever corroborating the fact that this other incident that Mr. Rios was talking about occurred other than Mr. Rios saying that it occurred?

A. No.

Q. Okay. Lamont Burr was not called, this Lamont character?

A. No.

Q. The brother-in-law was not called as a witness?

A. No.

Q. Now, Diana Rodriguez, she was called as a witness, wasn't she?

A. Yes. I did her testimony.

Q. You prepped her and did her testimony, correct?

A. Correct.

Q. And you've reviewed that testimony, right?

A. Yes.

Q. Okay. At any point, did you attempt to elicit from Ms. Rodriguez that she was present when this other murder or shooting supposedly happened on a day that was not the day of the murder?

A. No.

Shields - direct

254

Q.   Okay.   Now, if you were going to pursue that evidence at the trial, you would also need to disclose those witnesses to the State as part of the defense witnesses, right?

A.   You would, yes.

Q.   Okay.   And --

MS. GOLDEN:   Excuse me one second.

Could we have a break?   I think there's a juror that's struggling.

THE COURT:   Okay.   I apologize.   Yeah, we'll take our lunch break -- I mean our afternoon break now.   We'll come back at 2:50.

All rise.

(Jury out at 2:19 p.m.)

THE COURT:   Ms. Shields, you can step down.   You're not to discuss the substance of your testimony.

MR. SCAHILL:   Did you say 2:50?

THE COURT:   2:50, yes.

MR. SCAHILL:   All right.   Thank you.

THE COURT:   I'll see you at 2:50.

(Recess at 2:20 p.m., resuming at 2:49 p.m.)

(Change of reporters.)

(Proceedings heard in open court; jury out:)

THE COURT: All right. Before I call in the jury, I got I think two notes from one juror. I'm going to read them. My plan is to, after we close the evidence for the day, to hold this juror back so that each side can ask questions of him.

It reads: I just need to talk about being excused from this case. Three weeks is too long for me to be here. I am a lead RT, respiratory therapist, in the NICU, neonatal intensive care unit, in PICU, pediatric intensive care unit. I work on nights and I work with all of the new RTs and help and instruct with critical infants. We have critical staffing and I am the one who fills in the gaps to help out. Three weeks is too long. And I would be okay with helping for a week. Me being here this long can put infants' lives at risk on this short notice.

Signed, Braydon -- or Brandon.

Second note reads: I thought there would be a longer jury selection with everyone. I thought about it after I talked on stand. And I've never been sentenced to jail, but I am currently on probation, finish May 1, 2026, for retail theft, since the food wasn't -- or I can't read the -- food amount was over $300 it was a felony. I thought I would get a chance to talk to someone yesterday or today about it, but it has not been able to happen. Once this probation is over, I should be able to get this off my record. I just don't know if

me being on probation for this would mess up the case with me being in the jury.

So those are the two notes. As I said, once the jury goes home for the day, I will keep this individual back and ask him questions concerning his two notes. It's Brandon Davis.

Do we have Ms. Shields?

MR. J. RICHARDS: Your Honor, I'll...

(Pause.)

THE COURT: We can line up the jury.

LAW CLERK: All rise.

(Jury in at 2:54 p.m.)

THE COURT: All right. Please take your seats.

Remind the witness that you remain under oath.

Mr. Scahill, you may proceed.

MR. SCAHILL: Thank you, Judge.

BY MR. SCAHILL:

Q. Welcome back, Judge.

A. Thank you.

Q. I think when we left off, I was asking you some questions about Diana Rodriguez, and I want to go back to that just briefly. Okay?

A. Okay.

Q. Before Diana Rodriguez testified, you were the person that prepared her for testifying, right?

A. I met with her briefly to prepare her, yes.

Q.   Okay.  And that would include sort of going over the general scope of her testimony with her?

A.   Yes.

Q.   Okay.  And did she -- as you recall it, did she testify consistently with what she had talked to you about?

A.   Yes.

Q.   All right.  Now, in the sequence of these proceedings, Diana Rodriguez testified right after Jaime Rios testified; is that correct?

A.   I don't remember that, but if it -- if it's true, it's true.

Q.   I think we're going to --

        MR. SCAHILL:  You have that?

        MS. GOLDEN:  Yeah.

        MR. SCAHILL:  I just want to make sure we're talking about the same thing.

BY MR. SCAHILL:

Q.   While my colleague is pulling that up, you did -- did you review the whole trial transcript at some point in the last couple of years after Mr. Richards had contacted you about it?

A.   Yes.

Q.   Okay.

        MR. SCAHILL:  Is that what these markings are, Carrie?

        MS. GOLDEN:  Which?

        MR. ENGQUIST:  The blue tab?

MR. SCAHILL: Oh, okay. Thank you.

Judge, may I approach to attempt to refresh the witness's recollection?

THE COURT: Yes.

BY MR. SCAHILL:

Q. Okay. You don't need to read all this, I promise.

A. Thank you.

Q. So tab -- if you look at the tab here, that's Diana Rodriguez's testimony. If you'd just flip back a couple of pages and see if that reminds you that she testified right after Jaime Rios testified. And I apologize for the cumbersome exhibit.

A. Yes.

Q. Okay. All right. Thank you. I will take that from you.

A. Thank goodness.

Q. So we don't make a huge mess of this lovely courtroom.

So at the time that you were putting Diana Rodriguez on the stand, you had heard from your client, Mr. Rios' testimony that this murder that he was referring to in the confession was not actually the murder that the confession said he was sort of retaliating for but was some other murder that had occurred, you know, a week later or so?

A. Right.

Q. All right. And you had a witness on the stand right after Mr. Rios who was named as being present when that occurred,

right?

A.   Yes.

Q.   Okay.   But you did not ask Ms. Rodriguez any questions about whether that actually did occur as Mr. Rios described it in his testimony just before her, right?

A.   No, I didn't.

Q.   Okay.   Can you think of any reason why you wouldn't have done that if it would have corroborated his story?

A.   I don't recall the reasoning.   I don't recall if it was a real issue for us.   I know we felt trying to follow up on that other -- I'm going to call it the other -- the earlier shooting or later shooting, whatever that was -- would have been seen as immaterial because it didn't relate specifically to the one shooting that we're talking about.

Q.   Okay.   Well, let's -- let's unpack that a little bit.

       So the -- with respect to the materiality part of it, your client was saying, I did make statements to the police describing that an event happened, meaning that he was shot at, right?

A.   I -- I -- that's how I remember it, yes.

Q.   Okay.   And -- and that that information, as is contained within the confession, actually did come from him to the police, right?

A.   Did come from him?

Q.   I'm sorry.   Did come from him, right.   You were correct.

A.   Yes.

Q.   Okay.  So with respect to the materiality or the importance of that information, it would be material, wouldn't it, to prove that he was telling the truth about that incident as he described on the stand, wouldn't it?

A.   I believe and we had discussed that if we had started going down that hole of that piece that the state would have objected to it being immaterial to what we were dealing with as two separate incidents.  And, therefore -- and Diana, we had -- we had discussed, and we is Jack and I, what was the purpose of Diana in the -- and it was more to close things out, kind of put punctuation on things, than it was for a lot of assistance in the case.

Q.   So you still could have attempted to ask the questions of her.

A.   You're right.

Q.   And you also could have attempted to obtain corroborating documentation about this other incident also before trial.

A.   I don't know if there was ever an effort.  Keeping in mind that I came on the case maybe two to four weeks before.  The earliest I can find any knowledge of my being on the case was a couple of weeks earlier.  Somewhere in there, could have even been two months, but I don't -- so I don't know.  And I don't remember this as an issue.

Q.   So this -- this other incident that Mr. Rios said happened

Shields - cross

261

that wasn't the one that led to the murder, that description was a very important part of the confession, wasn't it?

A. I will allow you to say so.

Q. Okay. And it was important because this wasn't like, you know, this thing just kind of happened and it didn't relate to, you know, Mr. Rios's actions. The confession describes Mr. Rios reacting to that shooting and then deciding to go into rival gang territory to get essentially revenge with a -- with one of his gang colleagues, right?

A. I don't remember all of it on that issue because the fact is it wasn't the case we were dealing with. We were dealing with this other one.

Q. Well, you were -- you were dealing with a case that Mr. Rios was describing in his confession. He's in front of his house, and a car drives up with rival gang members in it and shoots at him which then causes him as a rival gang member to go and retaliate for that transgression. I mean, that's the crux of what the confession was, right?

A. And I'm not sure that having that out there is a help to him.

Q. I'm sorry. Which -- which part is a help to him?

A. What you just said.

Q. That -- that proving that this other incident --

A. That he was going to go somewhere and retaliate?

Q. Well, sure you wouldn't --

A.   That was not part of our understanding of the case.  And so the answer is no, it made no sense to do that.

Q.   Right.  But if he's -- if your client is saying these things happened and I did not retaliate and I can prove that they happened, then that would help your client, wouldn't it, because it would show that this -- he's not lying, this thing did happen.

A.   I have a couple of answers to that.

Q.   All right.  Let's hear it.

A.   One is have you ever tried a case at 26th Street and seen how much evidence you were able to get out?

     And then the other one is I think you're going too much -- it doesn't fit the way the case was coming down.

     Now, Jack Carey made a decision.  That's the best I can tell you.  I didn't -- I never said to him we should, you know, hone in on this piece, and he never said to me we should hone in on this piece --

Q.   Okay.

A.   -- that you're talking about.

Q.   Got it.

     Well, you made a decision too, though, with Diana Rodriguez, right?

A.   Yes.

Q.   Okay.  You could -- and just so we're clear with the dates here that are in play.  The date of the Morales murder is

June 27th of 1989, right?

A. That sounds right.

Q. Okay. And according to Mr. Rios on the stand at his criminal trial, this other incident where he was shot at is either July 2nd or July 3rd of 1989, right?

A. I can't tell you. I will -- if that's the evidence, it is.

Q. But it was after -- it was after the murder.

A. Okay.

Q. And so he's essentially using this other incident to explain something that happened after a crime had already been committed, the crime, in fact, that he is charged with, right?

A. And that's some help to his case, I do not see how.

Q. Well, he can prove that the police -- according to him, what his theory is is that the police took partially true information and embedded it into a confession that then inculpated him, right?

A. If you say so. I wouldn't see it that way.

Q. Well, that -- isn't that what he said? He said, I told them this and then sort of twisted it and made it this other date instead.

A. I hear you.

Q. Okay. And so, again, proving the fact that he's telling the truth about this incident that he says happened on July 2nd or 3rd is gonna corroborate what he says and help him to prove whatever that theory is, isn't it?

A.   My answer remains the same.  It didn't seem to be the most advantageous way to go down that rabbit hole.

Q.   Is it -- oh, I'm sorry.  Go ahead.

A.   So...

Q.   Was it not advantageous because you were not able to find any corroborating information other than his say-so?

A.   I never looked.

Q.   You --

A.   I told you I came on the case two to four, five, six weeks before the trial.  Jack Carey worked up that case.  All of the stuff, everything in the case points to Jack Carey having had this case for over a year at that point.  You notice that almost all the testimony is elicited by Jack.  All the cross is elicited by Jack, okay.  It wasn't a mistake.  It was because Jack Carey's -- it was Jack Carey's case, and he had worked that case.

Q.   You didn't see in your review of the case file any attempts by Jack Carey to do things like subpoena police records from July 2nd or 3rd of 1989 or interview witnesses about what happened on that day --

A.   I didn't --

Q.   -- near Mr. Rios's address or anything of that ilk before you got on the case, did you?

A.   No.

Q.   Okay.  And so there was, in fact, no corroborating evidence

that was admitted at Mr. Rios's criminal trial other than his say-so that this -- this incident supposedly happened on the 2nd or 3rd of July?

A.   Okay.   Yes.

Q.   Okay.   You were asked a bunch of questions about this -- this phone book bruise stuff, and I talked to you a little bit about it at the beginning, but I just wanted to circle back.

Mr. Rios was not making any claims that he -- the reason he didn't have marks on himself was that he was hit with a phone book and a flashlight or a billy club, right?

A.   He did not say that.

Q.   Okay.   He was alleging that he was physically coerced in a different fashion, right?

A.   I think there was a thing about his face, his head being pushed down.

Q.   Right.   And that, he was saying that Mason grabbed him by the hair and slammed his face into the desk while he was handcuffed, right?

A.   Right.

Q.   Okay.   This is not the kind of allegation that is -- of force that's not going to leave a mark.   This is someone slamming a face, nose, mouth and all of that right into a hard desk, right?

