355

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                          )   Case No. 22 CV 3973
                                     )
              Plaintiff,             )
                                     )
        v.                           )
                                     )
REYNALDO GUEVARA; MICHAEL            )
MASON; and JOANN HALVORSEN,          )
as Special Representative of         )
ERNEST HALVORSEN, Deceased,          )   Chicago, Illinois
                                     )   February 4, 2026
              Defendants.            )   9:51 a.m.

VOLUME 3
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:        LAW OFFICE OF STEPHEN L. RICHARDS
                          BY:  MR. STEPHEN L. RICHARDS
                               MR. JOSHUA S. RICHARDS
                          53 W. Jackson Boulevard
                          Chicago, Illinois 60604

For the Defendant         BORKAN & SCAHILL, LTD.
Guevara:                  BY:  MR. TIMOTHY P. SCAHILL
                               MR. GRAHAM P. MILLER
                          20 S. Clark Street
                          Chicago, Illinois 60602

For the Defendants        THE SOTOS LAW FIRM, P.C.
Mason and Halvorsen:      BY:  MR. JOSEPH M. POLICK
                               MR. JOSH M. ENGQUIST
                               MR. JEFFREY R. KIVETZ
                               MS. CAROLINE P. GOLDEN
                          141 W. Jackson Boulevard
                          Chicago, Illinois 60604

Court Reporter:               KRISTA M. BURGESON, RPR, RMR, CRR
                             Official Court Reporter
                             219 S. Dearborn Street, Room 1420
                             Chicago, Illinois 60604
                             Telephone:  (312) 435-5567
                             krista_burgeson@ilnd.uscourts.com

                    *    *    *    *    *

            PROCEEDINGS REPORTED BY STENOTYPE
     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

357

(Proceedings heard in open court; jury out:)

THE COURT:  Call the case.

THE CLERK:  22 C 3973, Rios versus Guevara.

THE COURT:  Appearances, please.

MR. S. RICHARDS:  Stephen Richards on behalf of plaintiff.

MR. SCAHILL:  Timothy Scahill on behalf of defendant Reynaldo Guevara.

MR. ENGQUIST:  Josh Engquist on behalf of defendants Mason and Halvorsen.

MR. MILLER:  Graham Miller on behalf of Guevara.

MS. GOLDEN:  Caroline Golden for Mason and Halvorsen.

MR. KIVETZ:  Good morning.  Jeff Kivetz on behalf of Mason and Halvorsen.

MR. POLICK:  Morning, Your Honor.  Joseph Polick on behalf of Mason and Halvorsen.

THE COURT:  All right.

MR. J. RICHARDS:  Josh Richards on behalf of plaintiff.

THE COURT:  Good morning.

Mr. Scahill?

MR. SCAHILL:  Yes.  Thank you, Judge.

Last night when we adjourned, right before we adjourned, the second-to-last issue was this issue about an instruction about guilt and innocence and relevance that we

358

were talking about, and I was giving that some thought overnight. It -- it sounds like the -- that the Court is considering an instruction on that issue. And so one of the things that I wanted to -- well, it's two things really, one substantive and one procedural.

With respect to the instruction, is the Court -- if one is going to be given, going to distribute that as part of the instruction edits that we have due Friday? And if we are going to be tendered a draft instruction, there was part of it that I wanted to flag substantively that -- that we would like to have included because of the nature of the evidence as it's come in, and it relates, of course, to the -- to the COI.

So what our -- I guess what our position is, consistent with Your Honor's ruling on the motions in limine, which indicated that you would be instructing the jury that the certificate -- Certificate of Innocence plays no role in determining that matter, we were -- we would be seeking either in that instruction on guilt or innocence or as part of the COI instruction that's been tendered by the -- the Court for the draft instructions, that that subject matter be included in that.

THE COURT: Mr. Richards, do you have a response --

MR. S. RICHARDS: I just want to be absolutely clear on what is being requested. If you can give me some draft language so I can think about what you're saying. I'm just not

sure exactly what you're saying, that's all.

THE COURT: Here's the -- here is my proposal. I won't give any limiting instruction when the transcript testimony comes in. You have I believe until Friday to offer any modifications or objections to the current draft set of instructions. And so to the extent that either side feels it is appropriate to bring it in, I will do it through that.

MR. SCAHILL: Okay. So we will include that as part of the revisions due Friday then.

THE COURT: Correct.

MR. SCAHILL: Thank you.

THE COURT: And be mindful that there are other instructions in there concerning transcript testimony, even if it doesn't call out the transcript testimony, such as a witness who has appeared, what you can use that for, as opposed to a witness who has not appeared, and what the purpose that you can use that testimony for.

So in cases like this that involve a lot of substantive prior testimony, I encourage the parties to look at the draft instructions to see whether modification, addition, or subtraction is -- is needed.

MR. SCAHILL: One inquiry on that. I am not exactly sure when Mr. Rios himself is going to take the stand. I assume it's this week. My guess is that the Certificate of Innocence may come up. I know Your Honor has already given an

in -- in-trial instruction on the COI when it came in.  So, again, I don't know what he is going to say, but to the extent there is, you know, testimony about that -- we -- we may just get you a draft of the revisions ahead of time in case something comes up that we want to flag just so you have know -- just so you know what our position is.

THE COURT:  Okay.

MR. S. RICHARDS:  Your Honor, in terms of scheduling, my current thought is that Mr. Rios may testify on Monday or maybe he may begin on Friday and it'll go over into the weekend.  That would be our current plan.  If anything changes in that respect, I will let everybody know.

THE COURT:  Okay.

What is the plan for today?

MR. S. RICHARDS:  Okay.  The plan for today is readings.  And then after the readings, which will take a lot of the day, the witness will be Benjamin Carrero.  And I have given notice of that to the defendants that that is our plan. If -- if it goes near the end of the day, we had said we would call Mason.  If we're close -- too close to the end, I will skip that and fill the remaining of the day by, if I can, putting in some of the transcripts that the defense wanted, such as Daniel Noon or others.

THE COURT:  Okay.  Will those transcripts be similar question and answer, with a witness from the stand?

361

MR. S. RICHARDS: Right, either an actor or me or Josh.

THE COURT: Okay. That is fine. And I suspect everyone knows by now, 4:00 o'clock is where I start looking at whether we break early or not. It's the 4:00 to 4:30 window where I will -- I won't keep them past 4:30, but, you know, if it is 4:00 o'clock and it's 4:15, I won't make you put someone on for 10 minutes or 15 minutes.

Okay. Any other issues from any other defendants to raise?

MR. SCAHILL: No, Your Honor.

THE COURT: And for the plaintiffs?

MR. S. RICHARDS: No.

I'm sorry, go ahead, Josh. I spoke too soon.

MR. J. RICHARDS: Your Honor, I did send over to defense counsel some cross-outs and an underline or two of the Guevara, two pre-trial hearing testimony and the trial testimony. I don't know if they have a position on that.

I was crossing out some extra sustained objections that should have been crossed out at -- there were, like -- I think there was one point where an and or a day in the middle of a paragraph wasn't highlighted; or when an answer went on to the next page, there's some things like that that I emailed the defendants this morning.

THE COURT: So they haven't had a chance to review it.

MS. GOLDEN: That is correct.

THE COURT: I don't know how to make it more plain. We have deadlines for a reason, particularly when it comes to trial. Those deadlines are to avoid wasting the jury's time. It's simply not practical or feasible for me to expect the defendants to be in a position to have reviewed something they received this morning, not knowing it was coming.

The strike outs, I recall when looking at many of the designations, there were colloquies that aren't questions and answers. I had hoped the parties would just skip over that, unless it was pertinent, meaning, switching to cross-examination, that probably makes sense to denote. But the deadlines also serve other purposes, and that is to prevent prejudice to the other side and to interfere with the Court's ability to address the issues in a timely manner.

I am supposed to be past the days where I am working weekends and nights on a trial. And disregarding my deadlines forces me to do that. And I have indulged it, but I won't anymore.

And so you have the approved designations. Those are the designations that are authorized to be read. Period.

MR. S. RICHARDS: Your Honor, we understand.

MR. J. RICHARDS: I understand.

THE COURT: Anything else?

MR. J. RICHARDS: No, Your Honor. I will just read

the highlights as they were approved.

THE COURT: Okay. And --

MS. GOLDEN: Your Honor, may I?

THE COURT: Yes, Ms. Golden.

MS. GOLDEN: Am I ever going to -- do they have a copy for me to look at? While they're doing one, I can look at the other two, is because there were things that didn't make any sense. It took me a lot of time to go through and identify them. But if -- I can do it while they're doing the first reader, if they give me the other two.

THE COURT: That is fine.

MS. GOLDEN: Okay. We can agree to strike some of those 'cause it will make it more appealing reading to the jury.

THE COURT: Right. Reading transcripts ever appealing for the jury?

MR. SCAHILL: Appealing is too strong of a word, I think.

MS. GOLDEN: If it makes sense.

THE COURT: Yes.

That is fine. I appreciate the effort.

And then as far as the designations go, I believe the only ones left for me to address are Torres, correct?

MR. S. RICHARDS: Correct.

MR. SCAHILL: Yes.

364

MR. POLICK: Yes.

THE COURT: All right. And you'll -- I know where I am going. I just want to write it up. So I will try to do that while the designations -- or the transcripts are being read today.

All right. It is 10:00 o'clock. We will bring in the jury.

MR. POLICK: Thank you.

MR. SCAHILL: Thank you, Judge.

THE COURT: Oh, one reminder, since we are reading, remember people have a natural tendency to read quickly. Court reporters don't appreciate that. And so if you want a good record, and happy court reporters, remember to read at a measured pace.

MR. KIVETZ: We very much understand, Your Honor. Thank you.

MR. SCAHILL: Thank you, Judge.

(Jury in at 10:02 a.m.)

THE COURT: Good morning. Please take your seats.

All right. Welcome back, Ladies and Gentlemen. We will continue with the evidence today. But before we do that, I have to ask, does anyone have anything to report to me?

All right. Seeing no hands, Mr. Richards, you may proceed.

MR. S. RICHARDS: Thank you, Your Honor.

May I explain to the jury what I am going to do now?

THE COURT:  I will do it.

So some of the testimony -- or some of the evidence that you hear today will be read-in testimony from other proceedings.  So a reader will take the stand.  And the transcripts, for context, you know Krista is here, she is taking down everything that is said.  You have heard during the trial, question, answer, question, answer, and those -- that is the format of the transcript, where there is a question, there is an answer, and so we have transcripts from other proceedings, not this case, but other proceedings related to the events in this case, and some of the evidence that you receive will be those transcripts.  Rather than have someone stand up and just read it, you can also present it by just reading the question and then having a witness answer.

And so prior to it, you will understand who is being -- who is giving the testimony, but it won't actually be that individual.  It will be someone reading that -- what that person said during that other proceeding.

MR. S. RICHARDS:  Your Honor, we will proceed by way now of reading the transcript.

Could the person representing the witness take the stand, please?

Okay.  Josh, can you step up?

THE COURT:  And Ladies and Gentlemen, since this is

not the witness testifying, I am not going to swear them in.

They will just read the transcript of a witness who had been

sworn in some other time.

REYNALDO GUEVARA, DEPOSITION

BY MR. S. RICHARDS (reading):

Q. Officer, would you state your full name for the record, please?

A. Investigator Reynaldo Guevara. That's G-u-e-v-a-r-a.

Q. And Officer Guevara, by whom are you employed?

A. I am employed by the Chicago Police Department, gang crimes unit.

Q. And how long have you been a Chicago Police Officer?

A. I have been a Chicago Police Officer for 17 years.

Q. And how long have you been with the gang crimes unit?

A. I have been with the gang crime unit for 12 years.

Q. Officer Guevara, I want to direct your attention back to June and July of 1989.

Were you a gang crimes officer back in those months?

A. Yes, I was.

Q. And sometime after June 27, 1989, did you learn that on that date a man by the name of Luis Morales had been shot to death at 1316 North Western Avenue?

A. Yes, I did.

Q. And after learning that information, did you speak to anybody about that?

Guevara - deposition

367

A. Yes, I did.

Q. And when did you speak to that person or persons?

A. I spoke to those persons a couple of days prior to that -- I mean a couple of days after that.

Q. Do you remember the exact date?

A. No, not exactly I don't.

Q. And how many persons did you speak to?

A. Numerous people -- persons, I'm sorry.

Q. Did you receive information from any persons relative to the shooting of Luis Morales?

A. Yes, I did.

Q. And when did that occur?

A. That occurred a couple days prior to the 6th of June or July.

Q. Did you obtain this information on the street?

A. Yes, I did.

Q. And how many persons gave you information?

A. Several.

Q. Specifically what information did you obtain relative to the shooting of Luis Morales?

MR. S. RICHARDS: And just keep -- slow down. And I should too.

BY THE WITNESS:

A. The information that I received relating to the shooting of Luis Morales was that as far as the two individuals that were

Guevara - deposition

368

involved in the shooting.

BY MR. S. RICHARDS:

Q. And were those individuals identified to you as being involved?

A. One named Jaime -- Jaime, also known as Jaime Rios -- Rio- -- Rios, and the other one's name Tino. At the time I did not know who Tino was.

Q. The person or persons you learned that from, were these people informants of yours?

A. Yes, they were.

Q. In conveying the information -- question: In conveying the information about who the people involved were, did those informants ever give you the source of their information?

A. Yes.

Q. How did these people -- what did these people indicate -- how did these people indicate to you that they knew that Mr. Rios was involved?

A. Well, the time that I spoke with them on the street, they related to me that they heard of one Jaime Rios, to them known at that time as Jaime.

Q. And --

A. I produced -- if it was Jaime Rios, they said yes, Rios. Him and Tino were involved in the shooting of Luis Morales, known to them as New York at the time.

Q. So the victim was known to these people as New York?

A.   Correct.

Q.   And was -- Officer, when they -- when you were given the name Jaime Rios, did you know who they were speaking about?

A.   Yes, I did.

Q.   And in fact, did you know Jaime Rios?

A.   Yes, I did.

Q.   And would you identify him for the record?

A.   Yes, he is.

Q.   And the answer?

A.   Yes, he is.

Q.   I'm sorry?

     If you go to Line 10, beginning A.

A.   It is the gentleman sitting right there were with the back and grayish jacket, gray pants --

     MS. GOLDEN:  Objection.  I think a portion of the transcript has been skipped.

     Could you start again on Line 5?

     MR. S. RICHARDS:  Line 5.  I'm sorry.

     Let's go back to Line 5.  Could you, please?

     THE WITNESS:  Sure.

BY MR. S. RICHARDS:

Q.   And in fact did you know Jaime Rios?

A.   Yes, I did.

Q.   And is that person in court?

A.   Yes, he is.

Q.   And would you identify --

Question:   And would you identify him for the record?

A.   It is the gentleman sitting right there with the black and grayish jacket, gray pants, and the white socks, black shoes.

Q.   Did you know him to be a member of a gang?

A.   Yes, I did.

Q.   Did you have any -- question:   Did you have any information to indicate that this shooting had in fact been gang related?

A.   Yes, I did.

Q.   Now, after obtaining this information from these confidential informants, what did you do?

A.   After I received the information from the informants, I began to look for Jaime Rios.

Q.   Did you do anything else at the same time?

A.   Yes, I did.

Q.   What were you doing at the same time you were looking for Mr. Rios?

A.   At the same time I was looking for Mr. Rios, I was looking for the witness on the incident.

MR. S. RICHARDS:   Could you please re-read that answer?

BY THE WITNESS:

A.   At the time that I was looking for Mr. Rios, I was also looking for the witness on the incident.

BY MR. S. RICHARDS:

Guevara - deposition

371

Q.   And were there more than -- was there more than one witness that you were looking for?

A.   Yes, there were -- there was more than one.

Q.   Did you succeed in locating any of these witnesses before you saw Mr. Rios?

A.   No, I did not.  I located Jaime Rios before.

Q.   And when was that?

A.   That was on the 6th of June or July.

Q.   July 6th?

A.   July 6th.

Q.   And about what time of day was that?

A.   It was about 10:00 o'clock at night when I located Jaime, between 9:30 and 10:00 o'clock at night.

Q.   And at that time you were working?

A.   Yes, I was still working.

Q.   You were in an unmarked vehicle?

A.   Yes, I was.

Q.   Were you working with a partner at that time?

A.   Yes, I was.

Q.   And who was that?

A.   My partner, Steve Gawrys.

Q.   When you located Mr. Rios, where was he at?

A.   He was riding a bike on the street in front of the -- 1440 Leavitt.

          MR. S. RICHARDS:  Could you please read that answer

again?

BY THE WITNESS:

A.   He was riding a bike on the street in front of 1440 Leavitt.

BY MR. S. RICHARDS:

Q.   And did you later learn that that was, in fact, his address?

A.   Yes, I did.

Q.   And what happened then, Officer, after you located Mr. Rios on the street?

A.   After I located Mr. -- after I located Jaime, Jaime and I prior, had prior conversations before, so I knew Jaime.  And I asked him to accompany us to Area 5 for -- for further investigation of this particular incident.

Q.   Did you tell him what incident you were referring to?

A.   Yes, I did.

Q.   What did Mr. Rios say at this time?

A.   He agreed to go to Area 5 with us.

Q.   Did you in fact take him to Area 5?

A.   Yes, I did.

Q.   Was Mr. Rios handcuffed at this time?

A.   No, he was not.

Q.   Was he free to leave?

A.   He was free to go any time he wanted to.

Q.   And you and your partner drove Mr. Rios to Area 5?

Guevara - deposition

373

A.  Yes, we did.

Q.  And when you got to Area 5, did you ever do any questioning -- did you personally ever do any questioning of Mr. Rios?

A.  No, I did not.

Q.  And to your knowledge, was that done by the Area 5 detectives?

A.  Yes, it was.

Q.  Now, Officer Guevara, did you subsequently learn from Area 5 detectives that in fact Mr. Rios had made a statement with regard to the shooting of Luis Morales?

A.  Yes, I did.

Q.  And approximately what time did you first learn that in fact Mr. Morales had made a statement concerning that incident?

A.  You mean Mr. Rios?

Q.  I'm sorry.  Mr. Rios.

        Question:  I'm sorry.  Mr. Rios.

A.  Yes, that was approximately midnight or a little bit after midnight on the same night.

Q.  And is that when Mr. Rios was placed under arrest?

A.  Yes, he was.

        MR. S. RICHARDS:  Now we come to -- okay.

                REYNALDO GUEVARA, DEPOSITION

BY MR. J. RICHARDS (reading):

Q.  Good afternoon.

Officer, you said that you do remember what date it was when you first got assigned the case?

THE COURT: While the reader is orienting himself, are we switching perspectives? Have we switched to a new examiner, or was it just --

MR. J. RICHARDS: Correct, Your Honor.

THE COURT: Giving Mr. Richards a break?

MR. S. RICHARDS: No. It is switching from the State's Attorney question to defense attorney question.

THE COURT: Okay.

MR. S. RICHARDS: So he's now playing Jack Carey --

THE COURT: Okay.

MR. S. RICHARDS: -- for the answers.

THE COURT: Feel free to orient the jury as to the date and point in the testimony.

Mr. -- or the reader, do you have -- do you know where we are or do you need the page?

THE READER: No, I don't.

MR. J. RICHARDS: Your Honor, may I approach --

THE COURT: Yes.

MR. J. RICHARDS: -- and help the reader?

(Pause.)

MR. J. RICHARDS: Cross-examination by Mr. Carey.

BY MR. J. RICHARDS:

Q. Good afternoon.

Guevara - deposition

375

Officer, you said that you do remember what date it was when you first got assigned the case?

A.   No, not exactly.  I believe it was a couple days prior to having contact with Jaime Rios.

Q.   Okay.  And the shooting was on the 27th of June; is that right?  To the best of your knowledge.

A.   To the best of my knowledge.

Q.   Now, you said that you spoke to several people; is that correct?

A.   That is correct.

Q.   Okay.  And several -- you learned in the course of your investigation that several people had identified a Jose Melendez; is that correct?

A.   No, I did not.

Q.   Okay.  And did you learn that Javier Torres, who was with the victim, identified Jose Melendez?

A.   No, I did not, not at the time.

Q.   And did you learn that Mario Flores, who was on the street with his girlfriend that night, identified Jose Melendez?

A.   No, I did not.

Q.   Do you know Jose Melendez, otherwise known as Macho?

A.   I know a Macho, but I don't think that's the right -- that's the Macho that I know.

Q.   Did you learn of a witness by the name of Samantha Hudson?

A.   Yes, I did.

Q.   And her description of the two offenders were two men, 5 feet 3 to 5 feet 5 inches tall; is that right?

A.   I don't recall the description, no.

Q.   Okay.  But you did talk to her?

A.   No, I don't think I talked to her.  I was looking for her and another female, which I did not have any success in finding.

Q.   They live right behind the firehouse on Potomac?

A.   That is correct.

Q.   And do you remember what shifts you were working then?  I mean, you were working the third shift the night you brought Jaime in; is that right?

A.   No, I was not, I was working the day watch.  I was working the second shift from 0900 hours in the morning to 1735, which is about 5:30 at -- 1730 hours at night.

Q.   So you were -- so you were working overtime that day?

A.   Yes, I was.

Q.   Okay.  And did you work overtime any other day in your attempts to contact these other witnesses who were listed in the police report?

A.   I might have.  I'm not sure about it.

Q.   And you were unsuccessful in locating any of those witnesses; is that correct?

A.   That is correct, sir.

Q.   Now you said that -- you testified before that several

people gave you information about Mr. Rios; is that correct?

A. That is correct.

Q. Did you put that in your report?

A. I believe -- I believe that was put on the report was -- was some informants.

Q. Okay. Didn't you say that two informants?

A. I believe I said -- said several.

Q. Well, do you remember whether it said several or two?

A. No, I don't remember at this point right now.

Q. Is there anything that would refresh your recollection?

A. Possibly the supplementary report.

Q. Okay. While I look for that -- now, you said that the people you talked to gave you two names; is that right?

A. That is correct.

Q. Okay. Well, now I have -- I am going to show you -- may I approach the witness, Judge?

The Court: Sure, why don't you go ahead and mark it.

Mr. Carey: Okay.

BY MR. J. RICHARDS:

Q. I am going to show you what I am marking Defendant's Number 1 for identification. I am going to ask you to take a look at this and see if you recognize that.

A. Yes.

Q. Okay. And what do you recognize that to be?

A. This is the supplementary report.

Guevara - deposition

378

Q. Okay. And in your supplementary report, isn't it a fact that you wrote that you got information from two separate reliable informants?

A. Yes.

Q. Okay. And that's what -- you didn't put several in there, did you?

A. No, not several, two.

Q. And do you remember when you got that information?

A. I believe it was a couple of days prior to having contact with Mr. Rios.

Q. Okay. And do you remember the first time you went to Mr. Rios' house?

A. No. The first time I went to Mr. Rios' --

MR. J. RICHARDS: I didn't finish the question. Sorry.

THE WITNESS: Okay.

BY MR. J. RICHARDS:

Q. Okay. And do you remember the first time you went to Mr. Rios' house? Was it the day that you brought him in for questioning?

A. No. The first time I went to Mr. Rios' house was the day that I received the information.

Q. And how many days before you actually brought him in was that?

A. One or two days prior to that, I would say.

Q.   And do you remember what time it was when you went by to see him?

A.   It was about -- it was during the day.

Q.   Was his wife home?

A.   I went to the place that he was living before.  I did not know he was living there at the time.

Q.   And what was the other address -- what was the address that you went to?

A.   Figures I cannot give you, but I can tell you it was on Wolcott.

Q.   Did you put that in your report?

A.   No.

Q.   Now, in fact, you put -- the address you put in your report was 1440 North Leavitt; isn't that correct?

A.   That is correct.

Q.   Now, in the course of your investigation, did you learn that Mr. Morales, the person who had been shot, was a Spanish Cobra?

A.   I knew that prior to that.

Q.   Okay.  When you received the name of Jaime Rios, you knew who they were talking about; is that right?  These informants?

A.   I received the name Jaime.

Q.   Okay.  Now in the course of your investigation, do you remember going to the schoolyard on Leavitt Street the afternoon of July 6th?

A.   I remember being in the neighborhood numerous times.

Q.   Well, I am just talking about July 6th, the afternoon of July 6th, the day -- the afternoon before Jaime came in for questioning.

A.   I remember.  I think I was there, yes.

Q.   Do you remember taking photographs of some of the guys in the neighborhood that day?

A.   No, I don't think so.  Or I don't remember if I took any photographs that day.

Q.   You have taken photographs of people in the neighborhood before?

A.   I have taken photographs.  Yes, I have.

Q.   And it may have been that day, but your recollection is a little fuzzy on that, is that safe to say?

A.   I don't recall taking any photographs that particular day, no.

Q.   Well, do you remember being in the schoolyard that afternoon?

A.   I have been in that schoolyard many times.

Q.   Do you remember seeing Jaime in the schoolyard that afternoon?

A.   No, I do not remember seeing him that particular afternoon.

Q.   Okay.  Had you seen him on other occasions in the schoolyard?

A.   I don't remember I have seen him prior to that in the

schoolyard, but I have seen Jaime Rios quite a few times.

Q. Do you remember -- now you were working with a partner on July 6th of last year; is that right?

A. That is correct.

Q. With Detective Gawrys?

A. Yes.

Q. Okay. Do you remember him taking any photographs the afternoon of July 6th?

A. No, I don't. I don't remember any of us taking any photos that particular day.

Q. So you had the information about the witnesses and about Jaime for approximately two or three days, and the first person you were able to locate was Jaime Rios; is that right?

A. Yes, Jaime Rios was the first person we located.

Q. And after you located him, you brought in Javier Tor- -- Javy Torres to look at a line up; is that right?

A. I don't remember if we brought in Javier Torres or not.

MR. J. RICHARDS: Moving to Page A50, Line 10.

Mr. Carey continues.

BY MR. J. RICHARDS:

Q. Well, you knew that some of the people who were at the scene named other people and not Jaime Rios; is that right? The people who are listed as witnesses at the time of the shooting, none of those people said it was Jaime Rios. Is that fair to say?

Guevara - deposition

382

A.   No, I was -- during the time I was never aware of anybody naming anybody other than the person that I spoke to naming Jaime Rios or Tino.

Q.   Did you pick up Tino?

A.   We were looking for him.  We never succeeded in picking him up.

Q.   Now, you did know that one of the descriptions was for someone between 5 feet 3 and 5 feet 5; isn't that right?

A.   I -- I believe so.

Q.   Now, the knowledge that you had when you had went looking for Jaime Rios, was any -- was that based on anyone who had been on the scene at the time of the shooting?  In other words, did any of the people who were on the scene listed in the reports as witnesses say it was Jaime Rios?

A.   Not to me, no.

Q.   Okay.  And the only persons that you knew of were your confidential informants and rumors on the street?

A.   Correct.

Q.   Did you ever have a conversation with Mr. Luis Juartez?

A.   Yes, I did.

Q.   And he was one of the people who was on the street at the time of the shooting; is that right?

A.   That is correct, yes.

        MR. J. RICHARDS:  Turning to Page A53, question --
Line 14.

BY MR. J. RICHARDS:

Q. You said that in the course of your investigation you read some of the police reports; is that right?

A. I said prior -- during the course of my investigation, I have knowledge of two persons involved in the incident. That's it.

Q. Did you read any of the police reports?

A. Some, not all.

Q. Okay. Did you read the descriptions given by Mr. Luis Juartez?

A. No, I did not.

Q. Okay. Were you aware that Detective Noon brought Mr. Juartez in to look at photograph books?

A. No, I was not aware of that.

Q. Do you remember which police reports you did read?

A. No, I do not.

Q. Other than Mr. Juartez, after the arrest, did you talk to any of the witnesses listed in the police reports?

A. No, I didn't. I tried to look for them, but I couldn't get in contact with them.

MR. J. RICHARDS: And, Your Honor, for the record, that completes the reading of the transcript from February 9th, 1990, of the examination of Reynaldo Guevara.

THE COURT: Okay.

MR. J. RICHARDS: And, Your Honor, we will now be

moving to the date of April 3rd, 1990, a different examination

of Officer Guevara.  And Stephen Richards will now be reading

the exact -- the examination on direct by Mr. Marek, the

State's Attorney.

THE COURT:  Thank you.

MR. S. RICHARDS:  And to the reader, do you have the

right notebook now?

THE READER:  What page is that?

MR. S. RICHARDS:  Going to Page E24, which is the

second page --

THE READER:  Uh-huh.

MR. S. RICHARDS:  -- in the transcript.  Got that?

Thanks.

Okay.  Direct examination by Mr. Marek.

REYNALDO GUEVARA, DEPOSITION

BY MR. S. RICHARDS (reading):

Q.  Officer, would you state your name for the record, please?

A.  Investigator Guevara, G-u-e-v-a-r-a, Star Number 16345.

Q.  You're a Chicago Police officer?

A.  Yes, I am.

Q.  You're assigned to gang crimes north?

A.  Yes, I was.

Q.  And what is your current assignment?

A.  Gang crimes north.

Q.  And, Officer, I want to direct your attention back to

July 6th of 1989.  Were you a Chicago Police Officer assigned to gang crimes north back on that date?

A.  Yes, I was.

Q.  And on that date, did you transport Mr. Jaime Rios to Area 5 violent crimes?

A.  Yes.

Q.  And, Officer Guevara, did you at any time question the defendant, Jaime Rios, about the shooting death of Luis Morales?

A.  No, I did not.

Q.  And Detective or Officer Guevara, did you at any time ever pull the hair of Mr. Jaime Rios?

A.  No, sir.

Q.  Did you at any time ever see Mr. Jaime Rios' hair pulled by anyone in your presence?

A.  Not in my presence, sir, no.

Q.  Officer, did you ever threaten Mr. Rios with the loss of any parental rights to any child that he had?

A.  No, I did not.

Q.  Did anyone in your presence ever threaten him with any loss of parental rights?

A.  Not in my presence.

Q.  Did anyone in your presence ever threaten Ms. Diana Rodriguez with the loss of any parental rights to her child?

A.  No, not in my presence.

Q.   Did you personally ever threaten Ms. Diana Rodriguez with the loss of any parental rights to her child?

A.   No, I did not.

MR. J. RICHARDS:  For the record, Your Honor, I will now be reading the cross-examination that was conducted by Mr. Carey on April 3rd, 1990.

