614

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                          )   Case No. 22 C 3973
                                     )
                Plaintiff,           )
       v.                            )
                                     )
REYNALDO GUEVARA; MICHAEL            )
MASON; and JoANN HALVORSEN,          )
as Special Representative of         )
ERNEST HALVORSEN, Deceased,          )   Chicago, Illinois
                                     )   February 5, 2026
                Defendants.          )   10:00 a.m.

                         VOLUME 4
           TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
           BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:      LAW OFFICE OF STEPHEN L. RICHARDS
                        BY:  MR. STEPHEN L. RICHARDS
                             MR. JOSHUA S. RICHARDS
                        53 W. Jackson Boulevard, Suite 205
                        Chicago, Illinois  60604

For Defendant          BORKAN & SCAHILL, LTD.
Guevara:               BY:  MR. TIMOTHY P. SCAHILL
                             MR. GRAHAM P. MILLER
                        20 S. Clark Street, Suite 1700
                        Chicago, Illinois  60602

For Defendants         THE SOTOS LAW FIRM, P.C.
Mason and              BY:  MR. JOSEPH M. POLICK
Halvorsen:                   MR. JOSH M. ENGQUIST
                             MR. JEFFREY R. KIVETZ
                             MS. CAROLINE P. GOLDEN
                        141 W. Jackson Boulevard, Suite 1240A
                        Chicago, Illinois  60604

615

Court Reporter:            CHARLES R. ZANDI, CSR, RPR, FCRR
                           Official Court Reporter
                           219 S. Dearborn Street, Room 1426
                           Chicago, Illinois  60604
                           Telephone:  (312) 435-5387
                           charles_zandi@ilnd.uscourts.gov


                    *   *   *   *   *

              PROCEEDINGS REPORTED BY STENOTYPE
     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

616

(Proceedings heard in open court; jury out:)

THE CLERK:  22 C 3973, Rios v. Guevara for jury trial.

THE COURT:  Appearances, please.

MR. S. RICHARDS:  Stephen Richards for plaintiff.

MR. J. RICHARDS:  Joshua Richards for plaintiff.

THE COURT:  Good morning.

MR. SCAHILL:  Good morning, Your Honor.  Timothy Scahill on behalf of Reynaldo Guevara.

MR. POLICK:  Good morning, Your Honor.  Joseph Polick on behalf of defendants Mason and Halvorsen.

MR. ENGQUIST:  Good morning, Your Honor.  Josh Engquist also on behalf of Mason and Halvorsen.

MR. MILLER:  Graham Miller on behalf of Guevara.

MS. GOLDEN:  Caroline Golden for defendants Mason and Halvorsen.

MR. KIVETZ:  Good morning, Your Honor.  Jeff Kivetz on behalf of defendants Mason and Halvorsen.

THE COURT:  All right.  Good morning, everyone. Anything that I need to address before we start with the evidence today?

MR. S. RICHARDS:  Not from plaintiff's point of view.

MR. SCAHILL:  Not that's urgent.

MR. POLICK:  No, Your Honor.

THE COURT:  Okay.  We'll bring in the jury and we'll get started.

617

(Off the record.)

THE COURT: All right. We're back on the record.

I have an e-mail from juror Meredith Wach. It reads: I have become very sick with a high fever. I cannot come in for jury service today. I guess that means that I cannot return at all. I feel very bad, but I also don't want to get the entire jury sick. Please let me know what I should do. I will also call your phone number that you provided.

I'll hear from the plaintiff first on your thoughts.

MR. J. RICHARDS: Your Honor, may we have a moment to confer?

THE COURT: Certainly.

(Counsel conferring.)

MR. S. RICHARDS: Your Honor, the plaintiff's position is that we would like to keep the juror if at all possible.

COURT REPORTER: Can you get by the microphone, please?

MR. S. RICHARDS: I'm sorry.

We would like to keep the juror if at all possible. I think maybe a telephone inquiry of her as to what her condition is and whether she could actually return tomorrow. But our position is we want to keep her, and obviously the Court can -- will decide.

THE COURT: All right.

And for the defense?

618

MR. SCAHILL: We would like her as a juror, but we would defer to the Court's discretion in this issue. I understand this is a -- it sounds like it might be more than a one-day thing, but we would defer to the Court.

MR. POLICK: Without more information, we'll defer to the Court. I agree with Mr. Scahill.

THE COURT: Okay. I'm going to excuse the juror. I do not see -- or -- excuse me.

We've tried to contact the juror to find out why she was absent today. So a telephone inquiry would not be productive at this point. I have seven jurors present which is one more than I need in a civil case. I seat a jury of eight with the understanding that two of them are potential alternates should -- or -- and so we can proceed. I value the time of the jurors and having them wait another day to see whether the -- Meredith Wach, W-a-c-h, will feel better and the risk of potentially exposing the seven remaining jurors to whatever illness the missing juror has are significant concerns. And so I will not delay the trial for the purpose of waiting for her return.

So we are down a juror, leaving seven to hear the case and deliberate. I will call in the jury that we have.

THE CLERK: All rise.

(Jury in at 10:17 a.m.)

THE COURT: Please take your seats.

Loftus - direct

619

Welcome back, ladies and gentlemen. One of your fellow jurors has become very sick and has a high fever. Rather than risk delaying the trial or exposing you to the illness that she has, I'm excusing that juror so that we can continue.

Before we start with the evidence today, please let me know if you have anything to report.

Seeing no hands, we will continue with the evidence.

Plaintiffs, who is your next witness?

MR. S. RICHARDS: Plaintiff calls Dr. Geoffrey Loftus.

THE COURT: Okay.

Raise your right hand.

(Witness sworn.)

THE COURT: Mr. Richards, you may proceed once the witness is settled.

MR. J. RICHARDS: Yes, Your Honor.

Your Honor, may I proceed?

THE COURT: Yes.

GEOFFREY LOFTUS, PLAINTIFF'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MR. J. RICHARDS:

Q. Dr. Loftus, in a loud, clear voice, please state your name and spell it for the benefit of the court reporter.

A. My name is Geoffrey Loftus. First name is spelled G-e-o-f-f-r-e-y; last name is spelled L-o-f-t-u-s.

Loftus - direct

620

Q.   What is your current occupation?

A.   I'm an emeritus professor at the University of Washington in Seattle.

Q.   What is your educational and professional background?

A.   I got a Bachelor of Arts degree in experimental psychology from Brown University.  After that I got a doctorate, a Ph.D. also in experimental psychology from Stanford University.  Then I went to New York for a year of postdoctoral work at New York University.  And then in 1972, I went to the University of Washington as a faculty member.  And except for a year I spent in the mid-'90s teaching at MIT, I have pretty much been at the University of Washington ever since.

Q.   You mentioned the term emeritus professor.  What does that mean?

A.   Emeritus is just a fancy term for I retired from teaching at the University of Washington but I still maintain a strong connection with the university.  I have an office there.  I see students there.  I do a lot of what I did before I retired from teaching except that I don't teach, at least not officially, and I don't get a paycheck.

Q.   Do you do any research?

A.   I do.  I have done quite a bit of research over the past 60 years or so.

Q.   What are the fields of research that you've done?

A.   So my main research area has to do with human perception.

Loftus - direct

621

That's the study of how people get information into their brains from the world via their sense organs, their ears and their eyes and so on. And the associated study of human memory, how information once it's in the brain is stored there, supplemented, transformed in various ways and then used for whatever task a person wants to do that requires memory, that is most things that we do.

I also have a secondary research area that's taken up maybe 20 percent of my time, and that has to do with applications of mathematics to science.

Q. What do you mean by that, math -- applications of mathematics to science?

A. So there are two major ways in which mathematics is applied to all sciences, including my science of psychology.

The first is that mathematics is used to analyze and make conclusions from data. So you get data from an experiment. It's a whole bunch of numbers. Somehow you have to translate the numbers into a conclusion. And there's a whole field of statistics and probability that allows you to do that.

The second major way in which mathematics is applied to science is that mathematics are often very useful in terms of formulating theories of what you believe to be happening in some domain like human perception and memory and then allowing you to make mathematical predictions about the outcomes of

Loftus - direct

622

experiments.

Q.   You mentioned the term experimental psychology in terms of your education and professional experience.  What is experimental psychology?

A.   Well, the field of psychology is broadly divided into clinical psychology on the one hand and experimental psychology on the other.

So a clinical psychologist is a practitioner, somebody who sees clients with the intent of dealing with some sort of psychological problem, whereas an experimental psychologist like me isn't a practitioner.  I have never seen clients.  I never will see clients.  Instead, an experimental psychologist is fundamentally a scientist, somebody whose main job is to go out and do experiments, develop theory in an effort to understand how normal people operate; in my case, to understand how people get information from the world into their brains and then store and use that information later on.

Q.   Are you published?

A.   Yeah.  I have authored and coauthored eight books, I believe, somewhere around 110-ish journal articles and some book chapters.  Most of them have to do with my main research area of human perception and memory, but, again, maybe 20 percent have to do with my secondary research area of applications of statistics and mathematics.

Q.   Have you ever lectured about your research?

Loftus - direct

A.   I have.  I have -- over the years I've been invited, I don't know, maybe 150 or so times by various universities and other organizations to talk about the research that I and other people have done and also to talk about practical applications of this research stuff, such as trying to understand reliability of memory in legal cases.

Q.   And have you edited any scientific journals?

A.   Yes.  I was the main editor of one of the major journals in our field, this one was called *Memory and Cognition*, for a period of about four years.

I was also an associate editor of another major journal in our field, this one called *Cognitive Psychology*, for a period of about 25 years.

And I have been on editorial boards of various other journals, so, yeah, I've done quite a bit of editorial work.

Q.   These experiments in your research, how are they funded?

A.   They're funded -- in my case they've been funded by primarily the National Science Foundation and the National Institutes of Health.  They -- those two institutions, funding agencies, funded the research that I do for I think 39 years continuously.

Q.   Have you done any other work with the National Science Foundation besides that?

A.   Well, I've done grant proposal reviewing for both the National Science Foundation and the National Institutes of

Loftus - direct

624

Health.  This entails reading lots of grant proposals that people have submitted to the funding agencies in the hopes that the funding agencies will fund their work.

And so I have spent quite a bit time both as a member of formal committees and on an *ad hoc* basis reviewing grant proposals for the National Institutes of Health, the National Science Foundation, and various other agencies, both in this country and other countries, and then making recommendations to the funding agencies about how they should be spending their money.

Q.  Obviously you're testifying here today, but have you ever previously testified in court and been qualified to testify as an expert?

A.  Yes.

Q.  What were you qualified to testify as an expert of?

A.  Usually I've been qualified to testify as an expert in human perception and memory.

Q.  Where have you done this testifying?

A.  Well, I've testified in various counties in 17 states in the U.S.  I've testified in federal court, including this one, in 13 cities.  I've testified in military court at a U.S. Navy court-martial in Italy.  And I have testified in Canadian court in Winnipeg, Manitoba.

Q.  Have you testified here in this building?

A.  I have.

Loftus - direct

625

Q.   How many times?

A.   Twice.

Q.   Has your work been quoted in any legal opinions?

A.   Yeah.  About ten years ago the Illinois Supreme Court issued an opinion that relied on a research -- on a report I had written in a case.  In this opinion, they, as best I could tell from my lay perspective, kind of changed the Rules of Evidence insofar as admission of --

MR. MILLER:  Objection, Judge.

THE COURT:  Sustained.

BY THE WITNESS:

A.   -- expert testimony --

THE COURT:  There's an objection.

THE WITNESS:  Oh, sorry.

THE COURT:  It's sustained.

BY MR. J. RICHARDS:

Q.   Now, you've mentioned testifying.  Have those been civil trials or criminal trials or both?

A.   They have been both, but the vast majority have been in criminal trials.

Q.   In terms of criminal trials, let's -- let's start with that subject first.

Who are you called by, the defense or the prosecution?

A.   In all but one instance, I have testified on behalf of the defense in criminal trials.

Loftus - direct

626

Q.   What about the one instance?

A.   So the one instance was a murder trial in Anchorage, Alaska.  And in that case, I was asked to work and testify on behalf of the state, the prosecution, and I did.

Q.   Besides the one that you testified on behalf of the prosecution, have you worked with prosecutors involving criminal cases without testifying?

A.   I have.  There have been four or so other cases in which prosecutors called me and wanted to talk about my potentially testifying in a case.  But those cases resolved or otherwise went away before I had a chance to actually testify.

Q.   Do you have a reason why you've testified more for the defense than prosecution in criminal cases?

A.   I do, yeah.  My -- my general practice is to work and testify for people who ask me to work and testify for them and don't work and testify for people who don't.  And for whatever reason, I have been asked to work and testify in criminal cases a whole lot more by defense attorneys than I have by prosecutors.

Q.   Now, in terms of -- we mentioned lectures before.  I would like to go back to that.

        What are the talks you've given and to what organizations have those talks been to?

A.   Well, the large majority of talks I've given have been to universities that have invited me to speak.  But I have also

Loftus - direct

627

given talks to various organizations like Microsoft, for example. And I've given talks to a number of legally related conventions or conferences. Most of these have been for various defense agencies, but a handful of them have been for prosecution-related agencies or else at conferences that involve people from all walks of the criminal justice system.

Q. And is there -- do you have a reason as to why you choose to give these lectures to either these criminal defense agencies or prosecutor/community at large?

A. Yeah, again, it's much the same answer that I gave before. I give talks to people who ask me to give talks and don't give talks to people who don't ask me to give talks. And defense agencies have asked me to give talks to them a lot more than have prosecution-related agencies.

Q. So we've talked about criminal cases. I want to jump to you testifying in court in regards to civil cases.

What are the civil cases -- how many times have you been called to testify in civil cases?

A. Testify in civil cases? Oh, probably not more than 15 or 20.

Q. And in those cases, were you primarily testifying on behalf of plaintiff or defendant?

A. It's about 50/50.

Q. And in terms of civil cases, in terms of testifying for the plaintiff or the defendant, have there ever been occasions

where the plaintiff or defendant was the government or was it all nongovernmental parties?

A.   I would have to go back and look.  There have been a number of instances in which I've testified for the government.  I know, for example, I've testified in federal court in Massachusetts for the government in a civil case that was going on there.

Q.   Besides working on a case to testify, have you ever worked on a case not to testify?

A.   Yeah, quite a few of all the cases I've ever worked on, I usually only testify in maybe a quarter of them.  The rest settle in one way or another.

Q.   Now, we've mentioned the prosecution.  In terms of police officers, have you ever done your work on behalf of police officers and their work?

A.   I've testified on behalf of -- or worked on behalf of police officers in both civil cases and criminal cases.

Q.   Now, Dr. Loftus, why are you here testifying in this case?

A.   Well, I'm assuming I'm here to testify for the same reason I normally testify when I testify in a case, and that is to provide information, scientific information to the trier of fact, the jury, about how human perception and memory are understood to work.  And the hope is that the trier of fact can use this scientific information as a tool to do their job and apply it to individual witnesses to best understand which

Loftus - direct

witnesses' memories are reliable and which aren't.

Q.   In terms of your preparation for this case, have you interviewed any witnesses or anyone at all in this case?

A.   I have never interviewed any witnesses in this case or any other case I've ever worked on.

Q.   Why haven't you done so?

A.   Well, because as I said, my main job as I construe it when I testify is to provide scientific information to the trier of fact, the jury.  I don't need to interview witnesses in order to be able to do that.  I just have to know about the scientific -- relevant scientific evidence.  And I leave it to the jury to apply the scientific information that I provide as I said to specific witnesses.  And I don't need to interview witnesses to be able to do any of that.

Q.   Are you compensated for this work?

A.   Yes.

Q.   What is the rate at which you are compensated?

A.   I'm charging in this case at the rate of $300 an hour.

Q.   Is that your usual rate?

A.   It's a little cheaper than -- a little less than I normally charge.  I usually charge $350 an hour.

Q.   And in terms of either the $300 an hour or $350 an hour, is that the going I guess market rate for testifying in your field?

A.   As far as I can tell, other experts in my field charge

Loftus - direct

630

more, more like 4 or $500 an hour.

Q.   What's the basis for you charging in this case 300 or usually $350 an hour?

A.   There's no good reason.  It's just what I do.

MR. J. RICHARDS:  Your Honor, at this time I would seek to have Dr. Loftus continue his testimony as an expert in the field of human perception and memory.

THE COURT:  Okay.

Any objections?

MR. SCAHILL:  None other than the previous filings.

THE COURT:  Any other?

MR. ENGQUIST:  No, Your Honor.

THE COURT:  Okay.  Dr. Loftus may testify under Rule 702.

But first, ladies and gentlemen, I'll give you the following instruction now but you'll also receive it at the end of the case:

You are about to hear a witness and likely will hear other witnesses in the case who will give opinions about matters requiring special knowledge or skill.  You should judge this testimony in the same way you judge the testimony of any other witness.  The fact that such person has given an opinion does not mean that you are required to accept it.  Give the testimony whatever weight you think it deserves, considering the reasons given for the opinions, the witness's

Loftus - direct

631

qualifications and all of the other evidence in the case.

You may proceed, Mr. Richards.

MR. J. RICHARDS: Thank you, Your Honor.

BY MR. J. RICHARDS:

Q. Dr. Loftus, if you could, please briefly describe for the jury how memory works.

A. I could do that. It would facilitate things a lot if I were able to draw a little diagram that would make what I would say about how memory works a lot clearer. Is there some way that I could do that?

MR. J. RICHARDS: Your Honor, may the witness step down and use the overhead projector thingy?

THE COURT: That's fine.

THE WITNESS: Okay.

Okay. Let me know if I am not speaking loudly enough.

THE COURT: There's a microphone at that lectern.

THE WITNESS: Ah, okay. Good.

Okay. So what I will do is to first provide a little box and arrow diagram that illustrates in a very simplistic way how memory is understood to work. And then my plan, if it's okay with everybody, would be to provide a little hypothetical example to make this diagram a little less opaque.

So with that in mind, any memory -- or most memories anyway --

MR. SCAHILL: Judge, I guess I'm -- objection.

Loftus - direct

632

THE COURT: Right. So the objection to narrative is what I suspect is what it will be.

And so, Mr. Richards, Dr. Loftus, you should understand that your testimony is based on a question and answer format. The current question is how memory works and you would like to illustrate with a diagram so we are limited to that. Once you have drawn your diagram, counsel can ask you follow-up questions, but it's not a lecture.

THE WITNESS: Okay.

THE COURT: You don't have to address me. I haven't posed any question to you. Your lawyer -- or Mr. Richards will pose questions to you, and then on cross-examination, questions will be posed to you. That's how it works here. So if you're drawing your diagram, please continue, and then we'll wait for the next question.

BY MR. J. RICHARDS:

Q. So, Dr. Loftus, first just draw the diagram out on that piece of paper and let me know when you've finished drawing it.

A. Okay.

That would be my diagram.

Q. Okay. If you could please return to the witness stand, and I'll zoom out the diagram so it's a little better on the...

MR. J. RICHARDS: Your Honor, may I proceed?

THE COURT: Yes.

BY MR. J. RICHARDS:

Loftus - direct

633

Q.   So, Dr. Loftus, what does the green represent on that diagram?

A.   So to begin with, the green at the top represents the event in question.  When I talk about an event, the event could be a crime like the one that's at issue here, but it could be anything.  It could be a wedding, it could be a basketball game, it could be whatever.

The point that I am going to want to make is that a witness's eventual memory for the event is made up of two types of information.  You asked me about the green.  The green is the first route by which information about the event makes its way into a witness's eventual memory for the event.

To be a little more specific, when you experience any event, using sensory data coming into your brain via your --

MR. SCAHILL:  Objection, Judge.

COURT REPORTER:  I'm sorry.  Can you speak into your microphone?

THE COURT:  Basis?

MR. SCAHILL:  I'm sorry.  Objection.

THE COURT:  What's the basis?

MR. SCAHILL:  Narrative.

THE COURT:  Overruled.

You may continue.

THE WITNESS:  Thank you, Your Honor.

BY THE WITNESS:

Loftus - direct

634

A.   Using information that comes into your brain via your sense organs, you form a conscious experience, a conscious representation of what the event you're experiencing is all about.  And based on this conscious experience, you are able to add some information about what's going on in the event to your initial memory for the event.

There are two things about this conscious experience route that are important.

BY MR. J. RICHARDS:

Q.   Before we go to the -- well, let's start with that.

What are the two important things about the conscious experience portion?

A.   So to begin with, as you can see, I've represented it in green.  That is meant to be sort of a reminder that memory acquired during -- information acquired via this route is generally accurate.  It generally reflects faithfully what was going on in the actual event.

The second thing is that I've represented the amount of this conscious experience information in memory as being relatively sparse.  And that in turn is true for two reasons.

The first is that mathematically speaking, any event, even a very simple one, contains such a vast amount of information that it isn't possible for any normal human being to get more than a small proportion of it.

Secondly, there are often factors at work that

Loftus - direct

635

diminish the amount of information a witness is able to get via this route.

Just as a quick example, it's time-limited. Once the event ends, so does the witness's conscious experience of it and so does the witness's ability to acquire information via that route.

Q. So would you -- is what you're saying is as soon as the event ends the green route stops?

A. Yes, that's one of the ways in which information that a witness can acquire via this route is limited.

Q. What does the red mean on the diagram?

A. The red represents the second route by which witnesses can get information about the event in question that is at least relevant to the event. This is labeled postevent information which as the name suggests is information that is somehow relevant to the event that the witness acquires or can acquire at varying times after the event itself is over.

Under the right circumstances, the witnesses -- witnesses can and do use postevent information to fill gaps in their original memory, to plug holes, to create a better understanding of what the original event was all about.

And there are three important things that are relevant about postevent information.

Q. What are those three things?

A. So to begin with, I represented it in red. Again, that's

Loftus - direct

636

meant to be a reminder, not that postevent information is necessarily false but that it is questionable. In general we don't know whether postevent information accurately reflects what actually happened in the event or whether it doesn't.

The second thing I want to note is that I've represented there as being a lot of postevent information in this hypothetical witness's memory down at the bottom compared to the amount of conscious experience information. The reason for this is that in general, postevent information is easier to get and integrate into memory than is conscious experience information. Again, as an example, postevent information is not time-limited. Witnesses are perfectly capable of acquiring postevent information about some event and integrating it into their memory for an indefinite time after the event itself is over.

Sorry.

The third thing I want to say about postevent information is that that box labeled "memory" at the bottom is somewhat misleading. When you look at it, it's easy to tell which information came from conscious experience, it's green, versus which came from postevent information, it's red. From a witness's perspective, that's not what happens. In general a witness very quickly loses track of which information in their memory of an event came from conscious experience versus which came from postevent information. As far as the witness is

Loftus - direct

637

concerned at the end of the line, they just have a memory that they believe is a memory that they formed at the time the original event was taking place.

The critical consequence of this is that under the right circumstances, witnesses can develop memories that are very strong, very real seeming, very detailed, memories that are expressed with a lot of confidence, but memories that unbeknownst to the witness are potentially false in important ways because unbeknownst to the witness, the memory that they're describing is made up largely of postevent information whose accuracy is questionable.

