805

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                          )
                                     )
                Plaintiff,           )
                                     )
-vs-                                 )  Case No. 1:22-cv-03973
                                     )
REYNALDO GUEVARA; MICHAEL            )
MASON; and JoANN HALVORSEN,          )
as Special Representative of         )
ERNEST HALVORSEN, Deceased,          )  Chicago, Illinois
                                     )  February 6, 2026
                Defendant.           )  9:56 a.m.

VOLUME 5
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:      LAW OFFICE OF STEPHEN L. RICHARDS
                        BY:  MR. STEPHEN L. RICHARDS
                             MR. JOSHUA S. RICHARDS
                        53 West Jackson Boulevard, Suite 205
                        Chicago, Illinois  60604

For Defendant           BORKAN & SCAHILL, LTD.
Guevara:                BY:  MR. TIMOTHY P. SCAHILL
                             MR. GRAHAM P. MILLER
                        20 South Clark Street, Suite 1700
                        Chicago, Illinois  60602

For Defendants          THE SOTOS LAW FIRM, P.C.
Mason and               BY:  MR. JOSEPH M. POLICK
Halvorsen:                   MR. JOSH MICHAEL ENGQUIST
                             MR. JEFFREY ROBERT KIVETZ
                             MS. CAROLINE P. GOLDEN
                        141 West Jackson Boulevard, Suite 1240A
                        Chicago, Illinois  60604

806

Court Reporter:          CHARLES R. ZANDI, CSR, RPR, FCRR
                         Official Court Reporter
                         219 S. Dearborn Street, Room 1426
                         Chicago, Illinois  60604
                         Telephone:  (312) 435-5387
                         charles_zandi@ilnd.uscourts.gov


                *   *   *   *   *

            PROCEEDINGS REPORTED BY STENOTYPE
     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

807

(Proceedings heard in open court:)

THE CLERK: 22 C 3973, Rios versus Guevara, et al., for jury trial.

THE COURT: Good morning, everyone. Appearances, please.

MR. J. RICHARDS: Joshua Richards on behalf of Jaime Rios.

MR. S. RICHARDS: Stephen Richards on behalf of Jaime Rios.

MR. POLICK: Good morning, your Honor. Joseph Polick on behalf of Defendants Mason and Halvorsen.

MR. SCAHILL: Good morning, your Honor. Timothy Scahill on behalf of Reynaldo Guevara.

MS. GOLDEN: Caroline Golden for Defendants Mason and Halvorsen.

MR. KIVETZ: Good morning, your Honor. Jeff Kivetz on behalf of Defendants Mason and Halvorsen.

MR. ENGQUIST: And Josh Engquist on behalf of Defendants Mason and Halvorsen.

MR. MILLER: Graham Miller on behalf of Guevara.

THE COURT: Okay. Good morning, everyone. Anything for me to address before we bring in the jury?

MR. S. RICHARDS: Yes, your Honor.

THE COURT: Okay.

MR. S. RICHARDS: With respect to our expert, Melissa

Russano, she is present here today. She has a flight at 6 --

MR. J. RICHARDS: Something --

MR. S. RICHARDS: -- 6:00 o'clock this evening from O'Hare. I'm -- I have a fear that because of the direct -- length of direct of Mason and the possible crosses, which I can't control in terms of their length, she might miss her flight.

We would ask to interrupt the direct of Mason to put her on now to make sure that she makes her flight and then resume the direct of Mason after she testifies.

THE COURT: Okay. Any objection from any of the defendants?

MR. POLICK: Judge, normally, I wouldn't. I understand these things happen. And we are mid-direct with Defendant Mason. In full disclosure, with the Court's permission, I did intend to go into my direct examination of him while he was on the witness stand.

So, I'd rather not break up the continuity of it, but I'll leave it to the Court for planning purposes.

MR. SCAHILL: Judge, I would just add with respect to that, we're at the point in Mr. Mason's testimony where they're about to go into the interview room, and now they want to call a false confessions expert in the middle of that. Again, I'm not insinuating this is intentional, but strategically, it's prejudicial for that to occur in that manner.

I think we can get through both of those witnesses, at least I thought we'd be able to. Counsel, though, sent us this morning a list, I believe, of 47 exhibits that he still intends to get through with Mason. So, it appears as if this was known yesterday that this was going to take this lengthy amount of time to go through with Mason, and I think they called him sort of as a placeholder when they could have called other people.

And so now we're left with a stilted examination with somebody who's going to talk about the very thing where we're at the middle of the examination with. It's -- it's a little frustrating, Judge, to do it that way. Again, I still think we can get through Russano and Mason, but to break it up like that, we have problems with that.

MR. POLICK: Judge, just on the exhibit issue, to make the Court aware so it knows, we have a general agreement between the parties with regard to no objection to foundation; but again, there's like, I don't know, 47 exhibits there. Taken out of context, I don't know how Mr. Richards intends to use them, but we do have a general agreement on the foundation of those exhibits.

THE COURT: Okay. On the Russano issue, I'll allow the plaintiff to call her now. I understand the defendants' concerns, but I've got a witness who, though a paid expert, is facing an extra weekend in Chicago, as opposed to Defendant Mason, who has been here and presumably will be here for the

duration of the trial. So, I will allow the plaintiff to interrupt Mason's testimony.

As for the exhibits, if the parties reach agreement and there are no disputes for me to resolve, that's fine. I did wonder about some of the exhibits introduced yesterday, which were police reports, which come in for the truth as public records in a civil case; but there's a second layer of hearsay that I don't think anyone's addressed within those reports. And so I'll leave it to the parties to confer and see if they have any issues they need me to address with respect to the second level of hearsay in those reports.

Anything else that I can address for anyone?

MR. S. RICHARDS: No, your Honor.

MR. SCAHILL: No.

THE COURT: All right. So, are we starting with Russano today?

MR. J. RICHARDS: Yes.

THE COURT: Will you bring in the jury, please.

(Jury in at 10:02 a.m.)

THE COURT: Please take your seats.

Welcome back, ladies and gentlemen. I'll start as I do each day and ask if anyone has anything to report to me.

Seeing no hands, first, the -- or this morning, we're going to take a witness out of order. My understanding is that the witness is from out of town and needs to -- or has a flight

this evening back home.

And so we'll interrupt the testimony of Detective Mason so that we can take this witness and hopefully she'll testify -- give all of her testimony today and then can catch her flight home.

So, plaintiffs, your next witness.

MR. S. RICHARDS: Plaintiff calls Dr. Melissa Russano.

(Witness enters courtroom.)

THE COURT: All right. Raise your right hand, please.

(Witness sworn.)

THE WITNESS: Yes, I do.

THE COURT: Please take your seat.

You may start your examination once the witness is settled.

MELISSA BETH RUSSANO RODRIGUEZ, PLAINTIFF'S WITNESS, DULY SWORN

DIRECT EXAMINATION

BY MR. J. RICHARDS:

Q. Good morning, Dr. Russano. In a loud, clear voice, please state your name and spell it for the benefit of the court reporter.

A. My full legal name is Melissa Beth Russano Rodriguez, M-E-L-I-S-S-A, B-E-T-H, R-U-S-S-A-N-O, R-O-D-R-I-G-U-E-Z, but I just use Russano professionally.

Q. What is your current title?

A. I'm a professor of criminal justice at Roger Williams

University.

Q.   I'd like to talk to you and take a step back and talk about your educational background.  Did you receive a Bachelor's?

A.   I did.

Q.   Where did you receive your Bachelor's from?

A.   That was from the University of Virginia.

Q.   What was your degree that you received?

A.   I received a degree in -- a Bachelor's Degree in psychology, with a minor in Spanish.

Q.   After you received that degree, what did you do next for your education?

A.   So next, I started my graduate work at Florida International University, where I received a Master's and then a Ph.D. in psychology, with a specialization in legal psychology.

Q.   Why did you choose to go there?

A.   So, at the time, I knew I was interested in the intersection of psychology and law.  I had done some psychology/law-related research as an undergraduate.

     Specialized degree programs were pretty new where that intersection existed.  So, there was lots of people doing psychology and law-related research, but in more classic traditional disciplines like social psychology and cognitive psychology.  And there were a few programs at the time that had started to really focus in on the intersection of psychology

and law.

A lot of times people hear the term "forensic psychology" now, which is a larger term, but I was really focused on the non-clinical aspects of the intersection between these two fields. And Florida International University was probably one of three programs that existed at that time that had a specific program in that area. So, I also applied to and was accepted into some others, but this was the most focused program at the time that I applied to.

Q. And in terms of the process of applying for this program, what was that like?

A. So, when you're applying to a graduate program in psychology for a Ph.D. that's fairly different than just a Master's program. So, I was applying into the -- although I got a Master's along the way, I was applying into the Ph.D. program.

And Ph.D. programs are very selective because they only accept a few students per year, and that's because in rigorous Ph.D. programs, you are generally a funded student. So, you're not paying for your tuition. You get a stipend from the university, and you also work along the way to help pay for that. But those funded lines are few and far between.

So, it's a fairly selective process. They're fairly difficult to get into.

Q. What is a dissertation?

A.   So, as part of a Ph.D. program, a rigorous Ph.D. program, you have to do coursework, and then if you get a Master's Degree, you do a Master's thesis project.  And then you have to pass a bunch of exams called comprehensive exams or qualifying exams in order to get to the end stage, which is where you do your dissertation work.

And your dissertation work is a large research project that is -- it needs to be a meaningful contribution to the field, where you propose your study.  You have to present that to a committee who vets the proposal.  If you get approved, you then execute that study, and then you have to defend that study in front of a committee to make sure that it meets the scientific rigor that we would expect of a dissertation project.

Q.   And what was your dissertation topic?

A.   My dissertation topic involved the study of true and false confessions within the context of a laboratory paradigm that I created.

Q.   And in the course of doing this dissertation for your Ph.D., did you have any academic advisors?

A.   I did, yes.

Q.   Who were they?

A.   So, my primary dissertation adviser was Dr. Christian Meissner, who is a very prolific researcher in the field, scholar in the field of interrogations and confessions.

Q.   What year did you receive your Ph.D. in?

A.   2004.

Q.   After that, what did you do next in your career?

A.   So, at that point, I went on the job market because I'd been in school for a while, so I applied to a variety of academic institutions, and I landed at Roger Williams University, which is in Rhode Island.

Q.   And at Roger Williams University, what are your current academic positions?

A.   So, I hold the rank of full professor in the School of Justice Studies.  So, I'm a legal psychologist.  We have a very interdisciplinary -- School of Justice Studies houses our criminal justice and prelaw students and cyber security and some other majors.

So, I'm a professor of criminal justice where I teach criminal justice and psychology classes.

Q.   Before becoming a professor, did you hold any other titles?

A.   I was a graduate research assistant as a graduate student, and I also taught classes as a graduate student as well, so I was an instructor.

Q.   And for how long have you been at Roger Williams University?

A.   So, I started in 2004, so I think this is my 21st year.  I'd have to do the math.

Q.   What are your responsibilities as a professor at Roger

Williams?

A. So, my -- I can kind of divide my responsibilities as a professor up into three categories. The first is teaching. So, I teach undergraduates and graduate students.

And then I also have service responsibilities. Those are things like serving on committees at the school level and the university level.

And then I also have research responsibilities. So, as part of my -- kind of the hidden part of my job is doing research on my scholarly pursuits, and so that involves conducting studies, writing those studies up for publication, and so forth.

Q. What courses do you teach?

A. It depends on the semester, but in a typical academic year, I will teach Introduction to Criminal Justice. I will teach undergraduate legal psychology. I will teach graduate -- a graduate course in psychology and law, a graduate course in witness, suspects, and investigative interviewing. And then I teach research methods at both the undergraduate and graduate level.

Q. Are you tenured?

A. I am.

Q. What does it mean to be tenured?

A. So, tenure typically happens about six years in to your academic career. So, when I started at Roger Williams

Russano - direct

817

University, the initial rank that you enter in as is an assistant professor, and then after six years, you go up for promotion and tenure.

So, what that means is there is a rigorous review at kind of every level of the university, your department, and then your school, and then the university level, where they basically decide if they're willing to commit to you.

And to get tenure means you've achieved enough distinction in these different areas for them to say, "We're going to give you an extra level of" -- kind of think of it like job security, where they are saying, "You have -- you have met the criteria to be a long-term scholar and teacher at our university."

Q.   When did you receive tenure?

A.   2010.

Q.   Are you a member of any professional organizations in your field?

A.   I am.  I'm a member of the American Psychology Law Society, the American Psychological Association, APS, which is the Association for Psychological Science.  I'm a member of IIIRG, which is the International Investigative Interviewing Group.

And then depending on the funding, I try to stay a member of the American Society of Criminology, but it partly depends on whether I've got funding to keep that membership. But the other ones I maintain always.

Russano - direct

818

Q.   And you mentioned earlier forensic psychology.  Do you consider yourself a forensic psychologist, or do you consider yourself another type of psychologist?

A.   So, "forensic psychology" is a term that is a -- is used differently by different people.  It can be a term that refers to any psychologist that's working in the context of the legal system or the criminal justice system.

I use it in a more narrow fashion because when most people hear "forensic psychology," they think of clinical psychologists, people who do assessments or interventions with individuals.  I'm not a clinical psychologist.  I'm what I think of as a legal psychologist, which is a non-clinical research psychologist.

So, I call myself a legal psychologist, but it would be fair for others to refer to me as a forensic psychologist if they're taking a broader definition.

Q.   In terms of -- you mentioned research before.  What are your primary areas of research and expertise?

A.   So, I've done research in various psychology and law-related areas, but I've really focused my attention, especially over the last 15 years, on investigative interviewing, which encompasses police interrogations and confessions.

Q.   In addition to this research, have you been published, either academic articles or book chapters?

A.   I have.

Q.   Both or one or the other?

A.   Both.

Q.   What's the process of getting an academic article published?

A.   So, scientific publications are a little bit different depending on what field you're in.  In social science and in psychology in particular, the way the scientific peer review process works is after I've completed a study, I will write that study up into a manuscript form, and I will submit it to a scholarly journal.

That journal -- and there are different quality of journals, but what we strive for are the high-quality academic journals.  So I'm going to describe what that looks like because that's where I would publish and most researchers and reputable scholars would publish.

So, what happens is you submit your manuscript to the journal, and we have to submit it de-identified.  So, I can't have any identifying information because we're going to do something called blind peer review, which means they are then going to take that manuscript and send it out to other experts in the field, usually two to four, depending on the journal.

Those other experts are then going to critique my article, and they're going to -- their job is to sort of tear it apart, but in essence to make sure it's good science.  And

they're going to send their reviews back to the editor with a recommendation of whether it should be published or if I should have to rewrite it and resubmit the manuscript.

And then those reviews come back to me, and then I -- it's very rare to get it accepted immediately. Usually there's at least some revisions, or it's rejected and they say, "Sorry. We're not going to publish this."

But oftentimes, what will happen is they will send it back for revisions. I will have to address every single one of those reviewers' comments, and then I will send it back out, and it will go back out for review; or the editor will say, "Okay. I've looked this over, and I'm satisfied." And then ultimately, it's published.

Now, that's a really lengthy process, but it's important. It's an important process because that's how we ensure that when we publish in journal like that, it's good science, because we've got the check of other people who are knowledgeable in the field and in the methods making sure that we did the right things, so we can have confidence in the end results.

Q. What's the process of book chapters?

A. Book chapters can be a little bit different. So, typically with a book chapter, it's an invited article. You're invited by the editors of the book to submit a chapter.

It doesn't -- it can go through a peer review process.

Certainly, it goes through editorial peer review.  Depending on whether the book or the editor is using peer review, it can go through that process, but you have to look a little closer with a book chapter of what process it went through.

Q.   Approximately in the course of your career, how many articles have you had published through this peer review process?

A.   In the area of investigative interviewing, interrogation, and confession, about 20 through the scholarly articles and the process I've described.

And then in addition to that, in psychology, we use a peer review process when we present at conferences, so we also have our work vetted in that way.

Q.   Well, let's talk about that.  What is a conference, and why do you present at a conference?

A.   So, the process I just described, that publication process, can take a while.  And when I say a while, it can take a few years, actually, from the time that you start your study until the time it gets published because that process can be lengthy.

So in the meantime, what we do is we disseminate our research by gathering together with other academics in our field and presenting our research to one another.

And the conferences that I attend and most of the flagship conferences will use a similar peer review process. So, if I want to present my work, I have to submit a written

proposal.  They send that out for peer review.

Again, it's blind so that people reviewing don't know who I am and I don't know who they are.  That's to make sure everybody can be honest and they can say what they really think.  And then it's either accepted or not accepted.

So, that's another way that we ensure good science.

Q.  Now -- and how many chapters have you had published?

A.  I have to look at my CV.  I tend to publish those scholarly articles more than chapters, so maybe two or three chapters.

Q.  Now, you described the process of when other experts in the field, they'll peer review one of your articles.  Have you ever done that for someone else, been asked to peer review?

A.  All the time.

Q.  Now, you mentioned these flagship conferences.  What are some of the flagship conferences that you're talking about?

A.  So, I would say the big one for people who work in my field, in my area, is the American Psychology Law Society conference, which meets every year.  And that will involve both clinical and non-clinical psych law people.

And that's the one I primarily attend, but also the American Psychological Association is certainly one of the main flagship conferences.

Q.  Now, besides these conferences, have you ever given any talks with a professional group?

A.  Yes.

Q.   What's the process of doing a talk with a professional group?

A.   So, for -- what I would think of as invited talks, that's different.  So, for a conference presentation, I'm saying, "I would like to go and talk, and here's my proposal."  An invited talk is a group has sought me out and said, "We would like you to give a talk," usually about a specific topic, and so it's an invited process.

Q.   What are some of the groups that you've given an invited talk to?

A.   I've done a number of talks for a group called the High-Value Detainee Interrogation Group, which is a government agency in the Department of Justice.  They have funded a lot of my work, so I've given a lot of talks to them.

I've given talks to defense attorney groups, to conviction integrity units, other universities.

Q.   You mentioned conviction integrity units.  What are those?

A.   So, those are -- prosecutorial agencies will sometimes set up departments that look at potential cases of wrongful conviction, so conviction integrity units where they're reviewing cases to look at whether there were any potential wrongful convictions.  And sometimes they reopen cases to pursue those -- those issues.

Q.   Now, I first want to ask you this:  In terms of the number of times that you've presented at these flagship conferences

Russano - direct

824

with the peer-reviewed process, how many times have you presented at one of those types of conferences, roughly?

A.   Over 70.

Q.   And in terms of the invited talks, the invited presentations, how many times have you done that?

A.   Probably 15 to 20, maybe 25.

Q.   And when you're coming -- when you're telling that number, are you including courses that you've taught at Roger Williams University, or is that a different number?

A.   Oh, no.  No, not at all.  If I was counting the number of lectures I gave, that would be in the thousands upon thousands.

Q.   Have you taught any police officers ever?

A.   Yes.

Q.   In what context, the university or in other contexts?

A.   Both.

Q.   Have you -- in terms of teaching police officers or training police officers, what setting has that been in?

A.   So, I teach in the criminal justice department.  We have a Master's Degree in criminal justice, so we have a lot of police officers who come through our program.  So, I teach police officers in my regular classes on a yearly basis.

        And then separate from that, I've done training and instructing with police officers on how to interview and interrogate witnesses, victims, and suspects.

Q.   What police organizations have you done this training with?

A.   It's been a variety at the federal, state, and local levels, so I'll just name a few of them.

I have participated and done trainings with the Naval Criminal Investigative Services, NCIS is how a lot of people know them; Rhode Island State Police; a variety of local agencies in Rhode Island; Air Force Office of Special Investigations; Army Criminal Investigation Division; Wichita State Police -- I'm sorry, not Wichita State Police, Wichita Police Department, and then the Kansas State Police; Mesa PD, which is in Arizona.

Those are the ones I can think of off the top of my head.

Q.   Now, in terms of your research, how is that research funded, exactly?

A.   So, some research is funded and some isn't, but I've had -- I've been very fortunate to have a lot of funding through the federal government.  Most of that has been under the umbrella of the Department of Justice through that organization I mentioned called the High-Value Detainee Interrogation Group, which is an inter-agency organization that consists of the FBI, the DIA, and the DOD, which is the Department of Defense, and I'm sorry, the Defense Intelligence Agency.

I've also had some funding from the Department of Defense directly in the past, and then some smaller funding through a police training institute at Rogers Williams

University.

Q.   Now, would this be a grant, or is it called something else?

A.   Yeah, so these are grant-funded projects, which is, essentially, I submit an application for funding for particular projects.  It goes through a review process, and they decide whether or not to fund that project.

Q.   Approximately how many times has a grant of yours been approved by the Department of Justice?

A.   By the Department of Justice?  I think I've had 10 different contracts.

Q.   And in terms of the total amount of grant funding that you've received, what would you estimate that to be?

A.   So, the total is somewhere in the neighborhood of 2.4 million over -- since about 2010.  I want to be clear. That's not money that's getting paid to me.  It's money to fund projects to pay for participants and the cost of employing research assistants.  But it's roughly 2.4 million.

Q.   Now, in terms of -- we've talked about your academic work and your grant work.  In terms of being an expert witness, have you consulted as an expert witness before?

A.   I have.

Q.   And approximately how many times have you consulted as an expert witness?

A.   So, I wish I had the forethought when I started doing this 20-something years ago to track that, but I don't.  What I

would say is I've probably been consulted on, I don't know, maybe 75 cases.

And by consulted, what I mean by that is initial conversations with an attorney that may or may not result in me actually working on the case.

So, I get contacted on a regular basis. I do not take most cases that I get contacted about. I only devote a portion of my time to this, and so I'm fairly selective about that.

In terms of how many cases I've been retained on, again, it would be a ballpark guess, but over the course of my whole career, maybe 30 or so cases.

Q. And in terms of those cases, are they -- have they been mostly in the civil context or the criminal context or both?

A. I would say overall it's a fair balance of civil and criminal cases. If I looked at the universe of the calls I receive, more criminal than civil. But if I look at the cases I've actually been retained on and agreed to work on, it's probably in the neighborhood of 50-50.

Q. Now, looking at the criminal cases, those criminal cases, are you mainly retained by defense counsel or by the prosecution?

A. It's almost always the defense counsel because those are the only ones that call me. The prosecutors don't really seek out the services.

There are two exceptions to that where I've had -- or

maybe three. I've had calls from conviction integrity units, which are the prosecutorial agencies that are looking into cases, although I wasn't formally retained in those cases.

And there was a case very early on when I was in graduate school. It was actually the first case I ever consulted on. That was the prosecution. But I was not hired directly. A faculty member I was working with was retained, and then he asked me to assist with the case.

But by and large, it's the defense because they are the ones who seek out the services.

Q. And in terms of civil cases, who do you testify more on behalf of, the plaintiff or the defendant?

A. So, once again, the reverse is the situation in a civil case. It's usually the plaintiffs in a civil case who reach out to me. I cannot think of a single time -- there may have been one case where I had an initial call from the defense; but, you know, I'm happy to potentially work on either side, but it's just a matter of who seeks me out and whether it's a good fit.

Q. And in terms of the cases that you've both -- that you've been retained on, not just consulted, have you ever testified in court or at a deposition for any of those cases?

A. I have.

Q. And when you've testified in court, have you ever been admitted to testify as an expert witness?

Russano - direct

829

A.   Yes.

Q.   And what have you been qualified as an expert in on those occasions?

A.   So, when I testify in court, I'm qualified as an expert in the psychology of interrogations and confessions, investigative interviewing generally.  It can depend slightly depending on the nature of the case, but in the realm of investigative interviewing, interrogations, and confessions.

Q.   And where has it been that you've been qualified as such, what courts?

A.   I have testified in Chicago on a few cases.  I have testified in Massachusetts.  I have testified in New York.  There -- I've testified in some preliminary hearings elsewhere, like the state of Maryland.

Q.   Are you being compensated for your time with this case?

A.   I am.

Q.   What is your hourly rated?

A.   350 an hour.

Q.   Why is that your hourly rate?

A.   It's my hourly rate because it's generally what is the -- within the range of what experts make in this field.  It's, if I'm being candid, on the lower end.

      This isn't my primary job.  I do this in addition to my work as a professor and a researcher when I feel compelled to be involved in a case that I think is significant.  And so

I'm pretty selective.

But because it's not my primary job, I -- I can -- I set that rate at what I'm comfortable for expending my time on.

Q.   When you're retained, do you consider yourself an advocate for the side that hires you?

A.   No.

Q.   Why is that?

A.   Because I'm a scientist first and foremost, it's my job to present the science, and I'm not hired to give a particular opinion.  I'm hired to review a case and help to assist the trier of fact, whether that's the jury or the judge, to make informed decisions about this potential area.

