1010

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                            )
                                       )
                Plaintiff,             )
                                       )
-vs-                                   )  Case No. 1:22-cv-03973
                                       )
REYNALDO GUEVARA; MICHAEL              )
MASON; and JoANN HALVORSEN,            )
as Special Representative of           )
ERNEST HALVORSEN, Deceased,            )  Chicago, Illinois
                                       )  February 9, 2026
                Defendant.             )  9:50 a.m.

VOLUME 6
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:      LAW OFFICE OF STEPHEN L. RICHARDS
                        BY:  MR. STEPHEN L. RICHARDS
                             MR. JOSHUA S. RICHARDS
                        53 West Jackson Boulevard, Suite 205
                        Chicago, Illinois  60604

For Defendant           BORKAN & SCAHILL, LTD.
Guevara:                BY:  MR. TIMOTHY P. SCAHILL
                             MR. GRAHAM P. MILLER
                        20 South Clark Street, Suite 1700
                        Chicago, Illinois  60602

For Defendants          THE SOTOS LAW FIRM, P.C.
Mason and               BY:  MR. JOSEPH M. POLICK
Halvorsen:                   MR. JOSH MICHAEL ENGQUIST
                             MR. JEFFREY ROBERT KIVETZ
                             MS. CAROLINE P. GOLDEN
                        141 West Jackson Boulevard, Suite 1240A
                        Chicago, Illinois  60604

Court Reporter:         KATHLEEN M. FENNELL, CSR, RMR, FCRR
                        Official Court Reporter
                        219 S. Dearborn Street, Room 2328A
                        Chicago, Illinois  60604
                        Telephone:  (312) 435-5569
                        Kathleen_Fennell@ilnd.uscourts.gov
                            *   *   *   *   *
               PROCEEDINGS REPORTED BY STENOTYPE
      TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

1011

(Proceedings heard in open court; jury out:)

(Call to order.)

THE CLERK: 22 C 3973, Rios v. Guevara, et al., for jury trial.

THE COURT: Appearances, please.

MR. S. RICHARDS: Stephen Richards on behalf of plaintiff, Jaime Rios.

MR. J. RICHARDS: Joshua Richards on behalf of plaintiff.

MR. SCAHILL: Good morning, Your Honor. Timothy Scahill on behalf of Reynaldo Guevara.

MR. POLICK: Good morning, Your Honor. Joseph Polick on behalf of defendants Mason and Halvorsen.

MR. ENGQUIST: Good morning, Your Honor. Josh Engquist, also on behalf of Mason and Halvorsen.

MR. MILLER: Graham Miller on behalf of Rey Guevara.

MR. KIVETZ: And good morning, Your Honor. Jeff Kivetz on behalf of Mason and Halvorsen, and Carey Golden is also present.

THE COURT: Good morning, Ms. Golden. Can you state your appearance for us.

MS. GOLDEN: Yes, Your Honor. Caroline Golden for defendants Mason and Halvorsen.

THE COURT: All right. Good morning, everyone.

I saw that objections or modifications to the jury

instructions were filed, and then there was also this motion for sanctions filed yesterday.

Mr. Richards, have you had an opportunity to review that?

MR. S. RICHARDS: No, I have not. I glanced at it briefly, but I was preparing other matters in the trial, and I noticed that the leave had not yet been granted.

If leave is granted to file, I would ask for an opportunity to respond in writing.

THE COURT: How much -- I'm going to grant leave to file it. How much time -- well, first, for the defendants, how does the affidavit issue tie in to this proceeding in the sense that the plaintiff, to my recollection, has not affirmatively submitted the affidavit and did not elicit testimony concerning the paragraph at issue in the affidavit?

MR. SCAHILL: So we cited a number of cases in our brief.

THE COURT: I didn't ask you what cases you cited. I asked you to explain to me how it relates to this proceeding.

MR. SCAHILL: Because it taints the integrity of the entire basis of this lawsuit, which is -- would not have been permitted had the conviction not been vacated.

THE COURT: And how do you reach that conclusion?

MR. SCAHILL: Well, for one, Mr. Garcia's affidavit was carefully worded to use language to fit within the 1401

language, that this was not information that would have been or could have been shared at the time of trial, which, as he testified on the stand, is not true. And that is something that had that been a basis that was asserted, it would almost certainly have been rejected.

I think that's actually a requirement. You have to show a lack of diligence. And the fact that he's saying I would have taken Five back in the days, of course, would make him unavailable, but he said that he didn't know what any of that meant, and he was told to put it in there by Mr. Richards.

THE COURT: And you're referring to the Certificate of Innocence proceedings in the state court?

MR. SCAHILL: It was both submitted during the 1401, and it was submitted and actually relied on in the COI petition.

THE COURT: That particular paragraph was relied on in the COI order?

MR. SCAHILL: Well, the order references the affidavits. It does not go into detail about what parts are being relied on. It was very summary in nature of the ruling.

THE COURT: And if I recall, you described the Certificate of Innocence process as being based on nothing because it was unopposed.

MR. SCAHILL: That's true.

THE COURT: So explain to me the materiality.

1014

MR. SCAHILL: Well, what happens at a COI if the state's attorney does not oppose is --

THE COURT: It's granted, right?

MR. SCAHILL: Well, it's granted if there's --

THE COURT: By and large.

MR. SCAHILL: Yes, based on the review of the record though, which included -- there were only three attachments to the COI, and they were the three affidavits including --

THE COURT: But unlike the jury, I'm aware of the issues around your client, as well as writ large policies as to whether to pursue or to challenge Certificates of Innocence and the like related to your client.

And so in that real-world context, explain to me the materiality of the affidavit as it relates to this case.

MR. SCAHILL: So during Judge Atcherson's ruling, she's I don't believe just referencing pattern and practice things with respect to Mr. Guevara. She is referencing the trial record and specifically the affidavits.

And so, I mean, we can only take her at face value. That's what she is basing that on, and that's what she said in -- in court.

THE COURT: Okay. Mr. Richards, would you like to be heard?

MR. S. RICHARDS: Yeah. Well, first of all, he's confusing two judges, Atcherson and Reddick. Atcherson never

issued a written ruling of any kind because the State did not oppose the 2-1401 and -- at least after the time after the hearing, and then it was granted, so there was no ruling from Sophia Atcherson.  There was nothing for her to rely on because the State was saying the 2-1401 should be granted.

Now, the statement about whether he would have taken the Fifth was material to the 2-1401 possibly because it relates the issue of due diligence.  However, as to the COI, there was no issue of due diligence at that point.  The only issue was was Mr. Rios innocent or guilty.

So that part of the affidavit was not material to the COI, and there's no indication that was considered in Judge Reddick's written ruling.  All she said in her written ruling was that there was new evidence of innocence because of the affidavits, and -- or evidence of innocence because of the affidavits, and that there was a pattern and practice on the part of Guevara that she was considering.

So we don't think that the -- that paragraph of the affidavit was material to the COI.  As to 2-1401, it became immaterial when the State agreed to the 2-1401.

I would also indicate that the 2-1401 was not based on that one affidavit.  It was based on three affidavits plus a mountain of evidence of pattern and practice which was attached to the 2-1401.

THE COURT:  Okay.  For the affidavit, had that been an

affidavit prepared in this case, we'd be in a different posture. The affidavit was prepared for other proceedings, and so I leave it to those judges to enforce any mis- -- any irregularities concerning the statements, the preparation and submission of those affidavits.

I haven't heard how it's relevant to this case in that even if you strip out -- or in that the plaintiffs had not submitted it affirmatively. This was elicited on cross-examination. And independent of the conduct described in the identified paragraphs of the affidavit, we have other allegations of physical abuse against the plaintiff, as well as another witness, that are sufficient to proceed here.

With respect to the issue of the confidential informant or informants and their identity, I do need a response to -- I'm allowing that motion to be filed.

How much time do you need to respond, Mr. Richards?

MR. S. RICHARDS: I would need tomorrow by 8:00 p.m.

THE COURT: Okay. You'll have until the end of the day Wednesday to file your response. That's February 11th.

MR. S. RICHARDS: Your Honor, I hate to be -- ask the question, but that means 12:00 midnight on the 11th?

THE COURT: Yes.

MR. S. RICHARDS: Thank you.

THE COURT: And I'll just ask, Mr. Richards, do you know who the confidential informants are?

1017

MR. S. RICHARDS: No. And if you want me to explain orally, I think I can give you some insight on that.

All I know is when I asked for them to be produced by Judge Atcherson, I was told no files existed. There's an inference that could be drawn that Little Mike was an informant, and that would be based upon my client, as he testified at trial, seeing Guevara take out Little Mike, say I don't need you, Rios, and then showing Little Mike's picture to Rios.

So I think it's a possible inference that Little Mike is the informant.

Now, when I saw this document, which has the name Miguel, has two names, it has another nonconfidential informant, it has Rios, shooter with his IR, I had a brainstorm, maybe a wrong brainstorm.

THE COURT: When?

MR. S. RICHARDS: On Sun- -- on the night before I was preparing for the -- that would be the direct of Mason. I looked through all the documents that the State had tendered, including --

MR. J. RICHARDS: Defendants.

MR. S. RICHARDS: Defendants had tendered, sorry, including D-JJ. I made a mistake in assuming it had come from a Cook County State's Attorney's file. It did not. It came from the public defender's file.

1018

So when I said that, that was an error on my part. It didn't come from the state's attorney's file.

It struck me logically and later after we had the discussion on Friday that it might have come from the police file because in those days, the public defenders would subpoena street files, which are different from the CPD --

THE COURT: Your speculation is not helpful. Continue.

MR. S. RICHARDS: That's -- well, that's all I can say, but I do not know the identity of the confidential informants. I do not know if they exist or not.

If evidence is introduced that they existed, I will withdraw the claim that they don't exist because if they exist, they exist.

I'm also curious, and Your Honor doesn't have to inquire, as to what the purpose of that defense exhibit was and how they intended to introduce it, if at all.

MR. SCAHILL: Judge, may I comment or --

THE COURT: Sure.

MR. SCAHILL: We're missing a very important piece here from Mr. Richards, which is that he represented to the Court on Friday, "I have been told that Little Mike's real name is Miguel Martinez."

Whether Little Mike is the confidential informant or not is a different story than whether the names that are on

here are that. I asked Mr. Richards over the weekend early in the morning on Saturday to identify who had told him it was this person.

We are not talking about whether Little Mike is potentially an informant. We're talking about the people on the piece of paper, whether he has established that connection because he has already put those names in front of the jury and asked Officer Mason whether those were the confidential informants.

That is the problem is if -- if we have identified people, and he's represented to the Court that he had made that nexus, that is obviously a very important and borderline explosive type of allegation because the -- the sands of time have lost, you know, recollections from officers and all of that, but he purports to have made this connection.

Had that connection been made, obviously we talk to those people, we ask them what they said, if anything, to the police, and can corroborate that. Now we have these names out there in the spectre of the defendants --

THE COURT: Right, but what prejudice do you suffer from the names being out there if the claim is that the people do not exist and now the jury has been told that they do exist? That means you win, doesn't it?

MR. SCAHILL: Oh, for sure, yes. On that theory, yes, you are correct.

THE COURT: What other theory is there to -- what better rebuttal do you have to a person doesn't exist than here, they exist, and let me give you their name?

MR. SCAHILL: You are absolutely correct on that theory, but there's another theory that they're pursuing, too.

THE COURT: Okay.

MR. SCAHILL: That's the one I have the problem with, which is that they're saying, okay, even though he said you're never going to know their names in opening, maybe they do exist, but they didn't say the things that were attributed to them.

That's where the identity becomes a problem because if it's a knowable person and they have an IR number that's on there that they apparently have linked to that, according to Mr. Richards, what did they say?

Now, I have always had an issue with how they're proving up what they said in, you know, in a vacuum, and, you know, without any direct evidence, but that's neither here nor there because we're at trial now, and there are knowable people apparently that could have been asked these very questions. And to put it out there, it then looks like we are hiding something by not calling these people.

THE COURT: How is that not curable with an instruction that either side could have subpoenaed individuals to testify?

MR. SCAHILL: We couldn't have though. That's the problem I'm having. If there had been that nexus to that --

THE COURT: You said you're not worried about what actually happened, your argument was just that the jury may think that we didn't call these people, and isn't the response to that, well, the other side could have called them, too, and they didn't.

MR. SCAHILL: I do not believe so, and the reason I do not believe so is that we're the ones who got the informants, we're the ones who were using that information, the suggestion being if it were helpful, it would be put out there.

They have the opposite inference that they're seeking to draw, that these are names that if they were supportive of this and had said the things that you said that they'd say, you would put them out there. We did not have this nexus. Mr. Richards said that he did. He represented in court that there's a nexus between Little Mike and Miguel Martinez. I don't know what that is, and I asked.

THE COURT: Mr. Richards, what's the basis of tying Little Mike to Miguel Martinez?

MR. S. RICHARDS: Your Honor, it comes from privileged information, but if Your Honor -- I believe it's going to be disclosed in my client's testimony anyway. So after his deposition in which he said he didn't know the last name of Little Mike, I made inquiries and got either Miguel or

Michael -- Miguel or Michael and the last name Martinez.

At that point, I stopped, and the reason I stopped is actually -- goes to what I've done the last two days also. Those names are so common without IR numbers or dates of birth that it's impossible to track down. And I've assigned an investigator to do that. He doesn't -- the IR number doesn't help him. He's not the City of Chicago. But the -- you know, the City -- I think the City of Chicago could identify this person pretty easily. If it comes --

THE COURT: You're getting way far afield.

MR. S. RICHARDS: Sure.

THE COURT: I wanted to know what your basis is. I understand from you that your client identified, provided you with a name after his deposition.

So my next question is why did you not disclose that information as part of discovery in response to the interrogatory that the defendants sent your way?

MR. S. RICHARDS: Because he was not certain and because I couldn't nail it down. It was two first names and a last name that applied to hundreds of people, but --

THE COURT: And so what justifies you being able to introduce that at trial if you didn't disclose it during discovery when you just told me that you learned of this after your client's deposition?

MR. S. RICHARDS: Only that the defendants identified

an exhibit with the name, which they intended to use for some purpose.

THE COURT: What purpose do you know of that the defendants intended to use that exhibit other than to comply with their discovery obligations to produce documents?

MR. S. RICHARDS: Well, it just wasn't disclosed in discovery. It was identified as an exhibit at this trial.

THE COURT: Right, and they identified hundreds of exhibits, didn't they?

MR. S. RICHARDS: They identified quite a few. That was one of them.

THE COURT: As parties do in every case in litigation, don't they?

MR. S. RICHARDS: That's true.

THE COURT: Did they rely on it in summary judgment?

MR. S. RICHARDS: They did not.

THE COURT: And if they knew that was the name of the informant in a case where one of the claims is that there was no informant, probably be something they'd rely on in summary judgment, since we're now in the business of speculating, isn't it?

MR. S. RICHARDS: That is a true point. I would say the universe of exhibits they've said they might introduce at trial is much smaller than the volume of discovery, which is a total of, on both sides, 17,000 pages.

THE COURT: All right. You can't introduce any evidence of what your client told you concerning the identity of Little Mike that you did not disclose during discovery. It's barred as a discovery violation.

MR. S. RICHARDS: Understood.

THE COURT: All right. We're going to bring in the jury, and we're going to get started. Detective Mason can take the stand.

Your response is still due February 11th as to the first issue raised in the defendants' motion.

THE CLERK: All rise.

(Jury in at 10:10 a.m.)

THE COURT: Please take your seats.

Welcome back, ladies and gentlemen. I'll start the day by asking whether anyone has anything to report to me?

All right. Seeing no hands, we will continue with the examination of Mr. Mason.

Mr. Mason, I remind you that you are still under oath.

THE WITNESS: Yes, sir.

THE COURT: And who will be the first examiner?

MR. POLICK: Good morning, Your Honor.

Your Honor, with the Court's permission, I'd like to proceed with Mr. Mason's direct examination in the interests of time.

THE COURT: Okay.

So earlier in the trial, I think on Day 1, I explained that sometimes to avoid having to call witnesses multiple times, that a party will go into their own case while the witness is on the stand, and that's what is happening now. We're going to hear part of Mr. Mason's direct examination.

You may proceed.

MR. POLICK:  Thank you, Judge.

MICHAEL MASON, DEFENDANT HEREIN, SWORN,

DIRECT EXAMINATION

BY MR. POLICK:

Q.  Good morning, Mr. Mason.

A.  Good morning.

Q.  I think you told us last week you're 74 years old?

A.  Yes, sir.

Q.  When did you retire from the Chicago Police Department?

A.  In June 2006.

Q.  Are you married?

A.  Yes, sir.

Q.  Do you have any children?

A.  I have two children.

Q.  Do you have any grandchildren?

A.  I have two grandchildren.

Q.  When did you begin your career with the Chicago Police Department?

A.  In June of 1973.

Mason - direct

1026

Q.   And when you started with the police department, I assume you went to the academy?

A.   Yes, I did.

Q.   And after your training academy, what was your first assignment with the police department?

A.   I was assigned as a patrol officer in the 20th District.

Q.   And for those of us who are not familiar, where's the 20th District located generally in the city?

A.   It's the north -- north side of the city.  It's the lakefront to the city limits on the north.  At the time, it went down to Montrose Avenue and the north branch of the Chicago River on the west.

Q.   All right.  And after working as a patrol officer in the 20th District, what was your next assignment?

A.   After that, I was assigned to the 24th District.

Q.   And where is the 24th District located?

A.   That's basically the north part of the 20th District.  It's a new station that opened up in I think 1979 or 1980, so I was assigned when it was opened.

Q.   And what was your duties or assignment when you worked in the 24th District?

A.   It was a combination.  I was in patrol for a while, and at some point, I was assigned to a tactical unit.

Q.   Can you explain briefly what a tactical unit is.

A.   Tactical unit within the district sometimes works in

Mason - direct

1027

uniform, sometimes works in soft clothes, which is just civilian dress pretty much at the discretion of the commander is how they want to utilize you.

Q.   All right.   Then you became a detective?

A.   Yes, sir.

Q.   And what year was that?

A.   1987.

Q.   All right.   And during the events in this case in 1989, how long had you been with the Chicago Police Department?

A.   16 years.

Q.   Now, where were you assigned in June of 1989?

A.   Area 5 Violent Crimes.

Q.   All right.   And I believe you've indicated the address of that building is 5555 West Grand?

A.   Correct.   It's at the intersection of Grand and Central.

Q.   All right.   Is the building there sometimes referred to Grand and Central in addition to being called Area 5?

A.   Yes, sir.

Q.   All right.   How many floors are in that building?

A.   Two floors.

Q.   And what's on the first floor?

A.   The first floor is the 25th Police District, and the second floor is Area 5 offices, Detective Division offices.

Q.   All right.   So your unit was the Violent Crimes Unit?

A.   Yes, sir.

Mason - direct

1028

Q.   And that's part of the Detective Division on the second floor?

A.   That's correct.

Q.   Can you tell the jurors what the layout of that -- of your office was back then in 1989?

A.   So the second floor, there's two stairways that lead up to the second floor.  Both stairways you encounter the desk area, and there's just a large office, maybe half the size of this courtroom.  There's interview rooms on one wall, and the other wall is just a glass wall that looks down onto the 25th District.

There's -- on either end, there are hallways that lead back to interior offices.

Q.   All right.  And what about the area that you worked in as a detective, where was that in relation to these interview rooms that you're describing?

A.   Just the big open area.  There was a bunch of desks and chairs, and that was where I worked.

Q.   Okay.  What was your work attire back in June of 1989?

A.   Pretty much how I'm dressed now, sport coat, shirt and tie.

Q.   Was that true of your unit, the Violent Crimes Unit, as a whole?

A.   It was required, yes.

Q.   And back then when you had to prepare your reports, some of which have been shown in this case, how did you do that?

A.   We had manual typewriters.

Q.   Did you have a cell phone back then?

A.   No, sir.

Q.   If you needed to contact somebody by phone, how did you do it?

A.   Landline telephone.

Q.   And did everybody you need to contact always have a landline phone?

A.   No.

Q.   Were there any computers at your disposal to use?

A.   No.

Q.   And it's fair to say you weren't sending or trading emails with anyone back then, were you?

A.   No, sir.

Q.   All right.  Let's go back to June of 1989, and tell us how you got involved in the Luis Morales homicide investigation.

A.   When I got to work that day on the second shift, day shift, I was informed by my supervising sergeant that there had been a shooting, a gang-related shooting earlier in the night, and that midnight detectives had gone out on it, conducted a scene investigation, and were unable to speak with a few witnesses that had been identified by the beat officers.

     So our initial assignment was to see if we can locate those witnesses and conduct an interview with them.

Q.   Were you working with a partner that day?

A.   Yes, I was.

Q.   Who was your partner?

A.   Detective Brennan.

Q.   And what's Detective Brennan's first name?

A.   Bernard.

Q.   All right.  So you found out that it was a gang-related incident, correct?

A.   Yes, sir.

Q.   And there were some witnesses to be interviewed?

A.   That's right.

Q.   And did you become aware of anything else that day when you started work with regard to this investigation?

A.   Yes.  As the day went on, we found out that there had been a person identified as the shooter by one of the witnesses that the midnight detectives had spoken with and that that person had gone into the 14th District.

Q.   All right.  And who was that person, the suspect that had been identified?

A.   It was Jose Melendez.

Q.   And did he have a nickname?

A.   He had a nickname of Macho.

Q.   All right.  Now, did you work the scene at all on the midnight shift?

A.   No, sir.

Q.   And who handled the initial scene investigation on the

midnight shift?

A.   It was Detectives Boris and Johnston.

Q.   And --

A.   Yeah, Boris and Johnston.

Q.   Sorry about that.

And were they with your unit?

A.   They were assigned to Area 5 Violent Crimes, yes.

Q.   Okay.  And when you got your assignment the following day, did you review the report of Johnston and Boris?

A.   Yes, I did.

Q.   And I believe you also testified that you reviewed a general offense case report?

A.   That's correct.

Q.   Can you explain again what the general offense case report is.

A.   So the beat officers that respond to a call will make out the general offense case report.  They'll determine what type of crime had occurred and make out the report.

So they speak with witnesses that are available, observe the evidence, notify the crime lab to come, you know, document the evidence.

Q.   All right.  You mentioned that you learned the incident was gang related.  In terms of the victim or victims, do you know who the victims were?

A.   Yeah, the victim, Luis Morales, and actually -- I'm having

a moment here.  A second, Javier Torres, was listed as a witness but he's also a victim in this.

Q.   He was listed with Mr. Morales?

A.   Yes.

Q.   And what gang were they affiliated with?

A.   They were Spanish Cobras.

Q.   And the presumed offenders in this incident, what gang were they affiliated with?

A.   Latin Kings.

Q.   All right.  Now, from your work as a detective, were you generally familiar with those gangs, the Latin Kings and the Spanish Cobras?

A.   Yes, sir.

Q.   And back then in the -- this -- the area of the murder, where was that generally?  What are the major intersections?

A.   It's just north of the intersection of Western and Potomac. It was 1316 North Western was the address.

Q.   All right.  And in that area, were you familiar with the territories of these respective gangs, the Cobras and the Latin Kings?

A.   Yeah.  Western was basically the dividing line of the two gangs.  Spanish Cobras on the west, Latin Kings on the east.

Q.   And the murder itself, where -- what side of Western did it occur on?

A.   On the west side of Western.

Mason - direct

1033

Q.   All right.   And you said the Kings' territory was to the east?

A.   Correct.

Q.   And the Cobras' to the west?

A.   That's right.

Q.   Okay.   Now, getting back to Mr. Melendez, did you go to the 14th District?

A.   Yes, we did.

Q.   And what happened when you got to the 14th District?

A.   I spoke with the officers, two beat officers that were with Mr. Melendez.   I can't recall their names.   But they informed us that Melendez had come in to the 14th District and said, "I hear the police are looking for me.   I'm here to straighten it out."

Q.   All right.   Did you actually meet with Mr. Melendez at the time?

A.   Not at the 14th District, no.

Q.   All right.   And what did you ask the 14th District to do with Mr. Melendez?

A.   I asked if they could transport him to Area 5 to our office, and we had to try and find some witnesses in the meantime.

Q.   Okay.   So as the 14th District officers were transporting Mr. Melendez over to your offices, who were the witnesses that you were trying to locate?

A.   We were hoping to find Samantha Hudson and James Dean.

Q.   And were those two of the witnesses that Detectives Johnston and Boris had asked you to follow up on?

A.   Yes.

Q.   All right.  Were you successful in finding either of those witnesses?

A.   We were able to locate Samantha Hudson.

Q.   All right.  And after locating Samantha Hudson, what -- what occurred?

A.   We transported her to Area 5.  We also located Javier Torres, who was -- was already interviewed, but we brought him in to Area 5 also.

Q.   All right.  And, Mr. Torres, about how old was he at the time?

A.   He was about 15.

Q.   And based on your review of Johnston and Boris's report, who had Mr. Torres identified as the offender in this case?

A.   He identified Jose Melendez.

Q.   Okay.  So you said you brought Ms. Hudson to Area 5.  Did you interview her there?

A.   Yes, I did.

Q.   And what did you learn from Ms. Hudson's interview?

A.   I learned that she lived at 1419 West Potomac and was on the front steps of her residence.  She saw some people in the alley that she didn't recognize, and she went over there to see

Mason - direct

1035

what -- what might be going on.

She had some words with them. She went back to her front stoop, and then she kept an eye on them, and they walked to the north side of Potomac. One of them took a gun out of either his pocket or his waistband, and then the two of them walked east to Western Avenue and then north on Western Avenue. And moments later, she heard several gunshots, at which time she went inside.

Q. And did she tell you where she was in relation to her residence when she heard the gunshots?

A. I believe she was still on her front steps or by her doorway.

Q. All right. And Potomac, where is that in relation to Division and Western?

A. So Division is 1200 north, so Potomac is 1300 north, and this incident occurred at 1316 north.

Q. All right. And did Ms. Hudson tell you that she had actually witnessed the shooting that occurred on Western Avenue in the 1300 block?

A. No. She didn't see the actual shooting.

Q. Now, after interviewing Ms. Hudson, had Mr. Jose Macho Melendez been brought over to your unit?

A. Yes. He was present then.

Q. All right. And did you have a chance to interview Mr. Melendez at Area 5?

A. Yes, I did.

Q. And when you first saw Mr. Melendez, did you recognize him? Was he a person known to you?

A. No, sir.

Q. All right. And did you know what gang he was affiliated with?

A. I learned that he was affiliated with the Latin Kings.

Q. All right. And did you and your partner, Detective Brennan, interview Mr. Melendez?

A. Yes, sir.

Q. And what did you learn from that interview?

A. Excuse me.

After I advised Mr. Melendez of his *Miranda* warnings -- I need just a little more water.

MR. POLICK: Judge, may I approach?

THE COURT: Yes.

THE WITNESS: Excuse me.

MR. POLICK: Take a moment.

BY THE WITNESS:

A. So I advised Mr. Melendez of his *Miranda* warnings, and he told me that he understood those warnings, and he was willing to answer questions.

