1238

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
JAIME RIOS,                      )
                                 )
               Plaintiff,        )
                                 )
     -vs-                        )   Case No. 1:22-cv-03973
                                 )
REYNALDO GUEVARA; MICHAEL        )
MASON; and JoANN HALVORSEN,      )
as Special Representative of     )
ERNEST HALVORSEN, Deceased,      )   Chicago, Illinois
                                 )   February 10, 2026
               Defendant.        )   10:04 a.m.
```

VOLUME 7
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:     LAW OFFICE OF STEPHEN L. RICHARDS
                       BY:  MR. STEPHEN L. RICHARDS
                            MR. JOSHUA S. RICHARDS
                       53 West Jackson Boulevard, Suite 205
                       Chicago, Illinois  60604

For Defendant          BORKAN & SCAHILL, LTD.
Guevara:               BY:  MR. TIMOTHY P. SCAHILL
                            MR. GRAHAM P. MILLER
                       20 South Clark Street, Suite 1700
                       Chicago, Illinois  60602

For Defendants         THE SOTOS LAW FIRM, P.C.
Mason and                    BY:  MR. JOSEPH M. POLICK
Halvorsen:                        MR. JOSH MICHAEL ENGQUIST
                                  MR. JEFFREY ROBERT KIVETZ
                                  MS. CAROLINE P. GOLDEN
                       141 West Jackson Boulevard, Suite 1240A
                       Chicago, Illinois  60604

Court Reporter:        KRISTA M. BURGESON, CSR, RMR, CRR
                       Official Court Reporter
                       219 S. Dearborn Street, Room 1420
                       Chicago, Illinois  60604
                       Telephone:  (312) 435-5567
                       Krista_Burgeson@ilnd.uscourts.gov
                            *   *   *   *   *
              PROCEEDINGS REPORTED BY STENOTYPE
     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

1239

(Proceedings heard in open court; jury out:)

THE COURT:  All right.  We can call the trial.

THE CLERK:  22 C 3973, Rios v. Guevara, et al., for jury trial.

THE COURT:  Appearances, please.

MR. S. RICHARDS:  Stephen Richards on behalf of plaintiff.

MR. J. RICHARDS:  Joshua Richards on behalf of plaintiff.

MR. SCAHILL:  Good morning, Your Honor.  Timothy Scahill on behalf of Reynaldo Guevara.

MR. POLICK:  Good morning, Your Honor.  Joseph Polick on behalf of defendants Mason and Halvorsen.

MR. MILLER:  Graham Miller on behalf of defendant Guevara.

MR. ENGQUIST:  Good morning, Your Honor.  Josh Engquist on behalf of defendants Mason and Halvorsen.

MS. GOLDEN:  Caroline Golden on behalf of defendants Mason and Halvorsen.

MR. KIVETZ:  Good morning, Your Honor.  Jeff Kivetz on behalf of defendants Mason and Halvorsen.

THE COURT:  All right.  Good morning.

Rather than delay, I will bring in the jury and hear any matters after -- or before the lunch break, unless there is something dealing with the Riley or Rios testimony that I need

1240

to address beforehand.

MR. S. RICHARDS:  Just quickly, Your Honor.

I believe there is an agreement not to address former judges as "Judge," which is fine by us.  But the defendants addressed Attorney Shields as Judge or Your Honor, so either way, just bringing it to the Court's attention.

THE COURT:  Is that an issue with Riley?

MR. SCAHILL:  I know I did interchangeably refer to her as Judge.  That was their witness.  I didn't even recall we had made that agreement.  But I don't have a strong feeling about it either way.  Her background presumably is going to come in the same way as it did with Ms. Shields, so --

MR. POLICK:  We won't be calling her "Judge" while she is on the witness stand.

THE COURT:  Okay.

Anything else?

MR. S. RICHARDS:  No, Your Honor.

MR. POLICK:  No, Judge.

MR. SCAHILL:  No.

THE COURT:  All right.

We will bring in the jury.

THE CLERK:  All rise.

(Jury in at 10:06 a.m.)

THE COURT:  Please take your seats.

Good morning, ladies and gentlemen.  Welcome back.

1241

Does anyone have anything to report?

All right. Seeing no hands, one note on this morning, there is a witness who is not available the rest of the week, and so we are going to interrupt Mr. Rios's testimony and allow this witness to testify now as a courtesy to that witness. This is part of the defendants' case, correct?

MS. GOLDEN: Yes, Your Honor.

THE COURT: All right. So this is a witness that would have been called or is being called in the defense case, just out of order as a courtesy to the witness.

Ms. Golden, who is the witness?

MS. GOLDEN: Barbara Riley.

THE COURT: Okay.

Morning. Raise your right hand.

(Witness sworn.)

THE COURT: Please take your seat.

Ms. Golden, you may proceed when the witness is settled.

THE WITNESS: Excuse me, Your Honor. Can I have my own water? Is that water also for me?

THE COURT: If you need it, yes.

THE WITNESS: Yes, thank you.

THE COURT: Okay.

BARBARA RILEY, DEFENDANTS' WITNESS, SWORN,

DIRECT EXAMINATION

BY MS. GOLDEN:

Q. Could you please introduce yourself to the jury?

A. My name is Barbara Riley.

Q. And Ms. Riley, are you from the Chicagoland area?

A. I am.

Q. And with whom do you live?

A. Pardon me?

Q. With whom do you live?

A. Right now, just my husband.

Q. Okay. And how many years have you been married to your husband?

A. 25 years.

Q. And do you have any children?

A. I do.

Q. And they are grown?

A. Yes.

Q. All right.

Ms. Riley at the time of Mr. Rios's arrest in July of 1989, were you a licensed attorney?

A. Yes.

Q. And what state were you licensed in?

A. Illinois.

Q. And do you recall what year it was that you got your law license?

A. '85.

Q.   1985?  So 40 years ago?

A.   Uh-huh.

Q.   All right.  And when -- where did you go to law school?

A.   John Marshall.

Q.   And did you graduate in 1985, the same year that you got your law license?

A.   I did.

Q.   And what was your -- were you working during law school?

A.   Yes.

Q.   And what was your profession at that time?

A.   I was a nurse.

Q.   Okay.  Did you -- what was your first legal job after you graduated?

A.   State's Attorney's Office.

Q.   Okay.  And that's the Cook County State's Attorney's Office?

A.   Correct.

Q.   And your title there was an Assistant State's Attorney?

A.   Correct.

Q.   And so if you started that job in 1985, how long were you in the office?

A.   Till 1996.

Q.   So about 11 years?

A.   Correct.

Q.   What did you do for work when you left the State's

Attorney's Office?

A.   I was elected a judge.

Q.   Of Cook County?

A.   Correct.

Q.   And was that a countywide election?

A.   No, 11th sub circuit.

Q.   Did you -- and you ran for judge then in 1996?

A.   Correct.

Q.   And did you run for re-election?

A.   I think twice.

Q.   When did you stop sitting on the bench?

A.   2010.

Q.   So you were then a judge for about 14 years, from 1996 to 2010?

A.   Correct.

Q.   When you left the bench in 2010, what did you do for work?

A.   I was, like, private practice.

Q.   Was that in the Chicagoland area?

A.   Oh, yes.

Q.   And are you still working?

A.   No.

Q.   What -- when did you retire?

A.   I retired-retired, in '22.

Q.   Your secondary retirement, so to speak?

A.   Secondary retirement.

Riley - direct

1245

Q.   Okay.   And so you did private -- you were in private practice then for about ten years; is that right?

A.   Correct.

Q.   When did you start -- when did you become a nurse?

A.   I graduated from Cook County School of Nursing in 1968.

Q.   So for approximately how many years were you a practicing nurse before you joined the State's Attorney's Office in 1985?

A.   I still had a license and was working weekends --

Q.   Okay.

A.   -- even when I was a State's Attorney.

Q.   So from 1968, when you began working as a nurse, until 1985, you were working -- you were working all that time as a -- I'm sorry, I think I misspoke.

So from 1968 until 1985 you were working as a nurse?

A.   Correct.

Q.   And you continued to do that during law school?

A.   Correct.

Q.   And you continued to do that for a few years after you joined the State's Attorney's Office in 1985?

A.   Correct.

Q.   Okay.   So we have the chronology right, I think you were a nurse for about 17 years before you joined the State's Attorney's Office, and then for about 11 years, you were at the State's Attorney's Office, and then 14 or 15 years on the bench, and then in private practice for another 10 years.

A.   Correct.

Q.   All right.  So I'd like to focus back in time to that 11-year period that you were at the State's Attorney's Office, from 1985 to 1996.

What was your title in the office?

A.   I remained always an Assistant State's Attorney.

Q.   Okay.  And I know that was quite some time ago, but can you explain to the jury or give them an idea of what kinds of assignments you had during those 11 years?

A.   I started out in appeals, and then traffic court, misdemeanors, then 26th Street preliminary hearings.

By that time, narcotics were the biggest thing in the, you know, city.  I basically stayed in a narcotics channel, if you will, in the felony trial division.

Q.   And when you left for the bench, you left from the felony trial division?

A.   Yes.

Q.   Okay.  In July of 1989, were you assigned to the Felony Review Unit at the State's Attorney's Office?

A.   Correct.

Q.   And did your duties and responsibilities as an assistant in the Felony Review Unit include interviewing suspects and witnesses?

A.   Correct.

Q.   And can you explain generally how you would get the call to

Riley - direct

1247

-- or case assignment?

A.   Well, there were three of us working at any time, 12-hour shifts.   The headquarters was 26th and California.   So if I wasn't out on a call, I would be at 26th and California.

So either I got assigned right out of California -- but I know we carried some other means of communication.   Maybe in those days it was a beeper, that if 26th beeped us, we could call them.

I don't really remember walkie-talkies, so it must have been by beepers then.

Q.   Okay.   There were no cell phones?

A.   No.

Q.   Okay.   And there were no computers, right?

A.   No.

Q.   And then I think you mentioned a shift, or three people being assigned.   The shifts were -- can you explain the shifts in felony review?

A.   Yeah, 12 hours, but I am trying to remember when they started.   Maybe 7:00 to 7:00, 7:00 to -- in the afternoon till 7:00 in the morning.

Q.   Okay.

A.   I was young then, it --

Q.   And it was a long --

A.   I only worked nights.

MS. GOLDEN:   Sorry.   My apologies.

THE COURT: Be sure not to speak over each other, please.

THE WITNESS: Thank you.

BY MS. GOLDEN:

Q. I talked over you. I'm sorry.

So it was 12 hours on and 12 hours off, right?

A. Right.

Q. And then in any particular shift, you could be assigned to more than one case; is that right?

A. Correct.

Q. And in any particular case, you could interview more than one suspect or witness, right?

A. Yes.

Q. Okay. And for violent offenses like assault and murder, generally where were you when you interviewed the suspects?

A. With the police.

Q. And that would be at a police station usually?

A. Usually.

Q. Sometimes on scene?

A. Sometimes.

Q. Okay. Now, there were different ways to -- strike that.

Did you, in the course of your duties and responsibilities as a felony review assistant back in 1989, have occasion to orally interview suspects?

A. Yes.

Q.   And is that what is commonly referred to as taking an oral statement?

A.   Correct.

Q.   And when you are doing that at a police station, generally you're in an enclosed space, right?  Again, an office -- in an interview room or conference room?

A.   Correct.

Q.   And then police officers were usually present at the time, correct?

A.   Correct.

Q.   And these were people, when you are reporting to a police station to do an interview of a suspect, that are typically accused of violent crimes, right?

A.   I think what we did then was crimes against a person.  If it was a crime against a person, then we went and met the police.

     If it was like a garage burglary or, you know, property crime, I believe we could interview the police by phone.

Q.   Thank you.

     What typically would you do before going into an interview room with a suspect?

A.   Talk to the police, see why I was there.

Q.   Would you also read available reports?

A.   If they were there.

Riley - direct

1250

Q. Once you decided to speak with the suspect, would you introduce yourself?

A. Of course.

Q. And how would you introduce yourself?

A. Tell them my name was Barbara Riley. I was an Assistant State's Attorney. I was a lawyer. I was not their lawyer. I was working with the police.

Q. And was it your practice to give *Miranda*?

A. Always, just in case.

Q. And if they agreed to talk to you, would you then interview them?

A. Yes.

Q. If they -- if the suspect refused to speak with you, would you insist that they interview with you?

A. I don't know how I would have done that, no.

Q. If they said they didn't want to talk to you, you would stop the interview, right?

A. Correct.

Q. What if they asked for a lawyer?

A. Same thing.

Q. If they were drunk or high or otherwise incapacitated, what would you do?

A. There is no sense taking a statement from someone like that.

Q. Okay.

Riley - direct

1251

A.   I would have left.

Q.   But if they agreed to interview you, you would proceed, correct?

A.   Correct.

Q.   And when you interviewed the suspect, who was asking the questions?

A.   Well, first I would ask the suspect to tell me what happened.

Q.   And then you would listen to what he said and follow up with questions of your own?

A.   Correct.

Q.   Did you have a particular practice with respect to concluding an oral interview of a suspect?

      How would you end the interviews?

A.   By telling him that that statement needed to be memorialized somehow, that he could write it down if he wanted, or we -- I could call a court reporter that would -- I would ask the questions, he would give the answers, and the court reporter would type everything down like that.

Q.   So the handwritten statement that you offered, would that be in your handwriting or in the suspect's?

A.   I'm not sure, probably asking him if he wanted to write it himself.

Q.   Okay.  Have you ever given a handwritten statement to a suspect?

Riley - direct

1252

A.   You know what?  It just didn't happen.

Q.   Okay.  And your preference was for court-reported statements?

A.   Correct, because we could all read it.

Q.   Okay.  It left no ambiguity about what was asked and what was answered, right?

A.   And I think a lot of people were more comfortable talking what happened than writing down.

Q.   And the court-reported statement was a word-for-word transcription of the questions asked and the answers given.

A.   Correct.

Q.   Okay.  Can you explain -- and did you explain the difference in the two kinds of documentation of the statement to the suspect, like whether or not he could do a handwritten and the court reporter -- would you explain the process of the court-reported statement to them?

A.   Yes.

Q.   And can you explain to the jury what that process was?

A.   I told him that if he agreed to do a court-reported statement, I would leave -- I would not leave the Area, but I would go and arrange to have a court reporter come to the station, that that might take a little while, depending time of day.  This was 2:00 o'clock or something in the morning, right?

     So -- and then when the court reporter came, the court reporter would swear him in, just like we were in court, you

Riley - direct

1253

know, and would have her machine and write down everything.

And then we would have to wait again while the court reporter typed up his statement so it was on paper in black and white, and then we would review it.

Q.   And then would you sign it?

A.   Well, there was a police officer present for a court-reported statement, and all three of us would sign the court-reported statement, and at the very end when we were all done, the court reporter would take a Polaroid picture of the suspect.  And again, the three of us -- well, this time including the court reporter, I believe, signed the back of the Polaroid picture.

Q.   And whose option was it of how to document the oral interview?

A.   Clearly the defendant's.  He had to cooperate and participate.

Q.   Now, do you have any present recollection of interviewing Mr. Rios?

A.   No.

Q.   Do you have any present recollection of taking his court-reported statement?

A.   No.

Q.   But you have looked at his statement, correct?

A.   Yes.

Q.   And you have looked at his photograph, correct?

Riley - direct

1254

A.   Correct.

Q.   And did that jog any memory for you about taking the statement?

A.   I remember the procedure more than -- because we did it -- it was a ritual, it was a procedure, more than I remember the actual taking of the statement, let alone what Mr. Rios told me.

Q.   Are any of your memories specific to Mr. Rios?

A.   No.

Q.   Okay.  But you remember you did testify in Mr. Rios's criminal case, correct?

A.   Twice, I think.

Q.   And the first time was when?

A.   A motion to suppress.

Q.   And the second time was --

A.   The actual trial.

Q.   Okay.  And when you testified at trial, you took an oath before you took the stand, right?

A.   Motion to suppress, too.

Q.   And both times you took the oath seriously?

A.   I believe the court reporter only swore in the suspect when we -- yes, but the other two times, yes, I swore.

Q.   The two times that you testified --

A.   Yes.

Q.   -- you took an oath?

A.   Correct.

Q.   And you promised to tell the truth?

A.   Correct.

Q.   And you did, in fact, tell the truth, right?

A.   Yes.

Q.   And when you testified some 35 years ago, you -- did you remember taking his statement well enough to testify truthfully and accurately?

A.   Then, yes.

        MS. GOLDEN:   Okay.   I'm going to -- may I approach, Your Honor?

        THE COURT:   Yes.   You have free leave to approach.

BY MS. GOLDEN:

Q.   I would like to -- Ms. Riley, I'm going to give you what we've marked as Defendants' Exhibit 124-1.

        Do you recognize what that is?

A.   Pardon me.   The transcript from the actual trial.

Q.   Okay.   And this is testimony that you have reviewed before I just gave it to you, correct?

A.   Yes.

Q.   So I am directing your attention to page 456, line 15.

A.   Hang on.

        What line did you start on?

Q.   15.

A.   Okay.

Riley - direct

1256

Q.   When you -- let me -- let me -- I think this is -- okay.

You are the Barbara Riley that took Mr. Rios's court-reported statement in July of 1989, correct?

A.   Absolutely.  I never changed my name.

Q.   Okay.

And when you testified at trial, you testified about what you remembered about that initial oral interview, correct?

A.   Correct.

Q.   Okay.  And I'd like to read that testimony to the jury, if you would, and I will ask the questions, and if you could just read the answers.

MR. S. RICHARDS:  Objection.

THE COURT:  Basis?

MR. S. RICHARDS:  Not refreshing -- not proper refreshing recollection.

THE COURT:  Okay.  Response?

MS. GOLDEN:  Past recollection recorded.

THE COURT:  The objection is overruled.

You may ask the questions.

BY MS. GOLDEN:

Q.   And this is the testimony from back in November of 1990?

A.   Correct.

Q.   "Q.   Now where was it that you first spoke with the defendant?

A.   "A.   Headquarters at Area 5 Violent Crimes Section,

Riley - direct

1257

Violent Crimes Section in an interview room.

Q.   "Q.   When you entered the interview room, were you alone, or did someone go with you?

A.   "A.   I was with Detective Mason.

Q.   "Q.   When you entered the interview room, what is the first thing you said to the defendant?

A.   "A.   I introduced myself.  I explained to him that I was a lawyer, that I was not his lawyer, that I was a lawyer working with the police.

          I told him" --

          Do you want me to continue?

Q.   Please.

A.   "I told him that he had a right to remain silent.  He didn't have to talk to me if he didn't want to talk to me.

          "I explained that anything he said could be used against him in a court of law.  I told him he had a right to his own lawyer and that if he couldn't afford one, one would be present or would be appointed to be his lawyer.

Q.   "Q.   And what you just told the ladies and gentlemen of the jury, is that commonly referred to as *Miranda* rights?

A.   "A.   Yes.

Q.   "Q.   And after you advised him of his rights, did he indicate whether or not he understood what you were telling him?

A.   "A.   Yes.  I went through that.  I asked him did he

Riley - direct

1258

understand who I was, and he said yes.

Q. "Q. And after he indicated to you that he understood, did you then have a conversation with the defendant?

A. "A. Yes, I did.

Q. "Q. Was Detective Mason also present for that conversation?

A. "A. Yes.

Q. "Q. About how long did this first conversation last?

A. "A. I'd say approximately 30 minutes.

Q. "Q. At the end of the conversation, did you advise him of anything else?

A. "A. Yes. I told him that we could, the information he had given me, there were basically two things we could do with it. I could take what is called a handwritten statement. I would in my own handwriting write down what he had told me, or we could call a court reporter who would come right there to the Area and write down what he said in his own words."

Q. Does that refresh your recollection about --

A. Yes, it does.

Q. -- whether or not it would be in your handwriting or his?

A. Correct, it does.

Q. Okay. Could you continue on. I'll ask the question at line 15:

"Q. Did he indicate a preference for either handwritten or court-reported statement?

Riley - direct

1259

A.    "A.    He said he preferred a court-reported statement.

Q.    "Q.    After he had indicated he would like that type of statement, where did you go?

A.    "A.    I left the interview room and went back out in the general area there and called, made arrangements to have a court reporter to come.

Q.    "Q.    When you left that room, did Detective Mason leave with you?

A.    "A.    Yes, he did.

Q.    "Q.    Did you, in fact, call a court reporter?

A.    "A.    Yes, I did."

Q.    All right.  Ms. Riley, did you also testify at the criminal trial and at the pre-trial hearing about having a private conversation with Mr. Rios?

A.    Yes.

Q.    Okay.  And directing your -- and do you recall that as you sit here today, what you said to him and what he said to you?

A.    Like I said, it was -- it was a procedure.  It was a ritual.  I know what I would have done next.

Q.    But does any of your memory as you sit there today specifically relate to --

A.    No, no.

Q.    -- what happened with Mr. Rios?

A.    No.  I couldn't tell you exactly what I said.

Q.    And just because the court reporter is having a bit of a

trouble, we need to give a little beat before --

A.   I'm sorry.

Q.   -- before the question and answer.

Okay.  So directing your attention to page 459, which is where we just were, line 5, I am going to ask you to answer the questions as you did at trial, okay?  Are you there?

A.   Yes.

Q.   Okay.

"Q.   Now, while you were waiting for the court reporter, did you ever re-enter the interview room?

A.   "A.   Yes, I did.

Q.   "Q.   Did you enter alone or with someone else?

A.   "A.   This time I was alone.

Q.   "Q.   Did you speak with the defendant again.

A.   "A.   Yes, I did.

Q.   "Q.   Did you ever -- can you tell the ladies and gentlemen of the jury what the conversation consisted of?

A.   "A.   I was explaining it to him that I had called for a court reporter.  It was going to take a while for her to get there, him or her.

"I told, basically told him what procedure we would be following.  That we would, you know, there would be probably just three of us, meaning myself, him, and detective.

"The court reporter would take down everything he said, much as this one, on the machine.  Then we would wait for

Riley - direct

1261

the statement to be typed up and that after the statement was typed up, I would review it with him again. And he'd have an opportunity at that point to make any changes in it.

"And I asked him how he was doing. Did he need anything? Had he been treated all right? Questions along that line -- those lines.

THE WITNESS: Excuse me.

MS. GOLDEN: Sure.

BY MS. GOLDEN:

Q. "Q. Did you specifically ask him how he had been treated by the police officers in this case?

A. "A. Absolutely.

Q. "Q. What did he respond to you?

A. "A. He said, just fine. He had no complaints.

Q. "Q. Did you then leave the interview room after speaking with him again?

A. "A. Yes, I did."

Q. Okay. And did you also testify at trial, Ms. Riley, about the actual taking of the court-reported statement of Mr. Rios?

A. I'm sure I did.

Q. And do you have any present memory of that that's specific to Mr. Rios as you sit here today?

A. The trial itself?

Q. No, the taking of the court-reported statement.

A. Oh, no.

Q.   Okay.

So directing your attention to page 450, line 15.

A.   460?

Q.   I'm sorry, 460.

A.   Okay.

Q.   You're right.

Are you there?

A.   Yes.

Q.   Okay.

"Q.   Did a court reporter arrive sometime later at Area 5?

A.   "A.   Yes.

Q.   "Q.   When the court reporter arrived, what did you do?

A.   "A.   Then Detective Mason and myself and Mr. Rios and the court reporter sat down and took his court-reported statement.

Q.   "Q.   Was that court-reported statement taken at a conference room at Area 5?

A.   "A.   Yes.

Q.   "Q.   Did the statement begin at 4:39 in the morning?

A.   "A.   Yes.

Q.   "Q.   Did it end at 4:51 that same morning?

A.   "A.   Yes.

Q.   "Q.   After the court-reported statement was taken by yourself of the defendant, did you again leave that room?

A.   "A.   Yes.

Riley - direct

1263

Q.    "Q.    When you left the room, what did you do?

A.    "A.    When I left the room, I went -- waited for the court-reported statement to be typed up.

Q.    "Q.    Did the court reporter, in fact, type the statement up on paper in question-and-answer form?

A.    "A.    Yes, right there in the Area.

Q.    "Q.    When she completed typing up the statement, what did you do with that statement?

A.    "A.    Detective Mason and I went back, met with Mr. Rios, and I had him read that statement out loud to me page by page. And as he finished each page, all three of us initialed it.  I believe there were some changes made in that statement.

Q.    "Q.    Did you tell Mr. Rios if he wanted to make any kind of corrections to that statement he could do so?

A.    "A.    Yes.

Q.    "Q.    As you sit here today, do you recall if he in fact made any corrections in the statement?

A.    "A.    Yes, he did.

Q.    "Q.    After you went over each page with the defendant, when you came to the final page, did you ask him to do anything?

A.    "A.    Yes.

Q.    "Q.    What did you ask him to do?

A.    "A.    Sign his full signature.  We all signed our full signatures on the last page.

Riley - direct

1264

Q.   All right.  Directing your attention to page 464, line 19.

A.   Okay.

Q.   "Q.   Did you ask him anything before he signed it?

A.   "A.   I asked him if this truly and fairly was what he had told me.

Q.   "Q.   Did he indicate to you whether or not that was truly what he had told you?

A.   "A.   Yes, he did.  He said it was.

Q.   "Q.   I am now going to ask you a question before I show you an exhibit.  At the conclusion of the statement after Mr. Rios signed his name, was anything further done?

A.   "A.   The court reporter took a picture of Mr. Rios.

Q.   "Q.   And was that picture taken in your presence?

A.   "A.   Yes."

         MS. GOLDEN:  Could we have 6?

         Your Honor, I'd like permission to publish to the jury Defense Exhibit 6, which has been previously admitted, which is also People's Exhibit No. 31, referred to in the next question.

         THE COURT:  Any objection?

         MR. S. RICHARDS:  No objection.

         THE COURT:  All right.

         Published.

BY MS. GOLDEN:

Q.   "Q.   I am now going to show what has been marked as People's Exhibit Number 31 for identification.  Can you tell

Riley - direct

1265

the ladies and gentlemen what this is a picture of?

A.   A.   That's a picture of Mr. Rios right after I talked to him that night."

Q.   Okay.  Could you read the answer on line 15, please.

A.   Oh, I'm sorry.

"A.   Picture of Mr. Rios taken just after we had all finished signing the court-reported statement."

MS. GOLDEN:  Page -- there we go.  Thank you.

BY MS. GOLDEN:

Q.   Looking at the second page of Exhibit -- Defense Exhibit 6.

"Q.   I'm asking you to look at the back of that picture.  Tell me if there is writing there.

A.   "A.   Yes.

Q.   "Q.   What writing is on the back there?

A.   "A.   It says picture taken by J. Lupa, A/5, 7/7/89, at 6:10 a.m.  Witnesses.  There's my signature, Detective Mason's signature, and Mr. Rios's signature.

Q.   "Q.   Did Mr. Rios sign his name to this photograph in your presence?

A.   "A.   Yes.

Q.   "Q.   And does this photograph truly and accurately show how he looked -- how the defendant looked to you at the conclusion of that court-reported statement?

A.   "A.   Yes."

Q.   So, Ms. Riley, I think you also said that you don't have

Riley - direct

1266

any -- you said before you don't have any specific memory of the court-reported statement or the oral interview; is that right?

A.   No.

Q.   And so it's fair to say you don't remember how they -- how they compared to each other, is that also --

A.   No.

Q.   -- correct?

Okay.  So directing your attention to page 501, line 19?

A.   Hang on.  501?

Q.   Yes.  It should be about the third page from the back.

A.   Okay.  I found it.

Yes, I see it.

Q.   Okay.  And I'll ask -- I will start at line 19 reading your trial testimony.

"Q.   Ms. Riley, did the defendant ever ask you if he could make a phone call?

A.   "A.   No.

Q.   "Q.   Prior to the court-reported statement, you had an oral conversation with him, didn't you?

A.   "A.   Yes.

Q.   "Q.   And the court-reported statement is substantially the same conversation that you had with him before; is that right?"

A.   Hang on.

Q.   Line 6?

A.   "A.   Yes."

          MS. GOLDEN:  Okay.  Could I have Exhibit 5-2, please.

          I'm showing the witness what we've marked as Defense 5-2.

BY MS. GOLDEN:

Q.   It should be on your screen there.

A.   I see it.

Q.   Okay.  Do you recognize that document?

A.   Oops.  Yes.

Q.   And is that the court-reported statement you took of Jaime Rios on July 7, 1989?

A.   Yes.

          MS. GOLDEN:  Your Honor, I seek to admit and publish to the jury.

          THE COURT:  Any objection?

          MR. S. RICHARDS:  No objection.

          THE COURT:  All right.  Defense Exhibit 5-2 is admitted and may be published.

     (Defendants' Exhibit No. 5-2 received in evidence.)

          MS. GOLDEN:  And if we could show the final page, please.

BY MS. GOLDEN:

Q.   Ms. Riley, is that your signature on the last page of the document?

A.   Yes.

MS. GOLDEN:  And if we could show the bottom of all the other pages.

