1477

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                          )
                                     )
                 Plaintiff,          )
                                     )
-vs-                                 )   Case No. 1:22-cv-03973
                                     )
REYNALDO GUEVARA; MICHAEL            )
MASON; and JoANN HALVORSEN,          )
as Special Representative of         )
ERNEST HALVORSEN, Deceased,          )   Chicago, Illinois
                                     )   February 11, 2026
                 Defendant.          )   10:00 a.m.

VOLUME 8
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:      LAW OFFICE OF STEPHEN L. RICHARDS
                        BY:  MR. STEPHEN L. RICHARDS
                             MR. JOSHUA S. RICHARDS
                        53 West Jackson Boulevard, Suite 205
                        Chicago, Illinois  60604

For Defendant           BORKAN & SCAHILL, LTD.
Guevara:                BY:  MR. TIMOTHY P. SCAHILL
                             MR. GRAHAM P. MILLER
                        20 South Clark Street, Suite 1700
                        Chicago, Illinois  60602

For Defendants          THE SOTOS LAW FIRM, P.C.
Mason and    Halvorsen:      BY:  MR. JOSEPH M. POLICK
                                  MR. JOSH MICHAEL ENGQUIST
                             MR. JEFFREY ROBERT KIVETZ
                             MS. CAROLINE P. GOLDEN
                        141 West Jackson Boulevard, Suite 1240A
                        Chicago, Illinois  60604

1478

Court Reporter:          CHARLES R. ZANDI, CSR, RPR, FCRR
                         Official Court Reporter
                         219 S. Dearborn Street, Room 1426
                         Chicago, Illinois  60604
                         Telephone:  (312) 435-5387
                         charles_zandi@ilnd.uscourts.gov


                    *   *   *   *   *

                PROCEEDINGS REPORTED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

1479

(Proceedings heard in open court; jury out:)

THE COURTROOM DEPUTY: 22 C 3973, Rios versus Guevara, et al., for jury trial.

THE COURT: Good morning. Appearances, please.

MR. S. RICHARDS: Stephen Richards on behalf of plaintiff.

MR. J. RICHARDS: Joshua Richards on behalf of plaintiff.

MR. SCAHILL: Good morning, Your Honor. Timothy Scahill on behalf of Reynaldo Guevara.

MR. POLICK: Good morning, Your Honor. Joseph Polick on behalf of defendants Mason and Halvorsen.

MR. ENGQUIST: Good morning, Your Honor. Josh Engquist also on behalf of defendants Mason and Halvorsen.

MR. MILLER: Grant Miller on behalf of defendant Guevara.

MR. KIVETZ: Good morning, Your Honor. Jeff Kivetz on behalf of defendants Mason and Halvorsen.

THE COURT: Good morning.

Ms. Golden, I take it, will join us?

MR. ENGQUIST: Yes, Your Honor.

MR. POLICK: Yes.

THE COURT: If something comes up that requires her presence, just let me know and I'll wait since I called the case early.

Any issues that I need to address before bringing the jury in?

MR. J. RICHARDS: I think, Your Honor, we did end with an objection and then the jury was excused. And I believe you overruled the objection. I'm just curious if Your Honor was going to say the objection at the end of the day yesterday was overruled.

THE COURT: I can. Let me just double-check and see.

Okay. So the question concerned why did the plaintiff decide to get a Certificate of Innocence. He was into his answer, and then there was the objection, which I overruled.

And so I'll tell the jury that we ended the day on an objection. That's overruled. And then you'll be able to continue with your examination.

MR. J. RICHARDS: Thank you, Your Honor.

THE COURT: All right. Anything for the defendants?

MR. SCAHILL: We left off after the jury left talking about this issue with the indictment and the *Gilbert* instruction and all that.

We went back and looked. I believe what occurred is that the -- unfortunately this happens from time to time in the Cook County Circuit Court. They do not have the file. So we're just going to proceed on the questions and then the third-party witness on those issues.

MR. POLICK: We searched the state's attorney's file,

1481

Judge, and there were some documents from the aggravated assault matter embedded in the file. Unfortunately, the indictment was not one of them.

THE COURT: Okay. That's fine.

I thought about it more, and I still don't see how our circumstance is necessarily a *Heck* issue, because this civil action is not directed towards the May '89 conviction. But there are, as we discussed yesterday, there are other issues concerning what's asked for in that instruction that I don't know we've established such that it warrants an instruction from the Court, it's more of an evidentiary issue, which sounds like the defendants intend to present evidence of anyhow.

Any other issues?

MR. SCAHILL: The only other thing is that there has been some media coverage about settlements with respect to, not about this case, but about Mr. Guevara in general presented to City Council. It came out Monday. There were some other stories Tuesday.

I do not want anything specifically calling the jury's attention to that. But, you know, if Your Honor has some sort of anodyne statement to the jury about reminding them about media coverage, I know you do make those statements at the end of the day, but, you know, I suspect that's come up in perhaps criminal cases or other cases with Your Honor, so if there is some idea that you have that we could just sort of remind them,

1482

we would certainly -- you know, just like a gentle reminder without reference to this case that, you know, shouldn't be reading the news, headlines, that kind of thing.

THE COURT: My experience generally is in a handful of cases where there was press coverage, a note, either when I was on the other side of the bench or up here, "I saw this article, I didn't read it once I realized it dealt with this" or whatever it was. And if I get that note or a hand, then we'll inquire of the juror outside of the presence of the other jurors as to what it was. The parties will have the opportunity to ask questions of the juror and we'll decide what to do with that.

Outside of that, I share your concern about calling attention to it because, quite frankly --

MR. SCAHILL: Curiosity killed the cat.

THE COURT: Well, quite frankly, what drew my attention was I'm trying a case involving a detective, and I knew it would come. But I suspect people are numb. Like my wife reads the Tribune, and she didn't ask me like: Is that your case? And so because she's not as in tune with the ongoings of the *Watts* and the *Guevara* cases.

So I'll continue to ask and trust that the jurors will honor their oath and identify any issues that have come up.

Any other concerns for any of the other defendants?

MR. ENGQUIST: No, Your Honor.

MR. POLICK: No, Judge.

THE COURT: Ms. Golden, do you want to make your appearance.

MS. GOLDEN: Caroline Golden for defendants Mason and Halvorsen.

THE COURT: I've already acknowledged that I started early, so there is nothing to apologize for.

MS. GOLDEN: Very important water duty.

As far as the final jury instruction conference, my sense or thought was that I'd have it Friday at 9:00 a.m. before you bring the jury in so that we can resolve that. I don't know if the evidence is going to close.

I don't want to tell the jury that we're breaking early on Friday so that we can do it, just because we're asking them to come back after a holiday weekend. And so, you know, if the evidence goes up to whatever time on Friday or spills over into next week, that's consistent with their thoughts. I don't want tell them I'm cutting them loose early to bring them back the following week.

So we'll take that up Friday at 9:00 a.m. because I don't have call on Fridays. All right.

MR. SCAHILL: All right.

MR. POLICK: Okay, Judge.

MR. ENGQUIST: All right.

THE COURT: All right. We've got another 15 minutes.

So we'll break for now.  And at 10:00 I'll bring the jury in and we'll resume with the direct examination of Mr. Rios, after I explain to the jury that I overruled the objection at the end of the day.  All right.

MR. J. RICHARDS:  Thank you.

MR. POLICK:  Thank you, Judge.

(Recess at 9:45 a.m. to 10:00 a.m.; jury in at 10:00 a.m.)

THE COURT:  Please take your seats.  Welcome back, ladies and gentlemen.  Good morning.

I'll start as I normally do and ask if anyone has anything to report to me?

All right.  Seeing no hands.

Mr. Rios, if you can retake the stand.  I'll remind you that you remain under oath.

Mr. Richards, you can get ready to continue your direct examination.

And, folks, yesterday we ended on an objection.  I overruled the objection.  And so to the extent that Mr. Richards chooses to do so, he will continue with his examination.

You may proceed.

MR. J. RICHARDS:  Thank you, Your Honor.

JAIME RIOS, PLAINTIFF HEREIN, DULY SWORN,

DIRECT EXAMINATION

BY MR. J. RICHARDS:

Rios - direct

1485

Q.  Jaime, I just have a few more questions for you.

A.  Okay.

Q.  Did you ever possess a gun?

A.  Yes, I did.

Q.  What type of gun was that?

A.  That was a .45 automatic.

Q.  How did you get that gun?

A.  A friend of mine gave it to me.

Q.  A friend of yours.  Do you remember who that friend was?

A.  No.  It's a long time ago.

Q.  When you got that gun, what did you do with it?

A.  I sold it.

Q.  When did you sell it?

A.  It was around '88.

Q.  Why did you sell it?

A.  To buy some weed.

Q.  Now, yesterday you used the term "trustee."  I just want to ask you a few follow-up questions about that.

A.  Okay.

Q.  You were a trustee at Pontiac?

A.  Yes, I was.

Q.  And how long were you a trustee for?

A.  I wasn't their trustee for too long.

Q.  Why did you stop being a trustee?

A.  Well, one of the guys in one of the cells gave me a kite.

Rios - direct

1486

Q.   What's a kite?

A.   A kite is probably something written and folded into like a little square or however they fold it.  They could fold it so many ways, like a little triangle or something.  So it's a kite.  It's something written in a piece of paper.

So one of the guys told me "Could you pass this down to another cell."  And I grabbed it.  By the time I got to the other cell, the police stopped me, the security officers stopped me.  He took the kite away from me.  When they opened up the kite, they had a little bit of marijuana in it.

Q.   And when you were a trustee, were you paid to be a trustee?

A.   Yeah.  You get paid like 15 cents a day.

Q.   Besides being paid to be a trustee, did you have any other paid jobs in IDOC?

A.   Yeah.  I worked, I worked in Dixon.

Q.   And in Dixon, how many years were you working in Dixon?

A.   I probably worked like two to three years in Dixon.

Q.   And how much were you paid for those jobs in Dixon?

A.   Like 25 cents a day.

Q.   Lastly, Jaime, let me ask you this:  In your testimony yesterday and the day before, have you been telling the truth?

A.   Yes, sir, I have.

MR. J. RICHARDS:  I tender.

THE COURT:  Okay.  Which defendant will start?

MR. ENGQUIST:  I'll start, Your Honor.

Rios - cross

1487

THE COURT:  Mr. Engquist.

CROSS-EXAMINATION

BY MR. ENGQUIST:

Q.  Sir, I want to make sure I have the time kind of correct. You were arrested in July of 1998, right -- '89?  I'm sorry.

A.  '89, yes, sir.

Q.  And then you're in custody until you are released, correct?

A.  Yes, 2008.

Q.  Okay.  And you testified yesterday about how you were in shock after you were sentenced because you weren't sure where you were going to be going, what was going to be happening?

A.  Correct.

Q.  Okay.  But to be clear, that time you spent in prison, you were also serving time for two other convictions, isn't that correct?

A.  Yes, sir.

Q.  Okay.  And, in fact, you were out on bond at the time you were arrested for the Luis Morales murder, correct?

A.  Yes, sir.

Q.  Okay.  And you pled guilty to that felony before you were ever found guilty of the Luis Morales case?

A.  Yes, sir.

Q.  Okay.  And you were sentenced to three years for that?

A.  Yes, sir.  Time considered served.

Q.  Time considered served, because you served your time during

the time you were in prison?

A.   While I was in county.

Q.   Okay.  Now, sir, you also, you were also sentenced to two years, you were actually found guilty and pled guilty and sentenced to two years while you were in Livingston County --

A.   Yes, sir.

Q.   -- when you were serving your time?

A.   Yes, sir.

Q.   Okay.  And that was, that time was served while you were in prison too, right?

A.   Yes, sir.

Q.   Okay.  So that entire time you were serving for three different crimes?

A.   Yes, sir.

Q.   Okay.  Okay.  So let's -- all right.  Now let's focus just a little bit on Cook County jail.  At the time you were in Cook County jail, you were still a Latin King, correct?

A.   Yes, sir.

Q.   Okay.  And then you were sent to Pontiac?

A.   Yes, sir.

Q.   Okay.  And you were still a Latin King there?

A.   Yes, sir.

Q.   Okay.  Now, when you were going to -- when you go to prison as a gang member, it's not just as a Latin King.  You're under the larger umbrella of either the Folk or People Nation, isn't

that right?

A.   Yeah, everybody is in there, all different kind of gangs, rivals, all neutral gangs.  Everything is in there, yes.

Q.   So you would be under the whole kind of, I guess it would be the People flag at that point, right?

A.   Well, just Latin Kings.

Q.   Just the Latin Kings, okay.

        Yesterday you also talked about you had a relationship with a female guard, isn't that right?

A.   Yes, sir.

Q.   Okay.  And that lasted a couple months?

A.   A couple of months you could say.

Q.   Okay.  And you had a romantic relationship with her which included some sexual activity, right?

A.   No, sir.

Q.   No?

A.   No sexual activity, sir.

Q.   Okay.

        MR. ENGQUIST:  Page 67, starting on line 1.  It's in his deposition.

        MR. S. RICHARDS:  I understand.

        MR. ENGQUIST:  Okay.

BY MR. ENGQUIST:

Q.   Now, sir, when you give a deposition in this case, you swore to tell the truth, right?

Rios - cross

1490

A. Yes, sir.

Q. Okay. And weren't you asked this question, did you give this response:

"Question: And did your romantic relationship with the Correctional Officer Lazar include sexual activity?

"Answer: Yes, sir."

Did you give that answer, sir?

A. Can't recall.

Q. Okay. Now, I wasn't sure of the implication yesterday, but just to be clear, your relationship you had with this correctional officer, that was consensual, wasn't it?

A. Well, she was the one coming to my cell. I couldn't get out the cell. She was coming to my cell and talking to me.

Q. Okay.

MR. ENGQUIST: Page 75.

BY MR. ENGQUIST:

Q. Sir, weren't you asked this question and did you give this response:

Question, line 16: "So that the relationship you had with Correctional Officer Leanna Jo Lazar while you were in Pontiac Correctional Center, was that a consensual relationship between you and her?

"Answer: Yes, sir."

Did you give that response, sir?

A. Yes, sir.

Q.   Okay.  And then you were at Danville after that point?

A.   No.

Q.   Is that when you went to Menard briefly and then back to Danville?

A.   They sent me to Menard from there.

Q.   Okay.

A.   From Pontiac, they sent me to Menard.

Q.   And you were there briefly and then went to Danville, correct?

A.   Yes, sir.

Q.   Okay.  And at Danville you were still a Latin King as well, correct?

A.   Yes, sir.

Q.   Okay.  And then later on you transferred from Danville back to Menard?

A.   They sent me back to Menard, yes, sir.

Q.   Okay.  And that was because the superintendent thought you were a trouble maker, isn't that right?

A.   No.  The superintendent thought that I was there to obstruct his place, because he knew me from Pontiac.  He was at Pontiac before.  He was a superintendent in the south uppers.

Q.   Okay.  And I think you testified it was at Menard you decided that you were going to leave the gang, is that right?

A.   No.

Q.   When was that then?  When did you decide to finally leave

the gang?

A.   Dixon, Dixon.

Q.   In Dixon, okay.

Now, you never graduated from high school, correct?

A.   Excuse me?

Q.   You never graduated from high school?

A.   No, I did not.

Q.   Okay.  You completed one year of high school and then were expelled, right?

A.   I was almost out of my second year of high school, and I got expelled from school, yes.

Q.   Okay.  And that was for fighting, correct?

A.   Boxing, yeah.  I ended up fighting with a guy in the lunchroom, because he came to me and he hit me, and I just got up and started fighting, yes.

Q.   Okay.  But you did take advantage of the GED program and you got your GED, I think you testified 2004, is that right?

A.   Yeah, somewhere around there.

Q.   Okay.

A.   In Dixon.

Q.   Now, just focusing on your time in different institutions, your time in Cook County jail while you were awaiting trial, you didn't suffer any injuries, correct?

A.   No, I did not.

Q.   You were not involved in any fights at Cook County jail,

correct?

A.   No, I did not.

Q.   Okay.  You were never a victim of any assaults, were you, in Cook County jail?

A.   No, I did not.

Q.   And you never had any problems with rival gangs while you were at Cook County jail, correct?

A.   No, I didn't.

Q.   Okay.  Now, you did testify before about being afraid while you were in Cook County jail of being attacked, is that right?

A.   Yes, sir.

Q.   Okay.  But that never happened, correct?

A.   It never happened.

Q.   Okay.  And when you're at Cook County jail, your mother would visit you, let me see, every two to three months, is that right?

A.   Yes, sir.

Q.   Okay.  Now you went to -- then you went to Illinois Department of Corrections, right?

A.   Correct.

Q.   And that was after the first plea and guilty conviction and sentencing and then also your finding of guilty and sentencing in the Luis Morales murder, correct?

A.   Correct.

Q.   Okay.  And while you're at Illinois Department of

Corrections, you never suffered any illnesses, right?

A.   No.

Q.   Okay.  You were not injured while you were there?

A.   No.

Q.   Okay.  You weren't in any fights when you were there either, were you?

A.   No.

Q.   And you were never a victim of any assaults while you were there?

A.   No, sir.

Q.   Okay.  You never sought the need of any kind of mental health professional while you were there?

A.   No, sir.

Q.   And while you were there at those various institutions, we talked about them, you were able to see your family, correct?

A.   Yes, sir.

Q.   Your sister would visit you?

A.   My sister was the one that used to always bring my mom, yes, sir.

Q.   Okay.  And they would bring your son too, isn't that correct?

A.   Periodically, yes, sir.

Q.   Okay.  And while you were at every correctional center except Menard, you would see your son every two to three months, isn't that correct?

Rios - cross

1495

A.   You could say two to three months.  You could say probably six months from then.

Q.   I'm sorry, what was that?

A.   Two to three months or six months from then.

Q.   Six months from then, okay.

But it is correct though they would bring your son at every institution except Menard?

A.   Yes.

Q.   Okay.  And since your release, you haven't had any problems adjusting to outside life, isn't that correct?

A.   No, I'm not.  I haven't had any problems adjusting, no.

Q.   Okay.  No problems in your daily activities of your life, right?

A.   Not really.

Q.   No problems sleeping?

A.   No.

Q.   Okay.  And you even talked about it before, while you were in prison, you were able to rekindle a friendship with the woman who is now your wife, right?

A.   Yes.

Q.   Okay.  And you're happily married now?

A.   Yes, sir.

Q.   How long have you been married?

A.   Been married 13 years.

Q.   Okay.  And your son Jaime, Jr., he lives in Ohio, correct?

Rios - cross

1496

A.   Yes, sir.

Q.   Okay.  He has his own life now, right?

A.   Yes, sir.

Q.   He's married?

A.   Yes, sir.

Q.   Has kids?

A.   Three.

Q.   Okay.  And he comes back to Chicago usually once a year during the summer to visit you and visit the other family here in Chicago, correct?

A.   Yes.

Q.   I think his mother is still here, right?

A.   Yeah, his mother is still here.

Q.   Okay.  But you haven't gone there, right?

A.   I went to Ohio one time.

Q.   Okay.  But you really don't go back there because you work a lot?

A.   Yes, sir.

Q.   Okay.  But you do go on vacations, correct?

A.   When I get a chance to be able to go on a vacation, yes, sir.

Q.   Okay.  You've been, since you've been married, since you've been with your now wife, you've been to Hawaii with her, correct?

A.   Yes, sir.

Q.   Jamaica?

A.   Yes, sir.

Q.   Amsterdam?

A.   Yes, sir.

Q.   New York City?

A.   No, I haven't been to New York yet.

Q.   Okay.  All right.

A.   It was Puerto Rico to see my father.

Q.   Now, sir, I know it wasn't published for the jury, but there was some tax documents you looked at yesterday?

A.   Yes.

Q.   Okay.  Just to be clear, you talked about roughly how much you make a year.  But the tax documents that were in front of you yesterday, those were joint between you and your wife, isn't that right?

A.   Right now at the 50,000 mark that I make a year, that's on me, just me.

Q.   Just you?

A.   Yeah.

Q.   Anything else in that -- I'm sorry.  Anything else in those documents had to do with your wife, isn't that right?

A.   No.  That's all me.

Q.   Those are all you?

A.   Yes.

Q.   Okay.  Did you see those were joint filings?

Rios - cross

1498

A.   Excuse me?

Q.   Those were joint filings, sir.

A.   Yes, they are.

Q.   Okay.  She works, correct?

A.   Yes, she does.

Q.   And so since your release, you've held a job?

A.   I struggled at first trying to find jobs in Milwaukee, yes, sir.  But I did find a little daily pay that I worked for for a minute.  And then after that I ended up finding a landscaping job that I worked for about close to three years before I came back to Chicago.

Q.   And you've been employed the entire time you've been here in Chicago, correct?

A.   Yes, sir.

Q.   Okay.  So let's back it up a little bit.  You moved to Chicago when you were around 10 years old, right?

A.   About 8 or 9.

Q.   8 or 9, okay.

A.   '86.

Q.   You basically grew up here in Chicago, right?

A.   Here and in New York.

Q.   Okay.  You're basically like east of Humboldt Park, that's where you grew up?

A.   Yes, sir.

Q.   Okay.  And when you were younger, people would call you

Mongoose, right?

A.   Yes.

Q.   Okay.   Mongoose is that small, kind of aggressive animal that kills venomous snakes, right?

A.   Yes, sir.

Q.   Okay.   And then when you were 12 years old, you joined the Latin Kings?

A.   Yes, sir.

Q.   Okay.   And you talked about that a bit over the last couple of days, about how you started as a peewee?

A.   Yes, sir.

Q.   Okay.   And you said you started off as a peewee.   You're basically a lookout or the older fellows in the gang?

A.   Yes, sir.

Q.   Okay.   You got beat in into the gang.   But after that point, your loyalty is to make sure that you're a lookout so they don't get in trouble, correct?

A.   Correct.

Q.   So you're looking out for police?

A.   Yes.

Q.   So they can continue to do things like sell drugs, right?

A.   Yes, sir.

Q.   And you're also there to look out for rival gangs, right?

A.   Yes, sir.

Q.   Because the rival gangs may -- well, there is violence

Rios - cross

1500

going on between the rival gangs, isn't there?

A.   Yes, sir.

Q.   Okay.   You're worried about controlling -- the Latin Kings would be worried about controlling their area where they're selling their drugs?

A.   Yes, sir.

Q.   Okay.   Because if they lose their spot where they're selling their drugs, they lose their livelihood, right?

A.   Yes, sir.

Q.   It's about money?

A.   Yeah.

Q.   Okay.   So you're a lookout as a peewee when you are 12 years old for that purpose?

A.   Yes, sir.

Q.   And you pass along information to the older gang fellows, right?

A.   Yes.   I was a lookout.

Q.   Okay.   And then you said that you were kind of promoted at 14 to junior?

A.   Yes, sir.

Q.   Okay.   So you said as a junior Latin King you got more responsibility, right?

A.   Yes, sir.

Q.   Okay.   Now just go back.   When you were a peewee, the older guys would give you some money too, wouldn't they?

A.   No, sir.

Q.   They wouldn't give you any money?

A.   Not when I'm peewee.

Q.   There wasn't any kind of benefit?

A.   No, sir.

Q.   Okay.   The benefit was just doing what you could for the gang?

A.   You just watch out and look out for them.   That's it.

Q.   Okay.   Now, when you were a junior, your responsibilities increase?

A.   Yes, sir.

Q.   Okay.   And you testified that as a junior Latin King, you now had more responsibilities because that could actually include things like carrying drugs back and forth?

A.   Yes, sir.

Q.   Okay.   And you did that, right?

A.   Yes, sir.

Q.   Okay.   And when you are doing that and you are still also doing lookouts for security, aren't you?

A.   Yes, sir.

Q.   Okay.   But you were very clear that as a junior Latin King, you didn't have access to the weapons, right?

A.   Correct.

Q.   Okay.   But there were gang guns, weren't there?

A.   Excuse me?

Rios - cross

1502

Q. Gang guns?

A. I never seen one, a gang gun. I never experienced them giving me any gun when I was a junior at all.

Q. Sir, is it fair to say that Latin Kings would have different guns that different members could use for protection or for security?

A. Yes, sir.

Q. Okay. But as a junior, you didn't have access to those, is that what you are saying?

A. No, you cannot.

Q. Okay. That was a strict rule, I guess?

A. Yes, sir.

Q. Okay. And at this point as a junior, were you getting some of that kickback, some of that money from the drug sales when you were moving the drugs back and forth?

A. No, sir.

Q. So you are still being kept out of that?

A. Yes, sir.

Q. Okay. Now, at some point you actually talked about when you first joined the gang, and this was not yesterday, I think it was the day before, you talked about when you joined the Latin Kings, you would be playing sports with different Latin Kings against rival gangs?

A. Yes, sir.

Q. But just to be clear, this wasn't, this wasn't like a club

sport team, was it?

A.   No.  We just go and play sports against each other and that was it.

Q.   Okay.  And at times you'd be lookout for them so they wouldn't try to shoot and kill your members, right?

A.   We were talking about peewees.  We weren't talking about up and, up and being higher up --

Q.   Okay.

A.   -- and to that type of stuff.  It was just us playing against the next block or the next neighborhood football, whatever, rival football and that was it.

Q.   So you're talking about 12 years old?

A.   Yes, sir.

Q.   Okay.  And then at 14 years old?

A.   Same thing.

Q.   Same thing.  You're still just -- you're doing lookouts? You're moving drugs back and forth?

A.   Yes, sir.

Q.   But you're not -- but it's not violent at all?

A.   No, we're not getting violent at all.  We don't fight with nobody or anything like that.

Q.   That's for the older guys?

A.   Yes, sir.

Q.   Okay.  But you also talked about gangs, and you said gangs were a plague?

Rios - cross

1504

A.   Excuse me?

Q.   You talked about gangs being a plague in your block?

A.   Yes.

Q.   Because they were violent, correct?

A.   Yes.

Q.   People got shot?

A.   Yes.

Q.   People got hurt?

A.   Yes.

Q.   And it was all over drug territory?

A.   Over drugs, over money, yes.

Q.   Okay.  Now, you were also really clear the last couple days that you stopped being a gang member when your girlfriend Diana got pregnant in 1988?

A.   Correct.

Q.   And you became a family man?

A.   Yes, sir.

Q.   So you said you just stopped being a gang member?

A.   Yes, sir.

Q.   Okay.  And because you said you stopped being a gang member, you never got to the point of having access to weapons?

A.   I never ended up in that, in that position, sir.

Q.   You never got involved in shootings?

A.   Nope.  No shootings, no drug dealing to, to, to the fact of big, big drug dealing that I'm going to be opposing the gangs

or anything.

Q.   Okay.  But you did deal drugs, correct?

A.   Yes, sir.

Q.   Okay.  And that actually at the time of your arrest, that was your sole source of income, wasn't it?

A.   Yes, sir.

Q.   Okay.  Your sole source of income was going out and selling in front of your house or right near your house?

A.   Yes, sir.

Q.   That was your spot?

A.   Yes, sir.

Q.   That was where you made your money for rent, as you put it?

A.   Yes, sir.

Q.   Okay.  And from I remember from your deposition, you would -- that would involve you working from around noon to maybe 2:00, 3:00 o'clock in the afternoon?

A.   Yes, sir.

Q.   Okay.  So you would go out.  You'd work in the afternoon in front of your house.  And then I think you said your ritual then was to always go to your mother's house on Wolcott?

A.   1246 North Wolcott.

Q.   That's right.  You would go to Wolcott, ride your bike over to Wolcott, and then you would clean her house until late that night, take care of your dog and clean the house until late at night and then come home?

Rios - cross

1506

A.   Yes, sir.

Q.   That was your --

A.   Yes, sir.

Q.   Now, you also talked about your mother's house on Wolcott, how the first floor was kind of a hangout area, like a club almost for different people, wasn't it?

A.   It was a bar.  It was a bar.  It was called the social club.

Q.   A social club?

A.   Yeah.

Q.   A lot of Latin King?

A.   Bar, pool.

Q.   Okay.

A.   No.  Everybody in the neighborhood.  Gangbangers, older people, parents and all them, they all hang out in that, in that, in that club.

Q.   Okay.

A.   It's a social club in the neighborhood.

Q.   And just to be clear --

A.   And we lived above it.

Q.   -- that social club was in a Latin King territory?

A.   Yes, sir.

Q.   Okay.  So that social club wouldn't have your rivals, the Cobras, in there, would it?

A.   No, sir.

Rios - cross

1507

Q.   No.   It would be the Latin Kings and maybe other people from the People Nation that you were getting along with, correct?

A.   No.   It was just the people from the neighborhood.   And, yeah, it could be, it could be the allies too.   It could be some of the allies in there.

Q.   Some of the allies?

A.   Yes.

Q.   Okay.   But it was a Latin King hangout, wasn't it?

A.   It's a social club.   It's everybody's club.   It's not nobody's, nobody's hangout.

Q.   Okay.   Sir, isn't it are true that when you would go over to your mother's house, according to you, after you were done selling your drugs for the day at 2:00 or something, 3:00 in the afternoon, you would go over there, and you would just hang out with the older guys in the social club?

A.   Yes.

Q.   Okay.

A.   I used to play pool and things like that in there.

Q.   Okay.   So your schedule, your daily schedule as you put it back then in 1989 was roughly getting up sometime and heading downstairs and selling drugs for a couple hours?

A.   Yes.

Q.   Okay.   Until you were done.   And that would be your money that would cover your rent, cover, I'm assuming since that was

Q. your sole income, cover food, right? Is that correct?

A. Yes.

Q. Utilities?

A. I had $200 just for the rent. So utilities and that I paid on my own with the little money I had left from the sales, yes.

Q. Okay, from the sales. Yeah, you would pay all the -- I mean, because you were supporting yourself, your new baby and your girlfriend, right?

A. Yes.

Q. Okay. No one else was supporting them, right?

A. Well, my father-in-law used to give Diana some money.

Q. Okay. So he helped support her?

A. Yeah, he helped support her.

Q. Okay. But all your money came from drug sales at that point?

A. My money came from the drugs for my rent, yes, sir.

Q. Okay. And everything else?

A. Like food and stuff like that, the little bit of money left, yeah.

Q. Yeah. Going to the social club, for instance?

A. And the -- excuse me?

Q. If you spent any money when you were out, that came from your drug sales?

A. No. I didn't have no money to spend.

Q. Okay. But so just going back, your schedule was get up in

the morning, head downstairs.  By noon you're selling drugs until 2:00 or 3:00 in clock in the afternoon.  Then you would get back on your bike.  You would go back to Wolcott.  You said you would take care of your dog and always help clean up your mother's house.  And then you would spend the remainder of the time until later in the evening at the social club hanging out with people, apparently not spending any money, is that right?

A.  Not spending any money at all.

Q.  Not spending any money.  Okay.  And then you would come home.

And the reason why you didn't sell drugs at night is because it was too dangerous?

A.  There was no customers at night.

Q.  Because people wouldn't come into the neighborhood, right?

A.  Excuse me?

Q.  People wouldn't come into the neighborhood, isn't that correct?

A.  Correct.

Q.  Because it was dangerous?

A.  Every neighborhood is dangerous at night.

Q.  Okay.  Now, your neighborhood, and there has been some testimony about it, where you lived on Leavitt, we talked about the Leavitt-Schiller, that was a set, that was a group of Latin Kings, correct?

A.  Yes, sir.

Rios - cross

1510

Q. Okay. And the dividing line, it ended at Western, because then after Western, when you go west on Western, that's where the Cobras were, right?

A. Yes, sir.

Q. Okay. And those Spanish Cobras were rival, a direct rival to the Latin Kings, correct?

A. Yes, sir.

Q. And not only were they rivals, they're from the different nation. They're from the Folk Nation too, correct?

A. Yes, sir.

Q. Okay. And you did have duties as a Latin King to protect the neighborhood, correct?

A. Yes, sir.

Q. Because you were a foot soldier, weren't you?

A. Yes, sir.

Q. Okay. And to protect the neighborhood, you were protecting the neighborhood from outsiders or anyone coming to the neighborhood to start trouble, correct?

A. Yes, sir.

Q. Okay. And that protection included shooting at them if they started trouble in your neighborhood, isn't that correct?

A. Yes, sir.

Q. Okay. And you were a foot soldier, and that was one of your duties, isn't that correct?

A. Yes, sir.

Q.  And isn't it true, sir, that back in the summer and the spring of 1989, you had access to weapons to protect the neighborhood, to do your duty as a foot soldier for the Latin Kings?

A.  In '89?

Q.  Yes.

A.  I wasn't a gangbanger then.  I left in '88 when Diana got pregnant.

Q.  So your testimony, sir, just to be clear, is after 1988, when you left the gang --

A.  I was not active after that.

Q.  You were not active, right?

A.  Correct.

Q.  You did not have access to weapons?

A.  Correct.

Q.  You didn't do any shootings?

A.  Correct.

Q.  You couldn't represent yourself as a Latin King?

A.  Nope.

Q.  And you wouldn't do that, would you?

A.  You can't.

Q.  Okay.  Now, sir, your son was born on May 18, 1969 -- I'm sorry, 1989?

A.  Yes, sir.

Q.  Okay.  Now, sir, eleven days after your son was born, you

were involved in an incident in which you fired a gun at two people you thought were a rival gang?

