1759

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                          )  Case No. 22 C 3973
                                     )
                  Plaintiff,         )
          v.                         )
                                     )
REYNALDO GUEVARA; MICHAEL            )
MASON; and JoANN HALVORSEN,          )
as Special Representative of         )
ERNEST HALVORSEN, Deceased,          )  Chicago, Illinois
                                     )  February 12, 2026
                  Defendants.        )  10:00 a.m.

                         VOLUME 9
           TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
           BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:
For the Plaintiff:      LAW OFFICE OF STEPHEN L. RICHARDS
                        BY:  MR. STEPHEN L. RICHARDS
                             MR. JOSHUA S. RICHARDS
                        53 W. Jackson Boulevard, Suite 205
                        Chicago, Illinois  60604

For Defendant          BORKAN & SCAHILL, LTD.
Guevara:               BY:  MR. TIMOTHY P. SCAHILL
                             MR. GRAHAM P. MILLER
                        20 S. Clark Street, Suite 1700
                        Chicago, Illinois  60602

For Defendants         THE SOTOS LAW FIRM, P.C.
Mason and              BY:  MR. JOSEPH M. POLICK
Halvorsen:                  MR. JOSH M. ENGQUIST
                            MR. JEFFREY R. KIVETZ
                            MS. CAROLINE P. GOLDEN
                        141 W. Jackson Boulevard, Suite 1240A
                        Chicago, Illinois  60604

Court Reporter:        CHARLES R. ZANDI, CSR, RPR, FCRR
                       Official Court Reporter
                       219 S. Dearborn Street, Room 1426
                       Chicago, Illinois  60604
                       Telephone:  (312) 435-5387
                       charles_zandi@ilnd.uscourts.gov

                        *   *   *   *   *
              PROCEEDINGS REPORTED BY STENOTYPE
     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

1760

(Proceedings heard in open court; jury out:)

THE CLERK:  22 C 3973, Rios v. Guevara, et al., for jury trial.

THE COURT:  Good morning.

Appearances, please.

MR. S. RICHARDS:  Stephen Richards on behalf of plaintiff.

MR. J. RICHARDS:  Joshua Richards on behalf of plaintiff.

MR. SCAHILL:  Good morning, Your Honor.  Timothy Scahill on behalf of Reynaldo Guevara.

MR. MILLER:  Graham Miller on behalf of Guevara.

MR. POLICK:  Good morning, Your Honor.  Joseph Polick on behalf of defendants Halvorsen and Mason.

MR. ENGQUIST:  Josh Engquist also on behalf of defendants Halvorsen and Mason.

MS. GOLDEN:  Caroline Golden for defendants Mason and Halvorsen.

MR. KIVETZ:  And good morning, Your Honor.  Jeff Kivetz on behalf of Mason and Halvorsen.

THE COURT:  All right.  Good morning, everyone.

I saw a couple of filings last night.  I'll get to those in a moment.  But are there any issues, other issues the plaintiffs need to raise before we start the day?

MR. S. RICHARDS:  No.

1761

THE COURT: For defense?

MR. SCAHILL: No.

THE COURT: And for Mason and Halvorsen?

MR. ENGQUIST: No.

THE COURT: All right. We've got a few minutes. I will deal with the newly filed motion for sanctions first.

Have you -- have the defendants had an opportunity to review that?

MR. SCAHILL: Yes.

THE COURT: And any response?

MR. SCAHILL: Yes.

First of all, the question that was asked of Mr. Rios on direct was about a full strip search that was done every time she went in there and included a cavity search which we then -- which is illegal, which was illegal, which is still illegal, and was in violation of IDOC policies. So that's point number one to address what they contended here which they're citing a lawsuit that was settled which said that there were persons who were saying that those rules weren't followed. That's the general issue with respect to good faith basis. That is not an appropriate practice and never has been in IDOC.

Number two, the larger issue with respect to the facts of this case are that Mr. Rios was asked in discovery numerous times about issues with family members and the like and never disclosed any of that and sandbagged essentially both at his

1762

deposition and in discovery and then started blurting things out on the stand which were discoverable and which we were never given notice of before, and he of course has not named the mother or anyone else who supposedly was subjected to these things. And we had no idea that he would even be making those claims because he denied that there were any family problems. So there are both discovery issues and there are general issues with respect to the propriety of that -- that practice in general.

So there was clearly a -- a -- not only a good faith basis tethered to the facts of this case with respect to Mr. Rios never have -- not only not disclosing this but denying at his deposition that there were any family issues related to -- to his incarceration whatsoever.

And then of course this issue of routine strip searches to visitors has always been unconstitutional. Cavity searches have never been allowed, and that's what the law is. I mean, there are cases that he cites that does not say to the contrary at all.

THE COURT: Okay. Response?

MR. S. RICHARDS: Your Honor, in terms of the discovery violation there -- or alleged discovery violation, I don't believe this was encompassed in their discovery questions. I also don't remember having been cited a particular question in the deposition which touched this

particular issue. So I don't think that there's an undisclosure. They could have asked him any questions about prison if they wanted to at deposition, and they asked a number.

With respect to the good faith basis, I think if you look at counsel's question, it was pretty extreme in that he was saying that Mr. Rios was lying about it and that it was virtually impossible for the IDOC to have ever done anything like this whereas, in fact, in the '90s, they apparently were doing things like this because there are allegations and settlements of lawsuits, and I cited one particular case.

So I think that for him to say to Mr. Rios you're lying, this is absolutely impossible, IDOC never does this, IDOC does have regulations, but the lawsuit said that IDOC violated their own regulations by doing strip searches without reasonable suspicion.

THE COURT: Okay. The testimony I believe that's at issue is from page 1725 of the transcript starting at line 10. And the precede -- or actually I'm going to start at line 6. It reads:

"Your suggestion is that when somebody visits somebody in prison that they strip search them. Is that what you're telling this jury?

"A. Yes, sir.

"Q. Sir, you know that is not what happens.

1764

"A.   That is true.

"Q.   That is a complete lie, isn't it, sir?

"A.   No, sir.

"Q.   Have you ever seen that happen?

"A.   No, sir."

And so the issues that are raised is whether there's a good faith basis for Mr. Scahill to ask Mr. Rios whether that was a lie.  I think we have to back up and understanding that Mr. Rios, while incarcerated, could not have been a visitor and therefore could have no first-hand knowledge; i.e., was not a percipient witness to any strip searches, one has to question whether there's a good faith basis to elicit such testimony in the first place as it is blatant, rampant hearsay, not subject to any exception.

So what good faith basis do you have to elicit testimony for which the witness has no personal knowledge whatsoever?

MR. S. RICHARDS:  Mr. Rios represented to us that he had been told these things by his relatives.

THE COURT:  Which is hearsay.  I'm asking about his personal knowledge.

MR. S. RICHARDS:  He never witnesses the strip search, correct.

THE COURT:  And so that goes back to my question. What good faith basis is there to elicit testimony from the

1765

witness knowing that the witness has no first-hand personal knowledge?

MR. S. RICHARDS: Because it's admissible not as substantive evidence but for the effect on him that he was being told by his relatives that they were being strip searched --

THE COURT: Which --

MR. S. RICHARDS: -- and there was no objection to it.

THE COURT: Which I allowed. But to go into the level of detail -- or because I allowed it in that sense, how is it not appropriate to draw attention to the fact that he has no personal knowledge?

MR. S. RICHARDS: It's not inappropriate to draw attention to the fact that he has no personal knowledge. I believe it is inappropriate to say IDOC would never do such a thing.

THE COURT: Where did he say that?

MR. S. RICHARDS: He said -- I believe he said you know it's a lie; IDOC doesn't do that.

THE COURT: I read you the testimony. I did not hear Mr. Scahill say IDOC does not do that.

It is much better in front of me to say "I don't recall" or "I don't know" rather than to flail about and grasp for straws because I remind you, sir, that you have an obligation of candor towards the Court. And to guess is not

1766

invoking that -- or is not consistent with that obligation.

MR. S. RICHARDS: I stand corrected. I don't remember the exact testimony.

THE COURT: You are welcome to go back and look at the transcript and point me to evidence, but you keep -- you're now using my term, which is good faith basis, and you should have a good faith basis before making statements.

So I don't find that there was any misconduct or inappropriate examination concerning this topic because the witness himself, it was apparent from the circumstances as an inmate that Mr. Rios was not a visitor at Pontiac, not himself subject to any type of strip search. And, therefore, without any personal knowledge, it's fair to inquire that he is making it up and -- and that's just another way of saying lying. Making something up is lying. You may not like the terms. It's unfortunate. I don't see anything inappropriate with asking a witness whether "that is a complete lie, isn't it, sir?"

With that testimony -- or with that question --

(Brief interruption.)

THE COURT: Ms. Franklin will take the jurors. Please take them down to 11.

Counsel on the phone -- which stairwell is closed?

MR. J. RICHARDS: I think southwest, Your Honor.

THE COURT: It's time for our fire drill. I'm

grateful that it's happening early. We will take this up.

For counsel back on the phone -- for counsel on the phone, we have --

(Brief interruption.)

THE COURT: We'll come back afterwards.

(Recess at 10:05 a.m., until 10:20 a.m.)

THE COURT: Do we need the other Mr. Richards?

MR. S. RICHARDS: I would prefer that.

THE COURT: Okay.

MR. S. RICHARDS: He's downstairs picking up a witness.

THE COURT: Huh?

MR. S. RICHARDS: He's downstairs getting a witness through security.

THE COURT: Oh, through security?

MR. S. RICHARDS: Apparently there's an issue, yes.

THE COURT: Okay. We'll wait another few minutes until we have everyone and then we'll resume.

(Recess at 10:21 a.m., until 10:24 a.m.)

THE COURT: All right. We'll go back on the record.

One second before we bring the jury in.

So returning to the motion for leave to file a motion for sanctions, the motion for leave to file itself is granted. The motion for sanctions is denied for the reasons I stated before the break.

1768

And then in addition, looking at the relief sought, first plaintiff seeks to have the questions to Rios concerning the strip searches stricken. That relief is not appropriate.

As far as allowing Mr. Rios to call his mother and his sister, are they on your witness list?

MR. S. RICHARDS: No, Your Honor.

THE COURT: So why should you be allowed to call them now if you didn't disclose them as witnesses?

MR. S. RICHARDS: The issue is unexpected that we -- that the strip search or the existence of the strip search would be challenged.

THE COURT: Well, it was supposed to be offered only -- there was a motion *in limine* pretrial concerning family member experiences. Testimony was allowed only to the extent that it affected -- for the effect it had. It doesn't matter whether it was -- it happened or not so it seems to be a collateral issue.

But to the extent that you -- the plaintiff sought to introduce evidence that was hearsay evidence and not name the folks who could prove that up, that seems like an issue -- or if the plaintiff understood that he was going to introduce evidence concerning the strip searches, it's foreseeable that the plaintiff would need to introduce evidence to prove it up if it were to be offered for the truth. And so if they haven't been identified as witnesses, I don't understand how you're

able to call them now.  Did you identify them as potential witnesses in your 26(a)(1) disclosures?

MR. S. RICHARDS:  No, Your Honor.

THE COURT:  Another reason not to allow them to be called now.

You're in your case still.  You have the ability to call any disclosed witnesses whether in discovery or in pretrial disclosures as you see fit.  But it's a collateral issue that I don't know warrants much time.  But you've already accumulated 21 hours and 36 minutes of your 30 hours of trial time.

Is there any objection -- or do the defendants still object to the experiences of family members as far as calling witnesses to prove this up?

MR. SCAHILL:  Oh, yes.

MR. ENGQUIST:  Yes, Your Honor.

MR. SCAHILL:  Yes.

MR. ENGQUIST:  If they -- they were never disclosed. We would have taken depositions, but they were never disclosed for anything.

THE COURT:  Okay.  So the nondisclosure prohibits you calling the sister or the mother at this point.

All right.  I'm going to bring in the jury.  We'll get started with Mr. Guevara's testimony.  I'll explain to the jury that this is being taken out of order because of the need to

coordinate the timing of the appearance by video.

All right.

MR. SCAHILL: Thank you.

MR. ENGQUIST: Thank you, Judge.

(Off the record.)

THE COURT: All right. One of the jurors needs a few minutes so I'll take up another issue.

So I've got the response to the motion for sanctions, or the defendants' motion for sanctions concerning the nondisclosure of the identity of a confidential informant.

The issue as I understand it isn't so much what evidence has been presented about the existence of the confidential informants. It's that after the plaintiff's deposition, the plaintiff gave plaintiff's counsel the name of someone who could have been the confidential informant but did not disclose that through discovery which denied defendants the opportunity to seek out that person and seek discovery from that individual as a means of responding to the plaintiff's claims that the defendants made up the existence of the confidential informant.

In simpler terms, if the confidential informant existed or to the extent the confidential informant existed, the defendants had a right to pursue discovery to prove the existence and a name would have gone -- would have aided them in that effort.

1771

And so I do find that there is a discovery violation concerning the existence of the confidential informants, but I agree with the plaintiffs that dismissal of the case is too harsh a sanction. I further agree with the plaintiff that the sanction should be tied to the discovery violation itself. And in that regard, the appropriate sanction here is to dismiss the claim that defendant Guevara made up the existence of the confidential informants.

So that aspect of Count 2 is dismissed. Count 2 still stands technically because the other aspect of the claim is that defendant Guevara fabricated evidence by feeding evidence or having the confidential informant say things that weren't true. So that aspect of the claim survives.

So the motion for sanctions -- the defendants' motion for sanctions is granted in part and denied in part.

All right. So anything else that I can address for either side?

MR. S. RICHARDS: Not from plaintiff.

MR. SCAHILL: Not from us.

THE COURT: All right. Once the jury is ready, we'll bring them in and get started.

MR. SCAHILL: Thank you.

(Pause.)

LAW CLERK: All rise.

(Jury in at 10:33 a.m.)

THE COURT: All right. Please take your seats.

Welcome back, ladies and gentlemen. Aside from the fire drill, does anyone have anything to report to me?

And -- okay. This morning we are going to interrupt the redirect examination of Mr. Rios to hear from defendant Guevara remotely. The reason for this is just it's easier for me to schedule someone to appear remotely at a break so that we can set up the equipment and then take the equipment away without interrupting the flow of trial.

And so counsel with Mr. Guevara, can you hear me?

UNIDENTIFIED SPEAKER: Yes, Judge, we're ready.

THE COURT: Okay. I will swear the witness in.

And then, Mr. Richards, you may proceed with your examination.

Mr. Guevara, if you'd raise your right hand.

(Witness sworn.)

THE COURT: Okay. Mr. Richards, you may proceed.

REYNALDO GUEVARA, DEFENDANT HEREIN, DULY SWORN,

DIRECT EXAMINATION

BY MR. S. RICHARDS:

Q. Mr. Guevara, first of all, can you hear me?

A. Yes.

Q. Please tell me at any time if you can't.

A. Reynaldo Guevara.

Q. Thank you for stating your name.

Guevara - direct

1773

Could you spell your first and your last name?

A.   R-e-y-n-a-l-d-o, last name G-u-e-v-a-r-a.

Q.   Mr. Guevara, in June of 1989, you were a gang specialist with the Chicago Police Department?

A.   Yes.

Q.   Okay.  Sometime after June 27, 1989, you heard about the Luis Morales murder?

A.   On the advice of my attorney, I invoke my constitutional rights under the Fifth Amendment.

Q.   Thank you for answering the question.

Your supervisor did not ask you to investigate the Morales murder case?

A.   On the advice of my attorney, I invoke my Fifth Amendment, constitutional Fifth Amendment rights.

Q.   No detective from violent crimes Area 5 asked you to investigate the Morales murder case?

A.   On the advice of my attorney, I invoke my constitutional rights under the Fifth Amendment.

Q.   You began this investigation on your own?

A.   On the advice of my attorney, I invoke my constitutional rights under the Fifth Amendment.

Q.   At the time you began your investigation, you had only read the case report and had not read the detective's supplementary reports?

A.   On the advice of my attorney, I invoke my constitutional

Guevara - direct

1774

rights under the Fifth Amendment.

Q. On June 6, 19- -- I'm sorry -- on July 6, 1989, in the afternoon, you approached Jaime Rios, Macho Melendez, and Little Mike in the schoolyard on Leavitt?

A. On the advice of my attorney, I invoke my Fifth Amendment right, constitutional Fifth Amendment rights.

Q. You were with your partner, Officer Steven Gawrys?

MR. SCAHILL: Objection.

BY THE WITNESS:

A. On the advice of my --

THE COURT: What's the basis for --

BY THE WITNESS:

A. On the advice of my attorney --

THE COURT: One second.

What's the basis for the objection?

MR. SCAHILL: No evidentiary basis, partner.

THE COURT: It's overruled.

You may answer, Mr. Guevara.

BY THE WITNESS:

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

BY MR. S. RICHARDS:

Q. You and your partner Gawrys took Polaroid pictures of Jaime Rios, Macho Melendez, and Little Mike?

A. On the advice of my attorney, I invoke my constitutional

Guevara - direct

1775

Fifth Amendment rights.

Q.   You took Little Mike into your car, and when Jaime Rios asked if you wanted him too, you told Jaime Rios to go away?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   Later that day, you returned to Jaime Rios's home at 1440 North Leavitt?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You were accompanied by at least five other gang specialists:  Officers Gawrys, Vukonich, Zacharies, Longos, and Guzman?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You found Jaime Rios on his bicycle in front of his house at 1440 North Leavitt?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You grabbed Jaime Rios by his arm and pulled him off of his bicycle?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You handcuffed Jaime Rios behind his back?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Guevara - direct

1776

Q. You left Jaime Rios handcuffed behind his back in the alley in the custody of another officer?

A. On the advice of my attorney, I invoke my constitutional -- Fifth Amendment constitutional rights.

Q. You and a number of other officers entered Jaime Rios's apartment at 1440 North Leavitt?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. You and the other officers spent 15 to 20 minutes looking through the house at 1440 North Leavitt?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. You did not have a search warrant or a consent to search?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. You did not find a gun?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. You did not find any ammunition?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. You did not find any clothing or shoes which matched the description of witnesses at the scene?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Guevara - direct

1777

Q.   You did not find any clothing or shoes that had blood spatter on them?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You and Steven Gawrys took Jaime Rios to Area 5, still handcuffed behind his back?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   At the time you took Jaime Rios to Area 5, he was under arrest?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   At the time you took Jaime Rios to Area 5, you did not believe that you had probable cause to charge him with a crime?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   At the time you took Jaime Rios to Area 5, he did not go with you voluntarily?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You did not have an arrest warrant for Jaime Rios?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   At the time you took Jaime Rios into custody, he was not free to leave?

