1910

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                         )
                                    )
                Plaintiff,          )
                                    )
-vs-                                ) Case No. 1:22-cv-03973
                                    )
REYNALDO GUEVARA; MICHAEL           )
MASON; and JoANN HALVORSEN,         )
as Special Representative of        )
ERNEST HALVORSEN, Deceased,         ) Chicago, Illinois
                                    ) February 13, 2026
                Defendant.          ) 9:00 a.m.

VOLUME 10
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:    LAW OFFICE OF STEPHEN L. RICHARDS
                      BY:  MR. STEPHEN L. RICHARDS
                           MR. JOSHUA S. RICHARDS
                      53 West Jackson Boulevard, Suite 205
                      Chicago, Illinois  60604

For Defendant         BORKAN & SCAHILL, LTD.
Guevara:              BY:  MR. TIMOTHY P. SCAHILL
                           MR. GRAHAM P. MILLER
                      20 South Clark Street, Suite 1700
                      Chicago, Illinois  60602

For Defendants        THE SOTOS LAW FIRM, P.C.
Mason and             BY:  MR. JOSEPH M. POLICK
Halvorsen:                 MR. JOSH MICHAEL ENGQUIST
                           MR. JEFFREY ROBERT KIVETZ
                           MS. CAROLINE P. GOLDEN
                      141 West Jackson Boulevard, Suite 1240A
                      Chicago, Illinois  60604

Court Reporter:          CHARLES R. ZANDI, CSR, RPR, FCRR
                         Official Court Reporter
                         219 S. Dearborn Street, Room 1426
                         Chicago, Illinois  60604
                         Telephone:  (312) 435-5387
                         charles_zandi@ilnd.uscourts.gov


                         *   *   *   *   *


                    PROCEEDINGS REPORTED BY STENOTYPE
          TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

1912

(Proceedings heard in open court:)

THE CLERK: 22 C 3973, Rios versus Guevara, et al., for jury trial.

THE COURT: Good morning. Appearances, please.

MR. S. RICHARDS: Stephen Richards on behalf of plaintiff.

MR. J. RICHARDS: Joshua Richards on behalf of plaintiff.

MR. MILLER: Graham Miller on behalf of Defendant Guevara.

MR. POLICK: Joseph Polick on behalf of Defendants Mason and Halvorsen.

MR. SCAHILL: Good morning, your Honor. Timothy Scahill on behalf of Reynaldo Guevara.

MS. GOLDEN: Caroline Golden for behalf of defendants -- for Defendant Mason.

MR. ENGQUIST: Josh Engquist on behalf of Defendant Mason.

MR. KIVETZ: And good morning, your Honor. Jeff Kivetz on behalf of Defendant Mason.

THE COURT: Good morning. We'll pick up with the jury instruction conference, so feel free to take your seats.

So we're moving into the defendants' proposed instructions. It starts with instruction 3. Plaintiffs do not object to the proposed modification. I'll make the

proposed modifications, including the removal of Halvorsen.

Then we've got defendants' modification to Instruction 5. This is opposed.

Mr. Richards, the defendants point out that it's admissible as former testimony under 804(b)(1). The underlying trial, your client was present at, had the opportunity to examine the various witnesses. Why doesn't 804(b)(1) apply?

MR. S. RICHARDS: It does apply. You know, I strike -- it strikes me it does not apply to our use of those. But if the language is struck -- I'm withdrawing my objection.

THE COURT: Okay. The only -- so, I'll accept the defendants' proposed modifications. The only additional modification that I'll make is that in the first sentence, I will add some language. It currently reads, "During the trial, certain testimony was presented to you by the reading of transcripts." I will add, "from the underlying criminal proceedings," to differentiate the trial and suppression or whatever, underlying criminal proceeding transcripts from the deposition transcripts. And then I'll give the second sentence. "Generally, you should give this testimony the same consideration you would give it had the witnesses appeared and testified in open court.

For modification to 15, we have Carrero, Garcia, Hunt, and Rios, correct?

MR. POLICK: Correct, your Honor, and Burr.

1914

THE COURT: Burr, not Hunt. Okay. So there's the four, with Carrero, Burr, Rios, and Garcia.

MR. S. RICHARDS: Your Honor, we would object to putting in Rios because it was not admitted under 609. It was being admitted for some other purpose.

MR. SCAHILL: We would agree.

THE COURT: That's fair. So, Carrero, Burr, and Garcia.

MR. POLICK: Judge, just going back to Carrero, I know you ruled that we couldn't get Mr. Carrero's conviction in. He did testify that he was in prison with Mr. Rios, and then I think he volunteered when Mr. Scahill was cross-examining him that he had spent 30 years and didn't have much to lose or something to that effect.

But I don't know that we actually got the conviction in for him. I think the ruling was that we couldn't on Carrero.

THE COURT: Right. But the jury has heard evidence that he was convicted of a crime, right?

MR. POLICK: Correct.

THE COURT: I'll ask plaintiff, do you want Carrero included?

MR. S. RICHARDS: No.

THE COURT: All right.

MR. POLICK: And then with respect to Mr. Rios, the

1915

ruling was the convictions were inadmissible under 609; however, we could use them for other purposes of impeachment, and that certainly has occurred in this case. So, we might have to modify that a little bit with regard to Mr. Rios.

THE COURT: Right. Rios isn't going to be named in here because the purpose of the testimony wasn't that he's not telling the truth because he's a felon. It's that -- as I understand it, the marijuana conviction while in prison is a damage mitigation issue, in that he got two years consecutive based on that kite; and that the May 1989 assault was to rebut testimony that he -- to show that he was, from the defendants' perspective, still a member of the Latin Kings and that he shot, to contradict his testimony that he was never involved in a shooting on behalf of the Latin Kings.

MR. POLICK: Correct.

THE COURT: And so I don't know how -- it's not a 609 purpose.

MR. POLICK: Correct.

THE COURT: And so it would be wrong to tell the jury they may not consider evidence concerning those two convictions for any other purpose because, as I understand it, it was introduced for other purposes.

MR. POLICK: Yes.

THE COURT: Okay. We've got defendants' 16. I didn't see a response from the plaintiff on 16. Before I invite the

1916

response, I mentioned during the trial that I would add something to it. Currently, at the end of the first paragraph, I would add, "To assume that the answers would have been unfavorable, there has to be other evidence that supports that finding."

I get that from *LaSalle Bank Lake View*, 54 F.3d 387, at 390. It's at 391, where the Seventh Circuit discusses that silence alone or the direct inference of guilt from silence is forbidden, that the complainant has to produce evidence in support of its allegations, in addition to the -- to the witness's invocation of the Fifth Amendment.

So, with that planned addition and the defendants' modifications, I'll hear from you, Mr. Richards.

MR. S. RICHARDS: Yes. As to the defendants' modifications, we have no objection. Obviously, Defendant Halvorsen comes out.

Our pretrial position, which we would stand on, was that we are not required to introduce corroborating evidence, so I would note that objection to that part of the Court's instruction, but I have no further comment.

THE COURT: Understood. Candidly, when I think of it, I think of corroborating evidence; but I haven't necessarily seen that language, which is why I'm staying back to "other language that supports" because that's lifting the language directly from *LaSalle Bank*, and I'm not sure whether

1917

corroborating evidence is a higher standard than just some other evidence.

But your objection is noted, and I will give it. I haven't given the defendants an opportunity to speak on the sentence I'm planning to add. Any thoughts on that?

MR. SCAHILL: The only potential addition I would suggest is to have it read, excuse me, "To assume the evidence is unfavorable, there must be other evidence to support this beyond the invocation itself," or something like that, unless the Court thinks that's redundant. It just seems to me to be a possible addition for clarity.

THE COURT: All right. I understand what you're saying. I think in my haste, I just concluded it with "that finding." The goal here is to tie it back to what the assumption could be without getting too wordy.

Conceptually, if he's asked a question of whether he searched Rios's home and invokes his Fifth, then testimony from Mr. Rios that he searched his home prior to taking him to the police station is that other evidence.

And so I know that there needs to be -- or that the word -- the conclusion of that finding is somewhat ambiguous; and to the extent I'm able to find language that's accessible to a jury that parallels that line of reasoning, I will include it.

MR. SCAHILL: Thank you.

1918

THE COURT: Certificate of innocence, we talked about this to some extent yesterday, and I think we resolved it.

I understand the defendants' objection -- or plaintiff's objection to defendants' proposal as written was to be able to speak about the change that it made or the effect that it had on Mr. Rios with respect to damages; but I think yesterday, I concluded that I would not explicitly instruct as to damages and limited the certificate of innocence to the malicious prosecution claim.

Do I need to hear -- or does either side want to be heard more on that?

MR. S. RICHARDS: From plaintiff, I think we've discussed this issue thoroughly yesterday, and -- we did. It's taken care of, I think, in terms of --

THE COURT: Like it or not, it's been resolved, and we'll go with that. Okay. Right.

Okay. For defense?

MR. SCAHILL: Subject to -- we obviously have another instruction which touches on this issue, which is an additional proposed, which again could be included within this or separate, but it's this issue of mirroring the Court's ruling in docket 277 about specifically saying that, you know, innocence -- the certificate of innocence plays no role in determining guilt or innocence.

So, whether it's baked in to this or a separate one,

1919

I can't remember where we landed on that issue, but that is still something that we think is appropriate.

THE COURT: Either Mr. Decesaris has good notes on it, or we'll go back to the transcript; but we'll go back and revisit the discussion in finalizing this.

Defendants' modifications to 29, we discussed this one. I spoke about how I don't like the use of "illegal coercion." Rather, I'll leave it at "coercion" and then talk about legal and -- lawful and unlawful ways of doing it.

And I understand the defendants have listed with case support several ways or techniques that are lawful.

30 and 31 --

MR. POLICK: 29, though, will be over defendants' objection as to that, your Honor.

MR. SCAHILL: I think the Court's -- the Court is looking at the factors, the legal concepts, and going to consider putting those in, I think, is where we landed.

THE COURT: Right. So, the language of No. 2 will be neutral in the sense of, "The confession was not made by the plaintiff voluntarily, but rather was made involuntarily as a result of coercion by the defendant you are considering."

And then in the subparagraph or in the following paragraphs, I will include that police officers can implicate someone in a crime. I will essentially catalogue -- I will collect cases without telling the jury I'm collecting cases,

1920

and say these things are not -- or are unlawful.  These things are permissible, so that the jury can decide whether using, as I understand the case, impermissible tactics, the officers rendered the statement involuntary.

30 and 31, nice catch.  I -- these are claim-specific to Defendant Guevara.  I will make those changes.

32, I have "the manner indicative of innocence."  That was an oversight on my part.  I will include that.

There's the issue of probable cause, which is in dispute.  I see this as going one of two ways, either asking for an explanation how the state probable cause standard differs from the federal, or just going straight to, is it *Holt*, and lifting what they said in paragraph 68, not 69, where *Holt* states in a malicious prosecution action, quote, "Probable cause is defined as the state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged."

I'll hear from defendants first since it's your proposed modification.

MR. SCAHILL:  The language you just read is the language that you're proposing to put in there?  Is that what --

THE COURT:  Yes.  It's one of two ways.  Either I stick with -- either you explain to me how your modifications

citing state law differ in any real sense from the federal standard of probable cause, or if the Illinois standard, lifted verbatim and in relatively straightforward terms from a case that you cited, is appropriate.

MR. SCAHILL: Okay. With respect to that latter point, we agree. There is one thing that I think does need to be changed, though, with -- the Court's instruction says "had committed a crime." I believe for state law malicious prosecution has to be the charged crime rather than any crime, which is why we included the instructions from the underlying criminal proceeding.

THE COURT: I understand. Plaintiff, any preference?

MR. S. RICHARDS: We prefer the federal definition. I understand the defendants' argument as to "committed the offense charged." We absolutely agree that that's what should be done -- what should be said in this case.

There might be -- it might be different in a different case, but no one ever said that they had probable cause to arrest Jaime Rios for something else --

MR. SCAHILL: Well --

MR. S. RICHARDS: -- besides murder.

MR. SCAHILL: That's true. Except remember, there is a disparity between whether he pulled the trigger or whether he's guilty on an accountability theory. The confession says one thing; the eyewitness says another. So, I get it's the

1922

same crime, but the concept of accountability does need to be baked in to that.

THE COURT: Okay. So, it seems like naming the charged crime and using language that tracks that the reasonable person in the defendant's position would have believed that Mr. Rios had committed the charged crime.

MR. SCAHILL: Did we -- the only other issue I have is the last sentence about the plaintiff's conviction later being vacated does not itself mean that there was no probable cause. I believe -- I have to look it up. I believe that is in the federal instruction. I think that also applies to state claims as well. So, we would like that included. Hang on.

THE COURT: Response?

MR. S. RICHARDS: Could you restate that again? I think I might have missed something.

MR. SCAHILL: "The fact that plaintiff's conviction was later vacated does not by itself mean that there was no probable cause to charge plaintiff."

MR. S. RICHARDS: We have no problem with that.

THE COURT: Okay.

All right. 34 is the punitive instruction. I will include Defendant Guevara's financial condition.

We get to the defendants' additional instructions.

MR. KIVETZ: Your Honor --

THE COURT: Yes.

1923

MR. KIVETZ: Apologize. I just noticed something for instruction No. 27. This goes along the lines of using "defendants" as opposed to just "Defendant Reynaldo Guevara."

In the third line of the second paragraph, it says, "Whether the defendants altered or concealed evidence," as opposed to just Defendant Reynaldo Guevara.

THE COURT: I see. And that should be Defendant Guevara alone, right?

MR. KIVETZ: Correct, your Honor.

THE COURT: All right. Proposed addition 1, certificate of innocence, if some version of this is given over the plaintiff's objection, it will be added to the certificate of innocence instruction. I understand the parties' positions on it.

I've already ruled on addition 2, the Gilbert instruction.

Defendants' proposal 3, the plaintiffs point to *Beaman* and the Illinois Supreme Court decision in *Beaman*, and I read it the same as the plaintiffs.

So, *Beaman*, at paragraph 44, from the Illinois Supreme Court, that's 2019 IL 122654, says, "Liability thus depends on whether the defendant was actively instrumental in causing the prosecution, and the presumption of prosecutorial independence can be overcome by showing that the defendant improperly exerted pressure on the prosecutor, knowingly provided

1924

misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct instrumental in the initiation of the prosecution."

Then in paragraph 47, the Illinois Supreme Court writes that, "The Appellate Court standard failed to consider whether the defendants proximately caused the commencement or continuance of the criminal proceeding against Beaman. The Appellate Court focused its inquiry on whether the officers pressured or exerted influence on the prosecutor's decision or made known misstatements on which the prosecutor relied. On remand, the Appellate Court must examine whether the defendants' conduct or actions proximately caused the commencement or continuance of the original criminal proceeding by determining whether defendants played a significant role in Beaman's prosecution."

My read of the defendants' proposed instruction is that it overemphasizes the prosecutor's -- the presumption that prosecutors exercise independent judgment; and I'm just not quite sure how it fits, based on the facts of the case, the proposed instruction. We have Guevara arresting Rios, presenting him to Mason and Riley, and providing additional evidence concerning the -- the murder of Luis Morales.

And so defendants, why is this instruction necessary, given the facts of this case?

MR. SCAHILL: Well, all that evidence that your Honor

just referred to is disputed evidence specifically by both Riley and by Mason. So, I actually think that the Supreme Court's discussion of this issue, perhaps striking the first sentence of our proposed instruction, is precisely what the Supreme Court said should be applied with commencing/continuing.

There is a dispute about the role that Guevara played here. And so when we're talking about causation, I think we still need to include what that means by including the terms that your Honor just read from the Supreme Court, which would include improperly exerting pressure on prosecutors, knowingly providing misinformation, concealing exculpatory evidence, so on and so forth, or otherwise engaging in wrongful or bad faith conduct.

I think that's -- if we take out that first sentence, it keeps it in there, and it defines what that means because there's two sides to that story that's supported by the record.

THE COURT: Okay. Response?

MR. S. RICHARDS: I think we're coming -- we might be coming close to an agreement. I think the -- I interpret the *Beaman* Supreme Court in the same way, that it eliminated a presumption of prosecutorial judgment.

So, just off the cuff, if you modified the sentence -- the second sentence to say, "In order to establish that a defendant has caused the commencement or continuation of a

1926

criminal proceeding" -- I'd put it this way, "In considering whether a defendant has caused the commencement or continuation of a criminal proceeding, you may consider whether the defendant improperly exerted pressure on prosecutors, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct instrumental in the initiation of the prosecution."

So, we have no problem with these factors or examples being cited, if you take away the presumption of prosecutorial independence.

THE COURT: In the sense of the first sentence, but not the concept itself, correct?

MR. S. RICHARDS: Yeah. In other words, I think the first sentence comes out, and then the second sentence is just, "These are the factors you consider in terms of whether a defendant has commenced or continued a criminal proceeding."

I think what *Beaman* says is basically, you know, there's many people who can commence it or continue it. The prosecutor is one of these people. Obviously, the prosecutor's really important, and, you know, you need -- something has to flow to the prosecutor because he makes the ultimate charging decision.

But there's no presumption that the prosecutor is independent. He either was influenced or misled by somebody else or he wasn't or she wasn't.

THE COURT: Well, there's a presumption that can be overcome by showing these things. I think the defendants want the concept of an intervening cause, that is, prosecutor's discretion, and you want the different ways in which that discretion is rendered meaningless through the conduct of the police officer.

I'm perhaps oversimplifying, perhaps clumsily saying it. But what I will do is I will give some part of this as part of the malicious prosecution instruction, likely lifting the language from paragraph 44 of *Beaman*, the Illinois Supreme Court case.

Defendants' proposed instruction 4.

MR. SCAHILL: That might be baked in, too. It seems a little perhaps redundant now that I read it again.

THE COURT: Okay. My question was going to be how does it fit, but I agree -- but I just articulated how it fit when I talked about the intentions or my perceived intentions of the parties in wanting instructions around this.

And I do think that just the *Beaman* instruction will give you what you'd want with respect to being able to articulate and explain -- or gives each side the ability to argue proximate cause without explicitly saying to the jury proximate cause.

Okay. I did not think that the -- like, you cite *Blackmon*. *Blackmon*, in my view, was different because the act

itself was not a constitutional violation, the suggestive lineup. And so the simplified reasoning in that case is you can't make it a constitutional violation just because the prosecutors introduced it at trial, meaning you can't let it roll backwards towards the police officer.

But to the extent that the *Beaman* instruction captures it, I think the issue will be moot.

All right. The murder instruction, I didn't see a response targeted towards defendants' proposed instruction 5.

MR. S. RICHARDS: I'm sorry. I thought I made clear, maybe I -- and maybe I did not, that if the instruction on guilt/innocence and the proper consideration of it were given, I didn't have any problem with this instruction.

So, I think it goes both to malicious prosecution, and I think it also goes to the general issue of what guilt or innocence means in this case.

THE COURT: Okay. I agree in the sense that the facts in the underlying -- of the underlying criminal case came in in two ways. One, there's evidence -- or there was evidence offered -- was it the gentleman sitting on the curb -- not here, I'm thinking back to the evidence as it came in. Someone was sitting like on the stoop of a bar.

MR. KIVETZ: Huertas.

THE COURT: And said -- identified Rios as the shooter, but there's forensic evidence that it was a different

1929

caliber gun and testimonial evidence -- or that it was a .25-caliber gun, and testimonial evidence that Rios had a revolver with a larger caliber -- or access to.

So, I think that the different -- or the full scope of a murder charge under Illinois law is appropriate, so I will give that instruction.

Defendants' proposed 6 is on testimonial immunity. I'm not sure it's necessary at this point. I will give it if needed, but my understanding of the evidence is all of the misconduct occurred before trial -- all of the alleged misconduct in the case occurred before trial.

Do the plaintiffs disagree?

MR. S. RICHARDS: No.

THE COURT: And so, if that's the case, I'm not sure that the testimonial immunity instruction is necessary.

MR. POLICK: Judge, if it does become necessary, Halvorsen should be stricken from the first sentence.

THE COURT: Right. I agree with that. And when I say if needed, you never know what someone's going to say in closing. If it comes up, then I would give it.

MR. SCAHILL: Right. And I was just going to say, if there was a suggestion in closing, "They maliciously prosecuted him or fabricated him, and we know that because you heard their testimony and they lied" --

THE COURT: Right.

1930

MR. SCAHILL: -- that would be a problem.

THE COURT: So, that's my thought on the "if needed."

And then personal involvement, I addressed, I think, some of this yesterday. Mr. Richards pointed out that there are conspiracy claims. I will allow an instruction on the conspiracy claims, and so I -- my sense is that I need to meld -- or not meld, they might be two separate instructions, but I do need to provide the personal involvement instruction, and I will.

But I have to decide how that plays with the conspiracy instruction. And the conspiracy instruction that I would give would just be that the plaintiff must show that the individuals reached an agreement to deprive him of his constitutional rights, and the defendants took steps in furtherance to actually deprive him of those rights.

MR. SCAHILL: Is the Court going to -- we may need to -- I'm not sure if we're going to lodge an objection; but if it's going to be verbatim that, if we have one, we'll discuss amongst ourselves, if we need to file something just to preserve that -- I'm not sure if we will have an objection, but that may be --

THE COURT: That's fine. That's *Holloway versus City of Milwaukee*, 43 F.4th 760 at 769, Seventh Circuit 2022, as modified. I didn't say "overt acts" because term of art, but --

MR. SCAHILL: It seems to encapsulate most of that. I just don't want to -- we have our appellate department to deal with, and if we have to proffer a substitute instruction, then we'll do that.

THE COURT: I understand. Speaking of that, I will try to get the modified versions to you today. If not, I will -- I don't think I've had to email them to you yet, but I will get the revised set following this final instructions conference out to you for a couple of reasons: One, so you can make your record; and two, so that you can prepare them for closing -- or use them in your closings next week.

So, whether today or over the weekend -- if it's today, it will be entered on the docket. If it's over the weekend, I'll just email lead counsel. The email is not -- it's for transmission purpose. It's a transmittal email only. I'm not inviting discussion or responses. I just want to get you the information in a timely manner.

MR. POLICK: Judge, on that last one, again, Halvorsen should be stricken from the personal involvement one.

THE COURT: Right. I will control-F for Halvorsen --

MR. POLICK: Thank you.

THE COURT: -- in the Word document before it's sent out, probably also control-F for "defendants," just to make sure it's the appropriate use.

MR. ENGQUIST: Your Honor, on that note, I'm assuming

1932

you're going to instruct the jury on something that happened, why Ms. Halvorsen's no longer here?

THE COURT: Do the plaintiffs want that?

MR. S. RICHARDS: No, your Honor. I think -- no, we don't.

THE COURT: I'm not going to highlight it for them. You'll have your arguments to explain what the issues are. They will have their verdict form identifying who's here and who's not here. I see no reason to highlight the fact that I made a ruling.

MR. ENGQUIST: Okay. We can take care of it in arguments.

THE COURT: I'm sorry?

MR. ENGQUIST: We can take care of it in arguments. That's fine.

THE COURT: Well, what arguments do you have about Halvorsen if he's not here?

MR. ENGQUIST: I'm not even sure what I would say; but I have to say something about the fact that we introduced her and she was here for two weeks, so I have to say something.

MR. S. RICHARDS: Your Honor, if you did say anything, I think it should be along the lines of, "Defendant Halvorsen is no longer a party in this case. You are not to consider that for any purpose."

MR. POLICK: Judge, if I'm not mistaken, I think

1933

there's a pattern that covers it that's rather innocuous.  It might be in the 2.0 series, Seventh Circuit pattern.

THE COURT:  Okay.  I've never granted that motion.

MR. POLICK:  Yeah, it's rare.  I've seen it once, and that's where I think it is.  It is innocuous.  It's almost along the lines of what Mr. Richards has proposed.

THE COURT:  All right.  I'll look for the pattern.

MR. POLICK:  I'm sorry I don't have the exact one.

THE COURT:  No, no.  It's -- I'm here with the laptop or computer and can search, so -- and with help, so, Mr. Decesaris points me to 1.26.  It says, "Former party is no longer a defendant in this case.  You should not consider any claims against the former party.  Do not speculate on the reasons.  You should decide this case as to the remaining parties."

So, I will give 1.26.  Any objection to me giving that today?

MR. S. RICHARDS:  No objection from plaintiff.

THE COURT:  Okay.  All right.  We have a few minutes.  I'll give you a break before we call the jury in.  But I want to get a sense of timing because I will like to give the jury an update today.

So, we're in the defendants' case.  What are you thinking?

MR. SCAHILL:  So, today, we -- I think we're going to

1934

start actually with -- Ms. Rogala, of course, can't be here until 11:00, as she indicated before. So, I believe we're going to call Officer Gawrys and hopefully get him done quickly, then resume with Ms. Rogala. If there is time left in the day, we have a number of readings. We believe that is going to be more than enough evidence for the remainder of the day.

