2118

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                        )
                                   )
                Plaintiff,         )
                                   )
-vs-                               )  Case No. 1:22-cv-03973
                                   )
REYNALDO GUEVARA; MICHAEL          )
MASON; and JoANN HALVORSEN,        )
as Special Representative of       )
ERNEST HALVORSEN, Deceased,        )  Chicago, Illinois
                                   )  February 17, 2026
                Defendant.         )  10:07 a.m.


                    VOLUME 11
      TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
      BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:    LAW OFFICE OF STEPHEN L. RICHARDS
                      BY:  MR. STEPHEN L. RICHARDS
                      53 West Jackson Boulevard, Suite 205
                      Chicago, Illinois  60604


For Defendant         BORKAN & SCAHILL, LTD.
Guevara:              BY:  MR. TIMOTHY P. SCAHILL
                           MR. GRAHAM P. MILLER
                      20 South Clark Street, Suite 1700
                      Chicago, Illinois  60602

For Defendant         THE SOTOS LAW FIRM, P.C.
Mason:                BY:  MR. JOSEPH M. POLICK
                           MR. JOSH MICHAEL ENGQUIST
                           MR. JEFFREY ROBERT KIVETZ
                           MS. CAROLINE P. GOLDEN
                      141 West Jackson Boulevard, Suite 1240A
                      Chicago, Illinois  60604

2119

Court Reporter:          CHARLES R. ZANDI, CSR, RPR, FCRR
                         Official Court Reporter
                         219 S. Dearborn Street, Room 1426
                         Chicago, Illinois  60604
                         Telephone:  (312) 435-5387
                         charles_zandi@ilnd.uscourts.gov


                    *   *   *   *   *

            PROCEEDINGS REPORTED BY STENOTYPE
   TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

2120

(Proceedings heard in open court:)

THE CLERK: 22 C 3973, Rios versus Guevara, et al., for jury trial.

THE COURT: All right. Good morning. Appearances, please.

MR. S. RICHARDS: Stephen Richards on behalf of Plaintiff, Jaime Rios.

MR. J. RICHARDS: Joshua Richards on behalf of Jaime Rios.

MR. POLICK: Good morning, your Honor. Joseph Polick on behalf of Defendant Mason.

MS. CARNEY: Good morning. Caroline Golden on behalf of Defendant Mason.

MR. MILLER: Good morning, Judge. Graham Miller on behalf of Defendant Guevara.

MR. SCAHILL: Good morning, your Honor. Timothy Scahill on behalf of Reynaldo Guevara.

MR. ENGQUIST: Josh Engquist on behalf of Defendant Mason.

MR. KIVETZ: And good morning, your Honor. Jeff Kivetz on behalf of Defendant Mason.

THE COURT: Good morning, everyone. Any issues for me to address before we bring in the jury?

MR. J. RICHARDS: One, your Honor. I think the first issue to address is whether or not the Court should give an

2121

oral instruction or explanation to the jury of, I guess, the incident on Friday.

Pretty much the jury was excused, then your Honor went on the record with basically it was investigated and there was nothing. You know, the jury was taken out abruptly during -- during evidence. From our point of view, a brief --

THE COURT: I responded to the jury's note. If you recall, the incident Friday was initiated through a juror note, so my response on the note was the U.S. Marshal spoke with the individual and looked at her phone and laptop. There were no photos from court on her phone or laptop.

Do you think any further -- do I need to address it any further than that?

MR. J. RICHARDS: Maybe that you should just not consider this incident against either party, maybe that --

THE COURT: To what end?

MR. J. RICHARDS: So that there's no prejudice against either party. I mean, the person was sitting on defense counsel's side of the gallery. I don't know how they feel about it, but that's our perspective.

THE COURT: Any thoughts on that, defense?

MR. SCAHILL: It seems as if it was addressed. If you said it was nothing, then it seems like it's nothing. I don't know that we necessarily need to call more attention to it.

MR. ENGQUIST: I agree.

2122

MR. SCAHILL: I don't feel strongly about it, but that seems to me to be a sufficient remedy, what your Honor responded.

THE COURT: Yeah. I don't think anything further is necessary. I let the jurors know that their concern was investigated and nothing came of it.

As far as when I stepped outside with the jury, it's because I received the note. When I stepped into the hallway, I asked the jurors who observed this and asked them to identify whom they thought they saw taking pictures. I then told the jury to come back in, and I told the juror that if the individual had not been removed from the courtroom, that the juror could stand. No one stood, which confirmed for me that the individual had been appropriately identified by the courtroom security officer. And then I provided the explanation that the individual they felt was taking pictures was not taking pictures. So that concludes the matter for me.

What else?

MR. J. RICHARDS: Your Honor, similar to what defense did during expert testimony, when there's a tendering of the expert, I'll object, and I'll just rest on the motion to preserve that issue, if that's all right with the Court.

THE COURT: Okay. That's fine. You have to preserve your record. I understand that.

Anything else?

2123

MR. POLICK: Judge, we are going to proceed by way of a read-in for our first witness this morning. It's the court reporter, Janet Lupa. Two exhibits were marked during her deposition. Both have been admitted into evidence in this case. We'd ask leave to publish those exhibits when they come up during the reading of the deposition.

THE COURT: Any objection?

MR. POLICK: It's -- just for the record, it's Defense Exhibit 5, which is the court-reported statement, and Defense Exhibit 6, which is the photograph of Mr. Rios following his statement.

THE COURT: So those are already in evidence anyway?

MR. POLICK: Yes.

THE COURT: Okay. That's fine. Whose laptop or -- will it be from the -- okay. We can do that. Just let us know when to switch over to the laptop.

Anything else?

MR. SCAHILL: Just a matter of scheduling. So, after the read-in, there's going to be two live witnesses. We are going to rest after that. I'm not sure how long the cross is going to take, so where we're going to be left off.

I know there were draft jury instructions sent out -- I'm not sure how your Honor would like to address the issue of close. We certainly aren't going to have time today for all of the closings to get in, if we get to that point, so I don't

2124

know how your Honor would like to address that, whether we're going to see where we're at at the break, or how you would like to proceed in that fashion. I know we would like to use the final jury instructions and the like during our closing, verdict forms and such, so --

THE COURT: I think I published them Saturday, right?

MR. SCAHILL: Well, it said, "Draft," on them, but if those are final ones, then that's what we'll use.

THE COURT: They're not final until I read them to the jury.

MR. SCAHILL: Got it.

THE COURT: So they remain -- the final will be filed on the docket, and to avoid any confusion, I keep, "Draft," on them until the set that I actually read to the jury are put on there because who knows, something could happen today that requires another instruction, in which case they're not final. So, they've gone out. You have them.

My sense of it is, we'll see where we end. I will -- it probably takes me about 40 minutes to read these instructions, and so if we get to 3:00, then I'll just read the instructions so that we can start tomorrow with the openings. But if it's lunch -- at the lunch break and we're done, then you should be prepared to start closings. But we'll see where we are at the lunch break.

MR. SCAHILL: Okay.

2125

MR. POLICK:  Thank you, Judge.

MR. S. RICHARDS:  Thank you.

MR. ENGQUIST:  One final thing, your Honor.  The instruction on Halvorsen.

THE COURT:  I've got it up.  Yep.  I'll start the day with the Halvorsen instruction.

MR. ENGQUIST:  Thank you, your Honor.

MR. J. RICHARDS:  Thank you, your Honor.

(Jury in at 10:14 a.m.)

THE COURT:  Please take your seats.  Welcome back, ladies and gentlemen.

I apologize for the delay.  My morning call went longer than anticipated.  It tends to happen after holidays, where people don't account for the Monday off, so I've got a lot of things to be raised on Tuesday.

We're going to continue with the defendants' case, but before we do, I have an instruction for you that I'll read.

Ernest Halvorsen, represented in this case by JoAnn Halvorsen, is no longer a defendant in this case.  You should not consider any claims against Halvorsen.  Do not speculate on the reasons.  You should decide this case as to the remaining parties.

And that's why you don't see Mrs. Halvorsen anymore.

All right.  Who's up next for the defense?

MR. POLICK:  Judge, the defense calls Janet Lupa,

L-U-P-A, and this will be via deposition testimony.

THE COURT: All right. You may proceed.

As a reminder, I'm not swearing in the witness because it's a transcript. The witness was sworn in at whatever proceeding the transcript was created.

MR. POLICK: This is the deposition testimony of Janet Lupa, taken on September 25th, 2023. Examination by Mr. Engquist.

JANET LUPA, DEFENDANTS' WITNESS, VIA DEPOSITION

BY MR. POLICK:

Q. Ma'am, could you state your name and spell your last name for the court reporter.

A. Janet Lupa, L-U-P-A.

Q. Okay. Let the record reflect this is the deposition of Ms. Lupa, taken pursuant to notice and subpoena.

Ms. Lupa, after reviewing the transcript of the statement taken on July 7th, 1989, and just for everyone's edification here, it was initially Bates stamped JJS Rios 140 through, let me see, 151, and the photograph was marked JJS Rios 170 through 180.

After looking at those two items, Ms. Lupa, did it refresh your recollection at all about this court-reported statement?

A. No.

Q. Okay. Now, I know it took place back in 1989, but if you

Lupa - deposition

2127

can, can you give me an idea of what your -- what was your employment back in 1989?

A.  What was my appointment?

Q.  No, employment, your job?

A.  Oh, I'm sorry.  I was a certified shorthand reporter.

Q.  Okay.  And how many years did you work as a certified shorthand reporter?

A.  Probably 25 years.

Q.  Okay.  And what's the year to year roughly on that?

A.  '75 through 2002.

Q.  Okay.  And back in 1989, is it correct that you worked directly for Cook County?

A.  Yes, that is correct.

Q.  Okay.  And did you -- were you specifically working for the Cook County State's Attorney's Office back in July of 1989?

A.  Yes, I was.

Q.  Okay.  And what were your duties back in July of 1989 when you were working for the Cook County State's Attorney's Office?

A.  Well, we took depositions for the felony unit.  We were on call for homicides or anything that happens at night where we had to go out to the station.  And we did just what court reporters do, which is make a legal record of anything.

Q.  Can you give me an example of when you -- when you were called out to the police, are you talking about being called out to, like, a detective area to take a court-reported

Lupa - deposition

2128

statement? Is that what you're talking about as one of your job duties?

A. Yes, that is correct.

Q. Okay. And you said you were on call for that?

A. Yes.

Q. And if you recall how -- during the years you were working for the Cook County State's Attorney's Office, do you recall how many or approximately how many court-reported statements you took at a police station?

A. Hundreds.

Q. Okay. And did you have a certain standard practice in how you went about responding to a call for your services to go to a police station for the Cook County State's Attorney's Office?

A. Yes.

Q. And what was that standard practice, ma'am?

A. Well, as soon as I was called out, I would get to the station. I would take down the names of the person giving the deposition and certain information. Then I would be called into the room, the interview room, and I would take down the statement.

After that, I would type it up. I would come out, and I would type it up. And I would hand to it the State's Attorney once it was done. He would take it into the interview room and go over it with the detective who was there and the deponent.

Lupa - deposition

2129

And then after that was done, I would go in. I would take a picture of the deponent. And then I would put my sticker on the back to show what time I took the picture, and then I would make a couple of copies.

I would take the original back to 26th and California into the office.

Q. Okay. When you said you would take down the statement in the room with the State's Attorney, detective usually was present, and the person giving the statement, would you do that -- how would you do that?

A. I would always set up between the person asking the questions and the person answering the questions.

Q. Okay. And did you use, like, I guess it's a stenographer machine?

A. It's a Stenograph.

Q. And then you said -- just to be clear, after the statement was complete, then you said you would leave the room and type it up. Where would you type that up?

A. Usually, it could -- it could be in the bullpen. It could be in someone's office. It's wherever I could set up my typewriter.

Q. Okay. So, you would just leave the interview room or wherever the statement was taken to a different location just to type up what you had already recorded on your Stenograph machine?

Lupa - deposition

2130

A. That's correct.

Q. All right. So, let me -- and I know you don't have a memory of this after reviewing it, but I still want to show it to you so we can walk through the exhibits. All right?

A. Sure.

Q. So, let me show you what's been marked as Exhibit No. 1.

MR. POLICK: If we could publish Defense 5.

BY MR. POLICK:

Q. Do you see this here, ma'am?

A. Yes.

Q. Okay. This is what I referred to initially before as Exhibit No. 1. It's a series of photographs --

A. Pause.

Q. If you look at the very beginning, it's a series of photographs of a statement that was taken. If you look at the very beginning of it, it says, "Statement of Jaime Rios in an interview room of Area 5 Violent Crimes, Chicago Police Department, 5555 West Grand Avenue, Chicago, Cook County, Illinois, on Friday, June 7th, 1989, at the hour of 4:39 o'clock a.m."

And then you have present for -- it says, "Present: Ms. Barbara Riley, Assistant State's Attorney; Detective Michael Mason, star No. 12927, Area 5 Violent Crimes. Reported by: Janet K. Lupa, Book No. 8907-7."

Okay. And I'm assuming that --

A.  By the way, I'm sorry to interrupt, but did you say June 7th?  And it was actually July 7th.

Q.  I'm sorry.  I did misspeak if I said that.  Thank you for correcting me.

Based off what you see here, would that have been you, the Janet K. Lupa who took this statement?

A.  Yes.

Q.  Okay.  And would this be the format you would do when you would type up the statement outside of the interview room?

A.  Yes.

Q.  Okay.  Let's go down.  And I don't need to go through the specifics of it, but at the bottom of page 1, there are three sets of initials.  Do you see that there?

A.  Yes.

Q.  Okay.

A.  Yes.

Q.  Are there -- are any of those initials yours?

A.  No.

Q.  Okay.  And do you know why there's initials at the bottom of page 1?

A.  Yes.  They usually do that to show they have finished the page.

Q.  Okay.  When you say, "they," are you talking about the different participants in the statement?

A.  Correct.

Q.   Okay.  On page 2 of that exhibit, once again, those are the same -- when you see the markings at the bottom, that would be consistent with what your normal practice was, that someone would initial the bottom of the participants in the statement, is that correct?

A.   Yes.

Q.   Okay.  At the very bottom, we have here, "Witness signature," a witness's signature, and we have Jaime Rios, Barbara Riley, and Mike Mason.  Is this the standard format when you did your statements, when you typed up the court-reported statements, that you'd have signature spots for all the participants in the statement?

A.   Yes.

Q.   Okay.  And was it your standard practice that you yourself did not sign the statement?

A.   Yes.

Q.   Okay.  By reviewing Exhibit No. 1, can you confirm that this was, in fact, the statement that you took on July 7th, 1989, at 4:30 a.m. at Area 5 Violent Crimes?

A.   Yes.

Q.   Okay.  And to know the participants in the statement including the person giving the statement and the witnesses to the statement, where did you get that information from?

A.   Well, the State's Attorney usually gives me the name of the deponent and the name of the fatal shooting of, in this case,

2133

Morales. And then Michael Mason was a detective there.

Q. Okay. Did you know Michael Mason?

A. From working with him.

Q. Okay. Would you consider yourself friends with Michael Mason now?

A. No.

Q. Did you consider him a friend back then in 1989?

A. No.

Q. Okay. So, it's fair to say he was just a person you recognized the name, maybe recognized the face as someone you dealt with when you came to take court-reported statements?

A. That is correct.

Q. Okay. Let me show you what I've marked as Exhibit No. 2.

MR. POLICK: And if we could publish Defense Exhibit 6.

BY MR. POLICK:

Q. Okay. Can you see that, ma'am?

A. Yes.

Q. Okay. It's -- the first page there is a photograph, and it's also -- it's marked as People's Exhibit in the criminal case. Does that picture ring a bell as to what Jaime Rios looked like back in 1989?

A. No.

Q. Okay. There's a closeup of it, and then after the first page is where we have the back side here. It says, "Picture

Lupa - deposition

2134

taken by J. Lupa, A-5, 7-7-89, at 6:10 a.m. Witnesses," and then there's three signatures, Barbara Riley, Detective Michael Mason, and Jaime Rios.

Is any of that handwriting yours, ma'am?

A. That is all mine except for the signatures.

Q. Okay. And when you put the time on that picture, was that the time you were actually taking the photograph?

A. Yes.

Q. Okay. And then you would have the people who are in the room sign the back of the photograph?

A. Yes.

Q. Okay. So, based off your practice, ma'am, this photograph with the sticker on the back going back to page 1, is this how Mr. Rios appeared at 6:10 a.m. on the night he gave his statement?

A. Yes. This is the picture I took.

Q. Okay. This may sound like a silly question, but, ma'am, would you ever type up a statement for a person if the person did not actually speak those words and gave that statement?

A. What?

Q. I'm sorry. I'm trying. Would you ever type up a statement like this without actually being present for the person giving that statement?

A. Of course not. I --

Q. I just had to ask the question, ma'am.

Lupa - deposition

2135

Do you recall Barbara Riley?

A.   No.

MR. POLICK:   All right.   This is now the cross-examination by plaintiff's attorney, Mr. Joshua Richards.

BY MR. POLICK:

Q.   Back in 1989, when you would go to these station visits, did you wear any sort of ID badge?

A.   No.

Q.   When you went to these station visits, were you dressed in professional attire?

A.   Not at 4:30 in the morning.

Q.   What would be your typical dress when taking one of these court-reported statements?

A.   Jeans, a shirt.

Q.   When you took one of these -- when you took one of these court-reported statements, did you sort of do it like a deposition where you swear in the witness?

A.   No.

Q.   And when you said when you arrived -- and just to be clear, the people on that first page of the exhibit of that recorded statement where it says, basically, the people who were there, those are the people who are just inside the room, correct? It's not like everyone at the stationhouse?

A.   Correct.

Q.   Did you make any notes of -- in 1989, would you make any

notes as to who else was at the stationhouse or who else was involved in the case?

A. No.

Q. And did you use a tape-recorder to also record the statement, or did you just use your stenography device?

A. Just my stenography device, my court-reporting machine.

Q. And I believe -- and in 1989, the -- those machines didn't have extra features like a recorder built in?

A. No.

MR. POLICK: Nothing further. Further examination by Mr. Engquist.

BY MR. POLICK:

Q. When you were in this room, based on what you've seen here, when you were taking the statement, you said you were sitting in between the person asking the questions and the person giving the answers, is that correct?

A. That's correct.

Q. Okay. And when you were sitting there, even if you weren't in professional attire at 4:30 in the morning, would you have your Stenograph machine directly in front of you as you were typing?

A. Correct.

Q. Okay. In plain view of the person answering the questions, correct?

A. Correct.

Lupa - deposition

2137

Q.   And when you went through this and typed up the statement, you were typing up word for word what was said in that room, correct?

A.   Correct.

Q.   You wouldn't make any edits or corrections or changes on anyone's behest when you were typing this up, would you?

A.   No.

MR. POLICK:  Further examination by Mr. Richards.

BY MR. POLICK:

Q.   So, was the stenography machine usually in plain view of the person?

A.   Yes.

Q.   And was it your practice -- how did you introduce yourself, if you did?

A.   I didn't.

MR. POLICK:  Nothing further.  That concludes the deposition of Janet Lupa.

THE COURT:  Okay.  And defense's next witness?

MR. KIVETZ:  The defense now calls Dr. Jack Schafer.

THE COURT:  Okay.  Good morning.  Raise your right hand.

(Witness sworn.)

THE WITNESS:  I do.

THE COURT:  Please take a seat.

THE WITNESS:  Thank you.

Schafer -- direct

2138

THE COURT:  Mr. Kivetz, you may proceed when the witness has settled.

MR. KIVETZ:  Thank you, your Honor.

JOHN R. SCHAFER, DEFENDANTS' WITNESS, DULY SWORN

DIRECT EXAMINATION

BY MR. KIVETZ:

Q.   Dr. Schafer, can you please state and spell your name for the record?

A.   My name is John R. Schafer, S-C-H-A-F-E-R.  And I also go by the nickname Jack Schafer.

Q.   Dr. Schafer, can you please tell us what you currently do for a living?

A.   Right now, I'm employed as a professor in the law enforcement and justice administration at Western Illinois University.

Q.   How long have you been a professor at Western Illinois University?

A.   15 years.

Q.   What kind of classes do you teach at Western Illinois?

A.   I teach a basic 101 class, which is an introductory and overview of police operations.  I teach an interview and interrogation course, and I also teach a behavioral analysis course.  And I teach a graduate research methodology class.

Q.   Do you have a particular area of focus in your research as a professor at Western Illinois?

A.   As a professor, I focus my research on interview and interrogation, with an emphasis on the written narratives.

Q.   And can you please tell the jury about your educational background?

A.   Well, I -- I received a psychology -- a psychology major Bachelor's Degree with Western Illinois University, and then I achieved a Bachelor of Science Degree from Elmhurst College in business administration.

Then I received a Master's Degree in law enforcement and justice administration from Western Illinois University.  I earned a Master's Degree in clinical psychology from Fielding Graduate University.  And I received a Master's Degree in media psychology from Fielding Graduate University.

And I earned my Ph.D. in psychology from Fielding Graduate University.

Q.   What was the focus of your Ph.D. dissertation?

A.   The focus of my Ph.D. dissertation was interviewing and interrogation, focusing on the grammatical structures to determine the veracity of written and oral statements.

Q.   And I know you've been a professor for about 15 years now, but how did you first get started in the field of interviews, interrogations, disputed confessions?

A.   I was originally a police officer in Hinsdale, Illinois, and I received some basic interview training there.  And then I joined the FBI as a Special Agent, and I received more training

at Quantico, Virginia, in addition to in-services after my basic training.

I was assigned to the field, where I conducted numerous interviews and interrogations. And I also developed some criteria for an interviewing and interrogation course to interview high-value targets in the Middle East in the Iraq -- it was Afghanistan and Iraq wars.

In addition to that, I also developed some curriculum to assist intelligence agents who go overseas and they're in the undercover capacity, and they may have -- and they may have the unfortunate incident of being interviewed by some foreign intelligence service investigators, so I taught them how to basically conduct themselves in the interview.

And it was kind of interesting because my first undercover assignment, I actually was interviewed by a foreign intelligence service, and it was kind of interesting. My training kicked in, and I was able to withstand the interview process; and they let me go about my business.

But I think that experience gave me a really good insight into what it's like to be a suspect in a high-pressure atmosphere in the interview, where there's severe consequences. So, it gave me a good -- good experience on how to understand what goes on in the interview room with suspects.

I also have been an interrogator. It gave me good experience because I've conducted so many interviews.

And also, since I'm a professor, I conduct a lot of research in laboratories. So, I'm very familiar with each one of those roles.

Q. Let's start a little bit backwards, when you first started with the FBI. What year did you join the FBI as a Special Agent?

A. I joined the FBI in 1985, September.

Q. And in 1985, where were you first assigned?

A. I was assigned to the Hopi and Indian reservations in Arizona.

Q. And what type of cases did you work on in Arizona?

A. Typically in those cases, they were rape cases, child molestation cases, and a lot of homicides.

Q. Did that work entail performing interviews and investigations into those type of felony crimes?

A. Yes. I conducted hundreds of interviews while investigating the homicides and particularly the child molestation accusations.

Q. And how long were you stationed in Arizona?

A. Approximately three years.

Q. What was your second assignment with the FBI?

A. I was assigned to the counterintelligence unit, and what counterintelligence is is that foreign governments try to send intelligence officers to the United States to steal our secrets. And I would counter the intelligence. So, my job was

basically to conduct spy-catching operations.

Q.   And did you have to conduct interviews when you were working in counterintelligence?

A.   Yeah.   The interviews are a little bit different with intelligence operations because we interview lots of people; and our goal is not a confession, so to speak, but our goal is rather to gather bits and pieces of information so that we can put all of those bits and pieces together to find a comprehensive picture of what's going on, because a lot of times, they don't want to be discovered, and we need to discover them, so we can develop that picture by putting all these little pieces together.

Q.   How long were you in the counterintelligence division?

A.   Approximately six, almost seven years.

Q.   And what was your next large assignment with the FBI?

A.   My next assignment was Lancaster, California, where I was instructed to investigate a white supremacist group called the Nazi Low Riders; and that group contained about 59 active members, and they would harass, stab, beat, and murder minorities in the Lancaster area.

Q.   And did you personally participate in these investigation and interviews of potential suspects?

A.   Yes.   I conducted numerous interviews with the witnesses, the victims, and also the suspects.

Q.   What was your final assignment with the FBI?

Schafer -- direct

2143

A.   My final assignment with the FBI was I was a behavioral analyst with the FBI's national security division.

Q.   And what is the behavioral analysis program?

A.   The behavioral analysis program is kind of different than the one you're probably familiar with on TV, where you see the agents in the Behavioral Analysis Unit go to a crime scene and they try to figure out who did it based on the evidence at the crime scene.

In the behavioral analysis program, what we did, we typically had a suspect or a subject in the national security or counterintelligence arena, and we would try to get him to -- we would identify them, and then we would try to develop recruitment strategies to get that person to help us spy against their own country, in other words, become a double agent.

Or we have an American that's spying for another country, and our job was to collect all the information we could on those subjects or suspects, and then look for the behavioral patterns that they have, and then we would develop interview or recruitment strategies.

Q.   And so as part of your work in the behavioral analysis program, were you required to interview and interrogate individuals?

A.   Oh, yes.  That was the main part of our job was to interview, conduct a lot of interviews because we can't

directly ask the suspects or subjects about themselves, because that's kind of a give-away. So, what we have to do is talk to all the people around them to find out what they're up to. So, I conducted a lot of interviews.

Q. When you were with the behavioral analysis program, did you also perform certain types of counterterrorism measures?

A. Yes. When 9-11 came in, they transferred the emphasis from counterintelligence to counterterrorism. So, our job then focused on interviewing -- developing new techniques to develop high-value Middle Eastern suspects, and that was our job was to try to figure out the best way to interview the Middle Eastern targets.

Q. What -- how long were you with the behavioral analysis program?

A. Approximately seven years.

Q. And what year did you end up leaving the FBI's behavioral analysis program?

A. I retired in November 2005.

Q. And during your total time at the FBI, approximately how many interviews did you participate in?

A. My entire career? Well in excess of a thousand interviews of suspects and witnesses.

Q. By the way, before you became a Hinsdale police officer and a Special Agent of the FBI, did you work in the Armed Forces in any capacity?

