2333

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                          )
                                     )
            Plaintiff,               )
                                     )
-vs-                                 )  Case No. 1:22-cv-03973
                                     )
REYNALDO GUEVARA; MICHAEL            )
MASON; and JoANN HALVORSEN,          )
as Special Representative of         )
ERNEST HALVORSEN, Deceased,          )  Chicago, Illinois
                                     )  February 18, 2026
            Defendant.               )  9:58 a.m.


                    VOLUME 12
        TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
        BEFORE THE HONORABLE JEREMY C. DANIEL

APPEARANCES:

For the Plaintiff:    LAW OFFICE OF STEPHEN L. RICHARDS
                      BY:  MR. STEPHEN L. RICHARDS
                      53 West Jackson Boulevard, Suite 205
                      Chicago, Illinois  60604


For Defendant         BORKAN & SCAHILL, LTD.
Guevara:              BY:  MR. TIMOTHY P. SCAHILL
                           MR. GRAHAM P. MILLER
                      20 South Clark Street, Suite 1700
                      Chicago, Illinois  60602

For Defendants        THE SOTOS LAW FIRM, P.C.
Mason and             BY:  MR. JOSEPH M. POLICK
Halvorsen:                 MR. JOSH MICHAEL ENGQUIST
                           MR. JEFFREY ROBERT KIVETZ
                           MS. CAROLINE P. GOLDEN
                      141 West Jackson Boulevard, Suite 1240A
                      Chicago, Illinois  60604

2334

Court Reporter:          CHARLES R. ZANDI, CSR, RPR, FCRR
                         Official Court Reporter
                         219 S. Dearborn Street, Room 1426
                         Chicago, Illinois  60604
                         Telephone:  (312) 435-5387
                         charles_zandi@ilnd.uscourts.gov


                    *    *    *    *    *

               PROCEEDINGS REPORTED BY STENOTYPE
      TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK: 22 C 3973, Rios versus Guevara, et al., for jury trial.

THE COURT: All right. Good morning. Appearances, please.

MR. S. RICHARDS: Stephen Richards on behalf of plaintiff.

MR. J. RICHARDS: Joshua Richards on behalf of plaintiff.

MR. MILLER: Good morning, your Honor. Graham Miller on behalf of Reynaldo Guevara.

MR. SCAHILL: Good morning, your Honor. Timothy Scahill on behalf of Reynaldo Guevara.

MR. ENGQUIST: Good morning, your Honor. Josh Engquist on behalf of Defendant Mason.

MR. POLICK: Good morning, your Honor. Joseph Polick on behalf of Defendant Mason.

MS. GOLDEN: Caroline Golden on behalf of Defendant Mason.

MR. KIVETZ: Good morning, your Honor. Jeff Kivetz on behalf of Defendant Mason.

THE COURT: All right. Good morning, everyone.

Anything for me to address before we call in the jury, from the plaintiffs?

MR. S. RICHARDS: Yes, your Honor.

THE COURT: Okay.

MR. S. RICHARDS: Your Honor, with respect to the witness who has begun testimony yesterday, I would ask your Honor to instruct the witness to answer the questions, to answer yes-or-no questions yes or no, and to not give speeches about matters extraneous to the question, and -- or to give me permission to interrupt the answers to redirect the witness to the question I actually asked.

THE COURT: I will continue to listen. If you feel that the witness is becoming non-responsive, you can object, but understand that not every answer is a, "Yes," or, "No." There are "Yes, buts," and, "Yes, ands."

And so without hearing the particular question, I can't make that blanket ruling.

MR. S. RICHARDS: Thank you, your Honor.

THE COURT: Anything else?

MR. S. RICHARDS: Nope.

THE COURT: Anything --

MR. S. RICHARDS: Oh, except I did file the Rule 50 motion on the docket this morning I think around 4:00 a.m. or so.

THE COURT: Okay. I have not seen it yet. I will take it up later today.

Anything for the defendants?

MR. SCAHILL: No.

2337

MR. POLICK: No, your Honor.

THE COURT: All right. I did not make any changes to the verdict form. I am leaving in the conspiracy instruction. I'll, if necessary, write on that later.

But we'll bring in the jury and resume the cross-examination of -- is it Mr. Carrero?

MR. MILLER: Carballo.

THE COURT: Carballo. Okay.

MR. SCAHILL: I know your Honor's going to do this anyway, but I understand there's been news coverage, so just standard question. "Anything to report? Don't read the news," that kind of thing.

THE COURT: Certainly.

Mr. Carballo, you can take the stand.

(Jury in at 10:01 a.m.)

THE COURT: All right. Please take your seats.

Good morning, ladies and gentlemen. Does anyone have anything to report to me about the case?

All right. Seeing no hands, Mr. Carballo, I remind you that you remain under oath.

Mr. Richards, you may continue with your cross-examination.

MR. S. RICHARDS: Thank you, your Honor.

ANTHONY JOSEPH CARBALLO, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION (Resumed)

BY MR. S. RICHARDS:

Q. Attorney Carballo, I'd like to ask you some questions about Samantha Hudson. Do you recall that name?

A. Yes.

Q. Now, she was not an eyewitness, but a circumstantial witness in the case, correct?

A. Yes.

Q. Was she one of the witnesses you interviewed before trial?

A. I believe I did, yes.

Q. Okay. Now, however, you did not call her as a witness in your case, correct?

A. Correct.

Q. She was called as a witness in the defense case?

A. Correct.

Q. Do you recall -- sitting here now, do you recall the substance of her testimony in the defense case?

A. Yes.

Q. Okay. Her role in the case was that she encountered two people before the shooting. She had a conversation with them -- with those people, but she did not witness the shooting, correct?

A. Correct. She lived over -- I mentioned yesterday, there's a fire station at Potomac and Western, and she lived in the area of the fire station.

Q. Right. And she was -- testified that she was going to her

garbage cans.  She met two people, had a conversation with them, and then she saw them move in a certain direction; and then later, she heard the shots, correct?

A.   To that effect.  That was part of her testimony, yes.

Q.   Okay.  Now, as part of her testimony, she described one of the people she encountered near the garbage cans as having blond hair, correct?

A.   I don't recall that.

Q.   Would it refresh your recollection to view -- review her testimony at trial?

A.   It may.

Q.   What?

A.   Maybe.

        MR. MILLER:  Objection, Judge.

        THE COURT:  What's the basis?

        MR. MILLER:  Reading in the testimony.

        THE COURT:  Okay.  An answer was given.  The objection is overruled.  You can continue.

BY MR. S. RICHARDS:

Q.   I'd like to have you, without reading anything, please read and review the testimony.  Is that okay?

A.   Sure.

        MR. J. RICHARDS:  Your Honor, may I approach?

        THE COURT:  Okay.

        (Tendered.)

Carballo - cross

2340

BY MR. S. RICHARDS:

Q.  If you could read that and tell me when you've finished reviewing it.

A.  Okay.

Q.  Okay.  I'd like to see if your recollection is refreshed as to a few questions, just as to your memory without looking at the document.

Is it accurate to say that Samantha Hudson said that one of the two people she encountered had blond hair?

MR. MILLER:  Objection, Judge.

THE COURT:  Sustained.

(Counsel conferring.)

BY MR. S. RICHARDS:

Q.  I'm sorry.  Now that you've read the transcript, is your recollection refreshed as to her testimony?

A.  Yes, it is.

Q.  Okay.  So, after -- with your recollection being refreshed, did Samantha Hudson testify that one of the people she encountered had blond hair?

A.  She mentioned one person she thought had blond hair.

Q.  Okay.  And is your recollection refreshed as to whether Samantha Hudson was asked about viewing a lineup in which Jaime Rios was one of the participants?

A.  I believe so.

Q.  Okay.  With your recollection refreshed, did she, in fact,

Carballo - cross

2341

testify that she viewed a lineup where Jaime Rios was one of the participants and did not pick anyone out?

A.   I don't -- I don't know if the defendant -- if she said the defendant was one of the participants, but she did say that where she encountered the two subjects was in a dark alley. She was not out on the street on Western, and that she only saw them for a matter of seconds, and they were standing behind a garbage can.

MR. S. RICHARDS:  Your Honor, I would move to strike that answer as non-responsive to my question.

THE COURT:  That's overruled.  Let's go to sidebar.

(Proceedings heard at sidebar:)

THE COURT:  Mr. Richards, I touched on this yesterday afternoon.  My question is:  What non-hearsay purpose do you have for asking these questions?  It sounds like you're just reading in trial testimony.

MR. S. RICHARDS:  Your Honor, first, am I --

THE COURT:  You have not asked one question today as to his trial strategy or any investigation that he did.  You just asked him, "Did she say this at trial?"

MR. S. RICHARDS:  Your Honor, may I respond, and am I responding appropriately in terms of you hearing me but the jury not?

THE COURT:  Just respond, please.

MR. S. RICHARDS:  Okay.  It goes -- it goes to the

Carballo - cross

2342

weight and quality of the evidence and his trial strategy, but I will back it up and relate it to the trial strategy.

MR. MILLER: He's asking specifically about the testimony at trial at this point. This isn't, for example, when I was going through with him interviewing witnesses, determining, you know, whether they need to put them on and all that.

He's just -- this is another witness that wasn't read in or called, and he's just talking about what she testified to at trial.

THE COURT: Mr. Richards, to the extent that you don't tie it to those topics that you mentioned, I'm going to ask you to move on. And so if I ask you -- I'll invoke my protocol, which will be, "How much more?" And that will gradually escalate to, "Move on."

But this, "Did she say this at trial," particularly to the extent you try to say -- argue at trial -- or in closing that this evidence came in for the truth of the matter asserted, that's just going to result in me turning to the jury and saying -- to tell them, "No, it didn't." So, be mindful of that.

(Proceedings heard in open court, jury present:)

BY MR. S. RICHARDS:

Q. Let me withdraw the question and ask it -- ask a different question.

Carballo - cross

2343

So, you made a strategic decision not to call Samantha witness -- Samantha Hudson as a witness at trial; fair?

A.   Yes.

Q.   But when you made that strategic decision, you knew that she had viewed a lineup in which Jaime Rios was a participant, correct?

A.   No, I don't believe so.

Q.   You didn't know that?

A.   I believe she had looked at some photographs.  I don't know if she looked at a lineup.

Q.   All right.

A.   I knew she was not -- I knew she was not an eyewitness and did not witness it.

At the time, she was out in the alley prior to the incident, and when the incident occurred, she was back in the hallway of her residence.  She heard the gunshots, and she came out; and she did not see the incident occur or who committed it, so she couldn't identify who had committed the -- who had committed the murders -- the murder.

Q.   Okay.  But it's your testimony, even after reviewing the transcript, that she did not view a lineup in which Jaime Rios was a participant; she only saw photographs?  Is that your testimony as to what --

A.   That's what I saw in the transcript here, that she had -- she was shown some photographs.  So, I don't know if she saw a

lineup; and I don't know if she did see a lineup, if she testified -- I didn't see that she testified to that, and that the defendant was in that lineup.

Q. All right. Isn't it the truth that you knew before trial when you interviewed her that she had viewed a lineup in which Jaime Rios was a participant, and that she had not picked anyone out? Isn't that something you knew before trial?

MR. MILLER: Objection.

MS. GOLDEN: Objection.

THE COURT: Basis?

MR. MILLER: Asked and answered.

THE COURT: That's overruled. You may answer.

BY THE WITNESS:

A. I don't recall her viewing a lineup or a lineup that defendant was in. I know that there was a lineup that was held with other witnesses that -- including Mr. Huertas, who was an eyewitness, who viewed a lineup with the defendant in it.

But I don't recall her viewing a lineup and testifying that she -- saying that she viewed a lineup and the defendant was in it. I know that she testified that she couldn't identify either of the offenders or even the people that were in the alley before the -- when she was -- when she was taking her garbage out or out in the alley before the shooting took place.

BY MR. S. RICHARDS:

Q. Okay. Before -- so, it's your testimony that it's your recollection that Samantha Hudson did not view a lineup in which Jaime Rios was a participant; she had only seen -- she had only viewed lineups in which other people were participants? Is that your testimony?

A. I didn't say that. I said I didn't -- I didn't see her -- in the testimony I just reviewed and my recollection of talking to her, I don't recall her saying that she viewed a lineup and that the defendant was in that lineup.

I know she couldn't identify anyone. I know that she's testified, too, that she was shown photographs by the police of people, and I don't know if it included the defendant, but she couldn't identify either of the people that were out in the alley when she was out taking her garbage out or doing what she was doing in the -- by the alley before this occurred.

So, I -- but I don't recall if she ever told me that she looked at a lineup and that this defendant, Mr. Rios, was in that lineup.

Q. Do you recall -- you review police reports before you put on the case, correct?

A. Yes.

Q. Do you recall reading in the police reports that Samantha Hudson had viewed a lineup in which --

MR. MILLER: Objection, Judge.

THE COURT: That's sustained.

BY MR. S. RICHARDS:

Q. Now, with respect to your strategy on the case and your overall appreciation of the evidence, you knew that fingerprints had been taken in the case from a car, correct?

A. Yes.

Q. You knew that the fingerprints had not come back either to the victim or to Jaime Rios, correct?

A. Yes.

Q. Okay.

A. And the car -- and this was of a car -- I don't know if the jury has seen the scene photographs. This was of a car that was out on Western Avenue near where the shooting took place, and there was -- there was no evidence from either Mr. Rios or from any of our witnesses that anyone, including the defendant or the victim, had any contact with that vehicle. It was just next to the scene, so the police -- the evidence technicians dusted it for fingerprints.

Q. Okay. So, you don't recall Jaime Rios saying anything to anybody about the victim being in the vicinity of a car?

A. He may have said he was in the vicinity, but he never said he touched the car, and no one ever said that -- you know, he was basically touching his gun, had a gun in his hand, but he was not touching any car and didn't have contact with the car, nor did any of -- any of the witnesses, including Mr. Huertas,

Carballo - cross

2347

say that anyone had -- including the victim, had any contact with that car.

Q. You -- one of the pieces of evidence that you viewed before trial was the -- or that you had available was the .32-caliber gun which had been recovered from the home of Benjamin Carrero, isn't that true?

A. That's true.

Q. Okay.

A. That's -- that was the gun -- that was the gun that was thrown out the window by his girlfriend. I believe her name was Mendez.

Q. Iris Mendez?

A. Iris Mendez.

Q. Did you ever check to see if -- and that gun, the .32, was a revolver, correct?

A. A revolver, yes.

Q. Did you ever check to see, either in the reports or by examination, whether the gun that was recovered, the .32 gun, had any shells in it or any evidence that bullets had been fired from it?

A. I'm sure that the police, when it was -- when that gun was recovered, the police looked at it; but as far as the scene was concerned, there was no bullet evidence that was recovered that could have been compared to that gun.

There was three -- I think there was three shells,

which were .25-caliber shells, which were found on the sidewalk; and those were from an automatic weapon, which is different than a revolver. A revolver, when a revolver is shot, whether it's a .32 or a .38, as Mr. Rios said in his statement, that he had a .38-caliber gun at the time of the shooting; but in a revolver, when it's shot, it doesn't expend a cartridge like an automatic weapon, like a .25-caliber or a 9-millimeter weapon will expend that shell.

So, there's nothing to compare -- that was at the scene to compare with any gun, including that .32-caliber that Iris Mendez threw out the window when the police officers went to the house and executed a search warrant.

Q. And in terms of the -- you described the -- there were three .25-caliber shells that were found at the scene, correct?

A. I believe so, yes.

Q. So, those must have been expended from a .25-caliber gun, right?

A. Yes.

Q. By the way, when shells are expended from a gun, they're small, light objects, and they can bounce and go anywhere. So, it would be fair to say that just because three .25-caliber shells were found, it doesn't mean that that was all the bullets that were expended or the shells that were expended from the .25-caliber gun?

A. That's correct. It could have -- they could have not

recovered --

Q. There could have been other shells not recovered?

A. There could have been, yes.

Q. And the -- there were bullets recovered from the body of Mr. Morales, right?

A. Yes. I believe there were two bullets that were recovered from his body, one from his brain and one from, I believe, his abdomen. And there were five -- he had five gunshot wounds. We know he was shot five times. Three of those wounds were what they call through-and-through.

So, basically, the bullet was not recovered in his body. It went in the front of his body and then came out the back of his body and was not recovered.

Q. And it wasn't possible -- because of the deformation of the bullets found in the body, it wasn't possible to compare them to anything, correct?

A. Correct.

(Counsel conferring.)

BY MR. S. RICHARDS:

Q. I've asked -- you were asked some other questions about, sir, decisions involving the prosecution of Mr. Rios. Do you remember those questions were asked of the other -- by the defense?

A. Yes.

MS. GOLDEN: Objection. Your Honor, can we have a

sidebar?

THE COURT: Yes.

(Proceedings heard at sidebar:)

MS. GOLDEN: I don't know how much more of this there is to be done, but we just had a series of questions about the guns and the ammunition and the caliber, with no questions about his strategy, the State's position, or anything of that nature. He's just reading in testimony he wants the jury to hear in his question.

THE COURT: Response?

MR. S. RICHARDS: I was simply asking him about the evidence available to him before trial, which was a topic that was raised by the defense. But my next series of questions have nothing to do with the evidence or what happened at trial, so I'm done with that.

MS. GOLDEN: It's just hard to tell if these are preliminary questions to something else that's coming and -- so, I guess we'll just stay tuned.

THE COURT: Okay. We'll continue.

(Proceedings heard in open court, jury present:)

BY MR. S. RICHARDS:

Q. Now, the original charging decision, that was made by Kip Owen, correct?

A. I believe the original charging decision was made by Barb Riley, who was the assistant who went out, and then probably it

Carballo - cross

2351

was Kip Owen as well, who was -- he was the Felony Review supervisor at the time, of the Felony Review team, I believe.

Q. Okay. But it wasn't your decision?

A. The initial charging, I wasn't involved in.

Q. Now, you said earlier that you -- however, you made a decision, together with Kay Hanlon, or Kay Hanlon made the decision, to pursue the case to trial; is that fair?

A. That's correct.

Q. And it was mentioned that one alternative would be -- instead of taking the case to trial, would be to reach some sort of plea bargain, correct?

A. That is -- that is one option that occurs generally in the system. You know, and there -- there are generally, sometimes before trial, decisions that are made by the defense to, you know, seek to plead out or to discuss pleading out and trying to -- trying to plead guilty rather than going to trial.

So, that happens in the system.

Q. But to your memory, nothing -- and correct me if I'm wrong, nothing like that happened in this case? There was no plea bargaining, no plea discussion, no plea?

A. I would have to look at the blueback, but I don't recall any plea discussions in this case.

Q. Okay. And another third alternative might be that you and -- you or somebody decided to drop the prosecution altogether, correct?

A.   Sorry.   Could you re-ask that?

Q.   I'm sorry.   Another option is that you, as prosecutors, had the power to decide, "We're not going forward with the case. We're dropping the case.   We're doing what's called *nolle prosing* the case."

I'm not saying you did that.   I'm just saying that's within your power, correct?

A.   That is within our power, and that's always an option to *nolle pros* the case.

And that -- basically, *nolle pros* means that if you -- well, you can dismiss the case -- let's say, for example, a witness is unavailable, and you have to -- you can't proceed to trial.   You can do that *nolle pros*, and then recharge later on. But -- that's an option, but it didn't occur here.

Q.   And your decision to proceed with the prosecution was based upon the information you got from police officers, right?

A.   In part.

Q.   The information you got from witnesses?

A.   In part.

Q.   And particularly the information that you got from Luis Huertas?

A.   In part.

Q.   The information that you got from Detective Mason?

A.   In part.

Q.   The information that you got from former gang specialist,

Carballo - cross

2353

then Detective Guevara?

A.   You know, I don't think Guevara really had any substantive testimony to give.  He -- he was involved in the case, as far as, you know, transporting the defendant to -- to the police station, but he really wasn't a substantive witness in the case.

Q.   Okay.  And it also -- your decision also had to do with the information you had about Benjamin Carrero and his testimony, right?

A.   In part.

Q.   And one of the things you look at in terms of a decision to continue is whether all the evidence that is given to you is legal -- would be legally admissible at a trial, correct?

A.   Yes.

Q.   So, for example, part of your calculation was that by the time you went to trial, you were convinced that Jaime Rios's statement was legally admissible and you could use it, right?

A.   That was in part, yes, that was correct.  That was another -- another big piece of evidence that we had was his confession.

Q.   And if his -- if either his motion to quash arrest or his motion to suppress statements had been granted, that would have changed your calculus, right?

A.   Well, you're asking me to speculate, and what I would say, though, is we had other evidence.  Assuming that the motion to

suppress had been granted, we still had other evidence to prove his guilt.

Q. But the motion to suppress -- his statement was part of the evidence you had that you knew of going in to the trial, correct?

A. Yes.

MR. S. RICHARDS: One moment.

(Counsel conferring.)

MR. S. RICHARDS: No further questions.

THE COURT: Okay.

MR. MILLER: Just briefly on that, your Honor.

REDIRECT EXAMINATION

BY MR. MILLER:

Q. Good morning, Mr. Carballo.

A. Good morning.

Q. Even if Mr. Rios's confession had been suppressed, you still had the evidence to go to trial against Mr. Rios for murder, correct?

A. Correct.

Q. Primarily from the eyewitnesses?

A. Correct.

Q. Okay. Yesterday, you were asked some questions about the discovery that took place pretrial, correct?

A. Yes.

Q. And just -- I think you testified the discovery is each

side sends out discovery requests to the other side, and the other side must provide answers and responses to give each side fair notice of what the case is going to be when it gets to trial; is that accurate?

A. Correct. And it's -- it's by -- not just by sending a request. It's by rule, by Supreme Court rule. It's a requirement to produce.

Q. And you were asked yesterday to scroll through the entire common law record looking for the State's discovery requests and the defendant's response. Do you remember that?

A. Yes.

Q. Okay. What I'd like to show you --

MR. MILLER: If I could, Judge, is on Ms. Golden's computer, what was previously marked as Defendants' Exhibit 107.

BY MR. MILLER:

Q. Do you see that document?

A. Yes.

Q. Okay. And what is that document?

A. This is a -- the State's motion for pretrial discovery in the case of People versus Jaime Rios.

Q. Okay. Is that the discovery that counsel was having you look for, the discovery request?

A. Yes, this is it.

Q. And that's what you reviewed prior to -- or reviewed or --

did you issue this yourself?

A.   No, I -- this was issued prior to me being transferred in to the courtroom.  Another Assistant State's Attorney who was in the courtroom at the time would have tendered that to Mr. Carey, who was the primary defense attorney, earlier in the case.

And as I said yesterday, generally, both sides will serve the other with a written motion; but a lot of times as well, or sometimes in place of a written, they'll state on the record, you know, orally, a motion for discovery.  And the judge, Judge Karnezis, would, you know, say, "Motion for discovery -- State motion for discovery, defense motion for discovery."

Q.   Does this document that you're looking at appear to be the State's motion for discovery in Mr. Rios's case --

A.   Yes.

Q.   -- that you had reviewed prior to trial?

A.   Yes.  And this is -- this is a form motion, just like the defense has a form motion that they prepare for a particular case prior to the discovery process.

MR. MILLER:  Judge, I would move to admit Defendants' 107 into evidence.

THE COURT:  Any objection?

MR. S. RICHARDS:  No objection.

THE COURT:  It's admitted and may be published.

(Defendants' Exhibit No. 107 was received in evidence.)

MR. MILLER: Could we publish that, please, Judge.

BY MR. MILLER:

Q. Just briefly on this, Mr. Carballo, what is the first request the State is asking for? Can you just kind of tell the jury what that means?

A. To give written notice to the People of the State of Illinois of any defense, affirmative or non-affirmative, which the defendant intends to assert at any hearing or at trial.

Q. And you understand that to be the -- whatever defense that the defendant is going to claim to the charges that are brought against him?

