2518

```
                    IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
                            EASTERN DIVISION

JAIME RIOS,                        )  Case No. 22 C 3973
                                   )
              Plaintiff,           )
       v.                          )
                                   )
REYNALDO GUEVARA; MICHAEL          )
MASON; and JoANN HALVORSEN,        )
as Special Representative of       )
ERNEST HALVORSEN, Deceased,        )  Chicago, Illinois
                                   )  February 19, 2026
              Defendants.          )  9:53 a.m.

                              VOLUME 13
                TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
                BEFORE THE HONORABLE JEREMY C. DANIEL
APPEARANCES:
For the Plaintiff:    LAW OFFICE OF STEPHEN L. RICHARDS
                      BY:  MR. STEPHEN L. RICHARDS
                           MR. JOSHUA S. RICHARDS
                      53 W. Jackson Boulevard, Suite 205
                      Chicago, Illinois  60604

For Defendant         BORKAN & SCAHILL, LTD.
Guevara:              BY:  MR. TIMOTHY P. SCAHILL
                           MR. GRAHAM P. MILLER
                      20 S. Clark Street, Suite 1700
                      Chicago, Illinois  60602

For Defendants        THE SOTOS LAW FIRM, P.C.
Mason and             BY:  MR. JOSEPH M. POLICK
Halvorsen:                 MR. JOSH M. ENGQUIST
                           MR. JEFFREY R. KIVETZ
                           MS. CAROLINE P. GOLDEN
                      141 W. Jackson Boulevard, Suite 1240A
                      Chicago, Illinois  60604

Court Reporter:       CHARLES R. ZANDI, CSR, RPR, FCRR
                      Official Court Reporter
                      219 S. Dearborn Street, Room 1426
                      Chicago, Illinois  60604
                      Telephone:  (312) 435-5387
                      charles_zandi@ilnd.uscourts.gov

                         *   *   *   *   *
                PROCEEDINGS REPORTED BY STENOTYPE
      TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

2519

(Proceedings heard in open court; jury out:)

THE CLERK:  22 C 3973, Rios v. Guevara, et al., for jury trial.

THE COURT:  I'll take appearances, please.

MR. S. RICHARDS:  Stephen Richards on behalf of the plaintiff, Jaime Rios.

MR. J. RICHARDS:  Josh Richards on behalf of plaintiff.

MR. POLICK:  Good morning, Your Honor.  Joseph Polick of defendant Mason.

MR. SCAHILL:  Good morning, Your Honor.  Timothy Scahill on behalf of Reynaldo Guevara.

MR. MILLER:  Graham Miller on behalf of Reynaldo Guevara.

MR. ENGQUIST:  Josh Enquist on behalf of defendant Mason.  Also Caroline Golden is here.  She just stepped out.

MR. KIVETZ:  Good morning, Your Honor.  Jeff Kivetz on behalf of defendants.

THE COURT:  Good morning, everyone.

I realize Ms. Golden is set up here, not presently in the courtroom, and I did call the case a few minutes early.  But I did that because I wanted to address the question on whether the testimony or immunity instruction was necessary.

I've gone back and look at -- looked at the transcript.  Have you done that, Mr. Scahill?

MR. SCAHILL: I did not get a chance to go into that. I just got it early this morning. I'm sorry, Judge.

THE COURT: I got it this morning as well, and when I reviewed it, my understanding of the plaintiff's closing argument was to frame the testimony concerning fabricated confidential informant and information concerned materiality, would the result of trial have been different without the information from the informants and not necessarily the testimony itself, meaning, there was no argument that Guevara should be liable simply because he testified at trial. And in that context, I don't think that the instruction is necessary.

MR. SCAHILL: Okay. Thank you.

THE COURT: Looking at *Jones v. New York*, 34 F.4th 550, which deals with whether -- or the case states: Police officers cannot purify fabricated evidence by invoking *Briscoe's* absolute immunity rule, which I understand to mean that as long as it's not the testimony itself that is the subject of the claim, meaning, as long as it's the preinvestigation conduct, then the fact that an officer testifies about the preinvestigation conduct does not shield that preinvestigation conduct. And I didn't read the transcript of the closing argument to suggest that Guevara should be liable for what he said, as opposed to what he did prior to the trial.

So I won't give the instruction.

2521

Are there any other issues that I can address for the plaintiff?

MR. S. RICHARDS: No, Your Honor.

THE COURT: For the defense?

MR. SCAHILL: Not at this time.

MR. POLICK: No, Judge.

THE COURT: All right. Mr. Scahill, do you have a sense of how long you'll go?

MR. SCAHILL: A little bit over an hour, I think.

THE COURT: Okay. I'm limiting any rebuttal to 30 minutes. And so hopefully the jury gets the case by the lunch break. I'll bring them in at 10:00 and we'll get started.

MR. SCAHILL: Thank you.

MR. S. RICHARDS: Thank you, Judge.

(Pause.)

THE CLERK: All rise.

(Jury in at 10:00 a.m.)

THE COURT: Please take your seats.

Good morning. Welcome back. Does anyone have anything to report to me?

All right. Seeing no hands, we will finish up with closing argument of Detective Guevara.

Mr. Scahill, you may proceed when ready.

MR. SCAHILL: Thank you, Judge Daniel.

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 5 of 105 PageID #:23530
closing argument - defendant Guevara
2522

CLOSING ARGUMENT ON BEHALF OF DEFENDANT GUEVARA

MR. SCAHILL: I've been waiting a long time to talk to all of you directly again. Obviously you heard from me in opening statements. I sat here yesterday, like all of you, patiently waiting for my opportunity to speak to you, and it didn't come yesterday. But here I am this morning.

I sat here listening for two and a half hours to the plaintiff give their closing argument. I promise you I'm not going to be that long, which I'm sure you're all very relieved to hear.

As I listened to that closing argument, a couple of things occurred to me, and the main one was that it seemed to me at times that the individuals at this table were watching a different trial than the rest of us, that they were listening to different evidence than the rest of us heard, and that they were hearing and seeing witnesses that the rest of us didn't hear, because I have a very, very different recollection of the things that's -- that have happened over the past two and a half weeks in this courtroom.

I don't know, and, frankly, I don't really care, if Jaime Rios has managed to get his life together in the past 40 years. Maybe he has, maybe he hasn't. I'm sure he's different now than he was in 1989. We all are. This case is not about 2026. This case is about 1989 and who that man was in 1989 and what he did in 1989.

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 6 of 105 PageID #:23531
closing argument - defendant Guevara
2523

Make no mistake, on June 27th of 1989, the person who sits here in this courtroom with you today, and has sat here for two and a half weeks, killed Luis Morales. He did it. He did it because of a drive-by shooting that occurred on his drug spot and he went out to retaliate. They said the real killer is out there somewhere. He's not. He's here. He's been sitting with us this whole time.

He went out looking for a Spanish Cobra, and anyone would do. He wasn't looking for Luis Morales. He was looking for any member of a rival gang to shoot them and to kill them, because that is what he was trained to do. We heard him on direct about his gang experience and he tried to soft pedal it. But on cross-examination, he admitted -- he admitted this, he was a trained killer. He was trained as a foot soldier in the Latin Kings to protect the neighborhood. And he said he stood ready, willing, and able to do that by shooting rival gang members. That's not coming from me. That came from him.

He said -- remember the first questions I asked him on cross-examination, because he ended talking about how much of a scourge the Latin Kings were on the community. You know, he's right. He's right about that; how they taught their members to use violence indiscriminately, to have no regard for human life. He said that's how he was taught, how he was brainwashed to do that. That's not me saying that. That is him saying that. And that's what he did.

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 7 of 105 PageID #:23532
closing argument - defendant Guevara
2524

I mean, he tried to tell us he was out of that gang the year before. The problem with that is that every single time he was asked in 1989 if he's a member of the Latin Kings, proudly said that he was; proudly.

On direct examination, he said, well, I never progressed to that point in the gang where I was carrying guns or shooting people. Well, there's a little problem with that. The problem, as you all heard, and you had to wait for us to bring it out, is that in May of 1989, he was shooting at people. He pled guilty to it. And the interesting thing about that, he said, well, I didn't do that.

Did you hear what happened? Did you hear his version of what happened there, other than just saying I didn't do it? You didn't hear a word about that, because that's what he does. He gets backed into a corner and then he lies. And when he's confronted with things he said before, he just moves on as if nothing happened. You saw it over and over and over again.

And he did it again. He was an active member of the Latin Kings. He was trained to kill, and that's what he did. That is the only story that makes sense here. And we'll go through the confession a little bit. All of it tracks, all of it tracks to how he was living his life.

We asked him, okay, this case is about June 27, 1989. You're saying you didn't do it. Where were you? What were you doing if you weren't killing this man? He has no explanation.

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 8 of 105 PageID #:23533
closing argument - defendant Guevara
2525

He's given you no explanation. Actually that's not entirely true. He has given you explanations. He's given you six of them; six different alibis this guy has given you. In a case where he's saying he's innocent and he's told you six different stories of what was actually happening that night, that's all you should need to hear.

And then his attorney comes up after that, which was the most baffling thing I've ever heard in a courtroom, and says to him, Mr. Rios, you're not telling this jury you have an alibi, are you? No, I'm not. Are you kidding me? In a case where you're saying you didn't commit a murder, where were you? What were you doing? That is insane. Insane that we're listening to this.

Why are we here? Why is he allowed to pursue this lawsuit? I told you at the beginning of this case why that was. The process by which Mr. Rios ended up in this courtroom with his hand out asking for $39 million was paved with lie after lie. Again, you don't have to take my word for it. He admitted that. I counted them. 23 times, 23 times on that witness stand, I confronted him with something that he had said that he admitted was a lie under oath, perjury. That's the person who wants money from you.

You saw Mr. Carrero and Mr. Garcia. And we'll talk about them a little bit. But you couldn't trot out a series of less reliable people than those three. It's embarrassing,

embarrassing.

And then what do we hear happened leading to paving the way to this courtroom? Affidavits that they got -- his attorneys that are sitting here today, that they got, that they submitted to the Court that are lies. Undisputed lies. And not little white lies either, big lies. Ones that mean something. So he didn't do this by himself. He had help. It's fraud.

And he was only able to get away with it because the state's attorney at the time had no regard for the rule of law, none. Showed utter disdain for her solemn duty to enforce the laws of the state of Illinois. I'm not mincing words here. She has blood on her hands, Ms. Foxx.

MR. S. RICHARDS: Objection.

THE COURT: Sustained.

MR. SCAHILL: That's the process. That's why we're here. If they would have stood up as they should have, as their postconviction unit tried to do, we would not be here. You would not have spent three weeks of your lifes -- lives having to go through this evidence, which is a joke.

Ms. Foxx treated the postconviction proceedings and the COI proceedings with all the diligence and scrutiny that it takes for somebody to go get a library card. It's ridiculous. That's why we're here, and no other reason.

Everyone in this room should be shocked about that.

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 10 of 105 PageID #:23535
closing argument - defendant Guevara
2527

Everyone in this country should be shocked by that, and the state. It's embarrassing.

So when I started here what I said to you is that it's important for us to start at the end of this case and not at the beginning, and that -- that holds true. That was what the end of the case was. And we all heard it. We heard it from Ms. Rogala. We heard it from Mr. Carballo yesterday. Remember what he said?

Well, start with Ms. Rogala. And she said, look, this is somebody who spent her entire career in the State's Attorney's Office, not just for Ms. Foxx, but for numerous state's attorneys, entrusted with litigating postconviction petitions. And there's a lot of them. I mean, this happens all the time, and they're supposed to defend the integrity of these things, not just because it's the right thing to do and that's what they're charged with on behalf of the people -- I mean, that's who they represent is the people of the state of Illinois -- but the victims, the victims of these crimes, the families.

I mean, they're entitled to closure. They're entitled to have the state's attorney defend these things when murders and criminals come and try to erase the memory of their loved ones. They -- and she tried to do it. Okay. I'm not bashing Carol Rogala. She was trying to do it, and she got told to stop. She's the only person who knows about the facts of this

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 11 of 105 PageID #:23536
closing argument - defendant Guevara
2528

case, and she was told, just stop. For no reason.

Mr. Carballo told us yesterday, I didn't even know this was going on. He said, I was in that office a long time. It was a standing policy at the State's Attorney's Office, if your cases are coming up and they're on appeal or they're on postconviction, they call us up. We're the people who lived and breathed that case. Didn't even get so much as a phone call.

And we heard about how all this went on. There's no evidence that -- that's put on. Can you imagine, can you imagine if Jaime Rios, if there -- there was a trier of fact and he got on the stand in that case and put on the display of dishonesty that he put on in front of you? If that's how -- if that's the kind of evidence that was there, if -- if Tino Garcia who is nodding off on the stand on heroin, if he had to get on the stand? Come on. You know what would have happened. But that's not what happened, and that's why we're here.

Now, we heard a lot yesterday about the evidence in the case and the things that they thought were significant and all of this stuff. It is very, very important for all of you to understand the very limited scope of what you're being asked to do in this case, the actual claims in this case, because what is not at issue is almost as important as what is at issue.

Mr. Richards ticked off, I think he said there were 11

things, that he only needed to prove one of them and, you know, if he proved one of them, he wins. Your instruction manual in this case is two things: It's the jury instructions, which Judge Daniel read to you yesterday, and it's the verdict form, which is even more important because these are the questions that you're going to have to answer. You can and you should look at them, read them closely, read the verdict form closely, read the jury instructions closely. You are not going to find any one of those 11 things in there, zero. They're not in there. Not an issue in the case.

There is no claim that Mr. Rios's confession was fabricated. Did you know that? There's -- there is a claim that it is coerced. There is not a claim in this case that the police fabricated his confession. You will not find it in there. You will not be asked to decide that. It is not a claim in this case.

There's also no claim in this case that either Mr. Guevara or anyone else fabricated the identification of Mr. Huertas. Not a claim in the case. There's no claim in the case that they tricked him or cajoled him or fooled him or coerced him into falsely identifying Mr. Rios as the killer of his friend. Not an issue you have to decide in this case, not part of the jury instructions, not part of the verdict form.

Now, we heard a lot yesterday about how Mr. Huertas apparently has fooled himself for the last 40 years into

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 13 of 105 PageID #:23538
closing argument - defendant Guevara
2530

thinking that it was Mr. Rios.  And, you know, maybe it wasn't. They bring in Dr. Loftus who -- I mean, Dr. Loftus, this guy has testified in apparently 500 cases, all of them on behalf of criminal defendants, trying to get juries like yourself in criminal cases to not believe that eyewitnesses saw what they saw, 500 times.