A.   That's what you're saying.

Q.   Well, that's what Mr. Rios was saying, right?

A.   I -- I'm missing something.

Q.   That's what your client, Mr. Rios, said at the trial occurred, right?

A.   He said, yes, that his head was pushed down, forced down on the desk.

Q.   Well, he said his face was slammed onto the desk.

A.   Yes, okay.

Q.   Okay.  And you obtained photographs of Mr. Rios from after his confession, right?

A.   I am assuming there were some, but I can't remember them. And I -- I haven't seen them of late.

Q.   If there had been corroborating physical evidence of Mr. Rios being abused by the police, like photographs or medical records or something like that, that is, in fact, something that you would have put into evidence at his trial, right?

A.   Yes, of course.

Q.   Are you aware of anything of that ilk whatsoever being admitted at Mr. Rios's criminal trial?

A.   Not that I recall.

Q.   Okay.  With respect to Mr. Rios saying he was fed information or given information by the police to include in his confession, did he at any point make the claim on the stand as you recall it that it was Detective Mason and Assistant State's Attorney Barb Riley that were in the interrogation room

with him and Mason was writing on a whiteboard to have him follow those instructions while Barb Riley was sort of complicit in this and taking down, you know, his answers while he was being led down that path?

A. I'm not saying that's not true. Some -- all of that happened -- was within the testimony. I'm just not sure at what point --

Q. Was it?

A. -- Barb Riley was in the room with him and when the whiteboard was being done and who was in the room. I'm just not sure on that.

Q. You -- you recall him saying that at his trial?

A. No, you just said it.

Q. No, that's why I'm asking you about the criminal trial. Mr. Rios never said at his criminal trial that he's put in a room with Mason and Barb Riley and Barb Riley is involved in feeding him this information and Mason is on a whiteboard writing it down. He didn't say that, did he?

A. No. He said, this is a statement and that he was not abused when Barb Riley asked him about it. And that's both of their testimonies, I think.

Q. Yeah. Okay. I'm -- I'm asking something slightly different.

A. Okay. I'll listen more carefully.

Q. So it's probably a bad question. I'm going to try better

this time.

When you were listening to Mr. Rios testify and then you reviewed his testimony, at no point during his criminal trial testimony in 1990 did he testify about ASA Riley being complicit in feeding him information while Detective Mason was writing the facts of the case on a whiteboard and that's where he got the information from, there wasn't testimony to that effect by your client at his criminal trial, was there?

A.   That Barb Riley was a part of feeding him the information?

Q.   Correct.

A.   No.

Q.   And there also was no testimony from Mr. Rios that while he was with ASA Riley that Detective Mason was writing the facts of the case on a whiteboard either, was there?

A.   I don't recall that.

Q.   Okay.  What he was saying at his criminal trial, in effect, was that Guevara and at some point Mason were giving him information before he ever got to where the state's attorney was in the room?

A.   Yes.

Q.   Okay.

A.   I believe so.

Q.   Did Mr. Rios ever testify at his criminal trial as you recall it that while he was in the room with Barb Riley, the state's attorney, and Detective Mason, that there was, in fact,

no court reporter in there at all?

A. I'm a little confused. I'm not -- you mean at all ever?

Q. Yeah. Let me -- let me clarify for you.

So did Mr. Rios ever give a version of the events where he's brought into the room where the state's attorney is and Detective Mason is and they're talking to him about the case and he's not giving them the answers that they like, and instead of writing down what he's saying that Barb Riley, with no court reporter there, is literally writing down the answers instead?

A. I -- there's so many pieces to that. I can't say yes or no.

Q. Do you remember that happening?

A. I don't, but that -- I'm not sure that it -- that it's not been said. I don't know.

Q. You don't remember it being said at the criminal trial though?

A. No, I don't.

Q. Okay. The -- the first reference to Mr. Guevara doing anything untoward towards Mr. Rios from Mr. Rios's mouth, the first time that came up was at the criminal trial, wasn't it?

A. I don't know what came up before I got on that case. So I don't know -- I mean, so at the trial was the first time I heard it.

Q. Got it.

Shields - cross

270

And the trial occurs in November of 1990, right?

A. Correct.

Q. Okay. So this is about a year and a half after Mr. Rios's interaction with Mr. Guevara and Detective Mason, thereabouts?

A. Yes.

Q. Okay. You referenced a conversation and affidavit that Mr. Richards had discussed with you. Do you remember those questions? Do you remember those questions he asked you about the affidavit and talking to him at some point in the last couple of years?

A. Oh, okay. Yes.

Q. Okay.

A. Yes.

Q. But you did not submit an affidavit for Mr. Rios's postconviction petition, did you?

A. No.

Q. This was -- this was after the fact in connection with this case, this civil case?

A. Correct, way after.

Q. Okay. Got it. So you did not testify at Mr. Rios's postconviction proceedings?

A. I wasn't even aware of it going on.

Q. Okay. And, similarly, you didn't testify, nor were you asked to testify at his Certificate of Innocence proceedings either?

A.   I'm sorry.   At his what?

Q.   His Certificate of Innocence proceedings?

A.   No.

Q.   Okay.

MR. SCAHILL:  I think -- I think that's all I have for this witness, Judge.  I will tender to my colleague.

THE COURT:  Okay.

Mr. Polick.

MR. POLICK:  It will be Ms. Carrie -- or Ms. Golden, rather.

THE COURT:  Oh, okay.

MR. SCAHILL:  Thank you, Judge.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MS. GOLDEN:

Q.   Good afternoon.

Ms. Shields -- whoops.  Let me grab my notes.  Sorry.

We met a few years ago, right, when you gave your deposition?

A.   I think it was two and a half years ago.

Q.   Okay.  And at that time, it's fair to say you had literally no memory of the witnesses in this case, correct?

A.   I had almost no memory, yes.

Q.   Okay.  And that's probably still true today?

A.   It -- it's truer, let's say that.  I still have some lack

Shields - cross

272

of memory, but I have reviewed the report of proceedings, et cetera, and that does trigger a few things.

Q.   Sure.  But when we met, you had already looked at the record about 20 hours, right?

A.   God, I don't think I ever looked at anything that long.  I tried.  Let's say that.

Q.   Okay.  And you were given voluminous materials.  You had the common law record.  You had the pleadings.  You had police reports.  You deposition transcripts.  You had all those things two and a half years ago when we met, and you had still no memory of the -- basically no memory of the case, right?

A.   So I remember saying in the deposition that I had not read a whole bunch of those things because I wasn't sure what was going on, what we were doing.

Q.   Okay.

A.   You know, what was going to come out of the deposition.  But the eight hours, I think we got everything.

Q.   Good.

          Now, I want to just quickly talk about Jack Carey, the first chair in the case, right?

A.   Right.

Q.   He was more experienced than you, correct?  He had been in the office longer?

A.   I think we were probably in the office maybe -- maybe he was there a year longer.  I don't know.  But he wasn't -- we

were both in task force, and we had both come through the system, you know, of courtrooms.

Q. Okay. And you -- I think you mentioned on direct examination that there were investigators available to you in the office --

A. Yes.

Q. -- to use -- and you used those in murder cases a lot, right?

A. Yes.

Q. Okay. And they could interview witnesses, right?

A. Yes.

Q. They could go to a scene, right?

A. Yes.

Q. You could go with them, they could go out on their own, right?

A. Yes.

Q. Okay. And you never had any investigator refuse to do something that you asked them to do?

A. I don't think so.

Q. Okay. And do you remember the name Darryl Ellis?

A. Yes.

Q. And who is Mr. Ellis?

A. He was an investigator in the office, and he was one of the good guys, really great guys.

Q. Okay. Do you have any doubt that Jack Carey used all the

resources available to him to defend Mr. Rios?

A.   No, I have no doubt.

Q.   Okay.  One of the things -- Jack Carey you would say -- strike that.

I think we have talked about ethics in law, correct?

A.   Mm-hmm.

Q.   And an ethical lawyer should not elicit a lie, correct?

A.   Yes.

Q.   And an ethical lawyer should not introduce evidence he or she knows to be false, correct?

A.   Correct.

Q.   And Jack Carey was an ethical lawyer?

A.   Yes, he was.

Q.   Okay.  All right.

MS. GOLDEN:  I want to show you -- may I have the document reader, please --

BY MS. GOLDEN:

Q.   -- what we've marked as Defendants' Exhibit 128(5) which is part of the common law record.

Do you see that, Ms. Riley?

A.   Wrong person.

Q.   I'm sorry.  Ms. Shields.  Did I call you Ms. Riley before?

A.   You did.

Q.   I am so sorry.  My sincerest apologies.

A.   No, it's fine.  Hang on.

Okay.

Q. Do you see it?

A. I do.

Q. Do you recognize what this document is?

A. It looks like the answer to people's motion for pretrial discovery.

Q. And can you tell the ladies and gentlemen of the jury what this document is?

A. It's an answer to tell the state -- the state is asking for pretrial discovery -- this is before trial -- and this is the answer. This is what we have kind of thing.

Q. And this is filed in court?

A. Yes.

Q. Okay. And is that Mr. Carey's signature on the second page?

A. Can you drop it down a little?

Q. Whoops. Sorry.

A. Yes.

MS. GOLDEN: Okay. Can I publish this to the jury, Your Honor?

THE COURT: Are you seeking to admit it?

MS. GOLDEN: Yes.

THE COURT: All right.

Any objection to this document's admission?

MR. S. RICHARDS: No objection.

THE COURT: All right. Without objection, the exhibit is admitted. And from my record, it's 138-5?

MS. GOLDEN: 128.

THE COURT: Defense Exhibit 128-5 is admitted and may be published.

(Defendants' Exhibit No. 128-5 was received in evidence.)

BY MS. GOLDEN:

Q. In paragraph 2, can you tell the ladies and gentlemen of the jury who is identified in paragraph 2?

A. As possible witnesses?

Q. Yes.

A. Defendant -- wait. Hang on.

Q. Do you need it bigger?

A. Anybody in the Chicago police case report; the State's list of witness, anybody in that one; the grand jury testimony; preliminary hearing testimony may also testify. And then there's a list of people: Maria and Noria Garcia; Cynthia Baer; Darryl Ellis; Paul Brown; and Diana Rodriguez.

Q. Okay. And Maria and Noria Garcia, do you recall that those are Tino Garcia's sisters?

A. I didn't know that they were his sisters, but I assumed they were his family.

Q. Right. And would you expect that both Maria and Noria would have been thoroughly interviewed by either you or Mr. Carey before they were identified in the defendant's answer

to discovery?

A.   And possibly by Darryl Ellis.

Q.   Okay.  So someone from the defense team would have talked to them and obtained all of the information that they were able to get from them to -- to help Mr. Rios in this case?

A.   Yes.

Q.   Thank you.

MS. GOLDEN:  Thank you.

THE WITNESS:  That's it?

MS. GOLDEN:  Well, for me.  We'll see.

THE COURT:  Any redirect?

MR. S. RICHARDS:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. S. RICHARDS:

Q.   First of all, with respect to this practice of beating suspects with telephone books and either hard objects, you know, billy clubs, flashlights, whatever, you said that -- in response to a question that you heard it from clients and other sources.  What did you mean by that?

A.   So sometimes family goes into the police stations, and they will come back with stories of something they've either witnessed or been immediately told by their, you know, son or husband or, you know, that kind of thing.  So that would be what I was talking about.

And in addition and truth, you know, it's like in an

Shields - redirect

278

office people talk about everything that goes on, right? So the PDs talk about who is doing what and what they're hearing and that's how you learn a lot of things. And that's one of the things about the phone book.

Q. So the story about the phone book would sometimes come from family members who had gotten immediate outcries of this or witnessed things and gave you information corroborating such accusations. Is that what you're saying?

A. Yes. That's not the norm, but it did happen, yeah.

Q. And also was the story or the accounts a common thing, like it often occurred, it was not something out of the ordinary for you to hear something like that?

A. No, it wasn't out of the ordinary.

Q. Now, with respect to the counsel's questions about how inmates in the jail make up these stories, share these stories, figure out ways to put them out, you remember that line of questioning, correct?

A. Yes, I do.

Q. Okay. None of that line of questioning applies to Cristino Garcia, does it?

A. No.

Q. He wasn't in jail.

A. No, he wasn't.

Q. He wasn't facing any charges.

A. No.

Shields - redirect

279

Q.   He had no motive to make up something to suppress a statement.  He hadn't even made up a statement.  Is that fair?

A.   I'm sorry.  Could you ask it again?  I want to make sure I followed.

Q.   He -- not only was he not charged, not only was he not in jail, but according to the reports you read, there was no statement you ever saw from Cristino Garcia, correct?