THE COURT:  Okay.

REYNALDO GUEVARA, DEPOSITION

BY MR. J. RICHARDS (reading):

Q.   Now, Officer Guevara, you brought Mr. Rios in that night of the 6th of July; is that right?

A.   Yes.

Q.   Around 10:00 o'clock?

A.   I don't remember the time.

Q.   Approximately 10:00 o'clock?

A.   Approximately, yes.

Q.   You continued to work on the case that evening; is that correct?

A.   Yes, I did.

Q.   Went out looking for witnesses and so forth?

A.   Looking for the other supposed offender.

Q.   And about how late did yo]u work on this case?

A.   I don't remember, but it was, appears to be, in the early morning hours.  I don't remember exactly how late it was.

Q.   You came back and forth to Area 5 at a couple of points.

You were in the Area 5 headquarters?

A.   Couple occasions, yes.

Q.   And you saw Diana Rodriguez there, right?

A.   I don't remember seeing her, no, I do not.

Q.   Well, you know that a couple of your brother officers brought her into Area 5 headquarters that night; is that right?

A.   Do I?

Q.   Yes.

A.   No, I do not.

Q.   Did people tell you that they brought her in?

A.   No, I don't believe so.

Q.   You never saw her there?

A.   Not to my knowledge.

Q.   And so you don't -- was there a room next to where Mr. Rios was being interviewed?

A.   There were several rooms.

Q.   Did you look in that room?

A.   No, I did not.

Q.   Did you talk at all to the officers who assisted on the arrest that night -- Vukonich, Zacharies, Guzman, Longos, Healey?

A.   I believe I had some conversations with them.

Q.   None of those people told you that they brought in Diana Rodriguez?

A.   No.

Guevara - deposition

388

Q.   All right.  Now, it was just you and your partner when you picked up Jaime Rios; is that right?

A.   I believe so.

MR. J. RICHARDS:  Turning to Page E30.  Questioning by Mr. Carey.

BY MR. J. RICHARDS:

Q.   Now, you were the -- you arrested Jaime Rios, didn't you?

A.   Yes.

Q.   And you arrested him at Area 5?

A.   He was arrested at Area 5.

Q.   Well, you arrested him there, didn't you?

A.   I made out the arrest report, yes.

Q.   And you signed the arrest report?

A.   Yes.

Q.   You and your partner, Gawrys?

A.   Correct.

Q.   And that was because you brought him in, right?

A.   That is correct.

Q.   And you also said that there were other officers who assisted in the arrest; is that right?

A.   Other officers assisted in the investigation, yes.

Q.   Well, your report says the arresting officers were Vukonich, Zacharies, Guzman, Longos, Halvorsen, and Mason?

A.   That is correct.

Q.   Along with yourself and your partner?

A.   That's correct.

Q.   That is a total of eight?

A.   Correct.

Q.   And other than Halvorsen and Mason, those are the people that were out on the scene at Mr. Rios' home; is that correct?

A.   They might have been there.

Q.   You don't know?

A.   But I can't say for sure.

Q.   You didn't see them there?

A.   They might have been there.

Q.   The question was, did you see them there?

A.   Like I said, I don't remember.  They might have been there.

          MR. J. RICHARDS:  Now, Your Honor, we are switching back to Stephen Richards for a redirect examination by Mr. Marek.

          THE COURT:  Thank you.

          MR. S. RICHARDS:  Redirect examination by Mr. Marek.

                REYNALDO GUEVARA, DEPOSITION

BY MR. S. RICHARDS (reading):

Q.   Did it take eight officers --

          MR. S. RICHARDS:  I'm sorry.  Strike that.

BY MR. S. RICHARDS:

Q.   Did it take eight police officers to arrest Mr. Rios?

A.   No, it didn't.

Q.   You did not formally place him under arrest; is that

Guevara - deposition

390

correct?

A.   No.

Q.   You were put on -- you did the arrest report because you had been the person who took him into the area --

MR. S. RICHARDS:   Strike that.

BY MR. S. RICHARDS:

Q.   You were put on -- you did the arrest report because you had been the person who took him into Area 5 originally?

A.   That is correct.

MR. J. RICHARDS:   Your Honor, now switching back to recross-examination conducted by Mr. Carey.

THE COURT:   Okay.

REYNALDO GUEVARA, DEPOSITION

BY MR. J. RICHARDS (reading):

Q.   Well, you assisted in the arrest in that you questioned Mr. Rios later then, too, didn't you?

A.   No, I did not question him.

Q.   Didn't you tell him he could lose his newborn baby?

A.   No, that is not true.

Q.   You knew his wife was out there with the baby that night, didn't you?  On the streets?

A.   On the streets.  On the streets?

Q.   Yes.

A.   I believe she was on the street, yes.

Q.   So you did see her that night?

A.   Yes.

Q.   With the baby?

A.   I don't know if she had the baby, but I did see her on the street.

Q.   And did you -- you talked with Mr. Rios on the way to the Area 5 headquarters, didn't you?

A.   No, I didn't.

Q.   Nothing was said in the car?

A.   Nothing was said in the car.

        MR. J. RICHARDS:  Your Honor, and that concludes the testimony from April 3rd, 1990, of Officer Guevara.

        THE COURT:  Okay.

        MR. J. RICHARDS:  Your Honor, we are now moving to Thursday, November 29th, 1990, the trial testimony of Officer Guevara.  It begins with a direct examination conducted by Ms. Hanlon of the State's Attorney's Office.

        MR. S. RICHARDS:  Direct examination by Ms. Hanlon.

                REYNALDO GUEVARA, DEPOSITION

BY MR. S. RICHARDS (reading):

Q.   Sir, could you please state your full name, spelling your last name for the court reporter?

A.   Detective Reynaldo Guevara, G-u-e-v-a-r-a.  Star number is 16345.  And I am assigned to the Area 4 violent crimes unit, Chicago Police Department.

Q.   How long have you been a Chicago Police Officer?

A.   18 years.

Q.   18 years?

A.   Correct.

Q.   How long have you been a Detective?

A.   I have been a Detective for the past four months.

Q.   I'd like to call your attention to June and July of 1989. How you were -- how were you assigned within the Chicago Police Department, at that time?

A.   I was an investigator for the gang crime unit.

Q.   Can you explain to the Ladies and Gentlemen what an investigator in the gang crime unit does?

A.   An investigator of the gang crime unit, they deal with the gang activities in the area, Area 5, Area 6.  Usually two areas.  And what we deal with is with any crime that is committed by gang, gang members.

Q.   Detective, what areas were you specifically assigned to during that time?

A.   I was assigned to Area 5 and Area 6, both areas.

Q.   Can you tell the Ladies and Gentlemen of the jury the general boundaries to Area 5 and Area 6?

A.   Area 5 is covered from the river all the way up to O'Hare field.  And from I would say Roosevelt on the west end to Evanston.

Q.   And what about Area 6?

A.   Area 6 covers east of the river up to Evanston and down to,

I would say, about Lake Street, somewhere around there.

Q. Now, Detective, I want to call your attention specifically to July 3rd of 1989. Did you become involved in an investigation of the shooting death of Luis -- of Mr. Luis Morales?

A. Yes, I did.

Q. And how is it that you became involved in that particular investigation?

A. I got involved in that investigation when I came to work early that day, found out that the person by the name of Luis Morales was shot and killed at Potomac. And being familiarized with the area, I started talking to people on the streets.

Q. During the course of your investigation and speaking with people on the streets, did you come to learn the name of the shooter?

A. Yes, I did.

Q. What name were you given?

A. I was given by informant the name of Jaime and Tino as being involved in the shooting of Luis Morales. Jaime being the shooter.

Q. Detective, how is it that you gained information on that particular day?

A. The names were given to me, Jaime and Tino.

Q. How were those names given to you?

A. Through reliable informants.

Guevara - deposition

394

Q.   Can you explain to the Ladies and Gentlemen what a reliable informant is?

A.   Reliable informant is a person I had been dealing with that had given me prior information and people being involved in shooting and that lead to convictions.

Q.   After receiving that information, Detective, did you recognize either of those two people?

A.   Yes, I did.

Q.   Which person did you recognize?

A.   I recognized the person of Jaime.

Q.   And who did you recognize that person to be or what did you know him as?

A.   As Jaime Rios.

Q.   And how is it that you knew Jaime Rios?

A.   Well, I have -- I know Jaime Rios as being a member of the Latin Kings.  And I know his mother and I have had prior contacts with him.

Q.   After learning his name, Detective, did you yourself do anything?

A.   Yes, I did.

Q.   Tell the Ladies and Gentlemen what you did.

A.   For several days I was looking for him.

Q.   That search began on the 3rd of July, 1989?

A.   Yes, it did.

Q.   Were you able to find him on that particular date?

Guevara - deposition

395

A.   No, I did not.

Q.   Did you continue to look for him?

A.   Yes, I did.

Q.   On July 6, 1989, were you able to find Jaime Rios?

A.   Yes, I did.

Q.   Under which circumstances did you find him?

A.   He was on the street at -- in front of 1440 on Leavitt riding on a bicycle.

Q.   At about what time of the day was it that you first saw him?

A.   Approximately about 9:30 at night.

Q.   Were you alone at that time or were you with one of your partners?

A.   I was with my partner.

Q.   As you were working out on the street that night, Officer, were you in uniform or were you wearing plain clothes?

A.   I was working plain clothes.

Q.   When you say plain clothes, are you referring to being dressed much like the way you're dressed today?

A.   No.

Q.   Can you tell us what you mean by plain clothes?

A.   Blue jeans, jacket -- and regular street clothes.

Q.   And what type of a car were you driving?

A.   An unmarked car.

Q.   And what do you mean by an unmarked car?

Guevara - deposition

396

A.   Police vehicle that does not have any lights, or any marking indicating police squad.

Q.   Now, Detective, when you first saw Jaime Rios, what did you do?

A.   I approached him.

Q.   When you approached him, were you on foot or were you in your car?

A.   I was on foot.

Q.   And as you approached him, did you say anything to him?

A.   Yes, I did.

Q.   What did you say?

A.   I said, Jaime, I have been looking for you for the past three years -- three days, I'm sorry.  A few days or so.  And where have you been hiding?  He says, I haven't been hiding anyplace.  I have been around.

Q.   Did you say anything else to him?

A.   Yes, I did.

Q.   What did you say next?

A.   Then I informed him that I would like him to come to Area 5 with us on an investigation of a shooting of New York.  How that happened on Western Avenue.

Q.   And where is Area 5 located in the city?

A.   5555 West Grand.

Q.   After you told him that you would like him to accompany you to Area 5, did he make any kind of response to you?

Guevara - deposition

397

A.   Yes, he did.  He said he would.

Q.   After he indicated that he would go with you, what did you do next?

A.   Walked toward the car that was parked on Bell.  And put him in the back seat on the car.

          MR. S. RICHARDS:  Please re-read that.

BY THE WITNESS:

A.   Walked toward the car that was parked on Bell.  And put him in the back seat of the car.

BY MR. S. RICHARDS:

Q.   After he was placed inside of the car, where did you go?

A.   Well, we stayed there for a few seconds because a female approached us, also, meaning his girlfriend.  And wanted to find out why was he in the car.

Q.   Did she identify herself to you?

A.   I believe she did.

Q.   And she asked you why he was in the car; is that right?

A.   Yes.

Q.   Did you tell her anything?

A.   Yes, I did.

Q.   What did you tell her?

A.   I told her we are under investigation of the shooting that happened on Western Avenue.  That he was going to go to Area 5 with us and I would bring him back later on.

Q.   Did you then go on to Area 5 with the defendant?

A.   Yes, I did.

Q.   Did you have any other partners with you in the car?

A.   Yes.

Q.   And what would be your partner's name?

A.   Steven Garr.

Q.   Now, once you got to Grand and Central, what did you do with Jaime Rios?

A.   When we got to Grand and Central, I introduced him to Detective Mason and Halvorsen of Area 5 violent crimes and I left.

Q.   Did you ever return back to Area 5 that day?

A.   Yes, I did.

Q.   When you returned back, did you learn anything concerning Jaime Rios?

A.   Yes, I did.

Q.   What did you learn?

A.   I learned that he had given a statement implicating himself.

Q.   Now, Detective, were you working on this investigation on July 7th of 1989?

A.   Yes, I was.

Q.   And on that particular date, did you have occasion to go out and find any witness?

A.   Yes, I did.

Q.   Do you recall the name of the person that you went out to

Guevara - deposition

399

find?

A.   I went out and found Luis Huertas.

Q.   Do you remember where you picked up Huertas on the 7th of July?

A.   Yes.  I picked him up in an ice cream parlor on, I believe, 1313 on Western where he was working.

Q.   Did you -- do -- strike that.

Do you recall about what time this would have been?

A.   Between 4:30 and quarter to 5:00.

Q.   After you picked up Luis Huertas, where did you take him?

A.   I took him to Area 5 violent crimes.

Q.   And once you got to Area 5, where did he go?

A.   I introduced him also to Detective Mason and Halvorsen for the purpose of viewing a lineup.

Q.   I'm going to ask you, if you will, to look around the courtroom.  See if you see the person you know as Jaime Rios here today.

A.   Yes, I do.  The gentleman over there in the gray -- in the dark suit over there.

Ms. Hanlon:  May the record reflect the in-court identification of the defendant?

The Court:  Sure.

Ms. Hanlon:  May I have one second, Judge?

I have no other questions, Judge.  Thank you.

MR. J. RICHARDS:  Your Honor, I am now going to read

the cross-examination questions by Mr. Carey to Guevara that occurred on the trial date of November 29, 1990.

THE COURT:  Okay.

RAYMONDO GUEVARA, DEPOSITION

BY MR. J. RICHARDS (reading):

Q.  Detective now?

A.  Yes.

Q.  You have been promoted to detective recently?

A.  Yes, I have.

Q.  I'm sorry.  How long had you been in gang crimes?

A.  I was in gang crimes for 12 years.

Q.  And during that time, were you always working in, near, northwest side over there in Area 5?

A.  Yes.

Q.  And so, during that 12 years, you became quite familiar then with the gangs that operated in that area?

A.  Yes, I did.

Q.  What the boundaries of those gangs were?

A.  Yes, I did.

Q.  Basically north of Division and east of Western was Latin Kings territory; is that right?

A.  Yes.

Q.  West of Western over to California would be Cobras and Disciples?

A.  Yes.

Q. And north of Division up to, say, Armitage?

A. Yes.

Q. Okay. Now, when was your first involvement with this case?

A. If I recall, it was probably on the 3rd.

Q. So right after the shooting, you weren't involved in this?

A. No, I was not.

Q. Okay. Do you remember how -- who asked you to get involved?

A. No. Nobody particularly asked me to get involved.

Q. So, you sort of heard about the case and you voluntarily got involved?

A. That is correct.

Q. And you say you talked to some confidential informants; is that right?

A. Yes, I did.

Q. Were they gang members?

A. Yes, they were.

Q. Now, gang members sometimes lie to the police, don't they?

A. Sometimes.

Q. They set each other up, don't they?

A. Yes. Sometimes.

Q. Sometimes they will tell you somebody did it just to get them off the street, won't they?

A. If it's from the opposite gang, yes.

Q. Right. Now the -- you talked to how many people on this

case?

A. In numbers, I couldn't give you. But it was several people, yes.

Q. Several confidential informants?

Line 3.

A. Yes. Specifically two confidential informants. And the rest of them were informants, but they were not confidential.

Q. So you talked to some informants over a period of what time?

A. I would say for a period of -- I started working at 9:00 o'clock that morning. All through the day.

Q. Did you talk to Little Mike?

A. I talked to Little Mike, yes.

MR. J. RICHARDS: Moving to Page 284, Line 8.

BY MR. J. RICHARDS:

Q. Were these informants paid?

A. No, they were not.

Q. Well, when people give information, especially gang members, sometimes they expect something in return; isn't that correct?

A. Not necessarily, no.

Q. Sometimes?

A. Sometimes they do, yes.

Q. Maybe some -- some consideration in the future?

A. True, yes.

Q.   Now, these confidential informants that you talked to, neither one of them were at the scene the night Luis Morales got shot, were they?

A.   No, sir.

MR. J. RICHARDS:  Moving to Page 285, Line 2.

BY MR. J. RICHARDS:

Q.   Well, you don't know whether it was secondhand or thirdhand?

A.   True.

Q.   Now, you did look at police reports relative to this case, didn't you?

A.   Some.

MR. J. RICHARDS:  Moving down the page to Line 16.

BY MR. J. RICHARDS:

Q.   No one named in a police reports that you read, named Jaime Rios, did they?

A.   No.

Q.   In fact, two of the witnesses named another person, Macho Melendez; isn't that correct?

A.   No, sir, not at the time I didn't.

MR. J. RICHARDS:  Go back to Page 285.  Read starting on Line 24, please.

And, in fact, I will re-read that question from Line 19.

BY MR. J. RICHARDS:

Guevara - deposition

404

Q.   In fact, two of the witnesses named another person, Macho
Melendez; isn't that correct?

A.   No, I have no knowledge of anybody name-naming anybody
else.

Q.   You don't have any knowledge of that?

A.   No, sir.  Not at the time I didn't.

Q.   Do you recall what police reports you looked at?

A.   I believe I recall looking at the first, the beat officer's
report.

Q.   Did you look at the report that the two detectives, Boris
and Johnson, first detectives supplementary reports, that were
made out the following day, did you look at that report?

A.   No, I did not.

Q.   June 28th?

A.   No.

Q.   You didn't look at that?

A.   No, I did not.

Q.   That was available, though, wasn't it?

A.   Excuse me?

Q.   That report was available to you, wasn't it?

A.   It was made out on the 28th of June.  I do not recall
whether it was available to me or not.

Q.   But the case report was available?

A.   Yes.

Q.   And you read that?

A.   Yes.

Q.   Now, the case report gave descriptions, didn't it?

A.   I believe so.

         MR. J. RICHARDS:  Moving to Line 12.

BY MR. J. RICHARDS:

Q.   Well, were you looking for people that were described in the case report that you read?

A.   I was looking for the persons that were involved in this case.

Q.   Well, did you use the information in the report that you read to help you?

A.   No.

Q.   So, you ignored that?

A.   At this point, yes, I did.

Q.   Now, you worked overtime on this case, didn't you?

A.   Yes, I did.

Q.   You knew the victim was a Cobra, didn't you?

A.   Yes, I did.

Q.   And you knew Jaime Rios?

A.   Yes, I did.

Q.   In fact, you saw Jaime Rios earlier in the day he got arrested at the schoolyard at Leavitt, didn't you?

A.   No, I did not.

         MR. J. RICHARDS:  Moving to Line 14.

BY MR. J. RICHARDS:

Guevara - deposition

406

Q.   You went by there that afternoon, didn't you?

A.   I have been by several times, yes.

Q.   Jaime came up to your car, didn't he?

A.   No, he did not.

          MR. J. RICHARDS:   Moving to Line 23.

BY MR. J. RICHARDS:

Q.   Now, you said before when you came up to Jaime you said,
where you been hiding, right?

A.   Yes, I did.

Q.   Was he hiding when he was riding his bike in front of his
house?

A.   Not at the time.

Q.   So you wouldn't characterize that as hiding, riding in a
bike in front of his house?

A.   No, not at that time.  No.

Q.   And he didn't run away?

A.   No, he didn't.

Q.   Didn't try to escape?

A.   No, he did not.

Q.   Now, you say he went with you voluntarily; is that right?

A.   That is correct.

Q.   Isn't it true that you handcuffed him and took him to the
back of the house?

A.   No, I did not.  That's not true.

Q.   Now, you had information from what you called a reliable

informant that this was the guy, Jaime Rios, right?

A.   That is correct.

Q.   And so, he was your prime suspect in this murder; is that right?

A.   Yes, he was.  He was one of them.

Q.   You didn't handcuff him?

A.   No, I did not.

Q.   He went with you voluntarily?

A.   Yes, he did.

Q.   And you didn't go into his house and search either, did you?

A.   No, I did not.

Q.   Well, isn't it a fact that you stopped, handcuffed him, and put him by the fence along the side of his house while you searched his house?

A.   No, sir.  That is not true.

Q.   And isn't it also a fact that you and your partner went in the middle door because Jaime lives in the rear apartment up to the second floor and went in?  You let about three or four other police officers in the back door; isn't that correct?

A.   No, sir.  That's not correct.

Q.   Well, it is correct that there were about six other police officers out there that night; isn't that correct?

A.   I don't know if there were six, but there were other police officers.

Q. They are all gang crimes guys, too, right?

A. Yes.

Q. Let's say somewhere between five and eight police officers out there, including yourself and your partner?

A. No, I wouldn't say five.

Q. How many would you say?

A. I'd say about four or five, yes.

Q. So about -- at least -- well, five?

A. Yes. I would say.

MR. J. RICHARDS: Moving to Line 16.

BY MR. J. RICHARDS:

Q. You knew this was a murder case?

A. Yes, I did.

Q. The weapon hadn't been recovered by the time you went out to Jaime's house, had it?

A. No, it has not been.

Q. In fact, the information you had there were two weapons, right?

A. That is correct, yes.

Q. You didn't go up into his apartment and look for a weapon?

A. No, I did not.

Q. In the case report that you read and ignored, it was very specific clothing descriptions, weren't there?

A. I don't recall about any other description, whether just only on the heights or that's it.

Q.   Well, do you recall reading that one of the persons was wearing a red T-shirt, red shorts, British Knight gym shoes; and the second person hospital type shirt, blue jeans shorts, and British Knight gym shoes.  Do you remember that?

A.   No, not really.

Q.   You don't remember that?  So you didn't go in searching for those types of clothes either in Jaime Rios' apartment?

A.   No, I did not.

Q.   So, now when Jaime came in voluntarily, his wife asked to come along with him, didn't she?

A.   I do not recall her ever asking if she --

Q.   You don't recall that?

A.   No.

Q.   She came to the police station, though, didn't she?

A.   I -- I didn't see her at the police station.

Q.   You didn't see her?

A.   No, I did not.

     MR. J. RICHARDS:  Moving to Page 294, Line 4.

BY MR. J. RICHARDS:

Q.   You did see her out by the police car when Jaime was in the car, right?

A.   Yes, I did.

Q.   You didn't let them have a conversation at that time, did you?

A.   They did.  They had a conversation.

Q. Well, you told him in fact we'll bring him back, right?

A. True. I did.

Q. Okay. And she wanted to know what this was all about, right?

A. That's correct.

Q. And didn't you learn later from one of your fellow officers that some of your fellow officers took her into the police station?

A. No, I did not.

Q. And she sat there until about 3:30, 4:00 o'clock in the morning?

A. No, I did not.

Q. And -- well, you were back at Area 5, weren't you?

A. Yes, I was.

Q. And you were in and out that night, weren't --

A. Yes, I was.

Q. You were in the open area. For the Ladies and Gentlemen the second -- you were on the second floor. Jaime was on the second floor. Is that right?

A. That is correct.

Q. There's an open area on the second floor?

A. Yes, there is.

Q. And then there's small interview rooms?

A. That is correct.

Q. Around -- and you didn't see her in that open area?

Guevara - deposition

411

A.   No, I did not.

Q.   Did you go into any of those small rooms?

A.   No, I did not.

Q.   Did you ever go in to see Jaime?

A.   No, I did not.

Q.   You never went in to talk to Jaime?

A.   No, I did not.

Q.   Didn't you, in fact, go in and say, Jaime, I know you were out there.  Why don't you tell us that you were out there?

A.   No.

Q.   You don't remember saying that?

A.   I did not.  I do not say that.

Q.   Well, you were the arresting officer on this case, weren't you?

A.   Yes.

Q.   You signed the arrest report, you and your -- your partner. And on the arrest report there were eight police assigned as personnel, assigned and assisting in the arrest; is that right?

A.   That is correct, yes.

Q.   So there were eight people?

A.   No, sir.  There were not.

Q.   But there were eight people on the arrest report?

A.   Yes, there were.

Q.   Now, you got information from these confidential informants that Tino was one of the guys and Jaime was one of the

shooters; is that right?

A.   Yes.

Q.   Those were the two people involved?

A.   That is correct, yes.

Q.   And Tino was later put in a lineup; isn't that correct?
Tino was later put in a lineup, wasn't he?

A.   Tino was later put on a lineup, wasn't he?

        MR. J. RICHARDS:  Your answer is --

BY THE WITNESS:

A.   I don't know about that.

        MR. J. RICHARDS:  I will restart Line 4.

        THE WITNESS:  Sorry.

BY MR. J. RICHARDS:

Q.   Tino was later put in a lineup, wasn't he?

A.   I don't know about this.

Q.   You don't know about that?

A.   No, I don't.

Q.   Did you read any other reports June of -- July of 1988 or
'89 and today?

A.   No, I have not.

Q.   You never read anything about this case?

A.   No, I haven't.  I have not.

Q.   Well, wasn't a fact your purpose in going out to get Jaime
Rios was to arrest him for murder?

A.   My purpose was to bring him in and find out if he really

was involved in the case.

MR. J. RICHARDS:  Moving to Page 298, Line 6.

BY MR. J. RICHARDS:

Q.  These confidential informants also told you where you could get the guns, right?

A.  Yes.

Q.  Told you you could get the .25 caliber gun at Alex Lopez's house, right?

A.  I don't remember it, whether they said .25 caliber Alex Lopez's house, and .32 at somewhere else or the .38.  No, I do not.

Q.  If I showed you a copy of the warrants, would that refresh your recollection?

A.  I did not make the warrant.

MR. J. RICHARDS:  Moving to Page -- moving to Line 24 of the same page.

BY MR. J. RICHARDS:

Q.  If I showed you a copy of the warrant, would that refresh your recollection?

A.  Yes, yes.

Q.  Defendant's 2.

I'm going to show you what I'm going to mark as Defendant's Number 2 for identification.  Ask you to just take a look at that for a second.

A.  Yes.  It's a warrant.

Q.   Is that the warrant for Alex Lopez in his house?

A.   Yes, it is.

Q.   And is there a .25 -- the evidence to be searched for is .25 caliber semiautomatic gun in that warrant; is that right?

A.   Yes, it is.

Q.   So your recollection is refreshed now; is that right?

A.   My recollection is refreshed as far as the warrant, yes.

Q.   So the confidential informant that told you about the gun, the .25, told you you'd find it at Alex Lopez's house; is that right?

A.   Again, didn't tell me.  He told the person who made the warrant out, who wrote the warrant.

          MR. J. RICHARDS:  Moving to Page 300, Line 18.

BY MR. J. RICHARDS:

Q.   Well, you had two confidential informants; is that right?

A.   Yes, sir.  Correct.

Q.   They told you who did it and where the guns were, right?

A.   Yes.

Q.   Now, did you pass that information on to a brother officer or did you bring the confidential informant in to tell your brother officers?

A.   Brought him in to talk to the detectives.

Q.   So, you were with this confidential informant when he came in to talk to this police officer?

A.   I brought him in and turned him over to them.

Q. You knew what he was going to say, didn't you?

A. No, not exactly. I knew he was going to say about the gun, but that's not it. The purpose of bringing him in was to tell this other officer where he could find the gun so he could get a warrant, isn't it?

A. That's correct.

Q. Okay. So he got a warrant to search Alex Lopez and his house; is that right?

A. That is correct, yes.

MR. J. RICHARDS: Moving to Page 302, Line 6.

BY MR. J. RICHARDS:

Q. Your brother officers who served this warrant never recovered the .25 caliber gun, did they?

A. No, they did not.

Q. That was your reliable confidential informant that gave them that information?

A. Yes.

Q. They also told you, your confidential informant, reliable confidential informant told you there was a .38 used in this case, right?

A. Yes.

Q. And you brought him in and got a warrant to search Ben Carrero's house for that .38, didn't you?

A. Yes.

Q. You never got a .38, did you?

A.   No, we didn't.

Q.   That's the same confidential -- reliable confidential informant?

A.   Yes.

Q.   Same one that gave you Tino, too, right?

A.   That is correct, yes.

Q.   Now, the area of the shooting where Luis Morales died, you would consider that a high crime area, wouldn't you?

A.   Yes, I would.

Q.   Several shootings there during an average week?  There would be several shooting in that area?

A.   I don't know about every week, but yes, there's several shootings in that area.

Q.   Well, this was in the summertime around the 4th of July. That tends to be a time when there's more shootings, wouldn't you say, based on your 12 years of experience?

A.   Yes.

Q.   That summer was really no different, last summer, right, summer of '89?

A.   No, it was not.

Q.   Now -- not all of them are murders, but there are a lot of shootings, right?

A.   Yes, there are.

Q.   Especially along Western there where there's two gangs sort of rubbing up against one another?

A.   Yes.

Q.   You knew Macho Melendez, didn't you?

A.   I knew a Macho, yes.

Q.   In the Latin Kings?

A.   Yes.

Q.   Do you know what his rank was?

A.   I believe it was at that time he was the head of the Latin Kings in that section there.

         MR. J. RICHARDS:  Moving to Line 21.

BY MR. J. RICHARDS:

Q.   By the time you got the information from the street, about seven or eight days had gone by since the shooting; is that right?

A.   I believe the shooting was on the 26th and I started on the 20th -- on the 3rd.  Yes.  About that time.

Q.   Now, you had information from a reliable informant and you never went to a judge to get a warrant for the arrest of Jaime Rios, did you?

A.   No, I did not.

         MR. J. RICHARDS:  Moving to Page 306, Line 2.

BY MR. J. RICHARDS:

Q.   Can you tell us what a pitchfork tattoo means?

A.   Pitchfork tattoo means that you are Disciple, Latin Disciple.

Q.   Disciples run with the Cobras?

Case: 1:22-cv-03973 Document #: 346 Filed: 03/04/26 Page 64 of 259 PageID #:21426

A.   Yes, that is correct.

Q.   Kind of like Pontiac and Buick, they're all part of General Motors, they run together?

A.   Correct.

MR. J. RICHARDS:  Your Honor, for the record, we are now switching to the redirect examination by Ms. Hanlon.

THE COURT:  Thank you.

MR. S. RICHARDS:  Redirect examination.