Q. Can you give the jury some just quick examples of postevent information?

A. Well, anything that can be a source of information can be a source of postevent information.

So a witness is hearing about what happened in an event from other people or from the news media or by being interviewed by police. A witness engaging in any kind of identification procedure allows them to use the appearance of the suspect in the identification procedure as a means of reconstructing their memory of what the actual offender they saw commit the crime looks like.

So those are some examples of postevent information that are often relevant in real-world cases.

Q. And you use the term "witness," but in terms of a memory of

Loftus - direct

638

a witness, it doesn't have to be a witness necessarily.  It could be a memory of a birthday party.

A.  Oh, sure.  Yeah, I'm sorry.  I didn't mean to restrain my conversation to witnesses of crimes, let's say.  Yes.  What I've described here applies to anybody in any situation.  All of us are living our lives according to this way in which memory operates all the time.

Q.  Now, you mentioned about a witness or a person's memory, the box at the end.  So in terms of that box at the end, how confident is a person in their memories generally?

A.  So a -- the confidence a person expresses in some memory that they're relating depends on how much total information the witness has in their memory.

Under the right circumstances, as I said, it is perfectly possible for a witness to have a lot of information in their memory about the event that they've experienced. That's the kind of situation that I tried to illustrate in the diagram that I drew.  But as I said a minute ago, the -- any high confidence that a witness expresses in a memory that contains a lot of information may be confidence that is misplaced because, again, unbeknownst to the witness, a lot of the information in their memory on which they're basing high confidence in the memory is actually postevent information that may be accurate, but it also may be inaccurate.

Q.  So I would like to just take a quick step back in terms of

Loftus - direct

639

memory and what you're talking about, the science of memory.

How did it come about that this field was started?

A.  Well, the study of memory and perception has been ongoing since the middle of the 19th century, in other words, for almost 200 years.

The study of how -- the -- our understanding of how memory works that I have expressed simplistically in this diagram gained steam in the late '80s or early '90s.

Much of the driving force behind an attempt to understand how memory works and in particular to understand the critical role of postevent information in memory came about via legal cases in which it was shown without question that people were capable of developing memories that were very strong and were expressed with a great deal of confidence, but memories that, as it turns out, were demonstrably false.

So this -- this -- this -- these phenomena coming about in the legal system, both in criminal cases and in civil cases, provided a lot of impetus to try to understand the nuances of how memory works and in particular how postevent information can dramatically affect both the confidence that a person expresses in their memory and the accuracy of that memory.

Q.  Now, in terms of memory, how would you -- in the context of memory, how would you define actual reality in terms of memory?

A.  Well, I don't define actual reality in terms of memory.  I

Loftus - direct

640

just define actual reality in terms of reality.  Reality is what actually happens.  Reality could be captured by, let's say, recording an event on a -- on a video, would capture much of what the reality of the event is all about.  But when I say reality, I'm using the term pretty much in a commonsense meaning of the term.

Q.   In terms of moving to the green route, the conscious experience route, what are some of the factors that influence that conscious experience green route?

A.   So as I said earlier, there are many factors that influence the degree to which a witness is capable of acquiring information from an event via this conscious experience route.

I already mentioned the fact that time is an issue. Often the witness doesn't have very much time to experience an event and therefore doesn't have the capability of getting a lot of conscious experience information from it.

But there are other factors that are often important. They include things like the lighting during the event, the degree to which the witness is paying attention to what is eventually going to be important in the event, the degree to which the witness is or is not under conditions of very high stress.  These are some of the things that are often important in terms of how well a witness is able to form a memory of the event in question via conscious experience.

Q.   So let's start with lighting conditions.  I want to focus

Loftus - direct

641

on that area first.

How does lighting affect a witness's ability to accurately perceive what they are looking at?

A. Well, I'm sure it will come as a shock to nobody to learn that under conditions of dim, poor illumination, people are less capable of accurately perceiving what's going on in an event compared to normal illumination like the illumination in this room. But we understand at the physiological level what the bases are for the difficulties in perceiving under conditions of dim illumination and qualitatively what the effects of the illumination are going to be in terms of the kind of conscious experience information people are capable of acquiring.

And I can go through that very briefly, if you would like.

Q. Well, you -- you lose -- you use the term "physiological." What does that term mean?

A. That means we understand it in terms of the neural system that starts at the eyeball and makes it way back into relevant portions of the brain.

Q. Now, could you describe the physiological system in terms of a human's visual systems?

A. Sure.

All normal humans are equipped with two visual systems that operate in parallel. These are referred to as the

Loftus - direct

642

photopic visual system and the scotopic visual system.

The photopic visual system is the system that is used in conditions of everyday, normal illumination. So if we're outside during the day, or if we're inside in a well-lit room like this one, we're seeing the world with our photopic visual system.

The scotopic visual system is the system that kicks in when there's only a small amount of light available. So if we turned out all the lights in this room and allowed only a little bit to sneak in through those little windows in the door, we would be seeing the world using our scotopic visual system.

So the scotopic visual system has the capability of perceiving extremely small amounts of light, and it's basically the reason for its existence. But it acquires this capability at a cost, actually two costs.

The first is that the scotopic visual system can't see color. It sees the world in shades of gray.

The second is that the scotopic visual system can't resolve fine detail. From its perspective, it sees the world as blurred. So if I wanted to make a demonstration of how, let's say, the jury looked to me if I were seeing you only with my scotopic visual system, I could take a picture of it, put the picture into Photoshop, change the -- from color to grayscale in Photoshop and then blur it by a suitable amount.

Loftus - direct

643

So this blurred grayscale picture would be a representation of what the world would look like the jury would look to me if I was seeing it using only my scotopic visual system.

Q. Now, do the photopic and scotopic visual systems, do they operate simultaneously?

A. Generally not. There is a brief sort of range of light called the mesopic visual system that during which the photopic visual system is almost shut down and the scotopic visual system is just getting going. But for the most part, we're using either our photopic visual system or our scotopic visual system but rarely both at the same time.

Q. How do the lighting conditions affect perception?

A. Well, as I just said, if the lighting conditions are sufficiently low, if you're outside, for example, at night and seeing the world using your scotopic visual system, you can't see anything in color in the world, and you can't see fine detail.

Q. How does that affect the green conscious experience box?

A. Well, if you're seeing the world using your scotopic visual system, then you're conscious experience of the world is in grayscale and is blurred. So your initial memory based on your conscious experience will be likewise grayscale and blurred.

Q. And how would that affect the last box, the blue memory box?

A. Well, that's what I was talking about. The green conscious

Loftus - direct

644

experience route information in that box could not contain any color information or any high resolution information.  It would be perfectly possible for the witness's eventual memory to contain color information and high-resolution information, but that would have to be based on some form of postevent information about what happened during the event.

Q.   Is there a difference between daylight viewing and viewing with streetlights at night?

MR. SCAHILL:  Objection, Judge.

THE COURT:  Basis?

MR. SCAHILL:  Foundation, *Daubert*, and motion.

THE COURT:  Okay.  It's overruled.

He may answer.

THE WITNESS:  Thank you, Your Honor.

BY THE WITNESS:

A.   So seeing the world at night in the context of streetlights is of course better than having no light at all.  But streetlights are severely suboptimal for being able to see anything in fine detail.  There are basically three reasons for that that I can go into, if you would like.

BY MR. J. RICHARDS:

Q.   What's the first reason?

MR. SCAHILL:  Objection, Judge.

BY THE WITNESS:

A.   So the first reason is --

Loftus - direct

645

THE COURT: What's the basis of the objection?

MR. SCAHILL: Foundation. *Daubert*.

THE COURT: Let's go to sidebar.

(Proceedings heard at sidebar:)

THE COURT: All right. With respect to foundation, this witness has testified that there are various factors that affect memory to include light. This testimony seems -- this question seems to elicit further foundation on that.

With respect to the *Daubert*, my recollection is that the witness was unable to testify that any particular person in this case did not have sufficient lighting. That's not what the question is asking so how is the *Daubert* motion implicated?

MR. SCAHILL: My concern here, Judge, and it's part --

THE COURT: I didn't ask about your concern. I asked you how is the *Daubert* motion implicated.

MR. SCAHILL: Because he's not qualified to testify about streetlights and the various illumination of streetlights and the data fact. He's a perception and memory expert. He's not a streetlight engineer. He's not -- he's never been qualified for that. He's -- it's -- while he puts that in his report, we objected to it. And he's about to tell you that -- or this jury that there are, you know, certainly not in 1989 in Chicago, but he's about to tell the jury about how you can't see or a witness can't see well or see differently with streetlights versus something else, I don't think he's

Loftus - direct

qualified to do that.

THE COURT:  Okay.  The objection is overruled.  He's speaking generally as to his expertise and his study.  And so you can cross-examine him on that.

You may continue, Mr. Richards.

MR. SCAHILL:  Thank you.

(Proceedings heard in open court:)

BY MR. J. RICHARDS:

Q.  So you mentioned three points about this.  What was -- what is the first point you wanted to mention?

A.  The first point is that streetlights are deliberately meant to be dimmed.  Streetlights are designed so that they can allow people to, let's say, walk around in urban area without crashing into things, but they're not bright enough that you could typically read or accurately perceive what somebody looks like.  That's the first reason.

Q.  What is the second reason?

MR. SCAHILL:  Object to foundation, Judge.

THE COURT:  It's overruled.

You may answer.

BY THE WITNESS:

A.  The second reason is that in most environments, particularly urban environments, streetlights are generally spaced far enough apart that if a streetlight is useful for you in terms of helping you see, only one streetlight is going to

Loftus - direct

647

be relevant.

This means, for example, that if a witness, let's call him a witness, is looking at a person in the context only of a streetlight, the degree to which the witness is going to be able to accurately perceive the person's appearance is dependent on the exact geometrical configuration of the witness, the person the witness is looking at, and the streetlight.

The ideal configuration is that the streetlight is behind the witness in which case it illuminates the person being looked at full face.

The opposite, the worst situation, is that the streetlight is behind the person being looked at, in which case the person's face is in shadow and the person is basically seen by the witness in silhouette.

Typically the situation is somewhere between those two extremes, but typically it is changing from one time to another. The fact that in the context of a streetlight a person is being looked at is never fully illuminated means that in general it's a worse situation for being able to perceive what they look like than a situation in a uniformly illuminated room like this one or outside where light is coming from all directions.

Q. And what was the third factor?

A. The third factor is that streetlights can often block

things that are important to see and be able to memorize, like the appearance of a person you're looking at can be blocked by buildings, trees, cars, and other things.

Q.  So in terms of lighting and in terms of streetlights and positioning and stuff like that, is your basis of your testimony today from research studies involving lighting?

A.  It's from both research studies that provide information to engineers about how to construct streetlights.

Q.  And in terms of lighting in the contrast perception route, would you -- is it that this factor is more important than another or is it just a factor?

A.  These are just factors.

Q.  Now, moving on to the -- another factor I believe was attention.  What is attention?

A.  To explain what attention is from the perspective of people who study it, I need to first provide two pieces of foundational information, if I could.

Q.  What's the first piece?

A.  So the first piece of foundational information is that any person at any time is trying to accomplish some goal.  This goal could be as simple as holding a bottle of water.  It could be as complicated as doing brain surgery.  It could be anything in between.  But we're always trying to accomplish some goal.

        That's the first.

Q.  What about the second?

Loftus - direct

649

A.   The second is that at any given time, any human being is being bombarded by an enormous amount of information entering their brain through their sense organs, their ears, their eyes and so on.

Of this vast amount of information that is entering a person's brain at any given instant, only a very small portion of it is ever relevant to whatever goal the person is trying to accomplish.  The vast majority is irrelevant.

What this means is that in order to survive, we need some kind of filtering system that flexibly screens out the vast amount of incoming information that is irrelevant to what we're trying to accomplish and only let's through only that very small amount of incoming information that is relevant to what we're trying to accomplish.  If we didn't have this kind of screening system, the -- the irrelevant information would overwhelm the relevant information.  In other words, there would be information overload and we would never get anything accomplished.

So these two pieces of foundational information provide the wherewithal for me to briefly tell you what we mean by attention.

Q.   So but just briefly, the -- the system, this filtering system, that's evolved with us as human beings?

A.   Yes.

Q.   And overall, how does attention affect memory?

Loftus - direct

650

A.   So it's difficult for me to answer that without going into a little more detail about what attention is based on the foundational pieces of information that I provided you.

Q.   So in terms of what attention is, what is the best way to explain that?

A.   Right.

So as I said, it's necessary to have some kind of filtering system to screen out your relevant information.

When you look at the sense organs, the ears, the eyes and so on, and the various parts of the brain that they're attached to, what you discover is that a major design feature is a set of neurological filters that screen out incoming information in various flexible ways, and it is this combination of filters that we refer to as attention.

There is an imperfect metaphor that is useful for understanding how attention works, and that is of a spotlight. So, again, metaphorically you can think of attention as being kind of like a spotlight beam that moves from one part of our sensory world to another.  Whatever is being illuminated by this metaphorical spotlight beam is what's being paid attention to and whatever is not being illuminated is not being paid attention to.

Q.   So in terms of the metaphor, is the person, the witness, are they choosing the spotlight or is the spotlight just happening?

Loftus - direct

651

A.   Well, to some degree, the person is choosing the spotlight on the basis of whatever goal it is they're trying to accomplish.  So if you're trying to accomplish some particular goal, that means that certain elements of the event that you're experiencing will be important to accomplishing that goal and others won't be relevant to accomplishing the goal.

So your attentional spotlight pretty much automatically moves from one part of an event to another, landing on whatever elements of the event are relevant to whatever goal you're trying to accomplish.

Q.   So if a person is looking at something or experiencing something, what does it -- the role of attention play in that person not looking at something that is one would say important?  How does that play into that?

A.   I'm not sure I understand your question.  I mean, if you're experiencing some event and there's some aspect of the event that doesn't appear to be relevant to whatever your goal is, chances are you won't pay attention to that element of the event.

Q.   So in terms of not paying attention to that relevant portion of event, why does a witness fail to do that ultimately?

A.   So there are two reasons why a person might fail to pay attention to some element of an event that is maybe going to be important later on.

Loftus - direct

652

The first reason is that -- and we've just been briefly talking about this -- the witness has no reason to pay attention to it. It's not relevant to whatever goal they're trying to accomplish.

The second circumstance is kind of the opposite of that. That's when there are many things in the event that all are relevant to whatever goal the witness is trying to accomplish. Under those circumstances, the witness is going to have to make a choice about which elements of the event they're going to pay attention to versus which elements of the event they're going to not pay attention to.

And I might say that a consequence of this is that you only -- if you don't pay attention to some element of the event, you will not remember it later on, which means that if there are lots of elements of the event that all are relevant to whatever goal you're trying to accomplish and you pay attention to some of them but not to others, the elements of the event that you don't pay attention to will not be remembered later on.

Q. What -- in terms of a witness or viewer not knowing that some fact is going to be important in the future, is there any research that has delved into that topic?

A. There's a lot, and I could briefly describe that experiment if you'd like.

Q. Sure. Go ahead.

Loftus - direct

653

A.   So the experiment that I have in mind was one that took place on the campus of Cornell University back in New York State about 20 years ago.  And here's how that experiment worked.

If I'm the experimenter in the experiment, I go out onto campus and I stop a random person on the campus.  We'll call this person the witness.  The witness at this point has no idea that he or she is participating in the experiment.  And I engage this witness in conversation.  Perhaps I asked them to -- for directions to a campus building.

As the witness and I are having our face-to-face conversation, two guys approach us.  They're part of the experiment.  And they are carrying a door, a big standard-issue, opaque door.  So these guys with their door approach us and very rudely, they walk directly between me and the witness I'm speaking with, cutting off the witness's view of me for just a couple of seconds.

During those couple of seconds, I change places with one of the people carrying the door, and I walk off with my portion of the door.  And the result of this and many similar experiments is that for the most part, the witness doesn't realize that the person they are talking to at the end of the experiment isn't the same person that they were talking to at the beginning of the experiment.  Even when the witness is explicitly asked, hey, am I the guy you started this

Loftus - direct

654

conversation with, the witness more often than not says of course you are, you know, why wouldn't you be?

So the -- to answer your question explicitly about the relevance of this experiment, it demonstrates that if you don't have a reason to pay attention to something, you won't remember it later on. In this case, the witness had no particular reason to pay attention to the experiment -- the appearance of the experimenter. They had no idea they were going to be tested on it later on. So given that they didn't pay attention explicitly to the witness's appearance, they for the most part didn't remember, didn't memorize what the experimenter looked like even well enough to realize that he had changed into a completely different person a couple of moments later.

Q. So we're just talking about a conversation, right --

A. Yes.

Q. -- that's happening that's interrupted by an opaque door walking through. And the witness, they don't memorize the appearance of the person that they're just literally speaking with. Is that fair to say?

A. For the most part, yeah.

Q. Now, that's in terms of two people talking.

In terms of, you know, other situations how does an attention affect a person's ability to remember?

A. Well, as -- as I mentioned, if you don't pay attention to some element of the scene, like the appearance of an individual

Loftus - direct

655

you're talking to, you won't remember that element of the scene later on, which isn't, by the way, to say that if you do pay attention to something you're guaranteed to remember it later on. I guess a succinct way of putting it is that paying attention to some element of an event is necessary for remembering that element later on, but it's not sufficient for remembering that element later on.

Q. So in terms of talking to a person and the experiment in terms of having a memory of their appearance is what happens when you're not even talking to the person, are there any studies that have done that?

A. Well, most of the studies are of the sort that I have just described where you want to sort of set the situation up so that the person, the witness will have every opportunity to be able to see the person they're talking to and would have the ability to memorize them if they want because they're right in front of them.

So generally the -- these experiments are set up so that the witness does have at least some form of conversation with the experimenter.

Q. Without conversation, does a viewer's ability to not memorize an appearance of the person go down?

A. Well, if you're not having a conversation then there is the chance that you won't be looking at the person, won't have the person in your field of view, will be too far from the person

Loftus - direct

656

to be able to accurately resolve the appearance of their face. There would be many other reasons besides just not paying attention why you might not be able to perceive or later remember what they looked like.

Q.   So now I -- sort of going back when you talked about attention being limited, right?  We just talked about attention not being limited but now attention being limited, what are there, if there are any, experiments that focused on when attention is limited and how that affected memory?

A.   Yeah.  There have been thousands, literally thousands of such experiments over the last century and a half or so.  I'm happy to briefly describe, again, one I think that sort of nicely illustrates the limits of attention.

Q.   Go ahead.

A.   So this experiment may be familiar with -- to some people because it's been in the media quite a bit.  It's informally referred to as the invisible gorilla experiment.  And here's how that experiment works.

So a group of subjects were shown a film -- were shown a film.  The film took maybe on the order of a minute, maybe 50 seconds.  And in this film, there were two I'll call them basketball teams, two three-people basketball teams.  One team was dressed all in black, and the other team was dressed all in white.  Each team had their own basketball and they were passing it among themselves.  So the black team was passing it

Loftus - direct

657

among the various members of the black team, and the white team was passing their basketball among various members of the white team.

The subjects in the experiment were instructed to count how many passes were made, how many times the ball was bounced, in other words. That was their job.

So the -- everything began. People's balls started bouncing. The subjects were presumably trying to count how many bounces there were. But in the middle of the whole thing, about maybe 20 seconds into the movie, a large gorilla suddenly strolled onto -- into the middle of things. This was actually a woman dressed in a gorilla suit, but it looked like a gorilla. So this gorilla wandered in and amidst these people bouncing their balls, it beat its hands on its chest and then it wandered off stage left.

So, again, the remarkable finding from this and other related experiments is that for the most part, people don't even remember that there was a gorilla that showed up in the middle of this movie. When they're asked: Did you see anything weird or unusual as you were counting the number of times the ball was bounced, for the most part people are like no, I didn't see anything particular. And people, in fact, are often shocked when they're reshown the movie and they're able to see this gorilla that walked out in front of them.

So this I think nicely demonstrates the limitations of

Loftus - direct

658

attention, the sort of spotlight nature of attention. If the spotlight is on trying to count the number of times the ball is being passed, it's not on other aspects of the event, even a very salient aspect of the event such as a large gorilla that wanders out, stops a bit, and then wanders away.

Q. So in terms of this spotlight of nature, the spotlight of attention, in terms of a person going about their daily life, when something shocking happens in general, what is a person like that, what are they pointing their attention to?

A. I'm not sure what you mean by shocking, but generally shocking means that they had -- there's a sudden goal that has suddenly popped up. So if you're walking along the street and you see somebody, let's say, get hit by a car, your immediate goal will be to -- if you're a normal person will be to focus your attention, your limited attention on the person, on the car, figure out the degree to which the person is hurt, figuring out if you can somehow help and so on. So to the degree that your attention is on in my example the person who is hit by a car, it's not on other aspects of the scene such as, for example, the appearance of maybe a pedestrian who might be wandering around in the vicinity.

Q. And in the studies and research that's in your field, in terms of attention, has there any -- been any studies or research that focuses on weapons, either guns or knives?

A. There has, yeah.

Loftus - direct

659

There is a phenomena that is known as weapon focus. And what it demonstrates is that if there is a weapon in the scene, people tend to focus their attention on the weapon. To the degree that they're focusing their attention on the weapon, they're not focusing their attention on other aspects of the scene such as the appearance of the person who is holding the weapon.

Q. So in terms of when an assailant is holding a weapon, what are the other things that a witness would possibly be viewing other than the weapon?

A. Well, if you are experiencing an assailant holding a weapon and you think that you may perhaps be in danger from that weapon, your goal would be one of staying safe. So certainly your attention would be on the weapon, where it's pointing, what it's doing, if it's firing as I just mentioned in the context of weapon focus. But it would likely also be on other aspects of the scene like what are potential escape routes, can you call for help and so on.

Q. So you're talking about weapon focus. Is that a conscious thing someone is doing or is it a subconscious thing someone is doing?

A. It's an unconscious thing. As I said, typically when you suddenly formulate a goal like I don't want to get shot, your attention pretty much automatically goes to whatever it is that is relevant to that goal.

Loftus - direct

Q.   Can someone overcome that unconscious weapon focus?

A.   Well, probably if they put their mind to it and they have some time, they could.

Q.   And what happens -- we've talked about a situation with -- we're talking about a singular gun in this case.  Is there any science or data in terms of what happens when there are multiple assailants?

A.   Not that I know of, no.  The data that I know about have involved experiments in which there's a single weapon involved.

Q.   Now, what happens when there is this weapon focus that occurs?  What happens with the person's memory before the event, before the weapon is shown?

A.   Well, it depends on what the person's goal was prior to when the weapon was shown.  If the person was just walking down the street paying -- you know, minding their own business, trying to decide, figure out where they're going or decide what they're going to have for dinner that night, then their attention would be on that.

But if suddenly a weapon appeared being wielded by an assailant, as I said, their attention would likely be immediately drawn to the weapon and other elements of the event that would be relevant to the goal of staying safe, like how am I going to get out of here.

Q.   And attention, that goes to the green box, green route, conscious experience?

Loftus - direct

661

A.   Yeah.  To the degree that attention is relevant, it will affect both what aspects of the event, what information from the event goes into your conscious experience to begin with and what aspects of your conscious experience is put into your initial memory for the event.