So, I provide the information, and then it's up to the fact-finder to -- to use that.  It's not my job to opine on a particular -- for example, my job is not to sit here and tell the jury whether a confession in a case is true or false.  It's my job to provide the science to help you make decisions that you're faced with making.

Q.   Now, I just want to ask you one quick question, back to peer-reviewing.  What is a white paper?

A.   A white paper is a term that we use.  I don't know how widely it's used in different fields, but it's a scientific review paper that represents a consensus in a particular field.

So, it's different than just a regular publication.  It's the culmination of -- it's the summary of the state of the

Russano - direct

831

science in a particular field, and it's reflective of that expert community's agreement on what are the generally accepted principles of where we are.

So, it's a very significant paper.  It's an authoritative paper that summarizes the state of the science.

Q.   Have you ever been involved in a white paper?

A.   So, the way that white papers work, there's actually -- in the American Psychology Law Society, that's who puts out the paper, is there's only been -- in the history of it, there's only been three.  One has been on eyewitness identifications, and there's been two on interrogations and confessions.

The way that they work is the authors will write it, and then they will bring it to the community of scholars, the American Psychology Law Society.  So, at the annual conference, there will be a session where we have all been provided with this paper in advance, and then we can go and we can give input and feedback about this because again it's supposed to be a consensus paper.  It then gets submitted to a journal, and it still has to go through that rigorous peer review process.

So, in terms of the white papers on interrogations and confessions, the most recent one actually just came out in 2025.  So, I was there for that meeting where there was feedback about the -- about the paper, and I provided feedback informally because I was provided a copy of it when they were -- when they were writing it up; but then I also served as

a peer-reviewer for the actual paper in the publications. So I was involved in that way. The authors didn't know that because it was blind peer review, but I was one of the peer-reviewers.

Q. And also I want to clarify something. In terms of your training police officers at the agencies that you listed, is that paid for by the grants you've talked about, or is that funded by other means?

A. So, it's been both. I've done trainings and supported trainings where they were trainings that were funded by some of my grant projects.

So, for example, one of my grant projects involved designing and delivering a science-based interview and interrogation program. And it wasn't just to deliver the training. It was then to assess the effectiveness of that training.

So, we trained investigators, real world investigators, and we had them submit videos of their -- of suspect interrogations before and after their training. And we looked to see whether the training changed the way that they interrogated suspects. And we also looked to see what the outcome of those different techniques that they were using on the suspect were, so looking at rates of confession and cooperativeness.

So, those trainings were supported by grant funding. I wasn't paid to do them. I was paid to -- I mean, the grant

paid for the costs associated with those trainings.

Separate from that, I've been paid directly to do trainings by law enforcement. And that happened primarily after I helped develop this training program, I was then hired by various agencies to train other agencies in science-based methods of interviewing and interrogation.

MR. J. RICHARDS: Your Honor, at this time, the plaintiff seeks that Dr. Russano be qualified as an expert in the field of psychology and particularly the psychology of investigative interviewing, interrogation, and confessions, and to continue her testimony as such.

THE COURT: Any objections?

MR. KIVETZ: No objections, your Honor.

THE COURT: All right. Without objection, the witness may testify as to her opinions in the field of psychology, investigative interviewing, interrogations, and confessions.

Ladies and gentlemen, yesterday, I read that instruction on individuals offering their opinions. That instruction applies to this witness as well. It will be in the final instructions that you receive.

You may proceed.

MR. J. RICHARDS: Thank you, your Honor.

BY MR. J. RICHARDS:

Q. Dr. Russano, I first want to talk to you in the broadest sense of this field, false confessions. Can you define in your

field what a false confession is?

A. Sure. In the simplest terms, it's when someone makes an incriminating admission about being involved in a crime that they were not involved in.

Q. In terms of your research and in the field, how do we know or test that these false confessions actually occur in the real world?

A. So, I'll take part of your question because I think maybe there's two parts to that question.

We know that false confessions happen in the real world because we have documented cases of false confessions that we know have happened.

And there are multiple sources of databases of information. So, for example, there's an organization called the Innocence Project, which is a non-profit legal clinic that was started to use DNA evidence to exonerate people who had been wrongfully convicted. And since 1992, which is when the Innocence Project got started, they have amassed a database of people who were exonerated post-conviction through DNA evidence.

And we can look at those cases and see what the causes were of that wrongful conviction. And we know, for example, that false confessions have played a role in about 28 to 29 percent of those DNA exoneration cases.

There's a larger database called the National Registry

of Exonerations that track both DNA and non-DNA-related exonerations. Since 1989, I actually checked the number the other day for my class, I think it's 3,776 --

MR. KIVETZ: Objection, your Honor.

THE COURT: Basis?

MR. KIVETZ: Outside the scope, previously undisclosed opinion.

THE COURT: That is sustained.

BY MR. J. RICHARDS:

Q. So, in terms of the research in false confessions, in the research or in your field, is there a difference in what you would consider an interview and an interrogation?

A. It depends who you're asking. So, law enforcement will often use the term "interview" to refer to the questioning of a witness or a victim. And the term "interrogation" is almost exclusively referred to in terms of using -- I'm sorry, the questioning of a suspect. So, interrogation, suspect; interview, witness and victim.

Now, some law enforcement don't like the term "interrogation" at all, so they say, "I don't interrogate. I just interview." And they'll call that suspect interviewing.

It's really just semantics. So, what's important is what's happening during a questioning process, but whether you call it an interview or an interrogation is particular to -- to who's -- who's using that phrase.

Russano - direct

836

So, I sometimes will say suspect interviewing or an interrogation. Again, what I care about is what's happening during that process.

Q. Is there a difference between a confession and a false statement?

A. So, again, you're going to want to ask the person what they mean. A confession is a type of false statement, but oftentimes, the distinction that's being made there is a confession is somebody incriminating themselves; whereas, you can have a false witness statement where a witness or a victim gives a statement that implicates somebody else that's incorrect.

So, statement versus confession, usually that's referring to somebody else making the statement, as opposed to a person incriminating themselves.

THE COURT: Before you ask the next question, I just wanted to clarify that last objection. I sustained it as to part of the witness's answer.

There's a process when it comes to expert opinions where the party that's seeking to admit it has to disclose all the bases for their expert's opinions. And so when the witness said, "I checked the other day," that part had not previously been disclosed, so that part is not allowed. The answer preceding that was permissible.

You may continue.

MR. J. RICHARDS: Thank you, your Honor.

BY MR. J. RICHARDS:

Q. In terms of false statements and researchers, have researchers studied false statements in the field empirically over the years?

A. False confessions and false statements, yes.

Q. When I say empirically, what do you take that to mean?

A. "Empirical" is a word we use in the scientific world to describe the process of systematic observation, data collection, and analysis, which is very different than just everyday experiences or anecdotal experience.

It's using -- if you remember what you learned about the scientific method back if you took courses in any sort of science, there's a specific procedure that we have to follow so that we're remaining objective, and using that process is what we mean when we say empirical.

Q. Now, in terms of the methodologies that scholars in the social sciences use, what are those methodologies that are used to look at interviewing, interrogation, and the statements that come after that?

A. Researchers and experts in this field will rely on three general bodies of knowledge. So, one body of knowledge, which I've already talked about, are looking at those real life examples of false confessions.

So, what we do is we take those cases, and we

aggregate them; and we can look at trends that occur in most cases. So, in documented cases of false confessions, what types of techniques, what types of factors do we see? So that's one body of knowledge.

A second body of knowledge is 100-plus years of research on -- in the fields of psychology, cognitive psychology, social psychology, developmental psychology, to understand how human beings interact, think about, and might behave in the interrogation room. So, general principles of psychology.

And then we have this third category which are direct studies in the context of interviewing, interrogation, and confession. Within that bucket, there are different research methodologies, so they include things like descriptive analyses, surveys, experimental studies, something we call meta analyses, field experiments, field validations.

There's lots of different actual methodologies that you can use within these different buckets of -- that I described.

Q. Now, in terms of false confessions and the analysis of them, do the researchers distinguish between types of false confessions?

A. Yes.

Q. What are those distinguishing features or the distinguishing names?

A.   Generally, researchers will talk about or think about three different types of false confessions:  Voluntary, compliant, and internalized.

Voluntary false confessions are confessions where a person confesses to a crime they didn't commit absent any external pressures.  So, sometimes we will see this in a very high-profile case where people will come forward and confess to the crime even though they didn't do it.  It's usually due to some sort of mental illness or desire for attention or notoriety.

That's not really relevant to the police context because these people are doing it absent any external influence.  The two that really come into play in terms of a law enforcement context are the compliant and the internalized.

A compliant confession is when somebody falsely confesses.  At the time that they confess, they know they are innocent, but they are confessing for some instrumental gain or benefit.

Now, the reason for that confession, whatever that gain is can be different.  So, it can be they can't take the interrogation any longer.  They're tired.  They're exhausted, they're sleep-deprived, and they just want to go home; and they think if they confess, that lets them do that.

It can be that they have received the message that if they confess, it will be better for them.  They will get more

Russano - direct

840

lenient treatment.  If they -- if they confess, they will not lose -- or they will be able to go home or make a phone call or they will be charged with a lesser crime.

So, the benefit they perceive can be different for different people.

In extreme cases, it can be, "I'm being physically abused, and I want it to stop."  And so the benefit of it is, "I get this aversive situation to end."  But the key part of a compliant confession is they know they didn't do it at the time they're giving the confession.

Contrast that with an internalized confession, which is a situation where a person confesses to a crime they didn't commit due to external influence, but now they've actually started to question their own innocence.  They've become confused, and they start to believe they actually did it.  And in the most extreme cases, they can start to develop false memories of having committed the crime.

Q.  So, in terms of researchers, are these, the voluntary, the compliant, and the internalized, are they applied only to suspects, or are they applied to witnesses as well?

A.  It can apply to witnesses as well, not -- I suppose there can be voluntary false witness statements.  There absolutely can.  So, as an example --

MR. KIVETZ:  Objection, your Honor.

THE COURT:  Basis?

MR. KIVETZ: Undisclosed opinion.

THE COURT: Response?

MR. J. RICHARDS: Your Honor, I'll withdraw that question for now, and then I'll move on to another topic.

THE COURT: Okay. The objection is sustained as withdrawn.

BY MR. J. RICHARDS:

Q. Now, in terms of interrogations, what are the types of interrogations that are studied in the field?

A. I'm not sure I understand your question. Can you rephrase that?

Q. Are -- in the field, is there something known as accusatorial interrogation?

A. Yes.

Q. What is that?

A. Accusatorial interrogation is the typical style of interrogation that we see here in the United States and in North America. And that term, it's not that police would say, "I'm doing an accusatorial-style interrogation." They wouldn't necessarily use that term, but it's a term that researchers use to describe what interrogation typically looks like.

An accusatorial interrogation typically involves isolation of the suspect, and then it involves ramping up the anxiety of the suspect by confronting them with an accusation that they have committed the crime and a whole host of

Russano - direct

842

associated techniques that go along with that.

And then the third category that generally is a hallmark feature of an accusatorial interrogation is what we refer to as minimization, which is then providing face-saving excuses or justifications for why the person may have committed the crime and to convince them that their best option in this situation they find themselves in is to provide a confession.

So, we've got isolation, anxiety creation -- it's an anxiety-based model -- ramping up the perception that if they don't confess, things are going to be a lot worse and really, the only logical choice here is to confess. And then helping them see that through the use of minimization techniques.

Q. In terms of the accusatorial interrogation, are there any specific techniques that are related to that style of interrogation?

A. Yes.

Q. What -- what is one of those techniques?

A. Well, it's -- there's a host of techniques under those three categories that I just talked about. So, for example, one of the features of an accusatorial interrogation is to go into the room and essentially say, "We know you did this. We don't really need you to tell us that you did it. We're just trying to understand why you did it." So, that's what we call direct positive confrontation.

And then to shut down any denials. So, if the suspect

Russano - direct

843

starts to deny that they committed the crime, they're supposed to cut that off and not let them voice that because the idea is the more they voice that they didn't do it, the harder it will be to get them to admit it eventually. And then to start overcoming any objections they might have for why they couldn't have possibly committed the crime.

And then there is the specific techniques. So, oftentimes, they will confront the suspect with true or false evidence. They will use those minimization themes that I talked about. So, it might be things like, "You know, what you did wasn't that big of a deal. It could have been a lot worse." Or, "You weren't the -- you weren't the shooter. You were the -- you were just there as a witness," so trying to shift the blame to a coconspirator, or shifting the blame onto the victim.

So, in a sexual assault case, it might look something like, "If she hadn't been dressed the way she was," or, "She led you on." These are face-saving excuses that are supposed to lull the suspect into a false sense of security and make it easier for them to admit what the investigator thinks they did.

So, that's -- I can keep going, but those are some of the features of an accusatorial interrogation.

Q. Do you know what the Reid technique is?

A. I do.

MR. KIVETZ: Objection, your Honor.

THE COURT: Let's go to sidebar.

(Proceedings heard at sidebar:)

THE COURT: What's the basis for this objection?

MR. KIVETZ: Well, I think we're starting to attempt to -- I'm sorry.

I think that we're starting to get into an attempt to at least to try to apply the facts to the case using the Reid interrogation technique. It wasn't -- it wasn't used by the Chicago Police Department. Their insinuation is that it was.

I think it would be more proper just to refer to this technique as the accusatorial interrogation technique, which is what she's been referring to it as. I think we're approaching getting into violating the Court's motion *in limine*.

THE COURT: Okay. The question that's pending is just, "What's the Reid technique?" I haven't heard that it's not relevant. In fact, I heard the opposite, that it's just another name for an accusatorial technique. So, the objection is overruled.

I also want to revisit the objection as to not disclosed with respect to false witness statements. I've had the opportunity to pull up the witness's report. Page 13 says, "The extant literature review provided thus far is relevant not only to suspect interviewing and primary false confessions, but also to interviewing that results in a false witness statement," and then proceeds with a lengthy paragraph

concerning false witness statements.

So, I am -- Mr. Richards, you may continue with that line of inquiry. The objection is overruled because it was disclosed, as I've just indicated.

MR. KIVETZ: Okay, your Honor. Thank you.

(Proceedings heard in open court, jury present:)

BY MR. J. RICHARDS:

Q. What is the Reid technique?

A. The Reid technique is an interrogation protocol that is taught by a -- a private organization called the Reid Company, and they've been around since the '40s, I believe.

They are the -- they hold themselves out to be the most widely-used interrogation technique, or at least the most influential training company in the United States.

Many investigators, even if they haven't directly been Reid-trained, they have been Reid-influenced; and what I mean by that is most investigators learn how to interrogate by doing it and by learning on the job and working with other people and picking up pieces of what they have seen.

And so even though an investigator may never have actually gone through Reid training, which by the way, the headquarters are here in Chicago, they likely have adopted pieces of Reid training.

It's an accusatorial style approach. Much like I was describing before, there are nine steps to the process. Not

Russano - direct
846

every -- not every interrogation includes nine steps, but it's an example of an accusatorial style process that is typical of an American-style interrogation.

Q.   I want to backtrack for a moment to the three types, the voluntary, compliant, and the internalized; and I want to ask you again if researchers have looked into these three types of statements, voluntary, compliant, and internalized, in relation to witness statements.

A.   Certainly, compliant witness statements, yes.

I don't know if I can think of off the top of my head any direct studies on witness internalized false statements. I'd want to go back to the research on that.  It's certainly -- that is typically reserved -- studies on that have to do with primary false confessions, as opposed to witness statements.

But compliant witness statement, yes.

Q.   And those are researched in the field?

A.   Yes.

Q.   Is there something known as confirmation bias?

A.   Yes.

Q.   What is confirmation bias?

A.   Confirmation bias is a psychological phenomenon when we form an opinion about something and we then seek out and pay more attention to information that confirms our opinion, and we don't spend nearly as much time seeking out or giving weight to information that disconfirms our opinion.

And this happens in various aspects of life. So, for example, one of the reasons why politics is so polarizing in our country is that people tend to form an opinion about something, and then they listen to people who have that same opinion. They seek out news sources or podcasts that reinforce that. And they don't give as much weight to other opinions, and so we get further and further apart because we're sort of in our echo chambers. Right? That's confirmation bias when we are doing that process.

In the context of a law enforcement investigation, that can also happen. So, for example, in an interrogation, if the police form the belief that a particular person has committed a crime, that this is the suspect and this is how the crime happened, if they start to suffer from confirmation bias, also known as tunnel vision, sometimes we'll use that term, what happens is they start to give more weight to information that confirms that opinion, and they don't pay as much attention to information that disconfirms that opinion.

Now, this isn't intentional. It happens unintentionally. We don't realize that it's happening. But what then happens is it triggers a process, kind of a self-fulfilling prophecy in behavioral confirmation, where they then can interact with the suspect in a way that then elicits behavior to confirm their opinion.

So, if they walk into a room and they go, "I know this

person's guilty. I know what happened. My job is to get that statement from that person." They then -- what we know from research is they then start interacting with them in a way that causes the suspect to appear defensive. And so in turn, that defensiveness is viewed as confirmation that their hypothesis is correct, which is that the suspect is guilty.

And so they may start to tend to use more accusatorial style approaches, some of which I've talk about, which then in turn is interpreted by the suspect as -- they start to panic, and they start to feel like, "Oh, my God, there's no way out. This person is not believing me." And their nervousness and their anxiety is interpreted again as confirmation that they did it.

And so it can create a really bad cycle in the interrogation room, where investigators who have a certain theory that the suspect is guilty then behave in a way that creates the suspect to behave in a way that appears to confirm, and it can lead ultimately to the perception that the person is guilty and perhaps to a confession.

And then it's also more generally when you step outside of the interrogation room, it can then affect how investigators proceed with the case. So, for example, we know that when a confession is taken, that is so powerful that it can contaminate the collection of other evidence.

So, we know from studies, for example, that if a

Russano - direct

849

confession is taken and then the investigators go and interview other witnesses or show lineups to other witnesses, that knowledge that the suspect has confessed can influence the investigators' behavior in the way that they question the other witnesses or the way that they conduct the identification. That behavior can be suggestive, and then it can elicit information from those other witnesses that confirm the suspect.

So, for example, if I as the investigator know that the suspect has confessed, I then go conduct a lineup with a witness, and I use an identification procedure that is suggestive, so, I advertently or inadvertently, this can happen unconsciously, suggest who the suspect is, and then I get the identification, that now feeds into my confirmation bias because, "Aha, this person has identified the suspect. I was right all along."

And that can happen in a variety of contexts. We even see that in forensic examiners. So, if somebody is looking at forensic evidence and we give them information -- like fingerprint evidence, and we give them information that the person whose fingerprint they are looking at has confessed, they are more likely to find a match in that fingerprint evidence than if they didn't have that information.

And that process leads to what we call corroboration inflation, where a confession can then lead to other evidence,

but it's not really corroboration because it's been influenced by the confession.

Q.   So, in terms of false confessions, are there certain risk factors that are associated with false confessions?

A.   Yes.

Q.   What are those risk factors?

A.   So, we can generally divide the risk factors up into two types.   The first are dispositional or individual risk factors. Those are things about the person that make them more vulnerable in the interrogation situation.   These are things like mental illness, cognitive disabilities, age, youthful status, right, something stable, relatively stable about that person that puts them at greater risk.

The other category of risk factors are situational risk factors.   Those are factors associated with the interrogation situation itself, like the techniques that are being used.

Q.   So, in a sense, there's two buckets, dispositional and situational?

A.   Correct.

Q.   I'd like to first move to the dispositional bucket.   The factors that you mentioned, are those all of the factors possible, or is that just some?

A.   No.   There are more than just the three I mentioned.   So, the three big ones are mental illness, cognitive disabilities,

and then youthful status.

So, we know, for example, that in the population of false confessors, in those cases where we have proven false confessions, people under the age of 21 are overrepresented because our brains are not fully formed. We are not -- from a cognitive and emotional and psychological standpoint, full maturity is around 23 to 25 years old. So, we know that youth is a risk factor.

Some of the other ones, there are individual differences in how suggestible people are, so some people are more -- by nature more suggestible than others. So, if you are a high suggestibility person, that will put you at greater risk.

There's some evidence to suggest that, for example, AD/HD is a risk factor in the interrogation room because it's related to your ability to focus on the short-term -- it's related to your ability to think about the long-term and the short-term consequences and your ability to focus in the room.

And there are some others, but the main three that I mentioned are the ones that are probably the most noteworthy.

Q. You used the term "overrepresented." What does that exactly mean?

A. So, in those documented cases of false confessions from the DNA database, but also the larger database, we can look to see what characteristics are in those cases. So, one of the things

Russano - direct

852

we can look at is:  What was the age of the person who falsely confessed, right?

And, for example, in the -- what that data tells us is about half of false confessors are under the age of 21 in that database, which relative to the population is disproportionate. Right?  So, they are more likely to falsely confess than older people are.  That's what I mean by disproportionate.

Q.  In terms of the second bucket, the situational risk factors, what are some of the situational risk factors?

A.  So, this has to do with:  What are the -- what are the techniques that we know are associated with false confessions? We know that prolonged custody, isolation, and interrogation, so length of time, is a risk factor.  The longer an interrogation goes, the greater the risk of a false confession.

We know that when suspects are confronted with false evidence, evidence that is not true -- and when I mean confronted, what I mean by that is the investigator tells them, "We have DNA evidence that puts you at the scene," or, "We have a witness that has named you as the shooter," and that is actually false information -- whether or not the investigator knows it's false is irrelevant.  If it's actually false and it doesn't exist, that increases the likelihood of a false confession because an innocent person -- because false confessions only happen from innocent people, right?

An innocent person when faced with an investigator

Russano - direct

853

saying, "We have evidence," that creates extreme anxiety and panic. Even though they know it's not true, they feel trapped. And they are trying to figure out: What am I going to do here?

And remember, that gets coupled with the implication is if you confess, you will be better off. So, presentation of false evidence is a significant and serious risk factor to creation of false confessions.

I'll also note that even bluffing about evidence is problematic. So, there's a difference between saying, "We have somebody who has identified you as the perpetrator of this crime," and a bluff might look like, "What would you say if we found -- if there -- if we check this recording and there is a tape of you being present and committing this crime?" That's a bluff, right? It's not saying, "We have it," but, "If we check the tape, what's it going to show?"

You would think on its face that that wouldn't be problematic, but actually, research tells us that that bluff can lead to false confessions; and the reason for that is because that bluff is usually happening in the context of a larger accusatorial interrogation.

So imagine a situation where an innocent person is being questioned. They're denying that they did it. The investigator does not believe them. They are now being confronted with the idea that there could be this evidence that proves that they -- the investigator is saying it proves they

did it, and they know they're not on that tape. Right?

Because they want it to end, what sometimes happens is the innocent person grasps on to that and says, "Okay. Fine. Yes, I did it, because when they check the tape, they're going to see that I didn't. So I'm just going to tell them what they want to hear now, and I'll be able to get out of here, and this will all get cleared up later."

So, we know from known false confessors that this happens, where they will grasp on to that and say, "Oh, there's my lifeline." So counter-intuitively the bluff can actually work against them, and research shows that that also leads to false confessions.

Q. Okay. So, we talked about a -- I just want to -- when you say the term "isolation," what do you mean by saying isolation?

A. So, what I mean by that first of all is that most interrogations happen, and it's just the suspect. Right? Police would like to interview the person one on one. That doesn't always happen. Sometimes with a juvenile, for example, there will be a parent present. Rarely will there be a lawyer present because most lawyers would stop that process.

But typically, the police are going to isolate the person alone, deprived of any social support or communication with their friends, family, legal counsel.

The reason why that's significant is people have a fundamental need to affiliate, especially in stressful

situations, have a need for support. And the longer an interrogation goes where somebody is isolated from that social support, the more depleted that person becomes in terms of their emotional state and their cognitive resources.

So, if they're being subjected to an accusatorial, coercive interrogation, it's going to be harder and harder for them to keep their defenses up and to keep denying. And so isolation is a part of that psychological process.

Q. So, when you say isolation, you're saying isolation in terms of isolation away from other people. Is that the same thing as isolation just being in a room? Is that the same kind of thing?

A. You mean alone in a room?

Q. Yes.

A. No. So, isolation doesn't -- you're still isolated if you're only interacting with your interrogators. So, I mean isolation from the person's social support system, friends, family, others. I don't mean they are truly alone. Isolation custody in detention includes the interrogators with them.