BY MR. POLICK:

Q. And after you Mirandized him and he understood, what did you learn from him?

Mason - direct

1037

A.   He told me he had nothing to do with this shooting and was willing to do whatever he could to clear his name.

Q.   And where did he tell you he was because he had nothing to do with the shooting?

A.   Well, that's when I asked him to describe where he was that -- that evening of the 27th of June.

Q.   All right.  What information did you get from him?

A.   He told me that he had gone to a restaurant at the Holiday Inn in Evanston where his cousin works, and he had gone up there approximately 10:30 in the evening to pick up -- he picks up his cousin when his cousin gets off of work.

So he'd gone up there around 10:30, and that he spoke with his cousin when he was there, and he spoke with the -- another chef who was also in the kitchen area, and that he left around 11:30, drove his cousin home, and he stayed with his cousin just long enough to smoke a joint, and then he left and he got -- they arrived at his cousin's house around midnight.

Q.   And when you say he drove his cousin back home, do you mean back home to Chicago?

A.   Yeah, back to his cousin's home in Chicago.

Q.   And after he dropped his cousin off at his cousin's residence in Chicago, did he tell you where he went after that?

A.   He did.  He said he went to his girlfriend's.  I can't recall the address, but he left there and went to his girlfriend's and spent the night, the rest of the night there.

Q. All right. Given that you had Ms. Hudson at the station and also Mr. Torres, what was your next step in your investigation that day?

A. At that point, we felt like we should run a lineup and see if Mr. Melendez gets identified.

An additional witness arrived, Luis Huertas, and so we had now three people that were able to view the lineup.

Q. All right. And as you were getting ready to do this lineup, who brought Mr. Luis Huertas into the area station?

A. That was Gang Crimes Officer Daniel Noon.

Q. All right. The gang crimes -- first of all, did you know Gang Crimes Officer Noon?

A. I knew who he was, but I didn't -- I never been around him. You know, never worked with him.

Q. All right. Were you ever a gang crimes officer?

A. No.

Q. Did you ever work in the Gang Crimes Unit?

A. No.

Q. Did the Gang Crimes Unit have an office at your building at Grand and Central?

A. No.

Q. Where were their offices located at?

A. They were located at 2452 West Belmont.

Q. And is that sometimes referred to as Belmont and Western?

A. Yes, sir.

Q. And how far away is that from your station?

A. I would have to say it's like five or six miles.

Q. All right. And when Gang Crimes Officer Noon brought in Mr. Huertas, did he give you any information about who Mr. Huertas was?

A. He briefly just told us that he was another witness. He was out there when it -- when the shooting happened.

Q. All right. So did you then conduct a lineup?

A. Yes.

Q. All right. And can you just tell the jury what the procedure is to do the lineup.

A. So at Area 5, we have two rooms that we utilize. One room is relatively small. It's just big enough to hold eight or nine people. You know, it's not very much -- there's not a lot of room.

So that room has a window on one wall. It's a reflective glass on that side. The room adjoining it, of course, you can see through that glass, and that's where the witness would view the lineup. So the participants of the lineup are assembled in the room with the reflective glass.

There's also a speaker -- a speaker or microphone speaker connecting the two rooms.

Q. All right. So who were the participants in this particular lineup, the ones that were going to stand in it?

A. This was Jose Melendez and fillers.

Mason - direct

1040

Q.   All right.  And when you say fillers, who are the fillers?

A.   They could be other people from the lockup, or they could be just people out in the street that are willing to stand in the lineup.

Q.   All right.  And do you recall in this particular case whether they were individuals from the lockup or volunteers from outside the station?

A.   I can't be certain without --

Q.   All right.

A.   -- reviewing my report.

     MR. POLICK:  Can we show the witness what's marked as Defendants' Exhibit 50 E, as in Edward.

BY MR. POLICK:

Q.   When you have it up there, Mr. Mason, let me know and take a look.

A.   Yeah.

Q.   Go ahead and take a look at it.

A.   Uh-huh.  It says page 1.

Q.   Okay.  Before you read it, what is that?

A.   So this is the lineup report.  Every time you -- well, every time you conduct a lineup, you do a lineup report.

Q.   All right.  And was this report prepared at or near the time of the lineup with Mr. Jose Macho Melendez?

A.   Yes, sir.

     MR. POLICK:  All right.  Judge I'm going to move to

admit Defendants' Exhibit 50 E and ask that it be published to the jury.

THE COURT: Any objection?

MR. S. RICHARDS: No objection.

THE COURT: All right. It's admitted and may be published.

(Defendants' Exhibit No. 50 E received in evidence.)

BY MR. POLICK:

Q. All right. So getting back to the fillers, it sounds like your first choice would be the lockup area of the -- of the station itself, correct?

A. Yeah. We generally want to see if there's people in the lockup that fit, you know, the same physical characteristics of whoever is standing in the lineup.

Q. And at the building there at Grand and Central, where is the lockup located in relation to where your offices are?

A. It's downstairs in the 25th District.

Q. All right. So on the first floor area of the building?

A. On the first floor, yes.

Q. All right. And if you go into the lockup and you don't have fillers who meet those physical traits or characteristics of the suspect, what's your next option?

A. Usually -- usually we would ask the tactical members from the 25th District if they could -- if they knew anybody that would be willing to stand a lineup or if they could find

Mason - direct

1042

anybody that would be willing.

Q. All right. And now looking at Exhibit 50 E on the second page, are you able to determine whether these were individual -- the fillers, whether the fillers were individuals from the lockup area or volunteers from outside the station?

A. These were volunteers.

Q. All right. And in this particular lineup, can you tell me who was with the witnesses and who was with the participants?

A. Yeah. I was with the witnesses individually, and Detective Brennan was with the participants.

Q. All right. Meaning he was with Mr. Melendez and the fillers?

A. Yes.

Q. All right. So you had Ms. Hudson and Mr. Huertas as your witnesses, correct?

A. Yes.

Q. And when they view, how do they do that? Do they do that together? Do they do it separately? How is it done?

A. No, they view it separately. I -- first we assemble everybody. We allow the suspect to choose his place in the line, and once that's done, once everybody's ready, I go to where the witnesses are located in another room and bring them in individually.

We walk into the room, the viewing room, there's a curtain over the window, and just instruct them that we're

going to look at a lineup. It doesn't mean that, you know, the people in this lineup are the people that did it. We just want to know what you think.

Open up the curtain. They look. Sometimes we have the people stand -- stand up or walk up to the window individually, go back in line. I can't recall in this case if that's what we did, but --

Q. Was there an identification by either of the witnesses, either Ms. Hudson or Mr. Huertas in this lineup when they individually viewed it?

A. No.

Q. All right. Now, following the lineup at which there was no identification, did you have a chance to further interview Mr. Luis Huertas?

A. Yes, I did.

Q. All right. And what did you learn from Mr. Huertas?

A. He told us that he was -- he was sitting on the steps of a tavern, I think it was located at 1310 North Western, and this is shortly before the incident occurred.

He saw two people walking north on Western on the west side of the street, and they looked at him, and they signified that they were Spanish Cobras.

So Mr. Huertas didn't recognize them even though he lives in the neighborhood. So he said he stood up and took a good look at them as they walked by. They passed him.

And then next he saw the victim and Javier Torres walk out of a gangway at 1316, and then the two people that walked by him, the first one started shooting at Mr. Morales. And I think he said at that point, Javier Torres took off. He ran west on -- through the gangway.

And then the second offender, I believe the second offender also fired at the victim and at Mr. Torres.

Q. Did Mr. Huertas tell you anything else about the offenders' actions that he saw or heard?

A. I'm going to have to refer to my interview. I can't --

Q. Okay.

A. -- can't be certain.

Q. If we show you your supplemental report regarding this that's not admitted into evidence, would that help you refresh your recollection?

A. Yes, sir.

MR. POLICK: All right. If we can show the witness Defendants' 50 D.

Go to page 4, I believe it is. Yes.

BY MR. POLICK:

Q. Do you see that? Are you able to see that, Mr. Mason?

A. Yes, sir.

Q. Okay. Why don't you take a look at that and let us know when you're ready.

A. Okay.

Mason - direct

1045

Q.   Is your memory refreshed now?

A.   Yes, sir.

Q.   Okay.  So did Mr. Huertas tell you anything else about what the offenders did or what he heard while he was at the -- at the scene?

A.   I don't know if I -- did I say this or not, but both offenders had shot in the direction of the victim, and they ran eastbound across Western Avenue into an empty lot, and then he lost sight of them.

Q.   All right.  And from your interview of Mr. Luis Huertas, did you learn that he knew both of the victims, Mr. Morales and Mr. Torres?

A.   Yes, he did.

Q.   And was he able to give you a description of both of the offenders?

A.   He did provide a description.  It was similar to the description that was provided by Samantha Hudson with the addition that the shooter had a thin mustache.

Q.   And you're indicating that during your interview with Ms. Hudson, she was also able to give you a description of the two offenders?

A.   Yes.

Q.   All right.  And generally what was that description?

A.   They were young male white Hispanics, light -- light to medium complexion.  Ms. Hudson said that the -- one of them had

Mason - direct

1046

a thin, pointy nose.  She described the hair as straight hair and some clothing.  I can't recall the clothing.

Q.   And how did the description that Mr. Huertas gave you compare to what Ms. Hudson had told you?

A.   Those two descriptions were very similar.

Q.   All right.  So after this further interview of Mr. Luis Huertas, what was the next step in your investigation?

A.   So at that point, we decided we should go to the Holiday Inn in Evanston.

Q.   And when you say we, is that --

A.   My partner.

Q.   -- you and Detective Brennan?

A.   Yes.

Q.   All right.

A.   So we went to the Holiday Inn located at I think it was 1501 Sherman in Evanston, and --

Q.   What did you do when you got there?

A.   We went there, went to the restaurant, and spoke with two people.  One guy was Chef Louie.  I can't remember his last name, but he described himself as the executive chef at the restaurant, and we also spoke with Mr. Melendez's cousin. First name is Hector.

Q.   And what did you learn from the executive chef and Mr. Melendez's cousin?

A.   So Louie, the executive chef, told us that he knows

Melendez and that he saw Melendez on the evening of the 27th of June; that he arrived, I think he said between 10:00 and 11:00, or 10:00 or 10:30. He had been there until Hector got off of work. He said Hector usually gets off at 11:30, and then they left. The two of them left.

Q. All right. And after getting that information from the executive chef and Mr. Melendez's cousin, what did you do next?

A. Then we spoke with the cousin, Hector. He told us that Melendez generally picks him up from work, and that night he got there around 10:30, that Melendez got there around 10:30 and waited in the kitchen area until he got off of work.

He said that night he got off of work at 11:35. And then once he was off, he jumped in the car with Melendez, and Melendez drove him home. They got home around midnight.

Q. Meaning Mr. Martinez's home?

A. Yes.

Q. All right. And then after getting that information from those two individuals, what did you and Detective Brennan do next?

A. Well, we -- we decided to use the odometer on our vehicle to see how much of a distance the restaurant was from where this incident occurred at 1316 North Western.

Q. And what did you determine using that method?

A. We learned that it was over eight miles.

Q. All right. And based on that information and the

information that you received from the executive chef and Mr. Melendez's cousin, what did that tell you about Mr. Macho Melendez's alibi?

A.   Well, it seemed that the alibi was pretty good in his favor.

Q.   Did you then return to Area 5?

A.   Yes.

Q.   And upon your return to Area 5, what did you do?

A.   We spoke with Javier Torres.

Q.   All right.  And he's the 15-year-old you told us that had identified Mr. Melendez as the offender?

A.   Yes.

Q.   All right.  What happened during the interview with Mr. Javier Torres?

A.   So Mr. Torres told us that he had identified Jose Melendez because he really didn't get a very good look, but he kind of -- that the offender who was doing the shooting kind of resembled Melendez to Javier Torres.

        So he figured, well, he's a Latin King.  It's probably him.

        So after that, he said, "I couldn't really identify -- I couldn't be certain that Melendez is the shooter, but I thought it was."

Q.   So would it be fair to say he recanted his identification of Mr. Melendez?

Mason - direct

1049

A.   Yes, sir.

Q.   All right.  After getting that information from Mr. Javier Torres, what happened with Mr. Melendez?

A.   He was released.

Q.   And did you have any success in finding any other witnesses that the midnight detectives had asked you to follow up on?

A.   No.

Q.   All right.  The victim, Mr. Luis Morales, did you find out any further information about him that day?

A.   Yes.  We -- we learned that he passed around 2:00 in the afternoon.

Q.   And after learning that information, what did you do?

A.   Contacted his family, let them know.  Contacted the medical examiner's office, since they also conduct an investigation of -- you know, people are killed.

Q.   All right.  I just want to go back to the descriptions of -- that you were getting from these witnesses, and I think you told us that it was Mr. Torres, Javier Torres, who had given the description of Mr. Melendez, correct?

A.   Yes.

Q.   All right.  And that was contained in the report of Detectives Johnston and Boris?

A.   Correct.

Q.   When you saw that information, what was your reaction to that?

Mason - direct

1050

A.   The description that he was giving was basically of Jose Melendez.

Q.   All right.  And, now, you also told us you got descriptions from Ms. Hudson and Mr. Huertas, correct?

A.   Yes.

Q.   And you also reviewed what is called the general offense case report where there's some descriptions by the beat officers of the offenders in there as well?

A.   Yes, there was.

Q.   All right.  And when you considered the information that the beat officers got on the general case report and the information you got from Ms. Hudson and Ms. -- Mr. Huertas, how did that compare?

A.   They -- they were all describing the same people.

Q.   All right.

A.   Same person.

Q.   And now comparing that information to what Mr. Torres said about Mr. Melendez, were there any differences?

A.   Yeah, yeah, physical characteristics were different.

Q.   Okay.  What was different between what Mr. Torres was saying and the other witnesses were saying?

A.   So Mr. Melendez is much darker complected than the other witnesses had described.  He had an Afro style hair -- Afro style hair.  He has sort of a wide nose, and the other witnesses described the shooter as being light to medium

complected, straight hair, and a thin, pointy nose.

Q. And Mr. Melendez's characteristics at that time or descriptive characteristics, you're aware of that from reviewing a photograph of him, are you not?

A. Yes.

Q. All right. And did reviewing that photograph refresh your recollection?

A. Yes. Yes, it did.

Q. All right.

All right. Did that conclude your investigative steps on June 28th, 1989, the day following the -- the incident?

A. Yes, sir.

Q. Okay. And the report that is in evidence as 50 D, which I believe you're looking at, did that summarize your investigative steps for that day?

A. Yes. Let me just --

MR. POLICK: If we can go to the first page. Just scroll down. There we go.

BY MR. POLICK:

Q. Is that your report from the 28th?

A. Yes, sir.

Q. All right. Now, about a week later on July 6th, was there another development in this investigation?

A. Yes, there was.

Q. All right. What happened on July 6th of 1989?

Mason - direct

1052

A.   On the afternoon, Gang Crimes Officers Guevara and Gawrys came into Area 5 with two people that they identified as confidential informants.

Q.   All right.  And these would be officers from the same unit that Gang Crimes Officer Noon worked in?

A.   Correct.

Q.   All right.  Did you know Gang Crimes Officer Guevara at that time?

A.   Yeah, I knew who he was just from seeing him, but I didn't really know -- never worked with him.

Q.   All right.  And how about Gang Crimes Officer Gawrys? That's G-A-W-R-Y-S.

A.   Same.  Knew who he was.  Never worked with him.

Q.   All right.  And what did they tell you when they came into Area 5?

A.   They told me that the people they were with, the confidential informants that they brought in, were people that they had gotten information from in the past and that the information had been accurate, and today they were giving information about who the -- who the shooter was in this murder.

Q.   All right.  And back at the time, what was your understanding of a confidential informant?

A.   Well, a confidential informant is really anybody who has information that he wants to tell the police, but they are

Mason - direct

1053

unwilling to be identified and go to court and testify.

Q. And what is your understanding of the consequences that could happen to a confidential informant if his or her identity becomes known to the public?

A. They would be in grave danger if that happened.

Q. Okay. So what information did Guevara and Gawrys tell you that these two confidential informants had?

A. They told me that they had -- that these informants were hearing from people on the street that the shooter, the first shooter, was Jaime Rios of 1440 North Leavitt, and they knew him to be 18 to 20 years old.

Q. And the other offender? Was there information about him?

A. The second offender they knew only as Tino.

Q. And the gang affiliation of Mr. Rios and Tino? Did they have information on that?

A. Yes. They were Latin Kings.

Q. All right. Did you yourself meet with these two confidential informants?

A. Yes, I did.

Q. And when you met with them, did you interview them?

A. Yes.

Q. And did you get the sense that they were eye witnesses to the occurrence?

A. No.

Q. What was their source of information when you interviewed

Mason - direct

1054

them?

A.   Their source basically was just what they're hearing from other people in the neighborhood.

Q.   All right.  And what did they tell you during your interview of them?

A.   Essentially, the same thing, that Jaime Rios, they hear that Jaime Rios was the shooter, and he was with Tino.

Q.   All right.  What did you do next, Detective?

A.   I thanked those officers for that information, and I believe they left with the two informants at that point, and I went to my commanding officer.

Q.   And at that time, who was your commanding officer in the Violent Crimes Unit?

A.   Lieutenant Kujowski.

Q.   All right.  And is Lieutenant Kujowski still alive today?

A.   No.

Q.   All right.  And why did you go to talk with Lieutenant Kujowski?

A.   Well, he's the commanding officer, and I knew he took an interest in any murders that occurred in the 14th District because he had previously been assigned to the 14th District.

Q.   All right.  Any other reason that you went to speak with Lieutenant Kujowski?

A.   Well, I knew that he still had contacts from the 14th District as far as he had his own informants.

Q.   All right.  And without getting into the specifics of the conversation, what did you learn from your conversation with Lieutenant Kujowski?

A.   He told me that he's getting the same information, that Jaime Rios is the shooter and that Tino is the second shooter and that they're both Latin Kings.

Q.   And was it your understanding from this conversation with Lieutenant Kujowski that this, too, was word on the street?

A.   Correct.

Q.   All right.  Later that evening, did something happen on this investigation?

A.   Yeah, about 10:00 p.m. that evening, Gang Crime Specialists Guevara and Gawrys returned to Area 5, and with him was Jaime Rios, with them was Jaime Rios.

Q.   And did you instruct Officers Guevara and Gawrys to go locate Mr. Rios?

A.   No.

Q.   Did you expect Mr. Rios to be coming into your office later that evening?

A.   No, I did not.

Q.   All right.  I think last week you told us you had a different plan based on the information you had received from these two confidential informants, correct?

A.   Yes.

Q.   And what was going to be your next step in the

investigation?

A. Well, I was going to try and identify Jaime Rios through police identification records and obtain a photograph of him, as well as try to identify Tino and obtain a photograph of him.

And then I was going to compile a photo -- what we refer to as a photo spread and see if, you know, I could show that to some of the witnesses.

Q. All right. In order to get photographs like that, where -- where did you get that within the police department back then?

A. Well, I'd have to go to identification, which is located at 11th and State at that time.

Q. All right. And what is the identification section of the Chicago Police Department?

A. They -- they maintain the records of people who have been arrested and -- by the police department.

Q. And from time to time during your career as a detective, did you have occasion to go down to the identification section?

A. Yes, numerous times.

Q. All right. And so what would you need to do to get these photographs from the identification section?

A. Well, first you needed an IR number, which is assigned to everybody who's ever been fingerprinted.

Q. All right. Unique to that -- excuse me. Are you saying that IR number is unique to the individual?

A. Yes, it is.

Q.  All right.  And then with that information, what would you do?

A.  So then you have to fill out a request.  If -- if you want color photos, you have to -- you cannot get color photos immediately.  You have to wait until they get to them, which is usually a week.

Q.  All right.  And then assuming that you received the photographs from the identification section, what would have been your next step?

A.  Then I would assemble those pictures with some other pictures and go to one of the witnesses and ask them to take a look and see if they recognize anybody.

Q.  All right.  But now Guevara and Gawrys had brought in Mr. Rios to the station, correct?

A.  Yes.

Q.  All right.  Did you recognize Mr. Rios when you saw him?

A.  No.

Q.  All right.  And what did you do when Gawrys and Guevara brought Mr. Rios into the station?

A.  Well, I asked them what -- how did they encounter him, and they said that they saw him in the street I believe in front of his residence and that they told him that detectives want to talk to you and asked him if he'd come in and talk to us.

Q.  All right.  And where did you put Mr. Rios?

A.  I -- I walked him into one of the interview rooms that were

Mason - direct

1058

on that one wall that I described.

Q. All right. And at that time, was Mr. Rios handcuffed?

A. No.

Q. All right. And that day, were you working with your partner, Detective Brennan?

A. No.

Q. Where was Detective Brennan that day, if you know?

A. I -- I think he was just off that day.

Q. All right. And because he was not there, did you do anything to assist you in your investigation?

A. Yes. I asked Detective Halvorsen if he could give me a hand.

Q. All right. And what is Detective Halvorsen's first name?

A. Ernie.

Q. And was he also a detective in the Violent Crimes Unit at Area 5 where you worked?

A. Yes, he was.

Q. And in terms of being there at the unit, who had been there longer at that time, you or Detective Halvorsen?

A. Detective Halvorsen.

Q. All right. And did Detective Halvorsen agree to assist you?

A. Yes, he did.

Q. After putting Mr. Rios in this interview room, what was going to be your next step in the investigation?

Mason - direct

1059

A.  I anticipated that I would run a lineup if Mr. Rios agreed to participate in the lineup.

Q.  And what about -- so, strike that.

If you needed to do the lineup, that meant you needed to find witnesses, correct?

A.  Yes.

Q.  All right.  So what was your next step then?

A.  I asked Gang Crimes Specialists Guevara and Gawrys to go out and see if they could find any of the witnesses.  And I had some phone numbers myself.  I called some of the people that I had phone numbers for.

Q.  All right.  So when you asked Guevara and Gawrys to go search for these witnesses, did they remain at the station? What did they do?

A.  They left and went out.

Q.  All right.  Now, the interview room that Mr. Rios was placed in, first of all, where was that interview room in relation to where you were doing your work that evening?

A.  The -- my desk was just outside of that interview room.

Q.  All right.  And can you describe the room for the jurors; what's in it?

A.  There's a table, a couple of chairs, and a bench attached to the wall.

Q.  And how about -- about how big is the room itself?

A.  It's, you know, 10 by 8 maybe.  Maybe not that big.

Q. All right. And the room has a door?

A. Yes, sir.

Q. Is there a window in that door?

A. Yes, there is.

Q. All right. And do you recall where in the room Mr. Rios was when you placed him in there?

A. I'm sorry.

Q. Yeah, I'm sorry.

Do you recall where in the room Mr. Rios was sitting --

A. Oh.

Q. -- when you placed him in there?

A. I think he was just sitting on the bench. I'm not certain. He was free to walk around in there, so --

Q. All right. Were you successful in finding any of the witnesses at that time?

A. Not -- well, not a hundred percent certain if there was any contact with them, but nobody was willing or able to come in that evening.

Q. All right. And we're now talking about the evening of the 6th, correct?

A. Yes.

Q. July 6th?

A. Yes.

Q. All right. So without having the witnesses, did you at

Mason - direct

1061

some point return to the interview room that Mr. Rios was in?

A.   Yes, I did.

Q.   And what time approximately was that?

A.   That was about midnight.

Q.   And now we're moving into July 7th, correct?

A.   Yes.

Q.   All right.  Now, between 10:00 p.m. when Mr. Rios came into the station and midnight when you returned to the room, did you see any other police officers enter that room?

A.   No.

Q.   Did you see any other detectives enter that room?

A.   No.

Q.   During that same two-hour time period between 10:00 p.m. on the 6th to midnight, did anyone go into the room with Mr. Rios?

A.   Yes.

Q.   Who was that?

A.   There was a woman there.  Mr. Rios actually pointed that woman out to me by knocking on the door and pointing to her. He was behind the window in the door.  He was pointing to the woman who was sitting at the back of our office.

Q.   And when he motioned to you, what happened next?

A.   I went to the room.  I asked him what he needed.  He told me, "Can I talk to her?"

        So then I -- "just a second."  So I closed the door and went to her, asked her who she was.  I told her that

Mr. Rios wanted to talk to her and asked her if she wanted to talk to him, and she said, "Yes, I do."

Q. Did you get a sense of who she was in relation to Mr. Rios?

A. My recollection is she was a girlfriend.

Q. And did you allow her to visit with Mr. Rios in that interview room?

A. Yes.

Q. And approximately how long did they visit?

A. About 10 minutes.

Q. All right. And other than that, did anyone else enter that room during that two-hour period?

A. No.

Q. All right. Now, when you reentered the room at about midnight, who were you with?

A. I was with Detective Halvorsen.

Q. And was anyone else in the room other than you, Detective Halvorsen, and Mr. Rios?

A. No.

Q. And what happened at that time?

A. I advised Mr. Rios of his *Miranda* warnings. He stated he understood them, and I asked him if he'd answer questions about this, and he said he would.

Q. Okay. When you said you asked him if he would answer questions about this, what were you referring to?

A. I was referring to the shooting that occurred at 1316 North

Western on the 27th of June.

Q.   All right.  And did you give him any information about what you had learned about that shooting?

A.   No more information than that, that it was a shooting of a Spanish Cobra at 1316 North Western that had occurred on the 27th of June.

Q.   Did you relay any of the information that you had received from the confidential informants to Mr. Rios at that time?

A.   I did tell him that I'd been speaking with -- I'd been speaking with witnesses and people in the neighborhood and that they're telling me that he, Mr. Rios, was the shooter.

Q.   And when you told him that, did he speak to you or respond to that information?

A.   Yes, he did.

Q.   And what did Mr. Rios tell you at that time?

A.   Mr. Rios related that on the 27th of June, shortly before midnight, I think like 11:30 or so, he was in front of his residence with some other people, and a car drove by and started firing gunshots at him.

       And then the car, as it left, it drove towards Western Avenue and across Western Avenue, and he lost sight of it.

       So he said he figured they were Spanish Cobras because they went towards that.

Q.   All right.  And what did he tell you he did next?

A.   He said he went up into his apartment and got his gun, and

then he went out -- back out into the street and he ran into Tino.

He told Tino what -- what had happened, and Tino told him I'll get my gun, and I'll meet you over on Oakley.

Q. And did Mr. Rios tell you what type of gun he retrieved from his home?

A. Mr. Rios told me he had a .38 revolver.

Q. All right. And after he encountered Tino and Tino got his gun, what happened next?

A. The two of them walked towards Division and Western and crossed into the west side of Western, Spanish Cobra territory, and they walked through the west alley behind the firehouse, walked north through that alley looking for Spanish Cobra gang members.

Q. And did Mr. Rios tell you what his intention was if he encountered any Spanish Cobra gang members?

A. Yeah. He said he was going to shoot at them like they shot at him.

Q. All right. What did he tell you next?

A. He walked over to Artesian and Potomac because he said they sell dope over there, and he figured there would be a group and he could fire some shots over there.

Q. Did he tell you anything else?

A. He didn't find anybody over there, so he walked back, he and Tino walked back towards Western Avenue, and then they

walked north on Western from Potomac.

Q.   All right.  And just to be clear, Artesian is one block west of Western?

A.   Correct.

Q.   All right.  So they are now back on Western Avenue?

A.   Yes.

Q.   And what did he tell you happened when he and Tino got onto Western Avenue?

A.   He said they saw a guy sitting on the steps by a bar, and they -- I think they had some words back and forth, but they continued walking north on Western with Tino in the front, Mr. Rios behind him.