BY THE WITNESS:

A.   That BAR is me.

BY MS. GOLDEN:

Q.   Okay.  So you've looked at this before, and the BAR are your initials on the bottom of all the other pages, right?

A.   Barbara Ann, yes.

Q.   Okay.  And on the first page of the court-reported statement, it refers to the name of the court reporter.  Do you see that?

A.   Yes.  Janet Lupa.

Q.   Do you know Janet?

A.   Well, I did then.  I can kind of picture her in my mind.

Q.   She does exist.  She's a real person, right?

A.   Yeah.  Oh, definitely.  She was an official assigned to criminal, so I would have seen her in court -- we always had a court reporter -- or other court-reported statements.

Q.   By the way, did you type that statement up?

A.   Me?  No.  I still can't type.  No.

Q.   Okay.  And according to the statement, there were four people in the room at the time the court-reported statement was given, correct?

A.   Three of us and Janet Lupa, yes.

Riley - direct

1269

Q. Okay.

Ms. Riley, in your oral interview with Mr. Rios, did you tell him how to answer your questions?

A. No.

Q. Did Detective Mason tell him how to answer your questions?

A. No.

Q. The story you got came from Mr. Rios?

A. That's why I was there, to ask him his side, what happened.

Q. Did -- have you ever seen a -- would you take a court-reported statement of someone when the detective supplied all the information about the crime?

A. That wouldn't be a court-reported statement, no.

Q. Have you ever allowed a police officer direct -- have you ever allowed a police officer to tell you or dictate to you what the -- should be contained in a suspect's statement?

A. No. Usually, the police were quiet. It wasn't -- that's not what they did then. I wanted to hear the initial statement, when I first talked to the suspect, what happened. Tell me what happened. And, no, the police would never talk at a court-reported statement.

Q. Did you and Detective Mason -- I know these questions may seem silly to you, but I'm just going to ask them.

Did you and Detective Mason somehow conspire together to put words in Mr. Rios's mouth?

A. No.

Riley - direct

1270

Q. Did you or Detective Mason ever tell Mr. Rios that if he would just sign the statement, he could see his children -- child?

A. No.

Q. Would you have ever done that or condoned that sort of behavior?

A. No.

Q. All right. Ms. Riley, so we understand that you interviewed Mr. Rios for about half an hour, met with him privately, and took his court-reported statement, right?

A. Correct.

Q. And during all those personal interactions with him, you had the opportunity to observe him physically, correct?

A. Correct.

Q. And you had the opportunity to observe his demeanor; is that right?

A. Correct.

Q. So now bringing you back to the current century and decade, more specifically 2020, 2021, 2022, and 2023, were you aware that Mr. Rios filed a petition to vacate his conviction?

A. No.

Q. Did anyone from the State's Attorney's Office ever consult with you about whether or not to oppose his motion to vacate his conviction?

A. No.

Q.   Were you ever asked to testify?

A.   No.

Q.   Did anyone from the State's Attorney's Office consult with you about Mr. Rios's petition for a Certificate of Innocence?

A.   No.

MS. GOLDEN:  May I have a minute?

THE COURT:  Yes.

(Counsel conferring.)

MS. GOLDEN:  Your Honor, we tender the witness.

THE COURT:  Okay.

Mr. Scahill?

MR. SCAHILL:  Just very, very briefly, Judge.

THE COURT:  Okay.

MR. SCAHILL:  Thank you.

CROSS-EXAMINATION

BY MR. SCAHILL:

Q.   Good morning, Ms. Riley.  My name is Tim Scahill.  I'm going to ask you just several questions, sort of related to what Ms. Golden asked you.

But with respect to Janet Lupa, Janet Lupa was somebody who would not only do court reporting in court, but she would be called out by the State's Attorney's Office for exactly the purposes that you're testifying about here today. She would --

A.   Correct.

Riley - cross

1272

Q.  -- take down the statements?

A.  Correct.

Q.  Okay.  And this is somebody that you had worked with numerous times over your career?

A.  Yes.

Q.  Okay.  Is there any chance, I know you don't have specific recollection, but is there any chance that you made up the fact that Janet Lupa actually came there during the statement of Mr. Rios and really it was you and Detective Mason who was taking down this statement?

Is there any chance that that happened?

A.  No.  Maybe -- no, there is -- no.  None.  No, not possible.

Q.  So the scenario where it's just you, Detective Mason, and Mr. Rios, and Detective Mason is sort of leading Jaime Rios through the statement and you are duly taking that down instead of a court reporter, no chance that happened,  is there?

A.  None.

Q.  Okay.  And similarly, I know, again, you don't have specific recollection, but is there any chance, knowing the way that you've conducted yourself throughout your career, that really what happened is you went into the interview room with Mr. Rios, and Detective Mason got on a white board and started writing the things that Mr. Rios was to say, and then you were taking them down?

A.  No.

Riley - cross

1273

Q.   Is there any chance that any of that happened?

A.   No.

Q.   Okay.  That would be highly improper conduct by you, right?

A.   All the -- no.  I mean, yes, highly improper conduct all the way around.  No.

Q.   That is not something you would ever even consider doing?

A.   No.

Q.   Okay.  And Detective Mason back in 1989, this isn't like some close friend of yours or anything, is it?

A.   No.

Q.   All right.  And the name of Gang Crime Specialist Reynaldo Guevara has come up.

     Back in 1989, this wasn't like a close personal friend of yours or anything, was it?

A.   No, I -- no.

Q.   Okay.

A.   Uh-uh.

Q.   And, again, I know you don't have specific recollection of this, but is there any chance that either Detective Mason or Mr. Guevara in any way tried to put pressure on you to do things that you were not comfortable doing within the scope of your duties as a prosecutor at the police station?

A.   That would never happen.

Q.   Okay.  You have your job as a prosecutor, and you fulfilled that with -- with integrity; is that correct?

A.   Correct.

          MR. SCAHILL:  That's all the questions I have.  Thank you, Ms. Riley.

          THE COURT:  Okay.  Mr. Richards?

                    CROSS-EXAMINATION

BY MR. S. RICHARDS:

Q.   Good morning.

A.   Good morning.

Q.   Do you still have that document in front of you, that --

A.   I have the transcript of --

Q.   The transcript?

A.   -- the trial.  Trial, yes.

Q.   Okay.  Great.

          And, again, you have no present memory either of what happened during the interrogation, correct?

A.   Uh-huh.

          Sorry.  Correct.

Q.   And you have no present memory of the specifics of what you testified to at trial, correct?

A.   I remember the trial because I basically knew absolutely everybody involved in the trial, both for the defense and the State.

          So I remember being at the trial.  I don't remember exactly what I said at the trial, and I don't remember -- I wasn't present for the whole trial.  I was just called in

Riley - cross

regarding the statement I took.

Q.  Right.  But the specific -- but specifically, you have no present memory of what you said at the trial when you testified.

A.  Correct.

Q.  You do -- you said you know everybody at the trial, right?

A.  I did.

Q.  Including Jack Carey?

A.  Yes.

Q.  In fact, you remember him quite well.

A.  Yes.

Q.  As a person, right?

A.  Yes.

Q.  And as a Public Defender back then, right?

A.  Correct.

Q.  And I think you testified at your deposition that you had sort of a -- a kind of impression or your memory of his cross-examination; is that fair?

A.  Correct.

Q.  And without -- you don't remember the specifics; you just sort of remember kind of the Gestalt of how it went, is that fair?

A.  That is a good word.  Yes.

Q.  Okay.  Well, I'll use it again, Gestalt.

And the Gestalt of how it went was it was a kind of

vigorous cross-examination, which you remember, with -- I don't know.  Tell me how you remember it in terms of your feeling when he cross-examined you.

A.  Because I only did one single thing, that is, take the court-reported statement, I could not answer any of the other things he was grilling me on.

Q.  Okay.

A.  And that's what I remember, how I felt having to say no, no, over and over again.  That's what I remember.

Q.  Because basically your knowledge of the case was limited to taking the court-reported statement.

A.  Exactly.  Only what Mr. Rios told me.

Q.  All right.  Let me go over -- if you could turn to page 461.

A.  Okay.

Q.  And if you'd look, beginning with cross-examination by Mr. Carey, page 461, do you see it?

A.  What line do you want?

Q.  And just say if this is accurate by Mr. Carey:

        "Q.    About how long did it take you to read that statement, just a guess, today?

        "A.    I have no idea."

A.  Yes, what line?

Q.  I'm sorry.  Please start at line 4 on 461.

A.  Okay.  I see it.

Riley - cross

1277

Q.   And if you want to read it to me starting at line 4, I would appreciate it.

A.   4. My answer is:

     "A.   Yes."

     You asked me -- or he asked me:

     "Q.   Did the statement begin at 4:39 in the morning?"

     I answered:  "Yes."

Q.   I'm sorry.  I am looking at page 461.  Are we on the right page?

A.   Mine says 461.

Q.   Oh, I'm sorry.  I am on the wrong page, because I misread.

     Could you go to page 481 and start at line 4.

A.   Okay.

     "Q.   About how long did it take you to read that statement, just as a guess today?

     "A.   I have no idea.

     "Q.   No idea?

     "A.   Seven minutes.

     "Q.   Well, would it surprise you if I told you you started reading at a quarter after?

     I said:  "Yeah."

     "Q.   Well, you started reading at a quarter after. Now, were you assigned to Area 5 that day?

     "A.   Yes.

     "Q.   And did you have more than one Area that you

were covering?

"A.   That night?

"Q.   Right.

"A.   Had the State's Attorney been busy in Area 6, it is possible I might have had to go to Area 6 on assignment.

"Q.   Did you go to Area 6?

"A.   I can't tell you now if I did that night or not."

Want me to keep going?

Q.   Yes, please.

A.   "Q.   Where were you when they called you?

"A.   Here at 26th and California.

"Q.   So you drove immediately about 2:00 in the morning?

"A.   I got there at 2:00 in the morning.

"Q.   When you got there, you spoke to the detectives that were working on the case; is that right?

"A.   That is right.

"Q.   You spoke to Mason and Halvorsen?

"A.   Yes.

"Q.   Did you speak to anyone else?

"A.   No.

"Q.   Did you speak to Officer Guevara or Gawrys?

"A.   No.

"Q.   Did you see them there?

Riley - cross

"A.   No.

"Q.   Did you see Jaime Rios's -- Jaime Rios's girlfriend there?

"A.   No.

"Q.   Did you ever see her in the room with him?

"A.   No.

"Q.   Did you ever see her at all that night?

"A.   No.

"Q.   Did Mason tell you that his girlfriend had visited with him?"

Q.   Stop there, please.

Go to line 6.

A.   No.

"A.   No.

Q.   Beginning with after Mr. Carey, line 7.

A.   "Q.   And you were there from about 2:00 until about almost 5:00 in the morning?

"A.   It was later than that.  It was closer to 6:30.

"Q.   So from 2:00 to 6:30, you were there, and you didn't see his girlfriend at all --

"A.   No.

"Q.   -- while you were there?

"Now you read reports before you talked to Jaime, too; is that right?

"A.   Yes.

Riley - cross

1280

"Q.    Police reports?

"Do you remember which reports you read?

"A.    No.

"Q.    Did you read detectives' reports?

"A.    I couldn't tell you now.

"Q.    Did you look at any of those reports before you came to testify today?

"A.    No.

"Q.    Have you ever looked at those reports?

"A.    No.

"Q.    Since then?

"Now, there was a -- not a" -- I'm reading verbatim -- "Now, there was not a who lineup before you took the statement; is that correct?

"A.    I have no idea.

"Q.    So you had no idea if anyone had identified him?

"A.    No.

"Q.    And obviously you got there at 2:00 o'clock?

"A.    Yes.

"Q.    So you don't know what the police did to him before you got there?

"A.    No.

"Q.    And the first thing that you said to Jaime was, I am a lawyer working with the police, not your lawyer?

"A.    Yes.

"Q.    Is that right?

"A.    Yes.

"Q.    And he eventually told you that the police treated him all right?

"A.    Yes, he did.

"Q.    Now you began taking the statement, the court-reported statements, at 4:39 in the morning; is that right?

"A.    Yes.

"Q.    And you read him his rights.

"A.    Yes.

"Q.    You read him his rights before you took the court-reported statement; is that correct?  I mean, the first conversation you had with him, you read him his rights.

"A.    Yes, I did.

"Q.    He never told you he wanted a lawyer?

"A.    No, he didn't.

"Q.    Did you offer to give him a phone call?

"A.    No.

"Q.    Then you began asking him questions?  Well, at the court-reported statement you began, and you asked him what he told you that he was -- well, he told you that he was a Latin King; is that correct?

"A.    Yes.

"Q.    Then he -- you asked him, well, in your first

Riley - cross

1282

conversation with him, you asked him about a murder; is that right?

"A.    I don't recall if those were my exact words or not.

"Q.    Well, when you began the statement, he took you back to a scene outside his house; is that right?

"A.    Are you referring to the court-reported statement?

"Q.    Right.

"A.    Yes.

"Q.    And that somebody came by and shot at him and some other people who were out in front of his house?

"A.    Yes.

"Q.    And I believe -- now, he didn't give you the date.  You gave him the date, right?  You said, we are going to talk about June 27th?

"A.    In the court-reported?

"Q.    Right.

"A.    Yes.

"Q.    And now he told you about this shooting outside of his house.  Did you check that out at the 14th District to verify that there was a shooting?

"A.    No.

"Q.    Did Detectives Mason or Halvorsen in your presence check out that shooting?

Riley - cross

1283

    "A.   I have -- no, I have no idea."

      Excuse me.

Q.  While you're stopped, please go on reading, but please stop at line 9, and don't go further than that, okay?

A.  Okay.

    "Q.   Did they tell you that they checked it out?

    "A.   I don't know.

    "Q.   You don't remember?

    "A.   No.  They never told me anything like that.

    "Q.   Then he said he went and got his gun, a .38?

    "A.   Yes."

Q.  Thank you.

      Now, if you go down to the beginning of line 23 and line 24, can you start reading there?

A.  Okay.  Line 24.

    "Q.   Well, you knew that it was a .25-caliber gun that was used to kill Luis Morales; you did know that?

    "A.   No.

    "Q.   Well --

    "A.   I did not know that.

    "Q.   Well, was that in any of the reports you read?

    "A.   I can't remember now.

    "Q.   Was that in any of the discussions between you and the detectives?  Did they tell you that?

    "A.   I can't remember now.

Riley - cross

1284

"Q.    Well, when you questioned him, you said, when you were talking about Tino you said, did you know what kind of gun he had?  And he said he had an automatic .22, I think it was.  And you said, a .22 or a .25, didn't you?

"A.    Yes.

"Q.    So now do you know that you knew it was a .25?

"A.    No."

Q.    Stop.  Thanks.

We'll -- if you could go on to page 489, if you begin with line 2, and stop at line 11, please.

A.    "Q.    He told you that they -- that he was going to scare people, not to kill anybody; is that right?

"A.    He said he was going to scare them.

"Q.    He got Tino or Tino somehow got involved?

"A.    Yes.

"Q.    Cristino is the person's name?  You knew eventually that that was wrong, too?

"A.    No.

"Q.    Well, you know, don't you know now that Chris or Tino was never identified by anybody?"

Q.    Stop.  Thank you.

Please go ahead to line 14.

A.    "A.    No, I don't know that."

That was the answer.

Q.    Right.  And if you'd keep going.

A.   "Q.   You never talked to the detectives, or this just never came up, never -- your curiosity was never --

        "A.   No.  I don't know that.

        "Q.   But you do know that you corrected Jaime when he said .22."

Q.   Stop.  Please go to page 490, beginning at line 1.

A.   "A.   I don't know at all that I was correcting him.

Q.   And keep going, please.

A.   "Q.   Well, let me read it to you again.

        "Question:  How long was Tino gone to get that gun?

        "Answer:  At least ten minutes.

        "Your question:  "Did you see what kind of gun he had when he came back?

        "A.   No.

        "Q.   What -- did you know what kind of gun he had?

        "A.   He had an automatic.  .22 I think it was.

        "Question from you:  "A .22 or a .25.  Do you remember saying that now?

        "A.   Well, I never denied remembering saying it, but I'm not sure I was correcting him.  It sounds to me like I was clarifying.

        "Q.   Okay.  You talked before about the corrections that he made?

        "A.   Yes.

        "Q.   He made two corrections?

Riley - cross

1286

"A.    Yes.

"Q.    What were those corrections?

"A.    On the top of page 7, it was written, it said, all right, and it should be, they said all right.  And he inserted a Y to turn the T into a they.

"Q.    So that was his correction there?

"A.    Yes.

"Q.    And the other correction?

"A.    It is on the top of page 10.

"Q.    Uh-huh.

"A.    And the word as typed is thought.  So it says, he ran thought the empty lot and got lost.  He crossed out the T, and changed the word to through.

"Q.    That was the other correction that he made?

"A.    Yes.

"Q.    Now, how many court-reported statements have you taken as an Assistant State's Attorney?

"A.    Prior to this one or subsequent?

"Q.    Total.

"A.    Probably around 10 or 12.

"Q.    Isn't it true that almost all court-reported statements have corrections in them?"

Q.    Stop.

Please go to line 24.

A.    "A.    You mean every one of them?

"Q. In your experience, do most of the court-reported statements have corrections?

"A. Probably most of them.

"Q. Is that because the person who signs the statement has to initial that correction; is that right?

"A. I don't know."

Q. Stop.

Go on to -- go on to line 12, and just read to line 15 -- I'm sorry. Begin reading on line 13.

A. "Q. Well, if somebody initials a correction, it makes it look like they have read the statement, doesn't it?"

Q. Stop.

Go top Line 19.

A. "A. His initials are on the bottom of each and every page."

Q. Keep going.

A. "Q. Well, so, Jaime Rios, do you know if he graduated high school or not?

"A. Yes. I had asked him that. No, he had --

"Q. Did he graduate high school?

"A. No.

"Q. So he's correcting the grammar in this?

"A. It's mostly typos.

"Q. So they are typos, but he could tell you the difference between thought and through? He noticed that, or

Riley - cross

1288

did he notice that?

"A. No. He was reading it out loud.

"Q. Well, did you notice there was another typographical error in that he didn't notice, did he?

"A. No.

"Q. Didn't make that correction?

"A. No.

"Q. That was a capital I, small I that should have been a capital I, right?

"A. I don't know exactly which one you were referring to. I think there's more than one.

"Q. In any case, you got two corrections in the statement; is that right?

"A. Those two corrections he made in the statement.

"Q. Thank you."

Q. I'm going to stop here with the reading and then ask you some questions just about that issue, okay?

A. Yes.

Q. Now, you said that you knew Janet Lupa, right?

A. Uh-huh.

Q. Say yes or no?

A. I'm sorry, yes.

Q. And she was a court reporter at 26th Street, right?

A. Yes.

Q. Because the court reporters that were used by felony review

Riley - cross

1289

were the same court reporters that were used at 26th Street generally, right?

A.   Probably also in the misdemeanor courts and probably also in traffic court.

Q.   Right.

And the way it worked at 26th Street was that court reporters are not assigned to a specific courtroom.  They generally move between courtrooms, right?

A.   I think they had a whole different office that assigned them.

Q.   Right.

Okay.  But it wasn't like, for example, in other courts, where there's one court reporter designated, that court reporter was for that courtroom?

A.   No.

Q.   That was not --

A.   Not to my recollection.

Q.   Okay.

Now the court reporters in your experience were all highly trained, right?

A.   Yes.

Q.   They were all good typists?

A.   I don't know.

Q.   Okay.

A.   There is typos in this.

Riley - cross

1290

Q. All right. Well, let me ask you this. The procedure for a court reporter would be they would do whatever they do with the court reporting machine, right?

A. Yes, that little machine.

Q. Right? Which is a mystery to us, right?

A. Correct.

Q. And then they would produce a transcript, right?

A. Correct.

Q. They would review the transcript to see if it was correct, if it had been typed -- correctly typed up, correct?

A. You are asking me if the court reporters did that independently?

Q. Yeah, I mean the procedure for court reporters, whether they were in a courtroom or anyplace else is they do their magic with the court reporting machine, they produce a transcript, they review it for accuracy. Sometimes they ask for spelling of names so they get that exactly right, correct?

A. Correct.

Q. That happened often, right?

A. Often.

Q. And then eventually a transcript is produced, right?

A. Yes.

Q. Now, this particular transcript which was produced had at least two we can call them typographical or grammatical or spelling or some sort of error in them, correct, in that

Riley - cross

transcript, right?

A.   Yes.

Q.   And what you are saying to us is that based on your general experience, Jaime Rios would have gone through the transcript, asked to see if anything was accurate, and you're saying that he didn't make one substantive correction in terms of changing a date, time, what happened.  He didn't make any of those corrections.  Fair?

A.   Correct.

Q.   The only thing Jaime Rios did after he reviewed the transcript was to catch an error on two words and to make those corrections, right?

A.   Which you would have caught if you were reading it out loud.

Q.   Okay.  And you're saying that -- are you saying that he caught those errors, or did you point out those errors to him?

A.   I don't remember now.

Q.   Fine.  Okay.

         Isn't it true that in almost every court-reported statement you took, at least the 10 or 12, there were typographical or small grammatical errors, and they were corrected by the suspect, and his initials or her initials were placed by those corrections to small grammatical errors, isn't that true?

A.   I'm going to have to stand by what I said at trial, that

said most of them, but --

Q. Most of them. You're not sure all, but most -- that happened most of the time, right? Correct?

A. Correct.

Q. Okay. And isn't it the truth, isn't it the fact, that it was a deliberate practice to put in those smaller errors so the defendant or suspect could correct them, make a little notation, and that would be proof that the suspect had read the statement and that it was his statement? Wasn't that the general practice?

MR. SCAHILL: Objection.

THE COURT: Basis?

MR. SCAHILL: Foundation. Argumentative.

THE COURT: Okay. Overruled.

You may answer if you know.

BY THE WITNESS:

A. I'm going to stand by my testimony here, and to tell you the truth, until Mr. Carey asked me that, no, I had no understanding that that was done deliberately.

BY MR. S. RICHARDS:

Q. Okay. But you sitting here today have no explanation as to why that happened, these small errors in most of the statements you took, and in most of the statements you took, the suspects made those small corrections, correct? That's true, isn't it?

A. No. I don't know. I know that -- I read a lot of

transcripts, and there are oftentimes errors in transcripts,

particularly when they are being done under the gun in Areas,

so no, I can't answer that.

Q.   Okay.  Do you have a present memory as to any -- in any of

the 10 or 12 statements that you took where a suspect made a

substantive correction in the statement in terms of changing

something besides a small typo or grammatical error?

A.   No.

Q.   All right.  Now, I think we're now -- if we go back to page

493, line 23, could you begin reading at line 23, and stop on

the next page, at line -- 494, line 6, please.

A.   Line 23:

        "Q.    Thank you.

        "Now he went on to say where did Tino have the gun.

That was a question, right?  Right?  He said in his pocket.

        "A.    Yes.

        "Q.    That was wrong, wasn't it?

        "A.    I don't know.  That is what he told me.

        "Q.    You read the police reports, didn't you?"

Q.   Thanks.

        Now, please go to line 13 and begin at line 13.

A.   "A.    I can't recall now what -- which police reports I

read.

        "Q.    So you can't recall?

        "A.    No.

Riley - cross

1294

"Q.    Then you said that -- let me get back to -- then you talked about him crossing into Cobra territory across Western; is that right?

"A.    Yes.

"Q.    And he got a little mixed up at that point; isn't that right?

"A.    Which point are you referring to now?

"Q.    When he started talking about crossing into Cobra territory?

"A.    Okay."

Q.    Stop.

Go, please, to page 495, beginning with -- after Mr. Carey -- or line 11, 12.

A.    "Q.    Well Jaime Rios never told you anything in the statement about the women or any women in an alley, did he?

"A.    Which point?

"Q.    Well, when he crossed into Cobra territory in your first conversation.

"A.    The first time?

"Q.    Yeah.

"A.    No.  I don't remember him telling me that.

"Q.    You don't remember him telling you that?

"A.    No.

"Q.    He might have?

"A.    No, he did not.

"Q. Instead, he said two guys, he ran into two guys there in the alley, right?

"Q. Are these, these the guys that asked him what is up?

"Q. Well --

"A. I am confused as to which encounter you are talking about.

"Q. On Page 7, the top of Page 7.

"A. Right.

"Q. Said two guys, not two women, right?

"A. Right.

"Q. Then further down you asked him, did a car come by? He didn't tell you a car came by. You asked him did a car come by; is that correct?

"A. Yes.

"Q. And he said yeah? And then said Tino was walking towards Potomac, right?

"A. Yes.

"Q. And you said to him, you were on the north side, and he said yeah. And you said you got to Western and you turned left, you went north. He said yeah.

"A. Yes.

"Q. By the way, none of the people that you talked to -- well, did you talk to the confidential informant?

"A. No.

"Q.    So no one you talked to mentioned Tino; is that right?"

Q.  Stop, please.

Go to line 8, doing just line 8 and 9.

A.  9:

"Q.    Other than Jaime?"

Q.  Go to line 11.

A.  "A.    I basically just know what the defendant himself told me.

"Q.    And what the detectives told you?

"A.    But in the court-reported statement, I am dealing with what he had told me during my first interview with him.

"Q.    Next.  So they go up Western, and they are walking up Western, and he tells you he sees a guy sitting by a bar; is that right?

"A.    Right.

"Q.    Did you have him describe that person by the bar?

"A.    No.

"Q.    You don't know what this person looked like who was sitting outside the bar, only that Jaime saw a guy by a bar?

"A.    Right.

"Q.    Was he black or white?

Riley - cross

1297

"A.    I have no idea.

"Q.    Next there is a confrontation with the victim?

"A.    Yes.

"Q.    He shot at a range of about one foot according to Jaime?

"A.    Right."

Q.    Stop.

Go down to line 19, please.

A.    "Q.    That is a wrong fact?  It was not supported by the medical, was it?

"A.    I have no idea.

"Q.    He said that the victim was shot three times, and you know that was wrong, too, didn't you?

"A.    I have no idea."

Pardon me.

Q.    Take your time, please.  I think we are on line 2.

A.    "Q.    They didn't, no place in the reports told you how many times he was shot?

"A.    I can't remember that now.

"Q.    Did you confront Jaime at all with any of those inconsistencies about the physical evidence in the case?

"A.    I was just -- my whole goal was to take his statement.

"Q.    You got through taking the statement in 12 minutes, didn't you?

Riley - cross

"A.    During the court-reported?

"Q.    Right.

"A.    Yes.

"Q.    12 minutes for an 11-page court-reported statement; is that right?

"A.    Yes.

"Q.    Right?

"A.    Yes."

Q.    Stop.

Please go to page 500 beginning at line 2.

A.    "Q.    You knew the dates, didn't you?  You knew the date that Luis Morales got shot, didn't you?  You remember that, don't you?

"A.    You mean at the time did I know when Luis Morales was shot?

"Q.    Right, right.

"A.    Yes, I did.

"Q.    And you knew that that was impossible, that statement was impossible, didn't you?"

Q.    Stop.

Go to line 14, please.

A.    "A.    I merely wanted to know what he told me.

"Q.    Well, you wanted to get to the truth, didn't you?

"A.    I was there to record his statement.

"Q. Right. And you know that Mason and Halvorsen had him since about 10:00 o'clock the night before, 4:39 in the morning, right?

"A. No, I didn't know that either.

"Q. You didn't know that?

"A. No.

"Q. But you did ask him if he was treated fairly after you told him that you were a lawyer working with the police?

"A. Yes, I did.

"Q." --

Q. Stop.

Okay. No further questions on this document.

THE COURT: Mr. Richards, does that conclude your cross-examination as well?

MR. S. RICHARDS: I have a few more questions, or just this document?

THE COURT: Okay.

(Counsel conferring.)

BY MR. S. RICHARDS:

Q. So I just have a few more questions.

Again, I'm going to start with kind of like general memories of interrogations because you don't have a specific memory of this one, okay?

A. Correct.

Riley - cross

Q. So when you went to police stations, you would speak to suspects, and sometimes they were in custody, sometimes they'd already been arrested, right?

A. Correct.

Q. Sometimes they hadn't been arrested, correct?

A. Correct.

Q. All right. And you usually interviewed them, at least initially in an interview room, small room with a table, a desk, and a handcuff ring, right?

A. Correct.

Q. Now, you -- the suspects, when you spoke with them, did you ever see a suspect in handcuffs during an interrogation?

A. You mean when I am talking to them?

Q. No, actually I'm going to be a little more specific and maybe more specific to this case.

When you -- you know that you've testified at prior proceedings, the motion to suppress, that you never once saw Jaime Rios in handcuffs during this whole encounter, right?

A. Correct.

Q. That's true; you testified to that before, right?

A. Yes.

Q. Okay. But the first time you went in to see him was with yourself and Detective Mason in the small room with the handcuff ring, right?