A.   No, sir.

Q.   Sir, isn't it true that on May 29, 1989, at around 11:30 p.m. at 1115 West Pontiac in Chicago, Illinois, you fired a handgun at two individuals and shot a car?

A.   No, sir.

Q.   Isn't it true, sir, that after you shot at that car, you yelled out "King Love" and represented yourself as a Latin King?

A.   No, sir.

Q.   Sir, just to be clear, you pled guilty to aggravated assault in 1990, isn't that correct?

A.   Yes, sir.

Q.   And the aggravated assault you pled guilty for was for an incident that took place on May 29, 1989 at West Potomac?

A.   Yes, sir.

Q.   And you pled guilty to firing that firearm at those individuals, isn't that correct, sir?

A.   Yes, sir.

Q.   Now, your testimony is on June 27, 1989, around midnight, you were in front of your apartment at 1440 West Leavitt?

A.   No, sir.

Q.   I'm sorry, North Leavitt?

A.   No, sir.

Q.   Okay.  Well, sir, you gave a deposition again in this case, didn't you?

A.   Yes, sir.

Q.   And during that deposition, weren't you clear that on May -- June 27, 1989, you remembered that you were in front of your house around midnight?

MR. J. RICHARDS:  Objection.

THE COURT:  Basis?

MR. J. RICHARDS:  Improper impeachment.

THE COURT:  Response?

MR. ENGQUIST:  I'm about to get to it.  I was just actually lining it up.

THE COURT:  Okay.  The objection is overruled.

MR. ENGQUIST:  Okay.

BY MR. ENGQUIST:

Q.   So page 131, starting on line 15:

"Question:  Do you know where you were on the late evening of June 27, 1989, just before or around midnight?

"Answer:  Yes, sir.

"Question:  Where were you at that time?

"Answer:  Front of my house.

"Question:  When you say you were in front of your house, what house are you referring to?

"Answer:  At 1440 North Leavitt."

Do you remember giving those answers, sir, to those

questions?

A. Yes, sir.

Q. Okay. So during your deposition, you remembered that, correct?

A. They put the wrong date on that.

Q. Sir, this is from your deposition in this case.

A. Yes, sir.

Q. So in this case, were you confused when Mr. Polick asked you where were you on June 27th?

A. Yes, sir.

Q. You were confused?

A. Yes, sir.

Q. The whole time when you answered a series of questions on June 27th, you're saying: What I really meant to say was a completely different date?

A. The deposition on that was the 2nd or the 3rd on that, that you're saying I was in front of my house. The 27th, the 27th, the 27th, I was upstairs in my house already.

Q. Okay.

A. I was never in front of my house at the 27th.

Q. Sir, were you also confused when you gave your statement, and we'll get to that a little later, but were you also confused when you gave your statement, the court reported statement on what date you were talking about?

A. No. I told them, I told them the 2nd and the 3rd. They

Rios - cross

1515

put the 27th.

Q. Okay. So in your deposition, when Mr. Polick asked you that, you were confused. You thought it was, you were talking about July?

A. Yes, sir.

Q. Okay. Well, let's carry on from that.

Sir, isn't it true that you told Mr. Polick during your deposition on June 30th of 2023 that on June 27, 1989, just shortly before midnight, you were with a guy named Jamaica?

A. No, sir.

Q. Okay. And isn't it true, sir, that you had never come to learn that anyone had been shot on that day, on June 27th, 1989?

A. Nobody was shot at in front of my house. I wasn't shot at, I, myself, in front of my house or anything. No, sir, not on the 27th.

Q. All right. So let's start again on page 131, starting at line 24. And this is following up from where we left off before about June 27th --

A. Okay.

Q. -- in front of your house.

"And were you with anybody at that time?

"Answer: Yes, sir.

"Question: Who were you with?

"Answer:  Some guy named Jamaica.

"Question:  Do you know Jamaica's real name?

"No, sir.  They just call him Jamaica."

Do you remember those questions, sir?

A.   Yes, sir.

Q.   Okay.  Now, going down to page -- I'm sorry, line 12:

"Were you aware that evening that someone had been shot at 1316 North Western?

"Answer:  No, sir.

"That location, 1316 North Western, how close is that to your home at 1440 North Leavitt?

"About four or five blocks.

"Question:  Did you come to learn that someone from the Spanish Cobra street gang had been shot at 1316 North Western in late evening on June 27, 1989?

"Answer:  No, sir.

"Question:  You never heard of that incident?

"Answer:  No, sir."

Did you give those answers, sir?

A.   Yes, sir.

Q.   Okay.  Sir, but you're saying now that when Mr. Polick was asking you repeatedly about June 27th and asking where you were on the date of the shooting, you were confused, and you were talking about a different incident?

A.   He was talking about Jamaica, me talking to Jamaica on the

Rios - cross

1517

27th.  I never spoke to Jamaica on the 27th.  I spoke to Jamaica on the 2nd or the 3rd of July.

And on the 27th, like my routine that I was doing from home to my mom and back home to myself, it was 9:00, 8:00 to 9:00 o'clock that I used to come back home.  And I went upstairs when I came home.

There was nothing ever happened on the 27th in front of my house.

Q.  Okay.  Now, later on in your deposition, you were specifically asked questions about the fact that your version of events is that when you were talking to the police, you were talking to the police and the prosecutor about a completely different day when there was a shooting in front of your house, right?

A.  Yes, sir.

Q.  Okay.  And you talked about that separately, isn't that correct?

A.  No, no.  They talked to me in the, in the interrogation room.  That's while they were telling -- that's while they were asking me about me had been involved in a murder or anything like that.  And I told them that I see -- that something happened to me in front of my house the 2nd or the 3rd of July, that I got shot at in front of my house.  That's what I explained to them, and I told them about that.

Q.  Sir, I'm talking about in your deposition.

In your deposition, you're asked questions about June 27th, where you were. And we just went through those answers where you said you were and who you were.

And later on you talked about where you were, your version of events of where you were on July 2nd or 3rd, isn't that correct?

A. Correct.

Q. You talked about two separate incidents in your deposition?

A. Correct.

Q. Okay. One being June 27th, one being July 7th -- or July, I'm sorry, 2nd or 3rd, correct?

A. Yes.

Q. Okay. There is no confusion about the dates when you gave your deposition, right?

MR. J. RICHARDS: Objection.

THE COURT: Basis?

MR. J. RICHARDS: Argumentative.

THE COURT: Overruled.

BY MR. ENGQUIST:

Q. Isn't that correct, sir?

A. I can't -- I don't recall.

Q. Okay. You were with your lawyer during that time?

A. Yes, sir.

Q. Okay. You took breaks during the deposition?

A. Yes, sir.

Rios - cross

1519

Q.   Your lawyer asked you questions also, didn't he?

A.   No, sir.

Q.   Okay.  He had an opportunity to, didn't he?

A.   Yes, sir.

Q.   Okay.  If there is any confusion, it could have been cleaned up at any point, right?

A.   Yes, sir.

Q.   Okay.  Now, as a person of the neighborhood, especially a person who was, according to you, a recent -- former but recent Latin King, you would know about incidents where there is shootings taking place in your neighborhood, right?

A.   No.  You're, you're excluded from everything.

Q.   You're excluded?

A.   Yes.  Once you're not a Latin King, you don't get to know anything about them whatsoever.

Q.   Okay.  Now, but if you were a Latin King, you would be the first to know if a Cobra was shot, wouldn't you?

A.   If you were Latin King you might be, you might be told about it, yes.

Q.   Okay.  Now, just to be clear, when you were selling drugs in front of your house --

A.   Yes, sir.

Q.   -- after you say that you became the family man and were no longer with the Latin Kings --

A.   Yes, sir.

Q.   -- okay, even then, when you were selling there, you were doing so with the permission of the Latin Kings, weren't you?

A.   Yes, sir.

Q.   There was no way you could be out there selling drugs, getting drugs from them and selling them in the neighborhood if you weren't getting permission from them, right?

A.   Yes, sir.

Q.   Okay.  You could get in trouble for that, couldn't you?

A.   Of course.

Q.   You would get hurt from that, wouldn't you?

A.   Yes, sir.

Q.   Okay.  And so you were under their protection, isn't that correct?

A.   No, sir.

Q.   You weren't under their protection?

A.   No, sir.

Q.   So if you weren't under their protection, and someone came to take your spot, it would be up to you to fix it, wouldn't it?

A.   No.

Q.   Then who would protect you?

A.   I just have to give it up.

Q.   Just have to give it up?

A.   Yeah, because I'm not part of them.  So if somebody from their gang or anything come to try to take the spot where I was

Rios - cross

1521

at selling the drugs, I just have to give it up because I'm not part of them.

Q. But just to be clear, where you lived on Leavitt was a part of that set of the Latin Kings, correct?

A. Yes, sir.

Q. And if someone came from a rival gang into your area, even if you weren't a Latin King, okay, even assume that's true, and came into your area to shoot at somebody, right --

A. Uh-huh.

Q. -- that would be starting trouble, wouldn't it?

A. Yes, sir.

Q. And that's something the Latin Kings would shoot people for, isn't that correct?

A. Yeah.

Q. Okay. So even if you weren't a Latin King, you would expect if Cobras came into their territory and caused a problem with somebody who was recently retired from the Latin Kings --

A. Yes, sir.

Q. -- Latin Kings would still respond?

A. No, sir.

Q. They wouldn't respond?

A. No, sir.

Q. Even though you already testified to the fact that one of your duties was to protect the neighborhood?

A. That was when I was active with them.

Q. But the other soldiers were still with them, right?

A. Yes.

Q. They'd have to protect the neighborhood, wouldn't they?

A. Yes, sir.

Q. They'd have to respond, wouldn't they?

A. Yes, sir.

Q. It would still be a Latin King issue, wouldn't it?

A. Yes, sir.

Q. It would be an insult to have the Spanish Cobras come across Western into your territory, into Latin King territory and shoot at somebody in that territory, wouldn't it?

A. Yes, sir.

Q. That would be something you would get a response for, wouldn't it?

A. Sometimes, sometimes not.

Q. Sometimes not.

But when they did respond, they wouldn't respond with like a strongly worded letter, would they?

A. No, sir.

Q. No. It would be with guns?

A. It would be violence against violence, yes.

Q. Okay. And the violence wouldn't necessarily even have to be directed at the person that did it, isn't that right?

A. If it's personal, possible. If it's not personal, it's a possibility they get the wrong persons, yes.

Rios - cross

1523

Q. Okay. Well, you could just go, you'd send a message, you could just go after somebody in the Spanish Cobras, right?

A. Yes.

Q. Okay. Okay. So your version of events is that there was an attack on your drug selling spot and you on July 2nd or 3rd, just not the 27th, correct?

A. Correct.

Q. Okay. And initially you were saying it was a murder, but you don't know if anybody was hit, correct?

A. Correct.

Q. Okay. Now, you said that you were in front of your house with Diana?

A. Yes, sir.

Q. Okay. Daniel Rodriguez, Diana's brother?

A. Yes, sir.

Q. Okay. Lamont Burr?

A. Yes, sir.

Q. Okay. And Diana's mother was also there, right?

A. She came out after the shooting --

Q. Okay.

A. -- and told us to get upstairs.

Q. Okay. Jamaica wasn't there, was he?

A. No, sir.

Q. No. So when you were talking before, when we're going through your questions in your deposition about being with

Rios - cross

1524

Jamaica on June 27th --

A.   Correct.

Q.   -- it wasn't a confusion between June 27th and July 2nd, because Jamaica wasn't even with you on July 2nd?

A.   It was --

Q.   Jamaica was only with you on June 27th?

A.   It was, it was a misunderstanding of the date for the simple fact that he was talking to me the 7th, when Guevara came and locked me up.

Q.   Sir, just to be clear, in your deposition when you're asked directly about June 27th, you say you were there in front of your house with Jamaica.  Now, and you're saying but I was confused, because what I was really talking about was July 2nd or 3rd.  That's what you just testified to, right?

A.   That I was confused.

Q.   Okay.  But you also just said on July 2nd or 3rd, I wasn't with Jamaica.  So how did that, how did that confusion even get worse that now you're putting people there that weren't even there?

          MR. J. RICHARDS:  Objection.

          THE COURT:  Sustained.

          You can rephrase it.

          MR. ENGQUIST:  Sure.

BY MR. ENGQUIST:

Q.   Then, sir, if you were confused between June 27th and July

2nd, again, not -- we're not talking about when this case was being investigated.

A.  Yes, sir.

Q.  But in 2023, when Joe Polick is asking you questions with your lawyer in a conference room --

A.  Yes, sir.

Q.  -- you get confused again, right?

A.  Yes, sir.

Q.  And you start talking about where you were on June 27th. But now you're saying:  I was confused.  It was July 2nd, right?

A.  Yes, sir.

Q.  Okay.  And you said, we just read it in your testimony, you said on June 27th, I was in front of my house with Jamaica, right?

A.  Yes, sir.

Q.  You said that, right?

A.  Yes, sir.

Q.  Under oath?

A.  Yes, sir.

Q.  Okay.  And now you're saying, Well, I was confused.  I was thinking I was talking about a totally different date a week later?

A.  Yes, sir.

Q.  Okay.  But according to you, a week later, you weren't even

Rios - cross

1526

with Jamaica, right?

A.   I got locked up at the 7th.  So I was with Jamaica on the 7th.  That's when I got to the house and I spoke to Jamaica in the sidewalk, yes.

Q.   But on June -- but this whole story about July 2nd or 3rd, that story does not include Jamaica, does it?

A.   Jamaica was not there that day.

Q.   Okay.  So just to be --

A.   I was confused about the date, sir.

Q.   And you're confused about who you were with as well?

A.   No, sir.

Q.   Well, when you were talking, when you said you were confused and thought you were talking about July 2nd, you said the only person you were with was Jamaica?

A.   Yeah, that was mistaken.

Q.   So not only was the date wrong, and you were confused about that, you were confused because you weren't with Jamaica.  You were in fact with Diana.  You were with Daniel.  You were with Burr.  And Diana's mother was also around?

A.   She came out and she told us to go upstairs.

Q.   Okay.

A.   That was the 2nd or the 3rd.

Q.   Okay.  So that's the confusion.  The confusion is not only the date, it was who you were with?

A.   That was the three dates.  The confusion is the dates, not

Rios - cross

1527

the people I was with.

Q.  Okay.

A.  Yes, sir.

Q.  So you were, so you were with Jamaica?

A.  The 7th, the 7th --

Q.  The 7th?

A.  -- of July when they, when they come and pick me up from in front of the house.

Q.  Okay.  So when Mr. Polick was asking you where you were at the time of the shooting on June 27th, you thought he was talking about the day you were arrested, July 7th -- the 26th?

A.  I thought he was talking about the 7th.

Q.  Okay.  So you weren't confused about July 2nd.  You were thinking it was even later that he was talking about when he was talking about the murder?

A.  I got confused to the date, the 27th to the 7th, yes, sir.

Q.  Okay.  So let's go with what your story is here.  Your story is nothing happened on June 27th.

A.  Right.

Q.  I was all confused.  I was even confused up to 2023 on the dates.

On July 2nd or 3rd, you were in front of your house, correct?

A.  Yes, sir.

Q.  Okay.  You weren't selling drugs, right?

Rios - cross

1528

A.   No, sir.

Q.   Because your drug sales are done?

A.   No.  That day I didn't have no more drugs.

Q.   Okay.  And you were sitting in front of your house with Diana, Lamont Burr, Daniel Rodriguez, and the mother came down too, right?

A.   Yeah.  After the shooting in front of the house, she came downstairs and she told us to get our butt upstairs.  Yes, sir.

Q.   Okay.  No one died that night, right?

A.   Not to my knowledge, no.

Q.   Okay.  And you said a Cutlass pulled up and someone fired at you or fired in your direction?

A.   Yes, sir.

Q.   Okay.  And then this Cutlass drove away and drove towards Spanish Cobra territory?

A.   They went down, they went down Leavitt, and then it went up Hirsch, yes, sir.

Q.   Okay.  Towards Spanish Cobra territory?

A.   Yeah, towards Western.

Q.   Okay.  And I'm assuming you thought, well, Spanish Cobras, right?

A.   Correct.

Q.   Okay.  It wasn't a big leap at that point, right?

A.   Excuse me?

Q.   It wasn't a big leap of logic to think it was a Spanish

Rios - cross

1529

Cobra who did that?

A.   Correct.

Q.   Okay.  And so according to you, not only you get shot at or these bullets are flying in your direction, I'm not sure -- do you think you were a target or were they just spraying, spraying the area?

A.   I don't know.  I heard a pop inside of the car.  Some guy in the car screamed.  When I tried to get close to the car, thinking it's a firecracker because it's close to 4th of July, I tried to get close to the car.  I see a barrel come out.  They start shooting.

I push Lamont Burr.  I start running.  They scattered.  Diana was coming from the gangway towards me.  She seen me running towards her while they were shooting, and she ran with me, and we got in the gangway, and we went back upstairs.

Q.   Okay.

A.   And then we came back down.  And we are trying to figure out what was happening.  And my mother-in-law came down and told us to get upstairs, and that was it for the day.

Q.   So there is a shooting in front of your house?

A.   Yes, sir.

Q.   Okay.  You could have been shot?

A.   Yes, sir.

Q.   Lamont Burr could have been shot?

A.   Yes, sir.

Q.   Daniel Rodriguez could have been shot?

A.   Yes, sir.

Q.   Your girlfriend could have been shot?

A.   Yes, sir.

Q.   And your mother-in-law was running around, if she had come out earlier, she could have been shot?

A.   If she had been out there earlier, yeah, she could have been shot too.

Q.   And you're saying in response to that -- now, just to be clear, this is somewhere you sold drugs, right?

A.   Yes, sir.

Q.   If there is shootings at where you sell drugs, customers won't come to you for drugs, right?

A.   They'll come regardless.  If they're -- if you're an addict, you're going to go wherever.  And whenever you're going to go, you're going to go wherever to get your drugs.  Don't matter.  They'll step over a dead man just to get the drugs from you.

Q.   Well, yeah, I can imagine that was happening probably a lot with heroin and things like that.  Those addicts would probably come for anything, is that right?

A.   Back in the day, those days were drug-infected days that cocaine was all over the place.  Heroin was all over the place. Yes.

Q.   And so you expect your clientele to keep on coming back

anyway even if there is shootings?

A.   They'll keep coming.

Q.   Yeah, that's because you not only sold marijuana, you sold other drugs too, didn't you, sir?

A.   No, sir.

Q.   Sir, you have the addicts coming in.  You weren't afraid of them coming back, right?

A.   Yes, sir.

Q.   Okay.  Are you saying that you had people addicted to your marijuana and that's what they're coming back for?

A.   It's addictive, yes, sir.

Q.   Okay.  Now, you're saying that after all that happened, your livelihood, where you sell your drugs, your family was there, your friends are there, you were there.

A.   Yes, sir.

Q.   And in response to that, you go into the house and you do nothing?

A.   Yeah.  My mother-in-law told us to go upstairs, and you just went upstairs, and we did nothing.

Q.   Okay.  That sure isn't -- that's not the Latin King way, is it?

A.   Excuse me?

Q.   Is that the Latin King way, to turn the other cheek?

A.   No, sir.

Q.   But you were no longer a Latin King, right?

A.   Correct.

Q.   You didn't have access to guns, right?

A.   Correct.

Q.   Okay.

A.   Never got to that stage.

Q.   Never got to that stage, okay.

A.   Correct.

Q.   So for you to turn the other cheek, that was okay?

A.   Yes.

Q.   Okay.  Now, I don't want to get you confused.  The third day we're going to talk about is July 6th, okay.

A.   Okay.

Q.   All right.  July 6th, just to be clear, is the day you ended up going to Area 5, correct?

A.   It was July 7th.

Q.   No.  It was the evening of July 6th that you went to Area 5, isn't that correct?

A.   Didn't they pick me up July 7th?

Q.   Okay.  Well, you previously testified earlier in the day on July 6th, okay, you testified that you came out of your house. I believe you were done selling your drugs in the afternoon, right?

A.   Yes, sir.

Q.   So from right where you sell your drugs, pretty much right around the corner pretty much is the school lot, right?

A.   Yes.

Q.   Okay.  So you're done selling drugs.  You walk around the corner to the school lot.  You're going through there.  And that's when you say you saw in the afternoon, you see Gang Crimes Specialist Guevara and his partner out there talking to some guys, right?

A.   Yes, sir.

Q.   Okay.  You see Latin Kings, right?

A.   Excuse me?

Q.   They were Latin Kings, weren't they?

A.   Yes, sir.

Q.   Okay.  They were part of what you say is your former set?

A.   Yes, sir.

Q.   Okay.

A.   Former friends, former friends from a set, yes, sir.

Q.   Well, no Latin Kings are former friends, right?  I mean, you still maintain relationships with them, don't you?

A.   They still be your friends, yeah.

Q.   Yeah.  I mean, like Carrero was still your friend, wasn't he?

A.   Yes.

Q.   And he's still your friend today, isn't he?

A.   Yes, sir.

Q.   I mean, I know even after he testified today, you guys left together the courthouse?

Rios - cross

1534

A.   Yes, sir.

Q.   Yeah.  You guys went out to hang out together, right?

A.   No, sir.

Q.   You weren't walking around the streets in Chicago together?

A.   No.  We just walked to the corner of the street right there.  His sister-in-law picked him up, and he left with her.

Q.   Okay.  So these are your former, according to you, former Latin King members, friends, but there are some of them that are still friends?

A.   Also childhood friends, yes, sir.

Q.   Because you guys grew up together?

A.   Yes, sir.

Q.   You guys started off as peewees together and moved up?

A.   Yes, sir.

Q.   Right.  Okay.  So let me ask you, just to be clear, I'm going to go back.  There were some questions during your direct examination about Macho.  Do you remember those?

A.   Possibly.

Q.   Jose Melendez?

A.   Yeah, I remember him.

Q.   Okay.  And you said that he was, he was the big cheese in your set?

A.   Yeah.  He was the Inca for my set.

Q.   Okay.  Just to be clear, he was only about six months older than you, isn't that right?

Rios - cross

1535

A.  Yes, sir.

Q.  Okay.  So when you talk about the older guys in charge and watching out for the older guys --

A.  Yes, sir.

Q.  -- that's your age?

A.  No, sir.

Q.  Well, the guy in charge --

A.  Yes, sir.

Q.  -- was your age?

A.  Yes, sir.

Q.  Okay.  So it's clear that just because you're 18 or 19 years old doesn't mean you're not in charge of things, right?

A.  Yes, sir.

Q.  It doesn't mean that you don't have responsibility in the gangs, right?

A.  Yes, sir.

Q.  It doesn't mean you're like some peewee who just does lookouts.  It means that you could actually be a hard core gang member, right?

A.  Yes, sir.

Q.  It means that you could not only be the person who, you know, is selling the drugs.  You could be the person who is carrying the gun, isn't that right?

A.  Yes, sir.

Q.  It also means that at that age you could be the person

that's out there doing the stuff like you talked about, that if someone comes in and starts trouble, you may be going out and shooting them, right?

A.   Yes, sir.

Q.   Okay.   That was your age group?

A.   Yes, sir.

Q.   Okay.   You came up with Mr. Melendez, didn't you?

A.   Yes, sir.

Q.   Actually, Mr. Melendez -- you talked about prison a little bit.   When you were in your prison, you had to give a list of people that would be allowed to be visitors, right?

A.   Yes, sir.

Q.   Okay.   Mr. Melendez was on your list?

A.   Yes, sir.   Towards the end of my incarceration, they sent -- I got a letter from one of my friends from the house, and they sent me his information, and it was asked for me to go ahead and put him on my visiting list, that he would like to come and visit me.   So I put him on the visiting list, yes.

Q.   Okay.   He was your friend too?

A.   Yes, childhood friends.

Q.   Okay.   So when you're talking about -- and by the way, that was the end of your time in prison for when you --

A.   Yeah.

Q.   -- when you said you actually left the gangs too?

A.   In Dixon.

Rios - cross

1537

Q. Right?

A. Yes.

Q. Okay. So you're no longer -- so even in prison, when you stopped being a gang member, you still were friends with Mr. Melendez?

A. Yes.

Q. Okay. Okay. So let's go back to July 6th. So you're done selling drugs. You walk around the corner to the school lot. You see your former gang member friends being talked to by the police. And you said you see a guy name Mike get taken?

A. Yes, sir.

Q. Okay. And you spent a lot of time talking about how you were scared of Gang Crimes Specialist Guevara?

A. Yes, sir.

Q. Okay. And just to be clear, you were scared of Gang Crimes Specialist Guevara. You saw him have a friend of yours get into a car, Mike?

A. Yes, sir.

Q. And you were no longer in the gang, right?

A. Correct.

Q. And in response to that, you go up to him and say, "What about me?"

A. Yes, sir.

Q. "What about me? Take me too."

A. Correct.

Rios - cross

1538

Q.   So you're so afraid of him that you go to him and ask him to go along with?

A.   Yes, sir.

Q.   Okay.  All right.  So on July 6th --

MR. ENGQUIST:  Excuse me one second.  I forgot my water.

BY MR. ENGQUIST:

Q.   Okay.  So July 6th, later on that evening, so I'm assuming after the park, because you were on your way to Wolcott, you rode over to Wolcott, right?

A.   To take care of the chores at my mom's house, yes.

Q.   You have to do the chores, clean up after your dog, and then go down to socialize in the club?

A.   Yes, sir.

Q.   Until that evening?

A.   Yes, sir.

Q.   Okay.  Now, we know from the other testimony it's around 9:30 or 10:00 o'clock that you are coming back in front of your house on your bicycle?

A.   Yes, sir.

Q.   Okay.  And you're coming back in front of your house on your bicycle, that's when you are met by Gang Crimes Specialist Guevara and his partner, right?

A.   Yes.  When I got, when I got to Leavitt, I stopped and I start talking to Jamaica.  He was sitting down on the steps.

And then that's when Officer Guevara and his partner came out of the gangway right behind me and Guevara grabbed me. Yes, sir.

Q. Okay. And you gave your bike to Jamaica?

A. No. They just snatched me off the bike, and the bike just fell on the floor.

Q. All right. Okay. But Jamaica grabbed your bike, isn't that correct?

A. I never seen him grab the bike, because they took me around the building. Once you get around the building, you don't, you don't get to see where Jamaica was at.

Q. Okay.

A. Nor where they drop my bike at.

Q. All right. So just to be clear, you're denying that you willingly went with Gang Crimes Specialist Guevara, right?

A. Yes, sir.

Q. Now, after you were like "Please take me along with you," you were saying "I don't want to go"?

A. Yes, sir.

Q. Okay. Did you tell him you didn't want to go?

A. Yes, sir.

Q. Okay. So you're protesting even going?

A. Excuse me?

Q. You're protesting. You're saying, "I don't want to go. Don't take me"?

A.   No.   I told him "For what?"   And he just said, "Come on."
Grabbed me by the arm and took me off my bike and took me
around the building.

Q.   Now, to the police station, you were never interviewed,
isn't that right?

A.   Excuse me?

Q.   You were never interviewed on way to the police station,
were you?

A.   No, sir.

Q.   Okay.   So you get to Area 5?

A.   Yes, sir.

Q.   Guevara and his partner --

A.   Yes, sir.

Q.   -- take you upstairs, right?

A.   Yes, sir.

Q.   And then they bring you to Detective Mason?

A.   Yes, sir.   And they put me in a little interrogation room.
They set me down, still cuffed.

Q.   Okay.   Now, July 6, 1989, that night when you came into the
police station, that was the first time you met Michael Mason,
isn't that right?

A.   Yes, sir.

Q.   Okay.   Never saw him before?

A.   Never saw the guy before.

Q.   Never had any dealings with him before?

A.   Never had nothing to do with him at all.

Q.   You never had any dealings with him on the arrest -- well, you were on bond.  So you were -- for that other arrest you pled guilty to, right?

A.   Yeah, that didn't have nothing to do with him.

Q.   That agg. assault?

A.   Nothing.

Q.   Okay.  So you never dealt with him before?

A.   No.

Q.   You dealt with other detectives before, right?

A.   Yeah.

Q.   Yeah.  Okay.  So it wasn't new to you.  But you hadn't met him before, right?

A.   Correct.

Q.   Okay.  Now, you say that the first thing that happens is you're put in a chair, and you're handcuffed behind your back?

A.   I was handcuffed behind my back from the time they brought me in.

Q.   Okay.  The whole time?

A.   The whole time.

Q.   So right after you're put in the chair, handcuffed behind your back, the next thing that happens according to you is that --

A.   Yes, sir.

Q.   -- Michael Mason, a man you had never met before, grabs you

by the back of the head and slams you face first into the desk, isn't that right?

A.  Yes, sir.  After, after Guevara pulled out a picture out of a gang book, put it in front of me, asked me, "Do you know this guy?"

I said "Yeah."

He said, "Who's that?"

I said, "That's Little Mike."

He said, "Did you know that I already know everything about you.  I know that you and Tino killed this guy.  And you guys went across Western to shoot this guy."

And when I said, "No, it wasn't me.  I didn't know nothing about that."  Mr. Mason grabbed me through the back right here like this (indicating) and slammed me against the table.

Q.  Okay.  Sir, page 164, starting at line 19, weren't you asked these questions, didn't you give these responses:

"Question:  All right.  So after you were placed in the chair in the room, handcuffed behind your back, what's the next thing that happened?

"Answer:  Officer Mason grabbed me by the back of the head and hit me, hit me against the table face first, slammed my face in the table.

"Question:  Before Officer Mason did, did what you allege, did he say anything?

"Yes. He told me, 'We know you are -- we know you are -- you were there. And we know that you and Tino killed this guy' and, and that was it."

Did you give --

A. Mr. Mason never said a word. I said that. But Mr. Mason never said a word. That was Guevara.

Q. Okay. So that's wrong, right? Your sworn testimony is wrong, correct?

A. No. It's right.

Q. But --

A. Guevara, Guevara was the one speaking.

Q. Okay.

A. Not Mr. Mason.

Q. So when you said Officer Mason said that, this is another one of those mistakes you made in your deposition, correct?

A. Yes, sir.

Q. Okay. Just like the dates about who was there, where you were on the 27th, all confusing?

A. All confusion, yes, sir.

Q. Okay. All right. But just to be clear, so your story now and from what you testified over the last two days is that Detective Mason --

A. Yes, sir.

Q. -- don't know him, right?

A. Correct.

Rios - cross

1544

Q.   No bad blood between you two, right?

A.   No bad blood, no nothing.

Q.   Okay.

A.   I never even met the guy, never ever.

Q.   Stands behind you the entire time?

A.   Yes, sir.

Q.   Just waiting, right?

A.   Yes, sir.

Q.   And according to you, doesn't even say a word.  He only just grabbed your head and slams it down?

A.   Yes, sir.

Q.   Okay.  And then according to your testimony yesterday or the day before, he just stood there the entire time behind you?

A.   Yes, sir.  Yes, sir.

Q.   He was the big heavy, right?

A.   Yes, sir.

Q.   According to you, if I have this right, Gang Crimes Specialist Guevara brought you to the detectives office, and he was in charge of everything?

A.   Yes, sir.  He was the one interrogating me.  Yes, sir.

Q.   Okay.  And just to be clear, your whole face hit that table, correct?

A.   Yes.

Q.   You talked about your nose, your mouth, your eyes, your forehead, the whole kit and kaboodle?

A.   Yes, sir.

Q.   And you had your hands handcuffed behind your back, so you couldn't brace yourself at all, could you?

A.   Correct.

Q.   You couldn't block anything, right?

A.   Nothing.

Q.   And yesterday, yesterday you described the pain from a zero to a 10, I guess zero being no pain to 10 being the worst pain imaginable.  You put this at a 10.5, 10 and a half?

A.   Yeah.

Q.   I'm assuming the worst pain you ever felt in your life, right?

A.   Not the worst.

Q.   Not the worst.  You felt worse than 10.5?

A.   Yeah, I been, I been -- I got cut with a bike pedal in my leg one time.  That was really painful.

Q.   Okay.  What was that, an 11?

A.   That's more than 11.

Q.   Okay.

A.   I bled and everything.  Almost took, almost took my Achilles tendons.

Q.   Okay.  But this was a very hard hit, right?

A.   Yes.

Q.   Okay.  Without you bracing yourself at all?

A.   Correct.

Q. Okay. And it was excruciatingly painful, right?

A. Yes.

Q. I mean, I'm assuming you saw stars?

A. No, I didn't see stars. But it was painful.

Q. Okay. You didn't bleed at all though, right?

A. No, sir.

Q. Okay. Nose didn't bleed?

A. No, sir.

Q. Lips didn't bleed?

A. No, sir.

Q. Gums didn't bleed?

A. No, sir.

Q. No cuts?

A. No cuts.

Q. Okay.

A. Just a burning sensation and pain in my face. That's all.

Q. Okay. Just a burning sensation and pain that leveled 10 and a half at a scale from zero to 10?

A. Yes.

Q. Okay. So Detective Mason doesn't ask you any questions. He just bounces your face off the table?

A. Yes, sir.

Q. Okay. And this interview you had, now, you talked about this interview you had or interrogation you had with Guevara asking you questions. He shows you pictures of gang members,

right?