Guevara - direct

1778

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   When you got to Area 5, you placed Jaime Rios in an interrogation room?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   Detective Mike -- I'm sorry -- Detective Michael Mason was already in the room and sat behind Jaime Rios while you questioned Jaime Rios?

MR. ENGQUIST:  Objection, Your Honor.  Motion *in limine*.

THE COURT:  One second.

That's sustained.

BY MR. S. RICHARDS:

Q.   At some point during the interrogation, you witnessed Michael Mason grab Jaime Rios --

MR. ENGQUIST:  Objection, Your Honor.

THE COURT:  That's sustained.

BY MR. S. RICHARDS:

Q.   At some point in the interrogation, you showed Jaime Rios a picture out of a gang book of Little Mike?

A.   On advice of my attorney, I invoke my constitutional Fifth Amendment rights.

THE COURT:  Before you ask the next question, ladies and gentlemen, you'll get an instruction -- well, I'll give the

instruction now.

You're hearing defendant Guevara invoke his Fifth Amendment right not to incriminate himself in response to questions. You may, but are not required to, assume that defendant Guevara's testimony in response to those questions would have been unfavorable to him.

You may not, however, draw any inference from defendant Guevara's invocation of his Fifth Amendment right against any other party or person, meaning that you may not draw an unfavorable inference based on defendant Guevara's invoking his Fifth Amendment right against either defendant Michael Mason or defendant Ernest Halvorsen based solely on the invocation of his -- defendant Guevara's invocation of his Fifth Amendment rights.

You may continue.

MR. S. RICHARDS: Thank you.

BY MR. S. RICHARDS:

Q. At some point during the interrogation, you threatened Jaime Rios with the loss of his children if he did not give you a statement?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. You fed Jaime Rios the details of what he was to say which you took from the police reports and the witness statements which have been gathered in the case?

Guevara - direct

1780

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You told Jaime Rios to just say that he was there, present at the scene of the murder?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You have no alibi for your whereabouts for the period between approximately 10:00 p.m. on July 6, 1989, and 2:00 a.m. on July 7, 1989, when Jaime Rios was being interrogated at Area 5?

          MR. SCAHILL:  Objection to the form of the question.

          THE COURT:  It's overruled.

          You may --

BY THE WITNESS:

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

     (Counsel conferring.)

BY MR. S. RICHARDS:

Q.   You were present when a search warrant was executed for the home of Benjamin Carrero?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   Together with a white or Caucasian officer, you interrogated Benjamin Carrero about the .32 caliber gun which had been found outside his home when Benjamin Carrero was in

custody at Area 5?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You told Benjamin Carrero to say that Jaime Rios had given him the .32 caliber gun and that Jaime Rios had just used it to shoot someone?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You knew that this statement was a lie?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You told Benjamin Carrero that you would take away his children if he did not say that Jaime Rios had given him the gun and that Jaime Rios had said that Rios had just -- Rios had just used it to shoot someone?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   And that was a search warrant which was executed at the home of Benjamin Carrero on July 9th of 1989?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You have no alibi for your whereabouts on July 9, 1989, when Benjamin Carrero was being interrogated at Area 5?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   On July 7, 1989, you picked up Luis Huertas at the ice cream shop where he worked and took him to Area 5 to view a line-up?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   Luis Huertas was the only witness you took to view a line-up during the investigation of the Luis Morales murder?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You showed Luis Huertas a series of photographs and told him to pick out the person the he had seen?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   Luis Huertas told you that he did not recognize the shooter in any of the photographs?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   Jaime Rios was the only person in the line-up that was also in the photographs you showed to Luis Huertas?

          MR. SCAHILL:  Objection.

          May we have a sidebar very quickly?

          THE COURT:  Okay.  Sidebar.

     (Proceedings heard at sidebar:)

          MR. SCAHILL:  Judge, we -- we've heard from Mr. Huertas.  Mr. Huertas denied that that occurred.  The

Guevara - direct

1783

affidavit has not been entered substantively nor could it.  So I do not believe that there is any evidentiary basis to be asking this witness of this affirmatively given that we've heard the competent testimony from Mr. Huertas denying that that occurred.

THE COURT:  Response?

(Counsel conferring.)

MR. S. RICHARDS:  Your Honor, the affidavit was shown to him during the deposition.  He acknowledged --

MR. KIVETZ:  Your Honor, I can hear him.  I can hear him with the headphones off and so can the jury.

THE COURT:  You don't have to speak as loudly when speaking into the microphone.

MR. S. RICHARDS:  Okay.

Your Honor, the affidavit, the -- at the deposition the defendants went through the affidavit line by line.  He acknowledged it was his affidavit.  He acknowledged he signed it.  He acknowledged he swore to it.  It was attached as an exhibit to the -- to the deposition which was read to the jury. So our position is that the affidavit becomes part of the deposition because at the deposition he swore that was his affidavit and that he had signed it.

Now, he also recanted parts of it or was confused about it, but the fact is the jury heard it, heard him acknowledge it, and although it has not been separately

admitted, it could be and will be admitted in our case.

At the time the deposition was read in, my understanding was that it was their case taken out of order although I don't think it matters. So I believe the substance of the affidavit is in front of the jury, and that's sufficient corroboration to ask him these questions.

THE COURT: Okay. The objection is overruled. I do plan on explaining to the jury that there has to be -- that the invocation of silence alone is not enough that there has to be -- it has to be considered in light of the other evidence and that the plaintiff has to produce evidence to support its allegations, his allegations independent of the invocation of the Fifth. And that limiting instruction would be sufficient to address the defendants' concerns.

So you may re-ask the question.

MR. S. RICHARDS: Thank you.

(Proceedings heard in open court:)

THE COURT: The objection is overruled.

You may re-ask the question, Mr. Richards.

MR. S. RICHARDS: Thank you, Your Honor.

BY MR. S. RICHARDS:

Q. Jaime Rios was the only person in the line-up that was also in the photographs you showed to Luis Huertas?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You were present during the line-up when Luis Huertas was shown Jaime Rios?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   At the time you knew that Luis Huertas was picking Jaime Rios out of a line-up only because you had threatened to lock him up if he did not pick out Jaime Rios?

MR. SCAHILL:  Objection to the foundation.

THE COURT:  Overruled.

BY THE WITNESS:

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

BY MR. S. RICHARDS:

Q.   On July 28, 1989, you were at Area 5 at approximately 4:00 p.m. when Cristino Garcia was brought to the station by gang specialists O'Quinn and Mertes?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You do not have an alibi for the time when Cristino Garcia was interrogated?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You were present when Cristino Garcia told gang specialist O'Quinn that he had an alibi for the night of the murder, June 27, 1989?

Guevara - direct

1786

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You did not convey that information to any of the state's attorneys who tried the case against Jaime Rios for the murder of Luis Morales?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   On July 28, 1989, you interrogated Cristino Garcia about the Luis Morales murder?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   A Hispanic woman dressed in a suit and vest was present when you interrogated Cristino Garcia?

A.   On advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   Cristino Garcia refused to say that he was present for or had participated in the murder?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   When Cristino Garcia refused to say anything about the murder and denied involvement, you placed a large phone book on his head and beat him by striking the phone book with a billy club or a flashlight through the phone book?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   Cristino Garcia then told you that he would give you a statement if you let him make a phone call?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You let Cristino Garcia make a phone call?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You heard Cristino Garcia sister's tell Cristino Garcia not to say anything and that a lawyer was on the way to the station?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   After you overheard this conversation, you again beat Cristino Garcia with a flashlight or the billy club and the phone book?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   You stopped when you were told that Cristino Garcia's lawyer had arrived at the station?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q.   Several months later, you stopped Cristino Garcia on the street, took his picture with a Polaroid camera and threatened him?

A.   On the advice of my attorney, I invoke my constitutional

Guevara - direct

1788

Fifth Amendment rights.

Q. You never told any state's attorney that had you beat Cristino Garcia with a billy club and the phone book and that Cristino Garcia had refused to make a statement?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. You first met Jaime Rios when Jaime Rios was 14 years old?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. You also knew Jaime Rios's mother?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. When you first met Jaime Rios, you stopped him, patted him down, and asked for his name?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. On a second encounter when Jaime Rios was 14 years old, you again stopped Jaime Rios, patted him down, and searched him, finding nothing?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. On the same occasion in Jaime Rios's presence, you stopped five or six other people and also patted them down?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. In the summer of 1985 or 1986, in Jaime Rios's presence, you stopped Jose Macho Melendez, slapped him and said to him, don't you ever lie to me again?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. Sometime in 1985 in Jamie Rios's presence in the area of Le Moyne and Leavitt, you stopped someone, took his chain, and told him that if he wanted to pick it up, he would have to come, provide a receipt, come to the station, and sign a form?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. In this case, you have claimed that you first suspected Jaime Rios after speaking with confidential informants?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. How many confidential informants were there?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. What are their names?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. Did the informants give you reliable information in other cases before you spoke with them about Jaime Rios?

A. On the advice of my attorney, I invoke my Fifth Amendment constitutional rights.

Guevara - direct

1790

Q. What information did they give you about Jaime Rios?

A. On advice -- on the advice of my attorney, I invoke my constitutional rights under the Fifth Amendment.

Q. You never told assistant state's attorney Kip Owens that you had threatened Luis Huertas in order to make him identify Jaime Rios?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment right.

Q. You never told assistant state's attorney Kip Owens that you and Detective Mason had coerced Jaime Rios to make a false confession?

MR. SCAHILL: Objection.

THE COURT: Basis?

MR. KIVETZ: Motion *in limine*.

MR. S. RICHARDS: I'm sorry. May I withdraw and rephrase?

THE COURT: Okay. The objection is sustained. You may -- because the question is withdrawn.

You may rephrase.

BY MR. S. RICHARDS:

Q. You never told Assistant State's Attorney Kip Owens that you had coerced Jaime Rios to make a false confession?

A. On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

Q. You signed arrest reports in this case, Luis Morales murder

case, identifying yourself as an arresting officer?

A.   On the advice of my attorney, I invoke my constitutional Fifth Amendment rights.

           MR. S. RICHARDS:  One moment, Your Honor.

      (Counsel conferring.)

           MR. S. RICHARDS:  Nothing further.

           THE COURT:  All right.

           Any cross?

           MR. SCAHILL:  Just very briefly.

                         CROSS-EXAMINATION

BY MR. SCAHILL:

Q.   Good morning, Mr. Guevara.  Can you hear me okay?

A.   Yes.

Q.   Okay.  We know each other of course.  I'm --

A.   Yes.

Q.   Can you tell the ladies and gentlemen of the jury, where are you currently?

A.   I'm currently in Texas.

Q.   Okay.  Why are you in Texas?

A.   Because I moved to Texas.

Q.   That's where your residence is?

A.   Yes.

Q.   And who do you live there with?

A.   My wife.

Q.   Okay.  And what city in Texas in particular?

A.   I live in Helotes, Texas.

Q.   Okay.  Is that outside of San Antonio?

A.   In the area, yes.

Q.   Okay.  And what's your wife's name?

A.   Magnacette Guevara.

Q.   And how long have you been married to Magnacette for?

A.   40 years.

Q.   And is your wife employed?

A.   No.

Q.   What does -- what does she do now?

A.   She's at home, home wife.

Q.   She's at home, all right.  Was she employed for a time?

A.   Yes, she was.

Q.   Okay.  Where was she employed when she worked?

A.   I believe it was Social Security, I think, government.

Q.   And, sir, you're a father and a grandfather?

A.   Yes.

Q.   Okay.  You were previously employed by the Chicago Police Department; is that correct?

A.   That's correct.

Q.   And did you retire?

A.   Yes.

Q.   Okay.  Were you terminated from the Chicago Police Department or did you just retire in the normal course of --

A.   Retired.

Q.   Okay.

A.   Retired.

Q.   And that -- and that was what year, approximately?

A.   2005.

Q.   All right.  So that was over 20 years ago?

A.   Correct.

Q.   All right.  Have you had any employment since your retirement 20 some years ago?

A.   No.

Q.   All right.  Do you currently have -- do you get a police pension?

A.   Yes.

Q.   Okay.  Do you -- other than your -- your police pension, do you have any income whatsoever?

A.   No, just Social Security.

Q.   Okay.  And does your wife work?

A.   No, she doesn't.

Q.   Okay.  So is it fair to say that you and your wife just sort of survive on your Social Security and your police pension?

A.   That's correct.

Q.   All right.  Do you -- you reside in a home, yes?

A.   Yes.

Q.   You have a mortgage on that home?

A.   Yes, I do.

Q.   And do you still owe some money on it?

A.   Yes.

Q.   How much money, approximately, is in your bank account currently?

A.   Good luck.  Nothing.  I got about a thousand dollars, I believe about a thousand dollars.  I'm not sure.

Q.   Okay.  Do you have any investment accounts or anything like that?

A.   No, I do not.

Q.   Okay.  And after your police pension at the end of the month, how much money do you have leftover after you've paid your bills and mortgage and food and that kind of stuff?

A.   A few hundred dollars probably.

Q.   Okay.  How was -- I don't know if I asked you this, but how old are you, sir?

A.   I'm 82 years old.

Q.   Okay.  And you turned 82 in January of this year?

A.   Yes, I did.

Q.   Okay.  And is your -- how is your physical health?

A.   It's okay.  My mind is not that bright like it used to be.

Q.   Okay.  And have you -- have you noticed that sort of declining in the last couple of years?

A.   Oh, yeah.

Q.   Yeah.  Does that concern your wife?

A.   It concerns both of us.

Q.   Okay.  All right.

          MR. SCAHILL:  That's all the questions I have for you, Mr. Guevara.  Thank you.

          THE COURT:  Counsel for defendants, Halvorsen or Mason?

          MR. ENGQUIST:  No questions, Your Honor.

          THE COURT:  Mr. Richards, anything on that cross?

          MR. S. RICHARDS:  Yeah, just a couple of questions.

                    REDIRECT EXAMINATION

BY MR. S. RICHARDS:

Q.   Mr. Guevara -- is -- is it true that your police pension is $91,000 a year, or is it some other figure?

A.   Yes.

Q.   And how -- in addition to your police pension, how much Social Security do you -- do you receive?

A.   I think about $400.

Q.   Per month?

A.   Yes.

Q.   And does your wife receive Social Security?

          MR. SCAHILL:  Objection.

          THE COURT:  Sustained.

     (Counsel conferring.)

BY MR. S. RICHARDS:

Q.   You said that you retired from the Chicago Police Department?

A.   Yes.

Q.   What was the year that you retired?

A.   2005.

Q.   Okay.  And you've been retired ever since 2005?

A.   Yes.

     (Counsel conferring.)

          MR. S. RICHARDS:  No further questions.

          THE COURT:  Okay.  Anything on that?

          MR. SCAHILL:  Just one thing very quickly.

                    RECROSS-EXAMINATION

BY MR. SCAHILL:

Q.   Mr. Guevara, I forgot to ask you, you're asserting your constitutional rights in this case, right?

A.   Yes.

Q.   Okay.  And you said it was on the advice of your attorney?

A.   Yes.

Q.   Okay.  That -- that is not from me, that's a different attorney that you have.  Isn't that true, sir?

A.   Yes.

Q.   Okay.  I have not given you that advice in this case.  Is that accurate?

A.   That's correct.

Q.   Okay.  Thank you.

          MR. SCAHILL:  No more questions.

          THE COURT:  Anything on that, Mr. Richards?

MR. S. RICHARDS: No.

THE COURT: All right. Mr. Guevara, you're excused from the subpoena.

I'll disconnect the Webex and then, Mr. Rios, we will -- you can take the stand again.

(Off the record.)

THE COURT: All right. Mr. Rios, you can take the stand.

All right. Mr. Rios, you remain under oath.

Mr. Richards, you may proceed when ready.

MR. J. RICHARDS: Your Honor, may I proceed?

THE COURT: Yes.

JAIME RIOS, PLAINTIFF HEREIN, PREVIOUSLY SWORN,

REDIRECT EXAMINATION (RESUMED)

BY MR. J. RICHARDS:

Q. Good morning, Jaime.

A. Good morning.

Q. I just have a few more questions for you.

The first -- the first question is in terms of the aggravated assault charge that you pled guilty to, who was your attorney in that case? Was it a public defender or was it a private attorney?

A. I can't recall. I think it was public defender.

Q. Was it Jack Carey or was it a different person?

A. It was a different person.

Q.   Now, you were asked the questions about -- yesterday on cross about what happened during your trial.  Do you recall that?

A.   Correct.

Q.   Is it fair to say that the defensive alibi was not raised at your trial?

A.   Correct.

Q.   Is it fair to say that after your trial, after you were convicted and then when you moved to reverse your conviction on a 2-1401 petition, in that petition do you recall whether or not you raised a defensive alibi?

A.   No, I did not.

Q.   Are you alleging an alibi here in this case?

A.   No, sir.

Q.   Isn't it true that the first time that there's a mention of alibi is when the defendants asked you about alibi in their interrogatories to you?

A.   Yes, sir.

Q.   Now, I want to turn to -- back to the -- the court-reported statement.  You didn't give Barbara Riley the questions that she was supposed to ask you, did you?

A.   No, sir.

Q.   And isn't it true that during that entire question and answer with Barbara Riley she never once asked you where you were at 11:50 p.m. on June 27, 1989?

A.   No, she didn't.

          MR. SCAHILL:  Object to leading.

          THE COURT:  Overruled.

          You may answer.