And then we have a couple of witnesses on Tuesday. We can either discuss that at the end of the day, depending on how far we get, but the hope is that we can get it done Tuesday, with the evidence.

THE COURT: Okay. Any thoughts on the -- Mr. Scahill's view of the remaining evidence as far as it taking today and Tuesday?

MR. S. RICHARDS: Yeah. I think that's -- that is a fair estimate. In terms of any rebuttal case, I don't have a thought at present. Maybe something will occur to me. But whatever it is is not likely to be lengthy.

THE COURT: Okay. So, I will, at the end of the day, tell the jurors that we're on track to give them the case middle of next week, with the usual qualifiers. Okay.

MR. SCAHILL: Yes.

THE COURT: Sounds good. I'll bring the jury in at 10:00 a.m., unless -- are there any other issues anybody needs me to address?

MR. J. RICHARDS: I have a quick question, your Honor. I think two days ago, you mentioned the chief judge saying something about the day ending early. Is that not happening, and we are going to 4:30 today?

THE COURT: We're going to 3:30. I -- this is just a personal preference. I've said it to -- the email usually comes out like midday, "The mail room's closing at 2:30," or something like that.

But I told the jury that we'd go 10:00 to about 12:15 and then 2:00 to 3:30. And so they've probably made plans, and so I will stick with that.

MR. J. RICHARDS: Yes, your Honor.

THE COURT: All right?

MR. SCAHILL: Thank you, Judge.

MR. ENGQUIST: Thank you.

(Recess from 9:44 a.m. to 10:00 a.m.)

(Change of reporters.)

Gawrys - direct

1936

(Jury in at 10:00 a.m.)

THE COURT:  Good morning.  Take your seats.  Welcome back.

Does anyone have anything to report to me this morning?

(No response.)

THE COURT:  No.

Just to reorient you, we are in the defendants' case. There was a witness on the stand yesterday afternoon when we broke.  She's not available at this time, so we're going to call -- or defendants are going to call a different witness to testify.

Who is your next witness?

MR. ENGQUIST:  Stephen Gawrys.

(Witness sworn.)

THE COURT:  Counsel, you may proceed once the witness is settled.

MR. ENGQUIST:  Thank you.

STEPHEN GAWRYS, DEFENDANTS' WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ENGQUIST:

Q.  Could you please state your name and spell your last name for the record.

A.  First name Stephen, S-t-e-p-h-e-n.  Last name is Gawrys, G-a-w-r-y-s.

Q.   Mr. Gawrys, are you currently employed?

A.   No.  I'm retired.

Q.   Okay.  Now, before you retired, just to make it clear, you were a Chicago police officer, correct?

A.   Yes, I was.

Q.   And when did you start with the Chicago Police Department?

A.   It was in 1977.

Q.   And when did you retire?

A.   2008.

Q.   And since 2008, have you been retired?

A.   No.

Q.   Fully retired?

A.   No.

Q.   What did you do after you retired from the Chicago Police Department?

A.   I got a job through George Mason University as an adjunct professor to do -- create a gang unit in Trinidad and Tobago.

Q.   And how long did you do that for, sir?

A.   Well, I did it for nine months, and then when the contract ran out, that government wanted to keep me on for another year-and-a-half.

Q.   Did you have any other post-retirement employment other than that?

A.   Yeah.  I came back from that job in 2010, and then I got a job at the Assessor's Office -- Cook County Assessor's Office

in 2014, January.

Q.   And what was that job, sir?

A.   That was job chief investigations for tax fraud and exemption fraud.

Q.   Okay.  And how long did you do that?

A.   12 years.

Q.   But now you're fully retired?

A.   Almost 12.

        Yeah.

Q.   Can you give us a thumbnail sketch of your work with the Chicago Police Department?

A.   Well, I started out obviously in the academy, and then I went to the 2nd District, 51st and Wentworth, and then worked there for a while.  Went to special operations group in Area 1, was in the same building and was promoted to gang crime specialist somewhere around '84 -- '85, '86.  I'm not sure.

        And, then, promoted to detective in 1990.  And promoted to sergeant in 1996.  I worked there for a while. And, then, I went back to the academy as a sergeant back around 1997, '98.  Worked there for six years, seven years.  And, then, the last couple years, I finished up in Internal Affairs.

Q.   Okay.  Just focusing on your time as a gang crime specialist, what years were those roughly?

A.   Pardon me?

Q.   What years were those that you were a gang crime

Gawrys - direct

1939

specialist?

A.   It was like '85, '86 to, well, obviously '90.

Q.   Okay.  Can you describe what does it mean to be a gang crime specialist?  How are they different than other police officers?

A.   Well, you're -- police officers are in patrol.  We are in patrol, too.  And what we do is we're assigned gangs to monitor.  So, gang crime specialists are given -- I think most of us got two gangs to monitor.  Meaning by monitor is that you want to look at -- gather information on these gangs.

So, all -- basically the gangs are covered -- well, we were in Gang Crimes North.  So, you find out who the leaders are, the different sections, and where they live, who's in prison, who's out of prison, who's the section leaders, things like that.  Girlfriends, kids, cars, where they live.  And, then, we make a report every six months.  You're required to write up a report and send it through channels.

Q.   Do you remember what gangs you were assigned?

A.   Yeah.  I had the Latin Kings at 11th and Schiller and the Insane Unknowns at Armitage and Damen, I believe.

Q.   Okay.  Now, besides just gathering -- well, let me about go back to the gathering information.  Does that include talking to people on the street?

A.   Oh, yeah.  I mean, that's a big part of the job is to talk, is get out and actually do some community policing.  So, you're

Gawrys - direct

1940

talking to -- you're talking to the gang members. You stop, you talk to them, see what's going on to keep a handle on everything, see what's happening. You talk to business owners. You talk to citizens. This is just part of the routine.

Q. Okay. Now, besides gathering information and having that, would you also be involved -- would you actually find out about gang crimes and investigate any gang crimes?

A. Yes.

Q. And how would that come about?

A. Well, we would get notified -- the office would -- if there was something happening on the street, there was a shooting or something like that. Then they would assign gang specialists to go investigate, find out what's going on, gather up their reports, bring the reports back to the Gang Crimes North office.

Q. And what kind of reports would you get initially after a crime?

A. Well, you'd usually get just the opening general offense case report on there from the patrol car that was assigned the initial investigation.

Q. Okay. Now, as a gang crimes officer, when you said you were in patrol, would that mean you would be wearing a blue uniform when you were out?

A. No. We hardly ever wore uniforms. 99 percent of the time you were blue jeans and just shirts and vest and -- but hardly

a uniform.

Q. Would you ever be going out as gang crimes officer wearing a suit and tie?

A. No, never do that, no.

Q. Okay. Now, as part of your job in gang crimes, would you be assisting other units within the police department?

A. Oh, yeah, that was -- that's a big job, too. Because you're depended upon to -- which your information that you're gathering is to assist other units, other -- the detective division mainly and maybe other district tact teams.

So, they would call or -- call you or ask you about, do you know this, do you know that, did you hear this, what did you hear? So, you'd always be in communication with different groups. Mainly the detective division, you're just assisting them.

Q. And if you were out on the street and you developed information about a crime involving a gang, how -- would you pass that information along?

A. Oh, yes. Yes.

Q. Focusing your attention back to late June, beginning of July of 1989, and this case, I know, the Luis Morales murder, do you remember how you first became involved in the case?

A. Well, we were -- we were -- give the case by a sergeant. Gave us the assignment, Sergeant Stasica, to investigate this case. So, we had a couple reports, and we started doing it.

Q. When you said you were assigned this case, was this incident among other cases that you guys were given information on?

A. Pardon me? I don't understand.

Q. Was this the sole case you were given information on to go investigate by the sergeant, or was your team given information about other cases in the area?

A. Oh, we had other cases going, yes. But this one had been started, and then it fell through with the lineup. So, he gave us the case and said, you know, start looking at this with the team.

Q. Okay. And when you say a team, how many people were in your team?

A. Well, it's -- I don't know if you could call it a team, but it's a group of guys and we just work together as in tandem to gather information off the street as we can.

Q. Okay. Did you have a regular partner when you were a gang crime specialist?

A. Yes, there was.

Q. Who was that?

A. Rey Guevara.

Q. Now, when you were saying you were going out to try to find information about this murder, how would you go about doing that?

A. Well, you'd go on the street and see what -- you'd start

Gawrys - direct

talking to people and see if anybody says anything, talks to you. And then pass -- whatever information you get, you pass it on to the detective division.

Q. And did that happen in this case? Were you able to get any information from the street?

A. Yes.

Q. Okay. And how did that come about?

A. Well, it came from two CIs that gave us information. They were independent. So, we passed that information along to the detective division.

Q. Okay. Now, do you recall today who the CIs were?

A. No, I don't.

Q. Okay. I would assume you probably don't keep documents from back in 1989, your work as a gang crime specialist?

A. No, I don't. No.

Q. Okay. And do you specifically recall how you passed this information along about the CIs to the gang -- to the detectives at Area 5?

A. Usually we'd go to see them, or maybe in this case -- I don't remember -- bringing the CIs in. But we would talk -- go visit with the detectives that was assigned to the case and just relay the information we received.

Q. Okay. Is it unusual for you to bring CIs directly into the area to talk to a detective?

A. Do we?

Gawrys - direct

1944

Q.   Is it unusual for you to do that?

A.   No, I don't think so.  I mean, because you want the -- the reason is to have the detectives -- they have a better handling of what's going on with the case.  So, there may be things they know that we don't know.  So, we just give it to them and let them work on it and go from there.

Q.   Okay.  After passing that information along, did you and your partner then go -- did you go do anything else after passing the information along about the CIs?

A.   Well, whatever information we had, we went out and started looking for the subject.

Q.   Okay.  Now, when you went out looking for the subject, do you remember whether or not you looked for the subject by yourself, like just you and your partner, or were you with that group of officers from Gang Crimes North?

A.   No, I was with Rey Guevara, and then there were other officers involved, too.

Q.   And why would there be more officers involved than just you and Rey Guevara looking for Mr. Rios?

A.   Well, you're covering more area with more officers that are looking.  You know, if it's just the two of us, then it's just -- we're not covering an area.

Q.   Now, at that time when you were out looking for Mr. Rios, were you going out to arrest him?

A.   No.  No.

Q. Why not?

A. Well, we didn't have everything we needed to arrest him. But we would go and talk to him if we could find him.

Q. Okay. And were you able to find him?

A. Yeah, we did find him.

Q. And do you remember when that was?

A. It was on the 6th of July, 1989, at 1440 North on Leavitt.

Q. And do you remember what time of day it was?

A. It was in the evening, 9:30, 10:00 o'clock.

Q. And you were with your partner, Rey Guevara, at the time?

A. Yes.

Q. And do you recall how that came about when you saw Mr. Rios that night?

A. Just spotted him on the street, and then we started to talk to him. I asked him that we're doing an investigation and if he would like to accompany us into Area 5 to continue this investigation.

Q. And from your memory, did he agree to that?

A. Yeah. He voluntarily came in.

Q. Okay. Did you handcuff him?

A. No. No.

Q. Did you place him under arrest at that time?

A. No.

Q. Why not?

A. He wasn't going to be arrested yet. We just wanted to talk

to him -- well, give him to the detectives to talk to, pass it on.

Q.   Did you pat him down before getting into the car?

A.   Oh, yeah.

Q.   Why?

A.   Pat everybody down when they get in the car.  They're sitting behind us, so I don't want to have that safety issue.

Q.   Now, who transported Mr. Rios back to Area 5?

A.   Guevara and myself.

Q.   Okay.  When you were on the scene talking to Mr. Rios, were the other gang crimes officers present?

A.   Yes.

Q.   Were they involved in transporting him back?

A.   No.

Q.   Okay.  So, you transport Mr. Rios to Area 5.  What happens next?

A.   Well, we brought him upstairs, placed him in a room, and notified Detectives Mason and Halvorsen that we had Jaime Rios in here.  So, they -- we said -- they said, okay.  So, they're going to start the process of talking to him.  And we left.

Q.   Where would you go?

A.   Well, we probably went to see -- I don't remember exactly what we did.  But probably looked for witnesses that were on the reports to bring them in so that we can start helping with the lineups.

Gawrys - direct

1947

Q. Now, during the time when you first saw Mr. Rios on the street and asked him to come with you up until the time you brought him to Detective Mason, did you ever interview Mr. Rios about the incident?

A. No.

Q. Did your partner ever interview him?

A. No.

Q. Was there any questioning going on at all?

A. No, none at all.

Q. Okay. After you -- after Mr. Rios went into the interview room, did you go into the interview room?

A. No, we did not.

Q. Did your partner go into the interview room?

A. No.

Q. All right. So, you left off with you were, you think, possibly looking for witnesses?

A. Yes.

Q. At some point that night, were you made aware that something had occurred in the case, in the investigation?

A. Yes. We were notified by detectives that he had implicated himself in this incident. So, we went back into the office, detective division, and I started a arrest report.

Q. Okay.

        MR. ENGQUIST: If I can have the document camera, your Honor.

Gawrys - direct

1948

THE COURT: Okay.

MR. ENGQUIST: This is Defendants' 50 I, which is already in evidence.

MR. SCAHILL: Our screens aren't on, Judge.

THE COURT: Is that 50 I or 52 I?

MR. ENGQUIST: I believe 50 I.

THE COURT: When was it admitted?

MR. ENGQUIST: It was admitted --

MR. POLICK: Mason's cross.

MR. SCAHILL: When the plaintiff admitted it.

MS. GOLDEN: February 6th.

THE COURT: What's the date of the document?

MR. ENGQUIST: It is -- I'm sorry, I'm losing my spot here. July 7th of 1989.

THE COURT: Any objection to 50 I?

MR. S. RICHARDS: No objection.

THE COURT: All right. It can be published. To the extent it hasn't already been admitted, it's admitted.

MR. ENGQUIST: Thank you, your Honor.

BY MR. ENGQUIST:

Q. Mr. Gawrys, if you can take a look at the document that's on the screen. It should be right in front of you.

A. Yeah, here it is. Okay.

Q. You were speaking about the arrest report you drafted. Is that the arrest report you drafted, sir?

Gawrys - direct

1949

A.   Yes.

Q.   And you did the typing?

A.   Yes, I did.

Q.   Is that your signature there?

A.   It is.

Q.   Okay.  Now, if you can, can you read the narrative for the basis for the arrest.

A.   Arrestee has given a statement to the State's Attorney's Office that on 27 June '89, he in company with the second offender went to 1316 North Western Avenue and shot to death one Luis Morales.  The arrestee stated that he was armed with a .38-caliber revolver, which he fired.

Q.   Now, sir, were you present when he gave that statement?

A.   No.  No.

Q.   Were you present when the state's attorney talked to him and he gave a statement to the state's attorney --

A.   No.

Q.   -- to that effect?

     So, where did you get this information from?

A.   From the detectives.

Q.   Okay.  And you relied upon that information to be able to fill out the arrest report?

A.   Yes.

Q.   Now, on the arrest report, there are listed both you, Gang Crime Specialist Guevara, Gang Crime Specialist Vukonich,

Gawrys - direct

1950

Zacharies, Guzman, Longos, and also Detectives Halvorsen and Mason, correct?

A.   Correct.

Q.   Were you present when he was actually placed into custody?

A.   Well, it was in the building.  He was right there in a room, so he was --

Q.   And was Vukonich, Zacharies, Guzman, and Longos present during that time?

A.   You know, I don't know.  I don't remember.

Q.   Why do you have all the other gang crime specialists listed on the arrest report, sir?

A.   Well, it's a matter of getting some type of credit in the office that they helped on the investigation and to show that they were with us on the scene.

Q.   Is that a way for -- get information so when a state's attorney or criminal defense attorney is looking at it, they know the people that were present?

A.   Yes.

        MR. ENGQUIST:  Thank you, your Honor.  That's all I have for that one.

BY MR. ENGQUIST:

Q.   Now, what is the purpose for an arrest report?

A.   Well, it's for charging purposes, part of the paperwork that's used.

Q.   Can a person go down to lockup without an arrest report?

A.   No.

Q.   Okay.   Now, was any determination made when you were talking to the detectives about what the next steps were going to be?

A.   Well, I don't remember, but it -- normally, it's to run a lineup.  And you have to find the witnesses to bring them in and then get the fillers for the lineup to conduct a lineup.

Q.   Okay.  Now, were lineups run that night right after his arrest?

A.   No.   It was held over till the 7th.

Q.   Okay.

A.   Later that evening.

Q.   When you say "held over," what do you mean by that?

A.   Well, there's hold papers placed on the subject, and they'll go down to the lockup, but it'll be signed off by the watch commander down in the 25th District is where this area is.   So, then he gets placed in the lockup and held.  He would be held is that he's not going to go for the court call, and that he's being held because detective division is going to run lineups later on that day.

Q.   Okay.  Now, did you and your partner assist at all in the lineups?

A.   I think we -- I believe that we helped him with finding fillers, maybe picking up witnesses.  I'm not sure.

Q.   As a gang crime specialist, would you ever go and run the

Gawrys - direct

1952

lineups?

A. No, never. It's not our responsibility.

Q. Okay. And when you say "finding fillers," how would you assist by finding fillers?

A. Well, we'd help the detectives to find the bodies necessary for a physical lineup by either checking, in this case, the 25th District or you call the other districts around, 14th District and -- or other if you can't find -- to see if you can find comparables.

Q. When you say "comparables," what do you mean?

A. Well, in size and race and that to the offender.

Q. Okay. And if you can't find fillers for a lineup -- for in-person lineup -- you know, that are in lockup, where would you find them then?

A. Well, then we'd look for volunteers on the street.

Q. Okay. How would that go about?

A. Well, you'd ask guys to come in that -- you find some that look like they fit that are standing on corners and that. And we found four of them.

Q. Okay. Now, you also talked about bringing witnesses in --

A. Correct.

Q. -- to view the lineup? Okay.

And how --

THE REPORTER: I didn't hear that.

MR. ENGQUIST: I'm sorry.

BY MR. ENGQUIST:

Q. And you also talked about bringing witnesses in to view the lineup?

A. Yes.

Q. And how would you do that? What would your job -- for assisting in a lineup, how would that come about?

A. Well, to assist in a lineup, you'd go -- you're almost like a taxi service. You'd bring the -- contact the witnesses or go to their house, find them, and then bring them into the area to hand them over basically to the detectives so that they can run their lineups.

Q. As you sit here today, do you recall whether or not you assisted by either finding fillers and/or getting witnesses?

A. No.

Q. Okay. Now, when you were assisting in this lineup, you would have been working with your partner, Rey Guevara, correct?

A. Correct.

Q. And if Rey Guevara had transported a witness in, you would have been with him when you were transporting him?

A. That's correct.

Q. Now, when you're transporting a witness in because they're coming in for a detective who's running a lineup, would you interview that witness?

A. No. No.

Q. Why not?

A. It's not the time to do it.

Q. Would you show them photographs?

A. No, never. Never.

Q. Did that happen in this case?

A. No.

MR. S. RICHARDS: Objection.

THE COURT: Basis?

MR. S. RICHARDS: Assumes facts in evidence. He said he has no present memory of transporting witnesses.

THE COURT: It's overruled.

BY MR. ENGQUIST:

Q. Now, sir, you drafted one other additional report, is that correct, in this case?

A. Doing what?

Q. You drafted one other additional report --

A. Yes.

Q. -- related to this case?

A. Yes.

Q. What was that report, sir?

A. It's a supplementary report.

MR. ENGQUIST: Your Honor, if I can have the document camera again. Defendants' 50 G, which I believe is also in evidence already.

THE COURT: Okay. It may be published.

MR. ENGQUIST: Thank you.

BY MR. ENGQUIST:

Q. Sir, if you can take a look at the screen. Is this the other report you generated, sir?

A. Yes, I did.

Q. Okay. Now, in this report, you indicate, you put down all the different gang crime specialists in that group: you, Guevara, Vukonich, Zacharies. You also put down the detectives: Mason and Halvorsen. You have your Sergeant Stasica there, as well; is that correct?

A. Correct.

Q. And you have, was it Longos and Guzman?

A. Right.

Q. And if I have it correct, when you were at 1440 North Leavitt and you located Mr. Rios and asked him to come in, from this report, are you saying that Vukonich, Zacharies, and Stasica, Longos, and Guzman were all present on the scene?

A. Yes.

Q. However, they did not transport him in, correct?

A. No.

Q. Did you conduct a search when you were there?

A. A search of what? Of --

Q. His home?

A. Oh, no. No.

Q. Besides patting him down, did you do any other searches

Gawrys - direct

1956

there?

A.   No.

Q.   If we can go to the narrative you have here.  Is this a summary of your involvement in this case, yours and your partner, Detective Guevara's?

A.   Yeah, it's just a quick summary of what we did over the day.  More detailed is in the detective's sup.

Q.   Okay.  And what is the purpose of this report?  Why draft this report, if you know or if you remember?

A.   It's just to show that -- what our part was that we did with the sergeant and then a breakdown of the events.

Q.   Okay.  If you can, can you read the typewritten part that's there, or do you need me to focus in more?

A.   Which one?

Q.   The narrative.

A.   Oh, the whole thing?

Q.   Yeah, if you can.

A.   Okay.  RIs were assigned by Sergeant Stasica of Unit 760 to the investigation of the murder of Luis Morales, also known as New York.  This incident occurred 27 June '89 at 2350 hours at 1316 North Western.  RIs developed information from two separate reliable informants that the subject that killed New York was Jaime.  Jaime Rios of 1440 North Leavitt.

RIs were able to locate the subject on the street in front of 1440 Leavitt.  RIs at this time related to the subject

Gawrys - direct

1957

that he was under investigation for the aforementioned incident. At this time, the subject related that he would voluntarily accompany the RIs into Area 5 Violent Crimes. Once at Area 5 Violent Crimes, Detective Mason and Detective Halvorsen were appraised of the facts in this case thus far, and the investigation was turned over to these -- to said detectives.

RIs learned from aforementioned detectives that the subject, Jaime Rios, made a statement as to his involvement in this incident. The aforementioned detectives along with gang specialists conducted a lineup and aforementioned subject, Jaime.

Q. The next page.

A. Rios was positively identified as the subject who shot and killed New York Luis Morales. ASA Owen was appraised of the facts in this case and did approve charges of first degree murder against Jaime Rios.

Q. Thank you.

I just want to focus your attention on the last part of your narrative on the first page. It talks about the aforementioned detectives along with gang crime specialists conducted a lineup.

To be clear, did you actually conduct the lineup with the witness --

A. No.

Q.   -- in the Area?

A.   We just assisted in conducting it.

Q.   Now, I know as part -- before you came in today, you were able to review other police reports in this case to try to familiarize yourself for something that happened back in 1989?

A.   Yes.

Q.   Did you have any other involvement in this case after the lineup and this report was drafted on July 7th, 1989?

A.   No, none.

Q.   And you continued to work with Detective Guevara, correct?

A.   Correct.

Q.   He was your partner for the days afterwards?

A.   Yes.

Q.   Okay.  Did any gang crime specialist have any involvement in this case as far as you know after July 7th?

A.   Oh, I don't know.  I thought maybe for Tino was a second subject and Aubrey O'Quinn maybe, Gang Crime Specialist O'Quinn.  But I didn't really follow that.

Q.   And was -- based on what you read and based on your memory, did you or your partner, Gang Crime Specialist Guevara, have any involvement after the 7th?

A.   No.  No.

        MR. ENGQUIST:  One second, your Honor.

     (Counsel conferring.)

        MR. ENGQUIST:  I'll tender the witness, your Honor.

Gawrys - cross

1959

THE COURT:  Okay.  Mr. Scahill.

MR. SCAHILL:  Thank you.

CROSS- EXAMINATION

BY MR. SCAHILL:

Q.   Good morning, Mr. Gawrys.  How are you?

A.   Good morning.

Q.   Just a couple of brief questions.  First of all, I represent your former partner, Mr. Guevara.

The Gang Crimes North office was not at Area 5 back in 1989, was it?

A.   No, it was not.  It was at Belmont and Western.

Q.   That's miles away from Area 5?

A.   Oh, yeah.

Q.   Right?

A.   Yeah, correct.

Q.   Okay.  And that's sort of where you guys operated out of?

A.   That's where our office was.

Q.   All right.  But you would do sort of various gang-related tasks for other units of the Chicago Police Department as they focused on sort of the gang context.  Is that a fair characterization of what you guys would do?

A.   Yes.  It was our responsibility.

Q.   And one of your job duties, of course, was not to do suspect interviews in homicide investigations, was it?

A.   No, not normally.

Q.   Right.   That was the job of the detectives to do that when they were working up a case?

A.   Correct.

Q.   Right.   And directing your attention to July 6th and 7th of 1989, obviously Mr. Guevara was your partner during those shifts, right?

A.   Right.

Q.   And when you're out on the street doing your job as a gang crimes officer, you are pretty much always with your partner?