A.   Yes, I did.  In 1974, I joined the Army.  I was a helicopter mechanic.  And I got off active duty in 1977 and went to Western Illinois University.  And during my time at Western Illinois University, I joined the Active Marine Corps Reserve, where I served as a heavy equipment operator.

Q.   Now, after you left the FBI in 2005, what did you do next in your career?

A.   I worked for a company called Phoenix Consulting Group.

Q.   What type of work did you do at Phoenix Consulting Group?

A.   A great deal of my work at Phoenix Consulting Group was classified, so I can't really go into much of what I did; but what I can say is that I worked with our intelligence services. And again, the focus was on:  How do you develop techniques to interview high-value targets in the Middle East?

Q.   And what type of intelligence services did you work with?

A.   I worked with the DIA.  I worked with the FBI.  I worked with the CIA.  I worked with Navy SEALS.  I worked with Army Asymmetrical War Group.  I worked with the 82nd Airborne and a bunch of other agencies that are included in the intelligence world.

Q.   How long were you working at Phoenix Consulting Group?

A.   Four years.

Q.   And what did you do next in your career after leaving Phoenix?

A.   After I left Phoenix, I became a professor at Western

Illinois University.

Q. And that's what you currently do today, right?

A. Yes, sir.

Q. And you've been there for about 15 years, is that right?

A. Yes.

Q. And while you're a professor, do you also consult with intelligence agencies?

A. Yes, sir, I do. In fact, when I left the FBI in 2005, they employed me as a contractor to continue training their agents up until I think it was about 2018. So, for about 10 years, 12 years, I was continuing to train FBI agents.

I also work with private companies and also a large number of law enforcement agencies at the state and local level to assist them in evaluating witness and suspect written statements and testimony.

Q. Now, since you've been a professor at Western Illinois, have you published in the field of interviews, interrogations, and disputed confessions?

A. Yes, I have.

Q. How so?

A. I published a book called *Advanced Interviewing Techniques* in 2005. It's currently in its fourth edition, and it's being used widely in colleges and universities across the country, the colleges that teach law enforcement, justice administration.

Q.   What do you mean by it's in its fourth edition?

A.   That means it began in 2005, and then after so many years of selling the book, the publisher wants you to add more material to the book.  And then after so many years, if it still sells, they want you to add a little bit more material, about 25 percent each time you have an edition.  So, four editions, I've probably added 100 percent of the book, probably doubled the book.

     And they do that because they want to keep sales moving with new material and the latest.  You have to keep up on -- on the material, especially in a field like interviewing and interrogation.

Q.   Have you published any scholarly articles in the field of interviews and interrogations?

A.   Yes, I have.

Q.   Have your articles been peer-reviewed?

A.   Yes, they have.

Q.   What does that mean to be peer-reviewed?

A.   Peer-review means that there's a group of people who share the same expertise that you have; and what happens is when you turn in your research article, it goes to the people who have that same expertise in the same field, and they examine it to make sure it meets the stringent research standards that -- that make that a valid study.

Q.   Have you yourself been a peer-reviewer?

A.   Yes, I -- I think it was the fifth or sixth year in my career with Western Illinois University, I was invited to be a peer-reviewer for a journal called "The Executive" -- "Law Enforcement Executive Forum."

Q.   Do you also perform legal consulting in the field of interviews, interrogations, and disputed confessions?

A.   Yes, I do.  I consult with multiple local and state law enforcement and federal law enforcement agencies, as well as private industry.

Q.   Have you also worked with law firms in expert capacities?

A.   Yes, I have.

Q.   And have you worked with my law firm before?

A.   Yes, I have.

Q.   And do you have an hourly rate that you charge for your expert services?

A.   Yes, I do.

Q.   What is that rate?

A.   It's $450 an hour.

Q.   Is that a reasonable rate in your field?

A.   It's on the low side, sir.

Q.   Are you generally familiar with the scholarly articles, research, and laboratory experiments in the field of interviews, interrogations and disputed confessions?

A.   Yes, I am.  I have to keep up on those in order to keep consulting and teaching.

Q.   And I think you said it there, you keep up to date in the -- with the scholarly materials surrounding interviews, interrogations, and disputed confessions?

A.   Yes, I have to.  You have to stay on top of things.  If you're going to teach it and consult with law enforcement agencies, you have to provide the latest in the field.

MR. KIVETZ:  At this point, your Honor, we'd like to offer Dr. Jack Schafer in the field of interviews, interrogations, and disputed confessions.

THE COURT:  Any objections?

MR. J. RICHARDS:  No objection, notwithstanding prior motions.

THE COURT:  Okay.  The witness may testify as to his opinion concerning the topics identified by Mr. Kivetz.

You may proceed.

MR. KIVETZ:  Thank you, your Honor.

BY MR. KIVETZ:

Q.   As you just said, you indicated that you're familiar with the scholarly articles, research, and laboratory experiments in the fields of interview, interrogation, and disputed confessions.

Did you rely on those materials, as well as your life experiences, in forming your opinions in this case?

A.   Yes, I did.

Q.   Did you also review a number of specific materials and

documents related to this case in forming your opinions?

A.  Yes, I did.

Q.  Are the documents, articles, and research that you relied upon reasonably relied upon by persons in your field of expertise?

A.  Yes, they are.

Q.  Did you then prepare an expert report in this matter?

A.  Yes, I did.

Q.  And in that report, did you provide some of the opinions about some of the flaws or problems associated with false confession research?

A.  Yes, I did.

Q.  What are some of your fundamental concerns about false confession research?

A.  I think my primary concern is that the experimental cannot be replicated in the interrogation room because in order for us to do that, we would have to entice people to commit crimes, be arrested, and then interviewed by the police, and then we'd discover what they went through.  Well, that's unethical.  You can't do that.

So, what researchers try to do is they try to replicate what goes on into the interrogation room.  And the problem with that is there's something called external validity in research, and all external research means is:  Can the experimental findings in the experimental lab be attributed to

what goes on in the interrogation room?

And it has to basically meet three criteria. The first criteria is the atmosphere has to be the same. Well, the atmosphere is not the same in the laboratory as it is in the interviewing setting.

The second thing is that the people have to be the same. A student in college participating in a laboratory study is very different than a suspect in an interrogation room facing severe consequences. There's no consequences in the lab.

And the last thing is the tasks have to be the same, which the tasks in a laboratory setting are not the same as the ones that occur in the interrogation room.

So, you have to look at the results or the findings of experimental studies in the interrogation room with some caution because you can't scientifically make that leap and say what happened in the experimental room happens in the interrogation room.

And most of the scientists know this because typically, at the -- the fine print at the end of their research typically says, "We know that there's no external validity. We know we can't attribute the findings to the experimental room, but we think that the findings may happen."

So, typically in science, we like to base our conclusions on science, not assumptions.

Schafer -- direct

2152

Q.   What are the two leading experiments that false confession researchers primarily rely upon in order to discuss whether certain risk factors could potentially lead to a false confession?

A.   I think the primary one would be something called the ALT study, and then there was a follow-up to that study called the cheating study.

Q.   What is first the ALT study?

A.   The ALT study is -- it's an experiment that was conducted in a laboratory, and the experimenter recruited students to come in and engage in a typing experiment.  And the student was supposed to be met by another student to participate in the project, but that student was a confederate.  What I mean by a confederate is it wasn't a regular student.  That student worked with the experimenter.

So, what happened is halfway in to this -- about 60 seconds in to this writing experience, the students accidentally -- or were accused of hitting the ALT key.  And before the experiment started, the experimenter said, "You can engage in the typing experiment, but do not hit the ALT key because it will cause the computer to crash."  60 minutes in to the experiment, the computer crashed.

The experimenter accused the students of intentionally hitting the ALT key when they actually did not hit the ALT key. All the students refused and said, "I didn't hit the ALT key."

Then they looked at -- the experimenter looked at the confederate and said, "Did you see that person hit the ALT key?" And they either said, "Yes, we saw him hit the key," or, "We didn't see him hit the key."

The experimenter said based on that information, he wanted the students to sign a written confession saying that they hit the ALT key and crashed the computer.

Q. What were the consequences or punishment in the ALT key study?

A. See there goes -- when we talked about that criteria before, there was no punishment. The students went about their business. No matter if they signed a document or didn't sign a document, they went about their business, which is very different than when you're in an interrogation room. Those consequences are severe, and they could be -- put the person in prison for a long time.

So, there's a different atmosphere. So, they don't -- you can't necessarily draw any conclusions based upon the experimental science.

Q. I believe you said the second experiment is referred to as the cheating study, is that right?

A. Yeah. I think that one was authored by Dr. Russano, and in her experiment, she invited students in again to meet with a confederate, and they were supposed to engage in individual problems and group problems. And when they were engaged in the

individual problems, the confederate would then ask the person to help them with the answer and to solve the problem.

And that was in strict violation of the experimental rule, which said individual problems have to be solved individually. Group problems have to be solved with a group. You cannot help the other person in the individual.

She wanted to study what -- basically, two variables, minimization and making a deal. So, in the minimization, she had the experimenter interview the students and tell them, "Hey, it could have happened to anybody. It was a good thing to do. You didn't mean to do it. It was not intentional." So, they minimize it. "So, just sign the paper saying that you helped the student and you cheated."

With the deal, they said, "Either you sign the statement and everything goes away with minimal academic repercussions; or if you don't sign the statement, we're going to have to call the professor, and he's going to consider this as cheating," which is severe circumstances.

Q. Why is the cheating study a flawed method for determining whether a confession could potentially be false?

A. Again, it doesn't meet that criteria. The subjects are different. The environment -- number one, the environment's different. Number two, the suspects and the college students, they can't be compared to -- the atmosphere in the experimental room and the interview room cannot be compared. And the last

thing, the tasks are different the students are asked to perform.

But I think the major thing is there's no consequences. No matter what they do in the experimental room, they just go about their business.

Q. So, are you saying that there's a big difference between the consequences that happen in a study versus the consequences of going to jail for the rest of your life?

A. Absolutely.

Q. And that's not something that can be recreated?

A. No, you can't recreate that. No, that's almost impossible.

Q. Do false confession researchers like Dr. Russano also utilize what's called case studies in order to determine whether certain risk factors could lead to a false confession?

A. Yes, they do.

Q. Is one of those studies Dr. Drizin and Dr. Leo's review of 125 allegedly false confessions?

A. Yes, it is.

Q. What was that study about?

A. Well, that was a descriptive study. In other words, what Dr. Leo did is he gathered together 125 alleged false confessions. He reviewed those documents, and then he catalogued what occurred during those -- during his investigation.

When you have descriptive research, you can't make any

Schafer -- direct

2156

conclusions.  There's no causality.  So, whatever Dr. Leo comes up with, he cannot attribute it to anything that occurred in the interrogation room as a false confession risk.

Q.   How did the researchers go about determining whether these 125 confessions were false?

A.   Well, that's another thing that I have a problem with is that of the 125 confessions, over 91 percent of those cases, he got the information from newspapers, books, or magazine articles.

When we do research, newspaper articles are not the best place to find data because that's a secondary source.  And with research, we like to go back to the primary sources, in other words, the interview transcripts, the court transcripts and witness testimony.

So, there's a big problem with not being able to make a causation, but he can assume -- and he even mentions it in his article.  He says, "Although these factors don't meet the criteria for external validity," in other words, we can't bring the findings to the interview room, but he said, "Nonetheless, I assume or I think that this may be a risk factor."

Well again, he's not basing his -- his conclusion on scientific facts.  He's basing it more on feelings or perhaps ideology.

Q.   And also on newspaper articles, right?  Are newspaper articles a reliable source to determine whether a confession is

Schafer -- direct

2157

true or false?

A.   No, not -- it's a well-established fact that newspaper articles are not a good place to use -- or not a good place to obtain data for research.

Now, it can give you some leads to go to other places and the original sources, but to use that newspaper or book or magazine article, it's not appropriate in a scientific experiment.

Q.   So, I know that you talked about some of the flaws or concerns you have about lab experiments and the case studies. Do you have any other concerns about false confession research?

A.   Well, the thing that interests me is that they've identified these risk factors, but then the research does not -- it doesn't -- there's no foundation for those risk factors.

So they don't know to what degree that risk factor is a cause for a false confession.  So, if they can't determine if it is a risk factor, it's kind of hard to conclude that it is, in fact, a risk factor.

So, what they have a tendency to do is include many risk factors in the conclusion; and if they can't figure out what one is, it's even more difficult to figure out if you put five or six risk factors together, how do they then -- can be interpreted as a risk factor?  It's not based on scientific facts.

Q.   I want to talk a little bit about something that you just brought up.  Can researchers determine the prevalence rate at which a single risk factor could lead to a false confession?

A.   At this point, they cannot do it because we talked about the restrictions and the ethical problems.

Q.   Because they can't recreate it in real life?

A.   Yeah, that's the problem.  If we could, that would be great because then we would have direct research; but unfortunately, we can't do that.

Q.   Can research determine the prevalence rate at which a group of risk factors can potentially lead to a false confession?

A.   Well, like I mentioned before, if they can't figure out what one risk factor is a risk factor, to what degree, it's even more difficult to figure out what multiple factors are.

Q.   Now, I want to talk a little bit more about the risk factors, and let's start first with guilt-presumptive questioning, which is used in the accusatorial interrogation technique or the Reid method.

Do you agree that guilt-presumptive questioning is a risk factor that could lead to a false confession?

A.   No, I don't believe the guilt-assumptive approach is a risk factor because when you bring a suspect in to the interrogation room, you have to tell that person why they're there.  They're going to want to know, "Why am I here?"

So what you have to do is say, "I saw some witnesses,

and I interviewed them, and they said you were involved in the crime," or, "I have some evidence that shows you were involved in the crime."

So at some point, I think it's a courtesy to tell somebody why you're there. This is a serious situation they're in. You have to tell these people why they're there and what they're suspected of doing.

Q. So, are you saying it's almost necessary to use guilt-presumptive techniques in an interrogation?

A. Right. Like I said, I think it's a courtesy. If I'm going to be dragged into an interview room, I'm going to want to know why I'm there.

Q. Is guilt-presumptive technique or questioning commonly used in the United States?

A. Yes, I think it is. Because again, you have to start out at the beginning, "You're here because we think you committed this crime."

Q. Is guilt-presumptive questioning legally permissible in the U.S.?

A. Oh, yes, it is.

Q. Another risk factor that Dr. Russano talked about is isolation. Do you agree that isolation, just for a few short hours, is a risk factor that could lead to a false confession?

A. No, for a few hours, I don't think it's a risk factor. We're talking about something very serious that could put

someone in jail for a very long time.  So what we want to do is bring them in to an environment where there's as few distraction as possible because the interviewer wants the full attention of that suspect.  And if there's a lot of distractions, the suspect won't be able to make a knowledgeable decision as to what his actions should be in the future.

Now, if you mention long-term sleep deprivation, something that occurs over several days, that may be a risk factor, but we typically don't run into that with interviews.

Q.   And we're going to get into sleep deprivation in a little bit, but first, is isolation of a suspect for a few short hours before they talk to the suspect legally permissible in the U.S.?

A.   Yes, it is.

Q.   I want to talk about youth vulnerability.  Is that a risk factor that could lead to a false confession?

A.   Youth vulnerability could be a factor, if in fact, the person is, say, for example, 19 -- or 15 years old, and they're naive, and they haven't had much experience with the criminal justice system, that may be a factor.

Q.   Okay.  So, when you're looking at youth vulnerability, should you be taking into account the individual's life experiences?

A.   Oh, absolutely.  Because if you have somebody that's 18, which is the legal age for being an adult, and they have

extensive experience with law enforcement, they know the justice system, they certainly have been interviewed by the police, and maybe they've been incarcerated, that environment is totally different than that naive 15-year-old.

So, you have to take all that into consideration.

Q. Okay. And obviously, juveniles commit crimes, correct?

A. Oh, yes, they do, yes.

Q. And juveniles also provide true and accurate confessions, right?

A. Yes.

Q. I want to talk a little bit about this notion that the frontal cortex is not fully developed until the early 20s. Is that something that has been taken into account in false confession research?

A. I don't think it should be taken into account, but again, it depends on the experience of the suspect with the criminal justice system.

And also, when you think about it, at 18, you can legally buy a car. You can go out and get a job. You can make very serious decisions. You can get married.

So, I don't think the frontal lobe development has much impact on the person's ability to judge the difference between right and wrong.

Q. Because you're, at over 18, living life through different experiences at that time; is that fair?

Schafer -- direct

2162

A.   Yes.   And you're legally an adult.

Q.   Now, when looking at risk factors, is it appropriate to review the length of the interrogation itself?

A.   Well, the length of an interrogation, again, can be a risk factor if it exceeds, say, for example, 36 hours of continuous interviewing, in other words, there's no breaks, just continuous interviewing.  That could present a risk factor.

Q.   What is the average time of an interrogation in the U.S.?

A.   In my experience, the average time is about an hour-and-a-half to 2 hours.

Q.   And how do you go about calculating the length of the interrogation?

A.   Well, the standard method to calculate the length of an interrogation is to count only the time that the suspect was being actively questioned by the detective or interviewer, excluding the time when they're not being interviewed.

Q.   And you mentioned this a little while ago, but is there any research that supports that a certain amount of interrogation time could potentially lead to a false confession?

A.   At this point, no, there is no time that would indicate that a risk factor then comes into play based on the number of hours.  Right now, the research hasn't gone that far.

Q.   Now, is it legally permissible to interview a person for an hour-and-a-half to two hours in the U.S.?

A.   Oh, absolutely, yes.

Schafer -- direct

2163

Q.   And I think I forgot to ask you this earlier.  Is it also permissible to interview an individual over 18 without an adult?

A.   Yes, it is.

Q.   We talked about this a little bit, which was sleep deprivation as a potential risk factor.  What can you tell us about the research surrounding sleep deprivation?

A.   Sleep deprivation can be a factor if -- if somebody is awake or sleep-deprived for -- usually sleep deprivation begins at about 36 hours and kind of gradually increases up to about 48 hours.

But at this point, the -- you have to take a lot into consideration with sleep deprivation because you have to know the person's sleep patterns.  You have to know their circadian rhythm.  You have to know what their behaviors are.  How often do they stay up late, and how does sleep deprivation affect them?

Some people can get along with four hours of sleep, and some people can't do without eight.  So, you have to take all of those things into consideration before you can determine if sleep deprivation is, in fact, a risk factor.

Q.   But it sounds like to me that sleep deprivation as it relates to false confessions doesn't really play a factor until at least 36 hours plus of deprivation, right?

A.   Of active questioning, yes.

Q. So while we all might get tired from a late night or being up with the children or something like that, that's not necessarily going to lead to it being a risk factor for a potential false confession?

A. No. I raised three kids, and I was up many nights all night with those three kids; and then when I got up in the morning and went to work, I could still determine what's right or wrong. That didn't interfere with my sense of what's right or what's wrong or what's truth and not true.

Q. What about an interrogator asking questions that would minimize or rationalize a suspect's participation in a crime? Is that a risk factor for a false confession?

A. No, I don't think that's a risk factor because what you're trying to do is you want to talk to that suspect. They may be embarrassed. They may not want to talk about it directly, so what you want to do is give them an out.

Let's say, for example, somebody is involved in a barroom fight and the subject -- or the suspect stabs another person. And then during the interview, what police officers typically do is say, "Hey, you didn't walk into that bar looking for a fight. You didn't walk into that bar to stab somebody. You just walked in that bar, and then something happened, and then you defended yourself."

What you're doing is giving that person a face-saving way out to discuss what happened.

Q. I want to move off of minimization and talk about two other risk factors.

Can physical force lead to a potential false confession?

A. Yes, it can, yes.

Q. But in order for physical force to potentially lead to a false confession, it actually has to be present during the interrogation; is that fair to say?

A. Yeah, that's pretty obvious, because if physical force isn't there, then there's no way it could cause a false confession.

Q. And can threats also lead to a potential false confession?

A. Oh, yes.

Q. But same thing, is it fair to say that if there were no threats present in an interrogation, then they cannot have an effect on whether or not a confession is true or false, right?

A. Yeah, that's the same answer. If it's not there, how can it cause a false confession?

Q. I want to move on and kind of talk about the flip side and the dynamics that interviewers are faced during an interrogation. Can you tell us something a little bit about the dynamics between an interrogator and a suspect?

A. I think the primary concern, when I go into an interview and I talk to a suspect, I don't know if that person is guilty or innocent; but if he's truthful and he's innocent, his story

is going to sound truthful. But then the suspect who doesn't want to get caught, his story is also going to be created to give the illusion of truth.

So, the primary concern that I have going into interrogations, and most interrogators do, is: How do we determine the difference between a truthful suspect and a person trying to be truthful or giving the illusion of truth? It's very difficult.

Q. And are there techniques that interrogators use to try and obtain truthful statements from a suspect?

A. Oh there's a number of techniques, yes.

Q. What is arguably the number one?

A. The number one, I think, is rapport-building because if you think about it, we don't tell secrets to people we don't like, so if we like a person, we're more apt to tell them more things about ourselves. So, if you build rapport, that person now becomes more comfortable because you're building a psychological bridge between you and the suspect. They're more comfortable to talk to you about what happened.

Q. Now, I think in your report, you talked about essentially three options that guilty suspects employ during interrogation. Can you please tell the jury a little bit about those three options?

A. Yeah. It's kind of interesting, and I found this to be true through my experience; and that is approximately one-third

of the suspects make up their mind before they enter the interrogation room that they're going to confess. They've made up their mind.

Another third makes up their mind that they will not confess under any circumstances. And then there's the middle third, who are kind of sitting on the fence, and they're waiting to see, "How much evidence does the police have against me? And now I can make a decision whether I'm going to confess or not."

And during that, I guess, contemplation time, figuring out how much evidence the police have, they're going through this cost-benefit analysis constantly over and over again. "Is it better for me to confess, or is it better for me not to confess?" And they're waiting to see what evidence the police have.

Q. Okay. I just want to make sure I have an understanding. Are you saying that a third of the suspects, before they're even interviewed, just start -- and have already decided or elected to provide a true confession?

A. Yes. And the research backs that up, and it's good research because the researchers actually went to prison, asked the prisoners to recall the last time they were interrogated. So, we have the right people, the right task, and the right atmosphere.

Q. So, the other two-thirds essentially are performing this

cost-benefit analysis and determining whether or not they should confess or not confess?

A.   Yeah, the middle third, yes.

Q.   Okay.   Now, I want to talk a little bit about that middle third.   Are there certain tactics that that middle third of guilty suspects utilize in an interrogation room?

A.   Yeah, I think that's where -- remember, I told you about my experience of being interviewed by a foreign intelligence service, and I had to maintain my cover and I had to convince them that I was who I was pretending to be?   That gave me a lot of insight into how suspects think in the interrogation room.

So, what typically goes on is they try to use techniques to get information from the police to determine if they should confess or not.

Q.   And I think one of the tactics that you said that guilty suspects utilize in the interrogation room is something called the innocent-presumptive technique, is that right?

A.   Yes, but -- yes, innocent-presumptive.   What they're trying to do is to say, "I'm innocent.   I'm innocent.   I'm innocent." So, what typically happens in the interrogation is that the police then will start to reveal more and more information to that person to try to convince them that the police have sufficient information to accuse them or arrest them for the crime.

So, that ploy is used to get more information from the

police.

Q. And I think another tactic that you said that guilty suspects utilize in the interrogation room is called reaffirming denials. Can you tell the jury about that?

A. It's similar to the presumptive -- innocent-presumptive ploy, in that, "I didn't do it. I didn't do it. I didn't do it. I didn't do it." And in order for the police or interrogator to convince the suspect that they have sufficient evidence, you have to reveal evidence.

So, the more they hold out and continue to say they didn't do it, the more evidence is likely to be disclosed by the police. And that then goes into that calculation as to whether the risk is greater than the benefit of confessing.

Q. So, they're using it as a tactic to determine whether or not they should ultimately confess?

A. Yes.

Q. Now, another tactic that you had in your report that guilty suspects employ during interrogation is called false evidence ploys. Can you please tell the jury a little bit more about that?

A. Yeah. A false evidence ploy is nothing more than misdirection. "I didn't do it. That guy over there, he's the one that did it, not me." So, they're misdirecting the police off them to another person.

In another, say you had -- a suspect owns two guns and

he used one of those guns in a crime, and then he throws the gun away; and what he does then is point the police to the gun that was not used in the crime and then tell the police, "Hey, there's the gun I used.  Check the ballistics.  I'm innocent. It doesn't match."

And the other thing they do is they try to establish false alibis.  "It wasn't me, sir.  I was over here at the time."  And they typically provide as little information as possible so the police can corroborate it.  It makes it difficult for the police to corroborate.  "I was there, but nobody saw me, but I was there."  So that's misdirection.

Q.   Why do suspects employ those techniques?

A.   They employ misdirection to give them time to figure out what's going on, to give them time to again go through that risk-benefit analysis.

Q.   Another tactic in your report that you say guilty suspects utilize during interrogation is truth overlays.  What are those?

A.   Yeah, I've run into this a number of times where suspects were engaged or witnessed a crime in the past, and they are being suspected of committing that crime in the present.  So, what they do is they take all of the circumstances of the past, and they overlay it onto the present case; but they fail to tell the investigator, "Oh, that happened a month ago."

So, they do that to try to get the investigator,

Schafer -- direct

2171

again, to try to unravel things, and in unraveling things, the investigator then starts to say, "Hey, that's not what happened. This is what happened." Now they're revealing additional information.

Q. I know we've talked about minimization, and I think you just brought it up a little bit before when talking about false evidence ploys; but do guilty suspects also employ minimization tactics?

A. Oh, yeah. That's probably one of the primary tactics that suspects use is minimization. If the police can prove you were in the area, "Yes, I was in the area, officer, but I had nothing to do with the crime."

And a lot of times if they're involved in the crime, they'll say, "I admit to a lesser crime," not the big crime, the little, lesser included crime, because they know that they're going to get less time in prison if they go ahead and give up their activity on the lesser crime versus the greater crime.

Q. And I was just going to get into that. Why do guilty suspects employ these minimization tactics?

A. What they want to do is serve as little time in prison as possible.

Q. I think we touched upon this a little bit before, but do suspects lie during an interrogation?

A. Oh, yeah, suspects lie all the time during interrogations,

to -- I'm just saying they lie, of course, to what?  Not take responsibility for what they did, to get as little punishment as possible, and obtain things they don't deserve.