A. Right. For example, you asked yesterday about: Did he raise an alibi defense? And that would request if he's going to assert an alibi defense, to provide us with the alleged alibi and what the specifics are.

If he's going to plead insanity, that's an affirmative defense. He would have to plead that and present us with any discovery relating to -- to that defense.

Q. And just briefly, what is the second request asking for?

A. That's to furnish in writing to the People of the State of Illinois the names and last known addresses of persons the defendant intends to call as witnesses, together with their relevant written or recorded statements, including memoranda reporting or summarizing their oral statements, and any record

of prior criminal convictions of such witnesses known to the defendant or his attorneys.

Q. And that's just basically asking -- the State asking the defense, "What witnesses do you have"?

A. Yes, and --

Q. Okay.

A. And in turn, we would do the same -- the defense would do the same. They would let us know if -- they would let us know their witnesses. We would let them know our potential witnesses.

And generally, you know, as I said yesterday, they take -- whoever prepares the discovery responses would look at the police reports and, you know, put the people that are listed on police reports into the -- into the answer. And we file -- this is the motion. We file an answer to the motion as well.

MR. MILLER: We can take that down, please, Judge.

BY MR. MILLER:

Q. I am going to ask you to look at what has previously been marked as Defense Exhibit 111. Do you see that document?

A. Yes.

Q. Okay. And what is that document?

A. This is the defendant, Jaime Rios's, answer to the State, the People's motion for pretrial discovery.

Q. So, that would be what you were saying that is the

defendants' answer to the State's request that we just looked at, right?

A. Yes.

Q. Okay. And had you seen this prior to trial in the Rios case?

A. Yes, I would have seen this.

Q. The filed copy of that answer?

A. Yes. I would have reviewed that in preparation for trial.

MR. MILLER: I would move to admit Defense Exhibit 111.

THE COURT: Any objection?

MR. S. RICHARDS: No objection.

THE COURT: It's admitted and may be published.

(Defendants' Exhibit No. 111 was received in evidence.)

MR. MILLER: Can we publish it, please, Judge.

THE COURT: Yes.

BY MR. MILLER:

Q. And so looking at Mr. Rios's answer to your -- the State's first request asking what defenses will be raised, how does he respond to that?

A. Just a denial and reasonable doubt. You know, he's -- it's really just a reasonable doubt defense that he's going to -- he's not asserting any affirmative or non-affirmative defenses.

Q. And no alibi?

A. No alibi.

Q. And that's what you said yesterday, is that it appeared during trial that the defense theory was going to be reasonable doubt?

A. Yes.

MR. MILLER: All right. We can take that down. Thank you, Judge.

BY MR. MILLER:

Q. One other thing. You were asked about the motion to quash yesterday.

A. Yes.

Q. And that was the motion to quash arrest is your understanding?

A. Yes.

Q. And the defense filed that. And do you recall what the defense was alleging in their motion to quash?

A. Generally, yes.

Q. Okay. What was the claim?

A. The claim was that there wasn't -- that he was arrested without cause to arrest, probable cause to arrest.

Q. That Officer Guevara arrested Mr. Rios without probable cause to arrest?

A. Yes.

Q. Okay. And was there -- that was a filed motion by the defense?

A. Yes, I believe so, yes.

Q.   You reviewed this stuff prior to the criminal trial, right?

A.   Yes.

Q.   And there was a hearing on it?

A.   There were hearings on both the motion -- there was three motions, a motion to suppress statements, a motion to quash arrest and suppress evidence, which were in effect statements, and the third was a motion to disclose informants.

Q.   And if you recall, how did the judge rule on Mr. Rios's claim that he was falsely arrested by Officer Guevara?

A.   Judge Karnezis denied the motion.

        MR. MILLER:  No further questions, your Honor.

        THE COURT:  Okay.

        MS. GOLDEN:  No questions.

        THE COURT:  Mr. Richards?

        MR. S. RICHARDS:  One question.

                RECROSS-EXAMINATION

BY MR. S. RICHARDS:

Q.   Judge Karnezis denied the motion to quash arrest after hearing, from among other people, Officer Guevara, correct?

A.   Yes, and among other people, other witnesses as well.

        MR. S. RICHARDS:  No further questions.

        THE COURT:  Okay.  You may -- anything on that?

        MR. MILLER:  Nothing on that, your Honor.

        THE COURT:  All right.  You can step down.

        THE WITNESS:  Thank you.

2362

(Witness excused.)

THE COURT:  Any other witnesses?

MR. POLICK:  No, your Honor.

MR. SCAHILL:  No, your Honor.  The defense rests at this time.  Can we be heard at sidebar?

THE COURT:  Okay.

(Proceedings heard at sidebar:)

MR. SCAHILL:  Judge, at this time, I'm not sure if it's hit the docket yet.  We, I believe, have filed a Rule 50 motion, but I would also like to orally renew our motion for directed verdict for all the reasons that are stated in the motion and as were previously stated to the Court orally after the close of the plaintiff's case.

Additionally, on that, we obviously heard some more testimony from Mr. Carballo --

THE COURT:  I'm not hearing argument on the motion now.  I told you before trial that I will hear motions during breaks.  Your motion is made for the record.

Mr. Polick, your motion has been filed.  Do you anticipate any other motions?

MR. POLICK:  No, your Honor.  I'll stand on what I filed.

THE COURT:  Okay.  Mr. Richards, you referenced a motion yesterday.  Do you have a motion?

MR. S. RICHARDS:  Yes, your Honor.  We filed a Rule 50

2363

motion on one of the claims.

THE COURT:  Okay.  To the extent necessary, I'll hear argument, but otherwise, I'll set a schedule for responses to the pending motions.

Do you have a rebuttal case today, Mr. Richards?

MR. S. RICHARDS:  No.  We rest in rebuttal.

THE COURT:  All right.  We'll rest in front of the jury, and then I will read the instructions to give you an opportunity to gather your stuff, yourselves for closings.  And then depending on how long it takes for me to read the instructions, we'll proceed.

All right.

MR. SCAHILL:  Thank you.

(Proceedings heard in open court, jury present:)

THE COURT:  All right.  So, Mr. Guevara rests.  Does Mason rest as well?

MR. ENGQUIST:  Yes, your Honor.

MR. POLICK:  Yes, your Honor.  Subject to our -- the exhibits.

THE COURT:  Okay.  Plaintiff, do you have a rebuttal case?

MR. S. RICHARDS:  No, your Honor.  Plaintiff rests in rebuttal.

THE COURT:  All right.  Ladies and gentlemen, that concludes the evidence portion of the case.  We'll have two

things to do before you start deliberating. One is for me to instruct you on the law, and the other is for you to hear closing arguments.

I'm going to read the instructions to you now. Feel free to take notes if you like, but you will get a paper copy, each of you, of the instructions with you while you're deliberating.

Given that it's a stack of papers, I suspect you welcome the news that you don't have to worry about -- again, take notes if you want, but know that you'll get a paper copy with you.

Instruction 1. Members of the jury, you have seen and heard all the evidence, and you'll soon hear all the arguments of the attorneys. Now I will instruct you on the law.

You have two duties as a jury. Your first duty is to decide the facts from the evidence in the case. This is your job and yours alone. Your second duty is to apply the law that I give you to the facts.

You must follow these instructions even if you disagree with them. Each of the instructions is important, and you must follow all of them.

Perform these duties fairly and impartially. Do not allow sympathy, prejudice, fear, or public opinion to influence you.

Nothing I say now and nothing I said or did during the

2365

trial is meant to indicate any opinion on my part what the facts are or about what your verdict should be.

Instruction 2. In this case, Defendants Reynaldo Guevara and Michael Mason are retired police officers. Plaintiff Jaime Rios is a civilian. All parties are equal before the law and entitled to the same fair consideration.

Instruction 3. Ernest Halvorsen, represented in this case by JoAnn Halvorsen, is no longer a defendant in the case. You should not consider any claims against Halvorsen. Do not speculate on the reasons. You should decide this case as to the remaining parties.

Instruction 4. The evidence consists of the testimony of the witnesses, the exhibits admitted in evidence, and stipulations. A stipulation is an agreement between both sides that certain facts are true.

During the trial, certain testimony was presented to you by the reading of transcripts from the underlying criminal proceeding. You should give this testimony the same consideration you would give it had the witnesses appeared and testified here in court.

Instruction 6. Certain things are not to be considered as evidence. I will list them for you.

First, if I told you to disregard any testimony or exhibits or struck any testimony or exhibits from the record, such testimony or exhibits are not evidence and must not be

2366

considered.

Second, anything that you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded. This includes any press, radio, Internet, or television reports you may have seen or heard. Such reports are not evidence, and your verdict must not be influenced in any way by such publicity.

Third, questions, objections, and comments by the lawyers are not evidence. Lawyers have a duty to object when they believe a question is improper. You should not be influenced by any objection, and you should not infer from my rulings that I have any view as to how you should decide the case.

Fourth, lawyers' opening statements and closing arguments to you are not evidence. Their purpose is to discuss the issues and the evidence. If the evidence as you remember it differs from what the lawyers said, it's your memory that counts.

Instruction 7. Any notes you have taken during this trial are only aids to your memory. The notes are not evidence. If you have not taken notes, you should rely on your independent recollection of the evidence and not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollections or impressions of each juror about the testimony.

2367

Instruction 8. In determining whether any fact has been proved, you should consider all of the evidence bearing on the question regardless of who introduced it.

Instruction 9. You will recall that during the course of this trial, I instructed you that I admitted certain evidence for a limited purpose. You must consider this evidence only for the limited purpose for which it is admitted.

Instruction 10. Each party is entitled to have the case decided solely on the evidence that applies to that party. You must consider the evidence concerning each individual defendant only in the case against that individual defendant. You must not consider it against any other codefendant.

Instruction 11. You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life. In our lives, we often look at one fact and conclude from it that another fact exists. In law, we call this an inference. A jury is allowed to make reasonable inferences. Any inference you make must be reasonable and must be based on the evidence in the case.

Instruction 12. You may have heard the phrases "direct evidence" and "circumstantial evidence." Direct evidence is proof that does not require an inference, such as the testimony of someone who claims to have personal knowledge of a fact. Circumstantial evidence is proof of a fact or a series of facts that tends to show that some other fact is

2368

true.

As an example, direct evidence that it is raining is testimony from a witness who says, "I was outside a minute ago, and I saw it raining." Circumstantial evidence that it is raining is the observation of someone entering the room carrying a wet umbrella.

The law makes no distinction between the weight to be given to direct or circumstantial evidence. You should decide how much weight to give any evidence. In reaching your verdict, you should consider all the evidence in the case, including the circumstantial evidence.

Instruction 13. You must decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all. You must also decide what weight, if any, you give to the testimony of each witness. In evaluating the testimony of any witness, including any party to the case, you may consider, among other things, the ability and opportunity the witness had to see, hear, or know the things that the witness testified about; the witness's memory; any interest, bias, or prejudice the witness may have; the witness's intelligence; the manner of the witness while testifying; and the reasonableness of the witness's testimony in light of all the evidence in the case.

With respect -- Instruction 14. With respect to either a party or a witness who testified at this trial, you

may consider statements given by them under oath before trial as evidence of the truth of what he said in the earlier statements, as well as in deciding what weight to give his testimony during this trial.

With respect to other witnesses who testified at this trial, the law is different. If you decide that before the trial, one of these witnesses made a statement not under oath or acted in a manner that is inconsistent with his testimony here in court, you may consider the earlier statement or conduct only in deciding whether his testimony here in court was true, and what weight to give to his testimony here in court.

In considering a prior inconsistent statement or conduct, you should consider whether it was simply an innocent error or an intentional falsehood and whether it concerns an important fact or an unimportant detail.

Instruction 15. You have heard evidence that Lamont Burr and Cristino Garcia have been convicted of a crime. You may consider this evidence only in deciding whether their testimony is truthful in whole, in part, or not at all. You may not consider this evidence for any other purpose.

Instruction 16. You have heard Defendant Reynaldo Guevara invoke his Fifth Amendment right not to incriminate himself in response to questions. You may, but are not required to, assume that Defendant Guevara's testimony in

response to those questions would have been unfavorable to him.

For you to assume that Defendant Guevara's answers to a given question would have been unfavorable, there has to be other evidence that supports the issue the question referenced.

You may not draw any inference from Defendant Guevara's invocation of his Fifth Amendment right against Defendant Michael Mason.

Instruction 17. It is proper for a lawyer to meet with any witness in preparation for trial. It is also proper for a lawyer to pay for a witness's travel expenses to attend court.

Instruction 18. You may find the testimony of one witness or a few witnesses more persuasive than the testimony of a larger number. You need not accept the testimony of the larger number of witnesses.

Instruction 19. The law does not require any party to call as a witness every person who might have knowledge of the facts related to this trial. Similarly, the law does not require any party to present as exhibits all papers and things mentioned during that trial.

Instruction 20. Defendants Reynaldo Guevara and Michael Mason have been sued as individuals. Your decision in this case concerns only whether plaintiff Jaime Rios has proven his claims against each of those defendants.

Instruction No. 21. You must give separate

consideration to each claim and each party in this case. Although there are two defendants, it does not follow that if one is liable, the other is also liable. In considering a claim against the defendant, you must not consider evidence admitted only against the other defendant or only as to other claims.

Instruction 22. When I say a particular party must prove something by a preponderance of the evidence or when I use the expression "if you find" or "if you decide," this is what I mean: When you have considered all the evidence in the case, you must be persuaded that it is more probably true than not true.

Instruction 23. You have heard witnesses Melissa Russano, Geoffrey Loftus, and Jack Schafer give opinions about matters requiring special knowledge or skill. You should judge this testimony in the same way you judge the testimony of any other witness. The fact that such person has given an opinion does not mean that you are required to accept it. Give the testimony whatever weight you think it deserves, considering the reasons given for the opinion, the witness's qualifications, and all the other evidence in the case.

Instruction 24. A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath, and lawyers for each party may ask questions. The questions and answers are recorded.

2372

Deposition testimony of Luis Huertas, which was taken on September 18th, 2023, and Janet Lupa, which was taken on September 25, 2023, were presented to you. Deposition testimony is entitled to the same consideration and is to be judged, insofar as possible, in the same way as if the witness had been present to testify here in court. Do not place any significance on the behavior or tone of voice of any person reading the questions or answers.

Instruction 25. Certain diagrams and PowerPoint presentations have been shown to you. Those diagrams and PowerPoint presentations are used for convenience and to help explain the facts of the case. They are not themselves evidence or proof of any facts.

Instruction 26. You have heard evidence that Plaintiff Jaime Rios was awarded a Certificate of Innocence in the state court. You may consider the Certificate of Innocence only for the purpose of deciding whether the plaintiff has met his burden of proof with respect to his malicious prosecution claim. The state court's decision to issue a Certificate of Innocence is not binding on you in this case. The state court may not have had the same evidence before it that has been presented to you in this case.

You have listened to and heard all the evidence in this case and are to decide this case, including to the extent necessary, the plaintiff's innocence or guilt with respect to

the underlying criminal case, based on the evidence you heard in this case and this case alone.

Furthermore, the state court decided different issues than those before you when issuing the Certificate of Innocence. The state court was not asked, nor did it decide, the issue of whether the plaintiff's constitutional rights were violated or whether the defendants engaged in any misconduct under state or federal law.

The state court was not asked, nor did it decide, the issues of whether the plaintiff's confession was false, fabricated or coerced, whether Defendant Reynaldo Guevara fabricated or concealed any evidence, or whether Defendant Reynaldo Guevara maliciously prosecuted the plaintiff. These are issues for you alone to decide.

Instruction 27. If you decide for a defendant on the question of liability as to each claim against that defendant, then you should not consider the question of damages as to that defendant.

Instruction 28. Plaintiff Jaime Rios claims the defendant violated his right against self-incrimination by coercing him to confess to a crime. To succeed on this claim, the plaintiff must prove each of the following four things by a preponderance of the evidence:

1. The plaintiff gave a confession;

2. The confession was not made by the plaintiff

voluntarily, but rather, was made involuntarily as a result of unlawful coercion by the defendant you are considering;

3. The coerced confession was used against the plaintiff during his criminal case; and,

4. The plaintiff was damaged as a result.

The evaluation of whether a confession is unlawfully coerced involves consideration of the totality of the circumstances to determine whether the individual confessed voluntarily of his own free will, or whether the police overrode his volition by unlawful means.

Unlawful coercive conduct may include, for example, physical punishment, threats, repeated and prolonged questioning, or the failure to advise someone of constitutional rights. Lawful coercive conduct may include, for example, informing the suspect of the nature of the evidence against him or the potential penalties of offense or actively misleading a suspect by, for example, falsely suggesting other evidence of guilt.

If you find that the plaintiff has proved each of these things by a preponderance of the evidence with respect to the defendant that you are considering, then you must decide for the plaintiff and go on to consider the question of damages. If, on the other hand, you find that the plaintiff has failed to prove any of these things by a preponderance of the evidence, then you must decide for the defendant you are

considering, and you will not consider the question of damages unless you find for the plaintiff on any of his other claims.

Instruction 29. The plaintiff must prove by a preponderance of the evidence that Defendants Reynaldo Guevara and Michael Mason were personally involved in the conduct that plaintiff complains about. As a general matter, you may not hold a defendant liable for what other individuals did or did not do. However, with regard to the claim that the defendants violated Plaintiff Jaime Rios's right against self-incrimination, you may hold a defendant liable for that claim if, in addition to proving each element of that claim, the plaintiff proved each of the following by a preponderance of the evidence:

1. That Defendants Guevara and Mason reached an agreement to violate the plaintiff's right against self-incrimination; and,

2. The defendant you are considering performed at least one overt act in furtherance of actually violating the plaintiff's right against self-incrimination.

Instruction 30. Plaintiff Jaime Rios claims that Defendant Reynaldo Guevara violated his right to a fair trial by fabricating evidence that was used against the plaintiff at his criminal trial. To succeed on this claim, the plaintiff must prove each of the following four things by a preponderance of the evidence:

2376

1. The defendant knowingly fabricated evidence against the plaintiff, meaning he created evidence he knew to be false or, in other words, deliberately falsified evidence;

2. The evidence was used against the plaintiff at his criminal trial;

3. The evidence was material, meaning there is a reasonable likelihood that the result in the criminal proceeding would have been different if the fabricated evidence was not used in the plaintiff's criminal trial; and,

4. The plaintiff was damaged as a result.

If you find that the plaintiff has proved each of these things by a preponderance of the evidence, then you must decide for the plaintiff and go on to consider the question of damages. If, on the other hand, you find that the plaintiff has failed to prove any one of these things by a preponderance of the evidence, then you must decide for Defendant Guevara, and you will not consider the question of damages unless you decide for the plaintiff on any of his other claims.

Instruction 31. Plaintiff claims that Defendant Guevara violated his right to a fair trial by failing to disclose exculpatory and/or impeachment evidence that was material to the plaintiff's defense in the criminal case. To succeed on these claims, the plaintiff must prove each of the following three things by a preponderance of the evidence:

1. The defendant knowingly concealed from the

2377

prosecutor exculpatory and/or impeachment evidence, and that evidence was not otherwise available to the plaintiff through the exercise of reasonable diligence, to make use of at his criminal trial.

2.   The evidence was material, meaning that there was a reasonable likelihood that the result in the criminal proceeding would have been different if the evidence had been disclosed; and,

3.   The plaintiff was damaged as a result.

Exculpatory evidence is evidence that tends to show that the accused is not guilty of the crime.

Impeachment evidence is evidence that would have made the jury at the criminal trial less likely to believe a witness who testified against the accused at the criminal trial.

If you find that plaintiff has proved each of these things by a preponderance of the evidence, then you must decide for the plaintiff and go on to consider the question of damages.  If, on the other hand, you find that the plaintiff has failed to prove any one of these things by a preponderance of the evidence, then you must decide for Defendant Guevara, and you will not consider the question of damages unless you decide for the plaintiff on any of his other claims.

Instruction 32.  Plaintiff claims that Defendant Reynaldo Guevara maliciously prosecuted him.  To succeed on this claim, the plaintiff must prove the following five things

by a preponderance of the evidence:

1. The defendant caused the commencement or continuation of the criminal proceeding against the plaintiff;

2. The defendant lacked probable cause for doing so;

3. The defendant acted with malice; that is, he commenced or continued the prosecution for a reason other than to bring a guilty party to justice;

4. The criminal proceeding against the plaintiff was ultimately terminated in plaintiff's favor and in a manner indicative of innocence; and,

5. Plaintiff suffered harm as a result.

Probable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged.

A defendant commences or continues a prosecution when the defendant was actively instrumental in causing the prosecution. While there was a presumption of prosecutorial independence, that is, that a prosecutor exercises independent judgment when deciding to charge someone with a crime and when deciding to continue prosecuting that charge, that presumption can be overcome where a defendant improperly exerted pressure on the prosecutor, knowingly provided false information to the prosecutor, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct instrumental in the

2379

initiation of the prosecution.

If you find that the plaintiff has proved each of these things by a preponderance of the evidence, then you must decide for the plaintiff and go on to consider the question of damages. If, on the other hand, you find that the plaintiff has failed to prove any one of these things by a preponderance of the evidence, then you must decide for Defendant Guevara, and you will not consider the question of damages unless you decide for the plaintiff on any of his other claims.

Instruction 33. Plaintiff Jaime Rios was charged in his underlying criminal case with the offense of murder. A person commits the offense of murder when he, or one for whose conduct he is legally responsible, kills an individual without lawful justification if, in performing the acts which caused the death, he intends to kill or do great bodily harm to that individual, or he knows that such acts will cause death to that individual, or he knows that such acts create a strong probability of death or great bodily harm to that individual.

A person is legally responsible for the conduct of another person when either before or during the commission of an offense and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in planning or commission of the offense.

The word "conduct" includes any criminal act done in

2380

furtherance of the planned and intended act.

A person who is legally responsible for the conduct of another may be convicted of the offense committed by the other person even though the other person who it is claimed committed -- who it is claimed committed the offense is not amenable to justice or has not been prosecuted.

Instruction 34. If you find in favor of plaintiff Jaime Rios, then you must determine the amount of money that will fairly compensate him for any injury that you find he sustained and is reasonably certain to sustain in the future as a direct result of the defendants' conduct. The plaintiff must prove his damages by a preponderance of the evidence. Your award must be based on evidence and not speculation or guesswork. This does not mean, however, that compensatory damages are restricted to the actual loss of money. They include both the physical and mental aspects of injury, even if they are not easy to measure.

You should consider the following types of compensatory damages and no others:

The mental and emotional pain and suffering and loss of a normal life that the plaintiff has experienced and is reasonably certain to experience in the future. No evidence of the dollar value of mental and emotional pain and suffering or loss of a normal life has been or needs to be introduced.

There is no exact standard for setting the damages to

2381

be awarded on account of these factors. You are to determine an amount that will fairly compensate the plaintiff for any injury he has sustained.

Instruction 35. If you find for Plaintiff Jaime Rios, you may, but are not required to, assess punitive damages against any defendant you have found liable. The purpose of punitive damages are to punish a defendant for his or her conduct and to serve as an example or warning to the defendant and others not to engage in similar conduct in the future.

The plaintiff must prove by a preponderance of the evidence that punitive damages should be assessed against the defendant. You may assess punitive damages only if you find that his conduct was malicious or in reckless disregard of the plaintiff's rights.

Conduct is malicious if it is accompanied by ill will or spite or is done for the purpose of injuring the plaintiff. Conduct is in reckless disregard of the plaintiff's rights if, under the circumstances, the defendant simply did not care about the plaintiff's rights.

If you find that punitive damages are appropriate, then you must use sound reason in setting the amount of those damages. Punitive damages, if any, should be in an amount sufficient to fulfill the purposes that I have described to you, but should not reflect bias, prejudice, or sympathy towards any party.