I mean, this is the guy that you get when you are facing some real time and you have an eyewitness that's saying, I saw you do the crime, who is going to come in here and say, well, people who see crimes in the dark, they're not reliable. People who are under stress, that's not reliable either.

Do you know when most crimes are committed?  They're committed at night.  Do you know what?  Being a victim of a crime, probably pretty stressful.  If we're listening to the Dr. Loftuses of the world, nobody is ever getting convicted of anything.  I mean, this guy is the hired gun of hired guns.  I mean, I don't even know how you have time to testify in 500 criminal cases trying to get people off like that.  It's absurd.

And at the end of the day, you heard the testimony from Mr. Huertas.  I mean, you heard it via read-in.  He has said, look, time passes, people get details wrong sometimes over 40 years.  I'm sure we all have run into that.  He has been rock solid.  He is rock solid at the lineup.  You heard that immediately.  He said, that's the guy.  At trial, under

oath, points him out, that's the guy.

You heard Mr. Carballo. Mr. Carballo -- again, this guy doesn't have any, you know, loyalty to these police officers. These are not friends of his. He goes and walks the scene with this guy. He's in tears. He's in tears, talking about the death of his friend.

Why would Mr. Huertas want to have somebody who wasn't his friend's killer go down for that? Why would he want that? That doesn't make any sense at all. He said this guy was credible. He's a credible, credible witness.

You know who else said that Mr. Huertas was sticking to his story? This guy, Mr. Richards. Remember we heard Ms. Rogala? Ms. Rogala said at the postconviction this was undisputed. Mr. Richards stood up and said, Huertas is still saying this is the guy. This is still the guy, still pointing out my client.

So apparently Mr. Huertas has not only fooled himself, he's fooled everyone else, and he's also fooled Mr. Richards because he's sticking to his story. I mean, that should be the end of -- of the case, but at the end of the day, that is not even a claim that is in here, that this was false. Because it's not.

We heard a lot yesterday about Jaime Rios's false arrest by Mr. Guevara. Not a false arrest case. You're not going to have any instructions on that. You're not going to be

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 15 of 105 PageID #:23540
closing argument - defendant Guevara
2532

asked about that. It's irrelevant. It has nothing to do with it.

Now, look, there's plenty, plenty of reasons why Mr. Rios would come voluntarily with the police to go down to the police station. We'll get into them later. But at the end of the day, it doesn't matter at all. It is not a claim in this case; not a false arrest.

You heard about a search of his house. Not an illegal search case. You're not getting any instructions on that. Not on the verdict form. Not going to be asked to decide that. This is -- are all distractions.

There's no claim that Mr. Carrero's house was searched improperly. There's no claim that Mr. Carrero was unlawfully taken into custody.

There's also no claim -- you heard about these confidential informants. There is no claim that the existence of these confidential informants were made up. You heard from Mr. Richards at the beginning of this case that that's what it was going to show. That fell apart real quick. Not an issue in this case.

They're talking about false police reports that they say were submitted, which -- that they haven't proven any of that. No claim about false police reports either. Nothing.

May I have the overhead, Judge?

So six questions with respect to Mr. Guevara. That's

it. Did Jaime Rios prove by a preponderance of the evidence that Reynaldo Guevara violated his right against self-incrimination by coercing him to make a confession that was used against him?

Then you have: Did Jaime Rios prove that Mr. Guevara fabricated information from confidential informants? That's No. 2.

Third thing is: Did Mr. Guevara fabricate Mr. Carrero's testimony?

And then there's two questions about the famous Cristino Garcia. Did Mr. Guevara suppress evidence about Mr. Garcia's pizza and rib tips alibi; and did he suppress evidence that he had assaulted Cristino Garcia; and then there is a malicious prosecution claim. That's it. Those are the six questions you need to ask and no -- answer and no others.

So I'm going to go through those. I'm not going to read all the jury instructions to you like you were read yesterday. I'm going to assume you listened. You're going to have them back there, so we'll just try to highlight some of this and move this all along. Okay?

But before I get into that, we heard a lot about the Fifth Amendment yesterday, and you know I'm going to talk about that. And so before we get into the claims, let -- let's -- let's talk about that.

That's the instruction you're going to get. I'm not

closing argument - defendant Guevara

2534

going to read it to you again. You're going to have it back there.

We're here today largely because of allegations of violations of the Constitution. And, undoubtedly, constitutional rights, extremely important. Extremely -- this is the -- the bedrock and the backbone of our society. These are things that protect all of us from governmental overreach. Every single part of it is very important. And Mr. Guevara, like everyone else, has the right to have his constitutional rights protected, period, end of story.

Once we start making decisions about categories of people who are not entitled to their constitutional rights, we got a real problem with our democracy. So he -- he is entitled to that. He is entitled to his Fifth Amendment rights.

The other thing about this instruction that you need to understand is that we talked about inferences and unfavorable inferences for using your constitutional rights. Number one, there is no requirement that you draw that inference in the first place under any circumstances. It says that you may; you are not required to do that.

And in order to make that decision, you have to do two things. Number one, you need to look at whether there are reasonable reasons why somebody in Mr. Guevara's position would do what he did. I told you that at the beginning of the case, and I'm going to touch on it again in a minute. Okay. So

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 18 of 105 PageID #:23543
closing argument - defendant Guevara
2535

that's -- that's the first thing that you need to look at.

Are there legitimate reasons why an 82-year-old man would just decide to say, I'm going to sit this one out. That has nothing to do with his guilt of anything.

The second reason, which is probably even more important, is the last sentence of this. Actually, the second to last sentence: For you to assume that defendant Guevara's answers to a given question would have been unfavorable, there has to be other evidence that supports the issue the question referenced.

What does that mean? What that means is that you need to look at all the evidence and all the allegations that have been made mostly by Mr. Rios and decide whether you believe him first. Because if you don't believe him, you do not apply that inference.

Okay. And there are tons of reasons why the things that Mr. Rios said, above and beyond the two dozen times that he lied on the stand, that cause serious questions about whether he's a credible witness. So that is the way that this instruction works.

So what do we know? What do we know about the reasons why Mr. Guevara would have decided to do what he did? Okay. I'm not going to go in more on Ms. Foxx here. You already know my -- my views on that. I gave them to you at the front end of this.

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 19 of 105 PageID #:23544
closing argument - defendant Guevara
2536

But understand this: Ms. Foxx not only did no investigation, rubber-stamped a convicted murderer getting out of his conviction, she is the person who is responsible for prosecuting crimes in this county. She is the top law enforcement official in one of the largest cities in the country. She gets to decide whether criminal charges are lodged against people.

So maybe we would all look at that differently than Mr. Guevara, but it is -- is it an unreasonable thing not to trust her judgment given the way that all of this has played out? I don't think any one of us can imagine being put in that position and what we would do if we were put in that position. He made a decision. Maybe it's not one that we would all make, but it certainly is not an unreasonable one given how all of this has played out.

The other issue is that, as you heard from Mr. Guevara, he's not freelancing here. He was given advice by an attorney, not me, on what to do. We all do this all the time. We rely on professional advice in our personal lives. And attorneys exist to protect us from ourselves sometimes, even on things that we shouldn't be so worried about.

I mean, that's why we get people and hire people as -- and lawyers are a very, very important part of our society, and that's what he did. And the stakes are high for him. I mean, this is a man, as you saw, you know, he's rubbing his eyes. I

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 20 of 105 PageID #:23545
closing argument - defendant Guevara
2537

don't think his -- his memory is as good as -- as it's been. His mental health certainly is failing.

MR. S. RICHARDS: Objection.

THE COURT: Sustained.

MR. SCAHILL: He's living on a pension, supporting his wife. I don't know. The guy looks like he just gave up to me, but --

MR. S. RICHARDS: Objection.

THE COURT: Sustained.

Refer to the evidence, Counsel.

MR. SCAHILL: Whatever you make of this decision, right or wrong, just remember this: Mr. Guevara is not asking anything from you. It's not his lawsuit. He doesn't bear the burden of proof; not required to sacrifice his constitutional rights to help Mr. Rios. Mr. Guevara does not want money. It's not in the verdict form. You're not going to see any place for that.

All I'm saying is listen to all of the evidence that you heard and remember whose lawsuit that we've been listening to and who bears the burden of proof, and it's Mr. Rios.

So let's talk about the claims. Coerced confession claim. Again, not a fabricated confession claim, coerced. This is probably the easiest one of all because you can't coerce somebody's confession if you don't talk to them in the first place.

Now, I don't know why Mr. Rios is implicating Mr. Guevara in that. It sounds like there may have been some history. I don't know. Although, that's dubious as we'll get to in a minute. But all of the evidence, all of the evidence that you've heard, other than the words of somebody who perjured himself two dozens times in this courtroom, is that Mr. Guevara is not in that room. You heard Mr. Mason. You heard Ms. Riley. You have all of the reports, of which Mr. Guevara is on none of them, talking about the -- the questioning. None.

So -- and look, we heard Mr. Mason testify. Mr. Mason gave a deposition in this case, same way that Mr. Rios, and he wasn't impeached one time. This is a credible guy. This is not some friend of Rey Guevara's. You heard the read-in of Mr. Halvorsen. You decide for yourself, who is more credible, Mr. Mason or Mr. Rios about what happened there? Who is more credible, Ms. Riley who doesn't know any of these people or Mr. Rios who lied to you two dozen times? I mean, that's really as far as you need to go with that.

And look at the reports. I mean, these are not reports that are made, you know, days, months, weeks later. I mean, this is contemporaneous notes of this interview, in Mr. Mason's handwriting, by the way. I mean, there's a GPR that gets into the questioning of Mr. Rios. It's literally written out. Typed up same day about all these things that

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 22 of 105 PageID #:23547
closing argument - defendant Guevara
2539

happened.  And apparently there's some vast conspiracy for some reason to keep Mr. -- by a dozen people, at least, to keep Mr. Guevara off the reports.  None of it makes sense.

We heard from -- well, let's -- let's take a step back.

The coercion claim is based on two things and two things only.  He says that Mr. Mason took his head and he smashed it into a metal table with his handcuffs behind his back.  He said as a -- as a full-grown man to a child would do.  And, you know, Guevara was standing idly by.  Then he says that Mr. Guevara also was making some threats about him not seeing his kids or something like that.

Okay.  Those are the two things.  Those are the two theories.  Despite the fact that those are the two theories, we were treated to nearly an entire day of Dr. Russano talking about sleep deprivation and accusatory questioning and, you know, being hungry and thirsty and all of these things that have nothing to do with the allegations in this case.

I mean, you heard Mr. Rios.  I asked him, how long did this interrogation last?  And he said, well, you know, hours, hours.  And then I confronted him with, where he was sworn under oath, they talked to him for 15 or 20 minutes.  Sleep deprivation, hunger, thirst?  These are not issues that are -- we could have just taken Dr. Russano and not called her at all and it would -- you'd be in the same position on this claim

that you would have been without her. I mean, it has nothing to do with any of this in this case.

The pictures of Mr. Rios that are taken after the statement and at the lineup are pretty much all you need to know to know that this claim is nonsense. Because, again, use your common sense. You're going to get instructions on this. That's actually the most important tool that you bring here is common sense.

I mean, that's the most important part of the jury system is not just the instruction. You're not robots. You bring in here all of your life experiences, all of your common sense, dealing with people in the world, and -- and supporting inferences for how people would go about doing things, things you've observed in your personal life.

And, you know, looking at how a person would appear after they were abused, allegedly, in the manner in which Mr. Rios says he was abused is one of those things you can use your common sense about. Okay. Somebody's face does not get slammed into a table with a 10.5 out of 10 on the -- on the pain scale and not have a mark on him.

I mean, you look at those pictures of Mr. Rios with the red hoodie on, this guy looks better than I've ever looked a day in my life. He looks fresh as a daisy. His hair -- there's not a hair out of place on this guy, nothing. Not a busted lip, not a bruised eye, not a -- nothing, nothing on

this guy.

You know, one of the things that was interesting yesterday that I heard from Mr. Richards is he said, you know, you can look up these lineup photos and you -- and you can see that there's a bruise on his arm from the false arrest.

Now, the bruise is up here, so I don't know how you get that from handcuffs, but that apparently is the theory. Apparently this is not a guy that -- that is difficult to bruise. You're going to get a bruise from handcuffs and you're not going to have a mark on you from having your face slammed into a table? Ridiculous.

I mean, there's medical records that we've heard. I mean, gosh, he talks to an EMT at the Cook County Jail, says nothing. And they do a -- you know, he said they looked me over. Nothing, nothing on there.

When I was -- I think this was with Ms. Shields I sort of let out that I had taken some -- some Latin in the past. I took four years of Latin. I went to Catholic school for a long time. And there's a phrase here that -- that applies, and it -- what the Latin is is *in falsus uno, in falsus omnibus*. And you know what that means? It means if you're lying about one thing, you're probably lying about a bunch of other stuff, too, to put it plainly.

And so we can't segregate out what we -- it should be clear from the physical evidence that there is no abuse, just

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 25 of 105 PageID #:23550
closing argument - defendant Guevara
2542

looking at this guy's fix -- picture. I mean, you're -- the picture doesn't lie from him alleging that he was threatened by Mr. Guevara, because you don't get to do that. You don't get to make up one form of coercion and say, maybe -- maybe I wasn't abused, but this other thing really happened. It doesn't work like that. If you're lying about one thing, you're lying about the other thing.

But with respect to the threat, you know -- you know what else -- how else we know that that's not true? Think about it. Diana Rodriguez, this is the mother, okay, infant child, supposedly, supposedly Mr. Guevara is threatening to take this child away, and he says nothing about it to the mother?

And the mother is visiting him in jail, by the way. I mean, that's what he said. And he doesn't say, you know, Diana, this -- this officer, he said he's going to take away Jaime, Jr., be very careful, be on the lookout. Nothing. Says nothing about that. I mean, it takes months for this guy to cook up this story.

We're going to talk about Karen Shields in a little bit. She was one of my favorite witnesses in this case. I would have called her if they didn't. And the reason is that -- she told you the way that this goes down. You go to jail, you figure out, well, I confessed; now you're talking to other people; probably shouldn't have done that. How do I get

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 26 of 105 PageID #:23551
closing argument - defendant Guevara
2543

out of that?  What can I do?  Well, don't have any physical evidence of abuse.  Let's just say that it's something, you know, doesn't leave a mark.

You have kids.  Say that, you know, this is something that will tug at the old heartstrings.  Inmates talk.  They come up with these stories.  They have all the time in the world sitting there talking to other guys about their cases and they put all of this stuff in there to see what sticks.  It happens all the time.