A.   Right.

Q.   And if any statement had been made by Cristino Garcia, it would be someplace in the police reports, right?

A.   Let me think.

Q.   Take your time.

A.   It's late in the day.

     No statements like -- like a handwritten or typed up statement, no, from Cristino Garcia.

Q.   And Cristino Garcia was listed as a state's witness, correct?

A.   Yes.

Q.   So the state would have an obligation not only to tender any written or -- written or police report statements.  They would have an obligation to tender to you an account of any oral statement that Garcia had made, correct?

A.   Yes.

Q.   Particularly an exculpatory statement, a *Brady* statement, right?

A. Yes.

Q. Now, let me talk to you about this whole business about investigating July 2nd or July 3rd.

As a public defender, the public defender's office could subpoena reports from the police department, correct?

A. Correct.

Q. And you saw many such subpoenas in your time, right?

A. Yes.

Q. In fact, it was a routine practice of the murder task force to issue subpoenas for every case using the RD number. Is that not true?

A. That's correct.

Q. What is an RD number?

A. I forgot what it stands for. The RD numbers, though, are -- it's the number is assigned to someone who has been arrested, I think. It's been a long time.

Q. I understand. Do you remember CB numbers?

A. Hmm. I do, but I can't tell you what they are. RDs I think are police reports, but I don't know. I just don't remember.

Q. Would it refresh your recollection if it was a record division number that's specific to a case, like RD number associated, for example, with -- with Jaime Rios's case, right?

A. There would be some kind of number, yes, for sure.

Q. And when you subpoena under that number, the case specific

number, as was done in this case, you get all the reports which relate to the incident involving Jaime Rios, right?

A. You're supposed to, yes.

Q. Now, if there were any reports associated with the case, like a shooting that supposedly happened that day provoking a response, you would have seen that in the discovery, correct?

A. I can't say. Discovery is supposed to be everything comes that you've subpoenaed and all the records, but I can't say that you would necessarily get everything. I -- I can't vouch for that piece.

Q. Well, defense counsel made a big deal of the failure to gather any records involving something that happened in July 2nd or July 3rd. To your knowledge, was there any way to subpoena from the Chicago Police Department all records of events or shootings that happened on a particular day, say July 2nd or July 3rd?

A. Not that I'm aware of. It doesn't mean there isn't, but I'm not aware of it.

Q. Do you remember -- remember issuing such a subpoena in your career, subpoena for all -- all RD numbers occurring on July 2nd or July 3rd of some day, a specific date?

A. I don't remember doing that.

Q. Can you remember any instance of anybody else in the public defender's office doing that?

A. Not that I'm aware of.

Shields - redirect

282

Q.   Do you have any knowledge that the Chicago police would even comply with such a subpoena for all records of a shooting on a particular named day?

A.   I have no idea, but I would doubt it.

Q.   So when counsel asked you all these questions about investigating a shooting that happened on July 2nd or July 3rd of 1989, he was suggesting to you something which to your knowledge --

MR. SCAHILL:  Objection.  Form.

THE COURT:  It's overruled.

You may finish the question.

BY MR. S. RICHARDS:

Q.   He was suggesting to you something that to your knowledge there's no way to do, right?

A.   As far as I know.

Q.   Well, let me also talk to you about there's a lot of discussions about motions, pretrial motions, right?

A.   Mm-hmm.

Q.   Correct?

A.   Yes.

Q.   Which you in this case didn't participate in, right?

A.   Correct.

Q.   So I just want to make clear that they're different.

What is a motion to quash arrest?  What -- do you remember what that is -- what that's about, a motion to quash

Shields - redirect

283

arrest?

A.   So that anything come -- that comes out of the arrest isn't usable in trial.

Q.   Right.   And something -- anything coming out of the arrest would include things like statements, correct?

A.   Statements, fingerprints.

Q.   And would it be fair to say that the idea of a motion to quash arrest is when the defendant was arrested, nobody had probable cause, correct?

A.   Say that again.

Q.   In other words, the legal theory behind a motion to quash arrest --

A.   Oh.

Q.   -- is that somebody, the police officers go out, they arrest somebody, they don't have probable cause, and then everything that comes out of the arrest could be suppressed as fruit of the poisonous tree.   Is that fair?

A.   Yes.

Q.   That's very different than a motion to suppress statements, isn't it?

A.   Correct.

Q.   Because a motion to suppress statements is a motion which says as a result of something illegal happening, coercion, lack of *Miranda* warnings, all those things, the statement should be suppressed, right?

Shields - redirect

284

A.   Correct.

Q.   Now, do you recall actually in terms -- in this case two motions were filed, both a motion to quash arrest and a motion to suppress statements, right?

A.   That's my memory.

Q.   And Jaime Rios testified with respect to the motion to quash arrest, right?  Do you remember that testimony?

A.   Not offhand.

Q.   Okay.  Do you remember that Diana Rodriguez had testified with respect to the motion to quash arrest?

A.   I don't remember.

Q.   Well --

A.   I didn't focus on the -- whoops.

Q.   You were focusing on the trial --

A.   Right.

Q.   -- not what was happening before you got there?

A.   Yes.

Q.   Thank you.

     Now, the -- the defense counsel said that the first time that Jaime Rios made any allegation about hair pulling or being slammed -- head slammed in the table was at trial and that this had not come up at the motion to suppress.  Do you remember that testimony?

A.   I remember it being said, yes.

Q.   Let me show you what is marked as --

MR. J. RICHARDS: Your Honor, if we may have the HDMI linked to the plaintiff's table laptop.

MR. S. RICHARDS: You're talking high tech.

THE COURT: What is this exhibit number?

MR. J. RICHARDS: For the record, Your Honor, this is Exhibit No. 10, page 27.

THE COURT: Okay. The witness can see it.

BY MR. S. RICHARDS:

Q. Okay. So, first of all, do you see the top half of this document?

THE COURT: One second.

BY THE WITNESS:

A. Not -- I don't think so.

BY MR. S. RICHARDS:

Q. Is it on your screen?

A. Oh, I got it. Okay.

The motion to suppress statements?

Q. Right. Now, first of all, the caption, is that Jaime Rios's name and is the case -- case number on the caption?

A. Yes.

Q. All right. And who filed this motion?

A. Jack Carey.

Q. Okay. And if you can scroll down a little bit.

If you scroll down to 4.

A. Yes.

Q.   Point 4, what is -- what is the -- what is alleged in point 4 of the motion to suppress?

THE COURT:   Before she reads that, are you seeking to admit this document?  She can't read it into evidence.  You either need to admit it, refresh her recollection, or do something else with it.

MR. S. RICHARDS:   We would seek -- we would seek to admit it.

THE COURT:   Is there an objection to its admission?

MR. SCAHILL:   No, Judge, they can admit it.

THE COURT:   Okay.  Plaintiff's Exhibit -- I'm sorry. Was there an objection?

MS. GOLDEN:   No, no objection.

THE COURT:   All right.  Plaintiff's Exhibit 10 is admitted and may be published.

(Plaintiff's Exhibit No. 10 was received in evidence.)

BY MR. S. RICHARDS:

Q.   So if you look at paragraph 4 and you could read at 4, what is -- what is stated in paragraph 4 of the motion to suppress statements filed by Jack Carey?

A.   That in the course of the interrogation, Mr. Rios was handcuffed to a wall, had his hair pulled and was threatened with the loss of parental rights to this child.  His common-law wife was brought to the station, was threatened with having her child to whom defendant is the father taken away by the state,

Shields - redirect

287

and this threat was then used against defendant, Mr. Rios.

Q.   So it wouldn't be accurate to say that the claim of hair pulling, threatening a parental loss to the child was something that just came up in the middle of trial and then never had been brought to anyone's attention before.  Isn't that fair?

A.   That's fair.

Q.   Now, the defense counsel made a big deal of Jaime Rios not testifying to this -- to this event during the motion to suppress statements.  You remember that testimony, or those questions?

A.   I remember the questions.

Q.   Okay.  Would it be a reasonable strategy sometimes and one that was used in practice that you would file a motion to suppress, that the burden would be on the state to refute the motion to suppress, you would get the testimony of all the officers, and then you would save the claim; or if you lost the motion to suppress, you would bring up the claim at trial as a reason for the jury to disbelieve a confession or statement, was that a reasonable strategy that was sometimes employed?

          MS. GOLDEN:  Objection.

          THE COURT:  What's the basis?

          MS. GOLDEN:  Form and leading.

          THE COURT:  It's overruled.

          You may answer.

BY THE WITNESS:

Shields - redirect

288

A.   I think you have to repeat it for me.  It was long.

BY MR. S. RICHARDS:

Q.   Long and complex and wordy, exactly --

A.   I'm --

Q.   -- but I'm going to try.

So would it be a reasonable strategy -- first of all, who has the burden on a motion to suppress, the defendant or the state?

A.   I think it's the state.

Q.   So in other words, if a motion to suppress is filed, the state has to go forward with their evidence to refute the motion, correct?

A.   Yes.

Q.   Even if the defense puts on no evidence whatsoever, correct?

A.   Correct.

Q.   So if you file a motion to suppress statements, the minimum you'll get out of it is that the state will have to put on witnesses to try and refute it, but you don't have any obligation to put on your own witnesses if you don't choose to do so, correct?

A.   That's true.

Q.   And it's a reasonable strategy to do that because then you get testimony from the officers, you don't expose your own client to cross-examination, and you can bring up the same

claim again in terms of at least the statement at trial, right?

A.   Correct.

Q.   And that's exactly what happened here, isn't it?

MS. GOLDEN:   Same objections, Your Honor.

THE COURT:   It's overruled.

BY THE WITNESS:

A.   I don't recall the hearing on this motion and whether the police testified with this motion and then Jaime did not testify.

BY MR. S. RICHARDS:

Q.   Okay.

A.   So when you ask that question, I don't know the answer.

Q.   Fair enough.

(Counsel conferring.)

MR. SCAHILL:   Judge, could I inquire of counsel to repeat the exhibit number so I can locate this on my computer in case I want to use it?  Because I missed that.

THE COURT:   The exhibit that was just admitted?

MR. SCAHILL:   Yes.

THE COURT:   Plaintiff's Exhibit 10.

MR. SCAHILL:   Thank you.

BY MR. S. RICHARDS:

Q.   Now, you mentioned that, you know, using common sense or in your experience, one method of torturing somebody without leaving a mark is to use a phone book and a flashlight or a

Shields - redirect

290

billy club, correct?

A.   Yes.

Q.   Okay.  Wouldn't another method be to pull someone's hair?

A.   Could be.

Q.   That would be very painful, correct?

A.   We all know that.

Q.   We all know that.  But it would not leave a mark necessarily, would it?

A.   Correct.

Q.   And when somebody's face is slammed onto a table, whether a mark was left might depend on the manner, the experience of the person doing it or the force that was used, correct?

          MR. SCAHILL:  Objection.  Foundation.

          THE COURT:  Sustained.

BY MR. S. RICHARDS:

Q.   Now, we talked a little bit about in a criminal defense case what's the client's choice and what's the attorney's choice.  Do you remember those questions?

A.   Client stories and --

Q.   No, I'm sorry.  In other words, in a criminal case, there are a lot of decisions to be made.  Fair?

A.   Sure.

Q.   And some of those decisions committed -- are committed by law to the defendant himself.  He has to make the decision, right?

A.   He has to make a decision --

Q.   Well, for example, whose decision is it whether to take a bench trial or a jury trial, the attorney or the client?

A.   The client in conjunction with his attorney.

Q.   Advice?

A.   Right.

Q.   But ultimately the client's decision, correct?

A.   Yes.

Q.   And the decision as to whether to plead guilty or not guilty, whose choice is that?

A.   The client's.

Q.   And whether to go on the witness stand, whose choice is that?

A.   It's ultimately the client's.

Q.   Choice but of course with advice from counsel?

A.   Right.

Q.   Now, do you know of any law that says it's the client's choice as to which witnesses to talk to?

          MR. SCAHILL:   Objection.

          THE COURT:   Overruled.   Overruled.

BY THE WITNESS:

A.   Will you ask that again?

BY MR. S. RICHARDS:

Q.   Okay.  So in terms of the course of the -- of the case, everything else, for example, the investigation in the case,

who makes the choices as to that?