REYNALDO GUEVARA, DEPOSITION

BY MR. S. RICHARDS (reading):

Q.   Detective Guevara, did you explain the purpose of keeping your informants confidential?

A.   Well, the purpose of keeping my informants confidential, any informant is number one is to keep them alive.

Q.   And if you went around telling people who your confidential informants were, what would happen to them?

A.   The same thing happened to New York.

Q.   Now, Detective Guevara, your role in this investigation was to find Jaime Rios; is that not right?

A.   That is correct.

Q.   Were other detectives from gang crimes also helping you to look for him?

A.   Yes, sir, they were.

Q.   You were not the Detective assigned to this case, were you?

A.   No, I was not.

Q.   Now, you already testified that you received information from your informants about two individuals; is that correct?

A.   That is correct.

Q.   Which individuals did you learn was the actual shooter of New York?

A.   Jaime Rios.

Q.   Ms. Hanlon:  Now, counsel asked you about you introducing your informants to another officer who got a warrant.  Do you remember him asking you all about that?

A.   Yes, I do.

Q.   Detective Guevara, did you yourself go to Alex Lopez's house to get a gun?

A.   No, I did not.

Q.   Do you remember how many Detectives went to his house to look for this gun?

A.   No, I don't.

Q.   Do you know how long after this murder occurred that they went to the house to look for this gun?

A.   No, I don't.

Q.   Did you know where exactly in the house they looked?

A.   No, I don't.

Q.   Do you know who had come into that house and gone -- and had gone out of that house between the date of the murder and the date that the officers went to look for that gun?

A.   No, I don't.

Guevara - deposition

420

Q.   How about Benjamin Carrero's house, did you go there to look for a gun?

A.   No, I don't, did not.

Q.   Do you know how many officers went to -- there to look?

A.   No, I don't know how many.

Q.   Do you know if they were --

        MR. S. RICHARDS:  Strike that.

BY MR. S. RICHARDS:

Q.   Do you know if they looked?

A.   No.

Q.   Do you know if anybody went in and out of his house between the time of the murder and the time they went to look for the gun?

A.   No, I do not.

        MR. J. RICHARDS:  Your Honor, I am now going to read the recross-examination by Mr. Carey.

        THE COURT:  Okay.

        MR. J. RICHARDS:  Page 309, Line 23.

                REYNALDO GUEVARA, DEPOSITION

BY MR. J. RICHARDS (reading):

Q.   Now, you're the one that said that this confidential informant was reliable?

A.   Yes.

        MR. J. RICHARDS:  Oh, strike that.

        Line 15, Page 310.

BY MR. J. RICHARDS:

Q. Mr. Carey: You talked to this confidential informant sometime after the murder; right?

A. Yes.

Q. And when he told you where you could find the weapon then, not where they were two weeks ago, he said you can go find the weapon at Alex Lopez's and Ben Carrero's and that's why you got the warrant, right?

A. He told us where the weapon might have been.

MR. J. RICHARDS: Line 14.

BY MR. J. RICHARDS:

Q. You went with this information to a brother officer who went to a judge to get a warrant to go into somebody's house to look for a gun. And you said that might have been. Is that what you're telling us now?

A. That's what I'm saying, yes.

Q. This guy was reliable, wasn't he?

A. Yes, he was.

MR. J. RICHARDS: And, Your Honor, that concludes the trial testimony of Mr. Guevara from Thursday, November 29th, 1990.

THE COURT: Okay.

MR. J. RICHARDS: And, Your Honor --

(Counsel conferring.)

MR. J. RICHARDS: Your Honor, we are going to switch

readers, if we may.

THE COURT: Okay.

You may step off.

Ladies and Gentlemen of the Jury, you should be aware that -- I'm sorry, Krista.

COURT REPORTER: It's okay.

THE COURT: You should be aware that the spoken testimony, or the reading, is the evidence. You won't necessarily get the transcripts that were read in into evidence when you go back to deliberate. The same is true with any court proceedings, juries typically don't get any printouts of what's said during court. So it will be your memory that governs your deliberations.

And I don't think I mentioned this before but, again, if you need to stand periodically to stretch, feel free to do so.

MR. S. RICHARDS: Mr. Reader, when you're settled.

THE READER: Okay.

MR. S. RICHARDS: Okay. We will now be reading in testimony from the date of --

MR. J. RICHARDS: November 29th, 1990.

MR. S. RICHARDS: -- November 29th, 1990, at the trial of Jaime Rios.

Yuksel Konakci, called as a witness on behalf of the People of the State of Illinois, having been first duly sworn,

was examined and testified as follows:

Direct Examination, by Mr. Carballo.

Mr. Reader, please go and look at Line 23 on that page.

THE READER:  Yes.

YUKSEL KONAKCI, DEPOSITION

BY MR. S. RICHARDS (reading):

Q.  Doctor, could you please introduce yourself to the Ladies and Gentlemen of the Jury, and please spell your first name and your last name for the court reporter.

A.  Yes.  My first name is Yuksel, Y-u-k-e --

MR. S. RICHARDS:  Let me strike that, and I'll start again.

BY MR. S. RICHARDS:

Q.  Doctor, could you please introduce yourself to the Ladies and Gentlemen of the Jury and please spell your first name and your last name for the court reporter.

A.  My first name is Yu -- Yu --

THE READER:  I'm sorry, I can't really -- it's like a line across the --

MR. S. RICHARDS:  If it -- just for your benefit, the name is Yuksel, Y-u-k-s-e-l, C- -- spelled Y-u-k-s-e-l; last name Konakci, spelled K-o-n-a-k-c-i.

Again, strike that, and I will go back to the question.

BY MR. S. RICHARDS:

Q.   Doctor, could you please introduce yourself to the Ladies and Gentlemen of the Jury and please spell your first name and your last name for the court reporter.

A.   My first name is Yuksel, Y-u-k-c-e-l; last name Konakci, K-o-n-a-k-c-i.

Q.   Doctor, what is your profession?

A.   I am a physician.

Q.   And are you licensed -- in what jurisdictions are you licensed to practice medicine?

A.   Illinois, Missouri, Texas, and Georgia.

Q.   Okay.  Now, how long have you been licensed to practice medicine in the State of Illinois?

A.   Since 1972.

Q.   Doctor, could you please tell the Ladies and Gentlemen of the Jury what your educational background is?

A.   I graduated --

        MR. S. RICHARDS:  Josh.

        MR. J. RICHARDS:  Go to -- go to Page 249, Line 1.

BY THE WITNESS:

A.   I graduated from the University of Ankara, A-n-k-a-r-a, in Turkey, in 1960.  When I was in Turkey --

        MR. S. RICHARDS:  Okay.  I'm sorry, strike that.  We missed a question.

        THE WITNESS:  Okay.

MR. S. RICHARDS: So we'll go back.

BY MR. S. RICHARDS:

Q. Would you please briefly explain to the Ladies and Gentlemen of the Jury what your educational background is?

A. I graduated from the University of Ankara, A-n-k-a-r-a, in Turkey, 1960. When I was in the Turkey Army as a doctor for two years. Then I train and work as a -- then I train and work --

MR. S. RICHARDS: Wait, wait, let me strike that. We'll begin again. Please just concentrate on each word.

THE WITNESS: Uh-huh.

BY MR. S. RICHARDS:

Q. Would you please explain to the Ladies and Gentlemen what your educational background is?

A. I graduated from the University of Ankara, A-n-k-a-r-a, in Turkey, 1960. Then I was in the Turkey Army as a doctor for two years. Then I train and work in pediatrics in Turkey for four and a half years. Then I came to United States. And I had residency training in pathology for a total of six years. Then in July of 1974 I started working in the Cook County Coroner's Office, which later on became Cook County Medical Examiner's office.

Q. Are you a member of any professional organizations?

A. Yes, sir.

Q. What organizations?

A.   American Academy Forensic Scientists and Chicago Pathology Society.

MR. S. RICHARDS:  Let me start again.

BY MR. S. RICHARDS:

Q.   What organizations?

A.   American Academy Forensic Scientists and Chicago Pathological Society.

Q.   And do you specialize today in any particular field of medicine?

A.   Yes, sir.

Q.   What field is that?

A.   In anatomical and clinical patholo- -- pathology and in forensic pathology.

Q.   Could you please explain to the Ladies and Gentlemen of the Jury what the field of forensic pathology is?

A.   It is a branch of general pathology which is related with unnatural cause of death.

Q.   Do you hold any certifications from the American Board of Pathology?

A.   Yes, sir.

Q.   What certifications are those?

A.   I am certified in the anatomical pathology, clinical pathology, and forensic pathology.

Q.   How did you earn these certifications?

A.   First I completed required training.  Then I passed the

examination given by the American Board of Pathology.

Q.   Doctor, for how many years have you been engaged in the actual practice of pathology?

A.   Since I finish my residency in 1974.

Q.   Doctor, where are you currently employed?

A.   By the Cook County Medical Examiner's office.

Q.   What is your position there?

A.   Assistant medical examiner.

Q.   How long have you been an assistant medical examiner at the Cook County Medical Examiner's office?

A.   When I first started, it was Cook County Coroner's Office in 1974 --

THE COURT:   Okay.   Can we slow down, please?

MR. S. RICHARDS:   Yeah.

If you could please read slowly --

THE WITNESS:   Okay.

MR. S. RICHARDS:   -- for the court reporter.   Let me start again with my question, and then I'll go back.

BY MR. S. RICHARDS:

Q.   How long have you been an assistant medical examiner at the Cook County Medical Examiner's office?

A.   When I first started it was the Cook County Coroner's Office in 1974.   And then in 1976, Medical Examiner's System started.   And since then -- and since that time, I am assistant medical examiner.

Q. What is an autopsy?

A. External inspection and internal examination of the body and -- to determine the cause of death.

Q. In your career as a forensic pathologist, approximately how many autopsies have you performed?

A. Several thousand.

Q. Have you testified previously in court as an expert in the field of forensic pathology?

A. Yes, sir.

Q. How many times?

A. Several hundred times.

MR. S. RICHARDS: Going to Line -- Line -- I'm sorry.

(Counsel conferring.)

BY MR. S. RICHARDS:

Q. Mr. Carballo: --

MR. S. RICHARDS: I'm sorry, myself.

BY MR. S. RICHARDS:

Q. Your Honor, we would tender the doctor as an expert in the field of forensic pathology.

The Court: Good. Thank you.

MR. S. RICHARDS: Going back to myself.

BY MR. S. RICHARDS:

Q. Mr. Carballo: Doctor, I want to call your attention back to the date of June 29, 1989. Were you working at the Cook County Medical Examiner's office?

A.   Yes, sir.

Q.   The Court:  So things are clear, is there any objection to the doctor if need be referring to his report.

Mr. Carey:  No Judge.

The Court:  Very good.  Thank you.

Now Mr. Carballo.

Q.   Doctor, I want to show you a photograph which has previously been marked as People's Exhibit Number 15 for identification.  Do you recognize that photograph?

A.   Yes, sir.

MS. GOLDEN:  Objection.  We have an agreement to display --

MR. S. RICHARDS:  I'm sorry, what?

MS. GOLDEN:  Your Honor, I thought we were going to display the photographs.

THE COURT:  Yes.

Let's go to sidebar.

(Proceedings heard at sidebar:)

THE COURT:  The objection is that there is a photograph to display with the testimony being read.

What is the response?

MR. J. RICHARDS:  Your Honor, my response is that yes, there is an agreement to show exhibits which the jury was shown, but I think from this part of the transcript it's unclear to me if the jury back in 1990 was shown this exact

photograph.

THE COURT: Was the exhibit admitted into evidence at the trial?

MR. J. RICHARDS: I believe it later was. It is impounded. I -- I just don't know how Your Honor wants to go about that. If later on we say, oh, this was later admitted or not, I am not sure.

THE COURT: Okay.

MR. J. RICHARDS: And there is a juror standing up. I don't know if they have a question.

THE COURT: I advised the jury that to the extent they need to stand and stretch during breaks, they could.

So my understanding is that the agreement was that unless it was used to refresh recollection, that exhibits shown to the witnesses during their testimony in the underlying criminal case would be shown to this jury. If it was admitted into evidence, then it should be shown to this jury, because I understand both sides have argued that what that jury in the underlying criminal case had to consider affects the materiality analysis in this case.

So we will show it. It looks like it is on defense screens.

Are the plaintiffs prepared to display exhibits?

MR. J. RICHARDS: Your Honor, I can, using the defense exhibits, because they have those marked, and I know they

wanted -- they intend to publish them, so...

THE COURT: Okay.

Ms. Golden, are you prepared to display the exhibits at all?

MS. GOLDEN: I am. I am.

THE COURT: I can leave -- then we will -- to the extent that testimony comes along and there is an exhibit to be displayed and the plaintiffs don't ask, you can just say -- it doesn't have to be an objection. You could just notify me that there is an exhibit to be displayed.

MS. GOLDEN: Thank you.

THE COURT: Okay.

(Proceedings heard in open court:)

MR. S. RICHARDS: Let me go backwards to the transcript beginning at Line --

MS. GOLDEN: Objection.

Oh, thank you.

MR. S. RICHARDS: I'm sorry?

MS. GOLDEN: Before you start, can you make sure you have the table? Okay.

MR. S. RICHARDS: Am I good?

THE COURT: I will publish it when the time comes.

So, Ladies and Gentlemen, what we discussed is, as you have seen in court here, at times there are exhibits shown to witnesses, there are times where exhibits are shown to the

Konakci - deposition

432

jury, there are times where exhibits are admitted into evidence. I am going to allow you to see some of the exhibits that were admitted into evidence in the underlying criminal case that were referenced during this testimony. And so someone will notify me that an exhibit is ready to be shown, and then we will show it to you so that you can follow along with the testimony that's being read in.

So with that, I'm going to publish an exhibit to you.

MR. S. RICHARDS: Going to 252, Line 8.

BY MR. S. RICHARDS:

Q. Doctor, I want to show you --

MR. S. RICHARDS: Oh. Mr. Reader, are you with me?

THE WITNESS: Yes.

BY MR. S. RICHARDS:

Q. Doctor, I want to show you a photograph which has previously been marked as People's Exhibit Number 15 for your -- for identification. Do you recognize that photograph?

A. Yes, sir.

Q. And is that a photograph of the victim in this case, Luis Morales?

A. Yes, sir.

Q. Did you have occasion on that date to perform an autopsy on the person of the victim, Luis Morales?

A. Yes, sir.

Q. Does that photograph truly and accurately portray Luis

Morales on the date that you performed the autopsy on June 29th?

A. Yes, sir.

Q. Does the Cook County Medical Examiner's office assign a particular case number to each autopsy, each case?

A. Yes.

Q. What was the case number assigned to this case?

A. It is 553 on June, 1989.

Q. Doctor, did you perform an autopsy -- strike that.

Did your autopsy of Luis Morales include both an internal and external examination?

A. Yes, sir.

Q. Could you explain to the Ladies and Gentlemen what your external examination of Luis Morales revealed?

A. I observed multiple gunshot wounds. And also multiple abrasions --

Q. Abrasions --

A. -- abrasions and several small lacerations.

MR. S. RICHARDS: Let me repeat that.

BY MR. S. RICHARDS:

Q. Could you please explain to the Ladies and Gentlemen what your external examination of Luis Morales revealed?

A. I observed multiple gunshot wounds. And I also -- also multiple abrasions and several small lacerations.

Q. Specifically, as to the gunshot wounds, where were these --

Konakci - deposition

434

where were these wounds located?

A.   This was bullet entrance wound on the left anterior upper aspect of the forehead around this area.

Q.   Indicating, for the record, the doctor is pointing to the upper left of the forehead.

A.   Yes.   This entered into the cranial cavity, travel from the front to rear, lacerated the brain and logged in -- lodged into the posterior aspect of the brain inside the cerebellum.

        MR. S. RICHARDS:  Cerebellum.

        THE WITNESS:  Cerebellum.

BY MR. S. RICHARDS:

Q.   Where was the next wound that you located?

A.   Also, there was bullet entrance, one on the left elbow area, posterior inner aspect around there.  And that -- and that was exit wound off of the same bullet on the left forearm and on the interior aspect of the bullet traveled through the -- through and throughout inside of the left elbow, left forearm and made an exit.

Q.   Where was the next bullet wound that you observed?

A.   On the left side of the abdomen, upper aspect in this area. And that was --

Q.   Indicating for the record the lower left abdomen.

A.   About the navel area.  This area there was an entrance wound.  This bullet entered through the abdomen.  Lacerated the small intestine in the -- in the stomach and lodged into

muscular tissue in the back of the abdomen.

Q.   Where was the next bullet wound you located on the person of Luis Morales?

A.   On the anterior aspect of the right thigh anterior lower aspect around here, there was an entrance wound of the same bullet on the lower inner aspect of the right thigh.  This bullet traveled through and throughout inside of the right thigh and made an exit.

Q.   Did you observe any other bullet wounds?

A.   There was a fifth and last bullet wound.  It was in the upper aspect of the right arm on the rear, this area.  And there was a bullet exit of the same bullet and -- in inner aspect of the right arm.  This bullet traveled through and throughout and made an exit.

Q.   So your examination, Doctor, revealed that the victim was shot a total of five times?

A.   Yes.

Q.   And of the five bullet wounds that were inflicted here, two of these bullets had lodged and three others were through-and-through wounds?

A.   That's correct.

Q.   Could you please explain to the Ladies and Gentlemen what the procedure you conducted in your internal examination of Luis Morales?

A.   I opened the chest and abdomen and the neck area with my

Y-shaped incision and with the help of my autopsy technician. Also head was opened by incision, starting behind one ear, exit top of the head, and behind the other ear.  And opening the scalp with the, dot, dot, with external saw, opening the saw --

MR. S. RICHARDS:  I'm sorry.  Let me start again.

THE WITNESS:  Uh-huh.

MR. S. RICHARDS:  We can go backwards.

Going to Line 19 on the same page.

THE WITNESS:  Uh-huh.

BY MR. S. RICHARDS:

Q.   Could you explain to the Ladies and Gentlemen what the procedure you conducted in your internal examination of Luis Morales?

A.   I opened the chest and abdomen and the neck area with the Y-shaped incisions with the help of my autopsy technician. Also head was open by incision starting behind one ear, exit top of the head, and behind the other ear.  And opening the scalp with the external saw.  Opening --

MR. S. RICHARDS:  I'm sorry.  It's electrical saw.

BY THE WITNESS:

A.   Oh.  With the electrical saw, yes.

Opening the skull, exposing the brain, and examining the brain.

BY MR. S. RICHARDS:

Q.   What did your examination of the brain reveal?

A.   It revealed marked lacerations due to the bullet wound of the left side of the forehead.  And I recovered the bullet inside the brain in the left side in the cerebellum.

Q.   What other findings did you make in your internal examination?

A.   Also, in the abdomen, I saw lacerations of a small intestine and laceration of a stomach.  And lacerations of the muscle tissue in the rear of the abdomen -- abdomen.  And I recovered -- I recovered a bullet in the rear of the -- of the abdomen and in the muscle tissue.

Q.   Did you find any other significant -- any other significant finding in your internal examination of Luis Morales?

A.   No, sir.

Q.   Doctor, I am now going to show you what is -- what has previously been marked as People's Exhibit 16 for identification.  Do you recognize what's depicted in that photograph?

        MR. S. RICHARDS:  And please wait a moment.

    (Pause.)

        MR. S. RICHARDS:  Please read beginning 257, Line 2.

        THE WITNESS:  Okay.

BY THE WITNESS:

A.   This depicts the forehead area, mainly left side.  And it shows bullet entrance wound on the left upper aspect of the forehead.  It also shows several abrasions and one side of the

Konakci - deposition

438

abrasion shows two lacerations.

MR. S. RICHARDS: I'm sorry. Read -- I'm sorry. Yeah. Right. Sorry.

BY MR. S. RICHARDS:

Q. Okay. And now I'm going to show you what has been previously marked People's Exhibit 6 -- Number 17 for identification.

Do you recognize that photograph?

A. Yes, sir. This depicts the brain showing hemorrhage and lacerations.

Q. Now I'll show you what has been previously marked People's Exhibit Number 18 for identification.

Do you recognize that photograph?

A. This shows the elbow area and shows the bullet wound.

Q. This is the bullet wound to the elbow?

A. Yes.

Q. Now I will show you People's Exhibit Number 19 for identification.

Do you recognize that photograph?

A. This shows left forearm area and it shows bullet exit wound on the left forearm on the front of the left forearm.

Q. Okay. Thank you. People's Exhibit 20 for identification.

Do you recognize that photograph?

A. This shows the left side of the abdomen and bullet entrance wound in this area.

Q.   Okay.   People's Exhibit Number 21 for identification.

Do you recognize that photograph?

A.   This shows stomach which was lacerated.   This shows lacerations to the stomach.

MR. S. RICHARDS:   Let me begin again --

THE WITNESS:   Uh-huh.

MR. S. RICHARDS:   -- from 4.

BY MR. S. RICHARDS:

Q.   Okay.   People's Exhibit Number 21 for identification.

Do you recognize that photograph?

A.   This shows stomach which is lacerated.   This shows lacerations on the stomach.

Q.   Thank you.

People Exhibit Number 22 for identification.

Do you recognize what is depicted in that photograph?

A.   This depicts the intest- -- sorry.

This depicts the intestines with the lacerations. They were lacerated in two sides.   With hemorrhage also.

Q.   People's Exhibit Number 23 for identification.

Do you recognize what's depicted on that photograph?

A.   This depicts right thigh area and bullet entrance and exit wounds.

Q.   Okay.   Which is the -- in the photograph, which is the entrance wound and which is the exit wound?

A.   This is the entrance wound, this is the exit wound.

Q. So, the entrance wound is to the outside of the --

MR. S. RICHARDS: Please go to 259, Line 1.

THE WITNESS: Uh-huh.

BY THE WITNESS:

A. Yes. The interior aspect and exit wound of the inner aspect.

BY MR. S. RICHARDS:

Q. All right. People's Exhibit Number 24 for identification.

Do you recognize that?

A. This shows the rear of the right arm and it shows the bullet entrance and exit wound. This the entrance wound, this the exit wound.

Q. The top is the entrance wound, the darker -- darker-colored is the entrance wound?

A. Yes.

Q. And the lighter-colored being the exit wound?

A. Yes, sir.

Q. Finally, I'm going to show you People's Exhibit Number 25 for identification.

Do you recognize what's depicted in that photograph?

A. This shows the bullet which I recovered, one inside the brain and one inside the muscle tissue in the abdomen -- abdomen.

Q. Which one is the bullet that you recovered from the brain and which is the bullet from the abdomen?

A. This dis -- this disfigured bullet was recovered and the top bullet was muscle tissue in the abdomen back left side.

Q. Okay. Were you able to determine how the bullet that was recovered -- strike that.

Okay. Were you able to determine how the bullet that was recovered from the brain was in a deformed condition?

A. Yes.

Q. Why was that?

A. Apparently due to impact on the skull.

Q. Okay. I'm going to show you what's been previously marked as People's Exhibit Number 26 for identification.

Do you recognize that exhibit?

A. Yes, sir. This is the bullet envelope -- is it envelope? And the --

THE WITNESS: Is that envelope?

MR. S. RICHARDS: I'm sorry. It's envelope.

Let me strike and go back.

Begin on Line 7.

BY MR. S. RICHARDS:

Q. Okay. I'm going to show you what's been previously marked as People's Exhibit Number 26 for identification.

Do you recognize that exhibit?

A. Yes, sir. This is the bullet envelope in which I put the two bullets in which I recovered. It carries the Case Number 553 of June, 1989. Name of the victim, Mr. Luis Morales. And

date recovered.  My name.

Q.  Could you examine the contents of the bullet envelope?

A.  There are two bullets.  Yellow jacket.

Q.  Are those the bullets you recovered from the victim, Luis Morales?

A.  They are similar to the ones I found.

Q.  One of those bullets is a deformed bullet; is that correct?

A.  That's correct.

Q.  Where did you recover that bullet from?

A.  In the head inside the brain, sir.

Q.  Okay.  And the deformed bullet is recovered from the abdomen area you indicated?

A.  Yes, sir.

Q.  Are those bullets in substantially the same condition today as they were when you recovered them?

A.  Yes, sir.  They are similar to the ones I recovered, sir.

Q.  And you prepared the envelope that these bullets are contained in?

A.  Yes.

Q.  Doctor, based on your findings in this case, based on your training, your background, your experience, in performing autopsies, do you have an opinion within a reasonable degree of medical certainty as to the cause of death of Luis Morales?

A.  Yes, sir.

Q.  What was -- what is your opinion?

A.   It is multiple gunshot wounds.

Q.   Doctor, did you make any other observations of injuries to the victim, Luis Morales?

A.   I observed several abrasions to the face area.

        MR. S. RICHARDS:  Strike that.

        You want to go back --

        THE WITNESS:  Yeah.

        MR. S. RICHARDS:  -- to Line 19?

        THE WITNESS:  Yes.

BY MR. S. RICHARDS:

Q.   Doctor, did you make any other observations of injuries to the victim, Luis Morales?

A.   I observed several abrasions on the face area.  And also, several small lacerations.

Q.   Now, the lacerations, abrasions to the face area, where were those located?

A.   There -- there was small abrasions --

        MR. S. RICHARDS:  I'm sorry.  Strike -- strike that and I'll start again.

        THE WITNESS:  Sorry.

        MR. S. RICHARDS:  Okay.  Beginning with Line 23.

BY MR. S. RICHARDS:

Q.   Now, the lacerations, abrasions to the face area, where were those located?

A.   There was abrasions on the left side of the forehead around

Konakci - deposition

444

here.  And on this abrasions there were two small lacerations. And also, under the left eye, around this area, there was an -- an abrasion.  Lateral left eye in this area, there was linear lacerations.  On the lower aspect of the forehead, there was a small abrasion.

On -- on the nose, on -- on the top there was an abrasion.  On the tip of the nose there was rectangular shape abrasions.  On the left cheek there was an area of lacerations exhibiting linear patterns.  And on the top upper lip and left side there was also an area of abrasions with linear pile and radical patterns.  Also lateral to the left mouth area in this area there was an abrasion in this area.

Q.  Now, these abrasions --

MR. S. RICHARDS:  Strike that.  Begin again.  15.

BY MR. S. RICHARDS:

Q.  Now, these abrasions, could these abrasions have been caused from falling after being shot, falling on the victim's side of the face?

A.  Yes, sir.

Q.  Finally, I want to show you what's been previously marked as People's Exhibit Number 27 for identification.

Do you recognize that document?

A.  Yes.

Q.  What is that document?

A.  This is the report of the postmortem examination in the

case of Mr. Luis Morales, Case Number 553 of June, 1989.

Q.  Is this a certified copy of your report?

A.  Yes, sir.

Q.  I have no further questions.  Thank you, doctor.

        The Court:  Cross.

        MR. J. RICHARDS:  Your Honor, for the record, I am now going to do the cross-examination of the forensic pathologist that was conducted by Ms. Shields back in 1990.

        THE COURT:  Okay.

                YUKSEL KONAKCI, DEPOSITION

BY MR. J. RICHARDS (reading):

Q.  Doctor, you indicated that you removed two bullets from the body of Mr. Morales?

A.  Yes.

Q.  And both of those bullets were a small size?

A.  Yes.

Q.  Do you know what caliber they were?

A.  I don't know.

Q.  You don't know?

A.  No.

Q.  You have had experience in removing bullets in the past?

A.  Yes.

Q.  And do you know what -- and do you know that as bullets go, this was a very small size?

A.  Yes.

Q. Okay. They were about the same size?

A. Yes.

Q. You -- when Mr. Morales came to you, there was a bag of his clothing; is that correct?

A. Yes.

Q. And you observed the clothing?

A. Yes.

Q. You have already stated that you observed the body?

A. Actually, I received them later on in a bag.

Q. And you indicated just that you looked at that clothing?

A. Yes.

Q. And it is your opinion that the shooting occurred from quite a distance; isn't that correct?

A. There was no evidence of tattooing called stippling around the entrance wound.

Q. Would you explain to the Ladies and Gentlemen of the Jury what stippling is?

A. It is a kind of black multiple discoloration of the skin around the entrance wound due to embedding of the unburnt or particularly burned powder particles coming out the gun.

Q. So it is a discoloration around --

MR. J. RICHARDS: Strike that.

Line 2.

BY MR. J. RICHARDS:

Q. And that occurs on either the body or the clothing when the

shooting is at a very close range; is that right?

A.   That's correct.

Q.   And you saw no evidence of stippling either on the body or the clothing?

A.   No.

Q.   That clothing and those two bullets that you removed, you gave to the police department?

A.   Yes.

Q.   Now, when you did the autopsy, you noted a number of tattoos on the body; is that correct?

A.   Yes.

Q.   And on the right arm there was a pitchfork?

A.   Yes.

Q.   On the left upper chest there was the name Luis?

A.   Yes.

Q.   On the left arm a picture of a heart?

A.   Yes.

Q.   And on the right hand another pitchfork?

A.   Yes.

Q.   When you did this autopsy, you also removed some blood from the body and had it analyzed; is that correct?

A.   That's correct.

Q.   And that analysis showed there was no opiates in his body; isn't that true?

A.   That's correct.

Q.   No alcohol?

A.   No alcohol.

Q.   And no -- and no cocaine?

A.   There was no cocaine, however, there was metabolic and -- of cocaine, benzoylecgonine.

Q.   Would you explain to the Ladies and Gentlemen what a metabolize is?

A.   Degradation product of the substance in the body.

Q.   Is it what cocaine breaks down to after it's been in the body for a while; is that correct?

A.   That's correct.

Q.   That means that Mr. Morales had ingested cocaine but not recently at the time of his death?

A.   Not recent.

Q.   Not very recently?

A.   Yes.

Q.   Because this is what cocaine broke down into?

A.   Yes.

Q.   Is that correct?

A.   Yes.

Q.   You indicated that there were a number of abrasions to the face?

A.   Yes.

Q.   In all, there were nine abrasions to the face?

A.   Yes, I think about nine.

Konakci - deposition

449

Q.   And, Doctor, I'm going to show you what's been marked People's Exhibit Number 15 and ask if you can see all -- can see all of those abrasions in this photograph?