Q.   Now, I would like to turn to another aspect of the conscious experience, stress.

What is stress in the terminology of your field?  What does stress mean?

A.   Well, stress means, you know, just what the commonsense meaning of it is.  It has to do with the degree which you are aroused by something that's happening in the world.

I should say as a caveat that studying stress in the scientific laboratory, particularly studying effects of very high stress on humans, is scientifically challenging because there are obvious ethical constraints that preclude scientists even if they wanted to from putting people under conditions of very high stress where they might believe their lives are in danger and seeing how they react.  Generally you can't do that. But there are certain situations under which it is possible to investigate conditions of high stress.  So there have been a few experimental procedures in which very high stress is measured which is often the goal in studying stress.

Q.   So how does stress then affect memory?

A.   So the general finding is that under conditions of very

Loftus - direct

662

high stress, people's ability to carry out any kind of mental functioning, including their ability to memorize the appearance of people they are interacting with, is diminished compared to conditions of moderate stress.

I should say for the sake of completeness that under conditions of very low stress, people's mental functioning is also diminished.  In other words, it's good to be at an optimal level of stress or arousal in terms of doing your best in terms of whatever mental exercise you're engaged in.

Q.   And can -- can one person find an experience less stressful than another?

A.   You mean the same experience?

Q.   Yes.

A.   Sure.  I mean, there are individual differences with respect to just about everything, although, as I said, scientists are limited in terms of how they study high stress, and those limitations include detailed studies of individual differences among people.  It stands to reason that because people within the limitations of our physiology differ somewhat with respect to just about everything, they all likewise differ in terms of how they react to high stress.

Q.   So if someone is very stressed, what does that mean about their memory?  Is it poor or is it --

A.   Generally speaking, a person who experiences a very stressful event remembers that event less accurately than a

Loftus - direct

663

person who experiences the event under moderate stress.

Q.   So when there's high stress, what is that stress-producing event?  What is that -- how is that affecting the memory of the person?

A.   So with a very highly stressful event, as I said, the general finding in the relatively small number of experiments that can ethically study high stress is that people are poorer at mental functioning in general, including their ability to memorize the appearance of people they're interacting with.

Q.   What does this mean for a person experiencing a high stress event as to the details of the memory?

A.   So often people have memories that are very detailed of high stress situations which seems sort of paradoxical in the sense that what I just finished saying is that people remember details less accurately under conditions of high stress.

        What I say when I say that people typically have very detailed memories of the event is that they have details that come about via some form of postevent information.  The reason for that is that a very high stress event is for most people also a very salient event in their lives.  It's an event that they think about a lot, that they talk to other people about a lot.  It's an event that provides them with a great deal of opportunity to add details in their memory that may or may not be true.

        So there are lots of real-life examples of people

Loftus - direct

664

having undergone extremely stressful events and winding up with memories that are very strong and detailed but memories that could not have been formed as a result of the conscious experience at the time that the event was taking place.

Q. And you mentioned postevent info. That's the red route?

A. I'm sorry, yes, it is.

Q. And in terms of an event, are you aware of any sort of event that you've spoken about that researchers in your field look to as an example of that?

A. There are many, many examples in real life of people having strong memories that are either demonstrably false or at the very least are not memories that despite what the witnesses believe had gotten there via conscious experience at the time they were -- the event was taking place. I can give you an example of that if you --

Q. Can you give me an example of that?

A. Sure.

One of the examples that I find sort of telling is that of a bunch of witnesses who witnessed a horrific airplane crash some years ago. It was a United 737 that crashed as it was landing at the Colorado Springs airport in Colorado. It was clearly an awful, horrible event for these witnesses, extremely stressful.

And some of these witnesses were interviewed just after having witnessed this crash, and some of them provided

Loftus - direct

665

these accounts of seeing the terrified faces of the passengers on the plane as the plane was in the process of crashing. It was a -- it was an account that these witnesses described very vividly, and from what they were saying, it was clear that they are a very strong memory of having seen these terrified passengers.

Vivid, though, these memories may have been, it turned out that they could not have been memories that the witnesses formed at the time of the actual crash. We know this for two reasons.

The first is that the optics of airplane windows are such that although passengers inside can see out, people outside can't see in, at least not very well.

Second, the plane as it was crashing was going so fast and it was so far from these witnesses on the ground that there was absolutely no way that the witnesses would have been able to accurately perceive what the passengers' expressions were and what they were doing with their fingers.

So the conclusion is that these vivid, horrible details following this stressful event must have come about as a form of some kind of postevent information. We can hypothesize about what that postevent information might have been. Perhaps the witnesses to this horrible plane crash had tried to imagine what it would have been like if they themselves had been so unlucky as to have been passengers on

Loftus - direct

666

this jet.  And maybe in the context of these imaginings, they imagined their fellow passengers looking terrified and crawling out the windows and incorporated these images into their memory of what they actually saw.  Who knows whether that happened.

But what we know for sure, as I said, is that these vivid memories expressed by these witnesses didn't come about when they were perceiving the airplane crash even though they thought they did.  It came about somehow via some form of postevent information.

Q.  I would now like to move to duration in terms of conscious experience.

What is duration defined as in terms of conscious experience?

A.  So the duration simply is the total amount of time that in the context of a crime a witness to the crime is in the company of the offender who is committing the crime.

Q.  So taking a broad brush, how does duration in general affect memory?

A.  Well, again, it's certainly not rocket science that the longer a person has to experience some event the more opportunity they will have to acquire and put initial conscious experience information into their memory and the more complete their initial memory is likely to be.

Q.  Are there any specific duration categories that are used in the field?

Loftus - direct

667

A.   Well, there's a term called functional duration that is relevant to, for example, a witness who is witnessing a crime.

Q.   What is functional duration?

A.   So functional duration refers to that part of the total duration that the witness is in the offender's company during which the witness is capable of perceiving and memorizing the offender's appearance.

In order for any portion of the duration to count as functional duration, a number of things have to be simultaneously true.

As we talked about in the context of lighting, there has to be adequate lighting for the witness to accurately perceive what the offender's appearance looks like.

As we talked about with respect to attention, the witness has to be paying explicit attention to what the offender looks like.

As we talked about with respect to stress, the witness has to be under conditions of stress that they are capable of encoding things like the offender's appearance.

And there are other necessary conditions as well.  The offender has to be in the witness's field of view, not blocked by anything else and being face to face with the witness.

The offender has to be close enough to the witness that the witness is able to accurately perceive the details of their appearance and so on.

So it's only when all of these things are simultaneously true that any portion of the total duration that the witness is in the offender's company can count as functional duration. Even if the actual duration is, I don't know, let's say a minute, it's possible for the functional duration available to the witness to perceive and memorize the offender's appearance to be arbitrarily short. It could be as short as zero.

Q. So in terms of duration versus functional duration, by just extending duration, will that in and of itself extend functional duration?

A. Not necessarily. I mean, for example, if it's dark out the entire time, then extending duration isn't going to improve the ability of the witness to memorize anything having to do with color or fine detail.

Q. So -- so let me ask this to you another way. Will longer duration cure any defect in terms of attention, lighting, any of the other factors?

A. No. And by that I mean as I said earlier, if it's dark, if the witness is seeing the event using their scotopic visual system then it's not going to matter how long they have to experience the event. It's still going to be dark and you're still going to be limited in terms of the amount of information, or the witness is in terms of the amount of -- the kind of information that the witness can get.

Loftus - direct

669

As I said earlier, in order to memorize what somebody looks like, the witness has to be explicitly paying attention to the person's appearance.  So if you extend the time, it's not going to matter unless the witness is using that time to explicitly pay attention to the offender's appearance and so on.

Q.   I would like next to move to the topic of identification procedures and how they're studied in your field.

In your field, what is considered an identification procedure?

A.   It's any procedure in which a person looks at -- let's for the sake of brevity call him a suspect and make a decision about whether the suspect is a person they saw commit the crime or not.  That's the most general form of an identification procedure.

Q.   And in your field, are there studies -- is there a definition of unreliable identifying procedures?

A.   Yes.

Q.   What is that definition in your field?

A.   So if a witness makes a positive identification of a suspect in an identification procedure, that positive identification is only defined as being reliable.

If from the positive identification you can unambiguously conclude that there must have been a strong match between the witness's original conscious experience memory of

Loftus - direct

670

what the offender looked like on the one hand and the appearance of the identified suspect on the other hand, if you can't make that conclusion, then by definition the identification is not a reliable identification.

Q.   In field and studies, what are some of the factors that have led to unreliable identifications?

A.   Well, so let -- let me first categorize it in terms of the kind of identification procedure.

So very roughly, most identifications consist either of showup procedures in which a witness is shown a single suspect and asked is this the person you saw commit the crime, yes or no.

The other kind of general identification procedure is a lineup procedure.  Most people know what a lineup is.  A lineup can take the form of either a live lineup consisting of actual humans, or more often a photo lineup consisting of pictures of humans.

In a lineup, a suspect in a crime is put in and amongst a number of other people called fillers.  Typically there are five fillers, meaning the witness is looking at six people in all.  And in looking at these six people, the witness has to make two decisions.

The first is does any of these six people reasonably match my memory of what the offender looks like.

The second question, if the answer to that question is

Loftus - direct

671

yes, is of these six people, which of the person best matches my memory of what the offender looked like.

So those are the two kinds of identification procedures that are most widely used.

Now, you asked me, as I recall, what would make an identification procedure reliable or unreliable?

Q.   Yes.

A.   Okay.

Q.   And let's start first with the showup procedure.

A.   Yeah.  A showup procedure is intrinsically unreliable.

Unlike a properly done lineup procedure, a witness in a showup procedure could make a positive identification of the suspect even with no memory whatsoever of what the offender looks like.  All the witness has to do is say yeah, that's the guy, and they've made a positive identification.

In a showup procedure, a positive identification is universally known to be based on two factors.

The first factor is what I've already talked about and what is relevant and important; namely the degree to which the appearance of the suspect being looked at by the witness matches the witness's memory of the offender.

The other factor is essentially a whole collection of irrelevant factors:  How much does the witness expect that the person they're looking at is the offender?  How much social pressure is the witness feeling to make an identification?  How

Loftus - direct

672

much motivation does the witness have to make an identification and kind of be a hero?

So it is not possible in general to disentangle the degree to which a positive identification in a showup procedure is based on what is fundamentally important; namely, how well the witness's memory of the offender matches the appearance of the identified suspect in the showup versus the degree to which is based on any combination of these other irrelevant factors.

So as I have said, an identification in any kind of a showup procedure is an intrinsically unreliable identification.

Q.   What about the lineup procedure?

A.   So if a lineup is properly done, if it's unbiased, then it is at least a test of memory in the sense that if the witness identifies the suspect, you can conclude that at the very least, the match between the witness's memory of the offender and the suspect's appearance is stronger than the corresponding matches between the witness's memory of the offender and the appearances of any of the fillers.

So in that sense, it is a bona fide test of memory. That is assuming, of course, that the lineup, be it a photo lineup or a live lineup, is done in an unbiased fashion.

Q.   So let's then talk about bias and bias in terms of lineups.

In your field, is there a definition of lineup bias?

A.   Sure.  To begin with, let's talk about an unbiased lineup.

So to define an unbiased lineup, you assume that the

Loftus - direct

673

suspect is innocent.  The suspect is not the person seen by the witness.  So the witness is then looking at one suspect, five fillers, all of which have equal status.  They have never been seen before by the witness.

So a lineup is unbiased if the witness's chances of falsely identifying the innocent suspect are no greater than their chances of falsely identifying any of the equally innocent fillers in the lineup.

So a biased, to get to the answer to your question, a biased lineup is one in which, for whatever reason, the witness has a greater chance of falsely identifying the innocent suspect than they do of falsely identifying any of the equally innocent fillers.

Q.   And in general, what are some of the forms of lineup bias?

A.   So there are two general forms of lineup bias.

The first is physical bias.  Physical bias can take in turn, can happen for one or both of two reasons.

The first is that the suspect conforms more to the witness's description of the offender than do any of the fillers.  Just to use kind of an obvious example, if the witness described the offender has having a big gap between their front teeth and the suspect has a gap between his front teeth and then the offenders -- no, no, the -- sorry -- the fillers have gaps between their front teeth, the witness would immediately realize that the suspect with his gap is the only

Loftus - direct

674

viable candidate for the person they saw as the offender and the lineup would become essentially a showup procedure rather than a lineup procedure.

The other way in which a lineup can be physically biased is that one way or another, the witness stands out from the fillers. The witness is taller than all the fillers, the witness is shorter than all the fillers, or the witness is dressed in completely different clothing from all the fillers or whatever. If there's something that makes the witness -- sorry -- the suspect leap to the witness's attention in the lineup compared to all the fillers, it's biased in that way as well. So that's physical bias.

There's another general form of bias that I can describe if you would like.

Q. What's that general form?

A. So this has to do with what is referred to as double-blind procedures. Double-blind procedures, as many people probably know, has its roots in medical experimentation. But applied to a lineup, what is means is that in order for a lineup to be reliable, the police officer who is administering the lineup cannot know who the suspect is. If the police officer does know who the suspect is, the police officer is then in a position to unconsciously provide information to the witness about who they should be choosing from the lineup.

So if the lineup is not done double blind, in other

Loftus - direct

675

words, if the police officer knows who the suspect is, and the witness positively identifies the suspect, you can't tell whether the identification was based wholly on what's fundamentally important, namely the strong match between the witness's memory of the offender and the appearance of the identified suspect, or whether it's due to any unconscious, subtle, inadvertent information about who the suspect is provided to the witness by the police officer.

Q. So let's first start with a police officer who is administering the lineup and they know who the suspect is in the lineup.

How -- how does it happen that them by just being present are biassing the lineup?

A. There are many ways in which that could happen. It's been known since forever that people are perfectly con- -- capable of transmitting information to other people in ways that are subtle, nonverbal, unconscious.

So in the context of a lineup, a police officer could make a subtle gesture to the suspect without even realizing it.

The witness -- the police officer could make noises of approval when the witness seems to be focusing in on the suspect and/or noises of disapproval if the witness appears to be focusing on anybody else in any of the fillers.

If the witness appears to be choosing a filler, the police officer could say something like, well, is there anybody

Loftus - direct

676

else in this lineup who might look familiar to you and so on. There are many ways in which a police officer who knows who the suspect is could inadvertently provide information to the witness about who the suspect is.

Q. Now, in terms of you mentioned inadvertent information. What are -- what does that mean?

A. I mean information -- inadvertent information in general refers to information provided by somebody to somebody else that they do without meaning to. So I've already given some illustrations in the context of a lineup of how a police officer could provide inadvertent, unconscious, nonverbal information to the witness about who they, quote, should be, closed quote, choosing from the lineup.

Q. Now, besides -- with a -- if someone chooses a person in a lineup, does that have any effect down the road?

A. It depends on whether the witness is one way or another told that they had identified the suspect.

If the witness comes to realize that they have chosen the suspect, then that will have consequences on down the road.

Q. Is there a term for those consequences in your field?

A. It's called the lineup feedback effect.

Q. What is the lineup feedback effect?

A. So it refers to results of experiments that I can briefly describe how these experiments work if you'd like.

Q. Yes, go ahead.

Loftus - direct

677

A.   So in these experiments, people view a mock crime.  So maybe a hundred students will be in a classroom attending a class and somebody will race down, snatch a purse and run out the door.  This is a staged crime, but these students don't realize at the time that it's a staged crime.  From their perspective, it's real.

The -- all the witnesses -- and in my example a hundred of them -- are shown a lineup.  And the important thing is in the kinds of experiments I have in mind, the actual perpetrator of the crime is never in the lineup.  So they're shown six people, none of whom was the person that they all saw racing down and stealing the purse.

So in this case, maybe half the students, maybe 50, will not make an identification, but the other half, the other 50, will make an identification.  They choose somebody falsely because the actual perpetrator wasn't part of the lineup.

Of these 50, they are now randomly divided into two groups.  One of the groups is told that they falsely, that they chose the suspect, whoever they chose.  The other group is given no information.

The finding is that those people who are told that they correctly identified the suspect have -- there are two things that happen.

First of all, unsurprisingly, they later on are more confident that the person they chose was the actual person they

Loftus - direct

678

saw commit the crime.

Somewhat more subtly and surprisingly, they come to remember the circumstances for how they -- during which they saw the crime as being more conducive to be able to accurately remember what the criminal looked like. They remember themselves as having more time. They remember themselves as having paid more attention to what the criminal looked like. They remember themselves as -- they remember there being better lighting and so on.

So the explanation for this is if the witness is told that they made the right decision, then they will rehearse their memory of the person they chose in such a way that they'll strengthen their memory of that person that they, as it turns out, falsely identified as the person they saw commit the crime.

Once they have this strong memory of the person they saw commit the crime, their brain has to sort of justify how they got that strong memory. So their brain will readjust the circumstances or their memory of the circumstances under which they saw the person so that it does become more conducive for having memorized them to begin with. They remember themselves as having more time, as having paid more attention, as having had the person's face in their field of view longer and so on.

THE COURT: Before you ask the next question, we're going to take our lunch break now. We'll come back at

679

1:05 p.m.

So, ladies and gentlemen, enjoy your lunch.

All rise.

(Jury out at 12:00 p.m.)

THE COURT: All right.

Dr. Loftus, you may step down. Please come back a few minutes before 1:05.

THE WITNESS: 1:05 you're starting?

THE COURT: Yeah.

THE WITNESS: Okay. Thank you.

THE COURT: For the parties, I've asked my courtroom deputy to respond to the e-mail from the missing juror by stating: Thank you for the e-mail, Ms. Wach. Judge Daniel excused you from the jury and asked that you provide any documentation concerning your illness.

It remains to be seen whether I received anything, but if I do, I will share it with you.

Any issues for me to address before we break?

MR. S. RICHARDS: Not on behalf of plaintiff.

MR. ENGQUIST: No, Your Honor.

MR. MILLER: No, Your Honor.

THE COURT: All right. I'll see you back a few minutes before 1:05 so that we can get started at 1:05.

Thank you.

MR. J. RICHARDS: Thank you, Your Honor.

680

MR. S. RICHARDS:  Thank you, Judge.

MR. MILLER:  Thank you, Judge.

(Recess at 12:01 p.m., until 1:05 p.m.)

(Change of reporters.)

681

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                        )  Case No. 22 C 3973
                                   )
                  Plaintiff,       )
                                   )
-vs-                               )
                                   )
REYNALDO GUEVARA; MICHAEL          )
MASON; and JoANN HALVORSEN,        )
as Special Representative of       )
ERNEST HALVORSEN, Deceased,        )  Chicago, Illinois
                                   )  February 5, 2026
                  Defendant.       )  1:05 p.m.


            TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
           BEFORE THE HONORABLE JEREMY C. DANIEL


APPEARANCES:


For the Plaintiff:      LAW OFFICE OF STEPHEN L. RICHARDS
                        BY:  MR. STEPHEN L. RICHARDS
                             MR. JOSHUA S. RICHARDS
                        53 West Jackson Boulevard, Suite 205
                        Chicago, Illinois  60604


For Defendant           BORKAN & SCAHILL, LTD.
Guevara:                BY:  MR. TIMOTHY P. SCAHILL
                             MR. GRAHAM P. MILLER
                        20 South Clark Street, Suite 1700
                        Chicago, Illinois  60602


For Defendants          THE SOTOS LAW FIRM, P.C.
Mason and               BY:  MR. JOSEPH M. POLICK
Halvorsen:                   MR. JOSH MICHAEL ENGQUIST
                             MR. JEFFREY ROBERT KIVETZ
                             MS. CAROLINE P. GOLDEN
                        141 West Jackson Boulevard, Suite 1240A
                        Chicago, Illinois  60604

682

APPEARANCES (Cont'd):


Court Reporter:              CHARLES R. ZANDI, CSR, RPR, FCRR
                            JOSEPH RICKHOFF, CSR, RMR, CRR
                            Official Court Reporter
                            219 S. Dearborn Street, Room 1426
                            Chicago, Illinois  60604
                            Telephone:  (312) 435-5387
                            charles_zandi@ilnd.uscourts.gov

                        *   *   *   *   *

                PROCEEDINGS REPORTED BY STENOTYPE
      TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

Loftus - direct

683

(Proceedings heard in open court:)

THE COURT:  Are we ready to bring in the jury and continue?

MR. SCAHILL:  Yes.

THE COURT:  You can bring them in.

(Jury in at 1:06 p.m.)

THE COURT:  Please take your seats.

Mr. Richards, you may continue.

Dr. Loftus, I remind you you're under oath.

THE WITNESS:  Okay.

GEOFFREY LOFTUS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION (Resumed)

BY MR. J. RICHARDS:

Q.  Good afternoon.

A.  Good afternoon.

Q.  So, we left off talking about double-blind procedures and the lineup feedback effect.  I want to circle back and ask you about -- you talked about lineups.  You talked about showups. In your field, what does it mean for a double identification?

A.  So, a double identification refers to a form of bias in which the witness is looking at a lineup, either a physical lineup or a photo lineup, in which they have demonstrably seen the suspect before.  They've seen him in a different identification procedure, they've seen him -- they've seen a picture of him.  One way or another, it's known that the

Loftus - direct

684

witness has seen the suspect in some context other than the crime, presumably subsequent to the crime.

So, in that situation, the suspect will look familiar to the witness by virtue of the witness having seen him before. And if the witness then possibly identifies the suspect, you can't rule out the possibility that the identification was made not based on a match between the witness' memory of the offender and the suspect's appearance, but rather on a match between the suspect himself from whatever previous time the witness saw him or his picture and the suspect's appearance in the identification procedure.

Q. How does double identifications work in the context of the green path and the red path on your chart?

A. Well, it would be a form of post identifi- -- post-event identification in the sense that if the witness sees the suspect at some point, the witness can use the suspect's appearance as a means of reconstructing his memory of what the offender looked like. If the witness then sees the suspect subsequently in another identification procedure, the witness may well have a strong memory of the suspect as the offender. But unbeknownst to the witness, that isn't a memory that was constructed at the time that the crime was taking place. Rather, it was constructed at the time that the witness saw the suspect previously.

Q. Now, if -- can lineup bias in any form, either lack of

Loftus - direct

685

double-blind procedures or a double identification, can that happen simultaneously with the lineup feedback effect? Can both instances occur?

A. Well, certainly both instances can occur, but they generally occur sequentially. In other words, the witness would make an identification from a lineup, biased or not, and then the lineup -- then one way or another, the witness would learn, either explicitly or inadvertently, that they had picked the suspect from the lineup, which would trigger the lineup feedback effect.

Q. So, I want to -- earlier before the lunch break, we talked about at least two experiments. There was the gorilla experiment -- there was the gorilla experiment and also the opaque door experiment. In terms of -- and both of those experiments were done at universities, correct?

A. Correct.

Q. Now, I want to move next to studies in terms of lineups. Have there been any studies of lineups in the field that have been done?

A. Yeah. I mean, I described one in the context of the lineup, feedback effect experiment. But there have been others of various sorts, yeah.

Q. Have there been any investigations into double blind versus non-double-blind lineups in terms of any study -- field studies?