Q. Now, in terms of that situational bucket, the length of time of an interrogation, how is that a risk factor?

A. So, as I was explaining, the longer something goes on, the more tired and fatigued the person gets. Right? That's just -- that's fairly, I think, straightforward.

And interrogation involves a very complex process

Russano - direct

856

where an innocent suspect needs to deny, right, and they need to maintain their denials. And the longer that goes, and especially if it's coupled with things like sleep deprivation and other risk factors, other situational risk factors, time elapsed becomes problematic.

We know that in the U.S., most interrogations -- and when I say interrogation, I mean the entire length of time, from the time they get picked up and put in that room until it's over, including any breaks in questioning. All of that still counts. We know that it's usually under two hours.

So we know that from observational studies. We know that from surveying police officers. The average interrogation is probably about an hour and a half.

And we know from documented cases of false confessions that they tend to be much, much longer. When we see cases of false confessions, we're getting beyond two hours, three hours, four, hours, five hours, six hours, seven hours.

So length of time elapsed is associated with that higher risk.

Q. And length of time, to be clear, is not just the time they're being asked questions?

A. Absolutely not. It is a common mistake to think that the only time that counts is the active questioning. So, a lot of times, law enforcement might say, "Well, yeah, they were in the room for four hours, but we only questioned them for 60 minutes

Russano - direct

857

total.  There were two 30-minute sessions."  But that's not how humans react in that situation.  That's not what just affects.  It's the total time elapsed because they want to leave.  Right?

Even if they're sitting alone in the room for -- for time periods, that time, that cumulative experience of being isolated, being stressed, being anxious, all counts in terms of the risk that we are creating.

So, it's not just active questioning.  And that is definitely not how the research community considers length in terms of a risk factor.

Q.   Now, you mentioned sleep deprivation.  Why is that a risk factor?

A.   Sleep -- sleep is really important for our cognitive functioning.  And anybody who's ever been sleep deprived, if you've raised a child and spent overnights without sleep, you learn very quickly that you -- you do not respond the same way. You do not have the same psychological, emotional, cognitive, and physical resources.

And this is well-documented in any number of contexts, that sleep deprivation is associated with detriments in cognitive processing, psychological processing, motor skills, right, in many different capacities.

We know that sleep deprivation is a common technique that has been used as torture in various contexts.  Like

prisoners of war are subject to sleep deprivation because it's so detrimental.

And we know from research that sleep deprivation is associated with false confessions in the real world.  We know from laboratory research that it increases the risk of false confessions.  And that's because people are tired and they're less able to withstand the pressures of interrogation, and they're less able to think about the long-term consequences of confessing; and instead they focus on the short-term consequences.  It leads to myopic thinking where they just want it to end.  And that all creates a risk.

Q.  So, in terms of the situational bucket, we've talked so far about isolation, length of time, lies, bluffs, sleep deprivation.  Are there any other risk factors in that situational bucket?

A.  Yes.  So, threats and promises, both implicit and explicit, are another category that are significant and serious risk factors for producing a false confession.

Q.  What do you mean when you say threats and promises?

A.  So, a threat would be that they're -- the -- it is communicated to the suspect that something negative will happen if they don't confess.  That can be explicit, like, "We're going to take your child away," or, "We are going to make sure you're charged with the death penalty instead of life in prison."  Right?  That's a very explicit threat.

It could also be implied, which is more common. And so an implied threat would be, "You know, if you -- this is your chance to cooperate, and if you don't, how is this going to look to the jury? How do you think this is going to look?"

What we're communicating in that is, "Oh, they're going to look at this. If you keep denying, you're going to get the book thrown at you." The communication is, the threat is, "Things will be worse if you don't cooperate and tell us what we want to hear."

The flip side of that are the promises. Right? So again, we can have explicit promises. "If you confess, you'll be let go. You just have to place yourself at the scene, tell us what happened, and then you get to leave and go back to your life."

More common than that are those implied threats. "This is your opportunity to tell your side of the story. How is it going to look to that jury?" It goes hand in hand.

"If you confess, you're showing remorse. You're taking responsibility for your actions." The implication there is people will understand what you did more, and they will react accordingly.

Sometimes you'll say, "I can't make any promises, but I know the prosecutor in this case. I'll put in a good word for you." All of that is implying to the suspect that they will be better off if they confess and worse off if they deny.

And we know that those threats and promises, whether explicit or implicit, create a serious risk factor for a false confession.

Because if you go back to that big model, right, it's ramping up their anxiety, and then give them a way out. And that way out can be communicated in a variety of ways, blaming a coconspirator, the victim, appealing to their general self-interest; but all of it is communicating the same thing. "In this really bad situation I find myself in, the best of my bad options is to confess." That's the goal in terms of trying to get someone to confess.

Q. And besides use of threats and promises, is there any other risk factor in that situational bucket?

A. Sure. I mean, there are others, things like physical abuse certainly would count in this area. Deprivation of basic necessities, food, bathroom, sleep.

The use of leading and suggestive questioning processes, which goes along with the accusatorial interrogation style, is a risk factor for producing a convincing false confession. And so what I mean by that is -- and this is what we call the process of contamination.

So, sometimes what happens during an interview or an interrogation is the investigators leak information to the suspect about the crime. And this can be intentional, but it can also be unintentional.

So sometimes, for example, they might show them crime scene photos, and by showing them crime scene photos, they're giving them information that -- about the crime that they may not have known if they weren't there.

But it often happens through the investigators giving the suspect their theory of the case. "Here's what I think happened. I don't think you were the -- you were the mastermind behind this. I think it was your buddy. Right? And your buddy and you, you were just along for the ride."

They're communicating, and through explaining what they think happens, they're communicating information they think about the crime, or through a suggesting and leading question.

And the problem with that is that when they use these suggestive questioning processes and that information is later restated by the suspect, we don't know if that information is there because the person actually committed the crime and knew that or if they're just repeating back what the investigator told them. And when that happens, that's called contamination.

So, it's really important that investigators avoid that because the problem is after the fact, when you're looking at that confession, you're trying to figure out, "Okay. Did this person actually do it?" And one of the things you need to ask is: Did they provide information that only the perpetrator should have known? Right?

Russano - direct

862

Because if they did, that's a great sign that it's reliable, if they know something that nobody else should have known. And the problem is if the police knew it and they communicated that, well now it's not really very helpful.

So, we want to analyze that confession to figure out: Did they provide information that they couldn't have known otherwise? It wasn't in the public. It wasn't in the media. And if they did, did the police know about it? And if the police knew about it, did they communicate that to the suspect?

In a -- what we really would like to see is the suspect provide information that even the police didn't know. So, the classic example of that would be, you know, "I buried the murder weapon. I buried the gun in my backyard under the statue of a frog in my garden." Then the police go and they dig up the backyard, and they find the murder weapon, and they're able to tie that back.

That's called independent corroboration. That's a pretty good indication that person is telling the truth. So, always police are trained, they should be trained to seek out independent corroboration.

The dependent corroboration is when the suspect is providing information that the police knew. That's not quite as good as independent corroboration, but it can be good as long as the police didn't leak it.

So, contamination is a risk factor for creating a

Russano - direct

863

false confession.

Q.   So, besides that, are there any other risk factors in the situational bucket?

A.   I think we've covered most of the ones that -- that we talk about.

Q.   So, when you look at the dispositional and the situational, is one type more important than the other when it comes to false confessions or statements?

A.   Well, what I can say is this:  People have a generally easier time understanding the dispositional risk factors. Generally, people understand that younger people, that people with mental illness, that people with limited cognitive abilities are more vulnerable.

People have a harder time understanding the situational risk factors, and that's because most people can't possibly imagine ever confessing to a crime they didn't commit. It's just counterintuitive.  Right?  It's so against your own self-interests.

And when we're judging particularly other people's behavior, we have a tendency to make what are called dispositional attributions.  When we're looking at other people, we say, "They behaved the way they did because that's who they are."  And we don't generally appreciate the situation as much as we should.  And that applies to the interrogation room.

So, when most people are looking at a confession situation, they say, "Well, they confessed because they did it. They're guilty. That's their disposition, and that's why they confessed." And they fail to appreciate how impactful that situation itself can be.

We know, for example, that if an interrogation is recorded, okay, so if we have cameras in the room and we have different angles, and we show people a confession and from one angle, they're just viewing the suspect, and in another angle, they're just viewing the detective, they will view the suspect-focused confession as more voluntary than the detective-focused confession.

If you shift that perspective and they're watching the detective, it increases our ability to appreciate those situational, those interrogation techniques. But just watching it from the suspect's perspective, we tend to focus on and make a dispositional attribution.

So, I don't know if one is more important than the other. They all play a role in creating a risk. But I can for sure say people don't appreciate the situational risk factors as much as they do the dispositional.

Q. And in terms of each individual risk factor, is -- is one risk factor more important than the next?

A. Again, I mean, I don't -- we don't generally categorize them in that way. Certainly, in a given situation, there can

Russano - direct

865

be multiple risk factors, and you have to look at it the entire interrogation taken together because these risk factors are cumulative in nature.  Right?

So, it's not just, for example, that sometimes people are sleep deprived and that it's going on a really long time, but when you layer that on to presentation of false evidence and the implications of leniency, that's increasing the risk.

But there are some times that one factor can be so egregious that it can override everything.  There's really no dispute, for example, that if you physically abuse somebody, that can lead to a false confession.  And you don't need any of the rest of the stuff.  You can do that in a really short amount of time.

So, I don't really think about it as a hierarchy of risk factors, but you do really need to sort of look at the totality of the situation and see:  What is the likelihood of risk?

And if you believe that risk factors are present, right, if you determine, "I think these risk factors are present," the next step is to decide, "Can I trust the process that created this statement, or was the process so problematic that I really can't tell if this is true or false?  I can't use it as evidence because it wasn't collected in a way that gives us confidence that the statement would be accurate because an innocent person in this situation might confess or would

confess."

Q.   Do you -- earlier, you mentioned training police officers. Are -- is part of your training with these police officers going through these risk factors?

A.   Yes.

Q.   And in terms of going through these risk factors, how do you sort of explain why these risk factors are important?

A.   So, you know, the training, science-based interviewing and interrogation --

MR. KIVETZ:  Objection, your Honor.

THE COURT:  Basis?

MR. KIVETZ:  Scope.

THE COURT:  Response?

MR. J. RICHARDS:  Sidebar response?

THE COURT:  One second.

It's overruled.  You may continue.

BY THE WITNESS:

A.   Science-based interviewing and interrogation, the trainings that I've been involved in, our goal is to teach investigators how to do this well, meaning if they are interviewing someone or interrogating someone who is guilty or has information, we want them to be able to elicit that information in a reliable way.  Right?

So, we want to maximize the amount of information we get, maximize the amount of true confessions, but we want to

avoid false information and false confessions because nobody benefits from that. Right? If an innocent person confesses, that means the actual perpetrator goes free.

That's the goal of my research. That's the goal of my training is: How do we help investigators do this better? Right?

So when I'm talking and I'm training law enforcement, the first step is to make sure we're on the same page. Right? This is the goal. And then we explain the research. Here is what we know about the risk factors associated with false confessions, and here are the techniques that work. And by work, I mean will elicit information from the guilty, but do not increase the risk to the innocent. So, much like I'm explaining to you, in a longer version is what we talk about with them.

It's really important during the training just not -- to tell them not what they shouldn't do, but what they can do. So, the majority of the training is focused on: How do we do this well, right, so we can have confidence?

And the analogy that I like to use with them is to think about it like a crime scene. So, if we have a crime scene, there is a protocol that police need to follow in order to preserve the forensic evidence. So, they tape off the crime scene. They make sure that when they're collecting evidence, they're wearing gloves, they're following sterile procedures.

Russano - direct

868

Right?

Because when we collect that forensic evidence and we send it off to the laboratory and it's a match or there's incriminating evidence, if they followed that proper procedure, we can be confident in that evidence. But if they didn't follow the proper procedure, if they let people go trampling through the crime scene or they didn't wear gloves when they collected the evidence, well now the evidence is potentially contaminated. And now when the evidence comes back, we can't have confidence in what that evidence is demonstrating.

So, I explain it just like that, except in this case, the evidence is in the person's mind. Right? The information is the evidence we're trying to collect, and they need to use good diagnostic techniques to collect that evidence. That means avoiding techniques that can lead to false confessions and using techniques that lead to true confessions.

And if they don't do that, if they use poor questioning techniques, if those risk factors are present, it's like not wearing gloves. And so now, that resulting statement, we don't know if it's a product of the poor process or if it reflects actual guilt.

And so I talk to police officers as if, "You'll have to wear your gloves. You have to follow proper procedures. You have to be careful not to contaminate the evidence, the person's memory."

And so when they produce information, if you follow the good process, we can be confident that that process produces reliable information. But if they don't, well, then, it's not very helpful and informative because we don't know why the information in the statement is there, if it's a reflection of their guilt or just a poor interrogation process.

MR. J. RICHARDS: Your Honor, may I have a moment?

THE COURT: Yes.

(Counsel conferring.)

MR. J. RICHARDS: Tender.

THE COURT: Okay. Cross?

CROSS-EXAMINATION

BY MR. KIVETZ:

Q. Good morning, Dr. Russano.

A. Good morning.

Q. I think your background has been covered fairly thoroughly, but is it fair to say that you keep up to date on the research, scholarly articles, and laboratory experiments in the field?

A. I try to, yeah.

Q. Is it fair to say that you're a scientist that studies interrogations?

A. Yes.

Q. I think in your deposition, you referred to yourself as an interrogation scientist, is that right?

A. I've used that term, sure.

Q.   But you've never been a police officer, correct?

A.   That is correct.

Q.   You've never been through any type of police academy to train to be an officer, correct?

A.   Not to be an officer.  I've been through interrogation training.

Q.   You've never been a detective, right?

A.   No.

Q.   Never worked for the FBI, correct?

A.   Not directly, not as an agent.  I've been funded by the FBI.

Q.   You've never investigated any type of crime, correct?

A.   Correct.

Q.   You've never interviewed a suspect who was being investigated for committing a crime, right?

A.   Correct.

Q.   For instance, you've never interviewed a murder suspect, right?

A.   Correct.

Q.   You've never interviewed a suspect where the consequences could be that they could go to jail for the rest of their life, right?

A.   Correct.  I don't interview suspects directly.

Q.   I think you mentioned in your testimony that the accusatorial approach of questioning is the most prevalent

interviewing interrogation technique in the U.S., is that right?

A.   Yes.

Q.   It's widely used throughout all of North America, correct?

A.   Yes.

Q.   And that method in part is first bringing a suspect into an interview room and isolating them, right?

A.   Typically.  It doesn't have to be, but typically.

Q.   And that interrogation method includes, in part, firmly and directly accusing the suspect of having committed a crime, right?

A.   Typically, yes.

Q.   And I think that's called guilt-presumptive questions, right?

A.   Yes.

Q.   And when a suspect denies their involvement under the accusatorial method, the interrogator is supposed to shut down their denials, right?

A.   Yes.

Q.   For instance, if a suspect says, "I wasn't at the scene of the crime," the interrogator could say, "That's not true.  We know you were there"?

A.   They might say that, yes.

Q.   And using the interrogation method, an interrogator could also downplay the suspect's role in the crime, right?

A.   That is a fairly common technique, yes.

Q.   For instance, they could say, "Listen, we know you needed the money," something like that, right?

A.   Yes.

Q.   Or something like, "We know he provoked you," fair?

A.   Yes.

Q.   And the accusatorial approach ultimately is designed to try and get a confession from the guilty suspect, right?

A.   Yes.

Q.   You prefer a different interview method, though, correct?

A.   I would -- the science prefers a different interview method if the goal is to get reliable information.

Q.   And you promote that method, correct?

A.   Yes.

Q.   That's where you go out, and you teach to other police departments and I think you said other governmental officials, right?

A.   I have in the past, yes.

Q.   Like the Customs and Border Patrol, you've taught them, too, right?

A.   I've participated in one training with them, yes.

Q.   I want to ask you something different.  Based on your expertise and knowledge in interview and interrogation methods, the accusatorial interrogation method is legally permissible in the U.S., correct?

Russano - cross

873

A.   Yes.   But I'll caveat that to say there are -- there are lines that can be crossed that are not legal.   But the Reid method, for example, is legally permissible, and that is a style of accusatorial interrogation.

Q.   So, it's permissible to bring someone down to the police station and interview them in a small conference room, correct?

A.   Yep, yes.

Q.   It's legally permissible to isolate a suspect for a few hours before interviewing them, right?

A.   Yes.

Q.   It's permissible to use guilt-presumptive questioning, right?

A.   It's legally permissible, yes.

Q.   It's also permissible for an interrogator to shut down a suspect's denials, correct?

A.   Yes.

Q.   In fact, it's even permissible to lie to a suspect during interrogation, right?

A.   Yes.

Q.   You can, to use your terms, bluff a suspect, right?

A.   It's legally permissible.   It's not psychologically wise, but it's legally permissible.

Q.   And all of those tactics are permissible here in Illinois, correct?

A.   I mean, I'm not a legal expert, but to my understanding,

yes.

Q. They're also permissible in Rhode Island, right?

A. Again, I'm not a lawyer, but yes.

Q. I think --

A. You know, actually, I just want to say, there have been recently some states that have started to pass state laws to restrict lying to police. I don't know if Rhode Island is one of them. A lot of them are restricting that with juveniles right now, but there is a movement towards restricting lying to suspects.

Q. Understood. I think in your report, you stated that the growing number of DNA exonerations in this country affords you the unique ability to examine the contributing factors for wrongful convictions, is that right?

A. That sounds like something I would write, yes.

Q. All right. So, it sounds like from these DNA exonerations, you've determined that there are certain risk factors that are present that could potentially lead to a false confession?

A. I personally haven't done that analysis, but that analysis has been done.

Q. And you rely on those analyses in support of your opinions, correct?

A. Yeah. I mean, to be clear, it's -- these are aggregated case studies. This is one data point just to -- it's more used as we know false confessions occur. Here are the factors that

are present in these.  And then we go conduct other research to really answer the more definitive question of:  Are they statistically related?

Q.   Okay.  But you do rely on that data point, correct?

A.   That these confessions occur?

Q.   Correct.

A.   And these risk factors are present?  Yes.

Q.   Okay.  And from these DNA exonerations you've determined that lack of sleep, vulnerability, time in custody, and interrogation time could potentially lead to a false confession, is that right?

A.   That's not what I said.  So, we have some information from these DNA exoneration cases.  So, I think what I testified to was we can look at the age of the false confessors.  We can look at the type of crime.

I don't know that they've looked at, for example, length of time within those databases.  That would be from other research.

Q.   Okay.  What about the accusatorial interrogation method?  From those DNA exonerations, you've determined that the accusatorial interrogation method is a contributing factor towards false confession?

A.   Yeah, I actually don't think that those cases have been analyzed for the specific research questions you're asking.

Q.   Okay.

A.   We generally use that database to, one, establish that false confessions do occur in the real world, and then looking at factors like age and race and type of crime.  But they don't generally review what's actually occurred in those interrogations in those types of cases, or at least not -- not in the databases I'm referring to.

Q.   So, you're not relying at all upon those databases to determine whether or not certain risk factors could lead to a false confession?

A.   So, there are some analyses of some cases, but you keep asking me just about the DNA databases.

Q.   Yep.

A.   The DNA databases that I'm referring to I've used in a very limited way to talk about the prevalence of false confessions in them and the age.  There are research studies that have looked at some portion of exoneration cases, some of which might be DNA, some of which might be non-DNA; and they've looked at some of these other factors like length of time in them.  But that's not coming from the DNA databases that I think you're referring to.

Q.   Okay.  Well, the DNA databases that I'm referring to is the National Registration of Exonerations and the Innocence Project; fair?

A.   So, yeah.  The DNA -- the Innocence Project database that most people are referring to are the first 375 DNA exonerations

in this country.  They now track things a little bit differently, so the statistics I'm citing are to those first 375 DNA exonerations.

The National Registry of Exonerations, which is a much larger database, include those DNA exonerations, but then many, many other cases that didn't involve DNA.

Q.  Okay.  Exactly.  And then from those two databases, the reasons that we know the confessions were false is because the DNA proved that someone else committed the crime and, therefore, the confession had to be false, right?

A.  Well, in DNA cases, the DNA either exonerated the person, and sometimes in a sub-portion of DNA cases, they've actually identified the true perpetrator.  That doesn't always happen. So, sometimes it's -- they find that there was no match, so it exonerates the person; and then in a subset of cases, they identify who actually did it.

But DNA only helps us in DNA cases, not in the non-DNA cases.

Q.  And that's what I'm focusing on, the DNA cases.  Right? The DNA cases that you say you now can prove essentially because they're in this exoneration and Innocence Project are false because the DNA supports that the confession is false.

A.  Well, and they've been officially exonerated.

Q.  Okay.  But again, the DNA proved that those confessions were false, right?

Russano - cross

878

A.   If that's how you want to phrase it.  I -- they have been exonerated through the use of DNA post-conviction.  They've been declared factually innocent, and there was DNA involved in that exoneration.

Q.   What's the prevalence rate of false confessions in America?

A.   That's a great question.  Nobody can tell you; and anybody who sits up here and tells you that X percentage of false confessions occur in the world, it is an unknowable number.

And the reason why it's unknowable is because we don't keep records, police don't keep records of every interrogation that they've ever conducted; and we don't have ground truth because we don't have a crystal ball for us to know whether every confession is true or false in the real world.

So, there is no way to calculate the prevalence of false confessions, just like there's no way to calculate any number of phenomenon.  We don't know how many children are victims of child abuse because that's an unknowable number.  But we do know it's a problem, and we do know that through these documented cases.

Q.   So, you can't tell us the prevalence rate of false confessions in America, correct?

A.   Correct.  Nobody can.

Q.   And you can't tell us whether or not the prevalence rate of a single risk factor could lead to a false confession in America, right?

A.   I don't understand that question.

Q.   I think you also talked about how you rely on experimental research in order to support your opinions, is that right?

A.   That's part of what we rely on.

Q.   Okay.  And I believe that you found -- well, one of the first key experiments is this ALT-key experiment, is that right?

A.   That's one of the experiments in the land of the experimental studies.

Q.   One of the first pioneering studies; is that fair to say?

A.   I would agree with that, in that particular area.  I mean, there's been research for years and years, but in the experimental laboratory world, the ALT-key study is one of the pioneering first ones.

Q.   And in that experiment, college students were asked to complete a typing task and were explicitly instructed not to hit an ALT key, correct?

A.   Yes.

Q.   And then about a minute into the exercise, the computer suddenly crashed, and the experimenter accused the participants of hitting the ALT key, even though they didn't actually hit it; is that fair?

A.   In essence, yes.

Q.   And then they had one of the students, I think they referred to it as a confederate, either say that she saw the

participant hit the ALT key or that they didn't hit the ALT key, is that right?

A. So, to be clear, this paradigm has been used many, many times, but I think you're referring to the original study. I didn't conduct the study, but I'm very familiar with it. In that original study, what you said, yes.

Q. And then the experimenter then asked each of the subjects to sign a confession, and a certain amount of the participants signed the confession even though they didn't hit the ALT key; is that fair?

A. Yes.

Q. But there were some problems with that study, is that right?

A. There are some limitations to the study.

Q. And one of those limitations was that the experiment failed to capture some key elements of the real world interrogations and confessions, is that right?

A. Yes.

Q. Okay. What were those key elements?

A. So, the ALT-key paradigm, which we've learned a lot about, it was the first way that we started to study just the phenomenon of false confessions. Could we get people to admit to something that they didn't do?

When I entered the field, my dissertation study was actually -- because I looked at those paradigm studies, and I

thought that's really interesting, but can we make this closer to the real world?

So, for example, in the ALT-key paradigm, sometimes people are unsure if they hit the ALT key, so it's possible they might think to themselves, "Well, maybe I hit it and didn't realize it." And I wanted to study a situation in which they knew whether or not they committed the offense they were being accused of, so making sure that it was an intentional act. They weren't being accused of accidentally hitting the ALT key or doing something, but being accused of something with intention.

So, that's one example.

Q. Another example is that the consequences are different between a college experiment and the real world?

A. Sure. But we're not trying to -- yes. I mean, it is different to accuse somebody of doing something in the laboratory, and it's not a threat of going to prison, which is what we see in the real world.

But the important part here is that we're not trying to generalize the confession rates that we find in the laboratory to the real world. We're trying to generalize the underlying psychological processes that are occurring.

So, for example, if we manipulate the type of interrogation technique that we're using when we're accusing somebody of doing something, that difference in whether it

increases or decreases the true or false confession rate, that's what we're generalizing. We're not generalizing what percentage of people would confess in this situation.