     And suddenly the victim came out of a gangway, and Tino started firing at the victim right away.  And then Tino ran across Western Avenue back to the Latin Kings side, and Mr. Rios followed.  But he stopped in the middle of the street, fired a couple shots in the direction of where those victims were, and then he ran back across Western Avenue into a gang -- or into a vacant lot.

Q.   So following in the same direction as Tino?

A.   Yes.

Q.   Did Mr. Rios say -- tell you he said anything as he followed Tino?

A.   Yeah, he said he shouted "King love."

Q.   Did he tell you anything more about the incident during

this initial interview with Detective Halvorsen?

A.   That's all I can recall from my memory.  If I can review my interview with him, it might --

MR. POLICK:  Okay.  If we can show the witness I believe what's in evidence as 50 H, Defendants' 50 H, as in Henry.  And if we could go to page 3 of that document.

BY MR. POLICK:

Q.   Are you able to see that, Detective?

A.   Yeah.

Q.   All right.

A.   Okay.

Q.   All right.  Have you told us everything that happened within that particular interview based on your review?

A.   I see here that I forgot that he mentioned that a car pulled up.  While he was in the alley, a car pulled up and tried to buy some dope from him.

Q.   All right.  And that would be the alley between Artesian and Western?

A.   Yeah.  My recollection, it was --

Q.   Or is it the alley near Potomac?

A.   The alley closer to Potomac behind the firehouse.  Yeah, the west -- west alley of Western Avenue, and I think it was south of Potomac.

Q.   All right.  And did that event occur before the shooting began?

Mason - direct

1067

A.   Yes, it did.

Q.   All right.  And the interview itself with you, Detective Halvorsen, and Mr. Rios, how long did that last approximately?

A.   About 30 minutes.

Q.   At any time, Mr. Mason, during that interview did you pull Mr. Rios's hair?

A.   No, sir.

Q.   Did you grab his head and slam it off a table in the interview room?

A.   No, sir.

Q.   Did you threaten him in any way?

A.   No.

Q.   Did you threaten him with the loss of his parental rights to his child if he refused to give you a statement?

A.   No.

Q.   Did you hit or slap Mr. Rios?

A.   No.

Q.   Did you physically abuse him in any way?

A.   No, sir.

Q.   And with respect to Detective Halvorsen, did Detective Halvorsen pull Mr. Rios's hair?

A.   No.

Q.   Did he slam his head off the table in the interview room?

A.   No.

Q.   Did Detective Halvorsen threaten him?

Mason - direct

1068

A. No.

Q. Did Detective Halvorsen ever tell Mr. Rios or threaten him with the loss of parental rights to his child if he refused to give a statement?

A. No.

Q. Did Detective Halvorsen hit or slap Mr. Rios?

A. No, sir.

Q. Did Detective Halvorsen physically abuse Mr. Rios in any way?

A. No.

Q. Now, last week, you were asked some questions about your notes regarding this interview of Mr. Rios.

MR. POLICK: If we could show the witness Defendants' Exhibit 50 HH, Henry, Henry, which I believe is in evidence.

BY MR. POLICK:

Q. Do you have that document, Mr. Mason?

A. Yes, sir.

Q. All right. And, again, can you describe what this is again for the jurors so they know where we're at?

A. This is basically a note pad. It's titled General Progress Report, and it has some boxes that can be filled out, and then the rest of the page is mostly notepaper.

Q. All right. Fair to say these are your notes of Mr. Rios's interview?

A. Correct.

Q.   And I think you testified last week that it's incomplete, right?

A.   Yes.

Q.   We're missing a back side to this?

A.   Yes, sir.

Q.   All right.  But nonetheless, your notes here, is this verbatim what he's telling you?

A.   No, sir.

Q.   What is it?

A.   These are just notes, things that I want to write down while we're having a conversation that I feel I want to make sure I get right.

       Sometimes I write down the wrong thing.  That's why I -- they're notes.  I just write them down, then I doublecheck.

Q.   Fair to say you're trying to listen to what he was telling you?

A.   Yes, sir.

Q.   All right.  And then when you have these -- once you have these notes, what do you use the notes for?  What's the purpose of them?

A.   I use them to prepare my report and to refresh my memory.

Q.   Okay.  And the report you're referring to here is what we had up on the screen as 50 H, your supplemental report for the events of July 7th, correct?

Mason - direct

1070

A. Yes.

Q. All right. Now, once Mr. Rios told you these things, what did you and Detective Halvorsen tell him?

A. I informed him that he was under arrest.

Q. And was he then free to leave?

A. No.

Q. And was he placed in handcuffs?

A. Yes, he was.

Q. All right. After the interview ended and Mr. Rios was informed he was under arrest, what was your next step?

A. I left the room and called the Felony Review Unit of the Cook County State's Attorneys.

Q. Okay. And can you explain to the jurors what the Felony Review Unit of the Cook County State's Attorney's Office is?

A. So whenever Chicago police want to charge somebody with a felony, we are required to get approval of those charges from the State's Attorney's Office, and the Felony Review Unit is the 24-hour State's Attorney's Office that will come out any time of day to review whatever cases we're working on.

Q. And after they come in and review, what's their purpose of being there?

A. They're there to take any statements that the suspect or defendant might want to give.

Q. All right. And what about charging?

A. They're responsible for advising what charges would be

appropriate.

Q. Okay. Who has the discretion to lodge the charges against the suspect?

A. The state's attorney.

Q. All right. Do you have any discretion in that?

A. No.

Q. All right. Now, after you made that call to the Felony Review Unit, did someone arrive at Area 5?

A. Yes. Barbara Riley from the -- from that unit.

Q. All right. And if I refer to her as ASA Riley, will you know who I'm talking about?

A. Yes.

Q. All right. Approximately what time did ASA Riley arrive at Area 5?

A. I believe it was about 2:00 in the morning.

Q. And when she arrived at your offices, what happened next?

A. So I advised her what -- where we were at in the investigation, and then I gave her the reports that were available, and I told her what Mr. Rios had told me.

Q. And after providing that information to ASA Riley, what did she do?

A. She said she'd want to go in and talk with Mr. Rios.

Q. All right. And did she do that?

A. Yes.

Q. Okay. And was this in the same interview room that

Mason - direct

1072

Mr. Rios was in originally?

A. Yes. It was the same room. I went in with Barbara Riley, took the handcuffs off Mr. Rios, and she advised him of *Miranda* warnings. He said he understood them. She told him that she was a lawyer but not his lawyer. He understood that.

Q. All right. And after being advised of that, of his *Miranda* rights and that she was a lawyer, a state's attorney and not his lawyer, did Mr. Rios agree to speak?

A. Yes, he did.

Q. And what did he say to ASA Riley?

A. He essentially gave the same account of his actions that he had given me earlier.

Q. And was it just you, ASA Riley, and Mr. Rios in that interview room when he did that?

A. Yes.

Q. All right. And after he essentially recounted to ASA Riley what he had told you and Detective Halvorsen, what did ASA Riley do next?

A. She asked Mr. Rios if he'd be willing to repeat, or not repeat, but give that statement to her in front of a court reporter.

Q. All right. And what was Mr. Rios's response to that?

A. He said he would.

Q. All right. Approximately how long was the interview with ASA Riley, yourself, and Mr. Rios?

Mason - direct

1073

A.   It was about 30 minutes.

Q.   During that particular interview, did you physically abuse Mr. Rios in any way?

A.   No, sir.

Q.   Did you threaten Mr. Rios in any way?

A.   No.

Q.   Did you threaten him with the loss of his child if he did not give a statement to ASA Riley?

A.   No.

Q.   Did ASA Riley threaten Mr. Rios in any way?

A.   No.

Q.   Did she physically abuse him in any shape or form?

A.   No.

Q.   Now, did ASA Riley then contact a court reporter?

A.   Yes.

Q.   All right.  And how long was it before the court reporter was able to arrive at Area 5?

A.   I believe it was about 4:00 in the morning.

Q.   And after the court reporter arrived, what -- what happened next?

A.   Once the court reporter got set up in a separate room, not the room where the interviews had taken place, but a little larger room, I took Mr. Rios from the small interview room back to the second room, and Barbara Riley came in and then conducted an interview --

Q.   All right.

A.   -- of Mr. Rios.

Q.   And the court reporter, is she in this larger room as well?

A.   Yes.

Q.   And she's got her equipment set up?

A.   Yes.

Q.   And at this point, is Mr. Rios handcuffed when he's before the court reporter?

A.   No.

Q.   All right.  And then once ASA Riley got situated in the room, what happened next?

A.   She advised Mr. Rios once again of his *Miranda* warnings.

Q.   And did he indicate that he understood those warnings?

A.   Yes, he did.

Q.   And did she ask him if he wished to give a statement before the court reporter?

A.   Yes, she did.

Q.   And did he agree to do that and give a statement?

A.   Yes, he did.

Q.   And who asked the questions during that particular court-reported statement?

A.   Barbara Riley.

Q.   Did you ask any questions during the court-reported statement?

A.   No.

Q.   Approximately how long did the court-reported statement take to complete?

A.   It was about 15 or 20 minutes.

Q.   At any time you were in this larger room where the court-reported statement was being taken, did you ever write out on a white board what Mr. Rios's statement was going to be so that ASA Riley could take it down?

A.   No.

Q.   While you were in this larger room, was there even a white board in there?

A.   No, sir.

Q.   At any time while you and ASA Riley were in that conference room with the court reporter and Mr. Rios, did you ever dictate to Ms. Riley what Mr. Rios's statement would be, and she jotted it down on a piece of paper or a note pad?

A.   No.

Q.   After the statement was completed, Mr. Mason, what -- what was the next step that occurred?

A.   So I took Mr. Rios back to the interview room, and the court reporter typed up the statement.

And then once that was completed, Barbara Riley and myself went back into the interview room with Mr. Rios, and Barbara Riley read the statement out loud while the two of us looked over her shoulder at the statement as she was reading it.

Mason - direct

1076

Q.   All right.   And did it take some time for the court reporter to actually get it typed up in a readable form?

A.   Yes.

Q.   All right.   So now are we back in the -- we're back in the larger room where the statement is being read, or are we in the interview room?

A.   We were in the interview room at that point.

Q.   Okay.   And you're saying that ASA Riley is reading the statement to him?

A.   Yes.   She's reading it out loud.

Q.   Okay.   And what is happening as she is reading that statement to him now?

A.   Well, as she's reading the statement, if there were any corrections in the statement that Mr. Rios wanted to make, he was allowed to make any changes as he -- as the statement was being read.

Q.   All right.   And after that process was complete, was the statement signed?

A.   Yes, it was.

Q.   Who signed the statement?

A.   Mr. Rios, myself, Barbara Riley.

Q.   And were each of the pages also initialed by you three?

A.   Yes.

Q.   And after the statement was completed and signed and initialed, did the court reporter do anything else regarding

Mason - direct

1077

Mr. Rios?

A.   Yes.   She took a Polaroid photograph of Mr. Rios.

Q.   Okay.   For those of us that may not be familiar, what is a Polaroid?

A.   So it's a camera with film that takes a picture, and the picture comes right out of the camera, right then and there.

Q.   All right.   And then does the photograph develop over time?

A.   It does.   It takes moments, and it's a real picture.

        MR. POLICK:   All right.   If we could show the witness Plaintiff's Exhibit 18, which is the statement.   It's in evidence.   And if we could go to the last page of that statement.

BY MR. POLICK:

Q.   Are you able to see that, Mr. Mason?

A.   Yes, sir.

Q.   Okay.   And on the last page there at the bottom, are those the signatures you referred to?

A.   Yes, sir.

Q.   Okay.   And if you scroll up a few pages, do we see at the bottom initials at each page?

A.   That's correct.

Q.   All right.   And those are yours, Mr. Rios's, and ASA Riley's, correct?

A.   That's right.

Q.   Let me ask you this:   During the time when this statement

Q. was being taken by ASA Riley, was Mr. Rios shown any photographs from the scene of the murder?

A. I don't believe so.

Q. Okay. If it were, would it be in that statement?

A. It would be noted.

Q. All right. And you mentioned when you did your interview of Mr. Rios, he told you about this incident that kind of precipitated this event, correct?

A. Yes.

Q. That there was a shooting in front of his home, right?

A. That's right.

Q. Okay. And who did he tell you was -- was present for that, for that shooting?

A. He mentioned his girlfriend. I think his girlfriend was there and his brother-in-law, and there might have been somebody else. I can't recall the names.

Q. All right. And did he recount that in this court-reported statement as well?

A. Yeah, I believe he did.

Q. All right. If you look at page 3, do you see that, the first third of it?

Does that now refresh your memory as to who he said was there?

A. Yes.

Q. Okay. And the friend he said was there?

Mason - direct

1079

A.   Yes.   Lamont.

Q.   Okay.

(Counsel conferring.)

BY MR. POLICK:

Q.   At any time after the statement was taken, did ASA Riley ask you to go investigate this shooting incident that he had described?

A.   No.

Q.   And with respect to the statement, let me ask you this -- I believe you testified last week that you testified at Mr. Rios's criminal trial, correct?

A.   That's right.

Q.   And that took place in November of 1990.

A.   Yes.

Q.   Okay.   Now, at this trial in this courtroom, you've been here every day listening to the testimony, correct?

A.   Yes, I have.

Q.   When you were at Mr. Rios's criminal trial back in 1990, were you allowed to sit in the courtroom and listen to the testimony?

A.   No.

Q.   Okay.   And after you gave your testimony in that case, did you go back and sit in the courtroom and listen to the testimony?

A.   No, sir.   That's not allowed.

Q.   Okay.  You were asked some questions last week about stippling.  Do you remember that?

A.   Yes.

Q.   Okay.  Now, in this courtroom, you heard some testimony by Dr. Konacki from Mr. Rios's criminal trial, right?

A.   Yes.

Q.   Before you interviewed Mr. Rios, did you have any contact with Dr. Konacki, the medical examiner?

A.   No, I hadn't.

Q.   Did you speak to him in person or over the phone?

A.   I never did, no.

Q.   At the time that you did your interview of Mr. Rios, did you have the autopsy report or what Dr. Konacki referred to as the report of post-mortem examination?

A.   No, sir.

Q.   Did you have any information from the medical examiner's office or the morgue?

A.   Yes.

Q.   What was that, Detective?

A.   I had received what we refer to as the morgue report. That's prepared by a detective who's assigned to the morgue, and he -- he writes up the reports, just the general manner and cause of death that is observed and determined.

MR. POLICK:  All right.  If we could just show the witness first what we've marked as Defendants' Exhibit 50 F.

BY MR. POLICK:

Q.   Are you able to see that report, Mr. Mason?

A.   Yes, sir.

Q.   And the detective who prepared that report, can you give us his name?

A.   I believe that's Angelo.

Q.   All right.  And did Detective Angelo prepare that report at or near the time of the autopsy?

A.   Yes, he did.

Q.   And was it the regular practice of the police department to make such a report?

A.   Yes.

Q.   And does the police department keep that type of report in the course of its business?

A.   Yes, they do.

        MR. POLICK:  Judge, I would seek to admit Defendants' Exhibit 50 F.

        THE COURT:  Any objection?

        MR. S. RICHARDS:  No objection.

        THE COURT:  All right.  50 F is admitted and may be published.

    (Defendants' Exhibit No. 50 F received in evidence.)

BY MR. POLICK:

Q.   Now, Detective Angelo who prepared this particular report, is he assigned to your unit there at Area 5 Violent Crimes?

A.   No.

Q.   Where is his office at?

A.   He has an office at the morgue itself.

Q.   And in this report, what is Detective Angelo basically detailing about the autopsy itself?

A.   He's detailing the wounds and where the wounds are located.

Q.   And what did you learn about these wounds on the body from this report?

A.   I learned that there were eight gunshot wounds.  Two -- two of the wounds were entrance wounds with no exit, and the remaining wounds were through and through.

Q.   And was -- from this report, did you learn whether any bullet evidence was recovered?

A.   Yes.

Q.   And what was that?

A.   There were two -- two small-caliber copper-coated bullets recovered from the body.

Q.   All right.  Mr. Mason, is there anywhere in this report from Detective Angelo that mentions the word stippling?

A.   No, sir.

Q.   Now, after -- well, let me go to I believe was marked initially as Plaintiff's Exhibit 13, but we'll call this Defendants' 6 because I don't believe it was complete.

     Are you able to see that photograph, Detective?

A.   Yes, sir.

Q. And who is that a photograph of?

A. That's a photo of Jaime Rios.

Q. And who took that photograph?

A. Janet Lupa, the court reporter.

Q. All right. And does that fairly and accurately depict the way Mr. Rios looked at the time of his statement?

A. Yes, sir.

MR. POLICK: And, Judge, if it's not already in, I'd move to admit Defendants' Exhibit 6, which is also going to include the back side of that Polaroid photograph.

THE COURT: Any objection?

MR. S. RICHARDS: No objection.

THE COURT: Defendants' 6 is admitted and may be published.

(Defendants' Exhibit No. 6 received in evidence.)

MR. POLICK: Thank you.

BY MR. POLICK:

Q. All right. Now, if we go to the second page of the exhibit, are you able to see that, Mr. Mason?

A. Yes, sir.

Q. Okay. Is this the back side of the photograph?

A. Yes, it is.

Q. Okay. And do you recognize any of the handwriting on that?

A. Yes, I do.

Q. Okay. Whose handwriting do you recognize?

Mason - direct

1084

A.   That's my hand -- my signature.  I see Jaime Rios, he signed his name, and Barbara Riley signed her name.

Q.   All right.  And then at the top there, who wrote that in?

A.   That's photo taken by Janet Lupa.

Q.   All right.  And she's indicating there that this is at July 7th, 1989, at 6:10 a.m. in the morning, correct?

A.   Yes.

Q.   All right.  After ASA Riley took the statement and the court reporter took that photograph, did ASA Riley make a charging decision with respect to Mr. Rios at that time?

A.   She didn't make a decision.  She said that she wanted us to run the lineup and see if Mr. Rios was identified or not.

Q.   All right.  And that was the direction you were getting to -- from the Felony Review Unit?

A.   That's correct.

Q.   Now, you told us earlier today that some of these witnesses that you were trying to contact weren't available late that evening or early that morning, correct?

A.   That's right.

Q.   Okay.  So was there a time that was scheduled approximately to do a lineup with Mr. Rios in this case?

A.   Yeah, we were going to try and do this lineup around 5:00 p.m. on the 7th.

Q.   All right.  Now, that's roughly 12 hours later, correct?

A.   Yes.

Q.   All right.  Fair to say you went home and got some sleep?

A.   I did.

Q.   And what about Mr. Rios, where does he go while this passage of time is going on?

A.   After this picture was taken, we took him, myself and Detective Halvorsen, took him to the 25th District lockup downstairs.

Q.   And is there some type of report that has to be done to hold Mr. Rios in order to do these lineups?

A.   Yes, an arrest report.

Q.   Any other report that needs to be done to hold him down there?

A.   Well, we had to prepare some hold papers so he wouldn't be sent to court first thing.

Q.   Is that referred to as a hold past call -- court call report?

A.   Yes, sir.

     MR. POLICK:  All right.  If we could show the witness what's been marked as Defendants' Exhibit 50 J.

BY MR. POLICK:

Q.   And is this the hold past court report, Detective?

A.   Yes, sir.

     MR. POLICK:  Judge, I would seek to admit Plaintiff's Exhibit -- I'm sorry -- Defense Exhibit 50 J.

     THE COURT:  Any objection?

MR. S. RICHARDS: No objection.

THE COURT: Without objection, it's admitted. It may be published.

(Defendants' Exhibit No. 50 J received in evidence.)

BY MR. POLICK:

Q. All right. In looking at this report, Mr. Mason, who was this prepared by?

A. This was prepared by Detective Halvorsen.

Q. And when did he prepare this?

A. Right around the time we brought him down to the lockup, brought Jaime Rios to the lockup.

Q. Okay. And, I mean, on the date, it's --

A. On the date, 7th of July.

Q. All right. And the purpose of this as indicated by Detective Halvorsen?

A. The arrestee was going to -- was going to be viewed in a lineup.

Q. All right. And then this is -- is this approved by someone in your command?

A. Yes, sir. That's our commanding officer, Lieutenant Kujowski.

Q. Okay. Now, did a lineup occur later that day on July 7th?

A. Yes.

Q. And when approximately did the lineup occur timewise?

A. I believe that was around 5:00 p.m.

Q.   All right.  And who were the participants in this particular lineup?

A.   This one is Jaime Rios.

I believe -- I believe we had -- I can't -- I'd have to see that lineup report to be certain.

MR. POLICK:  Okay.  This is already in evidence.  If we could show the witness Defense Exhibit 50 K.

BY MR. POLICK:

Q.   Why don't you take a look at that, Detective, and I'll ask you some questions when you're ready.

A.   Okay.  I'm ready.

Q.   All right.  So looking at the report now, can you give us the time that the lineup was conducted?

A.   It was at 1715 -- well, 5:15 in the afternoon.

Q.   Okay.  And who was conducting this particular lineup?

A.   Myself and Detective Halvorsen.

Q.   All right.  And who was going to be with Mr. Rios and the fillers?

A.   Detective Halvorsen.

Q.   And who was going to be with the witnesses?

A.   I was.

Q.   All right.  And was it conducted in the same manner that you described before with the lineup of Mr. Melendez?

A.   Yes.

Q.   The procedure was the same?

A.   Same procedure.

Q.   All right.  And regarding the fillers, looking at this report, are you able to tell if you got those fillers from the lockup, or were they from outside the station?

A.   They were outside, volunteers.

Q.   And then which witnesses viewed the lineup with Mr. Rios?

A.   Mr. Huertas and Mr. Torres.

Q.   All right.  And before they viewed, was Mr. Rios allowed to pick his place in the lineup?

A.   Yes.

Q.   And when the witnesses Huertas and Torres viewed the lineup, was that again done separately?

A.   That's correct.

Q.   What happened when Mr. Huertas viewed that lineup?

A.   As soon as I opened that curtain, Mr. Huertas says, There he is, No. 1, that's the shooter."

Q.   And what did you say to him?

A.   I said, "All right, but let's finish looking at everybody and let's just run the lineup."

     So we had each person individually walk up to the window, make some turning motions, and returned to line.

     After all five of them had done this, I said to Mr. Huertas, "Okay, do you see the shooter?"

     He said, "Yes, No. 1, like I said."

Q.   Okay.  And that would be Mr. Rios?

A. Yes.

Q. And then was Mr. Huertas taken out and Mr. Torres brought into the lineup room?

A. Yes, he was.

Q. And what happened when Mr. Torres viewed the lineup?

A. Mr. Torres made no identification.

MR. POLICK: All right. I'm going to ask that we show Defense Exhibit 50 EEEE, which is a series of photographs. I believe these are in evidence.

BY MR. POLICK:

Q. All right. Let's just start with that first one, Detective. Can you identify what that is?

A. This is a photograph of the lineup that Mr. Huertas and Mr. Torres viewed.

Q. And if we go to the next photo in that group.

Is this -- what is this photograph?

A. This is also a photograph of the same lineup.

Q. All right. Now, where this is being taken, is that the -- is that the lineup room?

A. No. There's not enough room in the lineup room to take photographs of everybody. So we have them come out, and this is the back wall of our outer office. We just have them stand in the same configuration that they were in during the lineup.

Q. All right. And if we could go to the next photograph. What is this photograph showing us about the lineup?

A.   This is just a profile photo of everybody participating.

Q.   And the next photograph, what is this one here?

A.   Again, same lineup, profile photo.

Q.   All right.  Next photograph, and what does this photograph depict?

A.   And that's the other profile but the same order that everybody was in.

Q.   All right.  And if we could go to the next photograph.

A.   And another redundant photo.  We always try to take two photos of each position in case something happens to one of the photos.

Q.   All right.  And the next photograph.  Who is that a photograph of?

A.   That's a photo of Jaime Rios.

Q.   And does that fairly and accurately depict the way Mr. Rios looked at the time of the lineup?

A.   Yes, it does.

Q.   All right.  And the next photograph.  Who is that?

A.   That's a photo of Jaime Rios.

Q.   And, again, does that fairly depict the way Mr. Rios looked at the time of the lineup?

A.   Yes.

Q.   And why were there two photographs taken of Mr. Rios alone?

A.   That -- these are referred to as identification photos.  So if somebody is identified in the lineup, we photograph who the

person was that was identified individually.

Q.   All right.   And who took these particular photographs of the lineup and Mr. Rios?

A.   It was Detective Halvorsen.

Q.   Okay.   And when were they taken in relation to the lineup itself?

A.   Shortly after the lineup occurred, as soon as possible.

Q.   All right.   And do you know what type of camera he was using to -- to take those photographs?

A.   It was a 35-millimeter film camera.

Q.   Not a digital?

A.   No, sir.

        MR. POLICK:   Okay.   If we could show the witness what's been marked as Defense Exhibit 50 EEE.   That's three Es as opposed to four.

BY MR. POLICK:

Q.   And looking at what's in front of you, Mr. Mason, can you identify what that is?

A.   That's the evidence report regarding the lineup, photos of the lineup.

        MR. POLICK:   Your Honor, at this time, I'd seek to admit Defendants' Exhibit 50 Edward Edward Edward.

        THE COURT:   Any objection?

        MR. S. RICHARDS:   No objection.

        THE COURT:   It's admitted and may be published.

(Defendants' Exhibit No. 50 EEE received in evidence.)

BY MR. POLICK:

Q.  And who prepared this evidence report?

A.  Detective Halvorsen.

Q.  Okay.  And looking at the report, can you tell when he started and when he completed the photographs?

A.  Yeah.  He started it at 5:20 p.m. and finished it at 5:30 p.m.

Q.  All right.  And then further down in the document near the bottom, there's a listing of individuals.  Can you explain what that is?

A.  Yeah, these are the names of everybody that was in the lineup and what position they were, counting from the left.

Q.  And it indicates that Mr. Rios was the suspect who was identified?

A.  That's correct.

Q.  All right.  After the lineup photos are completed, what did you do in terms of your investigation now?

A.  So then at the completion of the lineup, we called felony review again.

Q.  All right.  The same section of the Cook County State's Attorney's Office that you described earlier?

A.  Yes.

Q.  And was it ASA Riley who returned at this time or someone else?

Mason - direct

1093

A.   No, a different state's attorney responded.

Q.   And do you recall his name?

A.   I believe it was Owen.

Q.   All right.  And what happened when ASA Owen got to Area 5?

A.   So he reviewed the case.  We gave him the reports just like we had done with Ms. Riley.

After he completed his investigation, he approved that we place a murder charge against Mr. Rios.

Q.   All right.  Following the approval of charges against Mr. Rios for murder, did you find out any further information about the other suspect who had been identified as Tino?

A.   Yes.  We learned that it was a person by the name of Cristino Morales, I believe.

Q.   Here, let's review your report.  If we go to 50 H.  I believe that's in evidence.

And if we go to the last page of that report, and I'll direct your attention, Mr. Mason, to the last paragraph of that report.

A.   Oh, okay.  Got it.

All right.

Q.   Okay.  And who -- who were you able to learn that Tino was?

A.   So Tino was Cristino Garcia, a male white Hispanic, 18 years old.

Q.   And after learning Tino's real name, what did you do?

A.   I placed a stop order on his record within the Chicago

Police Department.

Q.   All right.  And while we have that report in front of you, if you can look at the first page of it.  And you see on the section there at the bottom there where it says arresting officers?