A. There were handcuff rings in all the rooms.

Riley - cross

1301

Q.  Okay.

Well, here's the thing.  When you first went in, did you see Detective Mason uncuff Jaime Rios from the handcuff ring?

A.  I don't remember.  I never felt the need to have people I was talking to handcuffed.  That's all I can tell you.

Q.  Okay.  So your present memory one way or the other, you can't say whether you saw Mason uncuff Jaime Rios from the handcuff ring?

A.  Can't remember.

Q.  Okay.  And after you finished speaking with Jaime Rios, you -- with Detective Mason present, do you have any present memory as to whether after the interview was finished Detective Mason handcuffed Jaime Rios to the ring?

A.  I would be -- I don't see why.  No.  I can't -- I have no idea, but I don't understand why that would happen.

Q.  Well, it might happen because he was a murder suspect in custody, wasn't he?

A.  He was also voluntarily talking to me.

Q.  I know.  But he was a murder suspect who had just confessed to you to a murder, right?

A.  He never confessed to me.  You read the statement.

Q.  Okay.  Well, he made a statement to you in which he implicated himself in a murder; fair?

A.  He was there, yeah.

Riley - cross

1302

Q. Okay. And in terms of being -- being there, you had the option when you were speaking with people possibly of hearing other statements saying, you know, can you be a witness, or eventually charging them. Fair?

A. No.

Q. No?

A. I'm confused.

Q. Well, here's the thing. One of the things you did on felony review in addition to taking statements is you made charging decisions, right?

A. Sometimes.

Q. Okay. Yeah. So sometimes you would say -- you looked at the police reports, talked to the person, this person is going to be charged, correct?

A. I would probably have called the supervisor back at 26th Street, but eventually the State's -- someone from -- but this was an ongoing investigation. That wasn't appropriate here.

Q. Well, here's the thing. There were investigations where, after taking a statement, you called your supervisor. You said, listen, this is what I got, I got the statement, I got this, I got that, should we charge this person or not, right?

A. Correct.

Q. That happened, didn't it?

A. Yes.

Q. It didn't happen in this case after you had completed the

statement, correct?

A. Correct.

Q. Now, in terms of -- in terms again of the handcuffs, you say that in this case, you believe that, as in other cases, you would have, as part of your ritual, part of your procedure, you would have gone back into the room with you and Jaime alone just to make sure there was nothing fishy going on, he had not been mistreated, right?

A. Yes. And to tell him what was going to happen, yes.

Q. Okay.

Now, is it your memory, either your practice or specific to this case, that you went in to talk to Jaime alone in that room alone, he was not handcuffed?

A. I will say it again. I never felt the need to have someone I was talking to on this level be in handcuffs.

Q. Okay. Now, you had earlier said that you thought that -- you were refreshed, you remembered that you had given Jaime the choice between a court-reported statement and a handwritten statement, right?

A. Correct.

Q. Now, let's just be clear. Back in that day, back in the day, what a handwritten statement was, there was a form that the State's Attorney had, right?

A. Correct.

Q. And the form had, like, typing at the top where you could

Riley - cross

1304

fill in --

A. I'm trying to remember. But go on.

Q. Okay. Well, if you remember, you remember; if you don't, you don't. That's fine.

So this form had -- at the top, it had little blanks where you could put in the date of the interview, the date of the incident, who was there, who was not there, that could all be written in.

And then there were lines, and then you, the State's Attorney, could write out the statement, show it to the suspect, see if the suspect agreed, and then have the suspect sign it. That was the procedure, was it not?

A. You know, if you say there was a form like that, there could be, but don't forget, we also took statements from a witness. And you would never be calling in -- I don't ever recall doing a court-reported statement on a witness.

Is it possible I would use a form like that to record the statement of a witness? Perhaps.

Q. All right. Do you remember ever using a form like that to record the statement of a suspect? Right?

A. I don't -- no, I don't remember doing that. Not for something like -- no.

Q. Okay. So when you testified at the trial that you had given Jaime Rios the option of doing either a court reporter or the handwritten statement, was that accurate or not?

A.   Well, I could have done that, I suppose.  I could write it down on anything.  But -- I think everyone was more comfortable with the structure, if you will, of a court-reported statement rather than having to think up the words themselves.

Q.   I understand.

A.   Do you understand what I mean?

Q.   I do, but I want to be clear.

The handwritten kind of statement I am talking about is a statement where there's a form where you, the State's Attorney, write on the form, and then you show it to the suspect and he either signs off on it or not.

Do you ever remember there being a form like that?

A.   Not really.

Q.   Okay.

So when you testified at trial that you gave him the option of a court-reported statement or the handwritten statement, that was inaccurate testimony.  Fair?

A.   I just don't remember the form.

Q.   All right.

A.   I mean, if he had some objection to a court-reported statement, and obviously the police thought what he had to say was valuable, I would have written it down somewhere.  I just don't -- can't picture that form in my mind.

Q.   Okay.  Well, it was never the case that you would hand a suspect a piece of paper and just say, write down your version

of the events; that never happened in your memory, did it?

A.   I can't really recall.  I mean, I guess you could if they wanted to.  I mean, we only wanted to know what he had to say.

Q.   All right.

A.   But I don't remember them writing it in their handwriting, no.

Q.   Okay.  But somebody writing down something in their own words on a piece of paper, that would be what they wanted to say, right?

A.   If they wanted to do that, how could I stop them?

Q.   Well, they'd have to give him a piece of paper, right?

A.   I'm sure we could have done that.

Q.   And they'd have to be given a pen, right?

A.   I'm sure we could have done that.

Q.   But it never happened with Jaime Rios?

A.   No.  He said he wanted a court-reported statement.

Q.   Well, did the words court-reported statement come out of his mouth?  He just, without you saying anything, just said, you know, Ms. Riley, I want a court-reported statement.  Did he say that?

A.   No, no.  I told him how that would be and how it would happen.

        MR. S. RICHARDS:  One moment.

BY MR. S. RICHARDS:

Q.   Do you remember what Janet Lupa looked like, by the way?

A.   I think I remember her name more than her face.

Q.   Okay.  And during the court-reported statement, she would be sitting in one part of the room doing her magic with the court reporter machine, right?

A.   I don't understand what you mean.

Q.   I mean, in other words, during the court-reported statement, she wouldn't say anything, would she?

A.   No.

Swear him in.  She would swear him in before she started taking the court-reported statement.

Q.   All right.

Well, does it indicate anywhere in the court-reported statement that Jaime Rios was sworn in?

A.   I don't recall.  But that was a standard practice.

Q.   Okay.  Well, is that standard practice of swearing a suspect in, is that anywhere in this court-reported statement that we have today that the court reporter says to the suspect, raise your right hand.  You swear that what you are just going to say is the truth; does that appear in that statement?

A.   I don't know.  I don't know.  I mean, I would have skipped right over it.  It's like boilerplate.

Q.   All right.  But isn't it a fact that that boilerplate is not in this court-reported statement?

A.   I can't tell you.  I don't know.

Q.   Ant isn't it a fact that it was never in any court-reported

Riley - cross

1308

statement that you took?

A.   Wrong.

Q.   You remember court-reported statements where suspects were actually sworn in and --

A.   Remember the procedure and the ritual, yes.  Court reporter swore them in.

Q.   And you remember that happening, the court reporter swearing suspects in, asking if they swore to tell the truth, right?

MS. GOLDEN:  Objection.

THE COURT:  Basis?

MS. GOLDEN:  Asked and answered.

THE COURT:  It's overruled.

You may answer.

BY THE WITNESS:

A.   It happens at depositions.  The court reporter swears the people in.

BY MR. S. RICHARDS:

Q.   I know, but this is not a deposition, is it?

A.   It's treated the same way in that respect.

Q.   Okay.  And you are absolutely certain that it was treated in the same way in that respect way back then that the court reporters always swore in the suspects and asked them and tell them, you are swearing to tell the truth; that's your testimony, right?

A.  My recollection and my testimony.

Q.  And is there anything in the transcript of the statement where the court reporter says something like, testimony sworn before me on this such-and-such date.  Do you remember that being in the statement?

A.  I can't tell you that.  I don't know.

MR. S. RICHARDS:  Nothing further.

THE COURT:  Okay.

Redirect?

MS. GOLDEN:  Very briefly, Your Honor.

Could I have Exhibit 6?  If we could put on Exhibit 6, please.  And this has been previously admitted, so we would like to publish.

THE COURT:  Okay.

MS. GOLDEN:  My apologies.

5-2, please.

REDIRECT EXAMINATION

BY MS. GOLDEN:

Q.  Can you see, Ms. Riley --

MS. GOLDEN:  And can you make it so we have one complete page on the screen?

MR. KIVETZ:  One second.

Okay.  Here it is.

MS. GOLDEN:  Okay.

BY THE WITNESS:

Riley - redirect

1310

A.   I can read it.

BY MS. GOLDEN:

Q.   Okay.  This is -- could you scroll through the pages, please?

     You can tell here, can you not, that this is a photograph of the original handwritten -- or original court-reported statement, right?

A.   Yes.

Q.   And this is -- this is something that the court reporter types up after the statement has been given basically on the fly in some other room, right?

A.   Or -- I don't know.  It was the middle of the night at Area 5.  She could have been out in the middle of the -- I don't know that she went away to do that.  I can't remember that.

Q.   But this is a typewritten document, right?  It's not --

A.   Correct.

Q.   There's no computer spitting this out, right?

A.   No, no.

Q.   So there's one draft, and if any corrections need to be made, they need to be handwritten onto this particular document, right?

A.   Correct.

     MS. GOLDEN:  No other questions.  Thank you.

     THE COURT:  Anything on that, Mr. Scahill?

MR. SCAHILL:  Just very briefly, Judge.

RECROSS EXAMINATION

BY MR. SCAHILL:

Q.  You did not conspire with Janet Lupa to bake in some errors into this confession so you could then go and correct them later, did you, Ms. Riley?

A.  No.  Some court reporters were better than others.

Q.  Okay.  These statements that are being taken at Area 5 in the middle of the night are being done under time constraints that, for example, our court reporter here wouldn't have under, you know, the circumstances that we have in the confines of this courtroom, right?

A.  Well, most of the time when I -- a court reporter in the court would go home and type it up or go somewhere else and type it up.  But we were waiting.  I don't know -- we were waiting for her to type it so we could read it.

Q.  Right, she has to do it in relatively short order because you actually have to go over it with --

A.  Correct.

Q.   -- the person who gave you the statement?

A.  Correct.

Q.  Okay.  And as far as what is transferred onto that typewritten document, that is not a decision you're making, that's something that the court reporter is doing with their little machine, right?

A.   Correct.

Q.   And so, again, you're not telling Ms. Lupa or anyone else, make sure you don't take this down right so I can go back in there and --

A.   No.

Q.   -- make sure he corrects it?

     Okay.

     You were asked some questions about you not charging this under felony review.  Do you remember those questions?

A.   Uh-huh.

Q.   In this case -- well, let's just talk about this more generally.

     In cases where there are things like eyewitnesses who have not had a chance to come in for lineups, when somebody has confessed, it was very, very common to not charge it immediately until there had been some other investigation done on the case; isn't that true?

A.   Yes.  It is my understanding that this was just part of an ongoing investigation.

Q.   Okay.  So the fact that you don't say, okay, we're sending him to court right now, charge him, that is not some commentary or opinion by you that this is not a case that lacks sufficient basis to go forward, is it?

A.   No.

Q.   Okay.

Riley - recross

1313

You were also asked some questions about talking with Mr. Rios outside of the -- alone without the police there. Do you remember those questions?

A. Yes, I do.

Q. Okay. That was a matter of protocol in every single case where statements were made; isn't that true?

A. Correct.

Q. Okay. So there wasn't anything with respect to Mr. Rios's case in particular that you thought, you know, something fishy is going on here, I better talk to him alone. This happened in every case --

A. Yes.

Q. -- that there's a statement.

Okay. And, finally, you were asked a bunch of questions about handwritten versus court reported. What is the most superior, accurate way to take down somebody's statement in your experience as a State's Attorney?

A. I don't think it has anything to do with experience. These documents would wind up in court or before other people. Some people's handwriting was atrocious. You couldn't read it. Even the police were typing their reports.

Q. And the court reporters, they are taking down every ah and um --

A. Correct.

Q. -- and verbal pause, so it is the most accurate way to take

down exactly what is said in that room?

A.   Correct.

MR. SCAHILL:  Okay.  I have no further questions. Thank you, Ms. Riley.

THE COURT:  Anything on that?

MR. S. RICHARDS:  No, Your Honor.

THE COURT:  Okay.  Ms. Golden?

MS. GOLDEN:  No, Your Honor.

THE COURT:  Okay.

Ms. Riley, you may step down.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Ladies and gentlemen, we will go back to the plaintiff's case now.

Are we recalling Mr. Rios?

MR. J. RICHARDS:  Yes, Your Honor.

THE COURT:  Mr. Rios?

Please take a seat, Mr. Rios.  I remind you that you remain under oath.

Mr. Richards, you may start once the witness is settled.

JAIME RIOS, PLAINTIFF HEREIN, SWORN,

DIRECT EXAMINATION (RESUMED)

BY MR. J. RICHARDS:

Q.   Jaime, I believe yesterday in the afternoon, we left off with you being shown a picture of Little Mike from a book.  Do

you recall that?

A.   Correct.

Q.   Now, prior to seeing that picture of Little Mike, did you know who Little Mike was?

A.   Yeah, he was one of the fellow members from the neighborhood.

Q.   Now, with Little Mike, had you seen him prior to being shown that photograph?

A.   That same day that I got arrested in front of the house, I seen him earlier that day.

Q.   Now, when you saw him earlier that day, around what time was that?

A.   About 1:00, close to 2:00.

Q.   And when you saw him about 1:00 or close to 2:00, whereabouts did you see him?

A.   I was coming out my house with my bike, doing my routine like I usually do, go to my mom's house, and when I started driving down the -- my bike down the sidewalk of the school, the guys were hanging out by the schoolyard.

Q.   When you say the guys, who are you talking about?

A.   Talking about Jose Melendez, Little Mike, and a couple of more guys.

Q.   Guys in terms of Latin Kings?

A.   Yeah, the ones that were already still active.

Q.   And when you saw them, did you do anything?

A.   Yeah, I'd stop and I'd say hi.

Q.   And after you stopped and said hi, what happened next?

A.   Detective Guevara showed up in his car.

Q.   In his car, was that an unmarked car?

A.   Yes, sir.

Q.   And when Detective Guevara showed up in an unmarked car, what happened next?

A.   When Mr. Guevara showed up, he stopped his car.  He got out of his car.  He started taking Polaroid pictures of the guys.

Q.   From what distance was he taking these Polaroid pictures?

A.   You could say like from here to where you're at.

Q.   And when he was taking these Polaroid pictures, what were the guys doing?  Were they just standing there?

A.   They can't do nothing else.

Q.   After he took Polaroid pictures, what happened next?

A.   Well, he got back in his car and told Little Mike, come on, come with me, and Little Mike got in the car with him.

Q.   When Little Mike got in the car, did he get in the back of the car or the front of the car?

A.   He got in the back seat of the car.

Q.   And was Officer Guevara, was he there alone or with his partner?

A.   He was with his partner.

Q.   After you saw that and Little Mike got into the car, what happened with the car?

Rios - direct

1317

A.   I went to Guevara -- in my bike, I went to the window where he was at, and I went to the window where he was at, and I told him, you want me, too?  And he said, no, Rios.  Get out of here.

Q.   Why did you ask him do you want me, too?

A.   Just to talk to him.  Just to see what he would say to me.

Q.   And after that, what did you do?

A.   I rode back to my mom's house when he told me to get out of here.  I went back to my routine, where I was going to go.

Q.   Now, I want to ask you this.  Back earlier that night when you were taken by Detective Guevara and taken to the Area 5 station, when you were at Leavitt, did anyone ever show you a warrant for your arrest?

A.   No, sir.

Q.   Did anyone ever show you a search warrant to search your apartment?

A.   No, they didn't.

Q.   Did anyone ever give you any sort of consent to search to search your apartment?

A.   No.

Q.   Now, going back to the interrogation after you were shown the picture of Little Mike -- and was that picture like a printed photograph?  Was it a Polaroid?

A.   It was a Polaroid.

Q.   And after you -- and that Polaroid, what did it come out

of?

A.   Well, when I got in -- when they brought me into the room, I was handcuffed behind my back.  They sat me down.  The gang book was on top -- it was a gang book.  They had a gang book on top of the table, and that's what they were showing me the picture out of.  They snatched the picture out there, and they put it in front of me.

Q.   Now, the gang book, how did you know it was the gang book? Did it say gang book on it?

A.   No.  You just see a bunch of -- all pictures of all the people in it.

Q.   And this book, approximately how wide was this book?

A.   It's like one of those -- those binders right there, about this big, like this (Indicating.)

        MR. J. RICHARDS:  Your Honor, could the record reflect that the -- that Mr. Rios has formed a C with his hands that's maybe 3 to 4 inches?

        THE COURT:  Any objection?

        MR. SCAHILL:  No, Judge.

        MR. POLICK:  No, Your Honor.

        THE COURT:  All right.  The record reflects.

BY MR. J. RICHARDS:

Q.   And was it one gang book or multiple gang books?

A.   They only had one out.

Q.   And after were you shown the picture of Little Mike from

the gang book, was -- did they take the picture out of the gang book to show you --

A.   Yes.

Q.   -- or did the picture remain --

A.   Yes, they took the picture out of the gang book and put it in front of me on the table.

Q.   Now, after they took the picture out and put it on the table, what happened next?

A.   Well, after Guevara grabbed the picture out and put it in front of me, he asked me, do you know this guy?  I said, yes. He said, who is that?  And I said, that's Mikey, Little Mike.

Q.   And after you said that, what happened next?

A.   He said, well, did you know that I know that you killed this guy, and you know that I heard that you was with Tino. And you's guys went across Western and you's guys killed this guy here, and I want to know what happened.

Q.   And when he said that to you, did you respond in any way?

A.   Yeah, I told him I ain't know nothing about that.

Q.   And when you told him you didn't know nothing about that, what happened?

A.   I felt a hand grab me by the back of the hair right here like this, a full hand of hair like this, and slammed me against -- and slammed my face against the table.

Q.   Now, is it fair to say that back in '89, you had more hair than you have today?

Rios - direct

1320

A.   Yes, sir.

Q.   And when -- when your hair was grabbed, was that comfortable or uncomfortable?

A.   That was an uncomfortable feeling.  It hurt.

Q.   How much did it hurt, your hair being grabbed?

A.   Oh, it hurt pretty much.

Q.   Can you say on a scale of 1 to 10 the pain?

A.   You could at least say a 9.

Q.   And when your head was slammed on the table, how much did that hurt?

A.   You could say, like, a 10, 10-1/2.

Q.   Now, when that happened to you, what was the first thought that came into your mind, if you had any thoughts?

A.   Got scared.  I mean, just got scared of what they were doing to me right there.

Q.   Why were you scared?

A.   Because I getting hit.

Q.   Now, had you ever been in a situation where you'd been hit before?

A.   Yes, I had.

Q.   Such as?

A.   I used to box.

Q.   And did you box professional or amateur?

A.   Well, Amateo it was called.  Amateo boxers.  Basically, it's amateur boxers.

Rios - direct

1321

Q.   And how old were you when you first started boxing?

A.   Oh, we were young.  We were about 10 years old.

Q.   Where would you box?

A.   Neigos Gym on Division and Damen.

Q.   And when you boxed there, was it sparring?  Was it competitions?

A.   Yeah, we used to compete.

Q.   And approximately how long did you box for?

A.   Well, I been doing it since I was, like, 9 or 10.  My brother was the one running the gym, my oldest brother, and he had us in the gym all the time because my mom didn't want us in the streets.  So my oldest brother used to take us to the gym and beat us up, get us to fight, put us to go ahead and fight with another fellow, do some sparring.

Q.   And this was your older brother, Juan?

A.   Yes, sir.

Q.   And did you ever stop going to the gym?

A.   Yeah, for a while I did.

Q.   Why did you stop?

A.   Well, I stopped because there was nothing else for me to do in boxing.

     I ended up just giving it up, hanging out outside on the street instead.

Q.   Did you -- prior to this incident and being in this interrogation room but after you gave up boxing, did you ever

box in between that period?

A.   Here and there, we used to go to the gym and see what was going on.  Sometimes I used to just get into hitting the bag or get a little sparring session.

Q.   So is it fair to say that when you're boxing you get punched?

A.   Yes, you do.

Q.   You get punched on your body?

A.   Yes, you do.

Q.   And you get punched in your head?

A.   Yes, you do.

Q.   So -- and when you're boxing, are you afraid of being hit?

A.   No, because you know the opponent is the same size as you, the opponent is the same age factor, the same weight and everything.  So we're just evenly fighting with each other, just a competition.

Q.   So it's fair to say you're not afraid of being hit while you're boxing; is that fair to say?

A.   Correct.

Q.   So why did you have fear when your hair was pulled and your head was slammed to the table?

A.   Well, that's a different thing because I could tell you -- that's a different situation, when you got a 6'2" person behind you, possible but like 40 years old, you know, in his prime, big, just grab you through the hair and slam you against the

table like Mr. Mason did to me, that -- that hurts, and it's scary.

Q.   Now, when that happened, did you feel like you were free to leave?

A.   No.   I was still handcuffed.

Q.   When that happened, did you know what time it happened?

A.   That happened previously like -- they got me in the station about 10:00.   That happened about 11:00 or 12:00.

Q.   How do you know it happened at about 11:00 or 12:00?

A.   Because Mr. Guevara just kept on coming in and out of the room, and every time he'd come in and out of the room, they are supposed to have a clock, and I believe I seen the clock, but then again, I'm not too sure.

Q.   After your head is slammed to the table, what happened next?

A.   Well, they kept on -- Guevara kept on coming in and out of the room, telling me I was with Tino, that we saw this guy and we talked to these guys, and that we shot this guy on the corner.   And a bunch of other things about me talking to some lady, and Cristino, and that Cristino was with me, and that we met up and that we went across Western to shoot some people.

Q.   Now, as Guevara is walking in and out of the room, when he walks in and out of the room, is the door to the interrogation room, is that open or is it closed?

A.   The door is open, and Mason is with me at all times.   He

Rios - direct

1324

never left the room.

Q. Now-- and during this period, did you ever ask to use the bathroom?

A. No. I was scared.

Q. Why were you scared to ask to use the bathroom?

A. I was scared. I just wanted to get out of there.

Q. Did they ever -- did either -- did Guevara ever ask if you had to use the bathroom?

A. No.

Q. Did Mason ever ask you?

A. No.

Q. During this time when Guevara is going in and out, did you ever ask for water?

A. No.

Q. Why didn't you?

A. I was scared. I didn't want nothing but out of there. That's all I wanted.

Q. Did Detective Mason ever ask you if you were thirsty?

A. No.

Q. Did Officer Guevara ever ask you if you were thirsty?

A. No. He was too busy just telling me what was going on.

Q. Similarly, in that timeframe, were you ever offered any food or snacks?

A. No, sir.

Q. Did you ever ask for any food or snacks?

A.   No, sir.

Q.   Were you hungry?

A.   Yes.

Q.   Now, the -- during that whole time, are you sitting on that steel chair?

A.   Yes, with my hands -- with my hands still cuffed behind my back.

Q.   Now, what does it feel like to have your hands cuffed behind your back?

A.   Very uncomfortable.

Q.   Why does it feel very uncomfortable?

A.   Because during -- during the time that you got your hands in your back, your shoulders and your arms start to falling asleep, and they start hurting.

     It's like, let's say you get a charlie horse and you feel like when it comes in, and then it start leaving, that's how it feels, like a burning sensation all in your shoulders and all in your arms and your elbows and everything.  All your joints will start hurting due to the fact that you got them in a position that is not letting blood flow or anything like that just come through, and it hurts.

Q.   During -- during Officer Guevara going in and out, did you ever ask if you could go home?

A.   No.

Q.   Did -- why didn't you?

A.   Don't know.

Q.   During this time when Officer Guevara is going in and out, are you able to sleep?

A.   No.

Q.   Are the lights turned off ever in the interrogation room?

A.   No.

Q.   Now, as Guevara is going in and out, what happened next?

A.   He just kept going in and out and asking me about what was I doing, and telling me about Cristino, and that they told him that me and Cristino had went across Western and shot up some guys because they had shot at me, somebody had shot at me.  And he did all this questioning and interrogation about me being with Cristino, or Tino.  So that was about it.

Q.   And did Mason ever leave the room?

A.   No.  He stood behind me all the time.

Q.   Did there come a point in time when Officer Guevara kept going in and out of the room?

A.   Yes.

Q.   What happened then?

A.   One time he came back into the room and he told me that he was going to take my child away if I didn't go with what he was telling me, and he's telling me that I got to go tell a statement about what he is telling me right now and for me to go ahead and -- and figure out what I am going to do.  If not, he's going to take my kid away; that my -- my lady, Diana

Rodriguez, that she's in the building and she's downstairs with my baby, and that he'll let me see my baby and that as soon as I finish with him.

Q.   Now, when -- first of all, when -- when he said that to you about Diana Rodriguez being in the building, had you seen Diana Rodriguez in Area 5 as you were sitting in that interrogation room?

A.   No.   Last time I seen Diana was when they had me in the car by the schoolyard on Bell, and she tried to come to the car and talk to me, and they didn't let her.   And I couldn't hear what she was saying and she couldn't hear me.

So that's the last time I seen her.   Didn't see her in the station at all.

Q.   And when you were told this, that she was in the station, why did you believe him when he said that?

A.   He was threatening me about taking my child away, and I didn't -- I didn't know if it was true or not, that he had my girl in the building and my child.

Q.   Did you believe him when he said that he would take your child away?

A.   Yes.

Q.   Why did you believe him when he said that?

A.   Because I was afraid of him.   I was afraid of him.   And he was -- he was that type of person that -- that would try to do things like that to you, to threaten you and beat you and

Rios - direct

1328

things like that.

Q. And after he told that to you, what -- did you say anything to him?

A. No, I did not.

Q. After he told that -- when he told that to you, was Detective Mason present?

A. Yeah, he never left my back. He was right behind me.

Q. When he -- when -- when Guevara told that to you, did you say to him anything like, you're lying, I don't believe you?

A. Excuse me again?

Q. Did you say anything to Guevara like I don't believe you, that can't be true?

A. No. I only told him I need to do this.

Q. And you mentioned a statement.

A. Correct.

Q. What did -- at the time, the moment he said statement, what do you think he -- what did you understand that to mean when he said that?

A. He said something about writing on a paper, writing on a paper, or anything like that, the facts, the facts that he was giving me and stuff like that. And he said that if I go with that, with what he's telling me, and just myself in the situation and say that Tino was shooting and I was just with the person, that he'll go ahead and let me see my kid and let me go if so.

Q.   Now, did you eventually do a statement?

A.   Yes, I did.

Q.   In terms of -- from the moment he first mentioned the statement to you, what was the next thing that happened after that?

A.   The next thing that happened after that?  I was sitting there.  He kept on drilling me about -- about what he wanted me to say and do, and Mason was behind me.  There was a couple of cops on the door, but they starting to fade away little by little, and I believe Barbara Riley showed up around probably 2:00 or so, or something like that.

She -- she -- she came kind of late to where I was at 'cause it's already dark, and she came to the door and she looked at me and she said to me, do you know your Miranda rights?  And I said, yes I do.

And she said, well, I'm the police -- I'm the State attorney.  I'm here as a lawyer for the police.  I'm not here for you.  So I just shut down.  Didn't know what to say.

Q.   When -- how did you know it was dark?

A.   Well, you could tell it was dark, it was police starting to shift.  Shift status has changed, so shift doesn't change until probably 6:00, or probably 9:00 or 10:00, or probably the next shift probably be like 11:00.

THE COURT:  Before you go there, we'll take our lunch break.  Folks, we'll come back at 1:00 p.m.

All rise.

(Jury out at 12:00 p.m.)

THE COURT:  Mr. Rios, you can step down.

All right.  Any issues for me to take up from the defense side?

MR. POLICK:  No, Your Honor.

MR. SCAHILL:  Not at the moment.

THE COURT:  For the plaintiffs?

MR. J. RICHARDS:  No, Your Honor.

THE COURT:  All right.  I have one.

There was the offer of proof as to the good-faith basis for asking defendant Michael Mason about Defense Exhibit 50 JJ.  That was filed yesterday.

Is this separate from the anticipated -- or separate from the response to the defendants' motion?

MR. S. RICHARDS:  Yes, Your Honor, but my understanding is that you ruled on it, and I have no intention of filing anything further about it.

THE COURT:  I have ruled on certain aspects of it.  I have indicated that I did not think that the second part of the motion was appropriately before me because it's seeking -- asking me to sanction someone for an affidavit that was not offered in this case by the plaintiffs.

I've also ruled on whether Mr. Rios can introduce evidence that he knew or that he told you following his

Rios - direct

deposition about the identity of one of the confidential

informants as a discovery violation.