A.   One.

Q.   One, okay.  He doesn't show you any other pictures, right?

A.   No, sir.

Q.   Okay.  So no other pictures, just that.  And it's this time that you once again have that confusion and you start telling him about an incident you say that took place on July 2nd or 3rd?

A.   Yeah, because he's telling me I had something to do with this murder here.  And I told him that I know about something that happened to me in front of my house, and that's all I know about.

Q.   Okay.

A.   And I start telling him about what happened to me the 2nd and the 3rd.

Q.   All right.  So even though he's asking you -- not Mason apparently, just Guevara?

A.   It's all Guevara.

Q.   -- is asking you about a murder of Luis Morales on June 27th, you're regaling him with a story about July 2nd or 3rd?

A.   Yes, because that's the only thing that happened to me. That's the only thing like that happened to me within that time period that they were talking about.

Q.   I mean, you could have just said, because apparently you could have either given him what you told us in the deposition,

Rios - cross

1548

which was: No, on June 27th, I was with, I was with Jamaica in front of my house after I came back from my normal chores at my mother's house. You could have said that, right?

A. I could have said that, yes.

Q. Yeah. Or you could have gone with what you've said today, which is: No, on June 27th, I'm sorry, I was confused about Jamaica even being there. On June 27th, I was actually just going home, went straight up to my room and went to bed?

A. Yes, sir.

Q. You could have said those things?

A. Yes, sir.

Q. And if you said that, if you said the first one like you told us in your sworn testimony in your deposition, you'd have Jamaica as an alibi, right?

A. Yes, sir. He would have been an alibi, yes.

Q. He would have been an alibi.

And if you went with what you said today under oath, that you just came home, went upstairs and went to bed, you could have had your girlfriend as your alibi, right?

A. Yes, sir.

Q. Diana could say that, right?

A. Yes.

Q. She was with you.

You could probably get your mother to say he left the house around this time because he was busy cleaning up the

Rios - cross

1549

house like a good son, right?

A.   Yes, sir.

Q.   And he has to ride back.  You'd have her as an alibi?

A.   Yes, sir.

Q.   And you would have anybody else that you saw when you went up to your apartment as an alibi, right?

A.   Yes, sir.

Q.   But you didn't say that, did you?

A.   No, I did not.

Q.   No.  What you said was:  Let me tell you about an incident where I was shot at.  And by the way, it's not even the right day.  It's July 2nd or 3rd.

A.   Yes, sir.

Q.   Okay.  Now, during this -- so you tell him about this other incident, right?

A.   Yes, sir.

Q.   Okay.  And you say at that point, is it Guevara telling you things about the case?

A.   Yes, sir.

Q.   Okay.  And then that stops and they leave, and they call a state's attorney, right?

A.   Well, as they were telling me -- as Guevara was telling me what he wanted me to say and things like that, he kept on going in and out of the room.  Mason never went anywhere.  He was behind me all the time.

Q.   Okay.  And this conversation you had with Officer Guevara lasted 15 to 20 minutes?

A.   Well, 15 to 20 minutes before Barbara Riley showed up?

Q.   Yes.

A.   Yes.

Q.   Okay.  So 15, 20 minutes, this is what I want you to say. 15, 20 minutes, he leaves.  Then Barbara Riley shows up.  And you saw her the other day?

A.   No.  He was there when Barbara Riley showed up.

Q.   Who was there?

A.   Guevara.

Q.   Okay.  And you've heard Barbara Riley on the stand saying no, he wasn't there, right?

A.   Correct.

Q.   Okay.  And so was she not telling the truth?

MR. J. RICHARDS:  Objection.

THE COURT:  Overruled.

BY THE WITNESS:

A.   I believe she wasn't telling the truth.

BY MR. ENGQUIST:

Q.   Okay.  And if I have your story right, you said at that point you're brought to a different room, correct?

A.   About 15, 20 minutes after that, after she arrived, they took me out of there, and they walked me to another room.

Q.   Okay.  Were you still handcuffed behind your back?

Rios - cross

1551

A.   Yes, sir.

Q.   Were you handcuffed behind your back the entire time until you got to lockup?

A.   No.

Q.   Okay.  Did they unhandcuff you during the court reported statement?

A.   Yes, sir.

Q.   Okay.  So that's when you finally got unhandcuffed?

A.   He unhandcuffed me right there for a couple of minutes after she was taking care of the report and everything, and then they put me in the cuffs again and took me to lockdown.

Q.   All right.  So let's talk about when ASA Riley is there.

A.   Okay.

Q.   You get brought to a different room?

A.   Yes, sir.

Q.   You're handcuffed?

A.   Yes, sir.

Q.   And now it's not even a Q and A with you.  It's more of is it Guevara telling Barbara Riley what happened?

A.   No, because Guevara walked behind Mr. Mason.  And Mr. Mason kept going.  And once we go into the room, Officer Guevara left.  So it was just Mason and Barbara Riley with me.

Q.   Okay.  So now Guevara skedaddles?

A.   Yeah.  He didn't come into the room or nothing.  He just left.

Q.   Okay.

A.   He probably was downstairs or something.  I have no idea where he went.

Q.   Okay.  And now it's Detective Mason talking to Barbara Riley, ASA Riley about your statement?

A.   Mr. Mason never talked to Barbara Riley about anything.

Q.   Okay.  So who told Barbara Riley all those details?

A.   She had a piece of paper and she was, she was reading out of a piece of paper when I was sitting down next to her.  I'm sitting down right here.  She's sitting down right here.  She got a piece of paper, and she started asking me questions about that piece of paper.  From that piece of paper she started asking me questions.

Q.   Okay.  And when she asked you questions, did you give her answers?

A.   Yes, sir.

Q.   Did you tell her that you went across Western Avenue with a gun with Tino and shot it at somebody?

A.   Yes, I had to.

Q.   Okay.  So she asked you questions about, Hey, what happened?  And you said this is what happened, right, and you told her those stories?

A.   Her questions, her questions were close, close enough to what Guevara was telling me.

Q.   Okay.  So had you memorized what Guevara had told you?

A.   Like I said, it was close enough.

Q.   Okay.  All right.  Now, I think you also said diagramming the whole thing on a whiteboard?

A.   Yes.

Q.   Okay.  You said there is a whiteboard there.  Who is diagramming what on a whiteboard?

A.   Mr. Mason.

Q.   Okay.  So now Mr. Mason is drawing out the scene?

A.   He drew a box.  And when Riley was asking questions, he started moving the needle like, like a reminder:  You've got to go -- you remember, you went this way.  Remember, you went this way.  Remember, you stopped right here.  You talked to somebody over here.

Q.   Okay.  Now, this is your neighborhood, right?  Where the whole thing took place is your neighborhood, right?

A.   Yes.

Q.   You lived on Leavitt.  You lived on Wolcott.  You know that area, right?

A.   Yeah.  I know the whole grid, yes.

Q.   Yeah, you know the whole grid?

A.   Yes.

Q.   Okay.  So, I mean, you even know that spot where Luis Morales was murdered, right?  You know that bar?

A.   Yes.

Q.   Okay.

A.   I've been in that bar before, yes.

Q.   Okay.  You know that's Cobra territory?

A.   Yes.

Q.   I mean, it has Cobra markers all over it, doesn't it?

A.   Yes.

Q.   Graffitis all over it, right?

A.   Yes.

Q.   Okay.  You already knew which way the Cutlass went because you saw the Cutlass leave your house after shooting, and it went towards north Western territory, right?

A.   Yes.

Q.   Okay.  So you knew all those things, right?

A.   Yes.

Q.   Okay.  And so that's what you told her, right?

A.   Yes.

Q.   Okay.  Now, isn't it true that at some point after that, Barbara Riley left after talking to you initially, and when she came -- and she had talked to you about a court reported statement, right?

A.   Yes.

Q.   Okay.  And you agreed to give a court reported statement, didn't you?

A.   Yes.

Q.   Okay.  And a court reported statement would have a stenographer there taking down your words, right?

A.   Yes.

Q.   Okay.  And so that's what you expected to happen, right?

A.   I never done that before.  So yes, I guess you could say yes.

Q.   Okay.  And did Janet Lupa, the court reporter, come in and take your statement?

A.   I don't remember nobody in the room but being Mr. Mason and Barbara Riley.  That's it.  That's all I remember.  I don't remember the court reporter being there.

Q.   Okay.

A.   If she was, I didn't pay attention to her.  My focus was more on the threat.

Q.   Well, you were much clearer about that in your deposition, weren't you, sir?

A.   I believe so.

MR. J. RICHARDS:  Objection.

THE COURT:  Sustained.

BY THE WITNESS:

A.   I believe so.

THE COURT:  You don't have to answer.

Disregard the answer.

You can ask a different question.

THE WITNESS:  Sorry, Your Honor.

BY MR. ENGQUIST:

Q.   Sir, isn't it true that you told us during your deposition

that you didn't see a court reporter? There was no court reporter there?

MR. J. RICHARDS: Objection.

THE COURT: It's overruled.

BY MR. ENGQUIST:

Q. Right?

A. Correct.

Q. Okay. But just to be clear now, you're saying there might have been. I just wasn't paying attention?

A. I didn't see nobody. I was focusing on Barbara Riley and Mason. That was my main focus.

Q. Okay. Not a person sitting there typing?

A. If she was there doing this, she was not a threat, I wasn't paying attention to her. I don't even know if she was there or not.

Q. Now, sir, when you gave that statement, you know, before about you hadn't had anything to drink, is that correct?

A. Correct.

Q. Okay. But you didn't ask for any food or water, did you?

A. I didn't want anything. I just wanted out of there. That's it.

Q. All right. How late did you normally stay up?

A. I used to get home probably around 8:00, 9:00 o'clock. I probably stay up about 10:00 o'clock or so, watch Benny Hill and shows like that and just go to sleep.

Rios - cross

1557

Q.   Okay.  But you didn't start your day until noon, right?

A.   I didn't start my day until about 10:00, 12:00, yes, sir.

Q.   Okay.  Basically the afternoon, correct?

A.   Yes.

Q.   Okay.

A.   I would sell my little weed within that little time.  Yes, sir.

Q.   Okay.  Did you ever tell anybody you were too tired to give a statement?

A.   Excuse me?

Q.   Did you ever tell anybody you were too tired to give a statement?

A.   No, sir.

Q.   Okay.  Because you weren't, were you?

A.   I don't know if I was or not.  I was just feeling -- I had fear.  And now I've been there for a while already.  Yeah.

Q.   Okay.  Now, just to be clear, at some point you talked to Barbara Riley alone, isn't that right?

A.   Yeah, about 5 to 10 minutes.

Q.   Okay.  And during the time you talked to her alone in a room, she asked you specifically how have you been treated, right?

A.   Correct.

Q.   She asked you if you needed anything, right?

A.   Correct.

Q.   And she made sure to your well-being, isn't that right?

A.   Correct.

Q.   Okay.  And during that time, you never indicated to her anything about having your face smashed into a table?

A.   Correct.

Q.   Causing pain, 10 and a half out of a 10?

A.   Correct.

Q.   You never told her that you had been threatened at all?

A.   Correct.

Q.   You never told her that everything that we're talking about isn't true?

A.   Correct.

Q.   You never told her, "I wasn't even -- I was home in bed that day"?

A.   Correct.

Q.   You never told her:  Hey, depending on what version, either Jamaica is my alibi or my mom and Diana is my alibi, right?

A.   Correct.

Q.   You never said any of those things?

A.   No, sir.

Q.   Okay.  You told her you've been treated fair?

A.   No, sir.

Q.   Well, you didn't tell her you'd been treated poorly, did you?

A.   No, sir.

Rios - cross

1559

Q.   She asked you how you had been treated by the police, right?

A.   Yes, sir.

Q.   And you said fine?

A.   Yes.

Q.   Okay.  Okay.  Now, when you gave your statement, were you confused about what date you were talking about of the incident, whether it was June 27th or whether or not it was July 2nd or 3rd?

A.   When I gave the statement to Ms. Riley?

Q.   Yes.

A.   When she read what she was reading out of her paperwork, I had to go with what she was saying on the paperwork, on her paperwork.

Q.   Sir, when you gave a statement, it was like today.  She would ask a question.  You would respond in your own words, right?

A.   Yes, sir.

Q.   You didn't have a script in front of you, did you?

A.   No, sir.

Q.   Okay.  So when she asked you about why you were there, right --

A.   Yes.

Q.   -- when you gave a court reported statement --

A.   Yes, sir.

Q.   -- were you still confused about whether or not you were talking about June 27th or July 2nd?

A.   No, I don't think I was confused on that.

Q.   At that point you knew, okay, I know what I'm talking about here, right?

A.   No, because Guevara told me about the 27th, that he was talking about that I killed this guy and that Tino was with me and we killed the guy.

Q.   Okay.  Now, Tino, you don't even know him as Tino, do you?

A.   I do not.

Q.   Okay.  I mean, there is Tinos in the neighborhood, right?

A.   Yes.

Q.   Okay.  More than one Tino in the neighborhood probably?

A.   Possible.

Q.   Yeah.  But you never even knew him as Tino?

A.   No.

Q.   You knew him as Cristino?

A.   Yes.

Q.   Okay.

A.   That's how I met him, as Cristino.

Q.   You met him as Cristino.  He was your friend.  As a friend, you knew him as Cristino only?

A.   Yes.

Q.   Okay.  So when someone said to you, We hear you were with Tino, no one knew Cristino Garcia's name until you gave it to

Rios - cross

1561

them, isn't that right?

A.   Correct.

Q.   Okay.  So when someone told you that word on the street was that you committed this murder along with a guy named Tino --

A.   Correct.

Q.   -- your first idea was, well, maybe they're talking about Cristino Garcia, even though I don't even call him Tino?

A.   Correct.

Q.   Is that right?

A.   Correct.

Q.   Okay.  So you're the one who put his name out there?

A.   I asked Mr. Guevara if he's talking about Cristino Garcia.

Q.   Okay.  So you -- but you are the one who put him out there, right?

A.   Yeah.  I asked for if that was the name he was talking about.

Q.   Now, out of all the people you know, why would you throw in Cristino Garcia?

A.   That's the only one that sounds like Tino.

Q.   The only one.  But there is more than one Tino in your neighborhood, right?

A.   Yeah, but he's the only one in my neighborhood that's with a gang.

Q.   That's with a gang?

A.   Yes.

Rios - cross

1562

Q.   No other Tinos in your gang?

A.   No.

Q.   Okay.  But just to be clear, you're the one who gave the name Cristino Garcia?

A.   I asked him if he's talking about Cristino.

Q.   Okay.

A.   And he said yes, this is who I'm talking about.

Q.   Okay.  All right.  Now, when you first talked to Barbara Riley initially, you said when Detective Mason was in the room --

A.   Okay.

Q.   -- she read you Miranda, didn't she?

A.   Yes.

Q.   Okay.  And you told her you understood?

A.   Yes.

Q.   Okay.  And you didn't tell her you wanted a lawyer, right?

A.   Correct.

Q.   You didn't tell her you didn't want to speak?

A.   Correct.

Q.   Okay.  And before your court reported statement -- I know you don't remember the person apparently sitting there typing?

A.   Correct.

Q.   But you're not, you're not doubting the fact it is actually typed up by a Janet Lupa and she exists now?

A.   Yeah, she could have been there, yeah.

Q. Okay.

A. I don't doubt it.

Q. Okay. So at that point, she read you your Miranda again, Barbara Riley did?

A. Yeah. After she advised me of the Miranda rights earlier, then she gave me my Miranda rights when she went to do the court reporter.

Q. Okay. And at that time you said you wanted to continue to speak, right?

A. That's the first time she read me my Miranda rights saying that -- yes.

Q. Okay.

A. I went along with it.

Q. All right. Now, during your statement, there is a part where you're talking about the different calibers of guns?

A. Correct.

Q. Okay. Just to be clear, Gang Crimes Specialist Guevara, because you're saying he was doing all the talking, he was in charge apparently in the detective division --

A. Okay.

Q. -- he didn't tell you what kind of gun was used to murder, do the murder, did he?

A. No, he did not, not that I remember.

Q. Okay. So when you were giving out calibers, that was you giving out the calibers?

A.   The .22, yes, sir.

Q.   Okay.   The .22 and the .38?   Didn't you say you had a .38 or a .32?

A.   That's what he said I had, a .38.

Q.   Okay.   He never told you what kind of gun was used in the murder, right?

A.   No, sir, not that I know of.

Q.   Now, the first part of your statement when you talk about what was the reason for the murder, the fact that a Cutlass had pulled up in front of your house, shot at you, and then you were mad and went and got a gun, that story that you gave, right --

A.   Correct.

Q.   -- you're saying that part is true, except it happened on a different day and I didn't retaliate, right?

A.   Correct.

Q.   Okay.   So the first part of your statement, which I think is roughly the first four pages is actually a true story?

A.   Accurate.

Q.   Okay.

A.   That happened to me, yes, sir.

Q.   And that came from you?

A.   Yes.

Q.   Okay.

A.   That's something accurate that happened to me, yes, sir.

Rios - cross

1565

Q.   Okay.  And then after that point, after you get read that point, it's a mishmash between what you said you heard Detective Guevara said and then you also filling in some gaps too, right?

A.   Well, I was filling gaps into, into the point like I remember mostly everything he told me.  So besides that, I fill up gaps with them just to finish the court reporter, and hopefully I'll get out of there.

Q.   Okay.  But you added in a lot of -- even according to you, you're saying that you were given information you supposedly have to give.  But you filled in a lot of gaps, and you filled in some details yourself, didn't you?

A.   Those were details that he was telling me.

Q.   Okay.

A.   Officer Guevara.

Q.   They were all coming from him?

A.   Yes, sir.

Q.   Okay.

        MR. ENGQUIST:  If I can have the Elmo, that would be great.

BY MR. ENGQUIST:

Q.   I'm going to show you what is already in evidence, it's Defendants' Exhibit 5-3, which is the statement, okay.

        Now, sir, this is the statement we're talking about, correct?

A.   Correct.

Q.   Okay.  And like we talked before, there is Barbara Riley, the person you don't remember but you're not saying wasn't there, correct?

A.   Correct.

Q.   I'm sorry?

MR. J. RICHARDS:  Objection.

BY MR. ENGQUIST:

Q.   I'm sorry.  Janet Lupa, the person you're saying you don't remember?

THE COURT:  One second.  There is an objection.

What's the basis for the objection?

MR. ENGQUIST:  I misspoke.

MR. J. RICHARDS:  Yes.  Withdrawn.

THE COURT:  Okay.  And one administrative note.  You said this is 5-3.  I have 5-2, DX5-2 is the Rios statement by the court reporter.  Is this a different exhibit?

MR. ENGQUIST:  I thought 5-1, 5-2 and 5-3, there is the photograph of the statement and then there is two different copies of it.  This is just a clearer copy to read.

My apologies if this is not already an exhibit, already entered.  But it's the same exhibit as 5-1 and 5-2.

THE COURT:  Okay.  Any objection to publishing DX5-3?

MR. J. RICHARDS:  No, Your Honor.

THE COURT:  All right.  DX5-3 is admitted and may be

published.

MR. ENGQUIST:  Thank you, Your Honor.

(Defendants' Exhibit No. 5-3 was received in evidence.)

BY MR. ENGQUIST:

Q.  So just going back, and I'm sorry I misspoke, it talks about Janet Lupa as the court reporter.  As we said before, you don't recall her, but you're not saying she wasn't there?

A.  Correct.

Q.  Okay.  Now, so the beginning of the statement, you're talking about being a Latin King, correct?

A.  Correct.

Q.  And that's true, correct?

A.  At that time I was not a Latin King.

Q.  Okay.  But you told her, if you look partial way, part of the way down, maybe a little more than half the way down, the question was:

"Jaime, you are a member of a gang?

"Answer:  Yes."

A.  Yes.

Q.  "What gang?

"Answer:  Latin Kings."

A.  Yes.

Q.  "How long have you been a member of the Latin Kings?

"I've been at least five years.

"Since when were you -- since you were how old?

"Since I was 12."

Correct?

A. Yes, sir.

Q. Okay. That's all true, isn't it?

A. Yes.

Q. Okay. And then at the bottom of that page, the question is:

"Okay. And what is your rank in that gang?"

And you say "Foot soldier"?

A. At that time I was a foot soldier.

Q. Okay. So that's all coming from you, correct?

A. Yes, those things are coming from me.

Q. Okay. And then starting on the next page, she calls your attention to June 27, 1989. Do you see that?

I'm sorry, let me move back.

"Calling your attention to the evening of June 27, 1989, that was a Tuesday night. What were you doing?"

Do you see that?

A. Yes, sir.

Q. Okay. Okay. And this is where you tell her about the Cutlass, correct?

A. About the what?

Q. The Cutlass coming to your home and shooting near you, your friend Lamont and your lady.

A. Yes, I did say that.

Rios - cross

1569

Q.   Okay.   Now, your story, what you are telling the jury today is that what you were doing at that point is you were telling a true story just about a different time?

A.   They said -- they put it as, they put it as of 27th.   But if it's a different time, yes, sir.

Q.   Well, you said they put it as the 27th.   She asked you specifically, "What were you doing on the evening of June 27th.   That was a Tuesday night," correct?

A.   Yeah.   She asked was I ever done anything on the 27th.   Yes.

Q.   Okay.   And your response was to tell her about something that you're saying happened days later?

A.   Days later.

Q.   Okay.   And so when you are telling her about this story about the Cutlass, that's all true stories, right?

A.   Yes, sir.

Q.   Okay.   Except that you do leave out that Daniel Rodriguez was also a witness, correct?

A.   Daniel was in the house, yes.

Q.   Okay.   Let me skip forward.   This isn't the right spot.   Sorry.   All right.   This part right here.

         When you are talking about getting the gun, you're saying that did not come from you, correct?

A.   Correct.

Q.   Okay.   Now, when you give this response saying that you

Rios - cross

1570

were going to "shoot from inside my territory towards the territory to scare them the way they scared me," that didn't come from anybody but you, isn't that correct?

A.   Correct.

Q.   That's something that you added in there?

A.   Yes.

Q.   Okay.  Why did you feel the need to add in a little bit of color to make the story more believable that you were actually the murderer?

A.   Because Mr. Guevara said I just got to apply myself in the statement and that Tino was the shooter.  So he wanted me to imply myself in the statement and to being with Cristino.

So what I didn't remember, some of the things that he was embedded into me, I went on and said something like that.

Q.   Okay.  So your goal was to lie and to make it as believable as possible by adding in those details that could only come from you --

A.   Yes.

Q.   -- so everyone would believe that you were there at the murder?

A.   Yes.  That's why he implied to me to go ahead and do.  He instructed me to go ahead and imply myself into everything that was going on and the statement that he was giving me and what he was telling me about it.

Q.   Okay.  And there is other parts that you did that same

Rios - cross

1571

thing, isn't that correct?

A.   Some parts.

Q.   Okay.  Let's go to page 6 of that.  The question is:

"What were you looking for?"

The answer:  "I was looking for a little crowd so I could shoot at the Cobras and scare them like they scared me without hurting nobody."

Do you see that?

A.   Yes.

Q.   That's something that you decide to throw in there, right?

A.   No, sir.  That come from Guevara.

Q.   Okay.  This is with the right exhibit number, I'm sorry, Defense Exhibit Number 16, which is plaintiff's testimony from trial, starting on page, the number on the bottom will be 629, line 19.

Sir, during your criminal trial, were you asked these questions and did you give these responses?

A.   Yes, sir.

Q.   "Do you remember telling them 'I was looking for a little crowd so I could shoot at Cobras and scare them like they scared me without hurting anybody'?"

"Answer:  Yes."

A.   Yes.

Q.   "You told them that, is that right?

"Answer:  Yes.

Rios - cross

1572

"Question: So did that come from you or did that come from the -- or did the police tell you to say that?

"Answer: It comes from me."

Didn't you give those answers, sir, to those questions?

A. It's possible.

Q. It's possible? Do you think the court reporter got it wrong during your criminal trial when you spoke under oath?

A. No.

Q. Okay. So, sir, that part also came from you. You were adding a little more flavor into your own statement, correct?

A. Probably.

Q. Okay. And then when you went on, you went on, you kept on mixing in your own story into that, didn't you?

A. Not that I recall.

Q. Okay. Now, sir, just to be clear, you also in your statement stated that there was a car --

A. Yes, sir.

Q. -- that the victim fell behind?

A. Yes, sir.

Q. Okay. You were never shown a photograph of the scene, were you?

A. No, sir.

Q. Okay. That was never diagrammed out to you?

A. No, sir.

Q.   Okay.  And it was never told to you, was it?

A.   It was told to me by Guevara.  Guevara kept on stipulating about the facts and the pieces of the case that he had in hand. And he kept on telling me -- he kept on going in and out of the room and giving me more information about what was going on. And where did I go?  Which way I went?  Did I cross Western and all sorts of things like that.

Q.   Sir, would you be surprised if the fact of the victim falling behind the car actually isn't in the police reports?

A.   No, sir.

Q.   Okay.  And are you aware that detective -- or, I'm sorry, Gang Crimes Specialist Guevara wasn't on the scene at the time of the murder?

A.   No, sir.

Q.   Okay.  The fact that people knew that he fell behind the car is it came up later on when they had photographs of it and it was being described?

A.   Yes, sir.

Q.   The first person to talk about the victim behind the car on any record was you, sir.

A.   Yes, sir.

Q.   Okay.  You added that in, didn't you?

A.   No, sir.  That was told to me by Guevara and them.

Q.   Sir, isn't it true that you added that in because you remembered seeing the victim fall behind the car?

Rios - cross

1574

A.   No, sir.  I was never there.

Q.   Now, sir, I'm going to show you what's been previously marked as Defendants' Exhibit Number 6, your photograph after your statement.

A.   Yes, sir.

Q.   Now, I know you've already talked about this before to a certain degree, but just to be clear, there is no marks on your face, is there?

A.   I can't really see.  But no, there is no marks on my face.

Q.   No bruising?

A.   No bruising.

Q.   Not even a scratch?

A.   No.

Q.   Your hair even looks pretty good too, doesn't it?

A.   No.

Q.   A little messy for you?

A.   It's curly.  Can't you see?

Q.   Okay.  But just to be clear, there is no injuries anywhere on your body?

A.   No, sir.

Q.   Okay.  And this is after your face is supposedly slammed into the table with such force that it causes you pain 10.5 out of 10?

A.   Yes, sir.

Q.   Okay.  Now, after your statement is given, you go to the

lockup, isn't that right?

A.   Yes, sir.

Q.   Okay.  Now, when you go to the lockup, you're cold?

A.   Excuse me?

Q.   You're cold?

A.   It's summertime.  No, I was not cold.

Q.   All right.  Okay.  Sir, this is page 262, starting on line 15.  Sir, were you asked these questions and did you give these responses:

        "After taken back to the bullpen, after the lineups were completed, what's the next thing you remember?

        "Answer:  Just going to the bullpen.  Being cold.  Sleeping on a slab of steel.  Trying to get a little shirt that I had covering my arms.  That's it.  That's what I remember.  Feeling cold and sleeping on a slab of steel."

        Do you remember that?

A.   In the bullpen, yes.

Q.   Okay.  And, sir, yesterday you testified that when you were down in the lockup after your statement --

A.   Yes, sir.

Q.   -- you were sent down there, that someone from the lockup, right, like a lockup keeper --

A.   Yes.

Q.   -- okay, gave you some sweats to wear?

A.   Police use -- uniformed police came to my bars, put some

sweatshirt -- put some sweat pants and stuff in my bars and told me "Here."

Q. And they were working the lockup, weren't they?

A. Yes.

Q. Okay. So you're cold, right?

A. A little bit, yes.

Q. You testified to?

A. Yes.

Q. It's cold down there. I mean, this is --

A. Oh, yeah, it's cold down there, yes.

Q. Yeah, okay. So it's cold down there. This is a government air-conditioned building. You're kind of way down, you're down in the bottom of the building?

A. Correct.

Q. It's at night. You're cold. And they give you something warm to wear, right?

A. I didn't ask for it.

Q. Okay. It was an act of kindness, sir, wasn't it?

A. Not that I know of.

        MR. J. RICHARDS: Objection.

        THE COURT: Sustained.

BY MR. ENGQUIST:

Q. Sir, do you know why they would have given you a sweatshirt when you're cold?

        MR. J. RICHARDS: Objection.

Rios - cross

1577

THE COURT: Overruled. He can answer if he knows.

BY THE WITNESS:

A. I've been in bullpens before for aggravated, for the aggravated assault and things like that. They never brought anything to me just because I was cold.

BY MR. ENGQUIST:

Q. Okay. So this time someone brings you something when you're cold, and you put it on because you're cold, right?

A. No. I put it on because they put it on. Of course I'm going to grab it and put it on because it's cold in there.

Q. Okay. And then you continued to wear it because you were cold, right?

A. I got no choice but to wear it.

Q. You have no choice but to wear it?

A. Yeah. I grabbed it and I put it on. I got no choice but to wear it.

Q. Okay.

A. I didn't ask for it.

Q. All right. And then you just continued to wear it. It was your choice to continue to wear it, right?

A. It was given to me, so I wore it, yes.

Q. Okay. I mean, you had your --

A. It was not my choice.

Q. You had your shirt on underneath, didn't you?

A. Yes, sir.

Rios - cross

1578

Q. You could have taken it off at any time, right?

A. Never took it off.

Q. Okay. So the next day, we've already talked about it, there is a lineup, correct?

A. Yes, sir.

Q. Okay. I'm going to show you what has been previously marked as, I'm sorry, it's 7, Defendants' 7.

Sir, I know we've gone through Defendants' 7 before. That's your photograph after the lineup, isn't that correct?

A. Yes, sir.

Q. Okay.

MR. ENGQUIST: If I can have that published, Your Honor.

MR. ENGQUIST:

Q. And once again, sir, this is a good close-up of your face, isn't that right?

A. It is.

Q. Okay. And this is after several hours, actually almost half a day or something after you supposedly have your face slammed into a table, correct?

A. Yes, sir.

Q. Okay. Plenty of time for bruises to appear, things like that, right?

A. Correct.

MR. J. RICHARDS: Objection.

THE COURT: Overruled.

You can answer if you know.

BY THE WITNESS:

A. Correct.

BY MR. ENGQUIST:

Q. Okay. And, sir, once again, there is not a mark on you, is there?

A. Correct.

Q. Okay. All right. And then after that point, after the lineup, sir, you were sent to county?

A. I was sent to county, yes, sir.

Q. Okay. And I know you've talked about going to county, but at county, you went through a process of intake, right?

A. Yes, sir.

Q. And during that process of intake, you were interviewed?

A. Yes, sir.

Q. Okay. Just let me back up. When you went to the lockup, you also had to talk to the lockup keepers, didn't you?

A. To who?

Q. The lockup keepers, the police officers that run the lockup.

A. No.

Q. Okay. Do you remember them asking you if you had any complaints?

A. No.

Q.   Okay.  But you never -- okay.  But you never complained to any of them either, did you?

A.   No.

Q.   You never said, Oh, my face hurts?

A.   No.

Q.   Oh, I was abused?

A.   No.

Q.   Nothing?  Okay.

A.   No.

Q.   Okay.  Let's fast-forward now to Cook County.  You go to Cook County?

A.   Correct.

Q.   And, once again, you go through an intake process, right?

A.   Yes, sir.

Q.   Okay.  And during this intake process, they go through and they check you for marks and bruises and everything else, don't they?

A.   Yes, sir.

Q.   Okay.  It's pretty thorough?

A.   Yes.

Q.   And they ask you if you have any complaints, right?

A.   Yes.

Q.   They want to make sure you're healthy, right?

A.   Right, correct.

Q.   That you don't need any kind of medication?

Rios - cross

1581

A.   Correct.

Q.   You don't have any medical issues, right?

A.   Correct.

Q.   And they look for injuries, right?

A.   Correct.

Q.   Okay.  And during that time, they didn't find any injuries, did they?

A.   No, sir.

Q.   Okay.  And during that time, you never told them of any kind of problems, did you?

A.   No, sir.

Q.   Okay.  No complaints whatsoever?

A.   No.

Q.   Okay.

     MR. ENGQUIST:  Your Honor, again, Defendants' Exhibit Number 8, the photograph from the Cook County jail, if we can have that published.

     THE COURT:  Has that been admitted?

     MR. ENGQUIST:  It has been.

BY MR. ENGQUIST:

Q.   Sir, if you look at Defendants' --

     THE COURT:  When was it admitted?

     MR. ENGQUIST:  My apologies, Your Honor.  I thought it was.

BY MR. ENGQUIST:

Rios - cross

1582

Q.   Sir, if you can, does this clearly and accurately depict the way you looked at the time you were at intake at Cook County jail?