BY THE WITNESS:

A.   No, she did not.

BY MR. J. RICHARDS:

Q.   And do you recall whether or not in your court-reported statement if there's ever mention of any time whatsoever?

A.   I can't recall.  I don't think so.

          MR. J. RICHARDS:  A moment, Your Honor.

          THE COURT:  Okay.

     (Counsel conferring.)

BY MR. J. RICHARDS:

Q.   Jaime, you were asked some questions on -- by counsel yesterday about -- about your statements that you made at trial.  Do you recall those questions?

A.   Yes.

Q.   At trial, did you ever say that Detective Mason pulled your hair?  Did you ever say that at trial?

A.   I believe I did.

Q.   Did -- at trial, did you ever say that Detective Mason slammed your head into the table?  Did you ever say that?

A.   I believe I did.

Q.   At trial, did you ever say that Officer Guevara had

threatened you?

A.   Yes, sir.

Q.   Did you ever tell the jury at that trial that Officer Guevara had threatened to take your child away?

A.   Yes, sir.

Q.   Now, let me -- let me ask you this question.  So we've talked about the trial.  You've been asked questions about pretrial motions and what occurred at those motions.  In terms of from your arrest to when you were tried on the case, do you know how many times you were brought to court?

A.   No, I do not.

Q.   Do you remember what happened on each and every court date?

A.   No, I do not.

Q.   Besides a trial and besides a hearing, what else would happen on other court dates, if you remember?

A.   I have no -- I have no knowledge on that.  I don't understand.

Q.   And also is it fair to say at trial that you testified that Officer Guevara fed you details of the statements?

A.   Yes.

         MR. J. RICHARDS:  One quick moment, Your Honor.

         THE COURT:  Okay.

     (Counsel conferring.)

         MR. J. RICHARDS:  I tender.

         THE COURT:  Okay.

Recross?

MR. SCAHILL: Very briefly.

RECROSS-EXAMINATION

BY MR. SCAHILL:

Q. Mr. Rios, did I just hear you tell your attorney that you are not asserting an alibi for where you were on June 27th of 1989 in this case?

A. I didn't have a witness.

Q. No, I think he asked you whether you were asserting an alibi for your whereabouts during the time that Luis Morales was killed in this case and you told him that you were not.

A. Yes, sir.

Q. So you're -- you're not asking this jury to find that you were at someplace other than where Mr. Morales was killed on June 27, 1989?

A. Yes, sir.

Q. What I said is true? What I said is true? You're not asking them to determine whether you were at the place of the murder or not. Is that what you're saying?

A. Correct.

Q. Okay. And it is true that you've given at least six different alibis throughout the course of the proceedings leading up to today. Isn't that true, sir?

A. If you speaking about Guevara, Cristino and them, yes.

Q. No, I'm referring specifically to your version of the

events about where exactly you were and who you were with at the time when Luis Morales was killed.

A.   No, I did not.

Q.   Okay.  You have given at least five or six different versions of that, haven't you, sir?

A.   I can't recall.

Q.   You -- we went through yesterday at your deposition you testified on June 27, 1989, you were in front of your house with Jamaica.  Do you remember we went through that?

A.   That's when the arrest, yes.

Q.   And that is not what happened on June 27th, is it?

A.   Yes, it did.

Q.   It is what happened on June 27th?

A.   Yes.

Q.   Okay.  So on June 27th --

A.   No.  No, I did not.

Q.   Okay.  So that one --

A.   That was the 7th.

Q.   Okay.  So alibi one, not -- not there.

        We went through your answers to interrogatories where we asked you where you were on June 27th and you said you were at home, and you --

A.   Yes.

Q.   Right?

A.   Yes.

Rios - recross

1803

Q.   And you did not mention Diana Rodriguez, right?

A.   No.

Q.   Okay.  That's alibi number two, not a full and accurate description of your alibi, is it?

A.   They didn't mention no alibis.

Q.   We asked you where you were and who you were with on June 27, 1989, and you did not mention that you were with Diana Rodriguez, correct?

A.   I mentioned that I was home, yes.

Q.   Right.  But not with her, right?

A.   Correct.

Q.   All right.  Then when your attorney was asking you questions on direct examination, you then said for the first time in 37 years that you were actually at home with Diana?

A.   Yes, sir.

Q.   Okay.  And that's the first time you ever told that version of the events --

A.   Yes.

Q.   -- is two days ago, right?

A.   Yes, sir.

Q.   Okay.  And so then that's alibi number three, right?  We got the Jamaica one, you got the alone one, and now you have the Diana one.  So that's --

A.   The who?

Q.   -- counting three now, right?

A.   The who?

Q.   There's the one that you told us at your deposition --

A.   Okay.

Q.   -- where you were with Jamaica.  That's not true.  There's the one where you said you were alone, also not true.  And then there's the third one you told in this case which is with -- you were with Diana, right?

A.   Yeah, from different days, yes.

Q.   Okay.  So that's three so far, right?

A.   Yes.

Q.   And they're all different?

A.   Different days, yeah.

Q.   Okay.  And then at your criminal trial, you did not raise any alibi at all, right?

A.   Correct.

Q.   And at your postconviction, you also didn't raise any evidence of an alibi?

A.   Correct.

Q.   Isn't that correct?

A.   Correct.

MR. SCAHILL:  All right.  That's all I have.

THE COURT:  Okay.  Counsel for Mason and Halvorsen?

MR. ENGQUIST:  Nothing, Your Honor.

THE COURT:  All right.  Anything on that, Mr. Richards?

(Counsel conferring.)

MR. J. RICHARDS:  Nothing further.

THE COURT:  Okay.  Mr. Rios, you may step down.

Next witness.

There's a cable on the ground.  Be mindful of that not to trip, please.

THE WITNESS:  Yep.

THE COURT:  Raise your right hand.

(Witness sworn.)

THE COURT:  Okay.  Please have a seat.

Counsel, you may proceed once the witness is settled.

MR. S. RICHARDS:  Thank you.

LAMONT BURR, PLAINTIFF'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MR. S. RICHARDS:

Q.  Mr. Burr, could you please state, in a loud, clear voice, your name for the court reporter, spelling your first and your last name.

A.  Lamont, L-a-m-o-n-t, Burr, B-u-r-r.

Q.  Mr. Burr, how old are you?

A.  53.

Q.  And how far did you go in school?

A.  I graduated high school, one year of college.

Q.  Okay.  Where did you go to high school?

A.  Senn.

Q.   Where?

A.   Senn, Senn High School.

Q.   Senn, S-e-n-n?

A.   Yes.

Q.   And where did you do your one year of college?

A.   SIU, Carbondale, Illinois.

Q.   All right.  Are you currently single or married?

A.   Single.

Q.   And do you have children?

A.   Yes.

Q.   How many?

A.   Seven.  Seven.

Q.   Okay.  And do you support them?

A.   Not at this moment, but I was.  I just had a stroke recently so I have no income.

Q.   All right.  What is your occupation or profession?

A.   Barber.

Q.   Okay.  And are you working at that now or how is that going?

A.   It's off and on.  It gives and take with my standing.

Q.   Do you know the plaintiff in this case, Jaime Rios?

A.   Yes.

Q.   Can you point to him and point him out by something he's wearing?

A.   The brother with the grayish look, it's like off-black

button-up, salt and pepper hair that's sitting right behind the guy that's behind you.

MR. S. RICHARDS:  Okay.  May the record reflect the in-court identification of the plaintiff?

THE COURT:  It so reflects.

BY MR. S. RICHARDS:

Q.  Now, Mr. Burr, how long have you known Jaime Rios?

A.  I would say probably 46 years, 45.

Q.  How old were you when you met him?

A.  Probably about 11.

Q.  All right.  Now, Mr. Burr, have you ever been a member of a gang?

A.  Yes.

Q.  What gang were you a member of?

A.  Imperial Insane Vice Lords.

Q.  Okay.  Were you ever a member of the Latin Kings?

A.  No.

Q.  Did you ever -- did you leave the Vice Lords at some point?

A.  Yes.  I would say my junior year, maybe senior year of high school.

Q.  You left them?

A.  Yes.

Q.  All right.  In 1989, how old were you?

A.  1989?  I was 16, 17, something like that.

Q.  Okay.  In 1989, did you participate in any sporting events?

Burr - direct

1808

A.   Yes, basketball and baseball.

Q.   Did you play in any tournaments?

A.   Yes, all across the city of Chicago.

Q.   Now, approximately July 2nd -- 1st of 1989, was that a particular significant date of -- in terms of a tournament?

A.   Yes, it was a championship basketball game in the neighborhood, Bucktown, Wicker Park where I grew up at.

Q.   Okay.  Where was the championship game located exactly?

A.   In Wicker Park.

Q.   All right.

A.   I don't know the correct address, but it's on Honore.  Most people will say Damen, but the front of it is on Honore Street.

Q.   Okay.  On that day when you played in the championship game, did you succeed, fail, win anything?  What happened?

A.   Yeah, we won a championship, and I won MVP that day.

Q.   Okay.  Was that memorable to you that you won the championship and you won the MVP?

A.   Yeah.  I was very prestigious with basketball, sports period.

Q.   About what time did the game end?

A.   It was in the late evening, probably about 6:00 or 7:00, maybe 4:00, somewhere around about I would say 6:00 or 7:00.

Q.   What did you do after you left the game?

A.   I walked down Le Moyne, going west.  It was west going up Le Moyne towards Leavitt.

Q.   All right.  Did you eventually reach Leavitt?

A.   Yes.

Q.   When you reached Leavitt, did you see anyone you knew?

A.   Yes.

Q.   Who did you see you knew?

A.   Jaime.

Q.   Jaime Rios?

A.   Yes.

Q.   And what -- do you remember anyone else being out there with him?

A.   Not that I can recall.  It was some people out there, but I can't say exact their names.  I can't remember.

Q.   Did you approach Jaime?

A.   Yes.

Q.   And how long did you spend with him after something -- before something else happened?

A.   I probably was there no longer than 15, maybe 20 minutes.

Q.   After 20 minutes, did something startling happen?

A.   Yes.

Q.   Tell us about it.

A.   As I was talking to him, you know, I always looked to him to -- of my achievements of basketball or baseball.  That neighborhood we all played in, you know, against each other or with each other in sports.  And I was telling him that I won the MVP.  I had both trophies in my hand that day.

Burr - direct

1810

Q.   Okay.  After you told him that you had won the MVP, did something else happen?

A.   As I was talking to him, I heard screeching tires, you know.

Q.   Okay.

A.   He said "look out."  All I remember was being pushed to the ground.

Q.   You said you heard screeching tires and you were pushed to the ground.

A.   Yeah.

Q.   Who pushed you to the ground?

A.   Mr. Rios.

Q.   After Mr. Rios pushed you to the ground, did you hear anything?

A.   No, not at the moment.  And then as I was down -- because when I got pushed to the ground, I was very, you know, startled.  And there were gunshots.

Q.   Okay.  Now, did you see gunshots or did you hear gunshots --

A.   Heard gunshots.

Q.   -- or both?

        What?

A.   Heard gunshots.

Q.   Okay.  Did you see them?

A.   No, because I was on the ground.

Q. Did you see where they came from?

A. No. I just know they came from -- had to come from, just a thought, screeching tires. You know, where I live, if you hear screeching tires then gunshots, yeah, of course it had to have been from a car that was turning the corner at a high speed because that's the only way you would hear screeching tires.

Q. Did you eventually get up from the ground?

A. Yeah.

Q. What happened then?

A. I got up and noticed, you know, everybody had took off running in they directions, you know, and Mr. Rios went up, went up in his house.

Q. All right. Did you -- where did you go after you had heard the gunshots and the screeching and been pushed to the ground?

A. Took off running home.

Q. Okay. When you took off running home, did you get home or did you encounter anyone?

A. No, I got home. I ran home.

Q. Okay. Were you ever interviewed by the police about this or did you ever talk to the police about this?

A. Not that day. You know, they came around the next day, just really combing the whole neighborhood, just questioning any and everybody who think that they thought knew something about what happened the next -- you know, the other night.

Q. Okay. When the police came around combing the

Burr - direct

1812

neighborhood, did they speak to you?

A.   Yeah, I was one of the people they spoke to briefly.

Q.   Did the -- did they speak to you outside or did they take you someplace?  What happened?

A.   Yeah, I was on a -- I would say Wolcott and Potomac where my grandmother lived at.  I think that's 1269 North Wolcott.

Q.   Okay.  And you said the police came to you at 1269 West Wolcott, right?

A.   That's where I was at where my grand- -- on the block where my grandmother live.  It was like maybe me, three, four other people was out there.  They questioned all of us.  They basically questioned the whole neighborhood.

Q.   All right.  So when they were questioning all of you, what did -- were you able to tell them anything, what questions they asked?  How did it go?

A.   Well, no, because all I -- all I could be thankful and grateful for was being -- my life being saved being pushed to the ground.  Who knows if I wasn't pushed to the ground, I probably would have been shot that night or killed.

Q.   Did you ever have -- after that conversation with the police, did you ever have any further encounters with the police about any of this?

A.   No.

Q.   Okay.  I have -- wait.

     (Counsel conferring.)

BY MR. S. RICHARDS:

Q. Did -- did Jaime Rios's attorneys in his murder trial ever get in contact with you to come testify?

A. No.

Q. Okay. Was there any -- would you have had any problem coming to testify at the trial if somebody had called you as a witness?

A. No, I wouldn't have no problem with that, but I wouldn't have had too much to say but what I'm testifying to now, that I was actually saved by that brother pushing me to the ground. My life was saved that night, you know, and I heard screeching tires and gunshots. It wasn't too many more I could say. I wouldn't give any testimony than what I'm giving today.

MR. S. RICHARDS: No further questions.

THE COURT: Okay.

Cross?

MR. MILLER: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MILLER:

Q. Good morning, Mr. Burr.

A. How you doing?

Q. So you were with Mr. Rios in front of his house on this day that the Spanish Cobras drove by and shot at him?

A. I couldn't say if it was Spanish Cobras or whoever. I cannot say if it was Spanish Cobras.

Q. Okay. You don't know who it was --

A. Exactly.

Q. -- but you were there, right?

A. Exactly.

Q. Okay. Did it appear to you when these Spanish Cobras -- or when these individuals were shooting that they were intending to shoot at Mr. Rios?

A. I couldn't say if they were shooting at Mr. Rios that night or whoever. It was quite a few people out there. Like I said, I heard screeching tires, gunshots. You know, it was raining out. I couldn't say if they was shooting at Mr. Rios or anybody else.

Q. You were standing on the porch with Mr. Rios, correct?

A. Yes.

Q. Right in front of his house?

A. Mm-hmm.

Q. Yes?

A. Yes.

Q. You have to answer verbally.

A. Yes.

Q. And it was only you two out there on the front porch at the time, correct?

A. On the front porch.

Q. Right.

A. But like I said, it was quite a few other people out there

because that corner there is -- it's housing.  And back then it was Harold Washington housing, but now it's Bickerdike.  So it was more than just us out there, but it was just me and him on that porch.

Q.   Right.  There may have been people on the street or down the street that were out in --

A.   Somewhat like that, if I -- you know, if I can recollect. It's been a long time.

Q.   Sir, you got to try to let me finish my question before you begin your answer --

A.   Okay.

Q.   -- just for the court reporter's sake.  Okay?

A.   Oh, no problem.

Q.   Okay.  So there may have been people down the street or across the street, but in terms of in front of Mr. Rios's house at the time of this shooting, it was just you and Mr. Rios, correct?

A.   Yes.

Q.   His girlfriend wasn't there -- out there at the time, right?

A.   No.

Q.   His brother-in-law or his -- any of his girlfriend's brothers, they weren't out there, right?

A.   No.

Q.   And, in fact, hadn't you previously testified that there

were like 12 bullet holes in Mr. Rios's front door?

A.   I never testified to -- no.

Q.   That's not true?

A.   No.  No.

Q.   Okay.

A.   12 bullet holes?

Q.   You gave a deposition in this case, correct?

A.   Yes.

Q.   Okay.  And that was when the attorneys for --  you had attorneys asking you questions, including Mr. Rios's attorney?

A.   Yes.

Q.   Okay.  And you answered those questions?

A.   Yes.

Q.   And before you answered the questions, you swore an oath to tell the truth --

A.   Yes.

Q.   -- just like you swore an oath today; isn't that true?

        MR. MILLER:  Sorry.  Just lost my place.

BY MR. MILLER:

Q.   And you were asked about what happened after Mr. Rios pushed you down, correct?

A.   Yes.

Q.   All right.

        MR. MILLER:  It's Defense Exhibit 114, page 69, starting at line 22.

BY MR. MILLER:

Q.   And you testified:  "All I know, that he pushed me down. If he didn't push me down, I would have caught eight bullets. There was like 12 bullet holes in the door."

Did you give that response at your deposition, sir?

A.   If I did it, I probably have.  But like I said, it was a long time ago.  I was just really trying to recollect when you all was questioning me.  It probably was that many shots.

Q.   In the door of Mr. Rios's house, right?

A.   I couldn't say if it was the door.  If I gave the testimony of that, like I say, I'm just going off what I can remember at the time when you all questioned me on the deposition.

Q.   And the deposition was in July of 2023, correct?

A.   Was it?  It probably was.

Q.   Right.

A.   Yeah.

Q.   Okay.  So fair to say the fact that there were 12 bullet holes and that you wouldn't have -- even be alive today if Mr. Rios didn't push you down that these guys were shooting in Mr. Rios's direction?

A.   Yeah, I'm quite sure of that.

Q.   Okay.  So you -- after this occurred, you saw Mr. Rios run in his house, correct?

A.   Yeah, he -- he had to.  Like I said, I was on the ground. Everybody -- you know, from what I'm doing, he pushed me down.

Burr - cross

1818

He ran -- when I looked back up, he was gone.

Q.   Okay.  He ran into his house, right?

A.   Yeah, that was the only direction he could have ran.

Q.   Were you there when Mr. Rios came back out of the house?

A.   No, because I ran home.

Q.   All right.  And Mr. Rios approached you after this lawsuit was filed a couple of years ago, right?

A.   I wouldn't say approached.  As I can recollect that I think I ran into him -- into -- it's called the Kedzie Mall.  And, yeah, it was brought up, but I wouldn't say that he exactly approached me or came, you know, looking for me to approach me. I just ran into him.