A.   Correct.

Q.   And that's, among other things, a safety issue, right?

A.   Correct.

Q.   Particularly when you're dealing almost exclusively with violent gangs and the like, right?

A.   Yes.

Q.   So, it would not be a situation where you are going out onto the street to look for witnesses related to a gang investigation while your partner is just kind of hanging out in the area while you're out on the street; is that fair?

A.   That's fair.

Q.   So, wherever you are during that shift, Guevara is with you --

A.   Yes.

Q.   -- right?

          MR. SCAHILL:  Can I have the document camera, please,

Judge?

THE COURT: It's up.

MR. SCAHILL: Thank you.

BY MR. SCAHILL:

Q. With respect to this supplementary report, this is drafted by you, right?

A. Correct.

Q. So, you actually typed this out on a typewriter?

A. Yeah. Old-time typewriter.

THE COURT: Mr. Scahill, can you adjust the zoom.

THE WITNESS: Yeah, it's a little out of focus.

MR. SCAHILL: I'm sorry.

THE COURT: What's the exhibit number?

THE WITNESS: That's good.

MR. SCAHILL: 50 G.

THE COURT: Thank you.

MR. SCAHILL: Thank you.

BY MR. SCAHILL:

Q. And this report is dated, as you see here, July 7th of 1989, correct?

A. Correct.

Q. So, that's actually when you typed it out and submitted it, right?

A. Correct.

Q. So, this is a contemporaneous account of what both you and

Gawrys - cross

1962

Mr. Guevara did on that day --

A.   Yes.

Q.   -- right?  Okay.

And the way that -- I'm not going to read the report in detail again, but the way that this is written accurately states that you are given information from the detectives about the statement of Mr. Rios, right?

A.   Correct.

Q.   In other words, they told you what happened, not that you or your partner were involved in that interview of Mr. Rios, correct?

A.   No.  They told us.

Q.   Right.  So, you can safely say even though it's been almost 40 years later, Mr. Guevara is not in any interview room interviewing Mr. Rios on July 6th or July 7th --

A.   Correct.

Q.   -- isn't that true?  Correct?

A.   Correct.

MR. SCAHILL:  That's all I have.  Thank you, Judge.

THE COURT:  Mr. Richards.

CROSS- EXAMINATION

BY MR. S. RICHARDS:

Q.   Let me sort of go to one of the last points first.  You were with -- Rey Guevara was your partner, correct?

A.   Correct.

Q. So, whenever he was acting as a police officer, you would be with him, correct?

A. Yes.

Q. And whenever you were acting as a police officer, you would be with Rey Guevara, right?

A. Yes.

Q. Now, you're saying that you -- was it you and Rey Guevara who spoke to the confidential informants before July 6th or just him or just you?

A. No, I think -- I don't remember really.

Q. Okay.

A. If it was both of us.

Q. Well, was that the only conversation -- were the only conversations you and Rey Guevara had with the confidential informants conversations which took place before July 6th?

A. A conversation with the CIs?

Q. Yes.

A. I believe so.

Q. Okay. Well, did you or Rey Guevara bring in the confidential informants on another date after the arrest of Mr. Rios to speak to Detective Mason about information about where the guns would be located? Did that ever happen?

A. Not to my knowledge.

Q. And if somebody had brought in those -- if Rey Guevara had brought in those informants to speak to Detective Mason, you

would have been present, right?

A. Yes.

Q. And, to your knowledge, the confidential informants never gave you information about where the guns would be located, did they?

A. No.

Q. Let me go back a little bit to your gang expertise. Obviously, you were a gang expert back then, right?

A. Yes.

Q. In fact, you followed that out in your later career by being a gang expert in Trinidad and Tobago?

A. Tobago.

Q. All right. Great. Thanks.

And you said that you were assigned specifically to two gangs, the Latin Kings and another one, right?

A. Yes.

Q. Now, for the Latin Kings, that meant your job in particular was to go out, talk to Latin Kings, show your presence on the street, and in general interact with them, right?

A. Correct.

Q. So, interact would mean having conversations with them?

A. Yes.

Q. And in terms of your conversations, you would learn about the identities of Latin Kings, right?

A. The what?

Q. Who they were, who was a Latin King?

A. Yes, yes.

Q. You would learn about where the Latin Kings lived?

A. Yes.

Q. You would learn about who was the leaders of the Latin Kings, right?

A. Correct.

Q. You knew that the leader of a particular -- and the Latin Kings were divided in particular sets, right?

A. There were sections of them.

Q. Was the word -- term "set" used to describe section, or is that not appropriate?

A. Set?

Q. Set. Set of Latin Kings.

A. No, I don't --

Q. You don't remember that?

A. No. That doesn't strike me. Usually by sections.

Q. Sections. You called it a section of Latin Kings?

A. Well, there's a Beach and Spaulding section, there's Leavitt and Schiller. There's other ones.

Q. Right. Whether we call it a set or a section, that group of Latin Kings would be -- a have a specific area, right?

A. Correct.

Q. And a specific area where, for example, they controlled drug traffic?

A.   Yes.

Q.   In fact, that was kind of the main business of the gangs was the drug traffic and the money coming from it, right?

A.   Correct.

Q.   Now, the head of any set or section would be called the Inca, right?

A.   The leader?

Q.   The leader.

A.   Yeah.

Q.   The Inca, I-n-c?

A.   Yes.

Q.   Right.  And the deputy leader would be called the Casique, right?

A.   I don't know.  Don't remember that.

Q.   Okay.  So, you said you were familiar with the Leavitt and Schiller section of Latin Kings, right?

A.   Yes.

Q.   The leader of the Leavitt and Schiller section of the Latin Kings was Jose "Macho" Melendez?

A.   I don't remember that.

Q.   Well, do you remember who was the leader of the Leavitt and Schiller set of the Latin Kings?

A.   No, I don't.

Q.   You said -- now, do you remember prior to July 6th if you had knowledge as to whether Jaime Rios was a member of the

Gawrys - cross

1967

Leavitt and Schiller set of the Latin Kings?

A. I'm not sure. Don't remember.

Q. Fair enough. Anything more you wanted to add?

A. What? Pardon me?

Q. You seemed like you wanted to add something. I just wanted to make sure you have your answer --

A. No, I was just thinking. But no.

Q. Well, going back to your confidential informants, do you remember anything about who the confidential informants were?

A. No, I do not.

Q. Can you tell us whether they're male or female?

A. No, I can't.

Q. Can you tell us whether they were -- what race or origin they were, Hispanic, black, white, anything?

A. No. Can't remember.

Q. Can you remember -- well, you do remember that you and Guevara met with them, right?

A. Yes.

Q. Do you remember where you and Rey Guevara met with them?

A. No.

Q. Well, was it in the City of Chicago?

A. Yes. I'm guessing it was, yeah, because that's where we worked.

Q. Okay. And you said you worked the Latin King territory, right?

Gawrys - cross

1968

A. Correct.

Q. That's where you'd be out patrolling, right?

A. Yeah, sometimes.

Q. Okay. Generally speaking, you wouldn't be patrolling Spanish Cobra territory, right?

A. No, we would be.

Q. Okay. Do you remember if -- the confidential informants had given you reliable information in the past; is that true?

A. Yes.

Q. Do you remember what reliable information the informants had given you in the past?

A. No.

Q. You can tell us nothing about the reliable information they had given you?

A. No. I can't remember.

Q. All right. Do you remember whether you met the confidential informants individually or together?

A. I don't remember.

Q. Can you tell us if you met them on the street, in their homes, anything like that?

A. No. I don't remember.

Q. But you do have a specific memory, not a memory based on reviewing records or reports, of the arrest of Jaime Rios, right?

A. Yes.

Gawrys - cross

1969

Q.   Now, one thing that the confidential informants gave you or you knew was Jaime Rios's address, correct?

A.   Yes.

Q.   So, before you encountered him at 1440 North Leavitt, you knew that Jaime Rios's address was 1440 North Leavitt, right?

A.   Yes.

Q.   Now, you and the other members of the gang team went out to look for Jaime Rios on the day he was arrested, right?

A.   Correct.

Q.   Rey Guevara knew Jaime Rios personally, right?

A.   I don't know.  Don't remember that.

Q.   Well, did you know Jaime Rios personally?

A.   I don't know.  I don't think so.

Q.   All right.  Did you -- well, again, you say that you and Detective G- -- sorry, gang specialist at that time, soon to become detective -- were always patrolling the streets together, right?

A.   Correct.

Q.   For safety reasons among others, right?

A.   Correct.

Q.   Can you think of any reason why Rey Guevara would have encountered Mr. Rios on the streets during his duties without you being present?

          MR. SCAHILL:  Objection to form of the question.

          THE COURT:  It's overruled.

BY THE WITNESS:

A.   No.  I don't know.

BY MR. S. RICHARDS:

Q.   Did you know Jaime Rios's mother?

A.   No.

Q.   And you're certain of that?

A.   Yes.

Q.   Do you know any reason why, in terms of patrolling the streets, Rey Guevara would have met Jaime Rios's mother without you being present?

A.   No.

Q.   Do you remember the approximate dates or times when you met the confidential informants?

A.   No, not really.  Probably around 3rd, 4th, or 5th maybe, somewhere in there, of July.

Q.   Okay.  That relates to another issue.  You had said that the assignment to the Luis Morales murder came from Sergeant Stasica, correct?

A.   Correct.

Q.   Was it true that Rey Guevara without receiving assignment from anyone simply went out and decided on his own to investigate the Luis Morales murder?  Is that true?

A.   I have no idea.

Q.   If it happened, it was something you had no knowledge of?

A.   I have no --

Gawrys - cross

1971

THE REPORTER:  I'm sorry?

BY THE WITNESS:

A.  I have no knowledge of it.

BY MR. S. RICHARDS:

Q.  You were asked, I think, on your direct examination whether you would have kept the -- in your normal course, you would have kept the detectives investigating a murder abreast of the things you were doing to help out, right?

A.  Correct.

Q.  Do you have any present memory -- and you're aware, at least from reading the reports or maybe from your memory, that the detective assigned to the case -- or one of them -- was Detective Mason, right?

A.  Yes.

Q.  And another was Detective Brennan?

A.  Detective who?

Q.  I'm sorry, Detective Brennan?  Or am I getting the name wrong?

A.  No, I don't remember that.

Q.  Okay.  At a later point, Detective Halvorsen was assigned, right?

A.  Yes.

Q.  Now, did you have, as you and Detective Guevara were searching the streets looking for Jaime Rios, did you ever communicate your efforts to Detective Mason?

A. No, I don't remember specifically. But just that we would be looking for him.

Q. All right. But, I mean, you're saying that in the normal course, you wouldn't like go off on an investigation like this without checking with or informing the detective investigating of your efforts?

A. Correct.

Q. Okay. So, in terms of your efforts between the time you spoke to the confidential informants and July 6th, do you remember where you went to to find Jaime Rios?

A. No, I do not.

Q. Well, do you remember specifically before July 6th going to the address of 1440 North Leavitt to find Jaime Rios?

A. Before his arrest?

Q. Yes.

A. When would that be? I don't understand.

Q. So, you're saying during the period, as I understand you, July 3rd, 4th, and 5th, you and Detective Guevara are looking for Jaime Rios, right?

A. Correct.

Q. Okay. And you have the address of 1440 North Leavitt, right?

A. Yes.

Q. Before July 6th of 1989, did you and Detective Guevara go to the address of 1440 North Leavitt, which you had for Jaime

Gawrys - cross

1973

Rios, to try and find Jaime Rios?

A.   I don't remember doing it before, no.

Q.   Okay.  So, what you're saying is that during that period of time, you're looking for Jaime Rios, but you're looking for Jaime Rios in places other than his address, fair?

A.   Fair.

Q.   Now, you say that on the day when your team went -- July 6th, when you're looking for Jaime Rios to try and bring him or see if he's going to come in voluntarily, you and Detective Guevara go to the address of 1440 North Leavitt, right?

A.   Yes.

Q.   But the other members go different places, right?

A.   I don't know.  They probably came with us driving around.

Q.   Okay.  So, in other words, you say these other detectives when you're going to 1440 North Leavitt, the other detectives are in their cars and they're going towards 1440 North Leavitt, too, right?

          MR. SCAHILL:  Objection.

BY THE WITNESS:

A.   Well, some of them were there.

          THE COURT:  One second.

          Basis?

          MR. SCAHILL:  I believe he said detectives.

          MR. S. RICHARDS:  I stand corrected.

THE COURT:  The objection is sustained as to form.

It sounds likes you're going to ask the question again.  Feel free.

MR. S. RICHARDS:  Right.

BY MR. S. RICHARDS:

Q.  So, forgive my mistake.  The gang specialists, the ones listed on the arrest report, they were coming with you to go to 1440 North Leavitt, right?

A.  Yes.

Q.  Okay.  And, so, they were present at 1440 North Leavitt in their cars when you asked Jaime Rios to come with you voluntarily, right?

A.  Yes.

Q.  So, that's a total of --

(Counsel conferring.)

BY MR. S. RICHARDS:

Q.  So, you and Guevara, that makes two people, right?

A.  Correct.

Q.  And there were four other gang specialists with you going to 1440 North Leavitt to ask Jaime Rios whether he would come in voluntarily, right?

A.  Yes.  That's where we found him.

Q.  At 1440 North Leavitt, right?

A.  Outside, yes.

Q.  Which was his house, right?

A.   Well, turns out to be, yes.

Q.   Yes, his address, right?

A.   Right.

          MR. S. RICHARDS:  One moment.

     (Counsel conferring.)

BY MR. S. RICHARDS:

Q.   So, in terms of the -- let me ask you another question, which I omitted.  Approximately how many Latin Kings were members of the Schiller-Leavitt section?  Do you remember that?

A.   No, I don't remember.

Q.   Was it like more than 10, less than 10, more than 20?  Do you know?

A.   I have no idea.

Q.   Okay.  And did you -- at that time would you keep notes or memoranda of like who the gang members were, what they were doing, things like that?

A.   Yes.

Q.   Okay.  But, to your knowledge, those notes and memoranda no longer exist, fair?

          MR. SCAHILL:  Objection.

BY THE WITNESS:

A.   I don't think so.

          THE COURT:  One second.

          What's the objection?

          MR. SCAHILL:  Motions.

Gawrys - cross

1976

THE COURT: Okay. It's overruled. The answer stands.

THE WITNESS: Ask again.

BY MR. S. RICHARDS:

Q. Those notes and -- well, for example, you said you would write a memoranda every six months detailing things happening with the gangs, right?

A. Correct.

Q. That was part of your job, right?

A. Yes.

Q. Got it. Okay.

And, to your knowledge, do those six-month memoranda or any notes you had exist at this point?

A. No, not -- maybe with the department because they went up the channel to headquarters.

Q. All right. In terms of the Gang Crimes North, the unit, how many officers were in the unit?

A. Gang Crimes North was divided into tactical officers who were in uniform and then there were the gang crime specialists who were in civilian dress. How many, I have no idea.

Q. All right. Well, do you remember one -- you earlier said that one of the gang crime specialists was Aubrey O'Quinn, right?

A. Yeah, I think I mentioned his name.

Q. What about the name Daniel Noon, was he one of you?

A. Yes.

Gawrys - cross

1977

Q. Okay. And did you know him pretty well?

A. Yeah, we worked together.

Q. And Rey Guevara also worked with Gang Specialist Noon, right?

A. Yes.

MR. S. RICHARDS: One moment.

BY MR. S. RICHARDS:

Q. Oh, and another question. Sorry.

You said you worked with Guevara for two or three years before this, right?

A. I believe so, yes.

Q. Okay. Do you know who Guevara worked with before he worked with you?

A. I believe it was Danny Noon.

Q. Okay.

A. Not sure, but I think it was.

Q. You think Danny Noon was his prior partner?

A. I think so. He was his partner.

THE REPORTER: I didn't hear the last one.

BY THE WITNESS:

A. I believe that Danny Noon was Guevara's partner before me.

(Counsel conferring.)

THE COURT: Counsel.

MR. S. RICHARDS: I'm sorry.

THE COURT: The moments are becoming frequent and

extended.  I remind you to be efficient in the presentation of your evidence.

MR. S. RICHARDS:  Thank you.

Could I have the document camera, please?

BY MR. S. RICHARDS:

Q.  I'm showing you what's been previously marked as Defendants' 50 I.  Do you see that?

A.  Yes.

THE COURT:  It can be published.

MR. S. RICHARDS:  And I'd like to have it published.

BY MR. S. RICHARDS:

Q.  Okay.  In terms of that document that's been shown to you before, first of all, did you type it up at Area 5?

A.  Yes, I did.

Q.  Okay.  And did you sign -- you signed that document, correct?

A.  Yes, I did.

Q.  And Rey Guevara signed that document, correct?

A.  I believe so.

Q.  Well --

A.  I'm not sure if that's his signature or not.  Maybe I signed it for him.  I'm not sure.

Q.  You might have just written Rey Guevara for him above the type -- his --

A.  Right.

Gawrys - cross

1979

Q.   -- typed --

Okay.  But you would have shown Rey Guevara this document before sending it along, correct?

A.   Yes.

Q.   Because just like you were committed to the document, he would be, too, as one of the arresting officers, right?

A.   Correct.

Q.   Same thing with the arrest report, right?

A.   This is the arrest report.

Q.   I know.  But -- but the arrest report was signed by you, correct?

A.   Yes.  That's my signature.

Q.   And the -- you would have, again, shown that to Rey Guevara before it was passed up the chain, correct?

A.   Correct.

Q.   Let me show you what has been previously marked as --

MR. J. RICHARDS:  50 G.

BY MR. S. RICHARDS:

Q.   -- as 50 G.

MR. S. RICHARDS:  And if we could publish that to the jury again.

THE WITNESS:  Pardon me?  Oh.

MR. S. RICHARDS:  I'm sorry.  I'm asking the Judge.

THE COURT:  It's published.

BY MR. S. RICHARDS:

Gawrys - cross

1980

Q.   That's the supplementary report documenting the arrest, correct?

A.   Yes.

Q.   All right.  And your signature appears on that document?

A.   It's not my signature, no.

Q.   I'm sorry?

A.   Look like Rey signed this document.

Q.   Okay.  Well, the document, it says, S. Gawrys?

A.   Yes.

Q.   Is that your signature or him signing for you?

A.   He's signing for me.

Q.   Okay.  And he's signing -- he's signing his own signature on that for himself, correct?

A.   Yes.

Q.   And all being done with the approval of both of you before the document is submitted, right?

A.   Oh, yeah.

        MR. S. RICHARDS:  You can take that down.

        One moment, please, your Honor.

     (Counsel conferring.)

        MR. S. RICHARDS:  Nothing further.

        THE COURT:  Any redirect?

        MR. ENGQUIST:  Just a little bit, your Honor.

        Could I have the document camera again?  I'm just going to put up 50 I again.

REDIRECT EXAMINATION

BY MR. ENGQUIST:

Q.   Mr. Gawrys, the sergeant who signed that, Sergeant Healey --

A.   Yes.

Q.   -- is he your sergeant or a sergeant at Area 5?

A.   He's just -- he's a sergeant in Area 5 at the time.

Q.   Earlier plaintiff's counsel was asking you about Rey Guevara knowing people in the neighborhood that you don't have a memory of.  Do you remember that?

A.   Correct.

Q.   Now, do you know where Rey Guevara lived in Chicago?

A.   During what time?

Q.   During this time in the '80s.  Did he live in the Humboldt Park area?

A.   He grew up in it, yes.

Q.   So -- and he lived there, too, correct?

A.   Yeah, he did for a while.

        MR. ENGQUIST:  I'm sorry, my phone is asking me -- I'm sorry about that.

BY MR. ENGQUIST:

Q.   So -- and you didn't live in the Humboldt Park area, did you?

A.   No.

Q.   So, would it surprise you that Rey Guevara would know

people in the neighborhood -- in those neighborhoods -- more than you?

A.   Oh, yes.  He knew a lot of people.

MR. ENGQUIST:  That's all I have, your Honor.

THE COURT:  Mr. Scahill?

MR. SCAHILL:  Nothing further from me.

THE COURT:  Anything on that, Mr. Richards?

MR. S. RICHARDS:  No, your Honor.

THE COURT:  You may step down.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Who is next up for the defendants?

MR. SCAHILL:  I believe Ms. Rogala is here, so we're going to continue with that examination.

THE COURT:  Feel free to take your seat.  I remind you you are still under oath from yesterday.

THE WITNESS:  Thank you.

MR. SCAHILL:  May I proceed?

THE COURT:  Yes.

MR. SCAHILL:  Thank you.

CAROL ROGALA, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION (Resumed)

BY MR. SCAHILL:

Q.   Welcome back, Ms. Rogala.

A.   Thank you.

Rogala - direct

1983

Q.   Thank you for coming back.  We appreciate it.

I think when we left off yesterday, we were -- you were telling us a little bit about the investigatory process in post-conviction proceedings.  Do you recall that's where we left off?

A.   Yes.

Q.   Okay.  I want to switch gears just a little bit.  And between 2020 and 2022, is it fair to say that there was a pretty substantial case load at the post-conviction unit at the Cook County State's Attorney's Office?

A.   Yes.

Q.   And can you tell us how many post-conviction attorneys are within the post-conviction unit within that time period between 2020 and 2022?

A.   We were pretty short-staffed from -- in 2020.  So, I think there may have been five attorneys.  And then by 2022, we restaffed and there were ten plus me, so eleven.

Q.   Okay.  So, during that time period, what was a typical case load for a post-conviction attorney working in that unit?

A.   Anywhere from -- I think probably the lowest was in the 40s, and I know I had over a hundred cases that I was personally working on.

Q.   Now, these post-conviction cases, most of them were for pretty serious criminal offenses like murder, you know, sexual assault, things of that nature.  Is that a fair

characterization?

A.   Yes.

Q.   Okay.   Serious violent crimes for which people had been committed to correctional facilities for extensive periods of time?

A.   Exactly.

Q.   Okay.   That's where a lot of them were?

A.   Yes.

Q.   And, so, the underlying trial records for each one of those cases that you would have would often be thousands and thousands of pages.   Is that a fair characterization?

A.   Yes.

Q.   Okay.   And, then, you have appellate records and other things that are relating to each individual case, right?

A.   Correct.

Q.   And you, yourself, as a supervisor, took on a larger case load than any of your line assistants --

A.   Yes.

Q.   -- it sounds like?   Okay.

     Now, with respect to the day-to-day job duties of both yourself working on your own cases and the line assistants, it was a pretty varied sequence of things that you would have to do as an attorney; is that fair?

A.   Yes.

Q.   You wouldn't only have to do hearings sort of like what

we're doing here today, but you would have to work the cases up, too?

A. Yes.

Q. All right. So, that would include reviewing these thousands and thousands of pages of trial records, right?

A. Right.

Q. And going and finding and interviewing witnesses that come up?

A. Correct.

Q. And, then, doing the normal lawyering that we all love so much, writing briefs and appearing in court for statuses and all of that stuff?

A. And don't forget the research.

Q. And the research. Some of us love it, some of us don't. But that has to happen, too, right?

A. Yes.

Q. There's filings that need to be written on issues of law and things like that?

A. Correct.

Q. Okay. And, then, there's the evidentiary hearing part, too, right?

A. Right.

Q. So, can you sort of just give us a general snapshot of what does a post-conviction evidentiary hearing look like?

A. It looks very much like a trial. In the criminal world,

Rogala - direct

1986

the State or the prosecution always has the burden of proof. In a post-conviction hearing, that's reversed and it's the petitioner who has the burden of proving simply to the court -- there's no opportunity for a jury in a post-conviction proceeding. So, all the arguments are directed to the court.

And the petitioner has to convince the judge beyond -- by a preponderance of the evidence. So, it's a different standard than there would be in a criminal case that the new evidence is such that considered in light of what was presented at trial, the outcome might have been different.

Q. Got it.

And, so, the actual nuts and bolts of the hearing would be sort of similar to what we're doing here today in the sense of witnesses get called, they get asked questions by one side, they get cross-examined by another side, and that back-and-forth kind of goes on that way, fair?

A. Fair.

Q. There's just not a jury like these folks here?

A. Correct.

Q. There's a judge who is listening to that. And, then, if the hearing concludes to a point where they need to make a decision, it's the judge who makes the decision as to sort of what they're going to do under the standards that you've just told us about?

A. Yes.

Rogala - direct

Q.   Fair?  Okay.

Suffice it to say that the preparation for that takes a lot of time?

A.   It does.

Q.   Okay.  Because you have to prepare for the witnesses and interview them and all of that, right?

A.   Yes.

Q.   Now, as far as how the sequence of the presentation of evidence goes, you mentioned that the petitioner is the one with the burden, right?

A.   Yes.

Q.   So, when a hearing commences, the petitioner is the one that actually puts on their evidence first?

A.   Correct.

Q.   And, so, you as the representative of the State, you have to wait for them to call their witnesses, and then you're cross-examining them to try to poke holes in whatever they're saying, essentially, right?