Q.  Do suspects try and misdirect interrogators purposely?

A.  Oh, absolutely, because they're almost -- I go back to that time when I was interrogated.  I was under extreme pressure.  I wanted to survive this encounter.  So, you'd do almost anything you can think of to survive.

And that's what the suspect does.  "I've got to survive this interview with the least damage as possible."

Q.  And I know that there's many different ways a guilty suspect could minimize their participation in a crime, but is that, in your experience, one of the most common tactics that guilty suspects employ during an interrogation?

A.  Yeah, I think that's the one -- what they want to do is distance themselves from the crime, so that's the easiest way to distance yourself from the crime is to minimize your activities.

Q.  Now, I want to talk a little bit about the confessions that are oral statements themselves.  Can you have a confession that is true and accurate, but also contains some details that are not truthful or inaccurate?

A.  Oh, that's very common.  Because what happens, when we see a traumatic event, we focus our attention to specific things in that event.

Schafer -- direct

2173

So, you see that a lot with witnesses, too.  If a witness -- two witnesses see the same event, this witness here is focused on this part of the crime.  This witness over here is focused on this part of the crime.  They don't necessarily see what each other -- what each other saw, although it's the same event, only they have different focus.

And you've got to remember, suspects are witnesses to their own crimes, so they're focused on certain aspects of that crime, where their coconspirator may be focused on some different aspects of that crime.  So, it's normal to see that.

Q.   And based upon your experience and understanding of the research, is it also common?

A.   Yes, it's very common.  I would -- in fact, if the -- if the stories match too closely, that would be something I would have to look at.

Q.   Why is that?

A.   Because no two witnesses have I ever come across in my thousands of interviews have come up with identical stories. There's always some nuance that's different.

Q.   Now, do false confession researchers take into account this side of the interrogation room, having an understanding of what the suspects say, in order to determine whether or not a confession could be true or false?

A.   Yeah, that's the other problem I have with the false confession research is they only focus on police activities,

Schafer -- direct

2174

but they forget that the interview process is a dynamic process between two people. One -- it's -- and you're engaged in this tug of war with the truth. The investigator wants to find out the truth, and the suspect wants to keep the investigator from finding out about the truth.

So, it happens quite regularly.

Q. And in your opinion, should false confession researchers like Dr. Russano start taking into account the dynamics of the interrogation room that also includes tactics suspects utilize?

A. Yeah, I think the problem with most false confession researchers, they've never conducted real interviews in a real interview setting with real consequences, so it's difficult for them to imagine what occurs during the interview room.

And I know -- based on firsthand experience, I know what it's like to be the suspect. I know what it's like to be the interviewer. And I know what it's like to be the experimenter in a college campus, in a laboratory. Very different roles.

And it's hard to imagine because -- I'll go back to my primary example that I was trained how to conduct myself overseas if -- in the event I was interrogated. I practiced it. We role-played it. But it was totally different than when I stepped into that interrogation room and it was live and it was real and there was consequences. There's no way you can -- you can even imagine what goes on unless you've experienced it.

Q. No way to replicate it?

A. No way. There's no way to replicate it -- well, ethically. I mean, you can do it unethically.

MR. KIVETZ: Tender the witness.

THE COURT: Okay. Cross?

MS. GOLDEN: Nothing from us.

MR. SCAHILL: Nothing from us.

THE COURT: Plaintiffs?

CROSS-EXAMINATION

BY MR. J. RICHARDS:

Q. Good morning, Doctor.

A. Good morning.

Q. So, let me ask you this: Earlier, you were just tendered as an expert witness. In terms of testifying in court before, how many previous times have you been tendered as an expert witness in court?

A. Actually testified or tendered?

Q. Let's start with actually testified.

A. This is the first time I've -- well, no, I've testified as an expert in other topics in state and federal court.

Q. When you say other topics, what do you mean?

A. White supremacy.

Q. What do you mean by white supremacy?

A. White supremacy gang activities, I testified as an expert witness.

Schafer -- cross

2176

Q. But today is the first time you're testifying as an expert witness in regards to psychology and false confessions; is that fair to say?

A. Yes.

Q. Now, I want to circle back to getting your Ph.D. at Fielding Graduate University. Where is Fielding Graduate University located?

A. Santa Barbara, California.

Q. And when you were getting your Ph.D. at Fielding Graduate University, was that on campus or off campus?

A. They had satellite locations to conduct face-to-face interviews.

Q. When you say face-to-face interviews --

A. Or I mean classes. I'm sorry.

Q. In terms of those satellite locations, did you participate at the satellite locations, or did you participate on campus?

A. I typically went to Claremont College and UCLA, where they rented classroom space to conduct the classes.

Q. And there, the -- would it be the professors there live, or would they -- the professors be remote?

A. Oh, they were live.

Q. And in terms of your dissertation, who was your graduate advisor?

A. Pat. I don't recall her last name.

Q. Do you recall where -- was Pat employed at Fielding

Schafer -- cross

2177

Graduate University?

A. Yes.

Q. Was Pat a tenured professor at Fielding Graduate University?

A. Yes.

Q. Now, let me ask you this: Are you a tenured professor at -- is it fair to call Western Illinois University WIU, or is it --

A. WIU.

Q. Are you a tenured professor at WIU?

A. Yes.

Q. How long have you been tenured for?

A. Almost five years.

Q. Now, in terms of your role at WIU, have you ever been an advisor to a Ph.D. student's dissertation?

A. No. We don't have a Ph.D. program.

Q. Is there a Master's program?

A. Yes.

Q. Have you been anytime an advisor for a student's Master's thesis?

A. Yes, I have.

Q. Now, circling back to your dissertation, did you defend that in front of a panel?

A. Yes.

Q. Do you recall the members of the opinion panel and from --

where in the field they were from?

A.   Lynn -- it was Pat, Lynn Saba.  I don't remember the third person.  And my external leader was Gary Haslett from North Carolina.  He's an expert in detecting deception in written and oral communications.

Q.   Now, are you a member of the American Psychological Law Society?

A.   No.

Q.   Are you a member of the American Psychological Association?

A.   No.

Q.   Are you a member of the Association for Psychological Science?

A.   No.

Q.   Are you a member of the International Investigative Interviewing Group?

A.   No.

Q.   Are you a member of the American Society of Criminology?

A.   No.

Q.   Now, counsel asked you some questions about being published, and let's first start with the book.  Who is -- who's the publisher of your book that's currently on the fourth edition?

A.   Charles C. Thomas Publishers, Springfield, Illinois.

Q.   And what are the types of books that Charles C. Thomas Publishers publish?

A.   Primarily law enforcement and medical textbooks.

Q.   Now, in terms of the book, was there any peer-reviewing that went into the publishing of the book?

A.   Peer-reviewing meaning it was edited -- it went through an editorial process.  There was a page editor.  There was a research editor, and there was a legal editor to look to make sure that the cites were right, I didn't violate any legal restrictions.

Q.   In terms of -- and you recall on direct examination being asked about journal articles.  Do you recall that?

A.   Yes.

Q.   And in terms of journal articles, how many journal articles have you had published?

A.   I don't know specifically.  I've published over 40 journal and magazine and book chapters, but I don't know specifically how many articles I've published in a journal.

Q.   And in terms of the journal articles and the peer review, do you know if that was blind peer review?

A.   Some of them were and some of them weren't.

Q.   And do you know what blind peer review is?

A.   Yes, I do.

Q.   Can you explain what blind peer review is?

A.   They strip the title page and the authorship off the document itself so nobody can attribute who wrote the article, to avoid bias.

Q.   Have you ever given a paper at a conference where to give that paper at a conference, the -- the paper had to be peer-reviewed?

A.   Most of the time when I go to conferences, I do have to provide the document or the agenda that I'm going to talk about, yes, and they either accept it or reject it.

So, I don't know if that's a strict peer-review process.  I'm not sure.

Q.   Have you ever attended the conference for the American Psychological Law Society?

A.   No.

Q.   Have you ever attended the conference for the American Psychological Association?

A.   No.

Q.   In terms of your funding as a professor at WIU, do you know where that funding comes from?

A.   It comes from taxpayers, Illinois taxpayers.

Q.   Do you receive any grants?

A.   No, not personally.  Our department does.

Q.   And do you know what a grant is?

A.   Yes, I do.

Q.   What is a grant?

A.   A grant is where you make a proposal to conduct certain activities.  You apply for usually taxpayer money or private money.  And then if they like the project and they want to

support it, they will give you the money to conduct the activity. And there's no payback.

Q. Now, in terms of being retained as an expert witness, how many times have you been retained as an expert witness -- I'm not talking about testifying, just being retained as an expert witness in this specific field of psychology and false confessions?

A. I think six or seven.

Q. Six or seven times?

A. I've been engaged on six or seven cases.

Q. And of those six or seven cases, have they been civil cases or criminal cases?

A. Civil.

Q. And of those -- and of the civil cases, have you been retained by plaintiff's counsel or defense counsel?

A. Defense counsel.

Q. So, you've never been retained by plaintiff's counsel?

A. No, sir.

Q. Now, let me ask you this first off. Do you believe that false confessions exist?

A. Yes.

Q. And you know that false confessions exist because of the DNA exoneration cases; is that fair to say?

A. Yes.

Q. Would you agree that the definition of false confession in

its broadest term is an incriminating admission about being involved in a crime that they are not involved in?

Would you agree that that is the broadest definition of what a false confession is?

A. Yes.

Q. In your mind, is there a difference between an interview and an interrogation?

A. In my mind, I don't typically -- when I interview somebody, I don't break the interview into the interview/interrogation paradigm; but that is the accepted way to describe the interview process, but not -- I use a different tactic.

Q. When I say the term "empirical studies," what do you take that to mean?

A. That means either quantitative or qualitative studies that are conducted systematically to obtain data from the real world or experimental room.

Q. In terms of case studies, what's -- in your mind, is there a thing known as aggregated case studies?

A. Yes.

Q. And what are aggregated case studies?

A. Similar to the one that Drizin and Leo did in 2004, where they selected a group of alleged false confessions, and they put them all together into one group, and they looked at it.

Q. Do you know what a -- when I say the term "field experiment," what does that mean to you?

A.   That means typically when you can't conduct an experiment in the experimental environment or the laboratory, typically, you send somebody out to the field to make surreptitious observations; in other words, you're going to secretly look at what people do and catalogue their activities.

Q.   In your opinion, are there three types of false confessions?

A.   That's what the research shows.

Q.   One type is voluntary?

A.   Yes.

Q.   One type is compliant?

A.   Yes.

Q.   One type is internalized?

A.   Yes.

Q.   When I say the term "confirmation bias" what do you take that to mean?

A.   Confirmation bias is when we have an idea of what happened, and then what we do is we see other evidence or things; and what we try to do is then filter it through the confirmation that we think somebody's guilty, so anything that person says, we're going to filter it through a guilty filter.  And that interferes with the findings in an experiment.

Q.   Now, in terms of when someone makes a statement, either a confession or a witness statement, would you agree that it's important for investigators to be able to independently

corroborate what that witness or suspect says?

A.   Whenever possible, you want to corroborate what that victim or the witness said, or the suspect.

Q.   And it's best that you're corroborating something that is not known to the public; fair to say?

A.   Well, not necessarily.  If somebody says they were at a certain place at a certain time, you certainly have to corroborate that, but that could be known to the public.

Q.   But wouldn't you agree that it's better if there are facts not known to the public --

A.   Oh, I see.  You're talking about police sometimes withhold facts about a crime, and what they do is they interview the suspect to see if he can't come up with those facts that weren't released to the public.  Is that what you're referring to?

Q.   That's what I'm referring to.  So, in those situations, those types of facts then a suspect would say, that's really important because that can be gone and independently corroborated, correct?

A.   As far as the withheld evidence?

Q.   Well, let me ask you this:  So, let's say you're interviewing or interrogating a suspect, right?

A.   Right.

Q.   And the suspect says, "I have the gun, and it's buried under the oak tree in my backyard."  Right?  You would agree

that that fact is not known to the public when the suspect is telling you this information?

A.   Yeah, in that hypothetical, yes.

Q.   And so if the investigators are then to go to that oak tree in the backyard and dig up that gun, then that is independent, corroborating evidence; fair to say?

A.   Yes.

Q.   And that's important for investigators to get?

A.   Yes.

Q.   Now, do you believe that there are base -- base guidelines, base factors in how human beings interact with each other in the world?

A.   Are you talking about basic human behavior?

Q.   Yes.

A.   There is basic human behavior.  Because we're all humans, we all share the same drives, hunger, thirst, sleep, libido. We share those things across culturally as humans.

Q.   So, in terms of studies that are done in colleges, do you think it's wrong that these studies are trying to get sort of these base -- base motivations of human beings?

A.   I didn't understand what you said.  In --

Q.   Studies in colleges or studies in laboratories?

A.   Oh, in colleges.  Okay.  Laboratories, yeah.

Q.   Do you think that it's not a valid method to find out base motivations in that setting?

A.   I think it's a good beginning to say, "There may be something there."  We cannot make a causal relationship if something's there, but it's interesting, and it may be there; and we should pursue it using more complex research methods.

Q.   Now, in terms of risk factors, it is your position that the guilt-presumptive questioning, that is not a risk factor? That is your -- that is what you are saying; is that fair to say?

A.   Yes.

Q.   And if there are any journal articles or books that say guilt-presumptive reasoning -- guilt-presumptive questioning is a risk factor, you disagree with those; is that fair to say?

A.   I would disagree in the sense that that information, if it was obtained in a laboratory, those findings cannot be directly associated to a cause and effect that occurs in the interview room.

So, in that respect, they can't make that causal relationship based on science, only an assumption or an opinion.  And scientists base things on science, not opinions.

So, I would -- I would have to look at the findings and the research study, how it was conducted, who participated, and see if it met those three criteria.

Q.   And part of doing that is when you look at a report, either of yourself or another expert, you look at that report.  You see the footnote of the study, journal article that they're

referring to, and then you yourself can go look up and read that full study or journal article. That's what you're talking about, right?

A. Yes.

Q. And, of course, in this case, part of your duties as an expert is you reviewed Dr. Russano's report, right?

A. Yes.

Q. And you -- and in her report, she had about 150-plus footnotes; is that fair to say?

A. I didn't count them, sir.

Q. And for each of those footnotes, you looked up and read that entire case study or you had previously read any case study or article that was footnoted in her report; is that fair to say?

A. When you say every footnote, no, I don't think I reviewed every footnote. I only reviewed the footnotes that were of interest to me and connected with whatever topic she was discussing.

Q. Now, let me back up a minute. Do you know what a white paper is?

A. Yes, sir.

Q. What is a white paper?

A. A white paper is typically written about a classified topic. So, we have a topic we don't want to release classified information on, so what we do is we write a white paper; and in

Schafer -- cross

2188

the white paper, those are all the facts that we can disclose.

So, like -- yeah, that's basically -- it's something we can disclose, but there's more information there.

Q. Now, in terms of the white paper -- in terms of white papers, have you ever been involved in authoring a white paper?

A. Yes, I've written many white papers in my career.

Q. White papers in regards to false confessions?

A. No. You asked me if I wrote -- I did write white papers in my activities as a counterintelligence officer with classified information.

Q. Right. But I'm talking about -- I should have been -- I should have been more clear. I'm talking about white papers in terms of false confessions.

A. No, I don't think I've written a white paper, *per se*.

Q. Have you read any of the white papers about false confessions?

A. Yes, I have.

Q. How many are there?

A. I don't know. I think the American Psychological Association did maybe 13 white papers, emeritus -- you consider an emeritus brief a white paper?

Q. If you do, then --

A. See, I think we have a different definition of what a white paper is.

Q. Well, you tell me, what do you consider to be included in a

white paper -- as a type of white paper?

A.   Anything that's not classified and can be shared with the public.  I just understand white paper in the realm of counterintelligence and counterterrorism.

Q.   Now, speaking of counterintelligence and counterterrorism, it's fair to say that in that realm, that the people we're talking about are intelligent people; is that fair to say?

A.   It depends on how you define intelligent and what activities they're engaged in.

Q.   Well, let me ask you this:  In terms of your work as a counterintelligence operative, are you -- were you -- pre-9-11, were you dealing mostly with college-educated adults?

A.   I don't know all of them, but, yeah, I would say for the most part, they were college-educated and at least had training in intelligence operations, at the very least.

Q.   And that was both people that you're training to -- that are on our side and people that you're trying to turn to our side; fair to say?

A.   The people on our side, I can tell you 100 percent of the people on our side have been college graduates.  The other side, I'm not so sure because I don't get into the details of where they graduated and what their majors were.

Q.   And in terms of your experience being interrogated, you're a college graduate, right?

A.   Yes.

Schafer -- cross

2190

Q.   At the time you were being interrogated, were you a college graduate?

A.   In what respect?  Are you talking about the initial scenario I --

Q.   Yeah, the experience you talked about when you yourself were interrogated.

A.   Yes, yes.

Q.   And when you yourself were interrogated, you had training in interrogation techniques; is that fair?

A.   Yes.

Q.   You had training in interrogation evasion; would that be fair to say?

A.   Yes.

Q.   Now, moving back to the risk factors, it's your opinion that isolation in and of itself is -- for a few short hours is not a risk factor.  That's your opinion; is that fair to say?

A.   Yes.

Q.   And that in your opinion, isolation -- when does isolation begin, in your opinion?  If you're going to take a stopwatch and click start and then click end, what would be the start point and what would be the end point when you calculate isolation, in your opinion?

A.   It depends on how you define isolation.  If the suspect is with an interrogator or another interrogator, I wouldn't consider that isolation because they're with other people.  So,

it depends on what your definition of isolation is.

Q.   Well, in the field of false confessions, what is your understanding of how isolation is defined?

A.   The false confession researchers define isolation as that suspect does not have contact with friends, relatives, or loved ones.

Q.   Now, in terms of false confession researchers, let me ask you this:  Across, let's just say, the United States, not even North America, let's just say the United States, how many people are researching false confessions?

A.   Oh, I have no idea.

Q.   Do you have an estimate?

A.   I couldn't even -- many, because I've read all their research, so I know there's dozens of people investigating false confessions.

Q.   And it's fair to so that in terms of your research, your research doesn't involve false confessions; is that fair to say?

A.   That's not fair to say, no.

Q.   What does your research involve?

A.   I'm not sure I'm permitted to talk about that topic in this venue.

Q.   Are you saying that some of your research is classified and you can't talk about it?

A.   No.  My research has to do with the grammatical differences

between truthful and false written and oral documents, and there's a determination of veracity that is involved.

Q. Now, youth vulnerability, you agreed that that could be a factor; is that fair to say?

A. Yes, under certain circumstances, certainly, it can.

Q. And from your point of view, it's that if you don't have that much experience with the criminal justice system, you're going to be more vulnerable if you're young; is that fair to say?

A. Typically, yes.

Q. Now, when you're saying that, what about for someone who is youthful and has experience with an injust criminal justice system? How would that play into that factor?

A. I have no idea how that person would interpret the injustice, how they would feel about the injustice. It depends on the individual.

Q. Now, you were asked about development of the frontal cortex. Do you recall those questions on direct?

A. Yes.

Q. And I -- I just want to be clear, you don't disagree that the frontal cortex isn't fully developed until 23? You don't disagree with that?

A. Typically 25.

Q. Okay. So, it's 25. So, you don't disagree that the frontal cortex is not fully developed until 25?

Schafer -- cross

2193

A.   Yes.

Q.   Now, in terms of sleep deprivation, you say that that only happens usually beginning at 36 hours of sleep deprivation?

A.   The research demonstrates that typically, at -- beginning at 36 hours of no sleep, you tend to be sleep-deprived.

Q.   And is that research in terms of research of the psychology field as a whole, or are you referring to research just in terms of false confession research?

A.   Most of that sleep deprivation research is conducted in business environments, in environments other than false confession.

Q.   When you say a business environment, what do you mean?

A.   Like an experiment -- some of the experiments, an experimenter would keep a person up for, say, 36 to 48 hours, and then have them engage in some kind of intricate problem-solving activity.

     And they found out that in the business environment, their decision-making tends to be somewhat distorted at -- beginning at 36 hours.

Q.   So -- and also, your opinion about sleep deprivation not being a factor, part of your opinion, and correct me if I'm wrong, is that because you raised three kids and that you could still determine what was right and wrong with sleep deprivation, you're saying that's not a factor in false confessions.  Is that part of your opinion?

A.   I don't really understand your question.

Q.   Well, you recall mentioning on direct that you raised three kids.  Do you recall that?

A.   Yes.

Q.   And you recall that -- that after raising three kids and not sleeping a lot, you recall that you said that you were still able to determine what was right and wrong?  You recall that questioning on direct?

A.   Yes.

Q.   And so in terms of sleep deprivation being a factor, a risk factor in terms of false confessions, were you basing your opinion on your own personal experience?

A.   No, sir.  I was basing it on research.

In fact, Dr. Leo just published a journal article about sleep deprivation, and specifically, he stated that there's no amount of lost sleep hours that we can definitively say is a risk in false confessions.

Q.   And this recent study, when did you read it?

A.   When it came -- probably six or eight months ago.

Q.   And when you read it, did you include it in any sort of report?

A.   I don't think I put it in this report because I had submitted this report, and then I read the article.

Q.   But it's fair to say that you also made a declaration, too, right?

A.   Yes.

Q.   And that declaration was authored fairly recently, wasn't it?

A.   Yes.

Q.   About a month ago, wasn't it?

A.   Yes.

Q.   Now, your opinion is that minimization is not a risk factor; is that fair to say?

A.   Yes.

Q.   And you say that because you say that that's what the research shows; is that fair to say?

A.   And my experience.

Q.   Now, in terms of physical force, that is a risk factor if it's present during an interrogation, correct?

A.   Yes.

Q.   And when you say present during an interrogation, that means physical force before the questioning has occurred; is that fair to say?

A.   Anytime a suspect is in custody and you use physical force, it's absolutely wrong and prohibited.

Q.   And threats, threats are wrong, too; is that fair to say?

A.   Yes.

Q.   And that could be threats before an interview has begun, correct?

A.   Any threats you make to a suspect in custody is off-limits.

Schafer -- cross

2196

Q.   Now, let me ask you this:  In terms of deprivation of basic needs, is that a risk factor in false confessions?

A.   Again, we have to go back to the definition of basic needs and how often those basic needs have to be attended to and how -- and the personality of the person.

Perhaps somebody doesn't need to eat or drink because they're nervous, because they're being interrogated, and they don't need to go to the bathroom very often because they haven't eaten or drank anything.

So, it just depends on what -- how do you define that term?

Q.   Well, how do you define -- are basic -- do basic needs include having water?

A.   Yes.  But the amount of water we drink and when we drink it is also -- goes into that equation.

Q.   Do basic needs include food?

A.   Yes.  And again, it depends.  Our need for food, are we hungry?  Are we not hungry?

So, if -- I can go five, six hours without the need for food, so that wouldn't meet a basic need then.

Q.   And would you agree that a basic need is going to the bathroom?

A.   Yes, that would be a basic need.

Q.   Now, you mentioned -- I just want to be clear.  You mentioned in terms of three options that guilty suspects

employ, the third, the third, the third.  Do you remember that questioning on direct.

A.   Yes.

Q.   Now, let me just be clear, that differentiation into a third being -- making up their mind before and saying, oh, they're going to confess, a third not confessing under any circumstance, and a third sitting on the fence, is that based on your personal experience?

A.   No.   It's based on research that was conducted by Cleary and Bull in 2024.   And in that experiment, what they did is they surveyed prisoners who were serving time in prison, and they were given a survey to reflect back on the last time they were interviewed and to describe the circumstances of the interview or interrogation.

So, it's based on real people and real circumstances, and they're performing the same task.  So, that meets the credibility for findings.

Q.   Right.  And they were asking prisoners, correct?

A.   Yes.

Q.   And it's fair to say that one of the assumptions they made was that the prisoners were telling the truth?

A.   Yes.

Q.   And as part of the study, was there any sort of test that they did to see if any prisoner was malingering when they were filling out these surveys about whether or not they had made up

Schafer -- cross

2198

their minds about confessing or not before they were interrogated?

A.   Malingering in the fact -- when you say malingering, you mean lying?

Q.   Yes.

A.   Or being deceptive about what they wrote on the survey?

Q.   Yes.

A.   No, I don't believe that was done.

Q.   And when I say malingering, that's a specific term in psychology; fair to say?

A.   Yes.

Q.   And malingering is basically -- is an important thing to look at when making any psychological study because we're not mind-readers; is that fair to say?

A.   Yeah.  And that's the problem with survey research is that you don't know whether that person's telling the truth or not depending on the sensitivity of the questions.  If the questions are real sensitive, the probability of somebody not being truthful increases substantially.

Q.   And you would agree that a sensitive question is asking a prisoner whether or not they were planning to confess or not before being interrogated; fair?

A.   Based on my multiple interviews with prisoners, no, I don't think that is unusual.  In fact, they would -- they have a tendency to want to talk about that process.

THE COURT: All right. We'll break there for lunch. Ladies and gentlemen, we'll come back at 1:00 p.m.

I remind you not to discuss the case, research the case, or talk to others about the case. Thank you.

All rise.

(Jury out at 12:00 p.m.)

THE COURT: Dr. Schafer, you can step down. You're not to discuss the substance of your testimony with anyone.

THE WITNESS: Okay. Thank you.

THE COURT: All right. Any issues before the break?

MR. ENGQUIST: None, your Honor.

MR. MILLER: No, your Honor.

THE COURT: Okay. I'll see you back at 1:00.

(Lunch recess had from 12:01 p.m. to 1:00 p.m.)

(Change of reporters.)

2200

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                              )   Case No. 22 C 3973
                                         )
                Plaintiff,               )
        v.                               )
                                         )
REYNALDO GUEVARA; MICHAEL                )
MASON; and JoANN HALVORSEN,              )
as Special Representative of             )
ERNEST HALVORSEN, Deceased,              )   Chicago, Illinois
                                         )   February 17, 2026
                Defendants.              )   1:00 p.m.