2382

In determining the amount of any punitive damages, you should consider the following factors:  The reprehensibility of the defendant's conduct; the impact of the defendant's conduct on the plaintiff; the relationship between the plaintiff and the defendant; the likelihood that the defendant would repeat the conduct if an award of punitive damages is not made; for Defendant Reynaldo Guevara, his financial condition; and the relationship of any award of punitive damages to the amount of actual harm the plaintiff suffered.

Upon retiring to the jury room, you must select a presiding juror.  The presiding juror will preside over your deliberations and will be your representative here in court.

A verdict form has been prepared for you, and I will go over that in a moment.  When you have reached unanimous agreement on the verdict, your presiding juror will fill in and date the verdict form, and all of you will sign it.

Instruction 37.  The verdict must represent the considered judgment of each juror.  Your verdict, whether for or against the parties, must be unanimous.  You should make every reasonable effort to reach a verdict.  In doing so, you should consult with one another, express your own views, and listen to the opinions of your fellow jurors.  Discuss your differences with an open mind.  Do not hesitate to re-examine your own views and change your opinion if you come to believe it is wrong; but you should not surrender your honest beliefs

about the weight or effect of evidence solely because of the opinions of other jurors, or for the purpose of returning a unanimous verdict.

All of you should give fair and equal consideration to all of the evidence and deliberate with the goal of reaching an agreement that is consistent with the individual judgment of each juror. You are the impartial judges of the facts.

Instruction 38. I do not anticipate that you will need to communicate with me. If you do need to communicate with me during your deliberations, the only proper way is in writing. The writing must be signed by the presiding juror, or if he or she is unwilling to do so, by some other juror. The writing should be given to the Marshal, who will give it to me. I will respond either in writing or by having you return to the courtroom so that I can respond orally.

If you do communicate with me, you should not indicate in your note what your numerical division is, if any.

Now, the verdict form has 10 questions. The first seven questions concern liability, and they essentially track with the different claims. And so for each of the elements instructions that I gave, it said, "To prevail on this, the plaintiff has to prove these four things," or what have you. Each question aligns with that.

For example, question 1 is, "Did Plaintiff Jaime Rios prove by a preponderance of the evidence that Defendant

2384

Reynaldo Guevara violated his right against self-incrimination by coercing him to make a confession that was used against the plaintiff at his criminal trial?"

Below that is a space for an answer, yes or no. So, if he's proved his case, you check yes. If he hasn't proved his case, you check no.

You do that for each claim that the plaintiff has against the respective defendants.

Question 8 concerns damages, compensatory damages. It says, "If you have found in favor of plaintiff Jaime Rios; that is, if you answered yes to any of questions 1 through 7, then you must determine the amount of money that will fairly compensate him for any injury that you find he sustained and is reasonably certain to sustain in the future as a direct result of the claim or claims for which you found in favor of the plaintiff. Please enter that amount below."

It says compensatory damages, and there's a line next to it where you'd fill in any dollar amount.

Question 9 is the same except for punitive damages. If you have answered yes to question 1 and -- if you have answered yes to any of the questions on liability and decide to award punitive damages, question 9 is punitive damages with respect to Defendant Guevara. Question 10 is punitive damages with respect to Defendant Mason.

After you've answered the 10 questions, there's a

space for your signatures and a space with the date.

You will get one copy of the verdict form and -- well, you will sign and date one copy of the verdict form. Each of you will have a copy of the verdict form, but we only need one completed.

So, that concludes the instructions. Now the question is: Do we get started now, or do we take an early break? Is everyone okay to get started? All right.

Mr. Richards, you may start your closing argument. If you need to rotate the lectern, you can.

You'll be using the document camera?

MR. J. RICHARDS: Yes, your Honor, I will be.

May I proceed?

THE COURT: Yes.

CLOSING ARGUMENT ON BEHALF OF PLAINTIFF BY MR. J. RICHARDS

MR. J. RICHARDS: Ladies and gentlemen of the jury, on behalf of Jaime, my dad, and myself, I first want to thank you for your time and attention for the past two-and-a-half weeks. You've heard from many witnesses over the course of these past two-and-a-half weeks, both witnesses live in person and via transcript.

Now, his Honor just read to you the jury instructions and went through the verdict form. I'm going to start at the end, and I'm going to show you the verdict form.

As his Honor went over, the first seven questions of

closing - plaintiff

2386

the verdict form apply to each of our claims against the defendants. As you can see, there's, "Did Plaintiff Jaime Rios prove by a preponderance of the evidence that X," and then there's an answer yes and no.

But I'm going to start with question No. 7. Question No. 7 is, "Did Plaintiff Jaime Rios prove by a preponderance of the evidence that Defendant Reynaldo Guevara maliciously prosecuted him by commencing or continuing a criminal proceeding against the plaintiff with malice and without probable cause, which ultimately terminated in the plaintiff's favor?"

Now, I used a few terms when reading that question, and those terms, you've actually heard just now when his Honor read the jury instructions to you. Now, from time to time this morning and then later this afternoon, I'm going to go through and highlight some of those jury instructions, the law that the judge has just read to you.

All of the jury instructions that the judge just read are equally important. No one is more important than the other. And when I highlight one, I'm just merely highlighting it. I'm not going to waste your time by going through every single instruction again. I'm just highlighting the ones as I go through the verdict form and the law that relates to the questions on the verdict form.

I'm going to start off with Instruction No. 22, which

is, "When I say a particular party must prove something by a preponderance of the evidence or when I use the expression 'if you find' or 'if you decide,' this is what I mean: When you have considered all the evidence in the case, you must be persuaded that it is more probably true than not true."

This is our burden of proof as the plaintiff. We welcome that burden. And I would note that this burden is not the same burden that the State was held to when Jaime was tried in 1990. That was a burden of beyond a reasonable doubt, and that is not the burden here. In this case, in this courtroom, we have to prove that something is more probably true than not true, in a sense, only a slight tip of the scales of justice.

Now, No. 7, that question had a term "maliciously prosecuted," and you have an instruction on that.

"Instruction No. 32. Plaintiff claims that Defendant Reynaldo Guevara maliciously prosecuted him. To succeed on this claim, the plaintiff must prove the following five things by a preponderance of the evidence:"

And I'm going to start with No. 1, that the defendant caused the commencement or continuation of the criminal proceeding against plaintiff.

Now, these 1 through 5 things, I may sometimes refer to them as No. 1, or I may say, "Prong 1," or, "Prong 2," but that's just me going through the elements that we have the burden of proving.

Now, in regards to prong No. 1, that the defendant caused the commencement or continuation of the criminal proceeding against the plaintiff, what's happening here is the question is: What were the actions, Guevara's actions, that commenced or continued the criminal proceeding?

Now, over the course of this trial, you've heard about many of the actions that then gang specialist Guevara, now retired Detective Guevara, made in the course of what happened in 1989 and 1990. Here are some of the things:

Jumping into the investigation without being assigned; fabricating false reports that confidential informants had implicated Jaime Rios; taking those confidential informants to see Detective Mason; falsely arresting Jaime without probable cause; falsifying the circumstances of the day of Jaime's arrest; coercing Jaime's false confession by feeding him information, threatening to take his child, and condoning Mason's torture of Jaime; signing off on a false arrest report and supplemental report; bringing Luis Huertas to the lineup and suggesting that he identify Jaime, knowing the identification was false; bringing the same confidential informants to Mason to give false information about where guns would be found; coercing Benjamin Carrero to falsely state that Jaime had given him the gun and that he had just shot somebody; concealing the fact that Cristino Garcia had denied being there, given an alibi, and that Cristino Garcia was beaten with

closing - plaintiff

2389

phone books.

I just read off a list of about 11 options that we need to prove that Guevara commenced and continued the prosecution of Jamie Rios. We do not need to prove all of them. Any one of them would satisfy our burden for the first prong of malicious prosecution.

But I want to start off with the circumstances of the arrest of Jaime Rios on July 6th of 1989, July 6, at around 10:00 p.m., and not the early morning of July 7th. What happened that day and what the evidence has shown is the fulcrum, if you will, on which this case turns.

Here is what Jaime says happened. He comes home to his apartment at 1440 North Leavitt. He sees Jamaica there. Guevara arrives. He's there with his partner. Guevara takes Jaime off his bike, drags him to the side of the apartment building. Jaime is handcuffed. He's given to another officer, a third officer.

Jaime watches Guevara go into the middle stairwell and enter his apartment. Jaime can see into his apartment from the alley. He sees Guevara move through the apartment and open the back door of the apartment. Jaime sees three or four more officers enter the apartment. It looks like the apartment is being searched.

Nothing incriminating in the apartment is found, no gun, no clothes or shoes that match the description of the

killer of Luis Morales.

Jaime is put in Guevara's unmarked police car.  Diana Rodriguez shows up.  They try to speak to each other, but they can't.  Jaime is not read his Miranda rights.  He's taken to Area 5.

And here's what the defendants say happened.  Guevara and his partner arrive at 1440 North Leavitt.  They find Jaime there.  They ask Jaime to come down to the station, and he voluntarily complies.  Jaime isn't placed under arrest, and he voluntarily goes to Area 5.

So, what really happened?  Which set of circumstances have been proven by a preponderance of the evidence?

Now, I'm going to go on to another instruction, Instruction No. 12.

"You may have heard the phrases 'direct evidence' and 'circumstantial evidence.'  Direct evidence is proof that does not require an inference, such as the testimony of someone who claims to have personal knowledge of a fact.  Circumstantial evidence is proof of a fact or a series of facts that tends to show that some other fact is true.

"As an example, direct evidence that it is raining is testimony from a witness who says, 'I was outside a minute ago, and I saw it raining.'  Circumstantial evidence that it is raining is the observation of someone entering a room carrying a wet umbrella.

"The law makes no distinction between the weight to be given to either direct or circumstantial evidence. You should decide how much weight to give to any evidence. In reaching your verdict, you should consider all the evidence in the case, including the circumstantial evidence."

So, if we continue along the analogy, the rain in this case is the search and circumstances surrounding Jaime's arrest, his arrest, the search of his apartment. So then, what's the wet umbrella? What's the circumstantial evidence?

Now, let's for a moment assume that what the defendants say what happened is the truth, that Jaime voluntarily goes to Area 5, that he confesses to the crime. He tells them he threw the gun away. He tells them he was involved but wasn't the shooter. What would a reasonable detective do in that situation?

To consider what a reasonable detective would do in that situation, you have to consider what -- the evidence the police have so far in the case. What was the evidence that Mason knew about?

And we know what Mason knew about because there are police reports. And Detective Mason testified that he read those police reports, that he had read the police reports that were generated up to that point.

So, what's in those police reports? Well, he knows the description of the clothing that the offenders were

closing - plaintiff

2392

wearing: A red T-shirt, red shorts, British Knight gym shoes for one; a green hospital-type shirt, blue jeans, and British Knight gym shoes, and a blue steel gun. And that report is Defendants' Exhibit 50(A), and you will get that when you go back to the jury room.

He knows the caliber of the handgun, a .25-caliber blue steel gun. That's in 50(B), Defendants' 50(B). He knows that a second handgun is involved. He knows that there's a second description of a clothing that -- of black long-sleeved sweater, black shorts, black low-quarter gym shoes.

He knows that three .25-caliber cartridge casings are found on the sidewalk of the curb. He knows that witnesses have so far come forward. He knows that Luis Morales was shot five times.

What would a reasonable detective want to do? Now, let's assume again that for a moment, Mason believed that Jaime threw the gun into the lake two weeks after the shooting, but of course, Jaime's being interviewed one week after the shooting.

Would Mason want to search Jaime's home for the clothes that were worn that night, clothes matching either description? Would Mason hope that if he were to find those clothes and the shoes, would he find some blood splatter on them? The answer to both of those questions is yes. Mason would want to do that.

closing - plaintiff

2393

Now, then let's assume for a moment that Mason didn't believe Jaime, didn't believe that Jaime had gotten rid of the gun. Wouldn't he also then want to search Jaime's home for the gun?

Now, evidence in this case has shown that Mason knew how to obtain search warrants. You heard testimony about that. And Defendants' Exhibits 50(M), as in Mike, and 50(N), as in November, are both search warrants that Mason drafted for the search of homes to find guns.

Now, the evidence has also shown that Mason didn't necessarily need a search warrant to search a home. He could have gotten consent to search, like he did from Benjamin Carrero's mother to cure the defective search warrant that was for Benjamin Carrero's apartment.

And remember, according to Detective Mason, Jaime had volunteered to come to the station. According to Detective Mason, Jaime had volunteered to make a statement. And if Jaime was in such a volunteering mood, why did Mason not ask him for a consent to search his home? Detective Mason has offered no explanation of why he didn't do that.

Now, the evidence has also shown that Diana Rodriguez was at the station. No evidence one way or the other that she was asked if she would sign a consent to search their home.

In fact, you've got both Diana Rodriguez and Jaime Rios at the station, at Area 5. Isn't that the perfect time

to search their home, to get a search warrant?  They're both indisposed at the station.

Now, if one were to go and search and to find a gun, either a .25-caliber gun or a .32 or a .38 in Jaime's home, well, that would be independent corroboration, independent corroboration of the statement that Jaime made.  Of course, in addition to that, finding the clothes, that would also be independent corroboration, wouldn't they?

Now, what do we know that happened?  Right?  What happened is Jaime gives this coerced statement, but at that moment, felony charges aren't approved.  Barbara Riley wants more.  That's why they then go get Luis Huertas to make an ID.  More was needed.  More was needed to convict Jaime.  More evidence was needed.

So, at this point, also, on the early morning hours of July 7th, Mason does not go and get a search warrant for Jaime's home.  He doesn't.  And there's no explanation as to why he doesn't.

On July 8th, he doesn't get a search warrant for Jaime's home.  There's no explanation to why he does or doesn't.

And then July 9th rolls along.  July 9th is when gang specialist Guevara comes back with the CIs, and the CIs say to Guevara and to Mason, "Hey, there's these two locations, Alex Lopez's house and Benjamin Carrero's house, and there's guns

there." So what does Mason do? He gets search warrants for the two different guns, right?

Now I'm going to read to you Instruction No. 11.

"You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life. In our lives, we often look at one fact and conclude from it that another fact exists. In law, we call this inference. A jury is allowed to make reasonable inferences. Any inference you make must be reasonable and must be based on the evidence in the case."

What is a reasonable inference to make at this point? What is really the only logical inference to make? All of Mason's actions or lack of actions point to only one possibility. Mason knew that Rios's house had already been searched.

Now, that reasonable inference is that Guevara told Mason about the search and that the search came up empty, so why would Mason then do a search warrant? Right?

And after July 9th, when Alex Lopez's house is searched and Benjamin Carrero's house is searched and the .25-caliber gun isn't found, why doesn't he seek a search warrant then for Jaime's house, to either find a gun or to find the clothing? He does not. Why doesn't he? A logical inference is that he was already told that that home was searched and that search came up empty.

Now, one may think, well, why didn't Mason just do a search anyway, you know, immediately on the 7th, right?  He does a search that covers his tracks, you know, doesn't put anything on Guevara doing the illegal search.  Why doesn't he do that, right?

Well, you saw Defendants Exhibit 30, the photos of a search of Carrero's home, right?  Photos are taken when a search was done.  What's he going to do?  Get a search warrant, a bunch of officers go to the house, pictures are taken, and the house is going to look like it's been gone over?  He's not going to do that.

So, if we're following the analogy at this point, we've got a soaking wet umbrella.  It is more likely than not that what Jaime says happened at his house that night actually happened.  And if that happened, then Jaime was arrested in front of his home.  He was handcuffed, and he was not read his Miranda rights.

In this case, the paper trail, the reports that were generated speak louder than words in this case.

Now, Mason's actions alone, or the actions that he didn't take, that's not the only evidence in this case that a search occurred.  There are other two key pieces of evidence to consider.

First is the arrest report.  That's Defendants' Exhibit 50(I), as in item, and the supplementary report,

Defendants' 50(G).

Second is Officer Gawrys's testimony. And forgive me, but I still cannot pronounce his name. It's spelled G-A-W-Y-R-S. Now, both of those reports list other officers that are a part of the arrest, right, in this case, a part of the search.

So, we know that it wasn't just Guevara and Gawrys picking up Jaime, but Gawrys, he testified that when you do an arrest report, you put down everyone involved, so that they can get credit. They can get a part of the collar, so to peek. They get the stat.

Gawrys testified that those other gang crime specialists were there. So, the question is: If you're going to be picking up somebody voluntarily to come in, do you need that many officers? Do you need that many officers to just pick someone up, or do you need that many officers to conduct a search?

And Gawrys also testified that they cross sign the reports and signed for each other those reports.

More than that, on the April 3rd hearing, the testimony that was read in, I believe, on the first week of trial, you heard that Guevara testified that he did sign the arrest report.

So, by not putting in what really happened into these reports, every time a prosecutor reviews the reports in

preparation for trial, every time a prosecutor interviewed Guevara, false information was knowingly provided to the prosecutor.

Now, remember that I mentioned about 11 separate commenced and continued acts that Guevara made. We just need to prove by a preponderance only one of these claims; but as I said, the search that happened, this arrest that happened, is the fulcrum of the case. Jaime being arrested at his home, being brought to the station, not being given his Miranda warnings is the key inflection point in this case.

Now, I want to step -- take a step back and look at, well, what are the actions that Guevara did before the search? Well, jumping into the investigation without being assigned. Now remember, Mason says that he had no communication with Guevara before Guevara showed up with the CIs. On the other hand, we have Gawrys, who testified that he was always in communication with detective groups.

Gawrys also claimed that he doesn't remember specific communications with Mason, but that he told Mason, "We've been looking for him," as in Rios.

And you heard Guevara's trial testimony. He claims that he just started talking to people on the street.

Now, fabricating the CIs. So, Guevara brings the CIs sometime on July 6th to Mason. And it's a logical inference that Guevara tells the CIs what to say because the timeline

doesn't exactly match.

Remember, Guevara on the witness stand back in February 9th claims that he received a couple of days prior to July 6th information about Jaime. He also admits that he knew Jaime. He also admits that he had prior conversations with Jaime.

But according to Gawrys on the stand, it's only on July 6th that they learned where Jaime's address was from the confidential informants. Now, does this claim make sense in light of all the other evidence? Guevara is from the neighborhood. He's had prior dealings with Jaime. Is it likely that Guevara didn't know Jaime's address?

Now, defendants have pointed out that Jaime was on bond when he was arrested. How did Guevara not know his address? Guevara, who is the ex-partner of Daniel Noon.

Guevara needed to fabricate the CI information so that there would be an excuse to go to Jaime's house on the night of July 6th. Now, Jaime was falsely arrested without probable cause. How do we know that there wasn't probable cause? Well, Mason talked about it on the stand. He said that there was no probable cause to arrest Jaime based on the information from the CIs.

So, when Jaime -- so, when Guevara arrested Jaime at his house, put him in handcuffs, dragged him to the side of the house -- and remember, you saw the bruise on the forearm

in that lineup photo -- he was falsely arrested without probable cause.

Now, I want to next look at the actions after the search, after the false arrest. And I've already talked about the falsification of the police reports.

But let's talk about coercing Jaime's false confession. Jaime says Guevara fed him false information. Jaime says Guevara threatened to take away his child, and that Guevara condoned Mason's use of force on Jaime.

Jaime was cross-examined over many hours. His story is credible, and why it's credible is you have to look at all of his testimony.

Let's look at Jaime seeing Guevara in the schoolyard on the afternoon of July 6. Jaime never wavered from this. But also, Guevara, in that February hearing in 1990, admitted to being in the schoolyard on Leavitt Street.

Jaime has never wavered from Guevara feeding him false information. The threats to take away his child, that is corroborated by other witnesses in this case who were also threatened in the same way.

Now, let's next look at Guevara bringing Huertas to the lineup and suggesting to identify Jaime, knowing that the identification was false. Now, I'm going to circle back later to Huertas, sort of near the end of this closing argument, but I just want to make a first few quick points.

In none of the initial arrest reports, none of them, in -- and I'm talking about the beat officer report. Those are the first officers on the scene. I'm talking about Boris and Johnson's, the night detectives' report, who came next on the scene. In none of those reports, Huertas is mentioned at all.

And what's Huertas's testimony? His testimony is that Luis Morales died in his arms, that he was covered in blood, and that he spoke to police officers. And yet there's no documentary evidence that he spoke to any police officers.

The first time that Huertas is mentioned in any of the police reports is he's brought in by Daniel Noon, Guevara's ex-partner, the next day.

Huertas is the only person to ID Jaime. He's also the only person to be brought in by Guevara on any of the lineups of Jaime Rios. Everyone else who's brought in is not brought in by Guevara, and they don't ID Jaime Rios.

So, when Huertas IDs Jaime, at that instant, Guevara knew that that ID was false. Guevara never made -- in any of his conversations with prosecutors, ever told them that it was a false ID.

Now, let's look next to the CIs, on July 9th, Guevara bringing those CIs again to see Mason. Now, we know that that information was fabricated because the information turned out not to be accurate, right? A gun is never found at Alex Lopez's house, and the gun that was found at Benjamin Carrero's

closing - plaintiff

2402

house doesn't really match Jaime's supposed confession or the information from the CI.

And I'm going to get back to that gun later, again, when I'm going to be talking about Huertas later on, possibly this afternoon.

So, let's move on to coercing Benjamin Carrero. Now, in all of his testimony, Carrero never once wavered about being coerced by Guevara, ever. He was credible. He was credible even when he's asked the question about not taking the heat for the charge like Iris, his girlfriend, did. And he was credible. He was like, well, he didn't, but he should have.

Now, lastly, concealing that Cristino Garcia had been denied -- you know, alibi, the -- not revealing that Cristino had been beaten with the use of phone books. It's more likely than not that any one of these acts had occurred, and that satisfies the first prong of malicious prosecution.

Now, what's the second prong of malicious prosecution? I'm going to put 32 back up on the screen. The second prong is, "The defendant lacked probable cause for doing so."

Now, as I said earlier, there's no probable cause to arrest Jaime in front of his house. We know that from Mason.

There's no probable cause after Jaime's statement because Guevara knew that he had fed information to Jaime and threatened him.

There's no probable cause after Huertas ID'ed Jaime

because Guevara knew that ID was false.

There's no probable cause after Benjamin Carrero's statement because Guevara knew that he coerced Carrero to make that statement.

There's no probable cause when Cristino Garcia gave an alibi and was beaten with phone books.

At no point whatsoever, did Guevara have probable cause. There was never any sort of honest and sound suspicion on Guevara's part in relation to probable cause that Jaime Rios had committed a crime.

Now, the third prong is malice. The defendant acted with malice, that is, he commenced or continued the prosecution for a reason other than to bring a guilty party to justice.

Now, Guevara knew Jaime was and is innocent of the murder of Luis Morales. Because he knew that, he knew that he was not bringing a guilty party to justice.

It doesn't matter that we may never know the reason why Guevara did what he did. It's sufficient to know that given the evidence in this case, Guevara knew he was bringing -- he was not bringing a guilty party to justice.

Now, the fourth prong. The fourth prong is the criminal proceeding against plaintiff was ultimately terminated in plaintiff's favor in a manner indicative of innocence. Now, it's undisputed that Jaime filed a 2-1401 petition. It's undisputed that that petition was granted. It's undisputed

that when the petition was granted, the conviction was vacated. It's undisputed that when that happens, it's as if the conviction never happened. It's undisputed that in this country, someone is innocent before proven guilty; i.e., convicted.

But what is disputed here is whether or not the 2-1401 petition should have been granted at all in the first place. Now, if you read the instruction, there's nothing about whether or not the 2-1401 petition should have been granted or not in the first place. The evidence has shown that the 2-1401 was granted. The evidence has also shown that a COI was granted as well, and you saw that order granting the COI on the first day of evidence of this trial.

The criminal proceeding in this case was terminated in a manner indicative of innocence. The defense wants you to determine that the 2-1401 and the COI should not have been granted in the first place. That -- their argument is not relevant to the fourth prong. What happened happened. The 2-1401 was granted, and the COI was granted.

But let's just take a moment to look at what I think the defense is going to argue in their closing argument. They're going to argue that it was COVID, that times were tough, that Cook County State's Attorney's Office was stretched thin.