And Ms. Shields said it happens all the time.  Again, I'm going to touch on that later.  But she said that in every single case, everyone that she ever did with a confession, you move to suppress.  They have a form motion making these allegations that they're crossing things out.  That's how common that was that -- that they're making these allegations, because it is.  It's a powerful piece of evidence.  But when you have a powerful piece of evidence, that is powerful incentive for somebody to just cook up whatever they can.  So that's where this comes from.

But at the end of the day, what you need to decide on the coercion claim is, is do you believe literally just the words out of his mouth.  Because there is no other evidence.  There's no physical evidence; there's no documentary evidence; there's no other witnesses that are supporting him on this coercion claim.

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 27 of 105 PageID #:23552
closing argument - defendant Guevara
2544

Do you believe what Jaime Rios said, the guy who got impeached 23 times on the stand; or do you believe Michael Mason, Barbara Riley, Steve Gawrys, every piece of documentary evidence in this case, every report, and three or four pictures of Mr. Rios?

Who do you believe there? Do you believe a guy who's perjured himself 23 times who wants $39 million, or do you believe everything else? That's really what it comes down to. And it's his burden, it's his case, and it's really not close.

So that's the coercion claim. Then we have a set of due process claims. I told you what they were. There's the -- the Carrero fabrication claim, which is basically him saying that, you know, they made him lie on the stand. And then you have a couple of these Cristino Garcia claims. He had an alibi. You know, roughed him up, too, although apparently he wouldn't talk. That's -- that's -- those -- those are those claims.

Again, I promise you I'm not going to read you the instructions again, and I'm not gonna, but there's a couple of things that I want you to think about when you're looking through this claim. Okay.

First of all, these elements -- you know, and there's -- there's four on each of them -- actually, that's not -- that's not true. There's -- on the failure to disclose, there's three elements, and on the fabrication there's four.

closing argument - defendant Guevara

2545

But they're -- they're similar.

First of all, you -- you have to -- Jaime Rios has to sustain his burden in this case on every single one. This is not pick and choose that, well, maybe -- maybe he had two of these but, you know, not three of them. You know, or three out of four. You know, he has most of them. Every single one he has to prove or he loses on that claim. Every single one of those elements are his burden to prove, and if he misses one, that's it, he loses that claim in its entirety. That's the way the instructions work. Okay. And he has to prove that to you by a preponderance of the evidence, which, again, is mostly just what he's saying and nothing else.

So the first thing you need to look at is, did this happen? Okay. Did the thing that he's saying happened happen? Was Mr. Carrero forced to make these statements? Was Cristino Garcia beat up and give -- give an alibi to Mr. Guevara? If you don't believe that that happened, if you don't think that those are credible witnesses, you don't even actually need to go to any of the elements. So that's the first thing.

The second thing is, was the evidence itself exculpatory or -- or impeaching with respect to the -- the suppression claim. Okay. Evidence that someone else is not guilty of a crime is not necessarily exculpatory of whether, you know, a different person committed the crime, okay. You have to look at that.

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 29 of 105 PageID #:23554
closing argument - defendant Guevara
2546

The big one here, though, on all of these claims, is what's called "materiality." Materiality means that even if we -- even if we agree that these things happened, even if you agree that Cristino Garcia, who came in here having done heroin and not saying things for 30 years and just being an -- an utter disaster on the stand, even if you're convinced that this guy is telling you the truth, you still have to look at that and say, would this have changed this? Would Mr. Rios have been acquitted if the jury knew this? Would they have taken the statement, okay, the confession, which, again, the fabrication of that, not at issue in this case, okay. That is not something that is -- is a claim in this case.

Would they have taken a confession to criminal activity that came into evidence, an eyewitness who has been consistent over and over again, saying, I saw this person with my own two eyes commit this crime and say, yeah, even with that stuff, we're going to ride with Mr. Garcia on this one, or we're going to ride with Mr. Carrero on that one, let's let him go. That's what materiality means, would the result of the proceeding have been different, okay. That's how you have to examine that.

So, again, even if you agree with this stuff, it's a very important thing that you -- essentially what you're being asked to do is to put yourself back in that jury room in 1989 and say, well, if we knew this, would we have let this guy go?

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 30 of 105 PageID #:23555
closing argument - defendant Guevara
2547

Would we have let him get off for murder? Okay. That's what materiality essentially is.

With respect to the concealment claims, which, again, this is -- only pertains to the stuff with Mr. Garcia, you also have to look at whether the information that allegedly Mr. Garcia had, whether that was accessible with the use of reasonable diligence by the criminal defense attorneys.

Could they have obtained that information back in 1989 by -- by resort to reasonable diligence? Could they have gone to Mr. Garcia, who's a fellow gang member and friend of Mr. Rios, and said, hey, tell us about your -- they knew he was in police custody -- tell us about your time in police custody. Could they have done that and found this information out?

If they could have, even if you agree with all those other things, they still lose. So those essentially are what -- what the elements are that you need to examine with respect to -- to those claims. And that -- again, read through the instructions, but that's -- in layman's terms, that's sort of what you need to do.

So let's tick through these claims. Okay? The informants. The basis of this claim is that they say Mr. Guevara -- again, they concede that the informants exist, but what they're saying now is that we made up the information that they -- that they provided, okay. This claim is only against Mr. Guevara, by the way. All right?

Here's the problem with that.  Well, there's a lot of problems, but the first one is this:  It's not just Mr. Guevara who talked to these informants, okay.  Mr. Mason -- and it's -- it's also not secondhand information from Mr. Guevara either.  Mr. Mason testified in this case, I talked -- I saw these informants, I talked to these informants, they told me this information, okay.  Not a claim against Mr. Mason.  Mr. Mason said, I saw them.

Lieutenant Kijowski, same thing, another person talked to them.  It's documented in these reports.  You have the documentation.  You can read through it.  It's all there.

The second thing is, have they shown any actual evidence in this case that the -- that these informants didn't say that there were rumors on the street that Mr. Rios committed this crime?  Now, what we have is we have guesses and speculation and what might have happened.  We do not have any evidence, you have not heard any evidence from them at all, zero, zero evidence that any of this information was not given to the police.

And that's really all you need to know.  You don't need to know whether it's true or not.  All there needs to be is, these people said, hey, there's rumors on the street that these guys were involved.

Now, even if it's people who are trying to get somebody else in trouble or it didn't actually happen, that is

not the point.  Did these people say there were rumors on the street that this happened?

If you're going to make up a story about, you know -- and you're out to get Jaime Rios, why would you just say there were rumors on the street?  Wouldn't you have somebody say, well, you know, I saw them; or he said to me, it's rumors. It's second or thirdhand information.

It has nothing really to do -- as you heard from Mr. Carballo yesterday, it has nothing really to do with the case at all.  I mean, people don't get convicted based on rumors and hearsay and all of that in a courtroom.  I mean, that does not happen.  So if you're going to make up a story, if Mr. Guevara really is trying to go out and get this guy, you're probably going to think of a better story than that.

So, look, it rings true.  But, again, his burden, his burden.  He has to prove that -- that that did not happen.  And there's a couple of other -- and he hasn't done that, but there's a couple of reasons where -- of pieces of evidence where it suggests that that is exactly what happened.

Remember Little Mike?  He said Little Mike gets picked up.  Same day.  This is the same day that Mr. Rios is picked up.  He says that this Little Mike guy is, you know, brought into the police station.  And he says, I'm actually confronted with this.  They're telling me Little Mike is saying that -- that you did this.  He's picked up the same day.  Now, sounds

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 33 of 105 PageID #:23558
closing argument - defendant Guevara
2550

like Little Mike was a little snitch, but we know, like, who this is. He's with him. I mean, the timeline works out.

But at the end of the day, even if you are willing to speculate without evidence, which I would say it is not consistent with the jury instructions, that informants weren't saying the things that were attributed to them, what we heard from Mr. Carballo yesterday about these informants is that -- I called -- or we called Mr. Guevara to the stand. This is just the course of the investigation. The fact that there are informants has -- that are saying that there are rumors on the street, totally immaterial on the context of this case. He said this case was an eyewitness and a statement case, period, end of story. So it has very, very little to do with Mr. Guevara.

Just as in this trial there's, you know, puzzle piece witnesses, people who are put on to corroborate this or that, but the -- the crux of the case is not, you know, reliant on that stuff.

The same thing can be true about this informant business. It's immaterial. If -- pose the question this way: If the jury did not hear this information about the informants and they just had inculpatory statement, eyewitness, would that have changed it? Would that have changed the outcome of this case? Absolutely not.

And the other thing that you heard -- and this was

from Ms. Shields and Mr. Carballo -- Mr. Guevara did not withhold information about the identity of these informants. The way that this works out is that in criminal cases -- look, informants are a very useful tool in the sense of getting leads about where to focus your -- your attention in a -- in an investigation.

They occupy a pretty dangerous position because you burn your -- your informants, as I told you in opening, one of two things is going to happen. Either they're not going to give you information again or they're going to get killed. So, you know, it's something that is sacrosanct in law enforcement. However, it is not up to the police whether that information gets filtered to the criminal defendant. It's up to the courts. It's to some extent up to the prosecution because they're the ones objecting and litigating those cases. It has nothing to do with Rey Guevara. The Court decided not to -- to force them to give up the informants, so that's what they did.

Rey Guevara does not have any power over that at all. He's not interfering with that process at all. He's not saying to the prosecution, I'm not going to -- I'm not going to let you talk to these people. That is completely on the courts. It has nothing to do with them.

You -- you -- you're going to get what's called a personal involvement instruction which basically says you can't hold Mr. Guevara or Mr. Mason responsible for what other people

do or don't do, okay. So if we're in the business of saying well, you know, Rey Guevara was being shady with his informants, was he though? Because he's not the one who decided to -- to have this information come out. It was the courts.

You can't hold him responsible for something that happened in 1989 when he's not even given the opportunity to do that. The Court said don't turn this over and they didn't. And the reason that that happened is not because necessarily that there was some desire that you have to protect these informants, although that was probably part of it; it's that at the end of the day, it didn't really matter all that much. I mean, it was a statement case. It was an eyewitness case. And that's how it played out.

Now, now they are trying to make a thing of it because they don't have much else, but, you know, it had -- had -- didn't have much to do with the case. You heard it from Mr. Carballo. I mean, that's the way that these things play out.

So that's the informant claim.

Then we get to definitely my favorite witness, which was Tino Garcia. I don't know -- it -- it would be difficult to find a more pathetic and non-credible witness than Tino Garcia. And I'm -- I was not trying to be mean to this guy. I have a job to do. But, I mean, come on. This guy -- the stuff

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 36 of 105 PageID #:23561
closing argument - defendant Guevara
2553

with the drugs, I mean, what they said yesterday is, oh, he was honest, he said he was on drugs. No, no. It's not like they put the guy on the stand and said, sir, you know, isn't it true, you know, you've had some substance abuse problems? Yeah, I have.

That's not -- that's not how that happened. They didn't say anything about that. This guy is nodding off on the stand. I mean, his face is in his hands. He's forgetting questions and just staring at pieces of paper. I mean, it -- it was sad really. I mean, it was -- it was a sad, sad display up there.

And the -- the problem -- so, you know, I don't get any -- any pleasure in embarrassing this guy, but it isn't -- when you're in a federal courtroom, you've got to tell the truth, okay. And it's apparent what happened here. And this guy didn't just get a substance abuse problem, you know, this year. I mean, he's been struggling with this for a long, long time. He was struggling with it in 1989 and 1990. You heard him say that.

You know when else he was struggling with it? 2020. Okay, what happened in 2020? That's when they got this famous affidavit from him, which I'm going to talk about in a minute.

What Mr. Rios did is he got somebody who -- willing to say anything really. I mean, this is an old friend of his, lifelong drug addict, family member now. You know, and what

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 37 of 105 PageID #:23562
closing argument - defendant Guevara
2554

they did is they got this guy to say what they wanted him to say on a piece of paper because he would do anything. He would do anything.

I mean, that -- that's the kind of evidence that if they actually did their job at the postconviction would have come out. I mean, you look at an affidavit like that and you say, well, we'll take that for what its worth. But when you see somebody try to explain that on the stand and they perform in the way that he performed, it puts it in a different light. But it -- it also is pretty outrageous that that's the kind of person that they're putting words in the mouth of.

MR. S. RICHARDS: Objection.

THE COURT: Overruled.

MR. SCAHILL: And we're going to get to that in a second, but with the -- with the affidavit. But let's -- let's talk about his actual story. Let's talk about the story that he told.

Insane. This story is insane on its face. It has all -- it has all the -- all these insane little parts of it that none of them make any sense. He has what -- I think they're saying is a fake state's attorney who dressed up to look like a state's attorney, and Mr. Guevara, you know, has this -- this crisis actor or something that's in there and they're sort of leading him through this whole thing, but she's not really a state's attorney.

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 38 of 105 PageID #:23563
closing argument - defendant Guevara
2555

And then he says, well, you know, I pulled one over on mean old Mr. Guevara. And I told him, you know, I -- I'll make your statement if you'll let me call the lawyer, or let me call -- make a phone call. So then he calls his sister. And apparently this is like a DoorDash driver because he's there in 15 minutes, the lawyer shows up. And lo and behold, oh, we don't know who the lawyer is.

Wouldn't that be nice? Because he says the lawyer shows up and I tell the lawyer, Guevara is beating me up. Okay. And the lawyer says, well, that's all fine and good, but I got other stuff to do. Maybe I got to play golf. Maybe he's -- he says I don't have time for this, okay, just don't sign a statement.

Wouldn't it be great if you had a member of the bar that you could say, did this happen at that time? Did you respond to Area 5 in -- in July of 1989 and talk to Cristino Garcia? And isn't it true that he said these things? Wouldn't that be -- how compelling would that have been? That would have been a tough one to get around. I will -- I will admit, that would be a tough, tough one to get around.

Unfortunately, he doesn't remember anything about the guy. And his sister also doesn't remember anything about the guy. And his sister also isn't a witness in this case to even corroborate that that happened in the first place, even though it's Mr. Rios's sister-in-law. Wouldn't it be nice to hear

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 39 of 105 PageID #:23564
closing argument - defendant Guevara
2556

from her instead of Mr. Heroin for breakfast?

MR. S. RICHARDS:  Objection.

THE COURT:  Sustained.

MR. SCAHILL:  But you don't have that.

Then we have the affidavit.  I'll talk about the rib tips and the pizza in a minute here, but this is the one that was particularly problematic was -- was paragraph 13.