A.   Who makes the choices as to who to call?

Q.   Which witness to interview, which experts to get, all of that, who makes that choice?

A.   The attorney does hopefully with the advice of his client.

Q.   Right.  But in that case, it's the attorney making the choice and the client being the advisor, not the other way around, correct?

A.   Right.  Right.

Q.   And similarly with respect to alibi defenses, some notice has to be given, but, again, it's the -- isn't it the attorney's choice whether to raise that defense and not the client's?  Or do you know?

A.   That's a tough one.  Really the client and the attorney should be making that decision together.

Q.   Okay.

A.   But -- okay.

Q.   All right.  Well, when the answer -- the answer is filed like listing witnesses like we saw before, who is the person that files the answer listing witnesses or defenses?

A.   The counsel.

Q.   Including an alibi defense or alibi notice, correct?

A.   Correct.

Q.   Now, I'm not sure if you remember this much of the detail of the case, but was it fair to say that the statement

attributed to Jaime Rios, the court-reported statement, that statement named Cristino as the shooter, the killer. It didn't say, you know, I killed anybody, did it?

A. You asked me two questions.

Yes, it said that, and no, it did not say that Jaime did it, shot the guy.

Q. By the way, you've had experience as a public defender with statements produced or confessions produced, right? You've seen that?

A. Correct.

Q. You've seen that a lot as a public defender?

A. Yes.

Q. Particularly in murder cases?

A. Yes.

Q. Were you familiar in your practice of how police would interrogate and what methods they would use to obtain a statement? If you don't know, that's fine; if you do, that's fine too.

A. I was never in a room while a police officer was questioning a client or anybody for that matter. I know what the police say sometimes, and I know what clients say sometimes.

Q. All right. Well, wouldn't it be fair to say that a number of cases what you saw is there's statements that are produced, however they're produced, where the client has said something

Shields - redirect

294

like I didn't do the shooting but I was just there, somebody else did the shooting.  That was pretty common, wasn't it?

A.  Yes.

Q.  And sometimes that's called minimization, right?

A.  I don't think I ever used that word, but it applies.

Q.  But there's no way -- there was no way for you to determine whether that idea of saying I'm there but I'm not shooter came from the client or from the police, is there?

        MR. SCAHILL:  Objection to form.

BY THE WITNESS:

A.  Not without testimony.

        THE COURT:  There's an objection.

        THE WITNESS:  Oh, sorry.

        THE COURT:  The objection to form is overruled.

        You may answer.

BY THE WITNESS:

A.  Testimony would be the only way you'd know.

BY MR. S. RICHARDS:

Q.  Whether it was -- and this was the days before recording statements, correct?

A.  Right.

        MR. SCAHILL:  Objection.  Motion.

        THE COURT:  That's sustained.

BY MR. S. RICHARDS:

Q.  So in the case -- in this case where the statement produced

by the court and the court reporter is a statement in which Jaime Rios is saying, I wasn't the shooter but I was just there, there's no way for -- there would be no way for you to determine without testimony whether that was an idea that was Jaime Rios's idea of what to say or whether it was something suggested by the police?

A.   No, there's no way to know.

Q.   And in addition, there is no -- in the police reports you said, there's never any police report that you read in those days which had, like, a detailed question and answer, we asked this question and we got this answer, question, answer and so forth, you never got that amount of detail, did you?

A.   In a police report?

Q.   Yeah.

A.   Oh, no.

Q.   Police reports would just include kind of summaries of what the police officer said the client said without saying what the police officers asked.  Is that fair?

        MR. SCAHILL:  Objection.  Beyond the scope.

        THE COURT:  Sustained.

    (Counsel conferring.)

        MR. S. RICHARDS:  Nothing further.

        THE COURT:  Okay.  Anything on that?

        MR. SCAHILL:  Yes.  Thank you.

        If I can have the desk HDMI, please.  This is going to

be the same exhibit, Exhibit 10.  Perfect.

Josh, can you scroll to the top, please?

MR. ENGQUIST:  Sure.

RECROSS-EXAMINATION

BY MR. SCAHILL:

Q.   This motion to suppress which we've talked about, this was filed before you were involved in the case?

A.   That's correct.

Q.   Okay.

MR. SCAHILL:  Could you scroll up a little bit more, Josh?

MR. ENGQUIST:  Sure.

BY MR. SCAHILL:

Q.   When does this indicate that this was filed?

MR. SCAHILL:  Nope, other way.

MR. ENGQUIST:  I'm sorry.

BY THE WITNESS:

A.   January, something, 1990.

BY MR. SCAHILL:

Q.   Okay.  And the crime happened when?

A.   I think November of '89.

Q.   Okay.

A.   No.  Is that right?  July of '89.

Q.   June 27, 1989.

A.   Okay.  Good.

Q.   Okay.

A.   I would agree with you.

Q.   This is six months-ish after Mr. Rios was interrogated this comes up?

A.   Yes.

Q.   Okay.

        MR. SCAHILL:  Now, could you scroll down a little bit, Josh.  Let's go to paragraph 2.  Okay.

BY MR. SCAHILL:

Q.   Paragraph 2 reads -- well, paragraph 1 reads that Mr. Rios was arrested on July 7th and says that subsequently that the defendant, Mr. Rios, was interrogated at Area 5 headquarters by law enforcement officials or a person or persons acting on their behalf, including Gawrys, Guevara, Vukovich, Mason, Halvorsen.

        Do you see that?

A.   I do.

Q.   Okay.  At Mr. Rios's criminal trial, did he ever testify to having been interrogated by Gawrys or Vukovich ever?

A.   I don't recall it.  I remember Vukovich's name, but I don't remember why.

Q.   Okay.  Now, this is information in a motion to suppress as far as the interrogation, what happens in the interrogation room that you could only get from the guy who's in there, right?

A.   You mean that whole paragraph number 2 and who is on it?

Q.   Yeah.  You would have to get the information from a motion to suppress from your -- and what happened in the interrogation room from your client, right?

A.   Yes.  We would typically add police officers that were listed on the police reports for this section, and we would ask the client and then look at the police report too and put everything in there because a lot of times the client doesn't actually know all the police officers' names.

Q.   But you would ask him were you interrogated by these officers and get him to verify that and then put that in there?

A.   As much as you could, yeah.

Q.   Okay.

A.   But you would add anyone that was on the police report.

Q.   Well, you can't -- hang on.

A.   In the area of -- if anything -- anyone who was related to the statement.

Q.   Let's back up for one second.

A.   Okay.

Q.   When you file something in court, you as an attorney have your own obligation regardless of what your client says to only put things in there that are true, right?

A.   Yes.

Q.   Okay.  So if your client did not tell you that these one, two, three, four, five people interrogated him there, you can't

just list names there of people he didn't say interrogated them, can you?

MR. S. RICHARDS:  Objection.

THE COURT:  Sustained.

BY MR. SCAHILL:

Q.  Did Mr. Rios tell you at some point he was interrogated by these five officers?

A.  I don't know what he told Jack Carey.

Q.  Okay.  But this is a representation you're making on his behalf, correct, Mr. Rios?

A.  I'm -- that was a general representation of what we would do with question 2 here, with number 2 --

Q.  Okay.

A.  -- in terms of putting names on.

Q.  Now, it looks like you have Mason and Halvorsen crossed out there.  Do you see that?

A.  I see that.

Q.  Okay.  Do you have any explanation for why Mason and Halvorsen were both X'ed out of people who interrogated Mr. Rios?

A.  I don't.

Q.  Okay.  And you know from Mr. Rios's testimony, Mr. Rios said he was, in fact, interrogated by Mr. Mason.  That's what he was saying at trial, right?

A.  Right.

Q.   Okay.  And similarly, this appears to be crossed out that prior to the interrogation that he was not given his *Miranda* rights, correct?

A.   It appears to be.

Q.   All right.

A.   Yeah.

MR. SCAHILL:  Could you scroll down, please, Josh.

BY MR. SCAHILL:

Q.   And this practice of crossing things out in a form motion was something that was pretty commonplace in the public defender's office, right?  You would have a form motion, and if something didn't apply, you would cross it out, right?

A.   Yes.

Q.   And Mr. Carey had that practice too, didn't he?

A.   Obviously.

Q.   Okay.  Now, paragraph 4.  Paragraph 4 reads that in the course of the interrogation, Mr. Rios was handcuffed to a wall, had his hair pulled and was threatened with the loss of parental rights to this child.  His common-law wife was brought to the station, was threatened with having her child to whom defendant is the father taken away by the state and this threat was then used against defendant, Mr. Rios.

Do you see that?

A.   I do.

Q.   Okay.  First question:  Of the five people that are listed

in paragraph 2, does this paragraph say who did any of those things?

A.   No.

Q.   Okay.  Does this paragraph reference in any way, shape, or form that Mr. Rios's face was slammed into the desk?

A.   It does not.

Q.   Does this paragraph reference in any way, shape, or form that Mr. Rios was fed information to put into his confession?

A.   It does not say that.

Q.   Okay.  Let's go to the other paragraphs.  And if you can just -- I'm just going to have you read that, 5 and 6.

When you're done, just look up, and then I'm going to go to the next paragraph.

A.   Okay.

Q.   Okay.

MR. SCAHILL:  Can you go to the end, Josh?

(Counsel conferring.)

BY MR. SCAHILL:

Q.   And when you're done, just please look up.

MR. SCAHILL:  Okay.  And then right at the end, Josh.

BY MR. SCAHILL:

Q.   Do you see 11?

A.   Yes.

Q.   Okay.  And then I think the signature is at the bottom.  Let's take a look.  All right.  And this is just, wherefore,

Shields - recross

302

suppress the confession.

Okay. So you have now read the entirety of the motion to suppress?

A. Yes.

Q. Okay. Is there any reference anywhere in this motion to suppress filed in January of 1992 Mr. Rios's face being slammed in the desk?

A. No.

Q. Is there any reference to him being fed information by Mr. Guevara or anyone else?

A. No.

Q. Is there any specific reference that the things that Mr. Rios is saying were done were done by Mr. Guevara as opposed to one of the other four officers?

A. Nothing singles a person out.

Q. Okay. Let's -- I want to ask you some questions about this subpoenaing of police records.

You are not telling us, are you, that there is no way for you as a public defender to find information about a shooting incident if you do not have the specific RD number, are you?

A. It's a hard question to answer because it would seem logical that it wouldn't be difficult. However, now I'm going back 35 years. I can't talk about what they're doing now. But 35 years ago, there was no -- very little cooperation between

the police, the PD's office, or the police -- or the PD's office and the state's attorney.

Q. Ms. Shields, let's -- let me -- let me try to hone in a little bit more.

According to Mr. Rios, you had a date, you had a specific location for where a shooting that he described as a murder occurred, right?

A. Yes.

Q. Okay. You were armed with that information from your client, right?

A. Yes.

Q. And you're telling this jury that you were completely without any options to figure out whether a murder happened when you have literally the exact date and location where it occurred because you didn't have an RD number? That's not what you're telling this jury, are you?

A. I'm just answering the questions.

Q. Is that what you're saying though?

A. I'm not saying you're not fully armed. I'm not saying you're without arms. I'm saying that it would be very difficult to get that cooperation. You would need to try to get it and then get the judge to enforce it which would really be the key.

Q. Okay. You can send a subpoena --

A. I know.

Q.   -- and you could in 1989 and 1990 to the Chicago Police Department saying please provide me any and all documentation including 911 calls, police reports, witness statements, relating to a shooting incident that happened on July 2nd or July 3rd of 1989 at X address, being Mr. Rios, you could do that, right?

A.   I suppose you could try to do anything that you want to get.

Q.   You're -- you're -- we're going to have other members of the -- who are on the trial here, but I just want to make sure we understand what you're saying.

You don't think that a judge is going to enter a subpoena for that specific -- when you have a specific address --

A.   I didn't --

Q.   -- of a shooting, Ms. Riley -- now I'm doing it -- Ms. Shields?

A.   I am not saying that, obviously.

Q.   Okay.  And you -- neither you nor Mr. Carey ever sent any subpoena nor tried to get a court to enter a subpoena for anything relating to this shooting incident that happened on July 2nd or July 3rd of 1989, correct?

A.   I can't speak for what Jack Carey did before.  You know, when there are things like motions, I can.  I can speak for those.  But I can't speak for whether he tried to get that

information in some form or another before I came on the case.

Q.   Jack Carey was a very, very competent lawyer who would bend over backwards to zealously represent his client, right? Legend in the building, right?

A.   He is.

Q.   Okay.  And so your -- I just want to be clear.  You're -- you're not telling this jury that the -- the legendary Jack Carey couldn't get a subpoena entered to try to get police records knowing the date and the location of a -- of a shooting.  You're not saying that, are you?