A.   Yes.

Q.   Okay.  You can see all nine abrasions?

A.   Yes, they are visible.

Q.   Okay.  Those abrasions would not be consistent with or -- let me rephrase that, Doctor.

     Those abrasions would not be caused by the bullets, would they?

A.   No.

Q.   Would these -- would those abrasions be consistent with a struggle or a fight?

A.   They are due to blunt trauma.

Q.   As a result of blunt trauma?

A.   Yes.

Q.   And would they be consistent with taking the person's head and pushing it down on the sidewalk or against a car?

A.   Yes.

Q.   Doctor, you indicated stippling occurs at a close range. Do you know what is the range at which stippling usually occurs on the skin or clothing?

A.   It depends on the weapon or ammunition used.

Q.   In a small caliber, it probably wouldn't occur further than, what, two, three feet?

A.   Yes, usually.

MR. J. RICHARDS:  And now, Your Honor, moving back to the redirect examination by Mr. Carballo.

(Counsel conferring.)

THE COURT:  Okay.

MR. S. RICHARDS:  Okay.  Redirect examination by Mr. Carballo.

YUKSEL KONAKCI, DEPOSITION

BY MR. S. RICHARDS (reading):

Q.   Doctor, the abrasions that you have observed on the victim's face, on the side of his face you indicated were from blunt trauma?

A.   Yes.

Q.   And that falling down flat on your face from -- after being shot in this manner, that would be consistent with the blunt trauma you observed on his face; is that correct?

A.   That's correct.

Q.   You were talking about stippling.  You indicated stippling depends upon the type of gun?

A.   Yes, and the type of -- of ammunition used.

Q.   So, if it's a smaller gun or .25 caliber gun, there might not be any stippling observed; is that correct?

A.   Well, if they were fired close, usually we see stippling.

Q.   Okay.  And when you say observation of stippling based upon a -- on the size of the gun and caliber of the gun,

approximately how many feet away, it vary -- varies based upon the type of gun; is that right?

A. Yes. Depends upon the gun and the ammunition used.

MR. S. RICHARDS: Now, moving around -- we have to move to Page 270. I'm going to begin top of the page.

BY MR. S. RICHARDS:

Q. Mr. Carballo: Doctor, based on the number of autopsies you have performed, specifically autopsies relating to bullet wounds, is it uncommon for someone to not have stippling on their -- in the area of the wounds where the body and have been shot at close range?

MR. S. RICHARDS: Move to Line 9 and read from there.

BY THE WITNESS:

A. Now this depends on how close he was shot and depends on the gun and ammunition used.

BY MR. S. RICHARDS:

Q. Thank you.

MS. GOLDEN: Objection. Can we have that last --

MR. S. RICHARDS: Sorry?

MS. GOLDEN: The last -- the last answer was misread.

MR. S. RICHARDS: Oh, I'm sorry. The answer -- beginning at Line 9, that answer?

MS. GOLDEN: Yes.

MR. S. RICHARDS: Okay. Please, Mr. Witness, re-read the Line -- Line 9.

Konakci - deposition

452

MS. GOLDEN: Your Honor, can we have the question, too, please?

MR. S. RICHARDS: Oh, I'm sorry, my -- okay.

I am going to go backwards to Line 2.

THE WITNESS: Okay.

MR. S. RICHARDS: I'm going to read the question, then after the question, I want you to go to line 9. Okay?

BY MR. S. RICHARDS:

Q. 2, question: Doctor, based on the number of autopsies you have performed, specifically autopsies relating to bullet wounds, is it uncommon for someone to not have stippling on their -- in the area of the wounds or the -- of the -- or the body and have been shot at close range?

A. Now this depends on how close he was shot and depends on the gun and the ammunition used.

Q. Thank you.

THE COURT: All right.

Folks, we will take our break for lunch there. We will come back at 1:00 p.m.

All rise.

MR. S. RICHARDS: Your Honor, there's three lines of recross and then we're done.

MR. J. RICHARDS: We will do it after.

MR. S. RICHARDS: Okay, we'll do it after. I'm sorry.

THE COURT: We will go ahead and do the recross then.

Sorry.

YUKSEL KONAKCI, DEPOSITION

BY MR. J. RICHARDS (reading):

Q.   Doctor, at close range, though, there will be stippling; is that correct?

A.   Yes.

MR. J. RICHARDS:  Your Honor, that concludes the testimony of the doctor.

THE COURT:  Okay.

All right.  Now we will take our break.  We will come back at 1:00 o'clock.

All rise.

(Jury out at 12:01 p.m.)

THE COURT:  Any issues for me to address for either side?

MR. S. RICHARDS:  Not on behalf of plaintiffs.

MR. SCAHILL:  Nothing from defendant Guevara.

THE COURT:  All right.

MR. ENGQUIST:  No, sir.

THE COURT:  See you at 1:00.

(Recess at 12:02 p.m., until 1:00 p.m.)

454

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                        )
                                   )
                Plaintiff,         )
                                   )
-vs-                               )  Case No. 1:22-cv-03973
                                   )
REYNALDO GUEVARA; MICHAEL          )
MASON; and JoANN HALVORSEN,        )
as Special Representative of       )
ERNEST HALVORSEN, Deceased,        )  Chicago, Illinois
                                   )  February 4, 2026
                Defendant.         )  1:00 p.m.

VOLUME 3
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:     LAW OFFICE OF STEPHEN L. RICHARDS
                       BY:  MR. STEPHEN L. RICHARDS
                            MR. JOSHUA S. RICHARDS
                       53 West Jackson Boulevard, Suite 205
                       Chicago, Illinois  60604

For Defendant          BORKAN & SCAHILL, LTD.
Guevara:               BY:  MR. TIMOTHY P. SCAHILL
                            MR. GRAHAM P. MILLER
                       20 South Clark Street, Suite 1700
                       Chicago, Illinois  60602

For Defendants         THE SOTOS LAW FIRM, P.C.
Mason and Halvorsen:   BY:  MR. JOSEPH M. POLICK
                            MR. JOSH MICHAEL ENGQUIST
                            MR. JEFFREY ROBERT KIVETZ
                            MS. CAROLINE P. GOLDEN
                       141 West Jackson Boulevard, Suite 1240A
                       Chicago, Illinois  60604

455

Court Reporter:          CHARLES R. ZANDI, CSR, RPR, FCRR
                         Official Court Reporter
                         219 S. Dearborn Street, Room 1426
                         Chicago, Illinois  60604
                         Telephone:  (312) 435-5387
                         charles_zandi@ilnd.uscourts.gov


                    *    *    *    *    *

               PROCEEDINGS REPORTED BY STENOTYPE
     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

THE COURT:  All right.  Welcome back, everyone.

Any issues for me to address from the plaintiff's perspective?

MR. S. RICHARDS:  No, Your Honor.

THE COURT:  For defense?

MR. KIVETZ:  Yes, Your Honor.  We'd like to request that we be given an opportunity to read in Luis Huertas' trial and deposition testimony -- I'm sorry, just his deposition testimony.  Your Honor, there are exhibits -- rather, there are initial designations.  Plaintiff provided just counter designations.

We also have an issue with the readers.  For instance, we found it very difficult to understand.  A couple of the readers weren't able to pronounce some straightforward and maybe even perhaps some of the more complicated terms.

We have a reader here who is prepared and ready to go and capable of reading them appropriately in a neutral tone, and we'd request that he be permitted to be a reader.

THE COURT:  Okay.  What's up next from the plaintiff's view?

MR. S. RICHARDS:  From plaintiff's view is the Luis Huertas' trial testimony.  So I have a reader for that.

I do acknowledge there were some problems with the medical terms with my last reader, and I apologize for that.

This reader, however, doesn't have to read medical terms.  I've gone over with him exactly how to do it in terms of just reading the words accurately, period, without any, you know, other thing.  So, you know, for this one I think things would go fine.

I don't think I have any -- I do have an actor for the older Luis Huertas who I would like to use.  But if we get a break, I'd discuss it with defendants and see who they want to use, and I might be okay with that.

Obviously the read-in is the read-in.  And if they think they have better mastery of the designations and counter designations and can do a better job than I, I may not object to that.

MR. SCAHILL:  I think our issue -- the trial testimony, that's fine.  They can do that in the manner in which they had intended to do it.

I think the issue was also, in addition perhaps to some difficulties in comprehension, remember, the deposition designations were ones we designated, they didn't.  It's essentially our evidence, which we're fine having it taken out of order, but at the end of the day, it's evidence we wanted to put in.  And we think it's important for us to be involved in that process just as a give and take, that they have one and we have the other as the reader and the questioner on the dep.

And we do have somebody who is in the courtroom right

458

now who will do that, and one of our attorneys will ask the questions and have the AV running too.

MR. S. RICHARDS: Your Honor, may I respond?

THE COURT: No.

MR. S. RICHARDS: Sorry.

THE COURT: Because it's 1:02. You know I don't like having the jury waiting. We are at a trial where we are fighting about who reads in designations. Am I understanding the issue correctly?

MR. S. RICHARDS: You are.

THE COURT: That is absurd, and I am frankly disappointed. I am disappointed that you brought in readers who weren't clear, didn't seem practiced or rehearsed, doesn't seem like they'd seen it before. I don't like all the "strike that," "strike this," because guess what, lawyers don't get to strike stuff.

I know it's a tack that you use when you say, "Oh, I didn't mean to say that" or "I misread that." But you're not striking it. The jury is hearing it. It's not the picture of clarity. And that is frustrating.

There is no break. We just came back from a break. And so having an opportunity to confer, it comes at 2:30, but it doesn't come now. And so if the next set of evidence is another reader, it comes up and if -- so the fact that you put on two readers who had some issues already does not give me

confidence that your third reader will be much better.

Any objection to having the defendants use their reader to enter all of the designations with respect to Huertas?

MR. S. RICHARDS:  No.

THE COURT:  Okay.  Then is Huertas designations what you intend to introduce now?

MR. S. RICHARDS:  Well, first I'm doing the trial designations and --

THE COURT:  For Huertas?

MR. S. RICHARDS:  For Huertas.

THE COURT:  So the answer is yes?

MR. S. RICHARDS:  Yes, I am entering the Huertas trial designations now.

THE COURT:  Okay.  And then what is after that?

MR. S. RICHARDS:  The Huertas deposition designations, I have no problem with the defendants entering that with their reader.

THE COURT:  And once Huertas is done, what is next?

MR. S. RICHARDS:  What is next is Benjamin Carrero.

THE COURT:  So a live witness?

MR. S. RICHARDS:  Yes.

THE COURT:  Okay.  So that I believe addresses the defense concerns.  We will enter the Huertas designations, have them read in, and then after that we will return to the live

witness.

We'll bring in the jury now.

(Jury in at 1:05 p.m.)

THE COURT:  All right.  Please take your seats.

Welcome back, ladies and gentlemen.

My understanding is that there will be additional transcript testimony read in.  So my understanding is that this is testimony from an individual with the last name Huertas.  And this time the defendants will have the reader come up.  But it's going to be the same process that we spent the morning with where there is a question and answer given by someone sitting here reading prior testimony.

So we can start that now.

LUIS A. HUERTAS, TRIAL TESTIMONY

MR. S. RICHARDS:  (Reading):  Direct examination by Ms. Hanlon.

Q.  Sir, could you please state your full name?

A.  Luis Alfredo Huertas.

Q.  Mr. Huertas, could you please spell your last name for the court reporter, please.

A.  H-U-E-R-T-A-S.

Q.  How old are you, Mr. Huertas?

A.  I'm 27 right now.

Q.  Do you live here in the City of Chicago?

A.  Yes, I do.

Q.   For how many years have you lived in Chicago?

A.   Twenty-four years.

Q.   And the first three years of your life, where did you live?

A.   Puerto Rico.

Q.   Back in June of 1989, where were you living?

A.   Pardon me?

Q.   Back in 1989, where were you living?

A.   1313 North Western.

Q.   And did you live there with anyone else?

A.   A friend.

Q.   Mr. Huertas, are you working at the current time?

A.   Right now I'm working mechanics in my own.

Q.   Self-employed mechanic?

A.   Self-employed.

Q.   Are you going to school?

A.   I start school in December.

Q.   Can you tell the ladies and gentlemen where it is you're going to start school in December?

A.   I'm going to start school at Lincoln Technical Institute.

Q.   What are you going to study at Lincoln Tech?

A.   Automotive and diesel mechanic.

Q.   Are you single or married?

A.   I'm single.

Q.   Do you have any children?

A.   Not yet.  One on the way.

Q.  Do you name an individual by the name -- do you know an individual by the name of Luis Morales?

A.  Yes, I do.

Q.  And did you have a nickname for Luis?

A.  We called him New York.

Q.  Do you know how he got a nickname New York?

A.  He got that nickname from where he was born at.

Q.  He was born in New York?

A.  New York, yes.

Q.  How was it that you knew New York?

A.  Well, we were friends from time back.

Q.  How many years had you known him?

A.  11, 12 years.

Q.  Mr. Huertas, I want to direct your attention to June 27, 1989 at about 11:15 at night.  Do you recall where you were?

A.  Yes.  I was sitting at 1310 North Western waiting for a friend.

Q.  Can you tell the ladies and gentlemen what is located at 1310 North Western?

A.  A place me and my friend used to shoot pool.

Q.  And as you were sitting there on the street, were you alone or were you with someone else?

A.  No, I was alone.

Q.  About how long had you been sitting there waiting for your friend?

Huertas - trial testimony

463

A.   About 45 minutes, 50 minutes.

Q.   After these 45 or 50 minutes passed, did you see anyone?

A.   Two individuals turning on Western from Potomac.

Q.   From where you were sitting, Mr. Morales, what direction would Potomac Street have been in?

A.   They were going northbound on Western.

Q.   Okay.  Where was Potomac from where you were sitting, which direction?

A.   South.

Q.   Now, when you first saw these individual, you said they came off Potomac and turned down Western?

A.   On to Western.

Q.   Would they have been making a left hand turn on to Western?

A.   Yes.

Q.   How many people did you see?

A.   Two.

Q.   Were they men or women?

A.   Men.

Q.   Were you able to tell what race they were?

A.   They were Hispanic.

Q.   When they first turned on to that street, did you recognize either of the two men?

A.   No.

Q.   Once they turned on to Western, were heading northbound, were they heading toward your direction?

Huertas - trial testimony

464

A.   Yes.

Q.   Were you watching them?

A.   Everybody I don't know I watch.

Q.   Where did you see these two men walk to?

A.   They walked up to me.

Q.   Up to where you were sitting?

A.   Right.

Q.   Did they eventually get even with where you were?

A.   Yes.

Q.   And were you able to see any of these two individuals?

A.   One.

Q.   Would that have been a taller man or shorter man?

A.   Tall guy.

Q.   Did you know that taller man?

A.   No.

Q.   Can you describe for the ladies and gentlemen of the jury about how tall he was?

A.   He was a little shorter than me.

Q.   How tall are you, Luis?

A.   I'm 5'9.

Q.   Do you know about what kind of build he had?

A.   He was slim.  He was slim and light skinned.

Q.   Did you notice any -- were you able to see his face?

A.   Yes.

Q.   Did you notice anything about his face?

Huertas - trial testimony

465

A.   He had a thin moustache and like he was just growing it.

Q.   Now, when he got about even with you, how close in distance was he to you?

A.   Four feet.

Q.   And what part of his body was facing toward you?

A.   His face.

Q.   Can you tell the ladies and gentlemen what the lighting conditions were like right there on Western Avenue?

A.   It was well lit up.

Q.   Were there streetlights there?

A.   All the lights were on.

Q.   They were working that evening?

A.   Yes.

Q.   Were there any lights from any of the stores on that street?

A.   Yes.  On the bar right there in front.

Q.   Now, were you able to get a look at the shorter of the two men?

A.   I didn't get a good look at him.

Q.   When these men got to with you, Luis, did anything happen?

A.   Well, the taller guy represented Spanish Cobras to me.

Q.   When you say he represented Spanish Cobras, can you explain what that means to the folks on the jury?

A.   He was actually saying a name of a gang, a gang that he supposedly belonged to.

Q.  When he represented Spanish Cobras to you, what part of his body could you see?

A.  His face.

Q.  Did you respond to him?

A.  No.

Q.  After he made that representation, did you see him do anything else?

A.  Well, he looked at me for about 10 seconds, 15 seconds, then he kept walking.

Q.  Luis, when he represented Spanish Cobras, did you know who the Spanish Cobra street gang was?

A.  Yes.

Q.  Are you yourself a member of that gang?

A.  No.

Q.  Do you have friends that are members of that gang?

A.  Yes.

Q.  And was New York a member of that street gang?

A.  He wasn't.

Q.  New York wasn't?

A.  Oh, New York?  Yes.

Q.  New York?

A.  Yes.  I'm sorry.

Q.  Now, some of these men kept on walking, is that right?

A.  Yes.

Q.  Which direction were they walking in?

Huertas - trial testimony

467

A.   Northbound, Western.

Q.   What were you doing as they were walking northbound?

A.   I just kept my eye on them because didn't recognize them.

Q.   About how about far did they walk, Luis, before you noticed something else happen?

A.   About 35, 40 feet.

Q.   Did you ever lose sight of that guy as he was walking northbound?

A.   No.

Q.   Luis, I want you to stand up.  If you will look carefully around the courtroom and tell me if you see that tall individual that you are referring to here in court.

A.   Yes, I do.

Q.   Can you please point to him for me.

A.   Indicating.

Q.   Can you indicate something he has on?

A.   He has on a grayish tie with red.

Q.   You can have a seat, Mr. Morales.

          Indicating for the record the defendant.

          Now, when this person got about 15 feet from you, what part of him could you see?

A.   His back.

Q.   Was there anything between you --

          MR. S. RICHARDS:  I'm sorry.  (Reading):

Q.   Now, when this person got about 35 feet from you, what part

Huertas - trial testimony

468

of him could you see?

A.   His back.

Q.   Was there anything between you and he that was obstructing your view?

A.   Nothing.

Q.   Now, as he approached, as he was walking northbound on Western, did you notice or see anything else?

A.   Yes.  Yes, I did.

Q.   Tell us what you saw.

A.   New York and his friend Loco come out of the gangway.

Q.   When you say "his friend Loco," do you know what his real name is?

A.   I found out by the report his name is Javier.

Q.   Javier Torres.  Was Javier Torres a friend of yours also?

A.   Yes, for about a year.

Q.   Was Javier Torres a member of the Spanish Cobra street gang?

A.   Yes, he was.

Q.   Now, when these two men came out of the gangway, did one man come out first or did they come out together?

A.   Well, one came out first and the other one came behind him.

Q.   Who came out first?

A.   New York.

Q.   When New York stepped out of that gangway, Luis, were you able to see him?

A. Yes.

Q. What part of his body could you see?

A. The profile.

Q. Side view?

A. Side.

Q. Did you see what New York did when he stepped out of the gangway?

A. Well, yes, I did.

Q. What did he do?

A. He approached the two individuals that were walking northbound on Western.

Q. When you say "the two individuals," are you referring to the man you just identified?

A. Yes.

Q. And the other shorter man?

A. And the shorter guy.

Q. When New York approached them, where was Loco?

A. Loco was behind New York.

Q. Can you tell us what happened as they approached?

A. All I seen, both of them for about maybe half a minute. And then I seen New York do like this, like he was saying what's up.

(Ms. Hanlon): Indicating for the record, Judge, the witness has his arm outstretched with his palms up into the air.

Q.   After you saw New York in that position, what's the next thing you saw?

A.   The defendant took one step back and fired at him.

Q.   I want you to describe exactly what you see the defendant do after he took one step back from New York.

A.   Okay.  He lift his arm, went toward his belt, and when he came up, he pointed the pistol towards New York.

(Ms. Hanlon):  Indicating once again for the record the witness has made a motion with his arm in the front of his waistband, pointed his hand directly out in front.

Sorry.  Indicating once again for the record the witness has made a motion with his hand in the front of the waistband, pointing --

Indicating once again for the record the witness has made a motion with his arm in the front of the waistband, pointed his hand directly out front.

The Court:  Yes.

Q.   How close was the defendant to New York when he did this?

A.   About a foot.

Q.   What is the next thing you heard or saw, Luis?

A.   The next thing I saw was New York falling on the side.

Q.   Did you hear anything before you saw him fall?

A.   Yes.  The gunshot.

Q.   And can you tell the ladies and gentlemen about how many gunshots you heard?

Huertas - trial testimony

471

A.   I heard about four.

Q.   Can you tell us how close together or far apart these shots were?

A.   Shots were randomly like plop, plop.

Q.   Were you able to see anything while you were hearing those gunshots?

A.   The flame coming out of the gun.

Q.   After you heard those gunshot and saw the flame from the gun, what did you see New York do?

A.   Fall on the side, on the left side against the car and the pole.

Q.   Did you actually see New York's body hit the car or the pole?

A.   Yes.

Q.   And then he was down on the ground?

A.   He's on the ground.

Q.   What did Loco do when the defendant started shooting?

A.   Loco got nervous and he ran towards his house.

Q.   Can you tell us what direction Loco ran in?

A.   He ran west.

Q.   And did he run down a street, or where specifically did he run?

A.   Through a big empty lot.

Q.   What did defendant do after New York feel to the ground?

A.   He ran -- he ran -- he ran eastbound.

Huertas - trial testimony

472

Q. Were you able to see him, Luis, as he ran eastbound?

A. Yes, I did.

Q. Had you ever lost sight of the defendant?

A. Never.

Q. From the time he represented to you until the time he shot your friend?

A. Never.

Q. When he was running eastbound, what part of him could you see?

A. The side.

Q. Now, as he was running eastbound, what street was he crossing?

A. Western.

Q. Did he do anything as he was crossing Western Avenue?

A. When he got to the other side, he represented King Love, King Love and Spanish Cobra killer.

Q. I want you to tell the ladies and gentlemen exactly what you saw and heard him say.

A. Okay. He put -- he yelled out King Love and then he said Spanish Cobra killer.

Q. What direction was he facing in when he yelled that?

A. Westbound.

Q. Were you able to see any part of him at that time?

A. Face again.

Q. After he yelled that, did you see where he went?

Huertas - trial testimony

473

A. He ran through the lot and ran through the alley.

Q. Did you lose sight of him at that time?

A. Yes.

Q. Now, Luis, the shorter guy that was with the defendant, what did you see him do after the defendant shot New York?

A. After he ran, the shorter guy ran too, but he stopped halfway across the street.

Q. When you say "the street," what street are you referring to?

A. Referring to Western Avenue.

Q. When he stopped have way across Western Avenue, where was the defendant?

A. On the other side. He went all the way across.

Q. What did the see the shorter of the two guys do?

A. In the middle of the street, Western.

Q. Did he do anything?

A. He shot at Loco as Loco was running towards -- in the lot.

Q. What direction was he shooting, Luis?

A. West.

Q. Luis, are you familiar with that neighborhood where you were sitting?

A. Yes.

Q. And do you know anything about Western Avenue?

A. Yes. It's the -- Western is the borderline between one gang and another gang.

Huertas - trial testimony

474

Q. And what direction is -- does Western Avenue run in?

A. North and south.

Q. And on the east side of Western Avenue, whose gang territory is that?

A. Latin Kings.

Q. On the west side, whose territory is that?

A. Spanish Cobras.

Q. And you -- where you were sitting is on which side of the street?

A. Spanish Cobras.

Q. That's the same side that the shooting took place, right?

A. Yes.

Q. Now, after you saw the shorter guy shoot in the direction of Loco, where did you see him go?

A. He ran through the same lot the defendant did.

Q. And did you lose sight of him?

A. Yes.

Q. Luis, what did you do at that point?

A. At that point, since I seen Loco run towards, toward his house, I went to New York.

Q. And when you got to New York, were you the first person that was able to get to him?

A. Yes.

Q. Can you tell the ladies and gentlemen what you did when you got to your friend?

Huertas - trial testimony

475

A.   Well, I held him and I tried to talk to him, see if he respond.  But he was -- he wasn't responding.

Q.   Can you describe his condition?

A.   Okay.  He was unconscious.  And he had a wound on his left side of the head, which, which part of his insides got stuck to my pants, and he was all bloody.

Q.   When you say "a wound," Luis, what type of a wound could you see on the left side of his head?

A.   Bullet hole.

Q.   Do you notice any other injuries to his body?

A.   Yes.  By the stomach.

Q.   And what did you notice by the stomach?

A.   Another big pile of blood, big circle of blood.

Q.   Do you know what side of his stomach you saw that on?

A.   It was on the left side, the same side.

Q.   Were his eyes open or were they closed?

A.   They were open.

Q.   Did you speak to him?

A.   I was speaking to him, yes.

Q.   What were you saying?

A.   I was telling him, "New York, talk to me.  Talk to me, New York.  This is Flash," because that's what they used to call me.  And he wouldn't respond to me.

Q.   He was never able to speak to you?

A.   No.  But his eyes, his eyes would look at me and then look

Huertas - trial testimony

476

to the sides.

Q. Did he move at all?

A. No.

Q. Now, Luis, as you were sitting there on the street holding New York, did anyone else come to the scene?

A. Well, Loco shortly after.

Q. That's the same Loco that was with him earlier, is that right?

A. Yes.

Q. When Loco came back, what did he do?

A. He was very nervous. He was crying and pacing back and forth yelling -- crying, crying out, "No, not New York. No, can't be New York."

Q. Did you say anything to Loco?

A. I asked him to get the ambulance for him.

Q. And did he go and get an ambulance?

A. No. He kept passing back and forth nervously and crying.

Q. What did you do?

A. I kept yelling at him to go get the ambulance.

Q. Did he eventually arrive and get the ambulance?

A. Eventually he did.

Q. How far is the ambulance station from where you were?

A. Quarter of a block.

Q. Do you know if Loco ran there or how he got there?

A. He ran there.

Huertas - trial testimony

477

Q.  Did and ambulance come to where you were with New York?

A.  Yes.

Q.  When the ambulance got there, what did they do?

A.  They were checking for his pulse, checking for his pulse and his wounds.

Q.  Did they take him anywhere?

A.  Yes, they did.

Q.  Now, after they took New York, where did you go?

A.  I stood there in front with the police.

Q.  And did the police come after the ambulance or before the ambulance?

A.  They came after.

Q.  So New York was already gone when the police arrived?

A.  Okay.  They took New York and put him in the ambulance, and then came the police.  So he was still at the scene.

Q.  Luis, did you speak with some police officers there?

A.  Yes, I did.

Q.  Do you remember about how many police officers came that night?

A.  There was too many to count.

Q.  Were there also civilian people out on the street then?

A.  Yes, everybody from the other block.

Q.  How many civilians, if you know?

A.  15, 20, 25.

Q.  Now, Luis, what was your condition, the condition of your

Case: 1:22-cv-03973 Document #: 346 Filed: 03/04/26 Page 124 of 259 PageID #:21486
Huertas - trial testimony
478

clothing when you were standing there on the street?

A. Well, I had blood on my shirt, blood on my pants and part of his head on my pants on the bottom.

Q. Did the police talk to you?

A. Yes.

Q. Did you tell the police where you worked?

A. Yes.

Q. Did you give the police your address where they could find you?

A. Yes, I did.

Q. After speaking with the police there on the scene, did you go home that night?

A. Yes.

Q. I want to call your attention to that very next morning, which have been June 28th of 1989. Do you remember being contacted by any police?

A. Yes.

Q. Do you know the name of the police officer that contacted you?

A. Officer Noon.

Q. How was it that you saw Officer Noon on that day?

A. He came to get me at work.

Q. Where were you working at that time, Luis?

A. In an ice cream store across the street.

Q. When you say "across the street," across the street from

Huertas - trial testimony

479

where?

A.   From where that incident happened.

Q.   On Western Avenue?

A.   Yes.

Q.   Do you remember about what time Officer Noon picked you up?

A.   5:30 to 6:00 o'clock.

Q.   After he picked up, did he take you anywhere?

A.   I took me for a lineup.

Q.   And do you know where, specifically, he took you in the city?

A.   Grand and Central.

Q.   When you got to Grand and Central, you said he took you to see a lineup, is that right?

A.   Yes.

Q.   Can you explain to the ladies and gentlemen how it was that you -- well, did you view a lineup there?

A.   Yes.

Q.   Can you explain to them how you viewed that lineup?

A.   Okay.  I walked in the room and then in that room was a glass where I could see individuals that are in there.  And I walked in there.  Was five individuals in the wall.

Q.   Were they standing or sitting?

A.   They were standing.

Q.   Were you able to look at these five individuals?

A.   Yes.  They were facing towards me.

Case: 1:22-cv-03973 Document #: 346 Filed: 03/04/26 Page 126 of 259 PageID #:21488
Huertas - trial testimony
480

Q.   Luis, did you recognize any of those individuals as the man who shot your friend New York?

A.   None.

Q.   Did you tell the police that you couldn't recognize anyone?

A.   Yes.

Q.   Was the man that you just identified in court, the defendant, in that lineup that you saw?

A.   No, he wasn't.

Q.   After you told the police that he wasn't there, did they take you anywhere else?

A.   Well, after that they took me to a Area 6 I believe.

Q.   Okay.  Is that at Belmont and Western?

A.   Belmont and Western.

Q.   Which police took you there, if you know?

A.   Officer Noon took me there.

Q.   And when you got to Belmont and Western, where did he take you inside of that building?

A.   To the crime unit in back, the gang crime unit.

Q.   When you got into that crime unit, what did you do?

A.   Looked through some books.

Q.   When you say --

A.   Some photos.

Q.   Can you describe what the book -- when you say "books," can you describe what the books looked like?

A.   Like they.  They were blue.

(Ms. Hanlon):  Indicating for the record witness is holding his hands about maybe a foot high.

Q.   About how long, Luis?

A.   About this long.

Q.   Approximately a foot and a half long.

The Court:  Sure.

Q.   What was inside of these books that you looked at?

A.   Photos of rival gangs.

Q.   When you say "photos," were they snapshot photos?

A.   Snapshot.

Q.   How many books, Luis, did you look in?

A.   It was too many to count.

Q.   Was there more than 10?

A.   Yes.

Q.   More than 20?

A.   I think so.

Q.   How long did you stay there looking through these gang books?

A.   I took my time looking -- I took my time look looking through the books.

Q.   Took me about three and a half hours, four hours.

Were you able to pick anyone out of that book that shot your friend New York?