Loftus - direct

686

A.   Well, yeah.  There was a lineup done here in the State of Illinois about, I don't know, 20 years ago mandated by the Illinois state legislature.  And I can briefly describe this experiment if you like.

Q.   Sure.  Go ahead.

A.   So, in this experiment, there were about 500-ish, 550 maybe, lineups -- real-life lineups -- from three cities in Illinois.  I believe they were Peoria, Chicago, and Evanston.  So, the way it worked is that half of these lineups were done double blind, and the other half were done not double blind.  In other words, in the standard, traditional way.

What was found is that in the non-double-blind procedures, in other words, in the traditional procedures, there was about a 30 percent increase in identifications of the suspect compared to non-double-blind procedures, which indicates that in a non-double-blind procedure, there was something going on that caused the witness to identify the suspect more than if the police officer did not know who the suspect was, which suggests that, at least in these lineups that were part of the experiment, the police officers, when they knew who the suspect was, were doing something that significantly increased the chances that the witness would identify the suspect in the lineup.

Q.   So, in terms of scientific reliability in your field, overall, what would you say is the difference between reliable

Loftus - direct

687

identification versus unreliable as understood in the field?

A. I'm sorry, I don't understand the question.

Q. What are the main differences overall in the field when it comes down to a reliable identification versus an unreliable identification?

A. Main differences in terms of what? I mean, the only answer I can think of to that question is if in a real-life situation is the identification is unreliable. Then it should be given commensurately little weight in an evaluation of whether the identified person is guilty or innocent.

Q. So, I'd like to move to the red route, the post-event information. In terms of studies, how is post-event information studied in experimentation?

A. Well, in the most general sense, a witness experiences something. Something significant. Then after the witness experiences this event, either post-event information is provided of some sort -- typically, false post-event information -- in a experimental group, and in a control group, no such post-event information is provided. And, then, the analysis is the degree to which the post-event information is accepted and leads to false memories on the part of the witness.

Q. So, are you aware of any specific studies that have been done in regards to this?

A. Many, yeah.

Loftus - direct

688

Q.   Do you have -- do any come to your mind?

A.   Many.  I can give you an example of one if you like.

Q.   Sure.

A.   So, I'll describe one, just because it's sort of interesting, that was unusual in the sense that it was done in the context of a very high-stress situation.

Earlier, when I was talking about stress, I mentioned that it's normally unethical to put subjects in experiments under conditions of very high stress.  You just can't do that.  But there's some exceptions.  And one of the exceptions is military recruits who are being deliberately put under very high-stress situations to prepare for unpleasant events that they might experience, like being taken prisoner of war and tortured.

So, there was -- there have been a couple of experiments, actually, that have been done back in Connecticut with Naval recruits who were undergoing just this kind of training.  So, I'll describe one of them in answer to your question.

So, in this experiment, a number of recruits, many recruits, as was mandated by the training procedure, underwent an extremely stressful interview with an interviewer.  This interview took about a half hour.  The witness was required to look at the interviewer during the time they were being -- I should call this guy actually an interrogator.

Loftus - direct

689

The witness -- the recruits were required to look at the interrogator during the interrogation. And the interrogation was extremely unpleasant. The recruits were abused in both physical and verbal ways and by any measure of stress. It was an extremely highly stressful situation.

So, after they -- subjects had undergone -- recruits had undergone this extremely stressful interrogation, they were shown in one case nothing. That was the control group. And the other group, the other half of the subjects, were shown a picture of a guy who was not their interrogator, but questions were asked that suggested that the guy was the interrogator.

So, the subjects in this group would be shown a picture of this guy and asked things like, did he give you a -- did he offer you water during the interrogation? Stuff like that. So, post-event information had very strongly suggested that the person whose picture they were looking at was -- had been their interrogator.

Then everybody underwent a lineup in which not the interrogator, but the guy whose picture had been shown to the experimental subjects was part of the lineup. So, the people who had been shown the picture -- in other words, there had been provided post-event information -- falsely identified the guy as having been their interrogator with something like 90 percent probability, whereas people in the control group who hadn't been shown the guy's picture identified this guy with

Loftus - direct

690

maybe only a 15 percent probability, or something like that.

So, what this demonstrates is that following this extremely stressful situation in which the recruits had been in contact with their interrogator for a half hour, nevertheless, when they were provided false post-event information in the form of a picture of somebody who had not been their interrogator, they falsely identified that guy as having been their interrogator with a very high probability.

Q. So, I want to touch on something that I don't think we've touched on today yet, which is what you just mentioned, which is a control group. What's the importance of having a control group in a study?

A. So, typically, you have a control group to make sure that whatever effect you observe as a result of whatever experimental manipulation you've had in the experiment is effective. So, let's imagine that we hadn't had the -- that there hadn't been the control group in the experiment that I just mentioned. Let's suppose that everybody was shown the picture of the guy who hadn't been the interrogator, and suppose that 90 percent of all the people identified falsely this guy as having been their interrogator and that was that. Well, it would be impossible to tell whether their strong inclination to falsely identify the guy was due to the picture they had seen or due to something else. Maybe the guy who looked more like their actual experimenter than everybody else

Loftus - direct

691

in the lineup or something like that.

So, having a control group of the sort that I described in this experiment has always been a fundamental part of scientific research. It allows you to make unambiguous conclusions about the effect of whatever it is that you're trying to study.

Q. Is post-event information limited to what you described in that experiment showing a different photo or are there other types of post-event information?

A. As I mentioned earlier in response to a similar question, post-event information can be any kind of information. Anything that can be information can also be post-event information. So, you know, in general, talking about an event with friends or police officers, seeing the event depicted on media, all of those can be -- are examples of forms of post-event information.

Q. In terms of in this field of memory, what do the terms "confidence" and "accuracy" mean in this field?

A. Right. So, I've already touched on those terms. Accuracy means just what you think it means. It refers to the degree to which somebody's memory corresponds to what actually happened in the event. Confidence is the degree to which a person -- a witness describing some memory is certain that the memory that they're describing is accurate.

Q. So, in terms of -- in the field, is it logical to say high

Loftus - direct

692

confidence means high accuracy?

A.   In general, the way in normal, everyday life, high confidence is associated with high accuracy in general.  The higher a witness' confidence in some memory, the more accurate that memory is likely to be.

But what we've found in many, many experiments is that there are circumstances under which that relation between confidence and accuracy breaks down.  This breakdown of the normal relation between confidence and accuracy typically involves two ingredients.  And I've illustrated both ingredients in that diagram, wherever it is, that I drew.

The first ingredient is that the witness has relatively little, presumably, accurate conscious experience information that they got.  The second ingredient that the witness, for whatever reason, acquires a lot of post-event information.  So, the memory winds up being like the memory that I depicted in my diagram, one that has a lot of information in it, but a memory in which most of the information is post-event information that is of dubious accuracy.

What this means is the witness may recount this memory with a great deal of confidence because there's a lot of information in the memory.  But as I have said, unbeknownst to the witness, this post-event information may be accurate or it may be inaccurate.  So, the witness' accuracy in their

recounting of this confidently expressed memory depends entirely on the accuracy of the post-event information. Could be accurate, could be inaccurate.

So, in other words, it's under these circumstances that high confidence on the part of the witness doesn't necessarily mean that they're accurate. It just means that they have a lot of information about the event in their memory, but that information may be accurate or may be not.

MR. J. RICHARDS: Your Honor, may I have a moment?

THE COURT: Yes.

(Counsel conferring.)

MR. J. RICHARDS: I tender.

THE COURT: Cross.

MR. MILLER: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. MILLER:

Q. Good afternoon, Dr. Loftus.

A. Good afternoon.

Q. My name is Graham Miller. I'm going to have a few follow-up questions for you.

A. Okay.

Q. You were saying -- you were asked some questions about identification procedures and lineups and the role of perception and memory with respect to those, right?

A. Correct.

Loftus - cross

694

Q.   It sounded like you also said that these principles of perception and memory that apply to identification procedures apply in general when folks are trying to recollect events, the details of events.  Is that true?

A.   Sure.  What I did was to describe how memory works in general to all people under all situations.  Because of the nature of the case, we've been talking mostly about in the context of a witness viewing somebody commit a crime.

Q.   Okay.  And I think you said -- well, you've been retained by attorneys to testify in criminal and civil cases for about 40 years; is that right?

A.   Correct.

Q.   Okay.  And I think -- well, you wrote a report for this case, right, to explain your opinions?

A.   I did.

Q.   Okay.  And I think in that report, you said you've testified in maybe 500 cases?

A.   Yeah.

Q.   Okay.  And 90 to 95 percent of those would actually be criminal cases, right?

A.   Correct.

Q.   Okay.  So, we're talking about like 450, 475?

A.   At least, yeah.

Q.   Yeah, okay.  And, then, you said you had testified for the prosecution one time --

Loftus - cross

A.   Once, exactly.

Q.   -- out of those 475 at least cases?

A.   Yep.

Q.   Okay.  And, in fact, you tendered to us prior to this a case list where you -- because you keep track of the cases that you've testified in?

A.   I do.

Q.   Okay.  And I will represent to you while I was looking at that, I found about 86 cases that you were retained on just in Cook County itself.  Does that sound right to you?

A.   Yes.  That's reasonable.  I mean -- I'm sorry, they're not cases in which I testified.

Q.   Right.

A.   Just cases in which I worked in Cook County.

Q.   Okay.  Right.  You -- a good portion of those you may have testified in, but those are just cases that you've been retained to render opinions about identification procedures or perception and memory, right?

A.   Correct.

Q.   Okay.  And of those 86 cases, you've never testified on behalf of anybody but a criminal defendant or a former criminal defendant; is that correct?

A.   In Cook County, correct, yeah.

Q.   Right.  And when you're doing that, when you're testifying for criminal defendants or formal criminal defendants, it's

Loftus - cross

basically almost exclusively offering the opinion that eyewitness memory may not be accurate or reliable, right?

A.  Well, not to nitpick, but what I think I normally try to do, as I've done here, is to describe how memory works and describe the circumstances under which memory tends to be inaccurate and circumstances under which high confidence on a witness's part doesn't necessarily mean that the witness is accurate.

Q.  Okay.  But the criminal defense attorneys are not hiring you to say that the witness' identification of their client was accurate, are they?

A.  Typically not, no.

Q.  Typically not.  Okay.

A.  There have been circumstances under which they have, but it's rare.

Q.  Right.  In fact, was that the case when you are generally testifying for a civil defendant or a prosecution?  Is it that circumstance?

A.  Well, it's that circumstance.  It's also circumstances under which, for whatever reason, a witness makes a strong identification but it is the opinion -- it's the part of the defense case that the actual perpetrator was somebody else --

Q.  Right.

A.  -- other than the person who is identified.

Q.  In other words, out of the nearly or perhaps more than 500

Loftus - cross

cases that you've ever testified in, you've never been testifying to bolster the identification of a criminal defendant or a plaintiff, right?

A.   In a very few cases, I have, for whatever reason.  But those are definitely the exception rather than the rule.

Q.   Right.  And you said the reason for that is because you continue to be approached by criminal defense counsel, right?

A.   That's true.

Q.   Yeah.  And probably after the first, I don't know, 20, 50, a hundred times that you testified that eyewitness identifications may not be accurate, maybe that's the reason that they kept coming back to you, right?

A.   Could be.

Q.   Yeah.  Okay.  So, sort of, if I could -- I mean, I suppose that the overall, I guess, thrust of what you've testified to today is that confident identifications by an eyewitness may not be accurate or reliable, right?

A.   Well, I think that's one of the take-home messages, yeah.

Q.   And, then, you kind of talked --

A.   I'm sorry, if I could just --

Q.   Sure.  Go ahead.

A.   More specifically, the circumstances that lead to a situation in which high confidence doesn't necessarily correspond to high accuracy.

Q.   Right.  So, what you're saying is there may be a confident

Loftus - cross

698

identification made by a particular eyewitness, but there are certain circumstances that you've testified about where maybe you shouldn't be so quick to believe that particular eyewitness, right?

A.   That would be a way of putting it --

Q.   Okay.

A.   -- yeah.

Q.   So, if you do have a confident eyewitness, whether it's identification or just trying to remember an event or something like that, there's two possibilities, right?  One is that he or she does, in fact, remember the events as they occurred or the person as they appeared, and the other is that there has been some sort of circumstances that have made them confident, but it's, in fact, nevertheless inaccurate or unreliable memory, right?

A.   Yeah.  I mean, the way I would characterize it is either their conscious experience information was sufficiently complete that they were able to make an identification based on it, or that it wasn't complete, but it was supplemented by post-event information perhaps in conjunction with some sort of biased identification procedure.

Q.   Yeah.  And I suppose then what I want to ask you is, there are these circumstances where a witness's memory may be complete or accurate or reliable, right?

A.   Totally.  Absolutely.

Loftus - cross

Q.   It does exist out there?

A.   Sure.

Q.   You've never testified to it, but it does exist?

A.   I have, but on rare occasions.

Q.   Very rare?

A.   Yeah.

Q.   Okay.  So, the circumstances that you were talking about, they're sort of -- I think you described them as factors or you were asked about the factors, right?  You have encoding factors, which is the conscious experience itself, correct?

A.   Correct.

Q.   Okay.  And, then, the ultimate memory may also be influenced by post-event information that may come in through -- you testified to a couple of ways.  I think double identification if it's -- if we're talking about identification procedures, it's double identification or a lack of a double blind --

A.   Well, whether an identification procedure is biased or not, any identification of a witness -- sorry, of a suspect by a witness can act as a form of post-event information.

Q.   Right.  And we'll circle back to that.  Let me talk about the encoding factors that you spoke about first.

A.   Sure.

Q.   And you talked about lighting, for example, stress, attention, and duration of the event that the person is trying

Loftus - cross

to remember, correct?

A.   I did.

Q.   Okay.  And those aren't -- in your field, at least -- well, those aren't really quantifiable, right?  I mean, there's no set duration that -- for example, if you're wondering whether a person's memory of another person's appearance, there's not a set amount of time that they would need to see them?

A.   No, it's not a magic step function.  It's just that the more time you have, the better your memory --

Q.   Right.  It's --

A.   -- is going to be.

Q.   And it's kind of --

        THE COURT REPORTER:  Counsel, one at a time, please.

        MR. MILLER:  Oh, I'm sorry.

BY MR. MILLER:

Q.   The same -- is it the same with lighting?  You can't tell us a certain number where -- how is lighting measured?

A.   Actually, you can.

Q.   Okay.

A.   There's a specific lighting level measured objectively.

Q.   And what is the lighting level?

A.   You know, I can't remember.  There's so many weird measures of lighting that I can't remember exactly which of those measures is used or what the level is that requires use of -- that causes you to use your scotopic system as opposed to your

Loftus - cross

701

photopic system.

Q.   Okay.

A.   But there is such a level for normal humans.

Q.   So, you talked about the scotopic and the photopic system. There's another system in there, isn't there?

A.   I'm sorry, what are you referring to?

Q.   I think it's something in between.  Mesopic system?

A.   Yes, right.

Q.   That's -- you have your photopic.  That's very bright and detailed.  That's what's used in very bright circumstances, right?

A.   Photopic, correct.

Q.   And scotopic, which you were talking about when it's dark and you can't get a very -- you can't see color and you don't get a very detailed --

A.   Correct.

Q.   Right?

     And, then, there's the one in the middle, the mesopic or --

A.   Yeah.

Q.   Yeah.

A.   Which is -- rarely seems to -- it's sort of a transition stage that occurs typically when you start off using your photopic system and then you make your way into a situation of poor lighting.

Loftus - cross

Q.   And I wanted to ask you because you were speaking a lot about streetlights and the ability of people to see in streetlights.  First of all, you're not a lighting engineer, are you?

A.   Well, I'm not, but I've studied visual perception for the last 60 years, and you have to know about optics and light to be able to do that.

Q.   Okay.  Yet you can't tell us the level of light that you need in order to remember somebody's appearance?

A.   Oh, you mean the amount of light that requires you to use your scotopic system?

Q.   Correct.

A.   No.  I'm sorry, I don't remember that right now.

Q.   Okay.  Do you have any certifications or degrees in optics or photometry or illumination science, anything like that?

A.   No.

Q.   Okay.  And have you ever been part of any -- have you ever had any publications in those areas?

A.   Yes.

Q.   What publications did you have?

A.   So, I've had at least one publication on effects of contrast level on memory.  I can dig out that publication if you want.

Q.   Was streetlights mentioned in there?

A.   No streetlights.

Loftus - cross

703

Q.   Okay.

THE COURT REPORTER:   Sorry, say again.

BY THE WITNESS:

A.   No streetlights.  Sorry, that was just manipulating illumination in the laboratory.

BY MR. MILLER:

Q.   Is it your testimony that this scotopic system is what's used when streetlights are the source of illumination?

A.   So, when there's streetlights, part of the world will be lit up by streetlights and part of the world will be in shadow. And assuming you're close enough to the streetlight, whatever is illuminated by it will be available to your photopic system. Whatever is in shadow will not be available to your photopic system.  It will be processed by your scotopic system.

Q.   So, if an object or a person or an event occurs underneath the streetlight, you're still using your photopic system and you're going to see color --

A.   Yes, assuming --

Q.   -- and you're going to get detail?

A.   Right, assuming that what is going to be important is being illuminated by the streetlight.

Q.   Okay.  In that case, there's no reason to question somebody's identification based on poor lighting?

A.   Well, under the circumstances that you described, assuming that they are -- have plenty of time to see the -- let's say a

Loftus - cross

704

person's appearance using their photopic system because they're close enough to a streetlight and the streetlight is illuminating their face.  Assuming all of that is true, then, correct, lighting would not be a limiting factor in terms of the witness's ability to accurately perceive and memorize whoever they were looking at.

Q.   And, again, you can't give us a number with respect to duration.  So, several seconds while everybody was underneath the lights or the event occurred underneath the lights, that would be sufficient in order to -- assuming you were paying attention?

A.   Assuming you're paying attention and assuming that you're not under such high stress that you wouldn't be remembering --

Q.   Right.

A.   -- anything.

Q.   Okay.  Before we move on to attention, there's also other factors that may, in fact, make a later identification more accurate or reliable, correct?

A.   Well, there are other factors that if they were absent, they would become limiting factors in terms of an ability to perceive and memorize what somebody looks like.  If somebody, for example, were very far away, then distance would become a limiting factor in terms of the witness's ability to accurately perceive and memorize what the persons look like.  If the person is close up, then distance wouldn't be a limiting

Loftus - cross

factor.

Q. Okay. So, if distance is close up, that's, in fact, something that would support or that at least you wouldn't question or wouldn't be a reason to question a later memory or a later identification, right?

A. Yes. Thank you. That's the way I'd put it.

Q. And what is that distance at least in terms of --

A. Roughly -- well, if you're using your photopic system, it would be around 50 or 60 feet where distance starts to make a difference. If you were using your scotopic system, it would be around 20, 25 feet.

Q. Okay. So, even if you're using your scotopic system, 20, 25 -- anything less than 20, 25 feet distance isn't going to be a problem, right?

A. Correct.

Q. And the closer -- I assume the closer you get, the more -- the easier it is to encode that memory and the more likely it is that your memory will be accurate when you try to remember later on --

A. Yeah.

Q. -- after --

A. I mean, less is the chance that distance will be a limiting factor, correct.

Q. Okay. And if it's -- if you're using your photopic system, it's even as far out as 60 feet; is that true?

Loftus - cross

706

A. Correct.

Q. Okay. And if you're talking about 30, 15, 10, 5 feet, that's even better and better and better, right?

A. Yes.

Q. Okay. There's some other factors out there. The person's age plays a role, does it not? The witness's?

A. Yes. I regret to say that --

Q. Right.

A. -- as you get old, you get more decrepit in terms of your ability to do just about anything.

Q. Yeah. So, somebody, you know, in their 20s or 30s are going to have probably better eyesight, as well as be more capable of processing the information that they're taking in --

A. Oh, yes.

Q. -- quickly, rather than somebody who may be older or too young, right?

A. Yes.

Q. Okay. These are factors that you did not bring up with Mr. Richards, correct?

THE COURT REPORTER: Sorry?

BY THE WITNESS:

A. Yes.

THE COURT: So, the issue is the court reporter can only take down one person speaking at a time. So, the exchange here is, just as that indicated, that you hear part of a

Loftus - cross

707

question and you start to answer, but you have to wait until the individual is done speaking.  So, it's kind of stunted, not quite a conversation because you have to have natural give and take as opposed to the natural flow of a conversation.  So, I ask both of you to remember to let the other person finish before answering or asking.

MR. MILLER:  Thank you, Judge.

BY MR. MILLER:

Q.  Would familiarity with a witness's surroundings, if he was familiar with the surroundings, would that have any effect on his ability to encode a memory?

A.  Well, it would make it more easy to remember the surroundings themselves that he's familiar with, sure.

Q.  It would also help in terms of attention, correct, because you wouldn't be paying attention to any -- you would be paying more attention to something new in those surroundings as opposed to trying to acclimate yourself to something you're already familiar to?

A.  So, what you're saying is that if, for example, you're trying to figure out what a reasonable escape route would be in a dangerous situation, to the degree that you're familiar with the circumstances, you'd have to spend fewer attentional resources figuring out where such an escape route might be, compared to if you're unfamiliar with the circumstances.  Is that the kind of thing you're saying?

Loftus - cross

708

Q.   Sure.  Or if somebody is walking through a neighborhood that they're very familiar with, they may not be paying attention to new things as opposed to a new person or a new car that would be coming through that.  That would take their attention, correct, rather than having to worry about the surroundings, right?

A.   Correct.

Q.   That's another factor?

THE COURT REPORTER:  Sorry?

MR. MILLER:  I'm sorry, my fault.

I'm asking him bad questions.  Let me go back.

BY MR. MILLER:

Q.   That would be another factor, correct?

A.   Yes.

Q.   So, you talked a little bit about attention as a factor that could impede on somebody's memory formation, right?

A.   I did.

Q.   Okay.  And you said that if somebody's -- I guess in two different ways.  One, if the person's goal is not to remember the thing that they're later asked to remember, that's one way that attention affects memory encoding, correct?

A.   Correct.

Q.   And the other way is if there's just multiple things going on and their attention is divided?

A.   Correct.

Loftus - cross
709

Q.   But the flip side is true, the inverse is true, as well, correct?

A.   What do you mean?

Q.   Well, so, if a person's goal is to notice, to remember, for example, someone's appearance, that is going to help them to remember that person's appearance later on, correct?

A.   Yes, absolutely.

Q.   Okay.  And if there isn't much going on otherwise during the period of time that the memory is being formed, they're only paying attention to that one thing, that, again, is going to lead to a accurate and reliable memory, right?

A.   Well, assuming the thing that you're talking about, whatever it is, is relevant to whatever goal the witness is trying to accomplish, sure.

Q.   Sure.  And, so, you described it as kind of an attentional spotlight, so to speak, right?

A.   I did.

Q.   Okay.  So, you agree that if this attentional spotlight is, in fact, shining on a person or an event or an object that they're later asked to recall, as long as it's shining on it for a sufficient duration, there's a good chance that they're going to have a better memory of that event or person or object, right?

A.   If the attentional spotlight is on something that's ultimately going to be important like somebody's appearance,

Loftus - cross

710

then yes.  The greater duration the attentional spotlight is on the appearance, the more, what I've called, conscious experience information they'll get about the person's appearance and the more reliable any eventual identification will be.