And the ALT-key paradigm is one example. The paradigm I created involves accusing students of cheating in an academic context, which is more serious and carries more weight.

So, there's a variety of ways we can study this; but when it comes to generalizing the studies, because oftentimes laboratory studies are criticized for, "You used college students, so you can't generalize," that's really misunderstanding research methods and how and to what extent we can generalize things.

We absolutely can generalize laboratory research on interrogations and confessions. The underlying psychological processes can be generalized to the real world, even if it doesn't exactly look like a real world interrogation situation.

Q. So, you think that you can understand from a college kid getting accused of hitting an ALT key and compare that to a murder suspect in a room and the consequences are going to jail; is that what you're saying?

A. I think we can absolutely understand the effects of various techniques and the risk factors from laboratory studies like the ALT-key paradigm and others and understand how those underlying factors can be applied to the real world.

For example, age. Right? We can look at age and look

at the effects of age in the laboratory, and the vulnerabilities that come along with younger people can be studied in the laboratory in a variety of tasks; and that can be generalized because the psychological phenomenon associated and the deficits associated with younger people is constant regardless of the situation that they're in.

Q.   So, you've just alluded to this a little bit earlier.  You then created this cheating paradigm --

A.   Correct.

Q.   -- is that right?

A.   Yes.

Q.   And that's when you induced some participants to commit an intentional act of cheating, is that right?

A.   Some participants.  So, in that paradigm, one of the other things I wanted to do was -- with the ALT-key paradigm, traditionally, it's only used to study innocent people being accused of a crime they didn't commit.  Because my focus was also to figure out how to help police to get true confessions, I wanted a paradigm where we could study innocent and guilty people so I could tell what techniques were leading to true confessions as well as false confessions.

Q.   And in that study, you used college students again, is that right?

A.   In most of the studies, we've used college students.  I've actually recently conducted a study where we used community

members.

Q. You then interrogated the college students who were provably guilty or innocent and then tried to get them to sign a handwritten confession, is that right?

A. That's what happened in the study. I was not the actual interrogator because that would not be appropriate given my role, but I -- the interrogators in the study would accuse and try to elicit confessions.

Q. And the interrogator then would offer them a deal. If they'd sign the confession or if they took the deal, essentially the consequences were that they just had to come back for another session, is that right?

A. Not exactly.

Q. Okay. Well, if they did not take the deal, they were going to get some sort of academic reprimand, right?

A. Possibly. Do you want me to explain it?

Q. Sure.

A. So, again, this study, this paradigm has been used in multiple contexts. If we're referring to just the original study, which was the dissertation study I alluded to earlier, in that study, students at a university are accused of cheating during a task. Some of them are innocent, and some of them are guilty. They know whether they are innocent or guilty. There's no question about that. They know what the rule was that they broke, the task that they violated the rule on.

They are then accused. Some of them are, again, innocent and some are guilty, and we varied the techniques that we used. So, we had two manipulations.

The first was an explicit offer of leniency, sort of analogous to a plea bargain in the real world. So, "If you agree to sign this statement, you're going to have to come back. You're going to have to spend another hour with us, but that's probably going to be the end of it, but we can't guarantee it because it's up to the researcher in charge of the study."

They had previously been told that this may be considered a case of academic misconduct and cheating, so that is what's hanging over their heads. Or they weren't offered that deal.

We also manipulated the use of minimization. So, if you remember, that's the implying leniency, which is more common in the real world because in the real world officers aren't supposed to use explicit promises, but they do use minimization all the time. So we manipulated the use of minimization, or we didn't have it.

And then we looked to see the effects of the confession rates for both innocent and guilty people.

Q. So, I just want to make sure I understand the consequences. It was either one hour of reprimand or academic reprimand, where you told the professor that they were accused of

cheating, is that right?

A.   Not quite.  So, all participants were told, "Here's what we think happened.  We think that this violation of the -- the violation occurred.  If this happened, the professor may consider this a case of cheating," with all of the implications thereof.  So, at a university level, being accused of cheating can lead to expulsion, right, ultimately from the university in some situations.

They were then told that the professor in charge of the study wanted them to sign a confession statement, wanted -- well, they didn't say confession statement, wanted us to document the situation, which meant a confession statement.  And they were told that no matter what, they couldn't be guaranteed what the outcome was, that it was up to the professor.  The person running the study was going to go back and explain whatever the decision was.

So, it was not a clear -- a clear, "You're in -- it's okay if you don't."  It was, "If you sign" -- for the -- the deal condition, it was, "If you sign this, you're going to have to come back," that was one of the consequences, "but that will probably be it; but we can't guarantee it because ultimately it's up to somebody else," like the judge, right, if you're making this analogy.

In the minimization condition, it was, "I really think it's in your best interests to sign this.  If you don't sign

Russano - cross

887

it, things will be much worse for you. You were probably just trying to help the other person out. You didn't really realize what a big deal this was."

These are common themes that we would see in the interrogation room. There were no explicit promises made about the outcome. They were signing the statement knowing that they were admitting to cheating, and the consequences of that were to be determined in the future.

Q. And you think that you can equate those academic reprimands from a college kid confessing to a suspect confessing to murder?

A. I do think that the underlying psychological principles that we learned from these studies can be generalized to the larger population of interest.

Q. And, Dr. Russano, the consequences of academic reprimand are significantly different than the consequences of going to jail for the rest of your life, correct?

A. Absolutely.

Q. Also -- well, all right. I think one of the other areas that you rely on in support of your opinions is case study research, right? That informs whether or not certain risk factors could potentially lead to a false confession, is that right?

A. Are you referring to these aggregated documented false confession cases?

Q.  Well, the one that I'm referring to is that 2004 study by Leo and Drizin.  Are you familiar with that?

A.  So, that would be an example of an aggregated case study analysis.

Q.  Now, in that 2004 study by Leo and Drizin, researchers analyzed 125 cases of allegedly proven interrogation-induced false confessions, is that right?

A.  Yes.

Q.  And you relied on that study in support of your opinions, correct?

A.  I cite it in my report in terms of just documenting the existence of false confessions and some phenomenon.  It's a pretty minor point, but it's one data point in a universe of data points.

Q.  So, I'm unclear.  Did you rely on it, or did you not rely on it when you --

A.  I guess I don't know which part --

THE COURT:  You can't speak over each other.

THE WITNESS:  I'm sorry.

THE COURT:  So, question and then answer.  Please allow each other to finish.

Question?

BY MR. KIVETZ:

Q.  Did you rely on it or did you not rely on it when you cited to it specifically in your report?

A.   I mean, I cited it in my report, but in terms of my opinions about this particular case, I -- it doesn't really impact it.  My report provides a lot of background information about the science, but it doesn't really factor in to my opinions about this particular case, *per se*.

Q.   So, you -- you cited this case study in order to show that this is the science behind false confession research, right?

A.   I mean, what that -- where I cited it in my report -- and you can show me my report if you want me to speak more specifically, but I cited it as an example of there are case studies, aggregated case studies.

     And in that particular study, for example, out of these 125 cases, I think of those cases that went to trial as opposed to plea bargain, there was a conviction rate of, I think, 81 percent.

     And the point of citing that in my report was just to say that confessions are very powerful, and when they go to trial, they often lead to conviction when they're used at trial.

     So, to the extent that I was providing background information, it's in my report.  I guess my tripping point is relying on my opinions of the case.  It has nothing to do with my opinion, for example, about the risk factors that we've been talking about.

Q.   Did you think that was a reliable study?

A.   Drizin and Leo is one study.  There are some criticisms of that study.  It depends what you mean by reliable.  There are questions about how they included cases in the sample.  I don't take much issue with it.

I don't really rely on it in terms of any of the opinions I'm giving in this case beyond that there is the existence of false confessions and what I've already explained.

Q.   And just focusing on that study, then, the researchers stated that of the 125 cases, that they -- only interrogation-induced false confessions that can be classified as proven, that is, confessions that are indisputably false because at least one piece of positive evidence objectively establishes beyond any doubt that the confessor could not possibly have been the perpetrator.

Is that your understanding?

A.   Yeah.  I mean, I'd have to have the article in front of me if that's what they exactly wrote.  I'm not the author, but that sounds like what it -- they would say.

Q.   No reason to dispute it, correct?

A.   No.

Q.   You brought up some of the criticisms.  Isn't it true that the basis for demonstrably proving over 90 percent of those 125 false confessions came from newspaper articles?

A.   Yeah.  You know, I was actually reading something that Leo wrote about that particular article, and he says that that

is -- that they looked at newspaper articles, law reviews, databases, police report, police transcripts.

So you'd have to ask him. I am not a part of that study. I wasn't a part of culling that data. So, I don't really know, and I certainly have never heard that statistic.

Q. You've never heard that statistic before?

A. That 90 percent of it. If it's written in the paper, I might have read it. This is one paper out of thousands I've read, so --

Q. And you keep up on all the scholarly --

A. As best I can. This is a 2004 article. And again, it's not really -- the phenomenon of false confessions exist. Whether you take issue with some of the cases that they declare a proven false confession, you can remove that, and it doesn't change anything about what we know about the risk factors of false confessions. You can eliminate this whole study, and it doesn't change anything.

Q. The phenomenon of false confessions exists, but you can't tell us the prevalence rate, correct?

A. No one can tell you the prevalence rate. It's an unknowable number. Just like no one can tell you the true prevalence rate of child abuse. It doesn't mean that child abuse isn't a significant problem, though.

Q. I'm just looking at the clock here. One more question, and then we can move on.

Russano - cross

892

Are newspapers articles a reliable source to determine whether a confession is provably false?

A. I mean, that's not really -- that's how they culled their information about cases, I believe. Again, not my study. You would have to ask them.

But determining whether a confession is true or false is a complex issue. What they were trying to determine is whether they had been declared exonerated and, therefore, included in their database.

THE COURT: All right. We'll take a break for lunch. Folks, we'll come back at 1:00 p.m. All rise.

(Jury out at 12:00 p.m.)

THE COURT: Okay. Dr. Russano, you can step down. You're not to discuss the substance of your testimony with anyone.

Any issues to address before the break?

MR. S. RICHARDS: No, your Honor.

MR. POLICK: No, your Honor.

THE COURT: See you back at 1:00.

(Lunch recess had from to 12:01 p.m. to 1:00 p.m.)

(Change of reporters.)

893

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                        )
                                   )
               Plaintiff,          )
                                   )
-vs-                               ) Case No. 1:22-cv-03973
                                   )
REYNALDO GUEVARA; MICHAEL          )
MASON; and JoANN HALVORSEN,        )
as Special Representative of       )
ERNEST HALVORSEN, Deceased,        ) Chicago, Illinois
                                   ) February 6, 2026
               Defendant.          ) 1:00 p.m.


                        VOLUME 5
          TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
          BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:     LAW OFFICE OF STEPHEN L. RICHARDS
                       BY:  MR. STEPHEN L. RICHARDS
                            MR. JOSHUA S. RICHARDS
                       53 West Jackson Boulevard, Suite 205
                       Chicago, Illinois  60604

For Defendant          BORKAN & SCAHILL, LTD.
Guevara:               BY:  MR. TIMOTHY P. SCAHILL
                            MR. GRAHAM P. MILLER
                       20 South Clark Street, Suite 1700
                       Chicago, Illinois  60602

For Defendants         THE SOTOS LAW FIRM, P.C.
Mason and    Halvorsen:     BY:  MR. JOSEPH M. POLICK
                            MR. JOSH MICHAEL ENGQUIST
                       MR. JEFFREY ROBERT KIVETZ
                       MS. CAROLINE P. GOLDEN
                       141 West Jackson Boulevard, Suite 1240A
                       Chicago, Illinois  60604

894

Court Reporter:            CHARLES R. ZANDI, CSR, RPR, FCRR
                           Official Court Reporter
                           219 S. Dearborn Street, Room 1426
                           Chicago, Illinois  60604
                           Telephone:  (312) 435-5387
                           charles_zandi@ilnd.uscourts.gov


                    *    *    *    *    *

                PROCEEDINGS REPORTED BY STENOTYPE
       TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

MR. J. RICHARDS:  Your Honor, do you want me to grab the witness?

THE COURT:  Yes.

(Jury in at 1:00 p.m.)

THE COURT:  Dr. Russano, I remind you you remain under oath.

You may continue.

MR. KIVETZ:  Thank you, Your Honor.

MELISSA BETH RUSSANO RODRIGUEZ, PLAINTIFF'S WITNESS, SWORN,

CROSS-EXAMINATION (Resumed)

BY MR. KIVETZ:

Q.  Dr. Russano, would you agree with me that suspects also employ certain tactics during an interrogation in order to get an interrogator to believe that they did not commit the crime?

A.  Yes, sometimes.

Q.  For instance, suspects often lie during an interrogation, is that right?

A.  Yes.

Q.  A suspect will try to misdirect an investigator, is that right?

A.  Sometimes, yes.

Q.  A suspect could give a false alibi, is that right?

A.  They can.

Q.  And a suspect will even try and minimize their involvement

in crime, is that right?

A.   Sometimes.

Q.   Would you agree that a majority of the confessions in the United States are true and accurate?

A.   I would like to believe so.

Q.   No reason to dispute it?

A.   I mean, again, we don't -- we can't know the prevalence rate of true confessions either.  But there is reason to believe that there is more true confessions than false confessions.

Q.   Okay.  I want to talk a little bit about the time situation of an interrogation.  I think you said something about a specific time.  What is the average length of time of an interrogation in the US of a criminal suspect?

A.   So from the studies that we have, and there are a multitude of studies that have looked at this, on average it's about one and a half hours, 1.6 hours.  Under two is typical.

Q.   Okay.  So if the majority of confessions are true, then the average time limit of a true confession would take somewhere between the vicinity of around an hour and a half, is that right?

A.   Well, let's just back up a minute.  So the studies that look at the average length of interrogation, not all interrogations end with confessions, so that would include interrogations that don't end in confessions as well.

Q.   Okay.  I want to move on a little bit and ask to talk to you about some of the risk factors.  I think one of the risk factors that you talked about was guilt presumptive questions, right?

A.   Yes.

Q.   Now, if guilt presumptive questions were not present in the interrogation, then guilt presumptive questions could not have an effect on whether or not the confession was true or false, correct?

A.   So actually, let me -- I don't use the term "guilt presumptive questions."  I use guilt presumptive approach, which is to the interrogation itself.

        What I would -- the terminology I would use is leading and suggestive questions.

Q.   Okay.  So if the guilt presumptive approach was not present in the interrogation, then that could not have been a factor in whether or not the confession is true or false, fair?

A.   That's true.  In the absence of the presence of something, it can't be a risk factor.

Q.   Exactly.

A.   Yes.

Q.   All right.  And that's what I want to talk about a little bit with the rest of these risk factors.

        You also said that one of the risk factors is when an interrogator shuts down a suspect's denials, correct?

A.    That's part of an accusatorial approach.

Q.    All right.  And so if the interrogator does not shut down the denials during the interrogation, then that could not have been a factor in whether or not the confession was true or false, correct?

A.    So, again, the absence of any risk factor means it's not going to be a factor.  But I wouldn't call shutting down denials in and of itself its own risk factors.  I just want to clarify it's part of a guilt presumptive approach, but it's not a risk factor in isolation.

Q.    All right.  I think another one of the risk factors that you opined that could lead to a false confession is lack of sleep, right?

A.    Sleep deprivation, yes.

Q.    Sure.  So if sleep deprivation was not present in the interrogation, then it could not have been a factor as to whether or not it's true or false, right?

A.    Correct, correct.

Q.    Another one of the risk factors that you opined can lead to a false confession is prolonged custody, right?

A.    Custody, interrogation length is what we're walking about, yes.

Q.    And if there is no prolonged custody present before or after the interrogation, then it could not have been a factor in determining whether or not the confession was true or false,

right?

A.   I don't know what you mean by "before and after the interrogation."  Can you clarify --

Q.   Sure.

A.   -- what period of time we're talking about?

Q.   If there is no prolonged custody during or before the interrogation and before it led to a statement, then it could not have been a factor?

A.   By definition, there is no custody before the person is in custody.  And by "custody," I don't mean legal custody.

So if the time where they began the interview interrogation process to the time that the person finished their confession, if that time period was not prolonged, then it would not be a risk factor.

Q.   Exactly, okay.

I think you've also stated that a lack of food and water is a risk factor that could potentially lead to a false confession, is that right?

A.   Yes.

Q.   And so same question:  If there is no lack of food or water present in the interrogation, then it could not have been a factor in whether or not it's a true or false confession, right?

A.   Correct.

Q.   You've also talked about youth status as being a risk

Russano - cross

900

factor, correct?

A.   Correct.

Q.   By the way, you'd agree with me that when you turn 18, you're a legal adult in the US, right?

A.   A legal adult, yes.

Q.   Okay.  You can vote at 18?

A.   Yes.

Q.   You can join the military, correct?

A.   Yes.

Q.   And you can be tried as an adult for a felony crime at the age of 18, right?

A.   Some places even younger.

Q.   Exactly.

     Also, for youth vulnerability, shouldn't you consider a suspect's past experience with the police in order to determine whether or not that's a risk factor?

A.   No.

Q.   Not at all?

A.   Not in conjunction with his age, no.

Q.   Juveniles commit crimes all the time, right?

A.   They do.

Q.   All right.  In any event, if youth vulnerability was not present in the interrogation, then it cannot have an effect on whether or not it was true or false, right?

A.   If someone is over the age of 23, 24, 25, then youth would

not be a factor.

Q.   Now, another one of the risk factors that you opined can lead to a false confession is physical abuse, right?

A.   Yes.

Q.   If physical abuse was not present in the interrogation, then it can not have been a factor as to whether or not it was true or false, correct?

A.   Correct.

Q.   All right.  And finally, I think one of the last factors you opined can lead to a false confession is threats to a suspect, correct?

A.   That was one of them, yes.

Q.   Yeah.  I think you said threats and the promise of fulfilling that threat, is that fair?

A.   They go hand in hand.

Q.   All right.

A.   But they are separate concepts.

Q.   And if there were no threats or promises present in the interrogation, then it could not have been a factor in determining whether or not it's true or false, correct?

A.   In creating a risk, right.  If they're not present, then they're not a risk factor.

Q.   Okay.  I just have a few questions left.

         Is it fair to say that you can have a statement or a confession that admits guilt but also contains a fact that

isn't true without it necessarily being a false confession?

A.   Repeat that one more time.

Q.   Is it fair to say that you can have a statement that admits to guilt, but it also contains a fact that is not true without it necessarily being a false confession?

A.   Sure.

Q.   So a person can commit a crime and give a true confession but not give all the details accurately?

A.   Yes.

Q.   Also, in the studies that you've conducted, did you find that guilty people are more likely to confess than innocent people?

A.   Yes.

Q.   Is it fair to say that the number one driving factor of whether or not you were getting a true or false confession is the actual innocence or guilt of the person?

A.   That doesn't really make sense, right, because by definition, a confession from someone is either true or false. So you can only get true confessions from guilty people, and you can only get false confessions from innocent people.

Q.   That's what I'm saying.  Because if the person is guilty, then the confession can only be true?

A.   No.

Q.   What do you mean?

A.   If the person -- well, yes.  I mean, yes, that's true.  But

the way you phrased it's the number one driving factor, it's not the driving factor. It's just reality that confessions from guilty people are true and confessions from innocent people are false.

Q. Okay. Almost done.

Have you seen a new study from Scott Mourtgos and Ian Adams from the University of South Carolina that was recently peer reviewed and published in the Journal of Criminal Justice? It's called "Recalibrating the Risk of False Confession Wrongful Convictions: Interrogation Tactics and Inverse Probability."

A. I think I've seen it come across, but I haven't sat down and read it. It's relatively new I believe.

Q. It just came out in the past couple weeks, right?

A. Yeah. I think I've seen it. It's on my list of to do for reading, but I haven't read it yet.

Q. You don't know anything beyond it?

A. Beyond I'm familiar with the title.

MR. J. RICHARDS: Objection.

THE COURT: Basis?

MR. J. RICHARDS: Sidebar, Your Honor?

THE COURT: Okay.

(Proceedings heard at sidebar:)

THE COURT: What's the basis for the objection?

MR. J. RICHARDS: Your Honor, the basis for the

objection is that this recent treatise is a not proper confrontation of the witness. I'm not sure this treatise was disclosed to us as a learned treatise that the defendants intended to use as impeachment of the witness. I don't believe that this treatise is in their exhibit list. That was --

THE COURT: Is it your contention that they have to disclose every exhibit they intend to present to a witness during cross-examination?

MR. J. RICHARDS: No, Your Honor. But there has to be some, you know -- if the exhibit was disclosed in discovery, that's one thing. And then, you know, it doesn't have to be disclosed as an exhibit. But in this case, there is no disclosure at all of this, of this article.

THE COURT: The objection is overruled.

(Proceedings heard in open court:)

BY MR. KIVETZ:

Q. We talked a little about peer-reviewed articles and how it goes through a process, is that right?

A. Yes.

Q. Okay. And I know you said you haven't reviewed it, but do you understand that this particular article, "Recalibrating the Risk of False Confessions" has been peer reviewed?

A. I have no idea because I, like I said, I recognize the title. The journal, what is the name of the journal?

Q. It's the Journal of Criminal Justice.

Russano - cross

905

A.   So that's not a journal that typically experts in our field publish in.  So I would want to take a look and make sure that that journal follows the same process I described.

I mentioned on direct that there are different quality of journal.  And so I'm not familiar with that specific journal's process.

Q.   You said it's in your inbox to review though, correct?

A.   It's on my to-do list.

Q.   To-do list.

Well, would you be surprised to learn that what you earlier said that couldn't be done with regard to determining the prevalence of false confessions in wrongful convictions, that they actually figured out mathematically how to do it?

A.   I would be very surprised to learn that anyone could do it, because it's impossible.  They might have come up with some algorithm or formula where they're making assumptions, and they've come up with some way where they're assuming this, then that.  But it is an unknowable number, because the starting point of knowing that number is, first of all, how many interrogations are conducted in this country.

Q.   Okay.  And so using a mathematical formula, they determined that the probability of a false confession wrongful conviction associated with lawful interrogation tactics is 1 percent.

A.   Yeah, I'd want to read that study and how they came up with that number.  I do not believe that that is a number -- you

would have to look very critically at how they calculated that number.  They had to have been making a lot of assumptions.

Q.  And as you sit here today, you haven't read it, so you can't tell us whether or not it's mathematically improbable to determine the false convictions --

A.  I haven't read it.  Sorry.

Q.  -- a false conviction wrongful conviction rate?

A.  Yeah.  I don't even know -- the authors are not experts in the field that I am aware of.  So I don't know who these people are.

Q.  So according to them, that means that, and according to the peer review article, that 99 percent of confession cases using the accusatorial interrogation --

THE COURT:  Counsel, what's the basis for asking these questions when the witness has said she hasn't read it?

MR. KIVETZ:  Well, I'm asking her whether or not she's --

THE COURT:  What's the foundation if she hasn't read it?  How can she answer your question without speculating?

MR. KIVETZ:  Okay.  That's fair enough, Your Honor.  I'll withdraw.

Just one second, Your Honor.

(Off the record.)

MR. KIVETZ:  No further questions, Your Honor.

THE COURT:  All right.  Any other cross?

MR. SCAHILL:  No, Judge.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MR. J. RICHARDS:

Q.  I'm going to jump around a little in terms of topics that counsel touched on in his cross.  The first one I want to talk to you about is how counsel mentioned articles cited in your report.  How do you go about citing articles in your report?

A.  Well, I mean, I'm not sure I completely understand what you are asking me.  But any time that I am stating a fact or a specific research finding, I would include the citation for that, where that fact or that reference is coming from.

So we use something called APA format, where we put -- you know, in a footnote I would put the article that it's coming from, and then there would be a reference page to tie that to.

Q.  And in terms of your report, I mean, counsel just asked you about one or two of those cites.  How many total cites did you have in your entire report?

A.  I mean, I'd have to look at it, but probably in the neighborhood of a hundred or so, if I was to guess.

Q.  Well, would looking at your report refresh your recollection as to the exact number of cites of articles that you looked at in making your opinion and citing?

A.  Yes.

MR. J. RICHARDS:  Your Honor, may I approach the witness with Plaintiff's Exhibit 63?

THE COURT:  Yes.

BY THE WITNESS:

A.  So you want the number of references, not individual cites, right?

BY MR. J. RICHARDS:

Q.  If you could look at Plaintiff's Exhibit 63 and review it and let me know the total number of cases or studies that you referenced.