A.   Yes.

Q.   And you have people listed there from the Gang Crimes Unit, several of them, correct?

A.   Yes.

Q.   Why -- why are they listed there as arresting officers?

A.   That's part of the team that was working with Gawrys and Guevara, and they had -- they had been assisting, trying to find witnesses.

Q.   All right.  Were they actually the arresting officers of Mr. Rios?

A.   No, sir.

Q.   Who was that?

A.   That was myself and Detective Halvorsen.

Q.   All right.  And they're down here because they assisted in this investigation?

A.   That's right.

Q.   All right.  And then is it fair to say that this report that has been marked and is in evidence as 50 H is your summary of the events of your investigation that occurred on July 6th and 7th of 1989?

A.  Yes, sir.

MR. POLICK:  All right.  Your Honor, I'm going into another area, so if this is a good place to break.

THE COURT:  It is.  We'll take our lunch break.  We'll come back at 1:00 p.m.  All rise.

(Jury out at 11:57 a.m.)

THE COURT:  Okay.  Detective Mason, you can step down.

Anything that I need to address from the plaintiff's view before the lunch break?

MR. S. RICHARDS:  No, Your Honor.

THE COURT:  For any of the defendants?

MR. SCAHILL:  I don't know if we need to discuss it at this break or the next, but there's some witness sequencing things for tomorrow that I did want to address before the end of the day.  So I just wanted to put that out there as something that needs to be addressed.

THE COURT:  Have you raised this at all with the plaintiffs?

MR. SCAHILL:  Yes, we discussed this last week.  This is ASA Riley and then Mr. Guevara, which --

THE COURT:  Has it been resolved, or are you saying that I need to resolve it?

MR. SCAHILL:  I didn't think they were objecting to that, so I don't think it does need to be resolved.

THE COURT:  Okay.

MR. SCAHILL:  But it's something we, depending on how far we get today with the witnesses, we may need to do another thing where we break up a witness, so --

MR. S. RICHARDS:  Your Honor, as a general matter and at this specific issue, we have no objection to taking witnesses out of order for convenience.

THE COURT:  Who needs to go today?

MR. SCAHILL:  It's not today.  It's tomorrow.

THE COURT:  All right.  We'll take that up at the end of the day when we talk about our plan for tomorrow.

MR. SCAHILL:  Okay.

THE COURT:  All right.  See you back at 1:00.

MR. POLICK:  Thank you, Judge.

(Adjourned at 11:58 a.m., until 1:00 p.m.)

(Change of reporters.)

1097

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


JAIME RIOS,                          )  Case No. 22 C 3973
                                     )
                Plaintiff,           )
                                     )
-vs-                                 )
                                     )
REYNALDO GUEVARA; MICHAEL            )
MASON; and JoANN HALVORSEN,          )
as Special Representative of         )
ERNEST HALVORSEN, Deceased,          )  Chicago, Illinois
                                     )  February 9, 2026
                Defendant.           )  1:00 p.m.


                TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
                BEFORE THE HONORABLE JEREMY C. DANIEL


APPEARANCES:


For the Plaintiff:      LAW OFFICE OF STEPHEN L. RICHARDS
                        BY:  MR. STEPHEN L. RICHARDS
                             MR. JOSHUA S. RICHARDS
                        53 West Jackson Boulevard, Suite 205
                        Chicago, Illinois  60604


For Defendant           BORKAN & SCAHILL, LTD.
Guevara:                BY:  MR. TIMOTHY P. SCAHILL
                             MR. GRAHAM P. MILLER
                        20 South Clark Street, Suite 1700
                        Chicago, Illinois  60602


For Defendants          THE SOTOS LAW FIRM, P.C.
Mason and         BY:  MR. JOSEPH M. POLICK
Halvorsen:                   MR. JOSH MICHAEL ENGQUIST
                             MR. JEFFREY ROBERT KIVETZ
                             MS. CAROLINE P. GOLDEN
                        141 West Jackson Boulevard, Suite 1240A
                        Chicago, Illinois  60604

1098

APPEARANCES (Cont'd):

Court Reporter:          JOSEPH RICKHOFF, CSR, RPR, CRR
                         JENNIFER COSTALES, CRR, RMR, CRC
                         Official Court Reporter
                         219 S. Dearborn Street, Room 1426
                         Chicago, Illinois  60604
                         Telephone:  (312) 435-5387
                         charles_zandi@ilnd.uscourts.gov

                    *    *    *    *    *

               PROCEEDINGS REPORTED BY STENOTYPE
      TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE COURT:  We can bring in the jury.

(Jury in at 12:59 p.m.)

THE COURT:  Please take your seats.

Mr. Polick, you may resume when you're ready.

MR. POLICK:  Thank you, Judge.

MICHAEL MASON, DEFENDANT HEREIN, PREVIOUSLY SWORN

DIRECT EXAMINATION (Resumed)

BY MR. POLICK:

Q.  Mr. Mason, when we left off before the lunch break, I believe you told us that you had identified who Tino was, correct?

A.  Yes, sir.

Q.  And, then, did you say that you issued a stop order for his arrest?

A.  Yes, I did.

Q.  Okay.  Could you explain to the jurors what a stop order is?

A.  So, within the Chicago Police Department, a stop order would notify any officer who happened to arrest Cristino Garcia to not release him without talking with the detectives because he was now wanted in connection with this.

Q.  So, if he were to get picked up by another unit, your unit would be informed that he was in custody?

A.  Yes, sir.

Q.   All right.   I want to -- before I go further into your investigation, I just want to go back to the information you got from the confidential informants that you testified to this morning.   They were telling you that they heard on the street that it was Mr. Rios who was the shooter, correct?

A.   Yes.

Q.   Now, when you and Detective Halvorsen interviewed Mr. Rios, he didn't say that, did he?

A.   He gave a different account of his actions.

Q.   All right.   Who did he say was the initial shooter?

A.   He said that Tino was the main shooter.

Q.   All right.   And when ASA Riley then took his court-reported statement, did he maintain that same position in terms of who the shooter was?

A.   Yes, he did.

Q.   What was your reaction to that based on what you had learned from the informants and what you had learned in your interview with Mr. Rios?

          MR. S. RICHARDS:   Objection.

BY THE WITNESS:

A.   I didn't believe that -- that part of the story.

BY MR. POLICK:

Q.   Why not?

A.   Well, he had been identified by a witness as the guy who started the shooting.

Q.   That being Mr. Huertas?

A.   Yes.

Q.   All right.  I also wanted to ask you some questions about some of the people that you've already talked about today. Obviously, Detective Brennan was your partner, right?

A.   Yes, sir.

Q.   Okay.  I wanted to ask you some questions about Officer Guevara.  At the time of the events in this particular case, he was what was known as a gang crimes officer, correct?

A.   Yes.

Q.   And at some point later in his career, did he become a detective?

A.   Yes, did he did.

Q.   And at some point was he assigned to the same unit you were working in as a detective?

A.   Yes, he was.

Q.   Did you ever socialize with Mr. Guevara outside of work?

A.   No.

Q.   All right.  And, then, his partner, Officer Gawrys, was at the time of the events here also a gang crimes officer, correct?

A.   Yes.

Q.   And did he also, as his career went on, become a detective?

A.   Yes, he did.

Q.   And was he at one point assigned to the same unit that you

Mason - direct

1102

work in?

A.   Yes, he was.

Q.   All right.  And outside of work, did you socialize with Mr. Gawrys?

A.   No.

Q.   All right.  And one of the other people you told us about this morning was Gang Crimes Officer Noon, right?

A.   Yes.

Q.   And his first name is Dan, Daniel Noon?

A.   Yes, it is.

Q.   Did you socialize with Daniel Noon outside of work?

A.   No.

Q.   And how about Detective Ernest Halvorsen, who assisted you on July 7th, 1989, in this investigation?  Did you ever socialize with Detective Halvorsen outside of work?

A.   No.

Q.   All right.  I want to turn your attention now to July 9th of 1989.  Did something occur in your investigation of the Luis Morales homicide on that date?

A.   Yes, sir.

Q.   What happened?

A.   The same two informants who I had spoken to on July 6th were in Area 5, and I spoke with them.  And they told me that they had been to two residences on July 8th and at those locations, one was an Al Lopez, they observed that he had a

.25-caliber semiautomatic handgun, and Mr. Lopez told them that the gun was hot because it was used in the Luis Morales shooting.

Q. All right. And do you know, as you sit here today, how those same two informants you had spoken to back on July 6th had gotten to Area 5 on the 9th?

A. I don't recall today how they got there.

Q. All right. So, you got information from them about a .25-caliber pistol being at the residence of a gentleman by the name of Alex Lopez, correct?

A. Yes.

Q. Was Mr. Lopez someone who was known to you?

A. No, sir.

Q. And do you know, as you sit here today, if it was one of the informants or both of the informants that gave you the information about Mr. Lopez?

A. I don't -- I don't recall now.

Q. All right. And, then, did they give you further information about the weapons that may potentially be the murder weapons in this case?

A. Yes.

Q. What was that?

A. They were at the residence of Benjamin Carrero. And at that time -- on July 8th. And at that time, Benjamin showed them what he described as a .38-caliber revolver. Mr. Carrero

Mason - direct

1104

told the informants that that weapon was used in the murder of Luis Morales.

Q. All right. And as you sit here today, do you recall if it was one or both of the informants that gave you that information about a potential weapon being at the residence of Mr. Benjamin Carrero?

A. I do not.

Q. All right. Approximately how long was this conversation with the confidential informants?

A. It was about 20 minutes.

Q. All right. And, then, after getting that information from them, what did you do in your investigation?

A. I went to my commanding officer, Lieutenant Kijowski, told him what I had learned, and he instructed me that he would approve a search warrant for those two addresses.

Q. All right. Meaning the residence of Mr. Lopez and then the residence of Mr. Carrero?

A. That's correct.

Q. All right. Can you describe this warrant process or what you have to go through to get a warrant to the jury.

A. So, I have to document the -- all the events that lead me to believe that those weapons could be found at those locations. And, so, I've done that. I've done that. I document --

Q. What do you call -- when you say you document it, is there

Mason - direct

1105

a name of the report or document that you prepare?

A.   It's complaint for a search warrant.

Q.   All right.  And, then, once you fill out this complaint for the search warrant, what's the next part of the process?

A.   I presented that to Lieutenant Kijowski.  He looked it over, and he signed -- there's a place where the commanding officer signs the warrant that he approves it.

Q.   All right.  And, then, once your supervisor, Lieutenant Kijowski, approves, what's the next step in the process?

A.   Next step, I have to go to felony review and meet with a state's attorney, present that warrant to them.  They review it.  They ask me any questions if they have questions.  And at the conclusion of that, they approved it.  I believe that was State's Attorney Donohoe.

Q.   And after the state's attorney reviews, what's the next part of the process?

A.   Then I go before a judge, and he reviews the warrant and asks me questions about it.  And, then, at the conclusion of that, he signed the warrant.

Q.   All right.

        MR. POLICK:  If we can show the witness Defense Exhibit 50 M, as in Mary, which is in evidence.  And we can -- thank you.

BY MR. POLICK:

Q.   Are you able to see that, Mr. Mason?

A.   Yes, sir.

Q.   Okay.  And starting with 50 M --

MR. POLICK:  If we can go to the first page there?  Thank you.

BY MR. POLICK:

Q.   What is 50 M?  What is that?

A.   So, that's the complaint for the search warrant that contains a synopsis of my -- the investigation that I learned.

Q.   All right.  And who is this particular one -- this particular complaint for search warrant for?

A.   This is for Benjamin Carrero at his residence.

Q.   And his residence at the time?

A.   1419 North Wicker, second floor.

Q.   All right.  And did Mr. Carrero have a nickname that's indicated on the warrant here -- or this complaint for search warrant?

A.   Yes.  He was known as Baby.

Q.   All right.  And the basis for your complaint for search warrant, as you indicate in the narrative, what was that?

A.   It's jumping around a little bit there.

I described that I'm assigned as a detective to Area 5 Violent Crimes, the length of time I've been there; I was assigned to investigate this incident; when it occurred; where it occurred; the victim died as a result of the wounds that he received; and I learned from a confidential informant that

Jaime Rios had been implicated and subsequently identified by an eyewitness as the shooting -- as the shooter. Jaime Rios gave a detailed confession in the form of a court-reported statement and admitted that one of the guns used during this murder was a .38-caliber revolver.

Q. Okay.

MR. POLICK: And, then, if we could scroll down.

BY MR. POLICK:

Q. I see some writing along the margin there along the left-hand side. Do you know what that is?

A. Yes. Those are the signatures of each person that reviewed the complaint and approved it.

Q. All right.

MR. POLICK: If you could just scroll back up a little bit, I guess.

BY MR. POLICK:

Q. And, then, if we go to the final page of that exhibit, I believe, what is that document, the last page there we're looking at?

A. That's the actual search warrant itself signed by Judge Wright.

Q. All right. And this is for the Carrero residence at 1419 North Wicker Park, correct?

A. Yes.

Q. All right. Now, if we can look again at what's been marked

and in evidence as Defendants' Exhibit 50 N.  Tell us when you've had an opportunity to look at that.

And what is this we're looking at here, Mr. Mason?

A.  So, this is a complaint for the search warrant of Alex Lopez's residence.

Q.  Okay.  And Mr. Lopez's residence, where was that at the time?

A.  1418 North Bell.

Q.  All right.  How far away is that from the scene of the murder on Western, in the 1300 block of Western?

A.  I'm having trouble remembering exactly where Bell is.  I think it's by California, but I can't recall.

Q.  Okay.  And if we go to the last page of that document there.

MR. POLICK:  Do we have another page to this?  Thank you.

BY MR. POLICK:

Q.  What is that?

A.  So, that's the search warrant for that residence of Alex Lopez.

Q.  Okay.  Now, did you conduct the search at the Lopez residence?

A.  No, sir.

Q.  Who did that?

A.  Detective Brennan along with some other detectives went to

that location.

Q.   And do you know what the results of that search were?

A.   No -- no weapon was found.

Q.   All right.  So, is it fair to say you did the search at the Carrero residence?

A.   Yes, sir.

Q.   All right.  And did others go with you?

A.   Yes.

Q.   And who went with you for that search?

A.   Detective O'Donnell, Detective Curley, and Detective Enault along with our supervising sergeant, Sergeant Czarnecki, and two officers -- two uniform officers from the 14th District.

Q.   Was Officer Guevara part of that search team?

A.   No.

Q.   Were any gang crimes officers part of that search team?

A.   No.

Q.   Is there a police report that is prepared at or near the time of the search indicating the personnel that are going to be involved in the search or were involved in the search?

A.   Yes.

        MR. POLICK:  If we can show the witness Defense Exhibit 50 O, as in Oscar.

BY MR. POLICK:

Q.   Can you see that, Mr. Mason?

A.   Yes, I can.

Q.   And what is that document, just briefly the title of that?

A.   This is the search warrant data sheet.

Q.   And does that describe the personnel that were involved in the warrant?

A.   Yes, it does.

          MR. POLICK:   Judge, I'm going to move to admit Defendants' Exhibit 50 O, as in Oscar, into evidence.

          THE COURT:   Any objection?

          MR. S. RICHARDS:   No objection.

          THE COURT:   The exhibit is admitted and may be published.

     (Defendants' Exhibit 50 O received in evidence.)

BY MR. POLICK:

Q.   All right.   Looking at 50 O, Mr. Mason, who prepared that document?

A.   My supervisor, Sergeant Czarnecki.

Q.   And Sergeant Czarnecki, when you say your supervisor, was he a sergeant in the Violent Crimes Unit that you were assigned to?

A.   Yes, he -- yes, he was.

Q.   Okay.  And, then, we have your name, correct?

A.   Yes.

Q.   Detective Curley?

A.   Correct.

Q.   Detective Enault?

Mason - direct

1111

A.   That's right.

Q.   Detective O'Donnell?

A.   Yes.

Q.   And, then, you have two individuals from the 14th District?

A.   Yes.

Q.   Looks like Kuszynski?

A.   Yes.

Q.   I'm probably butchering that, but --

And Avila?

A.   Correct.

Q.   And it indicates where the search was going to be conducted, correct?

A.   Yes, it does.

Q.   And approximately what time of the day or evening was the search at the Carrero residence conducted?

A.   I'm looking.  I think it was like around 10:00, 10:30 at night.  I don't know if I see it here.

Q.   Okay.  Based on your memory, is that the approximate time the search was conducted?

A.   Yes, sir.

Q.   All right.  And what happened when you got to the residence at 1419 North Wicker Park?

A.   I encountered Mr. Carrero, either on his front porch or in the stairway -- the interior stairway of the building there.

Q.   Okay.  When you say "the building there," can you tell the

Mason - direct

1112

jurors what type of building it was.

A. It's a three-apartment -- I believe it was a brick three-apartment building. It had a -- what I would refer to as a garden apartment; some people might refer to it as a basement apartment. And, then, there was an apartment above that, which could be the first floor, and an apartment above that, which might be the second floor.

Q. And what happened when the warrant was executed at the Carrero residence?

A. I gave a copy of the warrant to Mr. Carrero and asked him to direct us to his residence.

Q. And did he do that?

A. Eventually.

Q. Go ahead, I'm sorry.

A. First took us to the second floor, and then we learned once we were there that that's not where he lived. Then he took us to the first floor where he actually lived. And, then, we searched -- we began the search of that apartment.

Q. Were there others you encountered in the building besides Mr. Carrero?

A. Yes.

Q. Who were they?

A. His girlfriend was there, Iris Mendez. And I believe his mother. I don't recall her name.

Q. And as the search was being conducted, what happened?

A.   Detective Curley noticed his girlfriend in a bedroom, and then she quickly went to the bathroom and said she needed to use the bathroom.  So, he went outside and watched the bathroom window from the outside.  And moments later the window opened up, and he could see Iris Mendez throw a gun out the window.

MR. POLICK:  All right.  I'm going to now show the witness only what we've marked as Defense Exhibit 30 for identification.  This is a group exhibit.

BY MR. POLICK:

Q.   Let me know when you've been able to see those photographs, Mr. Mason.

A.   Got it.  Yes, sir.

Q.   Okay.  Those three photographs, can you just in general without getting into the specifics of them, what do they depict?

A.   So, this one with the picket fence is the 1419 North Wicker.

Q.   Okay.  In general, do these three photographs depict the scene of the search at the Carrero residence at 1419 North Wicker Park?

A.   Yes.

Q.   And do they fairly and accurately depict that location and the item recovered?

A.   Yes, sir.

MR. POLICK:  Judge, I would move to admit Defense

Mason - direct

1114

Exhibit 30.

THE COURT: Any objection?

MR. S. RICHARDS: No objection.

THE COURT: Defense 30 is admitted and may be published.

(Defendants' Exhibit 30 received in evidence.)

BY MR. POLICK:

Q. So, looking at the first picture that we're seeing now, what is that, Detective Mason?

A. So, that is the residence at 1419 North Wicker Park. Like I said, the picket fence is in front of that 1419. Then there's a -- to the left, there's a stairway that leads up to the first floor.

Q. All right. And there's a gangway between the residence at 1419 and the neighboring property?

A. Yes, sir.

Q. All right.

MR. POLICK: Let's go to the next photograph.

BY MR. POLICK:

Q. And can you identify what that photograph is?

A. That's a picture of the window that Iris Mendez opened and threw a gun out of.

Q. All right. If you go to the next photograph, what is that?

A. That's the gun that she threw out the window.

Q. All right. And was that weapon recovered at the scene?

Mason - direct

1115

A.   Yes, it was.

Q.   And can you describe what kind of gun this is.

A.   This is a .32-caliber revolver.

Q.   Thank you.  Now, after the search at 1419 North Wicker Park was completed and the gun recovered, what happened with Mr. Carrero and his girlfriend, Ms. Mendez?

A.   They were both placed under arrest and transported to Area 5.

Q.   All right.  And at -- so, we're back at your office now?

A.   That's right.

Q.   All right.  And at Area 5, did you have an occasion to interview Mr. Carrero?

A.   Yes, I did.

Q.   Who was present for that interview?

A.   Detective Curley.

Q.   And what did you say to Mr. Carrero, and what did he say to you?

A.   I advised Mr. Carrero of Miranda warnings, and he said he understood them.  And I asked him if he'd answer some questions, and he said he would.

Q.   All right.  And understanding his rights, what did you ask Mr. Carrero?

A.   I asked him about the gun.

Q.   And what did he tell you about the gun?

A.   Well, he told me that on the evening of the 27th of June,

Mason - direct

1116

shortly after midnight, he was in front of his -- this residence, and Jaime Rios rode up on a bicycle. Jaime Rios reached into his waistband, pulled out this gun, and handed it to him and said, I just shot somebody, hang on to this, I'll be back.

Q. And after receiving that information from Mr. Carrero, what did you do?

A. I notified Felony Review, the State's Attorney's Office.

Q. Eventually, did an assistant state's attorney from Felony Review come to Area 5?

A. Yes.

Q. Do you recall the name of that particular state's attorney?

A. I believe it was Mr. Zick.

Q. Okay. What happened when Mr. -- or ASA Zick -- that's Z-i-c-k -- arrived?

A. He approved placing felony charges against Mr. Carrero and Iris Mendez of obstruction of justice.

Q. Was there -- after ASA Zick approved felony charges against Mr. Carrero and his girlfriend, was there any further instruction from Felony Review regarding Mr. Carrero?

A. Yes. Mr. Carrero had agreed to appear before the grand jury and testify as to what he told us.

Q. All right. Now, the grand jury, is that venue located in your building or anywhere near your building?

A. No.

Q.   Where would that be located?

A.   That's located at 26th and California, the criminal courts building.

Q.   All right.  And did Mr. Carrero, did he need to be held at the station overnight in order to go to court the following day?

A.   Yes.  Well, he was under arrest, so he was placed in the 25th District lockup.

Q.   All right.  And that would be downstairs at your building?

A.   Yes.

Q.   And, again, is there some report that's completed or that you need to get approved to hold him past the court call?

A.   Yes.  Again, we have to prepare a hold past court call report.

Q.   All right.

MR. POLICK:  And I'm showing the witness now what we've marked as Defense Exhibit U.

BY MR. POLICK:

Q.   And can you now identify what that document is.

A.   So, this is a hold for Benjamin Carrero, the hold past the court call.

Q.   All right.  Before you get into it, let me --

MR. POLICK:  Judge, may I admit Defense Exhibit 50 U, as in unicorn, into evidence?

THE COURT:  Any objection?

MR. S. RICHARDS:  No objection.

THE COURT:  It's admitted and may be published.

(Defendants' Exhibit 50 U received in evidence.)

BY MR. POLICK:

Q.  All right, Mr. Mason.  Looking at the report -- now, who prepared that?

A.  That's my partner, Detective Brennan.

Q.  Okay.  And this was prepared on what date?

A.  On July 10th.

Q.  Okay.  And the purpose indicated for holding Mr. Carrero?

A.  He was to appear before the grand jury the following morning.

Q.  And is this form approved by someone in your command?

A.  Yes, sir.  That's Sergeant Healy, a supervising sergeant.

Q.  And when you say "supervising sergeant," of your unit, Violent Crimes?

A.  Yes, sir.

Q.  All right.  With regard to who appears before the grand jury, is that your decision or the state's attorney's decision?

A.  That's always the state's attorney's decision.

Q.  And how about when the case eventually goes to trial, who makes the decision which witnesses to call at trial?

A.  State's attorney.

Q.  Was it your understanding that Mr. Carrero did, in fact, appear before the grand jury the following day?

Mason - direct

1119

A.   Yes, sir.

Q.   And showing you what's in evidence as Defense Exhibit 50 W, as in Walter.

MR. POLICK:   50 W.

BY MR. POLICK:

Q.   Do you have that report in front of you now, Mr. Mason?

A.   Yes, sir.

Q.   Okay.   And just looking at this report, this was prepared --

MR. POLICK:   If we could stay on page 1, please.

BY MR. POLICK:

Q.   This was prepared by Detective Enault?

A.   Yes, it was.

Q.   And it's also signed by -- or prepared by Detective Curley, correct?

A.   Yes.

Q.   And does this report that we've admitted into evidence as 50 W basically detail the events surrounding the search at the Carrero residence and the subsequent arrests of Mr. Carrero and his girlfriend?

A.   Yes, it does.

Q.   All right.   You've talked about a couple of guns that Mr. Rios mentioned that were used in the commission of this crime, one a .25-caliber automatic and the other being a .38 revolver.

First of all, can you explain to the jury a little bit just what the difference is between an automatic pistol and a revolver.

A.   So, a semiautomatic gun is one that all the bullets are stored in a magazine, which is in the handle of the gun.  And when the gun is fired, the bullets eject out of the gun automatically.

A revolver stores the bullets in a cylinder that turns through the barrel of the gun.  And when those bullets are fired, they stay in the gun.

Q.   All right.  And in your interview of Mr. Rios, he told you he had a .38-caliber revolver, correct?

A.   Yes.

Q.   And he also said he had the same gun when he gave the court-reported statement to ASA Riley, correct?

A.   Yes.

Q.   All right.  You told us a few minutes ago this gun that was recovered outside the Carrero residence that his girlfriend had thrown out the window was a .32-caliber revolver, correct?

A.   That's right.

Q.   Were you able to rule out the .32-caliber revolver as the murder weapon?

A.   No.

Q.   Why not?

A.   Well, like I mentioned before, there were three

through-and-through gunshot wounds in the victim.  So, those bullets were never recovered.  They were not lodged in the victim's body, and they just weren't recovered.  The shell casings stayed in the gun.  So, we had nothing as far as determining what weapon fired those bullets.

Q.   All right.  Now, at the scene, there were some shell casings found, correct?

A.   Yes.

Q.   And what did those turn out to be?  What caliber, if you recall?

A.   Those are .25-caliber shell casings.

Q.   But as you explained, those would have been ejected from the .25-caliber weapon when the gun was fired?

A.   Yes.

Q.   As opposed to the revolver, which retains the shell casing within the cylinder of the gun itself?

A.   Yes.

Q.   All right.  I'm going to take you now, Mr. Mason, to July 29th of 1989.  Did something with regard to this case in your investigation occur on that date?

A.   Yes.

Q.   What happened on July 29th of 1989?

A.   When I got to work, I was informed that Cristino Garcia had been arrested the night before.

Q.   And do you remember how you learned that information?

Mason - direct

1122

A.  I can't recall now.  And it would have been logical that my sergeant would have told me.

Q.  All right.  Were you present when Mr. Cristino Garcia was taken into custody?

A.  No.

Q.  Where was he when you came into work on the 29th?

A.  He was in the 25th District lockup.

Q.  Were you working with a partner or alone that day?

A.  I was alone that day.

Q.  And what was your understanding as to when Mr. Garcia, also known as Tino, had been arrested?

A.  It was the night before.  I don't recall exactly what time, but sometime in the evening, I believe.

Q.  All right.  And you had no contact with him the day before, correct?

A.  No.

Q.  So, on the 29th, when you came into work and you found out he's in the 25th District lockup downstairs, what happened next?

A.  Once again, tried to get ahold of the witnesses and see if I can get anybody in to view a lineup.

Q.  And were you able to locate any of the witnesses?

A.  I was only able to get Javier Torres to come in.

Q.  All right.  At some point did you meet with Mr. Tino Garcia?

A.   Yes, I did.

Q.   And can you tell us what happened when you met with Mr. Tino Garcia.

A.   Well, I brought him up from the lockup up to our office, put him in one of those interview rooms.  I advised him of his Miranda warnings, and he stated he understood those.  And I asked him if he'd answer some questions regarding this incident.