That still does not address part of the defendants' motion, where they are seeking to dismiss the claim overall, both for a discovery sanction and presumably for futility in that if the confidential informant does exist, then allegations such as I think in paragraph 53 of your complaint, that there was no confidential informant, and the information was fabricated, as opposed to and/or, then that claim goes away.

But you decide whether that's been addressed, but that is my understanding of what I have ruled on.

Setting that aside, this offer of proof, have the defendants had an opportunity to review it?

MR. SCAHILL:  Yes.

THE COURT:  Response?

MR. SCAHILL:  Well, it certainly does not address from our perspective the issues that we raised in our motion, and I'm certainly willing to let you know why I think that, but I don't think it addresses it really at all.

THE COURT:  Well, I'm not interested in addressing the motion until the time for briefing on that has passed.

My read of this is that they are asking to recall Detective Mason to ask him about Defense Exhibit 50 JJ.

What is your response to that?

MR. SCAHILL:  I don't think they've made the requisite

showing at this point for all the reasons we discussed yesterday.

THE COURT: Okay.

MR. POLICK: I would agree with that, Your Honor.

THE COURT: So I have reviewed the transcript when -- relevant to Defense Exhibit 50 JJ, and in light of the plaintiff's offer of proof, a couple of issues.

First, with respect to the names, plaintiffs have their answers, page 972 of the trial transcript:

"I'm going to give you a couple of names and see if this prompts your memory in any respect. Does the name Michael or Miguel Martinez, could one of them have been that name?

"Answer: I have no idea.

"Question: Could the name Hector Quintano or Quintero, could that be a name of one of them?

"Answer: I don't know."

So you have answers. "I have no idea" and "I don't know" are answers.

From there, plaintiffs decided to ask substantive questions about Defense Exhibit 50 JJ instead of asking the witness, "did you ever know," "would anything refresh your recollection," "take a look at this, let me know if this refreshes your recollection."

And so the plaintiff has made his choice with respect to examination on Defense Exhibit 50 JJ with respect -- or

examining Mr. Mason or Detective Mason with respect to that exhibit.

As far as the reasons for re-opening or recalling him, Defense Exhibit 50 JJ is a single-page document. It's got handwriting on it. At the top it reads: Shooter, Rios, Jaime, followed by an IR number and an address.

Below that are two names, Martinez, Miguel, Quintero, Hector, and with IR numbers, and an address. To the left, there is what appears to be PR, and I can't read the word underneath. To the right there is either LO or 2.0, next to Martinez, and next to Quintero is second.

Then the bottom third of the page is the name Linda Montgomery with some identifiers below it.

The plaintiff's position is that it's a reasonable inference that this document was written by a Chicago police officer, either Detective Mason, Gang Specialist Guevara or another officer. My understanding from the plaintiff's motion is that's because this document, which bears the production number CCPD SDT, which, according to the plaintiffs, is a Cook County Public Defender's document number.

Do any of the defendants agree or disagree with that?

MR. SCAHILL: That that's what it reflects? No, that's what it reflects.

THE COURT: Okay. Which is contrary to the representations made to Detective Mason during examination.

The representation to him was that it was a State's Attorney's document, which means that it was misrepresented to him as to what it was, but that's besides the point at this moment.

The document was -- could have been presented to Detective Mason during his examination. He could have been asked is this your handwriting; that question was not asked. And then plaintiffs also say that there's a reasonable inference that this document contains the names of two confidential informants and one nonconfidential informant.

I don't see any basis, any indication in the document whatsoever that supports those inferences.

There is an inference that this document identified Jaime Rios as the shooter because that label was placed above his name. It makes no -- I'm not making -- I am reading the document and not making any findings or anything like that with respect to the case.

But for the other three names, there is no indication whatsoever as to why they are listed on this. And so if Mason didn't write it -- we don't know if Mason wrote it because plaintiffs chose not to ask him whether he wrote it. There is no indication on the document itself as to what these other three names are, and so that means it is a world of possibilities; but a world of possibilities is not an inference, at least not a reasonable inference. And so tere's no reason to recall Mason with regard to Exhibit 50 JJ.

All right. So I can consider the issue of Document 321, the offer of proof, as to a good-faith basis for asking defendant Michael Mason about Defense Exhibit 50 JJ concluded.

Any other issues?

MR. S. RICHARDS: No, Your Honor.

MR. SCAHILL: No, Your Honor.

MR. POLICK: No, Judge.

THE COURT: All right. I'll see you at 1:00.

(Adjourned at 12:09 p.m., until 1:00 p.m.)

(Change of reporters.)

1336

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                        )
                                   )
          Plaintiff,               )
                                   )
-vs-                               )  Case No. 1:22-cv-03973
                                   )
REYNALDO GUEVARA; MICHAEL          )
MASON; and JoANN HALVORSEN,        )
as Special Representative of       )
ERNEST HALVORSEN, Deceased,        )  Chicago, Illinois
                                   )  February 10, 2026
          Defendant.              )  1:00 p.m.

VOLUME 7
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:    LAW OFFICE OF STEPHEN L. RICHARDS
                      BY:  MR. STEPHEN L. RICHARDS
                           MR. JOSHUA S. RICHARDS
                      53 West Jackson Boulevard, Suite 205
                      Chicago, Illinois  60604

For Defendant         BORKAN & SCAHILL, LTD.
Guevara:              BY:  MR. TIMOTHY P. SCAHILL
                           MR. GRAHAM P. MILLER
                      20 South Clark Street, Suite 1700
                      Chicago, Illinois  60602

For Defendants        THE SOTOS LAW FIRM, P.C.
Mason and Halvorsen:  BY:  MR. JOSEPH M. POLICK
                           MR. JOSH MICHAEL ENGQUIST
                           MR. JEFFREY ROBERT KIVETZ
                           MS. CAROLINE P. GOLDEN
                      141 West Jackson Boulevard, Suite 1240A
                      Chicago, Illinois  60604

1337

Court Reporter:          CHARLES R. ZANDI, CSR, RPR, FCRR
                         Official Court Reporter
                         219 S. Dearborn Street, Room 1426
                         Chicago, Illinois  60604
                         Telephone:  (312) 435-5387
                         charles_zandi@ilnd.uscourts.gov


                    *    *    *    *    *

              PROCEEDINGS REPORTED BY STENOTYPE
      TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

THE COURT: Mr. Rios, you can come back up.

And we can bring in the jury.

(Jury in at 1:00 p.m.)

THE COURT: Please take your seats.

Mr. Richards, you may proceed when ready.

MR. J. RICHARDS: Thank you, Your Honor.

JAMIE RIOS, PLAINTIFF HEREIN, DULY SWORN,

DIRECT EXAMINATION (Resumed)

BY MR. J. RICHARDS:

Q. Jaime, we left off talking about seeing Barbara Riley. After you saw Barbara Riley and she told you that she wasn't your attorney, she was working with the police, what happened next?

A. Well, she advised me of my Miranda rights.

Q. How did she advise you of your Miranda rights?

A. She just told me do I know my Miranda rights, and I told her yes.

Q. Now, prior to her saying that and between when earlier that night you were arrested by Guevara to when she told that to you, had you ever been told that -- have you ever been read your Miranda rights in between those two time periods?

A. No, sir.

Q. Now, when she advised you of your Miranda rights, what happened next?

Rios - direct

1339

A.   Oh, she stepped, she stepped to the side.  And Guevara and Mason was still -- Mason was still behind me.  And Guevara was still telling me what to do and what to say and to go ahead and be able to go ahead and say that I was with Cristino and to just give out a statement, and I'll be able to see my son and my girlfriend, and I'll be able to go home after that.

Q.   And then after that, what happened?

A.   After that, it was like a while after that, I spoke to Ms. Riley for just a brief minute.

Q.   And when you spoke to Ms. Riley for a brief minute, did you tell her what Detective Mason and Officer Guevara did to you?

A.   I did not.

Q.   Why didn't you?

A.   Because I was scared.  She said she was working with them and for them, not me.

Q.   After you spoke with her for that brief minute, what happened next?

A.   She left.  And they came back in, and they took me out the room.

Q.   When they took you out of the room, where did you go?

A.   They took me to a meeting room.

Q.   And in the meeting room, was that similar to the interrogation room or was it different?

A.   It was different.

Q.   How was it different?

Rios - direct

1340

A.   It was a bigger room with a bigger table, more chairs, a whiteboard.  And it was a glass door and square glass windows in the front.

Q.   And when you went into that room, what happened next?

A.   When I went into that room, Mr. Mason uncuffed me and told me to go ahead and sit down.

Q.   And did you sit down?

A.   Yes, sir.

Q.   And when you sat down, what happened next?

A.   Barbara Riley, she spoke to me and she read me my Miranda rights.

Q.   And when she read your Miranda rights, this time did she read them aloud?

A.   She read them aloud.

Q.   And when she read them aloud, what happened after that?

A.   I said I understand.

Q.   And after you said you understood, what happened next?

A.   Well, she was sitting down.  And she had a piece, a sheet of paper that she pulled out, and she put it on top, on top of the table, and she told me, "We could start now if you like."

Q.   And when she said "We could start now if you like," did you say anything?

A.   I said "Okay."

Q.   And after you said "Okay," what happened?

A.   She started reading me things about the page that she had

Rios - direct

1341

asking me questions.

Q.   And when she was asking you questions, were you giving answers?

A.   Yes, sir.

Q.   Now, at any time did you tell her, "Stop.  I don't want to do this anymore"?

A.   No, I did not.

Q.   Why didn't you?

A.   Because Mr. Mason was still in the room.  And he was, he was, to me, he was a threat to me.  I was scared that if I would have told her anything, since she was working with them, that he would have been more physical towards me.

Q.   And as your -- and as she's asking you questions and you're giving answers, what happens next?

A.   After that, they grabbed me.  And after we finished, they told me that we gonna, we gonna go ahead and write it down, and we're going to go ahead and let you read it, and we're going to go through, through this statement.

Q.   And did that happen?

A.   Yes, it did.

Q.   After that happened, what happened next?

A.   After that, we got to signing the statement.  She said, "We need you to sign a statement."  We ended up signing the statement.  I got up.  They put -- Mason put the cuffs on me and took me down to lockup.

Rios - direct

1342

Q.  Now, I'm going to --

MR. J. RICHARDS:  Your Honor, may I show the witness what's marked as Plaintiff's Exhibit 13.

THE COURT:  Yes.

MR. J. RICHARDS:  It's from the podium connection.

THE COURT:  Okay.

BY MR. J. RICHARDS:

Q.  Jaime, I'm showing now what's marked as Plaintiff's Exhibit 13.  Do you see that on the screen?

A.  Yes, sir.  Yes, sir.

MR. J. RICHARDS:  Your Honor --

BY MR. J. RICHARDS:

Q.  And that is you in that picture?

A.  Yes, sir.

Q.  And that is you in that picture after the court reported statement was taken?

A.  Yes, sir.

MR. J. RICHARDS:  Your Honor, if not already admitted, seek to admit Plaintiff's Exhibit 13 and publish.

THE COURT:  It's already been admitted.

MR. J. RICHARDS:  May I publish?

THE COURT:  It's published.

BY MR. J. RICHARDS:

Q.  Now, Jaime, looking at this picture, what are you wearing in this picture?

Rios - direct

1343

A.   I'm wearing a white tank top.

Q.   Now, that white tank top -- this picture doesn't show your bottom half, is that fair to say?

A.   Correct.

Q.   What were you wearing on your bottom half when this picture was taken?

A.   I had some white shorts and some, and some Puma shoes with red and white.

        MR. J. RICHARDS:   And, Your Honor, if we can take Exhibit 13 down.

BY MR. J. RICHARDS:

Q.   Now, when you went to the lockup, did you feel like you were free to leave?

A.   No, sir.

Q.   When you went to the lockup, what happened next?

A.   Officer came to my cell door, he came to the cell gate, it's basically bars, so he came to the cell, and he put a pair of jogging suits in my bars and told me "Here."

Q.   When he put the jogging suit on the bars and told you "Here," what did you think he meant by that?

A.   Put it on.

Q.   Did you put it on?

A.   Yes, I did.

Q.   After you put on the jogging suit, what happened next?

A.   After I put on the jogging suit, it was like 5 to 10

minutes after that, they took us out for lineup.

MR. J. RICHARDS: Now, Your Honor, if I could show the witness for the record Defendants' Exhibit 47-02.

THE COURT: It's in front of the witness.

BY MR. J. RICHARDS:

Q. Now, Jaime, I'm showing you what's been previously marked as Defendants' Exhibit 47-02. Do you recognize yourself in that photograph?

A. Yes. I'm right here in the end. I'm to my, to my left in the end of the, in the end of the lineup in red.

Q. And is that how you looked when the lineup was taken, when the lineup was done?

A. Yes.

MR. J. RICHARDS: Your Honor, at this time I'd seek that Defendants' Exhibit 47-02 be admitted and published.

THE COURT: Any objection?

MR. SCAHILL: No objection.

MR. ENGQUIST: No, Your Honor.

THE COURT: All right. Defense Exhibit 47-02 is admitted and may be published.

(Defendants' Exhibit No. 47-02 was received in evidence.)

BY MR. J. RICHARDS:

Q. So, Jaime, you're the leftmost person in that photograph?

A. Yes.

Q. And what are you wearing in this photograph?

Rios - direct

1345

A.   It looks like I'm wearing a white -- a red hoodie, a red sweatshirt, some Nike joggers, some red Nike joggers, some Puma shoes.

Q.   Now, is the red hoodie and the red joggers, is that the same red hoodie and red joggers that you were given while you were in lockup?

A.   Yes, sir, it is.

Q.   Now, let me just circle back and ask you this.  Remember yesterday I was asking you things about the Latin Kings, for example?

A.   Correct.

Q.   Are there any colors that are associated with the Latin Kings?

A.   Yeah.  It's black and gold, black and yellow, you could say.

Q.   Are there any colors associated with the Spanish Cobras?

A.   Yeah.  It used to, it used to be black and red, but now it's green and black.

Q.   In '89, was it black and red or was it green and black?

A.   It was green and black.

Q.   Did you own a lot of red clothing?

A.   No, sir.

Q.   Now, I want to ask you this:  Do you know what a birthmark is?

A.   Yes, sir.

Rios - direct

1346

Q. Do you -- I'm asking you, in terms of your right arm, do you have any birthmarks on your right arm?

A. No, sir, I do not.

Q. In 1989, did you have any birthmarks on your right arm?

A. No, sir, I did not.

MR. J. RICHARDS: For the record, Your Honor, I'm zooming in on the exhibit.

BY MR. J. RICHARDS:

Q. Now, Jaime, I'd like you to look at the exhibit. Do you see the cursor that I have that's moving around?

A. Yes, sir.

Q. Is that a birthmark of yours that is above and to the left of the cursor?

A. No. I have no birthmark in my arms.

Q. Do you know what that is?

A. No, I do not.

Q. You do not.

MR. J. RICHARDS: Your Honor, if we could take Defendants' Exhibit 47-02 down.

BY MR. J. RICHARDS:

Q. Now, Jaime, after you did this lineup, were you taken back to the lockup?

A. Yes, sir, they did.

Q. And when they took you back to the lockup, what happened?

A. When they took me back to the lockup, they told me, "Get in

Rios - direct

1347

there" and they told me leave the clothes behind.

Q.   And did you take off the clothes?

A.   Yes, I did.

Q.   And when you took off the clothes, were you again wearing that white tank top?

A.   Yes, back to the tank top and the white shorts.

Q.   Now, after that, were you taken to the Cook County jail?

A.   Yeah.   They came and got me, put handcuffs on me and put me on the bus and sent me to Cook County.

Q.   Now, when you got to Cook County, were you formally charged with the murder of Luis Morales?

A.   Yes, I was.

Q.   And when you were in county, did you stay in the county jail?

A.   Yes, I did.

Q.   Now, you had initially one public defender represent you for the charge of murder of Luis Morales, is that correct?

A.   Correct.

Q.   Who is that person?

A.   John Carey.

Q.   And did Mr. Carey, during the course of his representation of you, did he ever show you a filing, either a motion or something else, and ask you to approve it before he filed it?

A.   Yes.

Q.   He did?

A.   Yes.

Q.   Which ones?

A.   It's like a W-2 like for my taxes.

Q.   Besides the W-2, did he ever show you any other forms?

A.   No.

Q.   Okay.  Now, during the course of his representation of you, did he ever give you any of the police reports to keep with you while you were in Cook County jail?

A.   No, sir, he did not.

Q.   Now, is it fair to say that you went to trial on the murder of Luis Morales?

A.   Yes, sir, I did.

Q.   And in that trial, did you testify?

A.   Yes, I did.

Q.   And the result of that trial was you were convicted?

A.   Yes.

Q.   Now, after you were convicted, you were not sentenced on the day that the jury said guilty, is that fair to say?

A.   Not at the moment, right, correct.

Q.   You received your sentence a few months after that?

A.   Correct.

Q.   And what happened when you received your sentence?

A.   After you receive your sentence, after I received my sentence, they keep you in county for a minute, and then they go ahead and transfer you.

Q.   Now, the day that you received your sentence, I want to know what specifically happened with you.

A.   Well, when you get your sentence, they took me back upstairs to division 6 in county, and they put me back in my cell, and they had me just start picking all my stuff up because they said that we were going to be on transfer soon.

Q.   What was the thoughts going through your mind as this was happening?

A.   Fear.  I don't know where I'm going.  My mom doesn't know where I'm at.  Crying, emotionally disturbed.  I couldn't think, couldn't sleep.  It was just, it was just wrecked.  I was broken.

Q.   Now, did there come a time that you left the Cook County jail?

A.   Yes, I did.

Q.   Where was the first place that you were taken after the Cook County jail?

A.   Well, after Cook County jail, we went to Joliet.

Q.   And in -- I want to ask you about how you got from Cook County jail to Joliet.

A.   Well, that's a process.  They take you downstairs.  They strip down.  They make you, they make you bend down.  They make you spread your cheeks.  They make you cough.  They, they give you a jumpsuit and some slippers and tell you, "Here, put it on."

They'll start -- they'll shackle you, they'll shackle you from here to here (indicating).  They'll shackle your feet. And the chain, you'll have a chain that goes from here (indicating) to your waist and all the way to your feet.

Q.   And when you were chained, where were you taken to next?

A.   They take you downstairs, and then they take you out the door and put you inside a van or a bus or a school bus, like a big school bus.

Q.   And on the day you were taken to Joliet, were you put in a van or big school bus?

A.   I was put in a van.

Q.   And in the van, what was the process of being put in the van?

A.   When they put you in the van, you've got two rows of seats. They sit you down on the two rows of seats.  And from the back, from the back of the van, they got, they got a chain that they grab and they pull the chain.

Well, let's say your feet are right here like this (indicating), they pull the chain right on top of the chain that's holding your feet.  They'll pull the chain like that through everybody's feet all the way to the front, and they'll go ahead and put a lock on it.

Q.   And when they did that, what are the thoughts going through your mind?

A.   Like I said, crying.  Don't understand where I'm going, you

know. I'm truly lost of what's going on with me and, you know, just totally disarray.

Q. Now, did you arrive at Joliet?

A. Yes, I did, sir.

Q. When you arrived at Joliet, what was the first thing that happened?

A. Well, the first thing that happens when you get to Joliet, the officers come to inside the van. They'll unlock the chain. They pull the chain back, and they'll take out the first row. Then they get the first row outside of people. And then they'll do the other chain on the other row, and they bring out the other row of people and they put them back outside.

Q. And did that happen with you?

A. Yes, sir.

Q. And when you're outside of the van, what's the next step?

A. The next step -- excuse me. The next step, they take you, they take you inside the building. They strip you. They put you, they put you against a wall. They slap like some chalk on you, it's like some baby powder or some sort of baby powder or something like that that they'll slap on you in the front and in the back.

They tell you to put your jumpsuit back on. And they take you upstairs. They give you a bedroll. A bedroll is a blanket, a toothpaste, soap, a sheet and that's it. And they'll just take you upstairs and take you into a gallery,

Rios - direct

1352

which is a gallery, it's like a part of the penitentiary where there is a bunch of cells, and the gallery is right here where you could walk at. So they take you in that gallery and they'll start putting people inside of cells.

Q. And did that happen to you?

A. Yes.

Q. And when you got inside that cell, what's the first thing that you did?

A. The first thing that I do, you've got to put your, you've got to put your hands back up like this (indicating) to the gate, to the bars, and they'll go ahead and unlock the chains and everything, and they take all the chains off you and they leave you in the room.

Q. And when you're left in that room after that, what did you do?

A. They brought another guy into that room from the second row, and they let another guy in that room with me. And all we did, we just sit there and just sob.

Q. Now, what were you thinking about when you were sitting there and sobbing?

A. Scared. I don't know where I'm going. That's my main, my main -- my main understanding was I don't know where I'm going. My mom doesn't know where I'm going. Nobody knows where I'm at at this point. I'm just trying to figure out where I'm going.

Q. Now, before this, had you ever left the city limits of

Chicago?

A.   Yes, I've been out of Chicago before.

Q.   How many times?

A.   About two times.

Q.   And where did you go those two times?

A.   I went to New York.

Q.   To visit your father?

A.   Yes.

Q.   In terms of Illinois, outside of the city of Chicago, have you ever traveled to any part of Illinois outside of the city of Chicago prior to that?

A.   Well, if you could name Six Flags, that's the only place I ever been further than Chicago, so.

Q.   So that would be Six Flags in Gurnee?

A.   Yes.

Q.   Okay.  Now, you talked about a bedroll.

A.   Yes, sir.

Q.   Is a pillow included in the bedroll?

A.   No.

Q.   And if you can, can you show the jury with your fingers about how thick that bedroll is?

A.   The bedroll is about this thick (indicating).  It's just a small little thing like this (indicating).  But they roll it up into like a big blanket and they give you that.

Q.   Now, the first night that you're in Joliet, do you get a

Q. phone call to anyone?

A. No, not at the moment.

Q. And that night, did you sleep at all?

A. No.

Q. Were you fed anything when you arrived at Joliet?

A. Yeah. They come and they give you a little lunch bag, like a paper bag, they give you a little paper bag with a little sandwich, a little, a little, a little apple, and that's about it.

Q. The next morning in Joliet, what happened?

A. The next morning in Joliet, what they do, they'll start pulling people out of the rooms and chain -- putting the chains on them again and taking them downstairs for transfer.

Q. And did that happen to you?

A. Yes.

Q. And when you're taken downstairs for transfer, what happens?

A. When you go downstairs for transfer, they start separating people. This people here are going to this penitentiary, this ones are going to this penitentiary. They just start separating people into where they're going due to their cases.

Q. And what happened with you?

A. They told me I was going to K9 or K5 say better.

Q. And when they said you're going to K5, when they said that to you, at the time when they first said it to you, do you know

what they meant?

A.   No, I did not.

Q.   So when they tell you you're going to K5, what's the next thing that happens?

A.   The next thing that happened is they bring you back outside the building.  They started loading you up in the vans again and the same process, put the chain all the way around again, all the way to the front, lock it up, get everybody in and take off.

Q.   Now, when you took off, did you know -- did anyone tell you, Hey, this is going to be a one or a two-hour car ride, anything like that?

A.   No, they did not.

Q.   When the van that you were taken in to go from Joliet to K5, are there any sort of windows in that van?

A.   Yeah, they do got windows.  But they also got bars on the windows on the outside, got little bars on it for you won't try to get out the window or something, I guess.

Q.   Now, when you're in this van on the way to K5, are you in the van alone?

A.   No.

Q.   Who are you in the van with?

A.   Well, there is a row, there is a row of inmates here. There another row of inmates over here.  So about a good 12, 12 to 14 people in the van.

Rios - direct

1356

Q.   And on this -- in the van, are you saying anything to anyone on this trip down to K5?

A.   No.   I'm totally quiet, just listening to people just talk.

Q.   When you say "people just talk," are those correctional officers talking or are they fellow inmates?

A.   Fellow inmates that already been in situations like that. They've been in jail, and they've been in certain places in the penitentiary that they know where they're going.

Q.   And what were these inmates saying?

A.   They're saying that we're going to K5.   K5 is the thunder dorm, talking about K5 is a max dorm.   It's scary.   It's just, it's just totally lunacy to me that I'm being sent to somewhere like that.

Q.   Now, did you ever learn what K5 stood for?

A.   Yeah.   It's Pontiac, Pontiac Correctional Center.

Q.   On this trip to Pontiac Correctional Center, are your fellow inmates saying anything else?

A.   No.   They just said that it's dangerous.   It's totally dangerous in there.   It's a max joint.   A lot of killings, a lot of stabbing, beat-downs.   A lot of officers get hurt in that place and inmates and everything.   It's just total chaos in that place.   They call it thunder dorm.   They had a name for it.

Q.   Now, did the van arrive at Pontiac?

A.   Yes, it did.

Q. When it arrived at Pontiac, what was the first thing to happen?

A. The first thing to happen is that the officers go inside the van again. They uncuff the chain. They pull the chain back. They let the first row out. And then they'll do the same thing with the second row and let the second row out.

Q. And did you get out of the van?

A. Yes, I did.

Q. After you got out of the van, what was the next thing to happen?

A. The next thing to happen is that they'll -- there is this big gate, and that gate opens up into the penitentiary. And you walk right into the penitentiary down this, down this street that's in the middle of the penitentiary. It's like a street coming into the penitentiary like this (indicating).

Q. And is there anything on either side of the street?

A. Yeah. There's a yard over here where people go out to run, lift weights, use the phones, because they got phones on the walls and everything, and the same thing on this side (indicating).

Q. And when you say "people," do you mean correctional officers or inmates?

A. Inmates.

Q. And the street, are you walking down the street?

A. Yeah. You got to walk up the street.

Rios - direct

1358

Q.   And when you're walking that first day up the street, are the yards empty or are there people in the yards?

A.   There is a lot of people in the yards.

Q.   And the people in the yards, are they doing anything?

A.   Yeah.  They at the gate, they're at the gate of the yard just screaming at everybody that's coming in, profanity, talking about "You're mine.  Hey, beautiful.  Hey, I'm going to kill you" to some of the other guys.  They probably know each other.  Who knows what.  "Hey, I'm going to kill you.  You ain't going to last here."  All type of crazy stuff that you take into your head and you be like, whoa, where am I at now?  You know, very scary.

Q.   When there are people -- were they -- was anyone shouting specifically to you "You're mine"?

A.   To everybody.

Q.   And when you're hearing that, what are you taking it to mean when they say "You're mine"?

A.   Well, I'm thinking either you're going to be sexually his girl, either you're going to be abused by them, or either you're going to be beat up by them or anything like that.

Q.   And as you're walking down the street and other inmates are yelling these things, what are the correctional officers doing?

A.   They ain't doing nothing.  They're just walking you through.

Q.   And eventually, did you walk down that street?

A.   Yeah, because when you go up that street, they take you to intake.

Q.   And what happens at intake at Pontiac?

A.   At intake at Pontiac, they come and check with you and see, and see what -- where they gonna place you in the penitentiary, because they got different units where they could send you to. And they ask you either you want to go to a certain unit or they'll ask you if you want to go to PC.

Q.   When you say "PC," what does that mean?

A.   That's protected custody.

Q.   When they -- at the time when they said "PC," did you know it meant protective custody?

A.   No.

Q.   Was there anyone to explain what PC meant?

A.   Yeah, the officer.

Q.   And what did the officer say PC was?

A.   PC was supposed to be protected custody for those that don't want to be in population, want to go to protected custody due to the fact that either they told on their case, either they're mentally not capable of being in population or anything like that.  You're not stable or anything like that or you don't belong to a gang or anything like that, you're just going to have to go to PC.

Q.   Did you choose to go to PC?

A.   No.

Q.   Why didn't you choose to go to PC?

A.   Because I heard from the inmates that were with me at the point, they were saying that PC is worse than population.

Q.   When they told you that PC is worse than population, did they tell you why?

A.   Yes.  For the simple fact that they're a bunch of mentally, mentally, mentally disturbed people, mentally uncapable people of dealing with themself.  And it's very dangerous in there for the simple fact that these people are not capable of holding their mind together.

Q.   Now, when you're in intake and you don't elect to go to PC, what happened to you next?

A.   Well, they send me to the south uppers, which is, which is, which is one of the units that they'll send you to.

Q.   The south uppers, where is that in relation to I guess the Pontiac correctional institute, if you know?

A.   Well, when you first come in through the gates like this and up the hill like this, it's on the right side.  And it's two buildings.  They've got a south lowers and then they've got a south uppers.  It's on the right side, right side towards you could say the west side of, of the, of the penitentiary.

Q.   And you were taken to the south uppers?

A.   Yes.

Q.   What was the process of being moved from intake to the south uppers like?

Rios - direct

1361

A.   Well, when they move you to the south uppers, they give you a bedroll again.  They bring you upstairs.  They take you to a room.  They throw you in the room.  And, well, they put you in the room.  And they'll lock the door until they probably bring another inmate and put him in there with you, or either you go there and they already have an inmate in there, and they'll put you just with that inmate that's in the cell already.