A.   Yes, sir.

Q.   Okay.

        MR. ENGQUIST:  Your Honor, I would now ask to have that admitted into evidence.

        THE COURT:  Any objection?

        MR. J. RICHARDS:  No objection.

        THE COURT:  All right.  It's admitted and may be published.

        MR. ENGQUIST:  Thank you.

    (Defendants' Exhibit No. 8 was received in evidence.)

MR. ENGQUIST:

Q.   Now, this is a picture being taken by the Cook County Department of Corrections on July 8, 1989, correct?

A.   Correct.

Q.   Okay.  And once again, that's how you appeared, isn't that correct?

A.   Yes, sir.

Q.   And once again, just like they found when they did your intake, there is no injuries at all, right?

A.   Correct.

Q.   There is no marks, there is no nothing from this attack you said where Mason took your head and slammed it down onto a

table, correct?

A.   Correct.

Q.   Okay.  So, sir, I just want to -- are you all right?

A.   You can go ahead.

Q.   Okay.  Let's talk a little about the trial itself.  Now, at the trial, you didn't put on any alibi witnesses, did you?

A.   No, sir.

MR. J. RICHARDS:  Objection.

THE COURT:  Basis?

MR. J. RICHARDS:  Sidebar, if I may.

THE COURT:  Okay.

(Proceedings heard at sidebar:)

THE COURT:  Okay.

MR. J. RICHARDS:  Your Honor, in a criminal trial in the state of Illinois, it is not the defendant's choice to put on witnesses.  That's the decision of the attorney.  The question is not an appropriate question.

THE COURT:  My understanding of the question is he's asking what happened at the criminal trial.  And so that itself is appropriate.

Mr. Engquist, do you intend to get into the underlying decision-making involved in that process?

MR. ENGQUIST:  I'd bring up the fact of who he didn't call, the people that he said already would be alibis, Your Honor.

Rios - cross

1584

THE COURT: Response from you, Mr. Richards?

MR. J. RICHARDS: I still think that goes to the heart of my objection. It's about not how counsel has phrased it, it's who he didn't call. The attorney calls the witnesses, not the defendant in a criminal trial. If he were to ask a question, were such and such persons called, that would be appropriate. But asking did he call that witness, I believe that's objectionable.

THE COURT: Well, the witness would have been called on Mr. Rios' behalf in support of any defense. And so the objection is overruled at this point. You are free to raise it again if it goes into territory you think is improper.

Does either side oppose me telling the jury that in a criminal case the defendant has no obligation to present any case at all?

MR. ENGQUIST: No, Your Honor.

MR. J. RICHARDS: No, Your Honor.

THE COURT: All right. So I'll tell them that and then we can resume with the examination.

(Proceedings heard in open court:)

THE COURT: So the objection is overruled.

I do want to share with you my understanding is that Mr. Rios is going to be asked some questions about what happened at his criminal trial. For context for you, if you were hearing a criminal case here, I would instruct the jury in

Rios - cross

1585

a criminal case that a defendant has no obligation whatsoever to present any evidence. They can remain silent, and they can choose not to present a case, because the burden rests throughout the case with the government to prove a criminal defendant's guilt beyond a reasonable doubt.

And so, again, if this were a criminal case, I would instruct the jury that you can make no inferences one way or the other from a defendant's choice or exercise of their constitutional right not to speak or to present evidence.

You may proceed, Mr. Engquist.

MR. ENGQUIST: Thank you, Your Honor.

MR. ENGQUIST:

Q. So, sir, just kind of going back, there were no alibi witnesses presented at your trial, correct?

A. No, sir.

Q. Okay. So Jamaica was never brought in to testify about what occurred on June 27th, isn't that correct?

A. They couldn't find him.

Q. Okay. They couldn't find him, okay.

So your attorney was looking for Jamaica for the June 27th alibi?

A. I don't know what my attorney was doing. But I told him about the people that I spoke to and everything, and he said he would look into it.

Q. All right. Jamaica never came in, right?

A.   They never found him.

Q.   Okay.  And according to you, Daniel Rodriguez was there on what you say was now July 2nd or 3rd for the shooting, correct?

A.   Yes, sir.

Q.   Okay.  He was never called to testify, was he?

A.   He didn't want to.

Q.   Okay.  Lamont Burr, who was supposedly there during this July 2nd or 3rd shooting --

A.   Correct.

Q.   -- he never came in and testified?

A.   They didn't find him either.

Q.   Okay.  Your girlfriend didn't testify about that incident either, did she?

A.   She testified that I was at home.

Q.   She didn't testify, sir, that -- she wasn't an alibi witness, was she, sir?

A.   Don't know, sir.

Q.   She didn't testify about the shooting that supposedly took place on July 2nd or 3rd, did she?

A.   No, sir.  She didn't, she didn't go to court to do that, no, sir.

Q.   Your girlfriend's mother, who came downstairs and was aware of what happened, she didn't come in and testify that, oh, yeah, July 2nd or 3rd is when something happened, right?

A.   Yeah, they didn't bring her either.

Q.  Sir, you also testified that your girlfriend had moved on, and you guys broke up, and she had moved on long before you were ever convicted of this crime --

A.  Yes, sir.

Q.  -- while you were still in Cook County jail, right?

A.  Yes, sir.

Q.  Sir, isn't it because she knew that you had committed the crime and she had moved on?

A.  No, sir.

MR. J. RICHARDS:  Objection.

THE COURT:  It's sustained.

BY THE WITNESS:

A.  No, sir.

THE COURT:  You don't have to answer.

There is no answer.  The objection was sustained.

MR. ENGQUIST:  I'll tender the witness.

THE COURT:  All right.  Rather than move into a second cross, we'll break for lunch 5 minutes early.  We will come back at 1:00 p.m.

All rise.

(Jury out at 11:55 a.m.)

THE COURT:  Mr. Rios, you may step down.  You are not to discuss the substance of your testimony with anyone.

Any issues to address before we break for lunch?

MR. ENGQUIST:  No, Your Honor.

Rios - cross

1588

MR. J. RICHARDS: Not from plaintiff.

THE COURT: All right.

MR. SCAHILL: No.

THE COURT: I'm going to put something on your radar concerning the schedule for the next two days, a couple of wrinkles to the typical schedule.

There is supposed to be a fire drill in the building tomorrow. I don't know when. I can't opt out. And so I will tell the jury about it at the end of the day. I'll explain to them the process, which is essentially my clerk or courtroom deputy will take the jury out of the courtroom first, and then we will leave.

Essentially the way they typically work is lights will flash, the announcement will come, and it will tell us to go down one floor or three floors or something like that.

I've asked. We're not supposed to go out of the building for the fire drill. Sometimes they do direct you to a particular stairwell. And if that happens, during the fire drill, do not discuss the case outside the courtroom because I don't know that I can put you on a separate staircase than the jurors.

So we'll have that interruption. It's supposed to take about 10 to 15 minutes I'm told.

I do have a change of plea scheduled for tomorrow afternoon at 4:00 p.m. So we will break at 4:00 so I can

handle the criminal matter.

And then Friday I have a pre-surgical clearance appointment at 1:00 p.m. So my thought is that we'll go from 10:00 to 12:15, 12:30, and then we'll just break from 12:30 to 2:00 and then come back at 2:00 and do 90 minutes before breaking for the holiday weekend.

Part of that is my health appointment. But also the practice typically is that the Chief Judge will send something on Thursday or Friday saying send your staff home at 2:30 or 3:00. So I'll plan to go to 3:30. I think we'll be nearing the close of the evidence if I'm tracking correctly, and then Tuesday we'll come back. We'll have had our instructions conference that morning. And so then Tuesday, the jurors know it's going to spill over into the third week.

But if you have any thoughts or pushback on that, let me know before the end of the day because I'll tell the jury about those three scheduling issues at the end of the day before I send them home. All right.

MR. J. RICHARDS: All right.

MR. SCAHILL: Thank you.

THE COURT: See you back at 1:00.

(Recess at 11:58 a.m. until 1:00 p.m.)

(Change of reporters.)

1590

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                              )
                                         )
                  Plaintiff,             )
                                         )
-vs-                                     )  Case No. 1:22-cv-03973
                                         )
REYNALDO GUEVARA; MICHAEL                )
MASON; and JoANN HALVORSEN,              )
as Special Representative of             )
ERNEST HALVORSEN, Deceased,              )  Chicago, Illinois
                                         )  February 11, 2026
                  Defendant.             )  1:00 p.m.

VOLUME 8
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:     LAW OFFICE OF STEPHEN L. RICHARDS
                       BY:  MR. STEPHEN L. RICHARDS
                       53 West Jackson Boulevard, Suite 205
                       Chicago, Illinois  60604

For Defendant          BORKAN & SCAHILL, LTD.
Guevara:               BY:  MR. TIMOTHY P. SCAHILL
                            MR. GRAHAM P. MILLER
                       20 South Clark Street, Suite 1700
                       Chicago, Illinois  60602

For Defendants         THE SOTOS LAW FIRM, P.C.
Mason and              BY:  MR. JOSEPH M. POLICK
Halvorsen:                  MR. JOSH MICHAEL ENGQUIST
                            MR. JEFFREY ROBERT KIVETZ
                            MS. CAROLINE P. GOLDEN
                       141 West Jackson Boulevard, Suite 1240A
                       Chicago, Illinois  60604

1591

Court Reporter:                CHARLES R. ZANDI, CSR, RPR, FCRR
                               Official Court Reporter
                               219 S. Dearborn Street, Room 1426
                               Chicago, Illinois  60604
                               Telephone:  (312) 435-5387
                               charles_zandi@ilnd.uscourts.gov


                          *   *   *   *   *

                 PROCEEDINGS REPORTED BY STENOTYPE
         TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE COURT: All right. We'll bring in the jury.

(Jury in at 1:00 p.m.)

THE COURT: Please take your seats.

Welcome back, ladies and gentlemen.

Mr. Scahill, you can proceed once the witness has settled.

MR. SCAHILL: Thank you, Judge.

JAIME RIOS, PLAINTIFF HEREIN, PREVIOUSLY SWORN

CROSS-EXAMINATION

BY MR. SCAHILL:

Q.  Good afternoon, Mr. Rios.  My name is Tim Scahill.  I'm going to ask you some questions now.  Okay?

A.  Sure.

Q.  Yesterday afternoon, towards the end of your direct examination by your attorney, you were asked some questions about your current feelings about the Latin Kings organization. Do you remember that line of questioning?

A.  Yes, sir.

Q.  And what you said about your feelings in terms of the Latin Kings now is that they're garbage, garbage, straight out garbage; that they're users, abusers; that they take advantage of young kids like you; that they were groomers, and that when you were a kid, that they groom people; and that there is no such thing as them being your friends; that they were just

using people, and they're grooming kids, and they're not helping anybody at all.

Do you remember that?

A. Yes, sir.

Q. Okay. And that's the way you feel about the Latin Kings now, correct?

A. Today, yes.

Q. The Latin Kings back in the late '80s were brainwashing kids like yourself to believe that violence was justified in service of the gang?

A. Well, fatherless kids that they thought that they could just brainwash due to the fact that they ain't got nobody as a male figure in the house, yes.

Q. But the -- brainwashing kids like yourself to think that violence is okay in service of the gang, right?

A. Well, only when you become an active member, yes.

Q. And that one of the things they would try to brainwash kids like yourself into believing is that you should have no regard for human life, especially if it's against a rival gang member?

A. Correct.

Q. And that it was the gang over everybody else?

A. Correct. You protect yourself over everyone else, yes.

Q. And you were one of those kids that they were brainwashing back in the late '80s, right?

A. Yes, I was being groomed.

Rios - cross

1594

Q.   And it was that mindset that you had in the late '80s, wasn't it?

A.   Yes, sir.

Q.   And that mindset of having no regard for human life, particularly rival gang members, that's how you looked at the world back in 1989, wasn't it, sir?

A.   In '89?  No.

Q.   What about in '88?  Is that how you thought about it in '88?

A.   No.

Q.   What about in '87?

A.   No, sir.

Q.   Do you put any blame whatsoever on the Latin Kings organization for what landed you in prison, sir?

A.   I put the blame on everything, yes.

Q.   You put some blame on the Latin Kings for you ending up in prison, right?

A.   Yes, sir.

Q.   Do you put any blame on yourself?

A.   No, sir.

Q.   So, the blame is the Latin Kings and the police, right?

A.   Correct.

Q.   No blame whatsoever on Jaime Rios for the things that landed you in prison?

A.   Correct.

Rios - cross

1595

Q.   In 1989, I think you told counsel that you would not even identify yourself as a Latin King?

A.   Correct.

Q.   But that's not true, is it?  You would identify yourself as a Latin King, wouldn't you, sir?

A.   Yes, sir.

Q.   So, when you told counsel that in 1989 you wouldn't identify yourself as a Latin King, that was not a true statement, was it?

A.   For the simple fact that you're still going to be considered a Latin King regardless if you say you're not.

Q.   But you identified yourself as a Latin King still in 1989, correct?

A.   Yes, sir.

Q.   When you got into the police station and you were speaking to Detective Mason and to Ms. Riley, the ASA, you told them that you were a Latin King?

A.   Yes, sir.

Q.   And that was the truth, right?

A.   Nope.

Q.   Sir, you gave testimony at your criminal trial in November of 1990, correct?

A.   Correct.

Q.   Okay.  Swore to tell the truth, swore to tell the truth, the whole truth, and nothing but the truth, so help you God,

correct?

A.   Correct.

Q.   This is Defendants' Exhibit 216 at page 275, line 19.   You were asked these questions, and you gave these answers at your criminal trial.

"Question:   Now, when you talked to Detective Mason and the State's Attorney on July 7th of 1989, you told them that you were a Latin King, isn't that right?"

A.   Correct.

Q.   "Answer:   Yes.

"Question:   That was the truth, right?"

A.   Correct.

Q.   "Answer:   Yes."

Correct?

A.   Correct, yes.

Q.   Okay.   So, it was the truth, not only that you told them that you were a member of the Latin Kings in 1989, but that it was the truth that you were a member of the Latin Kings in 1989?

A.   I was not a member of the Latin Kings.

Q.   But you --

A.   But it's still going to be portrayed as one, especially to Mr. Guevara.

Q.   Sir, this was portrayed in front of the jury at your criminal trial when you testified, correct?

Rios - cross

1597

A.   Yes.

Q.   Were you telling the truth when you told that jury that you were -- that you truthfully told both the police and the State's Attorney that you were a Latin King in 1989?

A.   Yes.

Q.   Okay.  You also, in June of 1989, had an interaction with a gang officer named Noon, right?

A.   Yes, sir.

Q.   That is when you got arrested for the aggravated assault, which we're going to talk about again in a few minutes.  Do you remember that?

A.   Yes, sir.

Q.   And when you were speaking to Officer Noon, he asked you if you were a Latin King, and you also -- this is June of 1989, you identified yourself as a Latin King then, correct?

A.   Yes, sir.

Q.   As of the time of your criminal trial, this is now 1990, you were at that point a current foot soldier in the Latin Kings, isn't that correct?

A.   Yes, sir.

Q.   Okay.  So, not 1989, this is now a year later, right?

A.   Um-hum.

Q.   You have to say yes or no.

A.   Yes, sir.

Q.   You are a current foot soldier in the Latin Kings, right?

Rios - cross

1598

A.   Yes, sir.

Q.   And I think you've testified this morning that when you were a foot soldier in the Latin Kings, one of your duties was to protect the neighborhood from other gangs, right?

A.   Yes, sir.

Q.   And that would include, if necessary, shooting them, right?

A.   Yes, sir.

Q.   That was your job when you were a foot soldier, right?

A.   I never did that, but yes, that was the job for the foot soldiers, yes.

Q.   And that was something that when you were a foot soldier that you had signed on to do, right?

A.   Yes.

Q.   Now, the confession that you gave, which we'll go into in a little bit later, that details an incident where you're in Latin King territory, your house, right?

A.   Correct.

Q.   Individuals who you believe to be members of a rival gang, the Spanish Cobras, come by and take some shots at you, right?

A.   Correct.

Q.   And that according to the confession, you then pursued them back into Spanish Cobra territory to get some retaliation, right?  That's what the confession says?

A.   Pursuit?

Q.   After this happened, you then go into Spanish Cobra

territory to get some retaliation?

A.   Yes.

Q.   Okay.   That is exactly the kind of thing that a foot soldier would be expected to do as a Latin King, right?

A.   Yeah, they are expected to do that, yeah.

Q.   Okay.   So, the things that are being described here, even though you're saying that you did not actually do them, these are the exact kinds of things that you were trained and it was your duty to do as a foot soldier when you were a foot soldier in the Latin Kings, isn't that correct?

A.   Yes, you're groomed to do that.

Q.   After you got arrested, you continued to be a member of the Latin Kings?

A.   I had to pick it right back -- when I got in jail, I had to pick it back up.

Q.   You were an active Latin King in the Cook County Jail, right?

A.   Yes.

Q.   And you were an active Latin King for a very long time in prison as well, correct?

A.   Yes.

Q.   So, this isn't you fully divested yourself of being a member of the Latin Kings in 1988 or 1989; you were a Latin King for years and years after that, isn't that correct, sir?

A.   In the penitentiary, yes.

Q.   Okay.  Mr. Rios, do you recall during the pendency of this case that the defendants had sent you a list of questions to answer under oath called interrogatories?

A.   No, I don't remember that, but --

Q.   Okay.

MR. SCAHILL:  Judge, can I have just the monitor for the witness.

Can I have Defendants' Exhibit 12, please, Carrie. Is it up?

MS. GOLDEN:  It is.  Oh, I've got to --

BY MR. SCAHILL:

Q.   Okay.  Do you see what's been presented in front of you?

A.   Yes.

Q.   Okay.  Do you recognize that to be a document entitled, "Plaintiff's Answers to Defendant Michael Mason's First Set of Interrogatories to the Plaintiff"?

A.   Yes.

MR. SCAHILL:  Carrie, can you go to the last page, please.

BY MR. SCAHILL:

Q.   Do you see that, sir?

A.   Yes, sir.

Q.   That is your signature declaring under penalty of perjury that the contents of this document are true and correct except for those statements which are made on information and belief?

Do you see that?

A.   Yes.

Q.   So, you did answer the questions in here under oath about your case, didn't you, sir?

A.   Yes, sir.

Q.   And you verified, same oath that you took here today, that those are true and accurate, right?

A.   Yes, sir.

Q.   Okay.  One of the things that you were asked, and this is Interrogatory No. 1, is, "Have you ever been a member of or affiliated with any street gang?  If so, identify the name of any such street gang and/or organization; the dates of each membership and/or affiliation; your ranks or positions within the gang and/or organization; your duties and/or responsibilities relative to the street gang and/or organization; and the aliases, nicknames, or street names by which you were known within the gang; the name of any rival gangs; the date, if any, when you left the gang; and the reasons, if any, that you left the gang."

     Do you see that?

A.   Yes, sir.

Q.   Does your answer on here -- well, the answer you gave is yes, that you joined the Latin Kings in 1980 or '81, and that you were a Latin King until about 1987.

A.   Yes, sir.

Q. Okay. First of all, is that true?

A. Yes.

Q. Okay. I thought you said that you remained a member until 1988.

A. '88, my son -- wife Diana got pregnant in '88, so that's when I stopped being a gang-banger.

Q. So, you didn't stop in '87; you stopped in '88?

A. The beginning of '88.

Q. Okay. That sentence, "In 1987, I started stepping off from them because I had a child."

A. Yes, sir.

Q. You did not have a child in 1987?

A. She was pregnant.

Q. She was pregnant in 1987?

A. '88.

Q. Okay. Here, you said you had a child in 1987. That is not correct, is it?

A. No, it's not. Probably confused the date.

Q. "After 1989, when I was arrested, I was not a member of the gang."

A. I was not active, no.

Q. Here, it says you were not a member of the gang.

A. Yeah, not active.

Q. Okay.

A. When you're not active, you're not a member.

Q.   You did identify yourself, as we just discussed a moment ago, numerous times as a member of that gang in 1989, though?

A.   Yes, sir.

Q.   Okay.  And then it goes on to talk about your duties. "When I was a member of the gang, I was a foot soldier.  I had no rank.  I was selling drugs, protecting neighborhoods from other gangs, et cetera.  I was called Jaime or Rios.  The rival gangs were the Gangster Disciples, Spanish Cobras, Harrison Gents, and Ashland Vikings."  End of answer.

A.   Correct.

Q.   Is that an accurate description of your gang membership, sir?

A.   Yes, sir.

Q.   Was there any reference whatsoever in that interrogatory to you continuing to be a member of the Latin Kings when you were in the Cook County Jail in 1989 and 1990?

A.   Yeah, I had to pick it back up.

Q.   Okay.  That's not the question I asked you.

        Is there a reference in this answer to you continuing with your gang membership?

A.   No.

Q.   Reading this answer suggests that you stopped being a member of the gang and never rejoined, isn't that true, sir?

A.   I rejoined in the penitentiary, yes.

Q.   So, the answer that you gave under penalty of perjury, the

Rios - cross

1604

questions we asked you, they were not correct, were they?

A.   Some probably were not.

Q.   Okay.  You didn't add that you maintained your membership and rejoined the Latin Kings for years and years and years after 1989, did you?

A.   No, I did not.

Q.   Not a true statement, right?

A.   You could say that.

Q.   And one that you made under oath?

A.   Yes.

Q.   When you are a foot soldier in the Latin Kings, it is your responsibility to take orders and do whatever the chief of the Latin Kings says, right?

A.   Correct.

Q.   And if the chief of the Latin Kings tells a foot soldier to go out and commit a murder, you're supposed to do that, right?

A.   Yeah, if they're active, of course, yes.

Q.   And you were active when you were a foot soldier, right?

A.   Yes.

Q.   And those are the things that you stood ready, willing, and able to do when you were a foot soldier?

A.   That's what you're supposed to be ready to do, yes, to protect the neighborhood, yes.

Q.   And you were ready to do that when you were a foot soldier, weren't you?

Rios - cross

1605

A.   Yes, but I never did.

Q.   You never did except on June 27th of 1989?

A.   No, sir.

Q.   Let's talk about May of 1989.  First of all, as Mr. Engquist asked you, when you got arrested on July 6th, you were on bond for another crime that you had been arrested and charged for, right?

A.   Correct.

Q.   That related to an incident that happened on May 29th of 1989?

A.   I don't recall the dates, but yes.

Q.   Okay.  This was approximately 11 days after your son was born, this incident?

A.   Correct.

Q.   Okay.  And the underlying incident that that arrest related to, the allegations were that you fired a handgun at an individual who was in a vehicle, correct?  That was -- those were the allegations against you?

A.   That was the allegations, yes.

Q.   Okay.  And it was also alleged by the person who you had shot at that you also yelled out some gang slogans during that, specifically, "King love," right?

          MR. J. RICHARDS:  Objection.

          THE COURT:  Basis?

          MR. J. RICHARDS:  Sidebar?

THE COURT: Okay.

(Proceedings heard at sidebar:)

THE COURT: What's the basis for the objection?

MR. J. RICHARDS: I don't understand, in terms of counsel's questioning, the -- it's unclear the foundation. He hasn't made clear yet how my client heard these allegations, where this specific allegation is from. I think that needs to be cleared up.

THE COURT: Okay. That's overruled. The witness can speak to what he understood the allegations to be. We talked yesterday about how some of this was covered at his plea hearing in the factual basis presented by the prosecutor, even though he, Mr. Rios, never confirmed.

But it's fair to assume that he had some understanding of what the allegations against him were; and to the extent that the questions do not match the allegations, Mr. Rios is free to say, "No, that wasn't my understanding."

So, the objection is overruled.

(Proceedings heard in open court, jury present:)

THE COURT: So, the objection is overruled, and you may answer the question, Mr. Rios.

BY THE WITNESS:

A. What was the question again?

BY MR. SCAHILL:

Q. You understood that the allegations or accusations made

Rios - cross

1607

against you by the individual who said that you shot at him were that you had yelled out also, "King love," during that incident.

A.   I don't remember that.

Q.   You don't remember that the individual was claiming that that happened?

A.   I don't remember that because I never did it.

Q.   Okay.  You say you never did it, but you were, in fact, convicted of a felony for this underlying incident, correct?

A.   Yes, sir.

Q.   Okay.  And that conviction is currently still intact today, right?

A.   Yes, sir.

Q.   Okay.  You were charged with both attempted murder and aggravated assault for that incident, right?

A.   Yes, sir.

Q.   And you freely and voluntarily pled guilty for the aggravated assault related to that incident?

A.   Well, counsel told me to go ahead and plead guilty to aggravated assault, and they was going to break it down to -- they was going to break it down to aggravated assault and give me a misdemeanor for it and for me to go ahead and cop out for it.  That's what was due to counsel.

Q.   Sir, you did not get a misdemeanor for that shooting, did you?

Rios - cross

1608

A.   No, sir.

Q.   You got a felony conviction, right?

A.   Yes, sir.

Q.   And the charge was aggravated assault with a firearm, right?

A.   Yes, sir.

Q.   And that is still an intact conviction today, correct?

A.   Yes, sir.

Q.   And it was during that incident that you had -- not during the incident, but during the arrest for that incident where you spoke to Officer Noon, right?

A.   When he asked me if I was a Latin King, yes.

Q.   And you told him that you were?

A.   That's it.

Q.   The individual who was the alleged victim of this was an individual named Edwin Reyes?

A.   Don't know.

Q.   You don't know.  Okay?

         MR. SCAHILL:  Judge, at this time, I would like to admit into evidence the certified statement of conviction, which is Defendants' Exhibit 19.

         THE COURT:  Any objection?

         MR. J. RICHARDS:  No, your Honor.

         THE COURT:  All right.  Defendants' Exhibit 19 is admitted and may be published.

(Defendants' Exhibit No. 19 was received in evidence.)

BY MR. SCAHILL:

Q.  Sir, do you see that this is a certified statement of conviction of disposition in the People versus Jaime Rios?

Do you see that?

A.  Yes, sir, I do.

Q.  Okay.  And do you see that you were charged with both attempted murder and aggravated assault?

A.  Yes, sir.

Q.  Okay.  And looking on the -- let's see.

On page 4 of 7, do you see here that you pled guilty on September the 6th of 1990?

A.  Yes, we took a guilty plea on that.

Q.  And you got a consecutive sentence of three years, right?

A.  Time considered served in Cook County, yes.

Q.  But you got -- you're saying time served.  You would have gotten time served on your murder conviction for the time that you spent in Cook County, too, right?

A.  I don't know about that.

Q.  The three years that you got consecutive was additional time that you needed to serve in prison totally unrelated to your conviction for the murder of Luis Morales, correct?

A.  I don't know how that works, so I don't know what to tell you about that.

Q.  But neither Mr. Guevara or Mr. Mason had anything to do

with your underlying arrest or conviction for this aggravated assault for this incident that occurred on May the 29th, 1989, did they?

A.   No, they did not.

Q.   Okay.  You told your attorney yesterday with respect to your activities in the Latin Kings that you never made it to the step of being around with guns and stuff like that with them or participated in any shooting or anything.

A.   Correct.

Q.   That's what you said, right?

A.   Correct.

Q.   But you specifically pled guilty to a shooting, right?

A.   Yes, sir.

Q.   With respect to the rules that you're supposed to follow as a Latin King, I think you also told your attorney that one of the things that you're not supposed to do is you're not supposed to claim your set when you're out committing crimes?

A.   Correct.

Q.   Okay.  If a Latin King were to yell out, "King love," when they're shooting into a vehicle, that would be claiming your set while committing a crime, right?

A.   Yes, sir.

Q.   All right.  So, if, in fact, you did do those things, that would not be consistent with what the Latin Kings told you, right?

Rios - cross

1611

A.   That I --

Q.   That would not be consistent with how you were taught to act as a Latin King, right?

A.   Right.

        MR. J. RICHARDS:  Objection.

        THE COURT:  Basis?

        MR. J. RICHARDS:  Argumentative.

        THE COURT:  Overruled.

BY THE WITNESS:

A.   Correct.

BY MR. SCAHILL:

Q.   Let's talk about June 27th of 1989.

        THE COURT:  Before you get there, I want to address the conviction that you just heard about.

        By rule, evidence of another crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion, the person acted in accordance with the character.

        For example, I don't think this is true, but had I worn a white shirt every day this week, you couldn't use that to prove that on Thursday I wore a white shirt.  You'd have to evaluate Thursday based on the evidence related to Thursday.

        The evidence can be used for other purposes, and I'll leave it to the lawyers in argument to highlight whatever those purposes are; but in short, even if someone did fire a weapon

Rios - cross

1612

on Monday, that does not mean that -- you can't use that as evidence of what they did some other day.

You may continue.

MR. SCAHILL:  Thank you.

BY MR. SCAHILL:

Q.  I want to focus your attention now on June the 27th of 1989.  Are you with me?

A.  Okay.  Yes, sir.

Q.  When Mr. Engquist was asking you questions, he referred to a back-and-forth set of questions under oath at your deposition when you were asked about where you were and what you were doing on June 27th of 1989.  Do you remember those questions?

A.  Correct.

Q.  And he read to you from your deposition that you had told us under oath that on June 27th of 1989, that you were -- at or around the time of the murders, that you were in front of your house with this Jamaica character, right?

A.  I believe so.

Q.  Okay.  And you're telling us as you sit here today that that is not true; that is not what your alibi is for June the 27th of 1989, right?

A.  No, because I was -- I went upstairs to my house on the 27th.  That was -- that was basically the 7th or the 6th when they picked me up from in front of the house that I was talking to Jamaica.  It had nothing to do with the 27th.

Rios - cross

1613

Q.   Okay.  But at your deposition under oath, the alibi that you gave us then for that date, the date of the murder that we're here talking about, was that you were in front of your house with Jamaica; that's the answer that you gave?

A.   Yes, that's the answer that I gave.

Q.   And that's the answer that you gave under oath, right?

A.   Yes.  I was confused about the date, yes, but that's the answer I gave.

Q.   At the beginning of your deposition, which was in 2023, you were told by Mr. Polick that if you didn't understand any of the questions that are being asked, to go ahead and tell him that you don't understand.  Do you remember being told that?

A.   Correct.

Q.   And you agreed to do that, right?

A.   Correct.

Q.   During this back-and-forth with Mr. Polick about June 27th, 1989, at no point, did you say, "I'm confused," or, "I don't understand," or, "I got mixed up on the date," did you?

A.   No, I did not.

Q.   And with respect to that back-and-forth about the evening of June 27th of 1989, this wasn't just one question where you were asked about June when you were talking about the context of July; it was a number of questions about June, right?

A.   Correct.

Q.   And it was a number of questions not only about a date in

June, but about the shooting that happened on Western, right?

A.   That's what he was talking about, yes.

Q.   Okay.  You were asked -- this is page 131, line 15.  The sequence of questions that you were asked --

A.   Okay.

Q.   -- at your deposition were as follows, sir:

"Question:  Do you know where you were on the late evening of June 27th, 1989, just before or around midnight?

"Answer:  Yes, sir.

"Question:  Where?  Where were you at that time?

"Answer:  Front of my house.

"Question:  When you say the front of your house, what house are you referring to?

"Answer:  At 1440 North Leavitt.

"Question:  And were you with anybody at that time?

"Answer:  Yes, sir.

"Question:  Who were you with?

"Answer:  Some guy named Jamaica.

"Question:  Do you know Jamaica's real name?

"Answer:  No, they just call him Jamaica.

"Question:  And can you describe Jamaica to me?

"Answer:  Black, about 6 feet, black braids, possible -- possible, right now, his age would be probably 60 now.

"Question:  Did he have a Jamaican accident?

"Answer:  Yes, sir.

"Question:  Were you aware that evening that somebody had been shot at 1316 North Western?

"Answer:  No, sir."

"Question:  That location, 1316 North Western, how close is that to your home at 1440 North Leavitt?

"Answer:  About four to five blocks."

Let's pause there for a second.  First of all, you were asked those questions, and you gave those answers, right?

A.  Yes, sir.

Q.  Not only is Mr. Polick asking you about June 27th, he specifically then referred to that evening about the shooting on Western, right?

A.  Yes, sir.

Q.  You're not aware of any shooting on Western on July 6th when you were arrested, are you?

A.  No, sir.

Q.  Okay.  So again, Mr. Polick specifically told you in his questions that we're all talking about in these series of questions where you are at the time that the murder of Mr. Morales is committed, right?

A.  Correct.

Q.  And even though he brought that up now a second time, you're saying that you're conflating that with the date of your arrest, when there was no shooting at all?

A. Yes, sir.

Q. Okay. Let's go on. You're then asked -- this is page 132, line 18.

"Question: Did you come to learn that someone from the Spanish Cobras street gang had been shot at 1316 North Western in the late evening of June 27th, 1989?

"Answer: No, sir."

That was the next question, correct?

A. Correct.

Q. Once again, Mr. Polick is making clear to you that you're talking about what happened with the murder of Luis Morales, right?