Q.   Okay.  So you -- you ran into Mr. Rios, and when he saw you, though -- and this was, what, two or three years ago -- he said, can you help me out and be a witness for me with respect to this incident; isn't that true?

A.   Well, I'm going to say no because it wasn't really like that because we haven't seen each other in a minute.  So it was more like a meet and greet of not seeing other for a while and then, yes, it was brought up.

Q.   Are you saying he never asked you to come help him out and testify for him at this trial?

A.   He didn't say for no help out.  He said he might need me for testimony.

Q.   Have you been to this courthouse before, sir?

Burr - cross

1819

A.   No, except since I been coming, you know, to testify for this case.

Q.   For this case, right?

A.   Yeah.

Q.   And you been here -- how many days last week were you here?

A.   Probably four.

Q.   Four days last week?

A.   Yeah.

Q.   And were you here all day?

A.   Yeah.

Q.   Okay.  With Mr. Rios in the witness room across the hall?

A.   No.

Q.   In any event, whenever it was that Mr. Rios asked you to come here, you had no problem with that, right?

A.   No problem at all.

Q.   You grew up with Mr. Rios in the neighborhood?

A.   Yes.

Q.   Okay.  You guys have been friends since you were little kids?

A.   Yeah, you could say.

Q.   You went to grade school together?

A.   No, we didn't go to the same school, just same neighborhood.

Q.   You didn't go to Anderson with him?

A.   I was at -- in Wicker Park first and then went to Anderson.

Q. At the same time as Mr. Rios?

A. I couldn't say. I can't really remember if he was there when I went because he got me by at least two years.

Q. Okay. In any event, you've known Mr. Rios for, what, 40 some years or nearly 40 years?

A. Yes.

Q. Yeah. You know his mother, correct?

A. Yes.

Q. She watched you grow up?

A. Yes.

Q. All right. Does -- does he know your family?

A. Yes.

Q. And when you first spoke with Mr. Rios about this, did he tell you that it was important that you remember the exact date of this shooting?

A. I wouldn't say it was in that content of words because like I say, when we first ran back -- back into each other, we haven't seen each other in many years. You know, it was more for concern how your family doing, this and that, that and this, and then it came up about -- about testifying. But like I said, it wasn't no direct where he came looking for me. We just so happened to run into each other.

Q. Did he tell you that it was important that you remember the exact date of this shooting?

A. Well, yeah, of course I would have to remember the exact

date. I would have remembered more if it had been sooner, but it's -- it's -- that's a lot of years.

Q. It's a lot of years, right?

A. Yeah.

Q. And you're telling us today that you remember the exact date of this basketball tournament and this shooting, correct, not like an approximation, you know the exact date?

A. Yeah, I remember the exact date because I have two accomplishments that sits on my -- on my shelf right now.

Q. And you're talking -- that was when you won the MVP at this particular basketball tournament?

A. Yes.

Q. And you're saying because you won MVP you remember this exact date that this occurred --

A. I don't remember the date.

Q. Let me finish my question, please, sir.

A. I'm sorry for overtalking.

Q. Because you won the MVP, you remember this exact date of this particular basketball tournament back in 1989?

A. '99?

Q. '89?

A. I don't think it was '99. Okay. Yes.

Q. You believe it was 1999?

A. No.

Q. 1989?

Burr - cross

1822

A.   No, I said it couldn't have been '99.

Q.   Right.

A.   '89, yes.

Q.   And what date was this that this basketball tournament occurred?

A.   July 1st, July 2nd, somewhere around in there.

Q.   Well, I thought you remembered the exact date.  Was it July 1st or July 2nd?

A.   Like I said, it -- it been some years.

Q.   Yeah, it's been a while.

A.   So I know -- I know it was in July, say July 1st or 2nd, I could say either one of them days.  It's just I know it was that date and in the beginning of July because that was the time of the tournaments every year just like it is right now.

Q.   Okay.  It couldn't have been June 30th?

A.   No.

Q.   No?  Why not?

A.   Because tournaments are always in July.

Q.   What's the name of this tournament?

A.   Citywide tournament.

Q.   It's not called like the beginning of July tournament or whatever?

A.   No.  No.

Q.   Does the -- what date does this tournament fall on?

A.   July 1st.

Q.   No matter what day of the week, it's always July 1st?

A.   Yeah.  It's like July -- it's in the first week of July or July 1st every year.

Q.   Okay.  And so it could be on a Monday, Tuesday, Wednesday?

A.   I couldn't say.

Q.   Yeah.  It could have been any of the days, right?

A.   I couldn't say.

Q.   Right.  Isn't it true, sir, that before Mr. Rios brought this up to you a few years ago, you had put this entire incident out of your mind?

A.   How?  My life was saved that day.  And I also have accomplishments of playing basketball that sits on my -- my shelf, like I said.

Q.   Okay.  So you're saying you didn't put it out of your mind?

A.   However you want to put it.  No, I didn't put it out of my mind.

Q.   Okay.

     MR. MILLER:  Page 38, line 17.

BY MR. MILLER:

Q.   At your deposition, sir, were you asked this question and did you give this answer:

     "So you -- you had kind of -- you had put it out of your mind until he brought it up and then you started thinking back.  Is that what you're saying?

     "A.   Exactly."

Were you asked that question and give that answer?

A. Probably so.

Q. Probably so?

A. Yes.

Q. I mean, I'm reading this straight out of the transcript --

A. Yes.

Q. -- of your deposition.

And, in fact, until you spoke with Mr. Rios about it, you hadn't even told anybody about this shooting since June or July of 1989; isn't that true?

A. No.

Q. That's not true?

A. No.

Q. Okay.

MR. MILLER: Page 177, line 3.

BY MR. MILLER:

Q. Sir, at your deposition, were you asked these questions and did you give these answers:

"Q. So my understanding is you discussed that with the police the day after it happened, right?

"A. Yes.

"Q. When was the next time after that you discussed the incident with anyone?

"A. I ain't discussed that incident with nobody and up until right now."

Were you asked that question and did you give that answer?

A. Yeah, I gave that answer because I said before in the beginning of this testimony that the police came talking to quite a few people in the neighborhood.

Q. Right. And my question to you, though, was you haven't talked to anybody about this shooting from the time you talked to police in 1989 --

A. You just talking about --

Q. -- up until Mr. Rios came to you, correct?

THE COURT: I remind the witness, you can't -- you have to let him --

THE WITNESS: I'm sorry.

THE COURT: -- finish his question.

THE WITNESS: Okay.

THE COURT: And he will extend you the same courtesy in waiting for you to finish your answer.

Please re-ask the question.

BY MR. MILLER:

Q. My question to you, sir, was you had not spoken with anybody about this shooting from the time that you say you spoke to the police up until Mr. Rios -- back in 1989 up until Mr. Rios spoke to you about it just a few years ago; is that true?

A. Yes.

Q. Okay. And, in fact, when Mr. Rios first spoke to you about this incident and the date that it was on, you had actually thought it may have occurred in 1990 or 1991; isn't that true?

A. No.

Q. That's not true? Okay.

MR. MILLER: Page 33, line 9.

BY MR. MILLER:

Q. At your deposition, were you asked these questions and did you give these answers under oath:

"Q. Have you ever talked to Mr. Rios about a drive-by shooting that occurred back in 1989?

"A. I didn't even -- I didn't even know it was that long. I thought it was in '90 or '91 until -- until it was talked about maybe one time on the phone."

Did you -- were you asked those questions and did you give those answers under oath?

A. Yes.

MR. MILLER: Page 34, line 8.

BY MR. MILLER:

Q. Were you asked these questions and did you give this answer:

"So you -- you originally thought, what, I guess after all these years that the -- that it happened in like '90 or '91? How did you -- is that right?

"A. Yeah. I actually -- when he -- you know, when it

was brought back up, I actually forgot about the years."

Is that -- were you asked that question and did you give that answer?

A.  Yes.

MR. MILLER:  Page 36, line 20.

BY MR. MILLER:

Q.  Were you asked this question and did you give this answer:

"Q.  Did he tell you, like, the exact date that it happened?

"A.  No, I just told you when he -- told you before when he first brought it up, I really couldn't recollect back to the date or time, what year, you know.  We didn't talk that long about it, about him, for him to be telling me it was this date, that date, this and that or -- just over time I thought about that I have to give a deposition.  I'm like, I need to figure out what I know and what took place.  And what really made me start thinking is when I realized this guy saved my life, how could I forget about all that."

Were you asked that question and give that answer?

A.  Yes.

Q.  So initially you thought this might have occurred in 1990 to 1991, you talked to Mr. Rios, and then you remembered that it happened in 1989; is that true?

A.  Yes.

Q.  Okay.  And you talked to Mr. Rios, you talked to his

attorney as well, did you not?

A.   Yes.

Q.   Okay.  And now you remember not only the year but you remember the exact date that this occurred; is that true?

A.   Yeah, I can remember that and say that because, like I said, I have the trophies, and it has the date, the year on there.

Q.   Oh, you do have the trophies?

A.   Yeah, I still do have the trophies.

Q.   Okay.  Didn't we ask you whether you still have the trophies at your deposition and you said you didn't have them anymore?

A.   When I talked to you I didn't have them because my auntie that just passed away, she had them in her attic in her boxes. So I retrieved a lot of things that I thought I didn't have anymore.  And I have them trophies and a lot of the other accolades that I didn't think that I had anymore.

Q.   Did you bring that with you today?

A.   I wasn't asked to bring it today.

Q.   Oh, okay.  They didn't ask you to bring the trophy that says the date and the year that this occurred?

A.   No.

Q.   Oh, okay.  And does it have the exact date on it, this trophy?

A.   It's just the year.  It don't have the exact date.

Burr - cross

1829

Q.   So it says 1989?

A.   Yes.

Q.   Okay.  So does it say -- it doesn't say July 1st, it doesn't say July 2nd, and it doesn't say June 27th of 1989 --

A.   No.

Q.   -- is that true?

A.   No.

Q.   Okay.  All right.  So the reason -- you don't, in fact, remember the exact date of the shooting.  What you're saying is, I remember the date of this particular basketball tournament, and I know it happened the same day as the shooting, so, therefore, I remember the date of the shooting.  Is that a fair summary?

A.   No.

Q.   No?  You do, in fact, remember the exact date of the shooting?

A.   Yes, I can remember the date --

Q.   Is it --

A.   -- as I'm talking to you now.  Yeah, because like I told you, I just received the trophies, and before then as I talked to you with the deposition, things comes back to that date; and then, you know, like I say, it came back.

Q.   But you said the trophies didn't have the date on it.

A.   The year.  Sorry.

Q.   Right.

Burr - cross

1830

A.   I meant to say year.

Q.   And I understand now you've -- you remember that it was 1989.  I'm -- I'm more interested in knowing the exact date of this thing in 1989.

A.   How I know the date --

Q.   Yes.

A.   -- because on that day they had those same tournaments on July 1st, from July 1st through July 6th at that same park.

Q.   It's a five-day tournament?

A.   Yes.

Q.   Okay.  And it starts on July 1st every year no matter the day?

A.   Yeah.

Q.   Okay.  Back when this occurred, you were in high school, correct?

A.   Yes.

Q.   Okay.  And you -- during the school year you would play basketball for your high school team, right?

A.   Summertime.

Q.   Summertime?

A.   Yes.

Q.   Okay.  So in the summertime, you would play basketball in these tournaments, right?

A.   Yes.

Q.   And you played in dozens of these tournaments over the

course of your high school years?

A.   Yes.

Q.   All right.   In fact, you played in at least ten of them in Wicker Park alone, right?

A.   I couldn't say that many.

Q.   Okay.

A.   Probably so.

Q.   Probably?

A.   I said I can't say.

Q.   There's a lot of them, right?

A.   Yes.

Q.   You don't remember, in fact, how many even there were.

A.   I couldn't say the exact number.

Q.   Okay.   And these were all in the summer?

A.   Yes.

Q.   Yes?

        What were the dates of the other basketball tournaments you played in the summer of 1989?

A.   There wasn't.

Q.   That was the only tournament in 1989?

A.   In the summer.

Q.   Yeah.

A.   Yeah.

Q.   Okay.   But you just said you played in dozens of these things.

A.    I didn't say summer though.  You asked me -- you asked me about July 1st tournaments I played, yes.  I said yes.

Q.    How many tournaments -- how many basketball tournaments did you play in in 19- -- in the summer of 1989?

A.    Only that one.

Q.    That's the only one.  You remember that?

A.    In the summertime.

Q.    Okay.  So if you played in ten of these tournaments in Wicker Park alone, are you saying the other nine were during other years, not in 1989?

A.    No.

Q.    No?

A.    No.

Q.    How is it you remember it was just this one -- just 1989 was the only one year that it had one tournament in it?

A.    It's done every year on -- in July, the tournament, the summer tournament.

Q.    Okay.  And it never starts on June 30th or June 29th, does it?

A.    No.  No.

Q.    Okay.  Is this a pretty close-knit neighborhood back when you lived there?

A.    Yes.

Q.    Okay.  And you knew a lot of the people around the neighborhood?

A.   Yes.

Q.   You knew Jaime Rios?

A.   Yes.

Q.   You knew his family?

A.   Yes.

Q.   You knew his girlfriend Diana Rodriguez?

A.   I couldn't say exactly was that her name.

Q.   But you knew her?

A.   Yeah, I knew her.  I knew her by face.

Q.   You --

A.   I always couldn't say her -- I remember her name.

Q.   You knew Daniel Rodriguez?

A.   I can't say --

Q.   Her brother?

A.   I can't say.  Probably so.

Q.   You knew -- you knew Macho, right?

A.   Who was Macho?

Q.   You don't know who Macho is?

A.   I know many Machos.

Q.   Did you date Macho's sister?

A.   No.

Q.   Okay.  You were asked about Macho at your deposition, were you not?

A.   I can't remember.

Q.   Okay.

MR. MILLER: Page 129, line 8.

BY MR. MILLER:

Q. You were asked about Macho, and you were asked this question:

"How did you know him? Just from like the neighborhood?

"A. We boxed. We boxed out of the same arena, and I later -- boy, his sister and me about two years, I later -- I dated his sister for about a year or two. That was like '92, '93."

Were you asked that question and did you give that answer?

A. I didn't date his sister. I dated her friend, Diana.

Q. Oh, okay. So you dated Macho's sister's friend?

A. Yes.

Q. Okay. But you knew Macho?

A. Now that you say that Macho, yes, I know that Macho.

Q. Okay. And you knew Tino too, right?

A. Yes.

Q. Okay. You ever heard of anybody around the neighborhood that went by the name Jamaica?

A. No.

Q. Never heard of that, right?

A. Not in the neighborhood.

Q. All right. Sir, you've been convicted of armed habitual

Burr - cross

1835

criminal, correct?

A.   Yes.

Q.   That's a Class X felony?

A.   Yes.

Q.   All right.  And you were sentenced to seven and a half years in IDOC?

A.   Yes.

Q.   Okay.  You've also been convicted of robbery?

A.   Yes.

Q.   All right.  And you were sentenced to four years in IDOC for that?

A.   Yes.

          MR. MILLER:  One minute, Your Honor.

          THE COURT:  Okay.

     (Counsel conferring.)

          MR. MILLER:  No further questions, Your Honor.

          THE COURT:  Okay.

          Before we go there, we'll break for lunch.  We'll come back at 1:00 p.m. and resume with the cross-examination of this witness.

          All rise.

     (Jury out at 11:58 a.m.)

          THE COURT:  See you back at 1:00.

          THE WITNESS:  Yep.

          THE COURT:  All right.  Counsel, you're not -- no one

1836

is to discuss the substance of the witness's testimony with him.

Anything to address for the plaintiffs?

MR. S. RICHARDS: No, Your Honor.

THE COURT: For the defendants?

MR. SCAHILL: No, Your Honor.

MR. ENGQUIST: No, Your Honor.

THE COURT: All right. See you back at 1:00.

MR. ENGQUIST: Thank you.

(Recess at 12:01 p.m., until 1:00 p.m.)

(Change of reporters.)

1837

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                             )
                                        )
                Plaintiff,              )
                                        )
-vs-                                    ) Case No. 1:22-cv-03973
                                        )
REYNALDO GUEVARA; MICHAEL               )
MASON; and JoANN HALVORSEN,             )
as Special Representative of            )
ERNEST HALVORSEN, Deceased,             ) Chicago, Illinois
                                        ) February 12, 2026
                Defendant.              ) 1:00 p.m.

VOLUME 9
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:      LAW OFFICE OF STEPHEN L. RICHARDS
                        BY:  MR. STEPHEN L. RICHARDS
                             MR. JOSHUA S. RICHARDS
                        53 West Jackson Boulevard, Suite 205
                        Chicago, Illinois  60604

For Defendant           BORKAN & SCAHILL, LTD.
Guevara:                BY:  MR. TIMOTHY P. SCAHILL
                             MR. GRAHAM P. MILLER
                        20 South Clark Street, Suite 1700
                        Chicago, Illinois  60602

For Defendants          THE SOTOS LAW FIRM, P.C.
Mason and               BY:  MR. JOSEPH M. POLICK
Halvorsen:                   MR. JOSH MICHAEL ENGQUIST
                             MR. JEFFREY ROBERT KIVETZ
                             MS. CAROLINE P. GOLDEN
                        141 West Jackson Boulevard, Suite 1240A
                        Chicago, Illinois  60604

1838

Court Reporter:          CHARLES R. ZANDI, CSR, RPR, FCRR
                         Official Court Reporter
                         219 S. Dearborn Street, Room 1426
                         Chicago, Illinois  60604
                         Telephone:  (312) 435-5387
                         charles_zandi@ilnd.uscourts.gov


                    *   *   *   *   *

              PROCEEDINGS REPORTED BY STENOTYPE
    TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE COURT: All right. Do we have Mr. Burr?

MR. J. RICHARDS: I'll go get him.