A.   That's right.

Q.   Okay.  I want to ask you about a particular type of petition.  And those, I think we talked a little bit yesterday, are ones where there are -- petitioner has attached affidavits from people in support of their petition for post-conviction relief.  Okay?  Are you with me --

A.   Yes.

Q.   -- on those types?

         The first issue that I think you touched on yesterday was you need to look at whether the evidence that has been submitted via this affidavit is truly new evidence.  Do you remember that?

A.   Yes.

Q.   Okay.  Can you explain to us what that means in the context of a post-conviction proceeding?

A.   In a post-conviction proceeding, the petitioner is not allowed to relitigate the facts of the case.  He or she can present new information, meaning new witnesses who were not available at the time of trial, or in some cases, witnesses who did testify at trial have recanted or taken back their testimony that they presented to the original trier of fact, or there could be new evidence, new scientific evidence that was unavailable just because the technology changed or the standards within the investigatory practice.

         Like, for example, in arson the science changed from 30 years ago until the 2020s timeline.  So, how witnesses testified at the time of trial would not be the way they would testify today just because the technology and the science has changed.

Q.   And, so, was there a distinction between, for example, quote-unquote, new evidence in the sense that it didn't exist before and evidence that perhaps was available at a time but,

Rogala - direct

1989

you know, there was diligence that should have been shown to bring it to the court earlier than what it was in the post-conviction proceeding?

A. Yes. Both of the statutes require a person seeking relief to exercise diligence, meaning as soon as they know about the issue, they have an obligation to bring it to the court and not wait years for time just to keep going by.

Q. So, even if something, for example, did not exist at the time of the trial per se, there were still -- there was still significance within the proceeding where there needed to still be diligence even if it was developed after the trial?

A. Yes.

Q. Okay. So, in other words, you know, if a witness came forward, you know, a year or two after the conviction and brought evidence to the attention of the petitioner, legally, at least the argument is, you can't wait 10, 20 years to bring that up or else you wouldn't be showing the requisite diligence is the basic standard we're talking about?

A. That's correct.

Q. Okay. Was there a set of standards within the post-conviction unit for how you would go about sort of investigating that aspect of the claim?

A. We were guided by the statutes themselves. Section 2-1401 has a two-year statute of limitations, and we looked at that as what did the petitioner do within two years from when he or she

Rogala - direct

1990

discovered the claim? Did they bring it to the court or not? If not, that would be an argument that we could make to the court that the claim was barred or not available to be heard by the court.

The Post-Conviction Hearing Act had a different statute of limitations, essentially three years from the date of conviction. So, in that instance, we were looking at kind of that we generally gave the petitioner the benefit of the doubt. Did he come within three years of when he learned of the claim or she learned of the claim?

Q.   Thank you.

So -- and for the remainder of the questions here, I know we're sort of speaking in the abstract, but with respect to Mr. Rios's claim, that was a 1401 petition, right?

A.   Correct.

Q.   Okay. So, for the remainder of the questions when we're talking about these standards, if we can focus on 1401 just because that's our particular legal vehicle, okay?

A.   Okay.

Q.   All right. Now, in addition to the diligence aspect and the newness aspect, was there also a set of standards that you were to apply in the post-conviction unit for actually doing investigation into the veracity of the underlying affidavit that was submitted?

A.   Yes.

Rogala - direct

1991

Q.   Okay.   And what -- how typically were you supposed to go about looking into that?

A.   We would take the affidavit that we received and look at the information provided in it, read in the record from the original trial, any pretrial proceedings to see if that information had been presented to the court or was available to be presented to the court.

We would also look at what claims were raised in the direct appeal to see had this claim already been considered by not only the trial court but an appellate court.  Once we determined if the information in the affidavit was nowhere in the record, then we would look back to the police reports and see was this person named or even perhaps someone who came forward but didn't give a name, could we somehow place them in the original investigation?

If not, then we would look next to what's the relationship between the petitioner and this person and why are they coming forward now?

Q.   So, as far as doing that investigation, was part of the standards that were applied by your unit to actually go out sort of on the street, for lack of a better term, either by yourself or with investigators to try to talk to witnesses about the claims that are presented in the affidavit that you're addressing?

A.   Yes.

Q.   And how would you go about doing that?

A.   If I was handling the case -- it's the same procedure for the people who worked in my unit -- we would take the information that we had compiled, give it to our investigations unit.  Once an investigator was assigned, we would have a meeting with the investigator to let them know what we were looking for, where this person fit into the case, and then they would go out.

Sometimes just the investigator would go out. Sometimes the attorney assigned to the case would go with the investigator.  That was a case-by-case depending on schedules and when people were available.  It also in some cases depended on where the person was physically located, because oftentimes they were no longer in Chicago.

Q.   Now, if there were -- other than the affiants themselves, the people who have executed the affidavits, was part of the, for lack of a better term, best practices to see if you could talk to like former state's attorneys or police personnel who were implicated in the affidavit statements if you could?

A.   Yes.  If other people, prosecutors, police officers, even defense attorneys sometimes were implicated in the affiants' paperwork, we would try to talk to those people to see what they could tell us.

Q.   By the same token, third-party witnesses.  If you have somebody who's a big part of the criminal case, you might want

to try to go and speak to them also to see sort of where they come down on the these issues with the affidavits?

A. Yes,

Q. Okay. So, we're talking about just generally the pre-hearing investigation process. But were there times that the post-conviction unit would actually do the investigatory part of your job at the actual hearing?

A. Sometimes, yes.

Q. And could you explain to us how that would work.

A. Sometimes we were unable to secure interviews with affiants prior to the hearing. And the court had a schedule, and so we would just have the person come in. Petitioner would produce them at the hearing. And we would cross-examine them and probe their bias, their motive for coming forward, their actual knowledge. Could they see what they now claim to have seen, that type of information right at the hearing. And, then, the judge would be able to make a determination of that person's credibility.

Q. So, with -- you're referring to the petitioner's case where they put on their evidence, that aspect of it, right?

A. Yes.

Q. Okay. But that aspect of it at the hearing, that does not end the matter entirely. You get your opportunity to put on your witnesses, too?

A. Correct.

Rogala - direct

1994

Q.   Okay.  So, after the petitioner goes, they'll put on the people who were supporting their case.  You as the State then get the opportunity, just as the defendants in a civil case do, you call your witnesses to say, no, that's not true, or maybe there's something else more to this and you get to call a series of witnesses, too?

A.   Correct.

Q.   Okay.  Now, is the manner in which a post-conviction hearing proceeds similar to what we're doing here today where it's every day you're here putting on evidence and it just goes in one contiguous sort of proceeding, or does it go a little bit differently than that?

A.   Typically, it goes differently than that.

Q.   Okay.  How does it typically go in the post-conviction proceeding context with this stuff?

A.   Typically, the court would schedule the first day of the hearing, and the witnesses would be presented.  At the end of whatever witnesses were offered that day or whatever evidence was offered that day, the case was typically continued for a period of time, often more than a month, sometimes up to three months based on the court's schedule and how many other cases they had, the attorneys' schedules and when witnesses could be presented, again, because many of them were out of state by the time we did the hearing.

Q.   So, this would be sort of a day here, a day there over a

Rogala - direct

1995

period of sometimes many months or even over a couple of years, right?

A.   Yes.

Q.   That was not atypical at all for that to happen?

A.   No.

Q.   All right.  We're going to circle back to the hearing in a minute here, but when you get a post-conviction petition, does the State have to come up with a decision as to whether they're going to oppose it or not oppose it?

A.   Yes.

Q.   Okay.  And on the first -- at the first line, who is responsible once a post-conviction petition comes in for making that initial determination as to whether you're going to oppose it or not oppose it?

A.   Once the case was filed in court, it would come to me, when I was the supervisor, to assign it to someone in the unit or keep it for myself.  And, then, that person, whoever was assigned the case, would make that initial determination of whether we should proceed or not.

Q.   Based on sort of a basic review of the records and things of that nature?  Is that sort of how that goes?

A.   Yes.

Q.   If there was going to be a change in the position of the office to move from we're opposing this to not opposing this, were there a set of protocols in place to sort of put that up

Rogala - direct

1996

the chain of command?

A.   Yes.

Q.   And can you tell us how that worked.

A.   The person assigned to the case, if they after their investigation started to have concerns about the underlying -- the validity of the conviction, is it something that we can stand behind, then they would write a memo to me and lay out their concerns why they thought -- kind of the pros and cons to defend the conviction.  These are the ways we can.  Here are the major areas of concern.

Once I got that memo, then we would have a conversation to talk about that and then make a joint recommendation to my supervisor, who was the chief of the criminal prosecutions bureau, and also the deputy of the bureau.  We would have -- send them a memo and then generally have a follow-up conversation.

Q.   And was that because as far as the nuances of the case and the evidence, you folks at the post-conviction unit on the front lines were the ones knew the case better than anybody?

A.   Correct.

Q.   Typically, right?

So, you would make recommendations and they'd look at what you said, but you're the ones who were working this up.  You know it the best?

A.   Right.

Q.   And, then, you would get sort of a yea or nay sort of position from the higher-ups, and that's the way it would go?

A.   Yes.

Q.   And, ultimately, opposing, not opposing, not your final call.   That's the final call ultimately going up to the top of the State's Attorney for Cook County; is that --

A.   Correct.   It was not my call.

Q.   Right.   Your recommendation but not your ultimate decision?

A.   Correct.

Q.   Got it.   Okay.

So, let's get down to talking about Mr. Rios's post-conviction.   You do have a recollection of handling that particular petition?

A.   I do.

Q.   All right.   And that was filed in 2020, right?

A.   Yes.

Q.   2020, as we all will recall, was a very interesting year, wasn't it?

A.   It was.

Q.   Okay.   And why was that a very interesting year?

A.   It was COVID, and we were -- basically, our office continued to operate, but we were sent home.   Everybody was working remotely.   There were limitations on in-person meetings, interviews.   So, yeah, it was challenging.

Q.   Okay.   And was it challenging during that time period to

Rogala - direct

1998

actually be able to sort of dig your teeth into the investigation part of that petition, among others?

A.   It was.  I mean, we could still get the records.  There were issues with that because unfortunately in state court, everything is still in a paper form.  So, we would have to get the paper from the Clerk's Office, and there were limitations on when we could get -- physically go to the Clerk's Office to get those documents.  We also to have orders signed by the judge hearing the case.  So, that also presented a problem initially until they finally got some automation into that system.

So, once we had those records, we could proceed with that just like we did when we were in the office.  But when it came time to scheduling interviews, it was difficult because our investigators were limited initially in their ability to conduct face-to-face interviews.  Air travel was pretty much non-existent early in COVID.  And, then, there were safeguards put in place.  So, we had to wait until we could get to the point where they could do interviews.  And in this case, witnesses were out of state.

Q.   Well, I was actually just about to get to that.  There were -- with Mr. Rios's post-conviction petition, it got amended at one point, but ultimately there were three affidavits that had been attached to that?

A.   Correct.

Q.   That was Cristino Garcia, Benjamin Carrero, and then Luis Huertas, right?

A.   That's right.

Q.   Okay.  There was a hearing that commenced on the post-conviction petition at some point in 2022, right?

A.   Yes.

Q.   All right.  Before that commenced, had you or had your unit formulated a position as to whether you were going to oppose that petition or you were going to not oppose it?

A.   The position was to oppose the petition.

Q.   Okay.  And that was based on your preliminary review of the file and the affidavits and the like?

A.   Correct.

Q.   Okay.  So, the evidentiary hearing commenced the first day of it, in April of 2022, right?

A.   Yes.

Q.   Now, before that hearing commenced, had your unit interviewed Mr. Carrero?

A.   I don't think we were able to interview him prior to the hearing.

Q.   He was one of the out-of-state people?

A.   Correct.

Q.   Florida, right?

A.   Yes, as I recall.

Q.   Had your unit interviewed Mr. Garcia?

Rogala - direct

2000

A.   No.

Q.   Okay.  Had your unit interviewed Mr. Huertas?

A.   No.

Q.   Had you yet brought in any trial ASAs or Felony Review ASAs to get their perspective on it yet?

A.   Not yet, no.

Q.   Okay.  Or any police officers that were involved in the case.  At that point, had you done any of that investigatory work?

A.   No, we had not.

Q.   And you also had not interviewed Mr. Rios, at least, you know, sitting down with him?

A.   No.

Q.   Okay.  That would happen sometimes, but it was atypical?

A.   Atypical is the right word, yes.

Q.   Okay.  But certainly can be asked by the Office, right?

A.   Right.

Q.   And sometimes the petitioners would agree to actually sit down with you and give you your version of the events?

A.   Yes.

Q.   But that had not occurred by the time hearing commenced?

A.   No, it had not.

Q.   All right.  So, is it fair to say that the hearing in Mr. Rios's post-conviction was one of these hearings where you were deciding to do the actual investigation with the hearing

itself?

A.  Yes, that's correct.

Q.  All right.  So, when this hearing commenced, when it started in April of 2022, was it your intention at that point to do as you had described a few minutes ago and this was going to continue for any number of months where you would get the opportunity to call witnesses after Mr. Rios called his witnesses to sort of put on the whole case?

A.  Yes.

Q.  All right.  So, you did have an intention as of April that this was going to stretch on for many, many months probably?

A.  Correct.

Q.  Okay.  Are you aware during this time period as of April 2022 any other unit within the Cook County State's Attorney's Office that was doing a factual investigation into Mr. Rios's post-conviction claims?

A.  I was not aware.

Q.  Okay.  As far as you knew, only you and your unit were doing this?

A.  That was my understanding, yes.

Q.  Okay.  So, this hearing commences in April of 2022, right?

A.  Correct.

Q.  And your position at that time was we're opposing this petition, right?

A.  Yes.

Q.   And on that day, were there any witnesses called?

A.   Yes.

Q.   Who was called that day?

A.   Mr. Carrero.

Q.   All right.  And Mr. Carrero was put on by Mr. Richards as his witness?

A.   Correct.

Q.   And you got an opportunity to cross-examine Mr. Carrero?

A.   I did.

Q.   Okay.  What was your goal when you were cross-examining Mr. Carrero?

A.   My goal was to challenge why he was coming forward now, why he was changing his testimony from what he had testified to at the original trial, what he testified to in front of the grand jury, and basically to impeach him as a witness who was not credible.

Q.   Okay.  Now, one of the things that you reviewed was Mr. Carrero's affidavit that had been procured by Mr. Rios's team and attached to the post-conviction petition, correct?

A.   Yes.

Q.   All right.

     MR. SCAHILL:  Judge, can I have the document camera, please?

     This is Defendants' Exhibit 31, which has been admitted into evidence.

THE COURT:  Okay.

BY MR. SCAHILL:

Q.  Can you see that on the screen?

A.  Yes.

Q.  Do you recognize this to be at least the first page of Mr. Carrero's affidavit?

A.  Yes.

Q.  And you had this and were aware of this when you commenced this proceeding in April of 2022, right?

A.  Yes.

Q.  Okay.  Going to the second page, Mr. Carrero states in here in Paragraph 14:  I was unwilling to come forward before this date and would not have told anyone about Guevara's conduct because I was afraid of Guevara and what he might do to me.

Do you see that?

A.  I do.

Q.  Okay.  This language appeared to fit into this idea that you were talking about before where, hey, this is new and was not discoverable before?

A.  Yes.

Q.  At least as this is written, right?

A.  Correct.

Q.  Now, when you were cross-examining Mr. Carrero, you actually found out that Mr. Carrero had actually been speaking to Mr. Rios decades before this, didn't you?

Rogala - direct

2004

A.   Yes, I did.

Q.   Okay.  He testified at that hearing about having spoken to Mr. Rios in a correctional facility within a couple of years of the conviction?

A.   That's right.

Q.   Okay.  And, so, when we look at Paragraph 14 here -- well, let me ask you this first:  The significance of this information not being brought up until 2020 was very significant for the standards that you were applying, wasn't it?

A.   Yes.

Q.   Okay.  Because if there was no diligence -- if this actually had come up decades before, you could then prove that this actually had not been diligently presented to the court?

A.   Correct.

Q.   And if you win on that, it's game over essentially procedurally with the law?

A.   That's right.

Q.   Okay.

     MR. S. RICHARDS:  Objection.

     THE COURT:  The objection is sustained.

     You can re-ask the question.

     MR. SCAHILL:  Sure.

BY MR. SCAHILL:

Q.   Based on what you heard at the proceeding out of

Mr. Carrero's mouth and what was submitted in this affidavit, there's a factual inconsistency there, right?

A. Yes.

Q. Okay. And one that, at least from your perspective and the positions that you were taking, would be material to your argument that this was not diligently presented to the court?

A. That would have been my argument, yes.

Q. Okay. Now, on that day in April of 2022, there were no other witnesses called; is that fair?

A. Yes.

Q. Okay. Were there other witnesses who were sort of like on deck by Mr. Richards to call?

A. Yes.

Q. Okay. That was Mr. Garcia and Mr. Huertas?

A. Yes.

Q. All right. They were never called that day, though?

A. They were not.

Q. Why were they not called that day?

A. I had a family emergency.

Q. Okay. We don't need to go necessarily into the facts of that, but the hearing was cut short as a result of something totally unrelated to the merits of the case or the scheduling or anything like that?

A. That's correct.

Q. Okay. And, so, it was just Mr. Carrero, and then it was

continued to a different date?

A.   That's right.

Q.   All right.  In preparation for the hearing, did you review the affidavit of Mr. Garcia, as well?

A.   Yes.

Q.   All right.  But you did not have the opportunity to cross-examine him?

A.   No.

Q.   Because he was not called before the hearing was cut short, right?

A.   That's right.

Q.   And before we get to this, the hearing was continued to a day in, I believe, August of 2022?

A.   That's right.

Q.   All right.  So, at that point in time, April 2022, the intention is you're all just going to pick up again in a couple of months with the witnesses and go forth litigating this, right?

A.   Correct.

Q.   All right.

        MR. SCAHILL:  Carrie, can you pull up Exhibit 34 for me.

        This is in evidence.

BY MR. SCAHILL:

Q.   And while we're waiting for that to be pulled up,

Mr. Garcia, as you recall, was another person who was alleging in his affidavit that he had information that had not been available at the time of the trial that was now being presented?

A. Correct.

Q. Okay. Here we are.

You reviewed Mr. Garcia's affidavit in connection with your duties as the post-conviction attorney handling Mr. Rios's post-conviction?

A. Correct.

Q. All right.

MR. SCAHILL: Carrie, can you flip to the last -- not the last -- go up one. There we go.

BY MR. SCAHILL:

Q. And this -- the representations as you read them that were made by Mr. Garcia in Paragraph 14 -- I'm sorry, in Paragraph 13, was that: I was not asked to testify at the trial of Jaime Rios, and had I been asked to testify, I would have pled the Fifth, not because I was guilty, but because I was afraid of Detective Reynaldo Guevara.

Do you see that?

A. I do.

Q. And those were the representations that Mr. Garcia were making, as well, right?

A. Yes.

Rogala - direct

2008

Q.   And this, as you read it, was an explanation for why this would not have been evidence that was available before it is now being presented in 2020, even though it was information he had in 1989?

A.   That's correct.

Q.   And, so, if -- now, you know Mr. Garcia in the context of the case, he was named as a person that everybody knew about because he's in the confession of Mr. Rios?

A.   That's right.

Q.   Okay.  And, so, this representation as you viewed it was a position being taken by Mr. Rios that this is new evidence because he would not have come forward, right?

A.   Yes.

Q.   And had you had the opportunity to cross-examine Mr. Garcia about this, presumably you would have asked him about those topics of whether this was truly new or not?

A.   Correct.

Q.   And if it was, in fact, information that was known, he was willing to testify, you could have used that information to prove that, hey, this is not new evidence that couldn't have been discovered with diligence, right?

A.   Correct.

Q.   All right.  But you never had the opportunity to actually get into that with Mr. Garcia on the stand, right?

A.   Right.

Rogala - direct

2009

Q.   All right.   Because there was never any evidentiary hearing
beyond that first day in this case, was there?

A.   Correct.

Q.   Now, with Mr. Huertas, he obviously submitted an affidavit,
too, we referenced, right?

A.   Yes.

Q.   You had not spoken to him prior to the hearing commencing,
right?

A.   Correct.

Q.   But at the hearing -- well, let me ask you this first:   You
gave an opening statement at the hearing, right?

A.   Yes.

Q.   About what you thought the evidence was going to show?

A.   Right.

Q.   And you were there when Mr. Richards gave a statement what
he thought the evidence was going to show, right?

A.   Right.

Q.   And, in fact, at the hearing, Mr. Richards advised both you
and the court that Mr. Huertas is sticking to his story as
Mr. Rios as the shooter, right?

A.   Yes.

Q.   I mean, he said that in open court --

A.   Yes.

Q.   -- on behalf of Mr. Rios?   Okay.

         So, that was sort of the state of play even on

April -- in April of 2022, right?

A.   Correct.

Q.   So, the family emergency happens, this continues for a time after that.  You still were full steam ahead, we are opposing this petition, correct?

A.   Correct.

Q.   So, now I want to direct your attention to July of 2022, okay?

A.   Okay.

Q.   As of beginning of July, still full steam ahead, still intending to put the evidence on to contest Mr. Rios's petition, right?

A.   Right.

Q.   Continue fighting?

A.   Yes.

Q.   Nowhere near over at this point?

A.   No.

Q.   Okay.  You still intended this to go on for months and months and months, put on your own evidence?

A.   Correct.

Q.   Okay.  And the court had not heard anything on this case other than Mr. Carrero's testimony, which you were attempting to poke holes in, right?

A.   Right.

Q.   And as of July of 2022, you had not submitted any memo or

suggested to the State's Attorney that we should change our position from opposition to non-opposition, fair?

A.   Fair.

Q.   Okay.  And on the horizon here, going to call Huertas, you're going to maybe call the ASAs, see if there's any police officers who might testify, trial ASAs, Felony Review.  That's all on the table as a potential body of evidence to present, right?

A.   Correct.

Q.   In July of 2022, you were called into a meeting with your boss?

A.   That's right.

Q.   That's former State's Attorney Ms. Foxx?

A.   Correct.

Q.   Okay.

     And without getting into the specific rationales here, Ms. Foxx specifically told you to stand down on the Rios case; is that correct?

A.   Yes.

Q.   At that point at that meeting, to your knowledge, had Ms. Foxx or anyone else within the State's Attorney's Office other than your unit done any investigation into the factual merits of Mr. Rios's case?

A.   I wasn't aware of any other investigation in the office.

Q.   Okay.  As far as you knew, you were the only one, and your

unit, who had actually done the investigation into Mr. Rios's specific case, right?

A.   That's correct.

Q.   At this point, you obviously are -- you're a supervisor, but you're an assistant state's attorney, right?

A.   Right.

Q.   And you serve at the pleasure of the State's Attorney at the time, Ms. Foxx, right?

A.   Correct.

Q.   And she gave you a specific order, stand down and not oppose this anymore, correct?

A.   Correct.

Q.   And, so, is that essentially what you did?

A.   Yes.

Q.   Now, when you remove your opposition to a post-conviction petition, procedurally how does that work?  Like what is the effect in court of doing that?

A.   The petition is still before the court.  I just -- this case, and how it happens is tell the court that we are no longer opposing the petitioner's request for relief.  And, then, the court will review all of the documents that have been presented, the testimony that's been presented -- it's basically everything the petitioner has to offer in support of his claim -- and then make a decision based on the judge's interpretation of those facts and the law and what the correct

Rogala - direct

2013

outcome should be.

Q.   So, there was never in Mr. Rios's case any judicial finding on the merits of his post-conviction proceeding, correct?

A.   I don't -- no.

Q.   So, essentially, you removed the opposition, and then what happens is effectively the conviction is vacated and a new trial is granted?

A.   Correct.

        MR. S. RICHARDS:  Objection.

        THE COURT:  Basis?

        MR. S. RICHARDS:  Misstates the law and procedure.

        THE COURT:  The question was what happened, not about the law.  So, the objection is overruled.

BY MR. SCAHILL:

Q.   Are you familiar with the term nolle prosequi?  And that's -- I took four years of Latin, so I know what it means, but why don't you tell the ladies and gentlemen of the jury what it means.

A.   I know what it means.  I did not take Latin, but it essentially means that the case is over, that the prosecution is no longer pursuing the case.

Q.   Is that effectively what happened with Mr. Rios's case after the State's Attorney's Office removed their opposition to the post-conviction petition?

A.   Correct.

Q. That it was, as we say, nolle'd?

A. Yes.

Q. A nolle, that's not the same as an acquittal or a not guilty?

A. No.

Q. It's just saying we're not going to prosecute this any longer?

A. Correct.

Q. And it's certainly not equivalent to a finding by a judge of an acquittal or something like that?

A. Correct.

Q. All right. Now, at this point in time in -- this is now August of 2022, right?

A. Yes.

Q. When this was effectuated?

Mr. Rios had served the entirety of his sentence in prison, right?