                            VOLUME 11
            TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
            BEFORE THE HONORABLE JEREMY C. DANIEL
APPEARANCES:
For the Plaintiff:       LAW OFFICE OF STEPHEN L. RICHARDS
                         BY:  MR. STEPHEN L. RICHARDS
                              MR. JOSHUA S. RICHARDS
                         53 W. Jackson Boulevard, Suite 205
                         Chicago, Illinois  60604

For Defendant            BORKAN & SCAHILL, LTD.
Guevara:                 BY:  MR. TIMOTHY P. SCAHILL
                              MR. GRAHAM P. MILLER
                         20 S. Clark Street, Suite 1700
                         Chicago, Illinois  60602

For Defendants           THE SOTOS LAW FIRM, P.C.
Mason and                BY:  MR. JOSEPH M. POLICK
Halvorsen:                    MR. JOSH M. ENGQUIST
                              MR. JEFFREY R. KIVETZ
                              MS. CAROLINE P. GOLDEN
                         141 W. Jackson Boulevard, Suite 1240A
                         Chicago, Illinois  60604

Court Reporter:          CHARLES R. ZANDI, CSR, RPR, FCRR
                         Official Court Reporter
                         219 S. Dearborn Street, Room 1426
                         Chicago, Illinois  60604
                         Telephone:  (312) 435-5387
                         charles_zandi@ilnd.uscourts.gov

                    *   *   *   *   *
            PROCEEDINGS REPORTED BY STENOTYPE
    TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

THE COURT:  All right.  We're back on the record.

Any issues for me to address?

MR. KIVETZ:  No, Your Honor.

MR. S. RICHARDS:  No.

THE COURT:  All right.  Dr. Schafer, you may take the stand.  We'll bring in the jury.

THE CLERK:  All rise.

(Jury in at 1:00 p.m.)

THE COURT:  All right.  Please take your seats.

Dr. Schafer, I remind you you remain under oath.

Mr. Richards, you may proceed when ready.

MR. J. RICHARDS:  Thank you, Your Honor.

JOHN R. SCHAFER, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION (Resumed)

BY MR. J. RICHARDS:

Q.  Good afternoon, Dr. Schafer.

A.  Good afternoon.

Q.  I just have a few more questions for you.

The first is on direct this morning, you mentioned that between an interviewer and an interviewee, between the officer and the suspect, it's a dynamic process.  Is that fair to say?

A.  Yes.

Q.  And from your point of view, false confession researchers

forget that dynamic process.

A. Yes. Well, they don't forget it. They don't take it into account. I don't know if they forgot or it's just intentional.

Q. So in terms of research, if there's any sort of research where there's a camera on the person being interrogated and then there's a camera on the person doing the interrogation, that type of research doesn't take into play the dynamic process between interviewer and interviewee. Is that fair to say?

A. You're saying there's one camera on the suspect and there's one camera on --

THE COURT: Was there an objection?

MR. KIVETZ: There was.

THE COURT: Okay. Basis?

MR. KIVETZ: Form. Incomplete hypothetical.

COURT REPORTER: Can you get the microphone closer to you, please?

MR. KIVETZ: Yes. I apologize.

THE COURT: The objections to form are overruled.

You can answer.

BY THE WITNESS:

A. Did -- are you suggesting that we have one camera solely on the suspect and one camera solely on the interviewer?

BY MR. J. RICHARDS:

Q. Yeah, so there's two cameras in a sense going on.

Schafer - cross

2203

A.   There was one camera picking up the sound of the other person or not?

Q.   No, it's just one camera picking up what's -- what the interviewee is saying and then the simultaneous same camera picking up what the interviewer is saying, are you aware of any sort of experiments like that?

A.   I'm -- familiar with camera experiments, but I still -- still don't understand the question because if you're only -- if you're focusing on two people and you watch those videos, then you can see the dynamic between them.  But if you show me just the video of the interrogator or the suspect, then it doesn't show the dynamic.

Q.   But are you aware of any experiments such as that?

A.   I'm aware of experiments where -- about camera placement, either put the suspect in -- in the frame, put the interrogator in the frame or put both people in the frame.  You have over-the-shoulder vantage points, and you have cameras up in the corners.

Q.   And those camera experiments, would you say, do those look at the dynamic process in an interview?

A.   Well, it looks at the dynamic process but doesn't get the feel for what's in that room, the atmosphere, the attitudes. It doesn't get the -- the feeling you feel because when you're an observer and you look at film, it's a lot different than if you're actually in the room interrogating somebody.  That's

when you feel that tension. That's when you -- you feel what's going on and you -- you kind of feel that dynamic.

Q. So you're saying that in terms of feeling, it's -- it's -- you're feeling the body language of the other person. Is that what you're saying?

A. Well, you're not feeling it. You're looking at it certainly.

Q. And -- and it's -- so what you're saying is that certain people carry themselves in a certain way. Is that what you're saying?

A. That -- that would generally be true. People do carry themselves in different ways.

Q. And so you're saying that someone who carries themselves in a way where they're not a person to be messed with, that's a real thing. Isn't that true?

A. It depends upon how the receiver of that information interprets those nonverbal behaviors.

Q. Now, and so it's your point of view that if someone is just observing an interview, like they're -- they're through one of those two-way mirrors, right, they can't even opine about how that interview is going. They can't opine about and get experience from doing that. Is that fair to say?

A. Anybody can make an opinion about what they see. But it depends on are they basing it on what kind of observations, verbal, nonverbals, those types of things. So you can always

Schafer - cross

2205

make an opinion as to what might be going on in the -- in the interview room. But unless you can be there and feel that interaction between the two peoples, I think it's difficult.

MR. J. RICHARDS: A moment, Your Honor.

THE COURT: Okay.

(Counsel conferring.)

BY MR. J. RICHARDS:

Q. Now, in terms of the dynamics and people, would you agree that some people are more suggestible than others?

A. Yeah, I would agree with that. Yes.

Q. Some people are more just willing to say yes to questions. Is that fair to say?

A. By that do you mean they're people pleasers?

Q. Yeah.

A. Yeah, there are a category of people that are referred to as people pleasers, yes.

Q. And some people are more eager to cooperate with the police. Is that fair to say?

A. Yes.

Q. Some people are more eager to cooperate with interrogators. Is that fair to say?

A. Yes.

MR. J. RICHARDS: I tender.

THE COURT: Okay.

Mr. Kivetz?

REDIRECT EXAMINATION

BY MR. KIVETZ:

Q.   I just have a few follow-up questions.

You were just asked some questions about how certain individuals may be people pleasers.  But focusing a little earlier on in your testimony, you said there's three types of choices that -- or options, rather, that suspects utilize in the interrogation room.  Is that fair?

A.   That's correct, yes.

Q.   And one of them is to already have an informed choice to make a confession right away to a police officer; is that correct?

A.   Yes.

Q.   And in those instances, is it usual or typical that they -- that these people in the one-third category give a quick confession?

A.   Yeah.  Typically once you make a decision to confess, typically I've walked into a number of interview settings where I introduce myself, Hi, I'm Jack Schafer with the FBI, and they just say, okay, I did it; I want to tell you what happened.

Q.   So you barely even had an opportunity to get your name out?

A.   Within a half hour at the most they're talking because they want to talk.

Q.   Now, you said that those three options, it's not only based upon research in the area of interrogations and interviews and

disputed confessions, but it's also based upon your personal experience, right?

A. Well, yeah. Each -- each interview and suspect is different so you have to assess them a little bit differently. But they fall into the general categories that the research points out.

Q. You were asked some questions about whether or not false confessions exist, and I believe Mr. Richards cited some DNA examples from the national exoneration. Do you recall some of those questions?

A. Yes.

Q. And that's what led you in part besides common sense that false confessions actually happen, right?

A. Yes, they do.

Q. And that's because in those particular situations DNA proved that the false -- that it was actually a false confession, right?

A. Yes.

Q. Now, that study is from the National Exoneration Project where it was done over the course of 35 years and about 445 individuals in the United States had allegedly confessed and were found to be proven, right?

A. Yes. That's about right.

Q. My question -- my question is can you apply from that single data point, those 445 certain risk factors that could

potentially lead to a false confession, to the hundreds of thousands of felony convictions that occurred over the same 35-year time period?

A.   No.  No.  You can't.  Except there has been some studies that show that using advanced statistical probabilities --

Q.   Oh, I'm going to stop you there.  Just it's a previous point, but I understand where you're going.

But I guess my question is just focusing on my question, of the 445 DNA wrongful false confession convictions, can you determine from that data point alone whether or not those risk factors that were present in those 445 could be a risk factor in the hundreds of thousands that occurred in the same 35-year time period?

A.   No, you cannot make any conclusions based on accepted research methodology.

Q.   Because the 445 is just too small a data point, right?

A.   That's correct.

Q.   And that's why false confession researchers like Dr. Russano are running away from that data point in determining whether or not certain risk factors may apply to a false confession, right?

A.   Well, I don't know if they're running away from it, but they're not certainly emphasizing it in the latest literature that I've read.

Q.   And they're now focusing more on these laboratory

experiments and other case studies, correct?

A. Yes.

Q. Now, you were asked some questions about the education of some of the suspects that you interviewed in the course of your career. Do you recall that line of questioning?

A. Yes.

Q. And I believe Mr. Richards was asking you about, you know, some of the work you do in counterterrorism and suspects who might be working for the other side and their level of education. Do you recall that line of testimony?

A. Yes.

Q. Now, fair to say you've also interrogated individuals with low or minimal education; is that right?

A. Yes, probably more so than the other educated.

Q. And that would be with regards to your Nazi Low Rider investigation; is that right?

A. Absolutely.

Q. Okay. And also your work in Arizona. Is that fair?

A. Yes.

Q. Now, you were also asked some questions about youth vulnerability and specifically about this frontal cortex not developing until 24 or 25. Is there any research that shows that just because you're between the ages of 18 and 25 you're more likely to provide a false confession than say someone who is 26 or 30?

A.   Actually there is research that shows people who are between the ages of 25 and 39 actually have a greater risk at providing a false confession than suspects between the ages of 18 and 24.

Q.   You were also asked some questions about sleep deprivation. Do you recall that general line of questioning?

A.   Yes.

Q.   And I just want to make sure I understand your opinion.

Does sleep deprivation that could potentially lead to a false confession, does that happen after four to five hours or does the research show that it happens after 36-plus hours?

A.   Most of the research shows that sleep deprivation effects tend to begin around 36 hours of loss of sleep.

Q.   So even the flawed false confession research shows that sleep deprivation is only a risk factor after 36-plus hours?

A.   Yes.

Q.   Okay.

          MR. KIVETZ:  Thank you.  I have no further questions.

          THE COURT:  Okay.

          Mr. Richards?

     (Counsel conferring.)

          MR. J. RICHARDS:  Nothing off that.

          THE COURT:  Okay.

          MR. SCAHILL:  Oh.  Nothing from me.

          MR. MILLER:  Nothing, Judge.

THE COURT:  All right.  Dr. Schafer, you may step down.

And who will the next witness be?

MR. MILLER:  Mr. Anthony Carballo.

THE COURT:  Good afternoon.

Could you raise your right hand?

(Witness sworn.)

THE COURT:  Okay.  Please take a seat.

Mr. Miller, you may proceed once the witness is settled.

MR. MILLER:  Thank you, Judge.

ANTHONY JOSEPH CARBALLO, DEFENDANTS' WITNESS, DULY SWORN

DIRECT EXAMINATION

BY MR. MILLER:

Q.  Mr. Carballo, could you introduce yourself to the jury with your full name and go ahead and spell it for the court reporter's sake.

A.  Okay.  My name is Anthony Joseph Carballo, also go by Tony, C-a-r-b-a-l-l-o.

Q.  And what is your occupation, Mr. Carballo?

A.  I'm an attorney.

Q.  And in June of 1989, what was your employment?

A.  June of 1989, I was employed as an assistant state's attorney in Cook County.

Q.  And in November of 1990, same thing?

A.   Yes.

Q.   Okay.   And what was your role in Jaime Rios's prosecution?

A.   I was one of the trial assistants that prosecuted the case.

Q.   Okay.   Assistant state's attorney?

A.   Yes.

Q.   And one of the trial attorneys that tried the case?

A.   Yes.

Q.   When did you graduate law school and when were you admitted to the bar?

A.   I graduated law school in 1986, May of 1986, and was admitted to the bar that same year, in October.

Q.   And what did you do after finishing law school?

A.   After I finished law school, I started as an assistant state's attorney in the State's Attorney's Office.  I had -- I had clerked there for two years during law school as a -- as a volunteer in the State's Attorney's Office and then I was hired on as an assistant state's attorney in 1986.

Q.   And could you just give the jury a brief synopsis of the various assignments and roles that you had at the State's Attorney's Office.

A.   Yes.

I started, like other assistants when they first start out, in the criminal appeals division where you research and write appellate briefs.

I stayed in the appeals division for a period of time

Carballo - direct

2213

and became a supervisor. So I stayed a little bit longer than most of my peers.

I then was transferred for a very short time to First Municipal which is the misdemeanor courts in Chicago for about a month or less and then went into the felony courts over at 26th and California. I worked in the narcotics bureau as an assistant state's attorney trying felony narcotics cases. And then I went into the felony trial division where I also continued to try felony cases at 20 -- I was based at 26th and California which is the criminal courts building, the main criminal courts building in Cook County.

Q. So how long in total were you with the Cook County State's Attorney's Office?

A. Well, as I said, I was a clerk for a couple of years and then I was an assistant state's attorney for eight years, from 1986 to 1994.

Q. And how long were you in the felony trial division?

A. I would say I was in the felony trial division probably about six of those years, five, six of those years. I was also -- during that time I was in the special prosecutions bureau both, as I said, in narcotics. That's -- that's part of the special prosecutions bureau. And then later I was in the organized crime division for a period of time trying -- working up and investigating and trying felony cases.

Q. And aside from Mr. Rios's trial, had you -- have you tried

Carballo - direct

2214

any other murder trials?

A.   Yes.   During my -- during my eight-year career, I tried over 40 felony jury trials, most of which were murder trials, and hundreds of -- hundreds of bench trials, many of which were also murder trials.

Q.   As an assistant state's attorney, who is your client?  Who do you represent?

A.   We represent the People of the State of Illinois.

Q.   And what would you -- how would you describe the types of work, the types of tasks, the action items that a felony trial division attorney would do with respect to any particular case?

A.   Generally there's a period of file workup where you prepare the case ultimately for trial.  You're ordering police reports.  You're ordering photographs, basically getting all the documents that you need.  You are doing the discovery, what they call the discovery in the case, answering discovery, doing paperwork, that kind of thing, producing discovery to the defense which we're -- you know, we're required and obligated to do.

And then there -- there's the motion stage I guess would be, you know, the next stage where if defendants file pretrial motions, the motions are -- are heard by the Court and decided on by the Court.

And then there's the actual trial itself.  And the trial consisted of trial preparation as well as -- as putting

on the trial.

Q.   And is there also a process of preparing for -- you talked about trial preparation.  Is that -- what's involved in that?

A.   Basically in trial preparation, we would meet with the witnesses that -- that are involved in the case and the police officers that are involved in the investigation, and we would go to the scene of the -- where the crime occurred, you know, walk the scene, investigate the scene, see where everything -- everything significant is laid out.  And -- and then we would -- you know, we would meet with the witnesses and prepare our case and ultimately then put on the case to the -- to the -- whether it's a bench trial with the judge or a jury trial with -- with the jury.

Q.   So would it be fair to say that prior to actually trying the case, as one of the felony trial prosecutors, you would have reviewed all of the evidence, the documentary evidence, and talked to witnesses and evaluated the evidence that may be put on at trial?

A.   Yes.

Q.   And throughout that process, is there -- at some point as the felony trial division prosecutor, do you have to make a decision about whether to proceed to trial in a particular case or to try to attempt to get a plea agreement or some other alternative?

A.   Yes.

Carballo - direct

2216

Q. And who makes that decision?

A. We make the decision. The State's Attorney's Office makes the decision as to whether to proceed and prosecute the case and to go to trial or -- or to plead out a case.

Q. And when you say we, the State's Attorney's Office, is it -- who in particular or what role?

A. The trial assistants in the courtroom. We have -- we have supervisors in the office that are above us. But in each of the felony courtrooms, there's three assistant state's attorneys that are assigned to the courtroom, and they're referred to as -- as first chair, second chair, third chair. And the first chair is the most senior person in the courtroom. Third chair is the junior person in the courtroom. So the state's attorneys that are assigned to that courtroom will ultimately make a decision to proceed with the trial or to, you know, prosecute the case.

And if there's any issues, you know, we have -- we have supervisors that we can go to, what they call wing supervisors. Basically in the office at 26th Street there's -- there's various wings that have -- have several offices that there's a wing supervisor they call them. And the wing supervisor is always available if we need to talk about a case or, you know, we have questions about a case, things like that. But we ultimately make the decisions, you know, to proceed or not.

Carballo - direct

2217

Q. How do you make that decision to proceed or not? What are you looking at?

A. Well, we -- we look at the case. The -- you know, we work the case up. We talk to the witnesses, as I said, go to the scene. We review the documents. We meet with the witnesses and, you know, we evaluate the case to proceed. And basically it's -- it's, you know, a process that is done in every case that we do, whether it's a murder or an armed robbery, a rape, all the way, you know, to a -- to a felony theft. You know, you have to look at the case. You have to talk to the witnesses and then determine how you're going to proceed.

Q. And with respect to this decision on how to proceed with respect to a particular case, a particular criminal defendant, what role do the officers play in that decision?

A. They played no role in the -- in the decision to prosecute. They -- they don't decide that. It's -- it's the assistant state's attorneys that approve charges and then determine whether to proceed with the charge -- with the charges in the case.

Q. Okay. Do you recall when you became involved in or assigned to the Rios criminal case?

A. I was assigned to the courtroom. It was Judge Themis Karnezis was the trial judge that we were in front of for this case, and I was assigned probably a couple of months before the trial. I was assigned to his courtroom. And in -- in his

courtroom, there were -- there was myself as the third chair, Kay Hanlon who was the second chair and another first chair at that time I believe was Kip Owens. He was the most senior person in the courtroom.

And generally every four to eight months, the assistant state's attorneys are transferred from one courtroom to another so they get experience working with different judges in the building. And in this -- in this particular case, Judge Karnezis was the judge that I was assigned to at the time of this case. And I would say I got into that courtroom probably about a month or two, two months before the case went to trial.

Q. And who were the -- other than you, who were the trial attorneys for Mr. Rios's trial for the State's Attorney's Office?

A. The two trial attorneys were myself and Kay Hanlon who is -- was the second chair. She -- she was the first chair on the case, I was the second chair even though I was the third chair. I was the second chair since it was just her and I trying the case. She's the first chair which is the most senior attorney. I -- I was the second chair on the trial.

Q. And so you talked about some of the tasks that you would generally perform as the trial prosecutor prior to the trial. Did you take part in any of those with respect to Mr. Rios's case?

A. Yes, I was involved in the workup of the file. There was

some workup that was already done, and there were pretrial motions that were already heard in the case before I came into the courtroom. But after I came into the courtroom, I -- I then, you know, picked up -- picked up with the case and continued as the third chair, continued to work it up, make sure we had everything, make sure that everything was tendered to the defense, that we were prepared for trial, interviewed -- you know, called in and interviewed the witnesses and police officers that were coming in to testify at the trial.

Q. Okay. And as part of the sort of preparing for trial, you said you -- you interviewed witnesses, correct?

A. Yes.

Q. Was there any other stuff that you did in preparation for Mr. Rios's trial?

A. Well, there was -- there was quite a bit, you know, as far as I said, working the case up, making sure that we had everything, the photographs.

I also -- in this particular case, I went out to the scene. I think I went out to the scene a couple of times.

A -- I met with the witnesses. I -- we interviewed the witnesses at least, you know, once or twice before the -- the trial and -- and then made sure that we had everything in order to proceed to the trial.

Q. So it was you and Ms. Hanlon trying the case. Can you just kind of explain how that worked with you two, the dynamic? How

Carballo - direct

2220

did you split up the roles?

A.   Well, we were -- even though I was the third chair, she was the second chair, we were partners.  All three of us were partners, and we tried cases together and we worked up cases together in the courtroom.  This was -- Judge Karnezis was considered one of the -- probably the busiest courtroom in the -- in the building at 26th and California.  He liked to -- he liked to try cases and he prided himself on being a hard worker.  So usually the assistants that were put into his courtroom were -- were also hardworking assistants that wanted to try cases and wanted to -- you know, to develop as prosecutors.

         And -- and so we were -- we were partners on the case, and we, both Kay and I split up the witnesses, who was going to put on what witnesses, who was going to do the opening statement, who was going to do the closing arguments, who was going to do the rebuttal argument.  We have to get jury instructions prepared.  We have to make sure all the exhibits are -- are prepared.  In this particular case, you know, we went, and we prepared a diagram of the scene and went out to the scene and did that kind of thing to prepare.

Q.   And when it came to sort of strategic decisions with respect to the case, how were those made?

A.   They were made by both of us.  You know, we would confer and meet and prepare and work -- generally work together as a

team.  We worked -- you know, we worked pretty hard together and we worked very well together, all three of us.  But on this -- this particular case, it was Kay and I.

Q.  So you mentioned that of course after evaluating the evidence, you know, analyzing what's out there, that you make this decision about well, how are we going to proceed.  What was that decision in Mr. Rios's case?

A.  We evaluated the case.  We lined up the -- you know, the evidence and the witnesses, and we determined that we were going to proceed to trial.  And we then got ready for the trial.

Q.  And what was that based on?  What was the evidence that told you that this case should be tried against Mr. Rios?

A.  Well, we had -- we had several pieces of evidence in this -- in this case.  We had an eyewitness that we met with that we interviewed and -- and spoke with several times.  We had police officers that were -- were both detectives, violent crime detectives and gang crime specialists who were, you know, experts on gangs.

And we had a confession from the defendant, both an oral and a written court-reported confession from the defendant to the detectives in the case, the violent crime detectives and to an assistant state's attorney from the felony review unit.

And we also had -- although we're not required to prove a motive in a criminal case, we had a very strong motive

in this case. It was -- it was a rival gang shooting on rival gang territory, 1300 block of North Western.

So it was -- by the evidence as well as the testimony of the witnesses, it was determined that it was a -- a rival gang murder with two rival gangs, one being the Latin Kings and one being the Spanish Cobras, which -- which were not friendly towards each other. One -- one gang they referred to as People, they're a People Nation, that's the Latin Kings, and one is the Folks Nation, that is the Spanish Cobras.

And -- and they were basically divided by -- the territories were divided by Western Avenue which -- around 1300 North Western. The east -- going east of Western was Latin King territory. Crossing that street which one of our -- during the trial, one of the -- the gang specialists referred to Western as being the DMZ, or demilitarized zone, and the -- the dividing line between the gangs that the other side going west of Western was the Spanish Cobra territory.

Q. You mentioned one of the key pieces of evidence being an eyewitness. Who are you referring to?

A. I'm -- I'm sorry.

Q. Oh, sorry.

A. Could you repeat?

Q. I'm sorry. You ready?

A. Yes.

Q. You referenced one of the key pieces of evidence that went

into that decision was an eyewitness that you had.

A.   Yes.

Q.   Do you remember who that was?

A.   Yes, we had -- we had an eyewitness.  His name was Luis Huertas who was a person who lived and worked on Western Avenue and was a friend of the victim's.  He actually lived on the east side of Western and worked at an ice cream shop on the east side, but he was friends with the Spanish Cobras.  The defendant -- the victim in this case was a Spanish Cobra, and he was friends with the victim and had friends that were also Spanish Cobras on -- on the other side.

And I -- also we had a friend of the defendant's who was a Latin King, a guy named Benjamin Carrero who was also a -- what we call a third-party admission witness who testified that he met up with the defendant after the murder, shortly after the murder, and defendant gave him a gun and told him he had just shot somebody.

So we had -- we had him as -- in addition to all the other evidence.

Q.   With respect to Mr. Huertas, did you interview him prior to the trial?

A.   Yes, I did.

Q.   Okay.  You personally did?

A.   Yes, both my -- myself and Kay Hanlon met with and interviewed him, and I believe I interviewed -- I talked to him

Carballo - direct

2224

and walked the scene with him where everything happened along with Kay and also met with him in our office before the trial.

At 26th and California, the court -- the courthouse -- courtrooms are on one side, and then on the other side of the building which you can walk -- walk through the corridor is the office side. It's a 14-story building, and our offices were on the 12th floor.

Q. Before I get into the substance of that interview, let me just ask you generally. Why is it that you interview witnesses prior to trying a case?

A. Well, obviously you want to know what the witness is going to say and -- and prepare for the case. So you interview them and, you know, you find out what their testimony is going to be and whether they're credible, you know, what -- what knowledge they have, what -- what relevant knowledge that you can bring into the -- into the trial.

Q. And would you agree that when you're looking at or -- or inquiring about their credibility, obviously that's because you want to know whether they'll be credible when they testify, but would you agree that it's also part of your obligation as a prosecutor to ensure that the prosecution is legitimate, that these people saw what they saw or that they heard what they -- you know, when they're saying what they heard, it's true, all of that?

A. Yes, that's true, and, you know, our -- our job and our

goal is to -- to do justice, to convict people that are guilty of crimes and to not proceed, you know, with cases that we can't prove. And, you know, we -- we analyze the case and we determine whether a case should be tried or not or whether we can or can't proceed.

And that's especially -- especially true in gang related cases. Sometimes you're dealing with witnesses who when it comes around to trial that they're not available. They're not -- they're not willing to come to court or, you know, so that we're dealing with situations like that and we just have to -- we have to evaluate the witnesses and evaluate the evidence before we proceed.

Q. And so am I correct in assuming then that in addition to just listening what these witnesses have to say, you're also asking them questions to determine their credibility and whether they're being truthful?

A. Yes.

Q. Okay. And do you also ask questions to ensure that there was no police coercion or irregularities with respect to their interactions with the police?

A. Yes.

Q. All right. So in these interviews that you had with Mr. Huertas prior to trial, what did he tell you?

A. Mr. Huertas was a -- was a very detailed, very credible witness that, as I said, was a friend of the victim's. He told

Carballo - direct

2226

us that he was seated on the stoop of the bar at 13 -- I think it was 1316 North Western on the west side of the street which is the Spanish Cobras side of the street. There's a -- there's a bar that was there. He was sitting on the stoop, and he was alone sitting there. And he observed the defendant and another person who was with the defendant come from North Potomac -- west -- or East-West Potomac. Potomac runs east and west.