They're going to argue that ASA Rogala had a heavy

closing - plaintiff

2405

caseload. They're going to argue that ASA Rogala didn't contact any of the police officers involved; that ASA Rogala didn't contact any of the State's Attorneys involved; that ASA Rogala believed she would win; that the three affidavits of Carrero, Garcia, and Huertas were faulty; and that Kim Foxx, the at the time elected Cook County State's Attorney at the time, ordered Rogala to drop her opposition.

They further may argue that the State *nolle'ed* the case because it would have been pointless to try Jaime again because he had already served his sentence. And they are going to argue that the COI was not contested at the hearing when the COI was granted, and that hearing lasted minutes.

First of all, I think it's a bit ironic that the defendants want to give ASA Rogala some sort of benefit of the doubt when times were tough during COVID. I find it ironic because when times were tough in prison for Jaime, no access to the law library, no lawyer, they were expecting him to file a petition the moment Carrero had that conversation with him in prison.

But putting that aside -- and we'll get back to that point later -- what has the evidence shown?

First, 2-1401 petitions are commenced and continued all the time. It was not unusual that one witness was called the first day of the hearing and that the hearing stopped and then it was reset for another day.

On that day, multiple witnesses, not just Carrero, Garcia, and Huertas, were ready to be called to testify that first day.

What's also true that we learned when Ms. Rogala was on the stand was that the petition itself did not just include those three affidavits, those three claims for the 2-1401 petition being granted. Evidence was submitted with that petition that totaled about 1300 pages involving another claim.

And ASA Rogala admitted the following on the stand: That even when a 2-1401 petition is not contested, it's still up to the judge to make a determination, that Judge Atcherson could have still denied the petition.

ASA Rogala admitted on that stand that Judge Atcherson was given the petition and all those 1300 pages of exhibits before the hearing started.

ASA Rogala admitted on that stand that Judge Atcherson was a diligent judge and would have reviewed those documents before the hearing.

And also, finally, ASA Rogala admitted that if they had retried the case, Jaime could have gotten more time because of his marijuana conviction while in prison.

Now, it's true that when Judge Atcherson gave her ruling, she did not specifically state the grounds for why she was granting the 2-1401 petition; but she granted it, and that is all we have to prove by preponderance of the evidence.

Now, Judge Reddick is an entirely different judge than Judge Atcherson. She's separately elected to the bench. She is separately independent. And she is also a competent judge. And Judge Reddick granted the COI.

Now, moving to the fifth prong, that the plaintiff suffered harm as a result. It's undisputed that Jaime suffered harm. He was convicted. He served time in prison. And at this stage, because we haven't gone over questions 1 through 6, you don't need to determine what the amount of money damages are at this time. You do that after you answer questions 1 through 7.

But if you noticed, I haven't mentioned one thing yet. The evidence alone in this case satisfies our burden of proof that it's more likely than not that Guevara maliciously prosecuted Jaime Rios. But when I say that, I should be more specific. The evidence alone in this case, absent Guevara's remote testimony when he took the Fifth, satisfies our burden of proof. We don't need Guevara's taking the Fifth statements to prove malicious prosecution. That is just icing on the cake.

Instruction No. 16, "You have heard Defendant Reynaldo Guevara invoke his Fifth Amendment right not to incriminate himself in response to questions. You may, but are not required to, assume that Defendant Guevara's testimony in response to those questions would have been unfavorable to

closing - plaintiff

2408

him.  For you to assume that Defendant Guevara's answers to a given question would have been unfavorable, there has to be other evidence that supports the issue the question referenced.

"You may not draw any inference from Defendant Guevara's invocation of the Fifth Amendment against Defendant Michael Mason."

Now, I want to start first with that second paragraph in the instruction.  That second paragraph doesn't come into play here because question 7 is just a claim against Guevara and Guevara's actions.

Now, to the first paragraph, what is the other evidence in this case that supports the issue the question referenced when Guevara is asked?  Well, we have the police reports.  We have Mason's testimony.  We have Jaime's testimony.  We have Gawrys's testimony.

You have the trial testimony that you heard, especially Huertas's trial testimony and Guevara's trial and pretrial testimony.  You have Carrero's testimony, and you have Garcia's testimony.

Now, Guevara took the Fifth at least 80 times, but he did answer some questions.  One question he was asked was whether his counsel here, present in court today, advised him to take the Fifth, to which he responded that it wasn't.

It's immaterial who advised Guevara to take the Fifth. He knows what he did.  He made a decision not to come to court,

not to be a part of this trial. That's his right.

You'll see nothing in the instructions that says either a plaintiff or defendant has to show up to court. That law doesn't exist.

He wasn't here to hear the testimony of the other witnesses. He chose to invoke his Fifth Amendment right not to incriminate himself not hearing any of the evidence in this case, not hearing any of the other witnesses testify, not making some credibility decisions. He chose to take the Fifth.

Now, we don't have to prove what he doesn't want to incriminate himself about. We don't have to prove that. We don't have to prove if he's trying to prevent being charged with perjury. We don't have to prove if he's trying to prevent being charged with battery.

All we have to show, all that we have shown, is that there's other evidence that supports the issue of each question Guevara was asked.

The answer to question No. 7 is, "Yes." We have proved by a preponderance of the evidence that Guevara maliciously prosecuted Jaime Rios.

Now, I want to go back to the verdict form. I want to start with the first two questions of the verdict form.

Now, if you notice, these two questions are fairly similar. There's only one real difference with these two questions. The first question is asking about Defendant

2410

Reynaldo Guevara. The second question is asking about Defendant Michael Mason.

THE COURT: Counsel, I'm going to interrupt you there. We'll take our lunch break. We'll come back at 1:00 p.m. and continue with closing arguments.

All rise.

(Jury out at 12:00 p.m.)

THE COURT: All right. I'll see you back at 1:00, and enjoy your lunch.

MR. J. RICHARDS: Thank you, your Honor.

MR. SCAHILL: Thanks, Judge.

(Lunch recess had from 12:01 p.m. to 1:00 p.m.)

(Change of reporters.)

2411

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAIME RIOS,                           )  Case No. 22 C 3973
                                      )
                 Plaintiff,           )
         v.                           )
                                      )
REYNALDO GUEVARA; MICHAEL             )
MASON; and JoANN HALVORSEN,           )
as Special Representative of          )
ERNEST HALVORSEN, Deceased,           )  Chicago, Illinois
                                      )  February 18, 2026
                 Defendants.          )  1:00 p.m.

                        VOLUME 12
          TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
          BEFORE THE HONORABLE JEREMY C. DANIEL
APPEARANCES:
For the Plaintiff:     LAW OFFICE OF STEPHEN L. RICHARDS
                       BY:  MR. STEPHEN L. RICHARDS
                            MR. JOSHUA S. RICHARDS
                       53 W. Jackson Boulevard, Suite 205
                       Chicago, Illinois  60604

For Defendant          BORKAN & SCAHILL, LTD.
Guevara:               BY:  MR. TIMOTHY P. SCAHILL
                            MR. GRAHAM P. MILLER
                       20 S. Clark Street, Suite 1700
                       Chicago, Illinois  60602

For Defendants         THE SOTOS LAW FIRM, P.C.
Mason and              BY:  MR. JOSEPH M. POLICK
Halvorsen:                  MR. JOSH M. ENGQUIST
                            MR. JEFFREY R. KIVETZ
                            MS. CAROLINE P. GOLDEN
                       141 W. Jackson Boulevard, Suite 1240A
                       Chicago, Illinois  60604

Court Reporter:        CHARLES R. ZANDI, CSR, RPR, FCRR
                       Official Court Reporter
                       219 S. Dearborn Street, Room 1426
                       Chicago, Illinois  60604
                       Telephone:  (312) 435-5387
                       charles_zandi@ilnd.uscourts.gov

                   *   *   *   *   *
           PROCEEDINGS REPORTED BY STENOTYPE
    TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

THE COURT: All right. We can bring in the jury.

THE CLERK: All rise.

(Jury in at 1:00 p.m.)

THE COURT: All right. Please take your seats.

Welcome back, folks.

Mr. Richards, you may continue.

MR. J. RICHARDS: Thank you, Your Honor.

CLOSING ARGUMENT ON BEHALF OF PLAINTIFF BY MR. J. RICHARDS

MR. J. RICHARDS: Good afternoon. So where we last left off was about to look at questions No. 1 and 2 on the verdict form. I'm going to put that back up on the overhead projector.

Now, 1 and 2 are very similar questions being asked. They're both asking about coerced confessions. But question No. 1 deals with defendant Guevara and question No. 2 deals with defendant Mason.

However, both questions involve the same jury instruction, jury instruction No. 28: Plaintiff Jaime Rios claims that the defendants violated his right against self-incrimination by coercing him to confess to a crime. To succeed on this claim, the plaintiff must prove each of the following four things by a preponderance of the evidence:

No. 1. The plaintiff gave a confession;

No. 2. The confession was not made by the plaintiff

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 81 of 185 PageID #:23421
closing argument - plaintiff
2413

voluntarily but rather was made involuntarily as a result of unlawful coercion by the defendant you are considering;

3. The coerced confession was used against the plaintiff during his criminal case; and

4. The plaintiff was damaged as a result.

Now, I'm going to go back to that instruction in a little bit, but I just want to quickly touch on some of these first four prongs.

Now, I'm going to start off with prongs 1 and 3. There's no dispute here that plaintiff gave the confession. As you heard, there are two ways to be convicted of first degree murder in Illinois.

The first is to be the actual shooter.

The second is under accomplice theory. Basically the person was there, they were involved, but that person actually didn't fire the bullets that killed Luis Morales. So when you look at Jaime's coerced statement, it's still a confession. Even though he's not confessing to being the actual shooter, he's confessing under the accomplice type of first degree murder. So when you have, for example, AUSA Barbara Riley said, oh, that wasn't a confession. It was a confession.

Now, the third prong is whether or not the coerced confession was used against the plaintiff during his criminal case. That prong is not in dispute. I think there's been a multitude of evidence that that statement, the court-reported

statement, was put in in the case. That prong is not in dispute.

The fourth prong, plaintiff was damaged as a result. Now, no question that plaintiff was found guilty at his criminal trial. No question that he served prison time. No question that he was damaged by being in prison. As you heard from Karen Shields, the coerced confession was one of the two main pieces of evidence against Jaime Rios in her opinion, that and the eyewitness of Luis Huertas.

So -- and again, like question 7, at this point we're not asking for the amount of the damages to be determined, just that there were damages. So prongs 1, 3, and 4 as to not only Detective Guevara but to Detective Mason have been proven by a preponderance of the evidence.

The issue here is with prong 2. And prong 2 needs to be addressed individually as to each defendant.

So let's start with question 1, the question about defendant Guevara. What was the unlawful coercion that the defendant did in this case? What is the accusation here as it relates to defendant Guevara? Well, simply put, it's that defendant Guevara threatened to take away Jaime Rios's trial. And we have to prove by a preponderance of the evidence that this occurred, that this threat was made.

Now, Jaime Rios has testified that the defendant said this. There's corroborating evidence in that Benjamin Carrero

also testified that he was threatened with the same threat. And there's also circumstantial evidence that Jaime Rios had threat against him.

What is that circumstantial evidence? Well, for one, we have it from Detective Mason. According to Detective Mason, Diana Rodriguez has been brought into the station and is speaking with Jaime Rios. So if Detective Mason is to be believed circumstantially, it makes sense that this threat was made to Jaime. He sees his common-law wife in the station, the child is not there, and Guevara is making this threat.

Now, remember, Guevara took the Fifth in response to this line of questioning. However, unlike when I was talking about question 7 before the lunch break, in regards to Guevara taking the Fifth, in this case, him taking the Fifth can only be used in regards to question No. 1. Him taking the Fifth cannot be used against Detective Mason in regards to question No. 2.

But the question also asks, well, was Jaime's free will overcome, right? For that we have to look at the totality of the circumstances. We have to consider Jaime's youth, his lack of education. Remember he didn't get his GED until he was all the way in Dixon near the end of his prison sentence. A false arrest with no *Miranda* warnings; Jaime's suggestibility which we saw during his cross-examination; and the length of detention. No matter how you count the length of the

detention, he was there from 10:00 p.m. on July 6th to 6:00 a.m. the next day on July 7th.

And most importantly, you have to consider his prior experience with Guevara. His prior experiences with Guevara include both what Guevara did to him in the past, but they're also what he had heard Guevara had done to others. Remember, Guevara had stopped Jaime, had stopped him on more than one occasion. He had heard that Guevara would drop off people in rival gang territories. He had heard that Guevara would take people's jewelry and ask them, well, you can have it back if you come to the station with a receipt. He heard about his mother calling out Guevara, and he noticed how things changed between him and Guevara after that incident.

So when Guevara told him that he would take away his child if he didn't play along, Jaime believed him. His will had been overcome.

Now, the jury instruction makes clear that a threat is unlawful. The evaluation of whether a confession is unlawfully coerced involves consideration of the totality of the circumstances to determine whether the individual confessed voluntarily of his own free will or whether the police overrode his volition by unlawful means. Unlawful coercive conduct may include, for example, physical punishment, threats, repeated and prolonged questioning, or the failure to advise someone of constitutional rights. Lawful coercive conduct may include,

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 85 of 185 PageID #:23425
closing argument - plaintiff
2417

for example, informing the suspect of the nature of the evidence against him or the potential penalties of the offense, or actively misleading the suspect by, for example, falsely suggesting other evidence of guilt.

No question it was a threat to take away Jaime's child.

Now, I want to move next to question No. 2, the claim involving Detective Mason. Now, we already talked about prongs 1, 3, and 4. They're not at issue. They have been proven by a preponderance of the evidence of what has happened at court.

Now, as for Michael Mason, the claim is in terms of coercion that he used torture. Now, hair pulling in and of itself was physical force. And actually that's one of the points that both experts agreed on, Russano and Schafer. From their point of view, any force, any force at all, is unlawful. It's unlawful coercion.

The slamming head on the table, that is torture, and you don't need a bruise to prove that it happened. Jaime has always maintained that this happened.

Now, yes, Jaime did not tell Barbara Riley that he had been tortured. He did not tell Barbara Riley that he had been threatened by Officer Guevara. But remember what Barbara Riley testified to. When she first gets to the station, when she first talks with Jaime, she doesn't say, I'm a state's attorney, I'm independent, I work for the people. She doesn't

say that.  That's not what the testimony is.

What Barbara Riley says is I am working with the police.  I am not your attorney.  Now, given that, it's reasonable that Jaime didn't tell Barbara Riley about what he had just endured.  Would a reasonable person tell someone who just said oh, by the way, I'm working with the people that just tortured you and just threatened to take away your child, tell me if there's anything I should know?  No.

Now, maybe Barbara Riley should have said, I'm independent, I work for the people.  She did not.  She said she was working with the police.

And this other notion that the defense has brought up that the coerced confession motion wasn't filed until several months after the arraignment, you've heard from the defense own witness, former ASA Carballo.  You heard from him that the first phase is discovery, the second phase is motion practice, and it's not unusual for that type of motion to be filed a few months after arraignment.  In fact, it was kind of fast given the speed at which things moved in that courtroom.

Now, at this point, either in regards to Count No. 1 or Count No. 2, we have met our burden in regards to all four prongs from either of the defendants, if you're just considering the prongs against Guevara or if you're just considering the prongs against Mason.

However, you will get another instruction.

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 87 of 185 PageID #:23427
closing argument - plaintiff
2419

Instruction No. 29:  Plaintiff must prove by a preponderance of the evidence that defendants Reynaldo Guevara and Michael Mason were personally involved in the conduct that plaintiff complains about.  As a general matter, you may not hold the defendant liable for what other individuals did or did not do.

However, with regard to the claim that the defendants violated plaintiff Jaime Rios's right against self-incrimination, you may also hold a defendant liable for that claim if, in addition to proving each element of that claim, plaintiff proved each of the following by a preponderance of the evidence:

No. 1.  Defendants Reynaldo Guevara and Michael Mason reached an agreement to violate the plaintiff's right against self-incrimination; and

2.  The defendant you are considering performed at least one overt act in furtherance of actually violating the plaintiff's right against self-incrimination.

Now, if before getting to this point you decide the four prongs have been met in regards to Guevara, the four prongs have been met in regards to Mason, you don't need to go on to consider the issue of conspiracy.  However, in this case, there was a conspiracy.  Each defendant made an overt act.  Guevara threatened, Mason tortured.

But what is the evidence of the agreement?  It's what I talked about before lunch, the paper trail, the actions that

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 88 of 185 PageID #:23428
closing argument - plaintiff
2420

Mason did and did not perform in not getting a search warrant and not searching Jaime Rios's house. The arrest report and supp report that Guevara filed, that is evidence of the conspiracy. And so as both questions 1 and 2, the answer is yes.

And when you go back to the jury room and you are looking at the verdict form, the answer to questions 1 and 2 is yes.

Now, the next question, questions 3 and 4, are in a sense similar with questions 1 and 2. They're both asking a similar question. They're both asking, well, what do we have here? We have an issue of fabrication and fabrication. But unlike with questions 1 and 2 where we're talking about two different defendants, with questions 3 and 4, we're dealing with the same defendant, Guevara; but with questions 3 and 4, we're dealing with different acts of fabrication.

Now, you will get an instruction on fabrication. That is instruction No. 30: Plaintiff Jaime Rios claims that defendant Reynaldo Guevara violated his right to a fair trial by fabricating evidence that was used against the plaintiff at his criminal trial. To succeed on this claim, the plaintiff must prove each of the following four things by a preponderance of the evidence:

No. 1. The defendant knowingly fabricated evidence against the plaintiff, meaning he created evidence he knew to

be false, or, in other words, deliberately falsified evidence;

2. The evidence was used against the plaintiff at his criminal trial;

3. The evidence was material, meaning that there is a reasonable likelihood that the result in the criminal proceeding would have been different if the fabricated evidence was not used in the plaintiff's criminal trial; and

4. The plaintiff was damaged as a result.

Now, in regards to prong No. 4, the plaintiff was damaged as a result, again, we have Jaime Rios is found guilty. He went to prison. He has been damaged as a result. At this time you don't assess what those damages are but that he was damaged as a result.

Now, prong No. 3, the evidence was material. This prong is slightly different than what we've seen before in question 7 and questions 1 and 2. In question 7, that was just malicious prosecution. That wasn't asking, well, what overall happened at trial. Questions 1 and 2, that wasn't asking about what happened at trial. Questions 1 and 2 is just asking well, was the statement coerced and was it introduced.

In regards to fabrication, a question that's asked is materiality. But for this fabricated evidence, is there a reasonable likelihood that the result in the criminal proceeding would have been different?

So let's start off going back to question No. 3. In

this case we are talking about the fabricated evidence of the confidential informants, right? Prong No. 2, the confidential informants' information, that came out at trial. We know that. That's not in dispute. The confidential informants led to the raid on Benjamin Carrero's house. That's not in dispute.

What is in dispute is whether or not if the issue of fabrication, the issue of fabricated confidential informants, if that had not come into the trial, would the outcome have been different.

Well, Karen Shields says that the main two pieces of evidence were Huertas's eyewitness testimony and the statement. So that doesn't come into play here in terms of fabrication of the CIs.

What does come into play is what ASA Carballo said his opinion. His opinion was it's not just the eyewitness. It's not just the statement. It's the gang evidence that came in, the gang evidence that came in in relation to the CI.

Now, what is the evidence in regards to prong No. 1, right? Prong No. 1 is the defendant, in this case Guevara, knowingly fabricating evidence against the plaintiff, meaning he created evidence he knew to be false or, in other words, deliberately falsified evidence.

So he either created that the CIs said something that they did not say, or he created that the CIs -- or he said to the CI, hey, listen, CI, I want you to tell Mason this. I'm

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 91 of 185 PageID #:23431
closing argument - plaintiff
2423

going to write a report about it. Either way, there's fabrication. And it's not like fabrication with a CI comes poof out of thin air. It's a knowing act. It's a knowing act. It's not like he stumbled upon something. He physically did something. He physically brought CIs in. He talked to them. He relayed what they were saying. He did those acts.

Now, question No. 4 deals with Benjamin Carrero. Now, what was the fabrication involving Benjamin Carrero? What happened was the raid on Benjamin Carrero's house happens. He's taken into custody. Guevara speaks to him. Guevara says, hey, Benjamin, here's what I want you to do. I want you to tell the grand jury and a jury eventually, I want you to tell them that Jaime came to your house on June 28th, he had a gun, he took out the gun and he gave it to you and he said it was involved in a shooting. I want you to say that. Now, Benjamin Carrero would not have said that on his own, and he didn't want to say that. But what was a knowing act that Guevara did? He said to Benjamin Carrero, I will take away your child if you don't do this.

Now, in this case you have to separate out what was said at trial and what wasn't. So at trial on the stand, Benjamin Carrero didn't say the fully complete statement that he was instructed to earlier. But that didn't matter because he was impeached by his grand jury testimony so both of the statements came in anyway. That satisfies the second prong,

closing argument - plaintiff

2424

that the evidence was used against the plaintiff at his criminal trial. Both parts of the knowingly fabricated evidence were used. One was used when Benjamin Carrero was on the stand, and one was used when the impeachment from his grand jury testimony, testimony under oath, was given.

Now, what if there wasn't this evidence? Why is it material and why is it not? Well, remember, earlier I mentioned how there's two ways to charge someone with first degree murder in Illinois, two ways to convict someone. The first is they're the actual shooter; the second is they are involved under accountability theory.

The state, even though Carballo said on the stand that their theory was Jaime was the actual shooter, they didn't need to prove that. They could have proved that or accountability. That was the purpose of Benjamin Carrero testifying. His purpose was to say Jaime Rios was involved; Jaime Rios gave me the gun.

If that testimony had not happened, if Benjamin Carrero had said to Guevara, I'm not saying something, you can charge me with whatever, if Guevara had never said, I'm taking away your children, that evidence would not have existed. It wouldn't have.

And let's talk about the gun that is found at Benjamin Carrero's home. Now, you've heard evidence about two types of guns, handguns. One is a semiautomatic and one is a revolver.

Semiautomatic ejects spent cartridges; a revolver does not.

A revolver was recovered at Benjamin Carrero's home. Was the gun ever tested for recent firing? No evidence of that. Was the gun looked at to see, well, how many bullets are in it and are there nonfired bullets in there? Are there just spent casings or is it live ammunition? No evidence of that.

So when you look at the materiality of Benjamin Carrero's statements, without that statement, that gun is not relevant at all. You need that statement to be able to say that gun is connected to Jaime Rios. Without that there's -- without that there's nothing. Without that there's just a gun being found, no forensic evidence linking the gun to anything that occurred the night of June 27th.

And remember, too, there's no forensic evidence of fingerprints on that gun. There's no evidence of that. Now, this is before DNA obviously. But fingerprinting was something they did back then, and there's no evidence of Jaime Rios's fingerprints on that gun.

Now, Benjamin Carrero testified credibly when he came into court. He testified that he was threatened. He testified that he gave those statements. He testified that he threw his girlfriend Iris Martinez under the bus. He was honest.

Now, remember, in this case, you can take Guevara's Fifth Amendment invocations into account. There is other evidence here, Benjamin Carrero's statements on the stand, that

allow you to consider Guevara's invocation of his Fifth Amendment right and take it as if he had answered, it would not have been favorable to him.

Now, the last two questions that we're going to talk about, 5 and 6, it's slightly different from fabrication. It's talking about a violation of a right to a fair trial. Now, I just want to briefly talk about that and the importance of that.

In our country, it's about having an even playing field. In our country, it's about fair play. What guarantees that? It's the Constitution. It's the constitutional rights of every defendant. From the moment they are born until they go to trial, those rights stay with them, and those rights stay with them even after the trial is over.