Why was paragraph 13 important?  Well, what he says is, I was not asked to testify at the trial of Jaime Rios, and had I been asked to testify, I would have pled the Fifth, not because I was guilty, but because I was afraid of Detective Reynaldo Guevara.

What did he say about that?  Well, Mr. Garcia said, I don't know what that means.  I don't know what those words mean.  I was told to put it in there by Mr. Richards, this guy. He told me to put it in there.  Didn't know what it meant then; doesn't know what it means now.  And, oh, by the way, it's not true.  I wanted to help him.  I wanted to testify.  Nobody came.

Why was this important?  Now, he didn't know it was important.  You know who knew it was important?  Mr. Richards. You want to know why?  Because we heard from Mr. -- Ms. Rogala, if you don't have new information, if this is something that you could have discovered before, you don't get in the door, your murder conviction doesn't get thrown out, unless you have

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 40 of 105 PageID #:23565
closing argument - defendant Guevara
2557

new information, it's important language, and it just so happens that's the language that the lawyer tells him to put in there. And it's a lie.

I mean, this is stuff that you don't even need to hear any of this other stuff. Putting perjured information in a postconviction affidavit like that should be disqualifying regardless of anything else.

And then this alibi -- I mean, the alibi is -- is an entire claim in this case, that he says that, you know, I gave Guevara the alibi. I was eating pizza and rib tips on June 27, 1989. That's a whole claim, an entire constitutional claim in this case.

Well, part of the problem here, and there's a lot of them, number one -- you're going to get this affidavit, by the way, in the back -- he says he has this -- this -- this alibi, although all it says is that he ate dinner -- or maybe even not that. He just says he ate pizza and rib tips on a date. Okay.

You know what the affidavit doesn't say? I told Mr. Guevara about that. And then we heard him on the stand, he said, I actually didn't even give that to Mr. Guevara; I gave it to O'Quinn.

But forget about that, okay. Let's assume -- there's no evidence of this. Let's assume that Mr. Guevara had been told, which never, ever happened, that Mr. Garcia ate pizza and rib tips on June 27th of 1989, so what? You know what? I got

up this morning at 6:30 and I ate breakfast with my son like I do every day, got him off to school, okay. If somebody said to me, hey, Scahill, do you have an alibi for -- for the closing argument that was given in Rios v. Guevara? And I said to them, yeah, I ate breakfast with my son this morning. Okay, great. That was four hours ago.

This is not an alibi. I mean, I asked him up there on the stand: Do you know when this happened? Well, you know, I'm not sure. Well, it wasn't at midnight, though, was it? No, no, dinnertime. This is not an alibi. I ate dinner at some point is not an alibi.

You even heard that from Ms. Shields. I asked her. I said, you know, if somebody says, you know, I was somewhere a couple of hours before, is that an alibi for a murder? No. I mean, this is commonsense stuff. We didn't even really need her. But ludicrous that this is even a -- a claim in this case. Even if all of that happened, which by the way, it did not happen. I mean, remember I -- and, again, I'm not trying to embarrass this guy, but you come into a federal courthouse, you better be prepared to answer some tough questions.

Why did you -- why did you remember that you ate pizza and rib tips on June 27th of 1989, a month later? Was there something significant about that day? No. What day of the week was it? I don't know.

It was a random Tuesday a month before. I said, do

you remember what you ate last month?  Do you know, July of -- January 3rd, I don't remember what -- what date I said.  Don't remember.  He probably didn't even remember what he ate, you know, the day before.

I mean, and that's not just because of the heroin use. Nobody is going to remember that.  It's some random day.  I don't know why they're choosing to go with this as an alibi. This is a ridiculous claim by a person who has about the least amount of credibility that you could ever imagine.

What else do we know?  And, again, let's -- let's assume that this is the truth, which it's not.  He has this part about only being willing to come forward, you know, because, you know, Guevara is not the police anymore and being investigated and blah, blah, blah, all that stuff.

Well, the problem with that, according to Mr. Garcia anyway, is that he said, well, I did -- I did tell somebody about this.  I told Ricardo Rios, which is Mr. Rios's brother. And I told him when Mr. Rios was in prison.  Well, there's a couple of problems with that.  One of them is that that's false then because you weren't scared.  You did tell people.  And number two, you're going to tell me that Ricardo Rios, the brother of a guy who following this line of thinking, which, again, this is not what happened, but let's just follow the line of thinking, says that this guy has information that his brother, who is in prison, that he has information that could

help him get out of prison and nobody does anything with that information?  No.  Sorry.  That doesn't work that way.

The other thing is that just with the lawyer that Mr. Garcia forgot the name of conveniently, we don't hear from Ricardo Rios either, the brother.

MR. S. RICHARDS:  Objection.

THE COURT:  Basis?

MR. S. RICHARDS:  Instruction No. 19.

THE COURT:  The objection is overruled.

Ladies and gentlemen, instruction 19 states that the law does not require any party to call as a witness every person who might have knowledge of the facts related to this trial.  Similarly, the law does not require any party to present as exhibits all papers and things mentioned during this trial.

So while there's no obligation to call every person who has information, commentary on whether you heard evidence in this case is still appropriate.

MR. SCAHILL:  Thank you.

Nobody is required to call anybody, okay.  Wouldn't it be helpful, though?  It's his brother.  Could corroborate this important point.  I mean, particularly when you have a guy on the stand there who is kind of falling apart at the seams, you know, to have somebody come in here and say, yeah, he was telling the truth back then.  I heard it, I remember it, you

closing argument - defendant Guevara

2561

know, said it.  We didn't hear that.  We had the -- we had the drug addict here instead and -- and his word.

And then the sequence is wrong.  I mean, they said yesterday, well, yeah, maybe he got some of the details wrong and what happened first, what happened next, and this thing happened and it was a flashlight instead of a billy club, but he's remembered all this time that he got hit.

Look, you can even give somebody who's a drug addict one little thing to say and they're going to say it.  But the problem with telling a story that's not true is when people start asking sequences.  I mean, this is classic liar behavior, is you tell a story and you have the story you're telling and then you make him retell it and then you make him put things in sequence and then you ask him about little details and they kind of start screwing them up.

I mean, that's -- that's how you get to the bottom of when people aren't telling the truth.  And this guy was spun all in circles.  You want to know why?  Because he was just told, say you got hit, and gave a story.  And if you can't see things in your mind's eye as they happened, you start getting confused about the things that you said.  This is the number one way to catch a liar.  And that's a liar right there when you can't get these things right, because you should be able to replay it in your mind.

So none of this happened.  And, again, what you need

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 45 of 105 PageID #:23570
closing argument - defendant Guevara
2562

to do with materiality, put yourself in the position of the jury on the criminal case, how would they have looked at it? How would they have looked at it if they heard the things that you heard and what you heard him say?

Would they have said, oh, yeah, let's disregard everything that the eyewitness said. Let's disregard the statement. Let's -- what he's saying is true. It -- we're going to ride with Cristino Garcia. No way. If anything, if anything, that would have buried him even further because it looks like he's trying to gin up some evidence, okay, but not even close. I mean, that -- that -- that claim fails for so many reasons I lost count.

Then we got the -- the Carrero claims. Actually, before -- go back to -- to Tino Garcia for one second. The other thing -- and we're going to talk about this with Mr. Carrero in a second here. The other problem here is that we know that Mr. Garcia was in the police station because there's reports of it.

Mr. Guevara is not on any of those reports. It's Mr. Mason. Mason said to you, I talked to this guy, interviewed him, wouldn't talk, bing, bang, boom, let him go. In a lineup, didn't get ID'd, when that kind of stuff happens, let him go.

It's the -- look at the reports. It's the same day, it's the same day that he comes in that he does the reports.

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 46 of 105 PageID #:23571
closing argument - defendant Guevara
2563

You guys will have all of those as documentary evidence. You're going to have contemporaneous documentary evidence, a guy who is totally incredible on the stand, and you're going to go with that on a guy who sat on that for 30 years and comes here after having done heroin that morning. I mean, come on.

Look at the -- I -- I'm not running away from any of these reports at all. Look at them. Look at them closely and see what they say. Okay. Either you have a dozen people conspiring against poor Jaime Rios, or Jaime Rios isn't telling the truth. I mean, that's really the two things that you're talking about, and he's the one who bears the burden of proof. Not a close call.

So Carrero. A lot of the same problems here. I mean, Mr. Carrero, again, this guy's credibility was -- was zero. Zero. First of all, same thing. We know it's made up because of the paperwork. And the paperwork here is even more interesting because what Mr. Carrero says is that I'm at the police station; I'm only talking to Mr. Guevara. He's being mean. He's threatening me, all of this stuff, okay. Well, one of the things that we have in this case is what's called a GPR from Detective Mason.

Could I have the computer, please, Judge?

And, Carrie, can you pull up 50 II for me?

MS. GOLDEN: Yep.

MR. SCAHILL: Thank you.

closing argument - defendant Guevara

2564

Okay. So this is what's called a GPR, general progress report. It is a form that is only filled out by detectives and it's handwritten. And as you heard from Mr. Mason, it is in his handwriting. And what he's doing is he is -- as Mr. Carrero is speaking, he's taking down the things that he is saying, all right.

Now, why is this important? Well, according to Mr. Carrero, Mason is not in the room, just Guevara. What you would have to believe is that -- and, again, this is the date that Mr. Carrero is in the police station, that Mr. Guevara is in there, that he is really the one who is talking to Mr. Carrero, and that Mr. Guevara for some reason to shield his involvement in all this goes to Mason and says, hey, Mason, take down these things in your handwriting and put those in and make sure you don't mention me, at -- on the same day they've cooked this up. I mean, it's -- it's just a silly, ludicrous theory that they're selling you here.

The other problem -- could I have the document camera now?

The other problem is we got another perjured affidavit, guys. Mr. Carrero, remember what he says. He talks this stuff, you know, about how, you know, mean old Guevara told him what to say, and so on and so forth. But then what does he say, the magic words for postconviction, these ones are real important or else you don't get into the door: I was

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 48 of 105 PageID #:23573
closing argument - defendant Guevara
2565

unwilling to come forward before this date and would not have told anyone about Guevara's conduct because I was afraid of Guevara and what he might do to me. You need that because if you didn't have it back in those days, you don't get in the door postconviction.

Well, the only problem is, what he says, that is not true. He said, no, I ran into Mr. Rios in -- in prison, and I told him then. Now, none of that happened, of course, but even going with this, that then is a complete lie, because according to him, this happened in 1994.

So -- and I asked him, you would admit -- you told the -- if you're -- if you're unwilling to tell people because you're scared of Guevara, you literally told the worst person on earth because it's the guy who's going to use it, the guy who's in prison.

At least in theory he's going to use it, because you get information like that and you're sitting there and nobody likes prison, you're going to bring it up. Say, let me out. You know, this is new information I have now. Only Mr. Rios doesn't do anything with it? And he sits on it?

And I asked him, I said, so let's go with your -- your story here. That is not what you swore to under oath for the purposes of postconviction. That was not true, was it? I agree, that was not true. He admitted it. He admitted he committed perjury on the stand.

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 49 of 105 PageID #:23574
closing argument - defendant Guevara
2566

Again, that's really all -- the only place you need to go. And once somebody has committed perjury, you can throw out anything else that they have said because they are willing to lie under oath to you.

But there is more. The story that has been told by Mr. Carrero has changed quite a bit. Remember what Mr. Rios said on the stand -- well, the first thing he said on direct, he said, yeah, you know, I talked to this guy in prison and he said, you know, Guevara was threatening me and we bonded over Guevara and all of that. You know, threatened my kids, blah, blah, blah, all that.

And then I impeached him with his deposition testimony where he said, yeah, I ran into Mr. Carrero in prison and he said that Guevara beat me up. Well, that didn't happen. I mean, Carrero said Guevara never touched him. So you know what happened there is Mr. Rios mixed up Garcia and Carrero. He forgot which one he told to say A and which one he told to say B, okay. It's -- that's what happens when you make stuff up.

But he also said, never mentioned the name Guevara to me at all. That's what Mr. Rios said. When he talked to me in prison he said, I was beaten up -- which, again, different story -- and also never mentioned who it was. And now it's morphed into, we bonded over it was -- it was Guevara and, you know, had a big -- you know, we hugged it out because we bonded there. I mean, these stories are all over the place.

I mean, this guy was a member of the Latin Kings until he's 50, 50 years old.  Still one of his best friends.  You know, I asked him about this stuff about snitching and, you know, being a snitch in prison, not a good place to be.

I mean, look, I don't know if they talked or they didn't talk in prison, but I bet you they did, because when Mr. Carrero comes into prison, Mr. Carrero was a snitch.  He snitched on Mr. Rios.  He definitely did.  He testified against him, states's evidence in the -- in -- in the prosecution.  I bet you they had some words in prison there.

And Mr. Carrero has a decision to make, which is that you either help out your buddy or something is going to happen to you.  And guess what?  Nothing happened to that guy, did it?  And you can probably presume why that was.  And it had nothing to do with Mr. Guevara and it had everything to do with protecting his own hide.

But forget all of that for a second.  I mean, that's enough to -- to knock that claim out.  But materiality, what do we know about Mr. Carrero's statement?  Remember, Mr. Carrero flipped.  He flipped at the criminal trial.  He started making allegations at the criminal trial, okay.

Now, there appeared to be some funny business there.  He stopped cooperating.  He was a state's witness, stopped cooperating with them, and then shows up to court with Mr. Rios's attorney, fellow gang member.  You -- you don't --

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 51 of 105 PageID #:23576
closing argument - defendant Guevara
2568

you don't need to be a gang expert like Danny Noon to know what -- what probably happened there.

But the jury heard it. The criminal jury heard it. They still convicted him, okay. We don't need to speculate what the jury would have done. We know what the jury did. They heard Mr. Carrero and they found that he was not entitled to any credibility. And they came to the right decision on that. So for all of those reasons, the Carrero claims, not even close.

So that gets us to the final claim, which is malicious prosecution. Again, not going to read all the instructions to you, but there's -- there's -- there's some to unpack here, all right.

The first thing that you need to determine is -- and again, this claim is only, only against Mr. Guevara. Did Mr. Guevara cause the commencement or continuation of the criminal proceeding against Mr. Rios?

And what Judge Daniel has instructed you, and what's going to be in your instructions, is that there is a presumption of prosecutorial independence. Now, it can be overcome. You're getting instructions on that. But basically what that means is that in Illinois, the police do not institute prosecutions. Cook County State's Attorney's Office does. They do their own investigation. They interview witnesses. They make the decision, are we going to go forward

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 52 of 105 PageID #:23577
closing argument - defendant Guevara
2569

or not?  Okay.  Unless the police are tricking, cajoling, somehow leading them down the proverbial primrose path to try to exert some undue influence on them on the prosecution, the prosecution is assumed to have been the ones to commence or continue.