A.   What I am saying is what I said, which is that I can't speak for what he did on that.  I can speak for what he did on certain things.  I can't speak for what you've just said because I don't have any -- I don't have any records of his doing so.  I don't have any records of his not doing so.  It's, you know...

Q.   And you don't have any explanation for why he wouldn't have done so, right?

A.   That he what, huh?

Q.   You don't have any explanation for why he would not have done so, why he would not have sought those documents if, in fact, that was something that occurred?

A.   I do not.

Q.   Okay.  I'm going to ask a couple of questions about the motion to suppress.

Counsel asked you whether it was a reasonable theory -- or a reasonable decision for you to file a motion to suppress and then not put your client on to talk about the motion to suppress.  Do you remember those questions?

A.   I do.

Q.   That is not a good or reasonable theory if you want your client's confession suppressed, is it?

A.   You have to be clear that you're digging for evidence beforehand so your client understands what's going on.

Q.   But -- I'm sorry.

A.   It's not a regular practice, but I know that sometimes it's done, or was done.

Q.   The job number one, goal number one when you have an incriminating statement from your client is you do not want the jury to hear that, right?

A.   That is correct.

Q.   Okay.  And if you make a decision that you're not going to call your client, whether the state has the burden or not, that is almost always going to be a losing strategy if you're talking about coercion in the interrogation room, correct?

A.   It's a difficult road to climb.

Q.   Okay.  Can you think of a -- of a single time that that was successful where your client was alleging coercion in the interrogation room and you didn't call him to testify about it and that was a successful strategy to get the confession thrown

out?

A. Certain decisions get made for different reasons. I can't speak to all of them. I understand what you're asking. I won't disagree with you. I can't say. But I can't say also that it hasn't been successful in some places or what reasons attorneys make those decisions.

Q. And you don't recall Mr. Carey saying to you, you know, we -- we filed this motion to suppress, but really the reason for this was just to get the police officers on paper. We weren't really trying to get this statement out.

A. No, he never said that to me.

Q. You -- you were left with the impression that Mr. Carey very much wanted to get this statement out, weren't you?

A. Yes.

Q. Okay. And you would have expected him to do exactly that, to do everything that he could to try to get Mr. -- to get the jury not to hear that your client had made a confession to this murder?

A. Of course.

Q. Of course.

Cristino Garcia, you were asked some questions about the treatment of him and the phone books and motive. Do you remember that?

A. Yes.

Q. Okay. You reviewed Cristino Garcia's affidavit, right?

A.   Yes.

Q.   Okay.  When is the first time that he made this claim that this had happened to him?

A.   I don't --

MR. S. RICHARDS:  Objection.

THE COURT:  Basis?

MR. S. RICHARDS:  Beyond the scope.

THE COURT:  It's overruled.

BY THE WITNESS:

A.   I don't know.

BY MR. SCAHILL:

Q.   Well, when was his affidavit executed?

A.   I'm not sure.  I know it was -- I know it was a couple of years ago, maybe.

Q.   So this was 31 years later, right?

A.   If that's the first time, yes.

Q.   Okay.  You're familiar in what you do with this -- this concept of outcry, outcry?

A.   Well, I understand outcry.

Q.   Yeah.  What's outcry?

A.   So I don't understand how it works with this situation.

Q.   So let me -- let me bring us back to something you said.

I think you were talking about instances where family members may have talked to a criminal defendant, and he had made a statement soon after an event happened and then it

became part of the allegations of the -- or the corroboration of this, you know, coercion happening.  Do you remember -- do you remember those questions?

A.   Yes.

Q.   Okay.  And part of the credibility sort of baked into that is event happens and soon after event happens, somebody says something, and you get some credibility from that because that's -- it's outcry, happens immediately, right?

A.   Right.

Q.   Okay.  A statement about abuse 31 years later, if I'm correct that that's the first time it comes up, not very good outcry there, is it?

A.   I'm not going to comment on that.  I think, you know, it's not for me to say.

Q.   Okay.  But based on your -- the way that you evaluated outcry, probably not a very credible outcry?

A.   It's so common in a situation like this when people are younger and things happen and then later the witness who's been, like, not doing anything about it finds that they won't get in trouble now for coming forth.  That's the issue.  And that applies to the other kinds of outcry too.

So it's a dangerous question.  I understand your point.  Yes, it goes to the weight.  It goes to the weight.

Q.   I appreciate that.

And then the final topic I wanted to ask you about, I

guess it's related, is I thought counsel said that you did not see that Mr. Garcia, Cristino Garcia, had any motive to make up this -- this incident where he got -- supposedly got hit in the head with a phone book?  Do you remember those questions?  I thought you agreed with counsel when he said it.

A.  I may have said it.  I don't know.  I don't recall, so...

Q.  Mr. Garcia had plenty of motive, didn't he?

MR. S. RICHARDS:  Objection.

BY MR. SCAHILL:

Q.  Let me ask you this --

THE COURT:  Basis?

MR. S. RICHARDS:  Argumentative.

THE COURT:  Sustained as to foundation.

BY MR. SCAHILL:

Q.  Mr. Garcia had -- Mr. Garcia was a fellow gang member of Mr. Rios, right?

A.  I know he was a friend, yes.  And I -- yes, they were both, yes --

Q.  Okay.

A.  -- Latin Kings.

Q.  That's a common -- common motive that you've seen, right?

A.  Right.

Q.  Mr. Garcia also at the time of the affidavit was a family member of Mr. Rios, right?

A.  Garcia?

Shields - recross

311

Q.   Mm-hmm.

A.   Related?

Q.   Yeah.   They're -- Mr. Rios's brother is with Mr. Garcia's sister.

A.   Sister, okay, got it, you're right.   I know that.

Q.   Okay.   Familial connection --

A.   Yes.

Q.   -- a common motive there, right?

A.   Are they --

         MR. S. RICHARDS:   Objection.

         THE COURT:   Sustained.

BY MR. SCAHILL:

Q.   And, by the way, Maria Garcia is somebody that you and Mr. Carey put on your list of witnesses, right?

A.   Mr. Carey did.

         MR. S. RICHARDS:   Objection.

         THE COURT:   That one's overruled.

         You can go ahead and answer.

BY THE WITNESS:

A.   Mr. Carey did.

BY MR. SCAHILL:

Q.   Okay.   And I think you told Ms. Golden that you would have interviewed Maria Garcia as part of your obligations to represent your client when you're putting those witnesses down, right?

A.   I always try to interview all the witnesses that we possibly can and what relativity they have to the case.

Q.   And you do not recall Ms. Maria Garcia telling you that the -- her brother Cristino Garcia had called her to summon some unnamed lawyer down to the police station because he was being abused, did you?

A.   I never spoke to Maria Garcia that I recall.

Q.   Okay.  And you don't recall Mr. Carey advising you of information that Maria Garcia had told him that information despite her being on your list, right?

A.   I do not.

Q.   Okay.

         MR. SCAHILL:  That is all the questions that I have right now.  Thank you.

         THE COURT:  Okay.

         Any other recross?

         MS. GOLDEN:  No, Your Honor.

         THE COURT:  All right.

         Redirect?

         MR. S. RICHARDS:  Very briefly.

         MR. SCAHILL:  I'm done with the exhibit, by the way, Judge.  Thank you.  Unless counsel is using it.

         MR. S. RICHARDS:  I don't need the exhibits.

                  FURTHER REDIRECT EXAMINATION

BY MR. S. RICHARDS:

Shields - further redirect

313

Q.   Karen, in all of your practice as a public defender, first of all, you saw plenty of subpoenas that were issued by the Cook County public defender to police departments, correct?

A.   Oh, yeah.

Q.   And is it fair to say that all of the subpoenas you saw issued had RD numbers, CB numbers, or specific numbers relating to a case?  Is that fair?

A.   Yes.

Q.   And you never saw in all your time a subpoena issued to a -- for a particular date and time and place that was issued and returned and got information, did you?

A.   No, I didn't, that I recall.  I'm going to say it that way. I do -- if there was such a thing, I didn't -- I don't recall it.

     (Counsel conferring.)

BY MR. S. RICHARDS:

Q.   Okay.  We talked a little bit about those form motions. First of all, it was kind of a common practice, was it not, to like type up these motions and then have people fill the things out, you know, with pen or whatever, right?

A.   They were already done.  And then you added to it and you X-ed out as you could see from what Jack Carey did.  Now, that was, again, 35 years ago.

Q.   But 35 years ago, that was the way --

A.   It was done.

Shields - further redirect

314

Q.   -- it was done.  Right?

A.   Right.

Q.   And it was done because public defenders had huge caseloads and did not have the time that other attorneys might have to type up particularized motions, put in competent legal research, do whatever, that just didn't happen, did it?

A.   And it was an effort to make sure that nothing was missed, ironically.  So it was an effort to get through all the cases that we had.

Q.   And, in fact, in terms of public defender's office, they did their best, but there -- there weren't enough secretaries or investigators or paralegals to do the kind of detailed motions or motion practice that, you know, other attorneys can do nowadays.  Fair?

A.   That's fair.

Q.   Now, the state's attorney said that the motion named some officers and maybe they're not the right officers or weren't the officers who did things.

         Would defendants or suspects always know the names of the officers they were talking to?

A.   Absolutely not.

Q.   Was there any way you knew of to get, like, pictures or descriptions of particular officers so that you could show them to the defendant and say, listen, was that the officer or some other officer?

A.   No.   It helped to have the officers be there, you know, in the court because then somebody says, oh, I remember him or, you know, but otherwise, no.

Q.   So basically the practice was you looked at the officers on the police reports, you made deductions about which officers were -- the suspect where the defendant was talking about and then you would put the names and star numbers in to make sure that you covered everything, correct?

A.   Correct.

Q.   And occasionally in that process you wouldn't get all the officers that you wanted or you would get ones that really weren't involved in the investigation, correct?

A.   That's correct.

Q.   But you wanted to cover all of the bases to make sure that no judge could say something like this motion is not specific enough, you need more detail, et cetera?

A.   Or that someone was left off.

Q.   Or someone was left off.

And, in fact, the general objective of the practice in those days, for right or wrong, good or bad, was to include only the necessary detail so that the motion could be heard without putting in every little fact or everything somebody told you.   Is that fair?

A.   That's true.

Q.   And by the way, in criminal cases, are subpoenas returned

to the attorneys or to the court, or do you remember?

A.  I don't remember.  I think they -- I don't remember.

MR. S. RICHARDS:  Nothing further.

THE COURT:  Okay.  Anything on that?

MR. SCAHILL:  Just two brief issues.

I'm going to pull up Defendants' Exhibit 50 UUU for the witness.  Okay.

FURTHER RECROSS-EXAMINATION

BY MR. SCAHILL:

Q.  Do you see that this is a subpoena that is issued --

A.  Yes.

Q.  -- by --

MR. SCAHILL:  If you can scroll down --

BY MR. SCAHILL:

Q.  -- I believe your colleague, Mr. Carey.

Do you see that?

A.  By Jack Carey.

MR. SCAHILL:  Can you scroll down to the second page, Josh?

BY MR. SCAHILL:

Q.  Okay.  What is the communications division of the Chicago Police Department?

A.  What is it?

Q.  Yeah.

A.  It's where they do 911, answer the phone.  They have

Shields - further recross

317

information.

Q.   And one of the ways that you can get information about an incident like say a murder is to reference the date and the location, right?

A.   Yes.

Q.   Now, with -- going back to the motion to suppress --

MR. SCAHILL:  We are done with that, Josh.  Thanks.

BY MR. SCAHILL:

Q.   Are you saying that you -- when you would put names of officers on a motion to suppress that you would put it on there without knowing whether those officers were actually involved in an interrogation?  You would just -- it would sort of be overinclusive?

A.   No.  You might be overinclusive but not intentionally. What you would be doing is making sure that the people who were in the interrogation room or doing some part of it were not left off because your -- your client didn't know the names of everybody.  Not all the police report, only as it pertained to the police report and the statement as it related to the statement.  That was the big -- and there are police reports related to the --

Q.   But you're putting names of people that you don't know whether they were or were not involved in an interrogation on a motion filed with the court, right?

A.   You find out soon enough.

Q.   Right.

          THE COURT:  Counsel, I'm going to remind you that this witness did not complete that motion to suppress, so be mindful of the way that you phrase your questions.

          MR. SCAHILL:  I will, Judge.  Thank you.