A.   No.

Q.   Did you ever see the defendant, the guy you have identified

Huertas - trial testimony

482

here, did you ever see his picture in any of those books?

A.   No.

Q.   Now, after you told the police that he wasn't in the book, did they take you anywhere else?

A.   They brought me back home.

Q.   Now, Luis, I want to call your attention to a little bit later.  Would have been July 7th of 1989 at about a quarter to 5:00 or 5:00 o'clock in the evening.  Do you remember where you were?

A.   Well, that's the time that Officer Guevara came and picked me up.

Q.   Where did he pick you up from?

A.   Work again.

Q.   The same place you just told us where you were working?

A.   Yes.

Q.   When Officer Guevara picked you up that evening, where did he take you?

A.   Took me back to Area 5 on Grand and Central.

Q.   And did he tell you why he was taking you to Area 5 that particular day?

A.   Yes.

Q.   Why did he take you there?

A.   For a lineup.

Q.   Now, when you got to Grand and Central, Luis, where specifically did you go?

Huertas - trial testimony

483

A. Well, they put me in a little waiting room until they fix the lineup.

Q. Okay. Did they come to get you then?

A. Yes.

Q. Where did they take you?

A. To that little room with the glass and the individuals on the other side.

Q. Is that the same kind of room you had looked at the lineup a prior time before?

A. Yes.

Q. Now, when you entered that room to look through the glass, what happened?

A. Well, as soon as I entered the room, I noticed the defendant.

Q. Do you remember what position he was in in that lineup?

A. He was facing towards me.

Q. How many -- do you remember how many people were in the lineup?

A. Five.

Q. And do you remember which spot he was in?

A. Yes.

Q. Which spot was he in?

A. He was in number one spot.

Q. Now, when you told the detectives that you now recognized him, what did you tell the detectives that he had done?

A.   That he was the shooter.

Q.   And after you told them that, what did they say?

A.   They asked me to take my time and look through every individual and make sure that I get the right guy.

Q.   And this came after you had already pointed the defendant out once, is that right?

A.   Yes.

Q.   Did you then in fact take your time and look again at all the guys?

A.   Yes.

Q.   And did you in fact pick someone out that night?

        MR. S. RICHARDS:  I'm sorry.  (Reading):

Q.   And did you in fact pick someone out again?

A.   Yes.

Q.   Who did you pick out?

A.   Number one, the defendant.

Q.   Luis, I'm going to show you some exhibits, some photographs that I'm marking as People's Exhibits Number 2, 3 and 4 for identification.

        MS. GOLDEN:  Your Honor, may I have the system to display?

        THE COURT:  Yes.

        MS. GOLDEN:  Thank you.

BY MR. S. RICHARDS:  (Reading):

Q.   Luis, I'm going to show you what I have marked as People's

Exhibit Number 3 for identification.  Can you tell us what this is a picture of?

MS. GOLDEN:  Objection.

MR. S. RICHARDS:  I'm sorry.  Okay.  (Reading):

Q.  Luis, I'm going to show you some exhibits, some photographs that I'm marking as People's Exhibits Number 2, 3 and 4 for identification.

Luis, I am going to show you what I have marked as People's Exhibit Number 2 for identification.  Can you tell us what this is a picture of?

A.  The lineup that I seen.

Q.  And does this lineup truly and accurately show the way it looked to you when you viewed it in July of 1989?

A.  Yes.  But it was in a glass.  But it's the same lineup.

Q.  Can you see the person in this lineup that you identified as the shooter?

A.  Yes.

Q.  Luis, I'm going to ask you to take this pen if you will and place an "X" above the head of the person you identified.

A.  Indicating.

(Ms. Hanlon):  Indicating for the record, Judge, witness has put an "X" above the number one position in the lineup.

Q.  Luis, I am now going to show you what I'll call People's Exhibit Number 3 for identification.  What is this a photograph

Q. of?

A. Same lineup, but in different positions.

Q. Is this a side view?

A. Side view.

Q. And, again, did you see the person you identified?

A. Yes.

Q. Can you again take this -- again take this pen and put an "X" above his head.

(Ms. Hanlon): Indicating for the record, Judge, he's put an "X" above the number one person's head.

The Court: Yes.

Q. Does this picture truly and accurately show the lineup as you saw it in July of 1989?

A. Yes.

Q. Luis, I'm going to show you now People's Exhibit Number 4 for identification. Do you recognize this photo?

A. Yes.

Q. What is this a picture of?

A. The defendant.

Q. This is the guy you picked out of the lineup?

A. Yes, I did.

Q. Luis, I'm now going to show you what I have marked as People's Exhibit Number 5 for identification purposes. Can you look at this picture and tell us what is it a photo of?

A. It's a picture of the site where the incident happened, but

Huertas - trial testimony

487

as someone is looking at it southbound.

Q.   Luis, does this photograph show where you were sitting when this incident occurred?

A.   Yes.

Q.   I'm going to ask you to take this pen and to mark an "L" where you were standing when the shooting took place.

Now, look at the same photograph.  Does it show the gangway where New York came out of?

A.   Yes.

Q.   Can you put an arrow on that gangway where you saw him come out?

A.   Indicating.

Q.   Now, this same photograph, Luis, does it show where the defendant was standing when he shot New York?

A.   Yes.

Q.   Can you put a "D" on that spot?

A.   Indicating.

Q.   And, Luis, does this picture also show where New York was standing when he got shot by the defendant?

A.   Yes.

Q.   Can you put an "N"?

A.   Yes.

(Ms. Hanlon):  Judge, for the record, witness has placed an "LND" and arrow on the photograph.

Q.   Luis, I'm now going to show you what has been marked as

People's Exhibit Number 6 for identification.  What is this a picture of?

A.   The site where the incident happened.

Q.   And does this picture show the gangway again where New York came out of it?

A.   Yes.

Q.   Can you put another arrow right there.  And, Luis, can you also put an "X" where the defendant's body was when he got shot.

A.   The defendant?

Q.   I'm sorry.  The -- New York's body.  Thank you.  New York's body when he got shot.

A.   Indicating.

Q.   People's Exhibit Number 7 for identification, what's that a picture of?

A.   The same spot where the incident happened.

Q.   And do you notice anything written on this building there?

A.   Yes.

Q.   Can you tell the ladies and gentlemen what's written on that building?

A.   An S/C with a "Z" and "K."

Q.   Do you know what that means?

A.   Yes.

Q.   What does that mean?

A.   Stands for Spanish Cobras.

Huertas - trial testimony

489

Q.   I'm going to show you People Number 8 for identification. What is this a picture of?

A.   The same site looking at it northbound.

Q.   And does the gangway show in that picture?

A.   Yes, a little.

Q.   Does it also show the spot where New York was standing when he got shot?

A.   Yes.

Q.   Put an "X" on that spot.

        (Ms. Hanlon):   Judge, the witness has put an "X" directly under the streetlight.

Q.   People's Exhibit Number 9, what is this a picture of, Luis?

A.   Same spot.  Same spot but in the street.

Q.   Different view?

A.   Yes.

Q.   Finally I'm going to show you what's been marked as People's Exhibit Number 10 for identification.  Who is that a picture of?

A.   New York.

Q.   Do all of these pictures that I just showed you, Luis, truly and accurately portray the scene as you saw it when you were there in June of 1989?

A.   Yes.

Q.   Thank you, Luis.  You may take the stand again.

        Now in the few years past you had a little bit of

Huertas - trial testimony

490

trouble with the law, didn't you?

A.   Yes.

Q.   In 1988 you were convicted for possessing a stolen car --

in 1986 you were convicted for possessing a stolen car?

A.   Yes.

Q.   And in 1987 you were convicted for possessing a stolen car,

is that right?

A.   Yes.

        (Ms. Hanlon):  May I have a moment please, Judge?

        The Court:  Sure.

Q.   Since that time, Luis, you haven't been in trouble with the

law, have you?

A.   No.

        (Ms. Hanlon):  Judge, I have no further questions of

this witness at this point.

        The Court:  Defense.  Mr. Carey.

        MR. J. RICHARDS:  Your Honor, for the record, I'll now

read the cross-examination that was conducted by Mr. Carey on

November 29, 1990.

        THE COURT:  Okay.

BY MR. J. RICHARDS:

Q.   Good afternoon.  You're a twice convicted?

A.   Pardon me?

Q.   You're a twice convicted felon?

A.   Twice with auto theft.

Case: 1:22-cv-03973 Document #: 346 Filed: 03/04/26 Page 137 of 259 PageID #:21499
Huertas - trial testimony
491

Q. I'm sorry?

A. Twice with auto theft.

Q. Those were both felony convictions, is that --

A. Yes.

Q. Now, you lived on Western just about where the shooting took place back in 1989, is that right?

A. Yes.

Q. Okay. In fact, you worked that night, is that right?

A. Yes.

Q. Worked in the ice cream store across the street?

A. No. Right downstairs in where I live.

Q. But it was across the street from where the shooting took place?

A. Yes.

Q. You were sitting outside the bar at 1310 North Western, is that right?

A. Yes.

Q. That's a Cobra bar, isn't it?

A. Yes.

Q. And you were sitting out there for about 30 to 45 minutes?

A. About 45, 50 minutes.

Q. Okay. And this was the summer?

A. Yes.

Q. Okay. Did you see anybody else on the street that night?

A. No.

Huertas - trial testimony

492

Q.   Okay.  And the -- you saw two people, two men.  One was tall -- one was taller, one was shorter, is that right?

A.   Yes.

Q.   You saw them coming out of Potomac down by the fire station.  They turned the corner and walked towards you?

A.   Yes.

Q.   You watched because there was really no other traffic on the street that night, right?

A.   Yes.

Q.   Do you remember what they were wearing?

A.   Tall guy was in the green.  Green hospital shirt, short pants and gym shoes.

Q.   And you remember what the shorter guy was wearing?

A.   Well, all I noticed was red, red top.

Q.   Okay.  And you talked to the police the next day, is that right?  Talked to a detective, plain-clothed policeman?

A.   Yes.

Q.   And you gave that policeman a description, is that right?

A.   Yes.

Q.   And the description you gave of the shooter to that detective the next day was that the first person -- was that the first person, the shooter was about 5'6 to 5'7 with brown hair to his shoulders?  Do you remember telling the detective that?

A.   5'6.  Only a little shorter than me, I told him.

Huertas - trial testimony

493

Q. Do you remember telling him that he had brown -- that the shooter had brown hair to his shoulders?

A. Stop here.

Q. That's what you told?

A. Uh-huh.

(Ms. Hanlon): Indicating for the record his shoulder.

Q. You touched your shoulder?

A. No, I didn't touch the shoulder. Was up to that part right there.

Q. By your collar?

A. Right.

Q. And this person had a thin moustache, is that right?

A. Yes.

Q. You didn't say anything about a beard, right?

A. Well, no, I didn't say anything about a beard.

Q. I'm sorry?

A. I didn't say anything about a beard.

Q. So he had a thin moustache. And you said that the shooter had the red T-shirt and red shorts, didn't you?

A. No.

Q. You didn't say that to the police?

A. No. It was the shorter one.

Q. And you said the other person, when you were talking to the police, was the same height, 5'6 to 5'7; isn't that what you told the detective?

Case: 1:22-cv-03973 Document #: 346 Filed: 03/04/26 Page 140 of 259 PageID #:21502
Huertas - trial testimony
494

A.   No.

Q.   And you told the detective that that person had straight hair, didn't you?

A.   The short guy.

Q.   Right.  Told him he had straight hair?

A.   Straighter hair.

Q.   You didn't say the short guy.  You said a guy 5'6 to 5'7?

A.   That's the short guy.

Q.   And the other guy you told the --

A.   Little bit taller.

Q.   Was 5'6 to 5'7 too, didn't you?

A.   No.  He was a little shorter than me, and I'm 5'9.

Q.   You told the police that that person had a red T-shirt on too, didn't you?

A.   No.

Q.   You didn't tell the police that?

A.   No.

Q.   Now, you knew what the gang boundaries were out there, didn't you?

A.   Yes.

Q.   And anything like say in the 2600 block of the east/west street, that would be Cobra territory, wouldn't it, 2600 west? Western is 2400 west, right?

A.   Yes.

Q.   2600 west would be Cobras, wouldn't it?

Huertas - trial testimony

495

A.   Yes.

Q.   And anything east of the -- of Western, that would be Latin
King territory, right?

A.   Yes.

Q.   Okay.  Just one moment.

So the 2600 block of Division, that would be Cobra
territory, right?

A.   25.

Q.   26?

A.   Yes.

Q.   And the 2600 block of Evergreen, that would be Cobra
territory, wouldn't it?

A.   Yes.

Q.   And the 2600 block of Potomac, that would be Cobra
territory, wouldn't it?

A.   That whole area, yes.

Q.   And the 1200 block of Maplewood, that would be Cobra
territory too, wouldn't it?

A.   Yes.

Q.   Now, you talked to the police the day after the shooting,
is that right?

A.   Yes.

Q.   You lived on the King side of Western, is that right?

A.   Yes.

Q.   But you hung out with people you knew were Cobras, is that

Huertas - trial testimony

496

right?

A.   Yes.

Q.   The two guys that walked by, one of whom you pointed out in court, you'd never seen him before, is that right?

A.   No.

Q.   You never saw -- after that lineup, you haven't seen Jaime Rios since, have you?

A.   No.

Q.   Now, when the shooting occurred, you say that the person who did the shooting took a step back and shot, is that right?

A.   Yes.

Q.   He was about a foot away from New York when he shot, is that right?

A.   Yes.

Q.   Do you know if he shot him in the head first or the stomach first?

A.   Head first.

Q.   Okay.  And he fell at that point?

A.   He was going down.  He didn't actually fall all the way.

Q.   And then he shot him a couple of other times?

A.   Then he kept shooting.

Q.   Did you see where he shot him the second time?

A.   Well, I didn't see where the bullets went, but I seen his wounds.

Q.   Were you still sitting on the stoop at the bar when the

Huertas - trial testimony

497

shooting took place?

A.   On the front step of the building.

Q.   Now, I'm going to show you what's been previously marked People's Exhibit Number 5 for identification, ask you to take a look at that again.

A.   Yes.

Q.   Do you recognize what's in that photograph?

A.   Yes.

Q.   The Old Style sign, that's about where you were sitting?

A.   Yeah, right by the door right there.

Q.   There is no streetlight, is there?

A.   Yes, there's one.

Q.   That's in front of the bar?

A.   From the pole, yeah.

Q.   And there is a streetlight right in front of where the shooting took place, is that right?

A.   Yes.

Q.   Now, you say you looked at the two people's face as they walked by, is that right?

A.   One.

Q.   Okay.  Was the shorter guy behind him or in front of him?

A.   On the side of him.

Q.   Okay.  Towards the street or away from the street?

A.   Towards the street.

Q.   And the shorter guy was about 5'6?

Huertas - trial testimony

498

A. He was shorter than Jaime.

Q. Okay. Well, you told the police he was about 5'6, 5'7?

A. 5'5, 5'7.

Q. You're 5'9. And the taller guy was slightly taller or shorter than you?

A. He was shorter.

Q. So there was about an inch difference in their heights?

A. About an inch.

Q. And so that blocked your -- that sort of obstructed you. You couldn't really see the second person's face?

A. No.

Q. You could remember that he was wearing though?

A. By his shirt.

Q. You remembered his hair?

A. His hair.

Q. Do you remember talking to Detective Morris and Johnson?

A. I don't remember the officers that I talked to.

Q. Was one of the policemen you talked to tall, kind of thin?

A. I talked to so many police officers, I can't remember everyone.

Q. But the one -- some of them were taking notes when they talked to you, right?

A. Yes.

Q. Okay. Now, getting back to New York for a second, you knew him to be a gang member, right?

A.   Yes.

Q.   He was an active gang member?

A.   Yes.

Q.   And the man with him, Luis -- I'm sorry, Javier Torres, he was an active Spanish Cobra too, is that right?

A.   Yes.

Q.   Now, when you describe -- when you told the police about this confrontation with the two men that walked by, you said today that it was about 10 or 15 seconds?

A.   That he was looking at me.

Q.   Did he stop for 10 or 15 seconds?

A.   No.  He was walking.  He just kept looking at me.

Q.   That's how you were able to get a good look at him.  Did you stand up and look at him?

A.   No.  Sitting down.

Q.   You told the police you stood up and looked?

A.   I stood up when the incident happened.

Q.   In fact, you told the police you stood up and took a good look at both of them, didn't you?

A.   No.

Q.   You didn't say that to the police?

A.   No.

Q.   Did you tell the police about the 10 to 15 seconds?

A.   Yes.

Q.   You did tell them that?

Case: 1:22-cv-03973 Document #: 346 Filed: 03/04/26 Page 146 of 259 PageID #:21508
Huertas - trial testimony
500

A. Yes.

Q. Now, Detective Noon, he was in plain clothes, right?

A. Yes.

Q. Okay. And he took you to look at gang books, is that right?

A. Yes.

Q. Okay. He didn't tell you anyone to look out, did he?

A. No.

Q. You looked at them on your own?

A. Took my time.

Q. About four -- three, four hours you wanted to make sure. And you didn't pick anyone out at that time?

A. No.

Q. You looked at Latin King books, didn't you?

A. Yes.

Q. More than 10, maybe even more than 20 books?

Now, did you see the guns? Did you see that what kind of guns they were?

A. No.

Q. You did hear the person who was the shooter say something though, didn't you?

A. Across the street.

Q. The shooter?

A. Yes.

Q. Okay. Did you hear him say something to New York?

Huertas - trial testimony

501

A.   He represented to Loco as he was running.

Q.   When he walked up to New York, you heard him say to New York, "What's up"?

A.   No.

Q.   You told the police you heard him say that?

A.   No.   He went like this with his hand, like what's up.

Q.   You didn't -- so did you tell the police that you heard him say something or --

A.   No.

Q.   Okay.   How long did you live in that neighborhood?

A.   Eleven years.

Q.   Okay.   And you had never seen those two men before, is that correct?

A.   No.   Yes.   That's correct.

MR. S. RICHARDS:   Redirect examination by Ms. Hanlon.

Q.   Besides the streetlights at the bar, were there any lights on inside that bar?

A.   Yes.   They had a sign, a window and a sign outside.

Q.   Now, the shorter person that was with the defendant, he didn't talk to you, did he?

A.   No.

Q.   And when the defendant was first representing Spanish Cobras to you, where was the shorter of the two guys standing?

A.   On the other side of me towards the street.

(Ms. Hanlon):   Thank you, Judge.   I have no other

questions of Luis Huertas.

MR. J. RICHARDS: And for the record, Your Honor, that concludes the trial testimony of Luis Huertas from November 29th.

THE COURT: Okay. There is still more transcript testimony to be read in. The lawyers have changed because this is testimony that the defendants, or at least one of the defendants wants to admit. And it is I believe from the deposition of Huertas, correct?

MR. KIVETZ: Correct.

THE COURT: All right. Ladies and gentlemen, a deposition is, in civil cases, the parties have an opportunity to interview witnesses before the trial. You've heard excerpts from deposition transcripts read at various times during the case. There is a court reporter, the witness, the lawyers, and they ask the individual questions under oath at the deposition. So that's the context here.

You may proceed.

MR. KIVETZ: And this is the deposition upon oral examination of Luis Huertas taken at the Hampton Inn Geneva at 413 Lake Street in Geneva, New York. And the date that it was taken was September 18, 2023 at 11:00 a.m.

LUIS HUERTAS, DEPOSITION

BY MR. KIVETZ: (Reading):

Q. Could you state your name and spell your name for the

record, sir.

A.   My name is Luis Huertas, H-U-E-R-T-A-S.

Q.   I know the incident took place in 1989.

A.   Yes.

   (Interruption.)

        MR. KIVETZ:  I'll wait one second for a technical snafu.

        THE COURT:  Do we have that taken care of?

        A JUROR:  I don't know what happened.

        THE COURT:  It's fine.  Just let me know when we're settled.

        The first year my kids were at college, I let them like break through my do not disturb.  And they understand that I work, but they would inevitably call during the day, because with teenagers, everything has to be now.  So I'm understanding.

        All right.  You can go ahead.

        MR. KIVETZ:  Let's just start over.  (Reading):

Q.   I know the incident took place in 1989.

A.   Yes.

Q.   So I know that it's quite a long time ago.  If you need to look at anything to refresh your recollection or you're not sure of some of the details, let us know, okay?

A.   Okay.

Q.   Are you on any medication that would affect your ability to

Huertas - deposition

504

remember things or understand the questions today?

A.   I'm on psych medications now.

Q.   What psych medications are you on?

A.   Trazodone, Seroquel.

Q.   You said trazodone.  And what was the other?

A.   Trazodone and Seroquel.

Q.   Why are you on trazodone?

A.   Bipolar.

Q.   And the Seroquel, do you know why you're on that?

A.   Depression.

Q.   Okay.  And how long have you been on trazodone?

A.   About three years.

Q.   And how long have you been on Seroquel?

A.   Same amount of time.

Q.   Does the taking of trazodone affect your memory in any way?

A.   I've no idea.  But I know -- maybe it's my age.  I don't know, maybe it's my age.

Q.   What is your age?  Your memory --

A.   60.

Q.   And you're saying that your memory is not as good as it was when you were younger?

A.   It's definitely not as good.

Q.   Have you noticed a decline in your memory as you have gotten older?

A.   Yes.

Q.   More pronounced in the last few years?

A.   Yes.

Q.   So when you were diagnosed with bipolar disorder?

A.   When I was in Chicago many years back.

Q.   Can you give me a rough estimate of when?  I don't need an exact date, just a rough estimate.

A.   I was there about '90, 1990.

Q.   Okay.  That was the same time you were diagnosed with the depression back in 1990 or so?

A.   Yes.

Q.   Any other psychological condition that you can think of that might affect your ability today?

A.   No.

Q.   Are you on any other medication that could affect your memory or ability to understand the questions?

A.   I'm not sure, but I'm on high blood pressure medication. But I don't remember the name.  My wife gives it to me.

Q.   Okay.  And have you noticed any particular effect that it has on you, in particular about your memory or your ability to recall?

A.   I don't understand.

Q.   Have you noticed anything about taking the blood pressure medication, how it affects your memory?  Have you noticed any difference?

A.   No.

Q. We know you have testified in court before, correct?

A. Yes.

Q. About how many times have you testified in court?

A. Maybe once or twice.

Q. Was the last time back in 1990?

A. Yes.

Q. Just a little background, sir. Where do you currently reside?

A. Townside Apartments. My mailing address is 114 Genesis Way.

Q. How long have you been in that apartment?

A. About five years.

Q. Who do you live with?

A. My wife.

Q. How long have you been married, sir?

A. Pardon me?

Q. How long have you been married?

A. We've been married six years.

Q. Prior to living here -- just to be clear, we are in Geneva, New York, correct?

A. Yes.

Q. Prior to moving to Geneva, New York, where did you live?

A. In Tennessee, Nashville, Tennessee.

Q. How long did you live in Nashville, Tennessee?

A. Two years.

Huertas - deposition

507

Q.   Where did you live when you lived in Tennessee for those two years?

A.   I was homeless, so I had a tent.

Q.   And prior to moving to Tennessee approximately seven years ago, where did you live?

A.   In Kentucky.

Q.   Where in Kentucky?

A.   Bowling Green, Kentucky.

Q.   How long did you live there?

A.   Not long, six, seven months.

Q.   Where did you live there in Bowling Green?  Where did you live?  Do you remember your address?

A.   I lived at Salvation Army.

Q.   Okay.  Prior to being in Bowling Green, where did you live?

A.   Where did I live?

Q.   Yes, before Bowling Green.

A.   Over here, again, in Geneva, New York.

Q.   Okay.  For how long?

A.   About a year, for about a year.

Q.   And then before that?

A.   Chicago.

Q.   You were in Chicago for how many years?

A.   Went where?

Q.   How many years did you live in Chicago, sir?

A.   39 years.

Huertas - deposition

508

Q.   Before living in Chicago, were you born in Puerto Rico, correct?

A.   Yes.

Q.   Moved to Puerto Rico when you were how old?

A.   I came from Puerto Rico at three years old.

Q.   Are you currently employed, sir?

A.   No.

Q.   When was your last employment?

A.   Employment?

Q.   Yes.

A.   Back in '89, I worked at an ice cream shop.

Q.   Would this be the ice cream shop that is across the street from the bar where the incident took place?

A.   Where the shooting took place, it's across the street.

Q.   Just to be clear, we're talking about the shooting involving your friend back in 1989?

A.   Correct.

Q.   After 1989, when you were working at the ice cream shop, if I'm correct, you were also doing mechanic work, is that correct?

A.   Correct.

Q.   You were self-employed, correct?

A.   Self-employed.

Q.   How long did you do that?

A.   Since 12 years old I've been working on cars.

Q. How long -- when did you stop being a self-employed mechanic?

A. When I came this way to Geneva, New York.

Q. After leaving Chicago?

A. Yes.

Q. Why did you stop at that point?

A. Because I didn't have no tools.

Q. All right. Currently, sir, what do you do for money? What do your finances involve?

A. I pick up recyclable cans and bottles and take them to the redemption center.

Q. Do you receive any kind of governmental assistance, SSI?

A. SSI, yes.

Q. Sir, today, just to be clear, you are in a motorized electric chair, a scooter. Is there some kind of physical condition why you use that, sir?

A. I have neuropathy.

Q. How long have you been suffering from neuropathy?

A. Six months.

Q. Sir, if I can focus your attention a little bit to 1989. Where were you living, sir?

A. Across the street, right above the ice cream shop, with a friend.

Q. Now, the ice cream shop, do you recall the address?

A. 1313 North Western.

Q.   What neighborhood is that in, sir?

A.   It's in between the Humboldt Park area and Wicker Park area.

Q.   You said you were living with a friend while working at the ice cream shop, correct?

A.   Correct.

Q.   Would that be Luis Morales that you lived with?

A.   No.

Q.   Sir, back in 1989, did you belong to a street gang?

A.   No.  I retired.

Q.   When did you retire from your street gang, sir?

A.   About that time, '89, '90.

Q.   What gang was that in?

A.   Latin Disciples.

Q.   Why did you retire, sir?

A.   I got tired from all the violence and kids getting shot. It was too much for me.

Q.   And who was Luis Morales, sir?

A.   A friend of mine that I used to shoot pool with.

Q.   How long had you known Mr. Morales?

A.   About a year.

Q.   Did he belong to a street gang, sir?

A.   Yes, he did.

Q.   Do you remember what gang it was?

A.   Spanish Cobras.

Huertas - deposition

511

Q. Were the Spanish Cobras and Latin Disciples aligned?

A. I don't understand.

Q. I'm sorry. How about this, were the Latin Disciples, were they Folks or People?

A. I still don't understand.

Q. Were Spanish Cobras and Latin Disciples friends or enemies?

A. Kind of rivals. But they started out as friends.

Q. But you were retired from the Latin Disciples when you were friends with Mr. Morales, is that correct?

A. Yes.

Q. So fair to say you retired from Latin Disciples some time around 1988ish?

A. When I retired?

Q. Yes.

A. I could say about 1990.

Q. Were you a Latin Disciple at the time of the incident, the shooting?

A. At the time --

Q. What I have marked as Exhibit A is your transcript from the criminal trial in front of Judge Themis Karnezis on November 29, 1990 in the case of The People of the State of Illinois versus Jaime Rios.

I want to make sure that's clear what I have in front of you right now. But it's not opened, all right.

Did Luis Morales have a nickname?

A.   Yes.  But I forgot what his nickname was.

Q.   Would it be New York?

A.   New York, that's what it was.

Q.   And he had the nickname because he came from New York originally?

A.   I believe so.

Q.   Now, on June 27, 1989, is that the night he was shot?  Does that ring a bell, sir?  Do you remember that incident?

A.   What?

Q.   Do you remember the incident where Mr. Morales was shot and killed?

A.   Yes.

Q.   June 27, 1989?

A.   Yes.

Q.   Is that correct?

A.   Yes.

Q.   And you had plans to meet Mr. Morales that night?

A.   Yes.  We were going to go shoot pool.

Q.   Where were you going to be shooting pool?

A.   At the bar.

Q.   The bar that's roughly across from your apartment at 1313 North Western?

A.   A little before that.

Q.   At 13 North Western?

A.   I believe so.

Huertas - deposition

513

Q.   Do you remember the name of the bar?

A.   No, I don't remember.

Q.   That area where the bar was located, was that a certain gang territory?

A.   Yes.

Q.   What gang territory would that be, sir?

A.   Spanish Cobras.

Q.   Sir, this took place back in 1989.  Is it fair to say that your memory was better back in 1990 than it was -- about your events in 1989 than it is today?

A.   Correct.

Q.   Sir, do you recall giving testimony back in 1990 in the criminal case versus Jaime Rios?

A.   Yes.

Q.   And when you gave your testimony back in 1990, did you tell the truth?

A.   Yes.

Q.   Did you try to answer as complete as possible to the questions being asked?

A.   Yes, I did.

Q.   Sir, I want to direct your attention to page 152 on the bottom.  It's just a couple of pages into your deposition.  Are you there, sir?

A.   Yes.

Q.   I want to direct your attention to lines 8 through 13,

Huertas - deposition

514

where it's talking about your friend New York.

A. Yep.

Q. It indicates here on lines 12 and 13 you have known him for 11 or 12 years. Does that refresh your recollection about how long -- about how long you had known Mr. Morales prior to his death?

A. Really a year. I knew him from the street, but I really -- but I didn't really know his name or anything.

Q. Okay. So the 11 or 12 would have been how long you had known him. But the one year was how long you knew him well as a friend?

A. Correct.

Q. Okay. Sir, I want to go on from there. You made plans to meet your friend at the bar. And did you go to the bar, sir?

A. He didn't make it.

Q. I understand.

Did you go to the bar though and wait for him?

A. No. I was in front of the bar.

Q. How long were you in front of the bar that evening?

A. About a half hour.

Q. Okay. And after about a half hour, what happened?

A. These two guys came around the corner. I don't know what they were up to, but I was watching them. And they faced the gun at me. And that's when Mr. Morales came out of a gangway and they turned the gun from me to him.