Q.  Okay.  You gave sort of an example about when something traumatic or something -- I forget the words you used, but that might draw your attention away from what you were otherwise watching.  Do you remember that?  Somebody being hit by a car?

A.  Oh, yeah, I do.

Q.  Okay.  You kind of -- when you were talking about gun focus, you said there's something shocking that might show up that may take your attention away, and therefore it would be difficult for you to remember the thing that you were initially paying attention to.  Is that what it was?

A.  I'm not sure.  I mean, I talked about weapon focus.  And I talked, in answer to one of Mr. Richards' questions -- I made up a hypothetical example involving seeing somebody from an accident.  I'm not sure if I put those two things together.

Q.  Okay.  Those were not related?

A.  I don't remember, to be honest.

Q.  Okay.  Well, in any event, weapon focus, as you talked about, is based on studies that have shown that when a weapon is present, you're not paying attention to -- people generally aren't paying attention to much else; is that true?

Loftus - cross

A.   Well, I would temper that a little bit.  I would say that when a weapon is present, people tend to pay attention to the weapon relative to a control situation in which there's some benign object like, I don't know, a checkbook or a comb, or something like that.

Q.   Okay.

A.   But to the degree that that's happening, the person isn't paying attention to other aspects of the scene such as the appearance of the person who's holding the weapon.

Q.   Okay.  So -- and I thought that's perhaps why you were making this car accident example.  Because if you see somebody hit by a car, you're not necessarily paying attention to their appearance, you're paying attention to the fact of them getting hit by the car.  Is that --

A.   Oh, oh, probably.  Yeah, I mean, I didn't say that explicitly, but you're absolutely -- I mean, it makes sense.  If somebody is a victim of a car accident, your goal isn't going to be to figure out what they look like.  Your goal is to be able to figure out how badly hurt they are.

Q.   So, in that analogy, though, if you're watching the person that ultimately got hit by the car, perhaps they were attractive or they were interesting or you thought you might know them.  If you're paying attention to their appearance for some sufficient duration prior to them being hit by a car, are you saying that them being hit by a car would erase that

Loftus - cross

712

memory?

A.   Oh, no, I'm not.  I mean, this could -- would get us into another topic.  There is a phenomenon called attentional capture, which indicates that if you have paid attention to something and then something dramatic happens, you're less likely to remember it, even if you had been paying attention to it, than if you -- than if this dramatic event hadn't happened.

Q.   Okay.

A.   It's not, you know, a particularly powerful effect or one that, you know, comes up in situations that I've dealt with much.

Q.   Right.  It's not a powerful effect and it hasn't come up in any studies or research involving identification procedures later on, has it?

A.   No.  It's come up in studies of memory, but not identification procedures or memory for faces, as far as I know.

Q.   Okay.  So, I guess what I'm asking is as long as this person who got hit by the car was observed for the sufficient amount of time and they were paying attention to their appearance before they were hit by the car, there's no reason you wouldn't expect them to be able to identify that person later on in identification procedure or some kind of memory test, right?

A.   Sure.  That almost follows logically the way you put it.

Loftus - cross

713

If you pay sufficient attention prior to this accident, yeah, they'll be able to remember.

Q.  All right.  And the last thing I think that we haven't covered as far as the encoding factors is stress, correct?

A.  Correct.

Q.  And I think actually you said it yourself, there is -- what the evidence -- or what the research shows is that when there's a very high-stress situation, it actually impairs our cognitive ability and makes it more difficult for us to encode and then later remember events or people or appearances, right?

A.  Correct.

Q.  Okay.  And the same is true if you're -- if there's not enough stress.  If you're completely relaxed, you're also not working at an optimal level, correct?

A.  Yeah.  That hasn't been studied all that much.  I guess mostly because it somehow doesn't come up much in any interesting real-life situations.

Q.  But there is some optimal level, some amount of stress that would, in fact, make it the most likely that you would encode and then be able to later accurately recall an object and event or someone's appearance; is that true?

A.  Yeah.  As is probably evident to anybody who's taken a really important exam in college or high school or law school or whatever, it's not good to be completely blissed out when you're taking this exam, completely relaxed.  Nor is it good to

Loftus - cross

be terrified.  It's good to be at an intermediate level of stress or arousal to do your best job.

Q.  Okay.  And sort of similar to attention, if someone is observing an event or a person or an object and they're not particularly stressed at that time but they later become very stressed, they're not going to forget what they encoded while they were not stressed, true?

A.  Not to my knowledge.  I mean, I don't think there's any evidence that has explicitly investigated that.  But I see no reason why that should be true.

Q.  Okay.  As far as -- so, that kind of takes care of -- this is the conscious experience section.  Is that what we were talking about here in your diagram?  These encoding factors is the conscious -- that's where they fit in?

A.  That is what we've been talking about, yeah, for the last 20 minutes or so.

Q.  And, then, you also spoke about some of the things in red, the post-event information, at least as it applies to identification procedures, right?

A.  Yes.

Q.  Okay.  And you talked about prior exposure, which double blind -- or double identification was one you talked about?

A.  Correct.

Q.  And the idea here is that if -- before the test -- the memory test that you're looking at, if there has been some

Loftus - cross

715

prior exposure, if there's been -- for example, the crime occurred and then there's a lineup, then there's another lineup all involving the same people or the same suspect. Then the second lineup wouldn't be a good test, right?

A. We're mostly talking about a situation in which the only person common to the two identification procedures is the suspect. Yeah.

Q. Right. Okay. And the whole field of perception and memory that deals with these identifications, they all agree with that, right?

A. Yes.

Q. And that what you should really be looking for -- at if you want to really -- if you want to test the actual memory of a witness is the first time they're tested on that memory, right?

A. Yeah. I mean, just to be explicit, the ideal way of doing it would be to create an unbiased lineup, unbiased in both the physical sense and unbiased in the sense that it's done double blind, and show it to the witness. That would be the most pristine way of assessing their memory of the offender and whether their memory of the offender matches the appearance of the suspect.

Q. Okay. And, then, this double-blind procedures, the idea is that there's some covert or secret information that the police officer may be passing on to the witness that affects them in picking out the suspect because the police knows who the

Loftus - cross

suspect is.  Is that the idea?

A.   Did you say secret?  I mean, no -- not necessarily secret.

But, you know, certainly unconscious, covert, non-verbal.

Q.   Okay.  And really what you're saying is -- and I think the way you wrote it in your report -- is that if it's not a double-blind procedure, you cannot rule out the possibility that an identification was made based wholly or in part on information covertly provided by the police officer; is that correct?

A.   Yeah.  Or even in some cases overtly.

Q.   Yeah.  But it's speculation, right?  It's anything is possible, they may be doing this, correct?

A.   That was -- yeah, that was speculation why -- which is why it's good to have the kind of experiment like the one done in Illinois that I described that provides pretty solid data that such influence on the part of the police officers actually happens.

Q.   This is the 2006 Illinois lineup study?

A.   It was.

Q.   Okay.  Well, you left something kind of important out about that study; did you not?

A.   I'm sorry?

Q.   You left something important out about that study; did you not?

A.   Is what?

Loftus - cross

717

Q. Well, it didn't just test whether it was double blind or non-double blind, did it? There was another variable in there?

A. There was sequential versus non-sequential --

Q. Yeah. It --

A. -- which --

Q. Go ahead.

A. -- is not really -- sequential versus non-sequential, it's been shown, doesn't really make any difference.

Q. Has it or does the research show that sequential actually leads to less identifications than non-sequential?

A. It shows that -- it shows that sequential leads to less accurate identifications and also less inaccurate identifications. So, sequential -- doing a lineup sequentially versus simultaneously affects only the degree to which a witness is prone to choose somebody from the lineup as opposed to not choosing anybody at all. And it's sort of a wash in terms of the accuracy of the identification.

Q. In this 2006 study, the sequential was tied with the double blind, correct?

A. It was, yeah.

Q. Okay. So, there was a group that saw sequential double blind, and then there was a group that saw non-sequential traditional lineups, correct?

A. Not -- so -- sorry, let me get this straight. So, yes, one group was the traditional one that showed it simultaneously and

Loftus - cross

718

not double blind.  The other group was what I referred to as the recommended procedure in which it was shown both sequentially and double blind.

At some point, there was quite a bit of investigation into sequential versus simultaneous presentation of lineup members.  And the general consensus at this point is that it doesn't really matter whether it's done sequentially or simultaneously.  It's not going to effect -- it's not a form of bias, in other words, to do a lineup simultaneously versus sequentially.  So, it's not something that anybody really pays much attention to anymore.

Q.  It's your testimony that now in 2026, that the consensus among the experts in your field believe that there's no difference between sequential and non-sequential?

A.  There's a difference in the sense that it -- as I said, showing a lineup sequentially reduces the chances that a witness will choose somebody from the lineup as opposed to choosing nobody.  But the consequence of that is that they just won't make as many identifications.  They won't make as many false identifications.  They won't make as many correct identifications.

Q.  In any event, the fact that the double blind 2006 study -- blind, double blind -- didn't just test that; that there was another variable involved.  That's a confounding variable --

A.  It is.

Q.   -- for that study, right?

A.   Yeah.

Q.   Can you explain to the jury what a confounding variable is?

A.   Sure.  A confounding variable is where you vary two things at the same time.  So, it's not -- it's not possible just looking at the data to determine whether a given effect is due to one variable in the case we're talking about, whether it's done double blind, or whether it's due to the other variable.  In this case, whether the lineup members are shown sequentially or simultaneously.

An ambiguous result of this study is that the combination of showing lineup members simultaneously and not double blind increased the number of identifications of the suspect.  So, assuming that at least some of these suspects were innocent, it increases the chances that some kind of false identification is made.

Now, as far as how to disentangle these two variables, the only way to do it is by using certain mathematical procedures, which I did.  And the conclusion from these mathematical procedures was that simultaneous versus sequential didn't do much of anything.  But showing a lineup not double blind versus double blind increased considerably the chances that the witness would be influenced to the degree that they were more likely to make an identification of the suspect.

In other words, what this mathematical analysis

Loftus - cross

demonstrated is that the increase in identifications of the suspect that came about from doing the procedure both non-double blind and sequentially came about almost exclusively from the fact that it was done double blind rather than the fact that it was done simultaneously rather than sequentially.

Q.   So, you say you've mathematically figured that out, right?

A.   Yes.

Q.   And has that result ever been replicated at doing the test, doing the research as it should have been done, with one variable?

A.   Not to my knowledge.

Q.   Okay.  So, I just want to -- if I could use --

        MR. MILLER:  Do you guys have the markers?

        THE WITNESS:  What do you need?

        MR. MILLER:  I'm sorry, did you use the markers when you marked this up?  Do you have those with you?

        THE WITNESS:  I can give you the markers I need -- I used if you want.

        MR. MILLER:  Do you have them with up there?

        THE WITNESS:  I do.

        MR. MILLER:  Could I approach, your Honor?

        THE COURT:  Yes.

BY MR. MILLER:

Q.   So, just the last thing, Dr. Loftus.  You have your event here.  That's observed, correct?

Loftus - cross

721

A.   Yes.

Q.   All right.  And, then, the conscious experience takes into account all of these limiting factors that you talked about: stress, attention, correct?  Duration?

A.   Yes.

Q.   All right.

A.   Correct.

Q.   So, if you have a circumstance where you're asking a witness to remember an event wherein that witness did not have -- was not particularly stressed or at least overstressed, right, and there was no problem with the illumination, right, during the event and the duration -- which we don't have a number on it, but let's say it was sufficient, right --

A.   Yes.

Q.   -- and the person's attentional spotlight was, in fact, focused on, for example, the person's appearance --

A.   Mm-hmm.

Q.   -- okay, in addition to maybe we're talking about a young witness, you're talking about no problem with the distance, right?

A.   Correct.

Q.   Okay.  And the -- let's say the memory test -- it's important in this field, right, to take a look at the first memory test that's given so there's no further contamination, as you talked about, with prior exposure, right?

Loftus - cross

A.   Correct.  Yeah.  The first memory test is always the most reliable.

Q.   So, we're talking about the first memory test happening before there's much, if any, post-event contamination, so to speak.  There would be no reason to think that this memory here does not accurately and reliably mirror the actual event itself; is that true?

A.   Okay.  Are you ready for my answer?

Q.   Yes.

A.   So, two things.  First of all, yes, you've described a situation in which it would be ideal for a witness to be able to remember a person's appearance.  You've described all the circumstances as being good.

     Second, yes, it's true that the first memory test is more reliable than any subsequent memory test, but that the reliability of the first test presupposes that the memory test is done in a way that is itself reliable, that it's not a showup procedure, that it's not a biased lineup procedure, and so on.

Q.   And assuming that we don't have any information about any secret covert information being passed along by the police during this initial test, okay?

A.   Because it wasn't, for example, recorded, so you have no way of assessing it.

     MR. MILLER:  That's all I have.  I'll tender.

Loftus - cross

THE COURT:  Okay.  For Mason.

CROSS-EXAMINATION

BY MR. ENGQUIST:

Q.  I don't think I have a lot, Doctor.

You were talking about the double blind and you were talking about a bias in that.  Just to be clear, when you're using the term "bias," you're not talking about the person himself conducting the test being biased when you use that term; is that right?

A.  No, not necessarily.

Q.  Because, in fact, in 1989, double-blind identifications were not the norm in the country, were they?

A.  Absolutely not.

Q.  Okay.  And in fact, I think it was 1999 is the first time there was a recommendation by any kind of national -- I think it was National Institute of Justice recommended it in 1999, using double-blind techniques?

A.  Yes, I believe you're right.

Q.  So, it wasn't -- it probably didn't get instituted around this country until starting sometime in this century?

A.  Correct.

Q.  Okay.  So, I just want to then ask you -- I know you've gone through distance and you've gone through attention and things like that.  I don't think we need to kind of rehash that too much.  But just focusing on this thing about post-event

Loftus - cross

724

contamination.

Now, memories fade over time, right?

A.   Yes.

Q.   Okay.

A.   In other words, there's normal forgetting, right.

Q.   Yeah.

A.   Sure.

Q.   I hope it's normal, but yeah.

So, memories fade over time.  When a person's memory fades over time over a series of, let's say, decades, could post- -- can post-event contamination at that point affect their memories?

A.   Absolutely.

Q.   There would be more holes in their memory at that point after maybe two or three decades, correct?

A.   Correct.

Q.   And, then, a person -- say another person could talk to that person and can contaminate that memory 30 years later, right?

A.   Yes.

Q.   And that's fairly common, isn't it?

A.   I'm sorry?

Q.   That's fairly common, isn't it?

A.   I don't know how common it is, but it can certainly happen.

MR. ENGQUIST:  I think that's all I have, your Honor.

Loftus - redirect

725

Thanks.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. J. RICHARDS:

BY MR. J. RICHARDS:

Q.  I first want to touch on you were asked questions about the mesopic, right?  The transition stage?

A.  Yeah, right.

Q.  Now, I just want to be a little clear on that.  So, mesopic is when someone's going from well lit to dim lit or dim lit to well lit?

A.  Yeah.  It's a transition phase in which there isn't -- it isn't quite dark enough for scotopic but not light enough that photopic is completely used.

Q.  This transition stage, the mesopic stage, how long does it typically last?

A.  Well, it depends on lots of circumstances.  I mean, the degree to which you're transmitting back and forth between very dim light and very bright light, how dim the dim light is, how bright the bright light is, and so on.

Q.  And the conscious experience factors -- distance, age, familiarity, duration -- I think I'm forgetting a few -- but those are -- is any one more important than the other?

A.  Well, no.  I mean, it's an apples and oranges and peaches and pears comparison.  Any one of them in general can be a

Loftus - redirect

726

limiting factor in the sense that if you don't have enough light, it doesn't matter how much time you have. If you only see it for a millisecond, it doesn't matter how much light there is. If you're not paying attention, it doesn't matter how much light you have or how much time you have, and so on.

In other words, as I tried to probably inartfully describe earlier, in order for any given instant to count as a time that you can spend memorizing, let's say, the appearance of somebody you're watching commit a crime, many things have to be simultaneously true. If any of them aren't there, it can act as a limiting factor, which would eliminate or at least severely diminish your ability to memorize anything, including the ability of a person that you're looking at.

Q. So, counsel asked you -- kept using the phrase "duration." In terms of the conscious experience factors, what's more important, duration or functional duration?

A. Well, if we're talking about ability to remember some specific aspect of the scene -- and, typically, what we're talking about here is the ability to memorize the appearance of a person who is committing a crime -- then, as I tried to emphasize, it's functional duration that's critical. Functional duration is that time when all these necessary factors are simultaneously operating.

Q. Now, counsel asked you about people's goals in terms of remembering appearance or in terms of remembering a specific

Loftus - redirect

727

fact about an instance.  In terms of that goal, how quickly is that goal changed while an event is going on or --

A.  You know, so you can shift attention, assuming that you don't know what you're going to be looking for, in about a second-and-a-half.  Apart from that, I really don't know how to quantify the amount of time that it takes to change a goal.

Q.  Now, counsel asked about sequential versus non-sequential lineups.  I'm not sure we got a definition of what the difference is between them.  How does a sequential lineup work versus a non-sequential lineup?

A.  Right.  So, there are two ways -- so, let's suppose that you have a lineup consisting of six lineup members, five fillers and one suspect.  There are two ways that you can provide these six lineup members to a witness.  The first, which is more commonly used, is to show them all at once.  So, in a physical lineup, six people come out and they stand there. In a photo lineup, there is six pictures of people on a sheet of paper.

In a sequential lineup, as the term implies, a witness only sees one lineup member at a time.  So, in a live lineup, one person would come out and then they would go back, second person would come out, and so on.  Likewise, in a sequential photo lineup, the witness would see each picture sequentially and only see one picture of one lineup member at once.

So, for a while, there was quite a to-do in our

Loftus - redirect

728

community about sequential versus simultaneous lineups in the sense that it appeared that there were fewer false identifications made with simul- -- with sequential lineups than simultaneous lineups.  So, there was a recommendation that lineups should be done sequentially.

But that turned out to be premature because what wasn't really realized is that not only did simultaneous lineups reduce the number of false identifications, it also influenced the number of correct identifications, because, as I said earlier, what simultaneous presentation does was to just lead people to make fewer identifications of anyone as opposed to saying, no, I don't recognize anybody at all in this lineup.

So, as I tried to say earlier, presenting a lineup sequential -- simultaneously isn't a form of bias like a double identification is or doing an identification not double blind. It's not a form of bias.  It's just a way of shifting around a witness's criterion for choosing somebody, as opposed to choosing nobody.  Just like, for example, giving somebody an admonition operates in the same way.  If you give somebody an admonition the person may or may not appear in the lineup, the person is less inclined to make any identification at all than if you don't give an admonition.

But none of that has to do with bias -- with bias in the lineup.  It just has to do with how inclined you are to choose somebody, as opposed to choosing no one.

Loftus - redirect

Q.   And counsel used the word "secret" or "covert" when talking about a biased lineup when the officer knows who the suspect is in the lineup.  In terms of secret or covert, is it true that it's the officer actually hiding something or is it just body language or --

A.   There are many ways in which information on the part of an officer who knows who the suspect is can convey that information to the witness.  I've never used the term "secret."  I don't exactly know what it would refer to.  But certainly, the information can be covert.  It could be unconscious.  It could be non-verbal.  All of those terms I've used, because it happens in all situations.  It's the reason for why there are double-blind procedures in medical experiments and have been forever.  Or, you know, under some circumstances it could also be overt.

Q.   Now, in terms of the -- when you have a double-blind lineup where the officer doesn't know who the suspect is, can the lineup itself in terms of the individuals being lined up, can that still be biased even if the officer conducting the lineup doesn't know who the suspect is?

A.   Sure.  As I tried to indicate before, there are many ways that a lineup has to be conducted that are necessary for making it unbiased.  And any failure of any of these ways creates a biased lineup.  It's very hard, quite frankly, to produce an unbiased lineup.  I know because I've done it.

Loftus - redirect

730

And to answer your question directly, a lineup can be done double blind, but there could also be physical forms of bias of the sort I mentioned. The lineup could be done following a previous viewing of the suspect by the witness, what I call the double identification, and so on.

Q. The -- you talked about using a mathematical procedure for the statistics involving the Illinois study. Were the statistics that were used, were those accepted in the field as appropriate math to use to get the information?

A. Yeah. I created a mathematical model that was a form of a mathematical model that had been used by other people, and it was perfectly accepted in the field.

MR. J. RICHARDS: Your Honor, may I have a moment?

THE COURT: Yes.

(Counsel conferring.)

BY MR. J. RICHARDS:

Q. Counsel asked you about, basically, a perfect scenario with a conscious experience. If everything lines up and everything's perfect. Do you recall those questioning -- those lines of questions?

A. Yes.

Q. So, in a perfect scenario like that, is it still possible for post-event information to create some contamination?

A. I mean, realistically, yes. When you talk about a perfect scenario, it's -- you know, it would be a real stretch to say

Loftus - redirect

731

that under normal circumstances a witness could memorize every tiny feature of what somebody looked like.  So, to the degree that any actual feature of a person is missing for whatever reason, then post-event information could come along and serve to modify that feature.

So, you know, in a platonic ideal where a person memorizes every single detail of a person's appearance, where they have what literally amounts to a photograph of a person's appearance, then, no, it wouldn't be possible for post-event information to change that.

Q.   Counsel asked you about a first memory test, and I just want to sort of clarify what that is.  What is considered a first memory test?

A.   Well, it's just what it sounds like.  In this kind of a situation, if you see somebody -- if a witness sees somebody commit a crime, then ideally you undergo some identification procedure, the memory test prior to when the witness has had an opportunity to integrate any post-event information into their memory.  That is impossible.  You can start integrating post-event information into your memory immediately.  But the first test you have is, assuming it's unbiased in all -- and reliable in all otherwise -- in all other ways, the best test you can have, the most reliable.

Q.   And in terms of -- let me ask you this question:  In terms of a memory test, does a witness giving a description, a

description of the event to someone, the first time they do that, the first time they give that description, is that considered a memory test or no?

A.   Sure.  It would be a memory test.  I mean, descriptions are highly variable in their quality in the sense that some people are very good at describing what faces look like and other people are terrible.

Q.   And in terms of a memory test being contaminated, that could be by any number of things.  For example, showing photographs of a suspect or potential suspects to the witness before a unbiased lineup, fair?

A.   Well, if you just show a showup -- if you just show a single picture, it's a showup procedure, which I've already described as being intrinsically unreliable.

        MR. J. RICHARDS:  One more moment, your Honor, if I may.

        THE COURT:  Okay.

    (Counsel conferring.)

BY MR. J. RICHARDS:

Q.   And you mentioned the intrinsic reliability or unreliability.  And how, again, is that related to the confidence that the witness expresses in terms of their memory?

A.   They're kind of two different things.  Any identification procedure can be unreliable for any of the many ways that I've described.  But one feature of any identification procedure is

Loftus - redirect

733

that the witness is able to use the appearance of the person they've identified in the identification procedure as a form of post-event information based on which they can reconstruct their memory of the original offender.