A.  It's going to take me a minute.

Q.  And let me know when your recollection as to that number is refreshed.

   (Pause.)

BY THE WITNESS:

A.  Roughly 155 different references.  I might have miscounted, but --

BY MR. J. RICHARDS:

Q.  Well, let me ask it this way, is your recollection refreshed as to the number of references that you wrote in your report?

A.  Yes.

Q.  Roughly how many references did you cite in your report?

A.  Approximately 155.

Q.  Now, would those 155 references, were some of those, were

some of those publications about laboratory findings?

A.   Yes.

Q.   Were some of those case studies or aggregate case studies?

A.   Yes.

Q.   And besides that, were any other types of publications cited?

A.   Yes.

Q.   Such as?

A.   Other types of research, meta analyses, survey data, there is literature reviews, books cited, the cases cited, many different types of sources.

Q.   And is any one cite more important than another in the opinions you reached in this case?

A.   I mean, I don't know how to quantify that.  I mean, some are more important that others certainly.  I mean, some references I might have used for a singular data point and then other references I've cited multiple times.

     You know, it's hard to compare a single study versus, let's say, the white paper that I was explaining to you where I would reference it for other things.  So I don't know how to quantify it other than that.  Some are more influential than others.

Q.   But is it fair to say that you're using all of them to create your opinion?

A.   I used all of them to create my report, which provides a

lot of information. And, you know, some -- they're used for different reasons. Not every reference speaks to every piece of my opinion in this case.

Q. Some just are background in terms of the science in general, is that fair to say?

A. Yes, or the process of interrogation in this country, or some are case cites referencing case law that are relevant.

Q. Now, counsel asked you a few more questions about the Reid technique. Is it fair to say that -- and I think nine steps were mentioned?

A. Yes. In the Reid technique, they outline nine steps.

MR. KIVETZ: Objection, Your Honor.

THE COURT: Basis?

MR. KIVETZ: Outside the scope.

THE COURT: It's overruled. You may continue.

BY MR. J. RICHARDS:

Q. Now, are those nine steps part of the non-accusatorial interrogation interview part or the accusatorial interrogation part?

A. The nine steps are referring to once it shifts from what they call the behavioral analysis interview or the non-accusatorial part to the accusatorial part. So those are the nine steps of the second part.

Q. And counsel asked you if the Reid technique is legally permissible.

A.   Yes, he did.

Q.   But in your research, are you researching in order to find out if something is legally permissible?

A.   No.

Q.   What are you researching to find out?

A.   I'm interested in the psychological impact of these techniques and whether they lead to true or false confessions. So regardless of whether something is legal or illegal, it's whether it's a useful technique, a diagnostic technique that leads to reliable information.

     So in the case of deception, you can lie to suspects, but the research tells us that's a very dangerous proposition. So the legality of it is somewhat irrelevant for me from a psychological perspective.

Q.   And counsel asked you if you teach a different method than Reid.  Do you recall that?

A.   Yes.

Q.   Why do you teach a different method than Reid?

A.   Because, you know, the method that I teach is science based.  It relies on what we know from all of the research I've been referencing about what works the best in terms of eliciting reliable information from people and minimizing the risk of getting false information.  And I believe that's what everybody wants at the end of the day, is to be able to get true confessions and minimize false confessions.  And I believe

in following the science wherever that leads us.

Q. Counsel asked you a question about the Alt Key Lab study and your thesis study as well. What's the importance of lab research as it relates to your overall opinion?

A. So just it was my dissertation study, not that that's an important point, but there is a difference, so I just want to for the record.

Laboratory research is one type of research in a larger universe of methodology. And the strength of laboratory research is it's the only type of methodology that allows us to draw cause and effect conclusions.

So in a controlled environment where we can keep everything the same except the factors that we're interested in manipulating, that's what the advantage of laboratory research is. So that if I manipulate some variable, let's say some interrogation technique, and there is a change in the confession rate, I know that that change can be attributed back to my manipulation of that interrogation technique.

And it's only in laboratory settings that we can do that because we have high experimental control and internal validity.

In other methodologies, like if you go out into the field and you are observing real world interrogations, those have strengths as well, but they don't have that cause and effect -- we don't have the ability to draw causal conclusions,

cause and effect. And so what we do is we do all different types of research. We do laboratory research and we do field research, and we are looking at the converging findings of those things so that we can be confident that what we're finding in a laboratory also applies to the real world.

Q. Counsel asked you about duration of the interrogation. In terms of where the interrogation, quote-unquote, starts, in terms of the research, I guess the question is when do you click the start button on the stopwatch in terms of calculating the duration?

A. Yeah, so from a research perspective, researchers would calculate it at the time the person is taken into police custody or presence. And, again, I don't mean legal custody here. It doesn't mean that they're under arrest, but the time that they are now in control of the police. So you could factor that from the time they get, let's say, picked up from their home or if you want to start the clock at the time that they enter the interview room.

The key part is the clock don't start -- stop once it starts until the end of the elicitation of the confession.

Q. And counsel asked you tactics that suspects use in an interrogation, like lying, misdirecting, false alibi and minimization. Are those tactics independent from the two buckets that we talked about earlier when I was asking you questions earlier?

Russano - redirect

914

A.   So are you talking about the dispositional and the situational risk factors?

Q.   Yes.

A.    Okay.  Yes, for the most part.  We're talking about different things here.  So, you know, interrogation is a dynamic process between the suspect and the interviewers or interviewer or interviewers.  And of course there can be people in the interrogation room who are resisting and using what we call counter-interrogation tactics.  If you have a guilty person, they may deny it, right.  Most guilty people don't walk in and say "I did it" right away.  And so they can engage in strategies, counter-interrogation strategies and resistance strategies.

         The one thing I would say is minimization, so if you have somebody talking to you about suspects can minimize, meaning they can downplay their own role.  So it is possible that you have a guilty person who makes an admission, but they downplay their role in the crime.  That is often in response to the interrogator offering a minimization theme though.

         So it's important to think about if there is minimizing behavior by the suspect, meaning they offer a minimization excuse or theme, was that suggested to them by the interrogator, because that's very common in false confession cases where they'll adopt the interrogator's suggestion, or was that them doing that independently.

Russano - redirect

915

Q.   Counsel asked you about the youth factor of the risk factors.  I just want to be clear, what are the ages that go into the risk factors?

A.   We know that people under the age of 21, even under the age of certainly 25 as well are overrepresented, and that's because we know that people, even though they are legal adults at 18, that is an arbitrary line that we've drawn.  Nothing magical happens between the last night of your 17th birthday and the day you turn 18.  It is a progression.

And when I'm talking about maturity and development, we're talking about cognitive development and emotional development as well, psychological development.

So we know that that generally finishes, you reach full psychological and cognitive development by your mid-20s, right, 23, 24, 25.

So adolescence, even though we think of adolescence as teenagers has generally been defined, for example, in the white paper as under the age of 25.

Q.   And counsel asked you about an article that you haven't been able to look at yet.  Do you recall that question?

A.   Yes.

Q.   Now, in terms of looking at an article when it's published, what are the steps you take when reviewing a new article that's I guess one would say on the scene, so to speak?

A.   So, I mean, first of all, you know, you heard me ask some

questions, what journal is this in?  Who are the authors?  That gives me some information about what are their backgrounds? Are they statisticians?  Are they experts in this field?  Does the journal -- is the journal the type of journal that I described to you?

Or there are pay-for-play journals out there, I'm not suggesting this one is, where you can just pay a certain amount of money and have your article published, right.  So I'm going to look at the quality of the journal.  And then most importantly, I'm going to read it and I'm going to use my training and knowledge about the methodology.

So much like I was serving as a peer reviewer, I'm going to use that same critical lens and look at an article and look at its strengths and weaknesses and evaluate it that way.

Q.  If counsel were to give you that article now, do you think you could do that?

A.  I mean, on the spot?  I mean, we could sit here.  But, I mean, reading an academic article is probably a 45-minute endeavor.

MR. J. RICHARDS:  May I have a moment, Your Honor?

THE COURT:  Yes.

(Off the record.)

MR. J. RICHARDS:  I tender.

THE COURT:  Let's go to sidebar real quick.

(Proceedings heard at sidebar:)

THE COURT: All right. I wanted to provide some explanation and clarity concerning my questions about foundation for the article. Mr. Richards just brought it back up.

My concern was with both foundation, the witness has said she has not read it, as well as form. Essentially you can't read the article in through questions. And I'm not saying you were trying to do that, but you were referencing the article and then asking your question.

She hasn't read the article. She's an expert. You can offer her hypotheticals, would you agree X, whatever from the article or what have you, or have you considered X? I think that's permissible. But it has to be somewhat divorced from the article, because the article as of now isn't in evidence, and the witness has said that she has not read it.

So I'll leave you with that.

MR. KIVETZ: Thank you, Judge.

MR. SCAHILL: Thank you, Judge.

(Proceedings heard in open court:)

RECROSS-EXAMINATION

BY MR. KIVETZ:

Q. Just very quickly, who is Dr. Richard Leo?

A. He is another expert in the field of interrogations and confessions.

Q. He's been around for a long time, correct?

A.   Yes.

Q.   Okay.  And I told you earlier that the article that we've been talking about, Recalibrating the Risk of False Confession Wrongful Convictions, was published in the Journal of Criminal Justice.  Do you recall that?

A.   Yes.

Q.   Okay.  Would you be surprised to learn that Dr. Richard Leo has been a peer reviewer for the Journal of Criminal Justice?

A.   No.

         MR. KIVETZ:  I have no further questions.  Thank you.

         THE COURT:  Okay.  Anything on that?

         MR. S. RICHARDS:  No, Your Honor.

         THE COURT:  All right.  Dr. Russano, you may step down.

   (Witness excused.)

         THE COURT:  And who are we calling to the stand next?

         MR. S. RICHARDS:  We are recalling defendant Mason.

         THE COURT:  Okay.  Mr. Mason, I remind you you're under oath.

         THE WITNESS:  Yes, sir.

         THE COURT:  Mr. Richards, you may proceed when ready.

         MR. S. RICHARDS:  If we could get either --

           MICHAEL MASON, A DEFENDANT HEREIN, SWORN,

                       DIRECT EXAMINATION

BY MR. S. RICHARDS:

Q.  I'd like to show you what's been marked, was previously marked for identification as Defendants' Exhibit 50H.  I'm sorry.

MR. S. RICHARDS:  Can you display that?

THE COURT:  We can show it to the witness.

MR. S. RICHARDS:  Yeah, we're showing it to the witness for identification at this point.

BY MR. S. RICHARDS:

Q.  Okay.  Do you see it?

A.  Yes, sir.

Q.  All right.  I'm not sure if we've shown you this document before, but I just wanted to be clear about it.  Do you recognize this document?

A.  Yes, I do.

Q.  Is this document your clear and open supplementary report from July 7, 1989?

A.  Yes, sir.

Q.  All right.  And was this a document authored by you and signed by you?

A.  Yes.

MR. S. RICHARDS:  Now we would seek to admit.

THE COURT:  Any objection?

MR. POLICK:  No, Your Honor.

THE COURT:  All right.  Defense Exhibit 50H is admitted.  It may be published.

(Defendants' Exhibit No. 50H was received in evidence.)

BY MR. S. RICHARDS:

Q.   Okay.  Detective, I'd like to ask you some questions about the document.  But let's first go to chronologically where I think we stopped before.  I think we had gotten to the point where Jaime Rios is in the interview room.  And the door might be locked, might not be locked.  But eventually some time after midnight you go to talk to him, correct?

A.   That was about midnight.

Q.   Okay.  And when you went to talk with him, who did you go with, if anybody?

A.   I went with Detective Halvorsen.

Q.   Okay.  And was anyone else present during that interview besides you and Detective Halvorsen?

A.   Jaime Rios.

Q.   Okay.  Good point.

     Now, before questioning Jaime Rios, did you give him his Miranda warnings at that point?

A.   Yes, sir.

Q.   All right.  And were you taking notes or writing something down as you were speaking with him?

A.   I took some notes.  I don't know if I was taking them as I was speaking or as when there was a pause.

Q.   All right.  And you were taking those notes on a document called a general progress report, correct?

Mason - direct

921

A.   Yes.

Q.   And so those notes were either taken while you were speaking with him or you say where there is a pause.  You went into another room and wrote the notes?

A.   Not necessarily.  But I don't recall, like I said, exactly how I took the notes.

Q.   Okay.  I'd like to take down for the moment Defendants' Exhibit 50H and put up Defendants' Exhibit 50GG -- I'm sorry, Defendants' Exhibit 50HH.

Okay.  Look at the document on the screen.  Do you recognize that document?

A.   Yes, sir.

Q.   Is that document the general progress report detailing your interview with Jaime Rios?

A.   Yes, sir.

Q.   And was that document signed by you?

A.   Yes, it was.

MR. S. RICHARDS:  Seeking to admit Defendants' Exhibit 50HH and have that shown to the jury.

THE COURT:  Any objection?

MR. POLICK:  No, Your Honor.

MR. SCAHILL:  No, Your Honor.

THE COURT:  It's admitted and may be published.

(Defendants' Exhibit No. 50HH was received in evidence.)

BY MR. S. RICHARDS:

Q.   Now, I want you to look at that document and ask you first another question though.  Do you know what the abbreviation AOR stands for?

A.   At this time it's not ringing any bells with me.  I don't know, I don't know if I do or don't, but I can't recall right now.

Q.   Well, isn't that an abbreviation commonly used in GPRs for advised of rights, AOR?

A.   Not by me.

Q.   Okay.  Well, in this general progress report where you are detailing the interview, at any point does it say that Jaime Rios was advised of his rights?

A.   These are notes.  I did not write that down, no.

Q.   Okay.  And in terms of advising him of his rights, it's possible to give a suspect a written form in which he signs off and says that he's been advised of his rights and he understands them, correct?

        MR. POLICK:  Objection, foundation.

        THE COURT:  The objection is -- well, the objection is overruled.

BY THE WITNESS:

A.   I've never seen that in the Chicago Police Department, no.

BY MR. S. RICHARDS:

Q.   Okay.  But other forms, other forms of waiving rights were used, for example, forms for people giving consents to search,

correct?

A.    Okay.  Could you back that up a second?  We're talking about waiving -- okay.  Could you just repeat that?

Q.    Sure.  I'll withdraw it and I'll see if I can get to it.

So was there any prohibition against using a written form to see -- so a suspect could sign and say, I'm waiving my Miranda rights?  Was that -- is there any rule in the Chicago Police Department against doing that?

A.    I've never seen that form, so I don't know.  The form didn't exist as far as I'm concerned.

Q.    All right.  Well, was there any prohibition against just giving a suspect a piece of paper and asking him if he would write on the piece of paper that he was advised of his rights, he understood them and he was waiving them?

MR. SCAHILL:  Objection to form of the question.

THE COURT:  It's sustained.

BY MR. S. RICHARDS:

Q.    All right.  Did you in fact give Jaime Rios an opportunity to write down in his own handwriting that he was waiving his rights?

A.    No, sir.

Q.    Similarly, you could have given Jaime Rios a piece of paper at that point and said, Just write down your side of the story, correct?

MR. SCAHILL:  Objection.

THE COURT:  It's overruled.

BY THE WITNESS:

A.  That isn't something the -- when I received training, that was not something that was allowed.  The only statements were taken by the State's Attorney's office.

BY MR. S. RICHARDS:

Q.  All right.  So in other words, as part of your training, you were told that you could not give a suspect a piece of paper and ask him to write down his own story in his own words, is that true?

A.  I don't know if I was told I could not do that.  But I was advised that that's not something that we should do.

Q.  Were you told the reason why you should not let a suspect, give him a piece of paper and let him write down, or her, write down in their own words what their side of the story was?

A.  My understanding, that the Cook County state's attorney would document any statement that was taken either orally to the state's attorney, handwritten to the state's attorney, or recorded by the court reporter.

Q.  But that's not my question.

Was there some actual directive to you that you were forbidden to take down a statement, either orally, recorded, any other means, or having the suspect write it out, and that all statements had to be taken by the state's attorney?  Was that some sort of rule that you had to follow?

A.   I don't know, sir.  I don't recall.

Q.   Now, with respect to your handwritten notes about Jaime Rios's statement, first of all, if we can look --

          MR. S. RICHARDS:  Scroll down.

By MR. S. RICHARDS:

Q.   Is this document actually complete as to your handwritten notes or might it be missing a page or so?

A.   It appears to me that there is a missing page.

Q.   Okay.  And you reviewed documents provided to you for your testimony.  Have you ever found any document which includes the missing page?

          MR. SCAHILL:  Objection.

          THE COURT:  That's sustained.

          Let's go to sidebar.

   (Proceedings heard at sidebar:)

          THE COURT:  Where are we going with this, Mr. Richards?

          MR. S. RICHARDS:  I just wanted to establish that there is a missing page, which I think is missing from anything tendered by either of us.  The page is just missing.

          THE COURT:  Okay.  When say you've established that, now you're asking, have you ever found any document which includes the missing page, which seems like we're coming dangerously close to commenting on discovery in front of the jury, which you cannot do.  So be mindful of that.

You may proceed.

Any defendant need to be heard?

MR. SCAHILL:  No.  That was the objection.

THE COURT:  Okay.

MR. POLICK:  Thank you, Judge.

(Proceedings heard in open court:)

BY MR. S. RICHARDS:

Q.  All right.  Do you see also on this general progress report there is little boxes for the date of the original case report. Do you see that?

A.  Yes.

Q.  You did not fill that in, correct?

A.  I didn't.  My error.  That was my error.  I just didn't fill it in when I turned it in.

Q.  I'm just asking whether it's filled in, that's all.

A.  No.

Q.  All right.  And there is another, there is another box for date of this report with date, month, year and watch.  That box is not filled in either, is it?

A.  No, sir.

Q.  Now, going down to the body of this report, without going into every word, basically it kind of summarizes a statement by Jaime Rios that he was at Leavitt with Daniel Rodriguez, somebody named Lamont, and his girlfriend, Diane Rodriguez, correct?

A.   Yes, sir.

Q.   Now, in your notes there is no date given for when he was there with Daniel Rodriguez, Lamont and Diana, Diane Rodriguez, is there?

A.   There is no -- no, I did not write down a date.

Q.   It does give a time of 10:45 to 11:00 p.m., correct?

A.   Yes.

Q.   But no date?

A.   Correct.

Q.   No day of the week?

A.   No, sir.

Q.   No reference to June 27 anywhere in the GPR?

A.   On my notes, no, sir.

MR. S. RICHARDS:   May we take the exhibit down.   I'm sorry.

THE COURT:   Certainly.

BY MR. S. RICHARDS:

Q.   Now, let me see if we can summarize up to the point when you got this statement from -- after talking with Jaime Rios, hearing his statement, then you placed him under arrest, correct?

A.   Yes, sir.

Q.   Now, at the time you placed him under arrest, at that point did you put him in handcuffs?

A.   Yes.

Mason - direct

928

Q. Where was he taken after he was put in handcuffs?

A. Nowhere. He stayed right in that room.

Q. In handcuffs?

A. Yes.

Q. Okay. Was he handcuffed to the ring on the wall or just handcuffed?

A. I believe it was one handcuff on a wrist and one handcuff on the ring.

Q. Okay. Now, let me then -- then at that point you left the room and you went to call the state's attorney, correct?

A. Yes.

Q. And the reason you called the state's attorney is the reason you gave earlier, which is that it was the policy or the practice that statements had to be taken by the Cook County state's attorney, right?

A. That's right. Jaime Rios had implicated himself, so I needed to call the state's attorney now.

Q. Okay. To take the statement, right?

A. Correct.

Q. Also to make the charging decision?

A. Absolutely.

Q. Now, you don't have -- I may have asked this before, but you don't have any detailed record of the questions you asked or the answers that Jaime gave you, do you?

A. I do not.

Q.   And, in fact, to your knowledge, no such record exists, right?

MR. POLICK:  Objection.

MR. SCAHILL:  Objection.

MR. S. RICHARDS:  I'll withdraw.

THE COURT:  Okay.

BY MR. S. RICHARDS:

Q.   But let me sort of recap if I can or ask you, aside from Jaime Rios's statement, some of the evidence you had at that point, at that point you knew that .25 caliber bullets had been found on the scene, correct?

A.   I knew that .25 caliber shell casings had been found.

Q.   Thanks for the correction.

You knew that .25 caliber shell casings had been found on scene, correct?

A.   Yes, sir.

Q.   You knew that small caliber bullets had been found inside the body of the deceased, correct?

A.   Yes, sir.

Q.   You knew that a witness, Samantha Hudson, had had an encounter with people who may have been the shooters, correct?

A.   Yes, sir.

Q.   You knew that there was no evidence of close range firing according to the medical examiner, correct?

A.   I did not have that information.

Mason - direct

930

Q.   Okay.  You did have various descriptions from witnesses who had not at that point made identifications as to the circumstances that the shooting had taken place, that it had taken place at night, where it had taken place and so forth, correct?

MR. POLICK:  Objection to form.

THE COURT:  Overruled.

You may answer.

BY THE WITNESS:

A.   Could you repeat that, sir?

BY MR. S. RICHARDS:

Q.   I will.  I'll make it shorter and simpler.

You had information at that point that this was a gang related shooting, right?

A.   Yes.

Q.   You had information at that point that the victim was a Spanish Cobra, correct?

A.   Yes, sir.

Q.   You had information at that point that the shooters were possibly Latin Kings and had made -- and had said something about Latin Kings during the shooting, correct?

A.   I don't recall about if any of the witnesses had told me that there was mention of Latin Kings.

Q.   Okay.  You knew that Western Avenue was the boundary between the Latin Kings and the Spanish Cobras?

A.   Yes, sir.

Q.   You knew that fingerprints had been taken from the auto or the car on which the victim fell, right?

A.   That's right.

Q.   Now, how long did you leave Jaime in the room before the state's attorney came?

A.   I think the state's attorney got there around 2:00.  I think it was around 2:00 o'clock I believe.

Q.   In the morning?

A.   Yes.

Q.   And that point, to that point as far as you knew, Jaime Rios had not slept in the station, fair?

A.   I don't believe he did.  I didn't see him laying down at any time.

Q.   And at that point, Jaime Rios hadn't been fed anything while he was at the station, correct?

A.   I have no recollection of -- I don't think so, but I don't have any recollection of, you know, any food.

Q.   All right.  And how about drink, do you have, do you have any recollection that he had been given anything to drink?

A.   Again, I have no recollection.  Had he wanted anything to drink, we certainly provide water.

Q.   Now, when you -- after the state's attorney arrived at 2:00 a.m., what did you do?

A.   I spoke with her.  I informed her what, you know, how far

Mason - direct

932

we had gotten on the investigation, gave her the reports.

Q.   All right.  You said you informed her how far you'd gotten on the investigation and you gave her the reports, right?

A.   Correct.

Q.   The reports being the beat officer's report?

A.   Well, all the reports that were available at that time.

Q.   Which would include the beat officer's report, right?

A.   That would be one of them, yes.

Q.   The Boris and Johnston supplementary report detailing the identification of Macho Melendez?

A.   Yes.

Q.   Your subsequent report detailing the recantation of the identification of Macho Melendez and Macho Melendez being released, right?

A.   Yes.

Q.   And you would have given her information as to everything you had about the .25 caliber shell casings and the other circumstances of the shooting, right?

A.   Correct.

Q.   How long did it take for you to tell the state's attorney this information?

A.   I don't know.  I think we were speaking with Jaime Rios again at 2:30.  So it didn't take that long between 2:00 and 2:30.

Q.   So possibly about a half hour, right?

Mason - direct

933

A.   About that.

Q.   And when you spoke to her about the information, you also gave her the reports to read, right?

A.   Yes.

Q.   By the way, the time when she was in the station, did she just read the reports and hand them back to you or did she keep them with her?

A.   I don't recall.

Q.   All right.  As you were there, did you have your own copies of the reports?

A.   No.  I don't have my own copies.  I have the unit copy, the street file.

Q.   Okay.  So you had from the street file or the unit file, and you gave her xeroxes of those reports or how -- did she have her own set?  How did that work?

A.   I gave her, yeah, copies of those.

Q.   Okay.  So one, the original for you, and copies for her, right?

A.   Yes.

Q.   So those are documents available to both of you during this interview or interrogation, right?

A.   Yes, sir.

Q.   Now, during this interview with the state's attorney, did you inform the state's attorney that you had already given Miranda rights to Jaime Rios?

A. I did.

Q. And did you inform her that he was under arrest?

A. Yes.

Q. Did you describe to her whatever you knew, assuming you knew anything, about how Jaime Rios was picked up on the street by detective -- Gang Specialist Guevara?