Q.   And after advising Mr. Garcia of his rights and that he understood, what, if anything, did he say to you?

A.   He said he didn't want to answer any questions.  He didn't want to talk to me.

Q.   All right.  What did you do next?

A.   I left the room, and I went back down to the lockup to see if there were any people I could use as fillers for a lineup.

Q.   All right.  And were you able to find any individuals that could be used as fillers in that lineup?

A.   Yes.

Q.   Okay.  And how many other individuals were you able to find in the lockup that were similar in appearance to Mr. Garcia?

A.   There were only three.

Q.   And after finding those three individuals, what happened next?

A.   I called around to other districts to see if anybody had any available prisoners that would fit, and I was unsuccessful.

So, I went with the three that I had.

Q. All right. And after you had the three fillers, was Mr. Garcia also brought into the lineup as a participant?

A. Yes, he was.

Q. Was he allowed to choose his position just as Mr. Rios had been allowed to choose his?

A. Yes.

Q. And approximately what time on July 29th was the lineup with Mr. Garcia conducted?

A. I think I need to see the report to be certain.

Q. Okay.

MR. POLICK: Let's show the witness Defense Exhibit 50 EE, Edward, Edward.

BY MR. POLICK:

Q. Can you see that report in front of you now?

A. Yes.

Q. Okay. And just can you identify the nature of that report, just what it is.

A. This is the lineup report that was conducted on the 29th of July.

Q. And did you prepare that report at or near the time of the lineup?

A. Yes, I did.

MR. POLICK: Judge, I'd move to admit Defendants' Exhibit 50 Edward Edward.

THE COURT: Any objection?

MR. S. RICHARDS: No objection.

THE COURT: 50 EE is admitted and may be published.

(Defendants' Exhibit 50 EE received in evidence.)

BY MR. POLICK:

Q. Looking at the lineup report, Mr. Mason, this is the lineup report for Mr. Garcia's lineup, correct?

A. Yes.

Q. And approximately what time was the lineup conducted?

A. That was about 1:20 in the afternoon.

Q. All right. Now, did anyone help you conduct this lineup?

A. No.

Q. All right. So, if it's just you, how do you work that so -- well, describe how you did that.

A. So, I went down to the lockup, signed out the three prisoners I was going to use as fillers. I brought them upstairs, put them in the lineup room, and I went and got Mr. Garcia from the interview room, walked him into the lineup room. And I instructed Mr. Garcia to pick his place in the lineup and to line up the other individuals however he wanted. He did that.

And I told him to just -- all right, we're going to run this lineup in a minute. Just stay put. I walked out of that room, locked the door from the outside, and then went and got Mr. Torres, walked him into the viewing room, and opened

the curtain and let him look at the lineup.

Q. All right. And if you needed the participants in the other room to move or come closer to the glass, how did you do that?

A. I would use the speaker and microphone that is connected to both rooms.

Q. And did Mr. Torres view that lineup?

A. Yes, he did.

Q. And what happened when he viewed the lineup?

A. He made no identification.

Q. What did you do after the lineup?

A. After I put everybody back where they belonged, I called Felony Review.

Q. And eventually did someone from the Felony Review Unit appear at Area 5?

A. Yes.

Q. And who was the ASA that arrived this time?

A. I can't recall the name.

Q. Okay.

        MR. POLICK:  Let's show the witness Defense Exhibit DD.  D, as in David.

BY MR. POLICK:

Q. Can you see that, Mr. Mason?

A. Yes, sir.

Q. Okay. And looking at that report, just in general what is that report?

A.   That's a -- that's my supplementary report regarding the arrest and lineup of Mr. Garcia.

Q.   All right.

MR. POLICK:   Your Honor, I would move to admit Defense Exhibit 50 David David.

THE COURT:   Any objection?

MR. S. RICHARDS:   No objection.

THE COURT:   It's admitted and may be published.

(Defendants' Exhibit 50 DD received in evidence.)

MR. POLICK:   If we could go to the second page.

BY MR. POLICK:

Q.   And look that over, Mr. Mason.  If you can see if your memory is refreshed as to the assistant state's attorney who appeared at Area 5.

A.   Yes, sir.

Q.   And who was that?

A.   Assistant State's Attorney Connelly.

Q.   What happened when Assistant State's Attorney Connelly arrived at Area 5?

A.   Well, he reviewed the new developments.  He reviewed the reports that had been submitted.  And he informed me that State's Attorney's Office wouldn't be charging Mr. Garcia.

Q.   All right.  And did you agree or concur with the state's attorney's decision on that?

A.   I agreed that there wasn't enough evidence to proceed.

Mason - direct

1128

Q.   All right.  And you did have the statement, though -- even though Mr. Torres didn't make an identification, you still had the statement of Mr. Rios implicating Mr. Garcia, correct?

A.   Yes.

Q.   Could that be used in the charging process as you understand it?

A.   No, not as I understand it.

Q.   All right.  So, after ASA Connelly did not approve the charges against Mr. Garcia, what happened with Mr. Garcia?

A.   He was -- he was released.

Q.   And did you receive any further information or instruction from the Felony Review Unit regarding this investigation, specifically as to Mr. Garcia?

A.   No.

Q.   All right.

        MR. POLICK:  Your Honor, may I have a moment?

        THE COURT:  Yes.

        MR. POLICK:  Thank you.

    (Counsel conferring.)

BY MR. POLICK:

Q.   All right.  Mr. Mason, you've told us that in November of 1990 you testified at Mr. Rios's criminal trial?

A.   Yes, sir.

Q.   And is it also correct that prior to the trial in November, you also testified at a suppression motion?

Mason - direct

1129

A.   Yes.

Q.   After giving your testimony in Mr. Rios's criminal proceedings in 1990, is that the last involvement you had in that case until this lawsuit was filed?

A.   Yes, sir.

Q.   All right.  I want to draw your attention to the year 2020. Do you recall the pandemic?

A.   I do.

Q.   Okay.  In 2020, were you aware that Mr. Rios had filed a petition seeking to vacate or remove his murder conviction?

A.   No, sir.

Q.   Did anyone from the Cook County State's Attorney's Office contact you about Mr. Rios's petition to vacate?

A.   No, sir.

Q.   Did anyone from the Cook County State's Attorney's Office interview you about the case?

A.   No.

Q.   Going ahead two years later, in the year 2022, were you aware that an evidentiary hearing was going to be conducted on Mr. Rios's petition to vacate or remove his conviction?

A.   No.

Q.   Did anyone from the State's Attorney's Office contact you about that evidentiary hearing?

A.   No, sir.

Q.   Did the State's Attorney's Office ask you to testify at

Mason - cross

1130

that hearing?

A.  No.

Q.  Did the State's Attorney's Office ask you anything about your investigation that occurred back in 1989?

A.  No, sir.

Q.  Did they ask you any -- ask you about any of your opinions on the case?

A.  Not at all.

Q.  Going another year further, in 2023, were you aware that Mr. Rios had filed what's called a petition for a Certificate of Innocence?

A.  No, sir.

Q.  Did anyone from the Cook County State's Attorney's Office contact you about that proceeding?

A.  No, sir.

Q.  Did anyone from the State's Attorney's Office come and ask you to testify at a hearing on Mr. Rios's petition for a Certificate of Innocence?

A.  No.

        MR. POLICK:  Your Honor, I have no further questions of this witness.

        THE COURT:  Mr. Scahill.

        MR. SCAHILL:  Yes, Judge.  Thank you.

                        CROSS-EXAMINATION

BY MR. SCAHILL:

Mason - cross

Q. Good afternoon, Mr. Mason.

A. Good afternoon.

Q. My name is Tim Scahill. I represent Mr. Guevara in this same lawsuit. I'm going to jump around a little bit here. But let me start on July 6th of 1989, okay?

A. Yes, sir.

Q. I think you testified that on July 6th of 1989, Mr. Rios was brought into the Area 5 police station by Mr. Guevara and by his partner, Mr. Gawrys?

A. That's correct.

Q. All right. Now, you understood that Mr. Guevara and Mr. Gawrys were gang crimes officers?

A. Yes.

Q. And gang crimes officers, they don't even have an office in Area 5 in your building; is that correct?

A. That's correct.

Q. This is several miles away, right?

A. Yes.

Q. And I'm not sure if you touched on this, but what's the general sort of attire that gang crime officers wear when they're executing their duties?

A. I've only seen them dressed in civilian dress.

Q. Okay. We're talking about casual civilian dress, right, like T-shirts, sweatshirts, and jeans?

A. Yes.

Mason - cross

1132

Q.   These are not guys who go around in suits and ties and sport coats like detectives, right?

A.   No.

Q.   And with respect to the general role of a gang crimes officer within the police department, their role is essentially to specialize in following up on leads in the sort of gang area, right?

A.   That's right.

Q.   They're guys that are sort of -- have their ears to the street about what's going on in gang culture and to sort of help facilitate, you know, all sorts of investigations which might touch on, you know, the gang area, right?

A.   Correct.

Q.   But as far as specific homicide investigations, when you have a criminal suspect who's been taken into custody, gang crimes officers are not responsible for interviewing suspects and taking statements and the like, are they?

A.   No.

Q.   Okay.  That's the job of detectives like yourself, right?

A.   Yes, sir.

Q.   So, when Mr. Guevara and Mr. Gawrys brought in Mr. Rios, I think you testified they just sort of handed them -- him off to you, right?

A.   That's right.

Q.   And Mr. Rios's name obviously had come up a little bit

earlier in this investigation through the confidential informants you talked about, right?

A. Yes.

Q. And, so, after Mr. Guevara and Mr. Gawrys handed Mr. Rios off to you, you essentially took over in dealing with Mr. Rios at that point; is that right?

A. That's right.

Q. And, in fact, I think you said that after Mr. Rios was placed in an interview room, you actually asked Mr. Guevara and Mr. Gawrys to go back out on the streets and try to find some other witnesses who had been -- names had been brought up in the investigation, right?

A. Yes.

Q. So, after they sort of handed off Mr. Rios to you, they're not even physically in the police station for a time; is that right?

A. That's correct.

Q. Okay. And just so we're perfectly clear here, at no point ever was Mr. Guevara in the room while you were interviewing Mr. Rios?

A. No, he wasn't.

Q. Okay. He was not there when you were asking Mr. Rios about, you know, the incident that occurred on June 27th, 1989, was he?

A. No.

Q.   At any point?

A.   No, sir.

Q.   So, you were not there --

       MR. SCAHILL:  Well, strike that.

BY MR. SCAHILL:

Q.   Mr. Guevara was not feeding information about the crime to Mr. Rios in your presence in an interview room at Area 5, was he?

A.   No.

Q.   You weren't doing that either?

A.   No, sir.

Q.   Okay.  But certainly Mr. Guevara was not in the room when any conversation was being had with Mr. Rios about the crime, was he?

A.   No, sir.

Q.   And Mr. Guevara also had not ever, that you saw, threatened Mr. Rios with loss of parental rights, did he?

A.   No, sir.

Q.   You didn't do that either, though, right?

A.   No, I didn't.

Q.   But certainly Mr. Guevara didn't do it in your presence because he wasn't even there at all, was he?

A.   That's correct.

Q.   Is there any doubt in your mind whatsoever that Mr. Guevara was nowhere in that interview room at the time that you were

Mason - cross

1135

interviewing Mr. Rios?  Any doubt in your mind?

A.   No.

Q.   Were you friends with Rey Guevara in 1989?

A.   I wouldn't say that, no.

Q.   He was just a guy who worked in the same -- had the same employer as you and would help out on investigations; is that about accurate?

A.   Yeah.

Q.   Okay.  And you're not friends with Rey Guevara now, are you?

A.   No.

Q.   I assume you probably haven't talked to him in decades; is that fair?

A.   Certainly not since I retired.

Q.   Okay.  So, it's not like you kept up with him over the years and you guys are buddies, is it?

A.   No.

Q.   I'm just going to ask you this directly.  Are you, as you sit here today, covering up Rey Guevara's role in the investigation into the murder of Luis Morales, sir?

A.   No, sir.

Q.   Okay.  You were asked some questions last week, and I believe we touched on this earlier today, about the arrest report for Mr. Rios.  Do you remember those questions?

A.   Yes, I do.

Mason - cross

1136

Q.   Okay.   Let me just find this.

MR. SCAHILL:   Actually, Carrie, can you put up 50 I.

This is in evidence, so if I can have this published to the jury, please.

BY MR. SCAHILL:

Q.   You were shown this exhibit last week, which is the arrest report for Mr. Rios, correct?

A.   Yes.

Q.   Now, you were asked a bunch of questions last week about this having the names as arresting officers of Officer Gawrys and Officer Guevara at the bottom in Box 1 and Box 2.   Do you see that?

A.   Yes, sir.

Q.   Now, first of all, this arrest report is sworn to by -- not by Officer Guevara, but by Officer Gawrys, right?

A.   Yes, it is.

Q.   And that's the typical role of a Box 1 officer, right?

A.   Generally, yes.

Q.   Now, this report lists a number of arresting officers.   Do you see that on the bottom?

A.   Yes, I do.

Q.   That is Vukonich, Zacharies, Guzman, Longos, Halvorsen, and then yourself, right?

A.   Yes, sir.

Q.   Now, Mr. Guevara did, in fact, bring Mr. Rios to the police

Mason - cross

1137

station on July 6th, right?

A.   Yes, he did.

Q.   And he handed him off to you?

A.   Yes.

Q.   So, his role was related in some fashion to the ultimate arrest of Mr. Rios, right?

A.   Yes, it was.

MR. S. RICHARDS:   Objection.

THE COURT:   Basis?

MR. S. RICHARDS:   Calls for a conclusion.

THE COURT:   It's overruled.   The answer stands.

BY MR. SCAHILL:

Q.   So, let me just ask you this just generally.   Is having an officer like a gang crimes officer or a tactical officer who has taken someone into custody but not been present for, say, an interview, is this at all unusual to have a report written in this fashion?

A.   No, sir.

Q.   Okay.   This is a very, very typical scenario when someone has performed some role leading to the arrest of an individual, isn't it?

A.   Yes, sir.

Q.   All right.   This report that has Mr. Guevara's name on it, this is not some flaw in your plan to conceal the identity of Mr. Guevara's being in that interview room, is it?

Mason - cross

1138

A. No, sir.

Q. This is exactly how these reports are written, isn't it?

A. That's correct.

Q. You were asked some questions about the confidential informants that had implicated Mr. Rios in the murder of Mr. Morales. Do you remember those questions?

A. Yes.

Q. Mr. Guevara brought in these confidential informants physically into the Area, didn't he?

A. Yes, he did.

Q. You saw them with your own two eyes, right?

A. Yes, I did.

Q. And you heard what they said with your own two ears, correct?

A. Yes, sir.

Q. And you heard them say the information that Mr. Rios had -- there had been rumors in the neighborhood that he was involved in the Morales murder, right?

A. That's correct.

Q. Okay. These people weren't concocted out of thin air by you, were they?

A. No, sir.

Q. And they were not concocted by Mr. Guevara either because you saw them, right?

A. That's correct.

Q. And you spoke to them, correct?

A. Yes, I did.

Q. And you heard them with your own ears give the information implicating Mr. Rios, right?

A. Yes, sir.

MR. SCAHILL: Going to Defendants' Exhibit 50 H. Can you pull that up, please. This is in evidence.

BY MR. SCAHILL:

Q. You were asked some questions about this supplementary report relating to the arrest of Mr. Rios. Do you remember those questions?

A. I do.

Q. Okay. And, again, as the arresting officers, this has eight people on there, right?

A. Yes, sir.

Q. And, again, we see your name and Detective Halvorsen as the first two, right?

A. Correct.

Q. And, then, a bunch of gang crimes officers on there, right?

A. Yes, sir.

Q. Are these people being listed on this report, is this some indication that Mr. Guevara was in the room when you were interviewing Mr. Rios leading to him giving his statements about his involvement? Is that what the inclusion of those names mean, sir?

Mason - cross

1140

A.   No.

Q.   Okay.  And, in fact, if you go to the body of the report --

     MR. SCAHILL:  Second page please, Carrie.

BY MR. SCAHILL:

Q.   This report in the first paragraph actually specifically talks about the things that Mr. Guevara did and then later on the things that you did, right?

A.   Yes, sir.

Q.   Okay.  The first paragraph talks about that:  In continuation of this investigation, the reporting detectives --

     That would be, first of all, you and Detective Halvorsen, right?

A.   Yes.  However, that -- it should be reporting detective.  That "S" is a mistake.

Q.   Oh, okay.

     Met with members of Gang Crimes North as outlined in the format section of this report.

     That's referring to what we just looked at, which is a list of names, right?

A.   Yes.

Q.   All right.  It says:  During this meeting, information was related by Officers Gawrys and Guevara that they had received information from a reliable informant relative to the identity of the wanted offender to this incident.  This person was identified to be a Jaime Rios with his address.  These officers

further related that the same informant has given them information in the past which has resulted in arrests and convictions in court. This same informant also supplied them with a nickname of the second offender, Tino, a Latin King gang member.

Right?

A. Yes, sir.

Q. And that's all what you testified to earlier today with respect to what Mr. Guevara had done with respect to bringing in the informants, right?

A. Yes.

Q. And, then, it gives some additional information, and then later on it's talking about, under Jaime Rios, Mr. Rios's interview, right?

A. Yes, sir.

Q. And that references things that you did with Mr. Rios; is that correct?

A. Yes, sir.

Q. At no point in this report does it indicate that Mr. Guevara was involved in the questioning of Mr. Rios, does it?

A. No.

Q. And that's because Mr. Guevara was not involved in the questioning of Mr. Rios, correct?

A. He was not.

Mason - cross

1142

MR. SCAHILL:  Carrie, can I please get 50 HH, in evidence.

Permission to publish.

BY MR. SCAHILL:

Q.  You were asked questions about your interview of Mr. Rios on direct.  Do you remember those questions?

A.  Yes, sir.

Q.  And you testified that when you were interviewing him, at points you were sort of jotting down some notes of things that he said during that conversation, right?

A.  Yes.

Q.  This is being done contemporaneously?

A.  Yes, sir.

Q.  Okay.  And this document here, referred to as a general progress report, is where you were taking those notes down, right?

A.  That's right.

Q.  And this is in your handwriting, right?

A.  Yes, it is.

Q.  This is not Officer Guevara's handwriting, is it?

A.  No, sir.

Q.  And there's no reference to Officer Guevara anywhere on this document, is there?

A.  No.

MR. SCAHILL:  I'm done with that.  Thank you.

BY MR. SCAHILL:

Q. The decision to arrest Mr. Rios, did you consult Officer Guevara about that decision?

A. No.

Q. Okay. Did you see the state's attorney speaking to Officer Guevara about whether Mr. Rios should be arrested?

A. No.

Q. And when Mr. Rios eventually gave a court-reported statement, Officer Guevara was not in that room when that happened, was he?

A. No, he wasn't.

Q. That was you, ASA Riley, and Mr. Rios and the court reporter, correct?

A. Yes.

Q. After that occurred, did you see Officer Guevara at any point speaking to ASA Riley and trying to pressure her into charging Mr. Rios with a criminal offense?

A. No.

Q. Did you ever see Officer Guevara have any contact whatsoever with ASA Riley in Area 5?

A. No.

Q. Did Officer Guevara ever pressure you to try to implicate Mr. Rios in a criminal offense?

A. No.

Q. Did he put any pressure or try to influence the way that

you conducted yourself in any way, shape, or form in your dealings with Mr. Rios?

A.   No.

Q.   You were asked some questions about an individual named Benjamin Carrero.  Do you remember those questions?

A.   Yes, sir.

Q.   You were in court here when Mr. Carrero testified last week, correct?

A.   Yes.

Q.   Okay.  And you heard him testify about him supposedly having some contact with Mr. Guevara in the police station, right?

A.   Yes, I did.

Q.   Okay.  You were actually the one who talked to Mr. Carrero, correct?

A.   Yes.

Q.   Okay.  Officer Guevara was not involved in -- that you saw, any sort of interview or contact with Mr. Carrero in the police station, was he?

A.   No.

Q.   And last week we heard Mr. Carrero say that Mr. Guevara was on the scene when the search warrant was executed at his house.  Do you remember him saying that?

A.   Yes, I do.

Q.   That is not true, is it?

Mason - cross

1145

A.   No, sir.

Q.   And, in fact, when we looked at --

MR. SCAHILL:  Can I have 50 O, please, in evidence.

BY MR. SCAHILL:

Q.   When a search warrant is executed on an individual's house, there's all kinds of paperwork involved, isn't there?

A.   Yes, sir.

Q.   There's the complaint for the search warrant saying why you're going to -- why you want to search somebody's house, right?

A.   Yes.

Q.   And, then, there's also a report that details who exactly is on the scene when a search warrant is being executed, right?

A.   That's right.

Q.   You are on the scene for the execution of the search warrant at Mr. Carrero's house because you are the detective that's involved in this homicide investigation, right?

A.   Yes, sir.

Q.   All right.  And this is the report that is filled out relative to who else is going to be on the scene during the execution of that search warrant, right?

A.   Yes.

Q.   And this includes yourself and one of your partners, Detective Curley, right?

A.   Yes.

Q. And also another one of your partners, Detective Enault?

A. Yes, sir.

Q. And, then, it has several -- these are uniformed officers, right?

A. Two uniformed officers, the last two.

Q. And by the way, you didn't fill this report out yourself, did you?

A. No.

Q. This was Sergeant -- help me with the name there.

A. Czarnecki.

Q. Czarnecki. Okay.

Sergeant Czarnecki is filling this out in the manner in which you've seen these filled out many, many times by listing the personnel who were on the scene, correct?

A. Yes.

Q. And nowhere in this report is there any reference to Mr. Guevara, is there?

A. No, sir.

Q. You were present with Mr. Carrero when he was telling you about Mr. Rios's admissions to him the night of the murder, right?

A. Yes.

Q. You heard Mr. Carrero say that Mr. Rios had come to his house that evening, right?

A. Yes.

Q. That he had given him a firearm, correct?

A. Yes.

Q. And that he had made statements -- that Mr. Rios had made statements to Mr. Carrero that he had used it in a shooting, right?

A. Yes.

Q. Mr. Guevara was not present when those statements were made, was he?

A. No.

Q. And you did not threaten Mr. Carrero to get him to make those statements, did you?

A. No.

Q. And you certainly didn't see Mr. Guevara threaten Mr. Carrero because Mr. Guevara was not even in the room when these statements were made; isn't that correct?

A. That's correct.

Q. Same thing with Mr. Rios. When you're talking to Mr. Carrero, you are jotting down some things that he's saying on a GPR, aren't you?

A. Yes, sir.

        MR. SCAHILL: Carrie, can I have Defendants' Exhibit 50 II, in evidence.

BY MR. SCAHILL:

Q. The document that was previously admitted into evidence as 50 II is your general progress report relative to your

Mason - cross

1148

communication with Benjamin Carrero, correct?

A. Yes, sir.

Q. Okay. And that is in your handwriting, right?

A. Yes, it is.

Q. You didn't sit down with Officer Guevara after he had talked to Carrero and you're writing down in your handwriting the things that Mr. Carrero said to Officer Guevara, are you?

A. No, sir.

Q. You were writing these things down as Mr. Carrero is speaking them?

A. That's correct.

Q. And there is no reference anywhere in this report whatsoever of Officer Guevara, is there?

A. No, sir.

        MR. SCAHILL: Can I have Exhibit 50 S, please, in evidence.

BY MR. SCAHILL:

Q. This is a arrest report for Mr. Carrero from July of 1989?

A. Yes, sir.

Q. Okay. And is this a true and accurate copy of this arrest report?

A. Yes, it is.

        MR. SCAHILL: Can't remember if we admitted this, but if not, I'd seek to admit this into evidence.

        THE COURT: Any objection?

MR. S. RICHARDS: No objection.

THE COURT: 50 S is admitted. It may be published.

(Defendants' Exhibit 50 S received in evidence.)

BY MR. SCAHILL:

Q. You see the names on this report of the police personnel involved in this arrest?

A. Yes, I do.

Q. Okay. And who are those persons?

A. That's myself, Detective Curley, Detective Enault, Detective O'Donnell.

Q. Okay. Is there any reference whatsoever in this report to Officer Guevara?

A. No, sir.

Q. And is that because Officer Guevara had no role whatsoever in Mr. Carrero's arrest that you were aware of?

A. That's correct.

Q. Moving on to Cristino Garcia. Later that month in July, around July 29th of 1989, Mr. Garcia was in the Area 5 police station?

A. He was in the 25th District lockup.

Q. Okay. Did he get brought over to Area 5, or did you go over there to talk to him?

A. Well, I work in Area 5. The lockup is downstairs in 25th District.

Q. So, lockup's -- the 25th District lockup's in that

building?

A.   Yes.

Q.   Got it.  Okay.

So, you became aware that he was there, right?

A.   Yes.

Q.   And obviously he had been named in this Morales investigation before this, right?

A.   That's correct.

Q.   You're looking for him?

A.   Right.

Q.   And you are the detective -- one of the detectives who is involved in investigating this crime, right?

A.   Yes, sir.

Q.   So, you wanted to talk to this guy?

A.   I did.

Q.   Did you become aware of how Mr. Garcia had gotten into the police station that day?

A.   If it's listed on the arrest report, I would --

MR. SCAHILL:  Let's go to Defendants' Exhibit 50 DD.

This is in evidence.  Permission to publish.

BY MR. SCAHILL:

Q.   Do you see this Chicago Police Department supplementary report relating to the arrest of Cristino Garcia?

A.   Yes.

Q.   Who were the arresting officers for Cristino Garcia?

A.   So, that's Gang Crime Specialist O'Quinn and Gang Crime Specialist Mertes.

MR. SCAHILL:  If we can go to the --

BY MR. SCAHILL:

Q.   Well, first of all, on this first page there is no reference whatsoever to Officer Guevara, is there?

A.   No, sir.

MR. SCAHILL:  Second page.

BY MR. SCAHILL:

Q.   This is a narrative of the actions that were taken with respect to Mr. Garcia after he was in the police station, fair?

A.   Yes, sir.

Q.   And this -- we don't have to read line by line here, but in essence, this describes you talking to Mr. Garcia, advising him of his Miranda rights, and him declining to give a statement, right?

A.   That's correct.

Q.   And, then, I believe you testified about Felony Review coming and concurring that there was not sufficient evidence to hold and charge him, right?

A.   That's right.

Q.   Is there any reference in this narrative to any role that Officer Guevara played in any dealings whatsoever with Cristino Garcia?

A.   No, sir.

Mason - cross

1152

Q. And that's because Officer Guevara was not involved, that you saw, in any contact with Mr. Garcia at all, was he?

A. No, sir.

Q. And according to this, the persons who physically brought Mr. Garcia into the police station was Quinn and Mertes, it was not Guevara and Gawrys or Guevara and someone else, was it?

A. That's correct.

Q. I touched on this a little bit earlier, but after Mr. Rios gave his statement to the court reporter and ASA Riley, you did not see Officer Guevara speaking with Officer Riley at all, did you?