Q.   Now, the bedroll, did that bedroll have the same thing in it that the bedroll at Joliet had?

A.   Yeah, toothpaste, toothbrush, soap, and a sheet and a blanket.  That's it.

Q.   Now, when you got to the south uppers, was there another inmate already in your cell?

A.   Yes.

Q.   And did you enter that cell when you were told to?

A.   Yes.

Q.   Did you say anything to your new cellmate when you entered?

A.   No.  I did not really talk to nobody there in the room.  I didn't talk to him at all.

Q.   Now, when you go into your cell, what happened?

A.   They locked the door up, and I just sat down on the bunk.  That's it.

Q.   Do you remember around what time it was that you first went into your cell?

A.   I can't really recall, but it could have been approximately

Rios - direct

1362

like 5:00 or 6:00 in the afternoon sometime, in the evening.

Q. Now, what did -- can you describe the layout of the cell?

A. Yeah. It's like a 4-by-8 little cell. It has a steel, it has a stainless steel sink with a toilet built with it. And it has, it has a bunk, it has bunk beds. But the bunk beds are bolted. They're steel slabs bolted into the wall. So you've got one on top and you've got one in the bottom. And then, and then the cell over here is nothing but bars. It's open bars.

Q. Does the cell have a window to the outside?

A. No, it does not.

Q. Is the cell air-conditioned?

A. No.

Q. Is the cell heated?

A. No.

Q. How is the light inside the cell?

A. Real dim, real dim. Kind of dark.

Q. Where does the light come from?

A. It's on top, it's on top. It's like a little square right here like this (indicating) with big thick plastic, and there is a light inside of it.

Q. Now, if you're in your cell and facing towards the bars, what do you see? What's your view of?

A. Well, you get the view, you get the view of a gun tower inside the cell house. There is a gun tower inside the cell house. And you don't see nothing but -- there is windows,

Rios - direct

1363

there is windows with bars.  There is windows with bars right here like this (indicating).  And then down here like this, they've got like long, like long space heaters on the wall, like one here (indicating) and one on the other side, on the other side of the gallery.

Q.   And can you see to the outside from when you are looking through the bars?

A.   No.

Q.   Now, in terms of where your cell is, is your cell on the first floor or is it second, third, fourth?

A.   No.  My cell was on the -- 1, 2, 3, 4 -- on the fifth floor.

Q.   When you get in your cell for the first time that night, what's the next thing that happens?

A.   The next thing that happened is just they bring you lunch.

Q.   And what was lunch that first day?

A.   For that first day, they'll give you a little bag with a little sandwich, apple or orange.

Q.   And after lunch, what was the next thing to happen?

A.   Well, after lunch, the next thing to happen, they just -- that's it.  You stay there for the day.  They don't really do much.  And they'll do dinner at the end of the day.

Q.   In terms of that first day, how did dinner work?

A.   Well, for that first day, dinner, they'll bring some, they'll bring some food carts.  They'll bring some food carts.

They'll bring the food inside the food carts. And they'll go all the way, they'll start all the way from the beginning of the first cell, they'll start there and just giving out food to the guys all the way 'til they come to the end.

Q. Do you remember what you were fed that first night?

A. Yeah. It looked like a big piece, a big piece of turkey, a little bit of gravy, a little bit of mashed potatoes, and a little bit of cocktail fruits, and a little, and a little 2 percent carton of milk.

Q. What are the thoughts going through your mind when you're in your cell that first evening?

A. I just -- going through my mind and how I'm going to get to use a phone here. How can I ask for a phone call? How can I let my family know where I'm at? Nobody knows where I'm at. You know, I'm, I'm lost in words and what to say to the police to see if I could get a phone call or anything. But it's just scared.

Q. Did you get a phone call?

A. Yeah, I got the phone call the next day.

Q. What was the process of getting the phone call the next day?

A. They got a process over there that they got a phone they bring to your cell, to the bars. And the guy will stand there. It will be an inmate coming with the phone. And he'll give you the phone and tell you you've got 5 minutes to make your little

call.

So you go ahead and make your little call, your little quick 5 minutes. Once your little 5 minutes up, they don't even give you a chance. They'll just cut it off and say, "You've got to give me the phone," and they'll take it to the next cell and do the same thing to them. And it goes on all the way until they finish with everybody down here or upstairs.

Q. The inmate who gives you the phone to make a call, why is he the one to give you the phone, if you know?

A. Well, I guess they been there, they been there long enough, and they, they, they ended up becoming trustees.

Q. Trustees, is that a specific prison term?

A. Yes.

Q. That first telephone call that you got, who did you call?

A. My mom.

Q. Did she answer the phone?

A. Yes, she did.

Q. What did you say to her?

A. I told her that at the moment I don't really know the address where I'm at, but that they took me and they put me in a big jail.

Q. When you told that to your mom, what did she say to you?

A. She told me to be patient, that she'll find me, and she'll be able to see me soon.

Q. And when she said that, what did you say to her?

A.   I was lost for words.  I didn't, I didn't know what -- I didn't know how to answer.

Q.   Did she say anything else?

A.   She just told me to be patient.

Q.   And after she said to just be patient, did you say anything?

A.   No.  I was lost of words.  They hanged up the phone on me.

Q.   Now, in terms of the phone call being brought -- the phone being brought by a trustee to the cell, how often would that happen?

A.   Well, they got to run the phone through every gallery.  So you've got from downstairs on the south lowers, you've got four galleries downstairs that goes from 1 to 4.  And then you've got four galleries on top, on the second level that goes from 5, 5 to 8.

Q.   So --

A.   They run, they run the phone like, they'll run the phone here today.  Like you won't get to see the phone probably 'til about two, two weeks after that probably, probably a month, depending.

Q.   So you'd say roughly two weeks, every two weeks you would get a phone call?

A.   Roughly.

Q.   Now, taking you to the overnight from your first night at Pontiac, did you sleep?

Rios - direct

1367

A. No.

Q. Why didn't you sleep?

A. Because I was scared. I don't know what's going on here. I was just looking into trying to make that phone call. So I was just scared and couldn't sleep.

Q. Did you tell your cellmate you were scared?

A. No. I didn't talk to him at all.

Q. Did you use the bathroom in your cell?

A. Yes, I did.

Q. When you used the bathroom in your cell, the toilet, is it exposed?

A. Yes.

Q. So when you're using the toilet in your cell, what is your cellmate doing?

A. Well, he'll just go on top of his bunk. He get on top of his bunk and just put the sheet or the blanket on top of his face while I'm using the bathroom.

Q. In the whole time you're in the Illinois Department of Corrections, is that sort of what all your cellmates would do when you would use the bathroom?

A. Yes.

Q. And is that what you would do when your cellmate used the bathroom?

A. Yes.

Q. Now, what happened the first morning you were at Pontiac?

Rios - direct

1368

A.   The first morning I was in Pontiac, they, they come early in the morning and they do, they do a bar check.

Q.   What's a bar check?

A.   A bar check is that they come around with a little pole about like this (indicating), like a lead pole about this big like this (indicating), and they come by the cells like 5:00 o'clock in the morning or so, and they'll be banging on all the, all the bars in your cell.

Like you got the door like this, and it's all bars. They'll start just hitting the bars. They're looking for a certain, a certain sound to see if one of the bars, to see if it's either loose or cut or whatever. They'll just tap on everything and then go do that to every -- they'll go do that to every door all the way to the end.

Q.   And after the bar check, what was the next thing to happen?

A.   After the bar check, they go ahead and start calling galleries for breakfast.

Q.   And was your gallery called for breakfast?

A.   Yes, it was.

Q.   What's the process of a gallery being called for breakfast?

A.   What they do, they go ahead at the end, at the end of the gallery on this side like this, they open a box. They got some cranks, and they go ahead and say: "5 gallery ready for chow." And they just crank it up. All the cells, all the cell doors are open, and everybody just come out, out of the cells.

Rios - direct

1369

Q.   And you came out of the cell?

A.   Yes.

Q.   And where is everyone taken to when they get out of the cell?

A.   Everybody lines up, everybody lines up.  And there is a door, there's a door to the side.  Straight, straight ahead there is a door, and you go through that door.  And they take you inside this chow hall.  As soon as you go through that door, there is another door, and when they open it, it's the lunchroom.

So when you go in the lunchroom, you go by, by, you go by this, it's supposed to be like plastic glass.  And they got like a big, big spot like this that's open.  And when you get to that spot, they just pass you the tray.  You grab your tray, and you go sit down wherever you want to sit down.

Q.   Now, do you remember what the breakfast was that first morning?

A.   Yes.  It was some powder eggs, like two pieces of bread, a carton of milk and an orange.

Q.   Did you go sit down?

A.   Yes.

Q.   What are you thinking about as you're sitting down to breakfast that first morning?

A.   Breakfast that first morning, all I'm thinking about is just calling mom again, giving my mom a call and talking to her

some more and letting her know more about where I'm at.

Q. In the chow hall, are there any sort of -- are there any dangers to be aware of in the chow hall?

A. There is dangers everywhere in there. As soon as you come out, as soon as you come out the cell, it's dangerous. There is liability everywhere as soon as you come out that cell.

Q. Are there any specific dangers that are in the chow hall?

A. It's the same danger everywhere. It could be in the chow hall. It could be anywhere else. It could be on the gallery. It could be anywhere else. The danger is everywhere.

Q. What's the danger from?

A. All the inmates.

Q. Now, in terms of breakfast, how long do you get to eat breakfast?

A. They give you about 5 to 10 minutes to eat and go right back out, because they've got another gallery coming in.

Q. And after breakfast, did you go back to your cell?

A. Yeah, they take you back to your cell.

Q. And when you are back in your cell, what are you doing in there after breakfast?

A. Just sitting there thinking.

Q. Do you have any, on that first day, do you have any books or personal items?

A. No. I had nothing but that bedroll and the jumpsuit that they give you. That's it.

Rios - direct

1371

Q.   And what's the next thing that happens to you after breakfast and after you are back in your cell?

A.   Well, we're there, we're there all day until they come for lunch.

Q.   And then is lunch the same process?

A.   No.

Q.   What's the process for lunch?

A.   The process for lunch, they always give you that little bag with that little sandwich and that little either apple or an orange in it.  They don't take you out.  They don't take you out and take you into the chow hall again.

Q.   And after lunch, is that when you got that first phone call to your mom?

A.   Yes.

Q.   And then after that, was there dinner that night?

A.   Yeah.

Q.   And was dinner the same process as the breakfast process or was it a bagged lunch like lunch?

A.   Like breakfast.

Q.   Do you remember what the food was that first night?

A.   I believe it was some baked chicken, some baked chicken.  Possible, possible was like a little muffin or something like that and some, some green peas, and that was it.

Q.   And then that night, did you go to sleep?

A.   Around that night, yeah, I got a little bit of sleep, not

Rios - direct

1372

too much.

Q.   Now, you mentioned the light earlier of the cell.

A.   Correct.

Q.   Do you have control over whether or not that light is on or off?

A.   No, you don't control that.

Q.   So about what time do they have lights out?

A.   The lights goes out about 9:30 to 10:00 o'clock.

Q.   And in terms -- and then the second day, did the second day happen pretty much as the first?

A.   Yes.

Q.   Now, we talked about the phone and the phone coming about every two weeks.  What is the process of getting a shower at Pontiac?

A.   It's the same process as going to chow.  But they do it with like, at least they'll cut it down to about, let's say they'll take like five cells at a time, like 10 people at a time, they'll take them to the showers.  And you go into the showers.  And the showers is nothing but a big room.  And it's just like a ring that goes all the way around like this (indicating) with a bunch of showerheads sticking out just coming down, the water coming down.

Q.   And do you recall how many days it was until you got your first opportunity to shower?

A.   Yes, about a week.

Rios - direct

1373

Q.   And that first shower, what was -- what happened?

A.   Well, I went to the shower, and I was going to go shower and that, and there was, there was some guy in there smoking marijuana.  So I stepped back out the shower and went back, and went back to the cell.

Q.   Now, approximately how often is it your turn to get a shower?

A.   It was like every, like close to two weeks, like every one or two weeks.

Q.   And in terms of a shower, you mentioned that you get soap with your bedroll, is that the soap you use for the shower?

A.   Yes.

Q.   Are you given a towel to dry off.

A.   Yes.  They give you a little face towel.

Q.   In terms of shampoo, are you given any shampoo to use?

A.   No.  You don't get none of that.

Q.   And in terms of the shower room, would you say it's the same level of danger as the chow hall?

A.   Yes.

Q.   Are you worried about anything when you go and take a shower?

A.   Yeah.

Q.   What are you worried about?

A.   I'm worried about getting beat up, getting assaulted, getting raped, all sorts of things that they could do to you.

Q.   Is there a correctional officer to monitor the shower?

A.   Yes.

Q.   Is it one or more?

A.   Just one.

Q.   Besides the phone call and the shower, are you -- you mentioned a yard earlier?

A.   Yes, sir.

Q.   Is the process of going to the yard similar to the process of when you get a phone call or when you go to the shower or chow hall?

A.   It's more like when you go to the shower.

Q.   How often do you get to use the yard?

A.   Probably once or twice a month.

Q.   And when you get to use the yard, what's in the yard?

A.   Oh, the yard has weights that are all welded into the bars. It has weights welded into the bars. It had workout bench on the floor, that are bolted into the floor.

     They have, they have toilets. They had like potty toilets. But it's just, it's just a thing like a block, a cement block, it's like a square cement block like this (indicating), and it has two toilets there that you can use the toilet. You can use the toilet if you want to pee or use the bathroom or whatever in the open.

     And then it has like on the side over here to the wall where the toilets are at, they got like, like about five phones

Rios - direct

1375

on the wall that you can make collect calls to the house.

Q.   When you arrived at Pontiac to when you used the yard for the first time, about how many days or weeks was that?

A.   That was like probably towards the third week.

Q.   And that third week when you went out to the yard, was that your first time exiting the south uppers since you first went in?

A.   Yes, sir, it was.

Q.   When you went outside to the yard, what did you do that first time out in the yard?

A.   I tried to go and see if I could use the phone.  But the lines on that phone, the line on those phones were pretty long.  And we only got one hour to be out there in the yard.  And if that hour goes by, and you didn't get to the phone because you're still on the line, you just don't get to use the phone.

Q.   And that first time, did you use the phone?

A.   No.  It's such a big line.  I never made it.

Q.   What did you do instead?

A.   I just walked around the yard, just walked, walked, walked.

Q.   Now, in terms of the yard, what are the dangers in going to the yard?

A.   There is plenty of dangers out there.

Q.   What are the dangers?

A.   Well, you've got unstable people in the penitentiary, that they're looney.  They'll do anything.  They could hurt you,

just by you just looking at them, they'll try to hurt you or anything just because you look at them.

They could -- a riot could happen. Somebody could start stabbing somebody, and it just go crazy. And everybody start running and fighting with each other. The towers will take a shot. They make everybody stop.

There is a lot of dangers there. You could get, you could get hit in the head with some of the weights. You could get weights dropped on you, you know. You could get stabbed. You could get beat. You could get choked up or all type of crazy stuff around there, because that's -- there is certain little blind spots that the tower cannot see. And he will not be able to shoot anybody that are doing anything to anybody. So it's very dangerous and scary.

Q. Now, you mentioned that when you got to Pontiac and you got to the south uppers, did you only have one pair of clothes?

A. Yes, sir. All I had was the jumpsuit they gave me.

Q. Are you able to get more clothes in Pontiac?

A. Yeah. But by that time you got to go ahead and make sure that -- well, at that time I got to just call my mom, let her know where I'm at, how she could, how she could send me some money to that penitentiary, send money to me so I could be able to go to the commissary, which is the store, and be able to purchase like jogging suits, like gray jogging suits, probably a pair of gym shoes, soap, shampoo, laundry soap, noodles,

Rios - direct

1377

chili bags, chili bean bags, little things that you can buy off the commissary.

Q.   About how long did it take you to get to the commissary for the first time?

A.   For the first time, I was on that jumpsuit for over, for over two months.

Q.   And the process of going to the commissary, is that a similar process of going to the yard?

A.   Yes.

Q.   And is it similar that you -- how often do you get to go to the commissary?

A.   They come -- like I said, they got, they got four galleries downstairs and four gallery upstairs, and they just go by gallery to gallery.  So it could be like every, you could say like every three months to -- every three weeks to a month.

Q.   When you're -- that first trip to the commissary, what did you purchase?

A.   I purchased some toothpaste, a good toothbrush, some, some shoes, and the jumpsuit and some noodles.

Q.   When you say "noodles," what do you mean by noodles?

A.   Ramen noodles, they're Ramen noodles that you could go ahead, dry goods, dry food that you could put in a cup and throw hot water to it and heat it up and be able to eat it.

Q.   Would you eat that in the chow hall or in your cell?

A.   In the cell.

Q. How would you heat the water?

A. They used to sell this little, this little wiry thing that it has a plug to plug into the wall. So once you plug into the wall, the end of, the end of the wire over here has like a little metal thing, and it's curled up like this (indicating). It looked like -- they call it a stinger. So you just put that in the hot water -- in the water. And that stinger right there, when you plug it in, it will heat up the water. And once it heat up the water, you unplug it and just grab the water and pour it in your cup of soup.

Q. Now, we talked about earlier about that first phone call with your mom. When was the next time that you were able to get a hold of her?

A. It was like two to three weeks.

Q. And what was the conversation like during that second conversation with you and your mom?

A. It was a little bit more calmer on her part. But I was still worried and I was still delusional about where the hell I was at. And I spoke about my kid. How is my kid? Where is my kid?

Q. And at that time, were you and Diana Rodriguez still a couple?

A. No, we weren't.

Q. She had broken up with you before that?

A. Well, she had gotten pregnant before I even got convicted,

Rios - direct

1379

by another, by another man.  So we broke, we broke ties and that was it.

Q.   And she got pregnant while you were in jail awaiting trial for the Luis Morales case?

A.   When I was going to trial for the murder, yes.

Q.   So in prison, are you allowed to get visits from your family?

A.   You only could get visits from the people you put on your visiting list.  And they got to approve it.

Q.   How does that work, the visiting list?

A.   The visiting list, they give you a form.  You fill it out and you put the people that you want in your form, their address and everything, and they'll go through it.

If anybody had any case, anything that they've been in jail before, probation or anything, they will not be able to come in to visit you.  The only ones that could come in to visit you are the ones that are not in any situation that's like parole, been locked up before or anything like that. They'll do a background check on everybody that you put on your visiting list, and they'll just keep the ones that are clean, like my mom, my sister, my brothers, things like that.

Q.   How long was it until you had your first visit?

A.   Months, plenty of months.

Q.   And on that first visit, who was it that visited you?

A.   The only one that always been having my back, my mom.

Rios - direct

1380

Q.   Now, what is the process of having a visit in the penitentiary?

A.   Well, when your family come visit you in the penitentiary, they got to go through the gates.  They let you in.  You got to have your ID with you.  They let you in.  You're on the list.  They'll bring you in.

Their process over there is like when your family comes see you, they take you to this room.  And they strip-search them.  They tell them to take off their clothes.  A lady police go ahead and touch her in her privates, touch her under her, her breasts.  They'll touch her under her breasts, touch her in her privates and everything and then make her bend over, cough, spread her cheeks and everything.

And after they do that, they tell her to dress up again, and then they'll do the same process to the next person coming through.

Q.   And did you learn what they do to visitors from your mother?

A.   Yes.  My mom told me that they did that to her.

Q.   And when she told you that, how did that make you feel?

A.   It made me feel really bad, because she don't deserve to be going through that.

Q.   Did it make you feel like you wanted your mother to still visit you?

A.   At some point no, because she didn't deserve to go through

that. So at some point I didn't even want her to come see me, just to, just to that point, that she was getting, that she was getting treated like that.

Q. Now, what is the process that you go through before a visit?

A. Similar process. They'll go ahead and call you in the cell house. They'll call your name and tell you you got a visit. So you get ready. You put on your jumpsuit. If you've got to take a quick shower, you can take a shower inside your cell, because that's how we used to do since we used to not get to the shower periodically.

So we used to shower in the cell, or just grab a cup, hit the button on the water, just grab some water and just pour it on you, lather yourself up. Do the same process, throw the cups of water on you, take all the soap off, dry up. Put on a little bit of deodorant. Throw on the jumpsuit or throw on the, or throw on the little clothes that I bought from commissary, which was a pair of joggers and a sweatshirt. Just put that on and tell the officer you're ready.

They come. They cuff you up. They cuff you up in the front. And it has a chain that they hold while they take you all the way to the visitor room. Once they take you to the visitor room, they take you to this little intake room. And in the intake room, they take off the cuffs and everything, and they make you strip. You've got to strip.

You take off all your clothes. They make you bend down. They make you squat. They make you go ahead and cough and everything. And then they'll go ahead -- they even go through your hair and everything. And then they go ahead and open your mouth and everything, and they put their finger in your mouth and all that, and then they tell you, "Go ahead. Get dressed."

Once you get dressed, they'll take you to another door. They open that door and they let you into the visiting room. Once they let you into the visiting room, you can see your people sitting down at one of the tables, and that's where you go and sit down with them.

But you can't hug. You can't kiss. You can't do none, none of those things. You've got to be across from each other and not even touching hands.

Q. When -- let me just ask you one point of clarification. When you're bathing yourself inside the cell, where is all the water going that you're bathing yourself with?

A. It's going on the floor. And we pick it up just with another little towel. We just dry it up with a little towel. Or if not, we just clean the floor with the water and just rinse it out into, into the toilet. Just grab the water from the floor and just rinse it out into the toilet.

Q. Now, that first visit that you had with your mother, what happened?

Rios - direct

1383

A.   Well, when I first sit down, she looked at me and she just started crying.  And I couldn't do nothing but just stand there and just sob with her, you know.  No words.

Q.   Did you talk about anything?

A.   Yeah.

Q.   What did -- what were you able to talk about?

A.   Well, I talked to her about my son.  How is he doing?  How is the family doing?  You know, just, just things, checking up with her and see how she was holding up, you know, telling her not to really worry about me.

Q.   When you told her not to really worry about you, did she say anything in response?

A.   Yes, she did.

Q.   What did she say?

A.   How can I not?

Q.   Now, after this one-hour visit, what's the process of going back to your cell?

A.   For me, it's the same process.  Once you go into, once you go into the -- once your family is leaving, all you'll be able to say is "Bye," no touching, no hugging, no kissing, no nothing, or you could say just "Goodbye."

          They get you out first.  They get you, they get you to the little room.  They take you back into the little room.  And then after they get you back into the room, that's when they'll tell your family to get up and they can leave.

Rios - direct

1384

And once they put me in that little room, it's the same process going back to the cell house. They'll strip me. They'll make me bend over. They'll make me cough. They'll make me open up my -- just, you know, grab your cheeks, open them up, cough. And they'll open your mouth, do the same thing. And they tell you go ahead and get dressed. And they put the chain on you, and an officer come and take you back to the cell house.

Q. Now, besides an in-person visit, besides the phone call, are there any other ways you can communicate with your family on the outside?

A. Yes, there is.

Q. What's that?

A. You can write. You can write. You can write envelopes. You can write. You can buy a notepad. And they give you a pencil about this small (indicating), like this, with a little tip on it that you can write. They'll give you that. And you can buy that. You can buy the little pencils. You can buy the little notepad in the commissary, and you can buy envelopes in the commissary with preexisting stamps on them already.

Then you can go ahead and write, put the letter in it, put the letter on the bars. And the police, the police come and pick up the mail. And then they'll send it out after -- you can't close it. You can't close the mail, because they got to grab the mail. They've got to open it up. They've got it

read it.  They've got to check it and see if you're doing anything wrong, you know.  Like let's say somebody is trying to escape or something, you know, and they'll write it, they'll write it on the paper, and they'll put it in the envelope, and they send it out.

Well, they watch for all of that.  They go ahead and they read all your mail and everything.  Then they seal it themself.  Then they send it out if it's clear from, from the mail people to be able to send the mail out.

Q.   And when you would -- who would you write to when you wrote?

A.   My mom.

Q.   Besides your mom, would you write to anyone else?

A.   Yes, to my little sister.

Q.   And besides your little sister, would you write to anyone else?

A.   No, not really.  Probably, I probably wrote a couple of times to the mother of my kid.

Q.   Diana?

A.   Diana, yeah, at 1440 North Leavitt.

Q.   Did she ever write you back?

A.   She wrote back a couple of times, sent me pictures of the kid.

Q.   When you wrote to your mother, what would you write in those letters to her?

Rios - direct

1386

A.   Well, I tried to write mostly everything that was positive, you know.  And I used to just keep the negative of it out.  I didn't want to get her worried about anything, even though I am in danger of losing my life everyday, because that's what it was.  Right there, you wake up protecting yourself.  You go to sleep protecting yourself.  Never a day that you cannot protect yourself.  You've got to protect yourself at all times for the simple fact that it's danger all over the place lurking, all day everyday.

Q.   When you said "keep the negative out," what were the negative things that you would keep out?

A.   Just like I just said right now, all the, all the stabbings, all the lockdowns, all the abuse of other people, police getting hurt, all sorts of things.

Q.   Did you ever keep a journal or anything to write these things down?

A.   Oh, no.  Sometimes I used to just write and I used to not even send it out, because it was, sometimes it was too gruesome sometimes when I was writing.  But I was writing it to just letting stuff out, out of my system, to just try to block things out, just write things.  And sometimes I just -- most of the time I just ball it up and throw it away, because I can't send stuff like that to my mom.  But I do write it.  Excuse me.  But I do write it just to, just to get it out of my system, you know.

Rios - direct

1387

Q.   What are some of the gruesome things that you would write about?

A.   Oh, there was one time that I was in, in one of the cell house, and there was an argument between two guys.  And this guy turned around when he was about to walk away, and the other guy grabbed a mop ringer and just hit him in the head.  He landed on the floor, and his brain, brain matter all over the floor, blood all over the place.  The police came.  They bum-rushed the guy.  They grabbed him.  They took the mop ringer from him, and they took him away in the ambulance.  The ambulance came in front of the building.

Some of the officers grabbed the guy.  They picked him up.  They put him on a gurney, and they put him out of the penitentiary, sent him out to the hospital on the outside.

Q.   Was there a hospital on the inside of the penitentiary?

A.   Yes.  But that hospital would not be able to, would not be able to take care of people like that when they, when they get hurt like that.

Q.   Did you ever go to the hospital inside the penitentiary?

A.   Yeah, because they got to go ahead and give you a shot like for the flu and stuff like that.  They keep a real clean environment into medicine into flu, into flu season and stuff like that, because the officers that used to come from the outside, they used to bring in like the flu, little sickness, little coughs and all that, all those type of things.  And

Rios - direct

1388

since everybody in the penitentiary was free from all that, because none of that stuff was being in the building, we used to get sick from the officers bringing that sickness from the outside to the inside.

Q.   Now, we've talked about your son before.

A.   Yes, we have.

Q.   Did your son ever visit you in the penitentiary?

A.   Yes, he did.

Q.   When you got to the penitentiary, about what year and month was that when you arrived at Pontiac?

A.   I believe I arrived at Pontiac in '91.

Q.   Do you remember what month?

A.   '90, '91.  I'm not too sure.

Q.   When you arrived in Pontiac in '91, how long did it take before you had your first in-person visit with your son?

A.   Oh, my first visit was with my mom, and that was like close to six months or so.  And then to see my son, it was probably over a year before I seen my son for the first time.

Q.   Approximately how old was your son when you saw him for the first time in Pontiac?

A.   Oh, my kid was born in '89, so he was like going on 3.

Q.   When you saw your son for the first time, what happened?

A.   He didn't know who I was.

Q.   How do you know he didn't know who you were?

A.   Because my mom had to explain to him and my sister, Hey,

that's your dad.

Q. And after that, what did your son do?

A. He just looked at me. And I just tried to talk to him. But he was a little kid, so all he did was just look at me. They got a little playpen in the penitentiary for the kids. So he went to play in the playpen. I went over there to talk to him and see how he was doing and that, and he would just look at me and go back into playing his little toys and that. Like I was total stranger to my son.

Q. When was -- how long was it before you saw your son again during a visit after that?

A. It used to be like every -- close to every six, seven months.

Q. When you saw your son the next time, did he recognize you?

A. No, he did not. He just, he was still a baby, close to 5, he was close to 5 years old. And he was still a baby. So since I wasn't home with him, so every time he used to come, he didn't really recognize me until he got probably a little older.

Q. When he got a little older and started recognizing you, would he -- was he able to speak?

A. Yes.

Q. Would he ask you anything?

A. Yeah. He asked me, he asked me if I was in school. That's what he asked me, "Are you in school?" And I told him, "Yes,

I'm in school, Papi. I'll see you soon. You know, I'll be home soon."

Q. When you would tell him that you were in school --

A. Yes, sir.

Q. -- how did that make you feel?

A. Like shit.

Q. Why?

A. Because I'm lying to my kid about something I shouldn't be lying to him about, you know. I'm in jail, and that's it. Don't need to lie to him. But my mom and them wanted me to not expose the situation to him because he was too little to understand. So I had to just keep it away. I had to just put it under lock and key and keep it away from him.

Q. Was there ever a time that your son confronted you about not being in school, about actually being in prison?

A. Yes. There was one time he came, and he was already a little older, you know. My sister brought him, and she brought him with my mom and my little nephew, which is my sister's son. And they're about the same age.

So I was having a little fun with them, just talking to them. And my son told me, "You're not in school."

I said, "Yes, I am."

He said, "No, you're not."

I say, "Why you say that?"

"Because this is not school. I don't see books here."