A. Yes, sir.

Q. And your testimony is that you are still under the belief that you thought Mr. Polick was talking about the date of your arrest by Mr. Guevara?

A. Yes, sir.

Q. Despite now three times he's told you that it relates to the shooting, you still think it's about the arrest; is that what your testimony is?

A. Yes. The arrest was about the shooting.

Q. The shooting, though, happened on June 27th. That's what they're talking about, right?

A. Yes, sir.

Q. Okay. You go on again. This is line 18 of page 132.

Rios - cross

1617

"Question: Did you come to learn that someone from the Spanish Cobras street gang had been shot at 1316 North Western in the late evening of June 27th, 1989?

"Answer: No, sir.

"Question: You never heard about that incident?

"Answer: No, sir.

"Question: You knew nothing about it?

"Answer: No, sir.

"Question: You were aware at that time in June of 1989 that Western Avenue was a gang dividing line between the Latin Kings and the Spanish Cobras?

"Answer: Yes, sir."

Do you see that?

A. Yes, sir.

Q. Once again, this is now the fourth time Mr. Polick has said that these series of questions and answers, you're talking about June of 1989, not July of 1989, right?

A. Yes.

Q. And you were -- now being told four times, you were still confused as to whether he's talking about the date of your arrest or the date of the actual murder, right?

A. Yes, due to the fact that he talked about Jamaica.

Q. Right. But he's told you now it's the night of the murder that you're talking about four times, correct?

A. Yes, yes.

Rios - cross

1618

Q.   Still confused?

A.   Kind of, yes.

Q.   But at no point do you say, "Oh, I thought you were talking about a different -- different time."  At no point during those series of questions did you do that?

A.   No, sir.

Q.   At no point during this entire deposition did you do that, either?

A.   No, sir.

Q.   Your attorney, Mr. Richards, during this deposition, asked you some questions, too, didn't he?

A.   Yes.

Q.   Okay.  At no point did he ask you any clarifying questions and say, "Jaime, you know, when you were asked those questions about being with Jamaica, that wasn't really in June.  That was in July."

     He didn't do anything like that, did he?

A.   No, sir.

Q.   When you first took the stand in this case on direct, your attorney was asking you what you -- where you were and what you were doing on June 27th, and you said you had this routine. You would go to your mother's house, and then you came back home, and you went upstairs, and your girlfriend was there, Diana, right?

A.   Yes, sir.

Rios - cross

1619

Q.   Okay.  So, is that the alibi that you are -- that you're testifying is the true one as you sit here today?

A.   Yes, sir.

Q.   Okay.  So, at the time of the murders, you're in your home with your girlfriend Diana, right?

A.   Yes, sir.

Q.   Not with Jamaica?

A.   No, not with Jamaica.

Q.   Let's go to --

        MR. SCAHILL:  Can I get Defendants' Exhibit 12 back up there, just for the witness, please.

BY MR. SCAHILL:

Q.   Once again, during discovery, we asked you some questions to answer under oath, written questions.  Do you remember I was asking about that with respect to the gang?

A.   Yes, sir.

Q.   Okay.  Let's go to -- one second -- page 6.  Okay. Question No. 10, you were asked these questions in your written interrogatories.

        "Question:  Please specify in complete detail where you were and who you were with on June 27th of 1989."

        Do you see that, sir?

A.   Where you say?

Q.   Question 10, towards the bottom of page 6.  Do you see that?

A.   Okay.  Yes, yes.

Q.   You were asked that question by us before trial, right?

A.   Yes, sir.

Q.   Okay.  Please read your answer, sir.

A.   Excuse me.  "I woke up in my house, 1440 North Leavitt, around 8:00 or 9:00 in the morning.  I showered and went to my mom's house at 1246 North Wolcott.  I walked the dogs and fed them.  I went home at 9:00 or 10:00 o'clock.  I stayed at home" -- "I stayed at my house for the rest of the day" -- "for the rest of the night," say better.  Yes.

Q.   Okay.  Is that a complete and accurate response to what your alibi was on June 27th of 1989?

A.   Yes, sir.

Q.   Okay.  Do you see any reference to who you were with on June 27th of 1989?

A.   No, sir.

Q.   Okay.  Did you tell us in your Answers to Interrogatories that your alibi for the time of the murder and who you were with was your girlfriend Diana?

A.   No, sir.

Q.   Okay.  So now we have under oath, you've said you were with Jamaica at your deposition; not true, right?  In your interrogatories, you say you were at home, but you don't mention your girlfriend.

A.   Correct.

Q. Okay. So, also not true?

A. The question was about me, not about her.

Q. Does the question say who you were with, sir?

A. Yes, sir.

Q. Who were you with?

A. I was at my home.

Q. With who?

A. With Diana.

Q. Does it say that in that question, sir?

A. It asks, yes.

Q. It says you were with Diana?

A. Yes.

Q. Where?

A. I didn't say -- no, it doesn't say I was with Diana, no.

Q. So, not a fully accurate description of your alibi under oath in your interrogatories, is it, sir?

A. Correct.

Q. Okay. So, that's now two different alibis, correct?

A. Yes.

Q. Both under oath, right?

A. Yes.

Q. Both not totally true?

A. Not at the right, yes.

Q. Then in your statement that you gave --

A. Okay.

Rios - cross

1622

Q.  -- that says you're out committing the murder that night, right?

A.  Okay.

Q.  And just so we're clear -- and we'll get to this in a little bit, but these answers here, the questions and answers in this statement, these are answers you gave, right?

A.  Yes.

Q.  Okay.  You're saying that some of it's not true, but you actually gave the answers here, right?

A.  The beginning of the statement was -- were my statement.

Q.  Right.  But I'm saying that -- I'm not asking whether they're true or not right now.  We'll get into that.  But you actually gave these answers --

A.  Yeah, I made a statement.

Q.  Okay.  The things that are said on here are things that came out of your mouth?

A.  Things that I was fed, yes.  Came out of my mouth, yes.

Q.  So, you did give this statement; you're just saying some of it's not true?

A.  Yeah.  Most of it was fed to me.

Q.  We'll get to that.  But this is a third version of the events, though, that actually passed through your lips as something that happened on June 27th, right?

A.  Yes.

Q.  Okay.  Your criminal trial rolled around in November of

Rios - cross

1623

1990, right?

A.   '89, '90, yes.

Q.   It was November of 1990, correct, sir?

A.   Correct.

Q.   And you testified in your own defense at that trial, right?

A.   Yes.

Q.   You testified about all kind of things relating to the case, including your arrest, your questioning, all kinds of stuff like that, your statement, right?

A.   Yes, sir.

Q.   At no point did you ever testify about any alibi whatsoever in court, did you?

A.   Yes, sir.

Q.   You did or did not?

A.   No, I did not.

Q.   You did not tell your criminal jury, "I could not have committed this murder because I was somewhere other than on Western shooting Luis Morales," right?

          MR. J. RICHARDS:  Objection.

          THE COURT:  Basis?

          MR. J. RICHARDS:  Sidebar, please.

          THE COURT:  Okay.

     (Proceedings heard at sidebar:)

          THE COURT:  What's the basis?

          MR. J. RICHARDS:  Improper impeachment, and at trial,

one is asked questions and given answers.  The appropriate questioning would be, "You were never asked that question, and you never gave an answer.  Your attorney didn't ask you that question of where you were that night."

That's the appropriate line of impeachment, not, "You never told the jury this or that."

THE COURT:  Response?

MR. SCAHILL:  I'm trying to solicit the evidence at the trial, not to impeach him with questions that he was asked, which goes to materiality, which we've gone over a bunch of times; but it's the evidence at the trial, which the jury had or did not have.

THE COURT:  Yeah, the objection is overruled.  While I understand the procedural argument Mr. Richards is making, in response to a question, you tell the jury one thing or another, so it's another way of framing, "Were you asked that question," which seems like something that you can cover on redirect.

So, the objection is overruled.

(Proceedings heard in open court, jury present:)

THE COURT:  The objection is overruled.  The question was, "You did not tell your criminal jury, 'I could not have committed this murder because I was somewhere other than on Western shooting Luis Morales,' right?"

BY THE WITNESS:

A.  Correct.

BY MR. SCAHILL:

Q.   So, as you -- the version we've landed on today is the alibi is your girlfriend, right, Diana?

A.   Correct.

Q.   Okay.  And Diana did, in fact, testify at your criminal trial, right?

A.   Yes, sir.

Q.   She -- you were present when she testified, right?

A.   Yes, sir.

Q.   And she actually testified -- it was either right before or right after you, right?

A.   Yes, sir.

Q.   Okay.  At no point did Diana ever provide any testimony about your alibi at your criminal trial, either, did she?

A.   No, she did not.

Q.   Okay.  Diana never said to your criminal jury, "Jaime could not have committed this murder.  He was at home with me"?

A.   Correct.

Q.   Nothing like that?

A.   Correct.

Q.   I mean, she's the only person -- this is the mother of your child.  She's the only person who can put you somewhere other than on Western Avenue killing Luis Morales, right?

A.   Correct.

Q.   And she's called as a witness?

Rios - cross

1626

A.   Correct.

Q.   And she says nothing about it, right?

A.   Correct.

Q.   And then taking a step back, when you were being questioned by the police and by the State's Attorney at Area 5 on July 6th and 7th of 1989, at no point did you volunteer to either the police or to the prosecutor, "I could not have committed this murder.  I was at home with my girlfriend"?

A.   I did not.

Q.   Okay.  It was clear to you at some point during that questioning the time that -- and the date that you were being asked about, right?

A.   Correct.

Q.   At some point, you're told, "June 27th, 1989, this is the crime we think you're involved in, Jaime," right?

A.   Correct.

Q.   And you knew in your mind, according to you, that, "I couldn't have committed this crime.  I was at home with my girlfriend," right?

A.   Correct.

Q.   You knew that, right?

A.   Correct.

Q.   At no point did you say to Detective Mason, "Detective Mason, you've got it mixed up.  Go talk to Diana.  I was with her.  She'll clear all that up."

You never said anything like that, did you?

A.   No, sir.

Q.   And Ms. Riley, when you were speaking to her, you never said, "Ms. Riley, I can clear all this up.  Just go talk to Diana.  She's out in the lobby.  She's at home.  Go talk to her.  She'll tell you where I was on June 27th of 1989."

You didn't do anything like that, did you?

A.   No, I did not.

Q.   Let's switch gears for a minute and talk about Tino.

So, Cristino Garcia testified last week, right?

A.   Correct.

Q.   That's a friend of yours from back in the day, right?

A.   Yeah, he's an old friend.

Q.   Old friend.  Okay.  Also an old co-gang member of yours, Latin King, right?

A.   Yes.

Q.   You knew during the pendency of your criminal case before you went to trial that Cristino had gotten arrested and then released, right?

A.   Yes, sir.

Q.   Cristino never told you anything about his time in police custody, did he?

A.   No.

Q.   He said nothing about his mistreatment by the police to you at any point, did he?

Rios - cross

1628

A.   No, he did not.

Q.   All right.  But I think you testified yesterday that when you were looking at your -- pursuing post-conviction, you went to go seek out Mr. Garcia, right?

A.   Yeah, I was looking for him.

Q.   Okay.  And you found him sort of in the streets, right?

A.   No, my brother found him.

Q.   Your brother found him.  Okay.  But you had no information when you were looking for him that he actually had any information that would help your case, did you?

A.   No, I did not.

Q.   Okay.  You were just taking a shot in the dark, "Maybe my old friend Cristino might be able to help me out," even though you had no reason to know that he had anything to help you out with, right?

A.   He was brought to the station when I got locked up, so that's part of the lead of me looking for him.

Q.   But you had no idea that he was going to say that, you know, he got hit with the flashlight and the phone book and all of that stuff, right?

A.   No.  He never spoke to me.  When I spoke to him, I gave him my attorney's information, and I told him talk to my attorney.

Q.   And once he gets to Mr. Richards, it just so happens, of the two people that you sought out, Mr. Carrero and Mr. Garcia, both of them, even though you don't have any reason to know

Rios - cross

1629

Mr. Garcia had any helpful information, they've given helpful information to your attorney, right?

A.   Correct.

Q.   And you're aware that Mr. Garcia executed an affidavit for you, right?

A.   Correct.

Q.   And that was used in your post-conviction, right?

A.   Correct.

Q.   You used that to submit to a court to attempt to get your conviction thrown out, right?

A.   To get my conviction overturned, yes.

Q.   Yeah.  You were relying on what Mr. Garcia was saying in his affidavit, right?

A.   I was relying on whatever it is that was given to my lawyer.

Q.   Right.  But you're aware that that affidavit from Mr. Garcia was submitted to a court of law on your behalf under oath, right?

A.   Yes, sir.

Q.   Okay.  And you heard Mr. Garcia's testimony last week, right?

A.   Yes, sir.

Q.   You heard him tell this jury that the things that he was saying in the affidavit about not testifying and taking the Fifth back in the days because he was scared of Mr. Guevara,

that your attorney actually told him to say that?

A.   Correct.

Q.   Okay.

A.   I heard him say that.

Q.   Now, he had no idea what your attorney was talking about, but he swore under oath about it, right?  You heard him say that, right?

A.   Correct.

Q.   And this is an affidavit that you used affirmatively in the courts in this state to get your conviction thrown out, right?

A.   Correct.

Q.   And then you used it again, also, that same affidavit in your certificate of innocence proceedings, too, didn't you?

A.   I believe so.

Q.   Information that we all heard is false information that he swore under oath, right?

          MR. J. RICHARDS:  Objection.

          THE COURT:  Basis?

          MR. J. RICHARDS:  Sidebar, your Honor.

          THE COURT:  Okay.

   (Proceedings heard at sidebar:)

          THE COURT:  What's the basis?

          MR. J. RICHARDS:  Your Honor, counsel -- counsel's question was saying that the -- all of the affidavit was false. I think at most, maybe the witness Cristino Garcia said one or

two of the paragraphs was false, so that's not an accurate statement of the facts in evidence; and it's also asking this witness, Mr. Rios, to opine on evidence given by another witness in this case.

THE COURT: Response?

MR. SCAHILL: I was just asking whether he heard that in this courtroom. I didn't ask whether -- I wasn't asking his opinion about it.

THE COURT: Yeah. The objection's overruled. The sequence of questions is such that it started with, "You were here during that testimony." It's pointed towards the particular paragraph, and now this last question is just continuing that line of inquiry.

So, the objection is overruled.

(Proceedings heard in open court, jury present:)

THE COURT: You can go ahead and continue.

MR. SCAHILL: Was the question answered? I'm sorry. I don't remember whether he answered it or not.

THE COURT: It was not answered. Can you re-ask it?

MR. SCAHILL: Yeah, let me just rephrase it.

BY MR. SCAHILL:

Q. You -- you used an affidavit that has paragraphs that we all heard Mr. Garcia say were false in order to get your certificate of innocence, right?

A. Correct.

Rios - cross

1632

Q.   Okay.  Let's talk about the day of your arrest, July 6th.
Okay?

A.   Correct.

Q.   We're talking about July 6th, the day of your arrest --

A.   Okay.

Q.   -- when you're arrested by Mr. Guevara.  Okay?

A.   Yes, sir.

Q.   All right.  Earlier that day, your testimony is that you
were at a playground, and this Little Mike guy was with you,
right?

A.   He wasn't with me, but he was there, yes.

Q.   Okay.  And Mr. Guevara rolls up with his partner, correct?

A.   Correct.

Q.   And has an interaction with Little Mike, right?

A.   Correct.

Q.   Takes Little Mike into his car?

A.   Correct.

Q.   Now this -- again, this is the day that you're arrested;
you're arrested later that evening, right?

A.   Yes.

Q.   You then decide to go up and engage with Officer Guevara,
right?

A.   Yes.

Q.   He didn't come up to you; you went up to him, right?

A.   Yes.  I was on my bike, and I rode up to his window and

said, "Do you want me, too?"

And he said, "No.  Get out of here, Rios."

And I went back to my mom's house where I was going.

Q.  So this is July of 1989, right?

A.  Yes.

Q.  You told your attorney the other day that since you were 14, 15 years old, detective -- or Officer Guevara is just terrorizing you throughout the neighborhood and frisking you and putting drugs on you and all that stuff, right?

A.  Yes.

Q.  Hostile guy, right?

A.  Yes.

Q.  Scary guy?

A.  Scary guy, hostile, yes.

Q.  Okay.  And so he's so scary that you decide, when he's taking someone else into custody, to go over and to start engaging with him?  That's what your testimony is?

A.  Yes.

Q.  And you offered voluntarily to go in to the police station with him?

A.  I told him, "If you want me, too, that's it."

Q.  And you would have gone, right?

A.  If he would have told me to come in, yeah, I would have told him.

Q.  Voluntarily, right?

A.  Yeah, like then, yeah, when I asked him.

Q.  And then a couple of hours passed, and Guevara comes to your house, right?

A.  Yes.

Q.  Okay.  Same thing, "Come with us," right?

A.  Right.

Q.  And now you're saying, "No, I don't want to go," right?

A.  I didn't say I didn't want to go.  I said, "For what?"

Q.  Did you go voluntarily or not?

A.  No.

Q.  Okay.  You would have gone voluntarily a couple of hours before, but then a couple of hours passed, and you're saying, "No, not willing to do it this time."

A.  Right, correct.

Q.  What changed?

A.  What changed?

Q.  You just didn't feel like it then?

A.  His demeanor, the way he came to me, the way he grabbed me, the way he snatched me off of my bike.

Q.  You're the one who came and engaged him earlier in the day, getting into business that was with him and someone else, right?

A.  Him and his partner, yes.

Q.  And again, this is somebody that you were so frightened of in the neighborhood because he's harassing you that you decide

Rios - cross

1635

to go and stick your nose into other police business that you had nothing to do with, right?

A.   Well, being afraid of him didn't mean that I can't talk to him.

Q.   Were you trying to talk to him, or were you trying to interject yourself into an interaction he was having with another citizen?

A.   No.

Q.   No what?

A.   I wasn't trying to talk to him and get into any interaction of anything that he had going on with somebody else.

Q.   So, you weren't -- as of July of 1989, you weren't trying to steer clear of Officer Guevara, were you?

A.   No.

Q.   You had no problem going up to the guy, did you?

A.   No.

Q.   This is the same guy who you told this jury the other day is doing all kinds of nasty stuff to you, right?

A.   Yes.

Q.   You told this jury, I believe, that Officer Guevara had arrested you for marijuana?

A.   Yes, sir.

Q.   And I think the way that you told it was that there were people lined up, and, you know, you weren't there at first; and then there was a bag there, and he sent everyone else away and

put it on you and then arrested you and brought you downtown and booked you and all that, right?

A. Yes, sir.

Q. Have you ever seen any of the arrest reports for that incident?

A. No, sir.

Q. Have you ever seen any paperwork with Officer Guevara's name on it for that?

A. No, sir.

Q. Okay. Is that evidence that you have in this case to show this jury?

A. Excuse me?

Q. Do you have any evidence to show this jury, a police report, court records, anything like that? Did any of that happen?

A. Of what?

Q. The fact that Officer Guevara charged you with some marijuana offense and then it got thrown out.

A. He took me in, and he booked me, yes.

Q. And you're saying you went to court?

A. Yes.

Q. Any court records of that that we can see?

A. They threw it out. I must have gone to court if they threw it out.

Q. There's no record. You appear in court, nothing, right?

A.   Well, you appear in court, and they just say, "Dismissed." That's it.

Q.   Your marijuana arrest was just Gang Crimes North officers who caught you with a bag of marijuana, and then you just got released, sir; isn't that what happened?

A.   No, sir.

Q.   Okay.  This is Defendants' Exhibit 25 at page 53 -- sorry, page 52, at line 17.

        "Question:  You don't have any arrests by the Chicago Police Department other than that aggravated assault before July 1989?

        "Answer:  There was a marijuana charge that they grabbed some marijuana up from the floor, and they had the guys all on the wall, and they had me on the wall, too.  And he -- they decided to take me for the marijuana, but then they released me.  They let me go."

        Were you asked those questions, and did you give those answers at your deposition?

A.   Yes, sir.

Q.   Okay.  So, two things.  Number one, not booked, charges not going to court.  You just got released, right?

A.   No, I went to court.

Q.   Okay.  But you testified --

A.   They dismissed the case.

Q.   You testified under oath here that they just released you,

right?

A.   I know.  When I went to court, they released me.

Q.   Okay.  And when you were asked these questions by Mr. Polick, did you say in response to that question that that was Mr. Guevara who had done that?

A.   Mr. Guevara was the one that put me on the wall with all the other guys and said, "Okay.  You know what?  Everybody can leave.  Jaime you're coming with us."

Q.   Is that how you described it at your deposition, sir, that I just read?

A.   I don't remember.

Q.   You don't remember what I just read you?

A.   I didn't even hear it to be what you just said right now. About the case?

Q.   Let me read it to you again.

A.   Okay.

Q.   The way that you described it at your deposition, this incident that you told the jury this very long story about how Mr. Guevara had done all of these things, the way you described it at your deposition was, "There was a marijuana charge that they grabbed some marijuana up from the floor, and they had all the guys all on the wall, and they had me on the wall, too. And he -- they decided to take me for the marijuana, but then they released me.  They let me go."

A.   Yeah, that's correct.

Q. No reference to Mr. Guevara in that at all, is there, sir?

A. Mr. Guevara was the one that took me and put me in the car.

Q. I know that's what you're saying now, but you didn't say that there, did you?

A. No.

Q. Okay. And this stuff about your mother having an altercation with Mr. Guevara in the street about him supposedly being a chain snatcher or something like that, do you remember those questions from the other day?

A. Yeah, about him harassing us, yes.

Q. Okay. And your mother was a school security officer?

A. Yes.

Q. Okay. And she, to your knowledge, never -- even though she had the -- she went and confronted Mr. Guevara, she didn't go to the police department or anyone else and file a formal report, right?

A. Correct.

Q. Okay. There's no paperwork that you're aware of that any of this ever happened, right?

A. Correct.

Q. Okay. And I think you told us that your mother still lives with you, right?

A. My mom lives upstairs on the second floor. I take care of my mom, yes.

Q. Okay. And your mother has personal knowledge of that,

Rios - cross

1640

right?

A.   Of that day, yes.

Q.   Have you named your mother as a witness in this case, sir?

A.   No, sir.

Q.   Do you intend to call her as a witness in this case?

A.   No, sir.

Q.   These other incidents that you're talking about with Mr. Guevara that you said they're people from the neighborhood that were around when this happened, do you remember testifying about that?

A.   Yes.

Q.   Okay.  I think at one point, you said there were 25 guys around when Mr. Guevara came and started harassing you and other people, right?

A.   Yes, sir.

Q.   Who are those people?

A.   That was in Wicker Park.  That was in the basketball court. He harassed us when we was playing basketball, and then he was harassing us right there by the basketball court; and there was more people waiting to get next on the game, so yes, there were about 20-something people there.

Q.   Who?  Can you name us a couple of them?

A.   I had a couple -- I can't really name.

Q.   None of them?

A.   No.

Q.   Are any of them going to come in here and testify about that?

A.   I don't think so.

Q.   Just you, right?

A.   That's over 30-something years ago.  I don't think so.

Q.   Just your word, right?

A.   Yeah, him harassing us, yes.

Q.   No paperwork, no witnesses other than you, right?

A.   No, nobody made a complaint on him.

Q.   And this is your lawsuit, right?

A.   Yes, sir.

Q.   Okay.  And you understand that you're seeking money for this lawsuit, right?

A.   I'm seeking justice.

Q.   Is that what you're going to ask the jury for, justice, or are you going to ask them for money?

A.   Either/or.

Q.   Either/or.  Okay.  You'd be fine with either one?

A.   Well, I did 17 years in the penitentiary.

Q.   And you want money for that, right?

A.   Falsely convicted, yes.

Q.   And you want money for it, right?

A.   Yes.

Q.   Let's talk about this -- this other murder that you say -- or shooting that you say actually happened on July 2nd.  Okay?

Are you with me now?

A. Yes.

Q. Okay. Your story is that the sequence of events in your confession up until the point where you decide to go and get your gun and go get some retaliation, all of that, other than the date, is true, right?

A. It's true all the way to the point of going to get the gun. That's when it started being false. That's where Guevara fed me all them details and facts about what happened with Luis Huertas.

And from there on he kept on coming in and out of the room, kept on feeding me everything, details of what was going on and what he knew and what he wanted me to say and what he wanted me to do with the statement.

Q. Okay. All right. So, this -- but this other incident, as detailed in your confession, actually does happen, according to you, right?

A. Yes, sir.

Q. And the way that it goes down is that in front of your house, there's -- Diana is there, right?

A. She sees. She's coming down the gangway at the moment, yes.

Q. Okay. Lamont Burr?

A. Yes.

Q. Your brother-in-law, Daniel Rodriguez, he's there, right?

Rios - cross

1643

A.   Yes, yes.

Q.   Mother-in-law --

A.   Comes afterwards.

Q.   Comes afterwards.  But she knows that this happened, right?

A.   She heard the shots.  That's why she came out.

Q.   Right.  So, she knows that this is something that actually happened on this date, right?

A.   Yes.

Q.   Because even though she didn't witness the shooting, she comes down; all hell is broken loose because there's shots fired, right?

A.   Yes.

Q.   So you have -- let's take one step back.

     This issue of this other murder being what you were really talking about came up at your criminal trial through you, right?

A.   Yes.

Q.   You told your criminal jury the same thing you're telling this jury, which is that this thing happened; it was just -- happened on a different date, right?

A.   Yes.

Q.   And the only evidence that was submitted at your criminal trial that that actually happened was the things that you said out of your mouth, right?

A.   Yeah, because that happened to me.

Rios - cross

1644

Q.   Right.   But it didn't just happen to you.   It happened to four other people, too, right?

A.   Yes.

Q.   Okay.   And one of those people, Diana, testified at your criminal trial, right?

A.   Yes.

Q.   Okay.   Now, we know Diana didn't testify about your alibi, right?

A.   Yes.

Q.   She could have, right?   She didn't.

A.   Yes.

Q.   Okay.   She also doesn't say that, "I was in front of the house or in the gangway, and I became aware that somebody had taken some shots at Jaime and Lamont and my brother-in-law. And this is all a big mixup with the confession, and I can tell you that that's the way it happened because I saw it"?

A.   Correct.

Q.   She says nothing about that?

A.   Correct.

Q.   Even though she testifies, right?

A.   Correct.

Q.   And you've read her testimony, haven't you?

A.   Yes.

Q.   Okay.   She says some things to the jury about how she still loves you, still cares for you, all of that, right?

Rios - cross

1645

A.   Yes.

Q.   Even though she had moved on, this isn't somebody who's trying to put you away, right?  Trying to help you?

A.   Yes.

Q.   But the thing that is your theory about why this confession is fabricated, she says nothing about, does she?

A.   Which part of the confession?

Q.   The part where you say that this shooting occurred on July 2nd or 3rd, and not on June 27th of 1989, which is the thing that caused you to retaliate.

A.   Correct.

Q.   While you were in the Cook County Jail, you had the ability to take visitors, right?

A.   Yes.

Q.   To communicate on the phone with people from time to time?

A.   Yes.

Q.   And you would communicate with Diana sometimes, wouldn't you?

A.   Yeah.  Catch her at my mom's house, I'd talk to her, yes.

Q.   Okay.  Did you ever say to Diana, "Hey, Diana, remember on July 2nd or 3rd of 1989, when somebody came and took a shot at us and the police came?  The police think that that is the date of the murder.  I'm going to need you to come in and testify and tell the jury that because I'm facing some serious time here"?

Did you ever do anything like that?

A.   No, sir.

Q.   Did you ever talk to her and say, "Hey, Diana, can you talk to your brother Danny, who was standing out front with me when these people shot at me, and see if he can come in to court and testify?  Because I really, really need it.  I'm facing a lot of time here"?

Did you ever do anything like that?

A.   No, sir.

Q.   And Lamont, did you ever say to Diana, "Hey, Diana, can you go try to find Lamont?  I need him.  He can verify that the stuff I'm detailing in this confession, which is fabricated, he can come to my rescue and come in to court and tell this jury this stuff happened and the confession's not true"?

Did you ever say anything like that to Diana?

A.   No, I did not.

Q.   Did you ever say to Diana that the police had abused you?

A.   No, I didn't.

Q.   Okay.  Did you ever tell Diana, "Hey, Officer Guevara was threatening to take our child away"?  Did you ever say anything like that to her?

A.   She knew about that because she said that they told her they'll take her child away.

Q.   Did you ever say to her, "Diana, the police were saying to me that, hey, they're going to take my child away if I don't do

what they say.  Be very careful with baby Jaime"?

Did you ever say anything like that to her?

A.   No, sir.

Q.   You never told her anything about these circumstances of what you say are coercion by the police leading to this confession, right?

A.   Correct.

Q.   Are you aware of any attempts made by your legal team in your criminal case to try to get police records relating to this incident that you say happened in front of your house on July 2nd or 3rd of 1989?

A.   Not to my knowledge, no.

Q.   Okay.  You don't -- you're not aware of them sending any subpoenas or investigators or sending people out onto the street to see if, you know, they can, you know, talk to people in the neighborhood to see if they can verify that happened; you're not aware of any of that happening, right?

A.   No.

Q.   And you heard Ms. Shields testify last week, right?

A.   Yes.

Q.   Ms. Shields was talking about how Jack Carey was the best of the best, legendary guy, right?

A.   Yes.

Q.   Did you share that assessment of Jack Carey, good attorney?

A.   Very good attorney.

Q. Very good attorney who you're aware of no attempts whatsoever by him to try to corroborate this incident that you say happened on July 2nd or 3rd, right?

A. I believe he had the information, but I don't know if he followed through through it.

Q. Okay. He just let you testify about a shooting that happened and not back it up with any paperwork, right?

A. Correct.

Q. Okay. Be pretty helpful if you had it, though, wouldn't it?

A. Yes.

Q. Okay. And just so we're clear, you were told that this incident that happened was a murder, right?

A. Yes, sir.

Q. Okay. The cops came and they told you all that -- not that this was a shooting, but that someone actually got murdered, right?

A. Yes.

Q. Okay. Are you aware as you sit here today that the Chicago Police Department permanently, permanently keeps murder files?

A. Correct.

Q. Okay. Do you have -- are you aware of any evidence, a single slip of paper from the Chicago Police Department or anyone else that this incident, that this murder actually occurred on July 2nd or 3rd of 1989?

A. They said it could have happened. Somebody screamed in the car. Somebody got shot in the car. So, it could have happened, so they say it probably was a murder.

Q. The cops came, and they said that some dude got murdered, right?

A. They didn't say that some dude got murdered. They said that, "If some dude got murdered, we'll find out."

Q. The cops didn't come and say the dude was murdered?

A. No.

Q. Okay. Let's look at -- one second. Actually, let me come back to that.

251. Oh, sorry.

You told --

A. It was my stipulation.

Q. You told Detective Mason that there had been a murder?

A. It was my stipulation that I believe there was a murder.

Q. You said it was a murder.

A. Yes, sir.

Q. Okay. Got it. So, let's go to -- back to where we were a little bit ago on July 6th when you get arrested. Okay?

A. Yes, sir.

Q. Okay. So, brought down to Area 5, right?

A. Yes, sir.

Q. Placed in the interrogation room?

A. Yes, sir.

Rios - cross

1650

Q.   And it was Mason and Guevara and at first a couple of other police officers, right?

A.   At the door, yes.

Q.   Okay.  I think you testified earlier that the first time you were ever read your Miranda rights was by Ms. Riley.

A.   Yes, sir.

Q.   So, no detective ever read you your rights; is that true?

A.   No, sir, that's correct.

Q.   By the way, before your trial, you -- before the actual trial before the jury, you testified not once, but two other times in court to -- in front of Judge Karnezis, right?

A.   Yes.

Q.   That was on some pretrial motions, right?

A.   Yes, sir.

         MR. J. RICHARDS:  Objection.

         THE COURT:  Basis?

         MR. J. RICHARDS:  Can I have a sidebar, please?

         THE COURT:  Okay.

   (Proceedings heard at sidebar:)

         THE COURT:  What's the basis?

         MR. J. RICHARDS:  The basis is while, yes, there were two pretrial motions and they were heard simultaneously, I believe his testimony was only in regards to the -- to quash arrest and suppress evidence motion.  I could be mistaken, but that's what I believe that the evidence is.

Rios - cross

1651

THE COURT: So, what's the basis of the objection?

MR. J. RICHARDS: It misstates a fact in evidence -- or not even a fact in evidence. Assumes facts not in evidence.

THE COURT: Response.

MR. SCAHILL: I just asked if he testified. That's what I'm trying to establish, if he testified on the motions. He was there.

THE COURT: Yeah, the objection is premature. The question was just whether he testified. I can understand how counsel is tying it to the previous questions, but we have to wait until we hear the question to understand.

You may continue. The objection is overruled.