THE COURT: He can take the stand.

All right. We can bring in the jury.

(Jury in at 1:01 p.m.)

THE COURT: All right. Welcome back. Please take your seats.

Sir, I remind you that you remain under oath.

THE WITNESS: Um-hum.

THE COURT: Mr. Engquist, you may proceed when you're ready.

MR. ENGQUIST: Thank you, your Honor.

LAMONT BURR, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. ENGQUIST:

Q. Mr. Burr, I think you testified earlier that you live in the same neighborhood as Mr. Rios, correct?

A. Yes.

Q. You've known him for years?

A. Yes.

Q. You knew where he lived?

A. Yes.

Q. He knew where you lived?

A. Yes.

Q.   Okay.  It wouldn't be hard for him to find you if he wanted to find you in any way, would it?

A.   No.

Q.   Okay.  All right.  So, you were talking before.  I know when Mr. Graham was asking you questions, I know earlier in your deposition, you talked about July 2nd possibly being the date, but you said no, now you know it's July 1st, is that right?

A.   Yeah.

Q.   Okay.  And I know we didn't have the trophy.  We asked you about it during your deposition, but you said, "Oh, we found them.  I have them now.  But they only have the year, 1989," right?

A.   Yes.

Q.   Okay.  So, you said specifically it was a five-day tourney, correct?

A.   Yes.

Q.   And what you were saying is that you were at Wicker Park?

A.   Um-hum.

Q.   You had won --

A.   Um-hum.

Q.   -- the championship.  You got your trophy.  You got your MVP trophy, and you were there celebrating at the Wicker Park fieldhouse for a while into that evening, correct?

A.   No, I was not celebrating at -- at the park.

Q.   Where were you celebrating?

A.   I went home.

Q.   Okay.

A.   There was a celebration after the championship.  Like I say, I went home.

Q.   Okay.  So, you went home.  All right.

Now, just to be clear, you say it's a five-day tourney, correct?  You said that repeatedly.  It starts on the 1st.  It's a five-day tourney, always starts on the 1st, five-day tourney?

A.   Yes.

Q.   Okay.  If the tourney starts on the 1st and it's a five-day tourney, then if you were doing the championship, it wouldn't be on the 1st, would it?

A.   Yeah, mines would be.  The tournament I played, it was not a five-day tournament.  It's a City tournament in the park.  It's more than one tournament going on in that park.

Q.   Oh.  So when you said before it was a five-day tourney, you weren't saying your tourney was a five-day tourney; it might have been a one-off?

A.   Yeah.

Q.   Okay.  So, the five-day tourney you talked about that starts all the time on July 1st and ends on July 6th, that's not the tourney you were in; it's a completely different tournament?

A.   That ain't what I said, no.

Q.   Okay.  So, it's the same tournament?

A.   No.

Q.   Okay.  It's a different tournament?

A.   Exactly.

Q.   All right.  So, leaving that aside about the date, I want to talk about the neighborhood a little bit.  You said before that you were an Imperial Insane Vice Lord, correct?

A.   Yes.

Q.   That's part of the People Nation?

A.   What you mean by People?

Q.   Instead of Folks.

A.   Well, I guess you can say that.

Q.   Yeah.  Well, it's under the People Nation with your aligned gangs on that side, which includes the Latin Kings, correct?

A.   Yes.

Q.   Okay.  The Cobras would be Folks; they'd be adversaries, correct?

A.   Yes.

Q.   Okay.  And the folks were on the other side of Western from where your neighborhood was, wasn't it?

A.   Yes.

Q.   Okay.  And the Spanish Cobras were the rivals of the Imperial Insane Vice Lords as well, weren't they?

A.   No, no.

Q. Well, they were -- you were aligned with -- your gang was aligned with the Latin Kings, correct?

A. No. Just because it says the five don't mean that I'm aligned with the Kings or that. That's just hearsay.

Q. That's just hearsay?

A. Yeah.

Q. You're both part of the same People Nation, right, under that flag?

A. That's just hearsay.

Q. That's just hearsay? And what do you mean by just hearsay?

A. Well, I don't want to get into it definitely, but it's just hearsay.

Q. Okay. Your gang, the Imperial Insane Vice Lords, has rivals, and it has allies, correct?

A. Hearsay.

Q. Sir, I'm not even sure what you're saying.

A. What I mean by hearsay, the Imperial Insane Vice -- we dominated with a lot of People. As you say, there's Folks and People, right?

Q. Yes.

A. We did not have problems with Spanish Cobras or other gangs like the Imperial Gangsters or any of that. That's why when you say that, I say it's hearsay.

Q. Okay. So, you're saying your set, the Imperial Insane Vice Lords, didn't really have enemies?

A.   Not the same as a lot of other, as you would say, People or Folks.

Q.   Okay.  It just depends on the set of the other gang, right?

A.   Yeah.

Q.   Okay.  But your gang did have adversaries, correct?

A.   Yes.

Q.   And since you lived in that neighborhood, you knew where you lived was a Latin King neighborhood, where Jaime Rios lived?

A.   Hearsay.

Q.   I'm not sure what you're -- are you objecting to the question, sir?

A.   No, I'm not objecting to the question.  If I say yes or no, it wouldn't be -- it wouldn't be accurate.

Q.   So, you don't know if the neighborhood you lived in was controlled by the Latin Kings?

A.   No, it wasn't.

Q.   It wasn't, or you don't know?

A.   I don't know.

Q.   Okay.  Well, if there's been testimony already in this case that the Latin Kings set controlled the neighborhood in which Jaime Rios lived over there on Leavitt, 1440 North Leavitt, would you have any reason to doubt that?

          MR. S. RICHARDS:  Objection.

          THE COURT:  That's sustained.

Burr - cross

1845

BY MR. ENGQUIST:

Q.   All right.  Now, sir, are you at least aware that the Latin Kings in their -- in the neighborhood where you lived were rivals with the Cobras across the way on Western?

A.   You're asking me was I aware of that?

Q.   Yes.

A.   Yes.

Q.   Okay.  Now, were you also aware that Mr. Rios used that -- his address where he lived there on Leavitt as a place where he sold narcotics or sold drugs?

A.   No, no.

Q.   Okay.  Now, if -- if a gang member is attacked by a rival gang member, in your experience as an Imperial Insane Vice Lord, would you expect some type of retaliation?

A.   Hearsay, meaning that I'm not for sure.

Q.   Okay.  It's possible?

A.   Yeah, it's possible.

Q.   Okay.  So let's just focus in on the night that you say that you were there and there was a shooting at Mr. Rios and you thought he was being targeted, correct?

A.   I never said I thought I was being targeted.

Q.   Not him -- not you.  Mr. Rios.

A.   I couldn't say that.  I don't know who was targeted.

Q.   Okay.  Well, the bullets were shooting in your direction, correct?

A.   Yes.

Q.   And shooting in Mr. Rios's direction, correct?

A.   Yes.

Q.   Okay.  And after that shooting, you went home, correct?

A.   Yes.

Q.   And you saw Mr. Rios go up into his house?

A.   Yes.

Q.   And then you didn't know -- you don't know what he did for the rest of the night, do you?

A.   No, because I ran home.

Q.   Okay.  You don't know whether or not Mr. Rios retaliated, do you?

A.   No.

Q.   Okay.  You don't know whether or not Mr. Rios decided to go where that car went with somebody else and shoot somebody, do you?

A.   No.

         MR. ENGQUIST:  That's all I have, your Honor.

         THE COURT:  Okay.  Redirect?

         MR. S. RICHARDS:  Nothing off that.

         THE COURT:  Okay.  Sir, you may step down.  You're excused from your subpoena.

         THE WITNESS:  Thank you.  Enjoy the rest of your evening.

         THE COURT:  Thank you.

(Witness excused.)

THE COURT: Any -- or plaintiff, next witness?

MR. J. RICHARDS: Your Honor, at this time, we would seek that Defendants' Exhibit 37 be moved into evidence, but we are not seeking it to be published at this time. It had been shown previously, I think.

THE COURT: Any objection to the admission of Defense Exhibit 37?

MR. SCAHILL: Yes.

THE COURT: What's the basis for the objection?

MR. SCAHILL: Hearsay.

THE COURT: One second.

Okay. Let's go to sidebar.

(Proceedings heard at sidebar:)

THE COURT: All right. What's the response to the hearsay objection?

MR. J. RICHARDS: Your Honor, Defendants' 37, which is the affidavit of Luis Huertas, if you look at page 530 of this trial transcript, that is Defendants' Exhibit B that was being talked about during the -- the reading of the deposition.

And in addition to that, your Honor, I believe that that exhibit was put on the screen, and I believe the jury may have seen it. And I -- it goes to the prior agreement that the exhibits referenced or mentioned in these transcripts or depositions should be let in.

So, that's why 37 should be admitted.

MR. SCAHILL:  May I respond?

THE COURT:  Yes.

MR. SCAHILL:  First of all, whether it was referred to or not, it's as if somebody is on the stand.  It was used for the purposes of impeachment of the witness during his deposition, which, of course, could be used in that fashion.

They appear to be attempting to admit it substantively, and this is a classic out-of-court statement being offered for what appears to be the truth of the matter.

It was referred to as -- just as the trial exhibits from the trial were referred to and not admitted substantively, but for, you know, the same purposes that we would use things to -- you know, at any point in a trial to refresh or demonstrative.  But they want to use an affidavit for substantive purposes and independently put it in there.

They can talk about the testimony all they would like of Mr. Huertas, including the content of that affidavit, but not admit the affidavit itself as evidence.

THE COURT:  Anything further, Mr. Richards?

MR. J. RICHARDS:  No, your Honor.

THE COURT:  All right.  The objection is sustained. Defense Exhibit 37 is excluded on hearsay grounds.

MR. SCAHILL:  Judge --

(Proceedings heard in open court, jury present:)

THE COURT:  All right.  The objection is sustained.

Any other evidence or witnesses, plaintiff?

MR. J. RICHARDS:  No, your Honor.  Plaintiff rests.

THE COURT:  Okay.  I will hear any motions during the break.  Defense, do you intend to put on a case?

MR. SCAHILL:  Yes, subject to hearing at the break.  Yes, we do have a witness.  We're going to call Carol Rogala.

THE COURT:  Okay.  Ladies and gentlemen, the plaintiffs have rested their case in chief.  So, I know we've been bouncing between the two cases, but as a formal matter, we are now officially and fully in the defendants' case in chief.

(Witness enters courtroom.)

THE COURT:  Good afternoon.  If you'd raise your right hand.

(Witness sworn.)

THE WITNESS:  I do.

THE COURT:  You may be seated.

Counsel, you may proceed when the witness is settled.

CAROL ROGALA, DEFENDANTS' WITNESS, DULY SWORN

DIRECT EXAMINATION

BY MR. SCAHILL:

Q.  Are you ready?

A.  I am.

Q.  Good afternoon, Ms. Rogala.  Can you please state your name and spell it for the record.

Rogala - direct

1850

A.   Carol, C-A-R-O-L, last name Rogala, R-O-G-A-LA.

Q.   Ms. Rogala, are you currently employed?

A.   I am not.  I'm retired.

Q.   Okay.  When were you last employed?

A.   December of 2022.

Q.   Okay.  And in December of 2022, what was your job?

A.   I was the supervisor of the special litigation of the Cook County State's Attorney's Office.

Q.   Okay.  And how long had you been in that position for as of December of 2022?

A.   Five years.

Q.   Five years.  Okay.  Before we get into the substance of what that position is, can you just give us a brief synopsis of your educational background?

A.   I graduated with an undergraduate degree from the University of Kansas in journalism and French language and culture.

     I went to law school at the John Marshall Law School, which is now part of the University of Illinois at Chicago. And after that, I was sworn in as an attorney in Illinois.

Q.   Okay.  And what year were you sworn in as an attorney in Illinois?

A.   In 1994.

Q.   Okay.  After law school, did you enter into professional practice as an attorney?

Rogala - direct

1851

A.   I did.

Q.   All right.  What was -- what did you do right after law school?

A.   Right after law school, I worked for a temporary agency. I was editing law books for a company called Lawyer's Edge. And then in March of 1995, I was hired by the Cook County State's Attorney's Office.

Q.   Okay.  And did you maintain being an employee from 1995 all the way up to when you retired in 2022?

A.   Yes.

Q.   All right.  And can you give us a -- just a brief synopsis of your employment arc within the State's Attorney's Office between 1995 and 2022?

A.   I started in traffic court.  Then I worked in the misdemeanor courts in the City of Chicago in domestic violence, the domestic violence courts, and just, you know, simple batteries, that kind of thing.

Then I was assigned to the 4th District, which is the courthouse in Maywood.  I continued to work in traffic, misdemeanor, and domestic violence cases.

I did Felony Review and preliminary hearings in -- in Maywood.  Then I was transferred to what then was the night narcotics call, which was a special court that started at 4:00 o'clock in the afternoon handling only narcotics cases.

I did preliminary hearings and Branch 66, which is

Rogala - direct

1852

where murder cases and other indictments are done in the Cook County court system.

I was assigned to the felony trial division in September of 1999, and then I was a third chair. I progressed to being a second chair in a felony courtroom. I worked in the sex crimes unit.

Q. Can I pause for one second. There's -- you're talking about chairs, and we have a lot of laypeople on our jury here. Can you tell us a little bit what that means, being a first chair or a second chair, in the vernacular of the State's Attorney's Office?

A. In the State's Attorney's Office, in a felony courtroom, there are three prosecutors assigned to a particular -- working in front of a particular judge for a period of time.

The first chair is the most experienced attorney in the courtroom and is basically in charge of handling all of the cases in that courtroom.

A second chair is the next least senior person and works on all of the cases. Their job primarily is to make sure cases go to trial on time.

And then the third chair is the newest prosecutor in the courtroom with the least amount of felony experience, and they handle a lot of the discovery obligations and working cases up under the direction of the first chair in the courtroom.

Rogala - direct

1853

Q.   All right.   Thank you for that explanation.

And I cut you off.   So, what was the next step in your career with the State's Attorney's Office?

A.   So, I worked in the sex crimes unit investigating cases of child abuse, child sexual abuse, whether it was a coach or a family member.

Then I went from that unit back into the felony trial division.   I was promoted to that second chair level, making sure cases got to trial on time.

And from that position, I went to the special litigation unit, which is a specialized unit that handles post-conviction claims, meaning any claim that comes in after a conviction has been secured.

Q.   All right.  Let me pause right there.   What year was it when you entered the special litigation unit?

A.   2003.

Q.   2003.   Okay.   And you mentioned post-conviction duties with respect to that unit.   Can you explain to the ladies and gentlemen of the jury, and you did start to do that, what is a post-conviction claim?

A.   In Illinois, there are two statutes that allow someone who's been convicted of a crime to seek to overturn their conviction years after it's been entered.

Because they're statutory based, there are specific rules for each type of petition, and the person seeking the

Rogala - direct

1854

relief has to follow the rules of the particular statute.

Q.   Okay.  And as I understand it, there's a couple of different statutes that are in play.  One is the Post-Conviction Hearing Act, right?

A.   That's right.

Q.   Okay.  And another one is what's called a 1401 petition, right?

A.   Correct.

Q.   Can you explain to the ladies and gentlemen of the jury sort of just what's the difference between the two, if any?

A.   A petition under the Post-Conviction Hearing Act requires the defendant to still be serving a sentence; and the courts have defined what "in custody" means, as physically in custody in the penitentiary, but it could be somebody who's been paroled but is still subject to being taken back into the Department of Corrections.  They could be on probation on some lower-level crimes.

You have to raise claims that are allegations that constitutional rights have been violated.  So, for example, if your lawyer did not do what he or she was required to do under the law to give you the representation you're entitled to, that might be a claim that you could raise in a post-conviction petition because it's a violation of your right to counsel.

Q.   Okay.  And you're talking -- you were talking about the Post-Conviction Hearing Act.  What's a 1401 petition, as

Rogala - direct

1855

distinct from a Post-Conviction Hearing Act petition?

A.   A 1401 petition is actually Section 2-1401 of the Code of Civil Procedure, which allows a defendant to bring to the court's attention newly discovered evidence that was not available at the time of the trial, through no fault of the petitioner's -- no fault of their own.

We often see that in cases where there might be advances in DNA technology, and so they couldn't do DNA at the time; and now many years later, there's better technology, so new testing might show that -- change the evidence that was introduced at the time of trial.

Q.   But a 1401 petition isn't limited just to DNA types of cases; it is essentially to raise any sort of issue that a convicted person might be able to raise after they've already served their time in custody, is that fair to say?

A.   Yes.

Q.   Okay.  And you mentioned in the context of the Post-Conviction Hearing Act this concept of newfound evidence or things that were not available, you know, before the, you know, time period in which the petition was filed.  Do you remember those questions?

A.   Yes.

Q.   Do those considerations also factor in to the 1401 petitions?

A.   They do.

Rogala - direct

1856

Q.   Okay.   And can you explain how?

A.   In a 1401 petition, if there were witnesses who were not called at trial, maybe because nobody knew that somebody was out on the street and observed a crime take place, and that later that person came forward.  That was something that wasn't available to the defendant at the time of trial because nobody knew that person was there.

     There are also people who might have come forward but didn't give their name to the police.  It happens often, people don't want to give their name; but later, we learn their identity after the trial has already happened.

Q.   Okay.  And so you entered into that unit in about 2003?

A.   Correct.

Q.   And you continued being in that unit all the way up till you left in 2022?

A.   Right.

Q.   All right.  Did you maintain the same position within that unit over that period of time?

A.   No.  In --

Q.   Okay.  Tell us about your career arc within the -- are you calling it the special litigation unit or the post-conviction unit?

A.   It's technically the special litigation unit.  It's commonly referred to as the post-conviction unit.

Q.   Okay.  We may use that term interchangeably, but if you can

explain to the ladies and gentlemen of the jury your career arc within that unit and what those job duties entailed.

A.   When I was first assigned to the unit, I was what we call a line assistant.  So, I was assigned cases by my supervisor to evaluate claims that were raised to determine whether there was sufficient evidence in the petition to support a claim, if it was timely, if there was any other procedural bar.