A. Yes.

Q. Okay. So, even had this gone in, you know, a different way where a judge said, yeah, he's entitled to a new trial on the merits, the State can't put Mr. Rios back in prison, right, because he served his entire time, even if they decided to retry it?

A. Yes.

Q. Okay. So, even if the judge says, well, you know, things

Rogala - direct

2015

here shouldn't have gone, you know, the way that they did -- I mean, obviously that didn't happen. But you're still faced with do we retry somebody who we cannot even put into prison again because they've already served the entirety of their time, right?

A. Right.

Q. Okay. So, just so we sort of tie this up here, at the time that this directive was given to you to stand down on opposing this petition, there had been no evidence submitted to the court at the hearing other than -- on the witness stand other than Mr. Carrero, right?

A. Correct.

Q. And his testimony had not changed your position on the matter and your recommendations?

A. It did not, no.

Q. And we had -- and the court had not heard from Mr. Rios?

A. Correct.

Q. And they had not heard from Mr. Huertas?

A. No.

Q. And they had not heard from Mr. Garcia?

A. No.

Q. They had not heard from any police officers?

A. Correct.

Q. And they had not heard from any state's attorneys, correct?

A. Correct.

Q.   None of those people were examined or cross-examined, correct?

A.   No.

Q.   Okay.  One more question, which is sort of unrelated to some of this.  Are you aware of the process by which the state's attorney could go about obtaining old files from, for example, murder cases?

A.   Files --

Q.   Let me phrase this differently.

     Do you know what a permanent retention file is?

A.   Yes.

Q.   Okay.  What is that?

A.   That's a file that, as its name says, it's kept forever.  And, so, I know the Chicago Police Department has a policy and a protocol to permanently retain murder files.

Q.   Okay.  That was my next question.  Murder files are some of the types of files that are permanently retained and presumably can be obtained whether they occurred in 1960 or 2010?

A.   Correct.

          MR. SCAHILL:  One moment, Judge.

          THE COURT:  Okay.

     (Counsel conferring.)

BY MR. SCAHILL:

Q.   Just one more question.  You've mentioned DNA and fire science and all of that.  Those aspects of your job, that

wasn't any part of the Rios post-conviction?  It wasn't a scientific-based post-conviction?  This was --

A.   That's correct.  There was no scientific evidence --

Q.   Okay.

A.   -- at issue.

Q.   All right.  Thank you.

MR. SCAHILL:  I have no further questions right now.

THE COURT:  Okay.

Mr. Polick or Engquist?

MS. GOLDEN:  No questions.  Thank you, your Honor.

THE COURT:  Ms. Golden, thank you.

Mr. Richards.

MR. S. RICHARDS:  Thank you.

CROSS-EXAMINATION

BY MR. S. RICHARDS:

Q.   Attorney Rogala.

A.   Sir.

Q.   Or is it okay to call you Carol or --

A.   You can call me Carol.  That's fine.

Q.   Okay.  So, first of all, the realm of post-conviction attorneys, both on the prosecution side and the defense side, it's a pretty small club, wouldn't you say?

A.   Yes.

Q.   Okay.  You're a member of it or were?

A.   I was, yes.

Rogala - direct

2018

Q.   And I was a member on the other side?

A.   Yes.

Q.   And it's a very specialized area that a lot of attorneys don't deal with day-to-day, fair?

A.   Fair.

Q.   But before you got into this unit, you were a state's attorney for many years, right?

A.   Yes.

Q.   You served in a courtroom, right?

A.   Correct.

Q.   You tried cases?

A.   Yes.

Q.   You tried murder cases?

A.   Yes.

Q.   You were assigned to Felony Review at times?

A.   Yes.

Q.   And in looking at any post-conviction petition or 2-1401, one particular thing is very, very important, is to look at the trial record, right?

A.   Yes.

Q.   Because no matter what --

        MR. SCAHILL:  Excuse me, the affidavit is still up.

        MR. S. RICHARDS:  We can take it down, please. Thanks.

        MR. SCAHILL:  My apologies.

Rogala - direct

2019

BY MR. S. RICHARDS:

Q.   Because no matter what a defendant is saying, you know, no matter what evidence he has, it only makes sense, it's only material in light of the evidence that there is at trial, right?

A.   Right.

Q.   Similarly, as you said before, whatever claims he's making, he can't be just trying to go back and say, I think I had a bad trial, I'm innocent, I just want to do the whole thing over again.  That's not really a claim, right?

A.   No, that's not.

Q.   And one of your tasks is to determine is he actually saying something that might make a little bit of sense or is he just trying to relitigate the whole thing, right?

A.   Yes.

Q.   So, one of your considerations, an important one, is the weight and the quality of the evidence that was brought forward at trial?

A.   Yes.

Q.   And to get the reported proceedings in this case, as you said, back then, that could be a little bit of a chore, right?

A.   Correct.

Q.   Because the records back then were in paper and hadn't been scanned in, right?

A.   Right.

Rogala - direct

2020

Q.   Whereas nowadays it's scanned in, we can get it all pretty -- relatively easily, right?

A.   It's much easier now, yes.

Q.   Much easier now.

But in this case, before you proceeded to hearing, you certainly had the trial record, the report of proceedings, right?

A.   I had a copy of it, yes.

Q.   And the report of the proceedings is a document that's made up out of the transcripts of the pretrial hearings and the trial which then goes to the appellate court if there's an appeal so that they can review the record, right?

A.   Correct.

Q.   And that had been prepared in Mr. Rios's case because he had, in fact, a direct appeal, right?

A.   He did, yes.

Q.   He had never previously done a post-conviction petition, right?

A.   No, he had not.

Q.   And he hadn't done a -- previously done a 2-1401, right?

A.   Correct.

Q.   Now, how long, by the way, were you assigned to Felony Review?  How many stints did you do on that?

A.   I had one stint in Felony Review, but then I also in the Sex Crimes Unit did Felony Review of sex crimes.  So, it wasn't

Rogala - direct

2021

in the Felony Review Unit.  It was a separate unit.

Q.  And aren't those generally six-month stints?

What?

A.  In theory, yes.  But often not.

Q.  They would keep you longer?

A.  People would be kept longer.  So, it just depended on what the needs of the office were.

Q.  When did you do your stint in Felony Review?

A.  In 1998.

Q.  Okay.  Now, in 1998, was that before the time when interrogations were recorded, like there was recording of confessions?

A.  Yes.

Q.  So, in 1988 -- '98, as far as you know, the procedure about taking statements from defendants was -- pretty much is the same back as it was in the early '90s, correct?

A.  I know what it was when I was assigned to Felony Review.

Q.  Okay.  So, when you were assigned to Felony Review, the process of taking a statement from a defendant is that, first of all, you were called in by the police to take statements from defendants, right?

MR. SCAHILL:  Object to scope.

THE COURT:  That is sustained.  That's beyond the scope of direct.

MR. S. RICHARDS:  All right.

Rogala - direct

2022

BY MR. S. RICHARDS:

Q.  In terms of your review of the trial -- of the report of proceedings, have you reviewed it recently or did you just review it back then and haven't reviewed it since?

A.  I haven't reviewed it since 2022.

Q.  Okay.  So, in terms of my questions here, I would just ask you about your present memory or if anything would refresh your recollection.

First of all, with respect to the evidence against Jaime Rios at his trial, one piece of evidence that you're well aware of was that Benjamin Carrero had testified against him, right?

A.  Correct.

Q.  Another piece of evidence at the trial was that Jaime Rios had testified on his own behalf, right?

A.  Yes.

Q.  And Jaime Rios in that initial -- in his testimony had stated or accused Detective Mason of beating him -- of pulling his hair and pushing his face into a table, correct?

A.  Yes.

Q.  And Jaime Rios had also at his trial acknowledged making the statement, but essentially claimed the statement was false, right?

A.  Right.

Q.  And in addition to Jaime Rios testifying for himself, he

Rogala - direct

2023

had also presented defense witnesses, right?

A.   Yes.

Q.   And part of your consideration of this, as in any case, is what has the prosecution presented, what did the defense present back then, how did the case shake out in terms of the weight and quality of the evidence, right?

A.   Right.

Q.   So, you were aware then by looking at the record that Jaime Rios's attorneys had called a number of witnesses, one of them being Jaime Rios, right?

A.   Right.

Q.   Another one being his girlfriend or common-law wife, Diana Rodriguez, right?

A.   Right.

Q.   Another one being an eyewitness Samantha Hudson, right?

A.   I don't remember all the witnesses that were called.  I'm sorry.

Q.   Do you recall if he called Iris Mendez?

A.   I know her name from the case file.  I don't remember if she was called at trial.

Q.   Okay.  But you remember her name from the case file because she was connected to Benjamin Carrero, right?

A.   Correct.

Q.   She was the -- his girlfriend who was present during the search, right?

Rogala - direct

2024

A.   She was present at a search at Mr. Carrero's home, yes.

Q.   And like Mr. Carrero, she was also charged after the search, right?

A.   She was, yes.

Q.   Okay.  Do you recall Iris Mendez testifying at the trial that she was threatened with the loss of her children?

A.   I don't recall that, no.  I just don't remember.

Q.   Okay.  Would your recollection possibly be refreshed by reviewing her testimony at the trial?

A.   Yes.

        MR. SCAHILL:  Objection.  Can I have a sidebar just very quickly?

        THE COURT:  Yes.

        Go to sidebar, Mr. Richards.

    (Proceedings heard at sidebar:)

        MR. SCAHILL:  Judge, I'm not exactly sure where this is going, but my concern is we're running into a similar issue as happened with -- on the stand the other day where they began reading in trial testimony that the jury had not heard through a witness to essentially backdoor it in.

        And, secondly, what this witness said was that she's not retrying the criminal case.  She's looking at the affidavits to see whether they change it.  I'm concerned that we're getting to the point where we're going to start reading in the trial record through this witness to try to backdoor

Rogala - direct

2025

other evidence.

THE COURT: Response?

MR. S. RICHARDS: Your Honor, I'm not at the point of asking that it be read in as was done with Barbara Riley. What I'm just trying to do now is refresh her recollection as to the evidence of Iris Mendez, which was particularly relevant to the Benjamin Carrero claim, which has been discussed in detail.

So, I think this is relevant to her assessment of the post-conviction proceeding and to the issues raised by counsel, which are the affidavits, but the affidavits considered in the context of the trial record.

So, all I want to do now is to show her the testimony and see if it refreshes her recollection as to what Iris Mendez testified to at trial.

THE COURT: But to what end? My recollection was that the Carrero testimony was related to potential --

MR. S. RICHARDS: I'm sorry.

THE COURT: My recollection is that the Carrero testimony elicited on direct was related to whether this information could have been brought forth sooner, not necessarily to the veracity of it. Am I missing something about the direct examination topic?

MR. S. RICHARDS: I think so. I think her overall assessment of the post-conviction petition, although she raised and latched onto a procedural defect, which is what she

discussed, the overall, you know, purport of it was that she looked at the post-conviction petition, she looked at the trial record, she thought that --

THE COURT: She identified certain issues, and she was going to pursue certain issues during the proceeding because she thought they were -- supported her position.

MR. S. RICHARDS: But her assessment, and I can go backwards, would also involve determining whether the new evidence in light of the trial evidence would have made a difference.

But I can go backwards and discuss those issues with her before I go forwards.

THE COURT: I'm going to allow limited inquiry. But I share defense counsel's concerns, based on your earlier questions of this witness concerning the Felony Review process, that you are seeking to go beyond the scope of direct examination and shoehorn in evidence that is not appropriate for this witness. So, be mindful of that admonishment.

You may proceed with refreshing this witness's recollection.

(Proceedings heard in open court:)

THE COURT: The objection is overruled.

MR. S. RICHARDS: I would like to approach the witness with --

MR. J. RICHARDS: 11.

MR. S. RICHARDS: -- Plaintiff's Exhibit 11.

THE COURT: You have free leave to approach.

BY MR. S. RICHARDS:

Q. Would reviewing the trial transcript refresh your recollection as to what Iris Mendez had testified to at trial?

A. It would -- it would.

MR. S. RICHARDS: Your Honor, I seek leave to approach the witness.

THE COURT: You have free leave to approach.

(Tendered.)

BY MR. S. RICHARDS:

Q. Could you read beginning where I've pointed to and the pages on the testimony of Iris Mendez. And please let me know when you're finished reading.

THE COURT: While she reads, just a reminder, today we'll go a little bit past noon and then take the extended lunch break. So, if you're looking at the clock and wondering if I'm overlooking it, I am not.

(Pause.)

BY THE WITNESS:

A. Okay.

BY MR. S. RICHARDS:

Q. Are you finished?

A. Yes.

Q. After reviewing the testimony, is your recollection

Rogala - direct

2028

refreshed as to what Iris Mendez had testified to at the trial?

A.   It's refreshed as to what I read, yes.

Q.   Okay.  And, in essence, what Iris Mendez testified to at the trial was somebody had threatened her with loss of children during the encounter with the police following the search warrant, correct?

A.   Correct.

Q.   And that was one piece of evidence which was at least consistent or relevant to Benjamin Carrero's claims that he was threatened with loss of children, correct?

A.   I don't -- I don't understand your question.

Q.   I mean, one of the things Benjamin Carrero was saying was that -- wasn't one of the things he was saying that he had been threatened by Officer Guevara?

A.   He said he was afraid of Officer Guevara, yes.

Q.   Okay.  Now, I'd like to also talk to you a little bit and clarify some issues regarding 2-1401s and post-conviction petitions.  And we might get into the weeds a little bit, but I have to ask you some questions, okay?

A.   Okay.

Q.   All right.  So, first of all, let's distinguish between the procedure for a post-conviction petition and the procedure for a 2-1401, okay?

A.   Okay.

Q.   So, a post-conviction petition, one of the requirements is

Rogala - direct

2029

you have to be in custody, right?

A.   Right.

Q.   Or on mandatory supervised relief, right -- release, right?

A.   That's one way, yes.

Q.   One of the -- or it's possible also to file a post-conviction petition in some instances if you're on probation, but that really doesn't apply to murder cases?

A.   Correct.

Q.   And there's a -- there's two principles under post-conviction petitions which inform them.  One is that there's a time limit, statute of limitations, on filing them basically within three years of the date of conviction or within 90 days plus six months of the date the Illinois Supreme Court denies your petition for leave to appeal from the appellate decision?

A.   Correct.

Q.   Now, for Mr. Rios, all of those time limits on a post-conviction petition were well past, right?

A.   Correct.

Q.   And he wasn't even in custody anymore, right?

A.   Right.

Q.   By the way, on the issue of him being in custody, it's been brought out that you had those problems with COVID, with looking up witnesses, talking to people, and so on.  Do you remember those questions?

Rogala - direct

2030

A.   I do.

Q.   One possible alternative in a situation like this might have been for you to seek some sort of continuance of the hearing to a post-COVID time when it could be litigated maybe more easily; is that fair?

A.   I think we all did the best we could during COVID and asked for continuances when we needed them.

Q.   Okay.  And I appreciate that.

     But, also, in terms of Mr. Rios in terms of the galaxy of the cases -- or universe of the cases you were dealing with, many of the people filing post-conviction petitions are actually in custody, right?

A.   Yes.

Q.   So, on the part of those people, there would be a great motive to get to a resolution because maybe they might be released, right?

A.   That wasn't a motivation for how we scheduled petitions, if that's what you're asking.

Q.   That would be on the part of the petitioners.  They might have wanted to get it done more quickly because they were in custody?

A.   I --

Q.   Don't know.  Okay.  Fair enough.

A.   -- speculate what they thought.  I don't know.

Q.   By the way, during COVID, Zoom was available as an

Rogala - direct

2031

alternative to in-person meetings and visits, right?

A.   It did become available, yes.

Q.   In fact, we all learned how to use Zoom during that period?

A.   I learned how to use Zoom during that time.

Q.   Yes.

And in terms of, again, going back to the difference between a 2-1401 and a post-conviction petition, for a post-conviction petition, generally there's a statute of limitations as we said, but there's an exception to the statute of limitations, right?

A.   Yes.

Q.   That exception is newly discovered evidence of actual innocence, right?

A.   Right.

Q.   So, even though it could be 10, 20 years later, if newly discovered evidence of actual innocence pops up, you may be able -- you can get around the statute of limitations that we -- for a post-conviction petition that we talked about, right?

A.   If you're still in custody, yes.

Q.   If you're still in custody.

Now, with respect to the -- and let's talk a little bit about newly discovered evidence and what it means, okay?

A.   Okay.

Q.   So, the phrase is not "new evidence."  It's "newly discovered evidence," right?

Rogala - direct

2032

A. Right.

Q. So, the first requirement for newly discovered evidence, it just has to be something that's post-trial, right?

A. Yes.

Q. It has to have been learned after the trial, right?

A. Correct.

Q. If you knew the evidence before trial, not newly discovered evidence?

A. Correct.

Q. Now, you may have a claim against your attorney for not bringing it forward, and that would be a claim of ineffective assistance, right?

A. Right.

Q. Mr. Rios was not making any such claim with respect to ineffective assistance, was he?

A. No, he was not.

Q. And, by the way, a common claim of that sort is that the attorney didn't put on alibi witnesses, right?

A. That's one claim, yes.

Q. And the claim against the attorney would be because it's the attorney's decision whether to put on alibi witnesses. Maybe it's ineffective, maybe it isn't, something of that sort, right?

A. That is part of that claim, yes.

Q. And it's a very common claim in post-conviction cases?

Rogala - direct

2033

A.   In post-convictions, yes.

Q.   Now, going back again to differences, the 2-1401 there's a different statute of limitations that comes into play, correct?

A.   Correct.

Q.   So, the statute of limitations in terms of 2-1401 is generally you have to file within either two years of the judgment or two years of when the evidence was discovered, right?

A.   Right.

Q.   But there's also an exception in extraordinary cases for where there would be manifest injustice to enforce the two-year limitation, correct?

A.   That's one exception, yes.

Q.   So, for example, with respect to this business about Benjamin Carrero telling Jaime Rios in prison about the event, it might have been argued that the statute of limitations should be overlooked to prevent manifest injustice, right?

A.   Are you saying at the time he disclosed the information to Mr. Rios?  I'm not sure what you mean by --

Q.   What I mean is --

A.   -- overlooked.

Q.   -- you, after Mr. Carrero testified, said, listen, even if what Mr. Carrero's testifying is true, ah-hah, I got him, it's not -- it doesn't -- he's statutor- -- there's a time limit, a bar because Mr. Rios apparently learned this way back when and

Rogala - direct

2034

didn't file within two years of learning it, right?

A.   Right.

Q.   Okay.  But even though that was your -- would be your argument, Mr. Rios or his attorneys could have come back and said, the statute of limitations should be overlooked because to do so would be -- work manifest injustice in the case, fair?

A.   There's another part to that.

Q.   Which is?

A.   Mr. Rios had a duty of diligence in bringing the issue before the court when he discovered it.  He had an obligation to bring the matter before the court, not to sit on it and wait until later.

Q.   Right.  And at the time Mr. Rios was learning this information, he was in prison, right?

A.   Yes.

Q.   Didn't appear to be represented by an attorney so far as you know, correct?

A.   I don't know if he was represented.

Q.   Now, you have been -- there had been talk about -- the post-conviction -- the 2-1401 petition which was before you, have you had a chance to review it?

A.   I have not reviewed it -- I haven't studied it.  Let's put it that way.  I've scanned through it before today, but I haven't studied it, no.

Q.   Okay.

MR. S. RICHARDS: Well, could we put up marked as identification just on our screen Defendants' 60.

BY MR. S. RICHARDS:

Q. Do you have that on your screen?

THE WITNESS: Judge, may I move the screen? It's got a glare from the light.

THE COURT: Yes.

THE WITNESS: Thank you.

THE COURT: If it's possible. I'm not sure.

THE WITNESS: Maybe I'll just move. I'll do my best.

THE COURT: Okay.

THE WITNESS: Thank you.

BY MR. S. RICHARDS:

Q. Okay. I want you to look first at the first sentences and just the first -- let's stop on the first paragraph.

So, this is the amended motion, right?

A. That's what it says, yes.

Q. And it says that, first of all, he's looking -- the relief he's looking for, right, is either a new trial or a new hearing on his motion to quash arrest or a new hearing on his motion to suppress, right?

A. Yes.

Q. So, those are all the things he's asking for, which possible the court could give, not necessarily, right?

A. Right.

Q. And, by the way, if you get a new trial, does that mean that you can just -- you know, that's the end of the case?

A. I don't understand the question.

Q. Well, put it this way: If a criminal defendant is granted a new trial, there can be a new trial, right?

A. Yes.

Q. So, the relief Mr. Rios was asking for was a new trial at which presumably the State would try to prove him guilty beyond a reasonable doubt and he would defend himself, right?

A. Yes.

Q. Now, because of the circumstances which were went into before, that never happened, right?

A. Correct.

Q. By the way, you were asked questions earlier about whether he could get more time if he was convicted after a new trial. Do you remember those questions?

A. Yes.

Q. Okay. Generally speaking, the answer is, no, you can't get more time than you got originally, right?

A. Generally speaking, yes.

Q. But there are exceptions as, for instance, where there's new evidence of misconduct or bad deeds or something which would affect the sentence, which comes up after -- which has come up afterwards, correct?

A. That would come -- yes.

Q.   Okay.  Now, for example, in Mr. Rios's case to be specific, although he had served a certain time in the Illinois Department of Corrections for the murder, it could be argued at sentencing at a new trial that he should get more time because after all, he had picked up this marijuana case while he was in prison, right?

A.   That could be offered at sentencing, yes.

Q.   Right.  Because it would be new evidence to increase the sentence which was not available at the time of the original trial, right?

A.   Right.

Q.   So, if Mr. Rios had taken a new -- had been given a new trial, there would have been some risk of a longer sentence and serving more time, right?

A.   It's a possibility, yes.

          THE COURT:  We'll break there.  We'll pick back up at 2:00 p.m.

          All rise.

     (Jury out at 12:15 p.m.)

          THE COURT:  We'll see you back at 2:00, Ms. Rogala. Please not discuss the substance of your testimony with anyone.

          THE WITNESS:  Thank you, Judge.

          THE COURT:  Thank you.

          Anything to address before the break?

          MR. S. RICHARDS:  No, your Honor.

2038

MR. SCAHILL:  No, your Honor.

MR. POLICK:  No, Judge.

THE COURT:  See you at 2:00.

(Recess at 12:15 p.m., until 2:00 p.m.)

(Change of reporters.)

2039

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                            )
                                       )
                Plaintiff,             )
                                       )
-vs-                                   ) Case No. 1:22-cv-03973
                                       )
REYNALDO GUEVARA; MICHAEL              )
MASON; and JoANN HALVORSEN,            )
as Special Representative of           )
ERNEST HALVORSEN, Deceased,            ) Chicago, Illinois
                                       ) February 13, 2026
                Defendant.             ) 2:00 p.m.


VOLUME 10
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:     LAW OFFICE OF STEPHEN L. RICHARDS
                       BY:  MR. STEPHEN L. RICHARDS
                            MR. JOSHUA S. RICHARDS
                       53 West Jackson Boulevard, Suite 205
                       Chicago, Illinois  60604

For Defendant          BORKAN & SCAHILL, LTD.
Guevara:               BY:  MR. TIMOTHY P. SCAHILL
                            MR. GRAHAM P. MILLER
                       20 South Clark Street, Suite 1700
                       Chicago, Illinois  60602

For Defendants         THE SOTOS LAW FIRM, P.C.
Mason and              BY:  MR. JOSEPH M. POLICK
Halvorsen:                  MR. JOSH MICHAEL ENGQUIST
                            MR. JEFFREY ROBERT KIVETZ
                            MS. CAROLINE P. GOLDEN
                       141 West Jackson Boulevard, Suite 1240A
                       Chicago, Illinois  60604

2040

Court Reporter:            CHARLES R. ZANDI, CSR, RPR, FCRR
                           Official Court Reporter
                           219 S. Dearborn Street, Room 1426
                           Chicago, Illinois  60604
                           Telephone:  (312) 435-5387
                           charles_zandi@ilnd.uscourts.gov


                      *   *   *   *   *

              PROCEEDINGS REPORTED BY STENOTYPE
     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

Rogala - cross

2041

(Proceedings heard in open court:)

THE COURT: All right. Do we have the witness?

MR. SCAHILL: Yes. Carol, could you take the stand, please.

THE COURT: We'll go ahead and bring in the jury.

And, Mr. Richards, you can continue with your cross-examination.

(Jury in at 2:00 p.m.)

THE COURT: Please take your seats.

I remind the witness that you're still under oath.

THE WITNESS: Yes.

THE COURT: Mr. Richards, you may proceed when you are ready.

MR. S. RICHARDS: Thank you, your Honor.

If we can have --

MR. J. RICHARDS: Defendants' 60, your Honor, on the plaintiff's table.