Q. Let me stop you there for just one second. When you refer to the defendant, because we're sitting here in civil court today, who are you referring to?

A. I'm referring to Mr. Rios, Jaime Rios.

Q. Okay. Go ahead. You meant the criminal defendant, right?

A. Yes.

Q. Okay. Go ahead.

A. Oh, yeah. He's the -- he's the -- he's the criminal -- well, I refer to him as a criminal defendant because I -- he was a defendant when I prosecuted him.

Q. Okay. Go ahead.

A. But what Mr. Huertas told us then is that he saw the defendant and another person come from the corn- -- around the corner of Potomac. And we actually had a -- a diagram at the trial, too, that showed where -- where everything was, but on Potomac, there's -- on the corner of Potomac and Western, there's a Chicago fire station there. And it's that side of the street, the west side of Western, that's Spanish Cobra

territory.

So these guys came down, and they approached him. And he's watching them as he approached. And what he told us is that in that neighborhood, it's a very high crime gang neighborhood, and when you're -- you're in that neighborhood and you see someone coming, especially if you don't know who they are, you -- you know, you watch and you see what's going on, who they are.

When -- when they approached Mr. Huertas on the sidewalk, walking down the sidewalk, the defendant was closest to Mr. Huertas. And as he approached, he -- he did what they call false flagging. False flagging is where you give a signal to somebody that's not the true gang that you're in but, you know, you -- you let -- you give them a signal. In this case he gave a signal which was of the Spanish Cobras saying that, you know, I'm a Spanish Cobra. And when he false flagged him and did that, he was paying attention to him even more because he didn't know him, but he knew -- you know, he knew the neighborhood, knew the Spanish Cobra -- who the Spanish Cobras were, did not know the defendant.

At that time the defendant and his friend proceeded to walk further north just to 1316. Now, at 1316, right around the corner there, there is -- there is an empty lot with a sidewalk that -- that goes east and west. That -- as -- as Mr. Huertas watched the defendant proceed walking down the

Carballo - direct

2228

sidewalk, he then observed the victim, Mr. Morales, who his nickname was referred to as New York.  They called him New York.  He was a member of the Spanish Cobras.  He and another gentleman, Mr. Torres, whose nickname is Loco, they -- Mr. -- first Mr. Morales comes out from the gangway, the vacant lot, and comes out to the sidewalk.  And the other gentleman, Mr. Torres, was -- was behind.

So Mr. Huertas then observed the defendant and the other gentleman pull out guns.  They -- he saw Mr. -- the -- he saw the victim put up his hands.  He was right on the sidewalk and basically raised his hands like what's -- you know, what's going on, like I don't have a gun, or, you know, trying to signal that -- that he was surprised that -- that, you know, these guys had guns and he, you know, just didn't have a gun and that at that time, both of the offenders, the defendant and his friend, started shooting.  And the defendant shot the victim several times and the other offender was shooting as well.  The other offender was at that time Loco, who was with the victim, Mr. Morales, he turned and immediately ran back towards the -- the west through the vacant lot there.  And -- and there was shots being fired.

At that time the victim had fallen -- after being shot several times, fell on -- basically on his face onto the sidewalk.  And the defendant and his -- his friend ran east across Western to the other side of the street.  And when they

got towards -- they were out -- when defendant was out on the street, he turned again, and he shouted, King Love, Spanish Cobra Killer, and then turned and then ran eastbound towards the Latin King territory.

Q. Mr. Carballo, when Luis Huertas was telling you all of this and as you were preparing for trial, what was your evaluation of his credibility?

A. My evaluation that he was very credible and he was very descriptive, very detailed, to the point where, you know, he -- he told us, you know, very -- very significant details as to what he observed during the -- the murder.

Q. Did you have any concerns about -- while you were talking with Mr. Huertas, did you have any concerns about whether he was actually able to perceive and remember and later identify Mr. Rios?

A. No, because we had been out in the area, out at the scene. We had been there during the day and -- and in the late evening. So we knew the lighting in the area. We knew where -- where the lighting was from both the bar and from the streetlights. And he described the lighting in the area so we could see that. And -- and he was very detailed as to -- as to what he observed.

Q. Were there any -- as you were talking to Mr. Huertas and getting the information from him and asking him questions, were there any red flags with respect to improper police conduct or

Carballo - direct

2230

improper procedures that were used with Mr. Huertas --

A.   No.

Q.   -- in his identification?

A.   No, there weren't.  There were no -- no improper procedures.

Q.   Okay.  You mentioned Benjamin Carrero as well, correct?

A.   Yes.

Q.   Now, what Mr. Carrero, according -- your understanding of what Mr. Carrero told the police was that on the day of the murder, Mr. Rios came by and gave him a gun and made sort of an inculpatory statement about having been involved in a shooting, right?

A.   Yes.

Q.   Okay.  So did you attempt to -- or did you interview Mr. Carrero?

A.   We didn't -- I didn't interview Mr. Carrero before trial, but I had his grand jury testimony.  He was subpoenaed to come to court for the trial, and he didn't show up voluntarily to come to court until we had to, you know, notify the judge that he was -- he was under subpoena and not -- not cooperating.

        Mr. Carrero was also an admitted Latin King gang member, admitted friend of the defendant's.  And when we had originally planned to call him, he -- and to -- we wanted to meet with him in advance of the trial, he was not cooperating and didn't come to court.

Then we had a conversation with the judge the day before the testimony, the day before he finally showed up. And when he came to court, he was in the company -- he was taken -- he was driven to court by -- Mr. Rios's attorney drove Mr. Carrero and his girlfriend to court that day.

Q. Notwithstanding the fact that Mr. Carrero was a fellow Latin King and friends with Mr. Rios and was not cooperating with you with respect to a pretrial interview, was the state planning on calling him anyway?

A. Yes, we were planning on calling him anyway. And as I said, we had his testimony. After he was interviewed, he was subsequently brought to the grand jury. The grand jury at 26th and California is in 26th and California. It's on the fourth floor. And Mr. Carrero had testified before the grand jury which is a group of citizens just like yourselves that are -- that are asked to serve on the grand jury, and he testified before the grand jury.

So we had his -- his testimony under oath where he made -- where he was asked and made a statement and talked about meeting up with the defendant, Mr. Rios, on June 27th into the morning about 12 -- I think he said about 12:30 in the morning which was shortly after this murder had occurred, that he met up with the defendant, that the defendant asked him to -- to hold or, you know, take -- take the gun, take a gun that he had given him and that -- told him that he had just

shot somebody. And that's what he testified to in the grand jury.

So we had that testimony from him under oath which we were prepared, you know, when he came into court, we thought -- we had hoped and thought that he was going to testify truthfully; but if he wasn't, we had his -- his grand jury testimony to impeach him at the trial.

Q. And obviously you wouldn't know the officers, the police personnel that were involved in the investigation itself from all the reports and whatnot. Would you interview all those folks as well?

A. Yes.

Q. And did you do that in Mr. Rios's case?

A. Yes, we did.

Q. Did you talk to -- okay.

A. Yes, we did.

Q. And one last thing. The -- about your pretrial procedures.

Did you -- do you know who was the state's attorney who took the confession of Mr. Rios?

A. Yes. The assistant state's attorney at the time who took Mr. Rios's statement, his confession, was Barbara Riley. And she was an assistant state's attorney in the felony review unit at the time and was called out to come out to meet with Mr. Rios and the detective, detectives, that evening.

Q. And did -- did you know Ms. Riley? Have you worked with

Carballo - direct

2233

her before?

A.   I was never partners with Ms. Riley, but I knew her.  She was a contemporary of mine from the office.  She was also an assistant state's attorney in the felony trial division for a period of time.  She was -- she was a good -- good assistant state's attorney.  I never was a partner of hers during -- during my stay in the State's Attorney's Office.  But when I was in organized crime, special prosecutions organized crime, she came in -- as I was getting transferred out of that division, she was coming in.  So she took over some of the cases that I had -- that I was handling that I was working up.

So I -- knew her, and I knew her, you know from the office.  Coming up we -- I think she was around the same time I was coming in, maybe a little bit -- maybe a little bit ahead of me.  But she -- you know, she was a good state's attorney, had a good reputation.  And she subsequently, after leaving the office, went and became a judge in -- in Cook County, in the Circuit Court of Cook County.

Q.   All right.  With -- with respect to the trial itself, do you recall when this case was tried?

A.   This case was tried on November 28th through November 30th of 1990.

Q.   Okay.

A.   It was a Wednesday -- I remember it was a Wednesday through a Friday the case was tried.

Carballo - direct

2234

Q. Do you recall ultimately what the charges were against Mr. Rios? What was he being tried for?

A. First degree murder.

Q. Okay. Let me ask you this. From the state's perspective, in getting a conviction of Mr. Rios for first degree murder, did it matter whether Mr. Rios was, in fact, the shooter, the one that actually shot the victim, or whether he was just there with Tino and did not, in fact, shoot the victim?

A. It -- it -- it really didn't matter, you know, what exactly. We knew they were both shooters. But under the law, when two or more people commit a crime together, they are all responsible for not only their acts but the acts of their -- of their partners, of their people that they're committing the crime with. So it didn't matter to us whether Mr. Rios shot the fatal shot or shots -- this victim was shot five times -- whether he shot the fatal shot or shots or whether he was there with the person that did.

But based on the testimony of the eyewitness who was there, that defendant was shooting the gun and -- the gun that he had and the -- his friend was shooting as well. So they're both responsible whether -- whether one is a good shot and one is not a good shot, they're both equally responsible. They came to the crime together and committed the crime together. So they're both accountable under the -- there's a law in Illinois in most states, in all states that is called the law

Carballo - direct

2235

of accountability.

Q. And I ask that because in Mr. Rios's confession, he says he was just there, he wasn't the actual shooter; is that correct?

A. In his statement, in his confession to the state's attorney and to Detective Mason, he tried to minimize his involvement by saying that he was there. He shot a few times toward the building, but he basically puts -- puts himself in the position of his friend -- Tino is his name, Cristino Garcia -- and basically attributes the -- the -- the main shooting of the victim to -- to Tino.

Q. And so notwithstanding, though, the fact that Mr. Rios's confession said that he was just there, the state's theory at trial was that, in fact, Mr. Rios was the one that had shot and killed Mr. Morales; is that true?

A. Yes.

Q. Okay. And, again, why was that? Why did the state proceed on that theory?

A. Well, you know, we had eyewitness testimony from a credible witness who was a friend of the victim's and was very detailed in his -- in his testimony. He had observed it from a close distance where the crime happened and -- and it -- his testimony was corroborated by other witnesses that were -- that testified, including the defendant's own statement, his confession.

Q. And the witness you're referring to, that's Luis Huertas,

Carballo - direct

2236

correct?

A.   Yes.

Q.   Okay.  So at trial, the -- the state puts on evidence first, correct?

A.   Yes.

Q.   All right.  And what was sort of the key evidence that the state put on to prove its case?

A.   Our key evidence came from witnesses, officers, and from the state's attorney and -- and the detective, Detective Mason. We had an eyewitness.  We had a third-party admission through Mr. Carrero.  We had a confession from the defendant.

The defense ended up calling a witness who was not an eyewitness but was a current -- occurrence witness who was over on Potomac.  She lived right by the police station.  And her testimony, although she didn't -- she didn't identify the defendant, she didn't see the -- you know, what happened out on -- on Western, she -- her testimony also corroborated the testimony of -- of Mr. Huertas and -- and also corroborated the defendant's.

We also had testimony from a gang specialist, Dr. -- Detective -- or special -- gang specialist Dan Noon who -- who is now -- I understand he's deceased.  He was our gang expert in the case, and he testified to the gang territories and how gangs -- how the gang activity works in that area.  And he knows Mr. Rios and testified that -- that Mr. Rios also, he

Carballo - direct

2237

knew him as an active member of the Latin Kings, and he admitted to Officer Noon that he was an active member of the Latin Kings.

So he was the gang -- he was the gang expert. He was a very good witness during the case and as well as Detective Mason and assistant state's attorney Riley, Barb Riley testified at the trial.

Mr. Carrero, as I said, he came in and when he testified, we knew that he had come in with -- with Mr. Carey who was the defense attorney. He had drove him to court. And we had to impeach him with his grand jury testimony because he left out some testimony that -- so we had -- we presented that.

We presented his grand jury testimony through the court reporter from the -- from the grand jury. When a witness testifies in the grand jury, there's a court reporter who takes down the testimony under oath. And we called the court reporter to testify what Mr. Carrero told the grand jury and to impeach Mr. Carrero.

What happened was he had -- he had testified in the grand jury that he -- the defendant approached him afterwards. It was the morning of -- and he knew the morning of when this happened because it was -- he testified it was his birthday. And he testified that the defendant had approached him, gave him -- gave him a gun and said, I just shot somebody, can you, you know, hold this -- can you take this gun.

When he got to the -- to trial, after he had driven to court with the defendant's attorney, he said that he didn't remember saying that defendant told him he had just shot somebody. But he did -- he did testify in his direct examination that defendant did give him a gun, came up to him and gave him a gun, but he left that part out and claimed he didn't remember that. So we impeached him with that testimony.

Q. So at the criminal trial, just to be clear, Mr. Carrero came in, and he denied what he had testified to to the grand jury about the fact that Mr. Rios had admitted to him that he just was involved in a shooting, right?

A. Yes. But he admitted -- surprisingly he admitted that he did see the defendant, the defendant approached him shortly after this murder, and that the defendant gave him a gun.

Q. He --

A. And he testified that he remembered that because it was his birthday.

Q. Okay.

A. But he denied the part about the defendant saying that he had just shot somebody.

Q. And -- and Mr. Huertas, in fact, testified at the trial, correct?

A. Yes.

Q. Okay. And, you know, I think you told us what Mr. Huertas told you pre -- prior to the trial in your interviews with him

and -- and this jury has already heard, in fact, Mr. Huertas' testimony. But as you recall it, was what Mr. Huertas testified to at trial consistent with what he had told you in your pretrial interviews?

A. Yes. And, you know, when he -- when he told us what happened and when he walked us through the scene and everything, you know, and during the time that we met with him, Mr. Huertas not only what he said but how he said it, he was very -- very emotional. He was -- he was friends with the victim, so this -- this I think really affected him. And just the -- the way he said it, said things was very -- had -- had an impact on me, you know, as -- in talking to him and meeting with him.

And one of the things that I remember him saying was that after the victim was on the ground and -- and the defendant fled, he went to the victim and he described how the victim was. His eyes were open but he was basically not responsive. And he was there trying to help him. And it was very vivid.

This guy Tino, his -- the friend of the -- of the victim's who ran away and luckily didn't get shot, he came back shortly after the defendant and his friend ran away, and he was there at the scene. And it was very emotional. He was very upset, very -- you know, they were crying. He was crying. And Mr. Huertas was trying to get the friend, Loco, to go get the

ambulance because the ambulance was right on the corner there. The fire station was right there. So he was trying to get him to go and get -- and I remember him describing how the -- he had blood on his clothes and the victim had been shot in the forehead, in the head, and some of the victim's brain matter was -- had gotten onto his clothes and onto his pants. And he was very descriptive, very -- you know, very vivid in his description of what happened, how it happened, and what the defendant -- even with the defendant, what the defendant was doing and that kind of thing.

Q. Let me ask you this. Did Mr. Rios's confession come into evidence at the criminal trial?

A. Yes, it did.

Q. Okay. Let me ask you a couple of questions about that.

You said earlier that the motive for this murder was gang related, right?

A. Yes.

Q. So what was the state's theory, factual theory specifically with respect to that?

A. Well, there -- these are two rival gangs. They -- they are -- they're enemies. They hate each other. They -- you know, they want to kill each other.

And the motive became very clear from the defendant's own statement, his own confession that he had claimed that right before he went over to Western to shoot the -- the victim

Carballo - direct

2241

that someone drove by and took some shots at him and some of his friends that were out in the area of where he was at which was around his -- where he lived. And he said that he thought that they were Spanish Cobras because they were rivals, number one, and number two, they were -- they had driven back across -- towards -- towards Western, across Western towards the -- where the Spanish Cobras. And it was at that time that he said, I'm going to go get -- I'm going to go, you know, pay them back. I'm going to get a Spanish Cobra. And that's when he got his gun and went and found Tino and went over to the area.

Q. And so this event that shortly preceded the murder, this drive-by shooting, where -- where did that information came from?

A. That information came from the defendant. His confession was -- was very detailed as to what happened, and he gave the information.

But as far as the motivation and the rivalry, we also had the testimony of Officer Noon who was -- you know, who was a gang crime specialist. He was actually not only a gang crime specialist on the streets, but he also taught state's attorneys, federal prosecutors, taught classes on gangs in Chicago. So, you know, he testified as an expert in the case.

Q. When -- so when this evidence of this prior preceding drive-by shooting came out through Mr. Rios's confession at

Carballo - direct

2242

trial -- Mr. Rios testified at trial, correct?

A.   Yes, he did.

Q.   Did he deny that this event happened, this drive-by shooting that appears in his confession, did he deny that at trial?

A.   I don't believe he denied that.  He denied some things, claimed that they occurred differently.  But he -- I believe he admitted this -- this shooting, that he was shot at before -- or around the time that this -- this murder took place.

Q.   So he admitted that the drive-by shooting that's in his confession, in fact, happened?

A.   Yes.

Q.   How did he try to explain away this -- this piece of information related to motive at trial, if you recall?

A.   Well, you know, he tried to soften it up.  Like, you know, he was an admitted gang member.  He tried to say that, you know, he was getting out of the gang and this -- that kind of thing, but he was -- he had to admit that he was a member of the gang.  You know, so he tried to soften -- soften things up during his testimony.  But then he was crossed -- he was cross-examined by Kay Hanlon, my partner, and then admitted a lot of what he was -- he was trying to soften during the -- during the direct examination.

Q.   Let me ask you this.  At Rios's -- at the criminal trial, did Mr. Rios attempt to say for the first time that this

drive-by shooting, in fact, occurred after the murder of Luis Morales? Do you recall that?

A. I don't recall specifically him saying that, but I know he tried to change his -- his testimony about when it happened, I believe, when the shooting -- when they shot at him, whether it was before that happened or sometime around when that happened. But that was the statement he gave to the state's attorney.

Q. Right. Because the theory about the motive of course makes all the sense in the world if this drive-by by the Spanish Cobras happened shortly before Mr. Rios and Tino go to retaliate by going into Spanish Cobra territory and shooting at Spanish Cobras, right?

A. Yes.

MR. S. RICHARDS: Objection.

THE COURT: Sustained.

BY MR. MILLER:

Q. And did Mr. Rios or his attorneys at trial, did they call any witnesses to corroborate the timing of this drive-by shooting or to testify about when it occurred?

A. No, they didn't.

Q. Do you know who Lamont Burr is?

A. I heard the name, but I don't know who he is.

Q. He didn't testify at the trial?

A. No, he didn't.

Q. Okay. Mr. Rios's girlfriend at the time, she did testify

at the criminal trial, right?

A.   Yes, she did.

Q.   And she, according to Mr. Rios, was present at the time of the drive-by shooting?

A.   That's what he -- that's what Mr. Rios said in his statement, that she was present as well.  But -- and she testified at trial, but she did not testify anything about the -- the prior drive-by shooting.

Q.   Okay.  Was she even asked by Mr. Rios's attorney about when --

A.   No, she wasn't.

Q.   Another person that was supposedly there at the time of the drive-by was a Daniel Rodriguez, correct, a brother-in-law or maybe --

A.   I believe so.

Q.   Yeah.  Did he testify at the criminal trial?

A.   No.

Q.   No?

       Now, Mr. Rios said that the police, in fact, came by and investigated this drive-by or murder or whatever -- whatever it was, right?

A.   I don't believe he testified to that.

Q.   Okay.  Was any documentary evidence ever produced by Mr. Rios to sort of substantiate this claim that the drive-by happened after the murder of Morales?

Carballo - direct

2245

A.   No.

Q.   Okay.  Based on your experience trying all these felony cases over the years, would it have been difficult for the criminal defense to obtain such documentation if a shooting, in fact, did occur?

A.   No, they could -- they had the same opportunity that the state's attorneys had to subpoena records.  They could have subpoenaed records from the Chicago Police Department.  They could have, you know, sent an investigator out to investigate.  They -- they have the same -- same opportunities that -- that we have.

Q.   And if a subpoena had been issued and the Chicago police said, oh, we don't want to give you that information, what would have happened?

A.   If that would have happened, the defense would have made -- they could have and would have made a motion with the court before Judge Karnezis, and Judge Karnezis would have issued an order for whatever documentation that they were looking for.

Q.   Okay.  Let me ask you a little bit, what was gang specialist Guevara's role in this criminal trial?

A.   Officer Guevara's role in this case was minimal, very minimal.  He basically -- his involvement was transporting Mr. Rios to the police station, turning -- turning him over to the detectives.  And I believe he also picked up and drove Mr. Huertas over to the station the next day and presented --

presented Mr. Huertas to the detectives for a line-up.

Q. Okay. And -- and -- and in addition, obviously, the -- the initial identification of Mr. Rios came -- as being involved in this came from tips from sources that Mr. Guevara had spoken to on the street, correct?

A. Yes. The -- the information came from more than one confidential informant identifying Mr. Rios and Tino, Cristino, ultimately Cristino Garcia as being involved.

Q. And what role did this tip or the information from the tip play in the decision to prosecute Mr. Rios?

A. It played no role. You know, we didn't -- we didn't present informants. They -- they were not involved in the prosecution of this case.

Q. Okay. Why did you have Mr. Guevara testify at the criminal trial?

A. I think Mr. Guevara, his involvement was just as to, you know, how -- how the investigation progressed and how -- just showing the sequence of Mr. Rios getting picked up and brought to the station. And he was just part of the -- part of what had led up to him going to the police station ultimately then confessing to Detective Mason and Barb Riley.

Q. Did Mr. Guevara ever lean on you or try to persuade you to prosecute Mr. Rios or to do any -- make any decisions with respect to this prosecution?

A. No, he had no involvement in that, and he -- he didn't

Carballo - direct

2247

implicate Mr. Rios saying that, you know, he confessed to him or that he questioned him. He was not -- he was not one of the -- the detectives that was handling the investigation of the murder.

Q. Did Mr. Rios present an alibi during this criminal trial?

A. No, he didn't.

Q. What was the defense's theory of the case then?

A. The defense was basically reasonable doubt, you know, trying to create -- trying to create reasonable doubt in the case that -- just try to plug holes. But that was -- there was no alibi, never disclosed an alibi, never presented an alibi or any other defense.

Q. And what did the criminal jury ultimately find with respect to Mr. Rios's defense of reasonable doubt?

A. The jury found -- found him guilty, and the jury was out only a short time with dinner and did not believe the defense.

Q. And were you present for -- were you still in the case when Mr. Rios was sentenced?

A. Yes, I was.

Q. And what was he sentenced to?

A. Judge Karnezis sentenced him to 36 years in the Illinois Department of Corrections.

Q. And you were aware of the prior conviction that occurred just a month or so before the --

A. Yes.

Carballo - direct

2248

Q. -- Mr. Rios's conviction for trial in this case, right?

A. Yes, that occurred less than a month before, and that was presented at the sentencing hearing.

Q. And the time that -- Mr. Rios had to serve time for that as well, correct?

A. Yes, he was sentenced by Judge Toomin who was -- Judge Toomin was another judge in the -- in the criminal courts at 26th Street. And Judge Toomin sentenced him to three years consecutive to the -- to the sentence in our case.

Q. Okay.

MR. MILLER: Could I have one minute, Your Honor?

THE COURT: Yes.

(Counsel conferring.)

BY MR. MILLER:

Q. All right. Just a couple questions, couple more questions, Mr. Carballo.

As one of the trial prosecutors for Mr. Rios's murder trial, you had at least at some point reviewed the whole record up through the trial, all the documentary evidence in the case, right?

A. Yes, I did.

Q. You made your own evaluations of the evidence in collaboration with Kay Hanlon, correct?

A. Yes.

Q. You interviewed all or nearly all of the witnesses that

testified at the trial or that had knowledge about this case?

A.   Yes, we did.

Q.   Okay.  By the time this trial concluded, would you say you knew this case as well as anyone?

A.   I would say that I did.  And I was not involved in the pretrial motions, but I did review the pretrial transcripts. There was another assistant state's attorney, Frank Merrick, who was the former first chair in the courtroom, handled the pretrial motions.  But when I came into the courtroom, I reviewed the whole file.  I, you know, made sure it was ready and worked up.  And I would say that both Kay and I, Kay Hanlon and I, both knew the file -- knew the file very well.

Q.   Yeah.  I mean, in addition to the stuff those other attorneys did, you read all of that, and then you interviewed all the witnesses and then you put on the trial, right?

A.   Yes.

Q.   Okay.  So when the State's Attorney's Office was deciding whether or not they want to stand up for this conviction in the early 2020s or oppose Mr. Rios's attempts to vacate the conviction, did anybody ever come and ask you what you thought about it?

A.   No.  We were never contacted.  Both myself and Kay Hanlon were never contacted about this, this action that was taken, which protocol in the State's Attorney's Office when I was there and even after I was there was that if -- if anything

happened with a case that we had tried, we -- whether there was an appeal or a postconviction or something had happened, we would be notified whether we were in the office or not.

And -- and Kay Hanlon was -- was still working at the time. She was actually working for Cook County. She was a judge, judge in Cook County. I was working for a law firm in Cook County. We were never contacted about this and never had an opportunity to discuss the case with whoever made the decision to -- to do that.

Q. Okay. So not only were you not consulted, but you weren't even made aware?

A. No.

Q. And what about with respect to Mr. Rios seeking a Certificate of Innocence, did anybody ever tell you about that or ask your opinions about that?

A. We were never told about that. The only thing I remember being told was early on we were -- I was advised and so was Kay of the -- he had appealed afterwards. His appeal to the Illinois Appellate Court was affirmed, meaning that it was -- they -- the appellate court said that his conviction was proper.

And when this happened, the actions that were taken, we were never advised about this case. And I was surprised. The first contact I got about this was when I was subpoenaed for my deposition. I was deposed by -- by counsel before

this -- this trial.

MR. MILLER:  I'll tender the witness, Your Honor.