Questions 5 and 6 are about fair play. Did Jaime receive a fair trial? What are they asking? Both involve defendant Guevara. No. 5: Did plaintiff Jaime Rios prove by a preponderance of the evidence that defendant Reynaldo Guevara violated his right to a fair trial by knowingly concealing from the prosecutor material exculpatory and/or impeachment evidence, namely, potential alibi evidence provided by Cristino Garcia? That's No. 5.

No. 6 is: Did plaintiff Jaime Rios prove by a preponderance of the evidence that defendant Reynaldo Guevara violated his right to a fair trial by knowingly concealing from

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 95 of 185 PageID #:23435
closing argument - plaintiff
2427

the prosecutor material exculpatory and/or impeachment evidence, namely, evidence that defendant Guevara had assaulted Cristino Garcia?

Now, there's an instruction on this.  Instruction No. 31:  Plaintiff claims that defendant Reynaldo Guevara violated his right to a fair trial by failing to disclose exculpatory and/or impeachment evidence that was material to the plaintiff's defense in the criminal case.  To succeed on these claims, the plaintiff must prove each of the following three things by a preponderance of the evidence:

No. 1.  The defendant knowingly concealed from the prosecutor exculpatory and/or impeachment evidence, and that evidence was not otherwise available to the plaintiff through the exercise of reasonable diligence to make use of at his criminal trial;

2.  The evidence was material, meaning there is a reasonable likelihood that result in the criminal proceeding would have been different if the evidence had been disclosed; and

3.  The plaintiff was damaged as a result.

Now, in that instruction, you will also get two definitions.  The first is exculpatory evidence.  Exculpatory evidence is evidence that tends to show that the accused is not guilty of the crime.

Impeachment evidence is evidence that would have made

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 96 of 185 PageID #:23436
closing argument - plaintiff
2428

the jury at the criminal trial less likely to believe a witness who testified against the accused at the criminal trial.

Now, let's first talk about the potential alibi evidence that Cristino Garcia had, the -- the Father & Son Pizza. It is undisputed that Reynaldo Guevara never told the prosecution about this alibi evidence. Now, you heard from ASA Carballo on the stand. Part of his procedure is he interviews everyone, including the police. And he looks at the police reports.

Now, is there any police report that shows this alibi? No. It wasn't reported.

Is there any evidence that Guevara told this alibi to Carballo? No. If there was, Carballo would have said it on the stand.

And this alibi evidence, what is it? Is it the exculpatory evidence that we're talking about or is it the impeachment evidence? In this case it would be the exculpatory evidence, right? It's the evidence that tends to show the accused is not guilty of the crime.

And why is that? Well, the theory of the state is that Jaime Rios, with Cristino Garcia, a/k/a Tino, were the two perpetrators of the murder of Luis Morales. The state is saying that they are both there, that they are both present.

If one of them has an alibi, that's exculpatory evidence in regards to their case. If the jury had heard that,

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 97 of 185 PageID #:23437
closing argument - plaintiff
2429

is there reasonable likelihood that the result would have been different? Yes.

And why is that? Because that evidence would have attacked the statement that was put before them, the court-reported statement of Jaime Rios. It would have been exculpatory evidence. It would have been material. It would have changed the outcome of the case.

Now, No. 6 is a little different, right? No. 6 is the evidence about Guevara assaulting Cristino Garcia, battering Cristino Garcia, the phone book, billy club or flashlight methodology.

Now, a few things about that. One is from the testimony of Karen Shields, we know that that method of beating is used because it doesn't leave a mark, right? That's -- that's just science. The -- the greater area of the phone book, the padding of the phone book, that's not going to create a bruise. When someone takes a club, slams it against the phone book that's against a person's head, that's why that's done. It doesn't show any marks.

Now, the defense brought up a point about how, well, you know, in jail, you know, this rumor was going around. Karen Shields also testified that yeah, it was going around, and she would hear it from family members, immediate outcries she would hear.

But here's a key point. In regards to this case,

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 98 of 185 PageID #:23438
closing argument - plaintiff
2430

Cristino Garcia, he's never locked up. He's released. His alibi checks out. There's a lineup. He's not ID'd. He's free to go. He never goes into the jail. He never hears these stories.

He is telling the truth that he was physically beaten by Guevara.

Now, I will say this. On the stand, Cristino Garcia admitted to taking heroin that morning at 6:00 a.m., the day he testified. That is an honest admission. He is admitting to doing a crime, possessing heroin and taking it. And he is willing to say that on the stand. He's being honest about that. He is being honest about what happened to him. Who knows why he has the drug problem. Is it from this? Is it from something else? But he was honest about it.

During questioning, he couldn't remember the exact sequence of events. That's true. But there's one thing he did remember, one thing he was not wavering on: Getting hit in the head with a club and a phone book. He did not waiver from that.

And so that goes back to Guevara taking the Fifth. What is Guevara scared of? Is he scared of someone who has said on the stand, I took heroin and this happened to me? Is he scared that he's going to be charged? He didn't view the evidence. We have no idea. But if he's taking the Fifth, if he took the Fifth in regards to that question which he did, it

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 99 of 185 PageID #:23439
closing argument - plaintiff
2431

is fair to say that any answer he would have given would not have been favorable to him. It is fair to say that he did that act. He battered Cristino Garcia.

Now, remember, No. 5 is exculpatory evidence, evidence that would show the accused is not guilty of the crime. How does the beating of Cristino Garcia relate to the evidence that came in, right? Cristino Garcia not being -- Cristino Garcia being beat is not evidence that Jaime Rios didn't do the murder of Luis Morales. Cristino Garcia being beat is impeachment evidence against Guevara. Guevara is doing an illegal act. If the jury had known that this impeachment had happened, that these bad acts by Guevara would have happened, would they have believed any of Guevara's testimony on the stand? Would it have called into question Luis Huertas being taken in and the ID? Yes, it would have. It's material.

And I will talk about the first prong, that exercise of reasonable diligence. Reasonable diligence. That's the first prong.

The defense argument, or what I believe they will argue is that Karen Shields could have found this out about Cristino Garcia. She could have investigated or Jack Carey could have investigated and found this out and they would have been able to bring it forward to trial.

Well, let me start off first with Karen Shields and her testimony and whether or not, well, at the time in 1989,

1990s, were her and Jack Carey's actions, was there reasonable diligence?

Now, the first issue is getting in contact with Cristino Garcia. Cristino Garcia didn't have to talk to anybody. In fact, you had heard ASA Carballo said, well, he basically invoked the Fifth; ethically we can't talk to him from the state side. So how was someone supposed to get that information from Cristino Garcia? The only other person to get it from was Guevara.

The next point of, well, you know, she could have subpoenaed or she could have gone and talked to Cristino Garcia, well, remember this: Cristino Garcia was listed as a state's witness on their answer to discovery. And remember Karen Shields's testimony, that it was frowned upon to go and talk to state witnesses back then that were listed on their discovery. There would be a big hullabaloo. The judge would get angry at them. And remember, these public defenders are doing a noble job. They have to be in those courtrooms, in that courthouse, every day. They can't run away and do other cases in other courthouses. They have to be there and work with both the judges and the state's attorneys that are there. There is no way even with reasonable diligence that one could have found out what happened with Cristino Garcia.

So in regards to questions 5 and 6, the answer should be yes.

Now, I want to touch on another subject which is materiality. You've heard materiality in regards to the last four questions that we're seeking to have an answer from you, the jury, on.

Materiality is what would have the outcome been at trial, at the original criminal trial? And remember, what's being asked at the actual criminal trial is not guilt and innocence. That's not what the jury is deciding. The jury is deciding guilty or not guilty; did the state prove their case beyond a reasonable doubt. A very different standard from what we're talking about here.

Materiality doesn't mean that Jaime Rios would have had to prove that he was innocent at the criminal trial. That's not what materiality means. Materiality just means that the outcome would have been different, that he would have been able to poke enough holes into the state's case for the verdict to have been not guilty.

Now, if you'll notice, in all of the instructions I've gone through in regards to points 1 through 7, questions 1 through 7, is there any prong about Jaime Rios proving that he's innocent? There's not. That's not a requirement under the law. But in this case, there is evidence that points to and proves by a preponderance of the evidence his innocence.

Now, I will say this. At the beginning of the trial, you saw the Certificate of Innocence. That does not play in

closing argument - plaintiff

2434

any way whatsoever of whether or not Jaime Rios is innocent of the murder of Luis Morales. The only purpose of the Certificate of Innocence, the COI, is to show in regards to Count 7 that the matter ended in a manner indicative of innocence. It doesn't go to whether or not Jaime Rios is innocent of the actual murder of Luis Morales. It does not.

Now, what is the evidence of what happened? Remember, Karen Shields talked about well, there are two main things: The ID of Luis Huertas, number one; and number two, the court-reported statement, right? Those are the two main pieces of evidence.

Now, I want to start first with the ID of Luis Huertas, and there's two points there, right?

The first question to ask is did Luis Huertas actually see the shooting? What's the evidence or lack thereof of that? That's the first question to ask.

And the second question to ask is, well, if he did see this shooting, is his ID of Jaime Rios reliable?

Let's start with the first point. Did Luis Huertas actually see the shooting? Well, according to him, at trial, he says he was there; he saw the shooting; Luis Morales died in his arms; there was blood on his clothes; and he spoke with police officers at the scene. As I said before, there's no evidence that he talked to police officers at the scene. There's no police reports that indicate that.

And the beat officers and the initial midnight detectives, they would have noticed someone covered in blood. They would have talked to him. They would have filled out a GPR. Remember, GPR is that type of report that's handwritten by detectives. Remember? That's -- you will see one in evidence, the one where Detective Mason did not put a date or a watch time on that form.

Now, that's the first point of evidence that shows that Huertas did not see the shooting, right? That's the first point.

The second point is, well, who brought in Huertas the next day? Well, as I said before, it was Officer Noon, Guevara's ex-partner. And there's no evidence as to why Noon brought Huertas in, how Noon found out Huertas apparently knew about the shooting, no evidence of that whatsoever. We do not know why he brought in Huertas. Now, that's the evidence that points to, well, Huertas may not have been there originally.

But then let's talk about memory. And we had a full day of testimony from Geoffrey Loftus. And you'll get an instruction on that: You have heard witnesses, Melissa Russano, Geoffrey Loftus, and Jack Schafer, give opinions about matters requiring special knowledge or skill. You should judge this testimony in the same way you judge the testimony of any other witness. The fact that such person has given an opinion does not mean that you are required to accept it. Give the

closing argument - plaintiff

2436

testimony whatever weight you think it deserves, considering the reasons given for the opinion, the witness's qualifications, and all other evidence in the case.

Geoffrey Loftus's qualifications are not at issue here. The experience he has is not at issue here. The reasons he gave in terms of his opinion on the science of memory, that was the science. It's not contested.

Now, if you recall, the diagram that Dr. Loftus did, there was the green route and there was the red route. The green route is about, well, a person who is there, what are they actively perceiving and how well they can actively perceive that. That's the green route.

What's the red route? The red route was the postevent information and those two routes mixed together in someone's memory. And someone could have a memory that they believe is so real; however, it's not what reality was.

Now, in this case, in regarding Huertas, there is an ample amount of postevent information.

Now, first is that, well, if you recall Huertas's trial testimony, when he's asked about who Loco is, who Javier Torres is, he says, well, oh, I know that because I saw one of the reports. So already we know that at trial he has some postevent information. We are not sure which report he saw, but he saw one.

What's the other postevent information? Well, you

closing argument - plaintiff

2437

heard from ASA Carballo. He went to the scene multiple times with Huertas, walked the scene multiple times with him, interviewed him multiple times. That is postevent information. It's no wonder why Huertas, when he gets on the stand and later at his deposition believes truly that Jaime Rios killed Luis Morales.

In fact, you'll notice there's some differences. For example, at trial, he talks about seeing the fire come out of the gun. But you know from what Mason knew based on the reports, he never talked about that at all when he was originally brought in. The reports speak to how his memory is changing, his memory changing over time. And ASA Carballo believed him. He believed him even though, as we know from the deposition, that in 1990, Luis Huertas was diagnosed with bipolar. He believed him even though, according to his deposition, Luis Huertas was an outlaw member of a gang, that he had prior gang involvement.

If you remember Dr. Loftus talking about one of the case study experiments that was done about the 737, right? A 737 has crashed. There are witnesses on the ground on the scene, and they claim to say, well, they saw into the windows people's look of terror as the plane was crashing, right? But scientifically that was impossible because of how windows work in airplanes. People on the ground could have never have seen that.

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 106 of 185 PageID #:23446
closing argument - plaintiff
2438

What happened with the 737 is very similar to Luis Huertas's testimony, that he is saying that Luis Morales died in his arms. He was covered in blood. He was saying flash, flash. That is like the 737. His memory is creating gaps based on the postevent information.

Now, going backwards, let's talk about the ID, right? You heard from Geoffrey Loftus that there's a feedback effect. There's a consequence of when an ID happens, someone is told, hey, you made a positive ID, and from that point on, that is the memory that is created in that person's brain. They are going to believe that they made the correct ID. That's what the science shows.

So let's look at whether or not Luis Huertas made a good ID, right? Now, Dr. Loftus talked about two forms of bias in terms of a lineup. The first form of bias is, well, the officer doing the lineup, he knows who the offender is in the lineup, right? That's the first type of bias. And it's not something like the officer giving, you know, hand signals to the witness or anything like that. It's about body language. It's about the atmosphere in the room. It's about the unconscious signals that we pick up from other human beings because that's how we evolved. So that's the first part of bias in terms of what happened with that ID, right?

What was the second part of bias? Well, it's the makeup of the physical lineup itself. Two ways about that.

One is, well, if the persons that are lined up, the fillers and the suspect, if they look different. In obvious cases, well, if the suspect is white and everyone else is Hispanic, yeah, that's an obvious difference, right? That's going to drag someone's attention, right? There are more subtle ones like facial hair, heights, things like that.

But one of the things in this case was clothing. Remember this ID lineup is taking place on the afternoon of July 7th. It's the summer in Chicago. According to Detective Mason, fillers are picked up from the street, so they come in. They're in their tank tops. They're in their shorts. You see them there. And then they put in Jaime Rios.

Now, a few things about that. One is he's in a sweat suit. Being in a sweat suit in and of itself, that's vastly different from what other people were wearing in the lineup. Let's take that for one.

The second thing is is the color, the red sweat suit. Not only his color but the person standing next to him who had the green shirt. Now, why does that sound familiar? It's because if you look at the police reports, that matches the first descriptions that are given, one offender in red, one offender in a green top shirt. So assuming for the moment that Luis Huertas actually did see the shooting, right, even though he wasn't interviewed at the time, you're presenting him with a lineup where one of the offenders is wearing the same colors

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 108 of 185 PageID #:23448
closing argument - plaintiff
2440

that the shooter had, and one of the offenders is standing next to another offender who matches the color of the shirt that the other offender had. How that lineup was structured was biased.

Moving a step back, we have to consider, well, how did Huertas get to the lineup? And I've said this before and the evidence has shown, Guevara took him to the lineup. Unlike what ASA Carballo said on the stand, that Guevara didn't do much in this case, wasn't very involved, he took a key witness to do a lineup. And of all of the witnesses that did lineups, Huertas was the only one taken by Guevara. No one else was. And of all of the witnesses at the lineup, Huertas is the only one who IDs Jaime Rios. Javier Torres doesn't. Luis Huertas does.

And why was that? That was because Guevara showed a picture of Luis -- of Jaime Rios to Luis Huertas. And we know from science from Geoffrey Loftus that if something like that happens, the lineup ID is going to be tainted. It's going to be faulty. And in this case, when you combine that with the shirt, with the red sweatpants, the red sweater, that ID was flawed. No question about it. By a preponderance of the evidence, that ID was flawed, more likely than not it was flawed.

Now, what was other pieces of evidence that pointed to Jaime Rios being the killer of Luis Morales? Well, what wasn't there? As I mentioned before, there's -- there's no

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 109 of 185 PageID #:23449
closing argument - plaintiff
2441

fingerprints, number one. There's fingerprints that are taken on the car, but -- where Luis Morales falls over and against, but there's no fingerprints from Jaime Rios. The .25 caliber gun is never recovered. The gun that is recovered at Benjamin Carrero's house, there's no forensic evidence that links to that having been fired or fingerprint evidence that linked to Jaime Rios. There is gang evidence that has Jaime Rios being a member of the Latin King. But that's not good enough. And why we know that's not good enough is because that evidence, the CI evidence, that wasn't enough for even probable cause to arrest him.

So what's the remaining piece of evidence? We have the court-reported statement. Now, true, there were multiple statements, right? There's the first statement that they say that Jaime Rios made to Detective Mason, right? You have that GPR. Well, there's a problem with that.

Number one is there's no record of the questions and answers that were asked to Jaime Rios. There's not. The GPR that we have in evidence, well, that's undated. It's incomplete. And it doesn't really have any dates and times on it really to put context to the words that are apparently said by Jaime Rios. So that confession, if it can even be called a confession, is faulty.

Now, let's go to the court-reported statement, the court-reported statement that happens at 4:00 a.m. Now, there

is a difference in opinion in regards to false confessions. On the one hand, we have Dr. Melissa Russano, and on the other hand, we have Jack Schafer. Now, let's compare their qualifications.

Dr. Melissa Russano has been tendered and admitted as an expert witness many times before in court, in many different jurisdictions, and every one of those times it's in this field of false confessions.

Let's contrast that with Jack Schafer. This was the first time he was ever admitted as an expert in court in regards to false confessions, ever. He had been admitted as an expert prior, but that was involving white supremacist gangs. So that's the first difference.

What's the second difference? It's their educational background. Dr. Russano had to go through a rigorous process of applying to Ph.D. programs, a rigorous process of a dissertation on campus. Did Jack Schafer do that? No.

Is Jack Schafer even in the field? Granted he's a Ph.D. psychologist, as is Russano, but he's self-admitted not in the field of false confessions. He does entirely other different research, if you recall.

His point was that the dozen of researchers across the country, their research in regards to false confessions is wrong. The white papers that they have are wrong. Dr. Russano is wrong.

closing argument - plaintiff

2443

Now, don't take my word for it, that Dr. Russano is telling the right science. Don't take my word for it. Take the Department of Justice's word for it. They trusted her with $2.4 million of grant money to fund research. Trust them. Trust the Naval Criminal Investigation Services who hired her to help train their officers in regards to getting the right confession, not false confessions. Remember her goal is not to uncover false confessions with her research. Her goal is to make it so that officers get true confessions, not false ones.

Trust the Kansas State Police. Trust the Wichita Police Department. Trust the Air Force and Army's version of NCIS. Trust them when they are trusting Dr. Russano's methods and the risk factors of what goes into making a false confession false, of what the science is.

And what do we know? In this case, Jaime Rios, not highly educated. He doesn't have his GED at that point. He's dropped out of high school, number one.

Number two, English is not his first language. His first language is Spanish.

Number three, the time of isolation, he's taken into custody at roughly 10:00 at night. He doesn't give the court-reported statement until roughly six hours later at around 4:30 in the morning.

He's not given any basic needs. He's tired. He's being fed information to make in a coerced statement. He's

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 112 of 185 PageID #:23452
closing argument - plaintiff
2444

being advised to minimize. And of course he's been threatened and tortured, something that actually both Dr. Schafer and Dr. Russano agree on.

So when you look at the circumstances and the science that Dr. Russano talked about, it puts into doubt that statement. It puts into doubt whether or not Jaime Rios was even there at the scene.

But what it also puts in doubt is what Jaime Rios says in the statement. Does what he's saying in the statement match the evidence? And remember, Dr. Russano talked about this. The most important thing to validate a statement is independent corroboration. That's the most important thing. Is there any independent corroboration in this case, and the answer to that is no, there is not.

The statement is a false confession. So with the statement out by a preponderance of the evidence, with the ID of Huertas out by a preponderance of the evidence, even though we do not have to prove Jaime Rios innocent, that's what the evidence shows. He's innocent.

Now, going through questions 1 through 7, our position is obvious. It's yes to all. We have met our burden by a preponderance of the evidence.

What happens at that point? You get an instruction on that: If you find in favor of plaintiff Jaime Rios, then you must determine the amount of money that will fairly compensate

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 113 of 185 PageID #:23453
closing argument - plaintiff
2445

him for any injury that you find he sustained and is reasonably certain to sustain in the future as a direct result of the defendants' conduct.

The defendant [*sic*] must prove his damages by a preponderance of the evidence. Your award must be based on evidence and not speculation or guesswork. This does not mean, however, that compensatory damages are restricted to the actual loss of money. They include both the physical and mental aspects of injury, even if they are not easy to measure.

You should consider the following types of compensatory damages and no others: The mental and emotional pain and suffering and loss of a normal life that the plaintiff has experienced and is reasonably certain to experience in the future. No evidence of the dollar value of mental and emotional pain and suffering or loss of a normal life has been or needs to be introduced. There is no exact standard for setting the damages to be awarded on account of these factors. You are to determine an amount that will fairly compensate the plaintiff for the injury he's sustained.

Obviously the injury in this case is being in prison. That's the injury in this case. The loss of freedom and what happened to Jaime Rios in prison.

Now, let's go into what happened to Jaime Rios in prison. I will say this: Prison is not a nice place. It is not designed to be a nice place. Prison is designed to punish.

2446

It's designed to punish those who are there. That's the point of prison.

Now, we're not saying that anything happened was unconstitutional in regards to his prison time. What we're saying is prison is a terrifying experience. Prison is a loss of freedom. What is the amount of damages that relates to being in prison? What is the amount of damages in terms of what Jaime Rios went through in prison?

Prison is different for every single person that walks through the doors of a prison. Some people have an easier time than others. Some people have a harder time than others. Some people go to more maximum security prisons and stay there for longer, and some people go to minimum security prisons for longer.

But for Jaime Rios, no matter when he was in Pontiac, Menard, Danville, or Dixon, the fear is always there. The lack of freedom is always there.

Now, we're not saying that every day was awful. We're not. Some days are better than others. Not every day is a lockdown. Not every day you're getting three cold meals because it's a lockdown. Not every day you don't get to call your mother. Not every day you get yard access. It's different every day. Some days are better than others, and some days are worse.

What can we put, in a sense, on the price of losing a

child? You heard Jaime's testimony. Throughout the course of his prison experience, he saw his son a handful of times. He had to endure his son asking him, where are you? Are you at school? And having to lie to his son about where he is.

He's writing letters that are never sent because that's the only way he can get out what has been happening in prison, and he doesn't want to worry his family. He's calling his mom and telling her it's going to be all right when he knows it may not be.

He's going to see his family when they visit, and they tell him, hey, I was just strip-searched. And he's thinking, do I want them to have to go through it again, but he's also thinking, I need to see them; I need to see my son.

He's forced by the circumstances to rejoin the Latin Kings for protection. True, he could have gone into protective custody, but as you heard, protective custody is where the really crazy people are, where it's really not safe.

You heard about how there's no pillow. You heard about how there's no light to the window to the outside. You heard about how there's no air conditioning, how when it's hot, he basically sits on the toilet and basically pours water over himself to keep him cool. You heard about how when he was in Menard, the smell in the summer from the cow pasture wafted the whole place and he couldn't escape from it. I could go on and on in terms of the horrors of prison, and we would be here all

afternoon.

So what is the value of a loss of freedom?  What is the value of the fear every day?  What is the value of the loss of seeing your family?  How do you ascertain that?

There is no marketplace of freedom.  If you're in a car accident, you can go on Kelley Blue Book, you could see the value of your car.  You know what that same car, the mileage, what it's worth.  You can go buy yourself a new car.

If you -- if you're walking home from the supermarket and your bag rips open and you lose all your groceries, well, you know what's going to be the cost to replace that.  You're going to go to the supermarket, and it's what the market is.

But how do you figure out freedom?  How do you create a marketplace of, well, what is freedom worth?  And this is just a suggestion.

So you have two people side by side, both reasonable innocent men.  Both of these reasonable innocent men, they have unlimited funds.