And we heard from Mr. Carballo that that's exactly what happened.  And it's -- and he told you, honestly, Mason maybe -- I mean, Mason is not named in this claim, by the way -- Mason maybe.  He's the one who is in the statement with Barb Riley.  They're taking that statement.  But Guevara? Guevara didn't have really anything to do with this at all.  I mean, forget about exerting undue influence or pressuring them. Guevara didn't really have anything to do with the liability in this case at all.

I made my own decision.  I interviewed Mr. Huertas; walked the scene with him.  And this was an eyeball case.  He made his own assessment of that claim and he decided to go forward.  That's it.  I mean, that's really only as far as you need to go that -- to -- to knock that claim out, because you need to believe that somehow Mr. Guevara, despite saying I wasn't involved in any, you know, inculpatory statements of Mr. Rios, somehow he's the one who really was prosecuting this despite the fact that he said nothing of any import?

I mean, it's -- it's borderline ludicrous.  I mean, if you listened to Mr. Carballo, he said it all for you.  He -- he

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 53 of 105 PageID #:23578
closing argument - defendant Guevara
2570

ate it. He said, this is my case. I'm the one who are make -- is making the decisions. I decided to prosecute it. Rey Guevara had nothing to do with it.

Second thing, probable cause. You need to understand how low this standard is. Probable cause is not beyond a reasonable doubt. Probable cause is not the preponderance of the evidence standard that you're here to -- to apply. It is much, much, much lower than that, okay. And you're -- you're going to be read what the standard is.

But essentially, it's a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that a person has committed the offense they're charged with. An honest and sound suspicion, that is it, period, end of sentence.

It doesn't have to be -- even if the person gets acquitted, it -- it -- suspicion is what we're talking about. And this is sort of -- this is -- this is sort of flip-flopped. Mr. Rios has to prove that that did not exist.

In other words, that there wasn't even so much as a suspicion that he committed this crime at the time -- not at the time of his arrest, at the time that the prosecution was commenced, at the time of the trial.

At the time of the trial when they had a statement that Mr. Guevara was not present for and they had an eyewitness who had picked out Mr. Rios in a lineup who had been

interviewed by the state's attorney and -- and who had then later testified at trial; that there was not even so much as a suspicion based on that. That is -- this is not even close.

Even if you have nothing else, just Mr. Huertas, just Mr. Huertas is way -- that's -- cases are prosecuted all the time based on single eyewitnesses, okay. And you don't even have to believe that it could be prosecuted based on that, only that there's a suspicion.

And remember, with the statement, no claim in this case that the -- that the statement was fabricated. No claim in this case that the identification of Mr. Huertas was fabricated. You gotta answer those six questions. That's not one of them.

Even if it's just Mr. Huertas, that is more than you would ever need for reasonable -- for honest and sound suspicion. Said it at the lineup, said it at the interview, said it to Carballo, said it under oath at the trial, said it at his deposition in this case, apparently said it to Mr. Richards, because he's saying in open court that this guy is sticking to his story. I mean, you can begin and end there. People get convicted on this stuff all the time, much less this being -- being probable cause.

Then what we have -- the statement -- again, statement not one of the claims. I'm not going to go through the statement in great detail with you. You all have seen it a

bunch. This statement rings true in all of the important ways. Because what does it say? It's a very sad story that this -- that this city has experienced over and over again, thousands of times over the years. One gang shoots at another, retaliation, on and on. That's how it goes, okay.

It fits him in every way for all the reasons I said at the top of my argument. He's a gang member. You know he's shooting at people, okay. He pled guilty to it, despite him trying to say he wasn't. He says, oh, I wasn't a gang member, except he admits to, you know, every single person he's asked that he is a gang member. He tried to say he didn't, but that's what he was doing.

He talked about his training, he talked about what he was trained to do, how he was brainwashed to -- to commit violence, all of that. I mean, that's what -- that's -- read the confession. I mean, that's what -- what it's saying.

And by the way, when we're talking about probable cause, the fact that Mr. Rios has a confession which says, you know, really it was the other guy who pulled the trigger and not me -- and they talked about this a little bit yesterday -- that doesn't make any difference. This is accountability. People do this all the time. You can get convicted of murder whether you're the one who pulls the trigger or you were just with the guy who pulled the trigger.

So none of that matters. I mean, the statement,

detail -- and -- and we know that, from Mr. Huertas anyway, that that's not actually what happened, which he's -- Mr. Rios is the one who pulled the trigger. But, you know, common thing that people do is they try to say, well, yeah, I was there, but it was the other guy.

Okay. So the statement rings true in all this lead-up. It's at his dope spot, he's protecting the neighborhood as he's trained to do, which is go and retaliate. I mean, this is -- this is the stuff that he agreed with me that that's -- that's what he was doing.

He said -- this is another thing that he said, on the stand, he admitted he was ready, willing, and able to go commit a murder if he was told to do it. He said he never did it, which that's -- that's not how it happened. He said, I was ready, willing, and able to do it. That's how I was trained to do it and I would have done it. I just didn't get there. Okay. So all of that rings true.

Again, this other shooting, the only reason that's important in this case is because he brought it out. He denied it. He said, I never got to that point. And we know that he did, and he has no explanation for what he was doing other than shooting at somebody. So people -- and, again, it is not that he just pled guilty to this because he was -- knew he was getting a bunch of time. He got extra time. He got extra time for that. This is not some throwaway, everything is lumped in

together, you know, concurrent sentence kind of thing. He got three additional years for that, and he pled guilty. And he didn't -- I -- I don't know why they didn't say, well, what were you doing that day if you weren't shooting at somebody? They have no explanation at all and a guilty plea. That is an admission that he did it. That's -- tracks. It tracks in the confession.

But the most important part of that confession is the part about the drive-by shooting. And I told you at the beginning he was going to have this crazy story about this being something else, and lo and behold, that's what he said, okay.

But remember, what does he say? Yes, I told the police there was a shooting in front of my house. People took a shot at me. He keeps saying it's a murder. Police came. Bunch of people out there. I'm there. Diana is out there. Lamont Burr is out there. Brother-in-law is out there. Mother-in-law comes down. Okay. All kinds of people around there.

He says, but I didn't give them an alibi. You know, I didn't tell them what I was actually doing on the 27th. I started telling them about something that happened some other day. Okay. He's the one who brings that up. If that is not true, if that is not true that it's happened on some other day, what he has told us is exactly the motive for this murder.

That is game over.

Again, that's the most important part of this, how did it all go down. It's a retaliation shooting. How do we know that it happened on June 27th, as opposed to happening on this other date that he said? Well, number one, the only evidence that we have in this case that it happened on some other day is from Mr. Impeached with perjury 23 times, okay. Don't have anything else.

Police murder files and other files are kept. They're there from the police department. If somebody is shot, you can get them. Not only have you not seen those, there was never even an attempt by his attorneys to get them. If that exists out there, they would have gotten it. And the fact that you haven't seen it, nor has anyone else, means it does not exist. The fact that there was no attempt to get it means that was -- that was a dead end, okay.

How great would that be, how great evidence would that be under the circumstances of this case to say, look at this 911 call, look at this report. Shooting, right in front of Jaime Rios's house on a different day. That would be great, great evidence. That would be a tough one for me to get around. But you don't have it because it does not exist.

THE COURT: Counsel, you're at 80 minutes.

MR. SCAHILL: Sorry, Judge. Going a little long. I'm working my way through it.

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 59 of 105 PageID #:23584
closing argument - defendant Guevara
2576

If it did happen, you would have had all these other witnesses. You would have had Diana Rodriguez; you had the brother-in-law; you had the mother-in-law. Nobody ever gets called as a witness. They're there. Diana Rodriguez testified. Didn't -- wasn't asked about it. He's on trial for his life. You're not going to ask somebody about that? None of that happened.

And if it did happen, he would have said it at the trial. Not here, not the money trial where he's asking for, the trial where he's facing 36 years in prison. There is no rational explanation for that.

You're going to get a credibility instruction, credibility of witnesses. I see I'm going a little bit long so I'm not going to tick off all these things that he lied about, but you heard them all. You heard them all.

This stuff about the whiteboard with Mason, never a part of the criminal trial, never brought up. The gang book that he was saying he was shown, never part of the criminal trial, never made up -- or just made up. Denying *Miranda* rights, and he admitted it. I mean, all of these things.

He's -- my favorite one is the one where he says that, you know, Barb Riley is just -- she's -- she's the fake court reporter, she's making this stuff up, and she's really writing it out; there's no court reporter. You know, and then -- you know, now he changes it. I mean, it's just -- it's just crazy

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 60 of 105 PageID #:23585
closing argument - defendant Guevara
2577

stories. I mean, you guys, you -- you heard him testify; not a credible witness. I -- I mean, I don't know what else to say about that.

At the end of the day, though, again, how many people would have had to been in on this for this guy to be telling the truth? All these nonparties. Not just Mason, all these other people: Riley and Lupa and Carballo, apparently, Boris, Johnson, the whole gang crimes north team, the 14th District officers that went to Mr. Carrero's house? I mean, it -- it -- it's not credible.

The last part of the malicious prosecution claim is termination indicative of innocence. We heard a little bit about that yesterday. Now, I will agree, his -- his proceedings did terminate in his favor. They did get thrown out. They shouldn't have been, but they were. But that's not all you need to determine.

Was this a termination indicative of innocence? The answer is no. And the reason why the answer is no is that you heard about the process which produced this. If the process did not produce something that actually showed innocence, it has not been established. And you heard that that -- this hearing was about a minute and a half. And they've admitted in their closing, this is not evidence of actual innocence at all. You're getting an instruction about that, okay. It's only a --

MR. S. RICHARDS: Objection.

THE COURT:  That's sustained.

Ladies and gentlemen, the Certificate of Innocence is issued by a state court.  Your instruction says that the state court may not have had the same information that you have had and that you are to make an independent determination as to actual guilt or innocence.  But that Certificate of Innocence establishes that a state court found -- or issued -- or there's a box on it that checks innocent.

Do not misrepresent the evidence.

MR. SCAHILL:  The -- again, we heard about the process here.  But what I heard yesterday from Mr. Richards was that it doesn't matter the process that was used here.  All that matters is he got it, okay.  He has this thing.  Let me give you an analogy here.

If I steal your birth certificate and I steal your Social Security card and I go down to the DMV and I get a license with your name on it, that does not mean that I am you.  It means that I have committed fraud.  And that is precisely what happened here.  This is not a termination indicative of innocence at all.  In fact, the process shows this is a termination indicative of fraud.

I have heard from them a bunch of times, we're not retrying the murder case here.  And, you know, that's really all you heard yesterday, for the most part.  Trotting out the same theories that that jury heard and trying to say, well, the

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 62 of 105 PageID #:23587
closing argument - defendant Guevara
2579

confession says he was here and there, it's the wrong gun and all that. The jury heard all of that. The state's attorney knew all of it. They prosecuted it anyway. He got convicted anyway. That -- that's not what this case is about. I know they want it to be about that because they didn't like the outcome there. They got it right the first time.

This is -- you're not being asked in this case to determine whether the jury got it right. The jury got it right. They have specific claims here. It has nothing to do with, you know, all of these issues that were already litigated at the criminal trial. It's a distraction. Has nothing to do with this case at all, none.

Almost done.

These altercations that they say -- that he said he had with Mr. Guevara, again, just his word, just his say-so. He said his mother was the one who sort of got this going here with, you know, there's this big altercation with Mr. Guevara. Mother is not a witness, no complaints, no paperwork, no nothing, no other people to corroborate this at all, just his say-so. Doesn't come up at the criminal trial. This is all stuff that's being made up for the purposes of this case. You don't have a single stitch of paper or other witness who's corroborated any of that.

I have to talk about damages, too, just like my colleague Mr. Engquist did. I'm going to be a lot shorter.

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 63 of 105 PageID #:23588
closing argument - defendant Guevara
2580

Again, I don't know any other way I can say it. He's not entitled to 39¢, much less $39 million, okay. But what do we know? Not abused in prison, never hurt. His brother is there with him. His gang buddies are there. I mean, I'm sure prison is not great. It's not designed to be, but, you know, there's not anything extraordinary that's happening there. He's also getting five extra years, by the way, so he's -- he's there regardless.

MR. S. RICHARDS: Objection.

THE COURT: Basis?

MR. S. RICHARDS: Misstates the evidence, good time, not five extra years. Misstatement of the law and the facts.

THE COURT: Okay.

Ladies and gentlemen, the evidence is as you recall it.

The objection is overruled.

MR. SCAHILL: But the final thing I want to say is we were treated to two hours or so of how prison is like, what are birthdays like, what is Super Bowl Sunday like. We asked him -- as you heard at his deposition, we asked him questions about this stuff about the prison experience, and he's sandbagging and not talking about any of that. We asked him if he had any family issues as a result of his incarceration. Just said no. Did you have any adjustment issues after prison? He just says no.

And then we have all of these stories about full body cavity searches of his mother? I mean, come on. And the -- again, mother is not a witness. This stuff is being made up after the fact. Because if it really happened, he probably would have said that in discovery, and we would have heard it from somebody else.

Again, I'm sure prison is not a great place, but, you know, if you -- you know, as they say, if -- if -- if you can't do the time, don't commit the crime. And he committed that crime.

So, again, I -- I respectfully disagree with -- with my colleague, Mr. Engquist. I think it's lower than whatever he said, $100,000, even if you agree with all of this stuff.

And punitive damages, I mean, first of all, $39 million is just pure unadulterated greed. It's generational wealth. It's -- this -- that's a ridiculous sum. And punitive damages, you're going to try to punish some 82-year-old man who is, you know, living with his elderly wife, is an able-bodied person, greed. It should be zero.

Mr. Rios wants this case more than anything to be about Mr. Guevara. It is not Mr. Guevara's case. They want to run from their own story and have it be about Mr. Guevara. It's not about him. It's not about him invoking his constitutional rights. I don't blame him for doing that. I mean, because Mr. -- Mr. Rios was a disaster on the stand. I

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 65 of 105 PageID #:23590
closing argument - defendant Guevara
2582

mean, I would try to make it be about somebody else, too, if I were them.  But it's not.  It's his case.  It's his burden.  Okay.

Mr. Guevara doesn't have to prove anything.  He has to prove all of it.  Okay.  Rey Guevara is not asking you for anything.  What we're asking for you is not to reward the lies, not to reward the fraud on the state in the postconviction, not to reward trotting out these guys who are committing perjury in front of you.