BY MR. SCAHILL:

Q.   The motion that we are -- well, let's just move in generalities.

          Are you saying that you would put the names of police officers on motions to suppress without knowing whether they were or were not involved in the conduct that is claimed to be illegal in the motion to suppress?

A.   We would put the names of the police officers who were listed in the part of the report that related to the statement, brought them in, made a statement, here's an officer, okay.

Q.   You would do that without knowing whether that particular officer had engaged in any of the conduct of coercion, for example, that you are claiming in the motion?

A.   Possibly.

          MR. S. RICHARDS:  Objection.

          THE COURT:  That's sustained.

          Counsel, how much more do you have on this topic?

          MR. SCAHILL:  About two questions.

          THE COURT:  Continue.

BY MR. SCAHILL:

Q. You understand that accusing a police officer of physically abusing a subject is a very serious allegation, right?

MR. S. RICHARDS: Objection.

THE COURT: Overruled.

BY THE WITNESS:

A. No one wants to accuse anyone of anything that doesn't apply to them. And that's how people get taken off of there, you know. I can't vouch for what Jack did on there and his taking off Halvorsen and Mason. I just can say that it's no one -- you know, no one in the PD's office -- office is looking to take down police officers, believe me.

BY MR. SCAHILL:

Q. But the way that your motions are written is accuse first and strike out later, right?

MR. S. RICHARDS: Objection.

THE COURT: It's overruled.

BY THE WITNESS:

A. I will call up the PD's office and tell them so because that's the best I can do for you on that.

BY MR. SCAHILL:

Q. I'm sorry. I don't understand. You're going to call --

A. They had clients, I had clients, we all had clients. We had to do the best we could. So if we put -- leave out a name that is actually involved, then what happens then? You don't -- clearly you can't win that motion even though it's a

Case: 1:22-cv-03973 Document #: 345 Filed: 03/04/26 Page 222 of 256 PageID #:21328
Shields - further recross
320

crap-shoot in the first place.

Q.   So you make the accusation first even though you have no actual basis for it and you strike it out later?

A.   Absolutely not.   Now you're taking the words out of my mouth and changing them because that's not what I've said all along, period.

Q.   In Mr. Rios's case, did you have any actual evidence that those five officers that you listed in -- I'm sorry -- that were --

THE COURT:   Counsel, move on.   We've already established that Jack Carey, not this witness, filled out that motion to suppress.

MR. SCAHILL:   I apologize, Your Honor.   It's getting late in the day.

THE COURT:   It does not excuse the behavior.

MR. SCAHILL:   You're correct.   Thank you.

BY MR. SCAHILL:

Q.   Do you have any information that those five officers that are listed in Mr. Carey's motion to suppress actually all interrogated Mr. Rios?

A.   I don't.

Q.   Okay.

A.   I don't know one way or the other.

Q.   All right.

MR. SCAHILL:   That's all the questions I have.

Shields - further redirect

321

THE WITNESS:  Thank you.

THE COURT:  Any other recross?

Recross for Mason or Halvorsen?

MS. GOLDEN:  No, Your Honor.

THE COURT:  Okay.  Mr. Richards, anything on that?

MR. S. RICHARDS:  Just a couple of questions.

FURTHER REDIRECT EXAMINATION

BY MR. S. RICHARDS:

Q.  First of all, is that still on the screen?

THE COURT:  It's on the witness's screen.

MR. S. RICHARDS:  Oh, okay.

BY MR. S. RICHARDS:

Q.  So on the wit- -- on your screen, you're looking at this document which is a subpoena in the Jaime Rios case, right?

A.  Yes.

Q.  Okay.  First of all, for every request in that subpoena, is there either an RD number or a CB number?

A.  I would have to --

THE COURT:  It's beyond the scope.  She was asked about the communications division.  So for the communications division question --

MR. S. RICHARDS:  Okay.

THE COURT:  -- is there an RD number listed.

MR. S. RICHARDS:  Yes.

BY MR. S. RICHARDS:

Shields - further redirect

322

Q.   Is there an RD number listed for the communications division?

A.   I don't know.

Q.   Could you look where it says communications division.

A.   I'm looking.

Q.   It starts, any and all 911 calls?

A.   At the end it has under RD number and gives a number, at the end of that paragraph.

Q.   And is that the same RD number, as in the rest of the document, the RD number relating to the Jaime Rios case?

A.   I have no way of knowing.  But it looks like it because it's the homicide investigation of Luis Morales.

Q.   Okay.  And in terms of the reports you received, did you ever receive under that RD number a report of another shooting on June 27th of 1989 besides the shooting that related -- that resulted in the death of Luis Morales?

A.   I did not.

Q.   So --

A.   And I can't speak for Mr. Carey.

          MR. S. RICHARDS:  Nothing further.

          THE COURT:  Anything on that?

          MR. SCAHILL:  No, Judge.

          MS. GOLDEN:  No.

          THE COURT:  All right.

          Ms. Shields, you are done, and you are excused from

your subpoena.

THE WITNESS:  Thank you.

THE COURT:  Have a good afternoon.  You can step down.

Ladies and gentlemen, it's 4:25.  We will call that a day with the exception of Mr. Davis, if you could stay behind.

But I remind you, please do not discuss the case. Please do not research the case.  And if you identify anything that is inconsistent with any of my instructions to you to date, meaning someone tries to contact you or what have you, please remember to bring that to my attention.

Have a good evening.

All rise.

(Jury out at 4:26 p.m.)

THE COURT:  All right.  Take your seats.

Mr. Davis, I have two notes from you.

JUROR DAVIS:  Yeah.

THE COURT:  One concerning probation for, is it retail theft?

JUROR DAVIS:  Yeah.

THE COURT:  And if you could maybe move closer to the microphone at the end of the jury box.

JUROR DAVIS:  Oh, I'm sorry.

THE COURT:  I think that might help everyone hear you. And you're welcome to adjust it down.

Okay.  Does either side have any questions about the

probation for Mr. Davis?

MR. S. RICHARDS: No, Your Honor, and I don't think it's -- unless I'm missing something, I don't think anyone was asked about a criminal record, were they?

THE COURT: There were questions about interactions with law enforcement and whether that would interfere with your ability to be fair and impartial to the parties in this case. There were also the general questions of please identify anything that you think would preclude you from serving on the jury. We have a note raising it, and I'm inviting you to ask questions about that note. So either you have questions or you don't.

MR. S. RICHARDS: No, Your Honor.

THE COURT: Any questions from defendant Guevara?

MR. SCAHILL: No.

THE COURT: For Mason and Halvorsen?

MR. ENGQUIST: Yes, Your Honor.

THE COURT: Go ahead.

MR. ENGQUIST: What jurisdiction was this in?

JUROR DAVIS: Kendall County.

MR. ENGQUIST: Okay. Did this involve the Chicago Police Department at all?

JUROR DAVIS: Sorry. What was that?

MR. ENGQUIST: Did this involve the Chicago Police Department at all?

JUROR DAVIS:  No.

MR. ENGQUIST:  What year was it?

JUROR DAVIS:  It's from when I was in college, but the stuff didn't come forward until like 2023 when I was called. And then I talked to a lawyer about it because it was from so long ago.

And then for the -- I know there was one question about serving jail time.  I did not even go to jail.  I literally went to the courthouse and everything was done because it was after -- well, it was after September 22, nonviolent offenders there's no jail time served.  Yeah.

THE COURT:  Any other questions?

MR. ENGQUIST:  No, Your Honor.

MR. POLICK:  May I ask one?

THE COURT:  Yes.

MR. POLICK:  Sir, so am I understanding you correctly that whatever probation term you were given has been served and it's done with?

JUROR DAVIS:  It will finish May 1st.  I've done all my voluntary hours and everything.  I just didn't know, because my -- I know on the thing it said that -- I have a friend that's a cop.  He asked me -- well, he was like -- because my friend knows I did jury duty, like I got selected, he's like, I'm surprised you got selected considering you're on probation. So I just wanted to clarify if that was okay or if it would

would throw things off for the case or not because I didn't want it to be a cause for dismissal because I didn't want it to be my fault where things get messed up.

THE COURT: No, I appreciate it, and I appreciate you sharing.

Any other questions?

MR. POLICK: Not from me, Your Honor.

THE COURT: Okay. And then the second issue deals with work. It sounds like you work the overnight shift in the NICU and the PICU?

JUROR DAVIS: Yeah.

THE COURT: Do you have to work while you're serving jury duty?

JUROR DAVIS: No, but me not being there, there will not be charge coverage. And since there is all the new hires, some who have only been there for a couple of months, I am the one that if there's issues to answer the questions or deal with more critical patients they don't know or have questions about like throwing in nitric oxygen with high-frequency jet ventilation and oscillators where even some of the physicians struggle with.

THE COURT: Okay. Which health system do you work for?

JUROR DAVIS: I'm at Rush University Medical Center. And they do not know about my probation because everything

is -- once it's done, it should be good.

THE COURT: And is that the Rush Medical Center at the medical campus here on -- off 290?

JUROR DAVIS: Yes, off 1620 Harrison.

THE COURT: And the folks that you're training, I know it's an academic center training residents. Is it also training NICU personnel, other NICU personnel such as respiratory therapists?

JUROR DAVIS: Yes, the two newest people just finished their training in mid-January.

THE COURT: And I know you said that there was critical staffing. Are you saying that your employer is unable to fill the vacancy caused by you either with existing staff or with like locum staff?

JUROR DAVIS: So adults are unable to help in the NICU and PICU. As pediatric therapists, we help because we are basically life support certified so we could help the adults if they need to. But for strictly pediatric respiratory care, it only is us and with me not being there, there is no person who can be in charge on some of those nights. Like I've been working crazy overtime because of the staffing.

THE COURT: Okay. Any follow-up questions from plaintiff?

MR. S. RICHARDS: No, Your Honor.

THE COURT: From defense?

MR. SCAHILL:  No.

MR. ENGQUIST:  No.

MR. POLICK:  No, Judge.

THE COURT:  Okay.  I have to ask that you step back in the passageway and then I'll call you back in after I've had a chance to speak with the lawyers.

JUROR DAVIS:  Okay.

(Juror Davis exits.)

THE COURT:  All right.  Whatever the decision is I will of course couch it in terms of me shielding either side from any input.

So I'll hear from plaintiffs first on your thoughts.

(Counsel conferring.)

MR. S. RICHARDS:  Your Honor, I -- I hesitate to say this after listening to the last cross and the length of it, but I don't think this trial is lasting three weeks or anywhere near.  I think we're looking at more like a week and a half based upon what my case is.

THE COURT:  Okay.

MR. S. RICHARDS:  So we're -- we're against.  We think you should tell him we don't think it's going to be that long or whatever.

THE COURT:  Well, I won't tell him that, but I will tell him -- well, yeah.  I'll think about telling him that.  I don't want to overpromise.

For defendant Guevara?

MR. SCAHILL: I think we actually share the same sentiment that Mr. Richards does. We would -- I, A, don't think it's going to go that long but don't want you to commit on it; and, B, we would prefer to keep him.

THE COURT: Okay. And for Halvorsen and Mason?

MR. POLICK: We would agree with all that, Judge.

THE COURT: Yeah. Had he come in and said that he's trying to work and fill the night shifts, I would be concerned about his ability to pay attention during the day. That doesn't seem like an issue. I hope no hardship comes to any PICU or NICU nurses or NICU patients, but I don't think anything here is reason to excuse him.

What I will do is tell him that I'm not going to excuse him, that this is why I raise these issues on the front end. They weren't raised and now we are underway. The employer isn't making him work. And to the extent that there are shortages, while I commend his concern for his colleagues and for his patients, the employer should be able to fill that gap. And maybe I'll allude to perhaps things won't go as long as they -- we intend, or as I said up front. Given my level of excitement on hearing that news, I wouldn't want to put that with the juror.

So we'll call him back in. I'll tell him he's not excused. I'll try to be nice about it and see what happens.

(Juror Davis enters.)

THE COURT: Welcome back.

So I'm not going to release you from jury duty.

JUROR DAVIS: Okay.

THE COURT: I tried to address these issues during selection which is why I give perspective jurors the opportunity to raise any potential issues. While I'm sensitive to the issues concerning your patients and your colleagues who have to pick up the slack, I'm not convinced that they're of the sort that require excusing you from this jury at this time. We're not -- I'm not concerned about the issue concerning probation. It's not disqualifying. And so that's a nonissue. I'm actually glad that you were able to have a decent resolution to it.