Huertas - deposition

515

Q.   Prior to the people pointing the gun, do you recall where these two people came up to you and represented their gang to you?

A.   No, they didn't represent.

Q.   Let's go to page 153, sir, if you can.

A.   152.

Q.   153?

A.   Okay.

Q.   Starting on line 6, if you can follow along with me:

"Two individuals turning on Western from Potomac.

"Question:  From where you were sitting, Mr. Morales, what direction would Potomac Street have been in?

"Answer:  They were going northbound on Western."

Do you recall those people turning at the direction, sir, on Western?

A.   I remember.

Q.   And then further down on line 20 it says:

"How many people did you see?

"Answer:  Two.

"Were they men or women?

"Men."

Does that refresh your recollection about how many people that you saw that day in turn?

And do you recall those two people coming up to you directly across from you and speaking with you, sir?

Huertas - deposition

516

A.   No.

Q.   If you go to page 156, sir, I could direct your attention to line 14 through line 22.  In 14:

          "Question:  When these men got to you, Luis, did anything happen?

          "Answer:  Well, the taller guy represents Spanish Cobras to me.

          "Question:  When you say 'represented Spanish Cobras,' can you explain what that means to the folks in the jury?

          "Answer:  He was actually saying the name of the gang, the name of the gang that he supposedly belonged to."

          Do you see that there, sir?

A.   Yes.

Q.   Does that refresh your recollection on whether or not you have had contact with the people before they went over to the alley?

          Sir, do you recall now whether or not they represented their gang to you?

          Sir, can you answer the question?

A.   Yes.

Q.   Okay.  So, sir, when they came around the corner and they walked toward you --

A.   They represent Cobras, because I had been in that neighborhood so many years and I said no.  That's when he went in front, pulled a pistol out.  He was aiming it at me.

Huertas - deposition

517

Q. Okay. You said he was aiming the pistol at you prior to aiming it at someone else, correct?

A. Pardon?

Q. He was aiming at you initially the gun?

A. Yes.

Q. When he was talking to you, were you able to get a good look at the person's face?

A. Yes.

Q. Was it lit that night outside?

A. That, I don't remember. It's been too long.

Q. Do you remember if there were lights coming from the bar, sir?

A. No.

Q. Do you remember if there were streetlights?

A. Oh, yeah. Yes, I should say.

Q. So you said after he drew his gun, is that when your friend New York came out of the alley, sir?

A. He came out. He came out of the gangway, which is the back of the guys, those two guys.

Q. How close was New York to those two guys?

A. 20, 25 feet.

Q. What happened next, sir?

A. That's when they took the gun away from pointing at me and they went and faced it towards Luis Morales.

Q. What happened next?

Huertas - deposition

518

A.  One guy fired, and then they ran across the street to an empty lot.

Q.  Okay.  And how many times did he fire the weapon?

A.  About two or three times.

Q.  Okay.  What did you do next, sir?

A.  Well, Luis Morales was down.  I went over to see if I could make him come through.  But I had seen a bullet wound in his head and I knew it was over.

Q.  Do you recall whether or not when the shooter ran to the side of the street, whether he said anything when he left the scene?

A.  No.

Q.  Sir, if I can draw your attention to page 164.  Now, sir, would reviewing your testimony from 1990 refresh your recollection as to what occurred the night of 1989 when your friend was killed?

A.  If I had any recollection?

Q.  Would reviewing your testimony refresh your recollection, sir?  Would it help you remember?

A.  Yes, 1990.

Q.  Sir, looking at page 164, on line 13 through line 16:

        "Did he do anything as he was crossing Western Avenue?

        "Answer:  When he got to the other side, he represented King Love, King Love and Spanish Cobra killer."

        Do you see that, sir?

Huertas - deposition

519

A.  No, I don't remember.

Q.  You don't recall that now?

A.  No.

Q.  Okay.  When you testified about the night in 1990, were you telling the truth, sir?

A.  Yes.

Q.  You just can't remember the details?

A.  I can't remember now.  It was a long time.

Q.  And was your friend Luis Morales with anybody when he was shot?

A.  He was with one of his friends, one of his Spanish Cobra friends.  They called him Loco.

Q.  Did Loco get shot?

A.  No.

Q.  Do you remember what Loco's real name was?

A.  No.

Q.  Now, later that night, sir, did you speak to the police? The police did arrive, correct?

A.  Correct.

Q.  Now, sir, on June 28th would have been the following day. Do you remember being contacted by an Officer Noon?

A.  June 28th?

Q.  Yes.

A.  No.  That was the 29th after it happened, the 29th.

Q.  No.  It happened on the 27th.

Huertas - deposition

520

A.   Somewhere around there.

Q.   Do you recall an Officer Noon contacting you and coming to the ice cream shop where you worked?

A.   Yes.

Q.   When Officer Noon picked you up, was he with anybody else?

A.   Yes.  He had a partner with him.

Q.   Do you remember who the partner was?

A.   No.

Q.   Do you remember if Officer Noon took you anywhere?

A.   To Area 5.  He was showing me mugshots.

Q.   Do you remember seeing a lineup that day with Officer Noon?

A.   Yes.

Q.   I'm sorry.  Officer Noon took you to see the lineup?

A.   Yes.

Q.   Did you pick anybody out of that lineup?

A.   Yes.

Q.   How many lineups do you recall seeing in this case?

A.   How many lineups?

Q.   Yes, lineups, in-person lineups.

A.   Just that one lineup.

Q.   Okay, sir.  If I can draw your attention to page 172 of your previous testimony.  I'm looking at the bottom of the page 19.  Sir, you were asked these questions and gave these responses:

        "Do you remember about the time Officer Noon picked

you up?

"Answer:  5:30 to 6:00.

"Question:  After he picked you up, did he take you anywhere?

"Answer:  He took me to a lineup.

"Question:  Do you know where specifically he took you in the city?

"Answer:  Grand and Central.

"Question:  When you got to Grand and Central, you said he took you to see a lineup, is that correct?

"Answer:  Yes.

"Question:  Can you explain to the ladies and gentlemen how it was that you -- well, did you view a lineup there?

"Answer:  Yes.

"Question:  Can you explain how you viewed that lineup?

"Answer:  Okay.  I walked in a room, and then in that room there was glass where I could see individuals that were in there.  And I walked in.  There were five individuals in the wall.

"Question:  Were they standing or sitting?

"Answer:  They were standing.

"Question:  Were you able to look at these five individuals?

"Answer: Yes. They were facing towards me.

"Question: Luis, did you recognize any of the individuals as the man who shot your friend New York?

"Answer: None.

"Question: Did you tell the police you couldn't recognize anyone?

"Answer: Yes."

Sir, did you give the answer to those questions back in 1990?

A. Yes.

Q. So if we look at the next line, sir, "Was the man that you just identified in court, the defendant, in that lineup that you saw?" Your answer was, "No, he wasn't." Do you see that there, sir? You can look through. We're on page 174 now.

A. '74?

Q. Yes. 174 at the top.

A. May I say something?

Q. Sure.

A. When he took me to Area 5, which is Grand and Central, he showed me pictures, and I didn't recognize anybody in those pictures. But in the lineup, I did.

Q. I understand. But, sir, when you gave those answers to those questions, you were talking about a lineup where you told people you didn't see anybody.

Sir, isn't it true that the fact that after that point

Huertas - deposition

523

when you didn't make an identification, that you went to Area 6 with the Officer Noon and looked at photographs and didn't see the shooter in those photographs?

A.   No.

Q.   Sir, if I can direct your attention to page 174.  Did you give these answers to these questions -- if you go to 174, you can follow along.  I want to make sure you can see it. Starting with line 2:

"Was the man that you identified in court, the defendant, in that lineup that you saw?

"Answer:  No, he wasn't.

"Question:  After you told the police he wasn't there, did they take you anywhere else?

"Answer:  Well, after that they took me to Area 6 I believe.

"Question:  Okay.  Was that Belmont and Western?

"Answer:  Belmont and Western.

"Question:  Which police took you there, if you know?

"Answer:  Officer Noon took me there.

"Question:  And when you got to Belmont and Western, where did he take you inside that building?

"Answer:  To the crime unit in the back, the gang crime unit.

"Question:  When you got to the gang crime unit, what did you do?

"Answer: Looked through some books.

"Question: When you say --

"Answer: Some photos."

Do you see those there, sir?

A. Yes.

Q. Did you give those answers back in 1990, sir, to those questions?

A. Yes.

Q. And after going through that, do you recall now whether or not you went to go see books after a negative lineup with Officer Noon?

A. After the lineup, yes.

Q. And you didn't identify anybody in there, correct?

A. No.

Q. And do you recall how long you went through those photographs looking to see if you could find the shooter with Officer Noon?

A. I don't remember.

Q. Okay. Do you recall whether or not the plaintiff, the shooter in this case, Mr. Rios, was in the photographs with Mr. Noon, Officer Noon? Was Jaime Rios in the photographs that you viewed with Officer Noon?

A. Don't know. I didn't recognize no one in there.

Q. Okay. Sir, if I can just direct your attention to page 176. Why don't we start at the bottom of 175. Sir, did you

Huertas - deposition

525

give the answers to these questions starting line 21:

"How long did you -- how long did you stay there looking through the gang books?

"Answer: I took my time looking through the books. It took me about 3 and a half hours, 4 hours.

"Question: Were you able to pick anyone out of the book that shot your friend New York?

"Answer: No.

"Question: Did you ever see the defendant, the guy you identified here, did you see his picture in any of these books?

"Answer: No."

Did you give those answers to those questions back in 1990, sir?

A. If I gave those answers?

Q. Yes.

A. Yes.

Q. Were you telling the truth, sir?

A. Yes.

Q. Sir, do you recall then later on, on July 7th, being once again asked to come to Area 5 to see a lineup?

A. I don't remember the date, but yes.

Q. And do you recall who took you to the lineup?

A. I don't remember that either.

Q. And did you go straight from the ice cream shop to see the

lineup, sir?

A.   Yes.

Q.   Did you view photographs that day or just when you were with Officer Noon?

A.   Pardon me?

Q.   Did you review photographs that day or did you go straight --

A.   Yes, he showed me photographs.

Q.   Before your second lineup?

A.   Yes.

Q.   And do you recall what photographs you looked at before your second lineup, sir?

A.   I couldn't pick anybody out of the pictures.

Q.   Were you told who to pick, sir?

A.   Pardon me?

Q.   Were you ever told who to pick?

A.   No.

Q.   For that second lineup, sir, did you make an identification at Grand and Central?

A.   Not in the photos.

Q.   But for the lineup, when they actually had the people standing there?

A.   Yes.

Q.   Can you tell me about how that occurred?  What do you remember about that incident when you went to the lineup room?

Huertas - deposition

527

What happened when you went to the lineup room?

A.   Then I noticed him, because I remember he was looking at me in the street.

Q.   Did you notice him right away?

A.   Yes.

Q.   What happened when you noticed him right away?

A.   I picked him out.

Q.   Did anyone tell you who to pick?

A.   No.

Q.   Did anyone tell you what position the person that they wanted you to pick would be in?

A.   No.

Q.   Had you seen him, from the time you saw him that night when he shot your friend until you saw him in the lineup, had you seen him in between that time at all?

A.   No.

Q.   Had you seen him in any photographs before that time when you saw him in the lineup at all?

A.   No.

Q.   Okay.  Had you ever heard of Jaime Rios before that day?

A.   No.

Q.   Do you recall what the lineup looked like, sir?

A.   I don't remember.  Too long ago.

Q.   Do you think that you could identify the person you picked out back in 1989 today?

Huertas - deposition

528

A.   No.

Q.   So if you identified -- when you identified them in court, were you telling the truth, sir?

A.   Yes.

Q.   When you identified photographs in court of the person you identified, were you telling the truth, sir?

A.   Yes.

Q.   When you walked into that lineup room and you saw Mr. Rios and identified him as the shooter, were you completely sure he was the shooter?

A.   Yes.

Q.   If you had to gauge it, like a percentage of how sure you were, where would you put it?

A.   Pardon?

Q.   If I gave it from a 1 to 100 percent when you first saw him, where would you think your confidence was?

A.   98 percent.

Q.   Do you remember the detectives who took you into the lineup?

A.   Don't remember.

Q.   Does the detective -- does the name Detective Mason ring a bell?

A.   No.

Q.   Does the name Detective Halvorsen ring a bell?

        Did either of those detectives that were in the room

Huertas - deposition

529

with you ever tell you who to pick?

A.   No.

Q.   Did they ever threaten you in any way?

A.   No.

Q.   Officer Noon or the other officer that you drove to Area 5 for the lineups, did they ever tell you who to pick?

A.   No.

Q.   Did they threaten you?

A.   No one threatened to lock me up for obstructing justice.

Q.   That would be under the first occasion when you went back and looked at those books, is that correct?

A.   Correct.

Q.   What did Officer Noon say to you?

A.   He said, I could lock you up for obstructing traffic -- I mean justice.   'Cause he's in this picture.

Q.   In the pictures?

A.   But the pictures, he was younger.  He said the face never changes.  I said yes, it does.

Q.   You say he said that the person would be in the books that he was showing you, is that correct?

A.   Correct.

Q.   Do you know if Mr. Rios was even in the books that you saw?

A.   I wouldn't know.

Q.   And if I have this correctly, Officer Noon was saying that if you don't cooperate, you could be locked up for obstruction

Huertas - deposition

530

of justice?

A.   Correct.

Q.   You still didn't choose anybody though that day?

A.   Not in the books.

Q.   Because you didn't see Mr. Rios?

A.   No.

Q.   Is that correct?

A.   Correct.

         (Mr. Engquist):  Could we mark this as B, please.

         The following exhibit was marked for identification,
Defendant's Exhibit B.

Q.   I'm going to show you what we marked as Exhibit B, which is
titled "Affidavit of Luis Huertas," which is from, looks like
May 19th of 2020.

         Sir, do you recall this affidavit?

A.   Yes.

Q.   Now, prior to this affidavit, did you type this affidavit
up?

A.   Pardon?

Q.   Did you write this yourself?

A.   No.

Q.   Was it brought to you written already?

A.   Yes.

Q.   Prior to -- and this was, according to the back side of it,
it was signed on May 2020, correct, May 19th?

Huertas - deposition

531

A.   Correct.

Q.   Is that your signature, sir?

A.   Yes.

Q.   Prior to this being brought to you to sign, did you review your testimony from 1990?

A.   No.  I don't remember.

Q.   Okay.  Is today the first day that you have seen your testimony from back in 1990, sir?

A.   No.

Q.   When is the last time you saw it?

A.   It was in my apartment when I believe her name was Heather or something.

Q.   Did you read it then, sir?

A.   Yeah, she showed it to me.

Q.   Sir, let me go through this.  It says, number one, it says, "I testified at the trial of Jaime Rios and identified him as the shooter in the murder he was charged with."

         Do you see that?

A.   Yes.

Q.   That's true, is that right?

A.   Yes.

Q.   You did identify Jaime Rios in court, and you are saying still today you believe he was the shooter of your friend, correct?

A.   Yes.

Huertas - deposition

532

Q.   Number two, it says, "I identified Jaime Rios in a lineup I viewed on July 7, 1989," is that correct, sir?

A.   Yes.

Q.   Now, it says, "However, before I went to the lineup, I was contacted by Detective Reynaldo Guevara."

Do you remember Reynaldo Guevara at all?

A.   No, sir.

Q.   Did you ever have any dealings with Reynaldo Guevara on the street?

A.   No.

Q.   When is the first time you became aware of a person by the name of Reynaldo Guevara?

A.   I don't remember.

Q.   He wasn't known on the street for being a bad cop or anything at that point, was he, in '89 or '90?

A.   Not that I know of.

Q.   When was the first time you ever heard of him?  What was -- was that when plaintiff counsel's investigator came to see you?

A.   When they picked me up at the ice cream shop.

Q.   Who?

A.   Two officers.

Q.   Do you know if one of them was Reynaldo Guevara for sure?

A.   Excuse me?

Q.   Do you know if one of them was Reynaldo Guevara?

A.   Don't remember.

Huertas - deposition

533

Q.   When you say two officers picked you up at the ice cream shop, are you talking about the first time with Danny Noon or the second time?

A.   The second time.

Q.   Okay.  It says, "I have viewed a photograph which is attached to the affidavit that depicts Reynaldo Guevara."

     Do you remember that photograph, sir?

A.   I don't remember.

     (Mr. Engquist):  Can I mark this as C.

     The following exhibit was marked for identification, Exhibit C.

Q.   Was this the photograph, sir?  I am showing you Exhibit C that you were shown by the investigator.

A.   Yes.

Q.   Does that face ring a bell with you at all?

A.   Yes.

Q.   Do you know him?

A.   Yep.

Q.   How do you know him, sir?

A.   He interviewed me there in Area 5, second floor, I believe.

Q.   For this case?

A.   Huh?

Q.   For this case, was he one of the officers that drove you to Area 5?

A.   Yes.

Huertas - deposition

534

Q.   He was not the one that did the lineup.  Those were two detectives, correct?

A.   No.

Q.   Is that -- is that correct, sir?

A.   Yes.

Q.   Did Reynaldo Guevara tell you who to pick in that lineup?

A.   No.

Q.   Line number 6 here says, "Guevara was known as a dirty cop who could put cases on people and charge them for no reason."

Sir, you were saying before that you didn't know who Reynaldo Guevara was, is that correct?

A.   Back at that time, I probably did.  But I don't remember him now.

Q.   Beside someone telling you he was a dirty cop, do you have any reason to believe he was a dirty cop?

A.   At that time, no.

Q.   If you turn the page over, sir, turn it over to line 7, it says, "Guevara picked me up on July 7, 1989 and showed me a series of photographs and told me to pick out the shooter I had seen."

Do you remember that, sir?

A.   No, I don't remember.

Q.   And you didn't write that in here.  Someone else wrote it for you, is that correct?

A.   Yes.

Huertas - deposition

535

Q. As you sit here today, you don't recall Guevara showing you photos. You remember Danny Noon showing you photos on an earlier occasion, all those series of photos, correct?

A. Yes.

Q. Line 8, "I told Guevara I didn't recognize the shooter in any photographs."

Do you recall that now, sir?

A. Yes.

Q. Did you tell Guevara that you didn't recognize anybody on the drive to Area 5?

A. There was two officers there, and they wanted me to pick someone. But I didn't recognize anybody.

Q. To be clear, the first time you identified anybody is when you saw Mr. Rios live, correct?

A. Yes.

Q. Line 9, "Guevara threatened to have me locked up if I didn't identify a shooter."

Is this correct, sir? Was this Mr. Guevara or Mr. Noon who threatened you?

A. Yes.

Q. Which one, sir?

A. It was Noon.

Q. Okay. So that would have been on the previous occasion when you were at Area 6 at the gang crime office going through those series of photographs.

So when you were talking about Mr. Noon threatening you, not Mr. Guevara, that was when you were at Area 6 in the gang crimes office going through all of those photographs?

A.   Yes.

Q.   Then it says, number 10, "He took me to a station and showed me a lineup."

A.   Correct.

Q.   To be clear, did Mr. Guevara bring you to the lineup or two detectives?

A.   I don't remember.

Q.   As you sit here today, you don't remember who was in the lineup room with you that day?

A.   The officer?

Q.   Yes.

A.   No, I don't remember.

Q.   Line 11, "One of the people was also in the lineup in the station."

To be clear, sir, if I read this correctly, earlier you testified you don't recall ever seeing a picture of Jaime Rios when you were going through any of the photos, right?

A.   Correct.

Q.   Line 11 is not accurate?

A.   In the picture, I didn't know anybody.

Q.   Line 12 says, "He was the only person in the lineup who was also in the photo array."

Sir, do you ever remember seeing a photo array with Jaime Rios in it at all?

A.   No.

Q.   Number 13, "I have not willingly" -- I'm sorry.

"I have not willing to give this information to anyone before today because I wanted to leave the past behind.  I was afraid Detective Guevara would retaliate."

Sir, to be clear, were you afraid of Detective Guevara all these years?

A.   Yes.

Q.   How are you afraid of Guevara if you didn't know Detective Guevara?

A.   The way he spoke.

Q.   When he drove you to Area 5, the way he spoke to you scared you?

A.   At Area 5.

Q.   How did he speak to you that scared you?

A.   At the station, they didn't like me.  They threatened to lock me up.

Q.   You said Danny Noon threatened you.

A.   Yes.

Q.   But prior to someone coming to you with this affidavit and talking to you about Detective Guevara, did you even know the name Detective Guevara?

A.   No.

Q. So would it be fair to say you weren't hiding from Detective Guevara all these years, is that correct?

A. Correct.

THE COURT: How much more -- do you have a significant amount more? I'm asking if we should take our break now or if it's another 5 or 10 minutes and come back?

MR. KIVETZ: It looks like we have about 15 pages of dep transcript.

THE COURT: Okay. We'll take our afternoon break now. We'll come back at 3:05 p.m.

All rise.

(Jury out at 2:34 p.m.)

THE COURT: I'll see you back at 3:05.

(Recess at 2:35 p.m. until 3:05 p.m.)

(Change of reporters.)

MR. KIVETZ: Judge Daniel, would it be okay if we brought the witness up right now?

THE COURT: That's fine.

MR. KIVETZ: Thank you.

THE COURT: We can go back on the record.

Are there any issues that need to be addressed?

MR. S. RICHARDS: Not on the part of plaintiff.

THE COURT: Okay.

MR. ENGQUIST: Not from us, Judge.

THE COURT: All right. We can go ahead and see if the jury is ready to come back.

(Jury in at 3:06 p.m.)

THE COURT: Welcome back. Please take your seats.

Mr. Kivetz, you may proceed when ready.

MR. KIVETZ: Okay. We're still with the continued deposition of Luis Huertas from September 18, 2023.

BY MR. KIVETZ: (Reading)

Q. So would it be fair to say you weren't hiding from Detective Guevara after all these years; is that correct?

A. Correct.

Q. And you were willing to come forward and talk about all the details about what happened with your friend that got killed and the investigation afterwards up to the time he was identified up until court, is that fair to say?

A. Correct.

THE COURT:  Hold off one second.

(Pause.)

THE COURT:  Please continue.

BY MR. KIVETZ:

Q.  You weren't holding anything back when you testified in court, correct?

A.  Correct.

Q.  Just to be clear, when you went to court, you testified truthfully, correct?

A.  I picked someone.

Q.  You did testify truthfully when you were in court and under oath.

A.  Yes.

Q.  When you testified under oath in court if someone asked you a question, you would not have held back any details, correct?

A.  Correct.

Q.  Now, sir, I know your memory is not what it used to be when you were younger.  Back in 1990 or 1989, do you have any reason to doubt your identification of Jaime Rios as the person who shot and killed your friend?

A.  He looked at me first.

Q.  Do you have any reason to doubt your identification today?

A.  No.

Q.  I know, Mr. Huertas, we've been talking about your trial transcript.  Prior to giving trial testimony, do you remember

talking to any members from the Cook County State's Attorney's Office?

A.   Any officer?  Any other officer?

Q.   No, the attorneys, the ASA.

A.   Yes, but I don't remember his name either.

Q.   Do you recall being interviewed by them before going on trial to give your testimony?

A.   Yes.

Q.   During that time, did you tell them you had any reservations about who you chose in the lineup as the murderer?

A.   I don't remember.

Q.   If you had any reservation, you would have told them, correct?

A.   Yes.

Q.   Do you recall them ever asking if you -- if anyone ever told you who to pick?

A.   Nobody told me that.

Q.   And just to be clear, no member of the Chicago Police Department told you who to pick out as the murderer, correct?

A.   No.

Q.   That is correct?

A.   Correct.

Q.   No one from the State's Attorney's Office told you who to pick out as the murderer, correct?

A.   Correct.

MR. KIVETZ:  This is now the cross-examination by plaintiff's counsel.

BY MR. KIVETZ: (Reading)

Q.   So because I am not with you in person and I'm asking you the questions over Zoom, if at any time you don't hear me, please say something, okay?

A.   Okay.

Q.   Now, Mr. Huertas, back in 1989, you were living with a friend?

A.   Yes.

Q.   What was the friend's name?

A.   Nelson Reyes.

Q.   Nelson Reyes.  How did you know Nelson Reyes?

A.   We met in 1979, I believe.

Q.   How did you meet him in 1979?

A.   Nelson?

Q.   Correct.

A.   We were -- I was 15, and we were moving to the corner where he lived and there were mountains -- there was mountains of snow, and he started laughing because I fell.

Q.   And after that, you became friends?

A.   Yes.

Q.   Now, I want to ask you some -- about some other people. What I'm going to do is I'm going to say a name, and I want you to tell me if you recognize the name or not, okay?

A.   Okay.

Q.   The first name is Jose Melendez.  Do you know that name?

A.   I don't remember that name.

Q.   I'm going to -- I am next going to say a nickname to you and ask if you remember that.

     Do you remember or do you know a person by the nickname of Macho?

A.   No, don't remember.

Q.   Do you know anyone by the name of Javier Torres?

A.   No.

Q.   Now, on direct examination, the counsel for the defendant asked you if you were truthful during your testimony back in court back in 1990.

     You are today saying you were being truthful in 1990; is that correct?

A.   Correct.

Q.   And you are saying today that you didn't hold anything back in your answers?

A.   Correct.

Q.   Is that correct?

A.   Correct.

Q.   So let me ask you this:  Today you remember who your friend was that you were living with in 1989 when you were -- do you recall this question and answer from page 151 of your transcript starting with:

Huertas - deposition

544

"Q. And did you live there with anyone else?

"A. A friend."

Do you remember being asked that question and giving that answer?

A. Don't remember.

Q. Okay. So you don't remember that you were saying a friend, but not saying that friend's name. Fair?

A. If I was staying with a friend?

Q. Yes.

A. Yes, I'm still in touch with him.

Q. Okay. So why don't you give your friend's name at trial --

MR. KIVETZ: Excuse me.

BY MR. KIVETZ: (Reading)

Q. Okay. So why didn't you give your friend's name at trial as the person who you were living with?

A. Don't remember that either.

Q. Would you say that answering that question a friend instead of the person's name, would you say you were holding back, holding information back at trial?

A. No.

Q. Now, also during your direct examination, counsel had asked you about a person by the last name of Guevara, a Chicago police detective.

And is it fair to say that you are saying today that the first time you ever heard that name was when an

Huertas - deposition

545

investigator showed you a transcript of your previous proceeding, that being Heather. Is that your testimony today?

A. Yes.

Q. So I'd like to ask you a question about your transcript when you testified at trial.

For the record, I am looking at page 176, starting at line 13.

"Q. Now, Luis, I want you to call -- I want to call your attention to a little bit later, would have been July 7th of 1989, about a quarter to 5:00 or 5:00 in the evening. Do you remember where you were?

"A. Well, that's the time that Officer Guevara came and picked me up."

Do you remember being asked that question and giving that answer at trial back in 1990?

I don't -- oh.

A. I don't remember. Possible.

Q. Now, in terms of today and your testimony about what happened back in 1989, when you were talking to the assistant state's attorneys back before trial, you told them everything that you told us today, is that true?

A. Yes.

Q. You have mentioned that you retired from a gang which was the Latin Disciples?

A. Yes.

Huertas - deposition

Q.   And you retired -- was that after this incident occurred?

A.   After, yes.

Q.   Did you retire before or after you testified at trial?

A.   After.

Q.   And when you retired after testifying at trial, did you have to endure a beat out?

A.   No.

Q.   Do you know what a beat out is?

A.   Yes.  You get in a line.  Everybody beats you, and then you're out.

Q.   And you didn't have to do that to leave the Latin Disciples?

A.   No.  Well, I was called being -- being an outlaw.

Q.   Can you explain that?

A.   That's when you get out of the gang without a beat up -- beat out.

Q.   Is there a different effect of being out of the gang via being an outlaw versus a beat out?  What are the differences between the two?

A.   In the beat out, you are automatically out and never can come back.  Now, outlaw is when you just let everything go without the beat out.

Q.   Are there consequences for being an outlaw with a gang?

A.   No.

Q.   As an outlaw, can you return to the gang?

Carrero - direct

547

A.   Pardon me?

Q.   As an outlaw, could you return to the gang?

A.   If I wanted to at that time, yeah.

MR. KIVETZ:  That's the end of the transcript.

THE COURT:  Okay.  And plaintiffs, your next witness.

MR. S. RICHARDS:  Next witness would be Benjamin Carrero will be entering in the next couple minutes.

THE COURT:  Before you take a seat, if you'd raise your right hand.

(Witness sworn.)

THE COURT:  Please have a seat.  There's water there if you need it.

Mr. Richards, you may proceed once the witness is settled.

MR. S. RICHARDS:  Thank you, Your Honor.

BENJAMIN CARRERO, PLAINTIFF'S WITNESS, SWORN,

DIRECT EXAMINATION

BY MR. S. RICHARDS:

Q.   Mr. Carrero, could you please state your first and last name for the court reporter.

A.   Benjamin Carrero.

Q.   Spell your first and last name, please.

A.   B-E-N-J-A-M-I-N, C-A-R-R-E-R-O.

Q.   And Mr. Carrero, how far did you go in school?

A.   First year in high school.

Carrero - direct

548

Q.  What happened after the first year of high school?

A.  Dropped out.

Q.  What is your occupation or what have you done for a living?

A.  I work landscaping.

Q.  Okay.  When was the last time you worked landscaping?

A.  That was around four months ago.

Q.  And are you currently employed or not?

A.  No, I'm not working.

Q.  Where do you live?

A.  In Florida.

Q.  What city in Florida do you live in?

A.  Orange Park, Jacksonville.

Q.  And do you live there with anyone?

A.  Yeah, my girlfriend.

Q.  What's your girlfriend's name?

A.  Jennifer Gaya.

Q.  Spell the last name, please.

A.  G-A-Y-A.

Q.  Now, where were you born?  Where did you grow up?

A.  In Chicago.

Q.  Why did you move to Florida?

A.  To get out of the violence in Chicago.

Q.  When did you move to Florida?

A.  I think it was 2020.

Q.  Now, I'd like you to take your mind back to 1989.  In 1989,

Carrero - direct

549

where were you living?