So, even if they go into the identification procedure with a hazy, sketchy memory of what the actual offender looked like that they got there via their conscious experience root, they could emerge from the identification with a much stronger memory of the suspect they've identified as the person they saw commit the crime.

MR. J. RICHARDS: Nothing further.

THE COURT: Recross?

MR. MILLER: I don't have anything based on that, your Honor.

THE COURT: Mr. Engquist?

MR. ENGQUIST: Me either.

THE COURT: Dr. Loftus, you may step down. You're done.

THE WITNESS: Thank you, your Honor.

(Witness excused.)

THE COURT: Who will be the plaintiff's next witness?

MR. S. RICHARDS: Defendant Mason.

THE COURT: Okay.

MR. S. RICHARDS: Your Honor, brief sidebar?

THE COURT: Okay. Let me swear the witness in.

Mason - direct

734

(Witness sworn.)

THE COURT:  We will go to sidebar.

(Proceedings heard at sidebar:)

THE COURT:  Okay.

MR. S. RICHARDS:  I just want to make --

THE COURT:  Microphone, please.

MR. S. RICHARDS:  Under Rule 611(c)(2), I would ask permission to use leading questions.

THE COURT:  Any objections to treating this witness as an adverse witness?

MR. POLICK:  No, your Honor.

THE COURT:  Okay.

(Proceedings heard in open court:)

MICHAEL MASON, DEFENDANT HEREIN, SWORN

DIRECT EXAMINATION

BY MR. S. RICHARDS:

Q.  Detective Mason, could you please state your first and your last name, spelling each one for the court reporter.

A.  Michael, M-i-c-h-a-e-l, Mason, M-a-s-o-n.

Q.  Detective Mason, how old are you?

A.  74.

Q.  And, Detective Mason, approximately how tall are you?

A.  Six-one.

Q.  And approximately how much do you weigh?

A.  230.

Mason - direct

735

Q.   And back in 1989, I assume you had the same height?

A.   I believe so.

Q.   And what was your weight back in 1989, if you recall?

A.   A little thinner, maybe 215, like that.

Q.   Okay.  As of July 20 -- I'm sorry, June 29th, 1989, how long had you been a Chicago police officer?

A.   16 years.

Q.   And how long had you been a detective as of that date in 1989?

A.   Two years.

Q.   So, let me ask you some questions -- because I reviewed your prior deposition testimony, some things occurred to me.

     Let me first talk to you about the relationship between the gang specialists and the detectives.  I have some questions about that.  Is that okay?

A.   Sure.

Q.   So, first of all, what's the difference between -- or back then, 1989, what was the difference between a gang specialist and a detective?

A.   Well, a detective is responsible for investigating crimes.

     Gang crime specialist, at the time, primarily worked on the street in areas that were kind of plagued with gang activity.  And my understanding -- I've never been one.  My understanding is they were to develop information about who was in the gang and what the gang was up to.

Mason - direct

736

Q.   Now, you were assigned -- back in 1989, you were assigned to Area 5, correct?

A.   Yes, sir.

Q.   And that would be the area -- what's the proper title?  Is it Area 5 Violent Crimes?

A.   It's the unit I was assigned to, yes.

Q.   How many detectives in the unit approximately?

A.   I don't know that I can answer that.  40.  Something like that.

Q.   Now, the detectives who worked in the unit, did you work in shifts?

A.   Yes.

Q.   And was there sort of a midnight -- what were the shifts?

A.   Well, they're -- in police jargon, they're called the first watch, second watch, and third watch.  First watch is midnights, second watch is days, and the third watch is afternoons.

Q.   On June 27th of 1989, what watch were you assigned to?

A.   I believe I was working the second, day shift.

Q.   And did you know Detectives Johnston and Boris?

A.   Yes, I knew them.

Q.   On that date, July -- well, on the date of July 28th, 1989, what shift were they working?

A.   You're referring to June?

Q.   I'm sorry, June.  My mistake.  And thanks for correcting

Mason - direct

me.

A.   They would have been the midnight detectives.

Q.   With respect to assignment of cases to detectives, what was the structure of that?  Was there a lead detective who would be controlling the case or did you all just work as you came in for shifts?

A.   No, there's no lead detective per se.  The assignments were handled by the supervisors.  They would -- on that particular day, I came in and my supervisor told me I was working on this case.

Q.   Who was your supervisor?

A.   I believe it was Sergeant Murray.

Q.   Now, this -- Area 5, that's 555 West Grand, correct?

A.   It's 5555 West Grand.

Q.   Okay.  Where were the -- was there a unit of gang specialists assigned to Area 5, that area -- that police station, or were they assigned someplace else?

A.   No, they were not assigned there.  They were assigned at 2452 West Belmont.

Q.   Which would be the 14th District?

A.   No.  That's Area 6 headquarters.

Q.   Okay.  And do you know how many gang specialists were assigned to that headquarters?

A.   I have no idea.

Q.   Before June 27th of 1989, had you known Gang Specialist

Mason - direct

738

Guevara -- Reynaldo Guevara?

A.   I had met him before, but I don't know -- you know, I saw him around and I've met him, but I didn't really know him.

Q.   Okay.  Can you describe him?  Do you have a memory of him?

A.   Yeah.  Let's see.  In 1989, he was probably -- he's probably like in his 40s -- a male in his 40s, not as tall as I am, sort of stocky.

Q.   Wore glasses?

A.   I think he did at times.  I don't know if he always wore glasses.

Q.   Was there anything unusual about his clothing?  Did he wear rings or jewelry?

A.   I never paid attention to that.

Q.   Now, you said you got your assignment on the case from sergeant -- I'm sorry, was it Sergeant or Lieutenant Murray?

A.   Sergeant Murray.

Q.   In the chain of command, did Sergeant Murray, would he -- was he above or could he command gang specialists to do things?

A.   No.

Q.   Was the supervisor of the gang specialists Sergeant Stasica?

A.   I have no personal knowledge of who that was.

Q.   Now, on -- when you came in that day, you were assigned to the investigation of the murder of Luis Morales; is that true?

A.   Yes.

Mason - direct

Q.   Now, let me just ask you a general question about -- well, first this question.  Before you came in to testify today, did you review any documents to refresh your recollection or anything like that?

A.   Yes.  I read the reports that I've submitted, as well as the other reports that were submitted on this case, and my testimony that I've given previously.

Q.   Your testimony at trial, correct?

A.   Yes.

Q.   And your deposition testimony?

A.   Yes, sir.

Q.   Now, after reviewing those, do you remember giving testimony at your deposition and being asked questions about how was your memory of the events involving the investigation of the Luis Morales murder?

A.   Yes.

Q.   And at that time, you said your memory, understandably, was vague, a bit cloudy, and so forth.  Do you remember giving those answers?

A.   Yes.

Q.   Has your memory improved since then after reviewing the documents or thinking about it, or anything?

A.   I feel that I have a better memory of what I did, yes. I've had time to read over --

Q.   Okay.

Mason - direct

740

A.   -- reports.

Q.   So, you say you have a better memory of what you did, right?

A.   Yes.

Q.   Is your memory better as to what other people did, for example, than Gang Specialist Guevara?

A.   I don't understand.

Q.   Okay.  Well, you said you remember the things that you did back in the investigation, correct?

A.   Yes.

Q.   Maybe I'll get to more specifics.  Has your memory improved since the deposition as to what Gang Specialist Guevara did?

A.   I -- I think it's the same, but I am not certain.

Q.   All right.  Well, let's explore that, okay?

       Now, to the investigation of Luis Morales.  When you first got the case, did you review the beat officers or the case report?

A.   Yes, I did.

Q.   Did you review the supplementary report authored by the previous detectives on the case, Boris and Johnston?

A.   Yes, I did.

       THE COURT:  I'm going to -- we'll stop there and take our afternoon break.  We'll come back at 3:05 and continue with the direct -- the examination of this witness.

       All rise.

(Jury out at 2:34 p.m.)

THE COURT:  You can step down.

We'll take our afternoon break.

For the parties, before we break, I hope at the end of the day to -- or intend to at the end of the day tell the jurors that at some point tomorrow I'll give them a check-in on where we stand.  So, I'll need an update from the parties as to how things are progressing with respect to your respective presentation -- your presentation of your respective cases.  I know we talked about possibly ending next week.  I need to have a better sense of whether that's a possibility that I should let the jurors know about.

MR. SCAHILL:  Very good.

(Recess at 2:35 p.m., until 3:04 p.m.)

(Change of reporters.)

Mason - direct

742

(Jury in at 3:04 p.m.)

THE COURT: Everyone can take their seats.

All right. Mr. Mason, I remind you that you're under oath.

Mr. Richards, you may proceed.

MR. S. RICHARDS: Thank you, your Honor.

BY MR. S. RICHARDS:

Q. Detective Mason, I want to begin with talking about the two documents you were able to review when you were first assigned to the investigation of the death of Luis Morales.

First, I'm going to talk to you about the general offense case report. Can you tell us what a general offense case report is?

A. That is a report that the -- the responding patrol car, they get a call to go to a scene. They find a crime, and they would make out that report. That's the general offense case report.

Q. Now, generally speaking, or speaking, is there usually only one general offense case report for a case?

A. Generally.

Q. Okay. And as you said, the general offense case report would be made out usually by the beat officers who respond to whatever has happened, correct?

A. Yes.

Q. Now, have you had a chance to -- I know you saw the general

Mason - direct

743

offense case report when you were assigned to the case on June 28th of 1989.  Have you had a chance to review it since?

A.   Since when?

Q.   Since 1989.

A.   Yes.

Q.   And you've had a chance to review it recently?

A.   Yes.

Q.   All right.  Now, if you need to look at any document to refresh your recollection, just let me know; but is it true that the address of the occurrence was 1316 West Western?

A.   1316 North Western.

Q.   North Western.  I'm sorry.  And at that time in the case report, was this reported as a murder or a battery?

A.   It was an aggravated battery.

Q.   Because at the time of the case report, the victim was still alive, correct?

A.   Yes.

Q.   Now, what a general offense case report does is it has boxes where you can list, first of all, the victim, right?

A.   Correct.

Q.   Witnesses, right?

A.   Yes.

Q.   And the offenders, either the names of the offenders or descriptions of the offenders?

A.   That's correct.

Mason - direct

744

Q.   In addition, it includes a narrative section where the beat officers can write in some of the information they have learned, right?

A.   That's right.

Q.   Now, in this particular case, the victim was Luis Morales, right?

A.   Yes.

Q.   And two witnesses were listed in this case report?

A.   Yes.

Q.   One of them was Samantha Hudson?

A.   Correct.

Q.   One of them was James Dean?

A.   That's right.

Q.   And there was no offenders named in that report; fair?

A.   That's correct.

Q.   But there were descriptions of two offenders?

A.   Yes.

Q.   The first description was, in terms of clothing, red T-shirt, red shorts, British Knights gym shoes; is that true?

A.   I don't recall at this time exactly what the clothing description was.

Q.   Would any document refresh your recollection?

A.   The general offense case report would be helpful.

Q.   All right.

          MR. S. RICHARDS:  Your Honor, we would ask that this

Mason - direct

745

be shown on the screen only to the witness for -- and marked for identification.

MR. J. RICHARDS: From the plaintiff's table, a document that has been previously marked as Defendants' Exhibit 50(A).

THE COURT: The witness has Defense Exhibit 50(A) in front of him.

BY MR. S. RICHARDS:

Q. Do you see it there, detective?

A. Yes.

Q. Okay. After reviewing this document -- or having -- have you had a chance to review it yet, or do you want more time?

A. I'm good.

Q. Okay. So the first offender, in terms of clothing, was described as having a red T-shirt, red shorts, and British Knights gym shoes, is that accurate?

A. Yes, sir.

Q. And that same person was described as male, right?

A. Yes.

Q. And there's the -- in terms of race, there's the number 4 there, right?

A. Yes.

Q. For Chicago police reports, the number 4 means Hispanic, right?

A. White Hispanic.

Mason - direct

746

Q.   White Hispanic.  Okay.

And the age of that person is given as between 17 and 20 years old, correct?

A.   Yes.

THE COURT:  Counsel, are you seeking to admit the document or just to refresh his recollection with the question?

MR. S. RICHARDS:  I'm sorry, just refresh recollection.  So, we're not seeking to admit.

BY MR. S. RICHARDS:

Q.   So, is -- is your recollection refreshed as to this description in that document which you viewed at the time you began the investigation?

A.   Yes, sir.

Q.   So, is it true that the height listed for the first offender was between 5-foot-3-inches and 5-foot-7-inches, is that correct?

A.   That sounds correct.

THE COURT:  The document's no longer displayed, since it's --

MR. S. RICHARDS:  Oh, I'm sorry.

THE COURT:  You can't have him just read the document in.

MR. S. RICHARDS:  Oh, I understand.

THE COURT:  Either you're seeking to admit it or you have refreshed his recollection.  So, it's not being shown

Mason - direct

747

because the witness hasn't given an answer of, "I don't recall."

MR. S. RICHARDS: We would seek to admit it.

THE COURT: Is there any objection to the admission of Defense Exhibit 50(A)?

MR. POLICK: No, your Honor.

THE COURT: All right. It's admitted and may be published.

(Defendants' Exhibit No. 50(A) was received in evidence.)

BY MR. S. RICHARDS:

Q. All right. The document is still in front of you, correct?

A. Yes, sir.

Q. So, would it be accurate to say that the weight given for the first offender was 130 pounds?

A. Yes.

Q. The eyes of unknown color?

A. Yes.

Q. Hair black?

A. That's right.

Q. And the complexion light?

A. Yes.

Q. And for the second offender, described as wearing a green hospital-type shirt, blue jeans, and British Knights gym shoes; is that fair?

A. Yes, sir.

Mason - direct

Q.   That offender also being male Hispanic, right?

A.   Yes.

Q.   Between 18 and 20 years old?

A.   Correct.

Q.   And height listed as 5-foot-5.  Yes?

A.   Yeah, I'm not sure about the -- it says 5-foot-5, and then it says 5-foot-5, so usually that's a -- it would only be one. If it's 5-5, there should only be one 5-5 in there.

Q.   That's a little bit of an anomaly that two -- the same height is given twice rather than a range; fair?

A.   Correct.

Q.   And the weight of that person as 140 pounds?

A.   Yes.

Q.   So, from the -- that report, you got some basic information about the shooting, about the descriptions of the offender, and some possible witnesses, right?

A.   Yes, sir.

Q.   Now, Luis Huertas was not listed as a possible witness in that report, was he?

A.   No, sir.

        MR. J. RICHARDS:  Your Honor, if you could take 50(A) down.

     (Counsel conferring.)

BY MR. S. RICHARDS:

Q.   Now, in addition to that report, you had another report --

Mason - direct

749

(Counsel conferring.)

BY MR. S. RICHARDS:

Q.   The second report you were able to look at was a supplementary report authored by Detectives Boris and Johnston; is that not true?

A.   Correct.

Q.   Now, let's talk about the difference between the case report and the supplementary report.  What is a supplementary report?

A.   This supplementary report -- there are two different types of supplementary reports.  One the patrol division would use, and the other, this one, is what the detective division uses.

Q.   Okay.  What's the purpose of a supplementary report, as opposed to a case incident report?

A.   Well, the supplementary report would contain further information that was learned.

Q.   And is only one supplementary report generated in a case, or multiple supplementary reports?

A.   There can be several.

Q.   And those are -- sometimes have labels, such as progress report?

A.   Well, progress -- yeah, I guess you could -- progress report is a classification.

Q.   So, a supplementary report is a subset, right?

A.   It is a detective division classification describing the

Mason - direct

750

status of the case.

Q.   And another kind of supplementary report is a lineup report, correct?

A.   Yes.

Q.   And that details the circumstances of a lineup?

A.   That's right.

Q.   Now, another type of report is a cleared/closed report, correct?

A.   Yes.

Q.   What's a cleared/closed report?

A.   The indications of cleared and closed is that the report -- the offenders to the report have been identified and arrested and were charged and are awaiting trial.

Q.   All right.  And what is a cleared/open report?

A.   The offenders have been identified, but there may still be remaining offenders to be arrested.

Q.   Well, so, when you got to -- when you picked up this case and after you read the supplementary report, did you learn that at this point, there was a named offender?

A.   Yes, sir.

Q.   Who was the named offender named in the supplementary report?

A.   Jose Melendez.

Q.   And did Jose Melendez have a nickname?

A.   "Macho."

Mason - direct

751

Q.   Were you aware when you saw that what Jose "Macho" Melendez's gang affiliation was?

A.   He was a Latin King.

Q.   Did you know if he had any particular position in a particular set of the Latin Kings?

A.   At that time, I did not know that, no.

Q.   In the course of your investigation, did you learn it?

A.   Yeah, I received information.

Q.   Well, did you receive information that, in fact, Jose "Macho" Melendez was the -- was the leader of the -- was -- of a local set of Latin Kings?

A.   I had heard that, yes.

Q.   Okay.  Do you know if you heard that from some of the gang specialists, or do you know where you heard it?

A.   I don't recall.

Q.   Now, one thing you knew about this case was that the shooting -- and it was a shooting with a handgun, correct?

A.   Yes, sir.

Q.   Had occurred on Western Avenue, right?

A.   Correct.

Q.   Was there some significance to the fact that the shooting happened on Western Avenue?

A.   Well, Western Avenue is a dividing line between two gangs.

Q.   One gang being the Latin Kings?

A.   Yes.

Mason - direct

752

Q.   The other gang being the Spanish Cobras?

A.   Correct.

Q.   And it was also between -- the Latin Disciples also had territory on the side of the Spanish Cobras, right?

A.   I'm not so familiar with that gang.

Q.   Okay.  Now, this second report also contained more information about the shooting and about possible witnesses, did it not?

A.   It contained -- yeah, it contained more information than the original report, yes.

Q.   Okay.  And in terms of --

        MR. S. RICHARDS:  We would seek to admit 50(B).

        THE COURT:  Any objection?

        MR. POLICK:  No objection, Judge.

        THE COURT:  Without objection, 50(B) is admitted -- Defense Exhibit 50(B) is admitted and may be published.

     (Defendants' Exhibit No. 50(B) was received in evidence.)

BY MR. S. RICHARDS:

Q.   Okay.  So, this -- is this, in fact, a copy of Boris and Johnston's supplementary report?

A.   Yeah, as far as I know, it is.

Q.   Okay.  Well, does it have the name Detective R. Boris on it?

A.   Yes.

Q.   Did you know Detective Boris?

Mason - direct

A. Yes.

Q. And it has -- does it have his signature on it?

A. I don't know that I'd recognize his signature.

Q. And it also has a supervisor approval, J. Healy, 1383. Was that a supervisor?

A. Yes, sir.

Q. So, anyway, on the first page, and this is part of what you learned, there was a description -- another description of the person wanted; and that was male Hispanic, 18 years old, 5-8, 145, muscular, short afro-style combed back, wearing a black long-sleeve sweater, black shorts cut just above the knee, and black low-quarter gym shoes.

Was that the description of the offender that you received in that report from Boris and Johnston?

A. Yes, as described.

Q. Now -- and he was also -- at the end of it, it said, "Now known as Melendez, Jose M., a/k/a 'Macho'"?

A. Yes.

Q. So "Macho" was associated as the offender. It also says, "Armed with a .25-caliber blue steel automatic," right?

A. Correct.

Q. Let me talk to you a moment about .25-caliber. First of all did you learn from the reports that shells had been found at the scene?

A. Yes, I did.

Mason - direct

754

Q.   And what caliber were those shells?

A.   They were .25-caliber shells.

Q.   Now, a .22-caliber semiautomatic gun is a fairly common gun, wouldn't you say?

A.   You said .22?

Q.   I'm saying .22 now, right.

A.   .22-caliber is a common gun?  Yeah.

Q.   Okay.  A .25-caliber gun is much less common, isn't it?

A.   I don't know that I would say that.

Q.   Okay.  Well, you need different ammunition for a .22-caliber gun and a .25-caliber gun, correct?

A.   Yes.

Q.   So, the bullets from one are not going to fit in the other, correct?

A.   That's right.

Q.   And a semiautomatic gun ejects shell casings, right?

A.   Correct.

Q.   Whereas, a revolver does not?

A.   That's right.

Q.   Now, there were -- this report lists witnesses, does it not, down at the page it listed?

     One of the witnesses is Samantha Hudson again, right?

A.   Yes, sir.

Q.   One of the witnesses is James Dean?

A.   That's right.

Mason - direct

755

Q.   One of the witnesses is --

     (Counsel conferring.)

          MR. S. RICHARDS:  Sorry.

BY MR. S. RICHARDS:

Q.   I'm sorry.  One of the witnesses is Mario Flores, right?

A.   Correct.

Q.   And again -- and then --

     (Counsel conferring.)

BY MR. S. RICHARDS:

Q.   And another witness listed is Javier Torres, correct?

A.   That's correct.

Q.   Again, Luis Huertas not listed as a witness; fair?

A.   Yeah, he's not.

Q.   So, in terms of what you learned from the report about Samantha Hudson, basically, in summary, what you learned was that she had seen two individuals standing by garbage cans. One of them told her, excuse me, to shut the fuck up.  She believed that he had a gun.  They crossed Potomac, were out of sight, and then she thinks she hears six gunshots.

     That was her information, right?

A.   Correct.  So, that's what was related to these detectives, yes.

Q.   And as to James Dean, again, he was somebody who was near the shooting, may have witnessed the shooting.  He observed two subjects walk by him, and one of them fired a handgun.  That

Mason - direct

756

was -- that was what he had told these two detectives, right?

A.  Yes, sir -- well, yes, yes.

Q.  Okay.  If you have to modify your answer, just tell me.

(Counsel conferring.)

BY MR. S. RICHARDS:

Q.  Now, another witness was Javier Torres, right?

A.  Correct.

Q.  Okay.  And he would turn out to play an interesting role in the case.  Did he -- he was the one who actually identified "Macho," right?

A.  Yes.

Q.  He said he was there and he saw "Macho" shoot the victim, right?

A.  He did.

Q.  And, in fact, he pointed -- he looked at a Latin King photo album in the 14th District, and he identified a picture of the offender as being Jose M. Melendez, otherwise known as "Macho," right?

A.  That's right.

Q.  And also, those detectives showed the same books to Flores, and he -- Flores said that he knew "Macho," and he'd seen him on the street less than a half hour before the shooting incident, right?

A.  Yes, sir.

Q.  So, at that point, there were two witnesses either naming

Mason - direct

"Macho" as a shooter or placing him on the scene?

A.   That's right.

Q.   So, what the prior detectives on the case did, Boris and Johnston, before you got on the scene -- or were assigned, is they placed a stop order for Jose "Macho" Melendez, right?

A.   Yes.

Q.   Now, tell the ladies and gentlemen of the jury what a stop order is.

A.   So, a stop order is -- it's an internal message to everybody in the police department, basically, that, "If you encounter this person, we'd like to talk to him.  Don't let him -- if he gets arrested, notify us," that type of thing.

Q.   All right.

     (Counsel conferring.)

BY MR. S. RICHARDS:

Q.   And how does everybody in the police department know about the stop order?

A.   It's placed into the identification section.  Let's say he gets arrested and fingerprinted.  Identification would notify the lockup that there's a stop on that person and to notify the detectives.