A. I would have, yeah, I would have told her how he happened to be here, yes.

Q. So you told her that he had come voluntarily in a police car with Guevara and Gawrys, right?

A. Yes.

Q. Now, in fact, there were more -- you were -- now, you were not on the scene of him being picked up, right?

A. That's correct.

Q. Do you know if you told her that in fact, in fact, there were a total of at least six officers, gang specialists on the scene where he was encountered at the time he voluntarily came to the police station? Did you tell her that?

A. I don't believe I knew that or heard that.

Q. Okay. You knew it later though, didn't you?

A. I've heard you mention it.

Q. Well, Jaime Rios was placed under arrest according to you at sometime after midnight by you and Detective Halvorsen, right?

A. Yes.

Q. At that time, according to you, Detective Gawrys wasn't present, was he?

A. No, sir.

Q. I'm sorry, Gang Specialist Gawrys and Gang Specialist Guevara were not present, right?

A. Correct.

Q. And Gang Specialist Vukonich wasn't present, right?

A. Correct.

Q. And Gang Specialist Zacharies wasn't present, right?

A. Correct.

Q. And Gang Specialist Guzman wasn't present, right?

A. That's also correct.

Q. And Gang Specialist Longos wasn't present, correct?

A. Correct.

Q. And at that time, you're saying you didn't even know that Gang Specialist Vukonich, Vukonich, Zacharies, Guzman or Longos had any involvement whatsoever, did you?

A. At the time I spoke with the state's attorney?

Q. Yeah.

A. I have no recollection of -- I think I'd mentioned before I saw two, Vukonich and his -- Vukonich and his partner, I saw them. The other guys, I don't know if I even knew who they were by name. So I don't know necessarily that I knew they were there.

Q. Okay. So, and when you saw Vukonich and his partner there,

when did you see Vukonich and his partner there?

A.   That was earlier in the evening when his girlfriend was in the office.

Q.   Okay.  So they were there at the time his girlfriend was in the office, correct?

A.   Correct.

Q.   Was it your impression that they -- or did you have knowledge that they had brought her to the station?

A.   I kind of had that feeling that they did, because they seemed to be near her.  But I didn't really speak to them.

Q.   Okay.  But in terms of the people who actually arrested Jaime Rios, that was two people.  That was you and Halvorsen, right?

A.   Yes.

Q.   Now, in your --

MR. S. RICHARDS:  If we can put up H again and have you scroll up, and up.

BY MR. S. RICHARDS:

Q.   Okay.  So you can see what's on the screen?

MR. POLICK:  Which exhibit are you referring to, counsel?

MR. S. RICHARDS:  I'm sorry.  This is Defendants' Exhibit 50H.

MR. POLICK:  Thank you.

MR. S. RICHARDS:  Scroll down.  I'm confusing my

terms.  Okay, stop.

BY MR. S. RICHARDS:

Q.  All right.  Do you see where it lists arresting officers?

A.  Yes, sir.

Q.  You're listed, right?

A.  Correct.

Q.  Halvorsen is listed, right?

A.  Yep.

Q.  Gawrys, right?

A.  Yes.

Q.  Guevara, right?

A.  Yes.

Q.  Vukonich, right?

A.  Correct.

Q.  Zacharies, right?

A.  Also, yes.

Q.  Guzman and Longos, all listed as arresting officers, right?

A.  That's right.

MR. S. RICHARDS:  Okay.  We can take that down, Your Honor.

BY MR. S. RICHARDS:

Q.  Now, after you had spoken to the state's attorney, you then spoke to Jaime Rios in a room, not the room where you first spoke to him, right?

A.  No.  The first interview with the state's attorney was in

Mason - direct

938

the same room.

Q.   Okay.  So she actually came into the room.  And it was in that room where you had first had a conversation between -- with you, the state's attorney and Jaime Rios, right?

A.   Yes.

Q.   Okay.  And that's a relatively -- and was Halvorsen there as well or just you and the state's attorney?

A.   Just myself and the state's attorney and Jaime Rios.

Q.   All right.  And did you do an additional GPR to record that conversation that you had with Jaime Rios?

A.   No, sir.

Q.   So for that conversation, you weren't taking notes, right?

A.   No.

Q.   The state's attorney wasn't taking notes, right?

A.   I don't know if I can answer that.

Q.   Well, if you recall.

A.   I don't recall.

Q.   All right.  And, again, during that interview, neither you nor the state's attorney ever gave Jaime Rios a piece of paper and said, Jaime, write down your story?

A.   No.

Q.   By the way, Jaime Rios appeared to be able to speak English, right?

A.   Yes.

Q.   Didn't appear to be not understanding anything you said,

right?

A.   That's correct.

Q.   As far as you knew, he could read or write English, right?

A.   He said he could.

Q.   And you had no reason to disbelieve him?

A.   That's right.

Q.   So during this other next conversation, again, you cannot tell us what questions were asked or what answers were given, can you?

A.   No, sir.

Q.   Now, let me then -- now, after that conversation, you and the state's attorney left the room, right?

A.   Yes.

Q.   And where did you go?

A.   I was using a desk just outside of that office, so we went to that desk, or just outside of that interview room.

Q.   And did you have a conversation about, with the state's attorney about, you know, next move, where are you going, whatever?

A.   Well, I believe during that conversation with Jaime Rios she had already asked him if he'd be willing to give that statement in front of a court reporter.

Q.   All right.

A.   So that was the next move.

Q.   Next move is bring in the court reporter, right?

A.   Yes.

Q.   That could take a little time because they're not, you know, on tap at the station.  You have to call for them, right?

A.   Correct.

Q.   And the state -- the court reporter who eventually showed up was Janet Lupa?

A.   Yes.

Q.   Now, where -- when the court reporter showed up, did you move someplace else to take the court reported statement?

A.   Yes, we did.

Q.   Where did you move to?

A.   It's an office that's further into the interior of the building.  We generally referred to it as a conference room, but it's just another office, a little bigger, a little bigger than the room he was in.

Q.   Okay.  Was that office used exclusively for taking statements or for other purposes?

A.   It had other purposes.

Q.   What were the other purposes?

A.   I think like during the daytime there were some case management people that used that area.

Q.   Who were the case management people?

A.   Case management are detectives that are assigned to mostly misdemeanor crimes, like telephone threats and simple batteries, things like that where there is generally not a

detective that goes out and makes an in-person interview.  They do this mostly over the phone.

Q.  All right.  And was that room also used for like conferences, a traditional conference room where people meet and talk about stuff and that sort of thing?

A.  It's just another room, you know.

MR. POLICK:  Objection.

THE COURT:  One second.

The objection is to form?

MR. POLICK:  Yes, Judge.

THE COURT:  It's overruled.

You may answer.

BY THE WITNESS:

A.  It's just another room.  I mean, during the day there is people in there, and afterwards it's empty.

BY MR. S. RICHARDS:

Q.  Okay.  Anywhere in the station, did you ever use whiteboards to write things down or, you know, just for general purposes?

A.  I've never seen a whiteboard in a police station.

Q.  Okay.  When you -- when did the court reporter arrive?

A.  It was sometime, sometime after 4:00.  I can't be certain. But it was after 4:00 o'clock in the morning I believe.

Q.  And at that point the court reported statement was taken, right?

Mason - direct

942

A.   Yeah.   Once she got her -- yeah, she had to set up her equipment.   And then once she was ready, then we -- I took Jaime Rios into that room along with the state's attorney, and that's where --

Q.   Now, did the state's attorney tell you exactly what questions she was going to ask Jaime Rios during the court reported statement?

A.   No.

        MR. S. RICHARDS:   We would ask to display what's been previously admitted as, previously marked as Plaintiff's Exhibit 18.   I believe it's already been admitted under a different number.   But we would ask to admit and publish.

        THE COURT:   Any objection to the admission of Plaintiff's Exhibit 18?

        MR. POLICK:   No, Your Honor.

        MR. SCAHILL:   No, except I think we're going to have two exhibits of the same thing.   I mean, there is no substantive objection.

        THE COURT:   Okay.   Plaintiff's Exhibit 18 is admitted. It may be published.

   (Plaintiff's Exhibit No. 18 was received in evidence.)

BY MR. S. RICHARDS:

Q.   Do you see it on the screen in front of you?

A.   Yes, sir.

Q.   Okay.   And you've seen that document before, right?

Mason - direct

943

A.   Yes, I have.

Q.   Now, as to that document, does it reflect that you were present when the statement was taken beginning on July 7, 1989, beginning at 4:39 a.m.?

A.   Yes, sir.

Q.   All right.

MR. S. RICHARDS:   Scroll up.

MR. J. RICHARDS:   You mean down?

MR. S. RICHARDS:   Or scroll down and keep scrolling down.  And keep scrolling down.  Okay.  So scroll back up.

BY MR. S. RICHARDS:

Q.   So do you see the point where Barbara Riley asked about the evening of June 27, 1989, saying that was a Tuesday night, and says that -- asks where Jaime Rios was.  And he says, "At 1440 North Leavitt," right?

MR. POLICK:   Page, counsel, please?

MR. S. RICHARDS:   I'm sorry, page would be --

MR. J. RICHARDS:   Page 3.

MR. POLICK:   Thank you.

MR. S. RICHARDS:   Page 3.  Sorry

BY MR. S. RICHARDS:

Q.   Where he says he was with his brother-in-law, his friend Lamont and his lady.  Do you see where he says that?

A.   All right.  Yes.

Q.   By the way, did you and -- going further, he's going to,

Mason - direct

944

about to describe a shooting happening when he's present with his brother-in-law, his friend Lamont and his lady, correct?

A.   Yes.

Q.   Did you ever check anywhere to see if there had been any reports of a shooting at 1440 North Leavitt on June 27th?

A.   He didn't indicate to me that he ever called the police.

Q.   That's not my question.

When a shooting happens, many people may call the police, correct?

A.   It's possible.

Q.   There may be 911 calls, right?

A.   There may be.

Q.   Because people sometimes call 911 when shots are fired, don't they?

A.   They do.

Q.   Did you ever check to see if there was any report of 911 calls, case report generated, anything generated about a shooting on the evening of June 27, 1989 at 1440 North Leavitt?

A.   There was no indication that anybody had been shot by Jaime Rios.  It was simply that shots were fired.

Q.   Did you ever look for any, did you ever look for any report or 911 call that indicated that on June 27, 1989, at 1440 North Leavitt shots had been fired?  Did you ever look for such a report?

A.   No, sir.

Mason - direct

945

Q.   Was there some means you would have, just knowing a date, a time, a date, a time and a location, of reviewing records to see if there was a report for that date, for that time and at that location?

A.   Well, if there was -- if nobody got shot, then there would be no RD number generated, so there would be no report. However, if somebody had called the police and reported that shots were fired, then the only resource would have been police communications through their audiotape.

Q.   All right.  And could you have searched police communications for their audiotapes for that date and time to see if there is a call of shots fired?

A.   Eventually I could have done that, yes.

Q.   Did you ever do it?

A.   No.

Q.   Now, also he says in the statement that he was with his brother-in-law, right?

A.   Yes.

Q.   And in your GPR you record his brother-in-law's name as Daniel Rodriguez, right?

A.   I don't recall.  If I could see it, that would help refresh my memory.

Q.   I think that's already in evidence for the jury.

     MR. POLICK:  Judge, again, I'm going to object to the editorial.

MR. S. RICHARDS:  I'll withdraw the comment.

THE COURT:  The comment -- or the objection is sustained.

MR. S. RICHARDS:  Can we take down this and put back up 50.

MR. J. RICHARDS:  50HH.

MR. S. RICHARDS:  50HH.  Okay, we've got it.

BY MR. S. RICHARDS:

Q.  So if you look at the top, do you see that he said that he was, he was with Daniel Rodriguez, Lamont and his girlfriend, Diane Rodriguez?  Do you see where he says that, right?

A.  Yes.

Q.  Now, let's start with Daniel Rodriguez.  Did you ever contact him to see if it was true that shots had been fired on June 27th?

A.  No, sir.

Q.  Did you ever -- Diane Rodriguez, she was his girlfriend who came into the station, right?

A.  I don't remember her name.  But I do know that she was his girlfriend.

Q.  Okay.  And you do know that his girlfriend, whatever her name was, did come into the station, did she not?

A.  She did.  She was there earlier, yes.

Q.  Okay.  Did you ever speak with her about whether shots had been fired on June 27, 1989 or another day?  I mean, did you

ever talk to her about it?

A.   I never did speak with her afterwards, no.

Q.   Okay.  And it also mentions somebody named Lamont.  Did you ever ask Jaime Rodriguez for Lamont's last name -- Jaime Rios, sorry, Jaime Rios for Lamont's last name or contact information?

A.   I don't recall if I tried to identify him any further.

MR. S. RICHARDS:  All right.  If we take that down and put back --

MR. J. RICHARDS:  18?

MR. S. RICHARDS:  Yeah, 18.  Okay.  Scroll down.  Keep scrolling down.

BY MR. S. RICHARDS:

Q.   All right.  Let's start with, do you see where it says, "I went upstairs and got my gun."

Then there is, "Question:  What kind of gun is it, is that?"

And then it says, "A .38 snub nose."

Do you see where that says that, right?

A.   Yes.

MR. POLICK:  Page, please, counsel?

MR. S. RICHARDS:  I'm sorry, PDF 4.

BY MR. S. RICHARDS:

Q.   First of all, are you familiar with what a .38 snub nose is?

A.   Yeah.

Q.   It's a revolver, right?

A.   Yes, sir.

Q.   It's the kind, like all revolvers, it doesn't eject shells, right?

A.   That is correct.

Q.   And .38 caliber is a small caliber or large caliber?

A.   Let's see, well, it's bigger than a .25.  But I don't know, I don't know if I should be able to describe it as small or large.  I don't -- I'm not a weapons expert by any means.

Q.   Fair enough.

     And the color of it is also described as black, right?

A.   Yes.

Q.   It's not described as blue steel?

A.   No.

     MR. S. RICHARDS:  All right.  Keep scrolling down.

BY MR. S. RICHARDS:

Q.   Okay.  Do you see where this is, do you see where the question is --

     MR. S. RICHARDS:  What page are we on?

     MR. J. RICHARDS:  5.

     MR. S. RICHARDS:  Page 5.

BY MR. S. RICHARDS:

Q.   So you see where the question is:

     "Did you know what kind of gun he had?"

Mason - direct

949

And the answer, he says, "He had an automatic .22, I think it was."

Do you see that answer, right?

A. Yes.

Q. Well, you knew that the gun involved was .25 caliber, not .22 caliber, correct?

A. I knew one of the guns involved was a .25.

Q. Well, that gun, one of the guns that was involved, that was the gun that left the shells, right?

A. Yes.

Q. The three shells, right?

A. Yes, sir.

Q. And by the way, in all the descriptions that you received, everybody said that although shots were fired from two guns, everybody described only one person shooting and hitting the victim and him falling, correct?

A. I can't be certain. I can't be certain of that. I'd have to review my reports.

Q. Okay. Fair enough.

So in your earlier conversations with Jaime Rios, had he described the gun as a .22 or as a .25?

A. I don't recall. I don't recall if he described it.

Q. But obviously whoever was doing the questioning, when that person heard about a .22 immediately says, "A .22 or a .25," correct?

Mason - direct

950

MR. POLICK:  Objection, form.

THE COURT:  It's overruled.

BY THE WITNESS:

A.   The questioning was by the state's attorney, Barbara Riley.

BY MR. S. RICHARDS:

Q.   Okay.  Well, when he got the caliber of the gun wrong initially, did any kind of alarm bells go off in your head that maybe there was something wrong, that the statement might be false?

A.   No.

MR. S. RICHARDS:  Next page.  Keep going.  Keep going.  Okay, go back up.

BY MR. S. RICHARDS:

Q.   Now, this part or this page where it says that Tino -- I'm sorry, page what?

MR. J. RICHARDS:  Page 9.

MR. S. RICHARDS:  Page 9.

BY MR. S. RICHARDS:

Q.   At this point it says that Tino shot the guy.

How far away from the guy was he?

Do you see where he says he was at least one foot away from the guy?

A.   Yes.

Q.   And the question again is, "One foot.  He had his arms outstretched.  So the gun was a foot away from the guy when he

Mason - direct

951

shot him?"

And the answer is "Uh-huh," right?

A.   Yes.

Q.   So it's being described as somebody approaching somebody else, coming very close to him, his arm outstretched, and the gun very close to the person he was shooting.  Is that a fair description of what's being said here?

A.   Yeah, according to Jaime Rios, yes.

Q.   All right.  But according to the medical examiner, as you later learned, there was no evidence of close range firing, right?  Or did you ever know that?

A.   Well, I didn't learn that for quite some time, but --

Q.   Okay.  But you did learn it at some point, right?

A.   Yes, at some point.

MR. S. RICHARDS:  Okay.  Now, going back further down -- go back up, still on the same page.

BY MR. S. RICHARDS:

Q.   And do you see the question:

"Where were you when Tino was shooting this guy?

"Answer:  I was at least five miles away from him."

Do you see that question and that answer, right?

A.   Yes, I do.

Q.   Okay.  Now, when you were talking to Jaime Rios, did it seem like he had some sort of a mental illness?

A.   No.

Mason - direct

952

Q.  Did he seem irrational?

A.  No.

Q.  Did he seem like he had any problem understanding anybody?

A.  No.

Q.  All right.  So when his answer was "I was at least five miles away from him," didn't alarm bells go off in your head that maybe something is wrong with this statement?

A.  I thought he was nervous and he just misspoke.

Q.  Okay.  And that was one possibility, right?

A.  That's what I thought.

Q.  Okay.  But another possibility was he was trying to say, I don't have anything to do with this.  Isn't that another possibility?

          MR. SCAHILL:  Objection, form of question.

          THE COURT:  Sustained.

BY MR. S. RICHARDS:

Q.  But in any event, you didn't interrupt the questioning at that point to suggest any questions, any other questions about that, did you?

A.  No, sir.

          MR. S. RICHARDS:  Keep going down, going down.  Okay.  Stop right here.

BY MR. S. RICHARDS:

Q.  There was a question:  "What did you do with that gun?"

          And the answer:  "Well, about two weeks later, I threw

it in the lake.  I got rid of it."

MR. POLICK:  Page, counsel?

MR. S. RICHARDS:  I'm sorry.

BY MR. S. RICHARDS:

Q.  So do you see that question and that answer, right?

A.  Yes.

Q.  About two weeks after June 27th would be after the date you were talking with him, right?

A.  Yes.

Q.  All right.  Well, again, did that raise any alarm bells in your head, listen, he's saying he threw a gun in the lake, and the date he was supposed to throw the gun in the lake hasn't even come up yet?  Did you think he should have been questioned further about that?

A.  No.  Again, I thought he was nervous and misspeaking.

Q.  Okay.  Well, if he was nervous and misspeaking, he might have been misspeaking more on other issues, isn't that true?

MR. POLICK:  Objection.

THE COURT:  Sustained.

MR. S. RICHARDS:  I think you can take this down.

MR. J. RICHARDS:  Your Honor, take down Exhibit 18.

THE WITNESS:  Can I adjust this?

THE COURT:  You can try.  I don't know.  I've never sat there actually.

He's asking if he can adjust the witness screen.

THE WITNESS: It's just the glare. It's hard to read, that's all.

MR. S. RICHARDS: Well, I think we just took down the exhibits, didn't we?

MR. J. RICHARDS: Yeah.

MR. S. RICHARDS: Okay.

BY MR. S. RICHARDS:

Q. So after this statement was taken, Jaime Rios was still under arrest, right?

A. Yes.

Q. And your next task was to try and bring in witnesses to see if any of them would identify him in a lineup, right?

A. Yes.

Q. Now, the person you sent out to look for the witnesses or maybe just one witness was Gang Specialist Guevara, right?

MR. POLICK: Objection to the form.

MR. S. RICHARDS: I'll withdraw.

THE COURT: Okay. Sustained.

BY MR. S. RICHARDS:

Q. Well, after the court reported statement, did you have occasion to see Gang Specialist Guevara?

A. I don't have any recollection of seeing him afterwards.

Q. All right. Did you give directions to anybody to pound the pavement and bring in the witnesses for lineup or to see lineups?

A.   Well, I'm sure I asked somebody to see if they could contact the witnesses, but I can't recall who.

Q.   All right.  And that's the sort of thing that you might not actually keep a record of in a police report, some detail like that, like who went out to get who or anything like that, correct?

A.   Not necessarily.

Q.   Okay.

THE COURT:  We'll break for the afternoon break now.  So it's 2:30.  Let's come back at 3:00 and resume.

All rise.

(Jury out at 2:30 p.m.)

THE COURT:  All right.  Anything either party wants me to address before the break?

MR. S. RICHARDS:  No, Your Honor.

THE COURT:  Mr. Richards, do you have any sense of how much more time you have?  Are we midway, quarter of the way?

MR. S. RICHARDS:  I'm sorry, what?

THE COURT:  Are we midway, quarter of the way?

MR. S. RICHARDS:  We're midway.  I'm a plodder, but I'm plodding through.  But I think we -- you know, in terms of topics, I think I've got three or four major key points or so.

THE COURT:  Okay.

MR. S. RICHARDS:  So I think I might be finished by between 3:00 and 4:00, probably closer to 3:30 than to 4:00.

THE COURT: Okay. I will note, you've described yourself as a plodder, you're on the clock. And so I suspect both sides have more than enough time to present their cases, but the Seventh Circuit would require me to add additional time for good cause. I read that as also requiring efficient use of the time.

And so like with the statement, I've noted that there is a lot of scrolling until you get to your place as opposed to targeted jumping to where you need to be, and that's in my view not the most efficient way to go about it. But you present your case in the best way, just don't think -- I'm making a note of it should on the back end you need more time, I will consider that in deciding whether to grant more time.

Is there anything for me to address for the defense?

MR. SCAHILL: No, Judge.

MR. POLICK: No, Your Honor.

THE COURT: All right.

MR. S. RICHARDS: Your Honor, I do have one administrative inquiry. Do you have the clock running? And if it's been running, is it possible to give me an appraisal of how much time we've used or not?

THE COURT: By the end of the day or -- so plaintiff has used 12 hours and 6 minutes. Defendant has used -- defendants have used 6 hours and 56 minutes as of now.

MR. S. RICHARDS: Thank you.

(Recess at 2:33 p.m. until 3:00 p.m.)

(Change of reporters.)

(Jury in at 3:00 p.m.)

THE COURT: Please take your seats.

Welcome back. We'll continue with the examination of Mr. Mason.

Mr. Richards, you may proceed.

MR. S. RICHARDS: Yes.

BY MR. S. RICHARDS:

Q. Detective Mason, I have to go backwards a little bit for this series of questions. Was Jaime Rios handcuffed when you first saw him in the station?

A. No, sir.

Q. And you said earlier that Officer Guevara had brought him in, correct?

A. Him and his partner, yes.

Q. Did Guevara bring Jaime Rios to the interview room or did you?

A. I did.

Q. Okay. And what was Jaime Rios wearing when he arrived?

A. I have no independent recollection of what he was wearing.

Q. This was July 7th -- well, July 6th, and then July 7th of 1989, right?

A. Yes.

Q. In the summer, right?

A.   Yes.

MR. S. RICHARDS:  Could we show --

BY MR. S. RICHARDS:

Q.   Did you see the court reporter take a photo of Jaime Rios after the court-reported statement?

A.   Yes, I did.

MR. S. RICHARDS:  Show Defendants' Exhibit 13.

MR. J. RICHARDS:  Plaintiff's.

MR. S. RICHARDS:  I'm sorry, Plaintiff's Exhibit 13.

BY MR. S. RICHARDS:

Q.   Does that photograph accurately depict how Jaime Rios looked in the Polaroid taken by the court reporter after the interview?

A.   Yes.

MR. S. RICHARDS:  We would seek to admit Plaintiff's 13.

THE COURT:  Any objection?

MR. POLICK:  No, your Honor.

MR. SCAHILL:  No, your Honor.

THE COURT:  Plaintiff's 13 is admitted and may be published.

(Plaintiff's Exhibit 13 received in evidence.)

BY MR. S. RICHARDS:

Q.   Detective Mason, is that photograph, to your knowledge or recollection, the same photograph that was taken of Jaime Rios

after the court-reported statement?

A.   Yes, sir.

Q.   And do you now recollect that that was what he was wearing at least on top when he was brought to the station?

A.   Yes, sir.

Q.   Appropriate attire for a hot summer day, correct?

A.   Yes, sir.

          MR. S. RICHARDS:  You can take it down.

BY MR. S. RICHARDS:

Q.   And to your recollection, there was no -- he was not given a change of clothes or changed clothes between the time he came into the station and the time that photograph was taken, correct?