A. With --

Q. I'm sorry, with ASA Riley.

A. No.

Q. Okay. When Mr. Polick was asking you these questions, I think you touched on this, but charging decisions, whether somebody is going to be charged with a felony like a murder, that is not the decision that any police officer makes, is it?

A. No, sir.

Q. That is a hundred percent the job of the Cook County State's Attorney's Office?

A. That's correct.

Q. All right. But the police give the state's attorneys access to reports and things like that, right?

A. Yes.

Mason - cross

1153

Q.   You are not aware of any information whatsoever that Mr. Guevara was involved in the charging decision for Mr. Rios for this crime, are you?

A.   No, sir.

Q.   You certainly didn't see him taking any steps with the state's attorney to try to pressure them or encourage them to charge Mr. Rios, did you?

A.   No, sir.

Q.   You were asked questions by Mr. Polick at the end there about your knowledge that these post-conviction proceedings were going on and the Certificate of Innocence proceedings.  Do you remember those questions?

A.   Yes, I do.

Q.   And in 2000- -- 2021 and 2022, you were local, weren't you? You lived in this area, didn't you?

A.   Yes, sir.

Q.   Okay.  You were not in hiding, were you?

A.   No, sir.

Q.   If the State's Attorney's Office had called you up and said, Detective Mason, we're looking into this case that you investigated back in 1989, would love to hear your perspective on it because, you know, the guy that you were involved in the investigation filed a post-conviction, would you have helped out with that?

A.   Absolutely.

Mason - cross

1154

Q.   Would you have given them your recollections of the things that you recall happening back in those days?

A.   Yes, I would have.

Q.   You wouldn't have refused to participate in that, would you?

A.   No.

Q.   That -- maintaining the integrity of the cases that you've worked on, it's important to you, isn't it?

A.   Yes, it is.

Q.   Did you take pride in your job as a detective?

A.   I do.

Q.   And even if it was decades later and you're retired, you would have helped out, wouldn't you, if they called you up?

A.   Absolutely.

Q.   Would you have told them the same thing that you've told this jury today and last week?

A.   Yes.

Q.   Would you -- if they asked you whether Mr. Guevara was involved in questioning Mr. Rios, would you have told them, absolutely not, he was not involved in that?

A.   That's correct.

Q.   You would have told them about your contacts with Mr. Carrero and how you interviewed him, not Mr. Guevara, right?

A.   Yes.

Mason - redirect

1155

Q. You would have denied that there was any sort of threats or anything to Mr. Carrero if they had asked you?

A. Correct.

Q. And same thing with Mr. Garcia, you would have said, Rey Guevara was not involved in any interview that I saw of Mr. Garcia.

You would have told them that, right?

A. Yes.

Q. You also would have told them, had they asked you, that you were literally in the lineup room with Mr. Huertas when immediately when those curtains opened, he says, that's the guy, that's the guy who shot my friend?

A. Yes, I would have.

Q. But nobody ever asked you that, did they?

A. No.

Q. You only found out about all of this after you got notified that Mr. Rios was suing you in a civil lawsuit; isn't that correct?

A. That's correct.

MR. SCAHILL: I have no more questions, Judge. Thank you.

THE COURT: Mr. Richards.

REDIRECT EXAMINATION

BY MR. S. RICHARDS:

Q. Detective Mason, since this has been brought up, you

Mason - redirect

1156

remember the questions about socializing and partnership, and so forth?

A.   Yes.

Q.   Okay.  In fact, after Detective Guevara became a detective, he partnered with Detective Halvorsen, correct?

A.   He did.

Q.   And that went on for many years, correct?

A.   It did, yes.

Q.   Now, you also said that gang specialists had no office at Area 5, correct?

A.   Correct.

Q.   But there's no prohibition about gang specialists going in and out of Area 5, was there?

A.   No.

Q.   In fact, you've detailed interactions with gang specialists throughout this case -- throughout the case of the investigation of the murder of Luis Morales, correct?

A.   Yes, sir.

Q.   For example, without any assignment from you, Gang Specialist Noon brought in Luis Huertas to speak with you originally, right?

A.   That's correct.

Q.   And Luis Huertas was not even listed as a witness in the case officer's reports, correct?

A.   That's right.

Q.   So, the first time anyone knew that he was a potential witness was when Gang Specialist Noon brought him in, right?

A.   Yes.

Q.   And, by the way, you're aware that Luis Huertas said he was not only there and present and witnessed the shooting, but that he went over to the victim, he held him in his arms, and he got blood on him from the victim, correct?

A.   He never told me that.  He never gave me that kind of detail, no.

Q.   Okay.  So, would it surprise you to learn that that's what he testified to in court?

A.   If that's what he testified, then I guess I wouldn't be surprised, no.

Q.   And do you have any idea how the beat officers would miss someone in their initial report who is so close to the scene that he not only witnessed the shooting, but held the dying victim in his arms and got blood on him?

          MR. POLICK:  Objection.

          THE COURT:  Sustained.

BY MR. S. RICHARDS:

Q.   Now, let's talk about the number of people on the arrest report.  And I heard your explanation.  What you're maintaining is that -- well, first of all, it was said a moment ago, and maybe this is misspoken, that Detective -- I'm sorry, Gang Specialist Guevara turned Mr. Rios from his custody into your

Mason - redirect

1158

custody.  Is that a fair statement or no?

A.  No.  He wasn't in custody.

Q.  At all?

A.  No.

Q.  Well, you didn't know how -- you weren't present when Gang Specialist Guevara first encountered him, were you?

A.  No.

Q.  You weren't out on the scene in front of 1440 North Leavitt, were you?

A.  No, sir.

Q.  Now, with respect to Macho Melendez, he got to the station under his own steam, right?

A.  Yes.

Q.  He just walked right in, right?

A.  That's correct.

Q.  He came in voluntarily to give his alibi, right?

A.  Yes, sir.

Q.  Nobody had to drive him?

A.  No.

Q.  Six officers didn't have to go out to escort him voluntarily into the station, did they?

A.  No.

Q.  Okay.  Now, let me talk to you a little bit about your investigation in terms of your conversations with Jaime Rios. First of all, in your initial conversation with Jaime Rios, did

you ask him what he did with the gun?

A. I don't believe I asked him.

Q. Okay. In the conversation, did Barbara Riley ask him what he did with the gun?

A. Yes, sir.

Q. Okay. And did he tell Barbara Riley what he did with the gun?

A. He said that he threw it in the lake.

Q. Okay. That was before the court-reported statement. You're saying that he said he threw it in the lake?

A. I don't know if it was -- it was during the court-reported statement.

Q. Well, I'm going backwards before the court-reported statement. Was that something said during the court-reported statement only, or was it said before, when you and Barbara Riley were speaking with him?

A. I don't recall exactly what was spoken during those conversations.

Q. Okay. And you didn't keep detailed notes of what happened during that conversation between you, Barbara Riley, and Jaime Rios, did you?

A. No, sir.

Q. Did you ask Jaime Rios what he was wearing during the shooting?

A. I don't recall if I asked him that.

Mason - redirect

1160

Q.   All right.   Well, you knew that multiple witnesses had described the shooters as wearing British Knights shoes, correct?

A.   Yes.

Q.   Did you ever ask Jaime Rios either -- what kind of shoes he was wearing?

A.   I don't recall, sir.

Q.   Did you ever ask Jaime Rios whether he was wearing British Knights shoes?

A.   I don't recall.

Q.   When you -- you say that you went into the room with Barbara Riley, Jaime Rios had been handcuffed by you to the ring on the wall, right?

A.   Yes, sir.

Q.   In Barbara Riley's presence, you unhandcuffed him, right?

A.   Correct.

Q.   Okay.   And, then, when you and Barbara Riley and Jaime Rios finished that conversation, you again handcuffed him to the wall before Barbara Riley left, correct?

A.   I don't know if it was before Barbara Riley left or after.

Q.   Okay.   But, again, he was handcuffed to the wall, right?

A.   Not a hundred percent certain if he was handcuffed to the wall --

Q.   Okay.

A.   -- at that point.   I don't recall.

Q. Fair enough.

So, you're saying that this person under arrest in this interrogation room, that you left him unhandcuffed while you went to speak with Barbara Riley. That's possible, you're saying?

A. Yes, sir.

Q. Okay. It's also possible he was handcuffed, correct?

A. Correct.

Q. Now, when he was taken from the interview room to the interrogation room, was he in handcuffs?

A. No, sir.

MR. POLICK: Objection to the form.

THE COURT: Overruled.

BY MR. S. RICHARDS:

Q. After the court-reported statement, Barbara Riley was not -- hearing the court-reported statement, Barbara Riley was not ready to make a charging decision, fair?

A. Correct.

Q. She wanted more?

A. She did.

Q. Okay. And one of the "more" things that you guys could think of to do is to put Jaime Rios in a lineup and have a witness come view him in the lineup, right?

A. Yes, sir.

Q. That turned out to be Luis Huertas, right?

Mason - redirect

1162

A.   Correct.

Q.   And Luis Huertas was brought to view the lineup by Officer Guevara, correct?

A.   I don't recall how he got there.

Q.   Okay.  Have you ever had occasion to see Officer Guevara's testimony where he said that he brought him to the lineup?

MR. SCAHILL:  Objection to the form of the question.

MR. POLICK:  Join.

THE COURT:  It's overruled.

You can answer.

BY MR. S. RICHARDS:

Q.   Have you ever seen Guevara's -- in your preparation, have you ever seen Guevara's testimony at trial that Guevara brought Huertas to that lineup?

A.   I have not seen that, no.

Q.   Do you know of any other witness who Guevara brought to any lineup?

A.   I don't -- I don't recall.

Q.   Okay.

A.   I don't recall.

Q.   All right.  Well, Huertas, of all the witnesses, was the only witness who identified Jaime Rios in a lineup, fair?

A.   Yes.

Q.   Now, another way of corroborating Jaime Rios's statement would be to locate -- one way would be locate the clothes,

Mason - redirect

1163

right, the British Knights gym shoes?

MR. SCAHILL:  Objection.

THE COURT:  Overruled.

BY MR. S. RICHARDS:

Q.   That would be one measure of corroboration, if you had found that he did, in fact, own or have possession of British Knights gym shoes, right?

A.   I don't know how definitive that would be.  I mean, those are pretty popular shoes.  A lot of people own those.

Q.   But that would be one piece of evidence, correct?

A.   I guess so.

Q.   Well, let's talk about a more definitive piece of evidence. Another piece of evidence might be the gun that was used in the shooting, correct?

A.   Yes.

Q.   Because the gun might have Jaime Rios's fingerprints on it?

A.   It's possible.

Q.   The gun might match the ballistics evidence that you had, right?

A.   That's possible.

Q.   The gun, for example, if -- in terms of the .25-caliber shells, had you been able to find a gun in Jaime Rios's possession, you might have been able to match the shell casings to the gun, right?

A.   Yes, sir.

Mason - redirect

1164

Q. Okay. That never happened, right?

A. No, sir.

Q. Now, there's two ways to search a property or a house, right?

A. Two ways?

Q. Two legal ways, right?

A. Oh, okay.

Q. Let's go for the legal ways. Forget the illegal ones. Put those aside. Let's go for the legal ones.

MR. POLICK: Objection.

THE COURT: Sustained.

BY MR. S. RICHARDS:

Q. One legal way to search a house is by a search warrant?

A. Correct.

Q. And you described, in fact, how you got search warrants for two houses which the confidential informants informed you would be the places to find a gun, right?

A. Yes.

Q. Now, in fact, in terms of one of those properties, 1419 North Wicker Park, there was a little problem in terms of matching the information in the warrant to the actual property when you got there, right?

A. Yes.

Q. Okay. And that's kind of what you were hinting at before or describing, right? The fact that there's a garden

Mason - redirect

1165

apartment, right?

A.   Correct.

Q.   First floor apartment, right?

A.   Yes.

Q.   And then second or third floor apartment depending on how you define, it right?

A.   Yes, sir.

Q.   Now, when you -- your search warrant, which was shown before, said that Benjamin Carrero lived in the second floor apartment, right?

A.   That's right.

Q.   Turned out it was more accurate to say he lived in the first floor apartment, right?

A.   Yes, sir.

Q.   And, so, when you got there with a warrant and found that the number's wrong or possibly wrong, that could be a big problem with the warrant, right?

A.   It could be.

Q.   It might be later challenged in court that you got the wrong apartment, wasn't the right place, something like that, right?

A.   Yes.

Q.   But there was a way -- a legal way -- of fixing that, right?

A.   Yes, sir.

Mason - redirect

1166

Q.   The legal way of fixing that was to ask the resident of the first floor apartment, which is the right apartment, for a permission to search, right?

A.   Yes, sir.

Q.   And that's exactly what you did.  You got a permission to search from Theresa Carrero, right?

A.   Correct.

Q.   Totally voluntary, no pressure, she gave the permission to search, right?

A.   Yes, sir.

Q.   Now, the original confidential informants informed you that Jaime Rios lived at 1440 North Leavitt, right?

A.   Yes.

Q.   You --

A.   Yes, sir.

Q.   Okay.  So, you knew that was his address, right?

A.   Correct.

Q.   And, in fact, that same address is in the court-reported statement, right?

A.   I believe it is.

Q.   And there's also a reference, at least in the statement, to his mother's address at Wolcott, right?

A.   I -- it sounds correct.

Q.   All right.  Well, Jaime Rios was cooperating with you to the extent that he was talking to you, right?

A.   Yes.

Q.   Wasn't asking for a lawyer?

A.   No, sir.

Q.   Wasn't saying, hey, wait a minute, hold the phone, stop the interrogation, was he?

A.   No, sir.

Q.   He signed the statement, right?

A.   Yes, he did.

Q.   He signed the statement voluntarily, right?

A.   Yes, sir.

Q.   And naturally, since you were looking for the gun, you gave him a permission to search form and said, hey, Jaime, could you give us permission to search your residence, 1440 North Levitt? Didn't you do that?

A.   No, sir.

Q.   And did you also at that point talk to Barb Riley and draft up -- at this point the information you had was that a gun was involved, right?

A.   Yes, sir.

Q.   You had information that Jaime Rios lived at 1440 North Leavitt, right?

A.   Correct.

Q.   You had his story that he threw the gun in the lake, right?

A.   Yes.

Q.   And you didn't believe that for a minute, did you?

Mason - redirect

1168

A.   Not necessarily, no.

Q.   But you never got a warrant -- never either got permission from him to search 1440 North Leavitt, nor did you get a warrant to search 1440 North Leavitt, did you?

A.   No, sir.

Q.   And the reason you didn't do that is that Officer Guevara had told you that he had already searched 1440 North Leavitt, and you knew, since it had been searched, no gun would be found there, correct?

MR. SCAHILL:  Objection.

MR. POLICK:  Objection.

THE COURT:  Basis?

MR. SCAHILL:  Foundation.  Assumes facts.

THE COURT:  We'll take our afternoon break.  We'll come back at 3:00 p.m.

All rise.

(Jury out at 2:28 p.m.)

THE COURT:  You can step down, Detective.

What's the foundation for this question, Mr. Richards?

MR. S. RICHARDS:  I believe it's a reasonable inference from all of his actions.  One explanation of his actions is something else, and I have no idea what it was. Another explanation is that he knew that 1440 North Leavitt had already been searched.  Only one person could have told him that:  Guevara.

THE COURT: Well, there's two inferences there, right? One is that he knew there was no gun at the address. And two is that he knew there was no gun because Guevara told him that he had searched and there was no gun.

So, there's also the objection of assuming facts not in evidence. And we've talked about these inferences where you're asking questions that there's been no basis for evidence-wise yet and yet you continue to do it.

What evidence in the record supports these inferences that you are trying to draw?

MR. S. RICHARDS: One, the -- well, Jaime Rios will testify -- and I can recall Mason after Jaime Rios testifies. Jaime Rios will testify that the house was searched by Guevara and his group of gang specialists. So, if I will -- I think the question can be asked subject to connection because Jaime Rios is going to testify to that, as he testified at the motion to suppress, as he testified at trial, that the house was searched.

In terms of any gun being found, apparently no gun was found because no gun was ever produced from that search of 1440 North Leavitt. So, I think that's a reasonable basis to ask the question.

So, there's two explanations for the failure to seek either consent to search or a search warrant from that house. One inference is that -- or one explanation, which Mason's free

to give, is, I guess, you know, I was not -- you know, I was not attentive or I didn't know or it didn't occur to me or something like that; or the other explanation is he was told by someone, very reasonably Guevara, that the house at 1440 North Leavitt had been searched, which is why he was not interested in that until coincidentally -- or any search for the gun until coincidentally Guevara comes to him with the same two informants and they start giving information as to where the gun can be found in other places.

So, I do agree that it's subject to connection that I have to show evidence that the house was searched.

THE COURT: Right. But the way you phrased --

MR. S. RICHARDS: I can do that.

THE COURT: The way you phrased the question is as though all of those connections have been drawn. And I understand the defendants' objection to that, and I'm going to sustain the objection because this is cross. It takes steps.

And I would imagine these questions come out like, you know there was no gun at Rios's house, right? You get your answer, and if the answer is one that supports a follow-up question, it's, and that's because someone told you, didn't they? And that person was Guevara?

But it's not spouting it all out at once. Because there's no foundation in the record, at least to date, for that. And, so, the objection is sustained.

Mason - redirect

1171

You can try to get there another way, but the way you're doing it is not permissible and will not be allowed.

I'd also caution you against asking lay witnesses legal questions.  There are more than two ways to search a house.  You mentioned the warrant, the consent.  There's exigent circumstances, and there are probably other ways that I'm not thinking of.  There's no reason whatsoever to get into the various legal ways, and there's definitely no reason to hint at or to state in front of the jury or to suggest, absent evidence, illegal ways.  Inappropriate.  You do it again, I will admonish you in front of the jury.

Do you understand?

MR. S. RICHARDS:  Yes.

THE COURT:  Anything else?

MR. SCAHILL:  No.

MR. POLICK:  No, your Honor.

MR. S. RICHARDS:  No.

THE COURT:  See you at 3:00.

(Recess at 2:33 p.m., until 3:00 p.m.)

(Change of reporters.)

(Jury in at 3:00 p.m.)

THE COURT: Welcome back.

Before we broke, there was an objection. The objection is sustained. And I'll take this opportunity to remind you that questions and objections or comments by the lawyers are not evidence. It's the answers that the witness gives that are the evidence.

Mr. Richards, you may proceed.

MR. S. RICHARDS: Thank you.

BY MR. S. RICHARDS:

Q. I would like to go to a somewhat different topic. A revolver was recovered at Benjamin Carrero's house, right?

A. Yes, sir.

Q. We've been over this before. A revolver has a cylinder, right?

A. Yes, it does.

Q. And the cylinder holds the ammunition?

A. Correct.

Q. An unfired cartridge consists of a shell and a bullet, right?

A. Yes, sir.

Q. A fired or spent cartridge just consists of the shell?

A. Correct.

Q. A revolver cylinder holds both the unfired cartridges and the fired cartridges, right?

Mason - redirect

1173

A.  Yes.

Q.  Now, the gun that was recovered at Benjamin Carrero's house, if you remember, did it hold five or six cartridges?

A.  I have no recollection.

Q.  Okay.  Do you have any recollection whether the gun was fully loaded?

A.  I do not.

Q.  Were all the bullets unfired in the cylinder?

A.  I have no recollection if there were bullets in the gun.

Q.  Okay.  By the way, did you find in the search any ammunition for that gun, or do you remember?

A.  I don't recall finding ammunition.

Q.  Okay.  Now, the statement that you, the statement that you said that Carrero said that Jaime Rios said, "Hold this gun for me.  I've just shot somebody," correct?

A.  Yes, sir.

Q.  Okay.  That would apply that the victim had been shot by that gun, right?

A.  Yes.

Q.  Okay.  But the ballistics evidence we have is of .25 caliber shell casings at the scene, correct?

A.  Yes, that's correct.

Q.  And we have nothing definitive at the scene of a revolver being fired, correct?

A.  No, sir.

Mason - redirect

1174

Q.   Just a couple questions.  In terms of 1440 North Leavitt, do you remember, you don't know the name, but there was a person who appeared to be Jaime Rios's girlfriend at the station, right?

A.   Yes.

Q.   Okay.  And was it your understanding that she also lived at 1440 North Leavitt?

A.   I have no recollection of where she lived.

Q.   Okay.  But you also never asked her for a consent to search any place including 1440 North Leavitt, fair?

A.   Yeah, I did not.

Q.   And to your knowledge, no one else did either?

A.   No, sir.

Q.   There was a number of questions about petitions to vacate.  Do you remember those?

A.   Could you repeat what you --

Q.   I'm sorry.  We were talking -- the other attorneys were talking to you about petitions to vacate, things filed in the Circuit Court vacating people's convictions.  Do you remember that?

A.   Yes, sir.

Q.   Have you ever been contacted by the State's Attorney's office with respect to a petition to vacate or a post-conviction petition, something of the sort?

A.   No, sir.

Q.   Not in your entire career, correct?

A.   Correct.

          MR. S. RICHARDS:  Nothing further.  Thank you.

          THE COURT:  Okay, Mr. Polick.

          MR. POLICK:  Very briefly, Your Honor.

                    RECROSS-EXAMINATION

BY MR. POLICK:

Q.   Mr. Mason, did you direct Gang Crimes Officer Noon to bring in witness Luis Huertas in to Area 5?

A.   No, sir.

Q.   Did you direct Gang Crime Officers Guevara and Gawrys to bring Mr. Rios in to Area 5?

A.   No, sir.

Q.   Going back to when ASA Riley arrived at Area 5 to interview Mr. Rios, do you recall that?

A.   Yes, sir.

Q.   Once she arrived, were you compelled to take any notes or general progress reports of her interview of Mr. Rios?

A.   No, sir.

Q.   Were you compelled to do any notes or GPRs of her statement of Mr. Rios?

A.   No, sir.

Q.   At any time, did ASA Riley direct you to get a search warrant for Mr. Rios's home at 1440 North Leavitt?

A.   No.

Q.   At any time, did ASA Owen, who came later and eventually charged Mr. Rios, did ASA Owen ever ask you to go get a search warrant for Mr. Rios's residence?

A.   No.

MR. POLICK:  Thank you.  Nothing further, Your Honor.

THE COURT:  Mr. Scahill.

MR. SCAHILL:  Nothing further.  Thank you.

THE COURT:  Mr. Richards.

MR. S. RICHARDS:  Nothing further.  Thank you, Your Honor.

THE COURT:  All right.  You may step down.

(Witness excused.)

THE COURT:  Who will the next witness be?

MR. J. RICHARDS:  Jaime Rios.

THE COURT:  All right.  Please raise your right hand.

(Witness duly sworn.)

THE WITNESS:  Yes, sir.

THE COURT:  You may take a seat.

You may start when the witness is settled.

MR. J. RICHARDS:  May I proceed?

THE COURT:  Yes.

JAIME RIOS, PLAINTIFF HEREIN, DULY SWORN,

DIRECT EXAMINATION

BY MR. J. RICHARDS:

Q.   Jaime, in a loud, clear voice, please state your full name

for the record and spell it for the benefit of the court reporter.

A.   Jaime, J-A-I-M-E, Rios, R-I-O-S.

Q.   You are the plaintiff in this case?

A.   Yes, sir.

Q.   Besides Jaime Rios, have you used any other names?

A.   Jaime Rotger, James Rotger.

Q.   Can you please spell Rotger?

A.   R-O-T-G-E-R.

Q.   Where does that name come from?

A.   That's a German name.  It comes from my mom.  My grandfather was a German.

Q.   So it's your mother's maiden name?

A.   Yes, sir.

Q.   How old are you?

A.   I'm 56 right now.

Q.   What's your birth date?

A.   September 28, 1969.

Q.   Where were you born?

A.   Puerto Rico.

Q.   Where do you currently live?

A.   I live at 2224 North Lowell Avenue, Chicago, Illinois 60639.

Q.   How long have you lived at that address?

A.   I've been at address about 10 years.

Rios - direct

1178

Q.   The neighborhood where you live at right now, what's the name of that neighborhood?

A.   I believe it's -- at this moment I don't, I don't remember what that neighborhood name is.

Q.   How long have you lived in that neighborhood for?

A.   I lived in that neighborhood about the 10 years that I've been there right now.

Q.   Besides yourself, who else do you live with at that address?

A.   I live there with my wife.

Q.   What is your wife's name?

A.   Bobbie Byers Rios.

Q.   How is Byers spelled?

A.   B-Y-E-R-S.

Q.   And besides your wife, do you live there with anyone else?

A.   Yes.  Upstairs, my mom got the apartment upstairs.

Q.   So how many units are in the home then?

A.   I got two units.

Q.   And do you and your wife live in the first floor unit?

A.   We live in the first unit.

Q.   Do you own or rent?

A.   We own.

Q.   Is there a mortgage on the house?

A.   Yes, sir.

Q.   And when did you first start the process of purchasing that

home?

A.   It started like close to 10 years ago.

Q.   Are you currently employed?

A.   Yes, sir.

Q.   What is your job?

A.   I work for Hyatt Regency Hotel in Deerfield.

Q.   What do you do for Hyatt Regency?

A.   I'm an engineer, building engineer.

Q.   What are your duties as a building engineer?

A.   A building engineer, I fix plumbing, electricity, walls, whatever it is that I need to fix for the building to keep running and for the guests who have a well stay in the hotel. I make sure everything is properly running for they can go ahead and be able to have a good stay.

Q.   How long have you been doing that job for?

A.   I've been in that job for 10 years.

Q.   Is that a full-time or a part-time job?

A.   Full-time, sir.

Q.   Before that job, were you employed?

A.   Yes, sir, I was.

Q.   What were you doing at your prior job?

A.   I was working for Airways Systems.

Q.   What did you do for Airways Systems?

A.   Airways Systems, what we were doing was just local or commercial cleaning ductworks, cleaning the vents from

restaurants, basically all type of ductwork cleaning.

Q. And how many years have you been doing that? How many years did you do that for?

A. I did that about three years.

Q. Now, your wife Bobbie, how long have you been married to her?

A. I've been married to her about, what, 13 years.

Q. Is your wife employed?

A. Yes.

Q. What does she does?

A. She's in IT for United Airlines.

Q. Do you have any children?

A. Yes, I do.

Q. How many children do you have?

A. I have a son with Diana Rodriguez, and I got, have a stepson with my wife.

Q. Let's start with your son with Diana Rodriguez. What is his name?

A. Jaime Rios, Jr.

Q. What year was Jaime Rios, Jr. born?

A. He was born May 18, 1889.

Q. 1889?

A. 1989.

Q. And you mentioned Diana Rodriguez. Who is Diana Rodriguez?

A. That's the mother of my child, or Jaime Rios.

Rios - direct

1181

Q. How old is Jaime Rios, Jr. now?

A. Right now he's 36. He'll be 37 May 18.

Q. And does Jaime Rios, Jr. live with you?

A. No, sir.

Q. What does Jaime Rios, Jr. do?

A. He lives in and works in, he lives in Ohio and he works in -- he's a marine. So he's doing, he's doing protected duty in a company that's building planes.