Rios - direct

1391

You know, so I was like what can I say? I just ignored, I just ignored his little questions, and I just started laughing with him and told him, "Come on, let's do something. Let's go to the machine and get some little chips or some popcorn or something," just veer off from the conversation.

Q. When he was older than that, did you ever have any further conversations with him in prison?

A. Yes.

Q. And during those conversations, what would happen?

A. Well, he started to realize that I was not in school. So I started opening up and letting him know that I was incarcerated, that I was in jail, and this is not a school, because he's now understanding what it is. So I started being able -- I was able to go ahead and talk to him about it, where, you know, where I was at.

Q. And how would he respond when you would tell him these things?

A. Well, he used to cry. He used to cry because he wanted, he wanted me to, he wanted me to be home already with him. So he'll start crying. And he didn't want to leave. And the officers used to tell me that, since we leave first, since we leave first, they'll take us off the table first, and they take us out first before they tell your family to get up and leave.

So I'll get up first. I'm about to leave, and he used

Rios - direct

1392

to run to me, hug me and tell me that he didn't want me to go, that he wanted me to go, go back home with him.  And the officers used to come to me and tell me, "Mr. Rios, you know you can't be doing that."

I said, "I know.  But it's not me.  It's him.  He's coming to me.  He's hugging me.  I'm not, I'm not doing nothing, you know."

So they'll take me out and let me go, the same process and take me back to the cell house.  And my mom will take the kid and my sister and them, and they'll just leave.

And when I call home about a good two, three weeks after that, I call home and my mom was telling me that kid was crying all day.  He didn't want to go home.  Even when his mom came to see him, to pick him up, he didn't want to go.  So I don't know what to tell you.  So yes.

Q.   Now, besides your son, your mother, and your sister and your sister's nephew, did your father ever visit you in prison?

A.   No.  My father never made it to see me in prison.

Q.   Did you communicate with your father while you were in prison?

A.   Yeah.  I used to write to him, because I couldn't call him.  So I used to write to him.  But since he was illiterate, my stepmom used to be the one reading him the letters.  And then she'll go ahead and write what he says.  And he'll send me probably a couple of dollars and things like that for me to

Rios - direct

1393

take care of myself.

And he used to always tell me be strong. You know, you're not going to be, you're not going to be there forever.

So yes, I did have communication with him. But he never came to see me.

Q. In terms of sending a letter back and forth, approximately how long would it take for you to send a letter and then get a response about that letter from who you were sending it to?

A. Okay. Let's say today is, what, Tuesday? Okay. Let's say you made a letter today, and you put it on your bars. Remember, you can't seal it because they've got to grab it. They've got to read it and everything.

So you send the letter in. By the process that they do, by the time they get to reading your letter and everything, it might be two to three days before they seal it and send it out. So it will be like probably two to three weeks before they get a letter from you when you send it out.

Q. And then when would you get a response from them?

A. Same process, because when your letters come in, they do the same process. They'll open your letter, they'll check it. They'll even check the pictures. If you've got a girlfriend, and she's sending you nude pictures, you're not going to get those pictures. They're going to take them out of the envelope. And anything else that's in the letter that is not appropriate into the penitentiary and anything like that,

they'll go ahead and keep the letter.  You won't even get it.

Q.   Now, in terms of school in the penitentiary, how did that work?

A.   Well, you got to sign up for it first, and it's a big process.

Q.   What's the sign-up process of going to school in the penitentiary?

A.   Well, you've got to sign up for school first.  Depending on what you're signing up for, either you're signing up for GED, either you're signing up for some other classes that they got going on.  And you just sign up, and sometimes it takes months before you even get approved to be able to go, because there is so many people on the list.

And in the max joint like Pontiac, let's say that we started our program today, right.  Let's say we started our program today, let's say my GED program, I started my GED program today.  And something happens in the penitentiary, and the penitentiary goes on lockdown.  You're not coming back to school.  Everybody is locked down.  It's over with.  You got to reapply, you've got to wait again, and you've got to go ahead and make sure that when you do, when you do get back in, and it's the same process, you've got to try to see if you make it all the way to the day that you could graduate from there in that, in that, in that penitentiary.  Because so much, so many things happen that they're always locking the place up, so you

never get a chance to finish. You always got to go back to start again and back of the line again and starting again.

Q. Now, did you graduate high school?

A. No, I did not.

Q. Did you get your GED?

A. Yes, I did.

Q. Did you get your GED at Pontiac?

A. No. It was impossible to get it there.

Q. Did you try in Pontiac?

A. Yes, many times. I applied for every semester.

Q. Did you eventually get your GED in the Illinois Department of Corrections?

A. Yes, I did.

Q. Was that at Pontiac?

A. No.

Q. Where was that?

A. That was in Dixon, Illinois in 2004.

Q. And that's when you got your GED?

A. Yes, sir.

Q. You mentioned the term "lockdown."

A. Hmm-hmm.

Q. Can you explain what a lockdown is?

A. A lockdown is when something happens, either somebody got hurt, somebody got stabbed, an officer get hurt, anything like that, somebody is missing out of the count, anything like that,

they'll go ahead and lock the place up, meaning they'll put you in the cell, and it could be months from then until they figure out what happened that they'll let you out of that lockdown.

So you could be sitting there in that lockdown for over six months in a cell without being able to go to school, without being able to go to chow hall, without being able to go to the yard, without being able to -- anything.

The only thing they let you do get, and sometimes they used to even lock that down, and it was the visiting room. Sometimes they'll lock the visiting room down too, that you can't even get visitors for a certain amount of -- for the whole place for a certain amount of time until they go ahead and say, let's open it back up. And they'll open it back up, and that's when they start taking people, you know, signings for school, and your visits can start coming in again, all type of things. I mean, it's just ridiculous.

Q. When there was a lockdown, you weren't able to shower?

A. They'll shower you, but that comes like possible every other month that they'll come and give you a shower.

Q. What about the phone call from the trustee in front of the cell, did that happen during lockdown?

A. When you're locked down, they'll bring the phone around, yes, they do.

Q. And the lockdown, what happens with food during the lockdown?

A.   They'll do the same process like they do for that dinner. At night, they'll go ahead and bring the hot boxes, they called hot box.  So they got the hot boxes, they bring them in all the way to the end of the gallery.  And they'll start feeding everybody, giving them their trays all the way until they finish over here, the Styrofoam trays with whatever food they got in there all the way over here to the end.  They do that to every gallery.

Q.   And when they do that, is the food coming to you hot or cold?

A.   It's always cold.

Q.   And is that for all the meals during the day during a lockdown?

A.   All the meals.

Q.   In your whole time in IDOC, what was the longest lockdown that you had to endure?

A.   Longest lockdown was when one of the officers, I think it was a captain, they beat the captain up with a pipe, and they left him, they left him for dead on top of his desk.  So they locked us down for at least close to two years.

Q.   And was that at Pontiac?

A.   Yes.

Q.   In terms of a lockdown, what's the reaction from the other inmates when a lockdown happens?

A.   Well, there is a lot of different reactions.  You've got,

you've got some that are not stable up here. They'll go ahead and they want to get out of there, out of the lockdown, so they'll go ahead and throw piss at the police. They'll do little fires. They'll put like the pencil, they'll put the lead of the pencil inside a socket, and they'll touch it with another piece of the pencil in the socket, and that turns into -- that will spark, and that will turn a fire.

They grab the mattress, throw them outside through the gate. They'll fold the mattress in a way that it will fit right through the gate. They'll throw the mattress out there, and they'll throw the fire on it and get the mattress on fire.

And the whole cell house is full of smoke. All they can do is just open up the windows up there for the smoke to go out. But that smoke is going inside everybody's cell, and everybody is choking and trying to survive. So just wet a towel, wet a towel, put it in your face, anything.

You know, it's gruesome. Some of those people do some crazy stuff.

Q. Now, in terms of --

THE COURT: Before you continue, we'll take our afternoon break. We'll come back at 3:00 p.m.

All rise.

(Jury out at 2:31 p.m.)

THE COURT: I'll see you at 3:00.

MR. ENGQUIST: Your Honor, there could be a couple

issues before we start crosses, if you want to do that before we start crosses or --

THE COURT: We can do it now.

MR. ENGQUIST: All right. I just wanted to be clear on where we want to go -- where I want to go on a couple of the issues.

It hasn't been brought out, and I know we were limited under 609 not to bring in his earlier convictions or his conviction in 1990 that he was on bond for at the time of this one and also for the one while he's in prison. I know it can come in for different reasons. So we do plan on bringing that up having to do with, because that was part of his prison time, we intend to bring that up.

Also, Your Honor, with the 1990 conviction, plaintiff yesterday testified quite at length about how he was no longer in a gang as of 1988, how he wouldn't do certain things, like he didn't have access to a gun at that point. He was not that type -- he never became a full-fledged Latin King. He went into a series of things that he was not able to do at that point in 1988.

The conviction, his 1990 conviction has to do with a 1989, I believe May of 1989 aggravated battery or assault where he was shooting at somebody. And it's very gang related through the whole thing. So we were looking at that, because that has to go into -- it basically rebuts what he was saying

about how he wasn't in a gang, I didn't have access to a gun, I didn't have guns, I didn't do those things. And he pled guilty in 1999, agg. assault claim.

THE COURT: What evidence do you have that it was a gang-related shooting?

MR. ENGQUIST: Well, we have that -- we have the plea itself, but also we can also call in the witness himself who testified in aggravation during this case.

MR. SCAHILL: Can I add something to that?

THE COURT: One second.

MR. SCAHILL: I'm sorry.

THE COURT: And so the plea references a gang-related shooting?

MR. ENGQUIST: It relates -- well, it may not relate -- the gang part is not in there, but it has to do with the fact of him shooting at the car and shooting at the person. That comes in.

THE COURT: Mr. Scahill.

MR. SCAHILL: Two things specifically keyed to the record that I'm concerned about that Mr. Rios stated. One was on page 1199 of the transcript. He's talking about how it was against -- he went at length about the rules and whatnot of the Latin Kings, and one of the things that he said was a rule that they were not permitted to do was what he called claiming your set when you were committing a crime, because it would bring

heat back on the neighborhood.

So the underlying crime that we're talking about, the one that happened in I believe May 29th of 1989, the facts are that he did precisely that, that he shot at this car and said the same thing that he said in the confession, which was "King Love," which we can -- we have a witness on our may call list that can prove that angle up to rebut that issue that he brought out.

And what he's seeking to do is to say the confession is false because this is a thing that we are trained not to do as Latin Kings. Yet, we have a witness that said he did exactly that thing.

Furthermore -- hang on. On page 1200 of the transcript, Mr. Rios specifically says with respect to -- hang on, let me find this. I'm sorry, 1202. With respect to shootings, he says -- hang on. Okay. He's talking about how he had progressed through the Latin Kings. "I never made it to that step of me being around with guns and stuff like that with them or participated in any shooting or anything like that."

So he has volunteered he had never been involved in any shootings. Yet, he was not only convicted of a shooting, but pled guilty to that shooting. And this is right around the time where he says that he was not involved in doing those precise things.

And so he has raised that knowing full well he pled

guilty to doing that exact thing. And the jury is now left out here with him disclaiming having participated in any other shootings, knowing that he has a conviction that is intact on his record of doing exactly that, that same thing.

And the final thing is he, as Mr. Engquist referenced, he testified yesterday about not having a gun after he got out of the Latin Kings. And of course he pled guilty not only to having a gun, but using that gun in 1989, right around the time period that we're talking about.

So the concern is they're raising these things as if there is not evidence that exists there. And I believe in addition to this damages stuff with the extra time, these are things they've clearly opened the door on.

MR. ENGQUIST: Your Honor, just additionally, you were asking about proving up the gang part, besides the witness we have on our list, we also have the testimony of Officer Noon, which is going to be read in, because he was involved in that arrest for the aggravated assault.

And at that time, he would testify -- he did testify to the fact that plaintiff was a self-admitted Latin King at that time too.

THE COURT: Okay, Mr. Richards, response?

MR. S. RICHARDS: Well, first, let me take the last point first because I think that can be cleared up. In terms of Noon's testimony that Jaime Rios identified himself as a

Rios - direct

1403

Latin King to Noon, we have no problem with that. He was asked about that at deposition. He said, "Yes, I told Detective Noon that I was Latin King."

So we have no problem with that coming in as impeachment in terms of his status as a Latin King.

I think we then need to move towards the guilty plea. As Your Honor asked, and I don't think you got an answer, but we have a transcript I've attached to, I believe I attached to a prior pleading, which makes clear that the phrase "King Love" is not something he admitted to or is part of the adjudication of the aggravated assault. It is not. It's not charged in the indictment, because Illinois indictments tend to be barebones and only charge the elements of the offense.

I'm not absolutely certain that's the case, because I wasn't able to find the indictment. But at the guilty plea, the judge read what seems to be word for word in the indictment, there is no mention of King Love. There is also a factual basis read in by the state's attorney.

THE COURT: What about the witness that they said they're going to call who will say that -- who would tie up the gang-related aspect of it?

MR. S. RICHARDS: Well, that witness will testify to that if they call him. But just in terms of the guilty plea, there is nothing in the guilty plea in which my client said, "Yes, I did say 'King Love.'" So I don't think he's precluded

Rios - direct

1404

from denying it.

Now, the next question is whether the whole incident can come in through a witness, not through the guilty plea, but a witness saying he shouted out "King Love."

I think the problem with that -- they do have that witness, the witness testified at the sentencing hearing. So I accept their representation that they have a witness who will say my client said, shouted out "King Love."

Then I think you need to move to an analysis under 404(b), because I believe what the State is -- sorry, the defendants are trying to do is to prove that my client has a propensity, that they can demonstrate that he's guilty --

THE COURT: He's not on trial for murder here.

MR. S. RICHARDS: No. But they're saying that, they're saying -- it's their claim that he is guilty of the charged offense and that should reduce damages.

In order to prove that he's guilty of the charged offense, and that can reduce damages, their position as I understand it is that the fact that he shouted "King Love" on a prior occasion means that he in fact did shout "King Love" during the charged offense and, therefore, he did it.

I think that's the ultimate goal of what they're trying to do in terms of putting in that witness. He shouted "King Love" on one occasion. He shouted "King Love" on another occasion.

I am trying to resist the temptation to analogize this to other forms of behavior such as using phone books. But it seems to me this is pure propensity. He did one thing one time. He did another thing another time. And it's relevant, obviously. But I think under 403, you have to balance the probative value versus the prejudicial effect.

I think the key issue they want, the key thing that they're trying to establish is he was a Latin King, always a Latin King. He's lying when he says he wasn't a Latin King. And I think they should go for that.

I think also in terms of the King Love thing, I would say it's admissible separately, I don't like to say this, but I think it's admissible separately, that statement, not the shooting, the statement is admissible as an admission of a party opponent because it's his words, and he said them.

But if it's going to be admitted as an admission, it should be limited to the fact that he said the words "King Love," and the aggravated assault should be kept out under Rule 403.

And I think it's also the balance is more prejudicial than probative because, as I said, they have Officer Noon who will say: He told me he was a Latin King. And my client is not denying he told Officer Noon he was a Latin King.

So to get the Latin King point in, that does it for them. They don't need him shouting "King Love" in addition to

saying he's a Latin King.

MR. SCAHILL: Well --

THE COURT: I don't need anything more.

Anything else, Mr. Richards, on that?

MR. S. RICHARDS: No.

MR. J. RICHARDS: Wait.

MR. S. RICHARDS: I'm sorry.

(Off the record.)

MR. S. RICHARDS: Well, I think I made clear there is no stipulation to the factual basis. The attorney said nothing and my client said nothing. So no stipulation. Under Illinois law, he's not bound by the factual basis whatsoever. He's bound by the guilty plea and the elements of the offense, period. He's admitting the elements of the offense.

THE COURT: Okay. I understand your argument to be, your response to the areas that the defendants want to inquire of Mr. Rios to be under 404(b) that it's propensity evidence. This is not a murder case. And to the extent that it's related to -- one second.

So are the defendants seeking to show that -- to admit the aggravated assault conviction to show that he acted in accordance with that in the shooting of Luis Morales?

MR. SCAHILL: No. We're using it to impeach what he affirmatively stated on direct.

THE COURT: Mr. Engquist.

Rios - direct

1407

MR. ENGQUIST:  That's correct, Your Honor.

THE COURT:  And that's my understanding.  You cannot use it to argue guilt or innocence, because that would be an improper purpose with respect to the impeachment.

Your client testified, Mr. Rios testified, the question was:  "Did you ever seek permission to retaliate against someone?

"Answer:  No.  I was gone at '88 from that.  I never made it to that step of being around with guns and stuff, like that with them or participated in any shooting or anything like that."

A conviction for shooting during which he referenced "the gang" is directly implicated by that testimony.  And so in fairness, the defendants are able to elicit testimony concerning the assault because the plaintiff himself opened the door to that testimony.  It's relevant to two things:  One, his testimony that he was out of the life, I think he called it a family member and therefore out, and relevant to his testimony that he was never involved in any gang-related shooting.

With respect to the unfair prejudice, I don't see how the prejudice can be unfair when it's the plaintiff himself who injected it into the case.  And so the 403 arguments are not persuasive.  So you may inquire of that shooting.

MR. S. RICHARDS:  Your Honor, may we have an instruction, limiting instruction at the time that comes in

Rios - direct

1408

that it's only to be considered for those purposes and not for any other purpose, just to impeach his testimony as to his gang activity or membership and not for any other purpose?

MR. SCAHILL:  I do not have a problem with a limiting instruction.  However, there is another aspect of the limiting instruction that comes into play here, which is something that we submitted on Friday, which is this *Gilbert* instruction.  I believe that Mr. Rios, if his deposition testimony is any indication, is going to say, "I did not shoot at anyone."

I don't think -- I mean, he can say that.  As the Seventh Circuit said in *Gilbert*, you cannot force somebody to say something from the witness stand.  But I believe what the Seventh Circuit said in *Gilbert* is that what the Court is then supposed to do is when they utter that, those words, and, again, not the "King Love" part, the discharging of the firearm, to give an instruction essentially saying that those facts have been established via the guilty plea.

THE COURT:  Any response to that, Mr. Richards?

MR. S. RICHARDS:  Your Honor, yes.  We believe that *Gilbert* is not applicable for the reasons given in my pleading with respect to that issue.  So *Gilbert* is a totally different situation involving excessive force versus a guilty plea or a guilty finding as to a battery under *Heck versus Humphrey*.

There is no need for a *Gilbert* instruction in this case.  And it's also going to be very confusing to the jury to

Rios - direct

1409

tell them that it's dispositive as to the aggravated assault and not dispositive as to shouting "King Love." That's a very fine distinction to make.

The defendant has a right under Illinois law to enter an *Alford* plea. And, again, this was a plea in which he did not -- was not sworn to the facts, did not stipulate to the facts, did not agree to the facts. He only agreed to plead guilty, and he testified at his deposition as to why he did so.

So we don't believe a *Gilbert* instruction would be appropriate. A *Gilbert* instruction is designed to prevent the defendant or the plaintiff from having to admit something in open court, and he's denying it in open court. So it's not really applicable.

THE COURT: All right. I'm not prepared to rule on the *Gilbert* instruction right now. It seems to me I have some time because you'd have to call a different witness to introduce the conviction and the circumstances of the conviction, correct?

MR. SCAHILL: So I actually don't necessarily agree with that, because he --

THE COURT: How are you going to introduce the conviction? I'll ask a simpler question.

MR. SCAHILL: We can get it through Mr. Rios.

MR. POLICK: Through certified copy of conviction.

MR. SCAHILL: We can do that too, but --

Rios - direct

1410

THE COURT: And if he says, "I don't know what that is. I've never seen that"?

MR. POLICK: We have the guilty plea as well. So he can be impeached with his guilty plea.

MR. SCAHILL: I think it's simpler than that: Did you plead guilty to aggravated battery on X date, Mr. Rios? He's going to say yes. He said yes at his deposition.

THE COURT: Okay.

MR. J. RICHARDS: I thought it was aggravated assault.

MR. SCAHILL: Right.

THE COURT: I've got something else to go at 10 to. So go enjoy your 10-minute break. We will if we need to, if we get to it today, I'll go look at it, but you'll get it.

MR. SCAHILL: Okay. Thank you.

MR. POLICK: Thank you, Judge.

(Recess at 2:49 p.m. until 3:00 p.m.)

(Change of reporters.)

THE COURT: All right. We'll bring the jury in and continue with the examination. While the examination's ongoing, I'll look at the *Gilbert* issue.

(Jury in at 3:02 p.m.)

THE COURT: All right. Please take your seats.

Mr. Richards, you may continue.

MR. J. RICHARDS: Thank you, Your Honor.

BY MR. J. RICHARDS:

Q. Jaime, when you got to Pontiac, did you rejoin the Latin Kings?

A. Yes, I did.

Q. Why did you rejoin the Latin Kings?

A. Because it's better to join the Latin Kings inside the penitentiary due to the fact that you need protection. You need to be -- basically need protection. And if you gonna be in population, you got to be with somebody that's organizing -- and you got to be with an organization to be able to be in population.

If not, you go into PC, and PC is way worse for the simple fact that in PC, there's a lot of mental disabled people, not really mentally capable of holding itself and they could harm you in PC. PC is way worse than being in population. So being in population at least you got a circle that you could go ahead and be able to protect yourself and be able to make it to the next day.

Rios - direct

1412

Q. When you -- what was the process like of rejoining the Latin Kings in prison?

A. Well, when you in prison, you got to rejoin them. First you got to do -- the first thing you got to do when you get your transcripts from the penitentiary -- from -- from your case, when you get your transcript from your case, you got to turn it in to them, and they go ahead and go through your transcripts and see what you was locked up for, see if you were locked up for rape, tricking on people, or killing babies, killing womens, anything like that. If you were any of those type of people that are not mentally stable, you're out. You're not going to be able to be in there.

Q. And when you talk about your transcript for your case, you're talking about the -- you know, report of proceedings, the questions and answers that people were asked?

A. Really what -- what you got convicted for.

Q. When -- about how long did it take before you got your transcripts from your case when you were in Pontiac?

A. Oh, I got my transcripts about -- about a year from then after being convicted.

Q. And then did you hand them over to the gang?

A. Yes, I did.

Q. Do you remember who in the gang you handed them over to?

A. No, I do not.

Q. When you handed it over to them, was this in the yard or

was it in -- somewhere else?

A.   Inside the cell house.

Q.   How do you get your transcripts to someone inside the cell house if you're inside a cell?

A.   Because they got the trustee that keeps running around back and forth cleaning the floors and mopping the floors and everything in the gallery.  So they'll help you out if you need something like from another cell, another guy in a cell, you could just tell him, hey, could you take this over there to -- to my friend over there, and he will just grab it for you and take it over there for you.

Q.   Now, after you gave your transcripts over, were you accepted back into the Latin Kings?

A.   No.   They took a little while because they also got it -- they also got to go ahead and make sure that they call the streets and find out about you that -- who's -- who's your family, who's your brothers, if you have any, if you have any cousins, if you got any relatives that are still in the gang or anything like that that could go ahead and vouch for you. Basically, vouching for you, letting them know that you're okay.  You know, that you're not a rat, that you're not a baby killer, or that you're not a rapist and all sorts of things like that.

Q.   When -- when you're in prison as part of the Latin Kings, what are -- are -- what are the duties that you have as a

Rios - direct

1414

member of the Latin Kings in prison?

A.   In prison, you really don't have no duties.  It's just -- you just protect each other.  That's it.

Q.   How do you protect each other as a Latin King in prison?

A.   By being always in a group with each other.

Q.   Are you required to have any sort of weapon on you as a member of the Latin King?

A.   Yeah, they do.  They do got knives.  They do got all types of sorts of things that they could use to hurt other people.

Q.   What -- and is that a shank?

A.   Yes, you could call it a shank.

Q.   In prison, is it fair to say that nearly everyone has a shank of some sort?

A.   Well, not -- not mostly everybody because there's certain people that they cannot be given those things for the simple fact they're not mentally stable and they could hurt anybody with them, even the people that give it to them.

Q.   In terms of a shank, did any of your cellmates ever have a shank?

A.   Yes, they had.

Q.   What were the types of shanks that your cellmates had?

A.   Well, they -- like from the yard, they probably -- they probably cut a -- cut a bend, a little piece of wire, and they'll make an ice pick out of it and they'll -- they'll go ahead and grab that ice pick and insert into -- into like a --

end of a mop or something like that, a piece of stick or something. They'll stick it in there and they'll use it just to stab somebody.

Q. How do you -- when your cellmate has a shank, how -- how is there -- how do you trust that they won't use it on you?

A. You don't know. You do not know. You -- you -- you got to live with the -- you got to live with the fear of -- of this guy either using it on you or using it on somebody else or -- you have no -- you have no recollection of what they're going to do with it.

Q. Did you ever have a shank?

A. Yes. I made one.

Q. How did you make your shank?

A. I had grabbed some cardboard and I paste it together with a bunch of glue, let it get hard. And once it got hard, I just scrape it against the floor, made a tip on it, and that's what I used to carry around to protect myself.

Q. Now, when you were in prison when you rejoined the Latin Kings, were you informed of any sort of rules or bylaws that the organization had?

A. What, in the penitentiary?

Q. Yes.

A. Yeah, you can't be starting no trouble with anybody else because anything you do could cause a chain reaction, meaning a -- meaning a riot into -- into fighting, and you could have

the whole -- you could have everybody else in your -- in your organization that you're with, they could get hurt by you going and doing something that you ain't supposed to disrespect somebody, fight with somebody else, or anything like that. This is not allowed.

Q.   Is there any sort of constitution or manifesto of the Latin Kings?

A.   Yes, there is.

Q.   When did you first become aware of the -- the constitution or manifesto of the Latin Kings?

A.   It was like the second year, about the second year that I was in Pontiac.

Q.   And how did you become aware of the constitution or manifesto of the Latin Kings?

A.   I was -- I was -- I was in the cell with another Latin King and he was there before me and he had -- he had the paperwork and he was studying the paperwork.

Q.   Studying the constitution and manifesto?

A.   Constitution and the manifesto, yes.

Q.   As a Latin King in prison, were you required to do that?

A.   It's a must.

Q.   Why was it a must?

A.   Because it's like a religion.  They treat it like a religion in -- in the penitentiary.  They don't treat it like a criminal organization.

Q.   What do you mean in terms of it being treated like a religion?

A.   It's treated more like a religion.  Like -- like, let's say -- let's say something that -- that you got to abide by and just like in the Bible, you should not kill and you should not steal and stuff like that.  It got a bunch of stuff like that in it.

Q.   What's the stuff that they have in it in the Latin Kings?

A.   Basically it is you cannot be in homosexual activities.  You cannot be -- you cannot be stealing from people.  You cannot be doing harm to other people.  You can't -- you can't -- what you call it?  It's -- it's -- it's like borrow -- borrow money or -- or food or anything from other inmates because that could create a problem too.  So certain things like that.

Q.   How can borrowing food create a problem?

A.   Because if you can't pay, something is going to happen to you.  You're going to get hurt due to the fact that you can't pay these people back their money or the food that you took from them that -- that you asked for, things like that.  You -- you just can't -- you just can't be starting anything that could cause problems, because you could affect everybody else by what you're doing.

Q.   Did you have any sort of rank in the Latin Kings when you were a Latin King in prison?

Rios - direct

1418

A.   No, I did not.

Q.   And -- so you weren't like an Inca or the second-in-command person?

A.   Oh, no.

Q.   Now, in terms of your time in Pontiac, how many years total would you estimate that you were in Pontiac for?

A.   About -- you could say probably close to four years.

Q.   In Pontiac, did you ever run into Benjamin Carrero?

A.   Yes, I did.

Q.   And that would -- is that the same Benjamin Carrero that testified last week?

A.   Yes.

Q.   What were the circumstances of you running into Benjamin Carrero?

A.   Well, he had -- he did -- I guess he was just in the new and he was in intake, I believe.  And they let us all out to the yard for that -- for that week and he was in the yard and I ran into him in the yard.

Q.   And when you ran into -- ran into him in the yard, what happened?

A.   Well, we spoke about our family and everything.  And then we spoke a little bit about what happened to me and -- and in my case.

Q.   And what did Benjamin Carrero say to you?

A.   He say that Officer Guevara made him lie against me.

Q.   And when he said that to you, what did you say back to him?

A.   I told him not to worry, for the simple fact that it's over with, you know.  It happened, you know.  They made him lie against me, and I hold nothing against him for that.

Q.   Why did you say that to him?

A.   For the simple fact we grew up together and I knew that Guevara was very -- very dangerous and he did me the same way and got me in jail too.  So I knew the circumstances that he ran through when -- when Mr. Guevara locked him up and -- and told him to go ahead and lie against me.

So I knew the circumstances he was looking at when -- when that happened, so -- because we knew the same person, which was Guevara, you know, so we had something in common, which it was Mr. Guevara.

Q.   Now, were you in the south uppers for your entire stay at Pontiac?

A.   No, I got moved to the -- I got moved to the west house for a little while.

Q.   What's the west house like?

A.   It's another part of the penitentiary, but it's closer to the -- it's closer to the hospital.  So it's just a little -- it's smaller -- it's a smaller cell house.  It's a smaller cell house with the -- on the other side it's -- it's protected custody and on this side it's population.

Q.   And in that cell house, was there a similar process of

taking a shower?

A.   Yes.

Q.   Was there a similar process of getting food at chow hall?

A.   Yes.

Q.   Was there a similar process of the phone?

A.   Yes.

Q.   Was there a similar process of mail and visits?

A.   Yes.

Q.   In terms of -- circling back to the -- you trying to get your GED in Pontiac.

Why did you decide to go and get your GED, or try to get your GED?