(Proceedings heard in open court, jury present:)

BY MR. SCAHILL:

Q. You testified in court before your trial on two separate occasions before the trial?

A. Yes, sir.

Q. And one of those occasions was on February the 9th of 1990?

A. I believe so.

Q. I'm sorry?

A. I believe so.

Q. Okay. Let's go to page -- this is Defendants' Exhibit 14, at page 25, line 24.

And what we're talking about, just to reorient you, about whether you were read your rights or not.

A.   Correct.

Q.   And you said no detective ever read your rights?

A.   No detective ever read my rights, no.

Q.   Okay.  And at this proceeding on February 9th of 1990, you were sworn to tell the truth, the whole truth, and nothing but the truth, right?

A.   Yes, sir.

Q.   And you were asked these questions, and you gave these answers:

     "Question:  About what time were your read your rights, Mr. Rios?

     "Answer:  I believe it was around 12:00, 12:30.

     "Question:  That would be 12:00 to 12:30 a.m. on the 7th of July?

     "Answer:  Yes.

     "Question:  And who read you those rights?

     "Answer:  It was officer -- he weren't the one that arrested me, though.

     "Question:  Was it a detective?

     "Answer:  Yes.

     "Question:  And that was before he questioned you, right?

     "Answer:  Yes."

     Were you asked those questions, and did you give those answers on February the 9th of 1990?

A.   Yes, I did.

Q.   Okay.  And was that, in fact, true?

A.   I don't think so.

Q.   Okay.  So, you --

A.   The only one that told me my Miranda rights was Barbara Riley.  That's it.

Q.   So, you did not tell the truth under oath at this pretrial proceeding; is that what your testimony is here today, sir?

A.   I believe so.

Q.   Okay.  And again, that was -- you were sworn to tell the truth, the whole truth, and nothing but the truth?

A.   Yes, sir.

Q.   And you didn't do that, did you?

A.   I didn't know how to tell that Ms. Riley was the one that told me my rights.

Q.   But you knew you had to tell the truth, though.

A.   Yes, but that's the only one that read me my rights, Ms. Riley.

Q.   That's what you're saying here today, but you said something different in February of 1990, correct?

A.   Yes, sir.

Q.   The questioning by Mr. Guevara and Detective Mason that you say happened only lasted about 15 to 20 minutes?

A.   After Ms. Riley came in to the door, yes.

Q.   That's when Ms. Riley came in, after that, right?

A.   When Ms. Riley came through the door, they finished like 15, 20 minutes.  After that, they finished talking to me.

Q.   No, no.  We're maybe talking about something different.

Before Ms. Riley came and brought you into another room for questioning, the questioning that was done by Mason and you say Guevara lasted 15 to 20 minutes?

A.   No.  I'm saying that when she came, it was like 15, 20 minutes before they took me to the other room.

Q.   So, you're saying the questioning by Mason and Guevara did not last 15 to 20 minutes?

A.   Correct.

Q.   Okay.

A.   It was way longer than that.

Q.   Okay.  Well, let's look.  Defendants' Exhibit 125 at page 331, line 7.

"Question:  I understand that.  We'll get to some details later, but the point is this:  Do you have any idea or memory now of how long that first conversation that occurred in the first room before you met Barbara Riley, how long that conversation lasted?

"Answer:  About a quick 15 to 20 minutes.

"Question:  And after that conversation, do you remember how long it was before you were brought in to see Barbara Riley?

"Answer:  About five minutes or so."

Rios - cross

1655

A.   Yes, sir.

Q.   Okay.  You were testifying when your attorney was asking you questions about bathroom and eating and all that.  Do you remember that?

A.   Correct.

Q.   So, is it your testimony that during this 15- to 20-minute period where you're being questioned, you say by Guevara, but by Mason, that you are both hungry, thirsty, have to use the bathroom, and also are sleepy and want to take a nap?

A.   They didn't do none of that.

Q.   Okay.  But those things that your counsel was going through about the things you were experiencing, during that time of questioning, you were simultaneously hungry, thirsty, had to go to the bathroom, and sleepy?

A.   Yes.

Q.   And was that extremely traumatic for you to have to wait 15 to 20 minutes to do all four of those things, sir?

A.   Yes, sir.

Q.   And you had to do them all at the same time in that period?

A.   Yes, sir.

Q.   Okay.  You've been going longer than that now.  Do you need a break?

A.   No, sir.

Q.   Okay.  Now, you say that when you are brought in to the room -- let's make sure I get the sequence of events right --

Guevara shows you a picture from a gang book of Little Mike, and there's that back-and-forth; and then that's when you get your head slammed into the table, right?

A.   Yes.

Q.   At your criminal trial, you were talking about the sequence of events leading up to you giving your confession, right?

A.   Correct.

Q.   And you're talking about, you know, getting roughed up by Mason and all that, right?

A.   Correct.

Q.   Okay.  At any point during your criminal trial testimony, did you ever tell your criminal jury that you were shown a gang book with a picture of Little Mike or anyone else?

A.   No, sir.

Q.   Okay.  The first time you ever made that statement about what happened at your interrogation was during this lawsuit, right?

A.   That they showed me Little Mike's picture --

Q.   Yeah.

A.   -- out of the gang book?

Q.   Yeah.

A.   Yes.

Q.   First time you ever came up with that story was 30-plus years later, right?

A.   Well, it happened 30-plus years ago.

Rios - cross

1657

Q.   But you had -- when you were testifying at your criminal trial, sir, you knew you were facing some pretty serious consequences if you got convicted, right?

A.   Yes, sir.

Q.   And you wanted to make sure that you were telling that jury everything that you could tell them that would help you to avoid those consequences, right?

A.   Yes, sir.

Q.   And at no point did you ever tell them anything about being shown a gang book or being told about Little Mike and this is the guy; you didn't say anything like that, did you, sir?

A.   It wasn't part of the -- yeah, it wasn't part of the statement that they were making me do, so no, I did not.

Q.   And you didn't include that as the sequence of events that led up to giving your confession, either, did you?

A.   No, I did not.

Q.   Your confession does not have you as the person who actually pulled the trigger, does it?

A.   Correct.

Q.   Okay.  It has you essentially as being with Tino, and Tino's really the bad guy who pulls the trigger; you're just with him, right?

A.   That's what I was told to do, yes, sir.

Q.   Is that what you were told to do?

A.   Yes, sir.

Rios - cross

1658

Q.   Did detective -- I'm sorry, did Mr. Guevara, Officer Guevara tell you that you should say that you were not the shooter, that you were just there or something like that?

A.   Yes, sir.  Mr. Guevara said, "Just say that you were there, and we'll take it from there."

Q.   All right.  So, Guevara didn't try to get you to say that you were the actual shooter; he just said you were there with Tino?

A.   Yeah, he just kept on drilling me about me being with Tino and just say that I was there with him and --

Q.   But not that you're the shooter?

A.   Yeah.  He was just trying to build a case with me and get Tino to be the shooter.

Q.   Okay.  Let's go to Defendants' Exhibit 125.  This is page 170, line 9.  Again, this is your deposition in 2023 in this lawsuit.

A.   Okay.

Q.   Under oath.  Okay?  You were asked these questions, and you gave these answers:

     "Question:  All right.  And then when Guevara showed you this mugshot of Michael, what was he saying?

     "Answer:  He's saying, 'We know that you did this.  We know that you killed the guy.  And we're -- we're going to make sure that you would -- you're the one.'  And he started telling me about the guy that say I did it and that I was with Cristino

Rios - cross

1659

when he did this, and he kept drilling me about, 'You being the one, and I'm going to go ahead and make sure that I take your kid away if you don't tell us what happened.'  And he started drilling me about stuff that I didn't even know, talking about that I was there, that I shot the guy, and that I talked to a lady, that I did all type of stuff that I don't even remember any of that because I was never there."

A.  Yes.

Q.  Okay.  So, you testified at your deposition that Guevara was trying to tell you that you were the one that shot the guy?

A.  That I or Cristino, too, but I'd say I.

Q.  Okay.  Well, hang on.  You just told us a minute ago that he was trying to say that you were just there; it wasn't you who pulled the trigger, right?

A.  Yes, sir.

Q.  Okay.  But you told us at your deposition that Guevara was telling you that you're actually the trigger guy.

A.  Yes, sir.

Q.  Did he do that?

A.  Yes, sir.

Q.  So, it's not what's in the confession, that you're just there; what Guevara is trying to tell you is you're the guy who's actually the trigger man?

A.  Yes, sir.

Q.  Okay.  So -- and you wanted to go along -- you were scared,

right?

A.   Of course.

Q.   Okay.  You've got 10.5 out of 10, right?  You've got your head hit into the table, right?

A.   Yes, sir, correct.

Q.   Threatened to take your kids away?

A.   Yes, sir.

Q.   You're going to do whatever this man says to make sure he doesn't do anything to you, right?

A.   Yes, sir.

Q.   Okay.  And what he wants you to do is to say that you're the one who shot the guy?

A.   He wanted to implicate myself in the case, yes.

Q.   He wanted you to implicate yourself as the person who shot Mr. Morales, you, right?

A.   Right.

Q.   Okay.  And you were taking that very seriously, right?

A.   Yes.

Q.   You're going to do whatever Guevara says?

A.   Yes, sir.

Q.   But you didn't, did you?

A.   For his threat.

Q.   But you didn't, though.  You didn't do what he said.

A.   I did what he say.

Q.   Well, does your confession say that you're the one who shot

the guy?

A.   It says that I was there, shooting.

Q.   But what Guevara wanted you to say -- I think now that's what we've landed on -- he wants you to say you're the one who shoots the guy, right?

A.   Well, he told me that I shot the guy or Tino.  So, it could have been.

Q.   Well, you said at your deposition that Guevara, after showing you the picture of Michael, was telling you that you're the one who shot the guy, right?

A.   Yes, sir.

Q.   And that happened, right?

A.   It did not happen.

Q.   No, no.  I'm saying that happened that you're saying he told you that?

A.   Yes.

Q.   And you wanted to go along with that because you're scared of him, right?

A.   Yes.

Q.   But you didn't go along with that, right?

A.   Right.  He was naming both of us, so I was going with what he was talking about.

Q.   He says you're the shooter, and then you're so scared that you go in the room with Riley and Mason, and you say that you're not the shooter?

A.   Correct.

Q.   So, you didn't do what Guevara was saying?

A.   I did what he said.

Q.   Not you implicating yourself as the shooter, right?

A.   No, no.

Q.   You weren't so scared as to not try to still minimize your own involvement in this and say something that was essentially the opposite of what he was telling you to do, according to you, right?

A.   Correct.

Q.   The decision to say that it was not you who pulled the trigger but it was Tino was not something that Guevara said and was a decision that you made, right?

A.   No, sir.

Q.   But you still didn't do what Guevara said, even though he had threatened you?

A.   No, sir.

Q.   Before you went into the room with Riley and Mason, did you speak to Barb Riley alone with no officers around?

A.   For about five minutes, yes, sir.

Q.   Let's go to Defendants' Exhibit 125 at page 196.  This is at your deposition in 2023.

A.   Okay.

Q.   Swore to tell the truth, the whole truth, and nothing but the truth, right?

A.   Okay.

Q.   Okay.  This is page 196, line 19.

     "Question:  Did there come a time when the lawyer, Barbara, spoke to you alone?

     "Answer:  No, sir."

     Did you give those answers at your deposition?

A.   Yes, I did.

Q.   Was that true?

A.   No, sir.  I don't remember if she talked to me at that point or not.

Q.   So, once again, at your deposition, you said something that you knew was not true, right?

A.   I couldn't remember.

Q.   Okay.  You couldn't remember, but you still said that it wasn't true, right?

A.   Yeah, I couldn't remember if she talked to me at that time or not.

Q.   Has your memory gotten better now three years later, sir?

A.   Once I started looking through all the paperwork and everything, yes.

Q.   And so now you've realized that even though you said Barbara Riley didn't talk to you alone, now you remember that she did?

A.   For about five minutes.

Q.   And you are -- just so we're clear, you are accusing

Barbara Riley of being complicit in the misconduct that was committed against you at the police station, right?

A. Yes, sir.

Q. Okay. And you didn't remember -- you knew that at the time you gave your deposition, that you were accusing her of some misconduct, right?

A. Yes, sir.

Q. And you -- and the way that you phrased it in 2023 made it look like she had not met with you at all, when, in fact, she did, right?

A. She did what?

Q. You were trying to make it seem like she had not met with you and was not being honest when you gave your deposition in 2023, right?

A. No, she did.

Q. Yeah. And you said that she hadn't, right?

A. I couldn't remember if she had or not.

Q. And you understand that if you don't remember something and you still say that something happened, that that still is not the truth, right?

A. Correct.

Q. But you did it anyway, right?

A. Correct.

Q. So, you go into the room with Mason and Riley, right?

A. Correct.

Rios - cross

1665

Q.   Close the door?

A.   Correct.

Q.   Okay.  Guevara's not in there?

A.   No.  Guevara left.

Q.   And just so we're clear, you testified about some physical abuse.  Mr. Guevara didn't lay a glove on you?

A.   No, he did not.

Q.   Okay.  He didn't take the phone book with the flashlight and start hitting you, right?

A.   No.  He just threatened me about taking my kid, and he was the one that fed me the story about the guy that got killed.

Q.   Right.  But he didn't -- that's not what you're saying, right?

A.   He wasn't physical towards me, no, at all.

Q.   And again, Mason is somebody you don't know this guy from Adam at all, never met him?

A.   Right.

Q.   Guevara is the guy who you say was being hostile to you all the time, right?

A.   Correct.

Q.   And Guevara doesn't touch you, but the other guy is the one who's hurting you, right?

A.   Correct.

Q.   So, from this point on, once you're in that room, Guevara is not doing anything inappropriate to you at all?

Rios - cross

1666

A.   If he's -- I don't even know if he's in the building.  He's probably downstairs somewhere.

Q.   But he doesn't -- from this point on does nothing else --

A.   He's not in the room.

Q.   Hang on.

From this point on, he does nothing else inappropriate to you at all, right?

A.   No.

Q.   What I said is correct?

A.   Correct.

Q.   Okay.  So, let's go into the room.  In the room, you're talking about Mason going through the statement on a white board, right?

A.   Correct.

Q.   And are you just trying to kind of spit out what Mason's telling you to do?

A.   Miss Riley is writing.  Miss Riley is reading from a paper that she got in front of her, the questions.  She's giving me questions about what's going on.  So she's telling me, "You went this way, and did you talk to some guys over here?"

And Mr. Mason was just doing -- he drew a box on the whiteboard, and he was just going with the marker.  He just kept on going this way, and then he kept on going this way like this --

Q.   So --

Rios - cross

1667

A.   -- and just to the questions that she was answering -- sorry, asking.

Q.   So, is Mason telling you about the facts of how the shooting was supposed to have gone down?

A.   No.  Mason didn't say a word.

Q.   Oh, he didn't say a word at all?

A.   At all.

Q.   You're saying he's just writing on the board?

A.   He's just doing the board.

Q.   So, when -- when Ms. Riley is talking, you're saying Ms. Riley is feeding you information?

A.   Ms. Riley is reading off a paper that she got in front of her questions to me.

Q.   She's reading --

A.   And I'm giving her answers due to the fact -- to the board, what this guy is just writing on the board.

Q.   So, Mason's not saying, "You're the shooter.  You're not the shooter"?  He's not giving you any information at all?

A.   Mason never talked to me about anything, but he was there through the whole interrogation with Guevara when Guevara was feeding me everything.

Q.   And so he never actually says any information about how you're supposed to answer?  Is that what you're saying?

A.   No.  He was just the physical threat that I kept on looking at.

Rios - cross

1668

Q. Okay. So, let's go to page 191 of your deposition. This is Defendants' Exhibit 125, 191, line 8.

"Question: Do you recall what Mason was drawing on this board you're describing?

"Answer: Yeah. He was leading the statement on the board, telling me I came out of the alley. I went to another alley. I walked west. I walked north. Then I got into some guys. I ended up talking to a lady. I got into some guys. I spoke to some guys, and then I got into the front of the building and we got into a fight with some guy, and that I shot the guy and ran off"?

A. Yes, sir.

Q. Is that what Mason was telling you in the room?

A. He was not telling me. He's drawing it. He's drawing -- while Riley is asking off the paper, he's drawing it on the board. Like she said, "So, you went to an alley and talked to some guys." So, he put a line going this way like towards the alley.

Then he put another line saying that -- when she said, "Did you spoke to a car?" He drew a line and stopped, meaning, "There's a car right there. Go ahead and say that you spoke to a car."

Q. So you --

A. And then he kept on just moving the needle --

Q. So who said --

Rios - cross

1669

A.  -- while she was doing the questioning, Ms. Riley, out of her paper.

Q.  So, who told you that -- now, this is at the point where you're with the board, with Mason.  Who told you that you were the one that shot the guy and ran off?

A.  That was off the paper from Riley, I believe.

Q.  So, Riley says to you to say that you shot the guy and ran off?

A.  It was off the paper when she was reading the paper.

Q.  So she --

A.  She said, "So what did you do after you shot the guy?"  So I said, "I ran off."

Q.  So, she says that you shot the guy and ran off?

A.  She asked me, "What happened after you shot the guy?"  And I said, "I ran off."

Q.  Okay.  So, you -- so, the version that you gave her in the room was that you shot the guy and you ran off?

A.  That's what she asked me, "Did you shoot the guy?  After you shot the guy, what did you do?"  "We ran off."

Q.  Okay.  So, Barbara Riley is telling you a version of the events where you're actually the person who shot the guy and you ran off?

A.  That's what she's saying out of her paperwork, "After you's guys shot the guy, you's guys ran off."

Q.  No.  What you said was that she said, "I shot the guy and

ran off."

A.   Yeah, that's what I said.  She said, "After you guys shot the guy."

Q.   You keep saying, "You guys."

A.   Well, "You shot the guy and ran off."

Q.   You, Jaime Rios?

A.   Yeah, she said by yourself.

Q.   So now we have Guevara tells you that you're the guy --

A.   Yes.

Q.   -- who shot him, threatened you you've got to say it, taking your kids away if you don't say that you're the one who shot the guy?

A.   Yes.

Q.   You're also saying now Barbara Riley is telling you also you're the one who shot the guy, right?

A.   Off the paper she was reading, yes.

Q.   Right.  But your confession does not have you shooting the guy; it has you just being there, right?

A.   Correct.

Q.   So, despite what -- this coercion you're saying happened, you're still, according to you, anyway, not even following what they're saying?

A.   Correct.

         THE COURT:  Let's take a break there.  We'll take our afternoon break and come back at 3:00 p.m.

All rise.

(Jury out at 2:31 p.m.)

THE COURT:  Mr. Rios, I remind you not to discuss the substance of your testimony with anyone.

Is there anything to address before the break?

MR. SCAHILL:  No.

MR. S. RICHARDS:  No.

MR. J. RICHARDS:  No.

THE COURT:  Okay.  See you back at 3:00.

(Recess had from 2:32 p.m. to 2:59 p.m.)

(Change of reporters.)

THE COURT: Take your seats. We'll bring in the jury in a moment.

(Pause.)

THE LAW CLERK: All rise.

(Jury in at 3:00 p.m.)

THE COURT: Please take your seats.

Mr. Scahill, you may continue.

MR. SCAHILL: Thank you, Judge.

BY MR. SCAHILL:

Q. Mr. Rios, just want to be clear.

When you're in the room with Mason and Riley, is it your testimony that it was only Riley who was asking the questions?

A. Yes, sir.

Q. Okay. This is Defendants' Exhibit 125, page 329. Again this is your deposition, June of 2023, swear to tell the truth, the whole truth, and nothing but the truth so help you God, right?

A. Yes, sir.

Q. Page 329, line 11, you were asked these questions and you gave these answers, sir:

"First of all, you testified that you had a conversation with Barbara Riley and with Michael Mason where Michael Mason was using a white board where he made marks and made drawings while you were being questioned, correct?

"A." --

A.   Correct.

Q.   -- "correct."

        "Q.   Now during that interview, was Barbara Riley asking questions, was Michael Mason asking questions, or were they both asking questions?

        "A.   They both.

        "Q.   They were both asking questions?

        "A.   (Nodding).

        "Q.   Correct?

        "A.   Correct."

        Did you give those answers to those questions, sir?

A.   Yes, sir.

Q.   Okay.  Were those answers true?

A.   Well, Mr. Mason never did speak at any point right there, but he did the motions with the white board.

Q.   So you testified at your deposition in this case that Mr. Mason was asking you questions, and that was not true testimony, was it?

A.   She was asking the questions, and he was just doing the board.

Q.   Right.

        But you testified at your deposition that they both were asking you questions.

A.   She's asking the question, and he's doing the board into

the question.

Q. Sir, you were asked whether it was Mason, Riley, or both of them asking you questions, and you said it was both of them asking you questions.

That's what I just read to you, right?

A. Yes, sir.

Q. Okay. And you're telling us something different here though now, right?

A. Yeah, it's the same thing. They were both asking questions to that.

Q. I'm sorry. So now you're saying that they were both asking you questions --

A. No --

Q. Hang on. You're saying they're both asking you questions --

A. Right.

Q. -- or are you saying only Riley was asking questions and Mason was drawing?

A. Riley was asking the questions, and Mason was drawing it.

Q. Okay. So when you testified that it was both of them asking you questions, that was not true, was it?

A. They were both in the room and she's asking the questions, and he's writing it --

Q. Right.

So when you say they both were asking you questions,

that was --

(Court reporter interruption.)

BY MR. SCAHILL:

Q.   So when you testified that it was both of them were asking you questions, that was not true, was it?

A.   No, it was not.

Q.   Okay.  And that, again, was under oath at your deposition in this case, right?

A.   Yes, sir.

Q.   Okay.  Just for the benefit of the jury, a deposition is where we get our one opportunity to sit down with you in a room and ask you questions about your lawsuit.  You understood that, right?

A.   Yes, sir.

Q.   That's our one and only opportunity to get your side of the story, right?

A.   Yes, sir.

Q.   Okay.  We don't have access to you other than that, do we?

A.   No, you don't.

Q.   Okay.  And so when you're giving us these answers, this is our one opportunity to ask you questions, and you're not giving us the right information, are you?

A.   I don't remember everything, no.

Q.   But in that particular instance, you weren't?

A.   I don't remember everything, no.

Rios - cross

1676

Q.   When you were in the room with Mason and Riley, was there a court reporter in the room with you?

A.   I don't remember seeing the court reporter.  All I kept seeing was just Barbara Riley and Mr. Mason, which it was the threat.

Q.   Okay.  So are you saying there was no court reporter in that room, sir?

A.   I said I don't remember seeing her, no.

Q.   Exhibit 125 at page 199, line 3.  You were asked these questions, and you gave these answers.

My question was:

"Did the lawyer Barbara ever tell you that they could call a court reporter to come to the police station and take down your statement just like we have a court reporter here taking down your statement?

"A.   No.

"And then while you were in the room with Mason and the lawyer Barbara, do you recall sometime thereafter a court reporter coming to the police station?

"A.   No, sir."

Right?

A.   Correct.

Q.   Did a court reporter take this down, or did Ms. Riley handwrite out a statement and have you sign it?

A.   I do not recall.

Rios - cross

1677

Q.   You don't recall whether you actually made this statement or there was a handwritten statement?

A.   No.  I do not recall a court reporter doing the statement, writing the statement.

Q.   In that room, did Ms. Riley handwrite out a statement and have you sign it?

A.   She had a paper that she was reading the questions out of. That's the paper that I ended up signing.

Q.   Okay.  That she was writing down.

A.   I don't know if she was writing down or was it already written.

Q.   You're saying you don't know whether she -- well, let me -- let me actually take a step back.

          Are you saying that before you started answering the questions, that she had the questions and the answers already written down?

A.   She had a paper that she was reading the questions out of.

Q.   And was she taking the answers down from you?

A.   I don't -- I don't recall.

Q.   Is your testimony that Ms. Riley handwrote out a statement and then had you sign it; yes or no?

A.   The paper that she was reading out of, that's the same paper that she had me sign.

Q.   Okay.  And that's --

A.   And I don't remember a court reporter being in the room at

all.  I don't remember that.  I can't recall that there was a court reporter in there.

Q.  She has something in front of her and she's reading, and you're responding to questions --

A.  That's right.

Q.  -- and then she hands it to you, the thing that she's written out, to have you sign it?

A.  At the end -- at the end of the deposition that she was doing, yes, she had me sign the paper.

Q.  Okay.  Is it handwritten, or is it typewritten?

A.  The paper that she had was handwritten.

Q.  Okay.  So it's -- so you're telling us that there's -- you understand that this confession that we have here is a typed-out question and answer, right?

A.  Yes, sir.

Q.  Okay.  So are you telling us that Ms. Riley had a different version, where she wrote out the statement, handwrote out the statement and had you sign it?

A.  There was -- there was a paper statement that she made me write.

Q.  That she made you write?

A.  No, sir, that she made me sign.

Q.  Have you ever seen that piece of paper?

A.  No, sir.

Q.  Okay.  But it's something different than this.  That's what

you're telling us.

A.   Yeah, it was handwritten.

Q.   I see.  And that was -- what was the content of that, sir?

A.   I don't know.  The questions that she was asking me.

Q.   And the answers that you gave?

A.   Yes, sir.

Q.   And you're saying that that existed and that you signed it.

A.   Yes, sir.

Q.   And you've never seen that?

A.   Never seen the paper, no.

Q.   So that's something different than this?

A.   Yes.  It was a written statement.

Q.   This transcript of your statement, did you -- we talked about this before.  You actually gave the answers that are on here, right?

A.   Yes.

Q.   Okay.

A.   That's what I would say, yes.

Q.   It was not -- it was not Mason and Riley giving the answers for you.  You're actually uttering them out of your mouth, right?

A.   Yes.

Q.   Okay.

A.   Out of what I remember what Guevara was telling me, yes.

Q.   Now, sir, at your deposition, you told us, did you not,

Rios - cross

1680

that these answers were actually not given by you at all, that they were given by Mason and Riley, didn't you?

A.   In -- when I was in doing -- when I was doing the -- the statement, it was just them two, yes.  It was Riley and Mason.

Q.   So you were not actually saying these words, that they were saying -- putting things down that you never said?

A.   They never said the words.  I was saying the words that -- they were giving me a question and we were talking, and that was the answers that I was given.

Q.   So you gave the answers.  They didn't give the answers.

A.   Yeah, the answers Guevara was giving me earlier and feeding to me earlier before they even took me back there, routine, Mason and Barbara Riley.

Q.   But you were the one giving the answers, not them.

A.   Yeah, everything that was fed to me, yes.

Q.   Let's go to page 219, page 20 -- 219, line 20.

     You were asked quite a few questions at your deposition about the answers and the questions that are contained within here, right, sir?

A.   Correct.

Q.   Okay.  And one of those had to do with the point in your statement where you're crossing Western going into the Cobra territory to scare them like they scared you --

A.   Right.

Q.   -- remember that part?

A.   Right.

Q.   Okay.  And you told us at your deposition that you actually did not give the answers to that in here, that it was actually Riley and Mason who were putting those words in there themselves.

A.   That was the one -- she was the one asking the questions, and I was giving out the answers that Guevara was embedded into me.

Q.   Okay.  But that's not what you said at your deposition, was it?

A.   The only persons that was in there was just Barbara Riley and Mason carrying out what Mr. Guevara had did.

Q.   Okay.  So --

A.   They embedded me.

Q.   You, at your deposition in June of 2023, you were asked these questions and you gave these answers:

        "Q.   And she asked were you going to go to Western by yourself?  Were you going to cross Western?

        "A.   No.  I was going to shoot from inside my territory towards their territory, get them scared the way they scared me.

        "Do you see that?

        "A.   Yes, sir.

        "Q.   Was -- did you give that answer to her question?

        "A.   No.  Well --

Rios - cross

1682

"Q.   Well, if you didn't give that answer, who did?

"A.   They put this question in there and the answer. I didn't tell them this.

"Q.   So you never said that?

"A.   No, sir.

"Q.   So what's written there is not even given by you; is that correct?

"A.   Uh-huh.

"Q.   Is that a yes?

"A.   Yes, sir."

Those are the questions that you were asked and the answers that you gave, correct?

A.   Correct.

Q.   Okay.  That is not what happened, is it?

A.   Yes, it did.

Q.   Okay.  So now they're the ones who are literally taking down things that never passed through your lips and putting them on a piece of paper?

A.   Everything that was given to me by Guevara I was putting in that paper by when they asking me the questions, I'm giving them the answers that I could remember as much as I could remember from Mr. Guevara.

Q.   You told Mr. Polick at your deposition that you never even said the answers to it that we just read, right?

Right?

Rios - cross

1683

A.   Yeah, not my true answers.  Those are not my answers.

Q.   No.  Mr. Polick asked you whether you said those things, whether you spoke them from your mouth, right?

A.   Yes, sir.

Q.   And you told him you did not?

A.   Correct.

Q.   That is not what happened, is it?

A.   I gave -- I gave the answers, but they were not my answers.

Q.   Okay.  But you did say them?

A.   Yes, sir.

Q.   But you told Mr. Polick that you didn't say them?

A.   Yes, sir.

Q.   And that was not true, was it?

A.   Correct.

Q.   And you said that -- that same version of the events about your confession, and we can go through them if you want, over and over and over again at your deposition, you denied ever even having said the things that were in here and said that they put them in there instead, didn't you?

A.   Yeah, they embedded -- they embedded all the information into me, and I said it.

Q.   Sir, we can go through it if you want.

A.   Yes.

Q.   You said at your deposition over and over again with respect to your answers in here that you never even said these

things, that they said them and put them on a piece of paper.

Isn't that the version you gave at your deposition, sir?

A.   Yeah, that's true.

Q.   That is true, that these words never passed your lips and they just wrote them down?

A.   They put the paper -- they wrote down -- they did the answers and everything, and I just went with them on what they were talking about.

Q.   Okay.

A.   Yes.

Q.   Did you say them or not?

A.   Yes, sir.

Q.   Okay.  But you told us at your deposition you didn't say them.

You said they were just writing things down that you never said, right?  That's what you told them?

A.   In a way, yes.

Q.   That's not how it went down, was it?

A.   It went down similar to that, yes.

Q.   Similar, but -- similar in the sense that one thing happened and another thing didn't happen, right?

A.   Yeah, Barbara Riley and them -- Barbara Riley and Mason were the ones interrogating me -- interrogating me into doing that.

Q.   Right.  But these -- now what you're telling us is you did

say these things, they just weren't true.  But what you told us in 2023 is I never even said those things at all.

A.   Those things were said due to the fact that Guevara embedded all those things into me.

Q.   Right.  But you told us at your deposition you never said them at all, right?

A.   That Mrs. Riley and Mason did it, yes.

Q.   Okay.  There are parts of your statement that neither Mr. Guevara nor Mr. Mason ever told you to say at all.  You just said because you were saying things, right?

A.   Just running through -- just running through whatever I could remember, yes.

Q.   Going through the things that you remember from when you were on Western on June 27th of 1989, right?

A.   No, from the information that Mr. Guevara was feeding me.

Q.   But you -- you said things at your statement that Mr. Guevara, neither Mr. Guevara nor Mr. Mason nor Ms. Riley ever told you to say.  You said them and you made them up, right?

A.   Certain things.

Q.   Certain things like that you were going to look for a group of Cobras to shoot and scare them?  You said that, right?

A.   That was embedded to me, too.

Q.   I'm sorry, what?

A.   That was embedded to me by Guevara, but I did say it.

Q. He's the one -- he's the one who told you to say that?

A. He fed me the statement.

Q. Is he the one who told you to say that part of it?

A. He told me to just say that I was there, yes.

Q. Did he tell you to say that you were looking for a little crowd so you could shoot at Cobras and scare them?

A. Yes.

Q. Let's go to your trial testimony. This is Defendants' Exhibit 16, page 290, line 19:

"Q. Do you remember telling this -- them this: I was looking for a little crowd so I could shoot at Cobras and scare them like they scared me without hurting anybody?

"A. Yes.

"Q. You told them that; is that right?

"A. Yes.

"Q. So did this come from you, or did the police tell you to say that?

"A. That comes from me."

A. Yes.

Q. So that is not something you were told to say. That's something you decided to say.

A. They told me to go ahead and just go with the statement and whatever I don't remember, just go ahead and say something about it.

Q. And you made --

Rios - cross

1687

A.   Make it -- make it -- make it look real --

Q.   You made --

A.   -- basically.

Q.   You made this part up; you weren't told what to say there, right?

A.   That's what they did.

Q.   And the part about you going to shoot from inside your territory to their territory, you remember that part about your confession?

A.   Yes, sir.

Q.   Okay.  You were also not told to say that by the police. You decided to say that.

A.   I can't recall.

Q.   Defendants' Exhibit 16 at page 284, line 9:

        "Q.   Did Officer Guevara tell you to say this:  I was going to shoot from inside my territory towards their territory to get them scared the way they scared me.  Did he tell you that?

        "A.   No.

        "Q.   Who told you to say that?

        "A.   That comes out of me.

        "Q.   That comes out of you?

        "A.   Yes."

        You were asked those questions, and you gave those answers, right?