Because even though there's an opportunity to raise a claim, you can't relitigate the same thing over and over and over again.  So, that's one thing that we would look to make sure that the issues in the petition were actually new information and not something that was being rehashed.

Q.   Okay.  So, you were a line assistant for a time, and then did you progress past that to another position?

A.   I was a line assistant up until 2017, when I became the supervisor.

Q.   Okay.  When you say you became the supervisor, were you the supervisor of the entire unit?

A.   Yes.

Q.   Okay.  And in 2017, when you got promoted to supervisor, did your job duties change?

A.   Yes.

Q.   How so?

A.   In addition to handling my own caseload and doing the same thing I had done right from the beginning, I also supervised

Rogala - direct

1858

10 other Assistant State's Attorneys and also worked with the investigators and paralegals that helped us prepare cases for court.

Q.   Okay.  So, you mentioned some supervisory responsibilities, but also that you maintained your own caseload?

A.   That's correct.

Q.   All right.  And so even after you became the supervisor, you were actually still the frontline person who was assigned to particular post-conviction cases as the primary person on it, is that correct?

A.   Yes.

Q.   And we're going to get into some of those practices and protocols in a moment here, but just generally, what is the -- are the duties and responsibilities of a post-conviction attorney working for the State's Attorney's Office in your unit when you have a petition that is filed?

A.   Once a case is assigned to an attorney, that attorney will then get a copy of the record from the original trial.  They will order the case file from our warehouse so that they have all of the information that was available to the trial attorneys at the time of the trial.

They will review the petition to see:  What is the supporting information?  Is there a claim that requires scientific investigation?  Are there new witnesses who have come forward who need to be interviewed?

Rogala - direct

1859

And then the attorney will look at the statute and see:  Does this pleading or the formal papers, does it comply with the rules of the statute?

And then we make a decision on how to proceed with that claim.

Q.   Okay.  So, when you are the primary on it, either as a line or as a supervisor working your own caseload, is the original onus on you to sort of do those initial investigatory tasks?

A.   Yes.

Q.   Okay.  And so even after you became a supervisor with your own caseloads, that was the kinds of things that you were doing, like actually doing the underlying investigation into the petitions that were filed?

A.   Correct.

Q.   All right.  And as far as the general policy of the Cook County State's Attorney's Office post-conviction unit back in 2017 and 2022, is it fair to say that you took pretty seriously defending the integrity of convictions?

A.   Yes.

Q.   And that includes not only making sure that the convictions themselves are valid, but also that -- making sure that if someone's been convicted of a crime that they, in fact, committed, it's important that that is maintained, yes?

A.   Yes.

Q.   So, let's talk a little bit about the scope of the

Rogala - direct

1860

investigation. Once you get a petition that's filed by an individual seeking to have their conviction overturned, what are the list of things that you're supposed to tick through to do to look into those allegations?

A. The first is to get a copy of the trial transcript to know what evidence was presented at trial.

Next is to look at the supporting documentation for the petition. Is it affidavits from people who testified at trial who may be recanting or taking back the testimony that they offered at trial? Is it someone we've never heard of before that says, "I know what happened, and this is what I have to say about it"?

We would also do background checks on any person who provided an affidavit so we would know what their criminal history was. We would investigate them to know how -- what's the connection between that person who's providing an affidavit and the defendant in the case, other witnesses in the case, maybe the victim in the case.

So, what are the connections, so we have as much information as we can gather about the people who are coming forward to make -- support the claim that the conviction is not valid.

Q. Other than yourself as the line attorney, did you have other resources within the office to help you do some of this investigation during that time period?

Rogala - direct

1861

A.   Yes.  We had a team of investigators who were retired Chicago police officers, retired law enforcement from other agencies, very experienced investigators who we could provide information and ask them to do the legwork to go out and locate people and then do initial interviews with those people.

Q.   During the time --

THE COURT:  Before you ask that question, let's go to sidebar real quick.

(Proceedings heard at sidebar:)

THE COURT:  All right.  So, I was told by my courtroom deputy that a juror informed her that if we hear beeping during the trial, it's her glucose monitor going off because she has diabetes.

I've heard it twice.  I'd like to step out into the passageway with the juror to make sure that there are no issues; and I'll ask her if we need to break, I will break, or if we need to wrap for the day, I will wrap for the day because I don't -- sitting here, hearing it twice within the last 15 minutes gives me pause.

MR. SCAHILL:  Yeah, I heard it, too.  Thank you.

THE COURT:  All right.  I'll do that.

(Proceedings heard in open court, jury present:)

THE COURT:  Ms. Diaz, can I have a -- speak with you real quick?

(Juror exits courtroom at 1:31 p.m.)

1862

(Juror enters courtroom at 1:32 p.m.)

THE COURT: Okay. We're going to break for the day because an issue has come up that requires attention; and so unfortunately, we'll stop here, and we'll pick back up tomorrow at 10:00 a.m. Okay?

All rise.

(Jury out at 1:32 p.m.)

THE COURT: All right. Take your seats. I'll say it with the witness here so you understand why I'm interrupting your testimony.

We had a fire drill earlier that caused the juror's blood sugar to spike. I just spoke with her after conferring with the lawyers. My understanding is that she has injected -- she's taken her insulin, and yet it's not normalizing. So I have two concerns: One, the juror's health; but also the juror's attentiveness for the day.

And so after speaking with her and learning that she had given herself insulin and yet her monitor is still going off, I decided to break early today so that she can tend to that and hopefully it stabilizes or if she needs further medical attention, she can sit it -- or seek it.

So, with the testimony, we'll pick back up tomorrow at 10:00 a.m. So, the witness may step down.

I'll hear motions from counsel now.

MR. SCAHILL: Sure. Well, there's a scheduling issue

1863

that we can deal with later with Ms. Rogala.  I think she's not available right at 10:00 tomorrow, is that true?

THE WITNESS:  I can be here by 11:00.

MR. SCAHILL:  So, we'll fit other stuff in.  If we need a break --

THE COURT:  Okay.

MR. SCAHILL:  Judge, the -- can I go first?

MR. POLICK:  Go ahead.

MR. SCAHILL:  We move for a directed verdict under Rule 50.  We're obviously going to file a written motion at some point.  Would you like for me to tick through the arguments for your Honor?

THE COURT:  Yes, please.

MR. SCAHILL:  Sure.  So, on Count 2, the fabrication of confidential informants, obviously, part of that has already been dismissed.  With respect to the other aspects of that count, we do not believe there has been any evidence that's been submitted that information with respect to what the confidential informant said was fabricated by Mr. Guevara.

In fact, Mr. Mason verified that he was told that same information live on the stand.  I do not think that there is any evidence beyond the realm of speculation that any of that was fabricated.

The other issue is that I believe that the evidence has shown that the only -- remember, this is a due process

1864

claim. The only evidence of confidential informants that came out was via testimony from Mr. Guevara, which I believe is subject to absolute immunity. So, that would be for the second aspect of Count 2.

Also, I believe both substantively and under qualified immunity, I do not believe that the alleged fabrication of hearsay evidence from confidential informants is a -- can be a Fourteenth Amendment violation because it does not go to guilt or innocence. It's rumor and hearsay, which I think was specifically referenced within the testimony of Mr. Guevara that was read in.

And so I don't believe it substantively is a Fourteenth Amendment violation; and even if it was, I think it would be subject to qualified immunity as well.

THE COURT: Okay. Any other arguments?

MR. SCAHILL: Yes. With respect to Mr. Carrero, I believe that the fabrication of his statements is immaterial under the Fourteenth Amendment. This is a confession case. There's an eyewitness who has verified his identification of the plaintiff as the shooter. We have a confession that came in. There's not a fabrication of evidence claim relating to the confession itself. So that -- I know there's a coercion claim, but they have not attacked the veracity of the confession as part of their claims.

And so I think Mr. Carrero's testimony, which he

1865

actually walked back at the trial, is ultimately immaterial under *Brady* standards and under Fourteenth Amendment standards.

And also, we believe we are entitled to qualified immunity on that as well.

With respect to Mr. Garcia, that is Count 11, a couple of things. Number one, Mr. Garcia testified on the stand, contrary to his affidavit, that he was ready and willing to testify at Mr. Rios's trial.

The information that was placed in his affidavit, he testified, was not true, that he was told to put that information in there by Mr. Richards, and that he stood ready, willing, and able to testify. He's not only referenced in the police reports, but in the confession itself. So, we do not believe that that was suppressed at all.

Secondly, Mr. Garcia admitted, as did Mr. Rios's criminal defense attorney, Ms. Shields, that the supposed alibi that he gave was not an alibi at all. He said he was at home eating pizza and rib tips on the day. He did not say he was there at the time of the murder. And, in fact, he said that he had had that pizza and rib tips, I believe, around dinnertime; and he had been finished by it by midnight, so to the extent that he's alleging that he made -- gave an alibi to Mr. Guevara, that is not an alibi at all.

Thirdly, Mr. Garcia said on the stand that he actually didn't give the alibi to Mr. Guevara at all. He said that he

1866

gave it to Quinn or O'Quinn and that Mr. Guevara was not there when he gave that alibi. So, I don't believe that there's evidence that that was even given to Mr. Guevara, according to the testimony of Mr. Garcia.

The other -- I would also raise a qualified immunity argument on that count as well. This is an alibi of somebody that doesn't have anything to do with the plaintiff's guilt or innocence. And I don't think it's a valid claim; and even if it were, it would be subject to qualified immunity.

Same thing with respect to Count 12, which is suppressing that Mr. Guevara beat up Mr. Garcia. Again, I think this is actually controlled by *Petty versus City of Chicago*, which is that the physical coercion of a witness, while it may be something that would be a constitutional claim inuring to that person's benefit, is not a claim that -- unless you have a statement that is later the product of that coercion being used against them, is not a Fourteenth Amendment violation in and of itself. And again, I think that's controlled by the *Petty* case.

And to the extent that the Court disagrees, again, we would raise qualified immunity on that as well. It was not well-established in 1989 that physically abusing a suspect would -- could be a constitutional violation inuring to the benefit of a third party, which would be Mr. Rios.

Malicious prosecution, two things with that. Number

1867

one, the basis for this Court's granting summary judgment to the other defendants was on the eyewitness testimony of Mr. Huertas. Mr. Huertas, as we heard from the stand via his deposition, reaffirmed that he had identified Mr. Rios. He did it freely and voluntarily, and he stood by his identification.

Your Honor sustained our objection to the affidavit coming in substantively, so I do not believe that there is any competent evidence that is rebutting the fact that Mr. Huertas was identifying Mr. Rios as the offender.

And as the cases show us, an eyewitness identification, even if questionable, even if subject to impeachment, is generally sufficient to create probable cause. So, we believe, given the testimony of Mr. Huertas alone, that probable cause has been established.

Secondly, there's no evidence that Mr. Guevara was involved in commencing or continuing the prosecution of Mr. Rios. We asked Mr. Rios himself, and we also asked other witnesses whether there was any evidence that Mr. Guevara had pressured, cajoled, leaned on, or in any other way attempted to make the prosecution go forward on the prosecution against their will, exert any undue pressure; and they all denied that that occurred.

I asked Mr. Rios if he even remembered what Mr. Guevara said at his criminal trial. He didn't know.

We heard the testimony of Mr. Guevara. He did not put

1868

any incriminating statements in against Mr. Rios. And even if he had, I believe that would still be testimonial in nature and subject to absolute immunity.

So, I do not believe that the malicious prosecution claim can survive for all of those reasons.

THE COURT: Okay. Before I hear from Mason and Halvorsen, I'll hear any response now from the plaintiffs.

MR. S. RICHARDS: Thank you, your Honor. Let me go in reverse, starting with the malicious prosecution claim.

With respect to the malicious prosecution claim, Huertas, at his deposition, acknowledged signing the affidavit, that he had sworn to it; and it was incorporated basically as part of the deposition because it was attached as an exhibit. And he said that, "Yeah, these are the things I said under oath."

So, in addition, when Huertas, at his deposition, retracted or attempted to retract the content of the affidavit, he was all over the map, to say the least. He couldn't remember everything. He confused -- he confused Guevara with Noon. He confused Noon -- the two lineups and what was said to him.

He did reaffirm in the deposition that people had told him -- he had been shown something, and he said the people are too young, that he'd been threatened with obstruction of justice.

1869

So, judged in the light most favorable to the non-movant, there's plenty of evidence that Huertas gave a false identification; and he did so at the behest of Guevara, whose invocations in combination with the deposition are sufficient to establish that Guevara initiated the prosecution. He did so in various ways.

Throughout the case, he pushed it forward. The case went cold. There was no evidence against Jaime Rios. He brought in confidential informants to Mason. Mason kind of rejected them.

Then there's evidence that he engaged in a false arrest, that he brought Jaime Rios in without probable cause and took him to the station, again, moving the prosecution of Jaime Rios forward at a time that it had been stalled. He was the moving force.

Then, according to Jaime Rios, Guevara played a key role in coercing his statement by, among other things, telling him that he would lose his children if he didn't confess. So, according to the evidence that we have, Guevara was a prime mover in the prosecution of Jaime Rios.

But further, two more steps. The evidence, I believe, overall is that all of the witnesses who were brought forward to identify Rios, or actually, almost anybody else, didn't identify anybody. And it's not clear who they were brought to the station by, except in some instances Noon. But it appears

1870

from the body of the evidence that Guevara brought in Huertas.

And even if Huertas is confused on that issue, Guevara testified at trial that he brought in Huertas and had a conversation with him. It's not specified what the conversation was.

And in addition, although Mason says that only he and Halvorsen were present at the lineup, Guevara's own arrest report, if you look -- or the supplementary report about the arrest has a sentence in there where it says that a gang specialist, abbreviated, was present at the lineup. And the persons who signed that supplementary report were Guevara and his partner, Gawrys.

So, again, there's substantial evidence that he was pressured. And at his deposition, Huertas said that, "Before the lineup, somebody was talking to me and showing me pictures." Again, he's confused between Noon and Guevara. Sometimes he says Guevara. Sometimes he says Noon. But again, very substantial evidence that he -- that Guevara is again a prime mover.

He doesn't -- we don't have to show that he pressured a State's Attorney. It's sufficient to show that he provided tainted evidence, concealed exculpatory evidence, or otherwise moved the prosecution forward.

And then finally, when the case is stymied -- is not stymied, it's gone forward, but there's an issue as to whether

1871

they can find the gun, Guevara, according to our evidence, bribed confidential informants, brings them again to Mason. Mason says he doesn't know who they are. He doesn't know their track record. These are just people handed to him on a plate by Guevara.

These informants, one of them gives evidence, directs them to a place where no gun is found, which will go to the fabrication claim, which I'll discuss later; but the other one directs them to Carrero. And with respect to Carrero, the evidence is from Carrero that Guevara threatens to take his kid away unless Carrero says, "Jaime Rios brought me the gun. He said, 'I just shot somebody.' He gave me the gun."

So, every single piece of evidence in the case, Huertas, the statement, Carrero -- and those are the three major pieces of evidence -- all link back to Guevara; and Guevara has invoked the Fifth when asked about misconduct with respect to these issues.

So, as to malicious prosecution, this is essentially a rerun of the summary judgment motion. Your Honor was correct on summary judgment. You'll be correct now in terms of letting the malicious prosecution claim go forward.

Contrary to what the defendants' position is that we have to show -- there's some sort of presumption with an indictment, we have to show a break in the causal chain, that is not true under Illinois law under the *Beaman* case. What the

1872

*Beaman* case says is anybody who's involved could be held commenced and continued based upon their conduct.

With respect to Guevara, he's pushing forth. He's hiding exculpatory evidence. He's pushing forth inculpatory evidence. And in general, he's masterminding the prosecution, in our view.

Again, going backwards to -- let me just take the Carrero claim. The Carrero claim, which is essentially again the argument made at summary judgment, is that Carrero's evidence is not really a big deal because he just testifies that Jaime on the night of the murder brings him a gun and says, "I just shot somebody." And that is not important enough, particularly because he recanted part of it at trial.

But that argument fails because at trial, the grand jury testimony was admitted as substantive evidence. So, even though it was recanted by Carrero, it was brought in that he testified at the grand jury that, "Jaime gave me the gun. Jaime said, 'I just shot somebody. Hold the gun for me.'"

Third-party admissions like this are extremely powerful in criminal trials because you can't really argue that the police did it or -- normally, or the police tried to get -- you know, cooked this up or pressured somebody.

This is somebody saying, "Listen, my friend came to me on the night and gave me the gun and said, 'I did it.'" Very powerful evidence.

1873

The standard for whether it's material is whether it would have affected the outcome; but under *Brady*, the standard has to be considered very carefully because it's not a probability of a different outcome. It says reasonable probability, but that's not what the courts have said it means. It means a likelihood sufficient to undermine confidence in the outcome.

So, if we take the trial, which was hard fought, as the transcript shows, and we subtract from it Carrero, there is a reasonable likelihood that there would have been a different outcome. I think you can also consider the various claims cumulatively if you look at materiality.

Now, with respect to the coercion claim, I don't know that I heard that there's a motion to dismiss the coercion claim. If there is, I guess I could address it, but I didn't hear that. So, I think the coercion claim definitely survives.

With respect to the Cristino Garcia claim, I think we have to unpack and look at different issues. One issue is the alibi claim. The other issue is the coercion claim.

As to the alibi claim, I will admit that at this point, it stands on tenterhooks because at one point, Garcia said that Guevara was there when he gave the alibi to O'Quinn. At another point, he said Guevara was not there.

But again, look at the evidence in the light most favorable to the non-moving party, and I believe that claim

survives as well.

Now, as to the coercion claim, we are going to move for judgment on at least aspects of that because, first of all, the claim that -- of the phone books and the beating stands unrebutted. There is not a scintilla or a wisp of evidence at this point, maybe they'll produce it, but there's not a wisp of evidence that it didn't happen.

THE COURT: We're getting ahead of ourselves.

MR. S. RICHARDS: I guess I am. I'll backtrack.

THE COURT: Please keep it focused.