CAROL ROGALA, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION (Resumed)

BY MR. S. RICHARDS:

Q. So, you have that in front of you, the amended motion to vacate conviction?

A. Yes.

Q. So, just to make clear what Jaime Rios was asking for, he was asking for the judgment entered against him, the murder

Rogala - cross

2042

conviction, to be -- even -- he was either going to get -- he's asking for a new trial, right?

A.   Right.

Q.   We discussed that.  And he said -- also says, a hearing on new motions to quash arrest and on a new motion to suppress his custodial statements, right?  Those are things he's asking for in this petition, correct?

A.   Yes.

Q.   All right.  Now just so it's clear, a motion to quash arrest and a motion to suppress custodial statements, those are two different things, right?

A.   Right.

Q.   So, what a motion to quash arrests says is, "I was arrested without probable cause.  My arrest was illegal.  I gave a statement after an illegal arrest.  The statement should be thrown out," right?

        MR. SCAHILL:  Judge, object to scope.

        THE COURT:  One second.

        It's overruled.  You can answer, if you know.

BY MR. S. RICHARDS:

Q.   So, that's what a motion -- you're familiar with those, and that's what a motion to quash arrest would be, correct?

A.   A motion to quash arrest is to say that the arrest is illegal, yes.

Q.   And a consequence of that might be fruit of the poisonous

Rogala - cross

2043

tree, statement goes out, right?

A.   Yes.

Q.   And then if the statement goes out, you may go to trial without the statement, or if you're getting a new one of these, you could get a new trial without the statement coming in, right?

A.   Those are possibilities, yes.

Q.   But a motion to suppress custodial statements is a distinct sort of thing where what you're saying is, "Maybe my arrest was legal, but coercion was used.  Miranda warnings weren't given," things like that, right?

A.   Right.

Q.   And from reviewing the transcript, you knew that Jaime Rios had testified at the motion to quash arrest, but not at the motion to suppress custodial statements, correct?

A.   I don't recall today, but if that's what the transcript says --

Q.   You would agree with that?

A.   I would agree with it.

Q.   Okay.  And by the way, there's nothing unusual with a defendant sometimes not testifying at a motion to suppress custodial statements because the State has the burden of proof, they have to put on officers; and the defendant may choose to testify or not to testify depending, correct?

          MR. SCAHILL:  Object to scope.

Rogala - cross

2044

THE COURT: Sustained.

BY MR. S. RICHARDS:

Q. Yeah. Now, continuing through looking at the petition, it says that supporting -- and supporting exhibits are Exhibits 1, 2, 3, 4, 4A and 4B, and the remaining exhibits are contained in a separate document originally filed with the initial motion.

Do you see that?

A. That's what it says, yes.

Q. Now, in terms of what was actually filed with the court, the supporting documents were tendered on a CD, both to yourself and to the court, correct?

A. I know they were tendered electronically. I don't remember the format.

Q. Okay. But those documents included 13 -- 1,346 additional pages, correct?

A. I'll take your word on the number. It was a lot.

Q. It was voluminous?

A. Yes.

Q. Now, so -- and those documents, without going into any details about what they were, contained additional affidavits, transcripts, all sorts of other material, correct?

A. There was a lot of material, yes.

Q. So, that was potential material for an evidentiary hearing, aside from the affidavits of Huertas, Carrero, and Garcia, right?

A.   It could be, yes.

Q.   Okay.  Now, continuing on, if you keep scrolling up, a lot of the rest of the petition just sets forth the procedure, the facts at trial, and things like that, right, which you don't need to go into detail?

A.   Yes.

MR. S. RICHARDS:  Keep going.

Okay.  Stop.  Go backwards.

BY MR. S. RICHARDS:

Q.   So then, after recounting the trial, there is a section -- there's a section detailing Benjamin Carrero, right?

A.   Yes.

Q.   Like what we think he's going to say.  Okay.  Keep going.

Then a section on Luis Huertas and what we think he's going to say, right?

A.   Right.

Q.   And then keep going.

A section on Cristino Garcia and what he's going to say, right?

A.   Yes.

Q.   And then there's a section just about Reynaldo Guevara, about his possible invocation of the Fifth Amendment and other materials, without going into details, about Reynaldo Guevara; correct?

A.   Yes.

Rogala - cross

2046

Q.   And those are the materials in the additional 1346 pages, right?

A.   As best I recall, yes.

Q.   Okay.

THE COURT:  Okay.  I'm going to stop you there.  I'm going to take a short break.  The jury, if you could step outside.

All rise.

I'll be right there.

(Jury out at 2:08 p.m.)

THE COURT:  Mr. Richards, Mr. Scahill.

(Discussion held off the record.)

THE COURT:  All right.  We'll resume.

(Jury in at 2:11 p.m.)

THE COURT:  All right.  You can take your seats.

Before you get started, Mr. Richards, I'll just complete my record.

I received a note from the jury indicating that someone had been taking pictures in the courtroom, so I called the courtroom security officers so that we could inquire of the individual identified.  And so that was the interruption.

We will continue with the examination.

MR. S. RICHARDS:  Thank you, your Honor.

BY MR. S. RICHARDS:

Q.   So, the actual petition, apart from the CD with the 1,346

Rogala - cross

2047

pages of exhibits, the actual petition itself was about 100 --
was 150 pages itself, is that true?

A.   I'll take your word for it.

Q.   Fair enough.  Okay.  So, this was the material that went to
you and also went to Judge Atcherson, right?

A.   Yes.

Q.   So, let's move a little bit to the evidence hearing with
some preliminary questions.

     So, there's different procedures for usual
post-conviction petitions and 2-1401s, right?

A.   Yes.

Q.   For post-conviction petitions, there's a sort of set
three-stage process.  The first stage, the judge looks at it,
decides if it's frivolous.  The second stage, the State can
weigh in, move to dismiss, saying even if it's all true, it's
not a good claim.  And then there's a third stage is the
evidentiary hearing, right?

A.   Right.

Q.   And just in point of fact, your office would move to
dismiss many post-conviction petitions at the second stage and
were -- had a very high record of success on that front,
correct?

A.   I don't have the statistics, but we did often move to
dismiss at the second stage based on the laws and the fact.

Q.   And won?

Rogala - cross

2048

A.   We did win.

Q.   Now, with respect to a 2-1401, it's governed by the Rules of Civil Procedure, correct?

A.   Yes.

Q.   So, the procedure there is before we get to trial or a hearing, you could move to dismiss saying, "Even if all this is true, Mr. Rios doesn't have a case," right?

A.   Yes.

Q.   You didn't do that in this instance, correct?

A.   I did not.

Q.   The other procedure one could follow is you could file a motion for summary judgment saying, "We've investigated.  We have affidavits.  We -- we can show that this is not a good petition.  Therefore, summary judgment can be granted in our favor," correct?

A.   Yes.

Q.   But you didn't do that in this instance, either, right?

A.   Correct.

Q.   In fact, we did that, moved for summary judgment, and we lost, right?

A.   That's correct.

Q.   So, neither side gets summary judgment.  It goes to a hearing, at which we're going to call witnesses, right?

A.   Right.

Q.   Now, the -- the defense counsel pointed out that the

hearing is interrupted for a horrible reason after Carrero testifies, but other witnesses are available on deck to testify at that hearing, right?

A.   Correct.

Q.   Huertas by Zoom, right?

A.   As I recall, yes.

Q.   From New York, right?

A.   Yes.

Q.   And Garcia in person, correct?

A.   Yes.

Q.   Possibly Jaime Rios.

And there were also some additional witnesses from the additional material involving Guevara who were also available to testify or there to testify, correct?

A.   I don't remember who else was present other than the ones specifically related to this case.

MR. SCAHILL:   Judge, can I just have a very brief sidebar?

THE COURT:   Yes.

(Proceedings heard at sidebar:)

THE COURT:   Okay.

MR. SCAHILL:   Just to -- I think I know where Mr. Richards is going and staying clear of this 404(b) issue, which obviously, we would object to.  I just want to make sure that that is, in fact, what's going to happen so I'm not late

on my objection with him blurting out things about other acts and things like that which were not within the scope of my direct or pertinent to the evidentiary hearing.

So, I just wanted to clarify that we're not getting into that so I don't have to worry about sort of jumping on that before the cat is out of the bag, so to speak.

THE COURT: Mr. Richards, where are we headed?

MR. S. RICHARDS: I was just trying to rebut, as delicately as possible, the inference that it was -- the hearing was limited to those three witnesses; but I think I've established enough for that, so I can move on to another -- other issues.

MR. SCAHILL: That's fair.

THE COURT: Okay.

MR. SCAHILL: Thank you.

(Proceedings heard in open court, jury present:)

BY MR. S. RICHARDS:

Q. Now, the defense counsel also mentioned that at a hearing, of course, both sides can present evidence, right?

A. Right.

Q. And he also mentioned that typically, these hearings at 26th Street are not done in one day or in a continuous series of days. There's often long breaks where you put on some witnesses, then you bring back others. The defense puts on a case or the petitioner puts on a case and then you put on a

Rogala - cross

2051

Q. case, right?

A. Right.

Q. That's a pretty typical sequence, right?

A. Correct.

Q. So, with respect -- and he also mentioned that you have the ability to call witnesses to rebut the claims that a petitioner or a defendant might make, right?

A. Right.

Q. He mentioned that you could call police officers potentially, right?

A. Potentially, yes.

Q. And if the police officers were no longer with the Chicago Police Department, you could subpoena them, right?

A. Yes.

Q. Now, in this particular case, the claims of the petition just involved one officer, right?

A. I'm sorry. Repeat that?

Q. The claims in the petition all involved one officer, correct?

A. Yes.

Q. Garcia, Carrero, of course, Huertas, they all involved Reynaldo Guevara, right?

A. Right.

Q. Michael Mason was not named or identified in the petition for any reason, correct?

Rogala - cross

2052

A.   No, he was -- that's correct.

Q.   Nor was any prosecutor?

A.   Correct.

Q.   Nor was any criminal defense attorney?

A.   Correct.

Q.   So, one logical course for you would have been to call Reynaldo Guevara to rebut these allegations, right?

A.   Well, you're asking me to speculate on what I would have done, but that is a possibility.

Q.   Okay.  But an obstacle to that might have been that -- if Guevara at that point was taking the Fifth Amendment, correct?

A.   It would have been -- made it challenging, yes.

Q.   Okay.  And in addition, on the flip side, there's a possibility that we could have called Guevara, he would have taken the Fifth; and then an inference against your case would have been drawn -- might have been drawn from him taking the Fifth, correct?

A.   Again, you're asking me to speculate, but that could have happened.

Q.   I'm just wanting to point out that despite your success with Carrero, there was more going to happen in the hearing potentially than what we just -- what was actually done in April of 2022, right?

A.   Right.  I expected there to be more to the hearing, yes.

Q.   And that never happened because you got an order that you

Rogala - cross

2053

were supposed to not oppose the petition, right?

A.   Correct.

Q.   Or the motion to vacate, whatever you want to call it.

A.   Correct.

Q.   Now, let me just go into the procedure on a motion to vacate once you drop your opposition.

The judge is not compelled to grant the motion even though you dropped your opposition, correct?

A.   Correct.

Q.   The judge can still, on her own, Sophia Atcherson, can still deny the motion, and that will be that, right?

A.   The judge was left to make a decision, a final ruling on the petition, yes.

Q.   Right, one way or another, right?

A.   Right.

Q.   And the materials that Judge Atcherson had to rule were, first of all, the evidence she had heard during the evidentiary hearing, right?

A.   Right.

Q.   Plus all the materials in the petition, the affidavits, the 1346 pages.  All that was something that she could consider, right?

A.   Right.

Q.   However, she did grant the motion or petition, and the conviction was vacated, right?

A. Correct.

Q. So, at that point, the remedy or the relief ordered was a new trial, right?

A. Yes.

Q. So, at that point, the State's Attorney's Office could have gone ahead and said, "Okay. New trial. Let's set a trial date. Let's go from there," right?

A. Yes.

Q. But instead, the State's Attorney's Office chose to do what is known as *nolle pros*?

A. Correct.

Q. Okay. And I haven't had any Latin, but you all know that it means that the State drops the case, and the prosecution ends at that point, right?

A. Right.

Q. And that is what happened in this case, right?

A. Correct.

Q. Now, I just want to go -- circle back just to clarify. In terms of a resentencing after a new trial, Jaime Rios was under the sentencing regime of the '90s, where he would get day-for-day credit; in other words, if he got 36 years, for example, he would only be doing 18, right?

A. Yes.

Q. And that's changed over the years, but at his -- at that point, it definitely was 50 percent, right?

Rogala - redirect

2055

A.   Yes.

Q.   Nowadays -- nowadays, and possibly on a resentencing, it could be 100 percent time for any sentence, right?

A.   The statute now, it calls for 100 percent, yes.

Q.   Right.  So, unless he chose to go back under the old statute, there's a possibility at a new trial he could get 100 percent on whatever -- on whatever conviction, correct?

A.   It's possible.

MR. S. RICHARDS:  Nothing further.

THE COURT:  Okay.  Mr. Scahill.

MR. SCAHILL:  Just very briefly.

Carrie, can you pull up -- sorry, I surprised you -- Defendant's Exhibit 127-12.

Can I get the monitor just for the witness, please.

REDIRECT EXAMINATION

BY MR. SCAHILL:

Q.   Ms. Rogala, the court hearing at which the conviction -- at which you articulated your non-opposition and the *nolle pros*, that occurred on August 9th of 2022?

A.   That's correct.

Q.   Okay.  Before you went into that hearing, your directives were not just to remove your opposition to the petition, but were to follow the normal sequence of expecting that there was a new trial that was going to be granted, and then you following that up with a *nolle pros*, right?

Rogala - redirect

2056

A.   Yes.

Q.   Okay.  So, that sequence of events would ultimately result, in effect, in the termination of the case and the case not to be retried, right?

A.   Right.

Q.   And those were -- all of those directives were given explicitly to you by your superiors, including former State's Attorney Ms. Foxx, to go in that progression, right?

A.   Correct.

Q.   Now, the court hearing that those procedural mechanisms were effectuated in, how long did that last?

A.   A matter of minutes.

Q.   Okay.  When you indicated to Judge Atcherson that you were removing your opposition, you also indicated to her that in the event the new trial would be granted, that you would then be *nolle prosing* the case.  This was all within the sequence of the same sentence.  Do you recall that?

A.   Yes.

Q.   Okay.  And then after you uttered those words, did Judge Atcherson continue the case and say, "Well, I'm going to now review all of these things and determine whether that relief is going to be granted"?

A.   She did not.

Q.   Okay.  She immediately, right after that, immediately when those words passed your mouth, said, "Granted.  Conviction

Rogala - redirect

2057

vacated," correct?

A.   Yes.

Q.   So, this wasn't a point of deliberation for the court where it appeared to you, being in court, that she was looking through all of these exhibits and things and weighing whether it was sufficient; it was essentially a *pro forma* type of court appearance, right?

A.   Right.

Q.   And this sequence of events, when the State's Attorney's Office decides to remove their opposition, new trial granted, *nolle pros*, that is a very, very common procedural sequence of events in these cases when the State's Attorney removes their opposition, right?

A.   Yes.   In those cases where the State's Attorney removes their opposition, it does happen very quickly that the case is disposed of.

Q.   Right.   So, even when there can be circumstances where a court is looking at the record and sort of deliberating on their own, effectively, the practical impact of what you're doing is since you remove your opposition, the court essentially goes along with what the State's Attorney's Office is asking for, right?

A.   Essentially, yes.

Q.   Okay.   And the final point is that you were asked about filing a motion for summary judgment.   Do you remember those

questions?

A. I do.

Q. Okay. You testified that you were actually doing your investigation during the hearing, right?

A. Yes.

Q. So, if there were going to be a motion for summary judgment, you would need to develop the factual record before you did that, right?

A. Correct.

Q. Okay. And that -- if you were going to pursue that, that would be after you had put on the witnesses and after you had heard not only what the petitioner's witnesses said, but also the record that your witnesses had put on, correct?

A. Right.

Q. And that is something that you very well could have done after the record was developed, right?

A. Correct.

Q. So, there wouldn't really have been a basis to do that before you actually had the record before you; fair?

A. Fair.

MR. SCAHILL: Okay. I'm actually not going to need that, but thank you.

That's all the questions I have. Thank you.

THE COURT: Okay. Mr. Polick?

MS. GOLDEN: No questions. Thank you.

THE COURT:  Okay.  Thank you, Ms. Golden.

Mr. Richards.

MR. S. RICHARDS:  Just a couple.

RECROSS-EXAMINATION

BY MR. S. RICHARDS:

Q.  First of all, just as a side note, the attorney who appeared at that hearing before Judge Atcherson, that was not me, correct?  You saw it on the screen, but --

A.  I didn't look at the screen, but yes, I do see that you were not present that day.

Q.  Okay.  And the attorney who was present was Carla Milder, correct?

A.  Correct.

Q.  And you know who she is?

A.  I do.

Q.  Who was she?

A.  Well, she was an attorney that I dealt with in other post-conviction matters, but she's also your wife.

Q.  Okay.  With respect to Judge Atcherson's consideration of materials, although this hearing was short, all the materials had been given to her well before April, correct?

A.  Oh, yes.

Q.  So, she had an opportunity to review them before this short hearing in August, correct?

A.  She had possession of them.  I don't know what she did with

them.

Q.   Okay.  But you had dealings with her on other cases?

A.   Yes.

Q.   Okay.  She's a diligent and competent judge who reviews materials submitted to her, as far as you know?

         MR. SCAHILL:  Objection.  Foundation.

         THE COURT:  That's overruled.

BY THE WITNESS:

A.   In my opinion, yes.

         MR. S. RICHARDS:  Nothing further.

         THE COURT:  Anything on that?

         MR. SCAHILL:  No, nothing based on that.

         THE COURT:  All right.  Thank you.  You may step down.

         THE WITNESS:  Thank you, Judge.

    (Witness excused.)

         THE COURT:  Next witness?

         MR. SCAHILL:  We're going to be doing -- go ahead, Joe.

         MR. POLICK:  Judge, we're going to be proceeding by way of prior testimony.

         THE COURT:  Okay.  So, ladies and gentlemen, again, this is not -- we're going to hear prior testimony again, and so this is not the witness.  This is a reader playing the role of the witness.  Counsel will identify the proceeding and any other relevant information from the transcript, and then the

question and answer will essentially be a re-enactment of the transcript.

You may proceed when you are ready.

MR. KIVETZ: This is the trial testimony of Daniel Noon on Thursday, November 29th, 1990.

Daniel R. Noon, called as a witness on behalf of the People of the State of Illinois, having been first duly sworn, was examined and testified as follows:

This is the direct examination of ASA Mr. Carballo.

DANIEL R. NOON, DEFENDANTS' WITNESS, PRIOR TESTIMONY

DIRECT EXAMINATION

BY MR. KIVETZ:

Q. Officer, could you please introduce yourself to the ladies and gentlemen.

A. I'm gang crimes specialist Daniel R. Noon, star No. 5410, assigned to Gang Crimes North, Chicago Police Department.

Q. Officer Noon, how long have you been a Chicago police officer?

A. Almost 23 years.

Q. And you said you were assigned currently as a gang crimes specialist in Gang Crimes North?

A. Yes, sir.

Q. How long have you been a gang crimes specialist?

A. 11 years.

Q. And how long have you been assigned to Gang Crimes North?

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 153 of 208 PageID #:23070
Noon - prior testimony
2062

A.    11 years.

Q.    Prior to your assignment at Gang Crimes North, where were you assigned?

A.    I worked for 10 years in the 14th District station, which is the Humboldt Park area, in plain clothes, working with the street gangs in that area.

Q.    Does the 14th District cover the areas of Potomac and Western Streets?

A.    Yes, sir, it does.

Q.    How long have -- were you assigned to the 14th District?

A.    10 years.

Q.    What were your duties while you were assigned to the 14th District?

A.    Through my time in the 14th District, I worked in a plain clothes capacity working straight nights, 5:00 at night to 1:30 in the morning, monitoring the street gang activity within the 14th District boundaries, identifying street gangs, monitoring their activity, investigating their criminal offenses, which in fact, they were -- they involved themselves with.

Q.    Now, officer, you indicated you're assigned to Gang Crimes North.  Where is Gang Crimes North located?

A.    Our office is located Western and Belmont, which is within the Area 6 police district station itself.

Q.    How was the gang crimes unit of the Chicago Police

Department comprised?

A.   The City of Chicago is broken down into three sections: Gangs South, which roughly takes from Madison Street completely south to the city limits; Gangs West, which takes the center portion of the city; and my area of responsibility, which is roughly from Chicago Avenue all the way to the city limits, which would be Evanston on the north, Lake Shore Drive, as well as out to the airport.

Q.   Officer Noon, what are your duties as a gang crimes specialist?

A.   Detective 2 ratings within the Chicago Police Department. Our basic responsibilities is to, number one, identify the street gang members here in Chicago. This is the areas where they live, areas they frequent, to know the various logos, graffiti which they often put on the areas which they often call turf, to also investigate the activities which are criminal normally in nature that they are involved in.

And while investigating these criminal activities which they do participate in, to arrest and also prosecution of these people.

Q.   What other responsibilities do you have as a gang crimes specialist?

A.   Along with being a specialist assigned to Gang Crimes North, I'm also an instructor at the Chicago Police Department Academy. I teach the street gangs today to the Chicago police

officers, both at the recruit level, as well as in the service of training of the veteran officers.

Along with that, I also taught the U.S. Marshal at the MCC here in Chicago. I have also taught the Cook County Sheriff's Police newly formed gang unit, street crimes here in Chicago.

Also given seminars to State's Attorneys here in Cook County, as well as probation officers here in Cook County as well.

Q. Officer Noon, have you ever testified in court as an expert on gang activity?

A. Yes, I have, approximately 10 times in the last 10 years.

Q. Where was that at?

A. Here in the building, 26th and California, state level.

Q. Officer Noon, as part of your duties as gang crime specialist, are you assigned specifically to monitor any particular gangs?

A. Yes, sir. Each specialist is assigned to various street gangs. My particular gang happens to be the Gaylords street gang, also the Latin Kings.

Q. How are these gangs monitored? Could you explain to us that?

A. When I use the word "monitor," I'm referring to the contacts with these individuals, self-admission by these individuals, saying they're, in fact, a street gang member.

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 156 of 208 PageID #:23073
Noon - prior testimony
2065

This is done by observation on the street.

This is also accompanied with oftentimes where there's certain colors which in fact would be, in fact, identifying with that particular gang. The graffiti which, in fact, they put in their what they call turf, the areas they hang out at.

Mostly monitoring consists of watching their activity on the street.

Q. Now, are gang cards kept on individuals? How are gang cards kept on individuals, gang members?

A. In an arrest situation, we have what's known as a gang information card. This basically has information such as the person's name, sex, his race, date of birth, height, weight, general description of this individual, where he works at. Also, if, in fact, he is a gang member.

This is accompanied again by his self-admission. In other words, if a person says he's a Latin King, I will, in fact, put that on the part of the card saying, "Gang affiliation, Latin King."

Also, which section he might be from, North Side, South Side, what particular streets he's hanging at, as well as on his particular card vehicle in fact he may be driving.

Also, if he's charged with any type of an offense, what that would be. What happened, for example, what court, what date, what branch, such as that.

Also on the card in the lower right-hand corner is an

area which indicates if a photo is, in fact, of this person, and if so, the photo would be lodged in a gang photo book, which we kept at our office.

THE WITNESS: Jeff, can you excuse me for one second? I'm going to grab some water. Sorry.

BY MR. KIVETZ:

Q. Could you explain to us these gang photo books?

A. The gang photo books we use here in Chicago, these photographs are taken when an arrest is made, one of two ways. Number one, if we have our Polaroid with us in the station during our processing period, we'll take a photograph of the individual.

If, in fact, we know he has been arrested before or we don't at that point have a camera with us, knowing he's being charged with a misdemeanor or felony, procedures will be he will, in fact, be photographed in the lockup as well as fingerprinted.

Once a person is, in fact, fingerprinted by the Chicago Police Department, these photographs, negatives are kept on file downtown, and a number which is known and referred to as IR number he was given. So, therefore, if you know a guy has, in fact, been arrested before, and you have his IR number, it's not really required to take a photograph at that time because you can send downtown and obtain a photograph.

Q. How are the gangs in the City of Chicago divided?

A.   Here in the City of Chicago, we have approximately 75 active street gangs.  These active street gangs are broken down into two nations, if you will, the People Nation and the Folk Nation.

This took place back in Chicago probably about the early 1970s.  And right now of our 75 active street gangs, they will fall in, if you will, one side or the other.  They will either hang with all the People on one side or all the Folk on the other side.

Q.   Now, you indicated that you're assigned part of your duties as a gang crime specialist are to monitor the street gang Latin Kings.  Are you aware of what nation they belong to?

A.   Yes, sir.  The Latin Kings fall under the crown, which is part of the People Nation, along with Gaylords and Vice Lords. They are all considered People.  They call themselves People, and they are opposed to the opposing gang, which would be the Folks, such as either Spanish Cobras, Latin Disciples.