THE COURT:  Okay.

One second.

Any cross from the --

MR. S. RICHARDS:  Oh, sorry.

CROSS-EXAMINATION

BY MS. GOLDEN:

Q.  Do you need a drink of water?

A.  No, thanks.  I'm fine.

Q.  Good afternoon.

First I thought I might have misheard you.  Cristino Garcia, commonly known as -- or nickname was Tino, right?

A.  Yes.

Q.  And he was the person that Mr. Rios identified as his cohort in the course of the Morales shooting, correct?

A.  Yes.

Q.  And Javier Torres, that was the victim's friend, correct?

A.  Yes.

Q.  Okay.

A.  And Javier Torres was also -- his nickname was Loco.  I don't know if I misspoke on that.

Q.  I think you might have accidentally called him Tino?

A.  Oh.

Q.  But Torres is the guy who went running for the ambulance

and who was friends with the victim, correct?

A. Yes.

Q. Okay. There's a lot of names. I get it.

Okay. Back to Cristino Garcia, you mentioned before that one of the things you did was file workup and discovery in preparing for trial, right?

A. Yes.

Q. And Cristino Garcia was someone who was known to Mr. Carey and Mr. Rios's defense team, right?

A. Yes.

Q. And Jack Carey was an experienced criminal defense attorney back in June and July of 1990, correct?

A. Yes. Mr. Carey was -- was an experienced and I would say he was a competent defense attorney. He was in what they call the murder task force which is a special unit of the public defender's office that handles murder cases. And he had tried many murder cases, and he was considered to be one of the veterans -- veteran public defenders in the office at that time.

Q. And something else you did in preparing for trial or in the course of preparing for trial was to share with Mr. Carey and Mr. Rios's defense team all the police reports, correct?

A. Yes. And --

Q. And those police reports would have contained Mr. Garcia's name and address, right?

A.   Yes.   And there would have been -- in the discovery process, which I said there's the discovery process, then there's motion process, and then trial process.

In the discovery process, both sides are -- are responsible for producing wit- -- you know, identifying witnesses, what the -- you know, what the defense is in the case, that kind of thing.  And the state is -- is responsible for producing police reports and documents and evidence.  You know, the morgue -- the morgue photos, the autopsy report, all of the discovery has to be tendered before the case goes to trial.

Q.   Those are police -- those police reports that were tendered to Mr. Rios's defense team before trial also contained a description of what happened with Mr. Garcia when he was brought into the station, correct?

A.   Yes.

Q.   And the fact that he was not charged?

A.   Yes.

Q.   So Mr. Rios's defense team had all the information it needed to go out and interview Mr. Garcia if it so chose?

A.   Yes.

Q.   Did you ever interview Cristino Garcia?

A.   We did not interview him because he had asserted -- he had asserted his right to remain silent, and that was before, you know, we -- when he was initially spoken to.  So once that is

done, we -- we can't -- we can't talk to him.

Q. He was also a Latin King?

A. He was a Latin King, yes. He was -- he and Mr. Rios were both what they call foot soldiers. They were active members, but they weren't the leaders. You know, they weren't the leaders of the gang. They were just the people that did the -- did the work for the leaders of the gang.

Q. Okay. Mr. Carballo, I want to switch topics just briefly and talk about the motion to suppress statement that was filed by Mr. Carey in Mr. Rios's criminal case.

Did you -- that's something that you would have reviewed in the course of preparing for trial, correct?

A. Yes. I would have reviewed the -- the motion that was filed and the transcripts of the hearing.

Q. And there were four transcripts for pretrial hearings, correct?

A. Yes.

Q. That was February 9th, February 26th, March 30th, and April 3rd, correct?

A. Yes.

Q. Okay.

MS. GOLDEN: May I have the document camera, please.

BY MS. GOLDEN:

Q. And this is -- I'm showing Defendant's Exhibit 106 which is previously admitted.

Do you see this, Mr. Carballo?

A. Yes, I do.

Q. Okay. And can you briefly summarize what -- what we're looking at here?

A. This is Mr. Rios's motion to suppress statements that was made prior to trial by his attorney, Mr. Carey, Jack -- his name is Jack Carey. And this is what Mr. Carey had filed on behalf of Mr. Rios.

Q. And this was filed in January of 1990?

A. Yes, it was.

Q. And that's some four months after Mr. Rios's arrest, correct?

A. Yes.

Q. Okay. And it -- the motion describes acts of physical -- well, the purpose of the motion from the defense perspective is to prevent the jury, the criminal jury, from ever hearing anything about his court-reported statement, correct?

A. Yes.

Q. And so this is something -- and that statement could be a critical and implicating -- very damaging piece of evidence in front of a jury, correct?

A. Yes.

Q. Okay.

A. It could.

Q. And in this particular motion to suppress, Mr. Rios --

Mr. Rios through Mr. Carey alleged some physical coercion, did he not, in paragraph 4?

A.   Yes, he did.

Q.   Okay.

A.   He just -- just alleged that someone pulled his hair.

Q.   Well, handcuffed to a wall and had his hair pulled.

A.   Yeah.

Q.   Do you see that?

A.   Had his hair pulled, yes.

Q.   So as of January of 1990, had he made any claim that his head was slammed into a table by Detective Mason or anyone else?

A.   No, he never made that claim.

Q.   When was the first time you heard such a claim?

A.   First time that claim was made was during Mr. Rios's testimony at trial.  He never -- he never raised that at his motion to -- to suppress statements, and that was the first time that came out was at trial.

Q.   And that was ten months later in November of 1990, correct?

A.   Yes.

Q.   He didn't bring any of that up in any of the four pretrial hearings that were had in his case?

A.   Never.

             MR. S. RICHARDS:  Objection.

             THE COURT:  Basis?

MR. S. RICHARDS:  Relevance, and as to the statement in all of the -- in all of the four pretrial motions.

THE COURT:  It's overruled.  The question was in any of.

BY MS. GOLDEN:

Q.  In that motion to suppress statements, Mr. Rios also claimed he had never been given *Miranda* warnings before he was interviewed; is that right?

A.  Yes.  In the exhibit you just showed me, the motion, one of the allegations that was made in the motion was -- to try to suppress his confession was that he wasn't advised of his -- what they refer to as *Miranda* rights.

And in the motion you just showed, it was crossed -- that part of it during the motion, it was crossed out by Mr. Carey.  And what had happened was although in his motion he was alleging he was not advised of his *Miranda* rights before he confessed, he testified at the hearing on his motion to suppress, he testified that he was advised of his *Miranda* rights.  And it was during that hearing that Mr. Carey withdrew that allegation from his motion.

Q.  Okay.  On the subject back -- and I am almost done -- of Mr. Carey.  He knew how to issue a subpoena, right?

A.  Yes, he did.

Q.  In fact, he issued subpoenas in this case to the Cook County Medical Examiner's Office, I think Cermak, the Chicago

Police Department, Cook County Hospital; is that right?

A.  Yes.  Yes.

Q.  And he -- he -- he also issued multiple subpoenas to the Chicago Police Department, right?

A.  Yes, he did.

Q.  More than eight, right?

A.  There were several, yes.

Q.  He asked for police reports, photos, toxicology reports, right?

A.  Yes.

Q.  Personnel records, medical records, 911 calls?

A.  Yes.

Q.  Rap sheets, gang books, ballistics evidence?

A.  Yes.

Q.  And booking photos, right?

A.  Yes.

Q.  Did any of the subpoenas that Mr. Carey issued in this case ask for any records relating to a shooting incident outside of his home on July 2nd or 3rd 1989?

A.  No.

        MS. GOLDEN:  Could I have just one minute?

        THE COURT:  Yes.

        MS. GOLDEN:  No further questions.  Thank you.

        THE WITNESS:  Thank you.

        THE COURT:  Okay.  We'll take our afternoon break and

2259

come back at 3:00 p.m.

All rise.

(Jury out at 2:32 p.m.)

THE COURT: All right. Mr. Carballo, you can step down but are not to discuss the substance of your testimony with anyone.

THE WITNESS: Okay. Thank you, Judge.

THE COURT: All right. Anything to address before 3:00?

MR. S. RICHARDS: No, Your Honor.

MR. MILLER: No, Your Honor.

THE COURT: All right.

(Recess at 2:32 p.m., until 3:00 p.m.)

(Change of reporters.)

Carballo - cross

2260

THE COURT:  All right.  We'll bring in the jury.

(Jury in at 3:00 p.m.)

THE COURT:  All right.  Please take your seats.

Mr. Carballo, I remind you, you remain under oath.

Mr. Richards, you may proceed with your examination.

MR. S. RICHARDS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. S. RICHARDS:

Q.   Good afternoon, Attorney Carballo.

A.   Good afternoon, counsel.

Q.   Thank you.

Now, you were the third chair in Judge Karnezis's courtroom, correct?

A.   Correct.

Q.   But you were the second chair in terms of the murder, right?

A.   Yes.

Q.   And you were assigned to work on the case shortly before it went to trial, right?

A.   Yes.

Q.   Because you had been transferred into the courtroom, right?

A.   Yes.  Approximately I would say a couple months at least I was in Judge Karnezis's courtroom.

Q.   And before you tried the case, you reviewed all of the police reports, right?

Carballo - cross

2261

A.   Yes.

Q.   And you reviewed all the documents that had been filed on the docket, motions, answers, all those documents, correct?

A.   Yes.

Q.   You also reviewed the transcripts that had been taken of the hearings on the motions which had been filed, right?

A.   Yes.

Q.   In fact, have you had a chance to review the state's attorney's file on this case at all?

A.   I -- I haven't had a chance to review the physical file, but I did review the transcripts and -- and information that's in the -- that was in the file.

Q.   So -- and the transcripts, in fact, were included in the file and existed from the time the file was created to today. They still exist, the file in the state's attorney's file, the transcripts, right?

A.   Yes.

Q.   Now, Jaime Rios was charged with first degree murder on July 8th of 1989; is that true?

A.   Yes.

Q.   He was indicted on July 25th, 1989.  The indictment was filed on August 3rd, 1989; is that true?

A.   I can't give you the exact date at this time, but if that's -- that sounds -- sounds correct, I guess.

Q.   Okay.  Well, there's a common-law record that's been

Carballo - cross

2262

generated in this case; is that true?

A.   Yes.

Q.   What a common-law record is, it's a record of all the documents in the case which goes up to the appellate court on appeal, right?

A.   Yes.   When the case goes on appeal, the clerk prepares the appellate record, which includes the transcripts as well as what's in the court file.

Q.   And for some reason, the court file is called in Illinois the common-law record.

A.   Yes.

Q.   For reasons neither of us know, correct?

A.   I think probably historical purposes, yeah, that that's what they called it.

Q.   Okay.   Would it help you in terms of refreshing your recollection on any questions I answered -- I ask to have the common-law record available to you to review if you need to refresh your recollection?

A.   If there's something that I need to refresh my recollection with, that may be something that would assist, but I -- you know, I -- as of this time, I don't really need to do that, but whenever -- if there's something I need --

Q.   Okay.

A.   -- if you have that available, that would be fine.

Q.   Well, again, just a question of dates.   You said you have

no reason to disagree that the indictment was filed on August 3rd, 1989, correct?

A.   Right.

Q.   And the State filed an answer to discovery on September 7th of 1989, correct?

A.   I -- I don't know the date that it's file stamped, but what usually happens is when the case comes off of arraign- -- after it's indicted, it gets to the arraignment where it goes before the chief judge and gets assigned to a trial judge.  And in this case, you know, Judge Karnezis was the trial judge.

So that would have been sometime after that that the State would work the case up and file the answer.

Q.   All right.

(Counsel conferring.)

MR. S. RICHARDS:  Can I show you, to refresh your recollection if necessary, Plaintiff's 10, the common-law record.  We'll bring it up to you.

Oh, you're going to show it by screen?  Whichever.

MR. J. RICHARDS:  Your Honor, plaintiffs HDMI hookup at table.

THE WITNESS:  My screen is -- here it comes.

MR. J. RICHARDS:  I'll give you the paper.

MR. S. RICHARDS:  We're going to go the old-fashioned method.

Oh, here we go.

Carballo - cross

2264

BY MR. S. RICHARDS:

Q.   Okay.   So if you go --

A.   September 7, '89, looks like it's handwritten in there.

Q.   All right.   So that -- that's the date of the answer to discovery, right?

A.   Looks like it, yes.

Q.   Okay.   So after looking at that, is your recollection refreshed as to when the answer to discovery was filed?

A.   It looks like it was filed, yeah, on that date.

Q.   September 7th, 1989.

A.   That's when it's file stamped.

Q.   All right.   Now, in terms of what a State answer to discovery is, one thing it includes is a list of potential witnesses, right?

A.   Yes.

Q.   In this particular case, 47 witnesses are listed.   Does that seem accurate?

A.   Generally, what they do on the answer to discovery is they include all potential witnesses, including police officers, you know, if there's any police officers that are on the reports, things like that.

       So, yes, there's -- I didn't count -- I didn't count -- I didn't prepare the answer, this answer, but they list -- they list witnesses that potentially may be called.

Q.   Well, the process by which you go through is nobody is

making, like, an ultimate decision at the time you file the answer to discovery as to who you're going to actually call.

What you do is for safety's sake, you look at all the police reports, put all together the information, and list every possible person on the answer to discovery. Isn't that the procedure?

A. Generally, yes. In fact, the answer, I believe, says may or may not call.

Q. Correct.

A. Just on the answer that's what I believe it says and lists possible witnesses.

Q. Right. It's a list of possible witnesses to give the defense a heads up as to the universe of witnesses you might possibly call, right?

A. Right, and -- and vice-versa. The defense also has to file an answer to discovery as well, and they list anybody that they may or may not call.

Q. In addition to the ones they've already learned of from your answer to discovery, right?

A. Generally, yes.

Q. So on this particular answer to discovery, the witnesses included Jose Melendez; is that true?

A. Jose Melendez, he may have been listed because he was on the police reports.

Q. All right.

Carballo - cross

2266

A. But --

Q. And that was --

A. -- he was not called.

Q. That was Jose Macho Melendez. He was listed as a witness, right?

A. Yes. And he is, as we know, he is the leader of the Latin Kings, the defendant's gang.

Q. In fact, the leader of the Latin Kings in that particular neighborhood, the Schiller and Leavitt set, correct?

A. Yes.

Q. In addition, Cristino Garcia was listed on the answer to discovery as a State witness, right? Potential State witness.

A. Yes. He was listed because he was also listed on the police reports.

Q. Okay.

A. So the state's attorney that answered this, I believe it was Don Jonker who was -- he was in the courtroom prior to me being in the courtroom. He would have gone through the police reports and listed pretty much anybody that was listed.

Q. Mario Flores was also listed, right?

A. Yes.

Q. James Dean was listed, right?

A. I don't recall James Dean. That name doesn't ring a bell.

Q. But you remember Mario Flores as either a circumstantial or as a potential eyewitness who was on the scene of the shooting,

correct?

A.   He was not an eyewitness.  I believe he was on the scene after or sometime after the -- or he was -- he was not an eyewitness.  I know that.

Q.   Okay.

A.   He was circumstantial.

Q.   But he was also interviewed by the police, right?

A.   I believe he was.

Q.   Okay.  And he was -- he was shown lineups; is that true?

A.   I can't recall whether he was or not.

Q.   The other two names listed on the answer to discovery are Louie Lopez and Hector Martinez.

     Do you remember who those people were?

A.   No, I don't.  They were not called by either side.

Q.   All right.  With respect to Jose Macho Melendez, you were aware that he was originally named in one of the first police reports as the shooter, correct?

A.   He was named as a result of this witness, Mr. Torres, Loco, who -- he mentioned Melendez afterwards, but he then admitted that -- that he was not being truthful about that.

     And then Melendez I know was questioned by the detectives, and they verified that he had an alibi --

Q.   Okay.

A.   -- was not involved.

Q.   We'll get to the details of that later, but just as a

general matter, Melendez was initially identified by Javier Torres as the shooter even though Javier Torres later said that he lied. Is that true?

A. Yes.

Q. And Jose Melendez gave an alibi for the night of the shooting using Louie Lopez and Hector Martinez to say that Jose Melendez had been someplace else and hadn't even gotten back to the area until after midnight, correct?

A. I know he gave an alibi, and -- and that alibi was investigated by the detectives and determined to be verified.

Q. Because two witnesses said that he wasn't even on the scene. He got back to this area after midnight after the shooting, correct? That was the alibi, right?

MR. MILLER: Objection.

BY THE WITNESS:

A. He was not at the scene --

THE COURT: Basis for the objection?

MR. MILLER: Foundation.

THE COURT: That's sustained.

You can try a different way.

MR. S. RICHARDS: I'll get to it, Your Honor. Thank you.

BY MR. S. RICHARDS:

Q. Now, the common-law record in this particular case does not contain a State motion for discovery or a State motion to

disclose an alibi defense, does it?

A. Well, there would have been a motion for discovery filed by both sides. I don't know what the common-law record says, but routinely at the beginning of a case, the State presents the defense with a motion for discovery and the defense presents the State also with a motion for discovery. It's pretty routine in most felony cases and especially murder cases.

Q. In this common-law record, however, this common-law record, there is no file stamped State motion for discovery, is there?

A. I --

MR. MILLER: Objection, Judge.

THE COURT: Basis?

MR. MILLER: Foundation.

THE COURT: It's overruled.

You may answer if you know.

BY THE WITNESS:

A. I don't know. I -- I have not looked at the common-law record, but I looked at our -- our file. We have what's called a blue back. As you probably know, counsel, the State has a blue back, and on the blue back, we keep records.

And then the clerk, when you talk about the common-law record, that is the clerk that keeps those records. And whether -- whether a motion for discovery makes it to the -- to the file or not, I -- I don't have any reason to -- to know that.

Carballo - cross

2270

BY MR. S. RICHARDS:

Q. All right. Well, if we could look through the first -- looking through the first pages of the common-law record, tell me if you -- if you see at any point a file-stamped motion for discovery. I'm just asking about that.

A. Can you go --

Q. Go slower.

A. Can you go back?

Q. Okay. Go back.

A. Hold it. Now go -- go to the first page.

Q. All right.

A. Hold on. Okay. Keep going.

Q. Okay. Stop there.

A. Okay.

Q. Do you see these court dates, see where it says --

A. September 7th?

Q. Yeah. September 7th it says the State files an answer to discovery. Do you see that?

A. Yes.

Q. Do you see any notation before that saying that the State filed a motion for discovery? Is that notated?

A. It's not notated on here, but I do know that the routine procedure in Judge Karnezis's courtroom -- this is before Judge Karnezis, and what he does at the first -- first or second proceeding, he'll -- he will state on the record State

motion -- motion for discovery, defense motion for discovery, and the parties know in our -- you know, know their obligations and that they're required to.

So whether there's a motion filed for discovery, it may be an oral motion that's made during the -- during the hearing.

Q. That's fine.

A. Yeah.

Q. So it's possible that there were oral motions for discovery by both sides --

A. Right.

Q. -- but nothing was filed in writing; fair?

A. I don't know. I'd have to look in my blue back, too, the state's attorney's blue back to see what was filed, but this was all done before I got into the courtroom.

Q. Okay.

Now, on December 21st, 1989, the defense filed a motion to produce the confidential informants.

A. Can you go -- you want me to look at this right here?

Q. Well, we'll go to page 16, 17.

A. I do know that the defense filed a motion to disclose the confidential informants.

Q. Okay.

A. I don't know what the date is.

Q. Well, let's get -- let's get it fixed on the date because

it's going to come up.

A.   Yes, December 18th.  That's file stamped.

Q.   All right.  And then on January 5th, 1990, the defense filed a motion to quash arrest, so that would be on page 30 through 33.

A.   Yes.

Q.   So you see that?

A.   I don't see it here, but I know they filed a motion to quash arrest and a --

Q.   Okay.

A.   -- motion to --

Q.   Do you see it there though --

THE COURT:  We can't speak over each other.  Let the witness finish his answer before asking the next question.

Thank you.

MR. S. RICHARDS:  Thank you.

BY THE WITNESS:

A.   The defense filed several motions, pretrial motions, which is pretty much routine, and, you know, in these kind of cases, murder cases.  But they filed a motion to quash arrest and suppress evidence and a motion to suppress statements.

BY MR. S. RICHARDS:

Q.   Well, let's talk about each one of those.  I want to make sure that we are clear on the difference.

So what is a motion to quash arrest?  What does that

Carballo - cross

2273

say?

A.   Well, it depends on what they're -- what they're seeking. You know, motions are different, but this looks like pretty much a form -- form motion from the Public Defender's Office. Basically what they're trying to do is -- is quash the arrest, which, you know, it is what it says.  They're trying to basically nullify the arrest and to suppress evidence.

Q.   All right.  So basically what that motion says is the arrest should be quashed because there was no probable cause for the arrest, and things which are fruits of the arrest, like statements or other things potentially, should be suppressed and thrown out.

Is that fair?

A.   Yes.

Q.   Okay.  And that is distinct from a motion to suppress statements, right?

A.   A lot of times, it's -- it's separate, yeah.  Sometimes it's separate.

Q.   Okay.  Well, in this --

A.   In this case it was, yeah.

Q.   -- it was a separate motion, right?

A.   Yes, it was.

Q.   Motion to suppress statements.

And what a motion to suppress statements is the statements should be suppressed on Fifth Amendment grounds

because there's either been coercion or lack of *Miranda* warnings or illegal threats, something like that, right?

A.   It depends.  Are you asking in this specific case?

In this specific case, the motion to suppress statements did, you know, have a list of -- of different bases for the motion.

But like I said before, one of the -- one of the bases was the *Miranda*.  You know, he alleged in the motion wasn't advised of his rights, but then he testified at the hearing on the motion that he was advised of his rights, and he was advised by not only the detective but by the state's attorney, et cetera.

And so he -- so that was scratched out of the motion.

Q.   Well, we're going to need to clarify that a little bit.

First of all, there were distinct hearings on the motion to quash arrest and the motion to suppress statements. Isn't that true?

A.   Yes.

Q.   They occurred on different dates, correct?

A.   I believe there was -- there was four dates, and I believe some -- some of the evidence for both motions may have been -- may have been during the -- the hearings, you know, combined hearings.

Q.   Well, we'll go -- we'll go through that.

A.   All right.

Carballo - cross

2275

Q.   But first let me say that the motion to suppress statements, that was also filed on January 5th, 1990, correct? And we can go to page 26 to 29.

Okay.   Do you see that?

A.   No, I don't see that.   That's motion to quash.

That's the motion to suppress statements, yeah.

Q.   Okay.

A.   January --

Q.   January 5th.

A.   -- 5th.

Q.   Now my question to you about these dates is this:   Was there anything unusual about the motions being filed January 5th, 1990, when the State had filed their answer on September 7th of 1989?

Was that an exceptionally long delay?

A.   No, no.   It --

Q.   In fact --

A.   It -- generally it takes time, you know, from -- for the defense to file motions from the arraignment, so there's a time period built in for discovery.

Things tended to move a little bit faster in Judge Karnezis's courtroom because he was, you know, he was a judge that required the State -- you know, the state's attorneys and the defense to get their stuff filed and move the case along.

So -- but as to the timing of the defense filing this

Carballo - cross

2276

motion, I don't -- I don't -- and the answer to discovery, I don't believe that's -- there's any -- anything unusual about that.

Q.   No unusual delay between the filing of the State answer and the defense filing the motion to suppress statements and the motion to quash arrest, correct?

A.   I don't -- I don't -- I don't see anything unusual about that, but Mr. Carey, as I said, Mr. Carey was a -- was a diligent, you know, competent lawyer, and he may have had his reasons for -- for filing it when he filed it.

But it was done prior to trial, and there was hearings that were held on those motions, and -- and Mr. Carey handled that for the defense.  And this was before I came into the courtroom, but I read all the transcripts, but Frank Marek, who was the first chair in the courtroom, as I said, I read the transcripts and he handled the motions on behalf of the State's Attorney's Office.

Q.   Yes, but I repeat my question.  Was there anything -- any unusual delay that you can see based on your experience of trying cases at 26th Street during this time period, was there any unusual delay with the defense attorney filing these motions on January 5th when the State had filed their answer approximately three or four months earlier on September 7th?

Was there anything unusual about that whatsoever?

A.   I don't believe so.

Carballo - cross

2277

Q.   Thank you.

And since you were talking about --

A.   We don't --

THE COURT:   There's no question pending.

BY MR. S. RICHARDS:

Q.   And since we're talking about Judge Karnezis, would it be fair to say that in his courtroom, everybody had to put their track shoes on?

A.   Yes.   Judge Karnezis was a hard-working judge, very, very good judge, very fair, very, you know, very diligent.   When you were in his courtroom, whether you were on the defense side or the prosecution side, you had to work hard and -- and he was demanding, you know, of getting -- getting things moving along.

So -- but Mr. Carey was not the -- he was not assigned to that courtroom like I was.   He was on the murder task force, so he went to different judges.   I was -- we were assigned to the courtroom.   He was, you know, he would go to other courtrooms and had other cases as well as this case.

Q.   Let me just complete the thought here.

So you also testified at your deposition that the other quirk of Judge Karnezis, in addition to moving the cases along temporally, like, you know, court date to court date, also when the case got to trial, the case was tried very quickly in terms of the hours in the day, correct?

A.   I -- I wouldn't say it was tried quickly, but it was --

it's efficiently.

Judge Karnezis was somebody that when it came time for trial, he wanted the witnesses to be prepared -- you know, the witnesses to be ready. You know, he would call a witness -- we would call a witness, and then after that witness was completed, he would say, you know, State, call your next witness.

So you had to have -- you had to be prepared. You had to have your witnesses available and lined up, and he liked to work -- he was very efficient, but -- and he was very fair, but he was a hard worker.

And -- and he liked to try cases. He liked to -- he liked to try cases. That's why it was a good courtroom to work in because he was -- he was a smart judge, a good judge. He was hard working, and if you worked hard in his courtroom, you did well. You got good experience.

And that's both sides. That's both for the defense. The defense liked Judge Karnezis and the State liked Judge Karnezis because they got a good experience in his courtroom.

Q. All right. And just to complete the thought, this trial took about two days of evidence. You said at your deposition that in other courtrooms, it might have taken five, but part of the reason was that Judge Karnezis used the time efficiently, as you said, and he would hold the juries, you know, late in the evening sometimes to get things done.