To the first reasonable innocent man, you're going to say, hey, reasonable innocent man, I'm going to tell you everything that Jaime Rios went through, and you're going to tell me what would you do, how much you would pay per day to avoid that.  That's the first person you're going to ask.

Who is the second innocent reasonable person?  The second innocent reasonable person, he's someone who you don't

have to tell them what Jaime went through because he went through it. But you're going to ask this person a different question. This person is going to say -- you're going to ask them, well, what would you pay per day for a magic wand to make it so that your prison experience never happened?

Now, the first person, he's going to give a number because, you know, he hasn't been through it. He's going to hope that, well, it can't be that bad.

And the second person who has been through it who knows how bad it's been, he's going to pay whatever it takes to avoid that. And so what you do is you average those two numbers, basically doing limit math and creating a marketplace and what is that average in the middle.

That number is $6,000 per day of IDOC custody. That is the average that we believe you would get if you were to create that marketplace and ask two innocent reasonable men what they would pay per day to not be in IDOC custody.

Now, that's the first amount we're talking about. There's a second amount which is MSR, mandatory supervised release, or what people know as parole. Now, granted when you're on parole, you're not in custody. You have freedoms, but you're not completely free. What would you enjoy -- what would you pay to -- what would a reasonable innocent man pay on both ends to say, oh, you know, I don't want to be on MSR. I want a magic wand or I want some sort of magic device to

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 118 of 185 PageID #:23458
closing argument - plaintiff
2450

prevent being on MSR at all. That person would -- averaged out would be $1,000 per day.

Now, at this point, Jaime is a free man, but he still has his conviction hanging over his head. He still has his son who is a Marine who is an MP looking at him and judging him for being a convict, a convict who has been convicted of first degree murder. What's the cost of that per day until the conviction is vacated? That's $500 per day.

Now, ultimately Jaime Rios gets his COI, a Certificate of Innocence. What's the value per day between the conviction being vacated and being able to say to your son, look, I have a Certificate of Innocence, what's that value? That's $250 per day.

Now, what was Jaime Rios's time in prison? Now, you heard a few different numbers, and granted, it is a bit confusing, right? Because you heard that -- by ASA Carballo that he was sentenced to about 36 years in the Illinois Department of Corrections. Well, how does that make sense if he was sentenced in 1990 and he got out around 2008, right? The math doesn't make sense. And that's because in the early '90s and mid-'90s, how it worked is when you were sentenced to a felony conviction, whatever time you would get, you would divide that by two. It's called day for day credit. And that's the amount of time you would actually have to serve in prison. So take 36 -- well, and divide by 2, and that's what

you get.

Now, it is true that Jaime Rios had two other convictions. His first conviction was for aggravated assault, and he got three years IDOC. Well, what is that? That's really one and a half years.

And remember, he was convicted of that first before he was convicted of first degree murder. So there is a time period between when he's convicted of that and his time starts to run in terms of IDOC, right? Because that's what he's first convicted of so the clock is starting to tick on that, right? So when he's convicted and then sentenced for the murder case and gets sent down to Pontiac, the thunderdome, pretty much by that point roughly he's got about six to nine months' worth of doing the time on the aggravated assault. And then his time starts for the murder case.

Now, in addition to that, you heard about his marijuana conviction. Now, that marijuana conviction was -- two years was his sentence; but remember, we do the same dividing by 2, that adds a year.

So in terms of the time he spent at prison, you have to subtract around nine months, right, which is the clock ticking from when he actually gets to IDOC, right, because he's getting credit for the time in Cook County from the agg assault case, and then you have to subtract the one year extra he had to stay for the marijuana case. That is the time that Jaime

Rios should be compensated for.  That is $6,000 per day in IDOC.

Now, that is just one type of damages.  And that type of damages are called compensatory damages and the -- what you think Jaime Rios, what we have proved by a preponderance of the evidence what he is owed is the number you will put on that line.

But you have two other questions to answer.  The first is punitive damages against Guevara, and the second is punitive damages against Mason.

Now, if you remember, you're asked seven questions. Six of them deal with Guevara and only one of them deals with Mason, right?  Only question 2 deals with Mason.  So if you find for Mason in terms of question 2, then you're not going to assess punitive damages against Mason.  You're not going to fill in that last question, question No. 10.

But if you find for Jaime on any of the questions in regards to Officer Guevara, you will move on to punitive damages, and if you find on No. 2 for Jaime against Detective Mason, you will move on to punitive damages.

And like compensatory damages, you will also get an instruction on punitive damages:  If you -- instruction No. 35: If you find for plaintiff Jaime Rios, you may, but are not required to, assess punitive damages against any defendant you have found liable.  The purpose of punitive damages are to

punish a defendant for his or her conduct and to serve as an example or warning to the defendant and others not to engage in similar conduct in the future.

The plaintiff must prove by a preponderance of the evidence that punitive damages should be assessed against the defendant. You may assess punitive damages only if you find that his conduct was malicious or in reckless disregard of the plaintiff's rights. Conduct is malicious if it is accompanied by ill will or spite, or is done for the purpose of injuring the plaintiff. Conduct is in reckless disregard of the plaintiff's rights if, under the circumstances, the defendant simply did not care about the plaintiff's rights.

If you find that punitive damages are appropriate, then you must use sound reason in setting the amount of those damages. Punitive damages, if any, should be in an amount sufficient to fulfill the purposes that I have described to you, but should not reflect bias, prejudice, or sympathy toward any party.

In determining the amount of any punitive damages, you should consider the following factors: The reprehensibility of the defendant's conduct; the impact of the defendant's conduct on the plaintiff; the relationship between the plaintiff and the defendant; the likelihood that the defendant would repeat the conduct if an award of punitive damages is not made; for defendant Reynaldo Guevara, his financial condition; and the

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 122 of 185 PageID #:23462
closing argument - plaintiff
2454

relationship of any award of punitive damages to the amount of any actual harm the plaintiff suffered.

Now, to start off, I just want to be clear and just point this out to you, that there is a difference in assessing punitive damages between Reynaldo Guevara and Michael Mason, and that is the second to last paragraph at the bottom.

For Reynaldo Guevara and Reynaldo Guevara only, you are to consider his financial condition when determining the amount of punitive damages.

In regards to Detective Mason, you are not. You are not to consider Detective Mason's financial condition. In fact, there was no evidence of that put forward in this case at all.

So the first question is, well, as to each defendant, was the conduct either malicious or was it in reckless disregard of the plaintiff's rights? That second part, reckless disregard of the plaintiff's rights, that's fairly easy to prove by a preponderance of the evidence in regards to both Officer Guevara and Detective Mason. Both simply did not care about Jaime Rios's constitutional rights. If they had, they would not have done the actions that they did.

Those rights are old rights. Those amendments are old amendments. It's not that -- there's no evidence that says, well, hey, the defendants, we didn't -- we didn't know about these rights, right? That's not true. They're trained.

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 123 of 185 PageID #:23463
closing argument - plaintiff
2455

They're trained to know these rights. And in both instances, the officers disregarded them.

Now, in terms of malicious, conduct is malicious if it is accompanied by ill will or spite. Now, how do we know that? How is there preponderance of the evidence? How is there circumstantial evidence that that is related to Reynaldo Guevara, right? Well, you heard evidence about how there was Jaime Rios, heard from his mother that she had called out Guevara. After that, Guevara started acting differently toward him, more aggressively toward him. That is evidence that Guevara had malicious conduct, that Guevara had ill will or spite towards Jaime Rios.

And let's move into the other factors, the reprehensibility of defendants' conduct. Sending someone to prison for a crime that they did not commit is in and of itself reprehensible. It's an attack on the defendant, and it's an attack on the judicial system as a whole.

The purpose of the judicial system is to find guilty people and convict them. And the murderer of Luis Morales is still out there. That is reprehensible.

Look at the impact of Guevara's conduct on Jaime Rios. Without Guevara's conduct, Jaime Rios would not have been convicted.

Similarly, look at the impact of Detective Mason on defendants' conduct -- on Jaime Rios. Without those acts by

Mason, Jaime Rios would not have been convicted, would not have been sent to prison.

Now, in terms of the relationship between plaintiff and the defendant, we acknowledge there was no relationship between Mason and Jaime Rios before the incident. That's not present here. But there was a relationship between Guevara and Jaime Rios.

Now, the next factor, likelihood that the defendant would --

THE COURT: Counsel, before you go into that, we'll take our afternoon break and come back at 3:00 p.m.

All rise.

(Jury out at 2:32 p.m.)

THE COURT: Mr. Richards, how much more do you have?

MR. J. RICHARDS: Maybe ten, 15 minutes at most.

THE COURT: You've been going for 134 minutes.

MR. J. RICHARDS: That's two hours and --

THE COURT: Two hours and ten minutes. It's getting a bit long.

MR. J. RICHARDS: Okay.

THE COURT: All right. Any issues that I need to address for the defendants?

MR. SCAHILL: Just what the clock is.

THE COURT: As of -- the rough estimate is about two hours and 40 minutes remaining of plaintiff's time. I think

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 125 of 185 PageID #:23465
closing argument - plaintiff
2457

that defendants have seven or eight hours.

MR. SCAHILL:  We won't use that, Judge.  I promise.

MR. ENGQUIST:  We'll do our best.

THE COURT:  All right.  See you at 3:00.

MR. J. RICHARDS:  Thank you, Your Honor.

(Recess at 2:33 p.m., until 3:00 p.m.)

(Change of reporters.)

closing argument - plaintiff

2458

THE COURT: All right. We'll bring the jury back in.

(Jury in at 3:00 p.m.)

THE COURT: Please take your seats.

Mr. Richards, you may continue.

MR. J. RICHARDS: Thank you, Your Honor.

Ladies and gentlemen of the jury, I'll only take a few more minutes of your time. I think I'd be derelict in my duty if I didn't do some math in regards to those compensatory damages.

In terms of the total IDOC time, damages would be $36,135,000.

In terms of mandatory supervised release damages, the total would be $1,095,000.

In terms of the time between the end of MSR and the conviction being vacated, that dollar amount would be $2,007,500.

And lastly, the amount until the COI was granted would be $37,500.

The total that we are seeking, that we're seeking justice for Jaime for, is $39,275,000.

In sum, ladies and gentlemen, we have through the past two-and-a-half weeks, we have proved by a preponderance of the evidence the liability as to each and every claim.

We have proved by a preponderance of the evidence the amount of compensatory damages owed.

closing - defendant Mason

2459

We have proved by a preponderance of the evidence that there are punitive damages in this case as to both defendants.

Jaime can't have a magic wand to turn back time. Please give Jaime justice.

Thank you for your time and consideration.

THE COURT:  Okay.  Which defendant will go first?

MR. ENGQUIST:  I will, Your Honor.

Your Honor, can I have the document camera, please?

THE COURT:  It's up.

MR. ENGQUIST:  Thank you.  And I think -- can you put up the map first?

Actually, can Ms. Golden have it first?

CLOSING ARGUMENT ON BEHALF OF DEFENDANT MASON BY MR. ENGQUIST

MR. ENGQUIST:  Three times.  Three times Jaime Rios basically told the same account of what happened:  That on June 27th, 1989, Jaime Rios, a foot soldier for the Latin Kings, was in front of his apartment at 1440 North Leavitt.  He lived there around the corner from a local elementary school. Got it marked there on the map.  And it's the same building where his girlfriend lived, where his new son lived, and it was also in his territory, the Latin King territory.

And when he was there that night on June 27th, 1989, he said that a rival gang, the Spanish Cobras, crossed Western Avenue and came and shot at him in front of his house.

So he did what he was supposed to do as a Latin King.

He went upstairs. He got a gun, because that's a Latin King's job. Even today he admits to you that that is his job, or that was his job as a foot soldier, was to respond and that would up and include shooting at people, or shooting them.

So on June 27th, it was simple. They shot at him. He was going back to get some revenge. He got the gun. He went out Cobra hunting with his friend.

They were going to shoot into the Cobra's territory, and that is exactly what happened because on that light, Luis Morales, a Spanish Cobra from the other side of the street, was shot and killed.

He wasn't shot and killed because he happened to be the person that shot at Jaime Rios. He was shot and killed because he was a Spanish Cobra.

Three times, at least three times, starting around midnight on the 6th going to the 7th of July that story was told up until the time he actually gave his court-reported statement.

He told it -- and that wasn't even the same people. He told Detectives Halvorsen, Detective Mason. Then he told Detective -- I'm sorry. Then it was Mason and ASA Riley. He told her the same thing. And then he told -- he actually talked to ASA Riley again, but then he told the same story again this time with ASA Riley, Mason was in the room, and we also have the court reporter there. And his words are given,

and he gives a statement.

Now, the statement in this confession for this murder is the sole claim that he has against Mike Mason, and his sole claim is that it wasn't voluntary.  It was coerced.

And the important thing is, and I know you've seen the instructions a lot so I'm not going to bring them up here, but the Judge has instructed you already that you should use your common sense; that any inference you make has to be a reasonable one.  It can't just come out of the blue.

And just so, just like Mr. Kivetz told you at the beginning of this case, we want you to use your common sense when you walk through this evidence.  We want you to use that kind of -- that kind of mental acuity and think about the questions, think about what happened, what was actually presented to you when you start going through this evidence.

And when you do, I think you'll see a pattern, and the pattern you're going to see is that whenever Mr. Rios is confronted with anything, he changes.  Every time.

So it goes back to:  I was confused.  I didn't understand the question.  I didn't understand the time frame you were talking about.  I forgot what you were talking about. I forgot what I was talking about.  Did I testify to that?  Oh, maybe change my testimony again.

But one thing he's always very consistent in:  No matter how many times he changes his story, no matter how many

times he keeps on changing, he's consistent in the fact that nothing is his fault ever.

So, I'm going to talk really briefly about Russano before I get on to the confession because he brought it up in his closing here.

Dr. Russano came in and talked about different risk factors. They're just factors that could potentially have risk. We don't agree with them all, but let's just kind of tick through them a little bit.

Guilt-presumptive questioning. There's really no evidence of that other than the fact that this is why you're here, Jaime.

Age. He's 19 going on 20 at the time. He's 19 going on 20, and he's not a person who's never been involved with the police. This isn't new to him. So that doesn't matter.

Prolonged custody before he gave his statement. The police brought him in, he sat in an interview room, and this is undisputed, from 10:00-ish, 10:30-ish, to around midnight and that's when Mason and Halvorsen go in to talk to him.

He gives his first statement to them, the first out of the three times he says it that night almost right away. It's not waiting until he gives a court-reported statement until it's actually his own words being typed up by a court reporter. It's then. There's no prolonged period of time whatsoever.

Sleep deprivation. There's no evidence at all of

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 131 of 185 PageID #:23471
closing - defendant Mason
2463

sleep deprivation here. Just remember his schedule he always talked about. His schedule was getting up to be outside around noon. That's when he started his drug dealing, and he'd be out all night until the night, and he would come back sometime that evening.

The idea that this young man, sitting there when he's 20 years old who usually spends those kind of hours, would be too exhausted at midnight to not know what he was doing, that they would somehow coerce him is -- well, there's no evidence of that.

So what we're really left with are the two things about physical abuse and threats, and that's where we're kind of going with the whole -- that's what they're moving with.

So let's kind of talk about those are the issues because how does Mr. Rios explain his confession?

Well, you've heard him say it. The first part is true. The first part. I was shot at. I was shot at in front of my house by a rival gang. They drove off in a Cutlass. They turned and drove off into Spanish Cobra territory. That part is true.

But I just didn't know about the time frame. I was wrong on that. I was actually talking about a completely different day. So the first part of it's true, but it's kind of not true. And we -- and you heard Dr. Schafer talk about it, and he talked about the idea that when a guilty person is

giving a statement, sometimes they do truth overlays. They bring in a little bit of truth, they mix it up a little bit to give a feeling that they're telling the truth the whole way through, and that's what's happening here.

He's putting in something true, then changing it a little bit and saying, well, what really happened then, it happened at a different time. And what he does is what everybody does, and didn't actually need an expert really probably to say this, is that people minimize their involvement.

You probably have seen that and everyone's seen that any time they're talking to their kids or anybody else about it, when you confront them with something, they minimize their involvement.

And that's what he was doing here. Yes, I was there, but. I had a reason to be there. It wasn't my fault. I got a gun, but I didn't do the shooting. He's minimizing his involvement the entire time. But the first part is true.

Now, the next part of the statement that he gives he says is all being fed to him, fed to him by Rey Guevara. Rey Guevara is the one doing it the entire time.

But even that is not -- even there's no evidence of that either because Rey Guevara is not even in the room. He's not even there. You've heard that from Detective Mason, and not just now, from the very beginning in the reports and

everything else. Guevara is not there. Guevara brought him in with his partner Gawrys.

He wasn't even in the room. You heard that from Mason. You heard that from Halvorsen when he testified back when he was still alive during the criminal case, he testified to it. You heard it from ASA Riley. She's always maintained that. All the reports are consistent with that all the way through.

Okay. And for that to be true, for the fact that Rey Guevara would have been in that room doing this -- this constant threatening him or feeding him the details, you would have to believe that not only are him and Mason coming up with a strange plan to work this out to change all the reports to make sure it fits, but also Halvorsen would, Gawrys would, all the gang crime specialists would have to be involved in the whole thing, right?

How about any of the detectives on the floor? They'd have to be in on it, too, right? Everybody would have to be in on it, including the ASA. She'd have to be in on it, too. And maybe even the court reporter. She'd have to be in on it, too. They'd have to be all in on it to have Rey Guevara there and doing this thing. They'd all have to be involved.

And remember this is his burden. He's talked about it more than once. He has the burden in this whole thing to prove the case and to prove his case, what he's told you is true, and

what he's told you is true is that Rey Guevara was there even though there's no evidence of it other than him saying it. That's it.

Now, there's no lies to try to trick him. They're just simple facts. When he comes in, he gets treated the same way Jose Macho Melendez did when Macho came in. Macho came in voluntarily. Macho -- what happened when that happened? He came in. He sat down with Detective Mason.

Detective Mason says we're getting information that you're involved in this murder. What happens? Does he confess? No. He says, no, I wasn't there. Here's my alibi. This is what was going on. I wasn't involved.

When Mike Mason is confronted with information like that, he follows the information. So he gets the information about Macho Melendez. What does he do? He does police work. He goes out. He determines that the alibi actually fits.

Still doesn't trust him, talks to everybody else out, and he finds out, in fact, that he shouldn't even have been there to begin with, and then moves on.

But Mr. Rios wants you to believe that when he's confronted the same way, it's completely different. That's enough to send someone right over. Hey, where were you? I'm hearing that you were involved in this whole thing. It's just not realistic. It's just not true.

Now, what's also really important about the parts he

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 135 of 185 PageID #:23475
closing - defendant Mason
2467

says that were fed to him, the parts that he says he didn't say, someone else told him to say, is that he admitted to you, and you saw when I cross-examined him and when Mr. Scahill cross-examined him, he threw in facts in there or threw in little vignettes, whatever you want to call them, that he says he made up all his own, apparently to make it move along -- the story to move along better, to make it more believable.

So he wants you to believe that even though this is being fed to him, even though it's not true, that he's going to be confessing to being involved in a homicide that he's going to make up things to make the story sound better, because it didn't come from Rey Guevara. It came from him.

Like he admitted that -- on the stand he admitted that -- well, he says my friend Cristino, Cristino Garcia, I don't know him as Tino. I never called him Tino. That's what he said, right?

But apparently when someone says I hear you're with Tino. He says, oh, yeah, that's Cristino Garcia. That's my friend. He gives him up. He says that. He says that came from me. I just made that up.

So I'm just going to make something up to put my friend on the hook for murder? Because he's the one who put his name in the middle of the thing. But he wants you to believe that that's just something he threw in himself as kind of a flourish. He wasn't told to say that.

closing - defendant Mason

2468

He wasn't told what caliber gun was involved. But he does talk about calibers of guns in there. And, by the way, he chooses different caliber guns than supposedly he has. I mean, this is a person who said I had a gun once, not then. I had a gun before, a .45-caliber. Big gun. I didn't have one of these guns. Never had one of these guns.

But then, again, this is also the same person who told you -- I'm going to talk about this a little bit more, but this is the same person who told you I never even got to the rank of full Latin King, so I wasn't even allowed to have a weapon. But apparently he did.

He kind of forgot that part.

What did he also say that he made up and put into there -- into his own court-reported statement to make sure it sounded good? The whole plan of the attack. He said that came from him, not from anybody else. Apparently, when he's assigned to say this, he wants to bring up the fact that it was his plan to go across the street and to shoot into enemy territory, shoot at those Spanish Cobras just to scare them. That's how his initial plan was.

He said he came up with that all on his own. He threw that in there. Wasn't even asked for what was going to happen. He threw that in there himself. Why would a person make up something to make the story sound better if it wasn't true? Why is he doing that? Why is he supposedly helping someone put

closing - defendant Mason

2469

a case on him?

The simple answer is that you wouldn't. But he keeps on saying that anyway.

So all the parts where he was supposedly being told what to say, he's adding in details. And one important detail he also adds in is that he did say I never saw a picture of the scene. The only picture I saw was supposedly this guy Mike. I didn't see a picture of the scene.

We know he wasn't drawn a scene diagram. We don't have any of the photographs that he was shown. There was no pictures being shown, nothing about a car. But you know what he throws in there on his own? He throws in that when the Spanish Cobra guy, Mr. Morales, is shot, he falls behind a car.

There's no picture telling him that. There's no one telling him there's a car there. The only way you would know that he fell and died behind a car is if you were there.

The only people who knew that he fell and died behind a car was the guy who held him when he was dying in his lap, the people that were there on the scene that saw it, and the guy who shot him are the only people who knew that.

But somehow that fact gets in there, a fact that he says he came up with on his own. It didn't come from Rey Guevara. I guess that's that corroborating evidence everyone's been talking about, right, in the statement. Seems to fit, doesn't it?

So what does Mike Mason do to coerce him?  He basically says two things.  But first off, he describes Mike as a mute bully basically.  He doesn't say a word to him.  He stands behind him and doesn't say a word.  Just looms over him.

This is the detective that's in charge of the case.  This is the detective who's doing the investigation, right?  This is the detective that when someone initially is brought in after he gets -- after he gets the case from the midnight crew, right, because they worked on midnights, when he comes in the next day, he gets the materials, right away what happens?  Him and his partner are working on the case.

He's involved in the investigation.  He interviews the witnesses.  He goes to Evanston to talk to people.  That's what he does.  When -- when Macho Morales comes in, he sits down -- Macho Melendez comes in, he sits down with him and he goes through things with him.  He does that.

But apparently this time, he's a mute.  He just stands there.  Doesn't say a word.  They want you to believe the detective in charge said nothing.

Instead, he says that Mike Mason, who doesn't know him, there's no bad blood, there's no issues between them, as he's handcuffed behind his back.  Remember?  Can't block him, can't hold himself, can't stop himself.  Mike Mason grabs him by the back of the head and slams his head on the table, on a nice metal table.  That's what he says he does, out of the

blue.

That's what he says, and his own attorney calls it torture. It's torture. Now they're claiming Mike Mason tortured him.

And let's talk about how he describes it. Rios describes it as -- well, if I had to put it on a scale from 1 to 10, I'd put it at a 10-1/2. And my face came down, I couldn't stop myself, and I hit my entire face, entire face, flat against the table.

And you know what? Plaintiff's counsel was up here for over two hours, over two hours just now. You know what he didn't show you once after claiming my client tortured him? He didn't show the pictures.

Can we have Exhibit 6, please.

You might remember. This is the photograph taken by Janet Lupa that night after he gave his court-reported statement. This is the person who was slammed -- tortured -- had his face slammed into a table.

This is the person who came down without being able to restrain himself. There's not any blood anywhere. There's not even a fat lip. There's not a contusion anywhere. There's not a bruise. There's not a mark on him.

There's a reason why he didn't put it up during the over two hours he was talking to you: Because it makes no sense. Especially when you want to use an inflammatory word

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 140 of 185 PageID #:23480
closing - defendant Mason
2472

like torture, that he tortured him because that's what he wants you to believe, that he tortured him into falsely confessing, and that's the evidence that came out that night.