And -- and most of all, don't reward the senseless death of Luis Morales.  We heard his name in this case over and over again.  You saw some gruesome pictures of him.  And, you know, maybe he had some troubles in his life, too.  Sounds like he was involved in gangs.  You know, that happens sometimes, but this is still a human being who had a family, 25-year-old guy.

Mr. Rios had the opportunity to get his life back on track, get married, all of that.  Luis Morales did not.  His life ended that day.  You know, he deserved that chance to do that, and it was taken from him.  It was taken from him by the guy who has been sitting in this courtroom with us.  Keep that in mind.  That's what we're talking about.  We're talking about a real human life here.  That was taken from him for nothing.  Luis Morales didn't do anything to Mr. Rios, okay.  He was just a guy in another gang.

Justice is important, that's true, but, you know, that's not justice. Giving -- rewarding Mr. Rios in this case is not justice.

We can't go back in time. We can't. We can't have the State's Attorney's Office do the right thing that they should have done and -- and get back these three weeks of our lives. We can't do it. The only thing that you can do, the only thing that you can do is send a message with your verdict. That's the only right one: No, no, no, no, no.

Thank you.

THE COURT: All right. Mr. Richards, rebuttal.

MR. S. RICHARDS: Your Honor, a brief sidebar.

THE COURT: Okay.

(Proceedings heard at sidebar:)

THE COURT: Okay. Go ahead, Mr. Richards.

MR. S. RICHARDS: Okay. Just -- just two issues.

I'd request a five-minute bathroom break.

And second, I would suggest -- would ask for an addition to my time, given the fact that an hour and a half was just used by the defense counsel.

THE COURT: We've gone about three weeks now, not needing a bathroom break at 11:30. Is it an emergency?

MR. S. RICHARDS: Yes. I'm a diabetic, and it is an emergency. I'm afraid that it's an emergency.

THE COURT: You will have five minutes. You will not

get an additional 30 minutes. As I mentioned yesterday, your opening exceeded two hours. And there's -- what is your justification other than he went 90 minutes? He told me this morning that he would go just over an hour. He went an extra 20 minutes.

How does that entitle you to additional time?

MR. S. RICHARDS: Just proportional, an additional ten minutes, but that's my request.

THE COURT: Okay. That request is denied. You have 30 minutes.

MR. S. RICHARDS: Thank you.

(Proceedings heard in open court:)

THE COURT: Ladies and gentlemen, we're going to take a ten-minute break, come back and hear the rebuttal, and then you'll get the case after that.

All rise.

(Jury out at 11:34 a.m.)

THE COURT: Ten minutes.

(Recess at 11:34 a.m., until 11:42 a.m.)

THE COURT: All right. One of the objections that was raised during Mr. Scahill's closing argument concerned a Certificate of Innocence. I'm providing further explanation of my ruling on that.

Malicious prosecution claim is a state law claim. The state -- or at least in the eyes of the state, Mr. Rios is

2585

innocent.  And so while you may disagree with how it was obtained and while you may disagree with whether it shows that he's actually innocent, you have a document from a state court that says that he is innocent.  And so I don't know where you have any good faith basis of arguing that with respect to the state law claim that a state court signing a court order that he's innocent is not indicative of innocence.

Response?

MR. SCAHILL:  Well, I think the indicative of innocence --

THE COURT:  Let me put it another way.

What basis do you have this -- to tell this jury to ignore a state court finding that he is innocent with respect to a state law claim?

MR. SCAHILL:  Because I believe that the -- you have to look at the process by which it is obtained.

THE COURT:  Are you saying that this is a collateral attack on the state court judgment?  Because federal court would not be the venue for that.

MR. SCAHILL:  No, I'm not saying that.

THE COURT:  And so it is a standing state court order duly entered.

MR. SCAHILL:  That's true.

THE COURT:  And so what good faith basis do you have to argue that that state court order, which is valid and

2586

standing, is not indicative of innocence when it declares him innocent?

MR. SCAHILL: I'm not collaterally attacking the order. I'm collaterally attacking -- I'm not collaterally -- I'm attacking --

THE COURT: You're attacking the process.

MR. SCAHILL: Correct.

THE COURT: The order stands.

MR. SCAHILL: Yes.

THE COURT: And so it's one thing to say, yes, he has a Certificate of Innocence, but that does not mean he's innocent as the Court will instruct you. You're to decide that. That is not what you said. You attacked the judgment itself. And this is not the venue to do that.

MR. SCAHILL: So I'm not -- I'm not suggesting that the order does not exist. The order does, in fact, exist. I'm attacking what it means.

THE COURT: What does it mean -- what else could it mean then in the eyes of the state of Illinois that he is innocent?

MR. SCAHILL: Well, it -- so I actually don't think that that means that for the purposes of this proceeding. I think it only means that for the purposes of the Court of Claims proceedings. For the purposes of malicious prosecution, it is evidence to support indicative of innocence, but I don't

2587

believe it is binding uncontroverted evidence of that.

I think that's the way that the demarcation between what the statute says about it not being *res judicata* in other proceedings, how that's been interpreted, and that's sort of how the -- the line of reasoning and the -- and the basis for that is. It is an order. It is evidence of that element, but it is not binding uncontroverted evidence that cannot be attacked by other evidence such as how it was obtained and the basis for it.

THE COURT: Do you have any issue with the curative instruction that I gave the jury?

MR. SCAHILL: The one that you gave -- I mean, none other than what we had addressed in the -- in the -- in the motions, but no additional.

THE COURT: In the motions we addressed whether to introduce the Certificate of Innocence.

MR. SCAHILL: Right. And some of that was -- was addressed, but none other than -- just to make it simple for the Court and for the record, none other than what I had indicated in the -- in the motions.

THE COURT: Okay. We'll bring the jury back in.

Mr. Richards, you'll have 30 minutes. I'll give you a five-minute warning.

MR. S. RICHARDS: Thank you, Your Honor.

LAW CLERK: All rise.

(Jury in at 11:47 a.m.)

THE COURT: All right. Please take your seats.

Mr. Richards, you may proceed.

REBUTTAL ARGUMENT ON BEHALF OF THE PLAINTIFF BY

MR. S. RICHARDS: Good morning, ladies and gentlemen. And sorry -- sorry for the delay, and I hope that you will hear me out with my sort of final opportunity to address you before Josh pushes me onto the ice floor or otherwise takes over.

I'm not going to repeat anything he said. Virtually nothing. And if I do, stop taking notes and throw your pads at me, because my goal here is simply to answer some of the arguments you heard, some of the things we didn't have a chance to anticipate. But there is a slight bit of overlap. And let me talk about the overlap right now.

The key to this case is 1440 North Leavitt. That is the key. And Josh talked to you about how it made absolutely no sense, zero sense, that knowing Jaime Rios had confessed to a murder, knowing that he confessed to a murder with a gun, knowing that he had given a ridiculous story about throwing a gun into a lake in the future, that no search warrant was ever issued, and no consent was ever obtained for 1440 North Leavitt.

Now, that plays into two things. One is the malicious prosecution claim, which I think I'll need to clean up a few points on in a few moments.

But here's the more important point. And for this point, I'm going to borrow what Mr. Scahill said in his Latin phrase. One translation of that Latin phrase, by the way, is false in small, false in all. You heard Detective Mason on the stand. I questioned him in front of his attorneys. He, by the way, didn't take the Fifth. And congratulations to him for not doing that. He answered questions. I questioned him about whether he knew 1440 North Leavitt was the address. Yes. I questioned him whether he -- there's a possibility there was a gun there. Yes. I asked him about search warrants; said he knew that. I asked him about whether he had obtained -- he had tried to obtain a consent to search as he did for Benjamin Carrero's house. And then after I finished, his -- attorneys had an opportunity to explain it. Said, listen, you know, a little bird told me it's not at 1440 North Leavitt or some other thing. Nothing. Zero explanation. Zero.

MR. POLICK: Objection. Misstates the evidence.

THE COURT: The objection is overruled.

Ladies and gentlemen, the evidence is as you recall it.

MR. S. RICHARDS: What does that mean? It means that Mason -- we're not talking about Guevara now. We'll get to him in a few minutes -- Mason knew that that house had been searched. If Mason knew the house had been searched, there's only one or two people he could have gotten that information

rebuttal argument - plaintiff

2590

from, Guevara or Gawrys or maybe another gang specialist.

So the point at which he had Jaime Rios in custody, he knew he wasn't there voluntarily. He knew his house had been searched without a warrant. He knew that Jaime Rios shouldn't even be there. Because he wasn't there voluntarily and there was not one ounce, not one scintilla of probable cause to arrest Jaime Rios.

False in small, false in all. What does that mean? Mason plays into this case in only one way. He has taken the stand -- and, again, that's to his credit -- and denied under oath that he hit, they pulled Jaime Rios's hair and slammed him into that table.

So there's an issue there. Because he didn't take the Fifth and he denied it. But if he lied about 1440 North Leavitt, if he was false and not small, he is false in all and you cannot believe one other word he said, period.

Now, let me talk to you also a little bit about the coercion claim. And I'm not going to go into it in great detail. I would just urge you just to take it seriously. You should take everything seriously.

The word in the instructions, the word used is physical abuse or physical punishment, or something like that. Those are lawyers' words. We are talking about torture, torture; inflicting pain on somebody in order to get a result. That's what we're talking about.

rebuttal argument - plaintiff

2591

And there's a history to torture. And there's a history to who tortures and who's tortured. Probably started with the cavemen, people torturing each other for pleasure or to get something or whatever. But in the law, there's always been torturers and the tortured.

The Roman Empire, one of the benefits of being a citizen was you couldn't be tortured to give evidence. Slaves could be tortured. In the Middle Ages, knights and gentry could not be tortured. Peasants could be tortured.

In the American South --

MR. SCAHILL: Judge, objection.

THE COURT: Basis?

MR. SCAHILL: This is -- well, sidebar.

THE COURT: Okay.

(Proceedings heard at sidebar:)

THE COURT: Basis?

MR. SCAHILL: Judge, the -- the history of tortured during slavery in a civil rights case, come on. I mean, that -- this is -- this is so far beyond the scope of -- of argument. It is highly inappropriate to be talking about historical stains on our country's history in the context of this case.

THE COURT: Response?

MR. S. RICHARDS: Your Honor, I'm about to get to the Fourteenth Amendment, which is relevant and the civil rights

acts, which are relevant in this case and we're enforcing them.

THE COURT: Where is the evidence concerning this information? You're supposed to sum up the evidence in the case. You can argue, but you have to tie it to evidence. And there's been no evidence, there's been no historian who's testified about the history of torture in the Roman Empire. So you asked me for additional time to give a history lesson on evidence that's not in the record. No.

And so the objection is sustained.

Please move on. Stick to the evidence.

MR. S. RICHARDS: Thank you.

(Proceedings heard in open court:)

THE COURT: The objection is sustained.

MR. S. RICHARDS: But in this case, not talking about history, in this case, who are the people who have claimed or have been tortured? Jaime Rios, Cristino Garcia. The evidence shows that these people are not doctors or lawyers or businessmen from the Gold Coast. Because as the evidence will suggest, the people who get tortured are the people who are on the lower end of society; the people who are gangbangers; the people who live in poor neighborhoods. Because you don't torture people who are likely to complain. You torture people who are in a bad position to complain, like Jaime Rios and Cristino Garcia. That's who gets tortured. And that's what happened here.

rebuttal argument - plaintiff

2593

Now, that leads into another point, which is this: Mr. Scahill and Mr. Mason have criticized our witnesses, heroin addict, gangbangers, blah, blah, blah. We didn't pick these witnesses. If we had a flock of priests and nuns to testify that they were tortured by the police, you would have heard from them. These are the people we had, and we didn't pick them. Guevara picked them. Mason picked one. They picked the witnesses, not us.

Now, let's talk about the evidence as to the hairpulling and the face being slammed into the table, because there's a lot of evidence about that.

First of all, the claim here is, as I understand it, that that would have left a mark. No medical evidence to that effect, but that's what they say, common sense tells you that would have left a mark. We beg to differ.

First of all, hairpulling is a method, which by definition does not leave a mark. It's very painful, as we all know, but it doesn't leave a mark. You pull hair when you don't want to leave a mark.

Now, slamming the face into the table, this kind of reminds me of the old adage, you know, if you have the law on your side, you pound the law. If you have the facts on your side, you pound the facts. If you have neither, you pound the table.

These people have been pounding this table for the

whole case.  Every time they talk about this, they were slam -- slam something into a table.  But remember, Jaime Rios's face is not that far above the table.  And a table is a large flat surface, that like a phone book, distributes force.  And it's not like Mason punches him in the nose or hits him with a sharp object.  It's his whole face going into a flat table.  Doesn't necessarily leave a mark; bruise is not going to show up necessarily.

I would -- I'm not going to show you these pictures, but I ask you to look very carefully at the pictures again.  The court reporter picture, the lineup picture, and the Cook County intake picture.  Look in particular at this side of Jaime Rios's face.  You will see a faint mark and then a darker mark.  Could have been from having his face slammed into the table.

Now, in terms of the mark on his arm, could have been when he's pushed into the table and a mark is left.  That's one possibility.  It's not from the handcuffs.  That's just silly.

He testified, and he's always testified, that at 1440 North Leavitt, Guevara grabbed him by the arm, the upper arm, where you would grab somebody if you're dragging them away.  Looks like there's a bruise there.  Confirms what Jaime Rios said.

And they make a big deal of what was in a form motion that Jack Carey signed.  In fact, Karen Shields was hauled over

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 78 of 105 PageID #:23603
rebuttal argument - plaintiff
2595

the coals for a motion she didn't even have anything to do with. In the motion it says hairpulling. That came from Jaime. It came early on. It came at the appropriate point in a criminal trial, as attorney Carballo told you. That was when it would come up.

Now, with the detail of the head slamming not included, did they go in this form motion and write out a narrative of every little single fact they intended to prove or show at the motion to suppress? No, it is a motion. It is a form document to put the case into play and get a hearing.

And there is no evidence that you have heard. They could have introduced all of Jaime Rios's prior testimony, motion to quash, motion to suppress, whatever. They did not introduce one document which shows that Jaime Rios was called to testify at the motion to suppress and didn't mention the hair-pulling or being slammed into -- into the table. So that's nonsense. And you should reject it.

Before I forget, let me just briefly switch to Guevara and make some corrections or comments -- document camera?

Other way. Of course I get that wrong.

I've just highlighted some things that -- just to correct what was just said.