But with respect to the work thing, while sympathetic to it and understanding that it imposes some hardship, it's not a reason to remove you from the jury. So probably not the news you wanted to hear, but that's -- that's my decision, and we will proceed. And who knows. We may get lucky and not go the full three weeks, right?

JUROR DAVIS: Yeah. Sorry. May I speak?

THE COURT: Of course.

JUROR DAVIS: That was the only concern with the three weeks. It was a thing like I can try to adjust my schedule next week, but the following week it will be a little harder.

But I can try to move some shifts to like the back of the load of the week. But with me working here and doing that, that would give me five hours total each day of free time. So I'm trying to, like, figure out when to, like, sleep and shower.

THE COURT: Okay. Say that last piece again. You're trying to figure out --

JUROR DAVIS: When to physically sleep and shower.

THE COURT: So you are working?

JUROR DAVIS: Yeah.

THE COURT: Can you be excused from work?

JUROR DAVIS: I can try, but we still have the critical staffing issue.

THE COURT: Right. So how many days a week do you work?

JUROR DAVIS: So it's three 12-hour shifts. So I work from -- being on nights, I work from 7:00 p.m. to 7:30 a.m.

THE COURT: And which nights are you scheduled to work?

JUROR DAVIS: Next week it will be Sunday and I believe Wednesday and Thursday. I can try to move Wednesday and Thursday to Friday and Saturday and make it work if I can.

THE COURT: Meaning starting Friday at 7:00 p.m.?

Okay. Yeah, what I usually do is midstream, like probably Thursday or Friday I'll give an update on where I think things stand evidence-wise, how we're progressing with

respect to the case overall. And once you have that update and you have your schedule, we'll -- if we need to revisit this, we will. But at this time, you remain on the jury.

JUROR DAVIS: Okay. That's fine.

THE COURT: Thank you.

JUROR DAVIS: All right. Thank you.

Oh, sorry. I can be dismissed?

THE COURT: Oh, of course.

JUROR DAVIS: Sorry. I just wanted to make sure I'm not...

(Juror Davis exits.)

THE COURT: All right. Take your seats.

One question. That subpoena, it was DX 50 --

MR. SCAHILL: UUU. Sorry. We probably should come up with a better numbering scheme. But that is what it was marked as so that's what we're stuck with.

THE COURT: Okay. And my recollection is this is shown for identification?

MR. SCAHILL: Yes.

THE COURT: All right. Issues that I need to address this evening for the plaintiff?

MR. J. RICHARDS: Your Honor, just a quick inquiry.

I think -- and I've talked to counsel about this in terms of the Guevara designations from the trial, and if we had gotten to it today, it would have come on. We were going to do

it in the form of a reader on the stand, and I was -- I'm inquiring as to whether Your Honor was going to be giving an instruction about that before that happened, and if so, if Your Honor needs a heads-up before that's to occur.

THE COURT: Not an instruction. I don't think it would be an instruction at this point but I would provide context. This was testimony from an earlier trial. The reader is just reading what's on the -- from the transcript.

MR. J. RICHARDS: Okay. Thank you, Your Honor.

THE COURT: All right.

Are you asking that I give an instruction? We have instructions in the jury instructions related to transcripts. I think it becomes -- I see two views. One is they just come in and you instruct at the end. This case, because of the underlying -- this is why I asked some of the questions I asked earlier about the designations. If I'm looking at the hearsay rules, different things come in for different reasons. Guevara is going to be a declarant. And so I think -- and he's a party-opponent. And so all of it comes in for the substance. But for others, if they haven't testified, then -- here then the question of whether it is hearsay or not becomes slightly different then an instruction is needed.

So I'm mindful of those things, but to the extent the parties need to raise that and pursue it, feel free. So if you think a limiting instruction is appropriate for a given

excerpt -- or not excerpt but a given witness's transcript, feel free to suggest one.

Anything else from plaintiffs?

MR. S. RICHARDS: No, Your Honor.

THE COURT: All right. For defense?

MR. SCAHILL: Nothing from defendant Guevara.

MR. POLICK: Nothing from Mason and Halvorsen, Your Honor.

THE COURT: Okay. I'm going to go into the dep designations so that you have some more guidance and ask some questions about Torres, but first I wanted to address two things.

First was with Ms. Shields, Judge Shields. There was this line of questioning about what you put in the report. And I understand from a credibility perspective how that could be relevant here except it wasn't her document. When it comes to the ethical conduct type stuff, the Rule 11 type stuff of whether lawyers can do this, I feel that's getting far beyond the scope of what we're here for which is why I was moving you past that because it wasn't her document. And the questions were of the sort would a lawyer, and the answer is an unethical lawyer would, or in Judge Shields' case a public defender in the late '80s would because that was the practice and you had that. And so I didn't see the need to belabor that at risk of confusing the issues for the jury because we are not the

IARDC -- or ARDC. We are here for facts. And she told you what she did. And the credibility aspect of it is pertinent; whether it's appropriate for a lawyer to do it, not so much.

And then depositions, so my question on Torres and it's for the defense, is it the purpose of that testimony at the trial to clear the way for Mr. Rios's guilt?

MR. SCAHILL: I don't think that was the purpose of it, no.

THE COURT: What was the purpose of it then?

MR. SCAHILL: I think the purpose was for -- because remember the prosecution calls him, not the defense. The purpose as I understood it was to more or less neutralize a part of the investigation so they could hone in on the actual case that they were attempting to try without having to --

THE COURT: And that case was against Mr. Rios and not against Macho. And by having the witness who said it was Macho testify, oh, I lied, that opens the door to, well, who is the real shooter, which is, according to the state, Rios.

MR. SCAHILL: Well, I mean, remember, he recanted this before the trial. My concern is that the purpose isn't so much that as much as it is you have to go through the investigation and neutralize points that are not going to be pertinent to your case.

The problem that I have with putting that in the context of this case is what the plaintiff I think is

attempting to prove through that testimony is to use the out-of-court statement of Torres, this was Macho, for the truth of that matter, which I think I tried to explain in the latter part of the brief that that's the primary concern I have with it. So when we're talking about motives and purpose, I think that's my -- my main concern.

THE COURT: That this was Macho. You think the plaintiff is offering this to say that it was, in fact, Macho.

MR. SCAHILL: Yes, and, in fact, I think he said that in his opening. And that's a problem because that is an out-of-court statement that has not been sworn under oath which I understand why they need to reference it in the criminal proceedings, but using it for that purpose brings a double hearsay problem in this case if that's how they want to use it, and I think they do.

THE COURT: Mr. Richards, what's the purpose of the Torres testimony?

MR. S. RICHARDS: The purpose is to give the jury the weight and quality of the evidence against Mr. Rios so they can evaluate the constitutional claims.

You'll notice in my opening --

THE COURT: So that they can evaluate the constitutional claims?

MR. S. RICHARDS: Correct. In other words -- I can also address the hearsay points as well.

In this particular case, the Macho -- I mean, the testimony of Torres under Illinois law could have come in substantively.

THE COURT: Okay. My question goes back to what is your purpose here. You referenced the constitutional claims. Are you just saying that it goes to materiality?

MR. S. RICHARDS: It goes to the weight and quality, yes, exactly. It goes to materiality so it goes to whether if the jury had known about -- if they had known about Carrero, if they had known about Cristino Garcia, if they had --

THE COURT: You're getting far afield.

MR. S. RICHARDS: Sorry.

THE COURT: We're dealing with the Torres testimony.

MR. S. RICHARDS: Right. And, again, it just goes to the weight and the quality of the evidence in terms of how much evidence there was against Mr. Rios and whether any of the constitutional claims would have made a difference to the trial.

THE COURT: And so the Torres testimony goes to the constitutional violations that you're alleging in this case?

MR. S. RICHARDS: It does not go to whether the constitutional violations were committed except insofar as it goes to whether there's a reasonable likelihood of a different outcome if the constitutional violations had not been committed.

Is it possible for me to speak further on this point?

THE COURT: Sure.

MR. S. RICHARDS: So basically Macho's testimony, you're right. The state is right -- I'm sorry -- the defense is right that the state put in Torres's testimony to steal the thunder from the defense and put it in themselves.

However, it was clear that the defense's theory, not my theory, the defense's theory at trial in the opening and in the closing was in part Macho did it. That was their claim.

We don't care if Macho did it for this purpose. All we care is how much -- did Rios have a reasonable defense, would the constitutional violations have made a difference in terms of the trial.

So, now, I would like to address some of the hearsay concerns if Your Honor does not mind.

THE COURT: I do mind at this point.

MR. S. RICHARDS: What?

THE COURT: You said -- so the hearsay concern is whether the state had the same motives to inquire of Torres as the defendants in this case do.

And the defense argument is that that was a criminal case concerned with guilt or innocence. It was not a civil case concerned with constitutional violations or damages with respect to the individual defendants. And what you're telling me is that it goes to the constitutional violations which are

not motives of the state prosecutors. But you may continue.

MR. S. RICHARDS: Well, I -- I don't -- I think that's a misunderstanding of my argument which I would like to explain.

THE COURT: That's why I asked you two or three times about constitutional violations.

MR. S. RICHARDS: Right.

THE COURT: But you do not get to revisit it. You've said what you said. Move on to the hearsay concerns.

MR. S. RICHARDS: Okay.

As to the hearsay concerns, under Illinois law, a statement of identification made by a witness who testifies at trial is admissible. A statement of nonidentification is admissible. So there was no hearsay elicited during the testimony. It was not -- it was not hearsay what -- whatsoever.

THE COURT: That takes care of hearsay at the criminal trial. It does not take care of hearsay here.

MR. S. RICHARDS: Correct, which is why we are not asking to have it admitted substantively.

THE COURT: If you are seeking admission under 804(b)(1), you are seeking admission substantively.

MR. S. RICHARDS: Well, in terms of the motive and opportunity, the motive and opportunity of the criminal state and the defendants would be exactly the same. I think the

defendants would have wanted to establish that --

THE COURT:  How are the state prosecutors at trial dealing with constitutional violations in a case where they address that during the motion to suppress stage during which Mr. Torres did not testify?  No constitutional violations were at issue during the criminal trial presumably because those matters are normally addressed pretrial.  And if the motion to suppress is indicative of anything, it suggests that was the case in the Rios prosecution.

MR. S. RICHARDS:  Correct.  However, let me just give you another example.

If a witness had testified -- for example, Carrero.  Carrero testified --

THE COURT:  We're not talking about Carrero.  We're talking about Torres.

MR. S. RICHARDS:  Right.  But I need to illustrate my point.

THE COURT:  Go ahead.  Make your record.

MR. S. RICHARDS:  Carrero -- Carrero's testimony goes to a constitutional violation.  Why?  Because he testified he's coerced and he fabricated.

Torres said nothing of the sort.  Torres simply testified, I couldn't see the shooting.  I told the police it was Macho.  I lied about that.  That's it.  That is not related to a constitutional violation destroyed.  It's the weight of

the evidence. And the motives of the prosecutors are the same as the motives of these defendants. They would not do any more cross-examination of Torres because Torres had nothing to say about whether the confession was coerced. Torres had nothing to say about whether evidence was fabricated. Torres simply provided evidence which bears upon the constitutional violations only in terms of the weight and quality of the evidence. And the prosecutors have the same motives to establish the same testimony from Torres as these defendants knew here. Torres had no interaction with Mason. He had no interaction -- sorry -- he did have interaction with Mason and Mason just -- you know, but he didn't accuse Mason of misconduct. He didn't accuse anybody of misconduct.

THE COURT: Response?

MR. S. RICHARDS: Even Guevara.

THE COURT: Response?

MR. SCAHILL: I heard a much different story on opening from Mr. Richards than I'm hearing now. And the problem I have with that is there's a couple of problems.

They have insinuated that Mason somehow tricked or cajoled or used some sort of improper motives to get Mr. Torres to flip from a truthful identification of Macho to something else because the evidence led in that direction. That was a suggestion that I heard.

I also heard from Mr. Richards that the implication of

Macho by Torres was that for the purpose of showing that it was Macho which is not at all what the purpose of the criminal trial was. And both of those things directly relate to misconduct of police officers which have little to nothing to do with the prosecution.

The other issue is I believe that counsel is incorrect on the underlying usage under Illinois law of this with an identification. I cited *People v. Simpson* which, again, you -- if it's an unsworn identification you cannot admit that substantively at a trial to show that that is true, meaning this is Macho. You perhaps can use it to impeach their credibility. They want to use it for a substantive purpose.

MR. S. RICHARDS: I hate to say anything, but may I respond?

THE COURT: Yes.