A.   In Chicago.

Q.   And what was the address where you were living in 1989?

A.   1419 North Wicker Park.

Q.   Who did you live there with?

A.   My mom, my dad, my girlfriend, and my youngest -- my oldest son.

Q.   Let's start with your -- what is your mother -- what is your mother's name?

A.   Theresa Carrero.

Q.   And what is your father's name?

A.   Alfredo Carrero.

Q.   And you said you lived with your girlfriend.  What was her name?

A.   Iris.  Iris Mendez.

Q.   Now, you said you had a son at that point, four-month-old? I'm sorry?

A.   I think, yeah, yeah.

Q.   Okay.  What's his name?

A.   Benjamin Carrero.

Q.   Is that Benjamin Carrero, Jr., or just Benjamin Carrero?

A.   No, Benjamin David Carrero.

Q.   And what year was that son born in?

A.   '89.

Q.   Were the two of you, yourself and Iris Mendez, expecting

another child?

A. Yes.

Q. And so was -- she was pregnant, correct?

A. Yes.

Q. Do you know how many months pregnant she was approximately?

A. No.

Q. And when was -- did she eventually give birth?

A. Yes.

Q. And what date did she give birth, the date of your second child birthday?

A. October.

Q. Okay.

A. October, yeah.

Q. Now, on July 9th, 1989, did something happen with respect to your home?

A. Excuse me?

Q. We're talking about July 9th of 1989. Did something happen to your home on that date or to you?

A. Yeah, there was a police raid.

Q. Tell me how you first became aware that there was a police raid?

A. My mom told me that the police is in front.

Q. After your mom told you the police was in front, what did you do?

A. I ran through the hallway to go outside.

Carrero - direct

551

Q.   How many apartments -- did you live in a single family home, or what?

A.   It was an apartment.

Q.   Okay.  Did you live on the first floor or the second floor?

A.   The first floor.

Q.   Who lived on the second floor?

A.   Another neighbor, a lady.

Q.   Now, you said you ran in the hallway.  That's on the first floor, right?

A.   Yeah.

Q.   After you ran in the hallway, what happened?

A.   They came with the shotgun, and they took me upstairs.  But I was already in front.  I was in front of the porch.

Q.   So you're in front of the porch and you said the officers took you upstairs?

A.   Upstairs.

Q.   Now, about how many officers were there?

A.   At least 20.

Q.   You said the officers took you up -- upstairs to the lady's apartment.

     Was there any particular officer that you remember being part of the raid or part of the -- being there?

A.   Guevara.

Q.   Is that Reynaldo Guevara?

A.   Yes.

Q. Can you describe Reynaldo Guevara as he appeared to you back in 1989?

A. He was short, a little chubby with glasses.

Q. All right. And did you know what nationality he was?

A. To me, he was Puerto Rican.

Q. How was Guevara dressed?

A. Suit and tie.

Q. Had you ever met Officer Guevara before that date?

A. No.

Q. Now, you said the officer took you to the upstairs apartment. What happened in the upstairs apartment?

A. They started searching her house.

Q. All right. And as the officers were searching her house, the lady upstairs, what did -- happened with respect to you? What did they do, if anything?

A. They just had me handcuffed to the -- to the chair -- I mean, I was sitting down handcuffed.

Q. As you were sitting down being handcuffed, did you have any interaction with the police officers?

A. No. They just had me sitting there. The lady was on the side of me, and it was just ransacking her apartment.

Q. How long did the ransacking take -- take?

A. Not that long.

Q. Okay.

A. Until they seen my tattoo on my hand.

Q. Well, let's talk about your tattoo.

Did you have -- did you have a tattoo, a particular tattoo on your arm on that date?

A. Yeah.

Q. And what did the tattoo read or say?

A. It said Baby, my nickname.

Q. Okay. Now, did the nickname, tattoo of the nickname Baby come up in your interactions with the officers?

A. Yeah.

Q. How did that happen?

A. The officer said, "Hey, that's him right there," because of my tattoo.

Q. Do you know --

A. And --

Q. Sorry.

A. No, go ahead.

Q. Do you know what officer said "That's him" --

A. No.

Q. -- "right there"?

A. No.

Q. After the officer said that, what happened with you, if anything?

A. The lady said he doesn't live here. He lives downstairs. So they took me downstairs, but they didn't take me to the apartment. They took me straight into the police car.

Carrero - direct

554

Q.   When they took you straight into the police car, was there an officer in the police car?

A.   Yeah, one.

Q.   Okay.  That officer, was that Officer Guevara or somebody else?

A.   No, that was somebody else.

Q.   And the officer that was in the police car, can you describe him in any detail?

A.   No, he was like -- he was white.

Q.   Okay.  You remember him as being white?

A.   Yeah.

Q.   Now, after you got in the police car, were you driven anywhere?

A.   No, they -- that -- if they drove me anywhere?

Q.   Well, first of all, how long were you in the police car before anything else happened?

A.   Oh, I couldn't remember.  It was -- it was a while 'cause it was searching.

Q.   All right.  Now, when you were in the police car, could you see the search, or you were just waiting --

A.   No, I was downstairs in the police car.

Q.   All right.  Did the police car eventually move and drive you anywhere?

A.   Yeah, to Grand and Central.

Q.   Who was the -- was it the same officer --

A.   Yeah.

Q.   -- driving the police car?

A.   Yeah.

Q.   When you got to Grand and Central, what happened then?

A.   They took me upstairs.

Q.   Okay.  And they took you upstairs to where, what kind of room?

A.   Into the interrogation room.

Q.   All right.  And describe the interrogation room.

A.   It's small with a table and two chairs or three.

Q.   All right.  And were you handcuffed in the interrogation room?

A.   No.

Q.   Now, before the search occurred, did you have a gun in your house?

A.   Yes, I did.

Q.   Do you remember the caliber of the gun exactly?

A.   .22 or .32, something like that.

Q.   Okay.  And where was the gun stored normally?

A.   I had it in -- it was a small dryer where I used to dry my son's clothes.  I had it inside there.

Q.   Did you have anything else inside there?

A.   Two ounces of marijuana.

Q.   Now, with -- were -- were you ever told by the police, did the police tell you that they had found the gun and how they

Carrero - direct

556

found the gun?

A.   I think they did tell me that they found the gun.

Q.   Did they tell you where they found the gun?

A.   Yeah, outside in the gangway.

Q.   Okay.  Did they tell you if they knew how the gun got in the gangway?

A.   That somebody threw it.

Q.   Somebody threw it out --

A.   Uh-huh.

Q.   Okay.  Did they tell you who threw it out -- out of the house into the gangway?

A.   Yeah, my girlfriend.  Iris Mendez.

Q.   Okay.  Did you ever see the marijuana again?

A.   No.

Q.   Were you ever charged with the marijuana?

A.   No.

Q.   Were you ever charged with a gun?

A.   No.

Q.   At some point, did some officer or officers come into the interrogation room?

A.   Yeah.

Q.   Who were the officers?

A.   Guevara and some white guy.

Q.   Okay.  So Guevara and some white guy came into the interrogation room.

What did they say to you, and what did you say to them?

A. They asked me about the gun, that if Jaime Rios gave me the gun.

Q. And when they asked you whether Jaime Rios gave you the gun, what did you tell them?

A. I told them no.

Q. Did they take no for an answer?

A. No.

Q. And how long were -- did they tell you what, if anything, they wanted you to say?

A. Yeah, they told me -- could you repeat that again?

Q. Okay. What, if anything, did Officer Guevara or the other officer tell you that they wanted you to say, or did they tell you what they wanted to say?

MR. SCAHILL: Objection to the form of the question; compound.

MR. S. RICHARDS: I'll withdraw it.

THE COURT: Okay.

BY MR. S. RICHARDS:

Q. Okay, sir, break it down.

So you were telling us that you told Officer Guevara and the other officer that Jaime Rios did not give you the gun.

A. Yeah.

Q. Okay. So after you told them that Jaime Rios did not give

Carrero - direct

558

you the gun, what did the officers say to you, Guevara or the other one -- oh, by the way, between the two officers, who was doing the talking?

A.   Guevara.

Q.   What did Guevara say to you about when you said Jaime Rios didn't give you the gun?

A.   That if I don't say that Jaime Rios gave me the gun, that he was going to take my kids from me.

Q.   Okay.  And did you believe him?

A.   Yeah.

Q.   Now, did he tell you anything else about what he wanted you to say about Jaime Rios giving you the gun?

A.   Yeah, he said that -- to say that Jaime met me in the front, Jaime Rios met me in the front and that he took the gun out his waistband and handed it to me and said that hold this 'cause I just shot somebody.

Q.   Okay.  And did you eventually agree to say that -- to say that or agree with what Officer Guevara wanted you to say?

A.   Yeah, I agreed.

Q.   How long were you held at the police station before you agreed to say what Officer Guevara wanted you to say?

A.   That was, like, the next day.

Q.   Okay.  After you agreed that you would say what Officer Guevara wanted you to say, what happened then?

A.   They took me to the grand jury.

Carrero - direct

559

Q.   Now, when they took you to the grand jury, where is the grand jury located?

A.   Cook County, 26th and California.

Q.   Okay.  And when they took you to the grand jury, did they put you in front of the grand jury, and did you give testimony?

A.   Yes.

Q.   And what did you say to the grand jury about -- about what had happened?

     Did you give the grand jury the same thing that Guevara had told you to say?

A.   Yes, I did.

Q.   Now, you said you were taken to the grand jury.  Before you got from the police station to the grand jury, did you stop at anyplace else before you got to the grand jury?

A.   No.

Q.   Okay.  So they took you from the station to the grand jury.

A.   And took me back after to Grand and Central.

Q.   Okay.  So they put you back afterwards Grand and Central.

     After you testified before the grand jury, what happened then?

A.   I went back to Grand and Central.

Q.   I'm sorry, at -- my mistake.

     After you went back to Grand and Central, what happened then?

A.   They put me in lockup.

Carrero - direct

560

Q.   They put you in the lockup --

A.   Downstairs.

Q.   -- at 26th -- oh, put you at the lockup at Grand and Central?

A.   Yeah, at Grand.

Q.   And how long did you stay in the lockup at Grand and Central?

A.   To the next day until the paddywagon took us to County Jail.

Q.   All right.  And when the paddywagon -- I'm sorry, strike that phrase.

When the -- the squadrol took you to -- to -- took you to Cook County Jail, where did you go in Cook County Jail?

Where were you kept in Cook County Jail?

A.   Downstairs in the basement.

Q.   How long were you downstairs in the basement of Cook County Jail?

A.   I was there, like, not even a day.  I went to court.  They gave me an I-bond, and I walked out.

Q.   Okay.  When they gave you an I-bond and you walked out, did they tell you what you were being charged with?

A.   I forgot.

Q.   Okay.

A.   I couldn't --

Q.   It was some charge, correct?

A.   Yeah.

Q.   Now, what happened with that charge?

A.   They dropped it.

Q.   When did they drop it?

A.   I think it was that same year.

Q.   Okay.  Did you go to court on that charge for a number of dates, or it was dropped right away?  What was the story there?

A.   It was dropped I think the next court day I had.

Q.   Now, eventually, you were -- eventually, you were -- you testified at Jaime Rios's trial; is that correct?

A.   Yes.

Q.   Now, when you testified at Jaime Rios's trial, did you get some sort of subpoena from the state's attorney?  Or do you remember?

A.   No, I don't remember.

Q.   Do you remember how you got to -- to court to testify?

A.   Yeah.  I think it was one of his lawyers or -- whoever was representing him took me.

Q.   Okay.  When you testified at trial, did you testify at trial that Jaime Rios had given you the gun?

A.   Yes, I did.

Q.   Did you testify at trial that he had said, "I just shot someone, hold this for me"?

A.   Yes, I did.

Q.   Okay.  I'm sorry, did you do that at trial, or did you do

Carrero - direct

562

that at grand jury, or do you remember?

A.   I did it at trial.

Q.   Okay.  And after you testified at trial, what happened to you then?

A.   After I testified, I left.

Q.   All right.  Now, at some point, did you -- did you give an affidavit telling what had happened between you and Officer Guevara?

A.   To who?

Q.   I mean, did you give an affidavit to Jaime Rios or his attorneys that -- as to telling us what happened between --

A.   Telling them the truth?

Q.   And the affidavit was the truth?

A.   Yeah.

Q.   Now, did any -- are you friends with Jaime Rios?

A.   Yes, I am.

Q.   How long have you been friends with him?

A.   Long time.

Q.   All right.  And are -- and are you testifying today to what you just said because it is the truth?

A.   It's the truth.

Q.   And is anyone giving you anything to testify or to say anything --

A.   No, sir.

     (Counsel conferring.)

BY MR. S. RICHARDS:

Q.   When Officer Guevara told you -- you said you believed Officer Guevara when he told you that if you didn't do what he wanted you to do, he would take your kids away.

Do you remember that testimony a few minutes ago?

A.   Yes.

Q.   Why did you believe Guevara?

A.   'Cause he was one of those types of homicide that will get you.  I believed that he would take my kids.  He would see me in the neighborhood and he be just -- just looking at me like you better do what I tell you.   I ain't got no choice but to do it.

(Counsel conferring.)

MR. S. RICHARDS:  Nothing further.

THE COURT:  Okay.  Cross.

MR. SCAHILL:  Yes, Judge.

CROSS-EXAMINATION

BY MR. SCAHILL:

Q.   Good afternoon, Mr. Carrero.  My name is Tim Scahill, and I'm going to ask you some questions now, okay?

A.   Yes, sir.

Q.   Before you -- well, let me ask you this first.

When did you get into town here?

A.   Yesterday.

Q.   Okay.  And you've met with Mr. Richards to prepare you for

your testimony here today?

A. No, I see -- yeah, here today.

Q. Right.

And have you reviewed your transcripts from your testimony that you gave at the grand jury and at Mr. Rios's criminal trial?

A. Yeah.

Q. Okay. When did you review those?

A. Not so long ago.

Q. Okay. When you say not so long ago, within the past week?

A. No, today.

Q. You reviewed them today. Okay.

A. Not all of them, but I seen some of them.

Q. I see.

So when you were -- you testified on two occasions in -- one in 1989 and one in 1990, right?

A. Uh-huh.

Q. You have to say yes or no.

A. Yes.

Q. Okay. Thank you.

The first one was in July. It was on July 10th of 1989. That was the grand jury, right?

A. Yes.

Q. And the other one was at your friend Mr. Rios's criminal trial in November of 1990, correct?

A.   Yes.

Q.   Okay.  And I believe what your testimony is on both of those occasions, you intentionally lied under oath, right?

A.   Yes.

Q.   Okay.  On both occasions, you were sworn just like Judge Daniel swore you here today --

A.   Sure.

Q.   Hang on.

        -- to tell the truth, the whole truth, and nothing but the truth so help you God, correct?

A.   Yes, sir.

Q.   And on both occasions you lied repeatedly despite having taken that oath, right?

A.   Not today.  I didn't -- I'm not lying today.

Q.   Sir --

A.   You're talking about Cook --

Q.   -- in 1989 and 1990, one in the grand jury and one at the trial, you repeatedly committed perjury, didn't you?

A.   Yes, sir.

Q.   Okay.  And you did that intentionally, right?

A.   Yeah.

Q.   Okay.  The grand jury transcript is about six pages of your testimony, right?

A.   Yes.

Q.   Okay.  And your trial testimony is about 20 pages?

A.   I don't remember.

Q.   Give or take?

Okay.  Within those pages, you're asked many questions, right?

A.   Uh-huh, yes.

Q.   Okay.  How many separate lies did you tell under oath in 1989 and 1990 combined?

MR. S. RICHARDS:  Objection.  Not proper impeachment. Should be question and answer.

I'm sorry.  Objection.  Nothing else.

THE COURT:  Okay.  The objection's sustained as argumentative.

MR. SCAHILL:  Okay.  Thank you.

BY MR. SCAHILL:

Q.   And if I'm understanding your testimony here today, you are blaming Mr. Guevara for you committing perjury?

A.   Yes, sir.

Q.   Okay.  We'll come back to that in a minute.

Mr. Rios, the person who's sitting here in this courtroom today, has been your friend for a very long time?

A.   Yes, sir.

Q.   And he was not just a friend of yours, he was a fellow gang member of yours?

A.   Yes, sir.

Q.   You were a fellow member of the Latin Kings in 1989?

Carrero - cross

567

A.   Yes, sir.

Q.   Mr. --

MR. SCAHILL:   Judge, can -- the witness is kind of jumping on the questions.

THE COURT:   Okay.  Mr. Carrero, the process is there's a question and there's an answer.  There's a court reporter here.  It's hard for her to take two answers at once.  In fact, I think it's impossible.

THE WITNESS:   Okay.  Wait for him to finish?

THE COURT:   Let him ask the question, give it a beat, and then answer.

THE WITNESS:   All right.

MR. SCAHILL:   Thank you, Judge.  I appreciate that.

BY MR. SCAHILL:

Q.   You were also a member of the same what's called set of the Latin Kings back in 1989 with Mr. Rios, correct?

A.   Yes, sir.

Q.   What is a set of the Latin Kings?

A.   What you mean, a set of the Latin Kings?

Q.   What does that term mean?  You just told me you were in a set.

A.   It's a gang member.

Q.   What is a set, as opposed to the gang at large?  What does that mean?

A.   I -- I don't understand your question.

Carrero - cross

568

Q.   When somebody says that you're from a set of the Latin
Kings, does that have any meaning for you, sir, or no?

A.   You're a gang member.

Q.   Okay.   But there's a specific faction of that gang that
exists in a particular geographic area of the city, right?

A.   Yes.

Q.   All right.   And you were a member of the Leavitt and
Schiller set of the Latin Kings?

A.   Yes, sir.

Q.   As was Mr. Rios?

A.   Yes.

Q.   Okay.   And how long did you continue to be a member of the
Latin Kings?

A.   Well, I left that, like, in 2020 when I left Chicago.

Q.   So how old were you in 2020?

A.   I was 50 years old.

Q.   Okay.   So you continued to be a member of the Latin Kings
street gang until you were 50 years old?

A.   Yes.

Q.   Back in 1989, did you know an individual named Cristino
Garcia?

A.   Yes.

Q.   Okay.   And you knew him by the nickname of Tino?

A.   Yes.

Q.   And you knew that Mr. Rios also knew him by the nickname of

Tino, right?

A.   Yes.

Q.   We're going to get into this in specifics in a little bit, but at some point, you find yourself in prison at the same time with Mr. Rios after he got convicted of the murder that you testified him -- against him in, correct?

A.   Yes, sir.

Q.   When you were in prison, you also continued to be an active member of the Latin Kings, correct?

A.   Yes.

Q.   And, in fact, you were so active in prison as a Latin King gang member that you had to get moved around from prison to prison; isn't that correct?

A.   Yes, sir.

Q.   Are you aware of the Latin King constitution or manifesto?

A.   No, I really didn't read it.

Q.   You didn't read it?  Do you know what the first law of the Latin Kings manifesto is?

A.   No.

Q.   You never heard that once a King always a King?

A.   Oh, yeah, everybody knows that, but I didn't know it was the first.

Q.   But that is one of the -- one of the things you have to agree to abide by when you become a member of the Latin Kings, right?

A.   Yeah.

Q.   Okay.  And another one of the things that you have to agree not to do is not to snitch on your fellow gang members, right?

A.   Yes, sir.

Q.   Okay.  And one of the other things that you have to agree not to do is not to cooperate with law enforcement against your fellow gang members; isn't that true?

A.   Yes, sir.

Q.   And if you don't abide by those things, there can be some serious harmful consequences that come to you, can't there?

A.   Yes, sir.

Q.   You can get physically harmed if you snitch on a fellow gang member, can't you?

A.   Yes, sir.

Q.   You can get killed, correct?

A.   Yes.

Q.   And those dangers are particularly serious when you're in a correctional facility, right?

A.   Yes, sir.

Q.   Snitches are not treated well in prison, are they?

A.   No.

Q.   Okay.

     So with respect to what you say happened with Mr. Guevara, you told us, I believe, that Mr. Guevara had threatened to take away your kids or something like that?

A.   Yes.

Q.   All right.  Now, when is the first time you told anyone about that particular story?

A.   When I met Jaime Rios in -- in prison.

Q.   Okay.  And that was in about 1994 or 1995?

A.   '94, I believe.

Q.   Okay.  So just to set the stage here, Mr. Rios had already been convicted of the murder, right?

A.   Yes.

Q.   You are also in prison, correct?

A.   Yes.

Q.   And you find yourself in Pontiac maximum security prison, right?

A.   Yes, sir.

Q.   Both there together.

A.   Yes.

Q.   Okay.  And you and Mr. Rios had a conversation, correct?

A.   Yes.

Q.   What did you tell him about what happened with Mr. Guevara in 1995?

A.   That he threatened me to take my kids away if I didn't testify against him.

Q.   All right.  So as of 1994, you had told the person that you testified against, the fellow gang member, this story about Mr. Guevara, right?

A.   Yes.

Q.   At that time, Mr. Rios is just starting out his prison sentence, right?

A.   Yes.

Q.   Okay.  Because he got convicted in 1990, so he's only a couple years in, right?

A.   Yes.

Q.   Did Mr. Rios say to you at that time, Baby, Mr. Carrero, can you bring that information to the attention of my attorneys or the courts to help get me out of prison or anything like that?

A.   No.

Q.   Did he ever ask you to do any affidavit or anything like that at that point?

A.   No.

Q.   Okay.  Was he upset with you?

A.   Not really.

Q.   Did he -- did you suffer any consequences in prison for being labeled a snitch by the Latin Kings?

A.   No, sir.

Q.   Okay.  When you talked to Mr. Rios in prison, did you specifically tell him that it was Mr. Guevara who was the person who had made these threats to you?

A.   Yes.

Q.   Okay.  Did you ever tell Mr. Rios that Mr. Guevara had

beaten you up?

A.   No.

Q.   And that's -- that's true.  Mr. Guevara never beat you up or physically abused you in any way, shape or form, did he?

A.   No, sir.

Q.   Okay.  So if Mr. Rios testifies that you told him that Mr. Guevara actually had beaten you up, that would be a lie, wouldn't it?

A.   Yeah, I --

          MR. S. RICHARDS:  Objection.

          THE COURT:  Basis?

          MR. S. RICHARDS:  Commentary on credibility of another witness.

          THE COURT:  It's overruled.

          You may answer.

          THE WITNESS:  Could you repeat it again?

BY MR. SCAHILL:

Q.   If Mr. Rios said that you told him that Mr. Guevara had beaten you up to get you to implicate him in the crime, that would be a lie, wouldn't it?

A.   Yeah.  I didn't get beat up.

Q.   Okay.  And if Mr. Rios said that when you spoke to him in prison in 1995, you never mentioned the name Guevara, would that also be a lie?

A.   I did mention Guevara.

Carrero - cross

574

Q.   Okay.  So if he said something contrary, he would be -- he would not be telling the truth, would he?

A.   Could you phrase it in another way?

Q.   Sure.  Happy to.

If Mr. Rios said that when you two were speaking about what you're claiming happened to you that led you to implicate Mr. Rios that you never mentioned the name Guevara to him, would that be a truthful statement about what happened?

A.   I did mention Guevara.

Q.   Okay.  So if he said something to the contrary, that would not be consistent with the way that you remember it, would it, sir?

A.   Yeah.

Q.   Okay.  So let's flash forward now to 2008.  Mr. Rios is out of prison, right?

A.   Uh-huh, yes.

Q.   You are out of prison, correct?

A.   Yes.

Q.   All right.  And in this period of time, from when you tell him in 1995 this information about Mr. Guevara all the way up to 2008, he had never contacted you to try to get you to help him challenge his conviction based on what you were saying happened to you; is that true?

A.   Yeah.

Q.   Okay.  And from 2008, 2009, all the way up to 2020, so over

a decade, you kept in pretty regular contact with Mr. Rios, didn't you?

A.   Yes, sir.

Q.   Okay.  You would see him about once a month during that time period, right?

A.   Yes.

Q.   You would talk to him even more, right?

A.   Yes.

Q.   You'd communicate on social media, correct?

A.   That's where I found him at, social media.

Q.   Yeah, but you guys had a regular communication relationship for over a decade from this period of 2008 or 2009 all the way up to 2020, right?

A.   Yes, sir.

Q.   And at no point during that time period did Mr. Rios ever come to you and say anything along the lines of, hey, you remember that information that you told me in prison about how you were coerced into giving false testimony against me, can you do something with that to help me get out of my criminal conviction?

A.   That came about I think it was in 2020.

Q.   Okay.  So -- but at no point before 2020, despite him having, as you say, told you this decades before, did he ever ask you to relay that information to anybody to help him get out of the consequences of his criminal conviction.

A. No, sir.

Q. Okay. 2020 is the first time that that happens, right?

A. Yes.

Q. And at that point in 2020, Mr. Rios calls you up and asks you if you would do an affidavit for him, right?

A. Yes.

Q. And you agree to do that, correct?

A. Yes.

Q. The affidavit that you executed was in May of 2020?

A. I believe so.

Q. Okay. That affidavit was not drafted by you though, was it?

A. What you mean, drafted?

Q. You didn't type the affidavit out, did you?

A. No.

Q. Okay. And Mr. Rios never said to you what he wanted in that affidavit, right?

A. No.

Q. Okay. You talked to him, and then he showed up with this affidavit for you to sign --

A. Yes.

Q. -- right?

Okay. And then you read through it, made no corrections on it, right?

A. Yes.

Q. The only person that you spoke to about the content of this affidavit was Mr. Rios himself, right?

A. For that piece of paper, yeah.

Q. Okay. And after this was typed up, he shows up, and then he personally takes you to a notary public to have you sign it, right?

A. Yes, sir.

Q. Okay. So you were with him when -- or he was with you when you signed this affidavit, right?

A. Yes, sir.

Q. Okay. So if Mr. Rios says that he was not with you when you signed this affidavit at all, that would not be correct, would it?

A. No, it won't.

Q. All right.

MR. SCAHILL: Judge, if I can have -- you know what, I'm actually just going to approach. May I approach the witness to show him an exhibit?

THE COURT: You have free leave to approach.

MR. SCAHILL: Thank you.

BY MR. SCAHILL:

Q. Mr. Carrero, if you can take a look at what's previously been marked as Defendants' Exhibit 31.

A. 31.

Q. And if you can flip through that for me just really

quickly, and then I'm going to ask you some questions about it.

Are you done?

A. Yeah.

Q. Okay. Is this a true and accurate copy of the affidavit that you executed on behalf of Mr. Rios?

A. Yes.

Q. Okay. And did you understand that, when you were executing this, that this was going to be used for a court proceeding?

A. Yes, sir.

Q. And you understood this was going to be used for a court proceeding where Mr. Rios was attempting to get his conviction thrown out?

A. Yes, sir.

MR. SCAHILL: Okay. Judge, may I have permission to admit and publish this exhibit?

THE COURT: Any objection?

MR. S. RICHARDS: No objection.

THE COURT: All right. Without objection, Defense Exhibit 31 is admitted and may be published.

(Defendants' Exhibit No. 31 received in evidence.)

MR. SCAHILL: Thank you, Judge. May I have the document camera?

You can keep your copy there. I don't think it's being -- there we go. Okay. Mine's a little highlighted here, but let's go through a little bit of this.

BY MR. SCAHILL:

Q. Okay. When you were looking at this, I know you didn't type this up, but when you were looking at this, were you given the opportunity to make additions to it if you wanted to?

A. No.

Q. Okay. Mr. Rios did not give you the opportunity to add or change or amend anything on there?

A. Uh-uh.

Q. You have to say yes or no.

A. No, sir.

Q. Okay. Did you want to make changes to that affidavit?

A. No.

Q. Is that -- does that encapsulate the allegations that you believe were pertinent when you were telling Mr. Rios about your interaction with Mr. Guevara?

A. Yes, sir.

Q. Okay. Is everything that you put in there or that you signed on to there true?

A. Yeah.

Q. Okay.

A. Yes.

Q. Let's talk about a couple of these.

I think you mentioned in your direct examination that when the police came to your house for the search warrant that they seized some marijuana.

Carrero - cross

580

A.   Yes, sir.

Q.   Okay.   If you can flip to paragraph 7 on the second page, that reads:   "During the course of the search, officers found a .22-caliber revolver, which I had purchased on the street."

          Do you see that?

A.   Yes.

Q.   Okay.   Is there any reference either in that paragraph or any other paragraph in this affidavit to you having had some marijuana seized during that search?

A.   No, it's not on here.

Q.   Okay.   Paragraph 14.   That reads:   "I was unwilling to come forward before this date and would not have told anyone about Guevara's conduct because I was afraid of Guevara and what he might do to me."

          Did I read that correctly?

A.   Yes, sir.

Q.   Is that true?

A.   Yes, sir.

Q.   Did you not tell anyone what happened to you before the 22nd of May of 2020?

A.   No.

Q.   What about that guy?   What about Mr. Rios, did you tell him?

A.   About Guevara, when he threatened me?

Q.   Yeah.

Carrero - cross

581

A.   Yeah, I told him.

Q.   Okay.  So this statement about you being unwilling to come forward and not having told anyone is not true, is it?

A.   I was scared, man.

Q.   Okay.  Not the question I'm asking, sir.  Let's just focus for one minute.

Is this statement true, that you would not have told anyone about Guevara's conduct because you were afraid before the date that you signed this in 2020?  Is that a true statement?

A.   Yes.  I did.

Q.   Okay.  But you did tell somebody about that before May 22nd of 2020, didn't you?

A.   Yes, I did.

Q.   You told Mr. Rios?

A.   Yes.

Q.   Okay.  And that is, if you're scared, probably the worst person on earth to tell, isn't it?

A.   Yes.

Q.   Okay.  So because that's the person who it affected if it happened that way, right?

A.   Uh-huh, yes.

Q.   Okay.  So when you're saying I was afraid to say this, what you mean is that you were afraid to say it except to the very person who had the highest chance of actually telling people

about it, right?

A. Yes.

Q. Okay. And so this information that you signed on to about not -- that you wouldn't have told anyone is just false, isn't it, sir?