Q.   Right.  And what the detectives could do at that point, or one thing they could do is issue a warrant for his arrest, right?

A.   Well, at some point, if there was enough information to do

Mason - direct

758

that, that's a possibility.

Q. Well, let's talk about information enough to do that. Are you familiar with the phrase "probable cause"?

A. Sure.

Q. So, legally speaking, to arrest a person, you need probable cause --

A. Correct.

Q. -- to believe that they've committed a crime, right?

A. Yes.

Q. You can't go around just arresting anybody?

A. No, sir.

Q. And to get an arrest warrant, you have to go before a judge and show what the probable cause was, right?

A. Yeah. That's the last step, yeah.

Q. Now, in this particular case, as of the date when Javier Torres identified Jose "Macho" Melendez, there was probable cause for Melendez's arrest, was there not?

A. Yes.

Q. So, let me also ask you this: You eventually met Javier Torres, right?

A. Yes, I did.

Q. In the course of your investigation, right?

A. Yes.

Q. Javier Torres was 15 years old, right?

A. Correct.

Mason - direct

759

Q. He was a member of the Spanish Cobras gang, correct?

A. Yes, sir.

Q. And the Spanish Cobras, as we said before, were rivals to the Latin Kings?

A. Yes, sir.

Q. Now, I next want you to take a look at the -- what is marked Defendants' Exhibit --

MR. J. RICHARDS: Your Honor, can we take down 50(B).

MR. S. RICHARDS: And we would seek to admit Defendants' --

(Counsel conferring.)

BY MR. S. RICHARDS:

Q. So, talking about the --

(Counsel conferring.)

MR. S. RICHARDS: We would ask that the witness be allowed to see Plaintiff's Exhibit 37.

How are we doing that?

BY MR. S. RICHARDS:

Q. I want you to look at that report and see if you can identify it, Detective Mason.

A. So, that is a report that I submitted.

Q. All right. And what is the date of that report?

A. 28 June 1989.

Q. Is that the first report that you generated in this case?

A. I believe so.

Mason - direct

760

Q.   Okay.  So, on this report --

          MR. S. RICHARDS:  We would seek to admit Plaintiff's Exhibit 37.

          THE COURT:  Any objection?

          MR. POLICK:  No, your Honor.

          THE COURT:  Plaintiff's 37 is admitted and may be published.

     (Plaintiff's Exhibit No. 37 was received in evidence.)

BY MR. S. RICHARDS:

Q.   Okay.  So, this report is your progress report, right?

A.   Yes.

Q.   One of the things the progress report tells us is that at this point, Luis Morales is dead; he's been pronounced dead by the Medical Examiner, right?

A.   That's right.

Q.   So this is now a murder case?

A.   Yes.

Q.   And at this time, you list -- you list -- for the first time, Luis Huertas is listed as an eyewitness, correct?

A.   Yes, sir.

Q.   Samantha Hudson's still listed as -- well, actually, as a circumstantial witness, correct?

A.   Yes.

Q.   And that reflects the fact that she has information, but she's not claiming to have witnessed the shooting itself,

Mason - direct

761

right?

A.   Correct.  She has circumstantial information about the crime itself, but she didn't -- she's not a witness to the crime.

Q.   Right.  And the suspect is listed again as Jose M. Melendez, known as "Macho," right?

A.   Yes.

Q.   And then in addition, you have two alibi witnesses, Luis Lopez and Hector Martinez, right?

A.   Yes, sir.

Q.   Those are people providing an alibi for Jose "Macho" Melendez, right?

A.   Yes.

Q.   And lastly, you have, under "Re-interviewed," Javier Torres, who is again listed as an eyewitness, right?

A.   Yes.

Q.   Now, what happened on that -- on that -- the morning of the 28th is that Jose "Macho" Melendez walked in under his own steam to Area 5, right?

A.   He walked in to the 14th District.

Q.   Okay.  I stand corrected.  But nobody arrested him; nobody -- he just walked in to the 14th District, right?

A.   Yes.

Q.   Oh.  And remind me where the 14th District is.

A.   It's -- I can't recall the address, but it's California and

Mason - direct

762

Milwaukee Avenue, over there.

Q.   Okay.  So, Jose "Macho" Melendez walks in to the 14th District, and eventually, you get a chance to talk to him, right?

A.   Yes.

Q.   Do you talk to him at the 14th District or someplace else?

A.   No.  We talked to him at Area 5.

Q.   How did he get from 14th District to Area 5?

A.   The officers that were with him in the 14th District drove him over to Area 5.

Q.   And at the time that he came into Area 5, was he under arrest or not under arrest?

A.   He was under arrest.

Q.   So, brief -- given the fact that he was under arrest, you gave him Miranda warnings?

A.   Yes, sir.

Q.   Did you ever find out from him how he knew about the stop order and to come in to -- and to come and turn himself in to the police?

A.   Yeah.  He said that he heard the police were looking for him.

Q.   All right.  And did he say how -- that he knew what the police were looking for him for, what crime?

A.   I don't recall that he said that.

Q.   And this was just -- this was actually almost within hours

Mason - direct

763

of the time of the murder or the shooting, right?

A.   I don't recall what time -- I don't recall what time of day it was, but it was, you know, the daytime, I think, of the day -- like the following day from the shooting.

Q.   Right.  So, only -- you know, since the shooting happened about midnight, only about 12, 15, something like that, hours had passed between the murder or the shooting and Jose "Macho" Melendez coming in to the station, right?

A.   Right.

Q.   Now, at the time he came in, were you convinced that this was -- the motive for this shooting was gang-related?

A.   I wouldn't say I was convinced.  That was the information I was given.

Q.   Okay.  And you didn't have any information saying it was something else, like, you know, a fight, self -- you know, something not related to gangs?  You didn't have any information that there was some other motive for the shooting?

A.   No.

Q.   So, when -- and you yourself were not a specialist or not familiar with gangs, *per se*, right?

A.   That's correct.

Q.   That was something the gang specialists would do?

A.   They had -- yeah, they had much more experience with the gangs.

Q.   Because they would use the gangs as informants?

A.   I can't answer that.  I don't know what they -- I don't know what they do during the day.  I know they work around gangs.

Q.   So, knowing that it was a gang-related murder, and knowing that a gang member was coming in to talk to you about it, did you reach out to the gang specialists at that point to say, "Listen, this is a gang-type thing.  I could use some help on this"?

A.   No.

Q.   So, when Jose "Macho" Melendez came in to talk to you and after he was given Miranda warnings, he provided you with an alibi for this murder that had happened, you know, almost -- almost that day, but, you know, near midnight the day before, right?

A.   Yes.

Q.   But did he ever tell you how he knew the time of the murder?

A.   I don't recall that.

Q.   The alibi he gave you was that he had been at a Holiday Inn, and he had traveled back to Chicago, but he would have arrived too late for the murder, right?

A.   Yes.

Q.   If you can recall -- you can use the report as assistance -- did -- well, did he tell you why he was at the Holiday Inn, you know, around -- you know, after 11:00 but

Mason - direct

765

before midnight?

A. Yes. His cousin works there, and he goes to pick him up.

Q. Okay. And his cousin worked there as a chef, right?

A. He worked in the kitchen. I believe he was a chef. I'm not really -- I don't recall now.

Q. Something like that.

And did you, in fact, talk to his cousin, the kitchen worker?

A. Yes, I did.

Q. And his cousin, the kitchen worker, backed him up, right?

A. Yeah. He gave us -- he told us that he was working the night before, and he worked until 11:35, and Jose came to the restaurant between 10:00 and 10:30; and that when he got off at 11:35, they rode back to the cousin's house, and they arrived there around midnight.

Q. And where was the cousin's house located?

A. I don't recall right now.

Q. But it was someplace in Chicago; fair?

A. Yes.

Q. And probably near the scene of the shooting, or no?

A. I think he lived in that neighborhood.

Q. Okay.

A. Without referring to the report to see his address, I wouldn't recall.

Q. So, the Holiday Inn was how far away from the scene of the

Mason - direct

766

shooting?

A.   Well, at that time, we estimated it at over 8 miles.

Q.   Okay.  And 8 miles on what kind of road?  Highway?  City streets?  What?

A.   City streets.

Q.   And did you make an estimate of how much time it would take to drive from the Holiday Inn back to that location, leaving at 11:35?

A.   I'm not -- I think we used the estimate of how long it took us to get back.

Q.   Right.  Because you went to the Holiday Inn to actually interview the kitchen worker, right?

A.   Yes, sir.

Q.   Now, after you got this information about this alibi, which had been presented to you by the relatives of Jose "Macho" Melendez, did you go back to Javier Torres to re-interview him?

A.   Yes.  Well -- yes.

Q.   Okay.  And what he said is -- he backed off his identification of Jose "Macho" Melendez as the shooter and said that he actually hadn't seen the shooter, right?

A.   He didn't say he hadn't seen the shooter.  He said that he thought the shooter resembled "Macho," which is why he said it was "Macho."  But he said the shooter kind of resembled him.

Q.   Okay.  So, at first he said it was "Macho."  Then after you had re-interviewed him, he said, "Well, it kind of looks like

Mason - direct

767

"Macho," right?

A.   To that effect, yes.

Q.   But he also told you that he had seen "Macho" in the area before the shooting, and he never backed off that, did he?

A.   I don't think he ever said that to us.

Q.   You may not know this, but do you know what he said -- did you know that he was later called as a witness at trial; Javier Torres, that is?

A.   I -- I don't recall.

Q.   Okay.  And you don't know anything about Javier Torres's testimony at trial?

A.   I -- I don't recall.  I think you read it in here.  Was that -- you read something in from Torres.  I can't recall now.

Q.   Well, you don't have to bother with what -- you know, I'm not probing further on that.

But -- so, in the situation where Jose "Macho" Melendez was giving an alibi, right, and Javier Torres was backing off his identification saying, "It might be the guy. It looked like him, but I'm not sure it was him," didn't Javier Torres tell you -- or did he tell you that he had actually lied about the identification because he had a beef with Jose "Macho" Melendez?  Did he say that to you?

A.   No.

Q.   So, he wasn't saying -- he wasn't saying he lied initially; he was just saying, "I thought it over.  I'm not sure it's the

guy."  Is that your sense of what he was saying?

A.   No.

Q.   What was he saying?

A.   He was saying he thought it was -- the offender resembled the physical stature of "Macho" Melendez, and he knew "Macho" Melendez was an opposing gang member, so he assumed that that must be who did it.

Q.   All right.  Did he tell you that he had a beef with "Macho" Melendez or a particular reason to pick him out?

A.   I don't recall that, no.

Q.   Well, you would agree with me that among gangs -- first of all, Javier Torres was 15 years old, right?

A.   Yes.

Q.   And you would agree with me that among -- among the gangs, reporting somebody to the police is serious business, reporting another gang member to police is a serious thing, right?

A.   Yeah.  It's -- they don't normally want to snitch on their own gang.

Q.   And even -- because snitching on their own gang means they've broken the gang's code and they could be killed?

A.   Yeah.

Q.   And snitching on the other gang might involve retaliation by the other gang, and again, you might get killed?

A.   The first one is way more important.  The second one, that's just -- you know, we're opposing gangs.  We can say

Mason - direct

769

things about other gangs.

Q.   And you would agree with me that a lot of the information you get from gang members is not very reliable?

A.   You never know, that's correct.

Q.   So, the other witness you interviewed, the other witness you interviewed on that day was Luis Huertas, right?

A.   Yeah.  One of the witnesses, yeah.

Q.   Okay.  Let's just talk about Luis Huertas.  How did Luis Huertas get to Area 5?

A.   My recollection is that Officer Danny Noon brought him in.

Q.   Officer Danny Noon being a gang specialist, right?

A.   Yes.

Q.   And Officer Danny Noon being in the same unit as Reynaldo Guevara, right?

A.   Yes.

Q.   Did somebody ask Daniel Noon to bring Luis Huertas into the station?

A.   Not that I'm aware of.

Q.   Did you even know before he was brought in that Luis Huertas was an eyewitness to the shooting?

A.   No.

Q.   And there was no stop order on Luis Huertas, was there?

A.   No.

Q.   Did you ever -- you interviewed Luis Huertas, and he said that he had a good view of the shooter, and he saw the shooter,

Mason - direct

770

right?

A.   Yes, sir.

Q.   He didn't identify the shooter by name as anyone he knew, right?

A.   That's right.

Q.   And was Luis Huertas also a gang member?

A.   I don't believe so.

Q.   Okay.  Did you ask him about it, if he was a gang member?

A.   I can't recall now if I asked him or not.

Q.   Did you ever ask Luis Huertas why he hadn't spoken to the beat officers, that he had -- that he had just come in after being picked up by Daniel Noon?

A.   I don't recall that, sir.

Q.   Did you ever ask Daniel Noon why he went to pick -- to pick Luis Huertas?

A.   I have no recollection of whether I asked him or not.

Q.   And Daniel Noon wasn't one of the beat officers, right?

A.   No, sir.

Q.   He wasn't one of the detectives who had started the -- started the investigation, right?  He wasn't Boris or Johnston, right?

A.   No.

Q.   And you hadn't sent him out to look for anyone, had you?

A.   No, sir.

Q.   And, in fact, before he brought Luis Huertas in, you didn't

Mason - direct

even know that Luis Huertas existed, did you?

A.   That's right.

Q.   So, after that investigation on the 2- -- on the 28th of June -- first of all, after you got the alibi and the recantation from Javier Torres, you released Jose "Macho" Melendez, correct?

A.   Yes, sir.

Q.   And, of course, that was the right thing to do because you no longer had probable cause, did you?

A.   No.

Q.   So, between the 28th and the period of the next week, up to July 6th of 2- -- of 1989, were you still assigned to the investigation, or would it just go back and forth between whatever detective shifts there was?  Just trying to get a sense.

A.   I don't recall if I was assigned to it and did any -- you know, if I was looking for anybody and didn't find them.  I have no recollection what occurred between those days.  I don't -- I haven't seen any reports that I submitted.  I haven't seen any reports that anybody else submitted during that time.

Q.   Yeah.  So, between those two dates, nobody -- and we have the -- we have the reports.  It looks like nobody did anything with respect to the case, right?

A.   Yeah, there was no positive developments.

Mason - direct

772

Q.   Right.  Well, sometimes cases just kind of go cold, don't they?

A.   Yeah, I guess they do.

Q.   I mean, it's just the nature of the business, right?

A.   Sometimes you don't have any -- any evidence, any witnesses.

Q.   Leads -- I'm sorry to interrupt.

You don't have any evidence or leads, so you have to move on to the next case until something else happens, right?

A.   That's right.

Q.   Now, at any point during that period, did you call up the supervisor of the gang specialists or any particular gang specialist and say, "Listen, I need you to pound the pavements, beat the streets, find me some information on this case"?

A.   No.

Q.   Now later, you became aware that gang specialist Reynaldo Guevara sort of jumped into the case maybe around July 2nd or 3rd, right?

A.   No.

Q.   You never learned that?

A.   No.

Q.   Well, did gang specialist Guevara ever call up you or, to your knowledge, anyone else and say, "Listen, I'm jumping on this case.  I'm going to, you know, beat the bushes, talk to my confidential informants, and find out who did it"?

Mason - direct

773

Did you ever hear anything like that?

MR. POLICK: Objection to form.

THE COURT: Sustained.

BY MR. S. RICHARDS:

Q. Well, between those two dates, between June 28th and July 6th, did you have any conversations with Reynaldo Guevara?

A. No.

Q. Between those two dates, did Reynaldo Guevara ever tell you that he was working on the case?

A. No.

Q. Between those two dates, did Reynaldo Guevara ever tell you that he was talking to confidential informants about the case?

A. No.

Q. At any time between those two dates, between -- up until July 6th, did Reynaldo Guevara ever tell you, "Listen. I've talked to confidential informants. They tell me Jaime, who I think is Jaime Rios, and Tino did it"?

Between those two dates, did he ever say anything like that to you?

A. What were the dates again?

Q. Let's talk about -- well, ending at July 5th. So, beginning at June 28th, ending at July 5th, did Reynaldo Guevara ever call you up and say, "Listen, Mason. I've got a line on this case. People have told me that Jaime Rios and Tino did the shooting"?

Mason - direct

774

MR. POLICK:  Objection to form.

THE COURT:  Sustained.  How much more on this query? The witness has testified that he did not talk to Reynaldo Guevara between those two dates.

MR. S. RICHARDS:  I will move on to another topic.

BY MR. S. RICHARDS:

Q.  So, did something happen with respect to the case on July 6th?

A.  Yes, sir.

Q.  What happened?

A.  Gang crimes Officer Guevara and his partner, Officer Gawrys, came in to Area 5 and told me they had a couple of informants, confidential informants, that had information on the case.

Q.  When they told you that, first of all, do you remember about what time it was that they came in and told you that on July 6th?

A.  I don't recall the time.  It was in the afternoon, I believe, maybe late afternoon, early evening.

Q.  All right.  And did they say they had the -- did they say they had just gotten information from the informants, or did they actually bring the informants physically to you?

A.  They brought the informants to me.

Q.  All right.  So, these were two confidential informants.  Do you -- can you describe either of the informants?

Mason - direct

775

A.   No, sir.

Q.   Were they white?

A.   I can't get very specific.

Q.   Were they black, African-American?

A.   They were males.

Q.   Okay.  There's something.  How old were they?

A.   I don't recall.

Q.   Did you write down their names anywhere?

A.   Not that I recall.

Q.   Did anyone, to your knowledge, write down their names anywhere?

A.   I don't believe so.  I don't recall.

Q.   Now, you know that -- were you aware at some point during the trial of Jaime Rios's case that a motion was filed to produce the identity of the confidential informants?  Did anyone make you aware of that?

A.   I don't recall that.

Q.   During Jaime Rios's post-conviction case, the 2-1401, were you ever made aware that Judge Sophia Atcherson had entered an order saying the confidential informants could be produced?

          MR. SCAHILL:  Objection.

          THE COURT:  Basis for the objection?

          MR. SCAHILL:  Foundation.

          MR. POLICK:  Same objection.

          THE COURT:  The question is was he made aware.  He can

Mason - direct

776

answer what he was made aware of.

You may answer.

BY THE WITNESS:

A.  I was unaware of the post-conviction, so I wasn't aware of anything that was happening.

BY MR. S. RICHARDS:

Q.  So, during the post-conviction proceedings or the 2-1401 proceedings, you were never contacted by Assistant State's Attorney Carol Rogala about anything, were you?

A.  Not at all.

Q.  She never talked to you?

A.  No, sir.

Q.  And she certainly never told you about the order to produce the confidential informants' information?

MR. SCAHILL:  Objection.  Judge, can I be heard just very briefly on this?

THE COURT:  Yes.  Go to sidebar.

(Proceedings heard at sidebar:)

THE COURT:  Okay.

MR. SCAHILL:  Judge, what counsel appears to be doing is embedding facts into questions to ask this witness about things that he knows that he was not participating in to try to backdoor in judicial findings, and I do not think that's appropriate to do that.

THE COURT:  Response?

Mason - direct

777

MR. S. RICHARDS: Your Honor, it's -- the fact of the judicial finding is not -- is not pertinent. What's pertinent is whether he was given notice that there was no longer a legal reason not to release the names of the confidential informants, so --

THE COURT: That's not the question that you're asking. You are asking detailed questions. So, now I must ask, because it's been raised, what's your good faith basis for believing that this witness was made aware of the details that you were asking?

MR. S. RICHARDS: Yes. After the order was granted, I spoke to Carol Rogala. She said that they had searched or tried to find it and they could not find the identity of the confidential informants.

I think it would be a reasonable inference that one place she would go to was the person who spoke to the confidential informants, who was Detective Mason.

THE COURT: What are you drawing that inference from?

MR. S. RICHARDS: Well, I'm drawing that inference from the fact that she said that she had tried to search. The only way I can think that she could search is either through a record or through an officer.

THE COURT: I don't think that gives you a good faith basis to assume that she went to this particular officer.

Where was Mason at the time that you asked or that

Mason - direct

778

Rogala told you that she searched?  Had he been retired?

MR. S. RICHARDS:  Yes.

THE COURT:  Why would she go to a retired officer? What gives you a good faith basis to assume that she would go to a retired officer?

MR. S. RICHARDS:  Because he was an officer who had information on the case.

THE COURT:  The Chicago Police Department is a large entity that has records and maintained records for the purpose of being able to produce those records.  In the ordinary course, if you were issuing a subpoena in this case, you would subpoena the Chicago Police Department first.

So, no, the inference is rejected.  You don't have a good faith basis.  Move on.

MR. S. RICHARDS:  Thank you.

   (Proceedings heard in open court, jury present:)

BY MR. S. RICHARDS:

Q.  Now, when you spoke to the two confidential informants, that was in person, right?

A.  Yes, sir.

Q.  Were -- when you spoke to them, where in Area 5 did you speak to them?  Do you recall?

A.  I was in an inner office at Area 5.

Q.  All right.  And when you spoke with them, was gang specialist Guevara present?

Mason - direct

779

A.   Yes.

Q.   Who else was present between -- besides you, the two confidential informants, and gang specialist Guevara?

A.   Gang specialist Gawrys.

Q.   Okay.  Was Lieutenant Privelec (phonetic), if I have -- or I'm sorry, Kajanski (phonetic), was he involved in this as well?

A.   No, sir.

Q.   He was not?  All right.  So, in this conversation that you had with the two confidential informants, what did they tell you?

A.   They told me that they were getting information that the offender to the shooting was a Jaime Rios, who lived at 1440 North Leavitt.

Q.   Did they tell you any -- that they had information that anyone else was involved?

A.   Yes.

Q.   What did they say about the other person who was involved?

A.   They said the other one was a -- I'm sorry.  Both of them were Latin King gang members.  I believe they told me that, too.  But the second person was only known to them by the name Tino.

Q.   Now, the two people who you're talking to, the confidential informants, were they gang members?

A.   At this time, I couldn't say.

Mason - direct

780

Q.   But you would have asked -- you would have ascertained that at the time, right?

A.   I don't -- maybe.  I don't recall, though.

Q.   Well, do you know if they were also Latin Kings?

A.   I don't know if they were gang members, sir.

Q.   All right.  Do you -- was one of them named Little -- had the nickname Little Mike?

A.   Not that I know.

Q.   So, you're fairly certain as you sit here now that neither of them had a nickname of Little Mike?

A.   I don't recall their identities.

Q.   Okay.  Well, the informants whose identities you do not recall, did they have firsthand information as to who did the shooting?  What was their information based on?

A.   Their information was based on what they were hearing in the neighborhood.

Q.   Hearing from whom?

A.   Other people in the neighborhood.

Q.   Did they ever tell you the names of the other people in the neighborhood?

A.   Not that I recall.

Q.   Did they ever tell you, "You know, I just heard about it, but So-and-So has firsthand knowledge.  So-and-So is a witness"?

A.   No, sir.

Mason - direct

781

Q.  Did you attempt to obtain from them the names of the people who might actually be witnesses who actually saw something?