A.   That's correct.

Q.   Now, when Jaime Rios, when you first brought him into the interrogation room, was he handcuffed to the wall?

A.   No, sir.

Q.   Let me also talk to you, going back to another subject --

          MR. S. RICHARDS:  You can take that down.

BY MR. S. RICHARDS:

Q.   There's a category of Chicago police reports that are called arrest reports, right?

A.   Yes.  Yes.

Q.   Arrest report is different from almost any other Chicago police report because it's a sworn document, right?

A. Yes, it is.

Q. One reason it's a sworn document, at least one reason is that the arrest report provides probable cause for the arrest and for continuing with the case, right?

A. That's right.

Q. In this particular case, you were the person who arrested Jaime Rios, right?

A. Yes.

Q. You and Detective Halvorsen, right?

A. That's right.

Q. But in this case, you did not write the arrest report; is that true?

A. That's correct.

Q. In fact, the person or persons who wrote the sworn arrest report were Gang Specialists Gawrys and Guevara, right?

MR. SCAHILL: Objection.

THE COURT: Basis?

MR. SCAHILL: It's compound, and there's another issue that may need to be discussed at sidebar.

THE COURT: Okay. Let's go to sidebar.

(Proceedings heard at sidebar:)

THE COURT: Okay.

MR. SCAHILL: Judge, I'm not sure if he's going to show him the arrest report, but it is most certainly not sworn to by Mr. Guevara, and he is implying that it is and that

there's two people swearing to it, which is inaccurate.  So, he's compounding the two people together as if that is two people swearing to a report.  And that's, as I believe Mr. Richards knows, is not how the report is written.

THE COURT:  Response?

MR. S. RICHARDS:  I believe the report is signed by both Gawrys and Guevara.  And, so, if I'm mistaken as to who it's sworn to, I'd just like to show him the report, and he can say who swore to it, either one of the two but not him.  So, I think this can be cleared up by going to the report itself.

MR. SCAHILL:  Well, yeah, I don't care if he shows him the report.  He just asked him a question that implied that they both swore to it.  So, if he's going to show him the report and ask him about it, then that's fine.

THE COURT:  Okay.

MR. S. RICHARDS:  I would --

THE COURT:  Go ahead.

MR. S. RICHARDS:  Before we begin, I'll withdraw the question and ask another.

THE COURT:  Okay.  We'll do that.

MR. SCAHILL:  Thank you.

(Proceedings heard in open court:)

BY MR. S. RICHARDS:

Q.  Let me show you what has been marked for identification as Defendants' 50 I.  Do you see that on your screen?

Mason - direct

962

A. Yes.

Q. And after looking at this document, can you tell us what it -- well, is that the document -- the arrest report of Jaime Rios, right? Correct?

A. Yes, it is.

Q. And only -- when one person's arrested for a crime, generally speaking, there's only one arrest report, correct?

A. Correct.

Q. And this is the arrest report for the arrest of -- sworn arrest report for the arrest of Jaime Rios for the murder of Luis Morales, right?

A. That's right.

Q. Now, the two people who signed the report are Gawrys and Guevara, right?

        MR. POLICK: Objection.

        MR. S. RICHARDS: I'm sorry. Let me start.

BY MR. S. RICHARDS:

Q. First of all, the person who swore to the arrest report was Gang Specialist Gawrys, right?

A. Yes, sir.

Q. Guevara's partner, right?

A. Yes.

Q. And in addition, Guevara signed the report as second arresting officer, right?

        MR. SCAHILL: Objection. Foundation.

THE COURT: Are you seeking to admit the document?

MR. S. RICHARDS: I am.

THE COURT: Is there any objection to its admission?

MR. SCAHILL: No.

MR. POLICK: No, your Honor.

THE COURT: Defendants' Exhibit 50 I is admitted and may be published.

   (Defendants' Exhibit 50 I received in evidence.)

THE COURT: The objections are overruled and can be addressed on cross-examination.

BY MR. S. RICHARDS:

Q. All right. So, Detective Mason, in fact, looking at it now that it's displayed, the person who swore to the report is Gang Specialist Gawrys, right?

A. Yes.

Q. And the person who signed the report as second arresting officer is Gang Specialist Guevara, right?

MR. SCAHILL: Objection. Foundation.

MR. S. RICHARDS: Okay. Well --

THE COURT: One second. The objection is sustained.

BY MR. S. RICHARDS:

Q. Who is listed as the second arresting officer on the report?

A. Gang Crime Specialist Guevara.

Q. Does a signature appear above the name Gang Specialist

Guevara?

A.  Yes, it does.

Q.  Okay.  Without saying that's Guevara's signature, does it appear to be possibly a signature of Gang Specialist Guevara?

MR. SCAHILL:  Objection.  Foundation.

THE COURT:  Sustained.

BY MR. S. RICHARDS:

Q.  Would you recognize the signature of Gang Specialist Guevara?

A.  I would not.

Q.  Okay.  And this arrest report says that the arrestee has given a statement to the state's attorney, that he in company with a second offender went to 1360 North Western Avenue and shot to death one Luis Morales, and the arrestee stated he was armed with a .38-caliber revolver, which he fired.

That's what this arrest report says, right?

A.  Correct.

MR. S. RICHARDS:  Now, scroll down here.

BY MR. S. RICHARDS:

Q.  And, again, this arrest report lists as arresting officers Vukonich, Zacharies, Guzman, Longo, Halvorsen, and Mason, who are listed above Gawrys and Guevara in the box for first and second arresting officer.

So, again, all these officers are listed on this report as arresting officers, right?

A.   Yes.

Q.   By the way, you were not Guevara's supervisor, right?

A.   No.

Q.   Did he send any of his reports to you or show them to you before he submitted them for approval by you?

A.   No.

MR. S. RICHARDS:  Let's turn -- if we could take that down.

BY MR. S. RICHARDS:

Q.   Going to Defendants' Exhibit 50 G, do you see that on your screen?  I'm sorry?

A.   Yes.

Q.   Okay.  We're marking this for identification.

It's not on your screen?

A.   I see it now.

Q.   Oh, you do.  Okay.  Good.  All right.

Do you recognize this document?

A.   That's a supplementary report submitted by Gawrys and Guevara.

Q.   All right.  And this is not a sworn report, correct?

A.   No.

Q.   And, again, Guevara or Gawrys never submitted that one for your approval either, correct?

A.   No.

MR. S. RICHARDS:  We seek to have Defendants'

Mason - direct

966

Exhibit 50 G be admitted.

THE COURT:  Any objection?

MR. SCAHILL:  No.

MR. POLICK:  No, your Honor.

THE COURT:  Defense Exhibit 50 G is admitted and may be published.

(Defendants' Exhibit 50 G received in evidence.)

BY MR. S. RICHARDS:

Q.   Now, this report says this is a Gangs Crime North arrest by Beats 416, 4615/4616, and Area 5 Violent Crimes Beat 5521.

Do you see where it says that, right?

A.   Yes, I do.

Q.   So, again, this report says that it's at least in part, it's a Gang Crimes North arrest, right?

A.   Yes.

MR. S. RICHARDS:  You can take that down.

BY MR. S. RICHARDS:

Q.   After -- eventually some of the witnesses arrived at the station to view Jaime Rios in lineups, correct?

A.   Yes.  They were there to view a lineup, yes.

Q.   Okay.  And one witness, Samantha Hudson, did not identify Jaime Rios, correct?

A.   That's correct.

Q.   And a second witness, Javier Torres, did not identify Jaime Rios, correct?

Mason - direct

967

A.   That's correct.

Q.   Do you know who it was who brought Samantha Hudson to the lineup?

A.   I'm not certain she viewed this lineup.

Q.   Okay.  Do you know who brought Javier Torres to view the lineup?

A.   I do not.

Q.   Do you know who brought Luis Huertas to view the lineup?

A.   No, sir.

Q.   Do you know which police personnel were present during the lineup?

A.   Do you mean in the building?

Q.   No.  In the room where the lineup was held.

A.   Oh.  That was myself and Detective Halvorsen.

Q.   Yourself and Detective Halvorsen but no other police personnel, fair?

A.   Correct.

Q.   Between the time that photograph we saw was taken by the court reporter and the time Jaime Rios was taken to the lineup, he had been given different clothes to wear; is that true?

A.   Yes.

Q.   Who gave him the different clothes?

A.   I do not know.

Q.   Do you know where the clothes came from?

A.   No, I don't.

Q.   In a lot of the original reports, is it fair to say that one clothing description of the shooter that was given was that a person dressed in red, red shorts or red pants and a red shirt; is that fair?

A.   Yes, there was some mention of red.

Q.   Okay.  I'd like to show you what's been marked as Defendants' Exhibit 50 EEEE --

MR. S. RICHARDS:  No, I'm sorry.  Strike that.  Sorry.

(Pause.)

BY MR. S. RICHARDS:

Q.   So, first of all, is this a photo of that lineup in which Luis Huertas identified Jaime Rios?

A.   Yes, it is.

Q.   Okay.  And is Jaime Rios -- first of all, four of the people in the photograph are wearing T-shirts, correct?

A.   It appears that way.

Q.   Okay.  But one of the persons in the lineups is wearing a red jumpsuit or track suit, right?

A.   Yes.

Q.   And that's Jaime Rios, right?

A.   Yes, it is.

MR. S. RICHARDS:  We would seek to admit and publish 50 EEE, which actually is a group exhibit containing multiple photos.

THE COURT:  Any objection?

MR. POLICK: Judge, that's not the exhibit number I have for that particular photo.

MR. J. RICHARDS: Your Honor, for the record, it's Defendants' 50 EEEE. That's four Es.

MR. POLICK: Say it again.

MR. S. RICHARDS: 50, open paren, EEEE, close paren.

MR. POLICK: Okay. No objection to the photo.

MR. SCAHILL: No objection.

THE COURT: It's admitted and may be published.

(Defendants' Exhibit 50 EEEE received in evidence.)

BY MR. S. RICHARDS:

Q. So, that was the photograph you just identified as the photograph -- or one photograph of the lineup, correct?

A. Yes, sir.

Q. Now, by the way, were the participants in the lineup asked to make a turning movement so a profile could be viewed?

A. Yes, I believe they were.

Q. Was there any particular reason for that? Was there some evidence you had that the shooter had been seen in profile?

A. It's a standard procedure when I run a lineup.

Q. Okay. Let me then --

MR. S. RICHARDS: If you can scroll down.

BY MR. S. RICHARDS:

Q. And, then -- and is this a picture of the people in the lineup standing in profile?

A.   Yes, it is.

          MR. S. RICHARDS:  You can take it down.

          Put up Exhibit 50 K.

BY MR. S. RICHARDS:

Q.   Do you recognize this document?

A.   Yes.

Q.   Is that the lineup report of this lineup that was viewed by Luis Huertas and Javier Torres?

A.   Yes, it is.

          MR. S. RICHARDS:  And we would seek to admit this, which is Defendants' Exhibit 50 K.

          THE COURT:  Any objection?

          MR. POLICK:  No, your Honor.

          MR. SCAHILL:  No.

          THE COURT:  Without objection, it's admitted and may be published.

   (Defendants' Exhibit 50 K received in evidence.)

BY MR. S. RICHARDS:

Q.   By the way, this document shows that two officers and only two officers listed at the lineup are yourself and Halvorsen, right?

A.   That's right.

          MR. S. RICHARDS:  You can take it down.

BY MR. S. RICHARDS:

Q.   Okay.  Let me go now to July 9th, 1989, at about

Mason - direct

971

1400 hours. Do you remember meeting with confidential informants on that date for the purpose of obtaining search warrants?

A. I did not meet with them for the purpose of obtaining search warrants. I met with them because they had additional information.

Q. All right. Were these the same confidential informants you had met with on July 6th?

A. Yes, it is.

Q. And how did you know that they had additional information?

A. They came to Area 5 and told me that they had learned some new information.

Q. And did these informants come to Area 5 on their own, or were they brought by somebody else?

A. I don't recall at this time how they got there.

Q. Okay. Now, earlier at your deposition, you had said you couldn't remember whether you talked with them by telephone or in person, but now you're saying they definitely came in person, right?

        MR. POLICK: Objection. Improper impeachment.

        MR. S. RICHARDS: I'll withdraw it.

BY MR. S. RICHARDS:

Q. In this -- these informants came to meet with you in person, right?

A. Yes.

Q. Now, how long approximately had you spoken with them on July 6th?

A. Maybe 20 minutes.

Q. How long did you speak with them on July 9th?

A. I'm sorry, I thought you were referring to July 9th.

Q. Let's go back to July 6th. Sorry. I confused you.

The first interview you had with them on July 6th?

A. That was short.

Q. Brought in by Guevara and Gawrys. How long did that interview take?

A. That was short. It was maybe 10 minutes.

Q. And the second interview you had when they came in on 9th, how long did that interview take?

A. So, that was about 20 minutes.

Q. All right. And I would guess that you are -- again, you would tell me that you cannot remember anything about them other than the fact that they were male; is that fair?

A. That's correct.

Q. And you didn't take any notes or memoranda of who they were, what they looked like, or what they said, correct?

A. That's right.

Q. I'm going to give you a couple of names and see if this prompts your memory in any respect. Does the name Michael or Miguel Martinez, could one of them have been that name?

A. I have no idea.

Q.   Could the name Hector Quintano or Quintero, could that be a name of one of them?

A.   I don't know.

Q.   Have you been given a copy of the documents obtained from the state's attorney in discovery in this case to review?  Have you reviewed all those documents?

A.   I have.

Q.   Okay.  Let me put up Defendants' Exhibit 50 JJ.

Is this one of the documents you reviewed?

A.   Yes, it is.

Q.   And that document -- the first name at the top of the document is --

MR. SCAHILL:  Objection.

THE COURT:  Let's go to sidebar.

(Proceedings heard at sidebar:)

THE COURT:  What's the basis for the objection?

MR. SCAHILL:  Counsel again appears to be just reading in things he has not sought to admit, and he has also not established that this is -- this witness's -- this appears to come from the state's attorney.  So, there's a foundation issue, and there's an issue with just reading things in without admitting them.

THE COURT:  Response?

MR. S. RICHARDS:  Your Honor, I would ask to display it to him to see if it refreshes recollection.  If it doesn't,

Mason - direct

974

then I'll drop it.

MR. SCAHILL: I just want to make sure we're not conflating these issues of having him read things in. I don't know what he's refreshing his recollection about, but he can certainly -- he can refresh his recollection with a ham sandwich, as we all know, but I'm not sure what he said he doesn't remember.

THE COURT: Okay. This is not a refresh his recollection situation, at least not the way it was proposed. And, so, you did not answer the objection.

What good-faith basis do you have to ask this question and to ask substantive questions of this witness with respect to this document? The fact that he reviewed something does not create personal knowledge. Are you trying to impute information from this document to this witness? Because that would be improper.

MR. S. RICHARDS: The only good-faith basis I have is it was a document in the state's attorney's file. It has the name Jaime Rios on it with his IR number. It has the name Miguel Martinez. I do have --

THE COURT: Okay. You are about a foot away from the microphone. My concern is that you are too far away such that the jury is hearing the sidebar. So, please --

MR. S. RICHARDS: Okay. So, with respect to the document, one name given at trial for the informants was Little

Mason - direct

975

Mike. I do have a good-faith basis for believing that Little Mike is Miguel Martinez. I was hoping that --

THE COURT: What good-faith basis do you have that this witness knows the names of the informants?

MR. S. RICHARDS: I -- I just find it absolutely incredible that he has no knowledge whatsoever even of race and age or anything else. So, I'm trying to get him to say that, yes, indeed, he does know their identities. But if you think that I have no good-faith basis, then I will withdraw.

THE COURT: I can only think or evaluate the good-faith basis that you put forth. And that is why I'm asking you what good-faith basis.

Now, what you've told me is that you find it incredible that he does not know. I am not aware of that being a reason to establish a good-faith basis. It doesn't matter what you think. What evidence can you point me to that suggests there is a good-faith basis to ask these questions of this witness when this witness has said he does not recall these names, there's no indication that he created these documents, or any other tidbit of evidence from which I see a good-faith basis? So, can you point me to something?

MR. S. RICHARDS: I have stated the good-faith basis I have, that Little Mike is identified as -- in other documents or other evidence as the name of an informant. I have been told that Little Mike's real name was Miguel Martinez.

That's --

THE COURT: Now tie it to this witness to create a good-faith basis for asking this witness these questions.

MR. S. RICHARDS: All I can say is that the only good-faith basis would be that the name's recorded in the state's attorney's file and that this witness has said that he has absolutely no knowledge of these things. And I was hoping that -- to show that he does have knowledge and that these are the names.

THE COURT: Okay.

Yes?

MR. SCAHILL: I'm sorry, Judge, did I hear counsel just say that he knows the name of Little Mike? Because this is the first I'm hearing of this and tying this up to whoever this person is. I'm not sure where that comes from.

MR. POLICK: Me either, your Honor.

THE COURT: None of that matters in the sense that I am simply trying to -- I'm not trying to litigate the case at sidebar. That's not my purpose here. My purpose is to understand whether there is a basis for the questions in light of the objection. I have not heard a basis -- a good-faith reason to ask this witness whether he knows these names when it does not appear in any of his reports, there is no witness testimony that you're pointing to saying that, well, so-and-so said they told this witness that.

This witness has not indicated that he ever knew the names of these individuals that he met with. He simply does not recall. And, so, there's no indication that this witness contributed to what's in the state's attorney's documents. I think we all know that police reports get put on to the prosecutors and the prosecutors continue to conduct their investigation.

So, there are any number of intervening events that can explain why these names are in the state's attorney's files but may not be known by this witness, and I have not been shown any reason why any further examination on this topic concerning the state's attorney's files should be asked of this witness because Mr. Richards has not presented a good-faith basis.

So, the objections are sustained. I ask counsel to stay on task. And that's for both sides. Let's go back to the examination.

   (Proceedings heard in open court:)

BY MR. S. RICHARDS:

Q.  After you spoke with the informants who came to you with this additional information -- by the way, did you ask them why they were coming with the additional information?

A.  I don't recall if I asked them why, no.

Q.  All right. Did you ascertain their gang affiliation, if any?

A.  I don't recall that they were gang members.

Q.   But the information they were giving you was purportedly information about where the guns used in the homicide of Luis Morales could be found, right?

A.   That's correct.

Q.   That was pretty important information for your investigation, right?

A.   It's helpful.

Q.   All right.  Well, in fact, what you did after learning this information was you drafted complaints for two search warrants, right?

A.   That's right.

Q.   One search warrant was for the home of Alexander Lopez, right?

A.   Yes.

Q.   And your information from the informants was that one of the informants had said that Alex Lopez had showed the informant a .25-caliber semiautomatic and told him that the gun was hot because it was used in the murder of Luis Morales. That was the information you got, right?

A.   Yes.

Q.   And you were further told by the informant that Alexander Lopez told him that the weapon was hidden at his house because it was considered to be a safe hiding place, that he was afraid to move it because the police were looking for it.  That was the further information you got from him, correct?

Mason - direct

979

A.   That's right.

Q.   From the informant, right?

A.   Yes.

Q.   By the way, we're dealing again with gangs.  Did you have knowledge or information that the gangs sometimes, you know, had gangs with -- guns which were gang guns or joint guns and were moved from place to place for use of gang members?

A.   Yeah, I knew about that, yes.

Q.   So, you drafted the complaint for search warrant for Alexander Lopez based on the information the confidential informants had given you, right?

A.   Correct.

Q.   Now, was, in fact, the search warrant executed?

A.   It was.

Q.   Was any gun found?

A.   No, sir, not at that location.

Q.   Was Alexander Lopez ever questioned about whether what the informant had said about how he got the gun was true?

A.   I never spoke to him, so I don't know.

Q.   Do you know if anyone ever spoke to Alexander Lopez about this?

A.   I wasn't at that location, so I really can't answer that.

Q.   All right.  It was another officer who served that warrant or the complaint -- who served the warrant at Alexander Lopez's address, right?

A.   That's right.

Q.   All right.  Let's move on to --

     (Pause.)

BY MR. S. RICHARDS:

Q.   Let me just complete the circle.  Let me show you
Defendants' Exhibit 50 N.

          MR. POLICK:  N, as in Nancy, counsel?

          MR. S. RICHARDS:  N, as in Nancy, yes.

          MR. POLICK:  Thank you.

BY MR. S. RICHARDS:

Q.   If you look at that, is that a copy of your -- of the
complaint for a search warrant and search warrant?

A.   Yeah, that seems to be the first page of it.

Q.   And if we scroll down, you see the second page of it?

A.   Okay.  Yes.

Q.   All right.  And, then, the third page.

     Okay.  And, by the way, the procedure is a complaint
for a search warrant has to be submitted to a judge, right?

A.   It has to be submitted to several people before you get to
the judge, but, yes, eventually the judge.

Q.   Submitted to the state's attorney first?

A.   No.  Submitted to my commanding officer first, and then
after he approves it, then the Cook County state's attorney
looks at it.  And if they approve it, then I take it to a
judge.  And, then, if he approves it, he signs it.

Q.   All right.

MR. S. RICHARDS:  Seek to admit Defendants' Exhibit 50 N.

THE COURT:  Any objections?

MR. POLICK:  No, your Honor.

MR. SCAHILL:  No, your Honor.

THE COURT:  Defense Exhibit 50 N is admitted and may be published.

(Defendants' Exhibit 50 N received in evidence.)

BY MR. S. RICHARDS:

Q.   Is that, in fact, the complaint for a search warrant which you authored?

A.   Yes, it is.

Q.   And it simply contains the information we talked about before, right?

A.   Yes.

Q.   Now, next I'd like you to --

MR. S. RICHARDS:  Take that down, please.

BY MR. S. RICHARDS:

Q.   The other information which you received was information about a gun possibly being located at the house of Benjamin Carrero, right?

A.   Yes.

Q.   Now, the information -- and was this information from the same confidential informant or a different one or both of them?

A.   I don't recall if it was one or the other or both at this time.

Q.   Okay.  And what this informant said is that he had had a conversation with Benjamin Carrero, who showed him a blue steel .38-caliber revolver and told him that the gun was hot because it was used in the murder of Luis Morales, right?

A.   That sounds correct.  I can't see all of that, but that sounds like what -- what he told me.

Q.   Let's go to the warrant, and we'll get it straight.  Sorry.

MR. S. RICHARDS:  We would seek to admit Defendants' Exhibit 50 M.

MR. POLICK:  M, as in Mary?

MR. S. RICHARDS:  As in Mary, yes.

MR. POLICK:  Thank you.

BY MR. S. RICHARDS:

Q.   Is that the complaint for a search warrant for house of Benjamin Carrero and the .38-caliber revolver?

A.   Yes, sir.

THE COURT:  Was there any objection to the admission of 50 M?

MR. SCAHILL:  No.

MR. POLICK:  No, your Honor.

THE COURT:  It's admitted and may be published.

   (Defendants' Exhibit 50 M received in evidence.)

BY MR. S. RICHARDS:

Mason - direct

983

Q.   So, going down this, going to the second page, what this informant said was that Benjamin Carrero showed you a blue steel .38-caliber revolver, told him the gun was hot because it was used in the murder of Luis Morales, and the informant also stated that Benjamin Carrero told him the weapon was hidden there because it was considered to be a safe hiding place.

Is that the information you got before you went to -- before you submitted this search warrant for the house of Benjamin Carrero?

A.   Yes, sir.

Q.   Now, in fact, you did -- the warrant was approved.  In fact, there was a search of the house of Benjamin Carrero, right?

A.   Yes, sir.

Q.   Now, did you go to execute the search warrant yourself, or did you assign it to other officers?  What did you do?

A.   There were -- I think there were four detectives and a sergeant along with a uniform car from the 14th District.

Q.   All right.  So, you went personally to see that the search warrant was executed, correct?

A.   Yes.

Q.   All right.  And what happened when the search warrant was executed?  Do you recall?

A.   Exactly what happened, I -- I can give you a synopsis of what happened.

Mason - direct

984

Q. I'd like to hear a synopsis, please.

A. We went to that location. We saw Benjamin Carrero either -- he was either on the front porch or in the stairway inside. And we gave him a copy of the search warrant, told him we were there to search.

Q. Okay. Let's stop there.

After you gave him a copy of the search warrant and told him you were there to search, what happened?

A. He directed us to what he said was his apartment. Then we learned that wasn't his apartment. So, then we went to his apartment. And one of the detectives I was with saw his -- either his wife or girlfriend. She was acting a little suspiciously. She said she had to go to the bathroom. So, he went outside by the bathroom window on the outside and saw her throw a gun out the window.