Q. Now, you mentioned your stepson. What is your stepson's name?

A. Cam Jones.

Q. Does your stepson live with you and your wife?

A. No, he does not.

Q. How old is your stepson?

A. He's 36.

Q. Do you have any grandchildren?

A. Yes, I do.

Q. How many?

A. I've got five.

Q. Now, you mentioned your mother who lives upstairs. What is your mother's name?

A. Soccoro Rotger.

Q. How do you spell Soccoro?

A. S-O-C-C-O-R-O.

Q. Does your mother currently work?

A.   No.   She's retired.

Q.   What did she do before she was retired?

A.   She was a security guard for CPD or Chicago police, Chicago school system.

Q.   What school was she a security guard at?

A.   She was a security guard at Moos School on California and Shakespeare.

Q.   Now, you mentioned that you were born in Puerto Rico?

A.   Yes, sir.

Q.   Where in Puerto Rico were you born?

A.   I was born in Santurce, Puerto Rico.

Q.   Puerto Rico is an island, right?

A.   Yes, sir.

Q.   Part of the United States, right?

A.   Commonwealth.

Q.   What part of the island is that town located in, the east or west, north, south?

A.   It's on the east side of San Juan.

Q.   And about until what age did you live in Puerto Rico?

A.   About 6 or 7.

Q.   When you were in Puerto Rico as a child, who did you live with?

A.   I lived with my mom, my father and my father's family, my grandfather, my aunts, my uncles from my father's side.

Q.   Did you have any siblings?

A.   Yes, I did.

Q.   How many siblings do you have?

A.   I got two brothers, two older brothers, and I got a younger sister, younger than me.

Q.   Now, your two older brothers, what are their names?

A.   Juan Rios, he's the oldest, Ricardo Rios is the second oldest, and my little sister is Elizabeth Rios.

Q.   Were your parents married?

A.   Yes, they were.

Q.   In Puerto Rico, did your father work?

A.   Yes.

Q.   What did he do?

A.   He was working for a tire company.

Q.   And did your mother work?

A.   Yes.

Q.   What did she do?

A.   She was working for the Catholic school.

Q.   What was your dad's highest level of education?

A.   My dad didn't have a higher level of education for the simple fact his mom died when he was 13, so he had to, he had to turn around and take care of his siblings because he was one of the oldest ones.  And he never really finished school or anything, so my father was illiterate.

Q.   And the neighborhood you lived in in Puerto Rico, what was it like?

A.   It was more like city and country life together, like a mixture of country and city together.

Q.   What were the activities that you would do there in Puerto Rico?

A.   Well, since my brothers were older than me, and they were able to go out the gate, I used to always stay behind the gate with my grandfather doing chores, like making, making cages for the birds, for the pigeons that he used to grab around the house, for the chickens; go fishing in the back of the house, because there was a lagoon right behind the house.

And used to do a bunch of chores like helping my grandfather around the house and clean up, fixing stuff, learning how to use little tools and just stuff like some type of country stuff, like, you know, cutting sugarcanes, knocking down coconuts.

Q.   Now, you mentioned your father.  Did your father always live with you in Puerto Rico?

A.   No.  He left, he left like in, when I was like about probably 4 years old or 5 years old, he left to New York.

Q.   New York state or New York City?

A.   New York City.

Q.   And when he left, did that change anything at home?

A.   Yeah.  My mom stopped working for the Catholic school.  And she got enough money to leave from Chicago and we came -- leave from Puerto Rico and we came to Chicago.

Q.   Now, how old, how old were you when you came to Chicago?

A.   We got here in '76, so I was like probably 8 or 9.

Q.   Now, in Puerto Rico, did you speak Spanish or English?

A.   Pure Spanish.

Q.   And was Spanish your first language?

A.   Yes, sir.

Q.   So when you arrived to Chicago, did you know any Spanish at all -- any English at all?

A.   No.

Q.   How did you come to learn English then?

A.   Oh, hanging out with the guys in the street, running around with the guys in the neighborhood, the little friends that I had, and going to school.

Q.   When you moved to Chicago, did you move with your mother?

A.   Yeah, we came here with my mother, and we lived with my mom, yes, sir.

Q.   Did your siblings come as well?

A.   Yes, sir.

Q.   Now, when you came to Chicago, did your mother speak English?

A.   No, sir.

Q.   She only spoke Spanish?

A.   Yes, sir.

Q.   And was -- and did your -- was your mother the breadwinner of the family?

Rios - direct

1186

A.   Yes, sir.

Q.   You mentioned that she was a security guard at the local school.  Is that the first job she had when you guys moved to Chicago?

A.   No.  She had a crossing guard first.  She was a crossing guard for Andersen School on Wolcott and Division.

Q.   Now, approximately would you say how long it took you to learn to read and write English when you arrived in Chicago?

A.   It took about two to three years.

Q.   When you first moved to Chicago, where did you live?

A.   I lived on 1246 North Wolcott.

Q.   On Wolcott, did you live with your mother?

A.   Yes, sir.

Q.   Did you live with your siblings?

A.   Yes, sir.

Q.   The place on Wolcott, was that an apartment building or a single family home?

A.   It was, it was an apartment building.

Q.   What floor did you guys live on?

A.   They only had one floor, because downstairs it was a social club where they play pool, where they play music and drinking and play domino.

Q.   Now, where you were living, what neighborhood was that?

A.   That's Wicker Park area.

Q.   Now, back in the late '70s, early '80s, what was that area

Rios - direct

1187

like?  What types of people lived there?

A.  There were all kind of people.  There were all, there were blacks, Latinos, whites, a gang-infected area.

Q.  Besides your immediate family, did any extended family move to Chicago with you as well?

A.  Yeah.  My mom, my mom's brother and her sisters, they came to Chicago and they moved around the neighborhood.  Like my aunt lived like two houses away from us.

Q.  Did your father ever visit you?

A.  My father came over here to Chicago about one time only, and he never came back to Chicago after that.

Q.  Do you remember approximately when that was, when he came that one time only?

A.  That probably was like '82, '81, '82.

Q.  Now, you mentioned that the neighborhood was gang infected?

A.  Yes.

Q.  When you first arrived to Chicago, how did you first find out about the gangs?

A.  Well, there was one time I was in front of the house, and there was some writing on the wall.  And I was always curious, you know.  And I asked one of the guys that used to be in the club, and I asked him, What is that writing on the wall?

And he told me, Those are gang writing.

And I asked him, What is the gang?

And he told me, Well, over here is Latin Kings, so

that's why you see an L and a K on the wall or probably a crown or anything like that, you know.  So he said that was gang related.

Q.   How soon in Chicago, when you arrived in Chicago did you have that conversation?

A.   What you mean, with --

Q.   About the gang writings on the wall.

A.   Oh, that was like, I came here in '76, that probably be like '79, somewhere around there.

Q.   Now, you mentioned the Latin Kings.

A.   Yes, sir.

Q.   I want to ask you some questions about the Latin Kings if I can.

A.   Yes, sir.

Q.   Now, I want to start when you first saw those Latin King symbols on the wall and you had that conversation with that older man.  What did you think about the Latin Kings when you first heard that?

A.   Well, I didn't have no perspective of it.  I was, I was young, and I was just wondering what it was.  Didn't really understand what a gang was at the moment.

Q.   Did you later learn what the gang was?

A.   Yes.

Q.   When did your understanding of what the gang was first change?

Rios - direct

1189

A.   You're talking about previous?  You're talking about my younger years or in my older years?

Q.   Younger years.

A.   Okay.  Well, to us, the gang to us was we're protecting each other.  We're protecting ourselves, the neighborhood.  We used to do like sporting events against each other, against the other gangs and play baseball against the other gangs and everything like football, baseball and all that, soccer, whatever it was that kind of sport that we play.  Especially football, we just go ahead and play against each other.

Q.   Now, did you join the Latin Kings?

A.   Yes, I did.

Q.   How old were you when you first joined the Latin Kings?

A.   I believe I was 12.

Q.   When you first joined the Latin Kings at 12, what was the process of joining at age 12?

A.   At age 12, you just get in the middle and all the guys go get around you, and they'll start beating you up.  You could hit back, but they'll be beating you up for a good 20, 30 minutes probably depending.

Q.   And is there a term for this?

A.   Yeah, they're just trying to make you tough and see if you're tough enough to hang with them.

Q.   But is there a term for what that process is called?

A.   Yeah, it's a jump-in.

Rios - direct

1190

Q. Now, the jump-in, the people who are beating you up at 12, how much older are they than you?

A. Well, they're close to my age and probably a year older, that's about it.

Q. And how did those people know that you wanted to join the Latin Kings?

A. Because I was part of them as a buddy. And then in the buddy system, I ended just joining what they had going on, which was being a gangbanger.

Q. Now, when you're jumped in and after you are beaten, do you become a full member of the Latin Kings at age 12?

A. At age 12, you just become a peewee.

Q. And I'll circle back to that, but before I do, why did you decide to join the Latin Kings at 12?

A. Well, at the time we just -- we needed something to do. And we would just run around. And half, half of my guys, half of my guys and my friends were, we were a bunch of fatherless kids, and we were just being with each other, helping each other out, protecting each other.

Q. Was there anything in particular about the Latin Kings that wanted -- that you wanted to emulate or to be?

A. No. It was just the protection of feeling, feeling that bond with somebody else.

Q. Now, as a peewee, did you have any duties as a peewee in the Latin Kings?

A. Yeah, the little peewees were a number of lookouts, lookouts for the older guys that were out there.

Q. What did you -- who were you looking out for?

A. Police, gang members, anything of that sort.

Q. And when you were a peewee and you saw police or anything else that you are supposed to be looking out for, what would you do when you saw one of these things?

A. Just go to the older guys and let them know, hey, I seen this over here.

Q. And when you say "older guys" when you're 12 as a peewee, how much older than you are the older guys?

A. In they 20s, 30s.

Q. Now, when you're a peewee, are you allowed to have a gun?

A. No.

Q. When you're a peewee, are you allowed to sell drugs?

A. No.

Q. So besides being a lookout, are there any other duties of a peewee?

A. No.

Q. Now, is there a next step after becoming a peewee in the Latin Kings?

A. You become a junior.

Q. A junior?

A. Yeah.

Q. When you're a -- is it a junior Latin King or is it just a

Rios - direct

1192

junior?

A.   Junior Latin King.

Q.   When you're a junior Latin King, about how old does that occur at?  What age does that occur at?

A.   You probably could say about 14.

Q.   And do you know of why that happens at 14 or is it just the way it was?

A.   Well, it's basically because you look a little bit more mature now.  So it comes down to you being trusted more and to being around the bigger guys, and you being trusted more into doing things for them, like just, basically just watching out for everything that's going on.

Q.   Now, earlier you mentioned the jump-in, right, to become a peewee?

A.   Yes.

Q.   Is there any similar sort of I guess ceremony or initiation when you become a junior from being a peewee?

A.   No.

Q.   When you're a peewee -- I mean, sorry, when you're a junior, what changes between, in terms of your duties between being a junior and being a peewee?

A.   Well, now you probably could end up just holding, holding the older guys' drugs.  You probably end up doing things for them.  You know, like they'll send you to do certain things like probably break somebody's car or slash somebody's tire or

things like that.

Q.   And would you do those things like that when you were asked by the older Latin Kings?

A.   Well, I was really never asked.

Q.   Why weren't you asked?

A.   Because I was the type of kid that hanged around mostly with the older guys.

Q.   When you say "older," how old are we talking?

A.   Like 20 and up.

Q.   And why didn't they ask you to do those things?

A.   I had no idea.

Q.   And you mentioned earlier the social club that was on the first floor of your home.  Was that where the older guys were?

A.   Yes.

Q.   Now, earlier when I was asking you about peewees, and I asked you if you're able to sell drugs as a junior, are you allowed to sell drugs?

A.   No.

Q.   As a junior, are you allowed to have a gun?

A.   No.

Q.   Do you know why as a junior you're not allowed to sell drugs, but only hold drugs for the gang?

A.   Yes.

Q.   Why is that?

A.   Because you can't be selling drugs out there.  They don't

Rios - direct

1194

want you selling drugs out there, because they don't know if they grab you or something, and they'll put you in jail, and they probably get in trouble with probably your parents.

Q.   Now, did there come a time when you transfer above being a junior?

A.   Yeah.  When you turn 18, you're supposed to already become a senior when you turn 18.

Q.   And does that make you a full Latin King?

A.   Yes.

Q.   Now, is there any initiation that happens when you turn 18 and become a Latin King?

A.   Yes.

Q.   What is it?

A.   You got to get tagged.

Q.   What does tagged mean?

A.   Meaning you've got to get a tattoo with a symbol of the gang or either a crown or LK on it or anything symbolizing that neighborhood, that it's meant to be like for Latin Kings, anything that like a crown, like something that says LK or things like that.

Q.   Did you ever get tagged when you turned 18?

A.   No, sir.

Q.   Why didn't you?

A.   Because in '88, 1988, my girlfriend, Diana Rodriguez, got pregnant, and I stopped being with them.  I stopped hanging out

Rios - direct

1195

with them and I stayed back, because when you're having a child, when you're having a child, they let you go ahead and step aside and be a family member if you choose to do that.

Q. So in terms of being a family member, what does that mean in terms of the whole context of the Latin Kings organization?

A. Could you rephrase that again for me?

Q. Okay. When you're a family member, are you still a member of the Latin Kings?

A. No. You're inactive.

Q. And in terms of when you're a family member, do you have any duties towards the organization as a whole?

A. No.

Q. Now, when you're a full King, when you're 18, what are the duties of being a full member of the Latin Kings?

A. Well, at that point now you could have a gun. At that point you'll be doing worse things than you were doing when you was a peewee and a junior. You're being used more, and you're being like a fall guy for whatever it is that they send you to do. You could go do some shootings. You could go rob people. You can do all sorts of things that the older guys tell you to do.

Q. Now, I know you didn't get -- do you have any tattoos on you?

A. No, sir.

Q. Now, when you became a family member -- before you became a

family member, but after you were a junior, was there ever a time that you were a full Latin King but not tagged?

A.   No.

Q.   Did you want to be a full Latin King at the time?

A.   At that time my focus was my child coming.  Didn't want to be with them no more.

Q.   With a child coming, what was your thoughts on the Latin Kings at that point?

A.   At that point I didn't have no different thoughts of them. I just became a family member and didn't hang out with them no more.

Q.   Now, I'd like to -- are you aware of the hierarchy or the chain of command of how the Latin Kings were back in the late '80s?

A.   Somewhat, yeah.

Q.   What is the highest I guess rank one can have in the Latin Kings?

A.   It's an Inca.

Q.   And an Inca, is there another name for that?

A.   An Inca is a Mexican term for chief, the big boss.

Q.   And below the chief or the Inca, was there a position under that?

A.   Yeah.  It's call a Cacique.

Q.   Do you know how that's spelled?

A.   I believe it's K-A-S-I-Q-U-E.

Rios - direct

1197

Q.   And below that person, is there any other rank?

A.   Yeah, foot soldiers.

Q.   Now, do you know what the term "a set" means?

A.   Yes, sir.

Q.   What is a set?

A.   A set is a location on a neighborhood.  You could claim that you're from this neighborhood over here.  Let's say, let's say like the neighborhood I was, I was embedded with, like Leavitt and Schiller, that was a set.  So that whole neighborhood right there is just a set.

Q.   And within a set, is there an Inca and that second-in-command name?

A.   Every set has it.

Q.   Now, in terms of the neighborhood as a whole, what was -- well, let me ask you this.  In terms of the, I guess the entire Chicagoland Latin Kings territory, do you know the expanse, the total expanse of what that territory was for all of the Latin Kings?

A.   All the Latin Kings in what grid?  The grid where I was at?

Q.   Yes.

A.   Okay.  So there is only two -- there is only three, three -- there is only three sections in that grid.  And it goes from borderlines is Western is a borderline, Chicago Avenue is a borderline, Ashland is a borderline, and Milwaukee Avenue is a borderline.

Rios - direct

1198

So you're inside, inside a square right here.  So you've got Wolcott and Division, that's one set, crystal and Damen, that's another set, and Leavitt and Schiller, that's a third set.

Q.   Now, we've just gone over the borders.  Within those borders, were there any other gangs besides the Latin Kings?

A.   Yeah.  We have allies.

Q.   And at the time in the '80s, who were the allies of the Latin Kings?

A.   Well, the allies of the Latin Kings that had chapters around that same grid was Spanish Lords, Vice Lords, Unknowns, Familia Stones, GBO, YBO.  That's about it.

Q.   And outside the border that you described, were those rival gangs or allied gangs?

A.   They were all rivals.

Q.   What were the rivals of the Latin Kings in the '80s?

A.   It was Cobras, Disciples, Gangsters, Gents, Imperial Gangsters, Lovers, all sorts of things like that.

Q.   Now, in the set or in the set or the broader Latin Kings of the Chicago area, were there any rules that you had to follow?

A.   Yes.  There is plenty of rules.

Q.   What were some of the rules that you had to follow?

A.   Well, there is certain rules that you've got to follow because you cannot do anything without their consent.

Q.   When you say "their consent," who are you talking about?

A.   You got to go up to them and talk to them first before you do anything out of, out of, out of our grid to anywhere else.

Q.   When you say "them," are you talking about the Inca?

A.   The olders, yeah.

Q.   Now, besides that, were there any other rules?

A.   Yeah, there is plenty of rules.  There is rules that you can't be bringing heat to the neighborhood.

Q.   What do you mean by that?

A.   That you can't go out of your grid and start trouble somewhere else, and your grid over here doesn't know that you started trouble somewhere else, because that could bring a lot of trouble to them over here, and they could get hurt because they're not aware of it.  So you're not allowed to do that unless you talk to somebody to be able to go ahead and go somewhere and do whatever it is that you -- as you're explaining to them what you want to do.

Q.   Besides that, are there any other rules?

A.   Yes.  There is plenty of rules.  There is another rule that they use for the simple fact they send you to do something, things like that, there's a rule that you cannot be claiming your set.

Q.   What do you mean by "claiming your set"?

A.   Claiming your set, let's say you went in and busted somebody's car up or anything like that, and you're fighting with them and everything, you know, or whatever it is and you

Rios - direct

1200

take off or whatever, you can't claim what you are as -- I can't fight with you and then say, "Oh, I'm a King" and stuff like that and then have the police come to our neighborhood looking for Kings.

Also, another rule that you can't be bringing the heat to the neighborhood because that reflects on everybody else in the neighborhood.

Q.   Besides that, were there any other rules?

A.   Well, the rule is that you can't, you can't false flag.

Q.   What is false flagging?

A.   False flagging is when you go somewhere and you probably shoot somebody, and then you take off, and you go ahead and say a certain gang name just to throw them off to go somewhere else with the investigation.

Q.   Now, within the neighborhood, were there any rules of how you were supposed to conduct yourself as a member of the Latin Kings?

A.   Yeah.  In the neighborhood you can't, in the neighborhood that I was in back in the days when I was younger, you couldn't write on the walls.  You couldn't break into nobody's cars. You couldn't break into nobody's houses.  You can't be robbing nobody in the street.  You can't be doing no dirt in the neighborhood.  You can't do nothing that is going to go ahead and become problematic to the neighborhood.

Q.   What did the Latin Kings do to make money?

Rios - direct

1201

A. They sold drugs.

Q. What kind of drugs did they sell in the late '80s?

A. Well, they sold a lot of cocaine, a lot of weed, a lot of dope.

Q. Were you ever part of the overall trade of selling weed?

A. I sold a little bit of marijuana.

Q. What about coke or dope?

A. No.

Q. Where did the drugs come from?

A. The older guys.

Q. Do you know where they got the drugs from?

A. I do not.

Q. Now, are there any rules about snitching?

A. Yes.

Q. What are the rules about snitching?

A. You could get hurt.

Q. When you say "you could get hurt," what does that mean?

A. Well, you could get killed. You could get, you could get beat up. You could -- a whole lot of things that they could do to you.

Q. Could you get killed?

A. Yeah, I said that already, sir.

Q. In terms of snitching, were you allowed to snitch to the police?

A. No.

Rios - direct

1202

Q.   Were you allowed to snitch about rival gangs?

A.   No.

Q.   Why weren't you allowed to snitch about rival gangs?

A.   Because it becomes, it becomes, it becomes a barrier between you and the police as you telling them that these guys did something to you.  So you ain't supposed to be talking to the police, so you can't be tricking on nobody, rival or not.

Q.   Are there any rules about retaliation?

A.   Yes.

Q.   What are the rules about retaliation?

A.   You got to bring it to the higher up.  You've got to bring whatever problem it is that you've got going on, you've got to bring it to the higher up.  And either the higher ups let you go ahead and release you into being able to do something to whatever it is that you want to do, then you could go ahead and do what you want to do with no problems, you know, that would come to the neighborhood.  They would not be bothering you for that, for the trouble that comes to the neighborhood, because you already asked for permission.

Q.   Did you ever seek permission to retaliate against someone?

A.   No.  I was gone at '88 from that.  I never made it to that step of me being around with guns and stuff like that with them or participated in any shooting or anything like that.

Q.   Do you know what the term "lone wolf" means?

A.   Yes.

Q. What does the term "lone wolf" mean?

A. Lone wolf, it's a lone -- it's a single person doing bad things, you know, with no recollection to or no respect to the laws or the rules of the gang.

Q. Now, going back to being a family member.

A. Okay.

Q. When you're a family member, what is the relationship between you as a family member to the gang as a whole?

A. You're just a friend that they'll see and be like "Hi," "Bye," and that's it. You're not active. You don't hang with them. You don't know nothing about what they're doing. And they will not share anything or any information with you about what they got going on. Right now you're just an outsider to them, even though you've been there with them before and everything, now you become an outsider because you're not part of them.

Q. Are you -- but you're allowed to say "Hi" is what you are saying?

A. You can talk to them and say "Hi" and everything. But you can't hang with them or get into the things that they're doing and be aware of what they're doing.

Q. Now, you mentioned the impending birth of your child in '88.

A. Yes.

Q. In '88, did you still live at your mother's home?

Rios - direct

1204

A. No. In '88 I was still at my mom's for a couple of months and then I left with Diana to live in an apartment at 1440 North Leavitt.

Q. The apartment on 1440 North Leavitt, did you own or did you rent?

A. We rented from her father.

Q. And back then, what was the rent that you owed to her father?

A. It was $200.

Q. Now, 1440 North Leavitt, can you describe what that building looked like?

A. Yes. It's a brick building. It's a six-unit building. They got three units in the front and got three units in the back. There's a middle, there's a middle enclosed hallway in the back, and then there is a porch, there is a wooden porch in the back.

Q. In terms of the apartments that you described, where was your apartment located?

A. My apartment was the second apartment in the rear.

Q. Now, initially, before your son was born, was it just you and Diana Rodriguez living in that apartment?

A. Yes, sir.

Q. And then after your son was born, it was the three of you living in the apartment?

A. Yes, sir.

Rios - direct

1205

Q.   Now I'd like to take you back to your early teenage years when you were still living at home on Wolcott.

A.   Okay.

Q.   Do you know who Reynaldo Guevara is?

A.   Yes.

MR. J. RICHARDS:  Your Honor, if I could have the podium connected to the laptop.

Your Honor, if I could have this image be shown to the witness.  For the record, I'm showing Plaintiff's Exhibit 12.

THE COURT:  It's in front of him.

BY MR. J. RICHARDS:

Q.   I'm showing you what's marked as Plaintiff's Exhibit 12. Do you recognize who that is in the photograph?

A.   Yes.  That's Reynaldo Guevara.

MR. J. RICHARDS:  Your Honor, if it's not already admitted, I'd seek to have Exhibit 12 admitted and published to the jury.

THE COURT:  Any objection?

MR. SCAHILL:  None other than previously stated.

THE COURT:  Okay.  It's admitted and may be published.

(Plaintiff's Exhibit No. 12 was received in evidence.)

BY MR. J. RICHARDS:

Q.   And so that is Reynaldo Guevara?

A.   Yes, sir.

Q.   And is that what Reynaldo Guevara looked like back in the

late '80s?

A.   No.

Q.   How did he look like back in the late '80s?

A.   He was a little stocky, a little light-skinned, had glasses, and he had a big -- he had like a dark fro and a little stocky, a little chunky guy.

          MR. J. RICHARDS:   Your Honor, if we could take down Plaintiff's Exhibit 12 and take down the screen from the podium.

BY MR. J. RICHARDS:

Q.   Now, did you know who Reynaldo Guevara was prior to June of 1989?

A.   Yes, sir.

Q.   And Reynaldo Guevara is one of defendants in this case?

A.   I believe so.

Q.   And you're suing Reynaldo Guevara?

A.   Yes, sir.

Q.   Do you recall about how old were you when you first saw or became aware of Reynaldo Guevara?

A.   Possible I was about 14 probably.

Q.   And when you were 14 years old, what happened that made you aware of Reynaldo Guevara?

A.   Well, when I was walking down the neighborhood and all my cars stopped by me, and he said, "Hey you."  And I look at him, and it was an officer.  I look at him, and he said, "Hey you."

Rios - direct

1207

So I said "What."

And he said "Come here."

And I just stand on the sidewalk, didn't even move. So he got out the car, came to me.  He patted me down and asked me for my name.

Q.   And did you give him your name?

A.   Yes, sir.

Q.   Now, this interaction at age 14, was it in the summer or the winter?

A.   It was summer.

Q.   And Guevara, was he alone or was he with a partner?

A.   He had a partner.  He had a partner.

Q.   And the car, was it a marked car or an unmarked car?

A.   It was an unmarked car.

Q.   Do you remember that incident at 14 what his partner looked like?

A.   No.  It was just some white guy that he had in the car with him.

Q.   When Guevara stopped you, was he in a police uniform or was he in just normal civilian clothes?

A.   Plain clothes, blue jeans, T-shirt.

Q.   So when he stopped you, how did you know he was a police officer?

A.   Because of the car.

Q.   How did you know because of the car?

Rios - direct

1208

A.   Because the car was an unmarked Crown Victoria.  Those are common for them to be using at that time in those days.

Q.   And when Guevara patted you down, can you describe what that means that he patted you down?

A.   That means he'll go and grab --

THE WITNESS:  Can I say the privates, sir?

THE COURT:  Your testimony is your testimony.

BY THE WITNESS:

A.   All right.  He'll grab your privates.  He'll go in your pockets.  He'll check everything, everything in your body.  He'll even look for tattoos and see if you've got tattoos and everything.

BY MR. J. RICHARDS:

Q.   Now, after you told him your name, what did he do?

A.   Nothing.  He just said "All right," went back to his car and left.

Q.   After that day in the summer of -- in the summer when you were 14, did you have any other further interactions with him?

A.   Yeah.  There was another situation, about two more situations I believe I had with him.

Q.   Let's talk about the first situation.  When did that first situation occur?

A.   It happened in Wicker Park.

Q.   And how old were you when this situation at Wicker Park occurred?

A.   I believe I was still 14.

Q.   And what happened in Wicker Park?

A.   We were playing basketball in the basketball court, and he came and he parked with his partner.  He got out his car and he just started harassing the guys and started shaking people down, like patting some of the guys down and stuff like that. And he looked at me and he did the same thing to me.

Q.   Now, the car that he came in, was that a similar unmarked car?

A.   It's the same car he always drove.  It's a black Crown Victoria.

Q.   Was it the same partner that was with him when he stopped you that first time?

A.   I don't think so because I don't really -- I didn't really see his partner, what he looked like.  It was just a white dude.  And I didn't see his partner on the other, the other second occasion.

Q.   And when -- how many people were you with when he came over while you guys were playing basketball?

A.   Well, we were playing basketball.  It's five to five guys on each side.  There was some more guys standing on the side of the court waiting for next.  So it was pretty much like at least you could say 20 to 25 people around there.