A.   Well, I needed to get educated.  I never finished my high school.  So that was one of the things that I could go ahead and jump into and -- and keep my mind into the books instead of the -- instead of the surroundings around me that were just everyday threat.

Q.   Were you ever moved from Pontiac to another IDOC facility?

A.   Yes.  They shipped me -- from Pontiac, they shipped me to Menard Correctional Center.

Q.   Now, Menard Correctional Center, whereabout is that in Illinois?

A.   It's deep south.

Q.   So in terms of being shipped to Menard, was there any incident that preceded you being shipped to Menard?

Rios - direct

1421

A.   Yeah, I believe I got shipped out of the Pontiac to Menard for the simple fact that an officer in -- in Pontiac, she got to liking me and I got to liking her and we started talking, being friends with each other, being too friendly with each other, so they booked me and they took me out of the penitentiary just to -- just to leave her with her job.  So they got me up out of there.

Q.   In terms -- when you say "too friendly," what do you mean?

A.   Too friendly; touchy, feeling, you know, kissing and talking to each other.

Q.   Did you ever have sex with her?

A.   No, sir.

Q.   In terms of -- in terms of her, did she come onto you?

A.   Yes.

Q.   When she came onto you, did you feel like you could say no to her?

          MR. SCAHILL:  Objection.

          THE COURT:  Overruled.

BY THE WITNESS:

A.   No, I couldn't say no.  Why would I even -- like I was in the room.  I was in a cell mostly all day.  I couldn't get to her.  She used to always come to me, so I had no way to say no to her.

BY MR. J. RICHARDS:

Q.   Now, when you went to Menard, what does -- we -- you

Rios - direct

1422

described already what Pontiac sort of looks like, the layout.

A.   Mm-hmm.

Q.   What's the layout of Menard?

A.   Well, Menard is built inside a pit.

Q.   What do you mean by a pit?

A.   There's like a crater.  It's like a crater inside.  It's like a crater inside.  You got the penitentiary down here.  You got everything down here.  On the upper right side of the penitentiary, up on the hill, they got death row.  They got death row up there.  And then on the other side of -- of the -- of the penitentiary on the hill they got a cattle farm.

Q.   And in terms of Menard, when you got to Menard, did you go through intake again?

A.   Yeah, you go through there.

Q.   In terms of when you're going through Menard intake, are you allowed to bring anything with you from Pontiac to Menard?

A.   Your property -- your property might follow you probably a month after you're there.

Q.   And when you're at Menard, where was the first cell block you were put into?

A.   It was -- when you first come in -- when you first come into Menard, it's -- I believe it's lower east I think it is they call it.  I'm not too sure.  But it was one of the parts -- one of the first parts of the penitentiary when you first come in.  They got a cell house right here that is --

that's connected to the visitor room and all that together. And it's just one little cell house right here. And they got some -- got another cell house that way and another cell house this way.

Q.   At Menard, did Menard have a similar process of getting a phone call with the trustee walking out with a phone?

A.   Menard, yes.

Q.   What about the visiting procedure at the -- at Menard, was it the same or different from Pontiac?

A.   No, that one is way different.

Q.   How is it different?

A.   Because in Menard, since it's like a -- possibly like seven hours away from Chicago, somewhat like that. So what the process is that your family go ahead and book to be able to go to Menard. When you book to go Menard, you got to go to the certain place where you take the bus that goes to Menard.

The bus take you to Menard. The day you get there, you end up going into a little hotel that they have for visitors. That night, that day when you get there, they'll put you in that -- they'll put you in that little hotel. You got to pay for that little hotel.

So from that little hotel, you'll be able to see me -- the next day, they'll open -- when they open the penitentiary, you'll be able to come from there from that little hotel to come and visit. And then after you visit in there, you can go

Rios - direct

1424

back to the hotel and they'll do the same process for the next day.  You come visit again.  And then after the second day, they take you back to Chicago.

Q.  In terms of Menard, did your mom ever visit you in Menard?

A.  Yes.

Q.  How many times?

A.  One time.

Q.  Did your son ever visit you in Menard?

A.  No.

Q.  Did your sister ever visit you in Menard?

A.  No.

Q.  In terms of Menard, were -- was Menard also a maximum security prison like Pontiac?

A.  Yes, supermax.

Q.  With Menard, did you feel as -- as if you were safer in Menard, or did you feel like you were safer in Pontiac?

A.  Same thing; never feel safe.

Q.  What were the conditions like in Menard?

A.  Well, they were about the same -- the same as -- they were about the same as Pontiac, but it was one -- one -- one big difference about Menard.

Q.  Well, what was the one big difference?

A.  That the police were racist.

Q.  How were they racist?

A.  They were just white racist.  You could say Ku -- Ku Klux

Rios - direct

1425

Klan neighborhood type of -- type of racist up that way.

Q. Did you ever experience any type of racism from them?

A. Yes.

Q. What was the racism you experienced from the correctional officers at Menard?

A. Well, they calling people spics. Get in your room, you know. You don't belong here. You need to go back towards Chicago, to Illinois, things like that.

Q. Did you ever file any sort of complaint against any sort of guard?

A. No, I did not.

Q. Why didn't you?

A. Because it's -- you -- you put in a report about anybody, then everything else just start falling on you. Like it'll cause a chain of reaction of officers messing with you after that. You -- you tell on -- you tell on one of the officers and all the other officers catch -- catch wind of it, you're a target to them.

Q. And when you're a target to the other officers, how would another inmate treat you once you're the target of officers?

A. Well, inmates don't treat you any different. They treat you just like -- like just any other inmate, you know. But they know that you being -- you being tagged by the simple fact the way the officers reenact with you and not them.

Q. Now, in terms of Menard and the cells, were the cells clean

or dirty in Menard as compared to Pontiac?

A. They're about the same.

Q. In Menard, was it hotter or colder in Menard than in Pontiac?

A. Oh, it was colder in Menard.

Q. Do you know why it was colder in Menard?

A. Yes, because Menard is inside a pit, and from that pit every time it -- it -- it -- every time it snows or anything like that, it just comes from the pit, the wind comes down, down the hill like this, and it comes down and it's -- it's -- it just comes into the building. And it's way colder than Pontiac, because Pontiac was just a flat land and -- and cement block all -- all around it, while Menard was just a big pit that part of the walls is just -- it's just a mount- -- it's just a mountain and rocks.

Q. In -- in terms of -- so that's the winter. How was Menard in the summer?

A. Oh, Menard in the summer, since you got the cattle farm up there, all you do is smell manure through the whole year around. You smelling nothing but manure since the wind brings all the manure and everything down to the -- down the pit like this and everything goes into the cell houses and everything, and it stinks like straight crap up in there.

Q. So was Menard hotter because it's in the south of Illinois or was --

A.   Yes.

Q.   -- that the same?

A.   It's -- it's way hotter, too.  And due to the fact that you're in a pit, it makes it way hotter in that pit.

Q.   What -- what do you do to combat heat when you're in a prison cell?  I mean, you don't have air conditioning, right?

A.   Nope.

Q.   Are you allowed a fan?

A.   You do could buy a fan in commissary, but the fans are like some little thing like this that the air -- you could do probably better with a -- fanning yourself with a -- with a -- with a piece of paper.

Q.   Is that what you do -- would do to cool down?

A.   No.  I used to just put a towel into cold water and just wrap it around my neck.

Q.   And in terms of your cell in Menard, was there a window to the outside world?

A.   No.

Q.   Was the yard at Menard any different from the yard at Pontiac?

A.   Yes.

Q.   How was it different?

A.   Well, they don't let it -- they don't let all the cell houses -- they don't let all the cell houses out there at the same time.  They just do it one cell house at a time.

Rios - direct

1428

Q.   And when -- when you go out into the yard in Menard, were there phones, too, like in Pontiac?

A.   Yes.

Q.   Were there -- was there workout equipment?

A.   Yes.

Q.   Was there just a place to walk around?

A.   Yes.

Q.   When -- when you're in Menard, did you get a chance to try to finish your GED in Menard?

A.   Well, I applied for school and everything, but Menard was another one just like Pontiac.  It's lockdown, constant lockdowns.  Every two, three weeks, constant lockdowns.

Q.   So -- besides -- now, in Menard, did you ever have any sort of prison job or anything like that?

A.   No, I did not.

Q.   Did you have one in Pontiac?

A.   No, I was -- I -- I ran the gallery for about a good two, three weeks I was on the gallery.  I was a trustee for a minute in the gallery for about two, three weeks, and then they shipped me out of there.  That was in the west house, when I was in the west house.

Q.   Now, in terms of Menard, did you -- and is it the same type of bedding in Menard as in Pontiac?

A.   Yeah, they give you a bedroom and you got a -- you got a little thin mattress like this that you throw on top of that

Rios - direct

1429

slab of -- steel slab.

Q.   And it's the same type of steel slab?

A.   Yes, embedded to the wall.

Q.   Now, I may not have asked you this in terms of Pontiac, but in Pontiac, is there any TV?

A.   Yeah.

Q.   Where is the TV?

A.   Well, you could buy a TV.  You could purchase a TV, and you could put the TV in your room.

Q.   Did you ever have a TV in your room at Pontiac?

A.   My mom didn't have enough money to get me anything like that.  I did not.  I read books instead.

Q.   What kind of books did you read?

A.   Fiction, not -- fiction, nonfiction, you know, religious books, nonreligious books.

Q.   How does it work getting books in prison?

A.   Well, you could go ahead and apply for the law library and they'll -- they'll bring books around and they got a little cart that they bring around and they'll come and bring you a book and they'll ask you if you want a book or something and you could tell them "yeah," and they'll go ahead and they give you a clipboard.  You sign your name on it, and they'll go ahead and put the book that they gave you and they'll be back for that book like about a week or two they'll be back for that book and they'll be -- they'll be bringing some more books that

you could either exchange or you could either just get another book from them and give them the one you got and -- yeah, that -- that's the source of the -- of the books, how they bring the books around.

Q.   Are -- are you allowed to buy books or can you only loan?

A.   Well, if you gonna buy books, they want you to buy books that are not hard -- hardcover.  They're just regular, you know, little flexy books that you could buy; not too -- not too big of a book either.  You got to be a certain -- certain -- certain amount of sheets in it that -- that have the book like small.  You can't have no thick books or anything like that.

Q.   When -- when you were in Menard, did you ever leave Menard for another IDOC facility?

A.   When I was in Menard, I put in for -- for medium -- for medium institution, to go to a medium institution, and I got shipped to Danville.

Q.   Where is Danville in Illinois?

A.   Danville, Illinois, it's like -- it's -- I think it's south, and I believe it's like two to three hours from -- from Chicago.

Q.   And Danville, that -- that was a medium prison?

A.   Yes, a medium.

Q.   What -- what's it like in a medium prison?  What -- what's your cell like in a medium prison?

A.   Well, the cell in a medium prison is now you ain't got no

bars.  It's a steel door with a little -- with a little square window.  And it's -- it's the same process.  You got your -- you got your toilet, you got your steel -- stainless steel toilet, and you have -- you got your stainless steel toilet and you got your two bunks embedded into the wall.

Q.   In Danville, was there a window to look outside from --

A.   No.

Q.   -- the cell?

A.   No.  You can't look outside because -- it has a window, but you can't look outside because everything outside of that window is just the brick wall that you see that -- that runs all around the -- all around the penitentiary.

Q.   When you're in Danville, what -- was the food process of getting food similar to Pontiac and Menard?

A.   Well, at commissary?

Q.   Well, I'm talking about in terms of chow hall.

A.   Oh, yeah, the -- over there is the same thing.  They'll call -- they'll call the cell house.  But over here is different for the simple fact that the cell house -- that the chow hall is out of the building.  So you got to walk out of the building, even in the cold, just to get to the chow hall.  And you eat in there, then they -- they tell you about five minutes after that that you eat and everything, the same process, get up, back to the cell house.  And they would go ahead and bring -- and they'll go ahead and bring the next --

the next line for the chow house from -- from the unit.

Q.   And what -- there was commissary, too, in Danville?

A.   Yes.

Q.   In terms of Danville, how long were you in Danville?

A.   I was in Danville possibly close to a year.

Q.   In being in Danville in medium, does that mean that there's -- that it's less dangerous than a max like Pontiac or Menard?

A.   Well, they all -- they all have their danger.  You might be a little bit less danger over here, but it's still danger. It's -- it's no -- it's no such thing how you could measure that, because anywhere -- anywhere you could go, it's just people that are -- that aren't stable mentally and they'll -- they'll be able to hurt you if they want to.

Q.   In Danville, were you stuck in your cell the same amount of time as when you were stuck in your cell at Pontiac and Menard?

A.   It had a little bit more movement.

Q.   How so?

A.   Well, because over there a little bit more movement is that you're not assigning for -- for -- for the law library.  You don't assign for anything like that, for the gym, or you can't -- you don't assign for those things.  They'll do that through cell houses.  They'll go through the cell house and say, today is law library day, whoever's going to go to law library today, get against the wall, we're about to leave in a

minute.  And that's the way they used to do it there.

It wasn't -- there was no such thing like in Pontiac or Menard that you got to apply for it every time and -- and things like that, due to the fact that in Menard and in Pontiac, those places are -- are max joints, meaning that there's always something disrupting the place.  Either a fight, either a stabbing, either a beating, either the police getting hurt, either somebody doing something to somebody else, either raping somebody, or anything like that.  And until they find out what the situation is, they will not open the penitentiary up.  They'll keep it locked down.

So when you go to the medium joints like -- like Danville, those sorts of things are a little bit eliminated from the lockdowns.  If you do get a lockdown, it probably be like two, three months here and there, not like Pontiac or Menard that it was like -- every other month, it's like boom, it's locked down.

The schooling you had going on, it's done.  You got to wait until it starts again for you to reapply, reenter the school, and be able to go take the classes and everything and then be able to go ahead and -- and get your GED or whatever school program that are -- that you're doing.

Q.  In Danville, did your mother visit you?

A.  Yes.

Q.  Did your son?

Rios - direct

1434

A.   No.

Q.   In terms of Danville, was Danville a similar visiting process as Pontiac?

A.   Yeah, they are a similar process.  You come in, they -- they shake you down and they strip search you before they let you in.  They take off all your clothes.  They make you spread them, they make you cough, they go in your mouth.  With a -- with a rubber glove, they'll go in your mouth and check your mouth.  They go through your hair like this.

Same process they do in Menard, same process they do in Pontiac, they'll grab your -- your visitors, they go into this visiting room.  Before they get to the visiting room, they go ahead and strip them.  Your mom -- your mom goes there.  She got to take everything off.  From the bra to the panties to everything, they go ahead and -- they go ahead and check her.  They make her bend down, bend over, spread them, cough.  They do all that process.

And even the babies, even the babies.  When you got the babies and you come in with a baby, what they'll do, they'll take the baby with you inside -- inside the room, and they'll tell you, if there's anything on the baby, no.  And they'll go ahead and tell you change the diaper.  You got to take the diaper that the baby has on, take it off, throw it away, and put a new diaper on them before you go into the visiting room.

Q. And in Danville, in terms of -- or in any -- in any of the IDOC facilities you're in, do you really -- what choices do you have? What are the daily choices you can make on any given day?

A. Choices as in what?

Q. Well, choosing to do something or not to do something, what are your choices?

A. Well, your choices are school. Your choices are trying to get a little job. You could apply for other little things like for school, little jobs, and stuff like that. You could apply for those little things. And if they got the room for it, you might get the job. You might be able to make the list to be able to go to school, and things like that.

You could probably get to the law library, read books. And you can't really work on your case for the simple fact you don't really have all the materials, you know. And there's a lot of people doing legal work in there. So you try to get a book that you could work on a legal work or anything on the book, but you can't get that book at the time because somebody else already has it and on the list -- and there's a list that somebody else is already waiting for that book, so it'll be probably months or years before you get a -- a hand on that -- you know, ahold of that book to be able to look up -- look up whatever it is that you want to look up in it.

Q. Now, in -- in Danville, did you have your own TV?

Rios - direct

1436

A. Yes.

Q. What -- and then in Danville -- after Danville, did you move somewhere else?

A. From Danville, they send me back to Menard.

Q. And that second stint at Menard, how long did that last?

A. That was like two, three months. And then they got me out of there and they send me to Dixon.

Q. Now, is Dixon a max, a medium, or a minimum?

A. It's a minimum.

Q. And what's different about being in a minimum like Dixon?

A. The movement. You got more movement. You're -- you're able to move around a little bit more. They got more movement. And it's like -- it's like instead of the officers coming to get the line and move the line here and there, the line move on its own. They just call it; you get in line; they open the door; you're on your own going to the chow hall; you're on your own going to the yard; you're on your own going to the gym, but it's -- but it's still -- it -- it's still walking in a -- in a -- in line.

Q. And because it's minimum, does that mean it's safer than a max like Pontiac or Menard?

A. I never thought of any of those places being safe at all, no matter if it's a minimum, medium, max, or anything due to the fact that you got a lot of unstable people in there, and they could harm you at any time. All it takes -- all it takes

Rios - direct

1437

is for them to think something crazy about you and there you go. They're already at you.

Q. In Dixon, did you still share a cell with someone else?

A. Yes, I did.

Q. And in Dixon, was the cell a similar layout?

A. They all 6 by -- I believe it's 6 by 8, and they all got about the same layout, the two bunk beds on the -- embedded into the wall. Then you got the steel -- the -- the stainless steel toilet with a stainless steel sink and everything. And got the little light on top and -- yeah, it's about the same layout.

The only -- the only -- the only difference about that is just the door. The door is -- is a -- it's a solid steel door now with a -- with a -- with a square hole, with a square little window on it that has like that little metal in it, the little barbwire into them.

Q. At Dixon, Dixon is where you got your GED?

A. Yes.

Q. And when you were getting your GED at Dixon, were you interrupted by lockdowns?

A. Not really because Dixon wasn't -- wasn't that tough as -- as -- as in people going crazy and getting into lockdowns and that. It did happen. It did get a couple of lockdowns, but they don't -- they wouldn't last long. They wouldn't last long like in the max joints. In the max joints, you'd be locked

down possible for -- for even years if they -- if they want to. But in a medium -- but in a medium penitentiary, they go ahead and open the penitentiary up a little bit faster.

Q. When you -- did anything change for you when you got your GED at Dixon?

A. Yes.

Q. What changed for you?

A. One, I was able to get little jobs that I would have not be able to get without the GED. I would have been able to do things there that I could apply for things due to my GED, because they bring out like -- like all type of different sources of schooling that they'll bring in there. They'll bring some type of schooling that they come in there and you could go ahead and apply and see if you could go ahead and be able to get in due to your GED. If you ain't got a GED, don't even bother applying because you're not going to get it.

Q. How long were you at Dixon before you got your GED?

A. Possible three to four years before I got my GED.

Q. And after you got your GED, did you take any other courses or schoolwork at Dixon?

A. Yeah, I took culinary arts. And then I took food safety and sanitation. And then I took -- what you call it? It's doing like cleaning carpets and -- it -- it's called -- it's called -- it's called fire restoration.

Fire restoration, they used to bring all the mattress

Rios - direct

1439

and the sofas and everything from a house that had a fire and they'll bring it to our shop.  And what we do with that, we just go ahead and shampoo it.  Shampoo it, clean it up, get it all cleaned up and everything, dry and everything, and for you to go ahead and -- they'll go ahead and take it back to your house clean, like nothing ever happened to the sofa or whatever it is that they brought in to be able to get cleaned with the chemicals that we were using to clean these -- these things.

Q.  And when you're at Dixon, how are you feeling about yourself?

A.  Well, the same.  The same.  I'm -- I'm still incarcerated. I still can't see my family the way I want to.  I haven't seen my son in -- since I left Pontiac.  It's been like close to two and a half years since I went to the trip to Pontiac and Menard and -- and close to about two to three years that I didn't get to see the kid because I was a little bit too far and stuff like that.  So when I got to Dixon, I got to see my son probably about two, three months after I was there.

Q.  And that's when your son was older?

A.  Yes.  Yes, he was way older now.

Q.  Now, in terms of Dixon and -- what's the process -- when did you leave Dixon?

A.  I left Dixon in 2008.

Q.  When you left Dixon in 2008, what's the -- what's that process like?

Rios - direct

1440

A.   Well, they come.  They let you know that you're leaving the next day, and they make you pack all your stuff.  And if you want to leave anything behind to anybody, you could sign it out to them.  Like you could sign out your TV, because that's the way I got my TV in there.  They signed it out to me, a guy that I was -- a guy that I was in the cell with, he signed his TV out to me.  He signed his little fan to me.

     And if you want to sign your things out to somebody else that could use it in the penitentiary, you could go ahead and sign it out, or either you could take it with you, either or.  Or you could leave your clothes to anybody -- the clothes that you bought from the commissary, you could leave it to somebody else.

     The things you could probably -- the things you probably take, it'll be probably your letters and your -- and your pictures and -- and the books that you want to take with you, and -- and basically a dressout clothes because your family will bring you a pair of clothes that they'll give to you in the visiting room.

     You could go ahead and dress up and everything and -- and dress out with the -- with the visiting clothes that your family bring you.  You just put it on and you walk out with that and leave the -- and leave the DOC clothes behind.

Q.   And at that point, you went on mandatory supervised release?

Rios - direct

1441

A.   Yes.   I went to mandatory supervised release, and I took an interstate compound.

Q.   And the interstate, what does that do?

A.   Interstate compound is when you want to go to another penitentiary and you go ahead and -- well, when you're in a penitentiary and you ask for -- for interstate compound.  What it is is that they'll send you to where you want to go.

Let's say if I've -- I'm here in Illinois and I want to go, like I did, that I went to Milwaukee, and I went to Milwaukee at interstate compact, meaning that they'll ship you to Milwaukee and have you live in Milwaukee on parole, in Milwaukee, but with the rules of Chicago.

You can go to Milwaukee and do your parole over there with the rules and regulations from Chicago.  That's interstate compact.  So you'll be able to go to another -- another state and do your time over there for the parole and everything, but with the rules and regulations of Illinois, which is where you was embedded and bedded into the institution, and so you could be able to go to interstate compact and do your time over there in parole.  That's the way that works.

Q.   Now, I want to ask you some sort of overall questions about IDOC.

What happens on Christmas?

A.   Well, on Christmas Day, they usually lock it down.  They usually lock it down.  They bring -- they bring -- well, they

call it Christmas meal. You know, they'll come -- they'll come with -- they probably got some chicken and -- and -- and little pieces of cake and stuff like that, and they'll go with a hot box and they'll start again from the -- from the very end, they'll start it again all the way to the end, to the end and to separate it and give people those little things. And sometimes they probably give you like a -- like a little bag of candy, things like that.

Q. Do you know why they lock it down on Christmas?

A. They just lock it down because they don't want nobody just running around doing any -- any cooking into like -- they don't want a lot of people being in, like, certain cells doing cooking and -- and moving around and they don't want no movement or nothing. And they're understaff -- at the same point, they're understaff because a lot of staff go ahead and put in to be from the penitentiary for those days. So they be understaff so they really lock it down due to the fact that they're understaff -- due -- due to the Christmas Day and things like that, through the holidays.

Q. In terms of other holidays like, you know, Thanksgiving or July 4th or Easter, is it a similar thing with a lockdown?

A. Yeah. Yeah, but the only difference about it is that it doesn't last long. It just lasts probably a day or two compared to the real lockdowns that are from people doing harm to anybody, those lockdowns become from like two, three weeks

Rios - direct

1443

to months to probably years depending where you're at.

Q. In terms of a birthday, how do you celebrate a birthday in prison?

A. Well, I never really celebrated none of my birthdays in there, but some of the guys go ahead and when they -- when they go to commissary, they get like -- you could get like honey buns, like honey buns, little sweet little rolls and things like that. They go ahead and make a cake out of it. They'll put them all on top of each other and they act like it's a cake. And, yeah, they do little things like that. They very creative.

Q. The -- the other day we had the Super Bowl. What happens for the Super Bowl in prison?

A. You're on lockdown. You're on lockdown. You're definitely on lockdown.

Q. And if you don't have a TV, are you able to watch the game?

A. Well, you out of luck. You got no -- you got no way to watch the game unless -- unless -- unless your cellmate that -- that's with you has a TV. That's the only way you going to be able to watch the Super Bowl if your cellmate got a TV because if you don't got a TV and he don't got a TV, ain't none of y'all going to -- ain't none of you two going to watch anything.

Q. I want to move on to that next in terms of general interactions with cellmates when you're in IDOC. You already

Rios - direct

1444

mentioned before what you would do going to the bathroom.

A.   Mm-hmm.

Q.   What were some other rules or etiquettes that one had to keep between yourself and a cellmate?

A.   Meaning?

Q.   Well, for example, if -- if there's a TV in the cell, who gets control of the TV?

A.   Well, the owner of the TV.

Q.   And what if two people have TVs in a cell?  What happens then?  Do you both have your TV on?

A.   Well, you got to have -- you got to get yourself a pair of headphones regardless -- regardless if you gonna have a TV or not, you got to get a pair of headphones to put into the -- into the TV because you can't be -- you can't be having the TV blasting all loud in the gallery.  So they make you -- they make you go ahead and buy headphones to put into the TV because you can't be having the volume all up in the TV.  You always got to use headphones to listen to the TV while you watch it.

Q.   And how big is the TV that you're allowed to have, roughly?

A.   A little thing like this.  Back then, back then in those days, it was just like little -- a little square box, little regular little -- little TV, little tubes.  That's it.

Q.   In terms of your cell, how would you keep your cell clean?  Could you buy like Clorox and Lysol or anything like that?

A.   No.

Q.   So -- so then how would you clean your cell?

A.   Well, you could use your shampoo.  You know, they also -- they also sell -- they also sell detergent that you could use to wash clothes.  So they sell little boxes of detergent like this that you could use of Tide that you could use to wash your clothes and everything.  And some guys use it like me.  I used to use some of that water just to throw it on the floor and clean the floor up and things like that, yeah.

Q.   In terms of the detergent to wash your clothes, did you have access to a laundry machine?

A.   No, you wash your clothes in the toilet and in the sink.

Q.   And is -- besides washing your clothes in the toilet or the sink, are you allowed to send -- is there a process to send your clothes anywhere to be cleaned?

A.   No, there's not.

Q.   In terms of your sheets for your bedding, what do you do to clean those?

A.   Well, those you could change.  Those you could change because sometimes they got out the cell house.  They also you could send the sheets out, like if your sheets are broken or if the sheets are, you know, bloody or anything happened to the sheets, like they got ripped or they got damaged by any source of water or anything, anything that gets messed up you could give it back to them and they'll bring you some new ones.

Q.   When you look back on your prison experience, how do you

Rios - direct

1446

feel about it?

A.   Well, it was -- it was a -- it was a struggle from the beginning.  It's like nonstop -- nonstop -- nonstop protecting yourself.  You can't -- you got to live with eyes in your back, you know.  It's -- it's totally dangerous wherever you at even -- even in a medium max or medium joints and stuff like that.  Even in the low level penitentiaries, you got to be careful.  Like I said before, you got a bunch of unstable minds in those places that could harm anybody.  And if they could harm the police, they could harm me.  And I'm not -- you know, so I'm a small fry, you know, I was a small kid.  I was bony, little small bony kid and you got these guys that been in there for years and ages, and these guys are like huge, you know. You got a bunch of crazy people in there that are mentally disturbed and they're all -- they could be a danger to anybody.

So it was just fear, fear of anything happening to me all the time from the -- from day one all the way to the last day that I was in there.  It's just a fear of getting hurt, the fear of something happening to you, you know, because anything could happen at any time so that's why you always got to be aware of your surroundings.  You always got to be aware of everything that you're doing, make sure that you're not doing anything that's going to cause anybody else problems or their life, you know.  So you got to be very careful.

Q.   When -- when you were released from prison at Dixon and you

went on mandatory supervised release or parole.

A.   Okay.

Q.   What was the first thing you did when you got out?

A.   When I got out, the first thing I was supposed to do is just call my parole officer and make a visit with her because she got to come -- she got to come to the house and she got to check the house out and make sure that the house where you gonna be at is suitable for you to be there.

Q.   Where were you living in Milwaukee?

A.   I lived in Miller Parkway on 53rd and National.

Q.   What was -- besides checking in with your parole officer, what was the first thing that you did besides that?

A.   Had my ma's first cooked meal.

Q.   And did she come up to Milwaukee for that?

A.   She came to pick me up.

Q.   From Dixon?

A.   She came and got me from Dixon with my sister, yeah.

Q.   And then all three of you went up to Milwaukee?

A.   Yes, even my wife.

Q.   Your wife, did you meet her in prison?

A.   We known each other since we were kids from the neighborhood.

Q.   How did you establish contact with her?

A.   I was in Dixon, and she found out where I was at.  She looked me up and then she said she looked me up in the Internet

Rios - direct

1448

and she found out what institution I was at, and she wrote to me. And when I got the letter, I read the letter and I wrote her back, and we started talking then. And we've been together since.

Q. In terms of when you got on parole, did you have a job?

A. When I got on parole when I was in Milwaukee, I tried looking for jobs. It was -- it was kind of hard due to the fact that my background was killing -- was killing mostly all the jobs I was trying to apply to because they didn't -- they didn't want to accept me due to my -- to my background.

And then I found a daily pay. A daily pay is somewhere that you could go work for them for about a good day, you work for them for about a day, and they'll pay you like 40 bucks per the day just to work for them. And that's what I did for a minute until I was able to go ahead and establish something with my parole officer to give me a list of places that I could go ahead and apply to and what she -- what she -- what she did apply to me and gave me the list of where things that I could apply to. And I ended up applying for a couple of things, and I ended up with a landscaping job.