A.   Yes, sir.

Q.   Okay.  And it wasn't from -- Guevara never said to say that at all.  You decided to say it.

A.   He embedded all the type of information to me, and things that I did not know, I made little things up.

Q.   Let's detour for a second and talk about the lineup.

You told your attorney yesterday in great detail how a uniformed officer came down to your cell, he gave you a red sweat suit, you put it on, you went up to the lineup.  Do you remember that?

A.   Yes, sir.

Q.   Okay.  Did you review your deposition in preparation for your testimony, sir?

A.   Kind of.

Q.   Kind of?  Okay.

Your testimony prior to today was that this lineup, where you were wearing the red jumpsuit, is not even the lineup from this case at all.

A.   Now that I remember, no.

Q.   But that's what you testified before today.

You said this -- this lineup where I was wearing the red jumpsuit, that's not the lineup that has anything to do with this case?

A.   I didn't recall what lineup that was.

Q.   Your memory has now gotten better?

Rios - cross

1689

A.   No, it's 'cause the simple fact it's the dates on the lineup.

Q.   You told us at your deposition that no one had told you to put this red sweatshirt on for your lineup, right?

A.   Correct.

Q.   Okay.  That was not true, was it?

A.   They just put it on the bar and said here.

Q.   No.  When you gave your testimony in 2023 about no one having told you to put the red sweatshirt on and this lineup coming from a different case, when you swore under oath that that's actually what happened, that is not true, is it?

            MR. J. RICHARDS:  Objection.

            THE COURT:  Basis?

            MR. J. RICHARDS:  Improper impeachment, page, line, question, answer.

            THE COURT:  It's overruled.

            You may answer.

BY THE WITNESS:

A.   The officer came to the cell, put the -- put the uniform right there and told me to go ahead and grab it.  He said, "here."

BY MR. SCAHILL:

Q.   I understand you're saying that's what happened now.

A.   Yes, sir.

Q.   I'm asking you something different.

At your deposition, isn't it true that you told us that this incident with the red jumpsuit was not even from the day that you were in police custody, it was from some other time.

A.   That's what I thought, yes.

Q.   Okay.  And that was not true, was it?

A.   That was from the lineup of that day.

Q.   Right.

A.   But I didn't know --

Q.   But when you told --

A.   I didn't know what lineup they were talking about basically.

Q.   But, regardless, you decided at your deposition to say something different.

A.   I don't remember the lineup.

Q.   And so when you didn't remember, you just decided to say that this thing did not occur, right?

A.   I don't remember the lineup for the simple fact that when I went in there, I went in there with a white T-shirt, and then I was in a red jumpsuit being on the lineup.  So I don't even remember that guy in the lineup with the white T-shirt.

Q.   You remembered yesterday when you testified about it when your lawyer was asking you questions though, right?

A.   Yes, sir.

Q.   Okay.  And so even though at your deposition you didn't

remember and thought it was something else, now your memory has gotten better, right?

A.   Well, no, that's evidence that came through when I was -- when I was looking through the case.

Q.   Right, but you -- you didn't remember in 2023, but now you remember it in 2026, this vivid story of you being given the sweat suit between the bars and being told to put it on.

A.   Yes, sir.

Q.   Okay.  And so your memory has gotten better in the last three years.

A.   No, sir.

Q.   When you're in the Cook County Jail after you get charged, you're allowed to meet with your lawyer, right?

A.   Not at that point.

Q.   No, but eventually when you're there awaiting trial, your lawyers come and visit you, and you meet with them to prepare for trial, right?

A.   Yes, sir.

Q.   And that was Mr. Carey and Ms. Shields?

A.   Yes, sir.

Q.   And also when you were in the Cook County Jail as we talked about before, you're communicating with your mom, your sister, with your girlfriend Diana, right?

A.   Yes, sir.

Q.   Okay.  You had pretty ready access to a phone?

Rios - cross

1692

A.   Not every day.

Q.   Yeah, but regular access.

A.   Not every day, but, yeah, you could get use to the phone.

Q.   You were also now -- strike that.

     When you are in Cook County Jail, you were there in sort of a general population of people also awaiting trial, right?

A.   Correct.

Q.   And that included fellow Latin Kings.

A.   Yes.

Q.   Other people who are awaiting trial for serious crimes --

A.   Yes.

Q.   -- right?  And you're talking to those other inmates, right?

A.   Yes.

Q.   Okay, including your Latin King friends, right?

A.   Yes.

Q.   At some point, you become aware that there is a motion to suppress your confession that is filed, right?

A.   Suppress evidence, yes.

Q.   Okay.  And that evidence is this --

A.   Yes.

Q.   -- your confession.

     Okay.  And do you know when that was filed?

A.   No, I do not.

Rios - cross

1693

Q. Okay. Do you know that it was not filed for seven whole months after your arrest?

A. Well, I'm not the lawyer, so I'm not the one really filing. He got the information, so it's his duty to do his job, not mine's.

Q. And it's not filed for seven months until -- seven months after you got charged, right?

A. Correct.

MR. SCAHILL: May I have the document camera, Your Honor?

This is Defendants' Exhibit 106, which is I believe already in evidence. It's the motion to suppress.

BY MR. SCAHILL:

Q. You recognize this to be the motion to suppress statements that was filed on your behalf by your attorneys?

A. Yes.

Q. Do you see at the top that it is dated January 5th of 1990?

A. Yes.

Q. Okay. We're going to walk through some of these paragraphs, but you understand that this document made various allegations about the coercion and your -- leading up to your confession?

A. Yes, sir.

Q. All right. Before this is --

THE COURT: Before you continue, what was this exhibit

number again?

MR. SCAHILL:  106.

THE COURT:  I believe it's in as Plaintiff's 10.

MR. SCAHILL:  Oh, I'm sorry.

THE COURT:  But is there any objection to Defendant 106, which is the motion to suppress statements?

MR. J. RICHARDS:  No.

THE COURT:  Okay.  So Defendants' 106 is admitted as well.

(Defendants' Exhibit No. 106 received in evidence.)

THE COURT:  And may be published.

MR. SCAHILL:  Thank you, Judge.

BY MR. SCAHILL:

Q.  Before this is filed, now six months after your arrest, are you aware of any disclosure in court either through testimony or some filing that makes the allegation that your confession was coerced?

A.  I can't recall.

Q.  Okay.  As far as you know, the first time any claims about coercion are made on your behalf is in January of 1990.

A.  I believe so.

Q.  Okay.  And you, other than -- I don't want to know what you talked about with your attorneys about, but other than your attorneys, you do not make that claim to anybody.

A.  What claim would that be, sir?

Rios - cross

1695

Q.   The claim would be that your confession was the product of some sort of coercion, like you were physically abused or you were threatened.

A.   I talked to my lawyer about it.  That's it.

Q.   My question was other than your lawyer, did you ever, before this was filed, make any statement to anyone about coercion in your confession?

A.   No, sir.

Q.   All right.  Paragraph 2 states -- paragraph 1 talks about your arrest.

Paragraph 2 states that subsequently the defendant was interrogated at Area 5 headquarters by law enforcement officials or a person or persons acting on their behalf, including Gawrys, Guevara, Vukovich, Mason, Halvorsen.  Do you see that?

A.   Yes, sir.

Q.   That is one, two, three, four, five people, right?

A.   Yes, sir.

Q.   Were you interrogated by five people?

A.   No, sir.

Q.   Okay.  So that is incorrect, right?

MR. J. RICHARDS:  Objection.

THE COURT:  Basis?

MR. J. RICHARDS:  Withdrawn.

THE COURT:  You may answer.

BY THE WITNESS:

A.   The only one I remember that did that was Guevara, and all the other officers that you got right here, they never questioned me about anything or told me anything.

BY MR. SCAHILL:

Q.   Okay.  So when you say -- when it is said on your behalf that you were interrogated by these five people, that is not accurate, is it?

A.   They weren't interrogating me, no.  The only one interrogating me was -- was Guevara.

Q.   Okay.  So, again, when it says you were interrogated by these five people, not accurate, is it?

A.   It was just one person talking.

Q.   Okay.

A.   All the other people, they probably was there, but none of them spoke.  The only one was speaking was Guevara.

Q.   All right.  Paragraph 4 says that in the course of the interrogation, Mr. Rios was handcuffed to a wall, had his hair pulled, and was threatened with the loss of parental rights to his child.  His common-law wife was brought to the station, was threatened with having her child, to whom the defendant is the father, taken away by the State, and this threat was then used against the defendant -- against defendant Mr. Rios.  Do you see that?

A.   Yes, sir.

Q.  All right.  First question:  Does this motion, either in that paragraph or anywhere else, state who the person or persons are who did those things?

A.  No, it does not.

Q.  Okay.  Does this paragraph or any other part of this state that you had your head slammed into a table?

A.  No, it does not.

Q.  Does this or any other part of this motion state that you were fed information by any police officer or state's attorney that led to you giving your confession?

A.  No, it does not.

Q.  Does it talk about anything relating to sleep deprivation or not being allowed to use the bathroom or being hungry?  Does it say anything about that?

A.  No, it did not.

Q.  You then testified on two separate occasions before your trial in front of Judge Karnezis, right?

A.  Right.

Q.  These were pretrial motions --

A.  Correct.

Q.  -- right?

    You did testify at your motion to suppress, didn't you?

A.  I can't recall.

Q.  Okay.  Let's go to 125, page 72, line 19.  You were asked

Rios - cross

1698

these questions, and you gave these answers:

"Q. And you testified in February of 1990 in a pretrial suppression motion?

"A. Yes, sir."

Correct?

A. Yes, sir.

Q. Okay. At any point prior to your criminal trial in November of 1990, did you ever testify about any coercion that was inflicted upon you by anyone?

A. I don't recall.

Q. Okay.

MR. J. RICHARDS: Objection.

THE COURT: Basis?

MR. J. RICHARDS: Sidebar, Your Honor.

(Proceedings heard at sidebar:)

THE COURT: What's the basis of the objection?

MR. J. RICHARDS: Your Honor, the question -- it misstates facts in evidence. He testified, not at the motion to suppress statements. It was the other motions.

MR. SCAHILL: He testified he testified at the motion to suppress. He literally just said that.

MR. J. RICHARDS: There were different motions to suppress. That's the point.

MR. S. RICHARDS: Your Honor, if I may interject, there was a motion to quash arrest and a motion to suppress

statements, distinct motions, distinct bases.  He testified twice, but they were both respect with the motion to quash arrest.

He was never ever called as a witness at the motion to suppress statements.  It's a deliberate confusion between the motion to quash and the motion to suppress statements.

He did not testify at that motion.

MR. SCAHILL:  First of all -- well, I'll comment if you want.

THE COURT:  Okay.  So I don't understand the legal aspect of the objection in the sense that to the extent that the witness does not recall or is confused as to when he testified, that seems like something that needs to be addressed on redirect.

What I have right now is a question whether he testified at the motion to suppress.  He did not recall.  He was then somehow impeached without objection going to the deposition, even though the statement was I don't recall.  And at the deposition, he said testified in February of 1990 in a pretrial suppression motion; yes.

The next question is:  At any point prior to your criminal trial, did you ever testify about any coercion that was inflicted upon you by anyone?

The answer is:  I don't recall.

So I don't understand where we are with this objection

Rios - cross

1700

when the answer that you have is "I don't recall."

MR. S. RICHARDS:  Your Honor, if they continue along these lines, that's fine.  We'll clear it up in the course of events, but just for the record, it is an utter misstatement of what happened at the trial.

He did not testify at a motion to suppress statements.  He testified at a motion to quash arrest and suppress evidence, which is a motion to suppress statements --

THE COURT:  Tell me what the salient fact is here.  I assume that the defendant is offering it because there is a recorded statement under oath by your client.

What does it matter whether it's at a motion to suppress or a motion to quash if the import of the evidence is that it is a prior statement under oath?  Help me understand that distinction.

MR. S. RICHARDS:  I will.  He is claiming that there was no testimony --

THE COURT:  Closer to the microphone so that it is outside the hearing of the jury.  That is the whole purpose of this procedure.  I've explained it to you once.  This is the second time.

MR. S. RICHARDS:  Okay.  A motion to quash arrest and suppress evidence, including a statement, does not rest on a claim of coercion.  So to say that he made no claim of coercion when he did not testify at a motion to suppress statements,

Rios - cross

1701

which is the proper motion to bring up claims of coercion, and only testified at the motion to quash arrest and suppress evidence is misleading.

THE COURT: Okay. The objection is overruled, and we will stick with the practice of the person doing the examination gets to speak during objections. No more intervening.

You may continue.

(Proceedings heard in open court:)

THE COURT: The objection was overruled.

BY MR. SCAHILL:

Q. Mr. Rios, before you testified at your criminal trial in November of 1990, did you ever at any point testify about any coercion that was inflicted upon you by any police officer leading to your confession?

A. Possible I told my lawyer about Guevara.

Q. Not -- not what I asked.

Did you ever testify -- I'm not asking what you talked to your attorney about.

A. Okay.

Q. Did you ever testify in any proceeding ever before your criminal trial about any coercion inflicted upon you by any police officer?

A. No, sir.

Q. You did testify about some coercion at your trial, right?

A. Yes, sir.

Q. And at that point, you did not make any statement about you supposedly being led through your statement with a white board by Detective Mason, did you?

A. I did not.

Q. The first time you made any claim like that was in this lawsuit, right?

A. Yes, sir.

Q. 30-plus years later?

A. Yes, sir.

Q. Your attorneys also did not list as witnesses on your behalf this Jamaica person, right?

A. Correct. They couldn't find him.

Q. But they didn't even list him as a potential witness, did they?

A. But I did tell them.

Q. Sir, focus on the question.

Did your attorneys list -- I didn't ask whether they could find him. Did they list him as a witness?

A. No, sir.

Q. Did they list Mr. Burr as a witness?

A. No, sir.

Q. Did they list Daniel Rodriguez as a witness?

A. No, sir.

Q. You were present, of course, for the entirety of your

Rios - cross

1703

criminal trial, right?

A.   Yes, sir.

Q.   The prosecution called Mr. Huertas, right?

A.   Yes, sir.

Q.   Mr. Huertas identified you in open court as the person who he saw shoot his friend --

A.   Yes, sir.

Q.   -- correct?

They called Barbara Riley, who testified as to your statement, right?

A.   Yes, sir.

Q.   They called Mr. Guevara at some point, right?

A.   Yes, sir.

Q.   Okay.  Do you even remember what Mr. Guevara testified about at your trial?

A.   Not -- not really.

Q.   He didn't put in any incriminating statements about you at your trial, did he?

A.   I don't think so.

Q.   He didn't say Jaime Rios told me he shot Luis Morales or was present when he shot Luis Morales, right?

A.   Correct.

Q.   He didn't put any statements of you in, did he?

A.   No, he did not, not that I could recall.

Q.   Your friend, Mr. Carrero, testified though, right?

Rios - cross

1704

A.   Yes, sir.

Q.   Now, Mr. Carrero was a -- had been a friend of yours for quite a while before this, right?

A.   Yes, sir.

Q.   Fellow gang member, correct?

A.   Yes.

Q.   And he made some incriminating statements about you at your trial, right?

A.   Yes, sir.

Q.   And you told us yesterday that you ran into Mr. Carrero when you both were locked up in Pontiac, right?

A.   Yes, sir.

Q.   And as I recall your testimony yesterday, you said that you ran into him, and he said to you specifically that Mr. Guevara made him lie, right?

A.   Correct.

Q.   And that you forgave him because you knew that Mr. Guevara was involved, right?

A.   Yes, sir.

Q.   And that you guys had something in common.  So even though he was partially responsible for you doing a couple decades in prison, it was all forgiven.

A.   Yes, sir.

Q.   That is not how that conversation with Mr. Carrero went at all, is it?

Rios - cross

1705

A. Yes, it did.

Q. When you talked to Mr. Carrero, Mr. Carrero told you that he had gotten beaten up, right?

A. I don't remember that.

Q. Sir, isn't it true that Mr. Carrero told you that he was beaten up by the police?

A. He said he was harassed, yes, he was --

Q. Did he tell you that he was beaten up, sir?

A. No, sir.

Q. Let's go to Defendants' Exhibit --

A. Not that I recall.

Q. -- 125, page 93, line 4. Page 93, line 4:

"Q. And what did you and Mr. Carrero discuss as you were walking the yard at Pontiac?

"A. We discussed so many things, family, family, what's going on out there, you know, what happened to me, you know, during my case and everything.

"Q. What did you and Mr. Carrero discuss about the circumstances of what happened to you in your case?

"A. That they beat him up and they told him to say that I was -- that I was -- that I was the shooter and that I gave him a gun and some other things that I really don't remember what he said.

"Q. When Mr. Carrero said he was beaten up, did he say who beat him up?

Rios - cross

1706

"A.   No.

"Q.   And when Mr. Carrero told you that he was told to say that you had given him a gun, did he say who told him to say that?

"A.   The officer.

"Q.   About you?

"A.   The officer told him that.

"Q.   Which officer?  Did he specify?

"A.   I have no -- I have no idea which officer it was, possible his arresting officer.  I have no names."

Were those the questions that you were asked and the answers that you gave?

A.   Yes, sir.

Q.   So the way that you recalled it at your deposition is that Mr. Carrero gives you a story about being beaten up, and he can't even tell you who the officer was that was involved with him, right?

A.   Yes, sir.

Q.   But you told us yesterday this very vivid story about you guys bonding over the fact that it was Mr. Guevara, right?

A.   Yes, sir.

Q.   When, in fact, you told us at your deposition he didn't even mention the name Guevara to you.

A.   I didn't -- I didn't remember.

Q.   You remember now in front of this jury though, right?

A.   Since we been looking at the case, yes.

Q.   And are now -- are you now remembering that Mr. Carrero didn't tell you that he was beaten up either?

A.   Yes.

Q.   Okay.  When you were testifying at your deposition, you had forgotten which of your friends you had said to say was beaten up and which you had said to say something else, right?

A.   I couldn't recall --

Q.   Mixing him and Cristino up.

A.   I couldn't recall, yes.

Q.   So you mixed up who you -- who you told to say what, right?

A.   I couldn't recall which one was which.

Q.   You mixed up Tino and Mr. Carrero about the story of who was beaten up, right?

A.   I don't remember which one said that for simple fact that when they spoke to me, I told them to speak to my lawyer.  And whatever story they told, they told to my lawyer, not to me.

Q.   Not in prison though -- in prison --

A.   I didn't --

THE COURT:  We can't speak over each other.  I remind counsel and the witness to allow each other to finish before jumping in.

Thank you.

THE WITNESS:  Yes, sir.

BY MR. SCAHILL:

Q.   In prison, this was decades before you got out and were challenging your conviction, right?

A.   Yes, sir.

Q.   That's when Mr. Carrero, according to you, was telling you about his time in police custody, right?

A.   Yes, sir.

Q.   And at that time in prison, Mr. Carrero could not tell you the name of Mr. Guevara as somebody who had done anything to him, could he?

A.   He couldn't recall.

Q.   Okay.  So when you testified yesterday that you bonded over him saying it was Guevara, that was not true, was it?

A.   It was true.

Q.   How -- how could you have bonded over it was Mr. Guevara who had mistreated both of you if Mr. Carrero couldn't even remember the name of the person who had supposedly mistreated him?

A.   Because Guevara was the one that locked him up.

Q.   But he didn't tell you that, did he, Mr. Carrero?

A.   Yes.

Q.   He didn't tell you that.

A.   He took him to the station.  I knew that.

Q.   Mr. Carrero never said anything about Guevara doing anything to him, did he?

A.   Can't recall if he did say that he was given a gun and told

him to say that I was the one that gave him the gun.

Q.   Right, but he never -- I understand that, but --

A.   He mentioned Guevara then, back then, but he didn't mention Guevara in the -- in the penitentiary, no.

Q.   When you say then, you're talking about when you got out of prison and you were --

A.   And I started --

Q.   Hang on.

You were talking about decades later when you go back to Mr. Carrero for the affidavit and he starts saying the name Guevara.  That's what you're talking about, right?

A.   Yes, sir.

Q.   Okay.  But before that, never said the name Guevara to you at all.

A.   Didn't know his full story, no.

Q.   Right.  And also told you that he got beaten up, right?

A.   Yes.

Q.   And you heard him testify last week, right?

A.   Yes.

Q.   He said nobody ever beat me up.

A.   Correct.

MR. SCAHILL:  May I have the document camera, Judge?

This is Defendant's Exhibit 31 in evidence, the affidavit of Mr. Carrero.

THE COURT:  It may be published.

Rios - cross

1710

MR. SCAHILL:  Thank you.

BY MR. SCAHILL:

Q.  Mr. Carrero executed an affidavit on your behalf, right?

A.  Correct.

Q.  And you used that affidavit as part of your attempts to get your conviction vacated as part of your post-conviction, right?

A.  Correct.

Q.  Okay.  And you heard Mr. Carrero say that you actually took him to go get this thing signed, right?

A.  Yes.

Q.  Is that true?

A.  Yes.

Q.  You took him to go have this affidavit signed?

A.  Yeah, I took him to get certified, yes.

Q.  Page -- Defendants' Exhibit 125 at page 101, line 9.  Were you asked these questions, and did you give these answers:

        "Q.  Were you present when Mr. Carrero signed the affidavit?

        "A.  No, sir.

        "Q.  Did you become aware that Mr. Carrero had signed an affidavit about your case from anyone other than your attorney?

        "A.  No, sir."

        Were you asked those questions, and did you give those answers?

A.   Yes, and I couldn't recall really what -- what the situation was there.

Q.   So you -- you now remember that you actually did go with Mr. Carrero to have this signed, but you didn't remember that at your deposition, is that what you --

A.   We went -- we went to get some papers certified and to send to my lawyer.  That's it.  I don't remember what kind of paper he was getting certified or anything.  He just went over there, got it certified, and sent to my lawyer.  That's it.

Q.   Have you read this affidavit before?

A.   No.

Q.   Can you read paragraph 14 for us, please.

A.   Yes, sir.  "I was willingly to come forward before this date and would have not have told any -- anyone about Guevara conduct because I was afraid of Guevara and what he might do to me."

Q.   Okay.  It actually says -- I think you said willing.  I was unwilling, right?

A.   I was unwilling, yeah.

Q.   You know that that statement is not a true statement, right?

A.   I do not know that, sir.  It's not my statement.

Q.   You testified yesterday that Mr. Carrero actually had come forward to you and told you about Mr. Guevara's conduct, right?

A.   Yes.

Rios - cross

1712

Q.   Okay.   And so Mr. Carrero was willing to come forward
decades before this to tell you about Mr. Guevara's conduct,
right?

A.   Yes.

Q.   So when Mr. Carrero is saying I was unwilling to come
forward before this date, you know that's not true because he
actually told you.

A.   That's 30-something years ago.   I didn't -- I can't recall
what he said at that day.

Q.   But you know as you sit here today now that -- given what
you said yesterday, this is a false statement, right?

A.   If that's his false statement, that's his false statement.

Q.   And it's his false statement that you used in court to get
your conviction thrown out, right?

A.   I never read the statement, so it was used, yes.

Q.   It was used in your post-conviction to get your conviction
thrown out, right?

A.   Yes, sir.

Q.   And it was used in your Certificate of Innocence
proceeding, too, to get that, right?

A.   Yes, sir.

Q.   And it's false.   You know it's false, right?

A.   I never read the statement, so I can't tell you if it's
false or not.

Q.   But you know it's false as you sit here today though,

Rios - cross

1713

right?

A.   You calling it false.

Q.   No, I wasn't in Pontiac with you, sir.  You know that this is false because you know Mr. Carrero was definitely willing to come forward and talk about it because he told you.

A.   Yes.

Q.   So you -- you submitted false evidence to the court to get your conviction thrown out, sir, didn't you?

A.   Did I?

Q.   Yes.

A.   I never read this statement.

Q.   But it was submitted on your behalf, wasn't it?

A.   If it's submitted, yes.

Q.   And it's false, right?

A.   I can't -- I can't say it's false or not.

Q.   You know it's false because you were there, sir.  You know he was willing.  You heard it from his mouth, right?

            MR. J. RICHARDS:  Objection.

            THE COURT:  Sustained.

            Counsel, how much more do you have on this, this topic?

            MR. SCAHILL:  That's it.  I'm done with this.  Thank you.

BY MR. SCAHILL:

Q.   So you get convicted, right?

Rios - cross

1714

A.   Yes.

Q.   You're then sentenced in January of 1991?

A.   Yes.

Q.   And at that point, there's a stage of the proceedings called aggravation and mitigation, right?

A.   Okay.

Q.   You remember that part of the proceedings?

A.   Who knows?  Possible.

Q.   That's where you get to -- the State gets to call people to say you should get a really tough sentence, and you get to call people to say that, you know, you should get a more lenient sentence, right?

A.   Oh, yes.

Q.   All right.  Were there any witnesses called on your behalf in mitigation?

A.   I can't recall.

Q.   Okay.  There were -- there was a witness called against you in aggravation though, right?

A.   I believe so.

Q.   That was Mr. Reyes, Edwin Reyes?

A.   I can't recall.  I can't recall his name or anything.

Q.   But you recall the individual who you got charged for shooting at and then who you later pled guilty to shooting at coming and testifying in aggravation, right?

A.   Yes.

Rios - cross

1715

Q.   Okay.   And he told his version of the events about what you had done to him in May of 199 -- 1989, right?

A.   Well, I remember what they were accusing me of, yes.

Q.   All right.

A.   Not that I did it, but, yes, that I was being accused of.

Q.   But that you pled guilty to, correct?

A.   Yes, sir.

Q.   You also were given an opportunity to say anything that you'd like to the Court before they sentenced you, right?

A.   I believe so.

Q.   And you declined to make any statement?

A.   Yes.  Due to counsel.

Q.   So you get -- you get convicted.  You then get sent off to IDOC, right?

A.   Yes, sir.

Q.   You testified at great length yesterday about all of the things that happened in prison that were to you and things that were terrible about the prison experience, right?

A.   Correct.

Q.   Okay.  That included, you know, things about the food and lockdowns and abuse you saw and racism and all sorts of things like that, right?

A.   Correct.

Q.   All right.  And you are -- are you seeking compensation for those things for emotional distress?

Rios - cross

1716

A.   I'm seeking compensation for doing time for something I did not do, sir.

Q.   Right.  But -- but those types of things --

A.   Those are part of it, yes.

Q.   Those are part of the emotional distress that you're experiencing?

A.   Yes, sir.

          MR. SCAHILL:  Okay.  Can I have the document camera just for the witness, Judge?

BY MR. SCAHILL:

Q.   Sir, you were, once again, given a set of questions that we wanted to ask you before trial about matters relating to this case, right?

A.   Yes, sir.

Q.   And my client, Mr. Guevara, sent you a set of those to answer under oath, right?

A.   Excuse me?  Mr. Who?

Q.   My client, Mr. Guevara, sent you a set of questions to answer under oath, the ones that are being displayed to you right now, right?

A.   I guess so, yes.

Q.   Okay.  And you answered those questions under oath?

A.   I believe so.

Q.   All right.  One of the questions you were asked, sir, was to state in detail the nature of any physical, emotional, or

mental injuries, including their extent and duration, that you allege to have suffered as a result defendants' conduct as alleged in your complaint including, but not limited to, your arrest, prosecution, and incarceration, right?

A.   Correct.

Q.   And the full extent of your answer was:  When I went to prison, I missed my son and my mother.  I lived in daily fear of being attacked in prison.  I was mentally challenged. Right?

A.   Yes, sir.

Q.   Okay.  You testified for about two hours yesterday about all kinds of different specific things that happened, right?

A.   Yes, sir.

Q.   Okay.  Did you list any of those in response to the questions that we asked you?

A.   No, sir.

Q.   Okay.  Did you testify about any of those things at your deposition in this case?

A.   I don't believe so, sir.

Q.   Okay.  These are things that you're now saying for the first time in front of this jury happened, right?

A.   Those are things I remember, yes --

Q.   Okay.

A.   -- myself and my -- my experiences, yes.

Q.   Things that you remember that you were asked about and

never provided during the course of this case before you were in front of this jury, right?

A. Correct.

Q. When you were in prison, you also -- I think Mr. Engquist touched on this -- you engaged in conduct that got your sentence extended even further, right?

A. Yes, sir.

Q. You got caught with drugs in a correctional facility, right?

A. Yes, sir.

Q. And you pled guilty to that offense, right?

A. Yes, sir.

Q. And that was another felony conviction?

A. Yes, sir.

Q. That has never been overturned; that is still an intact conviction, right?

A. Yes, sir.

Q. And you were sentenced to yet another two years consecutive, so added on top of your sentence, as a result of your conduct, right?

A. Yes, sir.

Q. All right. So we now have the three-year sentence that you had for the aggravated assault and another felony conviction that you got in prison that extended your prison time above and beyond anything relating to the murder conviction, right?

A.   Yes, sir.

Q.   Because of things that you did that have nothing to do with the people you've sued in this case, right?

A.   I chose to grab the kite from the guy and give it to another person in another cell, that's all.

Q.   And you got more time for doing things that have nothing to do with the people you've sued in this case, right?

A.   Correct.

Q.   In prison, you talked yesterday about officers bringing the flu in and all kinds of things like that, right?

A.   Yes, sir.

Q.   You never got any illnesses in prison, did you?

A.   No, sir.

Q.   You never got injured in prison?

A.   No, sir.

Q.   You never got into any fights in prison?

A.   No, sir.

Q.   You never got physically or sexually assaulted in prison?

A.   No, sir.

Q.   You never -- you were getting periodic medical treatment there --

A.   Yes, sir.

Q.   -- right?

        You never got hospitalized for anything, correct?

A.   No, sir.

Rios - cross

1720

MR. SCAHILL:  Can I have -- is that 31, the certified statement?

MR. POLICK:  20.

MR. SCAHILL:  Oh, 20.

I'd like to publish the statement of conviction for the other -- for the marijuana conviction.

THE COURT:  That hasn't been admitted.  Are you seeking to admit it?

MR. SCAHILL:  Yes.

THE COURT:  Any objection to the DX 20?

MR. J. RICHARDS:  No objection.

THE COURT:  It's admitted and may be published.

(Defendants' Exhibit No. 20 received in evidence.)

BY MR. SCAHILL:

Q.  Do you see this, sir, what's in front of you in the Circuit Court of the 11th Judicial Circuit in Livingston County?

A.  Yes, sir.

MR. SCAHILL:  Okay.  Can you scroll down, please, Carey?

BY MR. SCAHILL:

Q.  Do you see this, an order and judgment on sentence from July 13th of 1995?

A.  Yes, sir.

Q.  And do you see that you are -- you were sentenced for this felony to serve a term of two years' imprisonment?

Rios - cross

1721

A.   Yes, sir.

Q.   And do you see in paragraph 2 that it indicates that your sentence is to be served consecutive to both the aggravated assault from the shooting incident and the murder that we're here to talk about, right?

A.   Yes, sir.

MR. J. RICHARDS:  Your Honor, may I have a sidebar?

THE COURT:  Yes.

(Proceedings heard at sidebar:)

THE COURT:  Yes?

MR. J. RICHARDS:  I ask that the limiting instruction be read again to the jury.

THE COURT:  Concerning?

MR. J. RICHARDS:  This conviction.

THE COURT:  To what end?  Like, how does a 1995 -- how is that propensity?  The earlier limiting instruction was propensity.  How does something that happened six years after the events in question demonstrate -- six years after, different in kind, different in type?

MR. J. RICHARDS:  I understand that Your Honor knows that.  I just want the jury to be instructed on a conviction, another felony conviction coming in.

THE COURT:  Okay.  I -- I'll give the limiting instruction as to the purpose of this marijuana conviction which relates to damages, correct?

MR. SCAHILL: That is correct.

THE COURT: All right. I'll do that.

(Proceedings heard in open court:)

THE COURT: So you just heard evidence concerning a conviction for possessing marijuana while he was incarcerated. This evidence comes in for a limited purpose, and that is concerning damages. Part of the damages that the plaintiff seeks, I believe, if I'm recalling his words correctly, were for the time he spent incarcerated, and this evidence may go to how much time he spent incarcerated with respect to the claims in this case versus other factors.

It's your job to determine what's what, but understand that this marijuana conviction is coming in only for the consideration of damages or the harms that he suffered as a result of these defendants' conduct.

You may continue.

MR. SCAHILL: Thank you.

BY MR. SCAHILL:

Q. You, I believe yesterday, testified about some issues that you had being in groups and things like that when you got out of prison.

Do you remember that?

A. Yes, sir.

Q. Okay. Are you suggesting that you had some difficulty adjusting to life outside of prison?

A. Yes, sir.

Q. Okay. Defendants' Exhibit 125 at page 297. You were asked these -- line 22. You were asked these questions, and you gave these answers at your deposition:

"Q. Have you had any problems adjusting to life outside of prison since you've been released?

"A. No, sir."

Did you give those answers?

A. Yes, sir.

Q. Okay. Did you at your deposition in 2023 not remember that you had some issues adjusting to life outside of prison when you told us that?