MR. S. RICHARDS: Sure. With respect to the informants claim, at this point, first of all, it's not true that the only reference to the informants is -- takes place at trial. That's not true. There's two reports which reference the confidential informant: The arrest report, a sworn document; and the supplementary report of arrest, not a sworn document, but both signed by Guevara.

So, it would be our contention that the fabrication of the confidential informant's information was something that apart from testimonial immunity is material.

Now, in terms of materiality at trial and how it worked out, there's a direct line between the claims in the reports and how the prosecutor used the evidence at trial, which was not simply as background, but substantively to suggest that, in fact, everybody knew that Jaime Rios did it,

1875

and that these courageous gang investigators had brought this to light.

So, therefore, we believe that claim still exists. We also believe that there's substantial evidence that the confidential informants gave information that was fabricated, either by themselves or by Guevara. There's a number of indications of that.

One is that -- and the most important is that the information they gave about where the guns were turned out to be false. One gun was not anywhere near -- was not at Alex Lopez's house. The other gun was -- a gun was found with Carrero, but it's the wrong gun. It's not a .38, as described in the statement. It's a .32. And the .25, the essential gun because it links to the shells, is found nowhere.

So, we believe there's, in the light favorable to the non-moving party, substantial evidence that the fabrication part of the confidential informants claim is maintained, also by Guevara's indications, apart from the other evidence.

And I think I've dealt with everything they brought up.

THE COURT: Okay. Mr. Polick, is there a motion?

MR. POLICK: There is, your Honor. The remaining claims against my clients are the coerced confession claim in Count 1, and there's some embedded conspiracy claims within that count. I'm going to direct this solely with regard to

1876

Defendant Halvorsen.

As your Honor is aware, individual liability under Section 1983 requires personal involvement. We heard Mr. Rios testify himself over the course of two days, and we've also examined the trial transcripts; and we do not see him identifying Defendant Halvorsen at all, much less attributing any act of coercion against Defendant Halvorsen.

At best, in the light most favorable to the plaintiff, he has some other officers standing outside the interview room door. However, none of them were identified as Defendant Halvorsen.

The Supreme Court, in *Colorado versus Connelly,* indicates that the predicate act for a Fifth Amendment claim must be coercion. There has been absolutely no evidence of coercion by Defendant Halvorsen in this case; and without that requisite element, that claim against Defendant Halvorsen must fail.

Defendant Halvorsen is also entitled to qualified immunity on that claim.

If plaintiff is anticipating or thinking about a failure to intervene claim, the problem there is no such claim has been pled in this case. The second amended complaint has a number of counts, but failure to intervene is not one of them. And even if it were, your Honor, I believe Defendant Halvorsen would also be entitled to qualified immunity on such a theory

1877

of liability.

Which brings me to the conspiracy claim that was embedded in Count 1. To start off with, I'm not even sure plaintiff is pursuing these claims anymore. He did not submit any jury instructions on his conspiracy claims. That's in contravention of the Court's standing order.

But putting that aside and assuming that it's still there, if the substantive claim of coerced confession is dismissed, then the derivative claim of conspiracy must also be dismissed.

Also on the conspiracy claims, I don't think there's been any evidence in this case of an agreement or any meeting of the minds with respect to Defendant Halvorsen.

Also, there is a line of cases that holds that in order to have a viable conspiracy claim, you have to have it between state actors and a private actor. And what the evidence has shown here is all we have is state actors, police officers. And a conspiracy claim that only involves state officers or state actors cannot go forward.

Also, we don't believe that there's a viable conspiracy claim here under the intracorporate conspiracy doctrine because Defendant Mason, Defendant Guevara, and Defendant Halvorsen were all part of the same organization, the Chicago Police Department.

And in addition to all those theories, we believe that

1878

Defendant Halvorsen would also be entitled to qualified immunity to the conspiracy claims to the extent that they are still going forward in this case.

THE COURT: Response?

MR. S. RICHARDS: With respect to Halvorsen, I would prefer, if your Honor doesn't mind, to allow me to mull on that and see if we actually oppose on Halvorsen or not, and to respond in writing if we do oppose as to Halvorsen.

THE COURT: Do you have a failure to intervene claim, in your view?

MR. S. RICHARDS: No. I think we have an embedded conspiracy claim, and I think that is viable as to Mason and Guevara to some extent; but I think we're very light on conspiracy involving Halvorsen.

THE COURT: What evidence have you elicited of Detective Halvorsen's participation in any coercive acts?

MR. S. RICHARDS: It would have to be an inference from his deposition designations where he testified at trial that he was part of the interrogation, and the remaining evidence that we have that the confession was coerced.

THE COURT: The testimony here was that -- from Mr. Rios, that he was sitting in the interrogation room. Mason was behind him. He grabbed him by the hair, smashed his face into the table. That's the only -- well, that and the threat to take his kids away are the only evidence elicited concerning

1879

any coercive tactics against Mr. Rios.  Where is Halvorsen in that?

MR. S. RICHARDS:  As I said, I cannot say, and we may agree to this motion.

THE COURT:  All right.  The motion as to Halvorsen is granted.  I have not seen or heard any evidence concerning Detective Halvorsen throughout this trial.  I agree with Mr. Polick's recitation of Mr. Rios's testimony, where he testified that he was in the room.  There were other officers around, but he did not point to Detective Halvorsen.

He was not shown a photograph of Detective Halvorsen. There's no indication at all of Detective Halvorsen's involvement in any of the alleged conduct, no evidence of any direct involvement from Halvorsen other than him being Detective Mason's partner.

So, the motion is granted as to Detective Halvorsen.

Any other -- I'll take the motions concerning Guevara under advisement.

Are the parties ready to address jury instructions, or would you prefer to take that up in the morning?

MR. SCAHILL:  I would prefer doing it, but I didn't bring my stuff.

THE COURT:  Yeah, that's -- it's unexpected time, so I figured I'd ask if you wanted to do it now.

MR. SCAHILL:  I mean, if you can give us half an hour,

we can go grab our stuff.  It's only 2:00 o'clock.

MR. POLICK:  Judge, was your appointment today, or is that tomorrow?

THE COURT:  My appointment is tomorrow.  I have the change of plea at 4:00 p.m. today.

MR. POLICK:  Okay.  Yeah, we could be back in -- well, it's up to the Court.  We could be back in half an hour or so and grab our --

THE COURT:  Do you want to just call it 3:00 to 4:00?

MR. SCAHILL:  Sure.  Let's do it.

THE COURT:  Okay.  All right.  I'll see you back at 3:00.

MR. J. RICHARDS:  Thank you, Judge.

MR. POLICK:  Thank you, Judge.

MR. SCAHILL:  Thank you, Judge.

(Recess had from 2:04 p.m. to 3:00 p.m.)

(Change of reporters.)

THE COURT: We'll do this like we did at the final pretrial conference. You're welcome to stay at the counsel table. I will start with the plaintiff's proposals.

For the plaintiff's, I took out what I thought -- the way it was submitted, it was every instruction and then changes were within it. And, so, as I go through these, I've taken out what I think are the changes, taken out in the sense of like took those pages with the changes. And, so, if I go to one and I've skipped something, let me know.

So, for example, I'm going to start with plaintiff's proposals to Instruction 17. If there's something that was altered or objected to prior to that, let me know.

But is Instruction 17 the first one that plaintiffs seek to change?

MR. J. RICHARDS: Your Honor, I think we had some bolded language on No. 14 maybe.

THE COURT: 14. One second while I -- I'm not sure what's going on with my computer. One moment.

I'll be right back.

(Pause.)

THE COURT: What are the proposed changes to 14?

MR. S. RICHARDS: So, for 14 in the bold, I believe what I did was with respect to either a party or witness who testified at trial, I added "or whose prior deposition testimony was admitted as substantive evidence."

1882

And, then, I think there's a little -- there's a little problem with how it was worded, and I cleaned that up a little bit and said -- and there's a bold "was" after "what" in between "what" and "said."  A "was" was added, which I think just cleans up the language there a little bit.

THE COURT:  Okay.  I'll have to look at that.  I'm still having trouble with my computer.  And I don't have it printed in front of me.  If it comes up --

Do you have a copy for me?

MR. S. RICHARDS:  Why not.

May I approach?

THE COURT:  Yes, please.

(Tendered.)

THE COURT:  Thank you.

And whose testimony was omitted from depositions as substantive evidence?

MR. S. RICHARDS:  Luis Huertas.  Also, I believe, Janet Lupa.  That will happen later, but I think that's coming in.

THE COURT:  Any objections to the proposed changes to Instruction 14?

MR. ENGQUIST:  Well, your Honor, it only focuses on deposition testimony.  A lot of the testimony that's been read in was also trial testimony.  I don't think separating it out and making it stand out where trial testimony's left out would

1883

be a problem. If it was just "or whose prior testimony was admitted as substantive evidence," that would be acceptable.

MR. SCAHILL: Well, there's a redundancy, though, also, which is that how the jury is supposed to treat depositions is covered in Instruction 25, and they're told to basically treat it the same as if it's a trial witness, which appears to be contemplated by the pattern instructions because I believe the Court's instruction was a pattern, which has both of those, which marry together.

THE COURT: My concern about the proposed changes, why should I assume that a jury or juror knows what "substantive evidence" means? And Mr. Scahill's point is well-taken. When I talk through these changes, there's a chance that I might come back -- or when I go back to make the changes -- consider whether it's covered by another instruction, which I may not be able to do when taking the instructions in isolation.

But we did have -- or will have deposition testimony that comes in for the truth of the matter asserted. I take it what's what you mean by substantive evidence, right?

MR. S. RICHARDS: Correct. And if you insert the phrase instead, "truth of the matter asserted," that might get closer to lay understanding of what they're supposed to do. I think we probably might even be able to go further and just say "comes in for its truth," maybe.

THE COURT: Right. And Mr. Scahill's point is that

there's another instruction to treat it just like any testimony you heard here in court, which may already cover it. So, I'll take it under advisement on No. 14.

What's the next one that plaintiffs propose?

MR. J. RICHARDS: That was No. 17.

THE COURT: Mr. Richards, did you need your copy back? My computer decided to start cooperating.

(Tendered.)

MR. S. RICHARDS: Thank you.

THE COURT: Thank you for letting me use that for the time being.

Any objection to the plaintiff's addition to Instruction 17?

MR. SCAHILL: I'm just looking up the statute. I mean, I assume that's what the statute says, but I'm -- I mean, that's probably fine.

THE COURT: Okay. So, I'll add that. It did come up at trial concerning plaintiff or plaintiff's counsel putting up -- I think it was Carrero who came up from Florida.

The next one I have is Instruction 25. Is there one before that?

MR. J. RICHARDS: Yes, your Honor.

THE COURT: There is one before that?

MR. J. RICHARDS: No, no, sorry. 25 is the next one.

THE COURT: Okay. I think this one is considered in

conjunction with 14 as to whether it's redundant.

Any response from the defendants on the proposed changes to 25?

MR. SCAHILL: No, assuming -- I believe Lupa is going to be read in?

MR. POLICK: Yes.

MR. SCAHILL: So, yeah, I think that's fine then.

THE COURT: Is there any other deposition testimony that's being read in?

MR. POLICK: Not depositions. It would be prior trial testimony.

THE COURT: Okay. My only concern is making sure that I capture -- to the extent that I identify the deponents or the trial testimony witnesses, that I capture -- either include them all or just lump them all as deposition testimony. And, so, if it's only two, I have no problem identifying the two.

26 from plaintiff's specifies which demonstratives have been shown. Any objection from defendants?

MR. SCAHILL: No.

MR. ENGQUIST: No.

THE COURT: 29 is one of the elements instructions.

First, was there one before that, Mr. Richards?

MR. S. RICHARDS: No.

THE COURT: And, so, it's Element 2 the plaintiff proposes adding "or one or more of the defendants acting in

1886

concert" after the second element.

Response from defendants?

MR. POLICK: That seems to be an embedded conspiracy construction, which should be a separate instruction, and I don't know that any were submitted by the plaintiff in this case. It seems to be mixing claims.

MR. SCAHILL: The other thing is that if you are attempting to extend the scope of liability to somebody who is not the direct actor, that is a conspiracy claim and nothing more, and there is not a conspiracy claim. So, if that was the claim, it would be baked into the conspiracy claim and extends the scope of liability there. But you can't put it as a prima facie element of the claim itself.

THE COURT: Mr. Richards, is this based on a conspiracy theory?

MR. S. RICHARDS: Yes.

THE COURT: And, so, what evidence in the case do we have of an agreement between Guevara and Mason?

MR. S. RICHARDS: I believe I summarized this in response to our objections to the defendants' modifications.

So, I listed the following things: The arrest and investigation of Jaime Rios was a joint operation between the Area 5 Violent Crimes, which Mason and Halvorsen were members, and Gang Crimes North, of which Guevara was a member. Guevara brought the alleged confidential informants to speak with

1887

Mason, who was present when they spoke with him. There is circumstantial evidence that Mason knew that Guevara had illegally arrested Jaime Rios and searched his home and had not given him Miranda warnings. Mason was present when Guevara threatened to take Jaime Rios's children away. Guevara was present when Mason pulled Jaime's hair and slammed his head against the table. Guevara and Mason were each present and acting in concert when they questioned Jaime Rios without giving him Miranda warnings. And Mason was present when Guevara threatened Benjamin Carrero.

So, that's a summary of our evidence for conspiracy or acting in concert.

THE COURT: Okay. Is there any dispute that there's evidence sufficient to support a conspiracy claim?

MR. POLICK: Yes. I think that all came through through Guevara's Fifth Amendment invocation. I don't think there's anything else. The evidence I heard was that the plaintiff, Mr. Rios, testified that Detective Mason basically stood there and said nothing. And he denied instructing anyone from the gang crimes unit to do anything in this case.

THE COURT: So, my recollection of the evidence is that Guevara arrests Little Mike, Rios approaches, Guevara lets him go, does nothing. Later that day, Guevara arrests Rios, searches the house, takes Rios back to the station. All of them, Guevara, Mason, I think the state's attorney were in a

1888

room.  Mason assaults Rios.

Is the conspiracy evidence based on an inference that they were acting in concert?

MR. S. RICHARDS:  Yes.

THE COURT:  Okay.  I'll have to look at the pattern and the case law to see how it comes in.  My sense is that any conspiracy claims rest on an agreement.  And, so, any instruction to that effect would have to be based on an agreement, provided that's what -- after checking, that's what the law bears out.

But it is something that's raised in the amended complaint.

MR. ENGQUIST:  Your Honor, plaintiff never submitted -- actually, no one ever submitted -- a conspiracy claim -- a specific jury instruction on that.  And based off -- here's the cases, one of them being Wilson --

THE COURT REPORTER:  Mr. Engquist.

MR. ENGQUIST:  I'm sorry.

THE COURT:  Microphones.

MR. ENGQUIST:  I'm sorry, your Honor, I'll start over.

No party submitted, especially plaintiff never submitted, any jury instruction on conspiracy.  At this point, we've had two different rounds of doing it, of submitting jury instructions and objections.  Last week was the final day to do that.  Nothing's been submitted.  At this point any trying to

1889

add in a jury instruction on conspiracy would be waived at this point.

And just one of the cases, though, that's out there is Wilson vs. Kelkhoff, it's K-e-l-k-h-o-f-f, 86 F.3d 1438, Seventh Circuit case. When a party doesn't raise a jury instruction on a claim, they waive the claim. So, to the extent that he was trying to allege a claim, a specific claim of conspiracy, that time has gone.

THE COURT: So, where we're here now is at the final pretrial conference, I explained that jury instructions are an ongoing process and that I would take the parties' proposals, put them into my own, and then give the parties time to object, modify, or propose additional instructions. And Mr. Richards has proposed an additional instruction within that timeframe. So, it's not waived.

And it's alleged in the complaint that there was -- Paragraph 59 of the second amended complaint: "Before the interrogation began, Mason, Guevara, and Mason's partner had agreed and conspired that interrogation should be conducted using illegal physical force and illegal threats and promises."

And, so, I'll look at the conspiracy claim and include one.

Then there are four parts underneath. The first proposal is: In considering a confession -- considering whether a confession was voluntary, you should consider the

1890

totality of the circumstances.

Any objection to that?

MR. SCAHILL: The first paragraph starting with "in considering," yes.

THE COURT: What's the objection?

MR. SCAHILL: The objection is that the inclusion of characteristics of the plaintiff, I think they're conflating criminal standards with 1983 standards. I believe that the focus of a coercion claim and whether a confession is involuntary has to focus on improper police coercion.

And, so, things like personal characteristics, like youth or in the case of Colorado vs. Connelly, things like insanity, intoxication, things like that, while they may be factual voluntariness considerations in the normal consideration of that term, the focus on whether there's a claim is on the conduct of the police and whether it's illegal.

And, so, including characteristics of the plaintiff I don't think is appropriate for this type of claim in this context.

THE COURT: Response.

MR. S. RICHARDS: Your Honor, we disagree. What Colorado vs. Connelly stands for is that the individual characteristics of a suspect standing alone cannot support a constitutional claim if there's no police conduct whatsoever. And the classic example is -- and I think this is what happened

1891

in Colorado vs. Connelly -- is an insane person walks into a police station and starts making statements. The police do nothing and just hear what the insane person has to say. In that case, there's no state action. There's no possible constitutional violation because the police have done nothing.

But if the police do anything, what they do is judged in the context of who they are dealing with. If it's a very young person, that's a factor. If it's a mentally ill person, that's a factor. If it's a person who has a physical disability which prevents their -- which has an impact on voluntariness. I think the constitutional standard is a combination of police action and individual characteristics, and there's a range.

There's some tactics that are so bad that the individual characteristics don't matter very much, such as physical abuse or threatening to take away one's children. Then, on the other hand, there are certain tactics which regardless -- or almost always regardless of the person's characteristics are okay, like lying, misrepresenting evidence, suggesting within proper legal limits that you might benefit from making a statement. Those are all things that police can do regardless of individual characteristics.

But I think on the middle ground, there's an interplay between police action and individual characteristics, and I think that's what 1983 is all about. I don't think the

1892

standards are different for 1983 and a criminal case. If there's a constitutional violation, there's a constitutional violation. If there isn't, there isn't.