Q.   So, the Spanish Cobras street gang is a Folk street gang, is that correct?

A.   Yes, that's correct.

Q.   What area of the City does the gang the Latin Kings operate in?

A.   The area of Humboldt Park.  Western Avenue is a dividing line.  If you're on Western Avenue between the area of North Avenue and Division Street, Western Avenue itself is, if you

Noon - prior testimony

2068

will, the Mason-Dixon line, the DMZ back in the service.

What this means is on Western Avenue itself, that's neutral territory, neutral street.  If you're on -- if you're east of Western Avenue between North Avenue and Division Street, you're now entering an area, a turf which is known as People, a turf which is frequented quite a bit by Latin Kings and other People gangs.

Once on Western Avenue you go westbound, you have now entered a turf area called Folk, which is predominantly all Spanish Cobras and Latin Disciples.  Basically the area of Humboldt Park, Western Avenue at that point is the dividing line.

Q.   Are you familiar with the leadership structure of the Latin Kings?

A.   Yes.

Q.   Could you explain to us what the leader -- leadership structure?

A.   In a street gang such as Latin Kings, leadership started at the bottom level is peewee, weekend gang-banger.  After he's established himself within that gang, he becomes like a foot soldier back in the service.  He carries out the orders from the chief, which are above.

Q.   After you go from foot soldier to the chief above foot soldier?

A.   That's correct, sir.

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 160 of 208 PageID #:23077
Noon - prior testimony
2069

Q.   What are the colors of the Latin Kings?

A.   They are gold and black.

Q.   Are you familiar with the hand signal for the Latin King?

A.   Yes.

Q.   Now, are you also familiar with the gang Spanish Cobras?

A.   Yes, sir.

Q.   Okay.  Does the Spanish Cobras street gang have the same type of leadership rank as the Latin Kings?

A.   Yes.

Q.   And do they also have colors?

A.   Yes, sir.

Q.   Do they also have hand signals?

A.   Yes.

Q.   What are the hand signals for the Spanish Cobras?

A.   The Spanish Cobras, when they represent, this means how they acknowledge from one to another, they either take their hand and form a C with their hand, fingers, a letter C; or else they will take their hand as indicating an Egyptian cobra, indicating to strike.  They will put their hand like this and come up with a cobra like that.

Q.   Are you familiar with the symbols for the Spanish Cobras?

A.   Yes.  Spanish Cobras will indicate in their graffiti, they will either have a coil snake letter as C.  They will also have what we call pitchforks, the main sign of the Folk Nation.

Q.   Now, Officer Noon, do you know anyone by the name of Jaime

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 161 of 208 PageID #:23078
Noon - prior testimony
2070

Rios?

A. Yes, sir, I do.

Q. Okay. Could you look around the courtroom here today and tell us if you see him here in the court?

A. Yes, sir, I do.

Q. Could you please point to him and describe what he's wearing today?

A. Sitting at the table with the blue suit on and blue and gray tie, light blue shirt next to counsel.

MR. KIVETZ: And this is Mr. Carballo, "Indicating the defendant for the record," and the court says, "Yes."

BY MR. KIVETZ:

Q. How long have you known the defendant, Jaime Rios?

A. About two years.

Q. Have you ever had any conversations with the defendant?

A. Yes, sir, I have.

Q. And during these conversations, has the defendant ever admitted to you that he is a member of any street gang?

A. Yes, sir, he did.

Q. What street gang has the defendant admitted that he's a member of to you?

A. Told me he was a Latin King, Latin King.

Q. Did you -- during your conversations with the defendant, did you ever learn what his rank is in the Latin Kings?

A. Yes, sir.

Q. What is his rank in the Latin Kings?

A. He's a foot soldier.

Q. What's a foot soldier?

A. He's a member of that gang. He doesn't call any shots as such, doesn't give any orders, doesn't hold any rank like being a president or treasurer. He's just one of the members, a foot soldier.

Q. What do the foot soldiers do?

A. Basically, the foot soldiers will carry out orders given to them by their upper echelon.

Q. Have you ever seen the defendant on the street in Chicago?

A. Yes, sir.

Q. Where have you seen him at?

A. 1400 block on Leavitt.

Q. Okay. And what area of the city is this in relation to gang territory, gang turf?

A. That's Latin King territory right there.

Q. Now, Officer Noon, based on your experience as a gang crimes specialist, based on your observations of the defendant and your personal contact with the defendant and with the Latin Kings, do you have an opinion, within a reasonable degree of certainty, as to whether this defendant is a member of the Latin Kings?

A. Yes, sir, I do.

Q. What is your opinion?

A.   He is a self-admitted member of the Latin Kings.

Q.   Now, Officer Noon, I want to direct your attention to June 28th of 1989, at approximately 5:30 to 6:00 o'clock in the evening.  Do you recall where you were at this time?

A.   Yes, sir.

Q.   Where were you?

A.   I was working in plain clothes, and I went over to pick up a witness.

Q.   Okay.  Do you recall that witness's name?

A.   Yes.  Luis Huertas.

Q.   Luis Huertas?  Where did you pick up Luis Huertas at?

A.   Place of employment, residence, 1300 block north on Western Avenue.

Q.   What was your purpose in picking him up for?

A.   Transport him to Area 5 Violent Crimes to view a lineup which was being conducted.

Q.   And is Area 5 violent crimes, is that located within your boundary Gang Crimes North?

A.   Yes, sir.  It is located 555 West on Grand Avenue.

Q.   When you took the witness, Luis Huertas, to Area 5, did he, in fact, view a lineup?

A.   Yes, sir, he did.

Q.   Was he able to make an identification in that lineup on June 28th of 1989?

A.   No, sir, he was not.

Q. Are you aware as to whether the defendant, Jaime Rios, was present in that lineup?

A. He was not present at that lineup at that time.

Q. Now, after you brought Luis Huertas to Area 5 for the purpose of this lineup, did you have occasion to take Huertas anywhere?

A. Yes, sir. I took Huertas back to my office at Western and Belmont to show him some books containing street gang members.

Q. Do you recall approximately how many books you showed him?

A. I would say approximately 10 or 12 at least.

Q. And do you remember what gangs -- regards to what gang books you showed him?

A. Yes. At first I showed him -- I showed the witness books containing self-admitted members of the People Nation, such as Latin Kings and other gangs. At that point, I did not -- at that point, he didn't make any identification.

So, what I did, I also showed the witness books in my office which contain self-admitted members of the Folk Nation, such as Disciples and Cobras, thinking that perhaps it might have been false-flagging type of shooting.

Q. When you say false-flagging, what do you mean by that?

A. This is when a gang will say one particular name which is actually the opposite of what they are. They false-flag.

Q. In all of the books that Mr. Huertas looked at, was he able to identify anyone?

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 165 of 208 PageID #:23082
Noon - prior testimony
2074

A.   No, sir, he was not.

Q.   And at the time that you were looking at the books with Mr. Huertas or the time that Mr. Huertas was looking through the books, did -- was the defendant, Jaime Rios, a suspect at that time?

A.   No, sir.

Q.   Was the defendant's photo in any of the photo books that you showed to Luis Huertas?

A.   No, sir.  His photo was not in the book at that time.

Q.   How do you know that, Officer Noon?

A.   Because I brought the book to court, and the photograph that is in that book of the defendant, Mr. Rios, was taken after he was arrested for this particular incident, which occurred three weeks later.

Q.   Officer Noon, I'm going to show you what is considered marked as People's Exhibit No. 28 for identification.  Do you recognize this book?

A.   Yes.  This here is a City of Chicago Department of Police, what we call a mug book, gang book.  This particular book is numbered 1765, and it contains self-admitted Latin Kings.

Q.   Is the defendant Jaime Rios's photo contained within that book?

A.   Yes, sir, it is.

Q.   What page is his photo contained in that book?

A.   His photo is on page 65.

Noon - prior testimony

2075

Q. Okay. Does that -- was that photograph in the book on the date that you showed Luis Huertas this book?

A. No, sir, it was not.

Q. And how again did you -- how do you know this?

A. Because this photograph was taken of the defendant after he was arrested. He had been identified in a lineup in Area 5 approximately one week later.

MR. KIVETZ: Mr. Carballo then says, "May I have a moment, your Honor. I have no further questions."

The court says, "Cross?

Mr. Carey says, "Yes, Judge."

And this is the examination by the defense attorney, Mr. Jack Carey.

BY MR. KIVETZ:

Q. Good afternoon. The book that you were looking at here, this isn't Latin King book No. 2, is it?

A. No. 2?

Q. No. 2.

A. I don't know of a Latin King book No. 2.

Q. Jaime Rios's picture is in Latin King book No. 2, isn't it? Oh, you don't know?

A. Only picture of Jaime Rios is in that book in your hand, sir.

Q. Have you ever heard of Latin King book No. 2 at the 14th District?

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 167 of 208 PageID #:23084
Noon - prior testimony
2076

A.   Sir, the 14th District has their own books.  We don't have --

Q.   They have Latin King books there?

A.   Yes, sir.

Q.   So, are you familiar with those books?

A.   I know they have their own books, yes, sir.

Q.   Well, you know that some of the witnesses in this case looked at the Latin King book at the 14th District?

A.   To my knowledge, the 14th District Tac. personnel were showing their books.  I wasn't present, sir, no.

Q.   Were you there when Mario Flores and Javier Torres looked at photo books of the -- at the 14th District?

A.   No, sir.  I was not present when they showed photos to witnesses.

Q.   Did you -- do you know if Luis Huertas looked at any of the Latin King books there?

A.   Not in my presence, no, sir.

Q.   Are there books with photographs of Latin Kings at the 14th District that are not included in the photograph books that you have?

A.   I would have no idea.  I assume there are there.  There probably would be.

Q.   Did you make an effort to show Luis Huertas the Latin King books in the 14th District?

A.   No.  I showed Latin King books from Gang Crimes North.

Q.   14th District is the district where Luis Morales was shot, isn't it?

A.   Yes, sir, that's correct.

Q.   You didn't show him books from that district?

A.   Counsel, I thought you said did I show him their books.

Q.   Did you show him the Latin King books in the 14th District?

A.   He was shown books of Latin Kings from Gangs North.

Q.   Let me ask the question again.  Did you show Luis Huertas Latin King books that are located at the 14th District?

Do you understand the question?

A.   No.   I did not show him books from the 14th District.

Q.   Luis Huertas lives and works on the east side of Western Avenue?

A.   He did.

Q.   Well, he did in July of 1989?

A.   Yes, sir.

Q.   That's where you picked him up?

A.   Yes, sir.

Q.   That's the Latin Kings side?

A.   Yes, sir.

Q.   You testified on direct about something like false-flagging?

A.   Yes, sir.

Q.   So, if somebody shot someone and said, "King love," and they were false-flagging, that could mean they were Cobras?

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 169 of 208 PageID #:23086
Noon - prior testimony
2078

A.   Yes, sir.

Q.   On the other hand, if they represented Spanish Cobras and then shot somebody and then said, "King love," you wouldn't really know which one was false-flagging?

A.   That's correct, sir.

        MR. KIVETZ:  Mr. Carey then says, "One moment, Judge. No further questions."

        Your Honor, we're now going to move on to the trial testimony of Daniel Noon from November 30th, 1990.  This is Officer Daniel R. Noon, called as a witness on behalf of the People of the State of Illinois, being first duly sworn, was examined and testified as follows:

        This is the direct examination of ASA Kay Hanlon.

     DANIEL R. NOON, DEFENDANTS' WITNESS, PRIOR TESTIMONY

BY MR. KIVETZ:

Q.   Could you please state your name, officer.

A.   Gang crimes specialist Daniel R. Noon, N-O-O-N, star 5410, assigned to Gang Crimes North.

Q.   Officer, are you the same officer who just testified yesterday?

A.   That is correct.

Q.   I'd like to draw your attention to June 5th of 1989.  Did you have a conversation with the defendant, Jaime Rios, on that date?

A.   Yes, I did.

Noon - prior testimony

2079

Q.   When I am referring to Jaime Rios, that is the person you have previously identified here in court as the defendant in this matter?

A.   Yes, that is correct.

Q.   When you had a conversation with him that evening, officer, did he ever tell you that he was a retired member of the Latin Kings street gang?

A.   No, he did not.

Q.   Did he tell you he was still an active member in the gang?

A.   Yes, he did.

Q.   This conversation on June 5th, 1989, occurred how much prior to the murder in this case?

A.    Three weeks.

        MR. KIVETZ:  This is now the cross-examination of defense attorney Jack Carey.

BY MR. KIVETZ:

Q.   Did he tell you his status in the gang?

A.   Other than the fact he was still actively with the Latin Kings, that was about all.

        MR. KIVETZ:  Okay.  That is the end of the two days of trial testimony.  We're going to now do another reading, your Honor.

        THE COURT:  Okay.

        MR. POLICK:  Judge, the next witness is Richard Curley.  That's C-U-R-L-E-Y.  That, too, will be by prior

testimony.

THE COURT: Okay.

MS. GOLDEN: May I tender a copy to the court reporter?

THE COURT: Yes.

MS. GOLDEN: Are you ready?

THE WITNESS: Um-hum.

MS. GOLDEN: Okay. This is the direct examination of Detective Richard Curley, who -- at the trial, the second day of the trial; and he was a witness called by the defense, by Jaime Rios.

Detective Richard Curley, called as a witness on behalf of the defense, being duly sworn, was examined and testified as follows:

RICHARD CURLEY, DEFENDANTS' WITNESS, PRIOR TESTIMONY

BY MS. GOLDEN:

Q. Sir, would you tell us your name.

A. Richard Curley.

Q. How are you employed?

A. I am a detective with the Chicago Police Department.

Q. Were you working as a detective in the Chicago Police Department in July of 1990?

A. Yes, sir.

Q. What was your assignment at the time?

A. July of 1990, I was --

Curley - prior testimony

2081

Q.   I'm sorry.   1989.   I apologize.

A.   I was assigned to Area 5 violent crimes.

Q.   And as part of that assignment, were you given -- what?
Were you given an assignment to execute a search warrant at
1419 North Wicker Park?

A.   Yes, sir.

Q.   And was the warrant for a .38-caliber revolver?

A.   Yes, sir, I believe it was.

Q.   And did you go to that location?

A.   Yes, sir, I did.

Q.   And how many police officers were with you?

A.   Seven officers.

Q.   Did you arrest Iris Mendez?

A.   Yes, sir, I did.

Q.   Did you take her to Area 5?

A.   Yes, sir, I did.

Q.   Did you question her?

A.   Let me correct that.   I did not take her.   We had another
car transport her.

Q.   Did you eventually question her?

A.   Yes, sir, I did.

Q.   You were at the scene when the warrant was executed, is
that right?

A.   Yes, sir.

Q.   And you learned at the time that she had a four-month-old

child?

You learned at the time that she had a four-month-old child, is that right?

A.  I don't remember about a child, sir.

Q.  Okay.  When you took her in to the police station, did you bring the child with?

A.  No, sir, I didn't bring no child.

Q.  Well, did you tell her where the child was?

A.  I didn't know she had a child.

Q.  You went into her apartment, though, didn't you?

A.  I'm sorry.  Would you repeat that?

Q.  You went into her apartment?

A.  I went into an apartment, yes, sir.

Q.  Well, is the apartment where she was living?

A.  She said she was, yes, sir.

Q.  You didn't see a child there?

A.  No, sir.

Q.  Did you see other people there?

A.  Yes, sir.

Q.  About how many?

A.  I saw -- I saw one elderly woman.

Q.  Was that all?

A.  At that time, yes, sir.

Q.  Well, now, detective, you filled out a report in this case, didn't you?

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 174 of 208 PageID #:23091
Curley - prior testimony
2083

A. Yes, sir.

Q. And you signed the report?

A. Yes, sir, I believe I did.

Q. I'm going to show you what I am going to mark as Defendant's No. 13 for identification. I'm going to ask you to take a look at this and see if you recognize this.

A. Yes, sir.

Q. I'm going to ask you to look at the top of the second page.

A. Okay.

Q. Now, in the portion of your report that says, "In custody," you made an entry that says, "Iris Mendez," is that correct?

A. Yes, sir.

Q. And under that, you said, "Unemployed, one child, two-and-a-half months old," is that correct?

A. That is what the report says, yes, sir.

MS. GOLDEN: Okay. Now there's the State's case, questioning by Mr. Carballo.

BY MS. GOLDEN:

Q. Officer Curley, on July 9th, 1989, you stated you went to the house located at 1419 North on Wicker Park to execute a search warrant?

A. Yes, sir.

Q. That was a search warrant for a gun, correct?

A. Yes, sir.

Q. When you arrived at the house, could you tell the ladies

and gentlemen what you did?

A.   We arrived at the scene, myself with other officers, and we proceeded to walk up the front stairs to the second floor landing.  As we were walking up the stairs, there was a man and a woman standing there, subsequently identified as Benjamin Carrero and Iris Mendez, and several other people standing on the porchway itself.

That is the porchway on the outside of the building.

Q.   When you confronted those people on the porch, what happened at that time?

A.   At that time, we identified Mr. Carrero as the gentleman we were looking for.  We identified ourselves.  We were in plain clothes, but we had a uniformed officer with us.

At that time, he was presented with a copy of a search warrant for his apartment and was told the reason we were there, as was Ms. Mendez.

Q.   Did you proceed into the building?

A.   We were directed by Mr. Carrero up to the top floor of the building.

Q.   Could you describe the building?

A.   Yes, sir.  The building is an older building.  As you walk up to the sidewalk, there is an apartment that you would walk ground level right into.  Then you'd walk up I would say about 15 stairs, which would take you to one apartment, and then approximately another 15 or 20 stairs, which would take you to

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 176 of 208 PageID #:23093
Curley - prior testimony
2085

the upstairs apartment.

Q.   What happened then once you entered the apartment?

A.   We were directed to the top apartment, the top apartment by Mr. Carrero, which he stated was his apartment.

Q.   When you went up, you say the top floor.  Did anything happen when you arrived to the top floor?

A.   Yes, sir.  Mr. Carrero and Ms. Mendez -- or Melendez, the door was open.  They took us into the apartment, at which time the officers began to search the apartment.

Q.   Now, the top floor is what you officers considered to be the second floor, since the first floor actually -- what they were considering was the first floor was actually the ground floor, is that right?

A.   No.  The top floor we were taken to I would have considered the third floor, considering the basement or -- not the basement, but the ground level to be the first floor, the next one to be the second, the next one to be the third.

Q.   I see.

A.   They evidently interpreted it to be the second floor.

Q.   What happened then?

A.   The search was going on, and I was standing there watching it close to the driveway.  And out of the corner of my eye, I observed Ms. Mendez slipping towards the doorway, saw her slip out the door and start to go down the stairs to the second floor apartment.

MS. GOLDEN: This is me talking. Could you read that answer again? I think you said, "driveway." I'll just start with line 12.

BY MS. GOLDEN:

Q. What happened then?

A. The search was going on, and I was standing there watching it close to the doorway. And out of the corner of my eye, I observed Ms. Mendez slipping towards the doorway, and saw her slip out the door and start to go down the stairs to the second floor apartment.

Q. When you observed this, what did you do?

A. I immediately told my sergeant I was going to follow her, and I followed her down to what I would have called the second floor apartment.

At that time, she entered the apartment, which was -- the door was open. There was an elderly woman standing there.

Q. Was this elderly woman subsequently identified?

A. Yes, she was.

Q. Was she identified as Mr. Carrero?

A. Yes, she was.

Q. And when you arrived at the door of Mr. Carrero, what happened then?

A. I identified myself to her as a police officer; and I tried to explain to her why we were there, but she did not speak English.

At that time, I called for one of the uniformed officers that was with me who spoke Spanish, asked him to translate for me our reason for being there.

Q.   Was that Officer Avila?

A.   Yes, sir, it was.

Q.   What happened then?

A.   We explained to her why we were there.  At that time, she stated that her son Benjamin and Iris lived in that apartment where she was standing.

I asked her, told her we were looking there -- we were there looking for a gun that had possibly been used in a murder, if it was all right for us to search there.  She stated it was.

At that time, I had the officer, through the translator, explain to her I would like to have her sign a permission to search form.  She understood what she had said and granted us permission and signed the form.

Q.   Did you subsequently enter into the apartment then?

A.   Yes, we did.

Q.   Where was Ms. Mendez at the time?

A.   She was standing next to Mrs. Carrero.  The three of us were standing right there in the doorway of the apartment.

Q.   Did Ms. Mendez have occasion to then go somewhere?

A.   Just prior to that, my sergeant and partner came from downstairs to make sure I was all right, and they also entered

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 179 of 208 PageID #:23096
Curley - prior testimony
2088

into the apartment.  As we were standing there, Ms. Mendez again slipped away and walked to the rear of the apartment, and I saw her go into the room, which would have been to my left. Not knowing what she was doing, I proceeded into the room after her.

Q.   Okay.

A.   Which turned out to be a -- to be a bedroom.

Q.   What did Ms. Mendez do then when you saw her inside the bedroom?

A.   She was just standing there.  And I asked her what she was doing.  She said, "I came in to look for something."  I didn't see nothing on her.  I just says, "Would you step back out into the front room?"

       At that time, she asked to use the washroom.

Q.   What did you say when she asked to use the washroom?

A.   I says, "Fine, no problem."  It was like 3 feet across the hall from where we were standing.

Q.   Did she, in fact, go into the washroom?

A.   Yes, she did.

Q.   When she went into the washroom, did she close the door?

A.   Yes, she did.

Q.   What did you do at that time?

A.   I listened at the bathroom door because from past experience, I know that guns and narcotics and everything are hidden in the bathroom, quite often in the tank of a toilet

bowl.

Q. You were listening at the bathroom door?

A. Yes, I was.

Q. What observations did you make?

A. Well, I didn't hear the sound of any urine going into the toilet. I did not hear a toilet bowl cover being moved. But I could hear what sounded like the window in the bathroom. It was an older building, and I heard the window being raised in the bathroom.

Q. Immediately after that, what did you do?

A. I told my partner John, "I am going outside to watch the outside." I immediately ran out the door, ran to the side of the building. As I --

Q. Approximately how far was that that you ran?

A. 50 feet.

Q. And when you ran outside the building, did you make any observations?

A. Yes, sir, I did.

Q. What did you observe?

A. As I entered the gangway, I observed Ms. Mendez leaning out the window and throw a gun out the window into the gangway.

Q. You state that Ms. Mendez was subsequently placed under arrest?

A. Yes, she was.

Q. Did you ever, or did any other officer in your presence

ever threaten Ms. Mendez?

A.   No, sir.

Q.   Did any -- specifically, did you or any other officer threaten to take Ms. Mendez's child away from her?

A.   No, sir.

Q.   What kind of gun did you recover?

A.   It was a .32-caliber automatic or .32-caliber.  I don't recall the name of the weapon.

Q.   Where was that recovered from?

A.   It was in the gangway alongside the building right next to the window from where -- the apartment where Ms. Mendez had thrown it out.

Q.   After you executed the search warrant of -- at this location, did you have occasion to go back to Area 5 to your police office?

A.   Yes, sir, we did.

Q.   And directing your attention to approximately 11:30 p.m., did you have an interview with Benjamin Carrero at Area 5?

A.   Yes, sir.

Q.   Who was present during the interview?

A.   Myself, Detective Mason, and Mr. Carrero.

Q.   What did Benjamin Carrero say to you, if anything, during this conversation.

     Detective Curley, do you recall what Benjamin Carrero said during this conversation?

Curley - prior testimony

2091

A.   Yes, sir, I do.

Q.   What did he say?

A.   After he had been advised of his rights by Detective Mason, he stated that on the evening -- on the late evening hours of the 27th or early morning hours of the 28th of June, 1989, he stated that he had been sitting on the front stairs of his building, at which time a friend of his by the name of Jaime Rios rode up on a bicycle.

Mr. Rios then took a gun from his waistband and handed it to Mr. Carrero and says, "I just shot somebody.  I want you to hold this gun for me.  I will return later to get the gun."

Mr. Carrero said he subsequently took the gun into the apartment and hid it in the closet in the bedroom.

MS. GOLDEN:  And then on redirect examination by Mr. Carey.

BY MS. GOLDEN:

Q.   Iris Mendez was arrested for obstruction of justice, is that right?

A.   Yes, sir.

Q.   And that was for throwing the gun out of the window, is that right?

A.   No, sir.

Q.   After she threw the gun out of the window, you arrested her for obstruction of justice?

A.   It was not just for throwing the gun out the window, no,

sir.

MS. GOLDEN: And that concludes the testimony of Detective Curley.

THE COURT: Okay.

MS. GOLDEN: I think you can sit tight up there.

MR. POLICK: Judge, our next witness will be Ernest Halvorsen. This, too, will be by prior testimony.

THE WITNESS: Counsel, are you starting with 26th of February?

MR. KIVETZ: Yes.

THE WITNESS: Okay.