Is that fair?

A.   Not late in the -- not generally late in the evening, but he would work efficiently.  You know, he wouldn't waste the jury's time.  He was very conscious of not wasting time and keeping things moving along, and that applied to -- mostly to the, you know, to the State because we, you know, we had presented the evidence and the burden.

But it also applied to defense, too.  They had to have their witnesses lined up when it was their turn, and -- but it was, you know, I can say that Judge Karnezis was -- it was a great assignment to be in because you learned how to prepare cases, and you learned to be ready and -- and, you know, you had to be prepared in his courtroom.

So we were working -- in that courtroom, we were on trial every day.  We were working day and night.  And we liked that because we were young.  You know, we were a lot younger than we are now, and we were, you know, getting good experience trying -- trying cases.

Q.   Okay.  On February 9th of 1990, the State added Benjamin Carrero and Iris Mendez to its list of witnesses; is that true?

A.   What was the date?

Q.   February 9th, 1990, the State added Benjamin Carrero and Iris Mendez to its list of witnesses.

A.   I know that -- I know that Benjamin Carrero was -- was on the list of witnesses.  As far as Iris Mendez, I don't know.  I

was not -- I was not the Assistant State's Attorney at that time in the courtroom, but if -- if I could look at the blue back or if you show me --

Q. Well --

A. -- on the record.

Q. Let's look at Defendants' Exhibit 40, pages 8 to 9.

A. And both of those witnesses did testify.

Q. We'll get to that, but thank you.

A. Okay, sure.

Okay.

Q. You see there where Mr. Marek is saying he's adding Benjamin Carrero and Irene Mendez to the list of witnesses?

A. Yes. That's -- and that's Frank Marek.

Q. Did I say Frank Marek or somebody else?

A. No. You asked if the State did that, and I said it was somebody else. I wasn't the state's attorney that did that, but it was Frank Marek who was in the courtroom before I got assigned there.

Q. Who added those two witnesses, right?

A. Yes.

Q. Now, the motion to quash arrest was heard on two separate dates, February 9th, 1990 and February 26th, 1990; is that true?

A. I believe --

Q. What?

A.   I believe so.

Q.   Okay.

A.   I'm not totally positive because I'd have to look at the dates.

Q.   Okay.  Can we look at, first of all, Defense 40, first page.  Does that appear to be the first page of the court date on February 9th, 1990?

A.   Okay.  I see that.

Q.   Okay.  So that was the first day of the motion, right?

A.   I believe so.

Q.   And can we look at Defense 41.

A.   I think that was the 26th of February.

Q.   Is that on?

     Okay.  So that was February 26th.  That was a continuation of the same motion, right?

A.   Yes.

Q.   Now, the reason it was continued was that on February 9th, 1990, Judge Karnezis said, listen, I've heard some witnesses.  I think I need to hear more.  I'd like to get both sides, maybe give me more witnesses or more information, right?

A.   I don't believe so.

Q.   You don't believe so?

A.   No.  The way things worked is on motions, sometimes they were what they call commenced and continued.

     What would happen is a motion would be started on one

Carballo - cross

2282

day, and then the judge would have a jury trial going.

So there would be other things going on in the courtroom. So the judge would say let's continue it to such and such a date and, you know, check everybody's schedule and come back on another date.

So I would have to look at the end of the prior date to see why it was continued or what happened, but it's not uncommon.

What happens is motions start and get commenced and continued to another date because other things are going on in the courtroom. Maybe a witness was not available.

I know that there was a -- there was times that witnesses were either unavailable or sick or something, they had to continue it.

Q. Well, let's look and verify this. Looking at Defense Exhibit 40, pages 75 to 79, to see the reason that there were two different dates, and can you review that once we get to it.

A. This looks like just -- it doesn't indicate why.

Q. Should we keep going? Okay, stop there.

Do you see where -- where Judge Karnezis says, "I will tell you that I'm not" --

MS. GOLDEN: Objection.

MR. S. RICHARDS: Sorry.

THE COURT: Sustained.

MR. S. RICHARDS: I'll withdraw it.

Carballo - cross

2283

BY MR. S. RICHARDS:

Q.   Do you see -- is your recollection refreshed if you look in the middle of the page where Judge Karnezis gives his reasons for wanting to have an additional date and hearing on the evidence?

A.   No.

Q.   Could you look at line 8 and then read that paragraph beginning on line 8, concluding on line 18.

A.   Okay.

Q.   Okay.  Do you see what I'm talking about, where Judge Karnezis says he thinks the evidence is a bit scanty.  He's not in a position to rule.  He wants to hear more?

         MS. GOLDEN:  Objection.

         THE COURT:  Sustained.

BY MR. S. RICHARDS:

Q.   Well, is your recollection refreshed now as to the reason why there was a second date for the hearing or not?

A.   The reason there was a second date for the hearing, there was more evidence that -- the hearing wasn't completed, so there was more evidence to present, and probably there was witnesses that weren't available.

         This was handled by Assistant State's Attorney Frank Marek who may not have been able to get in touch with a witness, but I know there's a continuation of the -- the hearing and more witnesses testified for -- for the State as

Carballo - cross

2284

well as for I believe the defense on these motions.

Q.   Okay.  But you did read lines 8 to 18 where Judge Karnezis explains himself.  You read those -- that paragraph, correct?

A.   Yeah, I don't think that he was -- I think he -- what you're implying, I don't think he was saying that.  I think he was -- there was additional evidence that he wanted to hear from other, maybe another witness or officers or whatever.  I don't know.

But I can't get into the judge's mind, but I do know that he ultimately denied the motions after hearing -- after hearing the evidence.

Q.   He did.  But at the time he made that ruling on February 9th, both sides had rested on the motion to quash arrest; isn't that true?

A.   I don't believe so, and I -- I was not in the courtroom at the time, so I can't attest to that.

Q.   All right.  Let's go back --

A.   You'd have to ask Mr. Marek.

MR. S. RICHARDS:  Go back, please.

Keep going.

BY MR. S. RICHARDS:

Q.   Okay.  Do you see at the beginning going back to there was two parts to the hearing on February 9th.  There was a part on -- before lunch where they heard evidence, correct?

A.   Yes, and there was -- it says -- oh, I see judge saying

we're taking a break.

Q. Right.

A. Typically what happens is, as I said, the judge is doing a lot during this time. You know, he's -- he's hearing evidence on a motion. Then he's dealing with the jury. You know, bringing the jury in, taking a break on doing motions, and then he's coming back.

You know, so a lot of times it commences and either continues over, you know, over a certain period of time or let's get to -- we'll continue this afternoon. Things like that happened in the courtroom, so --

Q. Correct.

But in this particular case what happened is that in the morning, both sides presented their evidence. In the afternoon, both sides argued on the motion. Didn't ask for more time for witnesses. And then after that, Judge Karnezis said I want to hear more. I want to hear more witnesses. Isn't that what happened?

MR. MILLER: Objection.

THE COURT: That is sustained.

Ladies and gentlemen, the transcript from this hearing is not before you. It is inappropriate to read in what was said at the testimony, and so questions that incorporate the language of the transcript are forbidden, which is why I keep sustaining the objection.

Counsel, do it the right way or move on.

BY MR. S. RICHARDS:

Q.  Okay.  Do you recall what Jaime -- that Jaime Rios testified at the hearing on February 9th, 1990?

MR. MILLER:  Objection.

THE COURT:  Sustained.

BY MR. S. RICHARDS:

Q.  Well, you testified earlier that Jaime Rios had testified at the motion to suppress statements.  Do you recall that testimony?

A.  Yes.

Q.  Okay.  In other words, you're saying that he testified at the motion to suppress statements and not at the motion to quash arrest or both?

A.  You know, I -- I know he testified.  I believe he testified at both of the motions, but I -- are you referring to him admitting that he was advised of his rights?

Q.  Well, he was advised -- he admitted that at the motion to quash and suppress, correct?

A.  I know he admitted that on the record.  I don't -- it was during the motions.  I don't know specifically what motion that was, but he admitted it.

Q.  Okay.  But you don't know of your own knowledge whether or not he testified at the motion to suppress statements, do you?

A.  I know he testified.  I -- as I said, I don't know which

hearing it was, but I do know he testified and admitted in his testimony that he was advised of his rights.

Q. Yes. But we're trying to get did he testify to that on the motion to quash arrest, which involved arrest without probable cause?

A. I don't recall.

Q. Okay.

A. It was during -- you know, the motions were -- were both presented around -- at the same time.

Q. Would anything refresh your recollection as to whether Jaime Rios testified at the motion to suppress statements or not?

A. I'd have to look at the transcript.

        MR. J. RICHARDS: Showing Defendants' 42.

BY MR. S. RICHARDS:

Q. Okay. Could you -- we'll scroll through that.

        Could you review that and let me know when you find an indication in the transcript, if you do, or if your recollection is refreshed, as to whether Jaime Rios testified at the motion to suppress statements.

A. What you're showing me is the officers' testimony.

Q. Right, well --

A. Yeah.

Q. Have you seen yet in our scrolling anyplace where Jaime Rios testifies on March 30th?

Carballo - cross

2288

MR. MILLER:  Objection, Judge.

BY THE WITNESS:

A.  If you're going to go through all the transcripts --

THE COURT:  One second.

What's the basis of the objection?

MR. MILLER:  Improper refreshing.

MR. S. RICHARDS:  I'll withdraw it.

THE COURT:  Okay.

MR. J. RICHARDS:  Now showing Defendants' 43.

MR. S. RICHARDS:  Well, just before.

BY MR. S. RICHARDS:

Q.  You've seen that was the -- the previous was Defendants' 42?

After reviewing Defendants' 42, is your recollection refreshed as to whether Jaime Rios testified at the motion to suppress statements held on March 30th, 1990?

A.  I -- I didn't see his testimony in what was scrolled down, but I know he testified at the pretrial motions.

Q.  I know, I'm asking you about March 30th, not pretrial motions generally.

A.  I'd have to look at -- I'd have to look carefully at the transcript.  I saw you scrolling through there, but all I saw was the detective and officer's testimony.

Q.  Okay.  So you didn't see any -- strike that.

Is your recollection refreshed after you looked at

Carballo - cross

2289

that as -- and take more time if you need, as to whether -- as to whether Jaime Rios testified on March 30th, 1990, on the motion to suppress statements?

A.   It doesn't refresh my recollection.

I do know, as I said, that he testified.  I don't know what date he testified on, and I know the motions went a period of several days.

Q.   Okay.  Let me look -- next go to --

MR. J. RICHARDS:  Defendants' 43.

BY MR. S. RICHARDS:

Q.   -- Defendants' 43, continuation of the motion to suppress statements.

Could you look at that and see if your recollection is refreshed as to whether Jaime Rios testified on April 3rd, 1990, at the motion to suppress statements?

A.   I'm looking at this, and this is Assistant State's Attorney Barb Riley's testimony.

So I know she testified.  I know all the officers testified that were involved.  So this is the part of -- part of the transcript.

I don't know what date that Mr. Rios testified.

Q.   Okay.

MR. MILLER:  Judge, can we have a sidebar?

THE COURT:  Yes.

(Proceedings heard at sidebar:)

THE COURT: Go ahead.

MR. MILLER: Judge, Mr. Carballo wasn't present at these things. He obviously has reviewed this stuff in the past and has some, you know, understanding of what they are, but all we're doing here is showing transcript after transcript.

He's saying my recollection is not refreshed to something that he was not there in the first place, and all that's coming out of it are questions that are literally saying, you know, what's in there, what's not in there, even if we're not -- if we're no longer quoting the direct language. It's improper.

THE COURT: Response?

MR. S. RICHARDS: Your Honor, it's been represented throughout this trial that -- falsely, that Mr. Rios testified at the motion to suppress statements. He did not. Defendants could clear this up with a simple stipulation.

MR. KIVETZ: Your Honor, he's basically yelling to the jury again.

MS. GOLDEN: Your Honor -- I sound really loud. Did I sound loud to you guys?

I have something to add.

At the final day of the hearing on April 3rd, 1990, Mr. Carey asked the judge to adopt the testimony from the prior dates as to the motion to suppress.

So I don't know what the big hullabaloo is, but he

Carballo - cross

2291

adopted those prior dates in February as testimony for the motion to suppress. And that's in the record at E 36 on Defense Exhibit 43.

THE COURT: Mr. Richards?

MR. S. RICHARDS: Your Honor, am I speaking softly enough?

THE COURT: You know what? Come over to sidebar.

(Proceedings continued at sidebar:)

MR. S. RICHARDS: Am I okay?

THE COURT: Yes. She will let us know if she can't hear us.

MR. S. RICHARDS: Okay. Your Honor, it's been repeatedly represented throughout the trial that Jaime Rios testified in person at the motion to suppress statements and he's been repeatedly -- the point being made that he is -- he did not testify as to the claims of coercion which he later testified to at trial.

However, at the motion to suppress statements, Jaime Carey only called the officers, and he was incorporating by reference the testimony of Jaime Rios only to establish that he was under arrest. He never presented testimony by Jaime Rios as to either that he was coerced or was not coerced.

So the representation that he somehow failed to testify to this at this hearing is not accurate. That's all I'm seeking.

Carballo - cross

2292

THE COURT: What do you say to Ms. Golden's link that prior testimony of Jaime Rios was adopted and considered by the court and, therefore, the testimony was before the judge?

MR. S. RICHARDS: It was only adopted and considered on the issue of whether he was under arrest for purposes of the motion, not that he was -- not that --

(Tendered.)

MS. GOLDEN: Then he goes on to talk about things that Rios did testify, so the State does object, but it's clear that he considered the testimony. And he could have -- whether he -- he could have asked him those questions. He chose not to.

THE COURT: Okay.

MR. MILLER: What the defense --

THE COURT: Microphone.

Why is this so hard for everyone? When you're at the tables, you can talk at this level and the microphone will pick you up just fine. Am I correct, court reporter?

So there's no need to hear. You shouldn't turn your head towards me while I'm on the bench and I hear you outside the headphones. That is just not necessary.

Over here, we are speaking in hushed tones, but we have to direct it to the microphone. It's not hard. Please, we're wasting the jury's time.

Now, what would you like to say, Mr. Miller?

MR. MILLER: Judge, I think what we continually said is that the -- he never brought this up affirmatively. Whether he was called and asked about it or not, he was on the stand, and even if he wasn't, he could have been called to the stand. Everything that we've said is he didn't bring any of this up until trial.

He also has a written motion where the head slamming isn't in there, which we brought out earlier.

The other thing is I don't think this is the correct witness to talk about this because he wasn't at this hearing.

THE COURT: What's the basis for the -- what's your basis for asking this witness about what was said? What independent knowledge does he have?

MR. S. RICHARDS: He reviewed the transcripts in preparation for trial. He said he reviewed the transcripts in preparation for trial, and this was part of his trial preparation, which was gone into in detail by the defense.

THE COURT: That I accept. I think that's a good-faith basis.

I will overrule the objection. You can continue spending your time with this witness however you see fit. You're over 25 hours of trial time, and I think you're at 25-and-a-half hours. Use your last four-and-a-half hours however you see fit.

(Proceedings heard in open court:)

Carballo - cross

2294

BY MR. S. RICHARDS:

Q.  Well, let me ask this question in this way.  You were present at trial when Jaime Rios testified, correct?

A.  Yes.

Q.  You heard him testify at trial that his hair had been pulled and his head had been slammed against the table, correct?

A.  He testified that his head was slammed against the table.

Q.  And his hair was pulled, correct?

A.  I don't -- I don't remember if he said his hair was pulled, but he was grabbed and slammed is what he said, which was not in his motion to suppress.

Q.  Okay.  The head slamming was not in the motion to suppress, but hair pulling was, correct?

A.  That was in the motion, yes.

Q.  And -- but -- and you have no memory as to whether he testified to the hair pulling at trial or not; is that fair?

A.  I believe he testified that his -- that his -- that he was pulled -- he was -- his face was smashed into the table is what he said.

Q.  By having his hair pulled and his face smashed, correct?

A.  I don't exactly know the -- whether it was the hair grab, but he said he was smashed into the table with his face.

Q.  Okay.  During --

A.  And --

Carballo - cross

2295

Q.   Sorry.

During trial, you never impeached him by asking him about whether he had testified to that -- those events at any prior proceeding, did you?

A.   I don't know.  He was cross-examined by Kay Hanlon, and I know he was cross-examined about bringing this up for the first time at his trial and he was shown photographs that showed that he did not have a mark on his body, on his face, you know, inconsistent with -- with him claiming that he got his face smashed into the table.

Q.   Specifically, do you remember Kay Hanlon asking him something like:  You didn't testify to this at your motion to suppress, did you?  Did she ask that question --

A.   I don't know if she specifically asked --

Q.   I'm sorry.  Let me finish, and then you can answer.

Did -- do you remember Kay Hanlon testifying at any time or asking Jaime Rios at any time at his trial whether he had testified at a motion to suppress about having anything physical done to him, either head slammed, hair pulled, anything of that sort?

Do you remember her asking those questions?

A.   I believe she did ask questions during her cross-examination that impeached him on his claim.

Q.   I'm not asking --

A.   I don't know specifically if she asked that, but she asked

questions that related to -- to that.

Q. I'm just asking about those specific questions, not questions related to it.

Do you recall her asking --

A. I'd have to look at her cross-examination, but I -- I know she -- her cross-examination dealt with a lot of the issues that he -- that he claimed.

Q. I'm sorry. In answer to my question, do you recall one way or another whether she asked him specifically whether he had testified to these things at a motion to suppress? It would be a yes or no question or you don't recall.

A. I don't recall.

Q. You don't recall. Thank you.

Now, on the day of trial, you struck from your answer a number of witnesses. Do you recall that?

A. I don't know -- we may have -- yeah, we may have struck some of the officers that weren't going to testify or witnesses that weren't going to testify, but I don't recall that specifically.

Q. Well, do you recall that you struck Jose Melendez from the answer?

A. I -- yeah, I believe so.

Q. You also --

A. I don't recall.

Q. Okay. Thanks.

You also struck Cristino Garcia, correct?

A. I believe so.

Q. You struck Mario Flores.

A. I don't recall.

Q. You struck James Dean.

A. I don't recall that either.

Q. You struck Louie Lopez.

A. I believe we indicated to the defense what witnesses we were not going to call as a courtesy to them.

Q. Right.

And one reason for striking witnesses from the answer is that at the beginning of the trial, generally a list of witnesses is read to the jury to see if they recognize anybody or if there's any issue, correct?

A. Right.

Q. Okay. Now, you've said before that you never interviewed Cristino Garcia before trial, correct?

A. Yes.

Q. You say that the reason or at least one reason that you did not interview him was that he was taking the Fifth. Do you remember that testimony?

A. I didn't say he was taking the Fifth. I said that he refused to -- he refused to speak I think is what I said.

But in effect, he was not -- he was not talking. He asserted his right not to talk and -- and we couldn't talk to

him.

Q.   Well, let me drill down on that.

     Asserting his right, he's asserting his right not to talk.  Is that taking the Fifth Amendment, or something else in your view?

A.   No, it's -- I think -- I think it's same thing.

Q.   Okay.

A.   Without specifically saying I'm taking the Fifth Amendment, you know, it's --

Q.   But it has the legal --

A.   He doesn't have to talk.

Q.   If he's refusing to talk to police and he's standing on his rights, it could be construed as taking the Fifth Amendment, saying I have a right not to talk to you; I'm not talking to you.  Right?

A.   Yes.

Q.   Okay.  So way back then, not in 2020, it was your perception that Cristino Garcia was taking the Fifth, and that it would be useless to try and talk with him.  Fair?

A.   I don't -- I don't -- I wouldn't say it that way, that it was useless.  It was that we couldn't.  He was not cooperating and refusing to speak, so, you know, ethically we could not speak to him.

Q.   Well, he hadn't asserted his right to counsel, had he?  He hadn't said I want a lawyer?

A.   He refused to speak.

Q.   Okay.  But he hadn't said I'm only talking to people unless I have a lawyer present, correct?

MS. GOLDEN:  Objection.

THE COURT:  Basis?

MS. GOLDEN:  Foundation.

THE COURT:  That's sustained.

BY MR. S. RICHARDS:

Q.   Okay.  You were aware, from reviewing the police reports, that Cristino Garcia was taken -- was placed under arrest and that on July 28th of 1989, he was interviewed at a police station, right?

A.   I don't recall the date, and I don't know if he was placed under arrest.  I know that he was interviewed, but I don't recall what the circumstances were other than him refusing to speak to the police.

Q.   Okay.  But it was at least possible though, even though he's refusing to speak to the police on July 28th, he could have changed his mind by the time you got the case and were looking to investigate, correct?

A.   Well, Mr. Cristino Garcia never -- never came to us and said that he was changing his mind and wanted to speak to us.

He had asserted -- he had asserted his rights, and ethically we couldn't -- we couldn't speak to him.

Q.   So if you had known that Cristino Garcia had been beaten by

Reynaldo Guevara with phone books and a flashlight, you would have disclosed that information to the defense, correct?

A. Well, that's -- that's speculation because that never happened.

Q. I'm just asking you hypothetically, if it had happened, if he had revealed that to you, would you have had an ethical obligation to give that information to the defense?

A. That never happened.

Q. I'm not asking you if it ever happened. I'm asking you if it had happened, would you have had an ethical obligation to reveal that information to the defense? Yes or no?

MR. MILLER: Objection.

THE COURT: Basis?

MR. MILLER: Speculation.

THE COURT: Overruled.

You may answer.

BY THE WITNESS:

A. I can't answer that. I don't -- I don't know. It never happened.

BY MR. S. RICHARDS:

Q. I'm sorry, but I am asking you to answer the question. Yes or no?

A. Yeah, I can't answer it. I don't know.

THE COURT: The witness answered and said he didn't know.

BY MR. S. RICHARDS:

Q.   Okay.  If you had known that Cristino Garcia had denied involvement in the murder and given Guevara an alibi, would you have disclosed that information to the defense?

MS. GOLDEN:  Objection.

THE COURT:  Basis?

MS. GOLDEN:  Foundation.

THE COURT:  It's overruled.

You may answer.

BY THE WITNESS:

A.   That never happened either, and I can't speculate as to something that never occurred.

BY MR. S. RICHARDS:

Q.   Well, let me just ask you in general.  Part of your duties as a trial prosecutor, you had a what's called a *Brady* obligation, correct?

A.   Yes.

Q.   Your *Brady* obligation was to reveal to the defense any information that might be exculpatory, might tend to show that Jaime Rios didn't do it, correct?

A.   Yes.  We have an obligation.  *Brady* is a case, is referring to a case, but we have obligations under the court rules as well as the cases that we present evidence that -- that we have, including police reports, and what's in the police reports would have been disclosed to the defense.

Carballo - cross

2302

Q. But information that is not in the police reports but that you knew about that was exculpatory, you had an ethical obligation to disclose that information to the defense. True?

A. Well, again, you're asking me to speculate, but I can tell you that that never occurred. No one ever alleged that it occurred, and no one ever -- the reports reflect that he asserted his rights, and that was the end of it.

They didn't force him to do anything. He asserted his rights, and he never -- he never made any incriminating statements or non-incriminating statements. He just said he didn't want to talk.

Q. I'm talking to you in general. You've described your duties as a prosecutor and the things you have to do.

Is it not the fact that one of your duties as a prosecutor in general, not in this specific case, is to disclose to the defense exculpatory information that comes to you by any source, police reports, witnesses, anything else?

Isn't that your ethical obligation?

MR. MILLER: Objection.

THE COURT: Basis?

MR. MILLER: Asked and answered.

THE COURT: It's overruled.

BY THE WITNESS:

A. We have obligations, ethical obligations, and if there's exculpatory evidence or inculpatory evidence, we have an

obligation to -- to produce that.

As far as the hypothetical that you're asking me, the speculative question you're answering, that never occurred.

BY MR. S. RICHARDS:

Q. I understand, but the first part of your answer, which you affirm, is that as a prosecutor, you had an ethical obligation to disclose exculpatory information to the defense; isn't that true?

MR. MILLER: Objection.

THE COURT: Basis?

MR. MILLER: Asked and answered.

THE COURT: Sustained.

BY MR. S. RICHARDS:

Q. And part of your duty is not only to exclude -- is not only to give the defense exculpatory information, but also to give them impeaching information, correct?

A. Yes, which we did.

Q. Thank you.

Now, at trial, you called Luis Huertas, right?

A. Yes. I didn't call him, but we called him together --

Q. You as the prosecution team called him?

A. -- but Kay Hanlon

THE COURT: We cannot speak over each other.

THE WITNESS: I'm sorry.

THE COURT: Please allow each other to finish.

BY THE WITNESS:

A.   We called him, my partner and I called him.  He testified at trial, and he was put on by Kay Hanlon, my partner.

BY MR. S. RICHARDS:

Q.   At trial, Luis Huertas testified that he was not a gang member, correct?

A.   Correct.

Q.   Okay.  And the fact that he was not a gang member was one factor in assessing his credibility.

A.   Not really.  Whether he was a gang member or not didn't matter.  He was friends -- he said that he was friends with the gang -- the gang members, the Spanish Cobra gang members, but he was not a member of the -- of the gang.

Q.   Okay.  And you were convinced by speaking with him that he was sincere.  He was not a member of the gang, correct?

A.   Yes.  I thought he was sincere in his testimony.  He was -- he was a credible witness.

Q.   And he was credible when he said he was not a member of the gang.

A.   Yeah.  And he had no qualms in telling us that he knew the gang members, that he was friends with the gang members, that he associated with those members.  So -- but he was not an active gang member himself.

Q.   Have you read Luis Huertas's deposition in this case?

A.   No, I haven't.

Carballo - cross

2305

MS. GOLDEN:  Objection.

THE COURT:  Basis?

MS. GOLDEN:  Foundation.

THE COURT:  That's overruled.  He knows whether he read it or not.

BY THE WITNESS:

A.  No, I didn't read his testimony -- his deposition.

BY MR. S. RICHARDS:

Q.  Okay.  It impressed you that he was willing to testify against a Latin King even though he lived in a Latin King territory, right?

A.  I was impressed by his testimony and the fact that after the trial was over, he had to go back to the same neighborhood and had to live, you know, on the same street where the murder occurred.