Now, I talked to -- I talked to the plaintiff about it. He even agreed, like, well, yeah, sometimes things don't come up right away, you know, bruises don't show right away.

So can we show Exhibit No. 7, please?

So this is the next morning or the next afternoon. Hours later. More time for those bruises, that awful torture to show up, the unrestrained smashing into a metal table. Remember? The pain 10-1/2 out of 10. Once again, there's not a mark on him, not a bruise, not even chapped lips. Nothing.

Well, maybe he's just really slow in developing bruises.

So can we show the next one?

Yeah, this is from Cook County. So this is after he's gone through everything at the police station. He's being sent over to Cook County. They take a picture of him, too, to document stuff.

Once again, nothing.

We also know that he talked to the lockup keeper that night, right? Never complained of any injuries. Never had any.

We know he talked to the intake over at Cook County. They do a whole medical exam. Never complained of anything.

closing - defendant Mason

2473

They sure didn't find anything.  No injuries.

We know he talked to the state's attorney.  Never complained of anything.  Never had any injuries.  We know he sure wasn't showing any injuries when Janet Lupa took his photograph because we just saw it.

You know, what's also really interesting about this is that the first time he made the allegation of his face being slammed in the table was at the criminal trial.  I know he filed a motion to suppress.  We've talked about that.  We talked about four different days of testimony, two different motions, all that kind of stuff.  We heard about that ad nauseam for the past couple days, haven't we?

But what was also really clear in there is that even after talking to his lawyer, Mr. Carey, the legendary Jack Carey who fought for his clients no matter what and put up the good fight, that guy that everyone respected, that he did the motion, he had different things on there, right, about what happened.  He said something about pulling hair.

But does he say I was tortured by slamming my face into the table?  It's not there.  There's never even a mention of that.  You would think that the legendary Jack Carey, who's going to put down all the information and look under every stone, would say, well, gee, you know, maybe I should put something in there about the fact that his face was smashed into a table, that he was tortured, that he had pain 10 out

of -- 10 -- no, 10-1/2 out of 10. Maybe he would put something in there.

No. First time that ever came up was when he's on trial because he's trying to misdirect, he's trying to come up with a new way to get around everything. That's when it first comes up.

And you know what they did at the trial? They just did what I did. They put up the pictures, because there's no injury whatsoever. There's no evidence that ever happened. That was something that was made up on the fly. That was that misdirection that you've heard about so much. That was not taking responsibility for your own actions.

Also, that statement, for you to believe plaintiff's story, for him to meet his burden, he has to make sense of this part, too, that Guevara is in charge. The gang crime specialist who works on the street in a team that goes around getting gang intelligence walks into the Area 5 detective headquarters and takes over.

He's going to conduct all the interviews. Apparently, he's going to walk in and see anybody he wants to see whenever he wants to see them. The detectives are just going to stand there mute because he's in charge now.

They want you to believe that he could walk in there and do whatever he wanted any time he wanted, it didn't matter who.

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 143 of 185 PageID #:23483
closing - defendant Mason
2475

And for the only way that to work, you'd have to have everybody in that building agreeing to some kind of behavior like this. Everybody. Because here is a cop from the street walking in and controlling an investigation in the detectives unit. That has to make sense.

And there's no way it can make sense. There's been no evidence that somehow Rey Guevara had this control over these people, that he had such close friends he could control everything that was going on. They didn't even work together.

You know what gang crimes did? And we talked about this quite a bit. Gawrys talked about it, and you heard the testimony before also from Danny Noon, who's now deceased, he talked about it during the criminal case. Their job is to be on the street, right? Plain clothes, jeans, tee shirts, sweat shirts, bulletproof vest, like tactical units.

And gang crimes specialists are out there to talk to people, get information, know what's happening on the street, get word on the street, like tips about who might have committed a murder.

They are not the ones conducting those investigations at detective headquarters. They are support. What did they do in this case? They do what gang crimes specialist do. They hear information. They pass it along. They bring people into the station to talk to the detectives. They act as taxicab service. I heard Gawrys say that.

closing - defendant Mason

2476

What do you do when you have to bring in a witness? They ask me to go get a witness, so they set it up. I go pick them up. We go bring them in.

But they are not conducting the interviews. They are not conducting the lineups. But plaintiff wants -- has you -- plaintiff wants you to believe that Gang Crimes Specialist Guevara walks into Area 5, everyone genuflects, and he controls everything so much that the lead detective will say nothing and stand there mute and apparently just do his bidding.

That's what plaintiff has to prove in order to meet his burden because that's his story.

Okay. Then we have -- then we have something interesting. Once we get past the whole idea that he smashed his face torturing him, you know, crushing his face on there, remember when Karen Shields was up there on the stand? I just remember.

Karen Shields is on the stand, and when they asked her about his head being hit to the table, she like, well, I just remember his face being -- maybe something about being pushed on the table. Even she didn't want to embrace the idea of his face being smashed, right? Because she knows there's no evidence of it, right?

So let's get past that point. Karen Shields wanted to run away from it, so let's get past that point.

His next thing, the other thing he says Mason did,

remember, the other, as plaintiff's counsel put it, overt act that he did was he signaled -- now, remember, he's not the one giving any questions. He's a mute. He's not telling him what to say. The next thing he did to signal to coerce Jaime Rios to confess to a crime that he's saying he didn't commit --

Can I get -- yeah, thank you -- Plaintiff's 93.

He drew this. There was a big white board apparently in Area 5 that is used, and what he says is he walks over there I guess with those little erasable markers or something, I don't know even if they had those back in 1989; but he says he walks over there and he draws that, and that I heard someone -- I don't know what it is. But he says that coerced me. That. That.

It was described when he drew it. I mean, it was a big production. He came down. I was waiting to see what happened. He came down. He drew it right here, and it was described: A square, a T, and a swoosh. That's it.

Was there any testimony or any explanation about what this meant? No. The only thing it was: Was this was the smoking gun. This is what coerced him. This is what he did during the conversation that he was having with Barbara Riley -- and by the way, I thought it was interesting, too.

He talked about ASA Riley, he called her Barbara over and over again. I guess that's the whole rapport thing that Mr. Schafer talked about, but he seemed very comfortable with

her when he's calling her by the first name, especially this woman who supposedly, I don't know, helped frame him, according to him, right?

This is the woman who sat back and blindly ignored everything that was going on and just wrote down whatever Mason was saying and was there while everything was being developed, right?

But he calls her Barbara.

Okay. But while she's talking to him, he says this is what Mason does so he knows what to say. Square, T, and a swoosh. That's the evidence they bring. That is the evidence of the coercion by Mike Mason: A beating torture that leaves no marks and no evidence, and a silent drawing of a square, T and swoosh which gets someone to admit to murder.

It's their burden to prove that that matters. It's their burden to prove that that's what caused it, because that's their story. And once again, like Mr. Kivetz said in the very beginning and what the Judge instructed you, please use your common sense.

So, that brings me to something that Dr. Schafer talked about, what guilty people do, they misdirect, and we talked about that some. But what's important is that you actually got to see a lot of that misdirection live from the stand. You saw it happening in real time.

It wasn't looking back at a deposition. It wasn't us

trying to piece things together through different testimony. You got to see it happen in real time.

Let me see. Let's start from one of the big ones right off the bat, the alibi, remember? So, shall we go through the different permutations of the alibi?

Now, after he was cross-examined by both me and Mr. Scahill, his own attorney got up there and said you're not saying you ever had an alibi, right? He's like, yeah, I don't have no alibi. That's how it ended.

Let's talk about how it started, okay?

We know he didn't give an alibi in the police station. Otherwise, if he gave an alibi, it would have been checked out just like it had with Mr. Melendez. He didn't give one then.

But in 1990 at his criminal trial, you heard it. He said he had no idea where he was. Couldn't give an alibi for June 27th. He had no idea.

Okay. That was then.

Oh, and then, that doesn't really work really well, so let me see, during his sworn interrogatories, he says -- this is another version -- he says I -- I went to my mom's house, then went home for the night and went to bed, because that fits his story now about his routine.

Remember the routine? I get up in the morning. I head outside. I stand in front around noon. I sell my drugs for two to three hours. And then I go on my bike and I go to

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 148 of 185 PageID #:23488
closing - defendant Mason
2480

my mom's house because I'm a dutiful son.

And I go to my mom's house. I clean up after my dog, I take care of things, and then I hang out in the club, which is a neighborhood club which happens to be a lot of Latin Kings because it's a Latin King neighborhood. I hang out there until late in the evening, and then I ride myself home. That's his normal routine.

But at least with that one, with the interrogatory response, well, mom can be a pretty important witness, couldn't she? She could at least say when he left that night. She could at least talk about his routine, right?

But she's not a witness. Never has been. Wasn't in 1989; isn't now in 2026.

So, well, okay, now I got to move a little bit from there because that one's really not working, so then in his deposition, he gives a new one, remember?

In his deposition, he goes where were you on June 27th? Mr. Polick was asking him the questions. And the questions were: Where were you on June 27th? He starts talking about it. And he says, okay, June 27th, the night of the murder, it's described a couple different ways, right?

And during that time when he's talking to him under oath again during his deposition what does he say? He says I was in front of my house at 1440 with a friend Jamaica, a Jamaican guy I know from the neighborhood, friend of mine, good

closing - defendant Mason

2481

guy, just hanging out, and we're hanging out there the whole time.

And it fits in with his routine. I go outside. I sell drugs. I go to mom's house. Come back. Hang out. And this time I'm just hanging out. So around -- I know where I was on June 27th, the night of the murder, I was hanging out in front of my house with a guy named Jamaica. Then I went upstairs to bed.

Well, that doesn't work either because then you'd have a couple different alibis, a couple different people to talk about. You'd have the mom to talk to because you were at the mom's house earlier. Maybe some people from the club. Oh, can't use them either. Then you have Jamaica, then you have the girlfriend. It's not going to work really well, is it? Because where's Jamaica? Who's Jamaica?

Well, according to Mr. Burr who came in, Mr. Burr said I'm from the neighborhood. I know everybody in the neighborhood. I walk around the neighborhood. I spend time in the neighborhood and goes on and on about the neighborhood. I don't know anybody named Jamaica. Never heard of that.

It's because he doesn't exist. That's not going to work.

So, time to misdirect again. So then we go back to, I don't know, I don't have an alibi. I've tried a couple different versions. I've changed a few different times, but

closing - defendant Mason

2482

every time I do, there's a problem. I have no evidence, and it should be a really easily accessible evidence, shouldn't it, like my family members.

So it goes back to not having one. That is a pattern and yet you saw over and over again every time Jaime Rios spoke about something. If it doesn't work, change the story over and over again.

So, another one that gets brought up, and it got brought up by Mr. Richards a little bit, the sweatshirt. Very insidious idea that he's wearing a sweatshirt and he wasn't wearing a sweatshirt the night before when he came in.

Well, he forgot about the fact -- well, remember, it seemed like it was going to be something like Mason or Halvorsen or maybe Guevara was down in the lockup, but someone did something bad to give him a sweatshirt until I reminded him that he testified under oath before that when he went to the lockup that night, it was cold. It was really cold. He couldn't sleep.

Well, then it makes sense. A lockup keeper gave him some sweats to wear. So he put some sweats on. That's it.

It makes it sound really bad when you don't know about the part being cold and someone gave him something to wear. It makes it sound like maybe it was something insidious going on. Maybe it was something weird going on. It was just someone giving someone clothes when they were cold.

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 151 of 185 PageID #:23491
closing - defendant Mason
2483

But once again, now it's part of a vast conspiracy to frame him.  That's what it is, by apparently the lockup keeper downstairs.  Apparently he's involved in the whole thing.

So the -- I guess, I'm not sure what watch, the midnight watch lockup keeper in 25, 25th District downstairs in 1989, he was apparently involved in this whole conspiracy, too, as well, right?

That's what you have to believe for plaintiff to meet his burden on this because it makes no sense otherwise, does it?  And where's the evidence of that?  I'm still waiting for it.

Another time where he's misdirecting and changing things, and you heard it again, he actually tried to do it at this trial:  *Miranda*.  He said repeatedly on his -- I'm not sure how many hours it was for his direct examination about *Miranda* warnings.  Wasn't given *Miranda*?  No, no one ever told me *Miranda*.  Mason didn't give me *Miranda*.  Mason didn't even speak.  Guevara didn't give me *Miranda* when he was in the room.  Halvorsen didn't give me *Miranda* -- actually, he didn't even mention Halvorsen.  But no one's given him *Miranda*.  I had no idea.  No *Miranda*.  No *Miranda*.

It's the same thing he tried in the criminal case.  You heard about that.  Initially, there's a motion filed, and it was brought up a lot over the last two days.  A motion filed, and one of those things in that motion was all different

things that were listed about why it should be thrown out, and one of them was that he wasn't given *Miranda*.

And you heard what happened.  His lawyer put that in, you know, as a filing.  This is a basis.  And then his client took the stand and said I was given *Miranda*.  So his lawyer, Jack Carey, crossed it off.  Why?  Because that's not a basis anymore because my client just said he got *Miranda*, and then he said he got *Miranda* again at trial.

But, you know, if it didn't work the first time, why not try it again because he sure tried it from over here, didn't he?  He looked you square in the face and told you, yeah, he never got *Miranda*.  Again, after trying that in 1990 and -- 1990, I believe it was, maybe '89 and 1990 and it not working then, he tried it again.

Now, you've heard a lot and you heard a lot today even about Jose Macho Melendez, and trying to give you the idea that implying possibly maybe he's the bad guy, maybe he did something.

Well, just remember a couple things about Mr. Melendez, and I'm not trying to vouch for him at all.  I mean, the evidence is that this man was at the time the leader of the same set of Latin Kings that he was.

But he's the one guy in this case with an actual alibi for the murder.  He's the one Latin King with an alibi.  That's it.  He's the one with one.  One that was checked out.  Didn't

take him at his word. It was checked out. But let's just talk about the other stuff that doesn't fit.

And you heard about this when Mr. Mason was talking about it. The original descriptions on the scene given to at least the paper car, the first car that was there, don't describe Melendez. They describe two white male Hispanics. They don't say curly hair. They say thin nose. There's all that -- just totally different descriptions going on early on in the case until a couple Spanish Cobras get involved, and then one of them says it was Macho Melendez. It was Macho that did it.

And they said, well, describe him. And you know what he does? He describes Macho Melendez. He's darker complected. He's got a wider nose, Afro-style hair. He does those things. He describes Macho Melendez. And then he goes, looks at a book, and goes that's him. Why? I know Macho. That's Macho. He picks out Macho.

And then when he's confronted with it, hey, this guy's got an alibi. You know, what's happening here? Um, I really didn't get a good look, but, you know, I mean, it's Macho. It's the guy across the way. He's the leader of that set over there. I thought it was him. I think I saw him earlier.

It's not evidence of anything. It doesn't go anywhere. I understand -- I understand, I really do understand why at a criminal trial they would try to make someone else the

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 154 of 185 PageID #:23494
closing - defendant Mason
2486

bad guy. I understand why they would try to shift blame over there.

They tried it before. It didn't work. It shouldn't work this time either. There's no evidence of it. But still they're going to put the spectre out there of Macho Melendez being involved in this whole thing when he wasn't.

And what I think is actually the biggest misdirection that he's done is the gang thing. His story is that he left the gang in 1989 -- '88, I'm sorry, 1988, when he found out his girlfriend was pregnant. That's when he left the gang.

And he decided he was going to become a family man, and that was his goal, a family man. I'm going to be a family man. I'm not in the gang. I'm now on the outside. I don't get information from the gang. Right? That's what he wants you to believe.

Now, what's quite clear also is that, and he said this himself, is that he says, oh, I never actually became a full member. Was much too young. I never took that next step. I joined when I was 12, right? That's what he says. I joined when I was 12 and I was a pee wee.

Then I moved up after two years and did more of the junior rank. So now I'm really handling more things, not just doing security work, right? Not just being a lookout. Doing more things. But I never took the next step. He talked about the next step happening around 17, 18 years old.

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 155 of 185 PageID #:23495
closing - defendant Mason
2487

Well, in 1988, he's 19. So apparently he never took that step, right? That's what he's saying. Oh, no, no, no. Just not me. I didn't take the step. That was the older guys would have the guns.

Jose Macho Melendez is his same age. They came up together, and he's acting like he's some old man, vastly more experienced. They came up together as pee wees, and he's saying no, I never got to that point. How could I have gotten to that point? I dropped out. I was a family man now. I wasn't involved in this thing, right?

Let's talk about other things that show that this is also the biggest misdirect there is. Ten days or so after his son is born -- you remember when he found out she was pregnant, he dropped the gang, right? When she's pregnant. But ten days after his son is born, there's an incident in which he pleads guilty to, having taking a gun and shooting at someone on the street, an aggravated assault. Remember that?

Think about the timing. This is a person who, according to him, was not in the gang. He was a family man. Never took that step. Part of the reason he never took that step, he couldn't do a few things. One of the things he couldn't do, because he was not a Latin King, remember, is he would not have access to guns. And he was quite clear about that. I would not have access to guns. I had a gun once. It was a .45. Someone gave it to me. I sold it for drugs so I

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 156 of 185 PageID #:23496
closing - defendant Mason
2488

could sell them, right?  Sell my drugs.

That's what he says.  I didn't have access to guns.  But he pled guilty to taking a gun and shooting at somebody ten days after his son was born.  Ten days.

When he's arrested on that, and he admits to this, too, he tells Gang Crime Specialist Danny Noon that he's a Latin King from the Schiller set.  He self-admits.  Something else he says he couldn't do if he was just the family man.  But he admits he did that.

So I'm not a Latin King.  I didn't do anything wrong.  Right?  But at the same time, what he's doing at the same time he's telling you, yeah, I'm telling people I'm a Latin King.  I'm shooting at people with guns I'm not supposed to have, and I'm selling drugs in Latin King territory and it's all just fine and dandy.

He wants you to believe that he does all these things, including setting up his own spot where he sells every day -- remember his whole thing, gets up in the morning, heads out at noon, sells drugs for two or three hours every day in front of his house, that's his spot.  His spot in Latin King territory, and he wants you to believe that he was doing that while he was quote/unquote on the outside from the Latin King nation.  On the outside.

And he wants you to believe that the Latin Kings are like, oh, that's fine.  You can represent being a King, you can

closing - defendant Mason

2489

have a gun, you can sell your drugs here, you can do whatever you want to do, it's just fine and dandy.

The one thing he's probably right about is when he was shot that night on June 27th, he was shot at by a Spanish Cobra or another rival gang because he was a Latin King, not because he was a family man.

And then they try to misdirect us on the whole firearm evidence. We know that Mr. Morales was shot multiple times. We know there's multiple through-and-throughs. We know there was no ballistic evidence taken up from the through-and-throughs. We know there's .25-caliber shell casings. We do know that, right? We know there were a couple bullets that were recovered, and according to even plaintiff's counsel when he was talking to our last witness here, there was no forensics that could link that to anything. That's true.

But -- and we don't know what caliber gun shot through and through. That wasn't recovered. All we know is we have .25-caliber casings. You know, are we supposed to believe him in his court-reported statement that it wasn't me with the .25. I had a revolver. It was that Tino guy that had the .25. Are we supposed to believe him there? Or maybe he had the .25.

Maybe he was misdirecting again. We don't know. But what we do know is that he knows specific facts about that murder that he wasn't -- he even says he wasn't told about, like where the body fell. He knew what caliber gun it was

because he knew what he was shooting that night.

And then I -- I'm sorry, I heard something in the closing about how there was no testing to see if it was a recently fired gun. I never heard any evidence of a magical test to tell if a gun was fired a few days before. Did you? Did you remember a witness getting on the stand, talking about there's testing that would be done to determine if a gun was fired a few days before?

Have you -- is this a Special CSI thing that we never heard about before? Sure wasn't heard about in this courtroom because we're just making things up now.

Now, there's a lot in there they talked about as part of a quote/unquote conspiracy with Rey Guevara, that Mike was involved with a conspiracy with Rey Guevara. He says you can tell because the reports are written in a way that, you know, doesn't have Rey involved.

Yeah, because he wasn't. When Gawrys was on the stand, he was asked: You wrote the arrest report? Yeah. Well, why did you put down all the other guys there? I mean, you guys didn't actually put the cuffs on him, right? No, we didn't. Why? Well, everybody that was involved in assisting we put on there. Why? So everybody would know.

They wanted to make sure everyone knew what happened here. They actually over-include. They over-include. And the reports you see Rey Guevara's name on have to do with his

closing - defendant Mason

2491

activities on the 6th and the 7th.  Same with Gawrys.

Nothing after that at all.  Nothing.  The -- his own report that was written by Gawrys is about the fact that what they did, he has it in here, about the CIs, informing Area 5, finding Jaime Rios, bringing him in, being told by the detectives that he had given an inculpatory statement, then they were assisting with the lineup, right?

And he told you what that was.  What does that mean? I don't remember exactly what I did, but what we would do is either -- maybe either getting witnesses or getting fillers. How would you get fillers?  Well, if they weren't in the lockup, we'd have to go out and try to get them from the street and see if they would come in.  And would you be doing that with your partner?  Yep.

And how would you do with witnesses?  Well, we'd reach out to the witnesses, either they would by phone or whatever, go out there, we'd pick them up.  We're a taxicab service. That's it.

Are they conducting the lineups?  No.  Are they showing them photographs?  No.  Are they telling him who to pick?  No.

Where does the telling him who to pick stuff come from?  It comes from them.  Does it come from Huertas?  No.  It comes from them.

So one thing at least they were clear about is that

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 160 of 185 PageID #:23500
closing - defendant Mason
2492

the evidence against Mike Mason actually has to be Mike Mason's evidence, right?  It can't be, oh, because Rey Guevara is taking 5, you can hold that against Mike Mason.  At least they got that part right.  It's in the instructions.  It's clear.

But what's also really important is that there has to be some evidence.  They have to meet a burden on their story, on what he says happened because what he says happened on that -- in that room was that Mike Mason tortured him by slamming his face into a table and then tricked him by showing him square, T, swish.

So faced with the lack of mountains of evidence against Mike Mason, what does he do?  Well, when he doesn't have anything to prove what's going on there, he brings in his old friends, and we heard from them, right?  We heard from Tino Garcia, we heard from Carrero, and we heard from Mr. Burr, right?

All people that the defense counsel knew about, but for some reason, and I bet you can guess why, Tino Garcia and Burr were never called at trial because I'm assuming, and I think it's probably a fair assumption, that when Mr. Carey got a look at them, he decided they weren't going to be hitting the stand at any time, would he?

MR. S. RICHARDS:  Objection.

THE COURT:  Sustained.

MR. ENGQUIST:  Let's start with Tino Garcia.

I don't think I need to go in a ton of detail on Mr. Garcia. I'm pretty sure Mr. Scahill will a lot more, but he admitted lying under oath over and over and over again. I know plaintiff's counsel was quite clear, he thought he was being very honest because he did admit that he had shot up I guess with heroin before he came in that day.

That's not the bravest step in the world, is it? He was caught. You could -- Mr. Scahill, pretty much everybody on that side of the table knew, and everyone could tell that he was high on something. And he admitted it. It's not a brave thing.

This is also the same person who admitted to lying under oath over and over and over again. He wasn't an honest person at all.

Let's talk about he actually said he had an alibi. Remember what the alibi was? That dinner the night of the 27th, him and his girlfriend got Father & Son's rib tips and pizza. He knows that he wasn't eating rib tips and pizza shortly before midnight on the 27th. That was at dinner time. He doesn't have an alibi for what he was doing that night at all.

I'm not sure why he would even call that an alibi. I can tell you what I had for breakfast today. It doesn't mean it's going to be an alibi for what happened to me in the evening. That's what they want you to believe here.

closing - defendant Mason

2494

They brought in Mr. Carrero. Once again, another person. Well, you know, just like Garcia who decided to say he had parts of his sworn affidavit I signed that's not true. They both say that.