It's commenced or continued. Commenced or continued. How was this case commenced? It was commenced when Jaime Rios was illegally arrested at 1440 North Leavitt. That's when it

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 79 of 105 PageID #:23604
rebuttal argument - plaintiff
2596

commenced. Had that not happened, he would have never given a statement; he would never have been identified. There would have been no case. The person who commenced it was Guevara, period, end of story. Doesn't matter what Carballo did later. He commenced it.

Second, manner indicative of innocence. That should just be obvious. With all this talk about fraud and all this nonsense of Kim Foxx, not worth going into it. I think Josh covered it.

The -- he said suspicion. Look at the instruction. Honest and sound suspicion. Honest. Was it honest and sound when Guevara falsely arrested my client and hauled him in without probable cause? Was that honest? Was it honest when Guevara coached Luis Huertas to give a false identification? Was that honest? Was it honest when Guevara suppressed favorable evidence and beat Cristino Garcia with phone books and a flashlight? That wasn't honest. That was dishonest. And it meant he had no probable cause.

Now, the other thing I'd like to say is they're trying to walk away from the search of -- of North Leavitt. Oh, it doesn't matter, it was litigated before, blah, blah, blah.

Look at what the instruction says. Otherwise engaged in a wrongful or bad faith conduct instrumental in the initiation of a prosecution.

What could be more wrongful? What could be more bad

faith than arresting somebody without probable cause? And of course it was instrumental in the initiation of the prosecution because without it, Jaime Rios would have been walking free. No statement, no identification, nothing, no probable cause. So we met all our elements there.

Let me talk about the -- this nonsense about alibi. Just think back in your own life. Let me pick out a date like June 27, 2025. Any of us know what we were doing on that day; where we were?

The fact is that innocent people often don't have alibis. Why? Because they're innocent. They don't know the date and time a crime has been committed. Nowadays of course maybe it's a little easier. We have cell phones, we have other ways.

But if you're asked where you were shortly before midnight on any day, how do you prove it? Well, maybe you're sleeping at home. How do you prove that? Well, you have to bring in relatives maybe. Oh, and then the relatives, the -- the story is, oh, they're just lying for you. They're just relatives.

Innocent people often don't have alibis, which is why no alibi is ever required in a criminal trial and wasn't in this one. And if they were so interested in alibis, Carballo could've asked Jaime Rios on the stand, which he didn't have to take, or his girlfriend about an alibi. He didn't, no evidence

that he did.  It wasn't expected.

Who does have alibis?  Guilty people.  Guilty people, like potentially Jose Macho Melendez, and we don't know for a fact that he did it.  But isn't it suspicious?  He walks in there voluntarily.  Doesn't -- nobody even drives him.  The day after he drives himself and immediately provides Officer Mason with an alibi.

Who told Jose Macho Melendez what time the murder was committed?  How did he know that?  Well, maybe he knew it because he did it.  He knew the time he needed an alibi for. He may have cooked it up in advance or he cooked it up afterwards, but it was a nice, sound alibi.

But if you looked at the police reports, there's some problems, because witnesses were still telling Mason that he was out there shortly before the shooting, which contradicted the alibi.

Now, we don't know, those witnesses are not testifying, just goes to Mason's course of conduct.  But the idea that alibi is significant here, nonsense.  You know, it's like one of these *Columbo* episodes where the killer, you know, does something and then works out a fake alibi and *Columbo* breaks it.

That guilty people more often, we would suggest, have alibis, sometimes quite sound ones, than innocent people. Innocent people don't have alibis because they didn't do it and

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 82 of 105 PageID #:23607
rebuttal argument - plaintiff
2599

they didn't know when it's supposed to happen.

And if you'll notice in the statement, the time is never listed. That's kind of left out. It just says June 27th at the top. Barb Riley doesn't even ask him in the body, you know, what date are we talking about, or what time are we talking about? It's all very, very vague.

Now, there's a suggestion from Mason's attorney that they have a smoking gun, that in the statement there's something about a body being near a car. And somehow that's important because it's not in the police reports.

Look at the police reports. Quite clear that the body fell near the car. Why in the world were they taking fingerprints from a car if the body wasn't near a car? Obviously a car was involved. The police knew it. Guevara could have known it. Anyone could have fed that detail to Jaime Rios. And they did.

Now, I'm a little bit confused about this shooting incident business. Are they saying it didn't happen? Are they saying that that part of the confession or the statement is false? What are they saying? I don't get it.

We had a witness testify that it happened, it happened on a different date. In the GPRs Mason is not saying the date of what that happened. Is this -- and if it was such a big deal, that this provides a motive and it's so easy to get records on it, which, by the way it's not, why don't the police

get records of that?  Do -- don't they -- why don't they check 911 calls for the 27th and see if people are reporting shootings?  They never do that.  Why?  Why?  Not answered.

And, by the way, again, as was shown when we looked at Jack Carey's subpoenas, even subpoenas to the communications department require an RD number.  The RD number was for this case, not some other case.

Was it impossible to find that?  Maybe not.  What Mason says is you have to look through communications records, ask the communications people to give all the 911 calls from a specific date and look through them one by one.  Maybe.  It wasn't done, who cares.

Now, let me talk also about -- let me just clarify this time in custody business because you've been I think misled about it.  And take it from an old public defender, also known as a public penitentiary deliverer, that there's -- there were rules back then in terms of penitentiary time.

It was 50 percent time, plus often a six-month additional credit.  So when it was 36 years, that wasn't 36 years, obviously, because he didn't spend 36 years in prison.  He was taken in custody July 7th of 1989.  He got out July 7th of 2008, exactly 19 years later.

But you'll be asking yourself, well, if he got 36 years and it's 50 percent, 18 years, where do the additional years come in, obviously?  One -- one is the marijuana case in

prison, add two years, 50 percent time. So it goes down from 19 years to 18 years.

The aggravated assault, three years. That would be one and a half years, but he probably got the six-month credit. And he was told at the time that it was time considered served. So that takes another year off. We get to 17 years.

Now, this weird math where you take 17 years and then you deduct five years for cases that are also at 50 percent time is absurd. That's not the way it worked and that's not the calculation.

So even if you accept Mason's attorney's calculation, it's not -- and say, okay, give him 100,000 a year, we're talking about 1.6 million, not 1.2 million. He saved himself $400,000 I guess, but it's nonsense.

Our calculation is correct, and it should be given. That's what the time involve -- involved is. It's up to you to determine how much each year is worth. Your instructions tell you, you gotta just do that on your own. We think what we said is reasonable.

You want to split the difference, we say about 2 million a year; Mason says 100,000 a year. Go to 1 million a year, if you want to. Or go to 3 million a year. It's not our call. It's your call.

The affidavits. I'm not going to bother going into -- showing you the affidavits. I could. But, first of all,

Cristino -- this -- oh, by the way, the major theory I think that Mr. Guevara had is blame somebody else. Somebody else is at fault. Who's at fault? How about Kim Foxx? No longer the State's Attorney, by the way, of Cook County, but she's at fault. She's corrupt. She's bad. She has blood on her hands.

Well, how about Jack Carey? Let's blame him. How about Karen Shields? Let's blame her. How about Stephen Richards? Oh, they love that one. I'm all at fault. False affidavits and so forth.

How about this unnamed criminal defense attorney who is giving this advice to Guevara to take the Fifth? Let's blame him. Let's blame Judge Atcherson. Let's blame Judge Reddick. Anybody else but him. It's classic.

And if you notice, all of the witnesses, Mason and his partner Gawrys, are running like the mad to get away from Guevara.

Let's talk about alibi for Guevara. He's claiming -- that's what his attorney is saying -- I wasn't at the -- I was not at Area 5 when Garcia was questioned. You can tell by the police reports, by the way, it's very suspicious. Guevara -- Garcia is brought in, 3:00 on one day. It's all the way the next day, 11:00 a.m. before he's interviewed by Mason.

What's happening in the middle? Why isn't any detective talking to somebody who is arrested on a murder case? Why would you want to let him sit without talking to him? Does

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 86 of 105 PageID #:23611
rebuttal argument - plaintiff
2603

that make any sense?

But if Guevara wasn't there, where are his alibi witnesses? Did he have a day off that day? Was he on vacation? Did Gawrys say, oh, that was the day that -- that Guevara was off on his own? No, nothing.

As to Luis Huertas, we know from the police reports and from Guevara's testimony, that Guevara brought Huertas to the identification. Uncontested. But, again, Gawrys is running away. Oh, maybe we brought Huertas. I don't know. I don't know. We always worked together. But, again, if Gawrys could come in here and say, listen, I was with him. I was with Guevara when we brought in Huertas. We didn't say word one to him. We didn't threaten him with obstruction of justice; we didn't show him any notice. All nonsense. Did you hear that? No.

THE COURT: Counsel, you have five minutes left.

MR. S. RICHARDS: Thank you.

Briefly on the affidavits. There's a lot of legal language in the affidavits. So what? Further affiant saith not. Did you ever say that in real life, further affiant saith not? It's a phrase in affidavits that's existed from the 17th century. It's what lawyers put in.

Lawyers suggest all sorts of things. Garcia didn't have to say anything. And I have no police power. I have no Area 5. I have no interrogation room. I have no handcuffs. I

Case: 1:22-cv-03973 Document #: 356 Filed: 03/04/26 Page 87 of 105 PageID #:23612
rebuttal argument - plaintiff
2604

have no power to charge anybody. These people said what they said. And even some of the contradictions are not much of anything. Didn't tell anybody. Could mean anybody or could be anybody except Rios. All this stuff about the affidavits is fluff and nonsense.

You see Garcia wrote it out himself. He doesn't know how to spell. Nobody held his -- the pen in his hand. There was some discussions of the Fifth Amendment, but you heard it from Carballo that he didn't interview him because he thought he would take the Fifth Amendment. That was not a crazy idea. It was certainly a possibility. He agreed to it. He didn't understand the Fifth Amendment. So what? It was in the affidavit.

And the claims of fraud and perjury directed at me personally, by the way, are nonsense. I can't testify about it, and I won't, but it's ridiculous.

Jaime Rios is entitled to what we are asking for. And don't compromise. The instructions tell you, decide little bit -- liability first, you'll have to be unanimous, then go on to damages. Don't compromise or mix the two. Liability first, then you can discuss damages.

And we all expect a fair verdict, whichever way it goes, and I thank you for your time. Thank you.

THE COURT: All right. Ladies and gentlemen, that concludes the arguments in the case. You'll be able to go back

2605

and start deliberating in a moment. So we're finally at the point where you can discuss the case amongst yourselves.

I remind you that at this point you set your schedule. You have -- you can go up till 6:00 p.m. each day, and you can start as early as 8:30 a.m. I -- it's hopeful if at the end of the day when you decide to break for the day if you send a note letting me know that you decided to break for the day and indicate what time to expect you in the morning so that we can have everything ready for you.

And so before I send you back, we have our court security officer, who Ms. Franklin will swear in.

THE CLERK: Please raise your right hand.

(Court security officer sworn.)

THE COURT: All right. So we'll send the evidence back shortly. Ms. Franklin has the jury instructions and the verdict forms for you. I recognize it's about lunchtime. Once you get settled, you'll let the CSO know, and then we'll be able to get lunch for you.

All rise.

(Jury out at 12:18 p.m.)

THE COURT: All right. Are there any disputes about the evidence or the exhibits that were admitted? Okay.

MR. J. RICHARDS: I believe there is one.

THE COURT: Which exhibit?

MR. J. RICHARDS: I believe it's Plaintiff's 10.

2606

THE COURT: The motion to suppress?

MR. J. RICHARDS: Well, Plaintiff's 10 is listed on the pretrial order as the whole common-law record. During the case, we sought to move in -- we just said Plaintiff's Exhibit 10. Now, we only showed a portion of Plaintiff's Exhibit 10, but we sought to admit Plaintiff's Exhibit 10 as a whole. And on the final pretrial order, Plaintiff's Exhibit 10 is listed as the common-law record.

So at the time, there was no objection from either of the defendants saying, oh, well, you know, it should only be the pages that were published. There was nothing like that.

Now, it's true that in terms of the final pretrial order, there's -- for example, there's one exhibit of the defendants' that comes to mind, 128-5. If you look at the final pretrial order on that, there is no 128-5. There's just 128. But they made a -- a subexhibit, and we did not object when that subexhibit came in. But that subexhibit was just a document that was used during Karen Shields' deposition.

So if during the trial, defendants, who knowing what Plaintiff's Exhibit 10 is, which is the common-law record, it says that in the final pretrial order. Not only that, the defendants got PDF copies and paper copy of our exhibits. They know what was included in Plaintiff's Exhibit 10 and they did not object to Plaintiff's Exhibit 10 coming in. We sought Plaintiff's Exhibit 10 to come in, there was no objection.

2607

Plaintiff's Exhibit 10 should come in as a whole. A party is not required to publish every single page of a document that's entered.

THE COURT: Response?

MR. SCAHILL: Judge, I have never heard of such a thing in my life. There is group exhibits all the time. Our understanding was the same understanding I believe the Court had, which was that this was the motion to suppress. The entire common-law record --

THE COURT: Don't assume what I understood. I hear what it's described and I write it down in my spreadsheet. I do not know what the exhibit is. I've looked at the pretrial order. There are no production numbers.

Was it produced to you in PDF form?

MR. SCAHILL: Yes.

THE COURT: And what was in the PDF form?

MR. SCAHILL: It's the entire common-law record.

MS. GOLDEN: It's 114 pages. It includes the Court's notes. It includes jury instructions. It includes the indictment. It includes, you know, so many things that were not at issue --

THE COURT: And so why not object to it when it was raised?

MR. SCAHILL: Because --

MS. GOLDEN: Go ahead.

2608

MR. SCAHILL: -- because they referenced a specific page in a document and we were under the impression, because they're asking about this, and group exhibits are used all the time, that we're talking about that discrete document, as opposed to all of the things within that.

I mean, they specifically only used that. I mean, I -- you know, I -- I feel like this is -- is, to -- to borrow the term from former Magistrate Schenkier, a little bit too cute by half. It was everyone's impression on our side that we're talking about this one thing, as opposed to 150 pages of things that the jury never heard about. I mean, this is exalting form way over substance.

It --

MS. GOLDEN: It has --

MR. SCAHILL: There's a sentencing --

MS. GOLDEN: -- the presentence --

MR. SCAHILL: -- document. There's hearsay all over it. I mean, this appears to me to be gamesmanship. I mean, the -- the clear intent was to use the motion to suppress, which we had no problem with. And then backdooring things that were never talked about, transcripts and all kinds of things is -- we're -- we're going down a point of asking the jury to do things that are, you know, being considered way outside the scope of the things that came in at trial.