MR. S. RICHARDS: Okay. First of all, I think counsel heard something in my opening which I was not saying. I was not, not accusing Mason of any misconduct with respect to Javier Torres, period. The -- Mason talked to him. He recanted. There was a conflict remaining between Torres and testimony and Macho. But at the point at which Torres recanted, Mason had no probable cause to arrest Macho. He had to let him go and he did. And I'm not saying there was anything wrong with that. I just think at that point the investigation took a different turn and then we are where we

are.  So that's point number 1.

Point number 2, under Illinois statute -- I haven't checked out *People v. Simpson*.  But under Illinois statute, identifications of -- prior identifications of a witness who testifies at trial and nonidentifications are admissible substantively.  They don't have to be sworn.  They just have to be identifications.  And they can't include detail, but if the witness says -- identified somebody in a line-up, it comes in.  And, in fact, the record is replete with that evidence coming in from many witnesses, Samantha Hudson, a whole lot of others.  Nobody objects because it comes in.

So I think, again, the point is it goes to the weight and quality of the evidence.  It's not directly related to constitutional violations because there's nothing to cross-examine on.  And I said to the jury very explicitly that this was not a murder case, that guilt and innocence was not relevant hardly at all and that their issue only was whether there was constitutional violations.  And I stick by that, and I will argue that and that's our case.  We think that guilt and innocence is a wild goose chase, with all due respect, invented by the defendants.  It has nothing to -- very little to do with the case, maybe as to damages I suppose.

THE COURT:  I recall during the January 29th hearing on the Torres motion you articulating that part of the significance of the Torres testimony was that when Torres went

in and identified Macho, he was presented with a gang book and he went through that book which included your client, Mr. Rios, and he did not identify Jaime Rios.

Do you recall that argument?

MR. S. RICHARDS:  I do, and I stand by it.  It goes to weight of the evidence, no misconduct.

THE COURT:  What evidence do you have that Jaime Rios was in that book?

MR. S. RICHARDS:  Well, the evidence --

THE COURT:  Let me rephrase.

What admissible evidence in this case do you have that Rios was in that book?

MR. S. RICHARDS:  The evidence -- the evidence is from actually officer -- I believe Officer Johnston.  It may have been a different officer who testified in the defense case that Jaime Rios was not in that gang book.

Also there's actually --

THE COURT:  That he was not in the gang book?

MR. S. RICHARDS:  I'm sorry, that Jaime Rios was in the gang book, three pages away.  Jaime Rios was in the 14th District gang book.  He was not in the Area 5 gang book.

UNIDENTIFIED SPEAKER:  Gang crimes book.

MR. S. RICHARDS:  Gang crimes book.

THE COURT:  And what evidence do you have that Jaime Rios was shown -- or not Jaime Rios -- that Torres was shown

multiple pages of the gang book?

MR. S. RICHARDS: Again, I have to look at the trial testimony in detail, but I believe the defendants called Johnston. The gang book, the 14th District gang book was actually brought into court. They had to wait for it.

THE COURT: Did Johnston deal with Torres when Torres flipped through the gang book?

MR. S. RICHARDS: Yes, that was the day before Torres spoke to Mason. And that was the day Torres identified Macho in the gang book, and he did not identify Jaime Rios who was three pages away in the same gang book which was the 14th District gang book which was brought into court so that Johnston could testify about it.

THE COURT: Who has designated in this case testimony of Officer Johnston anywhere?

MR. S. RICHARDS: I have not -- I subpoenaed him, but Your Honor quashed the subpoena.

I'm sorry.

(Counsel conferring.)

MR. S. RICHARDS: I'm sorry. The defense -- the defendants listed Johnston I believe on either may call or will call. And I subpoenaed him, and Your Honor quashed the subpoena.

THE COURT: Is Johnston testifying?

MR. SCAHILL: No.

MR. POLICK: No.

THE COURT: And remind me what the basis for quashing the subpoena was? Is he outside the district?

MR. S. RICHARDS: No, he's not outside the district.

MR. SCAHILL: They -- they had not listed him as a witness, the plaintiff.

THE COURT: So if Johnston does not testify at this trial, how do you establish that Torres was shown a page of the gang book with both Macho and your client in it?

MR. S. RICHARDS: Well, we would ask for either an accurate summary of the trial record which I proposed which the defendants may not agree to, but --

THE COURT: Did Johnston testify at the underlying criminal trial?

MR. S. RICHARDS: He did. And --

THE COURT: And yet you didn't designate any of his testimony?

MR. S. RICHARDS: I did not designate his testimony because I expected him to be here in person, and he was subpoenaed and the subpoena was accepted.

THE COURT: Okay. But you did not identify him as a witness that you intended to call which means there's a disclosure violation if I'm understanding the defense correctly.

MR. S. RICHARDS: I believe that that would be their

argument.  I think --

THE COURT:  What was my ruling?  You know, I'll look it up.  I won't waste your time.  I'll go look it up.

Okay.  For Torres, I'll have to look at the Johnston subpoena.  As I understand the plaintiff's perspective, it's relevant.  His testimony is relevant to materiality at trial in the sense that -- is it your contention, Mr. Richards, that the Torres testimony has significance even if the -- it's not admitted for the not identifying your client in the gang book?

MR. S. RICHARDS:  Yes.

THE COURT:  And what is the significance of the testimony in that case?

MR. S. RICHARDS:  Even apart from not identifying Rios in the gang book, and I'll note that he also did not identify Rios in a later line-up after Rios was arrested, the -- it goes to materiality in terms of how substantial the case was and how the case was affected by the constitutional violations.

THE COURT:  How does it go to materiality if the witness testifies were you able to see -- when you say this guy pulled the pistol, were you able to see what this guy looked like?  No.

MR. S. RICHARDS:  Well, that's what Torres said different things.  The first thing he said, and I believe Johnston will testify to that, is --

THE COURT:  Johnston's not testifying.

MR. S. RICHARDS: Well, we -- we object. Because even if Johnston doesn't testify, what Torres will -- what Torres would testify to is I did say that -- I did say that Macho was the shooter. I did say that -- I did say -- and I saw him in the area shortly before and then I saw him shoot. Then he recants that and says I didn't have a good view of the shooter.

By the way, he never recants seeing Macho in the area shortly before the shooting.

Now, when Mason, by the way, decides not to charge Macho, which as I said was a perfectly reasonable decision, he did that on the basis of Macho's alibi. And who dealt in grave detail with Macho's alibi other than the attorneys for Mason who in their opening detailed how Mason had discarded Macho as a suspect because of his alibi. But of course the contradiction remained between the alibi and what Torres said about seeing Macho in the area.

So the defense, through Jack Carey, raised the issue in opening and in closing argument saying, you know, you have a reasonable doubt. They didn't say they had -- they could prove Macho guilty beyond a reasonable doubt. They said you have a reasonable doubt as to who was the shooter because we've got this guy Macho in the picture. And we have an admissible testimony from Javier Torres who was on the stand and can be cross-examined that he had identified Macho originally.

THE COURT: The identification of Macho originally

doesn't gain any traction because he recants that. On cross he mentions that Macho is in the area.

All right. Anything else from the defendants on Torres?

MR. SCAHILL: No, Judge.

THE COURT: Anything else from plaintiff on Torres?

MR. S. RICHARDS: No.

THE COURT: All right.

With respect to the other designations, for Huertas, 307-2, all of the defendants' objections are overruled. As a general matter, I did not see in the objections any undue prejudice that would result if I were to allow the testimony. While I still feel strongly by the failure to abide by deadlines set, I don't see prejudice. This is not an invitation to rough -- run roughshod over any further deadlines set because I will strictly enforce them going forward.

So the Huertas hearsay objections are overruled. I understand the witness during the deposition was presented with his affidavit. But he was available and subject to questioning about the statements in that affidavit, and so I don't see the hearsay dangers being present.

With respect to Noon and 307 -3, there are objections to form and foundation, not a counter-designation. Those are overruled.

With respect to Flannery, 307-6, I don't see answers

for either of the designations.  And so what are we doing there?

MR. S. RICHARDS:  With Flannery, we have no problem with the defendants' designations which I thought were fine.

THE COURT:  Right.  But you counter-designate on pages 447, 448, and 450, and your counter-designations for Flannery do not include any answers so they're incomplete.

MR. S. RICHARDS:  All right.  Well, in that case we'll strike that.  We'll withdraw them.

THE COURT:  For Halvorsen, 307-7, for designation C12, lines 1 through 17, there's an objection to foundation and exhibits being unavailable.  The objection is sustained as to lines 1 through 13.  Lines 14 through 17 can come in as counter-designations.

And as I look at the lines 1 through 13, this is just the exchange where the attorney is refreshing the witness's recollection.  Refreshing recollection isn't the testimony. The testimony is the answer after the recollection had been refreshed.

The objection to C12, lines 22 through 16 -- or 22 through 16.16 -- sorry, I'm butchering that.  Page 12, lines 22 through page 16, line 16, those objections are overruled.  It's information concerning what the declarant -- information that the declarant had at the time which influences his actions.  So it's not for the truth of the matter asserted, just that he

knew it.

For page 18, lines 4 through 16, that objection is sustained. There's no real answer given by the witness.

The first response by the witness is: I would have to review the whole file to the entire scope of this investigation. Then he's asked: Did you review the file this morning? He says: Not every single report, no.

I don't see what relevance that has.

MR. S. RICHARDS: Your Honor, excuse me. Are we on Halvorsen?

THE COURT: Halvorsen, 307-7, page 18, lines 4 through 16.

Halvorsen, 307-8, the objection to page 35, lines 1 and 2 is sustained. The testimony is an objection sustained. It's not evidence.

Lines 38, 20 -- or page 38, lines 20 to 21, that objection is overruled.

Page 40, line 24, objection is to incomplete designation. That's sustained. It's a question that's interrupted by a colloquy. And then there's another question that precedes the next answer.

For Curley, page 533, lines 17 and 18, the objection is overruled.

For page 534, lines 7 through 10 concerning the shotgun, the relevance objection is sustained.

Page 534, lines 11 through 19, the objection is overruled.

Page 534, lines 23 to 24, the objection is sustained. There was no answer designated. And even if there was an answer designated, the answer says: I am sorry. I didn't hear you.

Paging 535, lines 8 through 14 and 19 through page 536, line 19, objection is overruled.

536, lines 20 to 537, line 16, the objection is overruled.

And Huertas, 289-4, the objection to page 195, lines 5 through 24, overruled.

I'm happy to expand on rationale. If either side likes me to, please identify what you'd like me to expand on.

MR. S. RICHARDS: No, Your Honor, we do not.

THE COURT: For defense?

MS. GOLDEN: No. Thank you.

THE COURT: Anyone else?

MR. SCAHILL: No.

THE COURT: All right.

MR. SCAHILL: We refer to Ms. Golden.

THE COURT: I will see everyone tomorrow morning at 10:00.

Have a good evening.

MR. S. RICHARDS: Thank you.

353

MR. POLICK:  Thank you, Your Honor.

MR. SCAHILL:  Thank you, Judge.

(Adjourned at 5:17 p.m., until February 4, 2026, at 10:00 a.m.)


*   *   *   *   *


We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Krista Flynn Burgeson*                    *February 4, 2026*
Krista Flynn Burgeson
Official Court Reporter

*/s/Charles R. Zandi*                         *February 4, 2026*
Charles R. Zandi
Official Court Reporter

*/s/Kelly M. Fitzgerald*                      *February 4, 2026*
Kelly M. Fitzgerald
Official Court Reporter

I N D E X

PAGE

CRISTINO GARCIA

Direct Examination By Mr. J. Richards:                    115
Cross-Examination By Mr. Scahill:                         127

CRISTINO GARCIA

Cross-Examination By Mr. Polick                           204
Redirect Examination By Mr. J. Richards                   209

KAREN SHIELDS

Direct Examination By Mr. S. Richards                     213
Cross-Examination By Mr. Scahill                          232
Cross-Examination By Ms. Golden                           271
Redirect Examination By Mr. S. Richards                   277
Recross-Examination By Mr. Scahill                        296
Further Redirect Examination By Mr. S. Richards           312
Further Recross-Examination By Mr. Scahill                316
Further Redirect Examination By Mr. S. Richards           321

INDEX TO EXHIBITS

PLAINTIFF'S EXHIBIT                                   RECEIVED

No. 39                                                    112
No. 10                                                    286

DEFENDANTS' EXHIBIT                                   RECEIVED

No. 34                                                    147
No. 35                                                    205
No. 128-5                                                 276