A. I didn't tell anybody.

Q. You told Mr. Rios.

A. But him. I told him. That was it.

Q. You told him in prison, right?

A. Yes.

Q. In a place where snitches can get killed, right, to a gang member who is in prison with you?

A. Yes.

Q. And you didn't have any concern that Mr. Rios was going to turn around either to other gang members or to his lawyers or to the court and tell them about what you said to try to get out? That didn't concern you?

A. I had -- at that time, I had 30 years, and I didn't care what happened to me. So I -- I talked to him about it, you know, about the Guevara, but he didn't -- he never told anybody else.

Q. So you didn't -- you didn't care about telling other people because you say you had a long prison sentence?

A. He didn't tell anybody.

Q. How did you know he wasn't going to tell anyone?

A. Because if he would have told somebody, I would have been stabbed up or something.

Q. You were not so scared of Mr. Guevara in prison to not tell the very person who this information impacted though, were you?

A. No, not while I was in prison.

Q. Okay. So can you see how reading this and saying you wouldn't have told anyone, yet you told Mr. Rios, how that could be construed as not an accurate statement, sir?

MR. S. RICHARDS: Objection, argumentative.

THE COURT: Sustained.

BY MR. SCAHILL:

Q. Paragraph 5, this indicates that a picture of Detective Guevara is attached to this affidavit and that you would identify him as the detective who forced you to testify falsely against Mr. Rios. Do you see that?

A. Yes.

Q. You actually were not shown a picture of Mr. Guevara, were you?

A. I seen a picture of Guevara.

Q. You were not shown a picture of Mr. Guevara by Mr. Rios though, were you?

A. No.

MR. SCAHILL: I'm done with this for now, Judge. Thank you.

BY MR. SCAHILL:

Q.   So let's talk about the -- your time at Grand and Central.

So search warrant happens.  They bring you down to the station, correct?

A.   Yes.

Q.   Okay.  You're being questioned by, among others, Mr. Guevara, right?

A.   Yes.

Q.   And I think what you told us is that what Mr. Guevara said to you was that if you don't say that Jaime Rios gave you the gun, that they're going to take your kids away, right?

A.   Yes.

Q.   Okay.  Mr. Guevara didn't say if Jaime Rios doesn't -- if you don't say Jaime Rios gave me the gun -- or if you say -- strike that.

Did Mr. Guevara ever say to you if you tell us that Jaime Rios gave you the gun, we'll just let you go?

A.   No.

Q.   Okay.  Let's go to Defendants' Exhibit 116.

Before today, there was an opportunity by the defendants in this case to ask you some questions at what's called a deposition, and that happened in 2023.  Do you remember that, sir?

A.   Yes.

Q.   Okay.  And that was down in Florida?

A.   Yeah.

Carrero - cross

585

Q.   Okay.  And you took an oath, the same oath you took here today --

A.   Yes, sir.

Q.   -- to tell the truth -- hang on -- to tell the truth, the whole truth and nothing but the truth, so help you God, in that deposition?

A.   Yes, sir.

Q.   This is going to be Defendants' Exhibit 116 at page 57, line 23.  It starts:

      "Q.   I'm sorry.  Okay, let me ask that again.

      What did Officer Guevara ask you about Jaime Rios?

      "A.   That if he brought me that gun.

      "Q.   And what did you tell him?

      "A.   I told him no.

      "Q.   Then what did he say?

      "A.   For me to say that Jaime gave me that gun and he'll let me go.

      "Q.   Did Officer Guevara say anything else to you?

      "A.   No."

      Were you asked those questions and did you give those answers at your deposition in this case, sir?

A.   Yes, sir.

Q.   That is not true, right?

A.   Yeah, 'cause he didn't let me go.

Q.   Right.  So -- but this testimony that I just read you that

you gave under oath in this case is not true, is it?

A. He --

Q. Sir, I'm just asking you if that testimony is true or not.

A. I couldn't recall, man, what I -- what I said.

Q. Did you tell the truth when you said that?

A. To the --

Q. At your deposition, did you tell the truth when the version of events that you gave were that not that Mr. Guevara was going to take away your kids, but that he would -- he said that he would let you go if you said that?

A. I think he said that he would let me go, but he didn't.

Q. Sir, you told Mr. Richards on direct that what Mr. Guevara said to you is that he'd take your kids away, and that's why you agreed to --

A. Yes.

Q. -- say it.

In your deposition that we just read you what you said was that he said he'd let you go if you said that, right?

A. Yes.

Q. Okay. So which one occurred?

A. That he would let me go.

Q. Okay. So he didn't say he was going to take your kids away?

A. No, that, he told me he was going to take my kids away.

Q. Okay. So it's the second one, not the first one?

A.   Yeah.

Q.   Okay.   So the one at your deposition is not true then.

A.   I can't recall.

Q.   You don't remember which one he said?

A.   No, what I said there.

Q.   Are you disputing that -- what you said at your deposition here, sir?

A.   No.

Q.   Okay.   You did give that version of the events under oath, didn't you, at your deposition for this case?

A.   Yes, sir.

Q.   Okay.   And is it that you're not sure whether you said this or you're not sure whether that's true?

A.   I'm not sure if it's that -- if it's true.

Q.   Okay.   So you might have -- might have told a little fib at your deposition, right?

A.   A little what?

        MR. S. RICHARDS:   Objection, argumentative.

        THE COURT:   Sustained.

BY MR. SCAHILL:

Q.   This -- you testified about some charges that you got for the gun, right, and they were thrown out.   Do you remember that testimony?

A.   Yes.

Q.   Okay.   That was your gun though, according to you anyway?

A.   Yeah.

Q.   Okay.  Your girlfriend Iris, she got charged for it, right?

A.   Yes.

Q.   And she ended up having to -- she ended up essentially taking the weight for it for you, right?

A.   Yes, sir.

Q.   Okay.  And you let her do that, didn't you?

A.   Well, I wasn't there in the room with her when she took the weight.

Q.   Yeah, but you let -- she had to go to the county jail for your gun, right?

A.   We both went to the county jail.

Q.   Yes, but she's the one who pled guilty to it, right?

A.   Yes, sir.

Q.   For your gun, right?

A.   Yes.

Q.   And she's pregnant at the time?

A.   Yeah.

Q.   Why didn't you just step up and say, it's my gun, I'll take the weight for it?

A.   I should have, but I didn't.

Q.   You let your pregnant girlfriend do it for your -- for your gun?

A.   She -- well, she said she did it because she didn't want to see me go to jail.

Carrero - cross

589

Q.   And that was okay with you, to let your pregnant girlfriend take the weight?

A.   That was after.  That was after the -- I didn't even know she was in the county jail with me.

Q.   But you still let her take the weight for your gun, right?

A.   Yeah, she took it, yeah.

Q.   Okay.  So let's talk about this grand jury.

So you go down to the grand jury.  Mr. Guevara is not at the grand jury, right?

A.   No.

Q.   Okay.  He's not sitting in the room and he doesn't take you down there, correct?

A.   Correct.

Q.   So at that point, is it your testimony that you were scared that Mr. Guevara was actually going to take your kids away?

A.   Yes.

Q.   Did you tell a single soul that Mr. Guevara had said anything like that to you --

A.   No, sir.

Q.   -- at the time?

You didn't tell your pregnant girlfriend, right?

A.   No.

Q.   You didn't tell your parents?

A.   No.

Q.   Nobody?

A.   Nobody.

Q.   Very first person you told was Mr. Rios after you ended up in prison with him, right?

A.   Yes, sir.

Q.   So let's fast forward about a year and a half.  You were at Mr. Rios's criminal trial, correct?

A.   Yes.

Q.   You get driven down there by Mr. Rios's attorney, Mr. Carey, right?

A.   Yes.

Q.   And you took the stand and you testified at that case, correct?

A.   Yes.

Q.   I believe I heard you tell Mr. Richards that your recollection of your testimony at the criminal trial was that you were consistent with your grand jury testimony in that you said Mr. Rios had given you the gun and that he had said that he had used it to shoot somebody, right?

A.   Yes.

Q.   That is not what occurred, is it?

A.   No.

Q.   No, I'm saying that's not what occurred at the trial with your testimony.

A.   When he went to court?

Q.   That is right.

A.   You mean 1990?

Q.   That's what we're talking about, yes.

A.   Yeah, I -- I never told them the truth.

Q.   But you told a different version of the supposed lie that you were telling, right?

A.   Yeah.

Q.   Okay.  When you testified at Mr. Rios's criminal trial, what you said was that Mr. Rios had given you the gun, but he had not said that he shot somebody, right?

A.   Yes.

Q.   Okay.  So you changed up the lie that you were telling, right?

A.   Yeah.

Q.   Okay.  And at what point between when you testified at the grand jury and then when you testified at the trial did you decide to change the lie that you told?

A.   I don't remember.

Q.   Now, Mr. Guevara, he's very clear with you, you need to say two things:  Jaime Rios gave me the gun; Jaime Rios told me he used it to shoot somebody.  Right?

A.   Yes.

Q.   And those are things that you say at the grand jury?

A.   Yeah.

Q.   Okay.  But even though you're scared of Mr. Guevara, you decide to not follow what his threats were and when you're

Carrero - cross

592

under oath just say one of the two things that he told you, right?

A.   Yes.

Q.   Okay.   When did you decide to tell a different version of that story?

A.   In 2020?

Q.   We're talking about 1990, sir.   You changed your story from the grand jury to the trial to only include one of the things that Mr. Guevara told you to say, right?

A.   Yeah, that he gave me the gun.

Q.   Right.   But you said the part about him not -- the part about him saying he used it to shoot somebody, you denied that that happened, right?

A.   I think I did.

Q.   Okay.   So going back to my original question, when did you decide, despite being terrified that Mr. Guevara was going to take your kids away, to not follow one of the things that he said and only follow the other thing that he said?

            MR. S. RICHARDS:   Objection, asked and answered.

            THE COURT:   It's overruled.

BY THE WITNESS:

A.   Oh, man.   You're confusing me here, man.   I can't recall, man.

BY MR. SCAHILL:

Q.   Why did you decide to only -- if you're so scared of

Mr. Guevara, why did you decide to defy the threats that he had made to you and only say the one thing he had told you about giving the gun and not the other thing about Jaime Rios saying that he used it to shoot somebody?

A. I don't know. It probably slipped my mind.

Q. Well, it more than slipped your mind, didn't it? I mean, at the trial, you actually denied having said the things that you said at the grand jury about that, didn't you?

A. I think I did.

Q. Yeah, you remember you said I didn't -- the transcript is wrong. I didn't say those things. Do you remember that?

A. No, I don't remember that.

Q. So you were not scared at that point in 1990 to defy what Mr. Guevara supposedly said to you about saying that Jaime Rios was saying he used gun to shoot somebody, were you?

A. No.

Q. Because you said it in open court, right?

A. Yeah.

Q. Okay. So you weren't so scared of Mr. Guevara as to not say those things, were you?

A. Yes.

Q. Okay. You also testified about someone threatening to take your kids away at the criminal trial, didn't you?

A. I think I did.

Q. Okay. So just to go back to what happened here according

Carrero - cross

594

to you, Mr. Guevara makes a threat to take your kids away and says you must say these things or that's going to happen, right?

A. Yeah.

Q. And you believed he was telling the truth, right?

A. Yes, sir.

Q. And you were scared for all these years, right?

A. Yep.

Q. Yet you appear in open court in a public courtroom and say exactly what was supposedly said to you by the police about taking your kids away, right?

A. Yes.

Q. So you weren't -- even in 1990, you were not scared as you testified in court, were you?

A. I didn't have no choice. He threatened me. I had to go do what he told me to do.

Q. But you -- but you testified in open court that you had been threatened, right?

A. I don't -- I testified I was threatened --

Q. Would you like me to show you the portion of your testimony --

A. Yeah.

Q. -- that I'm referring to to refresh your recollection, sir?

Okay. Just give me one moment to find it, and I will be right there.

MR. SCAHILL: May I approach to refresh, Judge?

THE COURT: Yes.

MR. SCAHILL: Thank you.

BY MR. SCAHILL:

Q. This is my only copy, so I'm just going to ask you to read the -- from lines 20 to 24 on this page and the top of this page to line 2. And when you're done with that, let me know, and I'll come grab it back from you.

And just look up when you're done, and take as much time as you'd like.

Are you done?

A. Yeah.

Q. Does that refresh your recollection about what you --

A. If --

Q. -- testified about at --

A. -- it's written on there, I did say it.

Q. Okay. So in open -- just so we're on the same page -- in open court, you did say that the reason why you were saying that Mr. Rios did not say the things about you -- strike that. It's a bad question. I'm going to start over.

Is the reason why you testified -- let me try it one more time.

First question. You did testify in open court in 1990 about the police supposedly threatening to take your kids away, right?

Carrero - cross

596

A.   Yes.

Q.   So you were not scared of Mr. Guevara at that point, were you?

A.   Yes, I still was.

Q.   But you said it anyway?

A.   Yeah.

Q.   Okay.  And so now we have you saying in open court this alleged threat that was made to you about the kids in 1990, right?

A.   Yes.

Q.   Okay.  And you said in 1994 to Mr. Rios that that happened, right?

A.   Yes.

          MR. SCAHILL:  Okay.  Judge, may I have the document camera one more time?

BY MR. SCAHILL:

Q.   So going back to what you swore for Mr. Rios's post-conviction about being unwilling to come forward before this date and not having told anyone about Guevara's conduct because you were afraid, that is not true because you actually said that on two other occasions in the '90s, right?

A.   Oh, yes.

Q.   Okay.  So, again, this information that you swore out for Mr. Rios's, your friend's, post-conviction, not true, is it?

A.   No.

Carrero - cross

597

Q. When you were on direct, did you say that after your interaction with Mr. Guevara that he -- he was giving you some menacing looks after that in the neighborhood?

A. Yeah.

Q. That's not true, is it, sir?

A. Yes, it is.

Q. You would see Mr. Guevara, and all he would be doing is patrolling the neighborhood; isn't that true?

A. He -- he wouldn't be patrolling. He'll be driving by.

Q. Let's go to -- let's go to your deposition, Defendants' Exhibit 116, page 65.

Page 65, line 17, you were asked these questions and you gave these answers at your deposition:

"Q. And when you would see Officer Guevara in the neighborhood around Leavitt and Schiller after you got out of Cook County Jail, did you have any further encounters with him?

"A. No. He would just by -- he would just ride by and just look at me."

A. Yes.

Q. That's it, right?

You testified at Mr. Rios's post-conviction hearing in April of 2022?

A. Yes.

Q. Okay. And you were flown out and your plane ticket was paid for by Mr. Richards?

Carrero - redirect

598

A.   Yes.

Q.   Okay.  And same thing here today.  You flew out here from Florida and had your plane ticket purchased by Mr. Richards to have you come here and testify?

A.   Yes, sir.

MR. SCAHILL:  That's all the questions I have of this witness right now.

THE COURT:  Okay.  Mr. Engquist?

MR. ENGQUIST:  Nothing, Your Honor.

THE COURT:  Redirect?

MR. S. RICHARDS:  Briefly.

REDIRECT EXAMINATION

BY MR. S. RICHARDS:

Q.   Mr. Carrero, you testified at the trial that someone had threatened to take your kids away, correct?

A.   Yes, sir.

Q.   But you didn't mention the name Guevara, did you?

A.   No.

Q.   Because you were afraid of Guevara.

A.   Yes, I was.

MR. SCAHILL:  Objection, leading.

THE COURT:  Sustained.

You'll disregard the answer.  The objection was sustained.

BY MR. S. RICHARDS:

Carrero - recross

599

Q.   Now, let me just ask you these alternatives.

When Guevara threatened you, did he threaten -- did he threaten to take your kids away?

A.   Yes.

Q.   Did he promise you that the charges would be dropped or that you would be let go?

A.   He told me he would let me go.

Q.   So one statement was a threat, the other statement was a promise.  Fair?

A.   Yeah.  Yes.

Q.   Do you know why the charges were dropped?

A.   No.

Q.   No one ever told you that.

A.   I can't remember.  I can't remember that.

(Counsel conferring.)

BY MR. S. RICHARDS:

Q.   Were you ever labeled a snitch in prison?

A.   No.

MR. S. RICHARDS:  Nothing further.

THE COURT:  Anything on that?

MR. SCAHILL:  Very, very briefly.

May I have the document camera, Judge?

RECROSS EXAMINATION

BY MR. SCAHILL:

Q.   Your affidavit that you submitted for Mr. Rios for his

Carrero - recross

600

post-conviction with respect to what Mr. Guevara said to you says: "Guevara said that if I did not say Jaime was the one who gave me the gun, he would take my kids away, and I would be charged with possessing the gun." Correct?

A. Yes.

Q. You did not say that he would let you go if you said these things about Mr. Rios in your affidavit, did you?

A. Yeah.

Q. You did not say that, did you, in your affidavit?

A. No, I didn't.

MR. SCAHILL: Okay. That's all I have. Thank you.

MR. S. RICHARDS: Nothing big. I might --

(Counsel conferring.)

MR. S. RICHARDS: Nothing further.

THE COURT: Okay.

Mr. Carrero, you are excused from your subpoena. You may step down.

(Witness excused.)

THE WITNESS: Want the paper back?

THE COURT: You can just leave it on the table.

MR. SCAHILL: Yeah, that needs to --

THE COURT: Thank you.

All right, folks, it's 4:20. We'll break there for the day, pick up tomorrow morning.

As a reminder, please don't discuss the case, please

don't research the case, and please don't let anyone discuss the case with you.  See you tomorrow.  Please arrive around 9:30.  We'll start promptly at 10:00.

All rise.

(Jury out at 4:21 p.m.)

THE COURT:  All right.  Any issues that I need to address from the plaintiff's view?

MR. S. RICHARDS:  No, Your Honor.

THE COURT:  And for any of the defendants?

MR. SCAHILL:  Nothing from me.

MR. POLICK:  No, Your Honor.

THE COURT:  Okay.  Any sense of what tomorrow looks like?

MR. S. RICHARDS:  Yes, Your Honor.  We are going to call Dr. Loftus.  I believe he arrives tonight, and I hope to have him on the stand first thing in the morning.

I anticipate my direct would be hour to an hour and a half at most -- I'm sorry, my associate's direct.  So if I have a sense of the cross, that will help me with my planning.  But after that, in the afternoon, and I apologize for the delay, I would be calling Detective Mason if there's time left in the day or hopefully the early afternoon.

THE COURT:  Okay.  That's fine.

And then do you have additional witnesses that need to testify to establish the factual predicates for your questions

of defendant Guevara other than the plaintiff?

MR. S. RICHARDS: Yeah. I mean, the only other witness, I think we have factual predicates for some things. I think we need to put my client on for the factual predicate for Claim No. 1, which I don't think has been established yet.

It will be our position that for Claims 2, 3, 4 and 5 and 6, we have sufficiently established the factual predicate. That's just our view at this point. But in terms of whatever Your Honor's view is would be the view, but I -- I think I would feel fairly comfortable in putting -- in doing the WebEx for Guevara on Friday afternoon.

MR. J. RICHARDS: Wait, wait.

MR. S. RICHARDS: Sorry.

(Counsel conferring.)

MR. S. RICHARDS: So, I mean, the question for us would be do we have the factual predicate without my client? If we do, we would be putting on Mr. Guevara by WebEx Friday afternoon, then my client on Monday. In the morning on Friday would be Dr. Russano. So, again, I think an hour and a half to two hours for my direct. I don't know how long the cross is planned for.

MR. J. RICHARDS: But --

THE COURT: Go ahead.

MR. J. RICHARDS: And, of course, Your Honor, if we don't have the factual predicate yet, then we have to put

603

Mr. Rios on first before Mr. Guevara, so that would flip that around.

THE COURT: Well, the factual predicate entirely depends on what questions you actually intend to pose to Detective Guevara. We've got the testimony of Garcia, the testimony of Carrero, fairly limited to them. Guevara through the transcript and I believe Huertas, but I don't recall what predicates, if any, Huertas would have established.

MR. S. RICHARDS: Predicates for what?

THE COURT: Huertas through his read-in testimony.

MR. S. RICHARDS: Yeah, I think we have the predicates for Huertas based on the deposition.

THE COURT: What did he say that ties to your claims, Luis Huertas?

MR. S. RICHARDS: What he said at the deposition was he acknowledged the affidavit. In the affidavit, he acknowledged it was his affidavit. He acknowledged he signed it. He acknowledged that he swore to it.

In the affidavit, he says that Guevara threatened him to -- or told him to pick out in the lineup. So I think as to the Huertas malicious prosecution claim, the predicate to ask Guevara the questions has been established.

We would also seek, if necessary -- well, we would seek to admit the affidavit as part of our case-in-chief. I think it came in sort of in their case in our case, but we

think that the affidavit, since he admits swearing to it in the deposition, is sufficient to establish the predicate for malicious prosecution. That's our position.

THE COURT: Okay. So if I understood -- I want to be able to invite a response from the defendants as to the substance. And so if I understood you correctly, Huertas, reference the affidavit, the substantive testimony is that Guevara told Huertas to identify Rios in the lineup.

Anything else substantively in that testimony?

MR. S. RICHARDS: No.

THE COURT: And then for Garcia, the phone book and flashlight, and then the pictures to -- that he threatened to show to other gangs. He said that there was -- there was discussion of Garcia being afraid of Guevara, but he also testified that that information was fed to him. So there's a question as to whether that's sufficient.

And then Carrero today, take my kids away, do as I told you. Am I missing anything as far as factual predicates?

MR. S. RICHARDS: Well, you didn't mention one, which I think I'm weak on, is on the alibi. I think there was -- Garcia at first said that Guevara was there when the alibi was told. Then later he said he wasn't there.

I think I have enough sufficiently for that because he originally said Guevara was there, but I think that would be, you know, an issue possibly. I don't want to give the

defendants any ideas, but I think my --

MR. SCAHILL: Already had it --

MR. S. RICHARDS: What?

MR. SCAHILL: Nothing. I was just -- I said I already had the idea.

MR. S. RICHARDS: You're making fun of me. Okay. In any event -- you're entitled to.

But that's a weakness I perceive in my case. I think I can defend it, but, you know, it's up to Your Honor obviously.

Now -- and, again, as to Claim 1, I don't think I put in any affirmative evidence at this point that my client was -- I think I have some evidence, but I think to make a factual predicate for many of my questions, I would need to put my client on to ask, you know, Guevara, for example, about whether he fed him information, whether he threatened to take his kids away, whether he witnessed another officer using physical force, et cetera. I think I need my client for those factual predicates.

So, I mean, there's a possibility if I have to, I'll put my client on the afternoon of Friday. My expectation would be, given the length I anticipate from defendants' cross, that -- and the length of our direct that there would be a break, and he'd be crossed on Monday.

And that raises a question which I'd like to pose to

606

Your Honor. My understanding is differently than in a criminal case where there's an overnight break, I am not allowed to discuss my client's testimony with him.

THE COURT: After he's been --

MR. S. RICHARDS: On direct before he's on cross.

THE COURT: Before cross?

MR. S. RICHARDS: Yeah.

THE COURT: You're not allowed to discuss the substance of your testimony with a witness who has been tendered for cross. That's my understanding of the rule.

I assume you're saying that because he's a party, there's a difference, but I'd have to -- you'd have to present me with case law that shows some different understanding.

If he's still on direct, or put differently, if no question has been asked on cross, he's not on cross, but once cross-examination starts, no one discusses the substance of the testimony with the witness.

MR. S. RICHARDS: Yeah, no, that's my understanding as well. I just want to clarify it because in criminal cases, you actually can consult overnight, but --

THE COURT: Right. But that's access to counsel thing.

MR. S. RICHARDS: Yeah.

THE COURT: Mr. Scahill, do you have a different view?

MR. SCAHILL: I do. I thought the rule was whether

they're on -- if someone starts on their direct and we break and it's the weekend, it was my understanding, whether cross is started or not, once, you know, the ball is snapped, to use a sports analogy --

THE COURT: Where do you find that rule?

MR. SCAHILL: Judge, I can grab it from Westlaw. You know, that's always the way that I've sort of understood it. But, again, as far as -- as far as citing rules, I'll come in the morning with it.

THE COURT: Okay. Please do.

MR. SCAHILL: I will.

THE COURT: All right. I don't see how we call Guevara without -- as to the claims specific to Mr. Rios without having Rios testify first, and so consider that in your planning.

And then for the defendants, I didn't invite the discussion yet, but -- I'm not making any rulings as to what predicates have been established, but I suspect everyone, including -- it should be no surprise that I'm also trying to keep a catalog of what things have been established or -- established, that's the jury's job to figure out if something's been established, at least raised such that there's a basis for asking Guevara questions concerning that.

All right. Any other issues for the plaintiffs?

MR. S. RICHARDS: No, Your Honor.

THE COURT: All right. Mr. Scahill, for Detective or Defendant Guevara?

MR. SCAHILL: Do you want a commentary on the proffer issues now? I'm happy to do that, or are we punting on that, to use another sports analogy, until the plaintiff goes?

THE COURT: We can wait. I suspect we'll have to sit down and work through the permissible areas for Guevara once they've all been established.

MR. SCAHILL: Fair enough.

MR. S. RICHARDS: Your Honor, would it be helpful for me to start preparing another list so we can rule in advance -- you can rule in advance on what I can ask Guevara or not? I'd like to do it either way, either, you know, question by question when I do it, or I'm willing to submit questions. I agreed to that earlier.

THE COURT: Either way is -- it doesn't matter to me. I'm not going to set a deadline. I will just, I said it before, if I call Guevara or allow Guevara to be called, we'll hash out what the parameters are based on the evidence presented in the trial to date.

Anything else, Mr. Scahill?

MR. SCAHILL: No, Judge.

THE COURT: And for Mason or Halvorsen? I never know who to go to.

MR. ENGQUIST: Either one is fine.

MR. POLICK: Judge, not to push, but anything on Mr. Torres just so if it is -- we can work out any testimony things tonight and not take up court time?

THE COURT: I appreciate all the transcripts today because that's what I've been looking at, and I'm happy to admit I am down a rabbit hole.

MR. POLICK: Understood.

THE COURT: I understand the issue. Plaintiffs got some district court cases that go their way. Defendants have some district court cases that go your way. There are two Seventh Circuit cases, possibly three if you include *Pizarro*, which I'm going to go read now, and I hesitate to invite the discussion, but I may as well.

My understanding is that the plaintiff's view is that the predecessor-in-interest issue is established for the reasons stated by Judge Kennelly and Judge Shadur and that essentially you don't need privity if the motivations are the same.

Is that a decent distillation of the view?

MR. S. RICHARDS: It is a decent distillation, and I wouldn't necessarily disagree entirely with Judges St. Eve and the other one.

MR. J. RICHARDS: Hamilton.

THE COURT: Hamilton?

MR. S. RICHARDS: What?

THE COURT: Hamilton and Kendall.

MR. S. RICHARDS: Hamilton.

THE COURT: And Kendall.

MR. J. RICHARDS: Of course.

MR. S. RICHARDS: Or Kendall.

But I think it's fact -- the analysis I think is fact specific, and I think it depends upon the purpose that the testimony is coming in for, and for all the reasons we've stated, I don't want to repeat them, we think --

THE COURT: All right. We're not there to argument yet. The defense view is the interests or the state interests are unique. The defendants -- in that the state is prosecuting a criminal case, not defending against alleged constitutional violations and the defendants in this case were not a party and were not allowed to -- not be allowed to be a party to a criminal prosecution, and, therefore, to go with Hamilton, St. Eve and Kendall, correct?

MR. SCAHILL: That's correct.

MR. POLICK: Yes, Your Honor.

THE COURT: So the rabbit hole concerns this: *Feldman* and *Reed* are both criminal cases, which means while they address the motive issue, they don't necessarily address the predecessor-in-interest issue because the predecessor-in-interest issue only applies to civil cases, so cases have conflated subsequently the issue of the predecessor in interest

with the same interests, and I don't know how that resolves, but I hope to resolve that this evening or sometime tomorrow and see where it leads.

MR. SCAHILL:  We wish you the best of luck, Judge.

(Laughter.)

MR. ENGQUIST:  Happy to read the rabbit hole.

THE COURT:  Given everyone's faces, I'm sorry I identified that rabbit hole, but it has me pondering.

All right.  Have a good evening.  I'll see everyone in the morning.

MR. SCAHILL:  Thank you, Judge.

MR. S. RICHARDS:  Thank you, Your Honor.

(Adjourned at 4:37 p.m., until 2/5/26 at 10:00 a.m.)

*   *   *   *   *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Krista M. Burgeson*

*/s/ Jennifer Costales*

*/s/ Kathleen M. Fennell*                    February 5, 2026
Official Court Reporters                          Date
United States District Court
Northern District of Illinois
    Eastern Division

612

I N D E X

WITNESSES                                              PAGE

REYNALDO GUEVARA
By Mr. S. Richards (Reading)                            366

REYNALDO GUEVARA
By Mr. J. Richards (Reading)                            373

REYNALDO GUEVARA
By Mr. S. Richards (Reading)                            384

REYNALDO GUEVARA
By Mr. J. Richards (Reading)                            386

REYNALDO GUEVARA
By Mr. S. Richards (Reading)                            389

REYNALDO GUEVARA
By Mr. J. Richards (Reading)                            390

REYNALDO GUEVARA
By Mr. S. Richards (Reading)                            391

RAYMONDO GUEVARA
By Mr. J. Richards (Reading)                            400

REYNALDO GUEVARA
By Mr. S. Richards (Reading)                            418

REYNALDO GUEVARA
By Mr. J. Richards (Reading)                            420

YUKSEL KONAKCI
By Mr. S. Richards (Reading)                            423

YUKSEL KONAKCI
By Mr. J. Richards (Reading)                            445

YUKSEL KONAKCI
By Mr. S. Richards (Reading)                            450

YUKSEL KONAKCI
By Mr. J. Richards (Reading)                            453

LUIS A. HUERTAS, TRIAL TESTIMONY                       460

613

INDEX (Continued)

WITNESSES:

LUIS HUERTAS
Deposition                                                  502


BENJAMIN CARRERO
Direct Examination By Mr. S. Richards           547
Cross-Examination By Mr. Scahill                563
Redirect Examination By Mr. S. Richards         598
Recross Examination By Mr. Scahill              599


DEFENDANT'S EXHIBIT                          RECEIVED
No. 31                                          578