A.  I don't recall.

Q.  All right.  And everything they -- nothing they told you gave you probable cause to arrest Jaime Rios, right?

A.  That's right.

Q.  So, you didn't seek an arrest warrant for Jaime Rios, did you?

A.  No, sir.

Q.  You didn't tell gang specialist Guevara or his partner to go find Jaime Rios, did you?

A.  No, sir.

Q.  Well, just tell me this.  After receiving the information from these informants, what was your plan with respect to the rest of the investigation?  How were you going to, you know, get Jaime Rios?

A.  Well, I would have liked to have gotten a picture of him and identified Tino and gotten a picture of him, and then I may have been able to show some photos to the witnesses.

Q.  Okay.  Sounds like a plan.  Did you get a photo of Jaime Rios?

A.  Not at that time.

Q.  Well, to get a photo of somebody, there is -- there is a -- tell me, first of all, what is an IR number?

A.  It's an identification records number from the Chicago

Mason - direct

782

Police Department.

Q.   Okay.  And being a little bit more specific, every time somebody in the City of Chicago is arrested for the first time, they are assigned an IR number, right?

A.   If they're fingerprinted.

Q.   If they're fingerprinted, they get an IR number, right?

A.   Yes.

Q.   And that number is a unique number which relates only to them, right?

A.   Only to those fingerprints, yes.

Q.   And fingerprints don't tend to change, right?

A.   Usually not.

Q.   Okay.  And if you -- a person usually has only one IR number throughout the course of their life, right?

A.   Usually, but I've seen -- I've seen where people have more than one IR number.

Q.   It happens occasionally, right?

A.   Yes.

Q.   But the usual course of events is that one person has one IR number, right?

A.   Yes.

Q.   Now, you were capable of going to the records division and pulling up -- putting in Jaime Rios's name and potentially getting an IR number, right?

A.   Well, I -- yes, I could go to records and request the IR

Mason - direct

783

number.

Q.   How long would it take you to get the IR number?

A.   Well, I need information specific to that Jaime Rios.  So, I need a date of birth.

Q.   All right.  And without a date of birth, you couldn't get the picture?

A.   If there's only one Jaime Rios, that's easy, but I don't know -- I don't know if that's a very common name in the system or not.

Q.   Okay.  And of course, for the name Tino, just the first name -- well, let me ask you this:  Was there -- at that time, did the Chicago Police Department have a nickname index?

A.   Not that I'm aware of.

Q.   Okay.  So, with the name Tino, you couldn't do anything, right?

A.   No.  That wasn't enough information.

Q.   So, basically after talking to the informants, what did you tell gang specialist Guevara and his partner to do, if anything?

A.   I thanked them, and they left.

Q.   Okay.  You didn't go -- you didn't tell them to go looking for Jaime Rios, right?

A.   No.

Q.   You didn't tell them to have -- you didn't tell -- you didn't tell them to arrest him, certainly, right?

Mason - direct

784

A.   No, I didn't.

Q.   That would have been wrong?

A.   Yeah, right.

Q.   Violation of his constitutional rights, right?

          MR. SCAHILL:  Objection.

          MR. POLICK:  Objection.

          THE COURT:  Sustained.

BY MR. S. RICHARDS:

Q.   Now, however -- well, I just want to get the process.

          So, could you have gone to the identifications bureau even without a date of birth and just say, you know, "Give me all the Jaime Rios'es you have even if there's different IR numbers on some of them"?

          MR. SCAHILL:  Objection to form.

          THE COURT:  Overruled.

BY THE WITNESS:

A.   At that time, I honestly can't recall.  It's over 35 years ago.  I'm not sure what exact information was required.  It was -- probably a lot easier now, but there were no computers or anything.

BY MR. S. RICHARDS:

Q.   Well, everything's easier now, correct?

A.   Well, in a way.

Q.   In a way.  Now, at some point, did -- at some point, did Guevara and Gawrys come back with -- to you with Jaime Rios,

Mason - direct

785

about 10:00 that night?

A.   Yes, sir.

Q.   And how did you know that they had arrived with Jaime Rios?

A.   I don't know if I got notified or if I happened to see them walk in.  I'm not sure.

Q.   All right.  After Jaime Rios walked in, did you talk to Guevara or Gawrys about whether -- when he was coming in, had he been arrested or why was he there?

A.   I did.

Q.   What did they say?

A.   They said they saw him on the street and talked to him and said, "The detectives would like to talk to you.  Do you want to come in and talk to them?"  And he said he would.

Q.   Did they ever tell you that there were five or six other gang officers with them when they went to talk to Jaime Rios?

A.   No.

Q.   Well, did you ever see -- so, did they ever tell you that Jaime Rios had been handcuffed when they found him at 1440 North Leavitt?

A.   No.

          MR. POLICK:  Objection.  Foundation.

          THE COURT:  That's overruled.

BY MR. S. RICHARDS:

Q.   At the time they brought Jaime Rios in, or at any other time, did they ever tell you that at the time they brought

Mason - direct

786

Jaime Rios in, he -- they searched his house?

A.   No, sir.

Q.   So, when Jaime Rios was brought in, where did he go?  What happened next?

A.   I took him into one of our interview rooms.  I patted him down, made sure he didn't have anything, any contraband.

Q.   Okay.  So, you patted him down to make sure that he didn't have a weapon, correct?

A.   Yes.

Q.   By the way, did Officer Guevara tell you that he had patted Jaime Rios, the wanted potential murderer, before he put him in his squad car?

A.   I don't know if he did or not.  I always pat people down regardless of who -- who else had them before.

Q.   Now, when the two of them -- the two gang specialists came in with Jaime Rios, were there any other gang specialists with them?

A.   No.

Q.   You didn't see gang specialist Vukanich?

A.   Later in the evening, I did.

Q.   Okay.  We'll get to that.

        By the time that they walked him in, did you see gang specialist Noon?

A.   No.

Q.   Or any of the other gang specialists who worked with

Mason - direct

787

Reynaldo Guevara?

A.   No.

Q.   Let me --

     (Counsel conferring.)

BY MR. S. RICHARDS:

Q.   Let me talk to you about -- we're going backwards a little bit -- about your training as a detective.

          So, you said you made detective about two years before this, right?

A.   Yes, 1987.

Q.   1987.   As part of your training as a detective, did you get training in interview techniques?

A.   Not that I recall.

Q.   You never went to a Reid course?

A.   I don't recall that.

Q.   Well, what kind of training did you get as a detective?

A.   It was a long time ago.   It was training about the law, procedures, what's required in our reports.   There's probably a lot more stuff I'm missing, but I don't recall.

Q.   Well, when you interviewed suspects or witnesses, did you have any particular procedure you used or techniques you used or things like that?

A.   No.

Q.   Well, you certainly were aware of the things you were allowed to do in terms of talking to suspects and the things

Mason - direct

788

you were not allowed to do, right?

A.   Yes.

Q.   For example, one of the things you're allowed to do is lie to suspects?

A.   You can.

Q.   One of the things you can do with suspects is you can tell them the evidence against them, right?

A.   Sure.

Q.   One thing you can do is you can tell -- legally, you can tell a suspect that you have evidence that you don't actually have, right?

A.   That's right.

Q.   One thing you can legally tell a suspect was just to suggest that, you know, his participation was minimal.  Maybe he's only a witness, that there are reasons for him to talk to you.  That's one thing you could do, right?

A.   I guess you could do that, yeah.

Q.   Okay.  And that's -- again, that's perfectly legal.  That's one way to get somebody to talk to you, right?

A.   They all sound legal to me, yes.

Q.   Okay.  But the things that are illegal are, for example, physical abuse?

A.   Correct.

Q.   Another thing that's illegal is to threaten to take someone's children away, right?

Mason - direct

789

MR. SCAHILL:  Objection.

THE COURT:  Basis?

MR. SCAHILL:  Legal conclusion.

THE COURT:  Okay.  Ladies and gentlemen, the -- as I've said a couple of times before, I will instruct you on the law as it applies to this case.  This question and the preceding questions are aimed at what the witness understood he could or couldn't do based on his training as a detective.

Am I correct in that, counsel?

MR. S. RICHARDS:  Yes.  I'm not asking for his opinion of the law or a legal finding.  I'm asking what he understood he could or could not do based on his training as a detective.

THE COURT:  So, with that context, you may continue.

MR. S. RICHARDS:  Thank you.

BY MR. S. RICHARDS:

Q.  Now, where did you --

(Counsel conferring.)

BY MR. S. RICHARDS:

Q.  I'm sorry.  I have to repeat a question.

So, is it your understanding that it was legal --

(Counsel conferring.)

BY MR. S. RICHARDS:

Q.  I'm sorry.  Yes, I have to repeat the question.

So, was it your understanding that it was not legal to threaten to take away someone's children?

Mason - direct

A.   I don't know that I ever considered that as something to do, so I -- that's not something I ever thought of.

Q.   Okay.  So, when you first took Jaime Rios -- you know, you spoke to him, where -- did you direct him to some -- after you patted him down, did you direct him to someplace to go in Area 5?

A.   Yes.  I took him to an interview room.

Q.   Now, what is an interview room at Area 5?  What does it look like?

A.   They're small rooms, maybe -- you know, I think I've described them as 8-by-10, but they're probably smaller than that.  They're not very big.  They're smaller than a bedroom, that's for sure.  And, you know, there's a table, a couple of chairs, and a bench.

Q.   Was there also a conference room or -- at Area 5?

A.   There's other -- there's other rooms that we utilized as a conference room, and there's additional rooms that are just offices.

     So, there's a room that we refer to as a conference room, but it's not really a conference room.  It 's just another room.

Q.   Okay.  Well, was that room somewhat larger, so, for example, if you wanted to bring in a court reporter and a State's Attorney, you've got room for everybody to sit down?

A.   Correct.

Mason - direct

791

Q.  You couldn't do that in one of those interview rooms?

A.  No.

Q.  No room to be -- not big enough, right?

A.  It's too small, yeah.

Q.  So, when you placed him in the interview room, did you just leave him alone for a while, or did you start talking to him right away?

A.  No.  I told him to have a seat.  I'll be in to talk to him in a little bit.  I said, "If you need anything, knock on the door."

There's a window in the door so I could see in there. He could stand in front of the window and knock on it, and I was right outside.

Q.  And the reason why he would have to knock on the door is the door was locked at that point, right?

A.  Not necessarily, no.  I don't recall locking it, but there could be other investigations going on at the same time, so people aren't free to move about as they choose once you're in the office.

Q.  Yeah, I'm not saying there's anything wrong with it.  It was -- you know, locking it might be a reasonable precaution, as you said, just because you can't have somebody wandering around Area 5?

MR. POLICK:  Objection to the form.

THE COURT:  Sustained.

Mason - direct

792

BY MR. S. RICHARDS:

Q. So, you told him to have a seat, told him to knock on the door if he needed anything. Then what happened?

A. I had some things to do. I had reports to -- you know, read over the reports. I was trying to get some witnesses. I was anticipating being able to run a lineup.

Q. Okay. So, you're basically -- oh, so you were planning to run a lineup with -- with Jaime Rios, right?

A. Sure.

Q. But you had no way -- unless he was under arrest, you had no way of compelling him to stand in a lineup, did you?

A. No. He came in voluntarily, so I assumed he'd be willing to stand in a lineup. I hadn't asked him that yet, but I was anticipating that.

Q. You were going to say to him, "Listen, just you're here voluntarily. Could you please stand in a lineup, but you can -- you can go anytime you want," right?

A. I don't know if I'd say it like that.

Q. Well, put it this way. At some point, you said, "Knock on the door if you need anything," right?

A. Yes.

Q. Did you tell him, "Listen. You're free to go. Knock on the door. If you want to walk out, go ahead." Did you ever say that to him?

A. I don't recall saying that, no.

Mason - direct

793

Q.   How long was it before you came back to speak to Jaime Rios in that room?

A.   Well, before I went to speak with him, I learned that there was a woman in the back of the office.  And I learned that because he knocked on the door and pointed to her through the glass.

So, I went to the door, opened the door, and I said, "What's up?"

And he said, "Can I talk to her?"

And I said, "All right.  Have a seat."

I closed the door.  There was only one woman on the chair at the back of the office.  So, I talked to her for a minute, and I asked, "Do you know him?  He seems to want to talk to you."

She said, "Yeah."

All right.  And I'm not sure exactly what the words were, but I knew that they had some relationship.

Q.   All right.  Was that woman -- if you recall, was that woman Diane Martinez?

A.   I don't recall her name right now.

(Counsel conferring.)

BY MR. S. RICHARDS:

Q.   I'm sorry.  Was that woman Diana Rodriguez?

A.   I don't recall her name.

Q.   Okay.  But she was a young Hispanic woman, right?

Mason - direct

A.   She was Hispanic, and she was young.

Q.   Okay.  I think we're agreed there.  And she was a woman, right?

A.   And she was a woman.

MR. POLICK:  Judge, I'm going to object to the editorializing of the answers.

THE COURT:  That's sustained.  Specifically, "I think we're agreed there."  That's not a question.

MR. S. RICHARDS:  Withdrawn.

BY MR. S. RICHARDS:

Q.   Detective, you said you were doing some things or trying to arrange some things for -- in the next -- well, how long was it?  He came in at 10:00 o'clock, right, 10:00 p.m.?

A.   Yes.

Q.   How long were you doing other things after 10:00 p.m.?

A.   It took until about midnight.

Q.   So, that was about two hours?

A.   Yes, sir.

Q.   So, he's there for about two hours in that room, right?

A.   Yes.

Q.   Possibly locked?

A.   I'm sorry?

Q.   Possibly a locked room, right?

A.   I don't recall.

Q.   Now, you said you were trying to find witnesses.  Were you

trying to find Javier Torres?

A.   He would be one of them, I think, that I would -- yeah, all of the witnesses that I knew about were the ones that I was trying to find.

Q.   So, the witnesses that you're talking about would be Samantha Hudson, Javier Torres, and Luis Huertas, right?

A.   Well, there were some other people that I never got to talk to.  I was still looking for them.

Q.   And those were Mario T. Flores and James Dean, right?

A.   Yes.

Q.   You never caught up with either Mario T. Flores or James Dean?

A.   No.

Q.   Now, when you were trying to look for these people, were you going out and doing it yourself, or were you sending other people to look?

A.   I believe I asked Gawrys and Guevara to see if they could find them in the neighborhood, and I did have some phone numbers for some of these people, so I was using the telephone.

Q.   Okay.  And we'll get to this later, but the upshot of that was that eventually, Guevara and Gawrys did bring in Luis Huertas, right?  Or do you know?

A.   I can't recall -- I think I may have mentioned it in my report.  Right now it escapes me as to who brought him in, if I noted it.

Mason - direct

Q.   Okay.  By the way, how did you get in contact with Guevara and Gawrys to ask them to bring anybody in?  Did you call them on the phone?  What happened?

A.   They were still there.  They brought in Jaime Rios, and I asked them at that time if they'd be able to try to find some of the witnesses.

Q.   Now, when you asked them that, were the other gang specialist officers also around then, Vukanich and Noon and some of the others?

A.   Not at that time, no.

Q.   All right.  So, they were nowhere around, right?

A.   There -- somebody was with -- when his girlfriend was there, and -- once I realized she was there, I know that there were two other gang crimes officers there.  And I don't recall who it was.

Q.   Okay.  So then, after the two hours, we're now at midnight. What happened then?

A.   So then I went into the room with Jaime Rios, along with my partner that evening, Detective Halvorsen.

Q.   All right.  By the way, was Detective Halvorsen your permanent partner, or just happened to be your partner that night?

A.   It was just that night.

Q.   Usually your partner was Detective Brennan, right?

A.   That's right.

Mason - direct

797

THE COURT:  All right.  We'll stop there, it's 4:28, before we go into the next series of questions.

Ladies and gentlemen, as a reminder, please do not discuss the case.  Please do not research the case.  Please do not let anyone discuss the case with you.

I plan to check in with the lawyers to get a sense of how we're proceeding.  I have my thoughts.  I suspect they have their thoughts, with an eye towards tomorrow.  We'll give you an update as to what the estimate of the trial is.

Again, it's an estimate, not a promise, but I understand you have things that you'd like to think about and plan; and to the extent I have better information now that we're underway, I will provide that update tomorrow for you.

So, have a wonderful evening.  I will see you back tomorrow at 10:00 a.m.

All rise.

(Jury out at 4:29 p.m.)

THE COURT:  You can step down.

All right.  Issues for me to address from the plaintiff's side?

MR. S. RICHARDS:  None, your Honor.

THE COURT:  For defense?

MR. SCAHILL:  Judge, I promised you yesterday that I would address this issue of speaking to witnesses who are on the stand; and this actually seems like a good time to address

Mason - direct

that, given that there's a party on the stand, so --

THE COURT:  Okay.

MR. SCAHILL:  The short answer, from my perspective, and as I believe under the rules are, is, as with many things, discretionary under 611(a).  There are -- and it would fall under the guise of, I believe, the last part of 611(a) about limiting the -- managing the testimony so it's a procedure effective for determining the truth.

Typically, the way that I've read the cases -- and this most often happens in depositions, but it's to prevent, you know, coaching and things of that nature.  But in civil cases, I think this is discretionary.

Your Honor mentioned, I believe, yesterday some cases in the criminal context, which there's -- the Sixth Amendment applies there, so it's a little bit different.  The Supreme Court said you can bar witnesses from talking during breaks, but not overnight, although I understand there's actually a Supreme Court case that's pending right now on that issue, *Villareal*.

So, Judge, I went down a rabbit hole, to borrow your term, last night.

THE COURT:  Well, they're fun for me now because I get to think about the law more than I did in practice, where I had deadlines, but okay.

MR. SCAHILL:  Yeah.  So, the answer is whatever the

Mason - direct

799

Court's decision is, you know, it should just be mutual. I've always felt it's most effective to get to the truth to not have attorneys talking to witnesses during their testimony, but whatever your Honor's pleasure is. I think we should do that under 611(a) to protect the fact-finding and truth-finding process, but again, discretionary.

THE COURT: Right. And so my practice during trial is that once a witness is tendered for cross-examination, then there's no more talking to him.

Deposition traditionally is all cross-examination, hence the prohibition against speaking to the witness you are representing. If you're representing the deponent, then you don't speak to him because it's cross-examination.

And not a civil -- or criminal case, so you don't get unfettered access to the client.

The rationale here is, one, that's how I came up in the law; but two, it contributes to the efficient presentation of testimony while on direct. For example, you may go over some things and then highlight, like, "Okay. We'll skip past this," or what have you.

And, you know -- so, I'll stick with the witnesses are not to discuss the substance of their testimony once tendered for cross.

MR. SCAHILL: So, the tricky part here is they've called Mason. They're going to call their client. This is

Mason - direct

technically an adverse direct, but --

THE COURT: Yeah.

MR. SCAHILL: It seems sort of --

THE COURT: Detective Mason, do you want the night off? I'm kidding. Don't answer that.

That was always the thing you'd say to your witness is, "You get a break."

It's the plaintiff's case. He has not been submitted for cross, and so the bar does not extend to a witness called by the opposing party because not cross yet.

MR. S. RICHARDS: Okay. Thank you, your Honor.

THE COURT: Any other issues?

MR. ENGQUIST: Yes, your Honor. Just so we have a better idea. I know -- I'm assuming we'll be starting tomorrow with Mason. Just trying to get an idea of lineup.

MR. J. RICHARDS: I can speak to that, your Honor.

THE COURT: Please.

MR. J. RICHARDS: So, judging -- for the lineup for tomorrow, I think it would be obviously continuing Mason. My guess is that may take the whole morning with direct and cross.

Afternoon, we would start with Russano. That may take the whole afternoon. If it doesn't, our next witness would be most likely Lamont Burr.

I think that would take the whole day. At the end of that, we may do some read-ins.

Mason - direct

So, I think the whole issue of Jaime Rios over the weekend may be moot, but maybe should I have spoken up earlier before our conversation.

THE COURT: I was eagerly anticipating the case that said it, and I recall -- when I was in practice, I would, like, anticipate various things, and I'd have it. And I had it at one point, so I do recall seeing case law on this issue of when you can and can't talk to a witness. I just can't -- I don't know where it was or what it was in.

But okay. That's fine for the plan. I like that we have transcripts that can be read in should we fall short on witness testimony. So, it's nice to have that buffer.

You will get an order on Torres tonight. I'll issue the order probably within the next few hours.

Any other issues?

MR. ENGQUIST: Yes, your Honor. Sorry.

I believe the two people he's talking about are potential read-ins are our read-ins, and we'd rather do them in our case in chief and not have them do them. So, it would be Noon and Curley.

THE COURT: Okay.

MR. ENGQUIST: We've already told him that already. I just wanted to make sure it was clear.

THE COURT: It may not be the order you want, but if we fall short on witnesses, you also have a party here that can

Mason - direct

802

at least get up and start his testimony.

MR. J. RICHARDS: All right. And in terms of, I guess, overall schedule for the jury, if -- even if we start, you know, Jaime like the end of the day Friday, I doubt we would get that much in. My estimate would be he would be finished at the earliest Monday afternoon, and so then it would be Guevara via WebEx Tuesday morning. And then I think we would be able to rest. And I don't know how long the defense case is going to be after that.

THE COURT: Okay.

MR. SCAHILL: So, if the plaintiff is -- if the plaintiff gets called Monday, he's probably going to take pretty much the whole day, so that's how that's going to go, would be my guess.

Our witnesses hopefully are going to be fairly short. What -- this morning was a bit longer than we had anticipated with Mr. Loftus -- I'm sorry, Dr. Loftus, so that kind of set us back a little bit there. But it is still possible we're done next week. It's not going to be by Wednesday. It might be by Friday, though.

I mean, I would love for that to happen, and we're going to endeavor to try to make that happen.

THE COURT: So, what I'll tell them is the case still may go into a third week, but it won't take a full three weeks. We'll leave it at that.

Mason - direct

803

MR. SCAHILL:  I think that's a very fair assessment.

THE COURT:  So, okay, sounds good.

Have a good evening, and I'll see you in the morning.

MR. J. RICHARDS:  Thank you, your Honor.

MR. SCAHILL:  Thank you, your Honor.

MR. ENGQUIST:  Thanks, Judge.

(Court adjourned, to reconvene at 10:00 a.m., February 6, 2026.)

(Concluded at 4:37 p.m.)

*   *   *   *   *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/Kelly M. Fitzgerald          *February 6, 2026*
Kelly M. Fitzgerald
Official Court Reporter

/s/Joseph A. Rickhoff           *February 6, 2026*
Joseph A. Rickhoff
Official Court Reporter


/s/Charles R. Zandi             *February 6, 2026*
Charles R. Zandi
Official Court Reporter

804

I N D E X

WITNESSES                                                PAGE

GEOFFREY LOFTUS
Direct Examination By Mr. J. Richards                    619

GEOFFREY LOFTUS
Direct Examination (Resumed) By Mr. J.                   683
Richards
Cross-Examination By Mr. Miller                          693
Cross-Examination By Mr. Engquist                        723
Redirect Examination By Mr. J. Richards                  725

MICHAEL MASON
Direct Examination By Mr. S. Richards                    734


PLAINTIFF'S EXHIBIT                                  RECEIVED
No. 37                                                   760


DEFENDANTS' EXHIBIT                                  RECEIVED
No. 50(A)                                                747
No. 50(B)                                                752