Q. All right. And the person who threw the gun out the window was Iris Mendez, right?

A. Yes.

Q. She was arrested, right?

A. Yes, she was.

Q. And you said that you had -- Benjamin Carrero had first gone up to the second floor, which turned out not to be his apartment. At some point -- by the way, did you know that Benjamin Carrero had a nickname?

A. I don't recall.

Q. Do you recall that he had a nickname "Baby" and a baby tattoo on his arm?

A. That sounds familiar.

Q. All right. So, in any event, a search was done of the house, right?

A. Yes.

Q. And Benjamin Carrero and Iris Mendez were taken to the police station, right?

A. Yes.

Q. Who took Benjamin Carrero to the police station?

A. I don't recall.

Q. All right. You said there were five officers present for the search warrant, right?

A. Well, there was four detectives, a sergeant, and two beat officers from the 14th District.

Q. All right. Were there any gang specialists there?

A. No.

Q. Now, you took Benjamin Carrero to the station, right? And was -- and what was he arrested for?

A. Obstruction of justice.

Q. Iris Mendez wasn't arrested for possessing the gun, correct?

A. No. She was also charged with obstruction of justice.

Q. Both were charged with obstruction of justice?

A. Yes.

Q. Neither was charged with possession of the gun?

A. No.

Q. Possession of the gun by either of them was illegal obviously, right?

A. At that time, I believe so.

Q. Okay. Did you make a conscious decision not to charge them with the gun and only to charge them with obstruction of justice? Was that your decision?

A. No. That was the state's attorney's decision.

Q. All right. When did you consult the state's attorney on what the charges would be?

A. After we had a conversation with both Benjamin Carrero and Iris Mendez.

Q. What time did Iris Mendez and Benjamin Carrero get to the station?

A. I can't recall right now. I'd have to review my report.

MR. S. RICHARDS: One second, your Honor.

(Pause.)

MR. SCAHILL: Judge, I think counsel's computer is being displayed to the jury.

MR. S. RICHARDS: I'm sorry, what?

A JUROR: Yeah, I can see it.

THE COURT: Thank you.

BY MR. S. RICHARDS:

Q. I'd like to -- first of all, you said a copy of your

report. Did you produce as a supplementary report detailing what happened during the course of the search warrant, or did Detective Curley do that?

A. The report was -- regarding the arrest of Benjamin Carrero and Iris Mendez, that was Detective Curley's report.

Q. Okay. So, because -- when you said that your recollection might be refreshed by looking at a report, do you mean by looking at Detective Curley's report?

A. That would -- yeah, that would be the report.

Q. Okay. Confused me. I got it straight now.

MR. S. RICHARDS: Could we look at Exhibit 50 W.

BY MR. S. RICHARDS:

Q. Do you see what's before you on your screen?

A. Yes.

Q. Is that, in fact, Detective Curley's supplementary report as to the arrest and search of -- arrest of Benjamin Carrero, search of his house, arrest of Iris Mendez?

A. Yes, it does.

Q. Okay.

MR. S. RICHARDS: We would seek to admit that report.

THE COURT: Any objection?

MR. POLICK: No objection, Judge.

MR. SCAHILL: No objection.

THE COURT: Without objection, Defense Exhibit 50 W is admitted and may be published.

Mason - direct

988

(Defendants' Exhibit 50 W received in evidence.)

BY MR. S. RICHARDS:

Q.   Again, that, in fact, is Curley's report.  By the way, did you see Curley's report before it was submitted?

A.   Before it was submitted.  I may have.  I don't recall.

MR. S. RICHARDS:  If you scroll down.

BY MR. S. RICHARDS:

Q.   Okay.  In any event, the report details the investigation --

MR. S. RICHARDS:  Scroll, please.  Scroll down.

BY MR. S. RICHARDS:

Q.   Okay.  So, you, in fact, interviewed Benjamin Carrero, right?

A.   Yes, sir.

Q.   And what Benjamin Carrero told you was that Jaime Rios had come by on June 27th or June 28th, took a handgun from his waistband, handed it to Carrero, and stated, hold this for me, I just shot somebody, I'll be back, and then he rode away on his bicycle.

So, that's what Carrero told you, right?

A.   Yes.

Q.   Now, who, if anyone, was with you when you interviewed Benjamin Carrero?

A.   Detective Curley.

Q.   All right.  Would it be your testimony that Gang Specialist

Guevara was not there?

A.   He was not there.

Q.   Do you know where he was?

A.   I do not.

Q.   How long was Benjamin Carrero kept -- this was at the 14th District?  Was this at Area 5 or the 14th District?

A.   This was at Area 5.

Q.   How long was Benjamin Carrero kept at Area 5?

A.   Well, he was kept at Area 5 until he went downstairs to the 25th District lockup, which would have happened after the state's attorney was done with their reviewing the case.

Q.   All right.  And you're saying that the state's attorney decided only to charge Benjamin Carrero and Iris Mendez with obstruction of justice, right?

A.   That's correct.

Q.   And did you have any input in that decision?  Did you suggest in any way that they should only be charged with misdemeanor obstruction of justice and not with possession of the gun?

A.   I believe it's a felony.

Q.   All right.  Either way, did you have any input as to whether they would be charged with only obstruction of justice and not with possession of the gun?

A.   No.  I just told the state's attorney what we learned, and they review it, and they make the decision on their own.

Q.   Did you tell the state's attorney that you hope that Benjamin Carrero would be a witness against Jaime Rios?

A.   No.

Q.   Do you know whatever happened with the charge against Benjamin Carrero?

A.   I learned later on that the charges were -- I think there was a charge of -- I mean a disposition of no probable cause.

Q.   All right.  And a disposition of no probable cause tends to happen when the police officers that could provide probable cause don't show up for the preliminary hearing, right?

        MR. SCAHILL:  Objection to form and foundation.

        MR. POLICK:  Join.

        THE COURT:  Sustained.

BY MR. S. RICHARDS:

Q.   Well, when a charge is brought in Cook County or the State of Illinois, the charge has to either go to the grand jury for indictment or for a preliminary hearing, right?

        MR. SCAHILL:  Objection.  Foundation.

        MR. POLICK:  Join.

        THE COURT:  Sustained.

BY MR. S. RICHARDS:

Q.   Well, speaking of the grand jury, Benjamin Carrero was brought the next day to the grand jury; was he not?

A.   I believe he was.

Q.   All right.  Were you present when he testified at the grand

jury?

A.   No, sir.

Q.   And he was held for at least day at Area 5 before he was taken to the grand jury, fair?

A.   No.   He was held in the 25th District lockup.

Q.   Okay.   How long was he held in the 25th District lockup?

A.   He would have been held past the next day's court call. And, so, he probably went the following day.

Q.   All right.   And the following day he would have been taken to the grand jury and then to Cook County jail, right?

A.   No.   I believe the following morning he either would have gone to court or he was held past the court -- past the court call.   And the reason for that was, I believe, he was going to go to the grand jury to testify on what he had -- what he had told the state's attorney.

Q.   All right.   So -- by the way, when he went to the grand jury, at that point he wouldn't have a lawyer before the grand jury, correct?

          MR. SCAHILL:   Objection.

          MR. POLICK:   Objection.

          THE COURT:   Sustained.

BY MR. S. RICHARDS:

Q.   Well, put it this way:   When he was brought before the grand jury, he would be testifying about the events involved in this case against him for obstruction of justice, right?

Mason - direct

992

MR. SCAHILL:  Objection.

THE COURT:  Sustained.

BY MR. S. RICHARDS:

Q.   Before -- well, was it not your expectation that after you had spoken to Benjamin Carrero, he was going to be a witness against Jaime Rios?

A.   I believed that he probably would.

Q.   All right.  Because he had given you information that would help convict Jaime Rios, right?

MR. SCAHILL:  Objection to the form of the question.

MR. POLICK:  Join.

THE COURT:  One second.

That's overruled.

You may answer.

BY THE WITNESS:

A.   Can you repeat that?  I'm not quite sure what you said.

BY MR. S. RICHARDS:

Q.   Okay.  So, the reason why -- you believed that Benjamin Carrero was going to be a witness against Jaime Rios, right?

A.   Yes.

Q.   And that was because the information he was giving you would help convict Jaime Rios of murder, right?

A.   I'm not necessarily qualified to say that it would help convict him.  I'm not a lawyer.  I don't prosecute.

Q.   All right.

A.   I --

Q.   Okay.

MR. J. RICHARDS:  Your Honor, if we could take down the jury screen.

(Pause.)

BY MR. S. RICHARDS:

Q.   Now, when you did an interview with Benjamin Carrero, you did GPRs on that interview, correct?

A.   Yes.  Yes, I did.

Q.   Detective Curley didn't do a GPR, correct?

A.   I don't believe so.

Q.   I'm showing you -- marking for -- as Defendants' 50 II.

Is that a copy of your GPR?

A.   Yes, sir.

Q.   And was this GPR dated?

A.   Yes.

MR. S. RICHARDS:  I'd like to seek to admit Defendants' Exhibit II -- I'm sorry, 50 II.

THE COURT:  Any objection?

MR. SCAHILL:  No.

MR. POLICK:  No, your Honor.

THE COURT:  Without objection, Defendants' Exhibit 50 II is admitted and may be published.

(Defendants' Exhibit 50 II received in evidence.)

BY MR. S. RICHARDS:

Mason - direct

994

Q. So, this GPR has the date of the original case report and the date of the report in the right-hand corner, correct?

A. Yes.

Q. By the way, this GPR doesn't indicate, does it, that it was Detective Curley who is with you during the interview, does it?

A. No.

MR. S. RICHARDS: Take it down.

We can take that down. Thank you.

THE COURT: Right. The monitor in front of the jury box shows what the jury sees. They currently see the seal.

MR. S. RICHARDS: Thank you very much, your Honor.

BY MR. S. RICHARDS:

Q. All right. Detective, now I want to move to the arrest of Cristino Garcia. Do you recall some of the circumstances of that?

A. Yes, sir.

Q. Now, first of all, you weren't present when he was arrested by detective -- or detectives -- I believe it's either detectives or gang specialists O'Quinn and Mertes?

A. I was not present, no.

Q. Did anyone notify you that he had been brought to Area 5?

A. Well, I had to get notified that he was there, otherwise I wouldn't have known about it. But I don't recall who notified me. But he was in the 25th District lockup.

Q. All right. Do you know how long after he was in the

Mason - direct

995

25th District lockup that somebody notified you that Cristino Garcia was there?

A. I believe he was arrested the evening before. And, then, when I got to work in the morning, somebody told me, probably my supervisor, that he was there.

Q. All right. So, he had been held overnight from -- he had been held overnight before you knew he was there when you got there in the morning, correct?

A. Yes.

Q. So, nobody notified you during the first period of time when he was there, correct?

A. I wouldn't have been working, so no.

Q. All right. Well, we had earlier seen in the course of the investigation of this case, for example, the beginning of the murder when the case was first assigned to the midnight officers and then you took over in the morning, there's always detectives at Area 5, right?

A. Yes.

Q. 24/7, right?

A. Correct.

Q. So -- and when -- Cristino Garcia was a suspect in a murder case; was he not?

A. Yes.

Q. And it was very important to interview him if possible; was it not?

A.   Sure.

Q.   And it would certainly be better to try and interview him right away when he got to the station, right?

A.   I guess that's preferable.

Q.   Okay.  Preferable.  All right.

         And, in fact, there had been either -- there had been a stop order issued for Cristino Garcia, correct?

A.   Yes.

Q.   Because there was probable cause to arrest Cristino Garcia for a murder?

         MR. SCAHILL:  Objection.

         THE COURT:  Sustained.

BY MR. S. RICHARDS:

Q.   Well, at the time, did you believe there was probable cause to arrest Cristino Garcia for murder?

A.   I did.

Q.   Did you ever learn why none of the detectives assigned to the previous watch had notified you sooner that Cristino Garcia was in custody?

A.   Other than I wasn't working.  I don't know what else -- I mean, how would they notify me if I'm not there?

Q.   Okay.  But no detective from that previous watch, to your knowledge, attempted to interview Cristino Garcia; is that true?

A.   I don't know of any detective that tried to interview him,

no.

Q.   But when you saw Cristino Garcia the next morning, he simply refused to talk to you, correct?

A.   Yes.

Q.   And, then, you spoke to the state's attorney about whether there would be charges filed against Cristino Garcia, right?

A.   Eventually, yeah, there were -- I did other things.

Q.   Oh, the other things you did were you brought in -- you conducted lineups of Cristino Garcia to see if anyone would identify him, right?

A.   Correct.

Q.   And nobody did?

A.   Correct.

Q.   Including Luis Huertas?

A.   I wasn't able to find Luis Huertas.

Q.   All right.  Who did you bring in to see if you could identify -- they could identify Cristino Garcia?

A.   Javier Torres.

Q.   And he didn't identify -- he did not identify Cristino Garcia, correct?

A.   Correct.

Q.   By the way, since Garcia was held overnight, there had to be one of these notifications, hold past court call, right?

A.   Yes.

Q.   Do you know who requested he be held past court call?

Mason - direct

998

A.   Yes.

Q.   Who?

A.   Detective Leonard.

Q.   All right.  And eventually, the state's attorney told you that he was not going to pursue charges against Cristino Garcia, correct?

A.   That's right.

Q.   Because at that point the only evidence against Cristino Garcia was from the statement of Jaime Rios, right?

A.   Correct.

Q.   No one had identified Cristino Garcia?

A.   No, sir.

Q.   Did you dress Jaime Rios in the red sweat suit?

A.   No, sir.

Q.   Did you ever physically assault Jaime Rios?

A.   No, sir.

Q.   Did you ever threaten to take away his child?

A.   No, sir.

Q.   Did you ever pull his hair and slam his head on the table?

A.   No.

     (Pause.)

BY MR. S. RICHARDS:

Q.   Just to be clear, Detective, it was a .32-caliber gun that was found in Benjamin Carrero's house, right?

A.   That's correct.

Q.   Not a .38, correct?

A.   Correct.

Q.   No .25-caliber gun was ever recovered, right?

A.   Not in this case.

Q.   All right.  Well, that's the case I'm concerned about.  But thank you.

     There was -- fingerprints were taken from the car, but no fingerprints ever linked to Jaime Rios, correct?

A.   As far as I can recall.

Q.   There were unidentified fingerprints on the car, but they were never linked to anyone else, correct?

A.   That's -- that's correct.

Q.   And the only shell casings recovered were .25 caliber?

A.   Yes.

     MR. S. RICHARDS:  Nothing further.

     THE COURT:  Okay.  Rather than launch into the cross, it's 4:08.  I'll probably break there for the weekend, and we'll pick up with Detective Mason on Monday.

     I did check with the parties concerning where they think they are and where I think they are.  And I don't think we'll go the full three weeks.  I can't say that we won't spill into the third week, however.  So, we are on pace, probably moving slightly faster than I anticipated.  And, so, we'll pick up next week, and if we make up more time, great.  If not, again, I appreciate your patience.  I appreciate your service.

I remind you not to discuss the case, not to research the case.  The Super Bowl is this weekend.  Hopefully you enjoy it.  And if you have a team in it, hopefully they win.  Have a good weekend.

All rise.

(Jury out at 4:10 p.m.)

THE COURT:  Given the posture, I ask that you not discuss the substance of your testimony with anyone over the weekend.

Anything for me to address for the plaintiffs?

MR. J. RICHARDS:  No, your Honor.

THE COURT:  You can step down, Detective.

All right.  For the defense?

MR. SCAHILL:  This may be something to address with counsel first, but counsel appeared to articulate at a sidebar that they -- someone told them that this individual on this note was the confidential informant, and I have a claim where they're saying my client made this up.  It would seem as if this was information that should have been provided.

So, that was the first I have heard of that.  So, again, maybe I need to look at discovery and all of that.  But that was a little jarring to hear.

THE COURT:  Response?

MR. S. RICHARDS:  Your Honor, I don't believe that was requested of us in discovery.  But I can provide counsel with

what information I have.

THE COURT: I don't have the discovery requests going back and forth.

Do you intend to introduce the names of the confidential informants or the identities of the confidential informants at this trial?

MR. S. RICHARDS: No.

THE COURT: If that's the case, what would be the remedy for any discovery violation?

MR. SCAHILL: Well, the claim is that my client made up informants. So, I mean, that obviously begs the question of if they exist and what they said and all of these other things that flow from that. I'm just speaking off the top of my head because I just heard it during the examination -- or sidebar.

THE COURT: Okay. Are you pursuing the claim that any of the defendants made up confidential informants?

MR. S. RICHARDS: Yes. Either their identity or the information they provided. I do note that my client said -- has testified that Little Mike was taken away by Guevara, and that Guevara showed him photographs of Little Mike. So, that's in evidence.

MR. SCAHILL: And we asked Mr. Rios at his deposition for the identity of Little Mike, and he said he just knew his name is Michael. Now they're saying it's Miguel something, full name.

And, by the way, I think the notes that they showed were from the PD's file, not the state's attorney's file. But that's neither here nor there. It seems like there's a full name for somebody that they're link- -- which there's no description in that note. It's just a name on a piece of paper which they're now linking to a material issue in the case that we're trying.

And the basis of the claim, of course, is not just the making up of the information. It's the making up of the existence of the informants, as well. So, perhaps we need to have a discussion. But it is a bit troubling to hear that at this stage.

THE COURT: I do think the parties need to confer. If any of the defendants were to pursue this, I would need to see either the questions at the deposition or the discovery requests that you believe would have required the production of the identity or any information concerning the confidential informants -- or in some cases, people ask for all information in support of your claims -- so that I can fully evaluate any discovery or failure to produce in discovery.

MR. SCAHILL: I mean, look, counsel may be right. I'm not looking at my discovery right now. But there's a discussion that will be had.

THE COURT: Okay. Monday, or whenever, we can -- once we're better informed collectively, we can take up the issue.

1003

I understand the concern and that it would be relevant to your defense.

Any other issues?

MR. ENGQUIST: Just lineup.

MR. POLICK: Making sure for Monday who we can expect, your Honor.

MR. ENGQUIST: I'm assuming it's finishing off Mason, then plaintiff?

MR. J. RICHARDS: Yeah.

MR. S. RICHARDS: Yes.

MR. ENGQUIST: Then is that it for you or --

MR. J. RICHARDS: Well, I mean, I think he would -- I mean, that would be the whole day probably, to be honest. If he does finish, then it would be Lamont Burr. But, yeah, my guess is that would be the whole day.

MR. SCAHILL: Yeah, for Monday for sure Mason. And if they're calling the plaintiff next, it's going to take us through the whole day and likely a good portion of the following day.

Along those lines, I can't remember if we flagged this or not, but there is a witness that we're going to need to call out of order, as well, who has travel issues. That's Barb Riley. So, our hope would be -- I know they have some other things moving around, but I believe she's leaving the country. So, we would request that we be allowed to call her out of

1004

order on Tuesday to get her in just so we can address that, and then they can reconvene.  My hope is that that's unopposed, given what happened with Dr. Russano today.  But that is what we're going to request to do.

MR. J. RICHARDS:  No objection if that even becomes an issue.

MR. SCAHILL:  Yeah, and then also Mr. Guevara.  The plaintiff will hopefully go.  Mr. Guevara is -- so, I have a partner who is in San Antonio who is making sure that everything is going to work.  She is supposed to go to Mexico City on Wednesday.  I do not think Mr. Guevara is going to take more than about 20 minutes.  So, the hope would be that we could fit him in too at that point.  If it needs to go the next day, I can try to figure something out, but that would be the most efficient way to deal with knocking those two witnesses out on Tuesday hopefully.

THE COURT:  Okay.

MR. S. RICHARDS:  So, just to reiterate, the defendant and -- I'm sorry, the plaintiff Jaime Rios and Lamont Burr, I think, are our next witnesses.

THE COURT:  All right.  Then you'd have Guevara to conclude your case, correct?

MR. S. RICHARDS:  Correct.

There is another witness, Heather Kukowski.  I think the defendants have an objection to that as her not being

1005

listed on the 26(a)(1)'s, although she was listed on the may-call list. So, I'll discuss that with them and see how I want to proceed.

MR. ENGQUIST: Well, we do object to the investigator who went out and secured the affidavit for Mr. Huertas coming and testifying. She was never listed as a witness. He did produce an e-mail he had to her when she was setting up arrangements to come out here, which included her saying that, yes, I'll go through all my notes and be ready to go, or something to that effect. There has been no notes, no information ever given about her other than the fact that we knew that she was the person that was out there.

So, there could be interview notes, there can be all sorts of different things that was never produced. If she was ever going to be a witness to rebut him in any way, then we would have taken her deposition definitely during discovery. So, yes, we would be objecting.

THE COURT: Did the plaintiffs ever disclose her throughout discovery?

MR. S. RICHARDS: We disclosed her existence throughout discovery and gave e-mail exchanges to the defendants. So, her existence was known.

MR. ENGQUIST: The -- yes, we knew that she was the person that was his investigator. That's it. We got the e-mail exchanges when he said he was flying her in here, and he

sent us that e-mail during the trial.

MR. S. RICHARDS: Oh, earlier e-mails were given between me and her to the defendants a couple of years ago.

THE COURT: Did you make her available for a deposition?

MR. S. RICHARDS: I didn't list her on the 26(a)(1)'s, but had they asked for a deposition, certainly I would have.

THE COURT: Did you ever give them any reason to believe that they would be able to ask for an investigator employed by you to be subject to discovery?

MR. S. RICHARDS: I would have no problem with it.

THE COURT: No. It's a fundamental fairness issue. If they -- you disclose on the 26(a)(1)'s material witnesses so the other side can say, oh, I'd like to talk to these people. You disclose -- you supplement that during discovery so that prior to the close of discovery, the other side could say, oh, I'd like to depose that person, I'd like to ask that person for documents.

If you did not disclose that this person would be a witness in this case and given who she is -- I understand from what I've heard today that she was an investigator employed by you to help you put together your case. Arguably, one could say she was part of the plaintiff's team.

I would not expect the other side to think, oh, let me depose someone on the other team. If I were in practice, you

1007

sent something to my firm asking to talk to a paralegal, an investigator, anyone else on my payroll who was not a disclosed expert, I would say no. I wouldn't even think to ask to do that because that would be so unexpected.

And, so, did you ever tell them, I will call my investigator to testify at trial?

MR. S. RICHARDS: Not until she was put on the will-call list. But they knew she was my --

THE COURT: After discovery had closed?

MR. S. RICHARDS: Correct.

THE COURT: All right. That's a failure to disclose. It's a discovery violation. And therefore, as a sanction, you are not allowed to call her at trial.

MR. S. RICHARDS: I understand, your Honor.

THE COURT: Anything else?

MR. SCAHILL: No.

MR. POLICK: No, your Honor.

MR. ENGQUIST: No, your Honor.

THE COURT: Have a good weekend. I'll see you.

Mondays I don't have call. And, so, if this issue concerning the confidential informants percolates up and becomes ripe, feel free to send Ms. Franklin an e-mail asking to be heard at 9:30 a.m. Otherwise, I'll see you at 10:00.

(Adjourned at 4:21 p.m. until 2/9/26 at 10:00 a.m.)

1008

*       *       *       *       *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Charles Zandi                    February 7, 2026
Official Court Reporter

/s/ Jennifer Costales                February 7, 2026
Official Court Reporter

/s/ Joseph Rickhoff                  February 7, 2026
Official Court Reporter

## I N D E X

PAGE

MELISSA BETH RUSSANO RODRIGUEZ

Direct Examination By Mr. J. Richards          811
Cross-Examination  By Mr. Kivetz              869

MELISSA BETH RUSSANO RODRIGUEZ
Cross-Examination (Resumed) By Mr. Kivetz      895
Redirect Examination By Mr. J. Richards:       907
Recross-Examination By Mr. Kivetz              917

MICHAEL MASON
Direct Examination By Mr. S. Richards          918

## INDEX TO EXHIBITS

PLAINTIFF'S EXHIBIT                        RECEIVED

 No. 18                                       942
 Plaintiff's Exhibit 13                       958

DEFENDANTS' EXHIBIT                        RECEIVED

 No. 50(H)                                    920
 No. 50(HH)                                   921
 Defendants' Exhibit 50(I)                    963
 Defendants' Exhibit 50(G)                    966
 Defendants' Exhibit 50(EEEE)                 969
 Defendants' Exhibit 50(K)                    970
 Defendants' Exhibit 50(N)                    981
 Defendants' Exhibit 50(M)                    982
 Defendants' Exhibit 50(W)                    988
 Defendants' Exhibit 50(II)                   993