Q.   And did he stop and talk with everyone there or just --

A.   No, no.  He just shook down a couple of guys.  He probably

Rios - direct

1210

knew them.  I don't know.  But he shook me down too.

Q.   When you say "shook down," what do you mean by the term "shook down"?

A.   Patted you down to see if you have anything on you or like that, things like that, just looking for stuff.

Q.   What stuff was he looking for?

A.   I don't know.  Probably money, guns, drugs.

Q.   Now, on that incident, did he find anything on anyone?

A.   No.

Q.   Now, you mentioned a second incident.  When did that second incident occur?

A.   It happened by my house when I was, when I was by my house on Wolcott.

Q.   How old were you when that incident occurred?

A.   Probably about 15 or 16.

Q.   What happened in regards to that incident?

A.   The same thing.  Stopped, shakedown.

Q.   Did he say anything to you?

A.   No.

Q.   Did you say anything to him?

A.   No.

Q.   And besides those two incidents, did you see him around the neighborhood, but he didn't stop you?

A.   There was certain times I'd see him riding around the neighborhood and stuff like that, and he didn't stop me.  He

Rios - direct

1211

just kept going.

Q.    How many -- how often would you see him riding around the neighborhood?

A.    In a week, probably once or twice a week.

Q.    Did you ever observe, besides the two -- besides the basketball incident where you saw Guevara shaking down other people, did you ever observe him interacting with other people other than yourself?

A.    Yes.

Q.    How often did you see him do that?

A.    Oh, there was one time that I was walking with Jose Macho Melendez and he stopped us.  He got out the car, came to Macho Jose Melendez, slapped him one time in the face and told him, "Don't you ever lie to me again."

Q.    When did that occur?

A.    That occurred like around '85, '86.

Q.    And was that the summer, spring, fall or winter of '85 or '86?

A.    That was summer.

Q.    Jose Macho Melendez, who is he?

A.    Well, he was, he was the Inca for Leavitt and Schiller, for that set.

          MR. S. RICHARDS:  Your Honor, if I could have the witness screen be on, and if I could for the record show the witness Plaintiff's Exhibit 28.

BY MR. J. RICHARDS:

Q.  Jaime, do you see the picture that's on your screen?

A.  Yes, sir.

Q.  Who is it that I'm showing to you on that screen?

A.  This is Jose Macho Melendez.

Q.  And is that how he looked in the late '80s?

A.  Yes.

MR. J. RICHARDS:  Your Honor, at this time I'd seek to publish Plaintiff's Exhibit 20 -- to admit Plaintiff's Exhibit 28 and publish it to the jury.

THE COURT:  Any objection?

MR. SCAHILL:  No.

MR. ENGQUIST:  No objection, Your Honor.

THE COURT:  All right.  It's admitted and may be published.

(Plaintiff's Exhibit No. 28 was received in evidence.)

MR. J. RICHARDS:  And, Your Honor, if I could take Plaintiff's Exhibit 28 down.

BY MR. J. RICHARDS:

Q.  Now, between the three incidents we've talked about and -- well, in terms of the three instances that we talked about, besides that, have you seen him interact with anyone else in the neighborhood?

A.  Not really.

Q.  Would you hear about things that he would do in the

neighborhood?

MR. SCAHILL:  Objection.

MR. ENGQUIST:  Join.

THE COURT:  It's overruled.  You may answer.

BY THE WITNESS:

A.  Yes.

BY MR. J. RICHARDS:

Q.  What would you hear about things that he would do?

MR. SCAHILL:  Objection.

THE COURT:  Okay.  It's overruled.

Ladies and gentlemen, there is this term called hearsay.  It's an out-of-court statement offered for the truth of the matter asserted.  My understanding based on prior discussions with the lawyers is that you're going to hear testimony concerning decisions that Mr. Rios made, and some of the things that informed those decisions were things that he understood from others.  And so the relevance of what he heard from others isn't necessarily that they were true, it's the conduct he -- the steps he took in response.

For example, if someone came in right now and said there was an alien spaceship outside, and I got up and ran to the window to take a look, it's not because there was an alien spaceship outside, it's because someone said it and I was curious and gullible and ran and looked.

And so ten years from now, if I were testifying, and

Rios - direct

1214

someone asked me, "Why did you go outside?  Or why did you run off the bench and go look out the window?"  I could say "Because someone said there was an alien spaceship outside" even though it wasn't true.

So for that limited purpose, this testimony concerning what he heard about Detective Guevara or Officer Guevara is coming into evidence.

You may continue.

BY MR. J. RICHARDS:

Q.   What would you hear about how Officer Guevara would interact with people in the neighborhood?

A.   Well, basically you hear that he was a thug, that he was just grabbing people, shaking them down, taking their money, taking their jewelry, telling people that if you want your stuff back, go to the station and bring your receipt, and you'll be able to get your stuff back.

Q.   Did he ever do that to you?

A.   No.

Q.   And you never saw him do that to someone else directly in front of you?

A.   There was one situation.

Q.   That one situation, when did that one situation occur?

A.   That situation happened in like '85.  He stopped, he stopped this guy from the neighborhood, and he just grabbed him and took his chain and told him that he wanted it back, get a

receipt and come to the station, sign a form and get his stuff back.

Q.   Do you remember where you were when you saw that?

A.   Yeah.

Q.   Where were you?

A.   I was at the store.

Q.   Which store?

A.   There was in the neighborhood I was living at, my building was right here (indicating), and this like one building, then another building right here.  And that building right there has a store imbedded right in the middle of LeMoyne and Leavitt.

You come from LeMoyne, and it's right there (indicating), you go straight.  And that's the store right here.  And he took the guy's stuff around the corner over here by close to in front of my house.

Q.   Was that the Wolcott house?

A.   No, no.

Q.   The Leavitt house.

And besides taking the jewelry and saying come down to the station if you want it back if you've got your receipt, did you hear about anything else that Guevara would say or do?

A.   Yeah.  He used to be threatening people.

Q.   What did you, what did you hear that his threats were about?

A.   Oh, he used to threaten people to get out the street.  If

not, I'm gonna come back and kick your ass.  Or, you know, he'll grab people and talk to them about where they been and things like that.  And he'll probably grab the guy and throw him in his car and tell him, "I'm gonna drop you off on the opposite side in your rivals, I'm going to go ahead and drop you off at your rivals if you don't tell me what I want to know" and things like that.  And he used to be harassing people.

Q.  Now, did you ever stand up to him and say "Stop doing that"?

A.  No, I did not.

Q.  Do you know if anyone ever did that?

A.  There was a situation one time that my mom was telling me.

Q.  What was that situation that your mom told you?

A.  He came --

MR. SCAHILL:  Objection.

THE COURT:  Sustained.

BY MR. S. RICHARDS:

Q.  Did you ever learn of a situation of someone standing up to Officer Guevara?

MR. SCAHILL:  Same objection.

BY THE WITNESS:

A.  Yes.  My mom.

THE COURT:  It's overruled.  You can answer.

BY THE WITNESS:

A.   Yes.  My mom.

BY MR. J. RICHARDS:

Q.   What did you learn about that situation?  What happened with that situation?

MR. SCAHILL:  Objection.

THE COURT:  It's overruled.  You can answer.

BY THE WITNESS:

A.   My mom told me that he came by the house in front of the club.  He stopped.  My mom went up to him, and my mom confronted him about him harassing me and my friends in the neighborhood.  And he just got pissed off and blew her off and took off.

BY MR. J. RICHARDS:

Q.   Now, when did your mom tell you about this incident?

A.   That was around '86, '87.

Q.   And after you were told about this incident in '86 or '87, did your interactions with Officer Guevara change or did they remain the same?

A.   No.  It changed.

Q.   How did they change?

A.   It changed on him being more aggressive to me.

Q.   What do you mean by that?

A.   Being more aggressive to me, he'll, he'll either have some -- he'll either -- either he grab somebody and shake them down and things like that and take drugs or anything from them,

and instead of taking that person, he'll probably put it on me. He'll push me around. His shakedown tactics now become a little bit more aggressive with his verbal abuse.

Q. And was this towards you specifically?

A. Well, towards me, yes, sir.

Q. Now, prior to the murder investigation into Luis Morales, had you ever been arrested by Guevara before?

A. Yes, sir.

Q. When were you arrested by Guevara before?

A. It was in, I believe it was '88.

Q. In '88?

A. Yes, sir.

Q. What did -- what were the circumstances of the arrest?

A. I didn't know nothing. I didn't know what was going on. I was upstairs in my house. And when I came down out of my house on 1440 North Leavitt, I came down to the empty lot. And I come down to the empty lot. As soon as I got out the door from my porch in the middle, as soon as I got out of the door of the porch in the middle, Guevara and a couple of his partners, they had all the guys against the wall. And then you got some of the officers on the side of the schoolyard looking for something.

They found a bag of marijuana. And they came back to the crowd where they had against the wall. And when I came down upstairs, he told me, "Oh, Jaime, you too, get against the

Rios - direct

1219

wall."

So I got against the wall. Once I got against the wall, he told all the other guys, "You all can leave. Come on, Jaime. You coming with me." And he put the marijuana on me and took me to jail.

Q. And that case, the marijuana, you were charged with possession of marijuana?

A. Yes, sir.

Q. What happened with that charge?

A. They threw it out because they never found anything on my, on my possession.

Q. So after that incident with the marijuana and after the other things you've spoken about, what was your -- how did you view Officer Guevara? What did you think about him?

A. Well, I view him with fear. Every time he comes around, you get kind of shaky about what is this guy gonna do now.

Q. Now, did you, after this incident with the marijuana, did you ever file a complaint with the authorities about Officer Guevara?

A. No, sir. Didn't know how.

Q. Now, in '88, did you have a job?

A. Yes, I did.

Q. What was your job?

A. I was working for Holiday Inn on Evanston.

Q. And what were your duties there?

A.   I was working in the kitchen with a chef, with the main chef named Paul.

Q.   How long did you have that job for?

A.   Well, I started the job in May '88, and they let me go after three weeks because I didn't, I didn't have a social security card to bring them at the moment.  So they let me go to be able to go ahead and be able to get the social security, the proper one, because I asked my mom for the social security for me to take to them, and when she gave me a social security, she gave me my little sister's social security.

So they told me bring the proper social security and you'll have the job and you'll keep working.  That's what my boss was telling me, which it was the main chef, Mr. Paul, in the kitchen.

Q.   Besides that, did you have any other employment or sources of income?

A.   No.

Q.   How did you pay for the rent to Diana Rodriguez's father?

A.   I started buying, I started buying like a little half ounce of marijuana, and I started selling it in front of my house, making at least $200 to be able to pay my rent.

Q.   Now, who did you buy that marijuana from?

A.   The older Kings.

Q.   And when you were doing that, were you doing that as a family member or were you doing that as a Latin King?

A. No. I was doing that as a family member just to pay for my apartment.

Q. Now, I'd like to turn to the summer of 1989. Did you kill Luis Morales?

A. No, sir.

Q. Do you recall where you were on June 27, 1989?

A. Yes. I was coming back from my mom's house back to 1440 North Leavitt. And when I got there, I went upstairs with my wife -- well, basically with my girlfriend, which was Diana Rodriguez.

Q. Now, in '89, did you have any sort of habit or regular schedule that you would do?

A. I had a routine that I used to do with my mom.

Q. What was that routine?

A. That routine was I get out my house around 2:00 o'clock basically, 1:00 or 2:00, because she was still at school. So when I get out the house, I go straight to her house. I go in the back and in the yard, I pick up my dog's poop. I bathe the dog. I clean my mom's house. I do all the chores that she needed me to do and help her out while I'm over there in the house with my mom.

Q. Why was your dog at your mom's house?

A. Because I couldn't have it in my apartment. My father-in-law didn't accept dogs in his apartments.

Q. Besides that, would you do anything else at your mom's

house?

A.   Not that I can, not that I can recall.

Q.   And as part of your routine, when would you leave your mom's house?

A.   Well, my routine was to about 8:00 o'clock or 9:00 o'clock, and then I go home around that time because if not, Diana catch a fit.

Q.   So let me ask you this, on the evening of June 27, 1989, did you ever hear any gunshots?

A.   No.

Q.   The early morning hours of June 28, 1989, did you ever hear any gunshots?

A.   No.

Q.   Did you -- was it common to hear gunshots in the neighborhood?

A.   Sure.

Q.   And did you at the time, did you know what a gunshot sounded like?

A.   Yes.

Q.   Now, moving to June 29, 1989, did anything of significance happen?

A.   June 29th?

Q.   Yes.

A.   Not that I can recall.

Q.   Anything happen on June 30th?

Rios - direct

1223

A.   No.

Q.   Anything happen on July 1st?

A.   No.

Q.   Anything happen on July 2nd?

A.   I believe there was a shooting in front of my house.

Q.   Now, that shooting in front of your house, can you describe what happened?

A.   I was coming home.  I went upstairs.  My regular routine, I go upstairs, put the bike up.  I come back downstairs.  I go to the front of the house.

My brother-in-law Junior or my brother-in-law Danny Rodriguez, Daniel, he was there sitting down.  And a couple of minutes after I sat down with him, Mr. Lamont Burr came and sat down with us.

Q.   Lamont Burr, who is Lamont Burr?

A.   He is an old friend of mine from when we were kids.

Q.   When did you first meet Lamont Burr?

A.   When I started going to school in Andersen.

Q.   And Lamont Burr, is he a Latin King?

A.   No.

Q.   And is your brother-in-law Daniel Rodriguez, is he a Latin King?

A.   No.

Q.   Now, when you are sitting there with Daniel Rodriguez and Lamont Burr comes by, what happens next?

Rios - direct

1224

A.   Well, we're sitting there, and the cars show up.  So I stand up from where I was at, and a car shows up.  And I hear a pop inside the car, like a little firecracker or something.  Then I hear somebody inside the car scream.

Q.   When the car came up, was the driver's side or the passenger side closer to you?

A.   It was the passenger side.

Q.   And what did the car look like?

A.   Well, it was a black car, like a black Ford, four door, or a Chevy, four door.

Q.   When you heard the firecracker and then the noise, what did you do?

A.   Well, when I was -- I got up from the steps.  And when I heard the firecracker and the guy scream, I thought it was a firecracker.  So I get close to the car, like two steps.  So when I look like this, I see a barrel of a gun coming out the window of the car and started shooting.

As soon as it started shooting, I went like this (indicating) and I pushed Lamont.  I pushed Lamont to the side, and I ran through the gangway.  So when I run into the gangway, Diana Rodriguez was coming towards us from the gangway.  So I ran into her, and we both ran back.  And my brother-in-law and Lamont just scatter.

Q.   And did you call 911?

A.   No.

Q. Why didn't you?

A. My mother-in-law came outside and told us to get our butt upstairs, and that was it.

Q. So your mother-in-law and your father-in-law, did they also live at 1440 North Leavitt?

A. She didn't live at 1440 North Leavitt. She lived like three buildings away from us in the same sidewalk.

Q. Now, did the police show up that night?

A. Yes. My brother-in-law went downstairs and he spoke to some cops that came by. And he said that the cops told him that nobody, nobody got hit, it's okay. We'll check it out, and they left.

Q. Now, I want to move forward a few days to July 6th of 1989. On July 6th of 1989, did you follow your routine that day and also go to your mother's house?

A. Yes. It was an everyday routine.

Q. And did you go there and did you clean up your dog's poop?

A. Hmm-hmm.

Q. You have to say "yes" or "no."

A. Yes.

Q. Did you do any of the other chores around the house?

A. Yes. I ended up washing dishes, cleaning up the bathtub, and a couple of more little chores before I left the house around 8:00 o'clock or 9:00.

Q. And when you left at 8:00 o'clock or 9:00, where did you

go?

A.   I went straight home.

Q.   What was -- did you walk, drive?

A.   Well, it's like 10 minutes to the house.  So if I take my bike, it's probably less.  But it's like if I walk, it's probably like 10 minutes.  If I take the bike, it's probably like 5 or 6 minutes.

Q.   And what kind of bike did you have back then?

A.   I had a Huffy.

Q.   A what?

A.   A Huffy.

Q.   Okay.  That bike, did you use the bike that day on July 6th?

A.   Yeah.  That was, that was my get-around bike.  That's what I used to get around with.

Q.   And did you return to your home on Leavitt?

A.   Yes.

Q.   When you returned to your home on Leavitt, what happened?

A.   I went upstairs, and that was it.

Q.   On July 6th?

A.   Yes.

Q.   Now, in terms of the murder of Luis Morales, were you ever arrested for the murder of Luis Morales?

A.   Yes, I was arrested.

Q.   How did the arrest happen?  What occurred?

Rios - direct

1227

A.   Well, I had gotten home from doing the same routine I do everyday with my mom.  I got home.  And I was on my bike.  And I got home.  And I stopped on the side of the other empty lot, and I stopped in front of this guy named Jamaica.  He was sitting down on the floor like by a step.  So I stopped right there and we started talking for a little while.

Q.   Do you know Jamaica's real name?

A.   No.  They just call him Jamaica.

Q.   Why do they call him Jamaica?

A.   Because he's a Jamaican guy.

Q.   When you stopped and spoke with Jamaica, what happened next?

A.   Oh, about a couple of seconds after I stopped to talk to him, Officer Guevara and another partner of his came behind me and said, "Hey, Jaime, I've been looking for you."

And I turned like this, and I'm like "For what?"

He said, "I need to talk to you."

And I told him again "For what?"

And that's when he grabbed me by the arm and said, "Come on.  You're coming with me."  And he took me to the back, to the back of the alley by the house, by the schoolyard.

Q.   Now, the partner that he was with, had you seen that person before?

A.   No.  But he was like some type of Filipino dude.  Never seen him before.

Rios - direct

1228

Q.   When he -- when you were taken back, what happened when you were taken back?

A.   Well, when he took me back, he took me -- you know, the schoolyard, the schoolyard has this, this fenced-up garbage cans.  So it got a square right here with fenced-up garbage cans where they got the garbage cans at.

So he cuffed me behind my back when he took me back there.  And when he cuffed me behind my back when he was back there, he hand me over to the other officer.

Q.   The other officer, do you remember what that other officer looked like?

A.   Some white guy.

Q.   And when you were with the other officer being handcuffed behind your back, did you feel like you were free to leave?

A.   No.

Q.   When you are handcuffed behind your back with that other officer, what happened next?

A.   Well, Guevara started walking towards my house.  He went into the middle, he went into the middle porch.  He walked upstairs with another partner of his, went inside my house, walked all the way to the back of the house, opened the back door of the porch, and there was like five or six more officers that went into the house.

Q.   Now, how did you -- how were you able to see him enter your house?

A.   Because from the schoolyard, you could look straight into the house, because the building is right here like this (indicating).  This is the back of the building right here like this, and this is the middle.  So he went, when he went up the stairs like this, he went inside my house.  My house really had no curtains, so you could see anybody that walking in the house back and forth.

Q.   And after you saw him walk into the house and open the back door for those other officers, what happened next?

A.   They, I guess they shook the house down, you know.  They searching the house.  And then after that, they came back downstairs.

Q.   Now, did you have a watch on?

A.   No.

Q.   What would you estimate is the amount of time that that took?

A.   Probably 15, 20 minutes.

Q.   And after 15 or 20 minutes, what happened next?

A.   Well, after he came out from the house, he come downstairs. He come to, he come to me where I was at with the officer.  He grabbed me by the arm, and he took me to his car, which it was on Bell.

Q.   And his car, was that a marked or an unmarked car?

A.   Unmarked car.

Q.   And when you were taken to the unmarked car, what happened?

Rios - direct

1230

A.   When he took me to the unmarked car, he put me in the back of the seat.  And then he was just hanging out, walking around for like 15, 20 minutes.  He was just hanging out, walking around, talking to the other officers.

Q.   And when you're sitting there in the car and watching him do this, does anything else happen?

A.   Yes.  Diana Rodriguez shows up with the baby.

Q.   And when she showed up, what happened?

A.   She tried to talk to me, but I couldn't hear.  And then she tried to get close to the car, and one of the officers got in front of her and told her, "No, you can't talk to him right now."

Q.   And after that, what happened next?

A.   Guevara came and got in the car with his partner and they took me.

Q.   Where did they take you?

A.   They took me to 5555 Grand.

Q.   When you got to 5555 Grand, what happened?

A.   When I got to 5555 Grand, they walked me through.  I was handcuffed behind my back.  They walked me through.  They walked me up some steps, some steel steps with some steel railings, and they put me in an interrogation room.

Q.   Now, while they're doing this, do you feel like you're free to go?

A.   No.

Rios - direct

1231

Q.   Now, when they put you into the interrogation room, can you describe what that interrogation room looked like?

A.   Yes.  It's like, you can say like 4-by-8, it could be like a 4-by-8 room.  It has a ring, it has a steel ring with a plate against the wall that they could cuff you to.  It has a steel table and it has a steel chair.

Q.   And you were placed into that room?

A.   Yes, sir.

Q.   Does that room have a view to the outside of the building?

A.   No.

Q.   Does that room have any windows?

A.   The door has a small square window, but you can't see nothing.  Once you go to that window and you look, all you can see is just the railing and the little sidewalk right here that that's on that -- let's say this is the sidewalk right here (indicating).  And all you can see if I'm looking from the door right here, and I'm looking from the door right here, so all you can see is just the railing right here.  You can't see downstairs or nothing because it's open, it's an open space, and then downstairs is the first floor.

Q.   Now, when you're put into that interrogation room, what happened next?

A.   Well, Mr. Guevara came in there.  Mr. Mason was in there. About four more officers were at the door.

Q.   When you say Mr. Mason, is that the same Mr. Mason who just

testified before you?

A.   Yes, sir.

Q.   Can you point him out and identify an article of his clothing?

A.   Yeah.   That's Mr. Mason right there with the grayish black jacket and the light blue shirt.

MR. J. RICHARDS:   Your Honor, may the record reflect an in-court ID?

THE COURT:   So noted.

BY MR. J. RICHARDS:

Q.   What happened next when the officers entered?

A.   Well, when the officers entered, Mason is behind me. Guevara is on the side of my left arm.   And Guevara grabs a gang book where they got pictures of guys in the gang books. So he bring out the gang book right here like this.   He pulled a picture out.   He put it in front of me and he said, "Do you know that guy?"   I'm cuffed up behind my back like this.   And he say, "Is that the guy?"

I look at the guy like that.   I said, "That's Little Mike."

Q.   And when you say "That's Little Mike," what happens next?

A.   I said, "That's Little Mike."

And he said, "Did you know that I already know that you killed, you killed this guy and that you and Tino did this?"   And he started ramping about what I did and that.

Rios - direct

1233

THE COURT: We're going to break there. It's 4:29.

I remind you not to discuss the case. Don't research the case. Don't talk about the case. Don't let anyone discuss the case with you. I'll see you back tomorrow morning, we'll try to start, I'll do my best to get us started at 10:00 a.m. So have a good evening.

All rise.

(Jury out at 4:29 p.m.)

THE COURT: You may step down.

All right. Should we talk about the order for tomorrow then.

MR. SCAHILL: We would like to call Barbara Riley out of order. She is, I believe, leaving the country the following day. And so if we can start with her right off the bat, I don't think her examination is going to be terribly long, and then we can resume with Mr. Rios. That would be my proposal.

MR. J. RICHARDS: No objection.

THE COURT: Okay. So we'll do that. I'll do what I did before, explain that the witness has a conflict. Tuesday is the day she's available. And so as a courtesy to her, we will take her testimony out of order.

Any other issues for me to address from plaintiff's view?

MR. J. RICHARDS: No, Your Honor.

THE COURT: From defendants?

MR. SCAHILL:  The only other issue is Mr. Guevara, obviously, we need to get done with the plaintiff in order to address the issues that Your Honor is addressing with foundation and the like.

It sounds like that is probably from Your Honor's perspective going to take obviously Mr. Rios being done and then all of us recalibrating what the questions are going to be.  So as much as I would like to try to get him on tomorrow, that sounds unlikely.  Is that a fair characterization?

THE COURT:  You guys know better than me.  My sense of it is that it makes the most sense because of the things, the logistics behind Guevara to just say Wednesday at 10:00, Wednesday at 1:00, something like that, so that we come back from a break -- as a reminder, they wheel in, it's like elementary school, they wheel in one of those for the VTC.  And so it sort of blocks the witness stand.  I think we can get it off to the side, but then there are a bunch of cables leading to it.  So I'd like to do it at a break or when returning from a break.  So whether it's 10:00, 1:00 or 2:30, I don't care, but it's more efficient in that sense.

MR. SCAHILL:  I'm going to have to consult with my person down there in Texas, who I know has some issues Wednesday.  So it actually might end up being Thursday as much as I'd like for it to be Wednesday.  But I will figure that out and report back tomorrow to the Court.  And we will get it at a

set time at some point this week and fit that in.

THE COURT: Okay. Anything else?

MR. SCAHILL: Not from me.

THE COURT: All right. So that everybody knows, I'll probably check in Wednesday to see where we are so that I can start thinking about the final instructions conference. And we'll set a time for that likely before the close of evidence so that we are all on the final page with respect to the final instructions before closing arguments. But I just need to get a better sense of when we anticipate all of the evidence closing, okay.

MR. SCAHILL: Fair enough.

THE COURT: All right.

MR. S. RICHARDS: Your Honor, I have a status at 9:30 in front of Judge Ellis. So just to let you know. I think I'm pretty close.

THE COURT: You are close. If you could check with her courtroom deputy and see if she can call you first. I don't know if she's able to bump your case up to the first. I don't know what her call looks like tomorrow. But it would probably be prudent to check in with her courtroom deputy. Okay.

MR. S. RICHARDS: Thank you.

THE COURT: All right.

MR. ENGQUIST: Thank you, Judge.

THE COURT:  Have a good night.

MR. J. RICHARDS:  Good night.

MR. POLICK:  Good night.

(Adjournment 4:33 p.m. until 10:00 a.m., February 10, 2026.)

*    *    *    *    *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/*Kathleen M. Fennell*                February 9, 2026
Kathleen M. Fennell                     Date
Official Court Reporter


/s/*Jennifer Costales*                  February 9, 2026
Jennifer Costales                       Date
Official Court Reporter


/s/*Joseph Rickhoff*                    February 9, 2026
Joseph Rickhoff                         Date
Official Court Reporter

1237

I N D E X

WITNESSES                                                    PAGE

MICHAEL MASON
Direct Examination By Mr. Polick                            1025

MICHAEL MASON
Direct Examination (Resumed) By Mr. Polick                 1099
Cross-Examination By Mr. Scahill                           1130
Redirect Examination By Mr. S. Richards                    1155
Recross-Examination By Mr. Polick                          1175

JAIME RIOS
Direct Examination By Mr. J. Richards                      1176


PLAINTIFF'S EXHIBIT                                     RECEIVED
No. 12                                                     1205
No. 28                                                     1212


DEFENDANTS' EXHIBIT                                     RECEIVED
No. 50 E                                                   1041
No. 50 F                                                   1081
No. 6                                                      1083
No. 50 J                                                   1086
No. 50 EEE                                                 1092
Defendants' Exhibit 50 O                                  1110
Defendants' Exhibit 30                                    1114
Defendants' Exhibit 50 U                                  1118
Defendants' Exhibit 50 EE                                 1125
Defendants' Exhibit 50 DD                                 1127
Defendants' Exhibit 50 S                                  1149