Q. And the landscaping job, how long did you do that for?

A. I did that landscaping job for about a good three years.

Q. And when you -- at the end of those three years of doing the landscaping job, did that correspond with when your parole ended?

Rios - direct

1449

A.    Yes.   And my parole officer -- my parole officer said she was very happy for the simple fact that I adjusted well, that I didn't give up on looking for jobs and that -- that she was proud of me for the simple fact that she never had an issue with me since I came home.

She never had -- when you -- there's a process when you go see the -- see the parole officer.  The process is you go upstairs, they grab you, they -- you go ahead and let them know who you're here to see, they'll go ahead and grab you. They'll come -- they'll come with a cup.  They'll come with a cup to do -- to do a drug test on you.  So they'll take you to a bathroom.  A male will take you to the bathroom.  No door on the -- no door on the -- on the toilet or nothing.  There's no door to the toilet or nothing.  And the guy will stand right there while you pee in the cup, seal it, give it back to him, and he'll take it with him to the back.  I guess they check it and see if you've been doing any drugs or anything.  Well, since I don't do drugs and I'm not a drug addict or anything like that, I never been a drug addict or anything like that, I never tasted any drugs whatsoever, I used to always come clean.

And I did a -- I did a clean slate with her, and she was very proud of me.  And I was very proud of myself for cleaning myself up the way I did by having a good job which the job was pretty good to me.  And I had good friends in the job, you know, and I was living pretty good over there.

Rios - direct

1450

Q.   After that time, did you -- did you stay in Milwaukee or did you move back to Illinois?

A.   No, after about five years, after about five years that I finished my parole and everything, I had to bring my butt back to Chicago.  I had to come back to Chicago.

Q.   Why did you have to come back to Chicago?

A.   Well, my mom got sick, and my brothers were locked up for a DUI.  So my brother was locked up for DUI.  My mom got a little sick.  My sister couldn't be over here with her.  So I had to leave my job that I was getting paid like at least $20 an hour. I was already up on $20 an hour.  So I had to bring myself back to Chicago, give up my job and everything just to come and take care of my mom.

Q.   And when you came back to Chicago, what job did you get?

A.   I came back to Chicago, and I came to live with my girl because she was my girlfriend at the time.  And when I was living with my girl, I started looking for jobs, and I found a job on Western and Polk.  So the job on Western and Polk, it was a vanity -- it was a vanity job, like building vanities and -- and -- and kitchen -- kitchen drawers and -- and vanities and stuff like that for the bathrooms, all wooden. And I was -- I was working doing the saw.  So I was the saw man in the whole company, cutting all pieces for everybody to go ahead and be able to put together the pieces and make -- make the vanity they needed to make for that -- for that customer

that asked for that type of vanity.

Q.   How long did you do that job for?

A.   I did that job for about two years, and it was -- and I left -- I left a $20 -- $20 a job -- I left a $20 job in Milwaukee to come over here to get 8.50 an hour doing the vanity work just to have a job and be able to see my mom and take care of her and do the chores for her like I always did.

And I always been the small guy at the house, always taking care of my mom.  So that was my duty, just always taking care of her and I was being behind her, the small guy in the house, always been in the house.

Just like in Puerto Rico with my grandfather never let me out the gate.  He used to keep me inside the gate.  My brother could leave out the gate, and I'm the only one that stays behind the gate with my grandfather chasing him around and learning how to do things with him and helping him out and things like that.  That's what I learned, that helping my family out is -- is -- is priority.

Q.   Now --

A.   Especially my mom.

Q.   Now, after the vanity job, did you then -- is that when you went to the hotel?

A.   No.

Q.   Was there a job in between?

A.   Yes.

Rios - direct

1452

Q.   What was that?

A.   I was working for airway system.  It's a -- it's a job that you do ductwork.  You do ductwork cleaning, like the air we're breathing in here right now with no dust or anything, that's the type of work I used to do.  I used to clean all the ductwork, make sure that we getting proper air inside the places that -- or the factories or the restaurants or anything that needed the hood cleaned, like all type of sorts of air duct connections that you need to clean and have certified and we'll put a -- we'll put a stamp on them after we clean them and everything because they got to be certified for -- for OSHA.

Q.   I want to ask you next a series of questions about your -- your relationships between your family members and yourself after you got out of prison.

A.   Okay.

Q.   In terms of the relationship between yourself and your mother, what was that like when you got out of prison compared to during prison and before prison?

A.   Well, I had -- I had -- my mom was like, you know, sometimes she used to point out things that she told me, you know, these -- you know, these things are different in you, you know.  This change on you, this over here, change on you, like -- like my attention span, you know, paying attention to other people and stuff like that, my -- my -- my mind was more

like all over the place.  Instead of just focusing on one thing, I'm focusing on everything around me instead of just one thing.

The other thing was attachment.  Like I didn't really want to get too attached to people because I feel like when I got incarcerated that I was taken from everything, and I didn't want that feeling again.  So I started shutting down from getting attached to people, especially sometimes my kid.

Q.   Now, what was the relationship like with your son when you were first released from prison?

A.   It was very rocky.

Q.   What do you mean by very rocky?

A.   Very rocky because he -- he -- his -- his thought in his mind was that when I come home, he was going to be able to just live with me and stay with me and be with me and have his life being with me.  But it wasn't so, you know.  I told him, we can't -- we can't do that for the simple fact you're in school, your mom is taking care of you, your mom is -- is liable for you.  And I ain't got nothing on my own right now.  I don't got no house.  I got nowhere to live right now or anything like that that I could bring you to.

And that was it.  And some of the parts that he felt -- he feel like I -- I abandoned him.  He felt -- like when I got home and I left to Milwaukee, he really got -- he really got ticked off that I left to Milwaukee because he

Rios - direct

1454

thought that I was coming to Chicago and be close to him and be a father to him and that, but I couldn't do that at the moment because I didn't want to be in Chicago. So I wanted to be somewhere that I could go ahead and get myself together and be able to put myself in -- in a better state of mind that I could be able to deal with and have him come with me and be with me.

Q. Did -- how did your son express those feelings to you?

A. Well, he used to express them by telling me that he hates the fact that I went to Milwaukee. He tells me that why I went over there, that why don't I come and pick him up and take him with -- take him with me.

And I used to explain to him we can't do that. You know, your mom is responsible for you right now. I gotten -- I don't have a stable place for you to be with me. And I cannot bring you with me because if I'm struggling, I ain't gonna be able to do nothing for you or with you because I'm -- I'm in a struggle right now. I wasn't -- I wasn't -- I wasn't making enough money. I wasn't -- I didn't have enough -- enough -- what you call that? I didn't have enough -- enough to give him what he wants, you know. So -- and my -- and my mindset of getting too attached to things, especially my son and everything was a little bit off, and I started, you know, try to work on those things and everything. And I started getting myself together to the point where I felt like I'm eligible now to be able to have my son with me.

Rios - direct

1455

Q.   Now, has your son ever expressed to you what it was like for him while you were in prison?

A.   Oh, yeah.

MR. SCAHILL:  Objection.

THE COURT:  The objection is sustained.

BY MR. J. RICHARDS:

Q.   In terms of your feelings about your time in prison, has -- has anyone ever spoken with you about how they viewed your time in prison and how did that affect you?

A.   How other people looked at my prison term?

Q.   Yeah, and how did that affect you when you heard them tell you about it?

MR. ENGQUIST:  Objection, Your Honor.

THE COURT:  That's sustained.  The witness can answer as to the effect it had on him.  His understanding of what others felt -- he can answer what effect that had on him, but he's not in a position to testify to what others actually felt.

BY MR. J. RICHARDS:

Q.   When -- in terms of the rocky relationship with you and your son, approximately how long did that last for after you were released from prison?

A.   When I got released in 2008, that was like probably 2010, 2011, you know, I started getting a little bit more into being a little bit better with him, and he started to show his feelings.  And the way I was feeling about the situation that

was going on with him, you know, was he doing okay at home, you know, was he being, you know, mistreated by his stepfather, all those things that I thought about, you know, those were my feelings and my -- my -- my understanding of, you know, what could be happening with him that he really wants to just get out of his mom's house and be with me.

Q.   Did your son ever live with you?

A.   No.

Q.   In terms of -- what -- how would you say your relationship is with your son now today?

A.   Well, my son right now, we're a little better right now than what we used to be due to the fact that when I came home and -- when I came home, it was a little while back after I came home that we were talking, me and my son was talking. And he decided and he asked me and he told me and he asked me for permission, he asked me, can I go to the Marines.  And I told him yes, just to get him out of the streets from Chicago because Chicago could go ahead and grab any kid and -- and swallow it, you know.  So I told my son, yes, you can go to the Marines, and he became an MP in North Carolina, Camp Lejeune. He did that for five years.  He took a five years term in the Marines.

Q.   And now that your -- you're out of prison, you're no longer on parole, what are your feelings in terms of the Latin Kings?

A.   Garbage.  Garbage.  Straight out garbage.  Users, abusers,

Rios - direct

1457

you know, take advantage of young kids like me. Groomers. When I was a kid, they just groomed people. There was no such thing as them being your friends or anything. They was just using people. They grooming kids. They're not helping nobody at all.

Q.   Now, is there a phrase once a King, always a King?

A.   Yeah, there's a phrase to that.

Q.   What does that phrase mean?

A.   That phrase means that once you're a King, you're always a King, no matter if you leave it or not. Due to the fact that in your neighborhood, you probably left it in your neighborhood and your guys that you used to roll with, they're like okay, he's not part of us no more.

But, that's the but, everybody else like oppositions, they don't care if you left it or not. To them you're still a King. So no matter if you left it or not, they still going to try to do you harm regardless you left it or not. That's when you're probably younger. But as an older man like I am now, none of that because I don't associate with nobody. And I'm a grown man, and I -- that part of life is back there where it should stay at and behind me, not in front of me.

Q.   Now, approximately how much money do you make right now from your job would you say?

A.   I think I'm getting paid like 23 something an hour right now. And I believe I get in -- in the year, I get like, what,

like -- like close to 45,000 to 50,000 a year.

Q. And do you file your taxes with the IRS?

A. Yes, I do.

MR. J. RICHARDS: Your Honor, can I approach Mr. Rios with Plaintiff's Exhibit 19?

THE COURT: Yes.

THE WITNESS: Okay.

BY MR. J. RICHARDS:

Q. Could you just -- if you can, you can take Plaintiff's Exhibit 19 out of that plastic sleeve and look through it, and if you can confirm with me that the documents in there are your IRS transcript. You could take out all the pages from the sleeve if you need to.

A. Yes.

MR. J. RICHARDS: And I'll retrieve the exhibit.

THE COURT: Okay.

MR. J. RICHARDS: Your Honor, at this time we'd seek to admit Plaintiff's Exhibit 19.

THE COURT: Any objection?

MR. SCAHILL: Yes, to the actual exhibit.

THE COURT: Basis for the objection?

MR. SCAHILL: Foundation.

THE COURT: That's overruled.

Any other objections?

MR. SCAHILL: That's it.

THE COURT:  All right.  Plaintiff's Exhibit 19 is admitted.

(Plaintiff's Exhibit No. 19 was received in evidence.)

THE COURT:  Do you intend to publish?

MR. J. RICHARDS:  Not right now, Your Honor.

THE COURT:  Okay.

MR. J. RICHARDS:  Your Honor, may I have a moment to confer?

THE COURT:  Yeah.

(Counsel conferring.)

THE COURT:  While he's doing that, every exhibit is not published in court.  It's in evidence which means it will go back with you.  Sometimes documents such as tax documents, when we publish it to you, it's published on the screens there. You might understand how that's probably not -- not always the best way.

(Counsel conferring.)

BY MR. J. RICHARDS:

Q.  Now, Jaime, if you could talk a little bit about anything that is different in terms of activities that you liked to do before you went to prison, versus after, if there's any difference at all.

A.  Yeah.  I can't take a punch no more, so I can't box no more.

Q.  Besides that, is there anything that you liked before that

you don't like now and why?

A.   Yeah, motorcycles.  I used to fix it and ride motorcycles, and I can't do that no more because I got hit twice already riding motorcycles so I got to give that up too.  That's something that I don't want to do anymore.

Q.   Do you still play sports?

A.   Yeah, I play a little sport.

Q.   Do you still go to sporting events?

A.   No, just some of my friends, like my cousins and -- and them, we get together once in a while in the weekends and -- in the summertime and just -- we just go ahead and play some baseball, some softball, just play softball against each other, you know, have a nice little time; you know, that's about it, things like that.

Q.   Do you like being in -- do you like going to parties or anything like that?

A.   I can't really do parties or anything like that because I really don't like crowds.  I -- I get a little edgy when I'm around crowds.  So it gets a little -- it gets a little bit kind of uncomfortable for me.

Q.   Was that the case before you went to prison?

A.   Oh, no.  No, before I went to prison, I was in full -- full crowds, parties, you know, hanging out with the whole family in a big crowd and, you know, family gatherings with everybody and picnics and crowded places.  I was able to go to see a baseball

game, see a football game.  You know, now it's like I don't really feel comfortable around those things.  And I love the sport and everything and all that, but just the fact that I feel kind of edgy and, you know, kind of off when I'm around a crowd.  It gets to me, yeah.

Q.   When you were released from prison, did you ever go to a baseball or a football game after your release?

A.   I went to a football game.

Q.   And who did you go with?

A.   I went with one of my cousins.

Q.   And what happened at the football game?

A.   At the football game, I stood up all day.  We were in the top shelves, and I was standing.  I never sat down.  I was just standing.  And my cousin kept on telling me sit down, sit down, and I just stand there.

     And we were watching -- we were watching Green Bay against the Bears.  And Green Bay got the last touchdown on the Bears so we never made it to the championship or anything like that due to the fact that Hester didn't run the ball properly that day.

   (Counsel conferring.)

BY MR. J. RICHARDS:

Q.   Now, at a certain point in time, did you decide to do something about your conviction for the murder of Luis Morales?

A.   Yes, I did.

Rios - direct

1462

Q.   What did you decide to do?

A.   I decided to start looking around for the people that were in the -- in the case and to see what they had to -- they had to -- they had going on on the case when they -- when they testified against me.  And I -- I spoke to a couple of them, and they wanted to speak with me too but already had spoke with Mr. Richard.  And I had told Mr. Richard that possibly I got some more people that would like to talk to him, and I just -- to just give Mr. Richard the information from the people, and the people will -- will call Mr. Richard, and Mr. Richard will talk to them.  And that's how we started our case.

Q.   In terms of the motion to vacate, why didn't you attempt to file your own motion to vacate while you were still in prison?

A.   Like I said, it was hard to get to the law library.  I didn't have no money to pay any of the guys that work in the law library to try to work the case for me.  And I wasn't -- I wasn't in -- I wasn't -- what you call this?  I wasn't capable enough to understand how to read a case or work a case or where to look, where to look and what to file.  So I didn't have the means to be able to do that so I couldn't do it.

Q.   When you talk about paying the guys in the law library, are you talking about paying lawyers?

A.   Inmates.

Q.   So like a jailhouse lawyer?

A.   Yes.

Q.   They're not actually lawyers?

A.   No.

Q.   When -- when do your -- when the motion to vacate was granted and you were no longer convicted, did that -- what were your feelings about that when that happened?

A.   A big relief, and then in a way, kind of sad.

Q.   What do you mean?

A.   My grandfather passed away.  My father passed away.  And I wasn't able to give them that -- I wasn't able to give them that -- that feeling of me being a free man and them knowing that I didn't do this.

Q.   Now, after the motion to vacate was granted, why did you then decide to get a Certificate of Innocence?

A.   To the fact that my son was telling me that -- he told me -- my son was telling me, Dad, you know, I know that you must have went through a whole lot and everything, but that's still -- that's still -- that stuff is still on your back, and I don't feel good for the simple fact that I was an officer, because he was an MP for the Marines.  And he was telling me that he didn't feel too good about me being a convict like he called it, and he said that I need to fight and to make it right.

        So I spoke with my lawyer, and I told him we need to fight this just to give them the peace of mind that they needed because that's all I'm doing this for, making sure that they

Rios - direct

1464

see that I wasn't -- I wasn't the one --

MR. SCAHILL: Objection. Objection, Judge.

THE COURT: Basis?

MR. SCAHILL: Motions.

May I be heard? We're almost at the end of the day.

THE COURT: Yeah, we'll break for there.

We'll come back tomorrow. I'll see you at 10:00 a.m.

As a reminder, please don't discuss the case. Please don't research the case. Please don't let others discuss the case with you.

All rise.

(Jury out at 4:26 p.m.)

THE COURT: All right. Which motion?

MR. SCAHILL: It's the Certificate of Innocence motion and your -- your ruling with respect to that. He seems to be inching perilously close to suggesting that he wanted to get the Certificate of Innocence to show that he was innocent, and that seems to be the clear line with respect to what his son was telling him to do and that seemed to be what he was about to say.

I think that that seriously runs afoul of that ruling because the Court said it's not evidence of that. It's purely a procedural fact rather than him sort of backdooring in this concept of getting a Certificate of Innocence to show that he is, in fact, innocent.

THE COURT: All right. So my recollection is that the question concerned why did he decide to get a Certificate of Innocence. What -- why he decided is something independent of the legal effect of both the Certificate of Innocence itself and the role that it plays in this case. So the reference to the jury instruction, that's a statement of the law which has nothing to do with any factual underpinnings of why he did it. I did bar the petition, and I believe the transcript of the proceedings, but the Certificate of Innocence is there. Why he obtained it is something he can speak to. And so the objection is overruled.

How much more do the plaintiffs have with Mr. Rios?

MR. J. RICHARDS: Ten to 15 minutes at most.

THE COURT: Okay. I take it we'll pick up with Mr. Rios in the morning?

MR. J. RICHARDS: Yes, Your Honor. Then the schedule after that, I assume cross will probably take most of the rest of the morning, not the whole day. And so I guess the issue then comes to when Detective Guevara can get on the Webex thing.

THE COURT: My understanding is Guevara will have to be Thursday?

MR. SCAHILL: Yes. He's not going to be available, or I'm not going to have somebody to be available with him Wednesday. So it's going to have to be Thursday.

1466

THE COURT: So we'll start the day Thursday with Guevara at 10:00 a.m.

MR. SCAHILL: Okay.

THE COURT: If Rios does not take all of tomorrow, what's the plan?

MR. J. RICHARDS: The plan is that I believe Lamont?

MR. S. RICHARDS: Sorry. Want me to speak to this?

So the next witness we have would be Lamont Burr, and that point we're going to face the fatal running out of witnesses issue. However, I would suggest in terms of filling in the day that there's a number of things the defendants want to do, like putting in transcripts which they can either do out of order or they can be put in in our case. I really don't care. But in terms of the Court's time, there's things like the Daniel Noon transcript, the Curley transcript.

THE COURT: Right. But with respect to the plaintiff's case, after Burr, you have Guevara. Do you have any other witnesses or transcripts in the plaintiff's case?

MR. S. RICHARDS: No.

THE COURT: Okay. And so what will happen is if Rios is down and Burr is up and down, then I will explain to the jury that with the exception of Guevara who will appear remotely and requires technical stuff, we're leaving the plaintiff's case and going into the Defendants' case. Okay.

MR. SCAHILL: I did want to raise a scheduling issue

1467

with respect to tomorrow.

So Mr. Rios is likely going to take most of the rest of the day. You know what? I'm going to address this issue with them because it's something else that I need to sort of fit in with a scheduling thing that I --

THE COURT: Yeah.

MR. SCAHILL: -- don't want to burden Your Honor with right now.

THE COURT: When you transition to your case, you've got transcripts as filler so you can go to the transcripts. It's simple in my mind.

MR. SCAHILL: Yeah. I just have somebody who is available tomorrow but they're not available Thursday. But I think we're going to end up going into Friday so hopefully she'll be available then and we can address that issue. But, again --

THE COURT: Okay.

MR. SCAHILL: -- I'll take it up with them.

MR. S. RICHARDS: Your Honor.

THE COURT: Go ahead.

MR. S. RICHARDS: Technically if they start their case, I assume I'll be granted leave to reopen to put in Guevara, and then --

THE COURT: You won't rest until Guevara goes in.

MR. S. RICHARDS: That's it. Thank you.

1468

THE COURT: This *Gilbert* issue, I've looked at the proposed instruction. I've looked at the underlying cases. And my question for the defendants is how is this a *Gilbert* issue? My understanding of *Gilbert* is that there was -- both *Gilbert* and *Viramontes* involved conduct that was part of the 1983 claim.

So in *Gilbert*, you've got the inmate hitting the guard and then the guard is using excessive force. In *Viramontes*, you've got *Viramontes* swinging at a guard, actively resisting, and then the guard's using excessive force. And so it was the same course of conduct that led to it, whereas there's no *Heck* issue here where it's an entirely separate offense unrelated to the defense in this case.

MR. SCAHILL: So my understanding of *Gilbert* and *Viramontes* is perhaps a little broader than that.

THE COURT: What is your understanding of *Heck*?

MR. SCAHILL: My understanding of *Heck* is that if you have a criminal conviction that you are collaterally estopped from denying all of the necessary conduct to that conviction.

THE COURT: Okay.

MR. SCAHILL: And so with respect to how that applies to this case, I don't think that -- I understand *Gilbert* and *Viramontes* related to conduct that was somewhat directly at issue with respect to the claims.

I believe the underlying principle is still that if

you have a criminal conviction that is intact you're still not allowed to deny necessary predicate conduct. Predicate conduct is an issue in this case. I understand it's not a claim, but it is an issue. And Mr. Rios is going to deny some of the necessary findings that were -- that undergirded that conviction, specifically the use of a firearm which he specifically denied having pulled the trigger or done anything of the sort.

So I think that the principles of *Heck* would still apply. It's still a relevant issue even if it's not the specific claim at issue. I think *Heck* would still apply to that type of testimony.

THE COURT: *Gilbert* dealt with forcing an individual to confess in open court to striking a guard. There's no forcing him to confess to anything because he's already convicted of the assault from May 1989.

MR. SCAHILL: Yes, but he's going to deny it. He's going to say I didn't do those things.

THE COURT: And then you hit him with a conviction. You're not -- were there convictions in *Gilbert* for striking the guard? There was. There was the adjudication from the prison authority.

But I still don't understand how -- yeah, I'm not going to give the *Gilbert* instruction. The reason I'm not going to give the *Gilbert* instruction is because the underlying

1470

portions are not really at issue here. It's not a continuation of the same events. An entirely separate offense for which you have a certified copy of the conviction and you can put that in. And if you need to collaterally prove up other issues relating to the underlying conduct, you will be able to put that in.

And so that addresses the issue. There's no issue of forcing Mr. Rios to admit to the 1989 conduct because it's there.

I've looked at the transcript of the plea. That makes no reference to King Love. It says essentially, and I'm oversimplifying, Rios was on the block, and he shot at a car that was driving by.

And so all of these other issues, particularly with respect to the instruction that you propose, where is that in the transcript?

MR. ENGQUIST: The King Love?

THE COURT: Yeah.

MR. ENGQUIST: The King Love is actually from the witness who testified in aggravation, Mr. Reyes.

THE COURT: And my -- where is that transcript? What exhibit number is that?

MS. GOLDEN: It's the sentencing, January 3, 1991.

MR. SCAHILL: Oh, you're asking about the sentencing.

THE COURT: And at his sentencing --

1471

MR. SCAHILL:  No.

THE COURT:  -- no one stands up and says, yeah, I admit to that?

MR. SCAHILL:  I think they're -- I think they're referring to something else.  They're talking about Rios's sentencing.  Your Honor is referring to the guilty plea from the September 1990, is that --

THE COURT:  I have it as Defendants' 18, Jaime Rios guilty plea.

MR. SCAHILL:  Yeah, that is -- yeah, that's 18, right. Yeah, there is no -- there is no reference to the King Love. That should not be -- even if there were a *Gilbert* instruction that -- I would agree, that should not be part of it.  It would only be the -- the discharge of the firearm which would be part of that.  But Your Honor is indicating you're not going to give that, so that's where that would be.

But the -- the maximum extent of a *Gilbert* instruction would be only the necessary elements as set forth, as counsel said earlier, in the indictment and then as he, you know, pled to, not the gang stuff.  That's separate -- separate evidence.

So it would be May 29th, while using a dangerous weapon, which was a gun, without lawful authority pointed and discharged the gun at Edwin Pacheco, and that placed Mr. Pacheco in reasonable apprehension of receiving a battery.

THE COURT:  And where did Mr. Rios acknowledge any of

1472

that conduct?

MR. SCAHILL: He acknowledges it by pleading -- it's from the indictment. So my understanding of *Gilbert* is when you plead guilty, you're pleading guilty to all of the necessary facts in the indictment.

THE COURT: Where is the indictment?

MR. SCAHILL: I don't know that we --

THE COURT: Is it a speaking indictment?

MR. SCAHILL: I think it's -- I think it's a written indictment. I don't know what --

THE COURT: A speaking indictment is one -- there are two types of indictments. On this date, you committed this offense, grand jury signs. The other is on this date, you went from point A to point B and while going from -- or I guess drug possession would be a better one. You can say, on this date, you possessed a kilogram of heroin, or you can say on this date you had a call with confidential source. Confidential source, you met with them, and it lays out everything in it. So is it the short indictment or the long indictment?

MR. SCAHILL: I don't know the answer to that.

MR. POLICK: I can tell you, Your Honor, it was a grand jury testimony taken on -- on that particular day.

THE COURT: That's different from the indictment. What does the indictment -- I'm following your chain of reasoning. You're saying that here are the necessary -- or I

don't know how things are done in state court. Here I would have a prosecutor read the factual basis, and then I'd turn to the defendant, and I'd say, did you hear what was -- what the prosecutor said, is what the prosecutor said true. They have just adopted the statement. They have admitted to all the pertinent facts or the factual basis.

This judge didn't do that according to this transcript. He went through the colloquy with Mr. Rios. He then said, do you intend to plead guilty; prosecutor, what's the factual basis? You don't hear from Rios again. So where do you have him acknowledging the underlying conduct?

MR. SCAHILL: So we will get the indictment. And the reason -- I -- I can have it for you in the morning. And the reason I say that is because I think what the legal effect of that is is regardless of what he says on the record, whatever the indictment says, that is the full -- the four corners of that is the full extent of which could be the subject of a *Gilbert* instruction. So the fact of whether he says something or says nothing, the fact that he has pled guilty means that the legal effect of that is that those facts and only those facts are determined to be incontrovertible.

So the indictment is going -- whatever the language of the indictment is is going to control that issue.

THE COURT: And to be --

MR. S. RICHARDS: Your Honor, can I speak?

THE COURT: One second.

And to be clear, I don't know that -- or my ruling on *Gilbert* is that it doesn't apply. I'm trying to understand what other potential issues may come up with this. And so I'm looking at the certified statement of conviction. It lists two counts: attempted murder, aggravated assault. And so if the indictment just says on this date you committed an aggravated assault, meaning the nonspeaking indictment, that's what you get.

MR. SCAHILL: Yeah.

THE COURT: And so all this other stuff, all these other facts that you put in, that's why I keep asking, where did you get them? Because they weren't in the transcript -- or to the extent they are in the transcript of the guilty plea, he never said, yeah, that's true. So I don't know what you're going to do with that.

And if the indictment doesn't say it then, the extent of the legal effect is that he pled guilty to aggravated assault. The other stuff you would have to prove up collaterally. I don't see how any instruction is warranted.

Yes, Mr. Richards.

MR. S. RICHARDS: Your Honor, as an Illinois state law maven, I can tell you that there is -- I have almost never seen a speaking indictment.

THE COURT: I don't need to speculate. Either they'll

show me the indictment or they won't.  If they don't show me the indictment, they haven't met their burden of persuasion and they don't get to introduce it.  So speculation is not helpful. They either produce it or they don't, unless you want me to allow speculation on this ruling.  I don't think you do since it's going your way.

MR. S. RICHARDS:  No, I don't, and I will shut up.

THE COURT:  Anything else from anyone?

MR. ENGQUIST:  No, Your Honor.

MR. SCAHILL:  No.  We'll have the indictment in the morning.

THE COURT:  All right.  Have a good night, Your Honor.

MULTIPLE COUNSEL:  Thank you, Your Honor.

(Adjourned at 4:43 p.m., until February 11, 2026, at 10:00 a.m.)

*  *  *  *  *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Krista M. Burgeson*              *February 11, 2026*
Krista M. Burgeson
Official Court Reporter

*/s/Jennifer Costales*               *February 11, 2026*
Jennifer Costales
Official Court Reporter

*/s/Kelly M. Fitzgerald*             *Date*
Kelly M. Fitzgerald
Official Court Reporter

1476

I N D E X

WITNESSES                                                    PAGE

BARBARA RILEY
Direct Examination By Ms. Golden                            1241
Cross-Examination By Mr. Scahill                            1271
Cross-Examination By Mr. S. Richards

                                                           1274

Redirect Examination By Ms. Golden                         1309
Recross Examination By Mr. Scahill                         1311


JAIME RIOS
Direct Examination (Resumed) By Mr. J.                     1314
Richards

JAMIE RIOS
Direct Examination (Resumed) By Mr. J.                     1338
Richards


PLAINTIFF'S EXHIBIT                                      RECEIVED
No. 19                                                      1459

DEFENDANTS' EXHIBIT                                      RECEIVED
No. 5-2                                                     1267
No. 47-02                                                   1344