A. No. I did not recall if I had any issues whatsoever, but my mom and my family noticed that I was different.

Q. All right. But you didn't tell us that at our one and only opportunity to ask you --

A. No, sir.

Q. Okay. You waited until you were in front of the jury to tell those stories when we actually asked you for that information before?

A. Yes, sir.

Q. Okay. You didn't -- you did remember that you had trouble adjusting to life. You just decided to tell us you didn't have that, right?

A. I just didn't remember at the moment, yeah. I was --

didn't recollect at the moment if I had any issues for the simple fact I didn't -- I didn't feel like I had any issues, but the people around me noticed I had little issues, so, yes, sir.

Q. Okay. You also testified at length yesterday about things that impacted your family life as a result of your incarceration.

Do you remember those questions?

A. Yes, sir.

Q. Okay. That included things about you said your mom went down to prison to visit you, and they supposedly had her strip searched or something?

A. Yes, sir.

Q. Okay. And, you know, issues with your son coming and all of that. Do you remember those questions?

A. Yes, sir.

Q. Okay. And those were certainly family problems that you were having as a result of your incarceration, weren't they, sir?

A. No, they were just issues that when my mom used to come visit me, they used to degrade her just to make her feel like not to come back again. Some degrading tactics that they use when you go visit somebody. They'll strip you. They'll do all type of sorts, like pat you down, touch your privates and everything and tell you to get dressed again before you see

your visitors.

Q.   You -- you, of course, never saw any of that happen at a correctional facility, did you?

A.   No, but to today -- this day, it's still common practice. They still do it.

Q.   Your suggestion is that when somebody visits somebody in prison that they strip search them; is that what you're telling this jury?

A.   Yes, sir.

Q.   Sir, you know that that is not what happens.

A.   That is true.

Q.   That is a complete lie, isn't it, sir?

A.   No, sir.

Q.   Have you ever seen that happen?

A.   No, sir.

Q.   Have you gone -- you've gone to visit your friends in prison and they strip you naked and make you bend over as a visitor; that's what you're saying?

A.   I would never go to visit anybody in a prison because I was there and I don't want to see that again.

Q.   Sir, you are making that up for the purposes of this jury. That does not happen.

          MR. J. RICHARDS:   Objection.

BY THE WITNESS:

A.   Yes, it does.

THE COURT: Sustained.

BY THE WITNESS:

A. Yes, it does.

BY MR. SCAHILL:

Q. When you're saying that your mother went down there and wouldn't come anymore, that's a problem that you're having with your family as a result of your incarceration, isn't it, sir?

A. No, sir.

Q. It's not? That didn't cause problems with your family?

A. No, sir.

Q. That was A-okay?

A. I was locked up. What else can they do?

Q. At any time, at any time before you were in this courtroom, did you ever mention anything in the course of this case about any of that happening?

A. No, sir.

Q. Ever?

A. No, sir.

Q. You -- you just decided to wait, after all these years that this case has been pending, just to bring it up in front of the jury, right?

MR. J. RICHARDS: Objection. Asked and answered.

THE COURT: It's overruled.

You can answer.

BY MR. SCAHILL:

Q.   And you didn't bring it up because you're making it up.

          THE COURT:   There's no answer.   You asked a question.
Let the witness answer.   Stop jumping in and interrupting.

BY THE WITNESS:

A.   No, sir.

BY MR. SCAHILL:

Q.   For your post-conviction, that gets filed in 2020, right?

A.   I believe so.

Q.   There was a hearing for about an hour on your
post-conviction on one day, right?

A.   Yes, sir.

Q.   And that hearing was Mr. Carrero testifying, right?

A.   Yes, sir.

Q.   You did not have to testify, did you?

A.   We didn't get the chance to, no, sir.

Q.   And Mr. Garcia didn't testify?

A.   No, sir.

Q.   And Mr. Huertas didn't testify?

A.   No, sir.

Q.   And Mr. Mason didn't testify?

A.   No, sir.

Q.   And Ms. Riley didn't testify?

A.   No, sir.

Q.   And there was no ruling by the judge about anything
relating to your case on the day that this evidentiary hearing

was held for about an hour, right?

A. Correct.

Q. And certainly nobody was cross-examining you about your claims in the case at that hearing, were they?

A. No, sir.

Q. And your Certificate of Innocence proceedings, you were there for that, right?

A. Every day.

Q. Well, it was only one day, right?

A. Yes.

Q. How long did that hearing last?

A. Hours.

Q. Your Certificate of Innocence hearing lasted hours?

A. Hours. I believe it was hours. I was there.

Q. Sir, the court proceeding lasted about two minutes, didn't it?

A. Benjamin was on the stand, so it couldn't be two minutes. He was there for a minute.

Q. We're talking about something different.

A. Okay.

Q. Your Certificate of Innocence proceeding in 2023, you went to court for that, right?

A. Yes, sir.

Q. You were in there in court.

A. Yes, sir.

Rios - cross

1729

Q. Okay. How long did that hearing last?

A. Not too long, I believe.

Q. It lasted about two minutes, didn't it?

A. I can't recall the time.

Q. Were there any witnesses called?

A. No, sir.

Q. Did you have to testify?

A. Not at the moment, no, sir.

Q. Well, never.

A. No, sir.

Q. Okay. Nobody ever cross-examined for that, did they?

A. No, sir.

Q. Nobody even asked you to testify.

A. No, sir, they didn't get to that point.

Q. Right. And Mr. Huertas didn't testify either, did he?

A. Didn't get to that point.

Q. And Carrero didn't testify?

A. Carrero was -- I believe Carrero testified, but I don't know if it was in that proceeding or in the proceeding that you were talking about that he testified about, but he didn't testify on that proceeding either.

Q. Mr. Garcia didn't testify either, right?

A. No.

Q. And Ms. Riley didn't testify?

A. No, sir.

Q.   And Mr. Mason didn't testify?

A.   No, sir.

Q.   And there were not in the documentary exhibits or anything that were produced during that hearing, were there?

A.   I can't recall.

Q.   It was all of about two minutes before that was granted without any evidence being presented to that court; isn't that true, sir?

A.   I can't recall if that's -- that's what happened.

MR. SCAHILL:  Judge, can I just have 30 seconds to consult?

THE COURT:  Okay.

(Counsel conferring.)

MR. SCAHILL:  I have nothing further at this time. Thank you, Judge.

THE COURT:  Okay.  Redirect.

MR. J. RICHARDS:  Your Honor, may I proceed?

THE COURT:  Yes.

REDIRECT EXAMINATION

BY MR. J. RICHARDS:

Q.   So, Jaime, on cross-examination, if I recall correctly, you were asked questions about duties of a foot soldier in the Latin Kings.

A.   Yes, sir.

Q.   And one of those duties of a foot soldier is to shoot at

rival gang members, is that true?

A. Yes, sir.

Q. Now, in the course of your time as a foot soldier, did you ever exercise that duty? Did you ever shoot at a rival gang member?

A. No, sir.

Q. Now, in terms of retaliation, you were asked some questions about that on cross.

Do -- when there's retaliation, does the retaliation have to be approved by anyone?

A. Yes.

Q. Who does the retaliation have to be approved by?

A. By the Inca and the Casique.

Q. And that's the chief and second in command?

A. The chief and second in command, yes, sir.

Q. Now, you were asked about Macho and Macho being put on your visitors list. Do you recall those questions?

A. Yes.

Q. Now, how was it that you learned that Macho wanted to speak with you?

A. Towards the end of my incarceration in Dixon, one of my friends wrote me and sent me his information and told me, hey, Jose Melendez want to know if you can put him on your visiting list. And I did that, I put him on the visiting list.

Q. Now, when you put someone on your visiting list in IDOC,

does that mean that they will -- that everyone on your visiting list will visit you?

A. No, for the simple fact they'll run a check on you, and if they run a check on you, they run a check on you to see if you been incarcerated before. And if you had, you got to write to the warden, and the warden will give you permission.

Q. Do you know if Macho was ever approved to be on your visitor list?

A. No, I never even followed up on it. I just put him in, and that was it.

Q. And do you know if -- and did Macho ever visit you?

A. No, sir.

Q. Do you know if Macho ever attempted to visit you?

A. No, sir.

Q. Now, you were asked some questions about a white board.

A. Correct.

Q. And that was the white board used during your coerced statement.

A. Correct.

Q. Now, you were making various shapes with your hands while you were describing what Detective Mason was drawing on the white board.

Do you recall that?

A. Correct.

Q. Would it help you -- well, do you see in your mind the

Rios - redirect

1733

image that Detective Mason drew?

A.   Yes, sir.

MR. J. RICHARDS:  Your Honor, I'd ask that the witness be allowed to step down and approach the overhead projector?

THE COURT:  That's fine.

MR. J. RICHARDS:  Your Honor, for the record, I'm going to mark this piece of paper, this sheet from a yellow pad that's blank, I'm going to mark it as Plaintiff's Exhibit 93 for identification.

THE COURT:  Okay.

BY MR. J. RICHARDS:

Q.   Now, Jaime, if you could, I just want you to draw what Detective Mason drew on the white board on that sheet of paper. Draw it as if the top of the sheet of paper is the top of the white board --

A.   Okay.

Q.   -- and the bottom is the bottom of the white board.

A.   Okay.

Q.   And let me know when you've finished drawing the image.

A.   Okay.  (Witness complied.)

Q.   Now, you just drew a square; is that correct?

A.   Yes, sir.

Q.   Is that everything that Detective Mason drew on the white board?

A.   No, sir.

Rios - redirect

1734

Q.   Can you draw what else he drew on the white board?

A.   (Witness complied.)

Q.   You just drew what looked like a T, is that correct?

A.   Yes, sir.

Q.   Besides the square and the T, did Detective Mason draw anything else on the white board?

A.   (Witness complied).

Q.   And you just drew looks like a swish, is that fair to say?

A.   Yes, sir.

Q.   And besides the square, the T and the swish, did Detective Mason draw anything else on the white board?

A.   No, that's about it.

          MR. J. RICHARDS:  Your Honor, at this time, I'd seek -- you can return to the witness stand.

          Your Honor, at this time, I would seek that Exhibit 93 be admitted, the identification marks be stricken, and it be published to the jury.

          THE COURT:  Any objection?

          MR. SCAHILL:  No.

          MR. ENGQUIST:  No.

          THE COURT:  All right.  It's admitted and may be published.

     (Plaintiff's Exhibit No. 93 received in evidence.)

BY MR. J. RICHARDS:

Q.   Now, I'd like to take a step back from the white board and

Rios - redirect

1735

turn to a subject that was -- that you were asked about on cross, that first seeing Barbara Riley.

Now, is it true that Barbara Riley said to you that she was not your attorney and she was working with the police?

A. Yes. That's what she said the first time she came into the door.

Q. She didn't say anything like I'm the attorney for the State of Illinois, I'm neutral; she didn't say anything like that?

A. No. She just said she was the state attorney for the police and not for me.

Q. Now, I also want to ask you this question. Diana Rodriguez, who was your girlfriend at the time in '89 and the mother of your child, you considered her sometimes a common-law wife, is that fair to say?

A. Yes, sir.

Q. And Diana Rodriguez had a brother.

A. Yes, sir.

Q. And what was her brother's name?

A. Daniel Rodriguez.

Q. Now, you've been shown your -- the court-reported statement a few times.

In your court-reported statement, you refer -- you mention a brother-in-law in one of your answers in that court-reported statement.

A. Correct.

Q.   When you say brother-in-law in your court-reported statement, who are you talking about?

A.   Daniel Rodriguez.

Q.   Diana or Daniel?

A.   Daniel.

Q.   Sorry.

          Now, you've been asked some questions about the trial in your case, and I -- I just want to ask you a few questions about that.

A.   Okay.

Q.   In that trial, unlike here where you're the plaintiff, you were the defendant.

A.   Correct.

Q.   And when you were the defendant in a criminal trial, you were present throughout your whole trial.

A.   Yes, sir.

Q.   You were sitting at the table with Mr. Carey and Ms. Shields.

A.   Yes, sir.

Q.   Now -- and is it fair to say that Ms. Shields came on to the case later on?

A.   Yeah, she came on, like, a couple of -- probably a couple of months after he started.

Q.   Now, in terms of what happens in a criminal trial and a criminal trial at Cook County to the best of your recollection,

Rios - redirect

1737

the State, they call witnesses first.

A.   Yes.

Q.   And then the State rests.

A.   Yes.

Q.   And then if you want, your attorney will call witnesses on your behalf.

A.   Yes.

Q.   In terms of the witnesses that your attorney calls on your behalf, did you have any say in that?

A.   Not really.

Q.   And you testified in your own defense during your trial.

A.   Yes, sir.

Q.   And you did have a say in that though.  That was your decision.

A.   Yes, sir.

Q.   Now, in terms of when there are witnesses testifying in a criminal trial in Cook County, if -- when that witness is on the stand testifying, the other witnesses, they're not in the courtroom, right?

A.   I believe everybody is still there.

Q.   Everybody is still in the courtroom.

A.   I believe they're -- either you're getting the witnesses from the stands or either you got the witnesses in the back where the lawyers go.

Q.   Okay.  And when the witness was testifying, were you asking

Rios - redirect

1738

the witness questions?

A.   No, sir.

Q.   Who was asking the witness questions?

A.   Mr. Carey.

Q.   Was Ms. Shields asking the witness questions?

A.   I can't recall.  Possible.

Q.   Were the state's -- assistant state's attorneys asking witnesses questions?

A.   I believe so.

Q.   Were you asking questions of witnesses?

A.   No, sir.

Q.   During the trial, would Carey or Ms. Shields ever turn to you and say do you want me to ask anything else?

A.   No, sir.

Q.   And when you were on the stand testifying, did you have any control of the questions that you were being asked by your attorney?

A.   No, sir.

Q.   When you were on the stand, did you have any control of the questions that the state's attorney was asking you?

A.   No, sir.

Q.   Now, you've been asked about -- you've been asked about testifying, and you've also been asked some questions about the testimony of other witnesses that occurred at your trial.  Do you recall that?

A.   Correct.

Q.   And you were asked questions on cross about Diana Rodriguez and her testimony during your trial.  Do you recall that?

A.   Correct.

Q.   Now, in terms of Ms. Rodriguez testifying, she was called by your attorneys in the defense case.

A.   Yes.

Q.   And she was called after you testified.

A.   Yes.

Q.   And in terms of -- do you recall every single question and answer that was asked of Ms. Rodriguez as you sit here on the stand today?

A.   No, sir.

Q.   As you sit on the stand here today, do you recall if there were any questions asked of Ms. Rodriguez, if she was ever asked the question about the night of June 27th, 1989?

        Was she ever asked any question in regards to June 27th, 1989?

A.   I don't believe so.

Q.   Do you have any doubt in your mind about that?

A.   No.

Q.   In terms of questions about July 2nd and July 3rd, was Diana Rodriguez ever asked a question that was asking her about July 2nd or July 3rd?

A.   No, sir.

Rios - redirect

1740

Q.   And let me just take a step back.

When I asked you about questions about June 27th of Ms. Rodriguez, in terms of the question asked, I'm talking about both questions from your attorney and questions from the assistant state's attorney.

Did either the assistant state's attorney or your lawyer ask Ms. Rodriguez about the night of June 27th?

A.   I can't recall if they did or not.

Q.   You can't recall.

A.   No.

Q.   Would looking at the transcript of your trial refresh your recollection --

A.   Okay.

Q.   -- as to whether or not -- as to whether or not either the assistant state's attorney or your attorney asked questions of Ms. Rodriguez in regards to June 27th?

And I can hand you the report of proceedings, and you can look through it, and let me know when your recollection is refreshed if that's okay.

A.   Okay.

MR. J. RICHARDS:  Your Honor, may I approach?

THE COURT:  Yes.

MR. J. RICHARDS:  And for the record, I'm going to turn -- I'm going to be showing defendant Plaintiff's Exhibit 11, and I'm going to turn in Plaintiff's Exhibit 11 to

page -- going to turn to page 647.

BY MR. J. RICHARDS:

Q.   And, Jaime, this is double sided.

A.   Okay.

Q.   So I want you to read through Ms. Rodriguez's testimony. And while you're reading through, don't say anything, just read through, and I want you to see if you see any time, by either defense counsel or the assistant state's attorney, if she's asked any question in regards to whether or not she's asked about the night of June 27th, 1989.

And when you're finished reading, let me know.

A.   All right.   "Ms. Diana Rodriguez" --

Q.   Don't read out loud.

(Pause.)

THE COURT:   While he's reading, can we go to sidebar real quick?

(Proceedings heard at sidebar:)

THE COURT:   Is it disputed whether this was asked? Can we just stipulate that she was not asked at trial about June 27th, 1989?

MR. SCAHILL:   Yes.

THE COURT:   All right.   We'll do that.

MR. SCAHILL:   Okay.

THE COURT:   Unless -- unless there's some trial benefit that you thought you were going to get from it other

than establishing the point that she wasn't asked.

MR. J. RICHARDS:  No, that was what I was --

THE COURT:  Okay.  We'll stipulate to it then.

(Proceedings heard in open court:)

THE COURT:  All right.  Mr. Rios, I think we'll save you some time.

I asked the parties at sidebar whether we would stipulate, there was a stipulation as to whether Ms. Rodriguez was asked at the criminal trial about June 27th, 1989.  The parties agree that she was not.

So stipulated?

MR. SCAHILL:  So stipulated.

MR. J. RICHARDS:  So stipulated.

THE COURT:  A stipulation, folks, is an agreement between the parties that you can take as true.  So you can take as true that at the criminal trial, Ms. Rodriguez was not asked about June 27th, 1989.

You may continue.

BY MR. J. RICHARDS:

Q.  And, Jaime, in regards to both the assistant state's attorney and your attorney, was Ms. Rodriguez ever asked about July 2nd or July 3rd, 1989?

A.  I don't think so.

MR. SCAHILL:  So stipulated.

MR. J. RICHARDS:  So stipulated.

THE COURT:   Okay.

BY MR. J. RICHARDS:

Q.   Now, when Ms. Rodriguez was called, you were asked by counsel if she talked about an alibi or anything like that. And is it fair to say that she did not discuss or was questioned about an alibi for you; is that fair to say?

A.   Correct.

Q.   Is it fair to say that alibi was not brought up in your answer to discovery?

A.   Correct.

Q.   And that answer to discovery was authored by your attorney, Mr. Carey.

A.   Yes, sir.

Q.   Similarly, you were shown a motion earlier on cross.   Did you write that motion?

A.   No, sir.

Q.   Did Mr. Carey show you that motion before he filed it?

A.   I can't recall.

Q.   Also, let me ask you this:   When you first met with Mr. Carey, that was -- was it at court, or was it in the jail?

A.   It was in court.

Q.   And in court, how long did you get to speak with him in court?

A.   I think it was just a brief proceeding, and after that, he spoke to me for a while.

Q.   And he spoke to you for a while in Cook County Jail.

A.   Yes, sir.

Q.   And Mr. Carey was a very good attorney, right?

A.   Yes, sir.

Q.   And as part of being a very good attorney, didn't he tell you don't talk to your case about anyone?

A.   Correct.

Q.   And you would talk to fellow inmates in Cook County Jail, right?

A.   No.

Q.   Well, let me ask you this:  Would you talk to Cook County inmates -- fellow inmates in Cook County Jail about your case?

A.   No, not about my case.

Q.   But you would talk with them about other things.

A.   Yes.

Q.   And when your family came to see you or if you would talk to them over the phone, would you talk to them about your case?

A.   No.

Q.   Now, do you -- do you know if Mr. Carey got all of the police reports on that first day that he appeared before you on your case?

Do you have any idea if he got all the reports?

A.   I have no clue if he did or did not.

Q.   Now, counsel asked you on cross-examination if you had ever mentioned to Ms. Rodriguez before your trial whether or not you

had told her about the threat to take away your child.  You never told her that, right?

A.  I never asked her about it, no.

Q.  But Ms. Rodriguez was asked about it when she testified in front of the jury.  Is that fair to say?

A.  Correct.

Q.  And, in fact, Ms. Rodriguez was asked the question:

"While you were at the station in this conference room, did anyone ever say anything to you about the baby then?"

She was asked that question, wasn't she?

A.  Yes, sir.

Q.  And she gave the answer:  "Yeah" --

MR. SCAHILL:  Objection, Your Honor.  Just reading testimony.

THE COURT:  Your objection is overruled.

BY MR. J. RICHARDS:

Q.  And she gave the answer:  "Yeah, they kept telling me that I am in -- asking me if I knew anything.  I kept telling them no.  They kept telling me that if I did, they were going to take my son.  And one, one of them, it was not just one cop, like, one will come, ask me one thing.  Another tell me different things.  One come -- come asking me if you know anything about the murder, it is better for you to speak up because your kid could be taken away and you could be arrested for accessory to murder.

"I kept telling them I do not know nothing about a murder. The other one will come and tell me, you know, we can take your kid away. If you know something, it is best to tell us something, kept on all night with the same thing."

You recall her giving that answer at trial, right?

A. Yes, sir.

THE COURT: All right. We're going to stop there.

Before I let you go, there are three scheduling items that I wanted to raise, two about tomorrow, one Friday.

Tomorrow at some time to be determined, we will have a fire drill in the courthouse. I can't stop it. I can't excuse us from it, and so I will warn you about it. Expect lights to flash and an announcement over the PA.

I will have my law clerk or Ms. Franklin take you out of the courtroom first. I'm told that we are not going outside the building. Usually we go down one to three floors. We reconvene. A fire marshal speaks to us and then we go back -- return to our normal business.

And so there will be three flights of stairs or up to three flights of stairs. Does anyone have a problem with stairs?

Okay. And so my law clerk or Ms. Franklin will lead you out first, take you down. We will then follow. This might be a situation where we're around each other. You can't discuss the case anyway. I've asked or instructed lawyers not

1747

to discuss the case during the fire drill. I'm told it takes between 10 and 15 minutes.

But you thought they ended in third grade. They did not. But it is -- I don't -- I make light, but I don't mean to make light. It's important in a large building like this to do this periodically.

You probably won't have to experience it again, but we do, and so we will.

So that's at a time to be determined. If it happens during a break, again, you'll just follow the instructions on the loud speakers and then reconvene in the jury room. Were it to happen on a break, we'll try to find you, either me or my staff will try to find you on the level they tell us.

There is a chance that they will shut down a stairwell, meaning it may not be the closest stairwell to us, and I'm sure they'll explain. I've gone through this before. They'll explain, like sometimes they dedicate a stairwell to emergency responders. And so if the firefighters are coming up the stairwell, they can't fight against the crowd, so they tend to shut one of the four stairways down for that.

The second matter for tomorrow is I have another matter that I need to address at 4:00 p.m., so we will break for the day tomorrow at 4:00 p.m. It's a criminal case, and so I don't delay criminal cases. I just fit them in around the trial, and 4:00 p.m. is the time where I will do that tomorrow.

And Friday will be a different schedule. I am supposed to have surgery in the next month or two. I have to get a preclearance, and so I'm kind of at the whim of my doctor who's available Friday at 1:00 p.m.

And so we will start at our usual 10:00. We'll go until noon-ish. Like, if we get to 12:15, great, and then we'll break until 2:00 p.m. So it will be a longer lunch break. We'll come back at 2:00 p.m., and then we'll go for 90 minutes, and then you will be released into the holiday weekend early.

We won't waste time Friday. I plan to do some stuff that I have to do outside of your presence with the lawyers in the morning and, if necessary, after the end of the day, and then we'll reconvene next week.

So I just wanted to forewarn you about the schedule over the next two days.

All right. Have a good evening. I remind you not to discuss the case, not to research the case, not to let others discuss the case with you. Have a wonderful evening.

All rise.

(Jury out at 4:32 p.m.)

THE COURT: All right. Mr. Rios, you can step down. You're not to discuss the substance of your testimony with anyone.

I do want to revisit this last objection about reading

1749

in testimony.

Where are we going with all of this, Mr. Richards?

MR. J. RICHARDS: Your Honor, the --

MR. S. RICHARDS: Can I jump in and just say I have to go to the bathroom?

THE COURT: You're free to step out.

MR. S. RICHARDS: Okay. I'm just -- I'm waiving my own presence.

THE COURT: Okay.

MR. S. RICHARDS: My associate will take care of it. Thank you.

MR. J. RICHARDS: Your Honor, I think where the -- where the defense has been going with this, I think they've been really hitting a lot on recent fabrication, right? I think that's where a lot of the line of questioning that defense counsel was going after.

And I think it's important to note that this is not a recent fabrication, that Ms. Rodriguez testified about it, and that it's not, like, you know -- it's, you know, it's not like it's all of a sudden he's saying that.

So I think it's important for the jury to hear that. And also, I mean --

THE COURT: Prior testimony would be admissible for -- to rebut a claim of recent fabrication for a declarant. This is not the witness's testimony, so what other hearsay exception

1750

do you have to it?

MR. J. RICHARDS: The other hearsay exception is that in terms of completeness, counsel asked what Ms. Rodriguez was testifying about at the trial. He opened the door, and I am asking further questions about what was testified at trial based on counsel opening the door to that line of questioning.

THE COURT: Response?

MR. SCAHILL: We asked about and stipulated about things that Ms. Rodriguez -- that she wasn't asked about specific dates.

We did not ask about conduct directed towards her. I mean, the rule of completeness, as I recall it, has to do with the same topic or subject matter. It's not carte blanche to just say anything and everything that happened in a deposition and in testimony.

It's just sort of a backdoor way to just read testimony on a topic that wasn't even -- even explored with this witness in the first instance.

THE COURT: When did -- when was Mr. Rios asked on cross-examination about any threats made to Ms. Rodriguez?

MR. J. RICHARDS: I don't think he was asked specifically about that. He was not.

THE COURT: So how does it complete the testimony?

MR. J. RICHARDS: It completes the testimony because they are talking about what was said at trial. They are

1751

arguing, in addition to that, that -- that one of the points is that but for the -- these constitutional violations, would Mr. Rios still have been found guilty or not guilty. That is still an important factor in the case.

And what was -- what the other jury heard during trial is relevant as to that and the -- the -- what, in terms of completeness, that's -- they've opened the door. They've asked this witness what was said at trial, trial strategies, overall themes, alibi. Witnesses who were called. It's -- it's fair game now to ask, you know, Mr. Rios's recollections of the trial and what was asked of witnesses.

THE COURT: I'm still not picking up what gives you the opportunity to read line by line from the trial transcript.

Why is that not a leading question? It's your witness. The question should be what were the topics that Ms. Rodriguez testified about at trial.

MR. J. RICHARDS: Well, then, Your Honor, if I'm allowed to ask that question, I can ask that question. And then if, on the stand he doesn't recall, then I'll have him read Ms. Rodriguez's transcript on the stand to refresh his recollection, and then I'll ask him what were the topics that Ms. Rodriguez was asked on the stand.

THE COURT: So I'll have the benefit of the transcript in the morning. I agree with the defendants that it's only implicated to the extent that Mr. Rios was asked about a topic

on cross-examination.

I don't think that questions on discrete topics opens the door to introducing the entire transcript or all of her testimony, and so it's limited to the topics that Mr. Rios was asked about on direct examination.

Is Ms. Rodriguez still alive?

MR. J. RICHARDS: I believe so.

THE COURT: Is she in the district or within 100 miles of the courthouse?

MR. J. RICHARDS: I believe so.

THE COURT: And so she could have been subpoenaed and asked to appear and been a declarant witness, but she wasn't, and it's not appropriate to put it in through Mr. Rios.

So keep that in mind. In the morning, I'll hear any new objections to those questions then; but going through the transcript and saying, was she asked this -- do you recall her being asked this question and giving this answer, that is -- I don't understand how that comes in under the rules of evidence. It's not completeness.

How long do you anticipate your redirect of Mr. Rios will take?

MR. J. RICHARDS: A moment, Your Honor?

THE COURT: Okay.

(Counsel conferring.)

MR. J. RICHARDS: 30 minutes at most.

1753

THE COURT: And then we'll have Guevara tomorrow at 10:00 a.m., and then we'll resume with Mr. Rios. Then I understand the plaintiffs will rest?

MR. S. RICHARDS: We may have one other witness, Lamont Burr.

THE COURT: Okay.

MR. S. RICHARDS: That's the only other witness.

MR. J. RICHARDS: And, Your Honor, I have to review the transcript. I believe enough foundation was laid for Defendants' 50 D, I believe, but I don't think anyone ever moved that into evidence. I believe it was used as -- they used it to refresh Detective Mason's recollection, and I probably moved that in in front of the jury, but I want to publish it.

MR. ENGQUIST: Just for my own refreshing, which is 50 D?

MR. SCAHILL: Yeah, I don't remember which one that is.

MR. J. RICHARDS: It was a report of Mason's -- I mean, I could be misspeaking, but I believe it's report of Mason's. He used it to refresh recollection, and he also affirmed that it was his report.

MR. POLICK: That's in, Your Honor. At least my score card. If they're talking about 50 D, it's a June 28th, '89 supplemental report by Detective Mason and Brennan. I think it

1754

might have been marked as Plaintiff's 20 as well, but I show it admitted.

THE COURT: Okay. I don't have it as admitted, but I will mark it as admitted because it doesn't sound like there's an objection to it.

MR. POLICK: No.

THE COURT: So Defense Exhibit 50 D is in evidence.

I don't know if I addressed DX 7, which is a Rios photo after the lineup. Mr. Engquist, you used it.

That photo is in, but that's another instance where I think it's in under a different exhibit number.

MR. POLICK: That's correct, Your Honor.

THE COURT: And so I take it there's no objection to the admission of DX 7, the Rios -- I think he's in the red sweatshirt at the time.

MR. J. RICHARDS: No, Your Honor.

THE COURT: Okay.

(Defendants' Exhibit No. 7 received in evidence.)

THE COURT: Okay. Any issues that I can address for the plaintiffs?

MR. J. RICHARDS: Just one point of clarification and another informative.

So am I allowed to put that into evidence in front of the jury, or is it just it goes back to them and I don't say anything in front of the jury formally in terms of the

1755

exhibits, like 50 D?

THE COURT: It's in evidence. You can publish it. I don't know who's going to address it. How are you going to get it in front of -- what witness are you going to put it in front of the jury with?

MR. J. RICHARDS: No, Your Honor, that's -- I'm probably not being clear. It's just --

THE COURT: Can you use it in closing? Yes.

MR. J. RICHARDS: Okay.

THE COURT: You can use any admitted exhibit in closing.

MR. J. RICHARDS: And then the next point, Your Honor, is we have a status tomorrow at 9:00 a.m. I'm assuming that the fire drill won't happen at 9:00 a.m., but maybe since I just said that it will now.

But if it -- if that does happen and our status hearing in another courtroom is delayed and that's why we're delayed, that's why we're delayed if that happens.

THE COURT: Is it on -- is your other status on this floor or another floor?

MR. J. RICHARDS: Another floor, I think.

THE COURT: Okay. I'll keep that in mind. Just send one of the defendants, defense counsel an email or a text, and then they can relay that to me.

Anything else?

1756

MR. J. RICHARDS: That's it, Your Honor.

THE COURT: And for defendants?

MR. ENGQUIST: I just need to make sure I get a copy or at least a picture of the new exhibit that was just created --

MR. J. RICHARDS: Oh.

MR. ENGQUIST: -- just because I didn't want it wandering off.

Thanks.

MR. J. RICHARDS: I struck the ID mark because I put for ID. Then it's admitted, so the ID mark is struck. Old school like that.

MR. ENGQUIST: Okay.

THE COURT: Okay. Mr. Scahill?

MR. SCAHILL: The WebEx link for Mr. Guevara, is that going to be sent out?

THE COURT: Oh, did I ever use WebEx in this case? It's always the same WebEx.

MR. SCAHILL: My associate's down there with Mr. Guevara making sure that the camera's not facing the floor or something.

MR. POLICK: I don't recall any hearings over WebEx, Your Honor. I think they've all have been in person.

THE COURT: All right. I'll send that to the parties this evening. Just pull it from another case.

1757

MR. SCAHILL:  That's all I have.

THE COURT:  Okay.

All right.  Have a good evening.  I'll see you in the morning.

MR. J. RICHARDS:  Thank you, Your Honor.

MR. SCAHILL:  Thank you, Judge.

   (Concluded at 4:45 p.m.)

                    *   *   *   *   *

       We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Jennifer Costales*


*/s/ Charles R. Zandi*


*/s/ Kathleen M. Fennell*                February 12, 2026
Official Court Reporters                 Date
United States District Court
Northern District of Illinois
Eastern Division

I N D E X

PAGE

JAIME RIOS
Direct Examination By Mr. J. Richards                    1484
Cross-Examination By Mr. Engquist                       1487

JAIME RIOS
Cross-Examination By Mr. Scahill                        1592
Redirect Examination By Mr. J. Richards                 1730

INDEX TO EXHIBITS

PLAINTIFF'S EXHIBIT                                  RECEIVED
  No. 93                                               1734

DEFENDANTS' EXHIBIT                                  RECEIVED
  No. 5-3                                              1567
  No. 8                                                1582
  No. 19                                               1609
  No. 106                                              1694
  No. 20                                               1720
  No. 7                                                1754