MR. SCAHILL: I do also have -- I disagree, of course. But this -- even if that were the case, this is both overinclusive and underinclusive. If you're talking about totality of circumstances, you're talking about totality of circumstances, which is everything. They're just spotlighting immutable characteristics.

And some of this appears to be an attempt to backdoor what Ms. Russano was saying as far as her characteristics, which were not legal pronouncements but psychological ones, which is not -- which may bear on how the jury looks at the evidence, but they should not be instructed on those as part of the law.

THE COURT: What I'm going to do is I'm going to look at the four cases cited after the plaintiff's proposed changes to Instruction 29 because I did invite the parties to identify examples of legal and illegal interrogation techniques and indicated that I would include those. And, so, to the extent those cases go to legal and illegal techniques, I will include them.

I will not co-sign Dr. Russano's testimony by spelling out the factors that she considers relevant to whether a confession was voluntary or not. I do see some aspect of that

1893

in the plaintiff's proposed instruction, but I'll stick to what's in the case law.

MR. POLICK: Judge, may I comment just on the elements of that instruction, particularly No. 2?

THE COURT: Okay.

MR. POLICK: That indicates that the confession was not made by the plaintiff voluntarily but rather was made involuntary as a result of coercion by the defendant you are considering.

I would think that would have to be improper coercion if we're going to make a distinction later on between what are proper and improper techniques. I mean, the whole dynamic is -- an atmosphere of an interrogation is coercion. So, to just say coercion I don't think is legally correct. It has to be improper coercion.

THE COURT: I have to look and see if the original --

MR. SCAHILL: I think we included illegal coercion. So, if we're defining legal terms, which your Honor has indicated you're going to do, I think those two concepts marry.

THE COURT: So, the way I originally wrote it in the paragraph following the elements is: "The evaluation of whether a confession is coerced involves consideration of the totality of the circumstances to determine whether the individual confessed voluntarily of his own free will or whether the police overrode his volition," and cite Giles. And

1894

my intention was to identify permissible and impermissible conduct with respect to determining whether a confession is coerced.

I would disagree. I think "coerced" is the operative word, not "legal" or "illegal." And, so, it's a framing issue that is probably on my part during this discussion. But it's going to be examples of what conduct is allowed during an interrogation and what conduct has been found -- or is not allowed. But the point is taken -- well-taken.

Moving to Plaintiff's 30.

MR. SCAHILL: Judge, we did -- I'm sorry. On 29, we did have some issues with the language in the last two paragraphs of that that, too, that we did want to spotlight, which was the use of -- it says "certain interrogation techniques," which is consistent with what your Honor's saying and what those are, but then they're including "and will result in" and then without -- the second one is -- has the --

THE COURT: I don't need to hear this. I just told you where I'm going to go. I'm going to look at the four cases that the plaintiffs have cited, identify what conduct was identified as permissible or not permissible, and leave it at that.

MR. SCAHILL: Okay. Thank you.

THE COURT: Plaintiff's 30. This is what Mr. Richards was referring to when he was responding to the motion. It's

another articulation of the materiality standard under Brady.

What's the defendants' view?

MR. SCAHILL: Our read is that the -- this is a pattern instruction, and that the pattern instruction should be used. That is not part of the pattern instruction.

THE COURT: Mr. Richards, how is this just not another way of stating what's already in Element 3?

MR. S. RICHARDS: Well, I think the problem is that if you look at Strickland and Brady, which use the same standard for materiality, they both use either the words "likelihood" or "probability," which suggest that there's a kind of test of going more than 50 percent in terms of affecting -- saying whether it's material, saying whether it would have changed something.

But Strickland itself makes clear that when they use the words "reasonable probability," what they meant was -- just like probable cause doesn't really mean probable cause, it means something else -- what they mean is something that's not more than 50 percent, but substantial enough to undermine confidence in the verdict and does not mean, you know, that the plaintiff must prove the fabricated evidence has more likely than not altered the outcome.

The difference, I think, is illustrated by the other -- another standard, which is I think going to be discussed by Attorney Rogala shortly, which is that for newly

1896

discovered evidence, you need to have more than 50 percent. If you don't show so conclusive that it would likely have altered the verdict, you don't get there.

So, they are different standards. I understand the difference is subtle, but I do think that's the law, and even though -- and I do think the pattern instruction, with all due respect, is defective in not including that concept.

THE COURT: Okay. I'll take that under advisement.

It's the same change for No. 31.

MR. SCAHILL: Judge, on these, I would just reference the fact that Strickland vs. Washington is not a Fourteenth Amendment materiality case. It's an ineffective assistance case. Just as we don't define beyond a reasonable doubt, reasonable likelihood I don't think has or needs a definition.

THE COURT: Okay. Plaintiff's 34, any objection to the proposed change?

MR. SCAHILL: No.

THE COURT: Plaintiff's 38 is an issue that comes up in the defendants' proposed changes, too, related to the certificate of instruction. Both parties are seeking changes to what I proposed. My thought is to add to what I proposed that: "The Certificate of Innocence is only relevant to the malicious prosecution claim and to damages. You may not consider the Certificate of Innocence for any other purpose."

Does that address the plaintiff's concerns?

1897

MR. S. RICHARDS: It does.

THE COURT: Does that address the defendants' concerns?

MR. SCAHILL: Well, the first part. The second part, I have a disagreement with. I don't know that the -- actually, I don't want to say I don't know. The Certificate of Innocence cannot be used for damages purposes insofar as it is suggestive of innocence. And that appears to be what they're getting at under Parish, which is that since I'm innocent, I'm entitled to more damages. That's fair.

But the Certificate of Innocence is not part of that. It is only a procedural fact, which is why we -- what we were using in ours was from your Honor's 277 -- Docket 277 -- on the motions in limine, which was an instruction that the jury be told that the Certificate of Innocence plays no role in determining innocence or guilt. Other things perhaps may, but not that.

THE COURT: What's your response to that, Mr. Richards?

MR. S. RICHARDS: Your Honor, I would just -- we disagree obviously as to whether it's relevant to damages with respect to guilt, innocence. We maintain our position legally. I understand maybe the Court disagrees.

There is another twist, though, in that in, I think, one of my responses to the Court's -- to the defendants'

1898

proposals was to narrow it down to the issue of damages with respect to the effect of a Certificate of Innocence on a plaintiff's life as evidence to show, you know, how bad his life was before he got the certificate and still had the lingering effects of the criminal conviction and how much better it was afterwards.

So, that's a separate theory as to damages. And I would just urge the Court to consider that and see if that's something that you want to instruct on.

THE COURT: So, as I understand Mr. Richards, the argument is that it is relevant to damages to the extent that his prospects improved after receiving the Certificate of Innocence.

MR. SCAHILL: I understand that that's what the argument is. The problem that we have with that is there is a order that's been read into the record, and that your Honor, I believe, has ruled is not hearsay because its relevance lies in its issuance.

We're now getting into this territory of having the order itself have some substantive impact on the case, which is going to seriously conflate those two issues, and is extremely prejudicial because of the way it reads. It reads that the plaintiff has been found innocent by a preponderance of the evidence, which happens to be the same standard that this jury is applying.

1899

That issue, instructing them or allowing it to be argued that way, is going to swallow up the Court's ruling that this is a procedural fact and nothing more, which I believe is what Patrick stands for.  I mean, they certainly can argue that his life was made better after this procedural fact.  And that's perhaps a fine argument.  But the jury still nonetheless, we believe, has to be told, because of the way that this is written, that the findings in the Certificate of Innocence are not evidence of innocence.

THE COURT:  But aren't they told that in the limiting -- or the instruction concerning the Certificate of Innocence?

MR. SCAHILL:  I mean, if they are told that.  I mean, we proposed that language from the Court.  And if that language is in there, we probably will not have an issue with that.  And Mr. Richards, of course, can make those arguments in closing, so long as the jury is told that the Certificate of Innocence plays no role in determining factual innocence or guilt.

THE COURT:  They're told that the state court's decision to issue a Certificate of Innocence is not binding on them.

MR. SCAHILL:  Right, which comes from the Certificate of Innocence statute, of course.  But binding is one thing, relevant to or evidence of is something else.  And if the basis of the Court's decision for admitting the Certificate of

1900

Innocence is evidence of a procedural fact for the malicious prosecution claim, that leaves open the prospect of it may not be binding upon you, but it is evidence of factual innocence, which I do not believe is a proper use of the certificate under Patrick.

THE COURT: Response.

MR. S. RICHARDS: Well, I mean, I guess now I'm slightly confused. Again, we interpret Patrick differently. But I think the Court has ruled against us on that issue previously, and unless your Honor's reconsidering the ruling, we respect it.

But with respect to damages in terms of what effect it has on somebody's life, you know, it's fine to say I can argue that. But if I can argue it, why wouldn't the jury be instructed on it? I mean, I think things can be used for two purposes.

One is a procedural fact which indicates the prosecution terminated in a manner indicative of innocence, which just means indicative and manner, not dispositive. I would just say whatever your Honor instructs the jury on and permits me to argue is what I will do. I tried to do that in opening, and I will follow through with whatever the Court rules.

MR. SCAHILL: Mr. Richards did argue that in opening, and I -- he was right in opening when he said the only purpose

1901

for which this can be used is to show that it was terminated in a manner indicative of innocence and no other purpose. I believe those were almost verbatim the words that Mr. Richards said, which is true.

It seems as if we're going a step further now, which, again, he can argue that and say his life changed after that. But if we start getting into the business of suggesting even to the jury that something that would be hearsay, meaning you were innocent because you have this thing that says you are, then we're butting up against this procedural fact issue.

That is a hearsay use of the COI even if there's a non-hearsay use of it that your Honor determined that the procedural fact aspect comes in.

THE COURT: Let's get back to Plaintiff's Proposed 38. Any other objections from -- any objections from the defendants on Plaintiff's Proposed 38?

MR. SCAHILL: So, I mean, I don't -- this seems to me to be unnecessary. And the reason it seems unnecessary to me is that the jury is given the elements of the claims in this case. I think factual guilt and innocence, in fact, does relate to some of those elements and not just the malicious prosecution aspect and not just the damages either.

I mean, if you have -- you know, for example, we have discussed extensively the confession and whether the things in there are true or not. If they are true and that that is --

1902

it's more likely that that was voluntary, although that's not entirely the issue. But it is certainly relevant to that, that somebody would say something that factually was true as opposed to saying something that was untrue, which would be suggestive of coercion.

So, this is not as black-and-white of an issue as I believe this instruction is making it out to be. I do not believe that Parish had any instruction like this. It's just out there. You can argue it. The elements are what the elements are. And guilt, of course, is not one of them, but it is relevant to determining some of those issues beyond the damages.

And, then, we're just redefining --

THE COURT: What is guilt relevant to beyond damages?

MR. SCAHILL: Well, of course, there's malicious prosecution. But then the other issue is there's materiality elements of all of the other claims, which you're looking at the nature and the character of the rest of the evidence. And, so, you have to evaluate those parts of the record, which, by definition, are guilt or innocence in determining whether they can meet the prima facie elements of all of those claims.

For example, the plaintiff does not have a coerced -- or a fabricated confession claim. Let's say the jury determines that it is true but coerced, but then they have to go to the next step and look at, well, let's look at Benjamin

1903

Carrero's statements. We have a true confession, and then we have what Benjamin Carrero said about the gun. Is that material in light of the fact that this other thing is true?

I would argue that it's not, and I intend to argue that it's not because of all these other things that are suggestive of actual guilt; therefore, even if it happened, is not a material aspect of the claim, and it should be rejected on those grounds.

MR. S. RICHARDS: Your Honor, may I --

THE COURT: Briefly.

MR. S. RICHARDS: Very briefly.

I think this is a reasonable instruction which captures what the defendants want because you can view it with respect to damages, which is what they want to do, saying he's guilty, therefore he gets less money. And also, you can consider the weight and quality of the evidence on the issues of, you know, whether things were material, which, again, is just exactly what the defendants said.

In terms of this argument that the fabrication of a confession has something to do with voluntariness, I would disagree. For one thing, I did have fabrication claims, which the Court dismissed on summary judgment. Also, I'm a little concerned because I think the defendants keep saying that there's some sort of state law procedure by which you can throw out a confession if it's fabricated, which is not true. You

can only throw out a confession under Illinois law if it's unconstitutionally involuntary.

So, you know, I see that the defendants are going to argue that the confession is true, therefore the defendant is guilty, therefore he's entitled to less damages.  Fine with that.

But I think the instruction I'm suggesting, even though it wasn't prescribed by the case, by Parish, is a good instruction.  I think it tells the jury what to do and reins in what I think otherwise might be a free-for-all of arguments on both sides as to whether Jaime Rios is guilty or innocent.  I think we want to keep the focus on the constitutional violations.

MR. SCAHILL:  The first sentence in that is completely inconsistent with the whole last paragraph.  There's no purpose for this.  We have elements.  That's what they are.  I mean, again, he's citing a case that does not support the instruction.

THE COURT:  Okay.  Buried in the instruction is something that is supported by the cited case, and that is that guilt or innocence is relevant to damages.  Some form of that will be given to the jury.

I asked the parties what else guilt or innocence is relevant to.  Mr. Scahill suggested that materiality was part of it, presumably in the context that -- not this case, but if

1905

there was overwhelming evidence -- or with respect to materiality.

I'm not quite sure I understand the defendants' materiality argument. How does actual innocence or guilt factor into materiality?

MR. SCAHILL: So, if -- we have, I believe, three or four claims under the Fourteenth Amendment, either for fabrication or Brady, okay, that are on discrete issues. We have two claims with respect to Mr. Garcia, and then we have a claim with informants, and then we have a claim with Carrero, okay?

Each one of those things needs to be looked at to see whether it would have -- there would have been a reasonable likelihood that had -- if that was fabricated or suppressed, it would have changed the outcome of the case.

What I think we are entitled to argue is that this person confessed. Luis Huertas saw him. There's overwhelming evidence of factual guilt. Therefore, if you agree with us on that, these other things are immaterial. Therefore, if he's factually guilty of these things, then these other things do not matter under the Constitution because they're immaterial, even if they happened.

MR. S. RICHARDS: Your Honor, can I respond and make a comment which I hope will be helpful?

THE COURT: Sure.

1906

MR. S. RICHARDS: I think there's two different -- the difference is kind of a timeframe. I think what Parish says if you're looking at guilt and innocence on damages, you make a judgment based upon all the evidence, even evidence that wasn't at trial, as to whether he's guilty or innocent. And if you're looking at materiality, by definition you're looking only at the evidence -- the trial evidence.

So, there's a difference between the two concepts, and I was trying to sort that out in the instruction, maybe clumsily. But I think that has to be kept in mind because the jury will hear -- you know, has heard a little evidence that -- new evidence he's innocent. They've also heard about what the trial evidence was back then. But they're two different analyses, even though they fudge into each other.

THE COURT: Okay. So, I'm going to give an instruction that actual guilt or innocence is relevant to damages. Why is anything further needed given that the elements explain what materiality is? It would seem buried in there that if he did it, then materiality wanes. If he didn't do it, then it makes it -- materiality recedes. So, it seems buried in the elements instruction already.

MR. SCAHILL: I'm fine with that instruction. If your Honor instructs that it is relevant to damages and nothing more, I'm fine with that instruction.

THE COURT: I won't say "and nothing more." I just

will point out that it is relevant to damages, and then the parties are free to argue actual guilt or innocence in the context of materiality and the elements instruction.

MR. SCAHILL: I'm fine with that.

THE COURT: Mr. Richards?

MR. S. RICHARDS: So am I.

THE COURT: So, there will be an instruction that it's relevant to damages under Parish. And, then, the rest will be left to the elements.

Instruction 39. I'm not going to mention the City of Chicago. He's raised his financial condition with respect to punitive damages. It's not relevant to compensatory damages.

As far as the verdict form, I'm not going to include the City of Chicago. They were not on trial in this case.

I didn't see any other changes from the plaintiff on the verdict form. Did I miss any?

MR. S. RICHARDS: No, although an obvious one has to be made now.

THE COURT: With Halvorsen, yes.

I didn't see any objections to the verdict form from the defendants.

MR. SCAHILL: Well, other than Halvorsen. But, yes, we agree to the verdict form other than now removing Halvorsen.

THE COURT: Hopefully -- you'll need to agree, but my goal here to make it simple for the jury. Pattern or parrot

1908

what they have to find so that they can be -- so that they know what they're doing.

There was an error in the verdict form, but I think it's been remedied because I struck the "creation of the confidential informants." I think the instruction -- or the verdict form had read just the "fabrication of the evidence" or "information from the informants." But I think that now that's correct: Fabricating material evidence against the plaintiff, namely, information from confidential informants.

Okay. I had hoped to avoid the 9:00 o'clock for everyone, but I've got to switch to the change of plea. I will pick up with the defendants' proposals tomorrow morning at 9:00 a.m.

MR. J. RICHARDS: Thank you, your Honor.

MR. SCAHILL: Thank you, your Honor.

(Adjourned at 3:55 p.m. until 2/13/26 at 9:00 a.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Kelly M. Fitzgerald                    February 13, 2026
Official Court Reporter

/s/ Joseph Rickhoff                        February 13, 2026
Official Court Reporter

/s/ Charles R. Zandi                       February 13, 2026
Official Court Reporter

1909

I N D E X

WITNESSES                                                   PAGE

REYNALDO GUEVARA
Direct Examination By Mr. S. Richards                       1772
Cross-Examination By Mr. Scahill                            1791
Redirect Examination By Mr. S. Richards                     1795
Recross-Examination By Mr. Scahill                          1796

JAIME RIOS
Redirect Examination (Resumed) By Mr. J.                    1797
Richards
Recross-Examination By Mr. Scahill                          1801

LAMONT BURR
Direct Examination By Mr. S. Richards                       1805
Cross-Examination By Mr. Miller                             1813

LAMONT BURR
Direct Examination By Mr. Engquist                         1839

CAROL ROGALA
Direct Examination By Mr. Scahill                          1849