MR. KIVETZ: This is the pretrial hearing that is conducted on February 26th, 1990, and the witness is Ernest Halvorsen. This is the direct examination by ASA Frank Marek.

ERNEST HALVORSEN, DEFENDANTS' WITNESS, PRIOR TESTIMONY

BY MR. KIVETZ:

Q. Detective, would you state your name for the record, please.

A. Ernest Halvorsen.

Q. And, detective, by whom are you employed?

A. Chicago Police Department.

Q. And your unit of assignment?

A. Area 5 Violent Crimes.

Q. And how long have you been a Chicago police officer?

A. 18 years.

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 184 of 208 PageID #:23101
Halvorsen - prior testimony
2093

Q.   And how long have you been a Violent Crimes detective?

A.   Nine years.

Q.   Detective, I want to direct your attention to July 6th of 1989 during the evening hours.  On that date and at that time, did you become involved in the investigation into the shooting of Mr. Luis Morales?

A.   That's correct.

Q.   And what happened at that time which made you become involved in that shooting?

A.   I was in the office at Area 5 Violent Crimes at 5555 West Grand Avenue.  Some officers from Gang Crimes North brought an individual in who they felt might have information about this case.

They initially informed Detective Mason about this person they had because he had been working on the case. Detective Mason then asked if I would help him in this investigation.

Q.   Had you been working on the investigation up until then?

A.   No.

Q.   And about what time of the day was this when these officers brought this individual in to the station?

A.   It was about 10:00 o'clock on the evening of 6 of July.

Q.   Is Detective Mason working at the present time?

A.   No, he's not.  He has had a heart attack.  He has been off at least a month and a half.

Q.   Detective, what is the first thing you did after you were asked to assist in the investigation by Detective Mason?

A.   I read the reports that had been prepared up to that time, and I conferred with the office of the gang crimes why they thought this individual had information about that homicide.

Q.   What happened then?

A.   We attempted to locate the witnesses that had been mentioned in the reports.  We couldn't find them.  After the witnesses were unavailable, me and Detective Mason sat down with Mr. Rios and conducted an interview.

Q.   Now, at this time, at the time that you spoke to Mr. Rios, was he handcuffed?

A.   No.

Q.   Up to this point, had he been in handcuffs at all?

A.   No.

Q.   Where was Mr. Rios when you conducted this interview with him?

A.   He was seated in Interview Room C at our office in Area 5.

Q.   Was the door to that room locked?

A.   It was not.

Q.   Was Mr. Rios free to leave?

A.   Yes, he was.

Q.   Was he under arrest at that time?

A.   No, he was not.

Q.   Did you, in fact, speak to Mr. Rios concerning the

Halvorsen - prior testimony

2095

investigation into the homicide of Luis Morales at that time?

A.   I sat in the room with Detective Mason as Detective Mason informed him of his Miranda rights and asked him a series of questions regarding this crime.

Q.   And did Mr. Rios furnish a statement with respect to this homicide?

A.   Yes, he did.

Q.   What was the substance of the statement, detective?

A.   Prior to Mr. Rios giving us a statement, we had absolutely no real evidence that he was an offender in this case.  We had information from informants that he may possibly be an offender.

The substance of his statement was he and another individual by the nickname of Tino were, in fact, involved in this matter.  He claimed that Tino did the actual killing; but in the discussion -- conclusion of his statement, he indicates to me he fires his gun two times in the direction of the victim and yells out, "King love."

Q.   After Mr. Rios gave that statement, what happened?

A.   At that time, I walked out of the room, and I told him he was under arrest and locked the door.

MR. KIVETZ:  This is from the court.

"You told who?"

"THE WITNESS:  Mr. Rios."

MR. KIVETZ:  Back to ASA Marek.

BY MR. KIVETZ:

Q. Is that person in court today?

A. Yes, he is.

Q. Would you identify him for the record?

A. He's sitting at the table wearing a gray shirt with a dark-colored jacket.

MR. KIVETZ: "May the record reflect the in-court identification of the defendant, your Honor?"

And the court says, "Yes, it may."

This is now the cross-examination of Mr. Carey, the defense attorney.

BY MR. KIVETZ:

Q. Detective Halvorsen, your first involvement was the evening of the 6th of July, is that correct?

A. That's correct.

Q. And what time did you become involved in the investigation?

A. About 10:00 o'clock at night.

Q. And you said at the time, you attempted to contact witnesses, is that correct?

A. That's correct.

Q. Did you do that by phone?

A. I don't recall where they were located.

Q. Do you remember how many times -- how many witnesses that they tried to contact?

A. Two, I believe.

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 188 of 208 PageID #:23105
Halvorsen - prior testimony
2097

Q.   Do you remember their names?

A.   No.

Q.   Was one of them Mario Flores?

A.   I'd have to review the reports in the case.

MR. KIVETZ:  Mr. Carey then asks the judge, "May I approach the bench?"

And the court says, "Sure."

BY MR. KIVETZ:

Q.   I am going to show you what has been marked as Defendant's No. 2 for identification.  This is the June 28th report of Detectives Mason and Brennan, which is a review of the witnesses in that case.  Do you want to take a look at that?

Is your recollection refreshed as to those witnesses?

A.   I see in the report there are two people listed at being eyewitnesses.

Q.   Well, in fact, there were four people, isn't that true?

A.   As eyewitnesses, no.

Q.   Well, do you remember, based on your review of the report now, which witnesses you contacted?

A.   I remember that on the 17th, we did a lineup that I conducted of Mr. Huertas or Mr. Torres.

Q.   Mr. Torres is the person that was standing right next to the victim when he was shot?

A.   Again, I have to review the file because I did not do the initial investigation in this case.

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 189 of 208 PageID #:23106
Halvorsen - prior testimony
2098

Q.   Okay.  So, Javier Torres was then the person standing right next to the victim when he was shot, is that correct?

A.   That's correct.

Q.   Now, you had -- prior to the 6th of July, you had no prior involvement in this investigation, is that right?

A.   That's correct.

Q.   And so you read all the reports that existed up until then, is that right?

A.   That's correct.

Q.   And you knew that there was four witnesses, Samantha Hudson, a Luis Huertas, a Mario Flores, and a Javier Torres, is that right?

A.   From what I read in the report there, there were only two eyewitnesses.

Q.   Mario Flores and Samantha Hudson, did you read the statements made by those two witnesses?

A.   On the 6th of July, I am sure I did, but I don't remember what they say now.

Q.   I am going to ask you to take a look at those statements, again, Defendant's No. 2 for identification.  Now, is your recollection refreshed on that issue?

A.   All I can attest to is the facts -- is the fact that I have read those reports, but I never myself talked to those persons.

Q.   They did give descriptions of two male white Hispanics about 5-foot-3 to 5-foot-5-inches tall with long hair, isn't

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 190 of 208 PageID #:23107
Halvorsen - prior testimony
2099

that correct?

A.   Again, I can only go with what is published in my report, and I never talked to those persons.

Q.   That is what you read in the report?

A.   I have to take a look at it again, to be truthful.

To the first set of reports you presented to me to refresh my memory, nowhere does either one of these people give a physical description, for Samantha Hudson or Mario Flores in either of those statements in either of those reports.

Q.   Does that report reflect your recollection as to the description?

A.   Which report?

Q.   The case report that you just looked at.

A.   No.   I have no independent recollection of description from back on the 27th of June 1989.

Q.   Did you look at Detective Mason's handwritten notes?

A.   Not that I recall.

Q.   So, you don't know which report you looked at on the 6th of July?

A.   I can't truthfully answer exactly every report I did or didn't look at.

Q.   Is it your practice to look at the case report?

A.   That's correct.

Q.   But in this case, you have no independent recollection as to whether you looked at the case report, is that right?

Halvorsen - prior testimony

2100

A.   I know I read the case report, but I can't recall what the case report said.  I can't remember if I saw that the offenders were 5-foot-3 to 5-foot-5-inches tall, male, white Hispanic. Again, I have to look at the report.

Q.   First one, 5-3 to 5-7, the first one 5-feet-5, is that right?

A.   Counsel, which report are we referring to here?

Q.   The case report.  Do you want to take a look at this again?

A.   This is the original reporting officer's report.

Q.   Right.  Did you look at that?

A.   Yes, I did.

Q.   And did you look at the description on there?

A.   I am sure I did.

Q.   Did you call the witness that gave this description?

A.   I don't know truthfully which witness gave that description.

Q.   Do you remember, based on any of your four reviews now of these reports, which witnesses you recalled -- called?

A.   We attempted to get ahold of Hudson -- not Hudson, Torres and Huertas because in the report they are listed as the only persons that can identify the actual offender.

Q.   Okay.  Now, were you aware, based on your review of these reports, that two of the witnesses named a "Macho" Melendez as the person who was the shooter?

A.   I read that.

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 192 of 208 PageID #:23109
Halvorsen - prior testimony
2101

Q. Did you speak to Detective Brennan at all?

A. Not on that night.

Q. But did you speak to detective -- but you did speak to Detective Mason, is that correct?

A. That's correct.

Q. Okay. And did he tell you that he had requested assistance from Gang Crimes North?

A. I knew that Gang Crimes North was actively involved in this investigation.

Q. And that evening, in fact, the Gang Crimes North brought in Mr. Rios, is that right?

A. That's correct.

Q. Do you know how many officers from Gang Crimes North were involved?

A. From what I recall, Officer Guevara and his partner, Steve Gawrys.

Q. Were any other officers involved from Gang Crimes North?

A. Not initially that I can recall.

Q. You testified that before you spoke with Mr. Rios, you gave him his Miranda warnings, is that correct?

MR. KIVETZ: I think you have to read that.

BY THE WITNESS:

A. Detective Mason gave him his Miranda warnings.

MR. KIVETZ: All right. And that is the end of that particular hearing. We are now moving on to Friday,

March 30th, 1990, which is another pretrial hearing. This again is the testimony of Ernest Halvorsen, and this is the direct examination by ASA Frank Marek.

BY MR. KIVETZ:

Q. Detective, would you state your name for the record.

A. Detective Ernest Halvorsen.

Q. Detective, by whom are you employed?

A. Chicago Police Department.

Q. And how long have you been a Chicago police officer?

A. 18 years.

Q. And you are currently assigned to Area 5 Violent Crimes?

A. That is correct.

Q. How long have you been a detective with Area 5 Violent Crimes?

A. Nine years.

Q. Detective, on July 6th, 1989, were you assigned to Area 5 Violent Crimes?

A. I was.

Q. And were you working on that day?

A. I was.

Q. And at approximately 10:00 o'clock p.m. on that day, did you have occasion to familiarize yourself with the investigation into the shooting death of Luis Morales?

A. I did.

Q. And what, if anything, happened at about 10:00 o'clock p.m.

Halvorsen - prior testimony

2103

to cause you to become involved in this investigation?

A.   Some officers from Gang Crimes North had brought an individual up to Area 5 who they felt might be implicated in this crime.  Detective Mike Mason, who had been working this investigation, requested that I help him out in this case.

Q.   Had you had any participation in the case up to that point?

A.   No.

Q.   Detective, did you sometime later that evening speak to the person that the gang crimes officers brought in?

A.   Yes, I did.

Q.   Was that Mr. Jaime Rios?

A.   Yes, it was.

Q.   And is that person in court today?

A.   He is.

Q.   Would you indicate him for the record?

A.   The gentleman sitting there with the black shirt on with the dark blue jacket on.

Q.   And approximately what time did this interview take place?

A.   Approximately midnight on the 6th of July going into the morning of the 7th of July.

Q.   Was anybody else present when this interview occurred?

A.   Yes, there was.

Q.   Who was that?

A.   Detective Mike Mason.

Q.   And, in fact, did Detective Mike Mason conduct the

Halvorsen - prior testimony

2104

interview?

A.   Yes.

Q.   He did.  And approximately how long did that interview take place?

A.   30, 35 minutes.

Q.   And during that interview, did Mr. Rios give a statement regarding the homicide of Luis Morales?

A.   He did.

Q.   And what happened following that interview?

A.   At the end of this interview, Mr. Rios was informed he was under arrest for murder.

Q.   And who did that?

A.   I did.

Q.   Prior to Mr. Rios being informed that he was under arrest, had he been handcuffed at any time?

A.   No.

Q.   After Mr. Rios was placed under arrest, was he then handcuffed?

A.   Yes, he was.

Q.   Detective, were you present for any other interviews by any detectives or Assistant State's Attorney conducted of Mr. Rios?

A.   I was not.

Q.   Detective, at any time, did you ever pull Mr. Rios's hair?

A.   I did not.

Q.   Detective, at any time, did any detective or any other

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 196 of 208 PageID #:23113
Halvorsen - prior testimony
2105

person in your presence ever pull Mr. Rios's hair?

A. They did not.

Q. Detective, did you at any time threaten Mr. Rios with the loss of any rights to his child?

A. I did not.

Q. Detective, did any other person in your presence ever threaten Mr. Rios with the loss of any rights to his child?

A. No.

MR. KIVETZ: Mr. Marek then says, "I have nothing further."

And the court says, "Cross."

This is now the cross-examination of defense attorney, Mr. Carey.

BY MR. KIVETZ:

Q. Detective Halvorsen, when were you assigned to this case?

A. Approximately 10:00 o'clock on the evening of the 6th of July.

Q. You hadn't worked on the case prior to July 6th?

A. I had not.

Q. And do you remember who brought Jaime Rios in to the station that night?

A. Some officers from Gang Crimes North.

Q. Do you remember who?

A. Rey Guevara, and his partner Gawrys.

Q. Did they drop him off and leave, or did they stay around?

Halvorsen - prior testimony

2106

A. From what I recall, they brought him in. They went back out and looked for witnesses.

Q. Did they come back in to Area 5?

A. Yes, they did.

Q. Did other gang crimes officers come in on this case?

A. Later in the evening, they did.

Q. Do you remember who they were?

A. No.

Q. Now, the first time you talked to Jaime Rios was 10:00 o'clock?

A. No.

Q. What were you doing between 10:00 and midnight?

A. Reviewing the case, conferring with Detective Mason, seeing if the gang crimes officers could locate the witnesses.

Q. Did you personally talk to any witnesses?

A. Repeat, counsel? I couldn't hear you.

Q. Did you personally talk to any of the witnesses?

A. No, not at that time.

Q. Did your partner?

A. Not at that time.

Q. Did your partner contact any witnesses?

A. We were unable to locate the witnesses at that time.

Q. And how did you attempt contact?

A. The gang crimes officers went out looking for them.

Q. Did you make any phone calls?

A.   Yeah, they were made.

Q.   And do you remember who you called?

A.   No, I do not.

Q.   Did you personally talk to any confidential informants on this case?

A.   I did not.

Q.   Did your partner?

A.   I have no knowledge if he did or did not -- or didn't.

Q.   Did he tell you that did?

A.   I don't recall.

Q.   Were you present -- you were present, though, when your partner interviewed Jaime Rios, is that right?

A.   For the first interview, that is correct.

Q.   And did -- and your partner told him what he knew about the case, is that right?

A.   That is correct.

Q.   He told him that there were confidential informants and identified them, is that right?

A.   I don't recall.

Q.   Do you recall anything about what your partner told him?

A.   Not really.

Q.   He did give some facts about the case, though, right?

A.   Yes, he did.

Q.   He gave him some background about what the investigation revealed?

Halvorsen - prior testimony

2108

A.   The investigation, why he was in our office, that is correct.

Q.   And he told him what the consequences of a murder charge are, right?

A.   No, he did not.

Q.   Now, when Officer Guevara and Gawrys came back in, they came to the second floor, is that right?

A.   At some time, yes.

Q.   And they talked to Mr. Rios's wife?

A.   I have no knowledge of that whatsoever.

Q.   You knew she was there, though, right?

A.   No.

Q.   Did you see her at all?

A.   I have no idea who she is.

Q.   Did she ever go in and talk to Mr. Rios?

A.   Not in my presence.

Q.   Were you present in the Area 5 office from 10:00 p.m. on July 6th to 4:00 o'clock in the morning?

A.   I was in and out of the office.

Q.   And you were on the second floor the whole time?

A.   Not the entire time.  I was in the building.

Q.   Between 10:00 and 12:00, were you on the second floor?

A.   I would say that would be right.

Q.   Did Jaime Rios ever ask you to talk to his wife?

A.   No.

Halvorsen - prior testimony

2109

Q.   Did he ever ask your partner?

A.   You'd have to ask my partner that.  Not in my presence.

Q.   He never asked in your presence?  Did you ever see his wife in the room with him, Jaime Rios?

A.   Again, counsel, I have no idea who his wife is.  I never saw her, never talked to her.

Q.   Did you ever see a woman in the room with him?

A.   Nope.

Q.   Did you ever see a woman in the open area that night?

A.   A woman?

Q.   A Puerto Rican woman in her late teens, early 20s?

A.   I can't recall.

Q.   Did you see any other women there?

A.   In our office?

Q.   Yes.

A.   I can't recall.

Q.   To your knowledge, did any of the other detectives or gang crimes specialists working on the case talk to a woman purporting to be his wife or girlfriend?

A.   I have no knowledge of that whatsoever.

Q.   Now, the room where the interview with Mr. Rios took place, what was in the room?

A.   Interview Room C.

Q.   Uh-huh.

A.   A table, a few chairs, bench against the wall.

Halvorsen - prior testimony

2110

Q. Was there a phone?

A. No.

Q. Was there a ring on the wall?

A. Yes, there was.

Q. And at some point, Mr. Rios was handcuffed to the ring on the wall, is that right?

A. That is correct.

Q. And he was locked in the room before he was handcuffed to the wall, is that right?

A. No, he was not.

Q. Well, the door was shut while he was in there, wasn't it?

A. That is correct.

Q. And the door was locked?

A. No, it was not.

Q. Did you test the door to see if it was locked?

A. I know it wasn't locked because I walked in and out. It was open.

Q. Did you test the door to see if it was locked?

A. Why would I want to test the door? I did not, no.

Q. You didn't?

A. I knew when he was placed in the room, the door was left unlocked.

Q. Did you personally search Mr. Rios?

A. No.

Q. Did your partner?

Halvorsen - prior testimony

2111

A.   I have no knowledge.

Q.   When Officers Guevara and Gawrys came back, what was the first time they came back, if you can recall?

A.   I can't recall that.

Q.   Was it before or after midnight?

A.   I can't truthfully tell you that.

Q.   Did you see them enter the room that Mr. Rios was in?

A.   No.

Q.   And where were you from midnight or from 12:30 to 4:00 in the morning?

A.   After I conducted this first interview with Detective Mason, I went out looking for the other suspect in this case.

Q.   So, you were gone from the other office?

A.   I was in and out.

Q.   So, you were gone for some period of time?

A.   Some period of time.

Q.   And the Area 5 office is at Grand and Central?

A.   5555 West Grand Avenue.

Q.   And the witnesses were over at Western, is that right, in the area of Western and Division?

A.   I have to review the reports to see where the witnesses lived.

Q.   How long were you gone?

A.   I have no independent recollection of how long I was gone.

Q.   So, there may have been other people who talked to Mr. Rios

Halvorsen - prior testimony

2112

while you were gone?

A.   It's a possibility.

Q.   And you personally were the detective who arrested Mr. Rios, is that correct?

A.   I was the detective that told him he was under arrest.

Q.   Did you fill out an arrest report?

A.   No.

Q.   Did your partner?

A.   If I recall, the officers from gang crimes filled out the arrest report.

Q.   And they signed the report as the arresting officers, is that correct?

A.   I'd have to see the report to see who signed it.

        MR. KIVETZ:  Mr. Carey then asked if he may approach. The court says, "Sure."  Mr. Carey then follows up with this question.

BY MR. KIVETZ:

Q.   Showing what I have previously marked as Defendant's No. 3 for identification, I ask you to review that document.

A.   I have reviewed it.

Q.   And do you recall what Defendant's No. 3 is?  Is that the arrest report?

A.   Could you say that again, counsel?

Q.   Is the document I just showed you, Defendant's No. 3, the arrest report?

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 204 of 208 PageID #:23121
Halvorsen - prior testimony
2113

A.    The arrest report for Jaime Rios.

Q.    And you did not sign that arrest report, is that correct?

A.    That is correct.

        MR. KIVETZ:  And that concludes the testimony for Detective Ernest Halvorsen.

        THE COURT:  Okay.  With that, we'll break for the weekend.

        Before you go, an update on where things stand.  I anticipate that the evidence will continue on Tuesday and conclude Wednesday, with hopefully getting to closing arguments on Wednesday of next week.

        I remind you, please do not discuss the case.  Please do not research the case.  Please do not let others discuss -- talk to the case -- talk to you about the case.

        Have a good weekend.  And reminder, Monday is a holiday, so I will see you Tuesday.

        All rise.

    (Jury out at 3:33 p.m.)

        THE COURT:  You may step down.

        THE WITNESS:  Thank you, your Honor.

        THE COURT:  Okay.  To recap, there was a note that I received that said a juror believed someone had taken pictures. The Marshals have investigated.  That turned out not to be the case, and so given the allegation, I had to ask to investigate. I apologize for any inconvenience to the individual or to the

Case: 1:22-cv-03973 Document #: 353 Filed: 03/04/26 Page 205 of 208 PageID #:23122
Halvorsen - prior testimony
2114

parties as far as the disruption to the day, but I couldn't ignore the concern.

Anything that I can address for the plaintiffs?

MR. J. RICHARDS: Just an inquiry in terms of the time.

THE COURT: Okay. One second. I'll have the time update for you in a second.

For the defendants?

MR. ENGQUIST: Yes, your Honor, just -- we haven't done the instruction -- you didn't do the instruction having to do with Halvorsen, so --

THE COURT: Right. I didn't -- I had forgotten this morning. I didn't want to do it while reading Halvorsen's testimony, so I will do it first thing Tuesday.

MR. ENGQUIST: Thank you, your Honor.

MR. SCAHILL: I did have one inquiry with respect to closing arguments. What is the Court's policy on using portions of the transcript as demonstratives?

THE COURT: The transcripts are not in evidence, and so -- is there an objection to the use of the transcripts?

MR. J. RICHARDS: Yes.

THE COURT: And so they will -- they're not evidence. It was read in, and the jury won't have any other transcripts, so you can't.

MR. SCAHILL: Okay. Fair enough.

MR. ENGQUIST: How long are we looking at for closings?

THE COURT: That's your call.

MR. ENGQUIST: Okay.

THE COURT: I will stick with my practice of I'll ask you beforehand how long you think you're going. Assuming you have sufficient time on your trial clock remaining, I -- you can go as long as you want. My reminder would just be to remind you that if you said you're going an hour and you're at 70, 80 minutes, maybe you're getting carried away and I will just remind you, "Counsel, that's 70 minutes." It's not to shut you down. It's to let you know that you're exceeding what you thought you were -- would be doing.

MR. ENGQUIST: Understood.

THE COURT: Okay?

MR. ENGQUIST: Um-hum.

THE COURT: I know with opening, there was an issue about moving about. Lapel mics can be made available. We just have to check and make sure that they're working before we bring the jury in because I don't like disrupting it for -- disrupting trial for technical issues. All right?

MR. POLICK: Yes, Judge.

THE COURT: I'll get you the updated jury instructions sometime over the weekend by email. Have a good weekend.

MR. POLICK: Thank you.

Halvorsen - prior testimony

2116

MR. SCAHILL:  Thank you, Judge.  Have a good weekend.

MR. S. RICHARDS:  Could you give us the clock?

THE COURT:  Sorry.  Charles, do you have that?

(Bench conference, not reported.)

THE COURT:  Earlier today, it was at 22 for plaintiffs and 19 for defendants.  That doesn't include this afternoon. We have to tally that and check it against the transcript, so -- but you have a sense of where you are.

MR. S. RICHARDS:  Um-hum.

THE COURT:  All right?  Thank you.

MR. SCAHILL:  Thanks, Judge.  Have a good weekend.

(Court adjourned, to reconvene at 10:00 a.m., 2/17/26.)

*   *   *   *   *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*/s/Charles R. Zandi*                    *February 14, 2026*

Charles R. Zandi
Official Court Reporter


*/s/Joseph A. Rickhoff*                  *February 14, 2026*
Joseph A. Rickhoff
Official Court Reporter

I N D E X

PAGE

STEPHEN GAWRYS
Direct Examination By Mr. Engquist          1936
Cross- Examination By Mr. Scahill           1959
Cross- Examination By Mr. S. Richards       1962
Redirect Examination By Mr. Engquist        1981

CAROL ROGALA
Direct Examination (Resumed) By Mr. Scahill     1982
Cross-Examination By Mr. S. Richards            2017

CAROL ROGALA
Cross-Examination (Resumed) By Mr. S. Richards  2041
Recross-Examination By Mr. S. Richards          2059

DANIEL R. NOON
Prior Testimony                             2061

DANIEL R. NOON
Prior Testimony                             2078

RICHARD CURLEY
Prior Testimony                             2080

ERNEST HALVORSEN
Prior Testimony                             2092