Q.  Okay.

A.  He actually lived across the street on the Latin King side. He lived above the ice cream shop and worked at the ice cream shop --

Q.  Right.

A.  -- at the time of the trial.

And when all was said and done, you know, we were all going home, but he was going home to -- to that neighborhood.

Q.  In your investigation of the case, did it ever occur to you that he might have been put up to give testimony against a

Carballo - cross

2306

minor member of the Latin Kings in order to protect Jose Macho Melendez, the leader of the Latin Kings in that area against a murder charge?

A. No.

MS. GOLDEN: Objection.

THE COURT: Overruled.

BY THE WITNESS:

A. No.

BY MR. S. RICHARDS:

Q. Okay. And another factor in assessing Luis Huertas's credibility, as with many witnesses, was that he had a job, right?

A. Well, that's -- I guess that's part of his credibility, that he was working, but that -- that wasn't determinative for me of his credibility.

Q. Okay. And when you interviewed Luis Huertas back in 1990, he didn't appear to be suffering from any mental disorder. True?

A. True.

Q. Now, Luis Huertas testified at trial, as you said, that he actually witnessed the shooting with his own eyes, correct?

A. Yes.

Q. And he further testified that he held Luis Morales in his arms until the ambulance arrived, correct?

A. He held -- I don't know if it was until the ambulance

arrived, but he held him for a period of time, where he was on the ground talking to him and trying to -- trying to get a response from him.

He said that -- that the victim's eyes were open, but he was not responding. He said that the -- he saw that the victim had a bullet hole in his forehead, on the left side of his forehead, and that blood and brain matter was coming out of his head and that it got onto his -- got onto --

Q. Luis Huertas --

A. Huertas said it got onto his clothing.

Q. Huertas's clothing?

A. Yeah.

Q. Okay.

A. And he said that -- that he was trying to communicate -- his nickname was Flash, and I recall him saying that. And then the victim was New York. He's, like, New York, New York, it's Flash. It's me, Flash, and his eyes were opened and he looked like he was looking at him, but he couldn't get a response.

And then he said that Tino -- or Loco Torres, Mr. Torres, came back and that he was there. He was very upset, crying. They were crying, and eventually he got Mr. Torres to go and get the ambulance, which was right around the corner, and then eventually the ambulance came.

Q. Now, he also testified, Luis Huertas, that is, that he spoke with police on the scene at the very moment when he was

holding or soon after when he was holding Luis Morales in his arms, correct?

A. I believe so, and I don't know when he spoke to them, but I believe that he said that he also went to the hospital, if I recall correctly. He said that he -- the victim was taken, he was still alive, but brain dead. He was taken to Cook County Hospital, and I believe that -- I believe that he may have gone to the hospital.

Q. Well, and we can look at -- if you're not sure of his exact testimony, would it refresh your recollection to view his testimony or not?

A. No, I -- I remember his testimony real well.

Q. Okay. So what he testified to at trial was that he spoke with police on the street, not in the hospital, on the street, correct?

A. I believe he tes- -- I believe he testified to that. I don't recall that specific point, but, you know, that wouldn't surprise me that he talked because he stayed at the scene until the victim was removed from the scene.

Q. Okay. So, again, the answer to that question is Luis Huertas testified at trial that he spoke with police on the scene, correct?

A. I -- I don't recall that specific testimony, but I believe that if you say that that's what he said, then that's -- that's -- I'm not disputing that.

Q. You're not disputing it. Okay.

A. No.

Q. And he testified that on the scene, he gave his name to the police, correct?

A. I believe so.

Q. And he testified that he gave his address to the police, and he told the police where they could find him. Do you remember that testimony?

A. I believe so.

Q. Now, in terms of your review of the police reports in this case, you reviewed the initial case report, did you not?

A. Yes.

Q. Okay. And as you're standing here now, do you have a memory of what was in the case report or not?

A. Not specific in the police report.

MR. S. RICHARDS: Can we show -- okay.

I'm putting up on the screen in front of you what's been previously marked as --

MR. J. RICHARDS: Defendants' 50 A.

BY MR. S. RICHARDS:

Q. -- Defendants' 50 A. Can you look at that document?

A. Yes.

Q. Okay. And that's a one-page document.

Is your recollection refreshed -- do you need more time to read it?

Carballo - cross

2310

A.  No, I can see it.

Q.  What?

A.  I can see the first page.

Q.  It only has one page.

MR. J. RICHARDS:  Two pages.

BY MR. S. RICHARDS:

Q.  Two pages, I'm sorry.  That's the first page.  When you're finished with the first page, please let us know.  We'll show you the second page.

A.  Okay.

Q.  Okay.  Have you reviewed the first and the second page?

A.  Not the second page.  It's still on the first.

Q.  Let me know when you're finished.

A.  Okay.

Q.  Okay.  This is -- are you done?

Specific question:  Luis Huertas's name is not listed on that report.  True?

A.  I don't see his name listed.

Q.  Okay.  And there are two witnesses listed on that report, the first page.

A.  Yes.

Q.  Those would be Samantha Hudson and Javier Torres, correct?

A.  I don't think it was Torres listed.

Q.  I'm sorry, James Dean.

A.  James Dean.

Carballo - cross

2311

Q.   Okay.

A.   I don't think that's Mr. Torres.

Q.   You're right.  I'm wrong.

Okay.  But there's no reference to Mr. Huertas on the beat officer's report.  Fair?

A.   On this first report.

Q.   Okay.  And you're aware that Luis Huertas was not mentioned as a witness on any report until Gang Specialist Daniel Noon brought Huertas to Area 5 on the afternoon of June 28th, 1989.

You recall that, correct?

A.   I know that he was listed on reports, including reports from Officer Daniel Noon, and that Daniel Noon did speak to him after the -- the murder, and I -- I don't know if you're --

Q.   Okay.

A.   If you want to show me Officer Noon's report.

Q.   That doesn't exist, but we can show you the next report, which is from detectives --

(Counsel conferring.)

MR. J. RICHARDS:  50 B.

BY MR. S. RICHARDS:

Q.   Okay.  Do you see that next report?

A.   Yeah, this is not Officer Noon's report.

Q.   Okay.  So is your recollection refreshed as to whether the first mention of Luis Huertas is on that report where Daniel Noon brought Huertas to Area 5 on the afternoon of June 28th,

Carballo - cross

2312

1989?

A.   I -- I believe he's listed in that report, but I don't know if that's the first time he was listed.

MR. S. RICHARDS:  Oh, I'm sorry.  I'm sorry, my mistake.

(Counsel conferring.)

MR. S. RICHARDS:  I'm sorry.  Let's take down that report.  That was my -- putting up --

(Counsel conferring.)

BY MR. S. RICHARDS:

Q.   Okay.  I'd like to show you previously admitted into evidence as report 50 D, report from Mason and Brennan.

A.   Uh-huh.

Q.   Do you see that on the screen?

A.   Is that what you're showing me here?

Q.   Yes.

A.   Yeah, he's listed there.

Q.   Okay.  So -- and that report is dated January 28th, 1989, correct?

A.   It's June --

Q.   I'm sorry, June 28th, 1989.

A.   Yes, the day -- the day -- this is the detective report. This is Detective Mason report from the day -- the date -- technically, the murder occurred on the 27th, but it was close to midnight.  So it was the 28th, goes into the 28th.

Carballo - cross

2313

Q.   So would you agree with me that the first time Luis Huertas is listed as a potential witness is on the Mason-Brennan report from June 28th, 1989, where it says that --

MS. GOLDEN:  Objection.

THE COURT:  Basis?

MS. GOLDEN:  Improper refreshing recollection.

MR. S. RICHARDS:  I'll withdraw it.

THE COURT:  Okay.

BY MR. S. RICHARDS:

Q.   Okay.  Is your -- have you had a chance to review that report?

A.   Could you show me the second page where he's listed?

Okay.  Yes.

Q.   Okay.  So it's on that report that for the first time Luis Huertas is listed as a witness, correct?

A.   I don't know if it's the first time, but he is listed on this, and this does contain his name, date of birth, his address, his Social Security number.

As I said, he lived across the street from where the murder occurred.  He worked across the street, and it does list that on the report, that he is -- that he worked at El Tropico Hilado Ice Cream Store and lived above that on the second floor, has his information, and he's -- his address, everything's listed there.

Q.   Okay.  Did you -- you said that you spoke to a lot of the

detectives on this case in preparing for trial, correct?

A.   Yes.

Q.   And the gang specialists?

A.   Yes.

Q.   And one of the gang specialists you spoke to was Daniel Noon?

A.   Spoke to Daniel Noon.  I put Daniel Noon on the stand.  I was the one who questioned him when he testified.

Q.   All right.  Did you ever ask Daniel Noon how he knew that Luis Huertas was a potential witness?

A.   Well, he knew that he was a witness because he talked to -- he talked to people.  I assume he talked to -- I know he talked to Huertas, and he took Huertas in for a lineup, so he knew that he was a witness.  So --

Q.   But my -- sorry.

        My question is did you ever ask Daniel Noon not whether he knew Luis Huertas was a witness but how he knew Luis Huertas was a witness?

        Did you -- do you recall asking him that question?

A.   No, because I think it was known that he was a witness, and it was known that Officer Noon knew he was a witness.

Q.   Okay.  And it was known that he was a witness to whom -- strike that question.  I'll withdraw.

        Now, you've been asked about the witnesses you called at trial.  Do you remember those questions from the defense?

Carballo - cross

2315

A.    Yes.

Q.    Okay.   Another witness you called that was mentioned before was Javier Torres, right?

A.    Yes.   And I think -- I can't recall if I -- I think -- we called him, but I think Kay might have put -- Kay might have put him on.

Q.    Okay.

A.    But he was called.

Q.    All right.   And do you recall his testimony --

A.    Yes.

Q.    -- yes or no?

      You do?

A.    I do.   Generally, I recall his testimony.

Q.    And is it fair to say that the reason for putting Javier Torres on the stand or at least part of the reason was to kind of steal the thunder from the defense and front for the jury that he had originally identified Macho Melendez, but had retracted --

      MR. MILLER:   Objection.

      THE COURT:   Basis?

      MR. MILLER:   Motion *in limine*.

      THE COURT:   That's overruled.   On direct examination, testimony -- several hearsay statements were elicited for the understanding as to how this witness proceeded with the investigation and the trial.

Carballo - cross

2316

You may answer.

BY THE WITNESS:

A. No, we -- he explained that during his testimony, but the reason that he was called is because he was present when the murder took place and to explain what happened.

What he could testify to was that once the gunfire started that he -- he fled the scene and -- and to explain the circumstances of that. And we did -- he did explain his earlier naming of Melendez and what happened and, you know, why that happened, so --

BY MR. S. RICHARDS:

Q. Well, what he testified was that he lied to the police when he originally identified Macho Melendez, correct?

A. He testified that, yes, he -- he -- he identified Melendez and that he was the leader, you know, and he then said I didn't see who -- I didn't -- I couldn't identify him as the -- as being there present.

Q. But my specific question is didn't he testify on the stand that he lied to the police when he originally said that Jose Macho Melendez was the shooter? Isn't that true?

A. That's just what I just said, yes. He said that he -- that he -- he lied about seeing Melendez.

Q. Okay.

A. Yes.

Q. Right, that he lied. Okay. Good.

Carballo - cross

2317

A.  Yes.

Q.  And -- but, he also said on the stand that he told the truth when he had told the police that he saw Macho Melendez in the area moments before the shooting.  Isn't that true?

A.  I don't recall that.

Q.  Would it refresh your recollection to view his testimony?

A.  I don't believe so.

Q.  Okay.

A.  Not me.

Q.  What?

A.  I don't believe it would, but I believe he recanted his testimony about Melendez before -- before he testified and during his testimony.

Q.  I'm not asking you about that.  I'm asking you about whether he testified at trial that he was telling the truth and that he was still saying that he saw Macho Melendez at the scene moments before the shooting?

     Do you recall that or not?

A.  I don't recall that.

        MR. MILLER:  Objection.

        THE COURT:  Basis?

        MR. MILLER:  Asked and answered; foundation.

        THE COURT:  All right.  Let's go to sidebar briefly on the headphones.

        (Proceedings heard at sidebar:)

THE COURT: Okay. I want to be clear about the scope of the door that was opened.

As I stated, on direct examination, there were plenty of questions about who this witness talked to and what he did in response and how that affected his trial presentation and strategy, and so the door is opened to that.

It's not open to read in all of the testimony as to who testified to what. You have to frame it in the context of what actions this witness took or what actions this witness did not take essentially, as I understood the direct, determinations made with respect to the underlying -- the prosecution of the case.

So with that, the objection to asked and answered is overruled. The objection as to relevance or whether it's beyond the scope of the direct is sustained. You can try it a different way, Mr. Richards.

(Proceedings heard in open court:)

BY MR. S. RICHARDS:

Q. Let me ask you this question. You said you spoke to all the witnesses before trial, correct?

A. All the witnesses, yeah, that we -- all the witnesses that we called, yes, they were all -- we interviewed them before they testified.

Q. That included Javier Torres.

A. That included Mr. Torres.

Carballo - cross

2319

Q.   Okay.  When you interviewed Mr. Torres before trial, did he tell you that he had seen Macho Melendez in the area of the shooting moments before the shooting?  Yes or no?

A.   I don't believe so.

Q.   Okay.  And -- and your recollection would not be refreshed you're saying by viewing his trial testimony; is that fair?

A.   I don't believe so.

Q.   Even though you were present when he testified.

MR. MILLER:  Objection.

THE COURT:  That's sustained.  Your question was when he interviewed Torres.  What's that got to do with the trial itself?  Two different time frames.

BY MR. S. RICHARDS:

Q.   You also know that Javier Torres testified that he originally picked Macho Melendez's picture out of a gang book --

MR. MILLER:  Objection, Judge.

BY MR. S. RICHARDS:

Q.   -- fair?

THE COURT:  It's overruled.

BY THE WITNESS:

A.   I know that he previously identified and named Macho Melendez, who was the leader of the Latin Kings in that -- in a neighborhood, but I don't -- I don't recall if it was picking him out of a gang book at that time or not, but I know he

was -- he did name him initially.

BY MR. S. RICHARDS:

Q. Now, you also called Benjamin Carrero as a witness, right?

A. Yes.

Q. And you knew or had at least suspicion at the time you called him that he was recanting at least part of his testimony.

A. I didn't know whether he was going to recant or not, but I suspected, because he wasn't cooperating and didn't come to court when we subpoenaed him to come to court, that he wasn't going to be cooperative.

And I did know that he was good friends with Mr. Rios and that they were fellow gang members. So, you know, I suspected that -- that he was not going to be cooperative.

And then we confirmed, after we raised the issue with the judge, we confirmed then the next morning that he had been driven to the courthouse by the defense counsel, Mr. Carey. He and his girlfriend were driven to court.

Q. His girlfriend being Iris Mendez?

A. Yes.

Q. Now, during his testimony, Benjamin Carrero did recant, as you said, part of his statement. He said -- now he said I got the gun from him, but Jaime Rios didn't say anything to me, correct?

A. In effect, yes, that's what he said.

Q.   Okay.  But he also said that the officers who had interrogated him had threatened to lock him up and take his children.  Fair?

A.   I believe that that -- I believe that came up that he tried to claim that, yes.

Q.   He testified to it.

A.   I believe that -- I recall that that was part of his testimony.

Q.   Okay.

A.   He also said that he never talked to the defense attorney on the way to the courthouse either.

Q.   I understand.  I'm just talking about the question I asked you.

And by the way, there was nothing improper about the defense counsel giving him a ride to the courthouse, was there?

A.   It's -- I thought it was highly unusual.

Q.   Okay.  Well, but Jack Carey, who's known for doing whatever he could, including giving people rides if people needed to get to the courthouse and testify; isn't that fair?

A.   Jack Carey was a -- was a competent, diligent attorney. And I don't know about driving witnesses to the courthouse -- adverse witnesses who weren't showing up for subpoenas, driving them to the courthouse.  I don't know if --

Q.   Now --

THE COURT:  All right.  We're going to break there

2322

because it's 4:30.

Ladies and gentlemen, I forgot to ask this morning. Did anyone have anything to report to me?

All right. Seeing no hands, I remind you please don't discuss the case or research the case, and we'll see you back here tomorrow at 10:00 a.m. I do anticipate that we will get to closing arguments or at least start them tomorrow, and so we're nearing the end of the case as far as the presentation of the evidence.

So all rise.

(Jury out at 4:31 p.m.)

THE COURT: All right, sir. You can step down. Please do not discuss the substance of your testimony with anyone. We'll see you tomorrow morning at 10:00 a.m.

Okay. Issues from the plaintiff to address this evening?

MR. S. RICHARDS: Your Honor, just a heads up. I'm in the middle of preparing a Rule 50 motion on the Cristino Garcia claim.

THE COURT: Okay.

MR. S. RICHARDS: So I can finish that up this evening and file it if that -- if the Court thinks that's appropriate.

THE COURT: It's not for me to tell you what or when to file a motion.

MR. S. RICHARDS: Good. But I'll file it.

2323

The other issue I had is -- well, actually, I'll put that in writing, too. It's an issue regarding closing argument, but I'll put that in writing.

THE COURT: What is the issue regarding closing argument which does affect how I oversee the trial?

MR. S. RICHARDS: Oh, okay. So there is a case which I looked up, became aware of yesterday which says that -- it's a case there was a reversal because the officers testified we're taking the Fifth, but we wish we could talk.

I'm a little concerned that some of the defense arguments could sort of verge into that testimony, such as he has a criminal defense attorney who told him not to talk. I didn't tell him not to talk. I'd like for him to talk, things of that sort.

Obviously, that's come in a little bit in the trial, but I'm just asking that it not go any further.

THE COURT: Are you anticipating arguments to that effect, Mr. Scahill?

MR. SCAHILL: I'm not exactly sure what he's -- I certainly asked questions of the --

THE COURT: He's saying that you should not be able in closing argument to stand up and say Mr. Guevara would have loved to have told you everything he knows about the case, but he couldn't because his lawyers told him not to.

MR. SCAHILL: I'm certainly not going to say that -- I

2324

know the case, because it's my case. He's talking about *Ruiz-Cortez*, and he's certainly not going to say -- and that case was the individual saying I'd love to talk, but I can't.

The fact of the matter is that he said that he's been given advice by counsel, which is about as far as it goes, which he's taking advice of his counsel and he's not -- and he's following that, period.

I'm not going to say he'd love to testify. He didn't say that, nor am I going to say it.

THE COURT: Okay. Does that address your concern, Mr. Richards?

MR. S. RICHARDS: It does.

THE COURT: Okay. Anything else?

MR. J. RICHARDS: One quick question because if we're going to roll right into closings tomorrow, and I forwarded this with defense counsel that I intend to use some of the jury instructions on the overhead monitor.

My question is, is do I have to strike the "draft" and the blue file stamped numbering when I do that?

THE COURT: Yes. I would imagine you would just -- well, if it's not on a PowerPoint, if it's on the document camera, I can email the Word version so that the "draft" can be removed.

All right. Anything for the defendants?

MR. POLICK: Yes, Judge. So we're anticipating to

2325

close tomorrow. Just in terms of planning, I'd like to know if there's going to be a rebuttal case?

MR. S. RICHARDS: Almost certainly not. If there is a rebuttal case, 15 minutes max.

MR. POLICK: Of who?

MR. J. RICHARDS: We'll see if we get there. It's rebuttal. We don't know yet.

MR. S. RICHARDS: We have to discuss a matter, but odds are not, and it won't be an undisclosed witness.

MR. MILLER: Relatedly, Judge, as to the close of the evidence, I don't believe Mr. Carballo was currently available tomorrow morning, but we'll work with whatever we have.

How much longer do we think we need with him?

MR. S. RICHARDS: Ten minutes.

MR. J. RICHARDS: Yeah, we have three pages left of our --

THE COURT: What do you mean he's not available tomorrow morning?

MR. MILLER: Well, I don't know what -- he was available today and --

THE COURT: He's under subpoena and I just told him before he stepped off the stand to be here at 10:00 a.m.

MR. MILLER: Okay.

THE COURT: I've instructed him not to discuss the substance of his testimony, but you can reach out to confirm

2326

that he will be here at 10:00.

If he hems or haws in any way, you let me know this evening so that I can have the marshal standing by to enforce my order for him to be here tomorrow at 10:00 a.m.

I suspect he understands and appreciates that, and we won't need to get there.  So it's not an issue from where I sit.

MR. MILLER:  I understand, Judge.  I just wanted to see, you know, so I can tell him and he can reschedule how much longer we have with him.

So it sounds like 10, 15 minutes?

MR. J. RICHARDS:  Yeah, three pages of our prep notes, so --

THE COURT:  Anything else for any other defendants?

MR. SCAHILL:  No.

THE COURT:  I had some issues that I would like to take up or remind the parties of.

First, to expand on the objections and the opening the door.  I'll review the testimony this evening, but my recollection of Mr. Carballo's direct was a lot of what you do in the investigation, what decisions did you make in the investigation, and a lot of who you talked to, what they told you and what you did.

And so I'm open to reminding the jury at some point that as far as I guess it would be effect on the listener,

2327

that's why much of that testimony or statements by others came in.

But I'll hear from the parties before I give that instruction.

MR. S. RICHARDS: We're fine with it.

MR. SCAHILL: I think that's appropriate.

THE COURT: Okay. And like I said, that's what opened that door to that.

Then there's exhibits. The parties are reminded that once the jury gets the case, I expect the exhibits to be ready to go back to the jury within 15 or 20 minutes. So you should discuss and confirm what's been admitted and have them in a format available to the jury.

We will go back on the record, and I will ask each side whether what they're handing up is the universe of exhibits that have been admitted and for the jury to consider, so please don't delay with that.

And then I saw Mr. Mason's or Detective Mason's motion for judgment on the conspiracy claim. I think that was filed today, so I don't expect that the plaintiffs have had an opportunity to review it, but it brought up a question that I had on my end concerning the verdict form, and that's whether there should be a question concerning conspiracy, provided that claim goes forward.

MR. S. RICHARDS: Your Honor, it strikes me as a good

2328

idea, and we will tender that.

THE COURT: Defense?

MR. SCAHILL: I think the way that the Court has dealt with it is within the scope of personal involvement, so I think it's actually covered by the coercion question. I don't know that there needs to be a separate one.

Conspiracy, as I understand it, just is a vehicle to rope a party into a claim that they may not have had a direct role in but were in a conspiratorial role. So I think it is subsumed within the question on -- because I believe it's only on the coerced confession claim. It's subsumed in that.

MR. POLICK: I would agree with that, Judge. I think the Court has tethered it to the coerced confession claim, so I don't know that we need to modify the verdict form.

THE COURT: I have tied it to the coerced confession claim as far as the instruction goes, and I haven't had a full opportunity to work through this.

But my concern would just be -- or my thought was if yes to Questions 1 and 2, meaning both defendants are liable for coerced confession, did you find that there was a conspiracy or an agreement between them; and my initial thoughts on that were more from an appellate-type perspective. If I'm wrong on the conspiracy but they didn't find based on a conspiracy, then there's no need to re-do that, right?

And so that's my thought. I don't know that that's a

2329

proper legal basis to add it to the verdict form, but that's -- I don't think anybody wants to come back over another three weeks and do this again. So it's an initial -- my initial thought is simply protecting this should it go up and come back down. We at least know what the decisions by the jury were.

That said, I realize the more questions you ask, you invite the potential for inconsistent verdicts. What happens if we get a yes and a no and then a yes? That's problematic.

So, all right, so plaintiffs are for it; defense is against it. I will give it some more thought.

I've reviewed the -- Detective Mason's motion, and I've been looking at some of the case law. And I know that the Seventh Circuit hasn't ruled on the 1983 intra-corporate conspiracy doctrine issue, and I know the parties addressed this at summary judgment.

But I don't know that I'll have a ruling in time for closings because the plaintiffs haven't had the opportunity to respond to the current motion, and I don't know how it shakes out when it comes to that doctrine in the 1983 context, as its origins stem from individuals within entities that are making corporate policies that has been expanded to other factors; whereas here, we're not dealing with corporate or bureaucratic policies as much as we're dealing with individual decisions in the 1983 context.

But I will give the verdict form some thought and

2330

decide whether to include the conspiracy question.

All right. Anyone wish to be heard on that issue?

MR. J. RICHARDS: Just to clarify, Your Honor, so does Your Honor want plaintiff to submit proposed language for that question?

THE COURT: I don't need language for the verdict question.

I will need at some point a response to your -- to the defendant -- or defendant Mason's 50(a) motion, which was -- was it filed today?

MR. POLICK: Yes, Your Honor, this morning. I thought we were going to get a little further than we did today.

THE COURT: Okay.

But, no, I don't need language on the jury instruction.

MR. S. RICHARDS: Your Honor, we'll respond either this evening or in the early morning hours.

THE COURT: Okay.

How I come out on the conspiracy issue, of course, determines whether I give the conspiracy instruction and that will determine whether I give the -- or whether there's a need for another question on the verdict form.

All right. Anything else?

MR. J. RICHARDS: When Your Honor said format of the exhibits, I assume you mean paper to give to the jury?

2331

THE COURT:  It's either paper or electronic with a clean laptop to go back.

MR. S. RICHARDS:  Thank you.

MR. J. RICHARDS:  Thank you, Your Honor.

THE COURT:  All right.  Have a good night.

MR. POLICK:  Thank you, Judge.

MR. SCAHILL:  Thank you, Judge.

(Adjourned at 4:45 p.m., until 2/18/26 at 10:00 a.m.)

* * * * *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Charles R. Zandi


/s/ Kelly M. Fitzgerald


/s/ Kathleen M. Fennell                    February 18, 2026
Official Court Reporters                   Date
United States District Court
Northern District of Illinois
Eastern Division

2332

I N D E X

WITNESSES                                               PAGE

JANET LUPA
Via Deposition                                          2126


JOHN R. SCHAFER
Direct Examination By Mr. Kivetz                        2138
Cross-Examination By Mr. J. Richards                    2175

JOHN R. SCHAFER
Cross-Examination (Resumed) By Mr. J. Richards          2201
Redirect Examination By Mr. Kivetz                      2206

ANTHONY JOSEPH CARBALLO
Direct Examination By Mr. Miller                        2211
Cross-Examination By Ms. Golden                         2251
Cross-Examination By Mr. S. Richards                    2260