And so Carrero is saying, no, no. I lied on that. That was wrong. Yep. Oh, yeah, I told him years and years before supposedly that Rey Guevara, even though he's not on any paper anywhere ever was involved, but he came in and threatened me. You know, he happened to threaten me in the same way you're saying he threatened to you, too? That's amazing. That's quite the coincidence inside the prison they came up with that one. But they decided to both keep it to themselves for at least another 10 or 12 years, maybe even longer. That's important, isn't it?

You know, when a coincidence like that comes up, saying, oh, my gosh. You know, he threatened me in the same way. Yeah, he threatened me, too. Yeah, he did that whole thing. I know, let's keep it to ourselves for at least another 20 years and see what happens next.

That's what they want you to believe because that's how their story unfolds. That's what it is.

All right. So, you know, when it comes down to why Garcia and Carrero would be saying what they said, why they admit to lying about a bunch of things over and over again, even different things under oath, and remember with Carrero it

closing - defendant Mason

2495

was, well, he told me to say that Rios came to me, gave me a gun, and said hide it for me. I shot someone today. Something to that effect, right?

But when he goes to trial, the State can't find him. He's not talking to them. Mr. Carey brings him in. Mr. Carey brings him in. He gets on the stand. He's, like, yeah, I had a gun and I got it from him, but he never said a word to me about where it came from.

He actually had to be impeached on it because he couldn't remember because he thought -- he said no, no, no, I was going with my third version, which is he was never even there that day. The gun was mine. My girlfriend was just taking the heat for it.

Remember that one? So we have multiple versions coming from him, and he couldn't even keep them straight even though it happens at the same time. He couldn't keep them straight at all. Mr. Scahill had to even show him his own testimony for him to go, oh, yeah, that's right. I only partially lied that day.

I guess the old adage of once a King always a King really do fit with those two people. They really stood up for the guy in that case. They're willing to come in here and say anything.

Then you have Mr. Burr, and I can see why he was never an alibi witness. Remember, okay, see, when they start talking

closing - defendant Mason

2496

about this and he starts talking about what happened that night, now he says, well, remember I was confused, and I wasn't confused, but I kind of was, and the shooting that happened in front of my house where I was shot at, that wasn't the 27th. It was -- it was, like, the 2nd or 3rd when that happened, July 2nd or 3rd, days later, right?

And I was outside with Burr, my girlfriend, my girlfriend's brother, Daniel Rodriguez, and then my girlfriend's mother came down. She said get yourselves inside and stay inside. So I stayed inside. I listened. I didn't go outside. I didn't do anything. That's -- remember? That's the new version of events, right?

And even though it's not an alibi for what happened on the 27th, because now he's moved the date, it's pretty darn important because at least you can poke some holes in things, as they put it. Poke a few holes in things. Maybe cause some reasonable doubt.

So to help himself out, his attorney -- actually, all of the attorneys don't call the girlfriend. I mean, she was there supposedly, right? Not only was she just -- wasn't upstairs just sitting in the house when it happened. She was supposedly down there. Gunshots near her, right?

She never testifies about it once. Not in 1989, not all the way through 2026.

How about her mother? Nope. Wasn't a witness in 1989

closing - defendant Mason

2497

all the way through 2026.

How about the brother Daniel Rodriguez? He wasn't even in the gang. Never a witness. Ever.

So we're left with Mr. Burr. Mr. Burr didn't come in at trial. He was never brought in to explain what happened, right? Even though supposedly he was there. He can tell everything what happened, right?

The problem with Mr. Burr is that Mr. Burr is pretty clear about I was there, there was a shooting, I got knocked down, right?

Okay. Let's even take him at his word for that part, okay? Just take him at his word for that part.

The next part gets a little harder taking his word on. When that happened. He says, well, I know it had to be, like, the 2nd. Maybe the 1st, once he realizes the 2nd is a Sunday. That sounds a little weird. Okay. So it was the 1st.

And he knows it's the 1st because there was always a tournament that ran from the 1st to the 6th, and it was a basketball tournament at Wicker Park, and he played in it. And he remembers that year because he got two trophies. Not just one, two. MVP and he got the trophy for the victory, right? For winning the championship.

Okay. And he remembers that. Asked him in the deposition, hey, do you happen to have anything from that to show when it happened? No, I wish I had that. Now magically

closing - defendant Mason

2498

when he got on the stand, he goes, no, I have those things. Well, where are they? Oh, no, no, they don't have the date on it. They just have the year, so they wouldn't be helpful anyway.

Okay. Even take him at his word for that part of it, that there are some trophies someplace. He couldn't explain credibly how a tournament that began on the 6th and supposedly -- started on the 1st and ended on the 6th, that he would somehow win the championship on the 1st? How a five-day tournament is ended apparently day one, that's when they hand out the trophies?

What it really points to is even if you were to take him as being true in anything, that maybe he saw a shooting that took place in front of the house where he said he saw Jaime Rios. It was him, Jaime Rios, no girlfriend out there, and him and Jaime Rios out there. He remembers other people being outside, too, just randomly across the street, and then after the shooting he sank to the ground. Jaime, inside the house, he leaves.

He doesn't know where Jaime went afterwards. He doesn't know if Jaime went in, got a gun, went back out looking for revenge. He doesn't know all of those things. And what he also apparently doesn't really have a good handle on is when it actually happened.

Even if you were to take him at his word that he was

around when there was a shooting out in front of 1440 North Leavitt, the only thing it points to is that it actually supports the fact of what he said in his court-reported statement, that he was shot at on the 27th, he went inside, got his gun, and went out. That's the only thing it fits with because the date sure doesn't make sense.

So, what do you do when you're putting on a case and you're going to be asking for -- I forgot how many millions he asked for again dollars -- and your alibi keeps on changing, and when it does, it never works, so that's gone. Your story about the fact of, oh, um, I was beaten doesn't pan out because, just like it did in that trial, there's no evidence of it. In fact, all the evidence points to you weren't tortured and smashed in the face with that kind of pain, right? None of that works.

When you're faced with that and when you have these witnesses that come in here that really aren't that credible, what do you do next? You attack the witness who actually identified you. That's what you do.

Luis Huertas. He's never shown any doubt that Jaime Rios was the person who shot and killed his friend. You even heard that during the post-conviction hearings that were going on, even Mr. Richards informed Carol Rogala, yeah, he's not flipping. He's holding with his identification. He never changed.

Now, yeah, he brought in an expert. That's great. They brought in Mr. Loftus. And what does he tell you? When it's dark and it's hard to see, it's harder to identify people. When they're far away, it's harder to see people, and it's harder to identify people, and you might make a mistake.

If you're not paying attention, you may not be able to identify somebody if you think -- or you're looking at something else.

And you know what happens? Memories fade. And over time your memories fade more, and there's more chance of a corruption. It's all true. That's what he says. I'm sure glad we had him in here to tell us that, but, yeah, that's what it is.

So let's talk about some of those points. Let's. Huertas was sitting in front of a bar with a beer sign right there that was lit up right near a street light. This is Western Avenue. Western Avenue, a big avenue here in Chicago. A major thoroughfare, right? 2400 West, right? Lights up and down it all the way through.

And he's saying that a person standing -- sitting there with lights behind him, with lights over the street, with a person coming up walking by -- remember he has one person in front, one person kind of off the shoulder -- they wouldn't be well lit enough for him to see his face.

It doesn't make any sense. There's lights everywhere,

and the shooting took place right underneath another light where he's being lit up there, too.

Of course, there's ample light to see.

Well, maybe he wasn't paying attention. Huertas talked about that in his criminal trial. He's sitting there, and these people came up that he didn't recognize. So he looks at them. Why? It's a dangerous neighborhood. He's on one side of the border from another rival gang, and he's sitting there as these guys come by, and he's looking at them.

What does the guy do? The guy throws the C up as Cobra, what's up. He doesn't respond. But he looks at the guy, and he's watching him. Why? He wants to make sure nothing bad happens. So he's watching them.

He's more attentive. He's looking at him carefully. His attention is not being drawn to something else. They want to talk about gun focus. There's no gun at this point at all. Gun doesn't come out until later on. He's already looked at his face in the lights.

So that doesn't make any sense. Was he close enough? Yeah. He was there, walking up to him, up to him, and passed him down the way. It wasn't like he was looking at him from a football field away.

Well, was there any doubt in his mind? Nope. Remember how they described the lineup? When he came in for the lineup, first thing he said: No. 1. Take your time, take

closing - defendant Mason

2502

your time, just look at everybody.  Okay.  No. 1.  That's the man who killed my friend.

So where's this weird corruption going on?  Oh, that's right.  It's coming from the idea that Rey Guevara -- apparently without Gawrys knowing, mind you, because Gawrys is with him -- Rey Guevara is secretly brainwashing him in some way on the ride to the police station.  That's what's happening.

Who says that?  They do.  Is that evidence?  Did Mr. Huertas ever say, they told me who to pick?  No.  I was confused.  I wasn't quite sure until the last second until they told me what happened.  It was all Rey Guevara, the boogeyman who's everywhere.  Nope.  That doesn't happen.

So -- but that's what you have to do.  You have to tear down the citizen who came forward and did that.  And then the next thing they go is, oh, what -- Huertas is not on any of the reports.  He didn't talk to police officers that night.

Well, apparently he did.  He talked about going to the hospital that night, so he left the scene.  And we know by the next day, because, remember, this happens after midnight and he's not pronounced dead until later on in the morning, right?  And you know what happens then after that -- after he's pronounced dead?  A police officer brings him in.  Mr. Moon -- Mr. Noon, right?  He is talking to police.  He just apparently didn't talk to the officers that were doing the report on the

scene.

There's a big delay. There's no mention of him until a couple hours later. A couple -- it's not like he appeared three weeks down the road out of the blue. It's a couple hours later, after his friend had died and he went to the hospital when they were trying to see what was going on with him, and then he died.

Yes, he was talking to police. Apparently, he was screaming at people to go get an ambulance. I'm sorry he didn't stay there and not go -- and stay there and not go to the hospital. Maybe he should have made sure he was there to give all the information to the officers there. But he sure the heck talked to the officers later on, didn't he?

And they're trying to say that there's some kind of insidious plot that he's made up. They actually implied that he got on the stand and lied repeatedly about what happened to his friend because if you don't have any evidence, you might as well tear down the person who came forward. You might as well tear down one of the victims.

Now, I know Mr. Scahill is probably going to be talking about this, but they keep on talking about a false arrest, a false -- a bad search. It has nothing to do with the claim against Mike Mason so I'm not going to spend a lot of time on it. I don't want to just talk.

But please take a look at the instructions. I know

closing - defendant Mason

2504

you've had them read to you twice, but they don't even talk about -- there's no -- false arrest doesn't even come up. Search doesn't even come up. Those were things that were tried in the criminal case, and they failed then. They aren't even claims here. This is more just misdirection.

All right. So plaintiff's now asking for, if I can remember here, 39 million and change after it's all said and done, and he figures that out by saying so if you take a random innocent person with unlimited funds and another random person with unlimited funds, one that knows persons in prison and one who doesn't, so apparently some kind of Elon Musk person that either went to prison or didn't go to prison, unlimited funds, okay? If you look at them together, you get a magic number of $6,000 a day.

I don't even know -- I mean, if we're going to make up figures, imaginary people and imaginary figures and having the imaginary make up a certain kind of marketplace because you have two different imaginary figures talking to each other, why not put in maybe some imaginary guilty people who would have unlimited funds, or maybe some people that don't have unlimited funds. Let's make it a big marketplace.

But take him at his word. That's how they came up with the number. We have imaginary people and imaginary people coming together to make an imaginary amount, and his imaginary amount is $6,000 a day, and then you add in all the extras he

has in here we get just shy of $40 million.

He's asking for generational wealth for everybody there. That's what they're asking for. Generational wealth. It's ridiculous.

So if plaintiff doesn't meet his burden, and he doesn't, the answer is really simple, and my response is really simple, and the jury instruction tells you this. If he hasn't met his burden and hasn't even come close, the answer to damages is zero. That's the appropriate number. The appropriate number is zero.

However, and I wouldn't be doing my job if I didn't address it more. If, and let me just stress, if you were to be considering damages in this case, then you need to look at what actually was going on here, who he was before he went in.

We know that five years of the time that he was in, he said in the beginning of the case and throughout this case he spent 17 years in. I didn't do the math with my calculator with all his numbers, by the way, to come up with the number he did. I didn't do that math. But we know he had five years for different crimes.

We know he was going into prison anyway. We know that he would have been on mandatory supervised release or parole anyway. We all know that. That was already there because the aggravated battery, right? The shooting.

So we know that, and that should be taken into account

closing - defendant Mason

2506

if you're thinking about it.

And I'm not going to argue that prison isn't bad. It's something we actually agree on. It's there to rehabilitate, but it's also not a place where people want to go back to, and I'm not going to try to say otherwise.

But what we do know about it is that when he went into prison, who he was. He was a young Latin King who got thrown out of school for fighting. He was violent.

He rose throughout the Latin Kings and stayed in the Latin Kings his entire time no matter what he says now. He spent his days with no lawful income. He spent his days selling drugs right near a schoolyard. That was his day. And he did that every day.

And we know that when he went to prison and went to Cook County Jail and all the different prisons he went to, he was never the victim of violence or sexual assault. He never even had a health issue.

We know that he never got any mental health treatment while he was in prison, and we know he's received -- there's no evidence of him ever receiving any mental health treatment since his release. Nothing like that. There's no bad dreams, sleepless nights, anything like that. He actually said he acclimated well. He had no problem acclimating to life outside. That's what he said.

We know that he finally did leave the gangs, leave the

closing - defendant Mason

2507

Latin Kings, late in his career, his time at IDOC. Okay. Hats off to him for that one actually. And we know, and I had to kind of question him about this and go back to his deposition again that he did admit that he -- every correctional facility he was in except for Menards he saw his son every two to three months, so he still kept that contact all the way through because his mother and sister made sure they brought him. We know that.

We know since his release -- you know, right before his release, he got his G.E.D. He left the gang, he's got his G.E.D. That's great. We know that we don't have any more arrests. We know he's kept his nose clean since his release. We know that he's been able to go off since that time and live a happy productive life.

He's been gainfully employed since then the entire time, which is great. He's been in apparently a happy loving relationship the entire time. He even started that before he left prison. That's great.

He's not the same man he was when he was 19 going on 20 when he was on the streets then in the Schiller Park area, in that area right there in Wicker Park. We know he wasn't the same person, and I'm glad he's not.

Since his release, he's been able to work. He averages, he said his highest amount is maybe about 40 to 50K he's made in a year, but him and his wife both work and they've

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 176 of 185 PageID #:23516
closing - defendant Mason
2508

done well. They've been able to do things like go on vacations. We know he's been in different places around the United Sates. We know he's been -- also been able to go overseas. We know he gets to go on vacations in different places. He knows his son comes to see him once a year, comes to visit everybody here in the family. We know that. We know he goes to visit his other son, his stepson. We know he's been able to do those things, and we know he hasn't had any problem acclimating since then.

But the most important thing is he hasn't gone back to who he was, and I'm not trying to say he did.

So if, and I have to stress if, you're considering damages, then I would suggest an amount about twice of what he makes now. I would suggest an amount of about 100K. That's what I would suggest.

And 100K a year, that's twice what he's making now, and if you're looking at somewhere between knock off five years roughly for his other things, you're looking at roughly 12 years, somewhere around 1.2, and I even hate saying that because I believe the honest answer should be zero.

But if you are to consider damages, it's not $40 million in generational wealth for the table over there.

MR. S. RICHARDS: Objection.

THE COURT: Basis?

MR. S. RICHARDS: For the table? I think he's

Case: 1:22-cv-03973 Document #: 355 Filed: 03/04/26 Page 177 of 185 PageID #:23517
closing - defendant Mason
2509

referring to --

MR. ENGQUIST: I'm sorry.

MR. S. RICHARDS: Objection.

MR. ENGQUIST: For plaintiff.

THE COURT: Okay. The table over there refers to the plaintiff who's sitting at the table.

You may continue.

MR. ENGQUIST: Okay. Anyway, what I'm saying is that generational wealth is not called for here. It's ridiculous.

So the next part is punitive damages. Remember he's -- my client has been sued and has been dealing with this case since 2022. He's a 74-year-old man, a husband, a father, a grandfather. He gave 30 years to the city and to the citizens here in the city as a police officer, and he's been retired for about two decades. And since 2022, he's had this hanging over him, and they want you to award punitive damages against him.

Now, you can assess punitive damages, and the jury instruction is going to say only if you find the contact was malicious and in reckless disregard to his rights. It was done with ill will and spite. And so let's talk about the behavior they're talking about.

What they described as torture, the smashing of his face with no injury. Remember? The 10-1/2 out of 10? And then what we still have on the screen there the -- I guess the

reckless brainwashing coercion by drawing square, T, swoosh.

Punitive damages aren't justified at all.

Also one of the things you should look at is the likelihood that the defendant would repeat the conduct if an award of punitive damages is not made. He's been retired for 20 years. Punitive damages designed to send a message to Mike Mason is absolutely unwarranted.

So I just want to be clear again. It's plaintiff's burden. You know what his story is. We've gone through it. And he hasn't met that burden. He hasn't proved his case at all. He hasn't proven what he said he was going to prove. His story is just not true, and he hasn't proven it.

You've heard the same evidence, much of the same evidence that was brought to the last jury who decided his fate. Didn't work then. It shouldn't be convincing now either.

When the evidence is clear, when you go back there and think about the claims against Mike Mason or the claim, please, look at it carefully. Please use your common sense just like we asked you to do from the very beginning and what's in the jury instructions because I think when you do and you look at it, you'll know that the claims of the worst pain imaginable from Mike Mason when he slammed his face down there was not going to ring true.

The coercion by using square, T, swoosh is just not

going to sound true.

The idea that somehow he's in cahoots with a gang crimes guy coming in there to magically swoop in to control Area 5 and all the detectives and all the investigation that's going on is just not true.

The idea that everybody, not just him, but everybody from the State's Attorney's Office to the lockup keepers are all conspiring for some reason to get him. It's just not true.

And I think when you look at all that evidence, I'm going to ask you to come back with the only verdict that makes sense, and that's finding Mike Mason not liable and letting him go off into retirement without this hanging over his head again.

Thank you.

THE COURT: All right. Ladies and gentlemen, it's 4:26, so we will break there for the day. We will come back tomorrow at 10:00, hear the last closing argument from Mr. Scahill, and then the plaintiff will have an opportunity for a brief rebuttal argument.

That unfortunately means that I give the admonishment one more time. You're not to discuss the case. You're not to research the case. Please don't let others talk about the case with you because you do not have the case yet to deliberate. So I'll see you tomorrow morning.

All rise.

2512

(Jury out at 4:26 p.m.)

THE COURT: All right. I take it, Mr. Scahill, you're up tomorrow morning.

MR. SCAHILL: Yes, I am.

THE COURT: And then rebuttal from plaintiffs, and then we will get the jury the case.

Are there any issues I need to address this evening?

MR. S. RICHARDS: From the plaintiff's side, no.

MR. SCAHILL: I believe there -- I do have one issue.

I believe during the plaintiff's closing, there were several references, and I know there was one specifically related to the CI information, where Mr. Richards referenced the fact that the CI information had come out at trial as part of his case on the due process claim, which I believe is now going to merit the instruction with respect to immunity and how you can't use -- because the only way that came out is through testimony from Mr. Guevara.

So I believe we now need to give that instruction, specifying that you cannot use testimony as the basis for any claims.

MR. S. RICHARDS: Your Honor --

THE COURT: Response?

MR. S. RICHARDS: -- we don't have a problem with that if the instruction given is the one we suggested, which I think covers both immunity and, you know, what the testimony could be

2513

used for.  I believe I submitted that earlier.

So if they want it, if they think that's helpful, we don't have a problem.

THE COURT:  The instruction that I have is Defendants' Proposed 6 or additional Instruction 6, which states:  You heard evidence that defendants Guevara, Mason and Halvorsen provided testimony during plaintiff Jaime Rios's underlying criminal case.  Plaintiff Jaime Rios's claims may be based only on investigative or pretrial conduct, not on testimony given in judicial proceedings.

Is that the one you're referring to, Mr. Scahill?

MR. SCAHILL:  Yes.

THE COURT:  Mr. Richards?

MR. S. RICHARDS:  Your Honor, I don't have it in front of me, but I believe in response to their tendering of that instruction in my response, I added an additional sentence.

THE COURT:  One moment.

And the proposal is that:  You may consider the testimony of Guevara, Mason and Halvorsen at trial or pretrial proceedings as evidence against them to the extent that such testimony bears upon their investigative or pretrial conduct?

MR. S. RICHARDS:  Yes.

THE COURT:  Response, Mr. Scahill?

MR. SCAHILL:  That seems redundant to me from what we included which refers to that same subject matter.  And also

2514

there's Halvorsen in there, but I assume Your Honor would just strike that.

THE COURT: What testimony did Mason or Guevara give that relates to their pretrial or investigative conduct?

MR. S. RICHARDS: He testified extensively at trial as to his interactions with the confidential informants, which we know is pretrial conduct because it's also in the arrest report.

So he was giving different versions of his interactions with the informants, and that bears upon his pretrial conduct even though he has immunity for whatever he said about it in trial.

THE COURT: And that would be testimony designated and read -- designated in this case and read to the jury?

MR. S. RICHARDS: It was, yes.

MR. SCAHILL: Judge, the problem I have with that is in order to set forth a due process claim, the evidence actually has to be admitted at the trial. The only evidence that was admitted at the trial was the testimony.

There are no -- there were pretrial activities that were testified about that is immune. There are no reports or other things that were admitted. That's sort of the problem I have with this entire issue. It's something I've raised a couple of times in motions before trial.

But the fact that he's testifying about what he did

2515

pretrial does not remove the immunity. In fact, that's the purpose of the immunity. We're talking about if there are reports, if they admitted a report, you know, that he drafted about the CIs, that perhaps would be a horse of a different color, but that is not what happened.

So I'm not even sure we need this business about the pretrial activities unless there was something that was admitted at the trial. I was waiting for that, and it did not occur in the sense of there was not reports from Guevara at the trial.

I think what the instruction should only refer to is the fact that you cannot use testimony at the trial to support the due process claim because there is no evidentiary predicate for pretrial activities that were admitted at the trial other than testimony.

THE COURT: Okay. I'll take a look at the record.

Is there any Mason testimony at issue?

MR. POLICK: I don't think so, Judge, because that claim is not directed against him, and his testimony at the criminal trial was consistent with what he said here. He met with these informants on two occasions.

MR. S. RICHARDS: We would agree.

THE COURT: Okay. I'll take a look tonight and have a ruling for you in the morning.

MR. SCAHILL: Thank you.

2516

MR. POLICK:  Thank you, Judge.

MR. S. RICHARDS:  Thank you.

THE COURT:  All right.  Have a good night.

MR. SCAHILL:  Thanks, Judge.

MR. J. RICHARDS:  Thank you, Your Honor.

(Adjourned at 4:34 p.m., until 2/19/26 at 10:00 a.m.)

\*   \*   \*   \*   \*

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Charles R. Zandi*

*/s/ Kelly M. Fitzgerald*

*/s/ Kathleen M. Fennell*                    February 19, 2026
Official Court Reporters                     Date
United States District Court
Northern District of Illinois
Eastern Division

2517

I N D E X

WITNESSES                                                    PAGE

ANTHONY JOSEPH CARBALLO
Cross-Examination (Resumed) By Mr. S. Richards    2337
Redirect Examination By Mr. Miller                2354

Recross-Examination By Mr. S. Richards            2361


DEFENDANTS' EXHIBIT                        RECEIVED

No. 107                                         2357
No. 111                                         2359

CLOSING ARGUMENTS                                PAGE

By Mr. J. Richards                              2385
By Mr. J. Richards                              2412
By Mr. Engquist                                 2459