THE COURT: Response?

2609

MR. J. RICHARDS:  Your Honor, the plaintiff's exhibit list was common-law record.  We did not call it a group exhibit.  If you look at --

THE COURT:  At trial, you referred to it as the motion to suppress.

MR. J. RICHARDS:  Right, but then we moved Group Exhibit 10 in.  So my impression was it was all in.

THE COURT:  What's your response to transcripts and other potentially excluded items not being in -- or coming in when they are not appropriately in?

MR. J. RICHARDS:  I'm not sure there were any transcripts in the common-law record.  That would have been the report of proceedings.

THE COURT:  Where is Plaintiff's Exhibit 10?  Did plaintiffs ever give me a thumb drive with the exhibits as required?

MR. J. RICHARDS:  No, I'm sorry.  I -- I have a thumb drive here with me.  I believe --

THE COURT:  Do you have a printed copy of Exhibit 10?

MR. J. RICHARDS:  This is the only copy I have, but it's what would go to the jury.

THE COURT:  I would like to look at it.

(Counsel conferring.)

MR. POLICK:  Judge, I know the Court is going through it, but there's a State of Illinois rap sheet for Mr. Rios in

2610

there, among other things. Certainly that was not admitted into evidence.

THE COURT: Point me to where in Exhibit 10 the transcripts are.

MS. GOLDEN: I think it was 76. Go down.

MR. SCAHILL: 76.

MR. POLICK: The transcripts I believe are part of a different part of the common-law record or bound separately because they are the report of proceedings. I'm just seeing the court-reported statement in there that has been admitted. But the transcripts from the criminal trial themselves are bound separately as the report of proceedings.

THE COURT: Okay. Plaintiffs -- Mr. Richards just represented to me that this binder, which has what I believe to be 110 pages based on the handwritten page numbers on the bottom of each page, is Plaintiff's Exhibit 10.

Is that correct, Mr. Richards?

MR. J. RICHARDS: Yes.

THE COURT: What in this 110-page document that I understand was turned over to you in PDF is objectionable?

MR. SCAHILL: Well, there's -- there's a presentence investigation, which has hearsay and things. There's rap sheets. There is -- which -- I mean, I guess if he wants his rap sheet in. There's photographs of --

MS. GOLDEN: Or Mr. Melendez or somebody with a baby.

2611

MR. SCAHILL:  Yeah.

MS. GOLDEN:  Photos of the scene that were not admitted.

MR. SCAHILL:  Autopsy reports.  I mean...

THE COURT:  What is in the presentence investigation report that prejudices the defendants?  You raised this issue.  You had time to think about it.  Give me your arguments.

MR. SCAHILL:  Hang on.  I'm trying to get to it.

MR. POLICK:  The point is, Judge, that -- these things were not considered by the jury.  They weren't shown to the jury.

THE COURT:  I don't --

MR. POLICK:  We -- we -- we didn't agree to the entire exhibit.

THE COURT:  You did not object to the admission of Plaintiff's Exhibit 10.  It was turned over to you on a particular format.  Either tell me that what you received from the plaintiff was not what's in this binder or tell me what prejudice you suffer.  I do not have a rule that a witness has to touch every piece of paper that comes into evidence.  I suspect there are volumes in this case that a witness has not touched.

MR. POLICK:  That's correct.  And we're not disputing that it is what it is.  But the jury didn't see all of what's in here.  It's not part of the case.

2612

THE COURT: Are you saying that for every document that you introduced, you had a witness and you published to the jury every single page of those documents that you admitted into evidence?

MR. POLICK: No, I'm not saying that.

THE COURT: So why should I hold the plaintiffs to a different standard?

MR. POLICK: It's not a different standard.

THE COURT: That's what you just said, the jury didn't see it. They saw a portion of Plaintiff's Exhibit 10.

MR. SCAHILL: Can we -- can we just confer? We actually might just remove our objection. Can I confer with my counsel for like 60 --

THE COURT: You have two minutes.

MR. SCAHILL: That's all -- that's all I was going to ask for.

(Counsel conferring.)

MR. SCAHILL: We'll actually remove our objection. It's fine.

MR. POLICK: Join in that.

THE COURT: Okay. So Plaintiff's Exhibit 10, which was admitted without objection, is -- remains admitted without objection.

Are there any other disputes about the evidence in the case?

2613

MS. GOLDEN: I don't believe so. I think we'd probably just like to look at his before he sends them back.

THE COURT: Okay.

Do we -- Mr. DeCesaris, can you hand this down, please.

(Counsel conferring.)

THE COURT: Are we sending all paper back to the jury?

MULTIPLE COUNSEL: Yes.

THE COURT: All right.

MS. GOLDEN: Well, I don't see 10 in here.

MR. SCAHILL: 10's right here.

MR. J. RICHARDS: 10 is in a separate binder.

MR. POLICK: Separate binder.

THE COURT: How much time do we need to compile those exhibits and get them --

MR. POLICK: Ours --

MR. SCAHILL: I think they're done.

MR. POLICK: We're ready.

THE COURT: Plaintiff?

MR. J. RICHARDS: I need less than five minutes.

THE COURT: All right.

(Pause.)

MR. J. RICHARDS: It's good.

MR. KIVETZ: Exhibit binders.

THE COURT: Okay. Do we have all of the exhibits that

2614

need to go back?

MR. SCAHILL: Yes, Your Honor.

MR. POLICK: Yes, Your Honor.

MR. J. RICHARDS: Yep.

THE COURT: Plaintiffs, do you agree that these are all the exhibits that are to go back?

MR. J. RICHARDS: Yes.

THE COURT: Both on your side and the defense side?

MR. J. RICHARDS: Yes, Your Honor.

THE COURT: Mr. Scahill, do you agree that these are all the exhibits that go back?

MR. SCAHILL: Yes.

THE COURT: Mr. Polick?

MR. POLICK: Yes, Your Honor.

THE COURT: All right. Those exhibits will go back.

Please leave good phone numbers with Ms. Franklin or Mr. DeCesaris so that we can contact you in the event of a note. With each party's approval -- or I ask for the discretion to notify you or resolve notes by telephone if they are nonsubstantive.

Plaintiff, is that okay with you?

MR. J. RICHARDS: No objection.

THE COURT: Mr. Sca- --

MR. SCAHILL: That's okay.

THE COURT: Mr. Polick?

2615

MR. POLICK:  No objection, Your Honor.

THE COURT:  And these tend to be -- you know how these things go sometimes though.  They're missing a page on something or what have you.  If it's substantive, I will call you back into the courtroom.

Please be within 10 to 15 minutes of the courthouse. 20 minutes after a call or a voicemail to you, I will bring in the jury and resolve the matter.

All right?

MR. POLICK:  Understood, Judge.

MR. J. RICHARDS:  Thanks, Your Honor.

MR. POLICK:  Thank you.

(Recess at 12:32 p.m., until 4:08 p.m.)

2616

THE CLERK:  22 C 3973, Rios versus Guevara.

THE COURT:  Okay.  I received a note.  It reads, "If we reach our decision after 4:30 p.m. today, will we need to show up tomorrow to read decision?"

My proposed response is, "Take all the time you need to deliberate.  When you have reached a verdict, I will call the parties to the courtroom and then bring you, the jury, in. At that time, I will announce your verdict.  I can receive your verdict any time prior to 6:00 p.m."

Mr. Richards, any thoughts on the proposed response to the note?

MR. J. RICHARDS:  No objection.

THE COURT:  Mr. Scahill?

MR. SCAHILL:  No objection -- yeah.  Okay.  No objection.  They were asking whether they could go home.  I think that's implied.  But I'm fine with that.

THE COURT:  Well, they're really asking do they have to come back tomorrow -- if they decide after 4:30, do they have to come back tomorrow?  And I want to answer their question.  I want to tell them that they should take the time they need to deliberate, but I also want to answer the question, which is any time before 6:00 p.m. -- and I won't tell them this, but if it came at 6:00 p.m., I'd call you in the courtroom, and I'd read the verdict.  So --

MR. SCAHILL:  I'm fine with that.

2617

THE COURT: Mr. Polick?

MR. POLICK: I'm fine with it, Judge.

THE COURT: All right. That's what I'll do. I'll send it back -- I'll write it out and then send it back.

(Recess had from 4:09 p.m. to 4:50 p.m.)

THE COURT: All right. I received a note, "We have reached a verdict." I will bring the jury in and receive the verdict.

(Jury in at 4:50 p.m.)

THE COURT: All right. Please take your seats. I understand we have a verdict.

FOREPERSON BERGIN: Yes.

THE COURT: Hand it to the CSO, and he'll come and bring it up.

(Tendered.)

THE COURT: Okay. "Question 1. Did Plaintiff Jaime Rios prove by a preponderance of the evidence that Defendant Reynaldo Guevara violated his right against self-incrimination by coercing him to make a confession that was used against the plaintiff at his criminal trial?

"Answer: Yes.

"Question 2. Did Plaintiff Jaime Rios prove by a preponderance of the evidence that Defendant Michael Mason violated his right against self-incrimination by coercing him to make a confession that was used against the plaintiff at his

2618

criminal trial?

"Answer:  No.

"Question 3.  Did Plaintiff Jaime Rios prove by a preponderance of the evidence that Defendant Reynaldo Guevara violated his right to a fair trial by knowingly fabricating evidence against the plaintiff, namely, information from confidential informants that was used against the plaintiff at his criminal trial?

"Answer:  Yes.

"Question 4.  Did Plaintiff Jaime Rios prove by a preponderance of the evidence that Defendant Reynaldo Guevara violated his right to a fair trial by knowingly fabricating material evidence against the plaintiff, namely, the testimony of Benjamin Carrero that was used against the plaintiff at his criminal trial?

"Answer:  Yes.

"Question 5.  Did Plaintiff Jaime Rios prove by a preponderance of the evidence that Defendant Reynaldo Guevara violated his right to a fair trial by knowingly concealing from the prosecutor material exculpatory and/or impeachment evidence, namely, potential alibi evidence provided by Cristino Garcia?

"Answer:  Yes.

"Question 6.  Did Plaintiff Jaime Rios prove by a preponderance of the evidence that Defendant Reynaldo Guevara

2619

violated his right to a fair trial by knowingly concealing from the prosecutor material exculpatory and/or impeachment evidence, namely, evidence that Defendant Guevara had assaulted Cristino Garcia?

"Answer:  No.

"Question 7.  Did Plaintiff Jaime Rios prove by a preponderance of the evidence that Defendant Reynaldo Guevara maliciously prosecuted him by commencing or continuing the criminal proceeding against the plaintiff with malice and without probable cause, which ultimately terminated in the plaintiff's favor?

"Answer:  Yes.

"If you have found in favor of plaintiff Jaime Rios" -- "Question 8.  If you have found in favor of Plaintiff Jaime Rios, that is, if you answered yes to any of questions 1 through 7, then you must determine the amount of money that will fairly compensate him for any injury that you find he sustained and is reasonably certain to sustain in the future as a direct result of the claim or claims for which you found in favor of the plaintiff.  Please enter that amount below.

"Compensatory damages, $750,000.

"Question 9.  If you have found in favor of Plaintiff Jaime Rios and against Defendant Reynaldo Guevara, that is, if you answered yes to question 1 or to any of questions 3 through 7, then you may, but are not required to, award

2620

punitive damages against Defendant Guevara.

"Punitive damages amount, zero.

"Question 10.  If you have found in favor of Plaintiff Jaime Rios and against Defendant Michael Mason, that is, if you answered yes to question 2, then you may, but are not required to, award punitive damages against Defendant Mason.

"Punitive damages, zero."

It's signed by each of the jurors and dated February 19th, 2026.

Would either side like me to poll the jury?

MR. S. RICHARDS:  Yes.

THE CLERK:  John Bergin, was this and is this now your verdict?

FOREPERSON BERGIN:  Yes.

THE CLERK:  Alda Chavez Diaz, was this and is this now your verdict?

JUROR CHAVEZ DIAZ:  Yes.

THE CLERK:  Kristopher Davis, was this and is this now your verdict?

JUROR DAVIS:  Yes.

THE CLERK:  Mary Johnson, was this and is this now your verdict?

JUROR JOHNSON:  Yes.

THE CLERK:  Kristi Malizio, was this and is this now your verdict?

2621

JUROR MALIZIO:  Yes.

THE CLERK:  Jasmine Moore, was this and is this now your verdict?

JUROR MOORE:  Yes.

THE CLERK:  Stephanie Sohn, was this and is this now your verdict?

JUROR SOHN:  Yes.

THE CLERK:  And so say you all, this is your verdict?

(Chorus of yeses.)

THE COURT:  Okay.  Ladies and gentlemen, I thank you for your service.  You're discharged.

If you have a few moments, I'd like to thank you personally.  I have certificates for you; and if anyone needs a letter for their employer, let me know, and I can get that printed and signed for you.

But you are done, and I appreciate your attentiveness, your timeliness, and your attention to the matter.

All rise.

(Jury out at 4:56 p.m.)

THE COURT:  All right.  There are pending motions. I'll enter judgment because the transcripts were prepared; and then any post-trial motions can be filed, and I will address those as they come in.

Any issues that the plaintiffs want me to address?

MR. S. RICHARDS:  No, your Honor.

2622

THE COURT:  And Defendant Guevara?

MR. SCAHILL:  Not at this moment.

THE COURT:  And Defendant Mason?

MR. POLICK:  No, your Honor.

THE COURT:  I didn't think so.

All right.  Thank you all.  I appreciate your timeliness throughout the trial, and go home and get some rest.

MR. SCAHILL:  Thank you, your Honor.

MR. KIVETZ:  Thank you, your Honor.

MR. POLICK:  Thank you, your Honor.

(Concluded at 4:57 p.m.)

* * * * *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/Kelly M. Fitzgerald          February 20, 2026
Kelly M. Fitzgerald
Official Court Reporter

/s/Charles R. Zandi          February 20, 2026
Charles R. Zandi
Official Court Reporter

I N D E X

                                        PAGE

                                        2522
CLOSING ARGUMENT ON BEHALF OF DEFENDANT
  GUEVARA
                                        2588
REBUTTAL ARGUMENT ON BEHALF OF THE PLAINTIFF
  BY MR. S. RICHARDS